**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

          Plaintiff,

    v.

CITY OF MADISON, WISCONSIN;
CITY OF MADISON ZONING BOARD
OF APPEALS; CITY OF MADISON PLAN
COMMISSION;  CITY  OF  MADISON
COMMON COUNCIL; Zoning Administrator
MATTHEW TUCKER, in his official
capacity; Director of Madison's Building
Inspection Division GEORGE HANK,
in his official capacity; and Alder TAG EVERS,
in his official capacity,

          Defendants.

CASE NO. 3:21-cv-00118

**EDGEWOOD HIGH SCHOOL'S
RESPONSE TO DEFENDANTS'
PARTIAL MOTION TO DISMISS AND
MOTION TO STRIKE**

**INTRODUCTION**

The Defendants' partial motion to dismiss principally argues that Edgewood's RLUIPA

claims are both moot and subject to RLUIPA's "safe harbor" provision.  If Edgewood was

electronically submitting this brief under the zoning compliant glow of the lights of Edgewood's

Goodman Athletic Complex, the City and its representatives might have a colorable argument.

But those lights do not exist, and Edgewood is still unable to use its field at night.  The lights do

not exist because Defendants never corrected their RLUIPA violations or removed the

substantial burden on Edgewood's religious exercise. Instead, Defendants invented new ways to

impose their land use regulations to ensure that Edgewood could not install its lights and use its

field.  Rather than respect Edgewood's property rights, remove the burden on Edgewood's

religious exercise and treat Edgewood equally, the Defendants instead merely exacerbated the

offending land use regulation by implementing and applying processes that themselves violated the Plaintiff's rights.  The Defendants' calculated efforts were not corrections of a violation that moot a dispute, but are new violations that have compounded the burden on Edgewood's religious exercise and continued the pattern of unequal treatment.

The Defendants' secondary arguments fair no better.  They first argue that the comparators Edgewood alleges to support its RLUIPA equal terms claim are insufficiently identical. However, Edgewood's Complaint establishes the plausibility of its alleged comparators in over twenty paragraphs of detailed factual allegations. Ignoring these allegations, Defendants' comparator argument relies instead on a counter-factual scenario predicated on unsupported and extraneous statements. At this stage, however, Edgewood's allegations control, and they readily satisfy the pleading standards.

At the same time they argue that the comparators are insufficiently pled, Defendants adopt the contradictory position that the Complaint is too robust and its details must be stricken. This inconsistency aside, Defendants fail to identify the immateriality of Edgewood's allegations to its claims or to explain how they would be prejudiced in answering the Complaint. Identifying both specific immaterial allegations and prejudice is required to strike pleadings under Seventh Circuit precedent, and Defendants' failure is dispositive of the issue.

Finally, Defendants contend that the individually-named Defendants must be dismissed as redundant of the municipality and its divisions. If Edgewood were bringing only federal claims, it might agree. But it is not. Instead, the Court may exercise supplementary jurisdiction over Edgewood's three state law claims, for which it properly seeks (among other remedies) writs of mandamus against the individually named officials. Accordingly, their involvement is not "redundant" and their dismissal would be improper.

2

**FACTS**

On February 22, 2019, Edgewood High School of the Sacred Heart, Inc. ("Edgewood") applied with the City of Madison for a lighting permit for its athletic field, the Goodman Athletic Complex. (Edgewood's Complaint ("Compl."), Dkt. 1, ¶ 140). Like James Madison Memorial High School ("Memorial") did the year before, Edgewood applied for its lights under the City's neutral, objective administrative approval process for outdoor lighting. (*Id.* ¶¶ 140-42). Edgewood and Memorial were both zoned as Campus-Institutional Districts. (*Id.* ¶ 65.) However, while Memorial received its lighting permit, Edgewood did not. (*Id.* ¶¶ 140-44).

The difference, according to the City, was that Edgewood had a Master Plan. The City of Madison and its Zoning Administrator, Matthew Tucker, withheld Edgewood's otherwise-approved permit, citing a new interpretation of Edgewood's Master Plan that allegedly prohibited lights for its field. (*Id.* ¶¶ 145-47). The Defendants went further, concluding that the Master Plan also prohibited Edgewood from hosting any "athletic contests" on its athletic field, whether day or night. (*Id.* ¶ 145). The City followed through on this interpretation, issuing citations to Edgewood for holding "athletic contests" on its athletic field—a field that Edgewood has used for decades to host all sorts of athletic competitions, games, practices, and other activities in furtherance of the school's Catholic mission. (*Id.* ¶¶ 107-112).

Defendants' novel interpretation of Edgewood's Master Plan directly contradicted how they interpreted and applied the Master Plan for the University of Wisconsin-Madison ("UW"). (*Id.* ¶¶ 119-138.) The UW shares the same zoning as Edgewood and Memorial, and like Edgewood had also adopted a Master Plan. (*Id.* ¶ 119). Both Edgewood's and UW's Master Plans are substantially similar in their treatment of lights and uses like "athletic contests." (*Id.* ¶¶ 121-126). However, Defendants permitted UW to use its fields and facilities for "athletic

3

contests" and permitted it to erect outdoor lighting. (*Id*. ¶¶ 127-38). The City has never cited UW for hosting "athletic contests." *Id*. ¶ 130. City officials, namely Defendant Tucker and his superior, Defendant Hank, misconstrued Edgewood's Plan with the direct effect, if not the intended purpose, of denying Edgewood the ability to erect lights and to host games or many of the other long-established uses of the field. (*Id*. ¶ 147). Defendants thereby severely limited the use of Edgewood's field during the day and effectively barred Edgewood from using its field for any activities at night. (*Id*. ¶ 3).

Shortly after its Zoning Board of Appeals upheld the citations, the City of Madison invited Edgewood to move to repeal its Master Plan. (*Id*. ¶¶ 149-51). The City Attorney advised that by removing the Master Plan as an impediment to erecting lights and hosting games, Edgewood would be on equal footing with other similarly situated schools and could have lights and games: "Edgewood could ask the City to repeal the ordinance that adopted its Master plan. As a consequence of repealing its Master Plan, Edgewood would revert to the standard regulations of the CI District in the zoning code, which would allow games and lights at the field." (*Id.* ¶ 151).

Based on discussions with City officials and the City Attorney's advice, Edgewood then worked to repeal its Master Plan. (Compl. ¶¶ 154-156). However, Defendant Alder Tag Evers and the Madison Common Council delayed the repeal of Edgewood's Master Plan. (*Id.* ¶¶ 157-59). They used that delay instead to promulgate new regulations targeted at Edgewood's light permit applications post-Master Plan repeal. (*Id.* ¶¶ 159-162). Before this change, the "standard regulations of the CI District" for lighting referenced by the City Attorney had involved review under an objective, administrative approval process like that recently enjoyed by fellow Campus-Institutional zoned applicants like Memorial. (*Id.* ¶¶ 160-61). But under this new amended

4

ordinance, a modification of a primary or secondary use by a Campus-Institutional District, if outdoors, would require a conditional use permit.  (*Id.* ¶ 161).  Accordingly, Edgewood's application would be governed by a more subjective and restrictive conditional use permit analysis.[1] (*Id.*)

Armed with this new, subjective set of criteria for outdoor lights, the City's planning staff nonetheless recommended granting Edgewood a conditional use permit, with conditions, for outdoor lights.  (*Id.* ¶ 175).  Undeterred, the Defendants Plan Commission and Common Council ignored the planning staff recommendation and denied Edgewood's permit.  (*Id.* ¶¶ 177, 180).  Both the Plan Commission's denial on May 12, 2020 and the Common Council's affirmance of that denial on January 20, 2021 failed to cite the substantial evidence required by law in support.  (*Id.*)

Edgewood filed this suit on February 19, 2021.  The Defendants now move to dismiss certain claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and to strike allegations it deems irrelevant and unnecessary under Rule 12(f).

### STANDARDS

On a Rule 12(b)(6) motion, courts must accept "all well-pleaded facts in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018) (citing *Pierce v. Zoetis, Inc.* 818 F.3d 274, 277 (7th Cir. 2016)).  Courts also generally must confine their review to the allegations within the

---

[1]  Lighting applications granted previously to public institutions zoned as Campus-Institutional that had been granted under the prior, less restrictive administrative process were "grandfathered in" and not subject to the more rigorous and burdensome process Alder Evers designed for Edgewood.  (*Id.* ¶ 161).

complaint. *See*, *e.g.*, *Thulin v. Shopko Stores Operating Co.,* 771 F.3d 994, 997 (7th Cir. 2014) (citing Fed. R. Civ. P. 12(d)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 576 (2007)). A claim is plausible "[w]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility requirement is not a "probability requirement"; it "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability on the claims pled." *See Twombly*, 550 U.S. at 556; *see also EEOC v. Concerta Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (if a complaint alleges facts "raising that possibility above a speculative level," the motion to dismiss must be denied). A plausible claim survives a motion to dismiss even if "recovery is very remote and unlikely," *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015) (internal citation omitted), and even if a different version of the events may appear more plausible. *In re Dealer Mgmt. Sys. Antitrust Litig.,* 313 F. Supp. 3d 931, 952 (N.D. Ill. 2018) (internal citations omitted).

**ARGUMENT**

**I.    Edgewood's Claims Are Not Moot Under Article III or RLUIPA Because the City Has Not Remedied Its Violations By Granting Edgewood Its Lights to Use Its Field at Night.**

Under both Article III jurisprudence and RLUIPA's safe harbor provision, 42 U.S.C. § 2000cc-3(e), a claim is only moot where the disputed issue giving rise to the complaint has been resolved. *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001) (A declaratory judgment claim is moot where "relief . . . would have no impact on the parties to

6

th[e] suit"); 42 U.S.C. § 2000cc-3(e) (providing liability shield where the government "chang[es] the policy or practice that results in a substantial burden on religious exercise . . ."). However, no disputed issues have been resolved here because Defendants have not "changed the policy or practice" at issue, and Edgewood continues to be thwarted in its attempt to use its athletic field at night to further its religious mission. As a result, there remains ample relief this Court can grant—especially considering the breadth of RLUIPA's "Judicial relief" provision, which authorizes the court to provide all "appropriate relief." *See* 42 U.S.C. §2000cc-2.  Accordingly, Edgewood's claims are neither moot nor subject to RLUIPA's safe harbor provision—which is meant to encourage local governments to "alleviat[e]" and "eliminat[e]" burdens on religious exercise, not reinforce them. 42 U.S.C. § 2000cc-3(e).

A.      **Edgewood's claims are not moot under Article III.**

The constitutional principle of mootness prohibits a party from bringing a claim when it no longer has a "personal stake in the outcome of the lawsuit." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160-61 (2016) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013)).  There is a "heavy burden of proving mootness." *Wisconsin Res. Prot. Council v. Flambeau Mining Co.*, 11-cv-45-bbc, 2012 WL 12996093, at *1-2 (W.D. Wis. May 7, 2012). The Defendants must show it is "impossible" for the Court to "grant any effectual relief" to Edgewood. *Church of Our Lord and Savior Jesus Christ v. City of Markham, Ill.*, 913 F.3d 670, 679 (7th Cir. 2019) (quoting *Campbell-Ewald,* 577 U.S. at 161).

The Defendants claim that Edgewood "ties most of its claims to the Edgewood Master Plan" and the City's interpretation and enforcement of it.  (Defendants' Brief in Support of Partial Motion to Dismiss and Motion to Strike ("Defs.' Br."), Dkt. 13, at 7).  Because that

Master Plan was repealed and citations issued for violations premised on that Master Plan were not pursued further, Defendants declare large parts of the Complaint moot.  (*Id*. at 7-8).

However, Defendants' argument fundamentally misapprehends the Complaint's claims and the remedies sought. Affirmative relief related to the Master Plan is available to Edgewood notwithstanding its repeal. Edgewood certainly seeks that relief from this Court. (*See* Compl., "Prayer for Relief").  The Master Plan was misused by Defendants as grounds to withhold a light permit that had been approved in February 2019 and to deny a second permit application in September 2019.  (Compl. ¶¶ 139-146, 166).  The repeal of the Master Plan in January 2020 did not result in the issuance of the permits that had been wrongfully denied. (*See generally*, Compl. ¶¶ 148-69). Edgewood seeks an order from this Court compelling the Defendants to process and issue the permits wrongfully denied.  (*See id*., "Prayer for Relief," sub. e); *see also, e.g., Atkins v. Christiansen*, No. 1-08-CV-972, 2009 WL 4042756, at *4 (W.D. Mich. Nov. 20, 2009) ("RLUIPA . . . authorizes all 'appropriate relief'") (citing 42 U.S.C. § 2000cc2(a)); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, No. 3:09-CV-1419 (JCH), 2017 WL 5015624, at *33–34 (D. Conn. Nov. 2, 2017) (interpreting RLUIPA's "appropriate relief" provision to authorize the court to affirmatively order the issuance of a permit).  The availability of that affirmative, mandatory injunctive relief demonstrates that Count I and II are not moot. *See Church of Our Lord*, 913 F.3d at 679 ("The church's complaint sought a declaration that the city had violated the law, an injunction against the city enforcing the zoning code to prevent the church from using the Property, and an award of money damages. None of that has happened yet, so the case is not moot.").

Edgewood also claims damages under RLUIPA, and its claims for damages related to the Master Plan have not been mooted.  The City issued citations for Edgewood's use of its field

8

based on the wrongfully interpreted Master Plan, which the Defendant Zoning Board of Appeals upheld on appeal.  (Compl. ¶¶ 115-118).   While the City Attorney may have backed away from taking any further enforcement action based on the citations and the City's ill-conceived ban on Edgewood's use of its field for "athletic contests," (*id*. ¶ 148, Ex. K), Edgewood still suffered damages arising from the resulting loss of use of the field, from contesting the citations and the appeals process, and more. (*See, e.g.*, Compl. ¶¶ 207, 244-245). It seeks those damages, (*id*. ¶¶ 207, 244-245, "Prayer for Relief", sub. f), and the temporary stay of further enforcement by the City Attorney does not moot them. Under Article III jurisprudence, "a claim for damages prevents mootness." *Anderson v. Hansen*, No. 20-C-1305, 2021 WL 535429, at *5 (E.D. Wis. Feb. 12, 2021) (citing *Buckhannon Bd. of Care Home, Inc. v. West Va. Dep't of Health and Human Res.*, 532 U.S. 608-09 (2001)).  Accordingly, "effectual relief" is available—not impossible—and this Court can grant Edgewood such relief arising from violations involving the Master Plan, notwithstanding that Plan's repeal and City Attorney's belated "non-enforcement" letter.

Most importantly, Edgewood's Complaint in Counts I and II is not limited to the Master Plan.  While the misinterpretation of the Master Plan is a part of how Defendants justified the disparate treatment of Edgewood, Edgewood's Complaint is not solely "tied to" the Master Plan.[2]  Other actions by Defendants violated the equal terms and substantial burden provisions of RLUIPA.  (*See* Compl. ¶¶ 200-205, 229-235).  For example, Edgewood alleges that Defendants, after promising that a repeal of the Master Plan would put Edgewood on the same footing as past lighting applicants, then scrambled to delay that repeal to pass a new conditional use permitting

---

[2] The Defendants' notion that all of Count I and II is premised on the now-repealed Master plan ignores the Complaint's clear allegations.  (*See, e.g.,* Compl. ¶¶ 205, 213).

process for Edgewood that was designed specifically to try and put Edgewood on *unequal* footing with past applicants, like Memorial.  (Compl. ¶¶ 149-164).  This is a violation of RLUIPA's equal terms and substantial burden provisions as alleged in Counts I and II.  (*See id*. ¶¶ 205, 235).  These claims are factually premised on the repeal of the Master Plan, not mooted by it.  Absent the Defendants' bait-and-switch, Edgewood's repeal of the Master Plan would have resulted in the issuance of permits under the old, objective administrative process enjoyed by Memorial and others, just as the City Attorney had promised.  Accordingly, "effectual relief" – damages, injunctive and declaratory relief – is certainly available to correct this violation and others[3] and to put Edgewood in the place it would have been but for the Defendants' unlawful conduct.

**B.      The Defendants' actions are not shielded by RLUIPA's safe-harbor provision**.

The Defendants also seek dismissal of the bulk of Edgewood's RLUIPA claims under that statute's "safe harbor" provision.  The safe harbor provision permits a governmental entity to avoid RLUIPA's "preemptive force" when it "chang[es] the policy or practice that results in a substantial burden on religious exercise . . . ." 42 U.S.C. § 2000cc-3(e).  Defendants contend that because they exempted Edgewood from enforcement of the Master Plan and "removed any alleged violations stemming from" it, Edgewood cannot pursue Count I and most of Count II.  (Defs.' Br. at 10).

The Defendants' safe harbor arguments fail for two reasons.  First, no corrective action was actually taken and the substantial burden remains. Second, the RLUIPA safe harbor should not bar claims where there are remedies for damages and affirmative injunctive relief.

---

[3] Defendants concede that Edgewood's claim that they violated RLUIPA by denying its conditional use permit is not moot. (Defs.' Br. at 7).

First, by its terms, the safe harbor provision requires that the City alleviate the burden and eliminate the violation. 42 U.S.C. § 2000cc-3(e).  Thus, to claim protection, the City is required to actually eliminate that burden or the unequal treatment. *Family Life Church v. City of Elgin*, No. 07-CV-0217, 2007 WL 2790763, at *5 (N.D. Ill. Sept. 24, 2007) (RLUIPA safe harbor applies when government "take[s] corrective action to eliminate a nondiscrimination provision violation.") (quoting *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 762 (7th Cir. 2003)).  In promulgating the safe harbor, Congress "plainly intended to allow each state to 'eliminate the discrimination or burden in any way it chooses, *so long as the discrimination or substantial burden is actually eliminated*.'" *Pratt v. Ott*, No. 1:20-CV-171, 2021 WL 1212587, at *5-6 (M.D. Pa. Mar. 31, 2021) (examining in detail the congressional intent behind RLUIPA's safe harbor provision) (quoting 146 Cong. Rec. S7774, S7776) (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy) (emphasis supplied)).

The Defendants have taken no corrective action and have not "removed any alleged violations stemming" from the Master Plan or otherwise.  To the contrary, Edgewood alleges that the repeal of the Master Plan did not function to correct a RLUIPA violation, but rather to perpetuate one.  (*See* Compl. ¶¶ 162-65).  Had the Master Plan repeal proceeded as the City Attorney promised and as Edgewood expected, the impediment created by the City's misinterpretation of it would have been removed and the February 2019 permit would have been released.  (*See, e.g.*, Compl. ¶ 155).  Had that occurred, it would have corrected the violation, because Edgewood would have had lights and full use of its field.  Instead, the repeal was manipulated – timed to occur only after Defendant Evers had put into place a new ordinance that subjected Edgewood to a heightened approval process different than the process for prior applicants.  (*Id*. ¶¶ 148-69).  As a result, the violations resulting from Defendants' denial of light

11

permits based on the misreading of the Master Plan were not corrected – they were merely continued and exacerbated by what the City claims now was "corrective" action.[4]  Edgewood alleges these actions were not corrective, but rather that the unequal treatment and burden created by the Defendants were cumulative.  (*Id*. ¶ 219).

RLUIPA's safe harbor provision cannot apply when the governmental entity does not actually remedy the violation, but instead merely adopts a new discriminatory mechanism. 42 U.S.C. § 2000cc-3(e); *United States v. Cnty. of Culpeper, Va.*, No. 3:16-cv-00083, 2017 WL 3835601, at *8 (W.D. Va. Sept. 1, 2017) ("The safe harbor provision embodies a congressional policy against federal micromanagement of a locality's land use decisions, *as long as the underlying RLUIPA violation has been cured.*") (emphasis added); *Pratt*, 2021 WL 1212587, at *5 (in reference to the safe harbor, providing "[t]he provision is, in essence, a federalism safety valve: as long as the challenged state or local law, policy, or regulation *is amended to comport with RLUIPA*, the latter will not preempt the former.") (internal citations omitted) (emphasis added).  A contrary interpretation would be absurd, allowing governmental entities to avoid liability by adopting new but different discriminatory land use regulations against the same victim as soon as a case is filed under the guise of a correction.

Edgewood has also alleged that Defendants' unlawful behavior was cumulative. (Compl. ¶¶ 219, 225, 227). Defendants ignore these allegations, likely because RLUIPA jurisprudence explicitly recognizes that substantial burden claims can be based on the cumulative impact of various land use regulations and decisions. *World Outreach Conf. Ctr. v. City of Chi.*, 591 F.3d

---

[4] Indeed, these changes were designed and intended to *prevent* a correction and remedy – i.e., to ensure that Edgewood's permit applications were not treated under the old objective standard that would have otherwise guaranteed their issuance.  (*See* Compl. ¶¶ 162-65).

531, 539 (7th Cir. 2009); *see also Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 95-97 (1st Cir. 2013) ("We recognize different types of burdens and that such burdens may cumulate to become substantial."). This jurisprudence precludes dismissal and is inconsistent with Defendants' implicit (and unsupported) position that one discriminatory and burdensome action can displace prior discriminatory and burdensome actions for purposes of RLUIPA's safe harbor provision. This Court is not precluded from evaluating the lawfulness of the Defendants' initial discriminatory and burdensome actions simply because they later came up with another way to maintain the burden on Edgewood's religious exercise and continue to treat Edgewood unequally.

The cases Defendants cite are inapposite to the present situation, each involving a violation that had been fully remedied and asking whether the plaintiff can sustain its claims based on prior, non-cumulative violations. In *Civil Liberties for Urban Believers*, the court dismissed the plaintiff's RLUIPA claims because amended ordinances "eliminate[d] a nondiscrimination provision violation" and no longer "substantially burden[ed] religious exercise." 342 F.3d at 762.  In *Petra Presbyterian Church v. Village of Northbrook*¸ 409 F. Supp. 2d 1001, 1008 (N.D. Ill. 2006), the district court noted that the parties agreed that later amendments to the zoning regime created equal footing and "eliminat[ed] the discriminatory policy."  There is no such agreement here.  Finally, in *Church v. City of St. Michael*, 205 F. Supp. 3d 1014, 1032 (D. Minn. 2016), the plaintiff's RLUIPA claim was dismissed only after the city both amended the zoning ordinance and issued the conditional use permit.  This "eliminated any alleged substantial burden and any alleged discriminatory treatment."  *Id.*  Here, the Defendants in effect replaced the Master Plan for another unequal, burdensome land use regulation and have not issued the unlawfully withheld permits to eliminate the substantial

13

burden they imposed on Edgewood.  They cannot point to any authority holding that 42 U.S.C. §

2000cc-3(e) applies absent actual remediation.

 Second, even if Defendants are found to have taken corrective action, the RLUIPA safe

harbor does not bar Edgewood's claims for unremedied prior harms, including damages and

attorneys' fees.  Just as Edgewood's claims for damages and attorneys' fees are not moot, (*see*

*supra* § I.A), the RLUIPA safe harbor does not apply to claims for damages and attorneys' fees.

*Pratt*, 2021 WL 1212587, at *6 (denying motion to dismiss RLUIPA claim under safe harbor

even after defendant had fully remedied injunctive request because plaintiffs could "pursue

monetary damages and attorney's fees"); *Family Life Church*, 2007 WL 2790763, at *5

(RLUIPA claim not subject to safe harbor after defendant remedied injunctive relief because

damages claim remained); *Christian Assembly Rios de Agua Viva v. City of Burbank*, 237 F.

Supp. 3d 781, 794-96 (N.D. Ill. 2017) (same); *Covenant Christian Ministries, Inc. v. City of

Marietta*, 654 F.3d 1231, 1244 (11th Cir. 2011) (same); *Lighthouse Inst. For Evangelism, Inc. v.

City of Long Branch*, 510 F.3d 253, 272-73 (3d Cir. 2007) (same).

 The Defendants in reply may argue that RLUIPA's safe harbor bars any and all

liability—including damages—where allegedly corrective action is taken.  In so doing, they will

likely continue to rely on general statements in *Civil Liberties for Urban Believers*, 342 F.3d

752; (*see also* Defs.' Br. at 9-10). But several district courts in the Seventh Circuit have rejected

any such interpretation of *Civil Liberties for Urban Believers* that would apply the safe harbor to

damages claims for historical RLUIPA injuries. *See Family Life Church*, 2007 WL 2790763, at

*4 ("[W]e do not read the RLUIPA or *Civil Liberties* to stand for the proposition that the

corrective action can retroactively erase injuries already incurred as well as the corresponding

ability to sue for damages."); *Rios de Agua Viva*, 237 F. Supp. 3d at 794-96 (allowing RLUIPA damages claim to proceed after ordinance amendment).[5]

Instead, the better reasoned cases—including the only case to have "applied traditional tools of statutory interpretation to the governmental-discretion provision to discern what Congress meant by it"—find that subsequent corrective action does not "foreclose all liability or damages" for unremedied prior harms. *Pratt*, 2021 WL 1212587, at *6 ("Nothing in the plain language of RLUIPA, its legislative history, or judicial treatment of the term 'preemptive force' suggests an intent to foreclose all liability or damages" after corrective action).

In *Pratt*, subsequent acts had already eliminated the impact of the alleged discrimination. *Id.* at *3 (plaintiff had been given a religious exemption). The court set out to determine what effect, if any, this had on plaintiff's unremedied prior injuries. *Id.* at *3-7.

The *Pratt* court grounded its analysis in the meaning of "preemptive force" as used in the safe harbor provision. *Id.* at *5. In so doing, it first examined the text of RLUIPA, and found that the contention that RLUIPA's safe harbor applies to harms incurred "*before* [the] corrective action finds no support in the statute's plain text." *Id.* at *5. This, according to the Court, was consistent with RLUIPA's legislative history, and jurisprudential usage of the term "preemptive":

> Our interpretation of the phrase "preemptive force" is in accord with jurisprudential usage of the term . . . . Congress had never used the phrase "preemptive force" prior to its inclusion in RLUIPA, and it is reasonable to assume Congress intended to borrow this usage from the case law concerning federal preemption. Had Congress intended for corrective action under the governmental-discretion provision to extinguish all relief under the private right of action established elsewhere in the statute, it could have more simply stated so.

---

[5] The Seventh Circuit itself has largely abandoned *Civil Liberties for Urban Believers*, to the extent it articulated a "substantial burden" standard that has since been superseded by the "much easier to satisfy" standard the Supreme Court articulated in *Holt v. Hobbs*, 574 U.S. 352 (2015), and *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014). *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015).

*Id*. at *6.

The case at bar well illustrates why the *Pratt* court's interpretation of prior injuries and sustained damages under RLUIPA's safe harbor is correct. Edgewood alleges that it sustained injuries in 2019 when Defendants twice wrongfully withheld lighting permits. (*See e.g.,* Compl. ¶ 230). The City's purported "corrective action" was repealing Edgewood's Master Plan. (Defs.' Br. at 10). But the "corrective action" did not, and has not, remedied the injuries Edgewood sustained in 2019 from the wrongful permit denials. Edgewood, accordingly, requests this Court remedy those prior injuries by awarding it damages and forcing Defendants to issue the wrongfully withheld permit(s). (Compl., "Prayer for Relief," sub. e).

Accepting Defendants' interpretation of the safe harbor and allowing the City to shield itself from liability under these circumstances based on its unimpactful "corrective action" runs contrary to RLUIPA's clear and consistent mandate to ensure discrimination is "actually eliminated." *Pratt*, 2021 WL 1212587, at *6; 42 U.S.C. § 2000cc-3(e); *Cnty. of Culpeper, Va.*, 2017 WL 3835601, at *8.  The harms Edgewood suffered in 2019 remain unremedied: Edgewood still does not have its light permits, and consequently continues to be denied any and all practical use of its field at night. (Compl. ¶¶ 3, 57).

## II.    Edgewood Adequately Pled Its Equal Terms Claim By Identifying Multiple Apt Comparators.

The Defendants seek to dismiss Count I of Edgewood's Complaint, the equal terms claim under RLUIPA, arguing that Edgewood has failed to identify a plausible non-religious comparator.   Under RLUIPA, a governmental regulation violates the equal-terms provision when it treats religious assemblies or institutions less favorably than secular assemblies or institutions that are similarly situated as to the relevant zoning criteria.  *River of Life Kingdom*

*Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 371 (7th Cir. 2010).  To establish a prima facie equal-terms violation, the plaintiff must ultimately come forward with evidence of a similarly situated secular comparator that is more favorably treated. *Immanuel Baptist Church v. City Chi.*, 344 F. Supp. 3d 978, 983-84 (N.D. Ill. 2018). But at the pleading stage, "[t]o survive a motion to dismiss, the [plaintiff] must allege facts that plausibly show the existence of a similarly situated secular comparator that is treated better than the [plaintiff]."  *Id*.

The Defendants correctly note that Edgewood's Complaint identifies the Madison Metropolitan School District ("MMSD") Schools, in particular Memorial, and the University of Wisconsin-Madison as comparators.  (Defs.' Br. at 12).  They assert that these schools are invalid comparators because they have been evaluated under "different regulatory regimes."  (*Id*. at 12-13).

But this is not true, and the Defendants fundamentally misunderstand the Complaint and ignore its allegations, including that Edgewood shares the same Campus-Institutional zoning classification as its comparators.  (Compl. ¶¶ 64-71, 194).  The first comparator is Memorial. On February 22, 2019, Edgewood submitted a virtually identical permit application for virtually identical lights to the one Memorial had submitted the year before under the same criteria.  (*Id*. ¶¶ 140-142).  At the time of the applications, both Memorial and Edgewood were zoned Campus-Institutional. (*Id*. ¶¶ 65, 140, 160).  Both lighting applications were subject to, and satisfied, the same objective criteria. (*Id*.)  Moreover, Edgewood's Complaint anticipated and incorporated the Defendants' long-held position that the Edgewood Master Plan was what prevented Edgewood from being treated like Memorial.  (*See id*. ¶¶ 149-151).  Given that the Defendants have grounded their course of conduct in the idea that the Edgewood Master Plan justifies their disparate treatment of Edgewood compared to other Campus-Institutional-zoned

17

schools, Edgewood affirmatively alleges that there are in fact no distinctions relevant to the analysis. (*Id*. ¶¶ 77-86). The Master Plan is not a valid basis for distinguishing Edgewood from its comparators, and indeed, it was only by misapplying and mis-interpreting the Master Plan that the Defendants could justify much of their disparate treatment. (*Id*. ¶¶ 139, 145-147, 151-153).

Moreover, by contorting Edgewood's Master Plan as they did, the Defendants treated Edgewood less favorably than its other comparator, the University of Wisconsin-Madison ("UW").[6]  Both Edgewood and UW are zoned Campus-Institutional. (*Id*. ¶ 119).  Both applied for similar lights, which were both supposed to be subject to the same objective criteria. (*Id*. ¶¶ 197-99). Moreover, UW, like Edgewood, had voluntarily adopted a Master Plan at the time of its lighting applications. (*Id*. ¶ 79).  As with Edgewood's Master Plan, UW's did not specifically refer to or allow for "athletic contests" and it only contained exemplary descriptions of the potential uses of various athletic fields. (*Id*. ¶¶ 119-138). Unlike with Edgewood, however, the City never referred to UW's Master Plan when analyzing its light permit applications for, among other projects, the Nielsen Tennis Stadium, and never denied UW a lighting permit on the grounds that the use for which the lights were being installed was not specifically identified in the Master Plan. (*Id*. ¶¶ 127-28, 131-38).  Overall, Edgewood alleges disparate interpretation of the two schools' Master Plans despite the similar contents of and proposed uses in those plans. (*See* Compl. ¶¶ 90-138).

The Defendants' historical effort to manufacture arbitrary and ill-founded distinctions between Edgewood and other institutions is not a defense, but rather a principal basis for

---

[6] Not only is this a separate violation of the RLUIPA's equal terms clause, (Compl. ¶¶ 197-204), the inconsistent treatment accorded the Edgewood Master Plan and the University of Wisconsin-Madison Master Plan shows that the City's attempt to use Edgewood's Master Plan to distinguish Edgewood from other Campus-Institutional zoned high schools that lack a Master Plan, like Memorial, is without merit.

Edgewood's claims.  For example, the Defendants argue that UW is an improper comparator because its Master Plan "contains no restriction on 'athletic contests.'" (Defs.' Br. at 13). But Edgewood's Master Plan also does not restrict "athletic contests"—that is Edgewood's point: neither UW's nor Edgewood's Master Plan mentions either field lighting or "athletic contests," yet the City has interpreted UW's as allowing such lighting and athletic contests and interpreted Edgewood's as not. (Compl. ¶¶ 133-38).  This comparison highlights Edgewood's allegations on disparate treatment, not the Defendants' argument about inapt comparators

Beyond ignoring large sections of Edgewood's Complaint, the Defendants' motion also misunderstands Edgewood's burden at the pleading stage.  At this stage, Edgewood is not "required to provide a detailed comparison that establishes unequal treatment in comparison to a nonreligious user." *Irshad Learning Ctr. v. Cnty. of DuPage*, 804 F.Supp.2d 697, 713 (N.D. Ill. 2011). Instead, Edgewood need only "allege facts that plausibly show the existence of a similarly situated secular comparator that is treated better." *Immanuel Baptist Church*, 344 F. Supp. 3d 984. A similarly situated comparator is one which is subject to the same objective "accepted zoning criteria." *River of Life Kingdom Ministries,* 611 F.3d at 371.

Accordingly, the Defendants are wrong to suggest that Edgewood must "point to any evidence" supporting their claims.  (Defs.' Br. at 13).  Edgewood has pleaded with great specificity the existence of two similarly situated comparators – Madison Memorial[7] and University of Wisconsin-Madison. Edgewood has also alleged that the other MMSD high schools zoned Campus-Institutional were allowed to use their fields while the City prevented

---

[7] Defendants incorrectly argue that Edgewood concedes that Memorial is an inapt comparator because its outdoor lighting was approved under an earlier standard.  (Defs.' Br. at 13).  That is untrue.  Memorial's 2018 and Edgewood's 2019 light applications were both subject to the same objective, administrative approval process.  (Compl. ¶¶ 140-42).  The Defendants withheld Edgewood's permit because of their pretextual and arbitrary mis-interpretation of the Edgewood Master Plan.  (*Id.* ¶¶ 145-47).

Edgewood from using its field in the same manner. (Compl. ¶¶ 194-95). Edgewood has gone beyond that and pleaded further that the Defendants' attempts to distinguish these comparators are ill-founded and arbitrary and have in fact formed part of the basis for Edgewood's claims. (*Id*. ¶¶ 77-86, 139, 145-147, 151-153); (*see also id.* ¶ 194 ("Edgewood is no different than the nonreligious high schools or the University of Wisconsin from the standpoint of the accepted zoning criteria of the Campus-Institutional District.")). The Defendants are in essence asking this Court to discount well-pleaded facts and instead grant a summary judgment-style dismissal, all contrary to the well-recognized rule that facts in the Complaint must be taken as true on a motion to dismiss. *See Iqbal*, 556 U.S. at 677-78 (factual allegations must be accepted as true at pleading stage).

Indeed, virtually all of the cases Defendants cite in support of dismissal for an insufficient comparator involved either summary judgement or factual determinations.[8] This Court should look instead to cases evaluating motions to dismiss. In *Immanuel Baptist*, the City of Chicago argued from outside the pleadings that differences in treatment among comparators stemmed from the "change[s] over time" to "land-use regulations." 344 F. Supp. 3d at 986. In rejecting this argument, the court noted:

> If that turns out to be true, the City may prevail in its argument that the library is not a valid comparator for the Church. But at this juncture the City offers no more than the possibility that different zoning regimes may account for differences in

---

[8] *See Eagle Cove Camp & Conference Center, Inc. v. Town of Woodboro, Wis.*, 734 F.3d 673, 676 (7th Cir. 2013) (appeal from summary judgment); *Church of Our Lord*, 913 F.3d at 672 (same); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 981 (7th Cir. 2006) (same); *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 827 (11th Cir. 2020) (same); *Signs for Jesus v. Town of Pembroke, NH*, 977 F.3d 93, 97 (1st Cir. 2020) (same); *River of Life*, 611 F.3d at 368 (appeal from denial of TRO and preliminary injunction); *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 614 (7th Cir. 2007) (appeal from denial of preliminary injunction); *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1299-1300 (11th Cir. 2006) (appeal from bench trial verdict); *Irshad*, 937 F. Supp. 2d at 914 (ruling on summary judgment). Only one case cited by the Defendants was postured as a motion to dismiss. However, even in *Bikur Cholim, Inc. v. Vill. Of Suffern*, 664 F. Supp. 2d 267, 278 (S.D.N.Y. 2009), the claim was dismissed because the plaintiff failed to identify any comparator at all.

> treatment; facts about the history of the City's [ordinances] lie outside the
> Amended Complaint and mere possibility does not defeat a motion to dismiss.

*Id*.  The validity of the distinctions the Defendants have drawn over the last two years between

Edgewood and other local educational institutions to justify their decisions may be a key area of

dispute in the matter going forward.  However, the Defendants cannot ask the Court to accept its

fact-intensive arguments on a motion to dismiss.

**III.   Edgewood's Complaint is Otherwise Properly Pled.**

Edgewood has the right to plead its claims in the manner it sees fit. *Lautzenhiser v.*

*Coloplast A/S*, No. 4:11-cv-86-RLY-WGH, 2012 WL 4530804, at *2 (S.D. Ind. Sept. 29, 2012)

(providing "Plaintiff should have the freedom to plead in the manner he sees fit").  Edgewood's

Complaint rightly joins the individual Defendants in their official capacities and does not contain

immaterial allegations.

**A.    Edgewood properly pleaded individual claims against Defendants Tucker, Evers, and Hank.**

The Defendants contend that individual Defendants Tucker, Evers, and Hank should be

dismissed from the case in its entirety because their inclusion is redundant of the City and its

Divisions'. (Defs.' Br. at 14-17). In particular, they argue, "there is no relief this Court may order

that requires Individual Defendants to remain as participants in this lawsuit." (*Id*. at 16).

Defendants' argument fails to consider the mandamus remedies requested to rectify Defendants'

state law violations.

Edgewood pleads claims against Defendants Tucker, Evers, and Hank in their official

capacities to preserve and effectuate the requested mandamus remedies for its state law claims.

Because Edgewood's mandamus requests provide an independent reason for their joinder, Tucker, Evers, and Hanks' inclusion is not redundant and does not warrant dismissal.[9]

Under Wisconsin law, "[m]andamus is the proper remedy to compel public officers to perform their statutory duties." State *ex rel. Hurley v. Schmidley*, 48 Wis. 2d 659, 662, 180 N.W.2d 605 (1970). Here, Edgewood requests that the Court "order[] that Defendants immediately issue the permit(s) to Edgewood." (Compl., "Prayer for Relief," sub. i). The basis of this requested remedy is twofold: first, that Tucker and Hank violated RLUIPA by refusing to issue Edgewood its light permit, even after it had satisfied the objective requirements of M.G.O. §§ 28.097 *et seq.* and 10.085 *et seq.* (Compl. ¶¶ 141, 174, 214). Second, that Tucker and Hank violated Edgewood's vested rights by failing to issue Edgewood a lighting permit after it had filed a fully compliant application in 2019. (*See* Compl. ¶¶ 267-300). Mandamus is a proper mechanism to remedy vested rights violations. *See, e.g., Golden Sands Dairy, LLC v. Town of Saratoga*, 318 Wis. 2d 704, 713-14, 913 N.W.2d 118 (2018). Edgewood therefore asks the Court to force these Individual Defendants to issue the permit(s), which therefore justifies, if not requires, that they be part of this case. (Compl., "Prayer for Relief," sub. i).

Edgewood has also made an alternative request for the Court to mandate the Defendants to issue the conditional use permit that Alder Evers first subjected Edgewood to through his legislative gerrymandering, then led the successful campaign to deny. Like with vested rights claims, mandamus is proper when a municipality denies a conditional use permit based on an unsupportable interpretation of facts. *See Hartland Sportsmen's Club, Inc. v. City of Delafield*, 2020 WI App 44, ¶ 20, 393 Wis. 2d 496, 947 N.W.2d 214 (affirming writ of mandamus ordering

_____

[9] The City has not contested this Court's supplemental jurisdiction over Edgewood's state law claims, and concedes that Edgewood's state law claims were adequately pled. (Defs.' Br. at 7).

issuance of conditional use permit and explaining that "[o]utright reversal [of the conditional use permit denial] is appropriate . . . where the factual evidence failed to support the municipality's or administrative tribunal's decisions."). This is exactly what Edgewood alleges. (Compl. ¶¶ 325-26). Therefore, the Court should not preclude mandamus as a potential remedy with respect to Edgewood's conditional use permit claim.

### B.    Edgewood's Complaint does not contain immaterial allegations or prejudice the City.

Defendants also ask the Court to strike Edgewood's unspecified allegations that it asserts are "immaterial." (Defs.' Br. at 17-19). Specifically, Defendants maintain that Federal Rule of Civil Procedure 8's "plain statement" rule requires Edgewood's factual allegations to be "streamlined," and that Edgewood failed to comply with their preferred pleading pattern by including "immaterial" allegations. (*Id*. at 17-19). Defendants identify some allegedly immaterial allegations pertaining to the history of Edgewood and its founders, and theological statements by a former Pope.  (*Id.* at 18-19). Thus, argue Defendants, the Court should strike "these and all other immaterial allegations" under Federal Rule of Civil Procedure 12(f) and require Edgewood to file an Amended Complaint. (*Id*. at 19). The Court should decline this invitation.

Rule 8 requires, among other pleading obligations, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While encouraging brevity, it does not require it nor impose a limit on pages or paragraphs. *See* Fed. R. Civ. P. 8. Nor does it require the plaintiff to plead its case in the manner most convenient to defendant. *Lautzenhiser*, 2012 WL 4530804, at *2 ("Plaintiff should have the freedom to plead in the manner he sees fit").  Seventh Circuit jurisprudence recognizes that what constitutes a "short and plain" statement is dependent on the factual and legal complexity of the case. *See Swanson v.*

*Citibank, N.A.*, 614 F.3d 400, 404-05 (7th Cir. 2010) ("A more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations, will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected.").

Federal Rule of Civil Procedure 12(f)—the context in which Defendants make their Rule 8 argument—allows the Court to strike "from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." *Id*.  However, "striking a party's pleadings is an extreme measure and motions to strike are viewed with disfavor and infrequently granted. In particular, the Seventh Circuit has cautioned that motions to strike extraneous matter . . . should only be granted if the complaint is actually prejudicial to the defendant." *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-cv-168-wmc, 2011 WL 1206768, at *10 (W.D. Wis. Mar. 15, 2011) (internal citations omitted); *see also LeSEA, Inc. v. LeSEA Broad. Corp.*, 379 F. Supp. 3d 732, 742 (N.D. Ind. 2019) ("Striking factual allegations in a complaint is . . . rarely granted, and is warranted only where 'the matter bears *no possible relation* to the controversy or may cause the objecting party prejudice . . .") (emphasis added) (internal citations omitted).  Thus, to prevail on a Rule 12(f) motion, Defendants "must state with particularity" which allegations are immaterial and "show[] that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration and that their presence . . . will be prejudicial to the moving party." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1380 (3d ed. 2021); *see also Hy Cite Corp.*, 2011 WL 1206768, at *10.

First, Defendants simply fail to identify the individual allegations that are immaterial or "unrelated to" Edgewood's claims. (*See generally*, Defs.' Br. at 17-19).  While they refer the Court to a small number of paragraphs about the Dominican Sisters, Fr. Leo, and the Pope, they

24

demand that "all other immaterial allegations" be stricken and that Edgewood re-plead its entire Complaint.  (*See id.* at 18-19).  This overreach, by itself, is dispositive of Defendants' motion and it should be denied. 5C *Federal Practice and Procedure*, § 1380.

Second, and more importantly, the Complaint does not contain any immaterial allegations. While Edgewood need not explain how each allegation is material, it can. Allegations pertaining to the history and mission of Edgewood and the Sinsinawa Dominicans are material to the existence of the school's "sincerely held religious beliefs," an element of its RLUIPA substantial burden claim that it is required to plead with plausibility. *See Lindell v. Casperson*, 360 F. Supp. 2d 932, 951 (W.D. Wis. 2005) (RLUIPA violation requires "substantial burden" on "sincerely held religious beliefs") (internal citations omitted).  The Complaint's allegations pertaining to the Catholic Church's views and teachings, and the statements of its recent pontiffs, are likewise relevant to establishing "sincerely held religious beliefs" and the burdens being created by the Defendants' actions.  Allegations pertaining to Edgewood's historical use of its field are material to demonstrating its established uses and the unreasonableness of the Defendants' interpretation of the Master Plan.  Finally, allegations laying out the extensive history of the Defendants' efforts to deny Edgewood's lights and use of its athletic field are relevant and material to establishing the Defendants' violations and, in particular, their cumulative nature. (Compl. ¶¶ 219, 225, 227).

Defendants' claimed desire for short, conclusory allegations runs contrary to Edgewood's obligation to plead plausible claims under *Iqbal.*  Defendants' proffered example shows the baselessness of their argument. Defendants suggest that Edgewood plead that "athletic activities have a long and important connection with the school." (Defs.' Br. at 18). Instead of relying on this arguably conclusory statement and potentially exposing itself to a 12(b)(6) motion,

25

Edgewood pleaded the underlying factual allegations to show a plausible connection between sports and the school's religious mission. *Iqbal¸* 556 U.S. at 678. Edgewood's factual allegations establishing the connection between athletics and the school's religious mission are "material" to its contention that its inability to host athletic and other activities at night "substantially burdens" its "sincerely held religious beliefs." *Lindell*, 360 F. Supp. 2d at 951.

Next, unable to identify immaterial allegations, Defendants' real objection appears to be that the Complaint is "too long" and contains allegations that they claim cannot be proven at trial. (Defs.' Br. at 18-19). Neither argument warrants a Rule 12(f) motion. First, Rule 12(f) does not tie materiality or redundancy with the number of pages or paragraphs. Fed. R. Civ. P. 12(f). The Defendants' generalized argument that Edgewood's Complaint is "too long"—however relevant and material its contents—is therefore simply not a defect to be remedied by Rule 12(f).

Likewise, Defendants' contention that the Complaint contains facts which cannot be proven is both incorrect and, more pertinently here, wholly inappropriate at the pleading stage. *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018) ("[U]nder Rule 8, 'evidence is not required at the pleading stage.'") (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014)). Specifically, Defendants contend that Edgewood will be unable to prove its allegations regarding the installation of the football field in 1930 because it cannot track down the founding Dominican Sisters or Father Leo to testify. (Defs.' Br. at 18-19). Likewise, argue the Defendants, St. Pope John Paul II is dead and therefore Edgewood has no way of proving the truth of his allegedly hearsay statements. (*Id*. at 19). The Rules of Evidence are not so limited.[10] Trial lawyers know that there are myriad ways this evidence could potentially be entered under

---

[10] Of course, evidence establishing Catholic teachings would likely only be necessary at trial if the City and other Defendants challenge the sincerity of Edgewood's religious beliefs.

the Federal Rules of Evidence. *See, e.g.,* Fed. R. Evid. 803(6) (records of regularly conducted activity), 803(16) (statements in ancient documents), 803(18) (statements in learned treatises, periodicals, or pamphlets), 807 (residual exception).

In any event, these evidentiary arguments are improper at the pleading stage. *Abu-Shawish*, 898 F.3d at 738. In the course of discovery, the parties may discover a newspaper article or internal Edgewood record from 1930 about the football field, or that Pope John Paul II's homily was transcribed and kept in the ordinary course of business or was published in a liturgical periodical. *See* Fed. R. Evid. 803(6), 803(16), 803(18). If these allegations are ultimately inadmissible, Edgewood will not be able to rely on them at summary judgment or trial. But this argument is entirely speculative at this point, and cannot support the Defendants' motion to strike.

Fourth, and finally, Defendants are required to show prejudice before the Court can grant a Rule 12(f) motion. 5C *Federal Practice and Procedure*, § 1380; *Hy Cite Corp.*, 2011 WL 1206768, at *10; *LeSEA, Inc.*, 379 F. Supp. 3d at 742. Yet Defendants fail to argue that they will be prejudiced if forced to answer Edgewood's Complaint. (*See generally*, Defs.' Br. (nowhere arguing prejudice)). Nor is being forced to answer the Complaint enough; rather, Defendants must show that the "allegation[s] at issue will confuse the issues in the case or [are] so lengthy and complex that it places an undue burden on the party." *LeSEA*, 379 F. Supp. 3d at 742. As evidenced by their dismissal brief, Defendants very clearly understand the allegations against them, and they have the resources to answer Edgewood's Complaint after what will be several months. Indeed, Defendants answered a similar complaint in the prior rendition of this case without issue. *See Edgewood High School of the Sacred Heart v. City of Madison, Wis., et al.*, No. 3:19-CV-683, Dkt. 18 (filed Oct. 8, 2019).

For all of these reasons, Defendants' motion to strike must fail.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss Edgewood's RLUIPA claims. It should likewise deny Defendants' motion to dismiss Edgewood's other federal claims, which Defendants barely address in their supporting brief, but which are meritorious and plausible as pleaded. Finally, the Court should deny Defendants' Motion to Strike Edgewood's Complaint.

Dated this 10th day of May 2021.

Respectfully Submitted,

GODFREY & KAHN, S.C.

*s/Mike Wittenwyler*
Mike Wittenwyler (SBN 1025895)
Jonathan Ingrisano (SBN 1033977)
Paul Covaleski (SBN 1117236)
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701
Phone: 608-257-3911
Fax: 608-257-0609
jingrisa@gklaw.com
pcovaleski@gklaw.com
mwittenw@gklaw.com

DALTON & TOMICH, PLC

*Noel W. Sterett (IL 6292008)
*Sorin A. Leahu (IL 6315515)
401 W. State Street
Rockford, IL 61101
(815) 986-8050 (telephone)
(313) 859-8888 (facsimile)
nsterett@daltontomich.com
sleahu@daltontomich.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiff*

28