IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

        Plaintiff,

v.

CITY OF MADISON, WISCONSIN,
CITY OF MADISON ZONING BOARD
OF APPEALS, CITY OF MADISON PLAN
COMMISSION, CITY OF MADISON
COMMON COUNCIL, ZONING
ADMINISTRATOR MATTHEW TUCKER,
DIRECTOR GEORGE HANK, ALDER TAG
EVERS

        Defendant.

OPINION AND ORDER

21-cv-118-wmc

---

Plaintiff Edgewood High School of the Sacred Heart, Inc. ("Edgewood") brought suit against defendants, arguing that they violated federal and state law in denying Edgewood a permit for outdoor lighting. Defendants brought a partial motion to dismiss certain defendants and to strike the current complaint as too detailed. (Dkt. #12.) For the reasons set forth below, the court will grant defendants' motion to dismiss Matthew Tucker, George Hank, and Tag Evers but deny the motion to strike, as well as dismissal of any other defendant.

OVERVIEW OF ALLEGATIONS[1]

A. **History of Edgewood**

Edgewood High School of the Sacred Heart, Inc. ("Edgewood") is a Catholic high

---

[1] The allegations set forth by plaintiff have not been proven, but at the motion to dismiss stage, the court takes all well-pleaded facts as true and views in a light most favorable to the non-moving party. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). Unless otherwise noted, therefore, all the facts that follow are taken directly from the allegations in plaintiff's complaint. (Dkt. #1.)

school. Originally founded in Madison, Wisconsin, in 1881 as "St. Regina Academy" in the downtown, then later as "Sacred Heart Academy," the high school and its sister college relocated as Edgewood to a donated 55-acre lot on the shore of Lake Wingra in 1927. Athletic events and competitions have been held on Edgewood's athletic field there since 1930.[2]

### B. Rezoning as a Campus-Institutional District

In 2011, Madison's Zoning Code rezoned Edgewood as a "Campus-Institutional District" under Section 28.097 at the same time as other, similar institutions like University of Wisconsin-Madison, the Madison Metropolitan School District ("MMSD"), and Madison Area Technical College. Those areas zoned as Campus-Institutional Districts were also given the opportunity to submit master plans "in order to facilitate and 'accommodate the future growth of these institutions.'" (Compl. (dkt. #1) ¶ 72.)

Master plans would include a description of the current campus, planned improvements, future land and building uses, and other pertinent information. A master plan accepted by the City would then govern the development of new buildings on the campus for the next ten years, and allow each institution to bypass attaining a conditional use permit for such buildings, instead getting approval from an architectural review committee. Edgewood and the University of Wisconsin-Madison ("UW") were the only

---

[2] Ironically, given its remarkable length and apparent thoroughness, the plaintiff's complaint leaves out the basic details of the parallel growth of Edgewood College with the high school, but both are detailed in their websites, as is the eventual addition of a grade school. *See* https://www.edgewood.edu/about/history and https://www.edgewoodhs.org/about/our_history.

2

two institutions to submit master plans. The city accepted Edgewood's plan ("Plan") in April 2014, as it did the UW's plan.

### C. Permit Application Under Master Plan

In 2018, Edgewood decided to upgrade its athletic field with seating, lighting, concessions, and restrooms. The City instructed Edgewood to submit a proposed amendment to its Plan reflecting these proposed field upgrades. A month later, however, the City interpreted Edgewood's 2014 Plan as restricting the school from holding any "athletic contests." Specifically, the City decided that, because Edgewood had not listed "athletic contests" as an identified use for the field, instead only listing team practices and physical education classes as a use in the Plan, "athletic contests" were strictly prohibited. Zoning Administrator Matthew Tucker issued an official notice to Edgewood on April 1, 2019, stating that Edgewood had violated zoning ordinances by holding games for its girls' soccer team on the field and ordering Edgewood to stop holding athletic contests on the field. Another notice was sent on May 15, 2019, again stating that Edgewood had violated ordinances.

Edgewood appealed these notices to the Madison Zoning Board of Appeals, which denied the appeal and affirmed Tucker's interpretation of the Plan. No other schools in the campus-institutional district have received zoning violation notices, despite UW also using its facilities for purposes not directly disclosed in its master plan.

Edgewood decided not to seek an amendment to its Plan at that point, and instead applied for outdoor lighting for its athletic field under the City's Chapter 10 outdoor lighting ordinance. This application was similar to the lighting applications granted to

3

MMSD by the City in 2018. Moreover, Edgewood's application was twice approved by the city's Building Inspection Division in February and March 2019. Nevertheless, the City also refused to release the permits, as the lights could be used for "athletic contests" that had been found prohibited by the Plan.

### D. Permit Application after Master Plan Repeal

In July of 2019, after the Zoning Board upheld the city's bar on athletic contests on Edgewood's field, City of Madison Attorney Michael May wrote Edgewood to notify the school that it could repeal its Plan "and return to the standard CI zoning, which would place it on equal footing with other high schools." (Compl. (dkt. #1) ¶ 149.) Assistant City Attorney John Strange reiterated this message a few days later, notifying Edgewood that repealing its Plan would allow it to install lights and play games on the field. Thus, Edgewood applied to repeal its Plan, understanding that the City would then grant its lighting permits under the City's outdoor lighting ordinance.

After Edgewood filed to repeal its Plan, however, City officials then moved to change outdoor lighting approval process for CI districts, requiring something called a "conditional use permit," rather than the more permissive Chapter 10 approval process. The City Plan Commission also allegedly delayed a vote approving Edgewood's proposal to repeal its Plan in order to push through this approval process change. Edgewood also submitted an application under the Chapter 10 process before the new ordinance was approved, but the City rejected that application based on its conflicting with Edgewood's existing Plan.

On October 1, 2019, the City passed the new lighting ordinance. At the same time, the City agreed that any CI-zoned institutions which were previously granted outdoor

lighting permits, such as MMSD and UW, were then "grandfathered in" under the former, less restrictive process. In contrast, on January 7, 2020, the Madison Common Council allowed Edgewood to repeal its Plan, but noted that it would be required to pass the conditional use permit process.

### E. Conditional Use Permit

Edgewood submitted a conditional use application for outdoor lighting on March 11, 2020. Since there had never been any previous, conditional use applications for outdoor lighting, the City's Planning Division issued a report on May 11, 2020, that recommended granting the application subject to certain conditions to which Edgewood agreed. Perhaps unsurprising at this point, the Plan Commission also denied Edgewood's new permit application outright on May 12, 2020, and the City's Common Council upheld that denial on January 20, 2021.

## OPINION

### I. Motion to Strike

The court will first contend with defendants' claim that portions of the complaint should be struck as irrelevant, overly complicated, and prejudicial to defendants in violation of Federal Rule of Civil Procedure 8(a). (Defs.' Op. Br. (dkt. #12) 17-19.) Rule 8(a) states that a pleading must be a "short and plain statement" of the plaintiff's claim for relief. Edgewood's complaint is hardly that, weighing in at 65 pages and containing 344 paragraphs. On the other hand, "[t]he primary purpose of [Rule 8] is rooted in fair notice: Under Rule 8, a complaint 'must be presented with intelligibility sufficient for a

court or opposing party to understand whether a valid claim is alleged and if so what it is.' *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775 (7th Cir. 1994) (*quoting Wade v. Hopper*, 993 F.2d 1246, 1249 (7th Cir.))

Here, there is little question of intelligibility. The complaint is lengthy, but tells a cohesive story that proceeds chronologically and understandably. Indeed, the fact that defendants were able to thoroughly respond to the complaint suggests that it was, at some level, straightforward as well. Additionally, the complexity of the case is a relevant factor, since multiple, arguably relevant permits and regulatory actions span several years and warranted a thorough accounting of the operative facts, if not in the complaint, then soon after as part of plaintiff's Rule 26 disclosure obligations. In fact, a stripped-down complaint may even have made that production more confusing given the tangle of administrative actions at least arguably at issue.

Defendants particularly focus their motion to strike on Edgewood's allegations that sports are integral to the school's religious mission. (Defs.' Opening Br. (dkt. #12) 18.) To be sure, paragraphs about specific papal views on sports may seem a bit beyond the necessities of notice pleadings. (Compl. (dkt. #1) ¶ 39.) Still, to state a RLUIPA claim, plaintiffs must show that the action they seek to protect is connected to "a sincerely held religious belief." *Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008). And since the paragraphs describing the importance of sports to Edgewood's religious mission could be read as part of plaintiff's effort to plead athletics, apparently including its continuation under a night sky, to be among it sincerely held religious beliefs, these disputed sections of the complaint are not obviously irrelevant to that claim.

6

Regardless, given all of the factors mentioned, defendants have not met the high burden to justify striking large portions of the complaint. "[A] plaintiff only risks dismissal for failure to abide by Rule 8 if a complaint is needlessly prolix, confusing, and/or unintelligible," and this complaint is not so utterly confusing that striking portions would be appropriate. *United States Sec. & Exch. Comm'n v. Bluepoint Inv. Couns., LLC*, No. 19-CV-809-WMC, 2021 WL 719647, at *13 (W.D. Wis. Feb. 24, 2021) (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775-76 (7th Cir. 1994)). Indeed, this is one more of a long line of such motions to strike that serve little, if any, purpose in advancing a litigation, which is why there are so disfavored in the first place. *United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir. 1975).

**II. Motion to Dismiss**

On the other hand, a motion to dismiss for failure to state a claim is designed to test the complaint's legal sufficiency and, therefore, is much more utilitarian. *See* Fed. R. Civ. P. 12(b)(6). Even so, this court must "constru[e] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). Dismissal is warranted only if no recourse could be granted under any set of facts consistent with the allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

To survive a motion to dismiss, therefore, a plaintiff need only allege sufficient facts to state a *plausible* claim for relief. *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir. 2015) (citing *Twombly*, 550 U.S. at 570). Only "when it is 'clear from the face of the complaint,

and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law' [is] dismissal . . . appropriate." *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

### A. Individual Plaintiffs

As an initial matter, defendants request that the court dismiss individual defendants Matthew Tucker, George Hank, and Tag Evers from the lawsuit. Specifically, defendants argue that Edgewood is not seeking any relief from the three individual defendants that cannot be obtained from the city itself, making claims against the individuals unnecessary.

In response, plaintiff has clarified that the claims against these individual defendants are being pursued only "in their official capacities to preserve and effectuate the requested mandamus remedies for its state law claims." (Pl.'s Opp'n. (dkt. #15) 21.) The plaintiff's concern seems to be that the individual defendants may need to be compelled to issue permits, making them necessary to the suit. First, that does not comport with the actual permitting process, as responsibility for issuing individual permits does not lie with the Director of Building Inspection or Zoning Administrator. Second, Edgewood's argument that it is simply preserving its mandamus remedies actually makes defendants' point that any remedy sought from Tucker, Hank, or Evers could be better attained from other, named defendants. Nor is Edgewood's one-page explanation as to why the individual defendants may be necessary sufficient to avoid the individual defendants' dismissal.

### B. RLUIPA Claims

As previously explained, several of plaintiff's claims are being pursued under RLUIPA to prevent the government from implementing land use regulations in a way that substantially burdens its religious exercise. 42 USCA § 2000cc. Defendants seek to dismiss these claims by arguing that since the Plan originally challenged was repealed *at Edgewood's request*, any alleged injury from its interpretation is now moot. Additionally, defendants suggest that any arguments stemming from the Plan are barred under RLUIPA's safe-harbor provision, as the City has both exempted Edgewood *and* changed the law. (Defs.' Opening Br. (dkt. #12) 6.) The court will address these two arguments in turn.

#### a. Mootness

Defendants first argue that Edgewood voluntarily withdrew its Plan and chose to seek conditional use approval, mooting any relief as to the former, as does the fact that Edgewood was exempted from any enforcement actions even when the Plan was still in effect. (Defs.' Op. Br. (dkt. #12) 6.) In response, Edgewood clarifies that it still seeks damages related to the City's original denial of lighting permits under the Plan. (Pl.'s Opp'n. (dkt. #15) 8.) The possible availability of remedies tied to that claim would appear to prevent the court from finding mootness. As the Seventh Circuit noted in a similar case,

> The church's complaint sought a declaration that the city had violated the law, an injunction against the city enforcing the zoning code to prevent the church from using the Property, and an award of money damages. None of that has happened yet, so the case is not moot.

*Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 679 (7th Cir. 2019).

In this case, Edgewood is requesting damages and an injunction compelling the city to issue lighting permits. While an injunction favoring Edgewood may or may not be appropriate, Edgewood's claim for damages is enough to ward off mootness. Defendants argue that absent an enforcement action against Edgewood, it has no claim for damages under the Plan. (Defs.' Op. Br. (dkt. #12) 6.) Even though the city may not have enforced its interpretation of the Plan against Edgewood, the Seventh Circuit has found that such allowances do not moot a case. *See Church of Our Lord*, 913 F.3d at 676 ("variances might relieve the church from certain parking regulations, but they say nothing about whether the church's use of the Property is permissible. And a conditional use permit does not moot the church's claim that it does not need one and is entitled to be treated as a permitted user as of right.").

Here, too, the fact that defendants waived enforcement does not address Edgewood's contention that the Plan never should have been interpreted to prevent athletic contests, nor does it moot Edgewood's challenge to the *denial* of a conditional permit. Edgewood may or may not be granted the relief sought at the end of this case,[3] but at the very least, it has requested remedies that present a live controversy for this court despite the Plan's repeal.

---

[3] While the merits of Edgewood's RLUIPA claims related to denial of a conditional use permit are not before the court at the moment, Edgewood may not necessarily be entitled to receive a lighting permit even if the Plan interpretation violated RLUIPA. Indeed, on similar facts in *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846 (7th Cir. 2007), the Seventh Circuit could not "find any basis, whether in cases or other conventional sources of law, or in good sense, for the proposition that the federal Constitution forbids a state that has prevented a use of property by means of an invalid (even an unconstitutional) enactment to continue to prevent that use by means of a valid one . . . So strange a rule of estoppel could hardly be thought an imperative of due process." *Id*. at 849.

### b. Safe Harbor Provision

Even if claims under the Plan are not moot, defendants also argue that they are barred by RLUIPA's safe harbor provision. Under RLUIPA,

> A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

42 U.S.C.A. § 2000cc-3.

Defendants again note that the City both halted enforcement against Edgewood and eventually changed the zoning ordinances, ameliorating any problems with the Master Plan requirements. (Defs.' Op. Br. (dkt. #12) 6.) Meanwhile, plaintiff argues that defendants (1) did not actually take any *corrective* action, and (2) cannot bar claims for damages or injunctive relief, even if corrective action was taken. (Pl.'s Opp'n. (dkt. #15) 10.)

First, there is the matter of whether defendants' actions were corrective. Edgewood's argument seems to be that it never received the permit, meaning that the burdening practice was not actually corrected. (Pl.'s Opp'n. (dkt. #15) 11.) As previously noted in *Petra*, there is no requirement that the city must award a permit to correct an action. 489 F.3d at 849. Instead, the City needs to remove any rules that treat religious institutions differently than other similarly situated institutions. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003) (finding that the safe harbor provision applied where the "amendments simply place churches on an equal footing with

nonreligious assembly uses."). This is not to say that the court is deciding at this point that the master plan framework *did* treat religious uses unequally; instead, for the sake of evaluating defendants' assertion of mootness, the court is looking at how the safe harbor rule might apply assuming the previous law violated RLUIPA. As such, the City's actions in passing a new lighting ordinance could properly be characterized as corrective. However, the fact that corrective actions were taken does not necessarily bar *all* relief under the Plan.

The question of whether damages for "corrected" actions under RLUIPA are barred is more complex. Defendant argues that monetary damages are explicitly barred for claims where the safe harbor applies. In *Civil Liberties*, the Seventh Circuit upheld a district court's finding that the plaintiff's claim for damages under a previous ordinance was moot, as "Appellants cannot demonstrate that the amended [zoning ordinance] recognizes any preexisting right of churches to operate in B, Z, or M zones. The amendments simply place restrictions on nonreligious assembly uses that are similar to or greater than those facing religious uses." 342 F.3d at 762.

There are two important points to be made about defendants' reliance on this language from *Civil Liberties*. First, the language that defendants rest their hat on is vaguely worded and relegated to a footnote. While it addresses similar damage claims, nothing in the footnote explicitly holds that claims for damages under the RLUIPA safe harbor provision are moot. Instead, the language concerns the effect that the zoning ordinances at issue had on plaintiff's ability to operate. Moreover, other district courts have rejected the notion that *Civil Liberties* creates a bar on damages under the safe harbor, disputing that RLUIPA or *Civil Liberties* "stand for the proposition that the corrective action can retroactively erase injuries already incurred as well as the corresponding ability to sue for

12

damages." *Family Life Church v. City of Elgin*, No. 07 CV 0217, 2007 WL 2790763, at *5 (N.D. Ill. Sept. 24, 2007.) For this reason, the court in *Family Life* held that "plaintiffs' claim for alleged damages already incurred under RLUIPA survives this motion to dismiss." *Id*.

Second, subsequent Seventh Circuit caselaw casts further doubt on defendants' reading of *Civil Liberties* as a complete bar to damages under the safe harbor. Most notably, the later-decided *Petra* decision seems to leave room for an award of monetary damages even where a RLUIPA violation has been remedied. Specifically, the plaintiff in *Petra* was challenging a preliminary injunction preventing the organization from using a building as a church, which was issued by the state court, and was thus unreviewable by the federal court. 489 F.3d 846. Critically, the Seventh Circuit held that even "[i]f Petra has a claim for damages that is not dependent on invalidating the injunction, it is time barred." 489 F.3d at 849. Thus, as in *Civil Liberties*, the court in *Petra* did not squarely address whether suits for damages are allowed under the safe harbor provision, and later district court cases have persuasively argued that *Petra* was implicitly holding claims *could* stand by acknowledging the possibility of damages if not time-barred.

For instance, the court in *Christian Assembly Rios De Agua Viva v. City of Burbank, Illinois*, 237 F. Supp. 3d 781 (N.D. Ill. 2017), argues that the Seventh Circuit in *Petra* "would have had no need to proceed to find a damages claim for an equal terms violation under a repealed ordinance time-barred" if the court had decisively held that parties may never seek damages where the safe harbor provision applies. *Id*. at 795. If nothing else, the fact that the court rests on the time bar, rather than simply stating that plaintiff may not seek damages, certainly suggests the possibility may remain that damages for past

13

repealed ordinances are available in some cases. The *Agua Viva* court also points to the Seventh Circuit's acknowledgement in other cases that "[c]ourts routinely entertain suits for damages stemming from repealed laws." *Id*. at 796 (quoting *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 804 (7th Cir. 2016)). As a result, district courts have explicitly allowed plaintiffs to seek damages for repealed ordinances under RLUIPA. *Family Life Church*, No. 07 CV 0217, 2007 WL 2790763, at *5.

Defendants also note that neither *Agua Viva* nor *Family Life* are precedential, while *Civil Liberties* is. As previously addressed, however, the problem with this argument is that it assumes that *Agua Viva* and *Family Life* directly contradict *Civil Liberties*. This is not so; *Agua Viva* and *Family Life* focus their analysis on areas left unaddressed by the Seventh Circuit in both the *Civil Liberties* and *Petra* decisions, attempting to tease out a more nuanced reading of the Seventh Circuit's position. As the court noted in *Agua Viva*, "[t]he Seventh Circuit has not squarely addressed the issue presented here, although its *Petra* decision provides . . . some guidance." *Agua Viva*, 237 F. Supp. 3d at 795.

Because *Family Life* and *Agua Viva* are not contrary to *Civil Liberties*, it behooves the court to look at how other courts in this circuit have attempted to draw lessons from the Seventh Circuit's limited guidance on a possible award of damages where the safe harbor may apply. The Northern District of Illinois has argued, and this court agrees, that nothing prevents a religious institution from pursuing damages incurred under a since-repealed ordinance. "Damages would redress the harm the Church suffered as a result of not being allowed to operate the property as a church without facing the [special use permit] process. Thus, the Court finds that the Church may pursue damages for its equal terms claim." *Agua Viva*, 237 F. Supp. 3d at 796.

14

Like the Northern District of Illinois, this court does "not read the RLUIPA or Civil Liberties to stand for the proposition that the corrective action can retroactively erase injuries already incurred as well as the corresponding ability to sue for damages." *Family Life Church v. City of Elgin*, No. 07 CV 0217, 2007 WL 2790763, at *5 (N.D. Ill. Sept. 24, 2007.) Regardless, in this case, plaintiff appears to be claiming its injury is *ongoing* by virtue of the continued denial of a conditional use permit, and the court is not prepared to preclude at least the possibility of continuing damages dating back to the alleged misapplication of the Plan. Accordingly, this court will await addressing this issue on a complete record.

    **c. Comparator**

Finally, defendants argue that Edgewood's equal-terms claims fail for lack of a comparator. (Defs.' Op. Br. (dkt. #12) 6.) In order to succeed on an equal-terms claim, Edgewood acknowledges that a plaintiff must show there is another comparable organization treated better than plaintiff. (Pl.'s Opp'n. (dkt. #15) 16.) A comparator is sufficiently similar if it is the same as the religious institution "from the standpoint of an accepted zoning criterion, such as 'commercial district,' or 'residential district,' or 'industrial district.'" *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 373 (7th Cir. 2010).

Here, Edgewood has offered both MMSD and UW as potential comparators, given that both are zoned campus-institutional districts and underwent permitting for similar lighting requests with far less trouble. (Pl.'s Opp'n. (dkt. #15) 17-18.) While defendants argue that neither is a proper comparator, as neither school ever had to undergo the

15

*conditional use* permitting process, which is new to the city, this, too, strikes the court as an issue better addressed on a full record. (Defs.' Rep. (dkt. #17) 13.) (citing *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1002–03 (7th Cir.2006).) First, because the court has declined to dismiss plaintiff's RLUIPA claims for mootness, Edgewood may still argue that it was treated differently than UW and MMSD under the Plan rules, which were the same for all campus-institutional districts. Second, while the rules regarding comparators have not been fully fleshed out by the Seventh Circuit, the definition expressed in *Vision Church* and cited by defendants was subtly criticized in the later *River of Life* decision, which adopted a "shift of focus from regulatory purpose to accepted zoning criteria." 611 F.3d at 371.

      Setting aside the thorny legal questions of what is necessary to be a proper comparator, the question of whether the other schools are similarly situated enough is a fact intensive question best taken up at summary judgment. Regardless, taking all well-pled facts as true, plaintiff has alleged that both MMSD and UW Madison are proper comparators. Discovery may show that either comparison is improper, but the court will not dismiss plaintiff's claims on those grounds at this early stage. The extent to which those institutions are inapposite can await summary judgment.

ORDER

IT IS ORDERED that:

1) Defendants motion to dismiss and strike (dkt. #12) is GRANTED IN PART and DENIED IN PART.

2) Defendants Matthew Tucker, George Hank, and Tag Evers are DISMISSED.

Entered this 3rd day of May, 2022.

                              BY THE COURT:

                              /s/

                              _____
                              WILLIAM M. CONLEY
                              District Judge