```
                                           Page 1

 1           UNITED STATES DISTRICT COURT FOR THE
 2              WESTERN DISTRICT OF WISCONSIN
 3                       --o0o--
 4   EDGEWOOD HIGH SCHOOL OF THE
     SACRED HEART, INC.,
 5
                   Plaintiff,
 6
                                 Case No. 3:21-cv-0018-wmc
 7
     CITY OF MADISON, WISCONSIN,
 8   et al,
 9                 Defendants.
     _____
10
11
12
                        DEPOSITION OF
13
                        GEORGE HANK
14
15
16                      April 27, 2022
17                    Madison, Wisconsin
18
19
20
21
22
23
24   Reported by:  Cheri Winter, CSR
25
```

Page 2

I N D E X

WITNESS                                    PAGE

GEORGE HANK

Examination by Mr. Ingrisano        5, 196

Examination by Ms. Zylstra          195

E X H I B I T S
No.        Description              Identified
Exhibit 1   10.085 outdoor lighting Madison    20
            ordinance
Exhibit 2   City of Madison Electrical         29
            Permit
Exhibit 3   City of Madison Site Plan          33
            Verification
Exhibit 4   Interrogatories                    34
Exhibit 5   Letter re alternative              70
            application, 9/30/2019
Exhibit 6   Letter to Michael Elliot           72
            From Mr. Tucker, 2/22/2019
Exhibit 7   Site Plan Verification             82
Exhibit 8   Email from Mr. Hank to             95
            Ethan Brodsky re Inquiry about
            permitted use at Edgewood
Exhibit 9   City of Madison Official Notice   102
Exhibit 10  Dudgeon-Monroe newsletter         122
Exhibit 11  City of Madison Official Notice   129

Page 3

EXHIBITS (Cont'd):
No.        Description              Identified
Exhibit 12  Letter from Attorney May to       150
            Attorney Lee, 7/12/2019
Exhibit 13  Document titled 28.097             167
            Campus-Institutional District
Exhibit 14  Edgewood High School Mission       171
            & Sponsors
Exhibit 15  1973 Yearbook pictures            184
Exhibit 16  Defendants' Response to            185
            Plaintiff's Request for
            Admission

Page 4

DEPOSITION OF GEORGE HANK, called as a witness, taken at the instance of the Plaintiff, pursuant to Notice, before Cheri Winter, Certified Shorthand Reporter, and a notary public in and for the State of Wisconsin, at the law offices of Godfrey & Kahn, S.C., One East Main Street, Suite 500, Madison, Wisconsin, on the 27th day of April, 2022, commencing at 8:59 a.m.

APPEARANCES:

For the Plaintiff:

    JONATHAN R. INGRISANO, ESQ.
    GODFREY & KAHN, S.C.
    One East Main Street, Suite 500
    Madison, Wisconsin 53701
    608.257.0609
    jingrisa@gklaw.com
    NOEL W. STERETT, Pro Hac Vice
    DALTON & TOMICH, PLC
    401 W. State Street, Suite 509
    Rockford, Illinois 61101
    815.986.8050
    nsterett@daltontomich.com

For the Defendant:
    SARAH A. ZYLSTRA, ESQ.
    TANNER JEAN-LOUIS, ESQ.
    BOARDMAN & CLARK, LLP
    1 South Pinckney Street, 4th Floor
    Madison, Wisconsin 53701
    szylstra@boardmanclark.com
    TJeanLouis@boardmanclark.com

Also Present:  Matthew Tucker

Page 5

WEDNESDAY, APRIL 27, 2022, 8:59 A.M.
--o0o--
GEORGE HANK,
having been first duly sworn, was examined and testified as follows:
--o0o--
E X A M I N A T I O N
BY MR. INGRISANO:

Q.   Good morning, Mr. Hank.  Can you please state your name and spell it for the record.

A.   George Hank.  My last name, H-a-n-k.

Q.   And what is your date of birth, sir?

A.   ███

Q.   And what's your current residential address?

A.   2118 East Mifflin Street, Madison 53704.

Q.   And how are you employed?

A.   I'm retired now.

Q.   When was your date of retirement?

A.   The last day in the office was approximately July 16th of last year.  I was on the clock until late September.

Q.   When you say "on the clock," what do you mean by that?

A.   I was burning vacation.

Q.   Mr. Hank, have you ever been deposed before?

Page 6

1    A.  I was thinking about that.  No.
2    Q.  Let me just lay out a couple of ground rules
3  that we can try to adhere to today, you and I, to make
4  sure this goes as smoothly as possible and we get a
5  nice, clean record of your testimony.
6        The court reporter off to your right is
7  reporting everything that we say on her stenograph
8  machine, so she can only record verbal answers.  So to
9  the extent that you can remember to give a verbal answer
10  to a question that I pose to you, she'll be able to
11  record that; okay?
12    A.  Yep.
13    Q.  So nods of the head, shakes of the head,
14  "uh-uhs" or "huh-uhs," are very difficult her to
15  transcribe; okay?
16    A.  Sure.
17    Q.  At the same time, it's also very difficult for
18  her to transcribe two people talking at the same time,
19  so to the extent you can let me finish my question
20  before you begin your answer, I will try to do the same
21  thing and wait for your answer to be complete until I
22  pose my next question; okay?
23    A.  Sure.
24    Q.  There may come a time in which your attorney
25  decides to pose on objection to a question that I pose.

Page 7

1  You know, I don't pretend I always ask perfect
2  questions.  So to the extent that she's going to do
3  that, if you can pause and stop your answer, let her
4  complete her objection, and then once she instructs you
5  not to answer, if you can do your best to try to answer
6  my question that would be great; okay?
7    A.  Okay.
8    Q.  All right.  This is not a marathon, so to the
9  extent you need to take a break, use the restroom, get
10  something to drink, confer with your counsel, just ask
11  for a break and we'll do our best to accommodate you as
12  soon as we can; okay?
13    A.  Sure.
14    Q.  If you don't understand a question that I've
15  asked, just like your attorney might object to a
16  question, you might not understand a question I've
17  asked, if you can just ask me to clarify and I will do
18  my best to do that; okay?
19    A.  Sure.
20    Q.  If you give an answer to a question, I tend to
21  think that you understood it; all right?
22    A.  I understand.
23    Q.  Okay.  Can I ask you, sir, where did you go to
24  high school?
25    A.  I went to Edgewood High School.

Page 8

1    Q.  And what year did you graduate?
2    A.  1975.
3    Q.  And you played athletics at Edgewood High
4  School?
5    A.  Yes, I did.
6    Q.  What sports did you play?
7    A.  Track and football.
8    Q.  And any other extracurriculars that you
9  participated in at Edgewood?
10    A.  Athletic-wise, no.
11    Q.  How about any other extracurriculars besides
12  athletics?
13    A.  I participated in Edgefest, you know, doing
14  things like that.
15    Q.  What was Edgefest?
16    A.  It was an annual event that they held trying
17  to raise money.  They had -- you know, it kind of was
18  like a festival, carnival-type thing.  They also had
19  shows in the gym, the Edgewood Follies, things of that
20  nature.
21        And I was just -- if you're at Edgewood, you
22  participated and helped out at events.
23    Q.  Sure.  So I'm an Edgewood '92 grad.  So when I
24  was there, we had Edgefest.  And had the -- the flea
25  market was held kind of in front of the school.

Page 9

1        Is that consistent with your recollection?
2    A.  I don't really remember a flea market.  I
3  remember a beer garden, but,
4    Q.  And then the Midway carnival ride, et cetera,
5  was done on the football field for a period of time.  Do
6  you recall that?
7    A.  I do recall that.
8    Q.  And Edgefest was run, to your knowledge --
9  well, let me ask you this:
10        To your knowledge, how long did Edgewood run
11  Edgefest?
12    A.  I believe it started when I was in high school
13  which was started in 1970.  I'm not sure how long it
14  went.
15    Q.  They are not currently doing Edgefest, though;
16  correct?
17    A.  Not that I'm aware of.
18    Q.  And do you recall the Edgewood athletic field
19  being used as part of Edgefest during those years that
20  you remember Edgefest being run?
21    A.  Yes, I do.
22    Q.  With respect to your participation in football
23  at Edgewood, did you utilize, as a football player, the
24  athletic field at Edgewood High School?
25    A.  Yes, I did.

3 (Pages 6 - 9)

Page 10

1    Q.   For what purposes?
2    A.   Practices.
3    Q.   Did you ever play any games on that field?
4    A.   No, I did not.
5    Q.   Were you ever -- at any time since you've been
6  at Edgewood, as a student to the present day, are you
7  aware of football games being played on that field?
8    A.   From when I was there, 1970 moving forward, I
9  am not aware of any games that were played there.
10   Q.   You never attended any football games at the
11  Edgewood field?
12   A.   No, I did not.
13   Q.   Have you ever heard of or seen any games being
14  played -- any games, football or otherwise, being played
15  on the Edgewood athletic field?
16       MS. ZYLSTRA:  Object to form.  You can answer.
17   A.   Not as an attendee.  I drove by and saw people
18  on the field and they looked like they were organized.
19  That was after the turf was down.
20   Q.   And when was that?
21   A.   3-4 years ago.
22   Q.   With respect to track, in your time at
23  Edgewood, did you utilize the Edgewood field for track?
24   A.   For conditioning.  I was a weight man, so I
25  was doing shot put and discus.  And we did that some

Page 11

1  other place so we weren't injuring people.  But
2  certainly they made us run.
3    Q.   Sure.  But that, again, was for practice.  Is
4  that what you're saying?
5    A.   Yes.
6    Q.   But any track meets held at Edgewood during
7  your tenure there as a student?
8    A.   No.
9    Q.   Since your graduation from Edgewood were you
10  ever aware of, or observe, any track meets being held on
11  the Edgewood track?
12   A.   I am aware of athletic competition that was
13  happening there.  I don't remember if it was soccer or
14  track in the spring where we went to observe.  Not me,
15  personally, but one of my staff did.
16   Q.   That was in 2019; correct?
17   A.   I believe so, yes.
18   Q.   Between your graduation and 2019, were you
19  aware of any track meets being held on the Edgewood --
20   A.   No.
21   Q.   Other than your experience and knowledge of
22  football practices, track practices, and Edgefest event,
23  are you aware of any other use of the Edgewood field
24  besides those from your experience there and from what
25  you've learned in the years since?

Page 12

1       MS. ZYLSTRA:  Object to form.  You can answer.
2    A.   Certainly, when I was there it was used for
3  Phy Ed.
4    Q.   Anything else?
5    A.   Not that I'm aware of or remember.
6    Q.   Have you ever heard of the Edgewood field
7  being used for Monroe Street farmer's market or a
8  farmer's market of any kind?
9    A.   No.
10   Q.   After graduating from Edgewood in '75, what
11  did you do?
12   A.   I went to college.  After -- I went to
13  college, let's go there.
14   Q.   And where did you go and what was your degree
15  in?
16   A.   I started out at Stevens Point in forestry.
17  After a year I came back to Madison, spent a year
18  pursuing electrical engineering and decided I was not a
19  good fit.  And after that, I got a degree in
20  construction administration.
21   Q.   What year did you complete that degree?
22   A.   I think it was December of '80.
23   Q.   Where were you employed -- how have you been
24  employed since your college graduation?
25   A.   Mainly, I was self-employed doing construction

Page 13

1  work.  Built decks, garages, remodeling, built a home.
2  And then I worked for All Channel Electronics for a year
3  installing and maintaining alarm systems, fire alarm
4  systems.
5       I did that for approximately a year and became
6  aware of an opening in the City and applied.
7    Q.   What opening was that?
8    A.   It was a housing inspector.
9    Q.   And that's with the City of Madison's Building
10  Inspection Department?
11   A.   That is correct.
12   Q.   When did you start in that position, about
13  what year?
14   A.   When I retired last year, it was just shy of
15  35 years.
16   Q.   So you spent 35 years in the City's building
17  inspection department; is that correct?
18   A.   That is correct.
19   Q.   And you became the head of that building
20  inspection department at some point in time; correct?
21   A.   Yes, I did.
22   Q.   When did that occur?
23   A.   I was a director for 16 years.
24   Q.   For 16 years?
25   A.   16.

Page 14

1    Q.  So the period of 2013 through 2020, you would
2  have been the director of the building inspection
3  department for that entire period of time; correct?
4    A.  That is correct.
5       MS. ZYLSTRA:  Counsel, I believe you meant
6  2021.
7       MR. INGRISANO:  Yeah, I was asking about 2013
8  through 2020, specifically, but --
9       MS. ZYLSTRA:  I apologize.
10    Q.  MR. INGRISANO:  When you retired in 2021, you
11  were at that point still the director; correct?
12    A.  That is correct.
13       MS. ZYLSTRA:  I apologize, Counsel.
14       MR. INGRISANO:  No, you're quite all right.
15    Q.  MR. INGRISANO:  Really quick, are you married,
16  sir?
17    A.  Yes, I am.
18    Q.  Do you have any children?
19    A.  Yes, I do.
20    Q.  What high schools do they attend?
21    A.  They attend East High School.  It's very
22  convenient.  We live five doors away, six doors away.
23    Q.  Understood.  Since your graduation from
24  Edgewood High School have you been on the athletic field
25  at Edgewood High School?

Page 15

1    A.  Since graduation, I probably walked around
2  there during Edgefest but nothing other -- nothing comes
3  to mind.
4    Q.  Sure.  Sir, what were your responsibilities as
5  Madison's director of the building inspection
6  department?
7    A.  Building inspection consists of five sections.
8  There is the new construction section, which is, I
9  think, fairly obvious.
10       Somebody wants to build a new build or alter
11  an existing one, we review plans, issue permits, and
12  then inspect the building, the electrical, plumbing, and
13  heating to make sure it complies with all state codes.
14       And then there is the minimum housing and
15  property maintenance.  I'm going to lump those together.
16  They are still considered separate, but we treat them as
17  one.  They are staff that inspect existing buildings and
18  properties for compliance with the minimum housing code.
19       They tell people to replace the roof when
20  shingles are falling off, paint the building, rebuild
21  chimneys.  The property maintenance people will direct
22  people to cut their grass in the summer, shovel their
23  sidewalk in the winter, pick up trash, graffiti.
24    Q.  So the really fun part of the job, right?
25    A.  Oh, yeah, get a lot of complaints from people

Page 16

1  when they are told to do things.
2       And then there is weights and measures.  For
3  those of you who do not know what that is, they ensure
4  measuring devices are accurate.  So when you go to a gas
5  station and buy five gallons of gas you are actually
6  getting five gallons of gas or a pound of hamburger, or
7  they actually check dryers to make sure that when you
8  put a quarter in that's supposed to run for 20 minutes,
9  or whatever it is, it actually runs for 20 minutes.
10       So they do a lot of different things.  Taxi
11  meters, making sure they are accurate.
12       And finally, there is the zoning section.
13  Zoning basically tells you what you can and cannot do
14  with your property.  Permitted uses.  So they are
15  involved with the development review.
16       If somebody brings forward plans or wants to
17  build a building, they make sure that it complies with
18  the zoning code.
19    Q.  So that zoning section is run by or headed up
20  by a zoning administrator; is that correct?
21    A.  That is correct.
22    Q.  And is that -- during the period of time from
23  2013 through 2021 who was the zoning administrator?
24    A.  Matt Tucker.
25    Q.  Mr. Tucker is here today?

Page 17

1    A.  Yes, he is.
2    Q.  And so Mr. Tucker -- is it fair to say, based
3  on your recitation, that Mr. Tucker, being the head of
4  one of those five areas you talked about, reported to
5  you during that period of time?
6    A.  That is correct.
7    Q.  With respect to -- I think I'm focusing here
8  on the zoning part of your job, but if I'm not, if I
9  shouldn't be, let me know.
10       But as part of your job as the director of the
11  building inspection department you were responsible for
12  interpretation of the building code; is that correct?
13    A.  Yes.
14       MS. ZYLSTRA:  Object to form.  You can answer.
15       THE WITNESS:  Yes.
16    Q.  MR. INGRISANO:  And that included, too, the
17  interpretation of municipal code chapters on electrical
18  permits; is that correct?
19    A.  That is correct.
20    Q.  In looking at the Madison municipal code, the
21  chapter on electrical requirements is Chapter 10; is
22  that right?
23    A.  That's really not the electrical.  I think 19
24  is.
25    Q.  Okay.

Page 18

1    A.  I believe you're referring to 10 point -- or
2  10.085, which is outdoor lighting.
3    Q.  Outdoor lighting.  Okay.
4      To your knowledge, that is the Madison code
5  provision that governs outdoor electrical -- outdoor
6  lighting?
7    A.  Outdoor lighting, yes.
8    Q.  So the issuance of electrical permits under
9  that Section 10.085, that falls under your department's
10  purview; is that right?
11    MS. ZYLSTRA:  Object to form.  You can answer.
12    A.  Really not issuing a permit under 10.085.
13  It's under Chapter 19 in the NEC.  That is just -- we
14  want to ensure that it meets the light standards that
15  are prescribed in 10.085.
16      But the electrical permit itself is
17  guaranteeing that it's installed properly, the wire is
18  sized properly, right burial depths.  Those are all
19  governed in the NEC, National Electrical Code.
20    Q.  Got it.
21    A.  The 10.085 is ensuring that the lights meet
22  standards for trespass, glare, things like that.
23    Q.  So 10.085 sets forth the criteria for outdoor
24  lighting along the lines of what you just said for glare
25  and proper -- other kind of objective criteria, light

Page 19

1  spill, things like that?
2    MS. ZYLSTRA:  Object to form.  You can answer.
3    A.  Yes.
4    Q.  But the assessment -- an application comes
5  into the building inspection department for a permit to
6  install outdoor lights in, let's just say, 2018; okay?
7      That permit is going to be reviewed under the
8  standards of 10.085, the application is going to be
9  reviewed under the standards of 10.085; correct?
10    A.  That is correct.
11    Q.  What other code sections will that application
12  be reviewed under?
13    A.  Reviewed under?  None.
14    Q.  Any other code sections in the Madison
15  ordinances material to whether that light permit is
16  going to issue?
17    MS. ZYLSTRA:  Object to form.  You can answer.
18    A.  There are -- I guess there are no -- there is
19  no plan review for electrical standards that I'm aware
20  of anywhere in the state of Wisconsin.
21      So basically most -- oh, most electrical is
22  feed by number of openings, number of circuits, size of
23  service.  But there isn't anybody that reviews that.
24      The inspectors ensure that it's installed
25  correctly.  Of course, they can ask the inspector before

Page 20

1  they do the work "will this be okay," but as a licensed
2  professional the person installing the wire, we find,
3  generally knows what they are doing and the proper size
4  wiring is installed, proper circuits, all that.
5      So they inspect and approve, when it's
6  correct, but there is no review of the actual lighting
7  circuits.
8    Q.  Got it.  So the review that you're describing
9  -- and, again, I'm trying to understand.
10      The review that you're describing is one of
11  making sure that the proposed lighting and the as-built
12  lighting meets the technical requirements that you're
13  looking for under 10.085; is that right?
14    A.  That is correct.
15      (Exhibit 1 marked)
16    Q.  MR. INGRISANO:  Mr. Hank, I'm handing you
17  what's been marked as Exhibit No. 1.
18      Do you recognize that, sir, as the 10.085
19  outdoor lighting Madison ordinance we have been talking
20  about?
21    A.  Yes, I do.
22    Q.  And, again, I don't know as much about this
23  area as you do, but can you confirm for me that 10.085
24  is not a conditional use analysis; is that right?
25    MS. ZYLSTRA:  Object to form, foundation.

Page 21

1    THE WITNESS:  So --
2    MS. ZYLSTRA:  I'm sorry, you should answer.  I
3  apologize.
4    A.  Can you ask the question again?
5    Q.  Sure.  Are you familiar with the concept of a
6  conditional use permit?
7    A.  Vaguely, yes.
8    Q.  What's your understanding, sir, of a
9  conditional use permit?
10    A.  People apply to do things that maybe are not
11  strictly allowed under the zoning code, and they would
12  maybe go to -- they would go to the Plan Commission
13  where it would be reviewed and would be maybe approved
14  with conditions that they have to -- you know, that if
15  it was an outdoor seating event, you know, for a
16  restaurant that they had to close, let's say, at 9:00
17  o'clock because it's close to a residential area and
18  they did not want to disturb the neighbors, they may
19  grant approval but have conditions on it.
20    Q.  And 10.085, as you said before, sets forth the
21  technical specifications that you're looking for in
22  reviewing outdoor lighting permits; correct?
23    A.  That's correct.
24    Q.  So your department is empowered -- if those
25  technical specifications are met, you're empowered to

6 (Pages 18 - 21)

Page 22

1 issue that permit; is that correct?
2    A.  Well, it is approved, and we're typically the
3 final signoff.
4        So if somebody else has approved the permit
5 and then we are -- as long as all the conditions are
6 met, then we would give a final signoff on it.
7    Q.  Can you give me an example of the kinds of
8 conditions you're talking about that would have to be
9 met?
10    A.  Again, I'll go back to an outdoor restaurant.
11 They would maybe say that -- they would say how many
12 tables are approved, that they are going have to provide
13 outdoor trash receptacles.
14        One of the standards that's typically in there
15 is that all exterior lighting must meet 10.085, all
16 right, so they would then -- that would be part of the
17 review that would happen, because somebody -- you know,
18 they wouldn't want to install lighting that would not be
19 compliant.  So we would review it to make sure that it
20 would meet the standards.
21        And then once everything is installed and
22 approved then we would do the final signoff on the
23 conditional use.
24    Q.  I'm not asking about conditional use at this
25 point.  I'm asking for just someone comes into your

Page 23

1 office with an application for an existing use, an
2 existing facility, additional, you know, existing space,
3 and they say, hey, we want -- in 2018, we want to add
4 outdoor lighting to that.
5        That's a permit application that's directed to
6 your office; is that correct?
7    A.  That is correct.
8    Q.  And your department in 2018 is authorized to
9 review that application for electrical outdoor lighting
10 and signoff and approve that permit application;
11 correct?
12    A.  To approve the lighting standards, yes.
13    Q.  Yes.  Okay.  What else could cause -- what
14 else has to be done -- I guess, let's do this this way:
15        In 2018, I come to you.  I've got a field in
16 the city of Madison and I want to add outdoor lights to
17 it.  I come in with my outdoor lighting application.
18        Describe for me the process.  I come in and I
19 put that on your desk.  Describe for me the process for
20 reviewing that outdoor lighting application?
21        MS. ZYLSTRA:  Object to form.  You can answer.
22    A.  The reviewer will take the submitted plans.
23 They will look to see what type of fixtures are being
24 provided, the height of them.  They also look at
25 computer-generated light readings that would be on the

Page 24

1 surface to make sure that when it gets to the property
2 line there is no trespass onto adjoining properties.
3        And that's -- if everything is -- if the
4 fixtures are full cutoff fixtures, there is not a whole
5 lot more involved with it.
6        You know, I'll add that if somebody tried to
7 do it without full cutoff fixtures it gets more
8 complicated, because then you have to take into account
9 glare.
10        When the ordinance was written, they basically
11 gave a pass to glare if it was a full cutoff fixture,
12 which is very helpful when you put a pole very high up
13 in the air.  Because if you're on the ground looking up,
14 you can see the bulb and that would create glare.  But
15 if it's a full cutoff fixture, glare is not an issue by
16 the ordinance.
17    Q.  So when that application I talked to you
18 about, the hypothetical 2018 application comes in, I
19 bring it to your office.  Who reviews that?
20    A.  At the time -- do you want the person's name?
21    Q.  Yeah, please.
22    A.  At the time, Steve Rewey did the majority of
23 them.  He's a building inspector.  And I think we were
24 training somebody else at the time to also do them.
25    Q.  So Steve Rewey is going to be looking at those

Page 25

1 things you talked about, the fixtures, the height, the
2 computer-generated light readings for trespassing and
3 spillover; correct?
4    A.  That's correct.
5    Q.  In assessing those things, he's looking really
6 at the four corners of the Exhibit 1, right, the 10.085
7 outdoor lighting ordinance, right?
8        MS. ZYLSTRA:  Objection to form.  You can
9 answer.
10    A.  Yeah, he's looking to make sure it meets those
11 standards, sure.
12    Q.  Is there any other ordinance that Steve would
13 be looking, at that time, to see if that standard has
14 been met and the permit can issue?
15        MS. ZYLSTRA:  Object to form.  You can answer.
16    A.  Steve would not be reviewing that, no.
17    Q.  Let's just say Steve looks at that 2018
18 application and signs off.  It's compliant with the
19 technical requirements of 10.085.
20        What happens next to my light application?
21    A.  It sits there waiting to be issued.
22    Q.  What is it waiting on?
23        MS. ZYLSTRA:  Object to form.  You can answer.
24    A.  To see -- if it was part of a broader
25 development review, generally it's going to be to make

Brown & Jones Reporting                    414-224-9533
A Veritext Company                      www.veritext.com

Page 26

1 sure that that broader development is in compliance.
2 Because we wouldn't want somebody to install lights and
3 find out that, oh, you can't do that.
4        But that's not the review -- Steve would not
5 be doing that type of review.
6    Q.   Who does that review?
7    A.   Typically, zoning.
8    Q.   So at some point in time in the process of my
9 light application we talked about here in 2018, some
10 point in time zoning is brought in and apprised there is
11 an outdoor lighting application?
12    A.   For significant ones, yes.
13    Q.   How would zoning know that there is a light
14 application that needs its review?
15    A.   Usually a part of a broader review.  You know,
16 somebody is installing -- altering their parking lot or
17 altering the -- what is perceived to be the altering or
18 changing the use of an area, and you'd want to make sure
19 that that use is approved by the zoning code.
20    Q.   Who apprises zoning that there is an
21 application that requires that broader review?
22        Steve gets done with his checklist, he signs
23 off on it.  How does zoning find out that there is
24 something that requires enhanced review?
25    A.   Commercial lighting, outdoor lighting, is

Page 27

1 typically entered into the -- our case tracking, our
2 review process.  So there might be -- it might only --
3 when it's brought in, somebody from zoning will look at
4 it and decide which agencies need to look at based on
5 what's being done.
6        So if they were -- again, if it was a parking
7 lot and they were altering stuff, it may involve traffic
8 engineering, it could involve engineering.  And then, of
9 course, then the final review part of that would be
10 zoning to make sure that what they are proposing to do
11 is approved under the zoning code.
12    Q.   So if a lighting application is otherwise
13 technically compliant with 10.085, are you saying that a
14 different zoning violation unrelated to the technical
15 specifications for lights could prevent that light
16 permit from issuing?
17        MS. ZYLSTRA:  Object to form.  You can answer.
18    A.   We would want to make sure that the proposed
19 -- what they were proposing to do with it was permit it.
20 Because if we give somebody a permit to do something and
21 then they go ahead and install that stuff and then we
22 come back later after they have invested a lot of money
23 and say "there is a problem, you can't use those the way
24 you want to use them," you know, the question is, "well,
25 why did you allow us to install them in the first place

Page 28

1 if we could not use them."
2    Q.   So then you're going to look at -- so where in
3 the code do you look at to see that a proposed use of
4 outdoor lighting can prevent the issuance of a permit
5 for outdoor lighting?
6    A.   I'm not going to look at no code.  I don't
7 know zoning that well.  I'm going to ask either one of
8 the zoning staff or the zoning administrator.
9    Q.   So in that situation you would defer to your
10 zoning administrator whether or not that electrical
11 permit, that's otherwise analyzed under 10.085, can
12 issue?
13    A.   Yes, I'll elaborate just little bit.  When I
14 was the director, I was responsible for enforcing a
15 stack of codes about that tall.  There is no way I could
16 know everything that was going on in any of those codes
17 or all of those codes.
18        So -- but I also thought I could read codes
19 and interpret codes, so I would go to the people that
20 would be the expert in those and ask "is this a problem,
21 show me where," and then we would discuss it.
22    Q.   We've talked about -- my hypothetical talked
23 about 2018.
24        Is this the same process you outlined that was
25 in place prior to the adoption of the

Page 29

1 Campus-Institutional District zoning code?
2    A.   I would say yes.
3    Q.   So the Campus-Institutional District code was
4 amended in October of 2019.  Are you familiar with that?
5    A.   I'm going to say no.
6    Q.   To your knowledge, the review of outdoor
7 lighting permits, applications, using 10.085, to your
8 knowledge, was the same for properties zoned
9 Campus-Institutional as well as properties that were
10 zoned otherwise; is that right?
11    A.   The review of 10.085, yes.
12    Q.   If the review of outdoor lighting for
13 Campus-Institutional districts changed in 2019, you're
14 not aware of the details of how that change occurred or
15 what those changes were?
16    A.   No.
17        (Exhibit 2 marked)
18    Q.   MR. INGRISANO:  Sir, I've handed you what's
19 been marked as Exhibit 2.  Can you identify that
20 document for me?
21    A.   Well, it consists of several documents.  One
22 is the electrical permit.  This one is to Madison
23 Metropolitan School District to install new lighting for
24 football and baseball fields, repair/alterations.
25        So it was an existing, and I believe they were

8 (Pages 26 - 29)

1 re-fixturing it.  And it was at -- it appears to be
2 Memorial High School.
3      Q.   So page 3 of this exhibit is the City of
4 Madison Site Plan Verification page.  Do you see that?
5      A.   Yes.
6      Q.   And it's a little hard with the photocopying,
7 but the status of the three different reviews that are
8 listed there it does say "Approved"; correct?  Can you
9 see that?  Turn the page a little bit.
10      A.   Yes.
11      Q.   And lighting review was done here by Steve
12 Rewey; correct?
13      A.   That's correct.
14      Q.   Did you have any involvement, to your
15 recollection, in the review or approval of a lighting
16 review for this permit?
17      A.   None.
18      Q.   Were you aware that this permit was filed when
19 it was?
20      A.   No.
21      Q.   Now, you mentioned before that zoning can
22 review these applications.  Is that reflected in the
23 third line of the review by Christina Thiele?
24      A.   Yes.
25      Q.   And, again, do you know what it is that she

1 would have been reviewing in the approval of this from a
2 zoning review standpoint?
3      A.   My understanding, probably very little,
4 because it was an existing lit field.
5      Q.   Here Madison Memorial High School is zoned
6 Campus-Institutional; is that correct?
7      A.   I do not know.
8      Q.   From this Exhibit 2, though, it would be your
9 expectation that the lighting review would be done under
10 10.085; is that right?
11      A.   That is correct.
12      Q.   Do you know what would be looked at from a
13 zoning review standpoint?
14      A.   Basically, that they haven't changed -- that
15 what they are doing here is not changing the use of the
16 areas.
17      Q.   To your knowledge are uses in the
18 Campus-Institutional District allowed at nighttime or
19 are they limited in any way to daytime, to daytime
20 hours, daylight hours?
21           MS. ZYLSTRA:  Object.  Foundation.  You can
22 answer.
23      A.   I'm -- I've -- I know very little about
24 Campus-Institutional zoning.  I had never heard of that,
25 to be honest with you, until this issue came up.

1      Q.   So you weren't involved with the amendment to
2 Madison ordinances that created the Campus-Institutional
3 zoning districts in 2013; is that right?
4      A.   Not at all.
5      Q.   So you have no knowledge about that process?
6      A.   Literally none at all.
7      Q.   You have no knowledge about the rationale or
8 the public policies behind creating that
9 Campus-Institutional District?
10      A.   After the effect, I believe the idea was --
11 no, actually, I'm sorry, I was thinking of something
12 different.  So no, I am not.
13      Q.   Who in your department at the time in 2013,
14 2012, 2011 would have been the most knowledgeable person
15 about the creation of the Campus-Institutional zone
16 district?
17           MS. ZYLSTRA:  Object to form, foundation.  You
18 can answer.
19      A.   From my department, it would have been Matt
20 Tucker, Jenny Kirchgatter, the assistant zoning
21 administrator, and any changes like this are also
22 involved people from the planning staff.
23      Q.   And planning is not -- is planning under your
24 purview or not?
25      A.   No.

1           (Exhibit 3 marked)
2      Q.   MR. INGRISANO:  Mr. Hank, I'm handing you
3 what's been marked as Exhibit No. 3.  Do you recognize
4 what this document is?
5      A.   Yes, it's a city site plan review.
6      Q.   It's labeled, "City of Madison Site Plan
7 Verification"; correct?
8      A.   That's correct.
9      Q.   It's two pages.  And this is a document that
10 you are familiar with that's generated by your
11 department; is that right?
12      A.   That is correct.
13      Q.   Again, this relates to a lighting application
14 for Edgewood High School; correct?
15      A.   That is correct.
16      Q.   And Steve Rewey, again, reviewed and approved
17 from your department?
18      A.   Yes, he did.
19      Q.   And according to this document, Exhibit 3,
20 Christina Thiele approved under zoning review; is that
21 right?
22           MS. ZYLSTRA:  Objection to form.  You can
23 answer.
24      A.   Yes.
25      Q.   To your knowledge, Madison Edgewood is zoned

Page 34

1 Campus-Institutional; is that correct?
2     A.  I'm trying to remember.  I believe it is now.
3     Q.  So, again, with Exhibit 3, in Steve Rewey's
4 approval under the lighting review, his review would
5 have been based upon the technical standards set forth
6 in 10.085; correct?
7     A.  That is correct.
8     Q.  And you don't know, specifically, what
9 Christina Thiele would have reviewed, if anything, when
10 she approved the zoning review; correct?
11     A.  Specifically, no.
12     Q.  Generally?
13     A.  Well, generally, if there is any question, she
14 would ask for input from Matt or Jenny, the zoning
15 administrator and the assistant zoning administrator, to
16 you know, is there something I'm missing here.
17        (Exhibit 4 marked)
18     Q.  MR. INGRISANO:  Sir, I've handed you what's
19 been marked as Exhibit 4.  Have you seen this document
20 before?
21     A.  I've seen one that's a lot thicker.  So I
22 think this might have been part of the large stack of
23 stuff that I received.
24     Q.  Sure.  So we posed interrogatory questions of
25 the defendants in this case.

Page 35

1        Did you review and -- hold on.  I see page 9
2 of the document.  That's certification signed by Matthew
3 Tucker.  Do you see that?
4     A.  Yes.
5     Q.  And that was dated December 9 of 2021.  Do you
6 see that?
7     A.  It looks like December -- oh, yes, I'm sorry.
8     Q.  Prior to December 9 of 2021, did you review
9 any -- did you review these answers to interrogatories
10 to confirm that they were true and accurate?
11     MS. ZYLSTRA:  I want to object somewhat based
12 on attorney-client privilege.  Let me think about that.
13 Can you repeat the question?
14     MR. INGRISANO:  Can you read that back,
15 please.
16        (Record read)
17     MS. ZYLSTRA:  Very limited question, Mr. Hank.
18 You're not to disclose your communications with your
19 counsel with respect to discovery, but I'll allow you to
20 answer that question.
21     A.  The date of it?  I'm not -- I don't think so.
22     Q.  Let me ask you to take a look, sir, at page 6
23 of Exhibit 4.  Interrogatory No. 6.
24        "Identify all City of Madison officials or
25 employees who reviewed or were consulted by Edgewood's

Page 36

1 outdoor lighting applications in 2019 and 2020."
2        Do you see that?
3     A.  Uh-huh.
4     Q.  Sorry?
5     A.  Yes, sorry.
6     Q.  You have been doing great so far with verbal
7 answers, but it's an easy pattern to fall back into.  So
8 I'm not trying to be rude to remind you to give verbal
9 answers.
10     A.  No, I appreciate it.
11     Q.  The response to Interrogatory No. 6, you kind
12 of cut through the objections, and beginning with
13 language, "Subject to and without waiving these
14 objections, the individuals who generally process the
15 applications were Matthew Tucker, Chrissy Thiele, Steve
16 Rewey, and George Hank.  In addition, John Strange may
17 have had some non-privileged communications regarding
18 the applications."
19        Did I read that correctly?
20     A.  Yes.
21     Q.  To your knowledge, are you -- do you know who
22 processed and reviewed Edgewood's lighting applications
23 in 2019?
24     A.  Well, the lighting plan would have been done
25 by Steve Rewey.

Page 37

1     Q.  Are you aware of anyone else who was consulted
2 or reviewed -- consulted with or reviewed those lighting
3 applications in 2019 and 2020?
4     A.  I looked at them very briefly with Mr. Rewey.
5 A concern was raised that they had -- that their
6 submittal included punt lighting, and technically punt
7 lighting would not be allowed under the lighting
8 ordinance because it is shining up into the sky.
9     Q.  When was the issue with punt lighting raised?
10     A.  I can't give you a really good answer.
11     Q.  But looking back at Exhibit 3, Steve Rewey
12 nevertheless approved the lighting review; correct?
13     A.  I believe it was -- it was post approval, and
14 our reviews are typically stamped conditionally
15 approved, because if we approve something that was --
16 say we approved a structural member and made a gross
17 error in it, we couldn't allow somebody to build it that
18 way, you know, in case -- we wouldn't want it to
19 collapse or, you know, injure somebody.
20        So while, yes, we approved it, we are going to
21 make you are fix it and do it correctly.
22     Q.  Sir, Exhibit 3 identifies lighting review as
23 having been approved and zoning review as having been
24 approved.  No permit for lighting to Edgewood High
25 School for outdoor lights for its football field was

Page 38

1 actually issued; correct?
2       MS. ZYLSTRA:  Objection.  Foundation.  If you
3 know.
4    A.  I'm not aware of a permit being issued.
5    Q.  Has anyone made you aware of the reasons why a
6 permit was not issued?
7    A.  It is my understanding it was because the
8 purpose to install the lighting was for athletic
9 competitions at night, and I believe it was the
10 interpretation that that was not permitted under either
11 their master plan at the time or they did not get the
12 proper approvals from the Plan Commission later.
13    Q.  Do outdoor lighting permit applications
14 identify the details of the proposed use of the
15 lighting?
16       MS. ZYLSTRA:  Object to form.  You can answer.
17    A.  Sometimes it's self-explanatory.
18    Q.  Who told you that the reason why the permits
19 didn't issue was because of the uses that Edgewood was
20 proposing?
21    A.  I believe they were discussions with Matt
22 Tucker and with our attorney.
23    Q.  John Strange?
24    A.  Yes.
25    Q.  And when did those discussions occur?

Page 39

1    A.  I'm sorry, I -- once I left there, dates
2 somewhat became meaningless.
3    Q.  Understood.  So the zoning review -- if you
4 look at Exhibit 3, the zoning review approval was
5 stamped March 1, 2019.  Do you see that?
6    A.  I'm trying to -- which one are we --
7    Q.  On Exhibit 3.
8    A.  What date did you say?
9    Q.  March 1, 2019.
10    A.  Oh yes, I'm sorry.
11    Q.  So based on that, the timing of those reviews
12 and approvals, in your experience, typically, how soon
13 would a permit issue on an otherwise approved
14 application during your tenure as a director?
15       MS. ZYLSTRA:  Objection.  Form, foundation.
16    A.  It varied -- it varies greatly.  Sometimes we
17 will have applicants that will look to start work prior
18 to this process being completed.  They would ask for an
19 early start.  It doesn't apply here.
20       But I have always been amazed at sometimes
21 people want the permit before the approval process is
22 completed and they really want to get started, and other
23 times it's all approved and it's ready to go and they
24 wait months to pull the permit.  So it varies greatly.
25    Q.  When you say "pull the permit," what do you

Page 40

1 mean by that?
2    A.  Pull the building permit for other projects.
3 I'm speaking in broad terms.
4    Q.  Sure.  But take away those kind of
5 extraordinary circumstance, kind of what I call marginal
6 scenarios.
7       Typical practice, assuming no odd
8 circumstances, what would you typically expect to see a
9 permit issued?
10       MS. ZYLSTRA:  Object to form.  You can answer.
11 Also lacks foundation.
12    A.  It could be as quickly as days and it could be
13 months longer.  It varies greatly.
14    Q.  If you look at Exhibit 2, sir, page 3 of
15 Exhibit 2, with the Madison Memorial permit.
16    A.  Uh-huh.
17    Q.  Zoning review was completed July 31; Urban
18 Design Commission review, August 6.  That's the last
19 date of approved review.
20       And that permit on the first page is dated
21 August 13; is that correct?
22    A.  I haven't looked at it in a long time.
23    Q.  Permit date.
24    A.  Yes, on August 13, 2018.
25    Q.  So in that circumstance there, from August 6

Page 41

1 of the last review approval to August 13 was the
2 issuance of that permit; correct?
3    A.  That is correct.
4    Q.  And given what you know about this permit in
5 Exhibit 2, that would be a reasonable period of time for
6 issuance; correct?
7       MS. ZYLSTRA:  Object to form.  You can answer.
8    A.  Yes.
9    Q.  With respect to the Edgewood permit, have you
10 seen a copy of that application, sir, from February of
11 2019?
12    A.  The complete application, I would say no.  I
13 looked at -- again, I think I mentioned I looked at some
14 specific pages with Steve Rewey when we checked about
15 punt lighting.
16       Oh, I find that -- it's my interpretation that
17 -- that our lighting ordinance has not caught up with
18 some of the best practices and it probably should just
19 include punt lighting with maybe some standards that it
20 has to shut off within a certain time after completion
21 of the use of the field or whatever.
22    Q.  So the lighting permit at issue in Exhibit 3,
23 did that not issue because of the punt lighting issue or
24 because of the questions about proposed uses?
25       MS. ZYLSTRA:  Object to form.

11 (Pages 38 - 41)

Page 42

1  Q.  If you know.
2  A.  I would -- I would say that it's my
3  recollection that it was because of the uses.
4  Q.  When a permit is not issued by your department
5  is a denial letter typically sent?
6      MS. ZYLSTRA:  Objection.  Foundation.  If you
7  know, go ahead and answer.
8  A.  Yes.
9  Q.  Have you ever seen a denial letter sent with
10 respect to the Edgewood lighting application at Exhibit
11 3?
12 A.  Not that I recall.
13 Q.  And a denial letter will typically set forth
14 the reasons for the denial and give a party the
15 opportunity to address the issues; correct?
16     MS. ZYLSTRA:  Object to form, foundation.  You
17 can answer.
18 A.  Yes.
19 Q.  From your discussions with Mr. Strange and
20 Mr. Tucker, what were the proposed uses of the lighting
21 that was causing this permit not to issue?
22     MS. ZYLSTRA:  I'm going to object on
23 attorney-client privilege and instruct you not to
24 answer.
25     You're asking about communications with City

Page 43

1  Attorney John Strange and Mr. Tucker.
2      If you are able to answer his question without
3  -- separately from any discussions involving Attorney
4  Strange, you can answer the question, but if it involves
5  your discussions with Attorney Strange, I'll instruct
6  you not to answer.
7      Do you want to hear that question again,
8  Mr. Hank?
9      THE WITNESS:  Please.
10     MS. ZYLSTRA:  Or do you want it rephrased?
11     MR. INGRISANO:  Counsel, are you taking the
12 position that his communications in 2019 regarding the
13 denial or non-issuance of this permit, that his
14 conversations with John Strange are privileged as of
15 that time period?
16     MS. ZYLSTRA:  Yes.  I mean, I do believe that
17 there is some -- to the extent that there are
18 non-privileged communications with John Strange, I
19 certainly think that those are open for review.
20     To the extent they involved solely Mr. Hank
21 and Mr. Tucker and Mr. Strange and those communications
22 were not revealed in any way, shape, or form than any
23 others, then I think they are attorney-client.
24 Q.  Have you ever had any discussions with
25 Mr. Tucker where counsel was not present about the

Page 44

1  reasons -- strike that.
2      Have you had any conversations with Mr. Tucker
3  when Mr. Strange was not present or anyone else from the
4  attorney's office where the proposed uses of the
5  lighting were discussed as the reason for non-issuance
6  of a permit?  Or to simplify it --
7  A.  Yeah, yeah.
8  Q.  Sorry, go ahead.
9  A.  I'd say I had multiple conversations with
10 Mr. Tucker about many things.
11     Can I confer with counsel?
12 Q.  Not while a question is pending, sir, I'm
13 sorry.
14     MS. ZYLSTRA:  Only if it involves an
15 attorney-client privilege.  If it involves an
16 attorney-client privilege you can confer with me outside
17 the room.  If it does not involve a privileged
18 communication -- right now his question was only --
19     MR. INGRISANO:  Mr. Tucker.
20     MS. ZYLSTRA:  -- did you have any
21 communications with Mr. Tucker, and I believe you
22 answered yes.  I believe.
23 Q.  MR. INGRISANO:  And I asked the follow-up
24 question, what were those discussions?
25 A.  It was the City's -- it's my remembrance it

Page 45

1  was the City's contention or our interpretation at that
2  time that athletic competitions could not be held there,
3  and allowing large capital investments to install
4  lighting, I think put us at risk of "well, you allowed
5  us to install that, why did you do that?"
6      An analogy, we had somebody who was building a
7  house, a very large house, and it was -- we found it was
8  way too close to the property line, and we stopped them
9  immediately when we became aware of it because we waited
10 for them to be completely done and it ended up in the
11 courts.
12     They may say "well, you became aware of it way
13 back when, why did you not stop them until it was
14 resolved?"
15 Q.  The interpretation that athletic competitions
16 cannot be held on the property, on the field, what was
17 that interpretation of?
18 A.  Depending on the time, it was the master plan
19 and -- and then later when the zoning changed to, I
20 think, the Campus-Institutional, I believe.  I'm not a
21 zoning expert.  But that would require them to get a
22 conditional use permit to alter what they were doing.
23     MS. ZYLSTRA:  Counsel, whenever you get to a
24 good stopping point, if we could take a restroom break.
25     MR. INGRISANO:  Yeah, one more thing.

12 (Pages 42 - 45)

Page 46

1    MS. ZYLSTRA:  Feel free to stop whenever you
2  want.
3    Q.  Beyond Mr. Tucker -- well, let me ask you
4  this:
5      Mr. Tucker is the one who identified the
6  master plan as the source for this idea that uses for
7  the property did not include athletic competitions; is
8  that fair?
9    MS. ZYLSTRA:  Object to form.  You can answer.
10   A.  I believe he is the one that brought it to my
11  attention.
12   Q.  Did he tell you what his analysis included in
13  that regard?
14   A.  I believe reviewing the document.
15   Q.  Did he confer with or consult with anyone else
16  that he disclosed to you?
17   A.  I would -- I do not have a definite knowledge
18  one way or another.
19   Q.  Did you review the Edgewood Master Plan as
20  part of your discussions and analysis of withholding
21  this permit?
22   A.  I'm trying to remember if it was this permit
23  or another one, but reviewed certain pages of the
24  document.  Certainly, I did not sit there and read the
25  whole document.

Page 47

1    Q.  Do you recall what pages you reviewed?
2    A.  They referred to what was allowed under -- for
3  uses for open spaces, I believe, and the field was
4  considered one of them.
5    Q.  Besides the open spaces page of the master
6  plan, of Edgewood's master plan, was there any other
7  section or reference that you're aware of that was
8  relied upon?
9    A.  Not that I'm aware of.
10   MR. INGRISANO:  We can take a break.
11   MS. ZYLSTRA:  Great.  Thank you.
12   (Recess)
13 BY MR. INGRISANO:
14   Q.  Back on the record.  Looking back at Exhibit
15  3.  You've got that in front of you?
16   A.  Uh-huh.
17   Q.  Where it says "Lighting Review - Approved.
18  Steve Rewey."  Do you see that?
19   A.  Yes.
20   Q.  Who enters in, in your office, the approved
21  status designation on this form?
22   MS. ZYLSTRA:  Objection.  Foundation.  Go
23  ahead and answer.
24   Q.  If you know.
25   A.  I believe Steve enters his own.

Page 48

1    Q.  And that's what I'm trying to figure out is
2  how this gets from his review to being here on this form
3  on this website.
4      To your knowledge, the reviewer is the one who
5  is actually going in and manually updating and creating
6  this form; is that right?
7    A.  Generally, I'm going to say yes, that is true.
8  When you ask Mr. Tucker, he might have a better answer
9  on it.
10     We deal with people, city staff, that aren't
11  really familiar with this.  There are -- they are
12  familiar with the reviews and the standards but not the
13  intricacies of this actual program.
14     An example, the person that does reviews for
15  demolition and what is happening with the materials,
16  typically, at least when I left, he would call and talk
17  to one of the zoning staff and/or he would send an email
18  to one of the zoning staff and they would enter it with
19  notes saying "email from Brian Johnson, approved," you
20  know, "okay to approve recycling plan," and that would
21  be in the system.
22     So I believe Steve enters his own, but if I
23  found out later that he is sending an email to somebody
24  saying "lighting plan is good, please approve me," it
25  would not surprise me.

Page 49

1    Q.  So does that same answer hold true, then,
2  where it has the status as closed and the contents of
3  the description on that same document, you believe it
4  would be Steve that would be entering in that field?
5    A.  Are you referring to the lighting review
6  approved, Steve Rewey, February 27th, 2019?
7    Q.  Exhibit 3 above the review where it says
8  "Description:  Lighting Edgewood activity field" and
9  "Status:  Closed."
10     Do you believe that Steve Rewey or someone
11  else would typically be responsible for entering in that
12  data?
13   A.  That would be done by somebody from zoning if
14  it's not auto-generated.
15   Q.  In your career as director at the building
16  inspection department, how many times did you bring in
17  the city attorney to discuss a lighting application --
18   MS. ZYLSTRA:  Objection --
19   Q.  -- an outdoor lighting application.
20   MS. ZYLSTRA:  Objection.  Form, foundation.
21  You can answer.
22   A.  None that I can recall.
23   Q.  Does Steve Rewey, when he's reviewing a
24  lighting application under 10.085 and its requirements,
25  does he have any sort of discretion in whether it meets

Page 50

1 the applicable standard?
2      MS. ZYLSTRA: Object to form. You can answer.
3   A.  I would say no.
4   Q.  Beyond what's in 10.085, are there any kind of
5 unwritten rules or guidance that your department has
6 when doing the lighting review?
7   A.  I'll speak in a broader term. Reviewers never
8 approve something unless it meets the code. If they are
9 going to -- if they are going to -- say, somebody is
10 going to submit a wall section and say they are going to
11 insulate it to R-19 and it requires R-21, we are not
12 about to say, yeah, that's close enough, go ahead, you
13 know, submit something that's accurate.
14      Another great example is somebody submitted
15 something once where they wanted us to approve a
16 handicap counter and they showed it being an inch too
17 high and we said no.
18   Q.  So 10.085, a reviewer like Steve Rewey, in
19 doing the lighting review, cannot vary from the
20 requirements and the specifications in 10.085; is that
21 right?
22   A.  That is correct.
23   Q.  Close enough is not good enough, right?
24   A.  Yeah, the phrase "close enough" for government
25 work does not apply.

Page 51

1   Q.  Got it.
2   A.  Either it meets it or it doesn't.
3   Q.  You had mentioned before that zoning is
4 brought into review an application for lighting if it's
5 significant enough to warrant their involvement.
6      Who makes the determination that a lighting
7 application involves significant issues?
8      MS. ZYLSTRA: Objection. Form. You can
9 answer.
10   A.  As it comes in, zoning is typically going to
11 look at any outdoor lighting that comes in, because if
12 they're going to look at it -- if it's brought in,
13 they're going to go "is something changing here," and if
14 all of a sudden they are going to -- if they are
15 installing new lighting, and, let's say, they are going
16 to light an outdoor area, paved area, at a parking lot,
17 the question will be "why are you doing this?"
18      And then we may than find out that it's for an
19 outdoor seating area, and they're going to say, well,
20 you're not approved for an outdoor seating area, you
21 should start that process now so that you can find out
22 whether or not you can do it.
23   Q.  So zoning basically has discretion as to
24 whether they are going to investigate further and see if
25 there aren't additional circumstances that require a

Page 52

1 closer review; is that correct?
2   A.  It kind of -- the word "discretion," they are
3 looking at it. If it's a like Memorial, they are not
4 substantially changing the lighting; they are putting up
5 new fixtures, maybe new poles.
6      But if it's really not substantially changing
7 that, they would -- their review would be very -- the
8 review would be basically "I looked at it, it's the
9 same."
10   Q.  But you just used the words "substantially
11 changing," so the words "substantially changing"
12 involves some sort of assessment by the zoning
13 department as to what is substantial and what's not
14 substantial; is that right?
15   A.  I guess that is correct.
16   Q.  In 2019, sometime after March 1 here as
17 demonstrated on Exhibit 3, did John Strange recommend to
18 you that you withhold the permit from your department?
19      MS. ZYLSTRA: I'm going to object on the basis
20 of attorney-client privilege. If the recommendation was
21 if Mr. Strange made that recommendation and there were
22 discussions that included others beyond the city staff,
23 then you can answer that question.
24      If the communications -- if there were
25 communications -- and I'm not saying there were -- about

Page 53

1 withholding the permit between you and John Strange
2 alone, I'm going to say that's privileged and you
3 shouldn't answer the question.
4      MR. INGRISANO: Counsel, there are a lot of
5 John Strange documents that have been produced in this
6 case. There are a lot of memos and recommendations, a
7 lot of communications even between John Strange and
8 outside legal counsel that have been produced in this
9 case.
10      Can you please identify for me the distinction
11 you're drawing between what's in those memos and
12 recommendations from John Strange versus what you have
13 instructed this witness not to answer?
14      MS. ZYLSTRA: Well, with respect to John
15 Strange, he appeared at numerous public hearings in
16 which he spoke in which he provided information and
17 testimony and argument and whatnot.
18      Certainly, we are not trying to claim
19 privilege on anything that involves John Strange in any
20 of his public facing statements, duties, et cetera. I
21 agree with that a hundred percent.
22      But that doesn't mean that he didn't also have
23 separate communications with city staff that may be
24 privileged.
25      I am not aware of Mr. Strange making any

Page 54

1 public -- or I'm not aware, as I sit here right now, of
2 him making any public discussions or whatnot as to --
3 with regard to the topic that you're talking about here
4 with Mr. Hank. That's a distinction I'm drawing.
5     I agree this is a tough issue, and, you know,
6 I think we will have to navigate it.
7     MR. INGRISANO: So is it your position that
8 advice of the Plan Commission is not privileged but
9 advice to Mr. Hank and his staff is privileged?
10     MS. ZYLSTRA: I think it's not as black and
11 white as that. I think it depends on the circumstances
12 and the topic of which he may be performing his role.
13     MR. INGRISANO: I'm not going to just concede
14 that issue.
15     MS. ZYLSTRA: Understand.
16   Q.   MR. INGRISANO: Mr. Hank, are you following
17 your attorney's advice not to answer that question?
18   A.   Oh yes.
19     MS. ZYLSTRA: Well, and can I hear the
20 question back, please.
21   Q.   MR. INGRISANO: Did John Strange recommend to
22 you or your department that you withhold this permit
23 application referenced in Exhibit 3?
24     MS. ZYLSTRA: Would you agree that if I
25 allowed him to answer that question that it would not be

Page 55

1 a waiver of the privilege just the fact that he answered
2 that question. Would you be willing to agree to that?
3     MR. INGRISANO: If I can get a similar
4 stipulation that I'm not agreeing that other questions
5 are privileged.
6     MS. ZYLSTRA: Understand. I'm not saying that
7 that applies for everything else, but just for that
8 particular question you're not going to turn around and
9 argue that that's a waiver of the privilege, the fact
10 that I allowed him to answer that.
11     MR. INGRISANO: I won't use your permission
12 here as a waiver argument.
13     MS. ZYLSTRA: Okay. So, Mr. Hank, with that
14 in mind, I'm allowing you to answer that question, which
15 is did Mr. Strange recommend withholding of the permit,
16 I believe is the question. If you know, if you recall.
17     THE WITNESS: I'm trying to figure out the
18 best, accurate way to answer this.
19   Q.   Don't let me distract you, I'm going to get
20 some water.
21   A.   All right. My memory of this is, Matt and I
22 discussed this and it was our belief that we should
23 withhold it, and then later we conferred with
24 Mr. Strange.
25   Q.   So my question then would be, did Mr. Strange

Page 56

1 approve, from an attorney standpoint, from a
2 recommendation standpoint, your decision to withhold the
3 permit?
4     MS. ZYLSTRA: Same stipulation?
5   A.   I would --
6     MS. ZYLSTRA: Wait, sorry. I needed an answer
7 on the record.
8     MR. INGRISANO: No, that's fine. Stipulation
9 is to nonwaiver on those two questions.
10     MS. ZYLSTRA: Correct. So you can answer,
11 Mr. Hank.
12   A.   Again, I believe, if I remember correctly, it
13 was our discussions that we should do this. We informed
14 Mr. Strange, and I'll put it this way, generally, we
15 follow our attorney's advice. I guess I'm going to
16 leave it at that.
17   Q.   I'm sorry, Mr. Hank, that's really not
18 responsive.
19     So you said you followed your attorney's
20 advice. My question goes to what advice did he give you
21 with respect to the issuance of the permit.
22     So I'm going to ask you, you and Mr. Tucker
23 decided non-issuance was appropriate. You go to
24 Mr. Strange, and Mr. Strange says what about your
25 decision regarding non-issuance?

Page 57

1     MS. ZYLSTRA: And for the record, same
2 stipulation?
3     MR. INGRISANO: Yes.
4     MS. ZYLSTRA: So you can answer that question,
5 Mr. Hank.
6   A.   I don't remember him opposing what we thought
7 we should do.
8   Q.   Is it your testimony that if he had opposed it
9 and had given you contrary advice, told you that your
10 decision was unwise in any way, you would have followed
11 his advice? Is that your testimony today?
12     MS. ZYLSTRA: I'll object to form. We're
13 still in the same stipulation from counsel, and based on
14 that stipulation I'll allow you to answer that.
15   A.   And I'll go back to and generally I'm going to
16 say we follow our attorney's advice.
17   Q.   But you don't recall what his advice was in
18 this particular instance?
19     MS. ZYLSTRA: Object to form, misstates
20 testimony. You can answer.
21   A.   I don't remember him saying "no, you need to
22 do it."
23   Q.   And you don't remember him saying "yes, this
24 is a solid idea" or words to that effect; fair?
25   A.   I really don't want to characterize what he

Page 58

1 said, but it -- if he would have said "no, you need to
2 do it," probably would have been a broader discussion
3 and that, and if he would have said "yes, you should do
4 it" we would have done it.
5          I don't want to put words in his mouth whether
6 or not he thought it was a good idea. Was he saying
7 that he could defend our decision, or maybe he didn't
8 think it was the best decision but he could defend what
9 we were doing, that I don't know.
10    Q.   I need your best recollection of what John
11 Strange told you about your decision to not issue this
12 permit.
13          MS. ZYLSTRA: Same stipulation?
14          MR. INGRISANO: Yes.
15          MS. ZYLSTRA: Thank you.
16    A.   I'm not trying to be evasive here. I just
17 don't remember if he was saying good idea, bad idea, or
18 I can defend what you're doing. I just don't remember.
19          All I remember is we thought -- we said what
20 we thought was an issue and we ended up doing that.
21    Q.   Did any of your communications with
22 Mr. Strange on this particular issue, the non-issuance
23 of the Edgewood permit, did any of that occur in writing
24 either in the form of a memo or in the form of email or
25 any other form of written document?

Page 59

1    A.   I believe most of our discussions regarding
2 this were in person or over the phone, Zoom or whatever.
3    Q.   And seizing on the word "most," Mr. Hank, is
4 there, to your knowledge, any documents reflecting your
5 communications with Mr. Strange on the non-issuance of
6 this permit?
7          MS. ZYLSTRA: Objection. Foundation.
8    A.   I -- I cannot definitively say. I'm sorry,
9 there's just thousands of emails.
10    Q.   Oh, I know. I've seen a lot of them.
11          You had made a reference earlier that your
12 department can issue an outdoor lighting permit subject
13 to conditions. Do you recall saying that?
14    A.   Yes.
15    Q.   What sort -- well, what sort of conditions can
16 be imposed on an approval an issuance of an outdoor
17 lighting permit?
18          MS. ZYLSTRA: Object to form. You can answer.
19    A.   Well, the big condition is you must do it to
20 the approved plan.
21          We are not going -- so if somebody applies and
22 it's going through the conditional use process and
23 agencies are putting conditions on it, we would ask them
24 to meet all those conditions prior to the actual
25 issuance of any permit, lighting permit, the electrical

Page 60

1 permit to install the lights or the building permit to
2 build whatever they wanted to build. Those conditions
3 typically have to be fulfilled in order before we will
4 issue a permit that will go through this plan review
5 process outlined in Exhibit 3.
6          So again, we would not want to actually issue
7 the permit until all the agencies have approved and
8 said, yes, this is okay, you can go forward.
9          Because if now all of a sudden they find out
10 they have to do something significantly different on
11 some other aspect, they are going to go, well, if we
12 knew that, we never would have redone our outdoor patio
13 if we couldn't use it or something like that.
14    Q.   In conjunction with Edgewood's filing of this
15 permit and your department's review of it, Edgewood was
16 aware, were they not, of the position that Mr. Tucker
17 was taking regarding the permissible uses of the
18 athletic field?
19          MS. ZYLSTRA: Objection. Form, foundation.
20    A.   I believe they were aware, yes.
21    Q.   So your state of concern previously was that
22 if you approve a light, an outdoor lighting, and then
23 someone uses it in a way that's not permitted, they will
24 come back and be mad at you for granting their permit
25 application; correct?

Page 61

1          I think you mentioned, too, that there could
2 be a lawsuit about granting a permit application in
3 those circumstances; correct?
4    A.   You mean the applicant, if we issued the
5 permit to the applicant and then later we had to come
6 back and tell them, no, you can't actually use the
7 lights, I would view that as very problematic.
8    Q.   Yes. That was your concern with Edgewood was
9 that you would issue a light permit, they would not be
10 allowed to play games under those lights, and that they
11 would come back and be upset with your department for
12 granting that application, incurring the expense of
13 installing those lights, and then not being able to
14 fully use the field; is that fair?
15    A.   That is fair.
16    Q.   Is there any other reason beyond that, that
17 concern, that they would have unmet expectations; any
18 other reason to withhold that permit?
19          MS. ZYLSTRA: Object to form. You can answer.
20    A.   Not that I'm aware of.
21    Q.   So if Edgewood was aware of the limitations
22 the City was trying to impose on the use of their field
23 but wanted to proceed forward with the lights anyway,
24 they should be able to get that permit, don't you agree?
25          MS. ZYLSTRA: Object to form, foundation. You

16 (Pages 58 - 61)

Page 62

1 can answer.
2     A.  I'm always concerned when somebody wants to
3 give away their rights in order to do something.  Um --
4     Q.  Mr. Hanks -- I'm sorry, go ahead.  I thought
5 you were done.
6     A.  By agreeing, by saying yes and issuing the
7 permit to install the lights when we know their intended
8 purpose, we're perceiving the purpose so they can play
9 competitions, you know, on the field when we don't think
10 that they are allowed.  I think that in someways saying
11 that, while they are not allowed, we are allowing them
12 to do it anyways, and I struggle with that.
13     Q.  So is it your testimony today, sir, that the
14 decision to withhold the permit from Edgewood was to
15 protect Edgewood?
16         MS. ZYLSTRA:  Object to form.  You can answer.
17     A.  Partly.  And also allowing them to do it -- I
18 think by doing it, tacit approval that they can use the
19 lights as much as we say, no, you can't.
20     Q.  You mentioned the perception of the -- the
21 perceiving of the uses of the property, or the
22 perceiving of the uses of the lights.
23         What in the light application tells you about
24 what the proposed uses of the lights are?  Or is it just
25 self-explanatory from the application itself?

Page 63

1     A.  If you're lighting a -- well, I'll refer to it
2 as an athletic field.  I guess, I would question why
3 you're lighting it if it is not to conduct competitions
4 there.
5     Q.  What were the permitted uses of the Edgewood
6 athletic field as you understood it in 2019?
7     A.  That master plan, pre-master plan?
8     Q.  Do you know?
9     A.  What I'm asking is 2019 pre- or post-master
10 plan?
11     Q.  2019.  February of 2019.
12     A.  If the master plan was in effect, I believe it
13 was limited to practices and Phy Ed.
14         If it was after the master plan was dissolved,
15 it would have been governed at the time under what was
16 allowed under the institutional zoning.
17     Q.  So Edgewood was free to host practices and
18 hold practices on its field under the master plan as you
19 interpreted it; is that right?
20     A.  That's correct.
21     Q.  Practices, is there any prohibition on holding
22 practices at night under the master plan?
23         MS. ZYLSTRA:  Object.  Form, foundation.  You
24 can answer.
25     A.  Not that I'm aware of.

Page 64

1     Q.  So there is the potential that practices --
2 that a valid use under the master plan for that athletic
3 field, i.e. practices, can incorporate lights; correct?
4         MS. ZYLSTRA:  Objection.  Form, foundation.
5 You can answer.
6     A.  Could they practice under the lights?  As long
7 as the lighting met the 10.085, I'm not aware of.
8     Q.  So there is a permitted use under the master
9 plan that is consistent with the use of outdoor lighting
10 under the permit that was approved but withheld under
11 Exhibit 3; correct?
12         MS. ZYLSTRA:  Objection.  Form, foundation.
13 You can answer.
14     A.  I'm -- again, I'll answer this way.  I am not
15 intimately familiar with the master plan.  I would think
16 there is a better person to ask that question that has
17 broader knowledge of it, but not that I'm aware of.
18 Maybe I'm missing something.
19     Q.  Not that you're aware of what, sir?
20     A.  Is there something else in the master plan
21 that would prohibit it, I'm not aware of it.
22     Q.  Has anyone ever cited to you anything in the
23 master plan that would prohibit Edgewood from hosting,
24 utilizing its field for practices at night using lights?
25         MS. ZYLSTRA:  Objection.  Form.  You can

Page 65

1 answer.
2     A.  I don't -- I don't believe somebody has
3 brought that to my attention.
4     Q.  So to the best of your knowledge there is at
5 least one permitted use of the athletic field that could
6 incorporate outdoor lighting at nighttime; is that
7 right?
8         MS. ZYLSTRA:  Objection.  Form, foundation,
9 misstates testimony.  You can answer.
10     A.  I would say probably, yes.  In the same way if
11 they decided to hold classes in the evening and wanted
12 to do Phy Ed in the evening, I would say I'm not aware
13 of something that would prevent that.
14     Q.  To your knowledge, was any issue with punt
15 lighting on Edgewood's applications for outdoor lighting
16 ever brought to their attention in writing?
17     A.  I am not specifically aware of that.  I --
18 yeah, I'm not specifically aware if it was in writing.
19     Q.  So if an outdoor lighting is issued -- outdoor
20 lighting application permit is issued and granted,
21 outdoor lighting is used, is installed upon the Edgewood
22 field, and they use the lighting for practices but
23 exceed that under the master plan -- under your
24 interpretation of the master plan -- and also start
25 hosting games which you say are not allowed under the

17 (Pages 62 - 65)

Page 66

1 master plan at the time, your department has tools and
2 enforcement mechanisms at your disposal to make sure
3 that permitted uses under the master plan are adhered
4 to; correct?
5        MS. ZYLSTRA: Object to form.
6    A.  Yes.
7    Q.  And if, in fact, you utilized -- your
8 department utilized those tools in 2019 when you issued
9 official notices to Edgewood for hosting games on their
10 field; correct?
11   A.  That's correct.
12   Q.  So if Edgewood had lights on its field that's
13 used most of the time for practices but sometimes used
14 for games, you could issue an official notice to them
15 saying, hey, your using these lights for games is not
16 permitted because games are not allowed under the master
17 plan; correct?
18   A.  That is correct.
19   Q.  Would you be able to issue a lighting permit
20 subject to a condition that the lights not be used for
21 games?
22       MS. ZYLSTRA: Objection. Form, foundation.
23 You can answer.
24   Q.  Or athletic contests? Excuse me.
25   A.  Yeah, I like to think that I have a common

Page 67

1 sense approach, and I really struggle when somebody says
2 I'm going to do something that doesn't make sense.  I
3 really struggle with that.
4        When somebody says they are not going to use
5 -- that they are going to only install it and use it for
6 practice and they are not going to use it for games, I
7 struggle with that.
8        Because my knowledge of that, of teams
9 practicing, they are trying to -- at least the ones I'm
10 thinking of, they don't practice, you know, after a time
11 when lights would be needed.
12       They are -- they are trying to get their
13 athletes home so that they can be with their families
14 for dinner and they can work on homework and stuff like
15 that.
16       Generally, you know, I'm not aware of --
17 again, limited knowledge.  I'm not aware of schools that
18 practice under lights.
19   Q.  Your experiences that you're bringing to the
20 table, your conception of common sense, is that
21 reflected in Exhibit 1, Section 10.085, that would allow
22 you to withhold a permit because of those feelings that
23 you have?
24       MS. ZYLSTRA: Object to form.  You can answer.
25   A.  10.085 does not generally refer to use of the

Page 68

1 property.  It is, does it meet the lighting standards.
2        The zoning review of the property where they
3 are adding a change to the property, you know, it wasn't
4 a lit field before where they are just re-fixturing, now
5 they are changing the intensity of the use.
6        So if they are installing lights so they can
7 have athletic competitions and have fans there to
8 look -- you know, watch games at night, that falls under
9 the use category.  And it's my understanding that under
10 the requested permits at the time neither one was an
11 allowed use.
12   Q.  But there was a permissible use for practices;
13 correct?
14   A.  Correct.
15       MS. ZYLSTRA: Late objection.
16       THE WITNESS: I'm sorry.
17       MS. ZYLSTRA: That's okay.
18   Q.  MR. INGRISANO: So, in essence, you're
19 substituting your judgment for what makes sense to
20 Edgewood's ability to use its facility for a permissible
21 use; is that right?
22       MS. ZYLSTRA: Objection. Form, foundation.
23 You can answer.
24   A.  I'm not -- I'm not submitting my -- or using
25 my, what I'm going to say, my judgment.  I'm just

Page 69

1 looking at and going, I'm not aware of anybody that
2 installs lighting just for practices.
3   Q.  And that's a sufficient basis for you to
4 withhold that permit?
5       MS. ZYLSTRA: Objection. Form, foundation.
6 You can answer.
7   A.  I'm not aware that Edgewood at any time said
8 that they just wanted to install them for lighting --
9 excuse me, for practices.  It was for so that they could
10 host athletic competitions.
11   Q.  But Edgewood was informed of the City's
12 position, correct, that even if lights were provided
13 they would not be permitted to -- they would not be
14 permitted to host athletic competitions, contests on the
15 field, right?
16       MS. ZYLSTRA: Objection. Form, foundation.
17   A.  It's my remembrance that, yes, they were told
18 at least at times that they could not hold athletic
19 competitions on the field.
20   Q.  They did not withdraw their lighting
21 application in light of that disclosure by the City;
22 correct?
23       MS. ZYLSTRA: Objection. Form, foundation.
24 You can answer.
25   A.  Not that I'm aware of.

1    Q.  Did Mr. Tucker, to your knowledge, inform
2  Edgewood that approval of Edgewood's lighting
3  application in February of 2019 would not require an
4  amendment to the master plan?
5       MS. ZYLSTRA:  Objection.  Form.
6    A.  I -- I don't know that.
7       MR. INGRISANO:  Let's take a five-minute
8  break.
9       MS. ZYLSTRA:  Okay.
10       (Recess)
11       (Exhibit 5 marked)
12  BY MR. INGRISANO:
13    Q.  Sir, I'm handing you what's been marked as
14  Exhibit 5.
15       Have you ever seen this document before?
16    A.  Not that I recall.
17    Q.  Okay.  Were you aware that Edgewood submitted
18  a second or alternative application for outdoor lighting
19  on or around September 30th, 2019?
20    A.  Yes, I'm aware of that.
21    Q.  What was the status -- whatever happened to
22  that application?  Was that application approved and
23  issued, denied, or approved and withheld, or is there
24  some other option?
25       MS. ZYLSTRA:  Objection.  Foundation.  Go

1  ahead and answer.
2    A.  I -- I believe, but, again, under 10.085 it
3  was approved, but I still believe we had the same
4  problem with whether or not the installation of the
5  lights created a change in use or intensity.
6    Q.  Okay.  With respect to the contents of this
7  letter, though, you don't recall reviewing that
8  alternative application; is that right?
9    A.  No, I do not.
10    Q.  So with respect to this idea, in the last
11  sentence of the first paragraph, "The revisions lower
12  the height of the four light poles from 80 feet to 68
13  feet, reduce the foot candle illumination intensity, and
14  remove punt lighting."
15       You can't say whether those revisions were
16  actually contained within that application; is that
17  right?
18    A.  That is correct.
19    Q.  Further, where it says, "As a reminder, the
20  existing approved application is identical to an
21  application submitted and used to issue twelve 80 foot
22  light poles with punt lighting at James Madison Memorial
23  High School in 2018," you don't know if -- you can't say
24  one way or the other whether that existing approved
25  application was in fact identical to Memorial's

1  application?
2    A.  That is correct.
3       (Exhibit 6 marked)
4    Q.  MR. INGRISANO:  Sir, I'm handing you what's
5  been marked as Exhibit 6, a letter to Mike Elliot, dated
6  February 27, 2019 from Matt Tucker.
7       Have you ever seen this letter before?
8    A.  I believe so, yes.
9    Q.  So just as a reminder, Exhibit 3 shows that
10  lighting was reviewed and approved on February 27 by
11  Steve Rewey; correct?
12    A.  Yes.
13    Q.  And then on March 1, received a zoning review
14  from Christina Thiele; correct?
15    A.  That's correct.
16    Q.  An approval -- excuse me -- dated March 1,
17  right?
18    A.  That's correct.
19    Q.  So on the earlier date, February 27, this
20  letter from Mr. Tucker, Mr. Tucker is Christina Thiele's
21  supervisor, right?
22    A.  That is correct.
23    Q.  And in the second paragraph of Exhibit 6, the
24  first line says, "the City believes this permit can be
25  issued without requiring amendment of the approved 2014

1  master plan."
2       Do you see that?
3    A.  Yes.
4    Q.  The next paragraph goes on to say, "Based on
5  the information the City currently has regarding the
6  historical use of the facility, it would appear that the
7  intended use of the facility as outlined in your letter
8  to the 'Edgewood Family' and detailed in the 'Frequently
9  Asked Questions' document would conflict with the
10  approved 2014 master plan for the site, which limits use
11  of the facility to team practices, physical education
12  classes, page 42, Section 3.8, Open Space Plan."
13       Do you see that?
14    A.  Uh-huh.
15    Q.  I'm sorry?
16    A.  Yes, I'm sorry.
17    Q.  So this is a communication by Mr. Tucker
18  advising Mr. Elliot of the City's position with respect
19  to the use of the field; correct?
20       MS. ZYLSTRA:  Objection to form.  You can
21  answer.
22    A.  Yes.
23    Q.  In fact, the last paragraph says:  The purpose
24  of this letter is to inform you that the issuance of any
25  lighting permit under MGO Section 10.085 does not change

Page 74

1 the City's position that the use of the facility under
2 the master plan is limited to, quote, "team practices,
3 physical education classes," end quote.
4          Do you see that?
5    A.  Yes.
6    Q.  So this letter does not inform Edgewood that
7 the lighting permit is going to be withheld; is that
8 right?
9    A.  No, it does not.
10    Q.  In fact, it informs Edgewood in the second
11 paragraph that the City believes that its light permit
12 can still be issued without requiring amendment of the
13 master plan; is that right?
14    A.  It appears to read that way, yes.
15    Q.  And so at what point in time after February 27
16 does the City change its position to decide that it
17 could not issue the permit given the contents of the
18 master plan?
19    A.  As to a specific date, I'm sorry, I just don't
20 know that.
21    Q.  Are you aware of the process by which -- so in
22 this letter they're saying, hey, you can't -- in this
23 letter they are saying you can get your lights without
24 needing to approve the master plan, but the subsequent
25 position by the City is that, no, you have to amend the

Page 75

1 master plan to get your lights; isn't that correct?
2          MS. ZYLSTRA:  Objection.  Form.  You can
3 answer.
4    A.  That is correct to my memory, yes.
5    Q.  And you don't know -- let me ask you this:
6          What did Mr. Tucker tell you about why the
7 City was changing its position in this regard?
8          MS. ZYLSTRA:  Objection.  Form.  You can
9 answer.
10    A.  Specifics, I'm struggling to remember.  But I
11 believe it was just a broader discussion that, you know,
12 why would you install lighting if you are not going to
13 have athletic competitions there.
14    Q.  Who was involved in that broader discussion to
15 your knowledge?
16    A.  I believe Matt and John Strange.
17    Q.  Did anyone from outside of your department
18 weigh in to either you or, to your knowledge,
19 Mr. Tucker, to provide input that contributed to this
20 change in position?
21    A.  People weighed in all the time about this
22 issue.  Did it have a material impact on the decision we
23 made?  I don't think so.  We followed what we believed
24 with the master plan and ordinances set at the time.
25    Q.  Did any city council alders or city council

Page 76

1 alders-elect contact your office, to your knowledge,
2 after February 27 and before your decision to make -- to
3 withhold the permit, to your knowledge?
4    A.  Specifically, not that I remember, but I'm
5 sure there was.
6    Q.  Do you recall receiving any input -- prior to
7 making the decision to withhold the permit, do you
8 recall receiving any input from members of the city
9 Common Council?
10    A.  Not specifically that I recall.  I'm sorry.
11 It's just -- again, there is -- there were hundreds of
12 emails, I'm sure you're well aware of, through open
13 records request where people weighed in on this.
14          And I guess I'll be blunt.  Even as much as an
15 alder wants to think that they can impact what we're
16 doing, I told -- I've told alders "no" many times,
17 because I didn't believe the ordinances or whatever was
18 defensible in what they wanted us to do.
19          I had an alder once saying "I'd hate to
20 overrule you," and my response was "you can't," because
21 they cannot.  I'm not going to do something that I
22 didn't believe I could defend under broke laws.
23    Q.  Did Exhibit 6 and the position that the permit
24 could be issued without requiring amendment versus the
25 subsequent position that amendment would be required,

Page 77

1 did that involve you overruling Mr. Tucker in any way?
2    A.  No, we tried to come to consensus and agree.
3 I never wanted to be in a position where I did not
4 agree with, let's say, something Matt was doing, and
5 say, yeah, I totally disagree with him but we did it
6 anyways.
7    Q.  So you two were in accord on the decision to
8 change this position?
9    A.  I believe so, yes.
10    Q.  Do you have any recollection of particular
11 ordinance code sections that you relied upon in deciding
12 that, no, you couldn't issue this permit without
13 amendment to the master plan, what code provisions
14 vested you with that ability?
15    A.  Again, if we're talking Campus-Institutional,
16 it would have been the zoning code.  Specifically, not
17 even close.
18    Q.  All right.
19          THE WITNESS:  Can I ask, do they have like an
20 outdoor racquetball court here or something?
21          MS. ZYLSTRA:  Let's go off the record.
22          (Discussion off the record)
23    Q.  MR. INGRISANO:  I'm going to ask you a
24 procedural question here for a minute.
25    A.  Sure.

Page 78

1    Q.  An application under an existing ordinance is
2  submitted on Day One and is under review, hasn't been
3  granted, hasn't been issued.
4        Day Two, the ordinance changes and changes the
5  analysis of the application that had been issued on Day
6  One.
7        Is that application assessed and judged under
8  the ordinances as they existed at the time of the
9  application or are they assessed and judged as of the
10  code during the time of analysis?
11      MS. ZYLSTRA:  Objection.  Form, foundation,
12  calls for a legal conclusion.  You can answer.
13    Q.  In your experience administering and
14  interpreting the municipal code.
15      MS. ZYLSTRA:  Same objection.  You can answer.
16    A.  Okay.  I will respond this way:
17        Under the building code, if you submit
18  something on a specific date, it is reviewed under the
19  building code that was applicable at that time.
20        I'm sorry, I don't know what the zoning
21  code -- if there is something in there that says, no, it
22  has to meet it when it was approved, that I don't know.
23        The building code, a lot of times there was an
24  -- if there was a change coming, people were rushing to
25  get plans in under the -- you know, under that date,

Page 79

1  because maybe a more stringent requirement was coming.
2  I just can't speak to zoning.
3    Q.  Mr. Hank, is there anything you would have
4  done differently with the two Edgewood permits you have
5  seen today?
6      MS. ZYLSTRA:  Objection.  Form, foundation.
7  You can answer.
8    A.  No, I don't think so.
9    Q.  You would have, again, chosen to withhold
10  Edgewood's lighting permits?
11      MS. ZYLSTRA:  Objection.  Form, foundation.
12  You can answer.
13    A.  As I know them right now, the answer is yes.
14    Q.  We talked earlier about the
15  Campus-Institutional District.  In general, I recall you
16  saying that you really didn't have anything to do with
17  the creation of the Campus-Institutional District zoning
18  code criteria.
19    A.  No.
20    Q.  So you're not familiar with or don't apply
21  kind of on a daily basis the idea of the uses that are
22  described -- permitted uses that are described in the
23  Campus-Institutional districts?
24    A.  Not at all.
25    Q.  You didn't have any involvement, did you, in

Page 80

1  the drafting, review, or adoption of Edgewood's master
2  plan in 2014?
3    A.  Definitely not.
4    Q.  In your job, though, do you recognize a
5  distinction between a master plan in the
6  Campus-Institutional District context versus a master
7  plan in the planned development, or PD, district
8  context?
9      MS. ZYLSTRA:  I'm sorry.  Can you repeat that
10  question for me?
11      (Record read)
12    A.  I'll answer it this way:  My limited
13  knowledge, the master plan is the zoning.  So I'm not
14  sure if it really makes any difference under one or
15  another.
16    Q.  You're not familiar, though, with the criteria
17  or the purposes or the objectives of a
18  Campus-Institutional master plan versus a PD master
19  plan?
20    A.  No.
21    Q.  Prior to 2019, had you ever looked at
22  Edgewood's master plan?
23    A.  I don't remember the specific date, but I
24  became aware of it when lighting the field first became
25  an issue.  I don't remember what that date was.

Page 81

1    Q.  Sure.  So did you review the master plan in
2  that context?
3    A.  There were specific things that were discussed
4  under what was allowed under the master plan.
5    Q.  My question was geared towards did you
6  actually review a copy of the a master plan at that
7  time?
8    A.  If I remember correctly, it was brought up on
9  a monitor in Mr. Tucker's office.
10    Q.  Do you recall any particular sections or
11  provisions of that master plan that you reviewed?
12    A.  I think, as discussed earlier, we looked at
13  the section that pertained to open space and also some
14  general provisions about lighting.
15    Q.  The general provisions about lighting,
16  however, weren't part of your rationale at any time for
17  why those permits were withheld; is that right?  So far
18  you've only talked about open spaces --
19    A.  I don't think so.  I believe it was pretty
20  much with regards to the uses that was outlined in the
21  open space.
22        You know, the lighting, if I remember,
23  referred to like pedestrian walkways and building
24  lighting, which, you know, that it had to meet.  It
25  should be dark sky compliant, things of that nature.

21 (Pages 78 - 81)

Page 82

1    (Exhibit 7 marked)
2    Q.   MR. INGRISANO:  Sir, I'm going to ask you if
3  you can recognize this document, Exhibit 7, as the first
4  page being again the City of Madison Site Plan
5  Verification.
6          But, generally, do you recognize this as being
7  the Madison Edgewood Master Plan that was approved in
8  2014?
9    A.   Yes.
10   Q.   Go to the Open Spaces page.  Bear with me for
11  a minute.  It should be after page 15, Section 3.8, sir.
12   A.   Page 15?
13   Q.   No, no, it's Section 3.8.  It's going to be
14  after -- hang on, I'm about there.  All right.  Page 42
15  on the bottom there.  This says, Section 3.8, Open Space
16  Plan.  Do you see that?
17   A.   Yes.
18   Q.   And you see down there is a subsection midway
19  down the first column entitled "Open Spaces"?
20   A.   Yes.
21   Q.   No. 1, Athletic field owned by Edgewood High
22  School.  Used for team practices, comma, physical
23  education classes?
24   A.   Yes.
25   Q.   Is that the language that the City has relied

Page 83

1  upon, to your knowledge, to withhold permits for the
2  City lighting?
3        MS. ZYLSTRA:  Objection.  Form, foundation.
4  You can answer.
5    Q.   For the outdoor lighting, excuse me.
6    A.   Under the master plan criteria, yes.
7    Q.   And this is the language that the City has
8  relied upon for its position in 2019 that athletic
9  contests could not be played on the athletic field; is
10  that right?
11       MS. ZYLSTRA:  Object to form, foundation.  You
12  can answer.
13   A.   I am not sure to be honest with you if it was,
14  at that time, Campus-Institutional that was in play at
15  that point, and I don't think this would then come into
16  play.
17       Sorry, again, master plan and
18  Campus-Institutional, where that line is when one ceased
19  to be in effect and when the other one started, I don't
20  know what that date is and which one governed.
21   Q.   Sure.  Exhibit 6, sir, Mr. Tucker's letter,
22  Exhibit 6, right here.
23   A.   Yeah.
24   Q.   He's citing 3.8, the Open Space Plan, as being
25  what limits Edgewood from its ability to host athletic

Page 84

1  contests on that field; correct?
2    A.   Yes.
3    Q.   And, in fact, he's saying that 3.8, page 42,
4  says that the use of that athletic field is limited
5  to team practices and physical education classes;
6  correct?
7    A.   That's what it's saying.
8    Q.   Is there any other provision in this document,
9  master plan -- I'm asking you to look at the
10  Campus-Institutional code.
11       Any other provision in this master plan, any
12  other provision, any other page that to your knowledge
13  the City has relied upon for the idea that Edgewood
14  cannot play games, athletic contests on its athletic
15  field?
16   A.   To my knowledge, no.
17   Q.   And it was the prohibition on athletic
18  contests in the master plan as you guys interpret it,
19  the City, that caused the withholding of the light
20  permit; correct?
21       MS. ZYLSTRA:  Objection.  Form, foundation.
22  You can answer.
23   A.   Under the Open Space Plan, yes.
24   Q.   And as the director of the building inspection
25  department that is the head of that unit which oversees

Page 85

1  the zoning administrator, that was your understanding of
2  the City's position on why games couldn't be played and
3  why lights were withheld; correct?
4        MS. ZYLSTRA:  Objection.  Form, foundation.
5  You can answer.
6    A.   Again, the answer is yes, assuming that it was
7  the master plan that was governing the decision at that
8  time.
9    Q.   The master plan is what Mr. Tucker cited in
10  his February 27, 2019 letter in Exhibit 6; correct?
11       MS. ZYLSTRA:  Objection.  Form, asked and
12  answered.  You can answer again.
13   A.   You're asking me to --
14   Q.   I just asked you what Mr. Tucker cited in his
15  letter.
16   A.   His letter he cites it, yes.
17   Q.   Has Mr. Tucker ever expressed to you any
18  additional grounds by which to disallow games that
19  aren't cited in Exhibit 6?
20   A.   Not that I'm aware of.
21   Q.   He never shared any other reasons that might
22  be out there with you?
23   A.   Not that I'm aware of.
24   Q.   Did he share any other reasons beyond 3.8 for
25  withholding lights?

22 (Pages 82 - 85)

Page 86

1        MS. ZYLSTRA:  Objection.  Form, foundation.
2 You can answer.
3        A.   Not that I'm aware of.
4        Q.   As you read that page, Open Spaces, bullet
5 point No. 1 on the use of the athletic field, did you
6 agree that that provision restricted the use of the
7 athletic field, that content of the master plan
8 restricted use of the athletic field?
9        A.   Yes, I agreed with that.
10       Q.   And did you understand master plans at that
11 point of everything in a master plan is a restriction on
12 how the property is supposed to be used?
13       MS. ZYLSTRA:  Objection.  Form.
14       Q.   That was a bad question.
15       If a master plan denotes -- based on what you
16 know about master plans, do you have an understanding
17 that if a master plan says that a field is going to be
18 used for an activity that is the only activity that
19 it can be used for?
20       MS. ZYLSTRA:  Objection.  Form, foundation.
21 You can answer.
22       A.   If somebody -- if they came to us and said we
23 want to do X with it, I think we would look at it and
24 just have a discussion and say under this -- when I look
25 at this and see that athletic field owned by Edgewood

Page 87

1 High School used for team practices, physical education
2 classes, and trying to say that athletic competition is
3 being held there, I really struggle saying that that
4 wasn't -- on why that would be omitted.
5        Q.   So the master plan indicates a project's
6 going to have a proposed future use of being a flag
7 football field.
8        Under your understanding of master plans, that
9 space can only be used for flag football; is that
10 correct?
11       MS. ZYLSTRA:  Object to form, foundation.  You
12 can answer.
13       A.   So if it says used for flag football and they
14 wanted to do something that would be comparable to flag
15 football, I could see where you would maybe have a
16 broader discussion and say could we approve it under
17 that.
18       I, again, find the omission of team practices
19 and physical education and omitting that they are going
20 to have competitions there seems challenging.
21       Q.   What's your definition of what a team practice
22 is?
23       MS. ZYLSTRA:  Object to form.  You can answer.
24       A.   The gathering of the team and working through
25 plays, plans, practicing those plays, conditioning.

Page 88

1        Q.   When you played football at Edgewood did you
2 ever participate in a scrimmage with another team?
3        A.   On that field, I don't think so.
4        Q.   Anywhere?
5        A.   Oh sure.
6        Q.   Is a scrimmage, is that an athletic contest or
7 is that a practice?
8        MS. ZYLSTRA:  Objection.  Form, foundation.
9 You can answer.
10       A.   I would -- I would say that it is a practice.
11       Q.   Based on what?
12       A.   Not really concerned about the score.
13       Q.   So it's kind of like an exhibition?
14       MS. ZYLSTRA:  Objection.  Form, foundation.
15 You can answer.
16       A.   I wouldn't go that far.  An exhibition means
17 you're still trying to -- you may consider whether or
18 not how many -- you know, who scored and how many
19 touchdowns and that.
20       My remembrance of scrimmages, you just line up
21 and one plays and you get to see how your particular
22 offense or defense is doing and how players are doing.
23 I don't really consider it a competition.
24       Q.   Got it.  Your department issued a permit in
25 2015 for the electrical for the installation of the

Page 89

1 scoreboard on the Edgewood field; correct?
2        MS. ZYLSTRA:  Objection.  Form, foundation.
3 You can answer.
4        A.   I don't think we actually did it for a
5 scoreboard.  I thought it was for underground conduit.
6        So the -- it was my understanding that the
7 practice field was going to be installed, the turf for
8 that, and if you're ever thinking about doing lighting
9 or anything in the future, you would -- you would want
10 to get those pipes in place so you did not have to
11 create a mess later.
12       Q.   So are you saying that you were unaware that
13 Edgewood installed a scoreboard in 2015?
14       A.   I'm not -- I'm not aware that the permit
15 specified a scoreboard.
16       Q.   Were you aware that Edgewood installed a
17 scoreboard in 2015?
18       A.   I heard they did that later.
19       Q.   You heard later that they did that or --
20       A.   I began -- I --
21       Q.   I'm sorry, sir, you have to let me finish my
22 question.
23       A.   Sure.
24       Q.   When you heard it later, you learned later
25 that they installed it or you learned that they

Page 90

1  installed it later than in 2015?
2       MS. ZYLSTRA: Object to form, but go ahead and
3  answer.
4       A.  I became aware that it was there when we
5  received complaints from people regarding the buzzer
6  that was built into it.
7       And prior to that, I don't think I knew that
8  they had a scoreboard there.
9       Q.  Would you agree with me that the scoreboard,
10 if you don't keep score and are not worried about score
11 in practices, you don't need a scoreboard for practices;
12 is that right?
13      MS. ZYLSTRA: Objection. Form, foundation.
14 You can answer.
15      A.  Necessary?  I know some places use it.  You
16 know, I think of basketball, you know, where teams will
17 be -- you know, a team may be playing, you know, itself,
18 JV against varsity.  They will have the clock running.
19      You know, I could see where they might do
20 something like that and have somebody acting as the
21 referee and doing, okay, it's 2nd and 3, and, you know,
22 they may possibly be doing that.  I don't know.
23      Q.  So your installation of the scoreboard is not
24 a violation of the master plan at that time as of early
25 2019 to your understanding?

Page 91

1       MS. ZYLSTRA: Object to form, foundation.
2       A.  That, I don't specifically -- I don't know the
3  master plan well enough to say whether or not that's a
4  violation.
5       Q.  Does it make sense to you to have a scoreboard
6  installed for practices but then not have lights
7  installed for practices?
8       MS. ZYLSTRA: Objection. Form, foundation.
9       Q.  I'll re-ask that question.
10      What I'm hearing you say is that you can
11 understand how you're going to have a scoreboard for
12 practice, but you don't agree that you would want to
13 have lights for practice.
14      Is that a fair statement of what your
15 understanding is?
16      MS. ZYLSTRA: Objection. Form.
17      A.  Again, I can think of why an institution may
18 want to have a scoreboard there so that they can
19 simulate game conditions.
20      But game conditions, you know, for a team
21 could be -- you know, that could be during the day
22 during practices.  Again, I don't think it necessarily
23 means that one leads to another.
24      Q.  So the ability to simulate a game during
25 practice is more important than the scheduling

Page 92

1  considerations of being able to hold practices later in
2  the day.  Is that what I'm hearing you say?
3       MS. ZYLSTRA: Objection. Form, foundation.
4  You can answer.
5       A.  Can you try that one more time?
6       MR. INGRISANO: Can you read that back,
7  please.
8       (Record read)
9       A.  I don't necessarily think one leads to the
10 other.  I believe that -- you know, again, I'll go back
11 to, I can see where an institution would want to have a
12 scoreboard and simulate game conditions during a
13 practice.
14      Q.  If the master plan just simply said "athletic
15 field," period, didn't go on to that next sentence,
16 would they have been permitted to install lights?
17      MS. ZYLSTRA: Objection. Form, foundation.
18 You can answer if you know.
19      A.  It certainly would make it easier, I would
20 think.
21      Q.  Would they have been permitted to play games,
22 athletic contests on that field?
23      MS. ZYLSTRA: Same objections.
24      A.  I would think so.
25      Q.  Do you have any understanding -- has anyone

Page 93

1  from Edgewood ever told you that it was Edgewood's
2  intent in their master plan to limit the use of the
3  field team practices and physical education classes?
4       A.  Nobody has said that to me.
5       Q.  To your knowledge, must a master plan identify
6  the specific uses that an open space or a sports
7  recreational facility is going to be used for?
8       MS. ZYLSTRA: Objection. Form, foundation.
9  You can answer.
10      A.  If it said used for team practices, physical
11 education, and football games, and then they come back
12 later and somebody is playing field hockey on it, I
13 think you could maybe say, you know, they didn't
14 envision -- they weren't playing field hockey at the
15 time, they are now doing field hockey.
16      You know, when I was there they didn't play
17 soccer.
18      Q.  No one played soccer in '75.
19      A.  What's that?
20      Q.  No one played soccer in America in '75.
21      A.  Yes.
22      Q.  Let me put a finer point on it, though.
23      If the master plan had just said athletic
24 fields, period, to your understanding of how master
25 plans work, would the City have gone back and required

Page 94

1 them in more detail to specify the use of that space?
2      For example: No, no, no, Edgewood, you have
3 to identify more specifically than "athletic fields,"
4 what it's going to be used for.
5      MS. ZYLSTRA: Objection. Form, foundation.
6 You can answer.
7      A. If it said that, I would think it would be a
8 lot easier to approve it.
9      Q. My question is, to your understanding to how
10 things work in your world, the division -- the
11 department that you're the head of, I'm asking if you
12 have an understanding as to whether athletic fields,
13 period, without that next sentence, whether that would
14 have been acceptable for the City's position as to the
15 description of the use of that space?
16      MS. ZYLSTRA: Objection. Foundation, form.
17 You can answer.
18      A. I would certainly want to involve the city
19 attorney's office and ask them to have a broader
20 discussion on this to make sure that they felt that if
21 we made a decision one way or another and we were going
22 to end up in court, that they could support the decision
23 that we were making.
24      Q. So your answer to my question is that you
25 believe that the city attorney's office would be brought

Page 95

1 in during the review and approval phase of a master plan
2 if the contents weren't specific enough. Is that what
3 your answer is, sir?
4      MS. ZYLSTRA: Objection. Form, foundation.
5 You can answer.
6      A. I would want to, yes.
7      Q. Is that the position of your zoning
8 administrator of the planning division as you're aware
9 of it?
10      MS. ZYLSTRA: Objection. Form, foundation.
11      A. I'm not going to speak for him.
12      (Exhibit 8 marked)
13      Q. MR. INGRISANO: I'm handing you what's marked
14 as Exhibit 8.
15      A. Uh-huh.
16      Q. Do you recognize this, sir, as an email
17 exchange between you and a Mr. Ethan Brodsky?
18      A. Uh-huh.
19      Q. Sorry, yes?
20      A. Yes, I'm sorry.
21      Q. That's okay. You're doing a good job.
22      And it's copied to Mr. Matthew Tucker;
23 correct?
24      A. Yes.
25      Q. And in this email exchange, dated from May of

Page 96

1 2019, Mr. Brodsky is raising the issue of the asserted
2 noncomplying use of the athletic field, correct, and
3 what basically your department is going to do about it?
4      MS. ZYLSTRA: I'll object to form. You can
5 answer. Please feel free to review the document.
6      THE WITNESS: Please, yes.
7      A. Okay. So what's your question?
8      Q. So this is a letter where -- well, let me put
9 a finer point on it.
10      First page, bottom of first page, one, two --
11 three paragraphs into Mr. Brodsky's email:
12      "Has the City position changed from what was
13 expressed in the letter from Attorney Strange to
14 Edgewood's attorneys on 3/21 and in the notice of
15 violation to Edgewood on 4/1?"
16      Do you see that?
17      A. Yes.
18      Q. So he's following up to see what your position
19 is on what's going on with Edgewood and its noncomplying
20 use of its field, right?
21      A. Yes.
22      Q. And you take the opportunity to describe the
23 difference between a citation and an official notice; is
24 that right?
25      A. That is correct.

Page 97

1      Q. What is the difference between those two
2 things?
3      A. An official notice is basically a warning. We
4 observe a violation, correct it by such and such a date,
5 and there is no penalty. If you don't, then we'll go
6 back from when we first saw it until you get into
7 compliance.
8      Q. Got it.
9      A. The citation is a ticket. It's a one-day
10 fine. So we could have -- say, if we chose somebody --
11 a great example is somebody doesn't shovel their
12 sidewalk, they get a ticket for that one day because
13 they didn't shovel their sidewalk.
14      The next day if we went there and the same
15 snow is there we could ticket them again.
16      Q. Got it. Do you have to issue an official
17 notice before issuing a citation?
18      MS. ZYLSTRA: I'll object to form. You can
19 answer.
20      A. No, you do not. There is one ordinance, the
21 snow ordinance, that says that enforcement shall be
22 commenced with a citation. I believe that's the only
23 one that's listed that way.
24      We could, for something really egregious, go
25 straight to a ticket; here's your ticket, what you did

Page 98

1 was really bad, we're going to follow up in two weeks
2 and if it's still going on we may issue another -- or we
3 would issue another ticket.
4     Q.   And then Exhibit 8, second paragraph of your
5 email back to Mr. Brodsky, "The City has not changed its
6 position.  We do not believe their master plan allows
7 athletic competitions.  Only team practices and physical
8 education classes are allowed."
9         Do you see that?
10     A.   That's correct.
11     Q.   You said the City has not changed its
12 position, we do not believe.  Is the "we" there, does
13 that refer to the City?
14     A.   Yes.
15     Q.   So you're speaking on behalf of the City of
16 Madison?
17     A.   At that point, yes.
18     Q.   At any point have you not spoken for the City
19 of Madison in your statements to either Edgewood or the
20 citizens of Madison on this issue?
21         MS. ZYLSTRA:  Objection.  Form, foundation.
22 You can answer.
23     A.   I believe I have only given what is my
24 position as a City employee.
25     Q.   But you did say that "we" refers to the City

Page 99

1 in Exhibit 8?
2     A.   Yes.
3     Q.   Okay.  Who is Ethan Brodsky?
4     A.   He's a neighbor of Edgewood.
5     Q.   Was Mr. Brodsky a source of any information
6 for you, your department, that was relied upon in making
7 your decision either to withhold lights or to issue the
8 official notices?
9         MS. ZYLSTRA:  Object to form.  You can answer.
10     A.   Is he -- can you ask that question again?  I
11 just want to make sure.
12         MR. INGRISANO:  Yeah, can you re-read that,
13 please.
14         (Record read)
15         MS. ZYLSTRA:  Same objection.  You can answer.
16     A.   Certainly not to withhold lights.  I can't
17 think of anything that he told us.
18         We would not rely on -- I think on what he's
19 telling us to look at the master plan.
20         I'm not sure if it was him or some other
21 neighbor that brought to our attention that they were
22 playing -- I think it was soccer games there at the
23 time, which we were not aware of.  And since that was
24 brought to our attention we went and looked at it, just
25 like any other complaint.

Page 100

1     Q.   So prior to the soccer games being brought to
2 your attention in 2019, were you or anyone in your
3 department aware of any games being played, any athletic
4 contests being played on that field since the
5 institution of the master plan?
6         MS. ZYLSTRA:  Objection.  Form, foundation.
7 You can answer.
8     Q.   To your knowledge.
9     A.   My knowledge, no.
10     Q.   So as far as you know, the Edgewood games in
11 2019 were the first time that you had ever heard -- and
12 since 2013, 2014 -- that games were being played on the
13 field; is that right?
14     A.   My personal knowledge, yes.
15     Q.   And no one has told you that any -- no one
16 from your department, no one that you supervised, has
17 told you that they were aware of games being played
18 earlier than that, that they learned earlier than these
19 games in 2019 that there were, in fact, athletic
20 contests being held onsite?
21         MS. ZYLSTRA:  I'll object to form.  You can
22 answer.
23     A.   Not that I'm aware of.  If somebody like --
24 say, when the soccer issue came up, and if somebody said
25 to one of my staff, oh, yeah, they did it last year

Page 101

1 also, I would not have knowledge of that.
2     Q.   Sure.  I'm only asking what you have knowledge
3 of.
4     A.   Yeah.  No, I am not aware of prior to when the
5 soccer issue came up, I am not aware of athletic
6 competitions being held there.
7     Q.   Sure.  So going back to your time even before
8 Edgewood became Campus-Institutional, even before the
9 master plan, dating all the way back to your time as a
10 student at Edgewood, these complaints about soccer games
11 in 2019 were the first time that you had ever heard
12 about games being played on that field; is that correct?
13     A.   I have subsequently heard that like in --
14     Q.   Sir, I asked you about the first time you
15 heard, all right?  I am not asking what you may have
16 learned since then.
17         These reportings in 2019, the first time you'd
18 ever heard of games being played on that field.
19         MS. ZYLSTRA:  Object to form.  Go ahead.
20     A.   Yeah, I have heard that when the issue of the
21 master plan and what it could be used for somebody said,
22 well, they were playing games in the '20s and '30s.  So
23 I had heard that from, I think, somebody at Edgewood or
24 whatever, that a game -- a couple of games had been
25 played there.  I have no idea how many.

Page 102

1 From like my time there in '70 through '75,
2 yeah, I think the first time I'm aware of a game being
3 played there was during that soccer issue.
4 Q. Sure. So we're talking about the official
5 notices and the citations.
6 If lights had been installed on the field and
7 the field was used for games or athletic contests,
8 contrary to what you believe the master plan provides,
9 you would be able to issue a citation or an official
10 notice for that breach; correct?
11 MS. ZYLSTRA: Objection. Form, asked and
12 answered. You can answer.
13 A. Yes.
14 (Exhibit 9 marked)
15 Q. MR. INGRISANO: Sir, do you recognize that as
16 an official notice issued by your department, dated
17 April 1, 2019?
18 A. Yes.
19 Q. Jacob Moskowitz, was he an employee that
20 reported to you at that time?
21 A. He directly reported to Matt, but, yes, his
22 ultimate supervisor, yes.
23 Q. Can you describe, sir, the process that
24 resulted in this particular official notice? How did
25 this official notice come to be, if you know?

Page 103

1 A. It's my remembrance that we received
2 complaints that they were actually holding athletic
3 competitions there, so Jacob went there to observe.
4 There was -- you could see online when games
5 were scheduled, so he went there at specific times when
6 supposedly a game would be playing to see if they were
7 actually playing.
8 Q. So the games were -- the existence of the
9 games were posted online?
10 A. It's my understanding.
11 Q. On what?
12 A. Something like that. It was -- maybe it was
13 -- it's my memory that there was some electronic posting
14 of it and we became aware of it through there.
15 It may have been from a neighbor that
16 forwarded something to us, but I believe it was an
17 electronic posting.
18 Q. Do you know when the City first developed its
19 interpretation that the Edgewood Master Plan prohibited
20 athletic contests?
21 A. No.
22 MS. ZYLSTRA: Object. Foundation. You can
23 answer.
24 A. I'm sorry.
25 Q. Prior to, but before that time in which you

Page 104

1 first learned that it was -- you know, before you first
2 suggested that the master plan prohibited games, do you
3 recall that your department received any complaints
4 about games being played on the field? Were there ever
5 any complains about games being played in 2018, 2017,
6 2016 to your knowledge?
7 A. To my knowledge, no.
8 Q. Is it your understanding that Edgewood first
9 started playing games on its field in May -- April-May
10 of 2019? Or are there games that were being played
11 prior to that that you weren't aware of?
12 MS. ZYLSTRA: Object to form, foundation.
13 A. So looking at this document --
14 Q. I'm not asking about the document, sir. I'm
15 asking about your state of knowledge.
16 I'm asking you about whether it's your
17 understanding that these May games that are the subject
18 of Exhibit 9 were the first such instance of games being
19 played, or whether based on what you've learned even
20 since then that there were other games being played on
21 the field that you simply either can't recall or weren't
22 aware of?
23 A. Again, I'm looking at this, it says it's
24 inspected by Jacob on 3/27/2019. Based on this, I would
25 believe that there was a game being played then.

Page 105

1 Q. Okay. So prior to March 27, is it your
2 understanding that March 27 was the first time that
3 Edgewood was starting to use its fields for games or
4 that there were other games that had been played even
5 before that?
6 MS. ZYLSTRA: Objection. Form, foundation.
7 You can answer.
8 A. I would believe that there should have been a
9 game prior to that because we went out there on the 27th
10 as a result of a complaint that they were playing games
11 there.
12 Q. That makes sense. 2019, was that the first
13 time then --
14 A. Yes.
15 Q. -- that you believe Edgewood ever started
16 using its fields for games?
17 A. Yes.
18 Q. The complaint that's under 28.097,
19 "Discontinuing holding athletic contests on the athletic
20 field on 2219 Monroe Street."
21 Do you see that?
22 A. Uh-huh.
23 Q. Is that yes?
24 A. Yes, I'm sorry.
25 Q. "Campus Master Plan states that the athletic

27 (Pages 102 - 105)

Page 106

1 field is used for team practices and physical education
2 classes," period.
3        Do you see that?
4    A.  Yes.
5    Q.  It says, "The Master Plan can be amended
6 pursuant to MGO 28.097(10)."
7        Do you see that?
8    A.  Uh-huh.
9    Q.  Is that yes?
10   A.  Yes.
11   Q.  Do you know who assigned Mr. Moskowitz to
12 investigate this situation that resulted in the official
13 notice?
14   A.  Jacob could have self-assigned.  The complaint
15 is in the system.  Or Matt Tucker could have given it to
16 him.
17       Jacob was the lead worker for the field staff,
18 so if it was there he could have just said, "I'll do
19 this myself," if it was in the tank of things to be
20 looked at.  Or Matt could have said -- it would be a
21 good question for Matt when you deal with him on Friday.
22   Q.  Does every complaint from a neighbor or a
23 citizen of the City of Madison result in an
24 investigation like what Mr. Moskowitz performed here?
25       MS. ZYLSTRA:  Objection.  Form, foundation.

Page 107

1 You can answer.
2    A.  If it alleges a violation of something that
3 would be in a violation, I would say yes.  The -- if
4 somebody -- you said a complaint.
5        If somebody complained about something that
6 wasn't a violation of city ordinance we're not going to
7 go look at it, at least my department isn't.
8    Q.  So every complaint received by your office,
9 does that result in somebody taking a look to see if
10 that complaint arises to the level of a violation of the
11 code?
12       MS. ZYLSTRA:  Objection.  Form, foundation.
13 You can answer.
14   A.  I want to figure out how -- I'm going to say
15 yes, there -- the exception to that would be, you
16 complain today on something, we issue an official
17 notice, they have got 30 days to comply, and if every
18 thing single day after that we get a complaint, we're
19 not going to go out and keep looking at it because we
20 have already seen it, we have had a due date of when
21 it's supposed to be done, we're not going to keep
22 looking at it during that timeframe.
23       But if somebody -- generally, I'm going to say
24 if somebody calls up and says "my neighbor hasn't cut
25 their grass and it's 10 inches long," yes, we're going

Page 108

1 to go look at that.
2        MS. ZYLSTRA:  Counsel, can we take a really
3 quick bathroom break?
4        MR. INGRISANO:  Sure.  Absolutely.
5        (Recess)
6 BY MR. INGRISANO:
7    Q.  Mr. Hank, do you know what particular
8 complaints or referrals came into your office that
9 resulted in the investigation on 3/27/2019 in Exhibit 9?
10   A.  No.
11   Q.  Do you know was there more than one to your
12 knowledge?
13   A.  I believe so, yes.
14   Q.  Any from members of the Common Council?
15   A.  Not that I'm aware of.
16   Q.  Prior to -- did you know when that complaint
17 came in?  Or that one or more complaints that resulted
18 in this investigation, do you know when those complaints
19 came in?
20   A.  Other than probably mid-March, no.
21   Q.  Before mid-March, in or before mid-March to
22 your knowledge had Mr. Moskowitz been apprised that
23 games on the -- or athletic contests on the athletic
24 field would be considered a violation of the master
25 plan?

Page 109

1    A.  I have no idea if he's had discussions with
2 Matt and John whether or not it would be, I just don't
3 know.
4    Q.  Again, you don't know if Mr. Moskowitz's
5 investigation was self-assigned, meaning he chose to do
6 it himself, or whether it was assigned by Mr. Tucker; is
7 that fair?
8    A.  I somewhat object to the phrase he decided to
9 do it on his own.  Again, he -- complaints sit in a tank
10 until they're assigned and he could just, you know, look
11 and say "oh, I've this issue here, it's on my way home,
12 I'll grab it," as opposed to Matt going, "Jacob, there
13 is this case here, go look at it."  He would have
14 discretion to do that.
15   Q.  I understand there are two ways that
16 Mr. Moskowitz can undertake an investigation.  Either
17 it's been self-assigned, meaning it was he himself
18 writes the books at the pool and decides to do it or it
19 can be assigned by Mr. Tucker; is that not correct?
20       MS. ZYLSTRA:  Object to form.  You can answer.
21   A.  Yes.  I'll give another example.  Somebody is
22 complaining that they are doing automotive repair in a
23 residential lot.  He's taking the information from the
24 complainant.  He's entering into it.  He could just
25 assign that case to him because he has firsthand

Page 110

1 knowledge of it and go and do it.
2       I just -- I want to be careful to not assume
3 who assigned it to Jacob, to it. Did he assign it to
4 himself because he saw it there, or did Matt or somebody
5 else assign it to him?
6   Q.   Who are the people that can assign
7 Mr. Moskowitz to do an investigation?
8   A.   Matt, Jacob could do it himself, I could do
9 it.
10   Q.   Anybody else?
11   A.   Generally, they wouldn't. "Assign" is a bad
12 word. "Jacob, it's here, can you go look at it," you
13 know. Jenny, the other assistant zoning administrator,
14 she could say "Would you go look at it?" Is she really
15 assigning it to him? No.
16       But generally you can self-assign an employee
17 because it's in their area or their expertise, or if
18 it's going to be assigned it might be through Matt or
19 myself.
20   Q.   Does Mr. Moskowitz have any sort of expertise
21 that would have made him the appropriate person to
22 investigate this?
23   A.   No. Again, I was just speaking in broader
24 terms.
25   Q.   Sure. So you don't know the particulars of

Page 111

1 how Mr. Moskowitz came to be the one investigating these
2 complaints?
3   A.   No.
4   Q.   Mr. Moskowitz does his investigation. Does
5 anyone have review or approval over his investigation
6 before a citation or official notice is issued?
7       MS. ZYLSTRA: Objection. Form, foundation.
8 You can answer.
9   A.   Generally, no.
10   Q.   So Mr. Moskowitz is empowered individually to
11 issue a citation or official notice after he's satisfied
12 with his investigation?
13       MS. ZYLSTRA: Same objection.
14   A.   If he is comfortable with it, yeah.
15   Q.   In this particular case for Exhibit 9, did
16 Mr. Moskowitz confer or consult with anyone else in your
17 department before this notice was issued?
18   A.   Not with me.
19   Q.   Do you know if he consulted with anybody else?
20   A.   I can't give a definitive answer. I don't
21 know.
22   Q.   Do you know if he conferred with anyone
23 outside of your department before issuing this official
24 notice?
25   A.   Conferred, I would hope not.

Page 112

1   Q.   You don't have any knowledge of him speaking
2 with anyone else other than the complainant?
3       MS. ZYLSTRA: Object to form. You can answer.
4   A.   Conferred, I read that -- or I'm hearing that
5 and thinking getting input from somebody.
6       We should not be issuing a notice based on
7 input from private citizens. You know, if a private
8 citizen had been calling and complaining that he should
9 base his opinion based on the law and not what the
10 private citizen is complaining about.
11   Q.   Mr. Moskowitz has the authority to issue
12 either a citation or an official notice for what he
13 observed in Exhibit 9; is that correct?
14   A.   Yes.
15   Q.   And what factors do your inspectors, do your
16 code enforcement officers utilize in deciding whether to
17 issue a citation or an official notice?
18   A.   If, like an example, he went there on the 27th
19 and witnessed the game and the master plan is not
20 allowing for it, he would be, I would say, fairly much
21 compelled to write an official notice telling him to
22 stop.
23   Q.   But why not a citation?
24   A.   Again, we almost exclusively start enforcement
25 actions with an official notice.

Page 113

1   Q.   So Edgewood is being notified in Exhibit 9 to
2 discontinue holding athletic contests on the athletic
3 field; correct?
4   A.   Uh-huh.
5   Q.   And is "athletic contest" defined anywhere, to
6 your knowledge, in the Madison municipal code or the
7 zoning ordinances?
8   A.   Not that I'm aware of.
9   Q.   Can you define an athletic contest?
10   A.   Well, my layman's interpretation is a
11 competition between two teams. I would just say
12 competition between two teams.
13   Q.   Based on your definition, would Edgewood be
14 allowed to host a math Olympics competition between West
15 and Edgewood on its field?
16       MS. ZYLSTRA: Objection. Form, foundation,
17 incomplete hypothetical. You can answer.
18   A.   That's a competition between two teams;
19 correct?
20       MS. ZYLSTRA: Same objections.
21   A.   My first reaction is I doubt that we would
22 consider it because it's not an athletic competition.
23   Q.   What does "athletic" mean?
24       MS. ZYLSTRA: Same objections. You can
25 answer.

29 (Pages 110 - 113)

Page 114

1    A.   One of the what I would say is the proscribed
2  sports.
3    Q.   Proscribed sports.  Can you give me examples
4  of --
5    A.   No.
6    Q.   I struggle with it, too, but I'm not the one
7  who issued a complaint talking about athletic contests,
8  so I need to understand what the City's position is on
9  how to define athletic contests.
10       So what is a proscribed sport?
11       MS. ZYLSTRA:  Same objections.  You can
12  answer.
13    A.   I knew as soon as those words came out I was
14  going to regret it.
15       I'm thinking, you know, soccer, track, field
16  hockey.  To be honest, I don't know enough about
17  Ultimate Frisbee to say whether or not it's one or not.
18  Something like that.
19       Baseball, softball, I would consider those
20  athletic competitions.  A math meet?  I don't think so.
21    Q.   Do you know how Jacob determined on March 27
22  that an athletic competition was occurring on that
23  field?
24       MS. ZYLSTRA:  Objection.  Form.
25    A.   It's my understanding he went there and saw

Page 115

1  two teams playing soccer with, you know, officials and
2  it was a competition.
3    Q.   Do you know any more details about what caused
4  him to conclude it was a competition, it was a game as
5  opposed to a scrimmage as we talked about before that
6  was more akin to a practice?
7    A.   I don't know, no.
8    Q.   When you were taking Phys Ed at Edgewood, were
9  there ever any classes in which you and your classmates
10  were engaged in athletic competitions within the context
11  of the Phy Ed class?
12       MS. ZYLSTRA:  Objection.  Form and foundation.
13  You can answer.
14    A.   Sure.
15    Q.   Under your reading of the master plan, would
16  that have been permitted or not permitted?
17       MS. ZYLSTRA:  Same objections.
18    A.   Under my reading of it, they would have been
19  allowed because it was a physical education class where
20  they were, let's say, playing touch football or
21  something of that nature.
22    Q.   So the only things the field, as you
23  understood it, could be used for were team practices and
24  physical education classes, correct, any other use was
25  prohibited?

Page 116

1    A.   I am reluctant to say any other use is
2  prohibited.
3    Q.   Exhibit 9 says, "The Campus Master Plan states
4  that the athletic field is used for team practices and
5  physical education classes."
6       Is it the City's position that any other use
7  that is not a team practice or physical education
8  violate -- or physical education class violated the
9  master plan during the period it was in effect?
10       MS. ZYLSTRA:  Objection.  Form, foundation.
11    A.   I find it hard to believe that we would object
12  if they were having an outdoor Mass on the field.
13    Q.   Even though that's not a permitted use under
14  the master plan pages that we saw?
15    A.   Correct.
16    Q.   What about nonphysical education classes.
17  What if a physics teacher decides she wants to go out on
18  the field and use the field for an experiment during the
19  day.  It's a class, but it's not a physical education
20  class.  Is that a violation of the master plan?
21       MS. ZYLSTRA:  Objection.  Form, foundation.
22    A.   Again, I would -- I would struggle with, say,
23  the physics class being out there and launching balloons
24  and taking readings and seeing how wind currents are
25  affecting them and argue that that would be prohibited.

Page 117

1    Q.   So even though the Campus Master Plan says
2  uses are going to be for team practices and physical
3  education classes, you would not issue a citation and
4  give a pass to the use of the field for other types of
5  educational classes?
6       MS. ZYLSTRA:  Objection.  Form, foundation.
7  You can respond.
8    A.   As much as we appear unreasonable at times, I
9  think we look at things individually and make a decision
10  based on what we believe would be appropriate.
11    Q.   Okay.
12    A.   You know, a class, they're doing something in
13  the middle of the afternoon during, you know, school
14  days as opposed to, you know, something happening on
15  Friday night at 8:00 o'clock at night.
16    Q.   So in your view, an appropriate deviation from
17  the terms of the master plan wouldn't result in a
18  citation from your office; is that correct?
19       MS. ZYLSTRA:  Same objections.
20    A.   The phrase that we use sometimes is "beneath
21  our notice."  Some things that occur are beneath our
22  notice.
23    Q.   What does that mean?
24    A.   I'm trying to think of what is a really good
25  example of beneath our notice.

30 (Pages 114 - 117)

Page 118

1    Something that maybe rise -- something that is
2  a purely technical violation, but the impact on
3  neighbors, the community, and that nobody would ever
4  even observe that it's going on because it's so
5  minuscule, you know, that is why I would use "beneath
6  our notice."
7    Q.  Sure.  In your estimation, it's minor, it's a
8  minor deviation from what's in the master plan; is that
9  fair?
10    A.  Correct.
11    Q.  Would a pep rally during this period of time
12  be beneath your notice?
13    MS. ZYLSTRA:  Objection.  Form, foundation.
14    Q.  Would it comply with the exact terms of the
15  master plan, is that sufficiently minor to be beneath
16  your notice?
17    A.  Good question.  I would like to have looked at
18  it in whole, you know, not just say, yeah, pep rally,
19  no.  If they have 5,000 people there, it may be
20  something to consider.
21    So I hesitate giving black and white answers
22  because there is -- there are discretions.  You know,
23  you're driving down Monroe Street at 31 miles an hour --
24  I guess now it's 25.  You're driving at 26, are you
25  going to get a ticket for it?  Of course not.  They are

Page 119

1  not about to do that.
2    But it gets to a certain level where, yes, you
3  will take enforcement action.
4    Q.  Sure.  So in your view do you have discretion
5  to label a graduation ceremony as being beneath your
6  notice?
7    MS. ZYLSTRA:  Objection.  Form, foundation.
8    A.  I would think that would be something that we
9  would look at in whole and say, you know, it's an
10  hour-long event.  The school orchestra that comes there
11  and plays for, you know, the Edgewood fight song, at the
12  beginning with the national anthem, they hand out
13  diplomas and they leave, is that a one-day event, once a
14  year, is that beneath our notice?  Possibly.  You know,
15  look at it as a whole.
16    Q.  So you're looking at the totality of the
17  circumstance; is that fair?
18    A.  Yes.
19    Q.  I think you already said, though, that like
20  campus liturgy, if Edgewood posted one on its field that
21  that's not something that you would issue a violation
22  for; is that right?
23    A.  I wouldn't want to -- I'm sorry.
24    MS. ZYLSTRA:  I'm sorry.  Form, foundation.
25  You can answer.

Page 120

1    A.  I wouldn't want to touch that one with a
2  10-foot pole.
3    Q.  How about a prayer vigil, students gathering
4  on the field?
5    MS. ZYLSTRA:  Same objection.  You can answer.
6    A.  I wouldn't want to touch that one with a
7  10-foot pole.
8    Q.  What about a walk or a run around the track
9  for charity; is that something that would be beneath
10  your notice?
11    MS. ZYLSTRA:  Same objections.
12    A.  That's interesting.  I think in the master
13  plan it talks about actually -- at least I thought there
14  was something in the master plan about the track being
15  used by the neighborhood so people could use it and go
16  run and stuff like that.
17    Is that much different?  I'm not really sure.
18  Now, again, if all of a sudden there is 10,000 people
19  swarming around the place, then it might become an
20  issue.
21    Q.  So big events, from what I'm hearing you say,
22  you know, that totality of circumstances, big events
23  with big pep rallies, big graduation, that could really
24  tip the scales for you.
25    With respect to team practice, is there any

Page 121

1  limitation on the number of students who could
2  participate in a team practice before it would somehow
3  and all of a sudden it would be a problem?
4    A.  I would say no.
5    Q.  So some football teams can have a hundred
6  players on them, probably not at Edgewood, but there
7  wouldn't be a problem with having a hundred kids on a
8  football field at Edgewood under the terms of its master
9  plan?
10    MS. ZYLSTRA:  Object to form.  You can answer.
11    A.  I would say no.
12    Q.  The old days, Edgefest.  Edgefest is a
13  historical use that they had used on that field for a
14  long time.
15    Would Edgefest be permitted under the master
16  plan or would you issue a violation on that?
17    MS. ZYLSTRA:  Objection.  Form, foundation.
18    A.  I -- my limited knowledge of the master plan,
19  I really don't feel qualified to answer that.  That may
20  be a good question for Matt on Friday.
21    Q.  There are bleachers on the Edgewood athletic
22  field; correct?
23    A.  I believe so.
24    Q.  And is there any limitation on the number of
25  people that could come and watch a practice or a

31 (Pages 118 - 121)

Page 122

1 scrimmage under the master plan?
2   A.  Not that I'm aware of, no.
3   Q.  If there was a complaint about the number of
4 people coming to a practice and watching or traffic
5 related to a practice or a scrimmage, is that something
6 that you would consider for a violation?
7       MS. ZYLSTRA:  Objection.  Form, foundation.
8 You can answer.
9   A.  I would say no.
10     (Exhibit 10 marked)
11   Q.  MS. INGRISANO:  I'm handing you what's been
12 marked as Exhibit 10, Mr. Hank.
13     Have you ever seen the newsletter from the
14 Dudgeon-Monroe Neighborhood Association?
15   A.  Nope.
16   Q.  Have you ever seen this document before?
17   A.  Nope.
18   Q.  I'm going to ask you to take a look at the
19 first section of this first page of Exhibit 10.
20     This email is dated -- looks like a newsletter
21 from dnmanews@dmna.org to Tag Evers and maybe others,
22 dated September 13, 2021.  Do you see that?
23   A.  Uh-huh.
24   Q.  I'm sorry?
25   A.  Yes.

Page 123

1   Q.  Thank you.  And so September 13, 2021 is after
2 the repeal of the master plan.  Do you have knowledge of
3 that?
4   A.  I believe that is correct, yes.
5   Q.  So this newsletter purports to identify weekly
6 homecoming activities in September of 2021 that's going
7 to be taking place on the Edgewood High School campus.
8 Do you see that?
9   A.  Uh-huh.
10   Q.  So the first thing you notice is annual powder
11 puff football game; correct?
12   A.  Yes.
13   Q.  Do you have an understanding of what powder
14 puff football is?
15   A.  I believe it's the female students playing a
16 game.
17   Q.  Is the powder puff football game, in your
18 understanding, would that be an athletic competition?
19       MS. ZYLSTRA:  Objection.  Form, foundation.
20   A.  I'm thinking back to when I was there.  It
21 would be hard to really construe that as a game, but I
22 think that was the intent, yes.
23   Q.  Next it lists an outdoor liturgy, on field,
24 with speakers.  Do you see that?
25   A.  Yes.

Page 124

1   Q.  Again, if that had occurred during the course
2 of the master plan being in effect you had said that you
3 would not issue a citation on that; correct?
4   A.  Certainly not, no.
5   Q.  Even though it's technically not permitted by
6 the terms of the master plan, right?
7       MS. ZYLSTRA:  Objection.  Form, foundation.
8 You can answer.
9   A.  Again, we're on -- out of the master plan,
10 we're in the --
11   Q.  I'm asking you to extrapolate that these -- if
12 these events occurred during the term -- so this is
13 actually how Edgewood is using the field now; correct?
14       MS. ZYLSTRA:  Objection.  Form, foundation.
15   A.  Yes, they were, yeah.
16   Q.  At least in September 2021, assuming the
17 Dudgeon-Monroe Neighborhood Association is correct on
18 this.
19     So if these uses of the field in 2021 had
20 occurred in 2018 or in the first half of 2019, you would
21 agree that the outdoor liturgy doesn't technically fall
22 into the terms of the permissible uses in the master
23 plan, but you still wouldn't issue a citation; correct?
24   A.  Certainly not.
25   Q.  A pep rally, again, we're seeing the field is

Page 125

1 actually being used for pep rallies.
2     If this had occurred back in 2018, early 2019,
3 it may or may not cause you to issue a citation; is that
4 right?
5       MS. ZYLSTRA:  Objection to form, asked and
6 answered.  You can answer.
7   A.  Again, I would not issue -- I would maybe have
8 somebody look at it, go see what's going on, and if it's
9 what I'm thinking maybe when I was there, you know,
10 probably falling beneath our notice because they
11 wouldn't get that many people there.  Maybe I'm wrong.
12   Q.  When a neighbor or a concerned citizen makes a
13 complaint and it's a technical violation of the code or
14 of a -- here, for example, a master plan, but it falls
15 beneath your notice, how do you communicate that to the
16 neighbor?
17       MS. ZYLSTRA:  Objection.  Form, foundation.
18 You can answer.
19   A.  If they followed up with us and asked what we
20 did with the complaint, we would explain what we did or
21 what we did not do and why.
22   Q.  Do you agree with me that there might be some
23 directors of the building inspection department that
24 might take a different view of what falls beneath their
25 notice than you have?

32 (Pages 122 - 125)

Page 126

1       MS. ZYLSTRA:  Objection.  Form, foundation.
2    A.   Sure, of course.
3    Q.   So while you wouldn't touch a campus liturgy
4  with a 10-foot pole, to use your words, a different
5  building inspector director might say, hey, not in the
6  terms of the Campus Master Plan, not permitted; correct?
7       MS. ZYLSTRA:  Objection.  Form, foundation.
8    A.   For an outdoor liturgy I would hope nobody
9  would touch that.
10    Q.   That's not in the Campus Master Plan, it's a
11  technical violation.  You're allowed to issue citations
12  for technical violations; correct?
13       MS. ZYLSTRA:  Objection.  Form, foundation.
14    A.   Yes.
15    Q.   During the time when the master plan was in
16  effect, in that dead part of the summer, in the early
17  part of the summer where there are no classes and
18  football hasn't started up yet and there are no
19  sanctioned school sports, isn't it fair to say that
20  under your reading of the master plan there was no
21  permissible use of that field during that period of
22  time?
23       MS. ZYLSTRA:  Objection.  Form, foundation.
24    Q.   There are no physical education classes to be
25  had, there are no team practices to be, Edgewood has no

Page 127

1  valid use for that field under the master plan?
2       MS. ZYLSTRA:  Same objections.
3    A.   Again, I'll go back.  I thought that in the
4  master plan it stated that the neighborhood could use
5  the field.
6    Q.   So neighborhood use, team practices, and
7  physical education classes are the only permitted uses
8  under the master plan.  Is that right?
9       MS. ZYLSTRA:  Wait --
10    Q.   Is that your understanding?
11       MS. ZYLSTRA:  Objection.  Form, foundation.
12  You can answer.
13    A.   So if somebody called up and said there's
14  eight neighborhood kids out there playing soccer, are we
15  going to spend our time to go look at that?  No.
16    Q.   But there is a distinction what your saying,
17  though, right, there is a distinction between what's
18  permitted in the master plan and what's a technical
19  violation versus what kind of violation you're actually
20  going to take action on; isn't that right?
21       MS. ZYLSTRA:  Same objections.
22    A.   Again, I'll go back to somebody alleges
23  something that would be a violation, we would tend to go
24  look at it and see if it rises to the level where we're
25  issuing an official notice.

Page 128

1    Q.   What I'm asking you is, you have stated today
2  that there is a distinction between what is a technical
3  violation of the master plan and a violation of the
4  master plan that you're prepared to take action on; is
5  that right?
6       MS. ZYLSTRA:  Same objections.
7    A.   Yes, everything we do has a modicum of
8  discretion.
9    Q.   Is Edgewood required -- during the terms of
10  the master plan when this interpretation was in place,
11  is Edgewood required to prohibit students from
12  recreating on a field if it wasn't part of a team
13  practice or a Phys Ed class?
14       MS. ZYLSTRA:  Same objections.
15    A.   I'm going to say look at it in the -- of what
16  they are actually doing.  If it's a small number of
17  people out there throwing a frisbee around, of course
18  not.
19       If all of a sudden half the school body is
20  there doing something, playing some type of event with
21  music and whatever, that's something that we would at
22  least have to look at and investigate to see whether or
23  not it rises to the level of where we would commence
24  enforcement.
25    Q.   Looking back to Exhibit 9, the date issued on

Page 129

1  this official notice was April 1, 2019.  Do you see
2  that?
3    A.   Yes.
4    Q.   And the correction -- the violation shall be
5  corrected on or before April 2, 2019; is that right?
6    A.   That is correct.
7    Q.   So it was basically an official notice to
8  immediately cease holding athletic contests on the
9  field; correct?
10    A.   That's correct.
11    Q.   And to your knowledge, Edgewood did not cease
12  immediately holding athletic contests on the field; is
13  that right?
14    A.   That is correct.
15       (Exhibit 11 marked)
16       MS. ZYLSTRA:  George, I don't know how long
17  you want to go today.  I don't know whether you need
18  lunch or not.
19       (Discussion off the record)
20       (Recess)
21  BY MR. INGRISANO:
22    Q.   Mr. Hank, I think that when we left I had just
23  put Exhibit 11 in front of you; correct?
24    A.   Yes.
25    Q.   You recognize that, sir, as a second official

33 (Pages 126 - 129)

Page 130

1 notice issued by the City of Madison related to the use
2 of the Edgewood athletic field; is that right?
3    A.   That's correct.
4    Q.   This one, again, was issued by Jacob Moskowitz
5 of your office?
6    A.   Uh-huh.
7    Q.   I'm sorry, is that a yes?
8    A.   Yes, it is.
9    Q.   And the beginning of this document under
10 "Complaint," it identifies one, two, three, four, five,
11 six -- seven dates that your office observed athletic
12 contests taking place on the field -- on the athletic
13 field taking place at 2219 Monroe Street.  Do you see
14 that?
15    A.   Yes, I do.
16    Q.   In fact, five of those seven dates occurred
17 after the date of your first notice at Exhibit 9;
18 correct?
19        MS. ZYLSTRA:  Let me try to find it.
20        THE WITNESS:  Actually, I was looking for
21 Exhibit 9.
22        MS. ZYLSTRA:  Here's my copy if you want it.
23    A.   I was curious.  Yeah, it's basically an
24 amended official notice.  Yes.
25    Q.   There it is.

Page 131

1    A.   Yeah, there it is.  I was going to see if it
2 was the same case number and it is.
3    Q.   So it's technically viewed as the same case?
4    A.   Yes.
5    Q.   To your knowledge, did anyone work with or
6 confer with Mr. Moskowitz in your office about this
7 second official notice, Exhibit 11, in light of the fact
8 that an earlier notice had been issued at Exhibit 9?
9    A.   Not that I'm aware of.
10    Q.   To your knowledge was this, in your words,
11 self-assigned or assigned by someone within your office?
12        MS. ZYLSTRA:  Objection.  Form.
13    A.   It is a continuation of the same case.  So it
14 would have stayed with Inspector Moskowitz.
15    Q.   Very good.  Thank you.
16        Given that the complained of activity
17 continued from Exhibit 9 to Exhibit 11, do you have any
18 understanding as to why a citation was not issued
19 instead of a second official notice?
20    A.   To the best of my memory, I believe they were
21 -- they expressed their opinion that they were going to
22 appeal it, and generally when somebody is going to
23 appeal one of our actions we put enforcement on hold.
24        We may go and still observe and see what's
25 going on, but we will not issue an official -- excuse

Page 132

1 me, citations or whatever, tickets.
2    Q.   So did you confer with Mr. Moskowitz about a
3 potential for appeal before he issued the official
4 notice?
5    A.   I did not.
6    Q.   Do you know if someone else in your office
7 did, about whether to issue a citation in light of the
8 anticipated appeal?
9    A.   No, I -- I am not aware that somebody -- I'll
10 phrase it this way:
11        This is different than normal as opposed to
12 sending out another official notice, an amended official
13 notice.  If it was me, I would have just said go there
14 on 3/29, 4/2, 4/16, all those dates, and just enter your
15 inspection notes in your case so that you have
16 observations on those dates.
17        I don't -- I think this really, from my
18 perspective, adds very little to what I think our case
19 is, but his inspection notes to me, when he gets to
20 court, would be applicable as opposed to I think this is
21 superul -- superful --
22    Q.   Superfluous?
23    A.   Yes.
24    Q.   But typically if an official notice is issued
25 and not complied with, would it not be your typical

Page 133

1 expectation that a citation would be forthcoming next?
2        MS. ZYLSTRA:  Objection.  Form, foundation.
3 You can answer.
4    A.   If there was -- if there was expressed -- if
5 the violator expressed their willingness and their
6 desire to comply and it was just going to be a matter of
7 a few days, that's fine, or if they express their desire
8 that they were going to appeal it to the zoning board.
9        They were challenging whether or not this was
10 a proper action and they wanted to go to the zoning
11 board of appeals to challenge what would have been
12 Matt's interpretation of this.
13    Q.   Sure.  Why would an attempt to appeal be
14 relevant to the decision whether to file a citation or
15 subsequent official notice?
16        MS. ZYLSTRA:  Objection.  Form.  You can
17 answer.
18    A.   We can always issue the citation, I believe,
19 up to eight months later, I think.  So 18 months later
20 Jacob could have sat there and issued a ticket for each
21 one of these days and sent them all at once.  Could have
22 done that.
23        But when we have somebody that has said I want
24 to appeal this to ZBA, then pretty much we're going to
25 put our enforcement action on hold to see what the

1 outcome is. Because if we send tickets and then all of
2 a sudden ZBA agrees with the violator that, no, you
3 shouldn't have done that, then we've got tickets that
4 are hanging out there that we are asking to be
5 dismissed.
6    Q.  And so it's the idea of not wanting to have to
7 dismiss an actual citation that's the sole reason that
8 you would defer a citation instead of issuing a second
9 official notice; is that right?
10       MS. ZYLSTRA:  Objection.  Form, foundation.
11 You can answer.
12    A.  Again, I did not see the need to issue a
13 second notice.  I think this was to augment the document
14 -- the documentation in the case to say, oh, by the way
15 Edgewood, we observed these things on this date.
16       So I think that's probably why they did this.
17 But, again, if we get somebody who says "I want to
18 appeal your interpretation of this," we typically do not
19 go on with prosecution at that point.
20    Q.  When you said this is why "they" did this,
21 again, Jacob Moskowitz, anyone else who was involved
22 with this citation, Exhibit 11, who would that have
23 been?
24       You used the plural "they" as to why they did
25 this in reference to Exhibit 11.  Who is they?

1    A.  Good question for Matt on Friday.  I --
2 looking at this, it's not standard, so I don't know if
3 this was discussions with Matt and legal counsel.
4    Q.  So there was some amount of analysis and
5 discussion behind the scenes of Exhibit 11 that you're
6 not aware of that resulted in what you would call a
7 deviation from typical practice; is that right?
8       MS. ZYLSTRA:  Objection.  Form, foundation,
9 misstates testimony.  You can answer.
10    A.  We like to be creatures of habit and do things
11 the same every time.  Consistency keeps us in a really
12 good spot.  Like I say, when I see this, I view it as
13 enhancing the record for the defendant.
14    Q.  Sure.  But what I'm asking you is, when you
15 talked about the decision-makers and the analysis that
16 went into issuing the Exhibit 11, you don't have any
17 details, but you are aware that there was at least one
18 other person working with Mr. Moskowitz in making the
19 determination as to how to proceed with the continued
20 violation of the master plan; is that right?
21       MS. ZYLSTRA:  Objection.  Form.  You can
22 answer.
23    A.  Based on this document, I would say yes.
24    Q.  In looking at Exhibits 9 and 11, Mr. Hank, do
25 you have an understanding of what harms your office was

1 trying to prevent in issuing these notices?
2       MS. ZYLSTRA:  Objection.  Form, foundation.
3    Q.  Can you identify them?
4       MS. ZYLSTRA:  Apologize, Counsel.  Same
5 objection.
6    A.  What harms?
7    Q.  Yeah.
8    A.  Well, we had received complaints that they
9 were holding athletic competitions on the field.  If
10 those complaints were accurate, it would be our -- it
11 would be our interpretation that they would be a
12 violation of the master plan.  So it was prudent for us
13 to go and look at it and see if the allegation was
14 accurate.
15    Q.  The deviation from the master plan to host
16 games resulted in a harm that you would want to use your
17 enforcement authority to prevent; is that fair?
18       MS. ZYLSTRA:  Objection.  Form.
19    A.  I struggle with the word "harm."  Again, I'll
20 just go back.  We have a complaint alleging that
21 something is going on that we believe, if accurate,
22 would be against the master plan.
23    Q.  Sure.  Let me phrase it differently then.
24       What's the interest the City has in enforcing
25 the master plan provisions to prevent games?  I mean,

1 what's the big deal?
2       MS. ZYLSTRA:  Objection.  Form.
3    A.  It's a document that Edgewood helped draft and
4 agreed to.  So having them abide to the document I think
5 is in the benefit of everybody.
6    Q.  So general compliance with an agreed document,
7 the City's interest in enforcing the master plan is
8 because it wants to enforce its agreement that it has
9 with its Campus-Institutional zone district that do
10 master plans; is that right?
11       MS. ZYLSTRA:  Objection.  Form.
12    A.  Yes.
13    Q.  Anything else that you can think of what --
14 any other interest that you can think of in the City
15 prohibiting athletic contests on these athletic fields?
16       MS. ZYLSTRA:  Objection.  Form.
17    A.  Not that -- not that I'm aware of, not to play
18 any bearing on this action.
19    Q.  In your more than 30 years in the building
20 inspection department -- I think you said 35, right?
21    A.  Almost.
22    Q.  Almost 35.  Were you aware of any other
23 instances in which a property owner was issued a notice
24 or citation for having athletic contests on an athletic
25 field?

Page 138

1    A.  No.
2    Q.  If a citation had issued with respect to the
3  violations of the master plan the City was contending,
4  do you know what fines and penalties Edgewood would face
5  or could have faced?
6        MS. ZYLSTRA: Objection.  Form.
7    A.  Unless explicitly enumerated in the ordinance,
8  I believe the first one is like $298, something like
9  that, ballpark.
10    Q.  Per violation?
11    A.  Per violation per day for a citation.
12    Q.  Was it your understanding that without a
13  master plan and just under the Campus-Institutional
14  District zoning provisions that Edgewood would have been
15  able to hold athletic contests on its field?
16        MS. ZYLSTRA: Objection.  Form, foundation.
17  You can answer.
18    A.  I'm sorry, can you run that by again?
19    Q.  Sure.  In the absence of a master plan, that
20  restricted athletic contests, right?
21    A.  Okay.
22    Q.  Which is what the City has contended here, and
23  if without a master plan -- strike that.
24        Without a master plan, the
25  Campus-Institutional District is governed by the

Page 139

1  Campus-Institutional zoning ordinances; correct?
2    A.  I believe that's correct, yes.
3    Q.  So without a master plan, would -- under the
4  Campus-Institutional zoning district ordinances, would
5  Edgewood had been allowed to use its athletic field to
6  host games in that circumstance?
7        MS. ZYLSTRA: Object to form.  You can answer.
8    A.  Not being an expert in, like, what the
9  Campus-Institutional District allows and does not allow
10  or what's a conditional use, I would just be hazarding a
11  guess.  Sorry.
12    Q.  Do you know how long a master plan is good
13  for; how long it's in place?
14        MS. ZYLSTRA: Object to form.
15    A.  No, I do not.  I believe there is an
16  expiration date written in them.
17    Q.  Okay.  Looking back at Exhibit 3, if Steve
18  Rewey had found the lighting application that Edgewood
19  submitted to be noncompliant, he would have issued some
20  sort of notice of noncompliance to Edgewood; correct?
21        MS. ZYLSTRA: Object to form, foundation.  You
22  can answer.
23    A.  Not a notice of noncompliance.  He would have
24  issued a plan withhold letter that would outline what
25  was wrong so that they could make corrections and submit

Page 140

1  plans that would comply with his reveal.
2    Q.  Got it.  Looking at Exhibit 3 where it says,
3  Status, colon, Closed.  What does that mean?
4        MS. ZYLSTRA: Object to form, asked and
5  answered.  You can answer.
6    A.  It means that the reviewing agencies have
7  completed their work and that it was believed at the
8  time it was in compliance with everything that was
9  submitted was in compliance, not that everything was
10  done in compliance.
11    Q.  Where it says "Project Type:  Permitted Use
12  Site Plan Reviews," do you see that?
13    A.  Yes.
14    Q.  Were there other types of project types that
15  could be populated in that field?
16    A.  Yes, there is.  And, again, I would say that
17  would be a great question for Matt.
18    Q.  Got it.  So you don't know what permitted use
19  site plan review means as opposed to other --
20    A.  Well --
21    Q.  Well, let me ask you this:  What does
22  permitted use site plan review mean to you?
23    A.  Well, it's a permitted use and it's a site
24  plan review, I assume -- and this could be dangerous --
25  that there is a conditional use site plan review.

Page 141

1        So there might be others, but --
2    Q.  And I believe you said Steve Rewey, to your
3  knowledge, would have been the one who would be filling
4  in these fields; is that right?
5    A.  No, no, no, no.
6        MS. ZYLSTRA: Object --
7        THE WITNESS: Sorry.
8        MS. ZYLSTRA: That's okay.  Go ahead.
9    Q.  Who would fill in the permitted use site plan
10  review on this document?
11    A.  Probably Christy.  The only thing that Steve
12  is filling in is under his review where he's putting
13  "Approved" and the date.
14    Q.  Got it.  Appreciate that.  Looking at Exhibit
15  2, the Memorial electrical permit.
16        As you sit here today, do you know of any
17  inquiries into Memorial's intended use surrounding this
18  electrical permit?
19    A.  No.  I'll add, again, this was an existing lit
20  field that they were redoing the lighting, so there
21  really is no change in use or intensity.  Probably
22  installing more efficient lighting is what this was
23  about.
24    Q.  Well, but in exhibit -- where is that?  My
25  apologies.  Oh, there it is.  Exhibit 6.

Page 142

1   A.  Yes.
2   Q.  In Exhibit 6, Mr. Tucker went outside of the
3  lighting application submitted by Edgewood to determine
4  that the permitted -- determine that the intended use
5  was different than what he believed was allowed;
6  correct?
7   A.  Yes.
8   Q.  It's based on the information the City --
9  strike that.
10      He said, "However, over the past weekend, I
11  received a copy of the letter sent to Edgewood
12  Family...relating to the institutions' present interest
13  to install lights."
14      So there he didn't look at just the four
15  corners of the lighting application, he was relying on
16  other information that had been brought to his attention
17  to decide what the intended use for those lights was,
18  right?
19   A.  Correct.  And I believe it was the Edgewood
20  High School newsletter.
21   Q.  And you're not aware of any attempt by your
22  department to look outside of the four corners of the
23  materials submitted by Memorial related to Exhibit 2;
24  correct?
25   A.  Not that I'm aware of.

Page 143

1   Q.  You made a reference in talking about the
2  complaints received regarding Edgewood's use of the
3  games or use of its field for games, you talked about
4  the people that were weighing in all the time.
5      Do you have a sense as to the number of
6  complaints you received regarding Edgewood's use of its
7  field for games in 2019?
8   A.  No.
9   Q.  Do you have a general sense as to who it was
10  that were making those complaints?
11   A.  Generally, from my knowledge, it was people --
12  I would refer to it as -- in the neighborhood.
13   Q.  Do you have knowledge of complaints from an
14  organization called "No New Stadium"?
15   A.  Complaints from that organization?  I'm not
16  aware of that.  I've heard of it, but I'm generally --
17  I'm going to say when we received a complaint it had a
18  name associated with it.
19   Q.  Individual person and not as a representative
20  of some sort of organization; is that right?
21   A.  Personally, not that I remember.
22   Q.  Sure.  Any complaints from representatives of
23  any of the neighborhood associations that you're aware
24  of speaking -- purporting to speak on behalf of the
25  association?

Page 144

1   A.  Again, not that I'm aware of.
2   Q.  I don't know if we touched on this before, but
3  to your knowledge was John Strange consulted on the
4  Memorial light permit issue you see on Exhibit 2?
5      MS. ZYLSTRA:  I'm going to object.  If you
6  give me the same stipulation, I'll allow him to answer
7  these questions on waiver of the privilege and will be
8  used in that manner I'll let him answer that question,
9  if he knows.  I'll object on foundation.  Go ahead.
10   A.  Not that I'm aware of.
11   Q.  In talking about the electrical permit that
12  issued in 2015, you said you didn't know about the
13  scoreboard but you did understand that there was
14  basically -- that the field was going to be plumbed for
15  future electrical; is that accurate?
16   A.  Correct.
17   Q.  And that future electrical was for the
18  potential for lights in the future.  Is that your
19  understanding?
20   A.  I think and sound, the permit said.
21   Q.  So it was your understanding in 2015 that
22  Edgewood was making future preparations for lights and
23  for possible sound; is that right?
24      MS. ZYLSTRA:  Object to form.  You can answer.
25   A.  Yes.

Page 145

1   Q.  Were you aware of what their timeframe was as
2  to whether they -- when they were hoping or planning to
3  put in lights and sound?
4   A.  No.
5   Q.  Edgewood had the potential, did they not -- or
6  Edgewood had the right, wouldn't they, to install lights
7  on their field for the future use when they were no
8  longer governed by a master plan; isn't that right?
9      MS. ZYLSTRA:  Objection.  Form, foundation,
10  incomplete hypothetical.  You can respond.
11   A.  Master plan is gone.  Campus-Institutional
12  zoning, to be honest with you, do I know would that
13  prohibit that?  I can't speak intelligently to that.
14   Q.  But they weren't prohibited from pulling an
15  electrical permit for the future installation of lights
16  in 2015; correct?
17   A.  That's correct.
18   Q.  So they are allowed to pull permits and invest
19  in their field for future use, too; correct?
20      MS. ZYLSTRA:  Objection.  Form, foundation.
21  You can respond.
22   A.  Sure.  They may be working with several alders
23  to get an -- excuse me -- an amendment to the ordinance
24  that would allow it.
25   Q.  Or they could get lights and then seek to

37 (Pages 142 - 145)

Page 146

1  repeal their master plan, too, couldn't they?
2       MS. ZYLSTRA:  Same objection.
3       A.  Again, I'll go back to where we would -- I
4  would be very concerned that we're allowing somebody to
5  go down a road where, if it doesn't change and they've
6  invested a significant sum of money and then the
7  response is you allowed us to do this knowing that it
8  wasn't legal at the time and now we can't do -- we have
9  invested all this money and now we're out this money,
10  why did you allow us to do that.
11      Q.  My question then applies to 2015, though.
12          Did you provide any kind of caution -- did
13  your department provide any kind of cautionary warning
14  to Edgewood in 2015 and say, hey, we know you're
15  plumbing your field for future lights and just so you
16  know, you won't actually be allowed to get lights
17  because you're not allowed to play games?
18      MS. ZYLSTRA:  Same objection.
19      A.  Sure.  The cost to install conduit underground
20  is minuscule compared to pulling the wire and then
21  installing the towers and putting lights on top of it.
22      Q.  So the amount of investment in infrastructure,
23  in your mind, in 2015, was different than in 2019 such
24  that Edgewood didn't need to be warned about potentially
25  unmet expectations; is that right?

Page 147

1       MS. ZYLSTRA:  Objection to form.  Go ahead.
2       A.  I'm not sure if somebody pointed out that, at
3  the time, when they gave them the permit, saying, you
4  know, this is only for putting under ground, you can't
5  legally do this.  I'm not sure if that happened back
6  then.
7       Q.  You're not sure.  Do you have any reason to
8  believe that that message was conveyed to Madison
9  Edgewood High School in conjunction with that electrical
10  permit in 2015?
11      A.  No.
12      Q.  Edgewood actually did appeal the official
13  notices at -- I think it's 9 and 10; correct?
14      A.  I believe so, yes.
15      Q.  Did you have any involvement with the City's
16  response to that appeal?
17      A.  No, I did not.
18      Q.  Who handled that matter for the City?
19      A.  Matt did.
20      Q.  Do you have any familiarity or knowledge about
21  how the ZBA review process works?
22      A.  Yeah, but -- yes.
23      Q.  Sure.  Do you have any idea what discretion,
24  if any, ZBA has to reverse official notices?
25      MS. ZYLSTRA:  Object.  Form, foundation, to

Page 148

1  the extent it calls for legal conclusion, but you can
2  answer.
3       A.  I would be taking a shot in the dark, so I'm
4  reluctant to do it.  I know some ZBA stuff, you know.
5  They -- like somebody applying for a variance, they
6  have to, I think, list grounds why they're doing it.
7           If it's appealing the interpretation of the
8  zoning administrator, to be honest with you, I don't
9  need -- I don't know if they need grounds.
10          Good question for Matt on Friday.  They may
11  just have the ability to say "we disagree."
12      Q.  Sure.  With respect to the notices issued here
13  on 9 and 11, these officials notices, do you know what
14  discretion, if any, the ZBA has to overturn those, to
15  reverse those?
16      A.  Well, I believe they have complete discretion
17  and then the City could decide whether or not they want
18  to appeal the decision of the ZBA.
19      Q.  To your knowledge, has your department ever
20  issued any citations or official notices to the
21  University of Wisconsin for using property for use not
22  specified in their master plan?
23      A.  Not that I'm aware of.
24      Q.  Have you ever, yourself, reviewed the
25  University of Wisconsin-Madison master plan?

Page 149

1       A.  No.
2       Q.  Were you aware of any effort by anyone in your
3  department to confirm that the university is using its
4  open spaces for athletics and sports and recreation as
5  the way they described it in the master plan?
6       A.  Not that I'm personally aware of, no.
7       Q.  Did you have any involvement in the process
8  for the City's repeal or termination of Edgewood's
9  master plan?
10      A.  None.
11      Q.  Who, if anyone, within your department would
12  have been responsible for speaking for the City on that
13  issue?
14      MS. ZYLSTRA:  Objection.  Form, foundation.
15      A.  Well, from building inspection it would have
16  been Matt.  I believe planning would be actively
17  involved.
18      Q.  So in the time period of, just say, the fall
19  of 2019, do you know who that would have been from
20  planning?
21      MS. ZYLSTRA:  Same objection.  You can answer.
22      A.  Well, Heather Stouder is the director, but it
23  could have been any one of the people underneath her.
24      Q.  So you don't have actual knowledge of who
25  would have been involved in that time?

Page 150

1    A.  Nope.
2    Q.  Okay.
3        (Exhibit 12 marked)
4    Q.  MR. INGRISANO:  Mr. Hank, have you seen this
5  letter before?
6    A.  I believe I have, yes.
7    Q.  See the middle paragraph where it says,
8  "Further enforcement of the zoning code, the ZBA
9  decision, and the notices of violation now rests with
10  the discretion of the city attorney.  This is to inform
11  that you I and my office will take no further
12  enforcement steps unless and until we inform you of our
13  decision to do so.  We will give you any ample notice of
14  any planned enforcement."
15        Did I read that correctly?
16    A.  Uh-huh.
17    Q.  Is that yes?
18    A.  Sorry, yes.
19    Q.  Prior to this issuance of this letter were you
20  consulted about the city attorney's decision to take no
21  further enforcement steps?
22    A.  I believe that under this official notice with
23  the multiple dates on it, that same basic statement was
24  being said contingent on what happened with ZBA.
25    Q.  For the record, you just held up Exhibit 11;

Page 151

1  correct?
2    A.  Yes.  So now, the ZBA decision is over and the
3  city attorney has said that they were not going to
4  pursue penalties based on these official notices at this
5  time.
6    Q.  Sure.  And I understand what the letter is
7  saying.  The letter is saying that at this time they are
8  not going to be basically prosecuting or further
9  enforcing Exhibits 9 or 11.
10        My question to you is, did Mr. May,
11  Mr. Strange, or his office advise you in advance that,
12  hey, we're not going to be enforcing the official
13  notices that your building inspection department issued?
14    A.  I believe so.
15    Q.  What do you recall?
16    MS. ZYLSTRA:  Counsel, can we have the same
17  stipulation as to this?  Thank you.  Go ahead.
18    MR. INGRISANO:  Same stipulation meaning that
19  you're allowing him to answer this question does not
20  waive privilege as to this question or create a subject
21  matter waiver for larger issues?
22    MS. ZYLSTRA:  Correct.  Thank you.
23    MR. INGRISANO:  Got it.
24    MS. ZYLSTRA:  Appreciate that.
25    A.  I believe -- again, I believe -- I remember

Page 152

1  sitting in a meeting with Matt, Mike May, and John
2  Strange where this was discussed.
3    Q.  But you don't recall the contents of any of
4  those discussions; is that right?
5    A.  Other than what is summarized in this letter.
6  Anything other than that, no.
7    Q.  But what I'm hearing you say, then, is you
8  recall meeting them with that office where they said,
9  hey, guys, just so you know, we're not going to be
10  enforcing these notices.  So they previewed, right, this
11  letter for you?
12    A.  Yes.
13    Q.  Did they say why they were not going to be
14  enforcing those?
15    MS. ZYLSTRA:  Can I just have a standing on
16  the stipulation?
17    MR. INGRISANO:  Those are dangerous.  I would
18  much rather just do one at a time.  I want to respect
19  your interest on that clarity so I'm not going to say
20  no, but we need to make sure.  Standing objections are
21  really bad in my opinion.
22    MS. ZYLSTRA:  That's fine.  Then I will just
23  say "same stipulation, counsel."
24    MR. INGRISANO:  Yes.
25    MS. ZYLSTRA:  Go ahead.

Page 153

1    MR. INGRISANO:  Thank you.  Sorry.
2    MS. ZYLSTRA:  No worries.
3    A.  Well, if it's meeting -- again, if it's the
4  meeting that I'm remembering, I believe it was Mike and
5  John mainly leading the discussion, and Mike giving us
6  his thoughts on it and on what we should and should not
7  do, and the results was this letter.
8    Q.  Mr. Hank, I'm sorry, but my questions are
9  actually going to what those thoughts were.
10        I understand there is a meeting, I understand
11  that they previewed it for you, that they gave their
12  thoughts.
13        I'm asking you what were there thoughts as to
14  why they were not going to be issuing citations that
15  Mr. Moskowitz spent a lot of time investigating and
16  issuing.
17    MS. ZYLSTRA:  Object to form.  You can answer.
18  And the same stipulation, Counsel?
19    MR. INGRISANO:  Agreed.
20    Q.  Why Mr. Hank, that's the question.  Why?
21    MS. ZYLSTRA:  Same stipulation?
22    MR. INGRISANO:  Same.
23    MS. ZYLSTRA:  Thank you.  Same objection.
24    A.  Again, I'll just go back giving us their legal
25  advice on what we thought we should be doing at this

Page 154

1  time.
2      Q.  Which was what?
3          MS. ZYLSTRA:  Same?
4          MR. INGRISANO:  Same.
5          MS. ZYLSTRA:  Thank you.
6      A.  And I believe the question or the thought was
7  that Edgewood had the right to appeal this to circuit
8  court, I think circuit court, and that while we were
9  going to hold in abeyance until it was resolved by the
10  zoning board, that we should at least hold it in
11  abeyance until their time had passed of where they could
12  appeal to circuit, I believe.
13     Q.  So it was explained to you, then, that they
14  were going to be taking no further enforcement steps
15  unless and until proved otherwise solely because of the
16  timeline for a pending appeal of the ZBA decision that's
17  referenced as having occurred last night, July 11?
18         MS. ZYLSTRA:  Object to form.  Same
19  stipulation, Counsel?
20         MR. INGRISANO:  Yes.
21         MS. ZYLSTRA:  Go ahead.
22     A.  I believe so, yes.
23     Q.  Nothing else that you can recall from that
24  meeting as to what their rationale was for not pursuing
25  those notices?

Page 155

1          MS. ZYLSTRA:  Same stipulation, Counsel?
2          MR. INGRISANO:  Yes.
3          MS. ZYLSTRA:  Thank you.
4      A.  Not that I recall.  Again, the fact that the
5  major concern was that, at least in their eyes, it
6  seemed a good possibility that they might appeal it to
7  circuit court.
8      Q.  Was there any discussion that pursuing the
9  these citations would be counterproductive or hurt the
10  chances on appeal?
11         MS. ZYLSTRA:  Same stipulation, Counsel?
12         MR. INGRISANO:  Yes.
13         MS. ZYLSTRA:  I'll also object to form.  You
14  can answer.
15     A.  Hurt our chances?  Not that I remember that
16  being a topic.
17     Q.  During this meeting, Mr. Strange neither --
18  I'm sorry.
19         Did Mr. Strange or Mr. May express any opinion
20  on the merits of either of the citations -- I'm sorry,
21  the official notices themselves or of the interpretation
22  of the master plan?
23         MS. ZYLSTRA:  Same stipulation?
24         MR. INGRISANO:  Yes.
25         MS. ZYLSTRA:  Object to form.  You can answer.

Page 156

1      A.  Not that I'm aware of.  And we'd be here if
2  they did object.  If they felt we were wrong, and I
3  don't think we would be here right now.
4      Q.  That's a discussion for a different day, Mr.
5  Hank.
6      A.  Yes, it is.
7      Q.  The letter goes on to paragraph 3, to the
8  second sentence of that paragraph, "We invite Edgewood
9  to file to terminate its master plan and return to the
10  standard CI zoning, which would put it on equal footing
11  with other high schools."
12         Did I read that correctly?
13     A.  Yes.
14     Q.  Did Mr. May or Mr. Strange preview that for
15  you in that meeting?
16         MS. ZYLSTRA:  Same stipulation, Counsel?
17         MR. INGRISANO:  Yes.
18         MS. ZYLSTRA:  And I'll object to form, but you
19  can answer.
20     A.  I believe this was brought up during that
21  meeting, yes.
22     Q.  Was it discussed in that meeting that the
23  repeal of the master plan would provide a pathway for
24  Edgewood to get its lights?
25         MS. ZYLSTRA:  Same stipulation?

Page 157

1          MR. INGRISANO:  Yes.
2          MS. ZYLSTRA:  And object to form, but you can
3  answer.
4      A.  I would say yes.
5      Q.  Did anyone mention in this meeting that the
6  repeal of the master plan would result in a pending
7  light application being granted and issued?
8          MS. ZYLSTRA:  Object to form.  Same
9  stipulation, Counsel?
10         MR. INGRISANO:  Yes.
11         MS. ZYLSTRA:  You can answer.
12     A.  I don't remember that specifically being
13  discussed.
14     Q.  To your knowledge, though, if the master plan
15  were repealed, are you aware of any other impediments to
16  the issuance of the Edgewood's February 2019 application
17  for outdoor lights?
18         MS. ZYLSTRA:  Object to form, foundation.  You
19  can answer.
20     A.  Again, based on my limited knowledge of the
21  standard CI zoning, no.
22     Q.  The mayor and Alder Evers -- is it pronounce
23  Evers or Evers?
24         MS. ZYLSTRA:  Evers.
25         MR. INGRISANO:  I went through the first five

40 (Pages 154 - 157)

Page 158

1 minutes of this case thinking he was Tony Evers' kid for
2 some reason. Don't tell him I said that.
3      Q.  I see on this letter, Exhibit 12, that the
4 mayor and Alder Evers is copied; is that right?
5      A.  Uh-huh.
6      Q.  Have you heard whether either the mayor or
7 Mr. Evers had any sort of response or reaction to
8 Exhibit 12?
9           MS. ZYLSTRA:  Same stipulation to the extent
10 it came --
11          MR. INGRISANO:  Yeah.  To the extent it came
12 from an attorney, yes.
13     A.  Not aware of any.
14     Q.  Have you ever spoken with either the mayor or
15 Alder Evers about the Edgewood lights or the use of the
16 Edgewood field?
17          MS. ZYLSTRA:  I'm going to object to the
18 extent that any discussions -- and I don't know that
19 there were any -- involved discussions with counsel.
20          Those will be privileged and I'll instruct you
21 not to answer.  To the extent you had discussions with
22 them outside of that, you can answer the question.
23          I'm not sure if you had any discussion, so
24 I'll start there.
25          MR. INGRISANO:  By counsel, you're referring

Page 159

1 to trial counsel, you?
2           MS. ZYLSTRA:  No, I think to the extent that
3 he's had discussions, if there was a meeting with
4 Attorney May and the mayor involving that he
5 participated in, I'm claiming privilege, at least until
6 I know what the answers are here.
7      A.  The mayor, I would say definitely no.  I don't
8 ever remember, at least with me, being in a meeting with
9 her where Edgewood came up.
10         With Alder Evers, if it was, it would have
11 been like in passing when we were talking about
12 something else.
13         But like talking specifics about Edgewood with
14 the alder, no.  Matt was leading those things.  If he
15 called in passing about something, I think he was
16 complaining about a place on the Beltline with lighting
17 issues and he may have just, like in passing, you know,
18 saying, you know, "Edgewood is still going on" or
19 something like that, you know.  But talking specifics
20 with him, no.
21     Q.  Not about the merits of --
22     A.  No.
23     Q.  Not about -- hold on.
24         You don't have any recollection of
25 conversations with Alder Evers about the merits of the

Page 160

1 interpretation of the master plan or the merits of the
2 citations that were issued by your department?
3      A.  No.
4      Q.  I will represent to you that the
5 Campus-Institutional District zoning ordinance was
6 amended in October of 2019.
7          What involvement, if any, did you have with
8 that amendment or the amendment process?
9      A.  I believe none.
10     Q.  To your knowledge, did anyone in your
11 department have a role or involvement in that amendment
12 or the amendment process?
13     A.  I would think certainly Matt did and maybe
14 Jenny.
15     Q.  Who is Jenny?
16     A.  Jenny Kirchgatter.
17     Q.  What's her role within your department, at
18 least as of that time in 2019?
19     A.  She's the assistant zoning administrator.
20 Generally, amendments to the zoning code are handled by
21 a joint group from planning and zoning, discussing them.
22 Matt certainly would have been involved.  And if anybody
23 else, I would assume it would have been Jenny.
24     Q.  Were you ever asked for any -- to review or
25 provide input on the amendment itself?

Page 161

1      A.  Not that I recall.
2      Q.  Did you ever review the amendment either
3 before or after its passage?
4      A.  Not that I recall.
5      Q.  Did anyone ever explain to you the impact or
6 changes created by that amendment?
7          MS. ZYLSTRA:  I'll object to form on that.
8      A.  Well, I believe one of the things that it did
9 was that it made some permitted uses become conditional
10 uses.
11     Q.  So you didn't review the amendment.  You
12 weren't involved with its process.
13         So I guess my question for you, sir, is, why
14 do you -- what's that belief based upon that it changed
15 some permitted uses to conditional uses?  How did you
16 come to that understanding?
17     A.  Because they ended up in front of the Plan
18 Commission.
19     Q.  "They" being who?
20     A.  Edgewood.
21     Q.  So is that the Plan Commission level that you
22 developed an understanding that that was what the impact
23 of the amendment was?
24     A.  I don't remember exactly when, but I remember
25 hearing that the amendment would -- would require --

41 (Pages 158 - 161)

Page 162

1 would take things that were permitted uses and turn them
2 into conditional uses. When that was, I'm sorry, I just
3 don't remember.
4     Q.  Okay.  Did you ever talk to anyone about why
5 this amendment was being proposed?
6     A.  Did I?  No.
7     Q.  So you don't know what motivated the
8 introduction of this amendment; is that fair?
9     A.  That is fair.
10    Q.  Were you involved, sir, with Edgewood's
11 application for a conditional use permit for its lights
12 in 2020?
13    A.  No, I was not.
14    Q.  Were you in any way consulted on the analysis
15 or issuance of a conditional use permit?
16    A.  No.
17    Q.  Were there any discussions with Mr. May,
18 Mr. Strange, Mr. Tucker, Mr. Parks, Mr. Evers, or
19 Ms. Stroud (sic) regarding your review and analysis of a
20 conditional use application?
21       MS. ZYLSTRA:  Same stipulation, Counsel?
22       MR. INGRISANO:  Yes.
23       MS. ZYLSTRA:  I'll also object to form on the
24 question.  You can answer.
25    Q.  May, Strange, Tucker, Parks, Evers, Stroud?

Page 163

1     A.  No.
2     Q.  After the October 2019 amendment to the
3 Campus-Institutional zoning ordinance, do you know if
4 outdoor light applications in the Campus-Institutional
5 zone districts were still under your department's
6 purview?
7       MS. ZYLSTRA:  Object to form.
8     A.  Well, certainly, the review of 10.085, yes.
9 Was there something in the Campus-Institutional that
10 allowed the Plan Commission to weigh in on whether or
11 not to allow lights?  No, I am not.  I don't have that
12 knowledge.  But the lighting standards, that was purely
13 my department.
14    Q.  Sure.  So, Mr. Rewey, is he under the -- is he
15 in the zoning administrator's department within the five
16 departments that you're in?
17    A.  No, he is a new construction inspector who
18 also does plan review --
19       (Reporter asks for clarification.)
20       He's a construction inspector.  He does plan
21 review for lighting and also for building.
22    Q.  Got it.  So, to your knowledge, Edgewood's
23 application for lights in 2020 did not fall to someone
24 like Mr. Rewey but fell into a different department
25 within the City; is that correct?

Page 164

1       MS. ZYLSTRA:  Objection.  Form, foundation.
2 You can answer.
3     A.  Again, if it's for compliance with 10.085,
4 that's purely Steve Rewey and building.  He's not
5 reviewing it for anybody else.  He's only reviewing it
6 for the standards of 10.085.
7       And then when it complies, it gets signed off
8 in the site plan review as similar in Exhibit 3.
9       But again, his review has absolutely nothing
10 to do with Plan Commission, zoning, or whatever.  It's
11 purely nuts and bolts; does it meet the lighting
12 standards in 10.085.
13    Q.  Got it.  Are you aware of any conditional use
14 permit applications for outdoor lighting during your
15 time as director up until your retirement other than
16 Edgewood's?
17       MS. ZYLSTRA:  Object to form.  You can answer.
18    A.  If you're going to talk about under
19 Campus-Institutional after the fact became aware of
20 Memorial.  But virtually any large development, the
21 exterior lighting goes through this process outlined in
22 Exhibit 3.
23    Q.  10.085?
24    A.  Yes.
25    Q.  Okay.

Page 165

1     A.  So any of those large buildings that you see
2 on East Washington Avenue or any exterior parking lot
3 lighting is reviewed under 10.085.
4     Q.  So outside of Campus-Institutional, regardless
5 of time, all other zoned districts have always -- their
6 outdoor lighting applications have always been reviewed
7 under 10.085; correct?
8     A.  Yes.
9       MS. ZYLSTRA:  Late objection.  Form,
10 foundation.  Go ahead.
11    A.  Yes.
12    Q.  Prior to the October 2019 amendment to the
13 Campus-Institutional District, outdoor lighting
14 applications for Campus-Institutional were also assessed
15 under 10.085; is that right?
16       MS. ZYLSTRA:  Same objections.
17    A.  I guess I want to be more direct.  All outdoor
18 lighting in a commercial setting, which Edgewood also is
19 because of the nature of the thing, all outdoor
20 commercial lighting falls under 10.085 and would be
21 reviewed and approved by either Steve Rewey or somebody
22 else doing lighting analysis.
23       And then when they were done with the review,
24 they would approve it in the documents similar to
25 Exhibit 3.

Page 166

1    Q.  So after the October 2019 amendment to
2  Campus-Institutional, in addition to 10.085 analysis
3  that was going to be done, Campus-Institutional
4  districts without a master plan were now also subject to
5  a conditional use permit requirement for outdoor
6  lighting; is that correct?
7        MS. ZYLSTRA:  Objection.  Foundation.  You can
8  answer.
9    A.  You know, there might be other things besides
10 lighting.  I believe the answer would be yes.  Again,
11 not an expert on --
12   Q.  I'm sorry, you said the answer was what?
13   A.  I believe the answer would be yes.  But that
14 might -- I don't know if outdoor lighting is the only
15 thing that they made a conditional use.
16   Q.  I didn't ask about any other thing; I asked
17 about outdoor lighting.
18      I'm not asking you to talk about the universe
19 of things that might not be subject to conditional use.
20 I'm asking you about outdoor lighting specifically.
21   A.  I believe they -- the reason I'm hesitating, I
22 don't know what the ordinance says, so I'm a little bit
23 apprehensive to shoot from the hip and say, yes, it does
24 that, when maybe it does it but through some other way.
25 I just don't know.

Page 167

1    Q.  Understood.
2        (Exhibit 13 marked)
3    Q.  MR. INGRISANO:  Mr. Hank, I'm handing you
4  what's been marked as Exhibit 13, which is a printout of
5  code section 28.097, Campus-Institutional District.  Do
6  you see that?
7    A.  Yes.
8    Q.  Now, I'm going to ask you to take a look at
9  Section 2, which is "Master Plan Requirement" on the
10 first page.
11   A.  Yep.
12   Q.  And you see where it says down there after
13 Section 2, after it says "Amended by ORD-19-69.
14 10-10-19."  Do you see that?
15   A.  Uh-huh.
16   Q.  Is that a yes?
17   A.  Yes, it is.
18   Q.  Have you had a chance to review this code
19 section since its amendment?
20   A.  No.
21   Q.  No?
22   A.  No.
23   Q.  Under (2)(d) on the first page.
24   A.  Uh-huh.
25   Q.  "In a Campus-Institutional District without a

Page 168

1  Campus master plan, the establishment, improvement, or
2  modification of any primary or secondary use occurring
3  outside of an enclosed building shall require
4  conditional use approval."
5        Do you see that?
6    A.  Yes.
7    Q.  Do you have an understanding as to what impact
8  that provision has on outdoor lighting permits for
9  Campus-Institutional districts without a Campus Master
10 Plan?
11       MS. ZYLSTRA:  Objection.  Form, foundation.
12 You can answer.
13   A.  Well, I could see how that would be -- how
14 that could be interpreted to mean that installing lights
15 might be -- might require conditional use.
16   Q.  All right.  Let's change gears here, Mr. Hank.
17 Do you need a break?
18   A.  No.
19   Q.  Sir, do you agree with me that Edgewood is a
20 religious institution?
21   A.  Yes.
22   Q.  A Catholic school?
23   A.  Yes.
24   Q.  When you were there at Edgewood you had a
25 religious education requirement, didn't you?

Page 169

1    A.  Yes.
2    Q.  The school would require attendance at school
3  liturgies; is that right?
4        MS. ZYLSTRA:  Object to form, foundation.  You
5  can answer.
6    Q.  When you were there.
7    A.  At school liturgies?  We -- I want to say I
8  don't remember having them.
9    Q.  Really?
10   A.  Yep.
11   Q.  Did you have any nuns or sisters on campus
12 that you recall?
13   A.  There were a few, yes.
14   Q.  And they taught classes?
15   A.  Yes.
16   Q.  Any priests on campus?
17   A.  Yes.
18   Q.  Did you ever go to the Edgewood website?
19       MS. ZYLSTRA:  Object to form.  You can answer.
20   A.  Occasionally, when I would get an email from
21 like, say, Dennis McKinley mentioning the passing of
22 somebody or whatever, you know, click on links and stuff
23 like that, but generally no.
24   Q.  Would you consider yourself to be an active
25 alumnus of Edgewood High School?

Page 170

1    MS. ZYLSTRA: Object to form. You can answer.
2    A.  An active alumnus. My best lifelong friends
3  are all Edgewood graduates. So how you interpret that,
4  it was -- my time there I always held very special. I
5  loved that institution.
6        Now, like later in life, you know, my wife and
7  I were not huge financial supporters of Edgewood. We
8  are public servants. Don't make a lot of money compared
9  to a lot of the people that graduate from there.
10       But I'm going to say Edgewood always had a
11  very dear spot in my heart for me.
12   Q.  Do you participate in any alumni events,
13  attend reunions, things like that?
14   A.  Certainly reunions, class reunions. I
15  actually get to go to about two of them every five years
16  because my wife is two years older than me.
17   Q.  She's an alum, too?
18   A.  Yes, she is. '73.
19   Q.  My wife is class of '93.
20   A.  Hmm.
21   Q.  With what frequency do you think you drive by
22  the school on Monroe Street?
23   A.  Not frequent at all.
24   Q.  Your activities of life don't cause you to
25  come to that part of town very often?

Page 171

1    A.  I live on the east side. The vast majority of
2  the time I spend on the east side of Madison. I've a
3  very good friend who lives by Odana that when I go and
4  visit him or spend time with him usually it's going up
5  on Monroe Street, but that's really not that often.
6    Q.  Understood.
7    A.  Did I say Nakoma?
8    Q.  When?
9    A.  Did I say the Nakoma Golf? He lives by the
10  Odana golf course.
11   Q.  Okay.
12   A.  Sorry, I just thought I misspoke.
13       (Exhibit 14 marked)
14   Q.  MR. INGRISANO: Mr. Hank, I'm handing you
15  what's been marked as Exhibit 14. It's a printout of
16  part of Edgewood's website and mission and sponsors.
17       You see page 2 has a mission statement and a
18  sponsorship statement. Do you see that?
19   A.  Uh-huh.
20   Q.  Is that a yes?
21   A.  Yes.
22   Q.  Thank you. Let me ask you to review that
23  mission and that sponsorship and let me know when you're
24  done.
25   A.  Okay.

Page 172

1    Q.  Do you have any reason to question or doubt
2  the sincerity of Edgewood's stated mission on this
3  document, Exhibit 13 --
4        MS. ZYLSTRA: Objection. Form, foundation.
5    Q.  MR. INGRISANO: -- 14, sorry.
6        MS. ZYLSTRA: I apologize, Counsel.
7  Objection. Form, foundation. You can answer.
8    A.  No.
9    Q.  You mentioned that Edgewood, before, is a
10  commercial entity and is therefore subject to the City's
11  zoning and land use regulations; correct?
12   A.  It may be a bad choice of the words. I
13  consider them -- they fall under the commercial building
14  code.
15   Q.  But you would agree with me that Edgewood is
16  subject to Madison's land use regulations; correct?
17   A.  Yes.
18       MS. ZYLSTRA: Late objection to form.
19       THE WITNESS: Sorry, I've got to keep waiting.
20  Yes.
21       MS. ZYLSTRA: That's okay.
22   Q.  They are not exempt in any way from review by
23  your department, review by the zoning administrator?
24       MS. ZYLSTRA: Object to form, foundation. You
25  can answer.

Page 173

1    A.  No, they are not.
2    Q.  Do you agree with me, sir, that the City's
3  decision to withhold the lighting permit had the effect
4  of restricting or limiting Edgewood's use of its
5  property?
6        MS. ZYLSTRA: Objection. Form, foundation.
7  You can answer.
8    A.  So the wheels are spinning. I'll answer
9  it this way: Under the assumption that
10  Campus-Institutional zoning does not prohibit them
11  playing games there, but does limit them from installing
12  lights. With that in mind, it would limit when they can
13  do that but not that they can do it. It's hard to play
14  a football game in the dark.
15       So again, I'm not sure exactly -- I'm not that
16  familiar with the Campus-Institutional document anymore,
17  so if it would not prohibit the playing of the games
18  without the lights, I don't think you can play them at
19  night, so that would restrict that or limit that.
20   Q.  The decision to withhold the permits, though,
21  restricted Edgewood's ability to have practices at
22  night, too; correct?
23       MS. ZYLSTRA: Objection. Form, foundation.
24  You can respond.
25   Q.  Just like you can't play a football game in

44 (Pages 170 - 173)

Page 174

1 the dark, you can't practice football in the dark,
2 right?
3        MS. ZYLSTRA: Same objection.
4     A. I would say yes, that is true.
5     Q. And, in fact, the decision to withhold the
6 light permit resulted in the fact that any permitted use
7 of the field that could be done during the daylight
8 hours was not available to Edgewood and restricted their
9 ability to have that same use at nighttime; isn't that
10 correct?
11        MS. ZYLSTRA: Objection. Form, foundation.
12 You can respond.
13     A. Yes, but similar to East and West that have
14 practice fields that aren't lit, so they would not be
15 able to practice at night.
16     Q. Do you agree with me, sir, the City's
17 interpretation of the master plan to prohibit athletic
18 contests and to restrict use of the field for team
19 practices and Phys Ed classes, that that restricted
20 Edgewood's use of its property?
21        MS. ZYLSTRA: Objection. Form, foundation.
22 You can answer.
23     A. Yes, but Edgewood also participated in the
24 drafting of that document, so they were, I'm going to
25 say, in agreement with it.

Page 175

1     Q. So you're saying that Edgewood agreed to limit
2 its field to be used for team practices and Phys Ed
3 classes?
4     A. I believe that's what the master plan says,
5 yes.
6     Q. But as I've asked you before, you're not aware
7 of any actual statements by Edgewood saying, yeah,
8 that's what we agreed to do?
9        MS. ZYLSTRA: Objection. Asked and answered.
10 You can answer.
11     A. Not that I'm aware of.
12     Q. So they had used this field for Edgefest for
13 all these years and now with the master plan they made
14 an intentional decision -- are you saying they made an
15 intentional decision to prohibit their uses for things
16 like Edgefest?
17        MS. ZYLSTRA: Objection. Form, foundation.
18 You can respond.
19     A. I am not -- I'm not sure when the original
20 master plan was -- was drafted and approved. I'm not
21 even sure they were doing Edgefest at that point.
22     Q. That's not my question. They had historical
23 precedent for using that field for Edgefest, and what
24 you're saying is with the master plan, the way they
25 drafted it, they intentionally decided to foreclose

Page 176

1 using that field for something like Edgefest during the
2 duration of the master plan. Is what that you're
3 saying?
4        MS. ZYLSTRA: Same objections.
5     A. I believe that's what the master plan says.
6     Q. I'm asking you what Edgewood -- what you know
7 what Edgewood's intention was in the drafting of the
8 master plan.
9        Did Edgewood intend in 2014 to limit that
10 field to only be used, by calling it an athletic field,
11 to only use it for team practices and Phys Ed classes?
12        MS. ZYLSTRA: Objection. Form, foundation.
13 You can answer.
14     A. I can't speak to Edgewood's intentions.
15     Q. One line in a 220-page master plan, you think
16 that shows Edgewood's intent to restrict their football
17 field to be used for practices and Phys Ed classes; is
18 that fair?
19        MS. ZYLSTRA: Objection. Form, argumentative,
20 foundation, asked and answered. You can answer it
21 again.
22     A. I can only assume that it was omitted because
23 it would have been -- if they said they had planned to
24 play games there, they have athletic competitions there,
25 especially night games, I don't -- it would have made it

Page 177

1 a lot more difficult to get their master plan approved.
2     Q. So you believe that if they had omitted the
3 line about the field being used for team practice and
4 Phys Ed classes, they had omitted that line, it just
5 said "athletic field," that that would have impacted
6 their ability to get that master plan approved?
7        MS. ZYLSTRA: Objection. Form, foundation.
8     A. It probably would have created a lot more
9 scrutiny from the neighbors that were involved in
10 helping, you know, navigate the master plan process.
11     Q. Do you have any knowledge, though, it would
12 have actually changed how that master plan was reviewed?
13        MS. ZYLSTRA: Objection. Form, foundation.
14 You can respond.
15     A. No, I have no knowledge of that.
16     Q. How many master plans have been submitted by
17 Campus-Institutional District since 2013?
18        MS. ZYLSTRA: Objection. Form.
19     A. I think two.
20     Q. And who?
21     A. Edgewood, and I think the university.
22     Q. And Edgewood's was the first; correct?
23     A. That, I don't know.
24     Q. You don't know if Edgewood's came before the
25 university's?

45 (Pages 174 - 177)

Page 178

1   A.   No.
2   Q.   You agreed with me earlier today that part of
3 your job is to enforce and interpret Madison's codes and
4 ordinances; correct?
5   A.   That's correct.
6   Q.   Are you aware of any rules or presumptions
7 that you're supposed to use in guiding your interpretive
8 power?
9       MS. ZYLSTRA:  Object to form.  You can answer.
10   A.   Well, I'd like to say I use good judgment in
11 my -- in my day.
12   Q.   Sure.  I think you also used the phrase
13 "beneath your notice" too, right?
14   A.   Yes.
15   Q.   And that's part of it, that's part of what you
16 bring to the table when you're interpreting zoning
17 ordinances?
18       MS. ZYLSTRA:  Object to form.  You can
19 respond.
20   A.   In everything that we do enforcement, some
21 things, you know, go back to shoveling the sidewalk.  If
22 you read the ordinance, it says you've got to clear edge
23 to edge the entire length.  We do have a point where if
24 you do a certain percentage the rest of it is going to
25 be beneath our notice.

Page 179

1   Q.   Is there any other athletic fields in Madison
2 with outdoor lighting that hosts athletic contests at
3 night?
4       MS. ZYLSTRA:  Objection.  Foundation.
5   A.   Any athletic fields with lighting that host
6 contests at night?
7   Q.   Yes.
8   A.   Okay.  I'm going to shoot maybe myself in the
9 foot.  I'm not aware of any that don't have -- if they
10 have lighting, I'm not aware of ones that don't have
11 contests at night.
12   Q.   Interesting take on my question.  I'll run
13 with it.
14       So, to your knowledge, all fields that have
15 outdoor lighting use that outdoor lighting for night
16 games; is that correct?
17       MS. ZYLSTRA:  Objection.  Foundation.  You can
18 answer.
19   A.   I'm not aware of ones that don't, let's put it
20 that way.  There may be, but I'm not aware of ones that
21 don't.
22   Q.   Name some fields for me in Madison, Wisconsin
23 where I can go and watch an athletic contest at night
24 under lights?
25   A.   Breese Stevens, Mansfield, Lussier Stadium.

Page 180

1 Any of the city softball diamonds.
2   Q.   Keep going, if you can.
3   A.   Those are the only ones that come to mind.
4   Q.   Are there any parks in Madison that have --
5 any city parks that offer nighttime ice skating in the
6 winter, to your knowledge?
7   A.   I believe so, but I'm not sure if they still
8 have competitions.  Maybe hockey.  I know Olbrich used
9 to have hockey boards.  The field by Sayle Street.  They
10 used to have hockey boards up there with lighting.  To
11 be honest, I'm not sure if those are still there.  So I
12 don't know.
13   Q.   Got it.  How about Nielsen Tennis Stadium on
14 the UW campus?
15   A.   I'm going to say I'm totally unaware of that
16 facility.  I know the indoor facility, but I really know
17 absolutely nothing about the outdoor tennis facility.
18   Q.   How about the Goodman Softball Complex at UW?
19   A.   I know it exists.  I've never been there for a
20 game.
21   Q.   Do you know it to have lights for night games?
22       MS. ZYLSTRA:  Object.  Foundation.  You can
23 answer.
24   A.   I cannot say that I have personal knowledge if
25 they do or they don't.

Page 181

1   Q.   Got it.
2       MS. ZYLSTRA:  Counsel, can we take a short
3 break?
4       MR. INGRISANO:  Absolutely.
5       (Recess)
6 BY MR. INGRISANO:
7   Q.   Mr. Hank, I'm going to ask you to get Exhibit
8 4 back in front of you, please.
9   A.   Yes.
10   Q.   I'm looking at exhibit -- I'm sorry, looking
11 at Interrogatory No. 1.
12       It asks about email addresses used by the
13 defendants, including personal email addresses from
14 which you would have sent or received emails related to
15 or referencing Edgewood's use of its athletic field.
16       And in the response, the only email that looks
17 related to you is GHank@cityofmadison.com.  Do you see
18 that?
19   A.   Uh-huh.
20   Q.   Is that yes?
21   A.   That is correct.
22   Q.   Are you aware of any other email addresses
23 that you would have used during this period of time of
24 this dispute -- let's just say from 2013 through your
25 retirement of 2021 -- that's any different, or

Page 182

1 additional emails that you would have used?
2     A.   That would have ever mentioned Edgewood?
3     Q.   That would have been related to, let's just
4 say, the use of Edgewood's athletic field.
5     A.   None.  Whenever a friend used my work email
6 address, they got admonished and I said to never use it
7 again and here's my personal.  Never.
8     Q.   So you used personal email for personal work
9 and work email for work; is that right?
10     A.   That is correct.
11     Q.   Interrogatory No. 4, sir.
12     A.   Yep.
13     Q.   Are you aware of any -- in your experience and
14 given your history with the department, are you aware of
15 any outdoor lighting permits that were denied to Madison
16 area schools from 2013 to the present?
17         MS. ZYLSTRA:  Objection.  Foundation.  I'm
18 sorry, you said "are you aware."  Strike that.
19         MR. INGRISANO:  Thank you.
20     A.   I'm not aware of any.
21     Q.   So to your knowledge, the denial of Edgewood's
22 -- or sorry, the withholding of Edgewood's permits is
23 the only example that you're aware of; is that fair?
24         MS. ZYLSTRA:  Objection.  Form.  You can
25 answer.

Page 183

1     A.   That's correct.
2     Q.   Interrogatory No. 5, are you aware of any
3 athletic fields in the city of Madison associated with
4 any public or private schools that are not permitted to
5 host athletic contests?
6         MS. ZYLSTRA:  Object to form.
7     Q.   I paraphrased No. 5 a little bit, but just.
8     A.   None that I'm aware of.
9     Q.   So I already asked you about other lighted
10 fields around the city of Madison.
11         Interrogatory No. 8 on page 7, "Identify all
12 city-owned parks and recreational areas that incorporate
13 outdoor lighting sufficient to permit nighttime athletic
14 events and activities, including football, baseball,
15 hockey, basketball, softball, ice skating, roller
16 skating or blading, skateboarding, pickleball, frisbee
17 golf, soccer, lacrosse, and track and field."
18         So are there any additional -- beyond what you
19 may have already identified in your prior answer, are
20 there any city-owned parks and recreational areas that
21 fit that bill?
22         MS. ZYLSTRA:  Objection.  Form.
23     A.   One that comes to mind that I didn't mention
24 earlier was Burr Jones field.
25     Q.   Any others?

Page 184

1     A.   I'm trying to think.  There is the park off of
2 McKenna Boulevard that has a bunch of softball diamonds
3 associated with it, Elver Park.  Bowman field.  I'm
4 drawing a blank on any on the southeast side that I can
5 think of.
6     Q.   Okay.  Interrogatory No. 9, "Identify all
7 permitted uses of Edgewood's athletic field during the
8 effective dates of Edgewood's master plan."
9         Is it fair from your prior testimony to say
10 the answer to that would be team practices and physical
11 education classes?
12         MS. ZYLSTRA:  Objection.  Form, foundation.
13 You can answer.
14     A.   Yes, what you just said.
15     Q.   Thank you.
16         (Exhibit 15 marked)
17     Q.   MR. INGRISANO:  Mr. Hank, I'm handing you
18 what's been marked as Exhibit 15.  I'll represent to you
19 that this is -- these are excerpts from Edgewood
20 yearbooks from the years 1973, '74, '75.
21         I'm going to ask you if you can find yourself
22 in any of these pictures.
23     A.   I'm struggling on the first one.  I found
24 myself on the second page.  Come on.  That might be
25 there behind, but okay, go ahead, go ahead.

Page 185

1     Q.   Take a red pen, sir, on the exhibit.  Can you
2 circle yourself on any of the pictures where you think
3 you are?
4     A.   Oh, dear god.  Okay.  I'm really struggling on
5 the first one.  The second one -- I know that's me
6 there.
7     Q.   You're the center?
8     A.   I'm the center.  So to be honest, two of them
9 I could not.
10     Q.   Okay.  Well, it's an old picture.
11     A.   And they are not color.
12     Q.   Not great copies.
13     A.   Yeah.
14         (Exhibit 16 marked)
15     Q.   MR. INGRISANO:  I'll hand you what's been
16 marked as Exhibit 16.  This is Defendants' Response to
17 Plaintiff Edgewood High School of the Sacred Heart,
18 Inc.'s Requests for Admissions.
19         Have you ever seen this document before?
20     A.   I believe I might have seen this.
21     Q.   Did you review this document before it was
22 sent out on December 9 of 2021 to review the accuracy of
23 the answers to these requests for admission?
24     A.   December 20 of 2021?
25     Q.   December 9 of 2021.  If you look at page 51 of

47 (Pages 182 - 185)

Page 186

1 this document, after Request No. 168, I know there are a
2 lot of requests, but signed by your attorneys and sent
3 out that date -- served on that date.
4      I'm asking you whether you reviewed the
5 accuracy of any of the responses to these requests to
6 admit prior to that.
7      A.   To be honest, I don't remember reviewing it.
8      Q.   Request No. 168, look at that if you could.
9      A.   168.
10     Q.   You were asked to admit that the City -- this
11 is on page 51.
12          You were asked to admit that the City did not
13 issue a written notice of denial for Edgewood's February
14 2019 lighting application for Edgewood's September 2019
15 lighting application.
16          And then after some objections, the answer is,
17 "Subject to and without waiving these objections, the
18 City Defendants deny."
19          Do you see that?
20     A.   Yeah, I see it.
21     Q.   Okay.  Are you aware of a written notice of
22 denial for Edgewood's February 2019 lighting
23 application?
24     A.   I'm trying to remember the exhibits that I
25 have seen.  I'm sorry, I don't think so.

Page 187

1      Q.   Have you seen a written notice of denial
2 issued by the City for Edgewood's September 2019
3 lighting application?
4      A.   Not that I remember.
5      Q.   I'll ask you to take a look at page 48.
6      A.   Yeah.
7      Q.   Request No. 155, the middle of the page:
8 "Admit that Olbrich Park, Warner Park and Duane F.
9 Bowman Park are city parks adjacent to residentially
10 zoned neighborhoods leased to high schools for athletic
11 events without restriction on light or sound."
12          Did I read that correctly?
13     A.   Yes.
14     Q.   And the response there is "City Defendants
15 deny."
16          Do you see that?
17     A.   Yes.
18     Q.   Do you know why you denied that Request No.
19 155?
20          MS. ZYLSTRA:  I'll object to the extent your
21 answer involves any communications with attorneys.  It's
22 attorney-client privilege, and I instruct you not to
23 answer the question.
24          If you can provide an answer to that question
25 that does not involve any communications with attorneys,

Page 188

1 you can answer it.
2          Can you answer that question, Mr. Hank, or
3 not?
4      A.   I'm not -- okay.  I'll answer it this way:
5          In regards to Obrich Park, I'm not aware of a
6 high school using that at all.  Warner Park.
7          The only one I think somebody is using is
8 Bowman field.  I have no knowledge that they have leased
9 Warner Park or Bowman field.
10     Q.   Sure.  But you do recognize that Duane F.
11 Bowman Park is leased to high schools for athletic
12 events?
13     A.   No, I'm -- no, actually, I am not aware of
14 that.
15     Q.   But you didn't say "I'm not aware" or "I don't
16 have any information"; you said that you deny this.
17          MS. ZYLSTRA:  Objection.  I'm going to
18 instruct you not to answer.  These are my answers that I
19 signed on behalf of the City.  You're asking him about
20 language that's being used on this document.  That, I
21 think, is my work product.
22          MR. INGRISANO:  And we have raised this issue
23 before.  We have consolidated answers from all these
24 defendants.  We don't know who is answering what and
25 what the factual basis --

Page 189

1          MS. ZYLSTRA:  I have --
2          MR. INGRISANO:  I'm sorry, I'm sorry, but
3 parties answer discovery; lawyers don't answer
4 discovery.  And if he's denying something I have the
5 right to inquire some factual that he has for why that
6 was denied.
7          If you're going to -- if you want to say on
8 the record that you did not consult with your client
9 before issuing these and that you issued these on your
10 own without consulting Mr. Hanks about these responses,
11 go ahead and make that record.
12          But I have a right to understand that these
13 are truthful answers from this party.
14          MS. ZYLSTRA:  Counsel, I am not preventing you
15 from asking him what he knows.  What you are asking him
16 is why the decision was made that counsel put in this
17 objection in this language.
18          I think your question could be asked and be
19 properly worded.  What your question asked him, I
20 believed invokes the attorney-client privilege.
21     Q.   What factual information are you aware of that
22 warrants denying that response with respect to Bowman
23 Park?
24          MS. ZYLSTRA:  I'll object to form, but you can
25 answer.  And asked and answered to the extent he's

Page 190

1 provided.
2    A.  I have no knowledge that any of these are
3 leased to high schools for athletic events, period.
4 I have no knowledge of that.  It's not under my
5 purview.
6    Q.  Understood.  But you denied it.  Your answer
7 is a denial.  It's not an "I don't have information
8 about that."
9       Are you aware of any facts that would say
10 that is -- are facts in that request to admit that
11 should be denied?
12       MS. ZYLSTRA:  Object.  Form, foundation,
13 argumentative.  You can answer.
14    A.  I did not provide information on this
15 personally.
16    Q.  Page 8, Request No. 14.
17    A.  Yes.
18    Q.  "Admit that electrical permits were
19 applied for and granted as part of the 2015 field
20 renovation."
21       You did not respond to that Request No. 14.
22 I'm asking for a response today.
23       MS. ZYLSTRA:  And I'll object, Counsel,
24 because, first of all, this is an objection, so that's
25 based on attorney -- that's based on mine.

Page 191

1       I also believe that there was follow-up
2 correspondence with regard to some of the requests to
3 admit so a further answer was given on that.
4       So I'll object on form and foundation.  But
5 Mr. Hank, you can answer that question.
6    A.  I believe the electrical permit was issued to
7 install the conduit for future lighting and speak -- and
8 PA system.
9    Q.  Page 7, sir, question No. 10.  "Admit that
10 lacrosse matches have been regular events on Edgewood's
11 field since 2015."
12       Do you admit or deny that response -- that
13 request?
14       MS. ZYLSTRA:  Objection.  Form, foundation,
15 asked and answered.
16       You can answer again, Mr. Hank.
17    A.  I have no personal knowledge that lacrosse
18 matches have been played there, ever.
19    Q.  Sir, you previously testified that you believe
20 Edgewood is a religious institution; correct?
21    A.  Yes.
22    Q.  I'll ask you to look at page 5, Request No. 3.
23       "Admit that Edgewood is a religious
24 institution under RLUIPA, 42 U.S.C. Section 2000cc, et
25 seq."  City Defendants deny that.

Page 192

1       What facts are known to you, sir, that would
2 cause you to deny this request?
3       MS. ZYLSTRA:  Objection.  Form, foundation.
4 Rule of Completeness and not reading the entire answer.
5 It calls for a legal conclusion.
6       MR. INGRISANO:  To the extent further answer
7 is required, the City defendants deny.  And so I'm going
8 to explore what facts this witness has, if any, that
9 would support his denial of this Request No. 3.
10    Q.  Mr. Hank?
11    A.  I'm going to say I'm not qualified to answer
12 that question under RLUIPA.  It is my personal belief
13 that they are a religious institution, but is it under
14 RLUIPA?  I have no idea.
15    Q.  Page 9, sir.  Request No. 17.  "Admit that
16 Edgewood's educational mission is in furtherance of the
17 sincerely held religious beliefs of the Dominican
18 Sisters of Sinsinawa and of Edgewood."  After a --
19    A.  I'm sorry, I was catching up.  I have a hand
20 injury from a table saw so I move slowly.
21    Q.  Sure.  No worries.
22    A.  17?
23    Q.  17.  "Admit that Edgewood's educational
24 mission is in furtherance of the sincerely held
25 religious beliefs of the Dominican Sisters of Sinsinawa

Page 193

1 and of Edgewood."
2       Did I read that correctly?  Did I read Request
3 No. 17 correctly?
4    A.  You did, and --
5    Q.  So, sir, my next question is, after an
6 objection the response given is, "To the extent further
7 answer is required, the City Defendants deny."
8       My question for you, sir, is are you aware of
9 any facts that caused you to deny that Edgewood's
10 educational mission is in furtherance of its sincerely
11 held religious beliefs of the Sinsinawan Dominicans or
12 of Edgewood?
13       MS. ZYLSTRA:  Objection.  Form, foundation,
14 rule of completeness.
15    A.  I am not aware.
16    Q.  Sir, page 10, Request No. 20.  "Admit that
17 athletics is a primary way some Edgewood students
18 correct with each other."
19       Did I read that correctly?
20    A.  Yes.
21    Q.  You go on to say, "Subject to and without
22 waiving these objections, the City Defendants object
23 that the request is vague and therefore deny."
24       Did I read that correctly?
25    A.  You're reading it correctly.

49 (Pages 190 - 193)

Page 194

1    Q.  Sir, in your experience as an Edgewood High
2  School alum and as a football player on that team, would
3  you agree that athletics is a primary way that some
4  Edgewood students connect with each other?
5        MS. ZYLSTRA:  Object to form.  You can answer.
6    A.  It was for me at the time.
7    Q.  Did others share -- to your knowledge, would
8  your lifelong friends that you've described from
9  Edgewood, would they share in that sentiment as well?
10       MS. ZYLSTRA:  Objection.  Form, foundation.
11   A.  I would believe so, yes.
12   Q.  In your experiences at Stevens Point and the
13  University of Wisconsin, would you also agree that
14  athletics is a primary way that students at the
15  university level can connect with each other?
16       MS. ZYLSTRA:  Same objection.
17   A.  Yes.
18   Q.  Do your kids play high school athletics?
19   A.  At the beginning.  They never -- they were
20  never good athletics.
21   Q.  We're in the same boat, Mr. Hank.
22       MR. INGRISANO:  Reserving my rights to insist
23  upon individualized answers to these, I will go ahead
24  and have no further questions on that.  I believe that's
25  about it.  I'm done.

Page 195

1        MS. ZYLSTRA:  I just have a couple follow-up
2  questions.
3            EXAMINATION
4  BY MS. ZYLSTRA:
5    Q.  Mr. Hank, I would like to pull out Exhibit 6.
6    A.  As long as it's not the yearbook.  Okay.
7    Q.  Long ago, earlier in the day, counsel had
8  asked you some questions about Edgewood's lighting
9  application in February of 2019 and asked you questions
10  about getting lights for purposes of practices.
11       Do you recall that line of questioning?
12   A.  Yes.
13   Q.  And I want you to take a look at Exhibit 6 and
14  turn to the question -- the first page of the question
15  and answer of the frequently asked questions.
16       And I want to direct your attention to the
17  last question on that page where it says, "Is Edgewood
18  High School planning to host night games at the Goodman
19  Athletic Complex if the permit for lighting is granted
20  by the City?"  The answer is "Yes."
21       Do you see that, sir?
22   A.  Yes, I do.
23   Q.  And this is connected to a letter to the
24  Edgewood community, dated February 22nd, 2019; correct?
25   A.  Yes.

Page 196

1    Q.  So at the time that Edgewood put in its
2  February lighting application, the stated intention of
3  Edgewood was to hold night games; correct?
4    A.  Based on the question and answers, yes.
5        MS. ZYLSTRA:  No further questions.
6            FURTHER EXAMINATION
7  BY MR. INGRISANO:
8    Q.  That question and answer was attached to the
9  February 27 letter, Exhibit 6; correct?
10   A.  To my understanding, yes.
11   Q.  And despite the content of that question and
12  answer, there is nothing in Exhibit 6 that is purporting
13  to deny Edgewood the issuance of that lighting permit;
14  is that correct?
15       MS. ZYLSTRA:  Object to form, foundation.  You
16  can answer.
17   A.  No.
18   Q.  And, in fact, Mr. Tucker confirms the City
19  believes this permit can be issued without requiring
20  amendment of the approved 2014 Master Plan; correct?
21       MS. ZYLSTRA:  Object to form.
22   A.  Yes.
23   Q.  And so the last paragraph:  "The purpose of
24  this letter is to inform you" -- meaning Mr. Elliot --
25  "that the issuance of any lighting permit does not

Page 197

1  change the City's position on the use of the facility."
2  Correct?
3        MS. ZYLSTRA:  I'll object to form.  You can
4  answer.
5    A.  Yes.
6    Q.  It's a warning, right?
7    A.  Yes.
8    Q.  Just because we issue you lights doesn't mean
9  we're going to allow you to host games; correct?
10       MS. ZYLSTRA:  Object to form, foundation.
11   A.  That is correct.
12       MR. INGRISANO:  That's all.  Thank you.
13       MS. ZYLSTRA:  Can we reserve the right to read
14  and sign, please.
15       (Deposition adjourned at 3:53 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 198

CERTIFICATE OF REPORTER

1
2
3     I, Cheri Winter, a Certified Shorthand
4  Reporter, Notary Public in and for the State of
5  Wisconsin, do hereby certify that the foregoing
6  deposition was taken before me, on the 27th day of April
7  2022; that it was taken at the request of the Plaintiff;
8  that it was taken in shorthand by me, a competent court
9  reporter and disinterested person, approved by all
10  parties in interest, and thereafter converted to
11  typewriting using computer-aided transcription; that
12  said deposition is a true record of the deponent's
13  testimony; that the deposition was taken pursuant to
14  Notice, that said GEORGE HANK, before examination was
15  sworn by me to testify to the truth, the whole truth,
16  and nothing but the truth relative to said cause.
17     Dated May 11, 2022.
18
19     _____
20          Cheri Winter
            Notary Public
21          State of Wisconsin
22
23
24
25

Page 199

1          Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
              Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   May 11th, 2022
5
   To: SARAH A. ZYLSTRA
6
   Case Name: Edgewood High School Of The Sacred Heart Inc v. City Of
7  Madison Wisconsin Et Al
8  Veritext Reference Number: 5188346
9  Witness:  George Hank      Deposition Date:  4/27/2022
10
   Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 200

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3     ASSIGNMENT REFERENCE NO: 5188346
      CASE NAME: Edgewood High School Of The Sacred Heart Inc v.
   City Of Madison Wisconsin Et Al
      DATE OF DEPOSITION: 4/27/2022
4     WITNESS' NAME: George Hank
5     In accordance with the Rules of Civil
6  Procedure, I have read the entire transcript of
   my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date        George Hank
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13     They signed the foregoing Sworn
   Statement; and
14     Their execution of this Statement is of
   their free act and deed.
15
      I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18     _____
   Notary Public
19     _____
   Commission Expiration Date
20
21
22
23
24
25

Page 201

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3     ASSIGNMENT REFERENCE NO: 5188346
      CASE NAME: Edgewood High School Of The Sacred Heart Inc v.
   City Of Madison Wisconsin Et Al
      DATE OF DEPOSITION: 4/27/2022
4     WITNESS' NAME: George Hank
5     In accordance with the Rules of Civil
6  Procedure, I have read the entire transcript of
   my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
   Date        George Hank
14
      Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
      They have listed all of their corrections
18  in the appended Errata Sheet;
      They signed the foregoing Sworn
19  Statement; and
      Their execution of this Statement is of
20  their free act and deed.
21     I have affixed my name and official seal
22  this _____ day of_____, 20____.
23     _____
   Notary Public
24     _____
25     Commission Expiration Date

Page 202

1           ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2         ASSIGNMENT NO: 5188346
3   PAGE/LINE(S) /       CHANGE       /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date          George Hank
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23      _____
        Notary Public
24
        _____
25      Commission Expiration Date

[& - 28.097]                                                          Page 1

**&**

**&**   3:6 4:5,12,15,21

**0**

**0018**   1:6

**1**

**1**   2:11 4:21 20:15
20:17 25:6 39:5,9
52:16 67:21 72:13
72:16 82:21 86:5
102:17 129:1
181:11
**1/7/57**   5:13
**10**   2:23 17:21 18:1
106:6 107:25
120:2,7 122:10,12
122:19 126:4
147:13 191:9
193:16
**10,000**   120:18
**10-10-19**   167:14
**10.085**   2:11 18:2,9
18:21,23 19:8,9
20:13,18,23 21:20
22:15 25:6 27:13
28:11 29:7,11
31:10 34:6 49:24
50:4,18,20 64:7
67:21,25 71:2
73:25 163:8 164:3
164:23 165:7,15
165:20 166:2
**10.085.**   18:12,15
25:19 164:6,12
165:3
**102**   2:22
**11**   2:24 129:15,23
131:7,17 134:22
134:25 135:5,16
135:24 148:13
150:25 151:9

154:17 198:17
**1100**   199:1
**11th**   199:4
**12**   3:3 150:3 158:3
158:8
**122**   2:23
**129**   2:24
**13**   3:4 40:21,24
41:1 122:22 123:1
167:2,4 172:3
**14**   3:6 171:13,15
172:5 190:16,21
**15**   3:7 82:11,12
184:16,18
**150**   3:3
**155**   187:7,19
**16**   3:8 13:23,24,25
185:14,16
**167**   3:4
**168**   186:1,8,9
**16th**   5:20
**17**   192:15,22,23
193:3
**171**   3:6
**18**   133:19
**1820**   199:2
**184**   3:7
**185**   3:8
**19**   17:23 18:13
50:11
**19-69**   167:13
**195**   2:5
**196**   2:4
**1970**   9:13 10:8
**1973**   3:7 184:20
**1975**   8:2

**2**

**2**   2:12 29:17,19
31:8 40:14,15
41:5 129:5 141:15
142:23 144:4

167:9,13,23
171:17
**2/22/2019**   2:18
**20**   2:11 16:8,9
185:24 193:16
200:16 201:22
202:22
**2000cc**   191:24
**2011**   32:14
**2012**   32:14
**2013**   14:1,7 16:23
32:3,13 100:12
177:17 181:24
182:16
**2014**   72:25 73:10
80:2 82:8 100:12
176:9 196:20
**2015**   88:25 89:13
89:17 90:1 144:12
144:21 145:16
146:11,14,23
147:10 190:19
191:11
**2016**   104:6
**2017**   104:5
**2018**   19:6 23:3,8
23:15 24:18 25:17
26:9 28:23 40:24
71:23 104:5
124:20 125:2
**2019**   11:16,18 29:4
29:13 36:1,23
37:3 39:5,9 41:11
43:12 49:6 52:16
63:6,9,11,11 66:8
70:3,19 72:6
80:21 83:8 85:10
90:25 96:1 100:2
100:11,19 101:11
101:17 102:17
104:10 105:12

124:20 125:2
129:1,5 143:7
146:23 149:19
157:16 160:6,18
163:2 165:12
166:1 186:14,14
186:22 187:2
195:9,24
**2020**   14:1,8 36:1
37:3 162:12
163:23
**2021**   14:6,10 16:23
35:5,8 122:22
123:1,6 124:16,19
181:25 185:22,24
185:25
**2022**   1:16 4:7 5:1
198:7,17 199:4
**20s**   101:22
**21**   50:11
**2118**   5:15
**216-523-1313**
199:3
**220**   176:15
**2219**   105:20
130:13
**22582**   198:18
**22nd**   195:24
**25**   118:24
**26**   118:24
**27**   1:16 5:1 72:6
72:10,19 74:15
76:2 85:10 105:1
105:2 114:21
196:9
**27th**   4:7 49:6
105:9 112:18
198:6
**28.097**   3:4 105:18
106:6 167:5

**[29 - address]**

**29**   2:12
**298**   138:8
**2nd**   90:21

**3**

**3**   2:14 30:3 33:1,3
   33:19 34:3 37:11
   37:22 39:4,7
   40:14 41:22 42:11
   47:15 49:7 52:17
   54:23 60:5 64:11
   72:9 90:21 139:17
   140:2 156:7 164:8
   164:22 165:25
   191:22 192:9
**3-4**   10:21
**3.8**   73:12 82:11,15
   83:24 84:3 85:24
**3.8.**   82:13
**3/21**   96:14
**3/27/2019**   104:24
   108:9
**3/29**   132:14
**30**   107:17 137:19
**30s**   101:22
**30th**   70:19
**31**   40:17 118:23
**33**   2:14
**34**   2:15
**35**   13:15,16 137:20
   137:22
**3:21**   1:6
**3:53**   197:15

**4**

**4**   2:15 34:17,19
   35:23 181:8
   182:11
**4/1**   96:15
**4/16**   132:14
**4/2**   132:14

**4/27/2022**   199:9
   200:3 201:3
**401**   4:16
**42**   73:12 82:14
   84:3 191:24
**44114**   199:2
**48**   187:5
**4th**   4:21

**5**

**5**   2:4,16 70:11,14
   183:2,7 191:22
**5,000**   118:19
**500**   4:6,12
**509**   4:16
**51**   185:25 186:11
**5188346**   199:8
   200:2 201:2 202:2
**53701**   4:13,22
**53704**   5:15

**6**

**6**   2:18 35:22,23
   36:11 40:18,25
   72:3,5,23 76:23
   83:21,22 85:10,19
   141:25 142:2
   195:5,13 196:9,12
**608.257.0609**   4:13
**61101**   4:16
**68**   71:12

**7**

**7**   2:19 82:1,3
   183:11 191:9
**7/12/2019**   3:3
**70**   2:16 102:1
**72**   2:18
**73**   170:18
**74**   184:20
**75**   12:10 93:18,20
   102:1 184:20

**8**

**8**   2:20 95:12,14
   98:4 99:1 183:11
   190:16
**80**   12:22 71:12,21
**815.986.8050**   4:17
**82**   2:19
**8:00**   117:15
**8:59**   4:8 5:1

**9**

**9**   2:22 35:1,5,8
   102:14 104:18
   108:9 111:15
   112:13 113:1
   116:3 128:25
   130:17,21 131:8
   131:17 135:24
   147:13 148:13
   151:9 184:6
   185:22,25 192:15
**9/30/2019**   2:17
**92**   8:23
**93**   170:19
**95**   2:20

**a**

**a.m.**   4:8 5:1
**abeyance**   154:9,11
**abide**   137:4
**ability**   68:20 77:14
   83:25 91:24
   148:11 173:21
   174:9 177:6
**able**   6:10 43:2
   61:13,24 66:19
   92:1 102:9 138:15
   174:15
**absence**   138:19
**absolutely**   108:4
   164:9 180:17
   181:4

**acceptable**   94:14
**accommodate**
   7:11
**accord**   77:7
**account**   24:8
**accuracy**   185:22
   186:5
**accurate**   16:4,11
   35:10 50:13 55:18
   136:10,14,21
   144:15
**acknowledge**
   200:11 201:16
**act**   200:14 201:20
**acting**   90:20
**action**   119:3
   127:20 128:4
   133:25 137:18
**actions**   112:25
   131:23
**active**   169:24
   170:2
**actively**   149:16
**activities**   123:6
   170:24 183:14
**activity**   49:8 86:18
   86:18 131:16
**actual**   20:6 48:13
   59:24 134:7
   149:24 175:7
**add**   23:3,16 24:6
   141:19
**adding**   68:3
**addition**   36:16
   166:2
**additional**   23:2
   51:25 85:18 182:1
   183:18
**address**   5:14
   42:15 182:6
   199:16

[addresses - answer]                                                    Page 3

**addresses**  181:12
  181:13,22
**adds**  132:18
**adhere**  6:3
**adhered**  66:3
**adjacent**  187:9
**adjoining**  24:2
**adjourned**  197:15
**administering**
  78:13
**administration**
  12:20
**administrator**
  16:20,23 28:8,10
  32:21 34:15,15
  85:1 95:8 110:13
  148:8 160:19
  172:23
**administrator's**
  163:15
**admission**  3:9
  185:23
**admissions**  185:18
**admit**  186:6,10,12
  187:8 190:10,18
  191:3,9,12,23
  192:15,23 193:16
**admonished**  182:6
**adoption**  28:25
  80:1
**advance**  151:11
**advice**  54:8,9,17
  56:15,20,20 57:9
  57:11,16,17
  153:25
**advise**  151:11
**advising**  73:18
**affixed**  200:15
  201:21
**afternoon**  117:13

**agencies**  27:4
  59:23 60:7 140:6
**ago**  10:21 195:7
**agree**  53:21 54:5
  54:24 55:2 61:24
  77:2,4 86:6 90:9
  91:12 124:21
  125:22 168:19
  172:15 173:2
  174:16 194:3,13
**agreed**  86:9 137:4
  137:6 153:19
  175:1,8 178:2
**agreeing**  55:4 62:6
**agreement**  137:8
  174:25
**agrees**  134:2
**ahead**  27:21 42:7
  44:8 47:23 50:12
  62:4 71:1 90:2
  101:19 141:8
  144:9 147:1
  151:17 152:25
  154:21 165:10
  184:25,25 189:11
  194:23
**aided**  198:11
**air**  24:13
**akin**  115:6
**al**  1:8 199:7 200:3
  201:3
**alarm**  13:3,3
**alder**  76:15,19
  157:22 158:4,15
  159:10,14,25
**alders**  75:25 76:1
  76:16 145:22
**allegation**  136:13
**alleges**  107:2
  127:22

**alleging**  136:20
**allow**  27:25 35:19
  37:17 57:14 67:21
  139:9 144:6
  145:24 146:10
  163:11 197:9
**allowed**  21:11
  31:18 37:7 45:4
  47:2 54:25 55:10
  61:10 62:10,11
  63:16 65:25 66:16
  68:11 81:4 98:8
  113:14 115:19
  126:11 139:5
  142:5 145:18
  146:7,16,17
  163:10
**allowing**  45:3
  55:14 62:11,17
  112:20 146:4
  151:19
**allows**  98:6 139:9
**alter**  15:10 45:22
**alterations**  29:24
**altering**  26:16,17
  26:17 27:7
**alternative**  2:16
  70:18 71:8
**alum**  170:17 194:2
**alumni**  170:12
**alumnus**  169:25
  170:2
**amazed**  39:20
**amend**  74:25
**amended**  29:4
  106:5 130:24
  132:12 160:6
  167:13
**amendment**  32:1
  70:4 72:25 74:12
  76:24,25 77:13

  145:23 160:8,8,11
  160:12,25 161:2,6
  161:11,23,25
  162:5,8 163:2
  165:12 166:1
  167:19 196:20
**amendments**
  160:20
**america**  93:20
**amount**  135:4
  146:22
**ample**  150:13
**analogy**  45:6
**analysis**  20:24
  46:12,20 78:5,10
  135:4,15 162:14
  162:19 165:22
  166:2
**analyzed**  28:11
**annual**  8:16
  123:10
**answer**  6:9,20,21
  7:3,5,5,20 10:16
  12:1 17:14 18:11
  19:2,17 21:2
  23:21 25:9,15,23
  27:17 31:22 32:18
  33:23 35:20 37:10
  38:16 40:10 41:7
  42:7,17,24 43:2,4
  43:6 46:9 47:23
  48:8 49:1,21 50:2
  51:9 52:23 53:3
  53:13 54:17,25
  55:10,14,18 56:6
  56:10 57:4,14,20
  59:18 61:19 62:1
  62:16 63:24 64:5
  64:13,14 65:1,9
  66:23 67:24 68:23
  69:6,24 71:1

73:21 75:3,9
78:12,15 79:7,12
79:13 80:12 83:4
83:12 84:22 85:5
85:6,12 86:2,21
87:12,23 88:9,15
89:3 90:3,14 92:4
92:18 93:9 94:6
94:17,24 95:3,5
96:5 97:19 98:22
99:9,15 100:7,22
102:12 103:23
105:7 107:1,13
109:20 111:8,20
112:3 113:17,25
114:12 115:13
119:25 120:5
121:10,19 122:8
124:8 125:6,18
127:12 133:3,17
134:11 135:9,22
138:17 139:7,22
140:5 144:6,8,24
148:2 149:21
151:19 153:17
155:14,25 156:19
157:3,11,19
158:21,22 162:24
164:2,17 166:8,10
166:12,13 168:12
169:5,19 170:1
172:7,25 173:7,8
174:22 175:10
176:13,20 178:9
179:18 180:23
182:25 183:19
184:10,13 186:16
187:21,23,24
188:1,2,4,18 189:3
189:3,25 190:6,13
191:3,5,16 192:4,6

192:11 193:7
194:5 195:15,20
196:8,12,16 197:4
**answered** 44:22
55:1 85:12 102:12
125:6 140:5 175:9
176:20 189:25
191:15
**answering** 188:24
**answers** 6:8 35:9
36:7,9 118:21
159:6 185:23
188:18,23 189:13
194:23 196:4
**anthem** 119:12
**anticipated** 132:8
**anybody** 19:23
69:1 110:10
111:19 160:22
164:5
**anymore** 173:16
**anyway** 61:23
**anyways** 62:12
77:6
**apologies** 141:25
**apologize** 14:9,13
21:3 136:4 172:6
**appeal** 131:22,23
132:3,8 133:8,13
133:24 134:18
147:12,16 148:18
154:7,12,16 155:6
155:10
**appealing** 148:7
**appeals** 133:11
**appear** 73:6 117:8
200:11 201:15
**appearances** 4:9
**appeared** 53:15
**appears** 30:1
74:14

**appended** 201:11
201:18
**applicable** 50:1
78:19 132:20
**applicant** 61:4,5
**applicants** 39:17
**application** 2:17
19:4,8,11 23:1,5,9
23:10,17,20 24:17
24:18 25:18,20
26:9,11,14,21
27:12 33:13 39:14
41:10,12 42:10
49:17,19,24 51:4,7
54:23 60:25 61:2
61:12 62:23,25
65:20 69:21 70:3
70:18,22,22 71:8
71:16,20,21,25
72:1 78:1,5,7,9
139:18 142:3,15
157:7,16 162:11
162:20 163:23
186:14,15,23
187:3 195:9 196:2
**applications** 29:7
30:22 36:1,15,18
36:22 37:3 38:13
65:15 163:4
164:14 165:6,14
**applied** 13:6
190:19
**applies** 55:7 59:21
146:11
**apply** 21:10 39:19
50:25 79:20
**applying** 148:5
**appreciate** 36:10
141:14 151:24
**apprehensive**
166:23

**apprised** 26:10
108:22
**apprises** 26:20
**approach** 67:1
**appropriate** 56:23
110:21 117:10,16
**approval** 21:19
30:15 31:1 34:4
37:13 39:4,21
41:1 59:16 62:18
70:2 72:16 95:1
111:5 168:4
**approvals** 38:12
39:12
**approve** 20:5
23:10,12 37:15
48:20,24 50:8,15
56:1 60:22 74:24
87:16 94:8 165:24
**approved** 21:13
22:2,4,12,22 26:19
27:11 30:8 33:16
33:20 34:10 37:12
37:15,16,20,23,24
39:13,23 40:19
47:17,20 48:19
49:6 51:20 59:20
60:7 64:10 70:22
70:23 71:3,20,24
72:10,25 73:10
78:22 82:7 141:13
165:21 175:20
177:1,6 196:20
198:9
**approximately**
5:19 13:5
**april** 1:16 4:7 5:1
102:17 104:9
129:1,5 198:6
**area** 20:23 21:17
26:18 51:16,16,19

51:20 110:17
182:16
**areas**   17:4 31:16
183:12,20
**argue**   55:9 116:25
**argument**   53:17
55:12
**argumentative**
176:19 190:13
**arises**   107:10
**asked**   7:15,17
44:23 73:9 85:11
85:14 101:14
102:11 125:5,19
140:4 160:24
166:16 175:6,9
176:20 183:9
186:10,12 189:18
189:19,25 191:15
195:8,9,15
**asking**   14:7 22:24
22:25 42:25 63:9
84:9 85:13 94:11
101:2,15 104:14
104:15,16 124:11
128:1 134:4
135:14 153:13
166:18,20 176:6
186:4 188:19
189:15,15 190:22
**asks**   163:19
181:12
**aspect**   60:11
**asserted**   96:1
**assessed**   78:7,9
165:14
**assessing**   25:5
**assessment**   19:4
52:12
**assign**   109:25
110:3,5,6,11,16

**assigned**   106:11
106:14 109:5,6,10
109:17,19 110:3
110:18 131:11,11
**assigning**   110:15
**assignment**   200:2
201:2 202:2
**assistant**   32:20
34:15 110:13
160:19
**associated**   143:18
183:3 184:3
**association**   122:14
124:17 143:25
**associations**
143:23
**assume**   110:2
140:24 160:23
176:22
**assuming**   40:7
85:6 124:16
**assumption**   173:9
**athletes**   67:13
**athletic**   8:10 9:18
9:24 10:15 11:12
14:24 38:8 45:2
45:15 46:7 60:18
63:2,6 64:2 65:5
66:24 68:7 69:10
69:14,18 75:13
82:21 83:8,9,25
84:4,14,14,17 86:5
86:7,8,25 87:2
88:6 92:14,22
93:23 94:3,12
96:2 98:7 100:3
100:19 101:5
102:7 103:2,20
105:19,19,25
108:23,23 113:2,2
113:5,9,22,23

114:7,9,20,22
115:10 116:4
121:21 123:18
129:8,12 130:2,11
130:12 136:9
137:15,15,24,24
138:15,20 139:5
174:17 176:10,24
177:5 179:1,2,5,23
181:15 182:4
183:3,5,13 184:7
187:10 188:11
190:3 195:19
**athletics**   8:3,12
149:4 193:17
194:3,14,18,20
**attached**   196:8
201:7
**attempt**   133:13
142:21
**attend**   14:20,21
170:13
**attendance**   169:2
**attended**   10:10
**attendee**   10:17
**attention**   46:11
65:3,16 99:21,24
100:2 142:16
195:16
**attorney**   3:3,3
6:24 7:15 35:12
38:22 42:23 43:1
43:3,5,23 44:15,16
49:17 52:20 56:1
96:13 150:10
151:3 158:12
159:4 187:22
189:20 190:25
**attorney's**   44:4
54:17 56:15,19
57:16 94:19,25

150:20
**attorneys**   96:14
186:2 187:21,25
**augment**   134:13
**august**   40:18,21
40:24,25 41:1
**authority**   112:11
136:17
**authorize**   201:11
**authorized**   23:8
**auto**   49:14
**automotive**   109:22
**available**   174:8
**ave**   199:1
**avenue**   165:2
**aware**   9:17 10:7,9
11:10,12,19,23
12:5 13:6 19:19
29:14 30:18 37:1
38:4,5 45:9,12
47:7,9 53:25 54:1
60:16,20 61:20,21
63:25 64:7,17,19
64:21 65:12,17,18
67:16,17 69:1,7,25
70:17,20 74:21
76:12 80:24 85:20
85:23 86:3 89:14
89:16 90:4 95:8
99:23 100:3,17,23
101:4,5 102:2
103:14 104:11,22
108:15 113:8
122:2 131:9 132:9
135:6,17 137:17
137:22 142:21,25
143:16,23 144:1
144:10 145:1
148:23 149:2,6
156:1 157:15
158:13 164:13,19

175:6,11 178:6
179:9,10,19,20
181:22 182:13,14
182:18,20,23
183:2,8 186:21
188:5,13,15
189:21 190:9
193:8,15

**b**

**b**  2:9
**back**  12:17 22:10
27:22 35:14 36:7
37:11 45:13 47:14
47:14 54:20 57:15
60:24 61:6,11
92:6,10 93:11,25
97:6 98:5 101:7,9
123:20 125:2
127:3,22 128:25
136:20 139:17
146:3 147:5
153:24 178:21
181:8 199:16
**bad**  58:17 86:14
98:1 110:11
152:21 172:12
**balloons**  116:23
**ballpark**  138:9
**base**  112:9
**baseball**  29:24
114:19 183:14
**based**  17:2 27:4
34:5 35:11 39:11
57:13 73:4 86:15
88:11 104:19,24
112:6,9 113:13
117:10 135:23
142:8 151:4
157:20 161:14
190:25,25 196:4

**basic**  150:23
**basically**  16:13
19:21 24:10 31:14
51:23 52:8 96:3
97:3 129:7 130:23
144:14 151:8
**basis**  52:19 69:3
79:21 188:25
**basketball**  90:16
183:15
**bathroom**  108:3
**bear**  82:10
**bearing**  137:18
**beer**  9:3
**began**  89:20
**beginning**  36:12
119:12 130:9
194:19
**behalf**  98:15
143:24 188:19
**belief**  55:22
161:14 192:12
**beliefs**  192:17,25
193:11
**believe**  9:12 11:17
14:5 18:1 29:25
32:10 34:2 37:13
38:9,21 43:16
44:21,22 45:20
46:10,14 47:3,25
48:22 49:3,10
55:16 56:12 59:1
60:20 63:12 65:2
71:2,3 72:8 75:11
75:16 76:17,22
77:9 81:19 92:10
94:25 97:22 98:6
98:12,23 102:8
103:16 104:25
105:8,15 108:13
116:11 117:10

121:23 123:4,15
131:20 133:18
136:21 138:8
139:2,15 141:2
142:19 147:8,14
148:16 149:16
150:6,22 151:14
151:25,25 153:4
154:6,12,22
156:20 160:9
161:8 166:10,13
166:21 175:4
176:5 177:2 180:7
185:20 191:1,6,19
194:11,24
**believed**  75:23
140:7 142:5
189:20
**believes**  72:24
74:11 196:19
**beltline**  159:16
**beneath**  117:20,21
117:25 118:5,12
118:15 119:5,14
120:9 125:10,15
125:24 178:13,25
**benefit**  137:5
**best**  7:5,11,18
41:18 55:18 58:8
58:10 65:4 131:20
170:2
**better**  48:8 64:16
**beyond**  46:3 50:4
52:22 61:16 85:24
183:18
**big**  59:19 120:21
120:22,23,23
137:1
**bill**  183:21
**birth**  5:12

**bit**  28:13 30:9
166:22 183:7
**black**  54:10
118:21
**blading**  183:16
**blank**  184:4
**bleachers**  121:21
**blunt**  76:14
**board**  133:8,11
154:10
**boardman**  4:21
**boardmanclark.c...**
4:22,23
**boards**  180:9,10
**boat**  194:21
**body**  128:19
**bolts**  164:11
**books**  109:18
**bottom**  82:15
96:10
**boulevard**  184:2
**bowman**  184:3
187:9 188:8,9,11
189:22
**breach**  102:10
**break**  7:9,11 45:24
47:10 70:8 108:3
168:17 181:3
**breese**  179:25
**brian**  48:19
**briefly**  37:4
**bring**  24:19 49:16
178:16
**bringing**  67:19
**brings**  16:16
**broad**  40:3
**broader**  25:24
26:1,15,21 50:7
58:2 64:17 75:11
75:14 87:16 94:19
110:23

[brodsky - circuit]

**brodsky** 2:21 95:17 96:1 98:5 99:3,5
**brodsky's** 96:11
**broke** 76:22
**brought** 26:10 27:3 46:10 51:4 51:12 65:3,16 81:8 94:25 99:21 99:24 100:1 142:16 156:20
**build** 15:10,10 16:17 37:17 60:2 60:2
**building** 13:9,16 13:19 14:2 15:5,7 15:12,20 16:17 17:11,12 19:5 24:23 40:2 45:6 49:15 60:1 78:17 78:19,23 81:23 84:24 125:23 126:5 137:19 149:15 151:13 163:21 164:4 168:3 172:13
**buildings** 15:17 165:1
**built** 13:1,1 20:11 90:6
**bulb** 24:14
**bullet** 86:4
**bunch** 184:2
**burial** 18:18
**burning** 5:24
**burr** 183:24
**buy** 16:5
**buzzer** 90:5

**c**

**ca** 199:25
**call** 40:5 48:16 135:6
**called** 4:1 127:13 143:14 159:15
**calling** 112:8 176:10
**calls** 78:12 107:24 148:1 192:5
**campus** 3:5 29:1,3 29:9,13 31:6,18,24 32:2,9,15 34:1 45:20 77:15 79:15 79:17,23 80:6,18 83:14,18 84:10 101:8 105:25 116:3 117:1 119:20 123:7 126:3,6,10 137:9 138:13,25 139:1,4 139:9 145:11 160:5 163:3,4,9 164:19 165:4,13 165:14 166:2,3 167:5,25 168:1,9,9 169:11,16 173:10 173:16 177:17 180:14
**candle** 71:13
**capital** 45:3
**career** 49:15
**careful** 110:2
**carnival** 8:18 9:4
**case** 1:6 27:1 34:25 37:18 53:6 53:9 109:13,25 111:15 131:2,3,13 132:15,18 134:14 158:1 199:6 200:3 201:3

**catching** 192:19
**category** 68:9
**catholic** 168:22
**caught** 41:17
**cause** 23:13 125:3 170:24 192:2 198:16
**caused** 84:19 115:3 193:9
**causing** 42:21
**caution** 146:12
**cautionary** 146:13
**cease** 129:8,11
**ceased** 83:18
**center** 185:7,8
**ceremony** 119:5
**certain** 41:20 46:23 119:2 178:24
**certainly** 11:2 12:2 43:19 46:24 53:18 92:19 94:18 99:16 124:4,24 160:13,22 163:8 170:14
**certificate** 198:1 201:11
**certification** 35:2 200:1 201:1
**certified** 4:3 198:3
**certify** 198:5
**cetera** 9:4 53:20
**challenge** 133:11
**challenging** 87:20 133:9
**chance** 167:18
**chances** 155:10,15
**change** 29:14 68:3 71:5 73:25 74:16 75:20 77:8 78:24 141:21 146:5

168:16 197:1 199:14,15 201:8 202:3
**changed** 29:13 31:14 45:19 96:12 98:5,11 161:14 177:12
**changes** 29:15 32:21 78:4,4 161:6 199:13 200:7 201:7,9
**changing** 26:18 31:15 51:13 52:4 52:6,11,11 68:5 75:7
**channel** 13:2
**chapter** 17:21,21 18:13
**chapters** 17:17
**characterize** 57:25
**charity** 120:9
**check** 16:7
**checked** 41:14
**checklist** 26:22
**cheri** 1:24 4:3 198:3,20
**children** 14:18
**chimneys** 15:21
**choice** 172:12
**chose** 97:10 109:5
**chosen** 79:9
**chrissy** 36:15
**christina** 30:23 33:20 34:9 72:14 72:20
**christy** 141:11
**ci** 156:10 157:21
**circle** 185:2
**circuit** 154:7,8,12 155:7

circuits   19:22 20:4
  20:7
circumstance   40:5
  40:25 119:17
  139:6
circumstances
  40:8 51:25 54:11
  61:3 120:22
citation   96:23 97:9
  97:17,22 102:9
  111:6,11 112:12
  112:17,23 117:3
  117:18 124:3,23
  125:3 131:18
  132:7 133:1,14,18
  134:7,8,22 137:24
  138:2,11
citations   102:5
  126:11 132:1
  148:20 153:14
  155:9,20 160:2
cited   64:22 85:9
  85:14,19
cites   85:16
citing   83:24
citizen   106:23
  112:8,10 125:12
citizens   98:20
  112:7
city   1:7 2:12,14,22
  2:24 13:6,9 23:16
  30:3 33:5,6 35:24
  42:25 48:10 49:17
  52:22 53:23 61:22
  69:21 72:24 73:5
  74:11,16,25 75:7
  75:25,25 76:8
  82:4,25 83:2,7
  84:13,19 93:25
  94:18,25 96:12
  98:5,11,13,15,18

98:24,25 103:18
  106:23 107:6
  130:1 136:24
  137:14 138:3,22
  142:8 147:18
  148:17 149:12
  150:10,20 151:3
  163:25 180:1,5
  183:3,10,12,20
  186:10,12,18
  187:2,9,14 188:19
  191:25 192:7
  193:7,22 195:20
  196:18 199:6
  200:3 201:3
city's   13:16 44:25
  45:1 69:11 73:18
  74:1 85:2 94:14
  114:8 116:6 137:7
  147:15 149:8
  172:10 173:2
  174:16 197:1
cityofmadison.c...
  181:17
civil   200:5 201:5
claim   53:18
claiming   159:5
clarification
  163:19
clarify   7:17
clarity   152:19
clark   4:21
class   115:11,19
  116:8,19,20,23
  117:12 128:13
  170:14,19
classes   65:11
  73:12 74:3 82:23
  84:5 87:2 93:3
  98:8 106:2 115:9
  115:24 116:5,16

117:3,5 126:17,24
  127:7 169:14
  174:19 175:3
  176:11,17 177:4
  184:11
classmates   115:9
clean   6:5
clear   178:22
cleveland   199:2
click   169:22
client   35:12 42:23
  43:23 44:15,16
  52:20 187:22
  189:8,20
clock   5:20,22
  90:18
close   21:16,17
  45:8 50:12,23,24
  77:17
closed   49:2,9
  140:3
closer   52:1
code   15:18 16:18
  17:12,17,20 18:4
  18:19 19:11,14
  21:11 26:19 27:11
  28:3,6 29:1,3 50:8
  77:11,13,16 78:10
  78:14,17,19,21,23
  79:18 84:10
  107:11 112:16
  113:6 125:13
  150:8 160:20
  167:5,18 172:14
codes   15:13 28:15
  28:16,17,18,19
  178:3
collapse   37:19
college   12:12,13
  12:24

colon   140:3
color   185:11
column   82:19
come   6:24 23:15
  23:17,18 27:22
  60:24 61:5,11
  77:2 83:15 93:11
  102:25 121:25
  161:16 170:25
  180:3 184:24
comes   15:2 19:4
  22:25 24:18 51:10
  51:11 119:10
  183:23
comfortable
  111:14
coming   78:24 79:1
  122:4
comma   82:22
commence   128:23
commenced   97:22
commencing   4:7
commercial   26:25
  165:18,20 172:10
  172:13
commission   21:12
  38:12 40:18 54:8
  161:18,21 163:10
  164:10 200:19
  201:25 202:25
common   66:25
  67:20 76:9 108:14
communicate
  125:15
communication
  44:18 73:17
communications
  35:18 36:17 42:25
  43:12,18,21 44:21
  52:24,25 53:7,23
  58:21 59:5 187:21

187:25
community 118:3
195:24
comparable 87:14
compared 146:20
170:8
compelled 112:21
competent 198:8
competition 11:12
87:2 88:23 113:11
113:12,14,18,22
114:22 115:2,4
123:18
competitions 38:9
45:2,15 46:7 62:9
63:3 68:7 69:10
69:14,19 75:13
87:20 98:7 101:6
103:3 114:20
115:10 136:9
176:24 180:8
complain 107:16
complainant
109:24 112:2
complained 107:5
131:16
complaining
109:22 112:8,10
159:16
complains 104:5
complaint 99:25
105:10,18 106:14
106:22 107:4,8,10
107:18 108:16
114:7 122:3
125:13,20 130:10
136:20 143:17
complaints 15:25
90:5 101:10 103:2
104:3 108:8,17,18
109:9 111:2 136:8

136:10 143:2,6,10
143:13,15,22
complete 6:21 7:4
12:21 41:12
148:16
completed 39:18
39:22 40:17 140:7
199:16
completely 45:10
completeness
192:4 193:14
completion 41:20
complex 180:18
195:19
compliance 15:18
26:1 97:7 137:6
140:8,9,10 164:3
compliant 22:19
25:18 27:13 81:25
complicated 24:8
complied 132:25
complies 15:13
16:17 164:7
comply 107:17
118:14 133:6
140:1
computer 23:25
25:2 198:11
concede 54:13
concept 21:5
conception 67:20
concern 37:5
60:21 61:8,17
155:5
concerned 62:2
88:12 125:12
146:4
conclude 115:4
conclusion 78:12
148:1 192:5

condition 59:19
66:20
conditional 20:24
21:6,9 22:23,24
45:22 59:22
139:10 140:25
161:9,15 162:2,11
162:15,20 164:13
166:5,15,19 168:4
168:15
conditionally
37:14
conditioning
10:24 87:25
conditions 21:14
21:19 22:5,8
59:13,15,23,24
60:2 91:19,20
92:12
conduct 63:3
conduit 89:5
146:19 191:7
confer 7:10 44:11
44:16 46:15
111:16 131:6
132:2
conferred 55:23
111:22,25 112:4
confirm 20:23
35:10 149:3
confirms 196:18
conflict 73:9
conjunction 60:14
147:9
connect 194:4,15
connected 195:23
consensus 77:2
consider 88:17,23
113:22 114:19
118:20 122:6
169:24 172:13

considerations
92:1
considered 15:16
47:4 108:24
consistency
135:11
consistent 9:1 64:9
consists 15:7
29:21
consolidated
188:23
construction
12:20,25 15:8
163:17,20
construe 123:21
consult 46:15
111:16 189:8
consulted 35:25
37:1,2 111:19
144:3 150:20
162:14
consulting 189:10
cont'd 3:1
contact 76:1
contained 71:16
contended 138:22
contending 138:3
content 86:7
196:11
contention 45:1
contents 49:2 71:6
74:17 95:2 152:3
contest 88:6 113:5
113:9 179:23
contests 66:24
69:14 83:9 84:1
84:14,18 92:22
100:4,20 102:7
103:20 105:19
108:23 113:2
114:7,9 129:8,12

130:12 137:15,24
138:15,20 174:18
179:2,6,11 183:5
**context**  80:6,8
81:2 115:10
**contingent**  150:24
**continuation**
131:13
**continued**  131:17
135:19
**contrary**  57:9
102:8
**contributed**  75:19
**convenient**  14:22
**conversations**
43:14 44:2,9
159:25
**converted**  198:10
**conveyed**  147:8
**copied**  95:22
158:4
**copies**  185:12
**copy**  41:10 81:6
130:22 142:11
**corners**  25:6
142:15,22
**correct**  9:16 11:16
13:11,17,18,20
14:3,4,11,12 16:20
16:21 17:6,12,18
17:19 19:9,10
20:6,14 21:22,23
22:1 23:6,7,11
25:3,4 30:8,12,13
31:6,11 33:7,8,12
33:14,15 34:1,6,7
34:10 37:12 38:1
40:21 41:2,3,6
42:15 50:22 52:1
52:15 56:10 60:25
61:3 63:20 64:3

64:11 66:4,10,11
66:17,18 68:13,14
69:12,22 71:18
72:2,11,14,15,18
72:22 73:19 75:1
75:4 84:1,6,20
85:3,10 87:10
89:1 95:23 96:2
96:25 97:4 98:10
101:12 102:10
109:19 112:13
113:3,19 115:24
116:15 117:18
118:10 121:22
123:4,11 124:3,13
124:17,23 126:6
126:12 129:6,9,10
129:14,23 130:3
130:18 139:1,2,20
142:6,19,24
144:16 145:16,17
145:19 147:13
151:1,22 163:25
165:7 166:6
172:11,16 173:22
174:10 177:22
178:4,5 179:16
181:21 182:10
183:1 191:20
193:19 195:24
196:3,9,14,20
197:2,9,11
**corrected**  129:5
**correction**  129:4
**corrections**  139:25
199:13 201:17
**correctly**  19:25
36:19 37:21 56:12
81:8 150:15
156:12 187:12
193:2,3,19,24,25

**correspondence**
191:2
**cost**  146:19
**council**  75:25,25
76:9 108:14
**counsel**  7:10 14:5
14:13 35:19 43:11
43:25 44:11 45:23
53:4,8 57:13
108:2 135:3 136:4
151:16 152:23
153:18 154:19
155:1,11 156:16
157:9 158:19,25
159:1 162:21
172:6 181:2
189:14,16 190:23
195:7
**counter**  50:16
**counterproductive**
155:9
**county**  200:10
201:15
**couple**  6:2 101:24
195:1
**course**  19:25 27:9
118:25 124:1
126:2 128:17
171:10
**court**  1:1 6:6
77:20 94:22
132:20 154:8,8
155:7 198:8 200:7
**courts**  45:11
**create**  24:14 89:11
151:20
**created**  32:2 71:5
161:6 177:8
**creating**  32:8 48:5
**creation**  32:15
79:17

**creatures**  135:10
**criteria**  18:23,25
79:18 80:16 83:6
**csr**  1:24
**curious**  130:23
**current**  5:14
**currently**  9:15
73:5
**currents**  116:24
**cut**  15:22 36:12
107:24
**cutoff**  24:4,7,11,15
**cv**  1:6

**d**

**d**  2:1 167:23
**daily**  79:21
**dalton**  4:15
**daltontomich.com**
4:17
**dangerous**  140:24
152:17
**dark**  81:25 148:3
173:14 174:1,1
**data**  49:12
**date**  5:12,18 35:21
39:8 40:19,23
72:19 74:19 78:18
78:25 80:23,25
83:20 97:4 107:20
128:25 130:17
134:15 139:16
141:13 186:3,3
199:9 200:3,9,19
201:3,13,25
202:20,25
**dated**  35:5 40:20
72:5,16 95:25
102:16 122:20,22
195:24 198:17
**dates**  39:1 130:11
130:16 132:14,16

150:23 184:8
**dating** 101:9
**day** 4:7 5:19 10:6
78:2,4,5 91:21
92:2 97:9,12,14
107:18 116:19
119:13 138:11
156:4 178:11
195:7 198:6
200:16 201:22
202:22
**daylight** 31:20
174:7
**days** 40:12 107:17
117:14 121:12
133:7,21 199:19
**daytime** 31:19,19
**dead** 126:16
**deal** 48:10 106:21
137:1
**dear** 170:11 185:4
199:10
**december** 12:22
35:5,7,8 185:22,24
185:25
**decide** 27:4 74:16
142:17 148:17
**decided** 12:18
56:23 65:11 109:8
175:25
**decides** 6:25
109:18 116:17
**deciding** 77:11
112:16
**decision** 56:2,25
57:10 58:7,8,11
62:14 75:22 76:2
76:7 77:7 85:7
94:21,22 99:7
117:9 133:14
135:15 148:18

150:9,13,20 151:2
154:16 173:3,20
174:5 175:14,15
189:16
**decks** 13:1
**deed** 200:14
201:20
**deemed** 199:20
**defend** 58:7,8,18
76:22
**defendant** 4:19
135:13
**defendants** 1:9 3:8
34:25 181:13
185:16 186:18
187:14 188:24
191:25 192:7
193:7,22
**defense** 88:22
**defensible** 76:18
**defer** 28:9 134:8
**define** 113:9 114:9
**defined** 113:5
**definite** 46:17
**definitely** 80:3
159:7
**definition** 87:21
113:13
**definitive** 111:20
**definitively** 59:8
**degree** 12:14,19
12:21
**demolition** 48:15
**demonstrated**
52:17
**denial** 42:5,9,13
42:14 43:13
182:21 186:13,22
187:1 190:7 192:9
**denied** 70:23
182:15 187:18

189:6 190:6,11
**dennis** 169:21
**denotes** 86:15
**deny** 186:18
187:15 188:16
191:12,25 192:2,7
193:7,9,23 196:13
**denying** 189:4,22
**department** 13:10
13:17,20 14:3
15:6 17:11 19:5
21:24 23:8 32:13
32:19 33:11,17
42:4 49:16 50:5
52:13,18 54:22
59:12 61:11 66:1
66:8 75:17 84:25
88:24 94:11 96:3
99:6 100:3,16
102:16 104:3
107:7 111:17,23
125:23 137:20
142:22 146:13
148:19 149:3,11
151:13 160:2,11
160:17 163:13,15
163:24 172:23
182:14 199:22
**department's** 18:9
60:15 163:5
**departments**
163:16
**depending** 45:18
**depends** 54:11
**deponent's** 198:12
**deposed** 5:25
**deposition** 1:12
4:1 197:15 198:6
198:12,13 199:9
199:12 200:1,3
201:1,3

**depths** 18:18
**describe** 23:18,19
96:22 102:23
**described** 79:22
79:22 149:5 194:8
**describing** 20:8,10
**description** 2:10
3:2 49:3,8 94:15
**design** 40:18
**designation** 47:21
**desire** 133:6,7
**desk** 23:19
**despite** 196:11
**detail** 94:1
**detailed** 73:8
**details** 29:14
38:14 115:3
135:17
**determination**
51:6 135:19
**determine** 142:3,4
**determined**
114:21
**developed** 103:18
161:22
**development**
16:15 25:25 26:1
80:7 164:20
**deviation** 117:16
118:8 135:7
136:15
**devices** 16:4
**diamonds** 180:1
184:2
**difference** 80:14
96:23 97:1
**different** 16:10
27:14 30:7 32:12
60:10 120:17
125:24 126:4
132:11 142:5

146:23 156:4
163:24 181:25
**differently** 79:4
136:23
**difficult** 6:14,17
177:1
**dinner** 67:14
**diplomas** 119:13
**direct** 15:21
165:17 195:16
**directed** 23:5
**directly** 102:21
**director** 13:23
14:2,11 15:5
17:10 28:14 39:14
49:15 84:24 126:5
149:22 164:15
**directors** 125:23
**disagree** 77:5
148:11
**disallow** 85:18
**disclose** 35:18
**disclosed** 46:16
**disclosure** 69:21
**discontinue** 113:2
**discontinuing**
105:19
**discovery** 35:19
189:3,4
**discretion** 49:25
51:23 52:2 109:14
119:4 128:8
147:23 148:14,16
150:10
**discretions** 118:22
**discus** 10:25
**discuss** 28:21
49:17
**discussed** 44:5
55:22 81:3,12
152:2 156:22

157:13
**discussing** 160:21
**discussion** 58:2
75:11,14 77:22
86:24 87:16 94:20
129:19 135:5
153:5 155:8 156:4
158:23
**discussions** 38:21
38:25 42:19 43:3
43:5,24 44:24
46:20 52:22 54:2
56:13 59:1 109:1
135:3 152:4
158:18,19,21
159:3 162:17
**disinterested**
198:9
**dismiss** 134:7
**dismissed** 134:5
**disposal** 66:2
**dispute** 181:24
**dissolved** 63:14
**distinction** 53:10
54:4 80:5 127:16
127:17 128:2
**distract** 55:19
**district** 1:1,2 3:5
29:1,3,23 31:18
32:9,16 79:15,17
80:6,7 137:9
138:14,25 139:4,9
160:5 165:13
167:5,25 177:17
**districts** 29:13
32:3 79:23 163:5
165:5 166:4 168:9
**disturb** 21:18
**division** 94:10
95:8

**dmna.org** 122:21
**dnmanews** 122:21
**document** 3:4
29:20 33:4,9,19
34:19 35:2 46:14
46:24,25 49:3
58:25 70:15 73:9
82:3 84:8,11 96:5
104:13,14 122:16
130:9 134:13
135:23 137:3,4,6
141:10 172:3
173:16 174:24
185:19,21 186:1
188:20
**documentation**
134:14
**documents** 29:21
53:5 59:4 165:24
**doing** 8:13 9:15
10:25 12:25 20:3
26:5 31:15 36:6
45:22 50:6,19
51:17 58:9,18,20
62:18 76:16 77:4
88:22,22 89:8
90:21,22 93:15
95:21 109:22
117:12 128:16,20
148:6 153:25
165:22 175:21
**dominican** 192:17
192:25
**dominicans**
193:11
**doors** 14:22,22
**doubt** 113:21
172:1
**draft** 137:3
**drafted** 175:20,25

**drafting** 80:1
174:24 176:7
**drawing** 53:11
54:4 184:4
**drink** 7:10
**drive** 170:21
**driving** 118:23,24
**drove** 10:17
**dryers** 16:7
**duane** 187:8
188:10
**dudgeon** 2:23
122:14 124:17
**due** 107:20
**duly** 5:4
**duration** 176:2
**duties** 53:20

| e |
| --- |

**e** 2:1,9 5:7
**earlier** 59:11
72:19 79:14 81:12
100:18,18 131:8
178:2 183:24
195:7
**early** 39:19 90:24
125:2 126:16
**easier** 92:19 94:8
**east** 4:6,12 5:15
14:21 165:2 171:1
171:2 174:13
**easy** 36:7
**ed** 12:3 63:13
65:12 115:8,11
128:13 174:19
175:2 176:11,17
177:4
**edge** 178:22,23
**edgefest** 8:13,15
8:24 9:8,11,15,19
9:20 11:22 15:2
121:12,12,15

175:12,16,21,23
176:1
**edgewood**  1:4 2:21
  3:6 7:25 8:3,9,19
  8:21,23 9:10,18,23
  9:24 10:6,11,15,23
  10:23 11:6,9,11,19
  11:23 12:6,10
  14:24,25 33:14,25
  37:24 38:19 41:9
  42:10 46:19 49:8
  58:23 60:15 61:8
  61:21 62:14,15
  63:5,17 64:23
  65:21 66:9,12
  69:7,11 70:2,17
  73:8 74:6,10 79:4
  82:7,21 83:25
  84:13 86:25 88:1
  89:1,13,16 93:1
  94:2 96:15,19
  98:19 99:4 100:10
  101:8,10,23
  103:19 104:8
  105:3,15 113:1,13
  113:15 115:8
  119:11,20 121:6,8
  121:21 123:7
  124:13 126:25
  128:9,11 129:11
  130:2 134:15
  137:3 138:4,14
  139:5,18,20 142:3
  142:11,19 144:22
  145:5,6 146:14,24
  147:9,12 154:7
  156:8,24 158:15
  158:16 159:9,13
  159:18 161:20
  165:18 168:19,24
  169:18,25 170:3,7
170:10 172:9,15
174:8,23 175:1,7
176:6,9 177:21
182:2 184:19
185:17 191:20,23
192:18 193:1,12
193:17 194:1,4,9
195:17,24 196:1,3
196:13 199:6
200:3 201:3
**edgewood's**  35:25
  36:22 47:6 60:14
  65:15 68:20 70:2
  79:10 80:1,22
  93:1 96:14 143:2
  143:6 149:8
  157:16 162:10
  163:22 164:16
  171:16 172:2
  173:4,21 174:20
  176:7,14,16
  177:22,24 181:15
  182:4,21,22 184:7
  184:8 186:13,14
  186:22 187:2
  191:10 192:16,23
  193:9 195:8
**education**  73:11
  74:3 82:23 84:5
  87:1,19 93:3,11
  98:8 106:1 115:19
  115:24 116:5,7,8
  116:16,19 117:3
  126:24 127:7
  168:25 184:11
**educational**  117:5
  192:16,23 193:10
**effect**  32:10 57:24
  63:12 83:19 116:9
  124:2 126:16
  173:3
**effective**  184:8
**efficient**  141:22
**effort**  149:2
**egregious**  97:24
**eight**  127:14
  133:19
**either**  28:7 38:10
  51:2 58:24 75:18
  98:19 99:7 104:21
  109:16 112:12
  155:20 158:6,14
  161:2 165:21
**elaborate**  28:13
**elect**  76:1
**electrical**  2:12
  12:18 15:12 17:17
  17:21,23 18:5,8,16
  18:19 19:19,21
  23:9 28:10 29:22
  59:25 88:25
  141:15,18 144:11
  144:15,17 145:15
  147:9 190:18
  191:6
**electronic**  103:13
  103:17
**electronics**  13:2
**elliot**  2:18 72:5
  73:18 196:24
**elver**  184:3
**email**  2:20 48:17
  48:19,23 58:24
  95:16,25 96:11
  98:5 122:20
  169:20 181:12,13
  181:16,22 182:5,8
  182:9 199:17
**emails**  59:9 76:12
  181:14 182:1
**employed**  5:16
  12:23,24,25
**employee**  98:24
  102:19 110:16
**employees**  35:25
**empowered**  21:24
  21:25 111:10
**enclosed**  168:3
  199:12
**ended**  45:10 58:20
  161:17
**enforce**  137:8
  178:3
**enforcement**  66:2
  97:21 112:16,24
  119:3 128:24
  131:23 133:25
  136:17 150:8,12
  150:14,21 154:14
  178:20
**enforcing**  28:14
  136:24 137:7
  151:9,12 152:10
  152:14
**engaged**  115:10
**engineering**  12:18
  27:8,8
**enhanced**  26:24
**enhancing**  135:13
**ensure**  16:3 18:14
  19:24
**ensuring**  18:21
**enter**  48:18 132:14
**entered**  27:1 201:9
**entering**  49:4,11
  109:24
**enters**  47:20,25
  48:22
**entire**  14:3 178:23
  192:4 200:5 201:5
**entitled**  82:19
**entity**  172:10

enumerated  138:7
envision  93:14
equal  156:10
errata  199:14,19
  201:7,10,18 202:1
error  37:17
especially  176:25
esq  4:11,20,20
essence  68:18
establishment
  168:1
estimation  118:7
et  1:8 9:4 53:20
  191:24 199:7
  200:3 201:3
ethan  2:21 95:17
  99:3
evasive  58:16
evening  65:11,12
event  8:16 11:22
  21:15 119:10,13
  128:20
events  8:22 120:21
  120:22 124:12
  170:12 183:14
  187:11 188:12
  190:3 191:10
evers  122:21
  157:22,23,23,24
  158:1,4,7,15
  159:10,25 162:18
  162:25
everybody  137:5
exact  118:14
exactly  161:24
  173:15
examination  2:4,5
  195:3 196:6
  198:14
examined  5:4

example  22:7
  48:14 50:14 94:2
  97:11 109:21
  112:18 117:25
  125:14 182:23
examples  114:3
exceed  65:23
exception  107:15
excerpts  184:19
exchange  95:17,25
exclusively  112:24
excuse  66:24 69:9
  72:16 83:5 131:25
  145:23
executed  201:10
execution  200:14
  201:19
exempt  172:22
exhibit  2:11,12,14
  2:15,16,18,19,20
  2:22,23,24 3:3,4,6
  3:7,8 20:15,17
  25:6 29:17,19
  30:3 31:8 33:1,3
  33:19 34:3,17,19
  35:23 37:11,22
  39:4,7 40:14,15
  41:5,22 42:10
  47:14 49:7 52:17
  54:23 60:5 64:11
  67:21 70:11,14
  72:3,5,9,23 76:23
  82:1,3 83:21,22
  85:10,19 95:12,14
  98:4 99:1 102:14
  104:18 108:9
  111:15 112:13
  113:1 116:3
  122:10,12,19
  128:25 129:15,23
  130:17,21 131:7,8

131:17,17 134:22
  134:25 135:5,16
  139:17 140:2
  141:14,24,25
  142:2,23 144:4
  150:3,25 158:3,8
  164:8,22 165:25
  167:2,4 171:13,15
  172:3 181:7,10
  184:16,18 185:1
  185:14,16 195:5
  195:13 196:9,12
exhibition  88:13
  88:16
exhibits  3:1
  135:24 151:9
  186:24
existed  78:8
existence  103:8
existing  15:11,17
  23:1,2,2 29:25
  31:4 71:20,24
  78:1 141:19
exists  180:19
expect  40:8
expectation  31:9
  133:1
expectations
  61:17 146:25
expense  61:12
experience  11:21
  11:24 39:12 78:13
  182:13 194:1
experiences  67:19
  194:12
experiment
  116:18
expert  28:20 45:21
  139:8 166:11
expertise  110:17
  110:20

expiration  139:16
  200:19 201:25
  202:25
explain  125:20
  161:5
explained  154:13
explanatory  38:17
  62:25
explicitly  138:7
explore  192:8
express  133:7
  155:19
expressed  85:17
  96:13 131:21
  133:4,5
extent  6:9,19 7:2,9
  43:17,20 148:1
  158:9,11,18,21
  159:2 187:20
  189:25 192:6
  193:6
exterior  22:15
  164:21 165:2
extracurriculars
  8:8,11
extraordinary
  40:5
extrapolate
  124:11
eyes  155:5

### f

f  187:8 188:10
face  138:4
faced  138:5
facility  23:2 68:20
  73:6,7,11 74:1
  93:7 180:16,16,17
  197:1
facing  53:20
fact  55:1,9 66:7
  71:25 73:23 74:10

84:3 100:19
130:16 131:7
155:4 164:19
174:5,6 196:18
**factors** 112:15
**facts** 190:9,10
192:1,8 193:9
**factual** 188:25
189:5,21
**fair** 17:2 46:8
57:24 61:14,15
91:14 109:7 118:9
119:17 126:19
136:17 162:8,9
176:18 182:23
184:9
**fairly** 15:9 112:20
**fall** 36:7 124:21
149:18 163:23
172:13
**falling** 15:20
125:10
**falls** 18:9 68:8
125:14,24 165:20
**familiar** 21:5 29:4
33:10 48:11,12
64:15 79:20 80:16
173:16
**familiarity** 147:20
**families** 67:13
**family** 73:8 142:12
**fans** 68:7
**far** 36:6 81:17
88:16 100:10
**farmer's** 12:7,8
**february** 41:10
49:6 63:11 70:3
72:6,10,19 74:15
76:2 85:10 157:16
186:13,22 195:9
195:24 196:2,9

**feed** 19:22
**feel** 46:1 96:5
121:19
**feelings** 67:22
**feet** 71:12,13
**fell** 163:24
**felt** 94:20 156:2
**female** 123:15
**festival** 8:18
**field** 9:5,18,24
10:3,7,11,15,18,23
11:23 12:6 14:24
23:15 31:4 37:25
41:21 45:16 47:3
49:4,8 60:18
61:14,22 62:9
63:2,6,18 64:3,24
65:5,22 66:10,12
68:4 69:15,19
73:19 80:24 82:21
83:9 84:1,4,15
86:5,7,8,17,25
87:7 88:3 89:1,7
92:15,22 93:3,12
93:14,15 96:2,20
100:4,13 101:12
101:18 102:6,7
104:4,9,21 105:20
106:1,17 108:24
113:3,15 114:15
114:23 115:22
116:4,12,18,18
117:4 119:20
120:4 121:8,13,22
123:23 124:13,19
124:25 126:21
127:1,5 128:12
129:9,12 130:2,12
130:13 136:9
137:25 138:15
139:5 140:15

141:20 143:3,7
144:14 145:7,19
146:15 158:16
174:7,18 175:2,12
175:23 176:1,10
176:10,17 177:3,5
180:9 181:15
182:4 183:17,24
184:3,7 188:8,9
190:19 191:11
**fields** 29:24 93:24
94:3,12 105:3,16
137:15 141:4
174:14 179:1,5,14
179:22 183:3,10
**fight** 119:11
**figure** 48:1 55:17
107:14
**file** 133:14 156:9
**filed** 30:18
**filing** 60:14
**fill** 141:9
**filling** 141:3,12
**final** 22:3,6,22
27:9
**finally** 16:12
**financial** 170:7
**find** 20:2 26:3,23
41:16 51:18,21
60:9 87:18 116:11
130:19 184:21
199:12
**fine** 56:8 97:10
133:7 152:22
**finer** 93:22 96:9
**fines** 138:4
**finish** 6:19 89:21
**fire** 13:3
**first** 5:4 27:25
40:20 71:11 72:24
80:24 82:3,19

96:10,10 97:6
100:11 101:11,14
101:17 102:2
103:18 104:1,1,8
104:18 105:2,12
113:21 122:19,19
123:10 124:20
130:17 138:8
157:25 167:10,23
177:22 184:23
185:5 190:24
195:14
**firsthand** 109:25
**fit** 12:19 183:21
**five** 14:22 15:7
16:5,6 17:4 70:7
130:10,16 157:25
163:15 170:15
**fix** 37:21
**fixture** 24:11,15
**fixtures** 23:23
24:4,4,7 25:1 52:5
**fixturing** 30:1
68:4
**flag** 87:6,9,13,14
**flea** 8:24 9:2
**floor** 4:21
**focusing** 17:7
**follies** 8:19
**follow** 44:23 56:15
57:16 98:1 191:1
195:1
**followed** 56:19
57:10 75:23
125:19
**following** 54:16
96:18
**follows** 5:5
**foot** 71:13,21
120:2,7 126:4
179:9

**football** 8:7 9:5,22
9:23 10:7,10,14
11:22 29:24 37:25
87:7,9,13,15 88:1
93:11 115:20
121:5,8 123:11,14
123:17 126:18
173:14,25 174:1
176:16 183:14
194:2
**footing** 156:10
**foreclose** 175:25
**foregoing** 198:5
200:13 201:18
**forestry** 12:16
**form** 10:16 12:1
17:14 18:11 19:2
19:17 20:25 23:21
25:8,15,23 27:17
32:17 33:22 38:16
39:15 40:10 41:7
41:25 42:16 43:22
46:9 47:21 48:2,6
49:20 50:2 51:8
57:12,19 58:24,24
58:25 59:18 60:19
61:19,25 62:16
63:23 64:4,12,25
65:8 66:5,22
67:24 68:22 69:5
69:16,23 70:5
73:20 75:2,8
78:11 79:6,11
83:3,11 84:21
85:4,11 86:1,13,20
87:11,23 88:8,14
89:2 90:2,13 91:1
91:8,16 92:3,17
93:8 94:5,16 95:4
95:10 96:4 97:18
98:21 99:9 100:6

100:21 101:19
102:11 104:12
105:6 106:25
107:12 109:20
111:7 112:3
113:16 114:24
115:12 116:10,21
117:6 118:13
119:7,24 121:10
121:17 122:7
123:19 124:7,14
125:5,17 126:1,7
126:13,23 127:11
131:12 133:2,16
134:10 135:8,21
136:2,18 137:2,11
137:16 138:6,16
139:7,14,21 140:4
144:24 145:9,20
147:1,25 149:14
153:17 154:18
155:13,25 156:18
157:2,8,18 161:7
162:23 163:7
164:1,17 165:9
168:11 169:4,19
170:1 172:4,7,18
172:24 173:6,23
174:11,21 175:17
176:12,19 177:7
177:13,18 178:9
178:18 182:24
183:6,22 184:12
189:24 190:12
191:4,14 192:3
193:13 194:5,10
196:15,21 197:3
197:10
**forth** 18:23 21:20
34:5 42:13

**forthcoming** 133:1
**forward** 10:8
16:16 60:8 61:23
199:16
**forwarded** 103:16
**found** 45:7 48:23
139:18 184:23
**foundation** 20:25
31:21 32:17 38:2
39:15 40:11 42:6
42:16 47:22 49:20
59:7 60:19 61:25
63:23 64:4,12
65:8 66:22 68:22
69:5,16,23 70:25
78:11 79:6,11
83:3,11 84:21
85:4 86:1,20
87:11 88:8,14
89:2 90:13 91:1,8
92:3,17 93:8 94:5
94:16 95:4,10
98:21 100:6
103:22 104:12
105:6 106:25
107:12 111:7
113:16 115:12
116:10,21 117:6
118:13 119:7,24
121:17 122:7
123:19 124:7,14
125:17 126:1,7,13
126:23 127:11
133:2 134:10
135:8 136:2
138:16 139:21
144:9 145:9,20
147:25 149:14
157:18 164:1
165:10 166:7
168:11 169:4

172:4,7,24 173:6
173:23 174:11,21
175:17 176:12,20
177:7,13 179:4,17
180:22 182:17
184:12 190:12
191:4,14 192:3
193:13 194:10
196:15 197:10
**four** 25:6 71:12
130:10 142:14,22
**free** 46:1 63:17
96:5 200:14
201:20
**frequency** 170:21
**frequent** 170:23
**frequently** 73:8
195:15
**friday** 106:21
117:15 121:20
135:1 148:10
**friend** 171:3 182:5
**friends** 170:2
194:8
**frisbee** 114:17
128:17 183:16
**front** 8:25 47:15
129:23 161:17
181:8
**fulfilled** 60:3
**full** 24:4,7,11,15
**fully** 61:14
**fun** 15:24
**further** 51:24
71:19 150:8,11,21
151:8 154:14
191:3 192:6 193:6
194:24 196:5,6
**furtherance**
192:16,24 193:10

**future** 87:6 89:9
144:15,17,18,22
145:7,15,19
146:15 191:7

**g**

**gallons** 16:5,6
**game** 91:19,20,24
92:12 101:24
102:2 103:6
104:25 105:9
112:19 115:4
123:11,16,17,21
173:14,25 180:20
**games** 10:3,7,9,10
10:13,14 61:10
65:25 66:9,14,15
66:16,21 67:6
68:8 84:14 85:2
85:18 92:21 93:11
99:22 100:1,3,10
100:12,17,19
101:10,12,18,22
101:24 102:7
103:4,8,9 104:2,4
104:5,9,10,17,18
104:20 105:3,4,10
105:16 108:23
136:16,25 139:6
143:3,3,7 146:17
173:11,17 176:24
176:25 179:16
180:21 195:18
196:3 197:9
**garages** 13:1
**garden** 9:3
**gas** 16:4,5,6
**gathering** 87:24
120:3
**geared** 81:5
**gears** 168:16

**general** 79:15
81:14,15 137:6
143:9
**generally** 20:3
25:25 34:12,13
36:14 48:7 56:14
57:15 67:16,25
82:6 107:23
110:11,16 111:9
131:22 143:11,16
160:20 169:23
**generated** 23:25
25:2 33:10 49:14
**george** 1:13 2:3
4:1 5:3,11 36:16
129:16 198:14
199:9 200:4,9
201:4,13 202:20
**getting** 16:6 112:5
195:10
**ghank** 181:17
**give** 6:9 7:20 22:6
22:7 27:20 36:8
37:10 42:14 56:20
62:3 109:21
111:20 114:3
117:4 144:6
150:13
**given** 41:4 57:9
74:17 98:23
106:15 131:16
182:14 191:3
193:6
**giving** 118:21
153:5,24
**gklaw.com** 4:14
**glare** 18:22,24
24:9,11,14,15
**go** 7:23 12:13,14
16:4 21:12,12
22:10 27:21 28:19

39:23 42:7 44:8
47:22 50:12 51:13
56:23 57:15 60:4
60:8,11 62:4
70:25 77:21 82:10
88:16 90:2 92:10
92:15 97:5,24
101:19 107:7,19
108:1 109:13
110:1,12,14
116:17 120:15
125:8 127:3,15,22
127:23 129:17
131:24 132:13
133:10 134:19
136:13,20 141:8
144:9 146:3,5
147:1 151:17
152:25 153:24
154:21 165:10
169:18 170:15
171:3 178:21
179:23 184:25,25
189:11 193:21
194:23
**god** 185:4
**godfrey** 4:5,12
**goes** 6:4 56:20
73:4 156:7 164:21
**going** 7:2 15:15
19:7,8,16 22:12
24:25 25:25 28:2
28:6,7,16 29:5
37:20 42:22 48:5
48:7 50:9,9,10,10
51:10,12,13,14,15
51:19,24 52:19
53:2 54:13 55:8
55:19 56:15,22
57:15 59:21,22
60:11 67:2,4,5,6

68:25 69:1 74:7
75:12 76:21 77:23
82:2,13 86:17
87:6,19 89:7
91:11 93:7 94:4
94:21 95:11 96:3
96:19 98:1,2
101:7 107:6,14,19
107:21,23,25
109:12 110:18
114:14 117:2
118:4,25 122:18
123:6 125:8
127:15,20 128:15
131:1,21,22,25
133:6,8,24 136:21
143:17 144:5,14
151:3,8,12 152:9
152:13,19 153:9
153:14 154:9,14
158:17 159:18
164:18 166:3
167:8 170:10
171:4 174:24
178:24 179:8
180:2,15 181:7
184:21 188:17
189:7 192:7,11
197:9
**golf** 171:9,10
183:17
**good** 5:9 12:19
37:10 45:24 48:24
50:23 58:6,17
95:21 106:21
117:24 118:17
121:20 131:15
135:1,12 139:12
148:10 155:6
171:3 178:10
194:20

**goodman** 180:18 195:18

**governed** 18:19 63:15 83:20 138:25 145:8

**governing** 85:7

**government** 50:24

**governs** 18:5

**grab** 109:12

**grad** 8:23

**graduate** 8:1 170:9

**graduates** 170:3

**graduating** 12:10

**graduation** 11:9 11:18 12:24 14:23 15:1 119:5 120:23

**graffiti** 15:23

**grant** 21:19

**granted** 65:20 78:3 157:7 190:19 195:19

**granting** 60:24 61:2,12

**grass** 15:22 107:25

**great** 7:6 36:6 47:11 50:14 97:11 140:17 185:12

**greatly** 39:16,24 40:13

**gross** 37:16

**ground** 6:2 24:13 147:4

**grounds** 85:18 148:6,9

**group** 160:21

**guaranteeing** 18:17

**guess** 19:18 23:14 52:15 56:15 63:2 76:14 118:24

139:11 161:13 165:17

**guidance** 50:5

**guiding** 178:7

**guys** 84:18 152:9

**gym** 8:19

**h**

**h** 2:9 5:11

**habit** 135:10

**hac** 4:15

**half** 124:20 128:19

**hamburger** 16:6

**hand** 119:12 185:15 192:19

**handed** 29:18 34:18

**handicap** 50:16

**handing** 20:16 33:2 70:13 72:4 95:13 122:11 167:3 171:14 184:17

**handled** 147:18 160:20

**hang** 82:14

**hanging** 134:4

**hank** 1:13 2:3,20 4:1 5:3,9,11,25 20:16 33:2 35:17 36:16 43:8,20 54:4,9,16 55:13 56:11,17 57:5 59:3 79:3 108:7 122:12 129:22 135:24 150:4 153:8,20 156:5 167:3 168:16 171:14 181:7 184:17 188:2 191:5,16 192:10 194:21 195:5

198:14 199:9 200:4,9 201:4,13 202:20

**hanks** 62:4 189:10

**happen** 22:17

**happened** 70:21 147:5 150:24

**happening** 11:13 48:15 117:14

**happens** 25:20

**hard** 30:6 116:11 123:21 173:13

**harm** 136:16,19

**harms** 135:25 136:6

**hate** 76:19

**hazarding** 139:10

**head** 6:13,13 13:19 17:3 84:25 94:11

**headed** 16:19

**hear** 43:7 54:19

**heard** 10:13 12:6 31:24 89:18,19,24 100:11 101:11,13 101:15,18,20,23 143:16 158:6

**hearing** 91:10 92:2 112:4 120:21 152:7 161:25

**hearings** 53:15

**heart** 1:4 170:11 185:17 199:6 200:3 201:3

**heather** 149:22

**heating** 15:13

**height** 23:24 25:1 71:12

**held** 8:16,25 11:6 11:10,19 45:2,16 87:3 100:20 101:6

150:25 170:4 192:17,24 193:11

**helped** 8:22 137:3

**helpful** 24:12

**helping** 177:10

**hesitate** 118:21

**hesitating** 166:21

**hey** 23:3 66:15 74:22 126:5 146:14 151:12 152:9

**high** 1:4 3:6 7:24 7:25 8:3 9:12,24 14:20,21,24,25 24:12 30:2 31:5 33:14 37:24 50:17 71:23 82:21 87:1 123:7 142:20 147:9 156:11 169:25 185:17 187:10 188:6,11 190:3 194:1,18 195:18 199:6 200:3 201:3

**hip** 166:23

**historical** 73:6 121:13 175:22

**history** 182:14

**hmm** 170:20

**hockey** 93:12,14 93:15 114:16 180:8,9,10 183:15

**hold** 35:1 49:1 63:18 65:11 69:18 92:1 131:23 133:25 138:15 154:9,10 159:23 196:3

**holding** 63:21 103:2 105:19 113:2 129:8,12

136:9
**home** 13:1 67:13
109:11
**homecoming**
123:6
**homework** 67:14
**honest** 31:25
83:13 114:16
145:12 148:8
180:11 185:8
186:7
**hope** 111:25 126:8
**hoping** 145:2
**host** 63:17 69:10
69:14 83:25
113:14 136:15
139:6 179:5 183:5
195:18 197:9
**hosting** 64:23
65:25 66:9
**hosts** 179:2
**hour** 118:23
119:10
**hours** 31:20,20
174:8
**house** 45:7,7
**housing** 13:8
15:14,18
**huge** 170:7
**huh** 6:14 36:3
40:16 47:16 73:14
95:15,18 105:22
106:8 113:4
122:23 123:9
130:6 150:16
158:5 167:15,24
171:19 181:19
**hundred** 53:21
121:5,7
**hundreds** 76:11

**hurt** 155:9,15
**hypothetical**
24:18 28:22
113:17 145:10

**i**

**i.e.** 64:3
**ice** 180:5 183:15
**idea** 32:10 46:6
57:24 58:6,17,17
71:10 79:21 84:13
101:25 109:1
134:6 147:23
192:14
**identical** 71:20,25
**identified** 2:10 3:2
46:5 183:19
**identifies** 37:22
130:10
**identify** 29:19
35:24 38:14 53:10
93:5 94:3 123:5
136:3 183:11
184:6
**illinois** 4:16
**illumination** 71:13
**immediately** 45:9
129:8,12
**impact** 75:22
76:15 118:2 161:5
161:22 168:7
**impacted** 177:5
**impediments**
157:15
**important** 91:25
**impose** 61:22
**imposed** 59:16
**improvement**
168:1
**inc.'s** 185:18
**inch** 50:16

**inches** 107:25
**include** 41:19 46:7
**included** 17:16
37:6 46:12 52:22
199:14
**including** 181:13
183:14
**incomplete** 113:17
145:10
**incorporate** 64:3
65:6 183:12
**incorporated**
201:12
**incurring** 61:12
**indicates** 87:5
**indicating** 199:14
**individual** 143:19
**individualized**
194:23
**individually**
111:10 117:9
**individuals** 36:14
**indoor** 180:16
**inform** 70:1 73:24
74:6 150:10,12
196:24
**information** 53:16
73:5 99:5 109:23
142:8,16 188:16
189:21 190:7,14
**informed** 56:13
69:11
**informs** 74:10
**infrastructure**
146:22
**ingrisano** 2:4 4:11
5:8 14:7,10,14,15
17:16 20:16 29:18
33:2 34:18 35:14
43:11 44:19,23
45:25 47:10,13

53:4 54:7,13,16,21
55:3,11 56:8 57:3
58:14 68:18 70:7
70:12 72:4 77:23
82:2 92:6 95:13
99:12 102:15
108:4,6 122:11
129:21 150:4
151:18,23 152:17
152:24 153:1,19
153:22 154:4,20
155:2,12,24
156:17 157:1,10
157:25 158:11,25
162:22 167:3
171:14 172:5
181:4,6 182:19
184:17 185:15
188:22 189:2
192:6 194:22
196:7 197:12
**injure** 37:19
**injuring** 11:1
**injury** 192:20
**input** 34:14 75:19
76:6,8 112:5,7
160:25
**inquire** 189:5
**inquiries** 141:17
**inquiry** 2:21
**insist** 194:22
**inspect** 15:12,17
20:5
**inspected** 104:24
**inspection** 13:10
13:17,20 14:2
15:5,7 17:11 19:5
49:16 84:24
125:23 132:15,19
137:20 149:15
151:13

inspector 13:8
19:25 24:23 126:5
131:14 163:17,20
inspectors 19:24
112:15
install 19:6 22:18
26:2 27:21,25
29:23 38:8 45:3,5
60:1 62:7 67:5
69:8 75:12 92:16
142:13 145:6
146:19 191:7
installation 71:4
88:25 90:23
145:15
installed 18:17
19:24 20:4 22:21
65:21 89:7,13,16
89:25 90:1 91:6,7
102:6
installing 13:3
20:2 26:16 51:15
61:13 68:6 141:22
146:21 168:14
173:11
installs 69:2
instance 4:2 57:18
104:18
instances 137:23
institution 91:17
92:11 100:5
168:20 170:5
191:20,24 192:13
institutional 3:5
29:1,3,9,13 31:6
31:18,24 32:2,9,15
34:1 45:20 63:16
77:15 79:15,17,23
80:6,18 83:14,18
84:10 101:8 137:9
138:13,25 139:1,4

139:9 145:11
160:5 163:3,4,9
164:19 165:4,13
165:14 166:2,3
167:5,25 168:9
173:10,16 177:17
institutions 142:12
instruct 42:23
43:5 158:20
187:22 188:18
instructed 53:13
instructs 7:4
insulate 50:11
intelligently
145:13
intend 176:9
intended 62:7 73:7
141:17 142:4,17
intensity 68:5 71:5
71:13 141:21
intent 93:2 123:22
176:16
intention 176:7
196:2
intentional 175:14
175:15
intentionally
175:25
intentions 176:14
interest 136:24
137:7,14 142:12
152:19 198:10
interesting 120:12
179:12
interpret 28:19
84:18 170:3 178:3
interpretation
17:12,17 38:10
41:16 45:1,15,17
65:24 103:19
113:10 128:10

133:12 134:18
136:11 148:7
155:21 160:1
174:17
interpreted 63:19
168:14
interpreting 78:14
178:16
interpretive 178:7
interrogatories
2:15 35:9
interrogatory
34:24 35:23 36:11
181:11 182:11
183:2,11 184:6
intimately 64:15
intricacies 48:13
introduction
162:8
invest 145:18
invested 27:22
146:6,9
investigate 51:24
106:12 110:22
128:22
investigating
111:1 153:15
investigation
106:24 108:9,18
109:5,16 110:7
111:4,5,12
investment 146:22
investments 45:3
invite 156:8
invokes 189:20
involve 27:7,8
44:17 77:1 94:18
187:25
involved 16:15
24:5 32:1,22
43:20 75:14

134:21 149:17,25
158:19 160:22
161:12 162:10
177:9
involvement 30:14
51:5 79:25 147:15
149:7 160:7,11
involves 43:4
44:14,15 51:7
52:12 53:19
187:21
involving 43:3
159:4
issuance 18:8 28:4
41:2,6 43:13 44:5
56:21,23,25 58:22
59:5,16,25 73:24
150:19 157:16
162:15 196:13,25
issue 15:11 19:16
22:1 24:15 25:14
28:12 31:25 37:9
38:19 39:13 41:22
41:23,23 42:21
54:5,14 58:11,20
58:22 59:12 60:4
60:6 61:9 65:14
66:14,19 71:21
74:17 75:22 77:12
80:25 96:1 97:16
98:2,3,20 99:7
100:24 101:5,20
102:3,9 107:16
109:11 111:11
112:11,17 117:3
119:21 120:20
121:16 124:3,23
125:3,7 126:11
131:25 132:7
133:18 134:12
144:4 149:13

186:13 188:22
197:8
**issued**  25:21 38:1
38:4,6 40:9 42:4
61:4 65:19,20
66:8 70:23 72:25
74:12 76:24 78:3
78:5 88:24 102:16
111:6,17 114:7
128:25 130:1,4
131:8,18 132:3,24
133:20 137:23
138:2 139:19,24
144:12 148:12,20
151:13 157:7
160:2 187:2 189:9
191:6 196:19
**issues**  42:15 51:7
151:21 159:17
**issuing**  18:12
27:16 62:6 97:17
111:23 112:6
127:25 134:8
135:16 136:1
153:14,16 189:9

**j**

**jacob**  102:19
103:3 104:24
106:14,17 109:12
110:3,8,12 114:21
130:4 133:20
134:21
**james**  71:22
**jean**  4:20
**jenny**  32:20 34:14
110:13 160:14,15
160:16,23
**jingrisa**  4:14
**job**  15:24 17:8,10
80:4 95:21 178:3

**john**  36:16 38:23
43:1,14,18 52:17
53:1,5,7,12,14,19
54:21 58:10 75:16
109:2 144:3 152:1
153:5
**johnson**  48:19
**joint**  160:21
**jonathan**  4:11
**jones**  183:24
**judged**  78:7,9
**judgment**  68:19
68:25 178:10
**july**  5:20 40:17
154:17
**jv**  90:18

**k**

**k**  5:11
**kahn**  4:6,12
**keep**  90:10 107:19
107:21 172:19
180:2
**keeps**  135:11
**kid**  158:1
**kids**  121:7 127:14
194:18
**kind**  8:17,25 12:8
18:25 36:11 40:4
40:5 50:4 52:2
79:21 88:13
127:19 146:12,13
**kinds**  22:7
**kirchgatter**  32:20
160:16
**knew**  60:12 90:7
114:13
**know**  7:1 8:13,17
16:3 17:9 20:22
21:14,15 22:17
23:2 24:6 26:13
26:15 27:24 28:7

28:16 30:25 31:7
31:12,23 34:8,16
36:21 37:18,19
38:3 41:4 42:1,7
47:24 48:20 50:13
54:5 55:16 58:9
59:10 62:7,9 63:8
67:10,16 68:3,8
70:6 71:23 74:20
75:5,11 78:20,22
78:25 79:13 81:22
81:24 83:20 86:16
88:18 90:15,16,16
90:17,17,19,21,22
91:2,20,21 92:10
92:18 93:13,16
100:10 102:25
103:18 104:1
106:11 108:7,11
108:16,18 109:3,4
109:10 110:13,25
111:19,21,22
112:7 114:15,16
114:21 115:1,3,7
117:12,13,14
118:5,18,22 119:9
119:11,14 120:22
125:9 129:16,17
132:6 135:2 138:4
139:12 140:18
141:16 144:2,12
145:12 146:14,16
147:4 148:4,4,9,13
149:19 152:9
158:18 159:6,17
159:18,19 162:7
163:3 166:9,14,22
166:25 169:22
170:6 171:23
176:6 177:10,23
177:24 178:21

180:8,12,16,16,19
180:21 185:5
186:1 187:18
188:24
**knowing**  146:7
**knowledge**  9:8,10
11:21 18:4 29:6,8
31:17 32:5,7
33:25 36:21 46:17
48:4 59:4 64:17
65:4,14 67:8,17
70:1 75:15,18
76:1,3 80:13 83:1
84:12,16 93:5
100:8,9,14 101:1,2
104:6,7,15 108:12
108:22 110:1
112:1 113:6
121:18 123:2
129:11 131:5,10
141:3 143:11,13
144:3 147:20
148:19 149:24
157:14,20 160:10
163:12,22 177:11
177:15 179:14
180:6,24 182:21
188:8 190:2,4
191:17 194:7
**knowledgeable**
32:14
**known**  192:1
**knows**  20:3 144:9
189:15

**l**

**label**  119:5
**labeled**  33:6
**lacks**  40:11
**lacrosse**  183:17
191:10,17

**land**  172:11,16
**language**  36:13
   82:25 83:7 188:20
   189:17
**large**  34:22 45:3,7
   164:20 165:1
**larger**  151:21
**late**  5:20 68:15
   165:9 172:18
**launching**  116:23
**law**  4:5 112:9
**laws**  76:22
**lawsuit**  61:2
**lawyers**  189:3
**lay**  6:2
**layman's**  113:10
**lead**  106:17
**leading**  153:5
   159:14
**leads**  91:23 92:9
**learned**  11:25
   89:24,25 100:18
   101:16 104:1,19
**leased**  187:10
   188:8,11 190:3
**leave**  56:16 119:13
**lee**  3:3
**left**  39:1 48:16
   129:22
**legal**  53:8 78:12
   135:3 146:8 148:1
   153:24 192:5
   199:1 202:1
**legally**  147:5
**length**  178:23
**letter**  2:16,18 3:3
   42:5,9,13 71:7
   72:5,7,20 73:7,24
   74:6,22,23 83:21
   85:10,15,16 96:8
   96:13 139:24

142:11 150:5,19
151:6,7 152:5,11
153:7 156:7 158:3
195:23 196:9,24
199:20
**level**  107:10 119:2
   127:24 128:23
   161:21 194:15
**licensed**  20:1
**life**  170:6,24
**lifelong**  170:2
   194:8
**light**  18:14,25
   19:15 23:25 25:2
   25:20 26:9,13
   27:15 51:16 60:22
   61:9 62:23 69:21
   71:12,22 74:11
   84:19 131:7 132:7
   144:4 157:7 163:4
   174:6 187:11
**lighted**  183:9
**lighting**  2:11 18:2
   18:3,6,7,24 20:6
   20:11,12,19 21:22
   22:15,18 23:4,9,12
   23:17,20 25:7
   26:11,25,25 27:12
   28:4,5 29:7,12,23
   30:11,15 31:9
   33:13 34:4 36:1
   36:22,24 37:2,6,7
   37:7,9,12,22,24
   38:8,13,15 41:15
   41:17,19,22,23
   42:10,20 44:5
   45:4 47:17 48:24
   49:5,8,17,19,24
   50:6,19 51:4,6,11
   51:15 52:4 59:12
   59:17,25 60:22

63:1,3 64:7,9 65:6
65:15,15,19,20,21
65:22 66:19 68:1
69:2,8,20 70:2,18
71:14,22 72:10
73:25 74:7 75:12
79:10 80:24 81:14
81:15,22,24 83:2,5
89:8 139:18
141:20,22 142:3
142:15 159:16
163:12,21 164:11
164:14,21 165:3,6
165:13,18,20,22
166:6,10,14,17,20
168:8 173:3 179:2
179:5,10,15,15
180:10 182:15
183:13 186:14,15
186:22 187:3
191:7 195:8,19
196:2,13,25
**lights**  18:21 19:6
   23:16 26:2 27:15
   37:25 60:1 61:7
   61:10,13,23 62:7
   62:19,22,24 64:3,6
   64:24 66:12,15,20
   67:11,18 68:6
   69:12 71:5 74:23
   75:1 85:3,25 91:6
   91:13 92:16 99:7
   99:16 102:6
   142:13,17 144:18
   144:22 145:3,6,15
   145:25 146:15,16
   146:21 156:24
   157:17 158:15
   162:11 163:11,23
   168:14 173:12,18
   179:24 180:21

195:10 197:8
**limit**  93:2 173:11
   173:12,19 175:1
   176:9
**limitation**  121:1
   121:24
**limitations**  61:21
**limited**  31:19
   35:17 63:13 67:17
   74:2 80:12 84:4
   121:18 157:20
**limiting**  173:4
**limits**  73:10 83:25
**line**  24:2 30:23
   45:8 72:24 83:18
   88:20 176:15
   177:3,4 195:11
   199:14 201:7
   202:3
**lines**  18:24
**links**  169:22
**list**  148:6
**listed**  30:8 97:23
   201:7,17
**listing**  201:7
**lists**  123:23
**lit**  31:4 68:4
   141:19 174:14
**literally**  32:6
**little**  28:13 30:6,9
   31:3,23 132:18
   166:22 183:7
**liturgies**  169:3,7
**liturgy**  119:20
   123:23 124:21
   126:3,8
**live**  14:22 171:1
**lives**  171:3,9
**llp**  4:21
**long**  9:10,13 22:5
   40:22 64:6 107:25

119:10 121:14 129:16 139:12,13 195:6,7

**longer** 40:13 145:8

**look** 23:23,24 27:3 27:4 28:2,3,6 35:22 39:4,17 40:14 51:11,12 68:8 84:9 86:23 86:24 99:19 107:7 107:9 108:1 109:10,13 110:12 110:14 117:9 119:9,15 122:18 125:8 127:15,24 128:15,22 136:13 142:14,22 167:8 185:25 186:8 187:5 191:22 195:13

**looked** 10:18 31:12 37:4 40:22 41:13,13 52:8 80:21 81:12 99:24 106:20 118:17

**looking** 17:20 20:13 21:21 24:13 24:25 25:5,10,13 37:11 47:14 52:3 69:1 104:13,23 107:19,22 119:16 128:25 130:20 135:2,24 139:17 140:2 141:14 181:10,10

**looks** 25:17 35:7 122:20 181:16

**lot** 15:25 16:10 24:5 26:16 27:7 27:22 34:21 51:16 53:4,6,7 59:10

78:23 94:8 109:23 153:15 165:2 170:8,9 177:1,8 186:2

**louis** 4:20

**loved** 170:5

**lower** 71:11

**lump** 15:15

**lunch** 129:18

**lussier** 179:25

### m

**m** 5:7

**machine** 6:8

**mad** 60:24

**madam** 199:10

**madison** 1:7,17 2:11,12,14,22,24 4:6,13,22 5:15 12:17 17:20 18:4 19:14 20:19 23:16 29:22 30:4 31:5 32:2 33:6,25 35:24 40:15 71:22 82:4,7 98:16,19,20 106:23 113:6 130:1 147:8 148:25 171:2 179:1,22 180:4 182:15 183:3,10 199:7 200:3 201:3

**madison's** 13:9 15:5 172:16 178:3

**main** 4:6,12

**maintaining** 13:3

**maintenance** 15:15,21

**major** 155:5

**majority** 24:22 171:1

**makers** 135:15

**making** 16:11 20:11 53:25 54:2 76:7 94:23 99:6 135:18 143:10 144:22

**man** 10:24

**manner** 144:8

**mansfield** 179:25

**manually** 48:5

**marathon** 7:8

**march** 39:5,9 52:16 72:13,16 105:1,2 108:20,21 108:21 114:21

**marginal** 40:5

**marked** 20:15,17 29:17,19 33:1,3 34:17,19 70:11,13 72:3,5 82:1 95:12 95:13 102:14 122:10,12 129:15 150:3 167:2,4 171:13,15 184:16 184:18 185:14,16

**market** 8:25 9:2 12:7,8

**married** 14:15

**mass** 116:12

**master** 38:11 45:18 46:6,19 47:5,6 63:7,7,9,12 63:14,18,22 64:2,8 64:15,20,23 65:23 65:24 66:1,3,16 70:4 73:1,10 74:2 74:13,18,24 75:1 75:24 77:13 80:1 80:5,6,13,18,18,22 81:1,4,6,11 82:7 83:6,17 84:9,11,18 85:7,9 86:7,10,11

86:15,16,17 87:5,8 90:24 91:3 92:14 93:2,5,23,24 95:1 98:6 99:19 100:5 101:9,21 102:8 103:19 104:2 105:25 106:5 108:24 112:19 115:15 116:3,9,14 116:20 117:1,17 118:8,15 120:12 120:14 121:8,15 121:18 122:1 123:2 124:2,6,9,22 125:14 126:6,10 126:15,20 127:1,4 127:8,18 128:3,4 128:10 135:20 136:12,15,22,25 137:7,10 138:3,13 138:19,23,24 139:3,12 145:8,11 146:1 148:22,25 149:5,9 155:22 156:9,23 157:6,14 160:1 166:4 167:9 168:1,9 174:17 175:4,13,20,24 176:2,5,8,15 177:1 177:6,10,12,16 184:8 196:20

**matches** 191:10,18

**material** 19:15 75:22

**materials** 48:15 142:23

**math** 113:14 114:20

**matt** 16:24 32:19 34:14 38:21 55:21 72:6 75:16 77:4

102:21 106:15,20
106:21 109:2,12
110:4,8,18 121:20
135:1,3 140:17
147:19 148:10
149:16 152:1
159:14 160:13,22
**matt's** 133:12
**matter** 133:6
147:18 151:21
**matthew** 4:24 35:2
36:15 95:22
**mayor** 157:22
158:4,6,14 159:4,7
**mckenna** 184:2
**mckinley** 169:21
**mean** 5:22 40:1
43:16 53:22 61:4
113:23 117:23
136:25 140:3,22
168:14 197:8
**meaning** 109:5,17
151:18 196:24
**meaningless** 39:2
**means** 88:16 91:23
140:6,19
**meant** 14:5
**measures** 16:2
**measuring** 16:4
**mechanisms** 66:2
**meet** 18:21 22:15
22:20 59:24 68:1
78:22 81:24
114:20 164:11
**meeting** 152:1,8
153:3,4,10 154:24
155:17 156:15,21
156:22 157:5
159:3,8
**meets** 11:6,10,19
18:14 20:12 25:10

49:25 50:8 51:2
**member** 37:16
**members** 76:8
108:14
**memo** 58:24
**memorial** 30:2
31:5 40:15 52:3
71:22 141:15
142:23 144:4
164:20
**memorial's** 71:25
141:17
**memory** 55:21
75:4 103:13
131:20
**memos** 53:6,11
**mention** 157:5
183:23
**mentioned** 30:21
41:13 51:3 61:1
62:20 172:9 182:2
**mentioning**
169:21
**merits** 155:20
159:21,25 160:1
**mess** 89:11
**message** 147:8
**met** 21:25 22:6,9
25:14 64:7
**meters** 16:11
**metropolitan**
29:23
**mgo** 73:25 106:6
**michael** 2:18
**mid** 108:20,21,21
**middle** 117:13
150:7 187:7
**midway** 9:4 82:18
**midwest** 199:17
202:1

**mifflin** 5:15
**mike** 72:5 152:1
153:4,5
**miles** 118:23
**mind** 15:3 55:14
146:23 173:12
180:3 183:23
**mine** 190:25
**minimum** 15:14
15:18
**minor** 118:7,8,15
**minuscule** 118:5
146:20
**minute** 70:7 77:24
82:11
**minutes** 16:8,9
158:1
**missing** 34:16
64:18
**mission** 3:6 171:16
171:17,23 172:2
192:16,24 193:10
**misspoke** 171:12
**misstates** 57:19
65:9 135:9
**modicum** 128:7
**modification**
168:2
**money** 8:17 27:22
146:6,9,9 170:8
**monitor** 81:9
**monroe** 2:23 12:7
105:20 118:23
122:14 124:17
130:13 170:22
171:5
**months** 39:24
40:13 133:19,19
**morning** 5:9
**moskowitz** 102:19
106:11,24 108:22

109:16 110:7,20
111:1,4,10,16
112:11 130:4
131:6,14 132:2
134:21 135:18
153:15
**moskowitz's** 109:4
**motivated** 162:7
**mouth** 58:5
**move** 192:20
**moving** 10:8
**multiple** 44:9
150:23
**municipal** 17:17
17:20 78:14 113:6
**music** 128:21

**n**

**n** 2:1 5:7,7,11
**nakoma** 171:7,9
**name** 5:10,11
24:20 143:18
179:22 199:6
200:3,4,15 201:3,4
201:21
**national** 18:19
119:12
**nature** 8:20 81:25
115:21 165:19
**navigate** 54:6
177:10
**nec** 18:13,19
**necessarily** 91:22
92:9
**necessary** 90:15
**need** 7:9 27:4
57:21 58:1,10
90:11 114:8
129:17 134:12
146:24 148:9,9
152:20 168:17

**needed** 56:6 67:11
**needing** 74:24
**needs** 26:14
**neighbor** 99:4,21
  103:15 106:22
  107:24 125:12,16
**neighborhood**
  120:15 122:14
  124:17 127:4,6,14
  143:12,23
**neighborhoods**
  187:10
**neighbors** 21:18
  118:3 177:9
**neither** 68:10
  155:17
**never** 10:10 31:24
  50:7 60:12 77:3
  85:21 180:19
  182:6,7 194:19,20
**nevertheless** 37:12
**new** 15:8,10 29:23
  51:15 52:5,5
  143:14 163:17
**newsletter** 2:23
  122:13,20 123:5
  142:20
**nice** 6:5
**nielsen** 180:13
**night** 38:9 63:22
  64:24 68:8 117:15
  117:15 154:17
  173:19,22 174:15
  176:25 179:3,6,11
  179:15,23 180:21
  195:18 196:3
**nighttime** 31:18
  65:6 174:9 180:5
  183:13
**nods** 6:13

**noel** 4:15
**non** 36:17 43:13
  43:18 44:5 56:23
  56:25 58:22 59:5
**noncompliance**
  139:20,23
**noncompliant**
  139:19
**noncomplying**
  96:2,19
**nonphysical**
  116:16
**nonwaiver** 56:9
**nope** 122:15,17
  150:1
**normal** 132:11
**notarized** 199:15
**notary** 4:4 198:4
  198:20 199:25
  200:10,18 201:15
  201:23 202:23
**note** 199:13
**notes** 48:19 132:15
  132:19
**notice** 2:22,24 4:3
  66:14 96:14,23
  97:3,17 102:10,16
  102:24,25 106:13
  107:17 111:6,11
  111:17,24 112:6
  112:12,17,21,25
  117:21,22,25
  118:6,12,16 119:6
  119:14 120:10
  123:10 125:10,15
  125:25 127:25
  129:1,7 130:1,17
  130:24 131:7,8,19
  132:4,12,13,24
  133:10,15 134:9
  134:13 137:23

139:20,23 150:13
  150:22 178:13,25
  186:13,21 187:1
  198:14
**notices** 66:9 99:8
  102:5 136:1
  147:13,24 148:12
  148:13,20 150:9
  151:4,13 152:10
  154:25 155:21
**notified** 113:1
**nsterett** 4:17
**number** 19:22,22
  121:1,24 122:3
  128:16 131:2
  143:5 199:8,14
**numbers** 201:7
**numerous** 53:15
**nuns** 169:11
**nuts** 164:11

**o**

**o** 5:7
**o'clock** 21:17
  117:15
**o0o** 1:3 5:2,6
**object** 7:15 10:16
  12:1 17:14 18:11
  19:2,17 20:25
  23:21 25:15,23
  27:17 31:21 32:17
  35:11 38:16 40:10
  41:7,25 42:16,22
  46:9 50:2 52:19
  57:12,19 59:18
  61:19,25 62:16
  63:23 66:5 67:24
  83:11 87:11,23
  90:2 91:1 96:4
  97:18 99:9 100:21
  101:19 103:22
  104:12 109:8,20

112:3 116:11
  121:10 139:7,14
  139:21 140:4
  141:6 144:5,9,24
  147:25 153:17
  154:18 155:13,25
  156:2,18 157:2,8
  157:18 158:17
  161:7 162:23
  163:7 164:17
  169:4,19 170:1
  172:24 178:9,18
  180:22 183:6
  187:20 189:24
  190:12,23 191:4
  193:22 194:5
  196:15,21 197:3
  197:10
**objection** 6:25 7:4
  25:8 33:22 38:2
  39:15 42:6 47:22
  49:18,20 51:8
  59:7 60:19 64:4
  64:12,25 65:8
  66:22 68:15,22
  69:5,16,23 70:5,25
  73:20 75:2,8
  78:11,15 79:6,11
  83:3 84:21 85:4
  85:11 86:1,13,20
  88:8,14 89:2
  90:13 91:8,16
  92:3,17 93:8 94:5
  94:16 95:4,10
  98:21 99:15 100:6
  102:11 105:6
  106:25 107:12
  111:7,13 113:16
  114:24 115:12
  116:10,21 117:6
  118:13 119:7

120:5 121:17
122:7 123:19
124:7,14 125:5,17
126:1,7,13,23
127:11 131:12
133:2,16 134:10
135:8,21 136:2,5
136:18 137:2,11
137:16 138:6,16
145:9,20 146:2,18
147:1 149:14,21
153:23 164:1
165:9 166:7
168:11 172:4,7,18
173:6,23 174:3,11
174:21 175:9,17
176:12,19 177:7
177:13,18 179:4
179:17 182:17,24
183:22 184:12
188:17 189:17
190:24 191:14
192:3 193:6,13
194:10,16
**objections** 36:12
36:14 92:23
113:20,24 114:11
115:17 117:19
120:11 127:2,21
128:6,14 152:20
165:16 176:4
186:16,17 193:22
**objective** 18:25
**objectives** 80:17
**obrich** 188:5
**observations**
132:16
**observe** 11:10,14
97:4 103:3 118:4
131:24

**observed** 112:13
130:11 134:15
**obvious** 15:9
**occasionally**
169:20
**occur** 13:22 38:25
58:23 117:21
**occurred** 29:14
124:1,12,20 125:2
130:16 154:17
**occurring** 114:22
168:2
**october** 29:4 160:6
163:2 165:12
166:1
**odana** 171:3,10
**odd** 40:7
**offense** 88:22
**offer** 180:5
**office** 5:19 23:1,6
24:19 44:4 47:20
76:1 81:9 94:19
94:25 107:8 108:8
117:18 130:5,11
131:6,11 132:6
135:25 150:11
151:11 152:8
**officers** 112:16
**offices** 4:5
**official** 2:22,24
66:9,14 96:23
97:3,16 99:8
102:4,9,16,24,25
106:12 107:16
111:6,11,23
112:12,17,21,25
127:25 129:1,7,25
130:24 131:7,19
131:25 132:3,12
132:12,24 133:15
134:9 147:12,24

148:20 150:22
151:4,12 155:21
200:15 201:21
**officials** 35:24
115:1 148:13
**oh** 15:25 19:21
26:3 35:7 39:10
41:16 54:18 59:10
88:5 100:25
109:11 134:14
141:25 185:4
**ohio** 199:2
**okay** 6:11,15,22
7:6,7,12,18,23
17:25 18:3 19:6
20:1 23:13 48:20
55:13 60:8 68:17
70:9,17 71:6
78:16 90:21 95:21
96:7 99:3 105:1
117:11 138:21
139:17 141:8
150:2 162:4
164:25 171:11,25
172:21 179:8
184:6,25 185:4,10
186:21 188:4
195:6
**olbrich** 180:8
187:8
**old** 121:12 185:10
**older** 170:16
**olympics** 113:14
**omission** 87:18
**omitted** 87:4
176:22 177:2,4
**omitting** 87:19
**once** 7:4 22:21
39:1 50:15 76:19
119:13 133:21

**ones** 26:12 67:9
179:10,19,20
180:3
**online** 103:4,9
**onsite** 100:20
**open** 43:19 47:3,5
73:12 76:12 81:13
81:18,21 82:10,15
82:19 83:24 84:23
86:4 93:6 149:4
**opening** 13:6,7
**openings** 19:22
**opinion** 112:9
131:21 152:21
155:19
**opportunity** 42:15
96:22
**opposed** 57:8
109:12 115:5
117:14 132:11,20
140:19
**opposing** 57:6
**option** 70:24
**orchestra** 119:10
**ord** 167:13
**order** 60:3 62:3
**ordinance** 2:11
20:19 24:10,16
25:7,12 37:8
41:17 77:11 78:1
78:4 97:20,21
107:6 138:7
145:23 160:5
163:3 166:22
178:22
**ordinances** 19:15
32:2 75:24 76:17
78:8 113:7 139:1
139:4 178:4,17
**organization**
143:14,15,20

**organized** 10:18
**original** 175:19
**outcome** 134:1
**outdoor** 2:11 18:2
  18:3,5,5,7,23 19:6
  20:19 21:15,22
  22:10,13 23:4,9,16
  23:17,20 25:7
  26:11,25 28:4,5
  29:6,12 36:1
  37:25 38:13 49:19
  51:11,16,19,20
  59:12,16 60:12,22
  64:9 65:6,15,19,19
  65:21 70:18 77:20
  83:5 116:12
  123:23 124:21
  126:8 157:17
  163:4 164:14
  165:6,13,17,19
  166:5,14,17,20
  168:8 179:2,15,15
  180:17 182:15
  183:13
**outline** 139:24
**outlined** 28:24
  60:5 73:7 81:20
  164:21
**outside** 44:16 53:8
  75:17 111:23
  142:2,22 158:22
  165:4 168:3
**overrule** 76:20
**overruling** 77:1
**oversees** 84:25
**overturn** 148:14
**owned** 82:21
  86:25 183:12,20
**owner** 137:23

**p**

**p.m.** 197:15
**pa** 191:8
**page** 2:2 30:3,4,9
  35:1,22 40:14,20
  47:5 73:12 82:4
  82:10,11,12,14
  84:3,12 86:4
  96:10,10 122:19
  167:10,23 171:17
  176:15 183:11
  184:24 185:25
  186:11 187:5,7
  190:16 191:9,22
  192:15 193:16
  195:14,17 199:14
  199:16 201:7
  202:3
**pages** 33:9 41:14
  46:23 47:1 116:14
**paint** 15:20
**paragraph** 71:11
  72:23 73:4,23
  74:11 98:4 150:7
  156:7,8 196:23
**paragraphs** 96:11
**paraphrased**
  183:7
**park** 184:1,3
  187:8,8,9 188:5,6
  188:9,11 189:23
**parking** 26:16
  27:6 51:16 165:2
**parks** 162:18,25
  180:4,5 183:12,20
  187:9
**part** 9:19 15:24
  17:8,10 22:16
  25:24 26:15 27:9
  34:22 46:20 81:16
  126:16,17 128:12

170:25 171:16
178:2,15,15
190:19 201:9
**participate** 88:2
  121:2 170:12
**participated** 8:9
  8:13,22 159:5
  174:23
**participation** 9:22
**particular** 55:8
  57:18 58:22 77:10
  81:10 88:21
  102:24 108:7
  111:15
**particulars** 110:25
**parties** 189:3
  198:10
**partly** 62:17
**party** 42:14
  189:13
**pass** 24:11 117:4
**passage** 161:3
**passed** 154:11
**passing** 159:11,15
  159:17 169:21
**pathway** 156:23
**patio** 60:12
**pattern** 36:7
**pause** 7:3
**paved** 51:16
**pd** 80:7,18
**pedestrian** 81:23
**pen** 185:1
**penalties** 138:4
  151:4
**penalty** 97:5
**pending** 44:12
  154:16 157:6
**people** 6:18 10:17
  11:1 15:19,21,22
  15:25 21:10 28:19

32:22 39:21 48:10
75:21 76:13 78:24
90:5 110:6 118:19
120:15,18 121:25
122:4 125:11
128:17 143:4,11
149:23 170:9
**pep** 118:11,18
  120:23 124:25
  125:1
**perceived** 26:17
**perceiving** 62:8,21
  62:22
**percent** 53:21
**percentage** 178:24
**perception** 62:20
**perfect** 7:1
**performed** 106:24
**performing** 54:12
**period** 9:5 14:1,3
  16:22 17:5 41:5
  43:15 92:15 93:24
  94:13 106:2 116:9
  118:11 126:21
  149:18 181:23
  190:3
**permissible** 60:17
  68:12,20 124:22
  126:21
**permission** 55:11
**permit** 2:13 18:12
  18:16 19:5,7,15
  21:6,9 22:1,4 23:5
  23:10 25:14 27:16
  27:19,20 28:4,11
  29:22 30:16,18
  37:24 38:4,6,13
  39:13,21,24,25
  40:2,9,15,20,23
  41:2,4,9,22 42:4
  42:21 43:13 44:6

45:22 46:21,22
52:18 53:1 54:22
55:15 56:3,21
58:12,23 59:6,12
59:17,25,25 60:1,1
60:4,7,15,24 61:2
61:5,9,18,24 62:7
62:14 64:10 65:20
66:19 67:22 69:4
72:24 73:25 74:7
74:11,17 76:3,7,23
77:12 84:20 88:24
89:14 141:15,18
144:4,11,20
145:15 147:3,10
162:11,15 164:14
166:5 173:3 174:6
183:13 191:6
195:19 196:13,19
196:25
**permits** 15:11
17:18 18:8 21:22
29:7 38:18 68:10
79:4,10 81:17
83:1 145:18 168:8
173:20 182:15,22
190:18
**permitted** 2:21
16:14 38:10 60:23
63:5 64:8 65:5
66:3,16 69:13,14
79:22 92:16,21
115:16,16 116:13
121:15 124:5
126:6 127:7,18
140:11,18,22,23
141:9 142:4 161:9
161:15 162:1
174:6 183:4 184:7
**person** 20:2 32:14
48:14 59:2 64:16

110:21 135:18
143:19 198:9
**person's** 24:20
**personal** 100:14
180:24 181:13
182:7,8,8 191:17
192:12
**personally** 11:15
143:21 149:6
190:15 200:11
201:15
**perspective**
132:18
**pertained** 81:13
**phase** 95:1
**phone** 59:2 199:3
**photocopying**
30:6
**phrase** 50:24
109:8 117:20
132:10 136:23
178:12
**phy** 12:3 63:13
65:12 115:11
**phys** 115:8 128:13
174:19 175:2
176:11,17 177:4
**physical** 73:11
74:3 82:22 84:5
87:1,19 93:3,10
98:7 106:1 115:19
115:24 116:5,7,8
116:19 117:2
126:24 127:7
184:10
**physics** 116:17,23
**pick** 15:23
**pickleball** 183:16
**picture** 185:10
**pictures** 3:7
184:22 185:2

**pinckney** 4:21
**pipes** 89:10
**place** 11:1 27:25
28:25 89:10
120:19 123:7
128:10 130:12,13
139:13 159:16
**places** 90:15
**plaintiff** 1:5 4:2,10
185:17 198:7
**plaintiff's** 3:9
**plan** 2:14,19 19:19
21:12 30:4 33:5,6
36:24 38:11,12
45:18 46:6,19
47:6,6 48:20,24
54:8 59:20 60:4
63:7,7,10,12,14,18
63:22 64:2,9,15,20
64:23 65:23,24
66:1,3,17 70:4
73:1,10,12 74:2,13
74:18,24 75:1,24
77:13 80:2,5,7,13
80:18,19,22 81:1,4
81:6,11 82:4,7,16
83:6,17,24 84:9,11
84:18,23 85:7,9
86:7,11,15,17 87:5
90:24 91:3 92:14
93:2,5,23 95:1
98:6 99:19 100:5
101:9,21 102:8
103:19 104:2
105:25 106:5
108:25 112:19
115:15 116:3,9,14
116:20 117:1,17
118:8,15 120:13
120:14 121:9,16
121:18 122:1

123:2 124:2,6,9,23
125:14 126:6,10
126:15,20 127:1,4
127:8,18 128:3,4
128:10 135:20
136:12,15,22,25
137:7 138:3,13,19
138:23,24 139:3
139:12,24 140:12
140:19,22,24,25
141:9 145:8,11
146:1 148:22,25
149:5,9 155:22
156:9,23 157:6,14
160:1 161:17,21
163:10,18,20
164:8,10 166:4
167:9 168:1,10
174:17 175:4,13
175:20,24 176:2,5
176:8,15 177:1,6
177:10,12 184:8
196:20
**planned** 80:7
150:14 176:23
**planning** 32:22,23
32:23 95:8 145:2
149:16,20 160:21
195:18
**plans** 15:11 16:16
23:22 78:25 86:10
86:16 87:8,25
93:25 137:10
140:1 177:16
**play** 8:6 10:3
61:10 62:8 83:14
83:16 84:14 92:21
93:16 137:17
146:17 173:13,18
173:25 176:24
194:18

**[played - problem]**

**played** 8:3 10:7,9
10:14,14 83:9
85:2 88:1 93:18
93:20 100:3,4,12
100:17 101:12,18
101:25 102:3
104:4,5,10,19,20
104:25 105:4
191:18
**player** 9:23 194:2
**players** 88:22
121:6
**playing** 90:17
93:12,14 99:22
101:22 103:6,7
104:9 105:10
115:1,20 123:15
127:14 128:20
173:11,17
**plays** 87:25,25
88:21 119:11
**plc** 4:15
**please** 5:9 24:21
35:15 43:9 48:24
53:10 54:20 92:7
96:5,6 99:13
181:8 197:14
199:12,12
**plumbed** 144:14
**plumbing** 15:12
146:15
**plural** 134:24
**point** 12:16 13:20
14:11 18:1 22:25
26:8,10 45:24
74:15 83:15 86:5
86:11 93:22 96:9
98:17,18 134:19
175:21 178:23
194:12

**pointed** 147:2
**pole** 24:12 120:2,7
126:4
**poles** 52:5 71:12
71:22
**policies** 32:8
**pool** 109:18
**populated** 140:15
**pose** 6:10,22,25,25
**posed** 34:24
**position** 13:12
43:12 54:7 60:16
69:12 73:18 74:1
74:16,25 75:7,20
76:23,25 77:3,8
83:8 85:2 94:14
95:7 96:12,18
98:6,12,24 114:8
116:6 197:1
**possibility** 155:6
**possible** 6:4
144:23
**possibly** 90:22
119:14
**post** 37:13 63:9
**posted** 103:9
119:20
**posting** 103:13,17
**potential** 64:1
132:3 144:18
145:5
**potentially** 146:24
**pound** 16:6
**powder** 123:10,13
123:17
**power** 178:8
**practice** 11:3 40:7
64:6 67:6,10,18
87:21 88:7,10
89:7 91:12,13,25
92:13 115:6 116:7

120:25 121:2,25
122:4,5 128:13
135:7 174:1,14,15
177:3
**practices** 10:2
11:22,22 41:18
63:13,17,18,21,22
64:1,3,24 65:22
66:13 68:12 69:2
69:9 73:11 74:2
82:22 84:5 87:1
87:18 90:11,11
91:6,7,22 92:1
93:3,10 98:7
106:1 115:23
116:4 117:2
126:25 127:6
173:21 174:19
175:2 176:11,17
184:10 195:10
**practicing** 67:9
87:25
**prayer** 120:3
**pre** 63:7,9
**precedent** 175:23
**preparations**
144:22
**prepared** 128:4
**prescribed** 18:15
**present** 4:24 10:6
43:25 44:3 142:12
182:16
**presumptions**
178:6
**pretend** 7:1
**pretty** 81:19
133:24
**prevent** 27:15
28:4 65:13 136:1
136:17,25

**preventing** 189:14
**preview** 156:14
**previewed** 152:10
153:11
**previously** 60:21
191:19
**priests** 169:16
**primary** 168:2
193:17 194:3,14
**printout** 167:4
171:15
**prior** 28:25 35:8
39:17 59:24 76:6
80:21 90:7 100:1
101:4 103:25
104:11 105:1,9
108:16 150:19
165:12 183:19
184:9 186:6
**private** 112:7,7,10
183:4
**privilege** 35:12
42:23 44:15,16
52:20 53:19 55:1
55:9 144:7 151:20
159:5 187:22
189:20
**privileged** 36:17
43:14,18 44:17
53:2,24 54:8,9
55:5 158:20
**pro** 4:15
**probably** 15:1
31:3 41:18 58:2
65:10 108:20
121:6 125:10
134:16 141:11,21
177:8
**problem** 27:23
28:20 71:4 121:3
121:7

problematic 61:7
procedural 77:24
procedure 200:5
201:5
proceed 61:23
135:19
process 23:18,19
26:8 27:2 28:24
32:5 36:14 39:18
39:21 51:21 59:22
60:5 74:21 102:23
147:21 149:7
160:8,12 161:12
164:21 177:10
processed 36:22
produced 53:5,8
product 188:21
production 199:16
199:17,22
professional 20:2
program 48:13
prohibit 64:21,23
128:11 145:13
173:10,17 174:17
175:15
prohibited 103:19
104:2 115:25
116:2,25 145:14
prohibiting
137:15
prohibition 63:21
84:17
project 87:5
140:11,14
projects 40:2
pronounce 157:22
proper 18:25 20:3
20:4 38:12 133:10
properly 18:17,18
189:19

properties 15:18
24:2 29:8,9
property 15:15,21
16:14 24:1 45:8
45:16 46:7 62:21
68:1,2,3 86:12
137:23 148:21
173:5 174:20
proposed 20:11
27:18 28:3 38:14
41:24 42:20 44:4
62:24 87:6 162:5
proposing 27:10
27:19 38:20
proscribed 114:1
114:3,10
prosecuting 151:8
prosecution
134:19
protect 62:15
proved 154:15
provide 22:12
75:19 146:12,13
156:23 160:25
187:24 190:14
provided 23:24
53:16 69:12 190:1
provides 102:8
provision 18:5
84:8,12 86:6
168:8
provisions 77:13
81:11,14,15
136:25 138:14
prudent 136:12
public 4:4 32:8
53:15,20 54:1,2
170:8 183:4 198:4
198:20 200:10,18
201:15,23 202:23

puff 123:11,14,17
pull 39:24,25 40:2
145:18 195:5
pulling 145:14
146:20
punt 37:6,6,9
41:15,19,23 65:14
71:14,22
purely 118:2
163:12 164:4,11
purporting 143:24
196:12
purports 123:5
purpose 38:8 62:8
62:8 73:23 196:23
purposes 10:1
80:17 195:10
pursuant 4:3
106:6 198:13
pursue 151:4
pursuing 12:18
154:24 155:8
purview 18:10
32:24 163:6 190:5
put 10:25 16:8
23:19 24:12 45:4
56:14 58:5 93:22
96:8 129:23
131:23 133:25
145:3 156:10
179:19 189:16
196:1
putting 52:4 59:23
141:12 146:21
147:4

**q**

qualified 121:19
192:11
quarter 16:8
question 6:10,19
6:22,25 7:6,14,16

7:16,20 21:4
27:24 34:13 35:13
35:17,20 43:2,4,7
44:12,18,24 51:17
52:23 53:3 54:17
54:20,25 55:2,8,14
55:16,25 56:20
57:4 63:2 64:16
77:24 80:10 81:5
86:14 89:22 91:9
94:9,24 96:7
99:10 106:21
118:17 121:20
135:1 140:17
144:8 146:11
148:10 151:10,19
151:20 153:20
154:6 158:22
161:13 162:24
172:1 175:22
179:12 187:23,24
188:2 189:18,19
191:5,9 192:12
193:5,8 195:14,14
195:17 196:4,8,11
questioning
195:11
questions 7:2
34:24 41:24 55:4
56:9 73:9 144:7
153:8 194:24
195:2,8,9,15 196:5
quick 14:15 108:3
quickly 40:12
quite 14:14
quote 74:2,3

**r**

r 4:11 50:11,11
racquetball 77:20
raise 8:17

raised 37:5,9
188:22
raising 96:1
rallies 120:23
125:1
rally 118:11,18
124:25
rationale 32:7
81:16 154:24
reaction 113:21
158:7
read 28:18 35:14
35:16 36:19 46:24
74:14 80:11 86:4
92:6,8 99:12,14
112:4 150:15
156:12 178:22
187:12 193:2,2,19
193:24 197:13
200:5,6,12 201:5,6
201:17
reading 115:15,18
126:20 192:4
193:25 199:20
readings 23:25
25:2 116:24
ready 39:23
really 9:2 14:15
15:24 17:23 18:12
25:5 37:10 39:22
48:11 52:6 56:17
57:25 67:1,3
79:16 80:14 87:3
88:12,23 97:24
98:1 108:2 110:14
117:24 120:17,23
121:19 123:21
132:17 135:11
141:21 152:21
169:9 171:5
180:16 185:4

reason 38:18 44:5
61:16,18 134:7
147:7 158:2
166:21 172:1
199:15 201:8
202:3
reasonable 41:5
reasons 38:5 42:14
44:1 85:21,24
rebuild 15:20
recall 9:6,7,18
42:12 47:1 49:22
55:16 57:17 59:13
70:16 71:7 76:6,8
76:10 79:15 81:10
104:3,21 151:15
152:3,8 154:23
155:4 161:1,4
169:12 195:11
receipt 199:19
received 34:23
72:13 90:5 103:1
104:3 107:8 136:8
142:11 143:2,6,17
181:14
receiving 76:6,8
receptacles 22:13
recess 47:12 70:10
108:5 129:20
181:5
recitation 17:3
recognize 20:18
33:3 80:4 82:3,6
95:16 102:15
129:25 188:10
recollection 9:1
30:15 42:3 58:10
77:10 159:24
recommend 52:17
54:21 55:15

recommendation
52:20,21 56:2
recommendations
53:6,12
record 5:10 6:5,8
6:11 35:16 47:14
56:7 57:1 77:21
77:22 80:11 92:8
99:14 129:19
135:13 150:25
189:8,11 198:12
201:9
records 76:13
recreating 128:12
recreation 149:4
recreational 93:7
183:12,20
recycling 48:20
red 185:1
redoing 141:20
redone 60:12
reduce 71:13
refer 63:1 67:25
98:13 143:12
referee 90:21
reference 47:7
59:11 134:25
143:1 199:8 200:2
201:2
referenced 54:23
154:17 200:11
201:15
referencing
181:15
referrals 108:8
referred 47:2
81:23
referring 18:1
49:5 158:25
refers 98:25

reflected 30:22
67:21
reflecting 59:4
regard 46:13 54:3
75:7 191:2
regarding 36:17
43:12 56:25 59:1
60:17 73:5 90:5
143:2,6 162:19
regardless 165:4
regards 81:20
188:5
regret 114:14
regular 191:10
regulations 172:11
172:16
related 122:5
130:1 142:23
181:14,17 182:3
relates 33:13
relating 142:12
relative 198:16
relevant 133:14
relied 47:8 77:11
82:25 83:8 84:13
99:6
religious 168:20
168:25 191:20,23
192:13,17,25
193:11
reluctant 116:1
148:4
rely 99:18
relying 142:15
remember 6:9 9:2
9:3,20 11:13 12:5
34:2 46:22 56:12
57:6,21,23 58:17
58:18,19 75:10
76:4 80:23,25
81:8,22 143:21

151:25 155:15
157:12 159:8
161:24,24 162:3
169:8 186:7,24
187:4
**remembering**
153:4
**remembrance**
44:25 69:17 88:20
103:1
**remind** 36:8
**reminder** 71:19
72:9
**remodeling** 13:1
**remove** 71:14
**renovation** 190:20
**repair** 29:24
109:22
**repeal** 123:2 146:1
149:8 156:23
157:6
**repealed** 157:15
**repeat** 35:13 80:9
**rephrased** 43:10
**replace** 15:19
**reported** 1:24 17:4
102:20,21
**reporter** 4:4 6:6
163:19 198:1,4,9
200:7
**reporting** 6:7
**reportings** 101:17
**represent** 160:4
184:18
**representative**
143:19
**representatives**
143:22
**request** 3:9 76:13
186:1,8 187:7,18
190:10,16,21

191:13,22 192:2,9
192:15 193:2,16
193:23 198:7
201:9,11
**requested** 68:10
**requests** 185:18
185:23 186:2,5
191:2
**require** 45:21
51:25 70:3 161:25
168:3,15 169:2
**required** 76:25
93:25 128:9,11
192:7 193:7
199:25
**requirement** 79:1
166:5 167:9
168:25
**requirements**
17:21 20:12 25:19
49:24 50:20
**requires** 26:21,24
50:11
**requiring** 72:25
74:12 76:24
196:19
**reserve** 197:13
**reserving** 194:22
**residential** 5:14
21:17 109:23
**residentially**
187:9
**resolved** 45:14
154:9
**respect** 9:22 10:22
17:7 35:19 41:9
42:10 53:14 56:21
71:6,10 73:18
120:25 138:2
148:12 152:18
189:22

**respond** 78:16
117:7 145:10,21
173:24 174:12
175:18 177:14
178:19 190:21
**response** 3:8 36:11
76:20 146:7
147:16 158:7
181:16 185:16
187:14 189:22
190:22 191:12
193:6
**responses** 186:5
189:10
**responsibilities**
15:4
**responsible** 17:11
28:14 49:11
149:12
**responsive** 56:18
**rest** 178:24
**restaurant** 21:16
22:10
**restrict** 173:19
174:18 176:16
**restricted** 86:6,8
138:20 173:21
174:8,19
**restricting** 173:4
**restriction** 86:11
187:11
**restroom** 7:9
45:24
**rests** 150:9
**result** 105:10
106:23 107:9
117:17 157:6
**resulted** 102:24
106:12 108:9,17
135:6 136:16
174:6

**results** 153:7
**retired** 5:17 13:14
14:10
**retirement** 5:18
164:15 181:25
**return** 156:9
**returned** 199:19
**reunions** 170:13
170:14,14
**reveal** 140:1
**revealed** 43:22
**reverse** 147:24
148:15
**review** 15:11
16:15 19:19 20:6
20:8,10 22:17,19
23:9 25:25 26:4,5
26:6,14,15,21,24
27:2,9 29:6,11,12
30:11,15,16,22,23
31:2,9,13 33:5,20
34:4,4,10 35:1,8,9
37:12,22,23 39:3,4
40:17,18,19 41:1
43:19 46:19 47:17
48:2 49:5,7 50:6
50:19 51:4 52:1,7
52:8 60:4,15 68:2
72:13 78:2 80:1
81:1,6 95:1 96:5
111:5 140:19,22
140:24,25 141:10
141:12 147:21
160:24 161:2,11
162:19 163:8,18
163:21 164:8,9
165:23 167:18
171:22 172:22,23
185:21,22 199:13
200:1 201:1

**reviewed** 19:7,9
19:12,13 21:13
33:16 34:9 35:25
36:22 37:2,2
46:23 47:1 72:10
78:18 81:11
148:24 165:3,6,21
177:12 186:4
**reviewer** 23:22
48:4 50:18
**reviewers** 50:7
**reviewing** 21:22
23:20 25:16 31:1
46:14 49:23 71:7
140:6 164:5,5
186:7
**reviews** 19:23
24:19 30:7 37:14
39:11 48:12,14
140:12
**revisions** 71:11,15
**rewey** 24:22,25
30:12 33:16 36:16
36:25 37:4,11
41:14 47:18 49:6
49:10,23 50:18
72:11 139:18
141:2 163:14,24
164:4 165:21
**rewey's** 34:3
**ride** 9:4
**right** 6:6 7:8,21
14:14 15:24 17:22
18:10,18 20:13,24
22:16 25:6,7
29:10 31:10 32:3
33:11,21 44:18
48:6 50:21,23
52:14 54:1 55:21
63:19 65:7 68:21
69:15 71:8,17

72:17,21 74:8,13
77:18 79:13 81:17
82:14 83:10,22
90:12 96:20,24
100:13 101:15
119:22 124:6
125:4 127:8,17,20
128:5 129:5,13
130:2 134:9 135:7
135:20 137:10,20
138:20 141:4
142:18 143:20
144:23 145:6,8
146:25 152:4,10
154:7 156:3 158:4
165:15 168:16
169:3 174:2
178:13 182:9
189:5,12 197:6,13
**rights** 62:3 194:22
**rise** 118:1
**rises** 127:24
128:23
**risk** 45:4
**rluipa** 191:24
192:12,14
**road** 146:5
**rockford** 4:16
**role** 54:12 160:11
160:17
**roller** 183:15
**roof** 15:19
**room** 44:17
**rude** 36:8
**rule** 192:4 193:14
**rules** 6:2 50:5
178:6 200:5 201:5
**run** 9:8,10,20 11:2
16:8,19 120:8,16
138:18 179:12

**running** 90:18
**runs** 16:9
**rushing** 78:24

**s**

**s** 2:9 199:16 201:8
201:8 202:3
**s.c.** 4:6,12
**sacred** 1:4 185:17
199:6 200:3 201:3
**sanctioned** 126:19
**sarah** 4:20 199:5
**sat** 133:20
**satisfied** 111:11
**saw** 10:17 97:6
110:4 114:25
116:14 192:20
**saying** 11:4 27:13
48:19,24 52:25
55:6 57:21,23
58:6,17 59:13
62:6,10 66:15
74:22,23 76:19
79:16 84:3,7 87:3
89:12 127:16
147:3 151:7,7
159:18 175:1,7,14
175:24 176:3
**sayle** 180:9
**says** 47:17 49:7
56:24 67:1,4
71:19 72:24 73:23
78:21 82:15 84:4
86:17 87:13 97:21
104:23 106:5
107:24 116:3
117:1 134:17
140:2,11 150:7
166:22 167:12,13
175:4 176:5
178:22 195:17

**scales** 120:24
**scenarios** 40:6
**scenes** 135:5
**scheduled** 103:5
**scheduling** 91:25
**school** 1:4 3:6 7:24
7:25 8:4,25 9:12
9:24 14:21,24,25
29:23 30:2 31:5
33:14 37:25 71:23
82:22 87:1 117:13
119:10 123:7
126:19 128:19
142:20 147:9
168:22 169:2,2,7
169:25 170:22
185:17 188:6
194:2,18 195:18
199:6 200:3 201:3
**schools** 14:20
67:17 156:11
182:16 183:4
187:10 188:11
190:3
**score** 88:12 90:10
90:10
**scoreboard** 89:1,5
89:13,15,17 90:8,9
90:11,23 91:5,11
91:18 92:12
144:13
**scored** 88:18
**scrimmage** 88:2,6
115:5 122:1,5
**scrimmages** 88:20
**scrutiny** 177:9
**seal** 200:15 201:21
**seating** 21:15
51:19,20
**second** 70:18
72:23 74:10 98:4

129:25 131:7,19
134:8,13 156:8
184:24 185:5
**secondary** 168:2
**section** 15:8 16:12
16:19 18:9 47:7
50:10 67:21 73:12
73:25 81:13 82:11
82:13,15 122:19
167:5,9,13,19
191:24
**sections** 15:7
19:11,14 77:11
81:10
**see** 23:23 24:14
25:13,24 28:3
30:4,9 35:1,3,6
36:2 39:5 40:8
47:18 51:24 73:2
73:13 74:4 82:16
82:18 86:25 87:15
88:21 90:19 92:11
96:16,18 98:9
103:4,6 105:21
106:3,7 107:9
122:22 123:8,24
125:8 127:24
128:22 129:1
130:13 131:1,24
133:25 134:12
135:12 136:13
140:12 144:4
150:7 158:3 165:1
167:6,12,14 168:5
168:13 171:17,18
181:17 186:19,20
187:16 195:21
**seeing** 116:24
124:25
**seek** 145:25

**seen** 10:13 34:19
34:21 41:10 42:9
59:10 70:15 72:7
79:5 107:20
122:13,16 150:4
185:19,20 186:25
187:1
**seizing** 59:3
**self** 12:25 38:17
62:25 106:14
109:5,17 110:16
131:11
**send** 48:17 134:1
**sending** 48:23
132:12
**sense** 67:1,2,20
68:19 91:5 105:12
143:5,9
**sent** 42:5,9 133:21
142:11 181:14
185:22 186:2
**sentence** 71:11
92:15 94:13 156:8
**sentiment** 194:9
**separate** 15:16
53:23
**separately** 43:3
**september** 5:21
70:19 122:22
123:1,6 124:16
186:14 187:2
**seq** 191:25
**servants** 170:8
**served** 186:3
**service** 19:23
**set** 34:5 42:13
75:24
**sets** 18:23 21:20
**setting** 165:18
**seven** 130:11,16

**shakes** 6:13
**shape** 43:22
**share** 85:24 194:7
194:9
**shared** 85:21
**she'll** 6:10
**sheet** 199:14 201:7
201:10,18 202:1
**shingles** 15:20
**shining** 37:8
**shoot** 166:23
179:8
**short** 181:2
**shorthand** 4:4
198:3,8
**shot** 10:25 148:3
**shovel** 15:22 97:11
97:13
**shoveling** 178:21
**show** 28:21
**showed** 50:16
**shown** 199:16
**shows** 8:19 72:9
176:16
**shut** 41:20
**shy** 13:14
**sic** 162:19
**side** 171:1,2 184:4
**sidewalk** 15:23
97:12,13 178:21
**sign** 197:14
**signature** 198:18
199:15
**signed** 35:2 164:7
186:2 188:19
200:13 201:18
**significant** 26:12
51:5,7 146:6
**significantly** 60:10
**signing** 199:20

**signoff** 22:3,6,22
23:10
**signs** 25:18 26:22
**similar** 55:3 164:8
165:24 174:13
**simplify** 44:6
**simply** 92:14
104:21
**simulate** 91:19,24
92:12
**sincerely** 192:17
192:24 193:10
199:21
**sincerity** 172:2
**single** 107:18
**sinsinawa** 192:18
192:25
**sinsinawan** 193:11
**sir** 5:12 7:23 14:16
15:4 20:18 21:8
29:18 34:18 35:22
37:22 40:14 41:10
44:12 62:13 64:19
70:13 72:4 82:2
82:11 83:21 89:21
95:3,16 101:14
102:15,23 104:14
129:25 161:13
162:10 168:19
173:2 174:16
182:11 185:1
191:9,19 192:1,15
193:5,8,16 194:1
195:21 199:10
**sisters** 169:11
192:18,25
**sit** 46:24 54:1
109:9 141:16
**site** 2:14,19 30:4
33:5,6 73:10 82:4
140:12,19,22,23

140:25 141:9
164:8
sits  25:21
sitting  152:1
situation  28:9
106:12
six  14:22 130:11
size  19:22 20:3
sized  18:18
skateboarding
183:16
skating  180:5
183:15,16
sky  37:8 81:25
slowly  192:20
small  128:16
smoothly  6:4
snow  97:15,21
soccer  11:13 93:17
93:18,20 99:22
100:1,24 101:5,10
102:3 114:15
115:1 127:14
183:17
softball  114:19
180:1,18 183:15
184:2
sole  134:7
solely  43:20
154:15
solid  57:24
solutions  199:1
202:1
somebody  15:10
16:16 22:4,17
24:6,24 26:2,16
27:3,20 37:17,19
45:6 48:23 49:13
50:9,14 59:21
62:2 65:2 67:1,4
86:22 90:20 93:12

97:10,11 100:23
100:24 101:21,23
107:4,5,9,23,24
109:21 110:4
112:5 125:8
127:13,22 131:22
132:9 133:23
134:17 146:4
147:2 148:5
165:21 169:22
188:7
someways  62:10
somewhat  35:11
39:2 109:8
song  119:11
soon  7:12 39:12
114:13
sorry  21:2 32:11
35:7 36:4,5 39:1
39:10 44:8,13
56:6,17 59:8 62:4
68:16 73:15,16
74:19 76:10 78:20
80:9 83:17 89:21
95:19,20 103:24
105:24 119:23,24
122:24 130:7
138:18 139:11
141:7 150:18
153:1,8 155:18,20
162:2 166:12
171:12 172:5,19
181:10 182:18,22
186:25 189:2,2
192:19
sort  49:25 52:12
59:15,15 110:20
139:20 143:20
158:7
sound  144:20,23
145:3 187:11

source  46:6 99:5
south  4:21
southeast  184:4
space  23:2 73:12
81:13,21 82:15
83:24 84:23 87:9
93:6 94:1,15
spaces  47:3,5
81:18 82:10,19
86:4 149:4
speak  50:7 79:2
95:11 143:24
145:13 176:14
191:7
speakers  123:24
speaking  40:3
98:15 110:23
112:1 143:24
149:12
special  170:4
specific  41:14
74:19 78:18 80:23
81:3 93:6 95:2
103:5
specifically  14:8
34:8,11 65:17,18
76:4,10 77:16
91:2 94:3 157:12
166:20
specifications
21:21,25 27:15
50:20
specifics  75:10
159:13,19
specified  89:15
148:22
specify  94:1
spell  5:10
spend  127:15
171:2,4

spent  12:17 13:16
153:15
spill  19:1
spillover  25:3
spinning  173:8
spoke  53:16
spoken  98:18
158:14
sponsors  3:6
171:16
sponsorship
171:18,23
sport  114:10
sports  8:6 93:6
114:2,3 126:19
149:4
spot  135:12
170:11
spring  11:14
stack  28:15 34:22
stadium  143:14
179:25 180:13
staff  11:15 15:17
28:8 32:22 48:10
48:17,18 52:22
53:23 54:9 100:25
106:17
stamped  37:14
39:5
standard  25:13
50:1 135:2 156:10
157:21
standards  18:14
18:22 19:8,9,19
22:14,20 23:12
25:11 34:5 41:19
48:12 68:1 163:12
164:6,12
standing  152:15
152:20

**standpoint** 31:2
31:13 56:1,2
**start** 13:12 39:17
39:19 51:21 65:24
112:24 158:24
**started** 9:12,13
12:16 39:22 83:19
104:9 105:15
126:18
**starting** 105:3
**state** 4:5,16 5:9
15:13 19:20 60:21
104:15 198:4,21
200:10 201:15
**stated** 127:4 128:1
172:2 196:2
**statement** 91:14
150:23 171:17,18
200:13,14 201:19
201:19
**statements** 53:20
98:19 175:7
**states** 1:1 105:25
116:3
**station** 16:5
**status** 30:7 47:21
49:2,9 70:21
140:3
**stayed** 131:14
**stenograph** 6:7
**steps** 150:12,21
154:14
**sterett** 4:15
**steve** 24:22,25
25:12,16,17 26:4
26:22 30:11 33:16
34:3 36:15,25
37:11 41:14 47:18
47:25 48:22 49:4
49:6,10,23 50:18
72:11 139:17

141:2,11 164:4
165:21
**stevens** 12:16
179:25 194:12
**stipulation** 55:4
56:4,8 57:2,13,14
58:13 144:6
151:17,18 152:16
152:23 153:18,21
154:19 155:1,11
155:23 156:16,25
157:9 158:9
162:21
**stop** 7:3 45:13
46:1 112:22
**stopped** 45:8
**stopping** 45:24
**stouder** 149:22
**straight** 97:25
**strange** 36:16
38:23 42:19 43:1
43:4,5,14,18,21
44:3 52:17,21
53:1,5,7,12,15,19
53:25 54:21 55:15
55:24,25 56:14,24
56:24 58:11,22
59:5 75:16 96:13
144:3 151:11
152:2 155:17,19
156:14 162:18,25
**street** 4:6,12,16,21
5:15 12:7 105:20
118:23 130:13
170:22 171:5
180:9
**strictly** 21:11
**strike** 44:1 138:23
142:9 182:18
**stringent** 79:1

**stroud** 162:19,25
**structural** 37:16
**struggle** 62:12
67:1,3,7 87:3
114:6 116:22
136:19
**struggling** 75:10
184:23 185:4
**student** 10:6 11:7
101:10
**students** 120:3
121:1 123:15
128:11 193:17
194:4,14
**stuff** 27:7,21 34:23
67:14 120:16
148:4 169:22
**subject** 36:13
59:12 66:20
104:17 151:20
166:4,19 172:10
172:16 186:17
193:21
**submit** 50:10,13
78:17 139:25
**submittal** 37:6
**submitted** 23:22
50:14 70:17 71:21
78:2 139:19 140:9
142:3,23 177:16
**submitting** 68:24
**subscribed** 200:10
201:14 202:21
**subsection** 82:18
**subsequent** 74:24
76:25 133:15
**subsequently**
101:13
**substantial** 52:13
52:14

**substantially** 52:4
52:6,10,11
**substituting** 68:19
**sudden** 51:14 60:9
120:18 121:3
128:19 134:2
**sufficient** 69:3
183:13
**sufficiently** 118:15
**suggested** 104:2
**suite** 4:6,12,16
199:2
**sum** 146:6
**summarized** 152:5
**summer** 15:22
126:16,17
**superfluous**
132:22
**superful** 132:21
**superior** 199:1
**superul** 132:21
**supervised** 100:16
**supervisor** 72:21
102:22
**support** 94:22
192:9
**supporters** 170:7
**supposed** 16:8
86:12 107:21
178:7
**supposedly** 103:6
**sure** 6:4,16,23
7:13,19 8:23 9:13
11:3 15:4,13 16:7
16:11,17 20:11
21:5 22:19 24:1
25:10,11 26:1,18
27:10,18 34:24
40:4 66:2 76:5,12
77:25 80:14 81:1
83:13,21 88:5

89:23 94:20 99:11
99:20 101:2,7
102:4 108:4
110:25 115:14
118:7 119:4
120:17 126:2
133:13 135:14
136:23 138:19
143:22 145:22
146:19 147:2,5,7
147:23 148:12
151:6 152:20
158:23 163:14
173:15 175:19,21
178:12 180:7,11
188:10 192:21
**surface** 24:1
**surprise** 48:25
**surrounding**
141:17
**swarming** 120:19
**sworn** 5:4 198:15
200:10,13 201:14
201:18 202:21
**system** 48:21
106:15 191:8
**systems** 13:3,4
**szylstra** 4:22

**t**

**t** 2:9 5:7
**table** 67:20 178:16
192:20
**tables** 22:12
**tacit** 62:18
**tag** 122:21
**take** 7:9 23:22
24:8 35:22 40:4
45:24 47:10 70:7
96:22 108:2 119:3
122:18 125:24
127:20 128:4

150:11,20 162:1
167:8 179:12
181:2 185:1 187:5
195:13
**taken** 4:2 198:6,7
198:8,13
**talk** 48:16 162:4
164:18 166:18
**talked** 17:4 24:17
25:1 26:9 28:22
28:22 79:14 81:18
115:5 135:15
143:3
**talking** 6:18 20:19
22:8 54:3 77:15
102:4 114:7 143:1
144:11 159:11,13
159:19
**talks** 120:13
**tall** 28:15
**tank** 106:19 109:9
**tanner** 4:20
**taught** 169:14
**taxi** 16:10
**teacher** 116:17
**team** 73:11 74:2
82:22 84:5 87:1
87:18,21,24 88:2
90:17 91:20 93:3
93:10 98:7 106:1
115:23 116:4,7
117:2 120:25
121:2 126:25
127:6 128:12
174:18 175:2
176:11 177:3
184:10 194:2
**teams** 67:8 90:16
113:11,12,18
115:1 121:5

**technical** 20:12
21:21,25 25:19
27:14 34:5 118:2
125:13 126:11,12
127:18 128:2
**technically** 27:13
37:6 124:5,21
131:3
**tell** 15:19 46:12
61:6 75:6 158:2
**telling** 99:19
112:21
**tells** 16:13 62:23
**tend** 7:20 127:23
**tennis** 180:13,17
**tenure** 11:7 39:14
**term** 50:7 124:12
**terminate** 156:9
**termination** 149:8
**terms** 40:3 110:24
117:17 118:14
121:8 124:6,22
126:6 128:9
**testified** 5:5
191:19
**testify** 198:15
**testimony** 6:5
53:17 57:8,11,20
62:13 65:9 135:9
184:9 198:13
200:6,7 201:6,9,12
**thank** 47:11 58:15
123:1 131:15
151:17,22 153:1
153:23 154:5
155:3 171:22
182:19 184:15
197:12
**thicker** 34:21
**thiele** 30:23 33:20
34:9 36:15 72:14

**thiele's** 72:20
**thing** 6:21 8:18
45:25 107:18
123:10 141:11
165:19 166:15,16
**things** 8:14,19
16:1,10 18:22
19:1 21:10 25:1,5
44:10 81:3,25
94:10 97:2 106:19
115:22 117:9,21
134:15 135:10
159:14 161:8
162:1 166:9,19
170:13 175:15
178:21
**think** 7:21 12:22
15:9 17:7,23
24:23 34:22 35:12
35:21 41:13 43:19
43:23 45:4,20
54:6,10,11 58:8
61:1 62:9,10,18
64:15 66:25 75:23
76:15 79:8 81:12
81:19 83:15 86:23
88:3 89:4 90:7,16
91:17,22 92:9,20
92:24 93:13 94:7
99:17,18,22
101:23 102:2
114:20 117:9,24
119:8,19 120:12
123:22 129:22
132:17,18,20
133:19 134:13,16
137:4,13,14,20
144:20 147:13
148:6 154:8 156:3
159:2,15 160:13
170:21 173:18

176:15 177:19,21
178:12 184:1,5
185:2 186:25
188:7,21 189:18
**thinking** 6:1 32:11
67:10 89:8 112:5
114:15 123:20
125:9 158:1
**third** 30:23
**thirty** 199:19
**thought** 28:18
57:6 58:6,19,20
62:4 89:5 120:13
127:3 153:25
154:6 171:12
**thoughts** 153:6,9
153:12,13
**thousands** 59:9
**three** 30:7 96:11
130:10
**throwing** 128:17
**ticket** 97:9,12,15
97:25,25 98:3
118:25 133:20
**tickets** 132:1
134:1,3
**time** 6:17,18,24
9:5 10:5,22 13:20
14:3 16:22 17:5
24:20,22,24 25:13
26:8,10 32:13
38:11 40:22 41:5
41:20 43:15 45:2
45:18 63:15 66:1
66:13 67:10 68:10
69:7 74:15 75:21
75:24 78:8,10,19
81:7,16 83:14
85:8 90:24 92:5
93:15 99:23
100:11 101:7,9,11

101:14,17 102:1,2
102:20 103:25
105:2,13 118:11
121:14 126:15,22
127:15 135:11
140:8 143:4 146:8
147:3 149:18,25
151:5,7 152:18
153:15 154:1,11
160:18 164:15
165:5 170:4 171:2
171:4 181:23
194:6 196:1
**timeframe** 107:22
145:1
**timeline** 154:16
**times** 39:23 49:16
69:18 76:16 78:23
103:5 117:8
**timing** 39:11
**tip** 120:24
**titled** 3:4
**tjeanlouis** 4:23
**today** 6:3 16:25
57:11 62:13 79:5
107:16 128:1
129:17 141:16
178:2 190:22
**told** 16:1 38:18
57:9 58:11 69:17
76:16,16 93:1
99:17 100:15,17
**tomich** 4:15
**tony** 158:1
**tools** 66:1,8
**top** 146:21
**topic** 54:3,12
155:16
**totality** 119:16
120:22

**totally** 77:5 180:15
**touch** 115:20
120:1,6 126:3,9
**touchdowns** 88:19
**touched** 144:2
**tough** 54:5
**towers** 146:21
**town** 170:25
**track** 8:7 10:22,23
11:6,10,11,14,19
11:22 114:15
120:8,14 183:17
**tracking** 27:1
**traffic** 27:7 122:4
**training** 24:24
**transcribe** 6:15,18
**transcribed** 200:7
**transcript** 199:12
199:13 200:5,12
201:5,11,17
**transcription**
198:11
**trash** 15:23 22:13
**treat** 15:16
**trespass** 18:22
24:2
**trespassing** 25:2
**trial** 159:1
**tried** 24:6 77:2
**true** 35:10 48:7
49:1 174:4 198:12
**truth** 198:15,15,16
**truthful** 189:13
**try** 6:3,20 7:5 92:5
130:19
**trying** 8:16 20:9
34:2 36:8 39:6
46:22 48:1 53:18
55:17 58:16 61:22
67:9,12 87:2
88:17 117:24

136:1 184:1
186:24
**tucker** 2:18 4:24
16:24,25 17:2,3
32:20 35:3 36:15
38:22 42:20 43:1
43:21,25 44:2,10
44:19,21 46:3,5
48:8 56:22 60:16
70:1 72:6,20,20
73:17 75:6,19
77:1 85:9,14,17
95:22 106:15
109:6,19 142:2
162:18,25 196:18
**tucker's** 81:9
83:21
**turf** 10:19 89:7
**turn** 30:9 55:8
162:1 195:14
**twelve** 71:21
**two** 6:18 33:9 56:9
77:7 78:4 79:4
96:10 97:1 98:1
109:15 113:11,12
113:18 115:1
130:10 170:15,16
177:19 185:8
**type** 8:18 23:23
26:5 128:20
140:11
**types** 117:4 140:14
140:14
**typewriting**
198:11
**typical** 40:7
132:25 135:7
**typically** 22:2,14
26:7 27:1 37:14
39:12 40:8 42:5
42:13 48:16 49:11

51:10 60:3 132:24
134:18

**u**

**u.s.c.** 191:24
**uh** 6:14 36:3 40:16
  47:16 73:14 95:15
  95:18 105:22
  106:8 113:4
  122:23 123:9
  130:6 150:16
  158:5 167:15,24
  171:19 181:19
**uhs** 6:14,14
**ultimate** 102:22
  114:17
**um** 62:3
**unaware** 89:12
  180:15
**underground** 89:5
  146:19
**underneath**
  149:23
**understand** 7:14
  7:16,22 20:9
  54:15 55:6 86:10
  91:11 109:15
  114:8 144:13
  151:6 153:10,10
  189:12
**understanding**
  21:8 31:3 38:7
  68:9 85:1 86:16
  87:8 89:6 90:25
  91:15 92:25 93:24
  94:9,12 103:10
  104:8,17 105:2
  114:25 123:13,18
  127:10 131:18
  135:25 138:12
  144:19,21 161:16
  161:22 168:7

196:10
**understood** 7:21
  14:23 39:3 63:6
  115:23 167:1
  171:6 190:6
**undertake** 109:16
**unit** 84:25
**united** 1:1
**universe** 166:18
**university** 148:21
  148:25 149:3
  177:21 194:13,15
**university's**
  177:25
**unmet** 61:17
  146:25
**unreasonable**
  117:8
**unrelated** 27:14
**unwise** 57:10
**unwritten** 50:5
**updating** 48:5
**upset** 61:11
**urban** 40:17
**use** 2:21 7:9 11:23
  20:24 21:6,9
  22:23,24 23:1
  26:18,19 27:23,24
  28:1,3 31:15
  38:14 41:21 45:22
  55:11 59:22 60:13
  61:6,14,22 62:18
  64:2,8,9 65:5,22
  67:4,5,6,25 68:5,9
  68:11,12,20,21
  71:5 73:6,7,10,19
  74:1 84:4 86:5,6,8
  87:6 90:15 93:2
  94:1,15 96:2,20
  105:3 115:24
  116:1,6,13,18

117:4,20 118:5
  120:15 121:13
  126:4,21 127:1,4,6
  130:1 136:16
  139:5,10 140:11
  140:18,22,23,25
  141:9,17,21 142:4
  142:17 143:2,3,6
  145:7,19 148:21
  158:15 162:11,15
  162:20 164:13
  166:5,15,19 168:2
  168:4,15 172:11
  172:16 173:4
  174:6,9,18,20
  176:11 178:7,10
  179:15 181:15
  182:4,6 197:1
**uses** 16:14 31:17
  38:19 41:24 42:3
  42:20 44:4 46:6
  47:3 60:17,23
  62:21,22,24 63:5
  66:3 79:21,22
  81:20 93:6 117:2
  124:19,22 127:7
  161:9,10,15,15
  162:1,2 175:15
  184:7
**usually** 26:15
  171:4
**utilize** 9:23 10:23
  112:16
**utilized** 66:7,8
**utilizing** 64:24
**uw** 180:14,18

**v**

**v** 199:6 200:3
  201:3
**vacation** 5:24

**vague** 193:23
**vaguely** 21:7
**valid** 64:2 127:1
**variance** 148:5
**varied** 39:16
**varies** 39:16,24
  40:13
**varsity** 90:18
**vary** 50:19
**vast** 171:1
**verbal** 6:8,9 36:6,8
**verification** 2:14
  2:19 30:4 33:7
  82:5
**veritext** 199:1,8
  202:1
**veritext.com.**
  199:17
**versus** 53:12 76:24
  80:6,18 127:19
**vested** 77:14
**vice** 4:15
**view** 61:7 117:16
  119:4 125:24
  135:12
**viewed** 131:3
**vigil** 120:3
**violate** 116:8
**violated** 116:8
**violation** 27:14
  90:24 91:4 96:15
  97:4 107:2,3,6,10
  108:24 116:20
  118:2 119:21
  121:16 122:6
  125:13 126:11
  127:19,16,23
  128:3,3 129:4
  135:20 136:12
  138:10,11 150:9

**violations** 126:12 138:3
**violator** 133:5 134:2
**virtually** 164:20
**visit** 171:4

**w**

**w** 4:15,16
**wait** 6:21 39:24 56:6 127:9
**waited** 45:9
**waiting** 25:21,22 172:19
**waive** 151:20
**waived** 199:20
**waiver** 55:1,9,12 144:7 151:21
**waiving** 36:13 186:17 193:22
**walk** 120:8
**walked** 15:1
**walkways** 81:23
**wall** 50:10
**want** 18:14 21:18 22:18 23:3,3,16 24:20 26:2,18 27:18,24 35:11 37:18 39:21,22 43:7,10 46:2 57:25 58:5 60:6 86:23 89:9 91:12 91:18 92:11 94:18 95:6 99:11 107:14 110:2 119:23 120:1,6 129:17 130:22 133:23 134:17 136:16 148:17 152:18 165:17 169:7 189:7 195:13,16

**wanted** 50:15 60:2 61:23 65:11 69:8 76:18 77:3 87:14 133:10
**wanting** 134:6
**wants** 15:10 16:16 62:2 76:15 116:17 137:8
**warned** 146:24
**warner** 187:8 188:6,9
**warning** 97:3 146:13 197:6
**warrant** 51:5
**warrants** 189:22
**washington** 165:2
**watch** 68:8 121:25 179:23
**watching** 122:4
**water** 55:20
**way** 23:14 27:23 28:15 31:19 37:18 43:22 45:8,12 46:18 55:18 56:14 57:10 60:23 64:14 65:10 71:24 74:14 77:1 78:16 80:12 94:21 97:23 101:9 109:11 132:10 134:14 149:5 162:14 166:24 172:22 173:9 175:24 179:20 188:4 193:17 194:3,14
**ways** 109:15
**we've** 28:22 134:3
**website** 48:3 169:18 171:16
**wednesday** 5:1

**weekend** 142:10
**weekly** 123:5
**weeks** 98:1
**weigh** 75:18 163:10
**weighed** 75:21 76:13
**weighing** 143:4
**weight** 10:24
**weights** 16:2
**went** 7:25 9:14 11:14 12:12,12 97:14 99:24 103:3 103:5 105:9 112:18 114:25 135:16 142:2 157:25
**west** 113:14 174:13
**western** 1:2
**whatnot** 53:17 54:2
**wheels** 173:8
**white** 54:11 118:21
**wife** 170:6,16,19
**willing** 55:2
**willingness** 133:5
**wind** 116:24
**winter** 1:24 4:3 15:23 180:6 198:3 198:20
**wire** 18:17 20:2 146:20
**wiring** 20:4
**wisconsin** 1:2,7,17 4:5,7,13,22 19:20 148:21,25 179:22 194:13 198:5,21 199:7 200:3 201:3

**wise** 8:10
**withdraw** 69:20
**withheld** 64:10 70:23 74:7 81:17 85:3
**withhold** 52:18 54:22 55:23 56:2 61:18 62:14 67:22 69:4 76:3,7 79:9 83:1 99:7,16 139:24 173:3,20 174:5
**withholding** 46:20 53:1 55:15 84:19 85:25 182:22
**witness** 2:2 4:2 17:15 21:1 43:9 53:13 55:17 68:16 77:19 96:6 130:20 141:7 172:19 192:8 199:9,12 200:1,4,11 201:1,4 201:15
**witnessed** 112:19
**witness'** 199:15
**wmc** 1:6
**word** 52:2 59:3 110:12 136:19
**worded** 189:19
**words** 52:10,11 57:24 58:5 114:13 126:4 131:10 172:12
**work** 13:1 20:1 39:17 50:25 67:14 93:25 94:10 131:5 140:7 182:5,8,9,9 188:21
**worked** 13:2
**worker** 106:17

**[working - zylstra]**

Page 41

**working** 87:24
135:18 145:22
**works** 147:21
**world** 94:10
**worried** 90:10
**worries** 153:2
192:21
**write** 112:21
**writes** 109:18
**writing** 58:23
65:16,18
**written** 24:10
58:25 139:16
186:13,21 187:1
**wrong** 125:11
139:25 156:2

**x**

**x** 2:1,9 5:7 86:23

**y**

**yeah** 9:3 14:7
15:25 24:21 25:10
44:7,7 45:25
50:12,24 65:18
66:25 77:5 83:23
99:12 100:25
101:4,20 102:2
111:14 118:18
124:15 130:23
131:1 136:7
147:22 158:11
175:7 185:13
186:20 187:6
**year** 5:20 8:1
12:17,17,21 13:2,5
13:13,14 100:25
119:14
**yearbook** 3:7
195:6
**yearbooks** 184:20

**years** 9:19 10:21
11:25 13:15,16,23
13:24 137:19
170:15,16 175:13
184:20
**yep** 6:12 167:11
169:10 182:12

**z**

**zba** 133:24 134:2
147:21,24 148:4
148:14,18 150:8
150:24 151:2
154:16
**zone** 32:15 137:9
163:5
**zoned** 29:8,10 31:5
33:25 165:5
187:10
**zoning** 16:12,13
16:18,19,20,23
17:8 21:11 26:7
26:10,13,19,20,23
27:3,10,11,14 28:7
28:8,8,10 29:1
30:21 31:2,13,24
32:3,20 33:20
34:10,14,15 37:23
39:3,4 40:17
45:19,21 48:17,18
49:13 51:3,10,23
52:12 63:16 68:2
72:13 77:16 78:20
79:2,17 80:13
85:1 95:7 110:13
113:7 133:8,10
138:14 139:1,4
145:12 148:8
150:8 154:10
156:10 157:21
160:5,19,20,21
163:3,15 164:10

172:11,23 173:10
178:16
**zoom** 59:2
**zylstra** 2:5 4:20
10:16 12:1 14:5,9
14:13 17:14 18:11
19:2,17 20:25
21:2 23:21 25:8
25:15,23 27:17
31:21 32:17 33:22
35:11,17 38:2,16
39:15 40:10 41:7
41:25 42:6,16,22
43:10,16 44:14,20
45:23 46:1,9
47:11,22 49:18,20
50:2 51:8 52:19
53:14 54:10,15,19
54:24 55:6,13
56:4,6,10 57:1,4
57:12,19 58:13,15
59:7,18 60:19
61:19,25 62:16
63:23 64:4,12,25
65:8 66:5,22
67:24 68:15,17,22
69:5,16,23 70:5,9
70:25 73:20 75:2
75:8 77:21 78:11
78:15 79:6,11
80:9 83:3,11
84:21 85:4,11
86:1,13,20 87:11
87:23 88:8,14
89:2 90:2,13 91:1
91:8,16 92:3,17,23
93:8 94:5,16 95:4
95:10 96:4 97:18
98:21 99:9,15
100:6,21 101:19
102:11 103:22

Wisconsin Rules of Civil Procedure

Chapter 804, Depositions and Discovery

Section 804.05

(6) Submission to Deponent; Changes; Signing.
If requested by the deponent or any party, when the
testimony is fully transcribed the deposition shall
be submitted to the deponent for examination and
shall be read to or by the deponent. Any changes in
form or substance which the deponent desires to
make shall be entered upon the deposition by the
officer with a statement of the reasons given by
the deponent for making them. The deposition shall
then be signed by the deponent, unless the parties
by stipulation waive the signing or the witness is
ill or cannot be found or refuses to sign. If the
deposition is not signed by the deponent within 30
days after its submission to the deponent, the
officer shall sign it and state on the record the
fact of the waiver or of the illness or absence of
the deponent or the fact of the refusal or failure
to sign together with the reason, if any, given
therefor; and the deposition may then be used as
fully as though signed unless on a motion to
suppress under s. 804.07 (3) (d) the court holds

that the reasons given for the refusal or failure
to sign require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.