Page 1

1          UNITED STATES DISTRICT COURT FOR THE
2              WESTERN DISTRICT OF WISCONSIN
3                        --o0o--
4    EDGEWOOD HIGH SCHOOL OF THE
     SACRED HEART, INC.,
5
                    Plaintiff,
6
                                Case No. 3:21-cv-0018-wmc
7
     CITY OF MADISON, WISCONSIN,
8    et al,
9                    Defendants.
     _____
10
11
12
                    VIDEOTAPED DEPOSITION OF
13
                        ALDER TAG EVERS
14
15
16                    April 28, 2022
17                    Madison, Wisconsin
18
19
20
21
22
23
24   Reported by:  Cheri Winter, CSR
25

Page 2

1                 I N D E X

2
WITNESS                                  PAGE
3
TAG EVERS
4
        Examination by Mr. Ingrisano            7
5

6

7              E X H I B I T S
8  No.          Description          Identified
9  Exhibit 17   Excerpt from Mr. Evers'      50
             website
10
   Exhibit 18   Legistar File No. 56981,     104
11             draft amendment to
             CI District ordinance
12
   Exhibit 19   Common Council approved meeting  115
13             minutes, August 6, 2019
14 Exhibit 20   Legistar printout of amendment  126
             details
15
   Exhibit 21   Printout detailing legislative  128
16             history of Edgewood Campus
             Master Plan repeal
17
   Exhibit 22   Letter from Edgewood H.S.,    131
18             dated July 29, 2019 to Mayor
             Rhodes-Conway and Heather Stouder
19
   Exhibit 23   Email from Atty. Strange     135
20             to Nathan Wautier
21 Exhibit 24   Memo from Atty. Strange to the  137
             Plan Commission, August 26, 2019
22
   Exhibit 25   Approved Plan Commission minutes,  141
23             August 26, 2019
24 Exhibit 26   Approved Plan Commission     144
             minutes, September 16, 2019
25

Page 3

1  EXHIBITS (Cont'd):
2  No.          Description          Identified
3  Exhibit 27   Approved Common Council meeting,  146
             September 3, 2019
4
   Exhibit 28   Wisconsin State Journal article,  149
5             September 4, 2019
6  Exhibit 29   Planning Division memo to Plan  157
             Commission re repeal of Edgewood
7             Master Plan, August 26, 2019
8  Exhibit 30   Memorandum from Atty. May and  158
             Atty. Strange to Plan Commission
9
   Exhibit 31   Electronic meeting request for  164
10             meeting on February 13, 2020
11 Exhibit 32   Email chain                 166
12 Exhibit 33   Planning Division staff report  170
             re: Edgewood's conditional use
13             permit, May 11, 2020
14 Exhibit 34   Text exchange with Mr. Gartler  195
             of No New Stadium
15
   Exhibit 35   Email exchange between Mr. Evers  197
16             and Keith Furman of Common Council
17 Exhibit 36   Email of District 13 resident  212
18
19 PREVIOUSLY MARKED EXHIBITS:
                              Page
20
   Exhibit 4                    225
21
   Exhibit 10                   190
22
   Exhibit 12                   133
23
   Exhibit 13                   81
24
   Exhibit 16                   215
25

Page 4

1         INFORMATION/DOCUMENTS REQUESTED

2                      Page
3  Edgewood Neighborhood Liaison        73
   Committee minutes
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1         VIDEOTAPED DEPOSITION OF TAG EVERS, called as
2  a witness, taken at the instance of the Plaintiff,
3  pursuant to Notice, before Cheri Winter, Certified
4  Shorthand Reporter, and a notary public in and for the
5  State of Wisconsin, at the law offices of Godfrey &
6  Kahn, S.C., One East Main Street, Suite 500, Madison,
7  Wisconsin, on the 28th day of April, 2022, commencing at
8  9:04 a.m.
9
   APPEARANCES:
10
   For the Plaintiff:
11
       JONATHAN R. INGRISANO, ESQ.
12     GODFREY & KAHN, S.C.
       One East Main Street, Suite 500
13     Madison, Wisconsin 53701
       608.257.0609
14     jingrisa@gklaw.com
15     NOEL W. STERETT, Pro Hac Vice
       DALTON & TOMICH, PLC
16     401 W. State Street, Suite 509
       Rockford, Illinois 61101
17     815.986.8050
       nsterett@daltontomich.com
18
19 For the Defendants:
20     SARAH A. ZYLSTRA, ESQ.
       TANNER JEAN-LOUIS, ESQ.
21     BOARDMAN & CLARK, LLP
       1 South Pinckney Street, 4th Floor
22     Madison, Wisconsin 53701
       szylstra@boardmanclark.com
23     TJeanLouis@boardmanclark.com
24
   Also present (telephonic):  Kate M. Smith, Assistant
25                     City Attorney

2 (Pages 2 - 5)

Page 6

1    THURSDAY, APRIL 28, 2022, 9:04 A.M.
2        --o0o--
3        THE VIDEOGRAPHER:  We are officially on the
4  record at 9:04 a.m.  Today's date is April 28th, 2022.
5  This is Media Unit No. 1 in the deposition of Tag Evers.
6        This deposition is being taken in the matter
7  of Edgewood High School of the Sacred Heart,
8  Incorporated vs. City of Madison, Wisconsin, et al.
9        This matter is pending in the United States
10 District Court for Western District of Wisconsin, Case
11 No. 3:21-cv-0018.  This deposition is being taken at the
12 offices of Godfrey & Kahn, located at One East Main
13 Street, Madison, Wisconsin.
14        My name is John Spohnholtz, the videographer
15 for Veritext Reporting, and the court reporter is Cheri
16 Winter.
17        Will counsel please state their appearances
18 and whom they represent, beginning with plaintiff's
19 counsel, and then the reporter will swear in the
20 witness.
21        MR. INGRISANO:  Jonathan Ingrisano of Godfrey
22 & Kahn on behalf of Plaintiff Edgewood High School.
23 Also present today is Attorney Noel Sterett.
24        MS. ZYLSTRA:  Sarah Zylstra and Tanner
25 Jean-Louis for all defendants.

Page 7

1            TAG EVERS,
2    having been first duly sworn, was examined and
3            testified as follows:
4            --o0o--
5        MR. INGRISANO:  Counsel, we do have someone on
6  the phone, too, right?
7        MS. ZYLSTRA:  Thank you for that.  Also,
8  appearing on behalf of the City is Attorney Kate Smith,
9  the Assistant City Attorney, by phone.
10        MR. INGRISANO:  Thank you.
11        E X A M I N A T I O N
12 BY MR. INGRISANO:
13    Q.  Sir, will you please state your name and spell
14 it for the record.
15    A.  Tag Evers, spelled T-a-g, E-v-e-r-s.
16    Q.  And is Tag your given name or is that short
17 for something?
18    A.  Tag is my given nickname.  My birth name is
19 Martin Adrian Evers, III, but at birth I was given the
20 name -- the nickname "Tag."
21    Q.  Thank you.  And if there comes a time today
22 where I call you Mr. Evers, please forgive me.  I'm
23 going to work very hard to not do that.
24    A.  You will not be the first, Jonathan.
25    Q.  I suspected that that was probably the case.

Page 8

1        Can you give me your date of birth, please.
2    A.  ██████████
3    Q.  And what is your residential address?
4    A.  2329 Keyes Avenue, spelled K-e-y-e-s, Madison,
5  Wisconsin, zip code 53711.
6    Q.  And is that your only residence?
7    A.  Yes, it is.
8    Q.  Where is that residence in relation to
9  Edgewood High School?
10    A.  Keyes Avenue is in the Dudgeon-Monroe
11 neighborhood two blocks from Monroe Street across the
12 street from the Edgewood campus.
13        My block, the 2300 block, is directly across
14 from the Edgewood campus.
15    Q.  So about how far of a walk would it be for you
16 to -- or how long of a walk in terms of time would it be
17 for you to walk to the Edgewood campus?
18    A.  Less than five minutes.
19    Q.  How are you currently employed, sir?
20    A.  I have two occupations.  I own -- I'm the
21 founder/owner and sole employee of True Endeavors
22 Concerts, LLC.  And I am an elected official, District
23 13 alder, on the Madison Common Council.
24    Q.  What's the nature of True Endeavors; what's
25 its business?

Page 9

1    A.  True Endeavors is a concert-promoting company;
2  meaning, an independent concert-promoting company.
3        By that, I mean, as I am -- a typical day
4  would be in negotiating deals, arranging for contract
5  agreements -- contractual agreements between agents that
6  represent national touring acts and my company for the
7  purpose of producing a live event performance.
8    Q.  And when did True Endeavors first come into
9  business?
10    A.  True Endeavors, around the year 2000 I started
11 doing shows under that particular name.
12        Prior to that, I produced shows in the Madison
13 area and in the Midwest under the name of "Tag Team
14 Productions."
15        So I have been producing concerts for nearly
16 30 years under two different names, two different
17 companies.
18    Q.  Thank you.  Mr. Evers, have you ever had your
19 deposition taken before?
20    A.  Never before, Jonathan.  I'm a little nervous
21 about this, if I might say.
22    Q.  Well, you're doing great so far.  But let's --
23 I want to give you a couple of ground rules that you and
24 I will both try to follow today to make sure that you're
25 able to freely express yourself and that we have a clear

Page 10

1   record and clean record of your testimony today.
2       A.   I would appreciate that very much.  Thank you.
3       Q.   Yeah.  So the court reporter that's sitting to
4   your left is recording everything that we say today
5   stenographically.  We also have a videographer today, as
6   you have seen.
7           The court reporter can only record verbal
8   responses, so all of my questions to you will be verbal,
9   and to the extent you can remember to be to give verbal
10  responses to all the questions, that will make her job a
11  lot easier.  Shakes of the head, nods of the head,
12  "uh-huhs" and "huh-uhs" work for the camera but don't
13  help her today.  So if you can remember to do that,
14  please, that would be great.
15      A.   I will do my best, Jonathan.  Thank you.
16      Q.   Great.  The other thing that really makes her
17  job harder is when we talk over each other.  And so to
18  the extent you can let me finish my question before you
19  begin your response that will make her job a lot easier
20  as well; okay?
21      A.   I understand.
22      Q.   I'll do the same thing; I'll try to let you
23  finish your response before I begin my next question;
24  okay?
25      A.   Thank you.

Page 11

1       Q.   There may come a time when your attorney
2   decides to pose an objection to a question that I ask.
3   If you are in the middle of a response or you are about
4   to respond, please let her, you know, get her objection
5   on the record before you begin your response, unless she
6   instructs you not to answer, and then you have to make
7   that decision there with her; okay?
8       A.   Thank you.  Yes, I understand.
9       Q.   All right.  This is not a marathon, so to the
10  extent that you need a break, please just let me know.
11  We will do our best to accommodate that, if not
12  immediately, as soon as we can; okay?
13      A.   Thank you.  Yes, I understand.
14      Q.   There is a media break scheduled typically
15  every hour and a half for the videographer, so we may
16  try to time things with that as well; all right?
17      A.   Okay.
18      Q.   If you don't understand a question that I ask,
19  I would ask you to please let me know and I'll do my
20  best to rephrase it or to clarify that question.
21          I don't pretend to ask perfect questions every
22  time, so if you don't understand it, let me know.  If
23  you do understand it and answer it -- well, let me just
24  say this:  If you answer a question, I tend to believe
25  and understand that you understand the question or else

Page 12

1   you wouldn't have answered it; okay?
2       A.   Okay.
3       Q.   All right.  Sir, can you give me a summary of
4   your educational history?
5       A.   I can -- do you want me to go back to high
6   school as well?  I graduated from high school from
7   Centerville High School in 1974.  I attended
8   undergraduate school at Wright State University, which
9   is in Dayton, Ohio, where I was born and reared.
10          And I took some breaks and did not actually
11  complete my undergraduate degree until I turned 31, in
12  19 -- sorry, 1987, I guess.  Yes.  And --
13      Q.   Go ahead.
14      A.   Okay.  With an honors degree in economics.
15      Q.   And was that degree from Wright State?
16      A.   From Wright State University.  That's not the
17  -- shall I go on?  Because I also have graduate --
18      Q.   Please.  Thank you.
19      A.   Then I applied and was admitted to the Ph.D.
20  program at University of Wisconsin in the field of
21  agricultural economics to study under Dan Bromley, who
22  is a prominent institutional economist, which is a
23  branch of economic theory that is more heterodox,
24  contrary to neoclassical economics.
25          And I came here to study global environmental

Page 13

1   crises, the economics of global environmental crises.
2           I did not finish that Ph.D., but -- due to
3   some personal crises in my life.  Both my parents died
4   within a short period of time.
5           I took a hiatus, and during that time I
6   started promoting shows with my own business.  And then
7   went back and completed a coursework, master's, an MA in
8   agricultural economics, and I believe a degree date of
9   my -- was issued in 1995.
10      Q.   Thank you very much.
11          Mr. Evers, I was an econ major as well.  I
12  have a degree from Loyola University.
13          Did you -- in your economics studies, were
14  there ever any urban economics classes such that you
15  were exposed to zoning laws, zoning ordinances, things
16  of that nature?
17      A.   Not in an applied sense, no.
18      Q.   Have you had any legal training during the
19  course of your education?
20      A.   I have taken a couple courses when I was in
21  graduate school from the law school.
22      Q.   And what was the areas of those law school
23  classes?
24      A.   One was on Indian law, Native American Indian
25  law, because under my study with Dr. Bromley, I was

Brown & Jones Reporting
A Veritext Company

414-224-9533
www.veritext.com

Page 14

1 looking at the treaty rights dispute in northern
2 Wisconsin, which in the late '80s, you will recall, was
3 a federal matter with Judge Crabb and about the treaty
4 rights of the Ogibwe tribes regarding spearfishing and
5 other rights that had -- they believed had been secured
6 through the treaties that they had signed with the
7 federal government but that were in dispute and in
8 contention.
9        And there was a lot of -- a lot of controversy
10 and even the threat of violence at various lakes in
11 northern Wisconsin when the tribes would go out to
12 engage in spearfishing.
13       So I decided to take a course in Indian law to
14 better understand the rights and privileges that had
15 been afforded to First Nations and the history of these
16 treaty rights disputes.
17       I can't -- I think I took another course from
18 the law school. I was more -- I think it was called
19 "Law and Economics," and it was very much a theoretical
20 course about kind of like property rights and things
21 like that.
22       But I did not take -- to answer -- perhaps I'm
23 volunteering too much. I did not take a contracts
24 course itself.
25    Q.   In either the Indian law/Native American law

Page 15

1 class you took during Law and Economics, did you study
2 any of the legalities of zoning laws, municipal zoning
3 laws?
4    A.   I don't recall.
5    Q.   Sir, may I ask if you're married?
6    A.   I've never been married.
7    Q.   Do you have any children?
8    A.   I do not have any children. I have a dog.
9    Q.   You mentioned your position as an alderperson,
10 as an alder, in the City of Madison.
11       When did you take office?
12    A.   I was sworn in, I believe the date is April
13 20th, 2019. I can't -- it's right around that time.
14 Maybe not April 20th, but the election, I think, was
15 held on April 2nd, 2019, sworn in that month roughly
16 April 20th, I think it was.
17    Q.   Understood. And the alder terms are two-year
18 terms; is that right?
19    A.   That is correct.
20    Q.   And so you were reelected in April of '21?
21    A.   That would be correct, yes.
22    Q.   When you first took office in April of 2019,
23 what was the status of the Edgewood athletic field as an
24 issue, to your knowledge, when you took office?
25       MS. ZYLSTRA: Objection. Form. You can

Page 16

1 answer.
2    A.   That's a big question.
3    Q.   Sure.
4    A.   That would require a long answer, and I don't
5 -- could you be more specific?
6    Q.   Sure. Was that an issue -- was the status of
7 -- was Edgewood's use of its football field --
8 Edgewood's use of its field with lights, were those two
9 issues that were issues you campaigned on for that 2019
10 election?
11    A.   My stance on the Edgewood field was one of the
12 -- one of the positions that I did express an opinion,
13 and I suppose one could say that I did campaign on that
14 issue, yes.
15    Q.   What was your position on Edgewood's field in
16 20 -- in April of 2019?
17    A.   Could you be more specific with your question,
18 please?
19    Q.   Can you just generally describe what your
20 position was. Were you in favor of Edgewood being able
21 to use its field for -- as an athletic field with lights
22 and for football games, or were you against that
23 proposal?
24    A.   I believed at the time, and I believe now,
25 that the use of Edgewood's athletic field for night

Page 17

1 games would be an incompatible use relative to the
2 impacts that would be experienced by adjacent neighbors.
3    Q.   And so in April of 2019 was -- there was also
4 an issue, wasn't there, about whether Edgewood could
5 play games at all on its field, right?
6    A.   Yes, that was -- that was an issue that I did
7 not campaign on, but that was an issue at the time that
8 was under debate, let's say.
9    Q.   When did you first learn that there was a
10 question or a controversy about whether Edgewood would
11 be able or should be able to play games or athletic
12 contests on its field?
13    A.   I don't have a specific date of when I would
14 have learned something like that.
15    Q.   Sure. Ballpark. Do you have a general
16 understanding of when you first learned that there was a
17 contention that Edgewood should not be allowed to play
18 games on its field?
19    A.   I would say sometime between, you know, late
20 fall of 2018 and to the early part of 2019, I became
21 aware that the then zoning administrator, Matt Tucker,
22 had contacted Edgewood and rendered an opinion regarding
23 the provisions within Edgewood's Campus Master Plan
24 describing the use of their open field.
25    Q.   How did you learn that Mr. Tucker had reached

5 (Pages 14 - 17)

Page 18

1 out to Edgewood in late fall of 2018?
2    A.  I don't recall.
3    Q.  To your knowledge, did anyone in your
4 neighborhood or in the surrounding neighborhoods of
5 Edgewood independently develop that opinion, that
6 contention, about Edgewood's ability to use its field
7 for games?
8        MS. ZYLSTRA:  Object to form.  You can answer.
9    A.  Could you restate your question?
10    Q.  Yeah.  That's a good example of perhaps a bad
11 question.
12        In your understanding, did anyone assist, any
13 members of the public, collaborate, confer, or assist
14 Mr. Tucker in that interpretation and position about
15 Edgewood's ability to develop -- I'm sorry, to use its
16 field for games?
17        MS. ZYLSTRA:  Object to form.  You can answer.
18    A.  I can't speak with certainty, of course.
19 Something may have happened that I'm not aware of.
20        But it's my understanding that that's not the
21 case.
22    Q.  So to your understanding, you have no
23 knowledge of anyone else suggesting that interpretation
24 to Mr. Tucker or otherwise promoting that interpretation
25 to Mr. Tucker?

Page 19

1        MS. ZYLSTRA:  Object to form.  You can answer.
2    A.  I have no knowledge of any private
3 conversations that residents in the community may have
4 had with Matt Tucker, if that's an answer to your
5 question.
6    Q.  Got it.  Can you describe for me what's
7 included in your alder district?
8    A.  Are you asking -- could you clarify your
9 question?  Do you mean geographically?
10    Q.  Sure.  However you describe it.  When you talk
11 about who you represent in the City of Madison how do
12 you describe it?
13        MS. ZYLSTRA:  Object to form.  You can answer.
14    A.  District 13, geographically, extends to the
15 western part of the district, the Dudgeon-Monroe
16 neighborhood, which goes -- follows Monroe Street up
17 Odana Road to capture a neighborhood that is just west
18 of Glenway, a small little neighborhood there.  And then
19 it includes homes on both sides -- dwellings on both
20 sides of Monroe Street, and includes the Forest Hill
21 Cemetery.  It includes the Edgewood campus.
22        Heading down Monroe Street towards Regent
23 Street, it also includes the neighborhoods on the other
24 side of Monroe Street, which would be the Vilas
25 neighborhood.  Adjacent to that, the Greenbush

Page 20

1 neighborhood across from South Park Street, and it
2 includes what is called "the triangle" which is bounded
3 by South Park Street, Regent Street, and West
4 Washington.  Adjacent to that, it includes the Monona
5 Bay neighborhood.  And then south of that, along South
6 Park, it includes the Bay Creek neighborhood.
7        To describe District 13 visually, it looks
8 like a crescent.
9    Q.  Thank you very much.
10        Does that crescent include Edgewood High
11 School?
12    A.  As I indicated in the answer to my previous
13 question, it includes the Edgewood campus.
14    Q.  Do you consider Edgewood to be a constituent
15 of yours?
16    A.  Yes, I do.
17    Q.  You stand for -- you otherwise come up for
18 re-election in the 2023 April cycle; correct?
19    A.  Yes, yes.
20    Q.  And have you made a determination of whether
21 you're going to run for re-election in April of 2023?
22    A.  I have not yet decided.
23    Q.  Have you ever expressed a desire to run for an
24 office higher than city Common Council alder?
25        MS. ZYLSTRA:  Object to form.  You can answer.

Page 21

1    A.  My father once ran for congress in 1962 with
2 the endorsement of John F. Kennedy, and I have a picture
3 of my father standing in the White House shaking John
4 Kennedy's hand.
5        His influence on my life is one of the reasons
6 why I ran to be an alder.  But I'm 65 years old.  I'm a
7 little old to be having ambitions that go beyond where
8 I'm at now.
9        I've had residents in District 13 who are
10 pleased with my work, and said, "You should run for
11 mayor or you should run for senator."  And while I find
12 that flattering, I have not seriously considered.
13        For one thing, I also have a business that I
14 find very gratifying that takes up a fair amount of
15 time.  And while being an alder also takes up a lot of
16 time, it's not nearly as time-consuming as being the
17 mayor of a vibrant city like Madison for assuming higher
18 office.  So I'm content to stay where I'm at at this
19 present time.
20    Q.  Thank you very much.
21        As an elected official who stands for
22 re-election you receive campaign donations; is that
23 right?
24    A.  Yes, that's true.
25    Q.  Can you estimate for me what percentage of

Page 22

1 your re-election campaign donations in 2021 came from
2 individuals who you know opposed lights and/or games on
3 the Edgewood field?
4      MS. ZYLSTRA:  Objection.  Foundation, form.
5 You can answer.
6      A.  I have never done that analysis, so I could
7 not say.
8      Q.  Is it fair to say that your typical donor is
9 someone that lives in the aldermanic district that you
10 are representing?
11      A.  Most of my donors live within District 13.
12      Q.  And you've reviewed a list of your donors in
13 the past?
14      A.  I have reviewed the list of my donors in the
15 past.
16      Q.  And you recognize, at least informally, that
17 most of them are opposed to the Edgewood lights and
18 development of the Edgewood field?
19      MS. ZYLSTRA:  Objection.  Form, foundation.
20 You can answer.
21      A.  Again, I have not done that analysis.  If I
22 may add, there are lots of issues in an aldermanic
23 district like District 13.
24      People who make donations for my re-election
25 are pleased with the work that I'm doing.  It does not

Page 23

1 mean, Jonathan, that they agree with every decision I've
2 made.  But they believe that on a balance that I'm doing
3 a job worthy of the title that I hold and that I deserve
4 re-election.
5      Q.  What's your affiliation with No New Stadium?
6      A.  I served an advisory role to their efforts to
7 oppose what we -- I imagine they agree with me -- is an
8 incompatible use in a residential neighborhood; that
9 being a stadium or a structure that would be able to
10 hold night games regardless of the impacts in the
11 adjacent neighborhood.
12      Q.  You describe it as an advisory role.  What did
13 that advisory role entail?
14      A.  Well, I have -- advisory role, I have no
15 official title, so I would just say that I would -- you
16 know, I -- you know, one of the things, the advice I
17 would have for them would be as you do your research are
18 stick to the facts.
19      And while that people felt emotional about
20 this, I encouraged them to stick to the facts.  And that
21 I believed at the time, based on the principles in our
22 city, that there would be a due process, a political
23 process where they would have voice.
24      I reminded them that voice does not mean veto,
25 but that voice is definitive of participatory democracy.

Page 24

1      I encouraged them that when they testified in
2 public hearings to not repeat each other, to stick to
3 the facts, to not offer emotional, rhetorical statements
4 that were not substantial.
5      I encouraged them to do their homework.  I
6 encouraged them to be respectful of Edgewood.  There are
7 -- all those kinds of things.  So very broadly.  That's
8 what I mean by offering advice.
9      Q.  Did you --
10      A.  And lastly, if I may add.  I also said that
11 there is no guarantee that they would prevail but that
12 they would have -- there would be a process.
13      Q.  Did you found No New Stadium?
14      A.  No, I did not.
15      Q.  Who did?
16      MS. ZYLSTRA:  Objection.  Foundation.
17      Q.  If you know.
18      A.  I don't.  I don't know of any single person
19 who founded No New Stadium.  It was a collection of
20 neighbors who gathered and started organizing.  It's an
21 informal, ad hoc group.  I don't believe they have legal
22 status.
23      Q.  Who -- it has a website; correct?
24      A.  That is correct.
25      Q.  Who is the administrator for the website?

Page 25

1      MS. ZYLSTRA:  Objection.  Foundation.  If you
2 know, go ahead and answer.
3      A.  I believe it's Yael Gen; spelled Y-a-e-l,
4 second name G-e-n.
5      Q.  Who else do you associate with the leadership
6 and operation of No New Stadium?
7      A.  There are a handful of residents who live in
8 direct proximity to the Edgewood campus along Woodrow
9 Avenue and on Monroe Street, and I would say also on
10 West Lawn.
11      Q.  And their names?
12      A.  Mark Gartler and his family, Marie Trest and
13 her family.  I mentioned Yael Gen, who lives -- or who
14 did live on Woodrow but has since, she and her husband,
15 have moved to DC just in January.
16      I'm trying to think who else would be
17 considered, say, the core members of this group.  Brad
18 Boyce, Ethan Brodsky.  I'm sure there are -- Shawn
19 Schey.  Residents who live within close proximity to the
20 Edgewood campus, principally.
21      Q.  Thank you.  Have you contributed content to
22 the No New Stadium website?
23      A.  Not directly.  First of all, I don't know the
24 answer to that because I have not checked out their
25 website in some time.

Page 26

1      It may be that they posted something that I
2 wrote on my aldermanic blog.  So, I guess I would have
3 to say I don't know.
4      Q.   Did you ever direct anything to them from your
5 aldermanic blog to be posted on their website?
6      A.   I don't recall.
7      Q.   Did they ever ask your permission if it would
8 be okay for them to post something from your aldermanic
9 blog?
10      A.   Again, Jonathan, I don't recall.
11      Q.   In addition to your alder email address, you
12 identified two other email addresses in this matter that
13 you use.
14      One is your business, True Endeavors, email
15 and the other is a gmail account; correct?
16      A.   I have multiple email addresses that it's a
17 challenge to keep track of.
18      Q.   Sure.  But between your alder email, True
19 Endeavors, and your gmail, that's three, is the entirety
20 of the emails that you've used -- email addresses that
21 you've used since 2018 for work and/or personal use?
22      A.   I have two True Endeavors emails; one that is
23 Tag@trueendeavors.com, and the more recent one,
24 tagevers@trueendeavors.com.  Because the
25 tag@trueendeavors.com has been filled up with spam.  And

Page 27

1 I don't know if you've ever had that problem before.
2      Q.   And then when you're communicating with No New
3 Stadium, well, what email address are -- what email
4 addresses do you use?
5      A.   I don't recall.
6      Q.   In the discovery in this case we had issued
7 certain document requests.
8      Have you searched your personal email
9 addresses for any relevant responsive documents that
10 were requested in this case?
11      A.   As instructed, yes, I did.
12      Q.   And you turned over all of those emails to
13 your attorneys?
14      A.   Yes, I did.
15      Q.   Have you ever advised anyone in the
16 neighborhoods that you represent, the neighborhood
17 associations for those neighborhoods or No New Stadium,
18 on the legislative process at the Common Council as to
19 how to better pursue their goals with respect to the
20 Edgewood's athletic field?
21      A.   That's a confusing question to me.  Could you
22 restate it, please?
23      Q.   Sure.  Given the fact that you are an alder,
24 have you ever advised, with your experience, your
25 knowledge of process who the right people are within

Page 28

1 government, have you ever advised anyone in the
2 neighborhoods, neighborhood associations, or No New
3 Stadium as to how to more effectively oppose Edgewood's
4 lights and expanded use of its athletic field?
5      MS. ZYLSTRA:  Objection.  Form.  You can
6 answer.
7      A.   As I stated earlier in response to one of your
8 questions that I encourage all constituents to stick to
9 the facts, to do their homework, to engage in the due
10 process, a political process of making sure that their
11 voices were heard, to be respectful, to be humble, and
12 also to -- while they can work hard to advocate their
13 positions, there is no guarantee they would prevail.
14      Q.   Would you agree that your goals with respect
15 to the Edgewood athletic field are the same goals
16 expressed by No New Stadium?
17      MS. ZYLSTRA:  Objection.  Form, foundation.
18 You can answer.
19      A.   I think my -- I would say I don't know exactly
20 because my goals were to make sure that voices were
21 heard and that there was an adequate process of review.
22      And I also realized that there -- well, let me
23 answer this:  There was not a one-to-one mapping an
24 agreement of what my policy goals were and, say, what
25 the goals and positions of No New Stadium.  Because as

Page 29

1 an alder, I felt a responsibility to look for acceptable
2 outcomes, which they may not have found acceptable in
3 their ideal scenario.
4      So I would not say that there was a one-to-one
5 mapping between my goals and theirs.
6      Q.   Can you identify any areas of divergence that
7 you're aware of between your position on the Edgewood
8 athletic field and the position of No New Stadium?
9      MS. ZYLSTRA:  I'm going to object to form.
10 You can answer.
11      A.   I can't think of those right now, but if you
12 gave me time -- it's been a couple years, Jonathan.
13      Q.   Do you have any recollection of the folks
14 associated with No New Stadium that wanted to take a
15 position where you've advised them -- and I'm not saying
16 about a tactic at this point, but a position on the
17 lights where you said, no, I don't think that's a viable
18 position to take?
19      A.   It would take me some time to think about
20 that.  Again, it's been a couple years.
21      Q.   In your position as an alder, have you ever
22 cast a vote on the Edgewood lights issue that would have
23 facilitated or expedited lights or the expanded use of
24 that field?
25      MS. ZYLSTRA:  Object to form.  You can answer.

Brown & Jones Reporting        414-224-9533
A Veritext Company            www.veritext.com

Page 30

1    A.  Can you repeat the question?
2        MR. INGRISANO:  Can you read that back,
3  please.
4        (Record read)
5    A.  I do not -- I believe the answer to that
6  question is no, as much as I recall.
7    Q.  It's fair to say that in all administrative
8  efforts the building inspection department, zoning
9  administration, and in matters before the Plan
10 Commission and Common Council, your public position has
11 been one of opposition to Edgewood's lights and expanded
12 use of its field; correct?
13       MS. ZYLSTRA:  Object to form.  You can answer.
14   A.  All right.  I cannot speak to the building
15 inspector or the zoning administrator, because I had no
16 influence and many times were not aware of the decisions
17 that they were making.
18       So regarding that part of your question, I
19 would say I had -- I can't -- I wouldn't agree with that
20 statement.
21       The second part of your question is that I had
22 always advocated for a political process and encouraged
23 Edgewood to -- to seek to amend their master plan.
24       While I did not agree that they should be able
25 to have lights for night games in direct -- considering

Page 31

1  the proximity of nearby neighbors, I advocated for a
2  process and believed that amending the master plan was a
3  better plan option than repealing the master plan.
4    Q.  You advocated Edgewood seek to amend its
5  master plan, but you realistically would not have
6  supported that amendment; is that correct?
7        MS. ZYLSTRA:  Object to form.  You can answer.
8    A.  I did not support an amendment that would
9  result in a football stadium in a traditional
10 residential neighborhood.
11   Q.  So the recommendation that Edgewood pursue an
12 amendment was really a recommendation that would have
13 resulted in any sort of -- it would have resulted in
14 delay for any actual change to the field; is that
15 correct?
16       MS. ZYLSTRA:  Objection.  Form.  You can
17 answer.
18   A.  I don't agree with the use of your word
19 "delay."  Again, what we're talking about, Jonathan, is
20 process.
21   Q.  And so do you -- you recommended that they
22 seek an amendment, but did you at that time have a
23 reasonable expectation that an amendment would pass for
24 the field particularly given that you opposed it?
25       MS. ZYLSTRA:  Objection.  Form, foundation.

Page 32

1  You can answer.
2    A.  I don't have -- I didn't have a reasonable
3  expectation that it would pass, nor did I have a
4  reasonable expectation that it would not pass.  I simply
5  did not know.  I could not predict the future.
6    Q.  And no silk ties going forward.
7    A.  Your tie is similar to mine and I'm having the
8  same problem.
9    Q.  Mine keeps flying off when I move or I fidget.
10   A.  Yeah.  That's a good looking tie.
11   Q.  Thank you.  Yours too.  We all got the gray
12 memo.
13       MS. ZYLSTRA:  We all got the red memo.  Gray
14 and red.
15       MR. INGRISANO:  As part of the 2019 campaign,
16 did you agree with the argument or position that
17 Edgewood was prohibited from playing games or athletic
18 contests on its athletic field?
19   A.  I don't recall specifically on that subject.
20   Q.  During your initial campaign, how did you
21 formulate your position on Edgewood's use of its
22 athletic field; what did you do, who did you confer
23 with, what research did you do to formulate that
24 position?
25       MS. ZYLSTRA:  Objection.  Form.  You can

Page 33

1  answer.
2    A.  Jonathan, I played high school football.  I
3  know what a football game sounds like.  I know the --
4  how loud a football game is when crowds cheer.
5        I have attended football games on a university
6  level and a professional level.  I know what happens
7  when it gets down to the red zone and both sides are
8  cheering loudly.  I know the noise that is made when a
9  play-by-play announcer has to broadcast sufficiently
10 loud to be heard over that cheering crowd.
11       I know what pep bands sound like and how loud
12 they have to play to be heard over an audience.  I was
13 in high school once and played under the lights.  I
14 heard my name called when I made a good play.
15       I also know that in the city of Madison, as
16 elsewhere throughout our country, urban high schools
17 that were founded in the early part of the 20th century
18 quite often do not have companion home stadiums, because
19 the traditional dense neighborhoods that formed around
20 them, generally speaking, with small lots and close
21 proximity to those facilities, simply could not bear
22 with the impacts of those loud football games, the
23 nature of which I was personally familiar with.
24       Therefore, it seemed quite obvious that this
25 was an incompatible use and an explanation why West High

Page 34

1 School did not have a home stadium, why East High School
2 did not have a home stadium. Or Stivers High School in
3 my hometown at Dayton, Ohio did not have a home stadium.
4 Where many private and public high schools throughout
5 our country do not have home stadiums, because of the
6 impact on the nearby traditional neighborhoods.
7     Why the Catholic high school near the National
8 Cathedral in DC does not have a home stadium. It's
9 simply a matter of incompatible use.
10    Q.   Mr. Evers, if I'm understanding your answer
11 correctly, a more direct answer to my question would
12 have been that you replied on your personal experience
13 and a common sense; is that correct?
14    A.   I'm sorry, my answer was too long. Yes.
15    Q.   Besides your own personal experiences and
16 observations of life in the world, did you do anything
17 else to formulate your position for the 2019 election on
18 the Edgewood field?
19        MS. ZYLSTRA: Object to form. You can answer.
20    A.   I would -- I think the answer to your question
21 is, I would talk to others who had come to the similar
22 conclusion, that a football stadium in a tradition --
23 was an incompatible use in a traditional residential
24 neighborhood.
25    Q.   So you talked to others. Would those have

Page 35

1 been -- did you talk to anyone in zoning or planning
2 with the City of Madison?
3        MS. ZYLSTRA: Objection. Form. You can
4 answer.
5    A.   Not while I was a candidate I didn't. These
6 people I had not yet met. Not -- at least not until
7 later in the campaign, so --
8    Q.   Did you meet with the sitting alder who was --
9 let me ask you this:
10       Who was the sitting alder when you were
11 campaigning?
12    A.   Allen Arntsen was the interim alder for
13 District 13.
14    Q.   Was he your opponent in that election?
15    A.   No, he was not. He was the interim alder,
16 meaning that he held the position because the previous
17 alder, Sarah Eskrich, had resigned to take a full-time
18 job outside of the city limits and therefore could not
19 devote full time.
20       And so there was a process by which an interim
21 alder is appointed -- not an election, but appointed --
22 to serve out the remainder of the term.
23       And so I did, yes, to answer your question,
24 speak with Allen Arntsen.
25    Q.   You spoke with him regarding the Edgewood

Page 36

1 field issue?
2    A.   Yes.
3    Q.   And what did he express to you on that issue?
4    A.   He listened, and so -- of course, to say what
5 he expressed to me would be to recount multiple
6 conversations, and, you know, I -- it was also some time
7 ago, so I don't know if I could possibly remember
8 exactly what he expressed to me.
9    Q.   Did he make any statements about positions
10 being taken by either the zoning or planning staff for
11 the City of Madison?
12       MS. ZYLSTRA: Object to form. You can answer.
13 Sorry.
14    A.   Oh. I'm just trying to do what I'm told,
15 waiting.
16       I don't recall.
17    Q.   You mentioned that there were others that you
18 talked to, to formulate your position.
19       Would it be fair to characterize those others
20 as being the neighbors of Edgewood and your potential
21 future constituents?
22    A.   Members of the Dudgeon-Monroe Neighborhood
23 Association would be people that I spoke to who had took
24 a position in opposition. Other residents who would
25 have -- people I did talk to.

Page 37

1     The simple answer to your question, did I
2 speak to people in District 13 particularly those who
3 had long opposed this? I would remind you, Jonathan,
4 that this was not a new issue, but it goes back to the
5 1990s and that it had been a longstanding controversy in
6 the neighborhood.
7    Q.   Outside of district -- did you confer with
8 anyone outside of District 13 where those conversations
9 helped formulate your position?
10    A.   Not while I was a candidate, no.
11    Q.   You mentioned not having any communication
12 with anyone in zoning or planning until later in the
13 election campaign.
14       What meetings did you have -- or what contact
15 did you have with zoning or planning then?
16    A.   I don't recall specific dates, but in the
17 spring of 2019, before the actual election, there was a
18 meeting with members of the neighborhood association,
19 the Dudgeon-Monroe Neighborhood -- representatives from
20 the Dudgeon-Monroe association, the Vilas Neighborhood
21 Association, representatives of No New Stadium, myself,
22 and my opponent at that time, David Hoffert, with
23 Assistant City Attorney John Strange, Zoning
24 Administrator Matt Tucker, for the purpose of trying to
25 understand the issue better. And so it was kind of an

Page 38

1 information meeting at that point.
2    Q.   When did that meeting occur?
3    A.   I don't recall the specific date.  But as I
4 indicated, sometime I think before the election in the
5 spring of 2019.
6    Q.   What do you recall city employees, city staff
7 saying in that meeting?
8    A.   I don't recall.  It was three years ago.  I
9 don't recall the specifics.
10    Q.   Was there any discussion in that meeting about
11 Edgewood's Master Plan?
12    A.   I don't recall the specifics, but I assume so.
13 That would have been one of the topics.
14    Q.   Did you take notes during that meeting?
15    A.   I did not.
16    Q.   Was it your typical practice to take notes in
17 meetings?
18       MS. ZYLSTRA:  Object to form.  You can answer.
19    A.   I wish I did.  Unfortunately, I'm not a very
20 good note-taker.  I mean, I asked for this, but I
21 haven't done -- taken any notes so far.
22       It would have been a lot easier if I had kept
23 a journal and a diary, but I did not.
24    Q.   You told your constituents that you would --
25 you basically guaranteed them, I think your words were,

Page 39

1 that there would be a process.  What do you mean by
2 that?
3       MS. ZYLSTRA:  Object to form.  You can answer.
4    A.   The City of Madison has -- places a lot of
5 value on process.  The City's comprehensive plan, the
6 most recent iteration, was completed in 2018, identifies
7 neighborhoods as the building blocks of the city.
8       There is a process regarding development in
9 various districts that principally uses conditional use.
10       There is a process in the CI District, the
11 Campus-Institutional District, on the part of the City's
12 zoning rewrite that became law in 2013 that codified
13 this process of balancing competing interests, ways in
14 which development can proceed to mitigate, minimize
15 impacts on adjacent neighbors.
16       And, you know, just basically a due process
17 where voices can be heard.  A fair and equitable
18 process.
19    Q.   You used the phrase "fair and equitable"; is
20 that right?
21    A.   Yes, I did use that phrase.
22    Q.   So you would agree with me that the City
23 legislative process should be fair --
24       MS. ZYLSTRA:  Object to form.
25    Q.   -- correct?

Page 40

1       MS. ZYLSTRA:  I'm sorry.  Object to form.  You
2 can answer.
3       MR. INGRISANO:  What's wrong with that
4 question, Counsel?
5       MS. ZYLSTRA:  You're asking him about the
6 City's process.  First, he's an individual and not the
7 process.  To the extent that your question is suggesting
8 that he's answering on behalf of a city, I have the
9 objection.
10       MR. INGRISANO:  No, I'm asking him as a
11 representative, elected official that represents
12 District 13.
13    Q.   You agree that the legislative process for the
14 citizens of the city of Madison should be fair?
15    A.   The process, yes, should be fair.
16    Q.   It should be equitable, to use your words;
17 correct?
18    A.   Correct.
19    Q.   Do you agree with me that that process should
20 be transparent?
21    A.   Yes, I believe that processes like this should
22 be transparent.
23    Q.   And that elected officials should operate in
24 good faith?
25    A.   Yes, I would agree with that statement.

Page 41

1    Q.   Have you ever expressed public support for
2 lights at Edgewood even with conditions?
3    A.   I encouraged both the neighbors and Edgewood
4 to consider the possibility of a compromise that would
5 be much along the lines of what Alder Arntsen had
6 suggested, which was to go slow.
7       And, in fact, the neighbors in a time period
8 of a meeting of six meetings in the summer of 2020,
9 started in the summer of 2020, nearby neighbors came up
10 with the process that could result in Edgewood having
11 lights.
12       And I tried to facilitate these meetings,
13 which would be to go slow, to measure the daytime use,
14 to have some way of addressing that daytime use through
15 technology that can mitigate the impacts, i.e., some
16 kind of sound barrier, which had first been proposed by
17 Edgewood's own sound study, then figure out if it were
18 possible to implement that into proceeding forward with
19 installing lights and having games.  A process of going
20 slow.  So I tried to facilitate a discussion along those
21 lines.
22       So I don't know if that answers your question,
23 but --
24    Q.   No, I'll follow up.
25       You may have proposed a process by which the

11 (Pages 38 - 41)

Page 42

1 parties could go forward, but have you ever actually
2 proposed or endorsed an actual technical proposal for
3 lights at Edgewood?
4        MS. ZYLSTRA:  Objection.  Form.
5     A.  I did not draft a proposal along those lines.
6 I did not feel it was my job to draft a proposal along
7 those lines.  I felt it was my job to try to facilitate
8 a conversation, a process that could lead to a potential
9 compromise that would be acceptable by both parties.
10    Q.  Sure.  And you've never supported an actual
11 proposal that would address and provide lights at
12 Edgewood; is that right?  That would result in lights at
13 Edgewood?
14    A.  I supported -- again, I have to go back to a
15 process, including I was in support of the neighbors'
16 proposal that could result in actual lights, yes, I
17 would say that.  Yes, the neighbors' proposal, a
18 four-step proposal, that the outcome of which could
19 indeed result in having lights.
20    Q.  You suggested a -- you were prepared to
21 endorse a proposal that involved future steps to measure
22 and address lights that you are saying could possibly
23 result in lights; correct?
24    A.  That would address it in the terms of
25 mitigating impacts in a traditional residential

Page 43

1 neighborhood, which my understanding, Jonathan, if you
2 go back and read the Statement of Purpose of the
3 Campus-Institutional District, specifically said that
4 for these types of projects in a campus institution,
5 mitigating impacts, the potential for adverse impacts is
6 necessary.
7        So I advocated a position completely in
8 conformity with the Campus-Institutional District's
9 Statement of Purpose.
10    Q.  But you advocated for a process; not proposals
11 for actual lights --
12    A.  I advocated a --
13    Q.  -- is that fair?
14    A.  No, I advocated a proposal that would -- could
15 result in lights, yes.
16    Q.  What were the terms of that proposal again?
17    A.  I don't have them right in front of me.
18    Q.  But it involved future studies, future
19 meetings with neighbors, and possible compromise going
20 forward; is that right?
21    A.  In the spirit of the Statement of Purpose
22 listed in the Campus-Institutional plan and identified
23 by Plan Commission members, there was a need to study
24 and try to come up with a compromise that could end up
25 in Edgewood having lights.

Page 44

1     Q.  So you were prepared to endorse -- you did
2 endorse a proposal for future compromise but not an
3 actual proposal for lights at Edgewood; is that correct?
4     A.  No, that's not correct.
5     Q.  What have you ever proposed or endorsed that
6 would result -- that would result in lights at Edgewood?
7     A.  Precisely, first measuring daytime impacts.
8 That was the first.  Measure -- measure the daytime use
9 that Edgewood currently enjoys.
10       Secondly, determine if there -- agree on ways
11 of how to measure that.  Both parties would have to say,
12 "How do you measure these impacts?"  So you have to
13 agree on that, study this.
14       Then to come up with ways to succeed it, what
15 could be done to minimize or mitigate those impacts, and
16 then to see if that -- to then try to come up with a
17 strategy of implementing those mitigation technologies
18 so that Edgewood could put up lights in a way that was
19 acceptable to both sides.  The outcome would be Edgewood
20 would have lights.
21    Q.  And if the neighbors would not agree with
22 those future measurements, would not agree with the
23 mitigation efforts that Edgewood would propose under
24 your framework, under your proposal for future
25 agreement, there wouldn't be lights; is that right?

Page 45

1     A.  Jonathan, it's just as possible that Edgewood
2 would not agree either.  When you have a process where
3 you're seeking to compromise you can't guarantee
4 outcomes.
5     Q.  But Edgewood repeatedly had said lights with
6 these conditions and that you and No New Stadium and the
7 neighborhoods all said no to that; is that correct?
8        MS. ZYLSTRA:  Objection.  Form.  You can
9 answer.
10    A.  The conditions at Edgewood put forth, as you
11 say, that were myself and others disagreed with because
12 those conditions did not address noise impacts.
13       That seemed to be the sticking point.  The
14 impacts of noise that were addressed in Edgewood's own
15 sound study were not addressed in Edgewood's own
16 conditions.
17    Q.  Sir, my question was tangible proposals,
18 conditions.  Edgewood gets lights with condition A, B,
19 and C attached to it.  No future process for measuring
20 anything, no future meetings, no agreement to agree on
21 something in the future.  Actual proposals.
22       Lights with conditions A, B, C, for example,
23 you said no every time; correct?
24       MS. ZYLSTRA:  Objection.  Form, foundation.
25 You can answer.

Page 46

1    A.   I opposed when -- again, those conditions
2  changed, Jonathan, over time.
3         Sometimes there were no limits on the number
4  of games.  Initially, the proposal was for 17 to 28
5  night games, then it changed to 46 to 64 night games.
6         The conditions that were presented did not
7  address impacts.
8    Q.   In every single one of those proposals that
9  were made by Edgewood you rejected; correct?
10        MS. ZYLSTRA:  Object to form.  You can answer.
11   A.   Jonathan, when I say I did not -- I rejected
12  conditions that did not address the preamble of the
13  Campus-Institutional District, because they showed those
14  conditions inadequately, Jonathan, mitigated or
15  minimized impact.
16   Q.   Mr. Evers, I understand you want to explain
17  why you said no to all those proposals.  I didn't ask
18  that; okay?
19        We're going to -- we've got a lot to cover
20  today, and so you've got to really work on answering my
21  questions.  If you want to elaborate with your counsel
22  afterwards, that's fine.
23        But right now, I'm asking you to confirm that
24  all the proposals that Edgewood provided that were
25  tangible, that said lights with whatever conditions

Page 47

1  those would be, you have rejected.  In your personal
2  capacity, you refused to support those proposals; is
3  that correct?
4    A.   I refused to support proposals that were
5  inadequate.
6    Q.   And you consider all of Edgewood's proposals
7  to be inadequate?
8    A.   Because they did not address the stipulations
9  set forth in the Campus-Institutional --
10   Q.   The answer to my question is yes, you
11  rejected all of the Edgewood's proposals?
12   A.   I suppose I -- let me just say that I --
13  again, I think I know what you're trying to get me to
14  say, Jonathan.  And I --
15   Q.   I'm just trying to get an answer to my
16  question, sir.
17        MS. ZYLSTRA:  Excuse me, Counsel.  You're
18  talking over each other.
19        MR. INGRISANO:  Yeah, well --
20        MS. ZYLSTRA:  I recognize -- I recognize --
21        MR. INGRISANO:  If he can answer my -- Sarah,
22  this is not a stump speech.  This is not a debate.  This
23  is a deposition.
24        We're going to have to bring Mr. Evers back
25  again if he wants to use every question as a stump

Page 48

1  speech opportunity.
2         So if you want to take a break and you can
3  talk to your client about answering questions directly,
4  we can do that.  But at this point in time, I'm on page
5  3, and if we don't start getting direct answers to
6  questions we are going to have to come back for a second
7  day.
8         MS. ZYLSTRA:  Counsel, my only comment was for
9  the court reporter's sake not to talk over each other.
10  I recognize your frustration.  I will -- at a break, I
11  certainly will confer with my client with regard to your
12  comments.
13        You can ask your question again.  I'm, just
14  for the court reporter's sake, trying to say please try
15  not to jump on each other.
16        MR. INGRISANO:  Read back my last question,
17  please.
18        (Record read.)
19   A.   I rejected Edgewood's proposals as being
20  inadequate, yes.
21   Q.   Thank you.  In May of 2020, the city planning
22  staff made a recommendation that Edgewood's conditional
23  use permit be granted subject to certain particular
24  conditions.
25        And you, in your capacity as an alder,

Page 49

1  rejected that position of the city planning staff;
2  correct?
3         MS. ZYLSTRA:  Objection.  Form.  You can
4  answer.
5    A.   I did, but if I could just add one more
6  caveat.  It's not uncommon for elected officials, Plan
7  Commission members, council members, to come up with
8  policy decisions that are disagreed with the staff
9  recommendations.  It's not uncommon.
10   Q.   Sir, is your re-election website in the 2021
11  election cycle, does that fairly summarize your public
12  statements on the Edgewood lights issue?
13   A.   Do you have specifics that you could show me?
14   Q.   I'm just asking.  You maintain a website,
15  right?  You need a website for your re-election?
16   A.   I have in the past, yes.
17   Q.   And you had a sub tab under that election
18  website on the Edgewood lights issue specifically;
19  correct?
20   A.   I believe so, yes.
21   Q.   And you posted comments to that?
22   A.   I'm sorry, sir?
23   Q.   You posted -- you posted other comments that
24  you had written to that website on that issue; correct?
25   A.   Perhaps they were items from my aldermanic

Page 50

1 blog, yes.
2      Q.   There would be nothing on your election --
3 re-election website that would be inconsistent with your
4 actual position on the Edgewood lights issue; is that
5 fair?
6      A.   I don't have it in front of me, but if you
7 want to show me it, I can take a look at it, sure.
8      (Exhibit 17 marked)
9      Q.   MR. INGRISANO:  Sir, this is an excerpt from
10 your website, is it not?
11     A.   It appears to be so, yes.
12     Q.   And there is a tab here that's dedicated to
13 the Edgewood lights issue in that campaign; correct?
14     A.   That is correct, yes.
15     Q.   And as part of that you have hyperlinks to
16 what you have written about Edgewood's push for a
17 stadium several times in the past year, which you
18 hyperlinked to here, here, and here.  Do you see that?
19     A.   Yes, I do.
20     Q.   And then you also hyperlinked a recent post
21 that you had written; correct?
22     A.   Yes, that's correct.
23     Q.   So those hyperlinks in that recent post, that
24 fairly summarizes your public position on the Edgewood
25 lights; correct?

Page 51

1      MS. ZYLSTRA:  Object to form.  You can answer.
2      A.   If you have copies of those posts, I can speak
3 to them, sure.  If you have copies for those hyperlinks
4 in those posts.
5      Q.   Did you create this page?
6      A.   I didn't create it myself.  I am not a person
7 that could do such a thing, but I oversaw it, yes.
8      Q.   Did you provide the content for the here,
9 here, and here hyperlinks?
10     A.   Yes.
11     Q.   So you wouldn't have provided the person that
12 created your website with inaccurate content; correct?
13     A.   That is correct.
14     MS. ZYLSTRA:  Late objection, form, on that.
15 Go ahead.
16     Q.   You never -- in reviewing your website, you
17 never recognized that you had posted something
18 incorrectly that didn't actually express your values and
19 position; is that right?
20     A.   I do not recall, but if I did I would have
21 issued corrections.
22     Q.   Have you ever made any private statements that
23 you would never support lights at Edgewood High School?
24     A.   I don't recall.
25     Q.   Take a break?

Page 52

1      A.   Sure.
2      MR. INGRISANO:  Why don't we take a break.
3      MS. ZYLSTRA:  Okay.
4      THE VIDEOGRAPHER:  We are off the record at
5 10:15 a.m.  This is the end of Media Unit No. 1.
6      (Recess)
7      (Attorney Jean-Louis exits proceedings.)
8      THE VIDEOGRAPHER:  We are back on the record
9 at 10:28 a.m.  This is the beginning of Media Unit
10 No. 2.
11 BY MR. INGRISANO:
12     Q.   Mr. Evers, Matt Tucker -- do you know who Matt
13 Tucker is?
14     A.   Yes, I do.
15     Q.   Matt Tucker attended a neighborhood meeting in
16 your district on Wednesday, October 17 of 2018, in which
17 use of the Edgewood athletic field was discussed.
18      To the best of your recollection, do you
19 recall attending that meeting?
20     A.   Yes, I do.  I attended that meeting.
21     Q.   What -- can you give me your best recollection
22 of what was discussed at that meeting?
23     A.   Edgewood made a presentation, a PowerPoint
24 presentation.  Mike Elliot, the president of Edgewood
25 High School and Brian Munson of Vandewalle Consulting

Page 53

1 led the presentation.
2      After the presentation there was question and
3 answers from the public.  It was held on the campus of
4 one of the buildings on the Edgewood campus.
5      Q.   Were you running at that point in time for the
6 alder seat in District 13?
7      A.   I had not declared my candidacy at that point.
8 I was considering it.
9      Q.   When did you formally declare your candidacy?
10     A.   I believe in November of 2018.
11     Q.   Did you speak at that meeting?
12     A.   I did.
13     Q.   And what did you say?
14     A.   I don't recall precisely.  The one thing I do
15 recall is that I noticed in one of the slides in the
16 PowerPoint that Lake Wingra was in the background and
17 that I did not hear anything in the presentation about
18 the potential impacts on the recreational uses of Lake
19 Wingra, considered by many to be a jewel of the
20 Dudgeon-Monroe neighborhood.
21      But beyond that, Jonathan, I don't recall the
22 specifics of what I said, you know, 3 1/2 years ago.
23     Q.   Was there any discussion in that meeting about
24 the Edgewood Master Plan?
25     A.   I don't recall.

14 (Pages 50 - 53)

Page 54

1    Q.   Was there any discussion in that meeting about
2 a limitation or prohibition on Edgewood's use of its
3 field for athletic contests or games?
4    A.   I don't recall.
5    Q.   Sir, is it your position that even if Edgewood
6 and the neighborhood associations were to reach an
7 accord on lights and games at the Edgewood field, that
8 additional questions would have to be answered about
9 impacts on Lake Wingra?
10   MS. ZYLSTRA: Object to form.
11   A.   I would answer that Lake Wingra would be among
12 the impacts that should be considered in any proposal to
13 build a stadium in that particular neighborhood.
14       And I may add that the impacts on Lake Wingra
15 are multitude, but not just -- it would include the
16 recreational use of the lake as well as the wildlife
17 around the lake.
18   Q.   So even if there was an accord between
19 Edgewood and the neighbors for a proposal, before you
20 would support it you would still have to be satisfied
21 that it addresses impacts on Lake Wingra; is that fair?
22   MS. ZYLSTRA: Object to form, foundation.  You
23 can answer.
24   A.   Among the stakeholders would be the Friends of
25 Lake Wingra, so that I would consider them to be a

Page 55

1 stakeholder along with the neighbors.
2        So I suppose the answer to your question is
3 yes, all stakeholders should have their voices heard.
4        And, for the record, this Friends of Lake
5 Wingra, I believe, a 501(c)(3) advocacy organization,
6 the details of which you can find by looking online.
7    Q.   Part of being sworn in to your position in
8 April of 2019, and given the fact that you live a
9 five-minute walk from Edgewood High School, prior to
10 your being sworn in, what uses of the athletic field at
11 Edgewood had you observed while you lived in that
12 district?
13   A.   Since I am not a nearby neighbor, I don't live
14 adjacent to the property, it would be anecdotal
15 observations of activities on the field, the specifics
16 of which I cannot name.
17   Q.   So you have never walked by or driven by or
18 biked by the field and observed activities on the field
19 prior to taking office?
20   A.   Yeah, I think I tried to say that anecdotally
21 I may have observed, but the specifics of which, of
22 course, are somewhat vague.
23   Q.   Sure.  When I hear the word "anecdotally," I
24 think that you're relaying something else that you've
25 heard.

Page 56

1        My question is, what have you observed -- in
2 your time living at that neighborhood, what have you
3 observed -- prior to taking office, what have you
4 observed on that field?
5    A.   People perhaps running on the track, practices
6 being held on the field, that kind of thing.
7    Q.   The people running on the track, did they look
8 to be students or someone else?
9    A.   I don't recall.  I can't say.
10   Q.   So running on the track and practices, are
11 those the only two things you can recall observing on
12 that field?
13   A.   I don't recall much else.  Again, it would
14 have only been driving by or walking by or biking by, as
15 you say, so it was not on my radar.  So I did not
16 observe much of anything, to be honest with you, because
17 I don't live right next to the property.
18   Q.   What about your observations led you to
19 believe that students on the field, people on the field
20 that you saw were engaged in a practice?
21   A.   Because it looked like a practice.  It did not
22 look like a game.  But, again, this would be all -- you
23 know, I've lived in that neighborhood since -- when did
24 I move -- in 2006, so all of this would be in passing,
25 not in a result of attending any particular event,

Page 57

1 practice, game, anything that may have taken place
2 there.  So I'm not a reliable reporter as to what was
3 taking place.
4    Q.   From your five-minute walk from where you
5 live, given that proximity, did you ever, before taking
6 office, hear any activity on that field?
7    A.   Prior to taking office, the types of things
8 that might be heard would be events like orientation
9 events where there would be loudspeakers from the
10 campus.
11       I wouldn't -- couldn't say whether it was
12 coming from the field or what, but you could hear --
13 sometimes you could hear things going on and I wouldn't
14 know if it was a game, if it was a practice, if it was,
15 you know, a party going on with music.  Sometimes you
16 could hear that.  But, again, I don't live in direct
17 proximity.
18   Q.   Sure.  When did you first hear thirdhand --
19 secondhand, excuse me, from someone in the neighborhood
20 that Edgewood was having games or athletic competitions
21 on the field?
22   A.   I don't recall, specifically.  I don't know
23 exactly when I would have heard that.
24   Q.   But you have heard from neighbors and people
25 in the neighborhood that there were games that were

15 (Pages 54 - 57)

Page 58

1 being hosted?
2     A.   At some point, yes.  Nearby neighbors would
3 complain about, you know, whistles and just, you know,
4 noise from the field.
5         I don't know if they were specific about
6 whether these were games or practices, but it would
7 definitely be secondhand information and I don't recall
8 when I would have heard that.
9     Q.   And you can't even say whether it was closer
10 to the time you moved in in 2006 versus closer to the
11 time that you were sworn in as alder?
12     A.   I would say probably the first time I heard
13 about it would be prior to the time I was sworn in,
14 after the time I had declared candidacy.
15        And, again, this became more a subject of
16 debate when Edgewood announced that it was seeking to
17 amend its master plan.
18     Q.   So prior to you declaring your candidacy, you
19 had never heard anyone say that Edgewood was playing
20 games on its field; is that accurate?
21     A.   I don't recall.  I don't recall, no.  It would
22 not be a subject that I would pay much attention to,
23 since I did not live close by (A), and I was, you know,
24 not a -- not either a candidate to become alder or sworn
25 in as an alder.

Page 59

1     Q.   Have you ever been on Edgewood's athletic
2 field?
3     A.   No.
4     Q.   Was there a time that you're aware of in which
5 that field was used for a farmer's market?
6         MS. ZYLSTRA:  Objection.  Foundation.  You can
7 answer.
8     A.   I don't believe the field has ever been used
9 as a farmer's market, the field itself.
10     Q.   Was there ever a time in which you were aware
11 the field was used for something called Edgefest?
12     A.   I have heard about Edgefest, but I have never
13 participated in it and I don't believe it was going on
14 when I lived in the neighborhood.  And I'm not sure
15 where it took place, whether it was on the field or
16 elsewhere on the campus.
17        From what I understand, the precise location
18 of the field also changed over time.
19     Q.   You mentioned that you were on campus, on the
20 Edgewood campus, for the October 2018 meeting?
21     A.   No, October 17th meeting, you said.
22     Q.   October 17 of 2018, right?
23     A.   Yes.
24     Q.   Was that your first time on the Edgewood
25 campus?

Page 60

1     A.   I don't believe so.  I can't recall.  But
2 probably may have attended a lecture, attended a meeting
3 of some sort.  May have -- I remember I took a class
4 from -- in business ethics from a professor at Edgewood,
5 but I can't remember if that was held on the Edgewood
6 campus or somewhere else back when I was doing my
7 master's.
8         I'm trying to think of anything else that
9 would have brought me to -- so I would say that that was
10 not the first time, but I don't recall precisely how
11 frequently or when I was on the campus before.
12     Q.   And at the time that you were there for a
13 lecture or some sort of presentation, would that have
14 been on the college campus to your recollection or the
15 high school?
16     A.   Probably on the college campus.  Most likely
17 on the college campus, yes.
18     Q.   Since you -- since declaring your candidacy
19 in -- I think you said in November of 2018, how many
20 times have you been on the Edgewood High School campus?
21     A.   One that I recall.  One in a meeting with Mike
22 Elliot and Steve Krantz on the Edgewood High School
23 campus.
24     Q.   And when did that meeting occur?
25     A.   March 9th of 2020.

Page 61

1     Q.   And what was that meeting about?
2     A.   It was about discussion about next steps of
3 what Edgewood intended to do.  And I recall at that
4 meeting encouraging them to go slow, asking them to
5 confer with the Edgewood Neighborhood Liaison Committee.
6         We talked about the pandemic and that we were
7 at the early days of the pandemic.
8         So it was about, you know, urging them not to
9 rush, but to, you know, reengage the neighbors.  I think
10 Mike and Steve realized that there had been kind of a
11 breakdown in communication, an erosion of trust, and I
12 was urging more conversation.
13         To my surprise, two days later, Edgewood
14 submitted their application for a conditional use
15 permit.
16         But I'll also add that during that
17 conversation made it clear that they saw getting
18 lights as the first step to several subsequent
19 applications to get -- to build out the rudiments of a
20 stadium.
21     Q.   What did they say specifically that caused you
22 to say that they made it clear?
23     A.   Well, they -- they -- as I said, they
24 indicated that this would be the first step, but the
25 next step would be to improve the sound system, to do,

Page 62

1  you know, the locker rooms and the concession stands and
2  expand the bleachers to achieve their long-stated goal
3  of having a lighted field and a stadium to be able to
4  hold night games in that neighborhood.
5      Q.  So you arrived for that meeting.  Do you
6  recall where you met?
7      A.  In an office somewhere, a conference room, I
8  think at Edgewood High School.
9      Q.  And you left right after the meeting?
10     A.  I believe so, yes.  Yeah, I did not get a tour
11 or anything like that of the high school.
12     Q.  In the 2019 timeframe, so January, February,
13 March, April, when you were campaigning --
14     A.  Uh-huh.
15     Q.  -- and when you were -- after you were sworn
16 in, in those first -- in kind of that first quarter
17 of -- just say the first five or six months of 2019, did
18 you become aware that Edgewood had issued an application
19 for lights for its outdoor -- outdoor lighting for its
20 field?
21         MS. ZYLSTRA:  Object to form.  You can answer.
22     A.  Yes.
23     Q.  How did you learn about that application?
24     A.  I don't recall.
25     Q.  During that period of time did you have any

Page 63

1  direct communications with city staff that may have
2  apprised you of that application?
3      A.  I don't recall.
4      Q.  Do you recall when you learned about
5  Edgewood's application for outdoor lighting in 2019?
6      A.  I may have read about it in the newspaper.
7      Q.  Do you recall when?
8      A.  It may have been in February of 2019.
9      Q.  Are you saying there was an article that was
10 published about the application for lights?
11     A.  I believe so, in the Wisconsin State Journal.
12     Q.  What, if anything, did you do related to
13 lights at Edgewood after you learned of that
14 application?
15         MS. ZYLSTRA:  Object to form.  You can answer.
16     A.  I don't believe I did much of anything other
17 than listen to the concerns of the members of the
18 liaison committee and of the Dudgeon-Monroe Neighborhood
19 Association who expressed some consternation that they
20 were not informed, that Edgewood did not, as in prior
21 instances, share their intentions explicitly with
22 representatives of the neighborhood.
23     Q.  So listening that to consternation, did you --
24 was that consternation expressed to you in meetings or
25 via email or phone calls?  How did it come to be that

Page 64

1  you learned of the neighbors' consternation?
2      A.  As a candidate, I had the practice of
3  attending the monthly meetings of the Dudgeon-Monroe
4  Neighborhood Association meeting, so I recall hearing
5  that discussed.  The specifics of that, I could not say,
6  because it's been some time.
7      Q.  So would that have been a March 2019
8  Dudgeon-Monroe Association Meeting?
9      A.  I don't know.  It's possible.  It could have
10 been.  They meet at the first Wednesday of every month,
11 so it's quite possible that it could have been March --
12 it could have been February, it could have been March,
13 but I don't know for sure.
14     Q.  At that period of time, do you recall, was
15 there a set time for the Dudgeon-Monroe Association
16 meetings; a set date and time did it meet, you know,
17 first Tuesday night of the month, for example?
18     A.  At that time and to this day they still meet,
19 unless there is some kind of conflict regarding a
20 religious holiday or something like that.  They would
21 meet the first Wednesday of the month at 6:45 p.m.
22     Q.  If Edgewood's lighting application was filed
23 on February 22nd, the next meeting of the Dudgeon-Monroe
24 Association would have been that first Wednesday in
25 March; is that correct?

Page 65

1      A.  I believe so, yes.
2      Q.  Does that spur your recollection as to when
3  you recall speaking about or hearing from the neighbors
4  about the consternation?
5      A.  As I said, that sounds plausible, yeah.  You
6  know, again, I can't say for sure, but that sounds
7  plausible.
8      Q.  You wouldn't have been talking about
9  Edgewood's lighting application before a lighting
10 application was actually submitted; is that right?
11     A.  Because I didn't know about it.  It was not a
12 point.
13     Q.  At that meeting what was discussed about
14 Edgewood's lighting application?
15     A.  I don't recall.
16     Q.  Do you recall speaking to that issue?
17     A.  I do not recall.
18     Q.  Do you know, does the Dudgeon-Monroe
19 Neighborhood Association, do they keep minutes of their
20 meetings?
21     A.  I believe so.
22     Q.  Do you recall any discussions at that meeting
23 about intent to oppose that lighting application?
24     A.  I don't recall.
25     Q.  After learning of that lighting application,

Page 66

1 or any time thereafter, did you ever have any
2 discussions with anyone in the building inspection or
3 zoning administration staff for the City of Madison
4 about that lighting application?
5      MS. ZYLSTRA:  Object to form.  You can answer.
6      A.  Certainly, not at the time.  Now, if sometime
7 later I don't recall if a conversation had about that
8 specific lighting application.  I did not speak with
9 building inspection.  I spoke with George Hank maybe
10 once or twice in my life.  And with Matt Tucker, I don't
11 recall if a specific conversation about that lighting
12 application ever came up.
13     Q.  So you don't have a recollection of any
14 conversation with Matt Tucker in which you were
15 advocating or proposing the denial or non-issuance of
16 that application?
17     A.  Again, I don't recall, but I don't believe I
18 ever offered an opinion on that to Matt Tucker.
19     Q.  Did you believe at that time that the lighting
20 application should be denied or not issued?
21     A.  It was my understanding, it was my belief,
22 that it should be denied on the basis of a belief that
23 it required an amendment to the master plan.
24     Q.  Where did that belief and understanding come
25 from; your belief and understanding that the master --

Page 67

1 that, in essence, the lighting should be denied unless
2 and until the master plan is amended?
3      A.  Well, a previous alder, Sarah Eskrich, in an
4 email, from what I understand, when Mike Elliot had
5 asked for temporary lighting to be able to hold a night
6 game on campus in the fall of -- I think of 2018, or
7 maybe it was 2017, wanted to put up portable lighting
8 and sound in order to be able to have a game.  And she
9 said such a change in use would trigger -- would require
10 an amendment to the master plan.
11     So I think the question that people had,
12 including myself, not fully understanding, because again
13 I wasn't the zoning administrator, I've never taken a
14 law on urban planning -- a course in urban planning that
15 looked at the details of such things.
16     It seemed to me that an amendment to the
17 master plan would have been appropriate.  And in the
18 absence of that, no.
19     Q.  Have you ever reviewed the Edgewood Master
20 Plan?
21     A.  Yes, I have.
22     Q.  And when was the first time you reviewed that
23 document?
24     A.  I do not recall.
25     Q.  Was it before or after you took office?

Page 68

1      A.  I don't recall.  It may have been just as I
2 was taking office or in the weeks leading up to it or
3 just after I took office.  Somewhere in that.  Probably
4 in the first six months of 2019, rough estimate.
5      Q.  When did you first become aware of the Sarah
6 Eskrich email to Mike Elliot that you said originated in
7 2017, maybe 2018?
8      A.  I don't recall.
9      Q.  Do you have a copy of that email?
10     A.  Not on me, but somewhere I think I have a copy
11 of that email, yes.
12     Q.  Have you ever advised No New Stadium or any
13 neighbors on complaining to the building inspection
14 department or zoning administration on the Edgewood
15 lighting applications?
16     A.  I don't recall ever doing so.  But to qualify
17 my answer, that means I don't know.  I may have, I may
18 not, I simply don't recall.
19     Q.  And you had no meetings with Mr. Tucker on the
20 question of whether the light permits should issue; is
21 that correct?
22     A.  That, I believe is correct, yes.
23     Q.  Can you recall any communications with any
24 city staff on the question of the issuance of the light
25 permit application on the first, say, seven or eight

Page 69

1 months of 2019?
2      A.  About the February application?
3      Q.  Yes.
4      A.  Certainly, none within the time period that it
5 was reviewed and denied.  If there were any
6 conversations, it would have been closer to the summer
7 of 2019, but I don't recall the details and I cannot say
8 for sure.
9      Q.  You mentioned that the Edgewood light
10 application was denied.  When was it denied?
11     MS. ZYLSTRA:  Objection.  Foundation.  You can
12 answer if you know.
13     A.  I don't know.
14     Q.  Have you ever seen a written communication
15 from the city advising Edgewood or the neighbors that
16 the application had been denied?
17     A.  You know, I don't recall seeing documents.
18 And maybe "denial" is the wrong word.  Held up, held in
19 abeyance, or whatever that -- there was some issue.
20     But, again, I wasn't the zoning administrator.
21 I wasn't the building inspector.  I had nothing to do
22 with it.  It was my impression that there was some
23 debate about that.
24     And no -- to answer your question, no, I did
25 not see documents using the word "denial."  But I was

18 (Pages 66 - 69)

Page 70

1 aware that there was debate about that.
2    Q.   Sure.  So without a formal letter of denial
3 how did you become aware that the application had been
4 denied or perhaps held up, as you said?
5    A.   I don't know.  This also may have been in a
6 newspaper article.  I can't recall.
7    Q.   Have you ever had any communications with city
8 staff and building inspection or zoning administration
9 in which you were advocating for an interpretation of
10 the master plan that would restrict Edgewood's use of
11 its athletic field?
12    A.   No, I never -- as I recall, I did not have
13 those conversations with city staff regarding.
14    Q.   So having reviewed the master plan shortly
15 after you took office, per your testimony, what do you
16 recall from that document restricted Edgewood's ability
17 to use its field for games or athletic competitions?
18    A.   Their description of the use of the open space
19 field.
20    Q.   And what about -- what, if any, terms in the
21 master plan did you read or interpret that would require
22 the denial or non-issuance of the outdoor lighting
23 application?
24        MS. ZYLSTRA:  I'll object to form.  You can
25 answer.

Page 71

1    A.   I really didn't -- was not an expert on how
2 the wording of the master plan impacted the decision of
3 the zoning administrator or the building inspector about
4 that.
5        So I had really no opinion about anything
6 having to do with that light -- that application, that
7 permit application, or had very little thought.
8        My understanding is that the description of
9 the open space field was to be used for practices and
10 Phys Ed classes, which was consistent with how Edgewood
11 had described the field in previous conversations with
12 the neighborhood, including minutes from meetings of the
13 Edgewood Neighborhood Liaison Committee.
14        And also how, you know, Edgewood spoke about
15 their field in subsequent years, including in 2015.
16 They identified it as principally as a place for
17 practices.
18    Q.   And what -- okay.  So let's talk about that.
19        You're saying the minutes from the Edgewood
20 Neighborhood Liaison Committee indicate that Edgewood
21 admitted or described itself that the field is limited
22 in use to practices and Phy Ed classes; is that correct?
23    A.   I don't have those minutes in front of me, but
24 from what I understand, this was either -- perhaps in
25 2014 when neighbors were asking, this was when the

Page 72

1 discussion began about a field upgrade.  So it was in
2 2014, perhaps early 2015.
3        And the question is what would the purpose of
4 this be, how would the field be used.  And it would be
5 used for practices.
6    Q.   And you have seen those minutes?
7    A.   I have, yes.
8    Q.   And you have them in your possession?
9    A.   I believe so, somewhere.  If I don't have them
10 on my possession, I can -- yeah, I can probably -- I
11 don't know if I have them in my possession.  I probably
12 can find them, so I have seen them.  I don't know if I
13 have them in my possession.
14        MR. INGRISANO:  Counsel, I do believe that
15 those would be responsive to a particular interrogatory
16 that was posed, so I will be asking that you supplement
17 it, to find those documents.
18        MS. ZYLSTRA:  And I will say they are not part
19 of the documents that were given.  But I think, as he
20 said, he's not sure if they are in his possession or he
21 can get them.
22        Assuming they are with -- they are not in his
23 possession, you may have to -- I don't know whether you
24 intend to subpoena records from the liaison committee or
25 the neighborhood association or whatnot, but they can

Page 73

1 produce them.
2        THE WITNESS:  Yeah, I don't know if I have
3 them or not, but if you want them I can get it.
4        MS. ZYLSTRA:  I can have him make the request,
5 as along as --
6        MR. INGRISANO:  I would like him to supplement
7 his production if he has them in his possession,
8 custody, or control.
9        MS. ZYLSTRA:  Understood.
10        MR. INGRISANO:  And if he does not have them
11 in his possession, custody, or control, I would like to
12 discuss further with you how we can get those.
13        MS. ZYLSTRA:  Understood.
14    Q.   You also mentioned that -- in 2015, that there
15 were representations made by Edgewood about the use of
16 its field.
17        What were those representations?
18    A.   There was an article in the Wisconsin State
19 Journal.  Edgewood High School president, Mike Elliot,
20 spoke about -- the purpose of the article was to
21 announce the gift of a one million, 1.5 million, I don't
22 recall the exact number, for an upgrade of the athletic
23 field.  The gift coming from Goodman Foundation.
24        And a subhead of the article, not the
25 headline, it was talked about how that this would be an

19 (Pages 70 - 73)

Page 74

1  upgrade to their practice field.
2       And at a certain point in the feature piece,
3  which I believe may have had a front page article in the
4  Wisconsin State Journal, Mike --
5  Q.  Was --
6  A.  Go ahead.
7  Q.  I'm sorry.  Was the statement about an upgrade
8  to the practice field, was that a quote of Mike Elliot
9  or was that another unquoted statement in the article?
10  A.  There was a quote of Mike Elliot saying -- and
11  I don't have it in front of me.  You probably have a
12  copy, so if you want to share it with me I can speak to
13  it.  Do you have a copy?
14  Q.  I'm asking to the best of your recollection.
15  A.  To the best of my recollection, Mike Elliot
16  said that this has been a source of controversy.
17       We were between two neighborhood associations
18  that had been vehemently opposed to lights and games,
19  and our purpose is to use this upgraded athletic field
20  principally for the purposes of practices.  That's my
21  recollection.  To have the best, highest quality field
22  for the purpose of practice, something to that -- that's
23  not an exact quote, but it's close enough.
24  Q.  Thank you.  You were aware, were you not, that
25  in 2015 Edgewood added a scoreboard to its field?

Page 75

1  A.  I don't know when that happened.  I don't
2  know.
3  Q.  But you agree that before you took office in
4  2019 Edgewood had a scoreboard on its field?
5  A.  I don't know for sure, but when -- there is a
6  scoreboard now.  I don't know when it was installed.
7  Q.  Do you have -- have any knowledge or
8  recollection of upgrades being made to that field in
9  between the years 2013 and 2015?
10  A.  I believe that there was an upgrade to the
11  field as a result of the gift from the Goodman
12  Foundation.
13  Q.  Which was in 2015?
14  A.  I believe so, yes.
15  Q.  Did you ever advise or help organize
16  opposition to the lights, um --
17  A.  Can we pause here just so I can use the
18  restroom one more time?
19  Q.  Sure.
20  A.  And you can think of your question.
21  MR. INGRISANO:  Absolutely.
22  THE VIDEOGRAPHER:  We are off the record at
23  11:09 a.m.
24       (Recess)
25       (Attorney Jean-Louis re-enters proceedings.)

Page 76

1       THE VIDEOGRAPHER:  We are back on the record
2  at 11:22 a.m.
3  BY MR. INGRISANO:
4  Q.  All right.  Mr. Evers, have any of your
5  constituents ever complained to you about other
6  activities other than athletic contests or games on the
7  Edgewood field?
8  A.  Yes.
9  Q.  What activities have you received complaints
10  about?
11  A.  Parties that -- you know, I believe that there
12  are gatherings that the school may have, either the
13  college or the school, I don't know which one.
14       But it would have to do, say, at the beginning
15  of the school year you have a big party, a welcome party
16  with a DJ.  Over the course of time I have been in
17  office there had been complaints about the noise that
18  that generates in the community.
19  Q.  And under the interpretation of the master
20  plan that you agree with, Edgewood would be -- was
21  restricted during the time the master plan was in
22  effect.  Edgewood would have been restricted from
23  posting anything on that field other than team practices
24  and physical education classes; correct?
25  MS. ZYLSTRA:  Objection.  Form, foundation.

Page 77

1  You can answer.
2  A.  I believe that the description of the open
3  space described practices in Phys Ed is what they
4  described.
5       So I'm not a zoning administrator.  I'm not an
6  expert in this.  It's my understanding that Edgewood had
7  defined the use of that open space for Phys Ed classes
8  and for practices, and I think if I -- again, not an
9  expert.
10       It's my understanding that the interpretation
11  of the zoning administrator is that limited the use of
12  those -- the field to practices in Phys Ed classes but
13  not actual games.
14  Q.  Sure.  And as the alder for that district,
15  would complaints about a use other than games, team
16  practices, or Phys Ed classes, be meritorious in your --
17  in your position?
18  MS. ZYLSTRA:  Objection.  Form, foundation.
19  You can answer.
20  Q.  Would you have treated it that way?  If
21  someone came to you during -- while the master plan was
22  in place and said, hey, Edgewood had a pep rally on its
23  field or Edgewood had a party with enhanced sound, would
24  that have been something that as the alder for that
25  district you would have said that's not permitted, we

Page 78

1  should put a stop to it?
2      MS. ZYLSTRA:  Objection.  Form.  You can
3  answer.
4      A.  As a hypothetical, I don't -- first of all, I
5  only become alder in 2019.  The master plan had been
6  adopted some five years prior to that.
7      I'm not aware of what kind of complaints
8  neighbors have.  So for me to speculate on how I would
9  respond should a complaint like that come up, I simply
10  cannot say.
11      Q.  The complaint with the party that you
12  referenced, when did that occur?
13      A.  Well, let me be specific.  That was not on the
14  practice field.  That was --
15      Q.  Where would --
16      A.  That was outside property.  I think -- I
17  believe it was -- I recollect now it was on the college
18  portion of the campus, so it was near -- near one of the
19  buildings.
20      And again, I don't know of the different
21  buildings, but it wasn't on the field itself.  So
22  somewhere on the college campus.
23      Q.  So while the master plan was in effect and you
24  were alder of that district, you agreed and took the
25  position that Edgewood did not have the ability to play

Page 79

1  athletic competitions or games on its field; is that
2  correct?
3      MS. ZYLSTRA:  Object to form.  You can answer.
4      A.  I understood they had no influence or no say
5  in the interpretation of Matt Tucker, but it seemed
6  reasonable to me that games -- you know, league games
7  were not to be held on the practice field based on that
8  interpretation.
9      Q.  And, in fact, Edgewood received official
10  notices from the city detailing that they were basically
11  in violation of the master plan for hosting games on the
12  field; is that correct?
13      A.  It's my understanding, yes, they did.
14      Q.  And as the alder of that district and given
15  that Edgewood is a constituent of yours, did you take a
16  position on the merits of those official notices?
17      A.  I do not believe I did, but I don't recall for
18  sure.
19      Q.  At any time did you advise other constituents
20  on how to complain to the city about games being played
21  on the field?
22      MS. ZYLSTRA:  Objection.  Form.  Asked and
23  answered.  You can answer.
24      A.  Explicitly, I don't believe I did, but -- or I
25  would say that in conversations with residents who said

Page 80

1  that they had issued complaints to the Madison Police
2  Department but received no response, I suggested they
3  should issue those complaints instead to the zoning
4  administrator, to the building inspection office, that
5  that would be the more appropriate place because they
6  weren't getting anywhere from complaints that they had
7  filed either within PD or with Edgewood itself.
8      Q.  In any complaints you received regarding the
9  use of the field for athletic competitions or games, did
10  you forward those on, ever, to the building inspection
11  department?
12      A.  I don't recall receiving direct complaints
13  myself about it, and I don't recall ever forwarding
14  anything to the zoning administration or building
15  inspection.
16      Q.  In other aspects of your job when you received
17  complaints from constituents that fall into something
18  that would be building inspection or zoning
19  administration, do you forward those directly or do you
20  advise your constituents on how to contact them?
21      A.  Typically, if I receive a complaint, I would
22  forward those to the appropriate person, the appropriate
23  department, and hope that there would be some kind of
24  followup.
25      Q.  Got it.  But you wouldn't take a position or

Page 81

1  express a position on the complaint; is that fair?
2      A.  Sometimes.  It depends on what the complaint
3  was.  I think it would be situational-specific.
4      Q.  You don't recall ever taking a position with
5  the city staff on the use of the field and whether that
6  should be the subject of citations or notices?
7      A.  I do not recall, no.
8      Q.  Beyond contacts with city administration
9  staff, have you ever expressed to any of your
10  constituents that Edgewood should have been fined for --
11  should have been fined or otherwise penalized for
12  hosting games on its field during the tenure of the
13  master plan?
14      A.  I don't recall ever having done so.  But
15  again, I don't know.  I can't say.
16      Q.  You're familiar with the Campus-Institutional
17  District zoning code provision?
18      A.  Uh-huh, yes.  If you have a copy of them I
19  would be glad to respond to any questions regarding
20  that.
21      Q.  If I can find Exhibit 13 for the witness.
22      Mr. Evers, I'm handing you what's been marked
23  as Exhibit 13 in this matter.
24      Do you recognize that as a printout of the
25  Campus-Institutional District zoning ordinance?

Page 82

1    A.   Yes.
2    Q.   Section 28.097?
3    A.   Yes, I do.
4    Q.   Sir, in reviewing this document, do you see
5  that there are several subsections that appear to have
6  been amended by an ordinance 19 dash 69, with a date of
7  10-10-19, October 10, 2019?
8    A.   If I may ask, since these are not highlighted
9  in yellow, are you -- I assume that "Am." stands for
10 "amendments."  Is that what you're referring to by these
11 dates?  Is that what you're referring to?
12   Q.   Well, that's what I was referring to.
13        Do you recognize that as being a citation to
14 an amended -- to an amendment?
15   A.   I don't know by looking at this if it's
16 referring to the subject matter that follows this
17 notation or if it's paragraphs preceding, but I'm aware
18 that there were charges made.
19   Q.   So, you are aware that there was an amendment
20 to the Campus-Institutional District zoning code in
21 October of 2019; correct?
22   A.   I am, yes.
23   Q.   With respect to that amendment, can you
24 identify for me, sir, what involvement you had with that
25 amendment?

Page 83

1    A.   Conversations with staff following the meeting
2  of the zoning board of appeals where it became apparent
3  that there was a flaw in the ordinance, in the
4  Campus-Institutional District ordinance, and I asked my
5  question based on reaction to what appeared to be
6  language that was inadequate needed to be changed,
7  asking what can be done.
8         And, specifically, with the Assistant City
9  Attorney John Strange, who handled land use questions
10 for the city, that was the beginning of my involvement.
11        And I did not -- since I'm not an expert in
12 zoning, I did not draft the amendment, but that would
13 have been the purview and responsibility of the city
14 attorney's office.  It was readily agreed that those
15 flaws existed that --
16   MS. ZYLSTRA:  And I'm going to -- Counsel, I'm
17 not certain if he's going to talk about communications
18 with Attorney Strange.
19        Can we have the same stipulation that we had
20 yesterday that it's not a wholesale waiver on privilege
21 if he reveals communications he had with Attorney
22 Strange?  I'm not sure he was going to.  I'm --
23   MR. INGRISANO:  Yeah, I mean, if he's -- one
24 followup I had about that stipulation from yesterday,
25 Counsel, was that I guess if this stipulation applies --

Page 84

1  you know, we talked about the stipulation yesterday with
2  respect to George Hank.
3         If that stipulation applies, it's going to be
4  applied again here today, I want to confirm that it will
5  be applied again tomorrow with respect to Mr. Tucker as
6  well, so that it won't be -- so there won't be kind of
7  selective -- basically selective and incomplete
8  assertions of privilege.
9    MS. ZYLSTRA:  I would agree with respect to
10 the topics that have been covered.
11   MR. INGRISANO:  Yes.  So far?
12   MS. ZYLSTRA:  So far.  To the extent that --
13 and I don't agree that it would cover any of my
14 communications, any of the litigation communications,
15 anything of that nature.
16   MR. INGRISANO:  I agree.
17   MS. ZYLSTRA:  But with respect to the specific
18 topics you've covered so far, I would agree with that.
19   MR. INGRISANO:  Okay.  That's fine.  So, yes.
20 So if Mr. Evers describes communications with
21 Mr. Strange, Mr. May --
22   MS. ZYLSTRA:  With regard to the topics you've
23 covered so far and --
24   MR. INGRISANO:  With regard to topics we
25 discussed yesterday and the topics that we -- as we go

Page 85

1  along today, that I will agree that that does not create
2  a subject matter waiver that I will try to enforce with
3  respect to other lines of questions or other witnesses.
4    MS. ZYLSTRA:  Okay.
5    MR. JEAN-LOUIS:  Topics that we've applied the
6  stipulation to.
7    MS. ZYLSTRA:  I think that's what he said.  I
8  think we are all on agreement on that.
9         So, I'm sorry.  I interrupted the witness
10 because I was unclear whether he was disclosing any such
11 communications or not.
12        I don't know whether you want the witness to
13 try and continue answering the question or who you would
14 like to --
15   MR. INGRISANO:  Can you reread, please, the
16 last -- let's just say, four or five lines of the
17 witness's answer.
18   THE REPORTER:  I'll just read the whole
19 answer.
20   (Record read.)
21   Q.   Readily agreed that those flaws existed.  Can
22 you continue your answer, sir, to the extent that you
23 were going to have more to say?
24   A.   Well, your question asked -- if you could
25 rephrase the question.  It's been some -- removed since

22 (Pages 82 - 85)

Page 86

1 the question was asked, so --
2    Q.   What involvement did you have with the
3 amendment?
4    A.   I asked if it were possible to do something to
5 address the flaws in the Campus-Institutional District,
6 and then the city attorney's office began working on it.
7    Q.   The characterization of the contents of the
8 ordinance as being flawed or being a flaw, whose
9 characterization of the ordinance was that?
10    A.   I don't recall.
11    Q.   You mentioned conversations with staff and
12 specifically John Strange.
13        How many conversations are we talking about?
14    A.   I don't recall.
15    Q.   And did those conversations occur in
16 face-to-face meetings, telephone, email, or a
17 combination?
18    A.   I don't recall specifically, but probably
19 mostly during phone calls, I would say.
20    Q.   And you said that those conversations began
21 after the zoning board of appeals issued its ruling
22 affirming those official notices that had been issued to
23 Edgewood; correct?
24    A.   Yes.  Right.  Based on the testimony that was
25 given and the transcript of -- you know, if you go back

Page 87

1 and place yourself in that meeting, there were questions
2 that came up that -- evidence of these flaws, yes.
3    Q.   So I'm just asking about timing, sir.
4        So your conversations with city staff and
5 Mr. Strange, those occurred --
6    A.   After.
7    Q.   -- after the zoning board of appeals had made
8 its determination against Edgewood; correct?
9    A.   Correct.
10    Q.   Thank you.  Other than Mr. Strange, what other
11 city staff -- after the zoning board of appeals'
12 decision comes down and you start having these
13 conversations with city staff in addition to
14 Mr. Strange, what other city staff were you having
15 conversations with?
16    A.   I think it was just John Strange.  I can't
17 think of anybody else that would have been responsible
18 for making an amendment to an ordinance.
19    Q.   Did you ask Mr. Strange to draft an ordinance
20 fixing the flaws that you saw in the provision or did he
21 suggest that course of action?
22    A.   I asked what could be done in order to address
23 these flaws not being an expert in these matters.  Kind
24 of that's what alders do since we are not professionals
25 in this regard.  And he gave an answer as to what could

Page 88

1 be done which was to draft an amendment to the
2 ordinance.
3    Q.   You asked him to go ahead and proceed with
4 that course of action?
5    A.   Yes.
6    Q.   Your experience with the city attorney's
7 office, do they draft proposed amendments to ordinances
8 without a request from an alder to do so?
9        MS. ZYLSTRA:  Objection.  Foundation, form.
10 You can answer.
11    A.   I don't know if they do or they don't.  I know
12 that they -- or do they do this without?
13        I think your question, if I understand it --
14 you can correct me if I'm wrong -- is do they operate
15 without the request of an alder.  I don't know.
16        But I know that when an alder requests, that
17 is a common path for a change in the ordinance.
18        In my experience in being on council, it seems
19 to me there are times when the city attorney's office on
20 their own volition noticing something that needs to be
21 changed or updated to circumstances changed.
22    Q.   Sure.
23    A.   Amendments tend to be reactive, not proactive.
24 Original legislation tends to be more prospective and
25 proactive.  But amendments address, you know, new

Page 89

1 eventualities, new things that come up.
2        And so I imagine, if I understand correctly --
3 and the city attorney's office can correct me later if
4 I'm wrong -- that while one avenue would be an alder
5 instigating this or requesting it, it could also come
6 out of the mayor's office, it could come from staff
7 recognizing something that needed to be changed.
8        So there is probably multiple parallel paths
9 to making updates to the ordinance.
10    Q.   If I understand your testimony correctly, sir,
11 in this particular instance, if I could summarize, you
12 asked Mr. Strange what could be done, he said you could
13 draft an amendment, and you asked him to proceed with
14 that path; correct?
15    A.   Correct.
16    Q.   When did you request Mr. Strange to draft that
17 ordinance amendment?
18    A.   It would have been sometime in the first week
19 of August 2019.
20    Q.   Did that request come in the same
21 communication or conversation in which Mr. Strange
22 advised you of what could be done?
23    A.   I believe so.  I cannot recall entirely the
24 substance of that conversation, but I believe it was
25 either the same conversation or perhaps a follow-up

Page 90

1 conversation shortly thereafter.
2    Q.  Okay.  Thank you.  What was the purpose --
3       MS. ZYLSTRA:  Counsel, I apologize.  You had
4 said yesterday you wanted me to say "stipulation" on
5 every question, and you just asked several questions of
6 which involve that same communication.
7       Could we please have that stipulation be for
8 those prior questions?
9       MR. INGRISANO:  I will retroactively --
10      MS. ZYLSTRA:  Thank you.
11      MR. INGRISANO:  -- confer the stipulation upon
12 those questions.
13      THE WITNESS:  I don't know what any of this
14 means, but --
15      MR. INGRISANO:  No, this is counsel
16 cooperating to avoid unnecessary disputes.
17      MS. ZYLSTRA:  And I trust you want me to
18 continue to say that?  Or do you want to give me a
19 continuing with respect to the topics --
20      MR. INGRISANO:  With respect to communications
21 with the development of the ordinance, communications he
22 had with Mr. May, Mr. Strange regarding the amendment to
23 the ordinance, we can agree on a stipulated that.
24      If you think I've exceeded that subject matter
25 area, you should probably raise it fresh, but I will be

Page 91

1 talking about the amended ordinance for awhile.
2       MS. ZYLSTRA:  Okay.  Thank you very much.
3    Q.  Mr. Evers, what was the purpose of the
4 amendment; what flaws were you attempting to fix?
5    A.  It was an attempt to address a flaw that would
6 allow a landowner to proceed with a significant change
7 of use that would be in contrast with the explicit
8 Statement of Purpose as articulated in the
9 Campus-Institutional District.
10      And if I might read without being suggestive
11 that this is a stump speech, that there were some
12 statements in the Statement of Purpose that were
13 evocative of what was lacking in the actual application.
14 And --
15   Q.  So --
16   A.  So let me finish.
17   Q.  You believe the amendment was necessary to
18 comport the intent of the statute with what was
19 written --
20   A.  In the Statement of Purpose to permit
21 appropriate institutional growth within boundaries while
22 minimizing the adverse effects associated with the
23 development and geographic expansion, point A.
24      Point B, balance the ability of major
25 institutions to change and the public benefits derived

Page 92

1 from change with the need to protect the livability and
2 vitality of adjacent neighbors.
3       And then point C, encourage the preparation of
4 campus master plans that enable adjacent neighborhoods
5 and the broader community to understand the levels of
6 development being proposed, their likely impacts, and
7 appropriate mitigation measures.
8       The Statement of Purpose, which the preamble
9 says is to, you know, accommodate the growth and
10 development needs of these institutions and to
11 coordinate the master plans of these institutions with
12 city plans, including the comprehensive plan, policy,
13 and zoning standards.
14   Q.  So the potential for lights at Edgewood, a
15 potential for a stadium, is what motivated your
16 amendment; is that right?
17      MS. ZYLSTRA:  Objection.  Form.  You can
18 answer.
19   A.  What motivated my amendment was a desire to
20 update the amendment so that the flaws that had been
21 identified, that institutions without a master plan
22 would be able to make substantial use -- substantial
23 changes to their use without addressing the potential
24 for adverse impacts or addressing the issue of
25 livability or vitality of adjacent neighbors.

Page 93

1       So while the Edgewood debate pointed to these
2 flaws, the purpose of the amendment was to address a
3 change in this so that institutions across -- who are in
4 the Campus-Institutional District would abide by the
5 intent of the ordinance itself.
6    Q.  But it was the Edgewood incident,
7 specifically, and the ongoing issues with that stadium
8 that highlighted for you the need for this change; is
9 that right?
10   A.  I don't know, Jonathan, if that's entirely
11 accurate, because it -- I don't know if you read the
12 transcript of the ZBA hearing, but it was suggested that
13 an institution within the CI District could use their
14 open space to have a correctional facility.
15      So, in effect, a high school could be
16 converted into a prison or that -- you know, that
17 farming could take place.
18      And this was considered by everybody present
19 to be somewhat inscrutable and inconsistent with the
20 Campus-Institutional District ordinance itself.
21      So while the debate around Edgewood pointed to
22 one example, there was one of several potential issues
23 that could come forth.
24   Q.  So beyond the hypothetical and potential
25 issues that could arise, the Edgewood stadium and lights

Brown & Jones Reporting            414-224-9533
A Veritext Company            www.veritext.com

Page 94

1 issue was the only actual controversy in existence that
2 pointed you to the need for this change; is that right?
3        MS. ZYLSTRA: Object to form. You can answer.
4    A. Well, it was the only active one, yes. But I
5 would suggest that, as I said before, that efforts to
6 amend an ordinance are reactive to situations as they
7 come up. And one then wants to address the changes so
8 that other situations similar do not come up.
9    Q. You are not aware of any other actual
10 controversy involving a Campus-Institutional zone
11 district that highlighted this issue; is that correct?
12   A. Not entirely so, because there were -- there
13 were residents in district -- in the District 5
14 aldermanic district where West High School, where there
15 was some concern.
16       This came up during the campaign. There was
17 apparently a move that said, well, West High should be
18 able -- should put up lights and have a stadium, which
19 obviously would have been opposed by nearby neighbors.
20       And so that -- while it had not risen to the
21 level of controversy as Edgewood, it was certainly
22 something that the District 5 alder at the time, Shiva
23 Bidar, was aware of and concerned about.
24   Q. Was Shiva Bidar, had she raised the issue of
25 amending the Campus-Institutional zone district prior to

Page 95

1 you raising the issue with John Strange?
2    A. I don't know.
3    Q. The comment regarding West High School and
4 Alder Bidar, were those in a public forum, in a public
5 record?
6    A. I don't recall. I don't -- it's been some
7 time, so I don't recall the source of them.
8       But this was -- apparently, there was a group,
9 I don't know if they've ever formed a Face group or
10 anything like that, but they were lobbying to have, you
11 know, lights on their field so that they wouldn't have
12 to travel to Memorial High School to have their games.
13   Q. What was the name of that group?
14   A. I don't know.
15   Q. And how did you learn of that group?
16   A. Others told me about it, so --
17   Q. Including Alder Bidar?
18   A. I don't recall.
19   Q. Who were the others that told you about it?
20   A. I don't recall.
21   Q. Your proposed amendment in -- strike that.
22       Your amendment only applies to
23 Campus-Institutional districts without master plans; is
24 that right?
25       MS. ZYLSTRA: Object to form.

Page 96

1    A. My amendment addressed the
2 Campus-Institutional District, and I think it addressed
3 -- so I'm not -- again, I don't quite understand your
4 question, but if you could rephrase it, that would help.
5    Q. I'm asking you what -- what
6 Campus-Institutional districts were affected by your
7 amendment.
8       Were the ones with master plans or without
9 master plans affected by the amendment that you
10 sponsored and introduced?
11   A. Well, I believe, to answer your question, that
12 if you look at Section 2, paren D, in a
13 Campus-Institutional District without a Campus Master
14 Plan, the establishment improvement or modification of a
15 primary or secondary use occurring outside with an
16 enclosed building shall require conditional use
17 approval.
18       So it was directed, this particular part of
19 it, although there were other changes that were made in
20 the course of the 3rd Substitute, I did address those
21 institutions without a Campus Master Plan.
22   Q. At this period of time in early -- first week
23 of August 2019, what Campus-Institutional districts that
24 you were aware of had master plans?
25   A. I think you want to rephrase your question,

Page 97

1 because the individual institutions are not
2 Campus-Institutional districts. Could you rephrase?
3    Q. Yeah, which properties had master plans?
4 Which Campus-Institutional zone districts had master
5 plans?
6    A. Edgewood High School and University of
7 Wisconsin at Madison -- not Edgewood High School, excuse
8 me, the Edgewood campus, which would include the three
9 different schools -- the college, the high school, and
10 the campus school.
11   Q. What impact, if any, did you intend your
12 amendment have on Edgewood's ability to obtain lights
13 for its field?
14       MS. ZYLSTRA: Object to form. You can answer.
15   A. The purpose of the amendment was to address
16 the flaw in the Campus-Institutional District, as it was
17 originally written and published into law in 2013, that
18 provided a loophole of sorts for campus institutions
19 without a master plan to make substantial changes to
20 their use without considering the potential for adverse
21 impacts affecting the livability and vitality of
22 adjacent neighborhoods.
23       So the goal was to be able to ensure that the
24 process that was in place, in the drafting of the
25 ordinance, to ensure neighborhood participation, i.e., a

Page 98

1 process of amending a master plan, or a process that was
2 in place in other districts that are not zoned CI, that
3 if they were to make those changes, i.e., a conditional
4 use.
5      And if I may request, it says it quite clearly
6 in the drafter's analysis of the amendment exactly what
7 the purpose of it is.  And if you want to enter that
8 into evidence I can read from that.  If you want to
9 copy --
10 Q.  No, sir.  I want an answer, actually, to my
11 question.
12      MR. INGRISANO:  Can you read back my question,
13 please.
14      (Record read)
15      MS. ZYLSTRA:  Same objection.  You can answer.
16 A.  To go through a process that was recognized
17 within the drafting of the ordinance itself.
18 Q.  So you wanted Edgewood's lights to go through
19 a conditional use permit process; correct?
20 A.  I wanted Edgewood to go through a process of
21 either conditional use or to go through the amendment
22 process, that there needed to be some kind of review
23 process as articulated in the intent of the campus, the
24 CI District itself.
25      It seemed to be quite obvious that was the

Page 99

1 intent of the ordinance from the very beginning.
2 Q.  You weren't involved with the drafting of the
3 ordinance in 2013?
4 A.  No, I was not.  I was not elected at that time
5 and I did not participate in any of the meetings that
6 neighbors held with Edgewood, and I was not a member of
7 the Edgewood Neighborhood Liaison Committee.
8 Q.  You were aware, were you not, that if the
9 Edgewood Master Plan was repealed without your amendment
10 that Edgewood would be entitled to get its lights under
11 the existing ordinance; correct?
12 A.  I understood that to be part of the flaw that
13 existed in the Campus-Institutional District, unintended
14 flaw, as it was drafted, yes.
15 Q.  You also recognize that if the Edgewood Master
16 Plan was repealed before your amendment there was
17 passed, Edgewood would have also been entitled to its
18 lights; correct?
19      MS. ZYLSTRA:  Objection.  Form.  You can
20 answer.
21 A.  Can you say that again, please?
22 Q.  Sure.  You also recognize, do you not, that if
23 Edgewood's Master Plan had been repealed before your
24 amendment passed that Edgewood would have been entitled
25 to its lights?

Page 100

1      MS. ZYLSTRA:  Same objection.  You can answer.
2 A.  Well, first of all, it wasn't just merely my
3 amendment.  I guess I want to say that, you know, it was
4 -- it was one -- this may not speak to your issue.
5      It was voted unanimously by Plan Commission
6 and only one council member objected, so it wasn't no
7 longer my amendment.  But it was my understanding that
8 if Edgewood, in the absence of a Campus Master Plan that
9 would create the possibility that they could go forward
10 with a -- without due process, without a process where
11 the interests of community and the partnership with the
12 neighbors that Edgewood had engaged in, in a four-year
13 process of developing that master plan, that they would
14 go ahead and do this without consideration.
15      So the answer to your question is yes.
16 Q.  "Yes" in terms of order of operation, if
17 Edgewood's Master Plan was repealed before your
18 amendment was repealed, Edgewood would get its lights.
19 That's what you just answered?
20      MS. ZYLSTRA:  Objection.  Form.
21 A.  I don't really -- since I'm -- I don't really
22 know if there weren't additional steps that were
23 required for Edgewood to be able to get their lights in
24 the absence of a master plan, not being a land use
25 attorney.

Page 101

1      What I do know is that if it were repealed,
2 there was this loophole and it appeared that Edgewood
3 was prepared to take advantage of this loophole.
4      I do not know with any degree of certainty if
5 it meant they automatically would get their lights if
6 there wasn't some other additional process.
7      But it seemed the concern that I had and that
8 others had that some kind of process should be required,
9 according to the purpose of the CI District, either you
10 amend the master plan to be able to make that
11 substantial change of use or you go through conditional
12 use, which again is very consistent with, you know, city
13 process.
14 Q.  Did Mr. May, Mr. Strange, Mr. Tucker, or any
15 other alder ever advise you that your amendment would
16 have to be passed before Edgewood's Master Plan repealed
17 in order to prevent lights from going on without a
18 conditional use permit?
19 A.  I do not --
20      MS. ZYLSTRA:  Same stipulation?
21      MR. INGRISANO:  Yes.
22 A.  I don't recall.
23      MR. INGRISANO:  Want to take a break?
24      THE VIDEOGRAPHER:  We are off the record at
25 12:04 p.m.  This is the end of Media Unit No. 2.

Page 102

1      (Recess)
2      THE VIDEOGRAPHER:  We are back on the record
3  at 12:37 a.m.  This is the beginning of Media Unit No.
4  3.
5  BY MR. INGRISANO:
6      Q.   Mr. Evers, that first week of August 2019 when
7  you were having your conversations with John Strange, do
8  you recall talking about that?
9      A.   You mean in reference to previous questions,
10 yes.
11     Q.   Yeah.  Regarding what can be done about the
12 ordinance and your request that he go ahead with his
13 notion of drafting an amendment, right?
14     A.   Right, yes.
15     Q.   Did you discuss with Attorney Strange in those
16 conversations your hypothetical of the correctional
17 facility?
18     A.   I don't recall.
19     Q.   But during those conversations the notion of
20 the correctional facility, that was a potential problem
21 that was in your mind at that time?
22     A.   It was an example of different kinds of
23 problems that could occur, yes.
24     Q.   You've described the amendment as attempting
25 to fix a flaw, close a loophole; is that accurate?

Page 103

1      A.   I believe I used those words, yes.
2      Q.   Have you ever heard Mr. Tucker describe --
3  describe what was being addressed as either a loophole
4  or a flaw?
5      A.   I don't recall.
6      Q.   Do you know what Mr. Tucker's involvement was
7  in the drafting of the Campus-Institutional District
8  zoning?
9      A.   I don't recall specifically.
10     Q.   With respect to the amendment itself, I
11 believe I understood you to say -- and please correct me
12 if I'm wrong -- that John Strange was the drafter of the
13 actual amendment?
14     A.   I believe that's correct, to the best of my
15 knowledge.  I don't know if others within the city
16 attorney's office or who he may have conferred with, I
17 don't know.
18     Q.   But was Mr. Strange the -- he was the person
19 that you were dealing with, with respect to the details
20 of that amendment being drafted; correct?
21     A.   Yes, in his role as assistant city attorney
22 who covered land use issues, yes, that's correct.
23     Q.   And there were no other persons from the city
24 staff -- city attorney's staff you were dealing with?
25     A.   Not that I recall.

Page 104

1      (Exhibit 18 marked)
2      Q.   MR. INGRISANO:  Mr. Evers, do you recognize
3  Exhibit 18?
4      A.   Yes.
5      Q.   And what is Exhibit 18, sir?
6      A.   Legistar File No. 56981, I believe, is the
7  draft of the amendment to the CI District ordinance, the
8  3rd Substitute which means it was the third version of
9  the draft of the ordinance change.
10     Q.   On the first page of Exhibit 18 there are
11 multiple sponsors listed.  Do you see that?
12     A.   Yes, I do.
13     Q.   Is it fair to say, however, that you were kind
14 of the initial or original sponsor of this amendment?
15     A.   I was the lead sponsor.  That is correct.
16     Q.   And in looking -- I'm to trying to track the
17 process here.
18          The file number, 56981, that was the file
19 number assigned for all drafts and versions of the
20 amendment we're talking about; correct?
21     A.   I believe that's so, yes.
22     Q.   And that's the number that would be listed and
23 referred to in Common Council or Plan Commission
24 agendas; correct?
25     A.   I believe that's so, yes.

Page 105

1      Q.   When I look at page 3 of this Exhibit 18, sir,
2  where halfway down the page, it says, "Text of
3  Legislative File 56981."
4          Do you see that?
5      A.   Yes.
6      Q.   And then there is a subsection for "Title";
7  right?
8      A.   Yes.
9          MS. ZYLSTRA:  I'm sorry, Counsel, can you help
10 me?  I'm not sure where you are.
11         MR. INGRISANO:  Are you on page 3?
12         MS. ZYLSTRA:  Oh, oh, I apologize.  I just
13 caught up.
14         MR. INGRISANO:  That's okay.
15     Q.   Do you know who's responsi -- or do you know
16 who drafted the title for this 3rd Substitute?
17     A.   I do not, no.
18     Q.   Where it says, "Body" and "Drafter's
19 Analysis," do you know who drafted that language?
20     A.   I cannot say for sure, but it would be
21 standard practice for the individual in the city
22 attorney's office who took a principal role in drafting
23 the -- drafting the ordinance, either resolution or
24 amendment or new ordinance or anything like that, the
25 drafter's analysis is usually, as far as I know, written

27 (Pages 102 - 105)

Page 106

1 by a member of the city attorney's office.
2    Q.  It was not drafted by you?
3    A.  That is correct.
4    Q.  And to your knowledge not by any alder?
5    A.  To my knowledge, yes.  To my knowledge.
6    Q.  So Mr. Strange would be the likely person who
7 would best be able to talk to me about who drafted that
8 and its contents; is that fair?
9       MS. ZYLSTRA:  Objection.  Foundation.  You can
10 answer.
11    A.  I cannot say for sure, but to the best of my
12 knowledge, yes.
13    Q.  But if you had a question about anything in
14 that section of, you know, whether it's fiscal note,
15 title, body, if you had a question about that, John
16 Strange would be the person you would talk to; correct?
17       MS. ZYLSTRA:  Objection.  Form, foundation.
18 You can answer.
19    A.  Based on my understanding at the time, that
20 Assistant City Attorney Strange was responsible for
21 drafting the ordinance, yes, if I had questions I would
22 have addressed them to Mr. Strange.
23    Q.  Sure.  You asked Mr. -- let me ask you this:
24       Starting on page 4 of this Exhibit 18 where it
25 says, "The Common Council of the City of Madison do

Page 107

1 hereby ordain as follows."
2       Do you see where I am?
3    A.  Yes.
4    Q.  What follows there is your understanding, is
5 it not, of the specific changes to the ordinance that
6 are -- that were being approved -- that was approved as
7 of 10/1/2019; correct?
8    A.  Not every line represents.  But if you wish
9 for me to help you here on being specific, the
10 underlined statements represent new language, and things
11 that were crossed out would represent, perhaps, one of
12 the iterations or changes that were made on the way to a
13 3rd Substitute.
14    Q.  Got it.  And this 3rd Substitute was adopted
15 and approved on October 1, 2019; correct?
16    A.  I believe that's correct.
17    Q.  And if you were looking to highlight or
18 contrast the changes made from the existing or
19 pre-existing ordinance to the amended or revised
20 ordinance, page 4 and 5 of this document would highlight
21 that for you; correct?
22       MS. ZYLSTRA:  Objection.  Form, foundation.
23 You can answer.
24    A.  Were there -- I'm also looking at other pages,
25 so -- which I don't -- haven't had time to take a look

Page 108

1 if there are any differences between the first five
2 pages and the pages that follow.
3       But I would say that, as I said before, that
4 the underline -- that this is marked up so that one who
5 is following along can see the changes that were made to
6 the ordinance and also changes that were made in the
7 various iterations to get to the point of a 3rd
8 Substitute.
9    Q.  Thank you very much.
10       When you asked Mr. Strange to go ahead and
11 draft the ordinance in that first week of August, was it
12 your understanding that he was, at that time, beginning
13 the process of putting pen to paper to draft the change?
14    A.  To the best of my knowledge, I assume so.  I
15 had no -- did he start that day, did he start the next
16 day?  I don't have any information to say one way or
17 another, but I assumed that he was getting started,
18 sure.
19    Q.  You don't have any reason to think that he had
20 begun that process earlier, right, in July?
21    A.  I cannot say for sure, but I do not believe he
22 had started that on the basis of the conversations that
23 I had with him in early August.
24    Q.  Do you have knowledge of any other person who
25 was consulted or otherwise somehow contributed to the

Page 109

1 language that was being employed in the first draft of
2 the ordinance?
3    A.  I cannot say for sure, and I don't recall.
4 Since I was not in daily consultation with Assistant
5 City Attorney Strange, I do not know who he consulted
6 with.
7    Q.  Sure.  In between the period of time that
8 first week of August and 10/1 of 2019 when the 3rd
9 Substitute was approved and adopted, were you receiving
10 drafts of the ordinance from Mr. Strange?
11    A.  Well, yes, I would have, because, if you'll
12 recall, there was a meeting on August 26 of the Plan
13 Commission, and I believe at that time the second
14 substitute was being considered.
15       So I guess the correct answer, Jonathan, is to
16 the best of my recollection, yes, but as to when and
17 explicitly, I don't recall.
18    Q.  Yeah.  No, that's fine.  I was just wanting to
19 see if you were receiving drafts during this process.
20    A.  I don't recall specifically.  I assume I would
21 have been, yes.
22    Q.  As a sponsor of --
23    A.  Yes.
24    Q.  -- right?  You would -- it's not like you got
25 to 10/1 of 2019 and had no idea what was being approved;

Brown & Jones Reporting          414-224-9533
A Veritext Company          www.veritext.com

Page 110

1 you had seen the different iterations of your amendment
2 that you're sponsoring along the way?
3     A.  Yes.  Let's also not make it sound like I took
4 a leading role in the drafting of this because I'm not
5 an attorney.
6         I was also a new alder with very little
7 experience in terms of what it means to actually draft
8 and write legislation.
9         So I did not actually contribute any language
10 specifically to this change.  It's beyond my ken, beyond
11 my ability.
12        But when the changes were made in response to
13 more information, then you would have to talk to
14 Assistant City Attorney Strange.  And it's not like I
15 was sent a draft and will you sign off on this.  I don't
16 recall that process.  It was me trusting his experience
17 and his knowledge to come up with the appropriate draft.
18     Q.  Sure.  And Mr. Evers, I'm only calling it your
19 amendment because you were the original, initial
20 sponsor.
21     A.  Yeah, I bristle at that a little bit because I
22 felt like it ended up being a city-wide adoption.  But I
23 understand for your point, yeah.
24     Q.  I'm trying to not have to use a bunch of words
25 every time I want to talk about the amendment.

Page 111

1     A.  You just gave me too much credit when you call
2 it the "Evers Amendment."
3     Q.  Well, I don't want to -- I could try calling
4 it "Tag's Law" and --
5     A.  And that would be certainly inappropriate, but
6 that's okay.  We can agree to disagree on that, how's
7 that?
8     Q.  Sounds good.
9         MS. ZYLSTRA:  How about the "CI Amendment"?
10    Q.  When you were receiving -- let me ask you
11 this:
12        At any point in the process, between that
13 first week in August and October 1, in which a 3rd
14 Substitute was adopted and approved, did you share the
15 draft, any drafts, of the amendment with any of your
16 constituents?
17    A.  I don't believe so, but I don't recall.
18    Q.  Do you recall receiving any input from your
19 constituents on -- from any of your constituents on one
20 or more of the drafts?
21    A.  I don't believe so, but I don't recall.
22    Q.  Exhibit 18 where it says "3rd Substitute,"
23 "Title" on the first page.
24    A.  Which page now?
25    Q.  I'm sorry, first page of Exhibit 18.

Page 112

1     A.  Right here?
2     Q.  In that squared off area.
3     A.  Up here?
4     Q.  Yeah, you see that --
5     A.  Yes.
6     Q.  -- encircled in the square?
7         That's the title of the ordinance amendment;
8 correct?
9     A.  I believe so, yes.
10    Q.  When you look up 10/1/2019, we have a final
11 action.
12        Below the blocked off box, it says, "Notes:
13 Introduced from Floor by Title Only 8/6/19."
14        Do you see that?
15    A.  No.  Where -- is this still on the first page?
16    Q.  On the first page right underneath the
17 block --
18    A.  Oh, yes, I see that.  Okay.
19    Q.  It says, "Introduced from the Floor by Title
20 Only 8/6/19."  See that?
21    A.  Yes.
22    Q.  Based on your experience as an alder -- as a
23 second-term alder, what does that mean?
24        MS. ZYLSTRA:  Objection.  Form, foundation.
25 You can answer.

Page 113

1     A.  It's my understanding that there is a process
2 where a resolution or an action of the council can be
3 introduced from the floor and that starts a process then
4 of referrals and then coming back to council for action.
5 But that it -- it needs to first be introduced.
6         It can be introduced as a part of getting on
7 the agenda to introduce, but also at the end of every
8 council meeting there is an opportunity to introduce new
9 business from the floor.  And I believe that was done in
10 this particular instance.
11    Q.  So new business can be introduced from the
12 floor, but it can also be introduced how?
13    A.  It can be introduced, as far as I understand
14 it, if I'm not mistaken, a number of different ways.
15 But it certainly is permissible to introduce something
16 from the floor.
17    Q.  An introduction as part of new business, not
18 -- so not an introduction from the floor, does that have
19 to be done within a certain period of time prior to a
20 meeting?
21    A.  That, I don't know.
22    Q.  Do you recall why this amendment was
23 introduced from the floor?
24    A.  I don't recall entirely, except that we wanted
25 to get started with it.  That's my understanding.

Page 114

1    Q.   Was there any reason why you wanted to get
2  started with it -- 8/6 would be the end of the first
3  week or near the end of the first week in which you had
4  consulted with Mr. Strange.
5         Is there any reason that was driving that
6  timing?
7         MS. ZYLSTRA:  Object to form.  You can answer.
8    A.   I believe that was the first Tuesday after the
9  discussions that were held with Assistant City Attorney
10 Strange.  So that if there was a sense that it was an
11 appropriate step to address the flaws and the
12 sloppiness, the language or whatever you want to call
13 it, in the CI District ordinance, this was our first
14 opportunity to do so.
15        It was the first Tuesday after that
16 discussion, so you can introduce something by title
17 only, which means you do not have to have completed the
18 draft to the resolution or the amendment.
19   Q.   So to the best of your recollection the
20 ordinance had not been drafted as of 8/6?
21   A.   Yeah, by "title only" means that it's
22 introduced by title only.
23   Q.   So by 8/6, you don't recall having received a
24 draft from Mr. Strange?
25   A.   I don't recall this, correct.  That's not to

Page 115

1  say there wasn't one at that time.
2         (Exhibit 19 marked)
3    Q.   Mr. Evers, do you recognize Exhibit 19 as the
4  meeting minutes for the Madison Common Council, approved
5  meeting minutes of the Madison Common Council for its
6  meeting dated Tuesday, August 6th, 2019?
7    A.   Yes.
8    Q.   And so this was the meeting in which your
9  amendment, the CI District amendment -- as counsel has
10 offered to call it -- was introduced on the floor,
11 right?
12   A.   Yes, that is correct.
13   Q.   In fact, if you look at page 36 of this
14 Exhibit 19, there is a section there, "Announcements &
15 Introduction of Items from the Floor."
16        Do you see that?
17   A.   Yes.
18   Q.   And that's got the File No. 56981, that we've
19 previously discussed, represents the amendment that
20 we're talking about?
21   A.   Yes.
22   Q.   And under this listing, 56981, "Sponsors."
23 There is one name listed and that's you?
24   A.   That's correct.
25   Q.   Which is consistent with the idea that you

Page 116

1  were the initial sole sponsor?
2    A.   I was the lead sponsor, right.  And it would
3  be appropriate, I might say, Jonathan, because this was
4  in District 13.
5    Q.   Got it.  And the Common Council took action on
6  the introduction of your item from the floor.  It looks
7  like this was referred for public hearing to the Plan
8  Commission due back on 8/26/19; is that right?
9    A.   That's what it says here, and it appears to be
10 so.
11   Q.   Is that what you recall occurring?
12   A.   I wasn't at that meeting, but that's what the
13 minutes say.
14   Q.   Oh.  Page 1, "Notified Absence."  And you are
15 listed.
16        So you were not present at that meeting; is
17 that right?
18   A.   That is correct, yes.
19   Q.   Again, I'm not familiar with parliamentary
20 procedure or anything like that.
21        How do you as a sponsor introduce something
22 from the floor when you are absent?  Or let me ask more
23 particularly here.
24        How did you introduce this amendment from the
25 floor when you were not present?

Page 117

1    A.   I didn't introduce it from the floor.
2    Q.   Was it announced from the floor?
3    A.   It was introduced, I believe, from another
4  council member, perhaps council president.  I don't know
5  who, but that -- it's not required that I be present to
6  introduce it from the floor.  I was on vacation at the
7  time.
8    Q.   So who introduced it from the floor on your
9  behalf?
10        MS. ZYLSTRA:  Objection.  Foundation.  If you
11 know.
12   A.   I don't recall specifically.
13   Q.   How did you get this on the agenda to be
14 introduced from the floor?
15   A.   I would probably notify council president.
16 And council president drafts the agenda and indicated
17 that there was, you know, work being done with the city
18 attorney's office on this.  We went to introduce this on
19 the floor to get the process moving.
20   Q.   Who was the council president at the time?
21   A.   At that time, Shiva Bidar.
22   Q.   If you didn't introduce this from the floor at
23 this meeting, when would have been the next meeting of
24 the Common Council in which this could have been
25 introduced?

Page 118

1    MS. ZYLSTRA:  I'm going to object to form.
2    A.   I don't know, because I don't have the
3  schedule in front of me.
4    Q.   Is there any set frequency by which the Common
5  Council meets?
6    A.   Generally, council meets every two weeks, but
7  in the month of August, I think there are less meetings.
8  That tends to be perhaps a month of vacation, so I'm not
9  sure.
10   Q.   It's a good time of year to take a vacation.
11   A.   Yeah, I wish I had the time to do so, but
12  maybe this summer.
13   Q.   How would you have requested Alder Bidar to
14  keep this on the agenda to be introduced on the floor?
15   A.   Either a phone call -- probably a phone call.
16  It could have been an email.  I was not able to do so in
17  person since I wasn't there.
18       And I could have also asked -- another
19  possibility would request that the city attorney's
20  office speak to the council president saying, "Can this
21  be introduced from the floor," and then have someone who
22  can -- you know, through Robert's Rules of Order, you
23  know, appropriately introduced.
24   Q.   But you don't have a particular recollection
25  as to how it occurred?

Page 119

1    A.   I actually do not.
2    Q.   Okay.  But somehow, too, though, the title
3  would have been conveyed so that it could be introduced
4  from the floor by title; correct?
5    A.   Yeah, but I didn't -- of course I didn't write
6  the title.
7    Q.   Sure.  So perhaps it's possible that
8  Mr. Strange or his office forwarded that to the Common
9  Council to be included on the agenda?
10   A.   It's possible, yes.
11   Q.   But you don't recall if you would have done
12  that or not?
13   A.   I was on vacation, so I may have spoken to
14  someone.  I may have authorized a process that they
15  could say, yes, we'll handle it, or something like that.
16       But, again, this is 3 1/2 years ago.  I don't
17  necessarily recall three years ago.
18   Q.   The title that you're seeing here on page 36
19  of this document, that was a title that you had -- had
20  you seen that title before --
21       MS. ZYLSTRA:  Objection.  Form.
22   Q.   -- introduced from the floor?
23   A.   I don't recall.
24   Q.   Can you read that title into the record,
25  please?

Page 120

1    A.   "By Title Only - Creating Madison General
2  Ordinance Sections 28.097, paren 2, paren d, and paren
3  e, requiring institutions in the Campus-Institutional
4  District without an approved Campus Master Plan to get
5  conditional use approval for the establishment of open
6  or enclosed stadiums, auditoriums, arenas, indoor or
7  outdoor sports recreational facilities, and agricultural
8  uses and for the installation of stadium lighting,
9  amplified sound, and the establishment or expansion of
10  outdoor seating over a specified capacity."
11   Q.   And that's the title of the amended ordinance
12  that you authorized to be introduced from the floor in
13  your name; correct?
14       MS. ZYLSTRA:  Object to form.  You can answer.
15   A.   I don't recall approving the specific wording
16  of this, but it is the title of -- of what was
17  introduced from title only, yes.
18   Q.   You don't know if you previewed that title
19  before it was introduced?
20   A.   I don't recall.
21   Q.   Do you recall talking with Mr. Strange about
22  what the title should be on your amendment?
23   A.   I do not recall.  I don't recall.
24   Q.   And, sir, would you agree with me that from
25  the title of this document, from the title of this

Page 121

1  ordinance as it was introduced on the floor, it would
2  not address, just based on the title, the correctional
3  facility issue that you had identified previously?
4       MS. ZYLSTRA:  Object to form.  You can answer.
5    A.   I don't -- actually, I don't know, because I'm
6  not an attorney who covers land use issues.  So I'm not
7  sure whether or not that would cover it or not.
8       I do know that there were additional
9  iterations that were made.  And as I said, I did not
10  take specific line-by-line, word-by-word editing of this
11  particular introduction by title only.
12       So whether or not it complied with broad
13  concerns about different examples of what could take
14  place or not, I cannot say because I do not recall.
15   Q.   But you would agree with me that the title
16  itself has limited its application to stadiums,
17  auditoriums, arenas, indoor or outdoor sports
18  recreational facilities, and agricultural uses; correct?
19       MS. ZYLSTRA:  I'll object to form.
20       THE WITNESS:  Are you suggesting I may answer
21  or not?
22       MS. ZYLSTRA:  Oh, I'm sorry.  Yes, go ahead
23  and answer.
24   A.   In this draft it appears to address those
25  issues as you state.

Page 122

1    Q.  And also -- in fairness, it also addresses the
2  issue of installation of stadium lighting, amplified
3  sound, and the establishment and expansion of outdoor
4  seating over a specified capacity; correct?
5    A.  That appears to be the wording of this initial
6  title, yes.
7    Q.  So by the title of this amendment itself, it
8  very specifically applies to the issue that you had been
9  working on involving the Edgewood athletic field;
10  correct?
11      MS. ZYLSTRA: Objection. Form. You can
12  answer.
13    A.  It addressed that. It looks like it also
14  addressed agricultural uses. But it did address the
15  concern around --
16      Yes, I think the answer to your question is
17  yes, but there is -- it looks like there was an attempt,
18  also, as I recall with discussion that came up in the
19  ZBA hearing about how -- that the oaks on the Edgewood
20  campus could have been turned into a -- you know,
21  agricultural purposes and farming, which was not
22  something that the city would be in favor of.
23      So I think there was an attempt to also
24  address that at that time. If you go back and look at
25  the transcript of the ZBA hearing there were a number of

Page 123

1  concerns that were raised.
2    Q.  But none of those concerns made it into the
3  title of the amended ordinance; right?
4      MS. ZYLSTRA: Objection. Form, misstates
5  testimony. You can answer.
6    A.  Agricultural uses are mentioned here, it looks
7  like. Yes.
8    Q.  Page 27 of Exhibit 19, sir. Item 104. Page
9  27, sorry.
10    A.  Yes.
11    Q.  Item 104, File No. 56839 is the proposed
12  repeal of the Edgewood Campus Master Plan; correct?
13    A.  Yes, that's correct.
14    Q.  So this was on the agenda that same day but
15  listed under new business; is that right?
16    A.  Introduction of new business for referral
17  without debate, yes.
18    Q.  And like your amendment introduced from the
19  floor, the Edgewood repeal amendment was referred to the
20  Plan Commission for public hearing due back 8/26/19;
21  correct?
22    A.  Yes, it appears there was a parallel path with
23  these two items.
24    Q.  It was your intention, was it not, sir, that
25  these -- that your ordinance have a parallel path with

Page 124

1  the Edgewood repeal?
2      MS. ZYLSTRA: Objection. Form, foundation.
3  You can answer.
4    A.  My intention was that we move forward with
5  addressing the flaw that was made evident, evidenced by,
6  yes, indeed, the Edgewood debate, but the other issues
7  that were worth reacting to in terms of, you know,
8  potential -- the potential for a landowner to take
9  advantage perhaps of a loophole and do something to the
10  detriment of adjacent neighborhoods.
11    Q.  In fact, it was so important to you, sir, that
12  your amendment be on the same schedule with the Edgewood
13  amendment that you had it introduced from the floor
14  while you were away on vacation; correct?
15      MS. ZYLSTRA: Objection. Form. You can
16  answer.
17    A.  I don't recall actually even knowing -- I
18  don't recall whether I knew that 104 was on the
19  schedule.
20      I opposed the repeal at all times. It was my
21  hope that Edgewood would amend their master plan and I
22  spoke out against repeal at every opportunity.
23    Q.  And what was your rationale for opposing
24  Edgewood's repeal of the master plan?
25    A.  That's an important question, but it would

Page 125

1  take me awhile to answer it.
2    Q.  If you can summarize it briefly that would be
3  great.
4    A.  The master plan took four years of
5  consultation and compromise between the neighbors and
6  Edgewood. I thought it would set a very bad precedent
7  to repeal a master plan halfway through somewhat
8  unilaterally.
9      I believe it was also a question as to what
10  would happen to the agreements that were in the master
11  plan between the neighbors and the institution itself;
12  the college, the high school, and the grade school.
13      There were repercussions but -- you know, and
14  lastly, just in short summary, I'll go back to the staff
15  report in 2014 recommending approval of Edgewood's
16  Master Plan. Staff said that a master plan, in light of
17  past disagreements that were sometimes contentions, the
18  master plan was the best possible tool for addressing
19  the concerns in a proactive, positive manner.
20      So my feeling was that this was the best tool
21  at the time, and given that the CI District did not
22  identify repeal as an option for fixing any problems
23  that would come up, but it identified a process, an
24  amendment process, that comported with the CI district's
25  values, the values of the comprehensive plan that that

32 (Pages 122 - 125)

Page 126

1 was the best way to go. That amending the master plan
2 would have been a much more productive path.
3    Q. I hate to get the long version.
4    A. Sorry for the long version. That is somewhat
5 of a lengthier version than you wanted, I'm sure.
6    Q. Master plan adoption by Campus-Institutional
7 District is a voluntary endeavor, isn't it?
8    A. Yes, it was voluntary for those who were --
9 who were entered in 2014, not for institutions that were
10 new institutions.
11    Q. Was it voluntary for Edgewood?
12    A. It was voluntary for Edgewood at the time,
13 yes.
14        (Exhibit 20 marked)
15    Q. MR. INGRISANO: Mr. Evers, I'm handing you
16 what's been -- the court reporter handed you what's been
17 marked as Exhibit 20.
18        Do you recognize that, sir, as a Legistar
19 printout of the details, the history -- legislative
20 history of your amendment?
21        MS. ZYLSTRA: Object to form. You can answer.
22    A. Yes.
23    Q. And if you look down at the table, the lower
24 part of -- I guess you would say in the middle of the
25 page of Exhibit 20, you see August 6, 2019 referred for

Page 127

1 public hearing at the Common Council.
2        That is consistent with the idea that it was
3 introduced from the floor on that 8/6 meeting; correct?
4    A. I believe so, yes.
5    Q. Below that is a line, August 5, 2019, from the
6 action by attorney's office, action referred for
7 introduction.
8        Do you have any idea what that means?
9    A. I cannot speak with certainty, but I assume
10 that may refer to my -- our conversation or my attempt
11 to answer your previous question as to how did this get
12 introduced from the floor.
13        I believe that, perhaps, the attorney's office
14 at my behest referred it for introduction.
15    Q. Did you receive any copy of any communications
16 on August 5 relating to that referral for introduction?
17    A. I do not recall.
18    Q. So this matter, this ordinance, was, according
19 to this document, referred for public hearing and
20 introduced from the floor the day after it was referred
21 for introduction by the city attorney's office; is that
22 fair?
23        MS. ZYLSTRA: Object to form. You can answer.
24    A. It appears to be so, but I -- yes, that
25 appears to be the case.

Page 128

1    Q. Mr. Evers, how many ordinance amendments have
2 you introduced from the floor in your two terms as an
3 alder?
4    A. I do not recall.
5    Q. More than one?
6    A. I don't recall.
7    Q. Can you recall any ordinance amendment that
8 you have introduced from the floor other than this
9 ordinance to the Campus-Institutional zone district?
10    A. I believe I have, but I can't recall
11 specifically what they are. I would have to get back to
12 you on that.
13        (Exhibits 21 marked)
14    Q. MR. INGRISANO: Why don't you keep that one
15 handy.
16    A. Which, 19 or --
17    Q. Yes, please -- I'm sorry, 20.
18        Mr. Evers, I'm handing you what's been marked
19 as Exhibit 21.
20        Do you recognize that as a printout similar to
21 what we saw in Exhibit 20 detailing that legislative
22 history for the Edgewood Campus Master Plan repeal?
23    A. Yes, I do recall.
24    Q. Sir, looking at that document, at the very
25 bottom you see that it was referred for introduction on

Page 129

1 July 30, 2019?
2    A. I do see that, yes.
3    Q. In your conversations with Attorney Strange
4 that first week of August, was there any discussion
5 about the referral for introduction of Edgewood's Campus
6 Master Plan?
7        MS. ZYLSTRA: Counsel, same stipulation?
8        MR. INGRISANO: Yes.
9    A. I do not recall.
10    Q. So your testimony here today, sir, that the
11 referral for introduction of the repeal of Edgewood's
12 Master Plan in no way contributed to the timing of your
13 request that Mr. Strange draft an amended ordinance?
14    A. My urgency was to fix the -- to address the
15 flaws in the CI District, the Campus-Institutional
16 District.
17        Was I aware that there was a move to repeal
18 the master plan? Yes, but these were parallel paths. I
19 opposed the repeal of the master plan. I continued to
20 oppose it all the way up to January 7, 2020, testifying
21 against it, feeling that it would be -- it would
22 undermine neighborhood trust and it was contrary to the
23 intent of the draft of the original ordinance which
24 never spoke about repeal as an option.
25        If we go back to this page, my desire was that

33 (Pages 126 - 129)

Page 130

1 we address the flaws that were made apparent in the CI
2 District ordinance.
3        MR. INGRISANO:  Can you go back and read my
4 question, please.
5        (Record read)
6    Q.  So from my perspective, sir, what I heard is
7 the answer to my question was, no, it did not?
8    A.  I would say that these were independent
9 actions and that it was more a coincidence rather than
10 driven -- one driving the other.
11   Q.  Great.  Thank you very much.
12       You referenced the approval date for the
13 Edgewood Campus Master Plan on Exhibit 21.
14       I do see that there.  January 7, 2020, adopt
15 and close the public hearing.  Do you see that?
16   A.  Yes.
17   Q.  So that's the date which references the action
18 by the Common Council to adopt and approve the repeal of
19 Edgewood's Master Plan?
20   A.  I believe so.  I believe that is correct, yes.
21   Q.  So the Edgewood Campus Master Plan was
22 referred for introduction on July 30th, 2019, referred
23 first for public hearing on August 6, 2019, and finally
24 adopted on January 7, 2020.  Fair?
25   A.  Correct, yes.

Page 131

1    Q.  The amendment you sponsored to change the
2 Campus-Institutional District ordinance was referred for
3 introduction on August 5, referred for public hearing on
4 August 6, and adopted by the Common Council on October
5 1, 2019; correct?
6    A.  That appears to be correct.
7    Q.  You mentioned that you were aware that
8 Edgewood had elected to seek repeal of its master plan;
9 correct?
10   A.  Yes.
11   Q.  When did you first learn that Edgewood had
12 elected to repeal its master plan?
13   A.  I'm not sure if I read about it in the paper
14 or if I learned it from someone on city staff.  I do not
15 recall.
16       (Exhibit 22 marked)
17       THE WITNESS:  I have -- I was given two copies
18 of this.
19   Q.  Oh.  You only need one.  You got the one
20 that's been marked Exhibit 22 in front of you?
21   A.  Yes.
22   Q.  Thank you, sir.
23       This is a letter dated July 29, 2019 from
24 Edgewood High School to the mayor and Heather Stouder.
25 Do you see that?

Page 132

1    A.  Yes.
2    Q.  Did you see this letter prior to having your
3 conversations with John Strange in that first week of
4 August regarding the amendment to the
5 Campus-Institutional zoning district?
6    A.  I do not recall.
7    Q.  Have you ever seen this letter before?
8    A.  I believe so, but I do not know when I first
9 laid eyes on it.
10   Q.  You don't have a recollection of receiving it
11 on or around July 29?
12   A.  I do not recall.  It would have likely been
13 forwarded to me at some time since this involve District
14 13, but I do not recall when.
15   Q.  When did you -- the conversation with John
16 Strange that first week in August, do you know how those
17 were initiated?
18   A.  By phone.
19   Q.  And do you know who initiated those
20 conversations?
21   A.  I don't recall, but I believe that we may have
22 had a scheduled phone call.  I don't know if I requested
23 it.  I think it's probably something I would have done
24 that requested a call with John.
25   Q.  And do you know when that call was scheduled

Page 133

1 -- let me ask a better question.
2        Do you know when the scheduling of that call
3 occurred?
4    A.  No, I don't recall.  Sorry.
5    Q.  Sir, if Edgewood High School had not elected
6 to repeal its master plan, would you have introduced
7 your ordinance on the floor on August 6, 2019?
8        MS. ZYLSTRA:  Objection.  Form.  You can
9 answer.
10   A.  Well, I can't say for certain in an answer to
11 a hypothetical of what I would or what I wouldn't have
12 done, but I was certainly concerned about -- you know, I
13 don't have the date of the ZBA hearing in front of me,
14 but it was at that time.
15       It was of concern in my mind that, you know,
16 this loophole or this flaw in the CI District existed,
17 and it was necessary or it was incumbent upon us to try
18 to do what we can to address this in short order.
19       So I don't -- I don't have the exact dates,
20 though, of this, what took place.
21   Q.  Mr. Evers, I'm handing you what's been marked
22 as Exhibit 12.
23       Do you recognize that as a letter from City
24 Attorney Michael May that you are copied on on page 2 of
25 Exhibit 12?

Page 134

1    A.  Yes, I do.  I recognize this.
2    Q.  And in this letter from City Attorney May to
3  Edgewood, third paragraph near the bottom of the page,
4  second sentence in the second line:
5       "We invite Edgewood to file to terminate its
6  master plan and return to the standard CI zoning, which
7  would place it on equal footing with other high
8  schools."
9       Do you see that?
10    A.  Yes, I do.
11    Q.  So you were aware, at least as of July 12,
12  that Edgewood had been invited by the city attorney to
13  repeal its master plan; correct?
14    A.  Yeah, and I strongly disagreed with that
15  advice.  I didn't believe it was based on sound legal
16  reason.
17       And I believe that Edgewood already was on
18  equal footing with the other high schools.  It's quite
19  clear they were.  The only difference was in
20  restrictions that they had brought on themselves by
21  agreeing to a master plan.
22    MR. INGRISANO:  I'm sorry, can you read back
23  my question again.
24       (Record read)
25    Q.  I'm trying to filter through your answer.  The

Page 135

1  answer to my question would be, yes, correct?
2       You were aware on July 12, 2017 that Edgewood
3  had been invited to repeal its master plan; correct?
4    A.  Oh, yes --
5    MS. ZYLSTRA:  Wait, wait.  Objection.  Form.
6  You can answer again.
7    MR. INGRISANO:  Well, if he wants to answer
8  the question, that would be great.
9    MS. ZYLSTRA:  Counsel, you asked the question.
10  The first word on his answer I believe was yes.
11    MR. INGRISANO:  Then I'll move to strike the
12  remainder of the answer for being nonresponsive and we
13  can come back here again when I have to depose him a
14  second day.
15    THE WITNESS:  I'm sorry, I don't understand
16  what just happened here.
17    MS. ZYLSTRA:  It's okay, Mr. Evers.
18    Q.  MR. INGRISANO:  When I ask you, Mr. Evers, a
19  yes or no question, to the extent that you can, in
20  fairness, answer a yes or no and not volunteer
21  unnecessary information that would make the day go a lot
22  faster.  Can we agree to that?
23    MS. ZYLSTRA:  I'll object to form.
24       (Exhibit 23 marked)
25    Q.  MR. INGRISANO:  Mr. Evers, I'm handing you

Page 136

1  what's been marked as Exhibit 23, which is an email from
2  John Strange to Nathan Wautier copied to Michael May and
3  Matthew Tucker.  Do you see that?
4    A.  Yes, I see it.
5    Q.  Have you ever seen this email before?  You can
6  take a look at it and read it if you're comfortable with
7  the document.
8    A.  I believe I've seen this before.  When, I'm
9  not sure.
10    Q.  Did you see it before your conversations with
11  John Strange the first week of August 2019?
12    A.  I do not recall.
13    Q.  Did this email have any impact on your
14  decision -- on either your decision to sponsor the
15  ordinance that we're talking about or the timing of this
16  introduction?
17    A.  I do not recall.  Because, again, I don't know
18  when I first saw this email.
19    Q.  Okay.  Did you see this email at any time
20  during the legislative process to enact your ordinance?
21    MS. ZYLSTRA:  I'll object to form.  You can
22  answer.
23    A.  I don't recall.
24    Q.  When you did receive this email, or review
25  this email, did you have any followup with Mr. Strange

Page 137

1  about its contents?
2    A.  I do not recall.
3    MS. ZYLSTRA:  And, Counsel, I've been assuming
4  this is the same subject matter and I don't need to
5  renew the stipulation?
6    MR. INGRISANO:  I see it as the same subject
7  matter.
8    MS. ZYLSTRA:  Thank you.
9    MR. INGRISANO:  So we're in agreement on that.
10       (Exhibit 24 marked)
11    Q.  MR. INGRISANO:  Mr. Evers, I'm handing you
12  what's been marked as Exhibit 24.  It's a memo from
13  Attorney John Strange, assistant city attorney to the
14  Plan Commission, dated August 26, 2019.
15       Do you see that?
16    A.  Yes, I see it.
17    Q.  Did you see this memorandum on or around the
18  time period of August 26, 2019?
19    A.  I do not recall.
20    Q.  Have you ever seen this memo before?
21    A.  I do not recall.  I will say I think I was
22  aware of it.  I recall John Strange saying I have
23  passed, you know, a memo around to Plan Commission
24  members, but I do not recall whether I actually received
25  a copy of it.

Page 138

1    Q.  Third page of this document, page 3, of
2  Exhibit 24, there is a summary of "Impact of passing
3  both Legistar items."  Do you see that?
4    A.  Uh-huh.
5    Q.  Yes?
6    A.  Yes, I do.
7    Q.  And the impact on passing the two Legistar
8  items that are being analyzed in this memo are the
9  Edgewood repeal and the amendment you sponsored;
10 correct?
11   A.  I believe so, yes.
12   Q.  And Mr. Strange concludes, quote, "If both
13 Legistar items are approved by the Common Council on
14 September 3, the practical impact on the ongoing
15 athletic field issue is that Edgewood would be allowed
16 to play games on its existing field, but any improvement
17 or modification of that field will require conditional
18 use approval, regardless of whether such improvement or
19 modification requires the construction of a building and
20 increase in zoning lot area."
21      Did I read that correctly?
22   A.  Yes, you did.
23   Q.  Was that your understanding of the -- is that
24 consistent with your understanding, sir, of the impact
25 of both legislative enactments being approved at the

Page 139

1  same meeting?
2    A.  Was it then or is it now?  Are you asking what
3  I understood then or --
4    Q.  At the time, while your amendment was under
5  consider and in process with the Common Council.
6    A.  I don't recall what I was thinking at the
7  time.  What I was mainly focused on was trying to
8  advance the CI District amendment while opposing repeal.
9       Those were -- that was my testimony, that was
10 my position.  I opposed repeal, so -- but I was in favor
11 of the amendment for the reasons I've stated.
12   Q.  Did you recognize, sir, that your amendment
13 that you sponsored would have limited impact if
14 Edgewood's Master Plan was repealed first?
15      MS. ZYLSTRA:  Objection.  Form.  You can
16 answer.
17   A.  Can you say that again, please?
18      MR. INGRISANO:  Can you read that back,
19 please.
20      (Record read)
21      MS. ZYLSTRA:  Same objections.
22   A.  I don't recall what I thought at the time, and
23 I didn't understand that to be the case.  It looks like
24 from the reading here that if they were both passed at
25 the same time that it would have the effect of Attorney

Page 140

1  Strange indicates here.
2    Q.  My question, though, didn't relate to
3  simultaneous approval; it related to if Edgewood's
4  amendment was -- if Edgewood's repeal was passed first.
5       So is it your understanding, sir, then or now,
6  that Edgewood's repeal, if it occurred first, would
7  limit the impact or the applicability of your sponsored
8  amendment on its athletic field?
9    A.  On Edgewood's athletic field, that appears to
10 be correct as far as -- as much as you stated, yes.
11   Q.  Was that your understanding at the time while
12 your amendment was under consideration in its various
13 iterations and amendments?
14      MS. ZYLSTRA:  Objection.  Form.  You can
15 answer.
16   A.  Yeah, I guess I understood that as to be the
17 case.
18      But, again, my entire focus was on trying to
19 get this one passed for the reasons that I've stated
20 while opposing Edgewood's desire to repeal their
21 ordinance.  I felt like amendment was the way to go.
22   Q.  Okay.  Thank you.
23      So, we saw on 8/6 in the Common Council, the
24 amendment you sponsored and the Edgewood proposed repeal
25 master plan were both referred to the August 26 Plan

Page 141

1  Commission meeting; correct?
2    A.  That is correct.
3       (Exhibit 25 marked)
4    Q.  MR. INGRISANO:  Mr. Evers, I'm handing you
5  what's been marked as Exhibit 25.
6       Do you recognize that as the approved meeting
7  minutes for the City of Madison Plan Commission dated
8  Monday, August 26, 2019?
9    A.  Yes.
10   Q.  And if I'm reading this correctly -- and,
11 again, I probably look at these documents a lot less
12 often than you do.
13      You were present at that meeting; correct?
14   A.  I was.  Yes, I was.
15   Q.  If you look at page 4 of this Exhibit 25, we
16 see your -- the amendment that you sponsored.  It's 2nd
17 Substitute came before the Plan Commission on page 4,
18 item 10; correct?
19   A.  Yes, that is correct.
20   Q.  And the activity on that agenda item looks
21 like it spans page 4, 5, and 6; correct?
22   A.  It appears to be the case, yes.
23   Q.  A lot of folks registered in support and in
24 opposition to your amendment to be sponsored; correct?
25   A.  Yes, it looks like there was considerable

36 (Pages 138 - 141)

Page 142

1 testimony.
2    Q.   Ultimately, as I read this, the amendment you
3 sponsored was re-referred to public hearing to the Plan
4 Commission to be returned by September 16, 2019.
5        Do you see that?  On page 5.
6    A.   Yes, I see that.
7    Q.   Is that an accurate statement of the action
8 taken on that amendment -- that proposed amendment that
9 day?
10    A.   I believe so, yes.
11    Q.   And, again, please forgive my ignorance.
12        What's it mean to re-refer for public hearing
13 to the Plan Commission?
14    A.   I think that this means it would come back to
15 the Plan Commission for further discussion, presumably
16 to get questions answered from staff on specific
17 subjects.
18    Q.   And as you look at page 7, item 14, File No.
19 56839, that's the Edgewood repeal of its master plan
20 being taken up for action; correct?
21    A.   Correct.
22    Q.   And like the amendment you sponsored, a lot of
23 folks interested in that proposed action one way or the
24 other?
25    A.   Yes, that's correct.

Page 143

1    Q.   And like the amendment you sponsored, the
2 Edgewood repeal was also re-referred for public hearing
3 to the Plan Commission due back that same day.  Do you
4 see that?
5    A.   Yes, that's correct.
6    Q.   So far, through August 26, 2019, the Edgewood
7 repeal and the amendment you sponsored are on the --
8 they have been heard twice now in the same year?
9        MS. ZYLSTRA:  Object to form.
10    Q.   Correct?
11    A.   Well, August 26, they were both heard the
12 first time.
13    Q.   Got it.  They were introduced at the same
14 hearing on August 6, and they were heard for the first
15 time together on August 26?
16    A.   That is correct.
17    Q.   Okay.  Thank you.  Again, I'm new to the whole
18 legislative process.
19    A.   Hey, I'm still new to it.  It's complicated.
20    Q.   Good time for a break?
21    A.   Sure.
22        MR. INGRISANO:  Want to take five?
23        THE VIDEOGRAPHER:  We are off the record at
24 1:48 p.m.  This is the end of Media Unit No. 3.
25        (Recess)

Page 144

1        THE VIDEOGRAPHER:  We are back on the record
2 at 1:57 p.m.  This is the beginning of Media Unit No. 4.
3 BY MR. INGRISANO:
4    Q.   Mr. Evers, you saw from Exhibit 25 that both
5 the Edgewood repeal and the amendment you sponsored were
6 re-referred to the Plan Commission for September 16;
7 correct?
8    A.   Correct.
9        (Exhibit 26 marked)
10    Q.   MR. INGRISANO:  Sir, I've handed you what's
11 been marked as Exhibit 26.
12        Do you recognize this as the approved meeting
13 minutes for the Plan Commission for its meeting dated
14 Monday, September 16, 2019?
15    A.   Yes, I do.
16    Q.   You were present at this meeting?
17    A.   I was, yes.
18    Q.   If you go to page 6 of this document, we see
19 item 18 --
20    A.   Yes.
21    Q.   -- is the amendment you sponsored.  It's 3rd
22 Substitute was coming on for action; correct?
23    A.   Yes, that's correct.
24    Q.   And the action taken, as I read this document,
25 was that the Plan Commission recommended it go to the

Page 145

1 council -- I assume that's the Common Council -- to
2 adopt with recessed public hearing.  Is that fair and
3 accurate?
4    A.   Yes, both was recommend to adopt.
5    Q.   Okay.  So going then to page 7, and looking at
6 the section that says, "Upcoming Matters - October 14,
7 2019." Do you see that?
8    A.   Yes.
9    Q.   The third dash or third bullet point says:
10        2219 Monroe Street and 1000 Edgewood College
11 Drive - Repealing the CI zoning master plan for the
12 Edgewood Campus, paren, College, High School and Campus
13 School, on their request.
14        Do you see that?
15    A.   Yes, I do.
16    Q.   So both have been referred to the plan council
17 for this hearing.
18        Do you have any understanding as to how
19 Edgewood's agenda item got moved to an upcoming matter
20 to be considered on October 14, 2019?
21    A.   Yes, because it was referred at the September
22 3rd meeting of the Common Council.
23    Q.   Did Edgewood request it be referred?
24    A.   No, Edgewood did not.
25    Q.   Did Edgewood oppose it being referred?

37 (Pages 142 - 145)

Page 146

1     A.   Yes, they did.
2     Q.   Why was it referred?
3     A.   Because the request principally of the three
4   council members who sat on the -- who sit -- who sat,
5   because not all of them are still on Plan Commission --
6   had a lot of questions, questions about what they
7   considered to be a complex subject; that being the
8   repeal of the master plan, and they needed more
9   information.  They requested more information.  They
10  needed more information.
11       (Exhibit 27 marked)
12     Q.   MR. INGRISANO:  I'm handing you what's been
13  marked as Exhibit 27.
14       Do you recognize that as the Common Council
15  September -- sorry, proceedings approved for the Common
16  Council meeting dated Tuesday, September 3, 2019?
17     A.   I do, yes.
18     Q.   And is this the meeting or proceeding in which
19  Edgewood's agenda item was moved to October?
20     A.   I believe so, yes.
21     Q.   We see on page 7 on this document, item 17,
22  the amendment you sponsored, File 56981, was under
23  review in this meeting; correct?
24     A.   Yes, it's on the agenda here.
25     Q.   And the agenda is under a subheading called

Page 147

1   "Report of Plan Commission."  Do you see that?
2     A.   Yes, I do.
3     Q.   Does that mean anything to you as to what was
4   heard and done with the amendment you sponsored that
5   day?
6       MS. ZYLSTRA:  Objection.  Form.  You can
7   answer.
8     A.   It is the kind of protocol that when something
9   gets referred from Plan Commission that shows up on the
10  agenda, the Plan Commission makes recommendations for a
11  referral.  It's just a recommendation.
12       And so we don't have to approve that
13  recommendation, but in this -- quite often, they are.
14  But there is instance where that recommendation, you
15  know, doesn't take place.
16       In this instance, the recommendation was to
17  comply with a request to have it referred back to Plan
18  Commission at their next meeting, which I believe it was
19  September 16.
20     Q.   Got it.  And it says there, bottom of page 7,
21  "A motion was made by Bidar, seconded by
22  Harrington-McKinney, to re-refer for recessed public
23  hearing to the Plan Commission.  The motion passed by
24  voice vote/other."  Do you see that?
25     A.   Yes.

Page 148

1     Q.   And so with that action, the amendment you
2   sponsored still remained and was heard next at the Plan
3   Commission on September 16 as detailed in Exhibit 26,
4   right?
5       MS. ZYLSTRA:  Object to form.  You can answer.
6     A.   I believe that's correct, yes.
7     Q.   Now, the following page, page 8, is the agenda
8   item for the repeal of the Edgewood plan, item 20, File
9   No. 56839; correct?
10     A.   Yes, that's correct.
11     Q.   And the motion was made on that by the same
12  Alder Bidar, and seconded by the same Alder
13  Harrington-McKinney; correct?
14     A.   Yes, that's the president and vice president.
15     Q.   And it looks like the language for item 17 and
16  the language from item 20 with respect to the motion
17  made to re-refer for recessed public hearing to the Plan
18  Commission is the same; correct?
19     A.   I can't -- well, the motions both involved
20  re-referral.  That is correct, yes.
21     Q.   The re-referral to the Plan Commission for the
22  Edgewood repeal was apparently referred to the October
23  meeting, whereas the referral for the amendment you
24  sponsored was continued to be referred to the September
25  Plan Commission meeting; correct?

Page 149

1     A.   That is correct, yes.
2     Q.   And you said that the reason for the referral
3   for the Edgewood repeal to October was because the
4   council had questions about the Edgewood repeal;
5   correct?
6       MS. ZYLSTRA:  Objection.  Form.  Go ahead.
7     A.   Specifically, not just council; the council
8   members, the three council members -- Alder Heck, Alder
9   Rummel, and Alder Lemmer -- who sat on Plan Commission,
10  spoke in favor of re-referral to the October 14th Plan
11  Commission meeting giving a number of different reasons
12  why they thought that would be in order.
13       (Exhibit 28 marked)
14       MS. ZYLSTRA:  I'm sorry, I reserve my
15  objection to this exhibit.  Certainly, it's not an
16  exhibit that's been produced in discovery to us.
17       MR. INGRISANO:  Sure.  I would note that this
18  exhibit was identified and linked to the complaint with
19  an exhibit in essence to the complaint that's filed in
20  this matter.  It's also a document that's public record.
21     Q.   Alder Evers, I'm handing you what's been
22  marked as Exhibit 28, which is a newspaper article from
23  the Wisconsin State Journal dated Wednesday, September
24  4, 2019.  Do you see that?
25     A.   I do.  And it's Alder Evers.  Thank you.

Brown & Jones Reporting
A Veritext Company
414-224-9533
www.veritext.com

Page 150

1    Q.  I'm sorry, I --
2    A.  I caught you.
3    Q.  I did, but I've been good.  That's the first
4  time I've done it today.
5    A.  I think it may be, Jonathan, so I'll give you
6  a pass.
7    Q.  Okay.  All right.  Alder Evers, do you see
8  this article has a section that covers the votes on the
9  Edgewood Master Plan repeal?
10    A.  Yes, I can read the article right here.
11    Q.  Do you recall reviewing this article or seeing
12  this article when it came out on or around September 4?
13    A.  I do not.
14    Q.  I'm going to ask you to go to the one, two,
15  three -- fourth paragraph of this excerpt, and it says,
16  "Alder Shiva Bidar, 5th District, said the reason for
17  the delay was to allow another proposal to get through
18  the Plan Commission and City Council first.  That
19  proposal would require Edgewood High School to apply
20  with the city before making modifications, such as
21  adding lights or a sound system, to its field if the
22  master plan is repealed."
23        Did I read that correctly?
24        MS. ZYLSTRA:  Object to form, rule of
25  completeness.  You can answer.

Page 151

1    A.  You have read it completely.
2    Q.  This paragraph above relates to -- it
3  references a Tuesday meeting which City Council voted 15
4  to 4 to delay the master plan vote for more than a month
5  to the October 14 Plan Commission meeting and October 15
6  City Council meeting.  Do you see that?
7    A.  I do.
8    Q.  Do you have any reason to disagree with the
9  article's statement in reporting of Alder Bidar's
10  reasoning for the delay of the Edgewood Master Plan
11  vote?
12    A.  Oh, I think it's really shoddy reporting.
13  Alder -- three council members who sit on the Plan
14  Commission spoke for about five minutes each.
15        Alder Bidar spoke for approximately that long.
16  You can't -- there is no way to adequately portray the
17  depth of the reasons that were given for the re-referral
18  in 2-3 short paragraphs.
19        So I would suggest to Jonathan that you should
20  produce a transcript of that meeting and then we can
21  have a discussion.
22    Q.  Do you have transcript of reporter Emily
23  Hamer's discussions with Alder Bidar?
24    A.  I do not.
25    Q.  Has Alder Bidar denied --

Page 152

1        MS. ZYLSTRA:  Objection.  Sorry, late
2  objection.  Form.  I'm unclear whether such exists based
3  on this article.  I just wanted a late objection.
4  Sorry.  Go ahead.
5    Q.  Do you -- has Alder Bidar, in conversations
6  with you, denied telling the reporter in this case that
7  that was the reason for the delay?
8    A.  I haven't spoken to Alder Bidar about this
9  article.  In fact, I didn't even know it existed until I
10  saw it referenced in the complaint.
11    Q.  Did you have any communication with Alder
12  Bidar to suggest or request that Edgewood's repeal of
13  its master plan be delayed into the October meeting?
14    A.  I do not recall.
15    Q.  Alder Bidar introduced your item from the
16  floor on August 6?
17    A.  I said it was possible.  I wasn't at that
18  meeting.  I would have to go back and look at the video
19  or the read the transcript, but I wasn't there.
20    Q.  August 6 you were listed as not being on
21  there.  You said you were on vacation; correct?
22    A.  Right.  On August 6.  So I don't know if she
23  was -- like I said, I don't know if Alder Bidar was the
24  one who introduced it from the floor.  I don't recall.
25    Q.  Whose motion was it to move Edgewood to the

Page 153

1  October 14 meeting.  Do you recall?
2    A.  I believe it was Council President Alder
3  Bidar.
4    Q.  Alder Bidar endorsed you for your April 2021
5  re-election campaign; correct?
6    A.  I believe she did, yes.
7    Q.  In fact, that endorsement, it was listed on
8  your website; correct?
9    A.  Yes, it was.
10    Q.  Do you consider Alder Bidar a friend and ally
11  on the Common Council?
12        MS. ZYLSTRA:  Object to form.  You can answer.
13    A.  She's no longer on Common Council.  When Alder
14  Bidar and I served for one term together, I had great
15  respect for Alder Bidar's leadership.
16    Q.  Would you consider her a friend and ally when
17  she was on the Common Council?
18        MS. ZYLSTRA:  Same objection.
19    A.  There were times where I agreed with Alder
20  Bidar, there were times when we did not.  We did not
21  always get along.
22        And we have never socialized.  We have never
23  had dinner together.  So I would not regard her as a
24  friend as much as I respect her.
25    Q.  Very good.  As of August 26th, you recognize

Brown & Jones Reporting          414-224-9533
A Veritext Company              www.veritext.com

Page 154

1 that the city's planning division staff was advising
2 that Edgewood's Master Plan could be repealed; correct?
3    A.   That is correct.
4    Q.   Around that same timeframe you also knew that
5 the city attorney's office was recommending approval of
6 the repeal of Edgewood's Master Plan; correct?
7        MS. ZYLSTRA: I'll object to form.  You can
8 answer.
9    A.   Can you say that again, please?
10       MR. INGRISANO: Sure.  Can you read that back.
11       (Record read)
12       MS. ZYLSTRA: Same objection.  Go ahead.
13   A.   Yes, I was aware that they approved it.  I
14 disagreed with the legal analysis -- excuse me, not
15 approved it; that they -- that they recommended
16 approving the request for repeal.  I disagreed with the
17 legal analysis.
18       I didn't, and still do, did not believe that
19 that was a correct legal interpretation.
20   Q.   What was your -- I think you've agreed that
21 you have had a couple classes in the law related to your
22 economics degree.
23       What was your basis for disagreeing with the
24 legal analysis by the city's attorneys?
25   A.   I'm glad you asked that question, because in

Page 155

1 the CI District ordinance, the use of the word "shall"
2 -- the use of the world "shall" said that if -- and I
3 don't have it right in front of me.  Perhaps if you
4 would allow me to take a look at the particular exhibit
5 where the CI District ordinance exists, I can speak to
6 that.  I'll try to find that.
7        MS. ZYLSTRA: I believe it's Exhibit 13.
8    A.   Exhibit 13.  The first page, Master Plan
9 Requirement (2).
10       "(2)(a) Any Campus-Institutional District
11 created after the effective date of this ordinance shall
12 submit a Campus Master Plan, which shall be approved as
13 part of the map amendment.
14       (b) Approved Campus Master Plans shall be
15 effected for 10 years, and, during that period, may be
16 altered pursuant to sub.(8) below."
17       And at no place in the language of the
18 ordinance does it mention the word "repeal."
19       It's my understanding that Edgewood did not
20 believe that they had an option to repeal until it was
21 brought up by Attorney May, that their understanding was
22 that they could either wait until the master plan
23 expired or that they could amend it.
24       And I think it was a novel interpretation,
25 this notion of repeal, and I think it sets a bad

Page 156

1 precedent.  For example -- and I know you don't like me
2 giving long answers, Jonathan -- what would the
3 incentive be for a neighborhood to engage in a lengthy
4 4-5 year process to develop a master plan, compromise
5 over issues and projects, if the developer unilaterally
6 could walk away from that plan halfway through.
7        I think it set a bad precedent for our city,
8 and I opposed legal analysis that contributed --
9 that Attorney Strange used.  We do not always agree.
10   Q.   Sure.  But in this case you disagreed with
11 both the planning staff and the city attorney's office;
12 correct?
13   A.   I disagreed, yes, with -- I suppose that's
14 correct.  If the planning staff also made that
15 recommendation, I -- I disagreed with the legal analysis
16 that suggested, in short, that voluntary means
17 voluntary out.  You and I could have lunch and discuss
18 this and debate it, but I think on the legal theory
19 there was no basis for that decision.
20   Q.   Sure.  My question was, both the city planning
21 division staff had recommended that the master plan
22 could be repealed, the city attorney's office
23 recommended the master plan should be repealed, and you
24 disagreed with both of the groups of professionals who
25 made recommendations?

Page 157

1    A.   I disagree with --
2        MS. ZYLSTRA: Wait, wait.  Object to form.  Go
3 ahead.  Sorry.
4    A.   Yeah, I don't think that they said that it
5 should be repealed.  I think they said it could be
6 repealed.  That it would -- that that was -- but I don't
7 -- I don't think that they -- they don't make
8 recommendations using the word "should" most generally
9 speaking.
10       MR. INGRISANO: Read my question back, please.
11       (Record read)
12   Q.   So I'll clarify.  August 26, 2019, the Plan
13 Commission recommended approval of the request to
14 repeal; correct?
15   A.   Can you say that again?  I'm sorry, Jonathan.
16   Q.   On August 26th, 2019, the planning staff
17 recommended approval of the request to repeal the
18 Edgewood Campus Master Plan?
19   A.   I would have to see the planning staff's
20 recommendations.
21       (Exhibit 29 marked)
22   Q.   MR. INGRISANO: Mr. Evers, I'm handing you
23 what's been marked as Exhibit 29.
24       Do you recognize that as the August 26, 2019,
25 Planning Division memo to the Plan Commission on the

Page 158

1  repeal of the Edgewood Master Plan?
2     A.  Yes, I do.
3     Q.  And page 2 of this document, first paragraph,
4  first and only paragraph, first sentence:
5        "In closing, the Planning Division believes
6  that the Plan Commission may find the standards for
7  zoning map amendments met and recommend approval of the
8  request to repeal the Edgewood Campus Master Plan to the
9  Common Council."
10       Did I read that correctly?
11    A.  Yes.
12       (Exhibit 30 marked)
13    Q.  MR. INGRISANO:  Alder Evers, I'm handing you
14  what's been marked as Exhibit 30.
15       Do you recognize that, sir, as a memorandum
16  from John May (sic) to the Attorney John Strange,
17  Assistant City Attorney to the members of the Plan
18  Commission?
19    A.  Yes.
20    Q.  And do you recognize, sir, that a cc went to
21  all alders for this memo?
22    A.  Yes.
23    Q.  Do you recall receiving this memo on or around
24  August 22 of 2019?
25    A.  I do not recall, but I'm sure I did.

Page 159

1     Q.  Second paragraph in the memo from City
2  Attorney May and Assistant City Attorney John Strange:
3        "In terms of the RLUIPA claim, the city's best
4  legal position would be if the master plan were repealed
5  and no other changes to the CI District ordinances were
6  adopted.  Therefore, our office recommends approval of
7  the repeal of the master plan."
8        Do you see that?
9     A.  Yes, I do.
10    Q.  And the city attorney, also, in that prior
11  sentence, described as the city's best legal position as
12  being if the master plan were repealed and no other
13  changes in CI District ordinances were adopted.  Do you
14  see that?
15    A.  Yes, I do.
16    Q.  Did you understand, at that time, that that
17  was a reference to the amendment you were sponsoring?
18       MS. ZYLSTRA:  Object to form.  You can answer.
19    A.  I don't recall what I was thinking when I read
20  this.
21    Q.  Is it fair to say, sir, that given the
22  unanimity of the recommendation to repeal Edgewood's
23  Master Plan, you recognize that Edgewood's Master Plan
24  was going to be repealed and that your best strategy
25  would be to at least delay its repeal until after the

Page 160

1  amendment you sponsored passed?
2        MS. ZYLSTRA:  Objection.  Form, foundation.
3  You can answer.
4     A.  No, I don't think that is, because based on
5  the memo that was circulated at the Plan Commission that
6  it -- on August 26, both 56839 and -- what's the number
7  for the other one?  I'm sorry, I don't have it in front
8  of me.  Someone help me here.  56981.
9        If they were both passed on the same day, it
10 would have the effect of -- so that there was no
11 particular order.  So that says one thing, but I did not
12 -- let me answer your other part of your question.
13       I did not, based on the discussion at Plan
14 Commission, there was not strong support.  If you read
15 the minutes of the Plan Commission, you read the
16 transcript and you go back and watch the debate, there
17 was not strong support at that August 26 meeting for
18 repeal.
19       In fact, based on the debate, it was wavering
20 between outright denial or referral to get more
21 information.  It was not clear that repeal was imminent.
22       So I guess I disagree with -- I guess I cannot
23 say it's a fair statement, so I would deny your claim.
24    Q.  Alder, you missed the August 6 Common Council
25 meeting.  You were not present because you were on

Page 161

1  vacation; correct?
2     A.  Yes, that was the last vacation I took.  It
3  was in Montreal and then the pandemic happened and I
4  have not been out of the country or taken any vacations
5  since.
6     Q.  Yeah, vacations have gotten few and far
7  between.  My daughter was in Spain when the pandemic hit
8  and had to come home in the middle of a semester abroad.
9  So I feel you on that one.
10       So the August 6 meeting, was that at the
11 beginning or the end of your vacation?
12    A.  I don't recall.
13    Q.  Or the middle?
14    A.  I don't recall.
15    Q.  Your conversations with John Strange that week
16 leading up to the August 6 Common Council meeting, did
17 those occur while you were on vacation as well?
18    A.  Yes, my conversations with John Strange were
19 while I was on vacation in Montreal by telephone.
20    Q.  What other City of Madison business did you
21 address while you were on vacation in Montreal that
22 year?
23    A.  I don't recall.
24    Q.  Do you recall discussing any city business
25 while you were on vacation?

Page 162

1    A.  I don't recall.  But it would -- whether I did
2  or not, it could have been as to whether how disciplined
3  I was in having time off on a vacation and any other
4  pressing matters.
5        I typically attend to matters even when I am
6  on vacation, so I may very well have stayed in touch
7  with other issues.
8    Q.  Sure.  Did you initiate your conversations
9  with John Strange -- strike that.
10       Did you schedule your conversations with John
11  Strange while you were in Montreal or before you left
12  for Montreal?
13   A.  I do not recall.
14   Q.  You had mentioned before that Edgewood -- I'm
15  switching now to the conditional use permit process
16  after the amendment you sponsored was passed and
17  approved.
18       You said that you were -- you recall being
19  disappointed when Edgewood submitted its application for
20  conditional use permit for lights for the field;
21  correct?
22   MS. ZYLSTRA:  Object to form, but you can
23  answer.
24   A.  As I indicated, I met on March 9th with then
25  Board President Steve Krantz and Mike Elliot to discuss

Page 163

1  next steps with a meeting I had tried to convene after
2  their -- I'm trying to get the timeline correct.  And so
3  after I -- what was it -- after the January 7th meeting,
4  in which the repeal was approved, I had asked several
5  times can we get together and talk and you let me know
6  what your next steps are.  And that meeting was held
7  finally on March 9th.
8        We had a long discussion in which I asked them
9  to go slow, to reconnect with the Edgewood Neighborhood
10  Liaison Committee, to reconnect with the neighbors and
11  to try to rebuild trust, which they admitted through
12  this rather fractious process had eroded.
13       So I was disappointed to learn just two days
14  later, without them bringing it up to me at that March
15  9th meeting, that they had already decided to go ahead
16  and file for a conditional use permit.
17   MR. INGRISANO:  Could you read my question
18  back, please.
19       (Record read)
20   Q.  The answer to my question is yes?
21   A.  Yes.
22   Q.  Okay.  Thank you.
23       To the best of your recollection, that
24  conditional use permit was filed in March of 2020?
25   A.  I believe the date was March 11th, 2020, yes.

Page 164

1    Q.  Prior to their application submission did you
2  meet with any city employees in anticipation of that
3  application?
4    A.  I do not recall.
5    Q.  Do you recall after -- let me ask you this:
6        In January or February of 2020, do you recall
7  any meetings with city employees related to the issue of
8  Edgewood's lights and field?
9    A.  I do not recall.
10   Q.  I think my stack is dwindling.
11   A.  Is that a good sign?
12   THE REPORTER:  Always.
13   Q.  Always.  When you see me pausing through my
14  outline to make lots of checkmarks, that's also a good
15  sign.
16   A.  Well, thank you, Jonathan.  I'm hopeful to get
17  home before dark, so -
18   Q.  Lawyers never mind it when I make checkmarks
19  on my outline.
20       (Exhibit 31 marked)
21   Q.  MR. INGRISANO:  Alder Evers, I'm handing you
22  what's been marked as Exhibit 31.
23       I see that as being an electronic -- a
24  printout of an electronic meeting request for a meeting
25  to occur Thursday, February 13th, 2020.

Page 165

1        Do you see that?
2    A.  Yes, I do.
3    Q.  The subject of that meeting is Edgewood.  Do
4  you see that?
5    A.  Yes.
6    Q.  And you are listed as a required attendee?
7    A.  Yes.
8    Q.  And then there is some -- it looks like there
9  is -- I've got to get a new glasses prescription.
10       There is a narrative that says, "Alder Tag
11  Evers is scheduling this meeting to help Edgewood's
12  neighbors to understand the process moving forward.
13  Some of the neighbors may attend the meeting in person
14  and others will participate by phone."
15       Did I read that correctly?
16   A.  Yes, you did.
17   Q.  Do you recall a meeting occurring on or around
18  that date, February 13?
19   A.  Actually, I don't.  Thank you for bringing
20  this to my attention, but I don't remember this meeting
21  taking place.  I have no doubt that it did, but I don't
22  recall it.
23   Q.  So do you recall having any meetings with city
24  staff between the approval of the amendment you
25  sponsored and the application by Edgewood for

Page 166

1 conditional use?
2    A.  Can you repeat the question?
3       MR. INGRISANO:  Sure.  Can you read that back,
4 please.
5       (Record read)
6    A.  I don't recall, Jonathan.  Not to say it
7 didn't happen, but I simply don't recall.
8    Q.  Understood.
9    A.  I may add that it looks like the purpose of
10 this -- the request for this was from neighbors, and so
11 I was doing this at their behest.
12    Q.  The neighbors have the ability to ask to meet
13 with city officials on their own behalf; correct?  They
14 don't have to have you involved; is that right?
15    A.  They don't have to, no.  But I will add that
16 it's not uncommon for neighbors to ask the alder to
17 arrange such a thing for the simple reason that
18 sometimes, unfortunately, staff being busy do not
19 respond in a timely manner to requests coming directly
20 from residents, and things are facilitated when the
21 requests are channeled through an alder.
22       (Exhibit 32 marked)
23    Q.  MR. INGRISANO:  Alder Evers, do you recognize
24 that as -- well, it's an email chain, but the bulk of
25 this email chain is an email from you to a series of

Page 167

1 addressees.  Do you see that?
2    A.  Yes, these went to Plan Commission members and
3 then appropriate members in city staff and to the mayor.
4    Q.  Got it.  And you sent this email?
5    A.  I did.
6    Q.  And this related to the Plan Commission's
7 consideration of Edgewood's conditional use permit
8 application; correct?
9    A.  Yes, which was scheduled for, I believe, May
10 8th of 2020.
11    Q.  Got it.  And I'm not going to ask you to go
12 through all of this, but the bottom line, page 2, second
13 to last paragraph, you write:
14       "For this and all the reasons enumerated, I
15 hereby request Edgewood's conditional use application be
16 placed on file without prejudice."
17       Did I read that correctly?
18    A.  Yes, you did.
19    Q.  What does it mean to have a conditional use
20 application to be placed on file without prejudice?
21    A.  Thank you for asking that question.
22       When something is placed on file, without
23 prejudice means it may come back after, I believe, a
24 30-day period for review and discussion.
25       To be placed on file, period, means it is done

Page 168

1 with.  So this placed on file without prejudice would
2 allow the applicant then to come back within a certain
3 period of time.
4    Q.  And your rationale and justifications for that
5 request are all set forth in that email; correct?
6    A.  Yeah, and I had a subsequent blog post, I
7 believe, to that, a follow-up one, dated, I believe,
8 around May 8th, which I assume you have a copy of as
9 well.
10    Q.  Eventually, the Plan Commission denied the
11 conditional use permit; correct?
12    A.  I believe they denied the vote, I believe
13 on -- whenever it would have been, May 11th, I think.
14 Not May 8th; May 11th sounds like the right date
15 if I'm remembering correctly.  Yes, they voted to
16 deny.
17       But they voted to deny without -- they voted
18 again to place it on file without prejudice allowing for
19 the applicant to come back.
20    Q.  Within that 30-day period?
21    A.  Not within; after a 30-day period they could
22 come back with, you know -- there was some
23 recommendations in that vote, too, suggesting -- if you
24 go and look at the minutes of that meeting, perhaps you
25 have those.

Page 169

1    Q.  You can keep coming back indefinitely, though,
2 can't you?  Can't the Plan Commission keep referring
3 this for -- be placed on file without prejudice an
4 unlimited number of times?
5    A.  No.
6       MS. ZYLSTRA:  Wait.  Objection.  Form,
7 foundation.  You can answer.
8    A.  Well, I don't know, you know, I' -- so legally
9 it's behind it.  But if this was not a referral, it was
10 -- it was to -- what did it say -- to place on file
11 without prejudice.
12       Placing on file without prejudice, from my
13 understanding -- and correct me if I'm wrong -- the city
14 attorney's office may speak to me afterwards, but I
15 understand that as a process by which it allows the
16 applicant to come back with a new application at a later
17 date.  But they would have to make some kind of
18 revisions and changes.  They would not come back with
19 the exact same application.  In other words, the door
20 would be open.
21    Q.  When this matter was being considered by the
22 Plan Commission, the planning staff recommended approval
23 of the conditional use permit with conditions; correct?
24    A.  I believe so, but I don't have the planning
25 staff recommendation in front of me.  But I recall

Page 170

1  planning staff did make that recommendation.
2      (Exhibit 33 marked)
3      Q.  MR. INGRISANO:  Sir, you recognize that
4  Exhibit 33 is the Planning Division staff report dated
5  May 11, 2020 related to Edgewood's conditional use
6  permit?
7      A.  Yes.
8      Q.  It was prepared by Tim Parks from the Planning
9  Division and Matt Tucker, the zoning administrator;
10  correct?
11      A.  It appears to be so, yes.
12      Q.  And at least, generally, the staff and
13  Mr. Parks and Mr. Tucker concluded that the conditional
14  use permit sought by Edgewood could be approved subject
15  to bullet-pointed conditions that they outline on pages
16  5, 6, and 7 of that report; correct?
17      A.  Correct.
18      Q.  Is it fair to say you disagreed with the
19  Planning Division staff report that the conditional use
20  permit should be issued subject to those conditions; is
21  that right?
22      A.  That's --
23      MS. ZYLSTRA:  Object to form.  You can answer.
24      A.  I'm sorry.  I'll pause.  I'll try to practice
25  pausing.

Page 171

1      Yes, I agree.
2      Q.  So you did not think their conditions were
3  satisfactory or sufficient in order to warrant approval
4  of the conditional use permit; is that fair?
5      A.  That is fair.
6      Q.  One of your principal concerns related to
7  noise reduction.  Is that a fair characterization?
8      A.  That was one of several, yes.  But I don't
9  believe that the noise impacts were sufficiently
10  addressed in their application, nor were they covered
11  sufficiently in the conditions set forth by staff.
12      Q.  Did John Strange and his department, the city
13  attorney, did they issue any sort of recommendation
14  pertaining to Edgewood's constitutional use permit?
15      MS. ZYLSTRA:  To the extent that's privileged,
16  same stipulation?
17      MR. INGRISANO:  Yes.
18      MS. ZYLSTRA:  You can answer.
19      A.  I'm not -- I don't know.
20      Q.  Page 8 and 9 of this Exhibit 33, planning --
21  that has a section on the planning staff's
22  recommendation there.  Do you see that?
23      A.  Starting on page 8 or --
24      Q.  Page 8, sorry.
25      A.  Headlined under "Conclusion" or --

Page 172

1      Q.  I've got it headlined under "Recommendation"
2  on page 8.
3      MR. JEAN-LOUIS:  Counsel, the copy, at least
4  that I have, it doesn't have pages on the bottom.
5      MR. INGRISANO:  Yeah, I appreciate that.  I'm
6  referring to the pagination on the top left corner of
7  the document.
8      A.  Okay.  I'm looking at --
9      Q.  Yeah, and the pagination 9 of 10, that is from
10  the file stamp because this was an exhibit in --
11      A.  Okay.  Well, I'm looking at this right now.
12      Q.  There you go.  That's where you should be,
13  sir.  Thank you.
14      Where it says "Recommendation," do you see
15  that?
16      A.  Yes.
17      Q.  And you recognize that, sir, as the
18  recommendation from the planning staff that you
19  reviewed?
20      A.  Yes.  That I reviewed, that I see right now
21  and I assume at the time I would have reviewed it, yes.
22      Q.  Sure.  Eventually, the issue of the
23  conditional use permit came before you as a member of
24  the Common Council when the Planning Commission's denial
25  of the permit was appealed; correct?

Page 173

1      MS. ZYLSTRA:  Object to form.  You can answer.
2      A.  Could you repeat your question, please?
3      MR. INGRISANO:  Could you read that back,
4  please.
5      (Record read)
6      A.  It came before the council as a whole, and
7  then I was a member of the council, I guess I'm probably
8  saying it came before you.  But it came before the
9  council as a whole.
10      Q.  Sure.  It came before the council of which you
11  are a member?
12      A.  That is correct.
13      Q.  Okay.  Thank you.  I apologize.  That was a
14  good clarification.
15      Did you consider the planning staff's
16  report -- did you, individually, consider the May 11,
17  2020 planning staff's report when you were deciding what
18  treatment Edgewood's appeal on the master plan
19  rejection -- I'm sorry, not master plan -- conditional
20  use rejection was before you?
21      A.  That seems to be a question that did I -- did
22  I consider.  I did not find it determinative, let me say
23  that, or compelling.  But did I consider it?  Yes.
24      Q.  Got it.  And with Exhibit 33, the planning
25  staff concluded that the conditions they were proposing

Page 174

1  minimized impairments of the use of the property for the
2  neighbors.  Is that a fair summary?
3        MS. ZYLSTRA:  I'll object.  Is it somewhere in
4  the document that you're --
5        MR. INGRISANO:  I'm asking based on his
6  recollection and review of the document.  I can point to
7  the language if he needs it.  He can't answer my
8  question without it.
9        MS. ZYLSTRA:  Fair enough.  Object to form.
10 You can answer.
11     A.  I think it's fair to say staff believed that
12 the conditions they offered were done for the purpose of
13 addressing potential impacts.
14     Q.  Sure.  Page 5, sir, and again I'm looking at
15 pagination top left corner.  Page 5, last paragraph:
16        In order to allow extended use of the athletic
17 complex into the evening, staff believes that the
18 commission should focus on the number of events held at
19 the facility and the hours during which those events may
20 occur.  Staff acknowledges that some number of neighbors
21 experience some amount of stadium noise, particularly
22 during athletic competitions.  However, by limiting the
23 number of events that occur in the complex during the
24 evening, the commission may create a balance between the
25 desire by Edgewood High School to use its athletic

Page 175

1  complex for evening sporting events and minimizing --
2  which is italicized -- minimizing impacts on the
3  residential neighborhoods that border the institution on
4  three sides consistent with Statement of Purpose for the
5  Campus-Institutional zoning district excerpted above,
6  paren, emphasis added, end paren.
7        Did I read that correctly?
8     A.  Yes, you did.
9     Q.  So is it fair to summarize that the planning
10 staff believed that their conditions that are outlined
11 throughout this memo would have the effect of minimizing
12 the impact on your other constituents in those
13 residential neighborhoods?
14     MS. ZYLSTRA:  Object to form.  You can answer.
15     A.  I think it's fair to say staff believed that
16 to be the case.
17     Q.  When you look at the standards for conditional
18 use approval, standard 3, which is recited above here on
19 page 5 of this Exhibit 33.
20        Standard 3 talks about, quote, "The uses,
21 values, and enjoyment of other property in the
22 neighborhood for purposes already established will not
23 be substantially impaired or diminished in any
24 foreseeable manner."
25        Do you see that?

Page 176

1     A.  Yes, I do.
2     Q.  So, the standard is not that there won't be
3  any impairment or diminution of the uses, values, and
4  enjoyment; is that right?
5     A.  I suppose I understand that the word -- the
6  qualifying word is "substantially" here.  So
7  substantially impaired or diminished in any foreseeable
8  manner.
9        So if you're suggesting that there is a
10 possibility of some impairment or some diminishment, I
11 suppose that is evident in that standard, yes.
12     Q.  And it's fair to say your constituents in the
13 neighborhood, other than Edgewood, that oppose
14 Edgewood's development of its field, they don't want any
15 additional impairment of their property; is that fair?
16     MS. ZYLSTRA:  Objection.  Form, foundation.
17 You can answer.
18     A.  I do not believe that to be the case.
19     Q.  So you've got a resolu -- you've got a
20 compromise that's being suggested here by professional
21 staff with the City of Madison, a compromise not being
22 offered by Edgewood and that compromise in the form of
23 those conditions was unacceptable to you; correct?
24     MS. ZYLSTRA:  Objection.  Form.  You can
25 answer.

Page 177

1     A.  That is correct.
2     Q.  And did you receive communications from your
3  neighbor -- from your neighbors and your constituents in
4  Dudgeon-Monroe and elsewhere in District 13 that they
5  also believed that the conditions being outlined by the
6  planning staff were unacceptable?
7     A.  Yes, that's -- that is correct.
8     Q.  Do you agree with me that the planning staff
9  -- well, let me ask you this:
10        Do you consider the planning staff to be
11 neutral, independent professionals?
12     A.  I think that's a fair assumption, yes.
13     Q.  And you didn't ever see any, what I would
14 call, pro-Edgewood bias from any of the city staff, did
15 you?
16     A.  That is correct, yes.
17     Q.  In fact, Zoning Administrator Tucker had
18 already interpreted the Edgewood Master Plan to contain
19 a substantial restriction on the use of that property,
20 did he not?
21     MS. ZYLSTRA:  Objection.  Form.  You can
22 answer.
23     A.  That is correct, yes.
24     Q.  Beyond the noise mitigation issues, can you
25 list for me any other inadequacies with the planning

Brown & Jones Reporting                414-224-9533
A Veritext Company                  www.veritext.com

Page 178

1 staff's report?  Note that I asked you to list and not
2 describe.
3        MS. ZYLSTRA:  Object to form.  You can answer.
4     A.   I would have to take the time to read this and
5 collect my thoughts and get back to you.
6        But the primary objection was that there were
7 -- there was no mitigation to the sound itself, no
8 addressing of the sound itself, which is something that
9 had come up in the two different sound studies.  One
10 that was paid for by Edgewood itself and the other paid
11 for by the neighbors.
12        In other words, a barrier of some sort which
13 would minimize the sound, because, as you probably know,
14 there were complaints about noise generated during
15 daytime use as well.
16     Q.   Thank you.  Do you ever blog on your District
17 13 aldermanic blog about your concerns and perceived
18 inadequacies with the planning staff report?
19     A.   I don't recall.  Note that we -- if I may add,
20 we don't receive these planning staff reports that many
21 days before a public hearing.  Sometimes it's just a
22 matter of, you know, 48 hours.
23     Q.   Understood.  You, as a member of the Madison
24 Common Council, you voted to uphold the denial of the
25 Planning Commission's -- well, you voted to uphold the

Page 179

1 Planning Commission's denial of Edgewood's conditional
2 use permit; correct?
3     A.   That's correct, yes.
4     Q.   Looking at the record, the totality of that
5 record that was before you as an alder for the City of
6 Madison, what did you -- what evidence did you rely upon
7 in coming to that conclusion?
8     A.   Well, principally, there is two points.  One,
9 that Edgewood offered no substantial evidence required
10 under state law that an applicant do so; that the uses,
11 values, and enjoyment of the property in the
12 neighborhood for purposes already established would not
13 be substantially impaired or diminished in a foreseeable
14 manner.
15        They offered no substantial evidence that this
16 would not occur.  And, in fact, they ignored their own
17 sound study's indication that just the crowd noise from
18 just a collection of 150 people attending an athletic
19 contest would exceed a 70 decibel level within the
20 adjoining neighborhoods.
21        They did not address -- offer any testimony
22 about property values, how property values would not be
23 impacted.  Residents were concerned about the potential
24 impact on their property values.
25        They did not address concerns of families who

Page 180

1 had young children in the neighborhood who go to sleep,
2 say, at 7:00 or 7:30.  You're a father, you know what
3 that's like, toddlers go to sleep early.  How that these
4 homes just within a hundred feet of an athletic field
5 were holding night games with cheering crowds and a
6 play-by-play announcement and pep band, how that this
7 could interrupt sleep.
8        They offered no substantial evidence, not no
9 iota of substantial evidence that the uses, values, and
10 enjoyment of other property in the neighborhood for
11 purposes that were established, that they had lived
12 there for years, would not be substantially impaired.
13        They chose not to offer that in their -- they
14 simply said in their meetings, the six meetings that
15 were held after the Plan Commission denial, that they
16 did not believe the impacts would be that bad.  They
17 offered no evidence to become -- that they wouldn't;
18 they just said they didn't believe it's so.
19        So, Jonathan, they just didn't offer
20 substantial evidence, and for that reason -- whereas the
21 residents did.  They offered what I believed to be
22 substantial impacts or evidence that those impacts were
23 foreseeable, were clearly foreseeable.  They could be
24 anticipated and they were reasonable concerns.
25        Now, despite the recommendations of the

Page 181

1 planning staff on a near unanimous basis, the Plan
2 Commission agreed that the applicant did not offer
3 substantial evidence that they would be able to abide --
4 live up to the standard, standard -- standard 3.
5        So that's the reason why that I voted the way
6 I did, and that's the way that the overwhelming majority
7 of council members joined in accepting the verdict of
8 the Plan Commission.
9     Q.   With respect to your issue with the noise, did
10 any city staff ever conclude that games at Edgewood
11 would violate applicable noise ordinances?
12     A.   The noise ordinance would not apply.  We don't
13 apply to stationary uses.  That is somewhat of a flaw in
14 the city's noise ordinance.
15     Q.   Um --
16     A.   They only apply to stationary sources --
17 excuse me.  They don't apply to things like, you know, a
18 football game.
19     Q.   Sure.  So the -- I've heard you say that there
20 were two reasons why you voted as you did.
21        First was Edgewood offered no substantial
22 evidence.  And the second was that you felt the
23 neighbors did offer substantial evidence --
24     A.   That's right.
25     Q.   -- is that fair?

Page 182

1    A.  Yes.
2    Q.  Okay.  With respect to the substantial
3  evidence offered by the neighbors, it sounds like one
4  category of that evidence was their personal accounts,
5  personal testimony of and their characterization of the
6  impacts on their lives; is that fair?
7        MS. ZYLSTRA:  Objection.  Form.  You can --
8  foundation.  You can answer.
9    A.  There are a number of concerns that were
10  anticipatory based on their understanding of what a
11  football game sounds like.
12        There was also measurements that were taken
13  that residents, neighbors visited football games being
14  held in other places in the area, and they also had
15  measurements of the sounds from the crowd noise
16  generated from daytime use.
17    Q.  And that's exactly your -- we're on the same
18  page here.
19        The first -- when we are talking about the
20  neighbors' substantial evidence, the first category.
21  And then you tell me if I'm wrong.  Or at least one
22  category is neighbors came to these hearings and said
23  this is how this is going to impact me, this is how it's
24  currently impacting me with current on-field use, and if
25  it happens at night these are what's naturally going to

Page 183

1  happen, right?
2        Their own anecdotal testimony of how this was
3  impacting their lives; fair?
4        MS. ZYLSTRA:  Object to form.  You can answer.
5    A.  It wasn't merely anecdote, Jonathan, it was
6  also supported by research by --
7    Q.  Hold on.  I'm going to get to that.
8    A.  Okay.
9    Q.  I'm asking you, first, you had people come to
10  hearings and call you and email you and tell you their
11  stories how this was impacting their lives.
12        And that was certainly one part of evidence
13  that you relied on in making your vote.  Fair or not
14  fair?
15    A.  I suppose so.  I don't know why you're raising
16  your voice, but yes, I think that's -- their own
17  personal experience was part of this, yes.
18    Q.  The second category of the evidence that you
19  considered and relied upon in your vote was the research
20  that you said was presented to you by these neighbors;
21  is that fair?
22    A.  And may I respond to that?  Research also
23  provided by Edgewood.
24    Q.  Okay.  Let's talk about the research provided
25  by the neighbors.

Page 184

1        What neighbors provided you with research that
2  you found to be compelling?  Identify the neighbors for
3  me that provided research that you found to be
4  compelling.
5    A.  The neighbors paid for a sound study by, I
6  believe it's Weiss Engineering (ph).  It's in Legistar.
7  You would have to -- I don't have the file or anything
8  like that.
9        But they paid for a study to be able to make,
10  you know, scientific determinations based on
11  measurements and mapping what the potential for those
12  impacts would be on the adjoining neighbor.
13    Q.  So we have the Weiss sound study.
14        What other piece of research did the neighbors
15  provide you that you relied upon that you found to be
16  compelling?
17    A.  Again, measurements taken of games being held
18  in the area.  Videos of those games.  Research about
19  -- that they had done regarding the impact on property
20  values.  And other cities where stadiums were built in a
21  neighborhood -- traditional residential neighborhood,
22  that kind of thing.
23    Q.  Anything else?
24    A.  That's all that I can recollect, but I'm sure
25  there was more.

Page 185

1    Q.  Who provided you videos?
2    A.  Residents in the neighborhood.
3    Q.  Do you have any recollection of specifics?
4    A.  As specific individuals who provided me the
5  videos?
6    Q.  Yes.
7    A.  I may.  Ethan Brodsky, I believe, is one.  And
8  videos, meaning videos that they had taken at different
9  games?
10    Q.  Videos that you referenced in your answer.
11    A.  I think Ethan Brodsky was one.  Marie Trest,
12  who lived across the street from -- on Monroe Street.
13    Q.  Both of those individuals are folks that you
14  listed as being involved in No New Stadium; correct?
15    A.  That is correct.
16    Q.  Who provided you with measurements?
17    A.  From the sound -- from the sound study.
18    Q.  You said that neighbors provided you with
19  measurements, so I'm following up on that answer to find
20  out who provided you with the measurements that you
21  referred to in your answer?
22    A.  I don't recall exactly who did.
23    Q.  And who provided you with research on the
24  impact on property values in other areas?
25    A.  I don't recall.

Page 186

1    Q.   Are all of those items that you identified
2  part of the public record in the Legistar?
3    A.   I believe so, but I can't say for sure.
4    Q.   Are there any items that you believe you
5  relied upon in coming to your decision that are not on
6  Legistar?
7    A.   I can't say for sure.  I don't know.
8        MR. INGRISANO:  Why don't we go ahead and take
9  a break.
10       MS. ZYLSTRA:  Sure.
11       THE VIDEOGRAPHER:  We are off the record at
12  3:08 p.m.  This is the end of Media Unit No. 4.
13       (Recess)
14       THE VIDEOGRAPHER:  We are back on the record
15  at 3:27 p.m.  This is the beginning of Media Unit No. 5.
16  BY MR. INGRISANO:
17   Q.   Mr. Evers, I'm going to ask you to go back all
18  the way to Exhibit 17.
19   A.   I'm sorry, I didn't keep these in any
20  reasonable order.
21   Q.   No, that's fine.  It's the one with your nice
22  glossy picture on the front.
23   A.   Well, thank you for complimenting my picture.
24  I did not have this here.  This is more recent, and a
25  new pair of glasses as well.

Page 187

1    Q.   I'd ask you to look at page 3 of that
2  document, last paragraph.
3        "As alder for the district, I am open to
4  compromise.  I continue to ask Edgewood to go slow, to
5  drop their sense of entitlement, this claim they have a
6  right to build a stadium in a traditional residential
7  neighborhood.  Work with neighbors to see if there is a
8  way to move forward without negatively impacting the
9  existing uses, enjoyment and value of nearby properties.
10  And if there's not, don't force the issue.  Build the
11  stadium somewhere else."
12       Did I read that correctly?
13   A.   Yes, you did.
14   Q.   Is that a fair summary of not just the
15  position you expressed on the campaign trail, but it's
16  also an expression of how you've guided yourself
17  throughout this issue?
18       MS. ZYLSTRA:  Object to form.  You can answer.
19   A.   I believe so, yes.
20   Q.   You note that you want to see Edgewood work
21  with the neighbors to see if there is a way to move
22  forward without negatively impacting existing uses,
23  enjoyment and value.
24       Is it your position that any negative impact
25  whatsoever caused by the stadium, as you characterized

Page 188

1  it, is unacceptable?
2        MS. ZYLSTRA:  Object to form.  You can answer.
3    A.   That's seems hypothetical.  I think we would
4  have to start talking about what you mean by negative
5  impacts and the specifics.
6        I think there are currently already negative
7  impacts that the neighborhood endures.  But as in many
8  things, these are relative.
9    Q.   Sure.  But the standard we talked about before
10  the break was this idea that conditional use permit is
11  assessed as to whether it creates substantial
12  impairments of property values and uses.
13       I guess my question for you is, were you
14  guided by a substantial impairment standard in your vote
15  or were you guided by a standard that says, hey, this
16  has to be without any negative impact on existing
17  uses --
18       MS. ZYLSTRA:  Object to --
19   Q.   -- enjoyment and value?
20       MS. ZYLSTRA:  I apologize, Counsel.  Object to
21  form.  You can answer.
22   A.   I would believe I was with the former, with
23  substantial, because you misquoted this.  I don't say it
24  doesn't read without any negative impacting -- negative
25  impacts.  It simply says without negatively impacting,

Page 189

1  which, again, is open to interpretation.
2    Q.   So you would insert the word substantially
3  negatively impacting in there as to what you meant?
4        MS. ZYLSTRA:  Objection.  Form.  You can
5  answer.
6    A.   You know, hypothetically, I would have to look
7  at the -- you know, when you make a statement, whether
8  it's campaign or otherwise, where I believe -- I think
9  that in the spirit of compromise that would be the
10  possibility that neighbors would have to put up with
11  some things that they didn't want.
12       But in the spirit of compromise that's exactly
13  what the four steps that the neighbors proposed to
14  Edgewood entailed, the potential for the possibility of
15  putting up lights and having night games.
16   Q.   Mr. Evers, do you agree with me that Edgewood
17  is a religious institution?
18       MS. ZYLSTRA:  Object to form.  You can answer.
19   A.   Yes.
20   Q.   And, in fact, sticking with that Exhibit 17,
21  on the third page, the paragraph above the one we were
22  just discussing, you write:
23       "The other option is for Edgewood, in keeping
24  with their Dominican values of Truth, Compassion,
25  Justice, Community and Partnership."

Page 190

1        You reference Edgewood's Dominican values;
2 correct?
3    A.   Yes.
4    Q.   So you recognize that it's a Dominican
5 institution?
6        MS. ZYLSTRA:  Object to form.  You can answer.
7    A.   Yes.
8    Q.   And do you recognize that that's a Catholic
9 order; correct?
10    A.   Correct.  Yes, I recognize it.
11    Q.   Edgewood is a Catholic school?
12    A.   Yes, it's my understanding, yes.
13    Q.   Alder Evers, I'm going to hand you what's been
14 marked previously as Exhibit 10.
15        Do you recognize that, sir, as a neighborhood
16 newsletter for the Dudgeon-Monroe neighborhood that you
17 received on September 13, 2021?
18    A.   Yes.
19    Q.   In the first section of that, it lists
20 Edgewood High School Homecoming activities week,
21 September 13 through 18.  Do you see that?
22    A.   Yes, I do.
23    Q.   It outlines what's going to be happening on
24 the Edgewood High campus for that upcoming week; is that
25 fair?

Page 191

1    A.   Yes.
2    Q.   And this takes -- September 13, 2021 is after
3 the repeal of the master plan; correct?
4    A.   Correct, yes.
5    Q.   September 13 and 14 annual powder puff
6 football games on field 6:30 to 7:30.  Do you see that?
7    A.   Yes, I do.
8    Q.   Under the master plan before it was repealed,
9 based on your understanding of how the city was
10 interpreting that master plan, would Edgewood have been
11 allowed to have a powder puff football game on its
12 field?
13        MS. ZYLSTRA:  Objection.  Form, foundation.
14 You can answer.
15    A.   I don't know.  I'm not -- I'm not a zoning
16 administrator.  I don't know what their determination
17 would be on powder puff non-league games.
18    Q.   Got it.  So you don't want to make a
19 determination of what city staff, how they would
20 interpret the master plan with respect to that
21 particular event?
22    A.   With respect to powder puff games, I simply do
23 not know how they would have decided in that regard.
24    Q.   Based on your inter -- you agreed with their
25 interpretation, though, that Edgewood Master Plan, that

Page 192

1 their use of the -- that Edgewood's use of the field was
2 restricted to team practices and Phys Ed classes;
3 correct?
4    A.   That was my understanding that team practices
5 and Phys Ed classes, that's my understanding of what,
6 again, what they put forth.
7        And, you know, I don't know where powder puff
8 football games come in, if that falls under the aegis of
9 some kind of activity that was within the general rubric
10 of practices in Phys Ed classes.  I don't know how they
11 would have viewed it.
12        I don't -- I didn't regard those games one way
13 or another.  Never had any thoughts about them.  So you
14 would have to talk to Matt Tucker.
15    Q.   And, again, but my question was more limited
16 than that.
17        I was just simply asking you if you agreed
18 with the planning staff's interpretation back when the
19 Edgewood Master Plan was in effect, whether you agreed
20 with their interpretation that Edgewood was limited in
21 its ability to use its athletic field to only team
22 practices and physical education classes?
23        MS. ZYLSTRA:  Object to form.  You can answer.
24    A.   I was somewhat -- what's the right word --
25 agnostic on the issue in that -- the issue of whether or

Page 193

1 not they could have games like a powder puff football
2 game.  Again, I was not an expert in that and
3 understanding.
4        My concern was -- I never was opposed to
5 daytime use.  My concern is that, quite frankly, we
6 just, as a matter of fact, regard what takes place
7 during the daytime quite differently than what takes
8 place at night.
9        And so I understood their logic about daytime
10 use, but it wasn't -- it wasn't something that was
11 driving me in my concern.  I always thought that
12 Edgewood should be able to have daytime games.  That
13 wasn't a particular concern.  Particularly in years
14 past, there were minimal number of games, there were a
15 small number of games and the impacts were minimal.
16        But to extent that use into the nighttime with
17 large crowds -- they initially wanted to have crowds of
18 1300 people in their first proposal -- is different
19 entirely than what had been taking place before.
20        So my concerns were always focused on night
21 games and the impact that would have on a traditional
22 residential neighborhood.  Not a good answer to your
23 question, but that was really my focus.
24    Q.   But you believed that Edgewood was -- that
25 hosting athletic competition on its field, Edgewood was

Page 194

1 in violation of its master plan?
2    A.   From what I believed was I understood the
3 interpretation of the zoning administrator.  Not being
4 an expert in that, I trusted that his logic and his
5 understanding was accurate.  The zoning board of appeals
6 voted 4 to nothing to support his determination in that
7 regard.  I believe that they had a legal basis for that
8 understanding.
9        And I would also say that's how the
10 neighborhood viewed that field.  That's how Edgewood had
11 portrayed it for many years.  Dating way back and up
12 prior to the time that it was upgraded, they referred to
13 it as a practice field.
14    Q.   Have you ever written in any of your blogs
15 after the repeal of the master plan, did you ever refer
16 to games as being now legal games, implying that games
17 weren't legal to be held on the field before but are
18 legal now?
19        MS. ZYLSTRA:  Object to form.  You can answer.
20    A.   I may have.  I'm not sure, but if you have
21 evidence to suggest I did, then I must have.  So I don't
22 know, but if you have proof of that I'm glad to look at
23 it.
24    Q.   But do you recall ever drawing a distinction
25 between a time in which Edgewood was technically not

Page 195

1 allowed to have games on its field and when they were?
2    A.   I don't recall specifically, but it's
3 certainly possible that I may have done so.
4        (Exhibit 34 marked)
5    Q.   MR. INGRISANO:  Mr. Evers, I'm handing you
6 what's been marked as Exhibit 34.
7        Do you recognize that, sir, as a text exchange
8 with a member of No New Stadium, Mark Gartler?
9    A.   Yes, I do.
10    Q.   And you're providing him with insight and
11 advice as to how to present his case in the case of No
12 New Stadium to either the Plan Commission or Common
13 Council; is that fair?
14        MS. ZYLSTRA:  Object to form.  You can answer.
15    A.   No, as I indicated in answers to previous
16 questions, Jonathan, I did offer advice to members of No
17 New Stadium.
18        These public hearings can last a long time.
19 People repeat themselves.  Like I said, please organize
20 to make sure people don't repeat themselves because that
21 makes meetings last a very long time.
22        And if you go back and watch the meetings on
23 the Madison City channel, you will find several other
24 people showed up.  And when it came their turn to speak,
25 to say I've registered to speak, they would say my

Page 196

1 points have already been made and sat down.  Where --
2    Q.   On the first page, though, Mr. Evers --
3    A.   Let me finish.
4    Q.   -- you were focusing on how to make a more
5 persuasive case; isn't that right?
6        MS. ZYLSTRA:  I'm going to interrupt, Counsel.
7 He wants to finish his answer.
8        MR. INGRISANO:  Well, he didn't -- he's done
9 answering the question.
10    A.   Well, no, I haven't.  You interrupted me
11 before I was finished.
12    Q.   Go ahead.
13    A.   As I also said in the earlier answers to your
14 question, Jonathan, I encouraged them to be fact-based
15 at all times, not engaged in emotions but to engage in
16 fact-based discussions, not emotional hyperbole.
17        So yes, I encouraged them to stick to
18 substantial evidence.  That was -- and the second of
19 these is the public hearing testimony is five minutes,
20 not three, but they don't have to go the full five
21 minutes, again, out of respect for everybody that it was
22 going to be a long night.  I don't see anything wrong
23 with that.
24    Q.   Sir, did I ask you if there was anything wrong
25 with that?

Page 197

1    A.   I volunteered that, because you seem to be
2 trying to make a point.
3    Q.   Speculation like that is what extends
4 depositions unnecessarily long.
5    A.   I didn't ask the question.
6        MR. INGRISANO:  Take a five-minute break.
7        THE VIDEOGRAPHER:  We are off the record at
8 3:44 p.m.
9        (Recess)
10        THE VIDEOGRAPHER:  We are back on the record
11 at 3:56 p.m.
12 BY MR. INGRISANO:
13    Q.   Mr. Evers, you previously acknowledged that
14 lights and home games for Madison Edgewood High School
15 would have some positive impact for the school; correct?
16    A.   I believe that's correct.
17        (Exhibit 35 marked)
18    Q.   MR. INGRISANO:  Mr. Evers, this is an email
19 exchange between you and Common Council member Keith
20 Furman; correct?
21    A.   He sent me this email.  He had apparently read
22 this on my blog, so he -- I did not send this to him.
23        I sent this to Plan Commission members in
24 advance of the May 11th Plan Commission meeting and to
25 -- it looks like I did send it to all alders as well,

Page 198

1 yes. So to that extent, that's correct, there is some
2 exchange there.
3    Q.   The bulk of this, though, is your email to the
4 Plan Commission; is that fair?
5    A.   Yes, this is what I had actually posted on my
6 blog. It's essentially what I wrote and posted. I
7 posted publically, yeah.
8    Q.   The last page of this exhibit, as part of your
9 email, the paragraph that is sixth from the bottom, or
10 maybe better stated fourth from the top.
11    A.   Yes.
12    Q.   You write, "It's understandable that Edgewood
13 would like to have night games on their field. It would
14 likely add an increment of school spirit, assist in
15 recruiting, and provide needed revenue."
16       Do you see that?
17    A.   Yes.
18    Q.   Have you given any thought about how much of
19 an increment it would add to school spirit at Edgewood
20 High School?
21    A.   I can't say that I have. I don't -- I think
22 it's fair to say that there would be some increment, the
23 size of which I think would be open to debate.
24    Q.   Sure. The record before the Common Council on
25 Legistar had also testimony from parents and students at

Page 199

1 Edgewood that talked about the importance of being able
2 to play games at Edgewood on their home field at night;
3 isn't that correct?
4    A.   If you're saying that there were family
5 members who testified that they wanted to see lights
6 allowing home games on their field at night, yes, there
7 were. So yes, that's correct.
8    Q.   At your high school when you played football
9 in Ohio, did your school have an on-campus stadium by
10 which you could play football?
11    A.   Yes, it did.
12    Q.   Have you ever attended a school that didn't
13 have an on-campus stadium for its sporting events?
14    A.   No, but I'm aware such examples exist, even in
15 our own city.
16    Q.   Okay. I am, too.
17       Do you have any -- in listening to all the
18 people that presented to the Common Council and to the
19 Planning Commission in meetings where you attended, did
20 you come away with any sort of conclusion as to the size
21 of the increment of the school spirit or sense of
22 community that might be created by having that stadium
23 on campus?
24       MS. ZYLSTRA: Objection. Form. You can
25 answer.

Page 200

1    A.   I am trying to answer your question honestly,
2 Jonathan. I think that it -- again, it's a relative
3 component that the idea -- I think it's undebatable that
4 there would be some increment of school spirit.
5       The question always is, does -- you know, it's
6 kind of like a cost-benefit analysis in a broader sense.
7 Is the increment of school spirit such that it exceeds
8 the costs, the impacts, the burden on the adjoining
9 properties, which is clearly the understanding in the CI
10 District ordinance when it was initially set up to try
11 to address those concerns.
12    Q.   You noted, also, it would have an incremental
13 positive effect on recruiting; correct?
14    A.   Potentially so, yes.
15    Q.   And by "recruiting," you mean recruiting of
16 athletes?
17    A.   Perhaps recruiting of athletes, or in a
18 competitive environment recruiting more students to
19 attend that institution.
20       It was claimed that Edgewood's numbers --
21 enrollment numbers were decreasing.
22    Q.   So you recognize there is a potential benefit
23 to the overall enrollment at Edgewood from having a
24 stadium on campus; is that right?
25    A.   I recognized that there were potential private

Page 201

1 benefits to be obtained if Edgewood were to have a
2 stadium.
3    Q.   And one of those benefits was increase in
4 enrollment; correct?
5    A.   Potentially so, but that's all -- that's still
6 hypothetical.
7    Q.   And you mentioned the benefit of added
8 revenue. Do you see that?
9    A.   Yes, I said that, but I also qualify this as
10 "likely add." And so this is a hypothetical, and no one
11 I think can speak definitively about that.
12       But it's just hypothetical that perhaps that
13 having a stadium would generate revenue of some sort for
14 the stadium. Purely hypothetical, though, which I
15 qualified by saying it would "likely add."
16    Q.   To your knowledge, is there any increase in
17 parent satisfaction or reduction in parental burden for
18 Edgewood parents associated with having a home field, a
19 home stadium on campus as opposed to having the games
20 played elsewhere in the city of Madison?
21       MS. ZYLSTRA: Objection. Form, foundation.
22 You can answer.
23    A.   That's a hypothetical. I don't know the
24 nature of that request. It's -- it is true that roughly
25 40 percent of Edgewood families live outside the city

Page 202

1 limits.  So, in some instances, some of those families
2 may have lived in Middleton.  For example, on the home
3 games when they were previously played at Breitenbach
4 Stadium may have been more convenient than if they were
5 actually played on the Edgewood field.
6        So it's purely speculative as to what the
7 wishes and desires and the specific advantages for those
8 families would be.
9    Q.  Did you ever talk to any Edgewood parents
10 about this very question of whether it would be a
11 benefit to them to have an on-campus stadium?
12    A.  Yes, I've had conversations with people who
13 were in favor of having the stadium.
14    Q.  And did they tell you, hey, it's a real burden
15 to drive my kid all around the city to be able to have
16 a -- I'm sorry.
17        It's a real burden to have to drive my kid all
18 around the city for home games?
19    A.  I don't recall what they said in those
20 conversations.
21    Q.  But was that a general sense?  Did you get the
22 sense that -- you know, you've been very clear about the
23 impacts on the neighbors, right?
24    A.  Uh-huh.
25    Q.  I guess, did you attempt to ascertain the

Page 203

1 burden on Edgewood parents of not having a home stadium?
2    A.  I received that, certainly, from lots of
3 emails.  I thought I had a good understanding of the
4 complaints of Edgewood families and their desire to have
5 a home stadium.
6        I also had conversations with parents whose
7 kids attended West High and they said, yes, it's a
8 hassle, but one that we don't mind making because we
9 understand that to have a stadium on the West High
10 campus would unfairly burden the nearby neighbors who
11 didn't buy into that when they moved into those homes,
12 that they had an established use to their homes that
13 would be impacted negatively for a stadium to occur at
14 West High.
15        So I've heard it from different standpoints,
16 you know what I mean?
17    Q.  Do you recall the names of the West High
18 parents?
19    A.  No, I don't.  Well, actually, I do recall the
20 name of one West High parents.  Ned Siebert and his
21 wife, Catherine Jagoe, whose son played sports at West
22 High.
23    Q.  Is he a member of No New Stadium?
24    A.  Yes, he was.
25    Q.  Do you recognize there is a benefit of public

Page 204

1 safety for Edgewood to have an on-campus stadium as
2 opposed to having all of its players and students drive
3 separately or independently to an off-campus stadium?
4        MS. ZYLSTRA:  Object to form.  You can answer.
5    A.  I understand the question, but I must admit I
6 found it somewhat -- for many years I never heard that
7 the complaint at holding their games at Breitenbach
8 Stadium in Middleton was concerns about actual safety
9 from the potential for traffic accidents.
10        I never -- I didn't hear that that was the
11 primary motivating concern.  The reason why it seemed
12 like you would still have away games in which those --
13 that necessary travel would take place.
14        So half the season, anyways, you are conceding
15 that you are going to be driving to these games.  So
16 there seemed to be some risk inherent in participating
17 in competitive sports, the additional burden of driving
18 to another field through a bus that would take them,
19 seemed to be something that they had managed in the
20 past.
21        So I didn't find it a compelling argument, but
22 I did hear that that was one of the concerns that was
23 raised.
24    Q.  Sir, the August 26, 2019, Plan Commission
25 meeting you were recorded on the record as saying,

Page 205

1 quote, "Public institutions have a built-in incentive to
2 pay attention to the public because they are dependant
3 on public support.  Private institutions must be careful
4 not to be seen as being willing to impose their will on
5 their neighbors, because to do so tears the fabric of
6 civil society and undermines our shared values of
7 commitment to community and partnership."
8        Do you recall saying that?
9    A.  I recall saying something like that.  Do you
10 have the exact transcript?  Because it was part of about
11 a five-minute conversation.  If I read the statement --
12 do you have the transcript?
13    Q.  I do, but do you recall saying that?
14    A.  Can I see the transcript?
15    Q.  I'm not asking you -- sir, I'm asking you if
16 you recall saying that.
17    A.  I would like to see the transcript before --
18    Q.  So do you not recall saying that, sir?
19    A.  I recall saying something to the effect
20 because -- yes, but I was wondering -- the reason why I
21 asked, Jonathan, if you have the transcript because you
22 were taking one paragraph out of an entire statement,
23 and I'd suggest that you may want to see the entire
24 statement in its context.
25    Q.  I'm asking you about that statement.  I'm not

52 (Pages 202 - 205)

Page 206

1 asking you about the context. Did you say that, sir?
2    A.  Yes, I did.
3    Q.  Okay.  You don't believe private institutions
4 like Edgewood have an incentive to cooperate with the
5 public; is that right?
6    A.  That's not what I said.
7       MS. ZYLSTRA:  Object to form.  You can answer.
8    Q.  So my statement is incorrect?
9    A.  I -- could you repeat your statement, please?
10    Q.  Sure.  You don't believe private institutions
11 like Edgewood have an incentive to cooperate with the
12 public; is that right?
13    A.  That's not what I said.
14       MS. ZYLSTRA:  Object to form, late.
15    Q.  You said public institutions have a built-in
16 incentive to pay attention to the public; is that right?
17    A.  I made an affirmative statement about public
18 institutions.
19    Q.  By implication, were you making any statements
20 about private institutions?
21    A.  No, I was not.
22       MS. ZYLSTRA:  Hold on.  Object to form.  Go
23 ahead.
24       MR. INGRISANO:  What's wrong with the form of
25 that question?

Page 207

1       MS. ZYLSTRA:  You are -- to me, you're
2 unfairly characterizing the statements.  You're taking
3 snippets of his.  I think it's argumentative.  And I
4 think he has -- you're trying to ask him about a
5 statement of which you're isolating.  So on rule of
6 completeness is my form objection.
7       I'm sorry, I think the answer was given, but
8 if the answer needs to be regiven, that's fine.
9    Q.  Do private institutions like Edgewood have an
10 incentive to be good neighbors?
11    A.  I would think private institutions -- do
12 private institutions have an incentive to be good
13 neighbors.  Do private institution have --
14       I think we all have an incentive, Jonathan, or
15 an obligation to be good neighbors.  So I -- so I think
16 we all have an obligation morally to be good neighbors,
17 yes.
18    Q.  Obligations, sure.  Incentives, sir.
19       MS. ZYLSTRA:  I'll object to form, foundation.
20    A.  No, what --
21       MR. INGRISANO:  What's your foundation
22 objection?
23       MS. ZYLSTRA:  You're asking --
24       MR. INGRISANO:  It's his statement.  I'm
25 asking his statements about his own opinions.  Why is

Page 208

1 that a foundation objection?
2       MS. ZYLSTRA:  From my point of view it's a
3 hypothetical because it's asking about all private --
4       MR. INGRISANO:  I'm asking about his opinions
5 about what he said on the record in a public hearing.
6       MS. ZYLSTRA:  I understand that, sir.  I'm
7 just trying to explain -- you asked me what my --
8       [Crosstalk]
9       THE REPORTER:  Okay, okay.  I can only take
10 one at a time.
11       MR. INGRISANO:  You objected to multiple,
12 almost every question, on baseless form and foundation
13 objections.  Now, I understand you're trying to coach
14 the witness, but stop.
15       MS. ZYLSTRA:  Counsel, you asked me what the
16 objection was and I tried to explain it.  If you don't
17 want me to explain it, that's fine.  I will make my
18 objection and then I will -- but you asked.
19    Q.  MR. INGRISANO:  Sir, in your opinion, do
20 private institutions have the same incentives to be good
21 neighbors as public institutions?
22       MS. ZYLSTRA:  Same objections.  You can
23 answer.
24    A.  Yeah, what I'm -- you're not allowing me to --
25 you're taking something that I wrote that was perhaps

Page 209

1 clumsily worded.
2       And I can explain if you're interested, and
3 I'm not sure you are in what I was trying to say in what
4 the incentives are.  And it has to do with consideration
5 of stakeholders and who are your immediate stakeholders.
6       Public high schools have stakeholders that are
7 geographically defined and also defined in terms of
8 those schools, those institutions being relied upon to
9 vote in the way of levy funds to finance those schools.
10       So in that sense, public institutions have a
11 direct connection towards and incentives from its
12 standpoint to be able to answer the needs of direct
13 stakeholders, including neighbors.
14       Private high schools, because of their very
15 nature, answer to a different set of stakeholders that
16 might not be, and generally are not, and certainly not
17 in Edgewood's case, geographically defined.
18       75 percent of Edgewood's families who send
19 their kids there do not live in the 53711 zip code.  And
20 the 53711 zip code is very broad.  Who knows what that
21 number presumably is higher regarding the neighborhood,
22 the adjacent neighborhoods that are defined as a concern
23 in the Statement of Purpose in the CI District.
24       So what I was trying to say in that one
25 snippet, is that there is a different set of

Page 210

1 stakeholders that provide incentives for how decisions
2 that get made, including development decisions.
3    Q.   Do you believe that those differences of
4 stakeholders warrant different treatment than public and
5 private institutions?
6    A.   Different stakeholders.  I do not believe
7 different treatment is appropriate at any time.
8    Q.   Sir, you've repeatedly characterized Edgewood
9 has being, quote, "entitled" or acting with a sense of
10 entitlement; isn't that correct?
11    A.   I said that it certainly had the appearance
12 they acted with an entitlement, because I participated
13 in meetings saying this is our property, we should be
14 able to do what we want and that we have a right to a
15 stadium.
16        And I tried to caution them and say you don't
17 have a right to a stadium, you have a right to go
18 through a process, i.e., either amending your master
19 plan or filing for a conditional use permit to get a
20 stadium.  But you do not have an inherent right to a
21 stadium.
22        So it conveyed to me a sense of entitlement
23 that I thought was not very constructive in terms of
24 neighborhood relations.
25    Q.   But in your public statements you've used the

Page 211

1 phrase "entitled" and "entitlement" with respect to
2 Edgewood; is that fair?
3    A.   Again, based on a response to the ways that
4 Edgewood comported themselves in meetings, yes, I felt
5 that they acted with a sense of entitlement which made
6 it more difficult to find a sense of compromise.
7    Q.   So the answer to my question is yes, you have
8 used the phrase "entitled" and "entitlement" with
9 respect to Edgewood; is that right?
10    A.   Yes, yes.
11    Q.   Thank you.  You've also said that you believe
12 Edgewood has attempted to impose its will on its
13 neighbors; is that correct?
14    A.   Yeah, and what I meant by that, Jonathan, is
15 that they were prepared, despite the fact community and
16 partnership and compassion are parts of the five values
17 that Edgewood holds forth, they were willing to take
18 advantage of this loophole.
19        They could have just as easily said we realize
20 that it's legal for us to do so, but in the spirit of
21 community and partnership we are not going to do so, but
22 in a sense impose our will upon the neighbors regardless
23 of impacts.  And that to me was concerning.
24    Q.   I'm sorry, sir, the answer to my question is,
25 yes, you have stated in the past that Edgewood is trying

Page 212

1 to impose its will on its neighbors?
2    A.   I said "instead of doing so."  So I think I
3 used it in a conditional sense if you look at the
4 wording of the statement.  Instead of trying to do so.
5        But if you could point out the exact statement
6 perhaps then I would -- I could respond differently.
7    Q.   You said at the beginning of the deposition
8 that one of your goals has been to foster a respective
9 -- I'm sorry, a respectful dialogue between the parties
10 in this matter; is that fair?
11    A.   It's been my hope all along, yes.
12        (Exhibit 36 marked)
13    Q.   MR. INGRISANO:  I'm handing you what's been
14 marked Exhibit 36.
15        MS. ZYLSTRA:  Counsel, if you could hold on
16 one second.
17        MR. INGRISANO:  I can make the record while
18 you're looking at the exhibit.
19        MS. ZYLSTRA:  I'm sorry, I thought that was a
20 question to the witness.  And I apologize, I thought you
21 were starting your question to the witness.
22        MR. INGRISANO:  Counsel, we have -- yes, we
23 have just marked Exhibit 36.
24    Q.   Sir, do you recognize this email exchange?
25    A.   I recognize this as an email received from a

Page 213

1 neighbor in District 13, a resident in District 13.
2    Q.   And you forwarded that?
3    A.   I forwarded it to my District 13 email
4 address.
5    Q.   And in that email, the neighbor refers to
6 Edgewood's supporters as "hordes."  Do you see that?
7    A.   I see that this is how this resident described
8 it, yes.
9    Q.   Do you consider that to be a respectful -- a
10 respectful comment about Edgewood's supporters?
11    A.   I do not.
12    Q.   And did you email this constituent to say,
13 hey, we need to be better than that, we need to be
14 respectful?
15    A.   I don't believe I emailed this person, but it
16 certainly would have been consistent for me to remind
17 residents to engage the folks at Edgewood with respect.
18        But I might also add, a resident in my
19 neighborhood lived on Woodrow Street had a rock thrown
20 through their bay window.  Residents in my neighborhood
21 who had signs exercising their First Amendment rights
22 saying "No New Stadium" had those signs stolen, had
23 signs that were defaced, that neighbors and residents in
24 my district received hate mail, including postcards
25 showing people in a casket saying, "This is you in 10

Page 214

1 years. You should move."
2      So, yes, things got rather agitated, and I was
3 always trying to ask for calm. Calm down, please, we
4 are obligated to treat each other with respect.
5      Q.   Are you aware of any anti-Catholic statements
6 or rhetoric made by either residents of those
7 neighborhoods or from No New Stadium?
8      A.   I'm not aware of any, no. And if it ever
9 occurred, Jonathan, I would have spoken out strongly
10 against it.
11      For the record, I financially support an
12 institution called Homeboy Industries in East L.A.,
13 founded and managed by a Jesuit priest named Father Greg
14 Boyle. It's the world's largest gang intervention
15 program.
16      I also financially support an organization run
17 by a Franciscan priest named Richard Rohr who runs an
18 organization called the Center for Action and
19 Contemplation based in Albuquerque.
20      I read books by Thomas Merton and of the
21 Catholic saints. I have no anti-Catholic bias, and I
22 would not tolerate the expression of anything along
23 those lines in this or any other aspect of my work as an
24 alder or as a community member. I find that
25 intolerable.

Page 215

1      Q.   You find what intolerable?
2      A.   The anti-Catholic bias or any kind of
3 prejudice or bias along those lines.
4      It might be better to say I find it
5 unacceptable. I would not tolerate it, is what I meant
6 to say.
7      Q.   Mr. Evers, I'm handing you what has been
8 marked Exhibit 16, Defendants' Responses to Request for
9 Admission in this case.
10      I represent to you, sir, that those answers
11 were served on us on or around December 9, December 2021
12 as indicated on page 51 of the document signed by the
13 your counsel, Attorney Zylstra. Do you see that?
14      A.   Yes.
15      Q.   Did you, at any time prior to -- on or prior
16 to December 9, review, provide input on the responses
17 found on this document, Exhibit 16?
18      A.   Yes, I believe so, yes. Not all of them,
19 because there are -- many of these don't have anything
20 to do with me at all.
21      Q.   So do these -- do you recall which requests
22 for admission that you had input in or responded to?
23      A.   Well, I don't recall them. I would have to go
24 over them one by one. But I think they would be the
25 ones that were specified in the complaint.

Page 216

1      So I believe the city attorney, the Assistant
2 City Attorney Patty Lawton discussed --
3      MS. ZYLSTRA:   Wait, wait, wait. I'm going to
4 object on attorney-client privilege. You're not to
5 reveal your communications with the City Attorney Patty
6 Lawton with regard to this document.
7      THE WITNESS:   Okay. Well.
8      Q.   Sir, do you believe that the document found in
9 Exhibit 16 fairly and truthfully reflects your answers
10 to the request to admit proposed in this litigation?
11      A.   I would have to get -- I would have to go over
12 every single point and it's apparently a 50-plus page
13 document, so I cannot say for sure.
14      Q.   I'm going to ask you to look at page 9 of this
15 exhibit, Request No. 17.
16      You were requested to admit that Edgewood's
17 educational mission is in furtherance of the sincerely
18 held religious beliefs of the Dominican Sisters of
19 Sinsinawa and of Edgewood. Do you see that?
20      A.   Yes, I do.
21      Q.   And after an objection, the last sentence of
22 the response says, "To the extent further answer is
23 required, the City Defendants deny."
24      Do you see that?
25      MS. ZYLSTRA:   I object on rule of completeness

Page 217

1 and ask that the sentence before that be read in.
2      Q.   Okay. Subject to and without -- so the
3 sentence before that says, "Subject to and without
4 waiving the objection, Subject to and without waiving
5 the objection" -- oh, that might have been why I got
6 confused. All right. So there is repetitive -- I'm
7 sorry.
8      "Subject to and without waiving the objection,
9 Subject to and without waiving the objection, the City
10 Defendants have insufficient information to admit or
11 deny the request pursuant to Rule 36(a)(4). To the
12 extent further answer is required, the City Defendants
13 deny."
14      Do you see that?
15      A.   Yes, I do.
16      Q.   Okay. As you sit here today, do you have any
17 information that would tell you that Edgewood's
18 educational mission is not in furtherance of sincerely
19 held religious beliefs?
20      MS. ZYLSTRA:   Object to form. You can answer.
21      A.   I don't have information to say that that is
22 not the case in front of me. No, I do not.
23      Q.   You cited Edgewood's Dominican values
24 previously; correct?
25      A.   In fact, I have them memorized.

Page 218

1    Q.   And you recognize that Edgewood is a Catholic
2 institution; right?
3    A.   That is correct.
4    Q.   Do you believe that it's insincere in its
5 holding itself out as a Catholic institution?
6        MS. ZYLSTRA:  Object to form.  You can answer.
7    A.   I would hope so.  I don't know for certain.  I
8 struggled at times where it felt like Edgewood was being
9 less than transparent, and I would wish more than
10 anything that they've been truthful in all their
11 statements, that they expressed a little bit more
12 compassion in the sense of the community and
13 partnership.  But I'm not God.  I dare not judge the
14 intents or the hearts of the folks at Edgewood.
15   Q.   So you have no reason to believe that
16 Edgewood's religious beliefs are not sincerely held; is
17 that correct?
18       MS. ZYLSTRA:  Object to form.  You can answer.
19   A.   I don't have that information in front of me,
20 no.
21   Q.   Sir, Madison Edgewood says that enrollment is
22 critical to its religious mission.
23       Do you have any reason to dispute or doubt
24 that?
25   A.   Without knowing more information, I would

Page 219

1 think I would need more information before I would try
2 to dispute it, doubt it, or attest to it.  I simply
3 would not be able to say in the absence of more
4 information.
5    Q.   Sir, would you agree that the absence of an
6 on-campus field with lighting puts Edgewood at a
7 competitive disadvantage relative to other schools in
8 the Madison area?
9    A.   No, I do not agree.
10   Q.   Why would you disagree with that?
11   A.   Well, because Madison Country Day School is a
12 private school, college preparatory school, without a
13 stadium.  They seem to do quite well and compete
14 probably with -- for the same student body -- excuse me.
15 Excuse me.
16       So there is no indication in my mind that
17 Madison Country Day School suffers that -- their
18 enrollment because they do not have a stadium.
19   Q.   Sir, is there any reason that Edgewood's field
20 today cannot be used for community outreach, evangelism,
21 assembly or prayer?
22       MS. ZYLSTRA:  I'm sorry, I coughed.  Could you
23 hear the end of the question?
24       THE WITNESS:  I believe I heard the question.
25       MS. ZYLSTRA:  All right.  Objection.  Form,

Page 220

1 foundation.  You can answer.
2    A.   From my understanding, that even particularly
3 because of changes within the CI District regarding
4 places of worship, that there aren't restrictions on
5 what Edgewood can do on their field.
6    Q.   So Edgewood could have a campus liturgy on its
7 field?
8    A.   Yes, particularly with my understanding of the
9 adjustments that were made, and the amendments that were
10 made on the Campus Master Plan, yes, they can.
11   Q.   Without lights on its field can you identify
12 for me, please, any activities that Edgewood could host
13 on its field?
14       MS. ZYLSTRA:  I'm sorry, can I hear that back?
15       (Record read)
16   Q.   After -- at night, after dark.
17       MS. ZYLSTRA:  Object to form.  You can answer.
18   A.   I don't know what kinds of activities you can
19 have at night without lights, so I can't identify what
20 you could do without lights and what you can't.
21   Q.   You agree with me, sir, that without outdoor
22 lighting for its field, Edgewood would be effectively
23 restricted from any activities after daylight hours on
24 the field?
25       MS. ZYLSTRA:  Object to form.  You can answer.

Page 221

1    A.   I would think that there is a probability that
2 without lights that activities -- official activities on
3 their field would not be possible.  Yes, I would agree
4 to that.
5    Q.   Are you aware of Defendant Matt Tucker
6 notifying Edgewood he believed its use of its athletic
7 field for athletic contests was outside of the
8 allowances under Edgewood's Master Plan?
9    A.   I -- that's my understanding, yes.  That was
10 back in, I believe -- I think started in October or
11 November of 2018 from what I understand and -- but I
12 don't have that timeline right in front of me.
13   Q.   Sir, during Common Council or Plan Commission
14 meetings have you ever texted members of the Common
15 Council or Plan Commission about matters under
16 discussion?
17   A.   I don't recall.
18   Q.   Is that something that you would possibly do
19 or is it impossible that you would do that as a matter
20 of practice?
21       MS. ZYLSTRA:  Object to form.  You can answer.
22   A.   I believe that it's possible that on any given
23 topic before us that text messages, perhaps, were
24 exchanged.
25       I don't know about this particular item.  It's

Page 222

1 not uncommon for people to text one another during a
2 meeting, particularly in a time of, you know, Zoom, that
3 kind of thing, that you might text somebody during a
4 meeting.
5     Q.  Sir, have you turned over any texts that you
6 have to your attorneys relating to consideration of
7 Edgewood's lights or stadium?
8     A.  I believe I have, yes.
9     Q.  Have you turned over all texts pertaining to
10 your sponsored ordinance amendment to
11 Campus-Institutional District zoning?
12     A.  I believe I have.  I was requested to turn
13 over texts, exchanges with certain individuals, so I
14 went back and looked for those individuals to see if
15 there was anything pertaining to this matter and turned
16 them over to the city attorney's office as requested.
17     Q.  Sir, page 47 of this exhibit, Request No. 151.
18     "Admit that requested lighting complied with
19 City's objective standards for outdoor lighting."
20     Do you see that?
21     A.  I do see it, yes.
22     Q.  Response is "See General Objection 11.  The
23 City Defendants deny."
24     Do you see that?
25     A.  Yes, I do.

Page 223

1     Q.  What information do you have, sir, that the
2 Edgewood lighting did not comply with the city's
3 objective standards for outdoor lighting?
4     A.  I quite honestly can't say at this point.  I
5 would have to go back and take a look at what requested
6 lighting you're referring to.
7     Was it the four light poles or was it some
8 other requested lighting and what objective standards
9 were.  So in the absence of more information, I frankly
10 would not be able to offer an opinion.
11     Q.  Do you have any information, sir, that
12 Edgewood's lighting applied for in February of 2019,
13 that that application did not comply with the standards
14 for lights under the outdoor lighting ordinance?
15     A.  I'm not a zoning expert, so that is not
16 something that I, without more information, really could
17 speak to affirmatively or in denial.
18     Q.  So the answer is no, you don't have any
19 information that would cause you to conclude that
20 Madison -- that Edgewood's lighting was noncompliant; is
21 that right?
22     MS. ZYLSTRA:  Object to form.  You can answer.
23     A.  I don't presently have that information.
24 That's correct.
25     Q.  Have you ever had that information?

Page 224

1     MS. ZYLSTRA:  Same objection.  You can answer.
2     A.  I'm not the zoning administrator and never
3 was, so I didn't -- I didn't make that determination.
4 So in the absence of more information I just don't know.
5     This was not a question that I really had a
6 lot of feedback on to that pertained to me.
7     Q.  Sure.  You do recall sitting down and going
8 over these requests and providing answers to them; is
9 that right?
10     A.  I recall going over requests as they applied
11 to -- generally speaking, to me in particular.  Those
12 were the ones that I recall looking at it with greater
13 specificity.
14     Q.  And did you determine which of those requests
15 applied to you?
16     MS. ZYLSTRA:  Counsel, we're getting close to
17 the line.
18     MR. INGRISANO:  I didn't ask him for any
19 communications with counsel.  I asked him if he
20 determined what issues applied to him.  If his answer is
21 no, his answer is no.
22     MS. ZYLSTRA:  Well, that's a yes/no question.
23     A.  Did I determine which ones applied to me and
24 which ones not?  No, I did not.  I --
25     MS. ZYLSTRA:  Uh.  I want to be careful that

Page 225

1 you don't disclose attorney-client communications and we
2 are close to that line.
3     Q.  I'll hand you what's been marked as Exhibit 4.
4     Sir, did you review the answers provided on
5 Exhibit 4 for their accuracy and truthfulness?
6     A.  Yes.
7     Q.  Did you do that, sir, on or before December 9,
8 2021?
9     A.  I believe so, yes.
10     Q.  Sir, are you aware of any outdoor lighting
11 permit denied to a Madison area school between 2013 to
12 present?
13     A.  No, I'm not -- I don't know.  Quite frankly, I
14 don't know.  So I'm not aware of any that has been done.
15 But I don't know.  I really don't.
16     Q.  Sir, Interrogatory No. 7, on page 6, "Identify
17 all drafters, contributors, sponsors and co-sponsors
18 of --
19     MS. ZYLSTRA:  Counsel, I think he's on the
20 wrong page.
21     Q.  Interrogatory No. 7, on page 6.
22     A.  Which -- what now?  No. 7?
23     Q.  No. 7, sir.  "Identify all drafters,
24 contributors, sponsors and co-sponsors of Ordinance 19
25 dash 69."  Do you see that?

Page 226

1    A.   Yes.
2    Q.   And you recognize Ordinance 19 dash 69 as the
3  ordinance amendment that you sponsored relating to the
4  amendment to the Campus-Institutional District; correct?
5    A.   Correct, yes.
6    Q.   Sir, do you know what Tim Parks' involvement
7  was with that ordinance amendment?
8    A.   I don't know specifically, except that he and
9  the planning department, I believe, perhaps was involved
10  in discussions.
11       But I can't say specifically, because, again,
12  I was not in the drafting room:
13    Q.   What was Matthew Tucker's role?
14    A.   I imagine that -- I don't know.  I guess I
15  don't know.  I can only speculate.  So I think the
16  correct answer would be I don't know.
17    Q.   And how about Heather Stouder?
18    A.   As the director of the planning department, I
19  imagine she would have some -- been involved in
20  discussions.
21       But, again, since I wasn't in the room where
22  it happened, I cannot say specifically what either
23  Heather's -- what any of these persons you've
24  identified, what their roles were.  But it's logical to
25  assume that they had some involvement indeed.

Page 227

1    Q.   Sir, are you able to identify all permitted
2  uses of Edgewood's athletic field during the effective
3  dates of its master plan?
4       MS. ZYLSTRA:  I'll object to form.  You can
5  answer.
6    A.   Please repeat.
7    Q.   Sure.  Are you able to identify all permitted
8  uses of Edgewood's athletic field during the effective
9  dates of its master plan?
10    A.   I don't know if I can identify all of them.
11  That's a big question.
12    Q.   Can you identify any permitted uses of
13  Edgewood's Master -- can you identify any permitted uses
14  of Edgewood's athletic field during the effective dates
15  of its master plan?
16    A.   Can I identify any permitted uses?  Well,
17  practices were identified as a permitted use during the
18  time of the master plan before -- so practices were
19  clearly, and Phys Ed classes.  Those two I know for
20  sure.
21    Q.   Any others?
22    A.   During the time of its master plan, the
23  effective dates of its master plan.  Religious
24  activities on the field would certainly have been
25  permitted.  Once the master plan -- or the CI District

Page 228

1  was modified to clean up the language there, that would
2  -- they were never forbidden.  There was no attempt to
3  ever stop Edgewood from doing that.
4       But it would be purely speculative, and I
5  would have to think about all the other permitted uses
6  of gatherings on the field for -- I don't know.
7       Again, I don't know other than practices that
8  were identified and Phys Ed classes what would be
9  permitted uses.  But I know that that was certainly a
10  subject of debate.
11       And as I've said earlier, I was a big agnostic
12  about whether or not Edgewood should be able to play day
13  games on their field or not.  That was not my primary
14  concern, ever.
15    Q.   The source of your understanding for the
16  permitted uses of team practices and physical education
17  classes was the Edgewood Master Plan itself, correct,
18  the Open Spaces?
19    A.   And the interpretation given by Matt Tucker.
20    Q.   And the interpretation that religious
21  activities were permitted use of the field comes from
22  the text of the Campus-Institutional District zoning
23  ordinance; is that correct?
24    A.   Certainly, when it was amended.  That's my
25  understanding, Jonathan, but I would have to go back, so

Page 229

1  I can't say for certain.  So to the best of my
2  knowledge, let me qualify it that way.
3    Q.   Sure.  So was it your position, sir, your
4  understanding that permitted uses included anything
5  identified in the master plan and anything identified as
6  a permitted use in the Campus-Institutional District
7  zoning ordinance?
8       MS. ZYLSTRA:  Object to form.  Foundation.
9  You can answer.
10    A.   Again, I'm no expert in zoning matters, so I
11  would rely heavily upon city staff and my understanding
12  of the permitted uses according to the master plan.
13    Q.   So whatever planning staff would say about
14  what the permitted uses were under the master plan, that
15  would be your interpretation of the permitted use?
16    A.   It would be that and the city attorney's
17  office would certainly be something that I would
18  consider in forming my own opinion.
19       And there -- that particular portion of the
20  master plan certainly was consonant with how Edgewood,
21  themselves, had described the use of the athletic field
22  for, you know, I would say a couple decades prior to the
23  time of this dispute.
24       MR. INGRISANO:  Subject to my right to recall
25  Mr. Evers unrelated to the issues regarding the request

58 (Pages 226 - 229)

Page 230

1  for admission, I'm done.
2       MS. ZYLSTRA:  And I'm not waiving, obviously,
3  our objection to that.
4       But we would like to reserve the right to read
5  and sign.  But I have no follow-up questions.
6       MR. INGRISANO:  All right.  Very good.
7       THE VIDEOGRAPHER:  This concludes the
8  deposition.  We are off the record at 4:50 p.m.  This is
9  the end of Media Unit 5.
10      (Deposition adjourned at 4:50 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 232

1            Veritext Legal Solutions
              1100 Superior Ave
2              Suite 1820
              Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   May 11th, 2022
5
   To: SARAH A. ZYLSTRA
6
   Case Name: Edgewood High School Of The Sacred Heart Inc v. City Of
7  Madison Wisconsin Et Al
8  Veritext Reference Number: 5188349
9  Witness:  Tag Evers      Deposition Date:  4/28/2022
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 231

1       CERTIFICATE OF REPORTER
2
3       I, Cheri Winter, a Certified Shorthand
4  Reporter, Notary Public in and for the State of
5  Wisconsin, do hereby certify that the foregoing
6  deposition was taken before me, on the 28th day of April
7  2022; that it was taken at the request of the Plaintiff;
8  that it was taken in shorthand by me, a competent court
9  reporter and disinterested person, approved by all
10 parties in interest, and thereafter converted to
11 typewriting using computer-aided transcription; that
12 said deposition is a true record of the deponent's
13 testimony; that the deposition was taken pursuant to
14 Notice, that said TAG EVERS, before examination was
15 sworn by me to testify to the truth, the whole truth,
16 and nothing but the truth relative to said cause.
17    Dated May 12, 2022.
18
                    _Cheri Winter_
19    _____
20         Cheri Winter
            Notary Public
21         State of Wisconsin
22
23
24
25

Page 233

1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 5188349
3    CASE NAME: Edgewood High School Of The Sacred Heart Inc v.
   City Of Madison Wisconsin Et Al
     DATE OF DEPOSITION: 4/28/2022
4    WITNESS' NAME: Tag Evers
     In accordance with the Rules of Civil
5  Procedure, I have read the entire transcript of
   my testimony or it has been read to me.
6
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8  _____   _____
9  Date         Tag Evers
10   Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
     Statement; and
14   Their execution of this Statement is of
     their free act and deed.
15
     I have affixed my name and official seal
16 this _____ day of_____, 20____.
17
18   _____
     Notary Public
19   _____
     Commission Expiration Date
20
21
22
23
24
25

Page 234

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 5188349
 3        CASE NAME: Edgewood High School Of The Sacred Heart Inc v.
   City Of Madison Wisconsin Et Al
          DATE OF DEPOSITION: 4/28/2022
 4        WITNESS' NAME: Tag Evers
 5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7        I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9        I request that these changes be entered
   as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
   Date          Tag Evers
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18     in the appended Errata Sheet;
          They signed the foregoing Sworn
19     Statement; and
          Their execution of this Statement is of
20     their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
          Notary Public
24  _____
25        Commission Expiration Date
```

Page 235

```
 1        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 5188349
 3  PAGE/LINE(S) /      CHANGE      /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
   _____    _____
20  Date          Tag Evers
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
          Notary Public
24  _____
25        Commission Expiration Date
```

**&**

**&** 5:5,12,15,21
6:12,22 115:14

**0**

**0018** 1:6 6:11

**1**

**1** 5:21 6:5 52:5
107:15 111:13
116:14 131:5
**1.5** 73:21
**1/2** 53:22 119:16
**10** 3:21 82:7
141:18 155:15
172:9 190:14
213:25
**10-10-19** 82:7
**10/1** 109:8,25
**10/1/2019** 107:7
112:10
**1000** 145:10
**104** 2:10 123:8,11
124:18
**10:15** 52:5
**10:28** 52:9
**11** 3:13 170:5
173:16 222:22
**1100** 232:1
**115** 2:12
**11:09** 75:23
**11:22** 76:2
**11th** 163:25
168:13,14 197:24
232:4
**12** 3:22 133:22,25
134:11 135:2
231:17
**126** 2:14
**128** 2:15
**12:04** 101:25

**12:37** 102:3
**13** 3:10,17,23 8:23
19:14 20:7 21:9
22:11,23 35:13
37:2,8 40:12 53:6
81:21,23 116:4
132:14 155:7,8
165:18 177:4
178:17 190:17,21
191:2,5 213:1,1,3
**1300** 193:18
**131** 2:17
**133** 3:22
**135** 2:19
**137** 2:21
**13th** 8:2 164:25
**14** 142:18 145:6,20
151:5 153:1 191:5
**141** 2:22
**144** 2:24
**146** 3:3
**149** 3:4
**14th** 149:10
**15** 151:3,5
**150** 179:18
**151** 222:17
**157** 3:6
**158** 3:8
**16** 2:24 3:24 142:4
144:6,14 147:19
148:3 215:8,17
216:9
**164** 3:9
**166** 3:11
**17** 2:9 46:4 50:8
52:16 59:22
146:21 148:15
186:18 189:20
216:15
**170** 3:12

**17th** 59:21
**18** 2:10 104:1,3,5
104:10 105:1
106:24 111:22,25
144:19 190:21
**1820** 232:2
**19** 2:12 12:12 82:6
115:2,3,14 123:8
128:16 225:24
226:2
**190** 3:21
**195** 3:14
**1956** 8:2
**1962** 21:1
**197** 3:15
**1974** 12:7
**1987** 12:12
**1990s** 37:5
**1995** 13:9
**1:48** 143:24
**1:57** 144:2

**2**

**2** 52:10 96:12
101:25 120:2
133:24 155:9,10
158:3 167:12
**2-3** 151:18
**20** 2:14 16:16
126:14,17,25
128:17,21 148:8
148:16 233:16
234:22 235:22
**2000** 9:10
**2006** 56:24 58:10
**2013** 39:12 75:9
97:17 99:3 225:11
**2014** 71:25 72:2
125:15 126:9
**2015** 71:15 72:2
73:14 74:25 75:9
75:13

**2017** 67:7 68:7
135:2
**2018** 17:20 18:1
26:21 39:6 52:16
53:10 59:20,22
60:19 67:6 68:7
221:11
**2019** 2:13,18,21,23
2:24 3:3,5,7 15:13
15:15,22 16:9,16
17:3,20 32:15
34:17 37:17 38:5
55:8 62:12,17
63:5,8 64:7 68:4
69:1,7 75:4 78:5
82:7,21 89:19
96:23 102:6
107:15 109:8,25
115:6 126:25
127:5 129:1
130:22,23 131:5
131:23 133:7
136:11 137:14,18
141:8 142:4 143:6
144:14 145:7,20
146:16 149:24
157:12,16,24
158:24 204:24
223:12
**2020** 3:10,13 41:8
41:9 48:21 60:25
129:20 130:14,24
163:24,25 164:6
164:25 167:10
170:5 173:17
**2021** 22:1 49:10
153:4 190:17
191:2 215:11
225:8
**2022** 1:16 5:7 6:1
6:4 231:7,17

232:4

**2023** 20:18,21

**20th** 15:13,14,16
33:17

**21** 2:15 15:20
128:13,19 130:13

**212** 3:17

**215** 3:24

**216-523-1313**
232:3

**22** 2:17 131:16,20
158:24

**2219** 145:10

**225** 3:20

**22582** 231:18

**22nd** 64:23

**23** 2:19 135:24
136:1

**2300** 8:13

**2329** 8:4

**24** 2:21 137:10,12
138:2

**25** 2:22 141:3,5,15
144:4

**26** 2:21,23,24 3:7
109:12 137:14,18
140:25 141:8
143:6,11,15 144:9
144:11 148:3
157:12,24 160:6
160:17 204:24

**26th** 153:25
157:16

**27** 3:3 123:8,9
146:11,13

**28** 1:16 3:4 6:1
46:4 149:13,22

**28.097** 82:2 120:2

**28th** 5:7 6:4 231:6

**29** 2:18 3:6 131:23
132:11 157:21,23

**2nd** 15:15 141:16

**3**

**3** 3:3 48:5 53:22
55:5 102:4 105:1
105:11 119:16
138:1,14 143:24
146:16 175:18,20
181:4 187:1

**30** 3:8 9:16 129:1
158:12,14 167:24
168:20,21

**30th** 130:22

**31** 3:9 12:11
164:20,22

**32** 3:11 166:22

**33** 3:12 170:2,4
171:20 173:24
175:19

**34** 3:14 195:4,6

**35** 3:15 197:17

**36** 3:17 115:13
119:18 212:12,14
212:23 217:11

**3:08** 186:12

**3:21** 1:6 6:11

**3:27** 186:15

**3:44** 197:8

**3:56** 197:11

**3rd** 96:20 104:8
105:16 107:13,14
108:7 109:8
111:13,22 144:21
145:22

**4**

**4** 3:5,20 106:24
107:20 141:15,17
141:21 144:2
149:24 150:12
151:4 186:12
194:6 217:11

225:3,5

**4-5** 156:4

**4/28/2022** 232:9
233:3 234:3

**40** 201:25

**401** 5:16

**44114** 232:2

**46** 46:5

**47** 222:17

**48** 178:22

**4:50** 230:8,10

**4th** 5:21

**5**

**5** 94:13,22 107:20
127:5,16 131:3
141:21 142:5
170:16 174:14,15
175:19 186:15
230:9

**50** 2:9 216:12

**500** 5:6,12

**501** 55:5

**509** 5:16

**51** 215:12

**5188349** 232:8
233:2 234:2 235:2

**53701** 5:13,22

**53711** 8:5 209:19
209:20

**56839** 123:11
142:19 148:9
160:6

**56981** 2:10 104:6
104:18 105:3
115:18,22 146:22
160:8

**5th** 150:16

**6**

**6** 2:13 126:25
130:23 131:4

133:7 141:21
143:14 144:18
152:16,20,22
160:24 161:10,16
170:16 225:16,21

**608.257.0609** 5:13

**61101** 5:16

**64** 46:5

**65** 21:6

**69** 82:6 225:25
226:2

**6:30** 191:6

**6:45** 64:21

**6th** 115:6

**7**

**7** 2:4 129:20
130:14,24 142:18
145:5 146:21
147:20 170:16
225:16,21,22,23

**70** 179:19

**73** 4:3

**75** 209:18

**7:00** 180:2

**7:30** 180:2 191:6

**7th** 163:3

**8**

**8** 148:7 155:16
171:20,23,24
172:2

**8/26/19** 116:8
123:20

**8/6** 114:2,20,23
127:3 140:23

**8/6/19** 112:13,20

**80s** 14:2

**81** 3:23

**815.986.8050** 5:17

**8th** 167:10 168:8
168:14

**9**

**9** 171:20 172:9
215:11,16 216:14
225:7
**9:04** 5:8 6:1,4
**9th** 60:25 162:24
163:7,15

**a**

**a.m.** 5:8 6:1,4 52:5
52:9 75:23 76:2
102:3
**abeyance** 69:19
**abide** 93:4 181:3
**ability** 18:6,15
70:16 78:25 91:24
97:12 110:11
166:12 192:21
**able** 9:25 16:20
17:11,11 23:9
30:24 62:3 67:5,8
92:22 94:18 97:23
100:23 101:10
106:7 118:16
181:3 184:9
193:12 199:1
202:15 209:12
210:14 219:3
223:10 227:1,7
228:12
**abroad** 161:8
**absence** 67:18
100:8,24 116:14
219:3,5 223:9
224:4
**absent** 116:22
**absolutely** 75:21
**acceptable** 29:1,2
42:9 44:19
**accepting** 181:7

**accidents** 204:9
**accommodate**
11:11 92:9
**accord** 54:7,18
**account** 26:15
**accounts** 182:4
**accuracy** 225:5
**accurate** 58:20
93:11 102:25
142:7 145:3 194:5
**achieve** 62:2
**acknowledge**
233:11 234:16
**acknowledged**
197:13
**acknowledges**
174:20
**act** 233:14 234:20
**acted** 210:12
211:5
**acting** 210:9
**action** 87:21 88:4
112:11 113:2,4
116:5 127:6,6
130:17 142:7,20
142:23 144:22,24
148:1 214:18
**actions** 130:9
**active** 94:4
**activities** 55:15,18
76:6,9 190:20
220:12,18,23
221:2,2 227:24
228:21
**activity** 57:6
141:20 192:9
**acts** 9:6
**actual** 31:14 37:17
42:2,10,16 43:11
44:3 45:21 50:4
77:13 91:13 94:1

94:9 103:13 204:8
**ad** 24:21
**add** 22:22 24:10
49:5 54:14 61:16
166:9,15 178:19
198:14,19 201:10
201:15 213:18
**added** 74:25 175:6
201:7
**adding** 150:21
**addition** 26:11
87:13
**additional** 54:8
100:22 101:6
121:8 176:15
204:17
**address** 8:3 26:11
27:3 42:11,22,24
45:12 46:7,12
47:8 86:5 87:22
88:25 91:5 93:2
94:7 96:20 97:15
114:11 121:2,24
122:14,24 129:14
130:1 133:18
161:21 179:21,25
200:11 213:4
232:16
**addressed** 45:14
45:15 96:1,2
103:3 106:22
122:13,14 171:10
**addressees** 167:1
**addresses** 26:12
26:16,20 27:4,9
54:21 122:1
**addressing** 41:14
92:23,24 124:5
125:18 174:13
178:8

**adequate** 28:21
**adequately** 151:16
**adjacent** 17:2
19:25 20:4 23:11
39:15 55:14 92:2
92:4,25 97:22
124:10 209:22
**adjoining** 179:20
184:12 200:8
**adjourned** 230:10
**adjustments** 220:9
**administration**
30:9 66:3 68:14
70:8 80:14,19
81:8
**administrative**
30:7
**administrator**
17:21 24:25 30:15
37:24 67:13 69:20
71:3 77:5,11 80:4
170:9 177:17
191:16 194:3
224:2
**admission** 215:9
215:22 230:1
**admit** 204:5
216:10,16 217:10
222:18
**admitted** 12:19
71:21 163:11
**adopt** 130:14,18
145:2,4
**adopted** 78:6
107:14 109:9
111:14 130:24
131:4 159:6,13
**adoption** 110:22
126:6
**adrian** 7:19

advance  139:8 197:24
advantage  101:3 124:9 211:18
advantages  202:7
adverse  43:5 91:22 92:24 97:20
advice  23:16 24:8 134:15 195:11,16
advise  75:15 79:19 80:20 101:15
advised  27:15,24 28:1 29:15 68:12 89:22
advising  69:15 154:1
advisory  23:6,12 23:13,14
advocacy  55:5
advocate  28:12
advocated  30:22 31:1,4 43:7,10,12 43:14
advocating  66:15 70:9
aegis  192:8
affiliation  23:5
affirmative  206:17
affirmatively 223:17
affirming  86:22
affixed  233:15 234:21
afforded  14:15
agenda  113:7 117:13,16 118:14 119:9 123:14 141:20 145:19 146:19,24,25 147:10 148:7

agendas  104:24
agents  9:5
agitated  214:2
agnostic  192:25 228:11
ago  36:7 38:8 53:22 119:16,17
agree  23:1,7 28:14 30:19,24 31:18 32:16 39:22 40:13 40:19,25 44:10,13 44:21,22 45:2,20 75:3 76:20 84:9 84:13,16,18 85:1 90:23 111:6 120:24 121:15 135:22 156:9 171:1 177:8 189:16 219:5,9 220:21 221:3
agreed  78:24 83:14 85:21 153:19 154:20 181:2 191:24 192:17,19
agreeing  134:21
agreement  28:24 44:25 45:20 85:8 137:9
agreements  9:5,5 125:10
agricultural  12:21 13:8 120:7 121:18 122:14,21 123:6
ahead  12:13 25:2 51:15 74:6 88:3 100:14 102:12 108:10 121:22 149:6 152:4 154:12 157:3 163:15 186:8

196:12 206:23
aided  231:11
al  1:8 6:8 232:7 233:3 234:3
albuquerque 214:19
alder  1:13 8:23 15:10,17 19:7 20:24 21:6,15 26:11,18 27:23 29:1,21 35:8,10,12 35:15,17,21 41:5 48:25 53:6 58:11 58:24,25 67:3 77:14,24 78:5,24 79:14 88:8,15,16 89:4 94:22 95:4 95:17 101:15 106:4 110:6 112:22,23 118:13 128:3 148:12,12 149:8,8,9,21,25 150:7,16 151:9,13 151:15,23,25 152:5,8,11,15,23 153:2,4,10,13,15 153:19 158:13 160:24 164:21 165:10 166:16,21 166:23 179:5 187:3 190:13 214:24
aldermanic  22:9 22:22 26:2,5,8 49:25 94:14 178:17
alderperson  15:9
alders  87:24 158:21 197:25
allen  35:12,24

allow  91:6 150:17 155:4 168:2 174:16
allowances  221:8
allowed  17:17 138:15 191:11 195:1
allowing  168:18 199:6 208:24
allows  169:15
ally  153:10,16
altered  155:16
ambitions  21:7
amend  30:23 31:4 58:17 94:6 101:10 124:21 155:23
amended  67:2 82:6,14 91:1 107:19 120:11 123:3 129:13 228:24
amending  31:2 94:25 98:1 126:1 210:18
amendment  2:11 2:14 31:6,8,12,22 31:23 66:23 67:10 67:16 82:14,19,23 82:25 83:12 86:3 87:18 88:1 89:13 89:17 90:22 91:4 91:17 92:16,19,20 93:2 95:21,22 96:1,7,9 97:12,15 98:6,21 99:9,16,24 100:3,7,18 101:15 102:13,24 103:10 103:13,20 104:7 104:14,20 105:24 110:1,19,25 111:2 111:9,15 112:7

[amendment - application]                                              Page 5

113:22 114:18
115:9,9,19 116:24
120:22 122:7
123:18,19 124:12
124:13 125:24
126:20 128:7
131:1 132:4 138:9
139:4,8,11,12
140:4,8,12,21,24
141:16,24 142:2,8
142:8,22 143:1,7
144:5,21 146:22
147:4 148:1,23
155:13 159:17
160:1 162:16
165:24 213:21
222:10 226:3,4,7
**amendments**
82:10 88:7,23,25
128:1 140:13
158:7 220:9
**american**   13:24
14:25
**amount**   21:14
174:21
**amplified**   120:9
122:2
**analysis**   22:6,21
98:6 105:19,25
154:14,17,24
156:8,15 200:6
**analyzed**   138:8
**anecdotal**   55:14
183:2
**anecdotally**   55:20
55:23
**anecdote**   183:5
**announce**   73:21
**announced**   58:16
117:2

**announcement**
180:6
**announcements**
115:14
**announcer**   33:9
**annual**   191:5
**answer**   11:6,23,24
14:22 16:1,4 18:8
18:17 19:1,4,13
20:12,25 22:5,20
25:2,24 28:6,18,23
29:10,25 30:5,13
31:7,17 32:1 33:1
34:10,11,14,19,20
35:4,23 36:12
37:1 38:18 39:3
40:2 45:9,25
46:10 47:10,15,21
49:4 51:1 54:11
54:23 55:2 59:7
62:21 63:15 66:5
68:17 69:12,24
70:25 77:1,19
78:3 79:3,23
85:17,19,22 87:25
88:10 92:18 94:3
96:11 97:14 98:10
98:15 99:20 100:1
100:15 106:10,18
107:23 109:15
112:25 114:7
120:14 121:4,20
121:23 122:12,16
123:5 124:3,16
125:1 126:21
127:11,23 130:7
133:9,10 134:25
135:1,6,7,10,12,20
136:22 139:16
140:15 147:7
148:5 150:25

153:12 154:8
159:18 160:3,12
162:23 163:20
169:7 170:23
171:18 173:1
174:7,10 175:14
176:17,25 177:22
178:3 182:8 183:4
185:10,19,21
187:18 188:2,21
189:5,18 190:6
191:14 192:23
193:22 194:19
195:14 196:7
199:25 200:1
201:22 204:4
206:7 207:7,8
208:23 209:12,15
211:7,24 216:22
217:12,20 218:6
218:18 220:1,17
220:25 221:21
223:18,22 224:1
224:20,21 226:16
227:5 229:9
**answered**   12:1
54:8 79:23 100:19
142:16
**answering**   40:8
46:20 48:3 85:13
196:9
**answers**   41:22
48:5 53:3 156:2
195:15 196:13
215:10 216:9
224:8 225:4
**anti**   214:5,21
215:2
**anticipated**   180:24
**anticipation**   164:2

**anticipatory**
182:10
**anybody**   87:17
**anyways**   204:14
**apologize**   90:3
105:12 173:13
188:20 212:20
**apparent**   83:2
130:1
**apparently**   94:17
95:8 148:22
197:21 216:12
**appeal**   173:18
**appealed**   172:25
**appeals**   83:2 86:21
87:7,11 194:5
**appear**   82:5
233:11 234:15
**appearance**
210:11
**appearances**   5:9
6:17
**appeared**   83:5
101:2
**appearing**   7:8
**appears**   50:11
116:9 121:24
122:5 123:22
127:24,25 131:6
140:9 141:22
170:11
**appended**   234:11
234:18
**applicability**
140:7
**applicable**   181:11
**applicant**   168:2,19
169:16 179:10
181:2
**application**   61:14
62:18,23 63:2,5,10

63:14 64:22 65:9
65:10,14,23,25
66:4,8,12,16,20
68:25 69:2,10,16
70:3,23 71:6,7
91:13 121:16
162:19 164:1,3
165:25 167:8,15
167:20 169:16,19
171:10 223:13
**applications** 61:19
68:15
**applied** 12:19
13:17 84:4,5 85:5
223:12 224:10,15
224:20,23
**applies** 83:25 84:3
95:22 122:8
**apply** 150:19
181:12,13,16,17
**appointed** 35:21
35:21
**appreciate** 10:2
172:5
**apprised** 63:2
**appropriate** 67:17
80:5,22,22 91:21
92:7 110:17
114:11 116:3
167:3 210:7
**appropriately**
118:23
**approval** 96:17
120:5 125:15
130:12 138:18
140:3 154:5
157:13,17 158:7
159:6 165:24
169:22 171:3
175:18

**approve** 130:18
147:12
**approved** 2:12,22
2:24 3:3 107:6,6
107:15 109:9,25
111:14 115:4
120:4 138:13,25
141:6 144:12
146:15 154:13,15
155:12,14 162:17
163:4 170:14
231:9
**approving** 120:15
154:16
**approximately**
151:15
**april** 1:16 5:7 6:1
6:4 15:12,14,15,16
15:20,22 16:16
17:3 20:18,21
55:8 62:13 153:4
231:6
**area** 9:13 90:25
112:2 138:20
182:14 184:18
219:8 225:11
**areas** 13:22 29:6
185:24
**arenas** 120:6
121:17
**argument** 32:16
204:21
**argumentative**
207:3
**arntsen** 35:12,24
41:5
**arrange** 166:17
**arranging** 9:4
**arrived** 62:5
**article** 3:4 63:9
70:6 73:18,20,24

74:3,9 149:22
150:8,10,11,12
152:3,9
**article's** 151:9
**articulated** 91:8
98:23
**ascertain** 202:25
**asked** 38:20 67:5
79:22 83:4 85:24
86:1,4 87:22 88:3
89:12,13 90:5
106:23 108:10
118:18 135:9
154:25 163:4,8
178:1 205:21
208:7,15,18
224:19
**asking** 19:8 40:5
40:10 46:23 49:14
61:4 71:25 72:16
74:14 83:7 87:3
96:5 139:2 167:21
174:5 183:9
192:17 205:15,15
205:25 206:1
207:23,25 208:3,4
**aspect** 214:23
**aspects** 80:16
**assembly** 219:21
**assertions** 84:8
**assessed** 188:11
**assigned** 104:19
**assignment** 233:2
234:2 235:2
**assist** 18:12,13
198:14
**assistant** 5:24 7:9
37:23 83:8 103:21
106:20 109:4
110:14 114:9
137:13 158:17

159:2 216:1
**associate** 25:5
**associated** 29:14
91:22 201:18
**association** 36:23
37:18,20,21 63:19
64:4,8,15,24 65:19
72:25
**associations** 27:17
28:2 54:6 74:17
**assume** 38:12 82:9
108:14 109:20
127:9 145:1 168:8
172:21 226:25
**assumed** 108:17
**assuming** 21:17
72:22 137:3
**assumption**
177:12
**athletes** 200:16,17
**athletic** 15:23
16:21,25 17:11
27:20 28:4,15
29:8 32:17,18,22
52:17 54:3 55:10
57:20 59:1 70:11
70:17 73:22 74:19
76:6 79:1 80:9
122:9 138:15
140:8,9 174:16,22
174:25 179:18
180:4 192:21
193:25 221:6,7
227:2,8,14 229:21
**attached** 45:19
234:7
**attempt** 91:5
122:17,23 127:10
202:25 228:2
**attempted** 211:12

**attempting** 91:4
102:24
**attend** 162:5
165:13 200:19
**attended** 12:7 33:5
52:15,20 60:2,2
199:12,19 203:7
**attendee** 165:6
**attending** 52:19
56:25 64:3 179:18
**attention** 58:22
165:20 205:2
206:16
**attest** 219:2
**attorney** 5:25 6:23
7:8,9 11:1 37:23
52:7 75:25 83:9
83:18,21 100:25
102:15 103:21
106:20 109:5
110:5,14 114:9
121:6 129:3
133:24 134:2,12
137:13,13 139:25
155:21 156:9
158:16,17 159:2,2
159:10 171:13
215:13 216:1,2,4,5
225:1
**attorney's** 83:14
86:6 88:6,19 89:3
103:16,24 105:22
106:1 117:18
118:19 127:6,13
127:21 154:5
156:11,22 169:14
222:16 229:16
**attorneys** 27:13
154:24 222:6
**atty** 2:19,21 3:8,8

**audience** 33:12
**auditoriums** 120:6
121:17
**august** 2:13,21,23
3:7 89:19 96:23
102:6 108:11,23
109:8,12 111:13
115:6 118:7
126:25 127:5,16
129:4 130:23
131:3,4 132:4,16
133:7 136:11
137:14,18 140:25
141:8 143:6,11,14
143:15 152:16,20
152:22 153:25
157:12,16,24
158:24 160:6,17
160:24 161:10,16
204:24
**authorize** 234:11
**authorized** 119:14
120:12
**automatically**
101:5
**ave** 232:1
**avenue** 8:4,10 25:9
89:4
**avoid** 90:16
**aware** 17:21 18:19
29:7 30:16 59:4
59:10 62:18 68:5
70:1,3 74:24 78:7
82:17,19 94:9,23
96:24 99:8 129:17
131:7 134:11
135:2 137:22
154:13 199:14
214:5,8 221:5
225:10,14

**awhile** 91:1 125:1

**b**

**b** 2:7 45:18,22
91:24 155:14
**back** 12:5 13:7
30:2 37:4 42:14
43:2 47:24 48:6
48:16 52:8 60:6
76:1 86:25 98:12
102:2 113:4 116:8
122:24 123:20
125:14 128:11
129:25 130:3
134:22 135:13
139:18 142:14
143:3 144:1
147:17 152:18
154:10 157:10
160:16 163:18
166:3 167:23
168:2,19,22 169:1
169:16,18 173:3
178:5 186:14,17
192:18 194:11
195:22 197:10
220:14 221:10
222:14 223:5
228:25 232:16
**background** 53:16
**bad** 18:10 125:6
155:25 156:7
180:16
**balance** 23:2
91:24 174:24
**balancing** 39:13
**ballpark** 17:15
**band** 180:6
**bands** 33:11
**barrier** 41:16
178:12

**based** 23:21 79:7
83:5 86:24 106:19
112:22 121:2
134:15 152:2
160:4,13,19 174:5
182:10 184:10
191:9,24 196:14
196:16 211:3
214:19
**baseless** 208:12
**basically** 38:25
39:16 79:10 84:7
**basis** 66:22 108:22
154:23 156:19
181:1 194:7
**bay** 20:5,6 213:20
**bear** 33:21
**began** 72:1 86:6
86:20
**beginning** 6:18
52:9 76:14 83:10
99:1 102:3 108:12
144:2 161:11
186:15 212:7
**begun** 108:20
**behalf** 6:22 7:8
40:8 117:9 166:13
**behest** 127:14
166:11
**belief** 66:21,22,24
66:25
**beliefs** 216:18
217:19 218:16
**believe** 11:24 13:8
15:12 16:24 23:2
24:21 25:3 30:5
40:21 49:20 53:10
55:5 56:19 59:8
59:13 60:1 62:10
63:11,16 65:1,21
66:17,19 68:22

72:9,14 74:3
75:10,14 76:11
77:2 78:17 79:17
79:24 89:23,24
91:17 96:11 103:1
103:11,14 104:6
104:21,25 107:16
108:21 109:13
111:17,21 112:9
113:9 114:8 117:3
125:9 127:4,13
128:10 130:20,20
132:8,21 134:15
134:17 135:10
136:8 138:11
142:10 146:20
147:18 148:6
153:2,6 154:18
155:7,20 163:25
167:9,23 168:7,7
168:12,12 169:24
171:9 176:18
180:16,18 184:6
185:7 186:3,4
187:19 188:22
189:8 194:7
197:16 206:3,10
210:3,6 211:11
213:15 215:18
216:1,8 218:4,15
219:24 221:10,22
222:8,12 225:9
226:9
**believed**  14:5
16:24 23:21 31:2
174:11 175:10,15
177:5 180:21
193:24 194:2
221:6
**believes**  158:5
174:17

**benefit**  200:6,22
201:7 202:11
203:25
**benefits**  91:25
201:1,3
**best**  10:15 11:11
11:20 52:18,21
74:14,15,21
103:14 106:7,11
108:14 109:16
114:19 125:18,20
126:1 159:3,11,24
163:23 229:1
**better**  14:14 27:19
31:3 37:25 133:1
198:10 213:13
215:4
**beyond**  21:7 53:21
81:8 93:24 110:10
110:10 177:24
**bias**  177:14 214:21
215:2,3
**bidar**  94:23,24
95:4,17 117:21
118:13 147:21
148:12 150:16
151:15,23,25
152:5,8,12,15,23
153:3,4,10,14,20
**bidar's**  151:9
153:15
**big**  16:2 76:15
227:11 228:11
**biked**  55:18
**biking**  56:14
**birth**  7:18,19 8:1
**bit**  110:21 218:11
**bleachers**  62:2
**block**  8:13,13
112:17

**blocked**  112:12
**blocks**  8:11 39:7
**blog**  26:2,5,9 50:1
168:6 178:16,17
197:22 198:6
**blogs**  194:14
**board**  83:2 86:21
87:7,11 162:25
194:5
**boardman**  5:21
**boardmanclark.c...**
5:22,23
**body**  105:18
106:15 219:14
**books**  214:20
**border**  175:3
**born**  12:9
**bottom**  128:25
134:3 147:20
167:12 172:4
198:9
**boundaries**  91:21
**bounded**  20:2
**box**  112:12
**boyce**  25:18
**boyle**  214:14
**brad**  25:17
**branch**  12:23
**break**  11:10,14
48:2,10 51:25
52:2 101:23
143:20 186:9
188:10 197:6
**breakdown**  61:11
**breaks**  12:10
**breitenbach**  202:3
204:7
**brian**  52:25
**briefly**  125:2
**bring**  47:24

**bringing**  163:14
165:19
**bristle**  110:21
**broad**  121:12
209:20
**broadcast**  33:9
**broader**  92:5
200:6
**broadly**  24:7
**brodsky**  25:18
185:7,11
**bromley**  12:21
13:25
**brought**  60:9
134:20 155:21
**build**  54:13 61:19
187:6,10
**building**  30:8,14
39:7 66:2,9 68:13
69:21 70:8 71:3
80:4,10,14,18
96:16 138:19
**buildings**  53:4
78:19,21
**built**  184:20 205:1
206:15
**bulk**  166:24 198:3
**bullet**  145:9
170:15
**bunch**  110:24
**burden**  200:8
201:17 202:14,17
203:1,10 204:17
**bus**  204:18
**business**  8:25 9:9
13:6 21:13 26:14
60:4 113:9,11,17
123:15,16 161:20
161:24
**busy**  166:18

buy 203:11

**c**

c 45:19,22 55:5
92:3
ca 232:25
call 7:22 111:1
114:12 115:10
118:15,15 132:22
132:24,25 133:2
177:14 183:10
called 5:1 14:18
20:2 33:14 59:11
146:25 214:12,18
calling 110:18
111:3
calls 63:25 86:19
calm 214:3,3
camera 10:12
campaign 16:13
17:7 21:22 22:1
32:15,20 35:7
37:13 50:13 94:16
153:5 187:15
189:8
campaigned 16:9
campaigning
35:11 62:13
campus 2:16 8:12
8:14,17 17:23
19:21 20:13 25:8
25:20 39:11 43:3
43:4,8,22 46:13
47:9 53:3,4 57:10
59:16,19,20,25
60:6,11,14,16,17
60:20,23 67:6
78:18,22 81:16,25
82:20 83:4 86:5
91:9 92:4 93:4,20
94:10,25 95:23
96:2,6,13,13,21,23

97:2,4,8,10,16,18
98:23 99:13 100:8
103:7 120:3,4
122:20 123:12
126:6 128:9,22
129:5,15 130:13
130:21 131:2
132:5 145:12,12
155:10,12,14
157:18 158:8
175:5 190:24
199:9,13,23
200:24 201:19
202:11 203:10
204:1,3 219:6
220:6,10 222:11
226:4 228:22
229:6
candidacy 53:7,9
58:14,18 60:18
candidate 35:5
37:10 58:24 64:2
capacity 47:2
48:25 120:10
122:4
capture 19:17
careful 205:3
224:25
case 1:6 6:10 7:25
18:21 27:6,10
127:25 139:23
140:17 141:22
152:6 156:10
175:16 176:18
195:11,11 196:5
209:17 215:9
217:22 232:6
233:3 234:3
casket 213:25
cast 29:22

category 182:4,20
182:22 183:18
cathedral 34:8
catherine 203:21
catholic 34:7
190:8,11 214:5,21
214:21 215:2
218:1,5
caught 105:13
150:2
cause 223:19
231:16
caused 61:21
187:25
caution 210:16
caveat 49:6
cc 158:20
cemetery 19:21
center 214:18
centerville 12:7
century 33:17
certain 27:7 48:23
74:2 83:17 113:19
133:10 168:2
218:7 222:13
229:1
certainly 48:11
66:6 69:4 94:21
111:5 113:15
133:12 149:15
183:12 195:3
203:2 209:16
210:11 213:16
227:24 228:9,24
229:17,20
certainty 18:18
101:4 127:9
certificate 231:1
234:11
certification 233:1
234:1

certified 5:3 231:3
certify 231:5
chain 3:11 166:24
166:25
challenge 26:17
change 31:14 67:9
88:17 91:6,25
92:1 93:3,8 94:2
101:11 104:9
108:13 110:10
131:1 232:14,15
234:8 235:3
changed 46:2,5
59:18 83:6 88:21
88:21 89:7
changes 92:23
94:7 96:19 97:19
98:3 107:5,12,18
108:5,6 110:12
159:5,13 169:18
220:3 232:13
233:7 234:7,9
channel 195:23
channeled 166:21
characterization
86:7,9 171:7
182:5
characterize 36:19
characterized
187:25 210:8
characterizing
207:2
charges 82:18
checked 25:24
checkmarks
164:14,18
cheer 33:4
cheering 33:8,10
180:5
cheri 1:24 5:3 6:15
231:3,20

**children** 15:7,8
180:1
**chose** 180:13
**ci** 2:11 39:10 93:13
98:2,24 101:9
104:7 111:9
114:13 115:9
125:21,24 129:15
130:1 133:16
134:6 139:8
145:11 155:1,5
159:5,13 200:9
209:23 220:3
227:25
**circulated** 160:5
**circumstances**
88:21
**citation** 82:13
**citations** 81:6
**cited** 217:23
**cities** 184:20
**citizens** 40:14
**city** 1:7 5:25 6:8
7:8,9 15:10 19:11
20:24 21:17 23:22
33:15 35:2,18
36:11 37:23 38:6
38:6 39:4,7,22
40:8,14 48:21
49:1 63:1 66:3
68:24 69:15 70:7
70:13 79:10,20
81:5,8 83:8,10,13
86:6 87:4,11,13,14
88:6,19 89:3
92:12 101:12
103:15,21,23,24
105:21 106:1,20
106:25 109:5
110:14,22 114:9
117:17 118:19

122:22 127:21
131:14 133:23
134:2,12 137:13
141:7 150:18,20
151:3,6 154:5
156:7,11,20,22
158:17 159:1,2,10
161:20,24 164:2,7
165:23 166:13
167:3 169:13
171:12 176:21
177:14 179:5
181:10 191:9,19
195:23 199:15
201:20,25 202:15
202:18 216:1,2,5
216:23 217:9,12
222:16,23 229:11
229:16 232:6
233:3 234:3
**city's** 39:5,11 40:6
154:1,24 159:3,11
181:14 222:19
223:2
**civil** 205:6 233:5
234:5
**claim** 159:3
160:23 187:5
**claimed** 200:20
**clarification**
173:14
**clarify** 11:20 19:8
157:12
**clark** 5:21
**class** 15:1 60:3
**classes** 13:14,23
71:10,22 76:24
77:7,12,16 154:21
192:2,5,10,22
227:19 228:8,17

**clean** 10:1 228:1
**clear** 9:25 61:17
61:22 134:19
160:21 202:22
**clearly** 98:5
180:23 200:9
227:19
**cleveland** 232:2
**client** 48:3,11
216:4 225:1
**close** 25:19 33:20
58:23 74:23
102:25 130:15
224:16 225:2
**closer** 58:9,10 69:6
**closing** 158:5
**clumsily** 209:1
**coach** 208:13
**code** 8:5 81:17
82:20 209:19,20
**codified** 39:12
**coincidence** 130:9
**collaborate** 18:13
**collect** 178:5
**collection** 24:19
179:18
**college** 60:14,16
60:17 76:13 78:17
78:22 97:9 125:12
145:10,12 219:12
**combination**
86:17
**come** 9:8 11:1
20:17 34:21 43:24
44:14,16 48:6
49:7 63:25 66:24
78:9 89:1,5,6,20
93:23 94:7,8
110:17 125:23
135:13 142:14
161:8 167:23

168:2,19,22
169:16,18 178:9
183:9 192:8
199:20
**comes** 7:21 87:12
228:21
**comfortable** 136:6
**coming** 57:12
73:23 113:4
144:22 166:19
169:1 179:7 186:5
**commencing** 5:7
**comment** 48:8
95:3 213:10
**comments** 48:12
49:21,23
**commission** 2:21
2:22,24 3:6,8
30:10 43:23 49:7
100:5 104:23
109:13 116:8
123:20 137:14,23
141:1,7,17 142:4
142:13,15 143:3
144:6,13,25 146:5
147:1,9,10,18,23
148:3,18,21,25
149:9,11 150:18
151:5,14 157:13
157:25 158:6,18
160:5,14,15 167:2
168:10 169:2,22
174:18,24 180:15
181:2,8 195:12
197:23,24 198:4
199:19 204:24
221:13,15 233:19
234:25 235:25
**commission's**
167:6 172:24
178:25 179:1

commitment
 205:7
committee  4:3
 61:5 63:18 71:13
 71:20 72:24 99:7
 163:10
common  2:12 3:3
 3:16 8:23 20:24
 27:18 30:10 34:13
 88:17 104:23
 106:25 115:4,5
 116:5 117:24
 118:4 119:8 127:1
 130:18 131:4
 138:13 139:5
 140:23 145:1,22
 146:14,15 153:11
 153:13,17 158:9
 160:24 161:16
 172:24 178:24
 195:12 197:19
 198:24 199:18
 221:13,14
communicating
 27:2
communication
 37:11 61:11 69:14
 89:21 90:6 152:11
communications
 63:1 68:23 70:7
 83:17,21 84:14,14
 84:20 85:11 90:20
 90:21 127:15
 177:2 216:5
 224:19 225:1
community  19:3
 76:18 92:5 100:11
 189:25 199:22
 205:7 211:15,21
 214:24 218:12
 219:20

companies  9:17
companion  33:18
company  9:1,2,6
compassion
 189:24 211:16
 218:12
compelling  173:23
 184:2,4,16 204:21
compete  219:13
competent  231:8
competing  39:13
competition
 193:25
competitions
 57:20 70:17 79:1
 80:9 174:22
competitive
 200:18 204:17
 219:7
complain  58:3
 79:20
complained  76:5
complaining  68:13
complaint  78:9,11
 80:21 81:1,2
 149:18,19 152:10
 204:7 215:25
complaints  76:9
 76:17 77:15 78:7
 80:1,3,6,8,12,17
 178:14 203:4
complete  12:11
completed  13:7
 39:6 114:17
 232:16
completely  43:7
 151:1
completeness
 150:25 207:6
 216:25

complex  146:7
 174:17,23 175:1
complicated
 143:19
complied  121:12
 222:18
complimenting
 186:23
comply  147:17
 223:2,13
component  200:3
comport  91:18
comported  125:24
 211:4
comprehensive
 39:5 92:12 125:25
compromise  41:4
 42:9 43:19,24
 44:2 45:3 125:5
 156:4 176:20,21
 176:22 187:4
 189:9,12 211:6
computer  231:11
conceding  204:14
concern  94:15
 101:7 122:15
 133:15 193:4,5,11
 193:13 204:11
 209:22 228:14
concerned  94:23
 133:12 179:23
concerning  211:23
concerns  63:17
 121:13 123:1,2
 125:19 171:6
 178:17 179:25
 180:24 182:9
 193:20 200:11
 204:8,22
concert  9:1,2

concerts  8:22 9:15
concession  62:1
conclude  181:10
 223:19
concluded  170:13
 173:25
concludes  138:12
 230:7
conclusion  34:22
 171:25 179:7
 199:20
condition  45:18
conditional  3:12
 39:9 48:22 61:14
 96:16 98:3,19,21
 101:11,18 120:5
 138:17 162:15,20
 163:16,24 166:1
 167:7,15,19
 168:11 169:23
 170:5,13,19 171:4
 172:23 173:19
 175:17 179:1
 188:10 210:19
 212:3
conditions  41:2
 45:6,10,12,16,18
 45:22 46:1,6,12,14
 46:25 48:24
 169:23 170:15,20
 171:2,11 173:25
 174:12 175:10
 176:23 177:5
confer  18:13 32:22
 37:7 48:11 61:5
 90:11
conference  62:7
conferred  103:16
confirm  46:23
 84:4

[conflict - correct]

conflict 64:19
conformity 43:8
confused 217:6
confusing 27:21
congress 21:1
connection 209:11
consider 20:14
41:4 47:6 54:25
139:5 153:10,16
173:15,16,22,23
177:10 213:9
229:18
considerable
141:25
consideration
100:14 140:12
167:7 209:4 222:6
considered 21:12
25:17 53:19 54:12
93:18 109:14
145:20 146:7
169:21 183:19
considering 30:25
53:8 97:20
consistent 71:10
101:12 115:25
127:2 138:24
175:4 213:16
consonant 229:20
consternation
63:19,23,24 64:1
65:4
constituent 20:14
79:15 213:12
constituents 28:8
36:21 38:24 76:5
79:19 80:17,20
81:10 111:16,19
111:19 175:12
176:12 177:3

constitutional
171:14
construction
138:19
constructive
210:23
consultation 109:4
125:5
consulted 108:25
109:5 114:4
consulting 52:25
consuming 21:16
cont'd 3:1
contact 37:14
80:20
contacted 17:22
contacts 81:8
contain 177:18
contemplation
214:19
content 21:18
25:21 51:8,12
contention 14:8
17:17 18:6
contentions
125:17
contents 86:7
106:8 137:1
contest 179:19
contests 17:12
32:18 54:3 76:6
221:7
context 205:24
206:1
continue 85:13,22
90:18 187:4
continued 129:19
148:24
continuing 90:19
contract 9:4

contracts 14:23
contractual 9:5
contrary 12:24
129:22
contrast 91:7
107:18
contribute 110:9
contributed 25:21
108:25 129:12
156:8
contributors
225:17,24
control 73:8,11
controversy 14:9
17:10 37:5 74:16
94:1,10,21
convene 163:1
convenient 202:4
conversation 42:8
61:12,17 66:7,11
66:14 89:21,24,25
90:1 127:10
132:15 205:11
conversations
19:3 36:6 37:8
69:6 70:13 71:11
79:25 83:1 86:11
86:13,15,20 87:4
87:13,15 102:7,16
102:19 108:22
129:3 132:3,20
136:10 152:5
161:15,18 162:8
162:10 202:12,20
203:6
converted 93:16
231:10
conveyed 119:3
210:22
conway 2:18

cooperate 206:4
206:11
cooperating 90:16
coordinate 92:11
copied 133:24
136:2
copies 51:2,3
131:17
copy 68:9,10
74:12,13 81:18
98:9 127:15
137:25 168:8
172:3
core 25:17
corner 172:6
174:15
correct 15:19,21
20:18 24:23,24
26:15 30:12 31:6
31:15 34:13 39:25
40:17,18 42:23
44:3,4 45:7,23
46:9 47:3 49:2,19
49:24 50:13,14,21
50:22,25 51:12,13
64:25 68:21,22
71:22 76:24 79:2
79:12 82:21 86:23
87:8,9 88:14 89:3
89:14,15 94:11
98:19 99:11,18
103:11,14,20,22
104:15,20,24
106:3,16 107:7,15
107:16,21 109:15
112:8 114:25
115:12,24 116:18
119:4 120:13
121:18 122:4,10
123:12,13,21
124:14 127:3

130:20,25 131:5,6
131:9 134:13
135:1,3 138:10
140:10 141:1,2,13
141:18,19,21,24
142:20,21,25
143:5,10,16 144:7
144:8,22,23
146:23 148:6,9,10
148:13,18,20,25
149:1,5 152:21
153:5,8 154:2,3,6
154:19 156:12,14
157:14 161:1
162:21 163:2
166:13 167:8
168:5,11 169:13
169:23 170:10,16
170:17 172:25
173:12 176:23
177:1,7,16,23
179:2,3 185:14,15
190:2,9,10 191:3,4
192:3 197:15,16
197:20 198:1
199:3,7 200:13
201:4 210:10
211:13 217:24
218:3,17 223:24
226:4,5,16 228:17
228:23
**correctional** 93:14
102:16,20 121:2
**corrections** 51:21
232:13 234:17
**correctly** 34:11
89:2,10 138:21
141:10 150:23
158:10 165:15
167:17 168:15
175:7 187:12

**cost** 200:6
**costs** 200:8
**coughed** 219:22
**council** 2:12 3:3
3:16 8:23 20:24
27:18 30:10 49:7
88:18 100:6
104:23 106:25
113:2,4,8 115:4,5
116:5 117:4,4,15
117:16,20,24
118:5,6,20 119:9
127:1 130:18
131:4 138:13
139:5 140:23
145:1,1,16,22
146:4,14,16 149:4
149:7,7,8 150:18
151:3,6,13 153:2
153:11,13,17
158:9 160:24
161:16 172:24
173:6,7,9,10
178:24 181:7
195:13 197:19
198:24 199:18
221:13,15
**counsel** 6:17,19
7:5 40:4 46:21
47:17 48:8 72:14
83:16,25 90:3,15
105:9 115:9 129:7
135:9 137:3 172:3
188:20 196:6
208:15 212:15,22
215:13 224:16,19
225:19
**country** 33:16
34:5 161:4 219:11
219:17

**county** 233:10
234:15
**couple** 9:23 13:20
29:12,20 154:21
229:22
**course** 13:19
14:13,17,20,24
18:18 36:4 55:22
67:14 76:16 87:21
88:4 96:20 119:5
**courses** 13:20
**coursework** 13:7
**court** 1:1 6:10,15
10:3,7 48:9,14
126:16 231:8
233:7
**cover** 46:19 84:13
121:7
**covered** 84:10,18
84:23 103:22
171:10
**covers** 121:6 150:8
**crabb** 14:3
**create** 51:5,6 85:1
100:9 174:24
**created** 51:12
155:11 199:22
**creates** 188:11
**creating** 120:1
**credit** 111:1
**creek** 20:6
**crescent** 20:8,10
**crises** 13:1,1,3
**critical** 218:22
**crossed** 107:11
**crosstalk** 208:8
**crowd** 33:10
179:17 182:15
**crowds** 33:4 180:5
193:17,17

**csr** 1:24
**current** 182:24
**currently** 8:19
44:9 182:24 188:6
**custody** 73:8,11
**cv** 1:6 6:11
**cycle** 20:18 49:11

**d**

**d** 2:1 96:12 120:2
**daily** 109:4
**dalton** 5:15
**daltontomich.com**
5:17
**dan** 12:21
**dare** 218:13
**dark** 164:17
220:16
**dash** 82:6 145:9
225:25 226:2
**date** 6:4 8:1 13:8
15:12 17:13 38:3
64:16 82:6 130:12
130:17 133:13
155:11 163:25
165:18 168:14
169:17 232:9
233:3,9,19 234:3
234:13,25 235:20
235:25
**dated** 2:18 115:6
131:23 137:14
141:7 144:13
146:16 149:23
168:7 170:4
231:17
**dates** 37:16 82:11
133:19 227:3,9,14
227:23
**dating** 194:11
**daughter** 161:7

**david** 37:22
**day** 5:7 9:3 48:7
64:18 108:15,16
123:14 127:20
135:14,21 142:9
143:3 147:5 160:9
167:24 168:20,21
219:11,17 228:12
231:6 233:16
234:22 235:22
**daylight** 220:23
**days** 61:7,13
163:13 178:21
232:19
**daytime** 41:13,14
44:7,8 178:15
182:16 193:5,7,9
193:12
**dayton** 12:9 34:3
**dc** 25:15 34:8
**dealing** 103:19,24
**deals** 9:4
**dear** 232:10
**debate** 17:8 47:22
58:16 69:23 70:1
93:1,21 123:17
124:6 156:18
160:16,19 198:23
228:10
**decades** 229:22
**december** 215:11
215:11,16 225:7
**decibel** 179:19
**decided** 14:13
20:22 163:15
191:23
**decides** 11:2
**deciding** 173:17
**decision** 11:7 23:1
71:2 87:12 136:14
136:14 156:19

186:5
**decisions** 30:16
49:8 210:1,2
**declare** 53:9
**declared** 53:7
58:14
**declaring** 58:18
60:18
**decreasing** 200:21
**dedicated** 50:12
**deed** 233:14
234:20
**deemed** 232:20
**defaced** 213:23
**defendant** 221:6
**defendants** 1:9
5:19 6:25 215:8
216:23 217:10,12
222:23
**defined** 77:7 209:7
209:7,17,22
**definitely** 58:7
**definitive** 23:25
**definitively**
201:11
**degree** 12:11,14
12:15 13:8,12
101:4 154:22
**delay** 31:14,19
150:17 151:4,10
152:7 159:25
**delayed** 152:13
**democracy** 23:25
**denial** 66:15 69:18
69:25 70:2,22
160:20 172:24
178:24 179:1
180:15 223:17
**denied** 66:20,22
67:1 69:5,10,10,16
70:4 151:25 152:6

168:10,12 225:11
**dense** 33:19
**deny** 160:23
168:16,17 216:23
217:11,13 222:23
**department** 30:8
68:14 80:2,11,23
171:12 226:9,18
232:22
**dependant** 205:2
**depends** 81:2
**deponent's** 231:12
**depose** 135:13
**deposition** 1:12
5:1 6:5,6,11 9:19
47:23 212:7 230:8
230:10 231:6,12
231:13 232:9,12
233:1,3 234:1,3
**depositions** 197:4
**depth** 151:17
**derived** 91:25
**describe** 16:19
19:6,10,12 20:7
23:12 103:2,3
178:2
**described** 71:11
71:21 77:3,4
102:24 159:11
213:7 229:21
**describes** 84:20
**describing** 17:24
**description** 2:8
3:2 70:18 71:8
77:2
**deserve** 23:3
**desire** 20:23 92:19
129:25 140:20
174:25 203:4
**desires** 202:7

**despite** 180:25
211:15
**detailed** 148:3
**detailing** 2:15
79:10 128:21
**details** 2:14 55:6
67:15 69:7 103:19
126:19
**determination**
20:20 87:8 191:16
191:19 194:6
224:3
**determinations**
184:10
**determinative**
173:22
**determine** 44:10
224:14,23
**determined**
224:20
**detriment** 124:10
**develop** 18:5,15
156:4
**developer** 156:5
**developing** 100:13
**development**
22:18 39:8,14
90:21 91:23 92:6
92:10 176:14
210:2
**devote** 35:19
**dialogue** 212:9
**diary** 38:23
**died** 13:3
**difference** 134:19
**differences** 108:1
210:3
**different** 9:16,16
78:20 97:9 102:22
110:1 113:14
121:13 149:11

178:9 185:8
193:18 203:15
209:15,25 210:4,6
210:7
**differently** 193:7
212:6
**difficult** 211:6
**diminished** 175:23
176:7 179:13
**diminishment**
176:10
**diminution** 176:3
**dinner** 153:23
**direct** 25:8 26:4
30:25 34:11 48:5
57:16 63:1 80:12
209:11,12
**directed** 96:18
**directly** 8:13
25:23 48:3 80:19
166:19
**director** 226:18
**disadvantage**
219:7
**disagree** 111:6
151:8 157:1
160:22 219:10
**disagreed** 45:11
49:8 134:14
154:14,16 156:10
156:13,15,24
170:18
**disagreeing**
154:23
**disagreements**
125:17
**disappointed**
162:19 163:13
**disciplined** 162:2
**disclose** 225:1

**disclosing** 85:10
**discovery** 27:6
149:16
**discuss** 73:12
102:15 156:17
162:25
**discussed** 52:17,22
64:5 65:13 84:25
115:19 216:2
**discussing** 161:24
189:22
**discussion** 38:10
41:20 53:23 54:1
61:2 72:1 114:16
122:18 129:4
142:15 151:21
160:13 163:8
167:24 221:16
**discussions** 65:22
66:2 114:9 151:23
196:16 226:10,20
**disinterested**
231:9
**dispute** 14:1,7
218:23 219:2
229:23
**disputes** 14:16
90:16
**distinction** 194:24
**district** 1:1,2 2:11
3:17 6:10,10 8:22
19:7,14,15 20:7
21:9 22:9,11,23,23
35:13 37:2,7,8
39:10,11 40:12
43:3 46:13 52:16
53:6 55:12 77:14
77:25 78:24 79:14
81:17,25 82:20
83:4 86:5 91:9
93:4,13,20 94:11

94:13,13,14,22,25
96:2,13 97:16
98:24 99:13 101:9
103:7 104:7
114:13 115:9
116:4 120:4
125:21 126:7
128:9 129:15,16
130:2 131:2 132:5
132:13 133:16
139:8 150:16
155:1,5,10 159:5
159:13 175:5
177:4 178:16
187:3 200:10
209:23 213:1,1,3
213:24 220:3
222:11 226:4
227:25 228:22
229:6
**district's** 43:8
125:24
**districts** 39:9
95:23 96:6,23
97:2,4 98:2
**divergence** 29:6
**division** 3:6,12
154:1 156:21
157:25 158:5
170:4,9,19
**dj** 76:16
**document** 27:7
67:23 70:16 82:4
107:20 119:19
120:25 127:19
128:24 136:7
138:1 144:18,24
146:21 149:20
158:3 172:7 174:4
174:6 187:2
215:12,17 216:6,8

216:13
**documents** 4:1
27:9 69:17,25
72:17,19 141:11
**dog** 15:8
**doing** 9:11,22
22:25 23:2 60:6
68:16 166:11
212:2 228:3
**dominican** 189:24
190:1,4 216:18
217:23
**donations** 21:22
22:1,24
**donor** 22:8
**donors** 22:11,12
22:14
**door** 169:19
**doubt** 165:21
218:23 219:2
**dr** 13:25
**draft** 2:11 42:5,6
83:12 87:19 88:1
88:7 89:13,16
104:7,9 108:11,13
109:1 110:7,15,17
111:15 114:18,24
121:24 129:13,23
**drafted** 99:14
103:20 105:16,19
106:2,7 114:20
**drafter** 103:12
**drafter's** 98:6
105:18,25
**drafters** 225:17,23
**drafting** 97:24
98:17 99:2 102:13
103:7 105:22,23
106:21 110:4
226:12

drafts 104:19
109:10,19 111:15
111:20 117:16
drawing 194:24
drive 145:11
202:15,17 204:2
driven 55:17
130:10
driving 56:14
114:5 130:10
193:11 204:15,17
drop 187:5
dudgeon 8:10
19:15 36:22 37:19
37:20 53:20 63:18
64:3,8,15,23 65:18
177:4 190:16
due 13:2 23:22
28:9 39:16 100:10
116:8 123:20
143:3
duly 7:2
dwellings 19:19
dwindling 164:10

**e**

e 2:1,7 7:11,15,15
8:4,4 25:3,4 120:3
earlier 28:7
108:20 196:13
228:11
early 17:20 33:17
61:7 72:2 96:22
108:23 180:3
easier 10:11,19
38:22
easily 211:19
east 5:6,12 6:12
34:1 214:12
econ 13:11
economic 12:23

economics 12:14
12:21,24 13:1,8,13
13:14 14:19 15:1
154:22
economist 12:22
ed 71:10,22 77:3,7
77:12,16 192:2,5
192:10 227:19
228:8
edgefest 59:11,12
edgewood 1:4 2:16
2:17 3:6 4:3 6:7
6:22 8:9,12,14,17
15:23 16:11,20
17:4,10,17,22 18:1
18:5 19:21 20:10
20:13,14 22:3,17
22:18 24:6 25:8
25:20 28:15 29:7
29:22 30:23 31:4
31:11 32:17 34:18
35:25 36:20 41:2
41:3,10 42:3,12,13
43:25 44:3,6,9,18
44:19,23 45:1,5,10
45:18 46:9,24
49:12,18 50:4,13
50:24 51:23 52:17
52:23,24 53:4,24
54:5,7,19 55:9,11
57:20 58:16,19
59:20,24 60:4,5,20
60:22 61:3,5,13
62:8,18 63:13,20
67:19 68:14 69:9
69:15 71:10,13,14
71:19,20 73:15,19
74:25 75:4 76:7
76:20,22 77:6,22
77:23 78:25 79:9
79:15 80:7 81:10

86:23 87:8 92:14
93:1,6,21,25 94:21
97:6,7,8 98:20
99:6,7,9,10,15,17
99:24 100:8,12,18
100:23 101:2
122:9,19 123:12
123:19 124:1,6,12
124:21 125:6
126:11,12 128:22
130:13,21 131:8
131:11,24 133:5
134:3,5,12,17
135:2 138:9,15
140:24 142:19
143:2,6 144:5
145:10,12,23,24
145:25 148:8,22
149:3,4 150:9,19
151:10 152:25
155:19 157:18
158:1,8 162:14,19
163:9 165:3,25
170:14 174:25
176:13,22 177:14
177:18 178:10
179:9 181:10,21
183:23 187:4,20
189:14,16,23
190:11,20,24
191:10,25 192:19
192:20 193:12,24
193:25 194:10,25
197:14 198:12,19
199:1,2 200:23
201:1,18,25 202:5
202:9 203:1,4
204:1 206:4,11
207:9 210:8 211:2
211:4,9,12,17,25
213:17 216:19

218:1,8,14,21
219:6 220:5,6,12
220:22 221:6
223:2 228:3,12,17
229:20 232:6
233:3 234:3
edgewood's 3:12
16:7,8,15,25 17:23
18:6,15 27:20
28:3 30:11 32:21
38:11 41:17 45:14
45:15 47:6,11
48:19,22 50:16
54:2 59:1 63:5
64:22 65:9,14
70:10,16 97:12
98:18 99:23
100:17 101:16
124:24 125:15
129:5,11 130:19
139:14 140:3,4,6,9
140:20 145:19
146:19 152:12
154:2,6 159:22,23
164:8 165:11
167:7,15 170:5
171:14 173:18
176:14 179:1
190:1 192:1
200:20 209:17,18
213:6,10 216:16
217:17,23 218:16
219:19 221:8
222:7 223:12,20
227:2,8,13,14
editing 121:10
education 13:19
76:24 192:22
228:16
educational 12:4
216:17 217:18

effect   76:22 78:23
93:15 139:25
160:10 175:11
192:19 200:13
205:19
effected   155:15
effective   155:11
227:2,8,14,23
effectively   28:3
220:22
effects   91:22
efforts   23:6 30:8
44:23 94:5
eight   68:25
either   14:25 36:10
45:2 58:24 71:24
76:12 80:7 89:25
98:21 101:9 103:3
105:23 118:15
136:14 155:22
195:12 210:18
214:6 226:22
elaborate   46:21
elected   8:22 21:21
40:11,23 49:6
99:4 131:8,12
133:5
election   15:14
16:10 20:18,21
21:22 22:1,24
23:4 34:17 35:14
35:21 37:13,17
38:4 49:10,11,15
49:17 50:2,3
153:5
electronic   3:9
164:23,24
elliot   52:24 60:22
67:4 68:6 73:19
74:8,10,15 162:25

email   2:19 3:11,15
3:17 26:11,12,14
26:16,18,20 27:3,3
27:8 63:25 67:4
68:6,9,11 86:16
118:16 136:1,5,13
136:18,19,24,25
166:24,25,25
167:4 168:5
183:10 197:18,21
198:3,9 212:24,25
213:3,5,12 232:17
emailed   213:15
emails   26:20,22
27:12 203:3
emily   151:22
emotional   23:19
24:3 196:16
emotions   196:15
emphasis   175:6
employed   8:19
109:1
employee   8:21
employees   38:6
164:2,7
enable   92:4
enact   136:20
enactments
138:25
encircled   112:6
enclosed   96:16
120:6 232:12
encourage   28:8
92:3
encouraged   23:20
24:1,5,6 30:22
41:3 196:14,17
encouraging   61:4
endeavor   126:7
endeavors   8:21,24
9:1,8,10 26:14,19

26:22
ended   110:22
endorse   42:21
44:1,2
endorsed   42:2
44:5 153:4
endorsement   21:2
153:7
endures   188:7
enforce   85:2
engage   14:12 28:9
156:3 196:15
213:17
engaged   56:20
100:12 196:15
engineering   184:6
enhanced   77:23
enjoyment   175:21
176:4 179:11
180:10 187:9,23
188:19
enjoys   44:9
enrollment   200:21
200:23 201:4
218:21 219:18
ensure   97:23,25
entail   23:13
entailed   189:14
enter   98:7
entered   126:9
234:9
enters   75:25
entire   140:18
205:22,23 233:5
234:5
entirely   89:23
93:10 94:12
113:24 193:19
entirety   26:19
entitled   99:10,17
99:24 210:9 211:1

211:8
entitlement   187:5
210:10,12,22
211:1,5,8
enumerated
167:14
environment
200:18
environmental
12:25 13:1
equal   134:7,18
equitable   39:17,19
40:16
eroded   163:12
erosion   61:11
errata   232:14,19
234:7,10,18 235:1
eskrich   35:17 67:3
68:6
esq   5:11,20,20
essence   67:1
149:19
essentially   198:6
established   175:22
179:12 180:11
203:12
establishment
96:14 120:5,9
122:3
estimate   21:25
68:4
et   1:8 6:8 232:7
233:3 234:3
ethan   25:18 185:7
185:11
ethics   60:4
evangelism   219:20
evening   174:17,24
175:1
event   9:7 56:25
191:21

events 57:8,9
174:18,19,23
175:1 199:13
eventualities 89:1
eventually 168:10
172:22
evers 1:13 2:3,9
3:15 5:1 6:5 7:1
7:15,19,22 9:18
13:11 34:10 46:16
47:24 52:12 76:4
81:22 84:20 91:3
102:6 104:2
110:18 111:2
115:3 126:15
128:1,18 133:21
135:17,18,25
137:11 141:4
144:4 149:21,25
150:7 157:22
158:13 164:21
165:11 166:23
186:17 189:16
190:13 195:5
196:2 197:13,18
215:7 229:25
231:14 232:9
233:4,9 234:4,13
235:20
everybody 93:18
196:21
evidence 87:2 98:8
179:6,9,15 180:8,9
180:17,20,22
181:3,22,23 182:3
182:4,20 183:12
183:18 194:21
196:18
evidenced 124:5
evident 124:5
176:11

evocative 91:13
exact 73:22 74:23
133:19 169:19
205:10 212:5
exactly 28:19 36:8
57:23 98:6 182:17
185:22 189:12
examination 2:4
231:14
examined 7:2
example 18:10
45:22 64:17 93:22
102:22 156:1
202:2
examples 121:13
199:14
exceed 179:19
exceeded 90:24
exceeds 200:7
excerpt 2:9 50:9
150:15
excerpted 175:5
exchange 3:14,15
195:7 197:19
198:2 212:24
exchanged 221:24
exchanges 222:13
excuse 47:17
57:19 97:7 154:14
181:17 219:14,15
executed 234:10
execution 233:14
234:19
exercising 213:21
exhibit 2:9,10,12
2:14,15,17,19,21
2:22,24 3:3,4,6,8,9
3:11,12,14,15,17
3:20,21,22,23,24
50:8 81:21,23
104:1,3,5,10 105:1

106:24 111:22,25
115:2,3,14 123:8
126:14,17,25
128:19,21 130:13
131:16,20 133:22
133:25 135:24
136:1 137:10,12
138:2 141:3,5,15
144:4,9,11 146:11
146:13 148:3
149:13,15,16,18
149:19,22 155:4,7
155:8 157:21,23
158:12,14 164:20
164:22 166:22
170:2,4 171:20
172:10 173:24
175:19 186:18
189:20 190:14
195:4,6 197:17
198:8 212:12,14
212:18,23 215:8
215:17 216:9,15
222:17 225:3,5
exhibits 3:1,19
128:13
exist 199:14
existed 83:15
85:21 99:13
133:16 152:9
existence 94:1
existing 99:11
107:18,19 138:16
187:9,22 188:16
exists 152:2 155:5
exits 52:7
expand 62:2
expanded 28:4
29:23 30:11
expansion 91:23
120:9 122:3

expectation 31:23
32:3,4
expedited 29:23
experience 27:24
34:12 88:6,18
110:7,16 112:22
174:21 183:17
experienced 17:2
experiences 34:15
expert 71:1 77:6,9
83:11 87:23 193:2
194:4 223:15
229:10
expiration 233:19
234:25 235:25
expired 155:23
explain 46:16
208:7,16,17 209:2
explanation 33:25
explicit 91:7
explicitly 63:21
79:24 109:17
exposed 13:15
express 9:25 16:12
36:3 51:18 81:1
expressed 20:23
28:16 36:5,8 41:1
63:19,24 81:9
187:15 218:11
expression 187:16
214:22
extended 174:16
extends 19:14
197:3
extent 10:9,18
11:10 40:7 84:12
85:22 135:19
171:15 193:16
198:1 216:22
217:12

**eyes** 132:9

**f**

**f** 21:2
**fabric** 205:5
**face** 86:16,16 95:9
**facilitate** 41:12,20
42:7
**facilitated** 29:23
166:20
**facilities** 33:21
120:7 121:18
**facility** 93:14
102:17,20 121:3
174:19
**fact** 27:23 41:7
55:8 79:9 115:13
124:11 152:9
153:7 160:19
177:17 179:16
189:20 193:6
196:14,16 211:15
217:25
**facts** 23:18,20 24:3
28:9
**fair** 21:14 22:8
30:7 36:19 39:17
39:19,23 40:14,15
43:13 50:5 54:21
81:1 104:13 106:8
127:22 130:24
145:2 159:21
160:23 170:18
171:4,5,7 174:2,9
174:11 175:9,15
176:12,15 177:12
181:25 182:6
183:3,13,14,21
187:14 190:25
195:13 198:4,22
211:2 212:10

**fairly** 49:11 50:24
216:9
**fairness** 122:1
135:20
**faith** 40:24
**fall** 17:20 18:1
67:6 80:17
**falls** 192:8
**familiar** 33:23
81:16 116:19
**families** 179:25
201:25 202:1,8
203:4 209:18
**family** 25:12,13
199:4
**far** 8:15 9:22
38:21 84:11,12,18
84:23 105:25
113:13 140:10
143:6 161:6
**farmer's** 59:5,9
**farming** 93:17
122:21
**faster** 135:22
**father** 21:1,3
180:2 214:13
**favor** 16:20
122:22 139:10
149:10 202:13
**feature** 74:2
**february** 3:10
62:12 63:8 64:12
64:23 69:2 164:6
164:25 165:18
223:12
**federal** 14:3,7
**feedback** 224:6
**feel** 42:6 161:9
**feeling** 125:20
129:21

**feet** 180:4
**felt** 23:19 29:1
42:7 110:22
140:21 181:22
211:4 218:8
**fidget** 32:9
**field** 12:20 15:23
16:7,8,11,15,21,21
16:25 17:5,12,18
17:24 18:6,16
22:3,18 27:20
28:4,15 29:8,24
30:12 31:14,24
32:18,22 34:18
36:1 52:17 54:3,7
55:10,15,18,18
56:4,6,12,19,19
57:6,12,21 58:4,20
59:2,5,8,9,11,15
59:18 62:3,20
70:11,17,19 71:9
71:11,15,21 72:1,4
73:16,23 74:1,8,19
74:21,25 75:4,8,11
76:7,23 77:12,23
78:14,21 79:1,7,12
79:21 80:9 81:5
81:12 95:11 97:13
122:9 138:15,16
138:17 140:8,9
150:21 162:20
164:8 176:14
180:4 182:24
191:6,12 192:1,21
193:25 194:10,13
194:17 195:1
198:13 199:2,6
201:18 202:5
204:18 219:6,19
220:5,7,11,13,22
220:24 221:3,7

227:2,8,14,24
228:6,13,21
229:21
**figure** 41:17
**file** 2:10 104:6,18
104:18 105:3
115:18 123:11
134:5 142:18
146:22 148:8
163:16 167:16,20
167:22,25 168:1
168:18 169:3,10
169:12 172:10
184:7
**filed** 64:22 80:7
149:19 163:24
**filing** 210:19
**filled** 26:25
**filter** 134:25
**final** 112:10
**finally** 130:23
163:7
**finance** 209:9
**financially** 214:11
214:16
**find** 21:11,14 55:6
72:12,17 81:21
155:6 158:6
173:22 185:19
195:23 204:21
211:6 214:24
215:1,4 232:12
**fine** 46:22 84:19
109:18 186:21
207:8 208:17
**fined** 81:10,11
**finish** 10:18,23
13:2 91:16 196:3
196:7
**finished** 196:11

**[first - forwarded]** Page 20

**first** 7:2,24 9:8
14:15 15:22 17:9
17:16 25:23 40:6
41:16 44:7,8
57:18 58:12 59:24
60:10 61:18,24
62:16,16,17 64:10
64:17,21,24 67:22
68:4,5,25 78:4
89:18 96:22 100:2
102:6 104:10
108:1,11 109:1,8
111:13,23,25
112:15,16 113:5
114:2,3,8,13,15
129:4 130:23
131:11 132:3,8,16
135:10 136:11,18
139:14 140:4,6
143:12,14 150:3
150:18 155:8
158:3,4,4 181:21
182:19,20 183:9
190:19 193:18
196:2 213:21
**fiscal** 106:14
**five** 8:18 55:9 57:4
62:17 78:6 85:16
108:1 143:22
151:14 196:19,20
197:6 205:11
211:16
**fix** 91:4 102:25
129:14
**fixing** 87:20
125:22
**flattering** 21:12
**flaw** 83:3 86:8
91:5 97:16 99:12
99:14 102:25
103:4 124:5

133:16 181:13
**flawed** 86:8
**flaws** 83:15 85:21
86:5 87:2,20,23
91:4 92:20 93:2
114:11 129:15
130:1
**floor** 5:21 112:13
112:19 113:3,9,12
113:16,18,23
115:10,15 116:6
116:22,25 117:1,2
117:6,8,14,19,22
118:14,21 119:4
119:22 120:12
121:1 123:19
124:13 127:3,12
127:20 128:2,8
133:7 152:16,24
**flying** 32:9
**focus** 140:18
174:18 193:23
**focused** 139:7
193:20
**focusing** 196:4
**folks** 29:13 141:23
142:23 185:13
213:17 218:14
**follow** 9:24 41:24
89:25 108:2 168:7
230:5
**following** 83:1
108:5 148:7
185:19
**follows** 7:3 19:16
82:16 107:1,4
**followup** 80:24
83:24 136:25
**football** 16:7,22
31:9 33:2,3,4,5,22
34:22 181:18

182:11,13 191:6
191:11 192:8
193:1 199:8,10
**footing** 134:7,18
**forbidden** 228:2
**force** 187:10
**foregoing** 231:5
233:13 234:18
**foreseeable** 175:24
176:7 179:13
180:23,23
**forest** 19:20
**forgive** 7:22
142:11
**form** 15:25 18:8
18:17 19:1,13
20:25 22:4,19
28:5,17 29:9,25
30:13 31:7,16,25
32:25 34:19 35:3
36:12 38:18 39:3
39:24 40:1 42:4
45:8,24 46:10
49:3 51:1,14
54:10,22 62:21
63:15 66:5 70:24
76:25 77:18 78:2
79:3,22 88:9
92:17 94:3 95:25
97:14 99:19
100:20 106:17
107:22 112:24
114:7 118:1
119:21 120:14
121:4,19 122:11
123:4 124:2,15
126:21 127:23
133:8 135:5,23
136:21 139:15
140:14 143:9
147:6 148:5 149:6

150:24 152:2
153:12 154:7
157:2 159:18
160:2 162:22
169:6 170:23
173:1 174:9
175:14 176:16,22
176:24 177:21
178:3 182:7 183:4
187:18 188:2,21
189:4,18 190:6
191:13 192:23
194:19 195:14
199:24 201:21
204:4 206:7,14,22
206:24 207:6,19
208:12 217:20
218:6,18 219:25
220:17,25 221:21
223:22 227:4
229:8
**formal** 70:2
**formally** 53:9
**formed** 33:19 95:9
**former** 188:22
**forming** 229:18
**formulate** 32:21
32:23 34:17 36:18
37:9
**forth** 45:10 47:9
93:23 168:5
171:11 192:6
211:17
**forum** 95:4
**forward** 32:6
41:18 42:1 43:20
80:10,19,22 100:9
124:4 165:12
187:8,22 232:16
**forwarded** 119:8
132:13 213:2,3

forwarding  80:13
foster  212:8
found  24:13 29:2
  184:2,3,15 204:6
  215:17 216:8
foundation  22:4
  22:19 24:16 25:1
  28:17 31:25 45:24
  54:22 59:6 69:11
  73:23 75:12 76:25
  77:18 88:9 106:9
  106:17 107:22
  112:24 117:10
  124:2 160:2 169:7
  176:16 182:8
  191:13 201:21
  207:19,21 208:1
  208:12 220:1
  229:8
founded  24:19
  33:17 214:13
founder  8:21
four  42:18 85:16
  100:12 125:4
  189:13 223:7
fourth  150:15
  198:10
fractious  163:12
framework  44:24
franciscan  214:17
frankly  193:5
  223:9 225:13
free  233:14 234:20
freely  9:25
frequency  118:4
frequently  60:11
fresh  90:25
friend  153:10,16
  153:24
friends  54:24 55:4

front  43:17 50:6
  71:23 74:3,11
  118:3 131:20
  133:13 155:3
  160:7 169:25
  186:22 217:22
  218:19 221:12
frustration  48:10
full  35:17,19
  196:20
fully  67:12
funds  209:9
furman  3:16
  197:20
further  73:12
  142:15 216:22
  217:12
furtherance
  216:17 217:18
future  32:5 36:21
  42:21 43:18,18
  44:2,22,24 45:19
  45:20,21

**g**

g  7:15 25:4
game  33:3,4 56:22
  57:1,14 67:6,8
  181:18 182:11
  191:11 193:2
games  16:22 17:1
  17:5,11,18 18:7,16
  22:2 23:10 30:25
  32:17 33:5,22
  41:19 46:4,5,5
  54:3,7 57:20,25
  58:6,20 62:4
  70:17 74:18 76:6
  77:13,15 79:1,6,6
  79:11,20 80:9
  81:12 95:12
  138:16 180:5

181:10 182:13
  184:17,18 185:9
  189:15 191:6,17
  191:22 192:8,12
  193:1,12,14,15,21
  194:16,16,16
  195:1 197:14
  198:13 199:2,6
  201:19 202:3,18
  204:7,12,15
  228:13
gang  214:14
gartler  3:14 25:12
  195:8
gathered  24:20
gatherings  76:12
  228:6
gen  25:3,13
general  17:15
  120:1 192:9
  202:21 222:22
generally  16:19
  33:20 118:6 157:8
  170:12 209:16
  224:11
generate  201:13
generated  178:14
  182:16
generates  76:18
geographic  91:23
geographically
  19:9,14 209:7,17
george  66:9 84:2
getting  48:5 61:17
  80:6 108:17 113:6
  224:16
gift  73:21,23 75:11
give  8:1 9:23 10:9
  12:3 52:21 90:18
  150:5

given  7:16,18,19
  27:23 31:24 55:8
  57:5 72:19 79:14
  86:25 125:21
  131:17 151:17
  159:21 198:18
  207:7 221:22
  228:19
giving  149:11
  156:2
gklaw.com  5:14
glad  81:19 154:25
  194:22
glasses  165:9
  186:25
glenway  19:18
global  12:25 13:1
glossy  186:22
gmail  26:15,19
go  12:5,13,17
  14:11 21:7 25:2
  41:6,13 42:1,14
  43:2 51:15 61:4
  74:6 84:25 86:25
  88:3 98:16,18,20
  98:21 100:9,14
  101:11 102:12
  108:10 121:22
  122:24 125:14
  126:1 129:25
  130:3 135:21
  140:21 144:18,25
  149:6 150:14
  152:4,18 154:12
  157:2 160:16
  163:9,15 167:11
  168:24 172:12
  180:1,3 186:8,17
  187:4 195:22
  196:12,20 206:22
  210:17 215:23

216:11 223:5
228:25
**goal** 62:2 97:23
**goals** 27:19 28:14
28:15,20,24,25
29:5 212:8
**god** 218:13
**godfrey** 5:5,12
6:12,21
**goes** 19:16 37:4
**going** 7:23 20:21
29:9 32:6 41:19
43:19 46:19 47:24
48:6 57:13,15
59:13 83:16,17,22
84:3 85:23 101:17
118:1 145:5
150:14 159:24
167:11 182:23,25
183:7 186:17
190:13,23 196:6
196:22 204:15
211:21 216:3,14
224:7,10
**good** 18:10 32:10
33:14 38:20 40:24
111:8 118:10
143:20 150:3
153:25 164:11,14
173:14 193:22
203:3 207:10,12
207:15,16 208:20
230:6
**goodman** 73:23
75:11
**gotten** 161:6
**government** 14:7
28:1
**grade** 125:12
**graduate** 12:17
13:21

**graduated** 12:6
**granted** 48:23
**gratifying** 21:14
**gray** 32:11,13
**great** 9:22 10:14
10:16 125:3
130:11 135:8
153:14
**greater** 224:12
**greenbush** 19:25
**greg** 214:13
**ground** 9:23
**group** 24:21 25:17
95:8,9,13,15
**groups** 156:24
**growth** 91:21 92:9
**guarantee** 24:11
28:13 45:3
**guaranteed** 38:25
**guess** 12:12 26:2
83:25 100:3
109:15 126:24
140:16 160:22,22
173:7 188:13
202:25 226:14
**guided** 187:16
188:14,15

### h

**h** 2:7
**h.s.** 2:17
**hac** 5:15
**half** 11:15 204:14
**halfway** 105:2
125:7 156:6
**hamer's** 151:23
**hand** 21:4 190:13
225:3
**handed** 126:16
144:10
**handful** 25:7

**handing** 81:22
126:15 128:18
133:21 135:25
137:11 141:4
146:12 149:21
157:22 158:13
164:21 195:5
212:13 215:7
**handle** 119:15
**handled** 83:9
**handy** 128:15
**hank** 66:9 84:2
**happen** 125:10
166:7 183:1
**happened** 18:19
75:1 135:16 161:3
226:22
**happening** 190:23
**happens** 33:6
182:25
**hard** 7:23 28:12
**harder** 10:17
**harrington** 147:22
148:13
**hassle** 203:8
**hate** 126:3 213:24
**head** 10:11,11
**heading** 19:22
**headline** 73:25
**headlined** 171:25
172:1
**hear** 53:17 55:23
57:6,12,13,16,18
204:10,22 219:23
220:14
**heard** 28:11,21
33:10,12,14 39:17
55:3,25 57:8,23,24
58:8,12,19 59:12
103:2 130:6 143:8
143:11,14 147:4

148:2 181:19
203:15 204:6
219:24
**hearing** 64:4 65:3
93:12 116:7
122:19,25 123:20
127:1,19 130:15
130:23 131:3
133:13 142:3,12
143:2,14 145:2,17
147:23 148:17
178:21 196:19
208:5
**hearings** 24:2
182:22 183:10
195:18
**heart** 1:4 6:7
232:6 233:3 234:3
**hearts** 218:14
**heather** 2:18
131:24 226:17
**heather's** 226:23
**heavily** 229:11
**heck** 149:8
**held** 15:15 35:16
53:3 56:6 60:5
69:18,18 70:4
79:7 99:6 114:9
163:6 174:18
180:15 182:14
184:17 194:17
216:18 217:19
218:16
**help** 10:13 75:15
96:4 105:9 107:9
160:8 165:11
**helped** 37:9
**heterodox** 12:23
**hey** 77:22 143:19
188:15 202:14
213:13

**hiatus** 13:5
**high** 1:4 6:7,22 8:9
  12:5,6,7 20:10
  33:2,13,16,25 34:1
  34:2,4,7 51:23
  52:25 55:9 60:15
  60:20,22 62:8,11
  73:19 93:15 94:14
  94:17 95:3,12
  97:6,7,9 125:12
  131:24 133:5
  134:7,18 145:12
  150:19 174:25
  190:20,24 197:14
  198:20 199:8
  203:7,9,14,17,20
  203:22 209:6,14
  232:6 233:3 234:3
**higher** 20:24
  21:17 209:21
**highest** 74:21
**highlight** 107:17
  107:20
**highlighted** 82:8
  93:8 94:11
**hill** 19:20
**history** 2:16 12:4
  14:15 126:19,20
  128:22
**hit** 161:7
**hoc** 24:21
**hoffert** 37:22
**hold** 23:3,10 62:4
  67:5 183:7 206:22
  212:15
**holding** 180:5
  204:7 218:5
**holds** 211:17
**holiday** 64:20
**home** 33:18 34:1,2
  34:3,5,8 161:8

164:17 197:14
  199:2,6 201:18,19
  202:2,18 203:1,5
**homeboy** 214:12
**homecoming**
  190:20
**homes** 19:19 180:4
  203:11,12
**hometown** 34:3
**homework** 24:5
  28:9
**honest** 56:16
**honestly** 200:1
  223:4
**honors** 12:14
**hope** 80:23 124:21
  212:11 218:7
**hopeful** 164:16
**hordes** 213:6
**host** 220:12
**hosted** 58:1
**hosting** 79:11
  81:12 193:25
**hour** 11:15
**hours** 174:19
  178:22 220:23
**house** 21:3
**how's** 111:6
**huh** 10:12 62:14
  81:18 138:4
  202:24
**huhs** 10:12
**humble** 28:11
**hundred** 180:4
**husband** 25:14
**hyperbole** 196:16
**hyperlinked** 50:18
  50:20
**hyperlinks** 50:15
  50:23 51:3,9

**hypothetical** 78:4
  93:24 102:16
  133:11 188:3
  201:6,10,12,14,23
  208:3
**hypothetically**
  189:6

## i

**i.e.** 41:15 97:25
  98:3 210:18
**idea** 109:25
  115:25 127:2,8
  188:10 200:3
**ideal** 29:3
**identified** 2:8 3:2
  26:12 43:22 71:16
  92:21 121:3
  125:23 149:18
  186:1 226:24
  227:17 228:8
  229:5,5
**identifies** 39:6
**identify** 29:6
  82:24 125:22
  184:2 220:11,19
  225:16,23 227:1,7
  227:10,12,13,16
**ignorance** 142:11
**ignored** 179:16
**iii** 7:19
**illinois** 5:16
**imagine** 23:7 89:2
  226:14,19
**immediate** 209:5
**immediately** 11:12
**imminent** 160:21
**impact** 34:6 46:15
  97:11 136:13
  138:2,7,14,24
  139:13 140:7
  175:12 179:24

182:23 184:19
  185:24 187:24
  188:16 193:21
  197:15
**impacted** 71:2
  179:23 203:13
**impacting** 182:24
  183:3,11 187:8,22
  188:24,25 189:3
**impacts** 17:2
  23:10 33:22 39:15
  41:15 42:25 43:5
  43:5 44:7,12,15
  45:12,14 46:7
  53:18 54:9,12,14
  54:21 92:6,24
  97:21 171:9
  174:13 175:2
  180:16,22,22
  182:6 184:12
  188:5,7,25 193:15
  200:8 202:23
  211:23
**impaired** 175:23
  176:7 179:13
  180:12
**impairment** 176:3
  176:10,15 188:14
**impairments**
  174:1 188:12
**implement** 41:18
**implementing**
  44:17
**implication**
  206:19
**implying** 194:16
**importance** 199:1
**important** 124:11
  124:25
**impose** 205:4
  211:12,22 212:1

**impossible** 221:19
**impression** 69:22
**improve** 61:25
**improvement**
  96:14 138:16,18
**inaccurate** 51:12
**inadequacies**
  177:25 178:18
**inadequate** 47:5,7
  48:20 83:6
**inadequately**
  46:14
**inappropriate**
  111:5
**incentive** 156:3
  205:1 206:4,11,16
  207:10,12,14
**incentives** 207:18
  208:20 209:4,11
  210:1
**incident** 93:6
**include** 20:10
  54:15 97:8
**included** 19:7
  119:9 229:4
  232:14
**includes** 19:19,20
  19:21,23 20:2,4,6
  20:13
**including** 42:15
  67:12 71:12,15
  92:12 95:17
  209:13 210:2
  213:24
**incompatible** 17:1
  23:8 33:25 34:9
  34:23
**incomplete** 84:7
**inconsistent** 50:3
  93:19

**incorporated** 6:8
  234:12
**incorrect** 206:8
**incorrectly** 51:18
**increase** 138:20
  201:3,16
**increment** 198:14
  198:19,22 199:21
  200:4,7
**incremental**
  200:12
**incumbent** 133:17
**indefinitely** 169:1
**independent** 9:2
  130:8 177:11
**independently**
  18:5 204:3
**indian** 13:24,24
  14:13,25
**indicate** 71:20
**indicated** 20:12
  38:4 61:24 117:16
  162:24 195:15
  215:12
**indicates** 140:1
**indicating** 232:14
**indication** 179:17
  219:16
**individual** 40:6
  97:1 105:21
**individually**
  173:16
**individuals** 22:2
  185:4,13 222:13
  222:14
**indoor** 120:6
  121:17
**industries** 214:12
**influence** 21:5
  30:16 79:4

**informal** 24:21
**informally** 22:16
**information** 4:1
  38:1 58:7 108:16
  110:13 135:21
  146:9,9,10 160:21
  217:10,17,21
  218:19,25 219:1,4
  223:1,9,11,16,19
  223:23,25 224:4
**informed** 63:20
**ingrisano** 2:4 5:11
  6:21,21 7:5,10,12
  30:2 32:15 40:3
  40:10 47:19,21
  48:16 50:9 52:2
  52:11 72:14 73:6
  73:10 75:21 76:3
  83:23 84:11,16,19
  84:24 85:15 90:9
  90:11,15,20 98:12
  101:21,23 102:5
  104:2 105:11,14
  126:15 128:14
  129:8 130:3
  134:22 135:7,11
  135:18,25 137:6,9
  137:11 139:18
  141:4 143:22
  144:3,10 146:12
  149:17 154:10
  157:10,22 158:13
  163:17 164:21
  166:3,23 170:3
  171:17 172:5
  173:3 174:5 186:8
  186:16 195:5
  196:8 197:6,12,18
  206:24 207:21,24
  208:4,11,19
  212:13,17,22

  224:18 229:24
  230:6
**inherent** 204:16
  210:20
**initial** 32:20
  104:14 110:19
  116:1 122:5
**initially** 46:4
  193:17 200:10
**initiate** 162:8
**initiated** 132:17
  132:19
**input** 111:18
  215:16,22
**inscrutable** 93:19
**insert** 189:2
**insight** 195:10
**insincere** 218:4
**inspection** 30:8
  66:2,9 68:13 70:8
  80:4,10,15,18
**inspector** 30:15
  69:21 71:3
**installation** 120:8
  122:2
**installed** 75:6
**installing** 41:19
**instance** 5:2 89:11
  113:10 147:14,16
**instances** 63:21
  202:1
**instigating** 89:5
**institution** 43:4
  93:13 125:11
  175:3 189:17
  190:5 200:19
  207:13 214:12
  218:2,5
**institutional** 12:22
  39:11 43:3,8,22
  46:13 47:9 81:16

81:25 82:20 83:4
86:5 91:9,21 93:4
93:20 94:10,25
95:23 96:2,6,13,23
97:2,4,16 99:13
103:7 120:3 126:6
128:9 129:15
131:2 132:5
155:10 175:5
222:11 226:4
228:22 229:6
**institutions** 91:25
92:10,11,21 93:3
96:21 97:1,18
120:3 126:9,10
205:1,3 206:3,10
206:15,18,20
207:9,11,12
208:20,21 209:8
209:10 210:5
**instructed** 27:11
**instructs** 11:6
**insufficient** 217:10
**intend** 72:24 97:11
**intended** 61:3
**intent** 65:23 91:18
93:5 98:23 99:1
129:23
**intention** 123:24
124:4
**intentions** 63:21
**intents** 218:14
**inter** 191:24
**interest** 231:10
**interested** 142:23
209:2
**interests** 39:13
100:11
**interim** 35:12,15
35:20

**interpret** 70:21
191:20
**interpretation**
18:14,23,24 70:9
76:19 77:10 79:5
79:8 154:19
155:24 189:1
191:25 192:18,20
194:3 228:19,20
229:15
**interpreted**
177:18
**interpreting**
191:10
**interrogatory**
72:15 225:16,21
**interrupt** 180:7
196:6
**interrupted** 85:9
196:10
**intervention**
214:14
**intolerable** 214:25
215:1
**introduce** 113:7,8
113:15 114:16
116:21,24 117:1,6
117:18,22
**introduced** 96:10
112:13,19 113:3,5
113:6,11,12,13,23
114:22 115:10
117:3,8,14,25
118:14,21,23
119:3,22 120:12
120:17,19 121:1
123:18 124:13
127:3,12,20 128:2
128:8 133:6
143:13 152:15,24

**introduction**
113:17,18 115:15
116:6 121:11
123:16 127:7,14
127:16,21 128:25
129:5,11 130:22
131:3 136:16
**invite** 134:5
**invited** 134:12
135:3
**involve** 90:6
132:13
**involved** 42:21
43:18 99:2 148:19
166:14 185:14
226:9,19
**involvement** 82:24
83:10 86:2 103:6
226:6,25
**involving** 94:10
122:9
**iota** 180:9
**isolating** 207:5
**issuance** 66:15
68:24 70:22
**issue** 15:24 16:6
16:14 17:4,6,7
29:22 36:1,3 37:4
37:25 49:12,18,24
50:4,13 65:16
68:20 69:19 80:3
92:24 94:1,11,24
95:1 100:4 121:3
122:2,8 138:15
164:7 171:13
172:22 181:9
187:10,17 192:25
192:25
**issued** 13:9 27:6
51:21 62:18 66:20
80:1 86:21,22

170:20
**issues** 16:9,9 22:22
93:7,22,25 103:22
121:6,25 124:6
156:5 162:7
177:24 224:20
229:25
**italicized** 175:2
**item** 116:6 123:8
123:11 141:18,20
142:18 144:19
145:19 146:19,21
148:8,8,15,16
152:15 221:25
**items** 49:25
115:15 123:23
138:3,8,13 186:1,4
**iteration** 39:6
**iterations** 107:12
108:7 110:1 121:9
140:13

**j**

**jagoe** 203:21
**january** 25:15
62:12 129:20
130:14,24 163:3
164:6
**jean** 5:20 6:25
52:7 75:25 85:5
172:3
**jesuit** 214:13
**jewel** 53:19
**jingrisa** 5:14
**job** 10:10,17,19
23:3 35:18 42:6,7
80:16
**john** 6:14 21:2,3
37:23 83:9 86:12
87:16 95:1 102:7
103:12 106:15
132:3,15,24 136:2

136:11 137:13,22
158:16,16 159:2
161:15,18 162:9
162:10 171:12
**joined** 181:7
**jonathan** 5:11
6:21 7:24 9:20
10:15 23:1 26:10
29:12 31:19 33:2
37:3 43:1 45:1
46:2,11,14 47:14
53:21 93:10
109:15 116:3
150:5 151:19
156:2 157:15
164:16 166:6
180:19 183:5
195:16 196:14
200:2 205:21
207:14 211:14
214:9 228:25
**journal** 3:4 38:23
63:11 73:19 74:4
149:23
**judge** 14:3 218:13
**july** 2:18 108:20
129:1 130:22
131:23 132:11
134:11 135:2
**jump** 48:15
**june** 8:2
**justice** 189:25
**justifications**
168:4

**k**

**k** 8:4
**kahn** 5:6,12 6:12
6:22
**kate** 5:24 7:8
**keep** 26:17 65:19
118:14 128:14

169:1,2 186:19
**keeping** 189:23
**keeps** 32:9
**keith** 3:16 197:19
**ken** 110:10
**kennedy** 21:2
**kennedy's** 21:4
**kept** 38:22
**keyes** 8:4,10
**kid** 202:15,17
**kids** 203:7 209:19
**kind** 14:20 37:25
41:16 56:6 61:10
62:16 64:19 78:7
80:23 84:6 87:23
98:22 101:8
104:13 147:8
169:17 184:22
192:9 200:6 215:2
222:3
**kinds** 24:7 102:22
220:18
**knew** 124:18
154:4
**know** 11:4,10,19
11:22 17:19 22:2
23:16,16 24:17,18
25:2,23 26:3 27:1
28:19 32:5 33:3,3
33:6,8,11,15 36:6
36:7 39:16 41:22
47:13 52:12 53:22
56:23 57:14,15,22
58:3,3,5,23 61:8,9
62:1 64:9,13,16
65:6,11,18 68:17
69:12,13,17 70:5
71:14 72:11,12,23
73:2 75:1,2,5,6,7
76:11,13 78:20
79:6 81:15 82:15

84:1 85:12 86:25
88:11,11,15,16,25
90:13 92:9 93:10
93:11,16 95:2,9,11
95:14 100:3,22
101:1,4,12 103:6
103:15,17 105:15
105:15,19,25
106:14 109:5
113:21 117:4,11
117:17 118:2,22
118:23 120:18
121:5,8 122:20
124:7 125:13
132:8,16,19,22,25
133:2,12,15
136:17 137:23
147:15 152:9,22
152:23 156:1
163:5 168:22
169:8,8 171:19
178:13,22 180:2
181:17 183:15
184:10 186:7
189:6,7 191:15,16
191:23 192:7,7,10
194:22 200:5
201:23 202:22
203:16 218:7
220:18 221:25
222:2 224:4
225:13,14,15
226:6,8,14,15,16
227:10,19 228:6,7
228:9 229:22
**knowing** 124:17
218:25
**knowledge** 15:24
18:3,23 19:2
27:25 75:7 103:15
106:4,5,5,12

108:14,24 110:17
201:16 229:2
**knows** 209:20
**krantz** 60:22
162:25

**l**

**l** 25:3
**l.a.** 214:12
**lacking** 91:13
**laid** 132:9
**lake** 53:16,18 54:9
54:11,14,16,17,21
54:25 55:4
**lakes** 14:10
**land** 83:9 100:24
103:22 121:6
**landowner** 91:6
124:8
**language** 83:6
105:19 107:10
109:1 110:9
114:12 148:15,16
155:17 174:7
228:1
**large** 193:17
**largest** 214:14
**lastly** 24:10
125:14
**late** 14:2 17:19
18:1 51:14 152:1
152:3 206:14
**law** 5:5 13:21,22
13:24,25 14:13,18
14:19,25,25 15:1
39:12 67:14 97:17
111:4 154:21
179:10
**lawn** 25:10
**laws** 13:15 15:2,3
**lawton** 216:2,6

**lawyers** 164:18
**lead** 42:8 104:15
  116:2
**leadership** 25:5
  153:15
**leading** 68:2 110:4
  161:16
**league** 79:6 191:17
**learn** 17:9,25
  62:23 95:15
  131:11 163:13
**learned** 17:14,16
  63:4,13 64:1
  131:14
**learning** 65:25
**lecture** 60:2,13
**led** 53:1 56:18
**left** 10:4 62:9
  162:11 172:6
  174:15
**legal** 13:18 24:21
  134:15 154:14,17
  154:19,24 156:8
  156:15,18 159:4
  159:11 194:7,16
  194:17,18 211:20
  232:1 235:1
**legalities** 15:2
**legally** 169:8
**legislation** 88:24
  110:8
**legislative** 2:15
  27:18 39:23 40:13
  105:3 126:19
  128:21 136:20
  138:25 143:18
**legistar** 2:10,14
  104:6 126:18
  138:3,7,13 184:6
  186:2,6 198:25

**lemmer** 149:9
**lengthier** 126:5
**lengthy** 156:3
**letter** 2:17 70:2
  131:23 132:2,7
  133:23 134:2
  232:20
**level** 33:6,6 94:21
  179:19
**levels** 92:5
**levy** 209:9
**liaison** 4:3 61:5
  63:18 71:13,20
  72:24 99:7 163:10
**life** 13:3 21:5
  34:16 66:10
**light** 68:20,24 69:9
  71:6 125:16 223:7
**lighted** 62:3
**lighting** 62:19
  63:5 64:22 65:9,9
  65:14,23,25 66:4,8
  66:11,19 67:1,5,7
  68:15 70:22 120:8
  122:2 219:6
  220:22 222:18,19
  223:2,3,6,8,12,14
  223:20 225:10
**lights** 16:8,21 22:2
  22:17 28:4 29:17
  29:22,23 30:11,25
  33:13 41:2,11,19
  42:3,11,12,16,19
  42:22,23 43:11,15
  43:25 44:3,6,18,20
  44:25 45:5,18,22
  46:25 49:12,18
  50:4,13,25 51:23
  54:7 61:18 62:19
  63:10,13 74:18
  75:16 92:14 93:25

94:18 95:11 97:12
  98:18 99:10,18,25
  100:18,23 101:5
  101:17 150:21
  162:20 164:8
  189:15 197:14
  199:5 220:11,19
  220:20 221:2
  222:7 223:14
**limit** 140:7
**limitation** 54:2
**limited** 71:21
  77:11 121:16
  139:13 192:15,20
**limiting** 174:22
**limits** 35:18 46:3
  202:1
**line** 107:8 121:10
  121:10 127:5
  134:4 167:12
  224:17 225:2
  232:14 234:7
  235:3
**lines** 41:5,21 42:5
  42:7 85:3,16
  214:23 215:3
**linked** 149:18
**list** 22:12,14
  177:25 178:1
**listed** 43:22
  104:11,22 115:23
  116:15 123:15
  152:20 153:7
  165:6 185:14
  234:7,17
**listen** 63:17
**listened** 36:4
**listening** 63:23
  199:17
**listing** 115:22
  234:7

**lists** 190:19
**litigation** 84:14
  216:10
**little** 9:20 19:18
  21:7 71:7 110:6
  110:21 218:11
**liturgy** 220:6
**livability** 92:1,25
  97:21
**live** 9:7 22:11 25:7
  25:14,19 55:8,13
  56:17 57:5,16
  58:23 181:4
  201:25 209:19
**lived** 55:11 56:23
  59:14 180:11
  185:12 202:2
  213:19
**lives** 22:9 25:13
  182:6 183:3,11
**living** 56:2
**llc** 8:22
**llp** 5:21
**lobbying** 95:10
**located** 6:12
**location** 59:17
**locker** 62:1
**logic** 193:9 194:4
**logical** 226:24
**long** 8:16 16:4
  34:14 37:3 62:2
  126:3,4 151:15
  156:2 163:8
  195:18,21 196:22
  197:4
**longer** 100:7
  153:13
**longstanding** 37:5
**look** 29:1 50:7
  56:7,22 96:12
  105:1 107:25

112:10 115:13
122:24 126:23
136:6 141:11,15
142:18 152:18
155:4 168:24
175:17 187:1
189:6 194:22
212:3 216:14
223:5
**looked**  56:21
67:15 222:14
**looking**  14:1 32:10
55:6 82:15 104:16
107:17,24 128:24
145:5 172:8,11
174:14 179:4
212:18 224:12
**looks**  20:7 116:6
122:13,17 123:6
139:23 141:20,25
148:15 165:8
166:9 197:25
**loophole**  97:18
101:2,3 102:25
103:3 124:9
133:16 211:18
**lot**  10:11,19 14:9,9
21:15 38:22 39:4
46:19 135:21
138:20 141:11,23
142:22 146:6
224:6
**lots**  22:22 33:20
164:14 203:2
**loud**  33:4,10,11,22
**loudly**  33:8
**loudspeakers**  57:9
**louis**  5:20 6:25
52:7 75:25 85:5
172:3

**lower**  126:23
**loyola**  13:12
**lunch**  156:17

**m**

**m**  5:24 7:11
**ma**  13:7
**madam**  232:10
**madison**  1:7,17
5:6,13,22 6:8,13
8:4,23 9:12 15:10
19:11 21:17 33:15
35:2 36:11 39:4
40:14 66:3 80:1
97:7 106:25 115:4
115:5 120:1 141:7
161:20 176:21
178:23 179:6
195:23 197:14
201:20 218:21
219:8,11,17
223:20 225:11
232:7 233:3 234:3
**mail**  213:24
**main**  5:6,12 6:12
**maintain**  49:14
**major**  13:11 91:24
**majority**  181:6
**making**  28:10
30:17 87:18 89:9
150:20 183:13
203:8 206:19
**managed**  204:19
214:13
**manner**  125:19
166:19 175:24
176:8 179:14
**map**  155:13 158:7
**mapping**  28:23
29:5 184:11
**marathon**  11:9

**march**  60:25
62:13 64:7,11,12
64:25 162:24
163:7,14,24,25
**marie**  25:12
185:11
**mark**  25:12 195:8
**marked**  3:19 50:8
81:22 104:1 108:4
115:2 126:14,17
128:13,18 131:16
131:20 133:21
135:24 136:1
137:10,12 141:3,5
144:9,11 146:11
146:13 149:13,22
157:21,23 158:12
158:14 164:20,22
166:22 170:2
190:14 195:4,6
197:17 212:12,14
212:23 215:8
225:3
**market**  59:5,9
**married**  15:5,6
**martin**  7:19
**master**  2:16 3:7
17:23 30:23 31:2
31:3,5 38:11
53:24 58:17 66:23
66:25 67:2,10,17
67:19 70:10,14,21
71:2 76:19,21
77:21 78:5,23
79:11 81:13 92:4
92:11,21 95:23
96:8,9,13,21,24
97:3,4,19 98:1
99:9,15,23 100:8
100:13,17,24
101:10,16 120:4

123:12 124:21,24
125:4,7,10,16,16
125:18 126:1,6
128:22 129:6,12
129:18,19 130:13
130:19,21 131:8
131:12 133:6
134:6,13,21 135:3
139:14 140:25
142:19 145:11
146:8 150:9,22
151:4,10 152:13
154:2,6 155:8,12
155:14,22 156:4
156:21,23 157:18
158:1,8 159:4,7,12
159:23,23 173:18
173:19 177:18
191:3,8,10,20,25
192:19 194:1,15
210:18 220:10
221:8 227:3,9,13
227:15,18,22,23
227:25 228:17
229:5,12,14,20
**master's**  13:7 60:7
**matt**  17:21 19:4
37:24 52:12,12,15
66:10,14,18 79:5
170:9 192:14
221:5 228:19
**matter**  6:6,9 14:3
26:12 34:9 81:23
82:16 85:2 90:24
127:18 137:4,7
145:19 149:20
169:21 178:22
193:6 212:10
221:19 222:15
**matters**  30:9
87:23 145:6 162:4

162:5 221:15
229:10
**matthew** 136:3
226:13
**mayor** 2:18 21:11
21:17 131:24
167:3
**mayor's** 89:6
**mckinney** 147:22
148:13
**mean** 9:3 19:9
23:1,24 24:8
38:20 39:1 83:23
102:9 112:23
142:12 147:3
167:19 188:4
200:15 203:16
**meaning** 9:2 35:16
185:8
**means** 68:17 90:14
104:8 110:7
114:17,21 127:8
142:14 156:16
167:23,25
**meant** 101:5 189:3
211:14 215:5
**measure** 41:13
42:21 44:8,8,11,12
**measurements**
44:22 182:12,15
184:11,17 185:16
185:19,20
**measures** 92:7
**measuring** 44:7
45:19
**media** 6:5 11:14
52:5,9 101:25
102:3 143:24
144:2 186:12,15
230:9

**meet** 35:8 64:10
64:16,18,21 164:2
166:12
**meeting** 2:12 3:3,9
3:10 37:18 38:1,2
38:7,10,14 41:8
52:15,19,20,22
53:11,23 54:1
59:20,21 60:2,21
60:24 61:1,4 62:5
62:9 64:4,8,23
65:13,22 83:1
87:1 109:12 113:8
113:20 115:4,5,6,8
116:12,16 117:23
117:23 127:3
139:1 141:1,6,13
144:12,13,16
145:22 146:16,18
146:23 147:18
148:23,25 149:11
151:3,5,6,20
152:13,18 153:1
160:17,25 161:10
161:16 163:1,3,6
163:15 164:24,24
165:3,11,13,17,20
168:24 197:24
204:25 222:2,4
**meetings** 37:14
38:17 41:8,12
43:19 45:20 63:24
64:3,16 65:20
68:19 71:12 86:16
99:5 118:7 164:7
165:23 180:14,14
195:21,22 199:19
210:13 211:4
221:14
**meets** 118:5,6

**member** 99:6
100:6 106:1 117:4
172:23 173:7,11
178:23 195:8
197:19 203:23
214:24
**members** 18:13
25:17 36:22 37:18
43:23 49:7,7
63:17 137:24
146:4 149:8,8
151:13 158:17
167:2,3 181:7
195:16 197:23
199:5 221:14
**memo** 2:21 3:6
32:12,13 137:12
137:20,23 138:8
157:25 158:21,23
159:1 160:5
175:11
**memorandum** 3:8
137:17 158:15
**memorial** 95:12
**memorized** 217:25
**mention** 155:18
**mentioned** 15:9
25:13 36:17 37:11
59:19 69:9 73:14
86:11 123:6 131:7
162:14 201:7
**merely** 100:2
183:5
**meritorious** 77:16
**merits** 79:16
**merton** 214:20
**messages** 221:23
**met** 35:6 62:6
158:7 162:24
**michael** 133:24
136:2

**middle** 11:3
126:24 161:8,13
**middleton** 202:2
204:8
**midwest** 9:13
232:17 235:1
**mike** 52:24 60:21
61:10 67:4 68:6
73:19 74:4,8,10,15
162:25
**million** 73:21,21
**mind** 102:21
133:15 164:18
203:8 219:16
**mine** 32:7,9
**minimal** 193:14
193:15
**minimize** 39:14
44:15 178:13
**minimized** 46:15
174:1
**minimizing** 91:22
175:1,2,11
**minute** 55:9 57:4
197:6 205:11
**minutes** 2:13,22
2:24 4:3 8:18
65:19 71:12,19,23
72:6 115:4,5
116:13 141:7
144:13 151:14
160:15 168:24
196:19,21
**misquoted** 188:23
**missed** 160:24
**mission** 216:17
217:18 218:22
**misstates** 123:4
**mistaken** 113:14
**mitigate** 39:14
41:15 44:15

**mitigated**  46:14
**mitigating**  42:25
43:5
**mitigation**  44:17
44:23 92:7 177:24
178:7
**modification**
96:14 138:17,19
**modifications**
150:20
**modified**  228:1
**monday**  141:8
144:14
**monona**  20:4
**monroe**  8:10,11
19:15,16,20,22,24
25:9 36:22 37:19
37:20 53:20 63:18
64:3,8,15,23 65:18
145:10 177:4
185:12 190:16
**month**  15:15
64:10,17,21 118:7
118:8 151:4
**monthly**  64:3
**months**  62:17 68:4
69:1
**montreal**  161:3,19
161:21 162:11,12
**morally**  207:16
**motion**  147:21,23
148:11,16 152:25
**motions**  148:19
**motivated**  92:15
92:19
**motivating**  204:11
**move**  32:9 56:24
94:17 124:4
129:17 135:11
152:25 187:8,21
214:1

**moved**  25:15
58:10 145:19
146:19 203:11
**moving**  117:19
165:12
**multiple**  26:16
36:5 89:8 104:11
208:11
**multitude**  54:15
**municipal**  15:2
**munson**  52:25
**music**  57:15

**n**

**n**  2:1 7:11,11 25:4
**name**  6:14 7:13,16
7:18,20 9:11,13
25:4 33:14 55:16
95:13 115:23
120:13 203:20
232:6 233:3,4,15
234:3,4,21
**named**  214:13,17
**names**  9:16 25:11
203:17
**narrative**  165:10
**nathan**  2:20 136:2
**national**  9:6 34:7
**nations**  14:15
**native**  13:24 14:25
**naturally**  182:25
**nature**  8:24 13:16
33:23 84:15
201:24 209:15
**near**  34:7 78:18,18
114:3 134:3 181:1
**nearby**  31:1 34:6
41:9 55:13 58:2
94:19 187:9
203:10
**nearly**  9:15 21:16

**necessarily**  119:17
**necessary**  43:6
91:17 133:17
204:13
**ned**  203:20
**need**  11:10 43:23
49:15 92:1 93:8
94:2 131:19 137:4
213:13,13 219:1
**needed**  83:6 89:7
98:22 146:8,10
198:15
**needs**  88:20 92:10
113:5 174:7 207:8
209:12
**negative**  187:24
188:4,6,16,24,24
**negatively**  187:8
187:22 188:25
189:3 203:13
**negotiating**  9:4
**neighbor**  55:13
177:3 184:12
213:1,5
**neighborhood**  4:3
8:11 18:4 19:16
19:17,18,25 20:1,5
20:6 23:8,11
27:16 28:2 31:10
34:24 36:22 37:6
37:18,19,20 43:1
52:15 53:20 54:6
54:13 56:2,23
57:19,25 59:14
61:5 62:4 63:18
63:22 64:4 65:19
71:12,13,20 72:25
74:17 97:25 99:7
129:22 156:3
163:9 175:22
176:13 179:12

180:1,10 184:21
184:21 185:2
187:7 188:7
190:15,16 193:22
194:10 209:21
210:24 213:19,20
**neighborhoods**
18:4 19:23 27:16
27:17 28:2 33:19
34:6 39:7 45:7
92:4 97:22 124:10
175:3,13 179:20
209:22 214:7
**neighbors**  17:2
24:20 31:1 36:20
39:15 41:3,7,9
42:15,17 43:19
44:21 54:19 55:1
57:24 58:2 61:9
64:1 65:3 68:13
69:15 71:25 78:8
92:2,25 94:19
99:6 100:12 125:5
125:11 163:10
165:12,13 166:10
166:12,16 174:2
174:20 177:3
178:11 181:23
182:3,13,20,22
183:20,25 184:1,2
184:5,14 185:18
187:7,21 189:10
189:13 202:23
203:10 205:5
207:10,13,15,16
208:21 209:13
211:13,22 212:1
213:23
**neoclassical**  12:24
**nervous**  9:20

neutral  177:11
never  9:20 15:6
  22:6 42:10 51:16
  51:17,23 55:17
  58:19 59:12 67:13
  70:12 129:24
  153:22,22 164:18
  192:13 193:4
  204:6,10 224:2
  228:2
new  3:14 23:5
  24:13,19 25:6,22
  27:2,17 28:2,16,25
  29:8,14 37:4,21
  45:6 68:12 88:25
  89:1 105:24
  107:10 110:6
  113:8,11,17
  123:15,16 126:10
  143:17,19 165:9
  169:16 185:14
  186:25 195:8,12
  195:17 203:23
  213:22 214:7
newsletter  190:16
newspaper  63:6
  70:6 149:22
nice  186:21
nickname  7:18,20
night  16:25 23:10
  30:25 46:5,5 62:4
  64:17 67:5 180:5
  182:25 189:15
  193:8,20 196:22
  198:13 199:2,6
  220:16,19
nighttime  193:16
nods  10:11
noel  5:15 6:23
noise  33:8 45:12
  45:14 58:4 76:17

171:7,9 174:21
  177:24 178:14
  179:17 181:9,11
  181:12,14 182:15
non  66:15 70:22
  191:17
noncompliant
  223:20
nonresponsive
  135:12
northern  14:1,11
notarized  232:15
notary  5:4 231:4
  231:20 232:25
  233:10,18 234:15
  234:23 235:23
notation  82:17
note  38:20 106:14
  149:17 178:1,19
  187:20 232:13
noted  200:12
notes  38:14,16,21
  112:12
notice  5:3 231:14
noticed  53:15
notices  79:10,16
  81:6 86:22
noticing  88:20
notified  116:14
notify  117:15
notifying  221:6
notion  102:13,19
  155:25
novel  155:24
november  53:10
  60:19 221:11
nsterett  5:17
number  46:3
  73:22 104:18,19
  104:22 113:14
  122:25 149:11

160:6 169:4
  174:18,20,23
  182:9 193:14,15
  209:21 232:8,14
numbers  200:20
  200:21 234:7

**o**

o  7:11
o0o  1:3 6:2 7:4
oaks  122:19
object  18:8,17
  19:1,13 20:25
  29:9,25 30:13
  31:7 34:19 36:12
  38:18 39:3,24
  40:1 46:10 51:1
  54:10,22 62:21
  63:15 66:5 70:24
  79:3 94:3 95:25
  97:14 114:7 118:1
  120:14 121:4,19
  126:21 127:23
  135:23 136:21
  143:9 148:5
  150:24 153:12
  154:7 157:2
  159:18 162:22
  170:23 173:1
  174:3,9 175:14
  178:3 183:4
  187:18 188:2,18
  188:20 189:18
  190:6 192:23
  194:19 195:14
  204:4 206:7,14,22
  207:19 216:4,25
  217:20 218:6,18
  220:17,25 221:21
  223:22 227:4
  229:8

objected  100:6
  208:11
objection  11:2,4
  15:25 22:4,19
  24:16 25:1 28:5
  28:17 31:16,25
  32:25 35:3 40:9
  42:4 45:8,24 49:3
  51:14 59:6 69:11
  76:25 77:18 78:2
  79:22 88:9 92:17
  98:15 99:19 100:1
  100:20 106:9,17
  107:22 112:24
  117:10 119:21
  122:11 123:4
  124:2,15 133:8
  135:5 139:15
  140:14 147:6
  149:6,15 152:1,2,3
  153:18 154:12
  160:2 169:6
  176:16,24 177:21
  178:6 182:7 189:4
  191:13 199:24
  201:21 207:6,22
  208:1,16,18
  216:21 217:4,5,8,9
  219:25 222:22
  224:1 230:3
objections  139:21
  208:13,22
objective  222:19
  223:3,8
obligated  214:4
obligation  207:15
  207:16
obligations  207:18
observations
  34:16 55:15 56:18

observe  56:16
observed  55:11,18
  55:21 56:1,3,4
observing  56:11
obtain  97:12
obtained  201:1
obvious  33:24
  98:25
obviously  94:19
  230:2
occupations  8:20
occur  38:2 60:24
  78:12 86:15
  102:23 161:17
  164:25 174:20,23
  179:16 203:13
occurred  87:5
  118:25 133:3
  140:6 214:9
occurring  96:15
  116:11 165:17
october  52:16
  59:20,21,22 82:7
  82:21 107:15
  111:13 131:4
  145:6,20 146:19
  148:22 149:3,10
  151:5,5 152:13
  153:1 221:10
odana  19:17
offer  24:3 179:21
  180:13,19 181:2
  181:23 195:16
  223:10
offered  66:18
  115:10 174:12
  176:22 179:9,15
  180:8,17,21
  181:21 182:3
offering  24:8

office  15:11,22,24
  20:24 21:18 55:19
  56:3 57:6,7 62:7
  67:25 68:2,3
  70:15 75:3 76:17
  80:4 83:14 86:6
  88:7,19 89:3,6
  103:16 105:22
  106:1 117:18
  118:20 119:8
  127:6,13,21 154:5
  156:11,22 159:6
  169:14 222:16
  229:17
offices  5:5 6:12
official  8:22 21:21
  23:15 40:11 79:9
  79:16 86:22 221:2
  233:15 234:21
officially  6:3
officials  40:23
  49:6 166:13
ogibwe  14:4
oh  36:14 105:12
  105:12 112:18
  116:14 121:22
  131:19 135:4
  151:12 217:5
ohio  12:9 34:3
  199:9 232:2
okay  10:20,24
  11:7,12,17 12:1,2
  12:14 26:8 46:18
  52:3 71:18 84:19
  85:4 90:2 91:2
  105:14 111:6
  112:18 119:2
  135:17 136:19
  140:22 143:17
  145:5 150:7
  163:22 172:8,11

173:13 182:2
  183:8,24 199:16
  206:3 208:9,9
  216:7 217:2,16
old  21:6,7
once  21:1 33:13
  66:10 227:25
ones  96:8 215:25
  224:12,23,24
ongoing  93:7
  138:14
online  55:6
open  17:24 70:18
  71:9 77:2,7 93:14
  120:5 169:20
  187:3 189:1
  198:23 228:18
operate  40:23
  88:14
operation  25:6
  100:16
opinion  16:12
  17:22 18:5 66:18
  71:5 208:19
  223:10 229:18
opinions  207:25
  208:4
opponent  35:14
  37:22
opportunity  48:1
  113:8 114:14
  124:22
oppose  23:7 28:3
  65:23 129:20
  145:25 176:13
opposed  22:2,17
  31:24 37:3 46:1
  74:18 94:19
  124:20 129:19
  139:10 156:8
  193:4 201:19

204:2
opposing  124:23
  139:8 140:20
opposition  30:11
  36:24 75:16
  141:24
option  31:3 125:22
  129:24 155:20
  189:23
ordain  107:1
order  67:8 87:22
  100:16 101:17
  118:22 133:18
  149:12 160:11
  171:3 174:16
  186:20 190:9
ordinance  2:11
  81:25 82:6 83:3,4
  86:8,9 87:18,19
  88:2,17 89:9,17
  90:21,23 91:1
  93:5,20 94:6
  97:25 98:17 99:1
  99:3,11 102:12
  104:7,9 105:23,24
  106:21 107:5,19
  107:20 108:6,11
  109:2,10 112:7
  114:13,20 120:2
  120:11 121:1
  123:3,25 127:18
  128:1,7,9 129:13
  129:23 130:2
  131:2 133:7
  136:15,20 140:21
  155:1,5,11,18
  181:12,14 200:10
  222:10 223:14
  225:24 226:2,3,7
  228:23 229:7

**ordinances** 13:15
88:7 159:5,13
181:11
**organization** 55:5
214:16,18
**organize** 75:15
195:19
**organizing** 24:20
**orientation** 57:8
**original** 88:24
104:14 110:19
129:23
**originally** 97:17
**originated** 68:6
**outcome** 42:18
44:19
**outcomes** 29:2
45:4
**outdoor** 62:19,19
63:5 70:22 120:7
120:10 121:17
122:3 220:21
222:19 223:3,14
225:10
**outline** 164:14,19
170:15
**outlined** 175:10
177:5
**outlines** 190:23
**outreach** 219:20
**outright** 160:20
**outside** 35:18 37:7
37:8 78:16 96:15
201:25 221:7
**overall** 200:23
**oversaw** 51:7
**overwhelming**
181:6
**owner** 8:21

**p**

**p.m.** 64:21 101:25
143:24 144:2
186:12,15 197:8
197:11 230:8,10
**page** 2:2 3:19 4:2
48:4 51:5 74:3
104:10 105:1,2,11
106:24 107:20
111:23,24,25
112:15,16 115:13
116:14 119:18
123:8,8 126:25
129:25 133:24
134:3 138:1,1
141:15,17,21
142:5,18 144:18
145:5 146:21
147:20 148:7,7
155:8 158:3
167:12 171:20,23
171:24 172:2
174:14,15 175:19
182:18 187:1
189:21 196:2
198:8 215:12
216:12,14 222:17
225:16,20,21
232:14,16 234:7
235:3
**pages** 107:24
108:2,2 170:15
172:4
**pagination** 172:6
172:9 174:15
**paid** 178:10,10
184:5,9
**pair** 186:25
**pandemic** 61:6,7
161:3,7

**paper** 108:13
131:13
**paragraph** 134:3
150:15 151:2
158:3,4 159:1
167:13 174:15
187:2 189:21
198:9 205:22
**paragraphs** 82:17
151:18
**parallel** 89:8
123:22,25 129:18
**paren** 96:12 120:2
120:2,2 145:12
175:6,6
**parent** 201:17
**parental** 201:17
**parents** 13:3
198:25 201:18
202:9 203:1,6,18
203:20
**park** 20:1,3,6
**parks** 170:8,13
226:6
**parliamentary**
116:19
**part** 17:20 19:15
30:18,21 32:15
33:17 39:11 50:15
55:7 72:18 96:18
99:12 113:6,17
126:24 155:13
160:12 183:12,17
186:2 198:8
205:10 234:9
**participate** 99:5
165:14
**participated** 59:13
210:12
**participating**
204:16

**participation**
97:25
**participatory**
23:25
**particular** 9:11
48:23 54:13 56:25
72:15 89:11 96:18
113:10 118:24
121:11 155:4
160:11 191:21
193:13 221:25
224:11 229:19
**particularly** 31:24
37:2 116:23
174:21 193:13
220:2,8 222:2
**parties** 42:1,9
44:11 76:11 212:9
231:10
**partnership**
100:11 189:25
205:7 211:16,21
218:13
**parts** 211:16
**party** 57:15 76:15
76:15 77:23 78:11
**pass** 31:23 32:3,4
150:6
**passed** 99:17,24
101:16 137:23
139:24 140:4,19
147:23 160:1,9
162:16
**passing** 56:24
138:2,7
**path** 88:17 89:14
123:22,25 126:2
**paths** 89:8 129:18
**patty** 216:2,5
**pause** 75:17
170:24

pausing  164:13
  170:25
pay  58:22 205:2
  206:16
pd  80:7
pen  108:13
penalized  81:11
pending  6:9
people  22:24
  23:19 27:25 35:6
  36:23,25 37:2
  56:5,7,19 57:24
  67:11 179:18
  183:9 193:18
  195:19,20,24
  199:18 202:12
  213:25 222:1
pep  33:11 77:22
  180:6
perceived  178:17
percent  201:25
  209:18
percentage  21:25
perfect  11:21
performance  9:7
period  13:4 41:7
  62:25 64:14 69:4
  96:22 109:7
  113:19 137:18
  155:15 167:24,25
  168:3,20,21
permissible
  113:15
permission  26:7
permit  3:13 48:23
  61:15 68:25 71:7
  91:20 98:19
  101:18 162:15,20
  163:16,24 167:7
  168:11 169:23
  170:6,14,20 171:4

171:14 172:23,25
  179:2 188:10
  210:19 225:11
permits  68:20
permitted  77:25
  227:1,7,12,13,16
  227:17,25 228:5,9
  228:16,21 229:4,6
  229:12,14,15
person  24:18 51:6
  51:11 80:22
  103:18 106:6,16
  108:24 118:17
  165:13 213:15
  231:9
personal  13:3
  26:21 27:8 34:12
  34:15 47:1 182:4
  182:5 183:17
personally  33:23
  233:11 234:15
persons  103:23
  226:23
perspective  130:6
persuasive  196:5
pertained  224:6
pertaining  171:14
  222:9,15
ph  184:6
ph.d.  12:19 13:2
phone  7:6,9 63:25
  86:19 118:15,15
  132:18,22 165:14
  232:3
phrase  39:19,21
  211:1,8
phy  71:22
phys  71:10 77:3,7
  77:12,16 192:2,5
  192:10 227:19
  228:8

physical  76:24
  192:22 228:16
picture  21:2
  186:22,23
piece  74:2 184:14
pinckney  5:21
place  57:1,3 59:15
  71:16 77:22 80:5
  87:1 93:17 97:24
  98:2 121:14
  133:20 134:7
  147:15 155:17
  165:21 168:18
  169:10 193:6,8,19
  204:13
placed  167:16,20
  167:22,25 168:1
  169:3
places  39:4 182:14
  220:4
placing  169:12
plaintiff  1:5 5:2,10
  6:22 231:7
plaintiff's  6:18
plan  2:16,21,22,24
  3:6,7,8 17:23 30:9
  30:23 31:2,3,3,5
  38:11 39:5 43:22
  43:23 49:6 53:24
  58:17 66:23 67:2
  67:10,17,20 70:10
  70:14,21 71:2
  76:20,21 77:21
  78:5,23 79:11
  81:13 92:12,21
  96:14,21 97:19
  98:1 99:9,16,23
  100:5,8,13,17,24
  101:10,16 104:23
  109:12 116:7
  120:4 123:12,20

124:21,24 125:4,7
  125:11,16,16,18
  125:25 126:1,6
  128:22 129:6,12
  129:18,19 130:13
  130:19,21 131:8
  131:12 133:6
  134:6,13,21 135:3
  137:14,23 139:14
  140:25,25 141:7
  141:17 142:3,13
  142:15,19 143:3
  144:6,13,25
  145:11,16 146:5,8
  147:1,9,10,17,23
  148:2,8,17,21,25
  149:9,10 150:9,18
  150:22 151:4,5,10
  151:13 152:13
  154:2,6 155:8,12
  155:22 156:4,6,21
  156:23 157:12,18
  157:25 158:1,6,8
  158:17 159:4,7,12
  159:23,23 160:5
  160:13,15 167:2,6
  168:10 169:2,22
  173:18,19 177:18
  180:15 181:1,8
  191:3,8,10,20,25
  192:19 194:1,15
  195:12 197:23,24
  198:4 204:24
  210:19 220:10
  221:8,13,15 227:3
  227:9,15,18,22,23
  227:25 228:17
  229:5,12,14,20
planning  3:6,12
  35:1 36:10 37:12
  37:15 48:21 49:1

67:14,14 154:1
156:11,14,20
157:16,19,25
158:5 169:22,24
170:1,4,8,19
171:20,21 172:18
172:24 173:15,17
173:24 175:9
177:6,8,10,25
178:18,20,25
179:1 181:1
192:18 199:19
226:9,18 229:13
**plans** 92:4,11,12
95:23 96:8,9,24
97:3,5 155:14
**plausible** 65:5,7
**play** 17:5,11,17
33:9,9,12,14 78:25
138:16 180:6,6
199:2,10 228:12
**played** 33:2,13
79:20 199:8
201:20 202:3,5
203:21
**players** 204:2
**playing** 32:17
58:19
**plc** 5:15
**please** 6:17 7:13
7:22 8:1 10:14
11:4,10,19 12:18
16:18 27:22 30:3
48:14,17 85:15
90:7 98:13 99:21
103:11 119:25
128:17 130:4
139:17,19 142:11
154:9 157:10
163:18 166:4
173:2,4 195:19

206:9 214:3
220:12 227:6
232:12,12
**pleased** 21:10
22:25
**plus** 216:12
**point** 29:16 38:1
45:13 48:4 53:5,7
58:2 65:12 74:2
91:23,24 92:3
108:7 110:23
111:12 145:9
174:6 197:2 208:2
212:5 216:12
223:4
**pointed** 93:1,21
94:2 170:15
**points** 179:8 196:1
**poles** 223:7
**police** 80:1
**policy** 28:24 49:8
92:12
**political** 23:22
28:10 30:22
**portable** 67:7
**portion** 78:18
229:19
**portray** 151:16
**portrayed** 194:11
**pose** 11:2
**posed** 72:16
**position** 15:9
16:15,20 18:14
29:7,8,15,16,18,21
30:10 32:16,21,24
34:17 35:16 36:18
36:24 37:9 43:7
49:1 50:4,24
51:19 54:5 55:7
77:17 78:25 79:16
80:25 81:1,4

139:10 159:4,11
187:15,24 229:3
**positions** 16:12
28:13,25 36:9
**positive** 125:19
197:15 200:13
**possession** 72:8,10
72:11,13,20,23
73:7,11
**possibility** 41:4
100:9 118:19
176:10 189:10,14
**possible** 41:18
43:19 45:1 64:9
64:11 86:4 119:7
119:10 125:18
152:17 195:3
221:3,22
**possibly** 36:7
42:22 221:18
**post** 26:8 50:20,23
168:6
**postcards** 213:24
**posted** 26:1,5
49:21,23,23 51:17
198:5,6,7
**posting** 76:23
**posts** 51:2,4
**potential** 36:20
42:8 43:5 53:18
92:14,15,23 93:22
93:24 97:20
102:20 124:8,8
174:13 179:23
184:11 189:14
200:22,25 204:9
**potentially** 200:14
201:5
**powder** 191:5,11
191:17,22 192:7
193:1

**powerpoint** 52:23
53:16
**practical** 138:14
**practice** 38:16
56:20,21 57:1,14
64:2 74:1,8,22
78:14 79:7 105:21
170:24 194:13
221:20
**practices** 56:5,10
58:6 71:9,17,22
72:5 74:20 76:23
77:3,8,12,16 192:2
192:4,10,22
227:17,18 228:7
228:16
**prayer** 219:21
**pre** 107:19
**preamble** 46:12
92:8
**precedent** 125:6
156:1,7
**preceding** 82:17
**precise** 59:17
**precisely** 44:7
53:14 60:10
**predict** 32:5
**prejudice** 167:16
167:20,23 168:1
168:18 169:3,11
169:12 215:3
**preparation** 92:3
**preparatory**
219:12
**prepared** 42:20
44:1 101:3 170:8
211:15
**prescription** 165:9
**present** 5:24 6:23
21:19 93:18
116:16,25 117:5

141:13 144:16
160:25 195:11
225:12
**presentation**
52:23,24 53:1,2,17
60:13
**presented** 46:6
183:20 199:18
**presently** 223:23
**president** 52:24
73:19 117:4,15,16
117:20 118:20
148:14,14 153:2
162:25
**pressing** 162:4
**presumably**
142:15 209:21
**pretend** 11:21
**prevail** 24:11
28:13
**prevent** 101:17
**previewed** 120:18
**previous** 20:12
35:16 67:3 71:11
102:9 127:11
195:15
**previously** 3:19
115:19 121:3
190:14 197:13
202:3 217:24
**priest** 214:13,17
**primary** 96:15
178:6 204:11
228:13
**principal** 105:22
171:6
**principally** 25:20
39:9 71:16 74:20
146:3 179:8
**principles** 23:21

**printout** 2:14,15
81:24 126:19
128:20 164:24
**prior** 9:12 55:9,19
56:3 57:7 58:13
58:18 63:20 78:6
90:8 94:25 113:19
132:2 159:10
164:1 194:12
215:15,15 229:22
**prison** 93:16
**private** 19:2 34:4
51:22 200:25
205:3 206:3,10,20
207:9,11,12,13
208:3,20 209:14
210:5 219:12
**privilege** 83:20
84:8 216:4
**privileged** 171:15
**privileges** 14:14
**pro** 5:15 177:14
**proactive** 88:23,25
125:19
**probability** 221:1
**probably** 7:25
58:12 60:2,16
68:3 72:10,11
74:11 86:18 89:8
90:25 117:15
118:15 132:23
141:11 173:7
178:13 219:14
**problem** 27:1 32:8
102:20
**problems** 102:23
125:22
**procedure** 116:20
233:5 234:5
**proceed** 39:14
88:3 89:13 91:6

**proceeding** 41:18
146:18
**proceedings** 52:7
75:25 146:15
**process** 23:22,23
24:12 27:18,25
28:10,10,21 30:22
31:2,20 35:20
39:1,5,8,10,13,16
39:18,23 40:6,7,13
40:15,19 41:10,19
41:25 42:8,15
43:10 45:2,19
97:24 98:1,1,16,19
98:20,22,23
100:10,10,13
101:6,8,13 104:17
108:13,20 109:19
110:16 111:12
113:1,3 117:19
119:14 125:23,24
136:20 139:5
143:18 156:4
162:15 163:12
165:12 169:15
210:18
**processes** 40:21
**produce** 73:1
151:20
**produced** 9:12
149:16
**producing** 9:7,15
**production** 73:7
232:16,17,22
**productions** 9:14
**productive** 126:2
**professional** 33:6
176:20
**professionals**
87:24 156:24
177:11

**professor** 60:4
**program** 12:20
214:15
**prohibited** 32:17
**prohibition** 54:2
**projects** 43:4
156:5
**prominent** 12:22
**promoting** 9:1,2
13:6 18:24
**proof** 194:22
**properties** 97:3
187:9 200:9
**property** 14:20
55:14 56:17 78:16
174:1 175:21
176:15 177:19
179:11,22,22,24
180:10 184:19
185:24 188:12
210:13
**proposal** 16:23
42:2,5,6,11,16,17
42:18,21 43:14,16
44:2,3,24 46:4
54:12,19 150:17
150:19 193:18
**proposals** 43:10
45:17,21 46:8,17
46:24 47:2,4,6,11
48:19
**propose** 44:23
**proposed** 41:16,25
42:2 44:5 88:7
92:6 95:21 123:11
140:24 142:8,23
189:13 216:10
**proposing** 66:15
173:25
**prospective** 88:24

protect 92:1
protocol 147:8
provide 42:11
  51:8 184:15
  198:15 210:1
  215:16
provided 46:24
  51:11 97:18
  183:23,24 184:1,3
  185:1,4,16,18,20
  185:23 225:4
providing 195:10
  224:8
provision 81:17
  87:20
provisions 17:23
proximity 25:8,19
  31:1 33:21 57:5
  57:17
public 5:4 18:13
  24:2 30:10 34:4
  41:1 49:11 50:24
  53:3 91:25 95:4,4
  116:7 123:20
  127:1,19 130:15
  130:23 131:3
  142:3,12 143:2
  145:2 147:22
  148:17 149:20
  178:21 186:2
  195:18 196:19
  203:25 205:1,2,3
  206:5,12,15,16,17
  208:5,21 209:6,10
  210:4,25 231:4,20
  233:10,18 234:15
  234:23 235:23
publically 198:7
published 63:10
  97:17

puff 191:5,11,17
  191:22 192:7
  193:1
purely 201:14
  202:6 228:4
purpose 9:7 37:24
  43:2,9,21 72:3
  73:20 74:19,22
  90:2 91:3,8,12,20
  92:8 93:2 97:15
  98:7 101:9 166:9
  174:12 175:4
  209:23
purposes 74:20
  122:21 175:22
  179:12 180:11
pursuant 5:3
  155:16 217:11
  231:13
pursue 27:19
  31:11
purview 83:13
push 50:16
put 44:18 45:10
  67:7 78:1 94:18
  189:10 192:6
puts 219:6
putting 108:13
  189:15

**q**

qualified 201:15
qualify 68:16
  201:9 229:2
qualifying 176:6
quality 74:21
quarter 62:16
question 10:18,23
  11:2,18,20,24,25
  16:2,17 17:10
  18:9,11 19:5,9
  20:13 27:21 30:1

30:6,18,21 34:11
  34:20 35:23 37:1
  40:4,7 41:22
  45:17 47:10,16,25
  48:13,16 53:2
  55:2 56:1 67:11
  68:20,24 69:24
  72:3 75:20 83:5
  85:13,24,25 86:1
  88:13 90:5 96:4
  96:11,25 98:11,12
  100:15 106:13,15
  122:16 124:25
  125:9 127:11
  130:4,7 133:1
  134:23 135:1,8,9
  135:19 140:2
  154:25 156:20
  157:10 160:12
  163:17,20 166:2
  167:21 173:2,21
  174:8 188:13
  192:15 193:23
  196:9,14 197:5
  200:1,5 202:10
  204:5 206:25
  208:12 211:7,24
  212:20,21 219:23
  219:24 224:5,22
  227:11
questions 10:8,10
  11:21 28:8 46:21
  48:3,6 54:8 81:19
  83:9 85:3 87:1
  90:5,8,12 102:9
  106:21 142:16
  146:6,6 149:4
  195:16 230:5
quite 33:18,24
  64:11 96:3 98:5
  98:25 134:18

147:13 193:5,7
  219:13 223:4
  225:13
quote 74:8,10,23
  138:12 175:20
  205:1 210:9

**r**

r 5:11 7:15
radar 56:15
raise 90:25
raised 94:24 123:1
  204:23
raising 95:1
  183:15
rally 77:22
ran 21:1,6
rationale 124:23
  168:4
reach 54:6
reached 17:25
reacting 124:7
reaction 83:5
reactive 88:23
  94:6
read 30:2,4 43:2
  48:16,18 63:6
  70:21 85:18,20
  91:10 93:11 98:8
  98:12,14 119:24
  130:3,5 131:13
  134:22,24 136:6
  138:21 139:18,20
  142:2 144:24
  150:10,23 151:1
  152:19 154:10,11
  157:10,11 158:10
  159:19 160:14,15
  163:17,19 165:15
  166:3,5 167:17
  173:3,5 175:7
  178:4 187:12

**[read - record]**                                                           Page 38

188:24 197:21
205:11 214:20
217:1 220:15
230:4 233:5,6,12
234:5,6,17
**readily**  83:14
85:21
**reading**  139:24
141:10 232:20
**real**  202:14,17
**realistically**  31:5
**realize**  211:19
**realized**  28:22
61:10
**really**  10:16 31:12
46:20 71:1,5
100:21,21 151:12
193:23 223:16
224:5 225:15
**reared**  12:9
**reason**  108:19
114:1,5 134:16
149:2 150:16
151:8 152:7
166:17 180:20
181:5 204:11
205:20 218:15,23
219:19 232:15
234:8 235:3
**reasonable**  31:23
32:2,4 79:6
180:24 186:20
**reasoning**  151:10
**reasons**  21:5
139:11 140:19
149:11 151:17
167:14 181:20
**rebuild**  163:11
**recall**  14:2 15:4
18:2 26:6,10 27:5
30:6 32:19 36:16

37:16 38:3,6,8,9
38:12 51:20,24
52:19 53:14,15,21
53:25 54:4 56:9
56:11,13 57:22
58:7,21,21 60:1,10
60:21 61:3 62:6
62:24 63:3,4,7
64:4,14 65:3,15,16
65:17,22,24 66:7
66:11,17 67:24
68:1,8,16,18,23
69:7,17 70:6,12,16
73:22 79:17 80:12
80:13 81:4,7,14
86:10,14,18 89:23
95:6,7,18,20
101:22 102:8,18
103:5,9,25 109:3
109:12,17,20
110:16 111:17,18
111:21 113:22,24
114:23,25 116:11
117:12 119:11,17
119:23 120:15,20
120:21,23,23
121:14 122:18
124:17,18 127:17
128:4,6,7,10,23
129:9 131:15
132:6,12,14,21
133:4 136:12,17
136:23 137:2,19
137:21,22,24
139:6,22 150:11
152:14,24 153:1
158:23,25 159:19
161:12,14,23,24
162:1,13,18 164:4
164:5,6,9 165:17
165:22,23 166:6,7

169:25 178:19
185:22,25 194:24
195:2 202:19
203:17,19 205:8,9
205:13,16,18,19
215:21,23 221:17
224:7,10,12
229:24
**receipt**  232:19
**receive**  21:22
80:21 127:15
136:24 177:2
178:20
**received**  76:9 79:9
80:2,8,16 114:23
137:24 190:17
203:2 212:25
213:24
**receiving**  80:12
109:9,19 111:10
111:18 132:10
158:23
**recess**  52:6 75:24
102:1 143:25
186:13 197:9
**recessed**  145:2
147:22 148:17
**recited**  175:18
**recognize**  22:16
47:20,20 48:10
81:24 82:13 99:15
99:22 104:2 115:3
126:18 128:20
133:23 134:1
139:12 141:6
144:12 146:14
153:25 157:24
158:15,20 159:23
166:23 170:3
172:17 190:4,8,10
190:15 195:7

200:22 203:25
212:24,25 218:1
226:2
**recognized**  51:17
98:16 200:25
**recognizing**  89:7
**recollect**  78:17
184:24
**recollection**  29:13
52:18,21 60:14
65:2 66:13 74:14
74:15,21 75:8
109:16 114:19
118:24 132:10
163:23 174:6
185:3
**recommend**  145:4
158:7
**recommendation**
31:11,12 48:22
147:11,13,14,16
156:15 159:22
169:25 170:1
171:13,22 172:1
172:14,18
**recommendations**
49:9 147:10
156:25 157:8,20
168:23 180:25
**recommended**
31:21 144:25
154:15 156:21,23
157:13,17 169:22
**recommending**
125:15 154:5
**recommends**
159:6
**reconnect**  163:9
163:10
**record**  6:4 7:14
10:1,1,7 11:5 30:4

48:18 52:4,8 55:4
75:22 76:1 85:20
95:5 98:14 101:24
102:2 119:24
130:5 134:24
139:20 143:23
144:1 149:20
154:11 157:11
163:19 166:5
173:5 179:4,5
186:2,11,14 197:7
197:10 198:24
204:25 208:5
212:17 214:11
220:15 230:8
231:12 234:9
**recorded** 204:25
**recording** 10:4
**records** 72:24
**recount** 36:5
**recreational** 53:18
54:16 120:7
121:18
**recruiting** 198:15
200:13,15,15,17
200:18
**red** 32:13,14 33:7
**reduction** 171:7
201:17
**reelected** 15:20
**reengage** 61:9
**refer** 127:10
142:12 147:22
148:17 194:15
**reference** 102:9
159:17 190:1
232:8 233:2 234:2
**referenced** 78:12
130:12 152:10
185:10 233:11
234:15

**references** 130:17
151:3
**referral** 123:16
127:16 129:5,11
147:11 148:20,21
148:23 149:2,10
151:17 160:20
169:9
**referrals** 113:4
**referred** 104:23
116:7 123:19
126:25 127:6,14
127:19,20 128:25
130:22,22 131:2,3
140:25 142:3
143:2 144:6
145:16,21,23,25
146:2 147:9,17
148:22,24 185:21
194:12
**referring** 82:10,11
82:12,16 169:2
172:6 223:6
**refers** 213:5
**reflects** 216:9
**refused** 47:2,4
**regard** 48:11
84:22,24 87:25
153:23 191:23
192:12 193:6
194:7 216:6
**regarding** 14:4
17:22 30:18 35:25
39:8 64:19 70:13
80:8 81:19 90:22
95:3 102:11 132:4
184:19 209:21
220:3 229:25
**regardless** 23:10
138:18 211:22

**regent** 19:22 20:3
**registered** 141:23
195:25
**regiven** 207:8
**rejected** 46:9,11
47:1,11 48:19
49:1
**rejection** 173:19
173:20
**relate** 140:2
**related** 63:12
140:3 154:21
164:7 167:6 170:5
171:6
**relates** 151:2
**relating** 127:16
222:6 226:3
**relation** 8:8
**relations** 210:24
**relative** 17:1 188:8
200:2 219:7
231:16
**relaying** 55:24
**relevant** 27:9
**reliable** 57:2
**relied** 183:13,19
184:15 186:5
209:8
**religious** 64:20
189:17 216:18
217:19 218:16,22
227:23 228:20
**rely** 179:6 229:11
**remainder** 35:22
135:12
**remained** 148:2
**remember** 10:9,13
36:7 60:3,5
165:20
**remembering**
168:15

**remind** 37:3
213:16
**reminded** 23:24
**removed** 85:25
**rendered** 17:22
**renew** 137:5
**repeal** 2:16 3:6
123:12,19 124:1
124:20,22,24
125:7,22 128:22
129:11,17,19,24
130:18 131:8,12
133:6 134:13
135:3 138:9 139:8
139:10 140:4,6,20
140:24 142:19
143:2,7 144:5
146:8 148:8,22
149:3,4 150:9
152:12 154:6,16
155:18,20,25
157:14,17 158:1,8
159:7,22,25
160:18,21 163:4
191:3 194:15
**repealed** 99:9,16
99:23 100:17,18
101:1,16 139:14
150:22 154:2
156:22,23 157:5,6
159:4,12,24 191:8
**repealing** 31:3
145:11
**repeat** 24:2 30:1
166:2 173:2
195:19,20 206:9
227:6
**repeatedly** 45:5
210:8
**repercussions**
125:13

**repetitive** 217:6
**rephrase** 11:20
85:25 96:4,25
97:2
**replied** 34:12
**report** 3:12 125:15
147:1 170:4,16,19
173:16,17 178:1
178:18
**reported** 1:24
**reporter** 5:4 6:15
6:19 10:3,7 57:2
85:18 126:16
151:22 152:6
164:12 208:9
231:1,4,9 233:7
**reporter's** 48:9,14
**reporting** 6:15
151:9,12
**reports** 178:20
**represent** 6:18 9:6
19:11 27:10
107:10,11 215:10
**representations**
73:15,17
**representative**
40:11
**representatives**
37:19,21 63:22
**representing**
22:10
**represents** 40:11
107:8 115:19
**request** 3:9 73:4
88:8,15 89:16,20
98:5 102:12
118:19 129:13
145:13,23 146:3
147:17 152:12
154:16 157:13,17
158:8 164:24

166:10 167:15
168:5 201:24
215:8 216:10,15
217:11 222:17
229:25 231:7
234:9,11
**requested** 4:1
27:10 118:13
132:22,24 146:9
216:16 222:12,16
222:18 223:5,8
**requesting** 89:5
**requests** 27:7
88:16 166:19,21
215:21 224:8,10
224:14
**require** 16:4 67:9
70:21 96:16
138:17 150:19
**required** 66:23
100:23 101:8
117:5 165:6 179:9
216:23 217:12
232:25
**requirement**
155:9
**requires** 138:19
**requiring** 120:3
**reread** 85:15
**research** 23:17
32:23 183:6,19,22
183:24 184:1,3,14
184:18 185:23
**reserve** 149:14
230:4
**residence** 8:6,8
**resident** 3:17
213:1,7,18
**residential** 8:3
23:8 31:10 34:23
42:25 175:3,13

184:21 187:6
193:22
**residents** 19:3
21:9 25:7,19
36:24 79:25 94:13
166:20 179:23
180:21 182:13
185:2 213:17,20
213:23 214:6
**resigned** 35:17
**resolu** 176:19
**resolution** 105:23
113:2 114:18
**respect** 27:19
28:14 82:23 84:2
84:5,9,17 85:3
90:19,20 103:10
103:19 148:16
153:15,24 181:9
182:2 191:20,22
196:21 211:1,9
213:17 214:4
**respectful** 24:6
28:11 212:9 213:9
213:10,14
**respective** 212:8
**respond** 11:4 78:9
81:19 166:19
183:22 212:6
**responded** 215:22
**response** 10:19,23
11:3,5 28:7 80:2
110:12 211:3
216:22 222:22
**responses** 10:8,10
215:8,16
**responsi** 105:15
**responsibility**
29:1 83:13
**responsible** 87:17
106:20

**responsive** 27:9
72:15
**restate** 18:9 27:22
**restrict** 70:10
**restricted** 70:16
76:21,22 192:2
220:23
**restriction** 177:19
**restrictions**
134:20 220:4
**restroom** 75:18
**result** 31:9 41:10
42:12,16,19,23
43:15 44:6,6
56:25 75:11
**resulted** 31:13,13
**retroactively** 90:9
**return** 134:6
**returned** 142:4
232:19
**reveal** 216:5
**reveals** 83:21
**revenue** 198:15
201:8,13
**review** 28:21
98:22 136:24
146:23 167:24
174:6 215:16
225:4 232:13
233:1 234:1
**reviewed** 22:12,14
67:19,22 69:5
70:14 172:19,20
172:21
**reviewing** 51:16
82:4 150:11
**revised** 107:19
**revisions** 169:18
**rewrite** 39:12
**rhetoric** 214:6

rhetorical 24:3
rhodes 2:18
richard 214:17
right 7:6 11:9,16
    12:3 15:13,18
    17:5 21:23 27:25
    29:11 30:14 39:20
    42:12 43:17,20
    44:25 46:23 49:15
    51:19 56:17 59:22
    62:9 65:10 76:4
    86:24 92:16 93:9
    94:2 95:24 102:13
    102:14 105:7
    108:20 109:24
    112:1,16 115:11
    116:2,8,17 123:3
    123:15 148:4
    150:7,10 152:22
    155:3 166:14
    168:14 170:21
    172:11,20 176:4
    181:24 183:1
    187:6 192:24
    196:5 200:24
    202:23 206:5,12
    206:16 210:14,17
    210:17,20 211:9
    217:6 218:2
    219:25 221:12
    223:21 224:9
    229:24 230:4,6
rights 14:1,4,5,14
    14:16,20 213:21
risen 94:20
risk 204:16
rluipa 159:3
road 19:17
robert's 118:22
rock 213:19

rockford 5:16
rohr 214:17
role 23:6,12,13,14
    103:21 105:22
    110:4 226:13
roles 226:24
room 62:7 226:12
    226:21
rooms 62:1
rough 68:4
roughly 15:15
    201:24
rubric 192:9
rudiments 61:19
rule 150:24 207:5
    216:25 217:11
rules 9:23 118:22
    233:5 234:5
ruling 86:21
rummel 149:9
run 20:21,23
    21:10,11 214:16
running 53:5 56:5
    56:7,10
runs 214:17
rush 61:9

s

s 2:7 7:15 8:4
    232:16 234:8,8
    235:3
s.c. 5:6,12
sacred 1:4 6:7
    232:6 233:3 234:3
safety 204:1,8
saints 214:21
sake 48:9,14
sarah 5:20 6:24
    35:17 47:21 67:3
    68:5 232:5
sat 146:4,4 149:9
    196:1

satisfaction
    201:17
satisfactory 171:3
satisfied 54:20
saw 56:20 61:17
    87:20 128:21
    136:18 140:23
    144:4 152:10
saying 29:15 38:7
    42:22 63:9 71:19
    74:10 118:20
    137:22 173:8
    199:4 201:15
    204:25 205:8,9,13
    205:16,18,19
    210:13 213:22,25
says 92:9 98:5
    105:2,18 106:25
    111:22 112:12,19
    116:9 145:6,9
    147:20 150:15
    160:11 165:10
    172:14 188:15,25
    216:22 217:3
    218:21
scenario 29:3
schedule 118:3
    124:12,19 162:10
scheduled 11:14
    132:22,25 167:9
scheduling 133:2
    165:11
schey 25:19
school 1:4 6:7,22
    8:9 12:6,6,7,8
    13:21,21,22 14:18
    20:11 33:2,13
    34:1,1,2,7 51:23
    52:25 55:9 60:15
    60:20,22 62:8,11
    73:19 76:12,13,15

93:15 94:14 95:3
    95:12 97:6,7,9,10
    125:12,12 131:24
    133:5 145:12,13
    150:19 174:25
    190:11,20 197:14
    197:15 198:14,19
    198:20 199:8,9,12
    199:21 200:4,7
    219:11,12,12,17
    225:11 232:6
    233:3 234:3
schools 33:16 34:4
    97:9 134:8,18
    209:6,8,9,14 219:7
scientific 184:10
scoreboard 74:25
    75:4,6
seal 233:15 234:21
searched 27:8
season 204:14
seat 53:6
seating 120:10
    122:4
second 25:4 30:21
    48:6 109:13
    112:23 134:4,4
    135:14 159:1
    167:12 181:22
    183:18 196:18
    212:16
secondary 96:15
seconded 147:21
    148:12
secondhand 57:19
    58:7
secondly 44:10
section 82:2 96:12
    106:14 115:14
    145:6 150:8
    171:21 190:19

sections  120:2
secured  14:5
see  44:16 50:18
  69:25 82:4 104:11
  105:4 107:2 108:5
  109:19 112:4,14
  112:18,20 115:16
  126:25 128:25
  129:2 130:14,15
  131:25 132:2
  134:9 136:3,4,10
  136:19 137:6,15
  137:16,17 138:3
  141:16 142:5,6
  143:4 144:18
  145:7,14 146:21
  147:1,24 149:24
  150:7 151:6
  157:19 159:8,14
  164:13,23 165:1,4
  167:1 171:22
  172:14,20 175:25
  177:13 187:7,20
  187:21 190:21
  191:6 196:22
  198:16 199:5
  201:8 205:14,17
  205:23 213:6,7
  215:13 216:19,24
  217:14 222:14,20
  222:21,22,24
  225:25
seeing  69:17
  119:18 150:11
seek  30:23 31:4,22
  131:8
seeking  45:3 58:16
seen  10:6 69:14
  72:6,12 110:1
  119:20 132:7
  136:5,8 137:20

205:4
selective  84:7,7
semester  161:8
senator  21:11
send  197:22,25
  209:18
sense  13:17 34:13
  114:10 187:5
  199:21 200:6
  202:21,22 209:10
  210:9,22 211:5,6
  211:22 212:3
  218:12
sent  110:15 167:4
  197:21,23
sentence  134:4
  158:4 159:11
  216:21 217:1,3
separately  204:3
september  2:24
  3:3,5 138:14
  142:4 144:6,14
  145:21 146:15,16
  147:19 148:3,24
  149:23 150:12
  190:17,21 191:2,5
series  166:25
seriously  21:12
serve  35:22
served  23:6
  153:14 215:11
set  47:9 64:15,16
  118:4 125:6 156:7
  168:5 171:11
  200:10 209:15,25
sets  155:25
seven  68:25
shakes  10:11
shaking  21:3
share  63:21 74:12
  111:14

shared  205:6
shawn  25:18
sheet  232:14 234:7
  234:10,18 235:1
shiva  94:22,24
  117:21 150:16
shoddy  151:12
short  7:16 13:4
  125:14 133:18
  151:18 156:16
shorthand  5:4
  231:3,8
shortly  70:14 90:1
show  49:13 50:7
showed  46:13
  195:24
showing  213:25
shown  232:16
shows  9:11,12
  13:6 147:9
sic  158:16
side  19:24
sides  19:19,20
  33:7 44:19 175:4
siebert  203:20
sign  110:15 164:11
  164:15 230:5
signature  231:18
  232:15
signed  14:6 215:12
  233:13 234:18
significant  91:6
signing  232:20
signs  213:21,22,23
silk  32:6
similar  32:7 34:21
  94:8 128:20
simple  37:1
  166:17
simply  32:4 33:21
  34:9 68:18 78:9

166:7 180:14
  188:25 191:22
  192:17 219:2
simultaneous
  140:3
sincerely  216:17
  217:18 218:16
  232:21
single  24:18 46:8
  216:12
sinsinawa  216:19
sir  7:13 8:19 12:3
  15:5 45:17 47:16
  49:10,22 50:9
  54:5 82:4,24
  85:22 87:3 89:10
  98:10 104:5 105:1
  120:24 123:8,24
  124:11 126:18
  128:24 129:10
  130:6 131:22
  133:5 138:24
  139:12 140:5
  144:10 158:15,20
  159:21 170:3
  172:13,17 174:14
  190:15 195:7
  196:24 204:24
  205:15,18 206:1
  207:18 208:6,19
  210:8 211:24
  212:24 215:10
  216:8 218:21
  219:5,19 220:21
  221:13 222:5,17
  223:1,11 224:5,7
  225:10,16,23
  226:6 227:1 229:3
  232:10
sisters  216:18

**sit** 146:4 151:13 217:16

**sitting** 10:3 35:8 35:10 224:7

**situational** 81:3

**situations** 94:6,8

**six** 41:8 62:17 68:4 180:14

**sixth** 198:9

**size** 198:23 199:20

**sleep** 180:1,3,7

**slides** 53:15

**sloppiness** 114:12

**slow** 41:6,13,20 61:4 163:9 187:4

**small** 19:18 33:20 193:15

**smith** 5:24 7:8

**snippet** 209:25

**snippets** 207:3

**socialized** 153:22

**society** 205:6

**sole** 8:21 116:1

**solutions** 232:1 235:1

**somebody** 222:3

**somewhat** 55:22 93:19 125:7 126:4 181:13 192:24 204:6

**son** 203:21

**soon** 11:12

**sorry** 12:12 18:15 34:14 36:13 40:1 49:22 74:7 85:9 105:9 111:25 121:22 123:9 126:4 128:17 133:4 134:22 135:15 146:15 149:14 150:1

152:1,4 157:3,15 160:7 170:24 171:24 173:19 186:19 202:16 207:7 211:24 212:9,19 217:7 219:22 220:14

**sort** 31:13 60:3,13 171:13 178:12 199:20 201:13

**sorts** 97:18

**sought** 170:14

**sound** 33:11 41:16 41:17 45:15 61:25 67:8 77:23 110:3 120:9 122:3 134:15 150:21 178:7,8,9,13 179:17 184:5,13 185:17,17

**sounds** 33:3 65:5,6 111:8 168:14 182:3,11,15

**source** 74:16 95:7 228:15

**sources** 181:16

**south** 5:21 20:1,3 20:5,5

**space** 70:18 71:9 77:3,7 93:14

**spaces** 228:18

**spain** 161:7

**spam** 26:25

**spans** 141:21

**speak** 18:18 30:14 35:24 37:2 51:2 53:11 66:8 74:12 100:4 118:20 127:9 155:5 169:14 195:24,25 201:11 223:17

**speaking** 33:20 65:3,16 157:9 224:11

**spearfishing** 14:4 14:12

**specific** 16:5,17 17:13 37:16 38:3 58:5 66:8,11 78:13 81:3 84:17 107:5,9 120:15 121:10 142:16 185:4 202:7

**specifically** 32:19 43:3 49:18 57:22 61:21 83:8 86:12 86:18 93:7 103:9 109:20 110:10 117:12 122:8 128:11 149:7 195:2 226:8,11,22

**specificity** 224:13

**specifics** 38:9,12 49:13 53:22 55:15 55:21 64:5 185:3 188:5

**specified** 120:10 122:4 215:25

**speculate** 78:8 226:15

**speculation** 197:3

**speculative** 202:6 228:4

**speech** 47:22 48:1 91:11

**spell** 7:13

**spelled** 7:15 8:4 25:3

**spirit** 43:21 189:9 189:12 198:14,19 199:21 200:4,7 211:20

**spohnholtz** 6:14

**spoke** 35:25 36:23 66:9 71:14 73:20 124:22 129:24 149:10 151:14,15

**spoken** 119:13 152:8 214:9

**sponsor** 104:14,15 109:22 110:20 116:1,2,21 136:14

**sponsored** 96:10 131:1 138:9 139:13 140:7,24 141:16,24 142:3 142:22 143:1,7 144:5,21 146:22 147:4 148:2,24 160:1 162:16 165:25 222:10 226:3

**sponsoring** 110:2 159:17

**sponsors** 104:11 115:22 225:17,17 225:24,24

**sporting** 175:1 199:13

**sports** 120:7 121:17 203:21 204:17

**spring** 37:17 38:5

**spur** 65:2

**square** 112:6

**squared** 112:2

**stack** 164:10

**stadium** 3:14 23:5 23:9 24:13,19 25:6,22 27:3,17 28:3,16,25 29:8,14 31:9 34:1,2,3,8,22 37:21 45:6 50:17

54:13 61:20 62:3
68:12 92:15 93:7
93:25 94:18 120:8
122:2 174:21
185:14 187:6,11
187:25 195:8,12
195:17 199:9,13
199:22 200:24
201:2,13,14,19
202:4,11,13 203:1
203:5,9,13,23
204:1,3,8 210:15
210:17,20,21
213:22 214:7
219:13,18 222:7
**stadiums** 33:18
34:5 120:6 121:16
184:20
**staff** 3:12 36:10
38:6 48:22 49:1,8
63:1 66:3 68:24
70:8,13 81:5,9
83:1 86:11 87:4
87:11,13,14 89:6
103:24,24 125:14
125:16 131:14
142:16 154:1
156:11,14,21
157:16 165:24
166:18 167:3
169:22,25 170:1,4
170:12,19 171:11
172:18 173:25
174:11,17,20
175:10,15 176:21
177:6,8,10,14
178:8,20 181:1
181:10 191:19
229:11,13
**staff's** 157:19
171:21 173:15,17

178:1 192:18
**stakeholder** 55:1
**stakeholders**
54:24 55:3 209:5
209:5,6,13,15
210:1,4,6
**stamp** 172:10
**stance** 16:11
**stand** 20:17
**standard** 105:21
134:6 175:18,20
176:2,11 181:4,4,4
188:9,14,15
**standards** 92:13
158:6 175:17
222:19 223:3,8,13
**standing** 21:3
**standpoint** 209:12
**standpoints**
203:15
**stands** 21:21 62:1
82:9
**start** 48:5 87:12
108:15,15 188:4
**started** 9:10 13:6
24:20 41:9 108:17
108:22 113:25
114:2 221:10
**starting** 106:24
171:23 212:21
**starts** 113:3
**state** 3:4 5:5,16
6:17 7:13 12:8,15
12:16 63:11 73:18
74:4 121:25
149:23 179:10
231:4,21 233:10
234:15
**stated** 28:7 62:2
139:11 140:10,19
198:10 211:25

**statement** 30:20
40:25 43:2,9,21
74:7,9 91:8,12,20
92:8 142:7 151:9
160:23 175:4
189:7 205:11,22
205:24,25 206:8,9
206:17 207:5,24
209:23 212:4,5
233:13,14 234:19
234:19
**statements** 24:3
36:9 49:12 51:22
91:12 107:10
206:19 207:2,25
210:25 214:5
218:11
**states** 1:1 6:9
**stationary** 181:13
181:16
**status** 15:23 16:6
24:22
**statute** 91:18
**stay** 21:18
**stayed** 162:6
**stenographically**
10:5
**step** 42:18 61:18
61:24,25 114:11
**steps** 42:21 61:2
100:22 163:1,6
189:13
**sterett** 5:15 6:23
**steve** 60:22 61:10
162:25
**stick** 23:18,20 24:2
28:8 196:17
**sticking** 45:13
189:20
**stipulated** 90:23

**stipulation** 83:19
83:24,25 84:1,3
85:6 90:4,7,11
101:20 129:7
137:5 171:16
**stipulations** 47:8
**stivers** 34:2
**stolen** 213:22
**stop** 78:1 208:14
228:3
**stories** 183:11
**stouder** 2:18
131:24 226:17
**strange** 2:19,21
3:8 37:23 83:9,18
83:22 84:21 86:12
87:5,10,14,16,19
89:12,16,21 90:22
95:1 101:14 102:7
102:15 103:12,18
106:6,16,20,22
108:10 109:5,10
110:14 114:4,10
114:24 119:8
120:21 129:3,13
132:3,16 136:2,11
136:25 137:13,22
138:12 140:1
156:9 158:16
159:2 161:15,18
162:9,11 171:12
**strategy** 44:17
159:24
**street** 5:6,12,16,21
6:13 8:11,12
19:16,20,22,23,24
20:1,3,3 25:9
145:10 185:12,12
213:19
**strike** 95:21
135:11 162:9

strong  160:14,17
strongly  134:14
  214:9
structure  23:9
struggled  218:8
student  219:14
students  56:8,19
  198:25 200:18
  204:2
studies  13:13
  43:18 178:9
study  12:21,25
  13:25 15:1 41:17
  43:23 44:13 45:15
  184:5,9,13 185:17
study's  179:17
stump  47:22,25
  91:11
sub  49:17 155:16
subhead  73:24
subheading
  146:25
subject  32:19
  48:23 58:15,22
  81:6 82:16 85:2
  90:24 137:4,6
  146:7 165:3
  170:14,20 217:2,3
  217:4,8,9 228:10
  229:24
subjects  142:17
submission  164:1
submit  155:12
submitted  61:14
  65:10 162:19
subpoena  72:24
subscribed  233:10
  234:14 235:21
subsection  105:6
subsections  82:5

subsequent  61:18
  71:15 168:6
substance  89:24
substantial  24:4
  92:22,22 97:19
  101:11 177:19
  179:9,15 180:8,9
  180:20,22 181:3
  181:21,23 182:2
  182:20 188:11,14
  188:23 196:18
substantially
  175:23 176:6,7
  179:13 180:12
  189:2
substitute  96:20
  104:8 105:16
  107:13,14 108:8
  109:9,14 111:14
  111:22 141:17
  144:22
succeed  44:14
suffers  219:17
sufficient  171:3
sufficiently  33:9
  171:9,11
suggest  87:21 94:5
  151:19 152:12
  194:21 205:23
suggested  41:6
  42:20 80:2 93:12
  156:16 176:20
suggesting  18:23
  40:7 121:20
  168:23 176:9
suggestive  91:10
suite  5:6,12,16
  232:2
summarize  49:11
  89:11 125:2 175:9

summarizes  50:24
summary  12:3
  125:14 138:2
  174:2 187:14
summer  41:8,9
  69:6 118:12
superior  232:1
supplement  72:16
  73:6
support  31:8 41:1
  42:15 47:2,4
  51:23 54:20
  141:23 160:14,17
  194:6 205:3
  214:11,16
supported  31:6
  42:10,14 183:6
supporters  213:6
  213:10
suppose  16:13
  47:12 55:2 156:13
  176:5,11 183:15
sure  9:24 16:3,6
  17:15 19:10 25:18
  26:18 27:23 28:10
  28:20 42:10 50:7
  51:3 52:1 55:23
  57:18 59:14 64:13
  65:6 69:8 70:2
  72:20 75:5,19
  77:14 79:18 83:22
  88:22 99:22
  105:10,20 106:11
  106:23 108:18,21
  109:3,7 110:18
  118:9 119:7 121:7
  126:5 131:13
  136:9 143:21
  149:17 154:10
  156:10,20 158:25
  162:8 166:3

172:22 173:10
  174:14 181:19
  184:24 186:3,7,10
  188:9 194:20
  195:20 198:24
  206:10 207:18
  209:3 216:13
  224:7 227:7,20
  229:3
surprise  61:13
surrounding  18:4
suspected  7:25
swear  6:19
switching  162:15
sworn  7:2 15:12
  15:15 55:7,10
  58:11,13,24 62:15
  231:15 233:10,13
  234:14,18 235:21
system  61:25
  150:21
szylstra  5:22

**t**

t  2:7 7:11,15
tab  49:17 50:12
table  126:23
tactic  29:16
tag  1:13 2:3 5:1
  6:5 7:1,15,16,18
  7:20 9:13 26:23
  26:25 165:10
  231:14 232:9
  233:4,9 234:4,13
  235:20
tag's  111:4
tagevers  26:24
take  14:13,22,23
  15:11 29:14,18,19
  35:17 38:14,16
  48:2 50:7 51:25
  52:2 79:15 80:25

93:17 101:3,23
107:25 118:10
121:10,13 124:8
125:1 136:6
143:22 147:15
155:4 178:4 186:8
197:6 204:13,18
208:9 211:17
223:5
**taken** 5:2 6:6,11
9:19 13:20 36:10
38:21 57:1 67:13
142:8,20 144:24
161:4 182:12
184:17 185:8
231:6,7,8,13
**taker** 38:20
**takes** 21:14,15
191:2 193:6,7
**talk** 10:17 19:10
34:21 35:1 36:25
48:3,9 71:18
83:17 106:7,16
110:13,25 163:5
183:24 192:14
202:9
**talked** 34:25 36:18
61:6 73:25 84:1
188:9 199:1
**talking** 31:19
47:18 65:8 86:13
91:1 102:8 104:20
115:20 120:21
136:15 182:19
188:4
**talks** 175:20
**tangible** 45:17
46:25
**tanner** 5:20 6:24
**team** 9:13 76:23
77:15 192:2,4,21

228:16
**tears** 205:5
**technical** 42:2
**technically** 194:25
**technologies** 44:17
**technology** 41:15
**telephone** 86:16
161:19
**telephonic** 5:24
**tell** 182:21 183:10
202:14 217:17
**telling** 152:6
**temporary** 67:5
**tend** 11:24 88:23
**tends** 88:24 118:8
**tenure** 81:12
**term** 35:22 112:23
153:14
**terminate** 134:5
**terms** 8:16 15:17
15:18 42:24 43:16
70:20 100:16
110:7 124:7 128:2
159:3 209:7
210:23
**testified** 7:3 24:1
199:5
**testify** 231:15
**testifying** 129:20
**testimony** 10:1
70:15 86:24 89:10
123:5 129:10
139:9 142:1
179:21 182:5
183:2 196:19
198:25 231:13
233:6,7 234:6,9,12
**text** 3:14 105:2
195:7 221:23
222:1,3 228:22

**texted** 221:14
**texts** 222:5,9,13
**thank** 7:7,10,21
9:18 10:2,15,25
11:8,13 12:18
13:10 20:9 21:20
25:21 32:11 48:21
74:24 87:10 90:2
90:10 91:2 108:9
130:11 131:22
137:8 140:22
143:17 149:25
163:22 164:16
165:19 167:21
172:13 173:13
178:16 186:23
211:11
**theirs** 29:5
**theoretical** 14:19
**theory** 12:23
156:18
**thing** 10:16,22
21:13 51:7 53:14
56:6 160:11
166:17 184:22
222:3
**things** 11:16 13:15
14:20 23:16 24:7
56:11 57:7,13
67:15 89:1 107:10
166:20 181:17
188:8 189:11
214:2
**think** 14:17,18
15:14,16 25:16
28:19 29:11,17,19
34:20 38:4,25
47:13 55:20,24
60:8,19 61:9 62:8
67:6,11 68:10
72:19 75:20 77:8

78:16 81:3 85:7,8
87:16,17 88:13
90:24 96:2,25
108:19 118:7
122:16,23 132:23
137:21 142:14
150:5 151:12
154:20 155:24,25
156:7,18 157:4,5,7
160:4 164:10
168:13 171:2
174:11 175:15
177:12 183:16
185:11 188:3,6
189:8 198:21,23
200:2,3 201:11
207:3,4,7,11,14,15
212:2 215:24
219:1 221:1,10
225:19 226:15
228:5
**thinking** 139:6
159:19
**third** 104:8 134:3
138:1 145:9,9
189:21
**thirdhand** 57:18
**thirty** 232:19
**thomas** 214:20
**thought** 71:7
125:6 139:22
149:12 193:11
198:18 203:3
210:23 212:19,20
**thoughts** 178:5
192:13
**threat** 14:10
**three** 26:19 38:8
97:8 119:17 146:3
149:8 150:15
151:13 175:4

196:20
**thrown** 213:19
**thursday** 6:1
164:25
**tie** 32:7,10
**ties** 32:6
**tim** 170:8 226:6
**time** 7:21 8:16
11:1,16,22 13:4,5
15:13 16:24 17:7
21:15,16,16,19
23:21 25:25 29:12
29:19 31:22 35:17
35:19 36:6 37:22
41:7 45:23 46:2
48:4 53:5 56:2
58:10,11,12,13,14
59:4,10,18,24
60:10,12 62:25
64:6,14,15,16,18
66:1,6,19 67:22
69:4 75:18 76:16
76:21 79:19 94:22
95:7 96:22 99:4
102:21 106:19
107:25 108:12
109:7,13 110:25
113:19 115:1
117:7,20,21
118:10,11 122:24
125:21 126:12
132:13 133:14
136:19 137:18
139:4,7,22,25
140:11 143:12,15
143:20 150:4
159:16 162:3
168:3 172:21
178:4 194:12,25
195:18,21 208:10
210:7 215:15

222:2 227:18,22
229:23
**timeframe** 62:12
154:4
**timeline** 163:2
221:12
**timely** 166:19
**times** 30:16 50:17
60:20 88:19
124:20 153:19,20
163:5 169:4
196:15 218:8
**timing** 87:3 114:6
129:12 136:15
**title** 23:3,15 105:6
105:16 106:15
111:23 112:7,13
112:19 114:16,21
114:22 119:2,4,6
119:18,19,20,24
120:1,11,16,17,18
120:22,25,25
121:2,11,15 122:6
122:7 123:3
**tjeanlouis** 5:23
**today** 6:23 7:21
9:24 10:1,4,5,13
46:20 84:4 85:1
129:10 150:4
217:16 219:20
**today's** 6:4
**toddlers** 180:3
**told** 36:14 38:24
95:16,19
**tolerate** 214:22
215:5
**tomich** 5:15
**tomorrow** 84:5
**tool** 125:18,20
**top** 172:6 174:15
198:10

**topic** 221:23
**topics** 38:13 84:10
84:18,22,24,25
85:5 90:19
**totality** 179:4
**touch** 162:6
**tour** 62:10
**touring** 9:6
**track** 26:17 56:5,7
56:10 104:16
**tradition** 34:22
**traditional** 31:9
33:19 34:6,23
42:25 184:21
187:6 193:21
**traffic** 204:9
**trail** 187:15
**training** 13:18
**transcribed** 233:7
**transcript** 86:25
93:12 122:25
151:20,22 152:19
160:16 205:10,12
205:14,17,21
232:12,13 233:5
233:12 234:5,11
234:17
**transcription**
231:11
**transparent** 40:20
40:22 218:9
**travel** 95:12
204:13
**treat** 214:4
**treated** 77:20
**treaties** 14:6
**treatment** 173:18
210:4,7
**treaty** 14:1,3,16
**trest** 25:12 185:11

**triangle** 20:2
**tribes** 14:4,11
**tried** 41:12,20
55:20 163:1
208:16 210:16
**trigger** 67:9
**true** 8:21,24 9:1,8
9:10 21:24 26:14
26:18,22 201:24
231:12
**trueendeavors.c...**
26:23,25
**trueendeavors.c...**
26:24
**trust** 61:11 90:17
129:22 163:11
**trusted** 194:4
**trusting** 110:16
**truth** 189:24
231:15,15,16
**truthful** 218:10
**truthfully** 216:9
**truthfulness** 225:5
**try** 9:24 10:22
11:16 42:7 43:24
44:16 48:14 85:2
85:13 111:3
133:17 155:6
163:11 170:24
200:10 219:1
**trying** 25:16 36:14
37:24 47:13,15
48:14 60:8 104:16
110:24 134:25
139:7 140:18
163:2 197:2 200:1
207:4 208:7,13
209:3,24 211:25
212:4 214:3
**tucker** 17:21,25
18:14,24,25 19:4

37:24 52:12,13,15
66:10,14,18 68:19
79:5 84:5 101:14
103:2 136:3 170:9
170:13 177:17
192:14 221:5
228:19
**tucker's**  103:6
226:13
**tuesday**  64:17
114:8,15 115:6
146:16 151:3
**turn**  195:24
222:12
**turned**  12:11
27:12 122:20
222:5,9,15
**twice**  66:10 143:8
**two**  8:11,20 9:16
9:16 15:17 16:8
26:12,22 56:11
61:13 74:17 118:6
123:23 128:2
131:17 138:7
150:14 163:13
178:9 179:8
181:20 227:19
**types**  43:4 57:7
**typewriting**
231:11
**typical**  9:3 22:8
38:16
**typically**  11:14
80:21 162:5

---

**u**

**uh**  10:12 62:14
81:18 138:4
202:24 224:25
**uhs**  10:12
**ultimately**  142:2

**um**  75:16 181:15
**unacceptable**
176:23 177:6
188:1 215:5
**unanimity**  159:22
**unanimous**  181:1
**unanimously**
100:5
**unclear**  85:10
152:2
**uncommon**  49:6,9
166:16 222:1
**undebatable**  200:3
**undergraduate**
12:8,11
**underline**  108:4
**underlined**  107:10
**undermine**  129:22
**undermines**  205:6
**underneath**
112:16
**understand**  10:21
11:8,13,18,22,23
11:25,25 14:14
37:25 46:16 59:17
67:4 71:24 88:13
89:2,10 92:5 96:3
110:23 113:13
135:15 139:23
159:16 165:12
169:15 176:5
203:9 204:5 208:6
208:13 221:11
**understandable**
198:12
**understanding**
17:16 18:12,20,22
34:10 43:1 66:21
66:24,25 67:12
71:8 77:6,10
79:13 100:7

106:19 107:4
108:12 113:1,25
138:23,24 140:5
140:11 145:18
155:19,21 169:13
182:10 190:12
191:9 192:4,5
193:3 194:5,8
200:9 203:3 220:2
220:8 221:9
228:15,25 229:4
229:11
**understood**  15:17
73:9,13 79:4
99:12 103:11
139:3 140:16
166:8 178:23
193:9 194:2
**unfairly**  203:10
207:2
**unfortunately**
38:19 166:18
**unilaterally**  125:8
156:5
**unintended**  99:13
**unit**  6:5 52:5,9
101:25 102:3
143:24 144:2
186:12,15 230:9
**united**  1:1 6:9
**university**  12:8,16
12:20 13:12 33:5
97:6
**unlimited**  169:4
**unnecessarily**
197:4
**unnecessary**  90:16
135:21
**unquoted**  74:9
**unrelated**  229:25

**upcoming**  145:6
145:19 190:24
**update**  92:20
**updated**  88:21
**updates**  89:9
**upgrade**  72:1
73:22 74:1,7
75:10
**upgraded**  74:19
194:12
**upgrades**  75:8
**uphold**  178:24,25
**urban**  13:14 33:16
67:14,14
**urgency**  129:14
**urging**  61:8,12
**use**  3:12 16:7,8,21
16:25 17:1,24
18:6,15 23:8
26:13,21 27:4
28:4 29:23 30:12
31:18 32:21 33:25
34:9,23 39:9,21
40:16 41:13,14
44:8 47:25 48:23
52:17 54:2,16
61:14 67:9 70:10
70:17,18 71:22
73:15 74:19 75:17
77:7,11,15 80:9
81:5 83:9 91:7
92:22,23 93:13
96:15,16 97:20
98:4,19,21 100:24
101:11,12,18
103:22 110:24
120:5 121:6
138:18 155:1,2
162:15,20 163:16
163:24 166:1
167:7,15,19

168:11 169:23
170:5,14,19 171:4
171:14 172:23
173:20 174:1,16
174:25 175:18
177:19 178:15
179:2 182:16,24
188:10 192:1,1,21
193:5,10,16
203:12 210:19
221:6 227:17
228:21 229:6,15
229:21
**uses** 39:9 53:18
55:10 120:8
121:18 122:14
123:6 175:20
176:3 179:10
180:9 181:13
187:9,22 188:12
188:17 227:2,8,12
227:13,16 228:5,9
228:16 229:4,12
229:14
**usually** 105:25

**v**

**v** 7:15 232:6 233:3
234:3
**vacation** 117:6
118:8,10 119:13
124:14 152:21
161:1,2,11,17,19
161:21,25 162:3,6
**vacations** 161:4,6
**vague** 55:22
**value** 39:5 187:9
187:23 188:19
**values** 51:18
125:25,25 175:21
176:3 179:11,22
179:22,24 180:9

184:20 185:24
188:12 189:24
190:1 205:6
211:16 217:23
**vandewalle** 52:25
**various** 14:10 39:9
108:7 140:12
**vehemently** 74:18
**verbal** 10:7,8,9
**verdict** 181:7
**veritext** 6:15
232:1,8 235:1
**veritext.com.**
232:17
**version** 104:8
126:3,4,5
**versions** 104:19
**versus** 58:10
**veto** 23:24
**viable** 29:17
**vibrant** 21:17
**vice** 5:15 148:14
**video** 152:18
**videographer** 6:3
6:14 10:5 11:15
52:4,8 75:22 76:1
101:24 102:2
143:23 144:1
186:11,14 197:7
197:10 230:7
**videos** 184:18
185:1,5,8,8,10
**videotaped** 1:12
5:1
**view** 208:2
**viewed** 192:11
194:10
**vilas** 19:24 37:20
**violate** 181:11
**violation** 79:11
194:1

**violence** 14:10
**visited** 182:13
**visually** 20:7
**vitality** 92:2,25
97:21
**voice** 23:23,24,25
147:24 183:16
**voices** 28:11,20
39:17 55:3
**volition** 88:20
**voluntary** 126:7,8
126:11,12 156:16
156:17
**volunteer** 135:20
**volunteered** 197:1
**volunteering**
14:23
**vote** 29:22 147:24
151:4,11 168:12
168:23 183:13,19
188:14 209:9
**voted** 100:5 151:3
168:15,17,17
178:24,25 181:5
181:20 194:6
**votes** 150:8
**vs** 6:8

**w**

**w** 5:15,16
**wait** 135:5,5
155:22 157:2,2
169:6 216:3,3,3
**waiting** 36:15
**waived** 232:20
**waiver** 83:20 85:2
**waiving** 217:4,4,8
217:9 230:2
**walk** 8:15,16,17
55:9 57:4 156:6
**walked** 55:17

**walking** 56:14
**want** 9:23 12:5
46:16,21 48:2
50:7 73:3 74:12
84:4 85:12 90:17
90:18 96:25 98:7
98:8,10 100:3
101:23 110:25
111:3 114:12
143:22 176:14
187:20 189:11
191:18 205:23
208:17 210:14
224:25
**wanted** 29:14 67:7
90:4 98:18,20
113:24 114:1
126:5 152:3
193:17 199:5
**wanting** 109:18
**wants** 47:25 94:7
135:7 196:7
**warrant** 171:3
210:4
**washington** 20:4
**watch** 160:16
195:22
**wautier** 2:20
136:2
**wavering** 160:19
**way** 41:14 44:18
77:20 107:12
108:16 110:2
126:1 129:12,20
140:21 142:23
151:16 181:5,6
186:18 187:8,21
192:12 194:11
209:9 229:2
**ways** 39:13 44:10
44:14 113:14

**[ways - zoning]**

211:3
**we've** 46:19 85:5
   115:18
**website** 2:9 24:23
   24:25 25:22,25
   26:5 49:10,14,15
   49:18,24 50:3,10
   51:12,16 153:8
**wednesday** 52:16
   64:10,21,24
   149:23
**week** 89:18 96:22
   102:6 108:11
   109:8 111:13
   114:3,3 129:4
   132:3,16 136:11
   161:15 190:20,24
**weeks** 68:2 118:6
**weiss** 184:6,13
**welcome** 76:15
**went** 13:7 117:18
   158:20 167:2
   222:14
**west** 19:17 20:3
   25:10 33:25 94:14
   94:17 95:3 203:7
   203:9,14,17,20,21
**western** 1:2 6:10
   19:15
**whatnot** 72:25
**whatsoever**
   187:25
**whistles** 58:3
**white** 21:3
**wholesale** 83:20
**wide** 110:22
**wife** 203:21
**wildlife** 54:16
**willing** 205:4
   211:17

**window** 213:20
**wingra** 53:16,19
   54:9,11,14,21,25
   55:5
**winter** 1:24 5:3
   6:16 231:3,20
**wisconsin** 1:2,7,17
   3:4 5:5,7,13,22
   6:8,10,13 8:5
   12:20 14:2,11
   63:11 73:18 74:4
   97:7 149:23 231:5
   231:21 232:7
   233:3 234:3
**wish** 38:19 107:8
   118:11 218:9
**wishes** 202:7
**witness** 2:2 5:2
   6:20 73:2 81:21
   85:9,12 90:13
   121:20 131:17
   135:15 208:14
   212:20,21 216:7
   219:24 232:9,12
   233:1,4,11 234:1,4
   234:15
**witness's** 85:17
**witnesses** 85:3
**witness'** 232:15
**wmc** 1:6
**wondering** 205:20
**woodrow** 25:8,14
   213:19
**word** 31:18 55:23
   69:18,25 121:10
   121:10 135:10
   155:1,18 157:8
   176:5,6 189:2
   192:24
**worded** 209:1

**wording** 71:2
   120:15 122:5
   212:4
**words** 38:25 40:16
   103:1 110:24
   169:19 178:12
**work** 7:23 10:12
   21:10 22:25 26:21
   28:12 46:20
   117:17 187:7,20
   214:23
**working** 86:6
   122:9
**world** 34:16 155:2
**world's** 214:14
**worship** 220:4
**worth** 124:7
**worthy** 23:3
**wright** 12:8,15,16
**write** 110:8 119:5
   167:13 189:22
   198:12
**written** 49:24
   50:16,21 69:14
   91:19 97:17
   105:25 194:14
**wrong** 40:3 69:18
   88:14 89:4 103:12
   169:13 182:21
   196:22,24 206:24
   225:20
**wrote** 26:2 198:6
   208:25

---
**x**
---
**x** 2:1,7 7:11
---
**y**
---
**y** 8:4 25:3
**yael** 25:3,13
**yeah** 10:3 18:10
   32:10 47:19 55:20

62:10 65:5 72:10
   73:2 83:23 97:3
   102:11 109:18
   110:21,23 112:4
   114:21 118:11
   119:5 134:14
   140:16 157:4
   161:6 168:6 172:5
   172:9 198:7
   208:24 211:14
**year** 9:10 15:17
   50:17 76:15
   100:12 118:10
   143:8 156:4
   161:22
**years** 9:16 21:6
   29:12,20 38:8
   53:22 71:15 75:9
   78:6 119:16,17
   125:4 155:15
   180:12 193:13
   194:11 204:6
   214:1
**yellow** 82:9
**yesterday** 83:20
   83:24 84:1,25
   90:4
**young** 180:1

---
**z**
---
**zba** 93:12 122:19
   122:25 133:13
**zip** 8:5 209:19,20
**zone** 33:7 94:10,25
   97:4 128:9
**zoned** 98:2
**zoning** 13:15,15
   15:2,2 17:21 30:8
   30:15 35:1 36:10
   37:12,15,23 39:12
   66:3 67:13 68:14
   69:20 70:8 71:3

**[zoning - zylstra]**                                         Page 51

77:5,11 80:3,14,18
81:17,25 82:20
83:2,12 86:21
87:7,11 92:13
103:8 132:5 134:6
138:20 145:11
158:7 170:9 175:5
177:17 191:15
194:3,5 222:11
223:15 224:2
228:22 229:7,10
**zoom**   222:2
**zylstra**   5:20 6:24
6:24 7:7 15:25
18:8,17 19:1,13
20:25 22:4,19
24:16 25:1 28:5
28:17 29:9,25
30:13 31:7,16,25
32:13,25 34:19
35:3 36:12 38:18
39:3,24 40:1,5
42:4 45:8,24
46:10 47:17,20
48:8 49:3 51:1,14
52:3 54:10,22
59:6 62:21 63:15
66:5 69:11 70:24
72:18 73:4,9,13
76:25 77:18 78:2
79:3,22 83:16
84:9,12,17,22 85:4
85:7 88:9 90:3,10
90:17 91:2 92:17
94:3 95:25 97:14
98:15 99:19 100:1
100:20 101:20
105:9,12 106:9,17
107:22 111:9
112:24 114:7
117:10 118:1

Wisconsin Rules of Civil Procedure

Chapter 804, Depositions and Discovery

Section 804.05

(6) Submission to Deponent; Changes; Signing.
If requested by the deponent or any party, when the
testimony is fully transcribed the deposition shall
be submitted to the deponent for examination and
shall be read to or by the deponent. Any changes in
form or substance which the deponent desires to
make shall be entered upon the deposition by the
officer with a statement of the reasons given by
the deponent for making them. The deposition shall
then be signed by the deponent, unless the parties
by stipulation waive the signing or the witness is
ill or cannot be found or refuses to sign. If the
deposition is not signed by the deponent within 30
days after its submission to the deponent, the
officer shall sign it and state on the record the
fact of the waiver or of the illness or absence of
the deponent or the fact of the refusal or failure
to sign together with the reason, if any, given
therefor; and the deposition may then be used as
fully as though signed unless on a motion to
suppress under s. 804.07 (3) (d) the court holds

that the reasons given for the refusal or failure
to sign require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.