Page 1

1          UNITED STATES DISTRICT COURT FOR THE
2              WESTERN DISTRICT OF WISCONSIN
3                        --o0o--
4    EDGEWOOD HIGH SCHOOL OF THE
     SACRED HEART, INC.,
5
                    Plaintiff,
6
                                Case No. 3:21-cv-0018-wmc
7
     CITY OF MADISON, WISCONSIN,
8    et al,
9                    Defendants.
     _____
10
11
12
                         DEPOSITION OF
13
                       MATTHEW TUCKER
14
15
16                     April 29, 2022
17                   Madison, Wisconsin
18
19
20
21
22
23
24   Reported by:  Cheri Winter, CSR
25

Page 2

1                I N D E X
2
  WITNESS                        PAGE
3
  MATTHEW TUCKER
4
      Examination by Mr. Ingrisano        5
5
      Examination by Ms. Zylstra        224
6
7
8
9              E X H I B I T S
10 No.        Description        Identified
11 Exhibit 37   Edgewood lighting application    64
              submitted February 2019
12
   Exhibit 38   Site Plan Verification          65
13              submitted by Forward Electric
14 Exhibit 39   Planning Division Staff Report,  105
              dated March 24, 2014
15
   Exhibit 40   Planning Division approval       154
16              letter for Edgewood Campus
              Master Plan, April 22, 2014
17
   Exhibit 41   Planning Division approval       157
18              letter for UW Master Plan,
              October 4, 2017
19
   Exhibit 42   Email exchange between          163
20              Mr. Tucker and Shawn Schey
21 Exhibit 43   Recommendation to repeal master  176
              plan from Mr. Strange to the
22              Plan Commission,
              November 11, 2019
23
   Exhibit 44   Memo from Mr. Parks to Plan     179
24              Commission, October 28, 2019
25

Page 3

1 EXHIBITS (Cont'd):
2 No.        Description        Identified
3 Exhibit 45   Excerpted email chain from    184
              Mr. Tucker to Brian Munson,
4              Michael Elliot, et al.,
              October 26, 2018
5
   Exhibit 46   UW Campus-Institutional       195
6              District Master Plan
7 Exhibit 47   Planning Division staff report,  212
              March 24, 2014
8
9
   PREVIOUSLY MARKED EXHIBITS:
10
                                Page
11
   Exhibit 1                     46
12
   Exhibit 2                    142
13
   Exhibit 3                     24
14
   Exhibit 5                    140
15
   Exhibit 6                    120
16
   Exhibit 7                     56
17
   Exhibit 13                    72
18
   Exhibit 18                   203
19
   Exhibit 29                   183
20
   Exhibit 30                   183
21
   Exhibit 33                   215
22
23
24
25

Page 4

1      DEPOSITION OF MATTHEW TUCKER, called as a
2 witness, taken at the instance of the Plaintiff,
3 pursuant to Notice, before Cheri Winter, Certified
4 Shorthand Reporter, and a notary public in and for the
5 State of Wisconsin, at the law offices of Godfrey &
6 Kahn, S.C., One East Main Street, Suite 500, Madison,
7 Wisconsin, on the 29th day of April, 2022, commencing at
8 9:01 a.m.
9
  APPEARANCES:
10
  For the Plaintiff:
11
      JONATHAN R. INGRISANO, ESQ.
12      GODFREY & KAHN, S.C.
      One East Main Street, Suite 500
13      Madison, Wisconsin 53701
      608.257.0609
14      jingrisa@gklaw.com
15      NOEL W. STERETT, Pro Hac Vice
      DALTON & TOMICH, PLC
16      401 W. State Street, Suite 509
      Rockford, Illinois 61101
17      815.986.8050
      nsterett@daltontomich.com
18
19 For the Defendants:
20      SARAH A. ZYLSTRA, ESQ.
      TANNER JEAN-LOUIS, ESQ.
21      BOARDMAN & CLARK, LLP
      1 South Pinckney Street, 4th Floor
22      Madison, Wisconsin 53701
      szylstra@boardmanclark.com
23      TJeanLouis@boardmanclark.com
24
      Also present (telephonic): Kate M. Smith, Assistant
25                City Attorney

Page 5

1      FRIDAY, APRIL 29, 2022, 9:01 A.M.
2               --o0o--
3         MATTHEW TUCKER,
4   having been first duly sworn, was examined and
5          testified as follows:
6               --o0o--
7 BY MR. INGRISANO:
8      Q.   Good morning.  Could you please state your
9 name and spell it for the record.
10      A.   Sure.  Matthew William Tucker, M-a-t-t-h-e-w,
11 W-i-l-l-i-a-m, T-u-c-k-e-r.
12      Q.   And what is your date of birth?
13      A.   ██████████
14      Q.   And what's your current residential address?
15      A.   5717 Crabapple Lane -- that's one word --
16 Madison, Wisconsin 53711.
17      Q.   Mr. Tucker, it's been more than 20 years since
18 I've lived in Madison.  Can you describe for me where
19 that address is?
20      A.   Sure.  It is on the southwest side of Madison,
21 Crabapple Lane is an east-west street that runs off of
22 Whitney Way, very close to the Orchard Ridge Elementary,
23 Toki Middle School.
24      Q.   Thank you.  And what's your current employer?
25      A.   I work for the City of Madison as the building

2 (Pages 2 - 5)

Page 6

1 inspection division director.
2    Q.   Mr. Tucker, have you had your deposition taken
3 before?
4    A.   I have.
5    Q.   How many times?
6    A.   Once, I believe.
7    Q.   What was that in relation to?
8    A.   A lawsuit in my position in the City of
9 Madison as a zoning administrator.
10    Q.   About how long ago was that?
11    A.   A couple years ago, maybe three.
12    Q.   Do you recall who the parties were in that
13 case?
14    A.   I do.
15    Q.   And who were they?
16    A.   It was the City of Madison and Adams Outdoor
17 Advertising.
18    Q.   Can you summarize kind of what the general
19 issue was in that litigation?
20    A.   They had interest in work related to
21 advertising signs, commonly referred to as billboards,
22 and the city's ordinance did not allow certain aspects
23 of what they wished to do.
24    Q.   So you were here for Mr. Hank's deposition on
25 Wednesday; correct?

Page 7

1    A.   Yes.
2    Q.   So you heard my spiel on kind of the
3 deposition rules and what we will try to accomplish here
4 today in terms of speaking and not talking over each
5 other, right?
6    A.   Yes.
7    Q.   So just to recap, I will try to let you finish
8 your answer before I ask my next question.  And if you
9 could please try to let me finish my question before you
10 begin your response; okay?
11    A.   Yes.
12    Q.   We will do our best to have verbal responses
13 today, please.
14    A.   Yes.
15    Q.   Great.  And if there comes a time when your
16 counsel objects to a question, please let her complete
17 her objection before you begin your answer unless she
18 instructs you not to answer; okay?
19    A.   Yes.
20    Q.   Okay.  Great.  Can you summarize your
21 educational history for me?
22    A.   How far do you want me to go back?
23    Q.   Why don't we start with high school.
24    A.   I went to Madison West High School, and I went
25 to the University of Wisconsin, Oshkosh, bachelor's of

Page 8

1 science.
2    Q.   Great.  And what year did you graduate from
3 West?
4    A.   1990.
5    Q.   And what year did you graduate from Oshkosh?
6    A.   1995.
7    Q.   Where did you go to grade school?
8    A.   I went to Our Lady Queen of Peace in Madison.
9 And I went to Van Hise for 8th grade, which is now, I
10 believe, called Hamilton Middle School.
11    Q.   Can I ask why you made a change in 8th grade?
12    A.   My parents and I negotiated a change to my
13 educational location.
14    Q.   I don't understand what that means, I'm sorry.
15    A.   I didn't want to go to Queen of Peace anymore
16 and they were allowing me to go to Van Hise.  That's
17 probably the best way of describing it.
18    Q.   Can you describe why you didn't want to go to
19 QP?
20    A.   I was not having a good experience there.
21    Q.   Based on students, interaction, or was it more
22 of an administrative issue?
23    A.   Probably both.  It's hard -- I mean, it was
24 quite a long time ago so I recall the structure being
25 not conducive to actually some of the other members of

Page 9

1 my family, too, so we just chose a different path.  And
2 I was -- they let me be a part of that decision, which
3 was great.
4    Q.   Sure.  What was your -- you may have said it
5 but I missed it.
6         What was your undergraduate program?
7    A.   I have an undergraduate in geography, a
8 bachelor's in science.
9    Q.   Any postgraduate education?
10    A.   No.
11    Q.   Any legal training?
12    A.   No.
13    Q.   Are you married?
14    A.   I am.
15    Q.   And do you have any children?
16    A.   I do.
17    Q.   What are their ages?
18    A.   I have a 15 year old and a 13 year old.
19    Q.   And can I ask where they attend school?
20    A.   The 15 year old is freshman at Memorial High
21 School, and the 13 year old is a 7th grader at Toki
22 Elementary -- or Middle School, excuse me.
23    Q.   So you describe yourself as the building
24 inspector division director; is that right?
25    A.   That's correct.

Page 10

1    Q.   How long have you held that title?
2    A.   I started that position in July of last year.
3    Q.   Was that the position that was vacated by
4  George Hank on his retirement?
5    A.   Yes.
6    Q.   So you assumed his duties, his role?
7    A.   Yes.
8    Q.   Prior to that, your position was as zoning
9  administrator; is that right?
10   A.   Correct.
11   Q.   How long had you been in that position?
12   A.   I started with the City of Madison in June of
13  2005, and I held that position continuously up till July
14  of last year.
15   Q.   And where were you employed before June of
16  2005?
17   A.   I worked for the city of Oshkosh, Wisconsin.
18   Q.   In what capacity?
19   A.   I was a city planner and I assumed zoning
20  administrator duties in that city.
21   Q.   So you heard George Hank's testimony regarding
22  his role and responsibilities as the building inspection
23  division director, did you not?
24   A.   I did.
25   Q.   During his service in that capacity was there

Page 11

1  anything -- or looking at his time in that capacity, was
2  there anything he testified to on Wednesday that you
3  thought to be false about the roles and responsibilities
4  of his division?
5    A.   Anything?  I mean, I --
6    Q.   To the best of your recollection.
7    A.   To the best of my recollection, I felt like he
8  had paraphrased the position pretty well, yeah.
9    Q.   With respect to, let's say, the new
10  administration, right, the building inspection division
11  under your supervision.
12       Have you instituted any changes from how
13  George Hank ran that division?
14   A.   No.
15   Q.   I'm going to focus on kind of your
16  responsibilities now when you were zoning administrator.
17       In that timeframe of -- I'm going to focus
18  mostly on the timeframe of 2014 -- 2013-2014 through,
19  let's just say, 2020; okay?
20       During that time -- I'm not asking for any
21  individual names -- but who generally reported to you
22  when you were the zoning administrator?  How was that
23  zoning administration department laid out from a chart
24  standpoint?
25   A.   Sure.  We have zoning code enforcement

Page 12

1  officers.  And there is a number of them.  I believe
2  there is six of them that -- actually, there is three of
3  them -- well, hold on.
4       So we had an assistant zoning administrator.
5  We had changed one of the zoning enforcement officers
6  into a second assistant zoning administrator in 2019,
7  2018.  So we ended up basically had two assistant zoning
8  administrators and four zoning code enforcement officers
9  who reported to me.  And there is a clerical person who
10  in tangentially reporting to me dually with a
11  supervisor.
12   Q.   So I count eight.  Is that fair?
13   A.   It should be --
14   Q.   Including you?
15   A.   It should be six -- oh, and seven, including
16  me.  And eight would be the clerical person.  So, yes.
17   Q.   How do you describe -- let me ask you this:
18       What were your responsibilities as Madison's
19  zoning administrator during the time of period we talked
20  about?
21   A.   Well, the position description that's on file
22  with the city describes the administration and
23  enforcement of the city's zoning and sign control
24  ordinance.  And I also managed other duties as assigned.
25       And so any variety of types of private

Page 13

1  property-related matters I may have involvement in.
2    Q.   So these other duties that you're talking
3  about, how did those come across your desk?
4    A.   Usually through collaboration with George.  I
5  also worked very closely with the planning director for
6  the city, because the zoning in Madison is very closely
7  connected to city planning.  It's the principal tool for
8  implementation of city plans.
9       So I would spend -- I would spend quite a bit
10  of time working with the planning director and her
11  staff, and I would also interact with other city
12  agencies because there was overlap or responsibility in
13  the zoning section that would connect to others.  It's
14  like city engineering, traffic engineering, the fire
15  departments, the city's real estate department.  Just a
16  variety of agencies.
17   Q.   Sure.  What's the difference between zoning
18  administration and planning?
19       And so as I understand it, at least it
20  includes kind of zoning being the implementation
21  mechanism for the planning department; is that right?
22   A.   Yeah, we often talk about it in those words,
23  but we also talk about it as being the law relative to
24  the use of land and the law for structures and
25  improvements on property.  So it has multiple functions

4 (Pages 10 - 13)

Page 14

1 in that regard.
2     Q.   With respect to the dispute and the
3 controversies involving Madison Edgewood's athletic
4 field here in, let's just say, the 2017, 2018, 2019 to
5 2020 timeframe, you had involvement with that as the
6 zoning administrator; correct?
7     A.   I did.
8     Q.   Would you say that that fell -- did your
9 involvement fall within the contours of that position
10 description on file with the city or was it more of one
11 of those other duties that you could be assigned from
12 time to time?
13    A.   I believe it would be under the principal
14 duties of the zone administrator.
15    Q.   Administration and enforcement of the zoning?
16    A.   Uh-huh.
17    Q.   I'm sorry, that's a yes?
18    A.   Yes, sorry.  My first one.
19    Q.   Hey, we're 15 minutes in.  That's actually not
20 bad.  I have seen a lot worse.
21        So I asked you about distinction -- well, let
22 me ask you this:
23        Help me understand the distinction between
24 building inspection and zoning administration as
25    A.   Sure.  So the building inspection division as

Page 15

1 George -- I think he did an excellent job of laying out
2 the variety of things that we do.
3        And the building inspection, zoning is part of
4 the regulations for developments.  We're associated with
5 permitting, permits, building permits and use approvals,
6 and we're associated with enforcement.
7        So it falls into building inspection because
8 that's sort of the common duties of that section, also.
9 That's why it placed there under Madison structure.
10    Q.   So in the building inspection side he's got
11 kind of enforcement personnel; correct?
12    A.   There are enforcement personnel in the
13 building inspectors.  There are housing inspectors and
14 property maintenance inspectors and weights and measures
15 inspectors.
16    Q.   And you had mentioned that you had at various
17 times under zoning administration, depending on
18 timeframe, two or four zoning code enforcement staff; is
19 that right?
20    A.   Correct.
21    Q.   So what would a zoning code enforcer -- I'll
22 use the word "enforcer" -- that might be not be the
23 right title -- the zoning code enforcer enforced versus
24 what a building code enforcement personnel would
25 enforce?

Page 16

1     A.   I'll probably give you a good example.  We
2 might have a scenario where someone has opened a
3 restaurant/tavern, which is basically a restaurant that
4 includes alcohol service.
5        The building code staff won't have building
6 codes.  They have a distinction about the service of
7 alcohol.  They would be -- it doesn't matter to them.
8        The zoning staff would administer the zoning
9 code, would look and follow the rules of the zoning code
10 that treat the use of a restaurant tavern different than
11 use of a restaurant.
12    Q.   Got it.  Is it fair to say that uses of
13 property is going to fall under zoning administration in
14 terms of enforcement as opposed to kind of the technical
15 features of a building or space will fall under building
16 inspection?  Is that a fair distinction I'm making?
17    A.   I wouldn't necessarily put it that way.  We
18 may be saying the same thing, but there is land use and
19 then there is use of buildings, too, like the occupancy
20 of buildings.
21        And the building code is principally looking
22 at the occupancy of buildings from a life safety
23 perspective where the zoning code is looking at the land
24 use, the buildings, where the buildings are located on
25 the property, factors such as that.

Page 17

1     Q.   Just to be clear on a going forward basis here
2 today, unless I kind of advise you otherwise I'm going
3 to be talking about your responsibilities and roles as
4 zoning administrator principally.
5        If I want to talk to you about your current
6 role about a building inspection division director I
7 will make that very clear; okay?
8     A.   Thank you.  That will be helpful.
9     Q.   So I'm focused on zoning administration only
10 at this point.
11    A.   Okay.
12    Q.   In that tenure that you had that position.
13 I'm not going to be talking about any changes that may
14 have occurred in zoning administration after you left
15 that zoning administration role; okay?
16    A.   Okay.
17    Q.   So the zoning code enforcement staff that you
18 had under you, did they have the same enforcement tools
19 at their disposal that George Hank described on the
20 building inspection side?
21    A.   Yes.
22    Q.   Official notices, citations?
23    A.   The citation is an enforcement tool.  An
24 official notice is a warning.  It's sort of like that
25 type of a communication.

5 (Pages 14 - 17)

Page 18

1    Q.  Sure.  And that was what I understood on
2  building inspection, too.  So it's the same?  From your
3  understanding it's the same?
4    A.  Yes.
5    Q.  Okay.  Can you describe Tim Parks' role as you
6  understood it as you were zoning administrator, what was
7  Tim Parks' role as planning administrator?
8    A.  Tim Parks is one of the development review
9  planners.  Do you me just focusing here on a little bit
10  of the topic?
11    Q.  Yes, please.
12    A.  Tim is also generally assigned or assumed
13  reviews related to Edgewood over time when I was in the
14  zoning administrator position.
15        So he would be the person that I would be
16  working with generally in the planning section.  We like
17  to refer to them as actually like shepherds of projects,
18  and he was, I would say, the point person for matters
19  related to Edgewood from planning.
20    Q.  To the extent you know, did Edgewood fall
21  under his purview based on geographic considerations or
22  was it a type of property owner?  What was the -- how
23  did Edgewood fall under his purview?
24    A.  So my understanding was there was a person
25  prior to Tim that had previously been working on matters

Page 19

1  related to Edgewood, and those effectively -- upon that
2  person's retirement, that person's responsibility was
3  transferred over to Tim.  So he was on notice.
4        It would generally be the staff person
5  assigned to the matters related to that or inquiries
6  related to that property, they would be directed to him
7  for whatever planning chose to do with it.
8    Q.  Do you know when he kind of assumed that role
9  over Edgewood?
10    A.  I believe it was probably, I want to say
11  around 2006 to 2007 maybe.
12    Q.  Did other Campus-Institutional districts have
13  kind of -- well, I'll just paraphrase it as a go-to
14  person in the Planning Division?
15    MS. ZYLSTRA:  Objection.  Form, foundation.
16  You can answer.
17    Q.  To the extent you know.
18    A.  The Campus-Institutional District came to be
19  in -- are you talking about the zoning district or just
20  those places?
21    Q.  The Campus-Institutional zoning district --
22  well, let me ask you this:
23        What's the distinction between the
24  Campus-Institutional zoning district and the places?
25    A.  Well, the Campus-Institutional zoning district

Page 20

1  is a section in the city zoning code that was written
2  and then ultimately mapped over certain places in the
3  city that the city decided were appropriate for that
4  zoning classification at the time of the adoption of the
5  maps.
6        The places are -- that's more of like
7  vernacular when we're talking about institutions like
8  the University of Wisconsin-Madison, Edgewood, which is
9  like a high school, college, and grade school.  And I
10  think that's just the three.  You maybe have high
11  schools.
12        They weren't zoned Campus-Institutional prior
13  to 2013, because the district didn't exist.
14    Q.  So I want to make sure I get my terminology
15  right, at least by the third deposition in the case.
16        When you refer to Edgewood, do you refer to
17  Edgewood as a Campus-Institutional District or do you
18  refer to basically a place that is a zoned
19  Campus-Institutional District?
20    A.  Refer to it in what regards?
21    Q.  Well, would it be technically incorrect for me
22  to say that Edgewood is a Campus-Institutional District?
23    A.  I believe that would be technically incorrect,
24  yeah.
25    Q.  So correct me, then.  Edgewood is a, what,

Page 21

1  with respect to Campus-Institutional District?
2    A.  I think Edgewood is an institution in our
3  community that also is zoned in the Campus-Institutional
4  zoning district.
5    Q.  Got it.  So institutions -- I guess it's
6  almost kind of self-defining.
7        Institutions are zoned Campus-Institutional
8  Districts?
9    A.  Not necessarily.
10    Q.  Okay.
11    A.  So the mapping was a different discussion.
12  And there are probably institutions that we would think
13  are institutions that are not zoned Campus-Institutional
14  zoning district.
15    Q.  Got it.  I think I understand.  Nice to get
16  that clear.  So I think we kind of got off track here a
17  little bit, not due to any fault of yours.
18        Did you tell me when you believed Tim Parks
19  kind of came to be generally responsible for
20  Edgewood-related projects?
21    A.  Yeah, I believe it was like 2006 to 2007,
22  around then.  To pin it down, it would probably be best
23  to -- they had a project that came through around then,
24  and I think it was at the college to build a dorm or
25  something along those lines.

6 (Pages 18 - 21)

Page 22

1    I recall the project.  And we'll just say the
2  file that the city had, which is the ongoing kind of
3  record from planning, was transferred from that retiree
4  on to an active staff, which would have been Tim.
5    Q.  I think where we diverged off of my train of
6  thought was -- let me ask you this question:
7    To your knowledge, are the other institutions
8  that are zoned as Campus-Institutional districts, do
9  they have kind of a go-to person in the Planning
10  Division?
11    MS. ZYLSTRA:  Objection.  Foundation.  If you
12  know.
13    A.  I don't know for sure.
14    Q.  So, for example, I believe Madison Memorial is
15  zoned Campus-Institutional District; correct?
16    A.  Yes.
17    Q.  If you had a question for someone in the
18  planning department related to Madison Memorial, is
19  there a particular person that you would go to that you
20  recognize kind of handles Memorial?
21    A.  I don't believe so, because so rarely do
22  things come up from Memorial.  People tend to take an --
23  assume a responsibility when there is regular and
24  recurring or frequent matters that a person becomes
25  assigned, if you will, I'll use that term, just because

Page 23

1  they have the institutional knowledge transferred to
2  them, or they carry the institutional knowledge from the
3  past.
4    Q.  Sure.  Is there a person at the Planning
5  Division who's been assigned to be the go-to person for
6  issues for University of Wisconsin-Madison?
7    A.  I don't know if one individual has been
8  assigned to their projects.
9    Q.  So is it your understanding or belief that
10  Edgewood has its own person at the Planning Division
11  because of just there being recurring or frequent issues
12  that arise?
13    A.  I would say it probably a little bit
14  differently.  It's just at the right size and scale and
15  amount and number of projects that an individual might
16  take it, which is common.
17    For example, like a project like Hilldale
18  might also have an individual, because it's -- as you
19  probably -- you're from Madison, I recall, you mentioned
20  -- or you grew up here -- from George's deposition.
21    If you recall Hilldale when the parking lot
22  was out front to what it was today, they kind of have
23  one person that's kind of a point person as a project
24  evolves to carry institutional knowledge.
25    So it's at the right size, if you would.  And

Page 24

1  you know, a place like UW is very large.  A place like
2  Madison College is the right size, also, which would
3  probably have an individual that would be kind of
4  handling the recurring projects.
5    Q.  And to your knowledge, is that a go-to person
6  for Madison College?
7    A.  I believe there is, but I don't know who that
8  is now, so yeah.
9    Q.  Thank you.  Let's talk about outdoor lighting
10  applications for a little bit.
11    I'll hand you what was marked in Mr. Hank's
12  deposition as Exhibit 3.  Do you recognize that
13  document, sir?
14    A.  I do.
15    Q.  And can you describe it for me and tell me
16  what it is?
17    A.  Sure.  So this is a printout copy of a report
18  that is generated from the city's site plan review
19  software, which is utilized to track certain processes
20  that the city is responsible for handling on private
21  property.
22    Q.  And do you know -- with respect to this
23  particular document, do you know who input the data that
24  appears in the fields in this document?
25    A.  I'm going to make just a common, but I think a

Page 25

1  very confident assumption on this, because I know who
2  does this mostly in our office.
3    So Christina Thiele, the person that's
4  identified here as the approver under zoning, she would
5  receive the application, she would set up the
6  application in our software, she would enter all of the
7  contact information that was part of the application.
8    She would set up the agency reviews.  In this
9  case you see lighting review and that there is a
10  default, which is a zoning review because this is a
11  thing that we manage for the City of Madison, this
12  application.
13    So she would have keyed in.  And then Steve
14  Rewey would be assigned a step.  And so he, on February
15  27th, would have keyed in the information.
16    I will note, though, sometimes Steve would,
17  like, call in and have someone enter the information on
18  his behalf and that would show up and, if we needed to,
19  dig deep and see who actually may have advanced it.  Our
20  assumption is that Steve would -- is authorizing this
21  entry.
22    Q.  Sure.  Authorizing the entirety of the entry
23  or just the entry of his line item?
24    A.  His piece, which was lighting review.
25    Q.  So this was an outdoor lighting application ,

Page 26

1  right, here on Exhibit 3 that's being reflected?
2      A.  Yes, I believe so.
3      Q.  And so, as I'm understanding you saying, an
4  outdoor lighting application would be received by the
5  zoning administration department?
6      A.  Not always.  The outdoor lighting applications
7  that relate to land use or site approvals tend to come
8  into the zoning office or they come into -- or sometimes
9  they may arrive to building inspection.  They are routed
10  over to zoning for entry and processing.
11      MR. INGRISANO:  Can you read back that answer,
12  please.
13      (Record read)
14      Q.  Sir, can you distinguish for me the difference
15  between a lighting application that relates to land use
16  and site approval versus a lighting application --
17  outdoor lighting application that relates to something
18  else?
19      MS. ZYLSTRA:  I'll object to form.  You can
20  answer.
21      A.  Sure.  I'll provide an example.  Sometimes we
22  will receive applications -- and by "we" I will say the
23  building inspection division -- we will receive
24  applications to light an existing private parking lot,
25  or change lighting on an existing parking lot.

Page 27

1      The parking facility pre-exists, and the
2  lighting application is received and processed directly
3  by the plan review section, and it doesn't find its way
4  to zoning.  It would not go through a process as shown
5  on Exhibit 3.
6      Q.  So you use the example of an existing parking
7  lot.  So that would be -- that would not fall under the
8  category of a lighting application that relates to land
9  use and site approval?
10      A.  That's correct.
11      Q.  And if it's related to, say, an existing
12  feature like a parking lot, you're saying it would then
13  kind of be received and input by the building inspection
14  group?
15      A.  Most likely, yes.
16      Q.  So in this particular case with Exhibit 3,
17  this was a lighting application to light an existing
18  athletic field; correct?
19      A.  Yes.
20      Q.  So why didn't this fall into something that
21  would have been entered into and received by the
22  building inspection, instead it's being treated as a
23  lighting application that relates to a land use and site
24  approval?
25      A.  The staff triage, the applications that come

Page 28

1  in and makes some determinations about process.  I am
2  not exactly sure if -- it might have originated coming
3  directly to zoning by Jennifer Luhman from Forward
4  Electric, or it might have been entered directly to the
5  -- or delivered directly, hand-delivered to the building
6  inspection office.
7      I think it came in via email because I
8  remember seeing a revision, an initial application and
9  revision almost immediately.
10      Can you repeat the question?  I --
11      MR. INGRISANO:  Sure.  Can you repeat my
12  question back, please.
13      (Record read)
14      A.  So because the staff have experience in these
15  types of matters, they, as far as their triage, have
16  sort of a process knowledge of talking to each other in
17  determining the right path for something, for lighting
18  submission.  And that the lighting of places related to
19  a use such as an athletic field or also the lighting in
20  -- an unusual lighting application like this, which is
21  unique in that lighting of this type is relatively rare,
22  would naturally trigger a closer look in a decision.
23      Parking lot lighting is very routine for us.
24  In fact, parking lot lighting is typically reviewed at
25  the time of site plan review for the development, unless

Page 29

1  the parking lot lighting is coming after the fact or
2  being changed after the fact.
3      Q.  Looking at Exhibit 3, sir, it says, in the
4  field where it says "Project Type."  Do you see that?
5      A.  Yes.
6      Q.  It says, "Permitted Use Site Plan Review."  Do
7  you see that?
8      A.  Yes.
9      Q.  Based on your understanding of the systems
10  employed, who would have keyed that in or chosen that
11  field?
12      A.  That is a default field that is selected by
13  the person who sets up, who would enter all the contact
14  information into the record.
15      So Christina Thiele would have selected this
16  default.  I believe there is four defaults you get to
17  pick from.
18      Q.  What are those defaults?
19      A.  There is permitted use site plan review.  I
20  believe there is a similar approval for conditional use.
21  There is an approval for alterations.  I don't recall
22  the precise phrasing.  There is one for alterations of
23  plan developments.  One for alterations of conditional
24  uses.
25      There is one that relates to land use

Page 30

1  applications that's kind of a continuation of matters
2  that go on to the city's Plan Commission, like zoning
3  map amendments, demolitions and conditional uses.
4      Q.  That sounds like more than four to me.
5      A.  I think there is five.  Permitted use,
6  conditional use, alteration to conditional use,
7  alteration plan development, and land use application
8  continuation.  I think there is just five.
9      Q.  In this particular instance, Christina has got
10 to figure out which is the appropriate category to put
11 this under?
12     A.  Correct.
13     Q.  And she made the determination that a
14 permitted use site plan review was the appropriate one?
15     A.  Yes.
16     Q.  And does that entail necessarily her
17 conclusion that these lights would involve a permitted
18 use of the property?
19         MS. ZYLSTRA:  Objection.  Form, foundation.
20 You can answer.
21     A.  No.
22     Q.  What would that -- well, let me ask you this:
23         Do you believe she properly coded this as a
24 permitted use site plan review?
25     A.  I think it was the correct choice of the

Page 31

1  choices given.
2      Q.  How is a permitted use site plan review --
3  what made it the correct choice?
4      A.  When they are trying to figure out how to
5  forward the record for reviews, they would use a process
6  of deduction.  It doesn't fit into the other categories
7  and this is the catchall category.
8      Q.  Does the phrase "permitted use" relate to or
9  refer to the lights itself or how the property is
10 presently being used or some other qualification?
11         MS. ZYLSTRA:  Object to form.  You can answer.
12     A.  I'm not understanding that question.  You're
13 not asking about Exhibit 3, are you?
14     Q.  Well, with respect to Exhibit 3 and the field,
15 permitted use site plan review, we're talking -- what
16 does that permitted use site plan, what does that mean;
17 what's permitted use site plan?
18         MS. ZYLSTRA:  Object to form.  You can answer.
19     A.  A permitted use site plan review, from a
20 processing standpoint, is a type of a review that
21 doesn't imply a special approval as necessary, like a
22 conditional use, like a planned development alteration.
23         It implies that -- that a -- from a process
24 standpoint, it's not defaulting to including reviewing
25 agencies and committees from -- in general, that's one

Page 32

1  piece of it.
2          And the other piece of it is it's the default
3  tool that we use when things don't fit into any other
4  category.  Like, if we had one that said,
5  "Campus-Institutional site plan review," that would be
6  fairly appropriate.
7          But of the ones that we have selected by
8  process of deduction, they end up selecting that, and it
9  has -- it doesn't have bearing on our determination of
10 the use; it's just how we process the applications in
11 our software.
12     Q.  If you go down and look where it says "Status
13 Closed," what does, in your experience, status closed
14 indicate on a form such as this?
15          I'll ask about generally first before I ask
16 about this particular case.  But when a status is listed
17 as being closed, what are the things that that could
18 indicate?
19     A.  Status closed is a workflow step, and it means
20 that this record was -- an action was taken to -- I
21 would use the term "finish" this record.  Reviews have
22 been completed, it had been placed in a status called
23 "approved" and then it gets advanced to a closed status.
24     Q.  After it goes from the -- we're talking about
25 workflow, right.  You've got the approved status and

Page 33

1  then it moves into closed.  What happens after that,
2  generally speaking?
3      A.  The matter is archived.  There may be other
4  steps that follow up, such as permit issuance,
5  construction, inspection.
6      Q.  Yeah, I mean, when we're talking about
7  workflow where does the work flow after it's -- when you
8  have it approved -- this was approved for lighting
9  review and by zoning review; correct?
10         MS. ZYLSTRA:  Object to form.
11     Q.  Exhibit 3?
12         MS. ZYLSTRA:  Object to form.  You can answer.
13     A.  The report says approved, lighting review and
14 zoning review, and what we believe this means is this
15 process was closed.
16     Q.  What process?
17     A.  The site plan review process.
18     Q.  Got it.  So the lighting review by Steve
19 Rewey, he was looking at.  And now we are talking about
20 Exhibit 3, I think, specifically.
21         But the lighting review by Steve Rewey on
22 Exhibit 3, that entailed him looking at the technical
23 specifications of the application and comparing it to
24 the requirements of 10.085; correct?
25     A.  Yes.

Page 34

1    Q.   And he or someone on his behalf entered the
2  status of approved; correct?
3    A.   Correct.
4    Q.   So it reflects his assessment that it met the
5  technical specifications?
6    A.   Yes.
7    Q.   And when it says "reviewed February 27, 2019,"
8  is that the date in which the status was changed to
9  "approved" or what determines the review date?
10      MS. ZYLSTRA:  Object to form.  You can answer.
11   A.   That would be the date the status was change
12  to approved.
13   Q.   As the zoning administrator, would you have
14  reviewed Mr. Rewey's work in basically signifying
15  approved status for the lighting review?
16   A.   No.
17   Q.   Same question for zoning review.  So on
18  Exhibit 3, Christina Thiele -- is that how you pronounce
19  it?
20   A.   Yes.
21   Q.   So Christina Thiele was the reviewer who was
22  checking the zoning review for this application; is that
23  right?
24      MS. ZYLSTRA:  Object to form.  You can answer.
25   A.   Yes.

Page 35

1    Q.   She worked on this application; is that right?
2       MS. ZYLSTRA:  Object to form.  You can answer.
3    A.   She advanced the workflow on this application.
4    Q.   And for her to change, to make the approved
5  status, to enter that into approved status, what
6  workflow did she have to advance to be able to do that?
7    A.   There is a select -- a drop down selectable in
8  the workflow that you select.
9    Q.   But substantively -- well, let me ask you
10  this:
11      Did you ever review Christina's denoting of
12  the zoning review on Exhibit 3 as being approved?
13   A.   No.
14   Q.   You didn't check her work and confirm that it
15  had been properly marked as approved?
16   A.   Well, after the fact that we had discovered
17  that this had happened, we did --I did check with her
18  and check her work to understand what her understanding
19  of her approval meant with this application.
20   Q.   And in doing that review after the fact -- so
21  let me ask you this:
22      You did that review after the fact, after
23  March 1?
24   A.   Yes.  Right.
25   Q.   You went back and said, hey, Christina, what

Page 36

1  did you do with the Edgewood light application?
2    A.   Yes.
3    Q.   Why did you do that?  What raised that issue
4  for you that caused you to go back after she had issued
5  that approval to review that work?
6    A.   We wanted to be clear, as clear as we could
7  be, with her limiting software, the city's position in
8  regard to the lighting request by Edgewood.
9       And I wanted to discuss with her, her
10  understanding of what her approval meant in advancing
11  the workflow.
12   Q.   How often did you -- after an approval was
13  issued on an application like this by your zoning review
14  staff, how often did you go back after the fact and ask
15  them to explain the impact or their understanding of the
16  impact of their work?
17      MS. ZYLSTRA:  Object to form.  You can answer.
18   A.   I wouldn't say routinely, but periodically
19  that happens to understand their determination.
20   Q.   Sure.  Did you know prior to March 1 that she
21  was reviewing this lighting application?
22   A.   I did not.
23   Q.   How did you become aware on March 1 or after
24  that she had advanced the workflow to approved?
25   A.   I think we -- I found out looking when I was

Page 37

1  looking into the matter.  Someone, I can't recall who,
2  it may have been Nathan Wautier, it may have been John
3  Strange, George.
4       It was brought to my attention and it was --
5  you know, that this had been marked approved.  I had
6  been sharing some communications and having some ongoing
7  discussions with staff about this matter, and there was
8  a letter I wrote to Mike Elliot, also, about this.
9       And the -- we needed -- I was asked to explain
10  what this meant.
11   Q.   Okay.  In reviewing her workflow, does that
12  mean that you asked her to explain what her process was
13  and what her analysis was as to why she marked approved?
14   A.   Yes.
15   Q.   And did you find her review and analysis
16  deficient?
17      MS. ZYLSTRA:  Object to form.  You can answer.
18   A.   No.
19   Q.   Should she had not approved the lighting
20  application zoning review as she did on Exhibit 3?
21      MS. ZYLSTRA:  Object to form.  You can answer.
22   A.   I don't believe her action was an approval of
23  the lighting application.  And I could explain why.
24   Q.   So when the word "zoning review approved"
25  appears on Exhibit 3, does that not mean that your

Page 38

1 department approved this application's -- the zone
2 review aspect of this application?
3     A.   If I was to agree to that, I believe that she
4 made a mistake approving it.
5         What she did was a procedural step in
6 advancing the workflow, which is mandatory in the
7 workflow to establish -- and it shows up in the
8 ordinance under the site plan review to establish a date
9 by which the work would be completed.
10         If you look at her note, that is her sole
11 interest is obtaining the date by which this is being
12 installed by from the applicant.
13         And I don't believe -- in talking with her she
14 was not aware of the situation with the CI zoning in the
15 master plan that is part of this litigation.
16     Q.   In a typical lighting application that comes
17 through where there is a lighting review and a zoning
18 review, someone from the building inspection department
19 approves, based on their review of the technical
20 specifications, someone from the zoning administration
21 department reviews zoning review, marks approved, that
22 permit has been granted -- that application has been
23 granted and the permit is issued; correct?
24         MS. ZYLSTRA:  Object to form.  You can answer.
25     A.   Yes.

Page 39

1     Q.   Are you aware of any other situations in your
2 tenure as a zoning administrator in which a lighting
3 application came in, lighting review is approved, zoning
4 review is approved as marked, confirmed on the form, and
5 the permit did not issue?
6         MS. ZYLSTRA:  Object to form.  You can answer.
7     A.   I'm not aware of a scenario like that.
8     Q.   What did Christina Thiele do or not do that
9 impacted the approval of this application?
10         MS. ZYLSTRA:  Object to form.  You can answer.
11     A.   What did she do or not do?
12     Q.   Well, let me ask you this:  She didn't make a
13 mistake in approving this application, did she?
14         MS. ZYLSTRA:  Object to form.  Misstates prior
15 testimony.  You can answer.
16     A.   I believe the system forced her to take an
17 action to set the date of compliance on this.  And this
18 is an extremely unique situation.
19         There is no other property in the city of
20 Madison that -- there would only potentially be the
21 University of Wisconsin-Madison and Edgewood that would
22 have been in this scenario.
23         And these staff are routinely approving and
24 advancing workflow on lighting things.  It's a very easy
25 mistake to make.

Page 40

1     Q.   So in your experience in dealing with an
2 outdoor lighting application, is it your testimony today
3 that the only thing that someone from your department at
4 the time, zoning administration in doing the zoning
5 review, the only thing they are concerned about is
6 establishing the date of completion?
7     A.   Her position was that, when I talked to her,
8 was that her approval was advancing the workflow because it's
9 mandatory.
10     Q.   I'm not talking about Edgewood right now.  I'm
11 talking about, generally speaking, when they're doing
12 lighting -- outdoor lighting reviews.
13     A.   Okay.
14     Q.   Right.  They are doing permitted use site plan
15 review, which you said was the most appropriate project
16 type.  There is a lighting review, a zoning review.
17         We talked about what Steve Rewey is looking
18 at.  He's looking at technical specifications on 10.085.
19         In doing these reviews, typically, is it your
20 testimony that the only thing that Christina Thiele is
21 really looking at is the date of completion for the
22 project, and if she obtains that date of completion, she
23 can mark it approved and it moves on to workflow.  Is
24 that your testimony?
25         MS. ZYLSTRA:  Object to form.  You can answer.

Page 41

1     A.   At the time, yes, that's what -- you know, her
2 -- when I spoke with her that's how she perceived this
3 application being processed.
4     Q.   And, again, we're going to talk about Edgewood
5 application.
6         But for all cases other than Edgewood, what I
7 said was the proper scope of review by Christina, check
8 the date of completion, if you obtain a date of
9 completion then in all other cases I can switch the
10 status to approved, I can click my little drop down, and
11 my workflow is advanced.  Is that accurate?
12         MS. ZYLSTRA:  Object to form.  You can answer.
13     A.   You know, I don't think so, because there are
14 other -- there are other times lighting can come into
15 play, also, in a wide variety of things that come across
16 their desk.
17         They may -- you know, these blanket statements
18 are hard to -- you know, because things don't come in
19 uniformly.  It's complicated.
20     Q.   I understand.  And I'll admit to you I'm
21 confused.
22         How does Christina Thiele know what she's
23 supposed to look at when they comes across her desk,
24 right?  She says, oh, I need to do a zoning review for a
25 lighting application, or any kind of zoning review.

11 (Pages 38 - 41)

Page 42

1  Christina Thiele's job, what is she supposed
2  to look at to advance this workflow, any workflow, on a
3  zoning review to the approved status?
4  A.  So typically what they do is they will check
5  the property zoning.  They will review the application
6  to discern what information is that's provided so they
7  can triage it to understand what's being requested.
8  They often check -- we have a few sources for
9  special conditions for property that we have identified
10  as unusual, unique, or there is some aspect you want to
11  be aware of that wouldn't be readily apparent.
12  And once they had gone through the triage and
13  the check, they would then be taking an action,
14  reviewing the application relative to their training.
15  Q.  Okay.  So was Edgewood denoted as a special
16  property?
17  A.  Not at the time.
18  Q.  Should Edgewood at the time of March 1, 2019
19  be denoted as a special property?
20  A.  It would have definitely helped had it been
21  identified in that grouping.  Those are -- those are ad
22  hoc.  They really added as we stumble into them more
23  than anything else.
24  Q.  Sure.  I'm trying to make sure I understand
25  your testimony here as to what the typical -- the

Page 43

1  analysis by someone like Christina would be doing in
2  zoning review.
3  So I heard you say that she's going to be
4  looking at the -- in doing her review, she's going to be
5  looking at the property zoning, and she's going to be
6  looking at kind of comparing that to what is being
7  requested.  And then, in theory, there is a third
8  category of is this a special property.  Is that a fair
9  summary?
10  A.  We talked about in general that's what happens
11  when a zoning review is submitted.
12  Q.  And I'm asking about the general process.
13  A.  Yeah, that's not this.
14  Q.  And, again, we'll talk about what this is here
15  in a minute.
16  A.  Yes, the general process would be that, yes.
17  Q.  Got it.  So it's your belief that Edgewood, in
18  hindsight, should have been marked as a special property
19  when Ms. Thiele was doing her review on Exhibit 3?
20  MS. ZYLSTRA:  Object.  Form.  You can answer.
21  A.  I think any time there is an unusual or unique
22  circumstance on a property we try and identify it so
23  staff don't overlook something or make a mistake.
24  And something like that would have probably
25  paused this and had it be brought to my attention.

Page 44

1  Typically those special conditions say something like
2  "check with Matt" or "check with Tim Parks" or something
3  along those lines.
4  This was such a routine thing that happens in
5  the background that there was no catch for that.  Yes.
6  Q.  Sure.  So what was it about Edgewood that was
7  unusual, or I think you used the phrase "unique," that
8  made -- strike that.
9  What was unusual or unique about Edgewood that
10  was important or material to the zoning review for this
11  lighting application?
12  A.  So Edgewood is zoned Campus-Institutional and
13  it has an adopted master plan.
14  Q.  How does that master plan impact the review
15  and approval of their February 2019 outdoor lighting
16  application?
17  A.  Ideally, the master plan would be checked for
18  consistency and compliance with the request for
19  installation of lighting.
20  MR. INGRISANO:  Can you read that back,
21  please.
22  (Record read)
23  Q.  The light permit as otherwise denoted --
24  sorry, the lighting application that was otherwise
25  denoted as approved for lighting review and zoning

Page 45

1  review on Exhibit 3, that permit was never issued; is
2  that correct?
3  A.  That's -- I believe so.
4  Q.  Was that application denied?
5  A.  I am not aware of the communications that
6  occurred between -- there were ongoing communications
7  happening between Attorney Wautier representing Edgewood
8  and Attorney John Strange.
9  My understanding is that it was implied, and
10  it may have been incorporated into a later written
11  communication.
12  Q.  That it was denied?
13  A.  Yes.  That wasn't being -- how about this;
14  that it wasn't being approved.
15  I don't know, like our office tends to not
16  deny things but tells how to get them approved, if that
17  makes sense.  It's not the negative; it's the here's
18  what you need to do in order to obtain approval.
19  It may be in the form of a denial.  It's very
20  rare and highly unusual for us to write a letter to
21  someone saying your project is being denied.  We will
22  tell them their project is being -- it requires
23  revisions or something along those lines.
24  Q.  Were you involved in the decision to not issue
25  the lighting application permit?

Page 46

1    A.  I believe that was the decision of George.
2  Was I involved?  I would have been part of the
3  discussion, yes.
4    Q.  And George is -- well, what was the rationale,
5  as you understood it, for why the existence of the
6  master plan justified the non-issuance of the permit?
7    MS. ZYLSTRA:  Counsel, to the extent this
8  involves any communications with John Strange, can we
9  have the same stipulation?
10    MR. INGRISANO:  Yes.
11    MS. ZYLSTRA:  Go ahead.
12    A.  The existence of the master plan -- can you
13  read that question back again?
14    (Record read)
15    A.  Okay.  I would need to show you Section 10.085
16  to explain that.
17    MS. ZYLSTRA:  It's Exhibit 1.
18    Q.  I'm handing you what's been marked as Exhibit
19  1, sir.
20    A.  So there are two aspects of this section.
21  First, I'll -- the first one I'll point out is
22  subsection (1) Purpose and Intent.
23    And towards -- in the last sentence of this,
24  in the Purpose and Intent, it says, "Installation of
25  outdoor lighting is not mandatory, but if installed, it

Page 47

1  shall be in conformance with the provisions of the
2  ordinance, the building code, and all other codes and
3  regulations as applicable under appropriate permit and
4  inspection."
5    And my recollection of the discussion was the
6  existence of the master plan and the words contained in
7  it, the allowances within it.  Which, that's an
8  extensive document.  There is various points where it is
9  this topic or, you know, is related to -- would be
10  inconsistent with that last sentence.  Because it would
11  result in a matter of noncompliance with an adopted
12  regulation, a map amendment, which is the master plan,
13  zoning map amendment.  That part.
14    Moving on to -- let's see here.  I'm looking
15  -- there is another section in here, and I'm sort of
16  struggling to find it right now, but -- here it is.
17    It's under "Approval Procedures," sub 5, sub
18  b:  "Upon review of the material described above, the
19  building inspection division may authorize the
20  installation of outdoor lighting fixtures."
21    And I'm pointing out the word "may,"
22  emphasizing the word "may."
23    So my recollection was those two sections
24  provided George -- were in consideration of George's
25  decision to withhold the permit.

Page 48

1    And, in turn, we offered direction to Nathan
2  Wautier on how to resolve matters to be able to -- for
3  them to be able to obtain lights.
4    Q.  Sir, who did the analysis that 10.085 (1) and
5  (5)(b) justified the withholding of the permit?
6    MS. ZYLSTRA:  Counsel, same stipulation?
7    MR. INGRISANO:  Yes.
8    MS. ZYLSTRA:  Thank you.
9    A.  All I can say is that -- all I have knowledge
10  of is that these were the sections that George used to
11  withhold issuance of the permit.
12    I don't know, I guess is a better answer to
13  your question.
14    Q.  Did you have any conversations with John
15  Strange and George Hank in which these citations, those
16  subsections of the statute were discussed?
17    A.  I probably did to be -- you know, there is a
18  lot of information here and I have a big job, so I don't
19  recall.  I'm sorry.
20    Q.  Understood.  Did George Hank come up with this
21  interpretation of 10.085 himself?
22    MS. ZYLSTRA:  Objection.  Form, foundation.
23  You can answer.
24    A.  I don't know.
25    Q.  And is it your testimony that the citation to

Page 49

1  10.085 and 10 point -- I'm sorry, 10.085 (1) and (5)(b),
2  that that was conveyed to Nathan Wautier in a written
3  communication?
4    A.  There is a written communication.  I probably
5  shared a copy of that.  I don't know about all the
6  communications between Nathan and John.
7    MR. INGRISANO:  Let's take a break.  It's past
8  10:00.
9    MS. ZYLSTRA:  All right.  We'll take a break.
10    (Recess)
11    Q.  MR. INGRISANO:  Back on the record.
12    Mr. Tucker, what role, if any, did you have in
13  the development and formulation of the interpretation
14  under 10.085 that you're saying Mr. Hank utilized to
15  withhold or deny the Edgewood permit?
16    MS. ZYLSTRA:  I'm going to object to form.
17  You can answer.
18    A.  By general practice, we operate in the agency
19  as sort of a team for bouncing ideas off or talking
20  things through, because what we do is complicated and we
21  take advantage of each other's sounding boards and such.
22    My recollection is, is that I was just made
23  aware of George's decision in that regard.  I don't
24  recall, but I probably was part of the conversation.  It
25  would be unusual for me not to be just because we worked

Page 50

1 together.
2    Q.   Do you know who suggested reliance on 10.085,
3 sub 1, in that last sentence you pointed me to?
4    A.   I don't.
5    Q.   Do you know who suggested reliance upon
6 Section 10.085, sub 5b, that you noted earlier?
7    A.   No.
8    Q.   Sir, we discussed Mr. Rewey's review and the
9 scope of his review for the lighting as a building
10 inspection department employee in Exhibit 3; correct?
11    A.   Yes.
12    Q.   And we established that he was looking for
13 technical compliance with 10.085; is that right?
14    A.   Yes, I believe so.
15    Q.   And he labeled that as "approved" as of
16 February 27, 2019, right?
17        MS. ZYLSTRA:   Object to form.   You can answer.
18    A.   That's what the report shows, yes.
19    Q.   And is it your testimony today that after
20 Mr. Rewey had approved the lighting review as being
21 compliant with 10.085 as approved, that Mr. Hank
22 subsequently decided to exercise his discretion under
23 (5)(b) of 10.085 to deny and withhold the permit?
24        MS. ZYLSTRA:   I'll object to form, foundation.
25 You can answer.

Page 51

1    A.   Yeah, I believe that's correct.
2    Q.   What did Mr. Hank express as being his
3 rationale or justification for why that was a warranted
4 exercise of his discretion?
5        MS. ZYLSTRA:   Same objection.   You can answer.
6    A.   We talked about -- if I can recall exactly
7 how.   Yeah, I don't -- can you ask me the question
8 again?   I'm sorry.   Can you read that back?
9        (Record read)
10    A.   So Mr. Hank and myself were in regular
11 conversations about this topic and issue.   And Attorney
12 John Strange was --
13        MS. ZYLSTRA:   Counsel, same stipulation?
14        MR. INGRISANO:   Yes.
15    A.   Yeah, it was more so.   Absolutely.   Like was
16 involved in the conversation.   And we were -- we were --
17 frankly, we were trying -- we were trying to understand
18 why -- um, that's not the right --
19        George and I were aware that a master plan
20 amendment was required.   We were -- we were aware that a
21 master plan amendment request was pending.
22        And that would have solved the issue had that
23 master plan amendment been approved, there wouldn't have
24 been a potential conflict.   And that was the path to the
25 permit that our discussions talked about having Edgewood

Page 52

1 take.
2    Q.   Sure.   I think my question was a little bit
3 different.
4        What did Mr. Hank express to you was his
5 rationale for why he was going to agree to use his
6 discretion and withhold that permit?
7        MS. ZYLSTRA:   Object to form.   You can answer.
8    Q.   If he didn't say anything or you don't
9 remember him saying anything, just let me know.
10    A.   I recall him and I talking about this, that
11 they need to have their master plan amendment approved
12 for the lighting to be allowed.
13    Q.   So you believed that a master plan amendment
14 was required for approval of the lights at that time; is
15 that correct?
16        MS. ZYLSTRA:   Object to form.   You can answer.
17    A.   At that point in time, we're talking about
18 after March, we've already been faced with this issue,
19 our default was working with their amendment that they
20 had already submitted to proceed towards approval.
21        So we were in a good place thinking they were
22 taking the right path.   So we were having to really kind
23 of step back and revisit the details of the master
24 plan -- it's a complicated document -- to review and
25 learn specifically what it said about something that,

Page 53

1 frankly, really caught us off guard as an alternative.
2 It was a right turn for us.   Surprising would be not out
3 of bounds.
4        MR. INGRISANO:   Can you read my question back,
5 please.
6        (Record read)
7    Q.   In February and March of 2021, did you believe
8 a master plan amendment was required in order for
9 Edgewood's light to be approved?
10        MS. ZYLSTRA:   Object to form.   You can answer.
11        MR. INGRISANO:   Can I have a basis for the
12 form objection?
13        MS. ZYLSTRA:   You're putting together two
14 months, and as I understood his testimony, as I
15 understand the documents that the time period is too
16 broad because it changed over time.
17        MR. INGRISANO:   Then he can explain that.
18 That's not a proper form objection.
19        MS. ZYLSTRA:   Well, I think it's vague as to
20 the specific --
21    Q.   All right.   Let me ask you this question then:
22        Did your position on whether master plan
23 approval, whether an -- is it your position that a
24 master plan amendment was required to approve lights,
25 did that position change at any time?

14 (Pages 50 - 53)

Page 54

1    A.  It did, yes.  And I wrote a letter to Mike
2 Elliot on the 27th of February.
3         And, at that time, once again, we were
4 reacting -- reacting to what was a surprise to us, a
5 lighting application and a communication of intent to
6 use the property.  And we wanted to warn, I guess if you
7 will, Mr. Elliot, the focus, which was install lights so
8 they can play games.
9         And we looked -- so after I had written that
10 letter, we took a very close and detailed look at the
11 master plan -- and by "we" I would indicate that would
12 be myself and George Hank and John Strange -- to see, I
13 would call it a fine toothed comb method, to determine
14 how a request for lighting would be identified under the
15 approved master plan.
16        Now, this master plan is kind of a reference
17 document.  It's not a book you read.  It's a document
18 you use that you might jump around on.
19        So we had jumped around on it before, but we
20 went back and read it in its entirety to understand
21 specifically what was being requested of us and how that
22 related to the approved master plan.
23    Q.  What input did you provide after reviewing the
24 entire document as to -- the master plan as to what
25 would need to be amended in order to grant the lights?

Page 55

1         MS. ZYLSTRA:  Counsel, same stipulation or did
2 you want it to be continued?
3         MR. INGRISANO:  Based on his review of the
4 document.
5         MS. ZYLSTRA:  Okay.
6    A.  So when I went through the documents, I looked
7 through the Open Spaces Plan.  I looked through the --
8 there is a section, and I'm paraphrasing, but it talks
9 about improvements, capital improvements, or those types
10 of things.  And then there is a section that also
11 discusses lighting.
12        And those were the three that I found that
13 related to lighting.  And so I sort of like tabbed
14 those, identified those, and understood how they related
15 to how they limited or restricted or otherwise governed
16 the property.  Identifying that those were things that I
17 believed would have needed amendment to accommodate some
18 things as individual as the lighting of February 22nd to
19 the broader use as reflected in the blank Elliot letter
20 to the families that was attached to the letter I wrote
21 on the 27th.
22    Q.  Did you have any written memoranda or email
23 communications with Mr. Hank and/or Mr. Strange in which
24 you identified the provisions that you just answered
25 about?

Page 56

1         MS. ZYLSTRA:  Same stipulation?
2         MR. INGRISANO:  Yes.
3    A.  I don't believe.
4    Q.  Sir, I'm going to hand you what's been marked
5 as Exhibit 7.  Please find all references in that
6 document to what you believe would require amendment of
7 that master plan before lights could be issued.
8         So you identified open spaces, improvements --
9 I'm sorry, improvements and lighting provisions in that
10 master plan.
11        I need you to identify on the record the pages
12 that you're relying upon.
13        MS. ZYLSTRA:  To be clear, Counsel, lights on
14 the athletic field as shown in Exhibit 3 or any lights?
15        MR. INGRISANO:  Lights on the athletic
16 field --
17    Q.  Sir, what I'm asking you to do is identify the
18 provisions that you pointed to and that you relied upon
19 that you had expressed as justifying the withholding of
20 that permit on February of 2019.
21    A.  You're asking for the three things that I just
22 identified, right?
23    Q.  If you were incomplete and there are more
24 things that you relied upon and that you communicated to
25 Mr. Hank and Mr. Strange, identify those, too.

Page 57

1    A.  Okay.
2    Q.  You do recognize that, sir, Exhibit 7 as a
3 copy of the master plan?
4    A.  Yeah, I'm assuming that's what it is.  This is
5 going to take me awhile because it's a big document.
6    Q.  Mr. Tucker, that's why we're here.
7    A.  All right.  I'm good with that.
8    Q.  Just for the record, the top of the left of
9 those pages are paginated for the exhibit for the
10 Western District timestamp, so we can rely on that.
11        MS. ZYLSTRA:  Oh, yeah, that's right.
12        MR. INGRISANO:  Go off the record.
13        (Discussion off the record)
14        (Recess)
15        (Record read)
16 BY MR. INGRISANO:
17    Q.  Go back on the record, please.
18        All right.  Mr. Tucker, you have had an
19 opportunity to review Exhibit 7; is that right?
20    A.  Yes.
21    Q.  And can you identify for me the provisions of
22 that document that are responsive to my last question?
23    A.  Sure.  The -- there is a broader campus plan,
24 page 18 in the document.
25    Q.  You're referring to page 18 where?

Page 58

1    A.   Exhibit 7, page 18, on the bottom.
2    Q.   And just because there is some conflicting
3  pagination, so let me just make sure.
4        Campus plans, also on the top right, that's
5  page 36 of 228.  Do you see that?
6    A.   Yeah.
7    Q.   Why don't we try to agree to reference the
8  pagination on the top right.
9    A.   Okay.  Sounds good.
10   Q.   So you're on page 36 of 228?
11   A.   Yeah.
12   Q.   And what language there are you relying upon?
13   A.   What I would say is it's not as much language,
14  it's the utter lack of language in the campus plan.
15       And the fact that there is -- that this campus
16  plan identifies -- does not identify the type of
17  improvement, which, you know, at the time we're having
18  this discussion it's lights, it's a press box, it's
19  expanded seating, locker rooms, concessions.
20       The utter lack of information in regard to the
21  campus plan and potential changes in the building's
22  addition, it's a building plan but it just lacks
23  information in that regard.  I will note that parking
24  lots are identified on this plan, which are not
25  necessarily buildings.  It leads us to believe that the

Page 59

1  plan does not provide a justification for us approving
2  that, lights.
3    Q.   And, again, your review when you were going
4  through this document with -- I think the phrase you
5  used was a "fine toothed comb," you were analyzing that
6  against simply the application for lights, correct, not
7  for prospective or anticipated applications for stadium
8  sound, bleachers, concessions, things like that;
9  correct?
10   A.   No, because this was a moving target.  You
11  know, we were constantly being asked to look at
12  hypotheticals and review broadly what the master plan
13  allowed.
14   Q.   The actual application before you is just for
15  lights; correct?
16   A.   It was never really before us, because it was
17  lights that involved allowing games to be played.
18   Q.   Is that in the application itself, lights that
19  allowed games to be played?
20   A.   It is not in the Exhibit 3, but it is
21  discussed by the Edgewood families in the letter that
22  Mike Elliot sent out that I had got a copy of it.
23   Q.   In an outdoor lighting application are the
24  potential uses and events to be lit by those lights, is
25  that part of what's in the application?

Page 60

1        MS. ZYLSTRA:  Object to form.  You can answer.
2    A.   It is implied.
3    Q.   Is it in the four corners of the document in
4  writing?
5        MS. ZYLSTRA:  Object to form.  You can answer.
6    A.   I don't believe so, no.
7    Q.   Is a landowner required to identify the
8  activities to be lit as a condition for approval of an
9  outdoor lighting application?
10       MS. ZYLSTRA:  Object to form.  You can answer.
11   A.   We may request that.
12   Q.   Did you?
13   A.   I'm sorry, we may request that information.
14   Q.   That would be part of Steve Rewey's typical --
15  let me ask you this:
16       How often have you requested under an
17  application for lighting under 10.085, how many times
18  have you requested in your career that follow-up
19  information from the landowner to identify the
20  activities and events that are going to be lit?
21   A.   As I stated earlier, most of the -- most of
22  the lighting applications that we receive are for
23  lighting parking lots.  So on their face, it's a parking
24  lot that's striped and has spots for cars, so on its
25  face it's obvious what the intent is.

Page 61

1        But I can't say definitively that we haven't
2  had a lighting application that was, like, for example,
3  intended to illuminate an outdoor seating area that
4  require conditional use.  You know, people are saying,
5  huh, this lighting is scary outside the building, do you
6  guys know about this over in zoning.  Because it would
7  have required a conditional use.
8        That has happened in the past.  But most of
9  the applications are for parking lots.  So like, 90 --
10  the upper 90s percentile are going to follow in that
11  category.
12       We're more trying to -- we're trying to
13  predict and not avoid problems, if you think of it from
14  that standpoint.
15   Q.   How many times have you actually required,
16  that you know of, a landowner to come back with
17  additional information to identify the activities and
18  events that are going to be lit?
19       MS. ZYLSTRA:  Objection.  Form, foundation.
20  You can answer.
21   A.   Um, and by application do you mean a -- do you
22  mean like Exhibit 3 where they actually submit a
23  lighting plan or --
24   Q.   An application that would otherwise be
25  governed by the technical specifications of 10.085.

16 (Pages 58 - 61)

Page 62

1  A.  Okay.
2      MS. ZYLSTRA:  Object to form, foundation.  You
3  can answer.
4  A.  Could I ask like a follow-up question?  I'm
5  just trying to understand this.
6  Q.  I'm asking what your practice -- I'm asking
7  how many times that you can identify in your career.
8  Because you mentioned you would go back and ask for that
9  information.  I'm asking how many times you have done
10 that.
11     MS. ZYLSTRA:  Form, foundation.  You can
12 answer.
13 A.  It's pretty rare.  I recall -- I recall one
14 athletic field one.  I do recall one in the mid-2000s.
15 I'm struggling on the details on it though.
16     It got brought to my attention because it was
17 for an athletic field, and it came from the building
18 inspection side, so it tells me that it came in as a
19 permit application like Exhibit 3.
20     But more often than not, people ask before
21 they apply.  But, you know, I would say it's rarely.  I
22 can't give you a definitive number, a very small number,
23 a handful.
24 Q.  Can you identify that field from the 2000s?
25 A.  Yeah, the Zion -- the Zion Church on West

Page 63

1  Badger Road.  A former car wash.  It's next to Burger
2  King off of Park Street.  They had approached us about
3  constructing a soccer field and had submitted a lighting
4  plan for lights on that soccer field.  It never got
5  built.
6  Q.  Okay.  Did it not get built -- well, let me
7  ask this:
8      Did the city issue permits for lights for that
9  field?
10 A.  I don't recall if permits were issued or not.
11 The field was never built.
12 Q.  Do you know why the field was never built?
13 A.  No.
14 Q.  Do you recall what you -- what your department
15 asked to follow up from the property owner in terms of
16 activities or events that were to be lighted or lit?
17 A.  Yes, we asked that.  We were attempting to
18 understand what the intent of the church was to create
19 this field.
20     We were also curious about the intended use,
21 the big issues like bathrooms and parking.  This was
22 under our old zoning code.  I believe it was a
23 conditional use.  And so we were trying to -- we were
24 trying to respond to the lighting ask with a return on
25 land use, like what are you asking for, we've got to

Page 64

1  figure out how to approve your field.  And lights are
2  going to be an aspect of it.
3  Q.  How was that property zoned at the time?
4  A.  Oh dear.
5  Q.  If you recall.
6  A.  I can't tell you.  It had a car wash on it
7  that was a disaster and got torn down.  I want to say
8  that it had a commercial zoning district on it.  CI
9  District didn't exist.
10 Q.  And it was at that time, there was no soccer
11 field there at the time, it was a proposal to develop a
12 soccer field with lighting; is that right?
13 A.  Yes.
14     MR. INGRISANO:  Go ahead and have this marked
15 as our next exhibit.
16     (Exhibit 37 marked)
17     THE WITNESS:  Did I say Zion Lutheran Church?
18 Because I don't know if they are Lutherans.  It's just
19 Zion Church.  Does it matter --
20 Q.  We won't hold you to the denomination at this
21 point.
22 A.  Okay.  Thank you.
23 Q.  We're going to come back to Exhibit 7 here in
24 a minute, Mr. Tucker.
25     But just while we're here, do you recognize

Page 65

1  Exhibit 37 as a copy of the lighting application that
2  was submitted by Madison Edgewood in February of 2019?
3  A.  I'm just trying to find a date on this.  Yeah,
4  I'm sorry, I'm trying to find a date on this just to
5  qualify and I'm struggling to find a date.
6      This may be a piece of something that was
7  attached to something that had a date on it, but I don't
8  -- unless somebody can point me to the date, I won't be
9  able to tell you when this one came in.
10 Q.  Understood.  All right.
11     MR. INGRISANO:  Let's have this marked.
12     (Exhibit 38 marked)
13 Q.  MR. INGRISANO:  Do you recognize -- let me ask
14 you this:
15     Does this document give you a little bit more
16 clarity on the application filed by Edgewood?
17     If you look at page 2 of this Exhibit 38, and
18 I'm seeing what looks like a stamp from the zoning
19 department.  Do you see that?
20 A.  Yes.
21 Q.  What does that stamp tell you?
22 A.  The page 2 stamp is our conventional site plan
23 approval stamp that we put on approved site plans.  It's
24 a wet stamp, which is basically a stamp of
25 acknowledgement that we slap on plans when we are

1 closing them out and archiving them.
2    Q.   And that stamp, do you recognize the signature
3 on that stamp?
4    A.   I do.
5    Q.   Whose signature is that?
6    A.   That's Christina Thiele's signature.
7    Q.   There is a field on that stamp with a
8 handwritten entry for date submitted.  Do you see that?
9    A.   Yes.
10    Q.   Do you have a sense from your experience as to
11 what that "date submitted" field represents?
12    A.   That would be the date that our office
13 received the application.
14    Q.   All right.  And you, sir, don't have any
15 reason to doubt or question whether Edgewood actually
16 submitted its light plan or its light application.
17        They did submit an application on February
18 22nd, did they not?
19    A.   I believe I had seen they did submit an
20 application February 22nd, yes.
21    Q.   And from a technical specification standpoint,
22 you agree with me that application met the
23 technical specifications required under 10.085; correct?
24        MS. ZYLSTRA:  Objection.  Form.  You can
25 answer.

1    A.   For some reason I thought that they had
2 included punt lighting.  That wasn't -- it might have
3 been missed by Mr. Rewey, so something about discussions
4 tells me that particularly I think Nathan Wautier might
5 have said we removed punt lighting, so it tells me that
6 the punt lighting was matched and it might have just
7 been missed.
8        So with that caveat, it seems like Mr. Rewey
9 missed the punt lighting, but otherwise it would have
10 been technically compliant with the standards of 10.085.
11    Q.   Okay.  You can put those two exhibits aside
12 for the moment.  We have digressed.
13        We were talking about Exhibit 7.  We were
14 going through your analysis of the master plan.  You
15 identified on page 36 of 228 the campus plan, and as I
16 understood it, the lack of language regarding lighting
17 as being material or important to your analysis of that
18 issue; is that fair?
19    A.   Yes.
20    Q.   Okay.  Is there anything else you want to add
21 about this page, page 36 of 228, beyond what you've
22 already said?
23    A.   Just page 36 also relates -- well, it starts
24 on page 36, but it runs through to page 39 which is a
25 map that correlate with the identified improvements,

1 including buildings and parking areas.
2    Q.   So the red on that map on page 39 of 228
3 indicates existing buildings?
4    A.   Yes.  Maroon-red is a color that indicates
5 existing buildings.
6    Q.   What, if anything, on this map identifies for
7 you the permitted uses of the existing buildings?
8        MS. ZYLSTRA:  Object to form.  You can answer.
9    Q.   If anything?
10    A.   The map references -- it references -- it has
11 numbers which speak to -- it starts back on page 36.
12        And in those references of those buildings and
13 those sites there are descriptions of use, there is also
14 descriptions of -- like, there is some parking areas
15 that have some words in the pages between 36 and 39.
16    Q.   Sure.
17    A.   That's it.
18    Q.   Got it.  So enumeration uses in the master
19 plan, like what you've pointed to here under building
20 uses, that enumeration of uses, in your view, functions
21 as a limitation of the uses, that they can only be used
22 for the uses identified in the document; is that
23 correct?
24        MS. ZYLSTRA:  Object to form.  You can answer.
25    A.   I think this is just one piece.  There is

1 other pieces of the master plan that talk about use
2 coming up later on in the document.
3        But I think they are generally covering the
4 buildings, generally touching on the use, but not a very
5 fine grain detail in pages 36 to the map on 39.
6    Q.   So, again, for 36 through 39, it was the
7 absence of language discussing lighting that you found
8 to be important?
9    A.   This is one place that we would expect to see
10 potentially an improvement at the scale of adding
11 lighting, yes.
12    Q.   Okay.  What was the next section or page of
13 the master plan that you relied upon?
14    A.   So further in this section, which I believe
15 it's called "Proposed Conditions," it's a big header in
16 the master plan on page 55.
17    Q.   55 of 228?
18    A.   Yeah, I think this is where we found it -- or
19 I found it.
20        There is a subsection called "Lighting," and
21 it talks about outdoor lights, security box lights and
22 other lights be carefully designed in conjunction with
23 this area.  And lighting shall comply with the
24 ordinances.
25        This is under -- I'm not exactly sure what

Page 70

1  this one is under by the way they have this heading set
2  up.  But it's another point where they are kind of
3  reiterating some discussion about lighting and how
4  lighting is installed.
5        I think we would expect to see a
6  non-debatable, very clear provision of allowance for
7  lighting for us to feel comfortable that the lighting
8  was allowed per the master plan.
9    Q.  So, if I may, if I understand it, you're
10  saying on page 55 of 228, on the second column, the
11  section is labeled "Lighting," you would -- in order to
12  allow lighting or to conclude that lighting would be
13  permissible under the master plan, you would want to see
14  more detail about the lighting that would cover or refer
15  to the outdoor field lighting; is that correct?
16    A.  Yes.  Part of the process of adopting a master
17  plan is to include the detail on these types of aspects
18  of the site which could have impacts on the -- on the
19  adjacent properties.
20        And we would expect to see more very -- we
21  would expect to see very clear words that included -- or
22  maps or other types of graphics than relying on the
23  limited words that we see here.
24        This master plan is a restrictive document
25  written by Edgewood, negotiated with the neighborhood,

Page 71

1  and we wanted this to be clear and this is another place
2  where it was not clear.
3    Q.  Let me stop you there for a second.  What
4  provisions -- let me ask you this:
5        We've talked a little bit about what your
6  expectations are and what you would have expected to see
7  in this document.
8        Prior to this one, how many
9  Campus-Institutional zone district master plans had you
10  reviewed and approved?
11    A.  I don't review and approve Campus Master
12  Plans, but this was the first Campus-Institutional
13  master plan that was created under the city's zoning
14  district for CI.
15    Q.  Sure.  And so who communicated what the city's
16  expectations were as to what the content of that
17  document would be to Edgewood?
18    MS. ZYLSTRA: Objection.  Form, foundation.
19  You can answer.
20    Q.  If you know.
21    A.  Well, the basic framework is in the ordinance.
22  If you read the ordinance you will see it between the --
23  you know, well, if somebody has the ordinance I could
24  read it to you.
25    Q.  Sure.  Actually, I'm going to ask you to point

Page 72

1  me to the provisions in the ordinance that you believe
2  require the level of specificity that you're saying here
3  that you expect.  And I'm going to hand you what's been
4  marked as Exhibit 13 for that purpose.
5    A.  And I'll note that this is the
6  Campus-Institutional District as it reads today in the
7  ordinance, not at the time that -- but essentially there
8  is a minor change -- maybe not a minor change, but there
9  is a change.
10    Q.  I think we can debate about that, Mr. Tucker,
11  about how minor that change actually is.
12    A.  Minor within words.
13    Q.  Let me ask you this important question then:
14        Did any of the provisions change that you
15  would rely upon to talk about, kind of the materiality
16  of the specificity of the lights, did those provisions
17  change with the October 2019 amendment?
18    A.  I'm not understanding that question.
19    Q.  What you would rely on in looking at that
20  ordinance, and say, hey, here's what we would have
21  expected from a specificity standpoint, did those
22  change?
23    A.  No.
24    Q.  So if you can go ahead and find those for me.
25    A.  Okay.  So, "Contents of Master Plan," section,

Page 73

1  subsection 5, talks about "The master plan shall include
2  the following elements and information."
3        And within that, there is a subsection called
4  "Facilities Plan."  And in that, it talks about under
5  the first part of the Facilities Plan, sub C, "Includes
6  a description of existing conditions on the campus and
7  the proposed conditions under the master plan,
8  including."
9        And it has a list, "Existing Conditions and
10  Proposed Conditions."  And one of the -- yeah, there is
11  two components.  One is "Future needs/capital
12  improvements," sub A, under "Proposed Conditions."
13    Q.  I'm sorry, sir, can you again reorient me
14  where you're looking?
15    A.  Sure.  I'm under sub 5, "Contents of Master
16  Plan," sub C, "Facilities Plan."
17    Q.  Got it.
18    A.  And then I'm in "Existing Conditions and
19  Proposed Conditions."
20    Q.  Okay.
21    A.  Existing conditions, that's probably pretty
22  obvious.
23        Proposed conditions, Future needs/capital
24  improvements.
25        My experience of administering this master

Page 74

1  plan, when Edgewood wanted to expand their parking lot,
2  the master plan showed they could do it and they were
3  able to expand their parking lot.
4        When they wanted to build a number of building
5  additions that they executed over the years that they
6  were under the master plan, we reviewed their requests
7  against the master plan and found generally those
8  projects they were proposing were generally consistent
9  with the master plan, generally.  And granted approvals
10 likewise.
11       And the installation of poles at the light or
12 lights at the athletic field is not shown in the future
13 needs or capital improvements aspect of this document.
14       I think we would also want to see under
15 proposed conditions open space areas, other open space
16 uses.  This matter is a matter of -- has been a
17 longstanding matter of focus between Edgewood and the
18 neighborhood, and we would expect clear words in the
19 ordinance that related to any modification of the use,
20 construction, additional structures, that would be
21 capital type improvements like the lighting poles.
22       And the document doesn't include that type of
23 information.
24    Q.  Okay.  Next.
25    A.  I'm going to need a little more time.  There's

Page 75

1  a -- I recall a distinct provision that I just want to
2  find that I didn't find when I was looking previously
3  when we paused related to lights.
4    Q.  Okay.
5    A.  I typically search the PDF to find the words.
6  I'm a cheater that way, particularly when I have read it
7  and then I'm looking back into it, so it's going to take
8  me a little bit of time.
9       MR. INGRISANO:  Okay.  We can go back off.
10       (Recess)
11 BY MR. INGRISANO:
12    Q.  Mr. Tucker, we took another break.  You had
13 some additional provisions you wanted to look for in the
14 document.
15       Again, and correct me if I'm wrong, we're
16 rounding out on identifying the content of the master
17 plan that you believe justified, at the time,
18 withholding the light permit.  Is that a fair summary?
19    A.  Yes.
20    Q.  Okay.  Last, we were on page 55 of 228.  We
21 talked about the lighting section on the right-hand
22 corner.
23       What next would you like to point me to,
24 please?
25    A.  I think we had one over here on 48 when they

Page 76

1  are talking about -- this is about Site One, which is
2  kind of in context.  I'm sort of like getting at all the
3  points where lighting is kind of -- it sort of sets the
4  tone for approval.
5    Q.  48, sir?
6    A.  Yeah, there is --
7    Q.  Top left?
8    A.  48, the bottom on the left side.
9    Q.  So we're going back?
10    A.  Yeah, yeah.  And then I'm -- what I'm trying
11 to do is identify all the places where lighting is,
12 because lighting is so clearly identified in multiple
13 places that it's a sensitive matter, that that's another
14 point where it kind of comes up which leads us to
15 believe that additional lighting would have been
16 prominently featured in the master plan for us to be
17 able to issue a permit.
18    Q.  I'm looking at page 48 of 228.  What about
19 that page should I be looking at?
20    A.  Towards the bottom there is a bullet that
21 says, "Ensure that parking ramp interior and lighting is
22 not visible from Woodrow Street at any time."
23       So it's something that speaks to lighting.
24 Maybe it's not relevant to the question, but it's part
25 of the master plan that speaks to the lighting.

Page 77

1       Next is on page 58.  Did we talk about that?
2    Q.  Let's go back to 48 for a second.
3    A.  Oh, sure.
4    Q.  So the reference to -- what does that
5  reference to lighting relate to?  Is that lighting for
6  all of Site One, specifically?
7    A.  Part of Site One.  It appears to be part of
8  Site One, which is adjacent to the athletic field, yeah.
9  And it's just speaking to lighting.
10       And so I provide that example of like when
11 lighting is proposed on the development of Site One,
12 it's going to be permissible.  You know, I would be
13 indicating to Edgewood or neighbors or the alder or
14 whoever, that the lighting -- the building in
15 development of Site One is acceptable.
16    Q.  Sure.  Really quick, though.  You weren't
17 involved in the negotiation or approval process for this
18 document back in 2014; is that right?
19       MS. ZYLSTRA:  Object to form.  You can answer.
20    A.  I was involved in the approval process of this
21 document.
22    Q.  And did you, at any time, ever convey to
23 Edgewood that -- let's back up for a second.
24       Prior to Edgewood adopting the master plan, it
25 could use its athletic field for any permissible purpose

20 (Pages 74 - 77)

Page 78

1 under the permissible permitted uses section of the
2 Campus-Institutional zoning code; is that right?
3    A.  That's correct.
4    Q.  And it could have added lights to that field
5 without any sort of analysis or review beyond Section
6 10.085; is that right?
7       MS. ZYLSTRA:  Object to form, foundation.  You
8 can answer.
9    A.  I believe so, yes.
10    Q.  Because, for example, when Memorial got its
11 lighting reviewed and approved in 2018, its application
12 as a Campus-Institutional zone institution was only
13 reviewed under 10.085; is that correct?  If you know.
14    A.  Well, the Memorial situation was also
15 different because it was an existing facility and there
16 was existing lighting being replaced.  But the lighting
17 was reviewed and approved under Section 10.085.
18    Q.  So do you know if Edgewood was ever notified
19 by you or anyone else during the process that this
20 master plan was being extensively and laboriously worked
21 on, that any activity not described or any proposed use
22 or condition not described in sufficient detail would be
23 prohibited?
24    A.  Can you ask that question again?
25    Q.  Sure.  Do you know if Edgewood was ever

Page 79

1 notified by you or anyone else that any activity not
2 described in sufficient detail would be prohibited?
3    A.  I would say broadly, yes.  We made it very
4 clear to Edgewood, the alder person in the district at
5 the time -- and by Edgewood, I'm speaking to the main
6 people working on this at the time.
7       So, you know, I don't recall if it was -- if
8 Mike Hall engaged, Mike Elliot was or not.  But we made
9 it very clear and everyone involved was quite happy that
10 we would have a document that would be able to guide and
11 manage everyone's expectations of the use and
12 development of the property.
13    Q.  You said "we made it very clear."  Who was the
14 "we" that was conveying that message?
15    A.  It would be myself, probably also involved in
16 the conversation would have been Tim Parks.  The
17 planning director at time was a fellow named Brad
18 Murphy, who had been involved in many of the very
19 contentious approvals at Edgewood over the years.
20       The alderperson for the district, I believe,
21 was Susan Ellingson at the time.  I think she was the
22 alder back then.
23       There were direct conversations with people
24 from the neighborhoods, their leadership people, some of
25 them I've been interacting with for as long as I have

Page 80

1 been working for the city about expectations and
2 understandings, very clearly noting that what goes in
3 the master plan will govern, will provide the
4 boundaries, the min-max, maybe you would say, for what
5 is to be allowed.
6       I'll point out that we are allowed to also
7 interpret and manage that master plan, you know, when
8 their building projects came in.  They were not precise
9 to the red-magenta, or whatever it was.
10       The buildings, those boxes didn't fit because
11 there was some understanding about how those aspects of
12 this -- but generally the additions occurred where the
13 boxes were.
14    Q.  Okay.  So it's your testimony that Edgewood
15 knew that if something wasn't identified in the master
16 plan it would not be permitted?
17    A.  Generally, yes.  With the understanding of
18 reasonableness, right?  So like the selling of snow
19 cones in the cafeteria is not going to show up in the
20 master plan.  I'm providing a ridiculous hypothetical
21 for you.
22       But the basic blueprint with expectations and
23 details is their adopted master plan, which they were
24 integral in crafting.  I was not part of the
25 negotiation, if you call it that, with the neighborhoods

Page 81

1 in Edgewood.  However, I had a check on -- like a review
2 and check on the workability of it.
3    Q.  Sure.  So look at the Campus-Institutional
4 District, Exhibit 13.  Do you have that in front of you,
5 sir?
6    A.  Yeah.
7    Q.  I'm looking at subsection 7, "Final Building,
8 Structured Parking, and Surface Parking Design Review."
9       Sub A, "All Campus Master Plans shall identify
10 building location and maximum height.  All buildings
11 properly identified on a Campus Master Plan must be
12 reviewed and approved by an Architectural Review
13 Committee prior to construction."
14       So it looks like buildings that are properly
15 identified get, what I would call, either expedited or
16 perhaps a facilitated review at the Architectural Review
17 Committee level; is that right?
18       MS. ZYLSTRA:  Object to form.  You can answer.
19    A.  No, I just think they get reviewed.  There is
20 nothing expedited about it.  But it's just done.
21    Q.  But there is no conditional use permit
22 requirement if it's on the master plan.  It gets
23 reviewed instead at the Architectural Review Committee
24 level; is that right?
25    A.  Yes.

21 (Pages 78 - 81)

Page 82

1    Q.  In your experience, is the Architectural
2  Review Committee review easier to attain and satisfy
3  than a conditional use permit?
4    A.  It depends.  I mean, one is -- there is
5  different standards.  Like a conditional use permit is
6  almost -- it's like a pass/fail.
7        And architectural review, in this context,
8  assumes the buildings are permissible, and it's talking
9  about how they look, how they are oriented, how they
10  orient, you know, their height, design, materials,
11  things along those lines.
12        So the building is given -- it's already
13  assumed it's okay.  You've worked out that detail.
14  You're not at the point of pass/fail.
15    Q.  Okay.  So what's the -- I'm hard pressed to
16  see the benefit as to why someone would have a master
17  plan as opposed to just stick with the
18  Campus-Institutional District zoning.
19        Do you have an understanding of the benefits
20  that the campus -- that the master plan is intended by
21  statute to confer?
22    A.  I find your statement shocking, to be honest.
23  Shocking.
24    Q.  I'm asking you to explain it to me, because I
25  don't understand why a school like Edgewood would put a

Page 83

1  master plan in because I don't understand what the
2  benefit is.
3        So maybe you can explain it to me.
4    A.  Sure.  So the history of Edgewood's
5  development and its expansion over time involved a
6  significant amount of tension between the two adjoining
7  neighborhoods and their associations and their
8  neighbors, okay.
9        And the reason why the Campus-Institutional
10  District exists is because Edgewood, along with UW and
11  Madison College, asked the city to find a better path
12  for their approvals, including a way to work out their
13  building expansions, interests outside of the high
14  stakes pass/fail process that is a conditional use.
15        They indicated to us that the detail, expense,
16  effort involved in preparing a conditional use
17  application for a building that could be denied was
18  relatively inequitable from their thought about what it
19  should take to work out these details.
20        And so they were front and center asking us to
21  help them create a better path for the evolution of
22  their campus, right.
23        So that's what the master plan did, was -- and
24  if you look at the site in 2013 to today, they executed
25  a number of building projects under the master plan,

Page 84

1  consistent with the master plan, that did not require
2  conditional use, were not called high risk from the
3  conditional use process.  They simply went through their
4  Architectural Review Committee, submitted building
5  permits and constructed.
6        And that, people could probably agree, is a
7  positive as compared to the past which was a great
8  challenge.
9    Q.  So those projects that were approved under the
10  master plan that you just referenced, you don't think
11  would have been able to pass under the prior regime; is
12  that fair?
13        MS. ZYLSTRA:  Objection.  Form, foundation.
14  You can answer.
15    A.  No, that's not what I'm saying at all.  I'm
16  saying that Edgewood asked us to create a more
17  predictable and -- a more predictable and, I will argue,
18  an easier way for those projects to be approved and
19  allowed which resulted in the CI District.
20        I will -- one thing I could -- I mean, I guess
21  they decide what's hard or not, but they are the ones
22  that asked us to create this district to make it easier.
23    Q.  Who at Edgewood made that request?
24    A.  We were -- the person that was running point
25  on for the three schools at Edgewood was Maggie

Page 85

1  Balistreri-Clarke.
2    Q.  You're saying that the campus -- are you
3  saying that the Campus-Institutional District zoning
4  ordinance was created at the request of Edgewood High
5  School?
6    A.  Edgewood High School, the University of
7  Wisconsin, and Madison College -- Madison Area Technical
8  College at the time -- were the three institutions that
9  approached the city.
10        They met with our consultant, they met with
11  staff, they met with the alderpersons that surrounded
12  their holdings with this interest.
13    Q.  And at the creation of this district was there
14  recognition by Edgewood that a tradeoff would be that
15  anything not in a master plan would not be approved or
16  would not be permitted?
17    A.  I wouldn't use the term "tradeoff."  I mean,
18  it was seen as an all-encompassing guiding document with
19  an alteration process if they wanted to make changes.
20    Q.  So anything not identified in a master plan,
21  say, you've got three buildings existing, okay, and you
22  have three buildings and those are identified in the
23  master plan.  Three future buildings, proposed
24  buildings, are also identified and specified.  And then
25  there is three vacant lots in the master plan.

22 (Pages 82 - 85)

Page 86

1      And over the course of the 10 years of the
2  master plan, maybe in year six a change -- you know,
3  something happens at the property owner -- I'm not
4  talking about Edgewood.  With the property owner.
5      And they decide, you know what, we'd really
6  like to change that vacant lot which was used previously
7  for a permissible use under the CI District ordinance to
8  a new, but otherwise, permitted use under the CI
9  District ordinance, but it's not in the master plan.
10      Is it your understanding that the only way
11  that that property owner can get that unspecified
12  project approved is to amend the master plan?
13      MS. ZYLSTRA:  Objection.  Form.  You can
14  answer.
15      A.  I believe that, yes, we would want an
16  amendment to the master plan to provide detail for the
17  use developments that was not outlined in the
18  pre-existing master plan at year six.
19      Q.  Even if the change that was being proposed in
20  the absence of a master plan would be governed by a
21  permitting process even lesser than a conditional use
22  permit process?
23      MS. ZYLSTRA:  Same objection.  You can answer.
24      A.  You just gave me a hypothetical that doesn't
25  relate to a master plan.

Page 87

1      Q.  Sure.
2      A.  So are you saying an under 4,000 square foot
3  building in a CI District that doesn't have a master
4  plan?
5      Q.  No.  All right.  Let's go back to your parking
6  example.
7      You've got the unspecified property.  It's not
8  recognized in the master plan as having any kind of
9  proposed use, right?
10      A.  So now you're saying that there is a master
11  plan.
12      Q.  There is a master plan, a parking lot.  It's
13  just a parking lot, no lighting.  And there is no
14  proposal in the master plan that governs lighting.
15      But in year six of the master plan the owner
16  decides I want to add lighting to my parking lot.  The
17  lighting would otherwise be governed by 10.085.
18      But you're saying they can't add that lighting
19  unless they amend the master plan.
20      Is that your interpretation of the master plan
21  requirement under the Campus-Institutional District
22  zoning ordinance?
23      MS. ZYLSTRA:  Object to form.  You can answer.
24      A.  I -- yeah, I -- I'm not sure.  That's an
25  interesting hypothetical.  A parking lot that does not

Page 88

1  have -- first off, I mean, these campus master plans
2  talk a lot about lighting.
3      So what you're saying is that the city would
4  have approved a document that had gaps in it maybe.
5      Q.  They talked about lighting with respect to the
6  four buildings that were already on -- the two buildings
7  that were already on the property.
8      A.  Well, I think if they had very prescriptive
9  language in the master plan, that yes, we would want to
10  do something to memorialize the change.
11      That's the kind of thing, like parking lot for
12  lighting for an existing parking lot, though, I'm not
13  sure necessarily that that would be perceived as a major
14  thing.  It might even be -- I don't know.  It's hard to
15  classify something like that.
16      Q.  You talked about parking lots before and you
17  advised that adding lighting to parking lots is not the
18  kind of lighting application under 10.085 that you would
19  typically give closer review to because it's very
20  straightforward; correct?
21      A.  Yes.
22      Q.  Now, we live in Wisconsin and we know that
23  parking lots aren't just used for parking; correct?
24      MS. ZYLSTRA:  Object to form.  You can answer.
25      A.  Parking lots are used are -- yeah, I'm not

Page 89

1  sure where you're going with this.
2      Q.  You live in Madison, Wisconsin.
3      A.  Yeah, yeah.
4      Q.  Monroe Street, parking lots are used to --
5  they are walled off and used for parties and tailgates
6  for game day all the time.
7      A.  Yes.  Five times a year.
8      Q.  At least.  Neighbors decide we don't want
9  lights for that parking lot because it's going to be
10  used to host tailgates into the wee hours of the night.
11  In fact, the property owner even brought temporary
12  lighting in, right?
13      So in that situation, why wouldn't you give a
14  parking lot the kind of enhanced review for lighting
15  application that you're describing now that you gave to
16  Edgewood High School?
17      MS. ZYLSTRA:  Objection.  Form.  You can
18  answer.
19      A.  So we look at a parking lot, in the use of a
20  parking lot, we're by and large not looking at the
21  one-offs, the five times a year, the unusual or unique
22  conditions.  We're treating them as reviews for lighting
23  and parking lots.
24      Those light levels may or may not even meet
25  code requirements for temporary uses.  I don't know.  It

23 (Pages 86 - 89)

Page 90

1 depends.
2        With the exception of tailgating, which we
3 don't regulate, when people do want to take down parking
4 lots in a normal place for a bar party or something like
5 that, a temporary use of a Christmas tree lot, we do
6 approve those.
7    Q.  If Edgewood wanted to use its parking lot to
8 host tailgating parties for UW Football Saturdays or
9 anything like that, would that be an approved use of the
10 parking lot under its master plan?
11       MS. ZYLSTRA: Objection. Form. You can
12 answer.
13    A.  Our -- the city's position on tailgating, at
14 least the city -- the department that I worked for, has
15 been that we don't regulate tailgating.
16    Q.  Is that a policy that Edgewood and other
17 property owners in Madison can find and apprise
18 themselves of?
19    A.  No.
20    Q.  We talked a little bit about -- we're going to
21 get back to the rest of the document. You got the fine
22 toothed comb out again, so I want to make sure you have
23 a chance to relay that.
24       We talked a little bit about the standards for
25 -- I want to talk a little about standards.

Page 91

1        What is the standard, as you read it, in the
2 Campus-Institutional District zoning ordinance on master
3 plan amendments on Exhibit 13?
4       MS. ZYLSTRA: Belated objection to form.
5    A.  So the standard for a master plan is a map
6 amendment. A master plan adoption is a map amendment.
7       Map amendments are covered in a later section
8 of the zoning code.
9    Q.  Okay.
10    A.  And your question, again, was -- can you read
11 it back to me?
12       (Record read)
13    A.  Subsection 6 is standards for master plan
14 approval.
15    Q.  Okay. That's what you would cite as the
16 standard for an amendment?
17    A.  For -- oh, I'm sorry, for an amendment. I
18 apologize. I thought you meant for -- okay.
19       So that is changes to master plan which is
20 subsection 10.
21    Q.  Okay.
22    A.  And there is a few processes there, and it's
23 -- so I believe that the -- depending on what processes
24 you're in. Because there are three options:
25       One is Plan Commission. The second is the

Page 92

1 zoning administrator can approve a minor alteration that
2 are provided the director of the department upon
3 recommendation of the alderperson, which is
4 consideration of the alderperson.
5        And then there is a third option, which is
6 substantial alterations, which go through the entire
7 process of adoption. And that does refer back to
8 Section 28.097(6), which is the standards.
9        So you could be in -- I mean, any of the three
10 in theory are probably using 28.097(6), but that's the
11 standard for consideration of alterations.
12    Q.  When you look at the Exhibit 13 in subsection
13 3, "Secondary Uses," what permissible secondary uses
14 does Edgewood's athletic field fall under or what did it
15 fall under during the master plan?
16       MS. ZYLSTRA: Object to form. You can answer.
17    A.  Under this was -- what am I looking at this
18 again?
19    Q.  Yeah, you're looking at -- well, let me ask
20 you this:
21        Edgewood's athletic field is -- regardless of
22 whether it was a master plan or not, it falls under one
23 of those secondary uses, at least one, right?
24    A.  Yes.
25    Q.  And what secondary uses does it constitute?

Page 93

1    A.  Yeah, I think it's -- without a master plan,
2 it's generally probably going to fall under the -- it
3 could be under 5, it could be under 14, which is a very
4 open-ended consideration.
5        And then in terms of the master plan, I mean,
6 it says in the master plan, it's identified in the Open
7 Spaces Plan.
8    Q.  Sure. But the use, the use of it is as an
9 indoor and outdoor -- sorry, as an outdoor sports
10 facility; correct?
11       MS. ZYLSTRA: Object to form. You can answer.
12    Q.  No. 5, under (b)?
13    A.  The use of the facility, when.
14    Q.  I'm just saying an athletic field would fall
15 under (3)(b)5. Do you agree or disagree with that?
16       MS. ZYLSTRA: Object to form.
17    A.  Generally speaking, an athletic field could
18 fall under (3)(b)5.
19    Q.  An athletic field that is being used for
20 practices, for Phy Ed classes, also falls under (3)(b)5;
21 correct?
22       MS. ZYLSTRA: Object to form.
23    A.  Um, 5 -- yes.
24    Q.  An athletic field that is used to host games
25 falls under (3)(b)5 as well; correct?

Brown & Jones Reporting                    414-224-9533
A Veritext Company                      www.veritext.com

Page 94

1        MS. ZYLSTRA:  Object to form.
2     A.   Could be.  Yep, it could.
3     Q.   An athletic field that hosts games at night
4  with lights also could fall under (3)(b)5 as well;
5  correct?
6        MS. ZYLSTRA:  Object to form.
7     A.   I think you're probably leaning more towards
8  16 in that one.  But I mean, we have conflicting -- you
9  know, there is overlap here.
10        So you tend to -- at least when I had always
11  administered zoning, you know, what you just described I
12  think it was more like 16 than 5.
13     Q.   Sure.  Have you ever seen an outdoor sports
14  facility with lights that doesn't rise to the level of
15  being a stadium?
16     A.   Outdoor sports facility with lights that
17  doesn't arise to the level of being a stadium.  Yes.
18        Whatever an outdoor sports facility means.  I
19  don't really know what that means, but --
20     Q.   Well, do you not have an interpretation of
21  what an outdoor sports facility is?
22     A.   As we're talking?
23     Q.   As the former zoning administrator and as the
24  current building inspection department director, do you
25  have an interpretation of what an outdoor sports

Page 95

1  facility is?
2        MS. ZYLSTRA:  Object to form.  You can answer.
3     A.   I think we would find a position on something,
4  yes.  We would -- we would, you know, consider what
5  we're looking at.  It's a very broad question.
6        Is a backstop at a field an outdoor sports
7  facility?  Is a golf course an outdoor sports facility?
8  I mean, those are two very distinctly different things.
9     Q.   So are you kind of resting then on this -- you
10  seem to be focusing on the word "facility" and is a
11  field a facility.
12        MS. ZYLSTRA:  Object to form.  You can answer.
13     A.   I think I'm more about sports.  I don't --
14  that's -- I would want to speak in more precision than
15  generality on something like that.
16     Q.   So sports and recreational.  Do you draw a
17  distinction between sports and recreation?
18        MS. ZYLSTRA:  Object to form.
19     A.   Yes.
20     Q.   And what's that distinction, what's the
21  difference?
22        MS. ZYLSTRA:  Same objection.
23     A.   Well, once again, like sports, are we talking
24  -- you know, you might classify a group of brothers
25  getting together to play football on Christmas Day as

Page 96

1  sports.  I might call that recreation.
2     Q.   Sure.
3     A.   And then you might call a contest between two
4  teams recreation and I might call it sports.
5        If I use that term, I don't know, I struggle
6  with those terms.
7     Q.   And that might be why those two are grouped
8  together under 5?
9        MS. ZYLSTRA:  Object to form.
10     Q.   Because of the difficulty in distinguishing
11  between sports and recreation, we should just put them
12  together in the same -- in the same branch for ease of
13  interpretation?
14        MS. ZYLSTRA:  Objection.  Form, foundation.
15  You can answer.
16     A.   Well, considering the all-encompassing nature
17  of the CI District, I think there was an idea of trying
18  to group outdoor things together.
19        And just the basic language of the basic
20  district as common people may look at it, both people
21  that are in the district, people that live in proximity
22  to the district.
23     Q.   So going back to my discussion about the
24  evolution of the athletic field.
25        The athletic field that is used for practices

Page 97

1  and the athletic field that is used for games and the
2  athletic field that is used for games at night under
3  lights.
4        Under each step of that, kind of what I'll
5  call an evolution, in each step of that process, it
6  still has never left and remains categorized as a
7  permitted use under (3)(b)5; correct?
8        MS. ZYLSTRA:  Objection.  Form.
9     A.   One of my -- like, who am I looking at this?
10  I'm not really understanding --
11     Q.   Your testimony before was that an athletic
12  field where the practices occur on is permitted
13  secondary use under (3)(b)5.
14     A.   Okay.
15     Q.   Right.  Your testimony before was that an
16  athletic field upon which games were played is also no
17  change, it's a (3)(b)5 permitted use; correct?
18     A.   Uh-huh.
19     Q.   And then if their games are played at night
20  under lights, it's still a (3)(b)5 permitted use;
21  correct?
22        MS. ZYLSTRA:  Objection.  Form.
23     A.   Yeah, it could be, yes.
24     Q.   If the only differences are the types of
25  activities that are occurring on that field, all of

Page 98

1 which are athletic in nature or recreational in nature,
2 and the timing of when those activities occur, it's
3 still being used for outdoor sports or recreation; isn't
4 that true?
5        MS. ZYLSTRA: Objection. Form.
6    A. I believe so, yes.
7    Q. And under subsection 10 of the
8 Campus-Institutional District, only a change to a
9 proposed use of an identified space is considered an
10 alteration that requires an amended master plan;
11 correct?
12    A. No.
13    Q. So changing types of activities of a (3)(b)5
14 outdoor sports and recreational facility requires master
15 plan approval?
16        MS. ZYLSTRA: Object to form.
17    Q. I'm sorry, master plan amendment approval.
18        MS. ZYLSTRA: Same objection. You can answer.
19    A. Now, once again, you're -- I'm not
20 understanding under what -- so it sounds like you're
21 talking about no master plan and then your question
22 jumps back into whether a master plan exists or not.
23 I'm not --
24    Q. No, I'm assuming your master plan at all --
25 well, we're talking about secondary uses, talking about

Page 99

1 secondary uses, right?
2    A. Right.
3    Q. And master plans have to identify use, right?
4    A. Right.
5    Q. And we have been talking the entire time about
6 (3)(b)5 indoor and outdoor sports and recreational
7 facilities.
8        And my question is, only if you're changing
9 the nature of the secondary use under (b), that is the
10 only type of change on an open space proposed use as we
11 see under 10:
12        "No alteration of an approved Campus Master
13 Plan, including changes of the proposed use of
14 identified open space areas."
15        Here -- and the example of the different types
16 of athletic fields, all those were the same proposed
17 use, (3)(b)5; correct?
18        MS. ZYLSTRA: Objection. Form, misstates
19 prior testimony. You can answer.
20    A. This isn't relevant. We're in a master plan.
21 This ordinance that you're asking me about questions is
22 not where I am working. I'm working in this master
23 plan.
24    Q. So the subsection (3)(a) and (b) of the CI
25 District ordinance, 28.097, does not apply in the

Page 100

1 context of a master plan?
2    A. The master plan that is adopted, which is
3 approved consistent with the ordinance, is what applies.
4    Q. And that ordinance says that the master plan
5 should -- when we're talking about uses. Uses are laid
6 out in (3)(a) and (3)(b); correct?
7        MS. ZYLSTRA: Object to form.
8    A. There is a -- there is the indication of the
9 uses that is, however, there is an adopted master plan
10 that we would look at, that we would -- we would steer
11 to.
12        We would not be looking at Section 28.097,
13 because there is an adopted master plan that has
14 encompassed all of the -- it should encompass all of the
15 requirements of Section 28.097.
16        So I'm not looking at Section 28.097. I'm
17 looking at the master plan. This is a -- this is a
18 document that has been approved by the city that is
19 effectively a guiding document for the questions that
20 you're asking.
21    Q. But the questions I'm asking relate to when a
22 master plan is required to be amended and you pointed to
23 Section 10. Section 10 uses the phrase "use," proposed
24 use, changes to proposed use.
25        Are you saying that the word "use" in Section

Page 101

1 10 does not relate or refer to the uses that are
2 outlined in (3)(a) and (3)(b) of the same statute?
3    A. I think it does, but that has been
4 incorporated into the master plan.
5        So the master plan document has gone through
6 and established the approved location and other aspects
7 of those uses in the master plan.
8    Q. So you're saying if the master plan can be
9 more specific of the type of (3)(b)5 outdoor sports
10 facility, and that that master plan, therefore, that
11 level of specificity controls for purposes of when an
12 amendment would be required; is that right?
13    A. That is, we would expect that the detail --
14 the master plan is many more pages than the zoning code.
15        The master plan will have the detail that we
16 would look to for understanding the conditions by which
17 that use is allowed to occur.
18    Q. And those expectations that you have, you've
19 referenced your expectations multiple times, those
20 expectations come from years of interpreting multiple
21 Campus-Institutional District master plans; correct?
22        MS. ZYLSTRA: Object to form.
23    A. There are two Campus-Institutional master
24 plans. That would not be -- I would have a different
25 basis than that, which is the basis by which a master

26 (Pages 98 - 101)

Page 102

1 plan is approved which is outlined in the ordinance.
2     Q.  So your expectations have been established by
3 and are being exercised upon the very first
4 Campus-Institutional master plan seen by the City of
5 Madison; correct?
6         MS. ZYLSTRA:  Object to form.  You can answer.
7     A.  Somebody had to be first.
8     Q.  Be careful what you wish for, right,
9 Mr. Tucker?
10     A.  They like the permits they got.  The structure
11 of this ordinance and the process for approval -- I'm
12 trying to get my words right here.  Let's see if I can
13 find it.
14         When you look at the Statement of Purpose of
15 the master plan, it is intended to provide clarification
16 between the institution and its neighbors.
17         So the expectation is they have a blank slate
18 to write this master plan in consideration of the
19 primary and secondary uses.  They have an opportunity to
20 provide significant detail, and that detail is relied
21 upon between the partners to understand the use of the
22 property under the terms of the master plan.
23     Q.  The neighborhoods and the neighbors are not a
24 party to this master plan, are they?
25         MS. ZYLSTRA:  Object to form.

Page 103

1     A.  Interestingly, this master plan has a section
2 that talks about incorporation of previous agreements
3 with the neighborhoods.  So it has brought into it, in
4 the spirit of goodwill and cooperation, the
5 understandings.  I mean, they are not the neighbors.
6 They are in the document.
7     Q.  You and Mr. Parks, though, recommended repeal
8 of the master plan when that issue came before the Plan
9 Commission and Common Council; correct?
10     A.  Yes.  I don't know what -- I can't speak on
11 behalf of Mr. Parks, and I didn't recommend it, although
12 we didn't oppose them repealing it, yeah.
13     Q.  And as part of that process, it was determined
14 -- statements were made that, in essence, this is not a
15 contract or an agreement between the neighbors and
16 Edgewood that the city should be in the business of
17 enforcing; correct?
18         MS. ZYLSTRA:  Object to form.  You can answer.
19     A.  Can you re-ask me that question again?  It had
20 a lot in it.
21     Q.  Yeah.  You advised the Plan Commission and the
22 Common Council that the master plan is not a traditional
23 agreement between Edgewood and its neighbors that the
24 city is tasked with enforcing; correct?
25         MS. ZYLSTRA:  Object to form.

Page 104

1     A.  I don't know what you mean, but adopted master
2 plans were tasked with enforcing, so --
3     Q.  Is a master plan an agreement between the
4 property owner and the property owner's neighbors?
5         MS. ZYLSTRA:  Object to form.  You can answer.
6     A.  No.
7     Q.  The master plan identifies a space on the
8 property as a proposed tennis court.
9     A.  Are you asking or telling?
10     Q.  I'm asking a question.
11     A.  Oh, okay.  I'm sorry.
12     Q.  If a property on -- a property that identifies
13 a space in its master plan as a proposed tennis court,
14 if the property ever changes its mind and wants to make
15 a basketball court instead, does that require a master
16 plan amendment?
17         MS. ZYLSTRA:  Objection to form.  You can
18 answer.
19     A.  In its purest sense, I would say that if they
20 wrote themselves into a tight box that said "basketball
21 court" and they wanted -- or "tennis court" and they
22 wanted to switch to a basketball court, they've written
23 themselves into a tight box.
24         We would be more than happy to consider as an
25 alteration clarification of the language so there was no

Page 105

1 ambiguity or question for that institution.  That's what
2 we do all the time in my job.
3         But if they wrote themselves into a tight box,
4 we would hold them to those words.
5     Q.  Is it your expectation that -- well, you've
6 talked about your expectations and there has to be a
7 certain level of specificity.
8         Are you requiring that tight box?  Would you
9 allow a property owner to just put "court" on a master
10 plan such that you're leaving the particular use open?
11         MS. ZYLSTRA:  Objection.  Form.
12     A.  I don't believe so, because the master plan
13 requires you to identify the uses and buildings, like,
14 we would look for clarification, generally.
15         But I hope you think we're not that -- well,
16 let me just say, like, we have two master plans that we
17 have dealt with in this scenario and we strive for
18 clarity in the words in those master plans.  We have one
19 now, but we had two.
20         MR. INGRISANO:  Mark this as the next exhibit,
21 please.
22         (Exhibit 39 marked)
23     Q.  MR. INGRISANO:  Sir, I'm handing you what's
24 been marked as Exhibit 39.  Are you familiar with this
25 document?

27 (Pages 102 - 105)

Page 106

1    A.   Yes.
2    Q.   Have you seen it before?
3    A.   Yeah, I probably reviewed it back in 2014.
4    Q.   And this is the Planning Division Staff Report
5  prepared for the Plan Commission, dated March 24, 2014;
6  correct?
7    A.   Yes.
8    Q.   And the application type is adopting
9  Campus-Institutional CI District master plan, and this
10 is the Edgewood matter, right?
11   A.   Yes.
12   Q.   Let me ask you to turn -- referencing the
13 pagination on the top right-hand corner, let me ask you
14 to turn to page 8 of 12.
15        And let me ask you to look at the one, two,
16 three -- fourth paragraph there and read along with me
17 here:
18        "The master plan document includes a series of
19 agreements between the institutions and the
20 Dudgeon-Monroe and Vilas neighborhood associations,
21 which were created to address past as well as
22 anticipated future issues related to the campus.  These
23 agreements are included in the plan by reference, and
24 are an essential element in fostering a positive
25 relationship between the campus and its neighbors.

Page 107

1  However, it should be noted that the city is not
2  specifically a party to the agreements in Sections 4.2
3  and 4.3, and enforcement of those agreements rests
4  outside of the city's zoning powers.  Additionally, the
5  agreement in Section 4.4 regarding the implementation of
6  the master plan and future operations of the campus
7  would also not likely be enforced through the city's
8  zoning powers."
9        Did I read that correctly?
10       MS. ZYLSTRA:  Objection.  Rule of
11 completeness.
12   Q.   Is there anything in the last few sentences in
13 that paragraph render what I just read to you misleading
14 or un-understandable?
15   A.   Sorry, you're starting with the word
16 "however"?
17   Q.   I started with the word "The master plan
18 document," through there.
19   A.   Oh, okay.
20   Q.   I'll keep reading the rest of the paragraph.
21       "While the city will have a regulatory role in
22 implementing the master plan through its review of
23 specific projects against the final approved plan and
24 City ordinances, staff foresees participating in the
25 implementation of the past and proposed agreements

Page 108

1  through its role on the proposed Architectural Design
2  Review Committee in Section 4.5 and an assisting in
3  resolving any conflicts that may emerge in the future,
4  but not through zoning enforcement."
5        Do you see that?
6    A.   Uh-huh.
7    Q.   Okay.  So let me ask you this:
8        The agreements between Edgewood and its
9  neighbors have nothing to do with your department; isn't
10 that right?
11       MS. ZYLSTRA:  Objection.  Form.
12   Q.   And that they are completely unrelated to the
13 enforcement of CI District ordinance in the master plan?
14       MS. ZYLSTRA:  Same objection.
15   A.   I'm not intimately familiar with the
16 agreements between Edgewood and its neighbors.
17       But generally, our office doesn't get into
18 enforcement of private agreements between property
19 owners.
20   Q.   Consistent with the language in Mr. Parks'
21 memo that you're familiar with, where it says,
22 "enforcement of those agreements rests outside the
23 city's zoning powers"; correct?
24       MS. ZYLSTRA:  Same objection.
25   A.   Yes.

Page 109

1    Q.   Okay.  So while fostering goodwill between
2  Edgewood and its neighbors is a nice aspiration, it's
3  not part of your job in deciding Edgewood's rights and
4  restrictions to its property under the zoning
5  ordinances; correct?
6        MS. ZYLSTRA:  Objection.  Form.
7    A.   So can you like -- can you read that -- can
8  you ask me that question again?
9    Q.   My simple question was, while fostering
10 goodwill and good relations between Edgewood and its
11 neighbors is a nice aspirational goal for the city, it's
12 not part of your zoning enforcement responsibilities;
13 correct?
14   A.   Oh, zoning enforcement?
15   Q.   Yes.
16   A.   No.
17   Q.   All right.  I don't think we've gotten our way
18 through Exhibit 7.  So we left off, again, talking about
19 the provisions of the master plan that you were relying
20 upon.
21   A.   Could we pause for just a little bit so I
22 could use the bathroom?  Or do you want me to finish --
23 you're in a question, so I don't --
24   Q.   Well, let me ask you this.
25   A.   Okay.

28 (Pages 106 - 109)

Page 110

1    Q.  How many more sections of the master plan are
2  you going to highlight for me?
3    A.  Three or four maybe.
4    MR. INGRISANO:  Okay.  Why don't we take a
5  break then.
6    (Lunch Recess)
7  BY MR. INGRISANO:
8    Q.  All right.  Mr. Tucker, we are going to get
9  through Exhibit 7 if it kills us both.
10   A.  I'm up.
11   Q.  So, again, we're looking through Exhibit 7 to
12 identify what you had relied upon in coming to your
13 conclusion that the Edgewood lighting application should
14 be withheld because of the contents of the master plan.
15     Is that a fair recitation of our exercise?
16   A.  Yes.
17   Q.  Okay.  And as we left off last, I believe I
18 was on page 48 of 228 of Exhibit 7, where you had
19 pointed out the second bullet point from the bottom on
20 the left-hand column that said, "Ensure that parking
21 ramp interior and lighting is not visible from Woodrow
22 Street at any time."
23     Do you see that?
24   A.  Yes.
25   Q.  If we are done talking about this page, can we

Page 111

1  move on to your next provision that you found to be
2  important?
3    A.  Sure.  So the next one will be -- we talked
4  about page 55 already.  We actually jumped back.
5      So the next one will be up on page 58.  And
6  this is another -- this is in -- this is under a
7  subsection called "Architectural Guidelines for
8  Perimeter Buildings."
9      And sub 7, which identifies site and building
10 lighting language, and there is an (a) and a (b) that
11 relates to lower height site lighting and non-glare and
12 cutoff shielding.
13     Good detail for us to rely on in understanding
14 lighting relative to this section.
15   Q.  Okay.  Thank you.  Next?
16   A.  We've got -- there is another -- this is
17 weird, actually, this one.
18     There is the subsection on page 80 that talks
19 about lighting, so it talks about pole lights at the
20 east and west ends of campus.
21     It's on page 80, on the right side, No. 4,
22 talking about site lighting, safety lights being turned
23 off, more sensitivity.  It kind of relates to the
24 broader context of lighting across the campus.
25   Q.  Okay.  Next?

Page 112

1    A.  I think that that's it.
2    Q.  Okay.  So all those provisions you just
3  pointed me to I believe dealt with the subject of the
4  lighting; is that correct?
5    A.  Yeah, that make reference to lighting, uh-huh.
6    Q.  You had mentioned that at some point in time,
7  in Exhibit 3, after Christina Thiele advanced her
8  workflow, checked the -- you know, had the drop down
9  approved, you said this matter came to your attention.
10     But if I'm recalling correctly you don't
11 recall precisely how it came to your attention?
12   A.  Yeah, I don't recall.  We just became aware
13 that the lighting submission on Exhibit 3 had been
14 advanced to completion.
15   Q.  Got it.  When you say "we," I got the sense at
16 some point after that came to your attention there was a
17 group that kind of sort of got together and began
18 looking at this issue and that group at least included
19 you and Mr. Strange and George Hank; is that fair?
20   A.  Yes.
21   Q.  Is there anyone else in that group that would
22 have been getting together to put their heads together
23 on this?
24   A.  Not that I recall, but it wouldn't surprise me
25 if Mike May, being the city attorney, wasn't

Page 113

1  tangentially involved.
2    Q.  Sure.  Do you have a sense of when this group
3  began looking at this issue, the issue of the lights and
4  the master plan applicability?
5    A.  Yes.  We had been interacting with Attorney
6  Nathan Wautier who was sort of fronting on this project
7  for Edgewood.
8      And because we had a pending application for
9  alteration of the master plan that was submitted and we
10 were in ongoing conversations -- some I participated in,
11 others I did not -- about different alternatives that
12 would be available for Edgewood to have an opportunity
13 to have lighting approved, or whatever else it is they
14 may have wanted -- call it stadium, call it games, call
15 it a change to reflect their usage of the space
16 consistent with what I had learned from that October
17 meeting.
18   Q.  But, again, I think where I'm trying to get a
19 sense from is more the timing.
20     At one point you referenced that your group
21 sat down, read through the master plan, and I think the
22 phrase you used was "fine toothed comb."
23     When was the fine toothed comb pulled out and
24 when were you kind of getting yourself comfortable with
25 the idea that the master plan and the provisions that

29 (Pages 110 - 113)

Page 114

1 you've identified for us permitted, if not justified,
2 withholding that permit?
3        MS. ZYLSTRA: Object to form. You can answer.
4    A.  So, Nathan Wautier kept coming back to us with
5 hypotheticals, alternative ideas, questions, and it was
6 -- you know, we needed to respond.
7        And so it was after -- I would say it would be
8 in the beginning of March, early March, that we were --
9 you know, to respond to those we were spending time, I
10 guess, if you will, because they weren't -- they weren't
11 proceeding with their application for alteration for
12 some reason that we couldn't understand. We were
13 struggling to understand why.
14   Q.  All right. So there is a disconnect in my
15 mind. I'm going you to ask you to try to help me fill
16 it up.
17       So we go from a situation where Christina
18 Thiele is completing her workflow, there is recognition
19 of a problem that gets communicated to you -- however
20 that happened -- your group pulls out a fine toothed
21 comb and begins the review.
22       What questions was Nathan Wautier asking other
23 than "where is my permit"?
24       MS. ZYLSTRA: Object to form. You can answer.
25   A.  So I don't recall or if I was necessarily

Page 115

1 point on discussions with Nathan, because my
2 understanding was he was having conversations with John
3 Strange, which is what happens, you know. It's not
4 unusual for the lawyers to be talking.
5    Q.  Lawyers talk to each other. I get it.
6    A.  Yeah. So I get -- I get sort of brought back
7 in, in consideration of these ongoing discussions to
8 process these hypotheticals or understand what it is.
9        Because we're -- I would say we were -- like I
10 said, we were surprised of the lighting plan submission
11 when there was a pending master plan alteration in our
12 office.
13       It was "what do they want to do." We were
14 trying to figure out what -- these are things that we
15 felt a responsibility to respond to, but they were
16 different proposals and it was unclear and so we were
17 trying to un-puzzle that.
18   Q.  Sure. I guess where I'm struggling is, at
19 some point in time someone must have apprised Nathan
20 that there was an issue such that he was even asking
21 follow-up questions and posing hypotheticals; is that
22 fair?
23       MS. ZYLSTRA: Objection. Form, foundation.
24 You can answer.
25   A.  So your question was what again?

Page 116

1    Q.  So at some point in time the problem is
2 recognized, brought to your attention.
3        Is Edgewood informed that -- is Edgewood and
4 Nathan informed that, hey, there is a problem that we're
5 looking into, we're not issuing the permit?
6    A.  Oh. I am not aware of when Nathan or
7 representatives of Edgewood's were informed. I just
8 wasn't -- I don't have any recollection of that.
9    Q.  So you don't know as far as when Edgewood and
10 Nathan were informed about the existence of a
11 complication that was being reviewed, you don't know
12 when that happened in relation to when you and John and
13 Hank pulled out the fine toothed comb?
14   A.  We would have -- we would have studied the
15 master plan and come to a position, and then I believe
16 that we would have informed Edgewood vis-à-vis Nathan,
17 maybe, but I don't really know, once again.
18       And this is happening -- the timing on things
19 is also like there is the -- I'm not exactly sure. And
20 to your -- I mean, I'm not privy to all the
21 conversations and I'm sort of doing my part and --
22   Q.  Do you recall there being any sit down
23 meetings that was part of what I'll call that fine
24 toothed comb process that you were describing where
25 you're sitting down, reviewing the master plans, talking

Page 117

1 through the provisions were your group -- John and
2 Mr. Hank and you -- were you guys meeting in person,
3 were you meeting on the telephone, communicating by
4 email, or some kind of combination of those things?
5    A.  I believe we had a meeting in person, and I
6 remember because I recall reviewing the master plan on
7 our -- I have a large television like that, a monitor
8 for us to commonly share.
9    Q.  Got it. And that's in your offices?
10   A.  Yeah, it would have probably been in my office
11 in the municipal building.
12   Q.  Got it. And then so to the best of your best
13 recollection, John and Hank would have been in that
14 in-person meeting?
15   A.  Yes.
16   Q.  I'm calling him Hank, sorry. Mr. Hank.
17       And then do you know how many meetings the
18 three of you had?
19   A.  No.
20   Q.  In addition to that meeting with the master
21 plan on the big screen, were there any other telephone
22 calls or emails where you guys were exchanging your
23 thoughts and impressions and analysis on this issue?
24       MS. ZYLSTRA: Same stipulation?
25       MR. INGRISANO: Yeah.

Page 118

1    A.   Not that I recall.  Not that I recall.
2    Q.   To the best of your recollection, you said you
3  all went through the master plan with a fine toothed
4  comb, you called it, did that review, that detailed
5  review of the master plan, did that occur in that
6  meeting on that screen, the three of you together,
7  walking through the master plan kind of front to back?
8    A.   What I recall was we were focused in on specific
9  sections.  To be clear, I don't think we -- I don't
10  recall us pulling up the master plan and word by word
11  going through it, okay, but I recall us spending time
12  focusing in on the particulars, the sections, searching
13  words, doing what we could to say, okay, really, how do
14  we understand how an aspect that is detached from a
15  stadium and a press box and a concession stand and
16  restroom building, which exclusively lighting falls
17  within the context of the master plan.  That was what we
18  were kind of focusing in on.
19    Q.   Was the meeting with the big screen, is that
20  where your conclusions from the master plan about the
21  provisions you just outlined for us, the ones you found
22  to be relevant, were those provisions the result of that
23  big screen meeting?
24    A.   I'm not totally sure.  By "those provisions,"
25  what are you --

Page 119

1    Q.   The provisions you highlighted for me in the
2  master plan.
3    A.   Oh, this.  Yeah, we identified --
4    Q.   Yeah, Exhibit 7.
5    A.   Sorry to speak on top of you.
6    Q.   No, that's okay.
7    A.   That was where we were attempting to find
8  anything that would relate to our formulating our
9  interpretation to the right associated with the master
10  plan showed that Edgewood was allowed to do for use and
11  improvement of the facility.
12    Q.   To the best of your recollection, was that
13  meeting -- in that meeting, did you walk into that
14  meeting with the master plan provisions already
15  identified that you were going to present to Mr. Hank
16  and Mr. Strange, or were the provisions that you
17  identified in paragraph 7 part of the process from that
18  meeting on the big screen?
19    MS. ZYLSTRA:  Same stipulation?
20    MR. INGRISANO:  Yes.
21    A.   I honestly don't recall if I -- you know,
22  three years ago, four years ago.  I can't remember.  I
23  don't recall.
24    Q.   Understood.  It was awhile ago.  All right.
25    I'm handing you what's been marked as

Page 120

1  Exhibit 6.  This is a letter from you to Mike Elliot,
2  dated February 27, 2019; correct?
3    A.   Uh-huh, yes.
4    Q.   And comparing it to Exhibit 3, the date of
5  this letter is the same date that Christina Thiele would
6  have completed her workflow on the zoning review; is
7  that correct?
8    MS. ZYLSTRA:  Objection.  Form.
9    A.   No.
10    Q.   I'm sorry.  Is it fair to say that the date of
11  this letter is the same date that Mr. Rewey completed
12  his workflow on the lighting review?
13    A.   Yes.
14    Q.   Did Ms. Thiele, in doing her workflow on March
15  -- you said on March 1; correct?
16    A.   Yes.
17    Q.   Had she been apprised of your letter dated
18  February 27 as part of or prior to her workflow tasks on
19  March 1?
20    A.   I don't recall.
21    Q.   So the first paragraph of your letter, Exhibit
22  6, that's your signature on the bottom of Exhibit 6?
23    A.   It is, yes.
24    Q.   First paragraph says, "On Friday, February 22,
25  the building inspection division accepted a lighting

Page 121

1  plan filed by Forward Electric on behalf of Edgewood
2  High School, to install lighting for the school's field.
3  Those plans will be reviewed for compliance with MGO
4  Section 10.085, and if the plans comply, electrical
5  permits will be issued when requested."
6    Do you see that?
7    A.   Yes.
8    Q.   The next line of your letter says, "The City
9  believes this permit can be issued without requiring
10  amendment of the approved 2014 master plan."
11    Did I read that sentence correctly?
12    A.   Yes.
13    Q.   Then you go on to discuss the attachment to
14  Exhibit 6 which is a letter to Edgewood; is that right?
15    A.   Yes.
16    Q.   To the Edgewood Family?
17    A.   Yes, yes.
18    Q.   And attaches a Q and A?
19    A.   Yes.
20    Q.   Your next paragraph of your letter goes on to
21  identify that -- well, it just says:
22    "Based on the information the city currently
23  has regarding the historical use of the facility, it
24  would appear that the intended use of the facility
25  outlined in your letter to the Edgewood Family and

Page 122

1 detailed in the "Frequently Asked Questions" document
2 would conflict with the approved 2014 Master Plan for
3 the site, which limits use of the facility to team
4 practices, physical education classes.  Page 42, Section
5 3.8, Open Space Plan."
6          Did I read that right?
7     A.   Yes.
8     Q.   You did not reference the Open Space Plan,
9 Section 3.8, in your response to my question about
10 Exhibit 7 and the content that you found to be material
11 and important to your analysis of whether or not to
12 issue the light permit; correct?
13     A.   Section 7 in the ordinance?
14     Q.   I'm sorry, Exhibit 7.
15     A.   Exhibit 7, which is the --
16     Q.   The master plan.  So when you went through
17 Exhibit 7, right, to find all the provisions you relied
18 upon that you found to be relevant, you did not
19 reference 3.8.
20     A.   Yes, I believe that's correct.  It wasn't one
21 of the tab sections.
22     Q.   So in March, then, when you were going through
23 with your fine toothed comb working with John Strange
24 and Mr. Hank, 3.8 was not relevant to your decision then
25 and analysis not to issue that permit.  Is that what

Page 123

1 you're saying?
2     A.   No.
3     Q.   It was important?
4     A.   Yes.
5     Q.   So let's go back to Exhibit 7 and find 3.8 on
6 page 42, which I believe is page 60 of 228 on 7.
7          So what from this page, what from 3.8, the
8 Open Space Plan, was material for you in the decision to
9 withhold the light permit from Edgewood?
10     A.   What was material would be the lack of words,
11 information in the Open Space Plan that referenced an
12 interest to light the athletic field.
13     Q.   So the absence of language regarding lighting
14 in 3.8 was what was material to you after March 1.  Is
15 that what you're saying?
16     A.   Yes.
17     Q.   Okay.  And before March 1, on February 27, you
18 were focused instead on the Open Spaces section Item No.
19 1, the description of the athletic field; is that
20 correct?
21     A.   Open spaces section, page 42, Section 3.8,
22 yeah.  Item 1, which was -- Item 1 is identified on the
23 map and referenced in page 42, yes.
24     Q.   And then your last paragraph on Exhibit 6,
25 says, "The purpose of this letter is to inform you that

Page 124

1 the issuance of any lighting permit under MGO Section
2 10.085 does not change the city's position that the use
3 of the facility under the master plan is limited to team
4 practices, physical education classes."  See that?
5     A.   Uh-huh, yes.
6     Q.   As of February 27, in Exhibit 6, your position
7 was that the contents of the master plan did not
8 themselves impact or prohibit the issuance of the
9 Edgewood permit; is that correct?
10     A.   Yes.
11     Q.   And that was no longer your position after
12 March 1; is that correct?
13     A.   Yes.
14     Q.   And in preparation of the February 27, 2019
15 letter, you had reviewed the master plan; correct?
16     A.   Yeah.  Yes, I would say the letter itself
17 implies, because I'm referencing a section, that I did
18 review the master plan, yes.
19     Q.   And after March 1, what caused you to go back
20 and re-evaluate the position that you set forth on
21 February 27?
22     A.   My discussions with George Hank in Section
23 10.085.
24     Q.   Okay.  And which section under 10.085 are you
25 referring to?

Page 125

1     A.   The Statement of Purpose we discussed earlier.
2 Let me see if I can find --
3     Q.   The two provisions you pointed to me before?
4     A.   Yes, sir.
5     Q.   Okay.  Between you and Mr. Hank, who initiated
6 that re-evaluation?
7     A.   I don't recall.
8     Q.   In light of the fact that you had set forth
9 the position on February 27th, was there any
10 communication you received from outside of your
11 department from any source that caused or contributed to
12 your decision to re-evaluate your position?
13     A.   Not that I recall.
14     Q.   Why did you re-evaluate your position?
15     A.   Mr. Hank, my supervisor, and I expressed -- he
16 came to me, from what I recall, and he was greatly
17 concerned that the -- that letting the lighting plan be
18 issued, the installation of the lights and the intent of
19 uses described in the Edgewood families would create an
20 unfavorable legal situation for the city in regard to
21 the master plan conflict with master plan allowances for
22 use of the facility.
23     Q.   So why did that warrant re-evaluating your
24 position from February 27?  You had already stated in
25 this letter that the Open Space Plan, the allowances

Brown & Jones Reporting
A Veritext Company

414-224-9533
www.veritext.com

Page 126

1 don't impact the issuance of the permit; correct?
2         MS. ZYLSTRA: Objection. Form, foundation.
3 You can answer.
4     A.   I don't -- would you -- I don't understand
5 that question. Could you ask me that again?
6     Q.   So you're saying that George Hank came to you
7 and said, hey, Section 3.8 in the limitation on use of
8 that athletic field creates a problem if we issue the
9 permit. Is that your testimony today?
10     A.   No, I wouldn't say it that way.
11     Q.   How would you say it?
12     A.   I would say that -- this is what I recall from
13 our conversation was Mr. Hank conferred with me that
14 Edgewood had indicated an intent to use the lights for
15 the purpose of games and which was -- and I'm trying to
16 remember exactly like how this went down.
17         And that, you know, my authority like sort of
18 starts and stops with the zoning code here, and George
19 Hank is overarching.
20         So he's the one that oversees the building
21 permitting and that side of things.
22         So he was the one who wanted to stop this in
23 its tracks regardless of what I thought, because of the
24 -- well, he's not like that, he wouldn't be regardless
25 of what I thought, but it was -- his position was for us

Page 127

1 to release the permit, allow the lights to be built
2 could be problematic for us, particularly if Edgewood
3 fell through on their intent as notified, as described
4 in the letter to the Edgewood families to use that for
5 athletic contests.
6     Q.   So you had already analyzed the master plan
7 and determined that the master plan could -- the master
8 plan was not inconsistent with the issuance of the
9 requested permit; correct?
10         MS. ZYLSTRA: Object to form. You can answer.
11     Q.   In Exhibit 6?
12     A.   Yeah, I wouldn't -- at the time, I don't think
13 I thought that we could deny the request. Okay. I was
14 -- that was my position at the time, that I recall.
15         And I recall conferring with Attorney Strange
16 on this, on navigating this prickly matter. And that
17 was what I recalled was our initial position which
18 resulted in the letter. I mean, those are my words,
19 so --
20     Q.   So Exhibit 6 was drafted in consultation with
21 Mr. Strange?
22         MS. ZYLSTRA: Same stipulation?
23         MR. INGRISANO: Yes.
24     A.   Yeah, he was involved in the -- yeah, the --
25 this, uh-huh.

Page 128

1     Q.   So, again, from just reading the first
2 paragraph, I understood your analysis to be that if the
3 plans, i.e., Edgewood's lighting application, complies
4 with 10.085, those electrical permits will be issued; is
5 that fair?
6     A.   That's what it -- it says those plans will be
7 reviewed for compliance and if the plans comply,
8 electrical permits will be issued when requested.
9 Uh-huh, yes.
10     Q.   Okay. But your testimony today is George Hank
11 believed there would be legal trouble if those permits
12 issued consistent with the analysis in your Exhibit 6;
13 is that right?
14     A.   I think George Hank used an abundance of
15 caution in -- and his ability as outlined in 10.085 to
16 withhold the permit. That's how I would characterize
17 it.
18     Q.   And you, in working with John Strange on
19 February 27 and before to formulate the position in
20 Exhibit 6, when you signed your name to this letter, you
21 believed that was a correct and proper interpretation of
22 the rights and responsibilities of your department in
23 this matter; is that right?
24     A.   No, I believe that's my signature on my letter
25 and that would be under the rights and responsibilities

Page 129

1 of me, not the department as a whole.
2     Q.   And as zoning administrator?
3     A.   Correct.
4     Q.   Got it. But you issued this letter in your
5 official capacity as zoning administrator believing that
6 this was the correct and proper handling of that
7 lighting application; is that right?
8         MS. ZYLSTRA: Object to form. You can answer.
9     A.   Yes.
10     Q.   And the analysis that you and Mr. Strange had
11 undertaken together, on February 27th and before, was
12 not a defective or deficient analysis in your opinion;
13 is that fair?
14         MS. ZYLSTRA: Same stipulation?
15         MR. INGRISANO: Yes.
16         MS. ZYLSTRA: And I'll object to form.
17     A.   I think we found -- when we spent some more
18 time with it, the issue, we came to an -- I would say a
19 more complete decision in regard to that matter.
20         And it may be an advanced decision from my --
21 our initial position we had come to on February 27th,
22 all the while, we're trying to help this matter along,
23 okay. If that makes sense.
24         Like we are attempting to further the question
25 asked which has potential processes.

33 (Pages 126 - 129)

Page 130

1   Q.   Sure.  When you say "we," you and Mr. Strange
2   and Mr. Hank were attempting to facilitate and move this
3   process along; is that right?
4   A.   Yes.  And I think it would be fair to say
5   there were probably other interested parties that were
6   curious.  Nathan Wautier, for example.
7   Q.   Curious like how?
8   A.   The matter of improving the field, the open
9   space area.  There were conversations that were
10  occurring that were discussing paths, alternatives,
11  methods, clarifications of things.
12       And it was a user of our time.  It was
13  something that we spent quite a bit of time during this
14  period working on.
15  Q.   Sure.  And your meetings with Mr. Strange in
16  formulating Exhibit 6, did you meet with him in person,
17  phone calls, emails, any combination of those three?
18       MS. ZYLSTRA:  Same stipulation?
19       MR. INGRISANO:  Yes.
20  A.   Probably all three.
21  Q.   And those would have occurred between the
22  timeframe of February 22nd and February 27th; is that
23  right?
24  A.   After the February 27th, I mean, there were
25  conversations, yeah.  There was --

Page 131

1   Q.   I'm asking specifically about your dealings
2   with Mr. Strange in formulating and creating Exhibit 6.
3   A.   Oh, okay.
4   Q.   All right?
5   A.   Yes.
6   Q.   Those meetings would have occurred between
7   February 22nd and February 27th, right?
8   A.   I believe so, yes.
9   Q.   You didn't have advanced notice that the
10  lighting application was going to be filed on February
11  22nd; is that right?
12  A.   We did not.  I don't recall.  We might have
13  heard about it, but I don't recall.
14  Q.   Does the tendency of a master plan amendment
15  that may or may not get approved impact a landowner's
16  rights to have other permits and land use requests
17  considered under the then existing either ordinances or
18  master plan?
19       MS. ZYLSTRA:  Objection.  Form.  You can
20  answer.
21  A.   No.
22  Q.   So the pending amendment request, which I
23  think you said was not pursued for reasons you don't
24  understand or know, that didn't foreclose any, what you
25  might argue, would be any contrary or contradictory

Page 132

1   requests from the landowner; is that right?
2       MS. ZYLSTRA:  Objection to form.  You can
3   answer.
4   A.   Can you -- this is a question -- can you ask
5   it again, please?
6   Q.   I'll just withdraw that question.
7   A.   All right.
8   Q.   So your postmarked one formulation of the
9   grounds and the reasons to withhold the permit were the
10  lighting deficiencies in the master plan as you saw them
11  by themselves sufficient to withhold the permit even if
12  the open spaces had been more broadly identified?
13       MS. ZYLSTRA:  Objection.  Form.  You can
14  answer.
15  A.   That's a pretty wild hypothetical and it
16  wasn't -- I wasn't the one that withheld the permit.
17  George Hank was.
18  Q.   Sure.  I meant, again, the withholding of the
19  permit that occurred, the rationales that were -- you
20  know, the justifications for that.
21       I'm just trying to understand whether -- I'm
22  just trying to figure out what kind of amendment would
23  have cured this problem, right?
24  A.   Yes.
25  Q.   And I had heard a lot about the 3.8 issue from

Page 133

1   the other witnesses.
2       So was it your understanding based on the
3   reasoning for the withholding of the permit had 3.8 been
4   amended to broaden the use of the field such that night
5   games would have been deemed a permissible use, would
6   the light permits still have been denied because of the
7   other problems with the nonspecificity of the
8   description of lighting in the master plan could be
9   identified?
10       MS. ZYLSTRA:  Objection.  Form.  You can
11  answer.
12  A.   So that's kind of an incomplete hypothetical.
13  Because if the master plan, Section 3.8, open space,
14  said night games could be played, it would imply that
15  light would be necessary, like you can't do it without.
16       So there would be words that related to more
17  than just night games.  They would talk to the lights
18  and figure out whatever those words may read, so it
19  would be clear and not ambiguous.
20  Q.   If it just said -- would an amendment of 3.8
21  that said athletic field to be used for games,
22  practices, and other recreational activities of the
23  Edgewood community, would you have required more and
24  required additional amendments to descriptions of
25  lighting in the master plan?

34 (Pages 130 - 133)

Page 134

1        MS. ZYLSTRA: Objection. Form.
2    A.  I think to be complete with that I would look
3  at the Campus-Institutional District and knowing -- I'll
4  just say knowing the historical sensitivity related to
5  this matter, and that is a thing that I know, we would
6  expect that any alteration approved that would use the
7  word or those words that related to the playing of games
8  or sports on there would have detail equal that related
9  to allowances for lighting.
10        It would not be without a complete circle,
11  like similar to the way lighting is referenced in other
12  aspects of the master plan related to perimeter
13  buildings and the light poles on the parking lot.
14    Q.  Got it.  So when the city said, hey, you have
15  to amend your master plan in order for us to release a
16  light permit, the amendment would have to have
17  sufficiently covered not just the use of the football
18  field, it would have had to address the lighted use of
19  the football field; is that right?
20        MS. ZYLSTRA: Object to form.  You can answer.
21    A.  Yeah, I believe that would be true.  I believe
22  you would have a very complete picture in the master
23  plan in regard to that use and improvement.
24    Q.  And do you know that that level of detail and
25  expectation was communicated to Edgewood after March 1?

Page 135

1        Was the nature and scope of the amendment
2  communicated to Edgewood that would have met that
3  expectation?
4    A.  I would say Edgewood was on notice, if I
5  could -- and I don't know if that's the right term --
6  from back in December of 2018 when they submitted their
7  alteration about the level of detail necessary.
8        So it would not come as a surprise, because we
9  had meetings with Brian Munson, Mike Elliot, and
10  explained to them the level of specificity necessary for
11  their ask to be complete and anticipate an outcome they
12  might be looking to get.
13    Q.  And lawyers love to fight about notice, they
14  can fight about notice all day long.  I really didn't
15  ask about notice.
16        What I asked was did the city communicate with
17  particular emphasis on this issue of the lighting
18  application.  Did you guys tell Edgewood, hey, what's
19  holding up your permit is the master plan which needs to
20  be amended, not just permit games but also needs to
21  address the lighting deficiencies that we're identifying
22  here?
23    A.  I know that there was a communication between
24  John Strange and Nathan Wautier that came out in March,
25  middle March.  It may have been in there.  I don't

Page 136

1  recall -- I don't recall specifically sharing that
2  information, but it may be in that letter.
3    Q.  So your review of the master plan with a fine
4  toothed comb in your discussions with Mr. Hank and
5  Strange in that regard, and your conclusions that the
6  master plan provided grounds to withhold the permit, you
7  actually came to believe that was the correct analysis;
8  correct?
9    A.  To withhold the permit?
10    Q.  Yeah, to withhold the permit and that the
11  grounds that you cited from the Exhibit 7, the master
12  plan.
13    A.  Oh.
14    Q.  The grounds that you cited, the provisions you
15  cited that provided the justification, you came to
16  believe after March 1 that that was the correct
17  interpretation and analysis of the issue, is that true,
18  or were you just doing this all to appease Mr. Hank?
19    A.  I wasn't doing it to appease Mr. Hank.  We
20  tend to work together and collaboratory, as a
21  collaboration.
22        Our interest was getting this right, being
23  correct, making sure that we were not going to be making
24  a mistake that could have a significant impact.
25    Q.  Is part of advancing -- was issuing Edgewood

Page 137

1  notices, official notices for hosting games on the
2  field, was that part of an effort to advance and resolve
3  this issue, was that viewed as being a productive use of
4  the city's time?
5        MS. ZYLSTRA: Objection.  Form, foundation.
6  You can answer.
7    A.  Getting resolution to what the city believes
8  is a violation is a productive use of our time.  And
9  issuing an official notice, which is basically like a
10  warning, can both sort of compel projects along, but it
11  also creates opportunities for appeal, which would
12  further things along.
13    Q.  Sure.  Were you consulted in part of any -- or
14  part of any group decisionmaking on whether to issue
15  official notices for Edgewood's hosting games in March
16  and April of 2019?
17    A.  Yes.
18    Q.  And what was your position as to whether those
19  notices should issue?
20    A.  Well, I mean, let's just step back.  I mean,
21  first, it was -- it would have been receiving a
22  complaint and following up with inspections.
23        And so there was no plan ahead of time.  There
24  was response to complaints that resulted in inspections
25  that then resulted in the issuance of official notices

35 (Pages 134 - 137)

Page 138

1  of violation.
2     Q.   Step back to Exhibit 3 for a second.  That was
3  the Edgewood site verification form.  Exhibit 3.
4     A.   Okay, yes.
5     Q.   You've got that in front of you.
6          Let's assume for a second that there was no
7  master plan issue, right, there was no --
8     A.   Is there a master plan in place or is there
9  not?
10    Q.   Let's just say there is no master plan at all.
11    A.   Okay, okay.  Sure.
12    Q.   And what would routine procedure from your
13 experience after Christina Thiele approves her workflow
14 March 1, what timeframe could Edgewood have reasonably
15 expected its permit, what's the turnaround time there?
16    A.   It varies -- oh, turnaround.  I mean, the
17 permit could be issued whenever.  The turnaround is
18 really at the timeline of the contractor.  Projects like
19 this -- you want me to elaborate?
20    Q.   So you're saying at any time?
21    A.   Yeah.
22    Q.   So, in theory, on March 1, Christina checks
23 the approved box, again assuming there is no master
24 plan, master plan issue or controversy, Christina checks
25 the box for approved on the zoning review, the

Page 139

1  contractor sees that I assume on the website?
2     A.   I'm not exactly sure.  I think, if I recall
3  correctly, some of these permits are sort of like,
4  almost like electronic approval.
5     Q.   Yeah.
6     A.   So this is a website.  It sends a link out.
7  It's posted out public and folks that are applicants.
8          Jennifer Luhman would have received an email
9  and would have told her what to do or what the status
10 is.  And then she -- there typically would be a permit
11 associated with this that could be issued at the
12 contractor's leisure.
13    Q.   Same day, March 1?
14    A.   In theory, yeah, could possibly be if it's
15 ready.
16    Q.   Under the city's interpretation of Edgewood's
17 Master Plan, Edgewood was entitled to use its field for
18 team practices; correct?
19    A.   Yes.
20    Q.   Does anything in Madison's zoning code
21 prohibit a school in the Campus-Institutional District
22 that's zoned Campus-Institutional District from
23 practicing on its property at night or using its
24 property at night?
25    MS. ZYLSTRA:  Object to form.  You can answer.

Page 140

1     A.   I don't believe so.  This situation you
2  describe, though, implies like it's set up for that use,
3  like, you know, right?
4     Q.   Well, if you have a -- well, okay.
5          If a school that's zoned Campus-Institutional
6  District has a permissible use, there is nothing in the
7  ordinances that would differentiate between the use of
8  that -- that permissible use in the daytime versus the
9  nighttime; is that fair?
10    MS. ZYLSTRA:  Objection.  Form.  You can
11 answer.
12    A.   Yeah, I believe that's true.
13    Q.   I'll ask you to take a look at Exhibit 5.  Let
14 me grab that for you.  I think I've got that right in
15 front of me.
16          Are you familiar with that document, sir?
17    A.   Yes.
18    Q.   That's a cover letter to a permit
19 application -- an alternative application.
20          The cover letter is from Attorney Wautier;
21 correct?
22    A.   Yes.
23    Q.   And what's the date of that letter?
24    A.   September 30, 2019.
25    Q.   And do you recall receiving that light

Page 141

1  application?
2     A.   Gosh, I bet Nathan was very purposeful in
3  making sure it arrived in my hands.  But I feel like
4  Nathan would have made sure I was there for this, but I
5  don't recall.
6     Q.   Do you know if that permit ever issued?
7     A.   It was -- this was not -- this was not
8  approved, no.
9     Q.   And why not?
10    A.   There is a document that covers this, the
11 review for this.  This is associated with a similar
12 document to Exhibit 3.  Do you -- is that in the record?
13    Q.   You know, there are a lot of documents.  I'm
14 just asking you based on your best knowledge and your
15 best recollection at this point.
16    A.   Yes.  It's partially exhibit -- I believe it's
17 partially Exhibit 37.  When I look at the date of the
18 map here, it says 26-September-19, but it doesn't have
19 the report of -- the report of the site planner.
20    Q.   Okay.  And from the best of your recollection
21 do you recall why that permit wasn't issued?
22    A.   Yes, I do.
23    Q.   And what do you recall?
24    A.   From what I recall, it was not issued because
25 the workflow, similar to Exhibit 3 page was under status

Brown & Jones Reporting
A Veritext Company

414-224-9533
www.veritext.com

Page 142

1  of -- I believe it's called reject, redraft, or
2  something like that.
3       And there is a zoning comment in there that
4  was written by me and it was processed by me.  But I
5  need to see it, see the words.  But it effectively says
6  obtain a master plan amendment to when, whatever.  I
7  don't know the rest of the words.
8    Q.   Got it.  Ballpark, though, again, general idea
9  is that in your view the situation hadn't changed and to
10 grant that light permit would still require a master
11 plan; is that right?
12   A.   At the time it was submitted, yes, that was
13 our position.
14   Q.   Whether it was on February 22nd or September
15 30th; is that right?
16   A.   Yes.
17       MS. ZYLSTRA:  Object to form.
18   A.   Yes.
19   Q.   Exhibit 2, sir, this is a permit for Madison
20 Memorial that was issued in 2018.  Are you familiar with
21 that document?
22   A.   I am.
23   Q.   And did your zoning department have anything
24 to do or review with that document to the best of your
25 recollection?

Page 143

1    A.   We did.
2    Q.   And what review was performed?
3        MS. ZYLSTRA:  Object to form.  You can answer.
4    A.   On page 3, you will find the site plan
5  verification, and our office processed this request
6  similar to -- well, it was, I guess, similar to Exhibit
7  3.  Similar, being that it was a Campus-Institutional
8  District and it was a lighting plan permit.  But it was
9  also different.
10   Q.   Different how?
11   A.   The Madison Metropolitan School District
12 property that this is proposed on -- commonly it's the
13 Memorial High School, but Mansfield, I think, is how
14 it's referred to -- is zoned Campus-Institutional
15 District without a master plan.
16       And the lighting on the football and baseball
17 fields pre-existed and was being modified with this
18 permit.
19   Q.   Sure.  Whether the lighting was pre-existing
20 or not it still had to comply with technical
21 specifications of 10.085; correct?
22   A.   Yes.
23   Q.   So you can't -- just because its lighting is
24 existent already and is being upgraded or replaced it
25 doesn't give you carte blanche to exceed the technical

Page 144

1  specifications of 10.085; is that right?
2    A.   That's correct.
3    Q.   So in your professional experience assessing
4  the Madison Memorial lighting application and the
5  Edgewood February 22, '19 lighting application, the only
6  distinction in the analysis between those two
7  applications is the existence of Edgewood's Master Plan;
8  is that right?
9        MS. ZYLSTRA:  Objection.  Form.  Misstates
10 testimony.  You can answer.
11   A.   No, I -- I mean, it's much more than that.
12 It's what's in the master plan, also.  I believe you
13 have a use question, also.
14   Q.   Existence and content of the master plan?
15   A.   Uh-huh, yes.
16       MS. ZYLSTRA:  Objection.  Form.  Go ahead.
17   A.   Yes.
18   Q.   So if Edgewood had elected not to adopt a
19 master plan in 2014, and its lighting application in
20 February of 2019 was just done, same as Memorial as a
21 Campus-Institutional District, they would have been
22 analyzed under the exact same standards; is that right?
23       MS. ZYLSTRA:  Object to form.  You can answer.
24   A.   Yes.
25   Q.   And you're not aware of any reason why the

Page 145

1  Edgewood Master Plan -- sorry, the Edgewood lighting
2  application in that circumstance would have been denied?
3    A.   I am not.
4    Q.   So it's fair to say that the existence and
5  content of the master plan, as interpreted by you and
6  Mr. Strange and Mr. Hank, was the sole reason that
7  Edgewood's Master Plan -- sorry, that Edgewood's
8  lighting application was not granted?
9        MS. ZYLSTRA:  Object to form.  You can answer.
10   A.   So, no.  I mean, I believe that we are in
11 charge with interpreting this, but the city council
12 adopted this master plan that had these words in it.
13       Edgewood proposed these words in good faith.
14 These words are relied upon by people, whoever they may
15 be.
16       The choice to have a master plan, which was
17 Edgewood's, had its benefits and its restrictions and
18 they chose it.
19   Q.   But, again, it's the master plan, its contents
20 and how you interpreted that was the difference between
21 issuance and denial; is that right?
22       MS. ZYLSTRA:  Object to form.  You can answer.
23   A.   Yes, I believe so.  I think I understand your
24 question.
25   Q.   You mentioned that Edgewood proposed all of

Page 146

1 the terms of its master plan in good faith.
2 　　As you sit here today are you aware of any
3 statements by Edgewood that would indicate that they
4 intentionally, knowingly, wanted to restrict the use of
5 their field into -- yeah, to restrict the use of their
6 field?
7 　　A.　This is tricky, because -- this question is
8 tricky, because it's relying on my memory of the 2014
9 process.
10 　　And I did attend a few meetings about this,
11 and I recall there were -- there were items of -- items
12 that lacked resolution that Edgewood wanted.  And I
13 recall basically affected it like a no-change on the
14 athletic field being a quick pass to move onto the
15 things that were contentious.
16 　　Like, this is okay, this is taken care of,
17 move on to Edgedome, move on to the more controversial
18 matters.  And that was like a draft plan that Potter
19 Lawson had shared with us.
20 　　I believe there was a meeting that Tim Parks
21 and I attended where we were, I recall, being asked
22 because they were getting to the finalization of their
23 master plan for submission and everyone was interested
24 in a positive outcome to the extent that it would be
25 possible.

Page 147

1 　　So this issue was resolved and other issues
2 were the focus of the problem.  And that was
3 acknowledged.
4 　　Q.　So the issue was resolved.  The issue being
5 lights on the field?
6 　　A.　The field, its usage -- a continuation of its
7 usage dating back to -- I think it was '96 was the last
8 time we touched it with the words -- or the words came
9 up again about team practices and gym class or whatever
10 were used at the time.
11 　　It was okay, this is not -- there is no
12 change, this is recognizing no change, move on to the
13 next -- the next controversial matters and work through
14 them.  And there were plenty.
15 　　Q.　Sure.  And you mentioned this was acknowledged
16 by Edgewood.  What are you saying was acknowledged and
17 how was it acknowledged?
18 　　A.　I can't say that I recall it being
19 acknowledged.  I recall this being an issue that the
20 neighborhood in particular, I recall, because there were
21 neighborhood people there and -- you know, Counsellor,
22 I'm going back to 2014 here with this, so if you just
23 give me a break on this.
24 　　But I remember this being a thing that was --
25 was a -- you have tension about things and this was just

Page 148

1 an, okay, we're good, let's talk about the other things.
2 And so like it was a touch-and-go is what I recall.
3 　　And I don't -- beyond that, I can't tell you
4 that anyone -- I can't even tell you who was even
5 necessarily the people who said that, but I recall it
6 was a thoughtful thing because I had dealt with it in
7 the past as a controversial matter.
8 　　Q.　I'm trying to remember your testimony from
9 earlier today, Mr. Tucker, about what, if any,
10 involvement you had in the creation of the
11 Campus-Institutional District zoning ordinance.
12 　　What role, what involvement, did you have in
13 the creation of that code provision?
14 　　A.　I was probably one of two or three people that
15 have the most knowledge about the creation and the
16 evolution discussions of the district.  I attended all
17 the meetings.  I was there from inception.
18 　　Q.　And who would the other folks be?
19 　　A.　So we had a consultant that we had hired out
20 of Minneapolis, and the woman's name was Suzanne Reece,
21 that was a principal code drafter.
22 　　She and I attended listening sessions.  I
23 think we probably had -- I don't know how many listening
24 sessions we had.  50 listening sessions, maybe, with
25 interested people prior -- this was back in 2007, prior

Page 149

1 to starting the drafting of the new zoning code.
2 　　We were meeting with interested parties, and
3 Edgewood, UW, and Madison College were one of those
4 meetings.
5 　　The staff team included city planner, now
6 planning director, Heather Stouder.  The alderperson for
7 the district was involved in some of the discussions for
8 -- particularly for Edgewood, and the alderperson for
9 the district around UW was also involved.  I believe
10 that was Shiva Bidar, and was the UW alder principally.
11 And then Susan Ellingson was the alderperson around
12 Edgewood.
13 　　Former Alderperson Julia Kerr was involved.
14 Your question was who was involved, right?
15 　　Q.　Yeah.
16 　　A.　Okay.  So obviously Maggie Balistreri-Clarke
17 was one of the prominent persons.  Gary Brown from the
18 University of Wisconsin, also prominent.  And a guy
19 named -- jeez, I forget his name at Madison College, but
20 I don't know, whatever.  His name is Mike something or
21 something like that.  Not really memorable.
22 　　There were neighbors of Edgewood because of
23 history that were interested and involved in
24 participating.  I recall Jon Standrich being involved.
25 He was past president of Vilas.

Page 150

1       There were any number of neighbors in the
2   Dudgeon-Monroe that were involved. The mayor probably
3   was apprised. I don't think the mayor really had a lot
4   to do with it, but the mayor was aware. Dave Cieslewicz
5   initially --
6       THE REPORTER: Sorry, what?
7       THE WITNESS: Cieslewics, C-i-e-s-l-e-w-i-c-z.
8   Mayor Soglin was aware. So it was a pretty wide swath
9   of our community. It was really an important community
10  decision, the writing of this district.
11      Q. Sure. Of all the folks you mentioned could
12  you make a distinction between people that were
13  consulted and had input, or it was just the people that
14  were actually putting pen to paper, rolling up their
15  sleeves and doing kind of the drafting and
16  decisionmaking?
17      A. So, yeah, the staff that were doing a lot of
18  drafting, you had Gary Brown and Marie Balistreri-Clarke
19  or -- yeah, Marie or -- is that her name?
20      MS. ZYLSTRA: Maggie.
21      A. Maggie. Thank you. Who were heavily
22  involved. And the consultant.
23      We also had a 25 person zoning code rewrite
24  advisory committee that was reviewing and overseeing
25  drafts. That committee was comprised of a variety of

Page 151

1   people, alders, developer interests. Nathan Wautier
2   attended those meetings.
3       Q. Was he on committee or attended?
4       A. Attended and provided feedback.
5       Others citizens that served on other board
6   committees and commissions. People that were volunteers
7   that were neighborhood interests that were appointed by
8   the mayor at the time. 25 person committee. Big
9   committee, lots of opinions. Review drafts, provide
10  commenting in regard to the evolution of the CI
11  District.
12      Q. Did the CI District start off -- you mentioned
13  the consultant who was retained, Susan Reece. Had she
14  helped other municipalities with other CI District
15  ordinances?
16      A. I'm not aware.
17      Q. Do you know if the starting point of the
18  Madison CI District ordinance was a template or past
19  ordinance that was used somewhere else?
20      A. I'm not aware.
21      Q. So you don't know if it's something that has
22  been replicated in a different city or its been cut from
23  whole cloth?
24      A. It could have been cribbed from other cities,
25  but it was originally written and draft in form

Page 152

1   consistent with the other sections of the district, and
2   then it evolved as feedback came through.
3       So we pretty much -- the code is written
4   custom.
5       Q. Sure.
6       MS. ZYLSTRA: Do you need another break?
7       THE WITNESS: Yeah, that would be good.
8       MR. INGRISANO: Okay. That works.
9       (Recess)
10  BY MR. INGRISANO:
11      Q. Mr. Tucker, can you describe for me the
12  distinction between a master plan in a
13  Campus-Institutional District context and a master plan
14  in a planned development, or PD, district context?
15      A. The term "master plan" in a planned
16  development context, I don't believe that exists. I
17  would need to look at the ordinance to be sure, but it
18  is not a thing.
19      Q. Okay.
20      A. Planned developments have general development
21  plans which allow basic rights of use, bulk, which is
22  sort of like building height, square footage, et cetera,
23  general development plan.
24      And then they have something called a
25  "specific implementation plan," which is a high level of

Page 153

1   detail for all aspects; building design, floor plans,
2   site landscaping, parking, lighting, you name it.
3   That's all it is.
4       For a planned development, there is not a
5   master plan. There is a general development plan and a
6   specific implementation plan.
7       Q. All right. Do you have a recollection of when
8   Edgewood's Master Plan became effective so as to control
9   its development of its property?
10      A. Yes. On Exhibit 7, there is a date stamp on
11  plans here. If I could find it, I will -- we
12  established that as the effective date for the plan
13  starting the tenure shot clock. 11/06/2015.
14      Q. 11/06/2015, that establishes the 10-year kind
15  of expiration period, correct?
16      A. Yeah, I refer to it as a shot clock, but
17  expiration period, yes.
18      Q. But actually the contents of the master plan
19  actually controlled it before that date as well, right?
20      MS. ZYLSTRA: Objection. Form. You can
21  answer.
22      A. No, the master plan does not take effect until
23  the sign-offs are completed and our -- the date where of
24  the sign-off, which in this case is the 6th of November,
25  2015.

Page 154

1    Q.  So you're saying the master plan was not
2  effective in 2014?
3    A.  It was not.  It was approved and in the
4  process of sign-off.
5      (Exhibit 40 marked)
6    Q.  MR. INGRISANO:  I'm handing you what's been
7  marked as Exhibit 40.
8      Sir, do you recognize that document?
9    A.  I believe I do, yes.  I believe this is the
10  approval letter issued by the City Planning office for
11  the Edgewood Campus Master Plan.
12    Q.  And that's dated April 22nd, 2014?
13    A.  Yes.
14    Q.  So the first paragraph says, "At its April 8,
15  2014 meeting, the Common Council approved a
16  Campus-Institutional District Master Plan for Edgewood
17  College, Edgewood High School and Edgewood Campus School
18  subject to the conditions that follow.  These conditions
19  of approval shall be satisfied prior to the master plan
20  taking effect and the issuance of building permits for
21  any of the projects contained in the plan."
22      Do you see that?
23    A.  Yes.
24    Q.  So as I read it -- and you tell me if you
25  agree or disagree.

Page 155

1      As I read that, yes, the conditions of
2  approval that are listed on this document have to be
3  satisfied prior to the master plan taking effect, but in
4  the interim there aren't going to be any building
5  permits that are going to be issued on the projects
6  contained on the plan; is that right?
7      MS. ZYLSTRA:  Object to form.  You can answer.
8    A.  Yes, with the explanation that if they weren't
9  able to complete the sign-off of the master plan and
10  they wanted to do a project, they would be proceeding
11  outside of the master plan like as a conditional use,
12  for example.  That's how that would be processed.  Or as
13  potentially a permitted use under CI.  It doesn't take
14  effect until.
15    Q.  "These conditions of approval shall be
16  satisfied prior to" -- dot-dot-dot -- "the issuance of
17  building permits for any of the projects contained in
18  the plan"; right?
19    A.  Correct.
20      MS. ZYLSTRA:  Object to form.
21    Q.  So if my master plan had -- a hypothetical
22  master plan had a project for a lighted field, my master
23  plan had been approved subject to some conditions, I
24  couldn't just defer, delay those conditions and draw a
25  new lighting application under the 10.085 and avoid the

Page 156

1  impact of the approved master plan, right?
2      MS. ZYLSTRA:  Object to form, foundation.  You
3  can answer.
4    A.  You might be able to.  Actually, you might be
5  able to because you have zoning that you are allowed to
6  work with until your master plan sign-off is complete.
7      You're not in a limbo of no zoning.  You would
8  be able to do things hypothetically.
9    Q.  Sure.  Have you ever talked with Timothy Parks
10  about why they include that language that says these
11  conditions of approval shall be satisfied prior to the
12  issuance of building permits for any of the projects
13  contained in the plan?
14    A.  I don't recall talking to him about that
15  specific phrase, no.
16    Q.  UW has a master plan; correct?
17    A.  They did.
18    Q.  And do you have a recollection as to when that
19  master plan went into effect to govern its property?
20    A.  I would have to see it for sure, but for some
21  reason I'm recalling it was January 1 of 2019, I think.
22      Their master plan actually has a date stamp
23  similar to this and they requested a letter.  We
24  provided a letter that verified that effective date
25  start.

Page 157

1      (Exhibit 41 marked)
2    Q.  MR. INGRISANO:  Sir, I'm handing you what's
3  been marked as Exhibit 41.
4      Have you ever seen this document before?  Look
5  to the last page of the document.  You are cc'd on it.
6    A.  Yeah, it appears to be the Planning Division's
7  approval letter for the University of Wisconsin master
8  plan.  I suspect I've seen it.  That's fair.
9    Q.  So similar to Exhibit 40, the Planning
10  Division is apprising the applicant that the Common
11  Council has adopted the master plan; correct?
12    A.  Yes.
13    Q.  This letter is dated October 4, 2017?
14    A.  Correct.
15    Q.  If I can ask you to take a look at page 6 of
16  this document, Bates stamped "UW Madison-005459."
17      Down at the bottom in bold it says, "The
18  10-year effective period for this master plan shall not
19  take effect until all of the required revisions and
20  stipulations have been made/satisfied.  No City-related
21  permits for projects in this CI District shall be issued
22  until the plan has been revised to address the comments
23  and conditions in this letter."
24      Do you see that?
25    A.  I do.

Page 158

1    Q.  Again, as with the Edgewood letter that we saw
2 in Exhibit 40, while the 10-year shot clock -- as you
3 described it -- doesn't start to tick, the approval
4 contained in this letter comes with a requirement that
5 permits not be issued until the plan has actually been
6 advised and addressed consistent with the letter; is
7 that right?
8        MS. ZYLSTRA:  Objection.  Form.
9    A.  No, the words are different actually.
10    Q.  No, I was asking you about this letter,
11 Exhibit 41.
12    A.  Yeah, okay.  I'm reading it.
13    Q.  "No City-related permits for projects in this
14 CI District shall be issued until the plan" -- meaning
15 the master plan that was just a notice of approval here
16 -- "has been revised to address the comments and
17 conditions in this letter."
18        Did I read that correctly?
19    A.  You're reading it correctly.
20    Q.  So the approved master plan has the effect of
21 prohibiting any permits unless and until this document
22 gets revised to address the comments and conditions;
23 correct?
24        MS. ZYLSTRA:  Object to form, foundation.  You
25 can answer.

Page 159

1    A.  That's the way this letter reads, but I don't
2 agree with the position that we -- well, that we would
3 be prohibiting the University of Wisconsin for the very
4 few city-related permits that they pull, which are
5 almost none.  They don't pull any permits.
6        I don't think this locked them down, so to
7 speak.  That's my term from the start at the 10-year
8 shot -- the 10-year lifespan of the master plan.
9        I don't believe Mr. Parks' letter is
10 technically correct here.  And I would probably -- if UW
11 approached me about that with the project, I would talk
12 with them about what they could do.
13    Q.  Again, you haven't talked to Mr. Parks about
14 the basis or rationale that he had in mind when he
15 drafted those words?
16    A.  No.
17    Q.  Sir, when did you personally become aware that
18 Edgewood was playing games on its field?
19    A.  Me, personally aware?  Do you mean literally
20 me seeing it or what do you mean?
21    Q.  What I would like to understand is when either
22 you -- when did you first either personally observe
23 games being played on the field or receiving a report
24 from someone who says they observed games on the field,
25 or a statement or communication from Edgewood saying

Page 160

1 they play games on the field?
2    A.  Okay.  I became aware in October of 2018.  I
3 forget the exact date.  There was a meeting that
4 Edgewood hosted at their facility to talk about their
5 interest to modify the -- well, I'll just say to create
6 a stadium space was what their interest was, for
7 simplicity.
8        And at that meeting they presented a
9 PowerPoint that indicated how the field was being used.
10 So Mike Elliot was running that meeting with Brian
11 Munson as his planning consultant, and at that meeting
12 was the first time I became aware of their usage as they
13 were representing it to the folks in attendance there.
14 And it included usage of the field for onsite games and
15 sports.
16    Q.  Got it.  So it was Edgewood disclosing in the
17 PowerPoint the use of the field?
18    A.  Yes.
19    Q.  Have you ever had any observations of the
20 Edgewood field?
21    A.  I mean, any observations of the Edgewood
22 field.  Yes, I have had observations of the Edgewood
23 field.  I've been by it.
24    Q.  Sure.  Have you ever seen activity on the
25 Edgewood field?

Page 161

1    A.  I have seen activity on the field.
2    Q.  What do you recall that activity constituting?
3    A.  I have seen children practicing football or
4 practice, I'll call it.  You know, gone by in late
5 summer, gone by on Monroe Street and seen what appeared
6 to be practices occurring.
7        It appeared to be, at least from my glancing,
8 you know, there were multiple people doing multiple
9 things on the field in different areas on the same
10 field.  So, it looked like a practice to me.
11    Q.  So, historically, beyond those observations of
12 practices, are you aware of ever in the history of your
13 life, are you aware of any other uses of Edgewood's
14 field that the school undertook other than practices?
15        MS. ZYLSTRA:  Objection.  Form as to time --
16 or vague as to time.
17    Q.  You went to Queen of Peace grade school, you
18 went to Van Hise after that, right?
19    A.  I did.
20    Q.  You went to what high school?
21    A.  West.
22    Q.  West.  That's right.  Any use of that field
23 throughout your life?
24    A.  I'm familiar with the use of the area where
25 the field is.  I wouldn't really call it use of the

Page 162

1 field, but the Edgefest community event that occurred,
2 occurred partially on an area of the athletic field.
3    Q.   Anything else?
4    A.   No, not that I'm aware of.
5    Q.   Do you have any knowledge of how long Edgefest
6 ran, from what year to what year?
7    A.   I don't.  However, I know it ended not long
8 after I graduated in 1990, I believe.  I don't think it
9 went on too much longer.  I don't know when it ended.  I
10 know it's not happening anymore.  It wasn't happening
11 when I moved back to Madison in 2005.
12    Q.   Understood.  Again, I'm asking for your
13 recollection.  I recognize it's a long time ago.
14       Do you have any recollection from the master
15 plan approval negotiation process, do you have any
16 recollection of Edgewood describing the current use of
17 its field -- then current use of its field during that
18 process?
19    A.   By describing, do you mean by referencing it
20 in the draft plan or do you mean their own words?
21    Q.   Their own words, whether it's in a writing
22 other than the master plan, a statement, oral.
23    A.   I don't recall.  I'm sorry.
24    Q.   Do you recall during that process any
25 statements by Edgewood or its personnel about its

Page 163

1 intended future use, describing its intended future use
2 of that field?
3       MS. ZYLSTRA:  Prior to October 2018?
4    Q.   During the master plan amendment process that
5 you described, do you recall any statements by Edgewood
6 describing its intended future use of its field?
7    A.   So by that you mean by when they had submitted
8 a master plan for approval from the city, so 2014-ish,
9 right?
10    Q.   During the process of negotiating, working
11 with your department on the master plan during the
12 approval process, that 2013-2014 timeframe.
13    A.   Understood.  I don't recall any focus,
14 frankly, on any change to the field.
15    Q.   Beyond the change, though, any statements of
16 intent as to how they were going to be using that field
17 going forward?
18    A.   I don't recall any focus, anything beyond what
19 I testified to earlier about, like, okay, touch and go,
20 no change, move on to controversial things.
21       (Exhibit 42 marked)
22    Q.   MR. INGRISANO:  I'm handing you what's been
23 marked as Exhibit 42.  It's an email exchange between
24 you and Mr. Shawn Schey.
25    A.   He's a she.

Page 164

1    Q.   Oh, sorry.  Is it Schey?
2    A.   Correct.
3    Q.   Do you recognize that email exchange?
4    A.   Yeah, I'm identified in it, so yes, I'm sure
5 it's mine.
6    Q.   I suppose you get your email exchanges with a
7 lot of neighbors of not just Edgewood but other property
8 owners that are unhappy?
9    A.   Yes, I do.  This one was actually very
10 frustrating.  I recall this.
11    Q.   So I'm going to ask you to turn to -- well,
12 let me ask you this:  What was frustrating about it?
13    A.   Ms. Schey was asking me -- Ms. Schey, I felt
14 like she was reacting to a -- to a rumor, and it -- when
15 I investigate these things, I really don't feel -- I
16 feel -- I want to make sure that I'm not being used to
17 take an action that might be seen as sort of naggy or
18 harassment-y towards someone.  And I just don't like it
19 when people set me up to -- I don't need to bother Mike
20 Elliot with this thing.
21       Like it was all, from my perspective up front,
22 I have to delicately call Mr. Elliot and talk to him
23 about a rumor, and I just don't like doing that.
24    Q.   Sure.  What was the particular rumor that you
25 recall with this exchange?

Page 165

1    A.   Ms. Schey had contacted me about allegedly
2 Edgewood using their lawn area for the parking of lots
3 and lots of cars and if they could do that and if it
4 would be possible.
5       It was a very weird question, frankly, that I
6 was posed here.  I don't know.
7    Q.   So in the email from Ms. Schey -- I'm on page
8 2, I'll call it kind of in the middle of the page where
9 it says January 12, 2017 at 7:19 p.m., right there in
10 the middle.
11    A.   Uh-huh.
12    Q.   She was telling you, as I read this just kind
13 of in the middle of her email:
14       "We were just informed that they" --
15 Edgewood -- "would like to add 35 night games to their
16 new track and field for football, soccer, track, and
17 lacrosse.  They have stated the following" -- and then
18 she's quoting -- "By combining current hard surface
19 parking (261), new hard surface parking (70), Edgewood
20 Campus School parking (30), Edgewood College overflow
21 parking (200), and grass overflow parking (220) for a
22 total of 781 parking spots, the Edgewood campus is able
23 to handle all parking for all events onsite.  Only
24 maximum football crowds would require parking areas
25 labeled as overflow.  To clarify, they do not yet" --

Page 166

1 the quote ends -- "To clarify, they do not yet have the
2 70 new hard surface parking spots mentioned above. They
3 also anticipate seven football games."
4       Do you see that?
5    A. Yeah.
6    Q. In the email above that, in your response, you
7 write:
8       "I could see us having little concern about
9 the seven home football games at the property, so long
10 as the parking does not rut up the lawn or kill the
11 grass or create an erosion/soil tracking problem. 35
12 events, that seems to be a stretch."
13       And then you go on to differentiate between
14 what you're talking about there for the Wisconsin Badger
15 home Football Saturdays, right?
16    A. Yes.
17    Q. So by this email from January of 2017, haven't
18 you received a report that Edgewood is playing games on
19 its field?
20       MS. ZYLSTRA: Object to form. You can answer.
21    A. No.
22    Q. The seven home games that you would have
23 little concern about don't reference Edgewood football
24 games; is that right?
25       MS. ZYLSTRA: Objection. Form.

Page 167

1    Q. Or do they?
2    A. I don't know what they are referencing. This
3 is a hypothetical that's being posed to me by Ms. Schey.
4       Her question to me is about parking on the
5 grass, and she references seven football games, but
6 she's asking me about parking on the grass.
7       So I actually checked with Engineering about
8 parking on the grass, can you do that from a civil
9 engineering perspective, like, I don't know the rules.
10 I was kind of like double checking.
11       I think the statement of this, that they are
12 going to have games or events is not the focus of this
13 question. They are not asking to -- her question to me
14 is not about that; it's about parking on the grass.
15       And for all I know, they're working out some
16 -- there is something in the works and they are talking
17 about parking on the grass.
18    Q. But in the context of the parking on the grass
19 issue, you received information that the context for
20 that parking on the grass is for Edgewood sporting
21 events occurring on its field, right?
22       MS. ZYLSTRA: Object to form, misstates facts.
23 You can answer.
24    A. I mean, they're talking about this, but my
25 understanding -- well, I mean, I don't really -- I mean,

Page 168

1 I don't really follow high school football or whatever,
2 but they don't play there, I believe. I was under the
3 understanding that they play at like Verona or Middleton
4 or something like that.
5       So I'm not aware of this, the basis of this
6 being that they are having events. There is talk about
7 how they could have events and they park up for alumni
8 and for Football Saturdays, which we've, you know, said
9 it's beneath our notice.
10    Q. In 2017, had you or anyone, to your knowledge,
11 in your department interpreted the Edgewood Master Plan
12 as not permitting games on the field?
13       MS. ZYLSTRA: I'm sorry, can I hear that one
14 read back?
15       (Record read)
16    A. I don't recall that issue coming up. I don't
17 know what other -- other people in my department might
18 have received inquiries. So I don't recall that being a
19 matter that came up.
20    Q. Was, in 2015, an electrical permit issue
21 related to the athletic field; correct?
22    A. Yes.
23    Q. And were you familiar with that permit?
24    A. I have become familiar with that permit.
25    Q. Sure. Did you undertake any review of the

Page 169

1 electrical permit in light of the master plan when that
2 was first applied for?
3    A. No. The electrical permits -- this was a
4 permit for the installation of an underground conduit,
5 so it could be visually inspected by the inspector, were
6 not the permits that would come across our desk for that
7 kind of an improvement.
8       So, frankly, I wasn't aware that it was issued
9 until sometime after it had been issued and inspected,
10 fair to say year -- years, plural.
11    Q. Sure. So given your interpretation of the
12 master plan in March of 2019, applying that in 2015,
13 should that permit have issued?
14       MS. ZYLSTRA: Object to form. You can answer.
15    A. I believe that we -- you know, in a situation
16 similar to this, we might issue it in -- with sort of
17 caution, like a recommendation of caution.
18       Like all they were doing was installing
19 conduit for future wiring to be pulled through for
20 future light and sound improvements. They weren't -- it
21 wasn't enabling any use, it wasn't enabling any -- any
22 actual --
23       It's a very strange electrical permit, because
24 what it is is just looking it up at a tube to make sure
25 that when they cover it up that it's okay for them to

43 (Pages 166 - 169)

Page 170

1 pull wire through.
2      And we might -- you know, in hindsight sitting
3 here today, we might put a clause in there like, you
4 know, this is being put in at the owner's own risk; they
5 may not be able to ever utilize it.
6      You know, but installation of conduit is just
7 not a thing that we spend time focusing on.  It's a
8 wise, advanced practice for people that have a potential
9 future interest, and we want to help people with that so
10 they don't have to tear up and redo things.
11      Q.   Sure.  Are you aware that Edgewood installed a
12 scoreboard around that same time?
13      A.   I don't know when the scoreboard got
14 installed, but I'm aware that a new scoreboard was
15 installed.
16      Q.   Given your interpretation of the master plan
17 in March of 2019, did the Edgewood Master Plan prohibit
18 the installation of that scoreboard?
19      A.   It did not.
20      Q.   And why is that?
21      A.   I -- I believe you could use a scoreboard as
22 part of team practices and physical education classes.
23 It's a device that could be -- probably a critical
24 device if you're trying to teach someone a sport that
25 involves things that are on scoreboards, like time.

Page 171

1      Q.   Sure.  So if that improvement can be tied to
2 at least one permitted use, here team practices, it
3 would be consistent with the master plan; is that right?
4      MS. ZYLSTRA:  Objection.  Form.
5      A.   Yeah, I think we would be considerate of that.
6 I also think that there was an existing scoreboard.  It
7 was a replacement of a scoreboard, I believe.  I believe
8 it was a replacement of a scoreboard.
9      Q.   Okay.
10      A.   That's something that we would probably
11 consider routine associated with team practices.
12      I wouldn't -- we would not take a restrictive
13 position to prohibit it, I believe.  So when they want
14 to pull the electrical permit for that, we would be
15 happy to issue that.
16      Q.   Is it your position, sir, based on your
17 interpretation of the Edgewood Master Plan, that any use
18 of the property that is not a team practice or physical
19 education class is a use incompatible with and
20 prohibited by the Edgewood Master Plan?
21      MS. ZYLSTRA:  Object to form.  You can answer.
22      A.   I guess, I think that -- and I mean, I have
23 been part of the conversations about activities
24 occurring on the field.  I think implying use sort of
25 gives it a standing.

Page 172

1      And the master plan does say that the uses of
2 that area are 14 practices and physical education
3 classes.
4      You know, we would use our -- we would have to
5 see what potentially people would put forth to ask us,
6 you know, for things that might happen on the field,
7 whether we would deem them a violation or beneath our
8 notice.
9      Q.   Got it.  Mr. Hank kind of described the
10 beneath our notice criteria in his deposition.
11      Did you have any disagreements with how he
12 characterized that discretion?
13      A.   I did not.  I would agree with how he
14 described it.
15      Q.   Sir, after becoming a Campus-Institutional
16 District -- after becoming zoned as a
17 Campus-Institutional District but before the effective
18 date of its master plan, Edgewood had unfettered use of
19 its athletic field as a sports and recreation facility;
20 is that right?
21      MS. ZYLSTRA:  Object to form.
22      A.   I'm not that comfortable with those terms.
23 But I would say the campus -- yeah, the words in the
24 district applied up until the master plan was -- the
25 signoff was completed and they effectively would have

Page 173

1 what -- they could have what would be allowed under the
2 district at that time, yes.
3      Q.   And after the expiration or termination of the
4 master plan, Edgewood would again have that more
5 expanded use and rights to its field; is that right?
6      MS. ZYLSTRA:  Objection.  Form.
7      A.   It would revert back to the words that are in
8 the ordinance, yes.
9      Q.   So permissible use -- so permissible use we
10 talked about in (3)(b), right?
11      MS. ZYLSTRA:  Objection.  Form.
12      Q.   Of the ordinance?
13      MS. ZYLSTRA:  Sorry, Counsel.  Same objection.
14      A.   I just need to find the exhibit there.  Here
15 we go.
16      Yeah, I believe so.  I believe they would be
17 operating under (3)(a) and (b).
18      Q.   And those identify the primary and secondary
19 permitted uses for property that is zoned as
20 Campus-Institutional District?
21      A.   Yes.
22      Q.   Are you aware of any support by members of the
23 Common Council or the Plan Commission for the idea of
24 Edgewood amending its master plan to prevent games,
25 lights, and to build a stadium?

44 (Pages 170 - 173)

Page 174

1     MS. ZYLSTRA:  Object to form.
2     A.  I'm aware of -- I am aware of a few alders, I
3  believe, who were supportive of them going through the
4  process for obtaining approvals.
5         I don't know if anyone was like, yeah,
6  whatever you put up I'm good to go.  But supportive of
7  the go through the process, yes.
8     Q.  Given the divisiveness of this issue and your
9  experience with it, right, your history, what you knew
10  about the relations between the neighbors and the like,
11  now, frankly, everything you've seen since, as you sit
12  here today, Mr. Tucker, do you really think that
13  Edgewood's attempt to amend its master plan, which would
14  require Plan Commission approval, had a snowball's
15  chance of getting passed in this matter?
16     MS. ZYLSTRA:  Objection.  Form, foundation.
17  You can answer.
18     A.  This is an opinion.
19     Q.  It is.
20     A.  And this is a hard hypothetical, because they
21  never went down that path.  Unfortunately, they never
22  chose to proceed in a master plan amendment.
23         However, our office was positively working
24  with Edgewood to identify the ways in which the
25  amendment could have been approved, and we also wrote

Page 175

1  staff report for a similar ask for a conditional use
2  after the master plan had been repealed and we were
3  recommending that the Plan Commission could, that they
4  may be able to find that the standards were met.
5         We didn't -- our staff position was relatively
6  positive, I would argue, but we left the work to the
7  Plan Commission to work out the final details.
8     Q.  But, again, my comment was not about your
9  staff.  We haven't talked about your staff yet.
10         My question was about your understanding of
11  the makeup of the Plan Commission and the Common
12  Council.
13         Do you really think that Edgewood could have
14  had confidence that Plan Commission, that Common
15  Council was going to approve an amendment to their
16  master plan that would have allowed them to get lights,
17  sound, and stadium seating?
18     MS. ZYLSTRA:  Same objections.
19     A.  Once again, that's sort of my opinion, but I
20  have been doing this job for quite sometime and I have
21  seen people give and take to find solutions to things.
22         And I guess I have faith in human nature, and
23  I believe that people can work things out to an extent
24  that everyone has some level of satisfaction.
25         That's the way our city works.  I mean, that's

Page 176

1  the way I have seen it work at least in almost all
2  cases.
3     Q.  Sure.
4     A.  I'm a positive person.  I have hope and faith
5  in these things.
6     Q.  How many memos did you and your staff put
7  together to recommend to either the Plan Commission or
8  the Common Council if they could repeal the master plan?
9     A.  Hmm, memos.  Gee, I think there was --
10     Q.  Staff reports, memos, however you want to
11  characterize them.
12     A.  I believe there was only one repeal request.
13  I don't recall exactly how that was staff reported.  I
14  don't.  I'm sorry.
15     Q.  Yeah, no worries.
16     A.  You might have an exhibit, I just don't
17  remember.
18     Q.  How many recommendations did the city
19  attorney's office make to either the Plan Commission or
20  Common Council to recommend repeal of the master plan?
21     MS. ZYLSTRA:  Objection.  Foundation.
22     A.  Yeah, I don't recall their communications
23  either, specifically.
24     (Exhibit 43 marked)
25     Q.  MR. INGRISANO:  Sir, have you ever seen

Page 177

1  Exhibit 43 before?
2     A.  Yes.
3     Q.  This is a recommendation, is it not, from
4  Assistant City Attorney John Strange to the City of
5  Madison Plan Commission, that they repeal the master
6  plan?
7     A.  What is the question again?
8     Q.  I asked you, is this note a recommendation
9  from the Assistant City Attorney John Strange to the
10  Madison Plan Commission that they repeal the master
11  plan?
12     A.  I'm just reading it, because it's detailed.
13     Q.  Sure.  Let me withdraw that question.
14         This is a memo from Mr. Strange to the City of
15  Madison Plan Commission outlining considerations they
16  should make and whether to recommend repeal; correct?
17     A.  I'm half of the way through the second page,
18  and what I've read so far is consistent with that.  I'm
19  almost done.
20         And then there is an article -- there's a
21  letter, a second letter that -- did you want me to
22  read the Barry Blonien letter or do you want me to just
23  focus on the John Strange memo?
24     Q.  If you think you need to review that to answer
25  my question, go ahead.

45 (Pages 174 - 177)

Page 178

1    A.  Okay.  And your question, just so I know
2  again, can you read to me again your question?
3         MR. INGRISANO:  Yeah, please do.
4         (Record read)
5    A.  Okay.  So the letter from Mr. Strange is
6  matters of consideration for the Plan Commission to
7  consider.  I don't think it's a recommendation to
8  repeal.  I didn't read that in there.
9         But I did see in the Boardman letter from
10  Attorney Blonien's statement that it would strengthen
11  the city's position in the litigation by repealing
12  Edgewood's Master Plan.
13        If I was a Plan Commissioner, I'm not exactly
14  sure how I would read that besides recognizing the
15  words.
16    Q.  Okay.
17    A.  And it's very legalese, Mr. Blonien's letter
18  to Attorney Mike May and Attorney John Strange, and I'm
19  not a lawyer.  I'm just not.  So I would need to confer
20  with my attorneys about what they're saying.
21    Q.  I didn't ask to you read it.  You volunteered
22  to.
23    A.  I know, I know, but I don't want to say
24  anything to it without reading it.
25    Q.  I understand.  I didn't like reading what

Page 179

1  Mr. Blonien wrote either.
2         MR. INGRISANO:  Will you have that marked,
3  please.
4         (Exhibit 44 marked)
5    Q.  I'm handing you what's been marked as Exhibit
6  44.  I think I may have misspoken in an earlier question
7  when I assumed that Mr. Parks was part of your staff.
8         But this is a memo from Mr. Parks to the Plan
9  Commission dated October 28, 2019.  Do you see that?
10    A.  Yes.
11    Q.  And do you recall receiving a copy of this
12  letter at or around the time of its date?
13    A.  Yeah, I recall reviewing it or reading it or
14  seeing its publication, yes.
15    Q.  And in the conclusion on page 3 of this
16  document, Mr. Parks concludes:
17        "In closing, the Planning Division believes
18  that the standards for zoning map amendments are met and
19  that the Plan Commission should recommend to the Common
20  Council that it approve Edgewood's request to repeal its
21  voluntary Campus Master Plan.  As the proposed ordinance
22  repeals the previous land use approval granted in 2014
23  and any conditions of same and effectively returns the
24  Edgewood campus to the status it had prior to April 8,
25  2014, staff does not believe that conditions of approval

Page 180

1  may be placed on the pending repeal request."
2         Do you see that?
3    A.  Yes.
4    Q.  Did you have any -- at the time that you
5  received and read this, did you formulate an opinion as
6  to whether you agreed or disagreed with that
7  recommendation?
8    A.  I formulated an opinion that I agreed with the
9  recommendation, I recall, is what I recall.
10    Q.  So based on that --
11    A.  If I could, I just -- I didn't recall if we
12  did a staff report, so thank you with providing me with
13  that when you asked me earlier an question if we had a
14  recommendation.
15        That helped me recall we did actually write a
16  staff report, and I didn't object to the position that
17  was being taken, yeah.
18    Q.  Sure.  In essence, based on Mr. Parks'
19  conclusion, is it fair to say that the process and
20  standard for repealing a master plan creates a lower
21  burden than the process for amending a master plan?
22        MS. ZYLSTRA:  Object to the form.
23    A.  The process for repealing a master plan is a
24  map amendment, to my understanding.  The process to
25  repeal a master plan is a simple map amendment covered

Page 181

1  under the zoning map amendment section.
2         The process to amend a master plan refers to
3  the changes to master plan section, subsection 10 of
4  28.097 which has three alternatives.  And those could be
5  more -- more complicated, more involved, and your words
6  -- I forgot what your words were again specifically.
7    Q.  I think amendment being more burdensome
8  than repeal.
9    A.  Well, more burdensome is tricky.  I would say
10  it's definitely more complicated, definitely requires
11  more materials to be submitted.
12        An amendment implies a request for some
13  alteration and modification.  A repeal is basically a
14  getting rid of the master plan and going to typical
15  conventional zoning.  So, yes.
16    Q.  But Edgewood's amendment of its master plan
17  would have required Plan Commission approval; correct?
18    A.  It would require -- I believe it requires a
19  recommendation of the Plan Commission and Common Council
20  approval.
21        It was the third category of the amendment as
22  we had considered it, the changes to master plan 10.  A
23  change constitutes a substantial alteration of the
24  original plan.  The procedure at 28.097(6) is required.
25        That was the process that they applied for.

Brown & Jones Reporting          414-224-9533
A Veritext Company          www.veritext.com

Page 182

1  Q.  Which one?
2  A.  The process of 28.097, paren 6.
3  Q.  Which provides what?
4  A.  It's the standards for master plan approval,
5  Common Council will approve, and it goes to that
6  section.  So major change.
7  Q.  Got it.  So it would have required Common
8  Council approval to amend master plan?
9        MS. ZYLSTRA:  Object to form.  Go ahead.
10  A.  Yes.  We're talking about what they applied, I
11  think, for December that they paused on in 2018-2019,
12  yes.
13  Q.  So the City of Madison, after March 1 of 2019,
14  with the decision to withhold the light permit, the city
15  had communicated to Edgewood that they could amend the
16  master plan to be able to get their lights; is that
17  right?
18  A.  We communicated that back in November of 2018
19  that they could amend for whatever they want to a amend
20  for.
21  Q.  But it was reiterated to them after the March
22  decision to withhold the permit, correct, to the best of
23  your knowledge?
24  A.  Yeah, I don't know when -- I'm not sure about
25  that communication.

Page 183

1  Q.  So I'm handing you what's been marked as
2  Exhibit 30.
3        Have you seen Exhibit 30 before?  Did you
4  receive that document?
5  A.  Yes, I have seen this.
6  Q.  And did you receive it at or around the time
7  that it was dated?
8  A.  Yeah, I would have seen it around then, yes.
9  Q.  And that document is a recommendation by John
10  Strange to repeal the master plan; correct?
11  A.  Yes.
12  Q.  Handing you what's been marked as Exhibit 29.
13  That's an earlier memo from Mr. Parks, dated August 26,
14  2019; correct?
15  A.  This one is August 22nd.  This is August 26th,
16  yeah.
17  Q.  But we saw the earlier -- we saw another memo
18  from Mr. Parks to the --
19  A.  October 28th.
20  Q.  October 28.
21  A.  And then like, yeah, August 26, yeah.  Yes, I
22  see this.
23  Q.  So looking at the August 26 memo, the
24  conclusion on the back page.
25        He had reached the same conclusion in August

Page 184

1  concluding that he would recommend repeal of the master
2  plan; correct?
3  A.  Yes.
4  Q.  So we've seen two memos from Mr. Parks
5  recommending repeal of the master plan; correct?
6  A.  Yes.
7  Q.  We have seen one memo from Mr. Strange
8  recommending repeal of the master plan; correct?
9  A.  Yes.
10  Q.  And we have seen one memo from Mr. Strange
11  outlining the standards that should be considered by the
12  Plan Commission in whether to recommend repeal of the
13  master plan; correct?
14  A.  Yes.
15        (Exhibit 45 marked)
16  Q.  MR. INGRISANO:  I'm handing you what's been
17  marked as Exhibit 45.
18        This is an excerpt of an email chain.  It was
19  originally attached as an exhibit to the complaint filed
20  by Edgewood in this matter.
21        Starting there in the middle of the page where
22  it says "Forwarded message" is a message email from you
23  to Brian Munson and Mike Elliot with various cc's;
24  correct?
25  A.  Yes.

Page 185

1  Q.  This date is dated October 26, 2018?
2  A.  Yep.
3  Q.  In the second paragraph, you write:
4        "After the neighborhood meeting of the
5  Wednesday, October 17, I became aware of the extensive
6  use of the athletic field at the northwest corner of the
7  site."
8        Did I read that correctly?
9  A.  Yes.
10  Q.  You had previously referenced the October 17,
11  2018 meeting as the meeting where you learned from a
12  PowerPoint presented by Edgewood that they were using
13  the field for games; is that right?
14  A.  Among other things, yes.
15  Q.  So with respect to Exhibit 46, sir, your --
16        MR. INGRISANO:  This is Exhibit 46, right?
17        THE REPORTER:  45.
18  Q.  45.  I'm getting ahead of myself.  Sorry about
19  that.  Exhibit 45, the email from you to Brian Munson
20  and Mike Elliot.
21        Your email says, "After the neighborhood
22  meeting of Wednesday, October 17, I became aware of the
23  extensive use of the athletic field."
24        What happened after that meeting where the
25  PowerPoint was presented that gave you awareness?

Page 186

1    A.   You know, I -- I think I meant "at" or "by"
2  saying that.  I'm sorry about that.  I think that's what
3  I meant was "at" the neighborhood meeting of that, I
4  became aware of it.
5       I will say that I remember this slide coming
6  up and getting caught off guard with it.  And I think
7  they might have given me -- I might have asked them for
8  the PowerPoint to confirm what I observed, and that
9  might be why it says "after."
10      But I just remember there being this quick,
11 hey, here's what we're doing.  And I'm like, wait a
12 minute, that doesn't sound right.
13      As I mentioned earlier with Shawn Schey, I
14 want to be fair and respectful of people when I
15 communicate with them.  I want to know what I'm talking
16 about.  And that might be why I chose that word.
17   Q.   Okay.
18   A.   But it would be fair to say like I learned of
19 it ostensibly at the October meeting and then got my
20 hands on that PowerPoint that helped me understand.
21   Q.   Got it.  And your email said, "I became aware
22 of extensive use of the athletic field."
23      What did you mean by "extensive use"?
24   A.   From what I recall, they had a long list of
25 users of that field that they had presented that they

Page 187

1  had indicated were -- they were identifying were current
2  uses of the field.
3       And there were -- to me it appeared to be a
4  pretty long list, the Madison 56ers, some coaches camp
5  for some football sport thing, I don't -- quarterbacks
6  or something.  Was it UW track or something like that?
7  Field hockey?
8       There was a long list of things that were on
9  this list and I used the term "extensive" because to me
10 it seemed like it was an extensive list of uses, which
11 is what I think they were intending to share when they
12 presented that document.
13   Q.   Okay.  Was it the "users" or the "uses."  I've
14 heard two different things from you that was disclosed
15 on that slide.
16   A.   Probably both.  I mean, it's users and uses.
17 So yeah, I would say both.
18   Q.   And was it the use of the field as it was
19 described or was it the extent of the use of the field
20 that gave you the concern?
21   A.   I would say it was the use of the field.  I'm
22 just trying to figure out how "extent" makes it
23 different there.
24      That long list of uses that they identified,
25 from my analysis of that page of the master plan, was

Page 188

1  inconsistent with physical education classes and team
2  practices, so the use of the field.
3    Q.   At the October 17 meeting were there any
4  neighbors there that raised complaints about the use of
5  the field?
6    A.   I don't recall.  I honestly can't -- there was
7  a lot of people that spoke.  I don't recall what their
8  speaking was at the meeting.
9    Q.   Prior to the October 17 meeting, had you
10 received any complaints about Edgewood's use of its
11 field for games or athletic competitions?
12   A.   No.
13   Q.   So after the neighborhood meeting it looks
14 like you also closely reviewed the adopted master plan
15 to determine how the language in the master plan relates
16 to the athletic field usage; correct?
17   A.   I specifically looked at the Open Space Plan,
18 actually just that page.  I was focusing on that page.
19   Q.   So your closer review of the adopted master
20 plan was limited to the Open Space Plan?
21   A.   That's what the next sentence -- I said
22 specifically the Open Space Plan section.
23   Q.   Okay.
24   A.   Yes.
25   Q.   But you don't say you specifically only looked

Page 189

1  at the open space section.  You say you closely looked
2  at the adopted master plan.  And then you say:
3       "Specifically, in the Open Space Plan, Section
4  3.8, the approve master plan identifies the athletics
5  field to be used for team practices, physical education
6  practices."
7    A.   Oh yeah.
8    Q.   "The lack of any further language in this
9  section, or any other language in sections of the
10 adopted master plan, leads me to the interpretation that
11 current programming and usage of the field is operating
12 outside of the allowance of the adopted master plan."
13 Right?
14   A.   Correct.  That sounds right, yeah.  I must
15 have looked at it a little more in depth.  First salvo,
16 we'll just say.
17   Q.   Sure.  So your close review of the master plan
18 in October of 2018, how did that compare to the fine
19 toothed comb review that you did after March 1 of 2019?
20   A.   The March 2019 review, we were looking very
21 closely at how the issuance of permits for lights would
22 relate to the words in the master plan.
23      I was focused in on the use of the athletic
24 field as identified in my comments in 2018 here.
25 Basically, this is sort of like putting them on notice

Page 190

1  to be sure to include language in their amendment if
2  they want to make this type of stuff permanent and
3  allowable.
4       Q.  So you reviewed the master plan in October of
5  the 2018, you reviewed it after March 1 of 2019, you
6  also reviewed it with John Strange in the five days
7  between February 22nd and February 27th; correct?
8       MS. ZYLSTRA:  Object to form.  You can answer.
9       A.  Sure.  I looked at it probably a few more
10  times than that, also, yes.
11      Q.  The first time that you are relying upon the
12  lighting provisions of the master plan or the absence of
13  lighting provisions in the master plan was after the
14  fine toothed comb review after March 1 of 2019; correct?
15      A.  Can you ask that again?
16      MR. INGRISANO:  Sure.  Can you read that back,
17  please.
18      (Record read)
19      A.  I don't think so.  I think we talked about
20  lighting as it related to the master plan in November
21  when we met with Brian Munson and Mike Elliot prior to
22  the submission of their request for alteration to build
23  the stadium, the grander project that was put on hold.
24      And there were follow-up conversations, you
25  know, when that -- you know, in preparation for the

Page 191

1  application being submitted.
2       I think they gave us a draft to make sure it
3  was thorough and complete.  They wanted to -- I recall
4  them doing this, or maybe they met with us to do this to
5  share.
6       We wanted to make sure the draft was complete
7  so it had a thorough review, so that would be before
8  they submitted their application.
9       Q.  Got it.  But your concern cited in both this
10  Exhibit 45, as well as in your February 27, 2019 letter,
11  your concerns are based expressly on 3.8, Open Spaces;
12  correct?
13      A.  Principally, yes.  I believe that principally
14  that's where we would expect the language to be found
15  that would clearly allow for the field, the lighting of
16  the field, the uses and activities on the field.
17      I mean, it could be -- there are other
18  sections, like there is a section that talks about
19  buffer area along Woodrow and putting in lighting, that
20  would need to be revisited for effectiveness.
21      And I recall -- I'm starting to recall now
22  Mike Elliot and Brian Munson talking about things like
23  fencing and extensive landscaping along those areas,
24  because lighting is going to be introduced where it
25  isn't.

Page 192

1       So it's not just Section 3.8, Open Spaces.
2  There would be other sections that would need to be
3  amended.
4       MR. INGRISANO:  Can you read back my question,
5  please.
6       (Record read)
7       Q.  So what I'm saying, sir, is what you cited in
8  this email and what you cited in the February 27th
9  letter, what's in the four corners of the document is
10  3.8; is that right?
11      A.  I'm specifically calling out and identifying
12  3.8 in that second paragraph, yes.
13      However, like, I'm also contemplating Section
14  3.1, Future Needs of Campus, on the second page:
15      Q.  With the language that you're citing as being
16  inconsistent, the use of the field versus what's
17  provided in the master plan, is 3.8.
18      3.8 in your letter on 2/27, 3.8 in your email,
19  that's the language that Edgewood is violating by its
20  extensive use of the field; correct?
21      A.  Yeah, so you're -- yes.
22      Q.  Thank you.
23      MS. ZYLSTRA:  Good time for a break?
24      MR. INGRISANO:  Sure.
25      (Recess)

Page 193

1  BY MR. INGRISANO:
2       Q.  Back on.  Mr. Tucker, to your knowledge, has
3  your department ever issued any citations or official
4  notices to the University of Wisconsin-Madison for using
5  property for use not specified in its master plan?
6       A.  No.
7       Q.  Has there ever been any effort by the city to
8  confirm whether UW is using its athletics and sports
9  recreational facilities or open spaces as they are
10  described in its master plan?
11      A.  We respond to complaints.  We haven't received
12  any complaints, so we haven't investigated to the best
13  of my knowledge.
14      Q.  But you would agree that under the standards
15  that you have identified here today for what's required
16  in the master plan, that if a space is identified for a
17  particular use in the master plan it cannot be used for
18  a different purpose; is that right?
19      MS. ZYLSTRA:  Object to form.
20      A.  It should be used consistent with the language
21  in the master plan.  I would say yes.  And that's what
22  we would expect to see.  So a different use would
23  probably be a violation, yes.
24      Q.  So if a master plan designates a space to be
25  used --

1    Well, so basically the limitation on the use
2 of any space or use is determined by the level of
3 specificity in the master plan; is that fair?
4    MS. ZYLSTRA:  Objection.  Form.
5    A.  We would expect to be able to look to the
6 master plan to get clarification on the use and the
7 improvement of a space, yes.
8    Q.  So if a space is designated as a flag football
9 field it should be used for flag football?
10    A.  You would expect that if it had a level of
11 specificity like that, like you said something about
12 basketball earlier today, volleyball or basketball, is
13 that what it was?  Yeah, probably that's what we would
14 look for.
15    Q.  Would you expect that a space labeled as being
16 for recreation would be allowed to host collegiate
17 varsity athletic competitions?
18    MS. ZYLSTRA:  Object to form.  You can answer.
19    A.  Potentially.
20    Q.  Even though there are other places in a master
21 plan that would be labeled as for athletics?
22    A.  Potentially, yeah.  We would need to provide
23 -- conduct a thorough review of that space and the words
24 -- it's a hypothetical, but we like to look at these
25 things in detail.

1    Q.  Have you looked at the UW master plan for its
2 description of how open spaces, athletic recreational
3 spaces are used?
4    A.  Yeah, as part of understanding, I have looked
5 at the UW master plan, yeah, I've referenced it.
6    (Exhibit 46 marked)
7    Q.  MR. INGRISANO:  Sir, is this the UW
8 Campus-Institutional District Master Plan that you are
9 familiar with?
10    A.  I'm going to suspect, yeah, this is for the
11 purposes of our -- yeah, this looks like the master
12 plan.
13    Mine has a binder on it or is in a PDF form,
14 but it definitely appears like this.  It's probably got
15 my letter in here.
16    Okay.  I don't see my letter in here or the --
17 well, do we --
18    Q.  For purposes of discussion I'm not going to
19 make you say and swear under oath this is the one and
20 only master plan.
21    But turn to page 126, sir, of this Exhibit 46.
22    A.  These, the red numbers?
23    Q.  Yes, the bottom left.  These were printed out
24 before we had them Bates labeled.
25    MR. INGRISANO:  This is part of the University

1 of Wisconsin production, Sarah.
2    MS. ZYLSTRA:  Okay.
3    Q.  126, right column under where it says
4 "Lakeshore Campus Design Neighborhood."
5    A.  Yes.
6    Q.  One, two, three -- third paragraph down:
7    "The Near West Fields will soon be upgraded.
8 The existing fields, at approximately 383,140 gross
9 square feet, will be re-graded to create five synthetic
10 turf flag football fields and one champion soccer
11 field."  And then it goes on to say, "A portion of the
12 fields will function as a storm water management
13 facility."
14    Sir, with that level of specificity identified
15 for the Near West Fields at Wisconsin, it would be your
16 expectation that conformity with the master plan
17 requires that's how that space will actually be
18 used?
19    A.  Yeah, I believe that's how they are describing
20 it.  The only part I would add is there might be another
21 section that also refers to something about that field
22 that I would need to -- I would need to look through the
23 whole document to see like there is an open space
24 section, and this is only the proposed facility
25 condition section.

1    Q.  But the whole part of the master plan review
2 process would be to eliminate any inconsistencies;
3 correct?
4    MS. ZYLSTRA:  Object to form.
5    A.  No, I don't think it's inconsistency; I think
6 it's other sections where the use of that field may be
7 covered.  It could be consistent.  I don't know.
8    Q.  But if it's inconsistent, it says the Near
9 West Fields will be used for poetry readings.  Now we've
10 got inconsistency.  And hopefully that would have been
11 avoided prior to adoption, correct, or addressed just
12 prior to adoption?
13    MS. ZYLSTRA:  Objection.  Form.
14    A.  We do our best to try and clarify as much of
15 this as we can, but it's not uncommon to find things
16 that need clarification and correction and we would work
17 with the responsible party to clarify that.
18    That would be a typical process for this kind
19 of thing.
20    Q.  Sir, let me ask you to turn to page 75.  It's
21 3.7, "Campus Land Use and Buildings."
22    It's a color map, is it not?
23    A.  Yes.  Is this the -- yes, yes.
24    Q.  So looking at the legend on this document, the
25 buildings in red represent athletics buildings, correct,

Brown & Jones Reporting
A Veritext Company

414-224-9533
www.veritext.com

Page 198

1 bottom left of the document?
2     A.   Yeah, there is something called -- there is a
3 classification that refers to it as athletics, yes.
4     Q.   And then there is a light green
5 classification, a different classification for
6 Recreation/Sports.  Do you see that?
7     A.   Yes.
8     Q.   And because they are two different colors and
9 described differently they represent different things,
10 is that right, different uses?
11     MS. ZYLSTRA:  Object to form.  You can answer.
12     A.   I would think there would be, yeah, some other
13 reference to -- yeah, the differences in those colors in
14 the plan.
15     Q.   Sir, the left side of this map as we are kind
16 of moving up, so in kind of the --
17     A.   Could I just --
18     Q.   Yeah.
19     A.   Could I go back to that?
20     Q.   Sure.
21     A.   So, you know, I've been working, you know, for
22 quite some time.
23         Athletics is like a department, like a
24 function, and this map might be reflective of like
25 athletics responsibility.  Like, you know the Kohl

Page 199

1 Center is in here.  Half of, interestingly, Camp
2 Randall, but not all of it because there is a green
3 piece which is recreation/sports.
4         So they have some distinction that they have
5 written into this.  There is also a red building at the
6 end of a dead-end cul-de-sac.  I'm not really sure what
7 that's about.
8     Q.   But this is a map that by its terms relates to
9 use.  First line, "The campus has a clear existing
10 building use pattern."
11         3.7 is labeled "Campus Land Use and
12 Buildings"; correct?
13     A.   Yes.  What I'm getting at is, like the red
14 buildings relate to like typically UW athletics, the
15 Kohl Center, which is hockey, basketball, I believe, and
16 then the Camp Randall which is football, and I think
17 there is a softball.
18         But there are a number of other things that
19 relate to competition and activities that occur on the
20 campus that are not UW sports teams.
21     Q.   Sure.
22     A.   And those could be like your example of flag
23 football is a thing, or competitive soccer at the West
24 Fields or whatever it was on the other page.
25         So I just wanted to note that I think that's

Page 200

1 partly why there is a distinction.  And some of these
2 aren't even in properties that are within the bounds of
3 the Campus Master Plan.
4     Q.   Sure.  But you're speculating right now as to
5 the distinctions that are being drawn between those two
6 things and you don't actually know; is that right?
7     A.   I recall doing some analysis and looking into
8 some of these other facilities and being aware that they
9 were places that -- you know, I'm sort of struggling a
10 little bit on that.
11         Like the tennis, the Nielsen Tennis and the
12 swimming place over by Willow Creek and Observatory
13 Drive that were places that were acknowledged in some
14 form in the master plan as places where competitive
15 sports and games may occur.
16         We believe there was language in the master
17 plan to support that.  And they wouldn't be red.  They
18 are a different color on this map.
19     Q.   Yeah, in fact, Nielsen Tennis stadium on this
20 map is coded green for recreation; correct?
21     A.   Which one is Nielsen?
22     Q.   You're not familiar?  I'll represent to you
23 that Nielsen Tennis is the light green building in the
24 top left corner in the map.
25     A.   Oh, it's probably over by the orange thing?

Page 201

1     Q.   Yes.
2     A.   Okay.  Thank you, yes.
3     Q.   And it's coded as recreation?
4     A.   In this plan it is on the map, it says
5 recreation/sports.
6     Q.   And you know that varsity tennis competitions
7 are held at Nielsen Tennis Complex; correct?
8     A.   I'm aware, I believe that's what happens
9 there, yeah.  Is this the UW varsity tennis team?
10     Q.   Are you aware of whether varsity tennis
11 matches for the UW tennis team occur at the Nielsen
12 Tennis stadium?
13     A.   I would have to look to see.  That's a fair
14 assumption, but I would really -- I'd like to see it to
15 say it.
16     Q.   Are you aware of any athletic competitions
17 that occur at the Natatorium that's coded in light green
18 off of Observatory Drive?
19     A.   I'm not personally aware of any.  I haven't
20 been to any there.
21     Q.   Okay.  You had mentioned before that UW does
22 not pull electrical permits.  Why is that?
23     A.   The university is -- my understanding is the
24 university is a charter entity of the state similar to
25 like the City of Madison, and the only local regulation

Page 202

1 the university is required to comply with is our zoning
2 code.
3    Q.   When did you learn of an effort to amend the
4 Campus-Institutional District zoning code in 2019?
5    A.   Are you referring to them in the -- when they
6 got adopted in October?
7    Q.   Yes.
8    A.   I became aware of that -- I was aware of
9 discussions, I want to say, that dated back to maybe
10 July, around when we were looking -- when the zoning
11 board was hearing the interpretation.  Possibly that far
12 -- that soon.  I don't recall exactly.
13    Q.   Who were those discussions with?
14    A.   I was talking with Attorney Strange about it.
15 I had had some discussions with planning staff.  There
16 was -- I recall some alderpersons asking me about it.
17 Are you curious --
18    Q.   Well, what alderpersons are you talking about?
19    A.   I recall -- I recall, obviously, Alder Evers,
20 Alder Bidar who had West High School in her district.  I
21 recall Alder Keith Furman who has -- I believe he has
22 Memorial in his district.
23       I'm trying to think who else there was.  Those
24 were three -- those were the only three that I can
25 recall at this point.

Page 203

1    Q.   I'm handing you what's marked as Exhibit 18,
2 sir.
3       Do you recognize that as a master document
4 memorializing the adoption of an amendment to the
5 Campus-Institutional District zoning ordinance that was
6 effective, final action, October 1, 2019?
7    A.   Yes.
8    Q.   Have you ever seen this document before?
9    A.   I have.
10    Q.   And this document references, if you look at
11 page 2 of this Exhibit 18, under "History of Legislative
12 File."  First line, "Attorney's Office, 8/05/2019,
13 Referred for Introduction."
14       Do you see that?
15    A.   Yes.
16    Q.   Did you have any involvement or knowledge of
17 the process beginning the referral for introduction for
18 this amendment?
19    A.   I honestly don't recall.
20    Q.   What role, if any, did you have in the process
21 of amending this ordinance?
22    A.   I believe the process that I would have had is
23 what the process I typically have with nearly all
24 ordinance amendments since I started the job as the
25 zoning administrator, which is I would be involved in

Page 204

1 the drafting of the language.  I'll use the terms
2 principally to make sure it fit into the ordinance.  So
3 it was administrable, it was clear, it was without
4 conflict with other sections, it was in the right place.
5       Sometimes I would get involved in the words
6 that were chosen to result in the effect from the
7 standpoint of preparing legislation on behalf of an
8 alderperson for interaction.
9    Q.   Did you have that role with this amendment?
10    A.   I was consulted on the language, yes, for
11 similar reasons.
12    Q.   When?
13    A.   I don't recall when that was.  It was sometime
14 in the process, because it -- they would have run it by
15 me to make sure it fit at some point.
16    Q.   Who is "they"?
17    A.   The city attorney or sponsoring alders.
18 Typically those are the people where text amendments
19 originate.
20    Q.   What do you recall -- who did you have contact
21 with regarding your input and thoughts on this
22 amendment?
23    A.   It would probably have been Attorney John
24 Strange.  He would have been the key person that I
25 interacted with on this language.

Page 205

1    Q.   How about Alder Evers -- Evers?
2    A.   Evers.
3    Q.   At least he's not here to hear.
4    A.   One of the things I would just need to know is
5 any -- I would need to understand a little better is any
6 of the sponsors that were named would be -- I would have
7 a communication with because they all own a piece of it,
8 so to speak, and I need their authorization.  I need to
9 communicate with them in regard to it because it's their
10 legislation.
11       So whomever was the sponsors of it, and the
12 list of sponsors there probably need added at a later
13 date people wouldn't have been consulted at the front
14 end of the drafting.  So I don't know who else.
15    Q.   Sure.  When --
16    A.   Wait, excuse me.  I do know that Shiva was
17 involved, Shiva Bidar, Alder Bidar, principally, because
18 she was watching the evolution of the Edgewood situation
19 knowing that she has West High School in her district.
20    Q.   You, again, were part of the group in the city
21 in 2011, 2012, 2013, if not before, that was working on
22 drafting the Campus-Institutional zoning ordinance;
23 correct?
24    A.   Yes.
25    Q.   Yesterday in his deposition, I'll represent to

Page 206

1  you that Alder Evers described this amendment that he
2  sponsored originally -- I'll represent to you he was the
3  original sole sponsor -- was designed to address what he
4  called a "flaw" or a "loophole" in the ordinance.
5      Would you agree with the characterization that
6  the ordinance that you assisted in drafting had a flaw
7  or a loophole that this ordinance was supposed to
8  address?
9      MS. ZYLSTRA: Object to form. You can answer.
10     A.  I heard that from some -- from sponsors. I
11 heard that as part of my review of this amendment, yes.
12     Q.  And the fix for the alleged flaw was the
13 language, revised ordinance.
14     MR. JEAN-LOUIS: Counsel, I believe it's the
15 same exhibit.
16     MR. INGRISANO: You know what, we could
17 probably just do that.
18     Q.  So the flaw that you heard expressed was the
19 flaw that was ultimately remedied by -- if you look at
20 the second to the last page of this Exhibit 18, where it
21 says "Page 2" at the top. Do you see that?
22     A.  Yes.
23     Q.  "The Common Council of the City of Madison do
24 hereby ordain as follows."
25     If you look under the revised Section 2 Master

Page 207

1  Plan Requirement, sub D:
2      "In a Campus-Institutional District without a
3  Campus Master Plan, the establishment, improvement, or
4  modification of any primary or secondary use occurring
5  outside of an enclosed building shall require
6  conditional use approval."
7      Do you see that?
8      A.  Yes.
9      Q.  Do you understand that that was the fix for
10 the alleged flaw?
11     MS. ZYLSTRA: Object to form. You can answer.
12     A.  Yes, that was the intent of the sponsors.
13     Q.  So previous to that, under the original
14 language of the master plan -- I'm sorry, of the
15 document, conditional use was only required where the
16 building floor space exceeded 4,000 square feet; is that
17 right?
18     A.  That's correct.
19     Q.  So what I'll call the 4,000 square feet floor
20 space provision, was it a flaw to have had that in the
21 original Campus-Institutional District ordinance?
22     MS. ZYLSTRA: Object to form, foundation. You
23 can answer.
24     A.  No, it's -- no, because it's in (c).
25     Q.  But (c), though, has been revised.

Page 208

1      A.  Right.
2      Q.  So what you had basically is that (c) is no
3  longer the sole requirement there's been to close the
4  flaw or the loophole that Alder Evers and others are
5  complaining about is to add that additional requirement
6  so that the conditional use permit is not just related
7  to floor space but rather for any establishment,
8  improvement, or modification of any primary or secondary
9  use occurring outside of an enclosed building; correct?
10     A.  Yes.
11     MS. ZYLSTRA: Late objection. Form. Go
12 ahead.
13     A.  Sorry. Yes.
14     Q.  So now, for the first time with this
15 amendment, we're seeing a restriction on modifications
16 of primary or secondary use, correct, whereas before it
17 was not use-related but rather only floor space related;
18 correct?
19     A.  Yeah, the -- yes, the original -- it's hard to
20 see with the strike-throughs and the distinctions
21 between the two, but the amendment expands upon the
22 original trigger and adds the modification to primary
23 and secondary uses occurring outside of an enclosed
24 building requiring conditional use.
25     And it also gives me the ability to do minor

Page 209

1  alterations and things like that.
2      Q.  So do you agree with the characterization that
3  the original ordinance was flawed?
4      MS. ZYLSTRA: Objection. Form, asked and
5  answered.
6      Q.  Let me withdraw the question. Let me ask you
7  this:
8      What governmental interests did the original
9  language advance?
10     MS. ZYLSTRA: Object to form, foundation. You
11 can answer.
12     A.  What do you mean by "original language"?
13     Q.  The original language before the amendment
14 occurred.
15     A.  The --
16     MS. ZYLSTRA: Same objections.
17     A.  The intent of the language in the master plan
18 in this section of this Campus-Institutional District
19 was an attempt to make a distinction between things that
20 were relatively minor and something that would -- or a
21 use or a -- excuse me, in this case a building expansion
22 that would trigger a greater community discussion
23 because of impacts on site, neighboring sites.
24     And the line in the sand that was drawn was a
25 4,000 square foot area limitation. And -- yeah, and I

1 believe that was -- I recall that being written into the
2 ordinance to create something that was allowed as
3 permitted in CI districts.
4     I recall the attorney at the time having
5 concerns about everything potentially being a
6 conditional use, which is why the 4,000 square foot was
7 allowed.
8     MS. ZYLSTRA: Wait. Same stipulation? To the
9 extent he was trying to reveal -- I couldn't tell if he
10 was revealing an attorney-client communication, which I
11 will object and pull it back.
12     MR. INGRISANO: Yeah, we don't know the
13 context. It could have been a public meeting.
14     MS. ZYLSTRA: I agree. That's why I --
15     A. So we, you know --
16     MS. ZYLSTRA: Mr. Tucker, I have to get a
17 stipulation from him not to waive the attorney-client --
18     MR. INGRISANO: I'm talking -- well, I need to
19 --
20     MS. ZYLSTRA: Do you want me to ask --
21     Q. You just mentioned that an attorney was
22 talking about that.
23     In what context was an attorney talking about
24 that? Was it in a public meeting, were there other
25 people in the meeting that were not city employees?

1     A. It was a public meeting. There were other
2 people in that, yeah.
3     MS. ZYLSTRA: Okay. Sorry.
4     THE WITNESS: I apologize, also.
5     MS. ZYLSTRA: No, go ahead.
6     A. So are you asking me when this happened, the
7 4,000 or --
8     Q. No, my question originally was what
9 governmental interest was being furthered by that
10 language.
11     And what I've heard you say is, the
12 government, the city, had an interest in drawing a
13 distinction between substantial projects and less
14 substantial projects; is that fair?
15     MS. ZYLSTRA: Same objection as far as
16 foundation. You can answer.
17     A. I mean, I would take it back to the Statement
18 of Purpose for the district really, which speaks to the
19 intent of the district.
20     And then a line was drawn at allowing a 4,000
21 square foot building addition as the difference between
22 permitted and conditional uses.
23     So the Statement of Purpose is kind of what
24 drives the -- you know, the compelling governmental
25 interest to have a conditional use process for a new

1 4,000 square foot building addition.
2     MR. INGRISANO: Have that marked.
3     (Exhibit 47 marked)
4     Q. MR. INGRISANO: Sir, do you recognize this as
5 the Planning Division staff report dated March 24, 2014,
6 for the adoption of the Edgewood Campus-Institutional
7 District plan?
8     A. Isn't this already an exhibit?
9     Q. It might already be.
10     A. Okay. Yeah, I'm pretty sure we already have
11 this in here.
12     Q. I'm trying to expedite things rather than
13 digging through the stack.
14     A. I've got it as No. 39.
15     Q. Same document?
16     A. Well, this one has a -- I think so. It looks
17 like it.
18     MS. ZYLSTRA: I believe it's the same one.
19     A. One has a case number at the top and the
20 other --
21     Q. Well, it's different documents so we will just
22 go with 47.
23     A. Okay.
24     Q. All right. I put this document in front of
25 you because starting on page 3, top left corner, it's

1 got the original language from the Campus-Institutional
2 District ordinance; correct?
3     A. I'm seeing it in the fourth page.
4     Q. Top of page 3 -- or I'm sorry, bottom of page
5 3, Statement of Purpose.
6     A. Yes, starts at the bottom of page 3 and
7 extends it to page 4 and 5.
8     Q. And so we're talking about sub 2, sub C:
9     "In a Campus-Institutional District without a
10 Campus Master Plan, individual development proposals and
11 changes that exceed 4,000 square feet in gross floor
12 area within any 5-year period shall require conditional
13 use approval." Correct?
14     A. Yes.
15     Q. So that language was incorporated into this
16 document, from your recollection, intentionally?
17     A. The staff report?
18     Q. No, in the ordinance.
19     A. Oh, yeah. That was the language written in
20 the ordinance. I don't know -- I mean, yes, it was
21 intentionally written in the ordinance.
22     Q. And gross floor area, is that a defined term?
23     A. I believe it is defined in the zoning code,
24 yes.
25     Q. How is that defined?

Page 214

1    A.   It's a complicated definition.  It basically
2  talks about area between the exterior walls, and there
3  is some exclusions like stairwells and unoccupied
4  basements.  I would have to read the extensive
5  definition in Section 28.211.
6    Q.   Got it.  So the original subsection 2(c) of
7  that statute was not, in your estimation, something that
8  would have been haphazardly drafted; is that fair?
9         MS. ZYLSTRA:  Object to form.  You can answer.
10   A.   The intent -- yeah, the intent of adding that
11 section was -- in its words, was deliberate in
12 consideration of development.
13   Q.   Did you ever hear anyone say that this
14 amendment in October 2019 was intended to specifically
15 address Edgewood in light of its attempts to repeal its
16 master plan?
17   A.   Not that I recall.  I recall there being the
18 -- you know, the relative -- well, I don't know how to
19 say it.
20        I think what happened was the ongoing
21 conversations about the status of places are zoned CI
22 and the city was looking -- I mean, I was being asked
23 broadly about all places zoned CI, which is more than
24 Edgewood, and under what rules they would be operating
25 absent a master plan.

Page 215

1        And Edgewood was one of those places, as was
2  West High School, who approached us on a capital
3  improvement project at the school.
4    Q.   Do you have Exhibit 33 in front of you?
5    A.   I can find it.  I'm not seeing it in front of
6  me.  What is it?
7    Q.   It's the May 11, 2020 planning staff report.
8    A.   Is this the conditional use?
9    Q.   Yes.
10   A.   I don't know if you gave that to me.
11   Q.   I don't think I have given that to you.  Oh,
12 there it is.  I'm handing you what's been marked as
13 Exhibit 33, sir.
14        Do you recognize that as a planning staff
15 report dated May 11, 2020 that you were a co-author of?
16   A.   This is the report, but I was -- and I am
17 listed as a co-author on this, as a "prepared by."
18   Q.   And you did, in fact, prepare that document?
19   A.   Yep, I participated with Mr. Parks in the
20 preparation of it, yes.
21   Q.   And by listing yourself as a preparer on the
22 document you agreed with all of its contents?
23   A.   Yeah.
24   Q.   Looking at the standard for conditional use
25 approval, standard No. 3.

Page 216

1    A.   And that's -- yep, okay, on page 6?
2    Q.   Yes.
3    A.   Okay.
4    Q.   Your memo recognizes that the standards is one
5  of a substantially impaired or diminished --
6         Standard 3 says, "The uses, values and
7  enjoyment of other property in the neighborhood for
8  purposes already established will not be substantially
9  impaired or diminished in any foreseeable manner."
10 Correct?
11   A.   Yes.
12   Q.   And in Exhibit 33, you and Mr. Parks concluded
13 that the proposed conditions that you would impose on an
14 approval for Edgewood's conditional use, that those
15 minimized the impairments to any neighboring properties;
16 is that fair?
17   A.   Just to be clear, I wrote, I was part -- I
18 have been part of almost no staff reports for
19 conditional use.  So it was not an area of my expertise,
20 that aspect of it.
21        My area of expertise is about enforcement.  My
22 name is on this report, and I know that, but that's not
23 my area of expertise.
24        Mr. Parks and the planning staff are the folks
25 that lead that.  My participation in this rare

Page 217

1  opportunity to share my name on a staff report was
2  related to enforceable conditions, how they might work,
3  how that might work.
4         So I'm just not an expert in that and those
5  folks do it on a daily -- on a bi-weekly basis.
6    Q.   On page 5 at the bottom of that document, last
7  paragraph.
8    A.   Yes.
9    Q.   The middle of paragraph beginning, "However,
10 by limiting the number of events that occur in the
11 complex during the evening, the commission may create a
12 balance between the desire by Edgewood High School to
13 use its athletic complex for evening sporting events and
14 minimizing" -- which is italicized -- "impacts on the
15 residential neighborhoods that border the institution on
16 three sides consistent with Statement of Purpose for the
17 Campus-Institutional zoning district excerpted above."
18   A.   I'm sorry, I'm on the bottom of page 5, and
19 it's page 5 of 10 on top and it says --
20   Q.   I'm sorry, I'm on page 5 of the memo.  Top
21 left corner, page 6 of 10.
22   A.   All right.  Okay.  Thanks.
23   Q.   So read it yourself where it says "However."
24   A.   Uh-huh.  Yes.
25   Q.   So the understanding of this memo, and

Page 218

1 particularly Mr. Parks and his staff, was that the
2 conditions imposed would relate to and have the effect
3 of helping to minimize any impacts or impairments on the
4 neighboring properties; correct?
5    A.  Yes.
6    Q.  In looking at this from an enforcement
7 standpoint, did you see any code violations relating to
8 Madison's noise ordinances would have -- would
9 permitting approval of this conditional use permit
10 subject to the conditions that were outlined there,
11 would that have the effect of nevertheless still
12 violating Madison's noise ordinances, to your knowledge?
13       MS. ZYLSTRA:  Object to form.  You can answer.
14    A.  Madison's noise ordinance that relates to
15 this, the use of this facility, is a disturbing the
16 peace ordinance administered by the police department
17 and they would be the ones that would be responsible for
18 that.
19       And as part of my ongoing and lengthy
20 involvement in this, had discussions with the Madison
21 Police Department that investigate noise complaints, and
22 they reiterated to me that if the city was going to
23 approve a place to have night games, athletic games,
24 WIAA sport contests, those activities, they would not
25 consider the typical normal activities to be a

Page 219

1 disturbing the peace.
2       However, if they had like a -- did a
3 ridiculously loud band at 11:00 o'clock after a game or
4 something like that, they would come and shut them down.
5       But the noise ordinance that's applicable here
6 is not the noise ordinance that my office administers.
7 It's the disturbing the peace noise ordinance at the
8 police department.
9    Q.  What noise ordinance does your office
10 administer?
11    A.  We are responsible for the noise ordinance
12 that relates to point of sound-generating noise, such as
13 equipment.  Think of compressors, generators, fans,
14 those types of things that are fixed noise pieces on the
15 ground, vacuums, that we measure the amount of noise at
16 the receiving property line and at the exiting property
17 line in some other cases.
18    Q.  So there is no objectively drawn Madison noise
19 ordinance, for example, that says you shall not create a
20 noise louder than X number of decibels at a particular
21 time or place?
22       MS. ZYLSTRA:  Object to form.  You can answer.
23    A.  There is the noise ordinance I just described,
24 which is the equipment noise ordinance which absolutely
25 says that.

Page 220

1       But the noise generated associated with events
2 is managed under -- effectively if they are disturbing
3 the peace, by the police department.
4    Q.  Got it.  The staff involved with Exhibit 33
5 recognized in that document that there had been
6 historical noise complaints; correct?
7    A.  You're asking if I knew they were noise
8 complaints?
9    Q.  No, the staff in this report recognized there
10 had been historical noise complaints.
11    A.  Are you pointing me to a section where I can
12 say there were noise complaints?
13    Q.  I will in a minute.
14    A.  Okay.  I mean, I know there were noise
15 complaints.
16    Q.  Sure.  Well, even based on your own knowledge,
17 despite you knowing there were noise complaints, that
18 did not prevent you from recommending approval with
19 conditions; correct?
20    A.  No, it did not prevent us from recommending
21 approval.  People can complain about anything.
22    Q.  And they do.
23    A.  They sure as hell do.
24    Q.  Sir, part of your job is to interpret
25 Madison's zoning ordinances; correct?

Page 221

1    A.  Yes.
2    Q.  Are there any rules or presumptions that are
3 supposed to guide you in that endeavor that you're aware
4 of?
5       MS. ZYLSTRA:  Objection.  Form.  You can
6 answer.
7    A.  Yes, there are.
8    Q.  And can you identify those for me?
9    A.  I would have to have a section of the
10 ordinance in front of me.  There is some words that talk
11 about conflicting ordinances, I think, plural, the word
12 "shall" means "shall" and may mean -- you know, those
13 types of things.  I would need to see that section.
14 It's sort of rules of interpretation.
15    Q.  Got it.  Anything outside of what's actually
16 in the code and its rules of interpretation section?
17    A.  That does what again?
18    Q.  That guides or governs your interpretation of
19 Madison's land use ordinances.
20       MS. ZYLSTRA:  Objection.  Form.  You can
21 answer.
22    A.  Yes, I think I'm understanding.  But like
23 state and federal law, there are times when we are
24 advised by our attorneys about case law that may
25 conflict with Madison general ordinance.

Page 222

1      Things that are along that line of regulation
2 that we would take into consideration and interpretation
3 of the application of the ordinance.
4     Q. How about of a rule of interpretation
5 that ordinances should be interpreted and applied with a
6 bias towards the free use of property?
7     MS. ZYLSTRA: Object to form. You can answer.
8     A. I don't know about that. I'm not aware of --
9 what is it again?
10     Q. Bias towards the free use of property. That
11 when dealing with two possible interpretations of an
12 ordinance you should choose the one that is biased
13 towards and in favor of the free use of property.
14     MS. ZYLSTRA: Same objection.
15     A. When you're in a point of conflict?
16     Q. Yes.
17     A. I'm not generally familiar -- I haven't
18 encountered that rule.
19     Q. Can you identify for me, please, the objective
20 characteristics the city wishes to promote or preserve
21 in the Campus-Institutional District zoning ordinance?
22     MS. ZYLSTRA: Object to form.
23     Q. Beyond what may be in the Statement of
24 Purpose.
25     MS. ZYLSTRA: Same objection.

Page 223

1     A. So the zoning code itself has an overall
2 Statement of Purpose, and I would look to that to
3 provide us with direction.
4     Q. Okay. Beyond the Statement of Purpose in that
5 ordinance and the Statement of Purpose in the ordinances
6 at large, that would be your answer?
7     A. What was it again, the question?
8     Q. Well, the question was, can you identify the
9 objective characteristics the city wishes to promote or
10 preserve in the Campus-Institutional District zoning
11 ordinance?
12     MS. ZYLSTRA: Same objections.
13     A. I'm not sure if I exactly understand that
14 question.
15     So I'll stand on my answer that I find the
16 Statement of Purpose gives us the most policy direction
17 on the rules of the city for this district and the
18 zoning code in its entirety.
19     MR. INGRISANO: All right. I've got no
20 further questions.
21     MS. ZYLSTRA: I just have one or two
22 clarifications.
23 ///
24 ///
25           EXAMINATION

Page 224

1 BY MS. ZYLSTRA:
2     Q. You got asked early in the day some questions
3 with respect to parking lots; correct?
4     A. Yes.
5     Q. Outside of what you do in terms of zoning with
6 respect to parking lots, are you aware of other
7 ordinances and regulations that relate to lighting of
8 parking lots?
9     MR. INGRISANO: Objection. Form. Leading.
10     A. Yes.
11     Q. I'll rephrase that.
12     Are there -- do you know whether other
13 regulations or ordinances exist as it relates to parking
14 lot lighting?
15     MR. INGRISANO: Objection. Form, leading.
16     MS. ZYLSTRA: It's not leading.
17     Q. Go ahead.
18     A. Yes.
19     Q. What are you aware of, sir?
20     A. There is a requirement that I believe it is
21 parking -- parking facilities with more than -- and I'm
22 guessing here -- either three, four, or five, but it's
23 one of those three stalls are required to be lit.
24     Q. And with respect to the staff report that you
25 were just talking about with respect to Exhibit 33, I

Page 225

1 thought I heard earlier in the day -- well, let me
2 strike that and start again.
3     Was it your understanding that the staff
4 report was determining that the conditions could be
5 found to be met or that they were met?
6     A. We don't find conditions to be met or not. We
7 provide a recommendation to the Plan Commission on if
8 they can find standards to be met.
9     Q. And the recommendation was whether they could
10 be found to be met or that they were met, if you know?
11     MR. INGRISANO: Objection. Form.
12     A. The words in there say that the Planning
13 Division believes that the Plan Commission can find, so
14 we're recommending that they could find the standards to
15 be met for conditional use.
16     MS. ZYLSTRA: Okay. No further questions. We
17 would like to reserve the right to read and sign.
18     MR. INGRISANO: Um --
19     MS. ZYLSTRA: Oh, I'm sorry, sir.
20     MR. INGRISANO: We're good. Thank you.
21     MS. ZYLSTRA: Sorry. Reserve the right to
22 read and sign. Thank you.
23     (Deposition adjourned at 5:23 p.m.)
24
25

Page 226

CERTIFICATE OF REPORTER

1
2
3      I, Cheri Winter, a Certified Shorthand
4  Reporter, Notary Public in and for the State of
5  Wisconsin, do hereby certify that the foregoing
6  deposition was taken before me, on the 29th day of April
7  2022; that it was taken at the request of the Plaintiff;
8  that it was taken in shorthand by me, a competent court
9  reporter and disinterested person, approved by all
10  parties in interest, and thereafter converted to
11  typewriting using computer-aided transcription; that
12  said deposition is a true record of the deponent's
13  testimony; that the deposition was taken pursuant to
14  Notice, that said MATTHEW TUCKER, before examination was
15  sworn by me to testify to the truth, the whole truth,
16  and nothing but the truth relative to said cause.
17      Dated May 12, 2022.
18
19          *Cheri Winter*
20          Cheri Winter
            Notary Public
21          State of Wisconsin
22
23
24
25

---

Page 227

1          Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
              Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
   May 12, 2022
5
   To: Sarah Zylstra, Esq.
6
   Case Name: Edgewood High School of The Sacred Heart, Inc. v.
7          City of Madison Wisconsin, et al.
8  Veritext Reference Number: 5188353
9  Witness: Matthew Tucker      Deposition Date: 4/29/2022
10
   Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
    shown
17
   above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25  NO NOTARY REQUIRED IN CA

---

Page 228

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
   ASSIGNMENT REFERENCE NO: 5188353
3  CASE NAME: Edgewood High School of The Sacred Heart, Inc. v.
             City of Madison Wisconsin, et al.
   DATE OF DEPOSITION: 4/29/2022
4  WITNESS' NAME: Matthew Tucker
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8      _____
9  Date          Matthew Tucker
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13      They signed the foregoing Sworn
             Statement; and
14      Their execution of this Statement is of
             their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17      _____
18      Notary Public
19      _____
20      Commission Expiration Date
21
22
23
24
25

---

Page 229

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
   ASSIGNMENT REFERENCE NO: 5188353
3  CASE NAME: Edgewood High School of The Sacred Heart, Inc. v.
             City of Madison Wisconsin, et al.
   DATE OF DEPOSITION: 4/29/2022
4  WITNESS' NAME: Matthew Tucker
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
   as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13      _____
   Date          Matthew Tucker
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
       They have listed all of their corrections
18          in the appended Errata Sheet;
       They signed the foregoing Sworn
19          Statement; and
       Their execution of this Statement is of
20          their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23      _____
   Notary Public
24      _____
25      Commission Expiration Date

---

Page 230

```
 1        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 5188353
 3  PAGE/LINE(S) /      CHANGE      /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____     _____
20  Date           Matthew Tucker
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
        _____
        Notary Public
24
        _____
25      Commission Expiration Date
```

| & | | | |
|---|---|---|---|
| **&** 4:5,12,15,21 | | | |

**0**

**0018** 1:6
**005459** 157:16

**1**

**1** 3:11 4:21 35:23
36:20,23 42:18
46:17,19,22 48:4
49:1 50:3 120:15
120:19 123:14,17
123:19,22,22
124:12,19 134:25
136:16 138:14,22
139:13 156:21
182:13 189:19
190:5,14 203:6
**10** 49:1 86:1 91:20
98:7 99:11 100:23
100:23 101:1
153:14 157:18
158:2 159:7,8
181:3,22 217:19
217:21
**10.085** 33:24 46:15
48:4,21 49:1,1,14
50:2,6,13,21,23
60:17 66:23 78:6
78:13 88:18 121:4
124:2,24 128:4,15
143:21 144:1
155:25
**10.085.** 40:18
61:25 67:10 78:17
87:17 124:23
**105** 2:14
**10:00** 49:8
**11** 2:22 215:7,15
**11/06/2015** 153:13
153:14

**1100** 227:1
**11:00** 219:3
**12** 106:14 165:9
226:17 227:4
**12/10/1971** 5:13
**120** 3:15
**126** 195:21 196:3
**13** 3:17 9:18,21
72:4 81:4 91:3
92:12
**14** 93:3 172:2
**140** 3:14
**142** 3:12
**15** 9:18,20 14:19
**154** 2:15
**157** 2:17
**16** 94:8,12
**163** 2:19
**17** 185:5,10,22
188:3,9
**176** 2:21
**179** 2:23
**18** 3:18 57:24,25
58:1 203:1,11
206:20
**1820** 227:2
**183** 3:19,20
**184** 3:3
**19** 141:18 144:5
**195** 3:5
**1990** 8:4 162:8
**1995** 8:6

**2**

**2** 3:12 65:17,22
142:19 165:8
203:11 206:21,25
213:8 214:6
**2/27** 192:18
**20** 5:17 228:16
229:22 230:22

**200** 165:21
**2000s** 62:14,24
**2005** 10:13,16
162:11
**2006** 19:11 21:21
**2007** 19:11 21:21
148:25
**2011** 205:21
**2012** 205:21
**2013** 20:13 83:24
205:21
**2013-2014** 11:18
163:12
**2014** 2:14,16 3:7
11:18 77:18 106:3
106:5 121:10
122:2 144:19
146:8 147:22
154:2,12,15 163:8
179:22,25 212:5
**2015** 153:25
168:20 169:12
**2017** 2:18 14:4
157:13 165:9
166:17 168:10
**2018** 3:4 12:7 14:4
78:11 135:6
142:20 160:2
163:3 182:18
185:1,11 189:18
189:24 190:5
**2018-2019** 182:11
**2019** 2:11,22,24
12:6 14:4 34:7
42:18 44:15 50:16
56:20 65:2 72:17
120:2 124:14
137:16 140:24
144:20 156:21
169:12 170:17
179:9 182:13

**183**:14 189:19,20
190:5,14 191:10
202:4 203:6
214:14
**2020** 11:19 14:5
215:7,15
**2021** 53:7
**2022** 1:16 4:7 5:1
226:7,17 227:4
**203** 3:18
**212** 3:7
**215** 3:21
**216-523-1313**
227:3
**22** 2:16 120:24
144:5
**220** 165:21
**224** 2:5
**22582** 226:19
**228** 58:5,10 67:15
67:21 68:2 69:17
70:10 75:20 76:18
110:18 123:6
**22nd** 55:18 66:18
66:20 130:22
131:7,11 142:14
154:12 183:15
190:7
**24** 2:14 3:7,13
106:5 212:5
**25** 150:23 151:8
**26** 3:4 141:18
183:13,21,23
185:1
**261** 165:19
**26th** 183:15
**27** 34:7 50:16
120:2,18 123:17
124:6,14,21
125:24 128:19
191:10

**27th**   25:15 54:2 55:21 125:9 129:11,21 130:22 130:24 131:7 190:7 192:8
**28**   2:24 179:9 183:20
**28.097**   92:8,10 99:25 100:12 181:4,24 182:2
**28.097.**   100:15,16
**28.211.**   214:5
**28th**   183:19
**29**   1:16 3:19 5:1 183:12
**29th**   4:7 226:6

**3**

**3**   3:13 24:12 26:1 27:5,16 29:3 31:13,14 33:11,20 33:22 34:18 35:12 37:20,25 43:19 45:1 50:10 56:14 59:20 61:22 62:19 92:13 93:15,18,20 93:25 94:4 97:7 97:13,17,20 98:13 99:6,17,24 100:6,6 101:2,2,9 112:7,13 120:4 138:2,3 141:12,25 143:4,7 173:10,17 179:15 212:25 213:4,5,6 215:25 216:6
**3.1**   192:14
**3.7**   197:21 199:11
**3.8**   122:5,9,24 123:5,7,14,21 126:7 132:25 133:3,13,20 189:4 191:11 192:1,10

192:12,18,18
**3.8.**   122:19 192:17
**30**   3:20 140:24 165:20 183:2,3
**30th**   142:15
**33**   3:21 215:4,13 216:12 220:4 224:25
**35**   165:15 166:11
**36**   58:5,10 67:15 67:21,23,24 68:11 68:15 69:5,6
**37**   2:11 64:16 65:1 141:17
**38**   2:12 65:12,17
**383,140**   196:8
**39**   2:14 67:24 68:2 68:15 69:5,6 105:22,24 212:14
**3:21**   1:6

**4**

**4**   2:18 111:21 157:13 213:7
**4,000**   87:2 207:16 207:19 209:25 210:6 211:7,20 212:1 213:11
**4.2**   107:2
**4.3**   107:3
**4.4**   107:5
**4.5**   108:2
**4/29/2022**   227:9 228:3 229:3
**40**   2:15 154:5,7 157:9 158:2
**401**   4:16
**41**   2:17 157:1,3 158:11
**42**   2:19 122:4 123:6,21,23 163:21,23

**43**   2:21 176:24 177:1
**44**   2:23 179:4,6
**44114**   227:2
**45**   3:3 184:15,17 185:17,18,19 191:10
**46**   3:5,11 185:15 185:16 195:6,21
**47**   3:7 212:3,22
**48**   75:25 76:5,8,18 77:2 110:18
**4th**   4:21

**5**

**5**   2:4 3:14 47:17 48:5 49:1 50:23 73:1,15 93:3,12,15 93:18,20,23,25 94:4,12 96:8 97:7 97:13,17,20 98:13 99:6,17 101:9 140:13 213:7,12 217:6,18,19,20
**50**   148:24
**500**   4:6,12
**509**   4:16
**5188353**   227:8 228:2 229:2 230:2
**53701**   4:13,22
**53711**   5:16
**55**   69:16,17 70:10 75:20 111:4
**56**   3:16
**56ers**   187:4
**5717**   5:15
**58**   77:1 111:5
**5:23**   225:23
**5b**   50:6

**6**

**6**   3:15 91:13 92:8 92:10 120:1,22,22 121:14 123:24 124:6 127:11,20 128:12,20 130:16 131:2 157:15 181:24 182:2 216:1 217:21
**60**   123:6
**608.257.0609**   4:13
**61101**   4:16
**64**   2:11
**65**   2:12
**6th**   153:24

**7**

**7**   3:16 56:5 57:2 57:19 58:1 64:23 67:13 81:7 109:18 110:9,11,18 111:9 119:4,17 122:10 122:13,14,15,17 123:5,6 136:11 153:10
**70**   165:19 166:2
**72**   3:17
**75**   197:20
**781**   165:22
**7:19**   165:9
**7th**   9:21

**8**

**8**   106:14 154:14 179:24
**8/05/2019**   203:12
**80**   111:18,21
**815.986.8050**   4:17
**8th**   8:9,11

**9**

**90**   61:9
**90s**   61:10
**96**   147:7
**9:01**   4:8 5:1

**a**

**a.m.**   4:8 5:1
**ability**   128:15
  208:25
**able**   35:6 48:2,3
  65:9 74:3 76:17
  79:10 84:11 155:9
  156:4,5,8 165:22
  170:5 175:4
  182:16 194:5
**absence**   69:7
  86:20 123:13
  190:12
**absent**   214:25
**absolutely**   51:15
  219:24
**abundance**   128:14
**acceptable**   77:15
**accepted**   120:25
**accommodate**
  55:17
**accomplish**   7:3
**accurate**   41:11
**acknowledge**
  228:11 229:16
**acknowledged**
  147:3,15,16,17,19
  200:13
**acknowledgement**
  65:25
**act**   228:14 229:20
**action**   32:20 37:22
  39:17 42:13
  164:17 203:6

**active**   22:4
**activities**   60:8,20
  61:17 63:16 97:25
  98:2,13 133:22
  171:23 191:16
  199:19 218:24,25
**activity**   78:21 79:1
  160:24 161:1,2
**actual**   59:14
  169:22
**ad**   42:21
**adams**   6:16
**add**   67:20 87:16
  87:18 165:15
  196:20 208:5
**added**   42:22 78:4
  205:12
**adding**   69:10
  88:17 214:10
**addition**   58:22
  117:20 211:21
  212:1
**additional**   61:17
  74:20 75:13 76:15
  133:24 208:5
**additionally**   107:4
**additions**   74:5
  80:12
**address**   5:14,19
  106:21 134:18
  135:21 157:22
  158:16,22 206:3,8
  214:15 227:16
**addressed**   158:6
  197:11
**adds**   208:22
**adjacent**   70:19
  77:8
**adjoining**   83:6
**adjourned**   225:23

**administer**   16:8
  219:10
**administered**
  94:11 218:16
**administering**
  73:25
**administers**   219:6
**administrable**
  204:3
**administration**
  11:10,23 12:22
  13:18 14:15,24
  15:17 16:13 17:9
  17:14,15 26:5
  38:20 40:4
**administrative**
  8:22
**administrator**   6:9
  10:9,20 11:16,22
  12:4,6,19 14:6,14
  17:4 18:6,7,14
  34:13 39:2 92:1
  94:23 129:2,5
  203:25
**administrators**
  12:8
**admit**   41:20
**adopt**   144:18
**adopted**   44:13
  47:11 80:23 100:2
  100:9,13 104:1
  145:12 157:11
  188:14,19 189:2
  189:10,12 202:6
**adopting**   70:16
  77:24 106:8
**adoption**   20:4
  91:6 92:7 197:11
  197:12 203:4
  212:6

**advance**   35:6 42:2
  137:2 209:9
**advanced**   25:19
  32:23 35:3 36:24
  41:11 112:7,14
  129:20 131:9
  170:8
**advancing**   36:10
  38:6 39:24 40:8
  136:25
**advantage**   49:21
**advertising**   6:17
  6:21
**advise**   17:2
**advised**   88:17
  103:21 158:6
  221:24
**advisory**   150:24
**affixed**   228:15
  229:21
**agencies**   13:12,16
  31:25
**agency**   25:8 49:18
**ages**   9:17
**ago**   6:10,11 8:24
  119:22,22,24
  162:13
**agree**   38:3 52:5
  58:7 66:22 84:6
  93:15 154:25
  159:2 172:13
  193:14 206:5
  209:2 210:14
**agreed**   180:6,8
  215:22
**agreement**   103:15
  103:23 104:3
  107:5
**agreements**   103:2
  106:19,23 107:2,3
  107:25 108:8,16

108:18,22
**ahead**  46:11 64:14
72:24 137:23
144:16 177:25
182:9 185:18
208:12 211:5
224:17
**aided**  226:11
**al**  1:8 3:4 227:7
228:3 229:3
**alcohol**  16:4,7
**alder**  77:13 79:4
79:22 149:10
202:19,20,21
205:1,17 206:1
208:4
**alderperson**  79:20
92:3,4 149:6,8,11
149:13 204:8
**alderpersons**
85:11 202:16,18
**alders**  151:1 174:2
204:17
**alleged**  206:12
207:10
**allegedly**  165:1
**allow**  6:22 70:12
105:9 127:1
152:21 191:15
**allowable**  190:3
**allowance**  70:6
189:12
**allowances**  47:7
125:21,25 134:9
**allowed**  52:12
59:13,19 70:8
80:5,6 84:19
101:17 119:10
156:5 173:1
175:16 194:16
210:2,7

**allowing**  8:16
59:17 211:20
**alteration**  30:6,7
31:22 85:19 92:1
98:10 99:12
104:25 113:9
114:11 115:11
134:6 135:7
181:13,23 190:22
**alterations**  29:21
29:22,23 92:6,11
209:1
**alternative**  53:1
114:5 140:19
**alternatives**
113:11 130:10
181:4
**alumni**  168:7
**ambiguity**  105:1
**ambiguous**  133:19
**amend**  86:12
87:19 134:15
174:13 181:2
182:8,15,19,19
202:3
**amended**  54:25
98:10 100:22
133:4 135:20
192:3
**amending**  173:24
180:21 203:21
**amendment**  47:12
47:13 51:20,21,23
52:11,13,19 53:8
53:24 55:17 56:6
72:17 86:16 91:6
91:6,16,17 98:17
101:12 104:16
121:10 131:14,22
132:22 133:20
134:16 135:1

142:6 163:4
174:22,25 175:15
180:24,25 181:1,7
181:12,16,21
190:1 203:4,18
204:9,22 206:1,11
208:15,21 209:13
214:14
**amendments**  30:3
91:3,7 133:24
179:18 203:24
204:18
**amount**  23:15
83:6 219:15
**analysis**  37:13,15
43:1 48:4 67:14
67:17 78:5 117:23
122:11,25 128:2
128:12 129:10,12
136:7,17 144:6
187:25 200:7
**analyzed**  127:6
144:22
**analyzing**  59:5
**answer**  7:8,17,18
19:16 26:11,20
30:20 31:11,18
33:12 34:10,24
35:2 36:17 37:17
37:21 38:24 39:6
39:10,15 40:25
41:12 43:20 48:12
48:23 49:17 50:17
50:25 51:5 52:7
52:16 53:10 60:1
60:5,10 61:20
62:3,12 66:25
68:8,24 71:19
77:19 78:8 81:18
84:14 86:14,23
87:23 88:24 89:18

90:12 92:16 93:11
95:2,12 96:15
98:18 99:19 102:6
103:18 104:5,18
114:3,24 115:24
126:3 127:10
129:8 131:20
132:3,14 133:11
134:20 137:6
139:25 140:11
143:3 144:10,23
145:9,22 153:21
155:7 156:3
158:25 166:20
167:23 169:14
171:21 174:17
177:24 190:8
194:18 198:11
206:9 207:11,23
209:11 211:16
214:9 218:13
219:22 221:6,21
222:7 223:6,15
**answered**  55:24
209:5
**anticipate**  135:11
166:3
**anticipated**  59:7
106:22
**anymore**  8:15
162:10
**apologize**  91:18
211:4
**apparent**  42:11
**appeal**  137:11
**appear**  121:24
228:11 229:15
**appearances**  4:9
**appeared**  161:5,7
187:3

appears 24:24
37:25 77:7 157:6
195:14
appease 136:18,19
appended 229:11
229:18
applicability
113:4
applicable 47:3
219:5
applicant 38:12
157:10
applicants 139:7
application 2:11
25:5,6,7,12,25
26:4,15,16,17 27:2
27:8,17,23 28:8,20
30:7 33:23 34:22
35:1,3,19 36:1,13
36:21 37:20,23
38:2,16,22 39:3,9
39:13 40:2 41:3,5
41:25 42:5,14
44:11,16,24 45:4
45:25 54:5 59:6
59:14,18,23,25
60:9,17 61:2,21,24
62:19 65:1,16
66:13,16,17,20,22
78:11 83:17 88:18
89:15 106:8
110:13 113:8
114:11 128:3
129:7 131:10
135:18 140:19,19
141:1 144:4,5,19
145:2,8 155:25
191:1,8 222:3
application's 38:1
applications 24:10
26:6,22,24 27:25

30:1 32:10 59:7
60:22 61:9 144:7
applied 169:2
172:24 181:25
182:10 222:5
applies 100:3
apply 62:21 99:25
applying 169:12
appointed 151:7
apprise 90:17
apprised 115:19
120:17 150:3
apprising 157:10
approached 63:2
85:9 159:11 215:2
appropriate 20:3
30:10,14 32:6
40:15 47:3
approval 2:15,17
26:16 27:9,24
29:20,21 31:21
35:19 36:5,10,12
37:22 39:9 40:8
44:15 45:18 47:17
52:14,20 53:23
60:8 65:23 76:4
77:17,20 91:14
98:15,17 102:11
139:4 154:10,19
155:2,15 156:11
157:7 158:3,15
162:15 163:8,12
174:14 179:22,25
181:17,20 182:4,8
207:6 213:13
215:25 216:14
218:9 220:18,21
approvals 15:5
26:7 74:9 79:19
83:12 174:4

approve 53:24
64:1 71:11 90:6
92:1 175:15
179:20 182:5
189:4 218:23
approved 32:23
32:25 33:8,8,13
34:2,9,12,15 35:4
35:5,12,15 36:24
37:5,13,19,24 38:1
38:21 39:3,4
40:23 41:10 42:3
44:25 45:14,16
50:15,20,21 51:23
52:11 53:9 54:15
54:22 65:23 71:10
78:11,17 81:12
84:9,18 85:15
86:12 88:4 90:9
99:12 100:3,18
101:6 102:1
107:23 112:9
113:13 121:10
122:2 131:15
134:6 138:23,25
141:8 154:3,15
155:23 156:1
158:20 174:25
226:9
approver 25:4
approves 38:19
138:13
approving 38:4
39:13,23 59:1
approximately
196:8
april 1:16 2:16 4:7
5:1 137:16 154:12
154:14 179:24
226:6

architectural
81:12,16,23 82:1,7
84:4 108:1 111:7
archived 33:3
archiving 66:1
area 61:3 69:23
85:7 130:9 161:24
162:2 165:2 172:2
191:19 209:25
213:12,22 214:2
216:19,21,23
areas 68:1,14
74:15 99:14 161:9
165:24 191:23
argue 84:17
131:25 175:6
arrive 26:9
arrived 141:3
article 177:20
aside 67:11
asked 14:21 37:9
37:12 59:11 63:15
63:17 83:11 84:16
84:22 122:1
129:25 135:16
146:21 177:8
180:13 186:7
209:4 214:22
224:2
asking 11:20
31:13 43:12 56:17
56:21 62:6,6,9
63:25 82:24 83:20
99:21 100:20,21
104:9,10 114:22
115:20 131:1
141:14 158:10
162:12 164:13
167:6,13 202:16
211:6 220:7

**aspect** 38:2 42:10
 64:2 74:13 118:14
 216:20
**aspects** 6:22 46:20
 70:17 80:11 101:6
 134:12 153:1
**aspiration** 109:2
**aspirational**
 109:11
**assessing** 144:3
**assessment** 34:4
**assigned** 12:24
 14:11 18:12 19:5
 22:25 23:5,8
 25:14
**assignment** 228:2
 229:2 230:2
**assistant** 4:24 12:4
 12:6,7 177:4,9
**assisted** 206:6
**assisting** 108:2
**associated** 15:4,6
 119:9 139:11
 141:11 171:11
 220:1
**associations** 83:7
 106:20
**assume** 22:23
 138:6 139:1
**assumed** 10:6,19
 18:12 19:8 82:13
 179:7
**assumes** 82:8
**assuming** 57:4
 98:24 138:23
**assumption** 25:1
 25:20 201:14
**athletic** 14:3 27:18
 28:19 56:14,15
 62:14,17 74:12
 77:8,25 92:14,21

93:14,17,19,24
 94:3 96:24,25
 97:1,2,11,16 98:1
 99:16 123:12,19
 126:8 127:5
 133:21 146:14
 162:2 168:21
 172:19 185:6,23
 186:22 188:11,16
 189:23 194:17
 195:2 201:16
 217:13 218:23
**athletics** 189:4
 193:8 194:21
 197:25 198:3,23
 198:25 199:14
**attached** 55:20
 65:7 184:19 229:7
**attaches** 121:18
**attachment**
 121:13
**attain** 82:2
**attempt** 174:13
 209:19
**attempting** 63:17
 119:7 129:24
 130:2
**attempts** 214:15
**attend** 9:19 146:10
**attendance** 160:13
**attended** 146:21
 148:16,22 151:2,3
 151:4
**attention** 37:4
 43:25 62:16 112:9
 112:11,16 116:2
**attorney** 4:25 45:7
 45:8 51:11 112:25
 113:5 127:15
 140:20 177:4,9
 178:10,18,18

202:14 204:17,23
 210:4,10,17,21,23
**attorney's** 176:19
 203:12
**attorneys** 178:20
 221:24
**august** 183:13,15
 183:15,21,23,25
**author** 215:15,17
**authority** 126:17
**authorization**
 205:8
**authorize** 47:19
 229:11
**authorizing** 25:20
 25:22
**available** 113:12
**ave** 227:1
**avoid** 61:13
 155:25
**avoided** 197:11
**aware** 36:23 38:14
 39:1,7 42:11 45:5
 49:23 51:19,20
 112:12 116:6
 144:25 146:2
 150:4,8 151:16,20
 159:17,19 160:2
 160:12 161:12,13
 162:4 168:5 169:8
 170:11,14 173:22
 174:2,2 185:5,22
 186:4,21 200:8
 201:8,10,16,19
 202:8,8 221:3
 222:8 224:6,19
**awareness** 185:25
**awhile** 57:5
 119:24

**b**

**b** 2:9 47:18 48:5
 49:1 50:23 93:12
 93:15,18,20,25
 94:4 97:7,13,17,20
 98:13 99:6,9,17,24
 100:6 101:2,9
 111:10 173:10,17
**bachelor's** 7:25
 9:8
**back** 7:22 26:11
 28:12 35:25 36:4
 36:14 44:20 46:13
 49:11 51:8 52:23
 53:4 54:20 57:17
 61:16 62:8 64:23
 68:11 75:7,9 76:9
 77:2,18,23 79:22
 87:5 90:21 91:11
 92:7 96:23 98:22
 106:3 111:4 114:4
 115:6 118:7 123:5
 124:19 135:6
 137:20 138:2
 147:7,22 148:25
 162:11 168:14
 173:7 182:18
 183:24 190:16
 192:4 193:2
 198:19 202:9
 210:11 211:17
 227:16
**background** 44:5
**backstop** 95:6
**bad** 14:20
**badger** 63:1
 166:14
**balance** 217:12
**balistreri** 85:1
 149:16 150:18

**ballpark** 142:8
**band** 219:3
**bar** 90:4
**barry** 177:22
**baseball** 143:16
**based** 8:21 18:21
  29:9 38:19 55:3
  121:22 133:2
  141:14 171:16
  180:10,18 191:11
  220:16
**basements** 214:4
**basic** 71:21 80:22
  96:19,19 152:21
**basically** 12:7 16:3
  20:18 34:14 65:24
  137:9 146:13
  181:13 189:25
  194:1 208:2 214:1
**basis** 17:1 53:11
  101:25,25 159:14
  168:5 217:5
**basketball** 104:15
  104:20,22 194:12
  194:12 199:15
**bates** 157:16
  195:24
**bathroom** 109:22
**bathrooms** 63:21
**bearing** 32:9
**becoming** 172:15
  172:16
**began** 112:17
  113:3
**beginning** 114:8
  203:17 217:9
**begins** 114:21
**behalf** 25:18 34:1
  103:11 121:1
  204:7

**belated** 91:4
**belief** 23:9 43:17
**believe** 6:6 8:10
  12:1 14:13 19:10
  20:23 21:21 22:14
  22:21 24:7 26:2
  29:16,20 30:23
  33:14 37:22 38:3
  38:13 39:16 45:3
  46:1 50:14 51:1
  53:7 56:3,6 58:25
  60:6 63:22 66:19
  69:14 72:1 75:17
  76:15 78:9 79:20
  86:15 91:23 98:6
  105:12 110:17
  112:3 116:15
  117:5 122:20
  123:6 128:24
  131:8 134:21,21
  136:7,16 140:1,12
  141:16 142:1
  144:12 145:10,23
  146:20 149:9
  152:16 154:9,9
  159:9 162:8 168:2
  169:15 170:21
  171:7,7,13 173:16
  173:16 174:3
  175:23 176:12
  179:25 181:18
  191:13 196:19
  199:15 200:16
  201:8 202:21
  203:22 206:14
  210:1 212:18
  213:23 224:20
**believed** 21:18
  52:13 55:17
  128:11,21

**believes** 121:9
  137:7 179:17
  225:13
**believing** 129:5
**beneath** 168:9
  172:7,10
**benefit** 82:16 83:2
**benefits** 82:19
  145:17
**best** 7:12 8:17 11:6
  11:7 21:22 117:12
  117:12 118:2
  119:12 141:14,15
  141:20 142:24
  182:22 193:12
  197:14
**bet** 141:2
**better** 48:12 83:11
  83:21 205:5
**beyond** 67:21 78:5
  148:3 161:11
  163:15,18 222:23
  223:4
**bi** 217:5
**bias** 222:6,10
**biased** 222:12
**bidar** 149:10
  202:20 205:17,17
**big** 48:18 57:5
  63:21 69:15
  117:21 118:19,23
  119:18 151:8
**billboards** 6:21
**binder** 195:13
**birth** 5:12
**bit** 13:9 18:9 21:17
  23:13 24:10 52:2
  65:15 71:5 75:8
  90:20,24 109:21
  130:13 200:10

**blanche** 143:25
**blank** 55:19
  102:17
**blanket** 41:17
**bleachers** 59:8
**blonien** 177:22
  179:1
**blonien's** 178:10
  178:17
**blueprint** 80:22
**board** 151:5
  202:11
**boardman** 4:21
  178:9
**boardmanclark.c...**
  4:22,23
**boards** 49:21
**bold** 157:17
**book** 54:17
**border** 217:15
**bother** 164:19
**bottom** 58:1 76:8
  76:20 110:19
  120:22 157:17
  195:23 198:1
  213:4,6 217:6,18
**bouncing** 49:19
**boundaries** 80:4
**bounds** 53:3 200:2
**box** 58:18 69:21
  104:20,23 105:3,8
  118:15 138:23,25
**boxes** 80:10,13
**brad** 79:17
**branch** 96:12
**break** 49:7,9 75:12
  110:5 147:23
  152:6 192:23
**brian** 3:3 135:9
  160:10 184:23
  185:19 190:21

191:22
**broad** 53:16 95:5
**broaden** 133:4
**broader** 55:19
57:23 111:24
**broadly** 59:12
79:3 132:12
214:23
**brothers** 95:24
**brought** 37:4
43:25 62:16 89:11
103:3 115:6 116:2
**brown** 149:17
150:18
**buffer** 191:19
**build** 21:24 74:4
173:25 190:22
**building** 5:25 9:23
10:22 11:10 14:24
14:25 15:3,5,7,10
15:13,24 16:5,5,15
16:15,21 17:6,20
18:2 26:9,23
27:13,22 28:5
38:18 47:2,19
50:9 58:22 61:5
62:17 68:19 74:4
77:14 80:8 81:7
81:10 82:12 83:13
83:17,25 84:4
87:3 94:24 111:9
117:11 118:16
120:25 126:20
152:22 153:1
154:20 155:4,17
156:12 199:5,10
200:23 207:5,16
208:9,24 209:21
211:21 212:1
**building's** 58:21

**buildings** 16:19,20
16:22,24,24 58:25
68:1,3,5,7,12 69:4
80:10 81:10,14
82:8 85:21,22,23
85:24 88:6,6
105:13 111:8
134:13 197:21,25
197:25 199:12,14
**built** 63:5,6,11,12
127:1
**bulk** 152:21
**bullet** 76:20
110:19
**burden** 180:21
**burdensome** 181:7
181:9
**burger** 63:1
**business** 103:16

**c**

**c** 5:11 73:5,16
150:7,7 207:24,25
208:2 213:8 214:6
**ca** 227:25
**cafeteria** 80:19
**call** 25:17 54:13
80:25 81:15 96:1
96:3,4 97:5
113:14,14,14
116:23 161:4,25
164:22 165:8
207:19
**called** 4:1 8:10
32:22 69:15,20
73:3 84:2 111:7
118:4 142:1
152:24 198:2
206:4
**calling** 117:16
192:11

**calls** 117:22
130:17
**camp** 187:4 199:1
199:16
**campus** 2:16 3:5
19:12,18,21,24,25
20:12,17,19,22
21:1,3,7,13 22:8
22:15 32:5 44:12
57:23 58:4,14,15
58:21 67:15 71:9
71:11,12 72:6
73:6 78:2,12 81:3
81:9,11 82:18,20
83:9,22 85:2,3
87:21 88:1 91:2
98:8 99:12 101:21
101:23 102:4
106:9,22,25 107:6
111:20,24 134:3
139:21,22 140:5
143:7,14 144:21
148:11 152:13
154:11,16,17
165:20,22 172:15
172:17,23 173:20
179:21,24 192:14
195:8 196:4
197:21 199:9,11
199:20 200:3
202:4 203:5
205:22 207:2,3,21
209:18 212:6
213:1,9,10 217:17
222:21 223:10
**capacity** 10:18,25
11:1 129:5
**capital** 55:9 73:11
73:23 74:13,21
215:2

**car** 63:1 64:6
**care** 146:16
**career** 60:18 62:7
**careful** 102:8
**carefully** 69:22
**carry** 23:2,24
**cars** 60:24 165:3
**carte** 143:25
**case** 1:6 6:13
20:15 25:9 27:16
32:16 153:24
209:21 212:19
221:24 227:6
228:3 229:3
**cases** 41:6,9 176:2
219:17
**catch** 44:5
**catchall** 31:7
**categories** 31:6
**categorized** 97:6
**category** 27:8
30:10 31:7 32:4
43:8 61:11 181:21
**caught** 53:1 186:6
**cause** 226:16
**caused** 36:4
124:19 125:11
**caution** 128:15
169:17,17
**caveat** 67:8
**cc'd** 157:5
**cc's** 184:23
**center** 83:20 199:1
199:15
**certain** 6:22 20:2
24:19 105:7
**certificate** 226:1
229:11
**certification** 228:1
229:1

**certified** 4:3 226:3
**certify** 226:5
**cetera** 152:22
**chain** 3:3 184:18
**challenge** 84:8
**champion** 196:10
**chance** 90:23
 174:15
**change** 8:11,12
 26:25 34:11 35:4
 53:25 72:8,8,9,11
 72:14,17,22 86:2,6
 86:19 88:10 97:17
 98:8 99:10 113:15
 124:2 146:13
 147:12,12 163:14
 163:15,20 181:23
 182:6 227:14,15
 229:8 230:3
**changed** 12:5 29:2
 34:8 53:16 142:9
**changes** 11:12
 17:13 58:21 85:19
 91:19 99:13
 100:24 104:14
 181:3,22 213:11
 227:13 228:7
 229:7,9
**changing** 98:13
 99:8
**characteristics**
 222:20 223:9
**characterization**
 206:5 209:2
**characterize**
 128:16 176:11
**characterized**
 172:12
**charge** 145:11
**chart** 11:23

**charter** 201:24
**cheater** 75:6
**check** 35:14,17,18
 41:7 42:4,8,13
 44:2,2 81:1,2
**checked** 44:17
 112:8 167:7
**checking** 34:22
 167:10
**checks** 138:22,24
**cheri** 1:24 4:3
 226:3,20
**children** 9:15
 161:3
**choice** 30:25 31:3
 145:16
**choices** 31:1
**choose** 222:12
**chose** 9:1 19:7
 145:18 174:22
 186:16
**chosen** 29:10
 204:6
**christina** 25:3
 29:15 30:9 34:18
 34:21 35:25 39:8
 40:20 41:7,22
 42:1 43:1 66:6
 112:7 114:17
 120:5 138:13,22
 138:24
**christina's** 35:11
**christmas** 90:5
 95:25
**church** 62:25
 63:18 64:17,19
**ci** 38:14 64:8 71:14
 84:19 86:7,8 87:3
 96:17 99:24 106:9
 108:13 151:10,12
 151:14,18 155:13

 157:21 158:14
 210:3 214:21,23
**cieslewics** 150:7
**cieslewicz** 150:4
**circle** 134:10
**circumstance**
 43:22 145:2
**citation** 17:23
 48:25
**citations** 17:22
 48:15 193:3
**cite** 91:15
**cited** 136:11,14,15
 191:9 192:7,8
**cities** 151:24
**citing** 192:15
**citizens** 151:5
**city** 1:7 4:25 5:25
 6:8,16 10:12,17,19
 10:20 12:22 13:6
 13:7,8,11,14 14:10
 20:1,3,3 22:2
 24:20 25:11 39:19
 63:8 80:1 83:11
 85:9 88:3 90:14
 100:18 102:4
 103:16,24 107:1
 107:21,24 109:11
 112:25 121:8,22
 125:20 134:14
 135:16 137:7
 145:11 149:5
 151:22 154:10
 157:20 158:13
 159:4 163:8
 175:25 176:18
 177:4,4,9,14
 182:13,14 193:7
 201:25 204:17
 205:20 206:23
 210:25 211:12

 214:22 218:22
 222:20 223:9,17
 227:7 228:3 229:3
**city's** 6:22 12:23
 13:15 24:18 30:2
 36:7 71:13,15
 90:13 107:4,7
 108:23 124:2
 137:4 139:16
 178:11
**civil** 167:8 228:5
 229:5
**clarification**
 102:15 104:25
 105:14 194:6
 197:16
**clarifications**
 130:11 223:22
**clarify** 165:25
 166:1 197:14,17
**clarity** 65:16
 105:18
**clark** 4:21
**clarke** 85:1 149:16
 150:18
**class** 147:9 171:19
**classes** 93:20
 122:4 124:4
 170:22 172:3
 188:1
**classification** 20:4
 198:3,5,5
**classify** 88:15
 95:24
**clause** 170:3
**clear** 17:1,7 21:16
 36:6,6 56:13 70:6
 70:21 71:1,2
 74:18 79:4,9,13
 118:9 133:19
 199:9 204:3

216:17
clearly 76:12 80:2
191:15
clerical 12:9,16
cleveland 227:2
click 41:10
client 210:10,17
clock 153:13,16
158:2
close 5:22 54:10
189:17 208:3
closed 32:13,13,17
32:19,23 33:1,15
closely 13:5,6
188:14 189:1,21
closer 28:22 88:19
188:19
closing 66:1
179:17
cloth 151:23
coaches 187:4
code 11:25 12:8
15:18,21,23,24
16:5,9,9,21,23
17:17 20:1 47:2
63:22 78:2 89:25
91:8 101:14
126:18 139:20
148:13,21 149:1
150:23 152:3
202:2,4 213:23
218:7 221:16
223:1,18
coded 30:23
200:20 201:3,17
codes 16:6 47:2
collaboration 13:4
136:21
collaboratory
136:20

college 20:9 21:24
24:2,6 83:11 85:7
85:8 149:3,19
154:17 165:20
collegiate 194:16
color 68:4 197:22
200:18
colors 198:8,13
column 70:10
110:20 196:3
comb 54:13 59:5
90:22 113:22,23
114:21 116:13,24
118:4 122:23
136:4 189:19
190:14
combination
117:4 130:17
combining 165:18
come 13:3 22:22
26:7,8 27:25
41:14,15,18 48:20
61:16 64:23
101:20 116:15
129:21 135:8
169:6 219:4
comes 7:15 38:16
41:23 76:14 158:4
comfortable 70:7
113:24 172:22
coming 28:2 29:1
69:2 110:12 114:4
168:16 186:5
commencing 4:7
comment 142:3
175:8
commenting
151:10
comments 157:22
158:16,22 189:24

commercial 64:8
commission 2:22
2:24 30:2 91:25
103:9,21 106:5
173:23 174:14
175:3,7,11,14
176:7,19 177:5,10
177:15 178:6
179:9,19 181:17
181:19 184:12
217:11 225:7,13
228:19 229:25
230:25
commissioner
178:13
commissions
151:6
committee 81:13
81:17,23 82:2
84:4 108:2 150:24
150:25 151:3,8,9
committees 31:25
151:6
common 15:8
23:16 24:25 96:20
103:9,22 154:15
157:10 173:23
175:11,14 176:8
176:20 179:19
181:19 182:5,7
206:23
commonly 6:21
117:8 143:12
communicate
135:16 186:15
205:9
communicated
56:24 71:15
114:19 134:25
135:2 182:15,18

communicating
117:3
communication
17:25 45:11 49:3
49:4 54:5 125:10
135:23 159:25
182:25 205:7
210:10
communications
37:6 45:5,6 46:8
49:6 55:23 176:22
community 21:3
133:23 150:9,9
162:1 209:22
compare 189:18
compared 84:7
comparing 33:23
43:6 120:4
compel 137:10
compelling 211:24
competent 226:8
competition
199:19
competitions
188:11 194:17
201:6,16
competitive
199:23 200:14
complain 220:21
complaining 208:5
complaint 137:22
184:19
complaints 137:24
188:4,10 193:11
193:12 218:21
220:6,8,10,12,15
220:17
complete 7:16
129:19 134:2,10
134:22 135:11
155:9 156:6 191:3

191:6
completed  32:22
  38:9 120:6,11
  153:23 172:25
  227:16
completely  108:12
completeness
  107:11
completing  114:18
completion  40:6
  40:21,22 41:8,9
  112:14
complex  201:7
  217:11,13
compliance  39:17
  44:18 50:13 121:3
  128:7
compliant  50:21
  67:10
complicated  41:19
  49:20 52:24 181:5
  181:10 214:1
complication
  116:11
complies  128:3
comply  69:23
  121:4 128:7
  143:20 202:1
components  73:11
compressors
  219:13
comprised  150:25
computer  226:11
concern  166:8,23
  187:20 191:9
concerned  40:5
  125:17
concerns  191:11
  210:5
concession  118:15

concessions  58:19
  59:8
conclude  70:12
concluded  216:12
concludes  179:16
concluding  184:1
conclusion  30:17
  110:13 179:15
  180:19 183:24,25
conclusions
  118:20 136:5
condition  60:8
  78:22 196:25
conditional  29:20
  29:23 30:3,6,6
  31:22 61:4,7
  63:23 81:21 82:3
  82:5 83:14,16
  84:2,3 86:21
  155:11 175:1
  207:6,15 208:6,24
  210:6 211:22,25
  213:12 215:8,24
  216:14,19 218:9
  225:15
conditions  42:9
  44:1 69:15 73:6,7
  73:9,10,12,18,19
  73:21,23 74:15
  89:22 101:16
  154:18,18 155:1
  155:15,23,24
  156:11 157:23
  158:17,22 179:23
  179:25 216:13
  217:2 218:2,10
  220:19 225:4,6
conducive  8:25
conduct  194:23
conduit  169:4,19
  170:6

cones  80:19
confer  82:21
  178:19
conferred  126:13
conferring  127:15
confidence  175:14
confident  25:1
confirm  35:14
  186:8 193:8
confirmed  39:4
conflict  51:24
  122:2 125:21
  204:4 221:25
  222:15
conflicting  58:2
  94:8 221:11
conflicts  108:3
conformance  47:1
conformity  196:16
confused  41:21
conjunction  69:22
connect  13:13
connected  13:7
consider  95:4
  104:24 171:11
  178:7 218:25
considerate  171:5
consideration
  47:24 92:4,11
  93:4 102:18 115:7
  178:6 214:12
  222:2
considerations
  18:21 177:15
considered  98:9
  131:17 181:22
  184:11
considering  96:16
consistency  44:18
consistent  74:8
  84:1 100:3 108:20

113:16 128:12
  152:1 158:6 171:3
  177:18 193:20
  197:7 217:16
constantly  59:11
constitute  92:25
constitutes  181:23
constituting  161:2
constructed  84:5
constructing  63:3
construction  33:5
  74:20 81:13
consultant  85:10
  148:19 150:22
  151:13 160:11
consultation
  127:20
consulted  137:13
  150:13 204:10
  205:13
cont'd  3:1
contact  25:7 29:13
  204:20
contacted  165:1
contained  47:6
  154:21 155:6,17
  156:13 158:4
contemplating
  192:13
content  71:16
  75:16 122:10
  144:14 145:5
contentious  79:19
  146:15
contents  72:25
  73:15 110:14
  124:7 145:19
  153:18 215:22
contest  96:3
contests  127:5
  218:24

context  76:2 82:7
  100:1 111:24
  118:17 152:13,14
  152:16 167:18,19
  210:13,23
continuation  30:1
  30:8 147:6
continued  55:2
continuously
  10:13
contours  14:9
contract  103:15
contractor  138:18
  139:1
contractor's
  139:12
contradictory
  131:25
contrary  131:25
contributed
  125:11
control  12:23
  153:8
controlled  153:19
controls  101:11
controversial
  146:17 147:13
  148:7 163:20
controversies  14:3
controversy
  138:24
conventional
  65:22 181:15
conversation
  49:24 51:16 79:16
  126:13
conversations
  48:14 51:11 79:23
  113:10 115:2
  116:21 130:9,25
  171:23 190:24

214:21
converted  226:10
convey  77:22
conveyed  49:2
conveying  79:14
cooperation  103:4
copy  24:17 49:5
  57:3 59:22 65:1
  179:11
corner  75:22
  106:13 185:6
  200:24 212:25
  217:21
corners  60:3 192:9
correct  6:25 9:25
  10:10 14:6 15:11
  15:20 20:25 22:15
  27:10,18 30:12,25
  31:3 33:9,24 34:2
  34:3 38:23 45:2
  50:10 51:1 52:15
  59:6,9,15 66:23
  68:23 70:15 75:15
  78:3,13 88:20,23
  93:10,21,25 94:5
  97:7,17,21 98:11
  99:17 100:6
  101:21 102:5
  103:9,17,24 106:6
  108:23 109:5,13
  112:4 120:2,7,15
  122:12,20 123:20
  124:9,12,15 126:1
  127:9 128:21
  129:3,6 136:7,8,16
  136:23 139:18
  140:21 143:21
  144:2 153:15
  155:19 156:16
  157:11,14 158:23
  159:10 164:2

168:21 177:16
  181:17 182:22
  183:10,14 184:2,5
  184:8,13,24
  188:16 189:14
  190:7,14 191:12
  192:20 197:3,11
  197:25 199:12
  200:20 201:7
  205:23 207:18
  208:9,16,18 213:2
  213:13 216:10
  218:4 220:6,19,25
  224:3
correction  197:16
corrections  227:13
  229:17
correctly  107:9
  112:10 121:11
  139:3 158:18,19
  185:8
correlate  67:25
council  103:9,22
  145:11 154:15
  157:11 173:23
  175:12,15 176:8
  176:20 179:20
  181:19 182:5,8
  206:23
counsel  7:16 46:7
  48:6 51:13 55:1
  56:13 173:13
  206:14
counsellor  147:21
count  12:12
county  228:10
  229:15
couple  6:11
course  86:1 95:7
court  1:1 104:8,13
  104:15,21,21,22

105:9 226:8 228:7
cover  70:14
  140:18,20 169:25
covered  91:7
  134:17 180:25
  197:7
covering  69:3
covers  141:10
crabapple  5:15,21
crafting  80:24
create  63:18 83:21
  84:16,22 125:19
  160:5 166:11
  196:9 210:2
  217:11 219:19
created  71:13 85:4
  106:21
creates  126:8
  137:11 180:20
creating  131:2
creation  85:13
  148:10,13,15
creek  200:12
cribbed  151:24
criteria  172:10
critical  170:23
crowds  165:24
csr  1:24
cul  199:6
cured  132:23
curious  63:20
  130:6,7 202:17
current  5:14,24
  17:5 94:24 162:16
  162:17 165:18
  187:1 189:11
currently  121:22
custom  152:4
cut  151:22
cutoff  111:12

**cv** 1:6

**d**

**d** 2:1 207:1
**daily** 217:5
**dalton** 4:15
**daltontomich.com**
 4:17
**data** 24:23
**date** 5:12 34:8,9
 34:11 38:8,11
 39:17 40:6,21,22
 41:8,8 65:3,4,5,7,8
 66:8,11,12 120:4,5
 120:10,11 140:23
 141:17 153:10,12
 153:19,23 156:22
 156:24 160:3
 172:18 179:12
 185:1 205:13
 227:9 228:3,9,19
 229:3,13,25
 230:20,25
**dated** 2:14 106:5
 120:2,17 154:12
 157:13 179:9
 183:7,13 185:1
 202:9 212:5
 215:15 226:17
**dating** 147:7
**dave** 150:4
**day** 4:7 89:6 95:25
 135:14 139:13
 224:2 225:1 226:6
 228:16 229:22
 230:22
**days** 190:6 227:19
**daytime** 140:8
**de** 199:6
**dead** 199:6
**dealing** 40:1
 222:11

**dealings** 131:1
**dealt** 105:17 112:3
 148:6
**dear** 64:4 227:10
**debatable** 70:6
**debate** 72:10
**december** 135:6
 182:11
**decibels** 219:20
**decide** 84:21 86:5
 89:8
**decided** 20:3
 50:22
**decides** 87:16
**deciding** 109:3
**decision** 9:2 28:22
 45:24 46:1 47:25
 49:23 122:24
 123:8 125:12
 129:19,20 150:10
 182:14,22
**decisionmaking**
 137:14 150:16
**deduction** 31:6
 32:8
**deed** 228:14
 229:20
**deem** 172:7
**deemed** 133:5
 227:20
**deep** 25:19
**default** 25:10
 29:12,16 32:2
 52:19
**defaulting** 31:24
**defaults** 29:16,18
**defective** 129:12
**defendants** 1:9
 4:19
**defer** 155:24

**deficiencies**
 132:10 135:21
**deficient** 37:16
 129:12
**defined** 213:22,23
 213:25
**defining** 21:6
**definitely** 42:20
 181:10,10 195:14
**definition** 214:1,5
**definitive** 62:22
**definitively** 61:1
**delay** 155:24
**deliberate** 214:11
**delicately** 164:22
**delivered** 28:5,5
**demolitions** 30:3
**denial** 45:19
 145:21
**denied** 45:4,12,21
 83:17 133:6 145:2
**denomination**
 64:20
**denoted** 42:15,19
 44:23,25
**denoting** 35:11
**deny** 45:16 49:15
 50:23 127:13
**department** 11:23
 13:15,21 22:18
 26:5 38:1,18,21
 40:3 50:10 63:14
 65:19 90:14 92:2
 94:24 108:9
 125:11 128:22
 129:1 142:23
 163:11 168:11,17
 193:3 198:23
 218:16,21 219:8
 220:3 227:22

**departments**
 13:15
**depending** 15:17
 91:23
**depends** 82:4 90:1
**deponent's** 226:12
**deposition** 1:12
 4:1 6:2,24 7:3
 20:15 23:20 24:12
 172:10 205:25
 225:23 226:6,12
 226:13 227:9,12
 228:1,3 229:1,3
**depth** 189:15
**describe** 5:18 8:18
 9:23 12:17 18:5
 24:15 140:2
 152:11
**described** 17:19
 47:18 78:21,22
 79:2 94:11 125:19
 127:3 158:3 163:5
 172:9,14 187:19
 193:10 198:9
 206:1 219:23
**describes** 12:22
**describing** 8:17
 89:15 116:24
 162:16,19 163:1,6
 196:19
**description** 2:10
 3:2 12:21 14:10
 73:6 123:19 133:8
 195:2
**descriptions** 68:13
 68:14 133:24
**design** 81:8 82:10
 108:1 153:1 196:4
**designated** 194:8
**designates** 193:24

**designed** 69:22
206:3
**desire** 217:12
**desk** 13:3 41:16,23
169:6
**despite** 220:17
**detached** 118:14
**detail** 69:5 70:14
70:17 78:22 79:2
82:13 83:15 86:16
101:13,15 102:20
102:20 111:13
134:8,24 135:7
153:1 194:25
**detailed** 54:10
118:4 122:1
177:12
**details** 52:23
62:15 80:23 83:19
175:7
**determination**
30:13 32:9 36:19
**determinations**
28:1
**determine** 54:13
188:15
**determined**
103:13 127:7
194:2
**determines** 34:9
**determining** 28:17
225:4
**develop** 64:11
**developer** 151:1
**development** 18:8
28:25 30:7 31:22
49:13 77:11,15
79:12 83:5 152:14
152:16,20,23
153:4,5,9 213:10
214:12

**developments**
15:4 29:23 86:17
152:20
**device** 170:23,24
**difference** 13:17
26:14 95:21
145:20 211:21
**differences** 97:24
198:13
**different** 9:1 16:10
21:11 52:3 78:15
82:5 95:8 99:15
101:24 113:11
115:16 143:9,10
151:22 158:9
161:9 187:14,23
193:18,22 198:5,8
198:9,10 200:18
212:21
**differentiate** 140:7
166:13
**differently** 23:14
198:9
**difficulty** 96:10
**dig** 25:19
**digging** 212:13
**digressed** 67:12
**diminished** 216:5
216:9
**direct** 79:23
**directed** 19:6
**direction** 48:1
223:3,16
**directly** 27:2 28:3
28:4,5
**director** 6:1 9:24
10:23 13:5,10
17:6 79:17 92:2
94:24 149:6
**disagree** 93:15
154:25

**disagreed** 180:6
**disagreements**
172:11
**disaster** 64:7
**discern** 42:6
**disclosed** 187:14
**disclosing** 160:16
**disconnect** 114:14
**discovered** 35:16
**discretion** 50:22
51:4 52:6 172:12
**discuss** 36:9
121:13
**discussed** 48:16
50:8 59:21 125:1
**discusses** 55:11
**discussing** 69:7
130:10
**discussion** 21:11
46:3 47:5 57:13
58:18 70:3 96:23
195:18 209:22
**discussions** 37:7
51:25 67:3 115:1
115:7 124:22
136:4 148:16
149:7 202:9,13,15
218:20
**disinterested**
226:9
**disposal** 17:19
**dispute** 14:2
**distinct** 75:1
**distinction** 14:21
14:23 16:6,16
19:23 95:17,20
144:6 150:12
152:12 199:4
200:1 209:19
211:13

**distinctions** 200:5
208:20
**distinctly** 95:8
**distinguish** 26:14
**distinguishing**
96:10
**district** 1:1,2 3:6
19:18,19,21,24,25
20:13,17,19,22
21:1,4,14 22:15
57:10 64:8,9 71:9
71:14 72:6 79:4
79:20 81:4 82:18
83:10 84:19,22
85:3,13 86:7,9
87:3,21 91:2
96:17,20,21,22
98:8 99:25 101:21
106:9 108:13
134:3 139:21,22
140:6 143:8,11,15
144:21 148:11,16
149:7,9 150:10
151:11,12,14,18
152:1,13,14
154:16 157:21
158:14 172:16,17
172:24 173:2,20
195:8 202:4,20,22
203:5 205:19
207:2,21 209:18
211:18,19 212:7
213:2,9 217:17
222:21 223:10,17
**districts** 19:12
21:8 22:8 210:3
**disturbing** 218:15
219:1,7 220:2
**diverged** 22:5
**division** 2:14,15
2:17 3:7 6:1 9:24

10:23 11:4,10,13
14:25 17:6 19:14
22:10 23:5,10
26:23 47:19 106:4
120:25 157:10
179:17 212:5
225:13
**division's** 157:6
**divisiveness** 174:8
**document** 24:13
24:23,24 47:8
52:24 54:17,17,24
55:4 56:6 57:5,22
57:24 59:4 60:3
65:15 68:22 69:2
70:24 71:7,17
74:13,22 75:14
77:18,21 79:10
85:18 88:4 90:21
100:18,19 101:5
103:6 105:25
106:18 107:18
122:1 140:16
141:10,12 142:21
142:24 154:8
155:2 157:4,5,16
158:21 179:16
183:4,9 187:12
192:9 196:23
197:24 198:1
203:3,8,10 207:15
212:15,24 213:16
215:18,22 217:6
220:5
**documents** 53:15
55:6 141:13
212:21
**doing** 35:20 40:4
40:11,14,19 43:1,4
43:19 116:21
118:13 120:14

136:18,19 150:15
150:17 161:8
164:23 169:18
175:20 186:11
191:4 200:7
**dorm** 21:24
**dot** 155:16,16,16
**double** 167:10
**doubt** 66:15
**draft** 146:18
151:25 162:20
191:2,6
**drafted** 127:20
159:15 214:8
**drafter** 148:21
**drafting** 149:1
150:15,18 204:1
205:14,22 206:6
**drafts** 150:25
151:9
**draw** 95:16 155:24
**drawing** 211:12
**drawn** 200:5
209:24 211:20
219:18
**drive** 200:13
201:18
**drives** 211:24
**drop** 35:7 41:10
112:8
**dually** 12:10
**dudgeon** 106:20
150:2
**due** 21:17
**duly** 5:4
**duties** 10:6,20
12:24 13:2 14:11
14:14 15:8

**e**

**e** 2:1,9 5:10,11
150:7,7
**earlier** 50:6 60:21
125:1 148:9
163:19 179:6
180:13 183:13,17
186:13 194:12
225:1
**early** 114:8 224:2
**ease** 96:12
**easier** 82:2 84:18
84:22
**east** 4:6,12 5:21
111:20
**easy** 39:24
**ed** 93:20
**edgedome** 146:17
**edgefest** 162:1,5
**edgewood** 1:4 2:11
2:16 18:13,19,20
18:23 19:1,9 20:8
20:16,17,22,25
21:2,20 23:10
36:1,8 39:21
40:10 41:4,6
42:15,18 43:17
44:6,9,12 45:7
49:15 51:25 59:21
65:2,16 66:15
70:25 71:17 74:1
74:17 77:13,23,24
78:18,25 79:4,5,19
80:14 81:1 82:25
83:10 84:16,23,25
85:4,6,14 86:4
89:16 90:7,16
103:16,23 106:10
108:8,16 109:2,10
110:13 113:7,12
116:3,3,9,16

119:10 121:1,14
121:16,25 123:9
124:9 125:19
126:14 127:2,4
133:23 134:25
135:2,4,18 136:25
138:3,14 139:17
144:5,18 145:1,1
145:13,25 146:3
146:12 147:16
149:3,8,12,22
154:11,16,17,17
158:1 159:18,25
160:4,16,20,21,22
160:25 162:16,25
163:5 164:7 165:2
165:15,19,20,22
166:18,23 167:20
168:11 170:11,17
171:17,20 172:18
173:4,24 174:24
175:13 179:24
182:15 184:20
185:12 192:19
205:18 212:6
214:15,24 215:1
217:12 227:6
228:3 229:3
**edgewood's** 14:3
53:9 83:4 92:14
92:21 109:3 116:7
128:3 137:15
139:16 144:7
145:7,7,17 153:8
161:13 174:13
178:12 179:20
181:16 188:10
216:14
**education** 9:9
122:4 124:4
170:22 171:19

172:2 188:1 189:5
**educational** 7:21
   8:13
**effect** 153:22
   154:20 155:3,14
   156:19 157:19
   158:20 204:6
   218:2,11
**effective** 153:8,12
   154:2 156:24
   157:18 172:17
   203:6
**effectively** 19:1
   100:19 142:5
   172:25 179:23
   220:2
**effectiveness**
   191:20
**effort** 83:16 137:2
   193:7 202:3
**eight** 12:12,16
**either** 81:15
   131:17 159:21,22
   176:7,19,23 179:1
   224:22
**elaborate** 138:19
**elected** 144:18
**electric** 2:13 28:4
   121:1
**electrical** 121:4
   128:4,8 168:20
   169:1,3,23 171:14
   201:22
**electronic** 139:4
**element** 106:24
**elementary** 5:22
   9:22
**elements** 73:2
**eliminate** 197:2
**ellingson** 79:21
   149:11

**elliot** 3:4 37:8 54:2
   54:7 55:19 59:22
   79:8 120:1 135:9
   160:10 164:20,22
   184:23 185:20
   190:21 191:22
**email** 2:19 3:3
   28:7 55:22 117:4
   139:8 163:23
   164:3,6 165:7,13
   166:6,17 184:18
   184:22 185:19,21
   186:21 192:8,18
   227:17
**emails** 117:22
   130:17
**emerge** 108:3
**emphasis** 135:17
**emphasizing**
   47:22
**employed** 10:15
   29:10
**employee** 50:10
**employees** 210:25
**employer** 5:24
**enabling** 169:21
   169:21
**enclosed** 207:5
   208:9,23 227:12
**encompass** 100:14
**encompassed**
   100:14
**encompassing**
   85:18 96:16
**encountered**
   222:18
**endeavor** 221:3
**ended** 12:7 93:4
   162:7,9
**ends** 111:20 166:1

**enforce** 15:25
**enforceable** 217:2
**enforced** 15:23
   107:7
**enforcement**
   11:25 12:5,8,23
   14:15 15:6,11,12
   15:18,24 16:14
   17:17,18,23 107:3
   108:4,13,18,22
   109:12,14 216:21
   218:6
**enforcer** 15:21,22
   15:23
**enforcing** 103:17
   103:24 104:2
**engaged** 79:8
**engineering** 13:14
   13:14 167:7,9
**enhanced** 89:14
**enjoyment** 216:7
**ensure** 76:21
   110:20
**entail** 30:16
**entailed** 33:22
**enter** 25:6,17
   29:13 35:5
**entered** 27:21 28:4
   34:1 229:9
**entire** 54:24 92:6
   99:5 228:5 229:5
**entirety** 25:22
   54:20 223:18
**entitled** 139:17
**entity** 201:24
**entry** 25:21,22,23
   26:10 66:8
**enumeration**
   68:18,20
**equal** 134:8

**equipment** 219:13
   219:24
**erosion** 166:11
**errata** 227:14,19
   229:7,10,18 230:1
**esq** 4:11,20,20
   227:5
**essence** 103:14
   180:18
**essential** 106:24
**essentially** 72:7
**establish** 38:7,8
**established** 50:12
   101:6 102:2
   153:12 216:8
**establishes** 153:14
**establishing** 40:6
**establishment**
   207:3 208:7
**estate** 13:15
**estimation** 214:7
**et** 1:8 3:4 152:22
   227:7 228:3 229:3
**evaluate** 124:20
   125:12,14
**evaluating** 125:23
**evaluation** 125:6
**evening** 217:11,13
**event** 162:1
**events** 59:24 60:20
   61:18 63:16
   165:23 166:12
   167:12,21 168:6,7
   217:10,13 220:1
**evers** 202:19 205:1
   205:1,2 206:1
   208:4
**everyone's** 79:11
**evolution** 83:21
   96:24 97:5 148:16
   151:10 205:18

evolved   152:2
evolves   23:24
exact   144:22 160:3
exactly   28:2 51:6
  69:25 116:19
  126:16 139:2
  176:13 178:13
  202:12 223:13
examination   2:4,5
  223:25 226:14
examined   5:4
example   16:1
  22:14 23:17 26:21
  27:6 61:2 77:10
  78:10 87:6 99:15
  130:6 155:12
  199:22 219:19
exceed   143:25
  213:11
exceeded   207:16
excellent   15:1
exception   90:2
excerpt   184:18
excerpted   3:3
  217:17
exchange   2:19
  163:23 164:3,25
exchanges   164:6
exchanging
  117:22
exclusions   214:3
exclusively   118:16
excuse   9:22
  205:16 209:21
executed   74:5
  83:24 229:10
execution   228:14
  229:19
exercise   50:22
  51:4 110:15

exercised   102:3
exhibit   2:11,12,14
  2:15,17,19,21,23
  3:3,5,7,11,12,13
  3:14,15,16,17,18
  3:19,20,21 24:12
  26:1 27:5,16 29:3
  31:13,14 33:11,20
  33:22 34:18 35:12
  37:20,25 43:19
  45:1 46:17,18
  50:10 56:5,14
  57:2,9,19 58:1
  59:20 61:22 62:19
  64:15,16,23 65:1
  65:12,17 67:13
  72:4 81:4 91:3
  92:12 105:20,22
  105:24 109:18
  110:9,11,18 112:7
  112:13 119:4
  120:1,4,21,22
  121:14 122:10,14
  122:15,17 123:5
  123:24 124:6
  127:11,20 128:12
  128:20 130:16
  131:2 136:11
  138:2,3 140:13
  141:12,16,17,25
  142:19 143:6
  153:10 154:5,7
  157:1,3,9 158:2,11
  163:21,23 173:14
  176:16,24 177:1
  179:4,5 183:2,3,12
  184:15,17,19
  185:15,16,19
  191:10 195:6,21
  203:1,11 206:15
  206:20 212:3,8

215:4,13 216:12
  220:4 224:25
exhibits   3:1,9
  67:11
exist   20:13 64:9
  224:13
existed   143:17
existence   46:5,12
  47:6 116:10 144:7
  144:14 145:4
existent   143:24
existing   26:24,25
  27:6,11,17 68:3,5
  68:7 73:6,9,18,21
  78:15,16 85:21
  86:18 88:12
  131:17 143:19
  171:6 196:8 199:9
exists   27:1 83:10
  98:22 152:16
exiting   219:16
expand   74:1,3
expanded   58:19
  173:5
expands   208:21
expansion   83:5
  209:21
expansions   83:13
expect   69:9 70:5
  70:20,21 72:3
  74:18 101:13
  134:6 191:14
  193:22 194:5,10
  194:15
expectation
  102:17 105:5
  134:25 135:3
  196:16
expectations   71:6
  71:16 79:11 80:1
  80:22 101:18,19

101:20 102:2
  105:6
expected   71:6
  72:21 138:15
expedite   212:12
expedited   81:15
  81:20
expense   83:15
experience   8:20
  28:14 32:13 40:1
  66:10 73:25 82:1
  138:13 144:3
  174:9
expert   217:4
expertise   216:19
  216:21,23
expiration   153:15
  153:17 173:3
  228:19 229:25
  230:25
explain   36:15 37:9
  37:12,23 46:16
  53:17 82:24 83:3
explained   135:10
explanation   155:8
express   51:2 52:4
expressed   56:19
  125:15 206:18
expressly   191:11
extends   213:7
extensive   47:8
  185:5,23 186:22
  186:23 187:9,10
  191:23 192:20
  214:4
extensively   78:20
extent   18:20 19:17
  46:7 146:24
  175:23 187:19,22
  210:9

exterior 214:2
extremely 39:18

**f**

face 60:23,25
faced 52:18
facilitate 130:2
facilitated 81:16
facilities 73:4,5,16
99:7 193:9 200:8
224:21
facility 27:1 78:15
93:10,13 94:14,16
94:18,21 95:1,7,7
95:10,11 98:14
101:10 119:11
121:23,24 122:3
124:3 125:22
160:4 172:19
196:13,24 218:15
fact 28:24 29:1,2
35:16,20,22 36:14
58:15 89:11 125:8
200:19 215:18
factors 16:25
facts 167:22
fail 82:6,14 83:14
fair 12:12 16:12
16:16 43:8 67:18
75:18 81:17 84:12
110:15 112:19
115:22 120:10
128:5 129:13
130:4 140:9 145:4
157:8 169:10
180:19 186:14,18
194:3 201:13
211:14 214:8
216:16
fairly 32:6
faith 145:13 146:1
175:22 176:4

fall 14:9 16:13,15
18:20,23 27:7,20
92:14,15 93:2,14
93:18 94:4
falls 15:7 92:22
93:20,25 118:16
false 11:3
familiar 105:24
108:15,21 140:16
142:20 161:24
168:23,24 195:9
200:22 222:17
families 55:20
59:21 125:19
127:4
family 9:1 121:16
121:25
fans 219:13
far 7:22 28:15
116:9 177:18
202:11 211:15
fault 21:17
favor 222:13
feature 27:12
featured 76:16
features 16:15
february 2:11
25:14 34:7 44:15
50:16 53:7 54:2
55:18 56:20 65:2
66:17,20 120:2,18
120:24 123:17
124:6,14,21 125:9
125:24 128:19
129:11,21 130:22
130:22,24 131:7,7
131:10 142:14
144:5,20 190:7,7
191:10 192:8
federal 221:23

feedback 151:4
152:2
feel 70:7 141:3
164:15,16
feet 196:9 207:16
207:19 213:11
fell 14:8 127:3
fellow 79:17
felt 11:7 115:15
164:13
fencing 191:23
field 14:4 27:18
28:19 29:4,11,12
31:14 56:14,16
62:14,17,24 63:3,4
63:9,11,12,19 64:1
64:11,12 66:7,11
70:15 74:12 77:8
77:25 78:4 92:14
92:21 93:14,17,19
93:24 94:3 95:6
95:11 96:24,25
97:1,2,12,16,25
121:2 123:12,19
126:8 130:8 133:4
133:21 134:18,19
137:2 139:17
146:5,6,14 147:5,6
155:22 159:18,23
159:24 160:1,9,14
160:17,20,22,23
160:25 161:1,9,10
161:14,22,25
162:1,2,17,17
163:2,6,14,16
165:16 166:19
167:21 168:12,21
171:24 172:6,19
173:5 185:6,13,23
186:22,25 187:2,7
187:18,19,21

188:2,5,11,16
189:5,11,24
191:15,16,16
192:16,20 194:9
196:11,21 197:6
fields 24:24 99:16
143:17 196:7,8,10
196:12,15 197:9
199:24
fight 135:13,14
figure 30:10 31:4
64:1 115:14
132:22 133:18
187:22
file 12:21 14:10
22:2 203:12
filed 65:16 121:1
131:10 184:19
fill 114:15
final 81:7 107:23
175:7 203:6
finalization
146:22
find 27:3 37:15
47:16 56:5 65:3,4
65:5 72:24 75:2,2
75:5 82:22 83:11
90:17 95:3 102:13
119:7 122:17
123:5 125:2 143:4
153:11 173:14
175:4,21 197:15
215:5 223:15
225:6,8,13,14
227:12
fine 54:13 59:5
69:5 90:21 113:22
113:23 114:20
116:13,23 118:3
122:23 136:3
189:18 190:14

finish 7:7,9 32:21 109:22

fire 13:14

first 5:4 14:18 32:15 46:21,21 71:12 73:5 88:1 102:3,7 120:21,24 128:1 137:21 154:14 159:22 160:12 169:2 189:15 190:11 199:9 203:12 208:14

fit 31:6 32:3 80:10 204:2,15

five 30:5,8 89:7,21 190:6 196:9 224:22

fix 206:12 207:9

fixed 219:14

fixtures 47:20

flag 194:8,9 196:10 199:22

flaw 206:4,6,12,18 206:19 207:10,20 208:4

flawed 209:3

floor 4:21 153:1 207:16,19 208:7 208:17 213:11,22

flow 33:7

focus 11:15,17 54:7 74:17 147:2 163:13,18 167:12 177:23

focused 17:9 118:8 123:18 189:23

focusing 18:9 95:10 118:12,18 170:7 188:18

folks 139:7 148:18 150:11 160:13 216:24 217:5

follow 16:9 33:4 60:18 61:10 62:4 63:15 115:21 154:18 168:1 190:24

following 73:2 137:22 165:17

follows 5:5 206:24

foot 87:2 209:25 210:6 211:21 212:1

footage 152:22

football 90:8 95:25 134:17,19 143:16 161:3 165:16,24 166:3,9 166:15,23 167:5 168:1,8 187:5 194:8,9 196:10 199:16,23

forced 39:16

foreclose 131:24

foregoing 226:5 228:13 229:18

foreseeable 216:9

foresees 107:24

forget 149:19 160:3

forgot 181:6

form 19:15 26:19 30:19 31:11,18 32:14 33:10,12 34:10,24 35:2 36:17 37:17,21 38:24 39:4,6,10,14 40:25 41:12 43:20 45:19 48:22 49:16 50:17,24 52:7,16

53:10,12,18 60:1,5 60:10 61:19 62:2 62:11 66:24 68:8 68:24 71:18 77:19 78:7 81:18 84:13 86:13 87:23 88:24 89:17 90:11 91:4 92:16 93:11,16,22 94:1,6 95:2,12,18 96:9,14 97:8,22 98:5,16 99:18 100:7 101:22 102:6,25 103:18 103:25 104:5,17 105:11 108:11 109:6 114:3,24 115:23 120:8 126:2 127:10 129:8,16 131:19 132:2,13 133:10 134:1,20 137:5 138:3 139:25 140:10 142:17 143:3 144:9,16,23 145:9,22 151:25 153:20 155:7,20 156:2 158:8,24 161:15 166:20,25 167:22 169:14 171:4,21 172:21 173:6,11 174:1,16 180:22 182:9 190:8 193:19 194:4,18 195:13 197:4,13 198:11 200:14 206:9 207:11,22 208:11 209:4,10 214:9 218:13 219:22 221:5,20 222:7,22 224:9,15 225:11

former 63:1 94:23 149:13

formulate 128:19 180:5

formulated 180:8

formulating 119:8 130:16 131:2

formulation 49:13 132:8

forth 124:20 125:8 172:5

forward 2:13 17:1 28:3 31:5 121:1 163:17 227:16

forwarded 184:22

fostering 106:24 109:1,9

found 36:25 55:12 69:7,18,19 74:7 111:1 118:21 122:10,18 129:17 191:14 225:5,10

foundation 19:15 22:11 30:19 48:22 50:24 61:19 62:2 62:11 71:18 78:7 84:13 96:14 115:23 126:2 137:5 156:2 158:24 174:16 176:21 207:22 209:10 211:16

four 12:8 15:18 29:16 30:4 60:3 88:6 110:3 119:22 192:9 224:22

fourth 106:16 213:3

framework 71:21

frankly 51:17 53:1 163:14 165:5

169:8 174:11
**free** 222:6,10,13
  228:14 229:20
**frequent** 22:24
  23:11
**frequently** 122:1
**freshman** 9:20
**friday** 5:1 120:24
**front** 23:22 81:4
  83:20 118:7 138:5
  140:15 164:21
  205:13 212:24
  215:4,5 221:10
**fronting** 113:6
**frustrating** 164:10
  164:12
**function** 196:12
  198:24
**functions** 13:25
  68:20
**furman** 202:21
**further** 69:14
  129:24 137:12
  189:8 223:20
  225:16
**furthered** 211:9
**future** 73:11,23
  74:12 85:23
  106:22 107:6
  108:3 163:1,1,6
  169:19,20 170:9
  192:14

**g**

**game** 89:6 219:3
**games** 54:8 59:17
  59:19 93:24 94:3
  97:1,2,16,19
  113:14 126:15
  133:5,14,17,21
  134:7 135:20
  137:1,15 159:18

159:23,24 160:1
  160:14 165:15
  166:3,9,18,22,24
  167:5,12 168:12
  173:24 185:13
  188:11 200:15
  218:23,23
**gaps** 88:4
**gary** 149:17
  150:18
**gee** 176:9
**general** 6:18 31:25
  43:10,12,16 49:18
  142:8 152:20,23
  153:5 221:25
**generality** 95:15
**generally** 11:21
  18:12,16 19:4
  21:19 32:15 33:2
  40:11 69:3,4 74:7
  74:8,9 80:12,17
  93:2,17 105:14
  108:17 222:17
**generated** 24:18
  220:1
**generating** 219:12
**generators** 219:13
**geographic** 18:21
**geography** 9:7
**george** 10:4,21
  11:13 13:4 15:1
  17:19 37:3 46:1,4
  47:24 48:10,15,20
  51:19 54:12
  112:19 124:22
  126:6,18 128:10
  128:14 132:17
**george's** 23:20
  47:24 49:23
**getting** 76:2 95:25
  112:22 113:24

136:22 137:7
  146:22 174:15
  181:14 185:18
  186:6 199:13
**give** 16:1 62:22
  65:15 88:19 89:13
  143:25 147:23
  175:21
**given** 31:1 82:12
  169:11 170:16
  174:8 186:7
  215:11
**gives** 171:25
  208:25 223:16
**gklaw.com** 4:14
**glancing** 161:7
**glare** 111:11
**go** 7:22 8:7,15,16
  8:18 19:13 22:9
  22:19 23:5 24:5
  27:4 30:2 32:12
  36:4,14 46:11
  57:12,17 62:8
  64:14 72:24 75:9
  77:2 87:5 92:6
  114:17 121:13
  123:5 124:19
  144:16 148:2
  163:19 166:13
  173:15 174:6,7
  177:25 182:9
  198:19 208:11
  211:5 212:22
  224:17
**goal** 109:11
**godfrey** 4:5,12
**goes** 32:24 80:2
  121:20 182:5
  196:11
**going** 11:15,17
  16:13 17:1,2,13

24:25 41:4 43:3,4
  43:5 49:16 52:5
  56:4 57:5 59:3
  60:20 61:10,18
  64:2,23 67:14
  71:25 72:3 74:25
  75:7 76:9 77:12
  80:19 89:1,9
  90:20 93:2 96:23
  110:2,8 114:15
  118:11 119:15
  122:22 131:10
  136:23 147:22
  155:4,5 163:16,17
  164:11 167:12
  174:3 175:15
  181:14 191:24
  195:10,18 218:22
**golf** 95:7
**good** 5:8 8:20 16:1
  52:21 57:7 58:9
  109:10 111:13
  145:13 146:1
  148:1 152:7 174:6
  192:23 225:20
**goodwill** 103:4
  109:1,10
**gosh** 141:2
**gotten** 109:17
**govern** 80:3
  156:19
**governed** 55:15
  61:25 86:20 87:17
**government**
  211:12
**governmental**
  209:8 211:9,24
**governs** 87:14
  221:18
**grab** 140:14

grade  8:7,9,11
  20:9 161:17
graded  196:9
grader  9:21
graduate  8:2,5
graduated  162:8
grain  69:5
grander  190:23
grant  54:25
  142:10
granted  38:22,23
  74:9 145:8 179:22
graphics  70:22
grass  165:21
  166:11 167:5,6,8
  167:14,17,18,20
great  7:15,20 8:2
  9:3 84:7
greater  209:22
greatly  125:16
green  198:4 199:2
  200:20,23 201:17
grew  23:20
gross  196:8 213:11
  213:22
ground  219:15
grounds  132:9
  136:6,11,14
group  27:14 95:24
  96:18 112:17,18
  112:21 113:2,20
  114:20 117:1
  137:14 205:20
grouped  96:7
grouping  42:21
guard  53:1 186:6
guess  21:5 48:12
  54:6 84:20 114:10
  115:18 143:6
  171:22 175:22

guessing  224:22
guide  79:10 221:3
guidelines  111:7
guides  221:18
guiding  85:18
  100:19
guy  149:18
guys  61:6 117:2,22
  135:18
gym  147:9

**h**

h  2:9 5:10
hac  4:15
half  177:17 199:1
hall  79:8
hamilton  8:10
hand  24:11 28:5
  56:4 72:3 75:21
  106:13 110:20
handful  62:23
handing  46:18
  105:23 119:25
  154:6 157:2
  163:22 179:5
  183:1,12 184:16
  203:1 215:12
handle  165:23
handles  22:20
handling  24:4,20
  129:6
hands  141:3
  186:20
handwritten  66:8
hank  10:4 11:13
  17:19 48:15,20
  49:14 50:21 51:2
  51:10 52:4 54:12
  55:23 56:25
  112:19 116:13
  117:2,13,16,16
  119:15 122:24

124:22 125:5,15
  126:6,13,19
  128:10,14 130:2
  132:17 136:4,18
  136:19 145:6
  172:9
hank's  6:24 10:21
  24:11
haphazardly
  214:8
happen  172:6
happened  35:17
  61:8 114:20
  116:12 185:24
  211:6 214:20
happening  45:7
  116:18 162:10,10
happens  33:1
  36:19 43:10 44:4
  86:3 115:3 201:8
happy  79:9 104:24
  171:15
harassment
  164:18
hard  8:23 41:18
  82:15 84:21 88:14
  165:18,19 166:2
  174:20 208:19
header  69:15
heading  70:1
heads  112:22
hear  168:13 205:3
  214:13
heard  7:2 10:21
  43:3 131:13
  132:25 187:14
  206:10,11,18
  211:11 225:1
hearing  202:11
heart  1:4 227:6
  228:3 229:3

heather  149:6
heavily  150:21
height  81:10 82:10
  111:11 152:22
held  10:1,13 201:7
hell  220:23
help  14:23 83:21
  114:15 129:22
  170:9
helped  42:20
  151:14 180:15
  186:20
helpful  17:8
helping  218:3
hey  14:19 35:25
  72:20 116:4 126:7
  134:14 135:18
  186:11
high  1:4 7:23,24
  9:20 20:9,10
  83:13 84:2 85:4,6
  89:16 121:2
  143:13 152:25
  154:17 161:20
  168:1 202:20
  205:19 215:2
  217:12 227:6
  228:3 229:3
highlight  110:2
highlighted  119:1
highly  45:20
hilldale  23:17,21
hindsight  43:18
  170:2
hired  148:19
hise  8:9,16 161:18
historical  121:23
  134:4 220:6,10
historically
  161:11

history  7:21 83:4
  149:23 161:12
  174:9 203:11
hmm  176:9
hoc  42:22
hockey  187:7
  199:15
hold  12:3 64:20
  105:4 190:23
holding  135:19
holdings  85:12
home  166:9,15,22
honest  82:22
honestly  119:21
  188:6 203:19
hope  105:15 176:4
hopefully  197:10
host  89:10 90:8
  93:24 194:16
hosted  160:4
hosting  137:1,15
hosts  94:3
hours  89:10
housing  15:13
huh  14:16 61:5
  97:18 108:6 112:5
  120:3 124:5
  127:25 128:9
  144:15 165:11
  217:24
human  175:22
hypothetical
  80:20 86:24 87:25
  132:15 133:12
  155:21 167:3
  174:20 194:24
hypothetically
  156:8
hypotheticals
  59:12 114:5 115:8
  115:21

**i**

i.e.  128:3
idea  96:17 113:25
  142:8 173:23
ideally  44:17
ideas  49:19 114:5
identified  2:10 3:2
  25:4 42:9,21
  54:14 55:14,24
  56:8,22 58:24
  67:15,25 68:22
  76:12 80:15 81:11
  81:15 85:20,22,24
  93:6 98:9 99:14
  114:1 119:3,15,17
  123:22 132:12
  133:9 164:4
  187:24 189:24
  193:15,16 196:14
identifies  58:16
  68:6 104:7,12
  111:9 189:4
identify  43:22
  56:11,17,25 57:21
  58:16 60:7,19
  61:17 62:7,24
  76:11 81:9 99:3
  105:13 110:12
  121:21 173:18
  174:24 221:8
  222:19 223:8
identifying  55:16
  75:16 135:21
  187:1 192:11
illinois  4:16
illuminate  61:3
immediately  28:9
impact  36:15,16
  44:14 124:8 126:1
  131:15 136:24
  156:1

impacted  39:9
impacts  70:18
  209:23 217:14
  218:3
impaired  216:5,9
impairments
  216:15 218:3
implementation
  13:8,20 107:5,25
  152:25 153:6
implementing
  107:22
implied  45:9 60:2
implies  31:23
  124:17 140:2
  181:12
imply  31:21
  133:14
implying  171:24
important  44:10
  67:17 69:8 72:13
  111:2 122:11
  123:3 150:9
impose  216:13
imposed  218:2
impressions
  117:23
improvement
  58:17 69:10
  119:11 134:23
  169:7 171:1 194:7
  207:3 208:8 215:3
improvements
  13:25 55:9,9 56:8
  56:9 67:25 73:12
  73:24 74:13,21
  169:20
improving  130:8
inception  148:17
include  70:17 73:1
  74:22 156:10

190:1
included  67:2
  70:21 106:23
  112:18 149:5
  160:14 227:14
includes  13:20
  16:4 73:5 106:18
including  12:14,15
  31:24 68:1 73:8
  83:12 99:13
incompatible
  171:19
incomplete  56:23
  133:12
inconsistencies
  197:2
inconsistency
  197:5,10
inconsistent  47:10
  127:8 188:1
  192:16 197:8
incorporated
  45:10 101:4
  213:15 229:12
incorporation
  103:2
incorrect  20:21,23
indicate  32:14,18
  54:11 146:3
indicated  83:15
  126:14 160:9
  187:1
indicates  68:3,4
indicating  77:13
  227:14
indication  100:8
individual  11:21
  23:7,15,18 24:3
  55:18 213:10
indoor  93:9 99:6

**inequitable** 83:18
**inform** 123:25
**information** 25:7
25:15,17 29:14
42:6 48:18 58:20
58:23 60:13,19
61:17 62:9 73:2
74:23 121:22
123:11 136:2
167:19
**informed** 116:3,4
116:7,10,16
165:14
**ingrisano** 2:4 4:11
5:7 26:11 28:11
44:20 46:10 48:7
49:7,11 51:14
53:4,11,17 55:3
56:2,15 57:12,16
64:14 65:11,13
75:9,11 105:20,23
110:4,7 117:25
119:20 127:23
129:15 130:19
152:8,10 154:6
157:2 163:22
176:25 178:3
179:2 184:16
185:16 190:16
192:4,24 193:1
195:7,25 206:16
210:12,18 212:2,4
223:19 224:9,15
225:11,18,20
**initial** 28:8 127:17
129:21
**initially** 150:5
**initiated** 125:5
**input** 24:23 27:13
54:23 150:13
204:21

**inquiries** 19:5
168:18
**inspected** 169:5,9
**inspection** 6:1
10:22 11:10 14:24
14:25 15:3,7,10
16:16 17:6,20
18:2 26:9,23
27:13,22 28:6
33:5 38:18 47:4
47:19 50:10 62:18
94:24 120:25
**inspections** 137:22
137:24
**inspector** 9:24
169:5
**inspectors** 15:13
15:13,14,15
**install** 54:7 121:2
**installation** 44:19
46:24 47:20 74:11
125:18 169:4
170:6,18
**installed** 38:12
46:25 70:4 170:11
170:14,15
**installing** 169:18
**instance** 4:2 30:9
**instituted** 11:12
**institution** 21:2
78:12 102:16
105:1 217:15
**institutional** 3:5
19:12,18,21,24,25
20:12,17,19,22
21:1,3,7,13 22:8
22:15 23:1,2,24
32:5 44:12 71:9
71:12 72:6 78:2
78:12 81:3 82:18
83:9 85:3 87:21

91:2 98:8 101:21
101:23 102:4
106:9 134:3
139:21,22 140:5
143:7,14 144:21
148:11 152:13
154:16 172:15,17
173:20 195:8
202:4 203:5
205:22 207:2,21
209:18 212:6
213:1,9 217:17
222:21 223:10
**institutions** 20:7
21:5,7,12,13 22:7
85:8 106:19
**instructs** 7:18
**integral** 80:24
**intended** 61:3
63:20 82:20
102:15 121:24
163:1,1,6 214:14
**intending** 187:11
**intent** 46:22,24
54:5 60:25 63:18
125:18 126:14
127:3 163:16
207:12 209:17
211:19 214:10,10
**intentionally**
146:4 213:16,21
**interact** 13:11
**interacted** 204:25
**interacting** 79:25
113:5
**interaction** 8:21
204:8
**interest** 6:20 38:11
85:12 123:12
136:22 160:5,6
170:9 211:9,12,25

226:10
**interested** 130:5
146:23 148:25
149:2,23
**interesting** 87:25
**interestingly**
103:1 199:1
**interests** 83:13
151:1,7 209:8
**interim** 155:4
**interior** 76:21
110:21
**interpret** 80:7
220:24
**interpretation**
48:21 49:13 87:20
94:20,25 96:13
119:9 128:21
136:17 139:16
169:11 170:16
171:17 189:10
202:11 221:14,16
221:18 222:2,4
**interpretations**
222:11
**interpreted** 145:5
145:20 168:11
222:5
**interpreting**
101:20 145:11
**intimately** 108:15
**introduced** 191:24
**introduction**
203:13,17
**investigate** 164:15
218:21
**investigated**
193:12
**involve** 30:17
**involved** 45:24
46:2 51:16 59:17

77:17,20 79:9,15
79:18 83:5,16
113:1 127:24
149:7,9,13,14,23
149:24 150:2,22
181:5 203:25
204:5 205:17
220:4
**involvement**  13:1
14:5,9 148:10,12
203:16 218:20
**involves**  46:8
170:25
**involving**  14:3
**ish**  163:8
**issuance**  33:4 46:6
48:11 124:1,8
126:1 127:8
137:25 145:21
154:20 155:16
156:12 189:21
**issue**  6:19 8:22
36:3 39:5 45:24
51:11,22 52:18
63:8 67:18 76:17
103:8 112:18
113:3,3 115:20
117:23 122:12,25
126:8 129:18
132:25 135:17
136:17 137:3,14
137:19 138:7,24
147:1,4,4,19
167:19 168:16,20
169:16 171:15
174:8
**issued**  36:4,13
38:23 45:1 56:7
63:10 121:5,9
125:18 128:4,8,12
129:4 138:17

139:11 141:6,21
141:24 142:20
154:10 155:5
157:21 158:5,14
169:8,9,13 193:3
**issues**  23:6,11
63:21 106:22
147:1
**issuing**  116:5
136:25 137:9
**italicized**  217:14
**item**  25:23 123:18
123:22,22
**items**  146:11,11

## j

**january**  156:21
165:9 166:17
**jean**  4:20 206:14
**jeez**  149:19
**jennifer**  28:3
139:8
**jingrisa**  4:14
**job**  15:1 42:1
48:18 105:2 109:3
175:20 203:24
220:24
**john**  37:2 45:8
46:8 48:14 49:6
51:12 54:12 115:2
116:12 117:1,13
122:23 128:18
135:24 177:4,9,23
178:18 183:9
190:6 204:23
**jon**  149:24
**jonathan**  4:11
**julia**  149:13
**july**  10:2,13
202:10
**jump**  54:18

**jumped**  54:19
111:4
**jumps**  98:22
**june**  10:12,15
**justification**  51:3
59:1 136:15
**justifications**
132:20
**justified**  46:6 48:5
75:17 114:1
**justifying**  56:19

## k

**k**  5:11
**kahn**  4:6,12
**kate**  4:24
**keep**  107:20
**keith**  202:21
**kept**  114:4
**kerr**  149:13
**key**  204:24
**keyed**  25:13,15
29:10
**kill**  166:10
**kills**  110:9
**kind**  6:18 7:2
11:15 13:20 15:11
16:14 17:2 19:8
19:13 21:6,16,19
22:2,9,20 23:22,23
24:3 27:13 30:1
41:25 43:6 52:22
54:16 70:2 72:15
76:2,3,14 87:8
88:11,18 89:14
95:9 97:4 111:23
112:17 113:24
117:4 118:7,18
132:22 133:12
150:15 153:14
165:8,12 167:10
169:7 172:9

197:18 198:15,16
211:23 222:4
**king**  63:2
**knew**  80:15 174:9
220:7
**know**  18:20 19:8
19:17 22:12,13
23:7 24:1,7,22,23
25:1 36:20 37:5
41:1,13,17,18,22
45:15 47:9 48:12
48:17,24 49:5
50:2,5 52:9 58:17
59:11 61:4,6,16
62:21 63:12 64:18
71:20,23 77:12
78:13,18,25 79:7
80:7 82:10 86:2,5
88:14,22 89:25
94:9,11,19 95:4,24
96:5 103:10 104:1
112:8 114:6,9
115:3 116:9,11,17
117:17 119:21
126:17 131:24
132:20 134:5,24
135:5,23 140:3
141:6,13 142:7
147:21 148:23
149:20 151:17,21
161:4,8 162:7,9,10
165:6 167:2,9,15
168:8,17 169:15
170:2,4,6,13 172:4
172:6 174:5 178:1
178:23,23 182:24
186:1,15 190:25
190:25 197:7
198:21,21,25
200:6,9 201:6
205:4,14,16

206:16 210:12,15
211:24 213:20
214:18,18 215:10
216:22 220:14
221:12 222:8
224:12 225:10
**knowing** 134:3,4
205:19 220:17
**knowingly** 146:4
**knowledge** 22:7
23:1,2,24 24:5
28:16 48:9 141:14
148:15 162:5
168:10 182:23
193:2,13 203:16
218:12 220:16
**kohl** 198:25
199:15

**l**

**l** 5:11,11 150:7
**labeled** 50:15
70:11 165:25
194:15,21 195:24
199:11
**laboriously** 78:20
**lack** 58:14,20
67:16 123:10
189:8
**lacked** 146:12
**lacks** 58:22
**lacrosse** 165:17
**lady** 8:8
**laid** 11:23 100:5
**lakeshore** 196:4
**land** 13:24 16:18
16:23 26:7,15
27:8,23 29:25
30:7 63:25 131:16
179:22 197:21
199:11 221:19

**landowner** 60:7
60:19 61:16 132:1
**landowner's**
131:15
**landscaping** 153:2
191:23
**lane** 5:15,21
**language** 58:12,13
58:14 67:16 69:7
88:9 96:19 104:25
108:20 111:10
123:13 156:10
188:15 189:8,9
190:1 191:14
192:15,19 193:20
200:16 204:1,10
204:25 206:13
207:14 209:9,12
209:13,17 211:10
213:1,15,19
**large** 24:1 89:20
117:7 223:6
**late** 161:4 208:11
**law** 4:5 13:23,24
221:23,24
**lawn** 165:2 166:10
**lawson** 146:19
**lawsuit** 6:8
**lawyer** 178:19
**lawyers** 115:4,5
135:13
**laying** 15:1
**lead** 216:25
**leadership** 79:24
**leading** 224:9,15
224:16
**leads** 58:25 76:14
189:10
**leaning** 94:7
**learn** 52:25 202:3

**learned** 113:16
185:11 186:18
**leaving** 105:10
**left** 17:14 57:8
76:7,8 97:6
109:18 110:17,20
175:6 195:23
198:1,15 200:24
212:25 217:21
**legal** 9:11 125:20
128:11 227:1
230:1
**legalese** 178:17
**legend** 197:24
**legislation** 204:7
205:10
**legislative** 203:11
**leisure** 139:12
**lengthy** 218:19
**lesser** 86:21
**letter** 2:16,18 37:8
45:20 54:1,10
55:19,20 59:21
120:1,5,11,17,21
121:8,14,20,25
123:25 124:15,16
125:25 127:4,18
128:20,24 129:4
136:2 140:18,20
140:23 154:10
156:23,24 157:7
157:13,23 158:1,4
158:6,10,17 159:1
159:9 177:21,21
177:22 178:5,9,17
179:12 191:10
192:9,18 195:15
195:16 227:20
**letting** 125:17
**level** 72:2 81:17,24
94:14,17 101:11

105:7 134:24
135:7,10 152:25
175:24 194:2,10
196:14
**levels** 89:24
**life** 16:22 161:13
161:23
**lifespan** 159:8
**light** 26:24 27:17
36:1 44:23 53:9
66:16,16 74:11
75:18 89:24
122:12 123:9,12
125:8 133:6,15
134:13,16 140:25
142:10 169:1,20
182:14 198:4
200:23 201:17
214:15
**lighted** 63:16
134:18 155:22
**lighting** 2:11 24:9
25:9,24,25 26:4,6
26:15,16,17,25
27:2,8,17,23 28:17
28:18,19,20,21,23
28:24 29:1 33:8
33:13,18,21 34:15
36:8,21 37:19,23
38:16,17 39:2,3,24
40:2,12,12,16
41:14,25 44:11,15
44:19,24,25 45:25
46:25 47:20 50:9
50:20 52:12 54:5
54:14 55:11,13,18
56:9 59:23 60:9
60:17,22,23 61:2,5
61:23 63:3,24
64:12 65:1 67:2,5
67:6,9,16 69:7,11

69:20,23 70:3,4,7
70:7,11,12,12,14
70:15 74:21 75:21
76:3,11,12,15,21
76:23,25 77:5,5,9
77:11,14 78:11,16
78:16 87:13,14,16
87:17,18 88:2,5,12
88:17,18 89:12,14
89:22 110:13,21
111:10,11,14,19
111:22,24 112:4,5
112:13 113:13
115:10 118:16
120:12,25 121:2
123:13 124:1
125:17 128:3
129:7 131:10
132:10 133:8,25
134:9,11 135:17
135:21 143:8,16
143:19,23 144:4,5
144:19 145:1,8
153:2 155:25
190:12,13,20
191:15,19,24
224:7,14
**lights** 30:17 31:9
48:3 52:14 53:24
54:7,25 56:7,13,14
56:15 58:18 59:2
59:6,15,17,18,24
63:4,8 64:1 69:21
69:21,22 72:16
74:12 75:3 78:4
89:9 94:4,14,16
97:3,20 111:19,22
113:3 125:18
126:14 127:1
133:17 147:5
173:25 175:16

182:16 189:21
**likewise** 74:10
**limbo** 156:7
**limitation** 68:21
126:7 194:1
209:25
**limited** 55:15
70:23 124:3
188:20
**limiting** 36:7
217:10
**limits** 122:3
**line** 25:23 121:8
199:9 203:12
209:24 211:20
219:16,17 222:1
227:14 229:7
230:3
**lines** 21:25 44:3
45:23 82:11
**link** 139:6
**list** 73:9 186:24
187:4,8,9,10,24
205:12
**listed** 32:16 155:2
215:17 229:7,17
**listening** 148:22
148:23,24
**listing** 215:21
229:7
**lit** 59:24 60:8,20
61:18 63:16
224:23
**literally** 159:19
**litigation** 6:19
38:15 178:11
**little** 18:9 21:17
23:13 24:10 41:10
52:2 65:15 71:5
74:25 75:8 90:20
90:24,25 109:21

166:8,23 189:15
200:10 205:5
**live** 88:22 89:2
96:21
**lived** 5:18
**llp** 4:21
**local** 201:25
**located** 16:24
**location** 8:13
81:10 101:6
**locked** 159:6
**locker** 58:19
**long** 6:10 8:24
10:1,11 79:25
135:14 162:5,7,13
166:9 186:24
187:4,8,24
**longer** 124:11
162:9 208:3
**longstanding**
74:17
**look** 16:9 28:22
32:12 38:10 41:23
42:2 54:10 59:11
65:17 75:13 81:3
82:9 83:24 89:19
92:12 96:20
100:10 101:16
102:14 105:14
106:15 134:2
140:13 141:17
152:17 157:4,15
194:5,14,24
196:22 201:13
203:10 206:19,25
223:2
**looked** 54:9 55:6,7
161:10 188:17,25
189:1,15 190:9
195:1,4

**looking** 11:1 16:21
16:23 29:3 33:19
33:22 36:25 37:1
40:17,18,21 43:4,5
43:6 47:14 50:12
72:19 73:14 75:2
75:7 76:18,19
81:7 89:20 92:17
92:19 95:5 97:9
100:12,16,17
110:11 112:18
113:3 116:5
135:12 169:24
183:23 189:20
197:24 200:7
202:10 214:22
215:24 218:6
**looks** 65:18 81:14
188:13 195:11
212:16
**loophole** 206:4,7
208:4
**lot** 14:20 23:21
26:24,25 27:7,12
28:23,24 29:1
48:18 60:24 74:1
74:3 86:6 87:12
87:13,16,25 88:2
88:11,12 89:9,14
89:19,20 90:5,7,10
103:20 132:25
134:13 141:13
150:3,17 164:7
188:7 224:14
**lots** 58:24 60:23
61:9 85:25 88:16
88:17,23,25 89:4
89:23 90:4 151:9
165:2,3 224:3,6,8
**loud** 219:3

**louder**  219:20
**louis**  4:20 206:14
**love**  135:13
**lower**  111:11
  180:20
**luhman**  28:3
  139:8
**lunch**  110:6
**lutheran**  64:17
**lutherans**  64:18

**m**

**m**  4:24 5:10,11
**madam**  227:10
**madison**  1:7,17
  4:6,13,22 5:16,18
  5:20,25 6:9,16
  7:24 8:8 10:12
  13:6 14:3 15:9
  20:8 22:14,18
  23:6,19 24:2,6
  25:11 39:20,21
  65:2 83:11 85:7,7
  89:2 90:17 102:5
  142:19 143:11
  144:4 149:3,19
  151:18 157:16
  162:11 177:5,10
  177:15 182:13
  187:4 193:4
  201:25 206:23
  218:20 219:18
  221:25 227:7
  228:3 229:3
**madison's**  12:18
  139:20 218:8,12
  218:14 220:25
  221:19
**magenta**  80:9
**maggie**  84:25
  149:16 150:20,21

**main**  4:6,12 79:5
**maintenance**
  15:14
**major**  88:13 182:6
**makeup**  175:11
**making**  16:16
  136:23,23 141:3
**manage**  25:11
  79:11 80:7
**managed**  12:24
  220:2
**management**
  196:12
**mandatory**  38:6
  40:9 46:25
**manner**  216:9
**mansfield**  143:13
**map**  30:3 47:12,13
  67:25 68:2,6,10
  69:5 91:5,6,7
  123:23 141:18
  179:18 180:24,25
  181:1 197:22
  198:15,24 199:8
  200:18,20,24
  201:4
**mapped**  20:2
**mapping**  21:11
**maps**  20:5 70:22
**march**  2:14 3:7
  35:23 36:20,23
  42:18 52:18 53:7
  106:5 114:8,8
  120:14,15,19
  122:22 123:14,17
  124:12,19 134:25
  135:24,25 136:16
  137:15 138:14,22
  139:13 169:12
  170:17 182:13,21
  189:19,20 190:5

**190**:14 212:5
**marie**  150:18,19
**mark**  40:23
  105:20
**marked**  3:9 24:11
  35:15 37:5,13
  39:4 43:18 46:18
  56:4 64:14,16
  65:11,12 72:4
  105:22,24 119:25
  154:5,7 157:1,3
  163:21,23 176:24
  179:2,4,5 183:1,12
  184:15,17 195:6
  203:1 212:2,3
  215:12
**marks**  38:21
**maroon**  68:4
**married**  9:13
**master**  2:16,18,21
  3:6 38:15 44:13
  44:14,17 46:6,12
  47:6,12 51:19,21
  51:23 52:11,13,23
  53:8,22,24 54:11
  54:15,16,22,24
  56:7,10 57:3
  59:12 67:14 68:18
  69:1,13,16 70:8,13
  70:16,24 71:9,11
  71:13 72:25 73:1
  73:7,15,25 74:2,6
  74:7,9 75:16
  76:16,25 77:24
  78:20 80:3,7,15,20
  80:23 81:9,11,22
  82:16,20 83:1,23
  83:25 84:1,10
  85:15,20,23,25
  86:2,9,12,16,18,20
  86:25 87:3,8,10,12

**87**:14,15,19,20
**88**:1,9 90:10 91:2
  91:5,6,13,19 92:15
  92:22 93:1,5,6
  98:10,14,17,21,22
  98:24 99:3,12,20
  99:22 100:1,2,4,9
  100:13,17,22
  101:4,5,7,8,10,14
  101:15,21,23,25
  102:4,15,18,22,24
  103:1,8,22 104:1,3
  104:7,13,15 105:9
  105:12,16,18
  106:9,18 107:6,17
  107:22 108:13
  109:19 110:1,14
  113:4,9,21,25
  115:11 116:15,25
  117:6,20 118:3,5,7
  118:10,17,20
  119:2,9,14 121:10
  122:2,16 124:3,7
  124:15,18 125:21
  125:21 127:6,7,7
  131:14,18 132:10
  133:8,13,25
  134:12,15,22
  135:19 136:3,6,11
  138:7,8,10,23,24
  139:17 142:6,10
  143:15 144:7,12
  144:14,19 145:1,5
  145:7,12,16,19
  146:1,23 152:12
  152:13,15 153:5,8
  153:18,22 154:1
  154:11,16,19
  155:3,9,11,21,22
  155:22 156:1,6,16
  156:19,22 157:7

157:11,18 158:15
158:20 159:8
162:14,22 163:4,8
163:11 168:11
169:1,12 170:16
170:17 171:3,17
171:20 172:1,18
172:24 173:4,24
174:13,22 175:2
175:16 176:8,20
177:5,10 178:12
179:21 180:20,21
180:23,25 181:2,3
181:14,16,22
182:4,8,16 183:10
184:1,5,8,13
187:25 188:14,15
188:19 189:2,4,10
189:12,17,22
190:4,12,13,20
192:17 193:5,10
193:16,17,21,24
194:3,6,20 195:1,5
195:8,11,20
196:16 197:1
200:3,14,16 203:3
206:25 207:3,14
209:17 213:10
214:16,25
**matched**  67:6
**matches**  201:11
**material**  44:10
47:18 67:17
122:10 123:8,10
123:14
**materiality**  72:15
**materials**  82:10
181:11
**matt**  44:2
**matter**  16:7 33:3
37:1,7 47:11

64:19 74:16,16,17
76:13 106:10
112:9 127:16
128:23 129:19,22
130:8 134:5 148:7
168:19 174:15
184:20
**matters**  13:1
18:18,25 19:5
22:24 28:15 30:1
48:2 146:18
147:13 178:6
**matthew**  1:13 2:3
4:1 5:3,10 226:14
227:9 228:4,9
229:4,13 230:20
**max**  80:4
**maximum**  81:10
165:24
**mayor**  150:2,3,4,8
151:8
**mean**  8:23 11:5
31:16 33:6 37:12
37:25 61:21,22
82:4 84:20 85:17
88:1 92:9 93:5
94:8 95:8 103:5
104:1 116:20
127:18 130:24
137:20,20 138:16
144:11 145:10
159:19,20 160:21
162:19,20 163:7
167:24,25,25
171:22 175:25
186:23 187:16
191:17 209:12
211:17 213:20
214:22 220:14
221:12

**meaning**  158:14
**means**  8:14 32:19
33:14 94:18,19
221:12
**meant**  35:19 36:10
37:10 91:18
132:18 186:1,3
**measure**  219:15
**measures**  15:14
**mechanism**  13:21
**meet**  89:24 130:16
**meeting**  113:17
117:2,3,5,14,20
118:6,19,23
119:13,13,14,18
146:20 149:2
154:15 160:3,8,10
160:11 185:4,11
185:11,22,24
186:3,19 188:3,8,9
188:13 210:13,24
210:25 211:1
**meetings**  116:23
117:17 130:15
131:6 135:9
146:10 148:17
149:4 151:2
**members**  8:25
173:22
**memo**  2:23 108:21
177:14,23 179:8
183:13,17,23
184:7,10 216:4
217:20,25
**memorable**
149:21
**memoranda**  55:22
**memorial**  9:20
22:14,18,20,22
78:10,14 142:20
143:13 144:4,20

202:22
**memorialize**  88:10
**memorializing**
203:4
**memory**  146:8
**memos**  176:6,9,10
184:4
**mentioned**  15:16
23:19 62:8 112:6
145:25 147:15
150:11 151:12
166:2 186:13
201:21 210:21
**message**  79:14
184:22,22
**met**  34:4 66:22
85:10,10,11 135:2
175:4 179:18
190:21 191:4
225:5,5,6,8,10,10
225:15
**method**  54:13
**methods**  130:11
**metropolitan**
143:11
**mgo**  121:3 124:1
**michael**  3:4
**mid**  62:14
**middle**  5:23 8:10
9:22 135:25 165:8
165:10,13 184:21
217:9
**middleton**  168:3
**midwest**  227:17
230:1
**mike**  37:8 54:1
59:22 79:8,8
112:25 120:1
135:9 149:20
160:10 164:19
178:18 184:23

185:20 190:21 191:22

**min** 80:4

**mind** 104:14 114:15 159:14

**mine** 164:5 195:13

**minimize** 218:3

**minimized** 216:15

**minimizing** 217:14

**minneapolis** 148:20

**minor** 72:8,8,11 72:12 92:1 208:25 209:20

**minute** 43:15 64:24 186:12 220:13

**minutes** 14:19

**misleading** 107:13

**missed** 9:5 67:3,7 67:9

**misspoken** 179:6

**misstates** 39:14 99:18 144:9 167:22

**mistake** 38:4 39:13,25 43:23 136:24

**modification** 74:19 181:13 207:4 208:8,22

**modifications** 208:15

**modified** 143:17

**modify** 160:5

**moment** 67:12

**monitor** 117:7

**monroe** 89:4 106:20 150:2 161:5

**months** 53:14

**morning** 5:8

**move** 111:1 130:2 146:14,17,17 147:12 163:20

**moved** 162:11

**moves** 33:1 40:23

**moving** 47:14 59:10 198:16

**multiple** 13:25 76:12 101:19,20 161:8,8

**municipal** 117:11

**municipalities** 151:14

**munson** 3:3 135:9 160:11 184:23 185:19 190:21 191:22

**murphy** 79:18

**n**

**n** 2:1

**naggy** 164:17

**name** 5:9 128:20 148:20 149:19,20 150:19 153:2 216:22 217:1 227:6 228:3,4,15 229:3,4,21

**named** 79:17 149:19 205:6

**names** 11:21

**natatorium** 201:17

**nathan** 37:2 48:1 49:2,6 67:4 113:6 114:4,22 115:1,19 116:4,6,10,16 130:6 135:24 141:2,4 151:1

**naturally** 28:22

**nature** 96:16 98:1 98:1 99:9 135:1 175:22

**navigating** 127:16

**near** 196:7,15 197:8

**nearly** 203:23

**necessarily** 16:17 21:9 30:16 58:25 88:13 114:25 148:5

**necessary** 31:21 133:15 135:7,10

**need** 41:24 45:18 46:15 52:11 54:25 56:11 74:25 142:5 152:6,17 164:19 173:14 177:24 178:19 191:20 192:2 194:22 196:22,22 197:16 205:4,5,8,8,12 210:18 221:13

**needed** 25:18 37:9 55:17 114:6

**needs** 73:11,23 74:13 135:19,20 192:14

**negative** 45:17

**negotiated** 8:12 70:25

**negotiating** 163:10

**negotiation** 77:17 80:25 162:15

**neighborhood** 70:25 74:18 106:20 147:20,21 151:7 185:4,21 186:3 188:13 196:4 216:7

**neighborhoods** 79:24 80:25 83:7 102:23 103:3 217:15

**neighboring** 209:23 216:15 218:4

**neighbors** 77:13 83:8 89:8 102:16 102:23 103:5,15 103:23 104:4 106:25 108:9,16 109:2,11 149:22 150:1 164:7 174:10 188:4

**never** 45:1 59:16 63:4,11,12 97:6 174:21,21

**nevertheless** 218:11

**new** 11:9 86:8 149:1 155:25 165:16,19 166:2 170:14 211:25

**nice** 21:15 109:2 109:11

**nielsen** 200:11,19 200:21,23 201:7 201:11

**night** 89:10 94:3 97:2,19 133:4,14 133:17 139:23,24 165:15 218:23

**nighttime** 140:9

**noel** 4:15

**noise** 218:8,12,14 218:21 219:5,6,7,9 219:11,12,14,15 219:18,20,23,24 220:1,6,7,10,12,14 220:17

non  46:6 70:6 111:11
noncompliance 47:11
nonspecificity 133:7
normal  90:4 218:25
northwest  185:6
notarized  227:15
notary  4:4 226:4 226:20 227:25 228:10,18 229:15 229:23 230:23
note  25:16 38:10 58:23 72:5 177:8 199:25 227:13
noted  50:6 107:1
notice  4:3 17:24 19:3 131:9 135:4 135:13,14,15 137:9 158:15 168:9 172:8,10 189:25 226:14
notices  17:22 137:1,1,15,19,25 193:4
notified  78:18 79:1 127:3
noting  80:2
november  2:22 153:24 182:18 190:20
nsterett  4:17
number  12:1 23:15 62:22,22 74:4 83:25 150:1 199:18 212:19 217:10 219:20 227:8,14

numbers  68:11 195:22 229:7

**o**

o'clock  219:3
o0o  1:3 5:2,6
oath  195:19
object  26:19 31:11 31:18 33:10,12 34:10,24 35:2 36:17 37:17,21 38:24 39:6,10,14 40:25 41:12 43:20 49:16 50:17,24 52:7,16 53:10 60:1,5,10 62:2 68:8,24 77:19 78:7 81:18 87:23 88:24 92:16 93:11 93:16,22 94:1,6 95:2,12,18 96:9 98:16 100:7 101:22 102:6,25 103:18,25 104:5 114:3,24 127:10 129:8,16 134:20 139:25 142:17 143:3 144:23 145:9,22 155:7,20 156:2 158:24 166:20 167:22 169:14 171:21 172:21 174:1 180:16,22 182:9 190:8 193:19 194:18 197:4 198:11 206:9 207:11,22 209:10 210:11 214:9 218:13 219:22 222:7,22

objection  7:17 19:15 22:11 30:19 48:22 51:5 53:12 53:18 61:19 66:24 71:18 84:13 86:13 86:23 89:17 90:11 91:4 95:22 96:14 97:8,22 98:5,18 99:18 104:17 105:11 107:10 108:11,14,24 109:6 115:23 120:8 126:2 131:19 132:2,13 133:10 134:1 137:5 140:10 144:9,16 153:20 158:8 161:15 166:25 171:4 173:6,11,13 174:16 176:21 194:4 197:13 208:11 209:4 211:15 221:5,20 222:14,25 224:9 224:15 225:11
objections  175:18 209:16 223:12
objective  222:19 223:9
objectively  219:18
objects  7:16
observations  160:19,21,22 161:11
observatory  200:12 201:18
observe  159:22
observed  159:24 186:8

obtain  41:8 45:18 48:3 142:6
obtaining  38:11 174:4
obtains  40:22
obvious  60:25 73:22
obviously  149:16 202:19
occupancy  16:19 16:22
occur  97:12 98:2 101:17 118:5 199:19 200:15 201:11,17 217:10
occurred  17:14 45:6 80:12 130:21 131:6 132:19 162:1,2 209:14
occurring  97:25 130:10 161:6 167:21 171:24 207:4 208:9,23
october  2:18,24 3:4 72:17 113:16 157:13 160:2 163:3 179:9 183:19,20 185:1,5 185:10,22 186:19 188:3,9 189:18 190:4 202:6 203:6 214:14
offered  48:1
office  25:2 26:8 28:6 45:15 66:12 108:17 115:12 117:10 143:5 154:10 174:23 176:19 203:12 219:6,9

**officers** 12:1,5,8
**offices** 4:5 117:9
**official** 17:22,24
  129:5 137:1,9,15
  137:25 193:3
  228:15 229:21
**offs** 89:21 153:23
**oh** 12:15 41:24
  57:11 64:4 77:3
  91:17 104:11
  107:19 109:14
  116:6 119:3 131:3
  136:13 138:16
  164:1 189:7
  200:25 213:19
  215:11 225:19
**ohio** 227:2
**okay** 7:10,18,20
  11:19 17:7,11,15
  17:16 18:5 21:10
  37:11 40:13 42:15
  46:15 55:5 57:1
  58:9 62:1 63:6
  64:22 67:11,20
  69:12 72:25 73:20
  74:24 75:4,9,20
  80:14 82:13,15
  83:8 85:21 91:9
  91:15,18,21 97:14
  104:11 107:19
  108:7 109:1,25
  110:4,17 111:15
  111:25 112:2
  118:11,13 119:6
  123:17 124:24
  125:5 127:13
  128:10 129:23
  131:3 138:4,11,11
  140:4 141:20
  146:16 147:11
  148:1 149:16

152:8,19 158:12
160:2 163:19
169:25 171:9
178:1,5,16 186:17
187:13 188:23
195:16 196:2
201:2,21 211:3
212:10,23 216:1,3
217:22 220:14
223:4 225:16
**old** 9:18,18,20,21
  63:22
**once** 6:6 42:12
  54:3 95:23 98:19
  116:17 175:19
**ones** 32:7 84:21
  118:21 218:17
**ongoing** 22:2 37:6
  45:6 113:10 115:7
  214:20 218:19
**onsite** 160:14
  165:23
**open** 55:7 56:8
  74:15,15 93:4,6
  99:10,14 105:10
  122:5,8 123:8,11
  123:18,21 125:25
  130:8 132:12
  133:13 188:17,20
  188:22 189:1,3
  191:11 192:1
  193:9 195:2
  196:23
**opened** 16:2
**operate** 49:18
**operating** 173:17
  189:11 214:24
**operations** 107:6
**opinion** 129:12
  174:18 175:19
  180:5,8

**opinions** 151:9
**opportunities**
  137:11
**opportunity** 57:19
  102:19 113:12
  217:1
**oppose** 103:12
**opposed** 16:14
  82:17
**option** 92:5
**options** 91:24
**oral** 162:22
**orange** 200:25
**orchard** 5:22
**ordain** 206:24
**order** 45:18 53:8
  54:25 70:11
  134:15
**ordinance** 6:22
  12:24 38:8 47:2
  71:21,22,23 72:1,7
  72:20 74:19 85:4
  86:7,9 87:22 91:2
  99:21,25 100:3,4
  102:1,11 108:13
  122:13 148:11
  151:18,19 152:17
  173:8,12 179:21
  203:5,21,24 204:2
  205:22 206:4,6,7
  206:13 207:21
  209:3 210:2 213:2
  213:18,20,21
  218:14,16 219:5,6
  219:7,9,11,19,23
  219:24 221:10,25
  222:3,12,21 223:5
  223:11
**ordinances** 69:24
  107:24 109:5
  131:17 140:7

151:15 218:8,12
220:25 221:11,19
222:5 223:5 224:7
224:13
**orient** 82:10
**oriented** 82:9
**original** 181:24
  206:3 207:13,21
  208:19,22 209:3,8
  209:12,13 213:1
  214:6
**originally** 151:25
  184:19 206:2
  211:8
**originate** 204:19
**originated** 28:2
**oshkosh** 7:25 8:5
  10:17
**ostensively** 186:19
**outcome** 135:11
  146:24
**outdoor** 6:16 24:9
  25:25 26:4,6,17
  40:2,12 44:15
  46:25 47:20 59:23
  60:9 61:3 69:21
  70:15 93:9,9
  94:13,16,18,21,25
  95:6,7 96:18 98:3
  98:14 99:6 101:9
**outlined** 86:17
  101:2 102:1
  118:21 121:25
  128:15 218:10
**outlining** 177:15
  184:11
**outside** 61:5 83:13
  107:4 108:22
  125:10 155:11
  189:12 207:5
  208:9,23 221:15

224:5
**overall** 223:1
**overarching**
126:19
**overflow** 165:20
165:21,25
**overlap** 13:12 94:9
**overlook** 43:23
**overseeing** 150:24
**oversees** 126:20
**owner** 18:22 63:15
86:3,4,11 87:15
89:11 104:4 105:9
**owner's** 104:4
170:4
**owners** 90:17
108:19 164:8

**p**

**p.m.** 165:9 225:23
**page** 2:2 3:10
57:24,25 58:1,5,10
65:17,22 67:15,21
67:21,23,24,24
68:2,11 69:12,16
70:10 75:20 76:18
76:19 77:1 106:14
110:18,25 111:4,5
111:18,21 122:4
123:6,6,7,21,23
141:25 143:4
157:5,15 165:7,8
177:17 179:15
183:24 184:21
187:25 188:18,18
192:14 195:21
197:20 199:24
203:11 206:20,21
212:25 213:3,4,4,6
213:7 216:1 217:6
217:18,19,20,21
227:14,16 229:7

230:3
**pages** 56:11 57:9
68:15 69:5 101:14
**paginated** 57:9
**pagination** 58:3,8
106:13
**paper** 150:14
**paragraph** 106:16
107:13,20 119:17
120:21,24 121:20
123:24 128:2
154:14 185:3
192:12 196:6
217:7,9
**paraphrase** 19:13
**paraphrased** 11:8
**paraphrasing** 55:8
**paren** 182:2
**parents** 8:12
**park** 63:2 168:7
**parking** 23:21
26:24,25 27:1,6,12
28:23,24 29:1
58:23 60:23,23
61:9 63:21 68:1
68:14 74:1,3
76:21 81:8,8 87:5
87:12,13,16,25
88:11,12,16,17,23
88:23,25 89:4,9,14
89:19,20,23 90:3,7
90:10 110:20
134:13 153:2
165:2,19,19,20,21
165:21,22,23,24
166:2,10 167:4,6,8
167:14,17,18,20
224:3,6,8,13,21,21
**parks** 2:23 18:5,7
18:8 21:18 44:2
79:16 103:7,11

108:20 146:20
156:9 159:9,13
179:7,8,16 180:18
183:13,18 184:4
215:19 216:12,24
218:1
**part** 9:2 15:3 25:7
38:15 46:2 47:13
49:24 59:25 60:14
70:16 73:5 76:24
77:7,7 80:24
103:13 109:3,12
116:21,23 119:17
120:18 136:25
137:2,13,14
170:22 171:23
179:7 195:4,25
196:20 197:1
205:20 206:11
216:17,18 218:19
220:24 229:9
**partially** 141:16
141:17 162:2
**participated**
113:10 215:19
**participating**
107:24 149:24
**participation**
216:25
**particular** 22:19
24:23 27:16 30:9
32:16 105:10
135:17 147:20
164:24 193:17
219:20
**particularly** 67:4
75:6 127:2 149:8
218:1
**particulars** 118:12
**parties** 6:12 89:5
90:8 130:5 149:2

226:10
**partly** 200:1
**partners** 102:21
**party** 90:4 102:24
107:2 197:17
**pass** 82:6,14 83:14
84:11 146:14
**passed** 174:15
**path** 9:1 28:17
51:24 52:22 83:11
83:21 174:21
**paths** 130:10
**pattern** 199:10
**pause** 109:21
**paused** 43:25 75:3
182:11
**pd** 152:14
**pdf** 75:5 195:13
**peace** 8:8,15
161:17 218:16
219:1,7 220:3
**pen** 150:14
**pending** 51:21
113:8 115:11
131:22 180:1
**people** 22:22 61:4
62:20 79:6,23,24
84:6 90:3 96:20
96:20,21 145:19
147:21 148:5,14
148:25 150:12,13
151:1,6 161:8
164:19 168:17
170:8,9 172:5
175:21,23 186:14
188:7 204:18
205:13 210:25
211:2 220:21
**perceived** 41:2
88:13

**percentile** 61:10
**performed** 143:2
**perimeter** 111:8
  134:12
**period** 12:19
  53:15 130:14
  153:15,17 157:18
  213:12
**periodically** 36:18
**permanent** 190:2
**permissible** 70:13
  77:12,25 78:1
  82:8 86:7 92:13
  133:5 140:6,8
  173:9,9
**permit** 33:4 38:22
  38:23 39:5 44:23
  45:1,25 46:6 47:3
  47:25 48:5,11
  49:15 50:23 51:25
  52:6 56:20 62:19
  75:18 76:17 81:21
  82:3,5 86:22
  114:2,23 116:5
  121:9 122:12,25
  123:9 124:1,9
  126:1,9 127:1,9
  128:16 132:9,11
  132:16,19 133:3
  134:16 135:19,20
  136:6,9,10 138:15
  138:17 139:10
  140:18 141:6,21
  142:10,19 143:8
  143:18 168:20,23
  168:24 169:1,4,13
  169:23 171:14
  182:14,22 208:6
  218:9
**permits** 15:5,5
  63:8,10 84:5

102:10 121:5
128:4,8,11 131:16
133:6 139:3
154:20 155:5,17
156:12 157:21
158:5,13,21 159:4
159:5 169:3,6
189:21 201:22
**permitted** 29:6,19
  30:5,14,17,24 31:2
  31:8,15,16,17,19
  40:14 68:7 78:1
  80:16 85:16 86:8
  97:7,12,17,20
  114:1 155:13
  171:2 173:19
  210:3 211:22
**permitting** 15:5
  86:21 126:21
  168:12 218:9
**person** 12:9,16
  18:15,18,24 19:4
  19:14 22:9,19,24
  23:4,5,10,23,23
  24:5 25:3 29:13
  79:4 84:24 117:2
  117:5,14 130:16
  150:23 151:8
  176:4 204:24
  226:9
**person's** 19:2,2
**personally** 159:17
  159:19,22 201:19
  228:11 229:15
**personnel** 15:11
  15:12,24 162:25
**persons** 149:17
**perspective** 16:23
  164:21 167:9
**phone** 130:17
  227:3

**phrase** 31:8 44:7
  59:4 100:23
  113:22 156:15
**phrasing** 29:22
**phy** 93:20
**physical** 122:4
  124:4 170:22
  171:18 172:2
  188:1 189:5
**pick** 29:17
**picture** 134:22
**piece** 25:24 32:1,2
  65:6 68:25 199:3
  205:7
**pieces** 69:1 219:14
**pin** 21:22
**pinckney** 4:21
**place** 20:18 24:1,1
  52:21 69:9 71:1
  90:4 138:8 200:12
  204:4 218:23
  219:21
**placed** 15:9 32:22
  180:1
**places** 19:20,24
  20:2,6 28:18
  76:11,13 194:20
  200:9,13,14
  214:21,23 215:1
**plaintiff** 1:5 4:2,10
  226:7
**plan** 2:12,16,18,21
  2:22,23 3:6 24:18
  27:3 28:25 29:6
  29:19,23 30:2,7,14
  30:24 31:2,15,16
  31:17,19 32:5
  33:17 38:8,15
  40:14 44:13,14,17
  46:6,12 47:6,12
  51:19,21,23 52:11

52:13,24 53:8,22
53:24 54:11,15,16
54:22,24 55:7
56:7,10 57:3,23
58:14,16,21,22,24
59:1,12 61:23
63:4 65:22 66:16
67:14,15 68:19
69:1,13,16 70:8,13
70:17,24 71:13
72:25 73:1,4,5,7
73:16,16 74:1,2,6
74:7,9 75:17
76:16,25 77:24
78:20 80:3,7,16,20
80:23 81:11,22
82:17,20 83:1,23
83:25 84:1,10
85:15,20,23,25
86:2,9,12,16,18,20
86:25 87:4,8,11,12
87:14,15,19,20
88:9 90:10 91:3,5
91:6,13,19,25
92:15,22 93:1,5,6
93:7 98:10,15,17
98:21,22,24 99:13
99:20,23 100:1,2,4
100:9,13,17,22
101:4,5,7,8,10,14
101:15 102:1,4,15
102:18,22,24
103:1,8,8,21,22
104:3,7,13,16
105:10,12 106:5,9
106:18,23 107:6
107:17,22,23
108:13 109:19
110:1,14 113:4,9
113:21,25 115:10
115:11 116:15

[plan - potentially]                                                    Page 34

117:6,21 118:3,5,7
118:10,17,20
119:2,10,14 121:1
121:10 122:2,5,8
122:16 123:8,11
124:3,7,15,18
125:17,21,21,25
127:6,7,8 131:14
131:18 132:10
133:8,13,25
134:12,15,23
135:19 136:3,6,12
137:23 138:7,8,10
138:24,24 139:17
142:6,11 143:4,8
143:15 144:7,12
144:14,19 145:1,5
145:7,12,16,19
146:1,18,23
152:12,13,15,23
152:25 153:5,5,6,8
153:12,18,22
154:1,11,16,19,21
155:3,6,9,11,18,21
155:22,23 156:1,6
156:13,16,19,22
157:8,11,18,22
158:5,14,15,20
159:8 162:15,20
162:22 163:4,8,11
168:11 169:1,12
170:16,17 171:3
171:17,20 172:1
172:18,24 173:4
173:23,24 174:13
174:14,22 175:2,3
175:7,11,14,16
176:7,8,19,20
177:5,6,10,11,15
178:6,12,13 179:8
179:19,21 180:20

180:21,23,25
181:2,3,14,16,17
181:19,22,24
182:4,8,16 183:10
184:2,5,8,12,13
187:25 188:14,15
188:17,20,20,22
189:2,3,4,10,12,17
189:22 190:4,12
190:13,20 192:17
193:5,10,16,17,21
193:24 194:3,6,21
195:1,5,8,12,20
196:16 197:1
198:14 200:3,14
200:17 201:4
207:1,3,14 209:17
212:7 213:10
214:16,25 225:7
225:13
**planned**   31:22
152:14,15,20
153:4
**planner**   10:19
141:19 149:5
**planners**   18:9
**planning**   2:14,15
2:17 3:7 13:5,7,10
13:18,21 18:7,16
18:19 19:7,14
22:3,9,18 23:4,10
79:17 106:4 149:6
154:10 157:6,9
160:11 179:17
202:15 212:5
215:7,14 216:24
225:12
**plans**   13:8 58:4
65:23,25 71:9,12
81:9 88:1 99:3
101:21,24 104:2

105:16,18 116:25
121:3,4 128:3,6,7
152:21 153:1,11
**play**   41:15 54:8
95:25 160:1 168:2
168:3
**played**   59:17,19
97:16,19 133:14
159:23
**playing**   134:7
159:18 166:18
**plc**   4:15
**please**   5:8 7:9,13
7:16 18:11 26:12
28:12 44:21 53:5
56:5 57:17 75:24
105:21 132:5
178:3 179:3
190:17 192:5
222:19 227:12,12
**plenty**   147:14
**plural**   169:10
221:11
**poetry**   197:9
**point**   17:10 18:18
23:23 46:21 49:1
52:17 64:21 65:8
70:2 71:25 75:23
76:14 80:6 82:14
84:24 110:19
112:6,16 113:20
115:1,19 116:1
141:15 151:17
202:25 204:15
219:12 222:15
**pointed**   50:3 56:18
68:19 100:22
110:19 112:3
125:3
**pointing**   47:21
220:11

**points**   47:8 76:3
**pole**   111:19
**poles**   74:11,21
134:13
**police**   218:16,21
219:8 220:3
**policy**   90:16
223:16
**portion**   196:11
**posed**   165:6 167:3
**posing**   115:21
**position**   6:8 10:2,3
10:8,11,13 11:8
12:21 14:9 17:12
18:14 36:7 40:7
53:22,23,25 90:13
95:3 116:15 124:2
124:6,11,20 125:9
125:12,14,24
126:25 127:14,17
128:19 129:21
137:18 142:13
159:2 171:13,16
175:5 178:11
180:16
**positive**   84:7
106:24 146:24
175:6 176:4
**positively**   174:23
**possible**   146:25
165:4 222:11
**possibly**   139:14
202:11
**posted**   139:7
**postgraduate**   9:9
**postmarked**   132:8
**potential**   51:24
58:21 59:24
129:25 170:8
**potentially**   39:20
69:10 155:13

172:5 194:19,22
210:5
**potter**  146:18
**powerpoint**  160:9
160:17 185:12,25
186:8,20
**powers**  107:4,8
108:23
**practice**  49:18
62:6 161:4,10
170:8 171:18
**practices**  93:20
96:25 97:12 122:4
124:4 133:22
139:18 147:9
161:6,12,14
170:22 171:2,11
172:2 188:2 189:5
189:6
**practicing**  139:23
161:3
**pre**  27:1 86:18
143:17,19
**precise**  29:22 80:8
**precisely**  112:11
**precision**  95:14
**predict**  61:13
**predictable**  84:17
84:17
**preparation**
124:14 190:25
215:20
**prepare**  215:18
**prepared**  106:5
215:17
**preparer**  215:21
**preparing**  83:16
204:7
**prescriptive**  88:8
**present**  4:24
119:15

**presented**  160:8
185:12,25 186:25
187:12
**presently**  31:10
**preserve**  222:20
223:10
**president**  149:25
**press**  58:18 118:15
**pressed**  82:15
**presumptions**
221:2
**pretty**  11:8 62:13
73:21 132:15
150:8 152:3 187:4
212:10
**prevent**  173:24
220:18,20
**previous**  103:2
179:22 207:13
**previously**  3:9
18:25 75:2 86:6
185:10
**prickly**  127:16
**primary**  102:19
173:18 207:4
208:8,16,22
**principal**  13:7
14:13 148:21
**principally**  16:21
17:4 149:10
191:13,13 204:2
205:17
**printed**  195:23
**printout**  24:17
**prior**  10:8 18:25
20:12 36:20 39:14
71:8 77:24 81:13
84:11 99:19
120:18 148:25,25
154:19 155:3,16
156:11 163:3

179:24 188:9
190:21 197:11,12
**private**  12:25
24:20 26:24
108:18
**privy**  116:20
**pro**  4:15
**probably**  8:17,23
16:1 19:10 21:12
21:22 23:13,19
24:3 43:24 48:17
49:4,24 73:21
79:15 84:6 92:10
93:2 94:7 106:3
117:10 130:5,20
148:14,23 150:2
159:10 170:23
171:10 187:16
190:9 193:23
194:13 195:14
200:25 204:23
205:12 206:17
**problem**  114:19
116:1,4 126:8
132:23 147:2
166:11
**problematic**  127:2
**problems**  61:13
133:7
**procedural**  38:5
**procedure**  138:12
181:24 228:5
229:5
**procedures**  47:17
**proceed**  52:20
174:22
**proceeding**  114:11
155:10
**process**  27:4 28:1
28:16 31:5,23
32:8,10 33:15,16

33:17 37:12 43:12
43:16 70:16 77:17
77:20 78:19 83:14
84:3 85:19 86:21
86:22 92:7 97:5
102:11 103:13
115:8 116:24
119:17 130:3
146:9 154:4
162:15,18,24
163:4,10,12 174:4
174:7 180:19,21
180:23,24 181:2
181:25 182:2
197:2,18 203:17
203:20,22,23
204:14 211:25
**processed**  27:2
41:3 142:4 143:5
155:12
**processes**  24:19
91:22,23 129:25
**processing**  26:10
31:20
**production**  196:1
227:16,17,22
**productive**  137:3
137:8
**professional**  144:3
**program**  9:6
**programming**
189:11
**prohibit**  124:8
139:21 170:17
171:13
**prohibited**  78:23
79:2 171:20
**prohibiting**
158:21 159:3
**project**  21:23 22:1
23:17,23 29:4

40:15,22 45:21,22
86:12 113:6
155:10,22 159:11
190:23 215:3
**projects**  18:17
21:20 23:8,15
24:4 74:8 80:8
83:25 84:9,18
107:23 137:10
138:18 154:21
155:5,17 156:12
157:21 158:13
211:13,14
**prominent**  149:17
149:18
**prominently**  76:16
**promote**  222:20
223:9
**pronounce**  34:18
**proper**  41:7 53:18
128:21 129:6
**properly**  30:23
35:15 81:11,14
**properties**  70:19
200:2 216:15
218:4
**property**  13:1,25
15:14 16:13,25
18:22 19:6 24:21
30:18 31:9 39:19
42:5,9,16,19 43:5
43:8,18,22 54:6
55:16 63:15 64:3
79:12 86:3,4,11
87:7 88:7 89:11
90:17 102:22
104:4,4,8,12,12,14
105:9 108:18
109:4 139:23,24
143:12 153:9
156:19 164:7

166:9 171:18
173:19 193:5
216:7 219:16,16
222:6,10,13
**proposal**  64:11
87:14
**proposals**  115:16
213:10
**proposed**  69:15
73:7,10,12,19,23
74:15 77:11 78:21
85:23 86:19 87:9
98:9 99:10,13,16
100:23,24 104:8
104:13 107:25
108:1 143:12
145:13,25 179:21
196:24 216:13
**proposing**  74:8
**prospective**  59:7
**provide**  26:21
54:23 59:1 77:10
80:3 86:16 102:15
102:20 151:9
194:22 223:3
225:7
**provided**  42:6
47:24 92:2 136:6
136:15 151:4
156:24 192:17
**provides**  182:3
**providing**  80:20
180:12
**provision**  70:6
75:1 111:1 148:13
207:20
**provisions**  47:1
55:24 56:9,18
57:21 71:4 72:1
72:14,16 75:13
109:19 112:2

113:25 117:1
118:21,22,24
119:1,14,16
122:17 125:3
136:14 190:12,13
**proximity**  96:21
**public**  4:4 139:7
210:13,24 211:1
226:4,20 228:10
228:18 229:15,23
230:23
**publication**
179:14
**pull**  159:4,5 170:1
171:14 201:22
210:11
**pulled**  113:23
116:13 169:19
**pulling**  118:10
**pulls**  114:20
**punt**  67:2,5,6,9
**purest**  104:19
**purpose**  46:22,24
72:4 77:25 102:14
123:25 125:1
126:15 193:18
211:18,23 213:5
217:16 222:24
223:2,4,5,16
**purposeful**  141:2
**purposes**  101:11
195:11,18 216:8
**pursuant**  4:3
226:13
**pursued**  131:23
**purview**  18:21,23
**put**  16:17 30:10
65:23 67:11 82:25
96:11 105:9
112:22 170:3,4
172:5 174:6 176:6

190:23 212:24
**putting**  53:13
150:14 189:25
191:19
**puzzle**  115:17

**q**

**qp**  8:19
**qualification**
31:10
**qualify**  65:5
**quarterbacks**
187:5
**queen**  8:8,15
161:17
**question**  7:8,9,16
22:6,17 28:10,12
31:12 34:17 46:13
48:13 51:7 52:2
53:4,21 57:22
62:4 66:15 72:13
72:18 76:24 78:24
91:10 95:5 98:21
99:8 103:19
104:10 105:1
109:8,9,23 115:25
122:9 126:5
129:24 132:4,6
144:13 145:24
146:7 149:14
165:5 167:4,13,13
175:10 177:7,13
177:25 178:1,2
179:6 180:13
192:4 209:6 211:8
223:7,8,14
**questions**  99:21
100:19,21 114:5
114:22 115:21
122:1 223:20
224:2 225:16

**quick** 77:16
146:14 186:10
**quite** 8:24 13:9
79:9 130:13
175:20 198:22
**quote** 166:1
**quoting** 165:18

**r**

**r** 4:11 5:11
**raised** 36:3 188:4
**ramp** 76:21
110:21
**ran** 11:13 162:6
**randall** 199:2,16
**rare** 28:21 45:20
62:13 216:25
**rarely** 22:21 62:21
**rationale** 46:4
51:3 52:5 159:14
**rationales** 132:19
**reached** 183:25
**reacting** 54:4,4
164:14
**read** 26:11,13
28:13 44:20,22
46:13,14 51:8,9
53:4,6 54:17,20
57:15 71:22,24
75:6 91:1,10,12
106:16 107:9,13
109:7 113:21
121:11 122:6
133:18 154:24
155:1 158:18
165:12 168:14,15
177:18,22 178:2,4
178:8,14,21 180:5
185:8 190:16,18
192:4,6 214:4
217:23 225:17,22
228:5,6,12 229:5,6

229:17
**readily** 42:11
**reading** 107:20
128:1 158:12,19
177:12 178:24,25
179:13 227:20
**readings** 197:9
**reads** 72:6 159:1
**ready** 139:15
**real** 13:15
**really** 40:21 42:22
52:22 53:1 59:16
77:16 86:5 94:19
97:10 116:17
118:13 135:14
138:18 149:21
150:3,9 161:25
164:15 167:25
168:1 174:12
175:13 199:6
201:14 211:18
**reason** 66:15 67:1
83:9 114:12
144:25 145:6
156:21 227:15
229:8 230:3
**reasonableness**
80:18
**reasonably** 138:14
**reasoning** 133:3
**reasons** 131:23
132:9 204:11
**recall** 6:12 8:24
22:1 23:19,21
29:21 37:1 48:19
49:24 51:6 52:10
62:13,13,14 63:10
63:14 64:5 75:1
79:7 112:11,12,24
114:25 116:22
117:6 118:1,1,8,10

118:11 119:21,23
120:20 125:7,13
125:16 126:12
127:14,15 131:12
131:13 136:1,1
139:2 140:25
141:5,21,23,24
146:11,13,21
147:18,19,20
148:2,5 149:24
156:14 161:2
162:23,24 163:5
163:13,18 164:10
164:25 168:16,18
176:13,22 179:11
179:13 180:9,9,11
180:15 186:24
188:6,7 191:3,21
191:21 200:7
202:12,16,19,19
202:21,25 203:19
204:13,20 210:1,4
214:17,17
**recalled** 127:17
**recalling** 112:10
156:21
**recap** 7:7
**receipt** 227:19
**receive** 25:5 26:22
26:23 60:22 183:4
183:6
**received** 26:4 27:2
27:13,21 66:13
125:10 139:8
166:18 167:19
168:18 180:5
188:10 193:11
**receiving** 137:21
140:25 159:23
179:11 219:16

**recess** 49:10 57:14
75:10 110:6 152:9
192:25
**recitation** 110:15
**recognition** 85:14
114:18
**recognize** 22:20
24:12 57:2 64:25
65:13 66:2 154:8
162:13 164:3
203:3 212:4
215:14
**recognized** 87:8
116:2 220:5,9
**recognizes** 216:4
**recognizing**
147:12 178:14
**recollection** 11:6,7
47:5,23 49:22
116:8 117:13
118:2 119:12
141:15,20 142:25
153:7 156:18
162:13,14,16
213:16
**recommend**
103:11 176:7,20
177:16 179:19
184:1,12
**recommendation**
2:21 92:3 169:17
177:3,8 178:7
180:7,9,14 181:19
183:9 225:7,9
**recommendations**
176:18
**recommended**
103:7
**recommending**
175:3 184:5,8
220:18,20 225:14

**record**  5:9 22:3
26:13 28:13 29:14
31:5 32:20,21
44:22 46:14 49:11
51:9 53:6 56:11
57:8,12,13,15,17
91:12 141:12
168:15 178:4
190:18 192:6
226:12 229:9
**recreation**  95:17
96:1,4,11 98:3
172:19 194:16
198:6 199:3
200:20 201:3,5
**recreational**  95:16
98:1,14 99:6
133:22 193:9
195:2
**recurring**  22:24
23:11 24:4
**red**  68:2,4 80:9
195:22 197:25
199:5,13 200:17
**redo**  170:10
**redraft**  142:1
**reece**  148:20
151:13
**refer**  18:17 20:16
20:16,18,20 31:9
70:14 92:7 101:1
153:16
**reference**  54:16
58:7 77:4,5
106:23 112:5
122:8,19 166:23
198:13 227:8
228:2 229:2
**referenced**  84:10
101:19 113:20
123:11,23 134:11

185:10 195:5
228:11 229:15
**references**  56:5
68:10,10,12 167:5
203:10
**referencing**
106:12 124:17
162:19 167:2
**referral**  203:17
**referred**  6:21
143:14 203:13
**referring**  57:25
124:25 202:5
**refers**  181:2
196:21 198:3
**reflect**  113:15
**reflected**  26:1
55:19
**reflective**  198:24
**reflects**  34:4
**regard**  14:1 36:8
49:23 58:20,23
125:20 129:19
134:23 136:5
151:10 205:9
**regarding**  10:21
67:16 107:5
121:23 123:13
204:21
**regardless**  92:21
126:23,24
**regards**  20:20
**regime**  84:11
**regular**  22:23
51:10
**regulate**  90:3,15
**regulation**  47:12
201:25 222:1
**regulations**  15:4
47:3 224:7,13

**regulatory**  107:21
**reiterated**  182:21
218:22
**reiterating**  70:3
**reject**  142:1
**relate**  26:7 31:8
77:5 86:25 100:21
101:1 119:8
189:22 199:14,19
218:2 224:7
**related**  6:20 13:1
18:13,19 19:1,5,6
21:20 22:18 27:11
28:18 47:9 54:22
55:13,14 74:19
75:3 106:22
133:16 134:4,7,8
134:12 157:20
158:13 159:4
168:21 190:20
208:6,17,17 217:2
**relates**  26:15,17
27:8,23 29:25
67:23 111:11,23
188:15 199:8
218:14 219:12
224:13
**relating**  218:7
**relation**  6:7
116:12
**relations**  109:10
174:10
**relationship**
106:25
**relative**  13:23
42:14 111:14
214:18 226:16
**relatively**  28:21
83:18 175:5
209:20

**relay**  90:23
**release**  127:1
134:15
**relevant**  76:24
99:20 118:22
122:18,24
**reliance**  50:2,5
**relied**  56:18,24
69:13 102:20
110:12 122:17
145:14
**rely**  57:10 72:15
72:19 111:13
**relying**  56:12
58:12 70:22
109:19 146:8
190:11
**remains**  97:6
**remedied**  206:19
**remember**  28:8
52:9 117:6 119:22
126:16 147:24
148:8 176:17
186:5,10
**removed**  67:5
**render**  107:13
**reorient**  73:13
**repeal**  2:21 103:7
176:8,12,20 177:5
177:10,16 178:8
179:20 180:1,25
181:8,13 183:10
184:1,5,8,12
214:15
**repealed**  175:2
**repealing**  103:12
178:11 180:20,23
**repeals**  179:22
**repeat**  28:10,11
**rephrase**  224:11

replaced 78:16
143:24
replacement 171:7
171:8
replicated 151:22
report 2:14 3:7
24:17 33:13 50:18
106:4 141:19,19
159:23 166:18
175:1 180:12,16
212:5 213:17
215:7,15,16
216:22 217:1
220:9 224:24
225:4
reported 1:24
11:21 12:9 176:13
reporter 4:4 150:6
185:17 226:1,4,9
228:7
reporting 12:10
reports 176:10
216:18
represent 197:25
198:9 200:22
205:25 206:2
representatives
116:7
representing 45:7
160:13
represents 66:11
request 36:8 44:18
51:21 54:14 60:11
60:13 84:23 85:4
127:13 131:22
143:5 176:12
179:20 180:1
181:12 190:22
226:7 229:9,11
requested 42:7
43:7 54:21 60:16

60:18 121:5 127:9
128:8 156:23
requests 74:6
131:16 132:1
require 56:6 61:4
72:2 84:1 104:15
142:10 165:24
174:14 181:18
207:5 213:12
required 51:20
52:14 53:8,24
60:7 61:7,15
66:23 100:22
101:12 133:23,24
157:19 181:17,24
182:7 193:15
202:1 207:15
224:23 227:25
requirement
81:22 87:21 158:4
207:1 208:3,5
224:20
requirements
33:24 89:25
100:15
requires 45:22
98:10,14 105:13
181:10,18 196:17
requiring 105:8
121:9 208:24
reserve 225:17,21
residential 5:14
217:15
resolution 137:7
146:12
resolve 48:2 137:2
resolved 147:1,4
resolving 108:3
respect 11:9 14:2
21:1 24:22 31:14
88:5 185:15 224:3

224:6,24,25
respectful 186:14
respond 63:24
114:6,9 115:15
193:11
response 7:10
122:9 137:24
166:6
responses 7:12
responsibilities
10:22 11:3,16
12:18 17:3 109:12
128:22,25
responsibility
13:12 19:2 22:23
115:15 198:25
responsible 21:19
24:20 197:17
218:17 219:11
responsive 57:22
rest 90:21 107:20
142:7
restaurant 16:3,3
16:10,11
resting 95:9
restrict 146:4,5
restricted 55:15
restriction 208:15
restrictions 109:4
145:17
restrictive 70:24
171:12
restroom 118:16
rests 107:3 108:22
result 47:11
118:22 204:6
resulted 84:19
127:18 137:24,25
retained 151:13
retiree 22:3

retirement 10:4
19:2
return 63:24
returned 227:19
returns 179:23
reveal 210:9
revealing 210:10
revert 173:7
review 18:8 24:18
25:9,10,24 27:3
28:25 29:6,19
30:14,24 31:2,15
31:19,20 32:5
33:9,9,13,14,17,18
33:21 34:9,15,17
34:22 35:11,12,20
35:22 36:5,13
37:15,20,24 38:2,8
38:17,18,19,21
39:3,4 40:5,15,16
40:16 41:7,24,25
42:3,5 43:2,4,11
43:19 44:10,14,25
45:1 47:18 50:8,9
50:20 52:24 55:3
57:19 59:3,12
71:11 78:5 81:1,8
81:12,16,16,23
82:2,2,7 84:4
88:19 89:14
107:22 108:2
114:21 118:4,5
120:6,12 124:18
136:3 138:25
141:11 142:24
143:2 151:9
168:25 177:24
188:19 189:17,19
189:20 190:14
191:7 194:23
197:1 206:11

227:13 228:1
229:1
**reviewed**   28:24
34:7,14 71:10
74:6 78:11,13,17
81:12,19,23 106:3
116:11 121:3
124:15 128:7
188:14 190:4,5,6
**reviewer**   34:21
**reviewing**   31:24
36:21 37:11 42:14
54:23 116:25
117:6 150:24
179:13
**reviews**   18:13 25:8
31:5 32:21 38:21
40:12,19 89:22
**revised**   157:22
158:16,22 206:13
206:25 207:25
**revision**   28:8,9
**revisions**   45:23
157:19
**revisit**   52:23
**revisited**   191:20
**rewey**   25:14 33:19
33:21 40:17 50:20
67:3,8 120:11
**rewey's**   34:14 50:8
60:14
**rewrite**   150:23
**rid**   181:14
**ridge**   5:22
**ridiculous**   80:20
**ridiculously**   219:3
**right**   7:5 9:24 10:9
11:10 13:21 15:19
15:23 20:15 23:14
23:25 24:2 26:1
28:17 32:25 34:23

35:1,24 40:10,14
41:24 47:16 49:9
50:13,16 51:18
52:22 53:2,21
56:22 57:7,11,18
57:19 58:4,8
64:12 65:10 66:14
75:21 77:18 78:2
78:6 80:18 81:24
83:22 87:5,9
89:12 92:23 97:15
99:1,2,3,4 101:12
102:8,12 106:10
106:13 108:10
109:17 110:8
111:21 114:14
119:9,24 121:14
122:6,17 128:13
128:23 129:7
130:3,23 131:4,7
131:11 132:1,7,23
134:19 135:5
136:22 138:7
140:3,14 142:11
142:15 144:1,8,22
145:21 149:14
153:7,19 155:6,18
156:1 158:7
161:18,22 163:9
165:9 166:15,24
167:21 171:3
172:20 173:5,10
174:9 182:17
185:13,16 186:12
189:13,14 192:10
193:18 196:3
198:10 200:4,6
204:4 207:17
208:1 212:24
217:22 223:19
225:17,21

**rights**   109:3
128:22,25 131:16
152:21 173:5
**rise**   94:14
**risk**   84:2 170:4
**road**   63:1
**rockford**   4:16
**role**   10:6,22 17:6
17:15 18:5,7 19:8
49:12 107:21
108:1 148:12
203:20 204:9
**roles**   11:3 17:3
**rolling**   150:14
**rooms**   58:19
**rounding**   75:16
**routed**   26:9
**routine**   28:23 44:4
138:12 171:11
**routinely**   36:18
39:23
**rule**   107:10 222:4
222:18
**rules**   7:3 16:9
167:9 214:24
221:2,14,16
223:17 228:5
229:5
**rumor**   164:14,23
164:24
**run**   204:14
**running**   84:24
160:10
**runs**   5:21 67:24
**rut**   166:10

**s**

**s**   2:9 150:7 227:16
229:8,8 230:3
**s.c.**   4:6,12
**sac**   199:6

**sacred**   1:4 227:6
228:3 229:3
**safety**   16:22
111:22
**salvo**   189:15
**sand**   209:24
**sarah**   4:20 196:1
227:5
**sat**   113:21
**satisfaction**
175:24
**satisfied**   154:19
155:3,16 156:11
157:20
**satisfy**   82:2
**saturdays**   90:8
166:15 168:8
**saw**   132:10 158:1
183:17,17
**saying**   16:18 26:3
27:12 45:21 49:14
52:9 61:4 70:10
72:2 84:15,16
85:2,3 87:2,10,18
88:3 93:14 100:25
101:8 123:1,15
126:6 138:20
147:16 154:1
159:25 178:20
186:2 192:7
**says**   29:3,4,6
32:12 33:13 34:7
41:24 46:24 76:21
93:6 100:4 108:21
120:24 121:8,21
123:25 128:6
141:18 142:5
154:14 156:10
157:17 159:24
165:9 184:22
185:21 186:9

196:3 197:8 201:4
206:21 216:6
217:19,23 219:19
219:25
**scale** 23:14 69:10
**scary** 61:5
**scenario** 16:2 39:7
39:22 105:17
**schey** 2:20 163:24
164:1,13,13 165:1
165:7 167:3
186:13
**school** 1:4 5:23
7:23,24 8:7,10
9:19,21,22 20:9,9
82:25 85:5,6
89:16 121:2
139:21 140:5
143:11,13 154:17
154:17 161:14,17
161:20 165:20
168:1 202:20
205:19 215:2,3
217:12 227:6
228:3 229:3
**school's** 121:2
**schools** 20:11
84:25
**science** 8:1 9:8
**scope** 41:7 50:9
135:1
**scoreboard** 170:12
170:13,14,18,21
171:6,7,8
**scoreboards**
170:25
**screen** 117:21
118:6,19,23
119:18
**seal** 228:15 229:21

**search** 75:5
**searching** 118:12
**seating** 58:19 61:3
175:17
**second** 12:6 70:10
71:3 77:2,23
91:25 110:19
138:2,6 177:17,21
185:3 192:12,14
206:20
**secondary** 92:13
92:13,23,25 97:13
98:25 99:1,9
102:19 173:18
207:4 208:8,16,23
**section** 13:13 15:8
18:16 20:1 27:3
46:15,20 47:15
50:6 55:8,10
69:12,14 70:11
72:25 75:21 78:1
78:5,17 91:7 92:8
100:12,15,16,23
100:23,25 103:1
107:5 108:2
111:14 121:4
122:4,9,13 123:18
123:21,21 124:1
124:17,22,24
126:7 133:13
181:1,3 182:6
188:22 189:1,3,9
191:18 192:1,13
196:21,24,25
206:25 209:18
214:5,11 220:11
221:9,13,16
**sections** 47:23
48:10 107:2 110:1
118:9,12 122:21
152:1 189:9

191:18 192:2
197:6 204:4
**security** 69:21
**see** 25:9,19 29:4,7
47:14 54:12 58:5
65:19 66:8 69:9
70:5,13,20,21,23
71:6,22 74:14
82:16 99:11
102:12 108:5
110:23 121:6
124:4 125:2 142:5
142:5 154:22
156:20 157:24
166:4,8 172:5
178:9 179:9 180:2
183:22 193:22
195:16 196:23
198:6 201:13,14
203:14 206:21
207:7 208:20
218:7 221:13
**seeing** 28:8 65:18
159:20 179:14
208:15 213:3
215:5
**seen** 14:20 66:19
85:18 94:13 102:4
106:2 157:4,8
160:24 161:1,3,5
164:17 174:11
175:21 176:1,25
183:3,5,8 184:4,7
184:10 203:8
**sees** 139:1
**select** 35:7,8
**selectable** 35:7
**selected** 29:12,15
32:7
**selecting** 32:8

**self** 21:6
**selling** 80:18
**sends** 139:6
**sense** 45:17 66:10
104:19 112:15
113:2,19 129:23
**sensitive** 76:13
**sensitivity** 111:23
134:4
**sent** 59:22
**sentence** 46:23
47:10 50:3 121:11
188:21
**sentences** 107:12
**september** 140:24
141:18 142:14
**series** 106:18
**served** 151:5
**service** 10:25 16:4
16:6
**sessions** 148:22,24
148:24
**set** 25:5,8 39:17
70:1 124:20 125:8
140:2 164:19
**sets** 29:13 76:3
**seven** 12:15 166:3
166:9,22 167:5
**share** 117:8
187:11 191:5
217:1
**shared** 49:5
146:19
**sharing** 37:6 136:1
**shawn** 2:20 163:24
186:13
**sheet** 227:14 229:7
229:10,18 230:1
**shepherds** 18:17
**shielding** 111:12

**shiva**  149:10 205:16,17
**shocking**  82:22,23
**shorthand**  4:4 226:3,8
**shot**  153:13,16 158:2 159:8
**show**  25:18 46:15 80:19
**showed**  74:2 119:10
**shown**  27:4 56:14 74:12 227:16
**shows**  38:7 50:18
**shut**  219:4
**side**  5:20 15:10 17:20 62:18 76:8 111:21 126:21 198:15
**sides**  217:16
**sign**  12:23 153:23 153:24 154:4 155:9 156:6 225:17,22
**signature**  66:2,5,6 120:22 128:24 226:19 227:15
**signed**  128:20 228:13 229:18
**significant**  83:6 102:20 136:24
**signifying**  34:14
**signing**  227:20
**signoff**  172:25
**signs**  6:21
**similar**  29:20 134:11 141:11,25 143:6,6,7 156:23 157:9 169:16 175:1 201:24 204:11

**simple**  109:9 180:25
**simplicity**  160:7
**simply**  59:6 84:3
**sincerely**  227:21
**sir**  24:13 26:14 29:3 46:19 48:4 50:8 56:4,17 57:2 66:14 73:13 76:5 81:5 105:23 125:4 140:16 142:19 154:8 157:2 159:17 171:16 172:15 176:25 185:15 192:7 195:7,21 196:14 197:20 198:15 203:2 212:4 215:13 220:24 224:19 225:19 227:10
**sit**  116:22 146:2 174:11
**site**  2:12 24:18 26:7,16 27:9,23 28:25 29:6,19 30:14,24 31:2,15 31:16,17,19 32:5 33:17 38:8 40:14 65:22,23 70:18 76:1 77:6,7,8,11 77:15 83:24 111:9 111:11,22 122:3 138:3 141:19 143:4 153:2 185:7 209:23
**sites**  68:13 209:23
**sitting**  116:25 170:2
**situation**  38:14 39:18 78:14 89:13

114:17 125:20 140:1 142:9 169:15 205:18
**situations**  39:1
**six**  12:2,15 86:2,18 87:15
**size**  23:14,25 24:2
**slap**  65:25
**slate**  102:17
**sleeves**  150:15
**slide**  186:5 187:15
**small**  62:22
**smith**  4:24
**snow**  80:18
**snowball's**  174:14
**soccer**  63:3,4 64:10,12 165:16 196:10 199:23
**softball**  199:17
**software**  24:19 25:6 32:11 36:7
**soglin**  150:8
**soil**  166:11
**sole**  38:10 145:6 206:3 208:3
**solutions**  175:21 227:1 230:1
**solved**  51:22
**somebody**  65:8 71:23 102:7
**soon**  196:7 202:12
**sorry**  8:14 14:17 14:18 44:24 48:19 49:1 51:8 56:9 60:13 65:4 73:13 91:17 93:9 98:17 104:11 107:15 117:16 119:5 120:10 122:14 145:1,7 150:6 162:23 164:1

168:13 173:13 176:14 185:18 186:2 207:14 208:13 211:3 213:4 217:18,20 225:19,21
**sort**  15:8 17:24 28:16 47:15 49:19 55:13 76:2,3 78:5 112:17 113:6 115:6 116:21 126:17 137:10 139:3 152:22 164:17 169:16 171:24 175:19 189:25 200:9 221:14
**sound**  59:8 169:20 175:17 186:12 219:12
**sounding**  49:21
**sounds**  30:4 58:9 98:20 189:14
**source**  125:11
**sources**  42:8
**south**  4:21
**southwest**  5:20
**space**  16:15 74:15 74:15 98:9 99:10 99:14 104:7,13 113:15 122:5,8 123:8,11 125:25 130:9 133:13 160:6 188:17,20 188:22 189:1,3 193:16,24 194:2,7 194:8,15,23 196:17,23 207:16 207:20 208:7,17
**spaces**  55:7 56:8 93:7 123:18,21

[spaces - steer]                                                                                    Page 43

132:12 191:11
192:1 193:9 195:2
195:3
**speak**  68:11 95:14
103:10 119:5
159:7 205:8
**speaking**  7:4 33:2
40:11 77:9 79:5
93:17 188:8
**speaks**  76:23,25
211:18
**special**  31:21 42:9
42:15,19 43:8,18
44:1
**specific**  53:20
101:9 107:23
118:8 152:25
153:6 156:15
**specifically**  33:20
52:25 54:21 77:6
107:2 131:1 136:1
176:23 181:6
188:17,22,25
189:3 192:11
214:14
**specification**
66:21
**specifications**
33:23 34:5 38:20
40:18 61:25 66:23
143:21 144:1
**specificity**  72:2,16
72:21 101:11
105:7 135:10
194:3,11 196:14
**specified**  85:24
193:5
**speculating**  200:4
**spell**  5:9
**spend**  13:9,9 170:7

**spending**  114:9
118:11
**spent**  129:17
130:13
**spiel**  7:2
**spirit**  103:4
**spoke**  41:2 188:7
**sponsor**  206:3
**sponsored**  206:2
**sponsoring**  204:17
**sponsors**  205:6,11
205:12 206:10
207:12
**sport**  170:24 187:5
218:24
**sporting**  167:20
217:13
**sports**  93:9 94:13
94:16,18,21,25
95:6,7,13,16,17,23
96:1,4,11 98:3,14
99:6 101:9 134:8
160:15 172:19
193:8 198:6 199:3
199:20 200:15
201:5
**spots**  60:24 165:22
166:2
**square**  87:2
152:22 196:9
207:16,19 209:25
210:6 211:21
212:1 213:11
**stack**  212:13
**stadium**  59:7
94:15,17 113:14
118:15 160:6
173:25 175:17
190:23 200:19
201:12

**staff**  2:14 3:7
13:11 15:18 16:5
16:8 17:17 19:4
22:4 27:25 28:14
36:14 37:7 39:23
43:23 85:11 106:4
107:24 149:5
150:17 175:1,5,9,9
176:6,10,13 179:7
179:25 180:12,16
202:15 212:5
213:17 215:7,14
216:18,24 217:1
218:1 220:4,9
224:24 225:3
**stairwells**  214:3
**stakes**  83:14
**stalls**  224:23
**stamp**  65:18,21,22
65:23,24,24 66:2,3
66:7 153:10
156:22
**stamped**  157:16
**stand**  118:15
223:15
**standard**  91:1,5
91:16 92:11
180:20 215:24,25
216:6
**standards**  67:10
82:5 90:24,25
91:13 92:8 144:22
175:4 179:18
182:4 184:11
193:14 216:4
225:8,14
**standing**  171:25
**standpoint**  11:24
31:20,24 61:14
66:21 72:21 204:7
218:7

**standrich**  149:24
**start**  7:23 151:12
156:25 158:3
159:7 225:2
**started**  10:2,12
107:17 203:24
**starting**  107:15
149:1 151:17
153:13 184:21
191:21 212:25
**starts**  67:23 68:11
126:18 213:6
**state**  4:5,16 5:8
201:24 221:23
226:4,21 228:10
229:15
**stated**  60:21
125:24 165:17
**statement**  82:22
102:14 125:1
159:25 162:22
167:11 178:10
211:17,23 213:5
217:16 222:23
223:2,4,5,16
228:13,14 229:19
229:19
**statements**  41:17
103:14 146:3
162:25 163:5,15
**states**  1:1
**status**  32:12,13,16
32:19,22,23,25
34:2,8,11,15 35:5
35:5 41:10 42:3
139:9 141:25
179:24 214:21
**statute**  48:16
82:21 101:2 214:7
**steer**  100:10

step  25:14 32:19
  38:5 52:23 97:4,5
  137:20 138:2
steps  33:4
sterett  4:15
steve  25:13,16,20
  33:18,21 40:17
  60:14
stick  82:17
stipulation  46:9
  48:6 51:13 55:1
  56:1 117:24
  119:19 127:22
  129:14 130:18
  210:8,17
stipulations
  157:20
stop  71:3 126:22
stops  126:18
storm  196:12
stouder  149:6
straightforward
  88:20
strange  2:21 37:3
  45:8 46:8 48:15
  51:12 54:12 55:23
  56:25 112:19
  115:3 119:16
  122:23 127:15,21
  128:18 129:10
  130:1,15 131:2
  135:24 136:5
  145:6 169:23
  177:4,9,14,23
  178:5,18 183:10
  184:7,10 190:6
  202:14 204:24
street  4:6,12,16,21
  5:21 63:2 76:22
  89:4 110:22 161:5

strengthen  178:10
stretch  166:12
strike  44:8 208:20
  225:2
striped  60:24
strive  105:17
structure  8:24
  15:9 102:10
structured  81:8
structures  13:24
  74:20
struggle  96:5
struggling  47:16
  62:15 65:5 114:13
  115:18 200:9
students  8:21
studied  116:14
stuff  190:2
stumble  42:22
sub  47:17,17 50:3
  50:6 73:5,12,15,16
  81:9 111:9 207:1
  213:8,8
subject  112:3
  154:18 155:23
  218:10
submission  28:18
  112:13 115:10
  146:23 190:22
submit  61:22
  66:17,19
submitted  2:11,13
  43:11 52:20 63:3
  65:2 66:8,11,16
  84:4 113:9 135:6
  142:12 163:7
  181:11 191:1,8
subscribed  228:10
  229:14 230:21
subsection  46:22
  69:20 73:1,3 81:7

91:13,20 92:12
  98:7 99:24 111:7
  111:18 181:3
  214:6
subsections  48:16
subsequently
  50:22
substantial  92:6
  181:23 211:13,14
substantially
  216:5,8
substantively  35:9
sufficient  78:22
  79:2 132:11
sufficiently  134:17
suggested  50:2,5
suite  4:6,12,16
  227:2
summarize  6:18
  7:20
summary  43:9
  75:18
summer  161:5
superior  227:1
supervision  11:11
supervisor  12:11
  125:15
support  173:22
  200:17
supportive  174:3
  174:6
suppose  164:6
supposed  41:23
  42:1 206:7 221:3
sure  5:10,20 9:4
  11:25 13:17 14:25
  18:1 20:14 22:13
  23:4 24:17 25:22
  26:21 28:2,11
  36:20 42:24,24
  44:6 52:2 57:23

58:3 68:16 69:25
  71:15,25 73:15
  77:3,16 78:25
  81:3 83:4 87:1,24
  88:13 89:1 90:22
  93:8 94:13 96:2
  111:3 113:2
  115:18 116:19
  118:24 130:1,15
  132:18 136:23
  137:13 138:11
  139:2 141:3,4
  143:19 147:15
  150:11 152:5,17
  156:9,20 160:24
  164:4,16,24
  168:25 169:11,24
  170:11 171:1
  176:3 177:13
  178:14 180:18
  182:24 189:17
  190:1,9,16 191:2,6
  192:24 198:20
  199:6,21 200:4
  204:2,15 205:15
  212:10 220:16,23
  223:13
surface  81:8
  165:18,19 166:2
surprise  54:4
  112:24 135:8
surprised  115:10
surprising  53:2
surrounded  85:11
susan  79:21
  149:11 151:13
suspect  157:8
  195:10
suzanne  148:20
swath  150:8

swear  195:19
swimming  200:12
switch  41:9 104:22
sworn  5:4 226:15
228:10,13 229:14
229:18 230:21
synthetic  196:9
system  39:16
systems  29:9
szylstra  4:22

**t**

t  2:9 5:10,10,11
tab  122:21
tabbed  55:13
tailgates  89:5,10
tailgating  90:2,8
90:13,15
take  22:22 23:16
39:16 49:7,9,21
52:1 57:5 75:7
83:19 90:3 110:4
140:13 153:22
155:13 157:15,19
164:17 171:12
175:21 211:17
222:2
taken  4:2 6:2
32:20 146:16
180:17 226:6,7,8
226:13
talk  13:22,23 17:5
24:9 41:4 43:14
69:1 72:15 77:1
88:2 90:25 115:5
133:17 148:1
159:11 160:4
164:22 168:6
221:10
talked  12:19 40:7
40:17 43:10 51:6
51:25 71:5 75:21

88:5,16 90:20,24
105:6 111:3 156:9
159:13 173:10
175:9 190:19
talking  7:4 13:2
17:3,13 19:19
20:7 28:16 31:15
32:24 33:6,19
38:13 40:10,11
49:19 52:10,17
67:13 76:1 82:8
86:4 94:22 95:23
98:21,25,25 99:5
100:5 109:18
110:25 111:22
115:4 116:25
156:14 166:14
167:16,24 182:10
186:15 191:22
202:14,18 210:18
210:22,23 213:8
224:25
talks  55:8 69:21
73:1,4 103:2
111:18,19 191:18
214:2
tangentially  12:10
113:1
tanner  4:20
target  59:10
tasked  103:24
104:2
tasks  120:18
tavern  16:3,10
teach  170:24
team  49:19 122:3
124:3 139:18
147:9 149:5
170:22 171:2,11
171:18 188:1
189:5 201:9,11

teams  96:4 199:20
tear  170:10
technical  16:14
33:22 34:5 38:19
40:18 50:13 61:25
66:21,23 85:7
143:20,25
technically  20:21
20:23 67:10
159:10
telephone  117:3
117:21
telephonic  4:24
television  117:7
tell  21:18 24:15
45:22 64:6 65:9
65:21 135:18
148:3,4 154:24
210:9
telling  104:9
165:12
tells  45:16 62:18
67:4,5
template  151:18
temporary  89:11
89:25 90:5
tend  22:22 26:7
94:10 136:20
tendency  131:14
tends  45:15
tennis  104:8,13,21
200:11,11,19,23
201:6,7,9,10,11,12
tension  83:6
147:25
tenure  17:12 39:2
153:13
term  22:25 32:21
85:17 96:5 135:5
152:15 159:7
187:9 213:22

termination  173:3
terminology  20:14
terms  7:4 16:14
63:15 93:5 96:6
102:22 146:1
172:22 199:8
204:1 224:5
testified  5:5 11:2
163:19
testify  226:15
testimony  10:21
39:15 40:2,20,24
42:25 48:25 50:19
53:14 80:14 97:11
97:15 99:19 126:9
128:10 144:10
148:8 226:13
228:6,7 229:6,9,12
text  204:18
thank  5:24 17:8
24:9 48:8 64:22
111:15 150:21
180:12 192:22
201:2 225:20,22
thanks  217:22
theory  43:7 92:10
138:22 139:14
thiele  25:3 29:15
34:18,21 39:8
40:20 41:22 43:19
112:7 114:18
120:5,14 138:13
thiele's  42:1 66:6
thing  16:18 25:11
40:3,5,20 44:4
84:20 88:11,14
134:5 147:24
148:6 152:18
164:20 170:7
187:5 197:19
199:23 200:25

**things**  15:2 22:22
32:3,17 39:24
41:15,18 45:16
49:20 55:10,16,18
56:21,24 59:8
82:11 95:8 96:18
115:14 116:18
117:4 126:21
130:11 137:12
146:15 147:25
148:1 156:8 161:9
163:20 164:15
170:10,25 172:6
175:21,23 176:5
185:14 187:8,14
191:22 194:25
197:15 198:9
199:18 200:6
205:4 209:1,19
212:12 219:14
221:13 222:1
**think**  15:1 20:10
21:2,12,15,16,24
22:5 24:25 28:7
30:5,8,25 33:20
36:25 41:13 43:21
44:7 52:2 53:19
59:4 61:13 67:4
68:25 69:3,18
70:5 72:10 74:14
75:25 79:21 81:19
84:10 88:8 93:1
94:7,12 95:3,13
96:17 101:3
105:15 109:17
112:1 113:18,21
118:9 127:12
128:14 129:17
130:4 131:23
134:2 139:2
140:14 143:13

145:23 147:7
148:23 150:3
156:21 159:6
162:8 167:11
171:5,6,22,24
174:12 175:13
176:9 177:24
178:7 179:6 181:7
182:11 186:1,2,6
187:11 190:19,19
191:2 197:5,5
198:12 199:16,25
202:23 212:16
214:20 215:11
219:13 221:11,22
**thinking**  52:21
**third**  20:15 43:7
92:5 181:21 196:6
**thirty**  227:19
**thorough**  191:3,7
194:23
**thought**  11:3 22:6
67:1 83:18 91:18
126:23,25 127:13
225:1
**thoughtful**  148:6
**thoughts**  117:23
204:21
**three**  6:11 12:2
20:10 55:12 56:21
84:25 85:8,21,22
85:23,25 91:24
92:9 106:16 110:3
117:18 118:6
119:22 130:17,20
148:14 181:4
196:6 202:24,24
217:16 224:22,23
**throughs**  208:20
**tick**  158:3

**tied**  171:1
**tight**  104:20,23
105:3,8
**till**  10:13
**tim**  18:5,7,8,12,25
19:3 21:18 22:4
44:2 79:16 146:20
**time**  7:15 8:24
11:1,20 12:19
13:10 14:12,12
18:13 20:4 28:25
40:4 41:1 42:17
42:18 43:21 52:14
52:17 53:15,16,25
54:3 58:17 64:3
64:10,11 72:7
74:25 75:8,17
76:22 77:22 79:5
79:6,17,21 83:5
85:8 89:6 99:5
105:2 110:22
112:6 114:9
115:19 116:1
118:11 127:12,14
129:18 130:12,13
137:4,8,23 138:15
138:20 142:12
147:8,10 151:8
160:12 161:15,16
162:13 170:7,12
170:25 173:2
179:12 180:4
183:6 190:11
192:23 198:22
208:14 210:4
219:21
**timeframe**  11:17
11:18 14:5 15:18
130:22 138:14
163:12

**timeline**  138:18
**times**  6:5 15:17
41:14 60:17 61:15
62:7,9 89:7,21
101:19 190:10
221:23
**timestamp**  57:10
**timing**  98:2
113:19 116:18
**timothy**  156:9
**title**  10:1 15:23
**tjeanlouis**  4:23
**today**  7:4,13 17:2
23:22 40:2 50:19
72:6 83:24 126:9
128:10 146:2
148:9 170:3
174:12 193:15
194:12
**toki**  5:23 9:21
**told**  139:9
**tomich**  4:15
**tone**  76:4
**tool**  13:7 17:23
32:3
**tools**  17:18
**toothed**  54:13 59:5
90:22 113:22,23
114:20 116:13,24
118:3 122:23
136:4 189:19
190:14
**top**  57:8 58:4,8
76:7 106:13 119:5
200:24 206:21
212:19,25 213:4
217:19,20
**topic**  18:10 47:9
51:11
**torn**  64:7

total 165:22
totally 118:24
touch 148:2
  163:19
touched 147:8
touching 69:4
track 21:16 24:19
  165:16,16 187:6
tracking 166:11
tracks 126:23
tradeoff 85:14,17
traditional 103:22
traffic 13:14
train 22:5
training 9:11
  42:14
transcribed 228:7
transcript 227:12
  227:13 228:5,12
  229:5,11,17
transcription
  226:11
transferred 19:3
  22:3 23:1
treat 16:10
treated 27:22
treating 89:22
tree 90:5
triage 27:25 28:15
  42:7,12
tricky 146:7,8
  181:9
trigger 28:22
  208:22 209:22
trouble 128:11
true 98:4 134:21
  136:17 140:12
  226:12
truth 226:15,15,16
try 7:3,7,9 43:22
  58:7 114:15

197:14
trying 31:4 42:24
  51:17,17 61:12,12
  62:5 63:23,24
  65:3,4 76:10
  96:17 102:12
  113:18 115:14,17
  126:15 129:22
  132:21,22 148:8
  170:24 187:22
  202:23 210:9
  212:12
tube 169:24
tucker 1:13 2:3,20
  3:3 4:1 5:3,10,17
  6:2 49:12 57:6,18
  64:24 72:10 75:12
  102:9 110:8 148:9
  152:11 174:12
  193:2 210:16
  226:14 227:9
  228:4,9 229:4,13
  230:20
turf 196:10
turn 48:1 53:2
  106:12,14 164:11
  195:21 197:20
turnaround
  138:15,16,17
turned 111:22
two 12:7 15:18
  46:20 47:23 53:13
  67:11 73:11 83:6
  88:6 95:8 96:3,7
  101:23 105:16,19
  106:15 125:3
  144:6 148:14
  184:4 187:14
  196:6 198:8 200:5
  208:21 222:11
  223:21

type 17:25 18:22
  28:21 29:4 31:20
  40:16 58:16 74:21
  74:22 99:10 101:9
  106:8 190:2
types 12:25 28:15
  55:9 70:17,22
  97:24 98:13 99:15
  219:14 221:13
typewriting
  226:11
typical 38:16
  42:25 60:14
  181:14 197:18
  218:25
typically 28:24
  40:19 42:4 44:1
  75:5 88:19 139:10
  199:14 203:23
  204:18

**u**

u 5:11
uh 14:16 97:18
  108:6 112:5 120:3
  124:5 127:25
  128:9 144:15
  165:11 217:24
ultimately 20:2
  206:19
um 51:18 61:21
  93:23 225:18
un 107:14 115:17
unclear 115:16
uncommon 197:15
undergraduate
  9:6,7
underground
  169:4
understand 8:14
  13:19 14:23 21:15
  35:18 36:19 41:20

42:7,24 51:17
  53:15 54:20 62:5
  63:18 70:9 82:25
  83:1 102:21
  114:12,13 115:8
  118:14 126:4
  131:24 132:21
  145:23 159:21
  178:25 186:20
  205:5 207:9
  223:13
understandable
  107:14
understanding
  18:3,24 23:9 26:3
  29:9 31:12 35:18
  36:10,15 45:9
  72:18 80:11,17
  82:19 86:10 97:10
  98:20 101:16
  111:13 115:2
  133:2 167:25
  168:3 175:10
  180:24 195:4
  201:23 217:25
  221:22 225:3
understandings
  80:2 103:5
understood 18:1,6
  46:5 48:20 53:14
  55:14 65:10 67:16
  119:24 128:2
  162:12 163:13
undertake 168:25
undertaken
  129:11
undertook 161:14
unfavorable
  125:20
unfettered 172:18

**unfortunately**
174:21
**unhappy** 164:8
**uniformly** 41:19
**unique** 28:21
39:18 42:10 43:21
44:7,9 89:21
**united** 1:1
**university** 7:25
20:8 23:6 39:21
85:6 149:18 157:7
159:3 193:4
195:25 201:23,24
202:1
**unoccupied** 214:3
**unrelated** 108:12
**unspecified** 86:11
87:7
**unusual** 28:20
42:10 43:21 44:7
44:9 45:20 49:25
89:21 115:4
**upgraded** 143:24
196:7
**upper** 61:10
**usage** 113:15
147:6,7 160:12,14
188:16 189:11
**use** 13:24 15:5,22
16:10,11,18,19,24
22:25 26:7,15
27:6,9,23 28:19
29:6,19,20,25 30:5
30:6,6,7,14,18,24
31:2,5,8,15,16,17
31:19,22 32:3,10
32:21 40:14 52:5
54:6,18 55:19
61:4,7 63:20,23,25
68:13 69:1,4
74:19 77:25 78:21

79:11 81:21 82:3
82:5 83:14,16
84:2,3 85:17 86:7
86:8,17,21 87:9
89:19 90:5,7,9
93:8,8,13 96:5
97:7,13,17,20 98:9
99:3,9,10,13,17
100:23,24,24,25
101:17 102:21
105:10 109:22
119:10 121:23,24
122:3 124:2
125:22 126:7,14
127:4 131:16
133:4,5 134:6,17
134:18,23 137:3,8
139:17 140:2,6,7,8
144:13 146:4,5
152:21 155:11,13
160:17 161:22,24
161:25 162:16,17
163:1,1,6 169:21
170:21 171:2,17
171:19,24 172:4
172:18 173:5,9,9
175:1 179:22
185:6,23 186:22
186:23 187:18,19
187:21 188:2,4,10
189:23 192:16,20
193:5,17,22 194:1
194:2,6 197:6,21
199:9,10,11 204:1
207:4,6,15 208:6,9
208:16,17,24
209:21 210:6
211:25 213:13
215:8,24 216:14
216:19 217:13
218:9,15 221:19

222:6,10,13
225:15
**user** 130:12
**users** 186:25
187:13,16
**uses** 16:12 29:24
30:3 59:24 68:7
68:18,20,20,21,22
74:16 78:1 89:25
92:13,13,23,25
98:25 99:1 100:5
100:5,9,23 101:1,7
102:19 105:13
125:19 161:13
172:1 173:19
187:2,10,13,16,24
191:16 198:10
208:23 211:22
216:6
**usually** 13:4
**utilize** 170:5
**utilized** 24:19
49:14
**utter** 58:14,20
**uw** 2:18 3:5 24:1
83:10 90:8 149:3
149:9,10 156:16
157:16 159:10
187:6 193:8 195:1
195:5,7 199:14,20
201:9,11,21

**v**

**v** 227:6 228:3
229:3
**vacant** 85:25 86:6
**vacated** 10:3
**vacuums** 219:15
**vague** 53:19
161:16
**values** 216:6

**van** 8:9,16 161:18
**varies** 138:16
**variety** 12:25
13:16 15:2 41:15
150:25
**various** 15:16 47:8
184:23
**varsity** 194:17
201:6,9,10
**verbal** 7:12
**verification** 2:12
138:3 143:5
**verified** 156:24
**veritext** 227:1,8
230:1
**veritext.com.**
227:17
**vernacular** 20:7
**verona** 168:3
**versus** 15:23 26:16
140:8 192:16
**vice** 4:15
**view** 68:20 142:9
**viewed** 137:3
**vilas** 106:20
149:25
**violating** 192:19
218:12
**violation** 137:8
138:1 172:7
193:23
**violations** 218:7
**vis** 116:16,16
**visible** 76:22
110:21
**visually** 169:5
**volleyball** 194:12
**voluntary** 179:21
**volunteered**
178:21

**[volunteers - worked]**

**volunteers** 151:6

**w**

**w** 4:15,16 5:10,11
  150:7
**wait** 186:11
  205:16 210:8
**waive** 210:17
**waived** 227:20
**walk** 119:13
**walking** 118:7
**walled** 89:5
**walls** 214:2
**want** 7:22 8:15,18
  17:5 19:10 20:14
  42:10 55:2 64:7
  67:20 70:13 74:14
  75:1 86:15 87:16
  88:9 89:8 90:3,22
  90:25 95:14
  109:22 115:13
  138:19 164:16
  170:9 171:13
  176:10 177:21,22
  178:23 182:19
  186:14,15 190:2
  202:9 210:20
**wanted** 36:6,9
  54:6 71:1 74:1,4
  75:13 85:19 90:7
  104:21,22 113:14
  126:22 146:4,12
  155:19 191:3,6
  199:25
**wants** 104:14
**warn** 54:6
**warning** 17:24
  137:10
**warrant** 125:23
**warranted** 51:3
**wash** 63:1 64:6

**watching** 205:18
**water** 196:12
**wautier** 37:2 45:7
  48:2 49:2 67:4
  113:6 114:4,22
  130:6 135:24
  140:20 151:1
**way** 5:22 8:17
  16:17 27:3 70:1
  75:6 83:12 84:18
  86:10 109:17
  126:10 134:11
  159:1 175:25
  176:1 177:17
**ways** 174:24
**we've** 52:18 63:25
  71:5 109:17
  111:16 168:8
  184:4 197:9
**website** 139:1,6
**wednesday** 6:25
  11:2 185:5,22
**wee** 89:10
**weekly** 217:5
**weights** 15:14
**weird** 111:17
  165:5
**went** 7:24,24 8:8,9
  35:25 54:20 55:6
  84:3 118:3 122:16
  126:16 156:19
  161:17,18,20
  162:9 174:21
**west** 5:21 7:24 8:3
  62:25 111:20
  161:21,22 196:7
  196:15 197:9
  199:23 202:20
  205:19 215:2
**western** 1:2 57:10

**wet** 65:24
**whitney** 5:22
**wiaa** 218:24
**wide** 41:15 150:8
**wild** 132:15
**william** 5:10
**willow** 200:12
**winter** 1:24 4:3
  226:3,20
**wire** 170:1
**wiring** 169:19
**wisconsin** 1:2,7,17
  4:5,7,13,22 5:16
  7:25 10:17 20:8
  23:6 39:21 85:7
  88:22 89:2 149:18
  157:7 159:3
  166:14 193:4
  196:1,15 226:5,21
  227:7 228:3 229:3
**wise** 170:8
**wish** 102:8
**wished** 6:23
**wishes** 222:20
  223:9
**withdraw** 132:6
  177:13 209:6
**withheld** 110:14
  132:16
**withhold** 47:25
  48:11 49:15 50:23
  52:6 123:9 128:16
  132:9,11 136:6,9
  136:10 182:14,22
**withholding** 48:5
  56:19 75:18 114:2
  132:18 133:3
**witness** 2:2 4:2
  64:17 150:7 152:7
  211:4 227:9,12
  228:1,4,11 229:1,4

  229:15
**witnesses** 133:1
**witness'** 227:15
**wmc** 1:6
**woman's** 148:20
**woodrow** 76:22
  110:21 191:19
**word** 5:15 15:22
  37:24 47:21,22
  95:10 100:25
  107:15,17 118:10
  118:10 134:7
  186:16 221:11
**words** 13:22 47:6
  68:15 70:21,23
  72:12 74:18 75:5
  102:12 105:4,18
  118:13 123:10
  127:18 133:16,18
  134:7 142:5,7
  145:12,13,14
  147:8,8 158:9
  159:15 162:20,21
  172:23 173:7
  178:15 181:5,6
  189:22 194:23
  204:5 214:11
  221:10 225:12
**work** 5:25 6:20
  33:7 34:14 35:14
  35:18 36:5,16
  38:9 83:12,19
  136:20 147:13
  156:6 175:6,7,23
  176:1 197:16
  217:2,3
**workability** 81:2
**worked** 10:17 13:5
  35:1 49:25 78:20
  82:13 90:14

**workflow**   32:19
32:25 33:7 35:3,6
35:8 36:11,24
37:11 38:6,7
39:24 40:8,23
41:11 42:2,2
112:8 114:18
120:6,12,14,18
138:13 141:25
**working**   13:10
18:16,25 52:19
79:6 80:1 99:22
99:22 122:23
128:18 130:14
163:10 167:15
174:23 198:21
205:21
**works**   152:8
167:16 175:25
**worries**   176:15
**worse**   14:20
**write**   45:20 102:18
166:7 180:15
185:3
**writing**   60:4
150:10 162:21
**written**   20:1 45:10
49:2,4 54:9 55:22
70:25 104:22
142:4 151:25
152:3 199:5 210:1
213:19,21
**wrong**   75:15
**wrote**   37:8 54:1
55:20 104:20
105:3 174:25
179:1 216:17

**x**

**x**   2:1,9 219:20

**y**

**y**   164:18
**yeah**   11:8 13:22
20:24 21:21 24:8
33:6 43:13 51:1,7
51:15 57:4,11
58:6,11 62:25
65:3 69:18 73:10
76:6,10,10 77:8
81:6 87:24 88:25
89:3,3 92:19 93:1
97:23 103:12,21
106:3 112:5,12
115:6 117:10,25
119:3,4 123:22
124:16 127:12,24
127:24 130:25
134:21 136:10
138:21 139:5,14
140:12 146:5
149:15 150:17,19
152:7 153:16
157:6 158:12
164:4 166:5 171:5
172:23 173:16
174:5 176:15,22
178:3 179:13
180:17 182:24
183:8,16,21,21
187:17 189:7,14
192:21 194:13,22
195:4,5,10,11
196:19 198:2,12
198:13,18 200:19
201:9 208:19
209:25 210:12
211:2 212:10
213:19 214:10
215:23
**year**   8:2,5 9:18,18
9:20,21 10:2,14

86:2,18 87:15
89:7,21 153:14
157:18 158:2
159:7,8 162:6,6
169:10 213:12
**years**   5:17 6:11
74:5 79:19 86:1
101:20 119:22,22
169:10
**yep**   94:2 185:2
215:19 216:1
**yesterday**   205:25

**z**

**z**   150:7
**zion**   62:25,25
64:17,19
**zone**   14:14 38:1
71:9 78:12
**zoned**   20:12,18
21:3,7,13 22:8,15
44:12 64:3 139:22
140:5 143:14
172:16 173:19
174:21,23
**zoning**   6:9 10:8,19
11:16,22,23,25
12:4,5,6,7,8,19,23
13:6,13,17,20 14:6
14:15,24 15:3,17
15:18,21,23 16:8,8
16:9,13,23 17:4,9
17:14,15,17 18:6
18:14 19:19,21,24
19:25 20:1,4 21:4
21:14 25:4,10
26:5,8,10 27:4
28:3 30:2 33:9,14
34:13,17,22 35:12
36:13 37:20,24
38:14,17,20,21
39:2,3 40:4,4,16

41:24,25 42:3,5
43:2,5,11 44:10,25
47:13 61:6 63:22
64:8 65:18 71:13
78:2 82:18 85:3
87:22 91:2,8 92:1
94:11,23 101:14
107:4,8 108:4,23
109:4,12,14 120:6
126:18 129:2,5
138:25 139:20
142:3,23 148:11
149:1 150:23
156:5,7 179:18
181:1,15 202:1,4
202:10 203:5,25
205:22 213:23
217:17 220:25
222:21 223:1,10
223:18 224:5
**zylstra**   2:5 4:20
19:15 22:11 26:19
30:19 31:11,18
33:10,12 34:10,24
35:2 36:17 37:17
37:21 38:24 39:6
39:10,14 40:25
41:12 43:20 46:7
46:11,17 48:6,8,22
49:9,16 50:17,24
51:5,13 52:7,16
53:10,13,19 55:1,5
56:1,13 57:11
60:1,5,10 61:19
62:2,11 66:24
68:8,24 71:18
77:19 78:7 81:18
84:13 86:13,23
87:23 88:24 89:17
90:11 91:4 92:16
93:11,16,22 94:1,6

**[zylstra - à]**

| | |
|---|---|
| 95:2,12,18,22 96:9 | 223:12,21 224:1 |
| 96:14 97:8,22 | 224:16 225:16,19 |
| 98:5,16,18 99:18 | 225:21 227:5 |
| 100:7 101:22 | **à** |
| 102:6,25 103:18 | à    116:16 |
| 103:25 104:5,17 | |
| 105:11 107:10 | |
| 108:11,14,24 | |
| 109:6 114:3,24 | |
| 115:23 117:24 | |
| 119:19 120:8 | |
| 126:2 127:10,22 | |
| 129:8,14,16 | |
| 130:18 131:19 | |
| 132:2,13 133:10 | |
| 134:1,20 137:5 | |
| 139:25 140:10 | |
| 142:17 143:3 | |
| 144:9,16,23 145:9 | |
| 145:22 150:20 | |
| 152:6 153:20 | |
| 155:7,20 156:2 | |
| 158:8,24 161:15 | |
| 163:3 166:20,25 | |
| 167:22 168:13 | |
| 169:14 171:4,21 | |
| 172:21 173:6,11 | |
| 173:13 174:1,16 | |
| 175:18 176:21 | |
| 180:22 182:9 | |
| 190:8 192:23 | |
| 193:19 194:4,18 | |
| 196:2 197:4,13 | |
| 198:11 206:9 | |
| 207:11,22 208:11 | |
| 209:4,10,16 210:8 | |
| 210:14,16,20 | |
| 211:3,5,15 212:18 | |
| 214:9 218:13 | |
| 219:22 221:5,20 | |
| 222:7,14,22,25 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.