

## Office of the City Attorney

**Michael P. May, City Attorney**     **Patricia A. Lauten, Deputy City Attorney**

ASSISTANT CITY ATTORNEYS

Roger A. Allen  
Steven C. Brist  
Lana J. Mades  
Lara M. Mainella  
Amber R. McReynolds  
Marci A. Paulsen  
Adriana M. Peguero  

Kevin B. Ramakrishna  
Kate M. Smith  
Jaime L. Staffaroni  
John W. Strange  
Doran E. Viste  
Brittany A. Wilson  
Jennifer A. Zilavy  

Room 401, City-County Building

210 Martin Luther King, Jr. Blvd.  
Madison, Wisconsin 53703-3345  
(Phone) 608-266-4511  
(Fax) 608-267-8715  
attorney@cityofmadison.com

LITIGATION ASSISTANT  
Patricia V. Gehler

March 21, 2019

Attorney Nathan Wautier  
Reinhart Boerner Van Deuren, S.C.  
P.O. Box 2018  
Madison, Wisconsin  53701-2018

Dear Attorney Wautier,

Thank you for your letter of March 12, 2019, outlining Edgewood High School's position regarding the stadium lights it proposes to build at its athletic field.

Your letter notes that the lighting application was stamped as approved by the Zoning Administrator. You argue that this vests certain rights in Edgewood that allows them to install 80-foot tall stadium lights at their athletic facility. As this letter will explain, Edgewood does not have vested rights because the proposed lights never complied with the approved Edgewood Campus Master Plan ("Campus Master Plan"), regardless of the administrative error in stamping Edgewood's application. In addition, because the lights are part and parcel of a plan to conduct athletic contests at night, neither the lights nor the athletic contests are in compliance with the Campus Master Plan.

As you are aware, the purpose of the Campus Institutional (CI) Zoning District is to accommodate the growth and development of the City's major educational institutions while minimizing the adverse impacts associated with development and geographic expansion. M.G.O. § 28.097(1)(a) (2019). To do this, the CI District allows for the creation of Campus Master Plans, which enable the institution to propose, among other things, future capital improvements, land uses and buildings, and open-space uses in 10-year increments. M.G.O. § 28.097(5)(c)2.a.-g. Institutions with approved Campus Master Plans detailing future improvements and

Exhibit S  
Sarah Zylstra Declaration

CITY-DEF-033163

March 21, 2019
Page 2

projects are not required to go through the traditional City approval process to complete projects identified in the plan. *See* M.G.O. § 28.097(7) (establishing an alternative design review process for projects approved in a Campus Master Plan). For projects and uses not identified in a Campus Master Plan, the ordinance is clear: "No alteration of an approved Campus Master Plan, *including changes to the proposed use of identified open space areas and other open space uses*, shall be permitted unless approved by the Plan Commission." M.G.O. § 28.097(10)(emphasis added).

Edgewood understood the purpose and role of the CI District when it created its Campus Master Plan. In Section 1.1, Edgewood writes that one of the purposes of the Campus Master Plan is to "study how growth can be accommodated and managed so as to strengthen the special character of the Edgewood Campus, and be sensitive to the impact that growth can have on the surrounding neighborhoods." *Campus Master Plan* at 1. Edgewood further writes that its Campus Master Plan will ensure that "all stakeholders are aware of potential future developments on campus." *Id.* Finally, Edgewood writes that the Campus Master Plan will set forth "an approval process for future developments" and "[p]rovide solutions for mitigating neighborhood impacts of future development and growth." *Id.*

In its Campus Master Plan, Edgewood identified 21 potential projects to be completed between 2014 and 2024, including, among other things, new buildings, additions to existing buildings, structured and surface parking, and curb cuts. As a result, during the 10-year period the Campus Master Plan is in effect, Edgewood is largely exempt from the City approval process for these projects, including from additional trips to the Plan Commission. This is, of course, a major benefit to institutions with approved Campus Master Plans.[1]

One project not identified in the Campus Master Plan is further development, improvement, or change of use of its athletic field (an "open space" in the Master Plan).[2] In Sec. 3.1, Future Needs, Edgewood acknowledges that Athletics and Fitness Space is lacking in a number of respects on its campus. *See Campus Master Plan* at 17. For example, Edgewood discusses how the Edgedome lacks space and

---

1. To date, Edgewood has constructed at least two (2) projects consistent with the approved Master Plan. Further, it utilized the Campus Master Plan amendment process in 2015, when it successfully amended the Campus Master Plan for a parking expansion.

2. As you know, Madison's Zoning Code is a permissive ordinance, which means "that the ordinance permits only those…uses that are specifically enumerated in the ordinance. In the absence of a variance or special exception, any uses or structures not specifically permitted by the ordinance are prohibited." M.G.O. § 28.004(1) (2019). Paragraph 15 of the April 22, 2014 approval letter makes clear that this provision of the ordinance applies to Edgewood's Master Plan, which does not note otherwise.

March 21, 2019
Page 3

how it is difficult to secure sites for off-campus field sports, such as soccer. *Id.* Edgewood chose to address these deficiencies in the Campus Master Plan by proposing changes to the Edgedome. *Id.* at 19-21. Conversely, Edgewood proposed no additions or changes to the athletic field, either in terms of buildings, lights, or expanded uses like athletic contests. *Compare Campus Master Plan* pgs. 10 and 21. In fact, Edgewood included an Open Space diagram that "describes the current open spaces shown on that site plan" and specifically states that the "[a]thletic field owned by Edgewood High School [is]…[u]sed for team practices, physical education classes." *Campus Master Plan* at 42-44. Thus, it is reasonable to see how Edgewood, the City, and the neighbors would be clear about the proposed use of the athletic field and how any change to the proposed "use of identified open space areas and other open space uses" would require Plan Commission approval. *See* M.G.O. § 28.097(10).

Initially, Edgewood engaged in this process, like it did for its parking lot expansion, by filing an application to amend the Campus Master Plan to build a new lighted stadium an change the use of the field to include athletic contests during the day and at night. Since then, it has decided not to go forward with its application - but also not to withdraw it – but to try and achieve these means administratively. To that end, Edgewood has submitted an application under Chapter 10 of the Madison General Ordinances to secure an electrical permit to install the lights outside of the Campus Master Plan process and circulated a spring sports schedule proposing to play soccer games at the field.

Edgewood's lighting application proposes to build four 80-foot tall stadium lights at its athletic field. As noted above, these new stadium lights are not depicted on either the existing or proposed facilities maps. Nor are they mentioned anywhere in the text of the Campus Master Plan. Your letter asserts that the stadium lights are permitted by subsection 7 of Section 3.6 of the Campus Master Plan, which provides:

> "7. Site and building lighting.
>    a. Utilize dark sky compliance light fixtures.
>    b. Provide lighting that is required for pedestrian safety and building code required exit lighting. Reduce glare and light spill towards the neighborhood, use lower height site lighting with non-glare and cut off shielding."[3]

---

3. It appears that in citing Section 3.6 (Perimeter Buildings) your letter actually cites the language found in Section 3.5 (Residence Halls and Buildings 14 & 16). There is a textual difference. The language in Section 3.6, subsection 7. does not contain a subsection 7(c). Instead, Section 3.6 is written as set out above where the "[r]educe glare and light spill towards the neighborhood, use lower height site lighting with non-glare and cut off shielding" is clearly just a requirement for the type of pedestrian safety and building code required exit lighting permitted on and around perimeter buildings, not a separate authorization for other kinds of lighting throughout campus.

March 21, 2019
Page 4

However, Section 3.6 is the section for "Perimeter Buildings". Stadium lights are not perimeter buildings. Subsection 7. requires lighting at buildings and building sites that is "necessary for pedestrian safety and building code required exit lighting". Stadium lighting is not necessary for pedestrian safety or building code required exit lighting. Finally, it requires those pedestrian safety or building code exit lighting to be "lower height site lighting". Even if they would be considered pedestrian safety or building code required exist lighting, 80 foot tall stadium lights are not "lower height site lighting". Thus, Edgewood's reliance on Section 3.6 is misplaced. The stadium lights are capital improvements that were required to be shown in the Campus Master Plan by M.G.O. § 28.097(5)(c)2 in order to be constructed without Plan Commission approval. Since the stadium lights are neither shown on nor mentioned in the Campus Master Plan, the Campus Master Plan must be amended per M.G.O. § 28.097(10).

Your letter alleges that the stamping of the lighting plan vests rights in the construction of the lights. I disagree. First, even if Edgewood's proposal satisfies the requirements of Chapter 10 of the Madison General Ordinance that does not mean they have vested rights. The Zoning Code is clear:

> "[w]here conditions imposed by any provision of this ordinance are either more restrictive or less restrictive than comparable conditions imposed by any other law, ordinance, statute, resolution or regulation of any kind, *the regulations which are more restrictive or which impose higher standards or requirements shall prevail*, unless an exception to this provision is specifically noted."

M.G.O. § 28.004(3)(emphasis added).

To that end, as shown above, Edgewood's application was *never* in compliance with Zoning at the time its lighting application was filed because the lights were not identified as improvements at the athletic field and therefore are simply not allowed absent additional Plan Commission approval. This clearly distinguishes the facts of this case from the facts in the *Lake Bluff* case you cite, where the plaintiff was able to show compliance with zoning regulations at the time the application was submitted. Moreover, this case can be distinguished from the *Bur* case you cite because the City's ordinance is not silent on the issue of which restriction applies – the more restrictive standard applies. *See* M.G.O. § 28.004(3). Finally, your reliance on McQuillin is also misplaced. The City is not extending a zoning interpretation, but rather reading the proposed conditions contained in the Campus Master Plan and enforcing the clear process outlined in the CI District Zoning Ordinance and Campus Master Plan for approving projects not identified in the Master Plan.

March 21, 2019
Page 5

Next, your letter attempts to establish Madison Memorial High School as a comparator to Edgewood. This attempt fails from the outset because Madison Memorial does not have a Campus Master Plan. Moreover, the stadium lights at Madison Memorial – unlike the proposed new stadium lights at Edgewood - were not erected for the first time in 2018. In fact, those lights have been in place for decades, long before the enactment of the CI District Zoning ordinance. Thus, Zoning viewed the update to those lights as maintenance, much like it would have viewed the installation of the new turf grass at the Edgewood Athletic Field.[4] Finally, this allegation is premature because the Edgewood has not availed itself of the process under the Campus Master Plan to get the lights approved.

Your letter also attempts to make the University of Wisconsin-Madison a comparator. On this point, I would just say that the City would fully expect the UW-Madison to seek an amendment to its Master Plan to install stadium lighting not identified on its Master Plan.

Finally, your letter alleges that the City's position on zoning compliance is simply a pretext to assuage the concerns of a small minority of plaintiff neighbors who oppose the stadium. Though irrelevant, again, I disagree. Responding to customer and applicant inquiries is something the Zoning Administrator does multiple times a day on projects throughout the City. Just because the Zoning Administrator looked at the issue again does not mean the resulting decision was meant to assuage a small group of neighbors. Moreover, the allegation lacks any credible foundation. As you know, City Staff has informally signaled support to work with Edgewood toward achieving the goals of its proposed Amendment to the Campus Master Plan.

From the City's perspective, this is not about whether Edgewood should be allowed to build a stadium, erect lights, or play games – it is about engaging in the process set out in the CI District Zoning Ordinance and Campus Master Plan for doing so. The Campus Master Plan clearly does not contemplate the proposed changes at its athletic field. The CI District Zoning ordinance is clear that where an improvement or project is not identified on a Campus Master Plan, the Plan Commission must approve the change. Thus, Edgewood should continue in the process it has already started to amend its Campus Master Plan.

---

4. It is worth noting that Edgewood did not seek City approval to install the new field grass or to increase the use of the field beyond physical education classes and team practices in conjunction with the installation of the new field grass.

March 21, 2019
Page 6

Sincerely,

John W. Strange

CITY-DEF-033168