## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

      Plaintiff,

      v.                                 Case No. 3:21-CV-118

CITY OF MADISON, WISCONSIN;
CITY OF MADISON ZONING BOARD
OF APPEALS; CITY OF MADISON
PLAN COMMISSION; and CITY OF
MADISON COMMON COUNCIL,

      Defendants.

---

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

Defendants City of Madison, Wisconsin, City of Madison Zoning Board of Appeals, City of Madison Plan Commission, and City of Madison Common Council (collectively "the City"), through their attorneys, Boardman & Clark LLP, submits the following proposed findings of fact in support of its motion for summary judgment:

**The Parties**

1.    Edgewood High School of the Sacred Heart, Inc. ("Edgewood") is a private Catholic college-preparatory high school located at 2219 Monroe Street in Madison, Wisconsin. Elliott Dep., dkt. #33, 19:2-9; Compl., ¶7.

2.    Edgewood High School shares a 55-acre campus on Lake Wingra with Edgewood College and Edgewood Campus School, which is a grade school. Zylstra Dec., Ex. A, Dep. Ex. 7, pages 18, 26 of 228; Elliott Dep., dkt. #33, 18:20 19:14.

3.      The City of Madison is a municipality in Dane County, Wisconsin.  Compl., ¶10; Answer, ¶10.

**The Creation of the Campus Institutional District Zoning**

4.      In 2007, the City of Madison began working on re-drafting portions of its Zoning Code.  Tucker Dec., ¶2.

5.      Edgewood High School, the University of Wisconsin and Madison College had approached the City about creating a better path for approval of their building expansions outside of the high stakes pass/fail process that was the conditional use process.  Tucker Dep., dkt. #32, 83:12 to 83:22, 85:6-85:9.

6.      Prior to the creation of the Campus Institutional District Zoning, whenever institutions like Edgewood High School, the University of Wisconsin and Madison College wanted to make changes to a building or outdoor open spaces such as adding a parking lot, the institution would need to prepare a detailed application.  Tucker Dec., ¶2.

7.      An application described in PFOF 6 would be reviewed by various internal departments at the City (depending on the project) and would then have to go before the City's Plan Commission at a public hearing.  Tucker Dec., ¶2.  Members of the public could attend those public hearings and speak out for or against the planned project after which, the City Plan Commission would vote on the proposed project.  Tucker Dec., ¶2.

8.      Edgewood High School, the University of Wisconsin and Madison College indicated to the City that the detail, expense, effort involved in preparing a conditional use application for a building that could be denied was relatively inequitable from their perspective and so they asked the City to help them create a better path for the evolution of their campuses. Tucker Dep., dkt. #32, 83:12 to 83:22, 85:6-85:9; Tucker Dec., ¶2.

9. On January 2, 2013, the City of Madison enacted M.G.O. § 28.097, creating the Campus-Institutional Districts. Tucker Dec., ¶2.

10. The statement of purpose of M.G.O. § 28.09 is identified in the ordinance itself and provides:

Statement of Purpose

The Cl District is established to recognize the City's major educational and medical institutions as important activity centers and traffic generators, accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards. The district is also intended to:

(a) Permit appropriate institutional growth within boundaries while minimizing the adverse impacts associated with development and geographic expansion.

(b) **Balance the ability of major institutions to change** and the public benefits derived from change **with the need to protect the livability and vitality of adjacent neighborhoods**.

(c) **Encourage the preparation of Campus Master Plans that enable adjacent neighborhoods and the broader community to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures**.

Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(1) (emphasis added); Tucker Dep., dkt. #32, 72:1-73:12; Zylstra Dec., Ex. C, Dep. Ex. 18; Evers Dep., dkt. #31, 104:1-9.

11. Campus master plans were voluntary for existing educational and medical institutions, but mandatory for any new education and medical institutions created after the passing of the ordinance. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(a).

12. For institutions adopting a campus master plan, the ordinance required that they identify a number of items, including submitting a facilities plan with existing conditions and proposed conditions for improvements. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(5)(c); Tucker Dep., dkt. #32, 72:1-73:12.

3

13.     The ordinance also provided that "The Common Council will approve or reject the Master Plan following a recommendation by the Plan Commission."  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(6).

14.     Further, the ordinance noted that approval of the master plan would be based in part on the plan's consistency with the goals of the City's Comprehensive Plan and adopted neighborhood, corridor or special area plans adjacent to campus boundaries.  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(6)(b).

15.     The Common Council's approval of a master plan had the effect of the master plan being an enacted ordinance of the City.  Tucker Dec., ¶3.

16.     The ordinance indicates that the master plan would be in effect for ten years. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(b); Tucker Dec., ¶3.

17.     Prior to the adoption of the Campus Institutional District Zoning, the property of the Edgewood campus was zoned residential. Tucker Dec., ¶6.

**Edgewood Voluntarily Submits a Master Plan**

18.     After Edgewood was rezoned from residential zoning to Campus Institutional District Zoning, Edgewood submitted a Campus Master Plan ("Master Plan") to the City of Madison on or about January 20, 2014.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 12 of 228; Hank Dep., dkt. #30,, dkt. #30, 82:1-9.

19.     Mike Elliot was the president of Edgewood High School at the time the Campus Institutional District Zoning was created and has been from July 2013 through today.  Elliot Dep. 12:13-14.  He was hired in March 2013.  Elliot Dep. 13:6-14.

20.     Elliott signed the Master Plan on behalf of the high school and by signing it, intended to abide by it.  Elliot Dep. 82:3-9.

21.     By letter dated April 22, 2014, the City informed Edgewood that the Common

Council had approved its submitted Master Plan, subject to conditions detailed in that letter.

Zylstra Dec., Ex. A, Dep. Ex. 7, page 6 of 228.

22.     The April 22, 2014 letter described in the prior PFOF  also provided that "[t]hese

conditions of approval shall be satisfied prior to the master plan taking effect and the issuance of

building permits for any of the projects contained in the plan[.]"  Zylstra Dec., Ex. A, Dep. Ex. 7,

page 6 of 228.  The letter continued and stated that after the Master Plan was revised to address

the conditions, Edgewood need to submit ten copies for review by the City's departmental staff

for their final approval prior to the master plan taking effect. Zylstra Dec., Ex. A, Dep. Ex. 7,

page 10 of 228.

23.     Edgewood's Master Plan did not become effective until November 6, 2015.

Tucker Dep., dkt. #32, 153:7-25.

24.     The City's letter to Edgewood dated April 22, 2014 stated:

"No alteration of an approved Campus Master Plan, ***including changes to the proposed
use of identified open space areas and other open space uses, shall be permitted unless
approved by the Plan Commission***, provided however, the Zoning Administrator may,
following consideration by the alderperson of the district, issue permits for minor
alterations that are approved by the Director of Planning and Community and Economic
Development and are consistent with the concept approved by the Common Council. If
the change or addition constitutes a substantial alteration of the original plan, the
procedure in Sec. 28.097(2) is required."

Zylstra Dec., Ex. A, Dep. Ex. 7, page 10 of 228 (emphasis added); Hank Dep., dkt. #30,, dkt.

#30, 82:1-9.  This language was nearly verbatim of the language of then M.G.O. §28.097(10).

Tucker Dec., ¶5.

25.     For institutions within the Campus Institutional District that did not adopt a

master plan, the construction of a new building or additions to existing buildings that exceeded

5

4,000 square feet in floor area on a zoning lot required conditional use approval.  Zylstra Dec.,
Ex. B, Dep. Ex. 13, §28.097(2)(c).

26.     The prior PFOF was not true for institutions that had approved master plans.  For
institutions that had approved master plans, for any project identified in their approved master
plan, the institution only needed to obtain approval of an architectural review committee. Zylstra
Dec., Ex. B, Dep. Ex. 13, §28.097(7); Tucker Dep., dkt. #32, 81:7-82:14.

27.     One benefit of the master plan process is that the projects identified in the master
plan were already approved as permitted with the architectural review committee reviewing
items like the height, design and materials of the construction.  Tucker Dep., dkt. #32, 81:7-
82:14.

28.     A benefit to the architectural review committee process for Edgewood was that in
the future it would not hold open meetings on its projects and would not need to seek the
approval of the two neighborhood associations.  Zylstra Dec., Ex. D, Dep. Ex. 55; Elliott Dep.,
dkt. #33, 100:6-101:18, 103:3-23.

29.     Edgewood's Campus Master Plan applied to the entire Edgewood campus, which
included three different entities—Edgewood College, Edgewood High School, and the grade
school.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 17-19 of 228; Elliott Dep., dkt. #33, 106:22-107:13.

30.     Edgewood High School owns the Open Space that is subject to this litigation.
Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228; Elliot Dep. 117:17-118:18.

31.     In Edgewood's Master Plan, it identified 22 different improvements that the
Edgewood Campus would make during the ten-year period of the Master Plan.  Elliott Dep., dkt.
#33, 673:12-74:10; Zylstra Dec., Ex. A, Dep. Ex. 7 at 36-39 of 228.

32.     The 22 projects identified in Edgewood's Master Plan were not limited to building improvements but included existing spaces, and included outdoor projects such as revising parking lots and adding three additional parking stalls.  Elliott Dep., dkt. #33, 74:6-75:22; Zylstra Dec., Ex. A, Dep. Ex. 7 at 38 of 228.

33.     With respect to the 22 different improvements identified in Edgewood's Master Plan, none involved improvements to an athletic field.  Elliott Dep., dkt. #33, 77:18-78:5; Zylstra Dec., Ex. A, Dep. Ex. 7 at 36-38 of 228.

34.     Under the City's Campus Institutional District Zoning Ordinance, Edgewood's Master Plan was required to include:

> (c) <u>Facilities Plan</u>.  Includes a description of existing conditions on the campus and the proposed conditions under the Master Plan, including:
>
> 1. <u>Existing Conditions.</u>
> a. ***Land uses*** and buildings.
> b. Building form (building type, height, bulk, etc.).
> c. Landmarks, historic sites and districts.
> d. Natural features and significant ***open-space areas***.
>
> 2. <u>Proposed Conditions</u>.
> a. Future needs/capital improvements.
> b. Phasing of proposed improvements.
> c. ***Future land uses*** and buildings.
> d. Building Form (building type, height, bulk, etc.).
> e. ***Landscape treatment***.
> f. ***Open-space areas and other open-space uses***.
> g. Relationship to transportation/access plan (parking, transportation demand management, etc.).

Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(5)(c) (emphasis added).

35.     Edgewood identified its Open Space in Section 3.8 of its Master Plan.  In terms of its athletic field under paragraph 1, Edgewood identified its use as "Athletic field owned by

Edgewood High School.  Used for team practices, physical education classes."  Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228.

**Active  Neighborhood Associations**

36.  In 2013, there were meetings between Edgewood and the Dudgeon-Monroe Neighborhood Association and the Vilas Neighborhood Association regarding Edgewood's Master Plan.  Elliott Dep., dkt. #33, 70:10-15.

37.  In 2013, the neighborhood associations and neighbors of Edgewood were active in monitoring Edgewood's growth and use of its space.  Elliott Dep., dkt. #33, 70:16-20.

38.  Elliott understood that based on his role with the Edgewood Neighborhood Liaison Committee, it was important for Edgewood to try and work with the neighbors and the neighborhood association on getting agreement as to the language in the Master Plan.  Elliott Dep., dkt. #33, 71:9-16.

39.  In 2013, Elliott was part of the neighborhood liaison committee where the issue of lighting was discussed.  Elliott Dep., dkt. #33, 91:10-14.

40.  The neighbors did not want lighting from Edgewood spilling into the neighborhood.  Elliott Dep., dkt. #33, 91:10-92:15.

41.  As part of Edgewood's Master Plan, there were a number of past agreements between Edgewood and the neighborhood associations that Edgewood reaffirmed and incorporated into its Master Plan.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 77 of 228; Elliott Dep., dkt. #33, 87:5-16.

42.  Some of those agreements referenced in the prior PFOF related specifically to lights and lighting.  Elliott Dep., dkt. #33, 87:5-90:11, Zylstra Dec., Ex. A, Dep. Ex. 7 at 78 of 228.

43.     Elliott was aware of noise being an issue that neighbors routinely raised with respect to changes to Edgewood's space during his time and Edgewood has occasionally received noise complaints from neighbors.  Elliott Dep., dkt. #33, 80:23-81:5.

44.     Elliott received and reviewed an earlier draft of Edgewood Campus's Master Plan that described number 1 under its Open Space as "Athletic field owned by Edgewood High School.  Used for team practices, physical educations classes, ***and other general light uses***." Elliott Dep., dkt. #33, 95:20-95:22 (emphasis added); Zylstra Dec., Ex. E, Dep. Ex. 54.  Elliott does not know who removed the language, "and other general light uses," from the final master plan or why it was removed.  Elliott Dep., dkt. #33, 96:4-97:6.

45.     Edgewood's Master Plan states: "The master plan process included internal planning and coordination among the three Edgewood schools, and a dynamic process of sharing information and discussion of issues with members of the two neighborhood associations as well as with the District 13 Alder, Sue Ellingson. The final master plan is the product of extensive engagement, collaboration and effort from all five entities." Zylstra Dec., Ex. A, Dep. Ex. 7 at 19 of 228; Hank Dep., dkt. #30, 82:1-9.

46.     Edgewood's Master Plan states: "Each campus institution, the surrounding neighborhoods and the Planning Department have reviewed the Campus Master Plan. It is an instrument of communication so that all stakeholders are aware of potential future developments on campus." Zylstra Dec., Ex. A, Dep. Ex. 7 at 16 of 228; Hank Dep., dkt. #30, 82:1-9.

47.     Edgewood's Master Plan states: "The Campus Master Plan will provide a basis for implementing development decisions so as to benefit all three institutions and the neighborhood by: . . . Providing solutions for mitigating neighborhood impacts of future

development and growth" Zylstra Dec., Ex. A, Dep. Ex. 7 at 16 of 228; Hank Dep., dkt. #30, 82:1-9.

48.     Edgewood's Master Plan states: "The residents of the city of Madison place high value on the established residential character of Dudgeon-Monroe and Vilas neighborhoods, and additionally place a very high value on the woods and other undeveloped areas that help characterize this unique area of the city. Edgewood shares these values. With our mutual vision of protection for our shared neighborhood and its natural resources, and in a spirit of collaboration, we proceeded to voice concerns, address issues and seek agreement." Zylstra Dec., Ex. A, Dep. Ex. 7 at 71 of 228; Hank Dep., dkt. #30, 82:1-9.

**$1.025 million Grant and the Wisconsin State Journal Article**

49.     In June of 2015, Edgewood High School announced that it had received a grant from the Goodman Foundation for $1.025 million to upgrade its track and field.  Elliott Dep., dkt. #33, 46:2-6, 117:17-118:23.

50.     Edgewood had started meeting with the Goodmans to try to secure the $1.025 million grant sometime in 2014.  Elliott Dep., dkt. #33, 118:24-120:6.

51.     A Wisconsin State Journal article dated June 15, 2015 states, "Elliott noted that one of the main benefits will be improvements in the practice facilities for the school's baseball and softball programs in the spring, when teams are forced to practice indoors. He added that the renovation will be a boon to all the students." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 115:22-117:21.  Elliott agrees that he expressed that sentiment to the reporter.  Elliott Dep., dkt. #33, 120:22-121:14.

52.     The Wisconsin State Journal article dated June 15, 2015 article quoted Elliott as saying, "We do require four years of physical education for both semesters, which is higher than

the national average and higher than the national requirement" and "This is a much-needed product for our students, to aid our physical education department and the athletic programs." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 121:15-122:20.  While Elliott does not recall if this was a quote he said, he agrees he expressed this sentiment.  Elliott Dep., dkt. #33, 121:15-122:20.

53.     The Wisconsin State Journal article dated June 15, 2015 article also stated, "In the past, Edgewood has provided its track-and-field facility to area parochial schools for practices and an annual meet — the only early track-and-field development experience for many grade-school students.  However, due to the deterioration of the track, the event has been held off-campus in recent years."  Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:4-22. Elliott expressed that sentiment to the reporter.  Elliott Dep., dkt. #33, 123:4-22.

54.     The Wisconsin State Journal article dated June 15, 2015 article noted, "According to Elliott, the project has received the support of area neighborhood groups that have balked in the past at the idea of turning the facility into a competition site for Edgewood's many athletic programs."  Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6.

55.     Elliott is quoted as saying, "We're between two neighborhood associations.  They have been vehemently opposed to us having lights or playing games here," he said. "We're really building this to be able to give our athletes the practice facilities that provide the best surfaces possible and to expand the amount of outdoor practices we can hold especially in the spring. That is our focal point."  Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6. While Elliott does not recall if this was a quote, he agrees he expressed this sentiment.  Elliott Dep., dkt. #33, 123:23-125:6.

56.    The Wisconsin State Journal article dated June 15, 2015 article uses the words "practice" or "practices" fourteen times.  Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 115:22-117:21.

**Edgewood Re-Affirms to Neighbors No Lighting and Field is for Practice**

57.    There was an Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015.  Schey Dec., ¶4, Ex. A.

58.    Maggie Balistreri-Clarke attended the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015 as the representative of Edgewood.  Schey Dec., ¶4, Ex. A.

59.    At the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015, Balistreri-Clarke provided an update as to Edgewood High School Construction, which is shown as #5 in the minutes attached as Exhibit a to the Schey declaration.  Schey Dec., ¶4, Ex. A.

60.    At the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015, Balistreri-Clarke indicated that as to the Edgewood High School Football Field, no additional lighting or seating would be installed. Schey Dec., ¶4, Ex. A.  She also confirmed that the football field would be a practice facility.  Schey Dec., ¶4, Ex. A.

61.    The two items in the prior PFOF are memorialized in the last two bullets under the High School Football Field heading in the minutes attached as Exhibit A to the Schey declaration.  Schey Dec., ¶4, Ex. A.

62.    After receiving news of the Goodman grant, Edgewood contacted the City to determine whether re-surfacing the existing track and field would require an amendment to its master plan.  Elliott Dep., dkt. #33, 128:21-129:19.

63.     The City told Edgewood that because it was simply exchanging the current track with a new track that the City would classify that as a replacement or a maintenance item which would allow Edgewood to complete the project without amending its master plan.  Elliott Dep., dkt. #33, 128:21-129:19.

64.     When resurfacing the track in 2015, Edgewood applied to the City for a permit to put PVC and conduit under the track for future lighting and communications.  Elliott Dep., dkt. #33, 132:5-10; Hank Dep., dkt. #30, 88:24-89:11; Tucker Dep., dkt. #32, 168:20-170:10.

65.     Edgewood was not intending or planning to put in lights at that time it applied for a permit for the PVC and conduit in 2015 because the technology was not there, but Edgewood hoped to install lights in the future.  Elliott Dep., dkt. #33, 124:18-126:10.

66.     It made financial sense for Edgewood to put the PVC and conduit that at the time the field was being resurfaced because otherwise, Edgewood would have had to dig up the field in the future to install the conduit.  Elliott Dep., dkt. #33, 132:24-133:4.

67.     In 2015 when it was resurfacing its track and field, Edgewood did not know if the technology for lighting would be available one year in the future, five years in the future or ten years in the future.  Elliott Dep., dkt. #33, 125:19-126:10.

68.     Elliott is not aware of any conversations occurring in 2015 with the City about when in the future Edgewood would put in lights or communications.  Elliott Dep., dkt. #33, 132:11-23.

**Increase in Games and Request for a Stadium**

69.     Following the track upgrades, Elliott admits that there was an increase in games on the athletic field that coincided with the improvements that occurred in 2015.  Elliott Dep., dkt. #33, 154:18-21.

70.     On May 10, 2016, Edgewood discussed with the neighborhood liaison committee the idea of adding seating and lights for its athletic field.  Elliott Dep., dkt. #33, 138:7-139:11; Zylstra Dec., Ex. G, Dep. Ex. 59.

71.     Neighbors and the liaison committee has raised field usage, traffic, parking, lights, and sound as concerns at some listening sessions Edgewood had held.  Elliott Dep., dkt. #33, 140:23-141:18.

**Edgewood's 1996 History with the Neighbors**

72.     Historically, going back as far as 1996, the neighborhood association has been opposed to Edgewood adding lighting and a sound system to its athletic field.  Schey Dec., ¶¶6-7, Exs. B & C.

73.     In 1996, Edgewood proposed to the neighborhood association a conditional use plan whereby Edgewood wanted to add lights, a sound system, and a grandstand to its athletic field.  Schey Dec., ¶6, Ex. C.  It also proposed a permanent structure for its athletic complex. Schey Dec., ¶6, Ex. C.

74.     The Dudgeon Monroe Neighborhood Association Council adopted a resolution endorsing the majority vote of the neighbors taken at a meeting on July 18, 1996.  Schey Dec., ¶6, Ex. C.  The association indicated to Edgewood that based on that vote, it would not support adding lights or a new sound system to its athletic field.  It also indicated that it would not support a larger grandstand but would support 300 bleacher seats.  Schey Dec., ¶6, Ex. C.

75.     Following the August 14, 1996 meeting of the neighborhood association, Edgewood revised its conditional use application with the City and removed all lights, the sound system and the larger grandstand.  Schey Dec., ¶7.

**Edgewood Reminded that Current Master Plan Does Not Allow Lights**

76.     In and around March of 2017, Elliott had a meeting with then Zoning Administrator Matthew Tucker about Edgewood's desire to move forward with a modified stadium.  Zylstra Dec., Ex. H, Dep. Ex. 72; Tucker Dec., ¶7; Elliott Dep., dkt. #33, 186:25-188:4.

77.     In regards to the meeting in the prior PFOF, Elliot wrote in an email that the City did "not feel the current master plan would let us proceed with a modified stadium.  Night use is the issue and it is in their mind a new or different usage. They [recommend] we continue to work with neighbors for an agreement."  Zylstra Dec., Ex. H, Dep. Ex. 72; Elliot Dep. 186:25-188:4; Tucker Dec., ¶7.  Tucker suggested Elliott work with the neighbors to try to come to agreement to mitigate the sound and noise associated with night games.  Tucker Dec., ¶7.

78.     In July of 2018, Elliott emailed then Alder Sara Eskrich, asking her to sign off on a minor amendment to the master plan so that Edgewood could hold an October 5 senior night football game with temporary lights and seating on its athletic field.  Zylstra Dec., Ex. I, Dep. Ex. 61; Elliott Dep., dkt. #33, 142:11-145:15.

79.     Alder Eskrich responded to the email in the prior PFOF stating that for a temporary game, Elliott should reach out to City staff but she could not sign off on the stadium lights as a minor alteration "because we've discussed very publicly that this requires a master plan amendment."  Zylstra Dec., Ex. I, Dep. Ex. 61; Elliott Dep., dkt. #33, 142:11-145:15.

80.     Elliott did not think he did, but he does not recall if he reached out to City staff as to a temporary game.  Elliott Dep., dkt. #33, 146:2-9.

81.     On October 17, 2018, Zoning Administrator Matt Tucker attended a neighborhood meeting at which there was discussion of Edgewood's proposal to add seating, lights and a sound system to its athletic field.  Tucker Dec., ¶8.

**Tucker Learns of Field Use**

82.     Edgewood presented its proposal at the October 17, 2018 meeting and described its current use of its athletic field.  Tucker Dec., ¶8.

83.     Following the October 17, 2018 meeting, Tucker sent an email to Elliott and Brian Munson, a consultant working with Edgewood.  Zylstra Dec., Ex. J, Dep. Ex. 64; Elliott Dep., dkt. #33, 156:13-24.  Tucker wrote:

> After the neighborhood meeting of Wednesday October 17, I became aware of the extensive use of the athletic field at the northwest corner of the site.  I also closely reviewed the adopted Master Plan, to determine how language in the master plan relates to the athletic field usage.  Specifically, in the "Open Space Plan" (section 3.8) the approve master plan identifies the athletics field to be used for "team practices, physical education practices."  The lack of any further language in this section, or any other language in sections of the adopted Master Plan, leads me to the interpretation that current programing and usage of the field is operating outside of the allowances of the adopted Master Plan.
>
> If you wish to continue the current level of programming on the field for 2019 and beyond, I believe that you will need to pursue an amendment to the approved Master Plan.  I would be happy to talk with you, Alder Arntsen, and the neighborhood liaison committee, should you choose to explore a Master Plan amendment to expand the use of the athletic field.  If you decide to continue with the current idea for a stadium expansion at the athletic field, you will also need to include language in this amendment that would incorporate allowing the current level of usage of the field to be allowable and continue.

Zylstra Dec., Ex. J, Dep. Ex. 64; Elliott Dep., dkt. #33, 156:13-24, 159:8-160:7; Tucker Dec., ¶9.

84.     Tucker did not include any neighbors or the neighborhood associations on his October 17, 2018 email to Edgewood but simply noted the issue for Edgewood.  Zylstra Dec., Ex. J, Dep. Ex. 64; Elliot Dep., 160:8-11; Tucker Dec., ¶9.

**Edgewood Files an Application to Amend its Master Plan**

85.     On November 14, 2018, Edgewood filed an application to amend its Master Plan to incorporate lighting, expand seating, add restrooms, team rooms, and storage and define its field use.  Zylstra Dec., Ex. K, Dep. Ex. 62; Elliott Dep., dkt. #33, 149:10- 151:20; Tucker Dec., ¶10.

86.     On November 14, 2018, Edgewood's then counsel, Katherine Rist, wrote to Mr. Tucker in response to his October 26 email.  Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep., dkt. #33, 161:23-162:23.

87.     Attorney Rist stated in her November 14, 2018 letter that to the extent Edgewood's Master Plan may be interpreted in a way which does not expressly permit athletic competition games, Edgewood's position was that such use is a legal nonconforming use. Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep., dkt. #33, 161:23-163:5.

88.     On November 20, 2018, Mr. Tucker responded to Atty. Rist by letter indicating that he disagreed with Edgewood's position that it established a legal nonconforming use. Zylstra Dec., Ex. M, Dep. Ex. 66; Tucker Dec., ¶11.

89.     Tucker also stated in his November 20, 2018 letter that he was aware that Edgewood had filed an amendment to its master plan that, if approved, would allow use of the athletic field for games  would make the issue moot and that in such instances, the City's internal policy is to suspend enforcement pending the result of the application for amendment.  Zylstra Dec., Ex. M, Dep. Ex. 66; Elliott Dep., dkt. #33, 164:4-165:7; Tucker Dec., ¶11.

90.     Tucker also indicated in that November 20, 2018 letter that if the amendment was denied, "then the City will send a formal notice of violation, and at that time we can discuss how Edgewood wishes to proceed."  Zylstra Dec., Ex. M, Dep. Ex. 66; Tucker Dec., ¶11.

**Edgewood Submits First Lighting Application for Night Games**

91.     On Friday, February 22, 2019, Edgewood submitted an application with the City for outdoor lighting of its athletic field.  This was a surprise to the City as Edgewood had submitted a master plan amendment. Zylstra Dec., Ex. N, Dep. Ex. 37; Tucker Dep., dkt. #32, 64:25-66:20, 52:13-54:22.

92.     The following Wednesday, on February 27, 2019, Mr. Tucker wrote a letter to Elliott:

> On Friday, February 22, the Building Inspection Division accepted a lighting plan filed by Forward Electric on behalf of Edgewood High School, to install lighting for the school's field. Those plans will be reviewed for compliance with MOO Section 10.085, and if the plans comply, electrical permits will be issued when requested.
>
> The City believes this permit can be issued without requiring amendment of the approved 2014 Master Plan. However, over the past weekend, I received a copy of the letter sent to "Edgewood Family" and a "Frequently Asked Questions" document relating to the institutions' present interest to install lights and an amplified sound system at the field (copy attached). These letters indicate that Edgewood intends to use the lights and sound system to host night games at the facility.
>
> Based on the information the City currently has regarding the historical use of the facility, it would appear that the intended use of the facility as outlined in your letter to the "Edgewood Family" and detailed in the "Frequently Asked Questions" document would conflict with the approved 2014 Master Plan for the site, which limits use of the facility to "team practices, physical education classes" (Page 42, Section 3.8, Open Spaces Plan).
>
> The purpose of this letter is to inform you that the issuance of any lighting permit under MGO sec. 10.085 does not change the City's position that the use of the facility under the master plan is limited to "team practices, physical education classes."

Zylstra Dec., Ex. O, Dep. Ex. 6;Tucker Dep., dkt. #32, 53:22-54:22.

93.     The attachment to which Tucker referred in the prior PFOF contained a letter that Elliott wrote to the "Edgewood Family" and included a "Frequently Asked Questions" document

in which Edgewood indicated that if it would host night games at its athletic field if the City issued the lighting permit.  Zylstra Dec., Ex. O, Dep. Ex. 6 at 3, 5; Elliott Dep., dkt. #33, 171:12-172:2, 174:23-175:16.

94.     The attachment referred to in PFOF 91 indicated that Edgewood was tabling the application to amend its Master Plan that Edgewood filed with the City.  Zylstra Dec., Ex. O, Dep. Ex. 6 at 3; Elliott Dep., dkt. #33, 171:12-172:2.

95.     On February 27, 2019, Edgewood's lighting application was stamped "approved" by Building Inspector Steve Rewey with the City as to the lighting review.  Hank Dep., dkt. #30, 24:17-24, 33: 2-18; Zylstra Dec., Ex. P, Dep. Ex. 3.

96.     Shortly after Tucker sent his February 27, 2019 letter, Tucker met with his supervisor, George Hank, and Assistant City Attorney, John Strange.  Hank Dep., dkt. #30, 38:18-24; Tucker Dep., dkt. #32, 45:24-48:24, 51:2-54:22.

97.     Hank decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b).  Tucker Dep., dkt. #32, 44:23-48:3.

98.     M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection."  Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12.

99.     Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application.  Tucker Dep., dkt. #32, 46:18-48:3.

100. M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3.

101. Hank was concerned about allowing Edgewood to make a large capital expenditure to install lighting when the City was contending that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

102. On March 12, 2019, Edgewood's counsel, Attorney Nathan Wautier wrote to the City regarding Edgewood's lighting application and objecting to the City's decision not to issue the lighting permit. Zylstra Dec., Ex. R, Dep. Ex. 70; Elliott Dep., dkt. #33, 178:22-179:12.

103. Assistant City Attorney John Strange responded to Atty. Wautier by letter dated March 21, 2019. Zylstra Dec., Ex. S, Dep. Ex. 71; Elliott Dep., dkt. #33, 180:6-11, 184:16-18.

104. Atty. Strange wrote in his March 21, 2019 letter, "In addition, because the lights are part and parcel of a plan to conduct athletic contests at night, neither the lights nor the athletic contests are in compliance with the campus master plan." Zylstra Dec., Ex. S, Dep. Ex. 71 at 1; Elliott Dep., dkt. #33, 184:16-18.

105. Atty. Strange wrote in his March 21, 2019 letter, "The stadium lights are capital improvements that were required to be shown in the Campus Master Plan by M.G.O. § 28.097(5)(c)2 in order to be constructed without Plan Commission approval" and "Since the stadium lights are neither shown on nor mentioned in the campus master plan, the campus master plan must be amended per MGO Section 28.097(10)." Zylstra Dec., Ex. S, Dep. Ex. 71 at 4; Elliott Dep., dkt. #33, 184:16-18.

106. Atty. Strange wrote in his March 21, 2019 letter, "To that end, as shown above, Edgewood's application was never in compliance with zoning at the time its lighting application

was filed because the lights were not identified as improvements at the athletic field and therefore are simply not allowed absent additional Plan Commission approval." Zylstra Dec., Ex. S, Dep. Ex. 71 at 4; Elliott Dep., dkt. #33, 184:16-18.

**City Receives Complaints About Edgewood Violating Master Plan**

107.    In late March 2019, neighbors near Edgewood contacted the City and complained that Edgewood was holding competitive games on its field in violation of its master plan. Tucker Dec., ¶13.

108.    The City sent an inspector to observe and after he witnessed athletic contests being held on Edgewood's field, the inspector issued Official Notices of Violation to Edgewood. Tucker Dec., ¶13; Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.

109.    The notices referenced in the prior PFOF instructed Edgewood to "[d]iscontinue holding athletic contests on the athletic field at 2219 Monroe Street" and noted that "The Campus Master Plan states that the athletic field is used for team practices and physical education classes. The Master Plan can be amended pursuant to MGO 28.097(10). Edgewood could accomplish this by proceeding with the Campus Master Plan amendment application currently on file with the Planning Division." Zylstra Dec., Ex. T, Dep. Exs. 9 and 11; Tucker Dec., ¶13.

110.    Notices of Violations are warnings. Tucker Dep., dkt. #32, 17:17-25; Tucker Dec., ¶13.

111.    The City did not issue a citation or fine Edgewood. Tucker Dec., ¶13.

112.    Edgewood appealed the Official Notice of Violations to the Zoning Board of Appeals ("ZBA"). Zylstra Dec., Ex. U, Dep. Ex. 74; Elliott Dep., dkt. #33, 196:15-197:9; Tucker Dec., ¶14.

113.    While its appeal to the ZBA was in progress, Edgewood was still meeting with the neighborhood association to try and come up to some resolution with regard to use of its field.  Elliot Dep. 196:15-197:14.

114.    Edgewood agreed not to move forward with its lights while it was still meeting with the neighborhood association and was still making progress.  Elliott Dep., dkt. #33, 200:25-17.

115.    Edgewood did not move forward to install lights from the time of Tucker's February 27, 2019 letter to the present.  Elliott Dep., dkt. #33, 186:5-10.

**Zoning Board of Appeals Hearing on the Violation Notices Causes Ordinance Amendment**

116.    The Zoning Board of Appeals held a public hearing on Edgewood's appeal of the Notices of Violation on July 11, 2019.  Tucker Dec., ¶14; Zylstra Dec., Ex. V, Dep. Ex. 76.

117.    At the July 11, 2019 hearing, Nathan Wautier, an attorney for Edgewood, argued that if one of the high schools without a master plan wanted to build a correctional facility, they would be allowed to do that as a matter of right under the then-current zoning code because a correctional facility was an identified secondary use.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 90:19-91:22, 87:14-25.

118.    At the July 11, 2019 hearing, Assistant City Attorney John Strange also told the Plan Commission that under Edgewood's argument, Edgewood could turn the Oaks, a green space on Campus with heritage trees, into a cornfield without Plan Commission approval because agricultural use is an allowable use under the ordinance.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 74:3-9; Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228.

119.    The Zoning Board of Appeals voted unanimously to affirm the decision of the Zoning Administrator.  Elliott Dep., dkt. #33, 203:11-15; Tucker Dec., ¶14.

120.     The Zoning Board's vote was a determination that Edgewood was required to amend its master plan to play competitive games on its athletic field.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 224-225, 246-247; Tucker Dec., ¶14.

121.     Edgewood never appealed the decision of the Zoning Board of Appeals.  Tucker Dec., ¶14.

122.     On July 12, 2019, then City Attorney Michael P. May wrote a letter to Edgewood's counsel.  Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

123.     Atty. May informed Edgewood that after ZBA denied Edgewood's appeal, further enforcement related to the Official Notices rested within the discretion of the City Attorney. Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

124.     Atty. May indicated in his July 12, 2019 letter that he would take no further enforcement steps unless and until he provided Edgewood ample notice.  Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

125.     Because Edgewood's entry of the master plan was voluntary, Atty. May invited Edgewood to file to terminate its Master Plan and return to the standard Campus Institutional Zoning.  Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶16.

126.     The restriction on Edgewood playing athletic contests on its field was due to the language in Edgewood's Master Plan.  Tucker Dec., ¶16.  If the Master Plan were repealed, Edgewood would be permitted to play athletic contests on its field pursuant to M.G.O. §28.097. Tucker Dec., ¶16.

127.     On July 29, 2019, Edgewood's counsel sent a letter to the Mayor, stating "Please accept this letter as the Edgewood school's formal request and consent for the mayor to sponsor

an ordinance for immediate repeal of ORD-14-00082 which established [Edgewood's] ten-year campus master plan." Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep., dkt. #33, 205:3-206:9.

128.   Elliott understood that because its Master Plan was enacted as an ordinance, that another ordinance has to enacted to repeal it. Elliott Dep., dkt. #33, 206:6-17.

**Flaw in Ordinance Discovered**

129.   Alder Evers began having conversations with Assistant City Attorney John Strange following the ZBA hearing, where, according to Evers, "it became apparent that there was a flaw in the ordinance." Evers Dep., dkt. #31,, dkt. #31, 82:23-83:15, 87:10-18.

130.   Alder Evers wanted "to address a flaw that would allow a landowner to proceed with a significant change of use that would be in contrast with the explicit Statement of Purpose as articulated in the Campus-Institutional District." Evers Dep., dkt. #31, 91:3-9.

131.   Evers testified:

Q. So the potential for lights at Edgewood, a potential for a stadium, is what motivated your amendment; is that right?

MS. ZYLSTRA: Objection. Form. You can answer.

A. What motivated my amendment was a desire to update the amendment so that the flaws that had been identified, that institutions without a master plan would be able to make substantial use -- substantial changes to their use without addressing the potential for adverse impacts or addressing the issue of livability or vitality of adjacent neighbors. So while the Edgewood debate pointed to these flaws, the purpose of the amendment was to address a change in this so that institutions across -- who are in the Campus-Institutional District would abide by the intent of the ordinance itself.

Q. But it was the Edgewood incident, specifically, and the ongoing issues with that stadium that highlighted for you the need for this change; is that right?

A. I don't know, Jonathan, if that's entirely accurate, because it -- I don't know if you read the transcript of the ZBA hearing, but it was suggested that an institution within

24

the CI District could use their open space to have a correctional facility.  So, in effect, a high school could be converted into a prison or that -- you know, that farming could take place. And this was considered by everybody present to be somewhat inscrutable and inconsistent with the Campus-Institutional District ordinance itself.  So while the debate around Edgewood pointed to one example, there was one of several potential issues that could come forth.

Evers Dep., dkt. #31, 92:14-93:23.

132.    Alder Evers testified:

Q. What impact, if any, did you intend your  amendment have on Edgewood's ability to obtain lights for its field?

MS. ZYLSTRA: Object to form. You can answer.

A. The purpose of the amendment was to address the flaw in the Campus-Institutional District, as it was originally written and published into law in 2013, that provided a loophole of sorts for campus institutions without a master plan to make substantial changes to their use without considering the potential for adverse impacts affecting the livability and vitality of adjacent neighborhoods.

Evers Dep., dkt. #31, 97:11-22.

133.    Alder Evers also testified:

Q. You are not aware of any other actual controversy involving a Campus-Institutional zone district that highlighted this issue; is that correct?

A. Not entirely so, because there were --there were residents in district -- in the District 5 aldermanic district where West High School, where there was some concern.  This came up during the campaign. There was apparently a move that said, well, West High should be able -- should put up lights and have a stadium, which obviously would have been opposed by nearby neighbors.

Evers Dep., dkt. #31, 94:9-18.

134.    Alder Evers asked Attorney Strange what could be done to fix the flaws in the ordinance, not being an expert in these matters.  Evers Dep., dkt. #31, 87:19-23.  Strange indicated that the ordinance could be amended and Alder Evers asked Strange to draft an amendment.  Evers Dep., dkt. #31, 87:19-88:5.

135.    Evers asked Strange to draft an amendment to the Campus Institutional District

Zooning in the first week of August of 2019.  Evers Dep., dkt. #31, 89:16-19.

**Amendment to Campus Institutional Zoning Ordinance**

136.    Assistant City Attorney John strange drafted an amendment to the Campus

Institutional District Zoning Ordinance.  Evers Dep., dkt. #31, 87:19-88:5, 106:13-22; Zylstra

Dec., Ex. C, Dep. Ex. 18 at 6.

137.    The Drafter's Analysis states in part:

> DRAFTER'S ANALYSIS: As currently written, on any parcel zoned in the Campus-
> Institutional (CI) District without a campus master plan, primary and secondary uses
> are allowed subject to conditional use requirements only upon the construction of a
> building that creates greater than 4,000 square feet of floor area, which the Zoning
> Code defines as "area under the roof of a building."  Primary and secondary uses that
> do not require the construction of a building (e.g., occur outside an enclosed building)
> are, thus, permitted without conditional use review.  Uses in the Cl District that may
> not require the construction of a building (including outdoor sports and recreational
> facilities, surface parking, utilities and transportation facilities, other uses related to
> the institution's primary mission, open stadiums, auditoriums and arenas, and
> agricultural uses) often require conditional use review in other city zoning districts,
> including residential and mixed-use and commercial districts. ***The purpose of this
> ordinance is therefore to treat uses that occur outside of an enclosed building in a
> Cl District like the same or similar uses in other zoning districts.***  This ordinance
> retains the requirement that the construction of new buildings or additions to existing
> buildings exceeding 4,000 square feet in floor area require conditional use approval.
> It then states that conditional use is always required for the establishment,
> improvement, or modification of any use occurring outside of an enclosed building.
> Finally, this ordinance clarifies that secondary uses in a Cl District must be
> predominantly used in a  manner that is directly related and complementary to the
> institution's primary uses.

Zylstra Dec., Ex. C, Dep. Ex. 18 at 6 (emphasis added); Evers Dep., dkt. #31, 104:1-9.

**Plan Commission Hearing on Edgewood Repeal and Proposed Amendment**

138.    On August 26, 2019, the City's Plan Commission held a public hearing.  Zylstra

Dec., Ex. Y, Dep. Ex. 25; Evers Dep., dkt. #31, 141:3-9.

139.    Two of the items on the Commission's agenda for the August 26, 2019 hearing were the ordinance for Edgewood to repeal its Master Plan (Legistar # 56839) and the change being proposed to M.G.O §28.097, the Campus Institutional District Zoning (Legistar # 56981). Zylstra Dec., Ex. Y, Dep. Ex. 25 at 7; Evers Dep., dkt. #31, 141:3-9.

140.    The amendment to the Campus Institutional District Zoning was re-referred to public hearing to the Plan Commission to be returned by September 16, 2019.  Evers Dep., dkt. #31, 142:2-10.  To "re-refer" a matter to a public hearing to the Plan Commission means that matter would come back to the Plan Commission for further discussion to get questions answered from staff on specific subjects.  Evers Dep., dkt. #31, 142:11-17.

**Plan Commission Re-Refers Edgewood Repeal Because of Questions**

141.    The Plan Commission recommended re-referral of the Edgewood repeal matter to the Common Council due back on the September 16, 2019 Plan Commission agenda.  Evers Dep., dkt. #31, 142:18-143:5; Parks Dec., ¶3.

142.    The Plan Commission meeting minutes state, "In recommending referral [of the Edgewood repeal matter], members of the Plan Commission requested more information [from City staff] on the impacts of repeal, the relationship between repealing the master plan and the proposed changes to the CI zoning district, ID 56981, and the status of the agreements that govern the property before the property was zoned CI."  Zylstra Dec., Ex. Y, Dep. Ex. 25 at 7; Evers Dep., dkt. #31, 141:3-9.

143.    Edgewood's Master Plan had incorporated prior agreements between Edgewood and the neighborhood association.  Elliott Dep., dkt. #33, 238:1-15; *see, e.g.*, Zylstra Dec., Ex. A, Dep. Ex. 7 at 73-80 and 47 of 228.

144.    The Plan Commission questioned at the August 26, 2019 hearing what would happen to those agreements referenced in the prior PFOF with a repeal of the master plan.  Parks Dec., ¶3.

145.    Atty. Strange wrote a memo to the Plan Commission dated August 26, 2019, to address the effects of Plan Commission Action on Legistar Items 56981 (the proposed ordinance change) and 56839 (the repeal item) and specifically, the effect if both matters passed at the same time.  Zylstra Dec., Ex. Z, Dep. Ex. 24; Parks Dec., ¶2.

146.    Atty. Strange wrote, "If both Legistar items are approved by the Common Council on September 3, the practical impact on the ongoing athletic field issue is that Edgewood would be allowed to play games on its existing field but any improvement or modification to that field will require conditional use approval regardless of whether such improvement or modification requires the construction of a building or an increase in zoning lot area."  Zylstra Dec., Ex. Z, Dep. Ex. 24 at 3; Parks Dec., ¶2.

147.    At a meeting on September 3, 2019, the Common Council took up a motion by Alder Bidar to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting.  Tucker Dec., ¶17.

148.    At a meeting on September 3, 2019 of the Common Council, three Plan Commission members—Alders Heck, Rummel and Lemmer—who were also on the Common Council spoke in favor of re-referring the Edgewood repeal matter to its October meeting "giving a number of different reasons why they thought that would be in order."  Evers Dep., dkt. #31, 149:2-12; Parks Dec., ¶4; Tucker Dec., ¶17.

149.    The Common Council voted to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting, which was the next meeting after the September 16 meeting.  Evers Dep., dkt. #31, 151:2-7; Parks Dec., ¶4; Tucker Dec., ¶17.

**Amendment to CI Ordinance Passes & Edgewood Second Lighting Application**

150.    The amendment to the Campus Institutional District Zoning continued and was considered by the Plan Commission on September 16.  Zylstra Dec., Ex. AA, Dep. Ex. 26; Evers Dep., dkt. #31, 144:9-145:4.

151.    On September 16, 2019, the Plan Commission voted to recommend that the Common Council consider the change to the Campus Institutional District Zoning.  Zylstra Dec., Ex. AA, Dep. Ex. 26 at 6; Evers Dep., dkt. #31, 144:9-145:4.

152.    The amendment was sponsored by 13 of the 20 Common Council Alders:  Tag Evers, Syed Abbas, Shiva Bidar, Grant Foster, Keith Furman, Patrick W. Heck, Zachary Henak, Rebecca Kemble, Lindsay Lemmer, Donna V. Moreland, Michael E. Verveer, Christian A. Albouras and Marsha A. Rummel.  Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.

153.    On September 30, 2019, Edgewood submitted a second lighting application for lights on its athletic field.  Zylstra Dec., Ex. BB, Dep. Ex. 5; Tucker Dec., ¶18.

154.    Because Edgewood's Master Plan was still in place, the City denied Edgewood's September 30 lighting permit.  Elliott Dep., dkt. #33, 238:21-239:18; Zylstra Dec., Ex. CC, Dep. Ex. 84; Tucker Dep., dkt. #32,, dkt. #32, 140:13-142:13; Tucker Dec., ¶18.

155.    On October 1, 2019, the Common Council voted to amend the Campus Institutional Zoning Ordinance found in M.G.O. §28.097.  Tucker Dep., dkt. #32, 203:1-9; Zylstra Dec., Ex. C, Dep. Ex. 18; Tucker Dec., ¶19.

156.    The amendment to the Campus Institutional District Ordinance provided that: (1) in a Campus-Institutional District without a Campus Master Plan, the construction of a new building or additions to existing buildings that exceed four thousand (4,000) square feet in floor area on a zoning lot within any five (5) year period shall require conditional use approval; and (2) in a Campus-Institutional District without a Campus Master Plan, the establishment, improvement, or modification of any primary or secondary use occurring outside of an enclosed building shall require conditional use approval but the Zoning Administrator may issue permits to repair or replace any existing facility related to a primary or secondary use provided that the proposed facility is of a similar bulk condition and at a similar location on the zoning lot as with the existing facility.  Zylstra Dec., Ex. C, Dep. Ex. 18 at 4; Tucker Dec., ¶19.

157.    On October 28, 2019, City staff Timothy Parks filed a staff report with the Plan Commission addressing the questions members raised at the August 26, 2019 Plan Commission meeting related to the Edgewood repeal matter.  Zylstra Dec., Ex. DD, Dep. Ex. 83; Parks Dec., ¶5.

**Edgewood Seeks Delay of Repeal of its Master Plan**

158.    In October and November 2019, Edgewood requested that the vote on the repeal of Edgewood's master plan be referred to later Plan Commission meetings.  Elliott Dep., dkt. #33,, dkt. #33, 235:17-236:17; Zylstra Dec., Ex. EE, Dep. Exs. 81 and 82.

159.    On December 9, 2019, the repeal of Edgewood's Master Plan came before the Plan Commission.  Elliott Dep., dkt. #33, 245:21-24; Parks Dec., ¶6.

160.    The Plan Commission voted that the Edgewood repeal ordinance be "placed on file."  Parks Dec., ¶6.  "Placed on file" means that the applicant could come back to the Plan

Commission at a later date and renew the request, potentially addressing any issue or concerns that the Plan Commission members raised.  Parks Dec., ¶6.

161.    The City's Legistar notes indicated that "[i]n recommending that the repeal be placed on file, members of the Plan Commission who voted in favor of the motion to place on file did not feel that the repeal met the standard for map amendments based on public health, safety, and welfare."  Parks Dec., ¶6.

**Common Council Votes to Repeal Edgewood's Master Plan**

162.    On January 7, 2020, the Common Council took up the Edgewood repeal ordinance.  Parks Dec., ¶7.

163.    The Common Council did not place the Edgewood repeal ordinance on file as the Plan Commission recommended but instead, voted 15 in favor of repeal of the master plan, 4 against, and with one non-voting member.  Elliott Dep., dkt. #33, 246:21-247:5; Parks Dec., ¶7.

164.    Elliott was pleased with the vote by the Common Council in favor of repealing Edgewood's Master Plan.  Elliott Dep., dkt. #33, 247:8-12, 247:24-248:12; Zylstra Dec., Ex. FF, Dep. Ex. 86.

**Edgewood Files Conditional Use Application for Stadium Lights**

165.    On March 11, 2020, Edgewood filed a conditional use application for outdoor lighting of its athletic field.  Elliott Dep., dkt. #33, 249:2-250:9; Zylstra Dec., Ex. GG, Dep. Ex. 87; Parks Dec. ¶8.

166.    Edgewood was proposing in its conditional use application construction and installation of either four 80-foot light poles or four 68-foot light poles.  Elliott Dep., dkt. #33, 250:2-14; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8077; Parks Dec., ¶8.

167.    Edgewood's conditional use application for outdoor lighting of its athletic field went before the Plan Commission of May 11, 2020.  Parks Dec., ¶9.

168.    Tim Parks prepared a staff report, dated May 11, 2020, for the Plan Commission. Parks Dec., ¶9.  A link to the May 11, 2020 Plan Commission  meeting is here: https://media.cityofmadison.com/mediasite/Showcase/madison-city-channel/Presentation/95ac2fc624f04a65b8ea74ac63ffcda31d/Channel/9087c9eda40246be9fac2783773f09f54d. Evers Dec., ¶2.

169.    A summary of staff's recommendation in the May 11, 2020 report states: "The Planning Division believes that the Plan Commission *can* find the standards for conditional use approval met to approve the installation of lights for the Goodman Athletic Complex at Edgewood High School at 2219 Monroe Street *subject to the recommended conditions* of approval beginning on page 8 of this report *and input at the public hearing*."  Parks Dec., ¶9; Zylstra Dec., Ex. HH, Dep. Ex. 33 at 1 (emphasis added).

170.    City staff did not find that the conditional use standards *were* met by Edgewood but only that the Plan Commission *could* determine they were met after consideration of the input from the public hearing. Parks Dec., ¶9; Zylstra Dec., Ex. HH, Dep. Ex. 33 at 1.

**Plan Commission Votes to Place Edgewood's Application on File Without Prejudice**

171.    At the May 11, 2020 Plan Commission meeting, the Plan Commission found the standards for conditional use were not met and placed the conditional use on file without prejudice.  Elliott Dep., dkt. #33, 250:15-251:11; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071; Parks Dec., ¶10.

172.    The Plan Commission notes state:  "[t]he Plan Commission could not find standard number 3 met finding that the lights would have a substantial negative impact on the

uses, values, and enjoyment of surrounding properties and that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera." Elliott Dep., dkt. #33, 250:15-251:11; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071; Zylstra Dec., Ex. II, Dep. Ex. 89; Parks Dec., ¶10.

173.    The notes in Legistar of the Plan Commission meeting indicated, "Members indicated they would be open to considering the request again.  (When it addresses the noise impacts) was presented by the applicant, including improved engagement with the neighborhoods and a limit to the number of games with lights."  Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071; Parks Dec., ¶10; Elliott Dep., dkt. #33,251:22-252:9.

174.    On May 21, 2020, Edgewood appealed the decision of the Plan Commission on its conditional use application.  Elliott Dep., dkt. #33, 255:14-18; Zylstra Dec., Ex. JJ, Dep. Ex. 90; Parks Dec., ¶12.

**Based on Substantial Evidence, Common Council Upholds Plan Commission Decision**

175.    Edgewood's appeal of its conditional use application came before the Common Council on January 19, 2021.  Parks Dec., ¶12.  A link to the January 19, 2021 Common Council meeting is here:  https://media.cityofmadison.com/mediasite/Showcase/madison-city-channel/Presentation/c3bdf04924f2446cad9f4a1bc2d6cdc11d/Channel/d29c91089bda40e7bb0fba20311ff0754d.  Evers Dec., ¶8.

176.    In a memo to the Common Council, Assistant City Attorney stated that at the Plan Commission hearing, Edgewood proposed that games be naturally limited to the total number required for Edgewood related teams. However, Plan Commissioners pointed out that this was not actually a defined limit as suggested by the Staff Report.  Evers Dec., Ex. D, at CITY-DEF

51975. The Common Council voted 13-4 to uphold the decision of Plan Commission and not grant the appeal.  Parks Dec., ¶12.

177.    Alder Evers testified:

Q. Looking at the record, the totality of that record that was before you as an alder for the City of Madison, what did you -- what evidence did you rely upon in coming to that conclusion?

A. Well, principally, there is two points. One, that Edgewood offered no substantial evidence required under state law that an applicant do so; that the uses, values, and enjoyment of the property in the neighborhood for purposes already established would not be substantially impaired or diminished in a foreseeable manner.

They offered no substantial evidence that this would not occur. And, in fact, they ignored their own sound study's indication that just the crowd noise from just a collection of 150 people attending an athletic contest would exceed a 70 decibel level within the adjoining neighborhoods.

They did not address -- offer any testimony about property values, how property values would not be impacted. Residents were concerned about the potential impact on their property values.

They did not address concerns of families who had young children in the neighborhood who go to sleep, say, at 7:00 or 7:30. You're a father, you know what that's like, toddlers go to sleep early. How that these homes just within a hundred feet of an athletic field were holding night games with cheering crowds and a play-by-play announcement and pep band, how that this could interrupt sleep.

They offered no substantial evidence, not no iota of substantial evidence that the uses, values, and enjoyment of other property in the neighborhood for purposes that were established, that they had lived there for years, would not be substantially impaired.

They chose not to offer that in their -- they simply said in their meetings, the six meetings that were held after the Plan Commission denial, that they did not believe the impacts would be that bad. They offered no evidence to become -- that they wouldn't; they just said they didn't believe it's so.

So, Jonathan, they just didn't offer substantial evidence, and for that reason -- whereas the residents did. They offered what I believed to be substantial impacts or

evidence that those impacts were foreseeable, were clearly foreseeable. They could be anticipated and they were reasonable concerns.

Now, despite the recommendations of the planning staff on a near unanimous basis, the Plan Commission agreed that the applicant did not offer substantial evidence that they would be able to abide -- live up to the standard, standard -- standard 3.

So that's the reason why that I voted the way I did, and that's the way that the overwhelming majority of council members joined in accepting the verdict of the Plan Commission.

Evers Dep., dkt. #31, 179:4-181:8.

178. Evers also testified:

Q. The second category of the evidence that you considered and relied upon in your vote was the research that you said was presented to you by these neighbors; is that fair?

A. And may I respond to that? Research also provided by Edgewood.

Q. Okay. Let's talk about the research provided by the neighbors. What neighbors provided you with research that you found to be compelling? Identify the neighbors for me that provided research that you found to be compelling.

A. The neighbors paid for a sound study by, I believe it's Weiss Engineering (ph). It's in Legistar. You would have to -- I don't have the file or anything like that. But they paid for a study to be able to make, you know, scientific determinations based on measurements and mapping what the potential for those impacts would be on the adjoining neighbor.

Q. So we have the Weiss sound study. What other piece of research did the neighbors provide you that you relied upon that you found to be compelling?

A. Again, measurements taken of games being held in the area. Videos of the those games. Research about -- that they had done regarding the impact on property values. And other cities where stadiums were built in a neighborhood -- traditional residential neighborhood, that kind of thing.

Evers Dep., dkt. #31, 183:18-184:22.

179.   Some of the evidence that the Alders received included:

- A sound study performed by Wise Associates that the neighbors living near Edgewood submitted (Evers Dec., Ex. A);

- A sound study performed by Talaske and TLC Engineering that Edgewood submitted (Evers Dec., Ex. B);

- Testimony and information that the proposed improvements would decrease property values, some of which was verbal but some were contained in written comments (Evers Dec., Ex. D at CITY-DEF 52286, 52287, 52298, 52322-24, 52335, 52334, 52378, 52389, 52397, 52440, and 52444);

- A letter from Friends of Lake Wingra opposing Edgewood's proposed improvements based on the potential environmental impact (Evers Dec., Ex. C);

- Videos that some of the public submitted related to the light glare and sounds of athletic games (including ones taken of Edgewood's use of its field), and the potential impacts on the neighborhood, *see, e.g.*, Evers Dec., Ex. D at 52356, 52509, 52464 with links to videos.  One resident wrote "When my husband deployed to Afghanistan in 2018, we tried to find ways to connect across the distance and the time zones -- as it turns out, great preparation for connecting during a pandemic. One day he met us at 3:30am, his time, for dinner over video chat. A soccer game was taking place on the field, which became so loud, with the windows closed, that we could no longer have a conversation in the dining room at the back of our house" and she took and sent a link to a video of that game, which she says she recorded from inside her house (Evers Dec., Ex. D, CITY-DEF 52634);

- Testimony from the public about how their uses, values and enjoyment of their property would substantially impaired or diminished (*see, e.g.*, Evers Dec., Ex. D at 52083-52085, 52285-52291, 52296-52384, 52386-52414, 52427-52449, 52483, 52507-52509);

- Testimony raising concerns about whether Edgewood would abide by the conditions given its past behavior and suggestions of Edgewood being dishonest (*see, e.g.*, Evers Dec., Ex. D at CITY-DEF 51985, 52083-52085, 52289, 52313, 52456, 52487, 52493-52497, 52507-52509).

Evers Dec., ¶6, Exs. A-D.

**Edgewood Files a Conditional Use Application in September 2021 that is Approved**

180.    On September 29, 2021, Elliott emailed City representatives informing them that Edgewood was going to be filing a conditional use application for a two-story commons addition.  Elliott Dep., dkt. #33, 260:24-261:15; Zylstra Dec., Ex. KK, Dep. Ex. 93.

181.    Edgewood filed the conditional use application for the two-story commons addition and it was approved by the Plan Commission and the Common Council.  Elliott Dep., dkt. #33,260:24-261:19.

182.    Alder Evers voted in favor of the two-story commons conditional use application. Evers Dec., ¶10.

**Other Campus Institutional District Entities**

183.    Edgewood College is building a stadium in Fitchburg and has been exploring that since at least July 2019.  Elliott Dep., dkt. #33, 24:3-26:1; Zylstra Dec., Ex. LL, Dep. Ex. 48.

184.    Edgewood High School has separate finances from Edgewood grade school and Edgewood College.  Elliott Dep., dkt. #33, 23:13-17.

185.    Edgewood High School has charged Edgewood College in the past for use of the high school's athletic fields.  Elliott Dep., dkt. #33, 23:13-24:2.

186.    Just like Edgewood High School, Edgewood College and grade school are sponsored by the Dominican Sisters of Sinsinawa and the college and grade school follow the same religious teachings and exercise of faith as the high school does.  Elliott Dep., dkt. #33, 19:10-20:2.

187.    Edgewood High School has typically played its football games at Breese Stevens field or in Middleton.  Elliott Dep., dkt. #33, 27:23-28:5.

188.    Edgewood High School has played its lacrosse games for the most part on its field at Edgewood.  Elliott Dep., dkt. #33, 29:9-11.

189.    Edgewood has played its baseball games at various fields, including Warner Park. Elliott Dep., dkt. #33, 29:18-24.

190.    Edgewood plays on at least one City-owned field.  Elliott Dep., dkt. #33, 29:18-30:3.

191.    Elliott is not aware of the City ever precluding Edgewood from using the City's fields when those fields are available.  Elliot Dep. 29:25-30:9.

192.    Elliott admits that for the most part, Edgewood's football program has been able to play night games at other venues.  Elliott Dep., dkt. #33, 31:20-32:2.

193.    Edgewood's boys soccer plays their night games either on the road or at Reddan park in Verona.  Elliott Dep., dkt. #33, 232:7-9.

194.    Elliott is not aware of Edgewood ever securing a field for nighttime use for any activities other than sports.  Elliott Dep., dkt. #33, 34:4-35:4.

195.    West High School is a competitor of Edgewood High School.  Elliott Dep., dkt. #33, 52:9-12.

196.    West High School has an athletic field on site but it does not have lights for its athletic field.  Elliott Dep., dkt. #33, 52:9-23; Tucker Dec., ¶20.

197.    West High School plays its night games off-site at Mansfield Stadium, which is a field located on Memorial High School's site.  Elliott Dep., dkt. #33, 52:9-53:1; Tucker Dec., ¶20.

198.    On August 17, 2018, Memorial High School submitting a lighting application for its athletic field.  Hank Dep., dkt. #30, 29:18-30:2; Tucker Dep., dkt. #32, 78:10-17; Zylstra Dec., Ex. MM, Dep. Ex. 2; Tucker Dec., ¶21.

199.    Memorial High School has never had a master plan.  Zylstra Dec., Ex. NN, RTA 11; Tucker Dec., ¶21.

200.    Memorial High School has had lights on its athletic field going back to the 1970s. Tucker Dec., ¶21.

201.    Memorial's April 17, 2018 lighting application was to replace the existing 6 light poles with 4 light poles.  Tucker Dec., ¶21.

202.    In 2015, when Edgewood replaced its old track with a new track, the City told Edgewood that because it was simply exchanging the current track with a new track, the City would classify that as a replacement or a maintenance, which would allow Edgewood to complete the project without amending its master plan.  Elliott Dep., dkt. #33, 128:21-129:19; Tucker Dec., ¶21.

203.    The City permitted Edgewood to proceed with the resurfacing of its track and field despite complaints from the neighbors.  Elliott Dep., dkt. #33, 128:21-129:19, 131:4-16.

204.    After the creation of the Campus Institutional District Zoning, only two entities proceeded with master plans:  Edgewood Campus and the University of Wisconsin.  Evers Dep., dkt. #31, 97:3-10; Hank Dep., dkt. #30, 177:16-21.

205.    In around March of 2018, the University of Wisconsin sought to add two tennis courts and outdoor lights as part of the Nielsen Tennis Stadium.  Tucker Dec., ¶22.

206.    The addition of the tennis courts and lights was before the University's Master Plan became effective.  Tucker Dec., ¶22.  The University of Wisconsin's Master Plan was not effective until January 1, 2019.  Tucker Dep., dkt. #32, 156:16-25; Tucker Dec., ¶22.

207.    As it related to the Nielsen Tennis Stadium, the University did not use limiting language in its Master Plan as to use.  Tucker Dec., ¶22.

208.    Tucker was aware that neighbors of Edgewood actively opposed Edgewood's attempts to expand its use of its athletic field with lights and sound systems in the past prior to Edgewood's adoption of its Master Plan.  Tucker Dec., ¶22.

209.    The University of Wisconsin's Master Plan contains more than one reference to the Nielsen Tennis Stadium.  Tucker Dec., ¶23; Zylstra Dec., Ex. OO, Dep. Ex. 46.

210.    The University's Master Plan referred to an expansion to the Nielsen Tennis Stadium as one of its proposed projects at page 136.  Tucker Dec., ¶23.

211.    The University's Master Plan noted that "events" were currently being held at Nielsen Tennis Stadium (page 319).  Tucker Dec., ¶23.

212.    In its landscaping section, the University made reference to its "large sporting events" on the same page where it depicted the Nielsen Tennis Stadium (p.324). Tucker Dec., ¶23.

213.    On page 325 of the University's Master Plan, it states "The Event Center Neighborhood is composed of a series of athletic competition and practice fields, campus greens, and plaza spaces."  Tucker Dec., ¶23.  That page also depicts Nielsen Tennis Stadium as part of the Event Center Neighborhood.  Tucker Dec., ¶23.

214.     Tucker testified:

Q. Has there ever been any effort by the city to confirm whether UW is using its athletics and sports recreational facilities or open spaces as they are described in its master plan?

A. We respond to complaints. We haven't received any complaints, so we haven't investigated to the best of my knowledge.

Tucker Dep., dkt. #32, 193:7-13.

215.     Only portions of the University's campus are zoned Campus Institutional and the rest of the University's land is zoned as a PD District Zoning, which has a different set of rules. Tucker Dec., ¶24.

216.     The University does not pull or obtain any electrical permits from the City because the University is a charter entity of the state, similar to the City itself, and the only local regulation that the University is required to comply with is the City's zoning code.  Tucker Dep., dkt. #32, 201:21-25; Tucker Dec., ¶24.

**Edgewood's Claims of Substantial Burden**

217.     Mike Elliott testified:

Q  Okay.  Mr. Elliott, how did the city's denial of a permit to allow athletic field lighting substantially burden the free exercise of your religion?

A  Our -- The way we go after students is through showing them our community, and community is a big thing for us.  We don't have kids that live in the neighborhood and just come to our school.  We have to earn or recruit every student that we get. And how we do that is showing what a community we are, and one of the biggest opportunities for bringing people in for communities, such as the campus schools, the parochial schools, the middle schools in the city, are our plays, but, more importantly, the biggest numbers are always our athletic events.  And that is something that we value and use a lot.

We also form partnerships with many of these groups, whether they're nonprofits, whether they're groups that are asking -- needing support for fundraisers, whether they are churches and schools, forming partnerships so that they can get to know

41

Edgewood better and together we can evangelize the Catholic religion and the Dominican values of the Sinsinawa Sisters.

We also have had to do a lot of shuffling around for our schedules.  We have asked a lot of our -- of the other schools.  When you play sports, you usually have a JV game. The bus comes to one place.  There is a JV game, and then the varsity follows. When you play Edgewood, that can't take place because there is not enough time, so unless they -- if the kids get out of school early, and the other schools are not willing to take kids out of school early for sporting events.

We also have to spend a lot of extra time looking for places to play.  When we find a place to play, every game is an away game, and that has financial costs.  We've had donors who were going to give us money as gifts to pay for things like the lights or other things.  When we didn't get the lights, they withdrew their gifts.  So we've had financial hurt.

We've had enrollment hurt because it really takes away from our recruiting -- the recruiting styles that work.  We've had partnerships that have broken.  Girls on the Run at one point ran at our facility.  Susan B. Komen wanted to do their walk.  We couldn't help them because they walk into the night.

And so it's been a burden in a lot of different ways that we have tried to continue to grow our enrollment, tried to continue to grow the student satisfaction, but not being able to hold classes, not being able to hold special events, fundraisers, other things and gather as a community, it's our one spot.  We're really, from an outdoor standpoint, we're landlocked, and that field is something that we cherish and want to show off as much as possible.

Q   Anything -- You gave a very lengthy answer, and I appreciate that.

A   Did you get that?

Q   Yes, I did.  Anything else that you would say in terms of substantially burdening your free exercise of religion?

A   Partnership, community are part of our mission, and probably the two biggest that we use to recruit and use to grow our community, and that's been a challenge that we have not -- that we've suffered from because we haven't been able to get the use of that field at any time possible.

Elliott Dep., dkt. #33, 262:2-264:24.

218.   Elliott testified that there would be some travel that students would have to do even if night games were held at Edgewood because even if the students stayed after school, the parents or the students would need to travel home.  Elliott Dep., dkt. #33, 268:9-25.

219.   Elliott admits that with respect to Edgewood's sports programs, "for the most part" Edgewood has been able to host their athletic games at other fields.  Elliott Dep., dkt. #33, 265:6-9.

220.   Elliott admits that Edgewood has had at least some amount of partnerships with nonprofits regarding daytime use of its field and that those partnerships have occurred even without the lights on its athletic field.  Elliott Dep., dkt. #33, 271:6-15.

221.   Deposition Exhibit 50 is an Edgewood High School Accreditation Report dated October 11-14, 2015.  Elliott Dep., dkt. #33, 42:21-25; Zylstra Dec., Ex. PP, Dep. Ex. 50.

222.   For Edgewood to maintain its accreditation, it has to do a self-study every seven years and Edgewood provided information to the Independent Schools Association of the Central States for its accreditation in 2015.  Elliott Dep., dkt. #33, 44:9-15.

223.   The Accreditation Report identified Edgewood's enrollment as 658 students in 2009-2010 and 539 students in 2015.  Elliott Dep., dkt. #33, 44:9-45:6; Zylstra Dec., Ex. PP, Dep. Ex. 50 at 73.

224.   Elliott was not sure but believes that currently, Edgewood has between 520-530 students.  Elliott Dep., dkt. #33, 45:7-13.

225.   In 2015, there was a $1.025 million renovation of the Goodman Athletic Complex, which included Edgewood's track and field.  Elliott Dep., dkt. #33, 46:2-6.

226.    One of the reasons that Elliott wanted the money to update those fields was he was hoping that it would increase enrollment at Edgewood High School.  Elliott Dep., dkt. #33, 47:23-48:3.

227.    Elliott testified:

> Q   Your enrollment for the school year for 2015 was 539 students, and you're telling me roughly in 2017 it was 470 students; correct?
> A   Yes.
> Q   That's a decrease in enrollment; correct?
> A   Correct.
> Q   And that was after the changes to the Goodman Athletic Complex; correct?
> A   I would have to look at our enrollment numbers to agree or disagree with that.
> Q   My question, sir, was the time period you just described, from 2015 to 2017, was after the athletic complex changes to the Goodman field; correct?
> A   Correct.

Elliott Dep., dkt. #33, 49:10-24.

228.    Elliott has not had a parent tell him that they would not send their child to Edgewood because Edgewood does not have lights on its athletic field.  Elliott Dep., dkt. #33, 267:6-10.

229.    Edgewood answered the following interrogatory as follows:

INTERROGATORY NO. 3: Identify all factual and legal bases and any supporting documents for the allegation that the denial of the conditional use permit or any other action by any defendant has imposed a substantial burden upon your free exercise of religion.

RESPONSE: In addition to its General Objections, Edgewood objects to Interrogatory 3 to the extent it constitutes an impermissible contention interrogatory. Edgewood further objects because Defendants' request that Edgewood identify "all factual and legal bases and any supporting documents" is premature as discovery has not yet ended. Subject to and without waiving these or its General Objections, Edgewood responds as follows:

In addition to the legal and factual bases set forth in Edgewood's complaint and supporting documents, Edgewood's religious mission statement as a Catholic High School is to educate the whole student for a life of learning, service, and personal responsibility through a rigorous academic curriculum that embraces the Sinsinawa Dominican values of Truth, Compassion, Justice, Community, and Partnership"— educating the student consistent with this mission statement is how Edgewood

44

"practices" its religion, and Defendants' conduct has burdened that practice in numerous ways:

• Edgewood cannot engage in "traditional" religious activities, such as holding mass or holding events containing a mass, on its own facilities at night. Many of Edgewood's community-based activities, including graduations, assemblies, pep-rallies, and celebrations, contain masses, none of which can be held on Edgewood's own facilities in non-daylight hours when many members of the Edgewood community are available to participate.

• A primary way that Edgewood educates the "whole" student in its mission is through participation in sports. The reality is that high school sports occur in the fall, winter, and spring, when days are shorter, such that the inability to host home games or practices at night functions as an inability to host them at all. This imposes a substantial and sometimes dispositive burden on students and families who cannot travel, or can only travel with great difficultly, to practices and "home games" in different locations. It also subjects Edgewood students to additional safety hazards associated with daily travel to offsite games and practices. These obstacles make it more difficult for students to participate in sports and Edgewood to fulfill its mission.

• Hosting onsite home games on Edgewood's property is a primary way in which the Edgewood religious community interacts with each other to further its religious mission. It is also a primary way in which Edgewood interacts with neighboring communities and students and families in parochial schools who are deciding whether to attend Edgewood. Moreover, the unique feeling of hosting an onsite home game in front of the Edgewood community is an irreplicable show of community support to Edgewood's current student-athletes and a draw for perspective student-athletes, as evidenced by the substantially increased community attendance at the onsite football games Edgewood was able to host last year before daylight hours became too short. Accordingly, Edgewood's inability to host onsite home games on its facility hinders its ability attracts students and families into the Edgewood community and spread and further its mission. In a contemporary culture that places a premium on athletics, modern on-campus athletic facilities enhance Edgewood's ability to compete for and attract students to attend a Catholic high school in furtherance of its religious mission.  Denial of such facilities hurts Edgewood's ability to attract students and thus limits and hinders its religious mission.

• Because Edgewood cannot host onsite home games and practices, it must rent fields from MMSD or other institutions. This empowers the City to restrict or refuse Edgewood from hosting games or having practices within the City or on any City-owned property, as it has done previously. Further, the monies that Edgewood unnecessarily spends on renting fields could be applied to other causes that further Edgewood's religious purposes. Goes off field for practice for fields.

Edgewood specifically reserves the right to supplement this response until the close of discovery.

Zylstra Dec., Ex. QQ, Dep. Ex. 94; Elliot Dep. 275:19-276:8.

230.    Edgewood responded to a request to admit as follows:

REQUEST FOR ADMISSION NO. 10: Admit that the conditional use approval process referenced in MGO 28.097 and MGO 28.183 is facially neutral.

RESPONSE: In addition to its General Objections, Edgewood objects on the grounds that RFA 10 seeks an admission of a legal conclusion and not merely the application of law to fact. Subject to and without waiver of its General Objections, admits in part and denies in part. Admits that the conditional use approval process referenced in M.G.O. §§ 28.097 and 28.183 are written facially neutral, but denies that they are facially neutral in purpose or application. Deny any and all allegations not expressly admitted.

Zylstra Dec., Ex. NN, RTA 10.

231.    Edgewood has not filed a notice of claim or an itemized statement of damages pursuant to Wis. Stat. §893.80.  Verbick Dec., ¶¶2-3.

Dated this 20th day of May, 2022.

Respectfully submitted,

*/s/ Sarah A. Zylstra*

Sarah A. Zylstra, State Bar No. 1033159
Tanner G. Jean-Louis, State Bar No. 1122401
Boardman & Clark LLP
1 South Pinckney Street, Suite 410
P. O. Box 927
Madison, WI  53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Attorneys for Defendants*