**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

_____

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

      Plaintiff,

      v.                            Case No. 3:21-CV-118

CITY OF MADISON, WISCONSIN;
CITY OF MADISON ZONING BOARD
OF APPEALS; CITY OF MADISON
PLAN COMMISSION; and CITY OF
MADISON COMMON COUNCIL,

      Defendants.

_____

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

_____

## INTRODUCTION

Plaintiff Edgewood High School of the Sacred Heart has long desired to install field lighting and an amplified sound system to hold night games on its athletic field on campus. The problem is that Edgewood is surrounded by residential property and its neighbors have for decades vehemently opposed any proposal that could spill light or amplified sound into their houses and yards. Two neighborhood associations have worked to actively mobilized residents against Edgewood's successive proposals for lights, dating back (at least) to a proposal Edgewood made in the 1990's. Due in part to the lack of neighborhood support (or indeed due to the fierce neighborhood opposition) Edgewood has not been successful in getting approval for a stadium in this densely populated neighborhood.

After Edgewood received a $1.05 million grant to upgrade its athletic track and field, it pursued a stadium with new vigor, but unlucky for Edgewood, prior to the grant, Edgewood

entered into a ten-year master plan agreement with the City and with the neighbors limiting Edgewood's use of the field to practices and physical education classes. Further, Edgewood was required to identify its current and future uses of its open space and the improvements it would undertake during the ten-year plan. Edgewood undisputedly admits that installing lights and a sound system were not among the improvements it identified nor were athletic contests identified as a current use. As a result, Edgewood, through one means or another, would have to obtain City approval through a process affording Edgewood's neighbors the opportunity to oppose Edgewood's request.

The history of Edgewood's request for stadium lights and the opposition by the neighborhood associations is long, but the upshot is that in January of 2021, Edgewood's conditional use application for the installation of lights on its athletic field was heard by the City's Plan Commission.  The Plan Commission determined that Edgewood's proposal failed meet the requirement that the uses, values, and enjoyment of surrounding properties would not be substantially impaired.  The Plan Commission indicated it would be open to considering the request again if Edgewood addressed addresses the noise impacts and improved engagement with the neighborhoods. Edgewood appealed to the Common Council, who affirmed the Plan Commission's decision. It is Edgewood's burden to show that such decisions were not supported by substantial evidence, which it cannot do in the face of the voluminous submissions received by the Common Council, including two sound studies, information related to environmental impacts, testimony about declining property values, testimony about the negative impact to the neighbors' enjoyment, and videos showing the impacts of such games—to name just a portion.

Unhappy that it cannot have Friday Night Lights for its high school football team, Edgewood searched for a new way to get its lights in this residential neighborhood—and landed

on suing the City contending religious discrimination under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the First Amendment, and Article 1, Section 8 of the Wisconsin Constitution. Edgewood's claims are baseless.  They City has not treated a similarly-situated secular institution more favorably and declining to allow Edgewood to install stadium lights in a residential neighborhood does not substantially burden Edgewood's ability to practice its Catholic faith.

Edgewood's claim that it has "vested rights" to build the lights because it met parts of a lighting ordinance (limited issues such as total foot-candles of light) but not the pivotal requirement that it comply with the master plan Edgewood itself authored is a non-starter. Vested rights are strictly construed and occur only when there has been strict and total compliance with ***all*** applicable rules.

Finally, Edgewood makes a due process challenge to Notices of Violations that the City sent Edgewood for violating its master plan. As shown below, the Notices are not unconstitutionally vague, but even more, these notices were merely warnings; the City never issued any citations or fines. Further, the City Attorney even sent a letter indicating that no enforcement would occur.  Edgewood can hardly be heard to complain about that.

## STATEMENT OF FACTS

Edgewood High School is a private, Catholic college-preparatory high school located at 2219 Monroe Street in Madison, Wisconsin. PFOF 1. Edgewood High School is located on the broader Edgewood Campus, which includes a college and a grade school. PFOF 2.

Edgewood Campus is nestled between the Vilas and Dudgeon Monroe neighborhoods, two traditional residential neighborhoods. *See* PFOF 45-48, 55. Edgewood and its neighbors have occasionally been at odds when it came to new development on the campus. Up until 2013,

Edgewood itself was zoned residential. PFOF 6, 17, 18. Under its residential zoning, Edgewood was required to obtain a conditional use permit for most new development on its campus. PFOF 5, 6. This required review by administrative and political bodies that relied in part on approval from neighbors. PFOF 6-8, 28.

In 1996, Edgewood proposed to the neighborhood association a conditional use plan that included plans for Edgewood to add lights, a sound system, and a grandstand to its athletic field. PFOF 73. It also proposed a permanent structure for its athletic complex. *Id.* The Dudgeon Monroe Neighborhood Association Council voted to endorse the plan only if Edgewood removed any references to lights, sound, or a permanent structure from the plan. PFOF 74. Following that vote, Edgewood revised its conditional use application with the City and removed all plans for lights, sound and/or a larger grandstand on the field from the application. PFOF 75.

Around 2007, Edgewood, the University of Wisconsin-Madison ('UW-Madison') and Madison college approached the City about creating a better, more predictable path for approval of their building expansions outside than the high stakes pass/fail of the conditional use permit process. PFOF 5-8.

At that time, whenever these institutions wanted to make changes to a building or outdoor open spaces such as adding a parking lot, the institution would need to prepare a detailed conditional use permit application. PFOF 6. That application would then be reviewed by various internal departments at the City (depending on the project) and would then go before the City's Plan Commission at a public hearing. PFOF 7. Members of the public could attend those public hearings and speak for or against the planned project after which, the City Plan Commission would vote on the proposed project. *Id.* These institutions indicated to the City that the detail, expense, and effort involved in preparing a conditional use application for a building that could

be denied was relatively inequitable from their perspective and so they asked the City to help

them create a better path for the evolution of their campuses. PFOF 8.

On January 2, 2013, as a result of the conversations that City staff held with Edgewood

and other institutions, the City of Madison enacted M.G.O. § 28.097, creating the Campus-

Institutional Districts. PFOF 5-9. The statement of purpose is identified in the ordinance itself

and provides:

(1) Statement of Purpose

The CI District is established to recognize the City's major educational and medical
institutions as important activity centers and traffic generators, accommodate the growth
and development needs of these institutions, and coordinate the master plans of these
institutions with the City's plans, policies and zoning standards. The district is also
intended to:

(a) Permit appropriate institutional growth within boundaries while minimizing the
adverse impacts associated with development and geographic expansion.

(b) **Balance the ability of major institutions to change** and the public benefits derived
from change **with the need to protect the livability and vitality of adjacent
neighborhoods**.

(c) **Encourage the preparation of Campus Master Plans that enable adjacent
neighborhoods and the broader community to understand the levels of development
being proposed, their likely impacts, and appropriate mitigation measures**.

PFOF 10 (emphasis added).

Campus master plans were voluntary for existing educational and medical institutions,

but mandatory for any new educational and medical institutions created after the passing of the

ordinance. PFOF 11. Edgewood and UW-Madison were the only two institutions that ultimately

decided to voluntarily adopt a master plan. PFOF 204.

For institutions like Edgewood that chose to adopt a campus master plan, the ordinance

required that they identify a number of items, including submitting a facilities plan with existing

conditions and proposed conditions for improvements. PFOF 12. The ordinance also provided

that "The Common Council will approve or reject the Master Plan following a recommendation by the Plan Commission." PFOF 13. Further, the ordinance noted that approval of the master plan would be based in part on the plan's consistency with the goals of the City's Comprehensive Plan and adopted neighborhood, corridor or special area plans adjacent to campus boundaries. PFOF 14.

A master plan, once approved, became an enacted ordinance of the City. PFOF 15, 127. Any CI-District Master plan was to be effective for ten years. PFOF 16, 127.

In 2013, Edgewood's representative began working with the two nearby neighborhood associations to prepare its master plan, which would ultimately require Common Council approval. PFOF 13, 36-48. The Edgewood Neighborhood Liaison Committee, which consisted of representatives from each of these entities, was the primary vehicle for these discussions. *See* PFOF 38, 39.

The neighborhood associations had long been active in monitoring Edgewood's growth and use of its space. PFOF 37. Edgewood's president Mike Elliott, who served on the Edgewood Neighborhood Liaison Committee, understood that it was important for Edgewood to try and work with the neighbors and the neighborhood association on getting agreement as to the language in the master plan. PFOF 38-39. As the master plan itself stated, "[t]he final master plan [was] the product of extensive engagement, collaboration and effort" between Edgewood and its neighbors. PFOF 45. The possibility of sound or light spilling over from Edgewood to the surrounding properties was a frequent topic of these discussions. *See* PFOF 39-43.

As mentioned earlier, the issues regarding light and sound dated back to well before the CI-District Ordinance. PFOF 72. To that effect, there were a number of past agreements between

Edgewood and the neighborhood associations that Edgewood reaffirmed and incorporated into its master plan, some of which related to light and lighting. PFOF 41, 42.

Institutions within the Campus Institutional District that did not adopt a master plan were required to obtain a conditional use permit to construct building or that exceeded 4,000 square feet in floor area on a zoning lot. PFOF 25. That was not true for institutions that had approved master plans. PFOF 26. For institutions that had approved master plans, all projects identified in the master plan were already approved as permitted, subject only to review by an architectural committee. PFOF 26-27. The architectural committee's review was limited to reviewing items like the height, design and materials of the construction. PFOF 27. The benefit of this process for Edgewood was that it would not need to hold open meetings on its pre-approved projects and would not need to seek the approval of the two neighborhood associations going forward on projects identified in its Master Plan. PFOF 28.

Edgewood's Master Plan identified 22 different improvements that the Edgewood Campus would make during the ten-year period of the Master Plan.[1] The 22 projects identified in the Master Plan were not limited to building improvements but included existing open spaces, and included outdoor projects such as revising parking lots and adding three additional parking stalls. PFOF 32. None of the identified projects involved improvements to an athletic field. PFOF 33.

Under the City's Campus Institutional District Zoning Ordinance, Edgewood's Master Plan was required to include:

(c) . . . a description of existing conditions on the campus and the proposed conditions under the Master Plan, including:

---

[1] The Campus Master Plan applies to the entire Edgewood campus, which includes three different entities—Edgewood College, Edgewood High School, and the grade school. PFOF 2, 29. Edgewood High School owns the open space that is subject to this litigation. PFOF 30.

1. Existing Conditions.
   a. ***Land uses*** and buildings.
   b. Building form (building type, height, bulk, etc.).
   c. Landmarks, historic sites and districts.
   d. Natural features and significant ***open-space areas***.

2. Proposed Conditions.
   a. Future needs/capital improvements.
   b. Phasing of proposed improvements.
   c. ***Future land uses*** and buildings.
   d. Building Form (building type, height, bulk, etc.).
   e. ***Landscape treatment***.
   f. ***Open-space areas and other open-space uses***.
   g. Relationship to transportation/access plan (parking, transportation demand management, etc.).

PFOF 34 (emphasis added).

Edgewood identified its open-space areas in Section 3.8 of its Master Plan. PFOF 35.

Among the open spaces identified in the plan was a site now known as the Goodman Athletic

Field (hereinafter Edgewood's 'athletic field'). PFOF 35, 225. The plan described the field as

follows: "Athletic field owned by Edgewood High School. Used for team practices, physical

education classes." PFOF 35. A prior draft of the master plan described the field as "Athletic

field owned by Edgewood High School.  Used for team practices, physical educations classes,

***and other general light uses***." PFOF 44 (emphasis added). The "and other general light uses"

language was removed prior to Edgewood submitting its final Master Plan. PFOF 44.

Edgewood submitted its master plan to the City in January of 2014. PFOF 18. Mike

Elliott signed the master plan on behalf of the high school, indicating the intent of the high

school to abide by the document. PFOF 20. That April, the City wrote to Edgewood that the

Common Council had approved its master plan, subject to conditions detailed in that letter.

PFOF 21, 22. The City's letter also explained that:

"No alteration of an approved Campus Master Plan, ***including changes to the proposed use of identified open space areas and other open space uses, shall be permitted unless***

8

> **approved by the Plan Commission**, provided however, the Zoning Administrator may, following consideration by the alderperson of the district, issue permits for minor alterations that are approved by the Director of Planning and Community and Economic Development and are consistent with the concept approved by the Common Council. If the change or addition constitutes a substantial alteration of the original plan, the procedure in Sec. 28.097(2) is required."

PFOF 24. This language was nearly verbatim of the language of then M.G.O. §28.097. *Id.* Edgewood completed its conditions of approval, and its master plan went into effect on November 6, 2015. PFOF 22, 23.

In June of 2015, Edgewood High School announced that it had received a grant from the Goodman Foundation for $1.025 million to upgrade its track and field. PFOF 49. Edgewood had begun discussions to secure that grant back in 2014. PFOF 50.

A Wisconsin State Journal article dated June 15, 2015, referencing the grant, states, "Elliott noted that one of the main benefits will be improvements in the practice facilities for the school's baseball and softball programs in the spring, when teams are forced to practice indoors. He added that the renovation will be a boon to all the students." PFOF 51. The article quoted Elliott as saying, "We do require four years of physical education for both semesters, which is higher than the national average and higher than the national requirement" and "This is a much-needed product for our students, to aid our physical education department and the athletic programs." PFOF 52. While Elliott does not recall if this was a quote he said, he agrees he expressed this sentiment. *Id.*

The article continued: "According to Elliott, the project has received the support of area neighborhood groups that have balked in the past at the idea of turning the facility into a competition site for Edgewood's many athletic programs." PFOF 54 (emphasis added). Elliott is quoted as saying, "We're between two neighborhood associations. They have been vehemently opposed to us having **lights or playing games here**," he said. PFOF 55 (emphasis added). "We're

really building this to be able to give our athletes the practice facilities that provide the best surfaces possible and to expand the amount of outdoor practices we can hold especially in the spring." *Id.* Again, while Elliott does not recall if this was a quote, he agrees he expressed this sentiment. *Id.* The article uses the words "practice" or "practices" fourteen times. PFOF 56.

The statements in the article that the field would be used for practice are consistent with what Edgewood had told its neighbors at an April 14, 2015 Edgewood Neighborhood Liaison Committee meeting where Edgewood representative Maggie Balistreri-Clarke provided an update as to Edgewood High School Construction. PFOF 57-61. She indicated that no new lighting or seating would be installed at the athletic field. PFOF 60. She also confirmed that the field would be a practice facility. *Id.*

After receiving news of the grant, Edgewood contacted the City to determine whether re-surfacing the existing track and field would require an amendment to its master plan. PFOF 62. The City told Edgewood that because it was simply exchanging the current track with a new track that the City would classify that as a replacement or a maintenance item which would allow Edgewood to complete the project without amending its master plan. PFOF 63. The City permitted Edgewood to proceed with the resurfacing despite complaints from the neighbors. PFOF 204.

In May of 2016, Edgewood raised the idea of adding seating and lights for its athletic field to the Liaison Committee, holding listening sessions on the topic. PFOF 70-71. At those listening sessions, neighbors expressed concerns about field usage, traffic, parking, lights, and sound. PFOF 71.

Around March of 2017, Elliott had a meeting with the City's then Zoning Administrator Matthew Tucker about Edgewood's desire to construct a modified stadium at the site of its

athletic field. PFOF 76. Referencing that meeting, Elliot wrote in an email that the City did "not feel the current master plan would let us proceed with a modified stadium. Night use is the issue and it is in their mind a new or different usage. They [recommend] we continue to work with neighbors for an agreement." PFOF 77. Tucker suggested that Edgewood work with neighbors to mitigate sound and noise associated with night games. PFOF 77.

Edgewood High School has typically played its football games at Breese Stevens field or in Middleton. PFOF 187. Edgewood's boys soccer team plays its home night games at Reddan park in Verona. PFOF 193. Edgewood has played its baseball games at various fields, at least one of which, Warner Park, is owned by the City. PFOF 189-190. Edgewood's president Michael Elliot is not aware of any instances where the City ever precluded Edgewood from using the City's fields when available. PFOF 191. Elliott admits that for the most part, Edgewood's football program has been able to play night games at other venues. PFOF 192. Elliott is not aware of Edgewood ever securing a field for nighttime use for any activities other than sports. PFOF 194.

Madison West High School is a competitor of Edgewood High School. PFOF 195. West High School has an athletic field on site but it does not have lights for its athletic field. PFOF 196. West High School plays its night games off-site at Mansfield Stadium, which is Memorial High School's home field. PFOF 197.

In July of 2018, Elliott emailed then Alder Sara Eskrich, asking her to sign off on a minor amendment to the master plan so that Edgewood could hold an October 5 senior night football game with temporary lights and seating on its athletic field. PFOF 78. Alder Eskrich responded that for a temporary game, Elliott should reach out to City staff but she could not sign off on the

stadium lights as a minor alteration "because we've discussed very publicly that this requires a master plan amendment." PFOF 79.

On October 17, 2018, then Zoning Administrator Matt Tucker attended a neighborhood meeting that included a presentation of Edgewood's proposal to add seating, lights and a sound system to its athletic field. PFOF 81-82. Edgewood's presentation described the school's then current use of the field for competition games, which had expanded since the 2015 renovation. PFOF 82. Following that meeting, Tucker sent an email to Elliott writing:

> After the neighborhood meeting of Wednesday October 17, I became aware of the extensive use of the athletic field at the northwest corner of the site.  I also closely reviewed the adopted Master Plan, to determine how language in the master plan relates to the athletic field usage.  Specifically, in the "Open Space Plan" (section 3.8) the approve master plan identifies the athletics field to be used for "team practices, physical education practices."  The lack of any further language in this section, or any other language in sections of the adopted Master Plan, leads me to the interpretation that current programing and usage of the field is operating outside of the allowances of the adopted Master Plan.
>
> If you wish to continue the current level of programming on the field for 2019 and beyond, I believe that you will need to pursue an amendment to the approved Master Plan.  I would be happy to talk with you, Alder Arntsen, and the neighborhood liaison committee, should you choose to explore a Master Plan amendment to expand the use of the athletic field.  If you decide to continue with the current idea for a stadium expansion at the athletic field, you will also need to include language in this amendment that would incorporate allowing the current level of usage of the field to be allowable and continue.

PFOF 83. Tucker did not include any neighbors or the neighborhood associations on his email but simply noted the issue for Edgewood. PFOF 84.

On November 14, 2018, Edgewood followed Tucker's recommendation and filed an application to amend its Master Plan that incorporated lighting, expanded seating, added restrooms, team rooms, and storage, and defined its field use to include athletic competitions. PFOF 85.

That same day, Edgewood responded to Tucker's October 26 email through counsel. PFOF 86. Edgewood's counsel wrote that to the extent Edgewood's Master Plan does not expressly permit athletic competition games, Edgewood's use of the field was a legal nonconforming use. PFOF 87. On November 20, 2018, Tucker responded by letter indicating that he disagreed with Edgewood's position that it established a legal nonconforming use. PFOF 88. He went on to say that he was aware that Edgewood had filed an amendment to its master plan that, if approved, would allow use of the athletic field for games would make the issue moot and that in such instances, the City's internal policy is to suspend enforcement pending the result of the application for amendment. PFOF 89. Tucker also indicated that if the amendment was denied, "then the City will send a formal notice of violation, and at that time we can discuss how Edgewood wishes to proceed." PFOF 90.

On Friday, February 22, 2019, Edgewood submitted an application with the City for outdoor lighting of its athletic field. PFOF 91. This was a surprise to the City as Edgewood had submitted a master plan amendment. PFOF 91. The following Wednesday, on February 27, 2019, Mr. Tucker wrote a letter to Elliott:

> On Friday, February 22, the Building Inspection Division accepted a lighting plan filed by Forward Electric on behalf of Edgewood High School, to install lighting for the school's field. Those plans will be reviewed for compliance with MOO Section 10.085, and if the plans comply, electrical permits will be issued when requested.
>
> The City believes this permit can be issued without requiring amendment of the approved 2014 Master Plan. However, over the past weekend, I received a copy of the letter sent to "Edgewood Family" and a "Frequently Asked Questions" document relating to the institutions' present interest to install lights and an amplified sound system at the field (copy attached). These letters indicate that Edgewood intends to use the lights and sound system to host night games at the facility.
>
> Based on the information the City currently has regarding the historical use of the facility, it would appear that the intended use of the facility as outlined in your letter to the "Edgewood Family" and detailed in the "Frequently Asked Questions" document would conflict with the approved 2014 Master Plan for the site, which limits use of the

facility to "team practices, physical education classes" (Page 42, Section 3.8, Open Spaces Plan).

The purpose of this letter is to inform you that the issuance of any lighting permit under MGO sec. 10.085 does not change the City's position that the use of the facility under the master plan is limited to "team practices, physical education classes."

PFOF 92. The attachment that Tucker referenced contained a letter that Elliott wrote to the "Edgewood Family" that included a "Frequently Asked Questions" section in which Edgewood indicated that it would host night games at its athletic field if the City issued the lighting permit. PFOF 93. The attachment also indicated that Edgewood was tabling the application to amend its Master Plan that Edgewood filed with the City. PFOF 94.

On the same day Tucker wrote that letter, Edgewood's lighting application had been marked "approved" by City Building Inspector Steve Rewey. PFOF 95. Rewey's review of the application was limited to compliance with the technical components of Madison's lighting ordinances. *Id.*

Shortly after Tucker sent this letter, he met with his supervisor, George Hank, and Assistant City Attorney, John Strange. PFOF 96. Hank indicated that the lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b). PFOF 97. Specifically, M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, ***and all other codes and regulations*** as applicable under appropriate permit and inspection." PFOF 98 (emphasis added). Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application. PFOF 99. In addition, M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." PFOF 100. Hank was concerned that allowing

14

Edgewood to make a large capital expenditure to install lights that could not be used for their intended purpose put the City at risk. PFOF 101.

On March 12, 2019, Edgewood's counsel, Attorney Nathan Wautier, wrote to the City objecting to the City's decision not to issue the permit. PFOF 102. Assistant City Attorney John Strange responded to Atty. Wautier by letter dated March 21, 2019. PFOF 103. Atty. Strange wrote, "because the lights are part and parcel of a plan to conduct athletic contests at night, neither the lights nor the athletic contests are in compliance with the campus master plan." PFOF 104. Atty. Strange continued, "[t]he stadium lights are capital improvements that were required to be shown in the Campus Master Plan by M.G.O. § 28.097(5)(c)2 in order to be constructed without Plan Commission approval." PFOF105. And, "Since the stadium lights are neither shown on nor mentioned in the campus master plan, the campus master plan must be amended per MGO Section 28.097(10)." PFOF 105. "To that end" Atty. Strange wrote, "Edgewood's application was never in compliance with zoning at the time its lighting application was filed because the lights were not identified as improvements at the athletic field and therefore are simply not allowed absent additional Plan Commission approval." PFOF 106.

In late March 2019, neighbors near Edgewood contacted the City and complained that Edgewood was holding competitive games on its field in violation of its master plan. PFOF 107. A City inspector went to observe and, after witnessing athletic contests on the field, the inspector issued Official Notices of Violation. PFOF 108. The notices instructed Edgewood to "[d]iscontinue holding athletic contests on the athletic field at 2219 Monroe Street." PFOF 108. Official notices are warnings. PFOF 110. The City did not issue a citation or fine Edgewood. PFOF 111.

Edgewood appealed the notices to the City's Zoning Board of Appeals ("ZBA"). PFOF 112. As the appeal progressed, Edgewood continued meeting with the neighborhood association to try to come to a resolution. PFOF 113. Edgewood agreed not to move forward with its lights while productive conversations continued. PFOF 114. To date, Edgewood has not taken action to install stadium lights on its field. PFOF 115.

The ZBA held a public hearing on Edgewood's appeal on July 11, 2019. PFOF 116. There, Edgewood's counsel argued that if one of the high schools without a master plan wanted to build a correctional facility, they would be allowed to do that as a matter of right under the then-current zoning code because a correctional facility was an identified secondary use. PFOF 117. Assistant City Attorney John Strange also told the Plan Commission that under Edgewood's argument, Edgewood could turn the Oaks (a green space on Campus with heritage trees) into a cornfield without Plan Commission approval because agricultural use is an allowable use under the ordinance. PFOF 118.

The ZBA voted unanimously to affirm the decision of the Zoning Administrator. PFOF 119. The ZBA's vote was a determination that Edgewood was required to amend its master plan to play competitive games on its athletic field. PFOF 120. Edgewood never appealed the ZBA's decision. PFOF 121.

On July 12, 2019, then City Attorney Michael P. May wrote a letter to Edgewood's counsel. PFOF 122. Atty. May informed Edgewood that after the ZBA denied Edgewood's appeal, further enforcement related to the Notices of Violation rested within the discretion of the City Attorney. PFOF 123. Atty. May indicated that he would take no further enforcement steps unless and until he provided Edgewood ample notice. PFOF 124. Because Edgewood's entry of the Master Plan was voluntary, he invited Edgewood to file to terminate its Master Plan and

16

return to the standard Campus Institutional Zoning. PFOF 125. The restriction on Edgewood playing athletic contests on its field was due to the language in Edgewood's Master Plan. PFOF 126. If the Master Plan were repealed, Edgewood would be permitted to play athletic contests on its field pursuant to M.G.O. §28.097. *Id.*

On July 29, 2019, Edgewood's counsel sent a letter to the Mayor, stating "Please accept this letter as the Edgewood school's formal request and consent for the mayor to sponsor an ordinance for immediate repeal of ORD-14-00082 which established [Edgewood's] ten-year campus master plan." PFOF 127. Elliott understood that because its Master Plan was enacted as an ordinance, that another ordinance had to be enacted to repeal it. PFOF 128.

Meanwhile, Alder Evers began having conversations with Assistant City Attorney John Strange following the ZBA hearing, where, according to Evers, "it became apparent that there was a flaw in the ordinance." PFOF 129. Alder Evers wanted "to address a flaw that would allow a landowner to proceed with a significant change of use that would be in contrast with the explicit Statement of Purpose as articulated in the Campus-Institutional District." PFOF 130. Evers testified:

Q. So the potential for lights at Edgewood, a potential for a stadium, is what motivated your amendment; is that right?

. . .

A. What motivated my amendment was a desire to update the amendment so that the flaws that had been identified, that institutions without a master plan would be able to make substantial use -- substantial changes to their use without addressing the potential for adverse impacts or addressing the issue of livability or vitality of adjacent neighbors. So while the Edgewood debate pointed to these flaws, the purpose of the amendment was to address a change in this so that institutions across -- who are in the Campus-Institutional District would abide by the intent of the ordinance itself.

Q. But it was the Edgewood incident, specifically, and the ongoing issues with that stadium that highlighted for you the need for this change; is that right?

17

A. I don't know, Jonathan, if that's entirely accurate, because it -- I don't know if you read the transcript of the ZBA hearing, but it was suggested that an institution within the CI District could use their open space to have a correctional facility.  So, in effect, a high school could be converted into a prison or that -- you know, that farming could take place.  And this was considered by everybody present to be somewhat inscrutable and inconsistent with the Campus-Institutional District ordinance itself.  So while the debate around Edgewood pointed to one example, there was one of several potential issues that could come forth.

PFOF 131. Alder Evers also testified:

Q. What impact, if any, did you intend your amendment have on Edgewood's ability to obtain lights for its field?

. . .

A. The purpose of the amendment was to address the flaw in the Campus-Institutional District, as it was originally written and published into law in 2013, that provided a loophole of sorts for campus institutions without a master plan to make substantial changes to their use without considering the potential for adverse impacts affecting the livability and vitality of adjacent neighborhoods.

PFOF 132. Alder Evers also testified:

Q. You are not aware of any other actual controversy involving a Campus-Institutional zone district that highlighted this issue; is that correct?

A. Not entirely so, because there were --there were residents in district -- in the District 5 aldermanic district where West High School, where there was some concern.  This came up during the campaign.  There was apparently a move that said, well, West High should be able -- should put up lights and have a stadium, which obviously would have been opposed by nearby neighbors.

PFOF 133.

Alder Evers asked Attorney Strange what could be done to fix the flaws in the ordinance,

not being an expert in these matters. PFOF 134. Strange indicated that the ordinance could be

amended. *Id.* During the first week of August 2019, Alder Evers asked Strange to draft the

amendment. PFOF 135.

Assistant City Attorney John strange drafted an amendment to the Campus Institutional

District Zoning Ordinance. PFOF 136. The amendment provided that: (1) in a Campus-

Institutional District without a Campus Master Plan, the construction of a new building or additions to existing buildings that exceed four thousand (4,000) square feet in floor area on a zoning lot within any five (5) year period shall require conditional use approval; and (2) in a Campus-Institutional District without a Campus Master Plan, the establishment, improvement, or modification of any primary or secondary use occurring outside of an enclosed building shall require conditional use approval but the Zoning Administrator may issue permits to repair or replace any existing facility related to a primary or secondary use provided that the proposed facility is of a similar bulk condition and at a similar location on the zoning lot as with the existing facility.[2] PFOF 137.

On August 26, 2019, the City's Plan Commission held a public hearing. PFOF 138. Two of the items on the Commission's agenda were the ordinance to repeal Edgewood's Master Plan (Legistar # 56839) and the proposed amendment to M.G.O §28.097, the Campus Institutional District Zoning ordinance (Legistar # 56981). PFOF 139.

The amendment to the CI-District ordinance was re-referred to public hearing to the Plan Commission to be returned by September 16, 2019. PFOF 140. To "re-refer" a matter to a public hearing to the Plan Commission means that matter would come back to the Plan Commission for further discussion to get questions answered from staff on specific subjects. *Id.* The Plan

---

[2] The drafters analysis stated in part that: "As currently written, on any parcel zoned in the Campus-Institutional (CI) District without a campus master plan, primary and secondary uses are allowed subject to conditional use requirements only upon the construction of a building that creates greater than 4,000 square feet of floor area . . . Primary and secondary uses that do not require the construction of a building (e.g., occur outside an enclosed building) are, thus, permitted without conditional use review.  Uses in the CI District that may not require the construction of a building (including outdoor sports and recreational facilities, surface parking, utilities and transportation facilities, other uses related to the institution's primary mission, open stadiums, auditoriums and arenas, and agricultural uses) often require conditional use review in other city zoning districts, including residential and mixed-use and commercial districts. ***The purpose of this ordinance is therefore to treat uses that occur outside of an enclosed building in a CI District like the same or similar uses in other zoning districts.***" PFOF 137.

Commission also re-referred Edgewood's repeal matter for public hearing to the Plan Commission due back on September 16, 2019. PFOF 141. The Plan Commission indicated that it re-referred the Edgewood repeal so it could obtain answers from City staff "on the impacts of repeal, the relationship between repealing the master plan and the proposed changes to the CI zoning district, ID 56981, and the status of the agreements that govern the property before the property was zoned CI." PFOF 142. Edgewood's master plan had incorporated prior agreements between Edgewood and the neighborhood association, and the Plan Commission questioned what would happen to those agreements if the master plan were repealed. PFOF 143-144.

Atty. Strange wrote a memo to the Plan Commission dated August 26, 2019, to address the effects of Plan Commission Action on Legistar Items 56981 (the  proposed ordinance change) and 56839 (the Edgewood master plan repeal) and specifically, the effect if both matters passed at the same time. PFOF 145. He wrote, "If both Legistar items are approved by the Common Council on September 3, the practical impact on the ongoing athletic field issue is that Edgewood would be allowed to play games on its existing field but any improvement or modification to that field will require conditional use approval regardless of whether such improvement or modification requires the construction of a building or an increase in zoning lot area." PFOF 146.

At a meeting on September 3, 2019, the Common Council took up a motion by Alder Bidar to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting. PFOF 147. Three Plan Commission members who were also on the Common Council spoke in favor of re-referring the Edgewood repeal matter to its October meeting, "giving a number of different reasons why they thought that would be in order." PFOF 148. The Common Council

voted to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting, which was the next meeting after the September 16 meeting. PFOF 149.

The amendment to the Campus Institutional District Zoning continued and was considered by the Plan Commission on September 16. PFOF 150. On September 16, 2019, the Plan Commission voted to recommend that the Common Council consider the change to the Campus Institutional District Zoning. PFOF 151.

On September 30, 2019, Edgewood submitted a second lighting application for lights on its athletic field. Because Edgewood's Master Plan was still in place, the City denied the lighting permit. PFOF 153.

On October 1, 2019, the Common Council voted to adopt the amendment the Campus Institutional Zoning Ordinance, M.G.O. §28.097. PFOF 155. The amendment was sponsored by 13 of the 20 Common Council Alders:  Tag Evers, Syed Abbas, Shiva Bidar, Grant Foster, Keith Furman, Patrick W. Heck, Zachary Henak, Rebecca Kemble, Lindsay Lemmer, Donna V. Moreland, Michael E. Verveer, Christian A. Albouras and Marsha A. Rummel. PFOF 152.

Shortly thereafter, Edgewood requested that the vote on the repeal of its master plan be referred to later Plan Commission meetings. PFOF 158. On October 28, 2019, City staff submitted a memo to the Plan Commission addressing the questions commissioners raised at the August 26, 2019 about the effects of repealing Edgewood's master plan. PFOF 157. In November, Edgewood requested another re-referral. PFOF 158. The Edgewood master plan repeal then came before the Plan Commission on December 9, 2019. PFOF 159. The Commission recommended that the Common Council vote against allowing Edgewood to repeal its master plan. PFOF 160. The City's Legistar notes indicated that many members of the

Commission "did not feel that the repeal met the standard for map amendments based on public health, safety, and welfare." PFOF 161.

On January 7, 2020, the Common Council took up the Edgewood repeal matter. PFOF 162. The Common Council did not follow the Plan Commission's recommendation but instead voted 15 in favor of repealing Edgewood's master plan and 4 against, with one non-voting member. PFOF 163. Elliott was pleased with the results of the vote. PFOF 164.

On March 11, 2020, after the repeal, Edgewood filed a conditional use application for its stadium lights. PFOF 165. Edgewood sought the construction and installation of either four 80-foot light poles or four 68-foot light poles. PFOF 166.

The Plan Commission heard the application on May 11, 2020. PFOF 168. Tim Parks prepared a memo, dated May 11, 2020, for the Plan Commission. PFOF 169. A summary of staff's recommendation was that "the Plan Commission *can* find the standards for conditional use approval met to approve the installation of lights for the Goodman Athletic Complex at Edgewood High School at 2219 Monroe Street *subject to the recommended conditions* of approval . . . *and input at the public hearing*." PFOF 169 (emphasis added).  Staff did not find that the conditional use standards *were* met but only that the Plan Commission *could* determine they were met after consideration of the input from the public hearing. PFOF 170.

At this May 11, 2020 Plan Commission meeting, the Plan Commission found the standards for conditional use were *not* met and placed the conditional use on file without prejudice. PFOF 171. Specifically, the minutes indicated that:

> The Plan Commission could not find standard number 3 met finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties and that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera.

22

PFOF 172. The minutes went on to state that "Members [of the Plan Commission] indicated they would be open to considering the request again.  (When it addresses the noise impacts) was presented by the applicant, including improved engagement with the neighborhoods and a limit to the number of games with lights." PFOF 173.

On May 21, 2020, Edgewood appealed the decision of the Plan Commission to the Common Council, which heard the appeal on January 19, 2021. PFOF 174, 175. The Common Council voted 13-4 to uphold the Plan Commission's decision. PFOF 176. Alder Evers testified:

> Q. Looking at the record, the totality of that record that was before you as an alder for the City of Madison, what did you -- what evidence did you rely upon in coming to that conclusion?
>
> A. Well, principally, there is two points. One, that Edgewood offered no substantial evidence required under state law that an applicant do so[,] that the uses, values, and enjoyment of the property in the neighborhood for purposes already established would not be substantially impaired or diminished in a foreseeable manner.
>
> They offered no substantial evidence that this would not occur. And, in fact, they ignored their own sound study's indication that just the crowd noise from just a collection of 150 people attending an athletic contest would exceed a 70 decibel level within the adjoining neighborhoods.
>
> They did not address -- offer any testimony about property values, how property values would not be impacted. Residents were concerned about the potential impact on their property values.
>
> They did not address concerns of families who had young children in the neighborhood who go to sleep, say, at 7:00 or 7:30. You're a father, you know what that's like, toddlers go to sleep early. How that these homes just within a hundred feet of an athletic field were holding night games with cheering crowds and a play-by-play announcement and pep band, how that this could interrupt sleep.
>
> They offered no substantial evidence, not no [one] iota of substantial evidence that the uses, values, and enjoyment of other property in the neighborhood for purposes that were established, that they had lived there for years, would not be substantially impaired.
>
> They chose not to offer that in their -- they simply said in their meetings, the six meetings that were held after the Plan Commission denial, that they did not believe

the impacts would be that bad. They offered no evidence to become -- that they wouldn't; they just said they didn't believe it's so.

So, Jonathan, they just didn't offer substantial evidence, and for that reason -- whereas the residents did. They offered what I believed to be substantial impacts or evidence that those impacts were foreseeable, were clearly foreseeable. They could be anticipated and they were reasonable concerns.

Now, despite the recommendations of the planning staff on a near unanimous basis, the Plan Commission agreed that the applicant did not offer substantial evidence that they would be able to abide -- live up to the standard, standard -- standard 3.

So that's the reason why that I voted the way I did, and that's the way that the overwhelming majority of council members joined in accepting the verdict of the Plan Commission.

PFOF 177. He further testified:

Q. The second category of the evidence that you considered and relied upon in your vote was the research that you said was presented to you by these neighbors; is that fair?

A. And may I respond to that? Research also provided by Edgewood.

Q. Okay. Let's talk about the research provided by the neighbors.  What neighbors provided you with research that you found to be compelling? Identify the neighbors for me that provided research that you found to be compelling.

A. The neighbors paid for a sound study by, I believe it's Weiss Engineering (ph). It's in Legistar.  You would have to -- I don't have the file or anything like that.  But they paid for a study to be able to make, you know, scientific determinations based on measurements and mapping what the potential for those impacts would be on the adjoining neighbor.

Q. So we have the Weiss sound study.  What other piece of research did the neighbors provide you that you relied upon that you found to be compelling?

A. Again, measurements taken of games being held in the area. Videos of the those games. Research about -- that they had done regarding the impact on property values. And other cities where stadiums were built in a neighborhood -- traditional residential neighborhood, that kind of thing.

PFOF 178. The Common Council had a voluminous amount of evidence before it related to

Edgewood's conditional use application, including the following:

- A sound study performed by Wise Associates that the neighbors living near Edgewood submitted;

- A sound study performed by Talaske and TLC Engineering that Edgewood submitted;

- Testimony and information that the proposed improvements would decrease property values, some of which was verbal but some were contained in written comments;

- A letter from Friends of Lake Wingra opposing Edgewood's proposed improvements based on the potential environmental impact;

- Videos that some of the public submitted related to the light glare and sounds of athletic games (including ones taken of Edgewood's use of its field), and the potential impacts on the neighborhood.  One resident wrote "When my husband deployed to Afghanistan in 2018, we tried to find ways to connect across the distance and the time zones -- as it turns out, great preparation for connecting during a pandemic. One day he met us at 3:30am, his time, for dinner over video chat. A soccer game was taking place on the field, which became so loud, with the windows closed, that we could no longer have a conversation in the dining room at the back of our house" and she took and sent a link to a video of that game, which she says she recorded from inside her house;

- Testimony from the public about how their uses, values and enjoyment of their property would substantially impaired or diminished;

- Testimony raising concerns about whether Edgewood would abide by the conditions given its past behavior and suggestions of Edgewood being dishonest.

PFOF 179.  Additional facts will be addressed below.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In making that determination, courts must "'consider all of the evidence in the record in the light most favorable to the non-moving party,'" and "'draw all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Illinois Central R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). Allegations are insufficient to show a genuine dispute; they must be supported by specific citations to the record, including depositions, documents, declarations, or other materials sufficient to show that "the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). *See also* Fed. R. Civ. P. 56(c)(1)(A).

To survive summary judgment, the opposing party "must make a 'showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Only disputes over material fact matter at summary judgment—specifically, disputes that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

Edgewood brings seven causes of action in its complaint. Count I and II are claims under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA);[3] Count III is a

---

[3] In its Order granting in part and denying in part Defendants' motion to dismiss (Dkt. 28), the Court found that while "the City's actions in passing a new lighting ordinance could properly be characterized as corrective," and that "there is no requirement that the city must award a permit to correct an action," the Court disagreed with Defendants' position that RLUIPA's safe harbor provision bars claims for damages arising from past violations of RLUIPA. (*Id*. at 11–12). The Court also disagreed with Defendants' position that all claims relating to actions taken while Edgewood's master plan was in effect are moot, which was based on similar reasoning to Defendants' safe harbor argument. Defendants believe

claim under the First Amendment; Count IV is a due process claim based on vagueness; Count V is a claim that plaintiff has a vested right to lighting; Count VI seeks judicial review of the Common Council's denial of a conditional use permit; and Count VII is a claim under Article I, Section 18 of the Wisconsin Constitution for infringement of religious freedom. As the law for Counts I, II, III and VII are inter-related, those claims will be addressed together followed by the remaining Counts.

## I.     NONE OF THE CITY'S ACTIONS VIOLATED RLUIPA'S EQUAL TERMS CLAUSE.

Edgewood erroneously asserts the City violated RLUIPA's equal terms clause. That clause is violated when a government "impose[s] or implement[s] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C.A. § 2000cc. To determine whether a religious institution has been given less than equal treatment when compared to a secular institution, the Court must look to see whether two institutions subject to the same land use regulations have been treated differently under the same accepted zoning criteria. *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 368–71 (7th Cir. 2010); *Eagle Cove Camp & Conf. Ctr., Inc. v. Town of Woodboro, Wis.*, 734 F.3d 673, 683 (7th Cir. 2013) (*abrogated on other grounds as recognized in Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006). A plaintiff must point to a similarly situated secular comparator that received more favorable treatment under the same zoning regulation. *Vision Church*, 468 F.3d at 1003. If a religious institution and its secular comparator "are treated the same from the standpoint of an accepted zoning criterion, that is enough to rebut an equal-terms

---

in the validity of those arguments and respectfully incorporate them for purposes of preserving those arguments for appeal, but understand the Court's ruling on those issues.

claim." *Eagle Cove Camp*, 734 F.3d at 683 (quoting *River of Life Kingdom Ministries*, 611 F.3d at 373) (alteration and ellipsis omitted).

Edgewood has posited two institutions as similarly situated secular comparators: the University of Wisconsin-Madison ("UW-Madison"), and Madison Memorial High School[4] ("Memorial High School") but neither of these institutions has ever filed a permit to light its open-space athletic facilities while subject to the same ordinances that applied to the lighting permit applications that Edgewood sought. For this reason, in addition to other reasons explained below, UW Madison and Memorial High School are not similarly situated comparators and Edgewood's equal terms RLUIPA claim fails.

## A.  UW-Madison is not a similarly situated secular comparator to Edgewood.

Edgewood claims that it was treated on less than equal terms to UW-Madison because in 2018, the City approved UW-Madison's application to install lights near Nielsen Tennis Stadium. Edgewood claims that the UW-Madison's master plan does not identify lights at that location, nor does it list athletic contests as a use of the site. (Compl., dkt. #1, ¶284.)

There are a number of problems with this argument. First, UW-Madison's application for the Nielsen tennis court was submitted in March 2018 ***before*** UW-Madison's master plan became effective, which occurred on January 1, 2019. PFOF 205-206. UW-Madison's application was therefore not subject to its master plan, which by definition means that UW-Madison is not a proper comparator. *See* Wis. Stat. §66.10015 ("if a person has submitted an application for an approval, the political subdivision shall approve, deny, or conditionally approve the application solely based on" the "requirements of a political subdivision that are in effect at the time the application for an approval is submitted to the political subdivision.").

---

[4] The school is currently in the process of changing its name from James Madison Memorial High School to Vel Phillips Memorial High School.

As the case law points out, an institution that was not subject to the same zoning rules and regulations as Edgewood cannot be a proper comparator as a matter of law. *See River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 369–70 (7th Cir. 2010) (quoting *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006)) ("the fact that [the church] and the elementary schools [which the church also contended were comparable, and which were permitted under a prior city ordinance but would have been excluded under the current ordinance] were subject to different standards because of the year in which their special use applications were considered compels the conclusion that there was no unequal treatment") (alterations in *River of Life*). Since UW-Madison was not subject to a master plan at the time of the application, it was not subject to the same zoning rules as Edgewood and the comparison fails.

Moreover, despite Edgewood's contentions, UW-Madison's master plan does reference the Nielsen Tennis Court expansion project, and regularly references the tennis stadium's use when discussing the University's major event facilities and athletic competition venues. PFOF 207-213. UW-Madison even made reference to its "large sporting events" on the same page where it depicted the Nielsen Tennis Stadium. PFOF 212.

Finally, there are other factors to show that UW-Madison is not a suitable comparator. The University does not pull or obtain any electrical permits from the City because the University is a charter entity of the state, similar to the City itself, and the only local regulation that the University is required to comply with is the City's zoning code. PFOF 216.

## B.  Memorial High School is not a similarly situated secular comparator to Edgewood.

Edgewood similarly argues that Memorial High School was treated more favorably than Edgewood and is a suitable comparator because the City approved Memorial's application in 2018 for lights for its athletic field. (Compl., dkt. #1, ¶285.) However, Edgewood's 2019 lighting

applications were fundamentally different from Memorial's 2018 application because Memorial never had a master plan and therefore, was not subject a master plan ordinance. PFOF 199. Edgewood was bound by the terms of its master plan, which excluded athletic competitions. Memorial, on the other hand, was subject to Madison's lighting ordinances, which permitted it to engage in any of the uses identified in the Campus-Institutional District ordinance, as written in 2018. The CI-District ordinance, at the time of Memorial's application in 2018, did not require conditional use permits for structures that were less than 4,000 square feet, and did not require conditional use permits for changes in use. PFOF 25.

In addition, Memorial's application was to **replace** its existing light poles (which date back to the 70's), and the City considered that maintenance, not a capital improvement or a new use. PFOF 198-202. The amendment to the City's CI-District Ordinance does not effect a religious gerrymander.

Edgewood next claims that the Common Council's October 2019 amendment to the Campus-Institutional District ordinance was an impermissible "religious gerrymander" specifically designed to prevent Edgewood from having lights on its athletic field. Compl., dkt. #1, ¶¶205, 290. "[A] religious 'gerrymander' that departs from basic principles of neutrality may [] support a[n] RLUIPA Equal Terms violation." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1309 (11th Cir. 2006). However, "[t]o prove this kind of statutory violation, [Edgewood] would have to show that the challenged zoning regulation separates permissible from impermissible assemblies or institutions in a way that burdens 'almost only' religious uses." *Id*.; *see also Vision Church*, 468 F.3d at 1003.

Edgewood cannot meet that burden. The 2019 CI-District amendment applies equally to all institutions in the City zoned Campus-Institutional that lack a master plan. This includes all of

the City's public high schools. Indeed, many of the alders who voted for the amendment, and

who participated in drafting it, did so due to concerns that public high schools within their

districts would be able to establish significant new uses of their properties without community

input. PFOF 129-133, 137, 152.

## II.     EDGEWOOD'S FREE RELIGIOUS EXERCISE HAS NOT BEEN SUBSTANTIALLY BURDENED.

Edgewood next argues that its current inability to host night games on its campus is a

substantial burden because 1) it cannot host traditional religious exercises such as mass or prayer

on its own field at night, nor can it host pep rallies or community events on its field at night 2) it

is more difficult for some students, parents, and fans to travel to off-campus athletic sites than to

attend a game hosted on-campus, 3) "the unique feeling of hosting an onsite home game in front

of the Edgewood community is an irreplicable show of community support to Edgewood's

current student-athletes and a draw for perspective student-athletes," and 4) the money used to

rent off-campus facilities could be put to other uses if Edgewood could host its own games at

night. PFOF 229. Edgewood's assertions do not carry the day.

To begin, a substantial burden is a burden that "puts substantial pressure on an adherent

to modify his behavior and to violate his beliefs." *Thompson v. Holm*, 809 F.3d 376, 379–80 (7th

Cir. 2016) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d

624 (1981)) (brackets omitted). "A substantial burden must place more than an inconvenience on

religious exercise." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729,

739 (6th Cir. 2007) (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228

(11th Cir. 2004)) (brackets and quotation marks omitted).

In a factually similar case, the Eighth Circuit found that a private Catholic school "ha[d]

not demonstrated that its religious exercise is substantially burdened, rather than merely

inconvenienced, by its inability to use its baseball field at night." *Marianist Province of United States v. City of Kirkwood*, 944 F.3d 996, 1001 (8th Cir. 2019). The court announced that it "agree[d] with other circuits that have concluded requiring a religious institution to use feasible alternative locations for religious exercise does not constitute a substantial burden." *Id.* (citing *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004) (finding that a Christian college was not substantially burden by being denied the ability to offer religious education at its preferred site when it was not "precluded from using other sites within the city"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227-28 (11th Cir. 2004) (requiring a synagogue to relocate was not a substantial burden even though it required elderly congregants to "walk[ ] a few extra blocks"); *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1007-09 (6th Cir. 2017) (Christian school not substantially burdened by denial of permit to relocate to a more convenient location because the school could still carry out its religious mission at its current location)).

Importantly, the Court in *Marianist Province* noted that the plaintiff Catholic school was "not being forced to violate its religious beliefs." 944 F.3d at 1001. "Rather, [the city's] regulations require only that [the school] engage in these forms of exercise—community outreach, athletic activities, student prayer, etc.—either during the day or at alternative locations." [5] *Id.*

Similarly, Edgewood has not identified a Catholic tenet that requires it host sports games at its Monroe Street location, at night, *see Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (finding no substantial burden where synagogues congregants did "not claim that their current location has some religious significance such that their faith requires

---

[5] Notably, Edgewood has never used another field for any nighttime use other than sports. PFOF 194.

a synagogue at this particular site."), and Elliott admits that "'for the most part" Edgewood has been able to host its athletic games at other fields. PFOF 219.

Edgewood's football program has been able to play night games at other venues and Edgewood's boys soccer has been able to play home night games at Reddan Park in Verona. PFOF 192-193. Elliott also admits that Edgewood has had at least some amount of partnerships with nonprofits regarding daytime use of its field and that those partnerships have occurred even without the lights on its athletic field. PFOF 220. It is not a substantial burden on Edgewood's free exercise of religion for Edgewood to limit itself to day games, or to host a portion of its home games at alternative locations.

In another similar case, a church (which also ran a school) argued that a city ordinance prohibited buildings over 25,000 square feet substantially burdened its free exercise of religion, as it prevented the church from expanding its facilities to build a 34,989 square foot gymnasium on-site. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 737 (6th Cir. 2007). The facts showed that the church was "unable to practice its religious beliefs in its current location because the facilities are too small for the needs of the congregation and staff" and that "[l]ack of adequate space has already forced Plaintiff to choose between its daycare ministry and its Christian Education ministry." *Id*. Further, the church was found to be "severely limited in its ability to recruit for the school because of the uncertainty about the future space and the current lack of programming." *Id*.

Despite these findings, Sixth Circuit determined that the church was not substantially burdened by the ordinance. As the court explained:

> The Township's denial does not preclude the church from moving its
> school to the church property; it does not require the church to forgo
> providing religious education; it does not preclude the church from
> enrolling students in its school; it does not prevent church members from

> entering the property and conducting worship or prayer services; it does
> not preclude the church from running religious programs and meetings in
> the evenings and on weekends; it does not preclude the church from
> accepting new members into its congregation.

*Id*. at 738.

While the court "underst[ood] the church's reason for wanting a gymnasium" and "concede[d] that it would be more convenient to have that facility onsite," the court was "hard-pressed to conclude that Living Water will be unable to carry out its church missions and ministries without it" and concluded that "mere inconvenience" does not "equate[] to a substantial burden." *Id*. at 739.

Edgewood "has not shown that its religious exercise will be substantially burdened by being limited to using its [athletic] field only during daylight hours, as it has for decades." *Marianist Province of United States*, 944 F.3d at 1001. To the extent that Edgewood's religious mission rests on its ability to host home games for its sports teams, Edgewood can fulfill that religious mission by hosting athletic contests during the daytime, or by hosting games at alternative facilities in the evening, as it always has. The mere inconvenience of having to find alternate locations for its night games is not a substantial burden. [6]

Further, Edgewood also has not been substantially burdened by the City's actions because Edgewood never had a reasonable expectation that it would be able to host night games on its field—an important factor that courts consider. *See Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 515 (4th Cir. 2016) ("The plaintiffs here never had a reasonable expectation that the property could be used as a church," and therefore the City's "denial of the variance in

---

[6] In addition, as Edgewood's president Michael Elliot testified, even if Edgewood hosted night games at its own field rather than an alternative location, its students would still need to travel and transport themselves (or be transported by their parents) home. PFOF 218. There is no evidence that it is more convenient for any given student to transport themself to and from Edgewood than it would be to transport themselves to and from Breese Stevens or Middleton High School.

the present case did not alter any pre-existing expectation that the plaintiffs would be able to use the property for a church facility"); *Christian Assembly Rios De Agua Viva v. City of Burbank, Illinois*, 237 F. Supp. 3d 781, 789 (N.D. Ill. 2017) (no substantial burden where "the Church had no reasonable expectation of using the property for religious purposes and assumed the risk of the SUP's denial and any zoning changes preventing use of the property as a church").

Additionally, "[a] self-imposed hardship generally will not support a substantial burden claim under RLUIPA, because the hardship was not imposed by governmental action altering a legitimate, pre-existing expectation that a property could be obtained for a particular land use." *Andon*, 813 F.3d at 515.

Here, the language in Edgewood's master plan is a self-imposed hardship, one that demonstrates Edgewood never had a pre-existing expectation that its field could be used for night games. Adopting a master plan has a number of advantages for an institution; notably, a decade's worth of projects and developments can be approved up-front instead of having to go through the risks and costs associated with pursuing a conditional use permit for each individual project. PFOF 25-28, 5-9. However, if an institution wishes to pursue projects or uses not identified in the master plan, the institution must amend the master plan to reflect those projects or uses. *See, e.g.*, PFOF 24, 83. The end result is that the trajectory of an institution's future development and uses will be predictable for both the institution and its neighbors.

However, before an institution can take advantage of those benefits, a master plan needs to be approved by the City's Common Council, PFOF 13, which means a master plan must garner some level of political support. If the community broadly opposes the projects named in the master plan, that opposition may influence Common Council members to vote against adopting it.

Perhaps to ensure the plan obtained approval, Edgewood worked closely with the neighborhood associations representing the Vilas and Dudgeon-Monroe neighborhoods in drafting the master plan. PFOF 38-39. As the document itself states, "[t]he final master plan is the product of extensive engagement, collaboration and effort" between Edgewood and the neighborhood associations (neighborhood associations that have objected to Edgewood building lights since the 90's). PFOF 45-48, 72-75. The end result of this process was a master plan that carefully dictated the height, location, and visibility of lights, and that stated that Edgewood's athletic field would be "[u]sed for team practices, physical education classes." PFOF 35, 42. If Edgewood ever had a reasonable expectation it could erect stadium lights to host athletic competitions on its field, it certainly did not after it self-imposed a master plan that clearly excluded stadium lights or night games.

## III.   EDGEWOOD'S REMAINING FREE EXERCISE CLAIMS ARE UNAVAILING FOR LARGELY THE SAME REASONS THAT ITS RLUIPA CLAIMS FAIL.

Edgewood also claims that the City violated Edgewood's rights to Free Exercise under the First Amendment.[7] The Court need not analyze these claims separately because, while it is possible to violate RLUIPA without violating the First Amendment, the First Amendment cannot

---

[7] Edgewood also briefly asserts in its complaint that by not affording Edgewood the ability to host night games on its field, the City has impermissibly imposed content-based restrictions on Edgewood's right of free speech and free assembly. However, sporting events are not expressive conduct falling within the protections of the First Amendment's rights to freedom of speech and assembly, absent additional context not present here (such as a competition held as a protest, *see e.g. Selfridge v. Carey*, 522 F. Supp. 693, 696 (N.D.N.Y. 1981) (restraint on Ruby match between American and South African teams strongly suggested censure due to the "singularly dramatic nature of the racial issue involved")). *See e.g.*, *Hernandez-Gotay v. United States*, 985 F.3d 71 (1st Cir. 2021), *cert. denied sub nom. Ortiz-Diaz v. United States*, 2021 WL 4733320, 211 L. Ed. 2d 178, 142 S. Ct. 336 (2021) ("Plaintiffs' assertion that cockfighting expresses [Puerto Rican] culture and deeply rooted sense of self-determination is insufficient to show that their sponsorship or exhibition of cockfighting would reasonably be understood by the viewer to be communicative" and thus does not implicate free speech) (brackets and quotation marks omitted); *Id.* at *80 (Because nothing in the animal cruelty statute "curtails any discussion or expression of a person's views regarding cockfighting" or "restrict[s] assembly for those purposes at all" the statute does not implicate freedom of assembly).

be violated in a zoning context without violating RLUIPA and the remedies afforded by

RLUIPA and the First Amendment are the same. *See Schlemm v. Wall*, 784 F.3d 362, 363 (7th

Cir. 2015) (bypassing the plaintiff's First Amendment arguments because RLUIPA "provides

greater protection"); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006)

("Given the similarities between RLUIPA § 2(a)(1) and First Amendment jurisprudence, we

collapse Vision's claims for the purpose of this analysis; this approach seems most consistent

with post-RLUIPA case law.").

The Court also need not consider Edgewood's claims under Wisconsin's Free Exercise

Clause separately, because while Wisconsin's Constitution offers greater protection to religious

exercise than the First Amendment, Wisconsin courts interpreting the Wisconsin Constitution

apply the same strict scrutiny test that federal courts apply to RLUIPA or RFRA (Religious

Freedom Restoration Act) claims. *See James v. Heinrich*, 2021 WI 58, ¶ 45, 397 Wis. 2d 517,

960 N.W.2d 350, 371 (applying Wisconsin Constitution) ("The least-restrictive-means standard

is exceptionally demanding, and it requires the government to show that it lacks other means of

achieving its desired goal without imposing a substantial burden on the exercise of religion by

the objecting party.") (quoting *Holt v. Hobbs*, 574 U.S. 352, 364-65 (2015)); *see also Peace*

*Lutheran Church & Acad. v. Vill. of Sussex*, 2001 WI App 139, ¶ 21, 246 Wis. 2d 502, 517, 631

N.W.2d 229, 237 (applying Wisconsin Constitution and noting it is more prohibitive than the

First Amendment; and stating, because the plaintiff failed to prove that its "sincerely held

religious belief" was "substantially burdened ... our analysis could stop here. However, we ...

briefly address the last two prongs ... that the law is based upon a compelling state interest which

cannot be served by a less restrictive alternative").

However, to the extent the Court wishes to consider Wisconsin's Constitution separately, one aspect of the test that is more clearly articulated in cases applying Wisconsin's Constitution than the federal Constitution is that the alleged burden on religious exercise "cannot be generic but must be related to the exercise of a religious belief." *Noesen v. State Dep't of Regul. & Licensing, Pharmacy Examining Bd.*, 2008 WI App 52, ¶ 25, 311 Wis. 2d 237, 252, 751 N.W.2d 385, 392; *see also Cnty. of Jackson v. Borntreger*, 2012 WI App 97, ¶ 15, 344 Wis. 2d 125, 820 N.W.2d 157 (*unpublished*); *Kollasch v. Adamany*, 99 Wis. 2d 533, 550, 299 N.W.2d 891, 899 (Ct. App. 1980), (*rev'd on other grounds in*, 104 Wis. 2d 552, 313 N.W.2d 47 (1981)).

"[T]he application of civil law requirements to religious beliefs does not always result in a burden on those beliefs." *Peace Lutheran Church*, 2001 WI App at ¶ 20. "Free exercise of religion does not necessarily mean the right freely to act in conformity with a religion. The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Id.* (quoting *Lange v. Lange*, 175 Wis. 2d 373, 383–84, 502 N.W.2d 143 (Ct. App. 1993)) (quotation mark omitted). "Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." *Kollasch*, 99 Wis. 2d at 550–51.

In other words, the burden cannot simply be a general burden or cost on a religious organization's activities, even if those activities constitute religious exercise; the burden must have a coercive effect on the organization's sincere religious beliefs. As Wisconsin's Supreme Court explained in *Coulee Cath. Sch. v. Lab. & Indus. Rev. Comm'n, Dep't of Workforce Dev.*, Wisconsin's Constitution does not dictate "that ***anything*** interfering with a religious organization is totally prohibited. General laws related to ***building licensing***, taxes, social security, and the like are normally acceptable." 2009 WI 88, ¶ 65, 320 Wis. 2d 275, 313, 768 N.W.2d 868, 887.

38

For example, while it was held that the Sisters of Benedictine were "engaged in a religious activity in furnishing meals to their guests for consideration" their religious beliefs were not burdened by the imposition of a sales tax on those meals where there was no evidence that "the sales tax would have a coercive impact on their religious beliefs ...." *Kollasch*, 99 Wis. 2d at 557–58.

Similarly, absent evidence of a doctrine or dogma showing that a church held a sincere religious belief proscribing secular items such a fire sprinklers being visible in church, a Church's sincere religious beliefs are not burdened by a fire code's requirement that it install sprinklers. *Peace Lutheran Church*, 2001 WI App at ¶¶ 19-20.

Here, there is no evidence of any Catholic or Dominican tenet requiring Edgewood to host its athletic competitions at night, at a particular location. Instead, Edgewood argues that Wisconsin's Constitution grants Edgewood a right to host games at night, at the location it finds most convenient, regardless of the effect such would have on the established uses of Edgewood's neighbors. It is safe to say that, as a religious educational institution, every activity Edgewood engages in arguably seeks to advance the school's educational mission, and is therefore in furtherance of Edgewood's religious belief that it must educate "the whole student" (at least to the extent that could be said about football). If any ordinance impacting the cost or convenience of Edgewood's operations was considered a burden on Edgewood's sincere religious beliefs, then Edgewood would be exempt from every ordinance, state statute, or regulation unless that rule was the least restrictive means to accomplish a compelling state interest. This would be in contravention of *Coulee's* instruction that general laws such as building permits are normally acceptable when they do not coerce a practitioner to modify its religious beliefs. 2009 WI at ¶

65; *see also Peace Lutheran Church*, 2001 WI App ¶ 20 (free exercise of religion is not the right to act freely in accordance with religion).

Edgewood cannot show that the City's actions had a coercive effect on its religious beliefs, and thus, its free religious exercise is not burdened under the Wisconsin Constitution. To the extent hosting football (or other sports) games is in furtherance of its religious mission, Edgewood can continue to host those games during the day or at alternative facilities, as it has.

A final note about Wisconsin's Constitution is that "[t]he Wisconsin Constitution does not authorize suits for money damages except in the context of a takings claim." *Schworck v. City of Madison*, No. 19-CV-312-WMC, 2021 WL 1820779, at *19 (W.D. Wis. May 6, 2021) (referencing Wisconsin's Free Exercise Clause), *aff'd as modified*, No. 21-2055, 2022 WL 832053 (7th Cir. Mar. 21, 2022). Because Edgewood's claims do not involve the state taking property from Edgewood without compensation, any claims for damages under the Wisconsin Constitution must be dismissed with prejudice. *Id.* Additionally, to the extent Edgewood is "seeking an injunction for a violation of [its] rights under the Wisconsin Constitution, this Court cannot address that request for relief." *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S. Ct. 900 (1984) (state sovereign immunity prohibits federal courts from ordering state officials to comply with state law)).

## IV.    EDGEWOOD DOES NOT HAVE A VESTED RIGHT TO CONSTRUCT STADIUM LIGHTS.

Edgewood erroneously asserts that the lighting permit applications it filed on February 22, 2019 and September 30, 2019 gave it a vested right to erect stadium lights. (Compl., dkt. #1, ¶¶274, 295, 299.) To begin, vested rights are created only when a landowner submits a permit application that is conformant with a municipality's regulations. *See Golden Sands Dairy LLC v. Town of Saratoga*, 2018 WI 61, ¶ 22, 381 Wis. 2d 704, 718, 913 N.W.2d 118, 125. However,

"strict and complete conformance with applicable zoning and building code requirements" is required for rights to vest. *Lake Bluff Hous. Partners v. City of S. Milwaukee*, 197 Wis. 2d 157, 174, 540 N.W.2d 189, 195 (1995). "The rule is an exception to the general policy that property owners obtain no vested rights in a particular type of zoning solely through reliance on the zoning as it exists at the time." *Meinholz, LLC v. Dane Town Bd. of Zoning Appeals & Adjustment*, No. 2021AP346, 2022 WL 1421072, ¶64 (Wis. Ct. App. May 5, 2022) (citing *Golden Sands*, 381 Wis. 2d 704, ¶21 (alteration and quoted source omitted)). "Vested rights should only be obtained on the basis of strict and complete compliance with zoning and building code requirements, because a builder's proceeding in violation of applicable requirements is not reasonable." *Lake Bluff Hous. Partners*, 197 Wis. 2d at 175.

Here, Edgewood does not have a vested right to stadium lights because none of the lighting permit applications it filed complied with the zoning regulations in effect at the time of filing. It is undisputed that both Edgewood's February 22, 2019 application and its September 30, 2019 application were filed while Edgewood's master plan was in effect. A Campus-Institutional District master plan is a zoning ordinance and as such, Edgewood needed to fully comply with that duly enacted master plan before it could claim any vested rights. PFOF 15. The 2019 lighting applications were not compliant with Edgewood's master plan because stadium lights were not identified in the master plan as a current use, nor was installation of stadium lights identified as one of the 22 projects that Edgewood indicated in its master plan as to its future land use projects. PFOF 31-33. The CI-District Ordinance expressly stated that no alteration of an approved Campus Master Plan, ***including changes to the proposed use of identified open space areas and other open space uses, shall be permitted unless approved by the Plan Commission***. PFOF 24. Adding stadium lights to an athletic field was a change in use

41

of an open space that required amendment to the master plan. PFOF 77-79. Edgewood did not have approval from the Plan Commission to install stadium lights at the time of its lighting applications and thus, it was not in strict and complete conformance with applicable zoning code at the time.

In addition, Edgewood stated that the lights would be used to host athletic contests and Edgewood's master plan precluded Edgewood from hosting athletic contests on its field. PFOF 93, 83. Conspicuously, Edgewood's master plan stated that the field would be "[u]sed for team practices, physical education classes." PFOF 35. The total absence of any language indicating that the field would be used for athletic competitions was not an oversight. [8] As Edgewood knew, the adjoining neighborhoods have long "been vehemently opposed" to Edgewood "having lights or playing games" on its field.[9] PFOF 55. If Edgewood's master plan had been written to allow the school to use its field to host athletic contests, it may not have garnered enough neighborhood support to gain approval by the Plan Commission or the Common Council. PFOF

---

[8]  Edgewood's decision to specifically list team practices and physical education as the only two identified uses of the field can only be read to exclude athletic contests. *Expressio unius est exclusio alterius* (the expression of one thing excludes another) is a "well-established canon" in Wisconsin. *State v. Delaney*, 2003 WI 9, ¶ 22, 259 Wis. 2d 77, 88, 658 N.W.2d 416, 421 The canon applies "when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S. Ct. 748, 760, 154 L. Ed. 2d 653 (2003). "The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference s the term left out must have been meant to be excluded." *Id.* (citing E. Crawford, Construction of Statutes 337 (1940) (the canon applies "when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference")). Physical education and team practices form a natural association in a reader's mind. Both uses are natural uses for an athletic field, and neither is particularly disruptive to nearby neighbors. Included together, they create a strong contrast with the excluded use, athletic contests, which while also an arguable natural use of an athletic field, differs sharply from the two included uses by its potential to interfere with the established patterns of use in the neighborhood.

[9]  In 1996, Edgewood sought a conditional use permit to include a lighted stadium to host athletic contests. Following neighborhood opposition, lights and extra seating were removed from the application. PFOF 73-75.

55, 57-61. Even in 2015 when Edgewood upgraded its track, after the master plan had already been approved, Edgewood continued to assure neighbors that the field would be used for practices only. PFOF 57-61.

Edgewood contends in its Complaint (¶77) that master plans govern buildings, not uses, but this argument is foreclosed by the plain language of the Campus-Institutional District ordinance. M.G.O. §28.097(5) lists the necessary contents of a master plan. Among those requires are that the master plan "[i]nclude[] a description of existing conditions on the campus and the proposed conditions under the Master Plan, including. . . [l]and uses," "[f]uture land uses," "[l]andscape treatment," and "[o]pen-space areas and other open-space uses…." PFOF 34.

Similarly, M.G.O. §28.097(10), which governs changes to a master plan, states that "[n]o alteration of an approved Campus Master Plan, *including changes to the proposed use of identified open space areas and other open space uses*, shall be permitted unless approved by" city officials. Edgewood's athletic field is an identified open space on its master plan, therefore any change to the proposed use of that space required an alteration of the master plan with City approval. PFOF 35. In fact, changes to open space uses are the only type of master plan alteration that is specifically enumerated in the ordinance, suggesting that the City's legislative officials viewed the regulation of open space uses through the master planning process as essential. PFOF 24.

Not only did the master plan preclude the use of lights to host athletic contests, it prohibited the installation of lights on the field at all. The CI-District ordinance requires that a master plan identify all "[f]uture needs/capital improvements." M.G.O. §28.097(5)2.a. The plans contained in Edgewood's 2019 lighting applications (first for four eighty-foot stadium lights, then for four sixty-eight-foot stadium lights) certainly describe 'capital improvements.' *See also*

PFOF 105. A capital improvement is "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Swanson v. Nelson*, 209 Wis. 2d 84, 562 N.W.2d 928 (Ct. App. 1997) (quoting *United States Fire Ins. Co. v. E.D. Wesley Co.*, 105 Wis. 2d 305, 309, 313 N.W.2d 833, 835 (1982)).

Stadium lights are a capital improvements as they require the expenditure of labor and money, and because serve to make Edgewood's property more valuable. Because stadium lights are capital improvements, M.G.O. §28.097(5)2.a dictates that they must be identified in the master plan. Edgewood did not do so here, and thus, the 2019 lighting applications did not create any vested rights.

Edgewood also asserts in its complaint that it has a vested right to stadium lights because noncompliance with the master plan was the only cited defect in the September 2019 lighting application, and the repeal of the master plan cured that defect. Compl., dkt. #1, ¶295. However, "[a] property owner's rights do not vest until the developer has submitted an application for a building permit that conforms to the zoning or building code requirements *in effect at the time of application*." *McKee Fam. I, LLC v. City of Fitchburg*, 2017 WI 34, ¶ 47, 374 Wis. 2d 487, 506, 893 N.W.2d 12, 22; *see also* Wis. Stat. § 66.10015 ("if a person has submitted an application for an approval, the political subdivision shall approve, *deny*, or conditionally approve the application *solely* based on" the "requirements of a political subdivision that are in effect *at the time the application for an approval is submitted*"). Because the September 2019 application did not comply with the zoning rules in effect in September of 2019 as Edgewood's master plan was still in effect, the application did not create any vested rights.

V.    THE CITY'S DECISION TO PLACE EDGEWOOD'S CONDITIONAL USE
      PERMIT APPLICATION ON FILE WITHOUT PREJUDICE FULLY
      COMPLIED WITH WIS. STAT. §62.23 AND M.G.O. §28.183.

Edgewood argues in Count VI that the City violated Wis. Stat. §62.23 because the City

lacked substantial evidence supporting its determination that Edgewood's conditional use permit

application did not satisfy the requirements of Madison's conditional use ordinance, M.G.O.

§28.183. Compl., dkt. 31, ¶322. Edgewood is incorrect as the City found that Edgewood's

application did not satisfy M.G.O. §28.183(6)(a).3, which requires the City to determine that

"[t]he uses, values and enjoyment of other property in the neighborhood for purposes already

established will not be substantially impaired or diminished in any foreseeable manner" by the

conditional use.

A conditional use permit applicant—here, Edgewood—"must demonstrate that the

application and all requirements and conditions established by the city relating to the conditional

use are or shall be satisfied, both of which must be supported by substantial evidence." Wis. Stat.

§62.23(7)(de)2.b. "The city's decision to approve or deny the permit" must also "be supported

by substantial evidence." *Id.* Edgewood alleges that the Plan Commission's decision to place

Edgewood's conditional use permit application on file without prejudice was unsupported by

substantial evidence, as was the Common Council's decision to uphold the Plan Commission's

decision on appeal.

Edgewood's argument faces an uphill battle given the standards that apply to

municipality decision-making. As the Wisconsin Supreme Court has noted, "substantial evidence

is less than a preponderance of the evidence" but "more than a mere scintilla." *Oneida Seven

Generations Corp. v. City of Green Bay*, 2015 WI 50, ¶ 44, 362 Wis. 2d 290, 311, 865 N.W.2d

162, 172. Importantly, "the weight to accord the evidence lies within the discretion of the

municipality." *Id.* In addition, "[t]here is a presumption that the City's decision is valid." *Id.* at

45

309–10, 865 N.W.2d 171 (quoting *Edward Kraemer & Sons v. Sauk Cnty. Bd. of Adjustment*, 183 Wis. 2d 1, 8, 515 N.W.2d 256 (1994)).

In determining whether the substantial evidence test is met, a court conducting a certiorari review should take into account all the evidence in the record. *Oneida Seven Generations*, 2015 WI 50, at ¶ 45 (brackets and quotation mark omitted). "[M]unicipal administrative decisions need not be in writing" and "a detailed or explicit explanation of the City's reasoning is not necessary." *Id.* at ¶¶ 48-49. "A finding not explicitly made may be inferred from other properly made findings and from findings which the [City] failed to make, if there is evidence (or inferences which can be drawn from the evidence) which would support such findings." *Id.* at ¶ 49 (quoting *Valadzic v. Briggs & Stratton Corp.*, 92 Wis. 2d 583, 591, 286 N.W.2d 540 (1979)). The Wisconsin Supreme Court has upheld municipal decision-making noting that "the basis of the City's decision ..  can be discerned from the recording of the Common Council's ... meeting and the recording of the ... Plan Commission meeting." *See Oneida Seven Generations*, 2015 WI 50, at ¶ 50.

Both the Plan Commission, and the Common Council relied on substantial evidence to reach their decision. The videos of the Plan Commission and the Common Council meetings are attached as links to the Declaration of Tag Evers and are being submitted by counsel on a thumb drive. PFOF. 168, 175. The Plan Commission's consideration of the Edgewood conditional use application spans nearly 5 hours, and the Common Council's, nearly 4 hours. As the meeting minutes following the Plan Commission vote provide:

> The Plan Commission found the standards were not met and placed the conditional use on file without prejudice. The Plan Commission could not find standard #3 met, finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties, and that no evidence was submitted by the applicant that there would not be negative impacts

on the lighted use of the field, and no mitigating measures proposed to limit those impacts (noise barriers, limit on events, etc.).

Members indicated that they would be open to considering the request again if some redress of the noise impacts was presented by the applicant, including improved engagement with the neighborhoods and a limit to the number of games with lights.

PFOF 172-173.

The meeting minutes accurately reflect the sentiments of Plan Commission members as expressed at the hearing. As the notes reflect, Edgewood failed its burden to provide substantial evidence showing that the lights would not negatively impact the existing uses, values, and enjoyment of neighboring properties. Edgewood's District Alder wrote a letter to the Plan Commission noting that ***Edgewood's own sound study*** showed that nighttime noise levels would exceed 70 decibels. PFOF 177.

Additionally, Edgewood failed to provide substantial evidence that it would abide by the conditions recommended by City staff. In a memo written to the Plan Commission, City staff wrote that Plan Commission members *could* find the standards of M.G.O. 28.183 met *if* "without exception, the number of scheduled non-practice events . . . using the stadium lighting after 7:00 PM be limited to a number per school year . . ." However Edgewood, in its proposals to the Plan Commission, would only agree to be limited to the total number of home games it was scheduled to host every year, plus any home games it needed to host if one of its teams advanced through a championship competition. As was pointed out in a memo to Common Council members on appeal, the Plan Commission believed this 'limit' was really no limit at all. PFOF176. Further, neighbors raised concerns about whether Edgewood would comply with the conditions given its past behavior and suggestions of Edgewood being dishonest with neighbors. PFOF 179.

Alder Tag Evers, who was among the Common Council Members who voted to uphold the Planning Commission's decision, testified at deposition that he and other alders so voted partly due to the lack of substantial evidence offered by Edgewood:

> Edgewood offered no substantial evidence required under state law . . . that the uses, values, and enjoyment of the property in the neighborhood for purposes already established would not be substantially impaired or diminished in a foreseeable manner.
>
> They offered no substantial evidence that this would not occur. And, in fact, they ignored their own sound study's indication that just the crowd noise from just a collection of 150 people attending an athletic contest would exceed a 70 decibel level within the adjoining neighborhoods.
>
> They did not address -- offer any testimony about property values, how property values would not be impacted. Residents were concerned about the potential impact on their property values.
>
> They did not address concerns of families who had young children in the neighborhood who go to sleep, say, at 7:00 or 7:30. . . . How that these homes just within a hundred feet of an athletic field were holding night games with cheering crowds and a play-by-play announcement and pep band, how that this could interrupt sleep.
>
> They offered no substantial evidence, not no [sic] [one] iota of substantial evidence that the uses, values, and enjoyment of other property in the neighborhood for purposes that were established, that they had lived there for years, would not be substantially impaired.
>
> They chose not to offer that in their -- they simply said in their meetings, the six meetings that were held after the Plan Commission denial, that they did not believe the impacts would be that bad. They offered no evidence to become -- that they wouldn't; they just said they didn't believe it's so.
>
> So . . . they just didn't offer substantial evidence, and for that reason -- whereas the residents did. They offered what I believed to be substantial impacts or evidence that those impacts were foreseeable, were clearly foreseeable. They could be anticipated and they were reasonable concerns.

PFOF 177-178.

Not only did Edgewood fail to meet its burden to provide substantial evidence that stadium lighting would **not** harm the existing uses, values, and enjoyment of neighboring

properties, substantial evidence was submitted showing that the stadium lighting **would** cause such negative impacts. PFOF 179.

In addition to considering Edgewood's own study showing that noise levels would exceed 70 decibels, alders also considered a sound study commissioned by the neighbors which showed that noise levels would be even higher than the levels shown in Edgewood's study. PFOF 179.

Numerous members of the adjoining neighborhoods submitted oral and written testimony to that effect. Neighbors submitted videos of football games at other high schools in the area to demonstrate how loud and bright nighttime football games can be. PFOF 179. One neighbor testified that she couldn't carry on a Zoom conversation from her own dining room with her husband—a service member stationed overseas in Afghanistan—because the noise from an Edgewood daytime soccer game was too deafening. PFOF 179. Forced to end the call, she took recorded a video of the game (taken from within her own house) in which loud cheering and screaming can be heard. *Id.*

Numerous neighbors submitted evidence that night-time use of the field would harm their property values, including studies of sports stadiums in other cities. PFOF 179. In *Eco-Site, LLC v. Town of Cedarburg*, 2019 WI App 42, ¶ 17, 388 Wis. 2d 375, 386, 933 N.W.2d 179, 184–85, the Court of Appeals found that similar evidence and testimony constituted substantial evidence in support of a city's decision to deny a conditional use application. The *Eco-Site* court noted that many residents expressed serious concerns about property values, personally believing that there would be a negative impact, and one resident cited to a study published in a journal on the impact on property values for living near a cell tower. *Id.* at 2019 WI App 42, n.6. The court further noted that public hearings on CUPs are not subject to the rules of evidence, but even if

they were, "a witness may give his or her opinion as to value of property the witness owns." *Id.* at 2019 WI App 42, n.7, 388 Wis. 2d 386, 933 N.W.2d 185. Thus, the testimony from Edgewood's neighbors on the negative impact on property values alone was sufficient substantial evidence to deny Edgewood's conditional use permit.

The Common Council also had a letter from Friends of Lake Wingra opposing Edgewood's proposed improvements because it believed it could harm the "Lake Wingra Experience" and impact wildlife, which dovetailed with neighbors expressing how their use, and enjoyment of the wildlife on and surrounding Lake Wingra would be substantially impaired. PFOF 179. The Common Council also received testimony raising concerns about whether Edgewood would abide by the conditions given its past behavior and suggestions of Edgewood being dishonest with the neighbors. PFOF 179.

There was far more than a mere scintilla of evidence supporting not granting Edgewood's conditional use application—there was an abundance of evidence to support the City's decision to place the conditional use application on file without prejudice, which allowed Edgewood to come back to the Plan Commission at a later date and renew the request, after addressing issues and concerns that were raised at the public hearings. PFOF 171, 160.

## VI.     THE NOTICES OF VIOLATION DID NOT VIOLATE THE DUE PROCESS CLAUSE.

Edgewood next asserts that the City violated its due process rights by issuing (and then upholding) Notices of Violation warning Edgewood that it was not allowed to host athletic contests on its field. (Compl., dkt. #1, ¶263.) Edgewood argues that the phrase "athletic contests" is unconstitutionally vague. (*Id.* at ¶260.) Edgewood's argument has no merit because its use of the field without doubt fell within the prescribed conduct.

To begin, "a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves [officials] free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. State of Pa.*, 382 U.S. 399, 402–03 (1966) "[D]ifficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. *Jordan v. De George*, 341 U.S. 223, 231 (1951). "Impossible standards of specificity are not required." *Id.*

As the U.S. Supreme Court has directed, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495, (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.") "A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Vill. of Hoffman Ests*, 455 U.S. at 495; *see also Parker*, 417 U.S. at 757 ("In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged.")

Here, Edgewood's vagueness challenge is even one step removed. The Notices of Violation are not actually legislation. The Notices were merely written warnings informing Edgewood that it was violating the terms of its master plan. The master plan itself is the legislation that Edgewood was charged for violating; thus, contrary to Edgewood's complaint, it is the language in the master plan that must give Edgewood fair notice that its conduct was proscribed. There is no question that competitive soccer games, competitive lacrosse games, and

competitive track and field meets are not team practices or physical education classes based on an ordinary meaning of those terms. Edgewood's assertion that it is unclear whether scrimmages or powderpuff games are prohibited is irrelevant because the conduct Edgewood was actually charged with was clearly proscribed.

And, even if the language of the Notices themselves could be subject to a vagueness challenge, competitive soccer games, competitive lacrosse games, and competitive track and field meets are all clearly "athletic contests." Indeed, when the City raised this issue with Edgewood, its counsel responded by letter arguing that Edgewood's athletic competition games were a legal nonconforming use. PFOF 87. Edgewood's counsel had no difficulty understanding the conduct that the City contended was prescribed by the Master Plan. PFOF 83, 86-87.

In the end, it was Edgewood, not the City, that drafted the language in its master plan limiting use of the field to team practices and physical education. Edgewood can hardly claim that it did not understand the plain meaning of the words it wrote and bound itself to.

### VII.   ANY CLAIMS FOR DAMAGES ARISING UNDER STATE LAW ARE BARRED BECAUSE EDGEWOOD FAILED TO PROVIDE DEFENDANTS REQUISITE NOTICE OF CLAIM UNDER STATE LAW.

Wisconsin Stat. § 893.80(1d)(b), Wisconsin's notice of claim statute, exists to "afford[] a municipality the opportunity to compromise and settle a claim." *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 28, 235 Wis. 2d 610, 629, 612 N.W.2d 59, 70. The statute requires a plaintiff suing a municipality to present the municipality with a notice that that substantially complies with each of the following four elements: "A notice must 1) state a claimant's address, 2) include an itemized statement of the relief sought, 3) be presented to the appropriate clerk, and 4) be disallowed by the governmental entity." *Id.* The notice must be provided within 120 days after the happening of the event giving rise to the claim. Wis. Stat. § 893.80(1d)(a)–(b).

Once a municipality has affirmatively pleaded non-compliance with Wis. Stat.

§ 893.80(1d), the Plaintiff has the burden to prove it timely provided the municipality with a

notice substantially complying with the statute. *Thorp*, 2000 WI at ¶ 24. While the statute does

not affect Edgewood's federal claims, *Id.* at ¶ 21, noncompliance will preclude any claim for

damages arising under state law. Edgewood has provided no evidence of compliance with the

statute, so to the extent Edgewood claims damages under state law, those claims are barred.

## CONCLUSION

Edgewood's RLUIPA claims, its First Amendment claim and its claim under Wisconsin

Constitution Article I, Section 8 all fail and should be dismissed because the City's actions do

not substantially burden Edgewood's exercise of its religious faith and the City has not treated a

similarly situated secular comparator more favorably. Edgewood's claim that it has a vested right

to its stadium lights also fails because at the time of its lighting applications, Edgewood had a

master plan that precluded stadium lights, absent the filing of an amendment to the master plan

and obtaining Plan Commission approval.

Edgewood's attack of both the Plan Commission and the Common Council's decision to

place its conditional use application for stadium lights on file without prejudice fares no better

because the undisputed evidence demonstrates that there was substantial evidence to support the

municipality's decision, especially given the high hurdle that Edgewood must overcome to prove

otherwise. In addition, Edgewood's due process challenge is easily dispatched as "athletic

contests" in the Notices of Violation were not void for vagueness as to the prescribed conduct

where the language in Edgewood's master plan limited the field to practices and physical

education classes. Finally, Edgewood's failure to serve a notice of claim bars recovery of

damages on its state law claims. For these reasons, Edgewood's complaint should be dismissed, in its entirety, with prejudice.

Dated this 20th day of May, 2022.

Respectfully submitted,

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra, State Bar No. 1033159
Tanner G. Jean-Louis, State Bar No. 1122401
BOARDMAN & CLARK LLP
1 South Pinckney Street, Suite 410
P. O. Box 927
Madison, WI  53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Attorneys for Defendants*