IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,
Plaintiff,

v.

CITY OF MADISON, WISCONSIN;
CITY OF MADISON ZONING BOARD
OF APPEALS; CITY OF MADISON
PLAN COMMISSION; and CITY OF
MADISON COMMON COUNCIL;
Defendants.

Case No. 3:21-CV-118

**DECLARATION OF MATTHEW TUCKER**

I, Matt Tucker, under penalty of perjury, declare as follows:

1. I am an adult resident of the State of Wisconsin, and I was the Zoning Administrator for the City of Madison from June of 2005 to June of 2021. I was then promoted to the position of Building Inspector Division Director, which position I have held since July of 2021. I make this declaration in support of defendants' motion for summary judgment. This declaration is based on my own personnel knowledge or records kept in the ordinary course of the City's business.

2. In 2007, the City of Madison began working on re-drafting portions of its Zoning Code. Edgewood High School, the University of Wisconsin and Madison College had approached the City about creating a better process for approval of their building expansions without going through the conditional use process. At that time, whenever these institutions wanted to make changes to a building or

outdoor open spaces such as adding a parking lot, the institution would need to prepare a detailed conditional use application. That application would then be reviewed by various internal departments at the City (depending on the project) and would then have to go before the City's Plan Commission at a public hearing. Members of the public could attend those public hearings and speak out for or against the planned project after which, the City Plan Commission would vote on the proposed project. These institutions indicated to the City that the detail, expense, effort involved in preparing a conditional use application for a building that could be denied was relatively inequitable from their perspective and so they asked the City to help them create a better path for the evolution of their campuses. As a result, on January 2, 2013, the City of Madison enacted M.G.O. § 28.097, creating the Campus-Institutional Districts.

3. Under M.G.O. § 28.097, current medical and educational institutions could voluntarily choose to submit a ten-year master plan, which would be considered by the Common Council. Campus master plans were voluntary for existing educational and medical institutions, but mandatory for any new educational and medical institutions created after the passing of the ordinance. The Common Council's approval of a master plan had the effect of the master plan being an enacted ordinance of the City.

4. For institutions within the Campus Institutional District that did not adopt a master plan, the construction of a new building or additions to existing buildings that exceeded 4,000 square feet in floor area on a zoning lot required

conditional use approval. That was not true for institutions that had approved master plans. For institutions that had approved master plans, for any project identified in their approved master plan, the institution only needed to obtain approval of an architectural review committee. One of the key benefits of the master plan process is that the projects identified in the master plan were already approved as permitted with the architectural review committee reviewing items like the height, design, and materials of the construction.

5. The Campus Institutional District Zoning Ordinance contained an important restriction on institutions with approved master plans. It provided:

> No alteration of an approved Campus Master Plan, ***including changes to the proposed use of identified open space areas and other open space uses, shall be permitted unless approved by the Plan Commission***, provided however, the Zoning Administrator may, following consideration by the alderperson of the district, issue permits for minor alterations that are approved by the Director of Planning and Community and Economic Development and are consistent with the concept approved by the Common Council. If the change or addition constitutes a substantial alteration of the original plan, the procedure in Sec. 28.097(6) is required.

M.G.O. §28.097(10) (emphasis added).

6. Prior to the adoption of the Campus Institutional District Zoning, the property of the Edgewood campus was zoned residential.

7. In about March of 2017, I met with Mike Elliott about Edgewood's desire to move forward with a modified stadium. I informed Mr. Elliott that I did not feel the current master plan would let Edgewood proceed with a modified stadium without an amendment to the master plan. I explained to Mr. Elliot that installing lights and use of the field for nighttime activities would be a new and

different use than what was disclosed in their master plan and would require an amendment. I suggested to Mr. Elliott that he work with the neighbors to try to come agreement about the proposed change, and in particular, work with them on mitigating sound and noise that would occur with night games.

8. On October 17, 2018, I attended a neighborhood meeting at which there was discussion of Edgewood's proposal to add seating, lights, and a sound system to its athletic field. Edgewood presented its proposal at that meeting and described its current use of its athletic field.

9. Following that meeting, I sent an email to Elliott and Brian Munson, a consultant working with Edgewood. I indicated that I had reviewed Edgewood's master plan and , in the "Open Space Plan" (section 3.8) of Edgewood's approved master plan, it identified the use of the athletic field to be for "team practices, physical education practices." I wrote that the lack of any further language in this section, or any other language in sections of the adopted Master Plan, led me to the interpretation that current programing and usage of the field was operating outside of the allowances of the adopted Master Plan. I told Mr. Elliott and Mr. Munson that if they wanted to continue the level of athletic games being held on the field for 2019 and beyond, Edgewood needed to pursue an amendment to the approved Master Plan. I also told them that if Edgewood decided to pursue a stadium expansion at the athletic field, Edgewood should include language in this amendment that would incorporate allowing the current level of usage of the field to for games to be played. I did not include any neighbors or the neighborhood

associations on his email to Edgewood but simply noted the issue for Edgewood. My email to Mr. Elliott and Mr. Munson is Deposition Exhibit 64.

10. On November 14, 2018, Edgewood's then counsel, Katherine Rist, responded to my October 26 email to Mr. Elliott and Mr. Munson. Attorney Rist argued that to the extent Edgewood's Master Plan was interpreted in a way which does not expressly permit athletic competition games, Edgewood's position was that such use is a legal nonconforming use. Also on November 14, 2018, Edgewood filed an application to amend its master plan and included incorporating the current level of field usage for athletic competition games, as I had suggested.

11. On November 20, 2018, I responded to Atty. Rist by letter indicating that I disagreed with Edgewood's position that it established a legal nonconforming use. I also stated that I was aware that Edgewood had filed an amendment to its master plan that, if approved, would allow use of the athletic field for games would make the issue moot and that in such instances, the City's internal policy is to suspend enforcement pending the result of the application for amendment. I indicated in my letter that if the amendment was denied, "then the city will send a formal notice of violation, and at that time we can discuss how Edgewood wishes to proceed." My letter has been marked as Deposition Exhibit 66.

12. There is a specific process for certifying a use as a legal nonconforming use. Edgewood has never undertaken to go through that process, despite my repeated suggestions that they do so.

13. In late March 2019, neighbors near Edgewood contacted the City and complained that Edgewood was holding competitive games on its field in violation of its master plan. I sent an inspector, Jacob Moskowitz, to observe and after he witness athletic contests being held on the field, he issued Official Notices of Violation, which have been marked as Deposition Exhibits 9 and 11. The notices instructed Edgewood to "[d]iscontinue holding athletic contests on the athletic field at 2219 Monroe Street" and noted that "The Campus Master Plan states that the athletic field is used for team practices and physical education classes. The Master Plan can be amended pursuant to MGO 28.097(10). Edgewood could accomplish this by proceeding with the Campus Master Plan amendment application currently on file with the Planning Division." Notices of Violation are warnings. The City did not issue a citation or fine Edgewood.

14. Edgewood appealed the Notices of Violation to the Zoning Board of Appeals. The Zoning Board of Appeals held a public hearing on Edgewood's appeal of the Notices of Violation on July 11, 2019. I attended that hearing. Deposition Exhibit 76 is a transcript of the hearing. The Zoning Board of Appeals voted unanimously to affirm the decision of me, the Zoning Administrator, and determined that Edgewood was required to amend its master plan to play competitive games on its athletic field.

15. Deposition Exhibit 12 is a letter that City Attorney Michael P. May wrote to Edgewood of which I received a copy. Atty. May informed Edgewood that after ZBA denied Edgewood's appeal, further enforcement related to the Official

Notices rested within the discretion of the City Attorney, that he would not take further enforcement steps unless he gave Edgewood ample notice and inviting Edgewood to terminate its master plan.

16. The restriction on Edgewood playing athletic contests on its field was due to the language in Edgewood's Master Plan that Edgewood itself had drafted. If the Master Plan were repealed, Edgewood would be permitted to play athletic contests on its field pursuant to then M.G.O. §28.097. Edgewood decided to seek repeal of its master plan.

17. At a meeting on September 3, 2019, the Common Council took up a motion by Alder Bidar to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting. Three Plan Commission members—Alders Heck, Rummel and Lemmer—who were also on the Common Council spoke in favor of re-referring the repeal matter to its October meeting. The Common Council voted to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting, which was the next meeting after the September 16 meeting.

18. On September 30, 2019, Edgewood submitted a second lighting application for lights on its athletic field. Because Edgewood's Master Plan was still in place, I denied the lighting permit. The attachment to the email marked as Exhibit 84 contains a record showing my denial and the reason for my denial.

19. On October 1, 2019, the Common Council voted to amend the Campus Institutional Zoning Ordinance found in M.G.O. §28.097. The amendment provided that: (1) in a Campus-Institutional District without a Campus Master Plan, the

construction of a new building or additions to existing buildings that exceed four thousand (4,000) square feet in floor area on a zoning lot within any five (5) year period shall require conditional use approval; and (2) in a Campus-Institutional District without a Campus Master Plan, the establishment, improvement, or modification of any primary or secondary use occurring outside of an enclosed building shall require conditional use approval but the Zoning Administrator may issue permits to repair or replace any existing facility related to a primary or secondary use provided that the proposed facility is of a similar bulk condition and at a similar location on the zoning lot as with the existing facility.

20. I understand Edgewood to contend that it has been treated differently that other public high schools. I completely disagree. For example, West High School has an athletic field on site but does not have lights for that field. Instead, West plays its night games off-site at Mansfield Stadium, which is a field located on Memorial High School's site. West and Edgewood are similarly situated, and West does not have lights for its field.

21. I have heard Edgewood compare itself to Memorial High School, which does have lights on its athletic field, but Edgewood misconstrues the relevant facts regarding Memorial. First, Memorial never had a master plan and did not define or limit its use of that field in a master plan. Second, Memorial has had lights on its athletic field going back to the 1970s, long before the creation of the Campus Institutional District Zoning. Third, Memorial's lighting application was to replace the existing 6 light poles with 4 light poles, not installing all new lighting. As it

was simply replacing current lights, this was no different than how the City treated Edgewood as it related to Edgewood's request to replace and resurface its track and field in 2015. As even Mr. Elliott concedes, the City told Edgewood that because it was simply exchanging the current track with a new track that the City would classify that as a replacement or a maintenance item which would allow Edgewood to complete the project without amending its master plan.

22. I have also heard Edgewood compare itself to the University of Wisconsin as it relates to the University's addition of two tennis courts and outdoor lights as part of the Nielsen Tennis Stadium. However, the University submitted its application in around March of 2018, which is before its Master Plan became effective. The University's Master Plan did not become effective until January 1, 2019. In addition, the University did not use limiting language in its Master Plan as to use, unlike Edgewood and I was aware that neighbors of Edgewood actively opposed Edgewood's attempts to expand its use of its athletic field with lights and sound systems in the past prior to Edgewood's adoption of its Master Plan.

23. Further, the University's Master Plan, which was marked as Exhibit 46 at my deposition, contained repeated references to the Nielsen Tennis Stadium and its use. First, the University's master plan referred to an expansion to the Nielsen Tennis Stadium as one of its proposed projects at page 136. It also noted that "events" were currently being held at Nielsen Tennis Stadium (page 319). Page 319 of the Event Center Neighborhoods section defines Event Center Neighborhoods "as three distinct nodes within campus that contain the major event

venues" which "must be accessible for thousands of campus users and visitors." Page 319 also lists Nielsen Tennis Stadium as one of the event venues contained in an Event Center Neighborhood. On page 325, it states "The Event Center Neighborhood is composed of a series of athletic competition and practice fields, campus greens, and plaza spaces." That page also depicts and identifies Nielsen Tennis Stadium as part of the Event Center Neighborhood. In its landscaping section, the University also made reference to its "large sporting events" on the same page and in the same discussion where it depicted the Nielsen Tennis Stadium (p.324).

24. In addition, the University is differently situated from Edgewood because only portions of the University's campus are zoned Campus Institutional and the rest of the University's land is zoned as a PD District Zoning, which has a different set of rules. Further, the University does not pull or obtain any electrical permits from the City because the University is a charter entity of the state, similar to the City itself, and the only local regulation that the University is required to comply with is the City's zoning code.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 25th day of May, 2022.

Matthew Tucker

\\msnfs2\share\DOCS\WD\25981\424\A4275591.DOCX