# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL OF THE
SACRED HEART, INC.,

                          Plaintiff,

v.                                       Case No.: 3:21-cv-00118-wmc

CITY OF MADISON, WISCONSIN, *et al*.

                          Defendants.

---

## PLAINTIFF EDGEWOOD HIGH SCHOOL OF THE SACRED HEART, INC.'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ..................................................................................1

FACTS .................................................................................................3

SUMMARY JUDGMENT STANDARD.................................................24

ARGUMENT .......................................................................................25

I.   A REASONABLE JURY COULD FIND EHS DID NOT VOLUNTARILY RESTRICT ITSELF OR WAIVE ITS EXISTING RIGHT TO USE ITS ATHLETIC FIELD FOR ATHLETIC CONTESTS OR OTHER USES RELATED TO EHS'S RELIGIOUS MISSION. ............................................26

   A.   EHS President Mike Elliott had no intention to forgo EHS's historical use of the field. ......................................................................29

   B.   The ordinary and plain meaning of "athletic field" is a piece of land prepared for recreation and games—even competitive ones. ......................................30

   C.   According to the City's own understanding, "team practices" and "physical education classes" can also entail "athletic contests" and "competitions." ................32

II.  A REASONABLE JURY COULD FIND THAT THE CITY VIOLATED EHS'S RIGHTS UNDER RLUIPA. ..................................................................34

   A.   A Reasonable Jury Could Find that the City Treated EHS on Less than Equal Terms in Violation of RLUIPA's Equal Terms Provision............................................34

      1.   *The Seventh Circuit's equal-terms test focuses on the "accepted zoning criterion" that generally define the character of the zoning district at issue.*.............................................................36

      2.   *EHS's use of its athletic field did not differ with respect to the accepted zoning criteria that determine whether a use should be excluded from the Campus Institutional zone given the purpose for which the zone was established.*.............................................................37

      3.   *A voluntary, ten-year master plan is not an "accepted zoning criterion."* ..........39

      4.   *The City treated EHS's light permit application on less than equal terms with Madison Memorial's application under section 10.085.* ..............................40

      5.   *Even if a voluntary, ten-year master plan is an "accepted zoning criterion" under River of Life, the evidence shows the City has treated*

i

*UW, which has had a master plan in place, more favorably than it has treated EHS.* ...........................................................................................42

6. *The City unequally penalized EHS for not expressly identifying every single one of its existing and intended uses of its athletic field at a higher level of specificity than required of UW, the MMSD high schools or even the City itself used under M.G.O. § 28.097(3)(b).* ................................44

7. *The evidence of how the City "gerrymandered" its ordinances to target and thwart EHS's use of its field is also sufficient to support an equal-terms claim.* ....................................................................................................45

B. A Reasonable Jury Could Find that the City Imposed a Substantial Burden on EHS's Religious Exercise in Violation of RLUIPA. ......................................46

1. *The "Substantial Burdens" provision governed each of the City's land use decisions which barred or burdened EHS's uses and intended uses of its field.* ......................................................................................................47

2. *The Seventh Circuit's "Substantial Burden" Precedent in As-Applied Cases.* .......................................................................................................49

i.  Whether the Government caused the religious institution undue delay, uncertainty, and expense. ...................................................................51

ii.  Whether the Government has sought to deprive a religious institution from continuing an existing legal use of its property. .....................53

iii. Whether the Government has prevented the organization from using its facility to serve the religious objectives of the organization. .........54

iv. Whether the religious organization had reasonable expectation of using its property for religious exercise. ...............................................55

v.  Whether the City's denials were absolute or whether the City could have approved permits subject to condition....................................56

vi. Whether the City's restrictions undermined EHS's mission, message and partnerships. ...............................................................................58

vii. Whether the individual burdens cumulate to be substantial. ...........59

3. The Eight Circuit's Decision in *Marianist Province of the United States v. City of Kirkwood* is distinguishable and not controlling........................59

III. THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON EHS'S CONSTITUTIONAL CLAIMS...........................................................................61

A.  EHS's Freedom of Speech and Expressive Assembly Claim is Meritorious. .............62

B.  EHS's Free Exercise Claim is Meritorious.....................................................................64

C.  EHS's Vagueness Challenge to the City's Prohibition of "Athletic Contests"
    on EHS's Athletic Field Is Meritorious. .......................................................................66

IV. EHS HAD A VESTED RIGHT TO A LIGHT PERMIT. ..................................................67

V.  THE PLAN COMMISSION AND COMMON COUNCIL'S DECISIONS TO
    DENY EHS A CONDITIONAL USE PERMIT FOR OUTDOOR LIGHTS WAS
    IMPROPER UNDER WIS. STAT § 60.62(4e)(b)1. ..........................................................69

VI. EHS IS ENTITLED TO ALL "APPROPRIATE RELIEF," INCLUDING
    DAMAGES AND A LIGHT PERMIT.................................................................................72

CONCLUSION...........................................................................................................................75

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE**

*Abdullahi v. City of Madison*,
   423 F.3d 763 (7th Cir. 2005) .................................................... 56

*Acad. of Our Lady of Peace v. City of San Diego*,
   No. 09-CV-962, 2012 WL 13175857 (S.D. Cal. May 11, 2012)............................ 49

*Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v.*
   *Twp. of W. Pikelan*d,
   721 F. Supp. 2d 361 (E.D. Pa. 2010) ....................................... 63

*AllEnergy Corp. v. Trempealeau Cnty. Env't & Land Use Comm.*,
   2017 WI 52, 375 Wis. 2d 329, 895 N.W.2d 368 ................................ 33

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................... 24

*BBL, Inc. v. City of Angola*,
   809 F.3d 317 (7th Cir. 2015) ............................................... 64

*Bethel World Outreach Ministries v. Montgomery Cnty. Council*,
   706 F.3d 548 (4th Cir. 2013) ....................................... 56, 57, 60, 62

*Burnett v. LFW Inc.*,
   472 F.3d 471 (7th Cir. 2006) ............................................... 24

*Burson v. Freeman*,
   504 U.S. 191 (1992).......................................................... 64

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014).......................................................... 34

*Cachera v. Procarione*,
   805 F. Supp. 716 (E.D. Wis. 1992)........................................... 64

*Carey v. Piphus*,
   435 U.S. 247 (1978).......................................................... 73

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).......................................................... 24

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*,
   No. 09-CV-1419, 2017 WL 5015624 (D. Conn. Nov. 2, 2017) ....................... 52, 74

*Christensen v. Equity Co-op. Livestock Sale Ass'n*,
   134 Wis. 2d 300, 396 N.W.2d 762 (Ct. App. 1986) ............................ 26

*Christian Assembly Rios De Agua Viva v. City of Burbank*,
　237 F. Supp. 3d 781 (N.D. Ill. 2017) ............................................................ 37, 72, 73

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
　508 U.S. 520 (1993) ...................................................................................... 46

*Church of Our Lord & Savior Jesus Christ v. City of Markham*,
　913 F.3d 670 (7th Cir. 2019) ....................................................... 54, 72, 73

*Church of Our Savior v. City of Jacksonville Beach*,
　69 F. Supp. 3d 1299 (M.D. Fla. 2014) .......................................................... 74

*City of Watseka v. Illinois Public Action Council*
　796 F.2d 1547 (7th Cir. 1986) ...................................................................... 73

*Civil Liberties for Urban Believers v. City of Chicago*,
　*(CLUB)*, 342 F.3d 752 (7th Cir. 2003) ........................................ 49, 50, 51, 53

*Clark v. Cmty. for Creative Non–Violence*,
　468 U.S. 288 (1984) ...................................................................................... 62

*Corp. of the Cath. Archbishop of Seattle v. City of Seattle*,
　28 F. Supp. 3d 1163 (W.D. Wash. 2014) ........................................ 37, 39, 41, 42

*Cutter v. Wilkinson*,
　544 U.S. 709 (2005) ...................................................................................... 62

*Digrugilliers v. Consol. City of Indianapolis*,
　506 F.3d 612 (7th Cir. 2007) ........................................................... 35, 37

*Eagle Cove Camp & Conference Center, Inc. v. Woodboro*,
　734 F.3d 673 (7th Cir. 2013) ....................................................................... 50

*Fortress Bible Church v. Feiner*,
　734 F. Supp. 2d 409 (S.D.N.Y. 2010) ........................................................... 74

*First Lutheran Church v. City of St. Paul*
　326 F. Supp. 3d 745 (D. Minn. 2018) ........................................................... 58

*Fulton v. City of Philadelphia*,
　141 S.Ct. 1868 (2021) .................................................................................... 64

*Goelzer v. Sheboygan Cnty.*,
　604 F.3d 987 (7th Cir. 2010) ....................................................................... 24

*Golden Sands Dairy LLC v. Town of Saratoga*,
　2018 WI 61, 381 Wis.2d 704, 913 N.W.2d 118 .............................. 28, 67, 75

*Gresham v. Peterson*,
   225 F.3d 899 (7th Cir. 2000) ......................................................................... 66

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ......................................................................................... 61

*Guru Nanak Sikh Soc'y. of Yuba City v. Cnty. of Sutter*,
   456 F.3d 978  (9th Cir. 2006) ....................................................................... 57

*Hanz Trucking, Inc. v. Harris Bros. Co.*,
   29 Wis. 2d 254, 138 N.W.2d 238 (1965)....................................................... 27

*Holt v. Hobbs*,
   574 U.S. 352(2015)............................................................................... 34, 50

*Immanuel Baptist Church v. City of Chicago*,
   344 F. Supp. 3d 978 (N.D. Ill. 2018) ....................................................... 36, 40

*Indeps. Gas & Serv. Stations Assns. v. City of Chicago*,
   112 F.Supp.3d 749 (N.D. Ill. 2015) ............................................................... 66

*Karlin v. Foust*,
   188 F.3d 446 (7th Cir.1999) ......................................................................... 66

*Lawhead v. Ceridian Corp.*,
   463 F. Supp. 2d 856 (N.D. Ill. 2006) ...................................................... 26, 33

*Life Ctr., Inc. v. City of Elgin*,
   993 F. Supp. 2d 863 (N.D. Ill. 2013) ............................................................ 66

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*,
   510 F.3d 253 (3d Cir. 2007)........................................................................... 62

*Marianist Province of the U.S. v. City of Kirkwood*,
   944 F.3d 996 (8th Cir. 2019) ................................................................... 59, 60

*McKee Fam. I, LLC v. City of Fitchburg*,
   2017 WI 34, 374 Wis. 2d 487, 893 N.W.2d 12 ........................................... 67

*Memphis Cmty. Sch. Dist. v. Stachura*,
   477 U.S. 299 (1986)....................................................................................... 73

*Midrash Sephardi, Inc. v. Town of Surfside*,
   366 F.3d 1214 (11th Cir. 2004) ..................................................................... 51

*Occidental Fire & Cas. Co. of N.C. v. Cont'l Bank N.A.*,
   918 F.2d 1312 (7th Cir. 1990) ................................................................. 27, 29

*Ottman v. Town of Primrose,*
2011 WI 18, 332 Wis.2d 3, 796 N.W.2d 411 ........................................ 69

*Petra Presbyterian Church v. Vill. of Northbrook,*
489 F.3d 846 (7th. Cir. 2007) ............................................ 37, 55

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.,*
450 F.3d 1295 (11th Cir. 2006) ........................................ 35, 45

*Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975) .......................................................... 62, 63

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .......................................................... 64

*River of Life Kingdom Ministries v. Vill. of Hazel Crest,*
611 F.3d 367 (7th Cir. 2010) ...................... 35, 36, 37, 39, 41, 42

*Roberts v. U.S. Jaycees,*
468 U.S. 609, (1984) ........................................................ 66

*Roman Cath. Bishop of Springfield v. City of Springfield,*
724 F.3d 78 (1st Cir. 2013) .............................................. 59

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) (per curiam ...................................... 64

*Sanders v. Jackson,*
209 F.3d 998 (7th Cir. 2000) ............................................ 30

*Schad v. Borough of Mount Ephraim,*
452 U.S. 61 (1981) ............................................................ 65

*Schaefer v. United States,*
251 U.S. 466 (1920) .......................................................... 49

*Schlemm v. Wall,*
784 F.3d 362 (7th Cir. 2015) ............................................ 50, 54

*Schuster v. Lucent Techs., Inc.,*
327 F.3d 569 (7th Cir.2003) ............................................ 33

*Sherbert v. Verner,*
374 U.S. 398 .................................................................... 51

*Source Servs. Corp. v. Chicagoland JobSource, Inc.,*
643 F. Supp. 1523 (N.D. Ill. 1986) .................................. 49

*South Bay United Pentecostal Church v. Newsom,*
   141 S. Ct. 716 (2021) .................................................................... 65

*Sts. Constantine & Helen Greek Orthodox Church, Inc. v.*
   *City of New Berlin,*
   396 F.3d 895 (7th Cir. 2005) ........................... 47, 51, 52, 53, 55, 60, 74

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021) ................................................................. 64

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
   309 F.3d 144 (3d Cir.2002) ........................................................... 62

*Thomas v. Chicago Park Dist.,*
   534 U.S. 316 (2002) ..................................................................... 63

*United States v. Paradies,*
   98 F.3d 1266 (11th Cir. 1996) ........................................................ 67

*United States v. Patel,*
   778 F.3d 607 (7th Cir. 2015) ......................................................... 30

*Vision Church v. Vill. of Long Grove,*
   468 F.3d 975 (7th Cir. 2006) ..................................................... 37, 46

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ..................................................................... 62

*Westchester Day Sch. v. Vill. of Mamaroneck,*
   504 F.3d 338 (2d Cir. 2007) ........................................................... 57

*World Outreach Conf. Ctr. v. City of Chicago (World Outreach I),*
   591 F.3d 531 (7th Cir. 2009) ................................... 49, 53, 54, 59, 60

*World Outreach Conf. Ctr. v. City of Chicago (World Outreach II),*
   787 F.3d 839 (7th Cir. 2015) ................................... 48, 52, 54, 55, 60

## Statutes

42 U.S.C. § 1983 ........................................................................ 72, 74

42 U.S.C. § 1988 ........................................................................... 74

42 U.S.C. § 2000(b)(1) ................................................................... 35

42 U.S.C. § 2000cc-2 ..................................................................... 72

42 U.S.C. § 2000cc-2(b) ................................................................. 35

42 U.S.C. § 2000cc-3(g) .................................................................................. 35, 48

42 U.S.C. § 2000cc-5(5) ........................................................................................ 49

42 U.S.C. § 2000cc-5(7) ........................................................................................ 34

42 U.S.C. § 2000cc-5(7)(A) ................................................................................... 34

42 U.S.C. § 2000cc-5(7)(B) ................................................................................... 34

42 U.S.C. § 2000cc – 2000cc-5 ............................................................................... 3

42 U.S.C. § 2000cc(a)(1) ........................................................................... 34, 47, 48

42 U.S.C. § 2000cc(a)(2)(B) ................................................................................... 47

42 U.S.C. § 2000cc(a)(2)(C) ................................................................................... 48

42 U.S.C. § 2000cc(b)(1) ........................................................................................ 34

42 U.S.C. § 2000cc(b)(3)(A), (B) ........................................................................... 50

42 U.S.C. § 2000cc-3 .............................................................................................. 73

Wis. Stat. § 66.10015(2)(a) ..................................................................................... 67

Wis. Stat. § 60.62(4e)(b)1 ....................................................................................... 69

## Rules

Fed. R. Civ. P. 56(a) ............................................................................................... 24

Fed. R. Civ. P. 56(c) ............................................................................................... 24

Fed. R. Civ. P. 56(c)(1) ........................................................................................... 24

Fed. R. Civ. P. 56(c)(4) ........................................................................................... 24

Edgewood High School of the Sacred Heart ("EHS") respectfully submits its brief in opposition to the City of Madison's motion for summary judgment as follows:

## INTRODUCTION

The City's motion for summary judgment must be denied because there is sufficient evidence upon which a reasonable jury could find that:

- EHS did *not* voluntarily restrict or waive its known right[1] to continue using its only athletic field for "athletic contests" or "other uses related to the institution's primary mission." (Pl.'s Additional Proposed Findings of Fact ("APOF") ¶¶ 76-83.)

- EHS has sought to use its only field at night to further its religious mission to educate the whole student and promote the Sinsinawa Dominican values of community and partnership. (APOF ¶¶ 2-15.)

- To use its field at night, EHS submitted an outdoor lighting application which the City approved for compliance with the City's outdoor lighting ordinance, Madison, Wis., Gen. Ordinances (M.G.O.) § 10.085, and for compliance with the City's zoning ordinances on March 1, 2019. (APOF ¶¶ 91-112.) EHS thereby acquired a vested right to a light permit under state law.

- The City later withheld the light permit based on the errant contention and pretext that EHS had waived its right to use its athletic field for "athletic contests" or any activities outside of physical education classes and practices. (APOF ¶¶ 114-131.)

- By withholding EHS's light permit after its application was approved, the City treated EHS on less than equal terms with James Madison Memorial High School (Memorial),

---

[1]After EHS was rezoned Campus Institutional in 2013, it was allowed as of right to continue using its property for "outdoor sports and recreational facilities"; "stadiums, auditoriums, and arenas, open or enclosed," and "other uses related to the institution's primary mission." Madison, Wis. Gen. Ordinances § 28.097(3) (capitalization altered).

which received a light permit to install new lights on its athletic filed.  (APFOF ¶¶ 133-138.)

- By limiting EHS's use of its field to practices and physical education classes, the City treated EHS in an unequal and more restrictive manner than the other institutions that had also been re-zoned Campus-Institutional. (APFOF ¶¶ 152-167.)

- By limiting EHS's use of its field to practices and physical education classes, the City substantially burdened EHS's religious exercise and caused damages. (APFOF ¶¶ 256-260.)

- After EHS challenged the City's actions, the City represented to EHS that if its Master Plan was repealed the City "would allow games and lights at the field." (APFOF ¶¶ 169-173.)

- In reliance on the City's representations, EHS filed to repeal its Master Plan.  (APFOF ¶ 174.)

- The City delayed the repeal of EHS's Master Plan to rush through a new ordinance specifically drafted to ensure EHS would not get its lights through an objective outdoor lighting application process but would be forced to go through a discretionary and onerous conditional use permitting process. (APFOF ¶¶ 175-218.)

- The City did so to target EHS and ensure that EHS would not be permitted to have lights at the field like other Madison schools. (APFOF ¶¶ 197-208.)

- EHS nevertheless applied for a conditional use permit, and the City's Planning Division staff recommended that EHS's application be granted subject to certain conditions—which EHS agreed to accept. (APFOF ¶¶ 221-239.)

- On May 12, 2020, the Plan Commission disregarded the staff's recommendation and voted to completely deny EHS's application. (APFOF ¶ 240.)

- On January 19, 2021, the Common Council upheld the Plan Commission's decision. (APFOF ¶ 255.)

- Since the City's unlawfully withholding of the light permit in March 2019, the City has prevented EHS from using its only field after daylight hours.

- By limiting EHS's use of the field to daylight hours, the City has substantially burdened EHS's religious exercise and caused damages.

As will be argued more fully below, the City's actions violated EHS's rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc – 2000cc-5, the United States Constitution, and state law.

## FACTS

### EHS and Its Mission

Plaintiff EHS is a Catholic high school that has served the City of Madison since 1881. The Dominican Sisters of Sinsinawa founded the school at its current location on Monroe Street and have sponsored it ever since.  (APFOF ¶ 1.)  Their sponsorship comes with the expectation that EHS follows and teaches Catholic teachings and follows the Sinsinawa Dominican Sisters' mission.  (APFOF ¶ 2.)  The religious mission of the school is to educate the whole student – mind, body and soul –  through a rigorous academic curriculum.  (APFOF ¶ 3.)

As a Catholic institution, EHS furthers its mission by bringing students to EHS to preach and teach the Gospel and to instill in students the Sinsinawa Dominican values of Truth, Compassion, Justice, Community and Partnership.  (APFOF ¶ 9.)  To further its mission and these values, EHS seeks to partner with other institutions, and to foster a sense of community among its

students, teachers, coaches, families, alumni, and the broader Madison community. (APFOF ¶¶ 8,11.)

That mission, EHS's continued existence and its enrollment largely depends on its ability to attract students and families to attend EHS.  (APFOF ¶ 10.)  EHS's partnerships with the parochial schools in Madison provide the opportunity to share mission, vision, and values with the parochial schools' students and their families.  (APFOF ¶ 10.)  By hosting parochial school athletic events on its athletic field, EHS can connect with parochial students and their families and promote EHS's religious mission and values.  (APFOF ¶ 10.)  Such events serve much like an open house and are critical to EHS's ability to recruit parochial students and student-athletes.  (APFOF ¶ 10.)

Athletics is an integral part of EHS's religious mission to educate the whole student and further the Sinsinawa Dominican values of community and partnership. (APFOF ¶ 6.)  EHS's commitment to educating the whole student can be seen in the fact that every student is expected to participate in co-curricular activities and roughly 75% satisfy this expectation by participating in one or more of EHS's athletic teams. (APFOF ¶ 5.)  While EHS offers twenty-one (21) athletic teams and co-ops, EHS only has a single athletic field on its campus on which to try to schedule and host their games, practices, community and non-athletic events. (APFOF ¶ 7.)

**An Opportunity to Bolster Enrollment and Build Partnership and Community**

As part of EHS's regular accreditation review, the Independent Schools Association of the Central States ("ISACS") conducted an accreditation visit of Edgewood in October 2015.  Their Report identified Edgewood's enrollment as 658 students in 2009-2010 and 539 students in 2015. (APFOF ¶ 28.)  ISACS made several recommendations to EHS designed to help reverse the negative enrollment trend.  They recommended:

- Find ways to house more sports on campus and to continue to investigate ways to provide the best facilities within reasonable distances.  (APFOF ¶ 29.)

- Review and enhance relationships with its current feeder schools and create alliances with schools new to Edgewood.  (APFOF ¶ 30.)
- Explore new ways and places to engage alumni.  (APFOF ¶ 31.)
- Develop and implement marketing strategies to distinguish the value of an Edgewood education.  (APFOF ¶ 32.)

EHS agreed, and moreover the ISACS recommendations affirmed EHS's desire to improve its athletic field as a means to engage prospective students, alumni and the community.  (APFOF ¶ 33.)

In a modern culture that places a priority on sports, athletic offerings and opportunities were recognized as important components of EHS's ability to attract new students and engage the community.  The offerings and facilities Edgewood has to offer prospective students, including athletic facilities, have to be comparable to local non-religious, public schools.  (APFOF ¶ 34.) For many, it is far harder to ask students and their families to come to Edgewood if it means both paying tuition and sacrificing some aspect of their child's high school experiences and opportunities with extra-curriculars.  (APFOF ¶ 35.)

That year, EHS received a generous gift of $1.025 million to use towards renovating the field.  (APFOF ¶ 36.)  The express purpose of the gift was to ensure that EHS's athletic field would continue its legacy as "a community-wide venue that serves all of Madison, from children to seniors, through games, camps, and other community activities." (APFOF ¶ 37.)  The gift fit perfectly with EHS's religious values of community and partnership. (APFOF ¶ 38.)

EHS installed a full-length, artificial turf field designed to host regulation football, soccer, lacrosse, and softball games, and it upgraded the track from cinder to modern shredded rubber. Around this same time, EHS installed and maintained a scoreboard for the field.  (APFOF ¶ 39.)

EHS designed the track and field improvements to be able to hold competitions because that was consistent with how the field had historically been used.  (APFOF ¶ 44.)  Those at the

school had always remembered games being played on the field, particularly freshman and JV football.  (APFOF ¶¶ 45, 46)

Since the track and field renovation in 2015, freshman and JV football have continued to play games on the field.  Boys' and girls' lacrosse, boys' and girls' soccer, boys' and girls' track, and middle school track all use the field for games or meets.  (APFOF ¶ 47.)  With the upgraded surface, EHS was able to welcome back the parochial school track programs and to partner with groups such as the Madison Westside Track Club.  (APFOF ¶ 42.)

EHS planned to continue improvements to the field, now known as the Goodman Athletic Complex.  EHS applied for and received a permit to install conduit under the field so that EHS could run wiring to power future field lighting and a sound system as soon as the technology became available to meet the City's requirements.  (APFOF ¶ 48.)

**The Limitations of a Field without Lights**

Having only one field and no lights substantially interferes with Edgewood's ability to use its field to further its mission.  (APFOF ¶ 15.)  Because students, teachers and coaches are at school, and parents and alumni are at work, EHS's best opportunity to build community with its field is after work – in the evening and past daylight hours.  (APFOF ¶ 16.)

Operating an athletic department with 21 teams and no ability to schedule practice and games after dark is a challenge.  In athletic conferences of which EHS has been a part, varsity football and soccer each have start times of 7:00 PM.  (APFOF ¶ 17.)  To satisfy these demands, EHS has to play "home" games at other athletic fields in Madison.  (APFOF ¶ 17.)

These "home" games on off-site fields are a financial burden.  EHS has to pay thousands of dollars per year to rent fields from the Madison Metropolitan School District and other organizations—funds which could otherwise be used to support EHS's mission and students.  It

costs approximately $900 per game to rent a field for football and approximately $250 per game for soccer, in seasonal fees.  (APFOF ¶ 22.)  Beyond annual games fees, in order to secure sites for games, EHS has had to make large, upfront capital contributions to field owners in both soccer and football, and since 2008, EHS has paid a total of $300,000 to these field owners in order to secure usage.  (APFOF ¶ 22.)  Continued dependence on off-site fields means that EHS risks incurring similar expenses in the future, as well as further seasonal fees.  (APFOF ¶ 22.)  Those fees would be substantially reduced with an on-campus, EHS-owned field that had the ability and flexibility to host games and practices after dark.  (APFOF ¶ 22.)

Complicating matters, EHS is given low priority for scheduling at these fields, and EHS has been bumped numerous times from MMSD facilities.  (APFOF ¶ 18.)  For example, a "home" varsity football game scheduled to be hosted on a City field, Breese Stevens, was bumped because the field booked another group, burdening EHS school staff with administrative hassles and concerning parents that their sons' "Senior Night" would be cancelled.  (APFOF ¶ 18.)

Where daytime starts are possible on EHS's field, in many cases, other teams have refused to play at that time.  (APFOF ¶ 19.)  Moreover, it is impossible for some parents to take off work, it is disruptive to pull students out of school early, and it is problematic in resolving transportation issues for bus companies.  (APFOF ¶ 19.)

Amongst the EHS community, EHS athletes, students, parents, and coaches are forced to drive to locations all over Madison to play "home" games which could otherwise be held on EHS's campus where athletes, students, faculty and coaches can simply remain after school to attend and where EHS can freely and fully promote its religious mission and values.  (APFOF ¶ 52.)  They face uncertainty that comes from not knowing where and when they will be able to play their

games or whether they will be bumped by other institutions that have priority use of the various fields EHS's team are forced to use.  (APFOF ¶ 53.)

Playing "home" games off campus is a burden on administrators.  Substantially more administrative time is spent by EHS staff in negotiating off-site field arrangements, scheduling off-site "home" games, finding alternative locations when conflicts arise, and coordinating travel.  (APFOF ¶ 54.)  EHS's Athletic Director, Christopher Zwettler, estimates that 40% of his work time had been spent scheduling and managing the issues arising from off-site "home games."  (APFOF ¶ 54.)  Since the field renovation, that estimate is 20% -- as the field is more available, less administrative time is required.  (APFOF ¶ 54.)

Frequent uncertainty about scheduling goes beyond games and impacts events, hurting Edgewood's external relationships.  Over the years, EHS has had to forego and cancel games, and community developing opportunities because of its inability to use its own field at night.  (APFOF ¶ 23.)  EHS has lost opportunities with community non-profit partners like the Susan G. Komen Foundation because it cannot accommodate their events needs for lights – lost opportunities to showcase EHS to the community, share values, and attract students.  (APFOF ¶ 23.)

**EHS Makes Further Plans for Improvement But is Stopped**

In 2017 and 2018, EHS wanted to continue its improvements to the field, adding seating, concessions, restrooms and storage, amplified sound and lights.  (APFOF ¶ 55.)  The City of Madison suggested that EHS seek to amend its Master Plan to pursue these changes given that the desired size of the expanded seating, concessions, restrooms and additional amenities made this a more significant building project than the field renovation.  (APFOF ¶ 56.)

In October 2018, City Administrator Matt Tucker sent an email to EHS President Mike Elliott advising that EHS was operating outside of the terms of its Master Plan by using the field

for uses other than "team practices, physical education classes." (APFOF ¶ 57.)  After an EHS neighborhood meeting on October 17, 2018, Mr. Tucker "closely reviewed" EHS's 2014 Master Plan and concluded that it identified the Goodman Sports Complex was to be used for "team practices, physical education classes."   (APFOF ¶¶ 58-59.)  He concluded that EHS's current programming and usage of the field is outside of the allowances of the Master Plan.  (APFOF ¶ 60.)

**EHS's Campus Institutional District Zoning and Master Plan**

The City adopted its current Zoning Code effective January 2, 2013. As part of this new code, the City created a new zoning designation called the "Campus-Institutional District," which is designed for "the City's major educational and medical institutions." Campus-Institutional Districts ("CI Districts") were created to "accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards."  M.G.O. § 28.097(1).  (APFOF ¶ 61.)

As of January 2, 2013, the City zoned EHS as a CI District under Section 28.097.  In addition to EHS, the City also rezoned the several other institutions as CI Districts, including James Madison Memorial High School (Memorial) and portions of the University of Wisconsin's campus.  (APFOF ¶ 63.)  At the time EHS's campus was rezoned Campus-Institutional, the uses allowed within the CI District were listed separately as either primary or secondary uses under Section 28.097.  The list of permitted "primary uses" included "educational uses associated with colleges, universities, and secondary and primary schools, including classroom buildings, libraries, and offices." M.G.O. § 28.097(3)(a) (capitalization altered).   The list of permitted "secondary uses" included "indoor and outdoor sports and recreational facilities"; "stadiums, auditoriums, and

arenas, open or enclosed," and "other uses related to the institution's primary mission." M.G.O. § 28.097(3)(b) (capitalization altered).  (APFOF ¶ 64.)

Section 28.097 regulates primary and secondary uses at a very general level (i.e. allowing "indoor or outdoor sports and recreation facilities, stadiums, auditoriums, or arenas") rather than at a highly specific, granular level (e.g., allowing outdoor sports and recreation facilities but only if they are used for ultimate frisbee, collegiate softball and yoga classes). Section 28.097 does not distinguish between day or night-time uses or restrict the primary or secondary uses to only daylight hours. M.G.O. § 28.097.  (APFOF ¶ 65.)  Under the CI District zoning, with respect to EHS's athletic field, any practices, games, or games at night were permitted secondary uses under M.G.O. § 28.097(3)(b)(5).  (APFOF ¶ 66.)

Under Section 28.097, institutions zoned CI District can voluntarily submit a campus master plan.  One of the purposes of the Master Plan was to facilitate and "accommodate the future growth of these institutions."  (APFOF ¶ 67.)  The asserted incentive for the existing institutions had to voluntarily adopt a Campus Master Plan was that in theory an approved master plan would streamline approval of future buildings.  (APFOF ¶ 69.) For any "buildings properly identified on a Campus Master Plan," the institution needed only obtain approval from "an architectural review committee prior to construction," rather than obtain "conditional use approval" from the City. M.G.O. § 28.097(2)(c), (7)(a).  In other words, if the City approved a master plan, the specific projects shown on the campus Master Plan would not be reviewed by the City's Plan Commission again.  (APFOF ¶ 70.)

According to M.G.O. § 28.097(5)(c)(1)–(2), a master plan generally includes a "description of existing conditions" and "the proposed conditions" on the campus, including "future needs/capital improvements," "phasing of proposed improvements," and "future land uses and

buildings." (capitalization altered). If an institution submitted a master plan, and that plan was approved by the City, then that plan governed the development of new buildings within the Campus-Institutional District zoned institution for the life of the plan, which is ten years. M.G.O. § 28.097(2)(b)–(d), (4), (7).  (APFOF ¶ 72.)   Section 28.097(7), entitled "Final Building Design Review," provides that "[a]ll buildings properly identified on a Campus Master Plan must be reviewed and approved by an architectural review committee."   The statute contains no language pertaining to architectural review of anything other than buildings.   (APFOF ¶ 71.)

Prior to EHS, no CI District master plan had ever been considered for approval by the City of Madison's Plan Commission:  the EHS Master Plan was the first in the City.  (APFOF ¶ 73.) Only EHS and the University of Wisconsin-Madison have ever adopted a master plan.   (APFOF ¶ 74.)

On January 20, 2014, EHS, together with Edgewood College and Edgewood Campus School submitted a joint Master Plan to the City of Madison.  (APFOF ¶ 75.)  EHS had very little involvement with the drafting of the Master Plan.  New to his job in 2013 and not then planning on undertaking a building project, Elliott did not dive into the Master Plan beyond the basics and signed as EHS President to help assist Edgewood College, who was the driving force behind the Master Plan.  (APFOF ¶ 76.)  On April 22, 2014, the City approved EHS's Master Plan, subject to conditions not relevant here.  (APFOF ¶ 84.)

Elliott and EHS did understand that the Master Plan was supposed to help facilitate or streamline specified building projects.  At no time did anyone from Edgewood College, EHS or the City inform him that the Master Plan could operate or would be interpreted to restrict or limit projects or uses that were not identified or not identified with a certain specificity within the Master Plan.  (APFOF ¶ 77.)

With respect to Section 3.8 of the EHS Master Plan discussing the "athletic field," Elliott did not intend to limit the use of EHS's athletic field to team practices or physical education classes. (APFOF ¶ 78.) At the time of signing, Elliott understood that EHS had the full use of its field as a sports and recreation facility or stadium under the Campus Institutional District zoning. He did not intend to give that up in signing the Master Plan and did not anticipate the City's interpretation in 2018. (APFOF ¶ 78.)

Perhaps this was because, at the time of his signing the Master Plan, Elliott knew and recognized that EHS had been using its field for sports and athletic events for over 100 years. EHS had played freshman and JV football on the field just months before. (APFOF ¶ 79.) He did not intend to give up and discontinue Edgewood's longstanding historical use of the field in signing the Master Plan. (APFOF ¶ 79.) Nor did he believe or understand that one line in a two-hundred-page document would have such a severe and unreasonable consequence as what Mr. Tucker would contend four years later. (APFOF ¶ 79.)

**The City Persists on the Restrictions on the Athletic Field and But Identifies a Path to Lights.**

EHS was frustrated by Mr. Tucker's October 2018 email restricting EHS's use of its field. (APFOF ¶ 86.) Moving forward on its previous plans, on November 14, 2018, Edgewood filed an application to amend its Master Plan to expand seating, add restrooms, team rooms, storage, lights and sound and, out of an abundance of caution, to define the field's use. (APFOF ¶ 87.) On the same date, EHS's counsel sent a letter to Mr. Tucker asserting that the Master Plan did not limit EHS's use of the field to practices and physical education classes. (APFOF ¶ 87.)

In January 2019, EHS retained Attorney Nathan Wautier to assist the school with the growing land use issues surrounding the field and Mr. Tucker's new interpretation of the Master Plan. (APFOF ¶ 88.)

On or about January 18, 2019, Mr. Wautier met with Mr. Tucker and Assistant City Attorney John Strange to discuss athletic field.  (APFOF ¶ 89.)

In discussing the pending Master Plan amendment, Attorney Wautier, Mr. Tucker and Attorney Strange agreed that the building structure sought would be difficult to pass in the Common Council, particularly if a protest petition was filed by neighbors that would then require three quarters of the Common Council to approve.  (APFOF ¶ 90.)  They then discussed the potential of EHS tabling the Master Plan amendment and instead pursuing lights, upgraded amplified sound, and bleachers separately.  (APFOF ¶ 91.)

Under a piecemeal approach without a master plan amendment, Mr. Tucker expressed to Mr. Wautier that the City would have to approve the lights if they complied with the technical photometric specifications under M.G.O. § 10.085.  (APFOF ¶ 92.)  Based on Mr. Wautier's meeting with Mr. Strange and Mr. Tucker, a couple of days thereafter he contacted the City to advise the City that EHS was tabling its Master Plan amendment. (APFOF ¶ 94.)

On Friday, February 22, 2019, Edgewood applied with the City for outdoor lighting of its athletic field.  (APFOF ¶ 95.)  On February 27, 2019, Mr. Tucker sent a letter to Elliott acknowledging receipt of the application, advising that the lighting application plans would be reviewed for compliance with MGO Section 10.085, and noting that if they complied then electrical permits would be issued.  (APFOF ¶¶ 96-97.)  Mr. Tucker went on to note that "[t]he City believes this permit can be issued *without requiring amendment of the approved 2014 Master Plan*."  (APFOF ¶ 98) (emphasis added.)

 Tucker had prepared his February 27, 2019 letter in consultation with Mr. Strange.  (APFOF ¶ 101.)  After the light application was received, Tucker and Strange met multiple times

to review and analyze the light application.[2] (APFOF ¶ 102.)   During that time, and in his preparation of his February 27 letter, Mr. Tucker reviewed the EHS Master Plan.  (APFOF ¶ 102.)

The same day, February 27, 2019, a City building inspector reviewed EHS's outdoor lighting application for compliance with M.G.O § 10.085., and approved it.  (APFOF ¶¶ 104-106.) On March 1, a City zoning department employee performed a zoning review and approved that, as well. (APFOF ¶¶ 108-109.)  She stamped "Final Approval" and signed as of March 1, 2019 on the physical EHS light application.[3]   (APFOF ¶ 110.)

**The City Pulls the Plug on EHS's Lights.**

The City did not issue EHS's permit.  (APFOF ¶ 114.)  After the lighting application was approved, the City changed its position.  (APFOF ¶ 115.)  This was unprecedented.  With a typical lighting application, after a lighting review approval and a zoning review approval, the application is considered granted and a permit is issued.  (APFOF ¶ 116.)   There has been no prior scenario where a lighting application's lighting review was approved, its zoning review was marked approved, and the permit did not issue.  (APFOF ¶ 116.)

On March 8, a week after the application had been approved, in a phone call with Mr. Wautier, Mr. Tucker advised that there may be a problem with the height of the light poles under the Master Plan and that the City may not be able to issue the permit.  (APFOF ¶ 117.)  On March 12, 2019, Mr. Wautier wrote to Mr. Strange, restating the prior approval of the lighting application

---

[2] On or about February 26, Mr. Wautier had a telephone call with Mr. Strange.  (APFOF ¶ 103.)  During the call, Strange again acknowledged that EHS's light permit was being reviewed for compliance with technical lighting requirements and advised Mr. Wautier that he had told Mr. Tucker and Heather Stouder, the Planning Division Director, that the light application and the zoning use under the Master Plan were two separate issues.  (APFOF ¶ 103.)

[3] On same day that the City approved the zoning review, Mr. Wautier received a communication between Mr. Tucker and a disgruntled EHS neighbor. (APFOF ¶ 111.)  In that communication, which asked about outdoor lighting for EHS's athletic field, Mr. Tucker took the same position as in his February 27, 2019 letter -- that M.G.O. Section 10.085 governed EHS's field lights.  (APFOF ¶ 111.)

and his understanding that the City "is considering the revocation of its prior approval of the complaint application based upon a *new* zoning interpretation for the Edgewood Campus that light poles *of any* height are not allowed!" (APFOF ¶ 118.)

What happened at the City isn't clear. At some point after his February 27, 2019 letter in which he noted that the lighting application would not need a Master Plan amendment, Mr. Tucker, Mr. Strange and George Hank, then-Director of the Building Inspection Division Director, pulled out a "fine toothed comb" to take a very close and detailed look at the EHS Master Plan. (APFOF ¶¶ 119-120.) Mr. Hank, according to Mr. Tucker, wanted to stop EHS's light permit "in its tracks…" According to Mr. Tucker, he was made aware of Mr. Hank's decision, whereas Mr. Hank asserted that he and Mr. Tucker discussed the light permit and "it was our belief that we should withhold it…"[4] (APFOF ¶¶ 121-122.)

Whoever was responsible, the City recognized that even under its new interpretation that the Master Plan could be used to withhold lights, there was at least one permitted use for the athletic field – team practices – for which the outdoor lights *could* have been permissibly used. (APFOF ¶ 125.) Nevertheless, Mr. Hank's concern was that if the City issued the light permit but still restricted EHS from playing games on its field, that EHS would be upset at his department for granting the application and allowing less than full use of the field. (APFOF ¶ 126.) According to Mr. Hank, this was the *only* reason – the risk that EHS would have unmet expectations that it could hold night games – for withholding the permit in its entirety. (APFOF ¶ 126-127.)

Again, the situation is unprecedented. No other outdoor light permits have been denied to a Madison-area school; EHS is the only one. (APFOF ¶ 129.) Mr. Hank had never before consulted with a City Attorney to discuss an outdoor lighting application. (APFOF ¶ 130.) And

---

[4] Mr. Hank cites Mr. Tucker as the source of Mr. Hank's interpretation of the Master Plan as precluding lights. (APFOF ¶ 123.)

there are no other public or private schools with athletic fields that were not permitted to host athletic contests.  (APFOF ¶ 131.)

The treatment of EHS's lighting application stands in contrast to that of James Madison Memorial High School.  On August 17, 2018, Memorial High School submitted a lighting application for outdoor lights for its athletic field.  (APFOF ¶ 133.)  Memorial's proposed lighting was required to meet the technical specifications of M.G.O. Section 10.085.  (APFOF ¶ 134.)  It was reviewed and approved and a permit issued a week later.  (APFOF ¶ 135.)

Both Memorial and EHS are zoned Campus Institutional District.  (APFOF ¶ 61.)  The City's only distinction made between the Memorial and EHS lighting applications was the existence of EHS's Master Plan.  If EHS had never adopted a Master Plan, its lighting application would have been judged under the same standards as Memorial. (APFOF ¶ 136.)  Again, this is a change from its position expressed in January 2019 and February 27, 2019, where the City represented that a light permit could issue without the need for a master plan amendment.  (APFOF ¶ 137.)

**The City Doubles Down on its Position that "Athletic Contests" are Prohibited on EHS's "Athletic Field"**

In the Spring of 2019, the City acted on its position that the EHS Master Plan prohibited the use of the Goodman Athletic Complex for "athletic competitions."  The City sent an inspector to EHS, he witnessed games on Edgewood's field, and issued Official Notices of Violation to Edgewood.  (APFOF ¶ 140.)  The notices asserted that EHS violated Section 28.097 by holding "athletic contests" on its athletic field, on the grounds that "[t]he Campus Master Plan states that the athletic field is used for team practices and physical education classes."  (APFOF ¶ 141.)  The notices also stated that "[a]ny person violating any provision of the City Ordinances enforced by

the Building Inspection Division is subject to the penalties provided by the appropriate Ordinance violated." (APFOF ¶ 143.)

The decision to issue the Notices was a highly discretionary one.  None of the other schools located in the Campus-Institutional District, with or without a master plan, have received a zoning violation or were alleged to be in violation of the City's Zoning Code for hosting "athletic contests" on their athletic fields. (APFOF ¶ 145.)  Mr. Hank admits that his department had discretion to decline enforcement of technical violations of the Master Plan.  Some violations would be "beneath our notice" and would not result in official notices or citations.  (APFOF ¶ 146.)  Mr. Tucker, now the current Building Inspection Division Director, agrees with Mr. Hank's formulation of the department's "beneath our notice" discretion.  (APFOF ¶ 148.)

As it did with Memorial, the City's treatment of EHS contrasts with its approach towards the University of Wisconsin-Madison ("UW").  UW is the only other institution zoned Campus Institutional District that has adopted a master plan.  (APFOF ¶ 152.)  The City agrees both that uses of buildings and spaces identified in the UW's Master Plan are subject to the same zoning and interpretative standards as for EHS's Master Plan and that buildings and spaces identified for a particular use in the UW Master Plan that are used for a different purpose would "probably" be a violation.  (APFOF ¶¶ 153- 154.)

However, the City has made no effort to confirm whether UW is using its athletics or sports and recreational facilities or open spaces as they are described in its Master Plan.  (APFOF ¶ 155.)  In its Master Plan, the UW describes one of its facilities as the "Goodman Softball Practice Facility."  (APFOF ¶ 156.)  That space, however, is used to host athletic competitions – UW softball games.  (APFOF ¶ 157.)  In its Master Plan, the UW describes the building use of one of its facilities, the Natatorium, as for "Rec Sports."  (APFOF ¶ 158.)  The City is on notice that this

space, however, is used to host athletic competitions, including high school varsity swimming and diving championship competitions.  (APFOF ¶ 159.)  In its Master Plan, the UW describes the building use of one its projects, the Nielsen Tennis Stadium Expansion as for "Athletics."  (APFOF ¶ 160.)  That building, however, has been used for high school athletic competitions, instructional camps and clinics, and private tennis lessons.  (APFOF ¶ 161.)  The UW Master Plan identifies the "Near West Fields" as "recreation fields" and indicates that they would be upgraded "to create five synthetic turf flag football fields and one championship soccer field."  (APFOF ¶ 162.)  That space, however, is elsewhere identified by UW as used for baseball, softball, lacrosse, rugby, "and more."  (APFOF ¶ 163.)

The City contends that it need not compare UW's Master Plan to its actual use because zoning enforcement is complaint-based;  the City reviews issues in response to actual complaints.  (APFOF ¶ 164.)  However, prior to Tucker's October 2018 email and related review setting forth his restrictive interpretation of the EHS Master Plan, Tucker had received no complaints about EHS's use of its field for games.  (APFOF ¶ 165.)  And the examples above of UW's use of buildings and spaces inconsistent with how they are described in its Master Plan was raised at the ZBA hearing, putting the City on notice.[5]  (APFOF ¶ 166.)  While EHS was subjected to the "fine toothed comb" review of its Master Plan (APFOF ¶ 120), Mr. Tucker and the City have never reviewed UW's adherence to its Master Plan.  (APFOF ¶ 167.)

**The City Again Represents a Path to Both Games and Lights for EHS's Field**

On July 12, 2019, then City Attorney Michael P. May wrote a letter to Edgewood's counsel and invited EHS "to file to terminate its Master Plan and return to the standard CI zoning."

---

[5] EHS takes no issue with the UW, its Master Plan, or the use of its buildings.  However, the comparison of the treatment between the UW and EHS shows both the absurdity of the City's interpretation of both the master plan provisions of the CI District zoning ordinance and the EHS Master Plan, and its selective and arbitrary enforcement of those interpretations.

(APFOF ¶ 169.)  According to the City Attorney, a return to CI zoning would place EHS on equal footing with other high schools.  (APFOF ¶ 170.)

After receiving May's July 12, 2019 letter, Messrs. Wautier and Strange discuss EHS's options with respect to the Master Plan.  Mr. Strange later summarized the options in an email, confirming that one option would be for the EHS to seek to repeal its Master Plan.  (APFOF ¶¶ 171-172.)  Strange also confirmed that by repealing the Master Plan, Edgewood would revert to the standard regulations of the CI District in the zoning code, "which would allow games and lights at the field."  (APFOF ¶ 173.)

On July 29, 2019, in reliance on the City's representations, EHS accepted the City's invitation and, with Edgewood College and the Campus School, formally requested the immediate repeal of the Edgewood Campus Master Plan.  (APFOF ¶ 174.)  The repeal of EHS's Master Plan was referred to the Common Council for introduction by the City Attorney's Office on July 30 and was scheduled to be introduced at the August 6, 2019 Common Council meeting.  (APFOF ¶ 175.)

On August 1, 2019, the Capital Times published an article on EHS's July 29 request to terminate its Master Plan.  (APFOF ¶ 176.)  In the article, City Attorney Michael May again reiterates that repealing the Master Plan will result in EHS being treated the same as other schools: "They've always been complaining to us that the real problem is that they're being treated differently than the other high schools, so I told them, 'You want to be treated the same as the other schools; have your master plan repealed."  (APFOF ¶ 177.)

**Alder Tag Evers Steps In to Prevent EHS's Lights**

Alder Tag Evers is the City of Madison Alder on the Common Council for the 13th District. First elected to that position in April of 2019, as a neighbor of the Edgewood campus and as the District 13 Alder, Mr. Evers has opposed EHS's development of its athletic field.  (APFOF ¶¶ 179-

180.)  Evers campaigned on the issue of Edgewood's field and at all times has been opposed to its further development.[6]  (APFOF ¶¶ 179-180.)

After EHS's July 29, 2019 request to repeal its Master Plan, and during the first week of August, Evers contacted Mr. Strange to discuss Campus Institutional District zoning.  (APFOF ¶ 183.)  He called Mr. Strange to address what could be done with the "flaws" in the zoning ordinance – perceived flaws that would allow landowners "to proceed with significant change of use that would be in contrast" with the purposes of the Campus Institutional District.  (APFOF ¶ 184.)

For Mr. Evers, the EHS field lights "debate pointed to these flaws."  Indeed, the EHS athletic field and lights issue was the only actual or active controversy that pointed to these flaws and the need for a change.  (APFOF ¶ 185.)  In that call, Mr. Strange advised the ordinance could be amended and Mr. Evers instructed him to proceed with drafting an amended ordinance.  (APFOF ¶ 186.)

Evers intended that his amendment would require EHS to go through a conditional use or Master Plan amendment process in order to get lights.  (APFOF ¶ 187.)  Further, he understood that if EHS's Master Plan was repealed without Evers' amendment, or before his proposed ordinance passed, EHS would be entitled to get its lights under the existing Campus Institutional District zoning ordinance.  (APFOF ¶¶ 188-189.)  Mr. Evers knew from the August 1 Capital Times article (which he was quoted in) and from the public legislative record that EHS's repeal was scheduled to go before the Common Council on August 6, 2019.  (APFOF ¶ 190.)

---

[6] Evers served an advisory role to a group calling itself "No New Stadium." (APFOF ¶ 181.)  No New Stadium has maintained a website critical of EHS and opposing its development of the Goodman Athletic Complex.  Evers shares No New Stadium's opinion on EHS's field and is aware of no areas of disagreement.  (APFOF ¶ 181.)

He put the wheels in motion. Mr. Evers' amendment was introduced in the Common Council from the floor and by title only. (APFOF ¶ 191.) The amendment was introduced from the floor on August 6 the day after it was referred for introduction by the City Attorney's Office because "we wanted to get started with it."[7] (APFOF ¶¶ 191-192.) By introducing it by title only, Evers did not need to have a completed draft ordinance at the time of introduction. (APFOF ¶ 191.)

While Mr. Evers claimed his ordinance was intended to address a general flaw in the zoning ordinance (APFOF 184), the title of his introduced ordinance amendment was specific to what EHS's situation upon repeal of its Master Plan. (APFOF ¶ 197.) Evers' title of his ordinance on August 6, 2019 was:

> Creating Madison General Ordinance Sections 28.097(2)(d) and (e) requiring institutions in the Campus Institutional District without an approved campus master plan to get conditional use approval for the establishment of open or enclosed Stadiums, Auditoriums, Arenas, Indoor or Outdoor Sports Recreational Facilities, and Agricultural Uses and for the installation of stadium lighting, amplified sound, and the establishment or expansion of outdoor seating over a specified capacity.

(APFOF ¶ 198.) Tellingly, the original title of the proposed ordinance specifically applied to the Evers' issues with EHS's athletic field. (APFOF ¶ 199.)

Most telling about motives and urgency: Mr. Evers was absent from the August 6, 2019 Common Council meeting. (APFOF ¶ 200.) Indeed, throughout this process working with Mr. Strange and getting his amendment introduced from the floor by title only, Mr. Evers was on vacation. (APFOF ¶ 201.) He did not wait to address this generalized flaw with his desired ordinance until his return; he communicated with Mr. Strange and arranged for the introduction of

---

[7] In deposition, Mr. Evers could identify no other legislation he has introduced from the floor since becoming an Alder in 2019. (APFOF ¶ 193.)

his sponsored ordinance at the August 6 meeting while he was out of the country in Montreal. (APFOF ¶ 201.)

Both EHS's Master Plan repeal and the Mr. Evers' amendment were introduced and referred for hearing before the Plan Commission on August 6.  (APFOF ¶ 196.)  Both were referred to the next Plan Commission meeting on August 26, 2019.  (APFOF ¶ 196.)   At the Plan Commission meeting on August 26, 2019, Mr. Evers addressed a question about whether his ordinance was "time sensitive."  (APFOF ¶ 204.)  He responded only that it was, then going on to talk about the City's "values" and the need to avoid an "exploitative environment" to differentiate public institution landowners from private ones:  "*Public institutions* have a built in incentive to pay attention to the public because they are dependent on public support, *private institutions* must be careful not to be seen as being willing to impose their will on their neighbors because to do so tears at the fabric of civil society and undermines our shared values of commitment to community and partnership."  (APFOF ¶ 205) (emphasis added.)[8]

As of August 26, the EHS Master Plan repeal and Evers' ordinance had been on a parallel path, legislatively.  (APFOF ¶ 210.)  However, the EHS Master Plan repeal was referred to the October 14, 2019 Plan Commission meeting while Evers' ordinance was referred to the September 16, 2019 Plan Commission meeting.  (APFOF ¶ 211.)

As reported by the Wisconsin State Journal on September 4, 2019, the Common Council voted to delay a decision whether to repeal the EHS Master Plan.  (APFOF ¶ 212.)  The State Journal continued:  "Ald. Shiva Bidar, 5th District, said the reason for the delay was to allow

---

[8] Mr. Evers' citation to community and partnership in APFOF 202 can fairly be read as a veiled reference to EHS and its values in its Mission Statement.  (APFOF ¶¶ 3, 206.)  Edgewood High School, Edgewood College and Edgewood Campus School are the only private institutions zoned Campus Institutional District.  All are Catholic religious institutions.  (APFOF ¶¶ 63, 207.)  At various times, Mr. Evers has described EHS as "entitled."  He believes that EHS has attempted to impose its will on its neighbors.  (APFOF ¶ 208.)

another proposal to get through the Plan Commission and City Council first.  That proposal would require Edgewood High School to apply with the city before making modifications, such as adding lights or a sound system, to its field if the master plan is repealed.  (APFOF ¶ 213.)  "City Council members who serve on the Plan Commission said they would like to know what the council decides on the field modification measure before voting on the master plan repeal."  (APFOF ¶ 214.)

The reporting was born out by the hearing itself.  At the September 3 hearing, Alder Marsha Rummel expressed that she believed a "stadium" should be a conditional use and that the CI District zoning ordinance should be "tweaked and amended" before moving forward with the EHS repeal.  (APFOF ¶ 215.)  Alder Shiva Bidar supported delaying the EHS Master Plan repeal and moving forward on the Evers' amendment, noting that the Common Council needed to give the Plan Commission "clarity" on one item [Evers' ordinance] so that the Plan Commission can decide another [the EHS Master Plan repeal.]  (APFOF ¶ 216.)

The EHS repeal would never catch up.  Evers' amendment was adopted by the Common Council on October 1, 2019.  (APFOF ¶ 217.)  EHS's Master Plan repeal was not approved and adopted by the Common Council until January 2020.  (APFOF ¶ 218.)  As a result of the repeal of the Master Plan, EHS was no longer subject to the Master Plan and the City's interpretation thereof.  EHS now had the undisputed ability to play athletic competitions on its field.  However, as a result of the passage of Mr. Evers' amendment before the Master Plan repeal, EHS would now be required to apply for a conditional use permit in order to obtain outdoor lighting for the Goodman Athletic Complex; EHS's lights were no longer subject just to Section 10.085.  (APFOF ¶ 209.)

EHS tried once again to adhere to the process laid out by the City.  On March 11, 2020, EHS applied for a conditional use permit exclusively to install four outdoor light poles.  (APFOF ¶ 221.)  No other improvements were sought in that application.  (APFOF ¶ 222.)  On May 11,

2020, the Planning Division's professional staff issued a Planning Division Staff Report to the Plan Commission.  (APFOF ¶ 223.)  While this process will be discussed more thoroughly below, at the May 11, 2020 Plan Commission meeting, the Plan Commission disregarded the Planning Staff Report and, finding the standards for conditional use were not met, placed the conditional use on file without prejudice. (APFOF ¶ 240.)

On May 21, 2020, Edgewood appealed the decision of the Plan Commission on its conditional use application.  The Common Council denied EHS's appeal on January 19, 2021. (APFOF ¶ 255.)

## SUMMARY JUDGMENT STANDARD

As the movant, the City must show "that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law" on each of EHS's claims. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To meet that burden, the City must submit admissible evidence establishing the material facts necessary to resolve the pending issues. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is not genuinely disputed must support the assertion by . . . (B) showing . . . that an adverse party cannot produce admissible evidence to support the fact."); Fed. R. Civ. P. 56(c)(4). The Court must view all facts and draw reasonable inferences therefrom in the light most favorable to the nonmovant, EHS. *Burnett v. LFW Inc*., 472 F.3d 471, 477 (7th Cir. 2006). Summary judgment is "only appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Goelzer v. Sheboygan Cnty.,* 604 F.3d 987, 992 (7th Cir. 2010); Fed. R. Civ. P. 56(c). To defeat the City's motion, EHS need only offer enough evidence upon which a reasonable jury could find in its favor. *See Celotex*, 477 U.S. at 322–25; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–49 (1986).

## ARGUMENT

At the center of the City's defense to each of EHS's claims is a genuine issue of material fact which precludes summary judgment. The centerpiece of the City's defense is EHS's 2019 Master Plan. The issue is whether by adopting that Master Plan EHS voluntarily restricted itself, or waived, its known right[9] to use its only athletic field for "athletic contests" or other "uses related to the institution's primary mission." While the City takes the position that EHS "voluntarily restricted itself from holding athletic contests on its [athletic] field," (Defs.' Answer ¶ 92, Dkt. # 29), EHS maintains that it did no such thing.

Based on the evidence of record, a reasonable jury could find the City's position not just wrong but evidence of bad faith and an effort to generate a pretext upon which to deny EHS and its students the same lights and rights the Madison Metropolitan School District (MMSD) high schools and their students enjoy under the Campus-Institutional Zoning, M.G.O. § 28.097.

This issue of fact is material because the City has relied upon EHS's alleged "voluntary" restriction or waiver under the Master Plan to justify the many ways it has denied EHS the full use of its field and lights since 2019. For example, based on its contention that EHS "voluntarily restricted itself from holding athletic contests on its field," the City contends it was justified in:

- limiting EHS's use of its athletic field to practices and physical education classes;

- withholding the light permit after the City approved EHS's light application in 2019;

- issuing EHS notices of violation for hosting girls' soccer games on the field;

- burdening EHS's religious exercise; and

- denying EHS the ability to use its field in the same way the MMSD schools and the University of Wisconsin-Madison (UW) use their fields in the same zoning district.

---

[9]When EHS voluntarily submitted its Master Plan for City approval in 2015, EHS had a right to use its land for "indoor and outdoor sports and recreational facilities"; "stadiums, auditoriums, and arenas, open or enclosed," and "other uses related to the institution's primary mission." M.G.O. § 28.097(3)(b).

(Defs.' Summ. J. Br., Dkt. # 42).

But the evidence of record, read in the light most favorable to EHS, is sufficient to show that EHS did not voluntarily restrict itself or waive its rights. Rather the facts and law establish that EHS was entitled to continue using its field as it has for nearly a century—namely for athletic contests and other uses which further its religious mission and the Sinsinawa Dominican values. And as explained more fully below, if the jury agrees that EHS did not voluntarily restrict itself and waive its rights, then the case is even clearer that the City 1) withheld EHS's light permit in 2019 on an improper and even pretextual[10] basis; 2) treated EHS on less than equal terms without justification; and 3) substantially burdened EHS's religious exercise without justification and in violation of EHS's federal and state rights.

As the issue of whether EHS "voluntarily" restricted itself is at the center of the City's defense to EHS's claims, EHS will first address the City's burden of proof and the evidence of record upon which a reasonable jury could reject the City's argument. EHS will then address the merits of its federal and state law claims and establish why the City is not entitled to summary judgment on any one of them, let alone all of them.

I.   **A REASONABLE JURY COULD FIND EHS DID NOT VOLUNTARILY RESTRICT ITSELF OR WAIVE ITS EXISTING RIGHT TO USE ITS ATHLETIC FIELD FOR ATHLETIC CONTESTS OR OTHER USES RELATED TO EHS'S RELIGIOUS MISSION.**

The City bears the burden of proving that EHS knowingly and voluntarily restricted itself or waived its known rights to continue using its athletic field for athletic contests or other uses related to EHS's primary, religious mission. See *Christensen v. Equity Co-op. Livestock Sale*

---

[10] There is a genuine issue of material fact as to whether the City's proffered reason for withholding the light permit was a pretext. *Lawhead v. Ceridian Corp.*, 463 F. Supp. 2d 856, 864 (N.D. Ill. 2006). A reasonable jury could find that it was a pretext based on the evidence which shows that EHS was still entitled to a light permit even if only for team practices and can infer that the light permit was withheld on an insufficient basis. *Id.*

*Ass'n*, 134 Wis. 2d 300, 303, 396 N.W.2d 762 (Ct. App. 1986); see also *Occidental Fire & Cas. Co. of N.C. v. Cont'l Bank N.A.*, 918 F.2d 1312, 1320 (7th Cir. 1990) (Waiver may be express or implied, but "the evidence must show a 'clear, unequivocal and decisive act of a party' demonstrating an intent to waive the known right.") (citation omitted). Drawing all inferences in EHS's favor, a reasonable jury could certainly reject the City's contention that EHS intended to voluntarily restrict itself and waive its known rights by submitting its Master Plan for approval in 2014. *Hanz Trucking, Inc. v. Harris Bros. Co.*, 29 Wis. 2d 254, 265, 138 N.W.2d 238 (1965) (Intent "is to be determined as a question of fact where the inference does not conclusively arise as a matter of law.")

The City attempts to carry its burden by delving into irrelevant history that predates the Campus Institutional Zoning District, which went into effect in 2013. The City also selectively uses quotes from a newspaper article in which EHS officials discussed how the renovated field would be used. But the same article includes quotes from the same officials discussing how the million-dollar gift from the Goodman Foundation made it possible for EHS to renovate the field to continue the field's "legacy" as "a community-wide venue that serves all of Madison" and a "competition field" on which EHS's teams "compete." (APFOF ¶ 37.)

The City cannot credibly dispute that EHS, at the time it submitted its Master Plan for approval, had an existing and known right to use its only athletic field for athletic contests and other uses related to its primary mission as a Catholic institution. (APFOF ¶¶ 64, 78.) Moreover, the evidence of record demonstrates that EHS was using its field for "athletic contests" and other uses related to its primary mission before, during, and after the Master Plan approval process.

(APFOF ¶¶ 45-47, 79, 82.)  EHS never stopped scheduling games for its various teams on its field, and never stopped using its field for other activities related to its primary mission.[11]

Moreover, the evidence shows that EHS installed—with the City's approval—a full-length, artificial turf field designed to host regulation football, soccer, lacrosse, and softball games in 2015. (APFOF ¶ 39.)  EHS openly installed and maintained a new scoreboard on the field. (APFOF ¶ 39.) And on July 7, 2015, the City even issued EHS a permit to install conduit under the field so that EHS could run wiring to power field-lighting and an upgraded sound system. (APFOF ¶ 48.) EHS renovated the field and installed the scoreboard, and the City approved the conduit permit more than a year after the City approved the Master Plan in April 2014—a Master Plan the City has claimed is evidence that EHS had "voluntarily restricted itself from holding athletic contests on its field." (Defs.' Answer ¶ 92, Dkt. # 29).

Nevertheless, the City would have the court or jury believe that the Master Plan intended to bring a complete halt to the various ways the school, its teachers, students, athletes, neighbors, alumni, and others in the community had used the field for nearly a century. The City would have the court and jury believe that EHS invested over a million dollars to renovate its field in 2015, erect a scoreboard, and install conduit under the field for lights and sound—*only* so that the field could be used for physical education classes and practices—leaving the field entirely useless for much of the year when team practices and physical education classes are not occurring. And the City would have the court and jury believe EHS intended to forego any use of the field not expressly identified as a "team practice" or "physical education class"—thereby prohibiting the field's use for a nearly limitless number of activities which were not expressly set forth in the

---

[11] In *Golden Sands Dairy LLC v. Town of Saratoga*, 2018 WI 61, 381 Wis.2d 704, 913 N.W.2d 118, the Wisconsin Supreme Court held a property owner can acquire a vested right to continue a use and cannot be deprived of that use simply by a change in zoning—especially when the property owner never actually abandons the use.

Master Plan such as walking, jogging, resting, skipping, releasing weather balloons for science class, playing frisbee, exercising, praying, or gathering, and further restricting use of the field from those not involved in team practices or physical education classes – such as neighborhood residents and community members who have been using the field since its inception. How absurd.

The City seeks to bind EHS on two sentence fragments contained in the over two-hundred-page Master Plan. In the Open Space Section of the Master Plan, EHS includes the following two sentence fragments: "Athletic field owned by Edgewood High School" and "Used for team practices, physical education classes." Both statements are true. Both also make plain that EHS was using and intending to use its "athletic field" to host what the City called and later defined as "athletic contests." Neither indicate that EHS was doing something as severe as foregoing its right to host athletic contests on its athletic field. The City can point to nothing else in EHS's voluminous Master Plan to support its position that EHS was deliberately intending to bring an abrupt end to its various teams' home games and all the other ways the field had been used for a century.

A. <u>EHS President Mike Elliott had no intention to forgo EHS's historical use of the field.</u>

As noted above, a waiver or relinquishment of a right must be made by a "clear, unequivocal and decisive act of a party' demonstrating an intent to waive the known right." *E.g., Occidental Fire & Cas. Co. of N.C.*, 918 F.2d at 1320 (7th Cir. 1990). EHS President Mike Elliott signed the 2014 Master Plan. (APFOF ¶ 76.) For many reasons, his execution of the Master Plan does not give rise to a waiver of EHS's rights to use its field, or at the very least creates a genuine issue of fact for a jury to decide.

The City's restrictive view of the Master Plan contradicts EHS's understanding of the purpose of the document. At the time of signing, Mr. Elliott understood that the Master Plan was supposed to help facilitate or streamline specified building projects. (APFOF ¶ 77.) At no time

did anyone from Edgewood College, EHS or the City inform him that the Master Plan could operate or would be interpreted to restrict or limit projects or uses that were not identified or not identified with a certain specificity.  (APFOF ¶ 77.)  This was the first Master Plan developed under the new CI District zoning ordinance.  (APFOF ¶ 73.)  Neither the City nor EHS had any pool of knowledge or prior experience to pull from.

Mr. Elliott's knew that EHS had been and presently was using the field for "athletic contests."  Elliott knew and recognized that EHS had been using its field for sports and athletic events for over 100 years.  (APFOF ¶ 78.)  EHS had played freshman and JV football games on the field just months before the signing.  (APFOF ¶ 78.)  And EHS and Elliott understood that this use was in allowable under EHS's zoning.  (APFOF ¶ 78.)

Moreover, as a matter of practical construction, EHS continued playing games on the field after signing the Master Plan.  There is no evidence that such use for athletic contests stopped in recognition of an agreed to restriction.  Instead, EHS's use of the field for games and other events has been continuous, even increasing in frequency upon the renovation of the field in 2015.  (APFOF ¶¶ 45-46, 82.)  EHS's substantial investment in the Goodman Athletic Complex to include "competition fields" in 2015 further belies an intent to limit usage.  (APFOF ¶¶ 36-41.)

B.  <u>The ordinary and plain meaning of "athletic field" is a piece of land prepared for recreation and games—even competitive ones.</u>

Beyond the clear evidence that EHS did not intentionally waive or limit its right to use its athletic field, the City's interpretation makes little sense.  The term "athletic field" is not a defined term under the Madison General Ordinances.  When words are not defined, they are to "be given their ordinary and plain meaning." *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000). To determine the ordinary and plain meaning, courts look to dictionary definitions. *United States v.*

*Patel*, 778 F.3d 607, 613 (7th Cir. 2015). According to the Oxford English Dictionary "field" is "a piece of land used for a particular purpose, especially an area marked out for a game or sport."[12] The Law Insider dictionary defines an "athletic field" as "a developed recreation area that may contain a playground as well as fields for competitive sports such as baseball, football, or soccer."[13] The online Webster's Dictionary defines a field as "an area constructed, equipped, or marked for sports."[14]

Even though the term "athletic contest" appears nowhere in the City's ordinances, the City itself owns and operates many spaces which it happens to call "athletic fields" and even has a website for making "Athletic Field & Court Reservations."[15] The City's website confirms it treats its own athletic fields according to the plain and ordinary meaning of the term. According to the City's website, City athletic fields are pieces of land on which many activities can occur, including "softball, baseball, soccer, football," "[y]outh athletic groups," "youth and adult league play," "tournaments & leagues," "cricket," "ultimate frisbee," and "a unique blend of active recreation and passive recreation spaces …ready for your imagination."[16] While the City's website identifies specific examples of how its fields are used, those examples do not serve as an exhaustive or restrictive list of activities for which the City's fields can be used.  For example, the City does not bar people from reserving the "Lacrosse Fields" to play field hockey on or prohibit people from

---

[12] *Field*, Lexico.com https://en.oxforddictionaries.com/definition/us/field (last visited on June 10, 2022).

[13] *Athletic Fields*, LawInsider.com https://www.lawinsider.com/dictionary/athletic-fields (last visited on June 10, 2022).

[14] *Field*, Merriam-Webster.com https://www.merriam-webster.com/dictionary/field (last visited on June 10, 2022).

[15] City of Madison Parks Div., *Athletic Field & Court Reservations*, https://www.cityofmadison.com/parks/reserve/FieldReservations.cfm. (last visited on June 10, 2022).

[16] City of Madison Parks Div., *Athletic Field & Court Reservations*, https://www.cityofmadison.com/parks/reserve/FieldReservations.cfm (last visited June 10, 2022).

reserving the "Football Fields" to host a scrimmage or practice on just because the website mentions that the fields are used for "league play." But the City wants to hold EHS to a different, more onerous standard of specificity.

Therefore, according to the plain and ordinary meaning of "athletic field" EHS, by labeling its field an "athletic field," indicated in its Master Plan that its field would be used for sports, competitions, and recreation.

C. <u>According to the City's own understanding, "team practices" and "physical education classes" can also entail "athletic contests" and "competitions."</u>

Not surprisingly, the City has difficulty distinguishing between "athletic competitions" and "team practice." Mr. Hank admitted during his deposition that team practices can involve inter-team scrimmages (for example, the varsity team playing the junior varsity team) with simulated game conditions and use of a scoreboard. (APFOF ¶ 132.) Mr. Hank defined an "athletic contest" as a "competition between two teams." (APFOF ¶ 132.) So, even under Hank's definition and understanding of what "team practices" entail, the Master Plan clearly provided that the athletic field would be used for "team practices" which can involve competitions between two teams or "athletic contests." Mr. Hank's understanding that "team practices" can entail competition between two teams matches Mr. Elliott's understanding as well. Like Mr. Hank, Mr. Elliott also attended EHS as a student and can recall using the field for team practices and physical education classes—each of which often involved students competing against each other in various games or athletic contests. (APFOF ¶ 132.) Will a physical education teacher violate Madison's zoning ordinances by incorporating an "athletic contest" into his or her class?

Ultimately, Mr. Hank's testimony reveals that the City drew an irrational and arbitrary line and ignored the plain and ordinary meaning of the word "athletic field" and arbitrarily read "team practices" and "physical education classes" to exclude "athletic contests" and any many other

activities for which high schools use their fields to advance their missions—just as contemplated by the Campus-Institutional Zoning District ordinance, M.G.O. § 28.097(3)(b). Moreover, the City violated Wisconsin state law which requires that land use regulations be interpreted and applied "with a bias towards the free use of property." *AllEnergy Corp. v. Trempealeau Cnty. Env't & Land Use Comm*., 2017 WI 52, ¶ 164, 375 Wis. 2d 329, 895 N.W.2d 368 (Kelly, J., dissenting). The City chose instead to apply what Mr. Tucker referred to as a "fine-toothed comb" approach to re-interpret EHS's 2014 Master Plan more than four years after it went into effect. (APFOF ¶ 120.)

In sum, the evidence demonstrates EHS did not voluntarily restrict itself or waive its rights to continue using its athletic field for athletic contests or other uses related to its primary, religious mission. Read in the light most favorable to EHS, the evidence shows that the City derived a novel and sweeping interpretation of the Master Plan: four years after the Master Plan was approved, years after the field had been improved to competition standards, years after a scoreboard was added and the field was plumbed for lights, and all while games had been continuously played beyond the bounds of memory. The City's shifting, inconsistent, and arbitrary positions provide sufficient basis for a reasonable jury's finding of pretext. *Schuster v. Lucent Techs., Inc*., 327 F.3d 569, 577 (7th Cir.2003); *see also Lawhead v. Ceridian Corp.*, 463 F. Supp. 2d at 856, 864 (N.D. Ill. 2006).

As will be discussed below, the City used its bad faith and pretextual reading of the Master Plan to impose undue demands on EHS, deny its approved light permit, issue notices of violation for hosting girls' soccer games, and force EHS and its students to suffer undue delay, burden, and expense in their simple effort to continue using their field as the EHS community has for nearly a century in furtherance of its religious mission and values.

33

## II.    A REASONABLE JURY COULD FIND THAT THE CITY VIOLATED EHS'S RIGHTS UNDER RLUIPA.

Congress enacted RLUIPA to provide "'very broad protection for religious liberty.'" *Holt v. Hobbs*, 574 U.S. 352, 356(2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). RLUIPA broadly defines "religious exercise to include "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). It also specifies that the "*use*, building, or conversion of real property for the purpose of religious exercise, shall be considered to be religious exercise of the person or entity that *uses or intends to use* the property for that purpose." (emphasis added) 42 U.S.C. § 2000cc-5(7)(B) (emphasis added).

Importantly, the City's motion does not dispute that EHS is a religious institution or question EHS's sincerity of belief. Nor does it raise an issue as to whether EHS's use and intended uses of its athletic field constitute "religious exercise" under RLUIPA, 42 U.S.C. § 2000cc-5(7). The evidence is nevertheless sufficient to confirm EHS's religious mission, sincerely held Sinsinawa Dominican values, and how EHS uses and intends to use its field in furtherance of the same. (APFOF ¶¶ 1-13.) Therefore, EHS's response can focus on how the City's various actions violated two different subsections of RLUIPA, namely the "Equal terms" provision, 42 U.S.C. § 2000cc(b)(1), and the "Substantial burdens" provision, 42 U.S.C. § 2000cc(a)(1). EHS will now address each in turn.

### A.    A Reasonable Jury Could Find that the City Treated EHS on Less than Equal Terms in Violation of RLUIPA's Equal Terms Provision.

The City argues that *none* of its actions violated the equal-terms provision, which states:

(1) EQUAL TERMS- No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

42 U.S.C. 2000(b)(1). This provision "is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses." *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007). In essence, the equal-terms provision requires local governments to afford religious institutions the same freedom and treatment as their best-treated nonreligious institutions.

RLUIPA specifies that a plaintiff need only produce *prima facie* evidence to support its equal-terms claim and shift the burden of persuasion on any element of the claim to the government. 42 U.S.C. 2000cc-2(b). To shift the burden, a plaintiff must produce *prima facie* evidence that (1) it is a religious institution, (2) subject to a land use regulation that either facially or as-applied (3) treats it on less than equal terms with (4) a nonreligious institution. *See River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 371 (7th Cir. 2010); *see also Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1307-1308 (11th Cir. 2006). Once the burden shifts, the government, not the religious institution, must show what the treatment received by the religious institution should not be deemed unequal.

Here, there is no genuine dispute over the first two elements. EHS is (1) a religious institution (2) that has been subjected to the City's application of its various land use regulations. Therefore, the only question that remains is whether the City treated EHS in any way on less than equal terms with any comparable nonreligious institutions. The City maintains that two comparators, James Madison Memorial High School and the University of Wisconsin, are inapt. Defs.' Summ. J. Br., Dkt. # 42, at 27-31. While RLUIPA does not provide a comprehensive list of comparable land uses, it does provide that its terms should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

1.   *The Seventh Circuit's equal-terms test focuses on the "accepted zoning criterion" that generally define the character of the zoning district at issue.*

In 2010, an *en banc* panel of the Seventh Circuit sought to address a circuit split over how comparable a nonreligious institution or assembly needs to be to qualify as a proper comparator under the equal-terms provision. *River of Life,* 611 F.3d 367. As this Court correctly noted, "[a] comparator is sufficiently similar if it is the same as the religious institution 'from the standpoint of an accepted zoning criterion, such as 'commercial district,' or 'residential district,' or 'industrial district.'" (Opinion and Order (Dkt. #28) 15). (*Edgewood High Sch. of the Sacred Heart, Inc. v. City of Madison*, No. 21-cv-118, slip op. at 15 (W.D. Wis. May 3, 2022), Dkt. # 28 (quoting *River of Life,* 611 F.3d at 373). Under *River of Life,* a non-religious institution need not be identical to the religious institution and may differ in many respects. *Id*. at 371; *Immanuel Baptist Church v. City of Chicago*, 344 F. Supp. 3d 978, 984 (N.D. Ill. 2018) ("As other courts have noted, however, an identical comparator is not required.").

What matters is whether the nonreligious institution or assembly differs with respect to the accepted zoning criteria that are generally applicable to or define the character of the zone from which the religious institution or its use is being excluded. *Id*. The test focuses on the general "character" of the zoning district at issue, and whether the religious institution or its use can be excluded based on the objective characteristics that determine whether a particular use fits or does not fit within the zoning district. *Id*. ("[S]hould a municipality create what purports to be a pure commercial district and then allow other uses, a church would have an easy victory if the municipality kept it out.")  *Id*. at 374.

Applying the *River of Life* test, the United States District Court for the Western District of Washington reiterated that the "'accepted zoning criteria' are the objective characteristics of a particular use that determine whether a use should be excluded from the zone, given the purposes

for which the zone was established." *Corp. of the Cath. Archbishop of Seattle v. City of Seattle*, 28 F. Supp. 3d 1163, 1168 (W.D. Wash. 2014); *Id.* at 1167 n.6 (citing *River of Life*, 611 F.3d at 373). The United States District Court for the Northern District of Illinois also interpreted *River of Life*'s test as placing the focus on the general criteria that define the zoning district at issue and the objective characteristics that determine whether an institution or use fits the zone or not. *Christian Assembly Rios De Agua Viva v. City of Burbank,* 237 F. Supp. 3d 781, 792 (N.D. Ill. 2017) ("The Court considers how the land use regulations at issue affect similarly situated institutions with respect to accepted zoning criteria, such as sufficiency of parking space, traffic control, or generation of significant taxable revenue.").

   2.   *EHS's use of its athletic field did not differ with respect to the accepted zoning criteria that determine whether a use should be excluded from the Campus Institutional zone given the purpose for which the zone was established.*

Typically, an equal-terms case involves a religious institution or assembly that wants to come into a zoning district in which a comparable nonreligious institution or assembly is already allowed to operate. *See, e.g. Digrugilliers*, 506 F.3d at 614–15 (Indianapolis kept a religious assembly from locating in a zoning district which permitted assembly halls, civic clubs, and schools as of right); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846 (7th. Cir. 2007) (village kept church from locating in an industrial district); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1002–03 (7th Cir. 2006) (village kept church from locating in a residential district).

But this case is distinguishable from those cases (all of which were decided before the Seventh Circuit established its "accepted zoning criterion" test) because, here, Madison was not keeping EHS from locating in a Campus Institutional District. EHS was already zoned Campus Institutional in 2013 along with the MMSD schools and parts of the UW Campus. (APFOF ¶¶ 63-64.) This case is different because the City sought to keep EHS from continuing to use its athletic

field in the same ways Madison Memorial and UW were allowed as of right to continue using their fields under M.G.O. § 28.097(3)(b).

The express purpose for which the Campus-Institutional Zoning District was established was to "accommodate the growth and development needs of [the City's major educational and medical institutions], and coordinate the master plans of these institutions with the City's plans, policies and zoning standards." M.G.O. § 28.097(1). Consistent with the district's purpose, M.G.O. § 28.097(3) identifies the uses that are allowed as of right within the district. Those allowable uses include the use of "indoor and outdoor sports and recreational facilities"; "stadiums, auditoriums, and arenas, open or enclosed," and "other uses related to the institution's primary mission." M.G.O. § 28.097(3)(b) (capitalization altered). That these uses were all freely allowed serves as a legislative declaration from the City that outdoor sports and recreation facilities and other uses related to a high school's primary mission *all fit with the purpose and objective* characteristics of the Campus Institutional districts.

None of the existing institutions, including EHS, which were rezoned Campus-Institutional in 2013 had to seek any additional approval to continue using their properties for outdoor sports, recreation, or other uses related to their primary missions. (APFOF ¶¶ 64-65.) Under section 28.097, campus master plans were voluntary for these institutions. (APFOF ¶ 67.) Moreover, master plans do not change the underlying Campus Institutional zoning, as they have a ten-year expiration. (APFOF ¶¶ 72.)  Therefore, neither EHS nor UW were required to submit a campus master plan to establish or secure their right to continue to use their fields in accordance with M.G.O. § 28.097(3)(b). Therefore, the City has no basis upon which to argue that EHS's continued use of its athletic field for outdoor sports, recreation, and other uses related to its primary mission did not fit with the character or purpose of the district.

Based on the objective characteristics of EHS's existing and intended use of its athletic field, the City did not have a justifiable basis for prohibiting EHS from using its athletic field in the same way the MMSD schools and UW were freely allowed to use their fields. It is undisputed that the MMSD schools were allowed to use their athletic fields and facilities to host activities related to their primary missions,[17] as well as "athletic contests." (APFOF ¶¶ 131, 145.)  But the evidence shows that the City barred EHS from doing the same in 2019 based on an errant and pretextual re-interpretation of EHS's voluntary, ten-year master plan four years after it went into effect. (APFOF ¶ 114-131.) This is unequal treatment.

### 3. *A voluntary, ten-year master plan is not an "accepted zoning criterion."*

Under *River of Life,* "an accepted zoning criterion" is an "objective characteristic[] of a particular use that determine[s] whether a use should be excluded from the zone, given the purposes for which the zone was established." *Corp. of the Cath. Archbishop of Seattle*, 28 F. Supp. 3d at 1167-68. A voluntary, ten-year master plan is not an objective characteristic of a particular use but is rather a tool that the existing institutions like UW and EHS could use to streamline future planning and development of their property over a ten-year period. (APFOF ¶ 69.) UW and EHS remained institutions with property located within a Campus Institutional District but sought the additional benefit of using the master plan process to streamline their future development—not secure their existing rights to continue using their property like the other institutions which were rezoned Campus-Institutional in 2013. That a campus master plan was voluntary and not required of the existing institutions shows that the master plan was not, in any sense, a generally applicable and objective criterion for determining whether EHS, UW, or the MMSD schools could use their property and fields for the uses allowed as of right in the Campus

---

[17] The City even hosts concerts on Breese Stevens field, which is Madison East High School's home field. https://www.breesestevensfield.com (last visited on June 9, 2022).

Institutional District.  *See Immanuel Baptist Church*, 344 F. Supp. 3d at 985 (Court rejected Chicago's argument that comparators needed to be identical and share the identical zoning designation to be consider comparators and noted. that while "[d]ifferential treatment with respect to the relevant zoning criterion within the same district might be more difficult to justify than differential treatment between districts, . . . that does not mean that comparators in a different district cannot be deemed 'comparable' for purposes of applying RLUIPA's equal-terms requirement.").

The City's motion for summary judgment does not even attempt to argue that EHS's use of its athletic field differed in any other material way from MMSD schools. Therefore, the City's motion must be denied.

4. *The City treated EHS's light permit application on less than equal terms with Madison Memorial's application under section 10.085.*

The treatment of EHS's lighting application stands in stark contrast to that of Madison Memorial's. On August 17, 2018, Madison Memorial submitted a lighting application for outdoor lights for its athletic field. (APFOF ¶¶ 133-138.)  Like EHS's proposed lighting, Memorial's lighting was required to meet the technical specifications of M.G.O. section 10.085. (APFOF ¶¶ 134.) Memorial's lighting application was reviewed and approved. (APFOF ¶¶ 135.)  And a permit was issued a week later. (APFOF ¶¶ 135.)  The City did not look beyond the four corners of the materials submitted by Memorial in its lighting application. (APFOF ¶¶ 138.) All that mattered to the City was that Memorial's outdoor lighting application complied with the technical requirements of section 10.085.

With EHS, the City acknowledged repeatedly that EHS's light application was subject to the same technical standard.  (APFOF ¶¶ 92, 96-103.)  The Master Plan did not impact the light application and no Master Plan Amendment would be necessary.  (APFOF ¶¶ 92, 96-103.)  These

40

facts were confirmed by Mr. Tucker in writing. (APFOF ¶¶ 96-98, 111.) The lighting application was approved by city staff on February 27 and March 1, 2015. (APFOF ¶¶ 104-110.) So far, EHS's treatment mirrored that of Memorial.

However, the City then went further. It arbitrarily changed its position and looked well beyond the four corners of the lighting application to consider both EHS's Master Plan and intended uses of the lights. (APFOF ¶¶ 137-138.) It applied unequal terms even after it confirmed that the terms were to be equal.

Moreover, even under the City's restrictive and narrow re-interpretation of EHS's outdoor lighting application, EHS had a permitted use of its field, i.e. team practices, which entitled EHS to lights. (APFOF ¶ 125.) So both Madison Memorial and EHS submitted lighting applications which were approved for compliance with section 10.085 and the City's zoning ordinances, but Madison Memorial's permit was released while EHS's was withheld. Even according to Mr. Tucker's letter dated February 27, 2019, EHS's right to lights was not contingent on EHS's waiver of its right to use its field for "athletic contests" and did not require EHS to amend its Master Plan. (APFOF ¶¶ 96-100.)

This same sort of unequal treatment with respect to lighting was held to be an equal-terms violation when the City of Seattle inhibited a private Catholic high school from installing lights just like the public high schools. *Corp. of the Cath. Archbishop of Seattle*, 28 F. Supp. 3d at 1165-68. In that case, the Catholic high school and public high schools at issue were zoned single-family residential, but the City exempted the public high schools from certain requirements of the City's otherwise generally applicable outdoor lighting ordinance. The court applied the *River of Life* test and asked "what characteristics the residential, single-family zone [was] meant to preserve, and what characteristics of a lighted athletic field would justify its exclusion from that zone." *Id.* at

1168-69.  Because the City could not show that a lighted, athletic field at a Catholic high school differed from a lighted athletic field at a public school from the standpoint of the accepted zoning criterion, the Court found an equal terms violation and ordered to City to treat the Catholic high school's lighting application on equal terms.  *Id.*  For the same, reasons the City's motion should be denied, and the City should be ordered to release EHS's light permit pursuant to its approved lighting application and vested right under Wisconsin's Building Permit Rule as addressed in Section IV below.

> 5. *Even if a voluntary, ten-year master plan is an "accepted zoning criterion" under River of Life, the evidence shows the City has treated UW, which has had a master plan in place, more favorably than it has treated EHS.*

While the "accepted zoning criteria" test is to be conducted at the level of the underlying zoning district, *see Corp. of the Cath. Archbishop of Seattle*, 28 F. Supp. 3d at 1168, EHS can also establish an equal-terms claim based solely on how the City treated UW more favorably. UW is the only other institution zoned Campus Institutional District that has adopted a master plan. (APFOF ¶ 152.) The City agrees that uses of buildings and spaces identified in the UW's Master Plan are subject to the same interpretative standards as applied to EHS's. (APFOF ¶ 153.) According to Mr. Tucker, buildings and spaces identified for a particular use in the UW Master Plan that are used for a different purpose would "probably" be a violation.  (APFOF ¶ 154.)

Pursuant to UW's Master Plan, the City has allowed UW to construct new outdoor athletic facilities and to use them for "athletic contests," even though UW did not use the words "athletic contests" to describe how these facilities were being used or would be used in the future. The City has not sought to bar UW from using its fields and facilities for "athletic contests," deny UW light permits, or demand that UW amend its Master Plan to provide the specificity the City demanded of EHS.

For example, in its Master Plan, the UW describes one of its facilities as the "Goodman Softball *Practice* Facility." (APFOF ¶ 156.) (emphasis added)  That space, however, is used to host more than just practices. It hosts Big Ten athletic contests, namely UW Big Ten softball games.  (APFOF ¶ 157.) In its Master Plan, the UW simply identifies the use of another facility, the Natatorium, as for "Rec Sports." (APFOF ¶ 158.) That space, however, is used to host athletic competitions, including high school varsity swimming and diving championship competitions. (APFOF ¶ 159.)  In its Master Plan, while some buildings are designated as for "Recreation Sports" the UW describes the Nielsen Tennis Stadium Expansion as for "Athletics." (APFOF ¶ 160.) That building, however, has been used for high school athletic competitions, instructional camps and clinics, and private tennis lessons.  (APFOF ¶ 161.)  The UW Master Plan identifies the "Near West Fields" as "recreation fields" and indicates that they would be upgraded "to create five synthetic turf *flag football* fields and one championship *soccer* field."  (APFOF ¶ 162.) (emphasis added). That space, however, is elsewhere identified by UW as used for baseball, softball, lacrosse, rugby, "and more." (APFOF ¶ 163.)

The City contends that it need not compare UW's Master Plan to its actual use because zoning enforcement is complaint-based. (APFOF ¶ 164.) However, Mr. Tucker's October 2018 email to EHS setting forth his restrictive interpretation of the EHS Master Plan was sent before Tucker had received any complaints about EHS hosting girls' soccer or other "athletic contests" on its field. (APFOF ¶ 165.) So, the City cannot justify its selective enforcement and decision to look the other way on UW's use of its various fields based on whether it has or has not received "complaints" regarding UW's field usage.

In fact, at the ZBA hearing in *2019*, EHS complained about how the City was treating UW more favorably. (APFOF ¶ 166.)  But to date, Mr. Tucker and the City have not reviewed UW's

adherence to its Master Plan. (APFOF ¶ 167.) Mr. Tucker, City Attorney Strange, and Mr. Hank took a "fine-toothed comb" approach to EHS's Master Plan. (APFOF ¶ 120.)  In contrast, the City intentionally looked the other way and has allowed UW to continue using its fields without surveillance, notices of violation, or demands to amend the UW Master Plan. This evidence provides a sufficient basis upon which a jury could find an equal terms violation.

6. *The City unequally penalized EHS for not expressly identifying every single one of its existing and intended uses of its athletic field at a higher level of specificity than required of UW, the MMSD high schools or even the City itself used under M.G.O. § 28.097(3)(b).*

At the time EHS's campus was rezoned Campus-Institutional in 2013, the uses allowed within the Campus Institutional District were listed separately as either primary or secondary uses under section 28.097. These uses were described at a very low level of generality. For example, the list of permitted "primary uses" included "educational uses associated with colleges, universities, and secondary and primary schools, including classroom buildings, libraries, and offices." M.G.O. § 28.097(3)(a)1.  (capitalization altered).  The list of permitted "secondary uses" included "indoor and outdoor sports and recreational facilities"; "stadiums, auditoriums, and arenas, open or enclosed," and "other uses related to the institution's primary mission." M.G.O. § 28.097(3)(b). The MMSD schools were entitled to continue these uses on their property without describing them at any greater level of specificity. The MMSD schools did not need to identify the specific classes that would be taught in the classroom buildings or sports which would compete in their recreational facilities, stadiums, or arenas. Section 28.097(3)(b) even generally allowed for "other uses related to the institution's primary mission." So, at the time EHS was preparing its Master Plan, the City regulated uses within the Campus Institutional district only at a very low level of generality.

In its Master Plan, EHS labeled its only on campus field as an "athletic field" and "recreation space" and thereby described the use of its field at the same level of generality employed in section 28.097.  No text in section 28.097 required EHS to be any more specific, and EHS was never notified during the Master Plan approval process that its failure to list a specific activity or use of its field would result in a forfeiture of EHS's right to continue its right to use the field for those purposes during the ten-year term of the Master Plan. (APFOF ¶ 77.) EHS only identified team practices and physical education classes as examples of activities which would occur on its field but did not intend, and never would have intended, these examples to be an exhaustive and restrictive list of activities for a ten-year period. (APFOF ¶ 80.) The facts show the City did not even interpret EHS's examples as an exhaustive and restrictive list until October 2018. (APFOF ¶¶ 58-59.)

However, four years after EHS's Master Plan was approved, the City treated EHS on less than equal terms by penalizing it for not describing its uses at a much higher level of specificity than was required of the other institutions operating within a Campus-Institutional District. In fact, the City turned EHS's effort to provide specific examples of how its field was used against EHS by treating EHS's examples instead as a final, exclusive list of activities for which the field could be used. This post-hoc, heightened demand on EHS was also unequal treatment.

       7.   *The evidence of how the City "gerrymandered" its ordinances to target and thwart EHS's use of its field is also sufficient to support an equal-terms claim.*

Finally, EHS could also establish an "equal terms" claim based on the evidence which shows that the City gerrymandered its land use regulations to target EHS. As the Eleventh Circuit has held, "a religious 'gerrymander' that departs from basic principles of neutrality may also support a RLUIPA Equal Terms violation." *Primera Iglesia Bautista Hispana of Boca Raton,* 450

F.3d at 1309. The Seventh Circuit has also recognized a RLUIPA gerrymander claim, although that claim was unsuccessful. *See Vision Church*, 468 F.3d at 1003.

EHS's gerrymander claim arises in the time and context of its application to repeal its Master Plan. Although EHS's Master Plan was ultimately repealed, the evidence viewed in the light most favorable to EHS shows the City quickly enacted a new ordinance specifically drafted and rushed through to target EHS and require EHS to undergo a more onerous CUP process—a process which a reasonable jury could find was pre-determined to ensure EHS would not obtain lights. (APFOF ¶¶ 175-218.) Like in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), where the city enacted a new ordinance designed to restrict one specific group, a reasonable jury could find that Alder Evers' ordinance requiring a CUP to install lights in the Campus Institutional District was drafted, and specifically tailored to, prevent EHS from achieving its intended goal of having a lighted field like the MMSD high schools which already had lighted fields. (APFOF ¶ 197-208.) The way in which Alder Evers' ordinance was initially drafted, the way and timing in which it was enacted, and the way in which the Common Council delayed the repeal of EHS's Master Plan, and the rationale they expressed collectively provides a sufficient evidentiary basis upon which a reasonable jury could infer and find that the City violated RLUIPA equal terms provision in this regard.  (APFOF ¶¶ 175-218.)

In sum, there is more than enough evidence upon which a reasonable jury can find that the City imposed its land use regulations in several ways that treated EHS, a religious institution, on less than equal terms with the nonreligious institutions in the Campus-Institutional District.

### B.   A Reasonable Jury Could Find that the City Imposed a Substantial Burden on EHS's Religious Exercise in Violation of RLUIPA.

The City also contends that it has never imposed its land use regulations in a way that substantially burdened EHS's religious exercise. To make its case, the City ignores Seventh Circuit

precedent and relies almost exclusively on out-of-circuit, distinguishable caselaw. The City also ignores just how severely the City's errant interpretation of EHS's Master Plan restricted EHS's religious land use and damaged the school. Moreover, the City asks the Court to decide as a matter of law what are quintessential jury questions, such as questions of substantiality, reasonableness, and feasibility.

Based on the facts of record and Seventh Circuit precedent, a jury could find that the City's actions, individually and cumulatively, substantially burdened EHS's religious exercise.

1. *The "Substantial Burdens" provision governed each of the City's land use decisions which barred or burdened EHS's uses and intended uses of its field.*

RLUIPA's "Substantial Burdens" subsection provides as a general rule that:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Congress enacted this subsection because it found that religious organizations were being frequently discriminated against "in the highly individualized and discretionary processes of land use regulation." 146 Cong. Rec. 16,698 (2000). The threat to religious liberty is greatest when government officials exert discretionary authority over whether to permit or restrict an organization's use of land because such authority can be used in discriminatory, unequal, and pretextual ways. *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005).

The "Substantial Burdens" subsection applies in any land use matter wherein the imposition or removal of the burden affects commerce among the States, 42 U.S.C. § 2000cc(a)(2)(B), or where the burden is imposed through a system of land use regulations, under

which the government makes, or has in place formal or informal procedures that permit it to make, individualized assessments of the uses of property. 42 U.S.C. § 2000cc(a)(2)(C). Both are satisfied here, and the City does not contend otherwise.

The following City actions all involved individualized assessments by the City of EHS's uses and intended uses of its property:

- The City's prohibition of any activities on the field outside of physical education classes and practices;
- The City's decision to withhold the light permit after EHS's application was approved in February  2019 based on how the City thought the lights would be used;
- The City's Notices of Violation issued on April 1, 2019, and May 15, 2019, for hosting "athletic contests on the athletic field";
- The July 11, 2019, Zoning Board of Appeal's decision affirming the City's restrictions on EHS's use of its only field and the notices of violation;
- Alder Tag Evers' ordinance which was drafted and implemented specifically to counter EHS's request to terminate its Master Plan; and
- The Plan Commission and Common Council's decisions denying EHS's CUP application for lights.

At each moment, the City, absent a compelling governmental interest and less restrictive means, was obligated by RLUIPA to not impose its regulations in a manner that substantially burdened EHS's religious exercise. As argued below, the City did not comply with this obligation.

Under the "Substantial burdens" subsection, EHS bears the initial burden of producing *prima facie* evidence that: 1) it is a religious institution; 2) subject to land use regulations; and 3) the land use regulations substantially burdened its religious exercise. 42 U.S.C. § 2000cc-(a)(1); *see also World Outreach Conf. Ctr. v. City of Chicago (World Outreach II)*, 787 F.3d 839, 840 (7th Cir. 2015). If EHS carries this burden, the burden then shifts to the City to demonstrate that the burdens were imposed in furtherance of a compelling governmental interest and were the least restrictive means of furthering that interest. *World Outreach II*, 787 F.3d at 840. Each of these elements are to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

Here, the City does not and cannot genuinely dispute the first two elements. As a Catholic high school, EHS qualifies as a religious institution under RLUIPA. *See, e.g., Acad. of Our Lady of Peace v. City of San Diego*, No. 09-CV-962, 2012 WL 13175857, at *2–3 (S.D. Cal. May 11, 2012) (recognizing a Catholic college-preparatory school as a religious institution under RLUIPA). Second, as an institution operating in a Campus-Institutional District, EHS has been subjected to the City's land use regulations and decisions which have burdened its use and intended uses of its field. 42 U.S.C. § 2000cc-5(5). Moreover, Madison makes no effort to argue that the burdens imposed were in furtherance of a compelling governmental interest or the least restrictive means. Therefore, the *only* element that remains at issue is whether the City imposed its land use regulations in any way that substantially burdened EHS's religious exercise.

Importantly, whether a burden is "substantial" is a question of fact for the jury. *World Outreach Conf. Ctr. v. City of Chicago (World Outreach I)*, 591 F.3d 531, 539 (7th Cir. 2009) (determining whether a burden is substantial is a question of fact). Whether a burden is "substantial" is a question of degree, and "questions of degree are peculiarly jury questions." *Source Servs. Corp. v. Chicagoland JobSource, Inc.*, 643 F. Supp. 1523, 1529 (N.D. Ill. 1986); *see also Schaefer v. United States,* 251 U.S. 466, 483 (1920) (with "a question of degree the field in which the jury may exercise its judgment is necessarily a wide one.")

2.   *The Seventh Circuit's "Substantial Burden" Precedent in As-Applied Cases*.

Because RLUIPA does not define "substantial burden," the courts have struggled to develop a uniform standard by which to analyze whether a burden is substantial. The Circuits have adopted widely divergent standards. The Seventh Circuit itself has even changed its own standards.

In *Civil Liberties for Urban Believers v. City of Chicago (CLUB)*, 342 F.3d 752 (7th Cir. 2003), the Seventh Circuit analyzed a facial, substantial burden challenge to Chicago's entire zoning scheme and held that for such a facial challenge to succeed a claimant must show that the

zoning scheme on its face rendered the claimant's religious exercise "effectively impracticable." *Id*. at 761. Facial challenges differ from as-applied challenges because they require a plaintiff to demonstrate that there is no set of circumstances where the challenged law would be valid, so the Seventh Circuit required proof that the *CLUB* churches could find no other locations within the City to build. *Id*. Applying such a standard to as-applied challenges is inappropriate because it would render the "Substantial Burdens" provision superfluous and no more protective than RLUIPA's "total exclusions" and "unreasonable limitations" provisions, 42 U.S.C. § 2000cc(b)(3)(A), (B).

Twelver years later, the Seventh Circuit abandoned the *CLUB* test completely in *Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015) in light of the Supreme Court's decision in *Holt v. Hobbs*, 574 U.S. 352 (2015). The Seventh Circuit determined that *Holt* articulated a standard "much easier to satisfy" than the onerous "substantial burden" standard adopted in *CLUB* and which this Court had to apply in the land use case of *Eagle Cove Camp & Conference Center, Inc. v. Woodboro*, 734 F.3d 673, 680 (7th Cir. 2013). According to *Holt* and *Schlemm*, a claimant need only show that the government action "seriously" burdened a particular[18] religious exercise to shift the burden to the government. *Schlemm*, 784 F.3d at 364-365.

In between *CLUB* and *Schlemm,* the Seventh Circuit had the opportunity to decide several as-applied substantial burden claims. These cases, unlike *CLUB*, have not been abandoned but guide how a jury can find a burden to be "substantial" in an as-applied case. According to the following Seventh Circuit precedent, the jury in this case can consider:

---

[18] The Supreme Court in *Holt* stressed that RLUIPA's substantial burden inquiry focuses only on the religious exercise being burdened and not on "whether the RLUIPA claimant is able to engage in other forms of religious exercise." 574 U.S. at 359-62.

i.  Whether the Government caused the religious institution undue delay, uncertainty, and expense.

In  *Sts. Constantine*, the Seventh Circuit analyzed an as-applied challenge to New Berlin's denial of a church's rezoning application. 396 F.3d at 899. The district court had inferred from *CLUB* that the church could not prevail, even in an as-applied case, unless the church could *"*show that there was no other parcel of land on which it could build its church." *Id*. But the Seventh Circuit refused to extend *CLUB* that far. *Id*. at 899-900.  Instead, the Seventh Circuit reversed the district court's summary judgment decision and held that New Berlin's decision to deny the church's rezoning application was a substantial burden regardless of whether other parcels could be found in the city to host the church. *Id*. at 901.  The court recognized that even though the church could have searched and even found other locations within the city to locate, or continued filing rezoning applications with the city for this particular property, "there would have been delay, uncertainty, and expense." *Id*. The court expressly held that just because a burden is not "insuperable" does "not make it insubstantial." *Id*. citing *Sherbert v. Verner,* 374 U.S. 398, 399 n. 2, (1963) (recognizing a substantial burden on an employee's religious exercise even though the employee could have found another job that did not require her to work on Saturdays); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (finding that the synagogues had standing to pursue their claims of a legal right to use their current locations for their religious exercise).

While the Seventh Circuit in *Sts. Constantine & Helen* noted a "whiff of bad faith" from the city, the church did not have to prove bad faith or animus to establish its claim. The text of the substantial burden provision as well as RLUIPA's legislative history make clear that a religious institution can show a substantial burden on its religious exercise without having to prove animus or "that there is an unconstitutional motivation behind a law." 146 Cong. Rec. 14,283 (2000).

However, evidence which shows the government acting arbitrarily, or in bad faith, or even shifting positions can buttress a substantial burden claim. *Sts. Constantine & Helen,* 396 F.3d at 900; *see also World Outreach II*, 787 F.3d at 843–44. Where the "nature of a defendant's challenged action suggests that a religious institution received less than even-handed treatment, the application of RLUIPA's substantial burden provision usefully 'backstops the explicit prohibition of religious discrimination in the later section of the Act.'" *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, No. 09-CV-1419, 2017 WL 5015624 at *15 (D. Conn. Nov. 2, 2017) (internal quotation marks omitted) (quoting *Sts. Constantine & Helen*, 396 F.3d at 900)).

Here, based on the evidence of record, a reasonable jury could find that the City imposed its land use regulations in a manner which has caused EHS significant delay, uncertainty, and expense. The City caused EHS tremendous uncertainty and expense when in October 2018 it changed its interpretation of EHS's Master Plan to prohibit *any* activities outside of team practices and physical education classes. (APFOF ¶ 256.) The City's shifting, vacillating positions and employment of its "fine toothed comb" approach on whether EHS could obtain a light permit also caused EHS substantial delay, uncertainty, and expense. (APFOF ¶ 257.) The City's broken promise that EHS would be treated "on equal footing with other high schools" and could "legally play games and install lights at its field" if it filed to terminate its Master Plan caused EHS delay, uncertainty, and expense. (APFOF ¶ 258.) And Alder Tag Evers' ordinance was specifically designed to cause EHS further delay, uncertainty, and expense in its efforts to obtain lights for its field. (APFOF ¶ 259.) All these actions present more than just a whiff of bad faith and less than even-handedness on the City's part. A reasonable jury could even interpret Alder Evers' comments at the Common Council meeting (set forth at length at APFOF ¶ 205) as specifically targeting EHS and mocking its commitment to the Sinsinawa values of "community and partnership," potentially

52

in light of the original title of his ordinance, specific to the EHS lights and field dispute.  (APFOF ¶¶ 204-206.)

In addition, the declarations of EHS President Michael Elliott and Athletic Director Christopher Zwettler also speak to how the school has been harmed by the delay, uncertainty, and expense caused by the City's actions. Therefore, under *Sts. Constantine & Helen*, EHS has presented more than enough evidence upon which a reasonable jury could find that the City imposed a substantial burden on EHS's religious exercise.

ii.   Whether the Government has sought to deprive a religious institution from continuing an existing legal use of its property.

In 2009, the Seventh Circuit analyzed another as-applied "substantial burden" claim brought by a Christian organization that acquired a former YMCA building and wanted to continue to use the facility for its existing legal uses, namely a community center with 168 single-room occupancy units. *World Outreach I*, 591 F.3d 531. In *World Outreach I*, the Seventh Circuit held that the City's efforts to deprive World Outreach the right to continue the legally established uses of the property constituted a substantial burden under RLUIPA. *Id.* at 537 (Court upheld conference center's substantial burden claim based on city's errant insistence that the center had to apply for a special use permit to continue an already-established, legal use of its property.). Because it was not a facial challenge to the City's zoning scheme, as in *CLUB*, World Outreach was not obligated to show that the City had rendered its religious exercise "effectively impracticable" or that it could not serve the poor at another location or establish a community center somewhere. The feasibility of alternative locations was not considered material to World Outreach's as-applied claim, *Id.*, and it should be considered material in this case.

In 2019, the Seventh Circuit reaffirmed that a religious institution could establish a "substantial burden" claim by showing that a municipality is demanding the religious institution

pursue additional or unnecessary zoning approvals to secure an existing, legally established right to use a particular property in a specific zoning district. *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670 (7th Cir. 2019) (Reversing the district court's summary judgment decision based on the District Court's failure to determine whether operating a church on the property at issue was a permitted use under the underlying zoning district regulations).

Therefore, under *World Outreach I* and the *Church of Our Lord*, EHS can establish its substantial burden claim based on the evidence that it had a legal right to use its field for athletic contests and other uses related to its primary mission under section 28.097 and that the City substantially burdened EHS's religious exercise by demanding EHS pursue additional or unnecessary zoning approvals to secure or establish that right. Because there is sufficient evidence upon which a reasonable jury can find the City of Madison did just that, the City's motion for summary judgment must be denied. The City cannot dispute that EHS had a right to use its field for athletic contests and other uses related to its primary mission, and a reasonable jury could find that the City imposed EHS's Master Plan in a manner which prohibited EHS from doing so— thereby substantially burdening its religious exercise.

Tellingly, the City has not even tried to explain what government interest was furthered by its post-hoc demand that EHS provide more specificity in its Master Plan than what the City itself used to describe the allowable use in the Campus-Institutional District under section 28.0297.

          iii.    Whether the Government has prevented the organization from using its facility to serve the religious objectives of the organization.

Even before the Seventh Circuit adopted the "much easier" to satisfy standard in *Schlemm v. Wall*, the Seventh Circuit had held in *World Outreach II* that "preventing a religious organization from using its facility to serve the religious objectives of the organization cannot be thought to have imposed *a merely insubstantial burden* on the organization." *World Outreach II*, 787 F.3d at

843 (emphasis added). Again, because World Outreach involved an as-applied claim, it did not matter whether World Outreach could use a different facility to serve its religious objectives. *Id*.

Under *World Outreach II,* EHS has presented sufficient evidence upon which a reasonable jury could find that the City imposed its land use regulations in a manner which prevented EHS from using its field to further the religious objectives of the school. (APFOF ¶¶ 2-16, 25) The ways in which EHS used and intended to use its field to serve the religious mission and values of the school is set forth more fully in the fact section of this response at pages 3-8 and supported by the declarations of Sister Kathleen Phelan, President Michael Elliott, and Athletic Director Christopher Zwettler. Wherefore, under *World Outreach II,* the City's motion for summary judgment must also be denied.

> iv.   Whether the religious organization had reasonable expectation of using its property for religious exercise.

When a religious organization has a reasonable expectation of using its property for religious exercise, governmental action that impedes that religious exercise may impose a substantial burden. *See Petra Presbyterian Church*, 489 F.3d at 851 ( "[O]nce the organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship on it."). This is so even though other properties might be available for the religious exercise, because the "delay, uncertainty, and expense" of selling the current property and finding a new one are themselves burdensome. *See Sts. Constantine & Helen*, 396 F.3d at 899–901.

The City asks this Court to decide as a matter of law that EHS did not have a reasonable expectation to 1) host athletic contests on its athletic field, 2) use its field for other activities related to its primary mission, 3) obtain a light permit after its lighting application was approved, and 4) obtain a CUP for lights after the Planning Division Staff found that the CUP could be approved and recommended conditions for its approval. But whether EHS's expectations were reasonable is

clearly an issue of fact for the jury. *Bethel World Outreach Ministries v. Montgomery Cnty. Council,* 706 F.3d 548, 557–59 (4th Cir. 2013) (Court found a "question of material fact as to whether [the plaintiff] had a reasonable expectation" and recognized that "modern zoning practices are such that landowners are rarely *guaranteed* approvals."); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (issues of reasonableness are jury questions).

Here, there is sufficient evidence upon which a reasonable jury could find that EHS had a reasonable expectation that it could continue to use its athletic field to host athletic contests and for other uses related to its primary mission. EHS had done so for a nearly 100 years and was even permitted as of right to do so after it was rezoned Campus-Institutional in 2013. (APFOF ¶¶ 71-72, 79.)  Based on EHS counsel's communication with the City in January 2019, Mr. Tucker's letter of February 27, 2019, and the ultimately-approved application, EHS also had a reasonable expectation of receiving a light permit.  Moreover, EHS had a reasonable expectation of receiving a light permit after it filed to terminate its Master Plan because the City reported that if EHS did so, the City would "would allow games and lights at the field." (APFOF  ¶¶ 169-173.) There is also sufficient evidentiary basis (namely the Planning Division staff report and recommendation for approval) upon which a jury could find that EHS had a reasonable expectation of receiving the CUP for lights. (APFOF ¶¶ 223-238.)

By denying EHS the uses and permits EHS had a reasonable expectation of continuing or receiving, a reasonable jury could find that the City imposed a substantial burden on EHS's religious exercise. Wherefore, the City's motion must be denied.

> v.  Whether the City's denials were absolute or whether the City could have approved permits subject to condition.

Other courts have also considered as a factor in the substantial burden analysis whether the government's permit denials were absolute when the permits could have been granted subject to

conditions. *See, e.g., Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 352 (2d Cir. 2007) (considering as a factor in its substantial burden analysis whether village's denial of school's application was conditional or absolute); *Guru Nanak Sikh Soc'y. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 991–92  (9th Cir. 2006) (finding substantial burden where county's denials significantly lessened the prospect of being able to build a temple in the future); and *Bethel World Outreach Ministries,* 706 F.3d at 558 ("we find it significant that the County has completely prevented Bethel from building any church on its property, rather than simply imposing limitations on a new building.").

Here, the evidence establishes that the City could have released the light permit pursuant to EHS's approved application with conditions but chose instead to withhold the permit altogether. (APFOF ¶¶ 114, 125, 128.)  EHS therefore was not able to install lights even for team practices— a lawful use even under the City's reinterpretation of the Master Plan. (APFOF ¶¶ 125.). Even under the City's restrictive interpretation of EHS's ten-year Master Plan, EHS was also not able to install code-compliant lights in anticipation of the Master Plan's automatic expiration or repealing the Master Plan earlier (as EHS did) to remove any question about its right to use its athletic field to host athletic contests. Just as the City had issued EHS a permit in 2015 to install conduit under the field so that EHS could run wiring to power field-lighting and a sound system in the future (APFOF ¶ 48), so too the City could and should have issued EHS the light permit to host athletic contests in the future, as it undisputedly would have been EHS's right upon repeal or expiration of the master plan.

The evidence also establishes that the Plan Commission and Common Council could have approved EHS's CUP application subject to the conditions suggested by the City's own staff— conditions which EHS was willing to accept. (APFOF ¶¶ 223-239.) But the Plan Commission and

Common Council decided to deny EHS's CUP altogether, thereby strengthening EHS's substantial burden claim. (APFOF ¶¶ 240, 225.)

By completely and absolutely denying EHS's 2019 light permit and subsequent CUP application, the City effectively denied EHS, including its students and broader community, any use of EHS's field after dark for any activities related to the school's religious mission, including but not limited to: team and club games, practices, parochial meets, school assemblies, alumni and donor events, band activities, outdoor school liturgies (including Mass) and school ceremonies. The City's denials have significantly lessened the prospect of EHS ever being able to have a lighted field for its students and community to use in furtherance of its religious mission and the Sinsinawa Dominican values – to build partnership and community and to build enrollment so that it can preach and teach the Gospel.   (APFOF ¶ 9.)

                 vi.      Whether the City's restrictions undermined EHS's mission, message and partnerships.

In *First Lutheran Church v. City of St. Paul*, the Court found that the church was likely to succeed on its substantial burden claim because the City imposed restrictions which undermined the Church's mission, preferred practices, and message. 326 F. Supp. 3d 745 (D. Minn. 2018). The Court highlighted how the Church wanted to serve more people and had capacity to do so on its own property but could not do so under the City's restriction. *Id*. at 762. The Court also noted how the City's restrictions limited both the number and types of services the Church could provide on its property and how the restrictions negatively impacted the Church's recruitment efforts and partnerships. *Id*.

Likewise, EHS has presented sufficient evidence upon which a reasonable jury could find that the City's restrictions and denials have undermined EHS's mission, preferred practices, and message. (APFOF ¶¶ 2-25.) A reasonable jury could find EHS has the capacity on its own property

to serve and host more people, partnerships, games and community developing activities but is precluded from doing so as a result of the way the City has imposed its land use regulations. Finally, the jury can also consider how the City's actions have negatively affected EHS's recruitment efforts and partnerships. (APFOF ¶¶ 10, 16-17, 144.)

> vii.    Whether the individual burdens cumulate to be substantial.

Courts have not only recognized "different types of burdens" but also "that such burdens may cumulate to become substantial." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 95 (1st Cir. 2013) (citing *World Outreach I*, 591 F.3d at 539 ("[W]hether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question.")).  Here, there is sufficient evidence upon which a jury could find that the City imposed burdens on EHS's use and intended use of its field which were not only individually substantial but also cumulated to become even more substantial.

The City's land use decisions and actions, individually and cumulatively, caused EHS to suffer significant financial loss, including, but not limited to, attorneys' fees, professional fees, and costs from the inability to host athletic contests and other activities on its field and from the gauntlet EHS has been required to run by the City. (APFOF ¶¶ 114, 256-260.)  By refusing to issue EHS's light permit in February 2019 and September 2019 and issuing notices of violation to EHS for hosting athletic contests on its athletic fields, the City imposed a substantial burden on EHS's religious exercise with no compelling reason, thus violating the Substantial Burdens provision.

> 3.    The Eight Circuit's Decision in *Marianist Province of the United States v. City of Kirkwood* is distinguishable and not controlling.

Despite EHS's ability to establish its "Substantial burdens" claim under the Seventh Circuit precedent and factors noted above, the City's motion relies primarily on an Eight Circuit case, *Marianist Province of the U.S. v. City of Kirkwood*, 944 F.3d 996 (8th Cir. 2019). This out-of-

circuit case is similar in that it involves a Catholic high school that was denied a light permit but is distinguishable in several key respects. First, the Eight Circuit's decision is directly at odds with the Seventh Circuits as-applied, substantial burden decisions noted above to the extent that Eight Circuit held a substantial burden claim cannot be established without a showing that there are no other feasible locations within a municipality where the religious exercise can occur. That proposition was expressly rejected in *Sts. Constantine & Helen*, 396 F.3d at 899 and implicitly rejected in *World Outreach I* and *World Outreach II.*

Moreover, the Eighth Circuit did not find a substantial burden because the school had *several* fields on its campus, including its *lighted* football and soccer fields "at which it could carry out its religious mission at night." *Marianist Province*, 944 F.3d at 1001. Here, EHS's claims can be distinguished and are much stronger. EHS, unlike the Marianist Province high school, only has a single field on its campus and that field is not lighted because the City has refused on numerous occasions to issue a light permit. (APFOF ¶¶ 7.) Without a single lighted field on which EHS can further its religious mission at night, the burden on EHS's religious exercise is much more substantial than what the Marianist Province high school faced, and certainly substantial enough to let the jury decide the question.

Even if the court finds that the feasibility or suitability of other locations EHS could lease or rent around the City is relevant or material to the substantial burden analysis, that question of feasibility or suitability should also be decided by the jury. *Bethel World Outreach Ministries*, 706 F.3d at 558 (Court denied county summary judgment because the court held that jury could find that the facilities the church had been forced to rent or use inadequately served the needs of its members, negatively affected the services it sought to offer, interfered with the church's ability to

host the people that wanted to come, limited the church's ability to offer various programs, created a sense of disunity, and did not adequately serve its religious purposes).

Viewing the facts in the light most favorable to EHS, EHS has presented sufficient evidence upon which a jury could find that the locations to which the City points are inadequate to serve EHS's religious purposes, do not meet the needs of its students and their families, negatively affects the programs and partnerships EHS seeks, interferes with EHS's ability to host family, alumni, parochial students, and even other schools who can only come to games and events after daylight hours, and impairs EHS's recruitment of students and efforts to promote the Sinsinawa Dominican values of community and partnership.

Accordingly, the City's motion for summary judgment on EHS's substantial burdens claims should be denied and EHS should be allowed to present its case to a jury and obtain all "appropriate relief" to which it is entitled, including damages and fees as set forth in Section VI.

## III.   THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON EHS'S CONSTITUTIONAL CLAIMS.

The City contends that the Court need not analyze EHS's constitutional claims separately because "the First Amendment cannot be violated in a zoning context without violating RLUIPA" and that the "remedies afforded by RLUIPA and the First Amendment are the same." (Defs.' Br. 37, Dkt. # 42.) But that is simply not true. RLUIPA and the First Amendment are not co-extensive. The statutory analysis under RLUIPA, which was enacted in 2000, differs from the way in which the Supreme Court has analyzed Free Exercise claims, as well as Free Speech and Assembly claims since 2000. Moreover, a lot has changed in the Supreme Court's own First Amendment jurisprudence since 2000.

In cases in which both RLUIPA and constitutional claims are present, federal courts will, and in fact must, consider the non-constitutional grounds first. *See Gulf Oil Co. v. Bernard*, 452

U.S. 89, 99 (1981). But just because a government action does not violate RLUIPA does not mean that it also does not violate a constitutional right. *See, e.g., Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 273 (3d Cir. 2007) ("[Because] the Plan does not violate RLUIPA, we now turn to the question whether the Plan violates Lighthouse's constitutional right to free exercise of religion."); *see also Bethel World Outreach Ministries*, 706 F.3d at 560-61. Further, RLUIPA was enacted to protect religious freedom, *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005); as such it is illogical to collapse free speech and assembly claims into its analysis.

A. EHS's Freedom of Speech and Expressive Assembly Claim is Meritorious.

The First Amendment to the United States Constitution provides religious institutions with the right to free speech as well as to peaceable assembly. The First Amendment also protects expressive conduct. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir.2002). Conduct will constitute protected speech if it is "imbued with elements of communication," given the factual context of the conduct. *Id*. at 160. When conduct is found to be expressive speech, it can still be regulated by regulations that are narrowly drawn to further a substantial government interest unrelated to the speech. *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 294 (1984). This level of scrutiny does not apply, however, if the limitation is a reasonable time, place, and manner regulation that is narrowly tailored to achieve a legitimate, content-neutral governmental interest. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Also, regulations that may appear to be time, place, and manner regulations are subject to heightened scrutiny if they act as prior restraints—which are presumptively invalid. *See Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975).

Even content-neutral time, place, and manner restrictions will be treated as prior restraints if they grant overly broad discretion to government officials charged with determining whether to permit the speech or expressive conduct and do not "contain adequate standards to guide the

official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). If the regulation is found to be a prior restraint, it is only acceptable if the putative censor is required to institute judicial proceedings to prove that the speech is unprotected, no restraint is instituted before judicial review unless it is to maintain the status quo, and there are insurances for a prompt, final judicial determination. *Conrad*, 420 U.S. at 560.

Here, the Court can find that EHS's desire to hold expressive assemblies and activities was unconstitutionally limited by the City's restriction on EHS's ability to use its field for any activities outside of team practices and physical education classes. This restriction on EHS and its students' freedom of speech and expressive assembly precluded them from assemblying on EHS's athletic field, even for expressive purposes and assemblies, for any reason other than a team practice or physical education class. *See Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Twp. of W. Pikelan*d, 721 F. Supp. 2d 361, 372–74 (E.D. Pa. 2010) (finding that the religious organization's desire to holding religious festivals on property it had acquired constituted expressive speech and allowed the organization to communicate its values to its members and the surrounding community).

Here, the City's highly restrictive and exceedingly narrow reading of the Master Plan violated EHS's and its students' freedom of speech and expressive assembly without any substantial government interest. The City's restriction was not a reasonable time, place, and manner restriction and served as a prior restraint which vested the Mr. Hank and Mr. Tucker with unbridled discretion as to when and when not to issue notices of violation or permit EHS's students from gathering on the field. To be a valid time, place, and manner restriction on speech and expressive assembly, a regulation must be content neutral, narrowly tailored to serve a substantial

government interest, and allow for reasonable alternative avenues for communication. *Burson v. Freeman*, 504 U.S. 191, 197 (1992); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 327 (7th Cir. 2015).

If a regulation is not content neutral then it is not a time, place and manner restriction and is subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  To issue the notices of violation in 2019, City officials had to make a content-based assessment of why EHS's students, coaches, and parents were assembled on the field. As such, the City's prohibition and notices of violation needed to be justified by a compelling government interest and narrowly tailored. They were not. The City has advanced no interest, let alone a compelling or substantial one, which justifies this prohibition. The City's restriction is even less justifiable because it prohibited expressive assembly on private property. *See Cachera v. Procarione*, 805 F. Supp. 716, 719 (E.D. Wis. 1992).

Accordingly, the City's motion for summary judgment on this issue should be denied.

B. EHS's Free Exercise Claim is Meritorious.

As the United States Supreme Court recently held, "a longstanding tenet of our free exercise jurisprudence…is that a law burdening religious exercise must satisfy strict scrutiny if it gives government officials discretion to grant individualized exemptions." *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1883 (2021) (Barrett, J., concurring). And "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67-68 (2020) (per curiam).

Importantly, under *Fulton* and *Tandon*, the test for determining whether a secular activity is comparable to a religious exercise is even easier to satisfy than the Seventh Circuit's "accepted zoning criterion" test for determining proper comparators under RLUIPA's equal-terms provision.

Here, the burdens imposed on EHS's religious exercise were not the result of the City applying a generally and neutrally applicable law. Rather they were the result of the City's individualized, discretionary, and even post-hoc assessments of EHS's use of its only field. And rather than afford EHS the same treatment and right to continue using its field in the same way the City was allowing the MMSD schools to use their fields, the City imposed severe restrictions and heightened demands on EHS. The City even turned EHS's February 2019 light permit application into an opportunity to individually assess what it believed EHS intended to do with the light permit and withheld the otherwise approved permit as a result. (APFOF ¶¶ 138.)

Therefore, under the Supreme Court's current Free Exercise Jurisprudence, the City's restrictions on EHS's use of its field, withholding of its light permit, and denial of the CUP are all subject to strict scrutiny—which they fail. The City cannot show that these decisions were in furtherance of a compelling government interest or the least restrictive means available to the City. The fact that the other high schools which were rezoned Campus-Institutional in 2013 along with EHS were allowed to continue using their athletic fields for "athletic contests" and other uses related to their primary missions undercuts any argument that City had a compelling governmental interest to prohibit EHS from doing the same. *See South Bay United Pentecostal Church v. Newsom* 141 S. Ct. 716 (2021).

The Supreme Court held long ago that "when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981). Here, the City has imposed its zoning laws in ways which have fringed upon EHS's protected liberties, and the City has not even tried to argue that the infringements were narrowly drawn or in furtherance of a sufficiently substantial government interest.

C.   <u>EHS's Vagueness Challenge to the City's Prohibition of "Athletic Contests" on EHS's
Athletic Field Is Meritorious.</u>

EHS challenges the City's decisions to prohibit EHS from hosting "athletic contests" on

its athletic field and to withhold the light permit on that basis on the grounds that the City's use of

term "athletic contest" was unconstitutionally vague because it failed to clearly indicate to EHS

how it could comply with the provision. *See Life Ctr., Inc. v. City of Elgin*, 993 F. Supp. 2d 863,

870 (N.D. Ill. 2013); *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (stating that "[t]he

void-for-vagueness doctrine forbids the enforcement of a law that contains 'terms so vague that

[persons] of common intelligence must necessarily guess at its meaning and differ as to its

application.'") (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629, (1984)). "The degree of

vagueness that the Constitution tolerates...depends in part on the nature of the enactment." *Indeps.*

*Gas & Serv. Stations Assns. v. City of Chicago*, 112 F.Supp.3d 749, 754 (N.D. Ill. 2015) (quoting

*Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir.1999)).

As indicated above, the term "athletic contest" is not defined in the Madison General

Ordinances. Mr. Hank, who made the decision to withhold EHS's light permit, defined "athletic

contest" as a "competition between two teams." (APFOF ¶ 132.) But even under Mr. Hank's

definition and understanding of what team practices entailed, the term "athletic contest" could

have been construed to prohibit EHS having its Varsity team scrimmage against its Junior Varsity

team. Would a competition between *more* than two teams – a track meet, for example – be

prohibited?  EHS, the neighbors, and even the City's Zoning Enforcement officer had no way of

knowing whether a notice of violation could also issue if, for example members of EHS's ultimate

frisbee club were competing against each other (even if just for practice), students were competing

against each other during physical education class, or if EHS's girls' freshman and JV soccer teams

were competing in a scrimmage on the field after school. Each of those activities fit Mr. Hank's definition of an "athletic contest."

While the other claims in this case should proceed to the jury, the issue of whether the term "athletic contest" was void for vagueness is a question of law for the court. *See United States v. Paradies*, 98 F.3d 1266, 1284 (11th Cir. 1996). Wherefore, the City's motion for summary judgment should be denied as to EHS's void for vagueness claim.

## IV.  EHS HAD A VESTED RIGHT TO A LIGHT PERMIT.

Wisconsin is in the minority of states that provide a vested right to build a structure upon the filing of a code-compliant permit application. *McKee Fam. I, LLC v. City of Fitchburg*, 2017 WI 34, 374 Wis. 2d 487, 893 N.W.2d 12; *Golden Sands Dairy*, 2018 WI 61, ¶¶ 1-34. In Wisconsin, this is called the Building Permit Rule. *Golden Sands Dairy*, 2018 WI 61, ¶ 1. "Wisconsin applies the bright-line building permit rule because it creates predictability for landowners, purchasers, developers, municipalities and the courts." *McKee Fam. I*, 2017 WI 34, ¶ 43. Under Wisconsin's Building Permit Rule, a landowner's rights vest when it submits "an application for a building permit that conforms to the zoning or building code requirements in effect at the time of application." *Id.* ¶ 47; *see also* Wis. Stat. 66.10015(2)(a).

Here, City officials advised that a lighting permit would issue if the application complied with M.G.O. § 10.085. (APFOF ¶ 92.)  EHS then submitted an outdoor lighting application to install lights at its athletic field on February 22, 2019. (APFOF ¶ 95.)  The City Attorney's office confirmed the application was being reviewed under Section 10.085.  (APFOF ¶ 103.) On February 27, 2019, City Building Inspector Steve Rewey reviewed *and approved* EHS's outdoor lighting application for compliance with M.G.O § 10.085. (APFOF ¶ 104.) Under Section 10.085, the City has no discretion as the technical standards were either met or not met. (APFOF ¶ 107.) Inspector

Rewey, who reviews most of the outdoor lighting applications submitted to the City, determined that EHS's application met the requirements of § 10.085. (APFOF ¶ 104.)

On February 27, 2019, the City's Zoning Administrator Matthew Tucker sent a letter to EHS confirming (again) in writing that "the City believes this permit can be issued without requiring amendment to the approved 2014 Master Plan." (APFOF ¶ 96.) Mr. Tucker testified that he had already reviewed the Master Plan in drafting his confirmation letter. (APFOF ¶ 102.) Two days later, on March 1, 2019, City Zoning Code Officer Christina Thiele, whom Mr. Tucker supervises, reviewed *and approved* EHS's outdoor lighting application for compliance with the City's zoning ordinances. (APFOF ¶¶ 108-110.)  That same day, Mr. Tucker told an EHS neighbor that the lights needed only to meet the Section 10.085 standard. (APFOF ¶ 111.) EHS's approved outdoor lighting application was then marked closed, which indicated that all reviews had been completed. (APFOF ¶ 112.)

Therefore, under the Building Permit Rule, EHS had a vested right to the light permit because it had submitted an application for a light permit that City staff reviewed and approved as being in conformity and compliance with the zoning and building code requirements in effect at the time of application.

While the City subsequently withheld the permit to which EHS was entitled based on its new interpretation of EHS's Master Plan, EHS's right had already vested. While the City may now claim that the application was not compliant when filed, the City's repeated affirmations to the contrary and its *actual* approval at least creates an issue of fact.  Moreover, even granting the City's position that EHS was *not* entitled to use its athletic field for athletic contests, EHS had an undisputed right to use its field for team practices at night. Therefore, the City was not justified in withholding EHS's light permit and it unlawfully interfered with EHS's right to lights for its field.

**V.   THE PLAN COMMISSION AND COMMON COUNCIL'S DECISIONS TO DENY EHS A CONDITIONAL USE PERMIT FOR OUTDOOR LIGHTS WAS IMPROPER UNDER WIS. STAT § 60.62(4E)(B)1.**

The City's arguments on the conditional use permit and the "substantial evidence" supporting its denial to EHS demonstrate why Mr. Evers was so keen to subject EHS to a conditional use analysis.  (APFOF ¶ 187.)  The City cites to a thick morass of a public record and a four- hour hearing.  (Def.'s PFOF ¶¶ 175, 177-179, Dkt. # 41).  It then overlays the burden of proof, presumptions, and the discretion the municipality is typically accorded in weighing the evidence.  (Defs.' Summ. J. Br., Dkt. #42, at 45-46.)  The result is an invitation for the Court to conclude that there must be "substantial evidence" somewhere in the record.  However, that invitation is invalid where the municipality applies the incorrect legal standard.  *See e.g., Ottman v. Town of Primrose*, 2011 WI 18, ¶ 52, 332 Wis.2d 3, 29, 796 N.W.2d 411.  Here, the Plan Commission applied an incorrect legal analysis and the Common Council's denial of EHS's appeal did not remedy that error.

The Planning Staff's May 11, 2020 Report is material to the Plan Commission's error. With the implementation of certain conditions, the Planning Staff concluded that the Plan Commission had a basis to find that the uses, values and enjoyment of neighboring property would ***not*** be substantially impaired or diminished.  (APFOF ¶ 231.) (Despite neighbor concerns about impacts, including noise, "staff believes that the Plan Commission ***may*** find standards 1, 3, and 4 met to allow the installation of the proposed lights…")(emphasis added).  The Planning Staff noted that many neighbors in close proximity to the Goodman Athletic Complex believed that the existing uses already impacted the quality of life in the neighborhood, primarily due to noise generated by the current use.  (APFOF ¶ 228.)

The Planning Staff concluded that that their recommended conditions would "limit the impacts of the ***expanded use*** of the stadium on nearby residents."  (APFOF ¶ 232) (emphasis

added.)  The Planning Staff thus framed the issue as whether to allow extended use of the Goodman Athletic Complex into the evening. (APFOF ¶ 233.)     The Planning staff concluded in pertinent part:  "While many of the comments received to date suggest an existing impact on uses, values, and enjoyment, the normal and orderly development of surrounding properties, or a negative impact on the public's "general welfare" from the daytime (unlighted) use of the athletic complex primarily due to noise generated, staff believes that the Plan Commission may find the conditional use standards met to allow the installation and use of lighting for the stadium under specific and limited conditions intended to minimize any *further impact* on the area surrounding the complex, *bearing in mind that the daytime use of the complex without lights is allowed by right*."  (APFOF ¶ 237.) (emphasis added).   The then-current daytime use referenced in APFOF 227 included athletic games, camps, team practices, community events, and neighbor, community and student recreational use.  (APFOF ¶ 229.)

The Planning Staff correctly recognized that EHS's daytime use of the field was allowed as of right, so that the issue for the Plan Commission was the further, or incremental, impact of extending that wholly allowable use into the nighttime.  The Plan Commission ignored the Staff's analysis and compounded its mistake by making two additional errors in its conclusion.  The Plan Commission made two findings.  First, "[t]he Plan Commission could not find standard number 3 met finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties…."  (APFOF ¶ 243.) Second, the Plan Commission found "that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera."  (APFOF ¶ 244.)  Both findings were in error.

First, there is no evidence in the record that the lights, by themselves, "would have a substantial negative impact."  Planning staff noted that the light plans issued had been previously reviewed and approved by Building Inspection Division Plan Review Staff relative to M.G.O. Section 10.085.  (APFOF ¶ 224.)  The Planning staff noted that they expected that any final plans will also meet that requirement.  (APFOF ¶ 224.)  In short, the lights met code.

Second, the Plan Commission found "that no evidence was submitted by the applicant that there would ***not be negative impacts*** on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera."   (APFOF ¶ 244.) However, the absence of any and all negative impacts is not the correct standard.  The standard cited by the Planning staff and relied upon by the Plan Commission was whether the "uses, values and enjoyment of other property… will not be substantially impaired or diminished in any foreseeable manner."  (APFOF ¶ 230.)

The Planning Staff report demonstrates that the Plan Commission had a sufficient record of substantial evidence to grant the permit if it had applied the correct standard. Planning staff took into consideration the significant number of comments received.  (APFOF ¶ 236.)  By advising that the Plan Commission could issue the permit with conditions, it necessarily was denoting that there was substantial evidence in the record from which to conclude that the "not substantially impaired" standard was met.  The conditions recommended minimized further or incremental impact and need not have eliminated all negative impacts.  The Plan Commission thus held EHS to a heightened, incorrect standard.  The questions the Plan Commission was supposed to answer, but did not, was the one formulated by the Planning Staff:  whether the further impact caused by extending daytime usage of the field in the nighttime hours substantially impaired neighbors' property and whether the conditions recommended by the Planning staff were sufficient to

minimize any impairments to a non-substantial level.  The Court knows what the Planning staff thought, but the Plan Commission's ruling demonstrates that it never addressed the proper question.

Nothing that the Common Council did during the appeal cured this error.  Indeed, the Common Council's actions merely solidified them.  The appeal came on for hearing on January 19, 2021 and the entire record before the Common Council is found in its entirety at https://madison.legistar.com/LegislationDetail.aspx?ID=4542871&GUID=B9777AC0-F2AF-4C4B-9E33-00C55C92776A.  (APFOF ¶ 246.)  Nothing in the record indicates that the Common Council recognized the correct standards identified by the Planning staff or found the "substantial evidence" warranting denial of the permit.  Instead, the proceedings concluded with a motion to grant EHS's appeal, which failed to carry.  (See APFOF ¶ 246.)

The City's denial of the EHS's conditional use permit should not be accorded deference.  The Plan Commission incorporated the incorrect legal analysis in its denial, and the Common Council adopted it – apparently without question.  All the while, the Planning staff – incorporating the correct legal analysis -- found that the Plan Commission could have issued the permit because of the minimizing impacts of the conditions proposed.

## VI.  EHS IS ENTITLED TO ALL "APPROPRIATE RELIEF," INCLUDING DAMAGES AND A LIGHT PERMIT.

RLUIPA broadly authorizes the court to grant "appropriate relief" to a religious institution when the government is found to have violated the institution's rights under the act. 42 U.S.C. § 2000cc-2; *see also* 42 U.S.C § 1983. Damages are a common form of relief granted under RLUIPA. *Church of Our Lord*, 913 F.3d at 680; *Christian Assembly Rios De Agua Viva*, 237 F. Supp. 3d at 797. In *Church of Our Lord,* the Seventh Circuit held that a religious institution or assembly could not only recover compensatory damages for out-pocket losses and other monetary

harms but could also recover for how the government's actions operated to distract the religious institution's leadership from its institutional objectives and placed stress on its members. 913 F.3d at 680. In addition, the institution can recover damages for "injuries as impairment of reputation, personal humiliation, and mental anguish and suffering.") *Id*. (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *see also Carey v. Piphus*, 435 U.S. 247 (1978). In *City of Watseka v. Illinois Public Action Council*, the Seventh Circuit also awarded damages for how municipal action affected the plaintiff's ability to recruit new members and disseminate its views and values to members of the community. 796 F.2d 1547, 1558 (7th Cir. 1986)

In *Christian Assembly Rios De Agua Viva*, the court even held that a religious institution could recover damages incurred as a result of a prior ordinance that had been repealed but used to keep a church from operating at a specific property. 237 F. Supp. 3d at 797. Based on the same analysis, this Court denied the City's Rule 12(b)(6) motion to dismiss EHS's case under RLUIPA's "safe harbor" provision, 42 U.S.C. § 2000cc-3. (Dkt. # 28 at 13-15).  And as in *Christian Assembly Rios De Agua Viva*, the scope of damages to which EHS is entitled is a question of material fact for the jury. 237 F. Supp. 3d at 797.

Based on the evidence of record, the jury could award EHS damages for how the City's re-interpretation of the Master Plan and decision to withhold the light permit caused EHS not only out-of-pocket losses and monetary harms (such as professional fees, increased construction costs, and the costs incurred as a result of having to host games and activities which could have been hosted on campus, (APFOF ¶¶ 256-260) but also for how the City's actions distracted EHS's leadership and burdened EHS's administration, teachers, coaches and students. (APFOF ¶¶ 54, 114.) The jury can also consider how the City's actions impaired EHS's reputation, caused EHS

significant aggravation and inconvenience, and frustrated its ability to recruit new students and promote its religious mission and values. (APFOF ¶¶ 114, 144, 257.)

In addition to damages, courts have broad latitude to issue various forms of declaratory and injunctive relief under RLUIPA. *See, e.g.*, *Chabad Lubavitch of Litchfield Cnty.*, 2017 WL 5015624, at *33–34 (ordering the Historic District Commission to approve the Chabad's application and issue the certificate of appropriateness that had been wrongfully denied as "appropriate relief" under RLUIPA); *Sts. Constantine & Helen*, 396 F.3d at 901 (ordering the district court to grant the church the relief and laying out the alternative ways the City and Church could approve the rezoning that had been requested); *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 520 (S.D.N.Y. 2010), aff'd, 694 F.3d 208 (2d Cir. 2012) (concluding that the relief ordered by the district court was within the court's authority and discretion under RLUIPA and 42 U.S.C § 1983—relief which included annulling and setting aside government decisions, and ordering the town to approve the church's site plan, issue a building permit); *Church of Our Savior v. City of Jacksonville Beach*, 69 F. Supp. 3d 1299, 1326 (M.D. Fla. 2014) (order entered directing City to grant church a conditional use permit).

Here, if the jury finds that the City violated RLUIPA's equal-terms and substantial burdens provisions or constitutional rights in the ways set forth above, the Court can order the City to provide EHS the light permit it was wrongfully denied in 2019, or in the alternative grant EHS the CUP permit the City wrongfully denied EHS in 2021. RLUIPA and 42 U.S.C. § 1988 also provide EHS the ability to recover its attorney's fees and costs if it prevails on any of its federal claims.

Under EHS's state law claims, the Court also has the authority to order the City to provide EHS the light permit. A common relief granted to landowners whose vested rights have been

violated is an order requiring the municipal entity to issue the permit for which the landowner has applied. *Golden Sands Dairy LLC*, 2018 WI 61, 381 Wis. 2d 704, 913 N.W.2d 118

## CONCLUSION

Wherefore the City's Motion for Summary Judgment should be denied.

Dated: June 10, 2022

ATTORNEYS FOR PLAINTIFF

By: *s/Jonathan R. Ingrisano*
    Jonathan Ingrisano
    State Bar No. 1033977
    Mike Wittenwyler
    State Bar No. 1025895
    GODFREY KAHN S.C.
    One East Main Street, Suite 500
    P.O. Box 2719
    Madison, WI 53701-2719
    Phone: 608-257-3911
    Fax: 608-257-0609
    jingrisano@gklaw.com
    mwittenwyler@gklaw.com

    *Noel W. Sterett
    DATLON & TOMICH, PLC
    IL Bar No. 6292008
    401 W. State Street
    Rockford, IL 61101
    Phone: (815) 986-8050
    nsterett@daltontomisch.com

    *Admitted Pro Hac Vice