UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

EDGEWOOD HIGH SCHOOL OF THE
SACRED HEART, INC.,                                    Case No. 3:21-cv-0018-wmc

         Plaintiff,

   v.

CITY OF MADISON, WISCONSIN, *et al.*,

         Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED FINDINGS
OF FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiff responds to Defendants' Proposed Findings of Fact in Support of Their Motion for Summary Judgment as follows:

1.     Edgewood High School of the Sacred Heart, Inc. ("Edgewood") is a private Catholic college-preparatory high school located at 2219 Monroe Street in Madison, Wisconsin. Elliott Dep., dkt. #33, 19:2-9; Compl., ¶7.

**Response:**    Not disputed.

2.     Edgewood High School shares a 55-acre campus on Lake Wingra with Edgewood College and Edgewood Campus School, which is a grade school. Zylstra Dec., Ex. A, Dep. Ex. 7, pages 18, 26 of 228; Elliott Dep., dkt. #33, 18:20 19:14.

**Response:**    Not disputed.

3.     The City of Madison is a municipality in Dane County, Wisconsin. Compl., ¶10; Answer, ¶10.

**Response:**    Not disputed.

4.     In 2007, the City of Madison began working on re-drafting portions of its Zoning Code. Tucker Dec., ¶2.

**Response:**     Not disputed.

5.     Edgewood High School, the University of Wisconsin and Madison College had approached the City about creating a better path for approval of their building expansions outside of the high stakes pass/fail process that was the conditional use process. Tucker Dep., dkt. #32, 83:12 to 83:22, 85:6-85:9.

> **Response:**     Disputed.  Edgewood College, not Edgewood High School (hereinafter "EHS") was involved in the creation of Campus Institutional District Zoning in Madison. June 9, 2022 Declaration of Judd Schemmel ("Schemmel Decl.") ¶ 5.  Edgewood College and EHS are separate and distinct institutions.  June 10, 2022 Declaration of Michael Elliott ("Elliott Decl.") ¶ 4.

6.     Prior to the creation of the Campus Institutional District Zoning, whenever institutions like Edgewood High School, the University of Wisconsin and Madison College wanted to make changes to a building or outdoor open spaces such as adding a parking lot, the institution would need to prepare a detailed application. Tucker Dec., ¶2.

> **Response:**     Not disputed.

7.     An application described in PFOF 6 would be reviewed by various internal departments at the City (depending on the project) and would then have to go before the City's Plan Commission at a public hearing. Tucker Dec., ¶2. Members of the public could attend those public hearings and speak out for or against the planned project after which, the City Plan Commission would vote on the proposed project. Tucker Dec., ¶2.

> **Response:**     Not disputed.

8.     Edgewood High School, the University of Wisconsin and Madison College indicated to the City that the detail, expense, effort involved in preparing a conditional use

application for a building that could be denied was relatively inequitable from their perspective and so they asked the City to help them create a better path for the evolution of their campuses. Tucker Dep., dkt. #32, 83:12 to 83:22, 85:6-85:9; Tucker Dec., ¶2.

> **Response:**    Disputed.  Edgewood College, not Edgewood High School (hereinafter "EHS") was involved in the creation of Campus Institutional District Zoning in Madison. Schemmel Decl. ¶ 6.  Edgewood College and EHS are separate and distinct institutions. Elliott Decl.¶ 4.

9.    On January 2, 2013, the City of Madison enacted M.G.O. § 28.097, creating the Campus-Institutional Districts. Tucker Dec., ¶2.

> **Response:**    Disputed.  The City adopted its current Zoning Code on October 26, 2012, with an effective date of January 2, 2013. Compl. ¶ 60; Ans. ¶ 60.

10.    The statement of purpose of M.G.O. § 28.09 is identified in the ordinance itself and provides:

Statement of Purpose

The Cl District is established to recognize the City's major educational and medical institutions as important activity centers and traffic generators, accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards. The district is also intended to:

(a) Permit appropriate institutional growth within boundaries while minimizing the adverse impacts associated with development and geographic expansion.

(b) ***Balance the ability of major institutions to change*** and the public benefits derived from change ***with the need to protect the livability and vitality of adjacent neighborhoods***.

(c) ***Encourage the preparation of Campus Master Plans that enable adjacent neighborhoods and the broader community to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures***.

3

Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(1) (emphasis added); Tucker Dep., dkt. #32, 72:1-73:12; Zylstra Dec., Ex. C, Dep. Ex. 18; Evers Dep., dkt. #31, 104:1-9.

**Response:**   Not disputed that the Proposed Finding of Fact ("PFOF") 10 correctly quotes the text of the ordinance provision cited.

11.   Campus master plans were voluntary for existing educational and medical institutions, but mandatory for any new education and medical institutions created after the passing of the ordinance. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(a).

**Response:**   Not disputed that PFOF 11 fairly paraphrases the ordinance provision cited.

12.   For institutions adopting a campus master plan, the ordinance required that they identify a number of items, including submitting a facilities plan with existing conditions and proposed conditions for improvements. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(5)(c); Tucker Dep., dkt. #32, 72:1-73:12.

**Response:**   Not disputed that PFOF 12 fairly paraphrases the ordinance provision cited.

13.   The ordinance also provided that "The Common Council will approve or reject the Master Plan following a recommendation by the Plan Commission." Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(6).

**Response:**   Not disputed that PFOF 13 correctly quotes the text of the ordinance provision cited.

14.   Further, the ordinance noted that approval of the master plan would be based in part on the plan's consistency with the goals of the City's Comprehensive Plan and adopted

neighborhood, corridor or special area plans adjacent to campus boundaries. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(6)(b).

**Response:**     Not disputed that PFOF 14 fairly paraphrases part of the ordinance provision cited.

15.     The Common Council's approval of a master plan had the effect of the master plan being an enacted ordinance of the City. Tucker Dec., ¶3.

**Response:**     Not disputed.

16.     The ordinance indicates that the master plan would be in effect for ten years. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(b); Tucker Dec., ¶3.

**Response:**     Not disputed.

17.     Prior to the adoption of the Campus Institutional District Zoning, the property of the Edgewood campus was zoned residential. Tucker Dec., ¶6.

**Response:**     Not disputed.

18.     After Edgewood was rezoned from residential zoning to Campus Institutional District Zoning, Edgewood submitted a Campus Master Plan ("Master Plan") to the City of Madison on or about January 20, 2014. Zylstra Dec., Ex. A, Dep. Ex. 7 at 12 of 228; Hank Dep., dkt. #30,, dkt. #30, 82:1-9.

**Response:**     Not disputed.

19.     Mike Elliot was the president of Edgewood High School at the time the Campus Institutional District Zoning was created and has been from July 2013 through today. Elliot Dep. 12:13-14. He was hired in March 2013. Elliot Dep. 13:6-14.

**Response:**     Disputed.  The Campus Institutional District Zoning was created effective January 2, 2013.  PFOF 9.  Mike Elliott assumed the role of president of EHS on July 1, 2013. May 10, 2022 Deposition of Michael Elliott ("Elliott Dep.") at 13.

20.     Elliott signed the Master Plan on behalf of the high school and by signing it, intended to abide by it. Elliot Dep. 82:3-9.

**Response:**  Disputed in part.  By signing and agreeing to abide by the Master Plan, with respect to Section 3.8 of the EHS Master Plan, Elliott did not intend to limit the use of EHS's athletic field to team practices or physical education classes.  Elliott Decl. ¶ 29.  At the time of signing, Elliott understood that EHS had the full use of its field as a sports and recreation facility or stadium under the Campus Institutional District zoning.  Elliott Decl. ¶ 29.  He did not intend to give that up in signing the Master Plan and did not anticipate the City's interpretation in 2018. Elliott Decl. ¶ 29.

21.     By letter dated April 22, 2014, the City informed Edgewood that the Common Council had approved its submitted Master Plan, subject to conditions detailed in that letter. Zylstra Dec., Ex. A, Dep. Ex. 7, page 6 of 228.

**Response:**     Not disputed.

22.     The April 22, 2014 letter described in the prior PFOF also provided that "[t]hese conditions of approval shall be satisfied prior to the master plan taking effect and the issuance of building permits for any of the projects contained in the plan[.]" Zylstra Dec., Ex. A, Dep. Ex. 7, page 6 of 228. The letter continued and stated that after the Master Plan was revised to address the conditions, Edgewood need to submit ten copies for review by the City's departmental staff for their final approval prior to the master plan taking effect. Zylstra Dec., Ex. A, Dep. Ex. 7, page 10 of 228.

**Response:**   Not disputed that PFOF 22 fairly paraphrases part of the cited exhibit.

23.   Edgewood's Master Plan did not become effective until November 6, 2015.

Tucker Dep., dkt. #32, 153:7-25.

**Response:**   Disputed.  The effect of the Master Plan was immediate, as no permits for

enumerated buildings projects could issue.  The City's April 22, 2014 letter provides that its

"conditions of approval shall be satisfied prior to the master plan taking effect and the issuance

of building permits for any of the projects contained in the plan" and later that "[n]o building

permits shall be issued until this plan has been revised to address the comments and conditions in

this letter."  Zylstra Decl., Ex. A, Dep. Ex. 7 at 6, 10 of 228.

24.   The City's letter to Edgewood dated April 22, 2014 stated:

> "No alteration of an approved Campus Master Plan, ***including changes to the proposed use of identified open space areas and other open space uses, shall be permitted unless approved by the Plan Commission***, provided however, the Zoning Administrator may, following consideration by the alderperson of the district, issue permits for minor alterations that are approved by the Director of Planning and Community and Economic Development and are consistent with the concept approved by the Common Council. If the change or addition constitutes a substantial alteration of the original plan, the procedure in Sec. 28.097(2) is required."

Zylstra Dec., Ex. A, Dep. Ex. 7, page 10 of 228 (emphasis added); Hank Dep., dkt. #30,, dkt.

#30, 82:1-9. This language was nearly verbatim of the language of then M.G.O. §28.097(10).

Tucker Dec., ¶5.

**Response:**   Not disputed that the PFOF 24 accurately quotes the cited exhibit.

25.   For institutions within the Campus Institutional District that did not adopt a

master plan, the construction of a new building or additions to existing buildings that exceeded

4,000 square feet in floor area on a zoning lot required conditional use approval. Zylstra Dec.,

Ex. B, Dep. Ex. 13, §28.097(2)(c).

**Response:**   Disputed.

26.     The prior PFOF was not true for institutions that had approved master plans. For institutions that had approved master plans, for any project identified in their approved master plan, the institution only needed to obtain approval of an architectural review committee. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7); Tucker Dep., dkt. #32, 81:7-82:14.

**Response:**     Disputed.  The cited provision provides that "all ***buildings*** properly identified on a Campus Master Plan must be reviewed and approved by an architectural review committee prior to construction."  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7)(emphasis added).

27.     One benefit of the master plan process is that the projects identified in the master plan were already approved as permitted with the architectural review committee reviewing items like the height, design and materials of the construction. Tucker Dep., dkt. #32, 81:7-82:14.

**Response:**     Disputed.  While streamlined review by an architectural review committee was a promised benefit of a master plan, EHS did not experience or observe any such benefit.  In EHS's experience, and in what it observed Edgewood College go through, the architectural review committee review was not a benefit.  Elliott Decl. ¶ 34.

28.     A benefit to the architectural review committee process for Edgewood was that in the future it would not hold open meetings on its projects and would not need to seek the approval of the two neighborhood associations. Zylstra Dec., Ex. D, Dep. Ex. 55; Elliott Dep., dkt. #33, 100:6-101:18, 103:3-23.

**Response:**     Disputed.  The email exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  The email sender, Maggie Balisteri Clark was not an agent or authorized party for EHS.  Elliott Decl. ¶ 48.

8

The evidence cited does not stand for the factual proposition asserted in that it at most references a draft of a proposed process. There is no evidence that the process was streamlined as proposed, and after the adoption of the Master Plan, Edgewood College's and EHS's neighbors weighed in on and complained about "everything." Elliott Dep. at 104-106.

29.     Edgewood's Campus Master Plan applied to the entire Edgewood campus, which included three different entities—Edgewood College, Edgewood High School, and the grade school. Zylstra Dec., Ex. A, Dep. Ex. 7 at 17-19 of 228; Elliott Dep., dkt. #33, 106:22-107:13.

**Response:**     Disputed. The cited evidence does not support the cited proposition that the Master Plan applied to the entire Edgewood campus. Nevertheless, not disputed that the Edgewood campus includes Edgewood College, EHS, and the Edgewood grade school.

30.     Edgewood High School owns the Open Space that is subject to this litigation. Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228; Elliot Dep. 117:17-118:18.

**Response:**     Not disputed.

31.     In Edgewood's Master Plan, it identified 22 different improvements that the Edgewood Campus would make during the ten-year period of the Master Plan. Elliott Dep., dkt. #33, 673:12-74:10; Zylstra Dec., Ex. A, Dep. Ex. 7 at 36-39 of 228.

**Response:**     Disputed. EHS identified four (4) projects in the Master Plan. Elliott Dep. 106-107. The remaining eighteen (18) projects were identified by Edgewood College, the Master Plan's principal drafting contributor and the institution most interested in adopting the Master Plan. Elliott Decl. ¶ 26-27.

32.     The 22 projects identified in Edgewood's Master Plan were not limited to building improvements but included existing spaces, and included outdoor projects such as

revising parking lots and adding three additional parking stalls. Elliott Dep., dkt. #33, 74:6-75:22; Zylstra Dec., Ex. A, Dep. Ex. 7 at 38 of 228.

> **Response:**     Disputed in part, as only three (3) of the 22 projects identified in the Master Plan related to parking.  Elliott Dep. at 74-75.

33.     With respect to the 22 different improvements identified in Edgewood's Master Plan, none involved improvements to an athletic field. Elliott Dep., dkt. #33, 77:18-78:5; Zylstra Dec., Ex. A, Dep. Ex. 7 at 36-38 of 228.

> **Response:**     Not disputed.

34.     Under the City's Campus Institutional District Zoning Ordinance, Edgewood's Master Plan was required to include:

> (c) <u>Facilities Plan</u>. Includes a description of existing conditions on the campus and the proposed conditions under the Master Plan, including:
>
> 1.   <u>Existing Conditions</u>.
> a.   ***Land uses*** and buildings.
> b.    Building form (building type, height, bulk, etc.).
> c.    Landmarks, historic sites and districts.
> d.    Natural features and significant ***open-space areas***.
>
> 2.   <u>Proposed Conditions</u>.
> a.   Future needs/capital improvements.
> b.    Phasing of proposed improvements.
> c.   ***Future land uses*** and buildings.
> d.   Building Form (building type, height, bulk, etc.).
> e.   ***Landscape treatment***.
> f.   ***Open-space areas and other open-space uses.***
> g.   Relationship to transportation/access plan (parking, transportation demand management, etc.).

Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(5)(c) (emphasis added).

> **Response:**     Not disputed that PFOF 35 accurately restates the ordinance provision cited.

10

35.     Edgewood identified its Open Space in Section 3.8 of its Master Plan. In terms of its athletic field under paragraph 1, Edgewood identified its use as "Athletic field owned by Edgewood High School. Used for team practices, physical education classes." Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228.

**Response:**     Not disputed that PFOF 35 accurately restates the narrow provision cited.

36.     In 2013, there were meetings between Edgewood and the Dudgeon-Monroe Neighborhood Association and the Vilas Neighborhood Association regarding Edgewood's Master Plan. Elliott Dep., dkt. #33, 70:10-15.

**Response:**     Not disputed.

37.     In 2013, the neighborhood associations and neighbors of Edgewood were active in monitoring Edgewood's growth and use of its space. Elliott Dep., dkt. #33, 70:16-20.

**Response:**     Disputed in part.  While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.

38.     Elliott understood that based on his role with the Edgewood Neighborhood Liaison Committee, it was important for Edgewood to try and work with the neighbors and the neighborhood association on getting agreement as to the language in the Master Plan. Elliott Dep., dkt. #33, 71:9-16.

**Response:**     Not disputed.

39.     In 2013, Elliott was part of the neighborhood liaison committee where the issue of lighting was discussed. Elliott Dep., dkt. #33, 91:10-14.

**Response:**     Disputed.  Conversations about lighting did not occur in the context of building the Master Plan in 2013.  Elliott Dep. at 89-90.

40.     The neighbors did not want lighting from Edgewood spilling into the neighborhood. Elliott Dep., dkt. #33, 91:10-92:15.

**Response:**     Disputed in part. While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.  Moreover, dispute the intended inference that light issues were addressed in the context of building or approval of the Master Plan when they were not.  Elliott Dep. at 89-90.

41.     As part of Edgewood's Master Plan, there were a number of past agreements between Edgewood and the neighborhood associations that Edgewood reaffirmed and incorporated into its Master Plan. Zylstra Dec., Ex. A, Dep. Ex. 7 at 77 of 228; Elliott Dep., dkt. #33, 87:5-16.

**Response:**     Disputed.  Except for the first item reaffirming all three schools' commitment to the Edgewood Neighborhood Liaison Committee, the referenced agreements pertained to Edgewood College; they were not EHS's agreements to reaffirm.  Elliott Decl. ¶ 49.

42.     Some of those agreements referenced in the prior PFOF related specifically to lights and lighting. Elliott Dep., dkt. #33, 87:5-90:11, Zylstra Dec., Ex. A, Dep. Ex. 7 at 78 of 228.

**Response:**     Disputed.  These were not EHS's agreements and did not pertain EHS's portions of the campus.  Elliott Decl. ¶ 49.

43.     Elliott was aware of noise being an issue that neighbors routinely raised with respect to changes to Edgewood's space during his time and Edgewood has occasionally received noise complaints from neighbors. Elliott Dep., dkt. #33, 80:23-81:5.

**Response:**     Disputed.  The evidence cited for this proposition was in the context of Edgewood College.  Elliott Dep. at 79-81.  EHS did not routinely receive noise complaints

during Mike Elliott's tenure and received occasional noise complaints from certain neighbors after EHS had made know its intent to add lights to its athletic field.  Elliott Decl. ¶ 51. Neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space.  Elliott Decl. ¶ 50.

44.    Elliott received and reviewed an earlier draft of Edgewood Campus's Master Plan that described number 1 under its Open Space as "Athletic field owned by Edgewood High School. Used for team practices, physical educations classes, ***and other general light uses***." Elliott Dep., dkt. #33, 95:20-95:22 (emphasis added); Zylstra Dec., Ex. E, Dep. Ex. 54. Elliott does not know who removed the language, "and other general light uses," from the final master plan or why it was removed. Elliott Dep., dkt. #33, 96:4-97:6.

**Response:**    Disputed.  The evidence cited for this proposition does not establish that Mike Elliott had reviewed this alleged earlier draft or that language was "removed."  Mike Elliott was not familiar with this document or its contents and could not offer testimony on it.  See Elliott Dep. at 95-97.

45.    Edgewood's Master Plan states: "The master plan process included internal planning and coordination among the three Edgewood schools, and a dynamic process of sharing information and discussion of issues with members of the two neighborhood associations as well as with the District 13 Alder, Sue Ellingson. The final master plan is the product of extensive engagement, collaboration and effort from all five entities." Zylstra Dec., Ex. A, Dep. Ex. 7 at 19 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:**    Not disputed that PFOF 45 accurately quotes the cited provision, but at the page labeled 20 of 228.

46.     Edgewood's Master Plan states: "Each campus institution, the surrounding neighborhoods and the Planning Department have reviewed the Campus Master Plan. It is an instrument of communication so that all stakeholders are aware of potential future developments on campus." Zylstra Dec., Ex. A, Dep. Ex. 7 at 16 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:**     Not disputed that PFOF 46 accurately quotes the cited provision, but at the page labeled 17 of 228.

47.     Edgewood's Master Plan states: "The Campus Master Plan will provide a basis for implementing development decisions so as to benefit all three institutions and the neighborhood by: . . . Providing solutions for mitigating neighborhood impacts of future development and growth" Zylstra Dec., Ex. A, Dep. Ex. 7 at 16 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:**     Not disputed that PFOF 46 accurately, but selectively, quotes the cited provision, but at the page labeled 17 of 228.

48.     Edgewood's Master Plan states: "The residents of the city of Madison place high value on the established residential character of Dudgeon-Monroe and Vilas neighborhoods, and additionally place a very high value on the woods and other undeveloped areas that help characterize this unique area of the city. Edgewood shares these values. With our mutual vision of protection for our shared neighborhood and its natural resources, and in a spirit of collaboration, we proceeded to voice concerns, address issues and seek agreement." Zylstra Dec., Ex. A, Dep. Ex. 7 at 71 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:**     Not disputed that PFOF 48 accurately quotes the cited provision, but at the page labeled 72 of 228.

14

49.     In June of 2015, Edgewood High School announced that it had received a grant from the Goodman Foundation for $1.025 million to upgrade its track and field. Elliott Dep., dkt. #33, 46:2-6, 117:17-118:23.

**Response:**     Not disputed.

50.     Edgewood had started meeting with the Goodmans to try to secure the $1.025 million grant sometime in 2014. Elliott Dep., dkt. #33, 118:24-120:6.

**Response:**     Disputed.  Elliott testified that it occurred in either 2014 or 2015.  Elliott Dep. at 119-120.

51.     A Wisconsin State Journal article dated June 15, 2015 states, "Elliott noted that one of the main benefits will be improvements in the practice facilities for the school's baseball and softball programs in the spring, when teams are forced to practice indoors. He added that the renovation will be a boon to all the students." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 115:22-117:21. Elliott agrees that he expressed that sentiment to the reporter. Elliott Dep., dkt. #33, 120:22-121:14.

**Response:**     Disputed in part.  Not disputed that PFOF 51 accurately, but selectively, quotes the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

52.     The Wisconsin State Journal article dated June 15, 2015 article quoted Elliott as saying, "We do require four years of physical education for both semesters, which is higher than the national average and higher than the national requirement" and "This is a much-needed product for our students, to aid our physical education department and the athletic programs."

Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 121:15-122:20. While Elliott does not recall if this was a quote he said, he agrees he expressed this sentiment. Elliott Dep., dkt. #33, 121:15-122:20.

**Response:**     Disputed in part.  Not disputed that PFOF 52 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

53.     The Wisconsin State Journal article dated June 15, 2015 article also stated, "In the past, Edgewood has provided its track-and-field facility to area parochial schools for practices and an annual meet — the only early track-and-field development experience for many grade-school students. However, due to the deterioration of the track, the event has been held off-campus in recent years." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:4-22. Elliott expressed that sentiment to the reporter. Elliott Dep., dkt. #33, 123:4-22.

**Response:**     Disputed in part.  Not disputed that PFOF 53 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

54.     The Wisconsin State Journal article dated June 15, 2015 article noted, "According to Elliott, the project has received the support of area neighborhood groups that have balked in the past at the idea of turning the facility into a competition site for Edgewood's many athletic programs." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6.

**Response:**    Disputed in part.  Not disputed that PFOF 54 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

55.    Elliott is quoted as saying, "We're between two neighborhood associations. They have been vehemently opposed to us having lights or playing games here," he said. "We're really building this to be able to give our athletes the practice facilities that provide the best surfaces possible and to expand the amount of outdoor practices we can hold especially in the spring. That is our focal point." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6. While Elliott does not recall if this was a quote, he agrees he expressed this sentiment. Elliott Dep., dkt. #33, 123:23-125:6.

**Response:**    Disputed in part.  Not disputed that PFOF 55 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

56.    The Wisconsin State Journal article dated June 15, 2015 article uses the words "practice" or "practices" fourteen times. Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 115:22-117:21.

**Response:**    Disputed in part.  Not disputed that PFOF 56 accurately, but selectively, quotes the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of

Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

57.     There was an Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  First, the cited exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Second, the statements attributed to Maggie Balisteri Clark are further hearsay.  Maggie Balisteri Clark was not a representative or agent of EHS nor was she authorized to make statements on EHS's behalf related to the lights.  Elliott Decl. ¶ 48.  Finally, Shawn Schey is an opponent of EHS's lights and a member of the group "No New Stadium."  April 28, 2022 Deposition of Tag Evers ("Evers Dep.") at 25;  Elliott Decl. ¶ 42.  EHS asked Ms. Schey to step down from the Edgewood Neighborhood Liaison Committee because she was inaccurately characterizing discussions to her own interpretation, meaning that notes from this witness are not supported by sufficient guarantees of trustworthiness.  Elliott Decl. ¶ 43.

58.     Maggie Balistreri-Clarke attended the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015 as the representative of Edgewood. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

59.     At the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015, Balistreri-Clarke provided an update as to Edgewood High School Construction, which is shown as #5 in the minutes attached as Exhibit a to the Schey declaration. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

60.     At the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015, Balistreri-Clarke indicated that as to the Edgewood High School Football Field, no additional lighting or seating would be installed. Schey Dec., ¶4, Ex. A. She also confirmed that the football field would be a practice facility. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

61.     The two items in the prior PFOF are memorialized in the last two bullets under the High School Football Field heading in the minutes attached as Exhibit A to the Schey declaration. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

62.     After receiving news of the Goodman grant, Edgewood contacted the City to determine whether re-surfacing the existing track and field would require an amendment to its master plan. Elliott Dep., dkt. #33, 128:21-129:19.

**Response:**     Disputed.  The cited evidence does not support that proposition.  Elliott contacted the City to determine what, if any, was required before the resurfacing of the track and field could be done.  Elliott Dep. at 128-131.  The Master Plan was not discussed in relation to this issue.  Elliott Dep. at 128-131.

63.     The City told Edgewood that because it was simply exchanging the current track with a new track that the City would classify that as a replacement or a maintenance item which would allow Edgewood to complete the project without amending its master plan. Elliott Dep., dkt. #33, 128:21-129:19.

**Response:**     Disputed.  See Response to PFOF 62.

64.     When resurfacing the track in 2015, Edgewood applied to the City for a permit to put PVC and conduit under the track for future lighting and communications. Elliott Dep., dkt. #33, 132:5-10; Hank Dep., dkt. #30, 88:24-89:11; Tucker Dep., dkt. #32, 168:20-170:10.

**Response:**     Not disputed.

65.     Edgewood was not intending or planning to put in lights at that time it applied for a permit for the PVC and conduit in 2015 because the technology was not there, but Edgewood hoped to install lights in the future. Elliott Dep., dkt. #33, 124:18-126:10.

**Response:**     Not disputed.

66.     It made financial sense for Edgewood to put the PVC and conduit that at the time the field was being resurfaced because otherwise, Edgewood would have had to dig up the field in the future to install the conduit. Elliott Dep., dkt. #33, 132:24-133:4.

**Response:**     Not disputed.

67.     In 2015 when it was resurfacing its track and field, Edgewood did not know if the technology for lighting would be available one year in the future, five years in the future or ten years in the future. Elliott Dep., dkt. #33, 125:19-126:10.

**Response:**     Not disputed.

68.     Elliott is not aware of any conversations occurring in 2015 with the City about when in the future Edgewood would put in lights or communications. Elliott Dep., dkt. #33, 132:11-23.

**Response:**     Not disputed.

**Increase in Games and Request for a Stadium**

69.     Following the track upgrades, Elliott admits that there was an increase in games on the athletic field that coincided with the improvements that occurred in 2015. Elliott Dep., dkt. #33, 154:18-21.

**Response:**     Disputed in part.  The upgrades were to ***the field*** and the track, and Elliott agreed that the number of games had increased.  Elliott Dep. at 154 (emphasis added).

70.     On May 10, 2016, Edgewood discussed with the neighborhood liaison committee the idea of adding seating and lights for its athletic field. Elliott Dep., dkt. #33, 138:7-139:11; Zylstra Dec., Ex. G, Dep. Ex. 59.

**Response:**     Not disputed.

71.     Neighbors and the liaison committee has raised field usage, traffic, parking, lights, and sound as concerns at some listening sessions Edgewood had held. Elliott Dep., dkt. #33, 140:23-141:18.

**Response:**     Disputed in part.  While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.

72.     Historically, going back as far as 1996, the neighborhood association has been opposed to Edgewood adding lighting and a sound system to its athletic field. Schey Dec., ¶¶6-7, Exs. B & C.

**Response:**     Disputed.  First, the cited exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Second, Shawn Schey is an opponent of EHS's lights and a member of the group "No New Stadium." Evers Dep. at 25; Elliott Decl. ¶ 42.  EHS asked Ms. Schey to step down from the Edgewood

21

Neighborhood Liaison Committee because she was inaccurately characterizing discussions to her own interpretation, meaning that notes from this witness are not supported by sufficient guarantees of trustworthiness.  Elliott Decl. ¶ 43.  Third, proposed facts from 1996 are immaterial and irrelevant to a zoning ordinance effective as of 2013 and a Master Plan agreed-to thereafter.

73.     In 1996, Edgewood proposed to the neighborhood association a conditional use plan whereby Edgewood wanted to add lights, a sound system, and a grandstand to its athletic field. Schey Dec., ¶6, Ex. C. It also proposed a permanent structure for its athletic complex. Schey Dec., ¶6, Ex. C.

**Response:**     Disputed.  See Response to PFOF 72.

74.     The Dudgeon Monroe Neighborhood Association Council adopted a resolution endorsing the majority vote of the neighbors taken at a meeting on July 18, 1996. Schey Dec., ¶6, Ex. C. The association indicated to Edgewood that based on that vote, it would not support adding lights or a new sound system to its athletic field. It also indicated that it would not support a larger grandstand but would support 300 bleacher seats. Schey Dec., ¶6, Ex. C.

**Response:**     Disputed.  See Response to PFOF 72.

75.     Following the August 14, 1996 meeting of the neighborhood association, Edgewood revised its conditional use application with the City and removed all lights, the sound system and the larger grandstand. Schey Dec., ¶7.

**Response:**     Disputed.  See Response to PFOF 72.

76.     In and around March of 2017, Elliott had a meeting with then Zoning Administrator Matthew Tucker about Edgewood's desire to move forward with a modified

stadium. Zylstra Dec., Ex. H, Dep. Ex. 72; Tucker Dec., ¶7; Elliott Dep., dkt. #33, 186:25-188:4.

    **Response:**    Not disputed.

77.    In regards to the meeting in the prior PFOF, Elliot wrote in an email that the City did "not feel the current master plan would let us proceed with a modified stadium. Night use is the issue and it is in their mind a new or different usage. They [recommend] we continue to work with neighbors for an agreement." Zylstra Dec., Ex. H, Dep. Ex. 72; Elliot Dep. 186:25-188:4; Tucker Dec., ¶7. Tucker suggested Elliott work with the neighbors to try to come to agreement to mitigate the sound and noise associated with night games. Tucker Dec., ¶7.

    **Response:**    Disputed.  No one at the City ever communicated that the Master Plan was a supposed obstacle to lights for the athletic field until March of 2019.  Elliott Decl. ¶ 38.  The cited exhibit indicates that Tucker advised that the EHS had eliminated issues with lights. Zylstra Dec., Ex. H, Dep. Ex. 72.  Tucker never clarified what he meant by usage, and never communicated a supposed prohibition on games until October 2018.  Elliott Decl. ¶ 25.

78.    In July of 2018, Elliott emailed then Alder Sara Eskrich, asking her to sign off on a minor amendment to the master plan so that Edgewood could hold an October 5 senior night football game with temporary lights and seating on its athletic field. Zylstra Dec., Ex. I, Dep. Ex. 61; Elliott Dep., dkt. #33, 142:11-145:15.

    **Response:**    Disputed.  Mike Elliott contacted Alder Eskrich for assistance with obtaining temporary lighting and bleachers to use on the field for a Senior Night varsity football game after Edgewood lost its off-campus stadium for the game.  Elliott Dep. at 142-147.  Elliott added a joke about her signing off on a minor or major amendment of the Master Plan.  Elliott Dep. at 142-147.

79.     Alder Eskrich responded to the email in the prior PFOF stating that for a temporary game, Elliott should reach out to City staff but she could not sign off on the stadium lights as a minor alteration "because we've discussed very publicly that this requires a master plan amendment." Zylstra Dec., Ex. I, Dep. Ex. 61; Elliott Dep., dkt. #33, 142:11-145:15.

**Response:**     Disputed.  Alder Eskrich had previously indicated that she could not sign off on the stadium lights as a minor alteration in the context of a larger building project adding seats, concessions and restrooms.  Elliott Decl. ¶ 38.

80.     Elliott did not think he did, but he does not recall if he reached out to City staff as to a temporary game. Elliott Dep., dkt. #33, 146:2-9.

**Response:**     Disputed.  Elliott does not remember.  Elliott Dep. at 146.

81.     On October 17, 2018, Zoning Administrator Matt Tucker attended a neighborhood meeting at which there was discussion of Edgewood's proposal to add seating, lights and a sound system to its athletic field. Tucker Dec., ¶8.

**Response:**     Not disputed.

**Tucker Learns of Field Use**

82.     Edgewood presented its proposal at the October 17, 2018 meeting and described its current use of its athletic field. Tucker Dec., ¶8.

**Response:**     Not disputed.

83.     Following the October 17, 2018 meeting, Tucker sent an email to Elliott and Brian Munson, a consultant working with Edgewood. Zylstra Dec., Ex. J, Dep. Ex. 64; Elliott Dep., dkt. #33, 156:13-24. Tucker wrote:

> After the neighborhood meeting of Wednesday October 17, I became aware of the extensive use of the athletic field at the northwest corner of the site. I also closely reviewed the adopted Master Plan, to determine how language in the master plan relates to the athletic field usage. Specifically, in the "Open Space Plan" (section 3.8) the

24

approve master plan identifies the athletics field to be used for "team practices, physical education practices." The lack of any further language in this section, or any other language in sections of the adopted Master Plan, leads me to the interpretation that current programing and usage of the field is operating outside of the allowances of the adopted Master Plan.

If you wish to continue the current level of programming on the field for 2019 and beyond, I believe that you will need to pursue an amendment to the approved Master Plan. I would be happy to talk with you, Alder Arntsen, and the neighborhood liaison committee, should you choose to explore a Master Plan amendment to expand the use of the athletic field. If you decide to continue with the current idea for a stadium expansion at the athletic field, you will also need to include language in this amendment that would incorporate allowing the current level of usage of the field to be allowable and continue.

Zylstra Dec., Ex. J, Dep. Ex. 64; Elliott Dep., dkt. #33, 156:13-24, 159:8-160:7; Tucker Dec., ¶9.

**Response:**   Not disputed.

84.   Tucker did not include any neighbors or the neighborhood associations on his October 17, 2018 email to Edgewood but simply noted the issue for Edgewood. Zylstra Dec., Ex. J, Dep. Ex. 64; Elliot Dep., 160:8-11; Tucker Dec., ¶9.

**Response:**   Disputed.  Tucker and the City at some point shared this new interpretation with Edgewood's neighbors, as they began complaining for the first time that Edgewood was playing games on its athletic field.  Elliott Decl.  ¶ 51.

85.   On November 14, 2018, Edgewood filed an application to amend its Master Plan to incorporate lighting, expand seating, add restrooms, team rooms, and storage and define its field use. Zylstra Dec., Ex. K, Dep. Ex. 62; Elliott Dep., dkt. #33, 149:10- 151:20; Tucker Dec., ¶10.

**Response:**   Not disputed.  Dispute any inference that EHS conceded that it was required to define its field use.  The letter identified in PFOF 86, in part, continued to assert that the Master Plan did not limit EHS's use of the field to practices and physical education classes. Zylstra Dec., Ex. L, Dep. Ex. 65.

25

86.     On November 14, 2018, Edgewood's then counsel, Katherine Rist, wrote to Mr. Tucker in response to his October 26 email. Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep., dkt. #33, 161:23-162:23.

**Response:**     Not disputed.

87.     Attorney Rist stated in her November 14, 2018 letter that to the extent Edgewood's Master Plan may be interpreted in a way which does not expressly permit athletic competition games, Edgewood's position was that such use is a legal nonconforming use. Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep., dkt. #33, 161:23-163:5.

**Response:**     Disputed as misleadingly incomplete and selective.  The Rist letter challenges Tucker's new interpretation of the Master plan generated by his recent review of it and notes historical uses of the field incompatible with a practical interpretation of Master Plan. Zylstra Decl., Ex. L, Dep. Ex. 65.  The letter demonstrates that EHS's counsel was making an alternative argument.

88.     On November 20, 2018, Mr. Tucker responded to Atty. Rist by letter indicating that he disagreed with Edgewood's position that it established a legal nonconforming use. Zylstra Dec., Ex. M, Dep. Ex. 66; Tucker Dec., ¶11.

**Response:**     Not disputed.

89.     Tucker also stated in his November 20, 2018 letter that he was aware that Edgewood had filed an amendment to its master plan that, if approved, would allow use of the athletic field for games would make the issue moot and that in such instances, the City's internal policy is to suspend enforcement pending the result of the application for amendment. Zylstra Dec., Ex. M, Dep. Ex. 66; Elliott Dep., dkt. #33, 164:4-165:7; Tucker Dec., ¶11.

**Response:**     Not disputed.

26

90.     Tucker also indicated in that November 20, 2018 letter that if the amendment was denied, "then the City will send a formal notice of violation, and at that time we can discuss how Edgewood wishes to proceed." Zylstra Dec., Ex. M, Dep. Ex. 66; Tucker Dec., ¶11.

**Response:**     Not disputed.

**Edgewood Submits First Lighting Application for Night Games**

91.     On Friday, February 22, 2019, Edgewood submitted an application with the City for outdoor lighting of its athletic field. This was a surprise to the City as Edgewood had submitted a master plan amendment. Zylstra Dec., Ex. N, Dep. Ex. 37; Tucker Dep., dkt. #32, 64:25-66:20, 52:13-54:22.

**Response:**     Disputed in part.  Not disputed that Edgewood submitted an application for outdoor lighting on February 22, 2019.  Disputed that this was a surprise, because Edgewood had already tabled its Master Plan amendment and discussed with City officials breaking up the multiple components of the proposed Master Plan amendment and pursuing some items, including lights, piecemeal without the need for an amendment.  June 10,  2022 Declaration of Nathan Wautier ("Wautier Decl.") ¶¶ 6, 7.

92.     The following Wednesday, on February 27, 2019, Mr. Tucker wrote a letter to Elliott:

> On Friday, February 22, the Building Inspection Division accepted a lighting plan filed by Forward Electric on behalf of Edgewood High School, to install lighting for the school's field. Those plans will be reviewed for compliance with MOO [sic] Section 10.085, and if the plans comply, electrical permits will be issued when requested.

> The City believes this permit can be issued without requiring amendment of the approved 2014 Master Plan. However, over the past weekend, I received a copy of the letter sent to "Edgewood Family" and a "Frequently Asked Questions" document relating to the institutions' present interest to install lights and an amplified sound system at the field (copy attached). These letters indicate that Edgewood intends to use the lights and sound system to host night games at the facility.

> Based on the information the City currently has regarding the historical use of the facility, it would appear that the intended use of the facility as outlined in your letter to the "Edgewood Family" and detailed in the "Frequently Asked Questions" document would conflict with the approved 2014 Master Plan for the site, which limits use of the facility to "team practices, physical education classes" (Page 42, Section 3.8, Open Spaces Plan).

> The purpose of this letter is to inform you that the issuance of any lighting permit under MGO sec. 10.085 does not change the City's position that the use of the facility under the master plan is limited to "team practices, physical education classes."

Zylstra Dec., Ex. O, Dep. Ex. 6;Tucker Dep., dkt. #32, 53:22-54:22.

**Response:**       Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a letter with many potential or implied factual propositions to which EHS cannot reasonably respond.

93.     The attachment to which Tucker referred in the prior PFOF contained a letter that Elliott wrote to the "Edgewood Family" and included a "Frequently Asked Questions" document in which Edgewood indicated that if it would host night games at its athletic field if the City issued the lighting permit. Zylstra Dec., Ex. O, Dep. Ex. 6 at 3, 5; Elliott Dep., dkt. #33, 171:12-172:2, 174:23-175:16.

**Response:**       Disputed.  Mike Elliott was part of a committee that drafted the letter. Elliott Dep. at 172.  EHS did not say that it would host night games but that it was "planning" to do so.  Zylstra Dec. Ex. O, Dep. Ex. 6 at 3.  EHS was conveying to its supporters that it was not conceding the City's interpretation that the Master Plan precluded games and that the school would resort to the appropriate recourse to challenge that interpretation.  Elliott Decl. ¶ 37.

94.     The attachment referred to in PFOF 91 indicated that Edgewood was tabling the application to amend its Master Plan that Edgewood filed with the City. Zylstra Dec., Ex. O, Dep. Ex. 6 at 3; Elliott Dep., dkt. #33, 171:12-172:2.

**Response:**     Not disputed.

95.     On February 27, 2019, Edgewood's lighting application was stamped "approved" by Building Inspector Steve Rewey with the City as to the lighting review. Hank Dep., dkt. #30, 24:17-24, 33: 2-18; Zylstra Dec., Ex. P, Dep. Ex. 3.

**Response:**     Not disputed.

96.     Shortly after Tucker sent his February 27, 2019 letter, Tucker met with his supervisor, George Hank, and Assistant City Attorney, John Strange. Hank Dep., dkt. #30, 38:18-24; Tucker Dep., dkt. #32, 45:24-48:24, 51:2-54:22.

**Response:**     Disputed in part.  Not disputed that Tucker, and Strange met.  Disputed that the cited evidence stands for the proposition that the meeting occurred "shortly after" Tucker's letter.  City employee Christina Thiele performed the zoning review on March 1, 2019. Hank Dep. at 72; Tucker Dep. at 34. On March 1, Thiele approved the zoning review.  Hank Dep. at 33-34, 72; Zylstra Dec., Ex. P, Dep. Ex. 3 at 1.  Thiele stamped and signed "Final Approval Date" as of March 1, 2019 for the EHS light application.   Zylstra Dec., Ex. P, Dep. Ex. 3 at 3; Ingrisano Decl. ¶ 3, Ex. 2, Dep. Ex. 38 at 3; Tucker Dep. at 65-66.  On March 8, a week later after the application had been approved, in a phone call with Wautier, Tucker advised that there may be a problem with the height of the light poles under the Master Plan and that the City may not be able to issue the permit.  Wautier Decl. ¶ 15.

97.     Hank decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b). Tucker Dep., dkt. #32, 44:23-48:3.

**Response:**     Disputed.  The cited testimony is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Tucker cannot attribute self-serving statements to another City representative for the truth of the matter

asserted.  In addition, According to Hank, Tucker and Hank discussed the light permit and "it was our belief that we should withhold it…"  Hank Dep. at 55.  Hank's rationale for withholding the permit was limited to the uses outline in the Open Spaces section of EHS's Master Plan. Hank Dep. at 81, 84-86.  He did not testify to relying on M.G.O. Section 10.085(1) and (5)(b).

98.     M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection." Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12.

**Response:**     Not disputed that PFOF 98 accurately quotes the cited ordinance provision.

99.     Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application. Tucker Dep., dkt. #32, 46:18-48:3.

**Response:**     Disputed.  The cited testimony is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Tucker cannot attribute self-serving statements to another City representative for the truth of the matter asserted.  According to Hank, Tucker and Hank discussed the light permit and "it was our belief that we should withhold it…"  Hank Dep. at 55.  Tucker was the source of Hank's interpretation of the Master Plan.  Hank Dep. at 46.  Hank's rationale for withholding the permit was limited to the uses outlined in the Open Spaces section of EHS's Master Plan.  Hank Dep. at 81, 84-86. Even under the new interpretation that the Master Plan used to withhold lights, Hank and City recognize that there was at least one permitted use for the athletic field – team practices – for which the outdoor lights could have been permissibly used.  Hank Dep. at 63-65.  Nevertheless,

Hank's concern was that if the City issued the permit but restricted EHS from playing games on its field, that EHS would be upset at his department for granting the application and allowing less than full use of the field.  Hank Dep. at 61.  According to Hank, this was the only reason – the risk that EHS would have unmet expectations that it could hold night games – for withholding the permit.  Hank Dep. at 61.  Hank claims that the decision to withhold EHS's permit was in part motivated by a desire to protect EHS.  Hank Dep. at 62.

100.    M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3.

**Response:**    Disputed.  The cited evidence does not stand for the proposition asserted.

101.    Hank was concerned about allowing Edgewood to make a large capital expenditure to install lighting when the City was contending that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

**Response:**    Not disputed.

102.    On March 12, 2019, Edgewood's counsel, Attorney Nathan Wautier wrote to the City regarding Edgewood's lighting application and objecting to the City's decision not to issue the lighting permit. Zylstra Dec., Ex. R, Dep. Ex. 70; Elliott Dep., dkt. #33, 178:22-179:12.

**Response:**    Disputed in part.  The cited exhibit noted not that the City had decided not to issue the lighting permit but that the City was "considering the revocation of its prior approval" of that permit.  Zylstra Dec. Ex. R, Dep. Ex. 70.  No decision on the February 22, 2019 light application was conveyed to EHS.  Wautier Decl. ¶ 16.

103.    Assistant City Attorney John Strange responded to Atty. Wautier by letter dated March 21, 2019. Zylstra Dec., Ex. S, Dep. Ex. 71; Elliott Dep., dkt. #33, 180:6-11, 184:16-18.

**Response:**     Not disputed.

104.     Atty. Strange wrote in his March 21, 2019 letter, "In addition, because the lights are part and parcel of a plan to conduct athletic contests at night, neither the lights nor the athletic contests are in compliance with the campus master plan." Zylstra Dec., Ex. S, Dep. Ex. 71 at 1; Elliott Dep., dkt. #33, 184:16-18.

**Response:**     Not disputed that PFOF 104 accurately quotes part of the cited letter setting forth the City's interpretation and argument as of that date.

105.     Atty. Strange wrote in his March 21, 2019 letter, "The stadium lights are capital improvements that were required to be shown in the Campus Master Plan by M.G.O. § 28.097(5)(c)2 in order to be constructed without Plan Commission approval" and "Since the stadium lights are neither shown on nor mentioned in the campus master plan, the campus master plan must be amended per MGO Section 28.097(10)." Zylstra Dec., Ex. S, Dep. Ex. 71 at 4; Elliott Dep., dkt. #33, 184:16-18.

**Response:**     Not disputed that PFOF 105 accurately quotes part of the cited letter setting forth the City's legal interpretation and argument as of that date.

106.     Atty. Strange wrote in his March 21, 2019 letter, "To that end, as shown above, Edgewood's application was never in compliance with zoning at the time its lighting application was filed because the lights were not identified as improvements at the athletic field and therefore are simply not allowed absent additional Plan Commission approval." Zylstra Dec., Ex. S, Dep. Ex. 71 at 4; Elliott Dep., dkt. #33, 184:16-18.

**Response:**     Not disputed that PFOF 106 accurately quotes part of the cited letter setting forth the City's legal interpretation and argument as of that date.

107.     In late March 2019, neighbors near Edgewood contacted the City and complained that Edgewood was holding competitive games on its field in violation of its master plan. Tucker Dec., ¶13.

**Response:**     Not disputed.

108.     The City sent an inspector to observe and after he witnessed athletic contests being held on Edgewood's field, the inspector issued Official Notices of Violation to Edgewood. Tucker Dec., ¶13; Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.

**Response:**     Not disputed.

109.     The notices referenced in the prior PFOF instructed Edgewood to "[d]iscontinue holding athletic contests on the athletic field at 2219 Monroe Street" and noted that "The Campus Master Plan states that the athletic field is used for team practices and physical education classes. The Master Plan can be amended pursuant to MGO 28.097(10). Edgewood could accomplish this by proceeding with the Campus Master Plan amendment application currently on file with the Planning Division." Zylstra Dec., Ex. T, Dep. Exs. 9 and 11; Tucker Dec., ¶13.

**Response:**     Not disputed that PFOF 109 accurately quotes parts of the cited exhibits.

110.     Notices of Violations are warnings. Tucker Dep., dkt. #32, 17:17-25; Tucker Dec., ¶13.

**Response:**     Disputed.  While Notices of Violations are "like warnings," they are appealable actions that "further things along."  Tucker Dep. at 137.

111.     The City did not issue a citation or fine Edgewood. Tucker Dec., ¶13.

**Response:**     Not disputed.

112.     Edgewood appealed the Official Notice of Violations to the Zoning Board of Appeals ("ZBA"). Zylstra Dec., Ex. U, Dep. Ex. 74; Elliott Dep., dkt. #33, 196:15-197:9; Tucker Dec., ¶14.

**Response:**     Not disputed.

113.     While its appeal to the ZBA was in progress, Edgewood was still meeting with the neighborhood association to try and come up to some resolution with regard to use of its field. Elliot Dep. 196:15-197:14.

**Response:**     Not disputed.

114.     Edgewood agreed not to move forward with its lights while it was still meeting with the neighborhood association and was still making progress. Elliott Dep., dkt. #33, 200:25-17.

**Response:**     Disputed.  The meeting minutes make clear that EHS's commitment while the group was making progress was subject to EHS Board approval.  Elliott Dep. at 197-201; Ingrisano Decl. ¶ 12, Ex. 11, Dep. Ex. 75 at 3.

115.     Edgewood did not move forward to install lights from the time of Tucker's February 27, 2019 letter to the present. Elliott Dep., dkt. #33, 186:5-10.

**Response:**     Disputed.  Edgewood did not move forward to install lights because it could not move forward to install lights because the City did not issue a permit.  Elliott Decl. ¶ 39.

116.     The Zoning Board of Appeals held a public hearing on Edgewood's appeal of the Notices of Violation on July 11, 2019. Tucker Dec., ¶14; Zylstra Dec., Ex. V, Dep. Ex. 76.

**Response:**     Not disputed.

117.    At the July 11, 2019 hearing, Nathan Wautier, an attorney for Edgewood, argued that if one of the high schools without a master plan wanted to build a correctional facility, they would be allowed to do that as a matter of right under the then-current zoning code because a correctional facility was an identified secondary use. Zylstra Dec., Ex. V, Dep. Ex. 76 at 90:19-91:22, 87:14-25.

**Response:**    Disputed.  The cited transcript demonstrates that Wautier answered a question from a Plan Commissioner regarding permitted uses where the question used correctional facilities as an example.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 90-91.  "Correctional facility" is a permitted secondary use under the Campus Institutional District zoning ordinance. M.G.O. Section 28.097(3)(b)(15).  Zylstra Decl., Ex. B, Dep. Ex. 13.

118.    At the July 11, 2019 hearing, Assistant City Attorney John Strange also told the Plan Commission that under Edgewood's argument, Edgewood could turn the Oaks, a green space on Campus with heritage trees, into a cornfield without Plan Commission approval because agricultural use is an allowable use under the ordinance. Zylstra Dec., Ex. V, Dep. Ex. 76 at 74:3-9; Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228.

**Response:**    Not disputed.

119.    The Zoning Board of Appeals voted unanimously to affirm the decision of the Zoning Administrator. Elliott Dep., dkt. #33, 203:11-15; Tucker Dec., ¶14.

**Response:**    Not disputed.

120.    The Zoning Board's vote was a determination that Edgewood was required to amend its master plan to play competitive games on its athletic field. Zylstra Dec., Ex. V, Dep. Ex. 76 at 224-225, 246-247; Tucker Dec., ¶14.

**Response:**     Disputed.  The cited transcript excerpts do not stand for the cited proposition.  Instead, the transcript indicates that the parties are there for an appeal to reverse, affirm or modify the Official Notices issued upon Edgewood by the City.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 7-8.  The Tucker Declaration's attempt to recast the nature of the proceedings and the determination made is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment, or alternatively, is objected to as opinion testimony pursuant to Federal Rule of Evidence 701.

121.    Edgewood never appealed the decision of the Zoning Board of Appeals. Tucker Dec., ¶14.

**Response:**     Disputed, as PFOF has been withdrawn.

122.    On July 12, 2019, then City Attorney Michael P. May wrote a letter to Edgewood's counsel. Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

**Response:**     Not disputed.

123.    Atty. May informed Edgewood that after ZBA denied Edgewood's appeal, further enforcement related to the Official Notices rested within the discretion of the City Attorney. Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

**Response:**     Not disputed.

124.    Atty. May indicated in his July 12, 2019 letter that he would take no further enforcement steps unless and until he provided Edgewood ample notice. Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

**Response:**     Not disputed.

125.    Because Edgewood's entry of the master plan was voluntary, Atty. May invited Edgewood to file to terminate its Master Plan and return to the standard Campus Institutional Zoning. Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶16.

**Response:**    Disputed in part.  Not disputed that May invited EHS to terminate its Master Plan and return to the standard Campus Institutional Zoning.  Disputed as to the master plan's voluntary as the cause of the invitation.  That proposition is not supported by the text of the letter exhibit cited and the Tucker Declaration's attempt to add that proposition to the letter does not appear to be made from personal knowledge and may well constitute inadmissible hearsay not appropriate for consideration on summary judgment.

126.    The restriction on Edgewood playing athletic contests on its field was due to the language in Edgewood's Master Plan. Tucker Dec., ¶16. If the Master Plan were repealed, Edgewood would be permitted to play athletic contests on its field pursuant to M.G.O. §28.097. Tucker Dec., ¶16.

**Response:**    Not disputed that this was the City's interpretation of the Master Plan that EHS was trying to get out from under with a repeal.  EHS disputes any legal conclusion that this legal interpretation was correct.

127.    On July 29, 2019, Edgewood's counsel sent a letter to the Mayor, stating "Please accept this letter as the Edgewood school's formal request and consent for the mayor to sponsor an ordinance for immediate repeal of ORD-14-00082 which established [Edgewood's] ten-year campus master plan." Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep., dkt. #33, 205:3-206:9.

**Response:**    Disputed in part.  Not disputed that the letter was sent and that PFOF 127 accurately quotes part of the cited letter.  Disputed that Edgewood's counsel sent the letter.  The

exhibit itself demonstrates that it was signed by representatives from the three Edgewood institutions.  Zylstra Dec., Ex. X, Dep. Ex. 22.

128.    Elliott understood that because its Master Plan was enacted as an ordinance, that another ordinance has to enacted to repeal it. Elliott Dep., dkt. #33, 206:6-17.

**Response:**    Not disputed.

129.    Alder Evers began having conversations with Assistant City Attorney John Strange following the ZBA hearing, where, according to Evers, "it became apparent that there was a flaw in the ordinance." Evers Dep., dkt. #31, 82:23-83:15, 87:10-18.

**Response:**    Disputed.  Evers contacted Strange during the first week of August 2019. Evers Dep. at 89, 102.  This was after Edgewood's notice of repeal on July 29, 2019.  Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep. at 205-206.

130.    Alder Evers wanted "to address a flaw that would allow a landowner to proceed with a significant change of use that would be in contrast with the explicit Statement of Purpose as articulated in the Campus-Institutional District." Evers Dep., dkt. #31, 91:3-9.

**Response:**    Disputed.  Evers was motivated to prevent EHS from adding lights to its field by changing the Campus Institutional District zoning ordinance to require conditional use permits for lighting before EHS repealed its Master Plan.  The EHS field lights "debate pointed to these flaws."  Evers Dep. at 93.  Indeed, the EHS stadium and lights issue was the only actual or active controversy that pointed to these "flaws" and the need for a change.  Evers Dep. at 93-94.  Evers intended that his amendment would require EHS to go through a conditional use or Master Plan amendment process in order to get lights.  Evers Dep. at 97-99.  The original title of Evers' proposed ordinance specifically applied to the Evers' issues with EHS's athletic field,

including a potential agricultural issue on the Edgewood campus that had come up during

discussions at the ZBA hearing.  Evers Dep. at 121-122.

131.    Evers testified:

Q. So the potential for lights at Edgewood, a potential for a stadium, is what motivated your amendment; is that right?

MS. ZYLSTRA: Objection. Form. You can answer.

A. What motivated my amendment was a desire to update the amendment so that the flaws that had been identified, that institutions without a master plan would be able to make substantial use -- substantial changes to their use without addressing the potential for adverse impacts or addressing the issue of livability or vitality of adjacent neighbors. So while the Edgewood debate pointed to these flaws, the purpose of the amendment was to address a change in this so that institutions across -- who are in the Campus-Institutional District would abide by the intent of the ordinance itself.

Q. But it was the Edgewood incident, specifically, and the ongoing issues with that stadium that highlighted for you the need for this change; is that right?

A. I don't know, Jonathan, if that's entirely accurate, because it -- I don't know if you read the transcript of the ZBA hearing, but it was suggested that an institution within the CI District could use their open space to have a correctional facility. So, in effect, a high school could be converted into a prison or that -- you know, that farming could take place. And this was considered by everybody present to be somewhat inscrutable and inconsistent with the Campus-Institutional District ordinance itself. So while the debate around Edgewood pointed to one example, there was one of several potential issues that could come forth.

Evers Dep., dkt. #31, 92:14-93:23.

**Response:**      Disputed.  This is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of a deposition testimony with many potential or implied

factual propositions to which EHS cannot reasonably respond.  See Response to PFOF 130.

132.    Alder Evers testified:

Q. What impact, if any, did you intend your amendment have on Edgewood's ability to obtain lights for its field?

MS. ZYLSTRA: Object to form. You can answer.

A. The purpose of the amendment was to address the flaw in the Campus-Institutional District, as it was originally written and published into law in 2013, that provided a loophole of sorts for campus institutions without a master plan to make substantial changes to their use without considering the potential for adverse impacts affecting the livability and vitality of adjacent neighborhoods.

Evers Dep., dkt. #31, 97:11-22.

**Response:**     Disputed.  First, this is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of a letter with many potential or implied factual propositions

to which EHS cannot reasonably respond.  Second, the cited transcript is non-responsive to the

question asked.  Evers later confirmed that his intent was that EHS be required to go through

either the conditional use permitting process or the master plan amendment process.  Evers Dep.

at 98.  See also Response to PFOF 130.

133.    Alder Evers also testified:

Q. You are not aware of any other actual controversy involving a Campus- Institutional zone district that highlighted this issue; is that correct?

A. Not entirely so, because there were --there were residents in district -- in the District 5 aldermanic district where West High School, where there was some concern. This came up during the campaign. There was apparently a move that said, well, West High should be able -- should put up lights and have a stadium, which obviously would have been opposed by nearby neighbors.

Evers Dep., dkt. #31, 94:9-18.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of a letter with many potential or implied factual propositions

to which EHS cannot reasonably respond. Evers recitation of what other unnamed individuals

supposed have said or raised is objected to as hearsay pursuant to Federal Rule of Evidence 801

and is not admissible as evidence on summary judgment.  See Evers Dep. at 95.  Evers admitted

that the EHS lights issue was the only active, non-hypothetical controversy pointing to the

supposed need for Evers's amendment.  Evers Dep. at 93-94.

134.    Alder Evers asked Attorney Strange what could be done to fix the flaws in the

ordinance, not being an expert in these matters. Evers Dep., dkt. #31, 87:19-23. Strange indicated

that the ordinance could be amended and Alder Evers asked Strange to draft an amendment.

Evers Dep., dkt. #31, 87:19-88:5.

**Response:**      Not disputed.

135.    Evers asked Strange to draft an amendment to the Campus Institutional District

Zooning in the first week of August of 2019. Evers Dep., dkt. #31, 89:16-19.

**Response:**      Disputed as ambiguous.  In the first week of August, Evers and Strange

conferred and Evers asked Strange to draft the new ordinance amending the Campus Institutional

District zoning ordinance.  Evers Dep. at 89, 102

136.    Assistant City Attorney John strange [sic] drafted an amendment to the Campus

Institutional District Zoning Ordinance. Evers Dep., dkt. #31, 87:19-88:5, 106:13-22; Zylstra

Dec., Ex. C, Dep. Ex. 18 at 6.

**Response:**      Not disputed.

137.    The Drafter's Analysis states in part:

DRAFTER'S ANALYSIS: As currently written, on any parcel zoned in the Campus-
Institutional (CI) District without a campus master plan, primary and secondary uses are
allowed subject to conditional use requirements only upon the construction of a building
that creates greater than 4,000 square feet of floor area, which the Zoning Code defines as
"area under the roof of a building." Primary and secondary uses that do not require the
construction of a building (e.g., occur outside an enclosed building) are, thus, permitted
without conditional use review. Uses in the Cl District that may not require the
construction of a building (including outdoor sports and recreational facilities, surface
parking, utilities and transportation facilities, other uses related to the institution's
primary mission, open stadiums, auditoriums and arenas, and agricultural uses) often
require conditional use review in other city zoning districts, including residential and
mixed-use and commercial districts. ***The purpose of this ordinance is therefore to treat***

*uses that occur outside of an enclosed building in a Cl District like the same or similar uses in other zoning districts.* This ordinance retains the requirement that the construction of new buildings or additions to existing buildings exceeding 4,000 square feet in floor area require conditional use approval. It then states that conditional use is always required for the establishment, improvement, or modification of any use occurring outside of an enclosed building. Finally, this ordinance clarifies that secondary uses in a Cl District must be predominantly used in a manner that is directly related and complementary to the institution's primary uses.

Zylstra Dec., Ex. C, Dep. Ex. 18 at 6 (emphasis added); Evers Dep., dkt. #31, 104:1-9.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of a letter with many potential or implied factual propositions

to which EHS cannot reasonably respond.

138.    On August 26, 2019, the City's Plan Commission held a public hearing. Zylstra

Dec., Ex. Y, Dep. Ex. 25; Evers Dep., dkt. #31, 141:3-9.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of the drafter's analysis with many potential or implied factual

propositions to which EHS cannot reasonably respond.  See Response to PFOF 130.  The

original title of the amendment indicates its actual purpose, specific to the EHS stadium and

lights dispute.  Evers' title of his ordinance on August 6, 2019 was:

> Creating Madison General Ordinance Sections 28.097(2)(d) and (e) requiring institutions in the Campus Institutional District without an approved campus master plan to get conditional use approval for the establishment of open or enclosed **Stadiums**, Auditoriums, Arenas, **Indoor or Outdoor Sports Recreational** Facilities, and Agricultural Uses and for the installation of **stadium lighting**, amplified sound, and the establishment or expansion of outdoor seating over a specified capacity.

Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36 (emphasis added).

42

139.    Two of the items on the Commission's agenda for the August 26, 2019 hearing were the ordinance for Edgewood to repeal its Master Plan (Legistar # 56839) and the change being proposed to M.G.O §28.097, the Campus Institutional District Zoning (Legistar # 56981). Zylstra Dec., Ex. Y, Dep. Ex. 25 at 7; Evers Dep., dkt. #31, 141:3-9.

**Response:**     Not disputed.

140.    The amendment to the Campus Institutional District Zoning was re-referred to public hearing to the Plan Commission to be returned by September 16, 2019. Evers Dep., dkt. #31, 142:2-10. To "re-refer" a matter to a public hearing to the Plan Commission means that matter would come back to the Plan Commission for further discussion to get questions answered from staff on specific subjects. Evers Dep., dkt. #31, 142:11-17.

**Response:**     Not disputed.

141.    The Plan Commission recommended re-referral of the Edgewood repeal matter to the Common Council due back on the September 16, 2019 Plan Commission agenda. Evers Dep., dkt. #31, 142:18-143:5; Parks Dec., ¶3.

**Response:**     Not disputed.

142.    The Plan Commission meeting minutes state, "In recommending referral [of the Edgewood repeal matter], members of the Plan Commission requested more information [from City staff] on the impacts of repeal, the relationship between repealing the master plan and the proposed changes to the CI zoning district, ID 56981, and the status of the agreements that govern the property before the property was zoned CI." Zylstra Dec., Ex. Y, Dep. Ex. 25 at 7; Evers Dep., dkt. #31, 141:3-9.

**Response:**     Not disputed.

43

143.    Edgewood's Master Plan had incorporated prior agreements between Edgewood and the neighborhood association. Elliott Dep., dkt. #33, 238:1-15; *see, e.g.*, Zylstra Dec., Ex. A, Dep. Ex. 7 at 73-80 and 47 of 228.

**Response:**    Disputed.  Except for the first item reaffirming all three schools commitment to the Edgewood Neighborhood Liaison Committee, the referenced agreements pertain to Edgewood College.  They were not EHS's agreements.  Elliott Decl. ¶ 49.

144.    The Plan Commission questioned at the August 26, 2019 hearing what would happen to those agreements referenced in the prior PFOF with a repeal of the master plan. Parks Dec., ¶3.

**Response:**    Disputed.  The cited evidence is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.

145.    Atty. Strange wrote a memo to the Plan Commission dated August 26, 2019, to address the effects of Plan Commission Action on Legistar Items 56981 (the proposed ordinance change) and 56839 (the repeal item) and specifically, the effect if both matters passed at the same time. Zylstra Dec., Ex. Z, Dep. Ex. 24; Parks Dec., ¶2.

**Response:**    Not disputed.

146.    Atty. Strange wrote, "If both Legistar items are approved by the Common Council on September 3, the practical impact on the ongoing athletic field issue is that Edgewood would be allowed to play games on its existing field but any improvement or modification to that field will require conditional use approval regardless of whether such improvement or modification requires the construction of a building or an increase in zoning lot area." Zylstra Dec., Ex. Z, Dep. Ex. 24 at 3; Parks Dec., ¶2.

**Response:**     Not disputed that PFOF 146 accurately quotes part of the cited memorandum.

147.    At a meeting on September 3, 2019, the Common Council took up a motion by Alder Bidar to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting. Tucker Dec., ¶17.

**Response:**     Not disputed.

148.    At a meeting on September 3, 2019 of the Common Council, three Plan Commission members—Alders Heck, Rummel and Lemmer—who were also on the Common Council spoke in favor of re-referring the Edgewood repeal matter to its October meeting "giving a number of different reasons why they thought that would be in order." Evers Dep., dkt. #31, 149:2-12; Parks Dec., ¶4; Tucker Dec., ¶17.

**Response:**     Disputed.  The cited evidence is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Moreover, Alders Rummel and Bidar stated that they wanted to delay Edgewood's repeal in order to allow Evers's ordinance to pass.  As reported by the Wisconsin State Journal on September 4, 2019, the Common Council voted to delay a decision whether to repeal the EHS Master Plan. Ingrisano Decl.¶ 11, Ex. 10, Dep. Ex. 28.  The State Journal continued:  "Ald. Shiva Bidar, 5th District, said the reason for the delay was to allow another proposal to get through the Plan Commission and City Council first.  That proposal would require Edgewood High School to apply with the city before making modifications, such as adding lights or a sound system, to its field if the master plan is repealed.  Ingrisano Decl. ¶ 11, Ex. 10, Dep. Ex. 28.  The article continued: "City Council members who serve on the Plan Commission said they would like to know what the council decides on the field modification measure before voting on the master

plan repeal."   Ingrisano Decl. ¶ 11, Ex. 10, Dep. Ex. 28.  Consistent with the State Journal's

reporting, at the September 3 hearing, Alder Marsha Rummel expressed that she believed a

"stadium" should be a conditional use and that the Campus Institutional District zoning

ordinance should be "tweaked and amended" before moving forward with repeal.   Ingrisano

Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by link) at 2:04:00, 2:04:40.  Also

consistent with the State Journal's reporting, at the September 3 hearing, Alder Shiva Bidar

supported delaying the EHS Master Plan repeal and moving forward on the Evers' amendment,

noting that the Common Council needed to give the Plan Commission clarity on one item

[Evers' ordinance] so that the Plan Commission can decide another [the EHS Master Plan

repeal].  Ingrisano Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by link) at 2:12:30.

149.    The Common Council voted to re-refer the Edgewood repeal matter to the

October 14, 2019 Plan Commission meeting, which was the next meeting after the September 16

meeting. Evers Dep., dkt. #31, 151:2-7; Parks Dec., ¶4; Tucker Dec., ¶17.

**Response:**     Not disputed.

150.    The amendment to the Campus Institutional District Zoning continued and was

considered by the Plan Commission on September 16. Zylstra Dec., Ex. AA, Dep. Ex. 26; Evers

Dep., dkt. #31, 144:9-145:4.

**Response:**     Not disputed.

151.    On September 16, 2019, the Plan Commission voted to recommend that the

Common Council consider the change to the Campus Institutional District Zoning. Zylstra Dec.,

Ex. AA, Dep. Ex. 26 at 6; Evers Dep., dkt. #31, 144:9-145:4.

**Response:**     Not disputed.

152.     The amendment was sponsored by 13 of the 20 Common Council Alders: Tag

Evers, Syed Abbas, Shiva Bidar, Grant Foster, Keith Furman, Patrick W. Heck, Zachary Henak,

Rebecca Kemble, Lindsay Lemmer, Donna V. Moreland, Michael E. Verveer, Christian A.

Albouras and Marsha A. Rummel. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31,

104:1-12.

**Response:**     Disputed.  While the thirteen alders eventually sponsored the amendment,

the original sole sponsor was Evers.  Evers Dep. at 115-116

153.     On September 30, 2019, Edgewood submitted a second lighting application for

lights on its athletic field. Zylstra Dec., Ex. BB, Dep. Ex. 5; Tucker Dec., ¶18.

**Response:**     Not disputed.

154.     Because Edgewood's Master Plan was still in place, the City denied Edgewood's

September 30 lighting permit. Elliott Dep., dkt. #33, 238:21-239:18; Zylstra Dec., Ex. CC, Dep.

Ex. 84; Tucker Dep., dkt. #32, 140:13-142:13; Tucker Dec., ¶18.

**Response:**     Not disputed.  EHS disputes the propriety of that denial.

155.     On October 1, 2019, the Common Council voted to amend the Campus

Institutional Zoning Ordinance found in M.G.O. §28.097. Tucker Dep., dkt. #32, 203:1-9;

Zylstra Dec., Ex. C, Dep. Ex. 18; Tucker Dec., ¶19.

**Response:**     Not disputed.

156.     The amendment to the Campus Institutional District Ordinance provided that: (1)

in a Campus-Institutional District without a Campus Master Plan, the construction of a new

building or additions to existing buildings that exceed four thousand (4,000) square feet in floor

area on a zoning lot within any five (5) year period shall require conditional use approval; and

(2) in a Campus-Institutional District without a Campus Master Plan, the establishment,

47

improvement, or modification of any primary or secondary use occurring outside of an enclosed building shall require conditional use approval but the Zoning Administrator may issue permits to repair or replace any existing facility related to a primary or secondary use provided that the proposed facility is of a similar bulk condition and at a similar location on the zoning lot as with the existing facility. Zylstra Dec., Ex. C, Dep. Ex. 18 at 4; Tucker Dec., ¶19.

**Response:**     Not disputed.

157.     On October 28, 2019, City staff Timothy Parks filed a staff report with the Plan Commission addressing the questions members raised at the August 26, 2019 Plan Commission meeting related to the Edgewood repeal matter. Zylstra Dec., Ex. DD, Dep. Ex. 83; Parks Dec., ¶5.

**Response:**     Not disputed.

**Edgewood Seeks Delay of Repeal of its Master Plan**

158.     In October and November 2019, Edgewood requested that the vote on the repeal of Edgewood's master plan be referred to later Plan Commission meetings. Elliott Dep., dkt. #33, 235:17-236:17; Zylstra Dec., Ex. EE, Dep. Exs. 81 and 82.

**Response:**     Not disputed.

159.     On December 9, 2019, the repeal of Edgewood's Master Plan came before the Plan Commission. Elliott Dep., dkt. #33, 245:21-24; Parks Dec., ¶6.

**Response:**     Not disputed.

160.     The Plan Commission voted that the Edgewood repeal ordinance be "placed on file." Parks Dec., ¶6. "Placed on file" means that the applicant could come back to the Plan Commission at a later date and renew the request, potentially addressing any issue or concerns that the Plan Commission members raised. Parks Dec., ¶6.

**Response:** Not disputed.

161.    The City's Legistar notes indicated that "[i]n recommending that the repeal be placed on file, members of the Plan Commission who voted in favor of the motion to place on file did not feel that the repeal met the standard for map amendments based on public health, safety, and welfare." Parks Dec., ¶6.

**Response:** Not disputed.

162.    On January 7, 2020, the Common Council took up the Edgewood repeal ordinance. Parks Dec., ¶7.

**Response:** Disputed.  The Common Council took up the Edgewood repeal on multiple occasions prior to January 7, 2020.  Evers Dep. at 128, 130; Ingrisano Decl. ¶ 8, Ex. 7, Dep. Ex. 21.

163.    The Common Council did not place the Edgewood repeal ordinance on file as the Plan Commission recommended but instead, voted 15 in favor of repeal of the master plan, 4 against, and with one non-voting member. Elliott Dep., dkt. #33, 246:21-247:5; Parks Dec., ¶7.

**Response:** Disputed in part.  The Parks Declaration's statements of other City representatives' statements and votes is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.

164.    Elliott was pleased with the vote by the Common Council in favor of repealing Edgewood's Master Plan. Elliott Dep., dkt. #33, 247:8-12, 247:24-248:12; Zylstra Dec., Ex. FF, Dep. Ex. 86.

**Response:** Disputed.  Elliott and EHS were pleased that a Master Plan that had been misinterpreted in 2018 to deny EHS from playing games on its athletic field and to deny lights was now behind them, but was not pleased that it had been delayed so that Evers' amendment to

49

the Campus Institutional District zoning code could pass and change the law to require EHS to go through a subjective conditional use analysis.  Elliott Decl. ¶ 45.

165.    On March 11, 2020, Edgewood filed a conditional use application for outdoor lighting of its athletic field. Elliott Dep., dkt. #33, 249:2-250:9; Zylstra Dec., Ex. GG, Dep. Ex. 87; Parks Dec. ¶8.

**Response:**    Not disputed.

166.    Edgewood was proposing in its conditional use application construction and installation of either four 80-foot light poles or four 68-foot light poles. Elliott Dep., dkt. #33, 250:2-14; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8077; Parks Dec., ¶8.

**Response:**    Not disputed.

167.    Edgewood's conditional use application for outdoor lighting of its athletic field went before the Plan Commission of May 11, 2020. Parks Dec., ¶9.

**Response:**    Not disputed.

168.    Tim Parks prepared a staff report, dated May 11, 2020, for the Plan Commission. Parks Dec., ¶9. A link to the May 11, 2020 Plan Commission meeting is here: https://media.cityofmadison.com/mediasite/Showcase/madison-city-channel/Presentation/95ac2fc624f04a65b8ea74ac63ffcda31d/Channel/9087c9eda40246be9fac27 83773f09f54d. Evers Dec., ¶2.

**Response:**    Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a link to a lengthy Plan Commission meeting with many potential or implied factual propositions to which EHS cannot reasonably respond.

169.    A summary of staff's recommendation in the May 11, 2020 report states: "The Planning Division believes that the Plan Commission *can* find the standards for conditional use approval met to approve the installation of lights for the Goodman Athletic Complex at Edgewood High School at 2219 Monroe Street *subject to the recommended conditions* of approval beginning on page 8 of this report *and input at the public hearing*." Parks Dec., ¶9; Zylstra Dec., Ex. HH, Dep. Ex. 33 at 1 (emphasis added).

**Response:**      Disputed.  The cited exhibit, Parks' memorandum, notes that "the Zoning Code states that the Plan Commission may not approve an application for a conditional use unless it can find that all of the standards found in Section 28.183(6)(a), Approval Standards for Conditional Uses, are met." Zylstra Dec., Ex. HH, Dep. Ex. 33 at 4.  Parks' memo concludes that " despite these concerns [by neighbors relating to noise], staff believes that the Plan Commission may find standards 1, 3, and 4 met to allow the installation of the proposed lights subject to conditions that would limit the impacts of the expanded use of the stadium on nearby residents." Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.  By noting that the Plan Commission may or "can" find the standards to have been met, the City's Planning Staff  necessarily concluded that there was substantial evidence in the record by which to grant the permit with conditions.

170.    City staff did not find that the conditional use standards *were* met by Edgewood but only that the Plan Commission *could* determine they were met after consideration of the input from the public hearing. Parks Dec., ¶9; Zylstra Dec., Ex. HH, Dep. Ex. 33 at 1.

**Response:**      Disputed.  See response to PFOF 169.  By advising the Plan Commission that it could determine the standards were met, it was necessarily concluding that there was sufficient evidence that the standards were met.

171.    At the May 11, 2020 Plan Commission meeting, the Plan Commission found the standards for conditional use were not met and placed the conditional use on file without prejudice. Elliott Dep., dkt. #33, 250:15-251:11; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071; Parks Dec., ¶10.

**Response:**    Not disputed.

172.    The Plan Commission notes state: "[t]he Plan Commission could not find standard number 3 met finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties and that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera." Elliott Dep., dkt. #33, 250:15-251:11; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071; Zylstra Dec., Ex. II, Dep. Ex. 89; Parks Dec., ¶10.

**Response:**    Not disputed that PFOF 173 accurately quotes part of the cited document.

173.    The notes in Legistar of the Plan Commission meeting indicated, "Members indicated they would be open to considering the request again. (When it addresses the noise impacts) was presented by the applicant, including improved engagement with the neighborhoods and a limit to the number of games with lights." Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071; Parks Dec., ¶10; Elliott Dep., dkt. #33,251:22-252:9.

**Response:**    Not disputed that PFOF 174 accurately quotes part of the cited document.

174.    On May 21, 2020, Edgewood appealed the decision of the Plan Commission on its conditional use application. Elliott Dep., dkt. #33, 255:14-18; Zylstra Dec., Ex. JJ, Dep. Ex. 90; Parks Dec., ¶12.

**Response:**    Not disputed.

175.     Edgewood's appeal of its conditional use application came before the Common Council on January 19, 2021. Parks Dec., ¶12. A link to the January 19, 2021 Common Council meeting is here: https://media.cityofmadison.com/mediasite/Showcase/madison-city-channel/Presentation/c3bdf04924f2446cad9f4a1bc2d6cdc11d/Channel/d29c91089bda40e7bb0fba20311ff0754d. Evers Dec., ¶8.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a citation to a lengthy common council meeting with many potential or implied factual propositions to which EHS cannot reasonably respond.

176.     In a memo to the Common Council, Assistant City Attorney stated that at the Plan Commission hearing, Edgewood proposed that games be naturally limited to the total number required for Edgewood related teams. However, Plan Commissioners pointed out that this was not actually a defined limit as suggested by the Staff Report. Evers Dec., Ex. D, at CITY-DEF 51975. The Common Council voted 13-4 to uphold the decision of Plan Commission and not grant the appeal. Parks Dec., ¶12.

**Response:**     Disputed.  The memo exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  The City may not introduce a self-serving memo to itself, created by its City Attorney's Office during the pendency of its Edgewood's first litigation.  See Edgewood High School of the Sacred Heart, Inc. v. City of Madison, Wisconsin et. al., 3:19-cv-00683-wmc (filed 8/21-2019, dismissed 2/11/2020).

177.     Alder Evers testified:

Q. Looking at the record, the totality of that record that was before you as an alder for the City of Madison, what did you -- what evidence did you rely upon in coming to that conclusion?

A. Well, principally, there is two points. One, that Edgewood offered no substantial evidence required under state law that an applicant do so; that the uses, values, and enjoyment of the property in the neighborhood for purposes already established would not be substantially impaired or diminished in a foreseeable manner.

They offered no substantial evidence that this would not occur. And, in fact, they ignored their own sound study's indication that just the crowd noise from just a collection of 150 people attending an athletic contest would exceed a 70 decibel level within the adjoining neighborhoods.

They did not address -- offer any testimony about property values, how property values would not be impacted. Residents were concerned about the potential impact on their property values.

They did not address concerns of families who had young children in the neighborhood who go to sleep, say, at 7:00 or 7:30. You're a father, you know what that's like, toddlers go to sleep early. How that these homes just within a hundred feet of an athletic field were holding night games with cheering crowds and a play-by- play announcement and pep band, how that this could interrupt sleep.

They offered no substantial evidence, not no iota of substantial evidence that the uses, values, and enjoyment of other property in the neighborhood for purposes that were established, that they had lived there for years, would not be substantially impaired.

They chose not to offer that in their -- they simply said in their meetings, the six meetings that were held after the Plan Commission denial, that they did not believe the impacts would be that bad. They offered no evidence to become -- that they wouldn't; they just said they didn't believe it's so.

So, Jonathan, they just didn't offer substantial evidence, and for that reason -- whereas the residents did. They offered what I believed to be substantial impacts or evidence that those impacts were foreseeable, were clearly foreseeable. They could be anticipated and they were reasonable concerns.

Now, despite the recommendations of the planning staff on a near unanimous basis, the Plan Commission agreed that the applicant did not offer substantial evidence that they would be able to abide -- live up to the standard, standard -- standard 3.

So that's the reason why that I voted the way I did, and that's the way that the overwhelming majority of council members joined in accepting the verdict of the Plan Commission.

Evers Dep., dkt. #31, 179:4-181:8.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of deposition testimony with many potential or implied factual

propositions to which EHS cannot reasonably respond.

178.    Evers also testified:

Q. The second category of the evidence that you considered and relied upon in your vote
was the research that you said was presented to you by these neighbors; is that fair?

A. And may I respond to that? Research also provided by Edgewood.

Q. Okay. Let's talk about the research provided by the neighbors. What neighbors
provided you with research that you found to be compelling? Identify the neighbors for
me that provided research that you found to be compelling.

A. The neighbors paid for a sound study by, I believe it's Weiss Engineering (ph). It's in
Legistar. You would have to -- I don't have the file or anything like that. But they paid
for a study to be able to make, you know, scientific determinations based on
measurements and mapping what the potential for those impacts would be on the
adjoining neighbor.

Q. So we have the Weiss sound study. What other piece of research did the neighbors
provide you that you relied upon that you found to be compelling?

A. Again, measurements taken of games being held in the area. Videos of the those
games. Research about -- that they had done regarding the impact on property values.
And other cities where stadiums were built in a neighborhood -- traditional residential
neighborhood, that kind of thing.

Evers Dep., dkt. #31, 183:18-184:22.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of a deposition testimony with many potential or implied

factual propositions to which EHS cannot reasonably respond.

179.    Some of the evidence that the Alders received included:

- A sound study performed by Wise Associates that the neighbors living near
  Edgewood submitted (Evers Dec., Ex. A);

- A sound study performed by Talaske and TLC Engineering that Edgewood submitted (Evers Dec., Ex. B);

- Testimony and information that the proposed improvements would decrease property values, some of which was verbal but some were contained in written comments (Evers Dec., Ex. D at CITY-DEF 52286, 52287, 52298, 52322-24, 52335, 52334, 52378, 52389, 52397, 52440, and 52444);

- A letter from Friends of Lake Wingra opposing Edgewood's proposed improvements based on the potential environmental impact (Evers Dec., Ex. C);

- Videos that some of the public submitted related to the light glare and sounds of athletic games (including ones taken of Edgewood's use of its field), and the potential impacts on the neighborhood, *see, e.g.*, Evers Dec., Ex. D at 52356, 52509, 52464 with links to videos. One resident wrote "When my husband deployed to Afghanistan in 2018, we tried to find ways to connect across the distance and the time zones -- as it turns out, great preparation for connecting during a pandemic. One day he met us at 3:30am, his time, for dinner over video chat. A soccer game was taking place on the field, which became so loud, with the windows closed, that we could no longer have a conversation in the dining room at the back of our house" and she took and sent a link to a video of that game, which she says she recorded from inside her house (Evers Dec., Ex. D, CITY-DEF 52634);

- Testimony from the public about how their uses, values and enjoyment of their property would substantially impaired or diminished (*see, e.g.*, Evers Dec., Ex. D at 52083-52085, 52285-52291, 52296-52384, 52386-52414, 52427-52449, 52483, 52507-52509);

- Testimony raising concerns about whether Edgewood would abide by the conditions given its past behavior and suggestions of Edgewood being dishonest (*see, e.g.*, Evers Dec., Ex. D CITY-DEF 51985, 52083-52085, 52289, 52313, 52456, 52487, 52493-52497, 52507-52509).

Evers Dec., ¶6, Exs. A-D.

**Response:**      Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy summary of multiple exhibits with many potential or implied factual propositions to which EHS cannot reasonably respond.

180.     On September 29, 2021, Elliott emailed City representatives informing them that Edgewood was going to be filing a conditional use application for a two-story commons addition. Elliott Dep., dkt. #33, 260:24-261:15; Zylstra Dec., Ex. KK, Dep. Ex. 93.

**Response:**     Not disputed, but irrelevant and immaterial.

181.     Edgewood filed the conditional use application for the two-story commons addition and it was approved by the Plan Commission and the Common Council. Elliott Dep., dkt. #33,260:24-261:19.

**Response:**     Not disputed, but irrelevant and immaterial.

182.     Alder Evers voted in favor of the two-story commons conditional use application. Evers Dec., ¶10.

**Response:**     Not disputed, but irrelevant and immaterial.

183.     Edgewood College is building a stadium in Fitchburg and has been exploring that since at least July 2019. Elliott Dep., dkt. #33, 24:3-26:1; Zylstra Dec., Ex. LL, Dep. Ex. 48.

**Response:**     Disputed in part.  The cited evidence supports the proposition that Edgewood College is building an athletic complex in Fitchburg, but PFOF 183 is not otherwise supported by the evidence cited.

184.     Edgewood High School has separate finances from Edgewood grade school and Edgewood College. Elliott Dep., dkt. #33, 23:13-17.

**Response:**     Not disputed.

185.     Edgewood High School has charged Edgewood College in the past for use of the high school's athletic fields. Elliott Dep., dkt. #33, 23:13-24:2.

**Response:**     Not disputed.

186.     Just like Edgewood High School, Edgewood College and grade school are sponsored by the Dominican Sisters of Sinsinawa and the college and grade school follow the same religious teachings and exercise of faith as the high school does. Elliott Dep., dkt. #33, 19:10-20:2.

**Response:**     Not disputed.

187.     Edgewood High School has typically played its football games at Breese Stevens field or in Middleton. Elliott Dep., dkt. #33, 27:23-28:5.

**Response:**     Disputed.  Varsity football home games are generally played at Breese Stevens, and Middleton before that.  Zwettler Decl. ¶ 14.  Freshman and JV football home games are typically played on EHS's athletic field, now known as the Goodman Athletic Complex. Zwettler Decl. ¶ 14.

188.     Edgewood High School has played its lacrosse games for the most part on its field at Edgewood. Elliott Dep., dkt. #33, 29:9-11.

**Response:**     Not disputed.

189.     Edgewood has played its baseball games at various fields, including Warner Park. Elliott Dep., dkt. #33, 29:18-24.

**Response:**     Not disputed.

190.     Edgewood plays on at least one City-owned field. Elliott Dep., dkt. #33, 29:18-30:3.

**Response:**     Not disputed.

191.     Elliott is not aware of the City ever precluding Edgewood from using the City's fields when those fields are available. Elliot Dep. 29:25-30:9.

**Response:**     Disputed.  EHS is not considered a priority user for the City's fields and has had a varsity football game get bumped from City fields.  Zwettler Decl. ¶ 6.

192.    Elliott admits that for the most part, Edgewood's football program has been able to play night games at other venues. Elliott Dep., dkt. #33, 31:20-32:2.

**Response:**     Not disputed.

193.    Edgewood's boys [sic] soccer plays their night games either on the road or at Reddan park in Verona. Elliott Dep., dkt. #33, 232:7-9.

**Response:**     Disputed.  The cited deposition transcript does not stand for the proposition asserted.

194.    Elliott is not aware of Edgewood ever securing a field for nighttime use for any activities other than sports. Elliott Dep., dkt. #33, 34:4-35:4.

**Response:**     Not disputed.

195.    West High School is a competitor of Edgewood High School. Elliott Dep., dkt. #33, 52:9-12.

**Response:**     Not disputed.

196.    West High School has an athletic field on site but it does not have lights for its athletic field. Elliott Dep., dkt. #33, 52:9-23; Tucker Dec., ¶20.

**Response:**     Not disputed.

197.    West High School plays its night games off-site at Mansfield Stadium, which is a field located on Memorial High School's site. Elliott Dep., dkt. #33, 52:9-53:1; Tucker Dec., ¶20.

**Response:**     Not disputed.

198.    On August 17, 2018, Memorial High School submitting a lighting application for its athletic field. Hank Dep., dkt. #30, 29:18-30:2; Tucker Dep., dkt. #32, 78:10-17; Zylstra Dec., Ex. MM, Dep. Ex. 2; Tucker Dec., ¶21.

**Response:**    Not disputed.

199.    Memorial High School has never had a master plan. Zylstra Dec., Ex. NN, RTA 11; Tucker Dec., ¶21.

**Response:**    Not disputed.

200.    Memorial High School has had lights on its athletic field going back to the 1970s. Tucker Dec., ¶21.

**Response:**    Not disputed.

201.    Memorial's April 17, 2018 lighting application was to replace the existing 6 light poles with 4 light poles. Tucker Dec., ¶21.

**Response:**    Not disputed.

202.    In 2015, when Edgewood replaced its old track with a new track, the City told Edgewood that because it was simply exchanging the current track with a new track, the City would classify that as a replacement or a maintenance, which would allow Edgewood to complete the project without amending its master plan. Elliott Dep., dkt. #33, 128:21-129:19; Tucker Dec., ¶21.

**Response:**    Disputed.  Elliott contacted the City to determine what, if any, was required before the resurfacing of the track and field could be done.  Elliott Dep. at 128-131. The Master Plan was not discussed in relation to this issue.  Elliott Dep. at 128-131.

203.    The City permitted Edgewood to proceed with the resurfacing of its track and field despite complaints from the neighbors. Elliott Dep., dkt. #33, 128:21-129:19, 131:4-16.

**Response:**     Disputed.  The cited authority does not support the propositions or inferences.  The testimony does not support that the complaints went to the City or that the complaining neighbors sought to disrupt the project.

204.    After the creation of the Campus Institutional District Zoning, only two entities proceeded with master plans: Edgewood Campus and the University of Wisconsin. Evers Dep., dkt. #31, 97:3-10; Hank Dep., dkt. #30, 177:16-21.

**Response:**     Not disputed.

205.    In around March of 2018, the University of Wisconsin sought to add two tennis courts and outdoor lights as part of the Nielsen Tennis Stadium. Tucker Dec., ¶22.

**Response:**     Not disputed.

206.    The addition of the tennis courts and lights was before the University's Master Plan became effective. Tucker Dec., ¶22. The University of Wisconsin's Master Plan was not effective until January 1, 2019. Tucker Dep., dkt. #32, 156:16-25; Tucker Dec., ¶22.

**Response:**     Disputed.  Per Planning staff, the effect of the UW's Master Plan was immediate upon approval on July 18, 2017, as no permits for enumerated buildings projects could issue.  Ingrisano Decl. ¶ 13, Ex. 12, Dep. Ex. 41 at 6; Tucker Dep. at 157-159.  The City's October 4, 2017 letter provides that while "the ten (10) year effective period for this master plan shall not take effect until all of the requires revisions and stipulations have been made / satisfied, it further provides that "[n]o building permits shall be issued until this plan has been revised to address the comments and conditions in this letter."   Ingrisano Decl. ¶ 13, Ex. 12, Dep. Ex. 41 at 6.  Tucker disagreed with the Planning division's letter.  Tucker Dep. at 159.

207.    As it related to the Nielsen Tennis Stadium, the University did not use limiting language in its Master Plan as to use. Tucker Dec., ¶22.

**Response:**      Disputed.  UW's Master Plan the building use of the Nielsen Tennis Stadium Expansion as for "Athletics."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 136.  Other uses in the Master Plan, such as the Natatorium, were identified as for "Rec Sports."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 137.  A color map in the Master Plan shows distinct treatment for "Athletics" uses in red and "Recreation Sports" uses in green.  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 75; Tucker Dep at 197-199.

208.      Tucker was aware that neighbors of Edgewood actively opposed Edgewood's attempts to expand its use of its athletic field with lights and sound systems in the past prior to Edgewood's adoption of its Master Plan. Tucker Dec., ¶22.

**Response:**      Disputed in part.  While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.

209.      The University of Wisconsin's Master Plan contains more than one reference to the Nielsen Tennis Stadium. Tucker Dec., ¶23; Zylstra Dec., Ex. OO, Dep. Ex. 46.

**Response:**      Not disputed.

210.      The University's Master Plan referred to an expansion to the Nielsen Tennis Stadium as one of its proposed projects at page 136. Tucker Dec., ¶23.

**Response:**      Not disputed.

211.      The University's Master Plan noted that "events" were currently being held at Nielsen Tennis Stadium (page 319). Tucker Dec., ¶23.

**Response:**      Not disputed.

212.     In its landscaping section, the University made reference to its "large sporting events" on the same page where it depicted the Nielsen Tennis Stadium (p.324). Tucker Dec., ¶23.

**Response:**     Not disputed.

213.     On page 325 of the University's Master Plan, it states "The Event Center Neighborhood is composed of a series of athletic competition and practice fields, campus greens, and plaza spaces." Tucker Dec., ¶23. That page also depicts Nielsen Tennis Stadium as part of the Event Center Neighborhood. Tucker Dec., ¶23.

**Response:**     Not disputed.

214.     Tucker testified:

Q. Has there ever been any effort by the city to confirm whether UW is using its athletics and sports recreational facilities or open spaces as they are described in its master plan?

A. We respond to complaints. We haven't received any complaints, so we haven't investigated to the best of my knowledge.

Tucker Dep., dkt. #32, 193:7-13.

**Response:**     Disputed.  Prior to Tucker's October 2018 email and related review setting forth his restrictive interpretation of the EHS Master Plan, Tucker had received no complaints about EHS's use of its field for games or athletic competitions.  Tucker Dep. at 188.

215.     Only portions of the University's campus are zoned Campus Institutional and the rest of the University's land is zoned as a PD District Zoning, which has a different set of rules. Tucker Dec., ¶24.

**Response:**  Not disputed.

216.     The University does not pull or obtain any electrical permits from the City because the University is a charter entity of the state, similar to the City itself, and the only local

regulation that the University is required to comply with is the City's zoning code. Tucker Dep., dkt. #32, 201:21-25; Tucker Dec., ¶24.

**Response:** Not disputed.

217.    Mike Elliott testified:

Q Okay. Mr. Elliott, how did the city's denial of a permit to allow athletic field lighting substantially burden the free exercise of your religion?

A Our -- The way we go after students is through showing them our community, and community is a big thing for us. We don't have kids that live in the neighborhood and just come to our school. We have to earn or recruit every student that we get. And how we do that is showing what a community we are, and one of the biggest opportunities for bringing people in for communities, such as the campus schools, the parochial schools, the middle schools in the city, are our plays, but, more importantly, the biggest numbers are always our athletic events. And that is something that we value and use a lot.

We also form partnerships with many of these groups, whether they're nonprofits, whether they're groups that are asking -- needing support for fundraisers, whether they are churches and schools, forming partnerships so that they can get to know Edgewood better and together we can evangelize the Catholic religion and the Dominican values of the Sinsinawa Sisters.

We also have had to do a lot of shuffling around for our schedules. We have asked a lot of our -- of the other schools. When you play sports, you usually have a JV game. The bus comes to one place. There is a JV game, and then the varsity follows. When you play Edgewood, that can't take place because there is not enough time, so unless they -- if the kids get out of school early, and the other schools are not willing to take kids out of school early for sporting events.

We also have to spend a lot of extra time looking for places to play. When we find a place to play, every game is an away game, and that has financial costs. We've had donors who were going to give us money as gifts to pay for things like the lights or other things. When we didn't get the lights, they withdrew their gifts. So we've had financial hurt.

We've had enrollment hurt because it really takes away from our recruiting -- the recruiting styles that work. We've had partnerships that have broken. Girls on the Run at one point ran at our facility. Susan B. Komen wanted to do their walk. We couldn't help them because they walk into the night.

And so it's been a burden in a lot of different ways that we have tried to continue to grow our enrollment, tried to continue to grow the student satisfaction, but not being able to hold classes, not being able to hold special events, fundraisers, other things and gather as a community, it's our one spot. We're really, from an outdoor standpoint, we're

landlocked, and that field is something that we cherish and want to show off as much as possible.

Q Anything -- You gave a very lengthy answer, and I appreciate that.

A Did you get that?

Q Yes, I did. Anything else that you would say in terms of substantially burdening your free exercise of religion?

A Partnership, community are part of our mission, and probably the two biggest that we use to recruit and use to grow our community, and that's been a challenge that we have not -- that we've suffered from because we haven't been able to get the use of that field at any time possible.

Elliott Dep., dkt. #33, 262:2-264:24.

**Response:**      Disputed.  This is an inappropriate proposed finding of fact under this

Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual

proposition but a lengthy copying of an interrogatory response with many potential or implied

factual propositions to which EHS cannot reasonably respond.

218.     Elliott testified that there would be some travel that students would have to do

even if night games were held at Edgewood because even if the students stayed after school, the

parents or the students would need to travel home. Elliott Dep., dkt. #33, 268:9-25.

**Response:**      Disputed as nonsensical.  All attendees at a sporting event travel home

afterwards unless they live at the stadium.

219.     Elliott admits that with respect to Edgewood's sports programs, "for the most

part" Edgewood has been able to host their athletic games at other fields. Elliott Dep., dkt. #33,

265:6-9.

**Response:**      Admits.

220.    Elliott admits that Edgewood has had at least some amount of partnerships with nonprofits regarding daytime use of its field and that those partnerships have occurred even without the lights on its athletic field. Elliott Dep., dkt. #33, 271:6-15.

**Response:**    Disputed.  EHS has been limited in its ability to partner with non-profits. Elliott Dep. at 271.  Without lights, there are more "asks" than EHS can accommodate.  Elliott Dep. at 271.  Partnerships with Girls on the Run and the Susan G. Komen Foundation have been lost.  Elliott Dep. at 263-264.

221.    Deposition Exhibit 50 is an Edgewood High School Accreditation Report dated October 11-14, 2015. Elliott Dep., dkt. #33, 42:21-25; Zylstra Dec., Ex. PP, Dep. Ex. 50.

**Response:**    Not disputed.

222.    For Edgewood to maintain its accreditation, it has to do a self-study every seven years and Edgewood provided information to the Independent Schools Association of the Central States for its accreditation in 2015. Elliott Dep., dkt. #33, 44:9-15.

**Response:**    Not disputed.

223.    The Accreditation Report identified Edgewood's enrollment as 658 students in 2009-2010 and 539 students in 2015. Elliott Dep., dkt. #33, 44:9-45:6; Zylstra Dec., Ex. PP, Dep. Ex. 50 at 73.

**Response:**    Not disputed.

224.    Elliott was not sure but believes that currently, Edgewood has between 520-530 students. Elliott Dep., dkt. #33, 45:7-13.

**Response:**    Not disputed.  Edgewood's current enrollment is 529.  Elliott Decl. ¶ 52.

225.    In 2015, there was a $1.025 million renovation of the Goodman Athletic Complex, which included Edgewood's track and field. Elliott Dep., dkt. #33, 46:2-6.

**Response:**      Not disputed.  Duplicative.  See Response to PFOP 49.

226.    One of the reasons that Elliott wanted the money to update those fields was he was hoping that it would increase enrollment at Edgewood High School. Elliott Dep., dkt. #33, 47:23-48:3.

227.    Elliott testified:

Q Your enrollment for the school year for 2015 was 539 students, and you're telling me roughly in 2017 it was 470 students; correct?

A  Yes.

Q That's a decrease in enrollment; correct?

A Correct.

Q  And that was after the changes to the Goodman Athletic Complex; correct?

A  I would have to look at our enrollment numbers to agree or disagree with that.

Q My question, sir, was the time period you just described, from 2015 to 2017, was after the athletic complex changes to the Goodman field; correct?

A  Correct.

Elliott Dep., dkt. #33, 49:10-24.

**Response:**      Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of an interrogatory response with many potential or implied factual propositions to which EHS cannot reasonably respond.

228.    Elliott has not had a parent tell him that they would not send their child to Edgewood because Edgewood does not have lights on its athletic field. Elliott Dep., dkt. #33, 267:6-10.

**Response:**       Disputed.  At least one student, R.F., left EHS because of the time and

travel complications created by EHS's inability to hold night games and practices on site.

Zwettler Decl. ¶ 18.

229.   Edgewood answered the following interrogatory as follows:

INTERROGATORY NO. 3: Identify all factual and legal bases and any supporting
documents for the allegation that the denial of the conditional use permit or any other
action by any defendant has imposed a substantial burden upon your free exercise of
religion.

RESPONSE: In addition to its General Objections, Edgewood objects to Interrogatory 3
to the extent it constitutes an impermissible contention interrogatory. Edgewood further
objects because Defendants' request that Edgewood identify "all factual and legal bases
and any supporting documents" is premature as discovery has not yet ended. Subject to
and without waiving these or its General Objections, Edgewood responds as follows:

In addition to the legal and factual bases set forth in Edgewood's complaint and
supporting documents, Edgewood's religious mission statement as a Catholic High
School is to educate the whole student for a life of learning, service, and personal
responsibility through a rigorous academic curriculum that embraces the Sinsinawa
Dominican values of Truth, Compassion, Justice, Community, and Partnership"—
educating the student consistent with this mission statement is how Edgewood
"practices" its religion, and Defendants' conduct has burdened that practice in numerous
ways:

• Edgewood cannot engage in "traditional" religious activities, such as holding mass or
holding events containing a mass, on its own facilities at night. Many of Edgewood's
community-based activities, including graduations, assemblies, pep-rallies, and
celebrations, contain masses, none of which can be held on Edgewood's own facilities in
non-daylight hours when many members of the Edgewood community are available to
participate.
• A primary way that Edgewood educates the "whole" student in its mission is through
participation in sports. The reality is that high school sports occur in the fall, winter, and
spring, when days are shorter, such that the inability to host home games or practices at
night functions as an inability to host them at all. This imposes a substantial and
sometimes dispositive burden on students and families who cannot travel, or can only
travel with great difficultly, to practices and "home games" in different locations. It also
subjects Edgewood students to additional safety hazards associated with daily travel to
offsite games and practices. These obstacles make it more difficult for students to
participate in sports and Edgewood to fulfill its mission.
• Hosting onsite home games on Edgewood's property is a primary way in which the
Edgewood religious community interacts with each other to further its religious mission.
It is also a primary way in which Edgewood interacts with neighboring communities and

students and families in parochial schools who are deciding whether to attend Edgewood. Moreover, the unique feeling of hosting an onsite home game in front of the Edgewood community is an irreplicable show of community support to Edgewood's current student-athletes and a draw for perspective student-athletes, as evidenced by the substantially increased community attendance at the onsite football games Edgewood was able to host last year before daylight hours became too short. Accordingly, Edgewood's inability to host onsite home games on its facility hinders its ability attracts students and families into the Edgewood community and spread and further its mission. In a contemporary culture that places a premium on athletics, modern on-campus athletic facilities enhance Edgewood's ability to compete for and attract students to attend a Catholic high school in furtherance of its religious mission. Denial of such facilities hurts Edgewood's ability to attract students and thus limits and hinders its religious mission.

- Because Edgewood cannot host onsite home games and practices, it must rent fields from MMSD or other institutions. This empowers the City to restrict or refuse Edgewood from hosting games or having practices within the City or on any City-owned property, as it has done previously. Further, the monies that Edgewood unnecessarily spends on renting fields could be applied to other causes that further Edgewood's religious purposes. Goes off field for practice for fields. Edgewood specifically reserves the right to supplement this response until the close of discovery.

Zylstra Dec., Ex. QQ, Dep. Ex. 94; Elliot Dep. 275:19-276:8.

**Response:**    Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a lengthy interrogatory response with many potential or implied factual propositions to which EHS cannot reasonably respond.

230.    Edgewood responded to a request to admit as follows:

REQUEST FOR ADMISSION NO. 10: Admit that the conditional use approval process referenced in MGO 28.097 and MGO 28.183 is facially neutral.

RESPONSE: In addition to its General Objections, Edgewood objects on the grounds that RFA 10 seeks an admission of a legal conclusion and not merely the application of law to fact. Subject to and without waiver of its General Objections, admits in part and denies in part. Admits that the conditional use approval process referenced in M.G.O. §§ 28.097 and 28.183 are written facially neutral, but denies that they are facially neutral in purpose or application. Deny any and all allegations not expressly admitted.

Zylstra Dec., Ex. NN, RTA 10.

**Response:**   Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of discovery response with multiple potential or implied factual propositions.

231.   Edgewood has not filed a notice of claim or an itemized statement of damages pursuant to Wis. Stat. §893.80. Verbick Dec., ¶¶2-3.

**Response:**   Not disputed.

Dated: June 10,  2022

ATTORNEYS FOR PLAINTIFF

By: *s/Jonathan R. Ingrisano*
    Jonathan Ingrisano
    State Bar No. 1033977
    Mike Wittenwyler
    State Bar No. 1025895
    GODFREY KAHN S.C.
    One East Main Street, Suite 500
    P.O. Box 2719
    Madison, WI 53701-2719
    Phone: 608-257-3911
    Fax: 608-257-0609
    jingrisano@gklaw.com
    mwittenwyler@gklaw.com

    *Noel W. Sterett
    DATLON & TOMICH, PLC
    IL Bar No. 6292008
    401 W. State Street
    Rockford, IL 61101
    Phone: (815) 986-8050
    nsterett@daltontomisch.com

    *Admitted Pro Hac Vice

27240211.2