UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL OF THE
SACRED HEART, INC.,

                                      Case No. 3:21-cv-00118-wmc

            Plaintiff,

    v.

CITY OF MADISON, et. al.,

            Defendant.

---

## PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT

---

Plaintiff Edgewood High School of the Sacred Heart ("EHS"), by and through his

counsel, Godfrey & Kahn, S.C., submits the following additional proposed findings of fact:

1.      EHS is a Catholic high school that has served the City of Madison since 1881.

June 7 Declaration of Sister Kathleen Phelan, O.P. ("Phelan Decl.") ¶ 4.  The Dominican Sisters

of Sinsinawa founded the school in 1881, and EHS moved to its current location on Monroe

Street in 1927.  June 10, 2022 Declaration of Michael Elliott ("Elliot Decl.") ¶ 3.

2.      As sponsors, the Dominican Sisters own the school, provide an annual gift, and

employ corporate sponsorship counsel that assists in managing the school  May 10, 2022.

Deposition of Mike Elliott ("Elliott Dep.") at 36.  Their sponsorship comes with the expectation

that EHS follows and teaches Catholic teachings and follows the Sinsinawa Dominican Sisters'

mission.  Elliot Decl. ¶ 5.

3.      The religious mission of the school is to educate the whole student – mind, body

and soul – for a life of learning, service, personal responsibility through a rigorous academic

curriculum that embraces the Sinsinawa Dominican values of Truth, Compassion, Justice,

Community and Partnership.  Phelan Decl. ¶ 7; Elliott Decl. ¶ 5.

4.      EHS shares a 55-acre campus with Edgewood College and Edgewood Campus School (K-8).  Elliott Decl. ¶ 4.  The high school, which is separately incorporated, owns approximately twenty-five of these acres. Elliott Decl. ¶ 4.

5.      EHS's commitment to educating the whole student can be seen in the fact that every student is expected to participate in co-curricular activities and roughly 75% satisfy this expectation by participating in one or more of EHS's athletic teams. Elliott Decl. ¶ 6.

6.      Athletics is an integral part of EHS's religious mission to educate the whole student and further the Sinsinawa Dominican values of community and partnership. Phelan Decl. ¶ 7.

7.      In total, EHS has twenty-one (21) athletic teams and co-ops.  June 10, 2022 Declaration of Christopher Zwettler ("Zwettler Decl.") ¶ 3.   Despite this large number of teams, EHS only has a single athletic field on its campus on which to try to schedule and host their games, practices, and events. Zwettler Decl. ¶ 4.

8.      In furtherance of the Dominican value of partnership, EHS develops and relies upon partnerships with other institutions in the community. Elliott Decl. ¶¶ 7-8.   For example, EHS's partnerships with the parochial schools in Madison provide EHS the opportunity to share its mission, vision, and values with the parochial schools' students and their families.  Phelan Decl. ¶ 12.

9.      As a Catholic institution, EHS furthers its mission by bringing students to EHS to preach and teach the Gospel and to instill in students the Sinsinawa Dominican values of Truth, Compassion, Justice, Community and Partnership.  Elliott Decl. ¶ 5.

10.     EHS's mission, continued existence and enrollment largely depends on its ability to persuade these students and families to attend EHS.  Elliott Decl. ¶ 7;  Phelan Decl. ¶¶ 9-11.

An important way EHS has partnered with the parochial schools over the years is by hosting parochial school athletic events on EHS's athletic field.  Elliott Decl. ¶ 8.  These events allow EHS the opportunity to connect with parochial students and their families and to promote EHS's religious mission and values.  Elliott Decl. ¶ 8.  Such events serve much like an open house and are critical to EHS's ability to recruit parochial students and student-athletes.  Elliott Decl. ¶ 8; Phelan Decl. ¶ 12.

11.     In furtherance of the Dominican value of community, EHS is called to foster a sense of community among its students, teachers, coaches, families, alumni, and the broader Madison community. Elliott Decl. ¶ 9.  EHS promotes and encourages its student-athletes to engage in team-based service to the community.  Phelan Decl. ¶ 8.

12.      EHS has only had a single, outdoor athletic field on its campus.  Elliott Decl. ¶ 10.

13.     Throughout its history, EHS has used its only on-campus athletic field as a unique venue that serves all of Madison, from children to seniors, through games, camps, and other community activities.  Elliott Decl. ¶ 10.

14.     One of the significant ways EHS believes it can promote and foster community is by hosting games and outdoor events on its only athletic field for everyone to attend.  Phelan Decl. ¶¶ 3, 6, 9, 14.

15.     Having only one field and no lights substantially interferes with Edgewood's ability to use its field to further its mission.  Elliott Decl. ¶ 20.

16.     For example, because students, teachers, and coaches are at school during the day, and because many parents and alumni work during the day, EHS's ability to reach these people

necessitates hosting athletic and community events in the evening after daylight hours.  Elliott Decl. ¶ 20.

17.      In athletic conferences of which EHS has been a part, varsity football and varsity soccer have start times of 7:00 PM.    Zwettler Decl. ¶ 5.  To satisfy these demands requirement, EHS has to play its "home" games at other athletic fields in Madison.  Zwettler Decl. ¶ 6.

18.      EHS has not been able to host all of the games it would like to at Breese Stevens field.  Zwettler Decl. ¶ 6.  EHS is given low priority for scheduling at these fields.  Zwettler Decl. ¶ 6.  All four of the other Madison Metropolitan School District high schools had priority over EHS for both MMSD and City fields.  Zwettler Decl. ¶ 6.  EHS has been bumped numerous times from MMSD facilities.  Zwettler Decl. ¶ 6.  For example, a "home" varsity football game scheduled to be hosted on a City field, Breese Stevens, was bumped because the field booked another group, burdening school staff with administrative hassles and concerning parents that their sons' "Senior Night" would be cancelled.  Zwettler Decl. ¶ 6.

19.      It is difficult for EHS to schedule games during daylight hours because, in many cases, other teams have refused to play at that time.  Zwettler Decl. ¶ 7.  It is impossible for some parents to take off work, it is disruptive to pull students out of school early, and it is problematic in resolving transportation issues for bus companies.  Zwettler Decl. ¶ 7.

20.      Other schools have canceled or declined to play EHS for these reasons. Zwettler Decl. ¶ 7.

21.      Prior to 2015, on multiple occasions EHS has been unable to secure a site for a soccer home game.  Zwettler Decl. ¶ 8.

22.      EHS has to pay thousands of dollars per year to rent fields from the Madison Metropolitan School District and other organizations—funds which could otherwise be used to

support EHS's mission and students.  Zwettler Decl. ¶ 12  It costs approximately $900 per game to rent a field for football and approximately $250 per game for soccer, in seasonal fees. Zwettler Decl. ¶ 12  Those fees would be substantially reduced with an on-campus, EHS-owned field that had the ability and flexibility to host games and practices after dark.  Zwettler Decl. ¶ 12.  Beyond annual games fees, in order to secure sites for games, EHS has had to make large, upfront capital contributions to field owners in both soccer and football, and since 2008, EHS has paid a total of $300,000 to these field owners in order to secure priority usage.  Zwettler Dec. ¶ 12.  Continued dependence on off-site fields means that EHS risks incurring similar expenses in the future, as well as further seasonal fees.  Zwettler Decl. ¶ 12.

23.     And over the years, EHS has had to forego and cancel games, and community developing opportunities because of its inability to use its own field at night.  Zwettler Decl. ¶ 8; Elliott Dep. at 263-264.  For example, EHS has lost opportunities with community non-profit partners like the Susan G. Komen Foundation because it cannot accommodate their events needs for lights.  Elliott Decl. ¶ 22.  This is a lost opportunity to showcase EHS to the community, to share EHS's values, and to attract students and drive enrollment.  Elliott Decl. ¶ 22.

24.     There are times when EHS cannot find suitable, off-campus locations to rent. Zwettler Decl. ¶ 8.  EHS's students, parents, and coaches struggle with the uncertainty that comes from not knowing where and when they will be able to play their games or whether they will be bumped by other institutions that have priority use of the various fields EHS's team are forced to use.  Zwettler Decl. ¶ 18.  Athletic Director Chris Zwettler has heard many complaints from EHS parents about the extra burdens not having a nighttime home field causes, and at least one past student, R.F., left Edgewood because of the time and travel complications created by EHS's inability to hold night games or practices on site.  Zwettler Decl. ¶ 18.

25.     Beyond athletics, EHS has used the field for numerous activities related to its primary mission as a Catholic High School and in furtherance of the Sinsinawa Dominican values.  Beyond games and practices, EHS—in furtherance of the Sinsinawa Dominican value of Community—has allowed the community to use the field for social, recreational and community building purposes.  Phelan Decl. ¶ 15.  Neighbors, local families, alumni, and other community members have frequently used the field as a place to gather, recreate, compete, and exercise over the years, and EHS's field has always been open to the community.  Elliott Decl. ¶ 10.

26.     In the 2008-2009 school year, EHS's enrollment was 687 students.  Zylstra Decl., Ex. PP, Dep. Ex. 50 at 73.  EHS then experienced a significant, five-year negative trend in enrollment. By the 2014-2015 school year, EHS's enrollment had dropped by more than hundred students to 582 students.  Zylstra Decl., Ex. PP, Dep. Ex. 50 at 73.

27.     To reverse the negative trend and survive as an institution, EHS had to identify ways to better meet the needs of its students and their families, develop deeper partnerships with local parochial schools, address issues of diversity, and accomplish its religious mission to educate the whole student and foster the Sinsinawa Dominican values of Partnership and Community.  Elliott Decl. ¶ 14.

28.     As part of EHS's regular accreditation review, the Independent Schools Association of the Central States ("ISACS") conducted an accreditation visit of Edgewood in October 2015.  Zylstra Dec., Ex. PP, Dep. Ex. 50.  The Accreditation Report identified Edgewood's enrollment as 658 students in 2009-2010 and 539 students in 2015. Elliott Dep. at 44-45; Zylstra Dec., Ex. PP, Dep. Ex. 50 at 73.

29.     ISACS made several recommendations to EHS designed to help reverse the negative enrollment trend.  Elliott Decl. ¶ 13.  First, for example, they recommended that EHS

continue think "creatively about ways to house more sports on campus and to continue to investigate ways to provide the best facilities within reasonable distances."  Zylstra Dec., Ex. PP, Dep. Ex. 50 at 61-62.

30.     Consistent with EHS's historical reliance on parochial feeder schools, ISACS recommended reviewing the school's relationship with its current feeder schools, to look for ways to enhance those relationships, and to create alliances with schools new to Edgewood. Zylstra Dec., Ex. PP, Dep. Ex. 50 at 14.

31.     ISACS also recommended that EHS explore new ways and places to engage alumni.  Zylstra Dec., Ex. PP, Dep. Ex. 50 at 20.

32.     In light of strong local public schools, ISACS also recommended that EHS develop and implement marketing strategies to distinguish the value of an Edgewood education. Zylstra Dec., Ex. PP, Dep. Ex. 50 at 20.

33.     EHS agreed with the recommendations.  Elliott Decl. ¶ 13.  The ISACS recommendations highlighted and affirmed EHS's desire to continue to seek to improve its athletic field as a means to engage prospective students, alumni and the community.  Elliot Decl. ¶ 13.

34.     In a modern culture that places a priority on sports, athletic offerings and opportunities are important components of EHS's ability to attract new students and engage the community.  Phelan Decl. ¶ 11.  The offerings and facilities Edgewood has to offer prospective students, including athletic facilities, have to be comparable to local non-religious, public schools.  Phelan Decl. ¶ 11.  A quality athletic field for sports and recreation that is open to the public is an important outreach tool to get people onto the EHS campus.  Elliott Decl. ¶ 11.

35.     For many, it is far harder to ask students and their families to come to Edgewood if it means both paying tuition and sacrificing some aspect of their child's high school experiences and opportunities with extra-curriculars.  Phelan Decl. ¶ 11.

36.     In 2015, the Goodman Foundation gave EHS a generous gift of $1.025 million to use towards renovating the field.  Elliott Decl. ¶ 15.

37.     The express purpose of the gift was to ensure that EHS's athletic field would continue its legacy as "a community-wide venue that serves all of Madison, from children to seniors, through **games**, camps, and other community activities." Zylstra Dec., Ex. F, Dep. Ex. 57 at 4 (emphasis added).

38.     The gift fit perfectly with EHS's religious values of community and partnership. Elliott Decl. ¶ 15.  With the gift, and with the generosity of other donors, EHS was finally able to renovate its track and field, which was in significant need of repair.  Elliott Decl. ¶ 15.

39.     In 2015, EHS installed a full-length, artificial turf field designed to host regulation football, soccer, lacrosse, and softball games, and it upgraded the track from cinder to modern shredded rubber.  Elliott Decl. ¶  16.  EHS checked with the City and confirmed it could go forward with the renovation.  Elliott Dep. at 128-131.  Around this same time, EHS installed and maintained a scoreboard for the field.  Elliott Decl. ¶ 16.

40.     As reported in the Wisconsin State Journal,  the central artificial turf area's full length "will hold **competition** fields" while the width "can be divided into three 50-yard practice fields.  Zylstra Dec., Ex. F, Dep. Ex. 57 at 5 (emphasis added).

41.     EHS President, Mike Elliott, stated that "our students will benefit greatly, with the best possible conditions to train and **compete** on." Zylstra Dec., Ex. F, Dep. Ex. 57 at 5 (emphasis added).

42.     While the track had been used for the parochial grade school track practices and invitational track meet, in the years prior it had stopped being used as such because of the track's deterioration.  Zwettler Decl. ¶ 16; Zylstra Dec., Ex. F, Dep. Ex. 57 at 6.  With the upgraded surface, EHS was able to welcome back the parochial school track programs and to partner with groups such as the Madison Westside Track Club.  Zwettler  Decl. ¶ 16; Zylstra Dec., Ex. F, Dep. Ex. 57 at 6.

43.     Moreover, the new track provided a safe surface for neighborhood residents for walking and jogging.   Zylstra Dec., Ex. F, Dep. Ex. 57 at 6.  The track and field have always been open to the neighborhood residents.  Elliott Decl. ¶ 10.

44.     EHS designed the track and field improvements to be able to hold competitions because that was consistent with how the field had historically been used.  Elliott Decl. ¶ 16.

45.     Dating back to Sister Kathleen Phelan's tenure as a teacher at Edgewood in 1968, EHS's field was used for freshman and JV football games.  Phalen Decl. ¶¶ 4, 15.

46.     EHS's President from 2005 to 2013, Judd Schemmel recalls playing freshman football games on that field when he was a student in the 1970s.  June 9, 2022 Declaration of Judd Schemmel ("Schemmel Decl.") ¶ 3.  Throughout Mr. Schemmel's tenure as President, EHS hosted freshman and JV football games on the field.  Schemmel Decl.  ¶ 4.

47.     Since the track and field renovation in 2015, freshman and JV football have continued to play games on the field.  Boys' and girls' lacrosse, boys' and girls' soccer, boys' and girls' track, and middle school track all use the field for games or meets.  Zwettler Decl. ¶ 15.

48.     Despite the substantial improvement created by the renovated turf and track, EHS still anticipated enhancing the field, now known as the Goodman Athletic Complex.  Elliott

Decl. ¶ 17.  On July 7, 2015,  EHS applied for and received a permit to install conduit under the field so that EHS could run wiring to power future field lighting and a sound system. Elliott Decl. ¶ 17.  EHS anticipated seeking lights as soon as the technology became available to meet the City's requirements.  Elliott Decl. ¶ 17.

49.    Lights are important, because EHS's inability to host games and activities at night on its own athletic field substantially burdens EHS's students, parents, partnerships with other schools, clubs, and organizations, and the community in multiple ways.  Elliott Decl. ¶ 18; Zwettler Decl. ¶ 17.

50.    By the time Mr. Elliott had become President, the field had fallen into disrepair, its value as an asset and community- and partnership-building tool was diminished, and, in his view, was a detriment to EHS's ability to attract students and to be competitive with other Madison-area high schools.  Elliott Decl. ¶ 12.  Because prospective students and their parents look at the quality of facilities, particularly athletic facilities, in making high school selection decisions,  making the athletic field an asset in EHS's mission was one of Mr. Elliott's priorities as President of the high school.  (Elliott Decl. ¶ 12.)

51.    EHS must pay thousands of dollars each year to rent fields from the Madison Metropolitan School District and other organizations—funds which could otherwise be used to support EHS's mission and students.  Zwettler Decl. ¶ 12.

52.    EHS students, coaches, and fans are forced to drive to locations all over Madison to play "home" games which could otherwise be held on EHS's campus where athletes, students, faculty and coaches can simply remain after school to attend and where EHS can freely and fully promote its religious mission and values.  Zwettler ¶ 19.

53.    EHS's students, parents, and coaches struggle with the uncertainty that comes from not knowing where and when they will be able to play their games or whether they will be bumped by other institutions that have priority use of the various fields EHS's team are forced to use.  Zwettler Decl. ¶ 18;

54.    Substantially more administrative time is spent by EHS staff in negotiating off-site field arrangements, scheduling off-site "home" games, finding alternative locations when conflicts arise, and coordinating travel.  Zwettler Decl. ¶ 10.  Edgewood's Athletic Director, Christopher Zwettler, estimates that 40% of his work time had been spent scheduling and managing the issues arising from off-site "home games."  Zwettler Decl. ¶ 10.  Since the field renovation, that estimate is 20% -- as the field is more available less administrative time is required.  Zwettler Decl. ¶ 10.

55.    In 2017 and 2018, EHS wanted to continue its improvements to the field.  Elliott Decl. ¶ 23.  The lighting technology had advanced such that EHS would be able to install outdoor field lighting while complying with the City's ordinance governing outdoor lights and eliminating light intrusion.  Elliott Decl. ¶ 23.  EHS wanted to expand seating, add concessions, restrooms and storage, add amplified sound and lights.  Elliott Decl. ¶ 24; Compl. ¶ 90; Ans. ¶ 90.

56.    The City suggested that EHS seek to amend its Master Plan to pursue these changes.  Compl. ¶ 91; Ans. ¶91.  Edgewood planned to do so, given that the desired size of the expanded seating, concessions, restrooms and additional amenities made this a significant building project.  Elliott Decl. ¶ 24.

57.     EHS had been in discussions and listening sessions with the City and neighbors about expanding the athletic complex, when in October 2018, City Administrator Matt Tucker sent an email to Mr. Elliott advising that EHS was operating outside of the terms of its Master Plan by using the field for uses other than "team practices, physical education classes."  Elliott Decl. ¶ 25; Zylstra Dec., Ex. J, Dep. Ex. 64.

58.     After a neighborhood meeting on October 17, 2018, Mr. Tucker "closely reviewed" EHS's adopted Master Plan to determine how language in the master plan relates to athletic field usage.  Zylstra Dec., Ex. J, Dep. Ex. 64.

59.     In his email, Mr. Tucker cited only the Master Plan's Section 3.8, Open Spaces, for the notion that the EHS Master Plan identified the athletics field to be used for "team practices, physical education classes."    Zylstra Dec., Ex. J, Dep. Ex. 64.

60.     The absence of any further language in the section, or of any other language in the Master Plan, led him to the interpretation that EHS's current programming and usage of the field is outside of the allowances of the Master Plan.  Zylstra Dec., Ex. J, Dep. Ex. 64.

61.     The City adopted its current Zoning Code on October 26, 2013, with an effective date of January 2, 2013. Compl. ¶ 60; Ans. ¶ 60.  As part of this new code, the City created a new zoning designation called the "Campus-Institutional District," which is designed for "the City's major educational and medical institutions." Compl. ¶ 61; Ans. ¶ 61. Campus-Institutional Districts were created to "accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards."  M.G.O. § 28.097(1).  Compl. ¶ 62; Ans. ¶ 62.

62.     EHS had no little or involvement in lobbying for the newly created Campus Institutional District zoning.  Schemmel Decl. ¶ 5.  EHS had no direct contact with the City with respect to this ordinance.  Schemmel Decl. ¶ 5.  Instead, the process was led by Edgewood College, University of Wisconsin and Madison College.  Schemmel Decl. ¶ 6.

63.     As of January 2, 2013, the City zoned EHS as a Campus-Institutional District under Section 28.097.  Compl. ¶ 64; Ans. ¶64.  In addition to EHS, the City also rezoned the following institutions into a Campus-Institutional District:  James Madison Memorial High School (Memorial), Madison East High School, Madison West High School, and Madison La Follette High School, portions of the University of Wisconsin's campus, and the Madison College Truax campus. Compl. ¶ 65; Ans. ¶ 65.

64.     At the time EHS's campus was rezoned Campus-Institutional, the uses allowed within the Campus Institutional District were listed separately as either primary or secondary uses under Section 28.097.  The list of permitted "primary uses" included "educational uses associated with colleges, universities, and secondary and primary schools, including classroom buildings, libraries, and offices." M.G.O. § 28.097(3)(a) (capitalization altered).  The list of permitted "secondary uses" included "indoor and outdoor sports and recreational facilities"; "stadiums, auditoriums, and arenas, open or enclosed," and "other uses related to the institution's primary mission." M.G.O. § 28.097(3)(b) (capitalization altered).  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(3)(a) & (b).

65.     Section 28.097 regulates primary and secondary uses at a very general level (i.e. allowing "indoor or outdoor sports and recreation facilities, stadiums, auditoriums, or arenas") rather than at a highly specific, granular level (e.g., allowing outdoor sports and recreation

facilities but only if they are used for ultimate frisbee, collegiate softball and yoga classes).
Section 28.097 does not distinguish between day or night-time uses or restrict the primary or
secondary uses to only daylight hours. M.G.O. § 28.097; April 29, 2022 Deposition of Matt
Tucker ("Tucker Dep.") at 140.

66.     Under the Campus Institutional District zoning, with respect to EHS's athletic
field, any practices, games, or games at night were permitted secondary uses under M.G.O. §
28.097(3)(b)(5).  Tucker Dep. at 97-98.

67.     Under Section 28.097, campus master plans were voluntary for existing
educational and medical institutions, but mandatory for any new education and medical
institutions created after the passing of the ordinance. Zylstra Dec., Ex. B, Dep. Ex. 13,
§28.097(2)(a).  One of the purposes of the Master Plan was to facilitate and "accommodate the
future growth of these institutions."  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2).

68.     The Planning Division Staff Report dated March 24, 2014 relating to the EHS
Master Plan approval contains a true and correct copy of the terms of the Campus Institutional
District zoning ordinance as it existed in 2014 prior to its amendment material amendment in
2019.  Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39; Tucker Dep. at 105-106.

69.     The asserted incentive for the existing institutions had to voluntarily adopt a
Campus Master Plan was that in theory an approved master plan would streamline approval of
future buildings. Elliott Decl. ¶ 34. For any "buildings properly identified on a Campus Master
Plan," the institution needed only obtain approval from "an architectural review committee prior
to construction," rather than obtain "conditional use approval" from the City. M.G.O. §
28.097(2)(c), (7)(a).  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097.

70.     In other words, if the City approved a master plan, the specific projects shown on the campus Master Plan would not be reviewed by the Plan Commission again.   Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39 at 7 ("Unlike other master plan or conceptual plan approvals that come before the Plan Commission such as Planned Development general development plans or preliminary plats, which are statutorily required to be followed by specific implementation plans or final plats, respectively, the specific projects shown on the Campus Master Plan will not be reviewed by the Plan Commission if those projects adhere to the approved master plan.")

71.     The ordinance, M.G.O. § 28.097(7), is titled "Final Building Design Review" and provides that "[a]ll buildings properly identified on a Campus Master Plan must be reviewed and approved by an architectural review committee."  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7). The statute contains no language pertaining to architectural review of anything other than buildings.  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7).

72.     According to M.G.O. § 28.097(5)(c)(1)–(2), a master plan generally includes a "description of existing conditions" and "the proposed conditions" on the campus, including "future needs/capital improvements," "phasing of proposed improvements," and "future land uses and buildings."  (capitalization altered). If an institution submitted a master plan, and that plan was approved by the City, then that plan governed the development of new buildings within the Campus-Institutional District zoned institution for the life of the plan, which is ten years. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(b)–(d), (4), (7).

73.     Prior to EHS, no master plan had ever been considered for approval by the City of Madison's Plan Commission.  Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39 at 6.  EHS's Master Plan was the first in the City.  Tucker Dep. at 71

74.     To date, only EHS and the University of Wisconsin-Madison have ever adopted a master plan under § 28.097.  Hank Dep. at 177.

75.     On January 20, 2014, Edgewood College, EHS, and Edgewood Campus School submitted a joint campus Master Plan.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 12 of 228.

76.     EHS had very little involvement with the drafting of the Master Plan.  Elliott Decl. ¶ 26.; Schemmel Decl. ¶ 7.  Edgewood College really wrote the document, with Mr. Elliott reviewing what pertained specifically to the high school.  Elliott Dep. at 94-95.  New to his job in 2013 and not then planning on undertaking a building project, Mr. Elliott did not dive into the Master Plan beyond the basics and ed as EHS President to help assist Edgewood College, who was the principal contributor behind the Master Plan.  Elliott Dep. at 103-105; Elliott Decl. ¶ 26.

77.     At the time of signing the Master Plan for EHS, Mr. Elliott understood that the Master Plan was supposed to help facilitate or streamline specified building projects.  Elliott Dep. at 103-105.  At no time did anyone from Edgewood College, EHS or the City inform him that the Master Plan could operate or would be interpreted to restrict or limit projects or uses that were not identified or not identified with a certain specificity.  Elliott Decl. ¶ 28.

78.     With respect to Section 3.8 of the EHS Master Plan, Mr. Elliott did not intend to limit the use of EHS's athletic field to team practices or physical education classes.  Elliott Decl. ¶ 29.  At the time of signing, Mr. Elliott understood that EHS had the full use of its field as a sports and recreation facility or stadium under the Campus Institutional District zoning.  Elliott Decl. ¶ 29; He did not intend to give that up in signing the Master Plan and did not anticipate the City's interpretation in 2018.  Elliott Decl. ¶ 29.

79.     Moreover, at the time of his signing the Master Plan, Mr. Elliott knew and recognized that EHS had been using its field for sports and athletic events for over 100 years. Elliott Decl. ¶ 30.  EHS had played freshman and JV football on the field just months before. Elliott Decl. ¶ 30.  He did not intend to give up and discontinue Edgewood's longstanding historical use of the field in signing the Master Plan.  Elliott Decl. ¶ 30.  Nor did he believe or understand that one line in a two-hundred-page document would have such a severe and unreasonable consequence.  Elliott Decl. ¶ 31.

80.     Instead, he believed the athletic field was fairly described by calling it an "athletic field."  Elliott Decl. ¶ 32.  Mr. Elliott understood that "team practices" and "physical education classes" were listed as examples, not limitations.  Elliott Dep. at 96-97; Elliott Decl. ¶ 32.

81.     Mr. Elliott certainly did not believe that EHS need to limit the characterized use of the field in order to win neighbor approval.  Elliott Decl. ¶ 33.

82.     Edgewood had been playing games on that field for decades.  Elliott Decl. ¶ 30; Schemmel Decl. ¶¶ 3-4; Zwettler Decl. ¶ 14.

83.     The Master Plan was "not intended to be a detailed blueprint for construction" on EHS's campus.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 17, 36 of 228.

84.     On April 22, 2014, the City approved EHS's Master Plan, subject to conditions not relevant here. Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39.

85.     [Intentionally omitted]

86.     After receiving Mr. Tucker's October 2018 email restricting EHS's use of its field, Mr. Elliott was frustrated by his interpretation.  Elliott Dep. at 157-158.

87.     On November 14, 2018, Edgewood filed an application to amend its Master Plan to incorporate lighting, expand seating, add restrooms, team rooms, and storage and define its field use. Zylstra Dec., Ex. K, Dep. Ex. 62; Elliott Dep. at 149-150.  On the same date, EHS's counsel sent a letter to Mr. Tucker in response to his October 2018 email.  Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep. at 161-162.  That letter, in part, continschued to assert that the Master Plan did not limit EHS's use of the field to practices and physical education classes.  Zylstra Dec., Ex. L, Dep. Ex. 65.

88.     In January 2019, EHS retained Attorney Nathan Wautier to assist the school with the growing land use issues surrounding the field and Mr. Tucker's new interpretation of the Master Plan.  June 10, 2022 Declaration of Nathan Wautier ("Wautier Decl.") ¶ 3.

89.     On or about January 18, 2019, Mr. Wautier met with Mr. Tucker and Assistant City Attorney John Strange to discuss athletic field.  Wautier Decl. ¶ 4.

90.     In discussing the pending Master Plan amendment, Attorney Wautier, Mr. Tucker and Attorney Strange agreed that the building structure sought would be difficult to pass in the Common Council, particularly if a protest petition was filed by neighbors that would then require three quarters of the Common Council to approve.  Wautier Decl. ¶ 5.

91.     Messrs. Wautier, Tucker and Strange then discussed the potential of EHS tabling the Master Plan amendment and instead pursuing lights, upgraded amplified sound, and bleachers each separately under each's administrative process.  Wautier Decl. ¶ 6.

18

92. Under a piecemeal approach, with respect to outdoor lighting for the athletic field under M.G.O. Section 10.085, Mr. Tucker expressed to Mr. Wautier that the City would have to approve the lights if they complied with the technical photometric specifications.  Wautier Decl. ¶ 7.

93. They likewise said that the City would not require a permit for upgraded amplified sound.  Wautier Decl. ¶ 6.  Mr. Strange and Tucker expressed understanding that EHS would likely go the route of a piecemeal approach and table its Master Plan amendment. Wautier Decl. ¶ 8.

94. Based on Mr. Wautier's meeting with Mr. Strange and Tucker, a couple of days thereafter he contacted the City's Planning Division Director to advise the City that EHS was tabling its Master Plan amendment.  Wautier Decl. ¶ 10.  EHS began work to prepare its outdoor lighting permit.  Wautier Decl. ¶ 11.

95. On Friday, February 22, 2019, Edgewood submitted an application with the City for outdoor lighting of its athletic field. Zylstra Dec., Ex. N, Dep. Ex. 37.

96. On February 27, 2019, Tucker sent a letter to Mr. Elliott on the subject of EHS's outdoor light permit.  Tucker Dep. at 119-120; Zylstra Dec., Ex. O, Dep. Ex. 6.  The letter acknowledged the City's receipt of EHS's February 22, 2019 light application.  Zylstra Dec., Ex. O, Dep. Ex. 6.

97. In his February 27, 2019 letter, Mr. Tucker advised that the lighting application plans will be reviewed for compliance with MGO Section 10.085, and that if they comply electrical permits will be issued when requested.  Zylstra Dec., Ex. O, Dep. Ex. 6.

98.     Mr. Tucker's letter goes on to say that "[t]he City believes this permit can be issued without requiring amendment of the approved 2014 Master Plan."  Zylstra Dec., Ex. O, Dep. Ex. 6.

99.     Mr. Tucker, in his letter, represented that a permit would issue upon compliance with M.G.O. Section 10.085.  Zylstra Dec., Ex. O, Dep. Ex. 6.

100.    Mr. Tucker issued that letter in his official capacity as the City of Madison Zoning Administrator.  Tucker Dep. at 129.  The letter confirms that the City believes the lighting permit can be issued without requiring amendment of the approved 2014 Master Plan. April 27, 2022 Deposition of George Hank ("Hank Dep.") at 196.

101.    Mr. Tucker prepared his February 27, 2019 letter in consultation with Mr. Strange.  Tucker Dep. at 127.

102.    After the light application was received, Mr. Tucker and Mr. Strange met multiple times to review and analyze the light application. Tucker Dep. at 130-131.  During that time, and in his preparation of his February 27 letter, Mr. Tucker reviewed the EHS Master Plan.  Tucker Dep at 124.

103.    On or about February 26, Mr. Wautier had a telephone call with Mr. Strange. Wautier Decl. ¶ 12.  During the call, Mr. Strange again acknowledged that EHS's light permit was being reviewed for compliance with technical lighting requirements and advised Mr. Wautier that he had told Mr. Tucker and Heather Stouder, the Planning Division Director, that the light application and the zoning use under the Master Plan were two separate issues.  Wautier Decl. ¶ 12.

20

104.     On the same day that Mr. Tucker's letter was sent, February 27, 2019, a City building inspector, Steve Rewey reviewed EHS's outdoor lighting application for compliance with the City's Outdoor Lighting Ordinance, M.G.O § 10.085., which governs the technical requirements for outdoor lighting throughout Madison.  Hank Dep. at 19-21; Zylstra Dec., Ex. Q, Dep. Ex. 1.   Rewey would not be looking at anything other than the technical, objective standards of M.G.O. Section 10.085.  Hank Dep. at 25.

105.     Steve Rewey reviewed EHS lighting application on behalf of the Building Inspection Department.  Hank Dep. at 33-34; Zylstra Dec., Ex. P, Dep. Ex. 3.

106.     Rewey approved the lighting application.  Hank Dep. at 33-34; Hank Dep. at 33-34; Zylstra Dec., Ex. P, Dep. Ex. 3.

107.     Under § 10.085, the reviewing building inspector has no discretion; the technical standards for the lighting review are either met or not met.  Hank Dep. at 49-51.

108.     City employee Christina Thiele performed the zoning review on March 1, 2019. Hank Dep. at 72; Tucker Dep. at 34.

109.     On March 1, Thiele approved the zoning review.  Hank Dep. at 33-34, 72; Zylstra Dec., Ex. P, Dep. Ex. 3 at 1.  Her zoning review was not deficient.  Tucker Dep. at 37.

110.     Thiele stamped and signed "Final Approval Date" as of March 1, 2019 for the EHS light application.   Zylstra Dec., Ex. P, Dep. Ex. 3 at 3; Ingrisano Decl. ¶ 3, Ex. 2, Dep. Ex. 38 at 3; Tucker Dep. at 65-66.

111.    On same day that Thiele approved the zoning review, Mr. Wautier received a communication between Mr. Tucker and a disgruntled Edgewood neighbor.  Wautier Decl. ¶ 13, Ex. 1.  In that communication, which asked about outdoor lighting for EHS's athletic field, Mr. Tucker took the same position as in his February 27, 2019 letter that M.G.O. Section 10.085 governed EHS's field lights.  Wautier Decl. ¶ 13, Ex. 1 at 4.

112.    EHS's approved outdoor lighting application was marked closed, which indicated that all reviews had been completed. Tucker Dep. at 32; Zylstra Dec., Ex. P, Dep. Ex. 3 at 1.

113.    Outdoor lighting permits can be issued the same day as approval.  Tucker Dep. at 139.

114.    EHS's permit did not issue.  Tucker Dep. 44-45; Hank Dep. at 38.

115.    After the lighting application was approved, the City changed its position.  Hank Dep. at 74-75; Tucker at 53-54.

116.    With a typical lighting application, after a lighting review approval and a zoning review approval, the application is considered granted and a permit is issued.  Tucker Dep. at 38. There has been no prior scenario where a lighting application's lighting review was approved, its zoning review was marked approved, and the permit did not issue.  Tucker Dep. at 39.

117.    On March 8, a week after the application had been approved, in a phone call with Mr. Wautier, Mr. Tucker advised that there may be a problem with the height of the light poles under the Master Plan and that the City may not be able to issue the permit.  Wautier Decl. ¶ 15.

118.    On March 12, 2019, Mr. Wautier wrote to John Strange.  Zylstra Dec., Ex. R, Dep. Ex. 70; Elliott Dep. at 178-179.  In Mr. Wautier's objection letter he restated the prior approval of the lighting application and his understanding that the City "is considering the revocation of its prior approval of the complaint application based upon a *new* zoning interpretation for the Edgewood Campus that light poles *of any* height are not allowed!"   Zylstra Dec., Ex. R, Dep. Ex. 70 at 1 (emphasis original).

119.    George Hank was the Director of the Building Inspection Division Director and Tucker's supervisor.  Hank Dep. at 13, 16-17; Tucker Dep. at 9-10.

120.    At some point after his February 27, 2019 letter in which he noted that the lighting application would not need a Master Plan amendment, Messrs. Tucker, Strange and Hank pulled out a "fine toothed comb" to take a very close and detailed look at the EHS Master Plan.  Tucker Dep. at 54.

121.    George Hank, according to Mr. Tucker, wanted to stop EHS's light permit "in its tracks…"  Tucker Dep. at 45-48.  According to Mr. Tucker, he was made aware of Hank's decision.  Tucker Dep. at 49.  Hank doesn't know when that decision was made.  Hank Dep. at 74.

122.    According to Hank, Mr. Tucker and Hank discussed the light permit and "it was our belief that we should withhold it…"  Hank Dep. at 55.

123.    Mr. Tucker was the source of Hank's interpretation of the Master Plan.  Hank Dep. at 46.

124.    Hank's rationale for withholding the permit was limited to the uses outlined in the Open Spaces section of EHS's Master Plan.  Hank Dep. at 81, 84-86.

125.    Even under the new interpretation that the Master Plan used to withhold lights, Hank and City recognize that there was at least one permitted use for the athletic field – team practices – for which the outdoor lights could have been permissibly used.  Hank Dep. at 63-65.

126.    Nevertheless, Hank's concern was that if the City issued the permit but restricted EHS from playing games on its field, that EHS would be upset at his department for granting the application and allowing less than full use of the field.  Hank Dep. at 61.  According to Hank, this was the only reason – the risk that EHS would have unmet expectations that it could hold night games – for withholding the permit.  Hank Dep. at 61.

127.    Hank claims that the decision to withhold EHS's permit was in part motivated by a desire to protect EHS.  Hank Dep. at 62.

128.    Outdoor lighting permits can also be issued subject to conditions. Hank Dep. at 37.  The City could issue notices or citations if EHS violated or exceeded those conditions. Hank Dep. at 66.  Issuing an official notice or citation would have been productive and would have created an opportunity for an appeal that would have moved this issue forward.  Tucker Dep. at 137.

129.    No other outdoor light permits have been denied to a Madison area school from 2013 to the present; EHS is the only one.  Hank Dep. at 182.

130.    Hank had never before consulted with a City Attorney to discuss an outdoor light application.  Hank Dep. at 49.

131.    There are no other public or private schools with athletic fields that were not permitted to host athletic contests on those fields.  Hank Dep. at 183.

132.    According to the City, an "athletic contest" is a "competition between two teams." Hank Dep. at 90-92.  Under this definition, practices also include elements of "athletic contests." See Hank Dep. at 88; Elliott Decl. ¶ 30.  Under the City's interpretation, scoreboards are beneficial for practice, but lights are not.  Hank Dep. at 88-91.

133.    The treatment of EHS's lighting application stands in contrast to that of Madison James Madison Memorial High School.  On August 17, 2018, Memorial High School submitted a lighting application for outdoor lights for its athletic field. Hank Dep. at 29-30; Zylstra Dec., Ex. MM, Dep. Ex. 2.

134.    Memorial's proposed lighting was still required to meet the technical specifications of M.G.O. Section 10.085.  Tucker Dep. at 143-144.

135.    Memorial's lighting application was reviewed and approved.  Tucker Dep. at 78. A permit was issued a week later.  Hank Dep. at 40-41.

136.    Both Memorial and EHS are zoned Campus Institutional District.  APFOF 61. The City's only distinction made now between the Memorial and EHS lighting applications was the existence of EHS's Master Plan.  Tucker Dep. at 144.  According to Mr. Tucker, If EHS had never adopted a Master Plan, its lighting application would have been judged under the same standards as Memorial. Tucker Dep. at 144.

137.    Again, this is a change from its position expressed in January 2019 and February 27, 2019.  APFOF 92, 97-99, 103, 110, 115.

138.     In reviewing and analyzing EHS's lighting application, Mr. Tucker went beyond the four corners of the lighting application to determine EHS's intended use of the lights.  Hank Dep. at 142.  The City did not look beyond the four corners of the materials submitted by Memorial in its lighting application.  Hank Dep. at 142.

139.     Typically, when a permit is denied, the City sends a denial letter setting forth the reasons and providing the applicant an opportunity to address whatever issue led to the denial.  Hank Dep. at 42.  The City never provided EHS a denial letter.  Elliott Decl. ¶ 38; Wautier Decl. ¶ 16.

140.     In the Spring of 2019, the City acted upon its interpretation that the EHS Master Plan prohibited the use of the Goodman Athletic Complex for "athletic competitions."  Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.  The City sent an inspector to observe and after he witnessed athletic contests being held on Edgewood's field, the inspector issued Official Notices of Violation to Edgewood.  Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.

141.     The notices asserted that EHS violated Section 28.097 by holding "athletic contests" on its athletic field, on the grounds that "[t]he Campus Master Plan states that the athletic field is used for team practices and physical education classes."  Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.

142.     These "violations" included the playing of high-school girls' soccer games, a boys' lacrosse game, and a track meet.  Elliott Decl. ¶ 40.

143.     The notices also stated that "[a]ny person violating any provision of the City Ordinances enforced by the Building Inspection Division is subject to the penalties provided by

the appropriate Ordinance violated." Zylstra Decl., Ex. T, Dep. Ex. 9, 11; Hank Dep. at 102, 129-130.

144.    After the Notices of Violation were issued, certain neighbors were making public statements that EHS was breaking the law by holding games.  Elliott Decl. ¶ 41.  Mr. Elliott saw stories to that effect in the newspaper and on the television.  Elliott Decl. ¶ 41.  EHS was greatly concerned that it was suffering reputational harm because of these notices.  EHS further lost donations from donors who believed that EHS was openly violating the law by hosting games on its athletic field.  Elliott Decl. ¶ 41.

145.    None of the other schools located in the Campus-Institutional District, with or without a master plan, have received a zoning violation or were alleged to be in violation of the City's Zoning Code for hosting "athletic contests" on their athletic fields.  Hank Dep. at 183.

146.    Hank admits that his department had discretion to decline enforcement of technical violations of the Master Plan.  Hank Dep. at 117.  Some violations would be "beneath our notice" and would not result in official notices or citations.  Hank Dep. at 117-121.

147.    In issuing notices of violations or citations, Hank, as the Building Inspection Division Director, has discretion not to enforce violations that other directors in his position might themselves choose to enforce.  Hank Dep. at 117-121, 125-128.

148.    Mr. Tucker, now the current Building Inspection Division Director, agrees with Hank's formulation of the department's "beneath our notice" discretion.  Tucker Dep. at 9-10, 172.

149.     EHS timely appealed the violation notices to the Zoning Board of Appeals ("ZBA") on May 31, 2019.  Zylstra Decl., Ex. U, Dep. Ex. 74.

150.     On July 11, 2019, the ZBA held a duly noticed public hearing on EHS's appeal. Zylstra Decl., Ex. V, Dep. Ex. 76.

151.     At the ZBA hearing, EHS argued that the EHS Master Plan did not waive EHS's right to continue hosting "athletic contests on its athletic field" or from using its athletic field for other activities related to its primary mission.  Zylstra Decl., Ex. V, Dep. Ex. 76.

152.     The University of Wisconsin-Madison ("UW") is the only other institution zoned Campus Institutional District that has adopted a master plan.  Hank Dep. at 177.

153.     The City agrees that uses of buildings and spaces identified in the UW's Master Plan are subject to the same zoning and interpretative standards as for EHS's Master Plan. Tucker Dep. at 193.

154.     Buildings and spaces identified for a particular use in the UW Master Plan that are used for a different purpose would "probably" be a violation.  Tucker Dep. at 193.

155.     The City has made no effort to confirm whether UW is using its athletics or sports and recreational facilities or open spaces as they are described in its Master Plan.  Tucker Dep at 193.

156.     In its Master Plan, the UW describes one of its facilities as the "Goodman Softball Practice Facility."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 72.

157.     The City, however, is on notice that this space, however, may be used to host athletic competitions – UW softball games.  Ingrisano Decl. ¶ 4, Ex. 3.[1]

158.     In its Master Plan, the UW describes the building use of one of its facilities, the Natatorium, as for "Rec Sports."   Zylstra Dec., Ex. OO, Dep. Ex. 46 at 137.

159.     That space, however, is used to host athletic competitions, including high school varsity swimming and diving championship competitions.  Ingrisano Decl. ¶ 5, Ex. 4.[2]

160.     In its Master Plan, the UW describes the building use of one of its projects, the Nielsen Tennis Stadium Expansion as for "Athletics."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 136.

161.     That building, however, has been used for high school athletic competitions, instructional camps and clinics, and private tennis lessons.  Ingrisano Decl. ¶ 6, Ex. 5.[3]

162.     The UW Master Plan identifies the "Near West Fields" as "recreation fields" and indicates that they would be upgraded "to create five synthetic turf flag football fields and one championship soccer field."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 126.

163.     That space, however, is elsewhere identified by UW as used for baseball, softball, lacrosse, rugby, "and more."  Ingrisano Decl. ¶ 7, Ex. 6.[4]

---

[1] In the event of objection to these materials, this Court may properly take judicial notice.  *See In re Copper Market*, 2003 WL 22495750 *2 (W.D.Wis. August 20, 2003)("Although it would be improper to take judicial notice of the contents of the articles for their truth because the truthfulness of the reports is not something "capable of accurate and ready determination," I can take judicial notice of the fact that the articles were published and that they contained information about defendants, solely for the purpose of determining whether the articles would have given a reader reason to make further inquiry into defendants' liability for antitrust violations.")  Accordingly, the Court can take judicial notice of the fact that articles were published and for the purpose of determining whether the articles would have given a City employee reason to make further inquiry into the UW's use of its facilities in conformance with the UW Master Plan.  With respect to web content maintained by the University of Wisconsin, as a public institution, Plaintiff contends that this Court can take judicial notice of those items as well under Fed.R. Evid. 201(b) and (d).

[2] See fn 1.

[3] See fn 1.

[4] See fn 1.

164.     The City contends that it need not compare UW's Master Plan to its actual use because zoning enforcement is complaint-based, i.e., that the City reviews issues in response to actual complaints.  Tucker Dep at 193.

165.     However, prior to Mr. Tucker's October 2018 email and related review setting forth his restrictive interpretation of the EHS Master Plan, Mr. Tucker had received no complaints about EHS's use of its field.  Tucker Dep. at 188.

166.     Examples of UW's use of buildings and spaces inconsistent with how they are described in its Master Plan was raised at the ZBA hearing, putting the City on notice.  Zylstra Decl., Ex. V, Dep. Ex. 76 at 37-40.

167.     Mr. Tucker and the City have not reviewed UW's adherence to its Master Plan. Tucker Dep. at 193.

168.     On July 11, 2019, the Zoning Board of Appeals voted to affirm the decision of the Zoning Administrator.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 246-247.

169.     On July 12, 2019, then City Attorney Michael P. May wrote a letter to Edgewood's counsel. Zylstra Dec., Ex. W, Dep. Ex. 12.  In the letter, the City invited EHS to file to terminate its Master Plan and return to the standard CI zoning."  Zylstra Dec., Ex. W, Dep. Ex. 12 at 1.

170.     According to the City Attorney, a return to CI zoning would place EHS on equal footing with other high schools.  Zylstra Dec., Ex. W, Dep. Ex. 12 at 1.

171.    After receiving May's July 12, 2019 letter, Messrs. Wautier and Strange discuss EHS's options with respect to the Master Plan.  Wautier Decl. ¶ 17.  At Mr. Wautier's request, Mr. Strange summarized the options in an email to Mr. Wautier dated July 17, 2019.  Wautier Decl. ¶ 17., Ingrisano Decl. ¶ 14, Ex. 13, Dep. Ex.  23.

172.    Mr. Strange confirmed that one option would be for the EHS to seek to repeal its Master Plan.  Wautier Decl. ¶ 17, Ingrisano Decl. ¶ 14, Ex. 13, Dep. Ex. 23.

173.    Mr. Strange also confirmed the City's position that by repealing the Master Plan, Edgewood would revert to the standard regulations of the CI District in the zoning code, "which would allow games and lights at the field."  Wautier Decl. ¶ 17, Ingrisano Decl. ¶ 14, Ex. 13, Dep. Ex. 23.

174.    On July 29, 2019, in reliance on the City's representations, EHS accepted the City's invitation and, with Edgewood College and the Campus School, formally requested the immediate repeal of the Edgewood Campus Master Plan.  Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep. at 205-206.

175.    The repeal of EHS's Master Plan was referred to the Common Council for introduction by the City Attorney's Office on July 30 and was scheduled to be introduced at the August 6, 2019 Common Council meeting.  Ingrisano Decl. ¶ 8, Ex. 7, Dep. Ex. 21; Evers Dep. at 128-129.

176.     On August 1, 2019, the Capital Times published an article on EHS's July 29 request to terminate its Master Plan.  Ingrisano Decl. ¶ 9, Ex. 8.[5]

177.     In the article, City Attorney Michael May again reiterates that repealing the Master Plan will result in EHS being treated the same as other schools:  "They've always been complaining to us that the real problem is that they're being treated differently than the other high schools, so I told them, 'You want to be treated the same as the other schools; have your master plan repealed."  Ingrisano Decl. ¶ 9, Ex. 8 at 4.

178.     Alder Tag Evers was aware of EHS's request to repeal its Master Plan.  Mr. Evers Dep. at 129.  In the Capital Times article, Mr. Evers was reported to say that "[i]f the city repeals the Master Plan, Mr. Evers said it would be easier for Edgewood to put up lights and amplified sound than to get new signs approved."  Ingrisano Decl. ¶ 9, Ex. 8 at 4.

179.     Alder Tag Evers is the City of Madison Alder on the Common Council for the 13th District.  Evers Dep. at 8.  He was first elected to that position in April of 2019.  Evers Dep. at 15.

180.     As a neighbor of the Edgewood campus and as the District 13 Alder, Mr. Evers has opposed EHS's development of its athletic field.  Elliott Decl. ¶ 42.  Mr. Evers campaigned on the issue of Edgewood's field and at all times has been opposed to its further development.  Evers Dep. at 16-17.

---

[5] See fn 1.  If objected to, this Court can take judicial notice that the article was published and for the purpose of determining whether the article would have given a Evers notice of the EHS repeal's referral to the August 6, 2019 Common Council meeting.

181.    Mr. Evers served an advisory role to a group calling itself "No New Stadium." Evers Dep. at 23.  No New Stadium has maintained a website critical of EHS and opposing its development of the Goodman Athletic Complex.  Elliott Decl. ¶ 42.  Mr. Evers shares No New Stadium's opinion on EHS's field and is aware of no areas of disagreement.  Evers Dep. at 25.

182.    Although EHS is one of Mr. Evers' constituents in his district, he has only been on the high school campus once and has never even taken a tour.  Evers Dep. at 60-62; Elliott Decl. ¶ 42.

183.    After EHS's July 29, 2019 request to repeal its Master Plan, and during the first week of August, Mr. Evers contacted Mr. Strange to discuss Campus Institutional District zoning.  Evers Dep. at 89, 102; APFOF 171.

184.    Mr. Evers called Mr. Strange to address what could be done with the "flaws" in the zoning ordinance – perceived flaws that would allow landowners "to proceed with significant change of use that would be in contrast" with the purposes of the Campus Institutional District.  Evers Dep. at 87-88, 91.

185.    The EHS field lights "debate pointed to these flaws."  Evers Dep. at 93.  Indeed, the EHS athletic field and lights issue was the only actual or active controversy that pointed to these flaws and the need for a change.  Evers Dep. at 93-94.

186.    Mr. Strange advised the ordinance could be amended.  Evers Dep. at 87-89.  Mr. Evers instructed him to proceed with drafting an amended ordinance.  Evers Dep. at 87-89.

187.    Mr. Evers intended that his amendment would require EHS to go through a conditional use or Master Plan amendment process in order to get lights.  Evers Dep. at 97-99.

188.    Mr. Evers understood that if EHS's Master Plan was repealed without Mr. Evers' amendment, EHS would be entitled to get its lights under the existing Campus Institutional District zoning ordinance.  Evers Dep. at 99.

189.    Mr. Evers also recognized that if EHS's Master plan was repealed *before* his amendment passed that EHS would be entitled to its lights.  Evers Dep. at 99-100.

190.    Mr. Evers knew from the August 1 Capital Times article and the public legislative record that EHS's repeal was scheduled to go before the Common Council on August 6, 2019. Ingrisano Decl. ¶ 9, Ex. 8 at 2; Ingrisano Decl. ¶ 8, Ex. 7, Dep. Ex. 21.

191.    Mr. Evers' amendment was introduced in the Common Council from the floor and by title.  Evers Dep. at 112-114.  The amendment was introduced from the floor on August 6 because "we wanted to get started with it."   Evers Dep. at 113-114.  By introducing it by title only, Mr. Evers did not need to have a completed draft ordinance at the time of introduction. Evers Dep. at 114.

192.    Mr. Evers' amendment was introduced from the floor the day after it was referred for introduction by the city attorney's office.  Evers Dep. at 127.

193.    Mr. Evers can identify no other legislation he has introduced from the floor. Evers Dep at 128.

194.    [Intentionally omitted]

195.    On August 6, Mr. Evers was the listed as the sole sponsor.  Evers Dep. at 115-116; Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36.

196.    Both the EHS Master Plan repeal and the Evers amendment were introduced and referred for hearing before the Plan Commission on August 6.  Evers Dep. at 130-131.  Both were referred to the next Plan Commission meeting on August 26, 2019.  Evers Dep. at 143.

197.    While Mr. Evers claimed his ordinance was intended to address a general flaw in the zoning ordinance (APFOF 184), the title of his introduced ordinance amendment was specific to what EHS's situation upon repeal of its Master Plan.  See Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36.

198.    Mr. Evers' title of his ordinance on August 6, 2019 was:

Creating Madison General Ordinance Sections 28.097(2)(d) and (e) requiring institutions in the Campus Institutional District without an approved campus master plan to get conditional use approval for the establishment of open or enclosed Stadiums, Auditoriums, Arenas, Indoor or Outdoor Sports Recreational Facilities, and Agricultural Uses and for the installation of stadium lighting, amplified sound, and the establishment or expansion of outdoor seating over a specified capacity.

Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36.

199.    The original title of the proposed ordinance specifically applied to the Mr. Evers' issues with EHS's athletic field, including a potential agricultural issue on the Edgewood campus that had come up during discussions at the ZBA hearing.  Evers Dep. at 121-122.  At the July 11, 2019 hearing, Assistant City Attorney John Strange also told the Plan Commission that Edgewood could turn the Oaks, a green space on Campus with heritage trees, into a cornfield without Plan Commission approval because agricultural use is an allowable use under the ordinance. Zylstra Dec., Ex. V, Dep. Ex. 76 at 74.

200.    Mr. Evers was absent from the August 6, 2019 meeting.  Evers Dep. at 116.

201.     Throughout this process working with Mr. Strange and getting his amendment introduced from the floor, by title only, Mr. Evers was on vacation.  Evers Dep. 116-117, 124, 152, 161.  He did not wait to address his desired ordinance until his return; he communicated with Mr. Strange and arranged for the introduction of his sponsored ordinance at the August 6 meeting while he was out of the country in Montreal.  Mr. Evers Dep. at 116-117, 124, 152, 161.

202.     Mr. Evers introduced his amendment to prevent EHS from getting lights upon repeal of its Master Plan.  APFOF 174-201.

203.     After learning of EHS's repeal request, Mr. Evers rushed to introduce his amendment by title only from the floor in an effort to prevent EHS's repeal request from going into effect first.  APFOF 174-178, 183, 186, 190-193, 195, 200-201.

204.     At the Plan Commission meeting on August 26, 2019, Mr. Evers addressed a question about whether his ordinance was time sensitive.  Ingrisano Decl. ¶ 17, August 26, 2019 Plan Commission Hr'g (by link) at 3:25:25.  Mr. Evers responded that it was time sensitive. Ingrisano Decl. ¶ 17, August 26, 2019 Plan Commission Hr'g (by link) at 3:25:25.

205.     Mr. Evers did not say why his ordinance's consideration was time sensitive, but went on in talking about the City's "values" and the need to avoid an "exploitative environment" to differentiate public institution landowners from private ones:  "Public institutions have a built in incentive to pay attention to the public because they are dependent on public support, private institutions must be careful not to be seen as being willing to impose their will on their neighbors because to do so tears at the fabric of civil society and undermines our shared values of commitment to community and partnership."  Ingrisano Decl. ¶ 17, August 26, 2019 Plan Commission Hr'g (by link) at 3:25:25.

206.    Evers' reference to "community" and "partnership" in APFOF 205 is a veiled reference to EHS and its values in its Mission Statement.  See APFOF 3.

207.    Edgewood High School, Edgewood College and Edgewood Campus School are the only private institutions zoned Campus Institutional District.  APFOF 63; Elliott Decl. ¶ 44.  All three are Catholic religious institutions.  Elliott Decl. ¶ 44.

208.    Mr. Evers has described EHS as "entitled."  Evers Dep. at 211.  Mr. Evers believes that EHS has attempted to impose its will on its neighbors.  Evers Dep. at 211.

209.    Under Mr. Evers' ordinance, EHS's light application would no longer be governed by the objective, administrative approval process of § 10.085 but would require a conditional use permit.  Zylstra Dec., Ex. C, Dep. Ex. 18 at 4; Tucker Decl. ¶19.

210.    As of August 26, the EHS Master Plan repeal and Mr. Evers' ordinance were on a parallel path, legislatively.  Evers Dep. at 123.

211.    However, the EHS Master Plan repeal was referred to the October 14, 2019 Plan Commission meeting while Mr. Evers' ordinance was referred to the September 16, 2019 Plan Commission meeting.  Evers Dep. at 144-146; Zylstra Dec., Ex. AA, Dep. Ex. 26 at 6, 7.

212.    As reported by the Wisconsin State Journal on September 4, 2019, the Common Council voted to delay a decision whether to repeal the EHS Master Plan.  Ingrisano Decl.¶ 11, Ex. 10, Dep. Ex. 28.

213.    The State Journal continued:  "Ald. Shiva Bidar, 5th District, said the reason for the delay was to allow another proposal to get through the Plan Commission and City Council

first.  That proposal would require Edgewood High School to apply with the city before making modifications, such as adding lights or a sound system, to its field if the master plan is repealed. Ingrisano Decl. ¶ 11, Ex.10, Dep. Ex. 28.

214.    The article continued:  "City Council members who serve on the Plan Commission said they would like to know what the council decides on the field modification measure before voting on the master plan repeal."   Ingrisano Decl. ¶ 11, Ex. 10, Dep. Ex. 28.

215.    Consistent with the State Journal's reporting, at the September 3 hearing, Alder Marsha Rummel expressed that she believed a "stadium" should be a conditional use and that the Campus Institutional District zoning ordinance should be "tweaked and amended" before moving forward with repeal.   Ingrisano Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by link) at 2:04:00, 2:04:40.

216.    Also consistent with the State Journal's reporting, at the September 3 hearing, Alder Shiva Bidar supported delaying the EHS Master Plan repeal and moving forward on the Mr. Evers' amendment, noting that the Common Council needed to give the Plan Commission clarity on one item [Mr. Evers' ordinance] so that the Plan Commission can decide another [the EHS Master Plan repeal.]  Ingrisano Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by link) at 2:12:30.

217.    Mr. Evers' amendment was adopted by the Common Council on October 1, 2019. Zylstra Decl., Ex. C, Dep. Ex. 18.

218.    EHS's Master Plan repeal was not adopted by the Common Council until January, 2020.  Elliott Dep. at 246-247; Parks Decl. ¶ 7.

219.    As a result of the repeal of the Master Plan, EHS was no longer subject to the Master Plan and the City's interpretation thereof.  EHS now had the undisputed ability to play athletic competitions on its field.

220.    However, as a result of the passage of Mr. Evers' amendment before the Master Plan repeal, Edgewood would be required to apply for a conditional use permit in order to obtain outdoor lighting for the Goodman Athletic Complex.

221.    On March 11, 2020, EHS applied for a conditional use permit exclusively to install four outdoor light poles.  Elliott Dep., at 249-250; Zylstra Dec., Ex. GG, Dep. Ex. 87; Elliot Decl. ¶ 47.

222.    No other improvements were sought in that application.  Elliott Decl. ¶ 47.  At that time, current uses of the field continued to include athletic games, practices, classes, camps, community events and neighbor, community and recreational use.  Elliott Decl. ¶ 47.

223.    On May 11, 2020, the Planning Division's professional staff issued a Planning Division Staff Report to the Plan Commission.  Zylstra Dec., Ex. HH, Dep. Ex. 33.

224.    Planning staff noted that the light plans issued had been previously reviewed and approved by Building Inspection Division Plan Review Staff relative to M.G.O. Section 10.085.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 8.  The Planning staff noted that they expected that final plans will also meet that requirement.

225.    Planning staff noted an "extensive landscaped buffer" along the western edge of the Goodman Athletic Complex.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

226.     No other improvements were proposed other than the lights.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

227.     EHS letter of intent included with the conditional use request included self-imposed conditions on timing for use of the proposed lights.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

228.     The Planning staff noted that many neighbors in close proximity to the Goodman Athletic Complex believe that the existing uses impact the quality of life in the neighborhood, primarily due to noise generated by the current use.   Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

229.     The then-current daytime use referenced in APFOF 227 included athletic games, camps, team practices, community events, and neighbor, community and student recreational use.  Elliott Decl. ¶ 47.

230.     The Planning staff believed Staff believes that the most relevant standards of approval for this request to meet are standards 1, 3, and 4 of M.G.O. Section 28.183(6) which most directly address the impact that a conditional use may have on surrounding properties:

> 1. The establishment, maintenance or operation of the conditional use will not be detrimental to or endanger the public health, safety, or general welfare.
>
> 3. The uses, values and enjoyment of other property in the neighborhood for purposes already established will not be substantially impaired or diminished in any foreseeable manner.
>
> 4. The establishment of the conditional use will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district.
>
> Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

231.    With the implementation of certain conditions, the Planning staff concluded that the Plan Commission had a basis to find that the uses, values and enjoyment of neighboring property would not be substantially impaired or diminished.   Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5 (Despite neighbor concerns about impacts, including noise, "staff believes that the Plan Commission *may* find standards 1, 3, and 4 met to allow the installation of the proposed lights…")(emphasis added).

232.    The Planning staff concluded that that their recommended conditions would "limit the impacts of the expanded use of the stadium on nearby residents."  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

233.    The Planning staff framed the issue as whether to allow extended use of the Goodman Athletic Complex into the evening.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.  They concluded that "well-regulated conditional use approval can balance the needs of Edgewood while minimizing further impact on surrounding properties consistent with the statement of purpose of the Campus-Institutional zoning district.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 7.

234.    The Planning staff concluded that the Plan Commission could balance EHS's use of the field with minimizing impacts on the residential neighbors by imposing conditions on the number of field usage events and the hours of use.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

235.    Planning staff recommended seven conditions to minimize impact on neighbors:

- Limitations on non-practice events.

- Use of lights limited to EHS, Edgewood College and Edgewood Campus School.

- Lights be turned off at set times.

- Event start times be scheduled to ensure light turn off times.

- Lights for team practices until 7:00 PM only.

- No changes to landscape buffer by EHS.

Zylstra Dec., Ex. HH, Dep. Ex. 33 at 6-7.

236.    Planning staff took into consideration the significant number of comments received.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

237.    The Planning staff concluded in pertinent part:  "While many of the comments received to date suggest an existing impact on uses, values, and enjoyment, the normal and orderly development of surrounding properties, or a negative impact on the public's "general welfare" from the daytime (unlighted) use of the athletic complex primarily due to noise generated, staff believes that the Plan Commission may find the conditional use standards met to allow the installation and use of lighting for the stadium under specific and limited conditions intended to minimize any ***further impact*** on the area surrounding the complex, ***bearing in mind that the daytime use of the complex without lights is allowed by right***."   Zylstra Dec., Ex. HH, Dep. Ex. 33 at 7 (emphasis added).

238.    They concluded that "well-regulated conditional use approval can balance the needs of Edgewood while minimizing ***further*** impact on surrounding properties consistent with the statement of purpose of the Campus-Institutional zoning district.   Zylstra Dec., Ex. HH, Dep. Ex. 33 at 7 (emphasis added).

239.    EHS immediately agreed to all conditions recommended by the Planning Commission. Elliott Decl. ¶ 46.

240.    At the May 11, 2020 Plan Commission meeting, the Plan Commission disregarded the Planning Staff Report and found the standards for conditional use were not met and placed the conditional use on file without prejudice. Elliott Dep. at 250-251; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 2.

241.    The record before the Plan Commission at the May 11, 2020 meeting is found its entirety at

https://madison.legistar.com/LegislationDetail.aspx?ID=4394445&GUID=48C312B2-F734-46EB-9B58-D9DA005C66B1.

242.    The record in opposition to the is comprised of public comments, statements by Alder Evers, and statements by the Dundgeon-Monroe Neighborhood Association.  See link at APFOF 241.

243.    The Plan Commission made two findings.  First, "[t]he Plan Commission could not find standard number 3 met finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties…."  Zylstra Dec., Ex. GG, Dep. Ex. 87 at 2.

244.    Second, the Plan Commission found "that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera." Zylstra Dec., Ex. GG, Dep. Ex. 87 at 2.

245.    On May 21, 2020, Edgewood appealed the decision of the Plan Commission on its conditional use application. Elliott Dep. at 255; Zylstra Dec., Ex. JJ, Dep. Ex. 90.

246.     The appeal came on for hearing on January 19, 2021 and the entire record before

the Common Council is found its entirety at

https://madison.legistar.com/LegislationDetail.aspx?ID=4542871&GUID=B9777AC0-F2AF-

4C4B-9E33-00C55C92776A.

247.     EHS presented facts and information in support of granting its appeal of the Plan

Commission permit denial, including light and sound study results.  See link at APFOF 246 at

Attachments 5, 14, 15, 16, 25, 27.

248.     The May 11, 2020, Planning Division Staff Report was part of the record before

the Common Council.  See link at APFOF 246 at Attachment 5 at 7.

249.     Also before the Common Council was Assistant City Attorney John Strange's

Memorandum outlining the standards for a conditional use appeal.  See link at APFOF 246 at

Attachment 7.

250.     As a result of Mr. Strange's memo, the Common Council knew that that

"substantial evidence" are "facts and information, other than merely personal preferences or

speculation, directly pertaining to the requirements an applicant must meet to obtain a

conditional use permit and that reasonable persons would accept in support of a conclusion."

See link at APFOF 246 at Attachment 7 at 3.

251.     Further, the Common Council also knew that the necessary facts and information

they considered must "directly pertain to requirements an applicant must meet," meaning that not

every piece of information the Council hears from a proponent or opponent is relevant to its

consideration. See link at APFOF 246 at Attachment 7 at 4.

252.     Alder Evers' amended Campus Institutional District zoning ordinance required a conditional use permit for the EHS's lights.  See link at APFOF 246 at Attachment 7 at 4.

253.     The Common Council knew that "[i]n its Staff Report, the Planning Division explained to the Plan Commission that, based on a review of the application and public comments opposing the proposal, it believed the two primary impacts of Edgewood's lighting request related to the light and noise associated with activities taking place on the field after dark. The Staff Report opined that both of these impacts could be addressed by focusing on conditions related to the number of events that could occur after dark. Accordingly, Staff recommended that the Plan Commission could find the conditional use standards met and approve the application with seven (7) specific conditions enumerated in the Staff Report, including a condition limiting the "number non-practice events (athletic competitions/games, school activities) using the stadium lighting after 7:00 PM … per school year (August 1 to July 31) to be determined by the Plan Commission following input at the public hearing." For a full list of the conditions proposed by staff, see the Staff Report."  See link at APFOF 246 at Attachment 7 at 5.

254.     The Common Council knew at the Plan Commission meeting, EHS agreed to the conditions proposed by the Planning staff.  See link at APFOF 246 at Attachment 7 at 5.

255.     The Common Council denied EHS's appeal on January 19, 2021.   See link at APFOF 246.

256.     The City's interpretation of the Master Plan starting in October 2018 caused EHS uncertainty and expense, including professional fees and legal expenses in reviewing and addressing that position.  Elliott Decl. ¶ 54.

257.    The City's failure to issue a permit for the otherwise compliant light application has delayed EHS's ability to install lights, which in turn has caused continued additional expense for EHS associated with using other fields, professional and legal expenses to address the City's actions, and increased anticipated costs of installation of the lights when that occurs.  Elliott Decl. ¶ 54.  Not getting lights in 2019 has likewise continued EHS's administrative burden on staff as they have had to continue scheduling other fields for "home" games.  Zwettler Decl. ¶ 54.  The inability to use its field at night continues to cause EHS students and parents frustration and inconvenience.  Zwettler Decl. ¶ 54.

258.    The City's position that EHS was required to repeal its Master Plan to use its athletic field for games caused EHS to incur significant professional and legal expenses in its attempt to comply with the City's process.  Elliot Decl. ¶ 54.

259.    The City's efforts to pass an ordinance amendment to counteract or subvert EHS's efforts to repeal its Master Plan caused EHS uncertainty and expense, including professional fees and legal expenses in reviewing and opposing that effort.  Elliott Decl. ¶ 54.

260.    The City's insistence upon and eventual denial of the conditional use permit for lights caused EHS to uncertainty and expense, including professional fees and legal expenses in its attempt to comply with the City's process, and in reviewing and addressing the result..  Elliott Decl. ¶ 54.

Dated this 10ᵗʰ day of June, 2022

ATTORNEYS FOR PLAINTIFF

By: *s/Jonathan R. Ingrisano*
        Jonathan Ingrisano
        State Bar No. 1033977

Mike Wittenwyler
State Bar No. 1025895
GODFREY KAHN S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701-2719
Phone: 608-257-3911
Fax: 608-257-0609
jingrisano@gklaw.com
mwittenwyler@gklaw.com

*Noel W. Sterett
DATLON & TOMICH, PLC
IL Bar No. 6292008
401 W. State Street
Rockford, IL 61101
Phone: (815) 986-8050
nsterett@daltontomisch.com

*Admitted Pro Hac Vice