UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL OF THE
SACRED HEART, INC.,

        Plaintiff,

v.

CITY OF MADISON, WISCONSIN, *et al.*,

        Defendants.

Case No. 3:21-cv-0018-wmc

---

## DECLARATION OF MICHAEL ELLIOTT

---

I, Michael Elliott, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the President of Edgewood High School of the Sacred Heart, Inc., ("EHS") the Plaintiff in the above-captioned action. I make this declaration on my personal knowledge.

2. I have served as the President of EHS since July 1, 2013. I am a 1977 graduate of EHS. In my capacity as President, I am responsible for the business operations of EHS. This includes, among other things, financial operations, fundraising, strategic planning, project development, and alumni relations.

3. EHS was founded by the Dominican Sisters of Sinsinawa in 1881. The Sisters have been in close relationship with the school as sponsors throughout its history. The school has been at its current location at 2219 Monroe Street since 1927.

4. EHS shares a 55-acre campus with Edgewood College and Edgewood Campus School (K-8). The three institutions are separate and distinct institutions, but all sponsored by the Sinsinawa Dominican Sisters. The high school, which is separately incorporated, owns and controls approximately twenty-five acres of the campus.

5. EHS is a Catholic institution. As a Catholic institution, EHS's mission is to preach and teach the Gospel and to instill students the Sinsinawa Dominican values of Truth,

Compassion, Justice, Community and Partnership. The school provides religious instruction and students are required to take religion classes as part of their curriculum requirements. Students are required to attend on-campus Catholic liturgies. As a Catholic and Dominican institution committed to community and living out the Gospel, all students must fulfill a community service obligation to meet graduation requirements. The Sisters expect EHS to follow, teach and promote Catholic teachings and EHS leadership is in frequent dialogue with our sponsors about the school's operations and mission.

6. EHS is committed to educating the whole student. Accordingly, every student is expected to participate in co-curricular activities. Roughly 75% satisfy this expectation by participating in one or more of EHS's athletic teams.

7. EHS's mission, continued existence and enrollment largely depends on its ability to persuade students and families to attend EHS. By partnering with other institutions and building community with those outside of EHS, the school satisfies its missions of Partnership and Community directly, but also indirectly by promoting the school and its values to attract students and increase enrollment. In many ways, enrollment is the mission – the school must have students to whom to preach and teach the Gospel and with whom to share its Dominican values.

8. In furtherance of the Dominican value of Partnership, EHS develops and relies upon partnerships with other Catholic institutions in the community. These partnerships help both to further our common mission and to drive enrollment. An important way EHS has partnered with the parochial schools over the years is by hosting parochial school athletic events on EHS's athletic field. These events allow EHS the opportunity to connect with parochial students and their families and to promote EHS's religious mission and values. Such events

serve much like an "open house" to showcase the school and are critical to EHS's ability to recruit parochial students and student-athletes.

9. In furtherance of the Dominican value of Community, EHS is called to foster a sense of community, internally among its students, teachers, coaches, families, alumni, and externally with the broader Madison community.

10. Despite the size of its campus, EHS has only a single, outdoor athletic field. Throughout its history, EHS has used this athletic field as a unique venue that serves all of Madison, from children to seniors, through games, camps, and other community activities. Neighbors, local families, alumni, and other community members have frequently used the field as a place to gather, recreate, compete, and exercise over the years, and EHS's field has always been open to the community. The track and field have always been, and continue to be, open to all neighborhood residents.

11. A quality athletic field for sports and recreation that is open to the public is an important outreach tool to get people onto the EHS campus.

12. By the time I had become President, the field had fallen into disrepair. It was no longer usable for track meets. Its value as an asset and community- and partnership-building tool was diminished and, in my view, was a detriment to EHS's ability to attract students and to be competitive with other Madison-area high schools. Prospective students and their parents look at the quality of facilities, particularly athletic facilities, in making high school selection decisions. Making the athletic field an asset in EHS's mission was one of my priorities as President of the high school.

13. As part of EHS's regular accreditation review, the Independent Schools Association of the Central States ("ISACS") conducts accreditation visits of EHS and makes recommendations. EHS's last accreditation review was in 2015. ISACS made several

3

recommendations to EHS designed to help reverse a negative enrollment trend. A true and correct copy of the report received is in the record as Deposition Exhibit 50. I participated in the review, and EHS and I agreed with the recommendations. I believe that enhancing our athletic field to be a better tool for partnership and community building, both internally and externally, was an important part of addressing many of the issue ISACS identified.

14. To reverse the negative trend and survive as an institution, EHS had to identify ways to better meet the needs of its students and their families, develop deeper partnerships with local parochial schools, address issues of diversity, and accomplish its religious mission to educate the whole student and foster the Sinsinawa Dominican values of Partnership and Community.

15. In 2015, the Goodman Foundation gave EHS a generous gift of $1.025 million to use towards renovating the field. The gift fit perfectly with EHS's religious values of community and partnership. With the gift, and with the generosity of other donors, EHS was finally able to renovate its track and field, which was in significant need of repair.

16. That year, EHS installed a full-length, artificial turf field designed to host regulation football, soccer, lacrosse, and softball games, and it upgraded the track from cinder to a modern, shredded rubber. Around this same time, EHS also installed and maintained a scoreboard for the field. Among other uses, the scoreboard was used for freshman and JV football games. EHS designed the track and field improvements to be able to hold competitions because that was consistent with how the field had historically been used.

17. Despite the substantial improvement created by the renovated turf and track, EHS still anticipated continuing to enhance the field, which was now renamed as the Goodman Athletic Complex. In planning for the future, on July 7, 2015, EHS applied for and received a permit to install conduit under the field so that EHS could run wiring to power future field

lighting and a sound system. We expected to install lights as soon as the technology became available to meet the City's requirements for compliant outdoor lighting.

18. Lights are important, because EHS's inability to host games and activities at night on its own athletic field substantially burdened EHS's students, their families, school administrators, and the school's partnerships and community-building in multiple ways.

19. Games and community and partnership events could not be held on the field at night. Games and events that could be moved to the daytime would necessarily limit our ability to schedule practices and other community and partnership events. Without lights, there are simply fewer hours in the day to accommodate the demands for the field.

20. Having only one field and no lights substantially interferes with and limits EHS's ability to utilize its field to further its mission to build partnership and community and to drive enrollment. Because students, teachers, and coaches are at school during the day, and because many parents and alumni work during the day, EHS's ability to reach these people is substantially bolstered by hosting athletic and community events in the evening after daylight hours.

21. Scheduling night games and practices at other fields creates logistical and scheduling burdens for families and parents. It also diminishes the sense of community that Edgewood is attempting to achieve with students, parents, alumni and community members. The goodwill associated with these events is transferred to a different location, and doesn't showcase EHS.

22. EHS has lost opportunities to host community non-profit partners like the Susan G. Komen Foundation because it cannot accommodate their outdoor events' needs for lights. These are lost opportunities to showcase EHS to the community, to share EHS's values, and to attract students and drive enrollment.

5

23. In 2017 and 2018, EHS wanted to continue its improvements to the field. By then, we believed that the lighting technology had advanced such that EHS would be able to install outdoor field lighting while complying with the City's ordinance governing outdoor lights and eliminating light intrusion on the campus's neighbors.

24. EHS wanted to expand seating, add concessions, restrooms and storage, add amplified sound and lights. From communications with the City, I understood that this was a building project that would require EHS to amend its Master Plan. This was based on the desired size of the expanded seating, concessions, restrooms and additional amenities made this a significant building project.

25. During this time, EHS was in discussions and listening sessions with the City and neighbors about expanding the athletic complex. In October 2018, City Administrator Matt Tucker sent an email to me advising that EHS was operating outside of the terms of its Master Plan by using the field for uses other than "team practices, physical education classes." I was surprised, confused and frustrated by this interpretation. Mr. Tucker did not clarify what he meant by usage, and he had never communicated a supposed prohibition on games until October 2018.

26. Mr. Tucker relied upon EHS's 2014 Master Plan. EHS and I had very little involvement with the drafting of the Master Plan. New to my job in 2013 when the Master Plan was being put together, my understanding was that it would govern and facilitate building projects. As I was not then planning on undertaking a building project for EHS, I did not dive into the Master Plan beyond what I thought were the basics. Edgewood College, who did intend to pursue many building projects, provided most of the content for the Master Plan – not EHS. I reviewed the provisions that I thought pertained to EHS and signed as EHS President more to assist Edgewood College, who was leading the charge on the Master Plan.

27.    EHS identified four (4) future projects in the Master Plan. The remaining eighteen (18) proposed projects were identified by Edgewood College and the Campus School..

28.    At no time did anyone from Edgewood College, EHS or the City inform me that the Master Plan would operate or would be interpreted to restrict permissible uses of EHS's property that were not identified or not identified with a certain specificity. No one expressed that EHS's field usage would be limited going forward.

29.    Since the dispute with the City has arisen, I have reviewed Section 3.8 of the EHS Master Plan many times. I did not intend to limit the use of EHS's athletic field to team practices or physical education classes. At the time of signing, I understood that EHS as a Campus Institutional District zoned institution had the full use of its field as a sports and recreation facility or stadium under the zoning ordinance. I did not intend to give that up in signing the Master Plan and did not anticipate the City's interpretation in 2018. Nor did I believe that one line in a two-hundred page document would have such a severe and unreasonable consequence.

30.    Moreover, at the time of my signing the Master Plan, I knew and recognized that EHS had been using its field for sports and athletic events for over 100 years. EHS had played freshman and JV football on the field just months before, and EHS had been playing such games on that field every season for decades. I observed my schoolmates playing football games on that field when I was a student at EHS. During my time at EHS, students would use the field to compete in various sporting activities, competitions and games, including during team practices and physical education classes. To my recollection and understanding, team practices and physical education classes themselves often include athletic contests or games.

31.    EHS had been using its field for these mission-related activities continuously and without interruption. I certainly did not intend to give up and discontinue EHS's longstanding

7

historical use of the field in signing the Master Plan. Nor did I believe or understand that one line in a two-hundred-page document would have such a severe and unreasonable consequence.

32. Instead, I believed the athletic field was fairly described by calling it an "athletic field" and would be used as such. I understood that "team practices" and "physical education classes" were listed as examples, not limitations.

33. I believe the City has implied that EHS or I misrepresented the use of the athletic field in the Master Plan in order to obtain its approval by the neighborhood. I certainly did not believe that EHS needed to limit the characterized use of the field in order to win neighbor approval. Neighbors already knew that the field had been used historically for games, practices, classes, and community events. Moreover, the Master Plan was not a priority for EHS or me as President. Again, our involvement was more as an accommodation to Edgewood College, our sister institution and partner.

34. I understood that streamlined review of building projects by an architectural review committee was a promised benefit of a master plan. However, EHS did not experience or observe such benefit since the approval of the Master Plan. In EHS's experience, and in what it observed Edgewood College go through, architectural review committee review was not a benefit.

35. In November 2018, I was involved in EHS's submission of a Master Plan amendment to improve its athletic field. Based on EHS's attorneys' communications with the City and the level of opposition we were sensing from some vocal members of the surrounding neighborhoods, EHS decided to table its Master Plan amendment and pursue parts of the field improvement plan in a piecemeal fashion.

36. EHS submitted its light application paperwork on February 22, 2019. On February 27, 2019, I received a letter from Mr. Tucker advising that (a) the City would issue a

lighting permit if the plans were found to be in compliance with technical requirements and (b) the Master Plan did not need to be amended to obtain the lighting permit. The letter went on to reiterate Mr. Tucker's position from October 2018 and warn that despite the issuance of a light permit, games on the field would not be permitted. A true and correct copy of that letter is in the record as Deposition Exhibit 6. Based on that letter, I expected the light permit to issue in short order.

37. Mr. Tucker's letter attached a communication from the EHS Board to the EHS community and he took issue with EHS' intent to play games on the field. In actuality, EHS was conveying to its supporters that it was not conceding the City's interpretation that the Master Plan precluded games and that the school would resort to the appropriate recourse to challenge that interpretation. While I disagreed with the City's continued interpretation that the Master Plan prevented games from being played on the field, EHS intended to challenge that interpretation through the proper processes.

38. The City never issued a lighting permit to EHS. The City never provided EHS a denial letter. No one at the City ever communicated that the Master Plan was a supposed obstacle to lights for the athletic field until March of 2019. Former Alder Eskrich had previously indicated that she could not sign off on the field's outdoor lights as a minor alteration in the context of a larger building project adding seats, concessions and restrooms.

39. EHS did not move forward to install lights because it could not move forward to install lights because the City did not issue a permit.

40. Instead, the City issued EHS with two Notices of Violation for playing games on the Goodman Athletic Complex. These "violations" included the playing of high-school girls' soccer games, a boys' lacrosse game, and a track meet.

9

41. After the Notices of Violation were issued, certain neighbors were making public statements that EHS was breaking the law by holding games. I saw stories to that effect in the newspaper and on the television. EHS was greatly concerned that it was suffering reputational harm because of these notices. EHS further lost donations from donors who believed that EHS was openly violating the law by hosting games on its athletic field.

42. I am familiar with Alder Tag Evers. As a neighbor of the EHS campus and as the District 13 Alder, Evers has opposed EHS's development of its athletic field. He affiliates with a group calling itself "No New Stadium." It maintains a website at https://nonewstadium.org/ critical of EHS and opposing its development of the Goodman Athletic Complex. Although EHS is a constituent of Alder Evers, I have knowledge of his only being on the EHS campus once. He has never asked to take a tour, to learn the issues facing the school, or to otherwise get to know the school, its students or its administrators.

43. I am also familiar with Shawn Schey. She is a neighbor of EHS, and is an opponent of EHS's lights and development of the Goodman Athletic Complex. In 2018, EHS asked Ms. Schey to step down from the Edgewood Neighborhood Liaison Committee because she was inaccurately characterizing meeting discussions to suit her own interpretation and desired outcomes. Ms. Schey stepped down and was replaced.

44. Edgewood High School, Edgewood College and Edgewood Campus School are the only private institutions zoned Campus Institutional District. All are Catholic religious institutions.

45. After EHS's Master Plan was repealed finally in January 2020, EHS and I were pleased that a Master Plan that had been misinterpreted since 2018 to deny EHS from playing games on its athletic field and to deny lights was now behind us. However, I was not pleased that the repeal had been delayed so that Alder Evers' amendment to the Campus Institutional

District zoning code could pass and change the law to require EHS to go through a subjective conditional use process for lights.

46. In 2020, while pursuing the conditional use permit made necessary by Alder Evers' amendment to the Campus Institutional District zoning, EHS received and reviewed the May 11, 2020 recommendation from the City's Planning staff to the Plan Commission, a true and correct copy of which is in the record as Deposition Exhibit 33. Those conditions were all agreeable and EHS assented to those conditions immediately.

47. On March 11, 2020, EHS applied for a conditional use permit, only seeking to install four outdoor light poles. No other improvements were sought. At that time, current uses of the field continued to include athletic games, practices, classes, camps, community events and neighbor, community and recreational use.

48. In reviewing the City's materials on summary judgment, the City relies on statements made by Maggie Balisteri Clark. Ms Clark was an employee of Edgewood College, not EHS. Again, those are separate institutions. Ms. Clark was not an agent or representative of EHS authorized to make statements on its behalf.

49. Further, in reviewing those materials, the City cites to agreements with the neighbors that are incorporated into the Master Plan. Except for the first item reaffirming all three schools' commitment to the Edgewood Neighborhood Liaison Committee, the referenced agreements pertained to Edgewood College. They were not EHS's agreements to reaffirm and the subject matter related to Edgewood College. The agreements related specifically to lights and lighting did not pertain EHS's portions of the campus.

50. Some of EHS's neighbors are opposed to EHS's lights and its use of its field. However others support EHS, and neighbors are not uniform in their views and treatment of EHS and the growth and use of the high school's space.

51. EHS did not routinely receive noise complaints during my tenure and received occasional noise complaints from certain neighbors after EHS had made know its intent to add lights to its athletic field. EHS never received complaints that it was unable to use its athletic field for games until after Mr. Tucker's interpretation was shared in October 2018.

52. EHS's current enrollment is 529.

53. The delay created by the City has significantly increased the cost of the lighting project. The bid in 2022 to add the lights has increased by $57,989 since the earlier bid in 2019.

54. As a result of the City's interpretation of the Master Plan starting in October 2018, EHS has faced uncertainty as to its future use of the field and incurred significant professional fees and legal expenses in reviewing and addressing the City's position. Because of the City's failure to issue a permit for the otherwise-compliant-light-application, EHS has been prevented and delayed in installing lights, which in turn has caused: continued additional expense for EHS associated with using other fields, professional and legal expenses to address the City's actions, and increased anticipated costs of installation of the lights when that occurs. The City's position that EHS was required to repeal its Master Plan to use its athletic field for games caused EHS to incur significant professional and legal expenses to comply with the City's process. Next, their insistence upon and eventual denial of the conditional use permit for lights caused EHS uncertainty and expense, including professional fees and legal expenses in reviewing and addressing that position. All of these actions have caused significant administrative burden for EHS's leadership, staff and volunteers.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of June, 2022.

Michael Elliott

27254238.1