```
                                                        Page 1
 1              UNITED STATES DISTRICT COURT FOR THE
 2                WESTERN DISTRICT OF WISCONSIN
 3                          --o0o--
 4    EDGEWOOD HIGH SCHOOL OF THE
      SACRED HEART, INC.,
 5
                      Plaintiff,
 6
                                    Case No. 3:21-cv-0018-wmc
 7
      CITY OF MADISON, WISCONSIN,
 8    et al,
 9                    Defendants.
      _____
10
11
12
                          DEPOSITION OF
13
                        JOHN W. STRANGE
14
15
16                        June 1, 2022
17                      Madison, Wisconsin
18
19
20
21
22
23
24    Reported by:  Cheri Winter, CSR
25
```

Page 2

1              I N D E X
2
   WITNESS                        PAGE
3
   JOHN W. STRANGE
4
       Examination by Mr. Ingrisano        5
5
6
7
              E X H I B I T S
8
9  No.         Description        Identified
10 Exhibit 107  Email from Wautier re      22
              delaying consideration of
11            Edgewood's proposal
12 Exhibit 108  Email exchange with Wautier    24
              Re Edgewood Statement
13
   Exhibit 109  Email exchange with Wautier    37
14            Re Meeting tonight,
              dated March 7, 2019
15
   Exhibit 110  Email from Matt Lee re      56
16            July 2nd meeting, dated
              July 1, 2019
17
   Exhibit 111  Series of emails re obtaining   57
18            copy of Edgewood's 3/12
              letter to city.
19
   Exhibit 112  Email from Matt Lee re      65
20            July 2nd meeting, dated
              July 1, 2019
21
   Exhibit 113  Email from Ethan Brodsky re    66
22            Questions about issue discussed
              at Edgewood ZBA hearing
23
   Exhibit 114  Memo from Ms. Stouder to Mayor  115
24            Rhodes-Conway and Madison Common
              Council, dated October 11, 2019
25

Page 3

1 E X H I B I T S
2 No.          Description          Identified
3 Exhibit 115     Curriculum vitae        116
4
5 PREVIOUSLY MARKED EXHIBITS:
6                              Page
7 Exhibit 3                    35
8 Exhibit 6                    26
9 Exhibit 12                   70
10 Exhibit 19                  104
11 Exhibit 20                  88
12 Exhibit 21                  83
13 Exhibit 22                  82
14 Exhibit 23                  74
15 Exhibit 24                  110
16 Exhibit 30                  111
17 Exhibit 31                  113
18 Exhibit 38                  35
19 Exhibit 45                  18
20 Exhibit 70                  40
21 Exhibit 71                  49
22
        QUESTIONS INSTRUCTED NOT TO ANSWER:
23
              Page / Line
24
              55 / 13
25

Page 4

1       DEPOSITION OF JOHN W. STRANGE, called as a
2 witness, taken at the instance of the Plaintiff,
3 pursuant to Subpoena, before Cheri Winter, Certified
4 Shorthand Reporter, and a notary public in and for the
5 State of Wisconsin, at the law offices of Godfrey &
6 Kahn, S.C., One East Main Street, Suite 500, Madison,
7 Wisconsin, on the 1st day of June, 2022, commencing at
8 8:56 a.m.
9
10 APPEARANCES:
11 For the Plaintiff:
12      JONATHAN R. INGRISANO, ESQ.
        GODFREY & KAHN, S.C.
13      One East Main Street, Suite 500
        Madison, Wisconsin 53701
14      608.257.0609
        jingrisa@gklaw.com
15
16 For the Defendants:
17      SARAH A. ZYLSTRA, ESQ.
        TANNER JEAN-LOUIS, ESQ.
18      BOARDMAN & CLARK, LLP
        1 South Pinckney Street, 4th Floor
19      Madison, Wisconsin 53701
        szylstra@boardmanclark.com
20      TJeanLouis@boardmanclark.com
21
22
23
24
25

Page 5

1       WEDNESDAY, JUNE 1, 2022, 8:56 A.M.
2                 --o0o--
3       ATTORNEY JOHN STRANGE,
4  having been first duly sworn, was examined and
5            testified as follows:
6                 --o0o--
7 BY MR. INGRISANO:
8     Q.   Good morning, Mr. Strange.  Could you please
9 state your name and spell it for the record.
10    A.   Sure.  John Strange, J-o-h-n, last name is
11 Strange, S-t-r-a-n-g-e, just like the word.
12    Q.   What is your current residential address?
13    A.   5010 La Crosse Lane.
14    Q.   That's in Madison?
15    A.   Madison, yep.  53705.
16    Q.   How are you employed, sir?
17    A.   I work for the University of Wisconsin.
18    Q.   In what capacity?
19    A.   I teach at the law school.
20    Q.   What courses?
21    A.   I teach legal research and writing.  Legal
22 courses.  That's it so far.  I've only been there for a
23 year.
24    Q.   When did you start that job?
25    A.   August of last year, 2021.

2 (Pages 2 - 5)

Page 6

1    Q.  And prior to that you were employed where?
2    A.  City of Madison.
3    Q.  In what capacity?
4    A.  City attorney's office, assistant city
5  attorney.
6        MS. ZYLSTRA:  And I know these are easy
7  answers, but for the court reporter try and slow down
8  just a little.
9        THE WITNESS:  Sorry.
10   Q.  MR. INGRISANO:  So, Mr. Strange, as assistant
11 city attorney what were your responsibilities in that
12 role?
13   A.  Well, I started in 2009 and I was in the
14 prosecution unit for about four to five years.  And so
15 in that capacity, I handled all manner of municipal
16 ordinance violations -- municipal ordinance violations
17 in municipal court.
18       And then sometime before I moved out of the
19 prosecution unit I started to represent Madison Metro
20 Transit, so transportation law.  That was probably in
21 about, I don't know, 2013 or so, 2014, when that
22 happened.
23       And then when I moved out of prosecution
24 altogether, I took over land use and zoning.  So from
25 about 2013 or '14 on, I was the primary lawyer for

Page 7

1  Madison Metro Transit and land use and zoning.
2        And then as I got closer to the time when I
3  left, I was also doing a lot of projects for the
4  Council.
5        For example, we had this task force on
6  structure of government.  It was a two- to three-year
7  period where I was lead staff for.  We ended up having
8  90 meetings with 11 members of this task force looking
9  at racial equity and social justice issues with respect
10 to Madison government.
11   Q.  Just so I'm clear, it was around 2013-2014
12 when you began taking on responsibilities for land use
13 and planning?
14   A.  That's my best guess, but I can't remember the
15 exact year.  I was in the prosecution unit for four to
16 five years or so.
17   Q.  And you continued to be responsible or
18 continued to work in the areas of transportation after
19 that?
20   A.  That's correct.
21   Q.  So you added land use to transportation.  You
22 didn't stop doing transportation?
23   A.  That's correct.
24   Q.  As assistant city attorney, when, if ever, did
25 you first engage in discussions with Edgewood or its

Page 8

1  representatives about its athletic field?
2    A.  With Edgewood or its representatives, probably
3  around the time that they filed for the application to
4  amend the master plan, if not after that.  I wasn't
5  involved in anything prior to that.
6    Q.  So is it fair to summarize perhaps you began
7  involvement late 2018, early 2019?
8    A.  That would be right, yeah.
9    Q.  Do you recall meeting with Edgewood or its
10 attorneys in January of 2019 to discuss the athletic
11 field?
12   A.  I don't recall off the top of my head meeting
13 with them.  I met with their attorneys either over the
14 phone or in person a number of times over the course of
15 a period of time.
16       I don't remember a specific meeting with their
17 attorneys and Edgewood officials.
18   Q.  Do you recall a particular meeting with Nathan
19 Wautier and Matthew Tucker in about the middle of 2018
20 in which you were discussing the master plan amendment?
21   A.  In the middle of 2018?
22   Q.  In the middle of January 2019.
23   A.  In the middle of January 2019, I don't recall.
24 I don't recall that.
25   Q.  Do you ever recall a meeting with Mr. Wautier

Page 9

1  in January 2019 or February of 2019 in which you were
2  discussing -- in which it was discussed about whether
3  Edgewood would table the master plan amendment?
4    A.  Are you asking about January or February or
5  both?
6    Q.  Let's ask about January.
7        Do you remember a January meeting with
8  Mr. Wautier in which he discussed tabling the master
9  plan amendment?
10   A.  I don't remember a meeting with him.  I
11 remember conversations that they had started to talk
12 about tabling the amendments, but I don't remember a
13 specific meeting.
14   Q.  Do you remember conversations with those that
15 had been telephonic conversations with --
16   A.  I don't recall if they were telephonic or in
17 person.  I just remember there were conversations.
18   Q.  Did you have any conversations with
19 Mr. Wautier about Edgewood adding lights to its athletic
20 field through the administrative process in January or
21 early February of 2019?
22       MS. ZYLSTRA:  Object to form.  You can answer.
23   A.  Well, I remember the discussion relative to
24 tabling the amendment, so they filed for an amendment to
25 the master plan in November.  They were going forward

Page 10

1 with that, and then they sort of stopped and decided
2 they weren't going to go forward with that anyway or
3 were considering not going forward with that anyway.
4       That was a very unusual circumstance for us in
5 general. Normally when somebody files an application,
6 they go through with it one way or the other. So
7 suddenly there were discussions about potentially
8 tabling that.
9       And I remember discussions about what happens
10 if we apply for lights. And I remember thinking I've
11 never known of an applicant to stop their application
12 and start applying for permits they would otherwise need
13 to get if they got the application ultimately approved.
14       So I don't remember when those were. You're
15 asking January or February. I can't tell if they were
16 January or February, but I remember those conversations.
17    Q.   You remember, do you not, sir, that Edgewood
18 filed a light application for -- an application for
19 lights under the outdoor lighting ordinance on or around
20 February 22nd of 2019; correct?
21    A.   I remember that they filed an application for
22 lights. I don't exactly know when they filed it.
23    Q.   Sure. Prior to them actually filing the
24 application, though, they had apprised you, hadn't they,
25 that they were considering tabling their amendment?

Page 11

1    A.   Right. They had discussed the possibility of
2 tabling the amendment and that's when they started to
3 ask about the possibility of basically trying to get the
4 things that were in their amendment without going
5 through the amendment.
6    Q.   Taking more of a piecemeal approach; is that
7 fair?
8       MS. ZYLSTRA: Objection. Form. You can
9 answer.
10    A.   I don't know that I would use the word
11 "piecemeal." All I remember is suddenly there were
12 talking about just filing a lighting application and
13 thinking that that was the only time I had ever known
14 that to happen where somebody just starts filing for
15 permits before they go through with their application.
16    Q.   You understood that their master plan
17 amendment was filed, as you said, in November of 2018.
18       Part of that amendment sought locker rooms;
19 correct?
20    A.   Correct.
21    Q.   And part of that sought concession stands?
22    A.   Correct.
23    Q.   Restrooms?
24    A.   I don't -- yeah, correct. There were
25 restrooms involved.

Page 12

1    Q.   And there was extra storage; correct?
2    A.   I don't remember the storage.
3    Q.   They didn't seek any -- after raising with you
4 the issue of tabling the master plan amendment, did they
5 not seek either locker rooms, concessions, or restrooms
6 through any other permitting process; is that right?
7       MS. ZYLSTRA: Objection. Form and foundation.
8 You can answer.
9    A.   Not that I recall.
10    Q.   When Edgewood's representatives, prior to
11 filing for their outdoor lighting permit, when they
12 raised the issue of seeking lighting did you confirm or
13 advise that a light application could be approved?
14       MS. ZYLSTRA: Objection. Form. You can
15 answer.
16    A.   At what point are you talk about?
17    Q.   Sure. Between the period of time in which
18 they first raised the issue of tabling the amendment and
19 seeking lights separately versus when they actually
20 filed their light application, did you ever advise them
21 or confirm that they could get a lighting application
22 approved?
23       MS. ZYLSTRA: Objection. Form. You can
24 answer.
25    A.   No, I did not. I was not -- 10.085, which is

Page 13

1 the lighting ordinance, that was not my area. So I
2 didn't know -- that was the first time I had ever even
3 heard of 10.085 as a separate issue, so I wasn't the
4 lighting lawyer.
5       So at that point I would have had no basis to
6 advise them about the technical aspects of lighting,
7 whether there is lumens, those kinds of things, so I
8 didn't know anything about that stuff.
9       I knew that there was interaction with zoning
10 code and to still be compliant with the zoning code, but
11 I didn't advise them one way or the other before they
12 filed the application.
13    Q.   Prior to Edgewood filing its application for
14 lights did you hear or see Matt Tucker advise Edgewood
15 or its attorneys that a lighting application could be
16 approved without a master plan amendment?
17    A.   No.
18    Q.   Same question with respect to sound approval
19 for amplified sound.
20       MS. ZYLSTRA: Objection. Form. You can
21 answer.
22    A.   What's the question?
23    Q.   Sure. Did you ever observe or hear Matt
24 Tucker advise Edgewood prior to its lighting application
25 being filed that it could get approval for amplified

Page 14

1 sound for its football field, for its athletic field?
2     A.   No.
3     Q.   Prior to the application being filed for
4 lighting did you ever see or observe or hear Matt Tucker
5 advise Edgewood on the subject of temporary bleachers?
6     A.   No, I -- I don't remember anything about
7 temporary bleachers until after -- after all of that.
8     Q.   In your communications with Matt Tucker prior
9 to Edgewood filing the lighting application did you and
10 he ever discuss whether the City would be able to
11 approve a lighting application without a master plan
12 amendment?
13         MS. ZYLSTRA:  Wait a minute, wait a minute,
14 wait a minute.  Let me hear it back.
15     (Record read.)
16         MS. ZYLSTRA:  Counsel, I think that's
17 attorney-client privilege and I'll instruct him not to
18 answer.  And if it is cabined with respect to the topics
19 that we have already covered, one of which relates to
20 the February 27th letter, I'm fine with him answering.
21         If it extends beyond that, if we don't put any
22 constraints with respect to the time period, then I
23 think I would call it privilege and instruct him not to
24 answer.
25         MR. INGRISANO:  This is the time period

Page 15

1 preceding that?
2         MS. ZYLSTRA:  If we're keeping it within that
3 time period I'll allow him to answer, but I just want --
4         MR. INGRISANO:  What time period is that?
5         MS. ZYLSTRA:  The February time period
6 relating to the lighting application in that letter.
7         MR. INGRISANO:  Okay.  So I'm asking about
8 before that lighting application.
9         MS. ZYLSTRA:  Well, I don't mind if it's --
10         MR. INGRISANO:  So I'm asking about February
11 and January of 2018.
12         MS. ZYLSTRA:  If it's cabined to that time
13 period I will let him answer.
14         Do you need the question back again?
15         THE WITNESS:  I would like the question back
16 again.
17         MS. ZYLSTRA:  I just want to be clear on the
18 issue.
19         MR. INGRISANO:  That's fine.
20     (Record read.)
21         MS. ZYLSTRA:  And that's in the
22 January-February 2019 time period.
23         THE WITNESS:  Right.  And you're asking for
24 advice that I gave him or just whether we consulted?
25     Q.   MR. INGRISANO:  I'm asking, at this point,

Page 16

1 consulting.
2     A.   I don't recall consulting or giving any
3 advice.  It would have been unusual for us to think
4 about it without an application on file, because there
5 are too many variables to guess at.
6         So prior to the application being filed, I
7 don't recall and I would doubt we did.
8     Q.   So in conjunction with the master plan
9 amendment filed by Edgewood in November of 2018, did you
10 review Edgewood's master plan?
11     A.   No.  When they filed it -- are you asking for
12 when they filed the plan?  No.
13     Q.   In conjunction with that, at or around that
14 time.
15     A.   No.
16     Q.   Did you review the Edgewood Master Plan at any
17 time prior to the filing of the light application in
18 February of 2019?
19     A.   Well, at some point the issue of games was
20 raised.  That was the first -- that was the first that I
21 had been brought into it, when it was -- the question
22 came up whether or not they could play games on the
23 field because of the language that said it was limited
24 to --
25         THE REPORTER:  You have to speak up.

Page 17

1         THE WITNESS:  Because it was limited to the
2 language of practices and classes.  Sorry.
3         And so I did look at that provision and that
4 would have been prior to the lighting application.
5         Because one of the reasons they talked about
6 tabling the amendment was because of the interpretation
7 about the games.  But my review of the master plan was
8 limited to that.
9     Q.   MR. INGRISANO:  When did you first review the
10 Edgewood Master Plan?
11     A.   I don't recall the date.  It would have been
12 when -- around the time when we communicated or Matt
13 communicated to Edgewood that the games were not allowed
14 on the field.
15         So it would have been around that time that he
16 came to me and said something like we found out that
17 they were playing games on the field and so what do you
18 think about this provision.
19     Q.   And that was communicated to Edgewood before
20 the master plan amendment was filed; correct?
21     A.   I don't know.  It would have been -- it was
22 either around that time or after that time.  I don't
23 remember when it was related to when it was filed.
24     Q.   So if Matt Tucker testified that he
25 communicated to Edgewood in or around October of 2018

5 (Pages 14 - 17)

Page 18

1  about his interpretation about games not being permitted
2  under the master plan it would have been at or around
3  that time that you would have first reviewed the master
4  plan?
5      MS. ZYLSTRA:  Objection.  Form, foundation.
6  A.  I don't -- like I said, I don't remember -- I
7  don't remember the date that he talked to me, the first
8  time he talked to me about the games.
9      You're asking about whether I reviewed the
10  master plan.  So he asked me about the games, and I
11  looked at the provision of the master plan that dealt
12  with the games and told him what I thought about that.
13      MS. ZYLSTRA:  Careful.
14  Q.  MR. INGRISANO:  I'll ask you to take a look at
15  Exhibit 45, Mr. Strange.
16      Mr. Strange, have you ever seen the email in
17  Exhibit 45, dated October 26, 2018, from Matt Tucker to
18  Brian Munson and Mike Elliot?
19  A.  I mean, I don't recall seeing -- I don't
20  recall seeing this.  I mean, I wasn't copied on the
21  letter.  I don't recall seeing this at the time.
22      I remember -- I remember this issue coming up
23  within the context of a larger meeting where it was
24  raised this issue about the games, and that's the first
25  I recall getting involved and talking to Matt about it.

Page 19

1  Q.  Sir, this is the first communication by the
2  City to Edgewood about a restriction on its ability to
3  play games on its field.
4      Do you have any reason to believe that you
5  were consulting with Mr. Tucker around this time on this
6  interpretation of the master plan?
7      MS. ZYLSTRA:  Objection.  Form, foundation.
8  A.  I mean, it's possible that I talked with him
9  in October if that's when this email came out.
10      I don't know for certain that I talked to him
11  prior to him sending this email.  I just remember him
12  consulting with me at some point about the fact that he
13  had learned information related to the number of games
14  being played, the kind of games being played on the
15  field.
16      And I don't remember the timeline with respect
17  to October or November when they filed the application.
18  Q.  Prior to Edgewood filing its light
19  application, sir, did you ever advise the City would
20  have no enforcement ability against team practices at
21  Edgewood held at night under the lights?
22      MS. ZYLSTRA:  Objection --
23  Q.  MR. INGRISANO:  Did you ever advise
24  Edgewood --
25      MS. ZYLSTRA:  Okay.  Thank you.

Page 20

1  Q.  MR. INGRISANO:  -- or its attorneys?
2  A.  When?
3  Q.  Prior to the filing of the light application,
4  did you ever advise Edgewood that the City would have no
5  enforcement ability against team practices at night with
6  lights?
7      MS. ZYLSTRA:  Objection.  Form, foundation.
8  A.  I don't recall advising Edgewood of that.
9  Q.  Or its attorneys?
10  A.  Or its attorneys.
11  Q.  Prior to filing the -- prior Edgewood's filing
12  of its light application, did Mr. Wautier ever advise
13  you that Edgewood would likely table its master plan
14  amendment?
15  A.  Prior to -- prior to filing the lighting
16  application did Nathan ever tell me that they were
17  considering tabling their --
18      Is that the same question you asked earlier
19  when we started all this?
20  Q.  That's the question I just asked.
21  A.  I know, but are you asking the same thing?
22  Q.  I don't think so, that's why I'm asking it
23  now.
24      MS. ZYLSTRA:  Object to form.  You can answer.
25  A.  Prior to filing -- prior to the time that they

Page 21

1  filed the lighting application I recall him telling me
2  that they were considering tabling the amendment.
3  That's all I recall about that.
4  Q.  Did you ask him why?
5  A.  I don't recall asking him why.  I recall that
6  one of the issues was the interpretation of games.
7  Q.  How was that an issue that would cause him to
8  table a master plan amendment that sought use of the
9  field?
10  A.  I don't know.  You would have to ask Nathan
11  that question.
12      That wasn't loud enough.  You'd have to ask
13  Nathan that question.
14  Q.  Okay.
15  A.  I don't know what motivated them.
16  Q.  Prior to filing the lighting application, to
17  your knowledge, was there any sort of protest petition
18  that was filed against Edgewood's master plan amendment?
19      MS. ZYLSTRA:  Objection.  Form, foundation.
20  You can answer.
21  A.  I don't recall.
22  Q.  Have you heard that any of the neighbors were
23  planning on filing a protest petition to Edgewood's
24  master plan amendment?
25  A.  I had not heard that.

Page 22

1    Q.   In your experience as a city attorney what
2  would the effect of a filing of a protest petition be on
3  an amended master plan?
4    A.   Well, to amend a master plan in the kind of
5  Campus-Institutional District you have to do a map
6  amendment, so that means changing the zoning.
7         So any time you do a map amendment there is a
8  possibility of a protest petition, and if a valid
9  protest petition is filed it increases the vote that's
10  required to three-quarters of the council instead of
11  majority vote.
12    Q.   So supermajority instead of a majority vote?
13    A.   I mean, three-quarters.  People have different
14  definitions of supermajority.
15    Q.   Understood.
16         (Exhibit 107 marked.)
17    Q.   MR. INGRISANO:  Mr. Strange, take a look at
18  Exhibit 107.
19         Do you recognize that, sir, as an email
20  exchange, the last email of which -- it appears the last
21  email of which you were copied upon.  Do you see that?
22    A.   When you say "the last email," are you talking
23  about January 22nd, 2019, 10:02 a.m.?
24    Q.   Yes, the most recent.
25    A.   I see I was copied on that email, yes.

Page 23

1    Q.   Do you recall being apprised on this date by
2  this email that Edgewood was confirming that it was not
3  requesting consideration of its project at the February
4  11th Plan Commission?
5    A.   You asked do I recall being apprised?  Sitting
6  here right now I don't recall.  I mean, this is three
7  years ago, right?
8         So I can look at this, though, and say I was
9  on this email, and I do recall hearing that they are not
10  going forward with the Plan Commission hearing, so I
11  certainly knew it around that time.
12    Q.   And, again, you don't recall having any
13  conversations with Mr. Wautier or anyone else at
14  Edgewood about why they were not requesting
15  consideration at that next Plan Commission meeting;
16  correct?
17    A.   I don't recall any specific conversations
18  about that.  I'm not saying they didn't happen.  I mean,
19  Nathan and I talked frequently, but if you're asking
20  about independent conversations, without any notes or
21  anything I don't know.
22    Q.   So the best of your recollection you were
23  apprised of the possibility of this being tabled by late
24  January, by the end of January 2019; correct?
25    MS. ZYLSTRA:  Objection.  Form.

Page 24

1    A.   Well, certainly by January 22nd, 2019 when
2  this email came through, and when it was set to go to
3  Plan Commission.
4         We knew it was going to go to Plan Commission
5  February 11, and so I would have found out sometime
6  before that.
7         It wasn't unusual for any project for me to
8  not be significantly involved in the preparations for an
9  upcoming Plan Commission meeting because there are so
10  many development projects throughout the City that
11  something like this could go all the way through without
12  me ever getting involved something like a big
13  development could.
14         So it wouldn't be surprising if they started
15  to say they are not going to go forward with it I was
16  made aware of that one way or the other.
17         (Exhibit 108 marked.)
18    Q.   MR. INGRISANO:  Mr. Strange, I'm handing you
19  what's been marked as Exhibit 108.
20         Do you recognize that, sir, as an email
21  exchange between and you Mr. Wautier, his email dated
22  February 22nd and yours dated February 23rd?
23    A.   Yes, I recognize it.
24    Q.   And that top email is an email that you sent?
25    A.   It looks like it.

Page 25

1    Q.   And that's your email address?
2    A.   Yes, that's my email address.
3    Q.   And in the email below Mr. Wautier is advising
4  you that Edgewood is tabling its master plan amendment;
5  is that right?
6    A.   That's correct.
7    Q.   And you responded by thanking him; is that
8  right?
9    A.   That's what it says.
10    Q.   And then you said, "I assumed this was going
11  to be the result."  Do you see that?
12    A.   I do see that.
13    Q.   Why did you assume that that was going to be
14  the result?
15    A.   I don't -- sitting here, I don't recall why I
16  assumed that.
17         I recall conversations with Nathan as they
18  were trying to make a final decision on that, and that's
19  probably based on information that he had provided me
20  that made me think that that's the way they were
21  leaning.  But I don't know for certain why I would have
22  said that I assumed that was going to be the result.
23    Q.   Is it fair to say, sir, that you were not
24  surprised by Edgewood's decision to table its amendment
25  if you had assumed that that was the result that they

Page 26

1 were going to be seeking?
2       MS. ZYLSTRA:  Object to form.  You can answer.
3       A.  I don't -- I mean, was I surprised?  I think
4 probably I was --
5       At that point we were hoping that they would
6 go through with the master plan amendment process, and
7 so surprise is probably not what I was feeling, just
8 more realistic.
9       This is what he had been telling they were
10 likely to do and now he sends me an email saying
11 this is what they are going to do.
12       Q.  I'll ask you to take a look at Exhibit 6,
13 Mr. Strange.
14       MR. INGRISANO:  Counsel, while he's looking at
15 that, just for the record, you're representing
16 Mr. Strange today?
17       MS. ZYLSTRA:  I am.
18       Q.  MR. INGRISANO:  Mr. Strange, I'm handing you
19 what's been marked as Exhibit 6 there in the binder, a
20 letter to Mike Elliot dated February 27, 2019 from Matt
21 Tucker.  Do you see that?
22       A.  I do.
23       Q.  And have you seen this letter before?
24       A.  I don't recall -- I don't recall seeing this
25 until preparing for the deposition shown to me as one of

Page 27

1 the exhibits.  But I don't recall seeing it.  I mean,
2 sitting here today I don't recall seeing it before that
3 time.
4       Q.  Did you assist Mr. Tucker in drafting this
5 letter?
6       A.  I did not assist him.  This was February 27th.
7 It would have been shortly after they filed the lighting
8 application.  I didn't -- Matt usually drafted these on
9 his own.
10       And he sometimes ran them past me, sometimes
11 he didn't.  I don't recall helping him draft like
12 language or anything.  It's possible that he ran it past
13 me but I don't remember drafting language.
14       Q.  So the first line on this letter says, "On
15 Friday, September 22nd, the Building Inspection Division
16 accepted a lighting plan filed by Forward Electric on
17 behalf of Edgewood High School to install lighting for
18 the school's field."  Do you see that?
19       A.  Uh-huh.
20       Q.  I'm sorry, is that a yes, Mr. Strange?
21       A.  Yes.  I'm sorry, I've never done this before.
22 I've never done a deposition, so normally --
23       Q.  The court reporter needs to hear your verbal
24 answers.  You've done a great job so far.
25       A.  Yes.

Page 28

1       MS. ZYLSTRA:  And can I just pause for a
2 second.  You know, it makes her job a lot easier --
3       THE WITNESS:  Yes, I know.
4       MS. ZYLSTRA:  -- if you don't talk over each
5 other.
6       THE WITNESS:  Yep, yep.
7       MR. ZYLSTRA:  You're talking over me now.  Do
8 your best to wait until he's done with his question
9 before you respond and he will do the same.  Thank you.
10       THE WITNESS:  Sorry.
11       Q.  MR. INGRISANO:  So, do you see that on Exhibit
12 6?
13       A.  Yes.
14       Q.  The February 22nd acceptance of a lighting
15 plan?
16       A.  February 22nd lighting plan, yes.
17       Q.  Between February 22nd and February 27th do you
18 recall conferring with Mr. Tucker about the issuance of
19 a permit for the lighting or the Edgewood Master Plan
20 and its limitations?
21       A.  I don't have an independent recollection of
22 conferring with him about this in between February 22nd
23 and February 27th when this was sent out.  It's possible
24 that I did.  If he called and sent me the letter it's
25 possible I did.

Page 29

1       I remember -- as I said earlier, I remember
2 when the application was filed not knowing anything
3 about 10.085, knowing that was more George Hank's area
4 and saying to them take a look at this application.
5       I knew that there were interactions with the
6 zoning code because of the zoning code provisions and
7 certain provisions in 10.085 related to other
8 regulations, but I didn't know anything about the
9 lighting aspect.
10       Sitting here today, I couldn't tell you the
11 difference between lumen and non-lumen, so I had sort of
12 left it up to them to try and figure out what the
13 application said.
14       Q.  To the best of your recollection when were you
15 first consulted about the Edgewood lighting application?
16       A.  I don't recall the first time I was consulted
17 about the Edgewood lighting application.
18       Q.  The end of the first paragraph of Exhibit 6,
19 it says, "Those plans" -- meaning the Edgewood lighting
20 plans -- "will be reviewed for compliance with MGO
21 Section 10.085, and if the plans comply, electrical
22 permits will be issued when requested."
23       Did I read that correctly?
24       A.  That's what the document says, yes.
25       Q.  Prior to -- let me ask you this:

Brown & Jones Reporting                414-224-9533
A Veritext Company                     www.veritext.com

Page 30

1    Did you ever have a contrary view of what
2 would happen to that lighting application or should
3 happen to that lighting application the difference from
4 that sentence?
5    MS. ZYLSTRA: Objection. Form. You can
6 answer.
7    A.  Did I ever?  Yes, I did.
8    Q.  And when did you first develop that?
9    A.  Well, George Hank said I don't think we can
10 issue this permit under 10.085.  I looked at 10.085,
11 looked at the master plan, looked at the map amendment,
12 and said I agree, they don't have anything in the master
13 plan about lights.  This is a capital improvement.
14    And I think my -- then, shortly after that,
15 Nathan and I had an exchange of formal letters where I
16 dug into the issue.
17    And so I don't know if it's contrary to that
18 line because that line says it's going to be reviewed
19 for compliance with MGO 10.085, and if they comply then
20 they would be issued.  That's true.
21    My ultimate decision was -- my ultimate
22 interpretation was they didn't comply.
23    Q.  The first time you recall analyzing, reviewing
24 that question was at some point with George Hank; is
25 that correct?

Page 31

1    A.  That's the first time that I recall, yes,
2 really looking into it and giving an interpretation from
3 our perspective.
4    Q.  The next line of this letter in the start of
5 the first -- in the start of the second paragraph, "The
6 City believes this permit can be issued without
7 requiring amendment to the approved 2014 Master Plan."
8    Do you see that?
9    A.  I do.
10    Q.  And on or before the date of this letter had
11 you ever expressed that statement or sentiment to anyone
12 else within the City?
13    MS. ZYLSTRA: Objection. Form.
14    A.  I don't recall ever making that sentiment, no.
15    Q.  Had you heard anyone from the City ever
16 express that sentiment to you?
17    MS. ZYLSTRA: Objection. Form.
18    A.  I don't recall hearing anybody express that
19 sentiment to me.
20    My thinking throughout this process was that
21 the master plan, whatever is being -- whatever is being
22 applied for has to comply with the master plan, right?
23    So we go through this process of having the
24 master plan amendment and then they switch gears in
25 filing a lighting application.

Page 32

1    And so my concern was, not knowing anything
2 about 10.085, making sure that the application complied
3 with all aspects of that, one of which is it's got to
4 comply with the other regulations.
5    And so I don't recall the dates and times when
6 all of those determinations were made.
7    My first recollection of really digging into
8 it and providing a legal answer was when I responded to
9 Nathan's statement that we had already approved it.
10    Q.  But prior to Edgewood filing its master plan
11 -- or I'm sorry, filing it's lighting application -- I
12 think I just heard you say this.
13    Prior to Edgewood filing its lighting
14 application you had come to the conclusion that lighting
15 would have to comply with Edgewood's master plan; is
16 that correct?
17    MS. ZYLSTRA: Object to form, foundation.  You
18 can answer.
19    A.  I had come to the conclusion that because the
20 master plan was still in effect we had to make sure that
21 whatever was being proposed in that area complied with
22 the master plan.
23    Q.  Between February 22nd and February 27, do you
24 know if you had any in-person meetings with Mr. Tucker?
25    A.  Sitting here today I can't recall an in-person

Page 33

1 meeting.  I'm sorry.  It's been a long time.
2    Q.  How about emails in which drafts of this
3 letter, Exhibit 6, may have been sent during that period
4 of time?
5    A.  Do I recall any emails?  I don't -- like I
6 said, there may have been emails.  I don't recall seeing
7 this letter up until that point.
8    If he -- if he contacted me about it, he may
9 have emailed it to me, he may have called me about it to
10 talk about it verbally.  If I looked at it, it was
11 pretty quick and then the letter went out.
12    Q.  With respect to this Exhibit 6, is anything in
13 this Exhibit 6 -- and take a look at it if you have to
14 further, the first page of Exhibit 6.
15    Did anything in this exhibit run contrary to
16 your understanding of the City's position on Edgewood's
17 lighting application as of February 27?
18    MS. ZYLSTRA: Objection. Form, foundation.
19 You can answer.
20    THE WITNESS:  Could you read that back to me
21 just so I understand the time.
22    (Record read.)
23    THE WITNESS:  Well, as I read this today, what
24 I read this saying is that the lighting application has
25 to comply with 10.085 and the master plan, and that it's

9 (Pages 30 - 33)

Page 34

1 being reviewed for compliance with MGO 10.085.
2      I don't -- on this date, February 27th, it
3 sounds like it was still being reviewed for compliance
4 with 10.085.
5      So I don't know that it necessarily takes a
6 position that I could say would be contrary.
7      What I testified to before was that when
8 George Hank raised his hand and said I don't think we
9 can issue this permit, and I looked closely at the
10 application, closely at the master plan and specifically
11 10.085, I determined that I agreed with him.
12   Q.  Mr. Strange, do you remember having a call
13 with Nathan Wautier on or around February 26 of 2019 in
14 which you agreed that the lighting application was a
15 separate issue from the zoning use and the master plan?
16   A.  No, I don't have any independent recollection
17 of that.
18   Q.  Do you recall telling Mr. Wautier that you
19 told Mr. Tucker and Ms. Stouder that the two were
20 separate issues?
21   A.  Do I recall Mr. Wautier telling?
22   Q.  Right.  Do you recall telling Mr. Wautier that
23 you told Matt Tucker and Heather Stouder that those were
24 separate issues, i.e., the light application and the
25 zoning use under the master plan?

Page 35

1   A.  I don't recall.  I don't recall telling Nathan
2 that, if that's what you're asking.
3   Q.  Do you remember telling Mr. Wautier at that
4 time on or around February 26th of 2019 that the
5 lighting application was presently then in the normal
6 process of being reviewed for compliance with 10.085?
7   A.  I don't recall conversations with Nathan on
8 February 26th.
9   Q.  Let me ask you to take a look at Exhibit 38,
10 sir.  Actually, let me ask you to take a look instead at
11 Exhibit 3.  It's a more legible copy.  Maybe keep a
12 bookmark on 38.
13   A.  I'll just remember the number.  That's easier
14 to see.
15   Q.  It is.  Sir, do you recognize Exhibit 3 as a
16 printout of a City of Madison Site Plan Verification?
17      MS. ZYLSTRA:  Objection.  Form, foundation.
18 You can answer.
19   A.  I do.
20   Q.  Have you ever reviewed this document before?
21   A.  I have.
22   Q.  And do you recall reviewing this in February
23 and/or March of 2019?
24   A.  Again, I'm having trouble with the date frames
25 you're giving.

Page 36

1   Q.  Sure.
2   A.  I'm sorry, you're asking me to recall
3 something over a period of time.
4      I recall when George raised the issue of
5 whether or not we could issue the permit.  I recall
6 asking Matt for documents at some point and I remember
7 he sent this to me.  That was the first time I saw this.
8   Q.  So the first time that you recall seeing
9 Exhibit 3 was after, you're saying, George Hank raised
10 the question of whether the light permit could be
11 issued; is that right?
12   A.  Right.  To the best of my recollection that's
13 the first time I would have seen this.
14   Q.  Did you have any discussions with either Steve
15 Rewey or Christina Thiele about their involvement with
16 this approval at Exhibit 3?
17   A.  No.  This is -- these site plan verification
18 forms, this is probably the third one I've ever seen in
19 my life, so I just wasn't involved in that sort of staff
20 process.
21   Q.  Understood.  But after the fact, and in
22 looking at the approval and in looking at George's
23 expression that he didn't think the light permit should
24 issue, in doing your review and advising the City, you
25 didn't go back and talk to Steve or Christina?

Page 37

1   A.  No.
2      (Exhibit 109 marked.)
3      MR. INGRISANO:  Mr. Strange, I'm handing you
4 what's been marked as Exhibit 109.
5   A.  Okay.
6   Q.  It's an email exchange between you and Nathan
7 Wautier starting Thursday, March 7, 2019, at 4:25 p.m.,
8 and ending March 7 at 6:24 p.m.  Do you see that?
9   A.  I do see this email that you -- this series of
10 emails.  If I could take a minute to read them all.
11   Q.  Yeah, please, go ahead.
12   A.  Okay.
13   Q.  Sir, do you remember discussing with
14 Mr. Wautier in this email a meeting that was coming up
15 on March 8th and whether or not to attend that meeting?
16      MS. ZYLSTRA:  Objection.  Form.  You can
17 answer.
18   A.  I recall that now, having reviewed this
19 document.
20   Q.  Did you attend that meeting on March 8?
21   A.  No.
22      MS. ZYLSTRA:  Objection.  Form.  You can
23 answer.
24   A.  No, I did not.
25   Q.  And you write on March 7 at 4:30 p.m., "No" --

1 as in saying you were not aware of a meeting tonight --
2 "There are some neighbors (I don't know if it's No
3 Stadium Now) who asked for a meeting with staff through
4 Alder Arntsen. That meeting is tomorrow. It is my
5 understanding they want clarification on process."
6      Did I read that correctly?
7   A. You did.
8   Q. So do you have an understanding of who was
9 going to be attending that meeting?
10      MS. ZYLSTRA: Objection. Form, foundation.
11   A. I don't.
12   Q. Do you know if Mr. Tucker attended that
13 meeting?
14   A. I don't know.
15   Q. Alder Evers?
16   A. I don't know. I just knew I wasn't going to
17 attend and that's pretty much the last I thought of it.
18   Q. Sure. At this point in time in communicating
19 with Mr. Wautier did you understand that Edgewood had
20 filed its lighting application?
21   A. I mean, they would have filed their lighting
22 application. Presumably, I would have understood that.
23 But sitting there I can't say that I recall that while I
24 was having this conversation with him.
25   Q. Sure. While you're having this email

1 conversation with Mr. Wautier did you understand at that
2 point in time that Mr. Hank had expressed a concern or
3 reservation about issuing the lighting permit?
4   A. I can't remember when George first did that in
5 relation to this email exchange.
6   Q. But there is nothing in this email that would
7 suggest that there is an issue to Mr. Wautier about the
8 Edgewood lighting application; is that right?
9   A. This email appears to be Nathan asking me if
10 there is a meeting whether Edgewood could go, whether I
11 was going to go, and I responded with what I knew about
12 that meeting at the time. I don't -- it doesn't contain
13 any other information than that.
14   Q. As you sit here today when you read this
15 email, as of March 7 you were not aware of any looming
16 or potential issues between Edgewood and the City of
17 Madison with respect to that lighting application as of
18 that March 7 date; is that right?
19      MS. ZYLSTRA: Objection. Form, foundation,
20 misstates testimony. You can answer.
21   A. I don't recall -- again, I don't recall the
22 date when I first heard about that from George.
23   Q. Did you receive any sort of report about what
24 was discussed at that meeting on March 8th?
25   A. No.

1   Q. On March 7, when you're sending this email --
2 in sending these emails to Mr. Wautier on Exhibit 109
3 were you aware that, per Exhibit 3, that the lighting
4 review and zoning review had already been stamped
5 approved by city staff?
6      MS. ZYLSTRA: Objection. Form. You can
7 answer.
8   A. I don't know. I don't think so. I don't
9 know. Again, the timeline is -- I don't know the exact
10 timeline.
11   Q. I'd ask you to look at Exhibit 70, sir. It's
12 going to be in the other binder.
13   A. Okay.
14   Q. Take a look at that Exhibit 70. Do you
15 recognize that document, sir?
16   A. I do.
17   Q. It's a letter to you dated March 12, 2019 by
18 Nathan Wautier; correct?
19   A. Correct.
20   Q. And you recall receiving this letter?
21   A. I do recall receiving this letter.
22   Q. Sir, in the second paragraph of the first page
23 of this Exhibit 70 it says, "It has come to my attention
24 that the City of Madison is considering the revocation
25 of its prior approval of the complaint application based

1 upon a new zoning interpretation for the Edgewood campus
2 that the light poles of any height -- that light poles
3 of any height are not allowed."
4      Did I read that correctly?
5   A. I mean, not verbatim, but yes.
6   Q. I misspoke once, but that's --
7   A. Yes.
8   Q. Okay. Do you know, sir, how it came to
9 Mr. Wautier's attention that there -- well, let me ask
10 you this:
11      As of March 12, 2019, was it your
12 understanding that the City of Madison was indeed
13 considering revocation of the prior approval?
14      MS. ZYLSTRA: Objection. Form. You can
15 answer.
16   A. Again, I don't recall the dates. I recall
17 that at some point George raised his hand and said
18 "hey," and we took a look at it and I agreed that we
19 couldn't issue it.
20      The next thing I recall is Nathan sending this
21 letter and saying -- and I don't know how they -- I
22 don't know how they learned of it, of a changed
23 interpretation or -- I don't.
24   Q. But you are saying that what you described as
25 George Hank raising his hand, you're saying that George

Page 42

1 Hank did raise his hand before you received this letter
2 from Nathan Wautier?
3       A.  That would be my -- that would be my best
4 guess that, yes, he did.
5             I mean, at that point, we would have
6 presumably -- based on Nathan's letter we would have
7 talked about it up until that point George would have
8 said something.
9       Q.  Do you recall how far, before receiving this
10 letter, that you would have been meeting with Mr. Hank
11 where he would have been expressing that concern and, as
12 you said, raising his hand about issuing that permit?
13          MS. ZYLSTRA: Objection. Form. You can
14 answer.
15       A.  I don't recall how far before.
16       Q.  Sir, if you look at Exhibit 109 briefly.  It
17 should be a separate exhibit.
18          Exhibit 109, when you look at some of the
19 markings on this document it references March 7 as being
20 a Thursday.  Do you see that?
21       A.  I do.
22       Q.  So is that consistent with the idea that there
23 is going to be a Friday meeting that was referenced on
24 March 8th in this document; correct?
25          MS. ZYLSTRA: Objection. Form, foundation.

Page 43

1 You can answer.
2       A.  Say that again.
3       Q.  Sure.  Is that consistent with the idea that
4 there is going to be a meeting the following day, March
5 8th, which would have been a Friday; correct?
6          MS. ZYLSTRA: Objection. Form.  You can
7 answer.
8       A.  If that's when the meeting happened.  I mean,
9 my email says at the time it looked like I thought the
10 meeting was going to be tomorrow, that would have been
11 Friday.  I don't have an independent recollection of
12 when the meeting actually occurred because I didn't go.
13       Q.  And as you said before, you don't have a
14 recollection of anyone confirming for you that meeting
15 occurred, right?
16       A.  Correct.
17       Q.  Sir, if Thursday, March 7 -- well, if March 7
18 is a Thursday, by my calculation March 12 would have
19 been a Tuesday.  Do you agree with that?
20       A.  Yes.
21       Q.  Do you recall meeting with George Hank over
22 the weekend on either March 9 or March 10?
23       A.  No.
24       Q.  Do you recall meeting with George Hank the day
25 before this meeting on March 12 -- I'm sorry, before the

Page 44

1 letter on March 12, so the meeting would have occurred
2 on March 11.
3          Do you recall a meeting with George Hank on
4 March 11?
5          MS. ZYLSTRA: Objection. Form. You can
6 answer.
7       A.  No, I don't recall a meeting with George.
8 What I recall from that day, to the best of my
9 recollection, is a telephone call with Nathan telling me
10 he was going to send me this letter, and I said okay.
11          But I didn't -- I don't recall meeting with
12 George or anybody else on that day.
13       Q.  So as of March 11 you knew that Exhibit 70 was
14 in process for Mr. Wautier; is that right?
15       A.  Well, I knew that he was thinking about
16 sending a letter.  I think he was trying to determine
17 whether he thought it was the best thing to do or not.
18          So I didn't know if it was coming or not or
19 what it would say.  And so that's what I recall from
20 that day or around that day.
21       Q.  Did he express to you why he was sending you
22 that letter?
23       A.  I think he expressed generally the same thing
24 he expressed in the letter.
25       Q.  Did he express how it had come to his

Page 45

1 attention?
2       A.  No, not that I recall.
3       Q.  In Exhibit 109, he's thanking you for getting
4 back to him.  He's telling you he's not going to attend
5 this meeting and he's wishing you to have a good
6 weekend; correct?
7       A.  That is correct.
8       Q.  So as of March 7, 2019, were you aware of any
9 issue that Nathan Wautier had with the City of Madison
10 regarding the light permit?
11          MS. ZYLSTRA: Objection. Form, foundation.
12 You can answer.
13       A.  I can't speculate to what issues Nathan may or
14 may not have had with the City at that point.
15       Q.  So when you talked to him on March 11 was that
16 the first you were hearing that Nathan was having a
17 problem with the City's position on the light permit?
18       A.  That's the first I recall hearing it.  I don't
19 know if we had conversations before that.
20          To be quite honest, my ears really didn't perk
21 up until I got a letter with a lawyer letter like this
22 thinking, ope, I better engage here.
23          So I don't recall if the 11th was the first
24 time he mentioned that or if it was before that.
25       Q.  But to the best of your recollection your

Page 46

1  meeting with George Hank was before receiving this
2  letter dated March 12; correct?
3      A.  Yes.
4      Q.  Exhibit 70.
5      A.  Yes.
6      Q.  And what can you remember about that meeting
7  with George Hank?
8          MS. ZYLSTRA:  Object to form.  You can answer.
9      A.  I remember George raising the question of
10 whether or not we can issue the permit when they aren't
11 in compliance with the master plan.
12         And then I read 10.085, and I said here's a
13 provision that says you have to be in compliance with
14 all regulations, read the master plan and see there were
15 no lights there, there were capital improvements, there
16 were no lights, there were no proposals for capital
17 improvements.  And I said, "George, I think you're
18 right."
19         Now, I don't, sitting here, have a
20 picture-perfect memory of that meeting.  I couldn't tell
21 you where we were.  I couldn't tell you if it was a
22 phone conference, but that's what I recall him saying.
23     Q.  How many meetings did you have with George
24 Hank?
25         MS. ZYLSTRA:  Objection.  Form.  You can

Page 47

1  answer.
2      A.  I don't recall, but I believe it was just one
3  on that issue.
4      Q.  And do you recall anyone else that was either
5  -- you said you don't remember if it was in person or on
6  the phone.
7          Do you recall anyone else who would have been
8  either on the phone or in the meeting?
9      A.  I don't recall anybody, but I would -- as
10 practice would have it, Matt would have been there.
11         I mean, Matt was -- or George was Matt's boss,
12 so --
13     Q.  Do you remember going through the master plan
14 with either George Hank or Matt Tucker at that meeting
15 or on that call?
16     A.  I don't recall going through the master plan
17 at that meeting.  But again, I can't recall the
18 specifics of the meeting.
19     Q.  Do you remember Matt Tucker saying anything
20 during that meeting if he was there?
21     A.  No.
22     Q.  So, to your understanding, George Hank had
23 expressed this interpretation of the master plan that it
24 didn't permit the lights; is that correct?
25     A.  George Hank expressed the concern that we

Page 48

1  could not issue the permit if it didn't comply with the
2  master plan.
3          He was the lighting person.  I think he was
4  looking for me for confirmation whether I thought it
5  complied with the master plan, and I said I don't think
6  it does and therefore it doesn't.
7          And I think that's -- that would have been the
8  likely way that it would --
9      Q.  What about the lighting permit did not comply
10 with the master plan?
11     A.  Well, the master plan did not propose stadium
12 lighting on the open space that they described as an
13 athletic field for practices and classes.
14         It did not describe it as a stadium, it didn't
15 describe it as an athletic complex, it didn't show any
16 lighting there.  And it specifically says in the CI
17 District ordinance that if you are going to propose a
18 different use for an open space or if you're going to
19 propose a capital improvement to -- that's not shown on
20 the master plan, that it requires Plan Commission
21 approval.
22         And that's what they were going for when they
23 had to file the application to amend the master plan.
24 They decided to table that.  Nothing changed about that.
25 That was still the case.

Page 49

1          The unusual thing was they stopped that
2  process and then they started going down this path of
3  just filing a 10.085 application without really giving
4  us information about what their intentions were.
5          And so I looked at the master plan and said
6  there are no lights proposed here.  There is a capital
7  improvement.  They need to go to the Plan Commission for
8  approval.
9          And, again, the provision was clear, both the
10 zoning code and 10.085, that it has to be compliant with
11 not only the technical specifications but with all the
12 regulations as well.
13     Q.  So Exhibit 71 is your response to
14 Mr. Wautier's letter; correct?
15     A.  Correct.
16     Q.  And that's dated March 21, 2019?
17     A.  That's correct.
18     Q.  So between receipt of his letter, dated March
19 12, 2019 and March 21 of 2019, what further analysis and
20 review did you do to be able to craft the response in
21 Exhibit 71?
22     A.  Well, they would have begun by reading the
23 letter closely, considering all of the points that he
24 was making as to why lighting would be allowed under the
25 master plan.  And I would look at those provisions of

Page 50

1 the master plan and decide whether I agreed with him or
2 not and then I would formulate a response.
3         So I also read the legal authority that he
4 cited with respect to vested rights and disagreed with
5 that and came to the conclusion that I didn't agree with
6 his position that the lighting application was going to
7 be denied and sent him our response and go from there.
8    Q.  In between March 12 and March 21, did you
9 confer with Mr. Tucker on the response?
10    A.  I don't recall conferring with him.  It would
11 have been actually probably unusual for me to do that at
12 that point because I was now in lawyer mode and crafting
13 a response.
14         It may be that I had him review the letter at
15 some point, but it would have been unusual for me to be
16 sitting with him and crafting a response with him.
17    Q.  In crafting your Exhibit 71, was it your
18 intent that that letter serve as the City's denial or
19 revocation of the lighting permit?
20         MS. ZYLSTRA:  Objection.  Form.  You can
21 answer.
22    A.  Denial; not revocation.  Because I wasn't
23 convinced this was actually ever -- it wasn't -- it was
24 never in compliance with the regulations and so there
25 was nothing to revoke.  It had never been issued.  It

Page 51

1 was a denial.
2    Q.  Prior to March 21 of 2019, did you have any
3 communications with anyone else from the City, City
4 officials, in formulating this response?
5         MS. ZYLSTRA:  I'm going to object.  That's
6 broadly phrased and I'm going to invoke the
7 attorney-client privilege.
8         To the extent you have any privileged
9 communications I want you to not disclose those.  To the
10 extent you have any non-privileged communications you
11 may answer.
12    A.  I don't recall any communications.  It would
13 have been very common for me to basically go into a hole
14 at this point and craft a response.
15    Q.  And so your attorney's objection kind of
16 muddied the waters here.
17         I'm not asking you for any non-privileged
18 communications.  I want to know about the existence of
19 communications.  I'm not asking you to disclose any
20 substance of the communication.  I want to know about
21 the existence of communications with anyone from the
22 City, any City official prior to March 21, 2019, that
23 you considered in formulating this response.
24    A.  I don't recall the existence of any
25 communications.  I don't recall what I would have done

Page 52

1 during that period of time.
2    Q.  Do you recall any communications that you
3 received or sent or had with any residents of the City
4 of Madison on or before March 21, 2019 related to
5 Edgewood's lights?
6         MS. ZYLSTRA:  Objection to form.  Do you mean
7 other than city officials, like you mean neighbors?  Is
8 that what you're trying --
9    Q.  MR. INGRISANO:  Neighbors and residents in
10 their capacity as residents and neighbors.
11    A.  No, I don't recall any communication with
12 residents or neighbors.
13    Q.  Sir, Exhibit 71, was it your intent that that
14 provide a complete response to Mr. Wautier's letter; in
15 other words, this letter sets forth all of your
16 conclusions as to your interpretation of the master plan
17 and why it prohibited the issuance of that light permit;
18 correct?
19         MS. ZYLSTRA:  Object to form.  You can answer.
20    A.  Not necessarily.  I mean, I wouldn't have
21 necessarily made more arguments than I needed to, to
22 refute what was in his letter.  So I made the ones that
23 I needed to address his points, but I would have not
24 necessarily made every single argument that I was
25 thinking at the time.

Page 53

1         Sitting here today, I can't recall
2 specifically leaving any out, but it would have been --
3 I wasn't certainly intending to waive any defenses by
4 including or not including anything.
5    Q.  As you sit here today are there any provisions
6 in the master plan that you can recall that you didn't
7 cite in your letter, Exhibit 71, that you believe
8 supported your conclusion?
9         MS. ZYLSTRA:  Objection.  Form, foundation.
10 You can answer.
11    A.  The purpose of my letter was to respond to the
12 provisions that he was citing as authority and telling
13 him then why I thought he was wrong.
14         I did not lay out an exhaustive list of
15 everything in the master plan that I thought did or
16 didn't support my interpretation.  And sitting here
17 today, I can't recall what those things may have been.
18         But my intent was to respond to his letter,
19 not to write an entire thesis on the issue.
20    Q.  And Exhibit 71, this is your -- this
21 represents your interpretation of the master plan and
22 why it prohibits the lights; correct?
23         MS. ZYLSTRA:  Object to form.  You can answer.
24    A.  Correct.  This was my response to him as to
25 why -- responding as to why the master plan would need

14 (Pages 50 - 53)

Page 54

1 to be amended to allow lights.
2    Q.  And you don't recall Mr. Tucker having any
3 input in formulating the arguments that you have in
4 Exhibit 71; correct?
5        MS. ZYLSTRA:  Objection.  Form, asked and
6 answered.  You can answer.
7    A.  I don't recall.  It's possible that I sent him
8 the letter to review it.  That would have been the
9 common practice.  But I don't recall him sitting down
10 with me to come up with a response.
11    Q.  And how about Mr. Hank; would you have sent it
12 to him as well?
13    A.  I don't -- that's -- I mean, it would have
14 been less common for me to do that.  It's possible that
15 I did, but it would have been less common for me to send
16 it to him as well.
17    Q.  After sending this letter, Exhibit 71, did you
18 have any additional conversations with Edgewood High
19 School or its representatives about issuance of the
20 lights?
21        MS. ZYLSTRA:  Object to form.
22    A.  Not that I recall.  I mean, it didn't give me
23 a time period, but I don't recall doing that.
24    Q.  Sir, what, if any, involvement did you have
25 with the issuance of the City of Madison's official

Page 55

1 notices for Edgewood's use of its athletic field for
2 athletic competitions?
3    A.  I recall being consulted about whether to
4 issue those notices.
5        MS. ZYLSTRA:  Careful.  At least with respect
6 to the notices, to the extent you had privileged
7 communications with anyone at the City that would invoke
8 attorney-client privilege I would instruct you not to
9 answer.
10        Your answer so far is fine just that he was
11 consulted.  I didn't want you to expand upon that
12 without a question.
13    Q.  MR. INGRISANO:  Did you advise the City that
14 it was on solid ground to issue those official notices?
15        MS. ZYLSTRA:  I'm going to object and claim
16 attorney-client privilege and instruct him not to
17 answer.
18        MR. INGRISANO:  So you're not waiving it on
19 this area?
20        MS. ZYLSTRA:  We haven't yet, and I haven't --
21 I'm concerned about going too further down the line in
22 terms of that.
23        So I think -- I think for right now I'm going
24 to hold on the privilege.  As you can tell, there is no
25 city representative here today.  That's due in part to

Page 56

1 schedules and the quickness of this deposition.  I may,
2 at a break, see if I can consult them on whether I can
3 continue on that topic.
4    Q.  MR. INGRISANO:  Mr. Strange, are you going to
5 listen to your attorney's advice on that?
6    A.  Yes.
7        (Exhibits 110 and 111 marked.)
8    Q.  MR. INGRISANO:  Mr. Strange, I'm handing you
9 what's been marked as Exhibit 110.  It's an email from
10 Attorney Matt Lee to you, dated July 1st, 2019.  Do you
11 see that?
12    A.  I do.
13    Q.  Do you recall receiving this email?
14    A.  Can I take a minute to read it?
15    Q.  Please do.
16    A.  Okay.  I do recall seeing this.
17    Q.  And Mr. Lee is expressing -- fair to say he's
18 expressing his displeasure about a record he received in
19 open records request that involved an email exchange
20 involving you; correct?
21    A.  That's correct.
22    Q.  Sir, Exhibit 110 references an attachment;
23 correct?  Looking at 110, sir.
24    A.  I'm looking at 110, an email, yes.
25    Q.  And there is an attachment, Strange 5-13-19

Page 57

1 email to Evers and follow up PDF.  Do you see that?
2    A.  I see that.
3    Q.  Sir, do you recognize Exhibit 111 as that
4 attachment?
5    A.  I don't recognize it as an attachment.  I
6 recognize 111.
7    Q.  And what is 111, sir?
8    A.  Well, it looks like an email that Lisa Veldran
9 printed out from Tag Evers to Lisa Veldran regarding
10 obtaining a copy of Edgewood's 4/12 letter to the City.
11        It looks like there is some other emails here
12 between Alder Evers and some individuals.  There is my
13 email to Alder Evers.  It looks like the original string
14 of emails where Ethan Brodsky requested a public record.
15    Q.  So starting, I guess, with the last page of --
16 second to last page of -- strike that.
17        The last page of this exhibit, EHS 10433.  Do
18 you see that?
19    A.  I do.
20    Q.  That's an email from Ethan Brodsky to you,
21 correct, dated Wednesday, April 3 of 2019?
22    A.  That's correct, looks like.
23    Q.  And he's asking you to get a copy of the
24 letter that Attorney Nathan Wautier sent to the City on
25 March 12; correct?

Page 58

1    A.   That's what it says, correct.
2    Q.   And you respond by advising him that you will
3 send a letter tomorrow when you have a minute and that
4 you would consider his email to be a formal public
5 records request, right?
6    A.   Correct.  That's what it says.
7    Q.   Do you oftentimes take emails such as what
8 Mr. Brodsky sent you and consider that or deem that to
9 be a formal records request?
10   A.   I don't know about oftentimes.  It's rare that
11 we get a request for one document.  Usually it's
12 hundreds and thousands.
13        So I think in this instance it would have not
14 been normal for me to go back and, say, submit a formal
15 requests record, which is what document they are looking
16 for.
17   Q.   Do residents in the city of Madison submit
18 record requests to you specifically?
19        MS. ZYLSTRA:  Object to form, foundation.  You
20 can answer.
21   A.   Sometimes.
22   Q.   So as part of your practice, as part of your
23 experience as assistant city attorney, you would receive
24 direct requests for records from residents in the city
25 of Madison?

Page 59

1    A.   It was not the usual.  Usually they sent them
2 directly to a department.  But, I mean, over 12 years
3 I've gotten emails from residents asking for documents.
4    Q.   And who is Ethan Brodsky?
5    A.   I don't know Ethan Brodsky other than to say
6 that I know that he was one of the neighbors of the
7 Woodrow complex.
8    Q.   To your recollection is his email to you of
9 April 3 the first time that you received a communication
10 from him?
11   A.   To the best of my recollection, yes.
12   Q.   Mr. Brodsky follows up with you, though,
13 correct, and asks for a spreadsheet that was attached to
14 that letter; correct?
15   A.   It looks like it.  That's what it says there,
16 yes.
17   Q.   On EHS 10430 you send an email to Alder Evers;
18 correct?
19   A.   Evers, yes.  It's very confusing but --
20   Q.   I caught myself.  I think I did a pretty good
21 job of that not following into that trap.
22        Your email to Alder Evers, May 13, 2019, at
23 9:11 a.m.; correct?
24   A.   Correct.
25   Q.   And you drafted that email?

Page 60

1    A.   I did.
2    Q.   And you write to Alder Evers, "Per his
3 request, I provided Ethan Brodsky with the spreadsheet
4 Edgewood provided the City back in April regarding the
5 potential nonconforming use"; correct?
6    A.   Correct.
7    Q.   "As I explained to Ethan, Edgewood did not
8 provide any other information, though they said they
9 could send me affidavits from athletic directors";
10 correct?
11   A.   Correct.
12   Q.   You write, "I did not ask for those since I
13 have no question they would say whatever needed to be
14 said."  Did I read that correctly?
15   A.   You did.
16   Q.   "I think Matt shared the spreadsheet with you,
17 but if not I've attached it here."  Do you see that?
18   A.   I do see that.
19   Q.   You then say, "Could you follow up with Ethan
20 or whomever you suggested may have information contrary
21 to what is contained in this spreadsheet"; right?
22   A.   Correct.
23   Q.   And then you write, "Again, I would be looking
24 for a 12-month gap in game play, maybe even when they
25 installed the field."  Right?

Page 61

1    A.   Correct.  That's what it says.
2    Q.   You didn't feel any need, did you, sir, to
3 follow up with issues that supported Edgewood's
4 arguments there, right?
5        MS. ZYLSTRA:  Objection.  Form.  You can
6 answer.
7    A.   I don't know what you mean by issues.
8    Q.   Sure.  You didn't need to -- you said
9 specifically that I did not ask for those, meaning the
10 affidavits from other athletic directors, right?
11   A.   Right.
12   Q.   I did not ask for those since I have no
13 question that they would say whatever needed to be said;
14 correct?
15   A.   That's what it says.  And I would say I didn't
16 feel the need to ask them for those affidavits because I
17 assumed that they would provide affidavits that
18 supported the dates that they put in the spreadsheet and
19 that -- assumed that would be part of it.
20        I think that what I was looking for at this
21 point was if Alder Evers mentioned that there was
22 evidence out there to the contrary trying to figure out
23 whether or not there was a nonconforming use would
24 require me to consider that information as well and pass
25 that on to Matt for his consideration of nonconforming

16 (Pages 58 - 61)

Page 62

1 use.
2       But I didn't -- I wasn't referring to all
3 issues when it comes to Edgewood. I was just referring
4 to those affidavits.
5    Q.   Sure. But you did ask Alder Evers to follow
6 up with whomever might have information that could
7 contradict Edgewood's position; correct?
8    A.   That's what it says, correct.
9    Q.   And you specified specifically that you would
10 be looking for a 12-month gap in games; is that rights?
11   A.   That's what it says.
12   Q.   So here you were looking to others to help
13 undermine Edgewood's argument for its nonconforming use.
14 Is that fair?
15      MS. ZYLSTRA: Objection. Form. You can
16 answer.
17   A.   I wouldn't characterize it that way. I
18 explained what I was doing to my response email to Matt
19 Lee which you probably also have.
20   Q.   Sure. But you can understand why a person
21 would be confused and take issue with what you wrote,
22 right?
23      MS. ZYLSTRA: Objection. Form, foundation.
24 You can answer.
25   A.   I'm not going to speculate on what other

Page 63

1 people might consider.
2    Q.   Well, let's look farther down this email chain
3 on the first page at 10429.
4       Do you know who Dianne Jenkins is?
5    A.   I don't.
6    Q.   In her email at the bottom of this page to
7 Lynn she writes, "Interesting that the City doesn't
8 trust them to provide corroboration." Do you see that?
9    A.   I do see that.
10   Q.   So at least one other person took your email
11 to say that you didn't trust Edgewood to provide
12 corroboration for its position. Is that fair?
13      MS. ZYLSTRA: Objection. Form. You can
14 answer.
15   A.   I don't know if that's fair or not. That
16 doesn't even frankly make sense.
17   I, in fact, did trust that they would be able
18 to provide the affidavits that they said they could
19 provide, so I don't know where that interpretation would
20 come from.
21   Q.   In 110, Exhibit 110, Mr. Lee and now Dianne
22 Jenkins are both taking your email to mean that you did
23 not trust Edgewood to provide truthful information. Is
24 that fair?
25      MS. ZYLSTRA: Objection. Form, foundation.

Page 64

1 You can answer.
2    A.   I mean, the documents speak for themselves. I
3 don't know if it's fair or not to say that that's what
4 they are doing.
5       The purpose of my email to Alder Evers was to
6 follow up on any other information that might be out
7 there regarding the potential of a nonconforming use. I
8 had already received Edgewood's.
9    Q.   And you knew that Mr. Evers was an opponent of
10 Edgewood getting lights; correct?
11      MS. ZYLSTRA: Objection. Form. You can
12 answer.
13   A.   Well, I knew -- I don't think it's fair to say
14 that he was an opponent of getting lights. He was a
15 proponent for them going through a process to get the
16 lights.
17      He clearly opposed the lights when it came --
18 when it was at the election. I don't know -- have
19 specific information about that.
20      But I know that he was the alder for that
21 district and that individuals in and around that area
22 opposed the lights and that he was -- they were his
23 constituents.
24   Q.   Do you think it's fair, Mr. Strange, for
25 someone like Mr. Evers to suggest that someone go

Page 65

1 through a long, expensive process when that person,
2 Mr. Evers, fully intends to deny the result of that
3 process anyway?
4       MS. ZYLSTRA: Objection. Form, foundation,
5 argumentative. You can answer.
6    A.   That's your narrative. I'm not going to
7 comment on your narrative.
8       I don't -- it assumes an enormous amount about
9 what Mr. Evers was thinking he would do under any
10 circumstances of a process.
11   Q.   We'll get to that.
12      MS. ZYLSTRA: Are we ready for a break?
13      MR. INGRISANO: Yeah, we are.
14      MS. ZYLSTRA: Okay. Thank you.
15      (Recess)
16      (Exhibit 112 marked.)
17      MR. INGRISANO: Mr. Strange, I'm handing you
18 what's been marked as Exhibit 112.
19      Do you recognize that, sir, as an email
20 exchange that includes your response to Mr. Lee in his
21 email found on Exhibit 110?
22   A.   Yes.
23   Q.   And you stated that your intention was to
24 convey that you believe the affidavits would support the
25 information in the spreadsheet while exploring whether

Page 66

1 that would be enough to establish a nonconforming use in
2 this case. Do you see that?
3     A. I do see that.
4     Q. You go on to say that, "You are correct,
5 Edgewood's lawyers have been professional and honest
6 with the City." Do you see that?
7     A. Yes.
8     Q. Would you agree, sir, that before and after
9 the date of this email, July 2nd, that Edgewood has been
10 honest in its dealings with the City pertaining to
11 lights and its athletic field?
12         MS. ZYLSTRA: Objection. Form, foundation.
13 You can answer.
14     A. Yes.
15     Q. Are you aware of any instance of dishonesty by
16 Edgewood High School?
17     A. Not with respect to me. I'm not aware of
18 anything else they have done or not done.
19         I was expressing my sorrow for him
20 misinterpreting that phrase that I used in the previous
21 email and wanted him to let Nathan know that it wasn't
22 nothing -- I didn't mean anything bad by it.
23     (Exhibit 113 marked.)
24     Q. MR. INGRISANO: I'm handing you what's been
25 marked as Exhibit 113.

Page 67

1         Do you recognize any of the emails on this
2 Exhibit 113?
3     A. I don't.
4     Q. The first email is a forward from Tag Evers to
5 a Dianne Jenkins. But the second email below that, the
6 email appears to have been forwarded from Ethan Brodsky
7 to Michael May and you're also listed as a recipient on
8 that email. Do you see that?
9     A. I do see that.
10     Q. Do you recall receiving this email on July
11 30th of 2019?
12     A. I don't. It looks like I was on vacation that
13 week according to the email.
14     Q. We're going to get to that.
15         Mr. Brodsky writes in the end of the first
16 line, "Usually I interact with Mr. Strange, but he is on
17 vacation this week and I had some pressing questions I
18 wanted to discuss." Did I read that correctly?
19     A. You did.
20     Q. So when Mr. Brodsky says that usually he
21 interacts with Mr. Strange, other than the exhibit we
22 looked at previously where he sent the email that you
23 interpreted as a formal records request, what other
24 interactions did you have with Mr. Brodsky, if you know?
25     A. That's the only one that I recall prior to

Page 68

1 this date. I think after this date he submitted a
2 longer public records request like in a formal -- formal
3 letter asking for a bunch of documents. And I may have
4 written him a letter in connection with that denying a
5 large portion of what he was asking for.
6         But I don't -- other than those public records
7 request incidents I don't remember any other
8 conversations with him.
9     Q. So when he says "usually I interact with
10 Mr. Strange," the only thing you can recall prior to
11 that date of July 30 was his email treated as a records
12 request?
13     A. That's the only thing I can recall, yes.
14     Q. He says, "But he" -- meaning you -- "is on
15 vacation this week."
16         Do you know, sir, were you in fact on vacation
17 during the week of -- I'll just call it -- July 30th?
18     A. I mean, sitting here today I can't recall. I
19 can say that is a normal time that we used to take
20 vacations to the Boundary Waters, so it makes sense.
21 But I don't recall sitting here today or exact dates of
22 vacations.
23     Q. Do you recall responding to this email of July
24 30?
25     A. I don't.

Page 69

1     Q. When you go on vacation do you set an
2 out-of-office alert that tends to bounce back email to
3 people that send emails to you?
4         MS. ZYLSTRA: Object to form. You can answer.
5     A. Usually I did. I can't say whether I did
6 every single time I went on vacation.
7     Q. Your typical vacations to the Boundary Waters,
8 how long were those?
9     A. A week, like a Saturday to Saturday sort of
10 thing.
11     Q. Boundary Waters don't typically have very good
12 cell coverage in my experience. Is that fair?
13     A. That's the beautiful thing about them. You're
14 correct.
15     Q. So is it your typical practice to not
16 work while you're on vacation at the Boundary Waters?
17     A. Correct. And I want to be clear, I can't say
18 for sure if I was in the Boundary Waters. If I'm
19 guessing, on a vacation, that's where we were.
20         But, yes, I did not work in the Boundary
21 Waters, I do not work in the Boundary Waters, and I only
22 get cell service when we drive into town.
23     Q. Got it. During those periods of time when
24 you're driving to town and get cell service do you check
25 work-related issues?

Page 70

1     MS. ZYLSTRA:  Object to form.  You can answer.
2     A.  I try not to.  I can't say that I don't ever.
3     Q.  Sure.  I'm going to have you take a look at --
4  you can put the loose exhibits to the side for a moment
5  and take a look at Exhibit 12 in the binders.
6     Sir, do you recognize Exhibit 12 as a letter
7  to Attorney Matthew Lee signed by a Michael May, city
8  attorney, dated July 12, 2019?
9     A.  I do.
10    Q.  And you are identified as a cc to that letter;
11 correct?
12    A.  Correct.
13    Q.  Do you recall receiving that letter on or
14 about that date?
15    A.  I remember the letter.  It would have been odd
16 for me to actually receive it because it was in our
17 office.  But yes, I got the letter.  I knew the letter
18 was there.  Nobody hand-delivered it to me.  It would
19 have just been our office.
20    Q.  Internal mail, internal delivery or email?
21    A.  I don't know.  It wasn't quite that formal.
22    Q.  Mr. May, as of this period of time, was your
23 boss, your supervisor; correct?
24    A.  Correct.  He was the city attorney.
25    Q.  And was there anyone that you reported to

Page 71

1  between you and Mr. May?
2     A.  No.
3     Q.  So you were a direct report to Mr. May; is
4  that correct?
5     A.  Correct.
6     Q.  The third paragraph of this letter, Exhibit
7  12, Mr. May writes, "We invite Edgewood to file to
8  terminate its master plan and return to the standard CI
9  zoning which would placed it on equal footing with other
10 high schools."  Do you see that?
11    A.  I do see that, yes.
12    Q.  Were you involved with Mr. May in crafting
13 this letter, Exhibit 12?
14    A.  No, Mike crafted this on his own and brought
15 it to me at some point to look at it, but it was in its
16 near final form when that happened.
17    Q.  What was your understanding, if you had one,
18 as to what the phrase "equal footing with other high
19 schools" meant or was intended to convey?
20    A.  That was leading up until the ZBA meeting.
21 Edgewood had asked us for what the process would be for
22 repealing their master plan, or I think their phrase was
23 "how we can terminate the master plan."
24    And the reason they gave us was that they
25 wanted to be in the same zoning as the public high

Page 72

1  schools, equal to the same zoning as the public high
2  schools, same footing, whatever the case may be.
3     And so I think that we looked into that, or I
4  looked into that, what is the process for terminating a
5  master plan before the 10 years runs, made the
6  determination that they could and this would be the
7  process.
8     And so since they had been asking for that, I
9  think Mike's intention here -- and I don't want to speak
10 for Mike obviously -- but was to say if that's the path
11 you want to go for the reasons that you've stated to be
12 on equal footing with the other high schools then we
13 invite you to do that.
14    Q.  It was the conclusion of your office, was it
15 not, that terminating the master plan was an appropriate
16 mechanism, an appropriate process for Edgewood to
17 pursue?
18    MS. ZYLSTRA:  Objection.  Form.  You can
19 answer.
20    A.  I don't know about the word "appropriate."  It
21 was an option for them.  You have to keep in mind that
22 at this point they still had their Campus Master Plan
23 amendment pending.  It was still there.  It could have
24 been pulled back to the Plan Commission at any point in
25 time.

Page 73

1     And so it wasn't altogether thinkable that
2  that was an option for them to continue.  After the ZBA
3  hearing they could have gone back to the Plan Commission
4  with their -- Plan Commission with their master plan
5  amendment.  We left it in referral so that it could
6  quickly be grabbed back because that's what they asked
7  for.  So it was sitting there.
8     Another option was for them to determine that
9  they could terminate the master plan.  It was a
10 voluntary master plan, so voluntary in, voluntary out.
11 That that was an option.  The other option they could do
12 was wait for it to expire.
13    Q.  So terminating -- I guess what I'm trying to
14 say, sir, is that your office determined that
15 terminating the master plan was a viable option for
16 Edgewood?
17    MS. ZYLSTRA:  Object to form.  You can answer.
18    A.  It was an option for terminating their master
19 plan becoming an institution in the CI District without
20 a master plan, which is what the other schools were and
21 which they kept saying we want to be the same as the
22 other schools.  And we said, well, the other schools
23 don't have a master plan, so if you don't have a master
24 plan you can terminate it.
25    Q.  But your office would not have invited

Page 74

1 Edgewood to file to terminate its master plan if you
2 believed that Edgewood didn't have the right to
3 terminate its master plan; correct?
4    A.  Correct.
5        MS. ZYLSTRA:  Object -- sorry.  Late objection
6 to form.  You can answer.
7    A.  Yes, I believe that that was an option for
8 them.
9    Q.  I'll ask you to take a look at Exhibit 23.
10 This is an email from you to Nathan Wautier, dated July
11 17, 2019; correct?
12   A.  Did you say July 17th?
13   Q.  Yes, July 17, 2019.
14   A.  Correct.
15   Q.  And cc'd to Michael May and Matthew Tucker?
16   A.  Correct.
17   Q.  And you drafted this email?
18   A.  I did.
19   Q.  Did you have any assistance with anyone in
20 formulating this email?
21   A.  I don't recall getting any assistance with
22 this.
23   Q.  Had you been speaking with Attorney Wautier in
24 advance of sending him this email to talk through the
25 options that you outlined in Exhibit 23?

Page 75

1    A.  I had talked to Nathan about these options.  I
2 think that's why he requested that I send it to him in
3 writing.
4    Q.  So I guess that goes to my question.
5        After the Michael May letter of July 12th,
6 what precipitated you sending this email to Mr. Wautier
7 on July 17?
8        MS. ZYLSTRA:  Object to form.  You can answer.
9    A.  He asked me for it.
10   Q.  This email outlines three options for Edgewood
11 to legally play games and install lights in its field;
12 correct?
13   A.  Correct.
14   Q.  Option One would be to amend the Campus Master
15 Plan; is that right?
16   A.  Correct.
17   Q.  And if Edgewood proceeded with that process it
18 would first go to Plan Commission for a recommendation;
19 correct?
20   A.  Correct.
21       MS. ZYLSTRA:  Object --
22       THE WITNESS:  Oh, I'm sorry.
23       MS. ZYLSTRA:  No, it's okay.
24   A.  Correct.
25   Q.  And after it goes to Plan Commission for

Page 76

1 recommendation assuming -- well, let me ask you this:
2        After it goes to Plan Commission for
3 recommendation, it would then go on to the Common
4 Council for a vote to approve or deny; correct?
5        MS. ZYLSTRA:  Object to form.  You can answer.
6    A.  Correct.  The amendment to the master plan had
7 to be done through a map amendment like we talked about
8 before which was a zoning change.
9        So zoning ordinance changes go to the Plan
10 Commission for recommendation and then to the Common
11 Council for final approval.
12   Q.  And because it was going to be a map amendment
13 -- because an amendment to a Campus Master Plan would be
14 a map amendment, neighbors would have the option and
15 ability to file a protest petition; correct?
16   A.  That is correct.
17   Q.  And the result of that, as you mentioned
18 before, would be that an amendment to the Campus Master
19 Plan would require a three-quarters vote of the Common
20 Council; is that correct?
21   A.  That is correct.
22   Q.  Option No. 2, you write, "Edgewood could ask
23 the City to repeal the ordinance that adopted its master
24 plan"; correct?
25   A.  Correct.

Page 77

1    Q.  And you go on to say, "As a consequence of
2 repealing its master plan, Edgewood would revert to the
3 standard regulations of the CI District in the zoning
4 code which would allow games and lights at the field."
5 Did I read that correctly?
6    A.  You did.
7    Q.  So as you understood, at the time of writing
8 this email, the standard requirements and regulations in
9 the Campus-Institutional District zoning ordinances
10 would allow lights and games on Edgewood's athletic
11 fields; correct?
12       MS. ZYLSTRA:  Object to form.
13   A.  The Zoning Board of Appeals process showed
14 that there were certain uses that were allowable in the
15 Campus-Institutional District that would not be subject
16 to conditional use review, specifically uses that would
17 occur outside of a building or in a building that is
18 less than 4,000 square feet.
19       So to the extent that there are identified
20 allowable uses in the CI District that didn't require a
21 construction of a building, those could be established
22 without constitutional use review.
23       That was a flaw in the ordinance that was
24 discovered during that process, but it's my opinion
25 that's what the law said and so that's what the email

Page 78

1 conveys.
2    Q.  Why do you call it a flaw?
3    A.  Because I wasn't involved in the initial
4 drafting of the CI District ordinance, but it was my
5 understanding that nobody intended for you to be able to
6 do certain things that didn't involve the construction
7 of a building without any review process.  But in my
8 view that's what the ordinance said.
9    Q.  But what you said is that if by repealing the
10 master plan Edgewood would revert to the standard
11 regulations in the zoning code which would allow games
12 and lights at the field; correct?
13       MS. ZYLSTRA:  Objection.  Form.  You can
14 answer.
15    A.  That's what it says.  That was my opinion at
16 the time.
17    Q.  So under the law at it stood at the time?
18    A.  At that time, right.
19    Q.  And so at that time the master plan was the
20 only obstacle to Edgewood getting its lights and game
21 use of its field; correct?
22       MS. ZYLSTRA:  Objection.  Form.  You can
23 answer.
24    A.  Correct.  The master plan prohibited the
25 playing of games and it didn't identify any development

Page 79

1 of that open space.
2    Q.  And as you understood, the entry into a master
3 plan was voluntary for Edgewood at the time that it did
4 so; correct?
5    A.  Correct.
6    Q.  So if Edgewood had never voluntarily adopted a
7 master plan it would have been able to get lights and
8 play games on its field; correct?
9       MS. ZYLSTRA:  Object to form.  You can answer.
10    A.  I mean, that's a bit of a hypothetical.  What
11 I can say is the master plan is what was prohibiting it
12 at the time.
13       I don't know what the circumstances would have
14 been at whatever point they would have tried to do what
15 they wanted to do without a master plan to tell you for
16 certainty what the circumstance were.
17    Q.  But to your knowledge, throughout this entire
18 process the master plan was the only obstacle to
19 Edgewood receiving lights and game use of its field;
20 correct?
21    A.  Correct.
22       MS. ZYLSTRA:  Object to form.  You can answer.
23    A.  Correct.
24    Q.  Your email to Mr. Wautier in Exhibit 23 talks
25 about the standard regulation of the CI District in the

Page 80

1 zoning code; correct?  Your sentence there, "Edgewood
2 would revert to the standard regulations in the CI
3 District in the zoning code"; right?
4    A.  Correct.
5    Q.  So you were talking about the CI District
6 regulations in the zoning code as of July 17, 2019;
7 correct?
8    A.  Correct.
9    Q.  Were you aware on July 17 of any discussions
10 by any city officials about changing the ordinance in
11 such a way that Edgewood would not have the ability to
12 get games or lights at its field?
13       MS. ZYLSTRA:  Object to form.  You can answer.
14    A.  No.
15    Q.  If you had been aware of any efforts or
16 discussions by city officials to change those
17 regulations as of the time you sent this email you would
18 not have made that representation; is that correct?
19       MS. ZYLSTRA:  Object to form.  You can answer.
20    A.  I don't -- I don't -- I mean, I'm not even
21 sure I fully understand the question.
22       I mean, it's a hypothetical.  It brings up a
23 lot of different issues.
24    Q.  Sir, would you have told Edgewood that by
25 repealing this master plan that they would revert to the

Page 81

1 standard regulations in the CI District in the zoning
2 code which would allow games and lights at the field if
3 you were, at that time, presently aware of efforts or
4 discussions about changing the ordinance such as that
5 would no longer be true?
6       MS. ZYLSTRA:  Objection.  Form, asked and
7 answered.
8    A.  I don't know -- I mean, I would know what -- I
9 would have not -- if there was an active effort, if
10 there was an ordinance introduced that would have
11 changed the ability of them to get lights or play games,
12 I would have explained that to them because it would
13 have been part of what was going on in the process of
14 the legislation.
15       What my interpretation was, was what the law
16 was as of the date they asked for this email.
17    Q.  I'm asking you, sir, not about whether or not
18 an ordinance had been introduced yet.  I'm asking you
19 about whether you had been aware of discussions amongst
20 city officials about changing the law or efforts
21 drafting proposals, anything like that, that you would
22 not have written that email the way you did.
23       MS. ZYLSTRA:  Objection.  Form.
24    A.  I can't say that I would never have written
25 the email the way I did, because what Nathan was asking

Page 82

1 me to do are what are the options under the current law.
2      This was the options -- regardless of whatever
3 discussions were going on, this was the options under
4 the current law.
5      I was not aware of any discussions about
6 changing the law. I don't know how I would have handled
7 that if they were a one-off conversation, an informal
8 request. But I wasn't aware of any conversations about
9 changing the law. But what I wrote was still what the
10 law was and that's what Nathan was asking for.
11   Q.  Very good. Thank you. Sir, I'm going to ask
12 you to take a look at Exhibit 22.
13      Sir, do you recognize this as a letter dated
14 July 29, 2019 to the mayor and the planning director
15 signed by a few representatives of the different
16 Edgewood entities?
17   A.  I recognize the doc -- I mean, I recognize it
18 as a letter from Edgewood on July 29th, 2019, yes.
19   Q.  You're not an addressee on this letter, right?
20   A.  No.
21   Q.  Nor are you a cc; is that right?
22   A.  Correct.
23   Q.  Do you recall receiving this letter, though,
24 at or around the time it was sent July 29th?
25   A.  I don't recall.

Page 83

1   Q.  Did you become aware around this time, the end
2 of July 2019, that Edgewood had taken the City up on its
3 invitation to seek repeal of its master plan?
4   A.  Yes, that's something they would have made me
5 aware of as soon as they knew about it.
6      It looks like this was July 29th, which is one
7 day prior to July 30th, so my guess is I'm still in the
8 Boundary Waters.
9   Q.  I guess that's part of my question, too, is do
10 you recall receiving word while you were in the Boundary
11 Waters, if that's where you were, do you recall being in
12 the Boundary Waters and hearing from someone at work,
13 "Hey, Edgewood just provided notice of its repeal of the
14 master plan"?
15   MS. ZYLSTRA: Object to form. You can answer.
16   A.  No. I was on vacation.
17   Q.  Sure. Do you recall returning from the
18 Boundary Waters to find out that Edgewood had submitted
19 its intent to repeal its master plan?
20   A.  I don't specifically recall that, but
21 obviously that would have been part of getting caught up
22 with whatever I missed when I was on vacation.
23   Q.  Sir, let me ask you to take a look at Exhibit
24 21.
25      Sir, in your capacity as a former assistant

Page 84

1 city attorney, do you recognize this as a printout from
2 the City of Madison Legistar website of legislative
3 information pertaining to the ordinance amendment to
4 repeal the Edgewood Campus Master Plan?
5   A.  I'm going to need to take a quick minute to
6 look at it.
7   Q.  Sure. Please do.
8   A.  Okay. Yes.
9   Q.  So when we look at a document like this, look
10 at the file number on the top left-hand corner, 56839.
11 Do you see that?
12   A.  I do.
13   Q.  And that's a file number -- file numbers of
14 that type would be assigned a particular number to a
15 particular legislative effort. Is that fair?
16   A.  Correct.
17   Q.  Let me ask you this generally. What does it
18 mean for a piece of legislation that the City of Madison
19 -- and we'll talk specifically about ordinance
20 amendments -- what's it mean to be referred for
21 introduction?
22   MS. ZYLSTRA: Objection. Foundation. If you
23 know.
24   A.  I don't know exactly what that phrase means.
25 I know that when legislation is introduced it's called

Page 85

1 "introduced."
2      I really don't know why they called it
3 "referred to introduction." I wasn't the city attorney
4 so I wasn't specifically responsible for those terms.
5   Q.  Sure. So this Exhibit 21, the bottom of the
6 chart has an entry date of 7/30/2019, Attorney's
7 Office/Approval Group under the heading "Action By." Do
8 you see that?
9   A.  Uh-huh.
10   Q.  Sorry, is that a yes?
11   A.  Yes. Thank you.
12   Q.  Do you know the attorney's office, does that
13 mean city attorney's office to your knowledge?
14   A.  That would be the city attorney's office, yes.
15   Q.  Do you know who in the city attorney's office
16 would have taken the action denoted on July 30th on this
17 Exhibit 21?
18   MS. ZYLSTRA: Object to form, foundation.
19   A.  Sue Mautz in our office is one person that
20 handled Legistar items. There were maybe a couple other
21 staff members who handled the Legistar items.
22      Attorneys did not handle the Legistar
23 technicalities of putting things in and moving them
24 around. We didn't even have authorization for that. So
25 I can't say for certain who would have done that.

22 (Pages 82 - 85)

Page 86

1  Q.  So to your knowledge you had no involvement
2  with that July 30, 2019 action denoted on Exhibit 21; is
3  that correct?
4     A.  Well, I'm not sure what that action is.  I
5  didn't put it in Legistar and note it referred for
6  introduction.  So I don't know exactly what action
7  you're talking about.
8     Q.  What involvement did you have with the file
9  No. 56839, the ordinance amendment to repeal the
10 Edgewood Campus Master Plan; what was your role with
11 that legislative effort?
12    A.  I probably drafted the ordinance, which in
13 this case was very simple; just repealing a repeal
14 ordinance.
15        I don't recall beyond that what my role was
16 other than to give it to staff to begin the legislative
17 process.
18    Q.  Do you recall when you drafted the ordinance
19 amendment?
20    A.  I don't recall the specific date.  It would
21 have been sometime between when they requested to
22 terminate the master plan and when it was introduced.
23    Q.  "Introduced" meaning?
24    A.  Put in Legistar.
25    Q.  Okay.  And can you tell from this record when

Page 87

1  it was put into Legistar?
2     A.  I can't.  I mean, that's a question you were
3  asking me before.  I don't know the date it was put in.
4  It looks like it was introduced to the Common Council on
5  August 6.
6     Q.  So what has to happen -- in your experience
7  with the city attorney's office what has to happen for
8  proposed legislation, where is that to be in the process
9  before it can be referred for public hearing as we see
10 on August 6, 2019 on Exhibit 21?
11    MS. ZYLSTRA:  Objection.  Foundation.  You can
12 answer, if you know.
13    A.  Well, what has to happen is a broad question.
14 There is a couple different ways it can happen with
15 respect to the Common Council.
16        One is you draft the ordinance, put it in
17 Legistar and set it for a date to be introduced.
18 Another is that council members can introduce items from
19 the floor if they want to do that.
20        And so it depends on -- it depends upon the
21 timing.  But if you can put together something in time
22 for it to get on the agenda, council meetings are on
23 Tuesday, agenda is finalized on Friday, so if you can
24 get something together to get on the agenda then it can
25 be on the agenda, otherwise it would have to be

Page 88

1  introduced from the floor, which is another thing that
2  happens.
3     Q.  How often have you been involved with
4  legislation introduced from the floor; how many times?
5     A.  Oh, gosh, I don't know.  I can't give you a
6  number.  I drafted between 3- and 500 ordinances while I
7  was with the City.  I can't tell you an exact number how
8  many times something was from the floor.
9     Q.  What proportion?
10    MS. ZYLSTRA:  Objection.  Form, foundation.
11    A.  I would not want to speculate as to the
12 number.  I mean, I don't know.  It's not the norm, but
13 it's not uncommon.
14    Q.  You don't recall doing any work on the
15 Edgewood amendment to repeal its master plan while you
16 were in the Boundary Waters?
17    MS. ZYLSTRA:  Objection -- I withdraw that
18 objection.  Go ahead.
19    A.  No, I wouldn't have done any work in the
20 Boundary Waters.
21    Q.  I'll ask you to take a look at Exhibit 20.
22        Do you recognize this, sir, as a Legistar
23 printout of the legislative information relating to the
24 amendment to the Campus-Institutional District zoning
25 ordinance?

Page 89

1     A.  Yes.
2     Q.  What role, sir, did you have with this
3  proposed legislation?
4     A.  Well, I drafted the -- there were a variety.
5  Obviously, you can see there were three substitutes.
6        So as the planning and zoning lawyer I was the
7  person to help draft the ordinances, the initial
8  ordinance, and we introduced this initially by title
9  only.
10    Q.  What does that mean?
11    A.  That means that you introduce an ordinance and
12 you just put a title on it.  You don't put the body on
13 it.
14    Q.  Sir, I'll represent to you -- it's cut off
15 with the hole punch on this binder, but I'll represent
16 to you on Exhibit 20 that the first date there where it
17 says attorney's office referred for introduction is
18 August 5, 2019.
19        Do you have any recollection of being involved
20 in referring this piece of legislation for introduction?
21    A.  Again, I don't know what that technically
22 means from Legistar's perspective.
23        I recall drafting it by title only ordinance,
24 but I don't recall the dates and the referral dates.
25    Q.  Prior to your deposition today, sir, have you

Page 90

1 reviewed the deposition transcript of Alder Tag Evers?
2    A.   No.
3    Q.   Have you talk with Alder Tag Evers about his
4 testimony?
5    A.   No.
6    Q.   I'll represent to you that Mr. Evers
7 represented that he conferred with you the first week of
8 August about drafting this legislation.
9         Do you have any recollection of that?
10    A.   I recall him calling at the end of the week
11 prior to the August 6th council meeting which would have
12 been that prior week.
13    Q.   So that would have been, by my estimate, you
14 said August 6 would have been the Common Council
15 meeting, right, because they were always on the first
16 Tuesday of the month?
17    A.   According to this document.  Not the first --
18 it's every other Tuesday, but there was on Tuesday.
19    Q.   We learned from one of the prior exhibits that
20 July 30 was a Tuesday; correct?
21         MS. ZYLSTRA:  Object to form.
22    A.   I don't know.
23    Q.   Yeah, Exhibit 113.
24    A.   Okay.
25    Q.   It says Tuesday, July 30th, 2019.  Do you see

Page 91

1 that?
2    A.   I do.
3    Q.   Do you have any reason to disagree that
4 Tuesday was -- that July 30th was a Tuesday?
5    A.   I don't have any reason to disagree with that.
6    Q.   So if Tuesday was July 30, then Friday would
7 have been August 2nd; correct?
8    A.   Correct.
9    Q.   Would you like to verify that on the calendar
10 on your phone?
11    A.   Sure.
12    Q.   Why don't you go ahead and scroll back to 2019
13 and confirm that August 2nd was a Friday.
14         MS. ZYLSTRA:  Off record.
15         (Discussion off the record.)
16    A.   So what are you asking me?
17    Q.   I'm asking you to confirm, sir, that August
18 2nd, 2019 was a Friday.
19    A.   Yes.
20    Q.   So that's the date that you recall Alder Evers
21 contacting you about the proposed ordinance -- drafting
22 the proposed ordinance?
23         MS. ZYLSTRA:  Object to form.  You can answer.
24    A.   I don't recall a date.  I recall that it was
25 the end of that week.

Page 92

1    Q.   So you don't know if it was Thursday or
2 Friday?
3    A.   I would say it was either Thursday or Friday.
4    Q.   You don't recall taking that call from the
5 Boundary Waters?
6    A.   I don't.
7    Q.   Did Mr. Evers say where he was?
8    A.   I don't recall if he said where he was.  I
9 don't know.  I don't know where he was.
10    Q.   Did he advise you he was on vacation?
11    A.   He may have.  I don't recall specifically what
12 his -- if he was on vacation or not.
13    Q.   At the time that you received the call from
14 Mr. Evers were you aware of Exhibit 22?
15    A.   I don't know.  I mean, I don't recall what I
16 was aware of when he called.
17    Q.   Did you and Mr. Evers discuss Exhibit 22 on
18 that phone call?
19    A.   I don't recall.  I don't -- I recall the phone
20 call being short and that he wanted to address the flaw
21 that was identified in the ordinance related to the
22 things that could be done without conditional use review
23 in the CI District.
24    Q.   So what happened during that conversation, how
25 did that conversation go, what do you recall?

Page 93

1    A.   Well, I recall that it was towards the end of
2 the week, the council meeting was the next week, and
3 that I didn't feel like I had time to put together a
4 full ordinance and so it would have to be introduced by
5 title only.
6    Q.   What was the urgency in doing that at that
7 time?
8         MS. ZYLSTRA:  Object to form.  You can answer.
9    A.   I don't know.  I was responding to his
10 request.
11    Q.   His request was to get an ordinance introduced
12 prior or on or before the August 6 meeting, is that what
13 you recall?
14    A.   What I recall is him asking for an ordinance,
15 and normally I would give -- I would give some
16 indication that the options are to -- you know,
17 introduced by title only now or wait until the next
18 round and put together a full ordinance.
19    Q.   What did he say about the option to either be
20 introduced by title or to wait for the next meeting?
21    A.   Well, I don't recall what he said because we
22 introduced it by title only.  That's the only option we
23 chose.
24    Q.   Prior to him asking you to draft an ordinance
25 was there any discussion about what the problem was that

Page 94

1  he was looking to address and what his options were?
2      MS. ZYLSTRA:  Object to form.  You can answer.
3      A.  Well, there was discussion after -- there was
4  a realization at the ZBA meeting as to what the
5  ordinance said or just said didn't do.
6      After the ZBA meeting I didn't have any
7  discussions about anything related to changing the
8  ordinance.
9      Q.  What realization did Mr. Evers express to you
10  after the ZBA hearing and before this call in August of
11  2019?
12      A.  My recollection is that Alder Evers and
13  several other alders were concerned that that's the way
14  the ordinance worked.
15      Because other alders also had schools in their
16  districts, specifically Alder Bidar had West High School
17  in her district, Alder Furman had Memorial High School
18  in his district, so they were trying to learn what the
19  option -- what they could or couldn't doing without
20  conditional use review in those districts.
21      Q.  The ZBA hearing was what day to the best of
22  your recollection?
23      A.  I don't recall the exact day.
24      Q.  It was early in the month of July; correct?
25      A.  Right.

Page 95

1      Q.  So in this call with Alder Evers in August,
2  the end of that first -- I guess you would call it was
3  either August 1 or 2, Thursday or Friday, as you
4  testified.
5      What was the problem framed by Alder Evers
6  that he was seeking to address?
7      A.  The one that I just testified to.  The fact
8  that in CI districts that don't have a master plan, you
9  can establish uses that don't require the construction
10  of a building without a conditional use process.
11      Q.  Those were his words, what did he say?
12      A.  I don't recall exactly what he said.  That was
13  what he wanted to do.  It was basically a request to try
14  and do something to address that problem.
15      Q.  And was there any discussion of Edgewood in
16  that call with Alder Evers?
17      A.  I don't recall any discussion of Edgewood on
18  that call.
19      Q.  So you had said that you drafted the ordinance
20  itself that's relating to the amendment to the
21  Campus-Institutional District zoning; correct?
22      A.  The conditional use ordinance you're referring
23  to?
24      Q.  Yes.
25      A.  Yes.

Page 96

1      Q.  So when you look at Exhibit 20, file No.
2  56981, is that what you're referring to when you call it
3  the conditional use ordinance?
4      A.  Yeah, Madison General to require conditional
5  use approval in Campus-Institutional districts for uses
6  involving -- yes.
7      Q.  We will just call it the conditional use
8  ordinance going forward and that will -- so when I'm
9  referring to the conditional use ordinance that's what
10  I'm referring to; okay?
11      A.  Okay.
12      Q.  And you were the drafter of the conditional
13  use ordinance; correct?
14      A.  Correct.
15      Q.  Did you receive input or assistance from
16  anyone in the drafting of that ordinance?
17      A.  I would have received -- I would have not
18  received any input with respect to the initial
19  introduction of the ordinance by title only.
20      It would have been common for me to consult
21  with Matt Tucker on the specifics of what the ordinance
22  would say and we may have talked to other staff as well.
23      Q.  Got it.  For an introduction by title, who --
24  well, let me ask you this:  Did you draft the title?
25      A.  I assume that I did.  I don't recall anybody

Page 97

1  else that would have drafted the title.
2      Q.  To your recollection, prior to August 5 of
3  2019, you had only one conversation with Alder Evers
4  regarding the drafting of this ordinance; is that
5  correct?
6      A.  That's my recollection.
7      Q.  So the title, when you look at Exhibit 20, the
8  title of the ordinance, it starts out with "3rd
9  Substitute."  Do you see that?
10      A.  I do.
11      Q.  What does that mean?
12      A.  That means that as the ordinance went through
13  the process certain changes were made to it once it was
14  introduced, and each time a change is made it's called a
15  substitute.
16      So you have the original 1st substitute, 2nd
17  substitute, 3rd substitute.
18      Q.  So the original, so the first change is then
19  called the 1st substitute, then the second change would
20  be a 2nd substitute, third change would be a 3rd
21  substitute.
22      A.  The 1st substitute really is just called a
23  substitute.  It doesn't say "1st," but, yeah.
24      Q.  Got it.  Do you recall the changes between the
25  original, the 1st substitute?

25 (Pages 94 - 97)

Page 98

1   A.  I do not.
2   Q.  How about between the 1st and 2nd?
3   A.  I don't.
4   Q.  2nd and 3rd?
5   A.  Do not.  I would say the documents speak for
6  themselves.
7   Q.  All of those different versions can be found
8  on Legistar; is that right?
9   A.  Correct.
10   Q.  So the title on Exhibit 20, per Exhibit 20,
11  the title of your ordinance, can you read that out loud
12  for me, please, into the record?
13   A.  3rd substitute, Amending Sections 28.097,
14  subsection 2 and subsection 3, of the Madison General
15  Ordinances to require conditional use approval in the
16  Campus-Institutional District for uses involving new
17  buildings or additions -- involving new buildings or
18  additions to existing buildings the establishment,
19  improvement, or modification exceeding 4,000 square feet
20  in ground floor area and for the establishment,
21  improvement, or modification of any occurring -- any use
22  occurring outside an enclosed building, area on a zoning
23  lot of any primary use and to require conditional use
24  approval for the establishment, improvement, or
25  modification of identified secondary uses.

Page 99

1   Q.  Thank you.
2       MS. ZYLSTRA:  Rolls off the tongue.
3   Q.  It does.  You have a way with words, sir.
4   A.  Thanks.
5   Q.  So you would have drafted that title for the
6  3rd substitute; correct?
7   A.  Well, you don't draft titles first -- you
8  don't necessarily draft a new title for every version,
9  so that probably would have been the original title.
10  You don't change the title necessarily as it goes
11  through the process, or at least I don't recall doing
12  that.
13   Q.  Okay.  The title, at least on Exhibit 20,
14  involves generally new buildings or additions.  And it's
15  not specific to a sort of type of building or addition,
16  correct, as long as it's over the 4,000 square feet --
17   A.  Correct.
18       MS. ZYLSTRA:  Object --
19   Q.  -- condition?
20   A.  Yes.
21       MS. ZYLSTRA:  Sorry, I didn't think he was
22  done.  Object to form.  You can answer.
23   Q.  And then it also goes on to relate to any use
24  occurring outside of the enclosed building; correct?
25  It's not specific to any particular types of uses?

Page 100

1       MS. ZYLSTRA:  Object to form.  You can answer.
2   A.  Correct.  It would be any of the uses
3  identified as allowable uses in the CI District, so
4  primary, secondary.
5   Q.  As you sit here today you don't recall any --
6  you don't recall any urgency expressed by Alder Evers as
7  to why he was raising this issue now for you on the end
8  of that first week in August; August 2, August 3.  You
9  don't recall any urgency that was motivating his
10  request, this call?
11       MS. ZYLSTRA:  Object to form.  You can answer.
12   A.  No.
13   Q.  Sir, Exhibit 20 demonstrates an enactment date
14  of -- well, it says final action 10/1 of 2019.  Do you
15  see that?
16   A.  I do.
17   Q.  And that is the date that the Common Council
18  adopted the ordinance you drafted and closed public
19  hearing on it; correct?
20   A.  Correct.
21   Q.  So what is the difference between the final
22  action of 10/1/2019 and the enactment date, to your
23  knowledge, on 10/11 of 2019?
24       MS. ZYLSTRA:  Objection.  Foundation.
25   A.  I don't recall other than the -- or I

Page 101

1  shouldn't I say don't recall.
2       I don't know other than ordinances do not
3  become effective until the mayor signs them after the
4  meeting.
5       So sometimes the enactment date -- or I would
6  really be more likely to refer to that as the effective
7  date.  That is related to when the mayor signs them and
8  not the day of the council meeting.
9   Q.  So is it your understanding, sir, the law
10  doesn't actually take effect until the mayor signs off
11  on it; correct?
12       MS. ZYLSTRA:  Object.  Foundation.  You can
13  answer.
14   A.  That's my understanding is that the effective
15  date is when -- is not the night of the council meeting.
16   Q.  Got it.  To your understanding and knowledge
17  is there a requirement that the mayor sign off and enact
18  the legislation within a certain period of time after
19  Common Council adoption?
20       MS. ZYLSTRA:  Objection.  Foundation.
21   A.  I'm not aware of that.  Again, I wasn't the
22  city attorney.  I'm not the city attorney.  So that's
23  more the specifics of, you know, when something is
24  passed, when it becomes effective, when it becomes
25  enacted when the mayor signs it, that was something I

Page 102

1  wasn't responsible for the details of that.
2       Q.  So, to your knowledge or in your experience,
3  when two pieces of legislation have final action on the
4  same day would have different enactment dates?
5       MS. ZYLSTRA:  Objection to form.  You can
6  answer.
7       THE WITNESS:  Can you read back the question?
8       (Record read.)
9  Q.  Is it possible that two --
10      A.  I understand the question.
11      Q.  Yeah.
12      MS. ZYLSTRA:  Same objection.
13      A.  I can't say that it's not impossible, but I
14  can't say it's not possible.
15      I'm not aware of any circumstances where
16  ordinances adopted on the same -- at the same council
17  meeting would become effective on the same date, because
18  it was my understanding that the mayor signed them off
19  at the same time.  So it would be unusual.
20      Now, are there some outliers, finance stuff?
21  Who knows.  Budget stuff?  There might be some weird
22  things that they do differently just for statutory
23  reasons.
24      Q.  Sure.  Sir, did you ever hear of or
25  participate in any discussions between city officials in

Page 103

1  which city officials expressed a desire to pass the
2  conditional use ordinance amendment prior to the repeal
3  of Edgewood's master plan?
4       A.  I don't recall any discussions like that with
5  city officials.
6       MR. INGRISANO:  Why don't we take a quick
7  break.
8       MS. ZYLSTRA:  Okay.
9       (Recess)
10      Q.  MR. INGRISANO:  Back on.  Mr. Strange, you had
11  mentioned that the conditional use ordinance amendment
12  was introduced by title; correct?
13      A.  Correct.
14      Q.  And to the best of your recollection you
15  drafted that original title?
16      A.  Correct.
17      Q.  And to the best of your recollection there was
18  one call with Alder Evers prior to you drafting that
19  original title; correct?
20      A.  Correct.
21      Q.  Beyond the conversation with Alder Evers, what
22  if anything else would you have drawn upon in drafting
23  the original title for its introduction?
24      A.  My identification of the hole in the
25  ordinance.

Page 104

1       Q.  I'll ask you to turn to Exhibit 19.  Do you
2  recognize that, sir, as the approved meeting minutes for
3  the Common Council meeting dated Tuesday, August 6th,
4  2019?
5       A.  That's what it appears to be, yes.
6       Q.  Do you remember, sir, if you were in
7  attendance at that Common Council meeting?
8       A.  I don't recall.
9       Q.  Is it your typical practice to attend such
10  meetings?
11      A.  No.  Mike May attended all the council
12  meetings and I attended when there was going to be an
13  issue that I knew about or that he requested me to
14  attend.
15      Q.  Got it.  Sir, to the best -- let me ask you to
16  turn to the last page of Exhibit 19.  Actually, it
17  should be labeled as the second to the last page, page
18  36.
19      So 36 on the bottom?
20      Q.  Yes.
21      A.  Okay.
22      Q.  And so, sir, looking at that file reference,
23  No. 56981, do you recognize that as being your
24  conditional use ordinance amendment from Exhibit 20?
25      A.  Let me just double check just to make sure the

Page 105

1  number is right.
2       Yes, that's the same number, 56981.
3       Q.  And this is the minutes entry for the
4  introduction of the items from the floor for your
5  ordinance amendment; correct?
6       A.  It appears to be, yes.
7       Q.  Can you read that title out loud for me,
8  please?
9       A.  The title right here?
10      Q.  Where it says "By Title Only," yes.
11      A.  "Creating Madison General Ordinance Sections
12  28.097(2)(d) and (e) requiring institutions in the
13  Campus-Institutional District without an approved campus
14  master plan to get conditional use approval for the
15  establishment of open or (unintelligible) --
16      THE REPORTER:  Uh, slow down.
17      THE WITNESS:  Oh, I'm sorry, sorry, sorry.
18      MR. INGRISANO:  Yeah, can you start over and
19  --
20      A.  I'm sorry.  I'm sorry.
21      Q.  I'm going to ask you to slow down and start
22  over; okay?
23      A.  I'm sorry.  I'll start over.
24      "Creating Madison General Ordinance Sections
25  28.097 subsection 2 (d) and (e) requiring institutions

27 (Pages 102 - 105)

Page 106

1  in the Campus-Institutional District without an approved
2  campus master plan to get conditional use approval for
3  establishment of open and enclosed stadiums,
4  auditoriums, arenas, indoor or outdoor sports
5  recreational facilities, and agricultural uses and for
6  the installation of stadium lighting, amplified sound,
7  and the establishment or expansion of outdoor seating
8  over a specified capacity."
9      Q.   Thank you.  And that's the title that you
10 drafted?
11     A.   I don't recall drafting the titles.  It
12 wouldn't have been my responsibility to do that.
13     Q.   You recognize, sir, that this title of what
14 was introduced from the floor on August 6 is more
15 narrowly crafted than the ordinance that was approved as
16 the 3rd substitute on October 1; correct?
17         MS. ZYLSTRA:  Objection.  Form.
18     A.   I would say that I recognize that it's
19 different.  I think your characterization would be
20 narrowly crafted.
21     Q.   Do you disagree that it's more narrowly
22 crafted?
23     A.   I think it's more specific.
24     Q.   So it's more specific in fact to the issues
25 that were arising with Madison Edgewood High School;

Page 107

1  correct?
2          MS. ZYLSTRA:  Objection.  Form.  You can
3  answer.
4      A.   To the extent that it talks about stadiums and
5  sports recreational facilities, those were the two
6  issues with the Edgewood case.
7          But there are other items there, like
8  auditoriums and arenas and agricultural uses that are
9  also stated.
10     Q.   Do you recall any agricultural issue being
11 raised at the ZBA hearing involving the Madison Edgewood
12 property?
13     A.   Yes.  At the ZBA hearing one of the examples
14 that Edgewood raised was some issue about the potential
15 of a correctional facility.
16         And I came -- I said in trying to explain the
17 hole in the ordinance said that theoretically an
18 agricultural use could be established if it didn't
19 involve a building.
20         And so we were trying to determine how to
21 address the hole in that ordinance.
22     Q.   And with respect to the stadium lighting,
23 amplified sound, establishment of or expansion of
24 outdoor seating, those were also issues involved in the
25 Edgewood athletic complex; correct?

Page 108

1      A.   Well, those were issues that were -- those
2  were items that were part of their original application
3  for a campus master plan which they had at this point
4  were not going through with.
5      Q.   And the 3rd substitute involved all of the --
6  well, strike that.
7          You recognize, sir, that stadiums,
8  auditoriums, arenas, indoor or outdoor sports and
9  recreational facilities and agricultural uses are all
10 permitted uses under the Campus-Institutional District
11 zoning ordinance?
12     A.   They are not permitted uses.  They are
13 allowable uses, which was another very odd part of that
14 ordinance.
15     Q.   Those are not the entirety of the permitted or
16 allowable uses under that ordinance; correct?
17     A.   Correct.
18     Q.   But the 3rd substitute per its title and its
19 contents is not limited to just stadiums, auditoriums,
20 arenas, indoor or outdoor sports recreational facilities
21 and agricultural uses; correct?
22         MS. ZYLSTRA:  Objection.  Form.
23         THE WITNESS:  I'm sorry, could you read that
24 back?  I was shuffling papers.
25         (Record read.)

Page 109

1      A.   The 3rd substitute, the content of the 3rd
2  substitute, as I recall, addresses any of the allowable
3  uses that occur outside of a building, so it is not
4  limited to these.
5      Q.   When did the title for this ordinance, the
6  conditional use ordinance, change?  When did that title
7  change?
8          MS. ZYLSTRA:  Objection.  Form, foundation.
9      A.   I don't recall when it changed.  I mean, I
10 would say the documents speak for themselves.
11     Q.   You changed it though; correct?
12     A.   I would have changed them.
13         MS. ZYLSTRA:  Wait, wait, wait, you guys are
14 talking over each other.  Objection.  Form.  Did you get
15 the whole answer?
16         THE REPORTER:  I'm not sure I got the whole
17 answer.  I'll read it back.
18         (Record read.)
19     A.   I don't recall changing the titles.  I recall
20 working on the meat of the ordinances, the substance of
21 the ordinance over that period of time.  I was less
22 concerned about the titles themselves, because those
23 aren't what become law.
24         The requirement for a title is that you give
25 general notice to the public about what the content of

Page 110

1 the ordinance is going to be.  So I was more concerned
2 at this point of just drafting the body of the
3 ordinance.
4    Q.  Who changed the title?
5    A.  I would have changed the title, but I'm saying
6 -- you asked me if I recall when I changed the title.  I
7 don't recall.
8    Q.  Why did you change the title?
9    A.  I don't recall.
10    Q.  Can you look at Exhibit 24, sir, and
11 familiarize yourself with this.
12       Do you recognize this as a memo you drafted to
13 the Plan Commission dated August 26, 2019?
14    A.  Yes.
15    Q.  And in this memo you are analyzing both the
16 map amendment for the Edgewood plan repeal and the
17 conditional use ordinance change; correct?
18    A.  Correct.
19    Q.  And your conclusion at the end of this memo on
20 page 3 in summary is that if both of those items are
21 approved by the Common Council on September 3, the
22 practical effect, practical impact, is that Edgewood
23 would be allowed to play games but that any improvement
24 or modification will require conditional use approval;
25 correct?

Page 111

1    A.  Correct.
2    Q.  And that improvement or modification would
3 include lights; correct?
4    A.  Correct.
5    Q.  And that was your analysis of what would
6 happen in the impact of how these two pieces of
7 legislation would interplay; is that correct?
8    A.  That's correct.
9       MS. ZYLSTRA:  Late objection to form.
10    Q.  MR. INGRISANO:  Are you aware of any reason
11 why these two enactments were being considered at the
12 same time other than mere coincidence?
13       MS. ZYLSTRA:  Objection to form, foundation.
14 But you said "are you aware"?
15       MR. INGRISANO:  Uh-huh.
16       MS. ZYLSTRA:  I remove that foundation
17 objection.  You can answer.
18    A.  I'm not aware.
19    Q.  Let me ask you to take a look at Exhibit 30,
20 sir.
21       This is a memo in which you are one of two
22 people on the "From" line to members of the Plan
23 Commission, dated August 22, 2019.  Do you see that?
24    A.  I do.
25    Q.  Did you draft this memo?

Page 112

1    A.  I don't recall if I did or not.
2    Q.  As a matter of typical practice when you are
3 on a "From" line in a memorandum on a city document do
4 you typically have input or approval over the document
5 before it goes out?
6       MS. ZYLSTRA:  Object to form.  You can answer.
7    A.  I would say I have input.  I mean, obviously,
8 city attorney is on this so approval is his.
9    Q.  In the second paragraph the memo says, "In
10 terms of the RLUIPA claim, the City's best legal
11 position would be if the master plan were repealed and
12 no other changes in the CI District ordinances were
13 adopted."  Did I read that correctly?
14    A.  You did read that correctly.
15    Q.  Do you know what other changes in the CI
16 District ordinances are being referenced there?
17    A.  I don't.
18    Q.  Do you know if that refers to your conditional
19 use ordinance amendment?
20    A.  I mean, I'm -- perhaps at the bottom it says,
21 "Additionally, several alders are proposing changes to
22 the CI District that would impact all of the entities in
23 the CI District --
24       THE REPORTER:  Slow down, please.
25    A.  Sorry.  "Additionally, several alders are

Page 113

1 proposing changes to the CI District that would impact
2 all of the entities in that CI District."
3       So I'm assuming that's what that was referring
4 to.
5    Q.  Do you know why it would be the City's best
6 legal position if the master plan were repealed and no
7 other changes in the CI District ordinance were adopted?
8    A.  Well, this -- I mean, this memo is dated
9 August 22nd, 2019, which is also the date that we
10 received the lawsuit from Edgewood, same day.
11       We obviously, at that point, hadn't had an
12 opportunity to read the entire lawsuit and digest it.  I
13 think that we had read it enough to realize they were --
14 their entire claim was based on the master plan, and a
15 relatively quick and obvious conclusion was without the
16 master plan they have no claim.
17       And so it's a simple statement that if the
18 master plan goes away then likely that's your best
19 position.
20       It really wasn't making a judgment on the
21 value of the RLUIPA claim, just analyzing the sort of
22 building blocks of the lawsuit.
23    Q.  Let me ask you to take a look at Exhibit 31.
24    A.  Okay.
25    Q.  This is a meeting invite dated for a meeting

1 start of February 13, 2020, and you're listed as a
2 required attendee. Do you see that?
3    A. I do.
4    Q. Do you recall being invited to this meeting?
5    A. I do.
6    Q. And do you recall attending that meeting?
7    A. I do.
8    Q. What was discussed during that meeting?
9    A. Well, I mean, Alder Evers scheduled the
10 meeting to help Edgewood's neighbors understand the
11 process moving forward and, as I recall, the questions
12 they had related to the conditional use process.
13        And I recall being asked a question what the
14 -- what the neighbors' rights were. And I said you
15 don't have any rights. We have the conditional use
16 process to go through.
17        They apply for a conditional use, go through
18 the process, you have an opportunity to attend the
19 meetings and present information just like Edgewood
20 does.
21        And I made a point to say I can't tell you how
22 to do that or what to do, just like we don't tell
23 Edgewood how to prepare their conditional use.
24    Q. So you didn't suggest any information that
25 would be helpful in rebutting Edgewood's request for

1 conditional use?
2    A. I did not. I remember this meeting because
3 they were very unhappy with me.
4    Q. Do you recall Alder Evers being unhappy with
5 you?
6    A. I don't recall him being unhappy with me. He
7 was, I think, trying to do the alder thing of providing
8 information to his constituents.
9        I don't recall him being unhappy with me or
10 saying anything in the meeting other than listening.
11 The neighbors did say some things to me but -- to
12 express their displeasure.
13        (Exhibit 114 marked.)
14    Q. MR. INGRISANO: Sir, I'm handing you what's
15 been marked as Exhibit 114.
16        Do you recognize this as a memo from Heather
17 Stouder to the mayor and the Madison Common Council
18 dated October 11, 2019?
19    A. That appears to be what this is, yes.
20    Q. You are listed as a cc on this document. Do
21 you see that?
22    A. I am, yes.
23    Q. And in this memo, Ms. Stouder is apprising the
24 mayor and the Common Council that on Wednesday, October
25 2, 2019, the city clerk received two protest petitions.

1    Q. Do you see that?
2    A. I do.
3    Q. And that pertains to Edgewood's repeal of its
4 master plan. Is that right?
5    A. That's what it says.
6    Q. Do you recall protest petitions being filed by
7 the neighbors against Madison's -- against Madison
8 Edgewood's attempt to repeal its master plan?
9    A. I don't have an independent recollection of
10 when they were filed. I recall that they were filed and
11 it's something I had to deal with, but they don't file
12 those with our office.
13    Q. Sure. You understood, did you not, that as a
14 result of petitions there actually was going to be a
15 three-quarters vote requirement in order to repeal the
16 Edgewood Master Plan?
17    A. Yes, eventually I did. I don't know when that
18 became obvious to me.
19    Q. So the eventual repeal of the master plan did
20 in fact require a three-quarter vote; correct?
21    A. Correct.
22        (Exhibit 115 marked.)
23    Q. MR. INGRISANO: Mr. Strange, I'm handing you
24 what's been marked as Exhibit 115.
25        And I don't know the date of this document or

1 when it was created, but do you recognize this as your
2 resume at least at some period of time while you were
3 still with the Office of the City Attorney?
4    A. That's what it appears to be. It's a little
5 odd to get it from you and not know where it came from.
6 I mean, do I think somebody created this on their own?
7 Probably not, but I don't know.
8    Q. Sure. I'll represent to you, sir, that it was
9 produced by the defendants in this litigation.
10    A. Okay.
11    Q. Let me ask you to take a look at this and tell
12 me what updates you -- first, take a look at this and
13 tell me what updates you would add to this document to
14 make it current as of today.
15        MS. ZYLSTRA: I'll object to form, but go
16 ahead.
17    A. Okay. I'm going to have to take a look at it.
18    Q. Yeah. Please.
19    A. Okay. Where you would you like to start?
20    Q. Start where you want to start. Start at the
21 beginning.
22    A. Okay. So, obviously, I don't work for the
23 City anymore. I work full time at the law school so I
24 would change that. I would change my dates of
25 employment with the City from June 2009 to August 1st,

Page 118

1 2021.
2       This would appear to be a document from prior
3 to when Mayor Satya Rhodes-Conway was elected, because
4 it references Paul Soglin.
5       I don't know exactly -- can't remember exactly
6 when she was elected but it's been a little while now.
7       This also appears to be back when the City
8 still had a transit and parking commission, which we
9 rewrote ordinances.  We -- I rewrote the ordinances that
10 involved the seven transportation-related committees.
11 We reduced those to one, to a transportation commission
12 and to a transportation policy and planning board.  So I
13 would update that.
14       I would include on here that I drafted that
15 ordinance.  I would add on here that I drafted the
16 ordinance to rewrite the Landmark -- the Historic
17 Landmark Ordinance so we now call it the Historic
18 Preservation Ordinance.
19       I would add on here that during the time
20 period from about 2017 to 2020-something, I was lead
21 staff to the task force on government structure that
22 involved over 90 meetings over the course of that time.
23 It involved writing a giant report on the status of the
24 City of Madison government structure as it relates to
25 equity and social justice issues.

Page 119

1       I would add to this that at some point in 2016
2 I handled the City's lawsuit involving the NRA's
3 challenge to guns on buses that we were successful in
4 circuit court, won in the court of appeals, and then
5 lost at the Supreme Court.  So I probably would add that
6 on here for better or worse just as an indicator of some
7 of the work that I had done.
8       And there are countless other things I could
9 imagine adding to this if I were trying to update it to
10 get a job.  But that's what comes to mind at the moment.
11       Q.  But the summary of the different professional
12 experiences you had working with Office of City
13 Attorney, Wisconsin Supreme Court, Office of the Wake
14 County Attorney, Kestenbaum Law Firm, Joyce L. Davis &
15 Associates, those or all accurate; correct?
16       MS. ZYLSTRA:  Object to form.  You can answer.
17       A.  Correct.  Those are places I worked.
18       Q.  So you would add your current job at the
19 University of Wisconsin Law School; correct?
20       A.  Yes.
21       Q.  The summary of your education is accurate and
22 complete?
23       A.  Yes.
24       Q.  When you said you would update your work with
25 the Office of the City Attorney, you mentioned some

Page 120

1 ordinances that you would be sure to note.
2       Can you identify again which ordinances you
3 would call out in your resume today?
4       A.  Chapter 33.55, Chapter 33.56, and Chapter 41
5 would be the ones that encompass the rewrites of all the
6 transportation-related ordinances.
7       And then Chapter 41 is where we parked the
8 Historic Preservation Ordinance.
9       I did the first half of that and then started
10 the second half of it around February-ish 2019 when we
11 started to rewrite the back half to do all the different
12 regulations for the historic districts.
13       That actually was just enacted a couple weeks
14 ago, so I was -- handed that off.
15       Q.  So those were ordinances you would call out
16 because you were particularly proud of your work on
17 those?
18       A.  I don't know if I would use the word "proud."
19 It demonstrates things that I did at the City that could
20 be appealing to a prospective employer if I were
21 applying for a job, but I don't know.
22       Q.  Sure.  With your taking over in the City
23 attorney's office responsibilities for zoning and land
24 use issues, you said in the 2013-2014 timeframe, were
25 you involved in any way in the creation of the

Page 121

1 Campus-Institutional zoning ordinance?
2       A.  No, I was not, no.
3       Q.  Were you involved in any way with the review
4 and creation of the Edgewood Master Plan?
5       A.  I was not.
6       MR. INGRISANO:  No further questions.
7       MS. ZYLSTRA:  Okay.  We will reserve the right
8 to read and sign.
9       (Deposition adjourned at 12:12 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

31 (Pages 118 - 121)

Page 122

CERTIFICATE OF REPORTER

1
2
3       I, Cheri Winter, a Certified Shorthand
4   Reporter, Notary Public in and for the State of
5   Wisconsin, do hereby certify that the foregoing
6   deposition was taken before me, on the 1st day of June
7   2022; that it was taken at the request of the Plaintiff;
8   that it was taken in shorthand by me, a competent court
9   reporter and disinterested person, approved by all
10  parties in interest, and thereafter converted to
11  typewriting using computer-aided transcription; that
12  said deposition is a true record of the deponent's
13  testimony; that the deposition was taken pursuant to
14  Subpoena, that said JOHN W. STRANGE, before examination
15  was sworn me to testify to the truth, the whole
16  truth, and nothing but the truth relative to said cause.
17     Dated June 8, 2022.
18
19
20           Cheri Winter
             Notary Public
21           State of Wisconsin
22
23
24
25

Page 123

1           Veritext Legal Solutions
                1100 Superior Ave
2                   Suite 1820
                Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
    June 8, 2022
5
    To: Ms. Zylstra
6
    Case Name: Edgewood High School Of The Sacred Heart, Inc. v. City Of
7   Madison Wisconsin, Et Al.
8   Veritext Reference Number: 5244848
9   Witness: John W. Strange     Deposition Date: 6/1/2022
10
    Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript. Please have the witness
13  review the transcript and note any corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change. Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address shown
17
    above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
    Sincerely,
22
    Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 124

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3   ASSIGNMENT REFERENCE NO: 5244848
        CASE NAME: Edgewood High School Of The Sacred Heart, Inc. v.
    City Of Madison Wisconsin, Et Al.
        DATE OF DEPOSITION: 6/1/2022
4       WITNESS' NAME: John W. Strange
5       In accordance with the Rules of Civil
6   Procedure, I have read the entire transcript of
    my testimony or it has been read to me.
7       I have made no changes to the testimony
    as transcribed by the court reporter.
8
9   Date        John W. Strange
10      Sworn to and subscribed before me, a
        Notary Public in and for the State and County,
11  the referenced witness did personally appear
        and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18      _____
        Notary Public
19      _____
        Commission Expiration Date
20
21
22
23
24
25

Page 125

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3   ASSIGNMENT REFERENCE NO: 5244848
        CASE NAME: Edgewood High School Of The Sacred Heart, Inc. v.
    City Of Madison Wisconsin, Et Al.
        DATE OF DEPOSITION: 6/1/2022
4       WITNESS' NAME: John W. Strange
5       In accordance with the Rules of Civil
6   Procedure, I have read the entire transcript of
    my testimony or it has been read to me.
7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date        John W. Strange
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23      _____
        Notary Public
24
        _____
25      Commission Expiration Date

Page 126

```
 1        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 5244848
 3  PAGE/LINE(S) /      CHANGE      /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date          John W. Strange
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
         Notary Public
24
    _____
25     Commission Expiration Date
```

[& - 33.56]                                                                  Page 1

**&**

**&**   4:5,12,18
  119:14

**0**

**0018**   1:6

**1**

**1**   1:16 2:16,20
  4:18 5:1 95:3
  106:16
**10**   43:22 72:5
**10.085**   12:25 13:3
  29:3,7,21 30:10,19
  32:2 33:25 34:11
  35:6 46:12 49:3
  49:10
**10.085.**   30:10 34:1
  34:4
**10/1**   100:14
**10/1/2019**   100:22
**10/11**   100:23
**104**   3:10
**10429**   63:3
**10430**   59:17
**10433**   57:17
**107**   2:10 22:16,18
**108**   2:12 24:17,19
**109**   2:13 37:2,4
  40:2 42:16,18
  45:3
**10:02**   22:23
**11**   2:24 7:8 24:5
  44:2,4,13 45:15
  115:18
**110**   2:15 3:15 56:7
  56:9,22,23,24
  63:21,21 65:21
**1100**   123:1
**111**   2:17 3:16 56:7
  57:3,6,7

**112**   2:19 65:16,18
**113**   2:21 3:17
  66:23,25 67:2
  90:23
**114**   2:23 115:13,15
**115**   2:23 3:3
  116:22,24
**116**   3:3
**11th**   23:4 45:23
**12**   3:9 40:17 41:11
  43:18,25 44:1
  46:2 49:19 50:8
  57:25 59:2 60:24
  62:10 70:5,6,8
  71:7,13
**12:12**   121:9
**12th**   75:5
**13**   3:24 59:22
  114:1
**14**   6:25
**17**   74:11,13 75:7
  80:6,9
**17th**   74:12
**18**   3:19
**1820**   123:2
**19**   3:10 104:1,16
**1st**   4:7 56:10 97:16
  97:19,22,23,25
  98:2 117:25 122:6

**2**

**2**   76:22 95:3 98:14
  100:8 105:12,25
  115:25
**20**   3:11 88:21
  89:16 96:1 97:7
  98:10,10 99:13
  100:13 104:24
  124:16 125:22
  126:22
**2009**   6:13 117:25

**2013**   6:21,25
**2013-2014**   7:11
  120:24
**2014**   6:21 31:7
**2016**   119:1
**2017**   118:20
**2018**   8:7,19,21
  11:17 15:11 16:9
  17:25 18:17
**2019**   2:14,16,20,24
  8:7,10,22,23 9:1,1
  9:21 10:20 15:22
  16:18 22:23 23:24
  24:1 26:20 34:13
  35:4,23 37:7
  40:17 41:11 45:8
  49:16,19,19 51:2
  51:22 52:4 56:10
  57:21 59:22 67:11
  70:8 74:11,13
  80:6 82:14,18
  83:2 86:2 87:10
  89:18 90:25 91:12
  91:18 94:11 97:3
  100:14,23 104:4
  110:13 111:23
  113:9 115:18,25
  120:10
**2020**   114:1 118:20
**2021**   5:25 118:1
**2022**   1:16 4:7 5:1
  122:7,17 123:4
**21**   3:12 49:16,19
  50:8 51:2,22 52:4
  83:24 85:5,17
  86:2 87:10
**216-523-1313**
  123:3
**22**   2:10 3:13 82:12
  92:14,17 111:23

**22582**   122:19
**22nd**   10:20 22:23
  24:1,22 27:15
  28:14,16,17,22
  32:23 113:9
**23**   3:14 74:9,25
  79:24
**23rd**   24:22
**24**   2:12 3:15
  110:10
**26**   3:8 18:17 34:13
  110:13
**26th**   35:4,8
**27**   26:20 32:23
  33:17
**27th**   14:20 27:6
  28:17,23 34:2
**28.097**   98:13
  105:12,25
**29**   82:14
**29th**   82:18,24 83:6
**2nd**   2:16,20 66:9
  91:7,13,18 97:16
  97:20 98:2,4

**3**

**3**   3:7 35:11,15
  36:9,16 40:3
  57:21 59:9 88:6
  98:14 100:8
  110:20,21
**3/12**   2:18
**30**   3:16 68:11,24
  86:2 90:20 91:6
  111:19
**30th**   67:11 68:17
  83:7 85:16 90:25
  91:4
**31**   3:17 113:23
**33.55**   120:4
**33.56**   120:4

**35**  3:7,18
**36**  104:18,19
**37**  2:13
**38**  3:18 35:9,12
**3:21**  1:6
**3rd**  97:8,17,20
  98:4,13 99:6
  106:16 108:5,18
  109:1,1

**4**

**4,000**  77:18 98:19
  99:16
**4/12**  57:10
**40**  3:20
**41**  120:4,7
**44114**  123:2
**45**  3:19 18:15,17
**49**  3:21
**4:25**  37:7
**4:30**  37:25
**4th**  4:18

**5**

**5**  2:4 89:18 97:2
**5-13-19**  56:25
**500**  4:6,13 88:6
**5010**  5:13
**5244848**  123:8
  124:2 125:2 126:2
**53701**  4:13,19
**53705**  5:15
**55**  3:24
**56**  2:15
**56839**  84:10 86:9
**56981**  96:2 104:23
  105:2
**57**  2:17

**6**

**6**  3:8 26:12,19
  28:12 29:18 33:3
  33:12,13,14 87:5

**87**:10 90:14 93:12
  106:14
**6/1/2022**  123:9
  124:3 125:3
**608.257.0609**  4:14
**65**  2:19
**66**  2:21
**6:24**  37:8
**6th**  90:11 104:3

**7**

**7**  2:14 37:7,8,25
  39:15,18 40:1
  42:19 43:17,17
  45:8
**7/30/2019**  85:6
**70**  3:9,20 40:11,14
  40:23 44:13 46:4
**71**  3:21 49:13,21
  50:17 52:13 53:7
  53:20 54:4,17
**74**  3:14

**8**

**8**  37:20 122:17
  123:4
**82**  3:13
**83**  3:12
**88**  3:11
**8:56**  4:8 5:1
**8th**  37:15 39:24
  42:24 43:5

**9**

**9**  43:22
**90**  7:8 118:22
**9:11**  59:23

**a**

**a.m.**  4:8 5:1 22:23
  59:23
**ability**  19:2,20
  20:5 76:15 80:11

81:11
**able**  14:10 49:20
  63:17 78:5 79:7
**acceptance**  28:14
**accepted**  27:16
**accurate**  119:15
  119:21
**acknowledge**
  124:11 125:16
**act**  124:14 125:20
**action**  85:7,16
  86:2,4,6 100:14,22
  102:3
**active**  81:9
**add**  117:13 118:15
  118:19 119:1,5,18
**added**  7:21
**adding**  9:19 119:9
**addition**  99:15
**additional**  54:18
**additionally**
  112:21,25
**additions**  98:17,18
  99:14
**address**  5:12 25:1
  25:2 52:23 92:20
  94:1 95:6,14
  107:21 123:16
**addressee**  82:19
**addresses**  109:2
**adjourned**  121:9
**administrative**
  9:20
**adopted**  76:23
  79:6 100:18
  102:16 112:13
  113:7
**adoption**  101:19
**advance**  74:24
**advice**  15:24 16:3
  56:5

**advise**  12:13,20
  13:6,11,14,24 14:5
  19:19,23 20:4,12
  55:13 92:10
**advising**  20:8 25:3
  36:24 58:2
**affidavits**  60:9
  61:10,16,17 62:4
  63:18 65:24
**affixed**  124:15
  125:21
**agenda**  87:22,23
  87:24,25
**ago**  23:7 120:14
**agree**  30:12 43:19
  50:5 66:8
**agreed**  34:11,14
  41:18 50:1
**agricultural**  106:5
  107:8,10,18 108:9
  108:21
**ahead**  37:11 88:18
  91:12 117:16
**aided**  122:11
**al**  1:8 123:7 124:3
  125:3
**alder**  38:4,15
  57:12,13 59:17,22
  60:2 61:21 62:5
  64:5,20 90:1,3
  91:20 94:12,16,17
  95:1,5,16 97:3
  100:6 103:18,21
  114:9 115:4,7
**alders**  94:13,15
  112:21,25
**alert**  69:2
**allow**  15:3 54:1
  77:4,10 78:11
  81:2

**allowable** 77:14
77:20 100:3
108:13,16 109:2
**allowed** 17:13
41:3 49:24 110:23
**altogether** 6:24
73:1
**amend** 8:4 22:4
48:23 75:14
**amended** 22:3
54:1
**amending** 98:13
**amendment** 8:20
9:3,9,24,24 10:25
11:2,4,5,17,18
12:4,18 13:16
14:12 16:9 17:6
17:20 20:14 21:2
21:8,18,24 22:6,7
25:4,24 26:6
30:11 31:7,24
72:23 73:5 76:6,7
76:12,13,14,18
84:3 86:9,19
88:15,24 95:20
103:2,11 104:24
105:5 110:16
112:19
**amendments** 9:12
84:20
**amount** 65:8
**amplified** 13:19
13:25 106:6
107:23
**analysis** 49:19
111:5
**analyzing** 30:23
110:15 113:21
**answer** 3:22 9:22
11:9 12:8,15,24
13:21 14:18,24

15:3,13 20:24
21:20 26:2 30:6
32:8,18 33:19
35:18 37:17,23
39:20 40:7 41:15
42:14 43:1,7 44:6
45:12 46:8 47:1
50:21 51:11 52:19
53:10,23 54:6
55:9,10,17 58:20
61:6 62:16,24
63:14 64:1,12
65:5 66:13 69:4
70:1 72:19 73:17
74:6 75:8 76:5
78:14,23 79:9,22
80:13,19 83:15
87:12 91:23 93:8
94:2 99:22 100:1
100:11 101:13
102:6 107:3
109:15,17 111:17
112:6 119:16
**answered** 54:6
81:7
**answering** 14:20
**answers** 6:7 27:24
**anybody** 31:18
44:12 47:9 96:25
**anymore** 117:23
**anyway** 10:2,3
65:3
**appealing** 120:20
**appeals** 77:13
119:4
**appear** 118:2
124:11 125:15
**appearances** 4:10
**appears** 22:20
39:9 67:6 104:5
105:6 115:19

117:4 118:7
**appended** 125:11
125:18
**applicant** 10:11
**application** 8:3
10:5,11,13,18,18
10:21,24 11:12,15
12:13,20,21 13:12
13:13,15,24 14:3,9
14:11 15:6,8 16:4
16:6,17 17:4
19:17,19 20:3,12
20:16 21:1,16
27:8 29:2,4,13,15
29:17 30:2,3
31:25 32:2,11,14
33:17,24 34:10,14
34:24 35:5 38:20
38:22 39:8,17
40:25 48:23 49:3
50:6 108:2
**applied** 31:22
**apply** 10:10
114:17
**applying** 10:12
120:21
**apprised** 10:24
23:1,5,23
**apprising** 115:23
**approach** 11:6
**appropriate** 72:15
72:16,20
**approval** 13:18,25
36:16,22 40:25
41:13 48:21 49:8
76:11 85:7 96:5
98:15,24 105:14
106:2 110:24
112:4,8
**approve** 14:11
76:4

**approved** 10:13
12:13,22 13:16
31:7 32:9 40:5
104:2 105:13
106:1,15 110:21
122:9
**april** 57:21 59:9
60:4
**area** 13:1 29:3
32:21 55:19 64:21
98:20,22
**areas** 7:18
**arenas** 106:4
107:8 108:8,20
**argument** 52:24
62:13
**argumentative**
65:5
**arguments** 52:21
54:3 61:4
**arising** 106:25
**arntsen** 38:4
**asked** 18:10 20:18
20:20 23:5 38:3
54:5 71:21 73:6
75:9 81:6,16
110:6 114:13
**asking** 9:4 10:15
15:7,10,23,25
16:11 18:9 20:21
20:22 21:5 23:19
35:2 36:2,6 39:9
51:17,19 57:23
59:3 68:3,5 72:8
81:17,18,25 82:10
87:3 91:16,17
93:14,24
**asks** 59:13
**aspect** 29:9
**aspects** 13:6 32:3

[assigned - cabined]

**assigned** 84:14
**assignment** 124:2
  125:2 126:2
**assist** 27:4,6
**assistance** 74:19
  74:21 96:15
**assistant** 6:4,10
  7:24 58:23 83:25
**associates** 119:15
**assume** 25:13
  96:25
**assumed** 25:10,16
  25:22,25 61:17,19
**assumes** 65:8
**assuming** 76:1
  113:3
**athletic** 8:1,10
  9:19 14:1 48:13
  48:15 55:1,2 60:9
  61:10 66:11 77:10
  107:25
**attached** 59:13
  60:17 125:7
**attachment** 56:22
  56:25 57:4,5
**attempt** 116:8
**attend** 37:15,20
  38:17 45:4 104:9
  104:14 114:18
**attendance** 104:7
**attended** 38:12
  104:11,12
**attendee** 114:2
**attending** 38:9
  114:6
**attention** 40:23
  41:9 45:1
**attorney** 5:3 6:5
  6:11 7:24 14:17
  22:1 51:7 55:8,16
  56:10 57:24 58:23

70:7,8,24 74:23
  84:1 85:3 101:22
  101:22 112:8
  117:3 119:13,14
  119:25
**attorney's** 6:4
  51:15 56:5 85:6
  85:12,13,14,15
  87:7 89:17 120:23
**attorneys** 8:10,13
  8:17 13:15 20:1,9
  20:10 85:22
**auditoriums** 106:4
  107:8 108:8,19
**august** 5:25 87:5
  87:10 89:18 90:8
  90:11,14 91:7,13
  91:17 93:12 94:10
  95:1,3 97:2 100:8
  100:8,8 104:3
  106:14 110:13
  111:23 113:9
  117:25
**authority** 50:3
  53:12
**authorization**
  85:24
**authorize** 125:11
**ave** 123:1
**aware** 24:16 38:1
  39:15 40:3 45:8
  66:15,17 80:9,15
  81:3,19 82:5,8
  83:1,5 92:14,16
  101:21 102:15
  111:10,14,18

**b**

**b** 2:7 3:1
**back** 14:14 15:14
  15:15 33:20 36:25
  45:4 58:14 60:4

69:2 72:24 73:3,6
  91:12 102:7
  103:10 108:24
  109:17 118:7
  120:11 123:16
**bad** 66:22
**based** 25:19 40:25
  42:6 113:14
**basically** 11:3
  51:13 95:13
**basis** 13:5
**beautiful** 69:13
**becoming** 73:19
**began** 7:12 8:6
**beginning** 117:21
**begun** 49:22
**behalf** 27:17
**believe** 19:4 47:2
  53:7 65:24 74:7
**believed** 74:2
**believes** 31:6
**best** 7:14 23:22
  28:8 29:14 36:12
  42:3 44:8,17
  45:25 59:11 94:21
  103:14,17 104:15
  112:10 113:5,18
**better** 45:22 119:6
**beyond** 14:21
  86:15 103:21
**bidar** 94:16
**big** 24:12
**binder** 26:19
  40:12 89:15
**binders** 70:5
**bit** 79:10
**bleachers** 14:5,7
**blocks** 113:22
**board** 77:13
  118:12

**boardman** 4:18
**boardmanclark.c...**
  4:19,20
**body** 89:12 110:2
**bookmark** 35:12
**boss** 47:11 70:23
**bottom** 63:6 85:5
  104:19 112:20
**bounce** 69:2
**boundary** 68:20
  69:7,11,16,18,20
  69:21 83:8,10,12
  83:18 88:16,20
  92:5
**break** 56:2 65:12
  103:7
**brian** 18:18
**briefly** 42:16
**brings** 80:22
**broad** 87:13
**broadly** 51:6
**brodsky** 2:21
  57:14,20 58:8
  59:4,5,12 60:3
  67:6,15,20,24
**brought** 16:21
  71:14
**budget** 102:21
**building** 27:15
  77:17,17,21 78:7
  95:10 98:22 99:15
  99:24 107:19
  109:3 113:22
**buildings** 98:17,17
  98:18 99:14
**bunch** 68:3
**buses** 119:3

**c**

**ca** 123:25
**cabined** 14:18
  15:12

calculation  43:18
calendar  91:9
call  14:23 34:12
  44:9 47:15 68:17
  78:2 92:4,13,18,20
  94:10 95:1,2,16,18
  96:2,7 100:10
  103:18 118:17
  120:3,15
called  4:1 28:24
  33:9 84:25 85:2
  92:16 97:14,19,22
calling  90:10
campus  22:5 41:1
  72:22 75:14 76:13
  76:18 77:9,15
  84:4 86:10 88:24
  95:21 96:5 98:16
  105:13,13 106:1,2
  108:3,10 121:1
capacity  5:18 6:3
  6:15 52:10 83:25
  106:8
capital  30:13
  46:15,16 48:19
  49:6
careful  18:13 55:5
case  1:6 48:25
  66:2 72:2 86:13
  107:6 123:6 124:3
  125:3
caught  59:20
  83:21
cause  21:7 122:16
cc  70:10 82:21
  115:20
cc'd  74:15
cell  69:12,22,24
certain  19:10
  25:21 29:7 77:14
  78:6 85:25 97:13

101:18
certainly  23:11
  24:1 53:3
certainty  79:16
certificate  122:1
  125:11
certification  124:1
  125:1
certified  4:3 122:3
certify  122:5
chain  63:2
challenge  119:3
change  76:8 80:16
  97:14,18,19,20
  99:10 109:6,7
  110:8,17 117:24
  117:24 123:14,15
  125:8 126:3
changed  41:22
  48:24 81:11 109:9
  109:11,12 110:4,5
  110:6
changes  76:9
  97:13,24 112:12
  112:15,21 113:1,7
  123:13 124:7
  125:7,9
changing  22:6
  80:10 81:4,20
  82:6,9 94:7
  109:19
chapter  120:4,4,4
  120:7
characterization
  106:19
characterize  62:17
chart  85:6
check  69:24
  104:25
cheri  1:24 4:3
  122:3,20

chose  93:23
christina  36:15,25
ci  48:16 71:8 73:19
  77:3,20 78:4
  79:25 80:2,5 81:1
  92:23 95:8 100:3
  112:12,15,22,23
  113:1,2,7
circuit  119:4
circumstance  10:4
  79:16
circumstances
  65:10 79:13
  102:15
cite  53:7
cited  50:4
citing  53:12
city  1:7 2:18 6:2,4
  6:4,11 7:24 14:10
  19:2,19 20:4 22:1
  24:10 31:6,12,15
  35:16 36:24 39:16
  40:5,24 41:12
  45:9,14 51:3,3,22
  51:22 52:3,7
  54:25 55:7,13,25
  57:10,24 58:17,23
  58:24 60:4 63:7
  66:6,10 70:7,24
  76:23 80:10,16
  81:20 83:2 84:1,2
  84:18 85:3,13,14
  85:15 87:7 88:7
  101:22,22 102:25
  103:1,5 112:3,8
  115:25 117:3,23
  117:25 118:7,24
  119:12,25 120:19
  120:22 123:6
  124:3 125:3

city's  33:16 45:17
  50:18 112:10
  113:5 119:2
civil  124:5 125:5
claim  55:15
  112:10 113:14,16
  113:21
clarification  38:5
clark  4:18
classes  17:2 48:13
clear  7:11 15:17
  49:9 69:17
clearly  64:17
clerk  115:25
cleveland  123:2
client  14:17 51:7
  55:8,16
closed  100:18
closely  34:9,10
  49:23
closer  7:2
code  13:10,10 29:6
  29:6 49:10 77:4
  78:11 80:1,3,6
  81:2
coincidence
  111:12
come  32:14,19
  40:23 44:25 54:10
  63:20
comes  62:3 119:10
coming  18:22
  37:14 44:18
commencing  4:7
comment  65:7
commission  23:4
  23:10,15 24:3,4,9
  48:20 49:7 72:24
  73:3,4 75:18,25
  76:2,10 110:13
  111:23 118:8,11

124:19 125:25
126:25
**committees**
118:10
**common** 2:24
51:13 54:9,14,15
76:3,10,19 87:4,15
90:14 96:20
100:17 101:19
104:3,7 110:21
115:17,24
**communicated**
17:12,13,19,25
**communicating**
38:18
**communication**
19:1 51:20 52:11
59:9
**communications**
14:8 51:3,9,10,12
51:18,19,21,25
52:2 55:1
**competent** 122:8
**competitions** 55:2
**complaint** 40:25
**complete** 52:14
119:22
**completed** 123:16
**complex** 48:15
59:7 107:25
**compliance** 29:20
30:19 34:1,3 35:6
46:11,13 50:24
**compliant** 13:10
49:10
**complied** 32:2,21
48:5
**comply** 29:21
30:19,22 31:22
32:4,15 33:25
48:1,9

**computer** 122:11
**concern** 32:1 39:2
42:11 47:25
**concerned** 55:21
94:13 109:22
110:1
**concession** 11:21
**concessions** 12:5
**conclusion** 32:14
32:19 50:5 53:8
72:14 110:19
113:15
**conclusions** 52:16
**condition** 99:19
**conditional** 77:16
92:22 94:20 95:10
95:22 96:3,4,7,9
96:12 98:15,23
103:2,11 104:24
105:14 106:2
109:6 110:17,24
112:18 114:12,15
114:17,23 115:1
**confer** 50:9
**conference** 46:22
**conferred** 90:7
**conferring** 28:18
28:22 50:10
**confirm** 12:12,21
91:13,17
**confirmation** 48:4
**confirming** 23:2
43:14
**confused** 62:21
**confusing** 59:19
**conjunction** 16:8
16:13
**connection** 68:4
**consequence** 77:1
**consider** 58:4,8
61:24 63:1

**consideration** 2:10
23:3,15 61:25
**considered** 51:23
111:11
**considering** 10:3
10:25 20:17 21:2
40:24 41:13 49:23
**consistent** 42:22
43:3
**constituents** 64:23
115:8
**constitutional**
77:22
**constraints** 14:22
**construction**
77:21 78:6 95:9
**consult** 56:2 96:20
**consulted** 15:24
29:15,16 55:3,11
**consulting** 16:1,2
19:5,12
**contacted** 33:8
**contacting** 91:21
**contain** 39:12
**contained** 60:21
**content** 109:1,25
**contents** 108:19
**context** 18:23
**continue** 56:3 73:2
**continued** 7:17,18
**contradict** 62:7
**contrary** 30:1,17
33:15 34:6 60:20
61:22
**conversation**
38:24 39:1 82:7
92:24,25 97:3
103:21
**conversations**
9:11,14,15,17,18
10:16 23:13,17,20

25:17 35:7 45:19
54:18 68:8 82:8
**converted** 122:10
**convey** 65:24
71:19
**conveys** 78:1
**convinced** 50:23
**conway** 2:24 118:3
**copied** 18:20
22:21,25
**copy** 2:18 35:11
57:10,23
**corner** 84:10
**correct** 7:20,23
10:20 11:19,20,22
11:24 12:1 17:20
23:16,24 25:6
30:25 32:16 40:18
40:19 42:24 43:5
43:16 45:6,7 46:2
47:24 49:14,15,17
52:18 53:22,24
54:4 56:20,21,23
57:21,22,25 58:1,6
59:13,14,18,23,24
60:5,6,10,11,22
61:1,14 62:7,8
64:10 66:4 69:14
69:17 70:11,12,23
70:24 71:4,5 74:3
74:4,11,14,16
75:12,13,16,19,20
75:24 76:4,6,15,16
76:20,21,24,25
77:11 78:12,21,24
79:4,5,8,20,21,23
80:1,4,7,8,18
82:22 84:16 86:3
90:20 91:7,8
94:24 95:21 96:13
96:14 97:5 98:9

99:6,16,17,24
100:2,19,20
101:11 103:12,13
103:16,19,20
105:5 106:16
107:1,25 108:16
108:17,21 109:11
110:17,18,25
111:1,3,4,7,8
116:20,21 119:15
119:17,19
**correctional**
107:15
**corrections** 123:13
125:17
**correctly** 29:23
38:6 41:4 60:14
67:18 77:5 112:13
112:14
**corroboration**
63:8,12
**council** 2:24 7:4
22:10 76:4,11,20
87:4,15,18,22
90:11,14 93:2
100:17 101:8,15
101:19 102:16
104:3,7,11 110:21
115:17,24
**counsel** 14:16
26:14
**countless** 119:8
**county** 119:14
124:10 125:15
**couple** 85:20
87:14 120:13
**course** 8:14
118:22
**courses** 5:20,22
**court** 1:1 6:7,17
27:23 119:4,4,5,13

122:8 124:7
**coverage** 69:12
**covered** 14:19
**craft** 49:20 51:14
**crafted** 71:14
106:15,20,22
**crafting** 50:12,16
50:17 71:12
**created** 117:1,6
**creating** 105:11,24
**creation** 120:25
121:4
**crosse** 5:13
**csr** 1:24
**current** 5:12 82:1
82:4 117:14
119:18
**curriculum** 3:3
**cut** 89:14
**cv** 1:6

**d**

**d** 2:1 105:12,25
**date** 17:11 18:7
23:1 31:10 34:2
35:24 39:18,22
66:9 68:1,1,11
70:14 81:16 85:6
86:20 87:3,17
89:16 91:20,24
100:13,17,22
101:5,7,15 102:17
113:9 116:25
123:9 124:3,9,19
125:3,13,25
126:20,25
**dated** 2:14,16,20
2:24 18:17 24:21
24:22 26:20 40:17
46:2 49:16,18
56:10 57:21 70:8
74:10 82:13 104:3

110:13 111:23
113:8,25 115:18
122:17
**dates** 32:5 41:16
61:18 68:21 89:24
89:24 102:4
117:24
**davis** 119:14
**day** 4:7 43:4,24
44:8,12,20,20 83:7
94:21,23 101:8
102:4 113:10
122:6 124:16
125:22 126:22
**days** 123:19
**deal** 116:11
**dealings** 66:10
**dealt** 18:11
**dear** 123:10
**decide** 50:1
**decided** 10:1
48:24
**decision** 25:18,24
30:21
**deed** 124:14
125:20
**deem** 58:8
**deemed** 123:20
**defendants** 1:9
4:16 117:9
**defenses** 53:3
**definitions** 22:14
**delaying** 2:10
**delivered** 70:18
**delivery** 70:20
**demonstrates**
100:13 120:19
**denial** 50:18,22
51:1
**denied** 50:7

**denoted** 85:16
86:2
**deny** 65:2 76:4
**denying** 68:4
**department** 59:2
123:22
**depends** 87:20,20
**deponent's** 122:12
**deposition** 1:12
4:1 26:25 27:22
56:1 89:25 90:1
121:9 122:6,12,13
123:9,12 124:1,3
125:1,3
**describe** 48:14,15
**described** 41:24
48:12
**description** 2:9
3:2
**desire** 103:1
**details** 102:1
**determination**
72:6
**determinations**
32:6
**determine** 44:16
73:8 107:20
**determined** 34:11
73:14
**develop** 30:8
**development**
24:10,13 78:25
**dianne** 63:4,21
67:5
**difference** 29:11
30:3 100:21
**different** 22:13
48:18 80:23 82:15
87:14 98:7 102:4
106:19 119:11
120:11

differently 102:22
digest 113:12
digging 32:7
direct 58:24 71:3
directly 59:2
director 82:14
directors 60:9
  61:10
disagree 91:3,5
  106:21
disagreed 50:4
disclose 51:9,19
discovered 77:24
discuss 8:10 14:10
  67:18 92:17
discussed 2:22 9:2
  9:8 11:1 39:24
  114:8
discussing 8:20
  9:2 37:13
discussion 9:23
  91:15 93:25 94:3
  95:15,17
discussions 7:25
  10:7,9 36:14 80:9
  80:16 81:4,19
  82:3,5 94:7
  102:25 103:4
dishonesty 66:15
disinterested
  122:9
displeasure 56:18
  115:12
district 1:1,2 22:5
  48:17 64:21 73:19
  77:3,9,15,20 78:4
  79:25 80:3,5 81:1
  88:24 92:23 94:17
  94:18 95:21 98:16
  100:3 105:13
  106:1 108:10

112:12,16,22,23
  113:1,2,7
districts 94:16,20
  95:8 96:5 120:12
division 27:15
doc 82:17
document 29:24
  35:20 37:19 40:15
  42:19,24 58:11,15
  84:9 90:17 112:3
  112:4 115:20
  116:25 117:13
  118:2
documents 36:6
  59:3 64:2 68:3
  98:5 109:10
doing 7:3,22 36:24
  54:23 62:18 64:4
  88:14 93:6 94:19
  99:11
double 104:25
doubt 16:7
draft 27:11 87:16
  89:7 93:24 96:24
  99:7,8 111:25
drafted 27:8 59:25
  74:17 86:12,18
  88:6 89:4 95:19
  97:1 99:5 100:18
  103:15 106:10
  110:12 118:14,15
drafter 96:12
drafting 27:4,13
  78:4 81:21 89:23
  90:8 91:21 96:16
  97:4 103:18,22
  106:11 110:2
drafts 33:2
drawn 103:22
drive 69:22

driving 69:24
due 55:25
dug 30:16
duly 5:4

e

e 2:1,7 3:1 5:11
  105:12,25
earlier 20:18 29:1
early 8:7 9:21
  94:24
ears 45:20
easier 28:2 35:13
east 4:6,13
easy 6:6
edgewood 1:4 2:12
  2:22 7:25 8:2,9,17
  9:3,19 10:17
  13:13,14,24 14:5,9
  16:9,16 17:10,13
  17:19,25 19:2,18
  19:21,24 20:4,8,13
  23:2,14 25:4
  27:17 28:19 29:15
  29:17,19 32:10,13
  38:19 39:8,10,16
  41:1 54:18 60:4,7
  62:3 63:11,23
  64:10 66:9,16
  71:7,21 72:16
  73:16 74:1,2
  75:10,17 76:22
  77:2 78:10,20
  79:3,6,19 80:1,11
  80:24 82:16,18
  83:2,13,18 84:4
  86:10 88:15 95:15
  95:17 106:25
  107:6,11,14,25
  110:16,22 113:10
  114:19,23 116:16
  121:4 123:6 124:3

125:3
edgewood's 2:11
  2:18 12:10 16:10
  20:11 21:18,23
  25:24 32:15 33:16
  52:5 55:1 57:10
  61:3 62:7,13 64:8
  66:5 77:10 103:3
  114:10,25 116:3,8
education 119:21
effect 22:2 32:20
  101:10 110:22
effective 101:3,6
  101:14,24 102:17
effort 81:9 84:15
  86:11
efforts 80:15 81:3
  81:20
ehs 57:17 59:17
either 8:13 12:5
  17:22 36:14 43:22
  47:4,8,14 92:3
  93:19 95:3
elected 118:3,6
election 64:18
electric 27:16
electrical 29:21
elliot 18:18 26:20
email 2:10,12,13
  2:15,19,21 18:16
  19:9,11 22:19,20
  22:21,22,25 23:2,9
  24:2,20,21,24,24
  25:1,2,3 26:10
  37:6,9,14 38:25
  39:5,6,9,15 40:1
  43:9 56:9,13,19,24
  57:1,8,13,20 58:4
  59:8,17,22,25
  62:18 63:2,6,10,22
  64:5 65:19,21

66:9,21 67:4,5,6,8
67:10,13,22 68:11
68:23 69:2 70:20
74:10,17,20,24
75:6,10 77:8,25
79:24 80:17 81:16
81:22,25 123:17
**emailed**  33:9
**emails**  2:17 33:2,5
33:6 37:10 40:2
57:11,14 58:7
59:3 67:1 69:3
**employed**  5:16 6:1
**employer**  120:20
**employment**
117:25
**enact**  101:17
**enacted**  101:25
120:13
**enactment**  100:13
100:22 101:5
102:4
**enactments**
111:11
**enclosed**  98:22
99:24 106:3
123:12
**encompass**  120:5
**ended**  7:7
**enforcement**
19:20 20:5
**engage**  7:25 45:22
**enormous**  65:8
**entered**  125:9
**entire**  53:19 79:17
113:12,14 124:5
125:5
**entirety**  108:15
**entities**  82:16
112:22 113:2

**entry**  79:2 85:6
105:3
**equal**  71:9,18 72:1
72:12
**equity**  7:9 118:25
**errata**  123:14,19
125:7,10,18 126:1
**esq**  4:12,17,17
**establish**  66:1 95:9
**established**  77:21
107:18
**establishment**
98:18,20,24
105:15 106:3,7
107:23
**estimate**  90:13
**et**  1:8 123:7 124:3
125:3
**ethan**  2:21 57:14
57:20 59:4,5 60:3
60:7,19 67:6
**eventual**  116:19
**eventually**  116:17
**evers**  38:15 57:1,9
57:12,13 59:17,19
59:22 60:2 61:21
62:5 64:5,9,25
65:2,9 67:4 90:1,3
90:6 91:20 92:7
92:14,17 94:9,12
95:1,5,16 97:3
100:6 103:18,21
114:9 115:4
**evidence**  61:22
**exact**  7:15 40:9
68:21 88:7 94:23
**exactly**  10:22
84:24 86:6 95:12
118:5,5
**examination**  2:4
122:14

**examined**  5:4
**example**  7:5
**examples**  107:13
**exceeding**  98:19
**exchange**  2:12,13
22:20 24:21 30:15
37:6 39:5 56:19
65:20
**executed**  125:10
**execution**  124:14
125:19
**exhaustive**  53:14
**exhibit**  2:10,12,13
2:15,17,19,21,23
3:3,7,8,9,10,11,12
3:13,14,15,16,17
3:18,19,20,21
18:15,17 22:16,18
24:17,19 26:12,19
28:11 29:18 33:3
33:12,13,14,15
35:9,11,15 36:9,16
37:2,4 40:2,3,11
40:14,23 42:16,17
42:18 44:13 45:3
46:4 49:13,21
50:17 52:13 53:7
53:20 54:4,17
56:9,22 57:3,17
63:21 65:16,18,21
66:23,25 67:2,21
70:5,6 71:6,13
74:9,25 79:24
82:12 83:23 85:5
85:17 86:2 87:10
88:21 89:16 90:23
92:14,17 96:1
97:7 98:10,10
99:13 100:13
104:1,16,24
110:10 111:19

113:23 115:13,15
116:22,24
**exhibits**  3:5 27:1
56:7 70:4 90:19
**existence**  51:18,21
51:24
**existing**  98:18
**expand**  55:11
**expansion**  106:7
107:23
**expensive**  65:1
**experience**  22:1
58:23 69:12 87:6
102:2
**experiences**
119:12
**expiration**  124:19
125:25 126:25
**expire**  73:12
**explain**  107:16
**explained**  60:7
62:18 81:12
**exploring**  65:25
**express**  31:16,18
44:21,25 94:9
115:12
**expressed**  31:11
39:2 44:23,24
47:23,25 100:6
103:1
**expressing**  42:11
56:17,18 66:19
**expression**  36:23
**extends**  14:21
**extent**  51:8,10
55:6 77:19 107:4
**extra**  12:1

**f**

**facilities**  106:5
107:5 108:9,20

**facility** 107:15
**fact** 19:12 36:21
  63:17 68:16 95:7
  106:24 116:20
**fair** 8:6 11:7 25:23
  56:17 62:14 63:12
  63:15,24 64:3,13
  64:24 69:12 84:15
**familiarize** 110:11
**far** 5:22 27:24
  42:9,15 55:10
**farther** 63:2
**february** 9:1,4,21
  10:15,16,20 14:20
  15:5,10,22 16:18
  23:3 24:5,22,22
  26:20 27:6 28:14
  28:16,17,17,22,23
  32:23,23 33:17
  34:2,13 35:4,8,22
  114:1 120:10
**feel** 61:2,16 93:3
**feeling** 26:7
**feet** 77:18 98:19
  99:16
**field** 8:1,11 9:20
  14:1,1 16:23
  17:14,17 19:3,15
  21:9 27:18 48:13
  55:1 60:25 66:11
  75:11 77:4 78:12
  78:21 79:8,19
  80:12 81:2
**fields** 77:11
**figure** 29:12 61:22
**file** 16:4 48:23
  71:7 74:1 76:15
  84:10,13,13 86:8
  96:1 104:22
  116:11

**filed** 8:3 9:24
  10:18,21,22 11:17
  12:20 13:12,25
  14:3 16:6,9,11,12
  17:20,23 19:17
  21:1,18 22:9 27:7
  27:16 29:2 38:20
  38:21 116:6,10,10
**files** 10:5
**filing** 10:23 11:12
  11:14 12:11 13:13
  14:9 16:17 19:18
  20:3,11,11,15,25
  21:16,23 22:2
  31:25 32:10,11,13
  49:3
**final** 25:18 71:16
  76:11 100:14,21
  102:3
**finalized** 87:23
**finance** 102:20
**find** 83:18 123:12
**fine** 14:20 15:19
  55:10
**firm** 119:14
**first** 5:4 7:25
  12:18 13:2 16:20
  16:20 17:9 18:3,7
  18:24 19:1 27:14
  29:15,16,18 30:8
  30:23 31:1,5 32:7
  33:14 36:7,8,13
  39:4,22 40:22
  45:16,18,23 59:9
  63:3 67:4,15
  75:18 89:16 90:7
  90:15,17 95:2
  97:18 99:7 100:8
  117:12 120:9
**five** 6:14 7:16

**flaw** 77:23 78:2
  92:20
**floor** 4:18 87:19
  88:1,4,8 98:20
  105:4 106:14
**follow** 57:1 60:19
  61:3 62:5 64:6
**following** 43:4
  59:21
**follows** 5:5 59:12
**football** 14:1
**footing** 71:9,18
  72:2,12
**force** 7:5,8 118:21
**foregoing** 122:5
  124:13 125:18
**form** 9:22 11:8
  12:7,14,23 13:20
  18:5 19:7 20:7,24
  21:19 23:25 26:2
  30:5 31:13,17
  32:17 33:18 35:17
  37:16,22 38:10
  39:19 40:6 41:14
  42:13,25 43:6
  44:5 45:11 46:8
  46:25 50:20 52:6
  52:19 53:9,23
  54:5,21 58:19
  61:5 62:15,23
  63:13,25 64:11
  65:4 66:12 69:4
  70:1 71:16 72:18
  73:17 74:6 75:8
  76:5 77:12 78:13
  78:22 79:9,22
  80:13,19 81:6,23
  83:15 85:18 88:10
  90:21 91:23 93:8
  94:2 99:22 100:1
  100:11 102:5

  106:17 107:2
  108:22 109:8,14
  111:9,13 112:6
  117:15 119:16
**formal** 30:15 58:4
  58:9,14 67:23
  68:2,2 70:21
**former** 83:25
**forms** 36:18
**formulate** 50:2
**formulating** 51:4
  51:23 54:3 74:20
**forth** 52:15
**forward** 9:25 10:2
  10:3 23:10 24:15
  27:16 67:4 96:8
  114:11 123:16
**forwarded** 67:6
**found** 17:16 24:5
  65:21 98:7
**foundation** 12:7
  18:5 19:7 20:7
  21:19 32:17 33:18
  35:17 38:10 39:19
  42:25 45:11 53:9
  58:19 62:23 63:25
  65:4 66:12 84:22
  85:18 87:11 88:10
  100:24 101:12,20
  109:8 111:13,16
**four** 6:14 7:15
**framed** 95:5
**frames** 35:24
**frankly** 63:16
**free** 124:14 125:20
**frequently** 23:19
**friday** 27:15 42:23
  43:5,11 87:23
  91:6,13,18 92:2,3
  95:3

[full - hypothetical]

Page 11

**full** 93:4,18 117:23
**fully** 65:2 80:21
**furman** 94:17
**further** 33:14
  49:19 55:21 121:6

**g**

**g** 5:11
**game** 60:24 78:20
  79:19
**games** 16:19,22
  17:7,13,17 18:1,8
  18:10,12,24 19:3
  19:13,14 21:6
  62:10 75:11 77:4
  77:10 78:11,25
  79:8 80:12 81:2
  81:11 110:23
**gap** 60:24 62:10
**gears** 31:24
**general** 10:5 96:4
  98:14 105:11,24
  109:25
**generally** 44:23
  84:17 99:14
**george** 29:3 30:9
  30:24 34:8 36:4,9
  39:4,22 41:17,25
  41:25 42:7 43:21
  43:24 44:3,7,12
  46:1,7,9,17,23
  47:11,14,22,25
**george's** 36:22
**getting** 18:25
  24:12 45:3 64:10
  64:14 74:21 78:20
  83:21
**giant** 118:23
**give** 54:22 86:16
  88:5 93:15,15
  109:24

**giving** 16:2 31:2
  35:25 49:3
**gklaw.com** 4:14
**go** 10:2,6 11:15
  24:2,4,11,15 26:6
  31:23 36:25 37:11
  39:10,11 43:12
  49:7 50:7 51:13
  58:14 64:25 66:4
  69:1 72:11 75:18
  76:3,9 77:1 88:18
  91:12 92:25
  114:16,17 117:15
**godfrey** 4:5,12
**goes** 75:4,25 76:2
  99:10,23 112:5
  113:18
**going** 9:25 10:2,3
  11:4 23:10 24:4
  24:15 25:10,13,22
  26:1,10,11 30:18
  38:9,16 39:11
  40:12 42:23 43:4
  43:10 44:10 45:4
  47:13,16 48:17,18
  48:22 49:2 50:6
  51:5,6 55:15,21,23
  56:4 62:25 64:15
  65:6 67:14 70:3
  76:12 81:13 82:3
  82:11 84:5 96:8
  104:12 105:21
  108:4 110:1
  116:14 117:17
**good** 5:8 45:5
  59:20 69:11 82:11
**gosh** 88:5
**gotten** 59:3
**government** 7:6
  7:10 118:21,24

**grabbed** 73:6
**great** 27:24
**ground** 55:14
  98:20
**group** 85:7
**guess** 7:14 16:5
  42:4 57:15 73:13
  75:4 83:7,9 95:2
**guessing** 69:19
**guns** 119:3
**guys** 109:13

**h**

**h** 2:7 3:1 5:10
**half** 120:9,10,11
**hand** 34:8 41:17
  41:25 42:1,12
  70:18 84:10
**handed** 120:14
**handing** 24:18
  26:18 37:3 56:8
  65:17 66:24
  115:14 116:23
**handle** 85:22
**handled** 6:15 82:6
  85:20,21 119:2
**hank** 30:9,24 34:8
  36:9 39:2 41:25
  42:1,10 43:21,24
  44:3 46:1,7,24
  47:14,22,25 54:11
**hank's** 29:3
**happen** 11:14
  23:18 30:2,3 87:6
  87:7,13,14 111:6
**happened** 6:22
  43:8 71:16 92:24
**happens** 10:9 88:2
**head** 8:12
**heading** 85:7
**hear** 13:14,23 14:4
  14:14 27:23

102:24
**heard** 13:3 21:22
  21:25 31:15 32:12
  39:22
**hearing** 2:22 23:9
  23:10 31:18 45:16
  45:18 73:3 83:12
  87:9 94:10,21
  100:19 107:11,13
**heart** 1:4 123:6
  124:3 125:3
**heather** 34:23
  115:16
**height** 41:2,3
**held** 19:21
**help** 62:12 89:7
  114:10
**helpful** 114:25
**helping** 27:11
**hey** 41:18 83:13
**high** 1:4 27:17
  54:18 66:16 71:10
  71:18,25 72:1,12
  94:16,17 106:25
  123:6 124:3 125:3
**historic** 118:16,17
  120:8,12
**hold** 55:24
**hole** 51:13 89:15
  103:24 107:17,21
**honest** 45:20 66:5
  66:10
**hoping** 26:5
**huh** 27:19 85:9
  111:15
**hundreds** 58:12
**hypothetical**
  79:10 80:22

**i**

**i.e.** 34:24
**idea** 42:22 43:3
**identification** 103:24
**identified** 2:9 3:2 70:10 77:19 92:21 98:25 100:3
**identify** 78:25 120:2
**imagine** 119:9
**impact** 110:22 111:6 112:22 113:1
**impossible** 102:13
**improvement** 30:13 48:19 49:7 98:19,21,24 110:23 111:2
**improvements** 46:15,17
**incidents** 68:7
**include** 111:3 118:14
**included** 123:14
**includes** 65:20
**including** 53:4,4
**incorporated** 125:12
**increases** 22:9
**independent** 23:20 28:21 34:16 43:11 116:9
**indicating** 123:14
**indication** 93:16
**indicator** 119:6
**individuals** 57:12 64:21
**indoor** 106:4 108:8,20

**informal** 82:7
**information** 19:13 25:19 39:13 49:4 60:8,20 61:24 62:6 63:23 64:6 64:19 65:25 84:3 88:23 114:19,24 115:8
**ingrisano** 2:4 4:12 5:7 6:10 14:25 15:4,7,10,19,25 17:9 18:14 19:23 20:1 22:17 24:18 26:14,18 28:11 37:3 52:9 55:13 55:18 56:4,8 65:13,17 66:24 103:6,10 105:18 111:10,15 115:14 116:23 121:6
**initial** 78:3 89:7 96:18
**initially** 89:8
**input** 54:3 96:15 96:18 112:4,7
**inspection** 27:15
**install** 27:17 75:11
**installation** 106:6
**installed** 60:25
**instance** 4:2 58:13 66:15
**institution** 73:19
**institutional** 22:5 77:9,15 88:24 95:21 96:5 98:16 105:13 106:1 108:10 121:1
**institutions** 105:12 105:25
**instruct** 14:17,23 55:8,16

**instructed** 3:22
**intended** 71:19 78:5
**intending** 53:3
**intends** 65:2
**intent** 50:18 52:13 53:18 83:19
**intention** 65:23 72:9
**intentions** 49:4
**interact** 67:16 68:9
**interaction** 13:9
**interactions** 29:5 67:24
**interacts** 67:21
**interest** 122:10
**interesting** 63:7
**internal** 70:20,20
**interplay** 111:7
**interpretation** 17:6 18:1 19:6 21:6 30:22 31:2 41:1,23 47:23 52:16 53:16,21 63:19 81:15
**interpreted** 67:23
**introduce** 87:18 89:11
**introduced** 81:10 81:18 84:25 85:1 86:22,23 87:4,17 88:1,4 89:8 93:4 93:11,17,20,22 97:14 103:12 106:14
**introduction** 84:21 85:3 86:6 89:17,20 96:19,23 103:23 105:4

**invitation** 83:3
**invite** 71:7 72:13 113:25
**invited** 73:25 114:4
**invoke** 51:6 55:7
**involve** 78:6 107:19
**involved** 8:5 11:25 18:25 24:8,12 36:19 56:19 71:12 78:3 88:3 89:19 107:24 108:5 118:10,22,23 120:25 121:3
**involvement** 8:7 36:15 54:24 86:1 86:8
**involves** 99:14
**involving** 56:20 96:6 98:16,17 107:11 119:2
**ish** 120:10
**issuance** 28:18 52:17 54:19,25
**issue** 2:22 12:4,12 12:18 13:3 15:18 16:19 18:22,24 21:7 30:10,16 34:9,15 36:4,5,24 39:7 41:19 45:9 46:10 47:3 48:1 53:19 55:4,14 62:21 100:7 104:13 107:10,14
**issued** 29:22 30:20 31:6 36:11 50:25
**issues** 7:9 21:6 34:20,24 39:16 45:13 61:3,7 62:3 69:25 80:23

106:24 107:6,24
108:1 118:25
120:24
**issuing** 39:3 42:12
**items** 85:20,21
87:18 105:4 107:7
108:2 110:20

**j**

**j** 5:10
**january** 8:10,22
8:23 9:1,4,6,7,20
10:15,16 15:11,22
22:23 23:24,24
24:1
**jean** 4:17
**jenkins** 63:4,22
67:5
**jingrisa** 4:14
**job** 5:24 27:24
28:2 59:21 119:10
119:18 120:21
**john** 1:13 2:3 4:1
5:3,10 122:14
123:9 124:4,9
125:4,13 126:20
**jonathan** 4:12
**joyce** 119:14
**judgment** 113:20
**july** 2:16,16,20,20
56:10 66:9 67:10
68:11,17,23 70:8
74:10,12,13 75:5,7
80:6,9 82:14,18,24
83:2,6,7 85:16
86:2 90:20,25
91:4,6 94:24
**june** 1:16 4:7 5:1
117:25 122:6,17
123:4
**justice** 7:9 118:25

**k**

**kahn** 4:6,12
**keep** 35:11 72:21
**keeping** 15:2
**kept** 73:21
**kestenbaum**
119:14
**kind** 19:14 22:4
51:15
**kinds** 13:7
**knew** 13:9 23:11
24:4 29:5 38:16
39:11 44:13,15
64:9,13 70:17
83:5 104:13
**know** 6:6,21 10:22
11:10 13:2,8
17:21 19:10 20:21
21:10,15 23:21
25:21 28:2,3 29:8
30:17 32:24 34:5
38:2,12,14,16 40:8
40:9,9 41:8,21,22
44:18 45:19 51:18
51:20 58:10 59:5
59:6 61:7 63:4,15
63:19 64:3,18,20
66:21 67:24 68:16
70:21 72:20 79:13
81:8,8 82:6 84:23
84:24,25 85:2,12
85:15 86:6 87:3
87:12 88:5,12
89:21 90:22 92:1
92:9,9,15 93:9,16
101:2,23 112:15
112:18 113:5
116:17,25 117:5,7
118:5 120:18,21
**knowing** 29:2,3
32:1

**knowledge** 21:17
79:17 85:13 86:1
100:23 101:16
102:2
**known** 10:11
11:13
**knows** 102:21

**l**

**l** 119:14
**la** 5:13
**labeled** 104:17
**land** 6:24 7:1,12
7:21 120:23
**landmark** 118:16
118:17
**lane** 5:13
**language** 16:23
17:2 27:12,13
**large** 68:5
**larger** 18:23
**late** 8:7 23:23 74:5
111:9
**law** 4:5 5:19 6:20
77:25 78:17 81:15
81:20 82:1,4,6,9
82:10 101:9
109:23 117:23
119:14,19
**lawsuit** 113:10,12
113:22 119:2
**lawyer** 6:25 13:4
45:21 50:12 89:6
**lawyers** 66:5
**lay** 53:14
**lead** 7:7 118:20
**leading** 71:20
**leaning** 25:21
**learn** 94:18
**learned** 19:13
41:22 90:19

**leaving** 53:2
**lee** 2:15,19 56:10
56:17 62:19 63:21
65:20 70:7
**left** 7:3 29:12 73:5
84:10
**legal** 5:21,21 32:8
50:3 112:10 113:6
123:1 126:1
**legally** 75:11
**legible** 35:11
**legislation** 81:14
84:18,25 87:8
88:4 89:3,20 90:8
101:18 102:3
111:7
**legislative** 84:2,15
86:11,16 88:23
**legistar** 84:2 85:20
85:21,22 86:5,24
87:1,17 88:22
98:8
**legistar's** 89:22
**letter** 2:18 14:20
15:6 18:21 26:20
26:23 27:5,14
28:24 31:4,10
33:3,7,11 40:17,20
40:21 41:21 42:1
42:6,10 44:1,10,16
44:22,24 45:21,21
46:2 49:14,18,23
50:14,18 52:14,15
52:22 53:7,11,18
54:8,17 57:10,24
58:3 59:14 68:3,4
70:6,10,13,15,17
70:17 71:6,13
75:5 82:13,18,19
82:23 123:20

**letters** 30:15
**life** 36:19
**light** 10:18 12:13
   12:20 16:17 19:18
   20:3,12 34:24
   36:10,23 41:2,2
   45:10,17 52:17
**lighting** 10:19
   11:12 12:11,12,21
   13:1,4,6,15,24
   14:4,9,11 15:6,8
   17:4 20:15 21:1
   21:16 27:7,16,17
   28:14,16,19 29:9
   29:15,17,19 30:2,3
   31:25 32:11,13,14
   33:17,24 34:14
   35:5 38:20,21
   39:3,8,17 40:3
   48:3,9,12,16 49:24
   50:6,19 106:6
   107:22
**lights** 9:19 10:10
   10:19,22 12:19
   13:14 19:21 20:6
   30:13 46:15,16
   47:24 49:6 52:5
   53:22 54:1,20
   64:10,14,16,17,22
   66:11 75:11 77:4
   77:10 78:12,20
   79:7,19 80:12
   81:2,11 111:3
**limitations** 28:20
**limited** 16:23 17:1
   17:8 108:19 109:4
**line** 3:23 27:14
   30:18,18 31:4
   55:21 67:16
   111:22 112:3
   123:14 125:7

126:3
**lisa** 57:8,9
**list** 53:14
**listed** 67:7 114:1
   115:20 125:7,17
**listen** 56:5
**listening** 115:10
**listing** 125:7
**litigation** 117:9
**little** 6:8 117:4
   118:6
**llp** 4:18
**locker** 11:18 12:5
**long** 33:1 65:1
   69:8 99:16
**longer** 68:2 81:5
**look** 17:3 18:14
   22:17 23:8 26:12
   29:4 33:13 35:9
   35:10 40:11,14
   41:18 42:16,18
   49:25 63:2 70:3,5
   71:15 74:9 82:12
   83:23 84:6,9,9
   88:21 96:1 97:7
   110:10 111:19
   113:23 117:11,12
   117:17
**looked** 18:11
   30:10,11,11 33:10
   34:9 43:9 49:5
   67:22 72:3,4
**looking** 7:8 26:14
   31:2 36:22,22
   48:4 56:23,24
   58:15 60:23 61:20
   62:10,12 94:1
   104:22
**looks** 24:25 57:8
   57:11,13,22 59:15
   67:12 83:6 87:4

**looming** 39:15
**loose** 70:4
**lost** 119:5
**lot** 7:3 28:2 80:23
   98:23
**loud** 21:12 98:11
   105:7
**louis** 4:17
**lumen** 29:11,11
**lumens** 13:7
**lynn** 63:7

**m**

**madam** 123:10
**madison** 1:7,17
   2:24 4:6,13,19
   5:14,15 6:2,19 7:1
   7:10 35:16 39:17
   40:24 41:12 45:9
   52:4 58:17,25
   84:2,18 96:4
   98:14 105:11,24
   106:25 107:11
   115:17 116:7
   118:24 123:7
   124:3 125:3
**madison's** 54:25
   116:7
**mail** 70:20
**main** 4:6,13
**majority** 22:11,12
**making** 31:14 32:2
   49:24 113:20
**manner** 6:15
**map** 22:5,7 30:11
   76:7,12,14 110:16
**march** 2:14 35:23
   37:7,8,15,20,25
   39:15,18,24 40:1
   40:17 41:11 42:19
   42:24 43:4,17,17
   43:18,22,22,25

44:1,2,4,13 45:8
45:15 46:2 49:16
49:18,19 50:8,8
51:2,22 52:4
57:25
**marked** 3:5 22:16
   24:17,19 26:19
   37:2,4 56:7,9
   65:16,18 66:23,25
   115:13,15 116:22
   116:24
**markings** 42:19
**master** 8:4,20 9:3
   9:8,25 11:16 12:4
   13:16 14:11 16:8
   16:10,16 17:7,10
   17:20 18:2,3,10,11
   19:6 20:13 21:8
   21:18,24 22:3,4
   25:4 26:6 28:19
   30:11,12 31:7,21
   31:22,24 32:10,15
   32:20,22 33:25
   34:10,15,25 46:11
   46:14 47:13,16,23
   48:2,5,10,11,20,23
   49:5,25 50:1
   52:16 53:6,15,21
   53:25 71:8,22,23
   72:5,15,22 73:4,9
   73:10,15,18,20,23
   73:23 74:1,3
   75:14 76:6,13,18
   76:23 77:2 78:10
   78:19,24 79:2,7,11
   79:15,18 80:25
   83:3,14,19 84:4
   86:10,22 88:15
   95:8 103:3 105:14
   106:2 108:3
   112:11 113:6,14

113:16,18 116:4,8
116:16,19 121:4
**matt** 2:15,19 13:14
13:23 14:4,8
17:12,24 18:17,25
26:20 27:8 34:23
36:6 47:10,11,14
47:19 56:10 60:16
61:25 62:18 96:21
**matt's** 47:11
**matter** 112:2
**matthew** 8:19 70:7
74:15
**mautz** 85:19
**mayor** 2:23 82:14
101:3,7,10,17,25
102:18 115:17,24
118:3
**mean** 18:19,20
19:8 22:13 23:6
23:18 26:3 27:1
38:21 41:5 42:5
43:8 47:11 52:6,7
52:20 54:13,22
59:2 61:7 63:22
64:2 66:22 68:18
79:10 80:20,22
81:8 82:17 84:18
84:20 85:13 87:2
88:12 89:10 92:15
97:11 109:9 112:7
112:20 113:8
114:9 117:6
**meaning** 29:19
61:9 68:14 86:23
**means** 22:6 84:24
89:11,22 97:12
**meant** 71:19
**meat** 109:20
**mechanism** 72:16

**meeting** 2:14,16
2:20 8:9,12,16,18
8:25 9:7,10,13
18:23 23:15 24:9
33:1 37:14,15,20
38:1,3,4,9,13
39:10,12,24 42:10
42:23 43:4,8,10,12
43:14,21,24,25
44:1,3,7,11 45:5
46:1,6,20 47:8,14
47:17,18,20 71:20
90:11,15 93:2,12
93:20 94:4,6
101:4,8,15 102:17
104:2,3,7 113:25
113:25 114:4,6,8
114:10 115:2,10
**meetings** 7:8
32:24 46:23 87:22
104:10,12 114:19
118:22
**members** 7:8
85:21 87:18
111:22
**memo** 2:23 110:12
110:15,19 111:21
111:25 112:9
113:8 115:16,23
**memorandum**
112:3
**memorial** 94:17
**memory** 46:20
**mentioned** 45:24
61:21 76:17
103:11 119:25
**mere** 111:12
**met** 8:13
**metro** 6:19 7:1
**mgo** 29:20 30:19
34:1

**michael** 67:7 70:7
74:15 75:5
**middle** 8:19,21,22
8:23
**midwest** 123:17
126:1
**mike** 18:18 26:20
71:14 72:10
104:11
**mike's** 72:9
**mind** 15:9 72:21
119:10
**minute** 14:13,13
14:14 37:10 56:14
58:3 84:5
**minutes** 104:2
105:3
**misinterpreting**
66:20
**missed** 83:22
**misspoke** 41:6
**misstates** 39:20
**mode** 50:12
**modification**
98:19,21,25
110:24 111:2
**moment** 70:4
119:10
**month** 60:24
62:10 90:16 94:24
**morning** 5:8
**motivated** 21:15
**motivating** 100:9
**moved** 6:18,23
**moving** 85:23
114:11
**muddied** 51:16
**municipal** 6:15,16
6:17
**munson** 18:18

**n**

**n** 2:1 5:10,11
**name** 5:9,10 123:6
124:3,4,15 125:3,4
125:21
**narrative** 65:6,7
**narrowly** 106:15
106:20,21
**nathan** 8:18 20:16
21:10,13 23:19
25:17 30:15 34:13
35:1,7 37:6 39:9
40:18 41:20 42:2
44:9 45:9,13,16
57:24 66:21 74:10
75:1 81:25 82:10
**nathan's** 32:9 42:6
**near** 71:16
**necessarily** 34:5
52:20,21,24 99:8
99:10
**need** 10:12 15:14
49:7 53:25 61:2,8
61:16 84:5
**needed** 52:21,23
60:13 61:13
**needs** 27:23
**neighbors** 21:22
38:2 52:7,9,10,12
59:6 76:14 114:10
114:14 115:11
116:7
**never** 10:11 27:21
27:22 50:24,25
79:6 81:24
**new** 41:1 98:16,17
99:8,14
**night** 19:21 20:5
101:15
**non** 29:11 51:10
51:17

**nonconforming**
60:5 61:23,25
62:13 64:7 66:1
**norm** 88:12
**normal** 35:5 58:14
68:19
**normally** 10:5
27:22 93:15
**notarized** 123:15
**notary** 4:4 122:4
122:20 123:25
124:10,18 125:15
125:23 126:23
**note** 86:5 120:1
123:13
**notes** 23:20
**notice** 83:13
109:25
**notices** 55:1,4,6,14
**november** 9:25
11:17 16:9 19:17
**nra's** 119:2
**number** 8:14
19:13 35:13 84:10
84:13,14 88:6,7,12
105:1,2 123:8,14
**numbers** 84:13
125:7

**o**

**o** 5:10
**o0o** 1:3 5:2,6
**object** 9:22 20:24
26:2 32:17 46:8
51:5 52:19 53:23
54:21 55:15 58:19
69:4 70:1 73:17
74:5 75:8,21 76:5
77:12 79:9,22
80:13,19 83:15
85:18 90:21 91:23
93:8 94:2 99:18

99:22 100:1,11
101:12 112:6
117:15 119:16
**objection** 11:8
12:7,14,23 13:20
18:5 19:7,22 20:7
21:19 23:25 30:5
31:13,17 33:18
35:17 37:16,22
38:10 39:19 40:6
41:14 42:13,25
43:6 44:5 45:11
46:25 50:20 51:15
52:6 53:9 54:5
61:5 62:15,23
63:13,25 64:11
65:4 66:12 72:18
74:5 78:13,22
81:6,23 84:22
87:11 88:10,17,18
100:24 101:20
102:5,12 106:17
107:2 108:22
109:8,14 111:9,13
111:17
**observe** 13:23
14:4
**obstacle** 78:20
79:18
**obtaining** 2:17
57:10
**obvious** 113:15
116:18
**obviously** 72:10
83:21 89:5 112:7
113:11 117:22
**occur** 77:17 109:3
**occurred** 43:12,15
44:1
**occurring** 98:21
98:22 99:24

**october** 2:24 17:25
18:17 19:9,17
106:16 115:18,24
**odd** 70:15 108:13
117:5
**office** 6:4 69:2
70:17,19 72:14
73:14,25 85:7,12
85:13,14,15,19
87:7 89:17 116:12
117:3 119:12,13
119:25 120:23
**offices** 4:5
**official** 51:22
54:25 55:14
124:15 125:21
**officials** 8:17 51:4
52:7 80:10,16
81:20 102:25
103:1,5
**oftentimes** 58:7,10
**oh** 75:22 88:5
105:17
**ohio** 123:2
**okay** 15:7 19:25
21:14 37:5,12
40:13 41:8 44:10
56:16 65:14 75:23
84:8 86:25 90:24
96:10,11 99:13
103:8 104:21
105:22 113:24
117:10,17,19,22
121:7
**once** 41:6 97:13
**ones** 52:22 120:5
**ope** 45:22
**open** 48:12,18
56:19 79:1 105:15
106:3

**opinion** 77:24
78:15
**opponent** 64:9,14
**opportunity**
113:12 114:18
**opposed** 64:17,22
**option** 72:21 73:2
73:8,11,11,15,18
74:7 75:14 76:14
76:22 93:19,22
94:19
**options** 74:25 75:1
75:10 82:1,2,3
93:16 94:1
**order** 116:15
**ordinance** 6:16,16
10:19 13:1 48:17
76:9,23 77:23
78:4,8 80:10 81:4
81:10,18 84:3,19
86:9,12,14,18
87:16 88:25 89:8
89:11,23 91:21,22
92:21 93:4,11,14
93:18,24 94:5,8,14
95:19,22 96:3,8,9
96:13,16,19,21
97:4,8,12 98:11
100:18 103:2,11
103:25 104:24
105:5,11,24
106:15 107:17,21
108:11,14,16
109:5,6,21 110:1,3
110:17 112:19
113:7 118:15,16
118:17,18 120:8
121:1
**ordinances** 77:9
88:6 89:7 98:15
101:2 102:16

109:20 112:12,16
118:9,9 120:1,2,6
120:15
**original** 57:13
97:16,18,25 99:9
103:15,19,23
108:2
**outdoor** 10:19
12:11 106:4,7
107:24 108:8,20
**outliers** 102:20
**outlined** 74:25
**outlines** 75:10
**outside** 77:17
98:22 99:24 109:3

**p**

**p.m.** 37:7,8,25
121:9
**page** 2:2 3:6,23
33:14 40:22 57:15
57:16,17 63:3,6
104:16,17,17
110:20 123:14,16
125:7 126:3
**papers** 108:24
**paragraph** 29:18
31:5 40:22 71:6
112:9
**parked** 120:7
**parking** 118:8
**part** 11:18,21
55:25 58:22,22
61:19 81:13 83:9
83:21 108:2,13
125:9
**participate** 102:25
**particular** 8:18
84:14,15 99:25
**particularly**
120:16

**parties** 122:10
**pass** 61:24 103:1
**passed** 101:24
**path** 49:2 72:10
**paul** 118:4
**pause** 28:1
**pdf** 57:1
**pending** 72:23
**people** 22:13 63:1
69:3 111:22
**perfect** 46:20
**period** 7:7 8:15
12:17 14:22,25
15:3,4,5,13,22
33:3 36:3 52:1
54:23 70:22
101:18 109:21
117:2 118:20
**periods** 69:23
**perk** 45:20
**permit** 12:11
28:19 30:10 31:6
34:9 36:5,10,23
39:3 42:12 45:10
45:17 46:10 47:24
48:1,9 50:19
52:17
**permits** 10:12
11:15 29:22
**permitted** 18:1
108:10,12,15
**permitting** 12:6
**person** 8:14 9:17
32:24,25 47:5
48:3 62:20 63:10
65:1 85:19 89:7
122:9
**personally** 124:11
125:15
**perspective** 31:3
89:22

**pertaining** 66:10
84:3
**pertains** 116:3
**petition** 21:17,23
22:2,8,9 76:15
**petitions** 115:25
116:6,14
**phone** 8:14 46:22
47:6,8 91:10
92:18,19 123:3
**phrase** 66:20
71:18,22 84:24
**phrased** 51:6
**picture** 46:20
**piece** 84:18 89:20
**piecemeal** 11:6,11
**pieces** 102:3 111:6
**pinckney** 4:18
**placed** 71:9
**places** 119:17
**plaintiff** 1:5 4:2,11
122:7
**plan** 8:4,20 9:3,9
9:25 11:16 12:4
13:16 14:11 16:8
16:10,12,16 17:7
17:10,20 18:2,4,10
18:11 19:6 20:13
21:8,18,24 22:3,4
23:4,10,15 24:3,4
24:9 25:4 26:6
27:16 28:15,16,19
30:11,13 31:7,21
31:22,24 32:10,15
32:20,22 33:25
34:10,15,25 35:16
36:17 46:11,14
47:13,16,23 48:2,5
48:10,11,20,20,23
49:5,7,25 50:1
52:16 53:6,15,21

53:25 71:8,22,23
72:5,15,22,24 73:3
73:4,4,9,10,15,19
73:20,23,24 74:1,3
75:15,18,25 76:2,6
76:9,13,19,24 77:2
78:10,19,24 79:3,7
79:11,15,18 80:25
83:3,14,19 84:4
86:10,22 88:15
95:8 103:3 105:14
106:2 108:3
110:13,16 111:22
112:11 113:6,14
113:16,18 116:4,8
116:16,19 121:4
**planning** 7:13
21:23 82:14 89:6
118:12
**plans** 29:19,20,21
**play** 16:22 19:3
60:24 75:11 79:8
81:11 110:23
**played** 19:14,14
**playing** 17:17
78:25
**please** 5:8 37:11
56:15 84:7 98:12
105:8 112:24
117:18 123:12,12
**point** 12:16 13:5
15:25 16:19 19:12
26:5 30:24 33:7
36:6 38:18 39:2
41:17 42:5,7
45:14 50:12,15
51:14 61:21 71:15
72:22,24 79:14
108:3 110:2
113:11 114:21
119:1

points  49:23 52:23
poles  41:2,2
policy  118:12
portion  68:5
position  33:16
  34:6 45:17 50:6
  62:7 63:12 112:11
  113:6,19
possibility  11:1,3
  22:8 23:23
possible  19:8
  27:12 28:23,25
  54:7,14 102:9,14
potential  39:16
  60:5 64:7 107:14
potentially  10:7
practical  110:22
  110:22
practice  47:10
  54:9 58:22 69:15
  104:9 112:2
practices  17:2
  19:20 20:5 48:13
preceding  15:1
precipitated  75:6
preparations  24:8
prepare  114:23
preparing  26:25
present  114:19
presently  35:5
  81:3
preservation
  118:18 120:8
pressing  67:17
presumably  38:22
  42:6
pretty  33:11 38:17
  59:20
previous  66:20
previously  3:5
  67:22

primary  6:25
  98:23 100:4
printed  57:9
printout  35:16
  84:1 88:23
prior  6:1 8:5 10:23
  12:10 13:13,24
  14:3,8 16:6,17
  17:4 19:11,18
  20:3,11,11,15,15
  20:25,25 21:16
  29:25 32:10,13
  40:25 41:13 51:2
  51:22 67:25 68:10
  83:7 89:25 90:11
  90:12,19 93:12,24
  97:2 103:2,18
  118:2
privilege  14:17,23
  51:7 55:8,16,24
privileged  51:8,10
  51:17 55:6
probably  6:20 8:2
  25:19 26:4,7
  36:18 50:11 62:19
  86:12 99:9 117:7
  119:5
problem  45:17
  93:25 95:5,14
procedure  124:5
  125:5
proceeded  75:17
process  9:20 12:6
  26:6 31:20,23
  35:6 36:20 38:5
  44:14 49:2 64:15
  65:1,3,10 71:21
  72:4,7,16 75:17
  77:13,24 78:7
  79:18 81:13 86:17
  87:8 95:10 97:13

99:11 114:11,12
  114:16,18
produced  117:9
production  123:16
  123:17,22
professional  66:5
  119:11
prohibited  52:17
  78:24
prohibiting  79:11
prohibits  53:22
project  23:3 24:7
projects  7:3 24:10
property  107:12
proponent  64:15
proportion  88:9
proposal  2:11
proposals  46:16
  81:21
propose  48:11,17
  48:19
proposed  32:21
  49:6 87:8 89:3
  91:21,22
proposing  112:21
  113:1
prosecution  6:14
  6:19,23 7:15
prospective
  120:20
protest  21:17,23
  22:2,8,9 76:15
  115:25 116:6
proud  120:16,18
provide  52:14
  60:8 61:17 63:8
  63:11,18,19,23
provided  25:19
  60:3,4 83:13
providing  32:8
  115:7

provision  17:3,18
  18:11 46:13 49:9
provisions  29:6,7
  49:25 53:5,12
public  4:4 57:14
  58:4 68:2,6 71:25
  72:1 87:9 100:18
  109:25 122:4,20
  124:10,18 125:15
  125:23 126:23
pulled  72:24
punch  89:15
purpose  53:11
  64:5
pursuant  4:3
  122:13
pursue  72:17
put  14:21 61:18
  70:4 86:5,24 87:1
  87:3,16,21 89:12
  89:12 93:3,18
putting  85:23

q

quarter  116:20
quarters  22:10,13
  76:19 116:15
question  13:18,22
  15:14,15 16:21
  20:18,20 21:11,13
  28:8 30:24 36:10
  46:9 55:12 60:13
  61:13 75:4 80:21
  83:9 87:2,13
  102:7,10 114:13
questions  2:22
  3:22 67:17 114:11
  121:6
quick  33:11 84:5
  103:6 113:15
quickly  73:6

**quickness**  56:1
**quite**  45:20 70:21

**r**

**r**  4:12 5:11
**racial**  7:9
**raise**  42:1
**raised**  12:12,18
  16:20 18:24 34:8
  36:4,9 41:17
  107:11,14
**raising**  12:3 41:25
  42:12 46:9 100:7
**ran**  27:10,12
**rare**  58:10
**read**  14:15 15:20
  29:23 33:20,22,23
  33:24 37:10 38:6
  39:14 41:4 46:12
  46:14 50:3 56:14
  60:14 67:18 77:5
  98:11 102:7,8
  105:7 108:23,25
  109:17,18 112:13
  112:14 113:12,13
  121:8 124:5,6,12
  125:5,6,17
**reading**  49:22
  123:20
**ready**  65:12
**realistic**  26:8
**realization**  94:4,9
**realize**  113:13
**really**  31:2 32:7
  45:20 49:3 85:2
  97:22 101:6
  113:20
**reason**  19:4 71:24
  91:3,5 111:10
  123:15 125:8
  126:3

**reasons**  17:5 72:11
  102:23
**rebutting**  114:25
**recall**  8:9,12,18,23
  8:24,25 9:16 12:9
  16:2,7 17:11
  18:19,20,21,25
  20:8 21:1,3,5,5,21
  23:1,5,6,9,12,17
  25:15,17 26:24,24
  27:1,2,11 28:18
  29:16 30:23 31:1
  31:14,18 32:5,25
  33:5,6 34:18,21,22
  35:1,1,7,22 36:2,4
  36:5,8 37:18
  38:23 39:21,21
  40:20,21 41:16,16
  41:20 42:9,15
  43:21,24 44:3,7,8
  44:11,19 45:2,18
  45:23 46:22 47:2
  47:4,7,9,16,17
  50:10 51:12,24,25
  52:2,11 53:1,6,17
  54:2,7,9,22,23
  55:3 56:13,16
  67:10,25 68:10,13
  68:18,21,23 70:13
  74:21 82:23,25
  83:10,11,17,20
  86:15,18,20 88:14
  89:23,24 90:10
  91:20,24,24 92:4,8
  92:11,15,19,19,25
  93:1,13,14,21
  94:23 95:12,17
  96:25 97:24 99:11
  100:5,6,9,25 101:1
  103:4 104:8
  106:11 107:10

  109:2,9,19,19
  110:6,7,9 112:1
  114:4,6,11,13
  115:4,6,9 116:6,10
**receipt**  49:18
  123:19
**receive**  39:23
  58:23 70:16 96:15
**received**  42:1 52:3
  56:18 59:9 64:8
  92:13 96:17,18
  113:10 115:25
**receiving**  40:20,21
  42:9 46:1 56:13
  67:10 70:13 79:19
  82:23 83:10
**recess**  65:15 103:9
**recipient**  67:7
**recognize**  22:19
  24:20,23 35:15
  40:15 57:3,5,6
  65:19 67:1 70:6
  82:13,17,17 84:1
  88:22 104:2,23
  106:13,18 108:7
  110:12 115:16
  117:1
**recollection**  23:22
  28:21 29:14 32:7
  34:16 36:12 43:11
  43:14 44:9 45:25
  59:8,11 89:19
  90:9 94:12,22
  97:2,6 103:14,17
  116:9
**recommendation**
  75:18 76:1,3,10
**record**  5:9 14:15
  15:20 26:15 33:22
  56:18 57:14 58:15
  58:18 86:25 91:14

  91:15 98:12 102:8
  108:25 109:18
  122:12 125:9
**records**  56:19 58:5
  58:9,24 67:23
  68:2,6,11
**recreational**  106:5
  107:5 108:9,20
**reduced**  118:11
**refer**  101:6
**reference**  104:22
  123:8 124:2 125:2
**referenced**  42:23
  112:16 124:11
  125:15
**references**  42:19
  56:22 118:4
**referral**  73:5
  89:24
**referred**  84:20
  85:3 86:5 87:9
  89:17
**referring**  62:2,3
  89:20 95:22 96:2
  96:9,10 113:3
**refers**  112:18
**refute**  52:22
**regarding**  45:10
  57:9 60:4 64:7
  97:4
**regardless**  82:2
**regulation**  79:25
**regulations**  29:8
  32:4 46:14 49:12
  50:24 77:3,8
  78:11 80:2,6,17
  81:1 120:12
**relate**  99:23
**related**  17:23
  19:13 29:7 52:4
  69:25 92:21 94:7

101:7 114:12
118:10 120:6
**relates** 14:19
118:24
**relating** 15:6
88:23 95:20
**relation** 39:5
**relative** 9:23
122:16
**relatively** 113:15
**remember** 7:14
8:16 9:7,10,11,12
9:14,17,23 10:9,10
10:14,16,17,21
11:11 12:2 14:6
17:23 18:6,7,22,22
19:11,16 27:13
29:1,1 34:12 35:3
35:13 36:6 37:13
39:4 46:6,9 47:5
47:13,19 68:7
70:15 104:6 115:2
118:5
**remove** 111:16
**repeal** 76:23 83:3
83:13,19 84:4
86:9,13 88:15
103:2 110:16
116:3,8,15,19
**repealed** 112:11
113:6
**repealing** 71:22
77:2 78:9 80:25
86:13
**report** 39:23 71:3
118:23
**reported** 1:24
70:25
**reporter** 4:4 6:7
16:25 27:23
105:16 109:16

112:24 122:1,4,9
124:7
**represent** 6:19
89:14,15 90:6
117:8
**representation**
80:18
**representative**
55:25
**representatives**
8:1,2 12:10 54:19
82:15
**represented** 90:7
**representing**
26:15
**represents** 53:21
**request** 56:19 58:5
58:9,11 60:3
67:23 68:2,7,12
82:8 93:10,11
95:13 100:10
114:25 122:7
125:9,11
**requested** 29:22
57:14 75:2 86:21
104:13
**requesting** 23:3,14
**requests** 58:15,18
58:24
**require** 61:24
76:19 77:20 95:9
96:4 98:15,23
110:24 116:20
**required** 22:10
114:2 123:25
**requirement**
101:17 109:24
116:15
**requirements** 77:8
**requires** 48:20

**requiring** 31:7
105:12,25
**research** 5:21
**reservation** 39:3
**reserve** 121:7
**residential** 5:12
**residents** 52:3,9
52:10,12 58:17,24
59:3
**respect** 7:9 13:18
14:18,22 19:16
33:12 39:17 50:4
55:5 66:17 87:15
96:18 107:22
**respond** 28:9
53:11,18 58:2
**responded** 25:7
32:8 39:11
**responding** 53:25
68:23 93:9
**response** 49:13,20
50:2,7,9,13,16
51:4,14,23 52:14
53:24 54:10 62:18
65:20
**responsibilities**
6:11 7:12 120:23
**responsibility**
106:12
**responsible** 7:17
85:4 102:1
**restriction** 19:2
**restrooms** 11:23
11:25 12:5
**result** 25:11,14,22
25:25 65:2 76:17
116:14
**resume** 117:2
120:3
**return** 71:8

**returned** 123:19
**returning** 83:17
**revert** 77:2 78:10
80:2,25
**review** 16:10,16
17:7,9 36:24 40:4
40:4 49:20 50:14
54:8 77:16,22
78:7 92:22 94:20
121:3 123:13
124:1 125:1
**reviewed** 18:3,9
29:20 30:18 34:1
34:3 35:6,20
37:18 90:1
**reviewing** 30:23
35:22
**revocation** 40:24
41:13 50:19,22
**revoke** 50:25
**rewey** 36:15
**rewrite** 118:16
120:11
**rewrites** 120:5
**rewrote** 118:9,9
**rhodes** 2:24 118:3
**right** 8:8 11:1 12:6
15:23 23:6,7 25:5
25:8 31:22 34:22
36:11,12 39:8,18
43:15 44:14 46:18
55:23 58:5 60:21
60:25 61:4,10,11
62:22 74:2 75:15
78:18 80:3 82:19
82:21 90:15 94:25
98:8 105:1,9
116:4 121:7
**rights** 50:4 62:10
114:14,15

**rluipa**  112:10 113:21
**role**  6:12 86:10,15 89:2
**rolls**  99:2
**rooms**  11:18 12:5
**round**  93:18
**rules**  124:5 125:5
**run**  33:15
**runs**  72:5

**s**

**s**  2:7 3:1 5:11 123:16 125:8,8 126:3
**s.c.**  4:6,12
**sacred**  1:4 123:6 124:3 125:3
**sarah**  4:17
**saturday**  69:9,9
**satya**  118:3
**saw**  36:7
**saying**  23:18 26:10 29:4 33:24 36:9 38:1 41:21,24,25 46:22 47:19 73:21 110:5 115:10
**says**  25:9 27:14 29:19,24 30:18 40:23 43:9 46:13 48:16 58:1,6 59:15 61:1,15 62:8,11 67:20 68:9,14 78:15 89:17 90:25 100:14 105:10 112:9,20 116:5
**scheduled**  114:9
**schedules**  56:1
**school**  1:4 5:19 27:17 54:19 66:16 94:16,17 106:25

117:23 119:19 123:6 124:3 125:3
**school's**  27:18
**schools**  71:10,19 72:1,2,12 73:20,22 73:22 94:15
**scroll**  91:12
**seal**  124:15 125:21
**seating**  106:7 107:24
**second**  28:2 31:5 40:22 57:16 67:5 97:19 104:17 112:9 120:10
**secondary**  98:25 100:4
**section**  29:21
**sections**  98:13 105:11,24
**see**  13:14 14:4 22:21,25 25:11,12 26:21 27:18 28:11 31:8 35:14 37:8,9 42:20 46:14 56:2 56:11 57:1,2,18 60:17,18 63:8,9 66:2,3,6 67:8,9 71:10,11 84:11 85:8 87:9 89:5 90:25 97:9 100:15 111:23 114:2 115:21 116:1
**seeing**  18:19,20,21 26:24 27:1,2 33:6 36:8 56:16
**seek**  12:3,5 83:3
**seeking**  12:12,19 26:1 95:6
**seen**  18:16 26:23 36:13,18

**send**  44:10 54:15 58:3 59:17 60:9 69:3 75:2
**sending**  19:11 40:1,2 41:20 44:16,21 54:17 74:24 75:6
**sends**  26:10
**sense**  63:16 68:20
**sent**  24:24 28:23 28:24 33:3 36:7 50:7 52:3 54:7,11 57:24 58:8 59:1 67:22 80:17 82:24
**sentence**  30:4 80:1
**sentiment**  31:11 31:14,16,19
**separate**  13:3 34:15,20,24 42:17
**separately**  12:19
**september**  27:15 110:21
**series**  2:17 37:9
**serve**  50:18
**service**  69:22,24
**set**  24:2 69:1 87:17
**sets**  52:15
**seven**  118:10
**shared**  60:16
**sheet**  123:14 125:7 125:10,18 126:1
**short**  92:20
**shorthand**  4:4 122:3,8
**shortly**  27:7 30:14
**show**  48:15
**showed**  77:13
**shown**  26:25 48:19 123:16
**shuffling**  108:24

**side**  70:4
**sign**  101:17 121:8
**signature**  122:19 123:15
**signed**  70:7 82:15 102:18 124:13 125:18
**significantly**  24:8
**signing**  123:20
**signs**  101:3,7,10 101:25
**simple**  86:13 113:17
**sincerely**  123:21
**single**  52:24 69:6
**sir**  5:16 10:17 19:1 19:19 22:19 24:20 25:23 35:10,15 37:13 40:11,15,22 41:8 42:16 43:17 52:13 54:24 56:22 56:23 57:3,7 61:2 65:19 66:8 68:16 70:6 73:14 80:24 81:17 82:11,13 83:23,25 88:22 89:2,14,25 91:17 99:3 100:13 101:9 102:24 104:2,6,15 104:22 106:13 108:7 110:10 111:20 115:14 117:8 123:10
**sit**  39:14 53:5 100:5
**site**  35:16 36:17
**sitting**  23:5 25:15 27:2 29:10 32:25 38:23 46:19 50:16 53:1,16 54:9 68:18,21 73:7

**slow** 6:7 105:16,21
  112:24
**social** 7:9 118:25
**soglin** 118:4
**solid** 55:14
**solutions** 123:1
  126:1
**somebody** 10:5
  11:14 117:6
**soon** 83:5
**sorrow** 66:19
**sorry** 6:9 17:2
  27:20,21 28:10
  32:11 33:1 36:2
  43:25 74:5 75:22
  85:10 99:21
  105:17,17,17,20
  105:20,23 108:23
  112:25
**sort** 10:1 21:17
  29:11 36:19 39:23
  69:9 99:15 113:21
**sought** 11:18,21
  21:8
**sound** 13:18,19
  14:1 106:6 107:23
**sounds** 34:3
**south** 4:18
**space** 48:12,18
  79:1
**speak** 16:25 64:2
  72:9 98:5 109:10
**speaking** 74:23
**specific** 8:16 9:13
  23:17 64:19 86:20
  99:15,25 106:23
  106:24
**specifically** 34:10
  48:16 53:2 58:18
  61:9 62:9 77:16
  83:20 84:19 85:4

92:11 94:16
**specifications**
  49:11
**specifics** 47:18
  96:21 101:23
**specified** 62:9
  106:8
**speculate** 45:13
  62:25 88:11
**spell** 5:9
**sports** 106:4 107:5
  108:8,20
**spreadsheet** 59:13
  60:3,16,21 61:18
  65:25
**square** 77:18
  98:19 99:16
**stadium** 38:3
  48:11,14 106:6
  107:22
**stadiums** 106:3
  107:4 108:7,19
**staff** 7:7 36:19
  38:3 40:5 85:21
  86:16 96:22
  118:21
**stamped** 40:4
**standard** 71:8
  77:3,8 78:10
  79:25 80:2 81:1
**stands** 11:21
**start** 5:24 10:12
  31:4,5 105:18,21
  105:23 114:1
  117:19,20,20,20
**started** 6:13,19
  9:11 11:2 20:19
  24:14 49:2 120:9
  120:11
**starting** 37:7
  57:15

**starts** 11:14 97:8
**state** 4:5 5:9 122:4
  122:21 124:10
  125:15
**stated** 65:23 72:11
  107:9
**statement** 2:12
  31:11 32:9 113:17
  124:13,14 125:19
  125:19
**states** 1:1
**status** 118:23
**statutory** 102:22
**steve** 36:14,25
**stood** 78:17
**stop** 7:22 10:11
**stopped** 10:1 49:1
**storage** 12:1,2
**stouder** 2:23 34:19
  34:23 115:17,23
**strange** 1:13 2:3
  4:1 5:3,8,10,11
  6:10 18:15,16
  22:17 24:18 26:13
  26:16,18 27:20
  34:12 37:3 56:4,8
  56:25 64:24 65:17
  67:16,21 68:10
  103:10 116:23
  122:14 123:9
  124:4,9 125:4,13
  126:20
**street** 4:6,13,18
**strike** 57:16 108:6
**string** 57:13
**structure** 7:6
  118:21,24
**stuff** 13:8 102:20
  102:21
**subject** 14:5 77:15

**submit** 58:14,17
**submitted** 68:1
  83:18
**subpoena** 4:3
  122:14
**subscribed** 124:10
  125:14 126:21
**subsection** 98:14
  98:14 105:25
**substance** 51:20
  109:20
**substitute** 97:9,15
  97:16,17,17,19,20
  97:21,22,23,25
  98:13 99:6 106:16
  108:5,18 109:1,2
**substitutes** 89:5
**successful** 119:3
**suddenly** 10:7
  11:11
**sue** 85:19
**suggest** 39:7 64:25
  114:24
**suggested** 60:20
**suite** 4:6,13 123:2
**summarize** 8:6
**summary** 110:20
  119:11,21
**superior** 123:1
**supermajority**
  22:12,14
**supervisor** 70:23
**support** 53:16
  65:24
**supported** 53:8
  61:3,18
**supreme** 119:5,13
**sure** 5:10 10:23
  12:17 13:23 32:2
  32:20 36:1 38:18
  38:25 43:3 61:8

62:5,20 69:18
70:3 80:21 83:17
84:7 85:5 86:4
91:11 102:24
104:25 109:16
116:13 117:8
120:1,22
**surprise** 26:7
**surprised** 25:24
26:3
**surprising** 24:14
**switch** 31:24
**sworn** 5:4 122:15
124:10,13 125:14
125:18 126:21
**szylstra** 4:19

**t**

**t** 2:7 3:1 5:11
**table** 9:3 20:13
21:8 25:24 48:24
**tabled** 23:23
**tabling** 9:8,12,24
10:8,25 11:2 12:4
12:18 17:6 20:17
21:2 25:4
**tag** 57:9 67:4 90:1
90:3
**take** 18:14 22:17
26:12 29:4 33:13
35:9,10 37:10
40:14 56:14 58:7
62:21 68:19 70:3
70:5 74:9 82:12
83:23 84:5 88:21
101:10 103:6
111:19 113:23
117:11,12,17
**taken** 4:2 83:2
85:16 122:6,7,8,13
**takes** 34:5

**talk** 9:11 12:16
28:4 33:10 36:25
74:24 84:19 90:3
**talked** 17:5 18:7,8
19:8,10 23:19
42:7 45:15 75:1
76:7 96:22
**talking** 11:12
18:25 22:22 28:7
80:5 86:7 109:14
**talks** 79:24 107:4
**tanner** 4:17
**task** 7:5,8 118:21
**teach** 5:19,21
**team** 19:20 20:5
**technical** 13:6
49:11
**technicalities**
85:23
**technically** 89:21
**telephone** 44:9
**telephonic** 9:15,16
**tell** 10:15 20:16
29:10 46:20,21
55:24 79:15 86:25
88:7 114:21,22
117:11,13
**telling** 21:1 26:9
34:18,21,22 35:1,3
44:9 45:4 53:12
**temporary** 14:5,7
**tends** 69:2
**terminate** 71:8,23
73:9,24 74:1,3
86:22
**terminating** 72:4
72:15 73:13,15,18
**terms** 55:22 85:4
112:10
**testified** 5:5 17:24
34:7 95:4,7

**testify** 122:15
**testimony** 39:20
90:4 122:13 124:6
124:7 125:6,9,12
**thank** 19:25 28:9
65:14 82:11 85:11
99:1 106:9
**thanking** 25:7
45:3
**thanks** 99:4
**theoretically**
107:17
**thesis** 53:19
**thiele** 36:15
**thing** 20:21 41:20
44:17,23 49:1
68:10,13 69:10,13
88:1 115:7
**things** 11:4 13:7
53:17 78:6 85:23
92:22 102:22
115:11 119:8
120:19
**think** 14:16,23
16:3 17:18 20:22
25:20 26:3 30:9
30:14 32:12 34:8
36:23 40:8 44:16
44:23 46:17 48:3
48:5,7 55:23,23
58:13 59:20 60:16
61:20 64:13,24
68:1 71:22 72:3,9
75:2 99:21 106:19
106:23 113:13
115:7 117:6
**thinkable** 73:1
**thinking** 10:10
11:13 31:20 44:15
45:22 52:25 65:9

**third** 36:18 71:6
97:20
**thirty** 123:19
**thought** 18:12
38:17 43:9 44:17
48:4 53:13,15
**thousands** 58:12
**three** 7:6 22:10,13
23:6 75:10 76:19
89:5 116:15,20
**thursday** 37:7
42:20 43:17,18
92:1,3 95:3
**time** 7:2 8:3,15
11:13 12:17 13:2
14:22,25 15:3,4,5
15:12,22 16:14,17
17:12,15,22,22
18:3,8,21 19:5
20:25 22:7 23:11
27:3 29:16 30:23
31:1 33:1,4,21
35:4 36:3,7,8,13
38:18 39:2,12
43:9 45:24 52:1
52:25 54:23 59:9
68:19 69:6,23
70:22 72:25 77:7
78:16,17,18,19
79:3,12 80:17
81:3 82:24 83:1
87:21 92:13 93:3
93:7 97:14 101:18
102:19 109:21
111:12 117:2,23
118:19,22
**timeframe** 120:24
**timeline** 19:16
40:9,10
**times** 8:14 32:5
88:4,8

timing  87:21
title  89:8,12,23
    93:5,17,20,22
    96:19,23,24 97:1,7
    97:8 98:10,11
    99:5,8,9,10,13
    103:12,15,19,23
    105:7,9,10 106:9
    106:13 108:18
    109:5,6,24 110:4,5
    110:6,8
titles  99:7 106:11
    109:19,22
tjeanlouis  4:20
today  26:16 27:2
    29:10 32:25 33:23
    39:14 53:1,5,17
    55:25 68:18,21
    89:25 100:5
    117:14 120:3
told  18:12 34:19
    34:23 80:24
tomorrow  38:4
    43:10 58:3
tongue  99:2
tonight  2:14 38:1
top  8:12 24:24
    84:10
topic  56:3
topics  14:18
town  69:22,24
transcribed  124:7
transcript  90:1
    123:12,13 124:5
    124:12 125:5,11
    125:17
transcription
    122:11
transit  6:20 7:1
    118:8

transportation
    6:20 7:18,21,22
    118:10,11,12
    120:6
trap  59:21
treated  68:11
tried  79:14
trouble  35:24
true  30:20 81:5
    122:12
trust  63:8,11,17
    63:23
truth  122:15,16,16
truthful  63:23
try  6:7 29:12 70:2
    95:13
trying  11:3 25:18
    44:16 52:8 61:22
    73:13 94:18
    107:16,20 115:7
    119:9
tucker  8:19 13:14
    13:24 14:4,8
    17:24 18:17 19:5
    26:21 27:4 28:18
    32:24 34:19,23
    38:12 47:14,19
    50:9 54:2 74:15
    96:21
tuesday  43:19
    87:23 90:16,18,18
    90:20,25 91:4,4,6
    104:3
turn  104:1,16
two  7:6 34:19
    102:3,9 107:5
    111:6,11,21
    115:25
type  84:14 99:15
types  99:25

typewriting
    122:11
typical  69:7,15
    104:9 112:2
typically  69:11
    112:4

**u**

uh  27:19 85:9
    105:16 111:15
ultimate  30:21,21
ultimately  10:13
uncommon  88:13
undermine  62:13
understand  33:21
    38:19 39:1 62:20
    80:21 102:10
    114:10
understanding
    33:16 38:5,8
    41:12 47:22 71:17
    78:5 101:9,14,16
    102:18
understood  11:16
    22:15 36:21 38:22
    77:7 79:2 116:13
unhappy  115:3,4
    115:6,9
unintelligible
    105:15
unit  6:14,19 7:15
united  1:1
university  5:17
    119:19
unusual  10:4 16:3
    24:7 49:1 50:11
    50:15 102:19
upcoming  24:9
update  118:13
    119:9,24
updates  117:12,13

urgency  93:6
    100:6,9
use  6:24 7:1,12,21
    11:10 21:8 34:15
    34:25 48:18 55:1
    60:5 61:23 62:1
    62:13 64:7 66:1
    77:16,22 78:21
    79:19 92:22 94:20
    95:10,22 96:3,5,7
    96:9,13 98:15,21
    98:23,23 99:23
    103:2,11 104:24
    105:14 106:2
    107:18 109:6
    110:17,24 112:19
    114:12,15,17,23
    115:1 120:18,24
uses  77:14,16,20
    95:9 96:5 98:16
    98:25 99:25 100:2
    100:3 106:5 107:8
    108:9,10,12,13,16
    108:21 109:3
usual  59:1
usually  27:8 58:11
    59:1 67:16,20
    68:9 69:5

**v**

v  123:6 124:3
    125:3
vacation  67:12,17
    68:15,16 69:1,6,16
    69:19 83:16,22
    92:10,12
vacations  68:20,22
    69:7
valid  22:8
value  113:21
variables  16:5

**variety** 89:4
**veldran** 57:8,9
**verbal** 27:23
**verbally** 33:10
**verbatim** 41:5
**verification** 35:16
36:17
**verify** 91:9
**veritext** 123:1,8
126:1
**veritext.com.**
123:17
**version** 99:8
**versions** 98:7
**versus** 12:19
**vested** 50:4
**viable** 73:15
**view** 30:1 78:8
**violations** 6:16,16
**vitae** 3:3
**voluntarily** 79:6
**voluntary** 73:10
73:10,10 79:3
**vote** 22:9,11,12
76:4,19 116:15,20

**w**

**w** 1:13 2:3 4:1
122:14 123:9
124:4,9 125:4,13
126:20
**wait** 14:13,13,14
28:8 73:12 93:17
93:20 109:13,13
109:13
**waive** 53:3
**waived** 123:20
**waiving** 55:18
**wake** 119:13
**want** 15:3,17 38:5
51:9,18,20 55:11
69:17 72:9,11

73:21 87:19 88:11
117:20
**wanted** 66:21
67:18 71:25 79:15
92:20 95:13
**waters** 51:16
68:20 69:7,11,16
69:18,21,21 83:8
83:11,12,18 88:16
88:20 92:5
**wautier** 2:10,12
2:13 8:19,25 9:8
9:19 20:12 23:13
24:21 25:3 34:13
34:18,21,22 35:3
37:7,14 38:19
39:1,7 40:2,18
42:2 44:14 45:9
57:24 74:10,23
75:6 79:24
**wautier's** 41:9
49:14 52:14
**way** 10:6 13:11
24:11,16 25:20
48:8 62:17 80:11
81:22,25 94:13
99:3 120:25 121:3
**ways** 87:14
**website** 84:2
**wednesday** 5:1
57:21 115:24
**week** 67:13,17
68:15,17 69:9
90:7,10,12 91:25
93:2,2 100:8
**weekend** 43:22
45:6
**weeks** 120:13
**weird** 102:21
**went** 33:11 69:6
97:12

**west** 94:16
**western** 1:2
**winter** 1:24 4:3
122:3,20
**wisconsin** 1:2,7,17
4:5,7,13,19 5:17
119:13,19 122:5
122:21 123:7
124:3 125:3
**wishing** 45:5
**withdraw** 88:17
**witness** 2:2 4:2 6:9
15:15,23 17:1
28:3,6,10 33:20,23
75:22 102:7
105:17 108:23
123:9,12 124:1,4
124:11 125:1,4,15
**witness'** 123:15
**wmc** 1:6
**won** 119:4
**woodrow** 59:7
**word** 5:11 11:10
72:20 83:10
120:18
**words** 52:15 95:11
99:3
**work** 5:17 7:18
69:16,20,21,25
83:12 88:14,19
117:22,23 119:7
119:24 120:16
**worked** 94:14
119:17
**working** 109:20
119:12
**worse** 119:6
**write** 37:25 53:19
60:2,12,23 76:22
**writes** 63:7 67:15
71:7

**writing** 5:21 75:3
77:7 118:23
**written** 68:4 81:22
81:24
**wrong** 53:13
**wrote** 62:21 82:9

**x**

**x** 2:1,7 3:1

**y**

**yeah** 8:8 11:24
37:11 65:13 90:23
96:4 97:23 102:11
105:18 117:18
**year** 5:23,25 7:6
7:15
**years** 6:14 7:16
23:7 59:2 72:5
**yep** 5:15 28:6,6

**z**

**zba** 2:22 71:20
73:2 94:4,6,10,21
107:11,13
**zoning** 6:24 7:1
13:9,10 22:6 29:6
29:6 34:15,25
40:4 41:1 49:10
71:9,25 72:1 76:8
76:9 77:3,9,13
78:11 80:1,3,6
81:1 88:24 89:6
95:21 98:22
108:11 120:23
121:1
**zylstra** 4:17 6:6
9:22 11:8 12:7,14
12:23 13:20 14:13
14:16 15:2,5,9,12
15:17,21 18:5,13
19:7,22,25 20:7,24
21:19 23:25 26:2

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.