**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

_____

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

        Plaintiff,

      v.                            Case No. 3:21-CV-118

CITY OF MADISON, WISCONSIN;
CITY OF MADISON ZONING BOARD
OF APPEALS; CITY OF MADISON
PLAN COMMISSION; and CITY OF
MADISON COMMON COUNCIL,

        Defendants.

_____

## DEFENDANTS' RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

_____

        Defendants City of Madison, Wisconsin, City of Madison Zoning Board of Appeals, City of Madison Plan Commission, and City of Madison Common Council (collectively "the City"), through their attorneys, Boardman & Clark LLP, respond to Plaintiff's Proposed Findings of Fact in Opposition to the Defendants' Motion for Summary Judgment (dkt. 48) as indicated below.

        1.     EHS is a Catholic high school that has served the City of Madison since 1881. June 7 Declaration of Sister Kathleen Phelan, O.P. ("Phelan Decl.") ¶ 4.  The Dominican Sisters of Sinsinawa founded the school in 1881, and EHS moved to its current location on Monroe Street in 1927.  June 10, 2022 Declaration of Michael Elliott ("Elliot Decl.") ¶ 3.

        **Response:**  Undisputed in part and disputed in part. [1] It is undisputed that Edgewood is a Catholic high school and that Dominican Sisters of Sinsinawa sponsor the school.  Neither Sister

---

[1] Defendants' decision not to dispute a particular fact in this pleading is for purposes of summary judgment only and is not acquiescence to the fact for purposes of trial. Discovery is ongoing. Defendants reserve the right to dispute any fact plaintiff offers in its proposed findings of fact.

Phelan nor Mike Elliott has personal knowledge or foundation to offer facts regarding what occurred in 1881 or 1927. Indeed, Mr. Elliott at his deposition repeated claimed lack of knowledge or that he was not aware for anything occurring prior to his hire in 2013. *See, e.g.*, Elliott Dep., dkt. #33, 53:17-54:2; 54:7-10; 55:21-56:1; 59:4-18; 67:5-10; 73:6-11; 94:11-13; 103:24-104:16; 106:18-21.

2.      As sponsors, the Dominican Sisters own the school, provide an annual gift, and employ corporate sponsorship counsel that assists in managing the school  May 10, 2022. Deposition of Mike Elliott ("Elliott Dep.") at 36.  Their sponsorship comes with the expectation that EHS follows and teaches Catholic teachings and follows the Sinsinawa Dominican Sisters' mission.  Elliot Decl. ¶ 5.

**Response:**  Undisputed.

3.      The religious mission of the school is to educate the whole student – mind, body and soul – for a life of learning, service, personal responsibility through a rigorous academic curriculum that embraces the Sinsinawa Dominican values of Truth, Compassion, Justice, Community and Partnership.  Phelan Decl. ¶ 7; Elliott Decl. ¶ 5.

**Response:**  With the clarification that the declarations refer to this as the mission of the school not the religious mission of the school, undisputed.

4.      EHS shares a 55-acre campus with Edgewood College and Edgewood Campus School (K-8).  Elliott Decl. ¶ 4.  The high school, which is separately incorporated, owns approximately twenty-five of these acres. Elliott Decl. ¶ 4.

**Response:**  Undisputed.

5.      EHS's commitment to educating the whole student can be seen in the fact that every student is expected to participate in co-curricular activities and roughly 75% satisfy this expectation by participating in one or more of EHS's athletic teams. Elliott Decl. ¶ 6.

**Response:**  Undisputed in part, disputed in part. The "can be seen in the fact that" language is opinion testimony, constitutes argument and is not supported by the declaration. It is therefore, disputed.

2

6.      Athletics is an integral part of EHS's religious mission to educate the whole student and further the Sinsinawa Dominican values of community and partnership. Phelan Decl. ¶ 7.

**Response:**  Undisputed in part and disputed in part.  Undisputed that this proposed fact is contained in the Phelan declaration but disputed.  Nowhere on the Dominican Sisters of Sinsinawa website is sports ever mentioned.  Elliott Dep., dkt. #33, 39:18-42:16.  Further, the website contains the Dominican Sisters of Sinsinawa's mission, Elliott agrees that the website accurately reflect the Sisters' mission, and there is no mention or sports or athletic activities in the Sisters' mission. *Id.*; Zylstra Second Dec., Ex. SS, Dep. Ex. 49. Elliott also testified that he was unaware of any requirement in the Catholic faith for an individual to participate in sports. Elliot Dep., dkt. #33, 39:3-8.

7.      In total, EHS has twenty-one (21) athletic teams and co-ops.  June 10, 2022 Declaration of Christopher Zwettler ("Zwettler Decl.") ¶ 3.   Despite this large number of teams, EHS only has a single athletic field on its campus on which to try to schedule and host their games, practices, and events. Zwettler Decl. ¶ 4.

**Response:**  Undisputed in part and disputed in part.  Undisputed that Edgewood has 21 athletic teams and co-ops.  Disputed as argumentative and misleading "despite this large number of teams," as many of those teams are indoor sports teams and their practices, games, and events all occur in the gymnasium and not on a field. *See, e.g.*, Zwettler Dep., dkt. #55, 129:19-22, 152:16-153:10, 154:5-7.  It is undisputed that Edgewood has an athletic field but disputed to the extent that the proposed fact concludes that such is the only outdoor open space in which physical education classes and practices occur. In their Master Plan, Edgewood identifies a second large open space area and states "The space is used as recreational space, physical education and athletic team practices. Zylstra Dec., dkt. #40-1, Ex. A, at page 60 of 228 and 62 of 228; *see also* Hank Dep., dkt. #30, 82:1-9 (authenticating document).

8.     In furtherance of the Dominican value of partnership, EHS develops and relies upon partnerships with other institutions in the community. Elliott Decl. ¶¶ 7-8.  For example, EHS's partnerships with the parochial schools in Madison provide EHS the opportunity to share its mission, vision, and values with the parochial schools' students and their families.  Phelan Decl. ¶ 12.

**Response:**  Undisputed.

9.     As a Catholic institution, EHS furthers its mission by bringing students to EHS to preach and teach the Gospel and to instill in students the Sinsinawa Dominican values of Truth, Compassion, Justice, Community and Partnership.  Elliott Decl. ¶ 5.

**Response:**  Undisputed but with clarification that Edgewood does not require its teachers

or its coaches to be Catholic. Zwettler Dep., dkt. #55, 10:24-11:2; Elliott Dep., dkt. #33, 14:9-12.

10.     EHS's mission, continued existence and enrollment largely depends on its ability to persuade these students and families to attend EHS.  Elliott Decl. ¶ 7;  Phelan Decl. ¶¶ 9-11. An important way EHS has partnered with the parochial schools over the years is by hosting parochial school athletic events on EHS's athletic field.  Elliott Decl. ¶ 8.  These events allow EHS the opportunity to connect with parochial students and their families and to promote EHS's religious mission and values.  Elliott Decl. ¶ 8.  Such events serve much like an open house and are critical to EHS's ability to recruit parochial students and student-athletes.  Elliott Decl. ¶ 8; Phelan Decl. ¶ 12.

**Response:** Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1071 (W.D. Wis. 2000) (chastising counsel for

including dozens of factual propositions within a single paragraph because court requires "each

paragraph shall state only one factual proposition"). Defendants also object on lack of foundation

to Elliott's declaration as to the high school partnering with and hosting grade school level

games of parochial schools on its field.  At his deposition, Mr. Elliott was asked: "Q   Are you

aware or do you know what sports the [Edgewood] grade school engages in?  A   I do not."

Elliott Dep., dkt. #33, 20:3-5. Elliott also denied knowledge about, for example, Edgewood's

field use from 2019 to present.  He testified, "Q   Okay.  Are you aware of any change in use of

4

Edgewood's athletic field from August of 2019 to present? A   Again, I would not know that at this point." Elliott Dep., dkt. #33, 222:14-17.  Subject to these objections, undisputed.

11.    In furtherance of the Dominican value of community, EHS is called to foster a sense of community among its students, teachers, coaches, families, alumni, and the broader Madison community. Elliott Decl. ¶ 9.  EHS promotes and encourages its student-athletes to engage in team-based service to the community.  Phelan Decl. ¶ 8.

**Response:**  Undisputed.

12.    EHS has only had a single, outdoor athletic field on its campus.  Elliott Decl. ¶ 10.

**Response:**  Undisputed in part and disputed in part.  It is undisputed that Edgewood has an athletic field but disputed to the extent that the proposed fact seeks to imply that such is the only outdoor open space in which physical education classes and athletic team practices occur. In their Master Plan, Edgewood identifies a second large open space area and states "The space is used as recreational space, physical education and athletic team practices. Zylstra Dec., dkt. #40-1, Ex. A, at page 60 of 228 and 62 of 228; *see also* Hank Dep., dkt. #30, 82:1-9 (authenticating document).

13.    Throughout its history, EHS has used its only on-campus athletic field as a unique venue that serves all of Madison, from children to seniors, through games, camps, and other community activities.  Elliott Decl. ¶ 10.

**Response:**  Undisputed in part and disputed in part. Elliott does not have foundation to testify to Edgewood's history prior to his hire in 2013.  At his deposition, he frequently stated that he had no knowledge of matters before his hire.  Elliott Dep., dkt. #33, 53:17-54:2; 54:7-10; 55:21-56:1; 59:4-18; 67:5-10; 73:6-11; 94:11-13; 103:24-104:16; 106:18-21.  Disputed as to Edgewood's "only on-campus" field.  *See* Response to PFF 12, incorporated by reference. Further, with respect to us of the field by others besides Edgewood, the Goodman Foundation

required Edgewood to allow neighbors, seniors and other schools to use the field in exchange for providing $1.025 million for upgrades to the field.  Elliot Dep., dkt. #33, 117:22-118:23.

14.     One of the significant ways EHS believes it can promote and foster community is by hosting games and outdoor events on its only athletic field for everyone to attend.  Phelan Decl. ¶¶ 3, 6, 9, 14.

**Response:**  Undisputed in part and disputed in part.  The Phelan declaration never says that it is a "significant way," and thus, that is disputed as unsupported.  Undisputed that Edgewood believes it can promote and foster community by hosting games and events.

15.     Having only one field and no lights substantially interferes with Edgewood's ability to use its field to further its mission.  Elliott Decl. ¶ 20.

**Response:**  Disputed. First, the proposed fact is a legal conclusion and improper for a proposed finding. *American National Property & Cas. Co. v. Graham*, No. 04-C-1185, 2006 WL 1589623 at *1 (E.D. Wis. June 2, 2006) (legal conclusions inappropriate as factual findings; such advocacy must be left to the argument portion of a brief and not proposed as a finding of fact). Second, as to one field, defendants incorporate their response to PFF 12. Third, Edgewood contends that it has continuously used its field for decades, which allows it to further its mission, and has been able to host others to use the field even without the lights.  *See, e.g.*, Zwettler Dep., dkt. #55, 17:17-22:24; Elliott Dep., dkt. #33, 21:4-21; 271:6-271:15.  Fourth, Elliott denied having knowledge of many things related to athletics and thus his statement is without foundation.  For example, he testified:

Q   Okay.  To the best of your knowledge, has Edgewood ever not been able to secure a site, whether it be at one of the facilities you just mentioned or the opposite team, has Edgewood ever not been able to secure a site for its game?

A   I'm not involved in the athletics to the degree of knowing that all the time.  I would just be guessing.

Elliott Dep., dkt. #33, 28:17-24.  Finally, Deposition Exhibit 68 identifies voluminous day games being played on Edgewood's field in 2018 alone, including several night games.  Zylstra Second Dec., Ex. TT, Dep. Ex. 68 at 4.

16.     For example, because students, teachers, and coaches are at school during the day, and because many parents and alumni work during the day, EHS's ability to reach these people necessitates hosting athletic and community events in the evening after daylight hours.  Elliott Decl. ¶ 20.

**Response:**  Disputed. First, Edgewood contends that it has continuously used its field for decades, which allows it to further its mission, and has been able to host others to use the field even without the lights.  *See, e.g.*, Zwettler Dep., dkt. #55, 17:17-22:24, 69:19-71:10; Elliott Dep., dkt. #33, 21:4-21; 271:6-271:15. Second, many of Edgewood's athletic programs hold competitions indoors and do not use outdoor fields.  *See, e.g.*, Zwettler Dep., dkt. #55, 129:19-22, 152:16-153:10, 154:5-7.  Third, Edgewood has the ability and does host night games for its athletic programs at off-campus sites, and even some on its athletic field.  Soccer plays night games on the road or at Reddan Park in Verona and plays its day games at Edgewood's field. Elliott Dep., dkt. #33, 32:3-8; Zwettler Dep., dkt. #55, 117:12-118:1.  Football plays at Breese Stevens and in the past has played at Middleton.  Elliott Dep., dkt. #33, 27:23-28:5.  There is no evidence that Edgewood cannot reach people by holding a night game at a different site than the Edgewood field.  In addition, Edgewood has scheduled a home football game to take place on its own athletic field at 4:30 p.m. on August 26, 2022.  Zwettler Dep., dkt. #55, 115:25-116:11. Deposition Exhibit 68 identifies voluminous day games being played on Edgewood's field in 2018 alone, including several night games.  Zylstra Second Dec., Ex. TT, Dep. Ex. 68 at 4.

17.     In athletic conferences of which EHS has been a part, varsity football and varsity soccer start times of 7:00 PM.   Zwettler Decl. ¶ 5.  To satisfy these demands requirement, EHS has to play its "home" games at other athletic fields in Madison.  Zwettler Decl. ¶ 6.

**Response:**  Disputed.  The Zwettler declaration violates the sham declaration rule.

*Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999) (plaintiff may not create sham issues

of fact through an affidavit that contradicts or "patches-up" prior deposition testimony);

*Babrocky v. Jewel Food & Retail Meats Cutters*, 773 F.2d 857, 861 (7th Cir. 1985) (noting

court's duty to ignore "sham" issues). Zwettler testified that not all varsity soccer games have

start times at 7:00 p.m. They play in the afternoons on Saturdays and sometimes on Friday

afternoons as well. Zwettler Dep., dkt. #55, 117:12-118:1. Zwettler even testified that it is better

for the soccer team to play in the afternoons at Edgewood's field rather than at night because

attendance is higher.  *Id.*, 118:6-19.  While varsity football generally has a start time of 7:00

p.m., Edgewood has hosted some home games in the afternoons. *See, e.g.*, Zwettler Dep., dkt.

#55, 115:25-116:11, 120:10-121:11, 123:6-19.  Edgewood has scheduled a home football game

to take place on its own athletic field at 4:30 p.m. on August 26, 2022.  Zwettler Dep., dkt. #55,

115:25-116:11.

18.     EHS has not been able to host all of the games it would like to at Breese Stevens
field.  Zwettler Decl. ¶ 6.  EHS is given low priority for scheduling at these fields.  Zwettler
Decl. ¶ 6.  All four of the other Madison Metropolitan School District high schools had priority
over EHS for both MMSD and City fields.  Zwettler Decl. ¶ 6.  EHS has been bumped numerous
times from MMSD facilities.  Zwettler Decl. ¶ 6.  For example, a "home" varsity football game
scheduled to be hosted on a City field, Breese Stevens, was bumped because the field booked
another group, burdening school staff with administrative hassles and concerning parents that
their sons' "Senior Night" would be cancelled.  Zwettler Decl. ¶ 6.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition"). Undisputed in part and disputed in part.  Disputed that Edgewood has been

bumped "numerous times" from MMSD facilities and disputed that "a 'home' varsity football

game scheduled to be hosted on a City field, Breese Stevens, was bumped because the field

booked another group, burdening school staff with administrative hassles and concerning parents

that their sons' "Senior Night" would be cancelled." First, Zwettler described some games being

bumped because of *weather*, whereas the proposed fact implies it was because of Edgewood

being a low priority versus public schools.  Zwettler Dep., dkt. #55, 120:10-121:17, 134:6-25.

Zwettler was asked repeatedly at deposition for specific information and claimed lack of

knowledge/recall. For example, he offered as an example that when bumped from an original

field, varsity football would play at an opponent's field. But when asked whether he recalled this

happening, he responded, "Not specifically, no." Zwettler Dep., dkt. #55, 141:22-142:20.

Further, as to senior night, Zwettler did not recall where that game was scheduled to be played,

and thus, his declaration conflicts with his prior deposition testimony.  Zwettler Dep., dkt. #55,

160:22-162:7. Further, the senior game was moved to an MMSD field—Lussier Field at

LaFollette High School, further undermining this proposed fact.  *Id.*

19.     It is difficult for EHS to schedule games during daylight hours because, in many
cases, other teams have refused to play at that time.  Zwettler Decl. ¶ 7.  It is impossible for some
parents to take off work, it is disruptive to pull students out of school early, and it is problematic
in resolving transportation issues for bus companies.  Zwettler Decl. ¶ 7.

**Response:**  Disputed.  First, the first sentence of this proposed fact does not identify what

games it is referring to but Zwettler testified to Edgewood hosting numerous sports' games at its

athletic field after the 2015 upgrades, including football, soccer, track, and lacrosse, which

games would occur in the afternoons.  Zwettler Dep., dkt. #55, 69:19-71:10.  Deposition Exhibit

68 identifies voluminous day games being played on Edgewood's field in 2018 alone, including

several night games.  Zylstra Second Dec., Ex. TT, Dep. Ex. 68 at 4.  As to the second sentence,

Zwettler does not have the foundation to testify to those opinions, but even if he did, he testified

that afternoon games at Edgewood's field had ***higher*** attendance, not lower. Zwettler Dep., dkt. #55, 123:1-19.

20.     Other schools have canceled or declined to play EHS for these reasons. Zwettler Decl. ¶ 7.

**Response:**  "These reasons" is vague and therefore, disputed. Further, Zwettler could not remember a single football game being canceled.  Zwettler Dep., dkt. #55, 120:10-17.  Zwettler also could not come up with a single instance where a game was canceled outright instead of simply being re-scheduled or played at different site, and none after 2015.  Zwettler Dep., dkt. #55, 138:22-144:23.

21.     Prior to 2015, on multiple occasions EHS has been unable to secure a site for a soccer home game.  Zwettler Decl. ¶ 8.

**Response:**  Undisputed.

22.     EHS has to pay thousands of dollars per year to rent fields from the Madison Metropolitan School District and other organizations—funds which could otherwise be used to support EHS's mission and students.  Zwettler Decl. ¶ 12  It costs approximately $900 per game to rent a field for football and approximately $250 per game for soccer, in seasonal fees. Zwettler Decl. ¶ 12  Those fees would be substantially reduced with an on-campus, EHS-owned field that had the ability and flexibility to host games and practices after dark.  Zwettler Decl. ¶ 12.  Beyond annual games fees, in order to secure sites for games, EHS has had to make large, upfront capital contributions to field owners in both soccer and football, and since 2008, EHS has paid a total of $300,000 to these field owners in order to secure priority usage.  Zwettler Dec. ¶ 12.  Continued dependence on off-site fields means that EHS risks incurring similar expenses in the future, as well as further seasonal fees.  Zwettler Decl. ¶ 12.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition"). Defendants object to the reference to $300,000 on grounds of the best evidence rule and unfair surprise as none of those records have been produced in discovery, despite a

request to do so, nor disclosed in plaintiff's rule 26 disclosures. Zylstra Second Dec., ¶9, Exs.

VV (RFP 6), UU.  Defendants do not dispute that Edgewood pays fees to use other athletic

fields, as do other school such as West High School.

23.     And over the years, EHS has had to forego and cancel games, and community
developing opportunities because of its inability to use its own field at night.  Zwettler Decl. ¶ 8;
Elliott Dep. at 263-264.  For example, EHS has lost opportunities with community non-profit
partners like the Susan G. Komen Foundation because it cannot accommodate their events needs
for lights.  Elliott Decl. ¶ 22.  This is a lost opportunity to showcase EHS to the community, to
share EHS's values, and to attract students and drive enrollment.  Elliott Decl. ¶ 22.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition"). Disputed that Edgewood has had to cancel games since 2015 as not supported by

the Zwettler declaration citation or the Elliott deposition citation. Undisputed that Edgewood

could not accommodate the Susan G. Komen Foundation and it was a lost opportunity.

24.     There are times when EHS cannot find suitable, off-campus locations to rent.
Zwettler Decl. ¶ 8.  EHS's students, parents, and coaches struggle with the uncertainty that
comes from not knowing where and when they will be able to play their games or whether they
will be bumped by other institutions that have priority use of the various fields EHS's team are
forced to use.  Zwettler Decl. ¶ 18.  Athletic Director Chris Zwettler has heard many complaints
from EHS parents about the extra burdens not having a nighttime home field causes, and at least
one past student, R.F., left Edgewood because of the time and travel complications created by
EHS's inability to hold night games or practices on site.  Zwettler Decl. ¶ 18.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition"). Dispute as argumentative "forced to use." *McMahon v. Carroll College*, No. 04-

C-384, 2007 WL 804149, at *2  (E.D. Wis. March 9, 2007) ("Arguments have no place in

proposed findings of fact or responses to such findings.").Defendants object as vague and

therefore dispute, "There are times when EHS cannot find suitable, off-campus locations to rent"

on whether that is referring to athletic facilities, buildings, or other places. Defendants object that

Zwettler does not have foundation to testify as to parents and students "uncertainty struggles"

and any such testimony is likely hearsay and is unlikely to be in admissible form at trial. As to

the last sentence, defendants also object that such is hearsay and unlikely to be in admissible

form at trial.  Defendants further object that "R.F." has not been disclosed in plaintiff's Rule 26

disclosure.  Zylstra Second Dec., Ex. UU.


25.     Beyond athletics, EHS has used the field for numerous activities related to its
primary mission as a Catholic High School and in furtherance of the Sinsinawa Dominican
values.  Beyond games and practices, EHS—in furtherance of the Sinsinawa Dominican value of
Community—has allowed the community to use the field for social, recreational and community
building purposes.  Phelan Decl. ¶ 15.  Neighbors, local families, alumni, and other community
members have frequently used the field as a place to gather, recreate, compete, and exercise over
the years, and EHS's field has always been open to the community.  Elliott Decl. ¶ 10.

**Response:**  Undisputed in part and disputed in part. "[R]elated to its primary mission as a

Catholic High School and in furtherance of the Sinsinawa Dominican values" and "in

furtherance of the Sinsinawa Dominican value of Community" are disputed as not supported by

the cited references.  The remaining portion is undisputed.


26.     In the 2008-2009 school year, EHS's enrollment was 687 students.  Zylstra Decl.,
Ex. PP, Dep. Ex. 50 at 73.  EHS then experienced a significant, five-year negative trend in
enrollment. By the 2014-2015 school year, EHS's enrollment had dropped by more than hundred
students to 582 students.  Zylstra Decl., Ex. PP, Dep. Ex. 50 at 73.

**Response:**  Undisputed in part, disputed in part. Undisputed that in the 2008-2009 school

year, EHS's enrollment was 687 students.  Disputed that "EHS then experienced a significant,

five-year negative trend in enrollment" as unsupported by the citation.  Disputed that enrollment

in 2014-2015 was 582 students as unsupported by the citation.  The enrollment for that year was 539 students. Zylstra Decl., Ex. PP, Dep. Ex. 50 at 73.

27.     To reverse the negative trend and survive as an institution, EHS had to identify ways to better meet the needs of its students and their families, develop deeper partnerships with local parochial schools, address issues of diversity, and accomplish its religious mission to educate the whole student and foster the Sinsinawa Dominican values of Partnership and Community.  Elliott Decl. ¶ 14.

**Response:**  Disputed in part. Elliott admitted that the Accreditation Report in the prior PFF indicated that one of the challenges for Edgewood is that the area's public schools are academically competitive and seen as a viable alternative to Edgewood.  Elliott Dep., dkt. #33, 50:9-51:15. It also noted that 53% of the population int eh area was Roman Catholic and there are 37 parishes and 12 Catholic elementary schools in the area. *Id.*  It noted that Edgewood was struggling to get those parish schools to feed their children to Edgewood High School. Specifically, it stated that for Edgewood to attract students and increase enrollment that it should "improve relationships with diocesan leadership" and "increase their presence in the [Catholic elementary] schools."  Elliott Dep., dkt. #33, 51:11-52:8; Zylstra Decl., Ex. PP, Dep. Ex. 50 at 19-20.

28.     As part of EHS's regular accreditation review, the Independent Schools Association of the Central States ("ISACS") conducted an accreditation visit of Edgewood in October 2015.  Zylstra Dec., Ex. PP, Dep. Ex. 50.  The Accreditation Report identified Edgewood's enrollment as 658 students in 2009-2010 and 539 students in 2015. Elliott Dep. at 44-45; Zylstra Decl., Ex. PP, Dep. Ex. 50 at 73.

**Response:**  Undisputed.

29.     ISACS made several recommendations to EHS designed to help reverse the negative enrollment trend.  Elliott Decl. ¶ 13.  First, for example, they recommended that EHS continue think "creatively about ways to house more sports on campus and to continue to investigate ways to provide the best facilities within reasonable distances."  Zylstra Dec., Ex. PP, Dep. Ex. 50 at 61-62.

**Response:**  Undisputed in part, disputed in part. The Accreditation Report did make some recommendations to increase enrollment but none of those related to athletics.  In fact, the Report on page 61-62 commends Edgewood on its athletics and notes its "rich history of success" and the word, enrollment or any variation, does not appear on page 61 or 62. Therefore, undisputed that the words "Continue to think creatively about ways to house more sports on campus, and to continue to investigate ways to provide the best facilities within reasonable distances" appears in the report at page 62. With respect to enrollment, the Report focuses on Edgewood's need to develop better relationships with diocesan leadership and to increase their presence in the Catholic elementary schools, not athletics. Elliott Dep., dkt. #33, 51:11-52:8; Zylstra Decl., Ex. PP, Dep. Ex. 50 at 19-20.

30.     Consistent with EHS's historical reliance on parochial feeder schools, ISACS recommended reviewing the school's relationship with its current feeder schools, to look for ways to enhance those relationships, and to create alliances with schools new to Edgewood. Zylstra Dec., Ex. PP, Dep. Ex. 50 at 14.

**Response:**  Undisputed in part, disputed in part.  "Consistent with EHS's historical reliance on parochial feeder schools," is disputed as unsupported by the citation.  The remaining portion is undisputed.

31.     ISACS also recommended that EHS explore new ways and places to engage alumni.  Zylstra Dec., Ex. PP, Dep. Ex. 50 at 20.

**Response:**  Disputed as unsupported by the citation.  Page 20 of Deposition Exhibit 50 does not refer to alumni at all.

32.     In light of strong local public schools, ISACS also recommended that EHS develop and implement marketing strategies to distinguish the value of an Edgewood education. Zylstra Dec., Ex. PP, Dep. Ex. 50 at 20.

**Response:**  Undisputed.

33.     EHS agreed with the recommendations.  Elliott Decl. ¶ 13.  The ISACS recommendations highlighted and affirmed EHS's desire to continue to seek to improve its athletic field as a means to engage prospective students, alumni and the community.  Elliot Decl. ¶ 13.

**Response:**  Disputed in part. "The ISACS recommendations highlighted and affirmed EHS's desire to continue to seek to improve its athletic field as a means to engage prospective students, alumni and the community" is not supported by the Report and not supported by the Elliott Declaration.  *See* response to PFF 29 and 27, which are incorporated by reference.

34.     In a modern culture that places a priority on sports, athletic offerings and opportunities are important components of EHS's ability to attract new students and engage the community.  Phelan Decl. ¶ 11.  The offerings and facilities Edgewood has to offer prospective students, including athletic facilities, have to be comparable to local non-religious, public schools.  Phelan Decl. ¶ 11.  A quality athletic field for sports and recreation that is open to the public is an important outreach tool to get people onto the EHS campus.  Elliott Decl. ¶ 11.

**Response:**  Undisputed in part, disputed in part.  Disputed that "In a modern culture that places a priority on sports, athletic offerings and opportunities are important components of EHS's ability to attract new students and engage the community" and "The offerings and facilities Edgewood has to offer prospective students, including athletic facilities, have to be comparable to local non-religious, public schools."  There is no foundation for these statements and the statements are at odds with Edgewood's own Accreditation Report.  *See* Response to PFF 27 and 29.  Further, Sister Phelan has not served at Edgewood in any capacity since 1989 and has no foundation to offer these statements.  Phelan Dec., ¶4.

35.     For many, it is far harder to ask students and their families to come to Edgewood if it means both paying tuition and sacrificing some aspect of their child's high school experiences and opportunities with extra-curriculars.  Phelan Decl. ¶ 11.

**Response:**  Defendants object that this statement is improper opinion testimony, and

without any foundation.  Sister Phelan has not served at Edgewood in any capacity since 1989.

Phelan Dec., ¶4.

36.     In 2015, the Goodman Foundation gave EHS a generous gift of $1.025 million to use towards renovating the field.  Elliott Decl. ¶ 15.

**Response:**  Undisputed.

37.     The express purpose of the gift was to ensure that EHS's athletic field would continue its legacy as "a community-wide venue that serves all of Madison, from children to seniors, through *games*, camps, and other community activities." Zylstra Dec., Ex. F, Dep. Ex. 57 at 4 (emphasis added).

**Response:**  Disputed in part.  The phrase, "The express purpose of the gift was to ensure

that EHS's athletic field would" is not supported by the citation. Undisputed that the quotation

appears in the newspaper article about the gift, except the article says, "other activities," not

"other community activities."  The statement is attributable to E.G. Schramka, which is hearsay.

38.     The gift fit perfectly with EHS's religious values of community and partnership. Elliott Decl. ¶ 15.  With the gift, and with the generosity of other donors, EHS was finally able to renovate its track and field, which was in significant need of repair.  Elliott Decl. ¶ 15.

**Response:**  Undisputed that the gift from the Goodmans allowed Edgewood to renovate

its track and field and such was in significant need of repair. Disputed that renovating a track and

field "fits" with Edgewood's religious values.  Elliott testified that he was unaware of any

requirement in the Catholic faith for an individual to participate in sports.  Elliot Dep., dkt. #33,

39:3-8.  Further, nowhere on the Dominican Sisters of Sinsinawa website is sports ever

mentioned.  Elliott Dep., dkt. #33, 39:18-42:16.  The website contains the Dominican Sisters of

Sinsinawa's mission, Elliott agrees that the website accurately reflect the Sisters' mission, and

there is no mention or sports or athletic activities in the Sisters' mission. *Id.*; Zylstra Second

Dec., Ex. SS, Dep. Ex. 49.  Edgewood also does not require its teachers or its coaches to be

Catholic.  Zwettler Dep., dkt. #55, 10:24-11:2; Elliott Dep., dkt. #33, 14:9-12.

       39.     In 2015, EHS installed a full-length, artificial turf field designed to host regulation football, soccer, lacrosse, and softball games, and it upgraded the track from cinder to modern shredded rubber.  Elliott Decl. ¶ 16.  EHS checked with the City and confirmed it could go forward with the renovation.  Elliott Dep. at 128-131.  Around this same time, EHS installed and maintained a scoreboard for the field.  Elliott Decl. ¶ 16.

      **Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition").  Undisputed in part and disputed in part.  The first sentence is undisputed.  As to

the second sentence, undisputed that Edgewood checked with the City about whether it needed to

amend its master plan to go forward with resurfacing the track and the City did not require an

amendment to Edgewood's master plan because it was simply resurfacing the old track.  Elliott

Dep. 128:21-129:19.  As to the third sentence, it is undisputed that Edgewood installed a

scoreboard around this time but Edgewood did not check and see if that required an amendment

to the master plan and it was unknown to the City in 2015 that Edgewood was doing so.  Tucker

Dep., 170:11-15.  Hank Dep., dkt. #30, 89:16-18.

       40.     As reported in the Wisconsin State Journal,  the central artificial turf area's full length "will hold ***competition*** fields" while the width "can be divided into three 50-yard practice fields.  Zylstra Dec., Ex. F, Dep. Ex. 57 at 5 (emphasis added).

      **Response:**  Undisputed that those words appear in the article.

       41.     EHS President, Mike Elliott, stated that "our students will benefit greatly, with the best possible conditions to train and ***compete*** on." Zylstra Dec., Ex. F, Dep. Ex. 57 at 5 (emphasis added).

      **Response:**  Undisputed that those words appear in the article.

42.     While the track had been used for the parochial grade school track practices and invitational track meet, in the years prior it had stopped being used as such because of the track's deterioration.  Zwettler Decl. ¶ 16; Zylstra Dec., Ex. F, Dep. Ex. 57 at 6.  With the upgraded surface, EHS was able to welcome back the parochial school track programs and to partner with groups such as the Madison Westside Track Club.  Zwettler  Decl. ¶ 16; Zylstra Dec., Ex. F, Dep. Ex. 57 at 6.

**Response:**  Undisputed.

43.     Moreover, the new track provided a safe surface for neighborhood residents for walking and jogging.  Zylstra Dec., Ex. F, Dep. Ex. 57 at 6.  The track and field have always been open to the neighborhood residents.  Elliott Decl. ¶ 10.

**Response:**  Undisputed as to the first sentence.  As to the second, Elliott does not have

foundation to state that it has "always" been open.  Elliott has denied having information about

numerous matters prior to his hire at Edgewood in 2013. *See, e.g.*, Elliott Dep., dkt. 33, 53:17-

54:2; 54:7-10; 55:21-56:1; 59:4-18; 67:5-10; 73:6-11; 94:11-13; 103:24-104:16; 106:18-21. He

also denied having knowledge about changes to the field from August 2019 to present.  "Q

Okay.  Are you aware of any change in use of Edgewood's athletic field from August of 2019 to

present? A   Again, I would not know that at this point."  Elliott Dep., dkt. #33, 222:14-17.

44.     EHS designed the track and field improvements to be able to hold competitions because that was consistent with how the field had historically been used.  Elliott Decl. ¶ 16.

**Response:**  Undisputed in part and disputed in part. Elliott does not have foundation to

testify as to how the field has historically been used and contended in his deposition not to know

many facts related to the athletic program.  *See, e.g.*, Elliott Dep., dkt. #33, 222:14-17 ("Q

Okay.  Are you aware of any change in use of Edgewood's athletic field from August of 2019 to

present? A   Again, I would not know that at this point."); *see also* Elliott denying knowledge of

matters prior to his hire, Elliott Dep., dkt. #33, 53:17-54:2; 54:7-10; 55:21-56:1; 59:4-18; 67:5-

10; 73:6-11; 94:11-13; 103:24-104:16; 106:18-21.  Further, Edgewood indicated numerous times

18

in 2015 that the renovated track was for the purpose of practices and that it was between two

neighborhood associations that have been vehemently opposed to Edgewood playing games on

the track. *See* Defendants' PFF 51-56. Further, Edgewood significantly increased its use of the

field after resurfacing the track as even Elliott admits. Elliott Dep., dkt. #33, 152:23-154:21.

45.     Dating back to Sister Kathleen Phelan's tenure as a teacher at Edgewood in 1968, EHS's field was used for freshman and JV football games. Phalen Decl. ¶¶ 4, 15.

   **Response:**  Undisputed that Edgewood used the field for freshman and JV football games

from 1968-1975 and 1984-1989.  Disputed for other years as without foundation and

unsupported.

46.     EHS's President from 2005 to 2013, Judd Schemmel recalls playing freshman football games on that field when he was a student in the 1970s.  June 9, 2022 Declaration of Judd Schemmel ("Schemmel Decl.") ¶ 3.  Throughout Mr. Schemmel's tenure as President, EHS hosted freshman and JV football games on the field.  Schemmel Decl.  ¶ 4.

   **Response:**  Undisputed.

47.     Since the track and field renovation in 2015, freshman and JV football have continued to play games on the field.  Boys' and girls' lacrosse, boys' and girls' soccer, boys' and girls' track, and middle school track all use the field for games or meets.  Zwettler Decl. ¶ 15.

   **Response:**  Undisputed.

48.     Despite the substantial improvement created by the renovated turf and track, EHS still anticipated enhancing the field, now known as the Goodman Athletic Complex.  Elliott Decl. ¶ 17.  On July 7, 2015,  EHS applied for and received a permit to install conduit under the field so that EHS could run wiring to power future field lighting and a sound system. Elliott Decl. ¶ 17.  EHS anticipated seeking lights as soon as the technology became available to meet the City's requirements.  Elliott Decl. ¶ 17.

   **Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition"). Undisputed in part and disputed in part.  When resurfacing the track in 2015,

Edgewood applied to the City for a permit to put PVC and conduit under the track for future

lighting and communications, which made financial sense to do while the track was ripped up.

Elliott Dep., dkt. #33, 132:5-10, 132:24-133:4; Hank Dep., dkt. #30, 88:24-89:11; Tucker Dep.,

dkt. #32, 168:20-170:10.  Edgewood, however, was not intending or planning to put in lights at

that time it applied for a permit for the PVC and conduit in 2015 because the technology was not

there, but Edgewood hoped to install lights in the future. Elliott Dep., dkt. #33, 124:18-126:10.

Elliott testified that Edgewood did not know if the technology for lighting would be available

one year in the future, five years in the future or ten years in the future. Elliott Dep., dkt. #33,

125:19-126:10.


49.     Lights are important, because EHS's inability to host games and activities at night
on its own athletic field substantially burdens EHS's students, parents, partnerships with other
schools, clubs, and organizations, and the community in multiple ways.  Elliott Decl. ¶ 18;
Zwettler Decl. ¶ 17.

**Response:**  Disputed. First, the proposed fact is a legal conclusion and improper for a

proposed finding. *American National Property & Cas. Co.*, 2006 WL 1589623 at *1 (legal

conclusions inappropriate as factual findings; such advocacy must be left to the argument portion

of a brief and not proposed as a finding of fact). Second, Edgewood contends that it has

continuously used its field for decades, which allows it to further its mission, and has been able

to host others to use the field even without the lights.  *See, e.g.*, Zwettler Dep., dkt. #55, 17:17-

22:24; Elliott Dep., dkt. #33, 21:4-21; 271:6-271:15.  Fourth, Elliott denied having knowledge of

many things related to athletics.  For example, he testified:

Q   Okay.  To the best of your knowledge, has Edgewood ever not been able to secure a
site, whether it be at one of the facilities you just mentioned or the opposite team, has
Edgewood ever not been able to secure a site for its game?

A   I'm not involved in the athletics to the degree of knowing that all the time.  I would
just be guessing.

Elliott Dep., dkt. #33, 28:17-24.  Finally, Deposition Exhibit 68 identifies voluminous

day games being played on Edgewood's field in 2018 alone, including several night games.

Zylstra Second Dec., Ex. TT, Dep. Ex. 68 at 4.


50.      By the time Mr. Elliott had become President, the field had fallen into disrepair,
its value as an asset and community- and partnership-building tool was diminished, and, in his
view, was a detriment to EHS's ability to attract students and to be competitive with other
Madison-area high schools.  Elliott Decl. ¶ 12.  Because prospective students and their parents
look at the quality of facilities, particularly athletic facilities, in making high school selection
decisions,  making the athletic field an asset in EHS's mission was one of Mr. Elliott's priorities
as President of the high school.  (Elliott Decl. ¶ 12.)

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition"). Disputed in part.  While Mr. Elliott asserts the field had fallen into disrepair when

he became president, Zwettler states in his declaration that both the JV football and freshman

football teams were using the field for competitive games.  Zwettler Dec., ¶14. In addition, with

regard to Elliott's statements as to attracting students and what parents and prospective students

look for, those statements lack foundation and are hearsay. Further, Edgewood's own

Accreditation Report did not identify athletics as important for increasing enrollment. *See*

Defendants Response to PFF 27 and 29, incorporated by reference.  Undisputed that improving

the athletic field was a priority for Mr. Elliott.

51.     EHS must pay thousands of dollars each year to rent fields from the Madison Metropolitan School District and other organizations—funds which could otherwise be used to support EHS's mission and students.  Zwettler Decl. ¶ 12.

**<u>Response:</u>**  Undisputed in part, disputed in part.  Undisputed that this sentence is in Zwettler's declaration, but this is inconsistent with other portions of Zwettler's declaration. Zwettler admits (Zwettler Decl. ¶15) that Edgewood has use of its field now and freshman and JV football, boys' and girls' lacrosse, boys' and girls' soccer, boys' and girls' track, and middle school track are all using the field, thereby eliminating the need to pay rent for fields for those sports.  Also Zwettler admitted that even if Edgewood had gotten lights for its field, Edgewood was in a long term contract would have continued to rent fields.  Zwettler Dep., dkt. #55, 109:2-111:6.

52.     EHS students, coaches, and fans are forced to drive to locations all over Madison to play "home" games which could otherwise be held on EHS's campus where athletes, students, faculty and coaches can simply remain after school to attend and where EHS can freely and fully promote its religious mission and values.  Zwettler ¶ 19.

**<u>Response:</u>**  Undisputed in part, disputed in part.  Dispute as argumentative "forced." *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  Undisputed that this sentence is in Zwettler's declaration, but this is inconsistent with other portions of Zwettler's declaration. Zwettler admits (Zwettler Decl. ¶15) that Edgewood has use of its field now and that freshman and JV football, boys' and girls' lacrosse, boys' and girls' soccer, boys' and girls' track, and middle school track are all using the field, thereby eliminating the need to drive for those games.  In addition, Elliott testified that there would be some travel that students would have to do even if night games were held at Edgewood because even if the students stayed after school, the parents or the students would need to travel home. Elliott Dep., dkt. #33, 268:9-25. In addition, there is no evidence that

Edgewood cannot promote its religious mission and values if the game is held on another field instead of Edgewood's field.

53.     EHS's students, parents, and coaches struggle with the uncertainty that comes from not knowing where and when they will be able to play their games or whether they will be bumped by other institutions that have priority use of the various fields EHS's team are forced to use.  Zwettler Decl. ¶ 18.

**Response:**  Disputed.  Dispute as argumentative "forced."  *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings."). Defendants also object that Zwettler does not have foundation to testify as to parents and students "uncertainty struggles" and any such testimony is likely hearsay and is unlikely to be in admissible form at trial.

54.     Substantially more administrative time is spent by EHS staff in negotiating offsite field arrangements, scheduling off-site "home" games, finding alternative locations when conflicts arise, and coordinating travel.  Zwettler Decl. ¶ 10.  Edgewood's Athletic Director, Christopher Zwettler, estimates that 40% of his work time had been spent scheduling and managing the issues arising from off-site "home games."  Zwettler Decl. ¶ 10.  Since the field renovation, that estimate is 20% -- as the field is more available less administrative time is required.  Zwettler Decl. ¶ 10.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  Defendants object to "substantially more" as no comparison is provided in the sentence.  The remaining sentences are undisputed.

55.     In 2017 and 2018, EHS wanted to continue its improvements to the field.  Elliott Decl. ¶ 23.  The lighting technology had advanced such that EHS would be able to install outdoor field lighting while complying with the City's ordinance governing outdoor lights and eliminating light intrusion.  Elliott Decl. ¶ 23.  EHS wanted to expand seating, add concessions, restrooms and storage, add amplified sound and lights.  Elliott Decl. ¶ 24; Compl. ¶ 90; Ans. ¶ 90.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  The first and third sentences are undisputed.  The second sentence is disputed. First, Elliott does not have foundation to testify about the technology or whether technology complied with the City's ordinance.  Further, Edgewood had in place a master plan in 2017 and 2018, which was enacted as a City ordinance, and outdoor lighting was not in compliance with master plan ordinance.  *See* Defendants PFF 105-106, incorporated by reference.

56.     The City suggested that EHS seek to amend its Master Plan to pursue these changes.  Compl. ¶ 91; Ans. ¶91.  Edgewood planned to do so, given that the desired size of the expanded seating, concessions, restrooms and additional amenities made this a significant building project.  Elliott Decl. ¶ 24.

**Response:**  Undisputed with the clarification that the City indicated that such would be required, and Edgewood more than "planned to," it did apply to amend its master plan.  On November 14, 2018, Edgewood filed an application to amend its Master Plan to incorporate lighting, expand seating, add restrooms, team rooms, and storage and define its field use. Zylstra Dec., Ex. K, Dep. Ex. 62; Elliott Dep., dkt. #33, 149:10- 151:20; Tucker Dec., ¶10.

57.     EHS had been in discussions and listening sessions with the City and neighbors about expanding the athletic complex, when in October 2018, City Administrator Matt Tucker sent an email to Mr. Elliott advising that EHS was operating outside of the terms of its Master Plan by using the field for uses other than "team practices, physical education classes."  Elliott Decl. ¶ 25; Zylstra Dec., Ex. J, Dep. Ex. 64.

**Response:**  Undisputed.

58.     After a neighborhood meeting on October 17, 2018, Mr. Tucker "closely reviewed" EHS's adopted Master Plan to determine how language in the master plan relates to athletic field usage.  Zylstra Dec., Ex. J, Dep. Ex. 64.

**Response:**  Undisputed.

59.     In his email, Mr. Tucker cited only the Master Plan's Section 3.8, Open Spaces, for the notion that the EHS Master Plan identified the athletics field to be used for "team practices, physical education classes."    Zylstra Dec., Ex. J, Dep. Ex. 64.

**Response:**  Undisputed in part, disputed in part.  The email cites Section 3.8 but also states, "The lack of any further language in this section, *or any other language in sections of the adopted Master Plan*, leads me to the interpretation that current programing and usage of the field is operating outside of the allowances of the adopted Master Plan." Thus, more than Section 3.8 was referenced.

60.     The absence of any further language in the section, or of any other language in the Master Plan, led him to the interpretation that EHS's current programming and usage of the field is outside of the allowances of the Master Plan.  Zylstra Dec., Ex. J, Dep. Ex. 64.

**Response:**  Undisputed.

61.     The City adopted its current Zoning Code on October 26, 2013, with an effective date of January 2, 2013. Compl. ¶ 60; Ans. ¶ 60.  As part of this new code, the City created a new zoning designation called the "Campus-Institutional District," which is designed for "the City's major educational and medical institutions." Compl. ¶ 61; Ans. ¶ 61. Campus-Institutional Districts were created to "accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards."  M.G.O. § 28.097(1).  Compl. ¶ 62; Ans. ¶ 62.

**Response:**  Undisputed.

62.     EHS had no little or involvement in lobbying for the newly created Campus Institutional District zoning.  Schemmel Decl. ¶ 5.  EHS had no direct contact with the City with respect to this ordinance.  Schemmel Decl. ¶ 5.  Instead, the process was led by Edgewood College, University of Wisconsin and Madison College.  Schemmel Decl. ¶ 6.

**Response:**  Disputed. Edgewood High School, the University of Wisconsin and Madison College had approached the City about creating a better path for approval of their building

expansions outside of the high stakes pass/fail process that was the conditional use process.

Tucker Dep., dkt. #32, 83:12 to 83:22, 85:6-85:9. Edgewood High School, the University of

Wisconsin and Madison College indicated to the City that the detail, expense, effort involved in

preparing a conditional use application for a building that could be denied was relatively

inequitable from their perspective and so they asked the City to help them create a better path for

the evolution of their campuses.  Tucker Dep., dkt. #32, 83:12-22, 85:6-85:9; Tucker Dec., ¶2.

The City of Madison enacted M.G.O. § 28.097, creating the Campus-Institutional Districts as a

response to those concerns. Tucker Dec., ¶2; Tucker Dep., 85:2-12.


63.     As of January 2, 2013, the City zoned EHS as a Campus-Institutional District
under Section 28.097.  Compl. ¶ 64; Ans. ¶64.  In addition to EHS, the City also rezoned the
following institutions into a Campus-Institutional District:  James Madison Memorial High
School (Memorial), Madison East High School, Madison West High School, and Madison
La Follette High School, portions of the University of Wisconsin's campus, and the Madison
College Truax campus. Compl. ¶ 65; Ans. ¶ 65.

**Response:**  Undisputed.


64.     At the time EHS's campus was rezoned Campus-Institutional, the uses allowed
within the Campus Institutional District were listed separately as either primary or secondary
uses under Section 28.097.  The list of permitted "primary uses" included "educational uses
associated with colleges, universities, and secondary and primary schools, including classroom
buildings, libraries, and offices." M.G.O. § 28.097(3)(a) (capitalization altered).  The list of
permitted "secondary uses" included "indoor and outdoor sports and recreational facilities";
"stadiums, auditoriums, and arenas, open or enclosed," and "other uses related to the institution's
primary mission." M.G.O. § 28.097(3)(b) (capitalization altered).  Zylstra Dec., Ex. B, Dep. Ex.
13, §28.097(3)(a) & (b).

**Response:**  Undisputed in part. Undisputed that the quotations appear in the ordinance.

Also undisputed that the ordinance contained a listing of both primary and secondary uses.

However, secondary uses were only allowed to the extent that they were utilized predominantly

in a manner that is directly related and complementary to the institution's primary uses. M.G.O.

§28.097(3). Further, M.G.O. § 28.097(5) required master plans to identify uses and once

26

identified in a master plan, any changes to those uses (regardless of falling within a primary or secondary use) were not permitted unless the City approved the change.  M.G.O. § 28.097(10).

65.     Section 28.097 regulates primary and secondary uses at a very general level (i.e. allowing "indoor or outdoor sports and recreation facilities, stadiums, auditoriums, or arenas") rather than at a highly specific, granular level (e.g., allowing outdoor sports and recreation facilities but only if they are used for ultimate frisbee, collegiate softball and yoga classes). Section 28.097 does not distinguish between day or night-time uses or restrict the primary or secondary uses to only daylight hours. M.G.O. § 28.097; April 29, 2022 Deposition of Matt Tucker ("Tucker Dep.") at 140.

**Response:**  Disputed as unsupported by the citation plaintiff's characterization of the ordinance as "at a very general level" and "highly specific, granular level."  Undisputed that M.G.O. §28.097 does not contain words related to day or night-time use but disputed to the extent that a use is identified in a master plan, as such would then be defined and would be distinguished.  M.G.O. § 28.097(5) and (10); Zylstra Dec., Ex. H, Dep. Ex. 72; Elliot Dep. 186:25-188:4 (Elliot writing in an email that the City did "not feel the current master plan would let us proceed with a modified stadium. Night use is the issue and it is in their mind a new or different usage."); Tucker Dec., ¶7.

66.     Under the Campus Institutional District zoning, with respect to EHS's athletic field, any practices, games, or games at night were permitted secondary uses under M.G.O. § 28.097(3)(b)(5).  Tucker Dep. at 97-98.

**Response:**  Disputed.  The Tucker citation does not support the proposed fact.  The questions related to a hypothetical, not Edgewood, and related to an institution that did not have a master plan and before the change in the Campus-Institutional District ordinance.  Tucker Dep. 98:19-23 ("A.   Now, once again, you're -- I'm not understanding under what -- so it sounds like you're talking about no master plan and then your question jumps back into whether a master plan exists or not.").

27

67.     Under Section 28.097, campus master plans were voluntary for existing educational and medical institutions, but mandatory for any new education and medical institutions created after the passing of the ordinance. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(a).  One of the purposes of the Master Plan was to facilitate and "accommodate the future growth of these institutions."  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2).

**Response:**  Undisputed but under rule of completeness, plaintiff is isolating to a

misleading effect the purpose of the Master Plan.  *See* Defendants PFF 10 for the complete

statement of purpose, which includes balancing growth with the need to protect the livability and

vitality of adjacent neighborhoods.

68.     The Planning Division Staff Report dated March 24, 2014 relating to the EHS Master Plan approval contains a true and correct copy of the terms of the Campus Institutional District zoning ordinance as it existed in 2014 prior to its amendment material amendment in 2019.  Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39; Tucker Dep. at 105-106.

**Response:**  Undisputed in part.  The report indicates that only relevant sections of the

ordinance are being included.

69.     The asserted incentive for the existing institutions had to voluntarily adopt a Campus Master Plan was that in theory an approved master plan would streamline approval of future buildings. Elliott Decl. ¶ 34. For any "buildings properly identified on a Campus Master Plan," the institution needed only obtain approval from "an architectural review committee prior to construction," rather than obtain "conditional use approval" from the City. M.G.O. § 28.097(2)(c), (7)(a).  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097.

**Response:**  Undisputed in part and disputed in part. Undisputed that there was an

incentive to adopting a master plan and it would streamline approval for future buildings and

other non-building proposed changes.  *See* Defendants PFF 26-28.  Dispute "asserted" and "in

theory" as argumentative.  The second sentence is undisputed.

70.     In other words, if the City approved a master plan, the specific projects shown on the campus Master Plan would not be reviewed by the Plan Commission again.   Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39 at 7 ("Unlike other master plan or conceptual plan approvals that come before the Plan Commission such as Planned Development general development plans or

preliminary plats, which are statutorily required to be followed by specific implementation plans or final plats, respectively, the specific projects shown on the Campus Master Plan will not be reviewed by the Plan Commission if those projects adhere to the approved master plan.")

    **Response:**  Undisputed.

71.    The ordinance, M.G.O. § 28.097(7), is titled "Final Building Design Review" and provides that "[a]ll buildings properly identified on a Campus Master Plan must be reviewed and approved by an architectural review committee."  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7). The statute contains no language pertaining to architectural review of anything other than buildings.  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7).

    **Response:**  Undisputed in part, disputed in part.  The first sentence is undisputed.  The second sentence is disputed. M.G.O. § 28.097(7)(b) applies to non-buildings, such as open space parking surfaces, and states, "In addition to undergoing the design review process in sub. (7)(a) above [the architectural review process]," and then continues to describe additional reviews that are required.

72.    According to M.G.O. § 28.097(5)(c)(1)–(2), a master plan generally includes a "description of existing conditions" and "the proposed conditions" on the campus, including "future needs/capital improvements," "phasing of proposed improvements," and "future land uses and buildings."  (capitalization altered). If an institution submitted a master plan, and that plan was approved by the City, then that plan governed the development of new buildings within the Campus-Institutional District zoned institution for the life of the plan, which is ten years. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(b)–(d), (4), (7).

    **Response:**  Undisputed in part and disputed in part.  As to the first sentence, the proposed fact contains some of the items required to be included but master plans require other items so the identification described is incomplete. As to the second sentence, such language is not contained in the cited reference and is therefore, unsupported. Generally, it is undisputed but there are many facts and situations that would affect the validity of that statement.

73.    Prior to EHS, no master plan had ever been considered for approval by the City of Madison's Plan Commission.  Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39 at 6.  EHS's Master Plan was the first in the City.  Tucker Dep. at 71.

**Response:**  Undisputed.

74.     To date, only EHS and the University of Wisconsin-Madison have ever adopted a master plan under § 28.097.  Hank Dep. at 177.

**Response:**  Undisputed.

75.     On January 20, 2014, Edgewood College, EHS, and Edgewood Campus School submitted a joint campus Master Plan.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 12 of 228.

**Response:**  Undisputed.

76.     EHS had very little involvement with the drafting of the Master Plan.  Elliott Decl. ¶ 26.; Schemmel Decl. ¶ 7.  Edgewood College really wrote the document, with Mr. Elliott reviewing what pertained specifically to the high school.  Elliott Dep. at 94-95.  New to his job in 2013 and not then planning on undertaking a building project, Mr. Elliott did not dive into the Master Plan beyond the basics and ed as EHS President to help assist Edgewood College, who was the principal contributor behind the Master Plan.  Elliott Dep. at 103-105; Elliott Decl. ¶ 26.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition").  Undisputed in part, disputed in part.  Disputed that Edgewood high school had

little involvement with the master plan.  Elliott received and reviewed drafts of the master plan

and Elliott testified that he was responsible for reviewing anything related to the high school and

that he did so.  Elliott Dep., dkt. #33, 94:19-95:7; Zylstra Dec., dkt. #40, Ex. E, Dep. Ex. 54.

Further, Ms. Balistreri-Clarke from Edgewood College was an agent for Edgewood High School

and routinely communicated with the City on behalf of the high school, including about the

athletic field at issue.  *See, e.g.*, Zylstra Dec., Ex. RR, Dep. Ex. 73. In addition, Elliott's assertion

that the high school was not planning on undertaking a building project is contradicted by the

master plan that he signed and his deposition testimony.  Zylstra Dec., dkt. #40, Ex. A, Dep. Ex.

7, page 36-38 of 228; Elliott Dep., dkt. #33, 107:14-108:14 (identifying 4 building projects in the master plan that the high school planned on completing, two of which were completed).

77.     At the time of signing the Master Plan for EHS, Mr. Elliott understood that the Master Plan was supposed to help facilitate or streamline specified building projects.  Elliott Dep. at 103-105.  At no time did anyone from Edgewood College, EHS or the City inform him that the Master Plan could operate or would be interpreted to restrict or limit projects or uses that were not identified or not identified with a certain specificity.  Elliott Decl. ¶ 28.

**Response:**  Undisputed in part, disputed in part. The first sentence is undisputed. The second sentence is disputed. First, under the City's Campus Institutional District Zoning Ordinance, Edgewood's Master Plan was required to include:

> (c) Facilities Plan. Includes a description of existing conditions on the campus and the proposed conditions under the Master Plan, including:
>
>   1.  Existing Conditions.
>   a.  *Land uses* and buildings.
>   b.  Building form (building type, height, bulk, etc.).
>   c.  Landmarks, historic sites and districts.
>   d.  Natural features and significant *open-space areas*.
>
>   2.  Proposed Conditions.
>   a.  Future needs/capital improvements.
>   b.  Phasing of proposed improvements.
>   c.  *Future land uses* and buildings.
>   d.  Building Form (building type, height, bulk, etc.).
>   e.  *Landscape treatment*.
>   f.  *Open-space areas and other open-space uses.*
>   g.  Relationship to transportation/access plan (parking, transportation demand management, etc.).

Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(5)(c) (emphasis added).  Second, the City's letter to Edgewood dated April 22, 2014 approving the master plan  stated: "No alteration of an approved Campus Master Plan, ***including changes to the proposed use of identified open space areas and other open space uses***, shall be permitted unless approved by the Plan Commission…" Zylstra Dec., Ex. A, Dep. Ex. 7, page 10 of 228 (emphasis added); Hank Dep., dkt. #30, 82:1-9. This

language was also nearly verbatim of the language of then M.G.O. §28.097(10). Tucker Dec., ¶5.

Thus, Edgewood was well aware that the Master Plan could operate or would be interpreted to

restrict or limit projects or uses that were not identified in the master plan.

78.     With respect to Section 3.8 of the EHS Master Plan, Mr. Elliott did not intend to limit the use of EHS's athletic field to team practices or physical education classes.  Elliott Decl. ¶ 29.  At the time of signing, Mr. Elliott understood that EHS had the full use of its field as a sports and recreation facility or stadium under the Campus Institutional District zoning.  Elliott Decl. ¶ 29; He did not intend to give that up in signing the Master Plan and did not anticipate the City's interpretation in 2018.  Elliott Decl. ¶ 29.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition").  Disputed.  First, Elliott's assertion that he had a specific intent contradicts

plaintiff's PFF 77, wherein Edgewood alleges that Elliott had little involvement in the drafting of

the master plan, was new to his job and did not dive in beyond the basics.  Second, both M.G.O.

§28.097 and the City's letter approving Edgewood's master plan put Edgewood on notice that its

master plan needed to describe the uses of open spaces.  The City incorporates its response to

PFF 77.  Third, Edgewood's description limiting its field use was by design given the history that

Edgewood had with its two surrounding neighborhood associations, who vehemently opposed

Edgewood putting up lights and playing competitive games.  Elliott even stated that in a

newspaper article in 2015.  *See* Defendants PFF 55, incorporated by reference.  The sham

declaration rule precludes Elliott's contradictory and self-serving declaration testimony.

*Maldonado*, 186 F.3d at 769 (plaintiff may not create sham issues of fact through an affidavit

that contradicts or "patches-up" prior deposition testimony); *Babrocky*, 773 F.2d at 861 (noting

court's duty to ignore "sham" issues). Finally, Edgewood even had a draft of a master plan with

broader language as to its field use and that language was narrowed by the time of the final draft. *See* Defendants PFF 44.

79.     Moreover, at the time of his signing the Master Plan, Mr. Elliott knew and recognized that EHS had been using its field for sports and athletic events for over 100 years. Elliott Decl. ¶ 30.  EHS had played freshman and JV football on the field just months before. Elliott Decl. ¶ 30.  He did not intend to give up and discontinue Edgewood's longstanding historical use of the field in signing the Master Plan.  Elliott Decl. ¶ 30.  Nor did he believe or understand that one line in a two-hundred-page document would have such a severe and unreasonable consequence.  Elliott Decl. ¶ 31.

**Response:**  Disputed.  Defendants incorporate their response to PFF 77-78. Defendants

object that there is no foundation for this proposed fact. Defendants also object to lack of

foundation because Elliott testified:

> Q   Okay.  Are you aware of any change in use of Edgewood's athletic field from August of 2019 to present?
>
> A   Again, I would not know that at this point.

Elliott Dep., dkt. #33, 222:14-17.  Elliott cannot now claim by declaration to know about field

usage. *Maldonado*, 186 F.3d at 769 (sham affidavit rule); *Babrocky*, 773 F.2d at 861 (noting

court's duty to ignore "sham" issues).

80.     Instead, he believed the athletic field was fairly described by calling it an "athletic field."  Elliott Decl. ¶ 32.  Mr. Elliott understood that "team practices" and "physical education classes" were listed as examples, not limitations.  Elliott Dep. at 96-97; Elliott Decl. ¶ 32.

**Response:**  Disputed.  Defendants incorporate their response to PFF 77-79. Defendants

object that there is no foundation for this proposed fact.  Moreover, Elliott received and reviewed

an earlier draft of Edgewood Campus's Master Plan that described its Open Space as "Athletic

field owned by Edgewood High School. Used for team practices, physical educations classes,

***and other general light uses***." Elliott Dep., dkt. #33, 95:20-95:22 (emphasis added); Zylstra

Dec., dkt. #40, Ex. E, Dep. Ex. 54. The language, "and other general light uses," was specifically

*removed* from the final master plan. Elliott Dep., dkt. #33, 96:4-97:6.  Elliott was well aware that the neighbors were opposed to playing competitive games and adding lights.  He even said so to a reporter in 2015.  Zylstra Dec., Ex. F, Dep. Ex. 57 (Elliott was quoted as saying, "We're between two neighborhood associations. They have been vehemently opposed to us having lights or playing games here"); Elliott Dep., dkt. #33, 123:23-125:6.

81.     Mr. Elliott certainly did not believe that EHS need to limit the characterized use of the field in order to win neighbor approval.  Elliott Decl. ¶ 33.

**Response:**  Disputed.  The Wisconsin State Journal article dated June 15, 2015 article about upgrades to the track and field noted, "According to Elliott, the project has received the support of area neighborhood groups that have balked in the past at the idea of turning the facility into a competition site for Edgewood's many athletic programs." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6.  Elliott is also quoted as saying, "We're between two neighborhood associations. They have been vehemently opposed to us having lights or playing games here," he said. "We're really building this to be able to give our athletes the practice facilities that provide the best surfaces possible and to expand the amount of outdoor practices we can hold especially in the spring.  That is our focal point." Zylstra Dec., dkt. #40, Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6.  In addition, at the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015 (of which Elliott was a member), Balistreri-Clarke indicated that as to the Edgewood High School Football Field, no additional lighting or seating would be installed. Schey Dec., ¶4, Ex. A. She also confirmed that the football field would be a practice facility. Schey Dec., ¶4, Ex. A.

82.     Edgewood had been playing games on that field for decades.  Elliott Decl. ¶ 30; Schemmel Decl. ¶¶ 3-4; Zwettler Decl. ¶ 14.

**Response:**  Object as vague as to which decades are being referred to. Undisputed that there was a period of time that Edgewood played games on its field.

83.     The Master Plan was "not intended to be a detailed blueprint for construction" on EHS's campus.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 17, 36 of 228.

**Response:**  Disputed in part.  The quotation is not referring to Edgewood's overall master plan but to the "Edgewood Campus Plan *Graphic*."  It is undisputed that the quotation appears at the cited page but under the rule of completeness, the next two sentences are: "Footprints for buildings, roadways, parking lots and landscape elements shown on the graphic are placeholders to communicate areas that are planned for future development. Each element is intended to be refined during the detailed design phase and will be vetted through the architectural review process."

84.     On April 22, 2014, the City approved EHS's Master Plan, subject to conditions not relevant here. Ingrisano Decl. ¶ 2, Ex. 1, Dep. Ex. 39.

**Response:**  Undisputed in part, disputed in part. Undisputed that the City wrote a letter dated April 22, 2014 indicating that the City's Common Council approved Edgewood's master plan on April 8, 2014, subject to certain conditions. Undisputed that the specifics of each condition are not relevant here, but the timing of those conditions are relevant as the master plan did not take effect until those conditions were satisfied and the City staff gave its final approval, which occurred in November 2015.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 6, 10 of 228; Tucker Dep., dkt. #32, 153:7-25.

85.     [Intentionally omitted]

**Response:**  N/A

86.     After receiving Mr. Tucker's October 2018 email restricting EHS's use of its field, Mr. Elliott was frustrated by his interpretation.  Elliott Dep. at 157-158.

**Response:**  Undisputed.

87.     On November 14, 2018, Edgewood filed an application to amend its Master Plan to incorporate lighting, expand seating, add restrooms, team rooms, and storage and define its field use. Zylstra Dec., Ex. K, Dep. Ex. 62; Elliott Dep. at 149-150.  On the same date, EHS's counsel sent a letter to Mr. Tucker in response to his October 2018 email.  Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep. at 161-162.  That letter, in part, continschued to assert that the Master Plan did not limit EHS's use of the field to practices and physical education classes.  Zylstra Dec., Ex. L, Dep. Ex. 65.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  The first two sentences are undisputed.  There is an error in the third sentence and it is disputed.  The sentence as written suggests that the language in the Master Plan did not limit use of the field to practices and physical education classes.  Atty. Rist does not make that argument in her letter.  Rather, her entire letter is that there is a legal non-conforming use based on historical use of the field—not that such use wasn't permitted under the language of the master plan.  Zylstra Dec., Ex. L, Dep. Ex. 65.

88.     In January 2019, EHS retained Attorney Nathan Wautier to assist the school with the growing land use issues surrounding the field and Mr. Tucker's new interpretation of the Master Plan. June 10, 2022 Declaration of Nathan Wautier ("Wautier Decl.") ¶ 3.

**Response:**  Undisputed in part, disputed in part.  "Growing" and "new" are disputed because they are both argumentative and not supported by the Wautier declaration.  The remaining portion of the proposed fact is undisputed.

89.     On or about January 18, 2019, Mr. Wautier met with Mr. Tucker and Assistant City Attorney John Strange to discuss athletic field.  Wautier Decl. ¶ 4.

**Response:**  Undisputed in part, disputed in part.  The Wautier declaration says they met to discuss "the Goodman Athletic Complex," not the athletic field specifically.

90.     In discussing the pending Master Plan amendment, Attorney Wautier, Mr. Tucker and Attorney Strange agreed that the building structure sought would be difficult to pass in the Common Council, particularly if a protest petition was filed by neighbors that would then require three quarters of the Common Council to approve.  Wautier Decl. ¶ 5.

**Response:**  Disputed.  Second Declaration of Matt Tucker, ¶3.

91.     Messrs. Wautier, Tucker and Strange then discussed the potential of EHS tabling the Master Plan amendment and instead pursuing lights, upgraded amplified sound, and bleachers each separately under each's administrative process.  Wautier Decl. ¶ 6.

**Response:**  Disputed.  Tucker Second Dec., ¶4.

92.     Under a piecemeal approach, with respect to outdoor lighting for the athletic field under M.G.O. Section 10.085, Mr. Tucker expressed to Mr. Wautier that the City would have to approve the lights if they complied with the technical photometric specifications.  Wautier Decl. ¶ 7.

**Response:**  Disputed.  Tucker Second Dec., ¶5.

93.     They likewise said that the City would not require a permit for upgraded amplified sound.  Wautier Decl. ¶ 6.  Mr. Strange and Tucker expressed understanding that EHS would likely go the route of a piecemeal approach and table its Master Plan amendment.  Wautier Decl. ¶ 8.

**Response:**  Disputed in part.  First, the Wautier declaration does not support that they City would not require a permit but only that the parties were unable to identify an administrative process for amplified sound at the meeting and that a permit was likely not necessary. Further, in Wautier exhibit 1, Wautier notes that Tucker said "lighting and sound are outside his realm." Wautier Dec., dkt. #51-1, Ex. 1 at 2.  Undisputed that there is not a specific City permit for sound. At best, a resident would potentially need an electrical permit for speakers. While Tucker does not recall stating that specifically to Mr. Wautier, based on his practice, if the topic came

up, he would have stated only that there is no specific permit related to sound but an electrical permit may be required depending on the circumstances.  Tucker Second Dec., ¶6.

94.    Based on Mr. Wautier's meeting with Mr. Strange and Tucker, a couple of days thereafter he contacted the City's Planning Division Director to advise the City that EHS was tabling its Master Plan amendment.  Wautier Decl. ¶ 10.  EHS began work to prepare its outdoor lighting permit.  Wautier Decl. ¶ 11.

**Response:**  Undisputed.

95.    On Friday, February 22, 2019, Edgewood submitted an application with the City for outdoor lighting of its athletic field. Zylstra Dec., Ex. N, Dep. Ex. 37.

**Response:**  Undisputed.

96.    On February 27, 2019, Tucker sent a letter to Mr. Elliott on the subject of EHS's outdoor light permit.  Tucker Dep. at 119-120; Zylstra Dec., Ex. O, Dep. Ex. 6.  The letter acknowledged the City's receipt of EHS's February 22, 2019 light application.  Zylstra Dec., Ex. O, Dep. Ex. 6.

**Response:**  Undisputed.

97.    In his February 27, 2019 letter, Mr. Tucker advised that the lighting application plans will be reviewed for compliance with MGO Section 10.085, and that if they comply electrical permits will be issued when requested.  Zylstra Dec., Ex. O, Dep. Ex. 6.

**Response:**  Undisputed.

98.    Mr. Tucker's letter goes on to say that "[t]he City believes this permit can be issued without requiring amendment of the approved 2014 Master Plan."  Zylstra Dec., Ex. O, Dep. Ex. 6.

**Response:**  Undisputed that the letter states this but under the rule of completeness, Mr. Tucker's supervisor disagreed and later determined that the permit could not issue. Hank decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b). Tucker Dep., dkt. #32, 44:23-48:3.  M.G.O. §10.085(1) provided in part, "Installation

of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection." Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12.  M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3.  Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application. Tucker Dep., dkt. #32, 46:18-48:3.  Hank was concerned about allowing Edgewood to make a large capital expenditure to install lighting when the City was contending that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

99.     Mr. Tucker, in his letter, represented that a permit would issue upon compliance with M.G.O. Section 10.085.  Zylstra Dec., Ex. O, Dep. Ex. 6.

**Response:**  Disputed in part.  Tucker stated that plans would be reviewed for compliance with M.G.O. §10.085 and if the plan comply, electrical permits would be issued when requested. Prior to any request for electrical permits, Hank decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b). Tucker Dep., dkt. #32, 44:23-48:3.  M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection." Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12.  M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3.  Hank believed that the language of Edgewood's Master Plan

was inconsistent with its lighting application. Tucker Dep., dkt. #32, 46:18-48:3. Hank was concerned about allowing Edgewood to make a large capital expenditure to install lighting when the City was contending that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14. Edgewood was also aware that "lighting and sound are outside his [Tucker's] realm." Wautier Dec., dkt. #51-1, Ex. 1 at 2.

100.    Mr. Tucker issued that letter in his official capacity as the City of Madison Zoning Administrator. Tucker Dep. at 129. The letter confirms that the City believes the lighting permit can be issued without requiring amendment of the approved 2014 Master Plan. April 27, 2022 Deposition of George Hank ("Hank Dep.") at 196.

**Response:**  Undisputed in part and disputed in part. The first sentence is undisputed. The second sentence is disputed. Edgewood was aware that "lighting and sound are outside his [Tucker's] realm." Wautier Dec., dkt. #51-1, Ex. 1 at 2. Hank was Tucker's supervisor and was responsible for compliance with §10.085. Hank Dep., dkt. #30, 17:10-19:10. Hank decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b). Tucker Dep., dkt. #32, 44:23-48:3. M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection." Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12. M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3. Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application. Tucker Dep., dkt. #32, 46:18-48:3; Hank Dep., dkt. #30, 37:22-38:24. Hank was concerned about allowing Edgewood to make a large capital expenditure to install lighting when the City was contending

that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

101.    Mr. Tucker prepared his February 27, 2019 letter in consultation with Mr. Strange.  Tucker Dep. at 127.

**Response:**  Undisputed with clarification that Mr. Strange did not assist Mr. Tucker with the language in the letter and Mr. Strange does not recall seeing the letter.  Strange Dep., dkt. #56 and #56-1, 26:18-27:13.

102.    After the light application was received, Mr. Tucker and Mr. Strange met multiple times to review and analyze the light application. Tucker Dep. at 130-131.  During that time, and in his preparation of his February 27 letter, Mr. Tucker reviewed the EHS Master Plan.  Tucker Dep at 124.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  Undisputed in part, disputed in part.  The first sentence is undisputed but only with the clarification that "met" includes phone calls and emails, which is what is contained in the cited reference.  The Tucker deposition citation does not support the proposed fact otherwise. "During that time" is confusing and vague.  Undisputed that Tucker reviewed Edgewood's master plan.

103.    On or about February 26, Mr. Wautier had a telephone call with Mr. Strange. Wautier Decl. ¶ 12.  During the call, Mr. Strange again acknowledged that EHS's light permit was being reviewed for compliance with technical lighting requirements and advised Mr. Wautier that he had told Mr. Tucker and Heather Stouder, the Planning Division Director, that the light application and the zoning use under the Master Plan were two separate issues.  Wautier Decl. ¶ 12.

**Response:**  Disputed.  Strange does not recall such a conversation occurring. Strange

Dep., dkt. #56, 34:12-35:8.


104.    On the same day that Mr. Tucker's letter was sent, February 27, 2019, a City
building inspector, Steve Rewey reviewed EHS's outdoor lighting application for compliance
with the City's Outdoor Lighting Ordinance, M.G.O § 10.085., which governs the technical
requirements for outdoor lighting throughout Madison.  Hank Dep. at 19-21; Zylstra Dec., Ex. Q,
Dep. Ex. 1.  Rewey would not be looking at anything other than the technical, objective
standards of M.G.O. Section 10.085.  Hank Dep. at 25.

**Response:**  Disputed in part.  The first sentence is not supported by the record citation.

The second sentence is not fully compliant with the deposition testimony cited. Hank testified at

page 25:

> Q.  Is there any other ordinance that Steve would be looking, at that time, to see if that
> standard has been met and the permit can issue?
>
> MS. ZYLSTRA:  Object to form.  You can answer.
>
> A.  Steve would not be reviewing that, no.

105.    Steve Rewey reviewed EHS lighting application on behalf of the Building
Inspection Department.  Hank Dep. at 33-34; Zylstra Dec., Ex. P, Dep. Ex. 3.

**Response:**  Assuming this proposed fact means Edgewood's February 22, 2019 lighting

application, undisputed that Rewey was one of the reviewers.


106.    Rewey approved the lighting application.  Hank Dep. at 33-34; Hank Dep. at 33-
34; Zylstra Dec., Ex. P, Dep. Ex. 3.

**Response:**  Undisputed in part, disputed in part.  Rewey conditionally approved his

portion of the lighting application, but did not have final say.  Rewey's supervisor, George Hank,

decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O.

§10.085(1) and (5)(b). Tucker Dep., dkt. #32, 44:23-48:3; Hank Dep., dkt. #30, 37:11-38:12.

M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if

installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection." Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12. M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3.  Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application. Tucker Dep., dkt. #32, 46:18-48:3; Hank Dep., dkt. #30, 37:22-38:24.  Hank was concerned about allowing Edgewood to make a large capital expenditure to install lighting when the City was contending that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

107.    Under § 10.085, the reviewing building inspector has no discretion; the technical standards for the lighting review are either met or not met.  Hank Dep. at 49-51.

**Response:**  Disputed. Hank testified that Rewey cannot vary the requirements or the specifications in §10.085 and the project either meets the standards or does not.  Hank Dep., dkt. #30, 50:18-51:2.  However, there is discretion in issuing permits for outdoor lighting  M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection." Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12.  M.G.O. §10.085(5)(b) also provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3.

108.    City employee Christina Thiele performed the zoning review on March 1, 2019. Hank Dep. at 72; Tucker Dep. at 34.

**Response:**  Disputed in part. Tucker testified that Thiele "advanced the workflow" on Edgewood's lighting application, which was a procedural step, but her action was not an approval of Edgewood's application nor did she review or was she aware of Edgewood's master plan. Tucker Dep. 34:21-35:3, 37:11-38:15, 39:8-40:9.  Thiele advanced the workflow because it was mandatory in the software.  *Id.*

109.    On March 1, Thiele approved the zoning review.  Hank Dep. at 33-34, 72; Zylstra Dec., Ex. P, Dep. Ex. 3 at 1.  Her zoning review was not deficient.  Tucker Dep. at 37.

**Response:**  Disputed in part. Tucker testified that Thiele "advanced the workflow" on Edgewood's lighting application, which was a procedural step, but her action was not an approval of Edgewood's application nor did she review or was she aware of Edgewood's master plan. Tucker Dep. 34:21-35:3, 37:11-38:15, 39:8-40:9.  Thiele advanced the workflow because it was mandatory in the software.  *Id.* Tucker stated that given the situation, her actions were not deficient but if looking at Exhibit 3 means that Thiele approved the application, then he would consider that a mistake because zoning review required review of the master plan.  Tucker also stated that it was an easy mistake to make because only Edgewood and University of Wisconsin had master plans that needed to be considered.  *Id.*

110.    Thiele stamped and signed "Final Approval Date" as of March 1, 2019 for the EHS light application.  Zylstra Dec., Ex. P, Dep. Ex. 3 at 3; Ingrisano Decl. ¶ 3, Ex. 2, Dep. Ex. 38 at 3; Tucker Dep. at 65-66.

**Response:**  Undisputed but with clarification that the application was not approved by Thiele.  Tucker testified that Thiele "advanced the workflow" on Edgewood's lighting application, which was a procedural step, but her action was not an approval of Edgewood's

44

application nor did she review or was she aware of Edgewood's master plan. Tucker Dep. 34:21-35:3, 37:11-38:15, 39:8-40:9.  Thiele advanced the workflow because it was mandatory in the software.  *Id.* Tucker stated that given the situation, her actions were not deficient but if looking at Exhibit 3 means that Thiele approved the application, then she did make a mistake.  Tucker also stated that it was an easy mistake to make because only Edgewood and University of Wisconsin had master plans that needed to be considered.  *Id.*

111.    On same day that Thiele approved the zoning review, Mr. Wautier received a communication between Mr. Tucker and a disgruntled Edgewood neighbor.  Wautier Decl. ¶ 13, Ex. 1.  In that communication, which asked about outdoor lighting for EHS's athletic field, Mr. Tucker took the same position as in his February 27, 2019 letter that M.G.O. Section 10.085 governed EHS's field lights.  Wautier Decl. ¶ 13, Ex. 1 at 4.

**Response:**  Disputed that Thiele approved the zoning review.  *See* response to PFF 109.  Undisputed that Mr. Wautier received a communication between Mr. Tucker and an Edgewood neighbor.  Disputed as to "disgruntled" as argumentative and not supported.  Disputed as vague that "Mr. Tucker took the same position" but undisputed that Tucker stated that exterior lighting must comply with M.G.O. § 10.085.

112.    EHS's approved outdoor lighting application was marked closed, which indicated that all reviews had been completed. Tucker Dep. at 32; Zylstra Dec., Ex. P, Dep. Ex. 3 at 1.

**Response:**  Disputed in part. Undisputed that the City's software shows status "closed" for Edgewood's outdoor lighting application.  The remaining portion is disputed. Tucker testified that such "is a workflow step" and that generally, but not as to Edgewood's application, it means reviews have been completed and the matter is advanced to allow other follow ups like permit issuance, construction, and inspection. Tucker Dep., dkt. #32, 32:12-33:5.  The question was specifically phrased to exclude Edgewood, which had a master plan.

113.    Outdoor lighting permits can be issued the same day as approval.  Tucker Dep. at 139.

**Response:**  Undisputed that Mr. Tucker testified "in theory," it could be possible if the permit was ready and there was no master plan in place but he testified that turnaround time varies. Tucker Dep., dkt. #32, 138:2-139:15.

114.    EHS's permit did not issue.  Tucker Dep. 44-45; Hank Dep. at 38.

**Response:**  Undisputed, assuming this refers to the February 27, 2019 lighting permit.

115.    After the lighting application was approved, the City changed its position.  Hank Dep. at 74-75; Tucker at 53-54.

**Response:**  Disputed in part.  The lighting application was not approved.  *See* Defendants response to PFF 106 and 109, incorporated by reference. Undisputed that after the February 27, 2019 letter, Hank decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b) and that such was change from the February 27th letter. Tucker Dep., dkt. #32, 44:23-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12.

116.    With a typical lighting application, after a lighting review approval and a zoning review approval, the application is considered granted and a permit is issued.  Tucker Dep. at 38. There has been no prior scenario where a lighting application's lighting review was approved, its zoning review was marked approved, and the permit did not issue.  Tucker Dep. at 39.

**Response:**  Undisputed in part and disputed in part.  The first sentence "is considered" is not supported by the citation and is disputed.  The testimony was that with a typical lighting application, after a lighting review approval and a zoning review approval, the application *has been* granted and a permit is issued. The second sentence is also somewhat disputed as the specific testimony was that there has been no prior scenario where a lighting application's

lighting review was approved, its zoning review "*was approved as marked*," and the permit did

not issue.  Tucker stated that this was a unique situation because only Edgewood and the

University of Wisconsin had master plans.  Tucker also indicated that there are certain special

conditions for property that the City has identified for its staff as unusual but Edgewood and UW

were not denoted as special property at the time but it would have helped Thiele if they had.

Tucker Dep., dkt. #32, 41;22-43:23.

117.    On March 8, a week after the application had been approved, in a phone call with
Mr. Wautier, Mr. Tucker advised that there be a problem with the height of the light poles
under the Master Plan and that the City may not be able to issue the permit.  Wautier Decl. ¶ 15.

**Response:**  Disputed.  Tucker Second Dec., ¶7. Also disputed that the application had

been approved.  *See* Defendants response to PFF 106 and 109, incorporated by reference.

118.    On March 12, 2019, Mr. Wautier wrote to John Strange.  Zylstra Dec., Ex. R,
Dep. Ex. 70; Elliott Dep. at 178-179.  In Mr. Wautier's objection letter he restated the prior
approval of the lighting application and his understanding that the City "is considering the
revocation of its prior approval of the complaint application based upon a *new* zoning
interpretation for the Edgewood Campus that light poles *of any* height are not allowed!"  Zylstra
Dec., Ex. R, Dep. Ex. 70 at 1 (emphasis original).

**Response:**  Undisputed that the letter so states but disputed as to the content.  *See* Mr.

Strange's letter responding.  Zylstra Dec., Ex. S, Dep. Ex. 71; Elliott Dep., dkt. #33, 180:6-11,

184:16-18.

119.    George Hank was the Director of the Building Inspection Division Director and
Tucker's supervisor.  Hank Dep. at 13, 16-17; Tucker Dep. at 9-10.

**Response:**  Undisputed.

120.    At some point after his February 27, 2019 letter in which he noted that the
lighting application would not need a Master Plan amendment, Messrs. Tucker, Strange and
Hank pulled out a "fine toothed comb" to take a very close and detailed look at the EHS Master
Plan.  Tucker Dep. at 54.

**Response:**  Undisputed that Messrs. Tucker, Strange and Hank took a very close and detailed look at the Edgewood master plan after the February 27, 2019 letter and that Mr. Tucker stated that before this time, he had "jumped around" the master plan without reading it in its entirety and that at this point, he read the master plan in its entirety, which he called a fine toothed comb method of review.

121.    George Hank, according to Mr. Tucker, wanted to stop EHS's light permit "in its tracks…" Tucker Dep. at 45-48.  According to Mr. Tucker, he was made aware of Hank's decision.  Tucker Dep. at 49.  Hank doesn't know when that decision was made.  Hank Dep. at 74.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  The first sentence is not supported by the citation and is therefore, disputed. The second sentence is incomplete in that Tucker said he was made aware but then Tucker continued his answer and stated that he was probably part of the conversation because it would be unusual for him not to be.  Tucker Dep., Dkt. #32, 49:18-50:1.  As to the third sentence, Hank stated that "[a]s to a specific date," he did not know when that date was, not that he generally did not know when the decision was made.  Hank Dep., dkt. #30, 74:15-20.

122.    According to Hank, Mr. Tucker and Hank discussed the light permit and "it was our belief that we should withhold it…"  Hank Dep. at 55.

**Response:**  Undisputed.

123.    Mr. Tucker was the source of Hank's interpretation of the Master Plan.  Hank Dep. at 46.

**Response:**  Undisputed in part, disputed in part. Undisputed that Tucker was *a* source of Hank's interpretation but disputed that he was the only source as Hank testified that he read parts of Edgewood's master plan.  Hank Dep., dkt. #30, 46:19-47:4.

124.    Hank's rationale for withholding the permit was limited to the uses outlined in the Open Spaces section of EHS's Master Plan.  Hank Dep. at 81, 84-86.

**Response:**  Disputed.  Hank also testified that he was concerned that allowing Edgewood to make a large capital expenditure to install lighting when the City was contending that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

125.    Even under the new interpretation that the Master Plan used to withhold lights, Hank and City recognize that there was at least one permitted use for the athletic field – team practices – for which the outdoor lights could have been permissibly used.  Hank Dep. at 63-65.

**Response:**  Disputed.  Dispute as argumentative "Even under the new interpretation that the Master Plan used to withhold lights." *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings."). Further Hank testified that he was not intimately familiar with the master plan and that there were better persons at the City to ask whether there are provisions in the master plan that would preclude lights for team practices. Hank Dep., dkt. #30, 64:1-64:21. As Assistant City Attorney John Strange explained, stadium lights like Edgewood sought were capital improvements that required an amendment to the master plan regardless if used only for practices.  Zylstra Dec., Ex. S, Dep. Ex. 71 at 4; Elliott Dep., dkt. #33, 184:16-18.  Thus, the stadium lights were never in compliance with the zoning code.  *Id.*  Further, Edgewood told the City expressly that the lights were for night games, not practices.  At the time that it submitted its lighting application, Elliott wrote to the "Edgewood Family" and included a "Frequently Asked Questions" document in which Edgewood indicated

49

that if it would host night games at its athletic field if the City issued the lighting permit. Zylstra

Dec., Ex. O, Dep. Ex. 6 at 3, 5; Elliott Dep., dkt. #33, 171:12- 172:2, 174:23-175:16.  There was

no mention of using the lights for team practices.  *Id.*

126.    Nevertheless, Hank's concern was that if the City issued the permit but restricted
EHS from playing games on its field, that EHS would be upset at his department for granting the
application and allowing less than full use of the field.  Hank Dep. at 61.  According to Hank,
this was the only reason – the risk that EHS would have unmet expectations that it could hold
night games – for withholding the permit.  Hank Dep. at 61.

**Response:**  Undisputed in part, disputed in part.  "Nevertheless" is disputed as

argumentative.  The remaining portion of the first sentence is undisputed.  The second sentence

is disputed as stated as Hank had already testified in his deposition about other reasons.  Hank

testified that the permit was not issued because the language of Edgewood's Master Plan was

inconsistent with its lighting application. Hank Dep., #30, 37:22-38:12; *see also* Tucker Dep.,

dkt. #32, 46:18-48:3. Hank also testified that he was concerned about allowing Edgewood to

make a large capital expenditure to install lighting when the City was contending that Edgewood

could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

127.    Hank claims that the decision to withhold EHS's permit was in part motivated by
a desire to protect EHS.  Hank Dep. at 62.

**Response:**  Undisputed with clarification on rule of completeness that Hank testified:

Q.  So is it your testimony today, sir, that the decision to withhold the permit
from Edgewood was to protect Edgewood?

MS. ZYLSTRA:  Object to form.  You can answer.

A.  Partly.  And also allowing them to do it – I think by doing it, tacit approval
that they can use the lights as much as we say, no, you can't.

128.    Outdoor lighting permits can also be issued subject to conditions. Hank Dep. at
37.  The City could issue notices or citations if EHS violated or exceeded those conditions.  Hank
Dep. at 66.  Issuing an official notice or citation would have been productive and would have

created an opportunity for an appeal that would have moved this issue forward.  Tucker Dep. at 137.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  Disputed.  The first and second sentences are not supported by the proposed citations.  The third sentence does not correctly characterize Tucker's testimony as he was not asked about a future event or it as a general statement.  He was asked specifically about Edgewood's notices and testified:

> Q.  Is part of advancing -- was issuing Edgewood notices, official notices for hosting games on the field, was that part of an effort to advance and resolve this issue, was that viewed as being a productive use of the city's time?
>
> MS. ZYLSTRA:  Objection.  Form, foundation. You can answer.
>
> A.  Getting resolution to what the city believes is a violation is a productive use of our time.  And issuing an official notice, which is basically like a warning, can both sort of compel projects along, but it also creates opportunities for appeal, which would further things along.

Tucker Dep., dkt. #32, 136:25-137:12.

129.    No other outdoor light permits have been denied to a Madison area school from 2013 to the present; EHS is the only one.  Hank Dep. at 182.

**Response:**  Undisputed with clarification that Hank testified that *he* was not aware of any outdoor lighting permits that were denied to another Madison area school.

130.    Hank had never before consulted with a City Attorney to discuss an outdoor light application.  Hank Dep. at 49.

**Response:**  Undisputed with the clarification that Hank testified that he could not recall consulting with the City Attorney on a lighting application.

131.    There are no other public or private schools with athletic fields that were not permitted to host athletic contests on those fields.  Hank Dep. at 183.

**Response:**  Undisputed that Hank testified that he was not aware of any.

132.    According to the City, an "athletic contest" is a "competition between two teams." Hank Dep. at 90-92.  Under this definition, practices also include elements of "athletic contests." See Hank Dep. at 88; Elliott Decl. ¶ 30.  Under the City's interpretation, scoreboards are beneficial for practice, but lights are not.  Hank Dep. at 88-91.

**Response:**  Disputed. "According to the City" is disputed as Hank was not a Rule 30(b)(6) witness. The first sentence is not supported by the cited reference.  The second sentence is also not supported by the cited reference.  The Hank testimony at pages 88-91 do not support plaintiff's third sentence, which is also argumentative.

133.    The treatment of EHS's lighting application stands in contrast to that of Madison James Madison Memorial High School.  On August 17, 2018, Memorial High School submitted a lighting application for outdoor lights for its athletic field. Hank Dep. at 29-30; Zylstra Dec., Ex. MM, Dep. Ex. 2.

**Response:**  Disputed in part, undisputed in part. Undisputed that on August 17, 2018, Memorial High School submitting a lighting application for its athletic field, which application was to replace the existing 6 light poles with 4 light poles.  Hank Dep., dkt. #30, 29:18-30:2; Tucker Dep., dkt. #32, 78:10-17; Zylstra Dec., Ex. MM, Dep. Ex. 2; Tucker Dec., ¶21.  Disputed that Edgewood's application stands in contrast as unsupported.  Unlike Edgewood, Memorial High School has never had a master plan. Zylstra Dec., Ex. NN, RTA 11; Tucker Dec., ¶21. Memorial also has had lights on its athletic field going back to the 1970s. Tucker Dec., ¶21.  In addition, in 2015, when Edgewood replaced its old track with a new track, the City told Edgewood that because it was simply exchanging the current track with a new track, the City would classify that as a replacement or a maintenance, which would allow Edgewood to complete the project without amending its master plan. Elliott Dep., dkt. #33, 128:21-129:19;

Tucker Dec., ¶21.  The City treated Memorial and Edgewood the same when it was replacing existing improvements but Edgewood's lighting application was a new improvement and Edgewood had a master plan.  Tucker Dep., dkt. #32, 78:10-17.

134.    Memorial's proposed lighting was still required to meet the technical specifications of M.G.O. Section 10.085.  Tucker Dep. at 143-144.

**Response:**  Undisputed.

135.    Memorial's lighting application was reviewed and approved.  Tucker Dep. at 78. A permit was issued a week later.  Hank Dep. at 40-41.

**Response:**  Undisputed.

136.    Both Memorial and EHS are zoned Campus Institutional District.  APFOF 61. The City's only distinction made now between the Memorial and EHS lighting applications was the existence of EHS's Master Plan.  Tucker Dep. at 144.  According to Mr. Tucker, If EHS had never adopted a Master Plan, its lighting application would have been judged under the same standards as Memorial. Tucker Dep. at 144.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  The first sentence is not supported by the citation but is generally undisputed. The second sentence is disputed.  Tucker previously testified in his deposition that it was also because Memorial already had lights so it was a pre-existing use and it was simply a replacement, rather than a new structure/use.  Tucker Dep., dkt. #32, 78:10-17, 143:2-18.  The third sentence is undisputed.

137.    Again, this is a change from its position expressed in January 2019 and February 27, 2019.  APFOF 92, 97-99, 103, 110, 115.

**Response:**  Object and dispute. This proposed fact is unclear and vague and cannot be answered because of its unclarity.  It is not a properly proposed fact.

138.   In reviewing and analyzing EHS's lighting application, Mr. Tucker went beyond the four corners of the lighting application to determine EHS's intended use of the lights.  Hank Dep. at 142.  The City did not look beyond the four corners of the materials submitted by Memorial in its lighting application.  Hank Dep. at 142.

**Response:**  Undisputed with clarification that such was required because Edgewood had a master plan and Memorial did not.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 12 of 228; Hank Dep., dkt. #30, dkt. #30, 82:1-9; Zylstra Dec., Ex. NN, RTA 11; Tucker Dec., ¶21.

139.   Typically, when a permit is denied, the City sends a denial letter setting forth the reasons and providing the applicant an opportunity to address whatever issue led to the denial.  Hank Dep. at 42.  The City never provided EHS a denial letter.  Elliott Decl. ¶ 38; Wautier Decl. ¶ 16.

**Response:**  Undisputed in part, disputed in part.  The first sentence is undisputed.  The second sentence is disputed.  *See* Assistant City Attorney John Strange's letter to Atty. Wautier dated March 21, 2019. Zylstra Dec., Ex. S, Dep. Ex. 71; Elliott Dep., dkt. #33, 180:6-11, 184:16-18.

140.   In the Spring of 2019, the City acted upon its interpretation that the EHS Master Plan prohibited the use of the Goodman Athletic Complex for "athletic competitions."  Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.  The City sent an inspector to observe and after he witnessed athletic contests being held on Edgewood's field, the inspector issued Official Notices of Violation to Edgewood.  Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.

**Response:**  Disputed in part, undisputed in part. The first sentence is disputed and not supported by the cited evidence.  The second sentence is undisputed.

141.   The notices asserted that EHS violated Section 28.097 by holding "athletic contests" on its athletic field, on the grounds that "[t]he Campus Master Plan states that the athletic field is used for team practices and physical education classes."  Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.

**Response:**  Undisputed.

142.    These "violations" included the playing of high-school girls' soccer games, a boys' lacrosse game, and a track meet.  Elliott Decl. ¶ 40.

**Response:**  Undisputed.

143.    The notices also stated that "[a]ny person violating any provision of the City Ordinances enforced by the Building Inspection Division is subject to the penalties provided by the appropriate Ordinance violated."  Zylstra Decl., Ex. T, Dep. Ex. 9, 11; Hank Dep. at 102, 129-130.

**Response:**  Undisputed.

144.    After the Notices of Violation were issued, certain neighbors were making public statements that EHS was breaking the law by holding games.  Elliott Decl. ¶ 41.  Mr. Elliott saw stories to that effect in the newspaper and on the television.  Elliott Decl. ¶ 41.  EHS was greatly concerned that it was suffering reputational harm because of these notices.  EHS further lost donations from donors who believed that EHS was openly violating the law by hosting games on its athletic field.  Elliott Decl. ¶ 41.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.

*Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions

within a single paragraph because court requires "each paragraph shall state only one factual

proposition").  Disputed. The proposed facts are hearsay and are without foundation. Edgewood

has not produced or cited to any such newspaper articles in discovery or in the declaration, but

even if it had, there is no foundation that Edgewood suffered any reputational harm.  Elliott has

not brought forth any evidence on why that would be so.  Edgewood has also not provided nay

information on donors and any loss of donors, and to have knowledge about a loss of a donor, by

definition, would be hearsay.

145.     None of the other schools located in the Campus-Institutional District, with or without a master plan, have received a zoning violation or were alleged to be in violation of the City's Zoning Code for hosting "athletic contests" on their athletic fields.  Hank Dep. at 183.

**Response:**  Disputed as not supported by the cited evidence.

146.     Hank admits that his department had discretion to decline enforcement of technical violations of the Master Plan.  Hank Dep. at 117.  Some violations would be "beneath our notice" and would not result in official notices or citations.  Hank Dep. at 117-121.

**Response:**  Undisputed with clarification that he referred to a "purely technical violation" that was "so minuscule" as to be "beneath our notice."

147.     In issuing notices of violations or citations, Hank, as the Building Inspection Division Director, has discretion not to enforce violations that other directors in his position might themselves choose to enforce.  Hank Dep. at 117-121, 125-128.

**Response:**  Disputed in part. His actual testimony was:

> Q.  Do you agree with me that there might be some directors of the building inspection department that might take a different view of what falls beneath their notice than you have?

> MS. ZYLSTRA:  Objection.  Form, foundation.

> A.  Sure, of course.

Plaintiff is unfairly cobbling together different portions of testimony to create an inference that was not testified to.

148.     Mr. Tucker, now the current Building Inspection Division Director, agrees with Hank's formulation of the department's "beneath our notice" discretion.  Tucker Dep. at 9-10, 172.

**Response:**  Undisputed with clarification that Tucker said he agreed with how Hank described it.

149.     EHS timely appealed the violation notices to the Zoning Board of Appeals ("ZBA") on May 31, 2019.  Zylstra Decl., Ex. U, Dep. Ex. 74.

**Response:**  Undisputed.


150.    On July 11, 2019, the ZBA held a duly noticed public hearing on EHS's appeal.
Zylstra Decl., Ex. V, Dep. Ex. 76.

**Response:**  Undisputed.


151.    At the ZBA hearing, EHS argued that the EHS Master Plan did not waive EHS's
right to continue hosting "athletic contests on its athletic field" or from using its athletic field for
other activities related to its primary mission.  Zylstra Decl., Ex. V, Dep. Ex. 76.

**Response:**  Defendants object that plaintiff has cited Deposition Exhibit 76, which is a

246-page transcript and plaintiff has not provided a pinpoint citation.  Undisputed that Edgewood

generally argued that it did not need to amend its master plan to play games on its field.


152.    The University of Wisconsin-Madison ("UW") is the only other institution zoned
Campus Institutional District that has adopted a master plan.  Hank Dep. at 177.

**Response:**  Undisputed.


153.    The City agrees that uses of buildings and spaces identified in the UW's Master
Plan are subject to the same zoning and interpretative standards as for EHS's Master Plan.
Tucker Dep. at 193.

**Response:**  Disputed.  The cited Tucker testimony is more limited.  He testified:

> Q.  But you would agree that under the standards that you have identified here
> today for what's required in the master plan, that if a space is identified for a
> particular use in the master plan it cannot be used for a different purpose; is that
> right?
>
>     MS. ZYLSTRA:  Object to form.
>
> A.  It should be used consistent with the language in the master plan.  I would say
> yes.  And that's what we would expect to see.  So a different use would probably
> be a violation, yes.

Tucker Dep., dkt. #32, 193:14-23.

154.    Buildings and spaces identified for a particular use in the UW Master Plan that are used for a different purpose would "probably" be a violation.  Tucker Dep. at 193.

**Response:**  Disputed in part. The cited evidence does not refer to buildings.  *See* Response to PFF 153.

155.    The City has made no effort to confirm whether UW is using its athletics or sports and recreational facilities or open spaces as they are described in its Master Plan.  Tucker Dep at 193.

**Response:**  Undisputed with clarification that Tucker said that the City responds to complaints and there has not been any complaints filed against UW.  Tucker Dep., dkt. #32, 193:7-13.

156.    In its Master Plan, the UW describes one of its facilities as the "Goodman Softball Practice Facility."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 72.

**Response:**  Undisputed that those words appear on a map in the master plan at page 72 but with clarification that the indoor practice facility is different that the Goodman Field, which can be seen on the map at page 72 as well as other depictions of both on pages 324 and 325.

157.    The City, however, is on notice that this space, however, may be used to host athletic competitions – UW softball games.  Ingrisano Decl. ¶ 4, Ex. 3.[2]

---

[2] In the event of objection to these materials, this Court may properly take judicial notice.  *See In re Copper Market*, 2003 WL 22495750 *2 (W.D.Wis. August 20, 2003)("Although it would be improper to take judicial notice of the contents of the articles for their truth because the truthfulness of the reports is not something "capable of accurate and ready determination," I can take judicial notice of the fact that the articles were published and that they contained information about defendants, solely for the purpose of determining whether the articles would have given a reader reason to make further inquiry into defendants' liability for antitrust violations.")  Accordingly, the Court can take judicial notice of the fact that articles were published and for the purpose of determining whether the articles would have given a City employee reason to make further inquiry into the UW's use of its facilities in conformance with the UW Master Plan.  With respect to web content maintained by the University of Wisconsin, as a public institution, Plaintiff contends that this Court can take judicial notice of those items as well under Fed.R. Evid. 201(b) and (d).

**Response:**  Disputed.  First, Defendants incorporate its response to PFF 156.  Second, the City is "on notice" of what is in UW's master plan, which includes reference Goodman Field being used to host competitions and large sporting events.  On page 325 of the University's Master Plan, it states "The Event Center Neighborhood is composed of a series of athletic competition and practice fields, campus greens, and plaza spaces."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 325. That page also depicts Goodman Field as part of the Event Center Neighborhood. *Id.*  That page also refers to "[b]oth competition and non-competition synthetic turf athletic fields" next to a picture of the Goodman field.  In its landscaping section, the University made reference to its "large sporting events" on the same page where it depicted the Goodman field (p.324). The University's Master Plan noted that "events" were currently being held at Goodman field (page 319).  There is no evidence that the indoor practice facility hosts games.  Defendants also object and dispute plaintiff's footnote to its proposed fact that the Court can take judicial notice of newspaper articles to try to impute knowledge to the City.  The Ingrisano declaration is without foundation.  Further, even the case plaintiff cites, *In re Copper Market*, 2003 WL 22495750 *2 (W.D. Wis. August 20, 2003), demonstrates plaintiff's request is improper. *Copper Market* states "Although it would be improper to take judicial notice of the contents of the articles for their truth because the truthfulness of the reports is not something 'capable of accurate and ready determination,' I can take judicial notice of the fact that the articles were published…." Here, plaintiff is not seeking to have the court take judicial notice just to show the article was published, Edgewood wants the court to admit the veracity of the information ***in*** the article, and not only that, but ***assume*** that City officials read them, and ***assume*** that City officials would know that the information was inconsistent (as plaintiff alleges) with information provided in UW's 432-page master plan! And what is ironic is that plaintiff did ask George Hank

about UW's Goodman Softball Complex to which he responded that he had never been there.
Hank Dep., dkt. #30, 180:18-20.  Plaintiff never asked Tucker.  Finally, defendants also object
because none of these articles that are attached to counsel's declaration have even been produced
in discovery.  Zylstra Second Dec., ¶3.

158.    In its Master Plan, the UW describes the building use of one of its facilities, the
Natatorium, as for "Rec Sports."   Zylstra Dec., Ex. OO, Dep. Ex. 46 at 137.

**Response:**  Undisputed that those words appear on page 137 but under rule of
completeness, the master plan includes as one of its intended projects for its ten-year plan,
constructing a new Natatorium facility that would be much larger but built on the same site.
Zylstra Dec., Ex. OO, Dep. Ex. 46 at 126.

159.    That space, however, is used to host athletic competitions, including high school
varsity swimming and diving championship competitions.  Ingrisano Decl. ¶ 5, Ex. 4.[3]

**Response:**  Disputed.  The Ingrisano declaration is without foundation and defendants
object and dispute that the Court can take judicial notice of newspaper articles to try to impute
knowledge to the City.  Even the case plaintiff cites, *In re Copper Market*, 2003 WL 22495750
*2 (W.D. Wis. August 20, 2003), demonstrates plaintiff's request is improper.  *Copper Market*
states "Although it would be improper to take judicial notice of the contents of the articles for
their truth because the truthfulness of the reports is not something 'capable of accurate and ready
determination,' I can take judicial notice of the fact that the articles were published…."  Here,
plaintiff is not seeking to have the court take judicial notice just to show the article was
published, Edgewood wants the court to admit the veracity of the information ***in*** the article, and
not only that, but ***assume*** that City officials read them, and ***assume*** that City officials would

---

[3] See fn 1.

know that the information was inconsistent (as plaintiff alleges) with information provided in

UW's 432-page master plan! Plaintiff never asked Tucker or Hank about these articles.

Moreover, defendants also object because none of these articles that are attached to counsel's

declaration have even been produced in discovery.  Zylstra Second Dec., ¶3.

160.    In its Master Plan, the UW describes the building use of one of its projects, the
Nielsen Tennis Stadium Expansion as for "Athletics."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 136.

**Response:**  Undisputed that those words appear in a chart at page 136 but under rule of

completeness, the facility is described differently in the text.  On page 325 of the University's

Master Plan, it states "The Event Center Neighborhood is composed of a series of athletic

competition and practice fields, campus greens, and plaza spaces."  Zylstra Dec., Ex. OO, Dep.

Ex. 46 at 325. That page also depicts the Nielsen Tennis Center as part of the Event Center

Neighborhood. *Id.*  That page also refers to "[b]oth competition and non-competition synthetic

turf athletic fields" next to a picture of the Nielsen Tennis Center.  In its landscaping section, the

University made reference to its "large sporting events" on the same page where it depicted the

Nielsen Tennis Center (p.324).  The University's Master Plan noted that "events" were currently

being held at Nielsen Tennis Stadium (page 319).

161.    That building, however, has been used for high school athletic competitions,
instructional camps and clinics, and private tennis lessons.  Ingrisano Decl. ¶ 6, Ex. 5.[4]

**Response:**  Disputed as unsupported.  First, Defendants incorporate its response to PFF

160.  Second, the Ingrisano declaration is without foundation and defendants object and dispute

that the Court can take judicial notice of newspaper articles to try to impute knowledge to the

_____

[4] See fn 1.

City.  Even the case plaintiff cites, *In re Copper Market*, 2003 WL 22495750 *2 (W.D. Wis. August 20, 2003), demonstrates plaintiff's request is improper.  *Copper Market* states "Although it would be improper to take judicial notice of the contents of the articles for their truth because the truthfulness of the reports is not something 'capable of accurate and ready determination,' I can take judicial notice of the fact that the articles were published…." Here, plaintiff is not seeking to have the court take judicial notice just to show the article was published, Edgewood wants the court to admit the veracity of the information *in* the article, and not only that, but *assume* that City officials read them, and *assume* that City officials would know that the information was inconsistent (as plaintiff alleges) with information provided in UW's 432-page master plan! Plaintiff never asked Tucker or Hank about these articles.  Moreover, defendants also object because none of these articles that are attached to counsel's declaration have even been produced in discovery.  Zylstra Second Dec., ¶3.

162.    The UW Master Plan identifies the "Near West Fields" as "recreation fields" and indicates that they would be upgraded "to create five synthetic turf flag football fields and one championship soccer field."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 126.

**Response:**  Undisputed.

163.    That space, however, is elsewhere identified by UW as used for baseball, softball, lacrosse, rugby, "and more."  Ingrisano Decl. ¶ 7, Ex. 6.[4]

**Response:**  Disputed as unsupported.  The Ingrisano declaration is without foundation and defendants object and dispute that the Court can take judicial notice of newspaper articles to try to impute knowledge to the City.  Even the case plaintiff cites, *In re Copper Market*, 2003 WL 22495750 *2 (W.D. Wis. August 20, 2003), demonstrates plaintiff's request is improper. *Copper Market* states "Although it would be improper to take judicial notice of the contents of the articles for their truth because the truthfulness of the reports is not something 'capable of

accurate and ready determination,' I can take judicial notice of the fact that the articles were published…." Here, plaintiff is not seeking to have the court take judicial notice just to show the article was published, Edgewood wants the court to admit the veracity of the information *in* the article, and not only that, but *assume* that City officials read them, and *assume* that City officials would know that the information was inconsistent (as plaintiff alleges) with information provided in UW's 432-page master plan! Plaintiff never asked Tucker or Hank about these articles.  Moreover, defendants also object because none of these articles that are attached to counsel's declaration have even been produced in discovery.  Zylstra Second Dec., ¶3.

164.    The City contends that it need not compare UW's Master Plan to its actual use because zoning enforcement is complaint-based, i.e., that the City reviews issues in response to actual complaints.  Tucker Dep at 193.

**Response:**  Disputed as stated given plaintiff's characterization.  The cite testimony was:

Q.  Has there ever been any effort by the city to confirm whether UW is using its athletics and sports recreational facilities or open spaces as they are described in its master plan?
A.  We respond to complaints.  We haven't received any complaints, so we haven't investigated to the best of my knowledge.

Tucker Dep., dkt. #32, 193:7-13.

165.    However, prior to Mr. Tucker's October 2018 email and related review setting forth his restrictive interpretation of the EHS Master Plan, Mr. Tucker had received no complaints about EHS's use of its field.  Tucker Dep. at 188.

**Response:**  Disputed.  Tucker testified that he did not recall, not that there were none.  In response to whether complaints were raised about Edgewood at the October 17 meeting, he said "I don't recall.  I honestly can't -- there was a lot of people that spoke. I don't recall what their speaking was at the meeting." Tucker Dep. 188:6-8.

166.     Examples of UW's use of buildings and spaces inconsistent with how they are described in its Master Plan was raised at the ZBA hearing, putting the City on notice.  Zylstra Decl., Ex. V, Dep. Ex. 76 at 37-40.

**Response:**  Disputed in part. Undisputed that Edgewood *argued* that UW's use of certain spaces was inconsistent with UW's Plan at the ZBA hearing but disputed that UW's use *is* inconsistent.  Defendants incorporate their responses to PFF 156 and 160, which demonstrate the consistency of UW's use with its master plan.

167.     Mr. Tucker and the City have not reviewed UW's adherence to its Master Plan. Tucker Dep. at 193.

**Response:**  Undisputed.

168.     On July 11, 2019, the Zoning Board of Appeals voted to affirm the decision of the Zoning Administrator.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 246-247.

**Response:**  Undisputed.

169.     On July 12, 2019, then City Attorney Michael P. May wrote a letter to Edgewood's counsel. Zylstra Decl., Ex. W, Dep. Ex. 12.  In the letter, the City invited EHS to file to terminate its Master Plan and return to the standard CI zoning."  Zylstra Decl., Ex. W, Dep. Ex. 12 at 1.

**Response:**  Undisputed.

170.     According to the City Attorney, a return to CI zoning would place EHS on equal footing with other high schools.  Zylstra Decl., Ex. W, Dep. Ex. 12 at 1.

**Response:**  Undisputed.

171.     After receiving May's July 12, 2019 letter, Messrs. Wautier and Strange discuss EHS's options with respect to the Master Plan.  Wautier Decl. ¶ 17.  At Mr. Wautier's request, Mr. Strange summarized the options in an email to Mr. Wautier dated July 17, 2019.  Wautier Decl. ¶ 17., Ingrisano Decl. ¶ 14, Ex. 13, Dep. Ex.  23.

**Response:**  Undisputed with clarification, Strange was asked to "describe the legal avenues for permitting games and lights under the Cl District Ordinance."  Ingrisano Decl. ¶ 14, Ex. 13, Dep. Ex. 23.

172.    Mr. Strange confirmed that one option would be for the EHS to seek to repeal its Master Plan.  Wautier Decl. ¶ 17, Ingrisano Decl. ¶ 14, Ex. 13, Dep. Ex. 23.

**Response:**  Undisputed.

173.    Mr. Strange also confirmed the City's position that by repealing the Master Plan, Edgewood would revert to the standard regulations of the CI District in the zoning code, "which would allow games and lights at the field."  Wautier Decl. ¶ 17, Ingrisano Decl. ¶ 14, Ex. 13, Dep. Ex. 23.

**Response:**  Disputed in part.  Undisputed that Strange wrote "As a consequence of repealing its Master Plan, Edgewood would revert to the standard regulations of the Cl District in the zoning code, which would allow games and lights at the field."  Dispute that "Mr. Strange also confirmed the City's position that by repealing the Master Plan." Strange only described what would occur under then current ordinances not "the City's position."

174.    On July 29, 2019, in reliance on the City's representations, EHS accepted the City's invitation and, with Edgewood College and the Campus School, formally requested the immediate repeal of the Edgewood Campus Master Plan.  Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep. at 205-206.

**Response:**  Disputed in part.  Undisputed that on July 29, 2019, Edgewood's counsel sent a letter to the Mayor, stating "Please accept this letter as the Edgewood school's formal request and consent for the mayor to sponsor an ordinance for immediate repeal of ORD-14-00082 which established [Edgewood's] ten-year campus master plan." Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep., dkt. #33, 205:3-206:9.  The statement "in reliance on the City's representations" is unsupported by the cited evidence and is disputed.

175.     The repeal of EHS's Master Plan was referred to the Common Council for introduction by the City Attorney's Office on July 30 and was scheduled to be introduced at the August 6, 2019 Common Council meeting.  Ingrisano Decl. ¶ 8, Ex. 7, Dep. Ex. 21; Evers Dep. at 128-129.

**Response:**  Undisputed.

176.     On August 1, 2019, the Capital Times published an article on EHS's July 29 request to terminate its Master Plan.  Ingrisano Decl. ¶ 9, Ex. 8.[5]

**Response:**  Disputed.  The Ingrisano declaration is without foundation and defendants object and dispute to the footnote in the proposed fact that the Court can take judicial notice of newspaper articles to try to impute knowledge to the City.  Here, plaintiff is not seeking to have the court take judicial notice just to show the article was published, Edgewood wants the court to admit the veracity of the information in the article, and not only that, but *assume* that a City Alder read the article and was aware of the information in it.  And what is worse, plaintiff never asked Alder Evers about this article despite deposing him for an entire day.  Moreover, defendants also object because this article attached to counsel's declaration has never even been produced in discovery.  Zylstra Second Dec., ¶3.

177.     In the article, City Attorney Michael May again reiterates that repealing the Master Plan will result in EHS being treated the same as other schools:  "They've always been complaining to us that the real problem is that they're being treated differently than the other high schools, so I told them, 'You want to be treated the same as the other schools; have your master plan repealed."  Ingrisano Decl. ¶ 9, Ex. 8 at 4.

---

[5] See fn 1.  If objected to, this Court can take judicial notice that the article was published and for the purpose of determining whether the article would have given a Evers notice of the EHS repeal's referral to the August 6, 2019 Common Council meeting.

**Response:**  Disputed in part.  The Ingrisano declaration is without foundation and defendants object and dispute that the Court can take judicial notice of newspaper articles to try to impute knowledge to the City.  Here, plaintiff is not seeking to have the court take judicial notice just to show the article was published, Edgewood wants the court to admit the veracity of the information in the article, and not only that, but *assume* that City alders read the article and was aware of the information in it.  And what is worse, plaintiff never asked Alder Evers about this article despite deposing him for an entire day.  Moreover, defendants also object because this article attached to counsel's declaration has never even been produced in discovery.  Zylstra Second Dec., ¶3.  Undisputed that Attorney May invited Edgewood to repeal its master plan.

178.    Alder Tag Evers was aware of EHS's request to repeal its Master Plan.  Mr. Evers Dep. at 129.  In the Capital Times article, Mr. Evers was reported to say that "[i]f the city repeals the Master Plan, Mr. Evers said it would be easier for Edgewood to put up lights and amplified sound than to get new signs approved."  Ingrisano Decl. ¶ 9, Ex. 8 at 4.

**Response:**  Disputed in part.  The first sentence is undisputed but with clarification that there is no timing assigned to the sentence so it is undisputed that at some point in time, Alder Evers was aware of Edgewood's repeal request. As to the remaining, the Ingrisano declaration is without foundation and defendants object and dispute that the Court can take judicial notice of newspaper articles to try to impute knowledge to the City.  Here, plaintiff is not seeking to have the court take judicial notice just to show the article was published, Edgewood wants the court to admit the veracity of the information in the article.  Further the matter attributable to Alder Evers is not even in quotes and what is worse, plaintiff never asked Alder Evers about this article despite deposing him for an entire day.  Moreover, defendants also object because this article attached to counsel's declaration has never even been produced in discovery.  Zylstra Second Dec., ¶3.

179.     Alder Tag Evers is the City of Madison Alder on the Common Council for the 13th District.  Evers Dep. at 8.  He was first elected to that position in April of 2019.  Evers Dep. at 15.

**Response:**  Undisputed.

180.     As a neighbor of the Edgewood campus and as the District 13 Alder, Mr. Evers has opposed EHS's development of its athletic field.  Elliott Decl. ¶ 42.  Mr. Evers campaigned on the issue of Edgewood's field and at all times has been opposed to its further development. Evers Dep. at 16-17.

**Response:**  Disputed in part.  Evers campaigned on and has been opposed to nights games as "an incompatible use relative to the impacts that would be experienced by adjacent neighbors."  Evers Dep., dkt. #31, 16:19-17:2.  He did not state that he was opposed to "further development" and that is disputed as unsupported by the citation.  In fact, Alder Evers voted in favor of Edgewood's two-story commons addition, which Edgewood sought in September of 2021.  Elliott Dep., dkt. #33, 260:24-261:19; Zylstra Dec., Ex. KK, Dep. Ex. 93; Evers Dec., ¶10.

181.     Mr. Evers served an advisory role to a group calling itself "No New Stadium." Evers Dep. at 23.  No New Stadium has maintained a website critical of EHS and opposing its development of the Goodman Athletic Complex.  Elliott Decl. ¶ 42.  Mr. Evers shares No New Stadium's opinion on EHS's field and is aware of no areas of disagreement.  Evers Dep. at 25.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  Disputed in part, undisputed in part.  The first sentence is undisputed.  The second sentence is hearsay and Elliott does not have foundation but for purposes of summary judgment, undisputed.  The third sentence is disputed as not supported by the cited evidence.

182.     Although EHS is one of Mr. Evers' constituents in his district, he has only been on the high school campus once and has never even taken a tour.  Evers Dep. at 60-62; Elliott Decl. ¶ 42.

**Response:**  Disputed in part.  Evers testified that he had been on the Edgewood college campus numerous times and only recalled being on the high school campus once but there is only one "campus" as Edgewood presented in its master plan.  Zylstra Dec., Ex. A, Dep. Ex. 7 at 12 of 228.

183.     After EHS's July 29, 2019 request to repeal its Master Plan, and during the first week of August, Mr. Evers contacted Mr. Strange to discuss Campus Institutional District zoning.  Evers Dep. at 89, 102; APFOF 171.

**Response:**  Disputed in part, undisputed in part.  Undisputed that during the first week of August, Mr. Evers contacted Mr. Strange to discuss Campus Institutional District zoning. Disputed as not supported by the cited evidence that such was after Edgewood's July 29, 2019 request to repeal its master plan.  The first week in August in 2019 ran from July 28 to August 3.

184.     Mr. Evers called Mr. Strange to address what could be done with the "flaws" in the zoning ordinance – perceived flaws that would allow landowners "to proceed with significant change of use that would be in contrast" with the purposes of the Campus Institutional District. Evers Dep. at 87-88, 91.

**Response:**  Undisputed in part, disputed in part. "Perceived" is not contained in the cited evidence, is argumentative and disputed.  The remaining portion of the proposed fact is undisputed.

185.     The EHS field lights "debate pointed to these flaws."  Evers Dep. at 93.  Indeed, the EHS athletic field and lights issue was the only actual or active controversy that pointed to these flaws and the need for a change.  Evers Dep. at 93-94.

**Response:**  Undisputed in part, disputed in part. The first sentence is undisputed.  The second sentence is disputed and contrary to the cited evidence.  Alder Evers testified:

Q. You are not aware of any other actual controversy involving a Campus- Institutional zone district that highlighted this issue; is that correct?

A. Not entirely so, because there were --there were residents in district -- in the District 5 aldermanic district where West High School, where there was some concern. This came up during the campaign. There was apparently a move that said, well, West High should be able -- should put up lights and have a stadium, which obviously would have been opposed by nearby neighbors.

Evers Dep., dkt. #31, 94:9-18.

186.    Mr. Strange advised the ordinance could be amended.  Evers Dep. at 87-89.  Mr. Evers instructed him to proceed with drafting an amended ordinance.  Evers Dep. at 87-89.

**Response:**  Undisputed.

187.    Mr. Evers intended that his amendment would require EHS to go through a conditional use or Master Plan amendment process in order to get lights.  Evers Dep. at 97-99.

**Response:**  Disputed in part.  Evers did not testify that he "intended that his amendment." It was not "Evers' amendment," and such is argumentative.  *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12. Undisputed that Evers testified that he wanted Edgewood to go through conditional use or Master Plan amendment process in order to get lights.

188.    Mr. Evers understood that if EHS's Master Plan was repealed without Mr. Evers' amendment, EHS would be entitled to get its lights under the existing Campus Institutional District zoning ordinance.  Evers Dep. at 99.

**Response:**  Disputed in part.  It was not "Evers' amendment," and such is argumentative. *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  Indeed, 13 of the 20 Common Council Alders sponsored the

amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers

Dep., dkt. #31, 104:1-12.  The remaining portion is undisputed.

189.    Mr. Evers also recognized that if EHS's Master plan was repealed **before** his amendment passed that EHS would be entitled to its lights.  Evers Dep. at 99-100.

**Response:**  Disputed in part.  It was not "Evers' amendment," and such is argumentative. *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  The remaining portion is undisputed.

190.    Mr. Evers knew from the August 1 Capital Times article and the public legislative record that EHS's repeal was scheduled to go before the Common Council on August 6, 2019. Ingrisano Decl. ¶ 9, Ex. 8 at 2; Ingrisano Decl. ¶ 8, Ex. 7, Dep. Ex. 21.

**Response:**  Disputed. The proposed fact is completely unsupported.  In addition, the Ingrisano declaration is without foundation and defendants object and dispute that the Court can take judicial notice of newspaper articles to try to impute knowledge to a City Alder.  Here, plaintiff is not seeking to have the court take judicial notice just to show the article was published, Edgewood wants the court to admit the veracity of the information in the article, and not only that, but **assume** that a City Alder read the article and was aware of the information in it.  And what is worse, plaintiff never asked Alder Evers about this article despite deposing him for an entire day.  Moreover, defendants also object because this article attached to counsel's declaration has never even been produced in discovery.  Zylstra Second Dec., ¶3.

191.    Mr. Evers' amendment was introduced in the Common Council from the floor and by title.  Evers Dep. at 112-114.  The amendment was introduced from the floor on August 6 because "we wanted to get started with it."  Evers Dep. at 113-114.  By introducing it by title

only, Mr. Evers did not need to have a completed draft ordinance at the time of introduction. Evers Dep. at 114.

**Response:**  Disputed in part.  It was not "Evers' amendment," and such is argumentative. *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  Further disputed that "Mr. Evers did not need to have a completed draft" as it was not his draft to complete but rather, the city attorney's office's draft as that office drafts ordinances.  Strange Dep., dkt. #56 and #56-1, 89:6-9; 87:13-88:8. The remaining portion is undisputed.

192.    Mr. Evers' amendment was introduced from the floor the day after it was referred for introduction by the city attorney's office.  Evers Dep. at 127.

**Response:**  Disputed in part.  It was not "Evers' amendment," and such is argumentative. *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  The remaining portion is undisputed.

193.    Mr. Evers can identify no other legislation he has introduced from the floor. Evers Dep at 128.

**Response:**  Undisputed with the clarification that Evers testified that he had done so but could not recall specifically which legislation.

194.    [Intentionally omitted]

**Response:**  N/A

195.    On August 6, Mr. Evers was the listed as the sole sponsor.  Evers Dep. at 115-116; Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36.

**Response:**  Undisputed.

196.    Both the EHS Master Plan repeal and the Evers amendment were introduced and referred for hearing before the Plan Commission on August 6.  Evers Dep. at 130-131.  Both were referred to the next Plan Commission meeting on August 26, 2019.  Evers Dep. at 143.

**Response:**  Disputed in part.  It was not "Evers' amendment," and such is argumentative.

Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the CI District

Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.

Undisputed that the Edgewood master plan repeal and the change to the CI District Zoning

ordinance were both introduced on August 6 and referred to the Plan Commission meeting on

August 26, 2019.

197.    While Mr. Evers claimed his ordinance was intended to address a general flaw in the zoning ordinance (APFOF 184), the title of his introduced ordinance amendment was specific to what EHS's situation upon repeal of its Master Plan.  See Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36.

**Response:**  Disputed. The proposed fact is not supported by the record citation.  Further,

the title referred to "Agricultural Uses."  At the July 11, 2019 hearing, Assistant City Attorney

John Strange told the Plan Commission that under Edgewood's argument, Edgewood could turn

the Oaks, a green space on Campus with heritage trees, into a cornfield without Plan

Commission approval because agricultural use is an allowable use under the ordinance, which

Evers said was part of the flaw. Zylstra Dec., Ex. V, Dep. Ex. 76 at 74:3-9; Zylstra Dec., Ex. A,

Dep. Ex. 7 at 60 of 228.  Evers testified:

   Q. So the potential for lights at Edgewood, a potential for a stadium, is what motivated
   your amendment; is that right?

MS. ZYLSTRA: Objection. Form. You can answer.

A. What motivated my amendment was a desire to update the amendment so that the flaws that had been identified, that institutions without a master plan would be able to make substantial use -- substantial changes to their use without addressing the potential for adverse impacts or addressing the issue of livability or vitality of adjacent neighbors. So while the Edgewood debate pointed to these flaws, the purpose of the amendment was to address a change in this so that institutions across -- who are in the Campus Institutional District would abide by the intent of the ordinance itself.

Q. But it was the Edgewood incident, specifically, and the ongoing issues with that stadium that highlighted for you the need for this change; is that right?

A. I don't know, Jonathan, if that's entirely accurate, because it -- I don't know if you read the transcript of the ZBA hearing, but it was suggested that an institution within the CI District could use their open space to have a correctional facility. So, in effect, a high school could be converted into a prison or that -- you know, *that farming could take place.* And this was considered by everybody present to be somewhat inscrutable and inconsistent with the Campus-Institutional District ordinance itself. So while the debate around Edgewood pointed to one example, there was one of several potential issues that could come forth.

Evers Dep., dkt. #31, 92:14-93:23 (emphasis added). In addition, Edgewood's own counsel believed that the amendment to the ordinance would impact other high schools just as much as it would impact Edgewood, and Edgewood officials warned public school officials that the ordinance would impact any improvements or modifications public schools wished to pursue for their athletic fields. *See* Zylstra Second Dec., Ex. WW, Dep. Ex. 106; Zwettler Dep., dkt. #55, 185:7-186:3, 190:14-22, 184:8-22 (Zwettler stating that the "For example, the ordinance will likely impact West High School and any improvements or modifications (no matter how small as there is no discretionary language) it wishes to pursue for its athletic fields," admitting that Edgewood's lawyers asked him to send the email to all athletic directors in Madison's public schools, and stating that "it was our understanding that this ordinance could impact all schools in the zoning areas.").

198.    Mr. Evers' title of his ordinance on August 6, 2019 was:

Creating Madison General Ordinance Sections 28.097(2)(d) and (e) requiring institutions in the Campus Institutional District without an approved campus master plan to get conditional use approval for the establishment of open or enclosed Stadiums, Auditoriums, Arenas, Indoor or Outdoor Sports Recreational Facilities, and Agricultural Uses and for the installation of stadium lighting, amplified sound, and the establishment or expansion of outdoor seating over a specified capacity. Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36.

**Response:**  Disputed in part.  It was not "his amendment," and such is argumentative.

Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the CI District

Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  The

remaining portion is undisputed.


199.    The original title of the proposed ordinance specifically applied to the Mr. Evers' issues with EHS's athletic field, including a potential agricultural issue on the Edgewood campus that had come up during discussions at the ZBA hearing.  Evers Dep. at 121-122.  At the July 11, 2019 hearing, Assistant City Attorney John Strange also told the Plan Commission that Edgewood could turn the Oaks, a green space on Campus with heritage trees, into a cornfield without Plan Commission approval because agricultural use is an allowable use under the ordinance. Zylstra Dec., Ex. V, Dep. Ex. 76 at 74.

**Response:**  Disputed that "The original title of the proposed ordinance specifically

applied to the Mr. Evers' issues with EHS's athletic field."  Edgewood had never proposed

agricultural uses and the cited evidence does not support such.  *See* Response to PFF 197.

Undisputed that at the July 11, 2019 hearing, Assistant City Attorney John Strange also told the

Plan Commission that Edgewood could turn the Oaks, a green space on Campus with heritage

trees, into a cornfield without Plan Commission approval because agricultural use is an allowable

use under the ordinance. Zylstra Dec., Ex. V, Dep. Ex. 76 at 74.


200.    Mr. Evers was absent from the August 6, 2019 meeting.  Evers Dep. at 116.

**Response:**  Undisputed.

201.    Throughout this process working with Mr. Strange and getting his amendment introduced from the floor, by title only, Mr. Evers was on vacation.  Evers Dep. 116-117, 124, 152, 161.  He did not wait to address his desired ordinance until his return; he communicated with Mr. Strange and arranged for the introduction of his sponsored ordinance at the August 6 meeting while he was out of the country in Montreal.  Mr. Evers Dep. at 116-117, 124, 152, 161.

**Response:**  Undisputed in part and disputed in part.  "Throughout this process" is vague and unsupported and therefore disputed.  Also disputed that it was not "his amendment," and such is argumentative.  Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12. Undisputed that Evers was on vacation in Montreal when he communicated with Mr. Strange, who in turn arranged for the amendment to the CI District Zoning Ordinance to be introduced from the floor of the Common Council by title only on August 6.  Evers testified what introducing something by title only meant:

Q.  It says, "Introduced from the Floor by Title Only 8/6/19."  See that?

A.  Yes.

Q.  Based on your experience as an alder -- as a second-term alder, what does that mean?

MS. ZYLSTRA:  Objection.  Form, foundation.  You can answer.

A.  It's my understanding that there is a process where a resolution or an action of the council can be introduced from the floor and that starts a process then of referrals and then coming back to council for action.  But that it -- it needs to first be introduced.  It can be introduced as a part of getting on the agenda to introduce, but also at the end of every  council meeting there is an opportunity to introduce new business from the floor.  And I believe that was done in this particular instance.

Evers Dep., dkt. #31, 112:19-113:10.

202.    Mr. Evers introduced his amendment to prevent EHS from getting lights upon repeal of its Master Plan.  APFOF 174-201.

**Response:**  Disputed.  Defendants object that citing to 26 different prior PFFs as support violates this Court's summary judgment procedures.  Defendants also object and dispute that it

was not "his amendment," and such is argumentative. *McMahon*, 2007 WL 804149, at *2

("Arguments have no place in proposed findings of fact or responses to such findings."). Indeed,

13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning

Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12. In addition,

plaintiff's proposed fact is unsupported. Defendants incorporate their responses to plaintiff's

PFF 174-201. Defendants also incorporate their replies to defendants PFF 130-133, in which

Evers addressed this issue.

203.    After learning of EHS's repeal request, Mr. Evers rushed to introduce his
amendment by title only from the floor in an effort to prevent EHS's repeal request from going
into effect first. APFOF 174-178, 183, 186, 190-193, 195, 200-201.

**Response:** Disputed. Defendants object that citing to 14 different prior PFFs as support

violates this Court's summary judgment procedures. Defendants also object and dispute that it

was not "his amendment," and such is argumentative. *McMahon*, 2007 WL 804149, at *2

("Arguments have no place in proposed findings of fact or responses to such findings."). Indeed,

13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning

Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12. In addition,

plaintiff's proposed fact is unsupported. Defendants incorporate their responses to plaintiff's

PFF 174-178, 183, 186, 190-193, 195, 200-201. Defendants also incorporate their replies to

defendants PFF 130-133, in which Evers addressed this issue.

204.    At the Plan Commission meeting on August 26, 2019, Mr. Evers addressed a
question about whether his ordinance was time sensitive. Ingrisano Decl. ¶ 17, August 26, 2019
Plan Commission Hr'g (by link) at 3:25:25. Mr. Evers responded that it was time sensitive.
Ingrisano Decl. ¶ 17, August 26, 2019 Plan Commission Hr'g (by link) at 3:25:25.

**Response:** Defendants object and dispute that it was not "his amendment," and such is

argumentative. Indeed, 13 of the 20 Common Council Alders sponsored the amendment to the

CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  Undisputed that Alder Evers stated that he did think there was a time sensitivity to the proposal in response to a question about that.

205.    Mr. Evers did not say why his ordinance's consideration was time sensitive, but went on in talking about the City's "values" and the need to avoid an "exploitative environment" to differentiate public institution landowners from private ones:  "Public institutions have a built in incentive to pay attention to the public because they are dependent on public support, private institutions must be careful not to be seen as being willing to impose their will on their neighbors because to do so tears at the fabric of civil society and undermines our shared values of commitment to community and partnership."  Ingrisano Decl. ¶ 17, August 26, 2019 Plan Commission Hr'g (by link) at 3:25:25.

**Response:**  Disputed in part.  Plaintiff's initial clause is argumentative.  "Arguments have no place in proposed findings of fact or responses to such findings." *McMahon*, 2007 WL 804149, at *2.  Defendants also object and dispute the reference to "his amendment," and such is argumentative.  Thirteen of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12. Disputed that Evers did not address the question as unsupported.  Undisputed only that Evers stated at the hearing "Public institutions have a built in incentive to pay attention to the public because they are dependent on public support, private institutions must be careful not to be seen as being willing to impose their will on their neighbors because to do so tears at the fabric of civil society and undermines our shared values of commitment to community and partnership." Defendants also note that this was two sentences, not one run-on sentence as plaintiff has set forth.

206.    Evers' reference to "community" and "partnership" in APFOF 205 is a veiled reference to EHS and its values in its Mission Statement.  See APFOF 3.

**Response:**  Disputed.  The proposed fact is completely unsupported.

207.   Edgewood High School, Edgewood College and Edgewood Campus School are the only private institutions zoned Campus Institutional District.  APFOF 63; Elliott Decl. ¶ 44. All three are Catholic religious institutions.  Elliott Decl. ¶ 44.

**Response:**  Disputed in part. Disputed that Edgewood High School, Edgewood College and Edgewood Campus School are the only private institutions zoned Campus Institutional District.  Tucker Second Dec., ¶2 (noting as examples that Davis Duehr Dean Eye Clinic, Unity Point Children's Psychiatric Hospital, Neighborhood House and the medical building at 20 S. Park are zoned CI).  Undisputed that Edgewood High School, Edgewood College and Edgewood Campus School are Catholic schools.

208.   Mr. Evers has described EHS as "entitled."  Evers Dep. at 211.  Mr. Evers believes that EHS has attempted to impose its will on its neighbors.  Evers Dep. at 211.

**Response:**  Undisputed with clarification.  Evers said that he "felt that [Edgewood] acted with a sense of entitlement which made it more difficult to find a sense of compromise."  Evers Dep., #31, 211:4-6.

209.   Under Mr. Evers' ordinance, EHS's light application would no longer be governed by the objective, administrative approval process of § 10.085 but would require a conditional use permit.  Zylstra Dec., Ex. C, Dep. Ex. 18 at 4; Tucker Decl. ¶19.

**Response:**  Disputed in part.  Defendants object and dispute that it was not "Mr. Evers' ordinance," and such is argumentative.  Thirteen of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  "Arguments have no place in proposed findings of fact or responses to such findings." *McMahon*, 2007 WL 804149, at *2. Disputed as unsupported by the cited evidence that Edgewood's light application would no longer be governed by the objective,

administrative approval process of § 10.085.  Undisputed that under the amended CI Ordinance, Edgewood's lighting application would require conditional use approval.

210.    As of August 26, the EHS Master Plan repeal and Mr. Evers' ordinance were on a parallel path, legislatively.  Evers Dep. at 123.

**Response:**  Undisputed in part, disputed in part. Defendants object and dispute that it was not "Mr. Evers' ordinance," and such is argumentative.  Thirteen of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  "Arguments have no place in proposed findings of fact or responses to such findings." *McMahon*, 2007 WL 804149, at *2. The remaining portion of the proposed fact is undisputed.

211.    However, the EHS Master Plan repeal was referred to the October 14, 2019 Plan Commission meeting while Mr. Evers' ordinance was referred to the September 16, 2019 Plan Commission meeting.  Evers Dep. at 144-146; Zylstra Dec., Ex. AA, Dep. Ex. 26 at 6, 7.

**Response:**  Undisputed in part, disputed in part. Defendants object and dispute "however" and "Mr. Evers' ordinance," as argumentative.  *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  It was not Mr. Evers' ordinance as 13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.  Undisputed that the Edgewood master plan repeal ordinance was referred to the October 14, 2019 Plan Commission meeting and the amendment to the CI District Zoning ordinance was referred to the September 16 Plan Commission meeting.

212.    As reported by the Wisconsin State Journal on September 4, 2019, the Common Council voted to delay a decision whether to repeal the EHS Master Plan.  Ingrisano Decl.¶ 11, Ex. 10, Dep. Ex. 28.

**Response:**  Undisputed in part and disputed in part.  Undisputed that the Common Council voted to refer the Edgewood master plan repeal ordinance to the Plan Commission's October 14th meeting.  The article is objected to as hearsay.

213.    The State Journal continued:  "Ald. Shiva Bidar, 5th District, said the reason for the delay was to allow another proposal to get through the Plan Commission and City Council first.  That proposal would require Edgewood High School to apply with the city before making modifications, such as adding lights or a sound system, to its field if the master plan is repealed.  Ingrisano Decl. ¶ 11, Ex.10, Dep. Ex. 28.

**Response:**  Disputed.  First, the article is hearsay and is not even quoting Alder Bidar.  Second, Alder Bidar spoke for several minutes at the September 3 meeting as to her reason for re-referring the matter to the October 14 Plan Commission and it did not involve allowing another proposal to get through the Plan Commission.  For her reasons, Alder Bidar stated that there were three individuals who were on both the Plan Commission and the Common Council, and that all three members spoke in support for referring the matter to the later October 14 date.  Alder Bidar also noted that in watching the August 26 Plan Commission meeting, there was an intense and long discussion at Plan Commission about the Edgewood repeal matter and based on the comments, the Plan Commission seemed to be torn toward referring the matter to a later meeting or recommending outright denial of Edgewood's repeal of its master plan.  Alder Bidar noted that sometimes it takes time and it makes sense to go slower to understand an issue so as to arrive at resolution everyone is comfortable with.  In essence, Alder Bidar inferred that referral to a later meeting would make it more likely that Edgewood's repeal ordinance would get through the Plan Commission.  Finally, Bidar noted that Plan Commission members are better situated to know what makes sense and the Common Council should follow the lead of the three Plan Commission members, all of whom were strongly advocating referral to the later October 14 meeting.  Her comments can be found 2:09:40-2:13:30 at

https://media.cityofmadison.com/mediasite/Showcase/madison-city-

channel/Presentation/29dd0d8cbe0941ee91b6cf303e83e2b51d/Channel/d29c91089bda40e7bb0f

ba20311ff0755f.

214.    The article continued: "City Council members who serve on the Plan
Commission said they would like to know what the council decides on the field modification
measure before voting on the master plan repeal." Ingrisano Decl. ¶ 11, Ex. 10, Dep. Ex. 28.

**Response:**   Disputed.  First, the article is hearsay. Second, the article oversimplifies and

does not properly characterize what was said at the meeting.  For example, Alder Heck was one

of the three Common Council members that also sat on the Plan Commission.  He spoke and his

comments are at 2:05:24- 2:07:52 of the link.  Alder Heck said that there were a lot of questions

of what repeal of the master plan would mean and that Plan Commission wanted sufficient time

for staff and the City Attorney to advise the Plan Commission because there were complicated

questions.  He noted as an example that there were a series of agreements between Edgewood

and the neighborhood, and the Plan Commission was uncertain what would happen to those if

they recommended repeal.  Alder Heck also raised questions about what would happen if UW

said that it wanted to repeal its master plan.  The Plan Commission was uncertain what that

would mean for the City and its various committees.  He also stated that referring the repeal to a

later date than the referral for the CI District Ordinance amendment was because the repeal

ordinance was a much more complicated problem than CI zoning amendment, which the Plan

Commission saw as needing a few tweaks but was much more straight forward.  He stated that

the Plan Commission saw a path forward for the CI zoning amendment and it was not

complicated whereas the master plan repeal was complicated.  Finally, he noted that many Plan

Commission members were leaning against allowing repeal because of the various questions and

it made sense to get answers to those questions before deciding on the repeal ordinance.

https://media.cityofmadison.com/mediasite/Showcase/madison-city-

channel/Presentation/29dd0d8cbe0941ee91b6cf303e83e2b51d/Channel/d29c91089bda40e7bb0f

ba20311ff0755f at 2:05:24- 2:07:52.

215.    Consistent with the State Journal's reporting, at the September 3 hearing, Alder
Marsha Rummel expressed that she believed a "stadium" should be a conditional use and that the
Campus Institutional District zoning ordinance should be "tweaked and amended" before moving
forward with repeal.   Ingrisano Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by link)
at 2:04:00, 2:04:40.

**Response:**  Disputed in part.  First, Alder Rummel's comments are found at 2:01:42-

2:05:22 of https://media.cityofmadison.com/mediasite/Showcase/madison-city-

channel/Presentation/29dd0d8cbe0941ee91b6cf303e83e2b51d/Channel/d29c91089bda40e7bb0f

ba20311ff0755f.  Alder Rummel spoke in favor of the referral to the October 14 meeting because

there were lots of questions that needed to be addressed.  She noted that Edgewood's master plan

covered a lot of projects that were pre-approved as part of the master plan process, and it was not

clear what would happen to those projects.  She also testified that Plan Commission members

seemed to think that a stadium might be ok but such should require conditional use approval and

that the CI District Zoning Ordinance needed to be tweaked before moving forward on it.  She

also noted that did not hear a lot of support for repealing the master plan.

216.    Also consistent with the State Journal's reporting, at the September 3 hearing,
Alder Shiva Bidar supported delaying the EHS Master Plan repeal and moving forward on the
Mr. Evers' amendment, noting that the Common Council needed to give the Plan Commission
clarity on one item [Mr. Evers' ordinance] so that the Plan Commission can decide another [the
EHS Master Plan repeal.]  Ingrisano Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by
link) at 2:12:30.

**Response:**  Disputed.  The proposed fact is not supported by the citation.  At a later point

in time, Alder Bidar did state that that giving the Plan Commission clarity about one item so they

could have better clarity about another does not change the fact that no item becomes law until the Common Council votes on the item.

217.   Mr. Evers' amendment was adopted by the Common Council on October 1, 2019. Zylstra Decl., Ex. C, Dep. Ex. 18.

**Response:**  Undisputed in part, disputed in part. Defendants object and dispute "Mr. Evers' ordinance," as argumentative. *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings.").  It was not Mr. Evers' ordinance as 13 of the 20 Common Council Alders sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12. Undisputed that the amendment to the CI District Zoning Ordinance was adopted by the Common Council on October 1, 2019.

218.   EHS's Master Plan repeal was not adopted by the Common Council until January, 2020.  Elliott Dep. at 246-247; Parks Decl. ¶ 7.

**Response:**  Undisputed that with clarification that in October and November 2019, Edgewood requested that the vote on the repeal of Edgewood's master plan be referred to later Plan Commission meetings. Elliott Dep., dkt. #33, 235:17-236:17; Zylstra Dec., Ex. EE, Dep. Exs. 81 and 82.

219.   As a result of the repeal of the Master Plan, EHS was no longer subject to the Master Plan and the City's interpretation thereof.  EHS now had the undisputed ability to play athletic competitions on its field.

**Response:**  There is no support cited for this proposed fact.  "A fact that is neither supported nor stipulated to is not a fact properly presented." *American National Property & Cas. Co. v. Graham*, No. 04-C-1185, 2006 WL 1589623, at *1 (E.D. Wis. June 2, 2006).

Undisputed that Edgewood no longer had a master plan after it was repealed and was no longer subject to it.

220.    However, as a result of the passage of Mr. Evers' amendment before the Master Plan repeal, Edgewood would be required to apply for a conditional use permit in order to obtain outdoor lighting for the Goodman Athletic Complex.

**Response:**  There is no support cited for this proposed fact.  *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 ("A fact that is neither supported nor stipulated to is not a fact properly presented.").

221.    On March 11, 2020, EHS applied for a conditional use permit exclusively to install four outdoor light poles.  Elliott Dep., at 249-250; Zylstra Dec., Ex. GG, Dep. Ex. 87; Elliot Decl. ¶ 47.

**Response:**  Undisputed.

222.    No other improvements were sought in that application.  Elliott Decl. ¶ 47.  At that time, current uses of the field continued to include athletic games, practices, classes, camps, community events and neighbor, community and recreational use.  Elliott Decl. ¶ 47.

**Response:**  Defendants object that this proposed fact is impermissibly multiple in nature.  *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition").  Undisputed with the clarification that the lighting application contained two alternative proposals: constructing and installing four 80-foot light poles or four 68-foot light poles.  Zylstra Dec., Ex. GG, Dep. Ex. 87 at CITY-DEF 008077.

223.    On May 11, 2020, the Planning Division's professional staff issued a Planning Division Staff Report to the Plan Commission.  Zylstra Dec., Ex. HH, Dep. Ex. 33.

**Response:**  Undisputed.

224.    Planning staff noted that the light plans issued had been previously reviewed and approved by Building Inspection Division Plan Review Staff relative to M.G.O. Section 10.085. Zylstra Dec., Ex. HH, Dep. Ex. 33 at 8.  The Planning staff noted that they expected that final plans will also meet that requirement.

**Response:**  Disputed in part, undisputed in part.  Planning staff noted that light plans submitted previously *for a stadium* had been reviewed and approved relative to MGO Section 10.085 and the staff expect that the final plans will also meet this requirement.  In addition, the material is not at page 8 of the cited reference but is on page 4 of 10.

225.    Planning staff noted an "extensive landscaped buffer" along the western edge of the Goodman Athletic Complex.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

**Response:**  Undisputed, with clarification that the Report notes the buffer is located "between the western edge of the athletic complex's track and the eastern curb line of the street."

226.    No other improvements were proposed other than the lights.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

**Response:**  Undisputed.

227.    EHS letter of intent included with the conditional use request included selfimposed conditions on timing for use of the proposed lights.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

**Response:**  Disputed in part, undisputed in part.  The cited reference does not support the characterization of "self-imposed conditions," and such is therefore, disputed.  The Report says only that the letter "outlines the intended use of the proposed lights."  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3 (page 4 of 10).

228.    The Planning staff noted that many neighbors in close proximity to the Goodman Athletic Complex believe that the existing uses impact the quality of life in the neighborhood, primarily due to noise generated by the current use.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 3.

**Response:**  Undisputed but with clarification that the actual sentence appears on internal page 5 (page 6 of 10) and states: "As many of the public comments received against the subject lighting request to date suggest, many of the neighbors in close proximity to the Goodman Athletic Complex believe that use of the stadium already creates impacts on the quality of life in the neighborhood, primarily due to the noise generated from the current use."

229.    The then-current daytime use referenced in APFOF 227 included athletic games, camps, team practices, community events, and neighbor, community and student recreational use.  Elliott Decl. ¶ 47.

**Response:**  Disputed in part.  First, as to the then-current daytime use referenced in the prior PFF, while the Report referenced in the prior PFF refers to public comments, there is no indication to what time period was involved for those speaking about the impacts on the quality of life.  Second, while Elliott's declaration contains this sentence, it is without foundation, especially given his statements in his deposition that he did not know about use of the field. For example, he testified, "Q   Okay.  Are you aware of any change in use of Edgewood's athletic field from August of 2019 to present?  A   Again, I would not know that at this point."  Elliott Dep., dkt. 33, 222:14-17.

230.    The Planning staff believed Staff believes that the most relevant standards of approval for this request to meet are standards 1, 3, and 4 of M.G.O. Section 28.183(6) which most directly address the impact that a conditional use may have on surrounding properties:

> 1.    The establishment, maintenance or operation of the conditional use will not be detrimental to or endanger the public health, safety, or general welfare.

> 3.    The uses, values and enjoyment of other property in the neighborhood for purposes already established will not be substantially impaired or diminished in any foreseeable manner.

> 4.    The establishment of the conditional use will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district.

Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

**Response:**  Undisputed.

231.    With the implementation of certain conditions, the Planning staff concluded that the Plan Commission had a basis to find that the uses, values and enjoyment of neighboring property would not be substantially impaired or diminished.   Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5 (Despite neighbor concerns about impacts, including noise, "staff believes that the Plan Commission **may** find standards 1, 3, and 4 met to allow the installation of the proposed lights…")(emphasis added).

**Response:**  Disputed in part, undisputed in part.  The ellipses remove relevant language that impact the proposed fact.  The language eliminated states "subject to **conditions that would** limit the impacts of the expanded use of the stadium on nearby residents."  The Report indicated that its statement was conditional because it was "subject to the recommended conditions of approval beginning on page 8 of this report **and** input at the public hearing."  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 1, Summary Recommendation.

232.    The Planning staff concluded that that their recommended conditions would "limit the impacts of the expanded use of the stadium on nearby residents."  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

**Response:**  Disputed.  The Planning staff did not determine that their recommended conditions would limit the impacts.  It stated that the Plan Commission could find the standards were met if conditions were imposed that would limit the impacts to nearby residents.  *See, e.g.*, Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5 (page 6 of 10) ("staff believes that the Plan Commission may find standards 1, 3, and 4 met to allow the installation of the proposed lights subject to conditions that **would** limit the impacts of the expanded use of the stadium on nearby residents."); at 6 (page 7 of 10) ("The Plan Commission should consider the input at the public hearing from the applicant and community and determine the number of lighted non-practice events (athletic competitions/games, school activities) that it feels would be reasonable.").

Further, the City staff noted in their report, "While standards 1, 3, and 4 are the ones most often directly or indirectly cited by individuals concerned with some or many aspects of a controversial conditional use application, they are almost the most difficult standards and impacts for the Plan Commission to quantify compared to more tangible impacts like utility capacity or traffic impacts." *Id.* at 5 (page 6 of 10).

233.    The Planning staff framed the issue as whether to allow extended use of the Goodman Athletic Complex into the evening.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.  They concluded that "well-regulated conditional use approval can balance the needs of Edgewood while minimizing further impact on surrounding properties consistent with the statement of purpose of the Campus-Institutional zoning district.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 7.

**Response:**  Disputed in part, undisputed in part.  Disputed that the Planning staff "framed the issue as whether to allow extended use of the Goodman Athletic Complex into the evening" as unsupported by the record citation. The second sentence is undisputed but with clarification that the actual sentence states, "While limited use of the athletic complex after dark may exacerbate the noise impacts suggested by many of those commenting on the request, staff believes that a well-regulated conditional use approval can balance the needs of Edgewood while minimizing further impact on surrounding properties consistent with the statement of purpose of the Campus-Institutional zoning district."

234.    The Planning staff concluded that the Plan Commission could balance EHS's use of the field with minimizing impacts on the residential neighbors by imposing conditions on the number of field usage events and the hours of use.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

**Response:**  Disputed that the Planning staff "concluded."  Undisputed that the Report states, "the commission may create a balance between the desire by Edgewood High School to use its athletic complex for evening sporting events and *minimizing* impacts on the residential

neighborhoods that border the institution on three sides consistent with statement of purpose for the Campus-Institutional zoning district excerpted above (emphasis added)."

235.    Planning staff recommended seven conditions to minimize impact on neighbors:

- •    Limitations on non-practice events.
- •    Use of lights limited to EHS, Edgewood College and Edgewood Campus School.
- •    Lights be turned off at set times.
- •    Event start times be scheduled to ensure light turn off times.
- •    Lights for team practices until 7:00 PM only.
- •    No changes to landscape buffer by EHS.

Zylstra Dec., Ex. HH, Dep. Ex. 33 at 6-7.

**Response:**  Generally undisputed.  The conditions are far more detailed do not correspond to Edgewood's language but generally these conditions were in the Report.  Further, with the first item, the Planning staff did not determine the scope of the condition but instead stated "The Plan Commission should consider the input at the public hearing from the applicant and community and determine the number of lighted non-practice events (athletic competitions/games, school activities) that it feels would be reasonable."

236.    Planning staff took into consideration the significant number of comments received.  Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.

**Response:**  Undisputed that the Planning staff report noted that there were a significant number of comments but what comments were considered is not contained in the Report and thus, is disputed as unsupported.  Undisputed that the Planning staff considered at least some of the comments received.

237.    The Planning staff concluded in pertinent part:  "While many of the comments received to date suggest an existing impact on uses, values, and enjoyment, the normal and orderly development of surrounding properties, or a negative impact on the public's "general welfare" from the daytime (unlighted) use of the athletic complex primarily due to noise

generated, staff believes that the Plan Commission may find the conditional use standards met to allow the installation and use of lighting for the stadium under specific and limited conditions intended to minimize any ***further impact*** on the area surrounding the complex, ***bearing in mind that the daytime use of the complex without lights is allowed by right***."   Zylstra Dec., Ex. HH, Dep. Ex. 33 at 7 (emphasis added).

**Response:**  Undisputed that the Planning staff Report so states but dispute the

characterization as a "concluded in pertinent part" as there was a separate staff recommendation.

238.    They concluded that "well-regulated conditional use approval can balance the needs of Edgewood while minimizing ***further*** impact on surrounding properties consistent with the statement of purpose of the Campus-Institutional zoning district.   Zylstra Dec., Ex. HH, Dep. Ex. 33 at 7 (emphasis added).

**Response:**  This is a duplicate.  *See* Defendants response to PFF 233.

239.    EHS immediately agreed to all conditions recommended by the Planning Commission. Elliott Decl. ¶ 46.

**Response:**  Disputed. The staff Report suggested that a condition be imposed based on

input at the public hearing that limited non-practice events (i.e., games and other events). In a

memo to the Common Council, Assistant City Attorney stated that at the Plan Commission

hearing, Edgewood proposed that games be naturally limited to the total number required for

Edgewood related teams. However, Plan Commissioners pointed out that this was not actually a

defined limit as suggested by the Staff Report. Evers Dec., Ex. D, at CITY-DEF 51975.

240.    At the May 11, 2020 Plan Commission meeting, the Plan Commission disregarded the Planning Staff Report and found the standards for conditional use were not met and placed the conditional use on file without prejudice. Elliott Dep. at 250-251; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 2.

**Response:**  Disputed as unsupported that "the Plan Commission disregarded the Planning

Staff Report."  Undisputed that the Plan Commission found the standards for conditional use

were not met and placed the conditional use on file without prejudice.

241.    The record before the Plan Commission at the May 11, 2020 meeting is found its entirety at https://madison.legistar.com/LegislationDetail.aspx?ID=4394445&GUID=48C312B2-F73446EB-9B58-D9DA005C66B1.

**Response:**  Disputed in part. Undisputed that the link is to Legistar item #60001, which

contains records related to the Plan Commission's consideration of Edgewood's conditional use

request.  Undisputed that the court can review and rely on such records.  There is no foundation

supplied that this link contains the entire record and in fact, it does not. For example, there were

individuals who came to the hearing and testified before the Plan Commission.  In addition, Plan

Commission had access to other information as Edgewood and neighbors appeared before it at

various meetings.

242.    The record in opposition to the is comprised of public comments, statements by Alder Evers, and statements by the Dundgeon-Monroe Neighborhood Association.  See link at APFOF 241.

**Response:**  Disputed in part. *See* response to PFF 241, which is incorporated by

reference.  Undisputed that some of the information that the Plan Commission members had

included public comments, statements by Alder Evers (and others) and a statement of the

Dudgeon-Monroe Neighborhood Association.

243.    The Plan Commission made two findings.  First, "[t]he Plan Commission could not find standard number 3 met finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties…."  Zylstra Dec., Ex. GG, Dep. Ex. 87 at 2.

**Response:**  Undisputed with clarification.  The Plan Commission "found the standards

were not met and placed the conditional use on file without prejudice. The Plan Commission

could not find standard #3 met, finding that the lights would have a substantial negative impact

on the uses, values, and enjoyment of surrounding properties, and that no evidence was

submitted by the applicant that there would not be negative impacts on the lighted use of the field, and no mitigating measures proposed to limit those impacts (noise barriers, limit on events, etc.). Members indicated that they would be open to considering the request again if some redress of the noise impacts was presented by the applicant, including improved engagement with the neighborhoods and a limit to the number of games with lights."

244.    Second, the Plan Commission found "that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera." Zylstra Dec., Ex. GG, Dep. Ex. 87 at 2.

**Response:**  Undisputed with clarification.  The Plan Commission "found the standards were not met and placed the conditional use on file without prejudice. The Plan Commission could not find standard #3 met, finding that the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties, and that no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field, and no mitigating measures proposed to limit those impacts (noise barriers, limit on events, etc.). Members indicated that they would be open to considering the request again if some redress of the noise impacts was presented by the applicant, including improved engagement with the neighborhoods and a limit to the number of games with lights."

245.    On May 21, 2020, Edgewood appealed the decision of the Plan Commission on its conditional use application. Elliott Dep. at 255; Zylstra Dec., Ex. JJ, Dep. Ex. 90.

**Response:**  Undisputed.

246.    The appeal came on for hearing on January 19, 2021 and the entire record before the Common Council is found its entirety at https://madison.legistar.com/LegislationDetail.aspx?ID=4542871&GUID=B9777AC0-F2AF4C4B-9E33-00C55C92776A.

**Response:**  Disputed in part. Undisputed that the link is to Legistar item #60646, which contains records related to the Common Council's consideration of Edgewood's conditional use request.  Undisputed that the court can review and rely on such records.  There is no foundation supplied that this link contains the entire record and it does not. For example, the Common Council had access to other information as Edgewood and neighbors appeared before it at various meetings.

247.    EHS presented facts and information in support of granting its appeal of the Plan Commission permit denial, including light and sound study results.  See link at APFOF 246 at Attachments 5, 14, 15, 16, 25, 27.

**Response:**  Undisputed that Edgewood presented materials and argued for granting its appeal, but dispute any implication that the information presented mandated granting Edgewood's appeal.  *See* reply to Defendants PFF 177-179, incorporated by reference.

248.    The May 11, 2020, Planning Division Staff Report was part of the record before the Common Council.  See link at APFOF 246 at Attachment 5 at 7.

**Response:**  Undisputed.

249.    Also before the Common Council was Assistant City Attorney John Strange's Memorandum outlining the standards for a conditional use appeal.  See link at APFOF 246 at Attachment 7.

**Response:**  Undisputed.

250.    As a result of Mr. Strange's memo, the Common Council knew that that "substantial evidence" are "facts and information, other than merely personal preferences or speculation, directly pertaining to the requirements an applicant must meet to obtain a conditional use permit and that reasonable persons would accept in support of a conclusion." See link at APFOF 246 at Attachment 7 at 3.

**Response:**  Undisputed that Attorney Strange quoted the statute in the memo.

251.    Further, the Common Council also knew that the necessary facts and information they considered must "directly pertain to requirements an applicant must meet," meaning that not every piece of information the Council hears from a proponent or opponent is relevant to its consideration. See link at APFOF 246 at Attachment 7 at 4.

**Response:**  Undisputed but the actual sentences read, "In addition, the statute provides

that the facts and information considered must 'directly pertain to the requirements and

conditions an applicant must meet to obtain a conditional use permit and that reasonable person's

would accept in support of a conclusion.' This means, for example, that not every piece of

information the Council hears from a proponent or opponent of a conditional use request is

relevant to its consideration of the requirements and conditions related to a specific conditional

use request."

252.    Alder Evers' amended Campus Institutional District zoning ordinance required a conditional use permit for the EHS's lights.  See link at APFOF 246 at Attachment 7 at 4.

**Response:**  Undisputed in part, disputed in part. Defendants object and dispute "Alder

Evers' amended Campus Institutional District zoning ordinance," as argumentative. *McMahon*,

2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to

such findings.").  It was not Mr. Evers' ordinance as 13 of the 20 Common Council Alders

sponsored the amendment to the CI District Zoning Ordinance. Zylstra Dec., Ex. C, Dep. Ex. 18

at 1; Evers Dep., dkt. #31, 104:1-12.  Undisputed that Edgewood was required to obtain

conditional use approval for its March 11, 2020 application, which proposed construction and

installation of stadium lights.

253.    The Common Council knew that "[i]n its Staff Report, the Planning Division explained to the Plan Commission that, based on a review of the application and public comments opposing the proposal, it believed the two primary impacts of Edgewood's lighting request related to the light and noise associated with activities taking place on the field after dark. The Staff Report opined that both of these impacts could be addressed by focusing on conditions related to the number of events that could occur after dark. Accordingly, Staff

recommended that the Plan Commission could find the conditional use standards met and approve the application with seven (7) specific conditions enumerated in the Staff Report, including a condition limiting the "number non-practice events (athletic competitions/games, school activities) using the stadium lighting after 7:00 PM … per school year (August 1 to July 31) to be determined by the Plan Commission following input at the public hearing." For a full list of the conditions proposed by staff, see the Staff Report."  See link at APFOF 246 at Attachment 7 at 5.

**Response:**  Undisputed that such is contained in the Attorney Strange Memo.


254.    The Common Council knew at the Plan Commission meeting, EHS agreed to the conditions proposed by the Planning staff.  See link at APFOF 246 at Attachment 7 at 5.

**Response:**  Disputed. Attorney Strange wrote in the cited reference, "At the Plan Commission hearing, Edgewood agreed to the conditions proposed by Staff and, with respect to a limit on the number of games, proposed that games be naturally limited to the total number required for Edgewood related teams. However, Plan Commissioners pointed out that this was not actually a defined limit as suggested by the Staff Report."


255.    The Common Council denied EHS's appeal on January 19, 2021.   See link at APFOF 246.

**Response:**  Undisputed with clarification that the Common Council voted not to grant the appeal of the Plan Commission's decision.


256.    The City's interpretation of the Master Plan starting in October 2018 caused EHS uncertainty and expense, including professional fees and legal expenses in reviewing and addressing that position.  Elliott Decl. ¶ 54.

**Response:**  Disputed.  First, the Elliott declaration is hearsay and without foundation as Edgewood has not produced evidence or detailed such in its Rule 26 disclosures and Elliott was not named as an expert.  Zylstra Second Dec., ¶7 & Ex. UU.  Second, Elliott is incompetent to testify on causation and such is a legal conclusion. *American National Property & Cas. Co. v. Graham*, No. 04-C-1185, 2006 WL 1589623 at *1 (E.D. Wis. June 2, 2006) (legal conclusions

inappropriate as factual findings; such advocacy must be left to the argument portion of a brief and not proposed as a finding of fact). Edgewood's legal expenses and professional fees were caused by Edgewood's own making in drafting a master plan and operating outside of the language that Edgewood itself, not the City, drafted. Elliott agreed that by signing the master plan, he intended to abide by it. Elliot Dep., dkt. #33, 82:3-9.

257.    The City's failure to issue a permit for the otherwise compliant light application has delayed EHS's ability to install lights, which in turn has caused continued additional expense for EHS associated with using other fields, professional and legal expenses to address the City's actions, and increased anticipated costs of installation of the lights when that occurs. Elliott Decl. ¶ 54. Not getting lights in 2019 has likewise continued EHS's administrative burden on staff as they have had to continue scheduling other fields for "home" games. Zwettler Decl. ¶ 54. The inability to use its field at night continues to cause EHS students and parents frustration and inconvenience. Zwettler Decl. ¶ 54.

**Response:** Defendants object that this proposed fact is impermissibly multiple in nature. *Aiello*, 104 F. Supp. 2d at 1071 (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition"). Disputed. First, the Elliott declaration is hearsay and without foundation as Edgewood has not produced evidence or detailed such in its Rule 26 disclosures and Elliott was not named as an expert. Zylstra Second Dec., ¶7 & Ex. UU. Second, Elliott is incompetent to testify on causation and such is a legal conclusion. *American National Property & Cas. Co.*, 2006 WL 1589623 at *1 (E.D. Wis. June 2, 2006) (legal conclusions inappropriate as factual findings; such advocacy must be left to the argument portion of a brief and not proposed as a finding of fact). Edgewood's legal expenses and professional fees were caused by Edgewood's own making in drafting a master plan and operating outside of the language that Edgewood itself, not the City, drafted. Elliott agreed that by signing the master plan, he intended to abide by it. Elliot Dep., dkt. #33, 82:3-9. The Zwettler comment about scheduling for "home" games is

disputed as Zwettler admits that since 2015, Edgewood has been able to have numerous sports games on its athletic field, including football, soccer, track, and lacrosse, which games would occur in the afternoons.  Zwettler Dep., dkt. #55, 69:19-71:10.  Deposition Exhibit 68 identifies voluminous day games being played on Edgewood's field in 2018 alone, including several night games.  Zylstra Second Dec., Ex. TT.  Defendants object that Zwettler does not have foundation to testify as to parents "frustration and inconvenience" and any such testimony is likely hearsay and is unlikely to be in admissible form at trial.

258.    The City's position that EHS was required to repeal its Master Plan to use its athletic field for games caused EHS to incur significant professional and legal expenses in its attempt to comply with the City's process.  Elliot Decl. ¶ 54.

**Response:**  Disputed.  First, the Elliott declaration is hearsay and without foundation as Edgewood has not produced evidence or detailed such in its Rule 26 disclosures and Elliott was not named as an expert.  Zylstra Second Dec., ¶7 & Ex. UU.  Second, Elliott is incompetent to testify on causation and such is a legal conclusion. *American National Property & Cas. Co.*, 2006 WL 1589623 at *1 (legal conclusions inappropriate as factual findings; such advocacy must be left to the argument portion of a brief and not proposed as a finding of fact). Edgewood's legal expenses and professional fees were caused by Edgewood's own making in drafting a master plan and operating outside of the language that Edgewood itself, not the City, drafted.

259.    The City's efforts to pass an ordinance amendment to counteract or subvert EHS's efforts to repeal its Master Plan caused EHS uncertainty and expense, including professional fees and legal expenses in reviewing and opposing that effort.  Elliott Decl. ¶ 54.

**Response:**  Disputed.  First, dispute as argumentative "The City's efforts to pass an ordinance amendment to counteract or subvert EHS's efforts to repeal its Master Plan."

*McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings."). Second, the Elliott declaration is hearsay and without foundation as Edgewood has not produced evidence or detailed such in its Rule 26 disclosures and Elliott was not named as an expert. Zylstra Second Dec., ¶7 & Ex. UU. Third, Elliott is incompetent to testify on causation and such is a legal conclusion. *American National Property & Cas. Co.*, 2006 WL 1589623 at *1 (legal conclusions inappropriate as factual findings; such advocacy must be left to the argument portion of a brief and not proposed as a finding of fact). Edgewood's legal expenses and professional fees were caused by Edgewood's own making, not the City.

260. The City's insistence upon and eventual denial of the conditional use permit for lights caused EHS to uncertainty and expense, including professional fees and legal expenses in its attempt to comply with the City's process, and in reviewing and addressing the result.. Elliott Decl. ¶ 54.

**Response:** First, dispute as argumentative "The City's insistence upon and eventual denial." *McMahon*, 2007 WL 804149, at *2 ("Arguments have no place in proposed findings of fact or responses to such findings."). Second, the Elliott declaration is hearsay and without foundation as Edgewood has not produced evidence or detailed such in its Rule 26 disclosures and Elliott was not named as an expert. Zylstra Second Dec., ¶7 & Ex. UU. Third, Elliott is incompetent to testify on causation and such is a legal conclusion. *American National Property & Cas. Co.*, 2006 WL 1589623 at *1 (legal conclusions inappropriate as factual findings; such advocacy must be left to the argument portion of a brief and not proposed as a finding of fact). Edgewood's legal expenses and professional fees were caused by Edgewood's own making, not the City.

Dated this 20th day of June, 2022.

Respectfully submitted,

/s/ Sarah A. Zylstra

Sarah A. Zylstra, State Bar No. 1033159
Tanner G. Jean-Louis, State Bar No. 1122401
BOARDMAN & CLARK LLP
1 South Pinckney Street, Suite 410
P. O. Box 927
Madison, WI  53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Attorneys for Defendants*

\\msnfs2\share\DOCS\WD\25981\424\A4561066.DOCX