## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

       Plaintiff,

    v.                                        Case No. 3:21-CV-118

CITY OF MADISON, WISCONSIN;
CITY OF MADISON ZONING BOARD
OF APPEALS; CITY OF MADISON
PLAN COMMISSION; and CITY OF
MADISON COMMON COUNCIL,

       Defendants.

---

### DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE
### TO DEFENDANTS' PROPOSED FINDINGS OF FACT

---

Defendants City of Madison, Wisconsin, City of Madison Zoning Board of Appeals, City of Madison Plan Commission, and City of Madison Common Council (collectively "the City"), through their attorneys, Boardman & Clark LLP, reply to Plaintiff's Response (dkt. #47) to Defendants' Proposed Findings of Fact in support of its Motion for Summary Judgment (dkt. #45) as follows:

1.    Edgewood High School of the Sacred Heart, Inc. ("Edgewood") is a private Catholic college-preparatory high school located at 2219 Monroe Street in Madison, Wisconsin. Elliott Dep., dkt. #33, 19:2-9; Compl., ¶7.

    **Response:**    Not disputed.

    **Defendants' Reply:**  Fact as proposed is undisputed.

2.    Edgewood High School shares a 55-acre campus on Lake Wingra with Edgewood College and Edgewood Campus School, which is a grade school. Zylstra Dec., Ex. A, Dep. Ex. 7, pages 18, 26 of 228; Elliott Dep., dkt. #33, 18:20 19:14.

    **Response:**    Not disputed.

**Defendants' Reply:** Fact as proposed is undisputed.

3. The City of Madison is a municipality in Dane County, Wisconsin. Compl., ¶10; Answer, ¶10.

**Response:** Not disputed.

**Defendants' Reply:** Fact as proposed is undisputed.

4. In 2007, the City of Madison began working on re-drafting portions of its Zoning Code. Tucker Dec., ¶2.

**Response:** Not disputed.

**Defendants' Reply:** Fact as proposed is undisputed.

5. Edgewood High School, the University of Wisconsin and Madison College had approached the City about creating a better path for approval of their building expansions outside of the high stakes pass/fail process that was the conditional use process. Tucker Dep., dkt. #32, 83:12 to 83:22, 85:6-85:9.

**Response:** Disputed. Edgewood College, not Edgewood High School (hereinafter "EHS") was involved in the creation of Campus Institutional District Zoning in Madison. June 9, 2022 Declaration of Judd Schemmel ("Schemmel Decl.") ¶ 5. Edgewood College and EHS are separate and distinct institutions. June 10, 2022 Declaration of Michael Elliott ("Elliott Decl.") ¶ 4.

**Defendants' Reply:** Defendants do not believe that plaintiff has properly disputed this fact. First, the proposed fact is amply supported by the Tucker Deposition cites. Second, Tucker testified that as to Edgewood approaching the City on this matter, "the person that was running point on for the three schools at Edgewood was Maggie Balistreri-Clarke." Tucker Dep. 84:23-85:1. While Edgewood contends that Ms. Balistreri-Clarke was an employee of Edgewood College and not of the high school, that does not change that she was speaking to the City about this matter on behalf of all three Edgewood schools. The Schemmel declaration states only that he personally had little to no involvement in the creation of Campus Institutional District Zoning in Madison and that to his recollection, the process was led by Edgewood College. That does not put into dispute that Balistreri-Clarke was speaking to the City on behalf of all three schools.

There are various examples of Ms. Balistreri-Clarke communicating with the City on behalf of Edgewood high school specifically, including as it relates to its athletic field. *See, e.g.*, Zylstra Dec., Ex. RR, Dep. Ex. 73. Whether or not an employee, she was an agent of Edgewood high school. This proposed fact, while helpful for historical context, is not essential to the City's summary judgment motion.

6.      Prior to the creation of the Campus Institutional District Zoning, whenever institutions like Edgewood High School, the University of Wisconsin and Madison College wanted to make changes to a building or outdoor open spaces such as adding a parking lot, the institution would need to prepare a detailed application. Tucker Dec., ¶2.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

7.      An application described in PFOF 6 would be reviewed by various internal departments at the City (depending on the project) and would then have to go before the City's Plan Commission at a public hearing. Tucker Dec., ¶2. Members of the public could attend those public hearings and speak out for or against the planned project after which, the City Plan Commission would vote on the proposed project. Tucker Dec., ¶2.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

8.      Edgewood High School, the University of Wisconsin and Madison College indicated to the City that the detail, expense, effort involved in preparing a conditional use application for a building that could be denied was relatively inequitable from their perspective and so they asked the City to help them create a better path for the evolution of their campuses. Tucker Dep., dkt. #32, 83:12 to 83:22, 85:6-85:9; Tucker Dec., ¶2.

**Response:**      Disputed.  Edgewood College, not Edgewood High School (hereinafter "EHS") was involved in the creation of Campus Institutional District Zoning in Madison. Schemmel Decl. ¶ 6.  Edgewood College and EHS are separate and distinct institutions.  Elliott Decl.¶ 4.

**Defendants' Reply:**   Defendants do not believe that plaintiff has properly disputed this fact. First, the proposed fact is amply supported by the Tucker Deposition cites. Second, Tucker testified that as to Edgewood approaching the City on this matter, "the person that was running

point on for the three schools at Edgewood was Maggie Balistreri-Clarke." Tucker Dep. 84:23-85:1. While Edgewood contends that Ms. Balistreri-Clarke was an employee of Edgewood College and not of the high school, that does not change that she was speaking to the City about this matter on behalf of all three Edgewood schools. The Schemmel declaration states only that he personally had little to no involvement in the creation of Campus Institutional District Zoning in Madison and that to his recollection, the process was led by Edgewood College. That does not put into dispute that Balistreri-Clarke was speaking to the City on behalf of all three schools. There are various examples of Ms. Balistreri-Clarke communicating with the City on behalf of Edgewood high school specifically, including as it relates to its athletic field. *See, e.g.*, Zylstra Dec., Ex. RR, Dep. Ex. 73. Whether or not an employee, she was an agent of Edgewood high school. This proposed fact, while helpful for historical context, is not essential to the City's summary judgment motion.

9.     On January 2, 2013, the City of Madison enacted M.G.O. § 28.097, creating the Campus-Institutional Districts. Tucker Dec., ¶2.

**Response:**     Disputed.  The City adopted its current Zoning Code on October 26, 2012, with an effective date of January 2, 2013. Compl. ¶ 60; Ans. ¶ 60.

**Defendants' Reply:**   As clarified, the fact that the City enacted M.G.O. §28.097 creating the Campus-Institutional Districts, which went into effect on January 2, 2013, is undisputed.

10.     The statement of purpose of M.G.O. § 28.097 is identified in the ordinance itself and provides:

Statement of Purpose

The CI District is established to recognize the City's major educational and medical institutions as important activity centers and traffic generators, accommodate the growth and development needs of these institutions, and coordinate the master plans of these institutions with the City's plans, policies and zoning standards. The district is also intended to:

(a) Permit appropriate institutional growth within boundaries while minimizing the adverse impacts associated with development and geographic expansion.

(b) ***Balance the ability of major institutions to change*** and the public benefits derived from change ***with the need to protect the livability and vitality of adjacent neighborhoods***.

(c) ***Encourage the preparation of Campus Master Plans that enable adjacent neighborhoods and the broader community to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures***.

Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(1) (emphasis added); Tucker Dep., dkt. #32, 72:1-73:12; Zylstra Dec., Ex. C, Dep. Ex. 18; Evers Dep., dkt. #31, 104:1-9.

**Response:**      Not disputed that the Proposed Finding of Fact ("PFOF") 10 correctly quotes the text of the ordinance provision cited.

**Defendants' Reply:**   Fact as proposed is undisputed.

11.     Campus master plans were voluntary for existing educational and medical institutions, but mandatory for any new education and medical institutions created after the passing of the ordinance. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(a).

**Response:**   Not disputed that PFOF 11 fairly paraphrases the ordinance provision cited.

**Defendants' Reply:**   Fact as proposed is undisputed.

12.     For institutions adopting a campus master plan, the ordinance required that they identify a number of items, including submitting a facilities plan with existing conditions and proposed conditions for improvements. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(5)(c); Tucker Dep., dkt. #32, 72:1-73:12.

**Response:**   Not disputed that PFOF 12 fairly paraphrases the ordinance provision cited.

**Defendants' Reply:**   Fact as proposed is undisputed.

13.     The ordinance also provided that "The Common Council will approve or reject the Master Plan following a recommendation by the Plan Commission." Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(6).

**Response:**      Not disputed that PFOF 13 correctly quotes the text of the ordinance provision cited.

**Defendants' Reply:**   Fact as proposed is undisputed.

14.     Further, the ordinance noted that approval of the master plan would be based in part on the plan's consistency with the goals of the City's Comprehensive Plan and adopted

neighborhood, corridor or special area plans adjacent to campus boundaries. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(6)(b).

**Response:**      Not disputed that PFOF 14 fairly paraphrases part of the ordinance provision cited.

**Defendants' Reply:**  Fact as proposed is undisputed.

15.      The Common Council's approval of a master plan had the effect of the master plan being an enacted ordinance of the City. Tucker Dec., ¶3.

**Response:**      Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

16.      The ordinance indicates that the master plan would be in effect for ten years. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(b); Tucker Dec., ¶3.

**Response:**      Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

17.      Prior to the adoption of the Campus Institutional District Zoning, the property of the Edgewood campus was zoned residential. Tucker Dec., ¶6.

**Response:**      Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

18.      After Edgewood was rezoned from residential zoning to Campus Institutional District Zoning, Edgewood submitted a Campus Master Plan ("Master Plan") to the City of Madison on or about January 20, 2014. Zylstra Dec., Ex. A, Dep. Ex. 7 at 12 of 228; Hank Dep., dkt. #30, dkt. #30, 82:1-9.

**Response:**      Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

19.      Mike Elliot was the president of Edgewood High School at the time the Campus Institutional District Zoning was created and has been from July 2013 through today. Elliot Dep. 12:13-14. He was hired in March 2013. Elliot Dep. 13:6-14.

**Response:**      Disputed.  The Campus Institutional District Zoning was created effective January 2, 2013.  PFOF 9.  Mike Elliott assumed the role of president of EHS on July 1, 2013. May 10, 2022 Deposition of Michael Elliott ("Elliott Dep.") at 13.

**Defendants' Reply:**   The portion of the fact that Mike Elliott was hired in March of 2013 and was the president of Edgewood High School from July 2013 through today is undisputed.  The remaining portion of the proposed fact is properly disputed.

20.     Elliott signed the Master Plan on behalf of the high school and by signing it, intended to abide by it. Elliot Dep. 82:3-9.

**Response:**   Disputed in part.  By signing and agreeing to abide by the Master Plan, with respect to Section 3.8 of the EHS Master Plan, Elliott did not intend to limit the use of EHS's athletic field to team practices or physical education classes.  Elliott Decl. ¶ 29.  At the time of signing, Elliott understood that EHS had the full use of its field as a sports and recreation facility or stadium under the Campus Institutional District zoning.  Elliott Decl. ¶ 29.  He did not intend to give that up in signing the Master Plan and did not anticipate the City's interpretation in 2018. Elliott Decl. ¶ 29.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. Rather, plaintiff must propose its own facts in separately numbered paragraphs. *American National Property & Cas. Co. v. Graham*, No. 04-C-1185, 04-C-1185, 2006 WL 1589623, at *1 (E.D. Wis. June 2, 2006) (improper to raise facts not contained in opposing party's own proposed findings and stating that party must provide a specific response to the movant's proposed findings of fact and set its own facts in separate numbered paragraphs consistent with local rules); *Computer Docking Station Corp. v. Dell, Inc.*, No. 06-C-32-C, 2007 WL 5117465, *2 (W.D. Wis. Jan. 10, 2007). Plaintiff's argumentative response does not put the proposed fact into dispute, which is amply supported by the citation.

21.     By letter dated April 22, 2014, the City informed Edgewood that the Common Council had approved its submitted Master Plan, subject to conditions detailed in that letter. Zylstra Dec., Ex. A, Dep. Ex. 7, page 6 of 228.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

22.     The April 22, 2014 letter described in the prior PFOF also provided that "[t]hese conditions of approval shall be satisfied prior to the master plan taking effect and the issuance of building permits for any of the projects contained in the plan[.]" Zylstra Dec., Ex. A, Dep. Ex. 7, page 6 of 228. The letter continued and stated that after the Master Plan was revised to address

the conditions, Edgewood need to submit ten copies for review by the City's departmental staff for their final approval prior to the master plan taking effect. Zylstra Dec., Ex. A, Dep. Ex. 7, page 10 of 228.

**Response:**      Not disputed that PFOF 22 fairly paraphrases part of the cited exhibit.

**Defendants' Reply:**  Fact as proposed is undisputed.

23.      Edgewood's Master Plan did not become effective until November 6, 2015. Tucker Dep., dkt. #32, 153:7-25.

**Response:**      Disputed.  The effect of the Master Plan was immediate, as no permits for enumerated buildings projects could issue.  The City's April 22, 2014 letter provides that its "conditions of approval shall be satisfied prior to the master plan taking effect and the issuance of building permits for any of the projects contained in the plan" and later that "[n]o building permits shall be issued until this plan has been revised to address the comments and conditions in this letter."  Zylstra Decl., Ex. A, Dep. Ex. 7 at 6, 10 of 228.

**Defendants' Reply:**  Fact as proposed is undisputed. The cited deposition states:

Q.  All right.  Do you have a recollection of when Edgewood's Master Plan became effective so as to control its development of its property?

A.  Yes.  On Exhibit 7, there is a date stamp on plans here.  If I could find it, I will – we established that as the effective date for the plan starting the tenure shot clock. ***11/06/2015***.

Q.  11/06/2015, that establishes the 10-year kind of expiration period, correct?

A.  Yeah, I refer to it as a shot clock, but expiration period, yes.

(Emphasis added.)  Nothing in Deposition Exhibit 7 says otherwise. In fact, that exhibit supports the proposed fact because it states expressly "These conditions of approval shall be satisfied ***prior to the master plan taking effect***" and "After the master plan has been revised to address any of the comments or conditions listed above, please file ten (10) copies of the final plan … for circulation to the City department staff listed above ***for their final approval prior to the master plan taking effect***."  Zylstra Decl., Ex. A, Dep. Ex. 7 at 6, 10 of 228 (emphasis added).  The conditions of approval were not satisfied until November 2015.

24.      The City's letter to Edgewood dated April 22, 2014 stated:

"No alteration of an approved Campus Master Plan, ***including changes to the proposed use of identified open space areas and other open space uses, shall be permitted unless approved by the Plan Commission***, provided however, the Zoning Administrator may, following consideration by the alderperson of the district, issue permits for minor alterations that are approved by the Director of Planning and Community and Economic Development and are consistent with the concept approved by the Common Council. If the change or addition constitutes a substantial alteration of the original plan, the procedure in Sec. 28.097(2) is required."

Zylstra Dec., Ex. A, Dep. Ex. 7, page 10 of 228 (emphasis added); Hank Dep., dkt. #30,, dkt. #30, 82:1-9. This language was nearly verbatim of the language of then M.G.O. §28.097(10). Tucker Dec., ¶5.

    **Response:**      Not disputed that the PFOF 24 accurately quotes the cited exhibit.

    **Defendants' Reply:**  Fact as proposed is undisputed.

    25.     For institutions within the Campus Institutional District that did not adopt a master plan, the construction of a new building or additions to existing buildings that exceeded 4,000 square feet in floor area on a zoning lot required conditional use approval. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(2)(c).

    **Response:**      Disputed.

    **Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff fails to cite any contrary evidence. *McMahon v. Carroll College*, No. 04-C-384, 2007 WL 804149, at *2 (E.D. Wis. March 9, 2007) ("Proposed factual findings which lack evidentiary support and responses to any such findings lacking evidentiary support do not create a triable issue of fact.").

    26.     The prior PFOF was not true for institutions that had approved master plans. For institutions that had approved master plans, for any project identified in their approved master plan, the institution only needed to obtain approval of an architectural review committee. Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7); Tucker Dep., dkt. #32, 81:7-82:14.

    **Response:**      Disputed.  The cited provision provides that "all ***buildings*** properly identified on a Campus Master Plan must be reviewed and approved by an architectural review committee prior to construction."  Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(7)(emphasis added).

    **Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff appears erroneously to try to limit the proposed fact to suggest that only buildings were required to undergo architectural

review. M.G.O. § 28.097(7)(b) applies to non-buildings, such as open space parking surfaces, and states, "In addition to undergoing the design review process in sub. (7)(a) above [the architectural review process]," and then continues to describe additional reviews that are required.  Thus, those projects have to undergo further review processes *in addition* to architectural review.

27.     One benefit of the master plan process is that the projects identified in the master plan were already approved as permitted with the architectural review committee reviewing items like the height, design and materials of the construction. Tucker Dep., dkt. #32, 81:7-82:14.

**Response:**     Disputed.  While streamlined review by an architectural review committee was a promised benefit of a master plan, EHS did not experience or observe any such benefit.  In EHS's experience, and in what it observed Edgewood College go through, the architectural review committee review was not a benefit.  Elliott Decl. ¶ 34.

**Defendants' Reply:**   Fact as proposed is undisputed. First, the Tucker deposition cite amply supports the proposed fact. Second, Elliott testified that Edgewood had a number of projects that were approved without going through the conditional use process.  Elliott Dep., dkt. #33, 105:4-106:8, 106:22-107:13.  Elliott's dissatisfaction, which stems only from the Stadium lights being denied when such lights were never identified in Edgewood's master plan, does not put into dispute that projects that *were included* in Edgewood's master plan only had to undergo architectural review. Further, Maggie Balistreri-Clarke, Edgewood College's Dean, who took the lead on the master plan process for Edgewood College and Edgewood High School, wrote Mike Elliott an email noting this specific benefit. Elliott Dep., dkt. #33, 100:6-108:15.

28.     A benefit to the architectural review committee process for Edgewood was that in the future it would not hold open meetings on its projects and would not need to seek the approval of the two neighborhood associations. Zylstra Dec., Ex. D, Dep. Ex. 55; Elliott Dep., dkt. #33, 100:6-101:18, 103:3-23.

**Response:**     Disputed.  The email exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  The email sender, Maggie Balisteri Clark was not an agent or authorized party for EHS.  Elliott Decl. ¶ 48.

The evidence cited does not stand for the factual proposition asserted in that it at most references a draft of a proposed process.  There is no evidence that the process was streamlined as proposed, and after the adoption of the Master Plan, Edgewood College's and EHS's neighbors weighed in on and complained about "everything."  Elliott Dep. at 104-106.

**Defendants' Reply:**   Fact as proposed is undisputed. Edgewood's attempt to draw a distinction between Edgewood College and Edgewood High School as it relates to the master plan process is not persuasive. First, the master plan was one document submitted on behalf of Edgewood College, Edgewood High School and Edgewood Campus.  Zylstra Dec., dkt. 40-1, Ex. A, Dep. Ex. 7, at 12 of 228.  Second, the evidence cited in support is an internal email that Edgewood produced so there is no concern that the email is not authentic.  In addition, Elliott admitted that Balistreri-Clarke generally transmitted truthful and accurate information to him. Elliott Dep., 102:14-18. Thus, it meets the criteria for trustworthiness. FRE 807. While Edgewood contends that Ms. Balistreri-Clarke was an employee of Edgewood College and not of the high school, that does not change that she regularly spoke to the City on behalf of all three Edgewood schools. *See, e.g.*, Tucker Dep. 84:23-85:1. There are various examples of Ms. Balistreri-Clarke communicating with the City on behalf of Edgewood high school specifically, including as it relates to its athletic field. *See, e.g.*, Zylstra Second Dec., Ex. RR, Dep. Ex. 73. Whether or not an employee, she was an agent of Edgewood high school. Finally, hearsay presented at summary judgment is permissible as long as the facts in those materials could later be presented in an admissible form at trial. *See Pullen v. House*, 88 F. Supp. 3d 927, 932 (W.D. Wis. 2015) ("the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form") (quoting *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014); *see also Harris v. Mason*, No. 17-CV-570-JDP, 2019 WL 1006093, at *4 (W.D. Wis. Feb. 28, 2019) ("Defendants object that Mason's statements to Love are inadmissible hearsay because Harris

does not provide an affidavit from Love. But Harris is allowed to present evidence on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial."). Ms. Balistreri-Clarke is being deposed and her testimony will be presented at trial.

29.     Edgewood's Campus Master Plan applied to the entire Edgewood campus, which included three different entities—Edgewood College, Edgewood High School, and the grade school. Zylstra Dec., Ex. A, Dep. Ex. 7 at 17-19 of 228; Elliott Dep., dkt. #33, 106:22-107:13.

**Response:**     Disputed.  The cited evidence does not support the cited proposition that the Master Plan applied to the entire Edgewood campus.  Nevertheless, not disputed that the Edgewood campus includes Edgewood College, EHS, and the Edgewood grade school.

**Defendants' Reply:**  Fact as proposed is undisputed.  First, plaintiff cites no contrary evidence.  Second, Deposition Exhibit 7 at 17 of 228 states "The Campus Master Plan will provide a basis for implementing development decisions so as to benefit all three institutions…" and on page 19, it identifies the three institutions as Edgewood College, Edgewood High School, and the grade school. Further page 12 of 228 shows the title of the document as the Edgewood Campus Master Plan and on the bottom, it shows the three institutions as Edgewood College, Edgewood High School, and the grade school.  Third, at multiple places in the Campus Master Plan, it refers to Edgewood's 55-acre campus, which is the entire campus.  *See, e.g.*, Deposition Exhibit 7 at 60 of 228.

30.     Edgewood High School owns the Open Space that is subject to this litigation. Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228; Elliot Dep. 117:17-118:18.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

31.     In Edgewood's Master Plan, it identified 22 different improvements that the Edgewood Campus would make during the ten-year period of the Master Plan. Elliott Dep., dkt. #33, 673:12-74:10; Zylstra Dec., Ex. A, Dep. Ex. 7 at 36-39 of 228.

**Response:**  Disputed.  EHS identified four (4) projects in the Master Plan.  Elliott Dep. 106-107.  The remaining eighteen (18) projects were identified by Edgewood College, the

Master Plan's principal drafting contributor and the institution most interested in adopting the Master Plan.  Elliott Decl. ¶ 26-27.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence demonstrates that one master plan was proposed and 22 different improvements were identified that would be made during the ten-year period.

32.     The 22 projects identified in Edgewood's Master Plan were not limited to building improvements but included existing spaces, and included outdoor projects such as revising parking lots and adding three additional parking stalls. Elliott Dep., dkt. #33, 74:6-75:22; Zylstra Dec., Ex. A, Dep. Ex. 7 at 38 of 228.

**Response:** Disputed in part, as only three (3) of the 22 projects identified in the Master Plan related to parking.  Elliott Dep. at 74-75.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence amply supports the proposed fact.

33.     With respect to the 22 different improvements identified in Edgewood's Master Plan, none involved improvements to an athletic field. Elliott Dep., dkt. #33, 77:18-78:5; Zylstra Dec., Ex. A, Dep. Ex. 7 at 36-38 of 228.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

34.     Under the City's Campus Institutional District Zoning Ordinance, Edgewood's Master Plan was required to include:

(c) <u>Facilities Plan</u>. Includes a description of existing conditions on the campus and the proposed conditions under the Master Plan, including:

    1.  <u>Existing Conditions</u>.
a.  ***Land uses*** and buildings.
b.  Building form (building type, height, bulk, etc.).
c.  Landmarks, historic sites and districts.
d.  Natural features and significant ***open-space areas***.

    2.  <u>Proposed Conditions</u>.
a.  Future needs/capital improvements.
b.  Phasing of proposed improvements.
c.  ***Future land uses*** and buildings.
d.  Building Form (building type, height, bulk, etc.).
e.  ***Landscape treatment***.
f.  ***Open-space areas and other open-space uses.***
g.  Relationship to transportation/access plan (parking, transportation demand management, etc.).

Zylstra Dec., Ex. B, Dep. Ex. 13, §28.097(5)(c) (emphasis added).

    **Response:**  Not disputed that PFOF 35 accurately restates the ordinance provision cited.

    **Defendants' Reply:**  Fact as proposed is undisputed.

    35.    Edgewood identified its Open Space in Section 3.8 of its Master Plan. In terms of its athletic field under paragraph 1, Edgewood identified its use as "Athletic field owned by Edgewood High School. Used for team practices, physical education classes." Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228.

    **Response:**  Not disputed that PFOF 35 accurately restates the narrow provision cited.

    **Defendants' Reply:**  Fact as proposed is undisputed.

    36.    In 2013, there were meetings between Edgewood and the Dudgeon-Monroe Neighborhood Association and the Vilas Neighborhood Association regarding Edgewood's Master Plan. Elliott Dep., dkt. #33, 70:10-15.

    **Response:**  Not disputed.

    **Defendants' Reply:**  Fact as proposed is undisputed.

    37.    In 2013, the neighborhood associations and neighbors of Edgewood were active in monitoring Edgewood's growth and use of its space. Elliott Dep., dkt. #33, 70:16-20.

    **Response:**  Disputed in part.  While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.

**Defendants' Reply:**   Fact as proposed is undisputed.  Elliott testified at the cited reference, "Q   Okay.  And back in 2013 when you participated in these meetings, the neighborhood associations and neighbors of Edgewood were active in monitoring Edgewood's growth and use of its space; true?  A   True."  Plaintiff wrongly attempts to add facts and to the extent Elliott is trying to change his deposition testimony, the sham affidavit precludes him doing so. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999) (plaintiff may not create sham issues of fact through an affidavit that contradicts or "patches-up" prior deposition testimony); *Babrocky v. Jewel Food & Retail Meats Cutters*, 773 F.2d 857, 861 (7th Cir. 1985) (noting court's duty to ignore "sham" issues).

38.    Elliott understood that based on his role with the Edgewood Neighborhood Liaison Committee, it was important for Edgewood to try and work with the neighbors and the neighborhood association on getting agreement as to the language in the Master Plan. Elliott Dep., dkt. #33, 71:9-16.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

39.    In 2013, Elliott was part of the neighborhood liaison committee where the issue of lighting was discussed. Elliott Dep., dkt. #33, 91:10-14.

**Response:**    Disputed.  Conversations about lighting did not occur in the context of building the Master Plan in 2013.  Elliott Dep. at 89-90.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence amply supports the proposed fact. Elliott testified of page 91:

Q   Did some of the communications in 2013 from the neighbors relate to trying to minimize the impacts of lighting at Edgewood's campus?
A   It depends what you mean.  I tried to explain minimize, meaning keeping it on our campus, that the cutoff -- the city ordinance says the cutoff has to be at the property line, and that was the premise I was going by.

Q   Right.  But at least there were some communications with the neighbors at the liaison committee that you were involved in in 2013 where the issue of lighting was being discussed?

A   Correct.

40.     The neighbors did not want lighting from Edgewood spilling into the neighborhood. Elliott Dep., dkt. #33, 91:10-92:15.

**Response:**     Disputed in part. While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.  Moreover, dispute the intended inference that light issues were addressed in the context of building or approval of the Master Plan when they were not.  Elliott Dep. at 89-90.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence amply supports the proposed fact. Elliott testified at the cited reference:

Q   Fair.  So back in 2013 when there were discussions about lighting at the neighborhood association and liaison committee meetings, there was discussion about what could and could not be done with respect to lighting.  But the neighbors at least were raising their desire or that they didn't want light from Edgewood to spill into the neighborhood?

A   They -- yes.  They had a concern of it spilling into the neighborhood.

41.     As part of Edgewood's Master Plan, there were a number of past agreements between Edgewood and the neighborhood associations that Edgewood reaffirmed and incorporated into its Master Plan. Zylstra Dec., Ex. A, Dep. Ex. 7 at 77 of 228; Elliott Dep., dkt. #33, 87:5-16.

**Response:**    Disputed.  Except for the first item reaffirming all three schools' commitment to the Edgewood Neighborhood Liaison Committee, the referenced agreements pertained to Edgewood College; they were not EHS's agreements to reaffirm.  Elliott Decl. ¶ 49.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence amply supports the proposed fact. First, Elliott testified:

> Q   Okay.  Now, if you'd turn to page 77 of 228.  The heading is 4.3, Affirming Past Agreements, and it says, "This section identifies agreements made between 1997-2013 to be reaffirmed and updated as part of the 2013 master plan."  Did I see that --did I read that correctly?
>
> A   Yes.
>
> Q   Okay.  You understood as part of signing off on this master plan that there were a number of prior agreements that were being reaffirmed and incorporated as part of your master plan; correct?
>
> A   Correct.

Second, Section 4.3, ¶1 begins "The three Edgewood Schools reaffirm their commitment to the Edgewood Neighborhood Liaison Committee as a primary vehicle for ensuring strong partnership and communication. The Committee representatives of the three Edgewood schools worked with the neighborhood representative -- to update the 1997 Neighborhood Liaison Committee formation document. The following updated agreement was approved by the Edgewood Neighborhood Liaison…"  Thus demonstrating these agreements applied to the high school as well as the college.  As a further example, Section 4.4 contains a limit on enrollment *for the high school*.  Plaintiff is simply incorrect.

42.    Some of those agreements referenced in the prior PFOF related specifically to lights and lighting. Elliott Dep., dkt. #33, 87:5-90:11, Zylstra Dec., Ex. A, Dep. Ex. 7 at 78 of 228.

**Response:**      Disputed.  These were not EHS's agreements and did not pertain EHS's portions of the campus.  Elliott Decl. ¶ 49.

**Defendants' Reply:**  Fact as proposed is undisputed. First, defendants incorporate their reply to the prior PFF.  Second, the fact is amply supported. Page 78 of 228 contains specific conditions related to lighting. Third, plaintiff is incorrect to suggest that none applied to the high school. Under "Interior Lighting," it provides that occupancy sensors were to be used in classrooms. Zylstra Dec., Ex. A, Dep. Ex. 7 at 78 of 228.

43.     Elliott was aware of noise being an issue that neighbors routinely raised with respect to changes to Edgewood's space during his time and Edgewood has occasionally received noise complaints from neighbors. Elliott Dep., dkt. #33, 80:23-81:5.

**Response:**      Disputed.  The evidence cited for this proposition was in the context of Edgewood College.  Elliott Dep. at 79-81.  EHS did not routinely receive noise complaints during Mike Elliott's tenure and received occasional noise complaints from certain neighbors after EHS had made know its intent to add lights to its athletic field.  Elliott Decl. ¶ 51. Neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space.  Elliott Decl. ¶ 50.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence amply supports the proposed fact. Elliott testified:

Q  Okay.  Were you aware of noise being an issue that neighbors routinely raised with respect to changes to Edgewood's space during your time?

     MR. INGRISANO:  Objection.  Form.

A  Yes.

Q  Okay.  Has Edgewood occasionally received noise complaints from neighbors?

A  Occasionally from neighbors.

Further, Elliott agreed that Edgewood would refer to the high school unless otherwise specified. Elliott Dep., dkt. #33, 31:14-19.

44.     Elliott received and reviewed an earlier draft of Edgewood Campus's Master Plan that described number 1 under its Open Space as "Athletic field owned by Edgewood High School. Used for team practices, physical educations classes, ***and other general light uses***." Elliott Dep., dkt. #33, 95:20-95:22 (emphasis added); Zylstra Dec., Ex. E, Dep. Ex. 54. Elliott does not know who removed the language, "and other general light uses," from the final master plan or why it was removed. Elliott Dep., dkt. #33, 96:4-97:6.

**Response:**     Disputed.  The evidence cited for this proposition does not establish that Mike Elliott had reviewed this alleged earlier draft or that language was "removed."  Mike Elliott was not familiar with this document or its contents and could not offer testimony on it.  See Elliott Dep. at 95-97.

**Defendants' Reply:**  Fact as proposed is undisputed. As to the claimed dispute for the review dispute, Elliott testified at 95:4-7, "Q   Okay.  So with respect to the drafts of the master plan, you reviewed anything having to do with the high school; correct? A   Yes." With respect to the claimed dispute regarding removal, such is non-sensical.  The cited references prove that Dep. Ex. 54 is an earlier draft of the master plan.  It stated "Athletic field owned by Edgewood High School. Used for team practices, physical educations classes, ***and other general light uses.***" The final draft of the master plan states "Athletic field owned by Edgewood High School. Used for team practices, physical education classes." *See* PFF 35, which plaintiff does not dispute. The language "and other general light uses" was, by definition, removed.

45.     Edgewood's Master Plan states: "The master plan process included internal planning and coordination among the three Edgewood schools, and a dynamic process of sharing information and discussion of issues with members of the two neighborhood associations as well as with the District 13 Alder, Sue Ellingson. The final master plan is the product of extensive engagement, collaboration and effort from all five entities." Zylstra Dec., Ex. A, Dep. Ex. 7 at 19 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:** Not disputed that PFOF 45 accurately quotes the cited provision, but at the page labeled 20 of 228.

**Defendants' Reply:**  Fact is undisputed, as clarified as to the cited page.

46.     Edgewood's Master Plan states: "Each campus institution, the surrounding neighborhoods and the Planning Department have reviewed the Campus Master Plan. It is an instrument of communication so that all stakeholders are aware of potential future developments on campus." Zylstra Dec., Ex. A, Dep. Ex. 7 at 16 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:** Not disputed that PFOF 46 accurately quotes the cited provision, but at the page labeled 17 of 228.

**Defendants' Reply:**  Fact is undisputed, as clarified as to the cited page.

47.    Edgewood's Master Plan states: "The Campus Master Plan will provide a basis for implementing development decisions so as to benefit all three institutions and the neighborhood by: . . . Providing solutions for mitigating neighborhood impacts of future development and growth" Zylstra Dec., Ex. A, Dep. Ex. 7 at 16 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:**      Not disputed that PFOF 46 accurately, but selectively, quotes the cited provision, but at the page labeled 17 of 228.

**Defendants' Reply:**  Fact is undisputed, as clarified as to the cited page.

48.    Edgewood's Master Plan states: "The residents of the city of Madison place high value on the established residential character of Dudgeon-Monroe and Vilas neighborhoods, and additionally place a very high value on the woods and other undeveloped areas that help characterize this unique area of the city. Edgewood shares these values. With our mutual vision of protection for our shared neighborhood and its natural resources, and in a spirit of collaboration, we proceeded to voice concerns, address issues and seek agreement." Zylstra Dec., Ex. A, Dep. Ex. 7 at 71 of 228; Hank Dep., dkt. #30, 82:1-9.

**Response:** Not disputed that PFOF 48 accurately quotes the cited provision, but at the page labeled 72 of 228.

**Defendants' Reply:**  Fact is undisputed, as clarified as to the cited page.

49.    In June of 2015, Edgewood High School announced that it had received a grant from the Goodman Foundation for $1.025 million to upgrade its track and field. Elliott Dep., dkt. #33, 46:2-6, 117:17-118:23.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

50.    Edgewood had started meeting with the Goodmans to try to secure the $1.025 million grant sometime in 2014. Elliott Dep., dkt. #33, 118:24-120:6.

**Response:** Disputed.  Elliott testified that it occurred in either 2014 or 2015.  Elliott Dep. at 119-120.

**Defendants' Reply:**  Fact as proposed is undisputed. Elliott testified that he believed it

was in 2014.  He testified:

Q   Okay.  Do you believe it was in 2015 versus 2014?

A   I don't know.  I mean, it most likely took awhile to develop the gift, so I would say 2014.

Q   Okay.  And can you put any other estimate on it, whether it was the beginning of '14 versus the end of 2014?

A   No.

Whether it was in 2014 versus 2015 is not material, however.


51.     A Wisconsin State Journal article dated June 15, 2015 states, "Elliott noted that one of the main benefits will be improvements in the practice facilities for the school's baseball and softball programs in the spring, when teams are forced to practice indoors. He added that the renovation will be a boon to all the students." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 115:22-117:21. Elliott agrees that he expressed that sentiment to the reporter. Elliott Dep., dkt. #33, 120:22-121:14.

**Response:**      Disputed in part.  Not disputed that PFOF 51 accurately, but selectively, quotes the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

**Defendants' Reply:**   Fact as proposed is undisputed.

52.     The Wisconsin State Journal article dated June 15, 2015 article quoted Elliott as saying, "We do require four years of physical education for both semesters, which is higher than the national average and higher than the national requirement" and "This is a much-needed product for our students, to aid our physical education department and the athletic programs." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 121:15-122:20. While Elliott does not recall if this was a quote he said, he agrees he expressed this sentiment. Elliott Dep., dkt. #33, 121:15-122:20.

**Response:**      Disputed in part.  Not disputed that PFOF 52 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

**Defendants' Reply:**   Fact as proposed is undisputed.

53.     The Wisconsin State Journal article dated June 15, 2015 article also stated, "In the past, Edgewood has provided its track-and-field facility to area parochial schools for practices and an annual meet — the only early track-and-field development experience for many grade-school students. However, due to the deterioration of the track, the event has been held off-campus in recent years." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:4-22. Elliott expressed that sentiment to the reporter. Elliott Dep., dkt. #33, 123:4-22.

**Response:**     Disputed in part.  Not disputed that PFOF 53 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

**Defendants' Reply:**  Fact as proposed is undisputed.

54.     The Wisconsin State Journal article dated June 15, 2015 article noted, "According to Elliott, the project has received the support of area neighborhood groups that have balked in the past at the idea of turning the facility into a competition site for Edgewood's many athletic programs." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6.

**Response:**     Disputed in part.  Not disputed that PFOF 54 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

**Defendants' Reply:**  Fact as proposed is undisputed.

55.     Elliott is quoted as saying, "We're between two neighborhood associations. They have been vehemently opposed to us having lights or playing games here," he said. "We're really building this to be able to give our athletes the practice facilities that provide the best surfaces possible and to expand the amount of outdoor practices we can hold especially in the spring. That is our focal point." Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 123:23-125:6. While Elliott does not recall if this was a quote, he agrees he expressed this sentiment. Elliott Dep., dkt. #33, 123:23-125:6.

**Response:**     Disputed in part.  Not disputed that PFOF 55 accurately, but selectively, quotes from the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

**Defendants' Reply:**  Fact as proposed is undisputed.

22

56.     The Wisconsin State Journal article dated June 15, 2015 article uses the words "practice" or "practices" fourteen times. Zylstra Dec., Ex. F, Dep. Ex. 57; Elliott Dep., dkt. #33, 115:22-117:21.

**Response:**     Disputed in part.  Not disputed that PFOF 56 accurately, but selectively, quotes the cited article.  Because Defendants' intended inference is that the article's contents demonstrate an intentional limitation of the field as a practice facility, under Federal Rule of Evidence 106 and the rule of completeness, the Court should consider all statements in the document for context.

**Defendants' Reply:**  Fact as proposed is undisputed.

57.     There was an Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  First, the cited exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Second, the statements attributed to Maggie Balisteri Clark are further hearsay.  Maggie Balisteri Clark was not a representative or agent of EHS nor was she authorized to make statements on EHS's behalf related to the lights.  Elliott Decl. ¶ 48.  Finally, Shawn Schey is an opponent of EHS's lights and a member of the group "No New Stadium."  April 28, 2022 Deposition of Tag Evers ("Evers Dep.") at 25; Elliott Decl. ¶ 42.  EHS asked Ms. Schey to step down from the Edgewood Neighborhood Liaison Committee because she was inaccurately characterizing discussions to her own interpretation, meaning that notes from this witness are not supported by sufficient guarantees of trustworthiness.  Elliott Decl. ¶ 43.

**Defendants' Reply:**  Fact as proposed is undisputed.  First, the exhibit is not hearsay. Shawn Schey is the current Vice President and a member of the Dudgeon Monroe Neighborhood Association and was a member of the Liaison Committee. Schey Dec., ¶2. She regularly attended meetings and averred in her declaration that minutes of meetings were kept in the regular course of business. She indicated that this was a meeting that she attended and that the minutes were accurate.  These facts satisfy FRE 803(6). As to Ms. Balistreri-Clarke, she spoke on behalf of Edgewood High School, as the minutes reflect. Whether or not an employee, she was an agent of Edgewood high school. Thus, it is an admission by a party opponent and a statement against interest. FRE 801(2); FRE 804(3). It also meets the criteria for trustworthiness. FRE 807. Finally, hearsay presented at summary judgment is permissible as long as the facts in those materials could later be presented in an admissible form at trial. *See Pullen*, 88 F. Supp. 3d at

932 ("the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form") (quoting *Olson*, 750 F.3d at 714); *see also Harris*, 2019 WL 1006093, at *4 ("Defendants object that Mason's statements to Love are inadmissible hearsay because Harris does not provide an affidavit from Love. But Harris is allowed to present evidence on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial."). Ms. Balistreri-Clarke is being deposed and her testimony will be presented at trial.

58.     Maggie Balistreri-Clarke attended the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015 as the representative of Edgewood. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

**Defendants' Reply:**   Fact as proposed is undisputed. *See* reply to PFF 57.

59.     At the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015, Balistreri-Clarke provided an update as to Edgewood High School Construction, which is shown as #5 in the minutes attached as Exhibit a to the Schey declaration. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

**Defendants' Reply:**   Fact as proposed is undisputed. *See* reply to PFF 57.

60.     At the Edgewood Neighborhood Liaison Committee meeting held on April 14, 2015, Balistreri-Clarke indicated that as to the Edgewood High School Football Field, no additional lighting or seating would be installed. Schey Dec., ¶4, Ex. A. She also confirmed that the football field would be a practice facility. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

**Defendants' Reply:**   Fact as proposed is undisputed. *See* reply to PFF 57.

61.     The two items in the prior PFOF are memorialized in the last two bullets under the High School Football Field heading in the minutes attached as Exhibit A to the Schey declaration. Schey Dec., ¶4, Ex. A.

**Response:**     Disputed.  See Response to PFOF 57.

**Defendants' Reply:**   Fact as proposed is undisputed. *See* reply to PFF 57.

62.     After receiving news of the Goodman grant, Edgewood contacted the City to determine whether re-surfacing the existing track and field would require an amendment to its master plan. Elliott Dep., dkt. #33, 128:21-129:19.

**Response:**     Disputed.  The cited evidence does not support that proposition.  Elliott contacted the City to determine what, if any, was required before the resurfacing of the track and field could be done.  Elliott Dep. at 128-131.  The Master Plan was not discussed in relation to this issue.  Elliott Dep. at 128-131.

**Defendants' Reply:**  Fact as proposed is undisputed. The cited reference amply supports

the proposed fact. Elliott testified:

Q  Okay.  Now, as I understood, after receiving the Goodman money, Edgewood replaced the existing track and field with a brand new track and field; correct?
A  Correct.

Q  Did you have any communications with the city regarding that change, from the old surfaces and field to the new?

A  I believe I did.

Q  Okay.  ***Did you have discussions on whether such a change would require an amendment to your master plan***?

A  ***I believe I did***.

Elliott Dep., dkt. #33, 128:21-129:8.

63.     The City told Edgewood that because it was simply exchanging the current track with a new track that the City would classify that as a replacement or a maintenance item which would allow Edgewood to complete the project without amending its master plan. Elliott Dep., dkt. #33, 128:21-129:19.

**Response:**     Disputed.  See Response to PFOF 62.

**Defendants' Reply:**  Fact as proposed is undisputed.  PFOF 62 does not put this fact in

dispute.  *See* reply to PFF 62.  In addition, at line 129:9-19, Elliott further testified:

Q  And what did you understand the city's position to be, if you recall?

A  My recollection was that we didn't need that because it was considered a resurfacing.

Q  Okay.  And did the city express to you that because you were simply exchanging the current track with a new track that the city would classify that as a replacement or a maintenance which would allow Edgewood to complete the project without amending its master plan?

A   Something -- yes.

64.     When resurfacing the track in 2015, Edgewood applied to the City for a permit to put PVC and conduit under the track for future lighting and communications. Elliott Dep., dkt. #33, 132:5-10; Hank Dep., dkt. #30, 88:24-89:11; Tucker Dep., dkt. #32, 168:20-170:10.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

65.     Edgewood was not intending or planning to put in lights at that time it applied for a permit for the PVC and conduit in 2015 because the technology was not there, but Edgewood hoped to install lights in the future. Elliott Dep., dkt. #33, 124:18-126:10.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

66.     It made financial sense for Edgewood to put the PVC and conduit that at the time the field was being resurfaced because otherwise, Edgewood would have had to dig up the field in the future to install the conduit. Elliott Dep., dkt. #33, 132:24-133:4.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

67.     In 2015 when it was resurfacing its track and field, Edgewood did not know if the technology for lighting would be available one year in the future, five years in the future or ten years in the future. Elliott Dep., dkt. #33, 125:19-126:10.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

68.     Elliott is not aware of any conversations occurring in 2015 with the City about when in the future Edgewood would put in lights or communications. Elliott Dep., dkt. #33, 132:11-23.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

**Increase in Games and Request for a Stadium**

69.    Following the track upgrades, Elliott admits that there was an increase in games on the athletic field that coincided with the improvements that occurred in 2015. Elliott Dep., dkt. #33, 154:18-21.

**Response:**    Disputed in part.  The upgrades were to *the field* and the track, and Elliott agreed that the number of games had increased.  Elliott Dep. at 154 (emphasis added).

**Defendants' Reply:**  Fact as proposed is undisputed. The fact is amply supported.

Plaintiff's clarification is unnecessary and improper but is not disputed by defendants.

70.    On May 10, 2016, Edgewood discussed with the neighborhood liaison committee the idea of adding seating and lights for its athletic field. Elliott Dep., dkt. #33, 138:7-139:11; Zylstra Dec., Ex. G, Dep. Ex. 59.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

71.    Neighbors and the liaison committee has raised field usage, traffic, parking, lights, and sound as concerns at some listening sessions Edgewood had held. Elliott Dep., dkt. #33, 140:23-141:18.

**Response:**    Disputed in part.  While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.

**Defendants' Reply:**  Fact as proposed is undisputed. Elliott testified at the cited

reference:

Q   Okay.  Then on the first page of this flyer, it's got a heading "Neighborhood Concerns."  Do you see that?

A   Yes.

Q   It says, "The concerns neighbors expressed were usage, traffic, parking, lights, and sound."  Is that correct?

A   Correct.

Q   And those were generally concerns that the Neighborhood Liaison Committee had expressed to Edgewood repeatedly in the past when it wanted to expand its use of its athletic field; true?

       MR. INGRISANO:  Objection.  Form.

27

A   Those were concerns that they've brought up in some listening meetings that we held, and so it was the neighbors and the liaison committee.

Q   And they had expressed those concerns for many years, is that right, prior to the May 2016 meeting?

A   I had heard complaints when I was -- after I became president when I brought this idea up.

Plaintiff wrongly attempts to add facts and to the extent Elliott is trying to change his deposition testimony, the sham affidavit rule precludes him doing so. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Maldonado*, 186 F.3d at 769 (plaintiff may not create sham issues of fact through an affidavit that contradicts or "patches-up" prior deposition testimony); *Babrocky*, 773 F.2d at 861 (noting court's duty to ignore "sham" issues).

72.     Historically, going back as far as 1996, the neighborhood association has been opposed to Edgewood adding lighting and a sound system to its athletic field. Schey Dec., ¶¶6-7, Exs. B & C.

**Response:** Disputed.  First, the cited exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Second, Shawn Schey is an opponent of EHS's lights and a member of the group "No New Stadium."  Evers Dep. at 25; Elliott Decl. ¶ 42.  EHS asked Ms. Schey to step down from the Edgewood Neighborhood Liaison Committee because she was inaccurately characterizing discussions to her own interpretation, meaning that notes from this witness are not supported by sufficient guarantees of trustworthiness.  Elliott Decl. ¶ 43.  Third, proposed facts from 1996 are immaterial and irrelevant to a zoning ordinance effective as of 2013 and a Master Plan agreed-to thereafter.

**Defendants' Reply:**  Fact as proposed is undisputed.  First, the exhibit is not hearsay. Shawn Schey is the current Vice President and a member of the Dudgeon Monroe Neighborhood Association and was a member of the Liaison Committee. Schey Dec., ¶2. She's been a member of the neighborhood association since 1985. She regularly attended meetings and averred in her declaration that minutes of meetings were kept in the regular course of business. These facts satisfy FRE 803(6) and are based on her personal knowledge. Plaintiff wrongly attempts to add

28

facts and to the extent Elliott is trying to impugn Ms. Schey's character, such statements are without foundation and disrespectful. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact). Further, Ms. Schey's testimony is supported by the corroborating meeting minutes.  Finally, hearsay presented at summary judgment is permissible as long as the facts in those materials could later be presented in an admissible form at trial. *See Pullen*, 88 F. Supp. 3d at 932 ("the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form") (quoting *Olson*, 750 F.3d at 714); *see also Harris*, 2019 WL 1006093, at *4 (litigant is allowed to present hearsay evidence on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial). Defendants are prepared to offer Ms. Schey's testimony as well as other neighbors involved at trial.

73.     In 1996, Edgewood proposed to the neighborhood association a conditional use plan whereby Edgewood wanted to add lights, a sound system, and a grandstand to its athletic field. Schey Dec., ¶6, Ex. C. It also proposed a permanent structure for its athletic complex. Schey Dec., ¶6, Ex. C.

**Response:**     Disputed.  See Response to PFOF 72.

**Defendants' Reply:**  Fact as proposed is undisputed.  *See* reply to PFF 72.

74.     The Dudgeon Monroe Neighborhood Association Council adopted a resolution endorsing the majority vote of the neighbors taken at a meeting on July 18, 1996. Schey Dec., ¶6, Ex. C. The association indicated to Edgewood that based on that vote, it would not support adding lights or a new sound system to its athletic field. It also indicated that it would not support a larger grandstand but would support 300 bleacher seats. Schey Dec., ¶6, Ex. C.

**Response:**     Disputed.  See Response to PFOF 72.

**Defendants' Reply:**  Fact as proposed is undisputed.  *See* reply to PFF 72.

75.     Following the August 14, 1996 meeting of the neighborhood association, Edgewood revised its conditional use application with the City and removed all lights, the sound system and the larger grandstand. Schey Dec., ¶7.

**Response:**      Disputed.  See Response to PFOF 72.

**Defendants' Reply:**  Fact as proposed is undisputed.  *See* reply to PFF 72.

76.      In and around March of 2017, Elliott had a meeting with then Zoning Administrator Matthew Tucker about Edgewood's desire to move forward with a modified stadium. Zylstra Dec., Ex. H, Dep. Ex. 72; Tucker Dec., ¶7; Elliott Dep., dkt. #33, 186:25- 188:4.

**Response:**      Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

77.      In regards to the meeting in the prior PFOF, Elliot wrote in an email that the City did "not feel the current master plan would let us proceed with a modified stadium. Night use is the issue and it is in their mind a new or different usage. They [recommend] we continue to work with neighbors for an agreement." Zylstra Dec., Ex. H, Dep. Ex. 72; Elliot Dep. 186:25-188:4; Tucker Dec., ¶7. Tucker suggested Elliott work with the neighbors to try to come to agreement to mitigate the sound and noise associated with night games. Tucker Dec., ¶7.

**Response:**      Disputed.  No one at the City ever communicated that the Master Plan was a supposed obstacle to lights for the athletic field until March of 2019.  Elliott Decl. ¶ 38.  The cited exhibit indicates that Tucker advised that the EHS had eliminated issues with lights. Zylstra Dec., Ex. H, Dep. Ex. 72.  Tucker never clarified what he meant by usage, and never communicated a supposed prohibition on games until October 2018.  Elliott Decl. ¶ 25.

**Defendants' Reply:**  Fact as proposed is undisputed. First, plaintiff cannot add facts and

the proposed fact is amply supported. Second, Elliott wrote an email to a parent of Edgewood

about his meeting with Matt Tucker and the quotation in the PFF are Mr. Elliott's exact words.

Plaintiff may not create sham issues of fact through Elliott's affidavit trying to contradict or his

prior deposition testimony and his own words in the email. *Maldonado*, 186 F.3d at 769;

*Babrocky*, 773 F.2d at 861 (noting court's duty to ignore "sham" issues).

78.      In July of 2018, Elliott emailed then Alder Sara Eskrich, asking her to sign off on a minor amendment to the master plan so that Edgewood could hold an October 5 senior night football game with temporary lights and seating on its athletic field. Zylstra Dec., Ex. I, Dep. Ex. 61; Elliott Dep., dkt. #33, 142:11-145:15.

**Response:**      Disputed.  Mike Elliott contacted Alder Eskrich for assistance with obtaining temporary lighting and bleachers to use on the field for a Senior Night varsity football game after Edgewood lost its off-campus stadium for the game.  Elliott Dep. at 142-147.  Elliott

30

added a joke about her signing off on a minor or major amendment of the Master Plan.  Elliott Dep. at 142-147.

**Defendants' Reply:**   Fact as proposed is undisputed.  Plaintiff's response does not put the proposed fact into dispute.  That Elliott in this litigation attempted to qualify his email as a "joke" does not change that he emailed Alder Sara Eskrich, asking her to sign off on a minor amendment to the master plan so that Edgewood could hold an October 5 senior night football game with temporary lights and seating on its athletic field.  The cited references amply support the proposed fact and Alder Eskrich's response to that email indicates that she did not believe it was a joke. Zylstra Dec., Ex. I, Dep. Ex. 61.

79.     Alder Eskrich responded to the email in the prior PFOF stating that for a temporary game, Elliott should reach out to City staff but she could not sign off on the stadium lights as a minor alteration "because we've discussed very publicly that this requires a master plan amendment." Zylstra Dec., Ex. I, Dep. Ex. 61; Elliott Dep., dkt. #33, 142:11-145:15.

**Response:**     Disputed.  Alder Eskrich had previously indicated that she could not sign off on the stadium lights as a minor alteration in the context of a larger building project adding seats, concessions and restrooms.  Elliott Decl. ¶ 38.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff's response does not put the proposed fact into dispute. Alder Eskrich's response is contained in the cited email. Further, plaintiff's attempt to create a dispute with Elliott's declaration is inconsistent with Elliott's own deposition testimony.  He testified:

Q  Did you understand from the email from Alder Eskrich that's in Exhibit 61 that she believed stadium lights would require a master plan amendment?

A  Yes.

Elliott Dep., dkt. #33, 149:2-6.  *Maldonado*, 186 F.3d at 769; *Babrocky*, 773 F.2d at 861 (noting court's duty to ignore "sham" issues).

80.     Elliott did not think he did, but he does not recall if he reached out to City staff as to a temporary game. Elliott Dep., dkt. #33, 146:2-9.

**Response:**     Disputed.  Elliott does not remember.  Elliott Dep. at 146.

**Defendants' Reply:**  Fact as proposed is undisputed.  Plaintiff's argumentative response

does not put the proposed fact into dispute, which is near verbatim what Elliott said at the cited

reference.

81.     On October 17, 2018, Zoning Administrator Matt Tucker attended a
neighborhood meeting at which there was discussion of Edgewood's proposal to add seating,
lights and a sound system to its athletic field. Tucker Dec., ¶8.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

**Tucker Learns of Field Use**

82.     Edgewood presented its proposal at the October 17, 2018 meeting and described
its current use of its athletic field. Tucker Dec., ¶8.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

83.     Following the October 17, 2018 meeting, Tucker sent an email to Elliott and
Brian Munson, a consultant working with Edgewood. Zylstra Dec., Ex. J, Dep. Ex. 64; Elliott
Dep., dkt. #33, 156:13-24. Tucker wrote:

> After the neighborhood meeting of Wednesday October 17, I became aware of the
> extensive use of the athletic field at the northwest corner of the site. I also closely
> reviewed the adopted Master Plan, to determine how language in the master plan relates
> to the athletic field usage. Specifically, in the "Open Space Plan" (section 3.8) the
> approve master plan identifies the athletics field to be used for "team practices, physical
> education practices." The lack of any further language in this section, or any other
> language in sections of the adopted Master Plan, leads me to the interpretation that
> current programing and usage of the field is operating outside of the allowances of the
> adopted Master Plan.
>
> If you wish to continue the current level of programming on the field for 2019 and
> beyond, I believe that you will need to pursue an amendment to the approved Master
> Plan. I would be happy to talk with you, Alder Arntsen, and the neighborhood liaison
> committee, should you choose to explore a Master Plan amendment to expand the use of

the athletic field. If you decide to continue with the current idea for a stadium expansion at the athletic field, you will also need to include language in this amendment that would incorporate allowing the current level of usage of the field to be allowable and continue.

Zylstra Dec., Ex. J, Dep. Ex. 64; Elliott Dep., dkt. #33, 156:13-24, 159:8-160:7; Tucker Dec., ¶9.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

84.     Tucker did not include any neighbors or the neighborhood associations on his October 17, 2018 email to Edgewood but simply noted the issue for Edgewood. Zylstra Dec., Ex. J, Dep. Ex. 64; Elliot Dep., 160:8-11; Tucker Dec., ¶9.

**Response:**     Disputed.  Tucker and the City at some point shared this new interpretation with Edgewood's neighbors, as they began complaining for the first time that Edgewood was playing games on its athletic field.  Elliott Decl.  ¶ 51.

**Defendants' Reply:**   Fact as proposed is undisputed. First, plaintiff cannot propose

additional facts in the response to defendants' proposed facts. *American National Property &*

*Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's

proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. Second, the cited

evidence amply supports the proposed fact. Elliott even testified as such.  He testified:

Q   Okay.  Mr. Tucker did not include on this email any of the neighborhood association or any of the neighbors; correct?

A   Not that I can see.

Q   Right.  He directed this just to you and Mr. Munson with some additional city personnel; correct?

A   It looks like that, yes.

Elliott Dep., dkt. 33, 160:8-15. Third, the Elliott declaration at ¶51 does not put this fact into

dispute in any way.

85.     On November 14, 2018, Edgewood filed an application to amend its Master Plan to incorporate lighting, expand seating, add restrooms, team rooms, and storage and define its field use. Zylstra Dec., Ex. K, Dep. Ex. 62; Elliott Dep., dkt. #33, 149:10- 151:20; Tucker Dec., ¶10.

**Response:**     Not disputed.  Dispute any inference that EHS conceded that it was required to define its field use.  The letter identified in PFOF 86, in part, continued to assert that the Master Plan did not limit EHS's use of the field to practices and physical education classes. Zylstra Dec., Ex. L, Dep. Ex. 65.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2.

86.     On November 14, 2018, Edgewood's then counsel, Katherine Rist, wrote to Mr. Tucker in response to his October 26 email. Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep., dkt. #33, 161:23-162:23.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

87.     Attorney Rist stated in her November 14, 2018 letter that to the extent Edgewood's Master Plan may be interpreted in a way which does not expressly permit athletic competition games, Edgewood's position was that such use is a legal nonconforming use. Zylstra Dec., Ex. L, Dep. Ex. 65; Elliott Dep., dkt. #33, 161:23-163:5.

**Response:**     Disputed as misleadingly incomplete and selective.  The Rist letter challenges Tucker's new interpretation of the Master plan generated by his recent review of it and notes historical uses of the field incompatible with a practical interpretation of Master Plan. Zylstra Decl., Ex. L, Dep. Ex. 65.  The letter demonstrates that EHS's counsel was making an alternative argument.

**Defendants' Reply:**   Fact as proposed is undisputed.  Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The Rist letter contains this argument and in fact, it is the primary argument in the letter.

88.     On November 20, 2018, Mr. Tucker responded to Atty. Rist by letter indicating that he disagreed with Edgewood's position that it established a legal nonconforming use. Zylstra Dec., Ex. M, Dep. Ex. 66; Tucker Dec., ¶11.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

89.     Tucker also stated in his November 20, 2018 letter that he was aware that Edgewood had filed an amendment to its master plan that, if approved, would allow use of the athletic field for games would make the issue moot and that in such instances, the City's internal policy is to suspend enforcement pending the result of the application for amendment. Zylstra Dec., Ex. M, Dep. Ex. 66; Elliott Dep., dkt. #33, 164:4-165:7; Tucker Dec., ¶11.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

90.     Tucker also indicated in that November 20, 2018 letter that if the amendment was denied, "then the City will send a formal notice of violation, and at that time we can discuss how Edgewood wishes to proceed." Zylstra Dec., Ex. M, Dep. Ex. 66; Tucker Dec., ¶11.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

**Edgewood Submits First Lighting Application for Night Games**

91.     On Friday, February 22, 2019, Edgewood submitted an application with the City for outdoor lighting of its athletic field. This was a surprise to the City as Edgewood had submitted a master plan amendment. Zylstra Dec., Ex. N, Dep. Ex. 37; Tucker Dep., dkt. #32, 64:25-66:20, 52:13-54:22.

**Response:**      Disputed in part.  Not disputed that Edgewood submitted an application for outdoor lighting on February 22, 2019.  Disputed that this was a surprise, because Edgewood had already tabled its Master Plan amendment and discussed with City officials breaking up the multiple components of the proposed Master Plan amendment and pursuing some items, including lights, piecemeal without the need for an amendment. June 10,  2022 Declaration of Nathan Wautier ("Wautier Decl.") ¶¶ 6, 7.

**Defendants' Reply:**   The portion of the proposed fact that on Friday, February 22, 2019,

Edgewood submitted an application with the City for outdoor lighting of its athletic field is

undisputed. That it was a surprise to the City is properly disputed. Such is not material to the

City's summary judgment motion.

92.     The following Wednesday, on February 27, 2019, Mr. Tucker wrote a letter to Elliott:

> On Friday, February 22, the Building Inspection Division accepted a lighting plan filed by Forward Electric on behalf of Edgewood High School, to install lighting for the school's field. Those plans will be reviewed for compliance with MOO [sic] Section 10.085, and if the plans comply, electrical permits will be issued when requested.
>
> The City believes this permit can be issued without requiring amendment of the approved 2014 Master Plan. However, over the past weekend, I received a copy of the letter sent to "Edgewood Family" and a "Frequently Asked Questions" document relating to the institutions' present interest to install lights and an amplified sound system at the field (copy attached). These letters indicate that Edgewood intends to use the lights and sound system to host night games at the facility.
>
> Based on the information the City currently has regarding the historical use of the facility, it would appear that the intended use of the facility as outlined in your letter to the "Edgewood Family" and detailed in the "Frequently Asked Questions" document would conflict with the approved 2014 Master Plan for the site, which limits use of the facility to "team practices, physical education classes" (Page 42, Section 3.8, Open Spaces Plan).
>
> The purpose of this letter is to inform you that the issuance of any lighting permit under MGO sec. 10.085 does not change the City's position that the use of the facility under the master plan is limited to "team practices, physical education classes."

Zylstra Dec., Ex. O, Dep. Ex. 6;Tucker Dep., dkt. #32, 53:22-54:22.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a letter with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff does not put forth any

contrary evidence.  In any event, defendants do not seek to have plaintiff admit the contents of

the letter but only that this letter was sent and what it said, which is undisputed and supported by

the cited references.

93.     The attachment to which Tucker referred in the prior PFOF contained a letter that Elliott wrote to the "Edgewood Family" and included a "Frequently Asked Questions" document in which Edgewood indicated that if it would host night games at its athletic field if the City

issued the lighting permit. Zylstra Dec., Ex. O, Dep. Ex. 6 at 3, 5; Elliott Dep., dkt. #33, 171:12-172:2, 174:23-175:16.

**Response:** Disputed. Mike Elliott was part of a committee that drafted the letter. Elliott Dep. at 172. EHS did not say that it would host night games but that it was "planning" to do so. Zylstra Dec. Ex. O, Dep. Ex. 6 at 3. EHS was conveying to its supporters that it was not conceding the City's interpretation that the Master Plan precluded games and that the school would resort to the appropriate recourse to challenge that interpretation. Elliott Decl. ¶ 37.

**Defendants' Reply:** Fact as proposed is undisputed. First, plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2. Second, plaintiff's word choice does not make the proposed fact disputed. Elliott testified as to the exhibit:

> Q Yeah. It says, "Is Edgewood High School planning to host night games at the Goodman Athletic Complex if the permit for lighting is granted by the city?" Do you see that question there, sir?
>
> A Yes.
>
> Q And the answer there is yes; correct?
>
> A Yes.

94. The attachment referred to in PFOF 91 indicated that Edgewood was tabling the application to amend its Master Plan that Edgewood filed with the City. Zylstra Dec., Ex. O, Dep. Ex. 6 at 3; Elliott Dep., dkt. #33, 171:12-172:2.

**Response:** Not disputed.

**Defendants' Reply:** Fact as proposed is undisputed.

95. On February 27, 2019, Edgewood's lighting application was stamped "approved" by Building Inspector Steve Rewey with the City as to the lighting review. Hank Dep., dkt. #30, 24:17-24, 33: 2-18; Zylstra Dec., Ex. P, Dep. Ex. 3.

**Response:** Not disputed.

**Defendants' Reply:** Fact as proposed is undisputed.

96. Shortly after Tucker sent his February 27, 2019 letter, Tucker met with his supervisor, George Hank, and Assistant City Attorney, John Strange. Hank Dep., dkt. #30, 38:18-24; Tucker Dep., dkt. #32, 45:24-48:24, 51:2-54:22.

**Response:**      Disputed in part.  Not disputed that Tucker, and Strange met.  Disputed that the cited evidence stands for the proposition that the meeting occurred "shortly after" Tucker's letter.  City employee Christina Thiele performed the zoning review on March 1, 2019. Hank Dep. at 72; Tucker Dep. at 34. On March 1, Thiele approved the zoning review.  Hank Dep. at 33-34, 72; Zylstra Dec., Ex. P, Dep. Ex. 3 at 1.  Thiele stamped and signed "Final Approval Date" as of March 1, 2019 for the EHS light application.   Zylstra Dec., Ex. P, Dep. Ex. 3 at 3; Ingrisano Decl. ¶ 3, Ex. 2, Dep. Ex. 38 at 3; Tucker Dep. at 65-66.  On March 8, a week later after the application had been approved, in a phone call with Wautier, Tucker advised that there may be a problem with the height of the light poles under the Master Plan and that the City may not be able to issue the permit.  Wautier Decl. ¶ 15.

**Defendants' Reply:**  Fact as proposed is undisputed. Even accepting the Wautier

declaration as true, it suggests that the meeting occurred prior to March 8.  March 8 is shortly

after February 27.

97.      Hank decided that Edgewood's lighting permit should not be issued to Edgewood based on M.G.O. §10.085(1) and (5)(b). Tucker Dep., dkt. #32, 44:23-48:3.

**Response:**      Disputed.  The cited testimony is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Tucker cannot attribute self-serving statements to another City representative for the truth of the matter asserted.  In addition, According to Hank, Tucker and Hank discussed the light permit and "it was our belief that we should withhold it…"  Hank Dep. at 55.  Hank's rationale for withholding the permit was limited to the uses outline in the Open Spaces section of EHS's Master Plan. Hank Dep. at 81, 84-86.  He did not testify to relying on M.G.O. Section 10.085(1) and (5)(b).

**Defendants' Reply:**  Fact as proposed is undisputed. First, the proposed fact is not

hearsay because Tucker is not attributing statements to Hank; rather, he is identifiable who made

the decision on behalf of the City and the basis for the decision. As he was involved when the

decision was made, he has personal knowledge of these facts and is competent to testify as to

such. Second, the proposed fact is consistent with Hank's testimony as he indicated that there

were concerns raised that the permit should not issue and that the permits were inconsistent with

Edgewood's Master Plan. Hank Dep., dkt. #30, 37:22-38:22, 44:25-47:4, 55:21-24, 60:21-62:19.

Counsel did not ask Hank what provisions in the ordinance were implicated by his concerns that

the application was inconsistent with the master plan. Further, John Strange confirmed at his

recent decision that Hank made the decision and his basis for that decision. Strange Dep., dkt. #56 and #56-1, 30:8-32:22. Finally, hearsay presented at summary judgment is permissible as long as the facts in those materials could later be presented in an admissible form at trial. *See Pullen*, 88 F. Supp. 3d at 932 ("the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form") (quoting *Olson*, 750 F.3d at 714); *see also Harris*, 2019 WL 1006093, at *4 (litigant is allowed to present hearsay evidence on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial). Hank will be asked at trial about the specific ordinance provisions he relied on.

98.     M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it shall be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations as applicable under appropriate permit and inspection." Tucker Dep., dkt. #32, 46:18-48:3; Zylstra Dec., Ex. Q, Dep. Ex. 1; Hank Dep., dkt. #30, 38:5-12.

**Response:** Not disputed that PFOF 98 accurately quotes the cited ordinance provision.

**Defendants' Reply:**  Fact as proposed is undisputed.

99.     Hank believed that the language of Edgewood's Master Plan was inconsistent with its lighting application. Tucker Dep., dkt. #32, 46:18-48:3.

**Response:**     Disputed.  The cited testimony is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Tucker cannot attribute self-serving statements to another City representative for the truth of the matter asserted.  According to Hank, Tucker and Hank discussed the light permit and "it was our belief that we should withhold it…"  Hank Dep. at 55.  Tucker was the source of Hank's interpretation of the Master Plan.  Hank Dep. at 46.  Hank's rationale for withholding the permit was limited to the uses outlined in the Open Spaces section of EHS's Master Plan.  Hank Dep. at 81, 84-86. Even under the new interpretation that the Master Plan used to withhold lights, Hank and City recognize that there was at least one permitted use for the athletic field – team practices – for which the outdoor lights could have been permissibly used.  Hank Dep. at 63-65.  Nevertheless, Hank's concern was that if the City issued the permit but restricted EHS from playing games on its field, that EHS would be upset at his department for granting the application and allowing less than full use of the field.  Hank Dep. at 61.  According to Hank, this was the only reason – the risk that EHS would have unmet expectations that it could hold night games – for withholding

the permit.  Hank Dep. at 61.  Hank claims that the decision to withhold EHS's permit was in part motivated by a desire to protect EHS.  Hank Dep. at 62.

**Defendants' Reply:**   Fact as proposed is undisputed. First, the proposed fact is not hearsay because Tucker is not attributing statements to Hank; rather, he is identifiable who made the decision on behalf of the City and the basis for the decision. As he was involved when the decision was made, he has personal knowledge of these facts and is competent to testify as to such. Second, the proposed fact is consistent with Hank's testimony as he indicated that there were concerns raised that the permit should not issue and that the permits were inconsistent with Edgewood's Master Plan. Hank Dep., dkt. #30, 37:22-38:22, 44:25-47:4, 55:21-24, 60:21-62:19. Further, John Strange confirmed at his recent decision that Hank made the decision and his basis for that decision. Strange Dep., dkt. #56 and #56-1, 30:8-32:22. In addition, hearsay presented at summary judgment is permissible as long as the facts in those materials could later be presented in an admissible form at trial. *See Pullen*, 88 F. Supp. 3d at 932 ("the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form") (quoting *Olson*, 750 F.3d at 714); *see also Harris*, 2019 WL 1006093, at *4 (litigant is allowed to present hearsay evidence on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial). Hank will testify at trial as he did in his deposition that the application was inconsistent with the master plan. Plaintiff impermissibly seeks to propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2. Nothing in the additional proposed facts contradict the proposed fact that Hank believed the lighting application was inconsistent with the master plan. Hank testified that he reviewed certain pages of the master

plan as part of his discussions and analysis in withholding the permit. Hank Dep., dkt. #30, 46:19-47:4.

100.    M.G.O. §10.085(5)(b) provided "Upon review of the material described above, the building inspection division *may* authorize the installation of outdoor lighting fixtures." *See also* Tucker Dep., dkt. #32, 46:18-48:3.

**Response:**    Disputed.  The cited evidence does not stand for the proposition asserted.

**Defendants' Reply:**  Fact as proposed is undisputed. The cited reference is first to

M.G.O. §10.085(5)(b), which states, "(b) Upon review of the material described above, the

Building Inspection Division may authorize the installation of outdoor lighting fixtures."  The

"see also" cite is Tucker testifying, "It's under "Approval Procedures," sub 5, sub b:  "Upon

review of the material described above, the building inspection division may authorize the

installation of outdoor lighting fixtures."  Tucker Dep., dkt. #32, 47:17-20.

101.    Hank was concerned about allowing Edgewood to make a large capital expenditure to install lighting when the City was contending that Edgewood could not use the lights for night games put the City at risk. Hank Dep., dkt. #30, 44:23-45:14.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

102.    On March 12, 2019, Edgewood's counsel, Attorney Nathan Wautier wrote to the City regarding Edgewood's lighting application and objecting to the City's decision not to issue the lighting permit. Zylstra Dec., Ex. R, Dep. Ex. 70; Elliott Dep., dkt. #33, 178:22-179:12.

**Response:**    Disputed in part.  The cited exhibit noted not that the City had decided not to issue the lighting permit but that the City was "considering the revocation of its prior approval" of that permit.  Zylstra Dec. Ex. R, Dep. Ex. 70.  No decision on the February 22, 2019 light application was conveyed to EHS.  Wautier Decl. ¶ 16.

**Defendants' Reply:**  Fact is partially admitted. Plaintiff admits that On March 12, 2019,

Edgewood's counsel, Attorney Nathan Wautier wrote to the City regarding Edgewood's lighting

application and objecting that the City was "considering the revocation of its prior approval" of

that permit.

103.     Assistant City Attorney John Strange responded to Atty. Wautier by letter dated March 21, 2019. Zylstra Dec., Ex. S, Dep. Ex. 71; Elliott Dep., dkt. #33, 180:6-11, 184:16-18.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

104.     Atty. Strange wrote in his March 21, 2019 letter, "In addition, because the lights are part and parcel of a plan to conduct athletic contests at night, neither the lights nor the athletic contests are in compliance with the campus master plan." Zylstra Dec., Ex. S, Dep. Ex. 71 at 1; Elliott Dep., dkt. #33, 184:16-18.

**Response:**     Not disputed that PFOF 104 accurately quotes part of the cited letter setting forth the City's interpretation and argument as of that date.

**Defendants' Reply:**  Fact as proposed is undisputed.

105.     Atty. Strange wrote in his March 21, 2019 letter, "The stadium lights are capital improvements that were required to be shown in the Campus Master Plan by M.G.O. § 28.097(5)(c)2 in order to be constructed without Plan Commission approval" and "Since the stadium lights are neither shown on nor mentioned in the campus master plan, the campus master plan must be amended per MGO Section 28.097(10)." Zylstra Dec., Ex. S, Dep. Ex. 71 at 4; Elliott Dep., dkt. #33, 184:16-18.

**Response:**     Not disputed that PFOF 105 accurately quotes part of the cited letter setting forth the City's legal interpretation and argument as of that date.

**Defendants' Reply:**  Fact as proposed is undisputed.

106.     Atty. Strange wrote in his March 21, 2019 letter, "To that end, as shown above, Edgewood's application was never in compliance with zoning at the time its lighting application was filed because the lights were not identified as improvements at the athletic field and therefore are simply not allowed absent additional Plan Commission approval." Zylstra Dec., Ex. S, Dep. Ex. 71 at 4; Elliott Dep., dkt. #33, 184:16-18.

**Response:**     Not disputed that PFOF 106 accurately quotes part of the cited letter setting forth the City's legal interpretation and argument as of that date.

**Defendants' Reply:**  Fact as proposed is undisputed.

107.     In late March 2019, neighbors near Edgewood contacted the City and complained that Edgewood was holding competitive games on its field in violation of its master plan. Tucker Dec., ¶13.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

108.     The City sent an inspector to observe and after he witnessed athletic contests being held on Edgewood's field, the inspector issued Official Notices of Violation to Edgewood. Tucker Dec., ¶13; Zylstra Dec., Ex. T, Dep. Exs. 9 and 11.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

109.     The notices referenced in the prior PFOF instructed Edgewood to "[d]iscontinue holding athletic contests on the athletic field at 2219 Monroe Street" and noted that "The Campus Master Plan states that the athletic field is used for team practices and physical education classes. The Master Plan can be amended pursuant to MGO 28.097(10). Edgewood could accomplish this by proceeding with the Campus Master Plan amendment application currently on file with the Planning Division." Zylstra Dec., Ex. T, Dep. Exs. 9 and 11; Tucker Dec., ¶13.

**Response:**     Not disputed that PFOF 109 accurately quotes parts of the cited exhibits.

**Defendants' Reply:**   Fact as proposed is undisputed.

110.     Notices of Violations are warnings. Tucker Dep., dkt. #32, 17:17-25; Tucker Dec., ¶13.

**Response:**     Disputed.  While Notices of Violations are "like warnings," they are appealable actions that "further things along."  Tucker Dep. at 137.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff impermissibly seeks to propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2.

111.     The City did not issue a citation or fine Edgewood. Tucker Dec., ¶13.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

112.   Edgewood appealed the Official Notice of Violations to the Zoning Board of Appeals ("ZBA"). Zylstra Dec., Ex. U, Dep. Ex. 74; Elliott Dep., dkt. #33, 196:15-197:9; Tucker Dec., ¶14.

**Response:**   Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

113.   While its appeal to the ZBA was in progress, Edgewood was still meeting with the neighborhood association to try and come up to some resolution with regard to use of its field. Elliot Dep. 196:15-197:14.

**Response:**   Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

114.   Edgewood agreed not to move forward with its lights while it was still meeting with the neighborhood association and was still making progress. Elliott Dep., dkt. #33, 200:25-17.

**Response:**   Disputed.  The meeting minutes make clear that EHS's commitment while the group was making progress was subject to EHS Board approval.  Elliott Dep. at 197-201; Ingrisano Decl. ¶ 12, Ex. 11, Dep. Ex. 75 at 3.

**Defendants' Reply:**   Fact as proposed is undisputed.  Elliott testified at the cited

reference,

> Q   And the fifth bullet down says DMNS.  It says, "If you are granted the ability by the city to move forward with the lights, will you?"  Do you see that, sir?
> A   Uh-huh.
>
> Q   Is that a yes?  Do you see that, sir?
>
> A   I see, "If you are granted the ability by the city to move forward with the lights, will you?"
>
> Q   Okay.  And the Edgewood High School response says, "No.  We made a commitment to not proceed with the lights while this group is still making progress/positive progression and for the duration of this process up to the next nine weeks."  Did I read that correctly?
>
> A   Yes.
>
> Q   Is that an accurate statement of Edgewood High School's position at the time of this meeting?

A   At the time of this meeting, yes.

Plaintiff impermissibly seeks to propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2. In any event, plaintiff's response does not put the proposed fact into dispute.

115.   Edgewood did not move forward to install lights from the time of Tucker's February 27, 2019 letter to the present. Elliott Dep., dkt. #33, 186:5-10.

**Response:**   Disputed.  Edgewood did not move forward to install lights because it could not move forward to install lights because the City did not issue a permit.  Elliott Decl. ¶ 39.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff impermissibly seeks to propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2.  In any event, plaintiff's response does not put the proposed fact into dispute.

116.   The Zoning Board of Appeals held a public hearing on Edgewood's appeal of the Notices of Violation on July 11, 2019. Tucker Dec., ¶14; Zylstra Dec., Ex. V, Dep. Ex. 76.

**Response:**   Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

117.   At the July 11, 2019 hearing, Nathan Wautier, an attorney for Edgewood, argued that if one of the high schools without a master plan wanted to build a correctional facility, they would be allowed to do that as a matter of right under the then-current zoning code because a correctional facility was an identified secondary use. Zylstra Dec., Ex. V, Dep. Ex. 76 at 90:19-91:22, 87:14-25.

**Response:**   Disputed.  The cited transcript demonstrates that Wautier answered a question from a Plan Commissioner regarding permitted uses where the question used correctional facilities as an example.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 90-91.  "Correctional facility" is a permitted secondary use under the Campus Institutional District zoning ordinance. M.G.O. Section 28.097(3)(b)(15).  Zylstra Decl., Ex. B, Dep. Ex. 13.

**Defendants' Reply:**   Fact as proposed is undisputed.  Whether it was in response to a question or not, it does not change or put into dispute the proposed fact.

118.     At the July 11, 2019 hearing, Assistant City Attorney John Strange also told the Plan Commission that under Edgewood's argument, Edgewood could turn the Oaks, a green space on Campus with heritage trees, into a cornfield without Plan Commission approval because agricultural use is an allowable use under the ordinance. Zylstra Dec., Ex. V, Dep. Ex. 76 at 74:3-9; Zylstra Dec., Ex. A, Dep. Ex. 7 at 60 of 228.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

119.     The Zoning Board of Appeals voted unanimously to affirm the decision of the Zoning Administrator. Elliott Dep., dkt. #33, 203:11-15; Tucker Dec., ¶14.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

120.     The Zoning Board's vote was a determination that Edgewood was required to amend its master plan to play competitive games on its athletic field. Zylstra Dec., Ex. V, Dep. Ex. 76 at 224-225, 246-247; Tucker Dec., ¶14.

**Response:**     Disputed.  The cited transcript excerpts do not stand for the cited proposition.  Instead, the transcript indicates that the parties are there for an appeal to reverse, affirm or modify the Official Notices issued upon Edgewood by the City.  Zylstra Dec., Ex. V, Dep. Ex. 76 at 7-8.  The Tucker Declaration's attempt to recast the nature of the proceedings and the determination made is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment, or alternatively, is objected to as opinion testimony pursuant to Federal Rule of Evidence 701.

**Defendants' Reply:**  Fact as proposed, with clarification, is undisputed. The Zoning

Board did vote to affirm the Official Notices that the City issued to Edgewood. This proposed

fact identified what the effect of that vote was, which was that it required Edgewood to amend its

master plan to play competitive games on its athletic field. That was the issue presented and

argued at Zoning Board of Appeals Hearing. The cited references support that. *See, e.g.*, Zylstra

Dec., Ex. V, Dep. Ex. 76 at 224:8-18 ("All right. So first of all, thanks to everyone who made

comments, and we appreciate -- as I said at the outset, appreciate the participation from the

public, and only -- the only thing I really have to respond to is just to ask the board to consider

only those comments that are prohibitive of the ordinance interpretation at issue here today,

46

which is: Is -- is a master plan amendment required? Is a Plan Commission approval required for

the change of an open space area?"); *see also id.* at 63:15-19 ("That doesn't mean that the City

doesn't think they should have games there. It just means that they think the Plan Commission

has to approve an amendment to the master plan in order to make that happen."); *id.* at 32:1-6

("Now, as you read in the City's brief, the one they settled on is found in General Ordinance

28.097(10), and that provision states that Plan Commission approval is required to change the

proposed use of an open space area identified in a campus master plan.").

121.    Edgewood never appealed the decision of the Zoning Board of Appeals. Tucker
Dec., ¶14.

**Response:**     Disputed, as PFOF has been withdrawn.

**Defendants' Reply:**  Defendants have withdrawn this PFF.  *See* dkt. 43 and 45.

122.    On July 12, 2019, then City Attorney Michael P. May wrote a letter to
Edgewood's counsel. Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

123.    Atty. May informed Edgewood that after ZBA denied Edgewood's appeal, further
enforcement related to the Official Notices rested within the discretion of the City Attorney.
Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶15.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

124.    Atty. May indicated in his July 12, 2019 letter that he would take no further
enforcement steps unless and until he provided Edgewood ample notice. Zylstra Dec., Ex. W,
Dep. Ex. 12; Tucker Dec., ¶15.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

125.    Because Edgewood's entry of the master plan was voluntary, Atty. May invited
Edgewood to file to terminate its Master Plan and return to the standard Campus Institutional
Zoning. Zylstra Dec., Ex. W, Dep. Ex. 12; Tucker Dec., ¶16.

**Response:**     Disputed in part.  Not disputed that May invited EHS to terminate its Master Plan and return to the standard Campus Institutional Zoning.  Disputed as to the master plan's voluntary as the cause of the invitation.  That proposition is not supported by the text of the letter exhibit cited and the Tucker Declaration's attempt to add that proposition to the letter does not appear to be made from personal knowledge and may well constitute inadmissible hearsay not appropriate for consideration on summary judgment.

**Defendants' Reply:**   Fact is partially admitted. It is undisputed that Atty. May invited

Edgewood to file to terminate its Master Plan and return to the standard Campus Institutional

Zoning.

126.     The restriction on Edgewood playing athletic contests on its field was due to the language in Edgewood's Master Plan. Tucker Dec., ¶16. If the Master Plan were repealed, Edgewood would be permitted to play athletic contests on its field pursuant to M.G.O. §28.097. Tucker Dec., ¶16.

**Response:**     Not disputed that this was the City's interpretation of the Master Plan that EHS was trying to get out from under with a repeal.  EHS disputes any legal conclusion that this legal interpretation was correct.

**Defendants' Reply:**   Fact as proposed is undisputed.

127.     On July 29, 2019, Edgewood's counsel sent a letter to the Mayor, stating "Please accept this letter as the Edgewood school's formal request and consent for the mayor to sponsor an ordinance for immediate repeal of ORD-14-00082 which established [Edgewood's] ten-year campus master plan." Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep., dkt. #33, 205:3-206:9.

**Response:**     Disputed in part.  Not disputed that the letter was sent and that PFOF 127 accurately quotes part of the cited letter.  Disputed that Edgewood's counsel sent the letter.  The exhibit itself demonstrates that it was signed by representatives from the three Edgewood institutions.  Zylstra Dec., Ex. X, Dep. Ex. 22.

**Defendants' Reply:**   Fact is partially admitted. It is undisputed that on July 29, 2019,

Edgewood sent a letter to the Mayor, stating "Please accept this letter as the Edgewood school's

formal request and consent for the mayor to sponsor an ordinance for immediate repeal of ORD-

14-00082 which established [Edgewood's] ten-year campus master plan."

128.     Elliott understood that because its Master Plan was enacted as an ordinance, that another ordinance has to enacted to repeal it. Elliott Dep., dkt. #33, 206:6-17.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

129.    Alder Evers began having conversations with Assistant City Attorney John Strange following the ZBA hearing, where, according to Evers, "it became apparent that there was a flaw in the ordinance." Evers Dep., dkt. #31, 82:23-83:15, 87:10-18.

**Response:**      Disputed.  Evers contacted Strange during the first week of August 2019. Evers Dep. at 89, 102.  This was after Edgewood's notice of repeal on July 29, 2019.  Zylstra Dec., Ex. X, Dep. Ex. 22; Elliott Dep. at 205-206.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff impermissibly seeks to

propose additional facts in the response to defendants' proposed facts. *American National*

*Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL

5117465, *2. The cited reference amply supports the proposed fact. Evers testified in part,

> Q.  With respect to that amendment, can you identify for me, sir, what involvement you had with that amendment?
>
> A.  Conversations with staff *following the meeting of the zoning board of appeals* where it became apparent that there was a flaw in the ordinance, in the Campus-Institutional District ordinance, and I asked my question based on reaction to what appeared to be language that was inadequate needed to be changed, asking what can be done.
>
> And, specifically, with the Assistant City Attorney John Strange, who handled land use questions for the city, that was the beginning of my involvement.

Evers Dep., dkt. #31, 82:23-83:10.  Plaintiff's response does not put the proposed fact into

dispute.

130.    Alder Evers wanted "to address a flaw that would allow a landowner to proceed with a significant change of use that would be in contrast with the explicit Statement of Purpose as articulated in the Campus-Institutional District." Evers Dep., dkt. #31, 91:3-9.

**Response:**      Disputed.  Evers was motivated to prevent EHS from adding lights to its field by changing the Campus Institutional District zoning ordinance to require conditional use permits for lighting before EHS repealed its Master Plan.  The EHS field lights "debate pointed to these flaws."  Evers Dep. at 93.  Indeed, the EHS stadium and lights issue was the only actual or active controversy that pointed to these "flaws" and the need for a change.  Evers Dep. at 9394.  Evers intended that his amendment would require EHS to go through a conditional use or Master Plan amendment process in order to get lights.  Evers Dep. at 97-99.  The original title of Evers' proposed ordinance specifically applied to the Evers' issues with EHS's athletic field,

including a potential agricultural issue on the Edgewood campus that had come up during discussions at the ZBA hearing.  Evers Dep. at 121-122.

**Defendants' Reply:**  Fact as proposed is undisputed. First, the cited reference amply supports the proposed fact.  In fact, it is a verbatim quote. Second, plaintiff impermissibly seeks to propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2. Third, plaintiff's response is argumentative.  "Arguments have no place in proposed findings of fact or responses to such findings." *McMahon v. Carroll College*, No. 04-C-384, 2007 WL 804149, at *2  (E.D. Wis. March 9, 2007). Finally, plaintiff does not fairly present or characterize Evers' testimony. As one example, Evers testified that this was not solely an issue related to Edgewood because concerns were raised about whether West High School should be able to put up lights and have a stadium. Evers Dep., dkt. #31, 94:10-95:12.

131.    Evers testified:

Q. So the potential for lights at Edgewood, a potential for a stadium, is what motivated your amendment; is that right?

MS. ZYLSTRA: Objection. Form. You can answer.

A. What motivated my amendment was a desire to update the amendment so that the flaws that had been identified, that institutions without a master plan would be able to make substantial use -- substantial changes to their use without addressing the potential for adverse impacts or addressing the issue of livability or vitality of adjacent neighbors. So while the Edgewood debate pointed to these flaws, the purpose of the amendment was to address a change in this so that institutions across -- who are in the Campus Institutional District would abide by the intent of the ordinance itself.

Q. But it was the Edgewood incident, specifically, and the ongoing issues with that stadium that highlighted for you the need for this change; is that right?

A. I don't know, Jonathan, if that's entirely accurate, because it -- I don't know if you read the transcript of the ZBA hearing, but it was suggested that an institution within the CI District could use their open space to have a correctional facility. So, in effect, a high school could be converted into a prison or that -- you know, that farming could take

place. And this was considered by everybody present to be somewhat inscrutable and inconsistent with the Campus-Institutional District ordinance itself. So while the debate around Edgewood pointed to one example, there was one of several potential issues that could come forth.

Evers Dep., dkt. #31, 92:14-93:23.

      **Response:**     Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a deposition testimony with many potential or implied factual propositions to which EHS cannot reasonably respond.  See Response to PFOF 130.

      **Defendants' Reply:**   Fact as proposed is undisputed. The cited reference amply supports

the proposed fact. *See* reply to PFF 130.

      132.     Alder Evers testified:

Q. What impact, if any, did you intend your amendment have on Edgewood's ability to obtain lights for its field?

MS. ZYLSTRA: Object to form. You can answer.

A. The purpose of the amendment was to address the flaw in the Campus-Institutional District, as it was originally written and published into law in 2013, that provided a loophole of sorts for campus institutions without a master plan to make substantial changes to their use without considering the potential for adverse impacts affecting the livability and vitality of adjacent neighborhoods.

Evers Dep., dkt. #31, 97:11-22.

      **Response:**     Disputed.  First, this is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a letter with many potential or implied factual propositions to which EHS cannot reasonably respond.  Second, the cited transcript is non-responsive to the question asked.  Evers later confirmed that his intent was that EHS be required to go through either the conditional use permitting process or the master plan amendment process.  Evers Dep. at 98.  See also Response to PFOF 130.

      **Defendants' Reply:**   Fact as proposed is undisputed. The cited reference amply supports

the proposed fact. Plaintiff cannot propose additional facts in the response to defendants'

proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer*

*Docking Station Corp.*, 2007 WL 5117465, *2. *See* reply to PFF 130.

133.     Alder Evers also testified:

Q. You are not aware of any other actual controversy involving a Campus- Institutional zone district that highlighted this issue; is that correct?

A. Not entirely so, because there were --there were residents in district -- in the District 5 aldermanic district where West High School, where there was some concern. This came up during the campaign. There was apparently a move that said, well, West High should be able -- should put up lights and have a stadium, which obviously would have been opposed by nearby neighbors.

Evers Dep., dkt. #31, 94:9-18.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a letter with many potential or implied factual propositions to which EHS cannot reasonably respond. Evers recitation of what other unnamed individuals supposed have said or raised is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  See Evers Dep. at 95.  Evers admitted that the EHS lights issue was the only active, non-hypothetical controversy pointing to the supposed need for Evers's amendment.  Evers Dep. at 93-94.

**Defendants' Reply:**  Fact as proposed is undisputed. The cited reference amply supports the proposed fact. *See* reply to PFF 130. As to the objection to hearsay, it goes to Evers' state of mind and is therefore, an exception to the hearsay rule and is admissible. FRE 803(3). Indeed, plaintiff has asserted in its Complaint numerous paragraphs as to Evers' motive and state of mind, suggesting animus towards Edgewood. In addition, plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2.

134.     Alder Evers asked Attorney Strange what could be done to fix the flaws in the ordinance, not being an expert in these matters. Evers Dep., dkt. #31, 87:19-23. Strange indicated that the ordinance could be amended and Alder Evers asked Strange to draft an amendment. Evers Dep., dkt. #31, 87:19-88:5.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

135.    Evers asked Strange to draft an amendment to the Campus Institutional District Zoning in the first week of August of 2019. Evers Dep., dkt. #31, 89:16-19.

**Response:**    Disputed as ambiguous.  In the first week of August, Evers and Strange conferred and Evers asked Strange to draft the new ordinance amending the Campus Institutional District zoning ordinance.  Evers Dep. at 89, 102

**Defendants' Reply:**  Fact as proposed is undisputed. The cited reference amply supports

the proposed fact. Evers testified:

Q.  When did you request Mr. Strange to draft that ordinance amendment?

A.  It would have been sometime in the first week of August 2019.

136.    Assistant City Attorney John strange [sic] drafted an amendment to the Campus Institutional District Zoning Ordinance. Evers Dep., dkt. #31, 87:19-88:5, 106:13-22; Zylstra Dec., Ex. C, Dep. Ex. 18 at 6.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

137.    The Drafter's Analysis states in part:

DRAFTER'S ANALYSIS: As currently written, on any parcel zoned in the Campus-Institutional (CI) District without a campus master plan, primary and secondary uses are allowed subject to conditional use requirements only upon the construction of a building that creates greater than 4,000 square feet of floor area, which the Zoning Code defines as "area under the roof of a building." Primary and secondary uses that do not require the construction of a building (e.g., occur outside an enclosed building) are, thus, permitted without conditional use review. Uses in the Cl District that may not require the construction of a building (including outdoor sports and recreational facilities, surface parking, utilities and transportation facilities, other uses related to the institution's primary mission, open stadiums, auditoriums and arenas, and agricultural uses) often require conditional use review in other city zoning districts, including residential and mixed-use and commercial districts. ***The purpose of this ordinance is therefore to treat uses that occur outside of an enclosed building in a Cl District like the same or similar uses in other zoning districts.*** This ordinance retains the requirement that the construction of new buildings or additions to existing buildings exceeding 4,000 square feet in floor area require conditional use approval. It then states that conditional use is always required for the establishment, improvement, or modification of any use occurring outside of an enclosed building. Finally, this ordinance clarifies that secondary

uses in a CI District must be predominantly used in a manner that is directly related and complementary to the institution's primary uses.

Zylstra Dec., Ex. C, Dep. Ex. 18 at 6 (emphasis added); Evers Dep., dkt. #31, 104:1-9.

**Response:**    Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a letter with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff cites no contrary

evidence. Plaintiff's objection is not well founded as this proposes one fact, which is the drafter's

analysis, which is included with the ordinance.

138.    On August 26, 2019, the City's Plan Commission held a public hearing. Zylstra Dec., Ex. Y, Dep. Ex. 25; Evers Dep., dkt. #31, 141:3-9.

**Response:**    Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of the drafter's analysis with many potential or implied factual propositions to which EHS cannot reasonably respond.  See Response to PFOF 130.  The original title of the amendment indicates its actual purpose, specific to the EHS stadium and lights dispute.  Evers' title of his ordinance on August 6, 2019 was:

> Creating Madison General Ordinance Sections 28.097(2)(d) and (e) requiring institutions in the Campus Institutional District without an approved campus master plan to get conditional use approval for the establishment of open or enclosed ***Stadiums***, Auditoriums, Arenas, ***Indoor or Outdoor Sports Recreational*** Facilities, and Agricultural Uses and for the installation of ***stadium lighting***, amplified sound, and the establishment or expansion of outdoor seating over a specified capacity.

Ingrisano Decl. ¶ 10, Ex. 9, Dep. Ex. 19 at 36 (emphasis added).

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff's objection is not well

founded. Plaintiff cannot add facts but must respond to defendants' facts. *American National*

*Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing

party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. Plaintiff's

response is argumentative.  "Arguments have no place in proposed findings of fact or responses to such findings." *McMahon*, 2007 WL 804149, at *2.

139.    Two of the items on the Commission's agenda for the August 26, 2019 hearing were the ordinance for Edgewood to repeal its Master Plan (Legistar # 56839) and the change being proposed to M.G.O §28.097, the Campus Institutional District Zoning (Legistar # 56981). Zylstra Dec., Ex. Y, Dep. Ex. 25 at 7; Evers Dep., dkt. #31, 141:3-9.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

140.    The amendment to the Campus Institutional District Zoning was re-referred to public hearing to the Plan Commission to be returned by September 16, 2019. Evers Dep., dkt. #31, 142:2-10. To "re-refer" a matter to a public hearing to the Plan Commission means that matter would come back to the Plan Commission for further discussion to get questions answered from staff on specific subjects. Evers Dep., dkt. #31, 142:11-17.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

141.    The Plan Commission recommended re-referral of the Edgewood repeal matter to the Common Council due back on the September 16, 2019 Plan Commission agenda. Evers Dep., dkt. #31, 142:18-143:5; Parks Dec., ¶3.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

142.    The Plan Commission meeting minutes state, "In recommending referral [of the Edgewood repeal matter], members of the Plan Commission requested more information [from City staff] on the impacts of repeal, the relationship between repealing the master plan and the proposed changes to the CI zoning district, ID 56981, and the status of the agreements that govern the property before the property was zoned CI." Zylstra Dec., Ex. Y, Dep. Ex. 25 at 7; Evers Dep., dkt. #31, 141:3-9.

**Response:**      Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

143.    Edgewood's Master Plan had incorporated prior agreements between Edgewood and the neighborhood association. Elliott Dep., dkt. #33, 238:1-15; *see, e.g.*, Zylstra Dec., Ex. A, Dep. Ex. 7 at 73-80 and 47 of 228.

**Response:**      Disputed.  Except for the first item reaffirming all three schools commitment to the Edgewood Neighborhood Liaison Committee, the referenced agreements pertain to Edgewood College.  They were not EHS's agreements.  Elliott Decl. ¶ 49.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence amply supports the proposed fact. First, Elliott testified at the cited reference:

Q   Okay.  That's fine, sir.  It's referring to the status of agreements.  You're aware that there were agreements between Edgewood and the neighborhood associations that were part of the2014 master plan; correct?

A   That's what this is stating.

        (Interruption - Cell phone)

Q   Well, earlier in the day, sir, we were looking at those site one agreements that were referenced in the master plan.  Do you recall that?

A   Yes.

Q   There were agreements between Edgewood and the neighborhood association that were incorporated into the master plan; correct?

A   Correct.

In addition, Dep. Ex. 7 is Edgewood's Master Plan and the cited references prove that prior agreements were incorporated. In fact, Section 4.3, ¶1 begins "The three Edgewood Schools reaffirm their commitment to the Edgewood Neighborhood Liaison Committee as a primary vehicle for ensuring strong partnership and communication. The Committee representatives of the three Edgewood schools worked with the neighborhood representative -- to update the 1997 Neighborhood Liaison Committee formation document. The following updated agreement was approved by the Edgewood Neighborhood Liaison…" Thus demonstrating these agreements applied to the high school. As a further example, Section 4.4 contains a limit on enrollment *for*

*the high school*. Plaintiff is simply incorrect to suggest that the agreements only applied to the

College and plaintiff's attempt to create a dispute as to whether the agreements applied to

Edgewood High School should be disregarded as a sham declaration. *Maldonado*, 186 F.3d at

769 (plaintiff may not create sham issues of fact through an affidavit that contradicts or "patches-

up" prior deposition testimony); *Babrocky*, 773 F.2d at 861 (noting court's duty to ignore "sham"

issues).

144.    The Plan Commission questioned at the August 26, 2019 hearing what would
happen to those agreements referenced in the prior PFOF with a repeal of the master plan. Parks
Dec., ¶3.

**Response:**    Disputed.  The cited evidence is objected to as hearsay pursuant to Federal
Rule of Evidence 801 and is not admissible as evidence on summary judgment.

**Defendants' Reply:**   Fact as proposed is undisputed. As to the objection to hearsay, it

goes to the Plan Commission's state of mind and is therefore, an exception to the hearsay rule

and is admissible. FRE 803(3). Indeed, plaintiff has asserted in its Complaint numerous

paragraphs as to City's motive and state of mind and suggested that the delay in the repeal of the

Edgewood master plan was arbitrary and capricious. Further, hearsay presented at summary

judgment is permissible as long as the facts in those materials could later be presented in an

admissible form at trial. *See Pullen*, 88 F. Supp. 3d at 932 ("the Federal Rules of Civil Procedure

allow parties to oppose summary judgment with materials that would be inadmissible at trial so

long as facts therein could later be presented in an admissible form") (quoting *Olson*, 750 F.3d at

714); *see also Harris*, 2019 WL 1006093, at *4 (litigant is allowed to present hearsay evidence

on summary judgment that might not be in the proper form, but that could be brought in the

proper form at trial). Finally, plaintiff admitted PFF 142, which contains the same information in

the meeting minutes.

145.    Atty. Strange wrote a memo to the Plan Commission dated August 26, 2019, to address the effects of Plan Commission Action on Legistar Items 56981 (the proposed ordinance change) and 56839 (the repeal item) and specifically, the effect if both matters passed at the same time. Zylstra Dec., Ex. Z, Dep. Ex. 24; Parks Dec., ¶2.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

146.    Atty. Strange wrote, "If both Legistar items are approved by the Common Council on September 3, the practical impact on the ongoing athletic field issue is that Edgewood would be allowed to play games on its existing field but any improvement or modification to that field will require conditional use approval regardless of whether such improvement or modification requires the construction of a building or an increase in zoning lot area." Zylstra Dec., Ex. Z, Dep. Ex. 24 at 3; Parks Dec., ¶2.

**Response:**    Not disputed that PFOF 146 accurately quotes part of the cited memorandum.

**Defendants' Reply:**  Fact as proposed is undisputed.

147.    At a meeting on September 3, 2019, the Common Council took up a motion by Alder Bidar to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting. Tucker Dec., ¶17.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

148.    At a meeting on September 3, 2019 of the Common Council, three Plan Commission members—Alders Heck, Rummel and Lemmer—who were also on the Common Council spoke in favor of re-referring the Edgewood repeal matter to its October meeting "giving a number of different reasons why they thought that would be in order." Evers Dep., dkt. #31, 149:2-12; Parks Dec., ¶4; Tucker Dec., ¶17.

**Response:**      Disputed.  The cited evidence is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  Moreover, Alders Rummel and Bidar stated that they wanted to delay Edgewood's repeal in order to allow Evers's ordinance to pass.  As reported by the Wisconsin State Journal on September 4, 2019, the Common Council voted to delay a decision whether to repeal the EHS Master Plan. Ingrisano Decl.¶ 11, Ex. 10, Dep. Ex. 28.  The State Journal continued:  "Ald. Shiva Bidar, 5th District, said the reason for the delay was to allow another proposal to get through the Plan Commission and City Council first.  That proposal would require Edgewood High School to apply with the city before making modifications, such as adding lights or a sound system, to its field if the master plan is repealed.  Ingrisano Decl. ¶ 11, Ex. 10, Dep. Ex. 28.  The article continued:  "City Council members who serve on the Plan Commission said they would like to

know what the council decides on the field modification measure before voting on the master plan repeal."   Ingrisano Decl. ¶ 11, Ex. 10, Dep. Ex. 28.  Consistent with the State Journal's reporting, at the September 3 hearing, Alder Marsha Rummel expressed that she believed a "stadium" should be a conditional use and that the Campus Institutional District zoning ordinance should be "tweaked and amended" before moving forward with repeal.   Ingrisano Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by link) at 2:04:00, 2:04:40.  Also consistent with the State Journal's reporting, at the September 3 hearing, Alder Shiva Bidar supported delaying the EHS Master Plan repeal and moving forward on the Evers' amendment, noting that the Common Council needed to give the Plan Commission clarity on one item [Evers' ordinance] so that the Plan Commission can decide another [the EHS Master Plan repeal].  Ingrisano Decl. ¶ 16, September 3, 2019 Common Council Hr'g (by link) at 2:12:30.

**Defendants' Reply:**   Fact as proposed is undisputed. First, plaintiff appears to admit as undisputed that at a meeting on September 3, 2019 of the Common Council, three Plan Commission members—Alders Heck, Rummel and Lemmer—who were also on the Common Council spoke in favor of re-referring the Edgewood repeal matter to its October meeting but appears to try to dispute they gave "a number of different reasons why they thought that would be in order." Evers' deposition testimony supports the proposed fact and such goes to state of mind and is therefore, not hearsay.  In any event, plaintiff's counsel included a link to the September 3, 2019 Plan Commission hearing in his declaration,

https://media.cityofmadison.com/mediasite/Showcase/madison-city-channel/Presentation/29dd0d8cbe0941ee91b6cf303e83e2b51d/Channel/d29c91089bda40e7bb0fba20311ff0755f and the Court can listen and confirm for itself that Heck spoke in favor of re-referral at 2:05:24-2:07:52, Rummel spoke at 2:01:42- 2:05:22, and Lemmer spoke at 1:55:44-1:56:40.

149.    The Common Council voted to re-refer the Edgewood repeal matter to the October 14, 2019 Plan Commission meeting, which was the next meeting after the September 16 meeting. Evers Dep., dkt. #31, 151:2-7; Parks Dec., ¶4; Tucker Dec., ¶17.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

59

150.    The amendment to the Campus Institutional District Zoning continued and was considered by the Plan Commission on September 16. Zylstra Dec., Ex. AA, Dep. Ex. 26; Evers Dep., dkt. #31, 144:9-145:4.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

151.    On September 16, 2019, the Plan Commission voted to recommend that the Common Council consider the change to the Campus Institutional District Zoning. Zylstra Dec., Ex. AA, Dep. Ex. 26 at 6; Evers Dep., dkt. #31, 144:9-145:4.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

152.    The amendment was sponsored by 13 of the 20 Common Council Alders: Tag Evers, Syed Abbas, Shiva Bidar, Grant Foster, Keith Furman, Patrick W. Heck, Zachary Henak, Rebecca Kemble, Lindsay Lemmer, Donna V. Moreland, Michael E. Verveer, Christian A. Albouras and Marsha A. Rummel. Zylstra Dec., Ex. C, Dep. Ex. 18 at 1; Evers Dep., dkt. #31, 104:1-12.

**Response:**    Disputed.  While the thirteen alders eventually sponsored the amendment, the original sole sponsor was Evers.  Evers Dep. at 115-116.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff cannot add facts and the

facts added do not put the proposed fact into dispute but rather confirm it.

153.    On September 30, 2019, Edgewood submitted a second lighting application for lights on its athletic field. Zylstra Dec., Ex. BB, Dep. Ex. 5; Tucker Dec., ¶18.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

154.    Because Edgewood's Master Plan was still in place, the City denied Edgewood's September 30 lighting permit. Elliott Dep., dkt. #33, 238:21-239:18; Zylstra Dec., Ex. CC, Dep. Ex. 84; Tucker Dep., dkt. #32, 140:13-142:13; Tucker Dec., ¶18.

**Response:**    Not disputed.  EHS disputes the propriety of that denial.

**Defendants' Reply:**  Fact as proposed is undisputed.

155.    On October 1, 2019, the Common Council voted to amend the Campus Institutional Zoning Ordinance found in M.G.O. §28.097. Tucker Dep., dkt. #32, 203:1-9; Zylstra Dec., Ex. C, Dep. Ex. 18; Tucker Dec., ¶19.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

156.    The amendment to the Campus Institutional District Ordinance provided that: (1) in a Campus-Institutional District without a Campus Master Plan, the construction of a new building or additions to existing buildings that exceed four thousand (4,000) square feet in floor area on a zoning lot within any five (5) year period shall require conditional use approval; and (2) in a Campus-Institutional District without a Campus Master Plan, the establishment, improvement, or modification of any primary or secondary use occurring outside of an enclosed building shall require conditional use approval but the Zoning Administrator may issue permits to repair or replace any existing facility related to a primary or secondary use provided that the proposed facility is of a similar bulk condition and at a similar location on the zoning lot as with the existing facility. Zylstra Dec., Ex. C, Dep. Ex. 18 at 4; Tucker Dec., ¶19.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

157.    On October 28, 2019, City staff Timothy Parks filed a staff report with the Plan Commission addressing the questions members raised at the August 26, 2019 Plan Commission meeting related to the Edgewood repeal matter. Zylstra Dec., Ex. DD, Dep. Ex. 83; Parks Dec., ¶5.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

**Edgewood Seeks Delay of Repeal of its Master Plan**

158.    In October and November 2019, Edgewood requested that the vote on the repeal of Edgewood's master plan be referred to later Plan Commission meetings. Elliott Dep., dkt. #33, 235:17-236:17; Zylstra Dec., Ex. EE, Dep. Exs. 81 and 82.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

159.    On December 9, 2019, the repeal of Edgewood's Master Plan came before the Plan Commission. Elliott Dep., dkt. #33, 245:21-24; Parks Dec., ¶6.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

160.    The Plan Commission voted that the Edgewood repeal ordinance be "placed on file." Parks Dec., ¶6. "Placed on file" means that the applicant could come back to the Plan Commission at a later date and renew the request, potentially addressing any issue or concerns that the Plan Commission members raised. Parks Dec., ¶6.

   **Response:**    Not disputed.

   **Defendants' Reply:**  Fact as proposed is undisputed.

161.    The City's Legistar notes indicated that "[i]n recommending that the repeal be placed on file, members of the Plan Commission who voted in favor of the motion to place on file did not feel that the repeal met the standard for map amendments based on public health, safety, and welfare." Parks Dec., ¶6.

   **Response:**    Not disputed.

   **Defendants' Reply:**  Fact as proposed is undisputed.

162.    On January 7, 2020, the Common Council took up the Edgewood repeal ordinance. Parks Dec., ¶7.

   **Response:**    Disputed.  The Common Council took up the Edgewood repeal on multiple occasions prior to January 7, 2020.  Evers Dep. at 128, 130; Ingrisano Decl. ¶ 8, Ex. 7, Dep. Ex. 21.

   **Defendants' Reply:**  Fact as proposed, with clarification of plaintiff, is undisputed.

Plaintiff does not seem to dispute that on January 7, 2020, the Common Council considered the

Edgewood repeal ordinance. Defendants did not suggest and did not mean to imply that this was

the first time or the only time that repeal ordinance was considered.

163.    The Common Council did not place the Edgewood repeal ordinance on file as the Plan Commission recommended but instead, voted 15 in favor of repeal of the master plan, 4 against, and with one non-voting member. Elliott Dep., dkt. #33, 246:21-247:5; Parks Dec., ¶7.

   **Response:**    Disputed in part.  The Parks Declaration's statements of other City representatives' statements and votes is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.

   **Defendants' Reply:**  Fact as proposed is undisputed.  The hearsay objection is not well

founded. Parks is not attesting to any individual's statements but identifying what the vote was at

the Plan Commission—a hearing which he attended and has personal knowledge as to the vote.

Finally, even if it were hearsay, which it is not, hearsay presented at summary judgment is

permissible as long as the facts in those materials could later be presented in an admissible form

at trial. *See Pullen*, 88 F. Supp. 3d at 932 ("the Federal Rules of Civil Procedure allow parties to

oppose summary judgment with materials that would be inadmissible at trial so long as facts

therein could later be presented in an admissible form") (quoting *Olson*, 750 F.3d at 714); *see*

*also Harris*, 2019 WL 1006093, at *4 (litigant is allowed to present hearsay evidence on

summary judgment that might not be in the proper form, but that could be brought in the proper

form at trial).

164.    Elliott was pleased with the vote by the Common Council in favor of repealing
Edgewood's Master Plan. Elliott Dep., dkt. #33, 247:8-12, 247:24-248:12; Zylstra Dec., Ex. FF,
Dep. Ex. 86.

**Response:**    Disputed.  Elliott and EHS were pleased that a Master Plan that had been
misinterpreted in 2018 to deny EHS from playing games on its athletic field and to deny lights
was now behind them, but was not pleased that it had been delayed so that Evers' amendment to
the Campus Institutional District zoning code could pass and change the law to require EHS to
go through a subjective conditional use analysis.  Elliott Decl. ¶ 45.

**Defendants' Reply:**  Fact as proposed is undisputed. First, the cited reference amply

supports the proposed fact.  Elliott testified:

Q  Mr. Elliott, I'm showing you Exhibit 86.  Do you recognize this as an email that you
wrote on January 8, 2020, to the Friends of Edgewood?

A  Yes.

Q  And directing your attention to the first paragraph, "We are pleased with last night's
vote by the Madison Common Council in favor of repealing Edgewood's master plan."
Did I read that correctly?

A  Yes.

Q  Does that sentence accurately reflect your thoughts and feelings at the time you wrote
this email?

A  Yes.

Second, plaintiff impermissibly seeks to propose additional facts in the response to defendants'

proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1; *Computer

Docking Station Corp.*, 2007 WL 5117465, *2. Third, plaintiff's response is argumentative.

"Arguments have no place in proposed findings of fact or responses to such findings." *McMahon*

*v. Carroll College*, No. 04-C-384, 2007 WL 804149, at *2  (E.D. Wis. March 9, 2007).

165.    On March 11, 2020, Edgewood filed a conditional use application for outdoor lighting of its athletic field. Elliott Dep., dkt. #33, 249:2-250:9; Zylstra Dec., Ex. GG, Dep. Ex. 87; Parks Dec. ¶8.

**Response:**    Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

166.    Edgewood was proposing in its conditional use application construction and installation of either four 80-foot light poles or four 68-foot light poles. Elliott Dep., dkt. #33, 250:2-14; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8077; Parks Dec., ¶8.

**Response:**    Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

167.    Edgewood's conditional use application for outdoor lighting of its athletic field went before the Plan Commission of May 11, 2020. Parks Dec., ¶9.

**Response:**    Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

168.    Tim Parks prepared a staff report, dated May 11, 2020, for the Plan Commission. Parks Dec., ¶9. A link to the May 11, 2020 Plan Commission meeting is here: https://media.cityofmadison.com/mediasite/Showcase/madison-city-channel/Presentation/95ac2fc624f04a65b8ea74ac63ffcda31d/Channel/9087c9eda40246be9fac2783773f09f54d. Evers Dec., ¶2.

**Response:**    Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a link to a lengthy Plan Commission meeting with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**   Fact as proposed is undisputed.  The proposed fact does not ask

plaintiff to admit the facts in the meeting but only that the link is a link to the May 11, 2020 Plan

Commission meeting. Plaintiff cites no contrary evidence and includes links to various city

meetings in plaintiff's counsel's declaration.

169.    A summary of staff's recommendation in the May 11, 2020 report states: "The Planning Division believes that the Plan Commission *can* find the standards for conditional use approval met to approve the installation of lights for the Goodman Athletic Complex at Edgewood High School at 2219 Monroe Street *subject to the recommended conditions* of approval beginning on page 8 of this report *and input at the public hearing*." Parks Dec., ¶9; Zylstra Dec., Ex. HH, Dep. Ex. 33 at 1 (emphasis added).

**Response:**    Disputed.  The cited exhibit, Parks' memorandum, notes that "the Zoning Code states that the Plan Commission may not approve an application for a conditional use unless it can find that all of the standards found in Section 28.183(6)(a), Approval Standards for Conditional Uses, are met." Zylstra Dec., Ex. HH, Dep. Ex. 33 at 4.  Parks' memo concludes that " despite these concerns [by neighbors relating to noise], staff believes that the Plan Commission may find standards 1, 3, and 4 met to allow the installation of the proposed lights subject to conditions that would limit the impacts of the expanded use of the stadium on nearby residents." Zylstra Dec., Ex. HH, Dep. Ex. 33 at 5.  By noting that the Plan Commission may or "can" find the standards to have been met, the City's Planning Staff  necessarily concluded that there was substantial evidence in the record by which to grant the permit with conditions.

**Defendants' Reply:**   Fact as proposed is undisputed. First, the cited evidence amply

supports the proposed fact. Second, plaintiff impermissibly seeks to propose additional facts in

the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL

1589623, at *1; *Computer Docking Station Corp.*, 2007 WL 5117465, *2. Third, plaintiff's

response is argumentative.  "Arguments have no place in proposed findings of fact or responses

to such findings." *McMahon v. Carroll College*, No. 04-C-384, 2007 WL 804149, at *2  (E.D.

Wis. March 9, 2007).

170.    City staff did not find that the conditional use standards *were* met by Edgewood but only that the Plan Commission *could* determine they were met after consideration of the input from the public hearing. Parks Dec., ¶9; Zylstra Dec., Ex. HH, Dep. Ex. 33 at 1.

**Response:**    Disputed.  See response to PFOF 169.  By advising the Plan Commission that it could determine the standards were met, it was necessarily concluding that there was sufficient evidence that the standards were met.

**Defendants' Reply:**   Fact as proposed is undisputed. First, the cited evidence amply

supports the proposed fact. Second, plaintiff impermissibly seeks to propose additional facts in

the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL

1589623, at \*1; *Computer Docking Station Corp.*, 2007 WL 5117465, \*2.

171.   At the May 11, 2020 Plan Commission meeting, the Plan Commission found the
standards for conditional use were not met and placed the conditional use on file without
prejudice. Elliott Dep., dkt. #33, 250:15-251:11; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071;
Parks Dec., ¶10.

**Response:**   Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

172.   The Plan Commission notes state: "[t]he Plan Commission could not find
standard number 3 met finding that the lights would have a substantial negative impact on the
uses, values, and enjoyment of surrounding properties and that no evidence was submitted by the
applicant that there would not be negative impacts on the lighted use of the field and no
mitigation measures proposed to limit those impacts, noise barriers, limits on events, et cetera."
Elliott Dep., dkt. #33, 250:15-251:11; Zylstra Dec., Ex. GG, Dep. Ex. 87 at 8071; Zylstra Dec.,
Ex. II, Dep. Ex. 89; Parks Dec., ¶10.

**Response:**   Not disputed that PFOF 173 accurately quotes part of the cited document.

**Defendants' Reply:**   Fact as proposed is undisputed.

173.   The notes in Legistar of the Plan Commission meeting indicated, "Members
indicated they would be open to considering the request again. (When it addresses the noise
impacts) was presented by the applicant, including improved engagement with the
neighborhoods and a limit to the number of games with lights." Zylstra Dec., Ex. GG, Dep. Ex.
87 at 8071; Parks Dec., ¶10; Elliott Dep., dkt. #33,251:22-252:9.

**Response:**   Not disputed that PFOF 174 accurately quotes part of the cited document.

**Defendants' Reply:**   Fact as proposed is undisputed.

174.   On May 21, 2020, Edgewood appealed the decision of the Plan Commission on
its conditional use application. Elliott Dep., dkt. #33, 255:14-18; Zylstra Dec., Ex. JJ, Dep. Ex.
90; Parks Dec., ¶12.

**Response:**   Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

175.    Edgewood's appeal of its conditional use application came before the Common Council on January 19, 2021. Parks Dec., ¶12. A link to the January 19, 2021 Common Council meeting is here: https://media.cityofmadison.com/mediasite/Showcase/madison-city-channel/Presentation/c3bdf04924f2446cad9f4a1bc2d6cdc11d/Channel/d29c91089bda40e7bb0fba20311ff0754d. Evers Dec., ¶8.

**Response:**    Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a citation to a lengthy common council meeting with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**   Fact as proposed is undisputed.  The proposed fact does not ask plaintiff to admit the facts in the Common Council meeting but only that the link is a link to the January 19, 2021 Common Council meeting. Plaintiff cites no contrary evidence and includes links to various city meetings in plaintiff's counsel's declaration.

176.    In a memo to the Common Council, Assistant City Attorney stated that at the Plan Commission hearing, Edgewood proposed that games be naturally limited to the total number required for Edgewood related teams. However, Plan Commissioners pointed out that this was not actually a defined limit as suggested by the Staff Report. Evers Dec., Ex. D, at CITY-DEF 51975. The Common Council voted 13-4 to uphold the decision of Plan Commission and not grant the appeal. Parks Dec., ¶12.

**Response:**    Disputed.  The memo exhibit is objected to as hearsay pursuant to Federal Rule of Evidence 801 and is not admissible as evidence on summary judgment.  The City may not introduce a self-serving memo to itself, created by its City Attorney's Office during the pendency of its Edgewood's first litigation.  See Edgewood High School of the Sacred Heart, Inc. v. City of Madison, Wisconsin et. al., 3:19-cv-00683-wmc (filed 8/21-2019, dismissed 2/11/2020).

**Defendants' Reply:**   Fact as proposed is undisputed. First, the citation supports the proposed fact. Second, plaintiff cites no contrary evidence. Third, hearsay presented at summary judgment is permissible as long as the facts in those materials could later be presented in an admissible form at trial. *See Pullen*, 88 F. Supp. 3d at 932 ("the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form") (quoting *Olson*, 750 F.3d at 714); *see also Harris*, 2019 WL 1006093, at *4 (litigant is allowed to present hearsay evidence

on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial). Edgewood's statements at the Plan Commission meeting are an exception to hearsay because they are admissions by a party opponent.

177. Alder Evers testified:

Q. Looking at the record, the totality of that record that was before you as an alder for the City of Madison, what did you -- what evidence did you rely upon in coming to that conclusion?

A. Well, principally, there is two points. One, that Edgewood offered no substantial evidence required under state law that an applicant do so; that the uses, values, and enjoyment of the property in the neighborhood for purposes already established would not be substantially impaired or diminished in a foreseeable manner.

They offered no substantial evidence that this would not occur. And, in fact, they ignored their own sound study's indication that just the crowd noise from just a collection of 150 people attending an athletic contest would exceed a 70 decibel level within the adjoining neighborhoods.

They did not address -- offer any testimony about property values, how property values would not be impacted. Residents were concerned about the potential impact on their property values.

They did not address concerns of families who had young children in the neighborhood who go to sleep, say, at 7:00 or 7:30. You're a father, you know what that's like, toddlers go to sleep early. How that these homes just within a hundred feet of an athletic field were holding night games with cheering crowds and a play-by- play announcement and pep band, how that this could interrupt sleep.

They offered no substantial evidence, not no iota of substantial evidence that the uses, values, and enjoyment of other property in the neighborhood for purposes that were established, that they had lived there for years, would not be substantially impaired.

They chose not to offer that in their -- they simply said in their meetings, the six meetings that were held after the Plan Commission denial, that they did not believe the impacts would be that bad. They offered no evidence to become -- that they wouldn't; they just said they didn't believe it's so.

So, Jonathan, they just didn't offer substantial evidence, and for that reason -- whereas the residents did. They offered what I believed to be substantial impacts or evidence that

those impacts were foreseeable, were clearly foreseeable. They could be anticipated and they were reasonable concerns.

Now, despite the recommendations of the planning staff on a near unanimous basis, the Plan Commission agreed that the applicant did not offer substantial evidence that they would be able to abide -- live up to the standard, standard -- standard 3.

So that's the reason why that I voted the way I did, and that's the way that the overwhelming majority of council members joined in accepting the verdict of the Plan Commission.

Evers Dep., dkt. #31, 179:4-181:8.

**Response:**      Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of deposition testimony with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**  Fact as proposed is undisputed.  Plaintiff's objection is not well

founded.  It was an answer to a question plaintiff's counsel posed. Plaintiff cites no contrary

evidence.

178.     Evers also testified:

Q. The second category of the evidence that you considered and relied upon in your vote was the research that you said was presented to you by these neighbors; is that fair?

A. And may I respond to that? Research also provided by Edgewood.

Q. Okay. Let's talk about the research provided by the neighbors. What neighbors provided you with research that you found to be compelling? Identify the neighbors for me that provided research that you found to be compelling.

A. The neighbors paid for a sound study by, I believe it's Weiss Engineering (ph). It's in Legistar. You would have to -- I don't have the file or anything like that. But they paid for a study to be able to make, you know, scientific determinations based on measurements and mapping what the potential for those impacts would be on the adjoining neighbor.

Q. So we have the Weiss sound study. What other piece of research did the neighbors provide you that you relied upon that you found to be compelling?

A. Again, measurements taken of games being held in the area. Videos of the those games. Research about -- that they had done regarding the impact on property values. And other cities where stadiums were built in a neighborhood -- traditional residential neighborhood, that kind of thing.

Evers Dep., dkt. #31, 183:18-184:22.

**Response:**    Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a deposition testimony with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**  Fact as proposed is undisputed.  Plaintiff's objection is not well founded.  It was an answer to questions plaintiff posed about a single topic, that is, the research relied upon. Plaintiff cites no contrary evidence.

179.    Some of the evidence that the Alders received included:

- A sound study performed by Wise Associates that the neighbors living near Edgewood submitted (Evers Dec., Ex. A);

- A sound study performed by Talaske and TLC Engineering that Edgewood submitted (Evers Dec., Ex. B);

- Testimony and information that the proposed improvements would decrease property values, some of which was verbal but some were contained in written comments (Evers Dec., Ex. D at CITY-DEF 52286, 52287, 52298, 52322-24, 52335, 52334, 52378, 52389, 52397, 52440, and 52444);

- A letter from Friends of Lake Wingra opposing Edgewood's proposed improvements based on the potential environmental impact (Evers Dec., Ex. C);

- Videos that some of the public submitted related to the light glare and sounds of athletic games (including ones taken of Edgewood's use of its field), and the potential impacts on the neighborhood, *see, e.g.*, Evers Dec., Ex. D at 52356, 52509, 52464 with links to videos. One resident wrote "When my husband deployed to Afghanistan in 2018, we tried to find ways to connect across the distance and the time zones -- as it turns out, great preparation for connecting during a pandemic. One day he met us at 3:30am, his time, for dinner over video chat. A soccer game was taking place on the field, which became so loud, with the windows closed, that we could no longer have a

conversation in the dining room at the back of our house" and she took and sent a link to a video of that game, which she says she recorded from inside her house (Evers Dec., Ex. D, CITY-DEF 52634);

- Testimony from the public about how their uses, values and enjoyment of their property would substantially impaired or diminished (*see, e.g.*, Evers Dec., Ex. D at 52083-52085, 52285-52291, 52296-52384, 52386-52414, 52427-52449, 52483, 52507-52509);

- Testimony raising concerns about whether Edgewood would abide by the conditions given its past behavior and suggestions of Edgewood being dishonest (*see, e.g.*, Evers Dec., Ex. D at CITY-DEF 51985, 52083-52085, 52289, 52313, 52456, 52487, 52493-52497, 52507-52509).

Evers Dec., ¶6, Exs. A-D.

**Response:**     Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy summary of multiple exhibits with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**  Fact as proposed is undisputed.  Defendants do not ask plaintiff to admit the truth of the testimony and documents but only that they were submitted to and received by the Alders of the City's Common Council.  The proposed citations show that and plaintiff cites no contrary evidence.

180.    On September 29, 2021, Elliott emailed City representatives informing them that Edgewood was going to be filing a conditional use application for a two-story commons addition. Elliott Dep., dkt. #33, 260:24-261:15; Zylstra Dec., Ex. KK, Dep. Ex. 93.

**Response:**     Not disputed, but irrelevant and immaterial.

**Defendants' Reply:**  Fact as proposed is undisputed.

181.    Edgewood filed the conditional use application for the two-story commons addition and it was approved by the Plan Commission and the Common Council. Elliott Dep., dkt. #33, 260:24-261:19.

**Response:**     Not disputed, but irrelevant and immaterial.

**Defendants' Reply:**  Fact as proposed is undisputed.

182.    Alder Evers voted in favor of the two-story commons conditional use application. Evers Dec., ¶10.

**Response:**    Not disputed, but irrelevant and immaterial.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff's suggestion that the proposed fact is irrelevant and immaterial is not only unnecessary but incorrect. Plaintiff has repeated suggested in its Complaint and at deposition that Evers was had personal animus against Edgewood but the fact that he voted in favor of another Edgewood project demonstrates that his opposition to the stadium lights was motivated not by any animus towards Edgewood but rather, he disagreed with the stadium lights for other reasons as he explained in his deposition.

183.    Edgewood College is building a stadium in Fitchburg and has been exploring that since at least July 2019. Elliott Dep., dkt. #33, 24:3-26:1; Zylstra Dec., Ex. LL, Dep. Ex. 48.

**Response:**    Disputed in part.  The cited evidence supports the proposition that Edgewood College is building an athletic complex in Fitchburg, but PFOF 183 is not otherwise supported by the evidence cited.

**Defendants' Reply:**   Fact as proposed is undisputed. Deposition Exhibit 48 is a Fitchburg Star newspaper from August 9, 2019. The third page of the document states, "While the timeline would make the plan complete by the April election, it could complicate a pair of projects that have been brought up over the past two weeks: an Edgewood College athletic and outdoor learning complex along Lacy Road." Zylstra Dec., dkt. #40-39, Ex. LL, Dep. Ex. 48 at 3. Two weeks prior to August 9 is the end of July. Thus, the entire proposed fact is supported. In any event, there is no dispute that Edgewood College is building a stadium in Fitchburg and has been exploring that since August 2019.  Whether it is July or August is immaterial.

184.    Edgewood High School has separate finances from Edgewood grade school and Edgewood College. Elliott Dep., dkt. #33, 23:13-17.

**Response:**    Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

185.    Edgewood High School has charged Edgewood College in the past for use of the high school's athletic fields. Elliott Dep., dkt. #33, 23:13-24:2.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

186.    Just like Edgewood High School, Edgewood College and grade school are sponsored by the Dominican Sisters of Sinsinawa and the college and grade school follow the same religious teachings and exercise of faith as the high school does. Elliott Dep., dkt. #33, 19:10-20:2.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

187.    Edgewood High School has typically played its football games at Breese Stevens field or in Middleton. Elliott Dep., dkt. #33, 27:23-28:5.

**Response:**    Disputed.  Varsity football home games are generally played at Breese Stevens, and Middleton before that.  Zwettler Decl. ¶ 14.  Freshman and JV football home games are typically played on EHS's athletic field, now known as the Goodman Athletic Complex. Zwettler Decl. ¶ 14.

**Defendants' Reply:**  The proposed fact, with the clarification plaintiff offers, is

undisputed, that is, that Edgewood High School has typically played its Varsity football games at

Breese Stevens field or in Middleton.

188.    Edgewood High School has played its lacrosse games for the most part on its field at Edgewood. Elliott Dep., dkt. #33, 29:9-11.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

189.    Edgewood has played its baseball games at various fields, including Warner Park. Elliott Dep., dkt. #33, 29:18-24.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

190.     Edgewood plays on at least one City-owned field. Elliott Dep., dkt. #33, 29:18-30:3.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

191.     Elliott is not aware of the City ever precluding Edgewood from using the City's fields when those fields are available. Elliot Dep. 29:25-30:9.

**Response:**     Disputed.  EHS is not considered a priority user for the City's fields and has had a varsity football game get bumped from City fields.  Zwettler Decl. ¶ 6.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff cannot add facts and the

proposed fact relates to Elliott's awareness. *American National Property & Cas. Co.*, 2006 WL

1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact);

*Computer Docking Station Corp.*, 2007 WL 5117465, *2.

192.     Elliott admits that for the most part, Edgewood's football program has been able to play night games at other venues. Elliott Dep., dkt. #33, 31:20-32:2.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

193.     Edgewood's boys [sic] soccer plays their night games either on the road or at Reddan park in Verona. Elliott Dep., dkt. #33, 232:7-9.

**Response:**     Disputed.  The cited deposition transcript does not stand for the proposition asserted.

**Defendants' Reply:**  Plaintiff is correct. There is a typo and the citation should have

been to Elliott Dep., dkt. #33, 32:7-9. The fact is properly disputed.

194.     Elliott is not aware of Edgewood ever securing a field for nighttime use for any activities other than sports. Elliott Dep., dkt. #33, 34:4-35:4.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

195.     West High School is a competitor of Edgewood High School. Elliott Dep., dkt. #33, 52:9-12.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

196.     West High School has an athletic field on site but it does not have lights for its athletic field. Elliott Dep., dkt. #33, 52:9-23; Tucker Dec., ¶20.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

197.     West High School plays its night games off-site at Mansfield Stadium, which is a field located on Memorial High School's site. Elliott Dep., dkt. #33, 52:9-53:1; Tucker Dec., ¶20.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

198.     On August 17, 2018, Memorial High School submitting a lighting application for its athletic field. Hank Dep., dkt. #30, 29:18-30:2; Tucker Dep., dkt. #32, 78:10-17; Zylstra Dec., Ex. MM, Dep. Ex. 2; Tucker Dec., ¶21.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

199.     Memorial High School has never had a master plan. Zylstra Dec., Ex. NN, RTA 11; Tucker Dec., ¶21.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

200.     Memorial High School has had lights on its athletic field going back to the 1970s. Tucker Dec., ¶21.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

201.     Memorial's April 17, 2018 lighting application was to replace the existing 6 light poles with 4 light poles. Tucker Dec., ¶21.

**Response:**     Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

202.    In 2015, when Edgewood replaced its old track with a new track, the City told Edgewood that because it was simply exchanging the current track with a new track, the City would classify that as a replacement or a maintenance, which would allow Edgewood to complete the project without amending its master plan. Elliott Dep., dkt. #33, 128:21-129:19; Tucker Dec., ¶21.

**Response:**     Disputed.  Elliott contacted the City to determine what, if any, was required before the resurfacing of the track and field could be done.  Elliott Dep. at 128-131.  The Master Plan was not discussed in relation to this issue.  Elliott Dep. at 128-131.

**Defendants' Reply:**   Fact as proposed is undisputed. The cited reference amply supports

the proposed fact. Elliott testified:

Q   Okay.  Now, as I understood, after receiving the Goodman money, Edgewood replaced the existing track and field with a brand new track and field; correct?

A   Correct.

Q   Did you have any communications with the city regarding that change, from the old surfaces and field to the new?

A   I believe I did.

Q   Okay.  ***Did you have discussions on whether such a change would require an amendment to your master plan***?

A   ***I believe I did***.

Q   And what did you understand the city's position to be, if you recall?

A   My recollection was that we didn't need that because it was considered a resurfacing.

Q   Okay.  And did the city express to you that because you were simply exchanging the current track with a new track that the city would classify that as a replacement or a maintenance which would allow Edgewood to complete the project ***without amending its master plan***?

A   Something -- yes.

Elliott Dep., dkt. #33, 128:21-129:19 (emphasis added).

203.    The City permitted Edgewood to proceed with the resurfacing of its track and field despite complaints from the neighbors. Elliott Dep., dkt. #33, 128:21-129:19, 131:4-16.

**Response:**     Disputed.  The cited authority does not support the propositions or inferences.  The testimony does not support that the complaints went to the City or that the complaining neighbors sought to disrupt the project.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff is adding facts to the proposed fact. The proposed fact does not state anything about neighbors disrupting the project or where the complaints went. The proposed fact is amply supported by Elliott's own testimony. Plaintiff cites no contrary evidence.

204.     After the creation of the Campus Institutional District Zoning, only two entities proceeded with master plans: Edgewood Campus and the University of Wisconsin. Evers Dep., dkt. #31, 97:3-10; Hank Dep., dkt. #30, 177:16-21.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

205.     In around March of 2018, the University of Wisconsin sought to add two tennis courts and outdoor lights as part of the Nielsen Tennis Stadium. Tucker Dec., ¶22.

**Response:**     Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

206.     The addition of the tennis courts and lights was before the University's Master Plan became effective. Tucker Dec., ¶22. The University of Wisconsin's Master Plan was not effective until January 1, 2019. Tucker Dep., dkt. #32, 156:16-25; Tucker Dec., ¶22.

**Response:**     Disputed.  Per Planning staff, the effect of the UW's Master Plan was immediate upon approval on July 18, 2017, as no permits for enumerated buildings projects could issue.  Ingrisano Decl. ¶ 13, Ex. 12, Dep. Ex. 41 at 6; Tucker Dep. at 157-159.  The City's October 4, 2017 letter provides that while "the ten (10) year effective period for this master plan shall not take effect until all of the requires revisions and stipulations have been made / satisfied, it further provides that "[n]o building permits shall be issued until this plan has been revised to address the comments and conditions in this letter."   Ingrisano Decl. ¶ 13, Ex. 12, Dep. Ex. 41 at 6.  Tucker disagreed with the Planning division's letter.  Tucker Dep. at 159.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff is adding and conflating facts, and misconstruing Tucker's straightforward deposition testimony. First, Tucker testified that the effective date for the University of Wisconsin's Master Plan was January 1, 2019. *See* Tucker Dep., 156:16-25. The University's Master Plan even states the effective date on its cover.

Zylstra Dec., dkt. #40-42, Ex. OO, Dep. Ex. 46 at 1. Nothing plaintiff cites puts that fact into

dispute. Exhibit 41, the letter plaintiff cites, even states that "The ten (10) year effective period

for this master plan *shall not take effect* until all of the requires revisions and stipulations have

been made/ satisfied."  The letter continues, "After the master plan has been revised to address

any of the comments or conditions listed above, please submit the revised master plan in

electronic form … for circulation to the City department staff listed above *for their final*

*approval prior to the master plan taking effect*." Ingrisano Decl., Ex. 12, Dep. Ex. 41 at 6. The

fact that Tucker did not believe it was correct to state that no "City-related permits" could be

issued until the master plan was approved does nothing to change or cast doubt on the effective

date of the University's Master Plan. Tucker Dep. 158:13-159:12.

207.    As it related to the Nielsen Tennis Stadium, the University did not use limiting
language in its Master Plan as to use. Tucker Dec., ¶22.

**Response:**      Disputed.  UW's Master Plan the building use of the Nielsen Tennis
Stadium Expansion as for "Athletics."  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 136.  Other uses in
the Master Plan, such as the Natatorium, were identified as for "Rec Sports."  Zylstra Dec., Ex.
OO, Dep. Ex. 46 at 137.  A color map in the Master Plan shows distinct treatment for "Athletics"
uses in red and "Recreation Sports" uses in green.  Zylstra Dec., Ex. OO, Dep. Ex. 46 at 75;
Tucker Dep at 197-199.

**Defendants' Reply:**   Fact as proposed is undisputed. First, the Tucker declaration

supports the proposed fact. Second, the proposed fact relates to the Nielsen Tennis Stadium.

Plaintiff impermissibly seeks to add facts about the Natatorium when it must respond to the fact

proposed. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise

facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007

WL 5117465, *2. Third, plaintiff admits PFF 209-213 are undisputed, all of which support that

the University did not use limiting language like Edgewood did in its master plan in describing

the athletic field.

208.    Tucker was aware that neighbors of Edgewood actively opposed Edgewood's attempts to expand its use of its athletic field with lights and sound systems in the past prior to Edgewood's adoption of its Master Plan. Tucker Dec., ¶22.

**Response:**    Disputed in part.  While true for some neighbors, neighbors were not uniform in their views and treatment of EHS and the growth and use of the high school's space. Elliott Decl. ¶ 50.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff cannot propose additional facts in the response to defendants' proposed facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, *2. The cited evidence amply supports the proposed fact. Elliott's declaration is also at odds with his deposition testimony and violates the sham declaration rule. For example, he testified:

Q   Okay.  Then on the first page of this flyer, it's got a heading "Neighborhood Concerns."  Do you see that?

A   Yes.

Q   It says, "The concerns neighbors expressed were usage, traffic, parking, lights, and sound."  Is that correct?

A   Correct.

Q   And those were generally concerns that the Neighborhood Liaison Committee had expressed to Edgewood repeatedly in the past when it wanted to expand its use of its athletic field; true?

        MR. INGRISANO:  Objection.  Form.

A   Those were concerns that they've brought up in some listening meetings that we held, and so it was the neighbors and the liaison committee.

Q   And they had expressed those concerns for many years, is that right, prior to the May 2016 meeting?

A   I had heard complaints when I was -- after I became president when I brought this idea up.

209.    The University of Wisconsin's Master Plan contains more than one reference to the Nielsen Tennis Stadium. Tucker Dec., ¶23; Zylstra Dec., Ex. OO, Dep. Ex. 46.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

210.    The University's Master Plan referred to an expansion to the Nielsen Tennis Stadium as one of its proposed projects at page 136. Tucker Dec., ¶23.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

211.    The University's Master Plan noted that "events" were currently being held at Nielsen Tennis Stadium (page 319). Tucker Dec., ¶23.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

212.    In its landscaping section, the University made reference to its "large sporting events" on the same page where it depicted the Nielsen Tennis Stadium (p.324). Tucker Dec., ¶23.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

213.    On page 325 of the University's Master Plan, it states "The Event Center Neighborhood is composed of a series of athletic competition and practice fields, campus greens, and plaza spaces." Tucker Dec., ¶23. That page also depicts Nielsen Tennis Stadium as part of the Event Center Neighborhood. Tucker Dec., ¶23.

**Response:**    Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

214.    Tucker testified:

Q. Has there ever been any effort by the city to confirm whether UW is using its athletics and sports recreational facilities or open spaces as they are described in its master plan?

A. We respond to complaints. We haven't received any complaints, so we haven't investigated to the best of my knowledge.

Tucker Dep., dkt. #32, 193:7-13.

**Response:**      Disputed.  Prior to Tucker's October 2018 email and related review setting forth his restrictive interpretation of the EHS Master Plan, Tucker had received no complaints about EHS's use of its field for games or athletic competitions.  Tucker Dep. at 188.

**Defendants' Reply:**  Fact as proposed is undisputed. First, the proposed fact is amply supported. Second, plaintiff's reliance on page 188 of Tucker's deposition does not put the proposed fact in dispute. The Tucker deposition cite does not relate to UW at all. Further, Tucker did not state that he had received no complaints about Edgewood; he stated in response to a question about whether complaints were raised about Edgewood at the October 17 meeting, "I don't recall.  I honestly can't -- there was a lot of people that spoke. I don't recall what their speaking was at the meeting." Tucker Dep. 188:6-8.

215.    Only portions of the University's campus are zoned Campus Institutional and the rest of the University's land is zoned as a PD District Zoning, which has a different set of rules. Tucker Dec., ¶24.

**Response:**  Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

216.    The University does not pull or obtain any electrical permits from the City because the University is a charter entity of the state, similar to the City itself, and the only local regulation that the University is required to comply with is the City's zoning code. Tucker Dep., dkt. #32, 201:21-25; Tucker Dec., ¶24.

**Response:**  Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

217.    Mike Elliott testified:

Q Okay. Mr. Elliott, how did the city's denial of a permit to allow athletic field lighting substantially burden the free exercise of your religion?

A Our -- The way we go after students is through showing them our community, and community is a big thing for us. We don't have kids that live in the neighborhood and just come to our school. We have to earn or recruit every student that we get. And how we do that is showing what a community we are, and one of the biggest opportunities for bringing people in for communities, such as the campus schools, the parochial schools,

the middle schools in the city, are our plays, but, more importantly, the biggest numbers are always our athletic events. And that is something that we value and use a lot.

We also form partnerships with many of these groups, whether they're nonprofits, whether they're groups that are asking -- needing support for fundraisers, whether they are churches and schools, forming partnerships so that they can get to know Edgewood better and together we can evangelize the Catholic religion and the Dominican values of the Sinsinawa Sisters.

We also have had to do a lot of shuffling around for our schedules. We have asked a lot of our -- of the other schools. When you play sports, you usually have a JV game. The bus comes to one place. There is a JV game, and then the varsity follows. When you play Edgewood, that can't take place because there is not enough time, so unless they -- if the kids get out of school early, and the other schools are not willing to take kids out of school early for sporting events.

We also have to spend a lot of extra time looking for places to play. When we find a place to play, every game is an away game, and that has financial costs. We've had donors who were going to give us money as gifts to pay for things like the lights or other things. When we didn't get the lights, they withdrew their gifts. So we've had financial hurt.

We've had enrollment hurt because it really takes away from our recruiting -- the recruiting styles that work. We've had partnerships that have broken. Girls on the Run at one point ran at our facility. Susan B. Komen wanted to do their walk. We couldn't help them because they walk into the night.

And so it's been a burden in a lot of different ways that we have tried to continue to grow our enrollment, tried to continue to grow the student satisfaction, but not being able to hold classes, not being able to hold special events, fundraisers, other things and gather as a community, it's our one spot. We're really, from an outdoor standpoint, we're landlocked, and that field is something that we cherish and want to show off as much as possible.

Q Anything -- You gave a very lengthy answer, and I appreciate that.

A Did you get that?

Q Yes, I did. Anything else that you would say in terms of substantially burdening your free exercise of religion?

A Partnership, community are part of our mission, and probably the two biggest that we use to recruit and use to grow our community, and that's been a challenge that we have

not -- that we've suffered from because we haven't been able to get the use of that field at any time possible.

Elliott Dep., dkt. #33, 262:2-264:24.

**Response:** Disputed. This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of an interrogatory response with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:** Fact as proposed is undisputed. Plaintiff's objection is not well

founded. It was an answer to a single question posed. Plaintiff cites no contrary evidence.

218. Elliott testified that there would be some travel that students would have to do even if night games were held at Edgewood because even if the students stayed after school, the parents or the students would need to travel home. Elliott Dep., dkt. #33, 268:9-25.

**Response:** Disputed as nonsensical. All attendees at a sporting event travel home afterwards unless they live at the stadium.

**Defendants' Reply:** Fact as proposed is undisputed. Plaintiff's objection concedes the

proposed fact. Plaintiff cites no contrary evidence.

219. Elliott admits that with respect to Edgewood's sports programs, "for the most part" Edgewood has been able to host their athletic games at other fields. Elliott Dep., dkt. #33, 265:6-9.

**Response:** Admits.

**Defendants' Reply:** Fact as proposed is undisputed.

220. Elliott admits that Edgewood has had at least some amount of partnerships with nonprofits regarding daytime use of its field and that those partnerships have occurred even without the lights on its athletic field. Elliott Dep., dkt. #33, 271:6-15.

**Response:** Disputed. EHS has been limited in its ability to partner with non-profits. Elliott Dep. at 271. Without lights, there are more "asks" than EHS can accommodate. Elliott Dep. at 271. Partnerships with Girls on the Run and the Susan G. Komen Foundation have been lost. Elliott Dep. at 263-264.

**Defendants' Reply:** Fact as proposed is undisputed. Plaintiff is impermissibly adding

facts. *American National Property & Cas. Co.*, 2006 WL 1589623, at *1 (improper to raise facts

not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL

5117465, *2. Elliott admits that some amounts have occurred. Elliott Dep., dkt. #33, 271:6-15.

221.    Deposition Exhibit 50 is an Edgewood High School Accreditation Report dated October 11-14, 2015. Elliott Dep., dkt. #33, 42:21-25; Zylstra Dec., Ex. PP, Dep. Ex. 50.

**Response:**    Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

222.    For Edgewood to maintain its accreditation, it has to do a self-study every seven years and Edgewood provided information to the Independent Schools Association of the Central States for its accreditation in 2015. Elliott Dep., dkt. #33, 44:9-15.

**Response:**    Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

223.    The Accreditation Report identified Edgewood's enrollment as 658 students in 2009-2010 and 539 students in 2015. Elliott Dep., dkt. #33, 44:9-45:6; Zylstra Dec., Ex. PP, Dep. Ex. 50 at 73.

**Response:**    Not disputed.

**Defendants' Reply:**   Fact as proposed is undisputed.

224.    Elliott was not sure but believes that currently, Edgewood has between 520-530 students. Elliott Dep., dkt. #33, 45:7-13.

**Response:**    Not disputed.  Edgewood's current enrollment is 529.  Elliott Decl. ¶ 52.

**Defendants' Reply:**   Fact as proposed is undisputed.

225.    In 2015, there was a $1.025 million renovation of the Goodman Athletic Complex, which included Edgewood's track and field. Elliott Dep., dkt. #33, 46:2-6.

**Response:**    Not disputed.  Duplicative.  See Response to PFOP 49.

**Defendants' Reply:**   Fact as proposed is undisputed.

226.    One of the reasons that Elliott wanted the money to update those fields was he was hoping that it would increase enrollment at Edgewood High School. Elliott Dep., dkt. #33, 47:23-4:3.

**Response:**    No response from Edgewood

**Defendants' Reply:**   Fact as proposed is undisputed.

227.    Elliott testified:

Q Your enrollment for the school year for 2015 was 539 students, and you're telling me roughly in 2017 it was 470 students; correct?

A  Yes.

Q That's a decrease in enrollment; correct?

A Correct.

Q  And that was after the changes to the Goodman Athletic Complex; correct?

A  I would have to look at our enrollment numbers to agree or disagree with that.

Q My question, sir, was the time period you just described, from 2015 to 2017, was after the athletic complex changes to the Goodman field; correct?

A  Correct.

Elliott Dep., dkt. #33, 49:10-24.

**Response:**      Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of an interrogatory response with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**   Fact as proposed is undisputed. Plaintiff's objection is not well

founded. Plaintiff offers no contrary evidence.

228.    Elliott has not had a parent tell him that they would not send their child to Edgewood because Edgewood does not have lights on its athletic field. Elliott Dep., dkt. #33, 267:6-10.

**Response:**      Disputed.  At least one student, R.F., left EHS because of the time and travel complications created by EHS's inability to hold night games and practices on site. Zwettler Decl. ¶ 18.

**Defendants' Reply:**   Fact as proposed is undisputed. Elliott was asked whether he ever

had a parent tell him that they would not send their kid to Edgewood because Edgewood did not

have lights on its athletic field and he responded, "I have not had a parent tell me that." Elliott

Dep., dkt. #33, 267:6-10. Plaintiff is impermissibly adding facts. *American National Property &*

*Cas. Co.*, 2006 WL 1589623, at \*1 (improper to raise facts not contained in opposing party's proposed fact); *Computer Docking Station Corp.*, 2007 WL 5117465, \*2.

229.    Edgewood answered the following interrogatory as follows:

INTERROGATORY NO. 3: Identify all factual and legal bases and any supporting documents for the allegation that the denial of the conditional use permit or any other action by any defendant has imposed a substantial burden upon your free exercise of religion.

RESPONSE: In addition to its General Objections, Edgewood objects to Interrogatory 3 to the extent it constitutes an impermissible contention interrogatory. Edgewood further objects because Defendants' request that Edgewood identify "all factual and legal bases and any supporting documents" is premature as discovery has not yet ended. Subject to and without waiving these or its General Objections, Edgewood responds as follows:

In addition to the legal and factual bases set forth in Edgewood's complaint and supporting documents, Edgewood's religious mission statement as a Catholic High School is to educate the whole student for a life of learning, service, and personal responsibility through a rigorous academic curriculum that embraces the Sinsinawa Dominican values of Truth, Compassion, Justice, Community, and Partnership"— educating the student consistent with this mission statement is how Edgewood "practices" its religion, and Defendants' conduct has burdened that practice in numerous ways:

•      Edgewood cannot engage in "traditional" religious activities, such as holding mass or holding events containing a mass, on its own facilities at night. Many of Edgewood's community-based activities, including graduations, assemblies, pep-rallies, and celebrations, contain masses, none of which can be held on Edgewood's own facilities in non-daylight hours when many members of the Edgewood community are available to participate.

•      A primary way that Edgewood educates the "whole" student in its mission is through participation in sports. The reality is that high school sports occur in the fall, winter, and spring, when days are shorter, such that the inability to host home games or practices at night functions as an inability to host them at all. This imposes a substantial and sometimes dispositive burden on students and families who cannot travel, or can only travel with great difficultly, to practices and "home games" in different locations. It also subjects Edgewood students to additional safety hazards associated with daily travel to offsite games and practices. These obstacles make it more difficult for students to participate in sports and Edgewood to fulfill its mission.

•      Hosting onsite home games on Edgewood's property is a primary way in which the Edgewood religious community interacts with each other to further its religious

mission. It is also a primary way in which Edgewood interacts with neighboring communities and students and families in parochial schools who are deciding whether to attend Edgewood. Moreover, the unique feeling of hosting an onsite home game in front of the Edgewood community is an irreplicable show of community support to Edgewood's current student- athletes and a draw for perspective student-athletes, as evidenced by the substantially increased community attendance at the onsite football games Edgewood was able to host last year before daylight hours became too short. Accordingly, Edgewood's inability to host onsite home games on its facility hinders its ability attracts students and families into the Edgewood community and spread and further its mission. In a contemporary culture that places a premium on athletics, modern on-campus athletic facilities enhance Edgewood's ability to compete for and attract students to attend a Catholic high school in furtherance of its religious mission. Denial of such facilities hurts Edgewood's ability to attract students and thus limits and hinders its religious mission.

•        Because Edgewood cannot host onsite home games and practices, it must rent fields from MMSD or other institutions. This empowers the City to restrict or refuse Edgewood from hosting games or having practices within the City or on any City-owned property, as it has done previously. Further, the monies that Edgewood unnecessarily spends on renting fields could be applied to other causes that further Edgewood's religious purposes. Goes off field for practice for fields. Edgewood specifically reserves the right to supplement this response until the close of discovery.

Zylstra Dec., Ex. QQ, Dep. Ex. 94; Elliot Dep. 275:19-276:8.

**Response:**        Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of a lengthy interrogatory response with many potential or implied factual propositions to which EHS cannot reasonably respond.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff's objection is not well

founded. Plaintiff offers no contrary evidence.

230.    Edgewood responded to a request to admit as follows:

REQUEST FOR ADMISSION NO. 10: Admit that the conditional use approval process referenced in MGO 28.097 and MGO 28.183 is facially neutral.

RESPONSE: In addition to its General Objections, Edgewood objects on the grounds that RFA 10 seeks an admission of a legal conclusion and not merely the application of law to fact. Subject to and without waiver of its General Objections, admits in part and denies in part. Admits that the conditional use approval process referenced in M.G.O. §§ 28.097 and 28.183 are written facially neutral, but denies that they are facially neutral in purpose or application. Deny any and all allegations not expressly admitted.

Zylstra Dec., Ex. NN, RTA 10.

**Response:**      Disputed.  This is an inappropriate proposed finding of fact under this Court's Summary Judgement Procedure in Article I.B.1 in that this is not a single factual proposition but a lengthy copying of discovery response with multiple potential or implied factual propositions.

**Defendants' Reply:**  Fact as proposed is undisputed. Plaintiff's objection is not well founded. Plaintiff offers no contrary evidence.

231.    Edgewood has not filed a notice of claim or an itemized statement of damages pursuant to Wis. Stat. §893.80. Verbick Dec., ¶¶2-3.

**Response:**      Not disputed.

**Defendants' Reply:**  Fact as proposed is undisputed.

Dated this 20th day of June, 2022.

                                                   Respectfully submitted,

                                                   */s/ Sarah A. Zylstra*
                                                   Sarah A. Zylstra, State Bar No. 1033159
                                                   Tanner G. Jean-Louis, State Bar No. 1122401
                                                   BOARDMAN & CLARK LLP
                                                   1 South Pinckney Street, Suite 410
                                                   P. O. Box 927
                                                   Madison, WI  53701-0927
                                                   Telephone: (608) 257-9521
                                                   Facsimile: (608) 283-1709
                                                   szylstra@boardmanclark.com
                                                   tjeanlouis@boardmanclark.com
                                                   *Attorneys for Defendants*

\\msnfs2\share\docs\WD\25981\424\A4561065.DOCX