**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

       Plaintiff,

     v.                                     Case No. 3:21-CV-118

CITY OF MADISON, WISCONSIN;
CITY OF MADISON ZONING BOARD
OF APPEALS; CITY OF MADISON
PLAN COMMISSION; and CITY OF
MADISON COMMON COUNCIL,

       Defendants.

**REPLY BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Sarah A. Zylstra, State Bar No. 1033159
Tanner G. Jean-Louis, State Bar No. 1122401
BOARDMAN & CLARK LLP
1 South Pinckney Street, Suite 410
P. O. Box 927
Madison, WI  53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Attorneys for Defendants*

# TABLE OF CONTENTS

Page No.

INTRODUCTION ...................................................................................................1

I.   THE PLAIN LANGUAGE OF THE MASTER PLAN ORDINANCE
     PREVENTED EDGEWOOD FROM USING ITS FIELD TO HOST
     ATHLETIC CONTESTS ............................................................................4

II.  EDGEWOOD CANNOT STATE A CLAIM UNDER RLUIPA ..........................9

     A.   Edgewood Was Not Treated Less Equally Than Other
          Institutions...................................................................................9

     B.   The CI-District Ordinance Does Not Effect A Religious
          Gerrymander ...............................................................................20

     C.   It Is Not A Substantial Burden For Edgewood To Host Its
          Nightime Games At Other Locations  ......................................21

          i.    Edgewood misquotes Seventh Circuit law ...................22

          ii.   The City did not cause Edgewood to suffer unreasonable
                delay, uncertainty, or expense........................................26

          iii.  No actions by the City deprived Edgewood from continuing
                an existing legal use of its property ...............................34

          iv.   Edgewood was not substantially burdened because it can
                still submit a conditional use permit application if it will
                agree to sufficient mitigating measures ........................36

III. EDGEWOOD'S FEDERAL FREEDOM OF SPEECH AND
     FREEDOM OF ASSEMBLY CLAIMS ARE MERITLESS ...............................38

     A.   The City Did Not Prevent Edgewood From Engaging
          In Expressive Conduct................................................................38

     B.   Edgewood's Free Exercise Claims Are Even Weaker Than
          Its RLUIPA Claims....................................................................41

IV.  EDGEWOOD'S DUE PROCESS CLAIM IS MERITLESS ...............................45

V.   EDGEWOOD'S CLAIM FOR DAMAGES UNDER STATE LAW
     AND ITS STATE CONSTITUTIONAL CLAIMS FAIL....................................45

i

Page No.

VI.   EDGEWOOD'S 2019 LIGHTING APPLICATIONS DID NOT
      GRANT EDGEWOOD A VESTED RIGHT TO LIGHTS BECAUSE
      THE APPLICATIONS WERE NOT COMPLIANT WITH ZONING ..........46

VII.  THE DENIAL OF EDGEWOOD'S CONDITIONAL USE PERMIT
      WAS BASED ON SUBSTANTIAL EVIDENCE .........................................48

CONCLUSION ...............................................................................................................52

## INTRODUCTION

Edgewood spends most of its energy in its response brief arguing that it had the right to play competitive sports games on its athletic field regardless of the language in its now-repealed master plan and that such was necessary to its Catholic mission. Edgewood practically ignores the real issue for the Court: whether Edgewood can meet its burden to show that City's denial of installing stadium lights under its conditional use ordinance was not supported by substantial evidence (more on this later).

But even if the Court were to waste time focusing on Edgewood's complaints about the City's interpretation of its now defunct master plan, Edgewood fares no better for several reasons. First, Edgewood asserts that using its field for competitive sports games at night is crucial to its religious mission. However, even Edgewood's president Michael Elliott admits that he was unaware of any requirement in the Catholic faith for an individual to participate in sports, and Edgewood does not even require its coaches to be Catholic. (Resp. to PPFF 38).

Second, even if the Court were to accept the importance that Edgewood claims that competitive games are to its religious faith, there is no evidence that Edgewood cannot practice its faith or fulfill its mission by holding night games at other fields. In fact, Edgewood says it has been engaging in its religious mission since 1881 and it has not previously had or needed a lighted field to do that. And Edgewood College, which Edgewood admits shares the same faith as the high school, is currently building a sports stadium off site in Fitchburg and is not insisting on games on its own campus. (DPFF 183, 186). The College certainly doesn't require a lighted field on its campus to practice the same Catholic faith and fulfill the same religious mission.

Edgewood's focus on its defunct master plan is even more remarkable because Edgewood essentially admits that it suffered no harm from the City's interpretation. It states

1

unequivocally in its brief, "EHS never stopped scheduling games for its various teams on its field, and never stopped using its field for other activities related to its primary mission." (Pl. Br. at 28). So, even if the City were incorrect on its interpretation that master plan prohibited competitive games—which the City was not—Edgewood never stopped playing its competitive games anyway.

But, contrary to Edgewood's assertions, the City was more than correct in its interpretation of Edgewood's master plan. While Edgewood tries unsuccessfully to dispute a number of the City's proposed facts, it cannot and does not dispute that:

- Prior to creation of the Campus Institutional District Zoning ordinance (M.G.O. § 28.097), whenever Edgewood wanted to make changes to a building or outdoor open spaces (like its athletic field), it needed to seek approval from the City's Plan Commission, which would hold a public hearing at which neighbors could appear and object. (DPFF 6-7).

- The City adopted the Campus Institutional District Zoning ordinance M.G.O. § 28.097 on October 26, 2012, with an effective date of January 2, 2013. (DPFF 9).

- The statement of purpose of M.G.O. § 28.097 includes balancing the ability of institutions to change with the need to protect the livability and vitality of adjacent neighborhoods and includes encourage campus master plans that enable adjacent neighborhoods to understand the development being proposed, their likely impacts, and appropriate mitigation measures. (DPFF 10).

- M.G.O. § 28.097 required Edgewood to submit a facilities plan that included its existing land uses and open space areas as well as identify its proposed future conditions, including its future needs/capital improvements, land uses, landscape treatment, and open-space areas. (DPFF 34).

- Edgewood voluntarily chose to submit a master plan and after City review and imposition of certain conditions, Edgewood's master plan was passed by the City Council and became an enacted City ordinance in January 2014. (DPFF 11-15).

- Just prior, in 2013, there were meetings between Edgewood and the Dudgeon-Monroe and Vilas Neighborhood Associations regarding Edgewood's master plan and Elliott knew it was important for Edgewood to get agreement with the neighborhood associations on the language in Edgewood's master plan. (DPFF 36, 38).

- In an article from 2015 when Edgewood received money for upgrades to the track and field, Elliott said that the upgrades to the track and field received support from area neighborhood groups "that have balked in the past at the idea of turning the facility into a competition site for Edgewood's many athletic programs." (DPFF 54).

- In that same article, Elliott acknowledged, "We're between two neighborhood associations. They have been vehemently opposed to us *having lights or playing games here*," he said. "We're really building this to be able to give our athletes the *practice* facilities that provide the best surfaces possible and to expand the amount of outdoor *practices* we can hold especially in the spring.  That is our focal point." (DPFF 55) (emphasis added).

- Elliott's comments correspond perfectly with Edgewood's 2014 master plan. In submitting its master plan to the City, Edgewood identified the open space area where its athletic field is located in its master plan as "Athletic field owned by Edgewood High School. Used for team practices, physical education classes." (DPFF 35).

- With respect to the 22 different improvements identified in Edgewood's Master Plan, none involved improvements to an athletic field. (DPFF 33).

- In light of all this, the City consistently told Edgewood at least since 2018 that Edgewood defined the use of its athletic field in its master plan, which in turn, was enacted as a City ordinance, when Edgewood wrote that its field was "Used for team practices, physical education classes" and that such did not include playing competitive games or installing stadium lights and playing competitive night games. (DPFF 83, 76-77).

These facts show that Edgewood was well aware of the opposition by its neighbors, knew that it need neighborhood support for its master plan, and knew that the neighborhood association would not have supported its master plan if it defined use of the athletic field to include stadium lights or competitive games. Elliott admitted as much in 2015. Even if one thought the City's interpretation were incorrect, that interpretation cannot be said to be arbitrary or capricious given these facts. And, when Edgewood submitted its lighting applications to the City to install stadium lights for night games, there is no dispute that Edgewood's master plan was still in effect, warranting denial of those applications. (DPFF 91, 153, 154).

In addition, in terms of Edgewood's claims of unequal treatment for its lighting applications, Edgewood admits the facts that show that its alleged comparators are not

comparators at all. Edgewood argues Memorial high school submitted a lighting application for its athletic field. But Edgewood cannot deny that Memorial (1) did not have a master plan, (2) has had lights on its field since the 1970s, and (3) was requesting to replace its current 6 light poles with 4 light poles, and thus, it was a maintenance project, not a new capital improvement or new use. Edgewood's assertion that UW is a comparator is equally misguided given that UW's master plan contains language about using their fields for competitive games and that the changes to Nielsen Tennis Stadium occurred prior to the UW's master plan becoming effective.

So, we now turn to the real issue in this case, which is the denial of Edgewood's conditional use application that it submitted after its master plan was repealed. To begin, Edgewood admits that the City's conditional use ordinance is facially neutral and even warned the athletic directors of Madison's public schools that the amendment would impact all schools. (DPFF 230; Resp. to PPFF 197). In addition, perhaps recognizing the battle it faces, Edgewood pitches its argument to this court that there was evidence for the City to grant it a conditional use permit. But that is not sufficient. Edgewood must also show there was no substantial evidence to support the denial of the permit. Edgewood does not even try to argue that.

In the end, Edgewood cannot stave off this well supported summary judgment motion.

## I.   THE PLAIN LANGUAGE OF THE MASTER PLAN ORDINANCE PREVENTED EDGEWOOD FROM USING ITS FIELD TO HOST ATHLETIC CONTESTS.

Edgewood leads off its lengthy response brief with a non-sequitur: Edgewood (somewhat incredulously) argues that it never intended to waive its right to use the field to host athletic contests and that the City bears the burden to prove that Edgewood did. (Pl. Br. at 26). Edgewood never explains why it believes this is an issue for this Court as defendants did not raise waiver in their brief-in-chief. Instead, Edgewood creates this strawman to avoid the issue the City did squarely present in its brief: legislative interpretation of the plain language of a

4

municipal ordinance, namely, Edgewood's master plan. Edgewood's attempt to re-focus this issue on what Edgewood intended is both irrelevant and an attempt to cloud the legal issue before the Court.

It is undisputed that Edgewood's master plan, a piece of municipal legislation that the Plan Commission approved and the Common Council enacted into law, had the effect of an ordinance. (Pl's resp. to DPFF 11-15). Once enacted, the language of the legislation is controlling, not the (unconvincing) post-hoc justifications for the language that Edgewood's president tries to offer during litigation. *FAS, LLC v. Town of Bass Lake*, 2007 WI 73, ¶ 21, 301 Wis. 2d 321, 733 N.W.2d 287 (quoting *Bruno v. Milwaukee County*, 2003 WI 28, ¶ 6, 260 Wis.2d 633, 660 N.W.2d 656) ("We interpret ordinances in the same manner as we interpret statutes because '[t]he rules for the construction of statutes and municipal ordinances are the same.'").

Further, in construing an enacted ordinance, the purpose of such construction is to discern the intention of the legislative body. *Schroeder v. Dane Cnty. Bd. of Adjustment*, 228 Wis. 2d 324, 333, 596 N.W.2d 472, 478 (Ct. App. 1999). If the language of the ordinance is plain, the court applies that language to the facts at hand and does not look beyond the language to ascertain its meaning. *Id.* Interpretation and application of a municipal ordinance to undisputed facts is a question of law. *Bruno*, 2003 WI 28, ¶ 6.

Here, the Campus-Institutional District Ordinance required institutions that submitted master plans to identify existing and future open spaces and their uses. In the Open Space section of Edgewood's master plan, Edgewood wrote that its athletic field would be "[u]sed for team practices, physical education classes." (DPFF 35). The City consistently told Edgewood at since at least 2018 that Edgewood has defined the use of its athletic field in its master plan as "team

practices, physical education classes" and that such excluded competitive games and stadium lights. (DPFF 83, 76-77)

Edgewood argues that the City penalized Edgewood for not describing its use of the field with greater specificity and that by definition, an "athletic field" can be used for competitive games. (Pl. Br. at 30, 44). On the contrary, the master plan described the use of the field with a very high degree of specificity that excluded athletic contests. Words of a statute or ordinance are read together, not in isolation. *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2007 WI 98, ¶ 27, 303 Wis. 2d 258, 277, 735 N.W.2d 93, 102 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as a part of a whole…"). Edgewood did not write in its master plan that it would use the open space as an athletic field, and such is a re-writing of the language of the ordinance. Edgewood wrote that it ***owned*** the athletic field and that its ***use*** was "for team practices, physical education classes."

Edgewood also argues that the master plan cannot be read to prohibit "athletic contests" because team practices and physical education classes can sometimes have elements of competition. (Br. at 32). However, this argument, even if accepted as true, goes nowhere. The City did not interpret its ordinance to prevent competition on connection with a team practice or P.E. class. Edgewood did not receive a Notice of Violation, for example, because its gym teacher set up a scrimmage as part of gym class. Edgewood was engaging in repeated use of its field to play competitive sports games, including some night games, at all levels. (*See* Resp. to PPFF 15 (citing deposition exhibit 68, which identifies voluminous day games being played on Edgewood's field in 2018 alone, including several night games).

In any event, even if Edgewood's intent were somehow relevant, the undisputed facts suggest that Edgewood knew precisely what it was doing when it drafted the language in its

6

master plan specifically narrowing the uses of the field to team practices and physical education classes. Edgewood was well aware that it needed the support of two neighborhood associations to the language of its master plan to get the plan passed by the Common Council and also knew that they were "vehemently opposed" and had "balked" at Edgewood "having lights or playing games" on its field. (DPFF 38, 54-55). Further, an earlier draft of the master plan had broader language related to use of the field, stating that it would be "[u]sed for team practices, physical educations classes, ***and other general light uses***." (Reply to DPFF 44). However, this description of the use of the field was replaced with the even narrower language that appeared in the final version. Under these facts, the City's interpretation and application of its ordinance that "Athletic field owned by Edgewood High School. Used for team practices, physical education classes" does not include competitive sports games is consistent with the plain language of the ordinance.

Finally, as an aside, even the Court were to apply a waiver analysis to the facts presented, summary judgment would still be warranted. Edgewood relies on only Elliott's declaration for its contention that Edgewood did not intend to limit the use of EHS's athletic field to team practices or physical education classes by choosing the language it did in its master plan. (Br. at 12). However, in its next breath, Edgewood contends that it and Elliott had very little involvement with the drafting of the Master Plan, that Elliott was new to his job in 2013 and "did not dive into" the master plan, and that Edgewood College was the driving force behind the master plan. (Br. at 11). While the City disputes some of those facts, they show unequivocally that Edgewood cannot claim it had a specific intention not to waive field usage for competitive games. Elliott pled himself out of being competent to offer any testimony as to Edgewood's intent for a document that he disclaimed being involved in drafting.

Edgewood makes a number of other, irrelevant arguments that can be quickly dealt with. It argues that the City held Edgewood to a higher standard than the City holds itself to, because the City's Parks Division's webpage lists a number of activities that take place on City-owned fields, but (Edgewood says) the City does not treat these lists as exhaustive or restrictive.[1] (Br. at 31). However, Edgewood's argument is illogical. The Parks Division's webpage is not an enacted master plan ordinance but merely a webpage; it is aimed at providing general information. The webpage was not "the product of extensive engagement, collaboration and effort" between parties with competing interests, as Edgewood concedes its master plan was. (DPFF 45). And most importantly (and unlike Edgewood's master plan), the webpage does not have the force of an ordinance or map amendment.

Edgewood next argues that the master plan could not possibly restrict Edgewood's land uses because Edgewood adopted the master plan voluntarily. But 'voluntary' does not mean 'unenforceable.' Contracts are voluntary (or else void for duress), yet contracts are still enforceable. Like an institution's decision to adopt a master plan, a contract involves tradeoffs whereby a party volunteers to undertake certain hardships in exchange for certain benefits. Perhaps most analogously in the zoning context, a Planned Unit Development designation may restrict a landowner or future landowner's use of a property, even if the designation was adopted voluntarily. *See Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 898 (7th Cir. 2005) (church's voluntary proposal that it be rezoned with a PUD limiting use of the site to church uses would have definitively prevented the church or any future landowner from building a school on the property). A 'conditional use permit' can do the same (it's in the name). So too can a master plan.

---

[1] Edgewood does not cite a single proposed fact or anything in the record to support this claim.

II.     **EDGEWOOD CANNOT STATE A CLAIM UNDER RLUIPA.**

    A. **Edgewood Was Not Treated Less Equally Than Other Institutions**.

Edgewood first complains that the City did not treat Edgewood the same way that the City treated institutions that were zoned Campus-Institutional but that lacked master plans. (Pl. Br. at 34-45). But Edgewood *did not want* to be treated the same as those institutions; it elected to be governed by a master plan for the specific purpose of receiving differential treatment. Under the CI-District ordinance, institutions without a master plan were required to obtain a conditional use permit before erecting ***any*** structure exceeding 4,000 square feet of total floor space. (DFF 25). A conditional use permit was required for such institutions even if the use of the structure fell within the allowable uses under the ordinance. The conditional use permit process can be difficult, expensive, and politically fraught. (DPFF 5-8). Institutions are required to develop detailed plans that must be approved by the Plan Commission after a public hearing where anyone opposed to a project may submit comments or testify against it. (DPFF 6-7).

Larger institutions such as the Edgewood Campus and UW-Madison, with more extensive plans for expansion and development, felt it was too onerous to go through the conditional use permit process for every project, especially considering that there was no guarantee of success. (DPFF 5-8). That is why such institutions approached the City about developing the master plan system.[2] Under that system, institutions with a master plan could have a decade's worth of development projects approved upfront, without having to describe each project with the same detail that required for a conditional use permit application. (DPFF 27).

---

[2] Before the CI-District ordinance was enacted, Edgewood was zoned residential and was required to go through the conditional use permit process for all of its development projects. (DPFF 17, 6-7).

The purpose of the CI District Ordinance is explicitly stated in the ordinance itself.

Creation of the CI Districts were intended to:

> (a) Permit appropriate institutional growth within boundaries while minimizing the adverse impacts associated with development and geographic expansion.

> (b) Balance the ability of major institutions to change and the public benefits derived from change with the need to protect the livability and vitality of adjacent neighborhoods.

> (c) Encourage the preparation of Campus Master Plans that enable adjacent neighborhoods and the broader community to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures.

M.G.O. § 28.097(1).

To ensure that the goals of the ordinance were met, the flexibility and facility of the master plan process was balanced by certain restrictions. One of these was that a master plan must describe existing land uses as well as future needs, capital improvements, land uses, and open-space uses. Under the ordinance, approval of the master plan must be based on the plan's treatment of these topics. M.G.O. §§ 28.097(5) and (6) (noting requirements of the institution's facilities plan and noting, "[a]pproval of the Master Plan will be based on the Plan's treatment of the [facilities plan's] topics").

Any changes to a master plan, and most specifically "changes to the proposed use of identified open space areas and other open space uses," required City approval. Changes to open spaces were expressly called out in the ordinance as requiring approval. This was necessary to facilitate the ordinance's goal to "protect the livability and vitality of adjacent neighborhoods" and "enable adjacent neighborhoods and the broader community to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures." M.G.O.

10

§ 28.097(1). If land uses or open-space uses were not included in a master plan as required, then the associated impacts and appropriate mitigation measures could not be addressed.

Further, if changes to land uses could be made without amendment to the master plan, then the "balance" the ordinance aimed to reach between "the ability of major institutions to change" and "the need to protect the livability and vitality of adjacent neighborhoods" could be upset. Certain projects and land uses identified in a master plan might be treated differently if City officials are made aware of existing land uses that change the context of those projects or uses. For that reason, master plan approval is conditioned on the plan's adherence to the requirement that it include a both "description of existing conditions on the campus" and "the proposed conditions under the Master Plan," including its future needs/capital improvements, land uses, landscape treatment, and open-space areas." M.G.O. §§ 28.097(5) and (6). This is particularly true for the topics enumerated in the ordinance, such as open space uses. *Id.*

Edgewood was aware of the benefits of adopting a master plan. (Pl. Br. at 11, "Elliott and EHS did understand that the Master Plan was supposed to help facilitate or streamline specified building projects."). Incredulously, Edgewood claims that it was not aware "that the Master Plan could operate or would be interpreted to restrict or limit projects or uses that were not identified or not identified with a certain specificity within the Master Plan." (*Id.*) But whether Edgewood was aware or not, that is what the CI District ordinance *says*.

Edgewood was not only aware of the benefits of the master planning process, it received them. The Edgewood High School, College and Campus School collectively identified 22 development projects that they intended to complete over the period of the master plan, which projects would not require them to seek a conditional use permit and repeatedly subject them to a

11

lengthy and public process. Several of these 22 projects were completed, including some projects that were specifically related to the high school. (*See* Reply to DPFF 27).

Having benefitted from the master plan process, Edgewood contends that it is religious discrimination and less than equal treatment for the City to enforce the rules that come with those benefits, reasoning that those rules are not applied to other institutions, which also do not receive the benefits that Edgewood and other master plan institutions did. Edgewood's argument highlights the importance of the requirement that "[a] plaintiff bringing an as-applied Equal Terms challenge must present evidence that a *similarly situated* nonreligious comparator received differential treatment under the challenged regulation. If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1311 (11th Cir. 2006).

Edgewood argues that under *River of Life's* objective zoning criteria test, Edgewood is similarly situated to UW-Madison and Madison's public high schools, reasoning that they share Edgewood's CI-District zoning classification. Edgewood cites *Immanuel Baptist Church v. City of Chicago*, 344 F. Supp. 3d 978, 984 (N.D. Ill. 2018), for the proposition that, when determining whether another institution is a similarly situated comparator, "[w]hat matters is whether the nonreligious institution or assembly differs with respect to the accepted zoning criteria that are generally applicable to or define the character of the zone from which the religious institution or its use is being excluded." (Pl's Br. at 36).

However, that proposition appears nowhere in *Immanuel Baptist*. To the contrary, that is practically the opposite of *Immanuel Baptist's* holding. In *Immanuel Baptist*, the City of Chicago argued that a church and a library were not similarly situated because they were not in the same

zoning district. The court rejected that argument, emphasizing that the land use regulation at issue was a parking ordinance, and that "the parking ordinance dr[ew] no distinction between parking requirements applicable to the two" districts. *Immanuel Baptist*, 344 F. Supp. at 985. What mattered under the RLUIPA equal terms analysis was whether the two institutions were similarly situated as to the objective criteria of the parking ordinance. In other words, the court looked at whether the two institutions were similar *with respect to the land use regulation at issue*. The court held that the overarching zoning district that each institution was located in was irrelevant.

Just as an institution is not automatically disqualified as a similarly situated comparator just because it is in a different zoning district, the mere fact that another institution is located in the same general zoning district is not enough to qualify that institution as a comparator under RLUIPA's equal terms clause. Nor is it enough to say that two institutions in the same zoning district both fit the criteria for inclusion within that zoning district. Of course Edgewood, UW-Madison, and the public high schools are somewhat similar "with respect to the accepted zoning criteria that are generally applicable to or define the character of the zone."[3] That is precisely why they were put in the same zone!

Edgewood's own brief explains why it is illogical to use zoning districts as the litmus test for whether Memorial and UW-Madison are similarly situated comparators. Edgewood wrote:

> Typically, an equal-terms case involves a religious institution or assembly that wants to come into a zoning district in which a comparable nonreligious institution or assembly is already allowed to operate. *See, e.g. Digrugilliers*, 506 F.3d at 614–15 (Indianapolis kept a religious assembly from locating in a zoning district which permitted assembly halls, civic clubs, and schools as of right); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846 (7th. Cir. 2007) (village kept church from locating in an industrial district); *Vision Church v. Vill.*

---

[3] It is also unclear how Edgewood managed to insert the requirement that an ordinance be "generally applicable" into the test. That language appears nowhere in *Immanuel Baptist*, nor can it be found in *River of Life's* majority opinion.

> *of Long Grove*, 468 F.3d 975, 1002–03 (7th Cir. 2006) (village kept church from locating in a residential district).
>
> But this case is distinguishable from those cases (all of which were decided before the Seventh Circuit established its "accepted zoning criterion" test) because, here, Madison was not keeping EHS from locating in a Campus Institutional District. EHS was already zoned Campus Institutional in 2013 along with the MMSD schools and parts of the UW Campus. (APFOF ¶¶ 63-64.)

(Pl. Br. at 37). If Edgewood wanted to be zoned Campus-Institutional, but the City refused, it would be fruitful to examine whether Memorial and UW-Madison are similar with respect to the accepted criteria that define the zone. But as Edgewood admits, that is not what this case is about. Similarly, whether athletic events or stadium lights fit within the zone is not, and has never been at issue. Edgewood's desire to erect stadium lights to host athletic contests at night in a residential neighborhood was denied first because Edgewood's own master plan prohibited it, and later because Edgewood's conditional use permit application failed to meet the criteria of the conditional use ordinance.[4] Neither Memorial nor UW are comparators on these land use regulations.

Edgewood proceeds to further pervert its confused version of *Immanuel Baptist's* holding and the Seventh Circuit's test by citing a Washington district court opinion for the proposition that "'accepted zoning criteria' are the objective characteristics of a particular use that determine whether a use should be excluded from the zone, given the purposes for which the zone was established." (Pl. Br. at 36-37). But the addition of a purpose-based analysis into the test fails to

---

[4] Edgewood also complains that the City issued Edgewood two notices of violation (essentially warnings) for hosting daytime games on its field. However, no fines were assessed in connection with these notices, and no enforcement action was taken. (DPFF 110-111, 122-124). The City did nothing to prevent Edgewood from hosting daytime games, it only provided Edgewood with official notice that this violated its master plan. Edgewood continued to host daytime games without interruption, despite the City's position, as Edgewood concedes in its response brief. (Pl. Br. at 28, "EHS never stopped scheduling games for its various teams on its field, and never stopped using its field for other activities related to its primary mission."). Given that Edgewood proceeded regardless, and given the fact that Edgewood repealed its master plan, this is a red herring and cannot form the basis of any claim against the City.

14

solve the problems inherent with using overarching zoning districts—as opposed to the land use regulation at issue—as the be-all, end-all for a comparator's analysis. What's more, the Seventh Circuit *explicitly rejected* the use of a purpose-based analysis, reasoning that "the use of 'regulatory purpose' as a guide to interpretation invites speculation concerning the reason behind exclusion," and that "the equal-terms provision as drafted by Congress omits the term 'regulatory purpose' or some cognate term." *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 371 (7th Cir. 2010). This Court has already recognized that Edgewood's proposed test is not the law in this Circuit. *See* Opinion and Order, dkt. 28 at 7 ("the [] River of Life decision . . . adopted a 'shift of focus from regulatory purpose to accepted zoning criteria.'"). Edgewood offers no basis for this Court to revisit its decision or to eschew Seventh Circuit precedent, which this Court is bound to follow.

Rather than adopt Edgewood's confused version of *Immanuel Baptist's* holding, this Court should do what the court in *Immanuel Baptist **actually did*** and examine whether Memorial and UW-Madison are similar *with respect to the land use regulation at issue*. *See Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*, 905 F.3d 357, 368 (6th Cir. 2018) (naming the Seventh Circuit as among the majority of circuits "holding that a comparator for an equal terms claim must be similarly situated *with regard to the regulation at issue*.") (emphasis in original).

Neither Memorial nor UW-Madison can be proper comparators to Edgewood because at the time those two institutions received allegedly more favorable treatment, neither institution had a master plan and the ordinance amendment under which Edgewood later applied for a conditional use permit was not yet enacted. And, Edgewood even admits that conditional use process for CI Districts is facially neutral and will impact any improvements or modifications public schools wished to pursue for their athletic fields the same as Edgewood. (DPFF 230;

15

Resp. to PPFF 197). The fact that these schools were in the same zoning district as Edgewood is irrelevant when the two institutions' applications were considered in different years and under two different versions of the ordinance.

*River of Life* (the case originating the 'accepted zoning criteria' test), cited *Vision Church v. Village of Long Grove* for the rule that if two institutions are evaluated under a different standards because they apply for zoning relief in different years, that "***compels*** the conclusion that there was no unequal treatment" and they cannot be proper comparators. *River of Life*, 611 F.3d at 370 (quoting *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1002–03 (7th Cir. 2006)) (emphasis added).

In *Vision Church*, a church and a school both fell into the same residential zoning district. Both institutions required a special use permit to operate within the residential zone, and both fell within the scope of the municipality's 'Public Assembly Ordinance.' 468 F.3d at 1002. Not only were the two institutions similar in all these respects, they were situated directly across the street from one another. *Id.* at 987, fn. 11. The school's special use permit was granted, while the church's "identical" application was denied only three years later. *Id.* at 1000, 987 fn. 11. The church's application, like the schools, fully satisfied all the criteria of the zoning code. The only material difference between the two applications was that the Public Assembly Ordinance was amended after the school's application was granted, and the church's special use permit was denied because the church's proposed development was too large. *Id.* at 987 fn. 11, 1002. The court held that because "the[] standards had changed slightly" between the school's application and the church's, the school was not a similarly situated comparator. *Id.* at 1002.

The present case is on all fours with *Vision Church*. When Memorial submitted its 2018 application to replace its *existing* stadium lights, athletic stadiums were a permitted use within

16

the CI-District, meaning that Memorial needed only to undergo a 'permitted use site plan review.' Under that review—which is conducted by the Department of Building Inspection—the lights needed only to comply with the building code (most relevant to Memorial's application, the lighting section of the building code) and the zoning code. Because Memorial had had lights on its field since the 1970's, and its application actually reduced the total number of lights (and with more modern lights that created less spillover), Memorial's application was approved. (*See* DPFF 198-201; Resp. to PPFF 133-135).

Similarly, when UW-Madison applied for lights for the Nielsen Tennis Stadium in 2018, its master plan was not yet in effect. (DPFF 206). UW's master plan had an effective date of January 1, 2019. Further, UW, unlike Memorial or Edgewood, is not required to obtain building permits from the City, because it is a state institution. UW is only required to comply with the zoning code. (DPFF 215-216).

When Edgewood applied for lights in 2019, it also underwent permitted use site plan review. While Edgewood's application complied with the lighting code, it was contrary to Edgewood's own master plan (which had the effect of a zoning ordinance). Therefore, the application was not compliant with the zoning code.[5] (DPFF 103-106). Edgewood argues that "[i]f EHS had never adopted a Master Plan, its lighting application would have been judged under the same standards as Memorial." (Resp. Br. at 16). But such ignores the reality that Edgewood *did* adopt a master plan and its application was subject to that ordinance.

---

[5] Edgewood erroneously claims that its February 2019 application received zoning approval because a document showing the status of the application had the word "approved" next to the box indicating its status under zoning review. But the City's zoning inspector explained that this was merely something that needed to be done to advance the workflow process, and the word "approved" was used only due to the limitations of the City's software. (Resp. to PPFF 108-109). Regardless, it is undisputed that Edgewood did not change its position in reliance on the City's 'approval' and thus Edgewood cannot claim a substantial burden on that basis.

To get its stadium lights, Edgewood needed to amend its master plan, repeal its master plan, or wait for the plan's ten-year term to expire. (Resp. to PFF 171, citing Dep. Ex. 23). Edgewood's master plan was eventually repealed at Edgewood's request but by then, the CI-District Ordinance had been amended to require that institutions without a master plan obtain conditional use approval for the establishment or improvement of a use occurring outside of an enclosed space.[6]

Obtaining a conditional use permit is a completely different type of zoning relief than obtaining a building permit under the previous permitted site plan review. The conditional use permit ordinance is in a separate chapter of the City's code than the CI-District ordinance, and a different standard is applied to conditional use permits than is applied to a building permit under permitted use site plan review. M.G.O. § 28.183. While permitted use site plan review required only compliance with building and zoning codes, the conditional use ordinance requires that a permit application be granted only if "[t]he uses, values and enjoyment of other property in the neighborhood for purposes already established will not be substantially impaired or diminished in any foreseeable manner" by the use.[7] M.G.O. § 28.183(3). While permitted use site plan

---

[6] Edgewood claims that the amendment was meant to target Edgewood. The amendment was in fact prompted by arguments Edgewood made when it appealed the Notices of Violation to the Zoning Board of Appeals. Edgewood's arguments revealed to the board and Common Council members that under the language of the ordinance as it existed at the time, nothing prevented the public high schools from erecting stadium lights or even building a farm or operating a prison on their property, so long as they did not erect a structure exceeding 4,000 square feet of floor space. (DPFF 116-118). While it was Edgewood that first pointed out the flaw in the ordinance, among the ordinance's many sponsors were the alders for Madison West High School and Madison East High School, and there was fear that West at least would attempt to build a stadium on its property. (DPFF 130-133). Each of those schools, like Edgewood, is located in a traditional urban neighborhood, and each currently lack a stadium or stadium lights.

[7] The relevant standard under the conditional use permit ordinance further demonstrates why it is illogical to use Edgewood's zoning district as the basis to determine whether another institution is a comparator. This standard looks to the characteristics of the surrounding properties, not the characteristics of the applicant. (PPFF 230). Edgewood's campus is bordered by two residential neighborhoods. (DPFF 36-37, 48). Edgewood's application was denied not because its desired use did not fit within the criteria of the

review is conducted by the Department of Building Inspection, a conditional use permit must be granted by the Plan Commission. M.G.O. § 28.183(6). Here, the Plan Commission found that the existing uses, values, and enjoyment of Edgewood's neighboring properties would be substantially impaired or diminished if Edgewood erected stadium lights and hosted athletic contests—complete with amplified sound and cheering fans—at night. (DPFF 171-172).

Just as in *Vision Church*, where the church's special use permit application was subject to a different standard because it was considered in a different year, the standard applied to Memorial and UW's 2018 applications had changed by the time Edgewood applied for a conditional use permit. Under the binding precedent established by *Vision Church*, that "compels the conclusion that there was no unequal treatment" and UW-Madison and Memorial are not similarly situated as a matter of law. *See also Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1311 (11th Cir. 2006) (two institutions are not similarly situated if they seek "markedly different forms of zoning relief, from different decision-making bodies, under sharply different provisions of local law.").

Edgewood also complains that UW-Madison allegedly hosts athletic contests at various facilities that Edgewood contends are not clearly designated to be used for athletic contests in UW's master plan, pointing to, for example, newspaper articles about the Goodman Softball Practice Facility, the Natatorium, and the Nielsen Tennis Stadium. There are at least three problems with Edgewood's argument.

First, unlike Edgewood's master plan, the UW did not limit use of its facilities to "team practices and physical education classes." Second, and more importantly, UW's master plan is actually replete with discussion of UW's use of these facilities for competitive games and large

_____

CI-District, but because the use was found to substantially impair the uses, values, and enjoyment of surrounding properties, properties which are zoned residential, not campus-institutional. (DPFF 171-172).

sporting events. (*See* DPFF 209-213; Resp. to PPFF 156-163). In describing Goodman Field and Nielsen Tennis Stadium in particular, UW actually uses the descriptive phrases, "series of athletic competition and practice fields" and "large sporting events" and UW actually includes expansion of the Natatorium and Nielsen Tennis Stadium as its intended master plan projects. Further, plaintiff conflates the Goodman Softball Practice *Facility* with the Goodman *Field*. UW's master plan shows that the Goodman Softball Practice Facility and the Goodman Field are not the same. (Resp. to PPFF 156-157). The softball practice facility, like the Natatorium, is an indoor facility, and activities occurring within enclosed buildings implicate different provisions than open spaces in a master plan.

Third, Edgewood's arguments are built on a house of cards anyway because Edgewood has not produced any admissible evidence, instead relying on various media reports that it asks the court to take judicial notice of for its alleged facts. But even setting aside that none of these articles were produced in discovery or identified on any Rule 26 disclosures (Zylstra Second Dec., ¶3), Edgewood is not only asking the court to take judicial notice that the fact that the articles on which it relies were published; rather, Edgewood wants the court to admit the veracity of the information *in* the article, and not only that, but *assume* that City officials read these, and *assume* that City officials would know that the information in these articles was inconsistent (at least as plaintiff alleges) with information provided in UW's 432-page master plan. There is no basis for the court to do that, especially when Edgewood has not even shown any of these articles to any witness.

**B.  The CI-District Ordinance Does Not Effect A Religious Gerrymander.**

Having failed to find a similarly situated secular comparator, Edgewood makes a desperate attempt to salvage a claim under RLUIPA's Equal Terms clause by arguing that the amendment to the CI-District Ordinance effected a religious gerrymander. (Pl. Br. at 45). A

20

genuine example of a religious gerrymander could support an Equal Terms violation. *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1309 (11th Cir. 2006). However, "[t]o prove this kind of statutory violation, [Edgewood] would have to show that the challenged zoning regulation separates permissible from impermissible assemblies or institutions in a way that burdens 'almost only' religious uses." *Id.*; *see also Vision Church*, 468 F.3d at 1003.

However, as the City explained in its opening brief, Edgewood cannot show that here. The CI-District amendment applies equally to all institutions in the City zoned Campus-Institutional that lack a master plan, including all of the City's public high schools.

This case is distinguishable from *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), which Edgewood cites, because in that case, a statute that was neutral on its face was written in a way that it ended up only regulating the ritual sacrifices performed by adherents of Santeria. Here by contrast, Edgewood and its counsel understood that the ordinance applied equally to Edgewood and the public high schools, and Edgewood's athletic director wrote to his counterparts at the other public high schools, warning them that the amendment would impact any improvements they wished to pursue on their athletic fields as well. (Resp. to PPFF 197).

Because Edgewood cannot show that the ordinance amendment burdens 'almost only' religious uses, Edgewood's religious gerrymander claim fails.

## C.  It Is Not A Substantial Burden For Edgewood To Host Its Nighttime Games At Other Locations.

Edgewood claims that denial of stadium lights for its athletic field is a substantial burden on its religious exercise, contending first that Seventh Circuit caselaw (*Word Outreach II*) stands for the proposition that a religious institution is substantially burdened every time it is prevented

21

from using its facilities to further its religious mission. This is incorrect and plaintiff completely misquotes *World Outreach II* to make the argument.

    i.    <u>Edgewood misquotes Seventh Circuit law.</u>

First, the Seventh Circuit has held, that "[a]ny land-use regulation that a [religious institution] would like not to have to comply with imposes a 'burden' on it, and so the adjective 'substantial' must be taken seriously lest RLUIPA be interpreted to grant [religious entities] a blanket immunity from land-use regulation." *World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009) ('*World Outreach I*') (finding that city's denial of demolition permit was only a "modest" burden because there was "a suitable alternative site" for church's desired use). "[S]ubstantiality is a relative term—whether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question." *Id.*; *see also Affordable Recovery Hous. v. City of Blue Island*, No. 12-CV-4241, 2016 WL 5171765, at *10 (N.D. Ill. Sept. 21, 2016), *aff'd*, 860 F.3d 580 (7th Cir. 2017) ("Generally speaking, RLUIPA does not provide religious institutions with immunity from land use regulations, nor does it relieve religious institutions from applying for variations, special permits, or exceptions to land use regulations."); *Young v. McKee*, No. 2:17-CV-23, 2019 WL 5273963, at *4 (W.D. Mich. July 16, 2019), ("RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word 'substantial.'").

Courts recognize that "a substantial burden is more than an inconvenience and is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Dorman v. Aronofsky*, No. 20-10770, 2022 WL 2092855, at *4 (11th Cir. June 10, 2022) (quotation marks omitted); *see also Shaw v. Cnty. of Milwaukee*, No. 22-C-97, 2022 WL

1063726, at *3 (E.D. Wis. Apr. 8, 2022) ("A 'substantial burden' puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."). As this Court recognized recently, the relevant inquiry is whether the land use rule at issue "*seriously violates*" the plaintiff's religious beliefs or exercise. *Schworck v. City of Madison*, No. 19-CV-312-WMC, 2021 WL 1820779, at *13 (W.D. Wis. May 6, 2021), *aff'd as modified*, No. 21-2055, 2022 WL 832053 (7th Cir. Mar. 21, 2022) (citing *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015)) (emphasis added).

> In its response brief, Edgewood writes that:

> Even before the Seventh Circuit adopted the "much easier" to satisfy standard in *Schlemm v. Wall*, the Seventh Circuit had held in *World Outreach II* that "preventing a religious organization from using its facility to serve the religious objectives of the organization cannot be thought to have imposed a merely insubstantial burden on the organization." *World Outreach II*, 787 F.3d at 843 (emphasis added).

(Resp. Br. at 54-55). But Edgewood quotes *World Outreach II* both **selectively** and **incorrectly**. In quoting *World Outreach II*, Edgewood omits language and fails to properly employ brackets or ellipses that might have alerted the Court that the language in *World Outreach II* did not stand for the proposition Edgewood attempts to ascribe to it. The actual language of *World Outreach II*, with the omitted portions included, is as follows:

> a frivolous suit aimed at preventing a religious organization from using its only facility—a suit that must have distracted the leadership of the organization, that imposed substantial attorneys' fees on the organization, and that seems to have been part of a concerted effort to prevent it from using its sole facility to serve the religious objectives of the organization (to provide, as a religious duty, facilities for religious activities and observances and living facilities for homeless and other needy people)—cannot be thought to have imposed a merely insubstantial burden on the organization.

*World Outreach Conf. Ctr. v. City of Chicago*, 787 F.3d 839, 843 (7th Cir. 2015).

> As the opinion is actually written, *World Outreach II* does not stand for the proposition that a religious entity is substantially burdened any time it is prevented from using one of its

facilities. The court only went as far as to say that the city's action in filing a burdensome, expensive, and frivolous lawsuit, which the court hinted may have been brought in bad faith to prevent World Outreach from using its only facility, was a substantial burden.

Were the court to have reached the holding Edgewood ascribed to it—that a religious organization is substantially burdened every time it is prevented from using a facility for its desired purpose—it would have had to overturn language it wrote in an earlier opinion in the same protracted litigation where the Court wrote that "[a]ny land-use regulation that a [religious institution] would like not to have to comply with imposes a 'burden' on it, and so the adjective 'substantial' must be taken seriously lest RLUIPA be interpreted to grant [religious entities] a blanket immunity from land-use regulation." *World Outreach I*, 591 F.3d at 539. It is notable that in the prior suit, the Seventh Circuit upheld Chicago's decision to deny a church's permit to demolish a historical building it owned. The court found it was not a substantial burden to deny the church's desire to build a family outreach center at the site given the presence of a suitable alternative location where the church could build. Nothing in *World Outreach II* suggests that the court thought it was overruling this holding of *World Outreach I*. Rather, the court wrote that "the reader's familiarity with our earlier opinion is assumed, enabling us to abbreviate our discussion." *World Outreach II* at 840.[8]

---

[8] Edgewood's assertion that *World Outreach II* was decided before *Schlemm v. Wall* is confusing. The opinion in *Schlemm* is dated April 21, 2015 while the opinion in *World Outreach II* is dated just over a month later, when the court's earlier decision in *Schlemm* should have been fresh in the court's memory. While it is true that *World Outreach I* was decided before *Schlemm*, *World Outreach I* stands for the opposite of the proposition Edgewood seeks to establish, and as explained, nothing in *World Outreach II* suggests *World Outreach I* is no longer good law. Indeed, courts in this circuit have continued to employ similar language in the wake of *Schlemm*. For example, in *Affordable Recovery Hous.*, 2016 WL 5171765 at *10, the district court wrote that "Generally speaking, RLUIPA does not provide religious institutions with immunity from land use regulations, nor does it relieve religious institutions from applying for variations, special permits, or exceptions to land use regulations." The district court's decision in *Affordable Recovery Housing* was affirmed by the Seventh Circuit. 860 F.3d 580 (7th Cir. 2017).

Edgewood's throwaway argument that it was substantially burdened because "the City's restrictions and denials have undermined EHS's mission, preferred practices, and message" fares no better. (Resp. Br. at 58). Edgewood relies on *First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745, 762 (D. Minn. 2018). In that case, a church and its community partner wished to serve the needs of St. Paul's homeless population out of the church's basement turning it into a day shelter complete with full-time social services. *Id.* The basement had the capacity to host 122 people *at a time*, but the city imposed a restriction requiring that it only serve 20 guests *per day*. *Id.* If 20 guests were served at the facility in the morning, the church would have to turn away anyone who showed up in the afternoon *even if the shelter was empty*. *Id.*

It was "First Lutheran's mission to be welcoming" and "to provide services to any many people as they can." *Id.* at 761–62. The court found that forcing First Lutheran to turn "guests away – especially when there is the space for them," put substantial pressure on the church to modify its practices in contravention with its mission, alter fundamental aspects of its community partnership, and "undermined First Lutheran's message to be welcoming to the homeless, the lonely, and the needy." *Id.* at 762. This, the court found, constituted a substantial burden.

As an aside, *First Lutheran* is not binding on this Court, but regardless, it is noticeably distinguishable from the facts here. In *First Lutheran*, the restrictions imposed by the city put substantial pressure on First Lutheran to modify its behavior in a way that directly contradicted the church's mission and beliefs. Here by contrast, the City's denial of Edgewood's lighting permit applications caused at most an inconvenience and some expense, given that Edgewood was able to continue hosting its sporting events on its athletic field during the daytime and at other locations at night. *See Dorman*, 2022 WL 2092855, at *4 (a substantial burden is more than an inconvenience). Edgewood was even able to host a few night games at its field. (Resp. to

25

PPFF 15). Edgewood has never contended that there is a Catholic tenet that requires it to host night games on campus, and only contends that hosting them elsewhere is less than ideal. (In fact, Elliot testified that he was unaware of any Catholic tenet in the Catholic faith for an individual to participate in sports and Edgewood does not even require its coaches to be Catholic, Resp. to PPFF 38). Thus, unlike First Lutheran, Edgewood has failed to show it faced substantial pressure to modify its behavior in contravention with its religious beliefs. The test in this circuit is whether the land use rule at issue "seriously violates" the plaintiff's religious exercise. *Schworck*, 2021 WL 1820779, at *13. Edgewood cannot meet its burden to demonstrate that its religious exercise or beliefs have been seriously violated, as opposed to merely inconvenienced.

  ii. <u>The City did not cause Edgewood to suffer unreasonable delay, uncertainty, or expense.</u>

   Edgewood next argues that the City caused Edgewood to experience delay, uncertainty, and expense when it denied Edgewood's lighting applications, which Edgewood contends is a substantial burden, citing *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 899 (7th Cir. 2005). However, "the expenditure of time or money alone does not constitute a substantial burden." *Christian Assembly Rios De Agua Viva v. City of Burbank, Illinois*, 237 F. Supp. 3d 781, 789 (N.D. Ill. 2017). There is no substantial burden where "any delay, uncertainty, and expense amount to ordinary inconveniences inherent in the zoning process." *Id*. at 788. "Instead . . . the delay, uncertainty, and expense must be accompanied by some additional arbitrary action or bad faith by the City." *Id.* at 789. Because Edgewood cannot show that the City's actions were arbitrary or in bad faith, Edgewood's argument fails.

   Edgewood erroneously argues that it does not have to prove bad faith to establish its claim, noting that under the text of RLUIPA itself and the statute's legislative history, a religious

institution can show a substantial burden without proving animus. But while bad faith is not a necessary element of a substantial burden claim, mere delay, uncertainty, and expense is not a substantial burden without a showing of bad faith. Otherwise, nearly any plaintiff who has gone through the zoning process could demonstrate it suffered a substantial burden.

Edgewood relies heavily on *Sts. Constantine* for its contention that the City imposed a substantial burden on its religious exercise by subjecting Edgewood to unreasonable delay, uncertainty, and expense. (Pl. Br. at 51). But the facts of *Sts. Constantine* demonstrate its inapplicability here. In *Sts. Constantine*, a Greek Orthodox Church asked the City of New Berlin to rezone a 14-acre parcel on its property from residential to institutional so that it could build a new church. *Sts. Constantine*, 396 F.3d at 898. The city was concerned that if the parcel was rezoned for institutional use, a school or other nonreligious facility could one day be built on the parcel, were the Church to cancel its construction plans. *Id.* "To allay this concern the Church modified its application by coupling" it with "a proposal that New Berlin promulgate a 'planned unit development [PUD] overlay ordinance' that would limit the parcel to church-related uses." *Id.* (brackets in original).

The New Berlin Planning Commission voted the proposal down, and cited as its reason that "if the Church didn't build a church on the property but instead sold the land, the purchaser would not be bound by the PUD." *Id.* But this was untrue. *Id.* ("Nothing in the text of the PUD proposed by the Church, in the provisions of the New Berlin Municipal Code, or in the general property law of Wisconsin or elsewhere, suggests that the ordinance would lapse with the sale of the property.") The Planning Commission's rejection of the proposal based on what was a patently frivolous basis was arbitrary and raised the inference of bad faith. *Id.* at 901.

The city suggested that the church either apply for a conditional use permit, or submit a new PUD request, neither of which would solve any problem that was not already solved by the solution the church had proposed and that the city already rejected based on its false statement. The city was asking the church to start the application process all over again for no reason at all, especially given the Plan Commission's reliance on an untrue statement to deny the initial proposal.

Edgewood's reliance on *Sts. Constantine* is misguided as Edgewood cannot show bad faith by the City. Further, the Seventh Circuit recognizes that the expenditure of time and money is an inherent part of the zoning process and is not enough, by itself, to state a substantial burden claim. *Eagle Cove Camp & Conf. Ctr., Inc. v. Town of Woodboro, Wis.*, 734 F.3d 673, 681 (7th Cir. 2013) ("the fact that [the plaintiff] has spent considerable time and money on various applications for rezoning does not constitute, *prima facie*, a substantial burden.") (abrogated on other grounds as recognized in *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015)); *see also C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 761–62 (7th Cir. 2003) (The fact that appellants "expended considerable time and money . . . does not entitle them to relief under RLUIPA's substantial burden provision . . . Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations.").

Edgewood argues that even if bad faith is needed to state a claim based on uncertainty, expense, and delay, Edgewood has met its burden. Edgewood claims that the city "changed its interpretation of EHS's Master Plan to prohibit *any* activities outside of team practices and physical education classes" but Edgewood fails to identify any false statements of the City or

even any earlier statements where the City interpreted the master plan to allow athletic contests (or any other uses). Edgewood's claim is untrue and Edgewood does not cite a proposed fact in support of this contention. In fact, it is an undisputed fact that as soon as the City's zoning inspector learned Edgewood was hosting athletic contests on its field, he wrote to Edgewood advising them to amend their master plan, explaining:

> [I]n the "Open Space Plan" (section 3.8) the approve master plan identifies the athletics field to be used for "team practices, physical education practices." The lack of any further language in this section, or any other language in sections of the adopted Master Plan, leads me to the interpretation that current programing and usage of the field is operating outside of the allowances of the adopted Master Plan.

(DPFF 81-83). The undisputed facts show that the City's interpretation of the master plan as prohibiting athletic contests on the field was *consistent* from the beginning.

Edgewood implies it was bad faith for the zoning inspector to later review the master plan with a fine-tooth comb in order to understand how Edgewood's lighting application fell within the plan. But as Edgewood notes, the master plan was a two-hundred page document, of which the "team practices, physical education" language is just one line. Had there been language in the master plan that would have allowed lights and athletic contests, a close reading of the master plan would have revealed it. But after a careful examination, the zoning inspector found no such language. Further, how can it ever be that a City's careful review of a two-hundred page master plan ordinance evinces bad faith?

Edgewood suggests that it was unreasonable of the City to hold the high school to the actual language in the plan because the high school's president, Michael Elliott, "did not dive into the Master Plan beyond the basics and signed as EHS President to help assist Edgewood College, who was the driving force behind the Master Plan." (Pl. Br. at 11, 53, 55). While it was Mr. Elliot's prerogative to sign the document after only a cursory review, it was not bad faith for

29

the City to treat the document more carefully. After all, the master plan had the effect of the ordinance, and one of the purposes of a CI-District master plan is to provide predictability for neighboring property owners.

Edgewood also claims that by enacting the ordinance amendment requiring a conditional use permit for improvements relating to land uses occurring outside of enclosed buildings, the City broke a promise that if Edgewood repealed its master plan, it would be "on equal footing with the other high schools." (Pl. Br. at 52). But Edgewood *was* on equal footing with the other high schools after the ordinance amendment, which applied equally to all campus institutions without a master plan (a description applicable to all the public high schools). Edgewood and its lawyers understood this and on the advice of counsel, Edgewood's athletic director wrote to his counterparts at the other public high schools, warning them that the amendment would impact any improvements they wished to pursue on their athletic fields as well. (Resp. to PPFF 197).

Edgewood's argument is further undermined because here, Edgewood never had a reasonable expectation that it could use its field to host athletic contests. *See, e.g. Christian Assembly*, 237 F. Supp. 3d at 783 ("Because the Church had no reasonable expectation of using the property for religious purposes, any delay, uncertainty, and expense the Church experienced or incurred while the City considered the SUP application and amended its zoning ordinance did not constitute a substantial burden."); *Calvary Temple Assembly of God v. City of Marinette*, Wis., No. 06-C-1148, 2008 WL 2837774, at *8 (E.D. Wis. July 21, 2008) (expense, delay, and uncertainty was not a substantial burden when church "had no reasonable expectation that it would be allowed to establish a professional office at its" property). It is doubly true that Edgewood had no reasonable expectation that it could use its field to host night games complete with stadium lights, amplified sound, and cheering fans, right in the midst of two quiet

residential neighborhoods, as even Edgewood recognized. Elliott confirmed as much in 2015 when he told a reporter in connection of upgrades to the athletic field that the renovated track and field would be used for practices and the upgrades received the support of two neighborhood associations who were "vehemently opposed" and had "balked" previously at Edgewood "having lights or playing games" on its field. (DPFF 38, 54-55).

Edgewood argues that it did have a reasonable expectation to host athletic contests on its field because it has supposedly done so (without lights) "for a nearly 100 years and was even permitted as of right to do so after it was rezoned Campus-Institutional in 2013." (Resp. Br. at 56). However, any such expectation became unreasonable after Edgewood presented its neighbors, City staff, the Plan Commission, and the Common Council with a master plan that restricted its use of the field to team practices and physical education classes and then succeeded in having *that* plan approved. *See Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 515 (4th Cir. 2016) ("A self-imposed hardship generally will not support a substantial burden claim under RLUIPA, because the hardship was not imposed by governmental action altering a legitimate, pre-existing expectation that a property could be obtained for a particular land use."). Edgewood knew that its neighbors had opposed intensive use of its field for decades; back in 1996, neighborhood opposition prompted Edgewood to remove language from a conditional use permit application that would have added lights and bleachers to its field. (Reply to DPFF 72-75).

Edgewood next argues that a February 27, 2019 letter from the City's zoning inspector gave Edgewood a reasonable expectation it would receive its lights. On February 27, 2019, the City's zoning inspector wrote to Edgewood that if Edgewood's lighting application was found to comply with M.G.O Section 10.085 (the City's lighting ordinance), the City "believe[d]" the

permit could be issued without Edgewood having to amend its master plan, but that Edgewood still would not be allowed to use the lights for their intended purpose unless the master plan was amended. (Pl. Br. at 56). While this letter might have given Edgewood *hope* it would receive its lights, it could not have given rise to a reasonable expectation for several reasons. First, as the Assistant City Attorney very shortly thereafter wrote to Edgewood, the CI-District ordinance required that the master plan describe future capital improvements, and stadium lights were capital improvements that were not contained or described in Edgewood's master plan. (Reply to DPFF 105). Even more, Edgewood admits that it did not take any actions in reliance on the February 27 letter, so there was no reliance and no substantial burden. (DPFF 115). *Cf. Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) ("once [an] organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship on it.").

In addition, the February 27 letter qualified that Edgewood's plan would be reviewed for compliance with MGO § 10.085, and only if the plans complied, could permits be issued. (DPFF 92). George Hank, the Building Inspection Director, determined that Edgewood's lighting application did ***not*** comply with § 10.085(1) and (5)(b). M.G.O. §10.085(1) provided in part, "Installation of outdoor lighting is not mandatory, but if installed, it ***shall be in conformance with*** the provisions of the ordinance, the building code, ***and all other codes and regulations as applicable*** under appropriate permit and inspection." (Emphasis added). Edgewood's lighting application did not comply Edgewood's master plan, which was an enacted municipal ordinance, and still in effect at the time it filed its lighting application. So, again, Edgewood could have no reasonable expectation that it would receive its lights.

Edgewood also argues that it had a reasonable expectation that it would receive lights after the Deputy City Attorney told Edgewood on July 17 that if Edgewood repealed its master plan, it would revert to the standard regulations of the CI District in the zoning code, which would allow games and lights at the field. (Pl. Br. at 19, 56). Edgewood says that it was substantially burdened and that the City violated Edgewood's reasonable expectations after the Common Council passed an ordinance requiring a conditional use permit for the improvement of a CI-District use occurring outside of an enclosed building. (*Id.*).

First, Edgewood *was* allowed to play games on its field after it repealed the master plan; nothing in the amendment changed that. Second, the ordinance amendment did not prohibit Edgewood from having lights on its field, it only required that Edgewood (or any other high school lacking lights, including both West High School and East High School) obtain a conditional use permit to do so. This was an improvement over Edgewood's prior position, where it was not allowed to have lights under the master plan at all. However, the Plan Commission and the Common Council found that there was substantial evidence that Edgewood's conditional use permit application failed to meet the requirements of the conditional use permit ordinance. (DPFF 171-172). The Plan Commission placed Edgewood's application on file without prejudice and encouraged Edgewood to file a revised application with improved mitigation measures. (DPFF 173). But Edgewood never did so.

Once again, whatever reasonable or unreasonable expectations may have gone unmet, there was no substantial burden because Edgewood did not take any actions or change its position in reliance on the Deputy Attorney's statement: Edgewood continued with its plan to repeal its master plan even after the ordinance amendment was passed. (DPFF 155, 158-159). When the City finalized the repeal of the master plan, Edgewood's president was pleased and

wrote to Edgewood's community that this was a positive outcome. (DPFF 164). If Edgewood had any expectation that repeal of the master plan would result in it having the ability to erect stadium lights as of right, that expectation could not have survived the ordinance amendment; yet, Edgewood had the chance to reverse its course and it did not.

Edgewood also contends that it had a reasonable expectation that its conditional use permit application would be granted after City staff wrote a report recommending that the Plan Commission *could* find that Edgewood's application satisfied the conditional use permit ordinance, "if" appropriate mitigation measures were put in place by the Plan Commission after consideration of public input, including a limit on the total number of nighttime games. (Pl. Br. at 57). But the staff recommendation was just that, a recommendation, and it was conditioned on the Plan Commission receiving public input and making a determination. (DPFF 169-170). What is more, in Edgewood's submissions to the Plan Commission, Edgewood asked that it only be limited to the total number of possible nighttime home games Edgewood would have in a year. This of course was not a limit at all. (DPFF 176). Because the report recommended only that the application "could" be granted "if" the total number of games was limited, Edgewood had no reasonable expectation that it could receive a conditional use permit without limiting the allowable number of games on the field. (*Id.*). Also, and once again, it is undisputed that Edgewood took no actions in reliance on the staff report. Therefore, there was no substantial burden resulting from any unmet expectations arising from the staff report as a matter of law.

     iii.   <u>No actions by the City deprived Edgewood from continuing an existing legal use of its property.</u>

Edgewood next argues that it had "a legal right to use its field for athletic contests and other uses related to its primary mission under section 28.097" and that the City substantially

burdened Edgewood's religious exercise by demanding Edgewood pursue additional or unnecessary zoning approvals to secure or establish that supposed right. (Resp. Br. at 54).

There are several problems with Edgewood's argument. First, Edgewood's argument is undeveloped. Edgewood makes no effort to explain *why* it had an existing right to use its field for athletic contests other than a fleeting reference to M.G.O. Section 28.097.[9]

However, the plain text of the master plan ordinance shows that Edgewood had no such right until it repealed its master plan. As explained, Section 28.097 required that a master plan identify existing and future land uses and open space uses and provides that no "changes to the proposed use of identified open space areas and other open space uses[] shall be permitted unless approved by" City officials as an amendment to the master plan. (DPFF 24). Therefore, until Edgewood amended or repealed its master plan, it was bound to the open space uses that were proposed in its master plan.

Second, even though Edgewood's use of the field to host athletic contests was unlawful, the City never made them stop, as Edgewood concedes. (Resp. Br. at 28, noting that Edgewood "never stopped scheduling games" and "never stopped using its field"). The City issued two Notices of Violation (or warnings), but the City never fined Edgewood and never took any other enforcement action. (DPFF 110-111, 122-124). Despite the notices, Edgewood continued to host athletic contests on its field. Therefore, the City did not prevent Edgewood from continuing any use of its field (legal or not) and Edgewood cannot establish a substantial burden on that basis.

---

[9] The conclusory statement that M.G.O. Section 28.097 allowed Edgewood and other campus institutions to host athletic contests "as of right" appears several times in Edgewood's brief (*see, e.g.* Resp. Br. at 1, 36, 38, 39, 56), but in none of those instances does Edgewood explain its argument. *See United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).")

Finally, Edgewood does not appear to argue that the City prevented Edgewood from continuing its existing use of the field by denying Edgewood's lighting permit applications. If Edgewood does so argue, that argument is particularly undeveloped. The City will briefly address that issue regardless. First, Edgewood had no right to receive lights during the term of the master plan for the same reasons discussed above and for the additional reason that stadium lights were not listed among the future capital improvements identified in Edgewood's master plan. Second, the lights were intended to allow nighttime use of the field, which is not a continuance of an existing use, but a new use or at the very least an expansion of an existing use. *Cf. Waukesha Cnty. v. Seitz*, 140 Wis. 2d 111, 117, 409 N.W.2d 403, 406 (Ct. App. 1987) (an increase in volume, intensity or frequency of a legal nonconforming use coupled with some element of identifiable change or extension will invalidate a legal nonconforming use).[10] Therefore, Edgewood has failed to show that the City substantially burdened it by denying its ability to continue an existing use.

iv.   Edgewood was not substantially burdened because it can still submit a conditional use permit application if it will agree to sufficient mitigating measures.

Edgewood argues the City substantially burdened Edgewood's free exercise of religion because even though the master plan did not allow use of the field to host athletic contests, Edgewood contends that "the City could and should have issued EHS the light permit to host athletic contests in the future, as it undisputedly would have been EHS's right upon repeal or expiration of the master plan." (Pl. Br. at 57).

---

[10] Edgewood does not argue in its response brief that it established a legal nonconforming use (and the zoning administrator explained to Edgewood's lawyer that it had not established a legal nonconforming use, *see* Reply to DPUF 87, 88). But the analogy is useful. Allowing Edgewood to host nighttime games would have increased the total volume of games, and nighttime games have at least some element of identifiable change compared to daytime games and are at the very least an *extension* of the prior use. An extension or change is not a continuance.

But the City could not do that because athletic stadium lights were not identified in the master plan as capital improvements, so allowing the lights would have violated the CI-District ordinance. Even so, the City did not absolutely deny Edgewood's lights but instead told Edgewood it would have to first amend its master plan.

Edgewood ultimately elected to repeal its master plan instead of amend it as City staff had repeatedly suggested. But first, it appealed the notices of violation it had received for hosting athletic contests on its field to the Zoning Board of Appeals ('ZBA'). The arguments Edgewood raised at that appeal alerted members of the Common Council (some of whom sat on the ZBA) for the first time that Madison West High School and Madison East High School (public schools without master plans) could erect stadium lights on their campuses without any input from neighbors or the public. Not only that, but as Edgewood pointed out to the ZBA, those schools could use their properties for agriculture or a correctional facility so long as they did not erect a new structure exceeding 4,000 square feet of total floor space.

The upshot is that by the time Edgewood finally repealed its master plan, the ordinance had been amended to require *all* campus institutions without a master plan seek a conditional use permit for the establishment or modification of an outdoor use. Even after the ordinance was amended, Edgewood chose to continue with its plan to repeal the master plan, rather than pursue the master plan amendment process.

After repealing its master plan, Edgewood submitted a conditional use permit application to the Plan Commission. However, the Plan Commission found that one of the standards of the conditional use permit application was not met. Specifically, the Commission found that there was substantial evidence that the established uses, values, and enjoyment of surrounding

37

properties would be harmed if the permit was granted because Edgewood did not agree to mitigation measures such as limiting the number of games it would hold on its field.[11]

But the Plan Commission's decision did not absolutely deny Edgewood's conditional use permit application. Quite the opposite, it is undisputed that the Plan Commission placed Edgewood's application on file without prejudice, meaning that Edgewood could apply again if it addressed the deficiencies in its first application. In fact, the minutes of the meeting reflect that "Members [of the Plan Commission indicated they would be open to considering the request again" if Edgewood addressed, the noise impacts, improved engagement with the neighborhoods, and agreed to a limit to the number of games with lights. (Reply to DPUF 173). That is fatal to Edgewood. "[W]hen the denial of a religious institution's application to build is not absolute, such would not necessarily place substantial pressure on the institution to alter its behavior, since it could just as easily file a second application that remedies the problems in the first." *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007). The undisputed facts therefore show that Edgewood was never absolutely denied a lighting permit and Edgewood cannot show a substantial burden on that basis.

## III.    EDGEWOOD'S FEDERAL FREEDOM OF SPEECH AND FREEDOM OF ASSEMBLY CLAIMS ARE MERITLESS.

### A.  The City Did Not Prevent Edgewood From Engaging In Expressive Conduct.

Edgewood fails to state a claim that the City violated Edgewood's freedom of speech or freedom of assembly rights under the U.S. Constitution because, without more, Edgewood's nighttime athletic events are not expressive conduct and thus do not fall within the protections of the First Amendment's freedom of speech or freedom of assembly provisions. Even if such

---

[11] Edgewood argues that it did agree to limit its number of games, but Edgewood only agreed to limit its total number of games to the total number of possible games in a year, including any potential championship or playoff games. The Plan Commission felt that this was not a limit at all. (DPFF 176).

activity could be considered expressive conduct, the City's actions were content-neutral time, place and manner restrictions that were narrowly drawn to achieve a significant government interest.

Reasonably, Edgewood does not appear to argue that nighttime athletic events are themselves expressive conduct, as absent more, athletic contests are not imbued with the elements of expressive conduct. *See e.g.*, *Hernandez-Gotay v. United States*, 985 F.3d 71 (1st Cir. 2021), *cert. denied sub nom. Ortiz-Diaz v. United States*, 2021 WL 4733320, 211 L. Ed. 2d 178, 142 S. Ct. 336 (2021) ("Plaintiffs' assertion that cockfighting expresses [Puerto Rican] culture and deeply rooted sense of self-determination is insufficient to show that their sponsorship or exhibition of cockfighting would reasonably be understood by the viewer to be communicative" and thus does not implicate free speech) (brackets and quotation marks omitted); *id.* at *80 (Because nothing in the animal cruelty statute "curtails any discussion or expression of a person's views regarding cockfighting" or "restrict[s] assembly for those purposes at all" the statute does not implicate freedom of assembly).

Instead, Edgewood argues that the City's interpretation of the master plan and the Notices of Violation the City issued precluded Edgewood and its students "from assembling on EHS's athletic field, *even for expressive purposes and assemblies*, for any reason other than a team practice or physical education class." (Resp. Br. at 63 (emphasis added)).

However, at no point did the City act to restrict Edgewood from conducting any expressive conduct on its field. When the City's Zoning Administrator first learned that Edgewood was hosting athletic contests on its field, he quietly told Edgewood that such was not allowed under the master plan and suggested that Edgewood add language allowing such use to a master plan amendment that was already underway. (DPFF 84). Only after the City began

receiving complaints from Edgewood's neighbors in the spring of 2019 did the City issue two Notices of Violation to Edgewood instructing it to "[d]iscontinue holding athletic contests on the athletic field at 2219 Monroe Street." (Reply to DPFF 107-110). The notices did not direct Edgewood to discontinue any other activity. (*Id.*).

Edgewood ignored the notices and continued playing athletic contests on its field without interruption. Edgewood does not allege that while it continued the very conduct proscribed by the notices—athletic contests—it ceased to continue some other expressive speech or assembly in response to the notices. Given that the master plan was repealed, no enforcement actions were taken with respect to the notices, and Edgewood did not alter its behavior as a result of the notices, there is no past, present or future harm to Edgewood's free speech and free assembly rights arising from the notices for which this Court can grant relief.

Lastly, even if the notices or the City's interpretation of the master plan could somehow be read as regulating expressive conduct, the City's actions reflect a valid, content-neutral place-based regulation. Edgewood was not prevented from assembling in one of its indoor gyms or auditoriums, and it was not prevented from hosting athletic contests at other locations. The notice merely prevented Edgewood from using one particular location to do something that Edgewood had told the City and its neighbors that it would not do. Given that Edgewood could have amended its master plan to allow athletic contests on the field, the restriction was narrowly tailored to achieve the City's substantial government interest to "[e]ncourage the preparation of Campus Master Plans that enable adjacent neighborhoods and the broader community to understand the levels of development being proposed, their likely impacts, and appropriate mitigation measures." (DPFF 10).

**B.  Edgewood's Free Exercise Claims Are Even Weaker Than Its RLUIPA Claims.**

RLUIPA "aim[s] to ensure greater protection for religious exercise than is available under the First Amendment." *Ramirez v. Collier*, 142 S. Ct. 1264, 1277, 212 L. Ed. 2d 262 (2022). Edgewood argues that it can state a separate First Amendment claim, even if it cannot state an RLUIPA claim. But Edgewood's arguments are even weaker without the protections afforded by RLUIPA. Indeed, "unlike RLUIPA, which explicitly defines as religious exercise: 'The use, building, or conversion of real property for the purpose of religious exercise,' the Free Exercise Clause does not define land use as a religious exercise." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 273 (3d Cir. 2007). The Third Circuit and "several sister circuits have held that, when the plaintiff does not show that locating its premises in a particular location is important in some way to its religion and the area from which plaintiff's building is excluded is not large, there is no constitutionally cognizable burden on free exercise." *Id.* at 274. Courts in the Seventh Circuit have followed this rule as well. *See, e.g. Irshad Learning Ctr. v. Cnty. of DuPage*, 804 F. Supp. 2d 697, 717 (N.D. Ill. 2011) ("when a religious plaintiff makes a Free Exercise challenge to a zoning regulation, it must explain in what way the inability to locate in the specific area affects its religious exercise.") (quoting *Lighthouse Inst.*, 510 F.3d at 274).

While the master plan was in place, the only place where Edgewood was restricted from erecting stadium lights was its own campus. Indeed, Edgewood College built a stadium with stadium lighting in Fitchburg. (DPFF 183). In addition, under the conditional use process, Edgewood can build anywhere where its lights will not substantially impair the established uses, values, and enjoyment of neighboring property owners. The area where Edgewood has so far not been able to install its lights is not large. Edgewood does not argue that its on-campus field bears

41

some religious significance, only that it is more convenient for its mission to educate the whole student and build community. *See Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006) (No free exercise burden where there is "no evidence that building a daycare center or building a daycare center on the particular site is intimately related to the religious tenets of" the church's religious beliefs) (brackets omitted).

Edgewood argues that under the Supreme Court's decision in *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), "the test for determining whether a secular activity is comparable to a religious exercise is even easier to satisfy than the Seventh Circuit's 'accepted zoning criterion' test for determining proper comparators under RLUIPA's equal-terms provision." (Resp. Br. at 64). Edgewood bases this argument on language in *Tandon* stating that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." 141 S. Ct. at 1296. But Edgewood's argument is incredibly confused. This language in *Tandon* referred to *facial* challenges to statutes where the text of the statute itself directs that religious activities be treated less favorably than comparable secular activities. In *Tandon*, the court found that California's COVID restrictions "treat[ed] some comparable secular activities more favorably than at-home religious exercise, permitting hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring together more than three households at a time" while households were not permitted to gather for religious activities. *Id.* at 1297. Such facially disparate treatment demands strict scrutiny. *Id.* at 1296.

By contrast, "RLUIPA's Equal Terms provision operates on a strict liability standard; strict scrutiny does not come into play." *Lighthouse Inst.*, 510 F.3d at 269 (3d Cir. 2007). As

RLUIPA provides for strict liability (and not strict scrutiny) whether a plaintiff succeeds in making a facial challenge or an as applied challenge, RLUIPA's protections are significantly stronger.

Edgewood brought an *as applied* RLUIPA challenge against the City. At no point has Edgewood attempted to argue that the City's ordinances are not facially neutral under RLUIPA's equal terms clause or the constitution. (In fact, Edgewood conceded in discovery that the City's conditional use process is facially neutral. DPFF 230). If a city applied a facially neutral statute more favorably to a secular land user than to a religious one, such could conceivably give rise to a free exercise claim or an equal protection claim (which Edgewood has not brought). *World Outreach I*, 591 F.3d at 535. But given that RLUIPA provides strict liability, as the Seventh Circuit noted, one "cannot see any point in a plaintiff's pitching a religious discrimination claim on any provision of the Constitution, rather than just on the statute." *Id.* To the extent Edgewood is attempting to argue it has a free exercise claim founded on unequal treatment, its claim fails for all the same reasons its claims fail under RLUIPA's Equal Terms clause.

Lastly Edgewood argues that all of the City's land use decisions in this case should be subject to strict scrutiny because "[a] longstanding tenet of our free exercise jurisprudence . . . is that a law burdening religious exercise must satisfy strict scrutiny if it gives government officials discretion to grant individualized exemptions." (Resp. Br. at 64, citing *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1883, 210 L. Ed. 2d 137 (2021)).

That language stems from line of cases, known as the *Sherbert* doctrine, which cases ultimately "stand for the proposition that where the [government] has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872,

884, 110 S. Ct. 1595, 1603, 108 L. Ed. 2d 876 (1990); *see also Fulton*, 141 S. Ct. 1868, 1878,

210 L. Ed. 2d 137 (2021) (having created an individualized exemption the city "may not refuse

to extend that exemption system to cases of 'religious hardship' without compelling reason.")

(brackets omitted).

For example, in *Sherbert v. Verner*, 374 U.S. 398, 401, 83 S. Ct. 1790, 1792, 10 L. Ed. 2d

965 (1963), South Carolina's unemployment benefits scheme deemed an applicant ineligible for

benefits if "he has failed, without good cause . . . to accept available suitable work when offered

[to] him . . . " *Id.* A Seventh Day Adventist was denied benefits because there was suitable work

available to her, but she refused the job because it required her to work on Sundays in

contravention of her religious beliefs. *Id.* The scheme's appellate forum determined that her

religious reasons for refusing the job did not fall within the individualized "good cause"

exemption to the application of the rule. *Id.* The Supreme Court found that the decision not to

apply an exemption to a religious hardship that was available for other hardships demanded strict

scrutiny. *Id.* at 374 U.S. 403.

But there are no parallels here. The CI-District ordinance did not contain any system of

individualized exemptions; rather institutions with master plans were subject to certain

provisions of the ordinance and those without master plans were subject to others. Whether or

not an institution had a master plan does not require an individualized analysis, either the

Common Council had voted to approve a master plan submitted by that entity, or it had not.

Moreover, even if there were a system of exemptions in place, Edgewood offers no

religious hardship that it argues justifies an exemption in this case (perhaps because Edgewood

cannot identify an exemption). Unless there is some category of individualized exemptions that

could encompass some hardship Edgewood suffered due to its religion, the *Sherbert* doctrine is

inapplicable. Additionally, the doctrine only applies if the failure to apply the exemption burdened Edgewood's religious exercise, which as the City has explained throughout its briefing, Edgewood cannot show here. Because the *Sherbert* doctrine is entirely inapplicable to the present case, any claims Edgewood makes that rely on that doctrine fail.

## IV.   EDGEWOOD'S DUE PROCESS CLAIM IS MERITLESS.

Edgewood goes to great lengths to argue that the City's definition of "athletic contests" is unconstitutionally vague under the Due Process Clause, because it is supposedly impossible to tell whether the term would apply to examples such as team scrimmages or competitions held during a physical education class. But the City already squarely addressed and preempted this argument in its opening brief, citing Supreme Court precedent dictating that a party cannot make a vagueness challenge to a rule when the actual conduct that party was held to account for was clearly prohibited. (Def. Br. at 51 citing *Parker v. Levy*, 417 U.S. 733, 756 (1974) ("[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495, (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.")).

Because Edgewood fails to cite any contrary case law, or even address this argument at all, Edgewood's Due Process claim fails. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failure to respond to an argument results in waiver).

## V.   EDGEWOOD'S CLAIM FOR DAMAGES UNDER STATE LAW AND ITS STATE CONSTITUTIONAL CLAIMS FAIL.

To begin, many of Edgewood's state law claims are completely out of the picture because Edgewood failed to address or dispute the City's defenses to them. *Bonte*, 624 F.3d at 466 (failure to respond to an argument results in waiver). For example, the City explained that

Edgewood is not entitled to damages on its state law claims because it failed to comply with the Wisconsin's Notice of Claim statute. Edgewood does not dispute that it failed to comply with the statute (DPFF 231), nor does it argue against application of that statute. In fact, Edgewood does not address the statute in its brief at all, and therefore fails to dispute that it is not entitled to any damages on its state law claims as a matter of law and the City is entitled to summary judgment on that issue.

Similarly, the City explained how Edgewood's alleged burdens do not fall within the Wisconsin Constitution's Freedom of Conscience clause, because the burdens are generic and not directly related to Edgewood's free exercise of religion. (Def. Br. at 38). Edgewood fails to respond to the City's arguments, or even reference the Wisconsin Constitution in its brief, therefore the City is entitled to summary judgment on Edgewood's claims under Wisconsin's Constitution. *Bonte*, 624 F.3d at 466.

## VI. EDGEWOOD'S 2019 LIGHTING APPLICATIONS DID NOT GRANT EDGEWOOD A VESTED RIGHT TO LIGHTS BECAUSE THE APPLICATIONS WERE NOT COMPLIANT WITH ZONING.

Edgewood acknowledges—as it must—that the applicable test governing when a Wisconsin landowner obtains a vested right to a building permit requires a landowner to first submit an application for a building permit *that conforms to the zoning or building code requirements in effect at the time of application*. (Resp. Br. at 67 (quotation marks omitted) (emphasis added)). After citing the correct rule of law. Edgewood proceeds to ignore it completely. Rather than try to demonstrate that its applications complied with the zoning code, Edgewood argues that it had a vested right to building lights because the City (supposedly) initially approved the applications before reversing course.

Edgewood essentially argues that after the City erroneously 'approved' Edgewood's application, the City was estopped from reversing course and denying the permit based on the

application's nonconformity with other zoning provisions. However, "the general rule is that a private party cannot assert estoppel against a municipality seeking to enforce a violation of one of its zoning rules, regardless of whether the elements of estoppel might be met." *Meinholz, LLC v. Dane Town Bd. of Zoning Appeals & Adjustment*, No. 2021AP346, 2022 WL 1421072, at *16 (Wis. Ct. App. May 5, 2022). Here, the basic elements of estoppel are not even met, estoppel requires: "(1) an action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance by the other, either through action or non-action; (4) which is to the detriment of the relying party." *Id.* It is undisputed that Edgewood took no actions and expended no funds in reliance on the City's initial 'approval' of the February 2019 lighting application, or the Zoning Administrator's February 2019 letter. (DPFF 115). Therefore, Edgewood cannot even make an estoppel claim at all.

Regardless, Edgewood must demonstrate what the rule requires: that its lighting application was in *full* conformity with the zoning laws then in effect. Edgewood cannot do this; as the City has explained at greater length elsewhere, the master plan prevented Edgewood from installing stadium lights and playing night games while the master plan was in effect and therefore, Edgewood's lighting applications were not compliant with the master plan zoning ordinance.

Edgewood argues that it still had a vested right to the lights because it claims "EHS had an undisputed right to use its field for team practices at night." (Pl. Br. at 68). Edgewood posits that it could have used the lights for team practices. Setting aside the fact that Edgewood never contended until this litigation that it wanted lights for practices, and even admitted in documents that its lighting application was for night games (DPFF 93), the glaring problem with this argument is that it does not address an issue that the City has raised repeatedly: stadium lights

are capital improvements that needed to be described in the master plan according to the dictates of the CI-District ordinance. (DPFF 105; DPFF 34, ordinance stating that a master plan must include future needs/capital improvements).

While Edgewood acknowledges early in its brief that master plans are supposed to include a description of "future needs/capital improvements," (Resp. Br. at 10), Edgewood does not address this argument that the lights were capital improvements despite the fact that the City presented it squarely in its brief. "The Seventh Circuit has clearly held that a party who fails to respond to points made upon a motion for summary judgment concedes those points." *Myers v. Thoman*, No. 1:09-CV-0544-JMS-DML, 2010 WL 3944654, at *4 (S.D. Ind. Oct. 6, 2010). Accordingly, the City is entitled to summary judgment on Edgewood's vested rights claims.

## VII.   THE DENIAL OF EDGEWOOD'S CONDITIONAL USE PERMIT WAS BASED ON SUBSTANTIAL EVIDENCE.

Edgewood argues that the Plan Commission applied an incorrect legal standard to its conditional use application, but as discussed more fully below, it is Edgewood that applies an incorrect standard. ((Pl. Br. at 69). Relying exclusively on a City staff report, Edgewood contends that because that report recommended to the Plan Commission that it *could* find the conditional use standards if, after public input, the Commission could determine a reasonable limit on non-practice events, that such automatically means that there was substantial evidence to grant Edgewood's lighting application. There are numerous fallacies with this argument.

First, to begin, the applicable legal standard is found in Wis. Stat. §62.23(7)(de)2.b. Under that provision, a conditional use permit applicant "must demonstrate that the application and all requirements and conditions established by the city relating to the conditional use are or shall be satisfied, both of which must be supported by substantial evidence." Wis. Stat. §62.23(7)(de)2.b. One such requirement is M.G.O. §28.183(6)(a).3, which requires Edgewood to

prove and the City to determine that "[t]he uses, values and enjoyment of other property in the neighborhood for purposes already established will not be substantially impaired or diminished in any foreseeable manner" by the conditional use. "The city's decision to approve or deny the permit" must also "be supported by substantial evidence." *Id.*

In this case, the Plan Commission found that that Edgewood failed to provide substantial evidence that the requirements of the conditional use permit ordinance were met. Specifically, the Plan Commission stated that "no evidence was submitted by the applicant that there would not be negative impacts on the lighted use of the field and no mitigation measures proposed to limit those impacts, noise barriers, limits on events." (DPFF 172). Edgewood failed its burden to provide substantial evidence showing that the lights would not substantially harm the existing uses, values, and enjoyment of neighboring properties. Edgewood's District Alder wrote a letter to the Plan Commission noting that ***Edgewood's own sound study*** showed that nighttime noise levels would exceed 70 decibels. (DPFF 177; *see also* DPFF 179).

And while the burden was on Edgewood to prove the absence of substantial harm, the Plan Commission did receive substantial evidence that the existing uses, values, and enjoyment of neighboring properties ***would*** be harmed. This substantial evidence is described at length in the City's opening brief and in multiple proposed findings of fact. (*See, e.g.*, Def. Br. at 46-50; DPFF 177, 179). The Plan Commission and Common Council received substantial evidence including two sound studies, testimony and information that the proposed improvements would decrease property values, a letter from Friends of Lake Wingra opposing Edgewood's proposed improvements based on the potential environmental impact, videos that some of the public related to the light glare and sounds of athletic games, including a video from one resident who could not have a video chat with her husband deployed to Afghanistan because the noise from an

49

Edgewood game was so loud even with the windows closed, and testimony from parents about the noise effects on their young children being able to sleep. (DPFF 179, 177).

Edgewood just flat out ignores this evidence in its response, perhaps because Edgewood cannot seriously contest that the Plan Commission had substantial evidence to find that the uses, values, and enjoyment of neighboring properties would have been harmed. Instead, without discussing any of the voluminous evidence the City described in its opening brief, Edgewood brazenly asserts that "no evidence in the record that the lights, by themselves, 'would have a substantial negative impact'" because "the lights met code." (Resp. Br. at 71). But the simple fact that the lights complied with the City's lighting ordinance does not conclusively determine that there would be no substantial harm to neighboring properties. This is particularly true given that, as Edgewood acknowledges, it was not simply about brightness, but noise. (Resp. Br. at 69). By failing to address the voluminous evidence presented to the Plan Commission, and by failing to develop a coherent argument, Edgewood concedes that the Plan Commission had substantial evidence supporting its decision.

In addition, Edgewood also ignores—at its peril—the case law that the City provided including cases that information about the potential decrease in property values alone has been found sufficient to uphold denying a conditional use permit. (Def. Br. at 49, citing *Eco-Site, LLC v. Town of Cedarburg*, 2019 WI App 42, ¶ 17, 388 Wis. 2d 375, 386, 933 N.W.2d 179, 184–85). And Edgewood's singular focus on the City staff report is misguided. First, Edgewood ignores that the staff report was written before the actual Plan Commission hearing and the Plan Commission heard hours of testimony—testimony that the city staff did not have at the time of the report was drafted. Further, the City staff recognized their own limitation, writing in their report, "While standards 1, 3, and 4 are the ones most often directly or indirectly cited by

50

individuals concerned with some or many aspects of a controversial conditional use application, they are almost the most difficult standards and impacts for the Plan Commission to quantify compared to more tangible impacts like utility capacity or traffic impacts." (Resp. to PPFF 232).

And, perhaps, most importantly, contrary to Edgewood's position, the Planning staff did not determine that their recommended conditions would limit the impacts to neighbors. The report stated that the Plan Commission could find the standards were met *if* conditions were imposed that would limit the impacts to nearby residents. (Resp. to PPFF 232). This can best be seen by the Planning staff's actual summary recommendation, which was qualified and conditional. The report indicated that its statement that the Plan Commission could potentially find conditions were met was conditional because it was "subject to the recommended conditions of approval beginning on page 8 of this report *and input at the public hearing*." (Resp. to PPFF 231). The report indicated that the Plan Commission would need to consider the input at the public hearing from the applicant and community and determine the number of lighted non-practice events that the Commission felt would be reasonable.[12] (Resp. to PPFF 232).

At best, Edgewood argues that there was substantial evidence to grant its conditional use permit. But Edgewood fails to understand that substantial evidence is less than a preponderance of the evidence, meaning that it is possible for substantial evidence to cut both ways. *See Oneida Seven Generations Corp. v. City of Green Bay*, 2015 WI 50, ¶ 44, 362 Wis. 2d 290, 311, 865 N.W.2d 162, 172. Edgewood needed to show *both* that there was substantial evidence supporting

---

[12] The staff report's recommendation on this point was premised on the assumption that conditions would be imposed sufficient to mitigate the harms that the report acknowledged would flow from Edgewood's use, including that, "without exception, the number of scheduled non-practice events . . . using the stadium lighting after 7:00 PM be limited to a number per school year . . ." However, at the Plan Commission meeting, Edgewood only agreed to be limited to the total number of home games it was scheduled to host every year, plus any additional championship games. This, the Plan Commission believed, this was really no limit at all. (Reply to PPFF 176.)

its application, **and** that there was no substantial evidence to deny its application. That is why Edgewood's failure to address what it calls the City's "thick morass" of evidence is fatal and demonstrates that Edgewood has not met its burden. (Pl. Br. at 69). And this is without Edgewood even addressing the discretion given to municipalities to weigh the evidence with respect to these decisions.

Accordingly, Edgewood's certiorari claim is based on a faulty premise: it asserts that there was substantial evidence to support the granting of a conditional use permit and therefore, the City erred in not doing so. But Edgewood ignores that it has the burden to also prove that there was not substantial evidence to deny its application. Edgewood does not even undertake that analysis. In any event, the City has cited to a plethora of substantial evidence to support denying Edgewood's conditional use application. Accordingly, Edgewood's claims under Wis. Stat. §62.23(7)(de)2.b. should be dismissed.

## **CONCLUSION**

For the above reasons, defendants respectfully request that the Court dismiss Edgewood's complaint in its entirety, including:

- Dismissing Edgewood's claims under RLUIPA's Substantial Burdens clause, its Free Exercise claims, and its claims under Wisconsin Constitution Article I, Section 8 because the City's actions did not substantially burden Edgewood's exercise of its religious faith;

- Dismissing Edgewood's claims under RLUIPA's Equal Terms clause, its Free Exercise claims, and its claims under Wisconsin Constitution Article I, Section 8 because the City has not treated a similarly situated secular comparator more favorably;

- Dismissing Edgewood's claim that it has a vested right to its stadium lights because at the time of its lighting applications, Edgewood had a master plan in effect that precluded stadium lights, absent filing an amendment to the master plan and obtaining Plan Commission approval;

- Dismissing Edgewood's appeal under Wis. Stat. §62.23 of the denial of its conditional use application for stadium lights because there was substantial evidence to support the

City's decision, especially given the high hurdle that Edgewood must overcome to prove otherwise;

- Dismissing Edgewood's due process challenge as "athletic contests" in the Notices of Violation were not void for vagueness where the language in Edgewood's master plan limited the field to practices and physical education classes;

- Dismissing all damages on its state law claims because Edgewood concedes that it failed to serve a notice of claim (Reply to Defendants' PFF 231) and it did not respond to defendants' legal arguments related to notice of claim; and

- Dismissing Edgewood's claims under Wisconsin Constitution Article I, Section 8 because Edgewood failed to respond to defendants' arguments that Edgewood's alleged burdens do not fall within the protections of Section 8.

Dated this 20th day of June, 2022.

Respectfully submitted,

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra, State Bar No. 1033159
Tanner G. Jean-Louis, State Bar No. 1122401
BOARDMAN & CLARK LLP
1 South Pinckney Street, Suite 410
P. O. Box 927
Madison, WI  53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
tjeanlouis@boardmanclark.com
*Attorneys for Defendants*
