Page 1

1          UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF WISCONSIN
2    - - - - - - - - - - - - - - - - - - - - - - - - - - -
     EDGEWOOD HIGH SCHOOL OF THE SACRED
3    HEART, INC.,
4                      Plaintiff,
                                        Case No.
5         vs.                           3:21-cv-0018-wmc
6    CITY OF MADISON, WISCONSIN, et
     al.,
7
                       Defendants.
8
     - - - - - - - - - - - - - - - - - - - - - - - - - - -
9
                   DEPOSITION OF:  TIM PARKS
10
              TAKEN AT:  GODFREY & KAHN, S.C.
11
        LOCATED AT:  One East Main Street, Suite 500
12                   Madison, Wisconsin
13                   August 16, 2022
14                9:00 a.m. to 12:08 p.m.
15          REPORTED BY:  VICKY L. ST. GEORGE, RMR.
16   - - - - - - - - - - - - - - - - - - - - - - - - - - -
17
18
19
20
21
22
23
24
25   JOB NO. 5374695

---

**Page 2**

1  A P P E A R A N C E S
2  GODFREY & KAHN, S.C., by
   JONATHAN INGRISANO
3  One East Main Street, Suite 500
   Madison, Wisconsin 53073
4  (608) 257-3911
   jingrisano@gklaw.com
5  Appeared on behalf of the Plaintiff.
6  BOARDMAN & CLARK, LLP, by
   SARAH A. ZYLSTRA
7  TANNER G. JEAN-LOUIS
   1 South Pinckney Street, 4th Floor
8  Madison, Wisconsin 53701
   (608) 257-9521
9  szylstra@boardmanclark.com
   Appeared on behalf of the Defendants.
10
11  I N D E X
12  WITNESS                                    PAGE
13  TIM PARKS
14  EXAMINATION BY MR. INGRISANO          4
15
16  E X H I B I T S   P R E V I O U S L Y   M A R K E D
17  NUMBER    DESCRIPTION                        PAGE
18  Exhibit 6  Letter Dated February 27, 2019      82
19  Exhibit 33  Planning Division Staff Report Dated 91
20         May 11, 2020
21  Exhibit 47  Planning Division Staff Report Dated 33
22         March 24, 2014
23  Exhibit 52  Approved Master Plan For the      52
24         Edgewood Campus
25  Exhibit 64  Email Dated October 26, 2018      70

**Page 3**

1  R E Q U E S T S
2      (No requests made.)
3
4
5  (Previously marked exhibits 6, 33, 47, 52 and 64 retained
6  by Attorney Ingrisano.)
7
8  (Original transcript was delivered to Attorney Ingrisano.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1          TRANSCRIPT OF PROCEEDINGS
2          TIM PARKS called as a witness herein,
3  after having been first duly sworn on oath, was
4  examined and testified as follows:
5              EXAMINATION
6  BY MR. INGRISANO:
7  Q.  Good morning, Mr. Parks.
8  A.  Good morning.
9  Q.  Can you please state your name and spell it for the
10  record?
11  A.  Sure.  Full name is Timothy M. Parks, P A R K S.
12  Q.  Thank you.  And what's your date of birth?
13  A.  December 16th, 1975.
14  Q.  And what's your current residential address?
15  A.  3537 Stonebridge Drive, Madison, Wisconsin, 53719.
16  Q.  And how are you currently employed?
17  A.  I am a planner with the City of Madison.
18  Q.  Okay.  Is planner the formal title?
19  A.  Yes.
20  Q.  Have you ever had your deposition taken before?
21  A.  Yes.
22  Q.  On what occasions?
23  A.  The last time I was deposed was either 2017 or 2018
24  in a lawsuit against the City by Adams Advertising.
25  Prior to that I was a deponent in a private land

**Page 5**

1  contract matter I want to say circa 2012 involving a
2  dispute between a buyer and seller at West Towne.
3  Q.  So you've been deposed twice, is that what I'm
4  hearing?
5  A.  Yes.
6  Q.  And what was the litigation involving the City, what
7  did that involve to the best of your recollection and
8  knowledge?
9  A.  A lawsuit by Adams Advertising claiming that the
10  City's regulations on billboards was onerous.
11  Q.  Okay.  So having done this before, let me just
12  quickly outline kind of the ground rules for both of
13  us today.  The court reporter off to your left is
14  recording everything that we say on her stenographic
15  machine, so she really can only accept verbal answers
16  and understand verbal answers.  So to the extent that
17  you can make your answers verbal, that would be
18  greatly appreciated, okay?
19  A.  Sure.
20  Q.  Nods of the heads, shakes of the head, ah-hah, uh-uhs
21  are very difficult for her.  So if we can try to
22  avoid those.  At the same time she can only really
23  record one person talking at a time.  So to the
24  extent that you can wait until I complete my question
25  before you begin your answer, I will do my best to

Page 6

1  try to let you finish your response before I begin my
2  next question, okay?
3  A.  Yes.
4  Q.  So there may come a time when your attorney decides
5   that she needs to object to a question that I've
6   asked.  That's typical.  I don't pretend to ask
7   perfect questions every time.  If you can do your
8   best to stop your response if you've started
9   responding and allow her to complete her objection;
10  and then unless she instructs you otherwise, to
11  please then do your best to respond to that question,
12  okay?
13  A.  Yes.
14  Q.  All right.  If you at any time, like I said, I don't
15  ask perfect questions, if at any time you find
16  yourself not understanding a question, not hearing a
17  question that I ask, please don't hesitate to ask me
18  to repeat it or rephrase it, okay?
19  A.  Yes.
20  Q.  Because if you answer a question, I tend to believe
21  that you understood it the first time, okay?
22  A.  Yes.
23  Q.  Thanks.  Outline for me, sir, your education history.
24  A.  How far back?
25  Q.  How about we just start with high school?

Page 7

1  A.  High school, graduated City Honors High School in
2   Buffalo, New York in 1993, got a bachelors degree in
3   environmental design from the University of Buffalo,
4   1997 and got a masters degree in urban planning from
5   the University of Buffalo in 1999.
6  Q.  And have you had any legal training?
7  A.  One class in land use law in grad school during the
8   masters of urban planning curriculum.
9  Q.  Sir, are you married?
10  A.  Yes.
11  Q.  Do you have any children?
12  A.  Yes, one.
13  Q.  And age, please?
14  A.  7.
15  Q.  And where does he or she attend school?
16  A.  Chavez Elementary School.
17  Q.  Sir, can I ask what you did to prepare for your
18   deposition?
19  A.  I met with our counsel from Boardman and Clark to go
20   over different --
21      MS. ZYLSTRA:  Careful, the substance of
22  the communications that you and I have are
23  privileged, and I'll instruct you not to disclose
24  those.  Saying that you met with me is fine, but the
25  topics are off limits.

Page 8

1      MR. INGRISANO:  Sure.
2  BY MR. INGRISANO:
3  Q.  I'm not asking you to talk about what you talked
4   about at this point.
5      How long did you meet with counsel?
6  A.  Four-and-a-half hours, maybe five.
7  Q.  And when did you meet with counsel?
8  A.  Yesterday morning, we spoke by phone yesterday
9   afternoon, and we met briefly before coming over to
10  your office this morning.
11  Q.  For a grand total of between four-and-a-half to five
12  hours?
13  A.  Correct.
14  Q.  Amongst those three events?
15  A.  Yes.
16  Q.  Okay.  When you were with counsel, did you review any
17  documents?
18  A.  Yes.
19  Q.  To the best of your recollection what documents did
20  you review?
21  A.  Reviewed our different responses to interrogatories,
22  mouthful.
23  Q.  Sure.
24  A.  Documents that I have been party to, different memos
25  I've written to the City's planning commission, a

Page 9

1  staff report I wrote to the plan commission in 2014,
2  a letter of approval that I wrote to Edgewood,
3  actually their architect in 2014.  Those are the ones
4  that I recall.
5  Q.  So the interrogatory responses, the memos that you
6   were the drafter of.  Anything else that you can
7   recall reviewing with counsel or at the request of
8   counsel?
9      MS. ZYLSTRA:  Object to the form.  You can
10  answer.
11      THE WITNESS:  What was the May 2022
12  document, my declaration.  I reviewed my
13  declaration.
14  BY MR. INGRISANO:
15  Q.  Outside of the sessions with counsel, had you
16  reviewed any other declarations or affidavits or
17  deposition transcripts in this case?
18  A.  I have not reviewed deposition transcripts.  I don't
19  believe I've reviewed anybody else's declarations.
20  Q.  Sir, you describe your employment as a planner with
21  the City of Madison; is that correct?
22  A.  Correct.
23  Q.  And how long have you been a planner with the City of
24  Madison?
25  A.  Since February 4th, 2004.  So about 18-and-a-half

Page 10

1    years.
2 Q.  And have you had the title of planner for that entire
3    duration?
4 A.  Yes.
5 Q.  Does the City of Madison differentiate between any
6    kind of levels or seniority of planners such as
7    planner 1, planner 2, senior planner, anything like
8    that?
9 A.  Yes.
10 Q.  And but you have been just a planner the entire time;
11    is that correct?
12 A.  I'm a planner 3 currently and have proceeded through
13    the professional series having previously been a
14    planner 2 and a planner 1.
15 Q.  Okay.  What are the distinctions between a planner 3
16    and a planner 2, if any?
17 A.  There are more responsibilities as a planner 3, more
18    higher level reviews, less oversight by supervisors.
19    That would be a way to characterize that professional
20    series, you know, increasingly more complex projects
21    with less oversight.  So the slide rule goes up from
22    1 to 3 and the amount of supervision goes down from 3
23    to 1, if you will.
24 Q.  Sure.  Is there a planner 4?
25 A.  Yes.

Page 11

1 Q.  Can you give me the timeline of approximately when
2    you were planner 1, 2 and 3, what time periods?
3 A.  I have been a planner 3 since September of 2013 and
4    prior to that I believe I was a -- made a planner 2
5    either in 2007 or 2008.
6 Q.  Do you have an expectation or timeline as to when you
7    would become a planner 4?
8 A.  No.
9 Q.  Are there any planner 4s with the City of Madison?
10 A.  Yes.
11 Q.  Who would those be?
12    MS. ZYLSTRA:  Objection, foundation.
13 BY MR. INGRISANO:
14 Q.  If you know.
15 A.  Well, to the extent that it's relevant, I can recall
16    Linda Horvath as a planner 4 or Rebecca Cnare as a
17    planner 4.  I'm not aware of anybody else that is
18    currently a planner 4.
19 Q.  How long have those two individuals been with the
20    City of Madison?
21    MS. ZYLSTRA:  Objection, foundation.  If
22    you know.
23    THE WITNESS:  I only know that Rebecca
24    started about six months before I did.  I don't
25    recall exactly the term of Linda's employment.

Page 12

1 BY MR. INGRISANO:
2 Q.  You mentioned the differing levels of supervision as
3    a planner 3 versus a planner 2, for example.  Who
4    does supervise you as a planner for the City of
5    Madison?
6 A.  My direct report is Kevin Firchow who is a principal
7    planner.  We both work for Heather Stouder who is the
8    director of the planning division, and the planning
9    division is within the Department of Planning,
10    Community and Economic Development which is helmed by
11    Matt Wachter.
12 Q.  Do you have a direct reporting line to Ms. Stouder?
13    MS. ZYLSTRA:  Objection, form.  You can
14    answer.
15    THE WITNESS:  I report to Mr. Firchow, and
16    he is a principal planner that reports to Ms.
17    Stouder.
18 BY MR. INGRISANO:
19 Q.  Thank you.  As a planner, as a planner 2, could you
20    describe for me what your job responsibilities were
21    with the City of Madison?
22 A.  At the time I was responsible for reviewing
23    development projects, I was responsible for
24    processing applications to go through the City's plan
25    commission process.  Those were probably my primary

Page 13

1    duties.
2 Q.  Okay.  And how are those duties different, if at all,
3    from being a planner 3 now?
4 A.  I am responsible for overseeing the public hearing
5    notifications for the plan commission, the plan
6    commission agenda in addition to reviewing projects,
7    accepting applications, coordinating reviews with
8    other City agencies who customarily provide feedback
9    and comments on land use questions that go through
10    the plan commission.  I've also been responsible or
11    been involved with different neighborhood planning
12    activities as part of the multi-disciplinary project
13    teams for neighborhood development plans and special
14    area plans.
15 Q.  Starting, when you started with Madison in February
16    of 2004, had you had prior work experience as a
17    planner?
18 A.  Yes.
19 Q.  And where was that?
20 A.  City of Kansas City, Missouri.
21 Q.  And for how long?
22 A.  Four years.
23 Q.  And were your responsibilities there similar to your
24    responsibilities as a planner with the City of
25    Madison?

Page 14

1 A. I was more -- my focus was primarily review of land
2 use applications and subdivision applications. I was
3 not as involved in the operations of the plan
4 commission in Kansas City like I am in Madison.
5 Q. You're familiar with Edgewood High School?
6 A. Yes.
7 Q. What was your first professional experience with
8 Edgewood High School?
9 A. I don't specifically recall.
10 Q. Do you have an approximate timeframe?
11 A. I would say circa 2008.
12 Q. And do you recall what that first experience would
13 have related to?
14 A. Could you clarify? Are you asking in my capacity as
15 someone who reviews applications for Edgewood or just
16 familiar with things that were happening on the
17 campus?
18 Q. Sure. I'm asking for your first time having
19 experience with Edgewood High School in your capacity
20 as a planner for the City of Madison.
21 A. I don't recall.
22 Q. Have you had any personal involvement with Edgewood
23 High School? Have you attended its campus for any
24 sort of events or do you have any friends or family
25 that attend Edgewood High School?

Page 15

1 A. No.
2 Q. Have you ever attended an event or sporting event at
3 Edgewood High School?
4 A. No.
5 Q. In speaking with Mr. Tucker, I was left with the
6 impression that you were at least in some sense
7 assigned to be the planner for the Edgewood Campus.
8 Is that a fair characterization?
9 A. I have probably since 2008 been involved in different
10 discussions and occasional project reviews with the
11 Edgewood Campus of which Edgewood High School is part
12 of.
13 Q. But to your knowledge have you been assigned as kind
14 of the go-to planner in any sort of sense with
15 respect to planning issues and development that comes
16 up with the Edgewood Campus?
17 A. I would say that I am the planner that would most
18 likely be assigned to Edgewood related matters.
19 Q. And do you know why that is?
20 A. Typically in our office we tend to develop
21 relationships with properties, projects, parties that
22 when those properties, projects or parties come up
23 either in the same site or different sites, we might
24 work with those parties again.
25 So in terms of reviewing matters that come

Page 16

1 up on Edgewood, I would probably be the first of the
2 group that I work in to be called to -- or called
3 upon because of my familiarity with different aspects
4 of the campus or its past land use requests, et
5 cetera.
6 Q. Okay. How many projects have you worked on with
7 respect to the Edgewood Campus?
8 MS. ZYLSTRA: Objection, foundation. You
9 can answer.
10 THE WITNESS: Six.
11 BY MR. INGRISANO:
12 Q. Can you identify those for me, please?
13 A. Well, there was the matter of a stadium. There was
14 their master plan, the repeal of the master plan, a
15 project that preceded the master plan which was an
16 addition to one of Edgewood College's dormitories. I
17 oversaw the review of the condominium that the three
18 institutions entered into, and I -- okay. What was
19 it, the Well which is a performing arts facility for
20 Edgewood College on Woodrow Street. And then more
21 recently the Edgewood High School Commons which was
22 replacing the high school's cafeteria, common
23 gathering space with a new space which I believe is
24 under construction right now.
25 Q. Did your recitation, did your enumeration there

Page 17

1 include projects that would have been part of the
2 master plan or approved or developed under the master
3 plan document?
4 MS. ZYLSTRA: Object to the form. You can
5 answer.
6 THE WITNESS: The commons addition was
7 originally identified in and approved originally
8 during the master plan's period of relevance or
9 period of enforceability, period of something. That
10 was approved by the architectural design review
11 committee, but Edgewood did not proceed with
12 construction at that time.
13 I believe there was also an elevator
14 addition and something they were going to do with
15 the auditorium that were a part of that review. But
16 again, I don't believe that they actually
17 constructed any of those projects. And as I just
18 mentioned, the commons was just reapproved last year
19 after the master plan repeal that got conditional
20 use approval and I believe has gotten permits to
21 start construction.
22 BY MR. INGRISANO:
23 Q. I believe Edgewood had a fine arts addition. Were
24 you involved in that?
25 A. Edgewood College, yes.

5 (Pages 14 - 17)

Page 18

1  Q.  How about the high school?
2  A.  I remember that there were discussions about it, and
3      it was part of perhaps what I refer to as the
4      auditorium you're referring to as the fine arts
5      facility.  That was part of I believe one of the
6      projects that went through the ADRC process during
7      the master plan.
8  Q.  There was a parking lot addition to Edgewood as well
9      in the last several years; is that right?
10 A.  Yes.
11 Q.  Were you involved with that?
12 A.  As part of the architectural design review committee,
13     yes.
14 Q.  Are you drawing a distinction between your
15     involvement with the architectural review committee
16     versus your role as a planner?
17 A.  No.
18 Q.  So the Well, the performing arts center, that's
19     different from the auditorium; is that correct?
20 A.  Yes.
21 Q.  At one point a driveway was added through the
22     Edgewood Campus from Monroe Street through to
23     Edgewood College.  Were you involved with that
24     project?
25 A.  No.  I believe that predated my involvement with

Page 19

1      Edgewood.
2  Q.  Okay.  So if I'm understanding you correctly, here is
3      what I took from your testimony as your involvement
4      with Edgewood, Edgewood Campus:  Parking lot, the
5      auditorium, the commons, the Well, the performing art
6      center at the college, the condominium division, the
7      addition to the Edgewood College dorm, the repeal of
8      the master plan, the master plan itself and what you
9      call the stadium.  Did I summarize that correctly?
10 A.  Yes.
11 Q.  Is there anything else on the Edgewood Campus that
12     you believe you were involved with in terms of a
13     planning and development standpoint on behalf of the
14     City?
15 A.  Not that I can recall.
16 Q.  When you said that you were involved with the
17     stadium, what do you mean by that?
18 A.  Well, I was the planner assigned to review the
19     amendment that was brought forth in the fall of 2018
20     to build a more permanent stadium, install a public
21     address system and add lighting.  So I was involved
22     in the review of that and the preparation for the
23     public hearings for that.  I was involved in the
24     conditional use review for the addition of lighting
25     after the master plan was repealed.

Page 20

1          MR. INGRISANO:  Can you read back that
2      last line, please?
3          (Record read.)
4  BY MR. INGRISANO:
5  Q.  So after the repeal of the -- apart from the
6      amendment process for the master plan, were you also
7      involved in any way in reviewing a lighting
8      application or lighting applications filed by
9      Edgewood for outdoor lights for its football field in
10     2019?
11         MS. ZYLSTRA:  Object to form.  You can
12     answer.
13         THE WITNESS:  I was aware that that
14     request had been submitted.  I was not involved in
15     the review of that request, however.
16 BY MR. INGRISANO:
17 Q.  You said you were involved with the master plan.  Are
18     you talking about the drafting and approval of the
19     master plan in 2014, 2013?
20         MS. ZYLSTRA:  Objection, form.  You can
21     answer.
22         THE WITNESS:  I wrote the staff report
23     that was presented to the plan commission and the
24     Common Council recommending that they could approve
25     the master plan.

Page 21

1  BY MR. INGRISANO:
2  Q.  During your time at -- working with Edgewood on the
3      projects that you've identified, did you have a
4      contact person at Edgewood High School for any of
5      these projects?
6  A.  Mike Elliott was the person that was the common
7      denominator in many of the projects.  Doug Hursh from
8      Potter Lawson was the, I guess the author, if you
9      will, of the master plan or the project manager for
10     the master plan.  I believe he was also involved in
11     the original commons proposal, but I'm not certain of
12     that.  And then Mike was involved in the stadium,
13     that question at both opportunities in 2018 and 2020
14     there were -- they were working with Vandewalle and
15     Associates on the application for the lights in 2020,
16     so Brian Munson was involved in that process and
17     preparation of their application and participation in
18     the public hearing.
19 Q.  Okay.  So just to back up, with respect to folks that
20     are contact people that were actually employed by
21     Edgewood High School, they were Edgewood employees,
22     was there anyone other than Mike Elliott that you
23     would have had contact with, whether it's inquiries,
24     answering their questions, posing your own questions
25     with respect to Edgewood Campus projects?

6 (Pages 18 - 21)

Page 22

1     MS. ZYLSTRA: Object to form, foundation.
2   You can answer.
3     THE WITNESS: I don't recall anybody else.
4 BY MR. INGRISANO:
5 Q.  And then as for outside representatives, people maybe
6   contractors, consultants that were hired by the
7   Edgewood Campus, you believe it was Brian Munson and
8   Doug Hursh were the representatives that you would
9   have been communicating with that were outside of
10   Edgewood High School?
11     MS. ZYLSTRA: Object to form. You can
12   answer.
13     THE WITNESS: The only other name that
14   comes to mind related to discussions about that fine
15   arts project would have been Mike Huffman who
16   provides a construction management. I think he has
17   a private consulting firm that does construction
18   management.
19 BY MR. INGRISANO:
20 Q.  Okay. Can you describe for me what was involved with
21   the condominium project you mentioned for the three
22   Edgewood entities?
23 A.  They were interested in dividing up the campus so
24   that they all had an ownership stake in the roughly
25   56 acres. They had originally discussed whether they

Page 23

1   would be able to create lots in fee simple by doing a
2   subdivision. It was felt that their subdivision
3   would be objected to by the community, and so they
4   felt that the condominium was a better way to create,
5   you know, distinct ownership interests in the campus
6   while providing sort of that governance framework
7   that a condominium declaration would provide for the
8   common maintenance of things that the three
9   institutions share on the 56 acres.
10 Q.  Did the condominium project, was that completed?
11 A.  Yes.
12 Q.  And do you recall approximately when that was
13   completed?
14 A.  I would say it was probably 2009 or 2010.
15 Q.  In your experience working with Edgewood Campus, you
16   would recognize, wouldn't you, that there are
17   distinctions between Edgewood High School, Edgewood
18   College and Edgewood Campus School in terms of
19   responsibility or interest in particular parts of
20   that 55 acre campus?
21     MS. ZYLSTRA: Object to form. You can
22   answer. Foundation.
23     THE WITNESS: Could you repeat?
24     MR. INGRISANO: Yeah, can you read that
25   back, please?

Page 24

1     (Record read.)
2     MS. ZYLSTRA: Same objections. You can
3   answer.
4     THE WITNESS: I'm not sure I understand
5   your question.
6     MR. INGRISANO: Sure.
7 BY MR. INGRISANO:
8 Q.  Edgewood College considers parts of that campus to be
9   part of the Edgewood College, correct?
10     MS. ZYLSTRA: Objection, form, foundation.
11   You can answer.
12     THE WITNESS: Yes.
13 BY MR. INGRISANO:
14 Q.  Edgewood High School considers parts of that campus
15   to be part of Edgewood High School, correct?
16     MS. ZYLSTRA: Same objections. You can
17   answer.
18     THE WITNESS: Yes.
19 BY MR. INGRISANO:
20 Q.  Edgewood Campus School believes that there are part
21   of that 55 acre parcel that are part of their campus,
22   correct?
23     MS. ZYLSTRA: Same objections. You can
24   answer.
25 BY MR. INGRISANO:

Page 25

1 Q.  Their school.
2 A.  Yes.
3 Q.  Okay. One of the parts that Edgewood High School
4   considers to be its property or its interest is the
5   athletic field, correct?
6     MS. ZYLSTRA: Same objections. You can
7   answer.
8     THE WITNESS: I don't specifically recall
9   which unit in the condominium is owned by which
10   institution.
11 BY MR. INGRISANO:
12 Q.  When Edgewood is seeking -- Edgewood High School is
13   seeking to improve that property or to amend master
14   plans or to seek additional use approval with respect
15   to that football field, you recognize that Edgewood
16   High School has the -- is the proper party to seek
17   those changes, correct?
18     MS. ZYLSTRA: Objection, form. You can
19   answer.
20     THE WITNESS: To the extent I understand
21   that -- their ownership, yes.
22 BY MR. INGRISANO:
23 Q.  Are there any other institutions besides the Edgewood
24   Campus that you are typically assigned?
25 A.  I have been involved in projects on the University of

7 (Pages 22 - 25)

Page 26

1    Wisconsin campus.
2  Q.  So when a UW project comes in, is it, therefore, more
3     likely to be assigned to you given your experience
4     with that campus?
5  A.  Yes.
6  Q.  Any other institution that is more likely to be
7     assigned to you because of your prior involvement?
8  A.  Institution, no, not that I recall.
9  Q.  Any other prior -- any other property owner that
10    you're more likely to be assigned because of your
11    involvement historically?
12 A.  I have worked with, for example, T.R. McKenzie on a
13    number of their projects.  I have worked with I
14    believe it's McKenzie 3000 on many of their projects.
15    Livesey Company on projects in the City of Madison,
16    John Flad from Flad Development, he and I have worked
17    together on a number of projects over the years.
18    Those are the ones that I can recall most
19    immediately.
20 Q.  Okay.  With your experiences with the Edgewood Campus
21    and the projects that you identified, have you
22    developed any impressions or opinions of
23    Edgewood High School?
24       MS. ZYLSTRA:  Object to form.  You can
25    answer.

Page 27

1        THE WITNESS:  Can you clarify?
2        MR. INGRISANO:  Sure.
3  BY MR. INGRISANO:
4  Q.  What are your thoughts with all the experience you
5     had working with Edgewood High School, what are your
6     thoughts and opinions about that institution?
7        MS. ZYLSTRA:  Same objection.
8        THE WITNESS:  I have none.
9  BY MR. INGRISANO:
10 Q.  As a planner at the City of Madison, did you have any
11    role in the drafting of the campus institutional
12    district zoning ordinance?
13 A.  Yes.
14 Q.  Can you describe that involvement for me?
15 A.  At the time that we were rewriting the City's zoning
16    code, the one that's currently in effect and has been
17    in effect since 2 January 2013, I was involved in the
18    staff team that was working with the consultant that
19    the City had hired to develop that ordinance.
20 Q.  What was the purpose for the campus institutional
21    zoning district to the best of your recollection?
22       MS. ZYLSTRA:  Objection, form, foundation.
23    You can respond.
24       THE WITNESS:  Well, to my understanding
25    historically institutions like Madison College, the

Page 28

1    University of Wisconsin-Madison, Edgewood were zoned
2    under our 1966 zoning code in a variety of mostly
3    conventional zoning districts.  Those institutions
4    were allowed in those districts, but it would be
5    fair to say that none of those districts in the 1966
6    zoning code were created or existed to serve medical
7    institutions, educational institutions which was the
8    thrust of what the CI district was created to
9    provide a zoning framework for.
10 BY MR. INGRISANO:
11 Q.  Why did they need their own special zoning framework
12    in your opinion?
13 A.  In my opinion I think it was felt both by the team
14    that was looking at the zoning code and how to
15    implement our -- or how to create a new zoning code
16    that would implement the City's 2006 comprehensive
17    plan that it was perhaps useful to have a zoning
18    district that would more specifically speak to the
19    unique characteristics of large educational
20    institutions, medical institutions like the three
21    hospitals, for example.  And so versus whereas those
22    were conventionally zoned districts under the 1966
23    code, the zoning that they had might not have
24    reflected, you know, large campuses with a variety of
25    buildings and uses and particular needs.

Page 29

1        So, for example, the general commercial
2    district in the 1966 code may have allowed colleges
3    and universities, but it was not clearly a district
4    that was primarily intended for colleges and
5    universities.  And so because of that and because the
6    2006 comprehensive plan identified some of those
7    larger institutional properties in -- I believe in
8    that plan it was referred to as the special
9    institutional district in the generalized future land
10    use maps in that '06 comp plan that because the new
11    zoning code was intended to implement the
12    recommendations in that '06 comprehensive plan, that
13    it was also felt that perhaps a special zoning
14    district that might, you know, reflect those needs
15    and the recommendations or the recognition of those
16    campuses and institutions in the 2006 comprehensive
17    plan would be useful.
18 Q.  Okay.  For a practical matter how did the campus
19    institutional district zoning change project
20    development for a zoned institution, a zoned property
21    owner under CID, campus institutional district,
22    versus the prior code?
23       MS. ZYLSTRA:  Objection, form, foundation.
24    You can answer.
25       THE WITNESS:  Well, I mean I think the

Page 30

1  campus institutional district has primary and
2  secondary uses that reflect the uses that would be
3  most common on the properties that are zoned campus
4  or that could be zoned campus
5  institutional. And it had bulk requirements that --
6  or has bulk requirements that recognize the type of
7  building and the type of site development that you
8  would expect to see in a campus institutional
9  district compared to a more conventional commercial
10  or residential zoning classification.
11  BY MR. INGRISANO:
12  Q.  So listing the primary and secondary uses though, how
13    does that -- how is that in the interest of the
14    institution just to have those primary and secondary
15    uses listed?
16       MS. ZYLSTRA: Objection, form, foundation.
17  You can answer.
18       THE WITNESS: I believe that it reflects
19  the uses that would be most commonly found on those
20  campuses.
21  BY MR. INGRISANO:
22  Q.  So it's -- beyond identifying what the uses are for
23    those types of campuses, what is the practical impact
24    of defining those primary and secondary uses?
25       MS. ZYLSTRA: Objection, form, foundation.

Page 31

1       You can answer.
2       THE WITNESS: I'm not sure I understand
3  your question.
4  BY MR. INGRISANO:
5  Q.  Beyond just listing what primary and secondary uses
6    are in the campus institutional ordinance, what's
7    the -- what is the purpose and intent of identifying
8    those uses?
9       MS. ZYLSTRA: Objection, form, foundation.
10  You can answer.
11       THE WITNESS: Well, you have uses on a
12  campus institutionally zoned property that are most
13  common or most unique to those campuses as opposed
14  to other like districts in our zoning code where
15  those uses are in many cases also identified but it,
16  again, speaks to identifying these institutions in
17  our adopted city plans and then providing a
18  regulatory framework for those institutions
19  including use lists and bulk requirements or
20  regulations that might better speak to the unique
21  nature of those campuses than other zoning
22  classifications where those uses may be allowed,
23  permitted or conditional but not necessarily
24  anticipating in a campus form.
25  BY MR. INGRISANO:

Page 32

1  Q.  When it was first promulgated, how did the campus
2    institutional district ordinance, how did that
3    regulate those permitted primary and secondary uses?
4       MS. ZYLSTRA: Objection, form, foundation.
5  You can answer.
6       THE WITNESS: Well, it regulated it,
7  regulated those campuses the way zoning regulates
8  any private property in the City of Madison in that,
9  you know, uses are allowed and bulk requirements are
10  established, and again, reflecting the statement of
11  purpose of the district that speaks to the existence
12  of these large institutions and their particular
13  needs creating a district for those properties to be
14  zoned in the CI district distinct from other
15  districts elsewhere around the City and in the
16  zoning code.
17  BY MR. INGRISANO:
18  Q.  But I guess where I'm trying to understand is the
19    list of secondary and primary uses in the campus
20    institutional zoning ordinance, those are permitted
21    uses, correct?
22       MS. ZYLSTRA: Objection, form, foundation,
23  incomplete hypothetical. You can answer.
24       THE WITNESS: They're allowed. The zoning
25  code establishes different requirements for

Page 33

1  different uses throughout the zoning code in that a
2  building of a certain height might be allowed but
3  over another height or a greater height may become a
4  conditional use. Building too close to a property
5  line in some zoning districts may require
6  conditional use approval.
7       So I would distinguish it as a use may be
8  allowed, but that there are conditions that it may
9  need to be -- that may need to be met that determine
10  whether or not something is permitted or
11  conditional.
12       (Exhibit 47 previously marked.)
13  BY MR. INGRISANO:
14  Q.  All right. Mr. Parks, I'm going to hand you what's
15    been previously marked as Exhibit 47 except for the
16    fact that there appears to have been highlighting
17    that has been added to the document since it was
18    originally marked involving your name. I'll tell you
19    that it's otherwise an accurate copy of Exhibit 47,
20    okay? Do you recognize Exhibit 47, sir?
21  A.  Yes.
22  Q.  And this is a planning division staff report dated
23    March 24, 2014 that you authored, correct?
24  A.  Yes.
25  Q.  And on pages -- starting on page 3, 4, 5 and 6 of

Page 34

1 this document, there is a recitation and a -- I'll
2 just say inclusion of the, at the time, current or
3 the then current campus institutional district zoning
4 ordinance, correct?
5 A. Yes.
6 Q. And subsection 3 identifies the uses within CI
7 districts, defines the uses as either primary or
8 secondary, correct?
9 A. Yes.
10 Q. And then there is a list of primary uses under (a)
11 and secondary uses under (b), correct?
12 A. Yes.
13 Q. So in 2014 when campus institutional district was in
14 play, an institution or a property that was zoned
15 campus institutional was permitted to use its
16 property for any of the primary or secondary uses
17 identified, correct?
18 MS. ZYLSTRA: Objection, form, foundation.
19 THE WITNESS: Would you clarify, please?
20 MR. INGRISANO: Sure.
21 BY MR. INGRISANO:
22 Q. All of those in (a) and (b) are permitted uses of a
23 property that's zoned campus institutional, correct?
24 MS. ZYLSTRA: Objection, form, foundation.
25 THE WITNESS: They're allowed within the

Page 35

1 district.
2 BY MR. INGRISANO:
3 Q. Yes. In 2013 prior to its master plan Edgewood High
4 School was able to use its football field as an
5 indoor or outdoor sports and recreational facility
6 under 3(b)(5), correct?
7 MS. ZYLSTRA: Objection, form, foundation.
8 You can answer.
9 THE WITNESS: Yes.
10 BY MR. INGRISANO:
11 Q. It could use its football field under 17 as a
12 stadium, auditorium and arena, open or enclosed,
13 correct?
14 MS. ZYLSTRA: Objection, form, foundation.
15 You can answer.
16 THE WITNESS: I don't know if I would
17 qualify the condition of their facility as a
18 stadium. Certainly it would be an outdoor sports
19 and recreation facility.
20 BY MR. INGRISANO:
21 Q. Okay.
22 A. I don't recall what the condition of that corner of
23 the stadium was in 2013, however.
24 Q. In 2013 did the City of Madison have any ability
25 under the campus institutional district zoning

Page 36

1 ordinance to prevent Edgewood from using its field as
2 an outdoor sports and recreation facility to your
3 knowledge?
4 MS. ZYLSTRA: Objection, form. You can
5 answer.
6 THE WITNESS: I don't recall.
7 BY MR. INGRISANO:
8 Q. To your understanding of the campus institutional
9 district zoning ordinance, if Edgewood wanted to
10 change one of the secondary uses, say, for example,
11 wanted to turn a general retail use under 3(b)(4)
12 into a museum, would the City under the CID ordinance
13 be able to regulate that?
14 MS. ZYLSTRA: Objection, form, foundation.
15 THE WITNESS: I believe that that would be
16 an interpretation for the zoning administrator or
17 his or her staff to determine what uses would be
18 allowed and under what auspicious in the campus
19 institutional district.
20 BY MR. INGRISANO:
21 Q. As one of the drafters involved in the drafting of
22 this statute, this ordinance, you don't have an
23 interpretation or a comment on that?
24 MS. ZYLSTRA: Objection, form, foundation.
25 You can answer.

Page 37

1 THE WITNESS: I don't care to interpret,
2 no.
3 BY MR. INGRISANO:
4 Q. Did you ever have an opinion that you've held. I'm
5 not asking you to come up with a new one now. Have
6 you ever held an opinion about the City's ability to
7 regulate amongst the permitted uses under 3 (a) and
8 (b)?
9 MS. ZYLSTRA: Objection, form. You can
10 answer.
11 THE WITNESS: That would be something that
12 the zoning administrator would be primarily charged
13 with providing an official interpretation.
14 BY MR. INGRISANO:
15 Q. So as a matter of fact though as you sit here today,
16 you have never between from today through the
17 promulgation of this statute, you've never developed
18 or formed your own opinion as to the propriety of the
19 City's regulation of any of the uses under 3(a) and
20 (b). I'm asking you as a matter of fact. I'm not
21 asking you to make an opinion today. I'm asking you
22 whether you ever have actually formed an opinion or
23 expressed an opinion about the City's ability to
24 regulate the uses in 3 (a) and (b)?
25 MS. ZYLSTRA: Objection to form. You can

10 (Pages 34 - 37)

Brown & Jones Reporting            414-224-9533
A Veritext Company            www.veritext.com

Page 38

1   answer.
2         THE WITNESS:  You're asking me whether I
3   have ever had an opinion about the implementation of
4   the allowed use list in the campus institutional
5   district.
6   BY MR. INGRISANO:
7   Q.  I asked you about whether you've ever formed an
8   opinion about the City's ability to regulate any of
9   the primary or secondary uses identified in 3(a) and
10  (b)?
11        MS. ZYLSTRA:  Objection, form.  You can
12  answer.
13        THE WITNESS:  I don't specifically recall.
14  BY MR. INGRISANO:
15  Q.  When you were involved in the drafting of the campus
16  institutional district zoning ordinance, did you have
17  any involvement in that process with anyone from
18  Edgewood High School?
19  A.  No, not that I recall.
20  Q.  To your knowledge was anyone from Edgewood High
21  School involved in the drafting or development of the
22  campus institutional district zoning?
23  A.  No, not that I recall.
24  Q.  Sir, what was your involvement with the Edgewood
25  master plan?

Page 39

1         MS. ZYLSTRA:  Object to form.  You can
2   answer.
3         THE WITNESS:  I was the reviewing planner
4   when it went through the plan commission process,
5   and I participated in two community discussions
6   where the campus master plan was presented to
7   surrounding neighborhoods.
8   BY MR. INGRISANO:
9   Q.  When you were reviewing as it went through the plan
10  commission process or when you were presenting to the
11  neighbors in those meetings, was that a complete and
12  final document?
13        MS. ZYLSTRA:  Object to form.  You can
14  answer.
15        THE WITNESS:  The staff report of March
16  24, 2014 would have been based on what Edgewood, the
17  campus institutions submitted to the City for
18  approval of their master plan.  The items that were
19  presented to the neighborhood were preceding that, I
20  cannot speak to what state the master plan was at
21  that time or those times.
22  BY MR. INGRISANO:
23  Q.  I guess my question is were you -- I'm not hearing
24  you say that you were involved in the actual drafting
25  of the content of the master plan; is that correct?

Page 40

1   A.  I may have reviewed draft documents, but I did not
2   myself draft those documents.
3   Q.  Looking at Exhibit 47, the document you drafted here,
4   the staff report, on the first page under the summary
5   there is a subsection applicable regulations and
6   standards, do you see that?
7   A.  Yes.
8   Q.  Do you think that's a fair summary that you drafted
9   of the campus institutional district zoning
10  regulation?
11        MS. ZYLSTRA:  Object to form.  You can
12  answer.
13        THE WITNESS:  I believe that it is.
14  BY MR. INGRISANO:
15  Q.  It says on the document the applicant is a Maggie
16  Balistreri-Clark, do you see that?
17  A.  Yes.
18  Q.  Do you know who she is?
19  A.  At the time she was with Edgewood College.  I believe
20  that her role was a vice or associate dean for
21  student relations.  I don't recall specifically the
22  exact title however.
23  Q.  And would it have been, during this process, would
24  you have been working with Ms. Balistreri-Clark?
25  A.  Yes.

Page 41

1   Q.  Do you recall during this process Ms.
2   Balistreri-Clark ever saying anything to you about
3   the use of Edgewood High School's athletic field?
4   A.  I don't specifically recall during the master plan
5   process any such discussions.
6   Q.  You had a couple qualifiers in there that I have to
7   follow up on, Mr. Parks.
8         You said you don't specifically recall.  Do
9   you generally recall any discussions regarding the
10  athletic field?
11  A.  I recall that there was concern during the master
12  plan process that Edgedome might be relocated
13  adjacent to the field but that that project and any
14  discussion of the field area was tabled until the
15  future.
16  Q.  Who were involved in those discussions that you said
17  were tabled?
18  A.  I don't specifically recall.
19  Q.  But again, we're talking these conversations that you
20  just relayed, you believe those were with Ms.
21  Balistreri-Clark?
22  A.  Yes.
23  Q.  What did you mean when you said the discussions on
24  the field, the athletic field, were tabled?  Tabled
25  how?

Page 42

1        MS. ZYLSTRA: Object to form. You can
2    answer.
3        THE WITNESS: Well, the master plan that
4    was submitted to the City didn't include specific
5    projects for the field. It included an allusion to
6    Edgedome and that it would be a future amendment to
7    the master plan at whatever time the institution or
8    institutions that were part of Edgedome would want
9    to bring those forward and that, you know, there
10   were no specific projects in the master plan for the
11   field or for the indoor facility that they -- or at
12   the time was referred to as Edgedome. I don't know
13   if it still is.
14 BY MR. INGRISANO:
15 Q.  Okay. You said you don't specifically recall during
16   the master plan process having a conversation with a
17   Maggie Balistreri-Clark beyond what I think we just
18   now mentioned were more generally.
19       Did you have conversations with Maggie
20   Balistreri-Clark about the athletic field outside of
21   the master planning process?
22       MS. ZYLSTRA: Object to form.
23       THE WITNESS: I believe that I may have
24   been involved in some correspondence about use of
25   the field while the master plan was in effect.

Page 43

1 BY MR. INGRISANO:
2 Q.  With Ms. Clark?
3 A.  Yes.
4 Q.  Do you recall what that communication related to
5   specifically?
6 A.  No, I do not.
7 Q.  During the master planning process, did the issue of
8   lights, outdoor lighting for Edgewood High School's
9   athletic field ever come up?
10      MS. ZYLSTRA: Object to form. You can
11   answer.
12      THE WITNESS: During the master plan
13   approval process?
14 BY MR. INGRISANO:
15 Q.  Yes.
16 A.  During the master plan approval process, no, I do not
17   recall that lights were specifically brought up.
18 Q.  Prior to the approval process as part of any
19   drafting, where you were reviewing drafts, do you
20   recall lights coming up?
21      MS. ZYLSTRA: Object to form. You can
22   answer.
23      THE WITNESS: No, I do not.
24 BY MR. INGRISANO:
25 Q.  Going back to Exhibit 47, first page there, the

Page 44

1    applicable regulations and standards, the last kind
2    of provision of that paragraph says "in the absence
3    of said plan" --
4        MS. ZYLSTRA: Counsel, I'm sorry, can you
5    direct me where you are?
6        MR. INGRISANO: Yeah, applicable
7    regulations and standards, page 1.
8        MS. ZYLSTRA: I'm sorry. I apologize.
9    Thank you.
10       MR. INGRISANO: Sure.
11 BY MR. INGRISANO:
12 Q.  The last couple lines of your applicable regulations
13   and standards summary, it says, "in the absence of
14   said plan," being a campus master plan, "individual
15   development proposals and changes that exceed 4,000
16   square feet in gross floor area within any five year
17   period shall require conditional use approval."
18       Do you see that?
19 A.  Yes.
20 Q.  So under the way the statute, this ordinance was
21   originally drafted, in the absence of a master plan,
22   anything on a campus institutional district property,
23   zoned property, that was greater than 4,000 square
24   feet of gross floor area would require conditional
25   use approval, correct?

Page 45

1        MS. ZYLSTRA: Objection, form, foundation.
2    You can answer.
3        THE WITNESS: That's what the ordinance
4    said.
5 BY MR. INGRISANO:
6 Q.  Okay. So anything less than 4,000 square feet in the
7   absence of a plan would be subject to what?
8        MS. ZYLSTRA: Objection, form, foundation.
9    You can answer.
10       THE WITNESS: I believe an administrative
11   review process, but that would be a zoning
12   enforcement and implementation matter first.
13 BY MR. INGRISANO:
14 Q.  So you think it would be administrative review
15   process but ultimately that's a zoning question,
16   correct?
17 A.  Correct.
18 Q.  And zoning at the time this plan went into place, the
19   zoning administrator was Matthew Tucker, correct?
20 A.  Correct.
21 Q.  Based on your familiarity with the zoning ordinance,
22   if there is a plan, if there is a master plan in
23   place and a property owner wants to make a change of
24   less than 4,000 square feet of gross floor area, what
25   governs that project, that proposal?

Page 46

1        MS. ZYLSTRA: Objection, form, foundation.
2   BY MR. INGRISANO:
3   Q.   If you know.
4   A.   The master plan.
5   Q.   Sir, below the applicable regulations and standards
6        do you see where it says summary recommendation?
7   A.   Yes.
8   Q.   And in fact you and your department recommended
9        approval of the master plan; is that correct?
10  A.   Yes.
11  Q.   Take a look at page 6 of Exhibit 47, sir.  Analysis
12       and conclusion.  Third paragraph.  "No master plan
13       has been approved for a CI zoned institution to date,
14       and the proposed master plan for Edgewood is the
15       first time the plan commission has had to consider
16       such a document."
17            Do you see that?
18  A.   Yes.
19  Q.   Since drafting this, University of Wisconsin has
20       adopted a master plan, correct?
21  A.   Yes.
22  Q.   So but the Edgewood master plan was indeed the first
23       master plan that the City reviewed and approved,
24       correct?
25  A.   Yes.

Page 47

1   Q.   And with respect to the master plan for Edgewood and
2        the issues involving the stadium, the Edgewood master
3        plan is the first time to your knowledge, is it not,
4        that the City has had to interpret provisions of a
5        master plan?
6            MS. ZYLSTRA:  Objection, form, foundation.
7        You can answer.
8            THE WITNESS:  Could you repeat the
9        question, please?
10           MR. INGRISANO:  Sure.
11  BY MR. INGRISANO:
12  Q.   Just like it's the first master plan to have been
13       approved and processed, is it not also the first
14       master plan that the City of Madison has had to
15       review and interpret for purposes of what's permitted
16       and what's not permitted?
17           MS. ZYLSTRA:  Same objections.  You can
18       answer.
19           THE WITNESS:  It is the first master plan.
20  BY MR. INGRISANO:
21  Q.   Okay.  Have there been any occasions with the
22       University of Wisconsin that you're aware of where
23       the City has had to sit down and interpret its master
24       plan to determine if something is permissible?
25  A.   I am not aware of any such occasions.

Page 48

1   Q.   Are you aware of any instances in which the
2        University of Wisconsin has been told that it cannot
3        proceed with a project because it's contrary to the
4        terms of its master plan?
5   A.   Yes.
6   Q.   And can you give me an instance of that, please?
7   A.   I recall that the addition to Sellery Hall required
8        an alteration to the plan because the height that was
9        indicated in the approved plan was less than the
10       height that the university desired when they
11       renovated and added a floor to Sellery.
12  Q.   Anything else?
13  A.   Not that I recall.
14  Q.   Are you aware of any time in which the University of
15       Wisconsin has been told that it can't use a building
16       or space because of how that use has been defined in
17       the master plan?
18  A.   That would be a zoning enforcement matter.  I do not
19       recall any such occasions, but I would not
20       necessarily be aware of all such occasions.
21  Q.   Sure.  I'm only asking what you're aware of, sir.  I
22       understand.
23           How many times have you been on the
24       Edgewood High School athletic field?
25           MS. ZYLSTRA:  Objection, form.  You can

Page 49

1        answer.
2            THE WITNESS:  I have never been on the
3        Edgewood High School athletic field.
4   BY MR. INGRISANO:
5   Q.   How many times have you been on the Edgewood High
6        School campus?
7   A.   Edgewood High School itself?
8   Q.   Yes.
9            MS. ZYLSTRA:  Object to form.  You can
10       answer.
11           THE WITNESS:  I recall two occasions.
12  BY MR. INGRISANO:
13  Q.   And what were those and when were those?
14  A.   I recall an architectural design review committee
15       meeting that was held in the Edgewood library.  I do
16       not recall when that meeting occurred.  And I recall
17       attending I believe it was the October 17th, 2018
18       community meeting that Edgewood hosted to discuss
19       changes to the football stadium that they were going
20       to pursue.
21  Q.   As part of those visits, did you have an opportunity
22       to observe and view the Edgewood High School athletic
23       field?
24  A.   No.
25  Q.   So you've never made any sort of visual assessments

Page 50

1     first person, of its location, its placement on the
2     property, et cetera?
3          MS. ZYLSTRA:  Object to form.  You can
4     answer.
5          THE WITNESS:  I have driven by it
6     countless times.  I have seen it both from within
7     the campus and from particularly Monroe Street.  And
8     in the case of Monroe Street, I have driven by it
9     countless times.
10          MR. INGRISANO:  Okay.
11  BY MR. INGRISANO:
12  Q.  When driving by it countless times, have you ever
13     seen activities or events taking place on the field?
14          MS. ZYLSTRA:  Objection, form, foundation.
15     You can answer.
16          THE WITNESS:  Yes.
17  BY MR. INGRISANO:
18  Q.  What activities -- can you describe what activities
19     you saw?
20  A.  No.  I mean in driving by, I mean I'm not counting
21     people or specifically recalling every such occasion
22     or what activity was being held on the field.
23  Q.  Sure.  So do you think you ever had occasion to see
24     games or athletic competitions being held on the
25     field?

Page 51

1  A.  Since February of 2004?
2  Q.  Yes.
3  A.  Likely, yes.
4  Q.  When did you first see an athletic contest or game
5     being conducted on the field?
6          MS. ZYLSTRA:  Objection, form, foundation.
7     You can answer.
8          THE WITNESS:  I do not specifically
9     recall.
10          MR. INGRISANO:  Okay.
11  BY MR. INGRISANO:
12  Q.  Have you ever, since coming to Madison, have you ever
13     heard of games or athletic competitions being held on
14     that field?
15          MS. ZYLSTRA:  Objection, form, foundation.
16     You can answer.
17          THE WITNESS:  I do not specifically
18     recall.
19  BY MR. INGRISANO:
20  Q.  As you were reviewing the master plan in 2013, 2014,
21     reviewing drafts, what was your understanding as to
22     how that field was presently being used by Edgewood
23     High School?
24          MS. ZYLSTRA:  Objection, form.  You can
25     answer.

Page 52

1          THE WITNESS:  I do not believe I knew how
2     Edgewood was using its field at that time.
3          MS. ZYLSTRA:  Counsel, if you're going to
4     go into a big document, can we take a break?
5          MR. INGRISANO:  Yeah.
6          (Recess taken.)
7          (Exhibit 52 previously marked.)
8  BY MR. INGRISANO:
9  Q.  Handing you what's been previously marked as Exhibit
10     52, the only difference, again, being highlighting
11     for your name in our search process.
12          Sir, do you recognize this, sir, as the
13     approved master plan for the Edgewood Campus?
14  A.  Yes.
15  Q.  And per page 1 of this document your name appears as
16     the person that had completed the planning review on
17     June 5, 2015; is that fair?
18  A.  Yes.
19  Q.  To the best of what I heard you testify earlier to,
20     and please correct me if I'm wrong, is that Mr. Doug
21     Hursh was the principal what I'll call scrivener or
22     drafter of this document.  Is that your
23     understanding?
24          MS. ZYLSTRA:  Object to form, foundation.
25     You can answer.

Page 53

1          THE WITNESS:  I believe that he was.
2  BY MR. INGRISANO:
3  Q.  Let me ask you to turn to page 42 of this document.
4     Bottom left-hand side corner.
5  A.  Okay.
6  Q.  Under 3.8 it says "open space plan."
7          Do you see that?
8  A.  Yes.
9  Q.  And then a little bit down second paragraph says "the
10     following list accompanies the open spaces diagram
11     and describes current open spaces shown on the site
12     plan:"
13          Do you see that?
14  A.  Yes.
15  Q.  And then "open spaces No. 1 athletic field owned by
16     Edgewood High School used for team practices,
17     physical education classes."
18          Did I read that correctly?
19  A.  Yes.
20  Q.  During your process, your involvement in the approval
21     process of this master plan, do you recall any
22     specific conversations about that language?
23  A.  No, I do not.
24  Q.  During the process, during the review and approval
25     process, do you recall giving any particular

Page 54

1    attention, you personally, to that language?
2 A.  I do not recall.
3 Q.  During the approval process that you were involved
4    with, did you have any impression that Madison
5    Edgewood High School was agreeing to restrict or
6    limit the use of its athletic field on its campus?
7         MS. ZYLSTRA:  Objection, form, foundation.
8    You can answer.
9         THE WITNESS:  Edgewood submitted the
10    master plan that the City approved.  They wrote the
11    master plan, and they included the language that
12    they included.  I cannot speak to how or why they
13    included that language.
14 BY MR. INGRISANO:
15 Q.  But as you sit here today, do you recall concluding
16    at any time that Edgewood was agreeing to restrict or
17    limit the use of its athletic field to only have
18    practices on that field or physical education classes
19    on that field?
20         MS. ZYLSTRA:  Objection, form.  You can
21    answer.
22         THE WITNESS:  I would return to the words
23    of their own master plan.
24 BY MR. INGRISANO:
25 Q.  Okay.

Page 55

1 A.  Which specifically state team practices, physical
2    education classes.
3 Q.  I'm asking you, sir, whether at any time between your
4    review of this document on June 5, 2015 and today
5    whether you have concluded or issued or stated an
6    opinion to anyone, even to yourself, that Edgewood
7    agreed to limit and restrict its use of its field to
8    only physical education classes and practices?
9         MS. ZYLSTRA:  Objection, form.  You can
10    answer.
11         THE WITNESS:  I would say yes, they did
12    limit themselves.
13         MR. INGRISANO:  Okay.
14 BY MR. INGRISANO:
15 Q.  When did you come to that conclusion?
16 A.  I don't specifically recall.
17 Q.  So you're aware that the City of Madison has
18    interpreted the language that we've looked at here,
19    used for team practices, physical education classes,
20    to be a restriction on Edgewood during the life of
21    the master plan, correct?
22         MS. ZYLSTRA:  Objection, form.  You can
23    answer.
24         THE WITNESS:  Yes.
25 BY MR. INGRISANO:

Page 56

1 Q.  And that the City of Madison's position was during
2    the life of the master plan that Edgewood could not
3    use its field for anything other than team practices
4    and physical education classes; is that correct?
5         MS. ZYLSTRA:  Objection, form.  You can
6    answer.
7         THE WITNESS:  Yes.
8 BY MR. INGRISANO:
9 Q.  When did you first learn of that interpretation by
10    the City of Madison?
11         MS. ZYLSTRA:  Same objection.  You can
12    answer.
13         THE WITNESS:  I believe it first came to
14    the City's attention at the neighborhood meeting
15    that Edgewood convened to discuss its plans for the
16    stadium.
17 BY MR. INGRISANO:
18 Q.  Okay.  Prior to that meeting was this language ever
19    to your knowledge discussed or reviewed as a
20    restriction on Edgewood High School?
21         MS. ZYLSTRA:  Object to form.  You can
22    answer.
23         THE WITNESS:  I don't recall any such
24    discussions.
25 BY MR. INGRISANO:

Page 57

1 Q.  So as you understand master plans in the City of
2    Madison under the campus institutional zoning
3    ordinance, an identification of a use of a building
4    or an open space acts as a restriction on that
5    building or open space for its use; is that correct?
6         MS. ZYLSTRA:  Object to form, foundation.
7    You can answer.
8         THE WITNESS:  I believe that it can.
9 BY MR. INGRISANO:
10 Q.  So what other -- what about the language on page 42
11    makes that a restriction on Edgewood High School?
12         MS. ZYLSTRA:  Object to form.  You can
13    answer.
14         THE WITNESS:  This would be first and
15    foremost an interpretation by the zoning
16    administrator, but open space section 1 clearly
17    identifies what the author of the master plan
18    intended that part of the master plan to be used
19    for.
20 BY MR. INGRISANO:
21 Q.  Okay.  Have you ever talked to Doug Hursh or Edgewood
22    High - or anyone at Edgewood High School about what
23    their intent was in drafting that language?
24         MS. ZYLSTRA:  Object to form.  You can
25    answer.

Page 58

1    THE WITNESS: I recall no specific
2  conversations.
3  BY MR. INGRISANO:
4  Q.  So beyond the language that's employed, you have no
5    understanding of what Doug Hursh's or Edgewood's
6    actual intent was; is that right?
7    MS. ZYLSTRA: Object to form. You can
8  answer.
9    THE WITNESS: I will not speak for their
10  intent, no.
11  BY MR. INGRISANO:
12  Q.  Did you ever tell anyone at Edgewood High School,
13    Edgewood College, Edgewood Campus School, Doug Hursh,
14    anyone, that a specification of a particular use in a
15    master plan would foreclose other uses for that
16    property going forward?
17  A.  Could you repeat or rephrase?
18  Q.  Sure. Did you ever identify or express to anyone at
19    Edgewood, Campus School, College, High School, Doug
20    Hursh, that a specification of a use in the master
21    plan would act to foreclose other uses for that part
22    of the property?
23    MS. ZYLSTRA: Object to form. You can
24  answer.
25    THE WITNESS: I don't recall and nor do I

Page 59

1    think that would have been my role.
2    MR. INGRISANO: Okay.
3  BY MR. INGRISANO:
4  Q.  Given this was the very first master plan being
5    reviewed and looked into by the City under the campus
6    institution district, did that role fall to anybody
7    in terms of explaining the impact of words being used
8    in the master plan?
9    MS. ZYLSTRA: Object to form, foundation.
10  BY MR. INGRISANO:
11  Q.  And the potential for a preclusive effect going
12    forward?
13    MS. ZYLSTRA: Same objections.
14    THE WITNESS: I don't recall any such
15  discussions.
16    MR. INGRISANO: Okay.
17  BY MR. INGRISANO:
18  Q.  Was there anyone else working with the Edgewood
19    Campus institutions, the schools, or their
20    representatives, Mr. Hursh, was there anyone else
21    working with them besides you in terms of the content
22    of the master plan to your knowledge?
23    MS. ZYLSTRA: Object to form. You can
24  answer.
25    THE WITNESS: From the City of Madison?

Page 60

1    From those private institutions?
2    MR. INGRISANO: Yes.
3  BY MR. INGRISANO:
4  Q.  City of Madison.
5  A.  I believe Matt Tucker would have been involved in the
6    review of the document.
7  Q.  Let me ask you to take a look at this document, page
8    58 in the bottom left-hand corner. Do you see
9    section 4.3?
10  A.  Yes.
11  Q.  And what is section 4.3?
12  A.  It's titled affirming past agreements.
13  Q.  Now, you had mentioned before the condominium project
14    whereby the campus was kind of divided and given
15    particular interest between the three entities,
16    correct?
17  A.  Yes.
18  Q.  Now, based on your familiarity with the master plan
19    based on your familiarity with the Edgewood Campus
20    given your past projects there, are you able to
21    identify in these -- this listing of past agreements,
22    are you able to identify which elements of the campus
23    those agreements relate to?
24    MS. ZYLSTRA: Objection, form, foundation.
25  You can answer.

Page 61

1    THE WITNESS: Generally, yes.
2    MR. INGRISANO: Okay.
3    THE WITNESS: I will note that these --
4    most of these agreements predate either my
5    involvement with Edgewood or my employment with the
6    City of Madison, however.
7    MR. INGRISANO: Sure.
8  BY MR. INGRISANO:
9  Q.  With respect to the No. 2 listed there, "housing in
10    the neighborhood affirm 2006 Dominican Hall
11    agreement."
12    Do you see that?
13  A.  Yes.
14  Q.  Dominican Hall is part of the Edgewood College,
15    correct?
16  A.  That is my understanding.
17  Q.  No. 3, "gate closures and campus entryways. Edgewood
18    Avenue gate Dominican Hall."
19    Again, Dominican Hall is part of the
20    Edgewood College property, correct?
21  A.  That is my understanding.
22  Q.  Okay. No. 4, the stream, do you see that, on page
23    59?
24  A.  Yes.
25  Q.  What part -- which of the schools' interests are

Page 62

1  related to the stream, Edgewood College, Edgewood
2  Campus School or Edgewood High School?
3         MS. ZYLSTRA:  Object to form.
4  BY MR. INGRISANO:
5  Q.  If you know.
6  A.  I believe it's Edgewood College.
7  Q.  Okay.  No. 6, "nonexclusive easement to City of
8  Madison for public use of Edgewood Drive, Park and
9  Pleasure Drive."
10        Do you see that?
11 A.  Yes.
12 Q.  Which part of the campus does that relate to?
13        MS. ZYLSTRA:  Objection, form, foundation.
14        THE WITNESS:  That is the southern edge of
15  the campus effectively between Lake Wingra and the
16  buildings.
17 BY MR. INGRISANO:
18 Q.  And that relates to Edgewood College's portion of the
19  campus, correct?
20        MS. ZYLSTRA:  Objection to form,
21  foundation.  You can answer.
22        THE WITNESS:  I do not specifically know.
23        MR. INGRISANO:  Okay.
24 BY MR. INGRISANO:
25 Q.  With respect to 4.3, affirming past agreements, do

Page 63

1  you see any agreements listed there that relate to
2  lighting for Edgewood High School's athletic field?
3        (Witness peruses document.)
4        THE WITNESS:  No.  In my cursory review of
5  this document, I do not see anything relating to the
6  lighting of the field.
7  BY MR. INGRISANO:
8  Q.  And from your understanding of the Edgewood master
9  plan, 4.3 identifies all of the past agreements
10  between Edgewood Campus and its neighbors that are
11  being included in the master plan; is that right?
12        MS. ZYLSTRA:  Objection, form, foundation.
13  You can answer.
14        THE WITNESS:  The section of the master
15  plan includes past agreements that were incorporated
16  into the master plan.
17 BY MR. INGRISANO:
18 Q.  And you're not aware of any other agreements between
19  the Edgewood Campus and the neighbors that are
20  incorporated in the master plan that are not listed
21  on 4.3; is that right?
22        MS. ZYLSTRA:  Objection, form.
23        THE WITNESS:  This section includes what
24  it includes.
25 BY MR. INGRISANO:

Page 64

1  Q.  And by not -- something is not included in this
2  section, it's not an agreement that's being affirmed
3  from the past; is that right?
4        MS. ZYLSTRA:  Objection, form.
5        THE WITNESS:  I'm not familiar with all of
6  the past agreements.  I can only respond to what's
7  in the master plan.
8        MR. INGRISANO:  Got it.
9  BY MR. INGRISANO:
10 Q.  Going back, I'm sorry, to Exhibit 47, your memo.
11  Bottom of page 7, top of page 8.  Last bottom line of
12  the paragraph on -- ending on page 7, "while failure
13  of the master plan to gain approval would not prevent
14  the future development of the campus, the conditional
15  use process would be a far less reliable option in
16  staff's opinion and could result in an adversarial
17  relationship between the campus and its neighbors
18  than appears likely to occur through the
19  implementation of the proposed master plan."
20        Do you see that?
21 A.  Yes.
22 Q.  And based on your experiences since 2014, do you
23  think that statement bore out as true?
24        MS. ZYLSTRA:  Object to form.  You can
25  answer.

Page 65

1        THE WITNESS:  I think that at the time
2  that the master plan was adopted, it did provide an
3  opportunity for some of the seeds of past division
4  to be put in the past and that there would be a
5  framework for the parties to move forward, the
6  neighborhood, the three institutions, I should say
7  neighborhoods and the three institutions to move
8  forward.  I mean there was no absolutes.  I think
9  that the, you know, entirety of that last paragraph
10  kind of reflects the past condition and hopes that
11  the master plan would be a better way forward.
12 BY MR. INGRISANO:
13 Q.  Sure.  But you've actually concluded, have you not,
14  that the master plan did not have the benefit of
15  streamlining the process for changes to the Edgewood
16  Campus?
17        MS. ZYLSTRA:  Objection, form, foundation.
18        THE WITNESS:  Would you please rephrase
19  that?
20        MR. INGRISANO:  Sure.
21 BY MR. INGRISANO:
22 Q.  Have you ever expressed to anybody that the master
23  plan process was not an efficient and helpful
24  mechanism to get projects approved on the Edgewood
25  Campus and that conditional use would have been just

17 (Pages 62 - 65)

Page 66

1  as efficient or burdensome?
2        MS. ZYLSTRA: Objection, form. You can
3  answer.
4        THE WITNESS: I don't recall any such
5  statements.
6 BY MR. INGRISANO:
7 Q.  So the idea of the master plan was that the
8    architectural review committee would streamline and
9    make more efficient approval of the projects that
10   were identified on the master plan, correct?
11 A.  Yes.
12 Q.  Was it your experience that the architectural review
13   committee provided that actual benefit?
14       MS. ZYLSTRA: Object to form. You can
15   answer.
16       THE WITNESS: I believe that it did.
17 BY MR. INGRISANO:
18 Q.  You didn't have just as many meetings with neighbors
19   fighting about content of the architectural review
20   being undertaken for Edgewood College projects than
21   you would have under a conditional use process?
22       MS. ZYLSTRA: Object to form. You can
23   answer.
24       THE WITNESS: I don't know if I understand
25   your question.

Page 67

1        MR. INGRISANO: Sure. Sure.
2 BY MR. INGRISANO:
3 Q.  You don't agree that Edgewood College would have been
4    just as well off under a conditional use project --
5    conditional use framework process than it was under
6    the architectural review given the number of
7    obstacles and objections provided by the neighbors?
8        MS. ZYLSTRA: Objection, form. You can
9    answer.
10       THE WITNESS: I don't recall a project
11   where Edgewood College was seeking approvals within
12   the master plan. You said specifically Edgewood
13   College.
14       MR. INGRISANO: Sure. Yeah.
15 BY MR. INGRISANO:
16 Q.  And you mentioned projects that Edgewood College had
17   approved through the master plan process including
18   the performing arts center, correct?
19 A.  My recollection is that that predated the master
20   plan.
21 Q.  What about the addition to the Edgewood College
22   dorms?
23 A.  That also preceded approval of the master plan. In
24   fact, that appeared at the plan commission meeting
25   before the master plan because they were, I believe

Page 68

1  that was Dereechy Hall -- no, Regina Hall or Regina,
2  that they were specifically seeking to move ahead
3  more quickly with that dormatory addition than the
4  process to create the master plan would have
5  afforded. So they specifically sought a conditional
6  use for Regina Hall separate from the master plan.
7 Q.  So you think that the master plan provided the
8    benefits that were promised to Edgewood Campus while
9    it was in place?
10       MS. ZYLSTRA: Object to form. You can
11   answer.
12       THE WITNESS: I believe that it did.
13 BY MR. INGRISANO:
14 Q.  Do you know why Edgewood College sought to repeal the
15   master plan?
16 A.  No, I do not.
17 Q.  Do you know why Edgewood Campus School sought to
18   replace the master plan -- or repeal the master plan?
19 A.  No, I do not.
20 Q.  Do you have an understanding of why Edgewood High
21   School sought to repeal the master plan?
22 A.  I believe that Edgewood High School felt that repeal
23   of the master plan afforded them a different process
24   for moving forward with what they wanted to do with
25   their athletic field.

Page 69

1 Q.  Were you aware, sir, that Edgewood High School
2    renovated its field in 2015?
3 A.  I am aware that they did that, yes.
4 Q.  Did you ever have any involvement with that project
5    at the time?
6 A.  No, I did not. I was aware of it. I believe it was
7    determined to be consistent with what language there
8    was in the master plan.
9 Q.  Who made that determination?
10 A.  Matt Tucker.
11 Q.  And he communicated that to you?
12 A.  I was aware of his decision, yes.
13 Q.  How did you become aware of that decision, sir?
14 A.  He told me verbally.
15 Q.  So in 2015 he told you that he believed that the
16   Edgewood field renovation was consistent with the
17   terms of the master plan?
18 A.  I do not specifically recall when he told me that.
19 Q.  Do you know was it before, after or during the
20   project?
21 A.  I do not recall.
22 Q.  Was it after the lawsuit had been filed that he told
23   you that?
24 A.  After which lawsuit and when?
25 Q.  Either one.

Page 70

1  A.  It was before.
2          (Exhibit 64 previously marked.)
3  BY MR. INGRISANO:
4  Q.  Mr. Parks, I'm handing you what's been previously
5      marked as Exhibit 64.  Again, your name is
6      highlighted, not in the original exhibit.  Do you
7      recognize that document?
8  A.  Yes.
9  Q.  You were -- this is an email dated October 26, 2018
10     from Matt Tucker to Brian Munson and Mike Elliott,
11     correct?
12 A.  Yes.
13 Q.  And you were cc'd on this email?
14 A.  Yes.
15 Q.  Did you -- the email references a neighborhood
16     meeting on October 17.  Did you attend that meeting?
17 A.  Yes, I did.
18 Q.  Mr. Tucker writes "after the neighborhood meeting of
19     Wednesday, October 17, I became aware of the
20     extensive use of the athletic field at the northwest
21     corner of the site."
22          Did I read that correctly?
23 A.  Yes.
24 Q.  Are you -- do you know how it was that Mr. Tucker
25     became aware of that use after the neighborhood

Page 71

1      meeting?
2          MS. ZYLSTRA:  I'll object, foundation.
3      You can answer.
4          THE WITNESS:  I recall from my attendance
5      at the meeting of October 17th that Edgewood
6      disclosed to those in attendance that they were
7      using it for athletic competitions, games, et
8      cetera.  I don't recall or am I specifically aware
9      of what Mr. Tucker did between that meeting which he
10     attended with me or I attended with him and the
11     sending of this email specifically how he arrived at
12     it.  But I do recall specifically from that meeting
13     of October 17 that Edgewood disclosed to the
14     community that they were using the field in the
15     manner that was in this email disclosed to be
16     contrary to the language in their master plan.
17 BY MR. INGRISANO:
18 Q.  What do you mean by disclosed?
19 A.  I don't recall their specific words, but they were
20     very forthright during the meeting that they were
21     using the field for athletic events.
22 Q.  There were neighbors at this meeting, correct?
23 A.  Yes.
24 Q.  Were there neighbors that expressed surprise that the
25     field had been being used for athletic events to your

Page 72

1      recollection?
2  A.  I would not characterize how people in attendance
3      reacted.
4  Q.  Do you see anything that caused -- that you took to
5      be a look of surprise or shock that this field was
6      being used for games?
7          MS. ZYLSTRA:  Object to form.  You can
8      answer.
9          THE WITNESS:  I, again, would not want to
10     characterize other people's emotions.
11 BY MR. INGRISANO:
12 Q.  Sir, you used the word "disclosed" as if it hadn't
13     been known to people beforehand.  Do you have any
14     reason to believe that Edgewood had been up to this
15     point hiding that it had been using the field for
16     games prior to October 17?
17         MS. ZYLSTRA:  Objection, form.  You can
18     answer.
19         THE WITNESS:  Would you care to rephrase
20     or repeat?
21         MR. INGRISANO:  Sure.
22 BY MR. INGRISANO:
23 Q.  You used the word "disclosed" as if it had not been
24     known publicly or hidden.  I'm asking you, sir, if
25     you have any reason to believe that Edgewood had been

Page 73

1      hiding the fact that it had been conducting games on
2      this field prior to that point?
3  A.  I did not say that they were hiding anything.
4  Q.  You chose to use the word disclose.  Why did you use
5      the word disclose in your answer that they --
6      Edgewood was -- disclosed at this meeting that they
7      had been playing games on the field?
8          MS. ZYLSTRA:  Object to form.  You can
9      answer.
10         THE WITNESS:  Well, I mean it was new
11     information to me.  Whether or not it was new
12     information to anybody else in the room, I would
13     not -- I could not say.
14 BY MR. INGRISANO:
15 Q.  So when you had been driving by the field all those
16     times and you believe that Edgewood was probably
17     playing games on those fields, you hadn't come to
18     that conclusion before October 17 of 2018?
19 A.  I never said that I concluded that they were playing
20     games on the field.
21 Q.  You said they were probably -- you assumed that they
22     were probably playing games on the field.  That was
23     apparently after October 17 of 2018?
24         MS. ZYLSTRA:  Object to form, you can
25     answer.

Page 74

1        THE WITNESS: I don't recall that I
2    specifically said when I observed any games being
3    played.
4  BY MR. INGRISANO:
5  Q.   Between the meeting on October 17 and Mr. Tucker's
6    email on October 26th, did you have any discussions
7    with Mr. Tucker about his review and interpretation
8    of the master plan as it relates to the athletic
9    field usage?
10 A.  I don't specifically recall.
11 Q.   Did you have any emails with Mr. Tucker regarding
12    this interpretation or his questions about the master
13    plan and field usage?
14 A.  I don't recall any emails.
15 Q.   Are you in the same building as Mr. Tucker?
16 A.  Yes.
17 Q.   Same floor?
18 A.  Yes.
19 Q.   How far away is your office from Mr. Tucker?
20 A.  100 feet.
21 Q.   Do you guys typically speak face-to-face when
22    questions arise in the office?
23 A.  Whenever possible.
24 Q.   You received this email, you're cc'd on it, October
25    26th. Do you recall having any conversations with

Page 75

1    Mr. Tucker, Ms. Stouder or anyone else in the
2    distribution list about what Mr. Tucker had written?
3  A.  I don't specifically recall any conversations.
4  Q.   And do you recall sending any emails pertaining to
5    this email?
6  A.  I do not.
7  Q.   Do you recall forming any conclusions as to whether
8    you agreed or disagreed with some or all of this
9    email?
10 A.  I have no reason to disagree with what he said on
11    October 26th.
12 Q.   I'm asking you, sir, at the time that you received
13    the email whether you formulated any agreement or
14    disagreement with the contents of this email.
15 A.  I don't specifically recall.
16 Q.   At any point since you received this email, did you
17    come to formulate an opinion agreeing or disagreeing
18    with Mr. Tucker's interpretation?
19        MS. ZYLSTRA: Objection, form. You can
20    answer.
21        THE WITNESS: I agree with his
22    interpretation.
23 BY MR. INGRISANO:
24 Q.   When did you start agreeing with Mr. Tucker's
25    interpretation?

Page 76

1        MS. ZYLSTRA: Objection, form. You can
2    answer.
3        THE WITNESS: I don't specifically recall.
4  BY MR. INGRISANO:
5  Q.   In October of 2018 were you aware of any neighbors
6    complaining about Edgewood hosting athletic
7    competitions on its field?
8  A.  No, I'm not specifically aware.
9  Q.   Did you -- after this email dated October 26th, did
10    you become aware of any complaints by neighbors
11    regarding the usage of the field for games?
12 A.  Formal complaints? No.
13 Q.   How about informal complaints?
14 A.  Would you care to characterize what an informal
15    complaint would be?
16 Q.   Well, you've answered formal complaints no. So you
17    qualified your answer with the word formal. So
18    what's the opposite of a formal complaint, Mr. Parks?
19 A.  We'll go with informal.
20 Q.   How about any informal complaints?
21 A.  I do recall talking to a couple of citizens who were
22    asking questions about the amendment that was
23    forthcoming about the athletic field, the
24    construction of a more permanent stadium, and they
25    were asking questions about the use of the field.

Page 77

1  Q.   Were they complaining about the use of the field,
2    that it shouldn't be used for games?
3  A.  Their complaints were general. I don't recall
4    specifically what they were concerned about.
5  Q.   This was after -- your best recollection is this was
6    after the date of Mr. Tucker's email on October 26,
7    correct?
8  A.  Yes, I believe that it was.
9  Q.   To the best of your knowledge you did not collaborate
10    or participate in Mr. Tucker's interpretation set
11    forth in Exhibit 64; is that right?
12 A.  Could you repeat that?
13 Q.   Sure. To the best of your -- what I'm hearing you
14    say though is you did not participate with Mr. Tucker
15    in forming that interpretation or collaborating with
16    him with respect to the interpretation set forth in
17    Exhibit 64?
18 A.  I did not write the email. I don't specifically
19    recall when he and I discussed the matter, but I
20    believe that we probably discussed it internally in
21    our office.
22 Q.   Okay. Sometime between October 17 and October 26?
23 A.  To the best of my recollection, yes.
24 Q.   And what do you recall from that conversation?
25 A.  I can't say. I don't recall specifically what we

Page 78

1    discussed.
2  Q.  Do you recall looking at the master plan together?
3  A.  I don't know if we did or not.  Presumably we did.
4  Q.  And so do you recall agreeing with Mr. Tucker that
5    the field was limited to team practices and physical
6    education classes?
7  A.  I believe I have said previously that I agree with
8    his interpretation.
9  Q.  I'm asking you at the time in between October 26 and
10   October 17 whether you believe that you agreed with
11   him at that time?
12  A.  I believe that I agreed with him.
13  Q.  In the spring of 2019 notices of violation were
14   issued on Edgewood High School for using its field
15   for athletic competitions.  Are you familiar with
16   that?
17  A.  I'm aware they were issued.
18  Q.  Did you have any involvement in the review and
19   issuance of those notices of violation?
20  A.  No, I don't recall having any involvement.
21  Q.  Do you recall being consulted in any way of the
22   issuance of those violations?
23  A.  I don't recall.
24  Q.  Do you recall formulating or expressing any agreement
25   with the issuance of those notices?

Page 79

1  A.  I don't recall.
2  Q.  In late 2018 Edgewood filed for an amendment of its
3    master plan, correct?
4  A.  I believe that's when it was filed, yes.
5  Q.  And you were involved in the review of that document
6    I believe you said earlier?
7  A.  Yes, I was.
8  Q.  That was seeking to add grandstands, right, larger
9    bleachers?
10  A.  My recollection of the project that was submitted
11   included lighting, public address and a more
12   permanent facility with permanent seating, concession
13   stand, restrooms, maybe a changing room for a team or
14   teams underneath that bleacher or grandstand.
15  Q.  Sure.  Storage?  Storage area as well?
16  A.  Perhaps.  Perhaps.
17  Q.  Bathrooms?
18  A.  I believe it included bathrooms.
19  Q.  Edgewood High School tabled that proposed amendment
20   in January of 2019, correct?
21      MS. ZYLSTRA:  Objection, form, foundation.
22   You can answer.
23      THE WITNESS:  I recall that it was tabled
24   by Edgewood, yes.
25  BY MR. INGRISANO:

Page 80

1  Q.  Did you have any conversations with Edgewood about
2    why they were doing that?
3  A.  I don't specifically recall.
4  Q.  Do you recall generally having any conversations with
5    Edgewood about tabling that amendment?
6  A.  I recall that prior to the plan commission meeting
7    they notified us that they did not wish to go to that
8    plan commission meeting and that they were delaying.
9    I don't recall specifically, but I believe it may
10   have had to do with trying to come to some sort of
11   accord with the adjacent neighborhoods.
12  Q.  Did you become aware that Edgewood had decided
13   instead to pursue just the lights independently
14   without making larger changes to what you called a
15   more permanent structure?
16  A.  I was aware that they submitted a permit request for
17   lighting.
18  Q.  Prior to their submission of that permit request, did
19   you have any discussions with anyone else in the City
20   or anyone at Edgewood or on behalf of Edgewood about
21   their ability to just add lights, outdoor lighting?
22  A.  I don't specifically recall any such conversations.
23  Q.  Okay.  Did you have any discussions with Mr. Tucker
24   or Mr. Strange in January of 2019 or February of 2019
25   about whether lights would be available to Edgewood

Page 81

1    under the outdoor lighting ordinance?
2        MS. ZYLSTRA:  Counsel, do we have the same
3    stipulation?
4        MR. INGRISANO:  Yes.
5        MS. ZYLSTRA:  With that stipulation you
6    can answer that question.
7        THE WITNESS:  The question was did I have
8    any conversations with Messrs. Tucker or Strange
9    about the lighting?
10  BY MR. INGRISANO:
11  Q.  About the ability of Edgewood to get outdoor lighting
12   under the outdoor lighting statute.
13       MS. ZYLSTRA:  In that timeframe.
14       THE WITNESS:  I don't specifically recall
15   such discussions.
16       MR. INGRISANO:  Okay.
17  BY MR. INGRISANO:
18  Q.  Any emails to that effect?
19  A.  Not that I specifically recall.
20  Q.  Any general recollection of emails during that time
21   on that subject?
22       MS. ZYLSTRA:  Same stipulation?
23       MR. INGRISANO:  Yes.
24       MS. ZYLSTRA:  Thank you.
25       THE WITNESS:  Again, I don't specifically

Page 82

1    recall emails.
2         (Exhibit 6 previously marked.)
3  BY MR. INGRISANO:
4  Q.   I'll show you what's been marked as Exhibit 6, Mr.
5       Parks.  Have you ever seen this document before?
6       It's a letter dated February 27, 2019 from Matt
7       Tucker to Mike Elliott?
8  A.   Yes, I have seen this.
9  Q.   Did you see this to the best of your recollection at
10      or around the time that it was dated February 27,
11      2019?
12  A.  I don't specifically recall.
13  Q.  Do you have any recollection of being consulted on
14      this letter in draft form or prior to its content
15      prior to it actually being sent?
16  A.  I was aware of the permit request.  I was not
17      involved in the formulation -- involved in the
18      processing of the request or this response that I
19      recall.
20  Q.  This would be, I think as you testified before, this
21      would be an issue for zoning, correct?
22  A.  Yes.
23  Q.  So you attempted to defer the interpretation of
24      zoning in these instances?
25        MS. ZYLSTRA:  Object to form.  You can

Page 83

1    answer.
2         THE WITNESS:  Yes.
3  BY MR. INGRISANO:
4  Q.   So when Mr. Tucker writes "the City believes this
5       permit can be issued without requiring an amendment
6       of the approved 2014 master plan," you have no reason
7       to disagree with that conclusion; is that right?
8         MS. ZYLSTRA:  Object to form, foundation.
9       You can answer.
10        THE WITNESS:  Would you repeat your
11      question, please?
12        MR. INGRISANO:  Can you read that back,
13      please?
14        (Record read.)
15        MS. ZYLSTRA:  Same objections, form and
16      foundation.  You can answer.
17        THE WITNESS:  I have no reason to
18      disagree.
19  BY MR. INGRISANO:
20  Q.  When Mr. Tucker writes "those plans," in the first
21      paragraph, "those plans will be reviewed for
22      compliance with MGO section 10.085 and if the plans
23      comply, electrical permits will be issued when
24      requested," you have no reason to disagree with that
25      statement, correct?

Page 84

1         MS. ZYLSTRA:  Objection, form, foundation.
2         THE WITNESS:  No, I would have no reason
3       to disagree.
4  BY MR. INGRISANO:
5  Q.   Did you have any discussions with Mr. Tucker or any
6       communications with Mr. Tucker, emails, for example,
7       about a change in his interpretation and statements
8       found on Exhibit 6 after this letter was sent?
9         MS. ZYLSTRA:  Object to form.  You can
10      answer.
11        THE WITNESS:  Can you clarify?
12        MR. INGRISANO:  Sure.
13  BY MR. INGRISANO:
14  Q.  Did you talk to Mr. Tucker or have any emails with
15      Mr. Tucker after February 27 where he took a
16      different interpretation than what was expressed on
17      Exhibit 6?
18  A.  Not that I recall.
19  Q.  So if Mr. Tucker changed his mind about what he had
20      written in paragraph 6, you don't know why he changed
21      his mind; is that fair?
22        MS. ZYLSTRA:  Object to form.  You can
23      answer.
24        THE WITNESS:  I don't recall where Mr.
25      Tucker changed his mind.

Page 85

1  BY MR. INGRISANO:
2  Q.   One of your responsibilities is -- as planner is to
3       process and advise the plan commission or the Common
4       Council on conditional use permit requests, correct?
5         MS. ZYLSTRA:  Object to form.  You can
6       answer.
7         THE WITNESS:  I would advise the plan
8       commission on conditional use requests.  And on the
9       occasions where a conditional use decision is
10      appealed to the Common Council, I may be asked to
11      advise the Common Council.
12        MR. INGRISANO:  Got it.
13  BY MR. INGRISANO:
14  Q.  How many conditional use permit requests have you
15      advised the plan commission on relating to outdoor
16      lighting for athletic fields?
17        MS. ZYLSTRA:  Object to form, foundation.
18      You can answer.
19        THE WITNESS:  I recall one and that would
20      be Edgewood High School.
21  BY MR. INGRISANO:
22  Q.  Are you aware of any other conditional use permit
23      applications that have been brought to the plan
24      commission respecting outdoor lighting for athletic
25      fields?

22 (Pages 82 - 85)

1 A. I don't recall any such applications, but I would not
2    preclude that there have not been other ones.
3 Q. Sure. After the campus institutional zoning went
4    into effect but before Edgewood had its master plan
5    approved, your reading of the statute, was there any
6    limitation on Edgewood's ability to play games on its
7    field?
8         MS. ZYLSTRA: Objection, form, foundation.
9    You can answer.
10        THE WITNESS: Prior to the master plan.
11 BY MR. INGRISANO:
12 Q. But after the promulgation of the campus
13    institutional zoning ordinance, was there any
14    limitation on Edgewood High School's ability to use
15    its field for games?
16        MS. ZYLSTRA: Same objections. You can
17    answer.
18        THE WITNESS: Not that I'm aware of.
19 BY MR. INGRISANO:
20 Q. After expiration of the Edgewood master plan, would
21    there have been any limitations on Edgewood's ability
22    to use its athletic field?
23        MS. ZYLSTRA: Objection, form, foundation.
24    You can answer.
25        THE WITNESS: Edgewood's master plan did

1    not expire.
2 BY MR. INGRISANO:
3 Q. Sure. After a master plan would expire, you would
4    revert back to campus institutional zoning without a
5    master plan, correct?
6         MS. ZYLSTRA: Objection, form, foundation.
7    You can answer.
8         THE WITNESS: To the extent that neither
9    of the adopted master plans have reached their
10   expiration date, presumably they would revert to the
11   base zoning district CI.
12        MR. INGRISANO: All right.
13 BY MR. INGRISANO:
14 Q. In reviewing the Edgewood plan to amend its master
15   plan, the proposal to amend its master plan in late
16   2018, did you formulate any opinions about the
17   likelihood the plan commission would approve that
18   amendment?
19        MS. ZYLSTRA: Objection, form, foundation.
20   You can answer.
21        THE WITNESS: I don't believe I knew how
22   that discussion would go.
23 BY MR. INGRISANO:
24 Q. So the answer is no, you didn't formulate any kind of
25   opinion or assessment?

1 A. Of how the plan commission would react to their
2    amendment request?
3 Q. Yes.
4 A. Not that I recall.
5 Q. So you had been working for 14 years at that point as
6    a planner working with the plan commission, but you
7    didn't have an assessment or an opinion or an
8    estimate as to how it would go down; is that right?
9         MS. ZYLSTRA: Objection, form,
10   argumentative, foundation. You can answer.
11        THE WITNESS: No. I don't recall.
12 BY MR. INGRISANO:
13 Q. To your knowledge has the zoning enforcement for the
14   City of Madison ever issued citations or official
15   notices to the University of Wisconsin for not using
16   property as specified in its master plan?
17 A. I'm not aware of any such activities.
18 Q. Okay. Are you aware of any uses by the University of
19   Wisconsin for its property, facilities or spaces that
20   differs from how those uses would be described in its
21   master plan?
22        MS. ZYLSTRA: Objection, form.
23        THE WITNESS: Would you repeat, please?
24        MR. INGRISANO: Sure.
25 BY MR. INGRISANO:

1 Q. Are you aware of any differences in how UW is
2    actually using its properties, parcels, buildings,
3    open spaces, as described in its master plan versus
4    how they're actually being used in -- today in
5    reality?
6 A. I am not aware of any such differences.
7 Q. What was your involvement in the repeal process for
8    Edgewood's master plan?
9 A. I wrote a memo to the plan commission advising them
10   how they could respond to the request.
11 Q. You did multiple memos on that subject, did you not?
12        MS. ZYLSTRA: Object to form. You can
13   answer.
14        THE WITNESS: There was a memo of -- for
15   the first plan commission meeting, and there was a
16   follow-up memo for a subsequent hearing by the plan
17   commission, yes.
18 BY MR. INGRISANO:
19 Q. And ultimately you concluded that the repeal should
20   be approved, correct?
21        MS. ZYLSTRA: Object to form.
22        THE WITNESS: That is what the memos say,
23   yes.
24 BY MR. INGRISANO:
25 Q. Did you have any involvement in the effort to amend

Page 90

1    the campus institutional district zoning code in
2    2019?
3 A.  Can you specify, is this the -- which amendment are
4    you referring to?
5 Q.  I call it Mr. Ever's amendment.  Tag Evers made an
6    effort to amend the campus institutional zoning
7    district in 2019.  Were you involved with that?
8         MS. ZYLSTRA:  Object to form, but you can
9    answer.
10        THE WITNESS:  I reviewed drafts of the
11   different versions.  I recall that the version that
12   ultimately was adopted was different than the one
13   that was initially introduced.
14 BY MR. INGRISANO:
15 Q.  Do you recall having any input in the changes to
16   those drafts?
17 A.  Yes.
18 Q.  What input did you communicate?
19 A.  I don't specifically recall, but it wouldn't be
20   uncommon in my role as a planner to advise on the
21   former content of changes to the zoning code.
22 Q.  But you would have been -- explain to me how the --
23   how that works in terms of how you communicate
24   changes.  Is there a shared system or platform where
25   you're uploading changes or are you communicating

Page 91

1    those by email?  How are your proposed changes to
2    draft legislation like that, how are those conveyed
3    and communicated?
4         MS. ZYLSTRA:  Object to form.  You can
5    answer.
6         THE WITNESS:  I think it varies on a
7    case-by-case basis.  They can occur in meetings, it
8    might occur via a document.  Sometimes I might be
9    proposing changes, sometimes I might be reacting to
10   changes that somebody else is proposing.  So it will
11   vary on a case-by-case or an amendment-by-amendment
12   basis.
13 BY MR. INGRISANO:
14 Q.  And in this particular instance with this change, you
15   don't -- do you have any recollection as to how you
16   were communicating your thoughts on the amendments?
17 A.  I don't specifically recall.
18        MR. INGRISANO:  Take five minutes?
19        MS. ZYLSTRA:  Sure.
20        (Recess taken.)
21        (Exhibit 33 previously marked.)
22 BY MR. INGRISANO:
23 Q.  I'm handing you what's been marked now as Exhibit 33.
24   Do you recognize that, sir, as the May 11, 2020
25   planning division staff report that you drafted

Page 92

1    regarding Edgewood's conditional permit use
2    application for lighting for its field?
3 A.  Yes.
4 Q.  In summary recommendation on the first page, can you
5    read that, please, out loud?
6 A.  And I quote, "the planning division believes that the
7    plan commission can find the standards for
8    conditional use approval met to approve the
9    installation of lights for the Goodman Athletic
10   Complex at Edgewood High School at 2219 Monroe Street
11   subject to the recommended conditions of approval
12   beginning on page 8 of this report and input at the
13   public hearing."
14 Q.  Okay.  Why did the planning division believe that the
15   planning commission can find the standards to have
16   been met?
17 A.  Based on the information that we had and in our
18   advisory role to the plan commission, we felt that
19   there was a path forward whereby the plan commission
20   could approve the conditional use subject to
21   conditions.
22 Q.  Got it.  And the information you had was everything
23   that would have appeared on Legistar prior to the
24   date of your report, correct?
25        MS. ZYLSTRA:  Objection, form.  You can

Page 93

1    answer.  Foundation.
2         THE WITNESS:  Yes.
3 BY MR. INGRISANO:
4 Q.  Anything else that you would have had at your
5    disposal in terms of information that would not have
6    been contained on that site?
7 A.  No, not that I recall.
8 Q.  So to that point, the information that you had at
9    your disposal, it formed your recommendation that the
10   plan commission can find the standards met, that
11   would have included public comment received up to
12   that point, correct?
13        MS. ZYLSTRA:  Objection, form.  You can
14   answer.
15        THE WITNESS:  Yes, we were aware of
16   voluminous public comment for and against the
17   lighting.
18 BY MR. INGRISANO:
19 Q.  Got it.  So based on everything that you were seeing
20   in the record, you believed that the standards still
21   could have been met, could have been found to have
22   been met by the plan commission subject to those
23   conditions that you were recommending and input at
24   the public hearing, correct?
25 A.  Yes.

Page 94

1  Q.  So evidence existed in the record that you believed
2     would allow for approval?
3         MS. ZYLSTRA: Objection, form.  You can
4     answer.
5         THE WITNESS:  Generally, yes.
6  BY MR. INGRISANO:
7  Q.  Okay.  So if you did not believe that there was
8     sufficient evidence in the record, I'm just trying to
9     kind of figure out what the opposite of your
10    conclusion here is, would be.
11        So if you had made the determination that
12    there was insufficient evidence in the record, would
13    our recommendation have read the planning division
14    believes the plan commission cannot find the
15    standards for conditional use met?
16        MS. ZYLSTRA:  Objection, form, foundation.
17    You can answer.
18        THE WITNESS:  I don't recall any such
19    discussions about a different recommendation than
20    the one that's in the report.
21  BY MR. INGRISANO:
22  Q.  Sure.  And I'm not asking you about what the actual
23     different recommendations are.  I'm just trying to
24     figure out what the options are available to you
25     generally speaking as a planner and making these

Page 95

1     kinds of recommendations in these reports.
2        You've said that what -- fair to say that
3    what you've said in your declaration in this case is
4    that you weren't saying the conditions were actually
5    met but rather that the plan commission can find the
6    standards to have been met, correct?
7  A.  That's correct.
8  Q.  Okay.  So I guess I'm trying to say is what's the
9     opposite of that, right?  If you've come to the
10    conclusion that you don't think the standards can be
11    met, how does your recommendation to the plan
12    commission look different?  I mean what do you say to
13    the planning commission when you review the evidence
14    and say there is not enough here that would in our
15    opinion permit approval?
16        MS. ZYLSTRA:  Objection, form.  You can
17    answer.
18        THE WITNESS:  It will vary on a
19    project-by-project basis.  I have recommended to the
20    plan commission that they not approve something.  I
21    have recommended that they should approve something.
22    In a project like this and in many projects that
23    I've reviewed where it can be as much about the
24    conditions as anything else.  And one of the factors
25    in determining whether or not a conditional use

Page 96

1     should be approved is whether the standards are met
2     or whether the standards can be met with conditions.
3        And so I would characterize this report as
4    being one where we were ensuring that we would
5    provide a road map for the plan commission should
6    they find that the standards were met, under what
7    conditions that approval should be couched.
8  BY MR. INGRISANO:
9  Q.  Got it.  So if I'm understanding you correctly, it's
10    kind of your -- the two choices include a
11    recommendation that standards are met or that they
12    can be met with these additional conditions; is that
13    fair?
14        MS. ZYLSTRA:  Objection, form.  You can
15    answer.
16        THE WITNESS:  I believe so.
17        MR. INGRISANO:  Okay.
18  BY MR. INGRISANO:
19  Q.  One of the caveats to your recommendation is input at
20    the public hearing, do you see that?
21  A.  Yes.
22  Q.  You attended the public hearing for the plan
23    commission for this conditional use permit?
24  A.  Yes, I did.
25  Q.  At that public hearing did you hear or learn any new

Page 97

1     evidence you hadn't already seen in the record to
2     that point on Legistar that would have caused you to
3     change your belief as to whether the standards can be
4     met with conditions?
5        MS. ZYLSTRA:  Objection, form, foundation.
6    You can answer.
7        THE WITNESS:  Could you repeat?
8        MR. INGRISANO:  Sure.
9  BY MR. INGRISANO:
10  Q.  I'm just asking whether you heard anything at the
11    public hearing, after, after -- the public hearing
12    occurred after you made this report, correct?
13  A.  Yes.
14  Q.  The question is did you hear anything at the public
15    hearing that you think would have caused you to
16    change your recommendation in Exhibit 33?
17        MS. ZYLSTRA:  Objection, form, foundation.
18    You can answer.
19        THE WITNESS:  I would say that I heard
20    testimony, verbal testimony, at the May 11th meeting
21    that was compelling.  I don't know if it would have
22    caused me to change my recommendation because my
23    recommendation was designed to provide the plan
24    commission a road map for approval if, among the
25    many factors including the input at the public

25 (Pages 94 - 97)

Page 98

1    hearing, they felt that they could approve the
2    conditional use.
3         So no, I don't believe that my
4    recommendation would have changed but that there was
5    certainly input at the hearing that would I feel
6    color how the plan commission viewed the request.
7  BY MR. INGRISANO:
8  Q.  Okay.  You didn't issue any sort of addendum to your
9    report --
10        MS. ZYLSTRA:  Objection --
11 BY MR. INGRISANO:
12 Q.  -- after the input at the hearing?
13        MS. ZYLSTRA:  Apologize, Counsel.
14   Objection, form.  You can answer.
15        THE WITNESS:  No.
16 BY MR. INGRISANO:
17 Q.  Did you at the hearing give a verbal revision to the
18   planning commission based on any of the input that
19   you heard at the hearing?
20 A.  No, I don't recall giving any such guidance.
21 Q.  So did the planning commission have any knowledge
22   when making its decision that you found any of the
23   public testimony hearing to be compelling?
24 A.  No.
25 Q.  Is it fair to say that you found the testimony at the

Page 99

1    public hearing to be compelling against Edgewood's
2    request?
3  A.  I feel that folks who testified, people who testified
4    during the meeting made persuasive arguments against
5    Edgewood's lighting request.
6  Q.  Were there any arguments that you heard in the public
7    hearing that were different from the arguments you
8    had seen in the comments prior to the hearing?
9         MS. ZYLSTRA:  Objection, form, foundation.
10   You can answer.
11        THE WITNESS:  In my personal opinion I
12   feel that both folks who did not provide written
13   comments as well as folks who did provided
14   persuasive verbal testimony at the plan commission
15   meeting.  And in the case where there may have been
16   written comments, folks who provided those written
17   comments may have added more dimension to their
18   comments during their testimony than may have come
19   across to the reader looking at them individually.
20 BY MR. INGRISANO:
21 Q.  Edgewood had the ability to use its field as it
22   wanted to for athletic competition, school events,
23   practices during the daytime as a matter of right,
24   correct?
25        MS. ZYLSTRA:  Objection, form, foundation,

Page 100

1    vague as to time.
2         THE WITNESS:  We stipulated to the plan
3    commission that yes, they could because that was one
4    of the offshoots of repealing the master plan was
5    that they would not be restricted like they had been
6    in the master plan.
7  BY MR. INGRISANO:
8  Q.  On page 4 of your report and analysis, second
9    paragraph, third line, you wrote "the unlighted
10   (daytime) use of the athletic field for athletic
11   competitions, school events and practices is allowed
12   by right as a secondary use complimentary to the
13   Edgewood High School primary use."
14        Do you see that?
15 A.  Yes.
16 Q.  You continue "staff does not believe that the
17   unlighted use of the stadium may otherwise be
18   regulated by the planning commission through its
19   consideration of the request to install lights."
20        Do you see that?
21 A.  Yes.
22 Q.  Were you aware of any discussions or murmurings
23   amongst the planning commission that they would seek
24   to regulate the unlighted use of the stadium, of the
25   field, through this request to install lights?

Page 101

1  A.  No.  But we wanted to preclude that line of thinking,
2    you know, or preempt it.
3  Q.  You also write in the following paragraph, "while the
4    planning commission has asked whether lights should
5    be allowed for the Goodman complex, staff does not
6    advise the plan commission apply conditions that may
7    be contrary to section 10.085."
8         Do you see that?
9  A.  Yes.
10 Q.  What you're saying there, correct me if I'm wrong, is
11   that the plan commission can't require different
12   technical specifications than what would otherwise be
13   permitted under the outdoor lighting statute; is that
14   right?
15        MS. ZYLSTRA:  Objection, form, foundation.
16   You can answer.
17        THE WITNESS:  We did not want the plan
18   commission to go into an area that they weren't
19   customarily involved in, and that includes the
20   enforcement of section 10.085 MGO.
21 BY MR. INGRISANO:
22 Q.  Page 7 under conclusion, you wrote "while many of the
23   comments received to date suggest --
24        MS. ZYLSTRA:  I'm sorry, Counsel, can
25   you -- where in the conclusion?  Can you direct me?

26 (Pages 98 - 101)

Page 102

1          MR. INGRISANO:  Middle of the first
2    paragraph of conclusion.
3          MS. ZYLSTRA:  Thank you, I apologize.
4    BY MR. INGRISANO:
5    Q.   "While many of the comments received to date suggest
6         an existing impact on uses, values and enjoyment, the
7         normal and orderly development of surrounding
8         properties or a negative impact on the public's
9         general welfare from the daytime (unlighted) use of
10        the athletic complex primarily due to noise
11        generated, staff believes the planning commission may
12        find the conditional use standards met to allow the
13        installation and use of lighting for the stadium
14        under specific and limited conditions intended to
15        minimize any further impact on the area surrounding
16        the complex bearing in mind the daytime use of the
17        complex lights -- complex without lights is allowed
18        by right."
19             Did I read that correctly?
20   A.   I believe so.
21   Q.   So in making your recommendation, you believe that
22        the conditions that you outlined previously on pages
23        6 and 7 of the -- of your memo, it was your opinion
24        that those minimized the further impact of having
25        games go from daytime into the nighttime hours; is

Page 103

1    that fair?
2          MS. ZYLSTRA:  Objection, form.  You can
3    answer.
4          THE WITNESS:  I believe that the
5    conditions for use of lighting would -- any use
6    under the lights, that the conditions would limit
7    those impacts.
8    BY MR. INGRISANO:
9    Q.   Because you recognize that there were going to be
10        impacts created by having day games on the neighbors.
11        That's what they were complaining about and to a
12        large extent, correct?
13         MS. ZYLSTRA:  Objection, form.  You can
14   answer.
15         THE WITNESS:  Neighbors were complaining
16   about a variety of different things including the
17   use of the field for practices and games.
18   BY MR. INGRISANO:
19   Q.   Sure.
20   A.   Yes.
21   Q.   But as you said before, there is nothing the City can
22        really do about that because it's a permitted use
23        during the day?
24         MS. ZYLSTRA:  Objection, form.  You can
25   answer.

Page 104

1          THE WITNESS:  The use of the field without
2    lights was allowed by the CI zoning.
3    BY MR. INGRISANO:
4    Q.   Right.  So the issue that you were looking at with
5         this report was now you're talking about a permitted
6         use under CI zoning that is now looking to be
7         extended further through lighting into the evening
8         hours, correct?
9    A.   The modification of the field to add lights would
10        allow the use of the field to go beyond what the
11        field could otherwise be used for.
12   Q.   Right.  And you're looking to minimize, with your
13        conditions you were looking to minimize the further
14        impact created by that pre-existing impact, correct?
15         MS. ZYLSTRA:  Objection, form.  You can
16   answer.
17         THE WITNESS:  We were recommending
18   conditions that would allow the field to be used
19   under the lights in a way that would balance
20   Edgewood's desire, particularly the high school's
21   desire, to use its field longer than it could
22   without lights with concerns that we were hearing
23   from neighbors about the use of the field.
24   BY MR. INGRISANO:
25   Q.   And in your opinion you believe the conditions you

Page 105

1    outlined in your report were sufficient to reduce the
2    impact to permit the lights in a way that the
3    standards would be met, correct?
4          MS. ZYLSTRA:  Objection, form.  You can
5    answer.
6          THE WITNESS:  We were recommending
7    conditions of approval that would provide a road map
8    for the plan commission to govern the use of the
9    field under the lights if they could find the
10   standards for conditional use approvals met.
11   BY MR. INGRISANO:
12   Q.   But you thought that they may, there was sufficient
13        evidence, you say they, the plan commission, may find
14        the conditional use standards met.
15   A.   Yes.
16   Q.   Subject to the limited conditions intended to
17        minimize any further impact on the area.
18             So you said, you were saying in this report
19        that based on the evidence that you were seeing,
20        based on your professional opinion that you could --
21        that there was sufficient evidence in the record for
22        the planning commission to say that the standards for
23        approval have been met subject to those conditions,
24        correct?
25         MS. ZYLSTRA:  Object to form, foundation.

27 (Pages 102 - 105)

Page 106

1    You can answer.
2        THE WITNESS:  The report does say that.
3 BY MR. INGRISANO:
4 Q.   And if you had concluded instead is that even with
5    all those conditions there would still be a
6    substantial impact that you would have said well, no,
7    maybe you can't find the standards to have been met,
8    correct?
9        MS. ZYLSTRA:  Objection, form.  You can
10    answer.
11        THE WITNESS:  We did not discuss
12    recommending that the condition not -- that the plan
13    commission not approve the conditional use that
14    would have -- if we had, then the report would have
15    been written in that vein.
16 BY MR. INGRISANO:
17 Q.  Sure.  But the evidence coupled with your conditions
18    that you were proposing, you were comfortable telling
19    the planning commission yes, you can meet the
20    standards for conditional use when you look at the
21    evidence and when you look at the conditions we're
22    saying to impose, yes, you can find substantial
23    evidence in the record to support approval of the
24    conditional use permit, right?
25        MS. ZYLSTRA:  Objection, form.

Page 107

1        THE WITNESS:  Again, we wanted to provide
2    the plan commission a road map for how to condition
3    the proposed lights with our best professional
4    guidance, providing them our best professional
5    guidance; that if they were going to do that, if
6    they were going to find the standards met, what
7    conditions we recommend that they apply in so doing.
8    So again, we were providing them a road map or a
9    path that if they were going to approve the
10    conditional use, under what auspicious they should
11    do so.
12 BY MR. INGRISANO:
13 Q.  Were you actually saying that if you -- if you
14    implement these conditions, you can find the standard
15    to be met?
16        MS. ZYLSTRA:  Objection, form.  You can
17    answer.
18        THE WITNESS:  Yes, I believe that's what
19    we were saying.
20 BY MR. INGRISANO:
21 Q.  And didn't you also advise the planning commission
22    that they had continuing jurisdiction to revisit this
23    issue if your recommendation was wrong?
24        MS. ZYLSTRA:  Objection, form.
25        THE WITNESS:  The plan commission has

Page 108

1    continuing jurisdiction on any conditional use that
2    it approves.
3 BY MR. INGRISANO:
4 Q.   Right.  So on page 8 you remind the plan commission
5    specifically that if they do adopt your
6    recommendation, your conditions, and they approve the
7    use permit, if there are further complaints in the
8    future or if those conditions should turn out to be
9    insufficient, they can revisit the conditions that
10    were imposed, correct?
11        MS. ZYLSTRA:  Objection, form.  You can
12    answer.
13        THE WITNESS:  Yes, that is what the zoning
14    code would allow the plan commission to do.
15 BY MR. INGRISANO:
16 Q.  In your experience, sir, working as a planner, do you
17    have an estimate or a sense of the number of times
18    that the planning commission follows your
19    recommendation versus not follows your
20    recommendation?
21 A.  Is that in whole or in part?
22 Q.  Overall.
23 A.  I would have to estimate that it is around 80 percent
24    of the time.  They may not follow our recommendation
25    at large for a project or they may, you know, modify,

Page 109

1    add, eliminate a condition that maybe is different
2    from what we were recommending or might have been
3    beyond what staff would recommend that they include.
4    So it would -- there are degrees in terms of, you
5    know, how strictly followed my recommendations or my
6    colleagues' recommendations are.  But I would
7    estimate it's around 80 percent.  It might even be a
8    bit more than 80 percent but conservatively.
9 Q.  In your experience with the Edgewood lights field
10    issue, whether it's with the lighting application,
11    whether it's with the consideration of the
12    conditional use permit, were you aware of any
13    neighbors in the Edgewood -- in the neighborhoods
14    surrounding Edgewood that opposed the idea of a sound
15    barrier wall being erected?
16 A.  I don't specifically recall discussion of a sound
17    barrier.  There were late allusions to whether or not
18    that was a way forward, but we never specifically
19    discussed the sound barrier.
20 Q.  And you never heard any neighbors come in for or
21    against the idea of a sound barrier?
22 A.  I do not recall.
23 Q.  Standard 3, looking again at Exhibit 47 -- sorry, not
24    47.  That's the wrong exhibit.  Sorry.  33.  Looking
25    at condition -- standard 3 on page 5, standard 3

28 (Pages 106 - 109)

Page 110

1 writes or says "the uses, values and enjoyment of
2 other property in the neighborhood for purposes
3 already established will not be substantially
4 impaired or diminished in any foreseeable manner."
5      Do you see that?
6 A. Yes.
7 Q. It was your belief in making your recommendation that
8 the conditions you set forth would result in any --
9 well, it wouldn't negate or eliminate any and all
10 impairment or diminishment, but it would cause it to
11 not be substantial; is that fair?
12      MS. ZYLSTRA: Objection, form, and I'm
13 sorry, I was reading. Could you repeat -- could I
14 hear the question back?
15      (Record read.)
16      MS. ZYLSTRA: Sorry, objection, form. You
17 can answer.
18      THE WITNESS: I believe so.
19      MR. INGRISANO: I think we can take a
20 break. I think I'm almost done.
21      (Recess taken.)
22 BY MR. INGRISANO:
23 Q. Mr. Parks, we've been talking about Exhibit 33 which
24 is a planning division staff report, and it says it
25 was prepared by you and Matt Tucker, correct?

Page 111

1 A. Yes.
2 Q. Were there any other planning division staff members
3 that were part of the group that worked with you in
4 coming to this report?
5      MS. ZYLSTRA: Object to form. You can
6 answer.
7      THE WITNESS: Heather Stouder reviewed the
8 document.
9 BY MR. INGRISANO:
10 Q. I assume she approved it to be submitted based on
11 that review?
12 A. Yes.
13 Q. After this report was submitted, did Edgewood High
14 School express its agreement with the conditions that
15 you identified?
16      MS. ZYLSTRA: Objection, form, foundation.
17 You can answer.
18      THE WITNESS: I don't specifically recall.
19 BY MR. INGRISANO:
20 Q. Page 3 of Exhibit 33 under project description,
21 second paragraph, you wrote "the current athletic
22 facility includes an artificial turf field designed
23 for use as a regulation competition soccer, football
24 and lacrosse field and a paving -- and a paved
25 running track that encircles the field."

Page 112

1      Did I read that correctly?
2 A. Yes.
3 Q. Where did you -- from what did you conclude that the
4 turf field surface was designed for use as a
5 regulation competition field?
6      MS. ZYLSTRA: Objection, form. You can
7 answer.
8      THE WITNESS: I believe that was
9 represented to us by Edgewood.
10 BY MR. INGRISANO:
11 Q. You had no reason to believe that that's in fact how
12 it was designed when it was implemented, as a
13 competition field?
14      MS. ZYLSTRA: Objection to form. He can
15 answer.
16      THE WITNESS: I don't believe that I knew
17 one way or another.
18 BY MR. INGRISANO:
19 Q. In working with Edgewood High School over the years
20 with a variety of projects you've identified, have
21 you ever had questions or concerns about Edgewood
22 High School's candor or truthfulness to you?
23      MS. ZYLSTRA: Objection, form, foundation.
24 You can answer.
25      THE WITNESS: Not that I specifically

Page 113

1 recall.
2      MR. INGRISANO: That's it. I've got
3 nothing further.
4      MS. ZYLSTRA: We'd like to reserve the
5 right to read and sign.
6      (At 12:08 p.m., the deposition concluded.)
7      *   *   *
8      COURT REPORTER: Same transcript orders?
9 MS. ZYLSTRA: Yes, please.

Page 114

```
1            C E R T I F I C A T E
2  STATE OF WISCONSIN )
                       ) SS
3  MILWAUKEE COUNTY   )
4       I, VICKY L. ST. GEORGE, Registered Merit
5  Reporter and Notary Public in and for the State of
6  Wisconsin, do hereby certify that the preceding deposition
7  was recorded by me and reduced to writing under my
8  personal direction.
9       I further certify that said deposition was
10 taken at the offices of GODFREY & KAHN, S.C., One East
11 Main Street, Suite 500, Madison, Wisconsin on
12 August 16, 2022, commencing at 9:00 a.m. and concluding at
13 12:08 p.m.
14      I further certify that I am not a relative or
15 employee or attorney or counsel of any of the parties, or
16 a relative or employee of such attorney or counsel, or
17 financially interested directly or indirectly in this
18 action.
19      In witness whereof, I have hereunto set my hand
20 and affixed my seal of office at Milwaukee, Wisconsin,
21 this 18th day of August, 2022.
22
23 _____
24      VICKY L. ST. GEORGE
         Notary Public in and for the
25       State of Wisconsin
         Commission Expires 1/29/2025
```

Page 115

```
1              Veritext Legal Solutions
                   1100 Superior Ave
2                      Suite 1820
                  Cleveland, Ohio 44114
3                Phone: 216-523-1313
4
   August 25th, 2022
5
   To: SARAH A. ZYLSTRA
6
   Case Name: Edgewood High School Of The Sacred Heart, Inc. v. City Of
7  Madison Wisconsin, Et Al.
8  Veritext Reference Number: 5374695
9  Witness: Tim Parks      Deposition Date: 8/16/2022
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 116

```
1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
3   ASSIGNMENT REFERENCE NO: 5374695
      CASE NAME: Edgewood High School Of The Sacred Heart, Inc. v.
   City Of Madison Wisconsin, Et Al.
      DATE OF DEPOSITION: 8/16/2022
4   WITNESS' NAME: Tim Parks
5   In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9   Date      Tim Parks
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed.
15
      I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18    Notary Public
19
   _____
20    Commission Expiration Date
21
22
23
24
25
```

Page 117

```
1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
3   ASSIGNMENT REFERENCE NO: 5374695
      CASE NAME: Edgewood High School Of The Sacred Heart, Inc. v.
   City Of Madison Wisconsin, Et Al.
      DATE OF DEPOSITION: 8/16/2022
4   WITNESS' NAME: Tim Parks
5   In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13
   _____
   Date      Tim Parks
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18 in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed.
21    I have affixed my name and official seal
22 this _____ day of_____, 20____.
23
   _____
24    Notary Public
25
   _____
      Commission Expiration Date
```