UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL OF THE
SACRED HEART, INC.,

        Plaintiff,

v.

CITY OF MADISON, WISCONSIN, *et al.*,

        Defendants.

Case No. 3:21-cv-00118-wmc

---

**PLAINTIFF EDGEWOOD HIGH SCHOOL OF THE SACRED HEART, INC.'S OPPOSITION TO CITY DEFENDANTS' MOTION TO DECLARE DISCOVERY CLOSED OR, IN THE ALTERNATIVE, TO LIMIT THE SEARCH FOR RECORDS**

---

      On September 2, 2022, the Court issued a Text Only Order granting in part Plaintiff Edgewood High School of the Sacred Heart's ("EHS") Motion to Compel and advising that it would "referee" disagreements about the scope of the City's final search. (Dkt. 72.)  Instead, and after weeks of maintaining the same position on search terms and criteria, the Defendants have now moved to close any further discovery – i.e., for reconsideration of the ruling on EHS's motion to compel.  Without hearing from EHS or considering the reasonableness of EHS's continued efforts to limit the scope and burden of the City's search, the Court has already indicated that it is prepared to grant Defendants' motion, "pulling the plug" on EHS's attempt to receive highly relevant and responsive documents not previously produced in this matter. (Dkt. 84.)  While EHS still hopes the parties can agree to terms without the Court's assistance, EHS asks the Court to follow through on its prior order and referee this dispute, which EHS believes should be resolved by ordering the City to search and produce documents pursuant to EHS's further-revised search terms communicated on September 26.  To do otherwise would penalize EHS for reasonably pressing the City to produce relevant documents in its possession and

contravene the strong reasons why the Court ordered the City to conduct a final search in the first place.

I.  **EHS HAS REPEATEDLY REVISITED REASONABLE SEARCH TERMS WITH DILIGENCE AND GOOD FAITH.**

By 9:45 AM on the second business day after the Court's September 2 Text Only Order, EHS had proposed revised search terms. (September 27, 2022 Declaration of Jonathan R. Ingrisano ("Ingrisano Decl.") ¶ 2, Ex. A, at 24.) Those terms reduced the number of City custodians to be searched from twenty-seven, as originally prescribed in the City's March 11, 2022 search summary, to sixteen. (Id.) EHS narrowed the original temporal scope from nine years, i.e., "2013 to present" to fourteen months comprising the most critical time period at issue in this litigation. (Id.) And it proposed search terms narrowed to "hit" only documents that contained references to "Edgewood OR EHS" and either "master plan," "permit," "light*," "field," "stadium," or "ordinance." (Id; compare to Dkt. 65-1, Searches 4-8.)

Almost a week later, on September 13, the City rejected EHS's terms and proposed its own search parameters. (Ingrisano Decl. ¶ 2, Ex. A at 23.) From September 14 through September 19, EHS's counsel sought more information and detail surrounding the search results from its September 7 search terms that the City had concluded were unacceptable. (Id., Ex. A at 18-22.) The parties disagreed with each other's positions (Id., Ex. A at 16-18.) The City declared an impasse, but on September 21, 2022, EHS reiterated that it would agree to tailor its searches further to exclude or reduce "false" or irrelevant hits identified by the City. (Id., Ex. A at 15.)

On Friday, September 23, EHS proposed revised terms to address the City's stated concerns. (Id., Ex. A at 12-13.) First, to address concerns that the part of the search that was hitting on *(Edgewood OR EHS) AND permit* was overbroad, EHS proposed to require such hits

2

to include at least one of the following *AND* qualifiers: "light*," "field" "Goodman," "stadium," "electric*," "games," "athletic" "appli*," "practice" or "class." (Id.) Second, given the City's estimation that 20% of their records were emails from constituents, EHS proposed that only emails "from," and not "to," three of the four identified City alder custodian accounts be searched. (Id.) This would reduce the emails from constituents but still capture an alder's statements in response.

      The City filed this this motion on September 23. On September 26, the Plaintiff proposed modified search criteria that narrowed the search in three more ways. (Id., Ex. A at 8-9.) First, EHS proposed to reduce the number of searched custodians from sixteen to nine, and with three of those nine having searches run only against the "from" emails they sent. (Id.) Second, it proposed to reduce the temporal scope of search from fourteen months to twelve. (Id.) Third, and finally, it eliminated six search terms – "games," "athletics," "practice," and "class" from its "permit"-related sub-search -- and "light*," "field" and "stadium" from the search, generally. (Id.) Later on September 26, the City confirmed that this revised search yielded just 7,069 "hits," and without having de-duplicated those results against the City's prior productions. (Id., Ex. A at 5-6.) The City still believed this was too many. (Id.) Still later on September 26, EHS proposed a fourth search iteration, this one incorporating the City's own ability to incorporate MINUS or "but not" searching to limit "false" or otherwise irrelevant "Edgewood" and "permit" hits within the City's documents. (Id., Ex. A at 3.)

      EHS has diligently put forth serious search proposals. It has attempted to understand why the City believes those terms are supposedly unreasonable. It has offered four compromise formulations since September 2. Its final proposed terms are objectively reasonable and narrowly tailored to this dispute. Custodians have been pared down to the key City

3

representatives directly involved in and with authority over this matter – Tucker, Hank, Parks, Stouder and Strange, and Evers, with reduced searching of the additional alder custodians (Districts 2, 6 and 5) – the inclusion of whom is the result of the City's reliance upon them to show its good faith.  Under EHS's last proposal, only the critical time period would be searched – October 2018 to October 2019.  The search terms have been narrowed substantially to tailor the searches to those events upon which EHS's claims are principally predicated:  (a) the City's October 2018 "no games" determination, (b) the February 2019 permit, and (c) the EHS Master Plan repeal and the related Evers' ordinance amendment.

> II. **THE CITY REFUSES TO COMPROMISE ON SEARCH CRITERIA THAT IT KNOWS WILL RESULT IN THE EXCLUSION OF SUBSTANTIAL RELEVANT INFORMATION.**

In contrast, since September 14, the City has submitted only one formulation of search criteria that it will agree to.  Since then, it has been unwavering in its insistence on those terms, having agreed to no adjustments or compromises.  (See e.g. Ingrisano Decl. ¶ 2, Ex. A at 1.) However, its original search criteria are deficient, and moreover are based on an incomplete and faulty formulation of the City's own search capabilities.

> A. <u>As Crafted, the City's Search Criteria Would Exclude Broad Swaths of Relevant Information.</u>

On September 14, the City proposed two material changes to EHS's September 7 search criteria.  (Ingrisano Decl. ¶ 2, Ex. A at 23.)  First, it proposed requiring that "cityofmadison.com" be in both the "to" and "from" domains – meaning that its email search would be limited to emails from a City of Madison employee to one or more other City of Madison employees.  (Id.)  Second, the City's proposed search would remove "permit" as a term and replace it with "light* permit" and "electrical permit."  (Id.)

4

The first proposed changed had two effects. First, by limiting searching to emails with "to" and "from" domains containing "cityofmadison.com," the City seeks to limit its search to internal emails, exclusively. As acknowledged by the City, this will have the effect of excluding from search any emails to and from third parties. (Ingrisano Decl. ¶ 2, Ex. A at 17.) In its motion now, the City tries to excuse this significant gap in its proposal by arguing that EHS's motion to compel was premised only on the absence of internal City emails. (Defs.' Br. in Supp., Dkt. 82 at 2, 6.) This is entirely untrue. While the absence of internal emails was conspicuous, the Plaintiff clearly requested "[e]mails and related documents to, from or copied to" various City custodians. (Dkt. 65-5 at 2-3.) Missing internal emails were certainly illustrative of a problem, but EHS's motion was premised on the incomplete searches highlighted in substantial part by relevant communications to and from third parties – i.e., Luhman and Brodsky. (Pl.'s Mem. Of Law, Dkt. 64 at 2, 6-8.) EHS specifically noted that it had found "no emails to, from or between City officials" relevant to key areas of the case. (Id. at 3.) Consistent with Alan Harper's admission that EHS's permit was withheld because of "continuous public outcry" (Dkt. 65-10), EHS must be able to see candid evidence – internal and external – of the impact of public outcry and other considerations on municipal decision-making and to see the City's shifting, varying and inconsistent responses thereto. Indeed, some of the most illuminating documents produced on August 17, 2022 were external communications that the City would now foreclose from search.

The proposed domain limitation has a second effect. It limits all searches to emails and will not search for hits in attachments. (Ingrisano Decl. ¶ 2, Ex. A at 21-22.) In other words, a relevant attachment – i.e., a memo, a draft letter – that otherwise satisfies the search criteria and "hits" on the search terms will only be caught in the search if it was sent or forwarded by email

*and* the forwarding email would by itself also hit the search criteria.  Accordingly, neither drafts shared internally only in person by savvy City officials nor drafts communicated by email with minimal comment will not be included in what the City would review and produce.

The second proposed change narrowed the search for "permit"-related search to two specific formulations – "light* permit" and "electrical permit."  (Ingrisano Decl. ¶ 2, Ex. A at 23.)  The City advocates for this specificity if for no other reason than it eliminates some seventy-five percent of the "hits" that *(Edgewood or EHS) AND permit* would otherwise generate.  (Id., Ex. A at 17, 23.)  However, there is no reason to believe that City officials typically or even frequently referred to the permit at issue as either a light permit, lighting permit or electrical permit.  Indeed, a key document in the City's August 17, 2022 supplemental production referred to it only as the "Edgewood permit" – a formulation that would not "hit" the City's narrow formulation.  (Dkt. 65-10.)

While EHS has proposed four different search variations since September 7, the City has not agreed to deviate from its original September 14 formulation.  (See e.g. Ingrisano Decl. ¶ 2, Ex. A at 1-2.)  The impact of the City's uncompromising restrictions on identifying responsive, relevant documents is almost certainly cumulative.  Attachments are out.  External emails are out.  Those Internal emails that refer to Edgewood and its "permit" only generally, and not more technically, are also out.  The parties are not throwing darts.  They are casting a net, and EHS has proposed a small net reasonably tailored to the task at hand.

     B.    <u>The City Is Ignoring Tools at its Disposal that Will Reduce Non-Responsive Documents.</u>

The City does not need to exclude entire classes of documents – external emails and attachments – to reduce its review burden.  It has other available tools to do so that bear less risk of missing responsive, relevant documents.  But the City has declined to employ them so far.

First, the City identified its ability to incorporate MINUS or "but not" searches in January. (Ingrisano Decl. ¶ 3, Ex. B.) However, it has ignored this functionality until EHS raised it in recent negotiations. (Id.) "But not" searching would allow the City to eliminate many irrelevant "hits" on key words – other Edgewoods, such as streets, Edgewood College, and Edgewood Campus School and verb tenses of "permit" such as "permitted" or "permitting." On September 23, the City forwarded samples of "false" hits. (Id. ¶ 4, Ex. C.) While ostensibly false hits on the "permit" search term, each of the documents hit on an "Edgewood" that was not a reference to EHS. (Ingrisano Decl. ¶ 4, Ex. C.) Six of the eight examples of these "false" hits could have been eliminated by MINUS terms such as "Edgewood Ave," "Edgewood College," "Edgewood Dr*" or unrelated "Edgewood" computer domain names. (Id.) Two of the example documents together alone exceeded 600 pages. (Id.) There is every reason to believe that thoughtful incorporation of MINUS search terms will fairly reduce "hits" and pages without excluding relevant "hits." To date, the City has ignored this tool and instead insisted on excluding external emails and attachments and incorporating two highly-specific formulations of "permit."

Second, the City admittedly has not yet filtered from its "hit" totals those documents that it has already produced. (See Ingrisano Decl. ¶ 2, Ex. A at 5-6.) This is a routine process in any document production and all litigation document review and management software applications offer this ability. The City has already produced substantial volumes of constituent emails sent to the City in support of or opposition to EHS's field usage and lights. Many of these would be expected to "hit" again on even EHS's reduced search criteria; however, there is no technical reason why these repeat documents could not be filtered out to reduce the City's (and EHS's) review burden. (Ingrisano Decl. ¶ 5.)

Finally, the City also has the ability to identify, segregate and more carefully review potentially privileged documents. The City can conduct second level domain searches or MINUS searches within its review set to identify documents authored by, to, from, or mentioning the known attorneys for the City involved during this period – including, for example, John Strange, Michael May, and the Boardman attorneys. Such documents can be segregated, with the balance of the presumptively non-privileged documents then receiving more expedited and less burdensome review.

Steadfast in its resolve to exclude external emails and attachments from search, the City has neither varied from its overly-restrictive search criteria expressed on September 14 nor employed impactful technical tools at its disposal. This is not a reasonable response to its obligations under the September 2 Text Only Order.

### III. THE COURT SHOULD NOT PULL THE PLUG ON A "FECUND SOURCE OF RELEVANT INFORMATION."

Granting Defendant's motion to declare that discovery is closed, with no documents produced in response to Plaintiff's partially granted motion to compel, would be an unjust result. In that instance, the prevailing party would be the one that dug in its heels and refused meaningful compromise, however artfully done, contrary to the September 2 Text Only Order. In such instances, litigants could simply "run out the clock" and receive, in effect, reconsideration of the underlying motion to compel when no compromise is reached. Meanwhile, the party denied discovery would lose its right to uncover relevant information despite meaningful attempts to reach compromise.

> This Court has previously recognized the materiality of the information EHS seeks.
>
> On the other hand, defendants' ESI, particularly their e-mail, is a *potentially* fecund source of relevant information that is not easily obtained from other sources. I say "potentially" because no one can say for sure what's there

> without looking, but *if* defendants or their agents made any unguarded statements tending to show animus toward plaintiff, then they likely did so in their e-mails to each other. (The odds of any defendant in a civil lawsuit remembering and admitting to such statements while being deposed are low).

*Haka v. Lincoln County*, 426 F.R.D. 577, 579 (W.D.Wis. 2007) (emphasis original). However, here the August 17, 2022 production shows that the City's unsearched documents are more than just "potentially fecund." That production actually demonstrated unguarded and/or inconsistent statements by City officials to each other and to the public previously unproduced and not captured by the City's search efforts. The briefing and proceedings on EHS's motion to compel demonstrated that that the City's records during the critical year – October 2018 through October 2019 – were not subject to meaningful search. There is no reason to reverse the Court's prior determination and pull the plug on discovery before it even starts.

## CONCLUSION

Plaintiff EHS wants only one year of records searched for nine City custodians using search terms refined to minimize both the Defendant's burden and the unreasonable risk of exclusion of relevant evidence. EHS requests that the Plaintiff's Motion be denied. In refereeing the dispute as originally ordered., Plaintiff EHS respectfully requests the Court impose the following terms:

    A.    Custodians for search will be limited to Hank, Tucker, Parks, Stouder, Strange, District 13, District 2, District 6 and District 5, provided that only the "from" emails and attachments from Districts 2, 6 and 5 emails would need to be searched.

    B.    The relevant timeframe for search will include only October 1, 2018 through October 15, 2019.

    C.    Search terms shall be formulated as follows:

    a. (Edgewood OR EHS) AND permit AND (light* OR field OR Goodman OR stadium OR electric* OR appli*) MINUS ("Edgewood Ave*" OR "Edgewood College" OR "Edgewood Campus School" OR "permitting" or "permitted");

    b. "Edgewood permit" and

    c. (Edgewood OR EHS) AND ("master plan" OR ordinance) MINUS ("Edgewood Ave*" OR "Edgewood Dr*" OR "Edgewood College" or "Edgewood Campus School")

D. The Defendants shall commence search and review immediately and shall begin a rolling production of responsive documents, the last installment of which shall occur no later than October 21.

Dated: September 27, 2022

Respectfully submitted,

GODFREY & KAHN, S.C.

*s/Jonathan Ingrisano*
Mike Wittenwyler (SBN 1025895)
Jonathan Ingrisano (SBN 1033977)
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
Phone: (414) 273-3500
Fax: (414) 273-5198
mwittenw@gklaw.com
jingrisa@gklaw.com

DALTON & TOMICH, PLC

*Noel W. Sterett (IL 6292008)
401 W. State St., Suite 509
Rockford, IL 61101
Phone: (815) 986-8050
Fax: (313) 859-8888
nsterett@daltontomich.com
*Admitted *Pro Hac Vice*
*Attorneys for Plaintiff*

27950796.1