Page 1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EDGEWOOD HIGH SCHOOL OF THE SACRED
HEART, INC.,

              Plaintiff,

                            Case No.
   vs.                    3:21-cv-0018-wmc

CITY OF MADISON, WISCONSIN, et
al.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF:  ALAN HARPER

TAKEN AT:  GODFREY & KAHN, S.C.

LOCATED AT:  One East Main Street, Suite 500
              Madison, Wisconsin
              August 31, 2022
           1:00 p.m. to 1:53 p.m.
REPORTED BY:  VICKY L. ST. GEORGE, RMR.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOB NO. 5419461

Page 2

```
 1          A P P E A R A N C E S
 2   GODFREY & KAHN, S.C., by
       JONATHAN INGRISANO
 3   One East Main Street, Suite 500
     Madison, Wisconsin 53073
 4   (608) 257-3911
     jingrisano@gklaw.com
 5   Appeared on behalf of the Plaintiff.
 6   BOARDMAN & CLARK, LLP, by
       SARAH A. ZYLSTRA
 7     TANNER G. JEAN-LOUIS
     1 South Pinckney Street, 4th Floor
 8   Madison, Wisconsin 53701
     (608) 257-9521
 9   szylstra@boardmanclark.com
     Appeared on behalf of the Defendants.
10
11            I N D E X
12   WITNESS                              PAGE
13   ALAN HARPER
14   EXAMINATION BY MR. INGRISANO            3
15
16          E X H I B I T S
17   NUMBER    DESCRIPTION                PAGE
18   Exhibit 168  Email String Dated 3-14-2019,   4
19           CITY-DEF-052785
20   Exhibit 169  Email String Dated 3-6-2019,   23
21           CITY-DEF-052814
22
23        R E Q U E S T S - NONE
24   (Original exhibits attached to original transcript.)
25   (Original transcript was delivered to Attorney Ingrisano.)
```

Page 3

```
 1          TRANSCRIPT OF PROCEEDINGS
 2        ALAN HARPER called as a witness herein,
 3    after having been first duly sworn on oath, was
 4    examined and testified as follows:
 5             EXAMINATION
 6   BY MR. INGRISANO:
 7   Q. Good afternoon, Mr. Harper.  Can you please state
 8      your name and spell it for the record?
 9   A. It's Alan Harper, A L A N, H A R P E R.
10   Q. And you're employed by the City of Madison, correct?
11   A. Correct.
12   Q. In what department?
13   A. Building inspection.
14   Q. What's your title with the building inspection
15      department?
16   A. Plan review specialist III.
17   Q. And what are your job responsibilities as a plan
18      review specialist III?
19   A. Primarily reviewing building and heating plans but
20      also issuing permits, land intake, some clerical
21      work.
22   Q. Thank you.  And who is your supervisor presently at
23      the building inspection department?
24   A. Kyle Bunnow.
25   Q. Can you spell that last name for me?
```

Page 4

```
 1   A. B U N N O W.
 2   Q. And was he your supervisor in the year 2019?
 3   A. He was.
 4   Q. And do you know who he reports to?
 5   A. He reports currently to Matt Tucker.
 6   Q. And in 2019 who did he report to?
 7   A. George Hank.
 8   Q. As a planning specialist III -- I'm sorry, plan
 9      review specialist III, do you supervise anyone at the
10      department?
11   A. I do not.
12          (Exhibit 168 marked.)
13   BY MR. INGRISANO:
14   Q. Mr. Harper, I'm handing you what's been marked as
15      Exhibit 168 which is a three page email stream.  Can
16      you go ahead and just review that, familiarize
17      yourself with that document?
18          (Witness peruses document.)
19          THE WITNESS:  Okay.
20   BY MR. INGRISANO:
21   Q. Thank you.  Sir, do you recognize that as an email
22      stream from March of 2019 that you were a participant
23      in?
24   A. Other than the last email which I have not seen
25      before.  Oh, it did come to me, so I'm not familiar
```

Page 5

```
 1      with that one.
 2   Q. You don't have a recollection --
 3   A. I don't have -- I have a recollection of the full
 4      stream except for the last section of it.
 5   Q. Okay.  Is your email address City of Madison,
 6      AHarper@CityofMadison.com?
 7   A. Yes, it is.
 8   Q. So let me ask you to take a look at the one, two,
 9      third email in this stream, the one that's at the
10      bottom of page 52784, do you see that, from Alan
11      Harper to Jennifer Luhman, March 14 at 2019, 1:41
12      p.m., do you see that?
13   A. Yes.
14   Q. Sir, you authored that email, correct?
15   A. That is correct.
16   Q. And you cc'd George Hank on that email?
17   A. I did.
18   Q. The text of that email says "I'm really -- I am not
19      really in the loop on this one but I thought you
20      were.  Due to the continued public outcry about the
21      project, we have been told by the director of our
22      department, George Hank, not to issue this permit
23      until further notice."
24          Did I read that correctly?
25   A. That appears to be correct, yes.
```

Brown & Jones Reporting          414-224-9533
A Veritext Company               www.veritext.com

Page 6

1 Q. And you wrote that email, correct?
2 A. I did write that email.
3 Q. At the time you wrote that email, you believed the
4    contents of that email to be true?
5        MS. ZYLSTRA: Objection, form. You can
6    answer. Go ahead.
7        THE WITNESS: Okay. I believe that my
8    intent is true.
9 BY MR. INGRISANO:
10 Q. What do you mean by that, sir?
11 A. I mean that there is really four different parts to
12    this email. First part absolutely true. I'm not
13    really in the loop on this one but I thought you
14    were. So I thought Jennifer Luhman was fully
15    informed as to what was going on. I had no idea what
16    was going on.
17        Due to the public -- due to the continued
18    public outcry about the project, that was my response
19    to what I heard in the news. I mean it was splashed
20    all over the place. So that was more my response to
21    why -- I should say my response to what I believed
22    was a reason we may not have been able to issue the
23    permit yet.
24        We have been told by the director of our
25    department, George Hank, so George did contact us or

Page 7

1    talked to us, and I don't remember who he talked to
2    or how, whether it was in person, it wasn't through
3    an email, but I think between the permitting counter
4    which would be myself and at that time Mike VanErem,
5    Shannon Davis and probably the zoning staff and the
6    clerical staff. He had told us that anything doing
7    with this project he wanted to be the point person
8    for information because he's the one that knew about
9    what was going on there.
10        And then not to issue the permit until
11    further notice is because he was actually in the
12    process of determining if all the proper approvals
13    had been made and the submittal to us met those
14    approvals. So really the first part, I wasn't in the
15    loop. Second part, public outcry, that was me saying
16    that it was my belief that this came because more
17    entities within the City would be involved because
18    there were so many people involved with it. And then
19    George was the person who had the best possibility of
20    determining who needed to approve what. And until
21    further notice means that we couldn't issue then
22    because we weren't sure if everything had been
23    properly submitted and approved.
24 Q. Okay. Let's break down that paragraph a little bit.
25 A. Okay.

Page 8

1 Q. You said, start with the line that says "we have been
2    told by the director of our department, George Hank."
3        Do you see that?
4 A. Yes.
5 Q. Who is the "we" that you are referring to?
6 A. That's the ones that I referred to a second ago which
7    would be, I believe, and I don't recall exactly, but
8    I believe it would be the plan review staff which is
9    also permit counter staff, the zoning staff and the
10    clerical staff which would make sense because those
11    would be the people involved in issuing the permit in
12    our office.
13        MR. INGRISANO: Can you read back that
14    last answer for me?
15        (Record read.)
16        THE WITNESS: That's not quite correct.
17        MR. INGRISANO: Okay.
18        THE WITNESS: It was close.
19 BY MR. INGRISANO:
20 Q. Go ahead.
21 A. No, I said the plan review staff who was also the
22    permit counter staff.
23 Q. The plan review staff is the same as the permit
24    counter staff?
25 A. Right.

Page 9

1 Q. So there are three groups?
2 A. It's not "and".
3 Q. Got it. So just I think that last answer kind of
4    warrants just saying if you could slow down a little
5    bit, and you have a tendency to trail off as you end
6    your answer. So if you could try to slow down a
7    little bit and finish strong, that will really help
8    the court reporter, okay?
9 A. Okay. I'll do what I can.
10 Q. Thank you very much. So the plan review staff/permit
11    counter staff, right, same people?
12 A. Yes.
13 Q. Okay. Zoning staff and the clerical staff, those are
14    the three groups of people that you included in the
15    "we".
16 A. Right.
17 Q. In this email. And were you there -- so you are
18    technically part of the -- which of those three
19    groups are you a part of?
20 A. I am the plan review and permit counter staff.
21 Q. Okay. Were you there when the zoning or clerical
22    staff were advised of not to issue the permit by Mr.
23    Hank?
24 A. I don't recall.
25 Q. How do you know that the zoning and clerical staff

Page 10

1  were told not to issue that permit by Mr. Hank?
2  A.  I guess I don't know for sure that they weren't.
3  Q.  So was your intention on March 14, 2019 to include
4      those three groups on the "we" that you knew at that
5      point that zoning, plan review and clerical had been
6      included, or is that your testimony now, sir, that
7      looking back on it, that's who would have been
8      included in the "we"?
9          MS. ZYLSTRA:  Objection, form, foundation.
10     You can answer.
11         THE WITNESS:  I would say that the "we" --
12     my recollection is that he did talk to all of us,
13     but I can't remember the method of communicating
14     with us.
15 BY MR. INGRISANO:
16 Q.  So you don't know if you had a personal conversation
17     with George Hank before sending this email about not
18     issuing that permit?
19 A.  Can you repeat?
20 Q.  Yeah.  Let me ask you, do you recall speaking with
21     George Hank personally, either face-to-face or on the
22     phone, on his instruction not to issue that permit?
23 A.  I can't recall exactly.
24 Q.  Okay.  Can you recall generally?
25 A.  Generally I did speak to him.  And I did speak to him

Page 11

1  because I was getting -- I was being asked whether we
2  could issue the permit.  So I do know that I -- I
3  spoke to him, but I don't know if I spoke to him in
4  the group or if he spoke to us together.
5  Q.  So the prior email below the one you sent at 1:41,
6      prior email from Jennifer Luhman was the same day at
7      1:03 p.m., do you see that?
8  A.  Not that one.  Which one is it?  Oh, it's this one.
9      Okay.  So you're talking about the one from Jennifer?
10 Q.  Yes.
11 A.  Okay.
12 Q.  That's about 38 minutes before you sent your email?
13 A.  Yes.
14 Q.  Back to her, correct, at 1:41?
15 A.  Right.
16 Q.  Okay.  Did you speak to Mr. Hank between those two
17     emails?  In that 38 minute period, do you recall
18     speaking with Mr. Hank on whether to issue this
19     permit?
20         MS. ZYLSTRA:  Objection, form, foundation.
21     You can answer.
22         THE WITNESS:  I don't remember
23     specifically speaking to him at that time.  However,
24     if I had gotten this email, completely supposition
25     here --

Page 12

1          MS. ZYLSTRA:  Object to form and
2      foundation.  You should testify to what you recall
3      and not speculate.
4          MR. INGRISANO:  Please let him finish his
5      answer.
6  BY MR. INGRISANO:
7  Q.  Go ahead, sir, finish your answer.
8  A.  If I had received an email that said the permit
9      hasn't been issued, do you have everything you need
10     from me for this, to get an answer to that question,
11     I would have had to ask George because I wouldn't
12     have known.
13 Q.  How many -- did you have -- so this email stream on
14     the Edgewood permit dates all -- your involvement
15     dates all the way back to Wednesday, March 6th of
16     2009, correct?
17 A.  Correct.
18 Q.  Did you have, in that preceding week before March 14,
19     did you have any communication with George Hank on
20     the Edgewood permit that you can recall?
21 A.  I do not recall.
22 Q.  So you don't recall -- do you know how -- let me ask
23     you this.
24         Do you know how he told other people in
25     your department in the zoning or clerical staff not

Page 13

1  to issue the permit?
2          MS. ZYLSTRA:  Objection, form, foundation.
3      You can answer, sir.
4          THE WITNESS:  I'm sorry, now I forgot what
5      the question was.
6  BY MR. INGRISANO:
7  Q.  Do you know how he told other people that you
8      mentioned included in the "we," the zoning staff, the
9      clerical staff, do you know how he told them not to
10     issue the permit?
11         MS. ZYLSTRA:  Same objections.  You can
12     answer.
13         THE WITNESS:  I may know but I don't
14     recall.  So if it was a meeting amongst all the
15     people, obviously I would know that.  But I don't
16     recall if there was a meeting amongst all the
17     people.
18 BY MR. INGRISANO:
19 Q.  Did you have any conversations with any department
20     staff after this email?
21 A.  Which email are you referring to?
22 Q.  This email being the March 14, 2019, 1:41 email.  Did
23     you have any other communications with folks in your
24     department after sending that email about not issuing
25     the permit?

Page 14

1  A. Yes, I had conversations with George.
2  Q. Okay. Anyone else besides George?
3  A. I don't recall anyone else.
4  Q. You and George work in the same office area?
5  A. At the time we did, yes.
6  Q. He's retired now, right?
7  A. Yes.
8  Q. How far away is your office from his or was it at the
9     time in 2019?
10 A. Probably 50 feet.
11 Q. And during this period of time, March 2019, was it
12    your -- were you generally working in the office?
13    You weren't working remotely?
14 A. Correct.
15 Q. Was Mr. Hank working remotely or was he generally in
16    the office?
17 A. He was often in the office, but he was also not in
18    the office due to meetings, things like that.
19 Q. Sure. So you recall specifically at some point Mr.
20    Hank would have told you not to issue the permit, but
21    you don't know how he would have told you that; is
22    that fair?
23 A. I don't think that's correct. I don't issue the
24    permits. So he wouldn't have told me not to issue
25    the permit. He would have told me that if anybody

Page 15

1     contacts us, have them contact him.
2  Q. But you didn't write that in your email, did you?
3        MS. ZYLSTRA: Object to the form.
4        THE WITNESS: I didn't. And we're talking
5     about the email on the 14th?
6  BY MR. INGRISANO:
7  Q. I'm talking about the email on the 14th at 1:41 p.m.
8  A. All right.
9  Q. You did not inform Ms. Luhman to contact Mr. Hank,
10    correct?
11 A. I had informed Ms. Luhman on several occasions by
12    telephone that she should be contacting George Hank.
13 Q. About the Edgewood permit?
14 A. About the Edgewood permit.
15 Q. But you didn't, when you had a chance to do so in
16    writing on any of the occasions in this email stream,
17    Exhibit 168, you didn't reiterate what you were
18    claiming to tell her on the phone which is she should
19    be calling George Hank?
20       MS. ZYLSTRA: Object to form. Go ahead.
21       THE WITNESS: Which is why I wrote I'm not
22    really in the loop on this one but I thought you
23    were thinking that she had been in contact with
24    George.
25 BY MR. INGRISANO:

Page 16

1  Q. So, sir, were you told by George Hank not to issue
2     this permit or not?
3  A. I was --
4        MS. ZYLSTRA: Object to the form. Go
5     ahead.
6        THE WITNESS: I was not because I don't
7     issue permits or I do -- to clarify, I do issue
8     permits, but this permit would have been handled by
9     the clerical staff, not myself.
10 BY MR. INGRISANO:
11 Q. So you wrote "we have been told by the director of
12    our department, George Hank, not to issue this
13    permit."
14    Do you see that?
15 A. Yes.
16 Q. Is that a lie?
17       MS. ZYLSTRA: Objection, form.
18 BY MR. INGRISANO:
19 Q. Were you not -- are you saying today that you were
20    not told by the director of our department, George
21    Hank, to issue this permit?
22       MS. ZYLSTRA: Same objection. You can
23    answer.
24       THE WITNESS: We were not told by George
25    Hank, the director, not to issue the permit at that

Page 17

1     time.
2  BY MR. INGRISANO:
3  Q. So you were not told, is that what you're saying?
4     Were you told, sir, or were you not told?
5        MS. ZYLSTRA: Objection, form. You can
6     answer.
7        THE WITNESS: Okay. We were told by the
8     director to have anyone contact him with -- to get
9     information about the permit, and we were also told
10    that the permit could not be issued at that time.
11 BY MR. INGRISANO:
12 Q. And were you told by -- and you were told this by Mr.
13    Hank?
14 A. Yes.
15 Q. And did he tell you why you should not issue the
16    permit and why you should have people contact Mr.
17    Hank?
18 A. He told us because he needed to look further into the
19    approvals, make sure the approvals were all in place
20    and proper and the submittal for the permit met those
21    approvals. And so he was contacting any entities
22    that may have had some say in this, and there are
23    several of them, many of them I don't even know who
24    they would be because I don't deal with that section,
25    I only deal with permits, I don't deal with approvals

Page 18

1  of projects such as this. So that is what he was
2  getting across to us, that he needed to know that
3  everything was properly done before we could issue
4  it. And at that point he didn't know that.
5  Q. And you knew this as of 1:41 p.m. on March 14th,
6  2019, you knew all that when you wrote this email to
7  Ms. Luhman, correct?
8      MS. ZYLSTRA: Objection, form. You can
9  answer.
10     THE WITNESS: Yes, I did know that George
11 was still looking into the matter to make sure that
12 everything was proper at that point.
13 BY MR. INGRISANO:
14 Q. But your email to Ms. Luhman at 1:41 does not explain
15 that George Hank is still looking into the various
16 aspects of the permit, correct?
17 A. I was under the impression that she already knew
18 that.
19 Q. Your email at 1:41 p.m. does not say anything to Ms.
20 Luhman about George Hank's process in looking at
21 issuing that permit, correct?
22 A. It does not say anything about that, that is correct.
23 Q. And in fact, your email goes on to say that instead
24 due to the issuance -- nonissuance of the permit is
25 due to the continued public outcry about the project,

Page 19

1  correct?
2      MS. ZYLSTRA: Objection, form, you can
3  answer.
4      THE WITNESS: It does not say that.
5  BY MR. INGRISANO:
6  Q. Your email says, "due to the continued public outcry
7  about the project, we have been told."
8      Correct?
9      MS. ZYLSTRA: Objection, form. You can
10 answer.
11     THE WITNESS: It does say "due to the
12 continued public outcry about the project, we have
13 been told."
14 BY MR. INGRISANO:
15 Q. You're saying right now today that was not George
16 Hank's reasoning for telling you not to issue the
17 permit, correct?
18 A. I am saying that was not George's -- the public
19 outcry was not George's reason for --
20 Q. Right. So you made that up, correct?
21     MS. ZYLSTRA: Objection, form. You can
22 answer.
23     THE WITNESS: No, I didn't make it up.
24 BY MR. INGRISANO:
25 Q. So you're attributing to George Hank an intent that

Page 20

1  he didn't actually say to you, correct?
2      MS. ZYLSTRA: Objection, form.
3      THE WITNESS: I did rewrite this, this
4  paragraph, because originally when I wrote it, it
5  did look like I was attributing the fact that the
6  permit was not being issued to George. When I
7  rewrote it, I felt that this was showing that there
8  were other extenuating circumstances still out there
9  waiting to be looked into and there was going to be
10 more issues with this one because there were so many
11 people involved from the public, from Edgewood, from
12 wherever.
13 BY MR. INGRISANO:
14 Q. And but you aren't familiar with this project.
15 You're out of the loop, correct?
16 A. I knew of the project. I didn't know any of the
17 specifics of what was going on in the project.
18 Q. So how do you know that there was continued public
19 outcry that was resulting in this permit not being
20 issued?
21     MS. ZYLSTRA: Objection, form. You can
22 answer.
23     THE WITNESS: I don't know that. I knew
24 that there was a significant amount of public
25 outcry. I didn't know if that had anything to do

Page 21

1  with it being issued or not being issued, but I did
2  know that there was very possibly several entities
3  because there were so many people in the public
4  involved in this that there would probably be more
5  entities possibly, though I don't even know what the
6  process is, that would be involved and approvals
7  that would need to be done.
8  BY MR. INGRISANO:
9  Q. So your testimony today, sir, is that you put the
10 notion of a continued public outcry and the
11 nonissuance of the permit in the same sentence but
12 didn't really know if they were connected or not; is
13 that fair?
14 A. Obviously there is some connection but the connection
15 is what I just said is that because of -- because of
16 the amount of public interest in the project, there
17 may have been other levels of approvals that were
18 needed beyond a simple lighting plan approval, zoning
19 approval. There may have been other entities
20 involved which I had no idea what they were because
21 I'm not involved with that process.
22 Q. Sir, your email goes on to say that -- I'm sorry.
23     But it's your testimony here today under
24 oath that George Hank did not tell you that this
25 permit should not be issued because of continued

|  |  |
|---|---|
| Page 22<br>1  public outcry, is that your testimony today?<br>2  A.  That is.<br>3  Q.  Mr. Hank told you not to issue the permit until<br>4    further notice, correct?<br>5        MS. ZYLSTRA:  Objection, form.  You can<br>6    answer.<br>7        THE WITNESS:  That may not have been his<br>8    exact words.  However, he did tell us that he was<br>9    still looking into the matter and needed to get --<br>10   make sure everything was done accurately before<br>11   issuing the permit.<br>12 BY MR. INGRISANO:<br>13 Q.  But recognized as of March 14 at 1:41 p.m. that the<br>14   plans underlying that permit had been approved and<br>15   the permit was otherwise ready to issue, correct?<br>16       MS. ZYLSTRA:  Objection, form, foundation.<br>17       THE WITNESS:  Okay.  So now you're<br>18   referring to --<br>19 BY MR. INGRISANO:<br>20 Q.  I'm asking, sir, as to your recollection, your<br>21   knowledge at that point in time.  You recognized on<br>22   March 14 that the plans had been approved and a<br>23   permit was otherwise ready to issue, correct?<br>24       MS. ZYLSTRA:  Objection, form, foundation.<br>25       THE WITNESS:  I did know that the lighting | Page 24<br>1  A.  It does appear to be the same email stream.<br>2  Q.  When Ms. Luhman sent you that email with the<br>3    attachment, you looked at the plans that she<br>4    enclosed, correct?<br>5        MS. ZYLSTRA:  Objection, form.  You can<br>6    answer.<br>7        THE WITNESS:  I probably looked at the<br>8    first page showing that the site plan review had<br>9    been approved.<br>10 BY MR. INGRISANO:<br>11 Q.  If you look at the first page of exhibit -- sorry,<br>12   second page of Exhibit 169, it's not a great copy,<br>13   but you can tell, sir, that the lighting review was<br>14   status approved, correct?<br>15 A.  I can see that, yes.<br>16 Q.  As of February 27, 2019; is that right?<br>17 A.  Yes.<br>18 Q.  Can you see, sir, the zoning review is also status<br>19   approved?<br>20       MS. ZYLSTRA:  Objection, form.<br>21       THE WITNESS:  I can't actually see that.<br>22 BY MR. INGRISANO:<br>23 Q.  All right.  That's not a great copy.  I'll hand you<br>24   what's been previously marked as Exhibit 3.  I'll<br>25   represent to you that that's the same document or |
| Page 23<br>1  plan had been approved which means that it met the<br>2  lighting ordinance.  I knew that zoning had signed<br>3  off on the permit which meant it met whatever zoning<br>4  would require.  Typically if I see that on a permit<br>5  such as this, I would expect that would be ready to<br>6  be issued.<br>7  BY MR. INGRISANO:<br>8  Q.  Earlier in this Exhibit 168, Mr. Harper, on the<br>9    second page there is a March 6 email from Jennifer<br>10   Luhman, 8:14 a.m., do you see that?<br>11 A.  Um-hum.<br>12 Q.  Sorry, is that a yes?<br>13 A.  Yes.<br>14 Q.  Sorry.  The court reporter has a hard time with<br>15   ah-hahs and uh-uhs.  Thank you.<br>16       And Ms. Luhman writes to you to say<br>17   "attached are the approved lighting plans."<br>18       Do you see that?<br>19 A.  I do see that.<br>20       (Exhibit 169 marked.)<br>21 BY MR. INGRISANO:<br>22 Q.  Mr. Harper, do you recognize Exhibit 169 as an<br>23   earlier iteration of that email stream from 168 that<br>24   attaches the approved lighting plans forwarded to you<br>25   by Ms. Luhman? | Page 25<br>1  similar document to what you have on the second page<br>2  of Exhibit 169.<br>3        Do you see, sir, from that document that<br>4  zoning review by Christina Thiele is stamped or<br>5  marked as status approved?<br>6  A.  I do see that.<br>7  Q.  And that's as of March 1, 2019?<br>8  A.  Oh, didn't know that was a question.  Yes, it says<br>9    March 1st, 2019.<br>10 Q.  Going back to Exhibit 169, sir, on the third page of<br>11   that do you see a site plan approval stamp on the<br>12   third page of this Exhibit 169?<br>13 A.  I do.<br>14 Q.  And do you recognize the signature on that site plan<br>15   approval?<br>16 A.  Appears to be the signature of Chrissy Thiele.<br>17 Q.  And what's the final approval date identified on that<br>18   document?<br>19 A.  Appears to be March 1st, 2019.<br>20 Q.  So, sir, is it fair to say that the second and third<br>21   pages of Exhibit 169 would indicate to you that this<br>22   is a plan that's been approved and that a permit<br>23   should be ready to issue?<br>24       MS. ZYLSTRA:  Objection, form, foundation.<br>25       THE WITNESS:  Yes, I'd say so. |

Page 26

1  BY MR. INGRISANO:
2  Q. In your experience -- how long have you been with the
3     building inspection department?
4  A. 22 years.
5  Q. In your 22 years, sir, have you ever seen a situation
6     where you saw a document, where you saw approvals
7     like you see on page 2 and 3 of Exhibit 169 where
8     plans have been approved where a permit was withheld
9     and not issued by the City of Madison?
10         MS. ZYLSTRA: Objection, form, foundation.
11    You can answer.
12         THE WITNESS: I would say nearly 100
13    percent of the time.
14 BY MR. INGRISANO:
15 Q. It's -- the permit is issued?
16 A. Is not issued at the point of the site plan review
17    being approved.
18 Q. So despite seeing the approvals on page 2 and page 3,
19    you're saying that 100 percent, almost 100 percent of
20    the time that permit would still not issue?
21 A. Now you have to remember we're talking about lighting
22    plans here.
23 Q. Yes.
24 A. I never see lighting plans. So in this case this is
25    a singularity. I deal with heating plans, building

Page 27

1     plans and occasionally plumbing. So I will see a
2     document like this quite often with building plans,
3     building plans, and when I see this and it has all
4     approvals on it, that doesn't mean the permit has
5     been approved yet. As far as I know, this is the
6     only lighting plan approval I have ever seen.
7  Q. So when you are asked to issue a permit -- let me ask
8     you this.
9          Go back to Exhibit 168, sir.
10 A. Okay.
11 Q. Second page.
12 A. Um-hum.
13 Q. After receiving -- after receiving the plans attached
14    to Exhibit 169, you write to Ms. Luhman at 8:53 a.m.
15    on March 6th, "I didn't realize you had approved
16    plans."
17         Do you see that?
18 A. Yes.
19 Q. So you were able to look at Exhibit 169 and confirm
20    that she did in fact have approved plans, correct?
21 A. Correct.
22 Q. All right. You go on to say "yes, you can do this
23    online or by mail or come in."
24         Did I read that correctly?
25 A. Yes.

Page 28

1  Q. And you're talking about at that point her coming in
2     online -- sorry, coming in or by mail or online
3     pulling that permit, correct?
4  A. Correct.
5          MS. ZYLSTRA: Objection.
6  BY MR. INGRISANO:
7  Q. So based on what you saw with Exhibit 169, you
8     believed that permit was ready to be pulled, correct?
9          MS. ZYLSTRA: Objection, form, foundation.
10    You can answer.
11         THE WITNESS: I did believe that at that
12    time, yes.
13 BY MR. INGRISANO:
14 Q. And that was consistent with your practice working at
15    the building inspection department in issuing permits
16    on behalf of the City of Madison, correct?
17         MS. ZYLSTRA: Objection, form, foundation.
18    You can answer.
19 BY MR. INGRISANO:
20 Q. You said one of your job functions, sir, was issuing
21    permits for the City of Madison. And what I'm asking
22    you, sir, is the fact that you told Ms. Luhman on
23    that date that yup, you have approved plans, you can
24    come in or by mail or online pull that permit, that
25    was consistent with what you had seen in your 22

Page 29

1     years at the City of Madison, correct?
2          MS. ZYLSTRA: Objection, form, foundation.
3          THE WITNESS: That was my understanding at
4     the time that the permit could be issued.
5  BY MR. INGRISANO:
6  Q. Got it. And that understanding changed at some
7     point; is that fair?
8          MS. ZYLSTRA: Objection, form, foundation.
9     You can answer.
10         THE WITNESS: That's fair.
11 BY MR. INGRISANO:
12 Q. And when did that understanding change, sir?
13 A. Sometime between the 6th and the 14th.
14 Q. But you don't know when?
15 A. No, I don't know when.
16 Q. And you don't know how Mr. Hank conveyed this
17    information to you, correct?
18         MS. ZYLSTRA: Objection, form. You can
19    answer.
20         THE WITNESS: I do not know.
21 BY MR. INGRISANO:
22 Q. In your prior emails back to Ms. Luhman prior to your
23    March 14, 1:41 p.m. email, you hadn't copied George
24    Hank, correct?
25 A. That goes back to the one where I told -- going back

Page 30

1 to March 6th at 8:53 a.m., you're saying at that
2 point I hadn't talked to George?
3 Q. Sir, I asked a very specific question.
4     In your emails prior to Ms. Luhman, prior
5 to March 14 at 1:41 p.m., all the prior emails in
6 this Exhibit 168, you had never copied George Hank
7 previously, correct?
8 A. That is correct.
9 Q. You had copied a Lisa Antony, correct?
10 A. That is correct.
11 Q. Who is Lisa Antony?
12 A. Lisa Antony is the original person who Jennifer
13 contacted on March 5th asking if they can apply for
14 this permit online. Lisa is one of the people who
15 would deal with online permits. She works in
16 clerical staff.
17 Q. So Lisa is a clerical staff; is that right?
18 A. Correct.
19 Q. So as a member of the clerical staff, you believe she
20 also would have been told by George Hank not to issue
21 this permit, correct?
22 A. I believe she would have been.
23 Q. Did you have any conversations with Lisa Antony about
24 issuing or not issuing this permit either before or
25 after your March 14, 1:41 p.m. email?

Page 31

1 A. Certainly not before the March 6th email where I
2 stated it can be applied for online.
3 Q. How about after?
4 A. Can you repeat the question?
5 Q. Have you had any conversations with Ms. Lisa Antony
6 about George Hank's instruction not to issue this
7 permit?
8 A. Well, speculating that she was in with the people
9 that were told at the same time, if that happened,
10 she would have known it.
11     MS. ZYLSTRA: His question is whether you
12 recall any specific communications you had with her.
13     THE WITNESS: Okay. I don't recall any
14 specific communications I had with her.
15 BY MR. INGRISANO:
16 Q. How about any general communications with her on the
17 topic of not issuing the Edgewood permit?
18 A. I didn't have any -- I don't believe I had any
19 conversations with her on the topic of not issuing
20 it. I did have conversations with her about Jennifer
21 Luhman asking about it being issued or not.
22 Q. Why did you copy George Hank on your 1:41 p.m. email?
23 A. Because if Jennifer had not been in contact with
24 George, then she needed to be, so I included George
25 so that Jennifer and George would be on the same

Page 32

1 email and could communicate with each other.
2 Q. But you believe you had talked to -- let me ask you
3 this.
4     Did you talk to George about the Edgewood
5 permit more generally or in relation to the specific
6 email from Ms. Luhman on March 14th to the best of
7 your recollection?
8     MS. ZYLSTRA: Object to the form,
9 foundation. You can answer.
10     THE WITNESS: After sending the email on
11 March 14th, George called me into his office which
12 resulted -- and I asked him if I should send a
13 clarification of that email, and he said that he
14 would. And then he sent the email at 4:59.
15 BY MR. INGRISANO:
16 Q. What else did George tell you in that call into his
17 office after you sent your email at 1:41 p.m?
18 A. That was a very brief meeting.
19 Q. Okay. I understand it's brief. What else did he say
20 during that meeting?
21 A. He said that he didn't feel that I worded the email
22 very well. I asked him if I should send a
23 clarification, and he said that he would do so and
24 that was the extent of it.
25 Q. And had you talked to him about the wording of your

Page 33

1 email at 1:41 p.m. prior to sending it?
2 A. I did not.
3 Q. Did Mr. Hank talk to you about 80 foot poles being a
4 violation of the master plan?
5 A. He did not.
6 Q. Were you involved with any communications with
7 Assistant City Attorney John Strange involving your
8 email or the response on that date, March 14th?
9 A. I'm not at all familiar with John Strange.
10 Q. You don't have any recollection of speaking with Mr.
11 Strange?
12 A. I don't have any recollection of that name.
13 Q. Do you have a recollection of speaking with anyone in
14 the assistant -- in the City Attorney's Office on
15 March 14 regarding the email that you sent on that
16 date?
17 A. I did not talk to anybody in the City Attorney's
18 Office.
19 Q. Please describe Mr. Hank's demeanor and affect
20 towards you when he called you into his office on
21 March 14.
22     MS. ZYLSTRA: Object to form. You can
23 answer.
24     THE WITNESS: He was concerned that what I
25 wrote could be misconstrued.

Brown & Jones Reporting 414-224-9533
A Veritext Company www.veritext.com

Page 34

1  BY MR. INGRISANO:
2  Q.  Anything else?
3  A.  No.
4  Q.  Did you receive any -- besides not liking your
5      phrasing, did he express any other criticism of you
6      for your handling of that situation?
7  A.  No, he didn't.
8  Q.  Have you had any kind of negative employment
9      consequences as a result of sending that email on
10     March 14?
11 A.  I have not.
12         MS. ZYLSTRA:  Late objection to form.
13     Sorry.
14 BY MR. INGRISANO:
15 Q.  So Mr. Hank in his email at 4:59 p.m. that same day
16     writes, "Alan is definitely out of the loop.  It had
17     nothing to do with public outcry."
18         Correct?
19 A.  That is what he wrote.
20 Q.  So he's directly contradicting what you wrote in your
21     prior email, correct?
22         MS. ZYLSTRA:  Objection, form, foundation.
23     You can answer.
24         THE WITNESS:  I don't think so.
25 BY MR. INGRISANO:

Page 35

1  Q.  So you write, "due to the continued public outcry
2      about the project, we have been told."
3          And he writes later, "it had nothing to do
4      with public outcry."
5          So he's contradicting what you wrote to
6      Jennifer Luhman, correct?
7          MS. ZYLSTRA:  Object to the form.
8          THE WITNESS:  I don't think so.
9  BY MR. INGRISANO:
10 Q.  Okay.
11 A.  I don't think so because the "it" he's talking about
12     is the issuance of the permit.  So he's saying the
13     issuance of the permit had nothing to do with public
14     outcry.
15 Q.  You mean the nonissuance of the permit?
16 A.  Issuance or nonissuance.
17 Q.  Okay.
18 A.  Either way.
19 Q.  And what were you saying was due to the continued
20     public outcry in your email?
21 A.  In my email I'm saying that due to public outcry,
22     there may be many more entities, approval layers
23     involved than what I would -- what I would expect on
24     some other projects.  But I have no idea what they
25     have for approval levels.

Page 36

1  Q.  Sir, what did you do to prepare for your deposition
2      today?
3  A.  When I first found out I was going to be deposed, I
4      looked through the -- any records I could find in our
5      office to see what the historical record was.
6  Q.  Anything else?
7  A.  I met with the lawyer.
8  Q.  When?
9  A.  Yesterday.
10 Q.  For how long?
11 A.  Two-and-a-half hours.
12 Q.  Did you review any documents with counsel?
13         MS. ZYLSTRA:  You can answer.
14         THE WITNESS:  We did.
15 BY MR. INGRISANO:
16 Q.  What documents did you review?
17 A.  Reviewed, let's see, what did we review.  Reviewed a
18     email chain similar to Exhibit 168 minus the last
19     email on there which I don't believe was on what we
20     looked at.
21 Q.  Okay.  Anything else?
22 A.  We looked at a plan review letter that I had written
23     for Edgewood so that we could get -- establish a --
24         MS. ZYLSTRA:  Careful.  Just what you
25     reviewed, not any --

Page 37

1  BY MR. INGRISANO:
2  Q.  What was the plan letter about, sir?
3          MS. ZYLSTRA:  Not the discussions with us,
4      but you can answer as to that.
5          THE WITNESS:  It was for a -- an
6      alteration to a building, alteration.
7  BY MR. INGRISANO:
8  Q.  On the Edgewood College campus?
9  A.  On the Edgewood College campus.
10 Q.  Anything else that you recall looking at?
11 A.  I don't recall anything else.
12 Q.  Okay.  Have you had communication with anyone else in
13     your department about your -- the substance of your
14     testimony today?
15 A.  I have not.
16 Q.  Have you had any communication with Mr. Hank
17     regarding the substance of your testimony today?
18 A.  I have not.
19         MR. INGRISANO:  I've got nothing further.
20     Thank you.
21         MS. ZYLSTRA:  We reserve the right to read
22     and sign.
23         COURT REPORTER:  Would you like the same
24     transcript order?
25         MS. ZYLSTRA:  Yes, please.  That would be

Page 38

1  great.
2       (At 1:53 p.m., the deposition concluded.)
3              * * *

Page 39

1           C E R T I F I C A T E
2  STATE OF WISCONSIN )
                      ) SS
3  MILWAUKEE COUNTY   )
4       I, VICKY L. ST. GEORGE, Registered Merit
5  Reporter and Notary Public in and for the State of
6  Wisconsin, do hereby certify that the preceding deposition
7  was recorded by me and reduced to writing under my
8  personal direction.
9       I further certify that said deposition was
10 taken at the offices of GODFREY & KAHN, S.C., One East
11 Main Street, Suite 500, Madison, Wisconsin on
12 August 30, 2022, commencing at 1:00 p.m. and concluding at
13 1:53 p.m.
14      I further certify that I am not a relative or
15 employee or attorney or counsel of any of the parties, or
16 a relative or employee of such attorney or counsel, or
17 financially interested directly or indirectly in this
18 action.
19      In witness whereof, I have hereunto set my hand
20 and affixed my seal of office at Milwaukee, Wisconsin,
21 this 3rd day of September, 2022.
22          *Vicky L. St. George*
23
24          VICKY L. ST. GEORGE
            Notary Public in and for the
25          State of Wisconsin
            Commission Expires 1/29/2025

Page 40

1           Veritext Legal Solutions
            1100 Superior Ave
2           Suite 1820
            Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
5  September 13, 2022
6  To: Ms. Zylstra
7  Case Name: Edgewood High School Of The Sacred Heart, Inc. v. City Of Madison, Wisconsin, Et Al.
8  Veritext Reference Number: 5419461
9  Witness: Alan Harper   Deposition Date: 8/31/2022
10
11 Dear Madam:
12 Enclosed please find a deposition transcript. Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change. Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 41

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 5419461
3       CASE NAME: Edgewood High School Of The Sacred Heart, Inc. v. City Of Madison, Wisconsin, Et Al.
        DATE OF DEPOSITION: 8/31/2022
4       WITNESS' NAME: Alan Harper
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____   _____
9  Date              Alan Harper
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
          Statement; and
14     Their execution of this Statement is of
          their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
       _____
18     Notary Public
19     _____
       Commission Expiration Date
20
21
22
23
24
25

Page 42

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 5419461
 3    CASE NAME: Edgewood High School Of The Sacred Heart, Inc. v.
   City Of Madison, Wisconsin, Et Al.
      DATE OF DEPOSITION: 8/31/2022
 4    WITNESS' NAME: Alan Harper
 5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
 8 well as the reason(s) for the change(s).
 9    I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____    _____
      Date           Alan Harper
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18      in the appended Errata Sheet;
      They signed the foregoing Sworn
19      Statement; and
      Their execution of this Statement is of
20      their free act and deed.
21    I have affixed my name and official seal
22 this _____ day of_____, 20____.
23    _____
            Notary Public
24
      _____
25    Commission Expiration Date
```

Page 43

```
 1        ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 5419461
 3 PAGE/LINE(S) /    CHANGE    /REASON
 4 _____
 5 _____
 6 _____
 7 _____
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____    _____
20 Date            Alan Harper
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23    _____
            Notary Public
24
      _____
25    Commission Expiration Date
```