UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EDGEWOOD HIGH SCHOOL OF THE
SACRED HEART, INC.,

                Plaintiff,                            Case No. 3:21-cv-00118

                v.

CITY OF MADISON, WISCONSIN, et al.,

                Defendants.

---

**CITY DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO
SUPPLEMENT THE SUMMARY JUDGMENT RECORD AND RESPOND TO
SUPPLEMENTAL ARGUMENT**

---

## INTRODUCTION

Plaintiff Edgewood High School moves to supplement its summary judgment pleadings, asserting that it has not delayed, there is good cause to supplement the pleadings, and the supposed evidence that it wants the Court to consider demonstrates that the City's summary judgment motion should be denied. In reality, Edgewood has delayed, there is no good cause, and the asserted evidence offers nothing new to this Court as shown below. In fact, this motion is simply a veiled attempt for Edgewood to re-argue its positions on summary judgment. Accordingly, the motion should be denied.

Moreover, to the extent the Court were to consider supplementation, the Court should consider the recent deposition testimony of Sister Phelan in which she admitted to having ***no personal knowledge*** of several of the matters included in her declaration. And even more problematic for Edgewood, she testified that she is not aware of any Catholic faith tenet or

1

principle concerning competitive sports, never mind night games. Her deposition testimony significantly undercuts Edgewood's claims.

## ARGUMENT

### I.     No Good Cause Exists to Supplement the Summary Judgment Record.

Edgewood asserts that there is good cause to supplement its response to summary judgment because Edgewood was diligent in pursuing discovery but the City did not produce these documents until after summary judgment was briefed. (Br., dkt. #81 at 3.) However, what Edgewood neglects to inform the Court is that these documents were not ***requested*** until ***after*** the summary judgment was briefed. With respect to the documents produced on August 17, 2022, plaintiff did not request those until July 15, 2022—two months after the summary judgment deadline. (Zylstra Dec., dkt. #69, at ¶25.) In addition, plaintiff has known about the existence of these documents since completing the Hank and Tucker depositions in April as the documents relate to questions from those depositions. Thus, plaintiff's reliance on the City not producing these documents until August 17 as a basis to support its motion is misguided. *See, e.g.*, *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 92 (5th Cir. 1996) ("use of [Rule 56(f)] not only requires meeting several benchmarks ..., but also requires due diligence *both* in pursuing discovery *before* the summary judgment initiative surfaces *and* in pursuing an extension of time thereafter. In other words, Rule 56(f) is designed to minister to the vigilant, not to those who slumber upon perceptible rights.") (emphasis in original) (citation omitted); Fed. R. Civ. P. 16(b)(4) (scheduling order may be modified "only for good cause and with the judge's consent.").

In addition, plaintiff further delayed in bringing the motion to supplement even once the documents were produced. Plaintiff waited over a month after receiving the documents to move for relief and did so ***after*** discovery has closed. Such is not timely. *See, e.g.*, *Graneros Unidos*

*S.A. de C.V. v. GSI Grp., LLC*, No. 10-3074, 2014 WL 10503851, at *1 (C.D. Ill. Dec. 10, 2014) (rejecting supplementation after summary judgment and discovery were closed, citing *Zingerman v. Freeman Decorating Co.*, 99 F. App'x 70, 72, 2004 WL 1088277, at *1 (7th Cir. 2004), for the proposition that trial court did not err in deciding summary judgment motion and declining joint motion to extend the discovery deadline).

**II.     The Evidence That Edgewood Seeks to Supplement Has Little to No Probative Value To the Summary Judgment Motion.**

    A.  <u>Edgewood's Proposed Additional Facts.</u>

Edgewood asserts that this alleged "new evidence" is "highly relevant" to its claims and its opposition to the City's pending Motion for Summary Judgment. (Br., dkt. #81 at 3.) However, a close look at the actual evidence demonstrates that (1) some of the evidence doesn't say what Edgewood contends it does and (2) the remaining evidence is consistent with the evidence that is already in the record, making it of little value. Indeed, Edgewood's motion is nothing but an improper attempt by Edgewood to re-argue its case.

To begin, plaintiff proposes to supplement its opposition to summary judgment with 13 additional proposed facts. (*See* dkt. #79.) However, for *five* of those 13 proposed findings of fact, plaintiff cites as support only its own previous proposed findings of fact, dkt. #48, that plaintiff filed on June 10, 2022. (*See* dkt. #79 at ¶¶ 261, 262, 263, 269, 270.)  For each of those five proposed findings of fact, there is absolutely nothing new added as support other than what plaintiff filed in June. And what is even more disingenuous, for a few of these proposed findings of fact, counsel did not simply repeat them word for word as what it filed in June, but slightly changed the wording of its original proposed finding of fact – again, without citing to any new evidence or having reason to change the language of the prior proposed finding of fact.

In addition, for three other of the proposed findings of fact, plaintiff's addition is either consistent with what has been produced before to the court on summary judgment, or is simply improper argument that should be struck. For example, Proposed Fact 101 originally provided that Mr. Tucker prepared his February 27, 2019 letter in consultation with Mr. Strange. (Dkt. #47, PPFF 101.) Plaintiff cited the Tucker deposition at 127 as support. Plaintiff seeks to add as "new" that Mr. Tucker shared multiple drafts of the letter with Mr. Strange and asserts that Mr. Strange was aware of its contents, citing Exhibit A to the Sterett Declaration. (*See* dkt. #79 at PPFF 101.) Exhibit A shows that the letter of Mr. Tucker was sent by email to Attorney John Strange with no commentary, but simply the letter attached to the email. But plaintiff already had the deposition of Matthew Tucker who testified that the letter at issue was drafted in consultation with Mr. Strange. That would by definition mean that Mr. Strange was aware of it. Mr. Tucker's deposition occurred on April 29, 2022. Thus, this evidence establishes nothing new that warrants supplementation of the summary judgment record.

With respect to new Proposed Finding of Fact 196, plaintiff improperly seeks to combine many proposed facts into one. *Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1071 (W.D. Wis. 2000) (chastising counsel for including dozens of factual propositions within a single paragraph because court requires "each paragraph shall state only one factual proposition"). However, taking the sentences individually, plaintiff seeks to add the second sentence (which it has put in bold) a selectively quoted phrase from the Evers deposition that the introduction of the amendment to the Campus Institutional ("CI") District ordinance and the referral of the Edgewood master plan repeal ordinance were a mere coincidence, citing the Evers deposition, dkt. #31, at 129-130. Setting aside that plaintiff's selective quotation does not fairly represent the testimony, plaintiff

had the Evers deposition at the time of summary judgment. There is no reason this sentence could not have been proposed as a fact at the time.

In terms of the third sentence, also in bold, that plaintiff seeks to add, plaintiff contends that Mr. Strange had recommended that the Evers ordinance could be introduced from the floor on August 6 for it to track with the repeal ordinance. (Dkt. #79 at PPFF 196.) First, plaintiff improperly misconstrues the document. There is no recommendation by Mr. Strange of anything in that email that he cites. Plaintiff is adding words that do not exist in the document. Moreover, Alder Evers is not even on the email, yet plaintiff seeks to suggest that this document somehow represents Evers' intent! Setting all of this aside, plaintiff's unsupported argument—that the timing of these two ordinances is somehow nefarious—is not new as plaintiff argued that on summary judgment. Plaintiff already proposed as findings of fact that the amendment to the CI District Ordinance was introduced on the floor on August 6 and that the Edgewood Master Plan repeal was also introduced and referred for hearing before the Plan Commission on August 6. (*See* dkt. #48 at PPFF 175, 190-191.) Thus, there is nothing new in this proposed fact other than improper argument.

With respect to new Proposed Finding of Fact 197, plaintiff seeks to add the sentence "the Evers Ordinance Amendment was targeted at EHS." But there is absolutely no support whatsoever for that statement, nor does plaintiff provide any citation for it. It is an unsupported and improper argument. *American Nat'l Prop. & Cas. Co. v. Graham*, No. 04-C-1185, 2006 WL 1589623, at *1 (E.D. Wis. June 2, 2006) ("A fact that is neither supported nor stipulated to is not a fact properly presented."); *McMahon v. Carroll College*, No. 04-C-384, 2007 WL 804149, at *2 (E.D. Wis. March 9, 2007) ("Arguments have no place in proposed findings of fact or responses to such findings."). As to the added sentence that Attorney Strange referred to the Edgewood

Master Plan repeal and the zoning ordinance amendment as the "Edgewood ordinances," such hardly supports the conclusion that the City targeted Edgewood. Indeed, when the CI District Zoning Amendment was introduced and as it was working its way through the City process, Edgewood had been in contact with the City to register its opposition to it, thus the reference. (Dkt. #33, Elliott dep., 214:7-13.) And Attorney Strange's shorthand reference to the Edgewood ordinances in a calendar invite does not change or have any relevance to what *Alder Evers* intended as he was not even on the calendar invite. Further, the amendment was generally applicable to any entity in the CI District and affected far more entities than Edgewood, as Edgewood itself has admitted. (*See* dkt. #57, Resp. to PPFF 197 (Edgewood officials warning public school officials that the ordinance would impact any improvements or modifications public schools wished to pursue for their athletic fields).) Indeed, 13 alders sponsored the amendment. (*See* dkt. #41, DPFF 152.)

With respect to new Proposed Findings of Fact 264 and 268, plaintiffs point to an email exchange between Forward Electric, Alan Harper, and George Hank in which Mr. Harper uses the phrase 'public outcry.' With respect to the comments by Alan Harper, plaintiffs ignore that Mr. Harper's email begins "I'm not really in the loop on this one but I thought you were." (Dkt. #65-10.) Further, Mr. Hank, who was involved with Edgewood, immediately responded to the Harper email the same day indicating that:

> Alan is definitely out of the loop.  It had nothing to do with public outcry.  We have a concern that the 80-foot poles may be a violation of their Master Plan and/or the Zoning Code.  We did not want to issue the permit to find that out and then order them down or change.

(*Id*.)  And this entirely consistent with what George Hank testified to at his deposition.

Plaintiff also fails to inform the court of what Alan Harper's testimony was regarding the document. Mr. Harper testified that he had no idea what was going on and stated unequivocally that George Hank never said anything about a public outcry or provided that as a reason for the denial of the permit. (Harper Dep., dkt. #91, 6:17-23, 19:6-23, 21:22-22:2.) Mr. Harper testified that he wrote public outcry based on things he read in the newspaper. (Harper Dep. at 6:17-23.) Harper testified that he did not know any of the specifics of the project and did not even know what the process was that would be involved or the approvals that would need to be obtained for this lighting permit. (Harper Dep. at 20:14-21:7.) Harper testified that he never sees lighting plans and the lighting plan approval of Edgewood, which was the subject of his email, was the first one he has ever seen in his 22 years with the City. (Harper Dep. 26:2-27:6.)

Finally, with respect to Proposed Finding of Fact 265, plaintiff posits that George Hank indicated that Edgewood's lighting permit needed to conform to a 68-foot light pole height requirement and asserts that if Edgewood submitted a conforming application (i.e., inferring one that met the 68-foot light pole requirement), the City would issue the permit. Plaintiff cites an email attached to the Ingrisano declaration but plaintiff is only half right. Hank did advise a resident that Edgewood's outdoor lighting permit had not yet been issued and that it needed to conform to a 68-foot light pole height requirement. However, Hank does not say that the City would issue a permit if Edgewood met the 68-foot height requirement alone but rather, indicated in that email that the permit would also need to meet other requirements for it to issue. Thus, the inference plaintiff seeks to add to the proposed fact—that meeting the 68-foot height requirement alone was sufficient for the permit—is not supported. *American Nat'l Prop.*, 2006 WL 1589623, at *1 (unsupported fact not properly presented).

B.   Edgewood's Supplemental Response to Defendants' Proposed Findings of Fact.

Plaintiff also seeks to supplement its responses to three of defendants' proposed finding of fact. However, again, there is nothing new. With respect to the supplemental response to Proposed Finding of Fact 97, plaintiff asserts that George Hank told Alan Harper that the permit was being withheld due to "public outcry." But as explained above, the evidence does not support that. Alan Harper testified that George Hank never said that to him, he was out of the loop on Edgewood, and that he made an unfounded assumption based on newspaper articles he read. (Harper Dep., dkt. #91, 6:17-23, 19:6-23, 21:22-22:2.)

Plaintiff also asserts that George Hank had inconsistent rationales in Proposed Finding of Facts 98 and 99. That is not only untrue, but in any event, it is based on evidence that the plaintiff knew long before summary judgment. Edgewood has been on notice since at least *2019* that the City believed Edgewood's proposed 80-foot poles exceeded the 68-foot maximum height limitation of its ordinances. In fact, Edgewood submitted a lighting application in September of 2019, which application lowered the proposed height of the lights from 80 feet to 68 feet. In a September 30, 2019 letter accompanying that application, Attorney Wautier wrote:

> "***The revisions lower the height of the four light poles from 80 feet to 68 feet***, reduce the foot candle illumination intensity, and remove 'punt' lighting. . . . if the City intends to continue to withhold an electrical permit under the Existing Approved Application, please use the attached Alternative Application to issue an electrical permit allowing Edgewood to install outdoor lighting in full compliance with City of Madison Ordinance Section 10.085 'Outdoor Lighting.'"

(Dkt. #40-29, Ex. BB (emphasis added). Counsel for Edgewood even quoted this letter *verbatim* at George Hank's deposition and cannot argue now that the issue is somehow new, warranting supplementation of summary judgement. (*See* Hank Dep., dkt. #30, 71:11-14.)

For the supplementation of its response to Proposed Finding of Fact 130, plaintiff impermissibly seeks to propose its own additional facts in response to defendant's proposed fact. That is improper. *See American Nat'l Prop.*, 2006 WL 1589623, at *1; *Computer Docking Station Corp. v. Dell, Inc.,* No. 06-C-32-C, 2007 WL 5117465, *2 (W.D. Wis. Jan. 10, 2007). In addition, the response is improperly argumentative. *See McMahon*, 2007 WL 804149, at *2. How Mr. Strange referred to something in a calendar invite of which Alder Evers was not even a recipient does not put into dispute what Alder Evers stated his intent was with respect to the ordinance.

### III.    Amending plaintiff's summary judgment filings would be futile.

Plaintiff seeks to add to the summary judgment record a proposed fact that Edgewood's permit was denied because of public outcry, relying solely on the Harper email. Such does not warrant supplementation for at least two reasons.

First, as explained above, plaintiff's contention that Edgewood's permit was denied because of public outcry is not supported by the actual record. Plaintiff seizes on a single email, written by an employee (Alan Harper) who cautioned that he was "not really in the loop on this one," who was not the employee assigned to review Edgewood's lighting application, and who had never even reviewed a lighting application before. The inaccurate statement in Alan Harper's email was quickly corrected by his department head, George Hank, who was involved. Alan Harper testified unequivocally that George Hank had never told him that Edgewood's permit was being withheld due to public outcry, but rather, that he simply assumed that the public outcry

related to the project, which he had seen in the media, had some connection to the withholding of the permit.

Second, even if plaintiff's proposed facts relating to the Alan Harper email were added to the summary judgment record, such would be futile. Plaintiff's new proposed facts do not help its RLUIPA equal terms claim because they do nothing to demonstrate that Edgewood was treated on less than equal terms than a similarly situated secular comparator, or that that the City enacted a religious gerrymander to impose a burden that applied only to religious practices. Plaintiff's substantial burden provision fares no better, as none of the new proposed facts demonstrate any burden on Edgewood's free exercise of religion. Finally, Edgewood's arguments that its new proposed facts bolster its free exercise and vested rights claims are undeveloped, and fail for the reasons discussed below.

A.  Edgewood's Request to Supplement cannot save its Equal Terms Claim.

To establish an equal terms claim, a plaintiff must show that two institutions subject to the same land use regulations have been treated differently under the same accepted zoning criteria. *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 368–71 (7th Cir. 2010); *Eagle Cove Camp & Conf. Ctr., Inc. v. Town of Woodboro, Wis.*, 734 F.3d 673, 683 (7th Cir. 2013) (*abrogated on other grounds as recognized in Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006). The comparator must have received more favorable treatment under the same zoning regulation. *Vision Church*, 468 F.3d at 1003.

Edgewood's proposed supplement to its summary judgment is immaterial to its equal terms claim because Edgewood has not explained how any of its proposed facts demonstrate that Madison Memorial High School or University of Wisconsin-Madison—Edgewood's proffered

comparators—are similarly situated. Nor is there any explanation of how the new proposed facts indicate that Edgewood was treated on less than equal terms than these two institutions ***with respect to the accepted zoning criteria***. This is key because, regardless of what Edgewood mistakenly believes about the City's purported purposes and motives, the City's purposes and motives are irrelevant to this objective inquiry. *See River of Life Kingdom Ministries*, 611 F.3d at 371 ("'Purpose' is subjective and manipulable, so asking about 'regulatory purpose' might result in giving local officials a free hand in answering the question 'equal with respect to what?' 'Regulatory criteria' are objective—and it is federal judges who will apply the criteria to resolve the issue."); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83, 125 (2d Cir. 2019) ("To prevail on an equal terms claim, a plaintiff must show that the challenged law – by its terms or operation – actually differentiates between religious and secular groups, not merely that it was enacted with the intent to adversely affect the religious group.").

If a religious institution and its similarly situated comparator "are treated the same from the standpoint of an accepted zoning criterion, that is enough to rebut an equal-terms claim." *Eagle Cove Camp*, 734 F.3d at 683 (partial abrogation on other grounds recognized in *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015)) (quoting *River of Life Kingdom Ministries*, 611 F.3d at 373) (brackets and ellipsis omitted). Because Edgewood cannot show that it was treated differently than any similarly situated comparator under the objective zoning criteria, Edgewood's equal terms claim fails.

Some courts also recognize that a plaintiff may establish an RLUIPA equal terms violation if it can show that a government entity enacted a "facially neutral law that nevertheless targeted religion through a 'religious gerrymander.'" *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1309 (11th Cir. 2006). "To prove this kind of statutory violation"

a plaintiff must "show that the challenged zoning regulation separates permissible from impermissible assemblies or institutions *in a way that burdens 'almost only' religious uses*." *Id.* (emphasis added).

Edgewood argues that newly disclosed emails demonstrate that "the City departed from basic principles of neutrality when it amended the Campus-Institutional zoning ordinance on October 1, 2019, to place a burden solely on EHS." (Br., dkt. #81, at 7.) However, that inference is impossible to draw. The amendment to the CI-District zoning ordinance applied equally to all institutions zoned CI that lacked a master plan,[1] something that Edgewood and its attorneys knew prior to this lawsuit and even ensured all the local high schools were aware of at the time of its consideration. (Dkt. #57, Resp. to PPFF 197.) Edgewood has never contended that Madison West High School or Madison East High School would be subject to a different standard if they sought to erect stadium lights nor could it.[2] In fact, concern about West High School erecting stadium lights was a concern of City Alders. (Dkt. #41, DPFF 133; dkt. #57, Resp. to PPFF 185.) Because Edgewood cannot show that any 'burdens' associated with the amendment to the CI District Ordinance fell solely on religious uses, Edgewood cannot demonstrate that the amendment was a religious gerrymander.

---

[1] Because Edgewood had not yet repealed its master plan at the time the ordinance was amended, the amendment actually did not apply to Edgewood at all. Edgewood decided to proceed with repealing its master plan *after* the amendment was enacted, and only then did Edgewood fall within the application of the amendment. In any case, the amendment provides that "[i]n a Campus-Institutional District without a Campus Master Plan, the establishment, improvement, or modification of any primary or secondary use occurring outside of an enclosed building shall require conditional use approval." M.G.O. §28.097(2)(d). By its plain terms, the amendment is applicable to any CI District without a master plan.

[2] To the contrary, Edgewood's athletic director wrote to his counterparts at the public high schools to warn them that they would be negatively affected by the amendment, noting that "[f]or example, the ordinance will likely impact West High School and any improvements or modifications (no matter how small as there is no discretionary language) it wishes to pursue for its athletic fields . . ." (Dkt. #57, Resp. to PPFF 185.)

Edgewood cites *Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 326 F. Supp. 2d 1140, 1153 (E.D. Cal. 2003), which Edgewood claims to have held that "evidence that County's decision to deny permit based on public outcry 'at least raises an inference of possible discrimination.'" (Dkt. #81 at 6). However, *Guru Nanak* did not say that. What the court in *Guru Nanak **actually*** said was that when a Sikh society chose a parcel of land for its temple that was specifically selected to address the county's zoning concerns but the county denied a permit for the temple anyways, that raised the inference of discrimination. The sole mention of "public outcry" in *Guru Nanak* was when it quoted a portion of the district court's decision in *Westchester Day Sch. v. Vill. of Mamaroneck*, 280 F. Supp. 2d 230, 243 (S.D.N.Y. 2003), *vacated*, 386 F.3d 183 (2d Cir. 2004). The quote from *Westchester* was that "defendants' complete denial of [plaintiff's] application was not based on any compelling governmental interest ... and that defendants' abrupt reversal and its 3–2 vote to deny plaintiff's application was a reaction to belated public outcry . . ." *Guru Nanak*, 326 F. Supp. 2d at 1153 (E.D. Cal. 2003) (quoting *Westchester,* 280 F. Supp. 2d at 243). The quote from *Westchester* was not part of an RLUIPA equal terms or discrimination analysis. Instead, the court was looking at whether the city had a compelling government interest to justify the substantial burden that the city had imposed on the operators of an Orthodox Jewish day school. The court held that appeasing public outcry was not a compelling government interest. Here, the City does not (and would not) argue that appeasing public outcry is a compelling government interest.

Plaintiff's references to 'discrimination' are particularly futile because Plaintiff has not even brought an RLUIPA discrimination claim. An RLUIPA discrimination claim is founded on a violation of 42 U.S.C. § 2000cc(b)(2) ("No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious

denomination."), while an equal terms claim is founded on a violation of 42 U.S.C. § 2000cc(b)(1) ("No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.").

Plaintiff's first cause of action in its complaint is specifically dedicated to alleged violations of Section 2000cc(b)(1). (Dkt. #1 at 38, Count I, Violations of the Religious Land Use and Institutionalized Persons Act Equal Terms Provision, 42 U.S.C. § 2000cc(b)(1)). No reference is made in the complaint at all to 2000cc(b)(2), nor did plaintiff cite that provision of RLUIPA in its original brief in opposition to summary judgment. (*See* Dkt. 46 at 10). "[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002). Even if Edgewood were allowed to amend its complaint by supplementing its opposition to summary judgment, such would be futile. Plaintiff's cursory and conclusory suggestions of possible discrimination are insufficient to state a claim, let alone survive summary judgment.

B.  Edgewood's Substantial Burden Claim remains Unsalvageable.

Edgewood argues that "evidence of the government acting arbitrarily, in bad faith, or with shifting positions can buttress a substantial burden claim," citing *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005); and *World Outreach Conf. Ctr. v. City of Chicago*, 787 F.3d 839, 843–44 (7th Cir. 2015). However, both cases are inapposite. Neither case even discusses 'shifting positions' (something that Edgewood fails to provide evidence of regardless), and both cases are instead examples of where the government imposed a substantial burden on a religious entity by *arbitrarily* burdening religious land uses, relying on frivolous interpretations of municipal law.

14

In *Sts. Constantine*, a city denied a church's request to rezone a parcel of land based on a plainly incorrect interpretation of law. 396 F.3d at 898–99. The cited reason for denial of the rezoning was so obviously incorrect that the court found there was at least a "whiff of bad faith" to the decision. 396 F.3d at 901. The substantial burden in *Sts. Constantine* was that the church in question would be forced to either find a new parcel or restart the permit process for no good reason at all. *Id.*

Similarly, in *World Outreach*, the court found that the city imposed a substantial burden on a religious organization when it sued the organization to enforce its patently incorrect interpretation of the zoning code. The lawsuit was deemed to be frivolous and the court found that the frivolous, bad-faith lawsuit substantially burdened the organization. 787 F.3d at 843–44.

Edgewood argues that the fact that the City has advanced numerous reasons for denial of the permit demonstrates the City's bad faith. Here, the fact that the City has cited multiple reasons for the denial of Edgewood's lighting permit does not demonstrate bad faith or form the basis for a finding of substantial burden because the City's reasons are ***all*** supported by municipal law. The fact City officials had more than one basis to support their decision is unsurprising given the circumstances.

While the denial of a zoning request based on a frivolous legal argument was held to be a substantial burden in *St. Constantine*, here, Edgewood has failed to show that the legal underpinnings of the City's decision were incorrect, never mind frivolous. Edgewood has not even attempted to dispute that Section 10.085 of the City's lighting code requires compliance with zoning, that City ordinances prohibited structures taller than 68 feet, or that City zoning ordinances require a master plan to identify all proposed capital improvements. (*See* Dkt. #58, Reply to DPFF 12, 34, 98, 105, 106).

15

To the extent that Edgewood argues that the uses of its field were irrelevant to Edgewood's permit application, that argument is foreclosed by the undisputed facts that Section 10.085 requires that any outdoor lighting "be in conformance with the provisions of the ordinance, the building code, and all other codes and regulations" and that the zoning code required a master plan to include all land uses and proposed open-space uses. (*See* Dkt. #58, Reply to DPFF 34, 98).

Because the City had numerous, well-founded reasons to deny Edgewood's permit, the denial was not arbitrary and *St. Constantine's* and *World Outreach* are inapposite.[3]

C.   Edgewood is Still Confused about the Rules Governing Strict Scrutiny.

Edgewood devotes a single paragraph (consisting of two sentences) in its brief to argue that its new proposed facts bolster its free exercise claim, writing that "the City's decisions . . . are subject to strict scrutiny because they were not the result the City's even-handed enforcement of generally applicable laws but rather involved individualized, discretionary, post-hoc and even targeted government actions." (Dkt. #81 at 9.) Edgewood claims that "[t]he evidence from the August 17 production addressed above bears this out" but Edgewood fails to identify which evidence it is referring to, or how that evidence supports this claim.

---

[3] In its brief, Edgewood cites two age-discrimination cases without any explanatory parentheticals, *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir.2003) and *Lawhead v. Ceridian Corp.*, 463 F. Supp. 2d at 856, 864 (N.D. Ill. 2006). These cases are apparently offered in support of Edgewood's position that the City's decision to deny Edgewood's permit was pretextual. Those cases discuss when a fact-finder may infer that the reasons proffered for an employment decision are pretextual. Edgewood has not offered any argument or explanation for why a test designed for the age-discrimination context has any bearing here, nor has Edgewood explained how the tests outlined in those cases could be applied presently. Thus, Edgewood's argument is undeveloped and is therefore waived. Lastly, those cases do not support Edgewood's position. *See e.g. Schuster*, 327 F.3d at 577 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations *must actually be shifting and inconsistent* to permit an inference of mendacity.") (citation omitted) (emphasis added). 'Over-defending' a decision by offering multiple reasons for a termination does not give rise to an inference of pretext when the reasons offered are substantially consistent. *Id.*

First, Edgewood's argument is extremely undeveloped, lacking completely in citation to authority or the record, and therefore it is waived. *See U.S. v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

Second, even if one were to reference Edgewood's previous briefing in an attempt to discern an argument, Edgewood's claim fails. In its previous brief in opposition to summary judgment, Edgewood similarly asserted that "a longstanding tenet of our free exercise jurisprudence…is that a law burdening religious exercise must satisfy strict scrutiny if it gives government officials discretion to grant individualized exemptions," citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1883 (2021) (Barrett, J., concurring). (Dkt. #46 at 64.) As the City explained in its reply brief on summary judgment, Edgewood severely misconstrues the rule from *Fulton*. *Fulton* stands for the proposition that if a government has created a system of individualized exemptions, the government "may not refuse to extend that exemption system to cases of 'religious hardship' without compelling reason." *Fulton*, 141 S. Ct. at 1878, 210 L. Ed. 2d 137 (brackets omitted). Absolutely nothing in *Fulton* suggests that strict scrutiny applies every time that a city official makes an assessment of whether an individual religious entity is in compliance with law or anytime an official acts within their discretion with respect to the religious entity.

Edgewood has not identified any system of individualized exemptions that it was excluded from. Indeed, Edgewood admitted before this lawsuit that the CI-District zoning ordinance applied equally to all institutions zoned CI that lacked a master plan and ensured all the local high schools were aware of that too. (Dkt. #57, Resp. to PPFF 197.) Nor has Edgewood identified any religious

hardship that it claims would justify an exemption from that system. Unless Edgewood can make those showings, *Fulton* is inapplicable.

    D.  <u>Edgewood's Vested Rights Claim Suffers from the Same Problems it did Before.</u>

Edgewood argues that "the City's August 17 production serves to confirm EHS's outdoor lighting application had been approved by the City and that its permit application was compliant when submitted." (Dkt. #81 at 9.) For support, Edgewood cites two of its amended proposed facts, claiming that Alan Harper and John Strange had said Edgewood's lighting plan was "approved."

But whether or not the lighting plan was approved does not answer the essential question of whether the lighting application was fully compliant with the zoning laws in effect at the time of the application. Indeed, even if a permit is actually *issued*, which never even occurred here, a landowner may still not obtain vested rights if the permit application was not compliant with zoning. *See Meinholz, LLC v. Dane Town Bd. of Zoning Appeals & Adjustment*, 2022 WI App 30, ¶ 83, 978 N.W.2d 88 ("Issuance of a permit which violates zoning ordinance not only is illegal per se, but is injurious to the interests of property owners and residents of the neighborhood adversely affected by the violation.") (brackets and ellipses omitted); *City of Milwaukee v. Leavitt*, 31 Wis. 2d 72, 78, 142 N.W.2d 169, 173 (1966) (city not estopped from revoking wrongfully issued occupancy permit).

"[I]t is well established that erroneous acts or representations of municipal officers do not afford a basis to estop a municipality from enforcing zoning ordinances enacted pursuant to the police power." *Willow Creek Ranch, L.L.C. v. Town of Shelby*, 2000 WI 56, ¶ 49, 235 Wis. 2d 409, 434–35, 611 N.W.2d 693, 704. "Binding municipalities to every representation made by subordinate employees would produce severe results for the municipalities. Endless litigation

would ensue over the words of those employees, and important municipal decisions would be delayed pending resolution of those suits." *Id*. at ¶ 50.

Whether or not Edgewood's lighting application was 'approved', and whether shifting reasons were given for the granting, denial, or withholding of Edgewood's lighting permit (which the City disputes), is irrelevant. All that is relevant is whether the permit application complied with the zoning regulations in effect at the time of the application. As is more fully explained in the City's summary judgment briefs, Edgewood's application did not comply with the applicable ordinances. The light poles were not identified as a capital improvement in Edgewood's master plan as required, and for that reason, the permit was noncompliant. Additionally, the light poles were intended for a use prohibited by the master plan. Because Edgewood's lighting application did not strictly comply with the applicable ordinances, Edgewood has no vested right to a light permit. Edgewood cannot create a vested right by claiming that erroneous statements by City employees estop the City from enforcing the zoning laws on which all residents of the City rely.

## IV.    If the Court Permits Supplementation, It Should Also Consider Sister Phelan's Testimony Contradicting her Own Declaration.

While the City does not believe supplementation is warranted, to the extent the Court does allow supplementation, the more relevant supplementation would be consideration of the deposition testimony from Sister Kathleen Phelan. Edgewood submitted a declaration of Sister Phelan to support its opposition to the City's summary judgment filing. (Dkt. #53.) However, at her deposition, Sister Phelan admitted that she did not have personal knowledge of many of the facts in her declaration and even admitted that she has not attended any game at Edgewood's field since she left as principal in 1989. (Phelan Dep., dkt. #90, 99:21-25.) The following chart highlights the lack of foundation with respect to Sister Phelan's declaration:

| Statements in Declaration | Deposition Testimony |
|---|---|
| ¶8.  As part of educating the whole student, I have observed and seen reports of many instances of Edgewood High School's athletes and teams participating in community service. For example, the EHS boys' football team hosts and runs the Madison Police Department's annual youth football camp for underprivileged youth on our campus field. They also serve at the Madison Food Pantry farms. Similarly, the girls' golf team has for 19 years hosted the annual Crusade for the Cure golf tournament for the Susan B. Komen Foundation. Bringing athletics, prayer and service together helps to instill and further our Dominican values. | Q   Thank you.  You refer in that paragraph to the boys' football team hosting the Madison Police Department's annual youth football camp; correct?<br>A   Correct.<br>Q   Can you tell me what that entails?<br>A   I don't know exactly what it entails now.  I do know just my point in here is service is important to the athletic teams, and I'm mostly aware of what I see in the paper or what I see on the evening news.  ….<br>Q   Okay.  So with respect to this event, it sounds like you have not personally --<br>A   No.<br>Q   -- viewed it; correct?<br>A   No.  Again, I see what -- I talk to people, I read the newspaper, I watch the evening news.<br>Q   Okay.  Do you know whether this particular event occurred at the time that you were principal?<br>A   No, it did not.<br>…<br>Q   Okay.  Do you know whether this is a daytime or nighttime event?<br>A   I don't know.<br>Q   Okay.  In that same paragraph you mention that the girls' golf team has for 19 years hosted the annual Crusade for the Cure golf tournament.<br>A   Correct.<br>…<br>Q   Is it fair to say, similar to the football example, that this is something that you have not personally been a part of or witnessed; correct?<br>A   Correct.<br>…<br>Q   The 19 years, you're getting that from the newspaper?<br>A   Yes.<br>Q   Okay.<br>A   And from TV.<br>(Phelan Dep. 87:10-89:23) |

20

| | |
|---|---|
| ¶ 11.  In a modern culture that places a priority on sports, athletic offerings and opportunities are important components of Edgewood High School's ability to attract new students. | Q   Okay.  Do you have any specialized education or training on the topic of whether modern culture places a priority on sports? <br> A   Can you ask that again, please? <br> Q   Sure.  Do you have any specialized training or education on the topic of whether modern culture places a priority on sports? <br> A   No, I have no training -- <br> Q   Okay. <br> A   -- in that area. <br> Q   Have you ever spoken about that topic? <br> A   Spoken formally? <br> Q   Correct. <br> A   No. <br> Q   Have you ever done any research or writing on that topic, of whether modern culture places a priority on sports? <br> A   No. <br> Q   Do you agree that you're not an expert on modern culture and sports? <br> A   I would agree.  I'm not an expert. I have no training, have never spoken, or done any research on the topic of whether modern culture places a priority on sports. I am not an expert. <br> (Phelan Dep. 97:23-98:18) |
| ¶11. The offerings and facilities Edgewood High School has to offer prospective students, including athletic facilities, have to be comparable to local non-religious, public schools. | Q   Thank you.  Have you ever looked at or compared at all the facilities Edgewood High School has to offer prospective students as compared to other nonreligious high schools in the Madison area? <br> A   No. <br> (Phelan Dep. 99:16-20.) |
| ¶13.  On campus events, including popular athletic events like Friday night varsity football games, provide unique opportunities to reach out and engage both prospective students, Edgewood High School alumni and members of the Madison community to bring them to campus to experience and witness Edgewood High School, its values and mission. | She admits that she has never researched how many people Edgewood High School reaches with its off-campus activities as opposed to its on-campus activities and she is not an expert on that topic (Phelan Dep. at 98:19-99:15.) |

And perhaps, more importantly, Sister Phelan gave other testimony that completely undercuts Edgewood's arguments.  Sister Phelan testified that:

- A person does not need to play or have played competitive sports to live and practice the Catholic faith or to adhere to the values of the Dominican Sisters of Sinsinawa. (Phelan Dep., dkt. #90, at 60:1-10.)

- There is no requirement that any of the Dominican Sisters of Sinsinawa's sponsored schools have an athletic field. (*Id.* at 66:20-67:4.)

- She is not aware of any Catholic tenet or principle of the Catholic faith that addresses playing competitive sports. (*Id.* at 60:11-22.)

- She received a theology certificate and none of the teachings of her theological classes involved playing competitive sports. (*Id.* at 60:23-61:4.)

- She is not aware of any published writings that identify playing competitive sports as part of the Dominican Sisters of Sinsinawa's religious beliefs. (*Id.* at 61:5-16.)

- The Dominican Sisters of Sinsinawa also sponsor Edgewood College and the Campus School. Sponsorship of the College and Campus School works in the same fashion as with the high school. (*Id.* at 65:13-66:7.)

- She is aware that Edgewood College is building an athletic facility in Fitchburg. The building of an offsite facility does not implicate at all the college's adherence to the Dominic Sisters of Sinsinawa's religious beliefs nor the College's living of the Catholic faith. (*Id.* at 67:18-22, 69:13-70:7.)

- Even though there is not a golf course on the Edgewood campus, the golf team is still able to honor the Dominican Sisters of Sinsinawa's values of community and partnership, that aspect of their religious beliefs, by holding events off campus. (*Id.* at 90:1-15.)

- She is sure there is a difference of opinions among alumni as to whether Edgewood High School should have lights on its field, that is part of diversity, and she would not consider an alum who doesn't support the lights as not being true to the Dominican Sisters of Sinsinawa's mission or the Catholic faith. (*Id.* at 105:8-21.)

In addition, Sister Phelan admitted that she has never seen any instance of the City of Madison engaging in religious discrimination against Edgewood. (*Id.* at 82:10-14.) Indeed, her

understanding as to the only reason why the City has not allowed Edgewood to install lights on its athletic field is because the neighbors have objected and are opposed to those lights. (*Id.* at 64:25-65:12.)

## CONCLUSION

For the above reasons, the City respectfully requests that the Court deny Edgewood's motion to supplement its summary judgment pleadings. In the alternative, the City requests that if the Court grants the motion, for the Court to also consider the deposition testimony of Sister Phelan.

Dated October 7, 2022.

BOARDMAN & CLARK LLP

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra, State Bar No. 1033159
Evan B. Tenebruso, State Bar No. 1085063
Tanner G. Jean-Louis, State Bar No. 1122401
P. O. Box 927
1 South Pinckney Street, Suite 410
Madison, WI  53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
etenebruso@boardmanclark.com
tjeanlouis@boardmanclark.com
*Attorneys for Defendants*