Page 1

1              UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF WISCONSIN
2    - - - - - - - - - - - - - - - - - - - - - - - - - -
     EDGEWOOD HIGH SCHOOL OF THE SACRED
3    HEART, INC.,
4                      Plaintiff,
                                        Case No.
5         vs.                           3:21-cv-00118-wmc
6    CITY OF MADISON, WISCONSIN, et
     al.,
7
                       Defendants.
8

     - - - - - - - - - - - - - - - - - - - - - - - - - -
9

                        DEPOSITION OF:
10        CORPORATE REPRESENTATIVE OF POTTER LAWSON, INC.
                         DOUG HURSH
11

              TAKEN AT:  GODFREY & KAHN, S.C.
12

          LOCATED AT:  One East Main Street, Suite 500
13                      Madison, Wisconsin
14                      September 2, 2022
15                    9:47 a.m. to 2:56 p.m.
16        REPORTED BY:  VICKY L. ST. GEORGE, RMR.
17   - - - - - - - - - - - - - - - - - - - - - - - - - -
18
19
20
21
22
23
24
25   JOB NO. 5414309

Page 2

```
1        A P P E A R A N C E S
2  GODFREY & KAHN, S.C., by
        JONATHAN INGRISANO
3  One East Main Street, Suite 500
        Madison, Wisconsin 53073
4  (608) 257-3911
        jingrisano@gklaw.com
5  Appeared on behalf of the Plaintiff.
6  BOARDMAN & CLARK, LLP, by
        SARAH A. ZYLSTRA
7  TANNER G. JEAN-LOUIS
        1 South Pinckney Street, 4th Floor
8  Madison, Wisconsin 53703
        (608) 257-9521
9  szylstra@boardmanclark.com
        Appeared on behalf of the Defendants.
10
11
12
13         I N D E X
14  WITNESS                          PAGE
15  CORPORATE REPRESENTATIVE OF POTTER LAWSON, INC.,
16  DOUG HURSH
17  EXAMINATION BY MR. INGRISANO          5
18  EXAMINATION BY MR. JEAN-LOUIS        77
19  EXAMINATION BY MR. INGRISANO        140
20  EXAMINATION BY MR. JEAN-LOUIS       151
21  EXAMINATION BY MR. JEAN-LOUIS       153
22
23
24
25
```

Page 4

```
1   N E W L Y   M A R K E D   E X H I B I T S
2  NUMBER    DESCRIPTION                    PAGE
3  Exhibit 170  Subpoena                        5
4  Exhibit 171  Declaration of Michael Elliott      43
5  Exhibit 172  Declaration of Judge Schemmel Dated  48
6        June 8 of 2022
7  Exhibit 173  Email Dated 10-16-2014, Potter11270  94
8  Exhibit 174  Email Dated October 20th, 2014,   95
9        Potter11511
10  Exhibit 175  Email String Dated 9-16-2011,     99
11        Potter13623
12  Exhibit 176  Email Dated 1-15-2014, Potter10469  107
13  Exhibit 177  Email Dated 1-15-2014, Potter10471  107
14  Exhibit 178  Email Dated 9-9-2013, Potter12553   113
15  Exhibit 179  Email Dated 11-14-2013, Potter08777  129
16
17
18        R E Q U E S T S
19        (No requests made.)
20
21
22  (Original exhibits attached to original transcript.)
23  (Original transcript was delivered to Attorney Ingrisano.)
24
25
```

Page 3

```
1   P R E V I O U S L Y   M A R K E D   E X H I B I T S
2  NUMBER    DESCRIPTION                    PAGE
3  Exhibit 13  Zoning Ordinance for the Campus    86
4        Institutional District
5  Exhibit 45  Email Dated 11-2-2018             65
6  Exhibit 52  Master Plan                       20
7  Exhibit 54  Email Dated 12-5-2013, EHS1825    62
8  Exhibit 153  Email String Dated 10-20-2014,    89
9        Potter11523
10  Exhibit 159  Table of Contents Dated 6-13-2013  29
11  Exhibit 160  Table of Contents Dated October 17, 34
12        2013
13  Exhibit 161  Table of Contents Dated November 12, 36
14        2013
15  Exhibit 162  Table of Contents Dated November 19, 37
16        2013
17  Exhibit 163  Email Dated 2-19-2013, Potter11717  54
18  Exhibit 164  Email String Dated 2-19-2013,     60
19        Potte11725
20  Exhibit 165  Letter Dated January 2, 2019      66
21  Exhibit 166  Letter Dated January 4, 2019      68
22  Exhibit 167  Letter Dated 1-6-2020, Potter8654  70
23
24
25
```

Page 5

```
1        TRANSCRIPT OF PROCEEDINGS
2        CORPORATE REPRESENTATIVE OF POTTER LAWSON,
3   INC., DOUG HURSH called as a witness herein, after
4   having been first duly sworn on oath, was examined
5   and testified as follows:
6        EXAMINATION
7  BY MR. INGRISANO:
8  Q.  Good morning, Mr. Hursh.  Can you please state your
9     name and spell it for the record?
10  A.  Doug Hursh.  D O U G, last name H U R S H.
11  Q.  Okay.  And you don't have counsel with you here
12     today; is that right?
13  A.  Right.
14        (Exhibit 170 marked.)
15  BY MR. INGRISANO:
16  Q.  Handing you what's been marked as Exhibit 170.  Do
17     you recognize that, sir, as a subpoena served on
18     Potter Lawson for testimony today?
19  A.  Yes.
20  Q.  And that's a corporate representative deposition.
21     It's my understanding today that you're here to
22     testify on behalf of Potter Lawson; is that correct?
23  A.  Yes.
24  Q.  Have you ever had your deposition taken before?
25  A.  No.
```

Page 6

1 Q. So let's go over just a couple quick ground rules,
2 try to make this go as smoothly and clearly as
3 possible. So the court reporter off to your left is
4 recording everything that we say on her stenographic
5 machine. What that means is she doesn't do well with
6 nods of the heads, shakes of the heads, ah-hahs or
7 uh-uhs.
8 A. Okay.
9 Q. So if you can remember to answer verbally to the
10 extent you can, that would be great. And I may ask
11 you at times to repeat an answer if you did an
12 ah-hah, and it's not meant to be rude, it's just
13 meant to make a clear record, okay?
14 A. Yes.
15 Q. At the same time she can't record two people talking
16 at once or it's very difficult for her. And so to
17 the extent that you can let me finish my question
18 before you begin your response, I'll do the same, try
19 to let you finish your response before I begin my
20 next question, okay?
21 A. Okay.
22 Q. There may come a time in which attorneys for the City
23 decide they want to object to a question that I've
24 asked. To the extent that you're in the middle of
25 your answer or haven't started your answer yet, if

Page 7

1 you can let them get their objection on the record
2 and then do your best to answer that question, okay?
3 A. Okay. Sure.
4 Q. All right. If there comes a time today when you
5 don't understand a question that I ask, I don't
6 pretend to ask perfect questions and I'm certainly
7 not an architect, so there are going to be some
8 things that I may not understand. So if that
9 happens, just ask me to repeat my question, tell me
10 there is something wrong with my question. I'll do
11 my best to rephrase it so that you can understand it.
12 A. Okay.
13 Q. This is not a marathon today, so to the extent that
14 you need to take a break to use the restroom, get a
15 drink, whatever, just let me know and we'll do our
16 best to accommodate that as soon as we can, okay?
17 A. Sure.
18 Q. All right. Looking at Exhibit A to the last page of
19 this Exhibit 170, there are a series of topics
20 identified for the Potter Lawson deposition. Have
21 you reviewed that before?
22 A. No.
23 Q. Okay. Let me ask you to just read to yourself
24 numbers 1 through 6.
25         (Witness peruses document.)

Page 8

1         THE WITNESS: Okay.
2 BY MR. INGRISANO:
3 Q. Are there any of those topics today that you don't
4 feel prepared to talk about?
5 A. No.
6 Q. Okay. Is there anyone else at Potter Lawson who you
7 think would be in a better position than you to talk
8 about any of those topics?
9 A. Not at Potter Lawson.
10 Q. Okay. Did you do anything today to prepare for your
11 deposition? Did you review any materials, talk to
12 anyone?
13 A. I got out the master plan and I was going to look at
14 it because I thought I was coming here at 1:00, so I
15 have not.
16 Q. That's okay. We will look at it there.
17         Sir, can you give me your date of birth?
18 A. May 10th, 1962.
19 Q. And what's your current residential address?
20 A. 6369 Briarcliff Lane in Middleton, Wisconsin 53562.
21 Q. And Potter Lawson, what's its business address?
22 A. It is 749 University Row, Suite 300, Madison,
23 Wisconsin.
24 Q. What's your position at Potter Lawson?
25 A. I am principal, shareholder and director of design.

Page 9

1 Q. What's it mean to be a principal or shareholder of
2 Potter Lawson?
3 A. I own stock in the company and I lead teams on
4 projects.
5 Q. As a director of design, what are your roles and
6 responsibilities?
7 A. I guess I direct the design within the office and
8 mentor younger architects and designers and review
9 projects as they go through the design process.
10 Q. And how long have you been the director of design at
11 Potter Lawson?
12 A. Oh, I don't recall. I have worked there for 33 years
13 and maybe I've been the director for 12 years.
14 Q. So approximately 2010 ish you would have been the
15 director; is that right?
16 A. I don't know for sure.
17 Q. Okay.
18 A. That could be right.
19 Q. Do you recall what your title was at Potter Lawson in
20 2013 and 2014?
21 A. It would be the same.
22 Q. Okay. Now, when we talk about designs, you mentioned
23 the word design, you mentioned the word architects
24 and projects. What is Potter Lawson in the business
25 of? What do they do?

3 (Pages 6 - 9)

Page 10

1 A. We are architects, interior designers. We are in the
2 business of providing architectural services that
3 include master planning, interior design,
4 architectural design, feasibility studies in
5 relationship to architectural projects, buildings,
6 yeah. I think that describes it.
7 Q. Sure. You mentioned master planning. What's
8 involved in master planning generally? What is
9 master planning?
10 A. Master planning is -- it's different for different
11 types of projects. Like maybe for a corporate
12 project it might just be looking at future expansion
13 capabilities on a site, you know, for future
14 buildings. For campuses it's looking at, you know,
15 the existing buildings, understanding what their
16 future changes might be in the build environment for
17 the campus, what type of facilities will they need in
18 the future, and they're used basically to guide
19 future development and to be able to communicate with
20 any stakeholders involved like surrounding property
21 owners, the city, disparate groups within the campus
22 so everybody knows kind of the plan for the future.
23 Q. Okay. Can you give me a summary of your educational
24 history starting in high school?
25 A. I went to high school in Orlando, Florida and then I

Page 11

1 went to -- I have two years of college for -- I got a
2 bachelors degree basically liberal arts, and then I
3 have four years of architectural education at the
4 University of Florida.
5 Q. And you mentioned you've been at Potter Lawson for 33
6 years?
7 A. Yes.
8 Q. Was that your first job after architecture school?
9 A. No.
10 Q. Where were you after architecture school?
11 A. During architecture school I worked for a residential
12 architect in Gainesville. In summers I worked for an
13 architect in Orlando as an intern. After that I
14 moved -- after I graduated and moved to Chicago, I
15 worked for two years in an architecture firm in
16 downtown Chicago. Then I worked for a year at Knothe
17 Bruce doing mostly multi-family work, and then from
18 then on I've been at Potter Lawson.
19 Q. Again, showing my ignorance of the architecture
20 field, what degrees, certificates, credentials do you
21 have as an architect?
22 A. So I have a bachelors degree in architecture and then
23 I have -- I'm a registered architect. You have to
24 take an exam. And I say I've been registered for
25 approximately 30 years in good standing and I have a

Page 12

1 license with the State of Wisconsin to practice
2 architecture.
3 Q. Can you, speaking now for Potter Lawson, can you give
4 me an understanding of Potter Lawson's working
5 history with the Madison Edgewood Campus?
6 A. Yes.
7     MR. JEAN-LOUIS: Object to form.
8     THE WITNESS: What's that?
9     MR. JEAN-LOUIS: Object.
10 BY MR. INGRISANO:
11 Q. Please answer.
12 A. Just answer? Okay. Let's see. So in I think in the
13 '90s, maybe 1994, '5, '6, somewhere around there, we
14 started to get involved with the campus, mostly with
15 the college as a part of the campus. At the time
16 they had dirt parking lots and we wanted to -- they
17 wanted to expand to get better parking facilities at
18 some buildings. So there was a master plan that was
19 done I think in 1996. I'm not sure that it was 100
20 percent approved by the City, but there was a master
21 plan done, there was a different zoning and
22 regulations than we have now for master planning and
23 zoning. But there was a master plan on record at
24 that time in 1996, and there were some agreements
25 made with the campus entities and the community.

Page 13

1     I think after that we worked with mostly
2 the college on the campus to provide architectural
3 projects. We did the Predolin Humanity Center which
4 was an addition, we did the Stream which is a visual
5 theater arts building, we did Mazzuchelli Hall which
6 is a science facility, we then did a residents hall
7 on campus, Dominican Hall. So several buildings.
8     Probably the most recent project we did on
9 the campus was for the high school was the performing
10 arts center which was the addition in the front of
11 the high school there.
12 Q. Okay. So you mentioned the campus entities.
13 A. Um-hum.
14 Q. Is that -- when you think of the campus entities,
15 what entities are you referring to?
16 A. It's the college, the high school and the campus
17 school. Sort of three separate entities. And I
18 didn't mention, I think we all know, we worked on the
19 master plan then with the rezoning in whenever that
20 was, 2011 through 2014.
21 Q. So to the best of your recollection Potter Lawson's
22 working relationship with one or more of the Edgewood
23 entities would have begun approximately in the mid
24 '90s?
25 A. Yes.

4 (Pages 10 - 13)

Page 14

1 Q. During that period of time would you characterize
2    yourself as the principal contact at Potter Lawson
3    for the Edgewood entities?
4 A. Not in the '90s, no.
5 Q. Okay. Who would that have been?
6 A. Mary Lawson.
7 Q. Was there a time when you took over principal
8    responsibility for the Edgewood Campus?
9 A. Yes.
10 Q. And when was that?
11 A. I'm not sure. So I did not work on the 1994, '5, '6
12    whatever master plan. I was involved in some of the
13    projects that were built on campus during that time.
14    When Mary retired, I'm not sure what day that was but
15    it may have been late 2000s, like 2008, 2006 maybe,
16    in that range.
17 Q. Okay. When you -- when -- so beginning, let's just
18    talk about the kind of that 2000 -- after -- let's
19    talk about the period of time after Mary Lawson
20    retires, and it's fair to say you take on principal
21    responsibility for Edgewood?
22 A. Yes.
23       MR. JEAN-LOUIS: Object to the form.
24 BY MR. INGRISANO:
25 Q. Were you retained, was Potter Lawson retained at that

Page 15

1    time in going forward on kind of a project-by-project
2    basis?
3 A. Yes.
4 Q. And so who -- so for buildings on the college campus,
5    who would have retained you?
6 A. The college.
7 Q. What projects, if any, did you do at Potter Lawson
8    for the Edgewood High School campus besides --
9    anything beyond the fine arts building?
10 A. No.
11 Q. Okay. Any current projects that are under way?
12 A. No.
13 Q. And when you did the fine arts project, who retained
14    you then?
15 A. The high school.
16 Q. And who was your lead contact person at Edgewood High
17    School?
18 A. So I should clarify, for the performing arts facility
19    at the high school, I was not involved in that
20    project.
21 Q. Okay.
22 A. Jim Moravec was the primary architect on that project
23    because he has experience with performing arts
24    facilities and I have not. My understanding was
25    Michael Elliott was the president of the high school

Page 16

1    and probably was the main contact.
2 Q. Okay. As a principal and shareholder at Potter
3    Lawson, as the -- as kind of the person who was the
4    principal contact for the company generally after Mary
5    Lawson retired, did you have any sort of building or
6    supervisory responsibility on projects at that time?
7       MR. JEAN-LOUIS: Object to the form.
8 BY MR. INGRISANO:
9 Q. For example, like you mentioned Jim Moravec working
10    on that project for Edgewood.
11 A. Yes.
12 Q. Were you supervising Mr. Moravec on that project?
13 A. No, not really, no.
14 Q. Okay. One of the projects you mentioned was -- let
15    me ask you this.
16       Have you or Potter Lawson ever been
17    retained by the Edgewood Campus School?
18       MR. JEAN-LOUIS: Object to the form.
19       THE WITNESS: No.
20 BY MR. INGRISANO:
21 Q. Was Potter Lawson involved with the Edgewood Campus
22    or work with the Edgewood Campus with respect to the
23    enactment of the campus institutional district zoning
24    ordinance?
25       MR. JEAN-LOUIS: Object to form.

Page 17

1       THE WITNESS: Yes.
2 BY MR. INGRISANO:
3 Q. Can you explain to me what Potter Lawson's
4    involvement was in that engagement?
5 A. So the City had changed the zoning, come up with a
6    new zoning for the City, updated zoning, which
7    included a district called campus institutional
8    district which required a master plan for campus such
9    as like hospital campus or a college campus or a
10    potentially, you know, an office corporate campus
11    where you could claim that zoning district or rezone
12    your property to that zoning district if you had a
13    master plan that was approved.
14       And so we went through the process of
15    creating a master plan in order to get into that
16    zoning district in order to make future approvals
17    easier for the campus.
18 Q. The City's enactment though of the -- the City's
19    decision and the terms and the text and the substance
20    of this new enactment, the campus institutional
21    district zoning --
22       (Interruption.)
23       (Record read.)
24 BY MR. INGRISANO:
25 Q. Sir, was it your understanding that a campus master

5 (Pages 14 - 17)

Page 18

1    plan was a condition, requirement for prerequisite
2    for being rezoned as a campus institutional district?
3  A.  Yes.
4         MR. JEAN-LOUIS:  Objection, form,
5    foundation.
6  BY MR. INGRISANO:
7  Q.  Sorry, go ahead.
8  A.  Yes.
9  Q.  And what was the basis for that understanding?  Where
10    did your understanding of that come from?
11  A.  It's written in the zoning code of the City.
12  Q.  Did anyone at the City of Madison ever confirm that
13    reading of the code that in fact a master plan was
14    required to become campus institutional?
15  A.  Yes.
16  Q.  And who was that?
17  A.  I would -- Matt Tucker, zoning administrator and Tim
18    Parks was a planner with the planning department.
19  Q.  Okay.  And do you recall when they advised you of
20    that?
21  A.  No.
22  Q.  Okay.
23  A.  But it was during the process.
24  Q.  Do you recall them advising you of that kind of
25    in-person, face-to-face or on the phone or in email?

Page 19

1  A.  It's probably a variety of those, but during the
2    process we did have meetings face-to-face with the
3    City in order to get information and recommendations
4    from them as to how to put the master plan together
5    and what it should include.
6  Q.  Okay.  Did anyone ever describe the master plan to
7    you as being voluntary?
8         MR. JEAN-LOUIS:  Object to form.
9         THE WITNESS:  Not that I recall.
10  BY MR. INGRISANO:
11  Q.  When the City decided to go the route and decided
12    they were going to create this new ordinance kind of
13    regime, do you know if Edgewood had any involvement
14    in the City's decision or planning or process to
15    amend their ordinances?
16         MR. JEAN-LOUIS:  Object to form and
17    foundation.
18         THE WITNESS:  I'm not sure.  I know that
19    the process for the City to create a new zoning
20    ordinance had ample time for public feedback.  I'm
21    not sure if the campus was involved with providing
22    feedback to the City regarding the new zoning
23    district.
24  BY MR. INGRISANO:
25  Q.  Okay.  But in your process of representing one or

Page 20

1    more of the Edgewood entities, you were not involved
2    for them in that process?
3  A.  Correct.
4         (Exhibit 52 previously marked.)
5  BY MR. INGRISANO:
6  Q.  Okay.  You wanted the master plan, sir.  We've got it
7    here for you.  I have not stapled it.  It's
8    double-sided.  I'm handing you what's been marked as
9    Exhibit 52.  There is also I note a handwritten
10    notation, Exhibit 7, at the bottom, but we'll refer
11    to this as Exhibit 52 for today's purposes.
12         MR. INGRISANO:  For the record, Counsel,
13    this is the document that bears the court filing
14    stamp filed 2-19-21 page 2 of 28 through page 228 of
15    228.
16  BY MR. INGRISANO:
17  Q.  Sir, I'm going to ask you to take a look at this
18    Exhibit 52.  Do you recognize this as the Edgewood
19    Campus master plan?
20  A.  Yes.
21  Q.  And you were involved in the preparation of this
22    document, correct?
23  A.  Yes.
24  Q.  May I ask, sir, who originally retained you to assist
25    with the master plan?

Page 21

1  A.  Edgewood College.
2  Q.  What did you understand would be the role of Edgewood
3    High School in the master planning process?
4         MR. JEAN-LOUIS:  Object to foundation.
5         THE WITNESS:  Both the high school and the
6    campus school were consulted with during the master
7    planning process, and the three institutions had to
8    approve the document before we submitted it.
9  BY MR. INGRISANO:
10  Q.  Okay.  Was there one institution more than the other
11    that took a lead role in preparing this document?
12         MR. JEAN-LOUIS:  Object to form and
13    foundation.
14         THE WITNESS:  Yes, the college.  The
15    college had more, at the time, more potential
16    projects than the campus school or the high school.
17    But both campus school and the high school also had
18    potential projects that they wanted included in the
19    master plan.
20  BY MR. INGRISANO:
21  Q.  Okay.  Let me ask you to turn, sir, looking at the
22    top right-hand corner of each of these pages, page 13
23    of 228.  Before we look at that though, can you kind
24    of summarize for me, sir, what was the process that
25    was in place for preparing and drafting this master

Page 22

1  plan?  How did it come about?
2  A.  It was a long process.  Let's think about what -- so
3  we met with the college, the high school, the campus
4  school.  We discussed potential future projects with
5  each of the institutions.  We then came up with sort
6  of a graphic that showed where potential projects
7  might occur on the campus.  We then met with the
8  neighborhood and the City and went through several
9  meetings with them.
10       The neighborhood created a liaison
11  committee which we met more often to try to address
12  the neighborhood's concerns with potential projects
13  that would occur on the campus which dealt with
14  traffic, noise, campus population, number of cars on
15  the campus, how close buildings came to the
16  neighborhood, what type of landscaping and green
17  space would be maintained.
18       There were, you know, several more
19  detailed elements as part of the master plan
20  including archaeological sites on the campus that
21  need to be maintained, storm water, grading, many
22  more things like that I think that are included in
23  the master plan.
24  Q.  Okay.  In terms of the kind of the required substance
25  of the plan, where did Edgewood -- where did the

Page 23

1  Edgewood entities get their guidance for what had to
2  be in the master plan?
3  A.  So that's a good question.  This was the first master
4  plan in the City as far as trying to rezone to campus
5  institutional zoning.  So there was not clear
6  direction from the City as to what should be included
7  in the master plan.  So there was, you know, a bit of
8  trial and error with creating the documents,
9  submitting it to the City, getting their feedback and
10  then modifying the documents to have some of the
11  necessary documentation that would be required for
12  the rezoning.
13       A lot of the information in the master
14  plan just comes from our knowledge as to what should
15  be included in a master plan to help guide future
16  development and to try to be comprehensive with all
17  the potential physical structures on the campus.
18  Q.  Sir, let's turn now to page 13 of 228.
19  A.  Okay.
20  Q.  Is that your signature on this page?
21  A.  Yes.
22  Q.  Okay.  This is a letter you wrote, drafted -- I'm
23  sorry, this is a letter you wrote dated May 13, 2015;
24  is that right?
25  A.  Correct.

Page 24

1  Q.  The first line of that letter says "thank you for
2  working with us to complete the rezoning of the
3  Edgewood Campus from conditional use to campus
4  institutional zoning."
5       Did I read that correctly?
6  A.  Yes.
7  Q.  So prior to becoming campus institutional zoning, I
8  take it from this sentence that Edgewood Campus was
9  zoned as conditional use?
10       MR. JEAN-LOUIS:  Object to form.
11       THE WITNESS:  Yes, conditional use as
12  within a residential zoning district.
13  BY MR. INGRISANO:
14  Q.  Okay.
15  A.  I am not sure which one.  But yeah.
16  Q.  So --
17  A.  Yes.
18  Q.  So based on that sentence, as of May 13, 2015, had
19  Edgewood been rezoned campus institutional zoning to
20  your understanding?
21       MR. JEAN-LOUIS:  Object to form,
22  foundation.
23       THE WITNESS:  Yes.
24  BY MR. INGRISANO:
25  Q.  When did that rezoning take place -- Strike that.

Page 25

1       When was that rezoning classification complete?
2       MR. JEAN-LOUIS:  Object to foundation.
3       THE WITNESS:  I'm not entirely sure but I
4  believe sometime in 2014.
5  BY MR. INGRISANO:
6  Q.  What would you -- what would make you think that?
7  What were you looking for on the front page of that
8  exhibit?
9  A.  I take that back.  It must be 2015.  It's the -- I'm
10  just looking at the title page of the exhibit that
11  has the zoning department sign-off.
12  Q.  So you're looking at page 12 of 228?
13  A.  Yes.
14  Q.  Where there is a stamp with handwriting on the front
15  of it?
16  A.  Correct.
17  Q.  And it --
18  A.  We submitted it in 2014, and that sign-off date was
19  2015.
20  Q.  Got it.  So to your understanding and based on your
21  involvement in the project, rezoning to campus
22  institutional didn't occur until that final sign-off
23  date, correct?
24  A.  I believe so.
25  Q.  The next page, page 14 of 228, you write again,

Page 26

1    that's again another letter from you dated December
2    3, 2015, correct?
3  A.  Correct.
4  Q.  It says "thank you for working with us to complete
5    the rezoning of the Edgewood Campus from conditional
6    use to campus institutional zoning."
7        Correct?
8  A.  Correct.
9  Q.  And again, it was your testimony today and your
10   understanding at the time that the master plan
11   process was a prerequisite to being rezoned as campus
12   institutional, right?
13 A.  Correct.
14 Q.  Let me ask you to turn to page 1 of the master plan,
15   page 17 of 228 where it says 1.1 master plan purpose,
16   do you see that?
17 A.  Yes.
18 Q.  Let me ask you to read that first paragraph to
19   yourself.
20       (Witness peruses document.)
21       THE WITNESS:  Okay.
22 BY MR. INGRISANO:
23 Q.  So the sentence that begins "the Edgewood Campus has
24   been zoned campus institutional which requires the
25   campus have an approved master plan to meet the

Page 27

1    zoning requirements."
2        Did I read that correctly?
3        MR. JEAN-LOUIS:  Object to the form.
4        THE WITNESS:  Yes.
5  BY MR. INGRISANO:
6  Q.  And that sentence reflects your understanding that
7    the master plan was indeed required to meet campus
8    institutional zoning requirements; is that right?
9  A.  Yes.
10 Q.  Did anyone at the City ever advise you that this
11   language in 1.1 was incorrect?
12 A.  No.
13 Q.  Did the City -- when this was first submitted to the
14   City of Madison, did they request edits or changes to
15   the master plan?
16       MR. JEAN-LOUIS:  Object to form.
17       THE WITNESS:  I would say yes.  To my
18   recollection we made changes to the master plan
19   based on the City's departments that review the
20   master plan.
21 BY MR. INGRISANO:
22 Q.  To your understanding the City of Madison reads the
23   master plan that's submit -- Strike that.
24       The City of Madison read this master plan
25   when it was submitted by you and Edgewood, correct?

Page 28

1        MR. JEAN-LOUIS:  Objection, foundation.
2        THE WITNESS:  I would support that.  I
3    would think that they would.
4  BY MR. INGRISANO:
5  Q.  You would hope so.
6  A.  Yes.
7  Q.  And if something was incorrect in that master plan
8    document from an ordinance standpoint, you would want
9    them to point that out, correct?
10 A.  Yes.
11       MR. JEAN-LOUIS:  Object to form.
12 BY MR. INGRISANO:
13 Q.  When you were in your master planning process
14   preparing the document, who was the -- who did you
15   understand to be the representative for Edgewood High
16   School?
17 A.  Michael --
18       MR. JEAN-LOUIS:  Objection to form.
19       THE WITNESS:  Michael Elliott.
20 BY MR. INGRISANO:
21 Q.  Did Judge Schemmel ever have any role in the master
22   plan process to your recollection on behalf of
23   Edgewood High School?
24 A.  I don't -- I don't think so.  I don't recall if he
25   was involved at the beginning.  I know Judge Schemmel

Page 29

1    was involved when we were working on the Dominican
2    Hall residence hall, but I don't recall on the master
3    plan if he was involved at the beginning.
4        (Exhibit 159 previously marked.)
5  BY MR. INGRISANO:
6  Q.  Sure.  Mr. Hursh, I'm going to hand you what's been
7    marked as Exhibit 159.  Do you recognize that
8    document?
9  A.  I don't recall, but it does look like a preliminary
10   table of contents.
11 Q.  Okay.  Is this something that -- it's got the Potter
12   Lawson stamp on it on the bottom.  I can represent to
13   you the Potter Lawson Bates labels Potter 06564
14   through 06565 notes that it came from your firm in
15   the subpoena production.
16       Do you recognize that as the Potter Lawson
17   insignia on the bottom right?
18 A.  Yes.
19 Q.  Did you create -- did you or anyone else at Potter
20   Lawson create documents like this to track work on
21   the master plan?
22 A.  Yes.
23       MR. JEAN-LOUIS:  Object to form.
24 BY MR. INGRISANO:
25 Q.  In looking at this Exhibit 159, table of contents,

Page 30

1 does it appear -- to your review, does it generally
2 track with the contents of the Edgewood Campus master
3 plan?
4 A.  It looks like it does, yes.
5 Q.  With respect to the third column in, it says
6 responsibility/coordination, do you see that?
7 A.  Yes.
8 Q.  Do you know who MBC is?
9 A.  Yes.
10 Q.  Who is that?
11 A.  Maggie Balistreri-Clark.
12 Q.  And who is -- who did she represent?
13     MR. JEAN-LOUIS:  Objection, form.
14     THE WITNESS:  She's the Dean of Students
15 or was the Dean of Students at Edgewood College.
16 BY MR. INGRISANO:
17 Q.  To your knowledge did she have any role or
18 responsibilities for Edgewood High School?
19     MR. JEAN-LOUIS:  Objection, form,
20 foundation.
21     THE WITNESS:  She -- no.  I mean she
22 wasn't an employee of the high school, but my
23 understanding is the three campuses gave her the
24 responsibility of coordinating the master plan for
25 the campus institutions.

Page 31

1 BY MR. INGRISANO:
2 Q.  Coordinating, taking on kind of the lead role?
3 A.  Yes.
4     MR. JEAN-LOUIS:  Objection, form, late
5 objection to form.
6 BY MR. INGRISANO:
7 Q.  And I'm sorry, I may have asked this already, DH is
8 you, right?
9 A.  Yes.
10 Q.  Doug Hursh?
11 A.  Yes.
12 Q.  And there are a couple of notations there, it says DH
13 slash or dash -- Strike that.
14     There are a couple notations where it says
15 DH, a dash or hyphen, PLI, do you see that?
16 A.  Yes.
17 Q.  Do you know what that represents?
18 A.  Potter Lawson, Inc.
19 Q.  What's the difference between a designation that says
20 DH versus a designation that says DH-PLI?
21 A.  I don't think there is any difference.
22 Q.  Okay.
23 A.  Not sure why that is like that.
24 Q.  How about SAA, do you know what those initials would
25 represent in that third column?

Page 32

1 A.  Yes, Schreiber Anderson and Associates.  They were
2 our civil and traffic consultants.
3 Q.  And how -- when it says on the next page, there is a
4 notation where it says on the last line it says DH
5 MBC, City, what's city or who is city?
6 A.  On that, on those portions of the master plan we
7 wanted input from the City to get more information
8 about how they wanted these aspects of the master
9 plan to be written.
10 Q.  So if I ask you to look at this page -- to your
11 understanding the column here
12 responsibility/coordination, is it fair to say that
13 the person designated, person or persons designated
14 as being responsible for a particular row, that they
15 are in fact, I'm sorry, responsible for advancing
16 that portion of the master plan?
17     MR. JEAN-LOUIS:  Objection, form,
18 foundation.
19     THE WITNESS:  I would say yes although as
20 far as the City's role, they wouldn't necessarily
21 write those sections.  But we needed their input and
22 review more heavily, and we wanted more sort of
23 feedback from them on those two topics.
24 BY MR. INGRISANO:
25 Q.  In looking at this document Exhibit 159, is it fair

Page 33

1 to say that there is no one from Edgewood High School
2 that has been designated as being responsible for
3 coordinating content on the master plan?
4 A.  Correct.
5     MR. JEAN-LOUIS:  Objection to form.
6 BY MR. INGRISANO:
7 Q.  I'm sorry?
8 A.  Correct.
9 Q.  When I look down at chapter 3, proposed conditions in
10 the one, two, three, four, five, sixth line down, it
11 says "open space landscaping and green space."
12     Do you see that?
13 A.  Yes.
14 Q.  And who is the responsible person for that section?
15 A.  Myself.
16 Q.  Give me a sense as to what was involved in being --
17 Strike that.
18     Do you agree with this document that you
19 were in fact the person that was responsible for
20 coordinating the content on the open space section of
21 the master plan?
22 A.  Yes.
23     MR. JEAN-LOUIS:  Object to form.
24 BY MR. INGRISANO:
25 Q.  And what was involved in coordinating that section?

Page 34

1 A.  We created site plan documents that outlined areas on
2    the campus that would remain green space and open
3    space similar to we drew areas on the plan for
4    potential future buildings.  So this plan was
5    designed to communicate that there would be open
6    space and green space in these potential areas.
7 Q.  Okay.
8 A.  I guess that's the beginning of that process.  Once
9    we did draw those drawings, the plans were circulated
10   to the different institutions to get their feedback
11   and approval before it went into the master plan.
12       (Exhibit 160 previously marked.)
13 BY MR. INGRISANO:
14 Q.  Okay.  Thank you.  I'm going to hand you what's been
15   marked as Exhibit 160.  Do you recognize that, sir,
16   as another table of contents created by Potter Lawson
17   dated October 17, 2013?
18 A.  Yes.
19 Q.  And is this a later version of what you saw on
20   Exhibit 159?
21 A.  Yes.
22 Q.  Okay.
23 A.  Looks like it.
24 Q.  With respect to chapter 1 where it says master plan
25   process, responsibility coordination says MBC-process

Page 35

1    DH-purpose, correct?
2 A.  Correct.
3 Q.  What's that distinction there meant to show?
4 A.  That I would write or draft a purpose narrative for
5    the master plan and Maggie would write the process
6    portion.
7 Q.  Looking down the responsibility/coordination column,
8    we get down to sustainability, I'm seeing some new
9    initials.  HS, do you know what that stands for?
10 A.  High school, high school/campus school.
11 Q.  Okay.  And how about SS, is that Susan Serrault?
12 A.  Yes.
13 Q.  I don't know if I have -- if this is a complete copy
14   of this document because it's only one page, but at
15   least on the one page that you're seeing here, Potter
16   6554, do you see any Edgewood High School references
17   other than under sustainability?
18       MR. JEAN-LOUIS:  Objection, form,
19   foundation.
20 BY MR. INGRISANO:
21 Q.  In the responsibility and coordination section,
22   row -- sorry.  Strike that.  Column.
23 A.  I do not.
24 Q.  Okay.  And again, with respect to the open space plan
25   three quarters of the way down this page, there is no

Page 36

1    change from the June 13, 2013 version on Exhibit 159,
2    correct?
3 A.  Correct.
4       MR. JEAN-LOUIS:  Objection, form.
5 BY MR. INGRISANO:
6 Q.  As it relates to open space plan, right?
7 A.  Right.
8       (Exhibit 161 previously marked.)
9 BY MR. INGRISANO:
10 Q.  Mr. Hursh, handing you what's been marked as Exhibit
11   161.  Do you recognize that as a November 12, 2013
12   version of the table of contents, correct?
13 A.  Correct.
14 Q.  Is it fair to say that with Exhibit 159, 160, 161,
15   this table of contents document was being used as
16   kind of a running-to-do list?
17       MR. JEAN-LOUIS:  Object to the form.
18       THE WITNESS:  Agreed.
19 BY MR. INGRISANO:
20 Q.  Looking at the responsibility/coordination column, do
21   you see any references to Edgewood High School
22   representatives?
23       MR. JEAN-LOUIS:  Objection, form,
24   foundation.
25       THE WITNESS:  No.

Page 37

1 BY MR. INGRISANO:
2 Q.  Under sustainability it does say HS/CS, right?
3 A.  Yup, on the second page, yes.
4 Q.  Okay.  That's the only reference that you understood
5    to mean the high school; is that fair?
6 A.  Correct.
7 Q.  With respect to the open space plan, page 2 chapter
8    3, you see now it appears to add Ed Taylor, do you
9    see that?
10 A.  Yes.
11 Q.  Who is Ed Taylor?
12       MR. JEAN-LOUIS:  Objection, foundation.
13       THE WITNESS:  Ed Taylor was an employee or
14   is an employee of the college.  He had more of a
15   public relations role I believe.
16 BY MR. INGRISANO:
17 Q.  Okay.  Do you recall working with Mr. Taylor on the
18   open space plan portion of the master plan?
19 A.  That is hard for me to say.  I know that we did work
20   with Ed on or were planning to work with Ed to help
21   with some of the descriptions.  I don't recall if he
22   ever did provide descriptions for that section.
23       (Exhibit 162 previously marked.)
24 BY MR. INGRISANO:
25 Q.  I'll hand you what's been marked as Exhibit 162, Mr.

Page 38

1 Hursh. Do you recognize that, sir, as a November 19,
2 2013 version of the table of contents to-do list?
3 A. Yes.
4 Q. This one, different from 161, actually references
5 chapter subsections on the far left column, correct?
6 A. Correct.
7 Q. And from your just quick review, those appear to
8 coincide with the section headings actually in the
9 master plan Exhibit 52, correct?
10 A. I would believe so.
11 MR. JEAN-LOUIS: Object to form.
12 BY MR. INGRISANO:
13 Q. With respect to 3.8, the open space plan, there is no
14 change and it's -- from what we see in Exhibit 161,
15 correct?
16 A. Correct.
17 Q. Responsibility/coordination still says DH Ed Taylor
18 to help with descriptions, correct?
19 A. Correct.
20 Q. And once again, with respect -- with the exception of
21 sustainability, the sustainability row, 3.10, there
22 are no references to any Edgewood employees you're
23 aware of as being under the
24 responsibility/coordination column, correct?
25 MR. JEAN-LOUIS: Objection, form.

Page 39

1 THE WITNESS: Can you say that -- can you
2 ask that again?
3 MR. INGRISANO: Sure.
4 BY MR. INGRISANO:
5 Q. With respect to the responsibility/coordination
6 column that we talked about on this document, Exhibit
7 162, again, there are no Edgewood High School
8 representatives that you recognize designated in any
9 of those --
10 A. Correct.
11 Q. -- items?
12 MR. JEAN-LOUIS: Objection, foundation.
13 BY MR. INGRISANO:
14 Q. Sir, is it fair to say that Edgewood College, Maggie
15 Balistreri-Clark, Ed Taylor, Susan Serrault, were the
16 folks that you worked with principally in preparing
17 and drafting the master plan on behalf of the
18 Edgewood Campus institutions?
19 A. Yes.
20 Q. Is it fair to say that your interaction with Edgewood
21 High School in this process was limited to working
22 with them on gathering specific types of information?
23 MR. JEAN-LOUIS: Objection, form.
24 THE WITNESS: Yes.
25 BY MR. INGRISANO:

Page 40

1 Q. Any other role that you recall interacting with
2 Edgewood on, Edgewood High School?
3 A. Edgewood High School, so Edgewood High School had
4 another architecture firm they were working with
5 during this process where they were looking at
6 renovations to the high school and where they might
7 have additions. And we met with them in the high
8 school to understand the types of future additions
9 and renovations that they would be doing to their
10 building so that we could include that in the master
11 plan.
12 We did send, during the process we did
13 send the master plan drafts to the high school and
14 the campus school for their review before anything
15 went out. And the high school and the campus school
16 were involved in a meeting, I don't know if it's
17 monthly meetings but they were regularly scheduled
18 meetings where the three institutions got together,
19 the leaders of the three institutions got together to
20 review things, mutual issues that they needed to
21 communicate to each other on which included reviewing
22 the process of the master plan. I was typically not
23 involved in those leadership meetings.
24 Q. What was the name of the architecture firm you met
25 with?

Page 41

1 MR. JEAN-LOUIS: Objection, form.
2 THE WITNESS: I think it's CaS -- they had
3 a strange name. CaS4, something like that. But
4 it's Paul Cuta, C U T A, is the principal architect.
5 BY MR. INGRISANO:
6 Q. Are they based in Madison?
7 A. Yes.
8 Q. So you had one or more informational meetings with
9 them to better understand what was actually being
10 planned for the main high school building; is that
11 fair?
12 A. Yes. I don't know if we had more than one. I think
13 they sent us their drawings, we had a meeting to
14 review and clarify, so maybe one or two meetings,
15 yeah.
16 Q. Okay.
17 A. Communications.
18 Q. So as I understand it, your recollection of Edgewood
19 High School's role in this process was to, and you
20 tell me if I misstate this, first, to provide
21 information as requested; second, to basically make
22 sure you understood with their architectural firm
23 their plans for the building; third, to review
24 drafts; and four, was attending the leadership
25 meetings?

Page 42

1        MR. JEAN-LOUIS:  Objection, form,
2    foundation, misstates previous testimony.
3 BY MR. INGRISANO:
4 Q.  Did I correctly state --
5 A.  I think yes.
6 Q.  -- what you said?
7 A.  I would say yes.
8 Q.  Was there anything else that you recall Edgewood
9    doing as far as being part of this process?
10 A.  The high school.
11 Q.  Yes, sorry.  Edgewood High School.
12 A.  I'm trying to recollect if they -- if representatives
13    from the high school ever attended some of the public
14    meetings that we had with the neighborhood or the
15    neighborhood liaison committee, but I don't recall.
16    For the most part, Maggie Balistreri-Clark was given
17    the responsibility of representing the campus in both
18    creating the master plan, meeting with the
19    neighborhoods, meeting with the neighborhood liaison
20    committee, being part of City meetings.
21 Q.  Got it.  In those meetings, did you understand when
22    Maggie was speaking on behalf of the campus entities,
23    did you understand that she had the ability to make
24    binding commitments on behalf of Edgewood High
25    School?

Page 43

1        MR. JEAN-LOUIS:  Objection, form,
2    foundation.
3        THE WITNESS:  I am not sure about binding
4    commitments, but I -- she did regularly, I believe,
5    attend the leadership meetings with the three
6    presidents and get feedback from the three of them
7    before making any types of presentations to the City
8    or the neighborhood.
9 BY MR. INGRISANO:
10 Q.  Okay.  When did you -- do you recall when -- let me
11    ask you this.
12        Did you attend any of those liaison
13    neighborhood meetings?
14 A.  Yes.
15 Q.  Do you recall when the last one was that you
16    attended?
17 A.  No.
18 Q.  After the master plan was approved, did you continue
19    to attend those meetings?
20 A.  No.
21 Q.  How are we doing?
22 A.  Good.
23 Q.  Need a break?
24 A.  No, I'm fine.  Thank you.
25        (Exhibit 171 marked.)

Page 44

1 BY MR. INGRISANO:
2 Q.  Mr. Hursh, let me hand you what has been marked as
3    Exhibit 171 which is a declaration of Michael
4    Elliott.  Have you ever seen this document before?
5 A.  No.  Is there a date on there?
6 Q.  Sure.  Last, second to last page 12, June 10, 2022.
7 A.  Okay.
8 Q.  This was submitted in this litigation by Mr. Elliott.
9 A.  Okay.
10 Q.  But you haven't seen that document before today; is
11    that right?
12 A.  No, I have not.
13 Q.  Let me ask you to take a look at paragraph 26 on page
14    6 of this document.  That paragraph starts with
15    Mr. -- it says "Mr. Tucker relied upon EHS's 2014
16    master plan."
17        Mr. Elliott goes on to say "EHS and I had
18    very little involvement with the drafting of the
19    master plan.  New to my job in 2013 when the master
20    plan was being put together, my understanding was
21    that it would govern and facilitate building
22    projects."
23        Did I read that correctly?
24 A.  Yes.
25 Q.  Do you have any reason to believe -- let me ask you

Page 45

1    this.
2        Do you have any reason to disagree with Mr.
3    Elliott's two statements there?
4        MR. JEAN-LOUIS:  Objection, form,
5    foundation.
6        THE WITNESS:  No.
7 BY MR. INGRISANO:
8 Q.  When he said that EHS and I had very little
9    involvement with the drafting of the master plan, do
10    you think that's a fair characterization?
11        MR. JEAN-LOUIS:  Objection, form,
12    foundation.
13        THE WITNESS:  Yes.  I mean they did not,
14    you know, participate in the direct drafting of the
15    plan but were involved in reviewing it.
16 BY MR. INGRISANO:
17 Q.  Sure.  He continues on "as I was not then planning on
18    undertaking a building project for EHS, I did not
19    dive into the master plan beyond what I thought were
20    the basics."
21        Did I read that correctly?
22 A.  Yes.
23 Q.  At that time when the master plan was being prepared
24    and drafted, was Edgewood High School planning on
25    what you would call a building project?

12 (Pages 42 - 45)

Brown & Jones Reporting          414-224-9533
A Veritext Company          www.veritext.com

Page 46

1        MR. JEAN-LOUIS:  Objection, form,
2    foundation.
3        THE WITNESS:  Not an immediate building
4    project, but we did have documents from their
5    architect that showed potential additions and
6    modifications to the existing building.
7  BY MR. INGRISANO:
8  Q.  Okay.  Do you have any reason to disagree with his
9    statement "I did not dive into the master plan beyond
10   what I thought were the basics" based on your
11   conversations with him, your observations of him?
12       MR. JEAN-LOUIS:  Objection, form,
13   foundation.
14       THE WITNESS:  I agree.
15 BY MR. INGRISANO:
16 Q.  He goes on to say "Edgewood College, who did intend
17   to pursue many buildings projects, provided most of
18   the content for the master plan, not EHS."
19       Did I read that correctly?
20 A.  Correct.
21 Q.  Do you agree with that statement?
22       MR. JEAN-LOUIS:  Objection, form,
23   foundation.
24       THE WITNESS:  Correct, yes.
25 BY MR. INGRISANO:

Page 47

1  Q.  In the last sentence he says, in his words he
2    characterizes Edgewood College as the one who was
3    "leading the charge on the master plan."
4        Do you think that's a fair
5    characterization?
6  A.  Yes.
7        MR. JEAN-LOUIS:  Objection, form.
8  BY MR. INGRISANO:
9  Q.  Paragraph 27, Mr. Elliott writes or testifies "EHS
10   identified four future projects in the master plan.
11   The remaining 18 proposed projects were identified by
12   Edgewood College and the Campus School."
13       Did I read that correctly?
14 A.  Yes.
15 Q.  Does that comport with your general recollection of
16   the ratio of projects by institution?
17 A.  Generally, yes.
18 Q.  Paragraph 33, sir, on the next page, page 8, the last
19   sentence of that paragraph 33, Mr. Elliott testifies
20   "again, our involvement was more as an accommodation
21   to Edgewood College, our sister institution and
22   partner."
23       Did I read that correctly?
24 A.  Yes.
25 Q.  Do you have any reason to disagree about -- with Mr.

Page 48

1    Elliott's statement there?
2        MR. JEAN-LOUIS:  Objection, form,
3    foundation.
4        THE WITNESS:  No.
5        (Exhibit 172 marked.)
6  BY MR. INGRISANO:
7  Q.  Mr. Hursh, handing you what's been marked as Exhibit
8    172, that's a declaration of Judge Schemmel dated
9    June 8 of 2022, do you see that?
10 A.  Yes.
11 Q.  Have you ever seen this document before?
12 A.  No.
13 Q.  First paragraph Mr. Schemmel testifies, "I was the
14   president of Edgewood High School from 2005 to 2013."
15       Did I read that correctly?
16 A.  Yes.
17 Q.  Do you have any recollection of -- let me ask you
18   this.
19       Do you have any reason to disagree that Mr.
20   Schemmel was the president of Edgewood from 2005 to
21   2013?
22       MR. JEAN-LOUIS:  Objection, foundation.
23       THE WITNESS:  No.
24 BY MR. INGRISANO:
25 Q.  Okay.  He says "I was succeeded in that role by

Page 49

1    Michael Elliott."
2        Do you see that?
3  A.  Yes.
4  Q.  Does that comport with your recollection of the --
5    who was being -- who was president at Edgewood High
6    School?
7  A.  Yes.
8  Q.  Paragraph 7 on the second page of this Exhibit 172,
9    he writes "to the best of my recollection I was not
10   involved in drafting or preparing Edgewood's 2014
11   master plan."
12       Do you see that?
13 A.  Yes.
14 Q.  And do you have any reason to disagree and believe
15   that he was involved in drafting and preparing that
16   plan?
17       MR. JEAN-LOUIS:  Objection, form,
18   foundation.
19       THE WITNESS:  I don't believe he was
20   involved in drafting it or putting it together.  I
21   don't have a very good recollection of what his
22   involvement was, but I would assume that he -- if we
23   had anything written or decided upon when he was
24   president, that he would have reviewed it.
25 BY MR. INGRISANO:

Page 50

1 Q.  Sure.  The second sentence on paragraph 7 says "my
2    tenure at Edgewood High School ended in July of
3    2013."
4        Do you see that?
5 A.  Yes.
6 Q.  From looking, whether based on your review of the
7    table of contents to-do lists or from your own
8    personal recollection, do you have a sense as to when
9    the significant portion of the drafting of the master
10   plan occurred?
11       MR. JEAN-LOUIS:  Object to form.
12       THE WITNESS:  Probably after June of 2013.
13 BY MR. INGRISANO:
14 Q.  After June of 2013.  Okay.
15       MR. INGRISANO:  Why don't we take five
16   minutes.
17       (Recess taken.)
18 BY MR. INGRISANO:
19 Q.  Back on the record.  While we were on break, it
20   looked just like you were clarifying the name of that
21   architecture firm with the court reporter?
22 A.  Yes.
23 Q.  Could you just put that into the record, please?
24   What is the name of the firm?
25 A.  I've already forgotten.

Page 51

1 Q.  Looking at your phone?  Okay.
2 A.  CaS4.  It means nothing to me.
3 Q.  The No. 4?
4 A.  Yes, the number 4.  That's why I cannot remember it.
5    Architecture, LLC.
6 Q.  Thank you.  Let me ask you to take a look at Exhibit
7    52, put the master plan back in front of us here.
8    And let's go to that open space section, 3.8 which I
9    recognize as being on page 60 of 228.  Are you there?
10 A.  Yes.
11 Q.  Okay.  So that's 3.8, the open space plan, correct?
12 A.  Correct.
13 Q.  And we talked about that before from the table of
14   contents to-dos that you were initially tasked with
15   drafting and then eventually Ed Taylor began helping
16   you; is that right?
17       MR. JEAN-LOUIS:  Objection, form.
18       THE WITNESS:  Yes, that's what the -- that
19   document states I guess as far as responsibilities.
20   I don't recall if Ed Taylor provided content or not.
21 BY MR. INGRISANO:
22 Q.  Got it.  In looking at page 60 of 228, it looks --
23   and then onto 61, there appear to be a series of
24   numbered open spaces; is that correct?
25 A.  Correct.

Page 52

1 Q.  And as I read it, am I correct that those numbered
2    open spaces correspond with the numbered open spaces
3    on the diagram on page 62 of 228?
4 A.  Yes.
5 Q.  Okay.  The diagram on 62 of 228, based on your
6    familiarity with the project and the campus, is that
7    an accurate representation of the campus?
8 A.  Yes.
9 Q.  Is it to scale?
10 A.  Yes.
11 Q.  Let me ask you to take a look back at page 60 of 228.
12   Number 1, it says "athletic field owned by Edgewood
13   High School.  Used for team practices, physical
14   education classes."
15       Did I read that correctly?
16 A.  Yes.
17 Q.  Do you know who contributed that language, that
18   content, to the master plan?
19       MR. JEAN-LOUIS:  Objection, foundation.
20       THE WITNESS:  I am not entirely sure.
21 BY MR. INGRISANO:
22 Q.  Okay.  Do you have any suspicions or best guesses?
23       MR. JEAN-LOUIS:  Objection, form.
24       THE WITNESS:  I know that we wrote that.
25   As far as getting feedback as to what we should

Page 53

1    write for that segment, I don't recall.  It was
2    probably something between myself and Maggie.
3 BY MR. INGRISANO:
4 Q.  Do you have any recollection of speaking with Mike
5    Elliott about open space item No. 1?
6 A.  I do not.
7 Q.  In drafting -- in working on this master plan and
8    3.8, what was your understanding of the impact, if
9    any, of how open space number 1 was drafted?
10 A.  Our --
11       MR. JEAN-LOUIS:  Objection, form,
12   foundation.
13       THE WITNESS:  The impact of this document
14   in our minds was to highlight green space and open
15   space on the campus that would remain green space
16   and open space and not be used for buildings.
17 BY MR. INGRISANO:
18 Q.  Okay.
19 A.  And I can say the description was just meant to
20   describe the different open spaces on the campus.  It
21   wasn't meant to limit use.
22 Q.  Did you have any conversations with anyone in the
23   City of Madison or working employed by the City of
24   Madison about open space item No. 1, the athletic
25   field?

Page 54

1  A.  I don't recall anybody having any feedback on that.

2  Q.  Okay.  Item No. 2 says "site of Edgewood Oaks, owned

3      by Edgewood High School.  This area is a large green

4      space with heritage trees planted by Governor

5      Washburn in the late 1800s.  The space is used as

6      recreational space, physical education and athletic

7      team practices."

8          Did I read that correctly?

9  A.  Yes.

10 Q.  So based on how those are described, athletic field

11     versus the Edgewood Oaks section, was it your

12     understanding that the Edgewood Oaks space could be

13     used as a recreational space because it's listed

14     there but the athletic field could not be used as a

15     recreational space?

16         MR. JEAN-LOUIS:  Objection, form.

17         THE WITNESS:  No.  Our intent for this

18     section was that it described the different types of

19     open space.  It wasn't a description of specific

20     uses for those spaces.  The uses that we listed were

21     just for communication purposes.

22         (Exhibit 163 previously marked.)

23 BY MR. INGRISANO:

24 Q.  Mr. Hursh, I'm handing you now what's been previously

25     marked as Exhibit 163, you can leave that open,

Page 55

1      Exhibit 163.  And let me ask if you've seen that

2      email and attachment before.

3          (Witness peruses document.)

4          THE WITNESS:  What was your question about

5      that?

6  BY MR. INGRISANO:

7  Q.  Yeah.  Do you recognize that email and the

8      attachment?

9  A.  You know, I don't recall it from 2013.

10 Q.  Okay.

11 A.  But it looks like a good email.

12 Q.  Do you recall -- let me ask you this.  On the cc on

13     this first page of 163, that's your email address

14     there?

15 A.  Yes.

16 Q.  D O U G H?

17 A.  Yes.

18 Q.  At PotterLawson.com?

19 A.  Correct.

20 Q.  And Susan Serrault, you mentioned her before, she was

21     one of the people that worked with you on the master

22     plan on behalf of Edgewood College, correct?

23 A.  Correct.

24 Q.  She writes to Judge Schemmel, "I have attached a copy

25     of the green space plan prepared by Potter Lawson.

Page 56

1      Would you please forward on to someone who can assist

2      me with this."

3          Do you see that?

4  A.  Yes.

5  Q.  And is that -- the second page of this document at

6      Potter 11718, do you recognize that as the green

7      space plan prepared by your firm?

8  A.  That looks like a draft --

9          MR. JEAN-LOUIS:  Object to the form.

10         THE WITNESS:  -- version.

11 BY MR. INGRISANO:

12 Q.  Do you recognize the handwriting on that second page?

13 A.  Yes.

14 Q.  Whose handwriting is that?

15 A.  That's mine.

16 Q.  And where it says site 1, do you see site 1 right

17     there?  That's the athletic field, correct?

18 A.  Yes, correct.

19 Q.  Can you read for me what those handwritten notations

20     say?

21 A.  Yes.  High school or abbreviated HS and there is a

22     dash, no night games-practice field-games, question

23     mark.

24 Q.  Okay.  Do you recall what you were intending to

25     convey with those notations?

Page 57

1  A.  I believe we were asking their input on do they use

2      the field for a practice field, for games, and did

3      they agree that there were no night games.

4  Q.  Was it your -- does no night games, does that mean

5      that there are not presently and have not been night

6      games or that there prospectively will not be night

7      games in the future?  Do you have an understanding?

8  A.  No, I don't.  Maybe both.

9  Q.  Okay.  Did you ever hear of any commitments, promises

10     or representations by someone from Edgewood High

11     School that they would not play night games on the

12     field?

13 A.  I believe there was an agreement in the 1996 master

14     plan if that was called a master plan that there

15     would not be -- that there was some agreement with

16     the adjacent neighbors that there would not be lights

17     on the field so that there would not be night games

18     because there would not be lights.

19 Q.  Okay.  But you weren't involved with that master

20     plan, correct?

21 A.  Correct.

22 Q.  The master plan incorporates, does it not, prior

23     agreements with the neighbors?

24 A.  I believe the master plan has a memorandum of

25     understanding with the neighbors in the back, and I

15 (Pages 54 - 57)

Page 58

1    believe it included some of the agreements from that
2    1996 document in the appendix.
3  Q.  All right.  So if we look at the table of contents on
4    Exhibit 52 which is page 15 of 228, we have 4.2 is
5    memorandum of understanding, correct?
6  A.  Correct.
7  Q.  4.3 is affirming past agreements, correct?
8  A.  Correct.
9  Q.  Let's take a look at those two sections.
10  A.  Okay.
11  Q.  Are you there yet?
12  A.  No.
13  Q.  I'm not either.
14      MR. JEAN-LOUIS:  It's on page 73 of 228 I
15    believe, Counsel.
16      MR. INGRISANO:  Thank you.
17      THE WITNESS:  73?
18      MR. INGRISANO:  73.
19  BY MR. INGRISANO:
20  Q.  All right.  4.2 on page 73 of 228 is 4.2 memorandum
21    of understanding, correct?
22  A.  Correct.
23  Q.  And page 77 of 228 is 4.3 affirming past agreements,
24    do you see that?
25  A.  Yes.

Page 59

1  Q.  All right.  In looking at 4.2, do you see any
2    references to a commitment to not include field
3    lights for the athletic field or to not host home
4    games -- I'm sorry, to not host night games?
5      MR. JEAN-LOUIS:  Objection, form.
6      THE WITNESS:  I do not.
7  BY MR. INGRISANO:
8  Q.  With respect to 4.3, affirming past agreements on
9    page 77, do you see any reference to affirming a past
10    agreement to not erect lights on the athletic field
11    or to not host night games on the athletic field?
12      MR. JEAN-LOUIS:  Objection, form.
13      THE WITNESS:  I do not see anything.
14  BY MR. INGRISANO:
15  Q.  Going back to Exhibit 163, sir.  That is the Susan
16    Serrault email.
17  A.  Yup.  Um-hum.
18  Q.  Do you have any recollection of asking Susan Serrault
19    to reach out to Edgewood High School or Judge
20    Schemmel to verify the use of the spaces on -- at 1
21    and 2 on the map?
22  A.  I do not remember this, but during the process we
23    wanted feedback from them and would put together
24    documents like this to get that.  And Susan helped to
25    facilitate that.

Page 60

1      (Exhibit 164 previously marked.)
2  BY MR. INGRISANO:
3  Q.  Got it.  Sir, handing you what's been previously
4    marked as Exhibit 164.  I'll represent that's a
5    continuation of an email stream after Exhibit 163.
6      Do you recall Mr. Schemmel's response or
7    Ms. Serrault's thank you at the top of this Exhibit
8    164?
9  A.  I don't remember this, but it looks like it happened.
10  Q.  Okay.  Again, you're cc'd on Mr. Schemmel's response
11    to Doug Hursh, correct?
12  A.  Correct.
13  Q.  And you're cc'd again on Susan Serrault's thank you
14    very much email, correct?
15  A.  Correct.
16  Q.  All right.  Mr. Schemmel on February 19, 2013 at
17    12:53 wrote in part, "location No. 1, in addition to
18    practices, games do take place on this athletic
19    field.  We play lower level boys and girls soccer as
20    well as lower level football.  Additionally, the
21    space is used as the home field for our varsity
22    lacrosse team.  The space has been used to host a
23    middle school level track and field meet comprised of
24    Catholic feeder schools.  We also use this space in
25    conjunction with high school's summer strength and

Page 61

1    conditioning programs."
2      Did I read that correctly?
3  A.  Yes.
4  Q.  Sir, in looking at Exhibit 164 and Mr. Schemmel's
5    description of how location No. 1 is used, and you
6    recognize location No. 1 is the Edgewood High School
7    athletic field?
8  A.  Yes.
9  Q.  Do you have any understanding, sir, as to why Mr.
10    Schemmel's description of the use of location No. 1
11    does not match the description of the use of location
12    1 at section 3.8 of the master plan?
13  A.  I believe our intent in the description of the open
14    space was not to necessarily include and determine
15    all the uses of that space in that chapter.  The idea
16    was more to identify open space.
17  Q.  Do you recall making a conscious decision, or do you
18    remember anyone making a conscious decision to not
19    include that language?
20      MR. JEAN-LOUIS:  Objection to form.
21      THE WITNESS:  I do not recall that.
22  BY MR. INGRISANO:
23  Q.  Do you recall anyone from Edgewood High School
24    telling you to intentionally restrict or limit the
25    description of the athletic field under 3.8 and

16 (Pages 58 - 61)

Page 62

1       bullet point 1?
2   A.   I do not.
3           MR. JEAN-LOUIS:  Objection, form.
4   BY MR. INGRISANO:
5   Q.   Did anyone at Edgewood High School ever tell you that
6       they didn't want to reference games in the master
7       plan because it would be harder to get neighborhood
8       approval?
9   A.   No.
10          MR. JEAN-LOUIS:  Objection, form.
11  BY MR. INGRISANO:
12  Q.   Did anyone at Edgewood College ever tell you hey,
13      don't -- let's not reference games on 3.8 because we
14      don't want to make it harder to get this passed?
15  A.   No.
16          MR. JEAN-LOUIS:  Objection, form.
17          (Exhibit 54 previously marked.)
18  BY MR. INGRISANO:
19  Q.   Sir, I'm handing you what's been marked previously as
20      Exhibit 54.  It's an email and attachment.  Have you
21      ever seen this document before?
22          (Witness peruses document.)
23  BY MR. INGRISANO:
24  Q.   Or the attachment?
25  A.   I don't specifically recall.  I don't remember if I

Page 63

1       have or not.  But it would seem like I have seen it
2       as we were using, getting information to put into the
3       master plan.
4   Q.   This is an email dated December 5, 2013, correct?
5   A.   Correct.
6   Q.   And you recognize that as a Maggie Balistreri's email
7       address?
8   A.   Yes.
9   Q.   And in this email she is asking Sister Kathleen
10      Malone, looks like Mike Elliott and Scott Flanagan to
11      contact Ed Taylor with corrections to chapter 1
12      through 3, correct?
13  A.   Correct.
14  Q.   And that comports with your recollection from the
15      table of contents to-do that Ed Taylor became
16      involved with helping with content on -- at least on
17      chapter 3, correct?
18          MR. JEAN-LOUIS:  Objection, form.
19          THE WITNESS:  Yes.
20  BY MR. INGRISANO:
21  Q.   Let me ask you on the attachment, sir, to look at the
22      page ending at the bottom right-hand corner EHS 1840.
23      Actually, if you look at the page beforehand, 1839,
24      the bottom of that page there is a subsection heading
25      open space plan-landscaping and green, correct?

Page 64

1   A.   Correct.
2   Q.   All right.  So now flip the page, there is a -- can
3       you read No. 1 out loud, please?
4   A.   "No. 1, athletic field owned by Edgewood High School
5       used for team practices, physical education classes
6       and other generally light uses."
7   Q.   Okay.  Now, looking at the language in No. 1 on this
8       document and compare it to 3.8 of the master plan,
9       would you agree with me, sir, that the phrase "and
10      other generally light uses" appears on Exhibit 54 but
11      not in the master plan?
12  A.   Correct.
13  Q.   And do you have any understanding of how the language
14      in Exhibit 54 "and other generally light uses" came
15      into being?
16  A.   I do not other than potentially Ed Taylor adding it
17      in.
18  Q.   Okay.  And do you have any understanding, sir, as to
19      where that language went and why it's not in the
20      final 3.8?
21  A.   I don't.  I do not.
22  Q.   All right.
23  A.   I could guess but I don't recall.
24  Q.   What would the guess be based on, sir?
25  A.   It's just a vague term that doesn't seem to add much

Page 65

1       to the description.
2   Q.   Okay.  But you don't recall having any conversation
3       with anyone at Edgewood High School or Edgewood
4       College about that language?
5   A.   No.
6           (Exhibit 45 previously marked.)
7   BY MR. INGRISANO:
8   Q.   Sir, I'm going to hand you what's been marked
9       previously as Exhibit 45 in this case.  The top email
10      is an internal email or it's an email from Michael
11      Elliott to an attorney at Foley and Lardner, but
12      below that is an October 26, 2018 email from Matthew
13      Tucker of the City of Madison.  Have you ever seen
14      that email before?
15  A.   Not that I recall.
16  Q.   Can I ask you to please read the second paragraph of
17      Mr. Tucker's email.
18  A.   That begins with "after the neighborhood?"
19  Q.   Yes.
20  A.   "After the neighborhood meeting of Wednesday" --
21  Q.   I'm sorry, to yourself.
22  A.   I'm sorry.
23          (Witness peruses document.)
24          THE WITNESS:  Okay.
25  BY MR. INGRISANO:

Page 66

1  Q.  Sir, in dealing with the City of Madison, had anyone
2     ever advised you that the master plan could be
3     interpreted to limit or curtail uses of open spaces
4     not identified in the master plan?
5         MR. JEAN-LOUIS:  Objection, form,
6     foundation.
7         THE WITNESS:  No.
8         (Exhibit 165 previously marked.)
9  BY MR. INGRISANO:
10 Q.  Mr. Hursh, handing you what's been marked previously
11    as Exhibit 165.  Do you recognize that, sir, as a
12    letter you drafted and signed?
13 A.  Yes.
14        MR. JEAN-LOUIS:  Objection, form.
15 BY MR. INGRISANO:
16 Q.  Dated January 2, 2019 to Brian Munson, correct?
17 A.  Correct.
18 Q.  Can you read the first line of that letter out loud.
19 A.  "In 2014 I helped lead the process of updating the
20    Edgewood Campus master plan and which was needed in
21    order to rezone the campus to campus institutional
22    zoning."
23 Q.  Thank you.  And that accurately reflects your role in
24    updating the campus master plan?
25 A.  Yes.

Page 67

1         MR. JEAN-LOUIS:  Objection, form.
2  BY MR. INGRISANO:
3  Q.  And again, it was your understanding that the master
4     plan was needed in order to rezone to campus
5     institutional, right?
6  A.  Correct.
7  Q.  Let me ask you to read that last paragraph to
8     yourself.
9         (Witness peruses document.)
10        THE WITNESS:  Okay.
11 BY MR. INGRISANO:
12 Q.  Does that paragraph, sir, that you wrote to Mr.
13    Munson accurately reflect your thoughts and
14    conclusions about the master plan interpretation
15    based on your experience in its drafting and
16    preparation?
17        MR. JEAN-LOUIS:  Objection, form.
18        THE WITNESS:  Yes, I agree.
19 BY MR. INGRISANO:
20 Q.  Given your experience and profession in master
21    planning at Potter Lawson, if a master plan required
22    every use of a space to be articulated, what kind of
23    burden would that place, if any, on the process of
24    creating a master plan?
25        MR. JEAN-LOUIS:  Objection, form,

Page 68

1     foundation.
2         THE WITNESS:  A master plan is sort of
3     looking at the ideas for future uses on the site
4     given the time of putting the master plan together.
5     So to expect the master plan to be all-inclusive for
6     eternity, identifying all uses would be hard to do.
7     The master plan should be a fluid document that can
8     be updated when the different uses are anticipated.
9  BY MR. INGRISANO:
10 Q.  Did anyone from the City of Madison ever tell you or
11    to your knowledge tell any of the Edgewood
12    institutions that all uses for open spaces or for
13    facilities had to be included in the master plan?
14 A.  No.
15        MR. JEAN-LOUIS:  Objection, form.
16        (Exhibit 166 previously marked.)
17 BY MR. INGRISANO:
18 Q.  Mr. Hursh, handing you what's been previously marked
19    as Exhibit 166.  Do you see that is also a letter
20    drafted and signed by you; is that correct?
21 A.  Yes.
22 Q.  Dated January 4, 2019?
23 A.  Correct.
24 Q.  This is two days after Exhibit 165, correct?
25 A.  Correct.

Page 69

1  Q.  Do you know were both of these letters, were either
2     or both of these letters actually sent to Brian
3     Munson?
4  A.  I don't recall -- I wouldn't know which one was sent
5     honestly.
6  Q.  Do you think one is an earlier draft of the other?
7  A.  Yes.
8  Q.  Looking at the second paragraph of 166, would you
9     read that to yourself.
10        (Witness peruses document.)
11        THE WITNESS:  Okay.
12 BY MR. INGRISANO:
13 Q.  In this Exhibit 166 you refer to not listing all
14    current uses of the field as an oversight, do you see
15    that?
16 A.  Yes.
17 Q.  What makes you say that?  What made you say that?
18 A.  I am guessing because of the way the City had
19    interpreted the document, to restrict uses if we
20    didn't include them, that we should include them if
21    that's the way the City was interpreting it.
22 Q.  Now --
23 A.  Specifically Matt Tucker from zoning.
24 Q.  Sure.  Had you changed your mind from Exhibit 165
25    that it was a misinterpretation, or is that still

Page 70

1    your opinion at that time?
2         MR. JEAN-LOUIS:  Objection, form,
3    foundation.
4         THE WITNESS:  65, I think they're -- they
5    are both accurate.
6  BY MR. INGRISANO:
7  Q.  Okay.  Both the letters, 165 and 166 --
8  A.  Yes.
9  Q.  -- express your feelings?
10  A.  Yes.
11         (Exhibit 167 previously marked.)
12  BY MR. INGRISANO:
13  Q.  Sir, Exhibit 167 previously marked.  This is a letter
14    signed by you to Alder Tag Evers, correct?
15  A.  Correct.
16  Q.  And you recall drafting and signing this document?
17  A.  Yes.
18  Q.  And why don't you take a moment to read that to
19    yourself, and let me ask if that document properly
20    reflects your sentiments on the uses of the athletic
21    field.
22         (Witness peruses document.)
23         THE WITNESS:  Okay.
24  BY MR. INGRISANO:
25  Q.  Does that letter accurately reflect your impressions

Page 71

1    and conclusions on the issue of the use of the
2    athletic field?
3  A.  It does.
4         MR. JEAN-LOUIS:  Objection, form.
5  BY MR. INGRISANO:
6  Q.  In all three of these letters, 166 -- I'm sorry, 165,
7    166, 167, do you believe all three of these letters
8    correctly reflect your understanding in 2013 and 2014
9    as to the purpose and intent of the master plan
10    document?
11         MR. JEAN-LOUIS:  Objection, form.
12         THE WITNESS:  Yes.  I would say yes.  I
13    think the one line that I don't like is where we
14    said the fact that we do not list all current uses
15    of the field is an oversight.  I don't like that
16    line as much.
17  BY MR. INGRISANO:
18  Q.  Why not?
19  A.  Because I felt when we created the master plan, it
20    wasn't meant to restrict or change the uses of the
21    fields.
22  Q.  Okay.
23  A.  And it wasn't meant to, you know, list absolutely
24    every activity that occurred there.
25  Q.  And your understanding of what the master plan was

Page 72

1    meant to do in 2013 and 2014 was based at least in
2    part on what the City told you, correct?
3         MR. JEAN-LOUIS:  Objection, form.
4         THE WITNESS:  Yes.
5  BY MR. INGRISANO:
6  Q.  Was it based on anything else other than your
7    understanding from the City?
8  A.  I mean the master plan was sort of based on our
9    experience in putting master plans together as well
10    as input from the City as to what was required.
11  Q.  So as far as what was required and what kind of the
12    plan was for a master plan, you drew upon what the
13    City was telling you and your own experiences?
14  A.  Correct.
15         MR. JEAN-LOUIS:  Objection, form.
16  BY MR. INGRISANO:
17  Q.  Let me ask you to go back to Exhibit 171.  That's Mr.
18    Elliott's declaration.
19  A.  Okay.
20  Q.  Let me ask you to turn to page 7 of that document.
21  A.  Okay.
22  Q.  Paragraph 28.  "At no time did anyone from Edgewood
23    College EHS or the City inform me that the master
24    plan would operate or would be interpreted to
25    restrict permissible uses of EHS's property that were

Page 73

1    not identified or not identified with a certain
2    specificity."
3         Did I read that correctly?
4  A.  Yes.
5  Q.  Do you have any reason to disagree with that, that
6    someone did in fact informed Mr. Elliott of that
7    interpretation?
8         MR. JEAN-LOUIS:  Objection, form and
9    foundation.
10         THE WITNESS:  I don't disagree with this
11    statement.
12  BY MR. INGRISANO:
13  Q.  So to your knowledge no one ever would have told him
14    or ever did tell him about that restrictive
15    interpretation?
16         MR. JEAN-LOUIS:  Same objections.
17         THE WITNESS:  I agree.
18  BY MR. INGRISANO:
19  Q.  He goes on to testify, "no one expressed that EHS's
20    field usage would be limited going forward."
21         Do you see that?
22  A.  Yes.
23  Q.  And did you ever hear anyone express a limitation on
24    field usage?
25         MR. JEAN-LOUIS:  Objection, form.

19 (Pages 70 - 73)

Page 74

1     THE WITNESS:  No.
2  BY MR. INGRISANO:
3  Q.  Were you on campus ever as a part of this process in
4     2013, 2014?
5  A.  Yes.
6  Q.  Did you ever observe No. 1, the athletic field on the
7     Edgewood High School campus, in use?
8  A.  I'm sure I did.  I used to live in the Dudgeon Monroe
9     neighborhood and would drive by the fields often.
10  Q.  When did you live in that neighborhood?
11  A.  I lived in that neighborhood from 1990 to 2010.
12  Q.  Did you ever observe games or athletic contests being
13     played on that field during your time living in that
14     neighborhood?
15  A.  Yes, yes.
16  Q.  Do you recall what kind of games?
17  A.  Football games, soccer games.
18  Q.  How far did you live, if you were to approximate, how
19     far did you live from the Edgewood field when you
20     lived there?
21  A.  Fairly far as far as the neighborhood goes.  I was
22     all the way to the west.  So maybe a few miles.
23  Q.  Were you familiar or were you aware of while you
24     lived in that neighborhood any neighbors who
25     complained about the fact that Edgewood was playing

Page 75

1     games on its field?
2  A.  No.
3  Q.  Paragraph 29, sir, second sentence.  Mr. Elliott
4     testifies "I did not intend to limit the use of EHS's
5     athletic field to team practices or physical
6     educations practices."
7     Do you see that?
8  A.  Yes.
9  Q.  Did you ever hear him express a contrary intent?
10  A.  No.
11     MR. JEAN-LOUIS:  Objection to form.
12  BY MR. INGRISANO:
13  Q.  It goes on to say "at the time of signing, I
14     understood that EHS as a campus institutional zoned
15     institution had the full use of its field as a sports
16     and recreational facility or stadium under the zoning
17     ordinance."
18     Do you see that?
19  A.  Yes.
20  Q.  It says "I did not intend to give that up in signing
21     the master plan and did not anticipate the City's
22     interpretation in 2018."
23     Do you see that?
24  A.  Yes.
25  Q.  Again, do you ever hear him express a contrary intent

Page 76

1     that he was willing to sacrifice some of the uses of
2     the field?
3     MR. JEAN-LOUIS:  Objection, form,
4  foundation.
5     THE WITNESS:  I did not.
6  BY MR. INGRISANO:
7  Q.  Next page, paragraph 32.  He writes "instead, I
8     believe the athletic field was fairly described by
9     calling it an 'athletic field' and would be used as
10     such.  I understood that 'team practices' and
11     'physical education classes' were listed as examples,
12     not limitations."
13     Do you see that?
14  A.  Yes.
15  Q.  Did you share that same understanding?
16  A.  Yes.
17     MR. JEAN-LOUIS:  Objection, form.
18  BY MR. INGRISANO:
19  Q.  Were you involved at all with Edgewood College's
20     process under the master plan involving the
21     architectural review committee?
22     MR. JEAN-LOUIS:  Objection, form.
23     THE WITNESS:  Can you repeat that?
24     MR. INGRISANO:  Sure.
25  BY MR. INGRISANO:

Page 77

1  Q.  Did you assist Edgewood College with any of its
2     projects after the master plan was formalized where
3     that process now in the master plan involved the
4     architectural design review committee?
5     MR. JEAN-LOUIS:  Objection, form.
6     THE WITNESS:  No.
7     MR. INGRISANO:  I've got no further
8  questions.  Do you want to switch seats?
9     MS. ZYLSTRA:  Sure, I think that's okay.
10  Can we take just a five minute break?
11     (Recess taken.)
12     EXAMINATION
13  BY MR. JEAN-LOUIS:
14  Q.  Could I have you please take a look at Exhibit 165
15     that you looked at previously which is a letter or a
16     draft of a letter dated January 2nd, 2019.
17  A.  Yes.
18  Q.  Had you testified earlier that you believed that
19     Exhibit 165 was an earlier draft of Exhibit 166?
20  A.  I am guessing yes.
21  Q.  If you could look at the last paragraph on Exhibit
22     165.  The first sentence of that paragraph, first
23     clause says "the document does not discuss the use of
24     the athletic field."
25     Did I read that correctly?

Page 78

1  A.  Yes.
2  Q.  Does the document indeed, the document assuming
3     that's the master plan, does the master plan describe
4     certain uses of the athletic field?
5        MR. INGRISANO:  Objection, form,
6     argumentative.  Go ahead.
7        THE WITNESS:  It does.
8  BY MR. JEAN-LOUIS:
9  Q.  And what use does the document list?
10 A.  What does the document list in the master plan?
11 Q.  Yes.
12 A.  Practice fields -- I'm trying to remember.
13 Q.  You can take a look at I believe page 60 of 228.
14 A.  Practice fields and athletic education -- team
15    practices, physical education classes.
16 Q.  Okay.  So the second clause in the first sentence of
17    the last paragraph of Exhibit 165 says, "we did not
18    specify any type of use or nonuse of the athletic
19    fields that are being discussed now."
20       Do you see that?
21 A.  Yes.
22 Q.  Do you agree that it's not true that the master plan
23    did not describe any type of use of the athletic
24    fields?
25       MR. INGRISANO:  Objection, form,

Page 79

1     argumentative.
2        THE WITNESS:  I agree that it describes
3     uses, but our intent was not to limit or describe
4     all uses of the fields in that open space plan
5     portion of the master plan.
6  BY MR. JEAN-LOUIS:
7  Q.  The next sentence says "because the master plan did
8     not include physical facility changes to the field,
9     we did not focus on the fields or spend time
10    discussing the uses of the fields with the
11    neighborhood, the City or the Edgewood institutions."
12       Did I read that correctly?
13 A.  Yes.
14 Q.  And if you turn to what was previously marked and
15    discussed today as Exhibit 163 and Exhibit 164.
16 A.  Okay.
17 Q.  Do you agree that Susan Serrault was discussing the
18    uses of the athletic field and that you were copied
19    on those emails?
20 A.  Yes.
21 Q.  And do you agree that the information that's being
22    provided to Susan Serrault is coming from a
23    representative of the high school?
24 A.  Yes.
25 Q.  Do you believe it is true that you did not discuss

Page 80

1     the uses of the field with the neighborhood?
2        MR. INGRISANO:  Objection, form.
3        THE WITNESS:  Yes.
4  BY MR. JEAN-LOUIS:
5  Q.  And do you agree that you also did not discuss the
6     uses of the field with the City?
7  A.  I -- yup, as far as I can recall.
8  Q.  But to the extent it says you did not discuss the
9     uses with the Edgewood institutions, would you agree
10    that that's not strictly accurate because they were
11    discussed in Exhibit 163 and 164?
12       MR. INGRISANO:  Objection, form,
13    argumentative.
14       THE WITNESS:  Yeah, I agree.
15 BY MR. JEAN-LOUIS:
16 Q.  You say it was assumed that the fields would continue
17    to be used for athletic games and events.
18       Who assumed?  What did you mean by that
19    sentence?
20 A.  Is this 165?
21 Q.  Yes, 165, I'm sorry.
22 A.  We assumed that.  In all of our dealings with the
23    process, we did not assume that the uses on the field
24    would change.  That was our assumption during the
25    process in working with Edgewood and the other

Page 81

1     institutions along with the City as well.  I think
2     the master plan -- our focus on the master plan was
3     mostly new buildings and how they might be physically
4     located on the site.  Like I said, there wasn't any
5     changes to the field, so we didn't focus on that.
6  Q.  Okay.  And then the last sentence says "to say that
7     the master plan document says it is illegal to play
8     games on the athletic field because it is not
9     mentioned in the document is a misinterpretation of
10    the document."
11       Did I read that correctly?
12 A.  Yes.
13 Q.  Is it true that that sentence does not appear on
14    Exhibit 166?
15 A.  Yes.
16 Q.  In Exhibit 166, the last paragraph starts, "the
17    document did not focus on the specific uses of the
18    athletic field, the field is only mentioned in the
19    open spaces section."
20       Did I read that correctly?
21 A.  Yes.
22 Q.  Do you believe that this sentence is more accurate
23    than the sentence in 1 -- the first sentence of the
24    last paragraph in 165?
25       MR. INGRISANO:  Objection, form.

21 (Pages 78 - 81)

Page 82

1           THE WITNESS: More accurate?  I feel like
2       they're both accurate.
3  BY MR. INGRISANO:
4  Q.  The last sentence says "the fact that we did not list
5       all current uses of the field is an oversight on our
6       part and should be corrected to include all future
7       uses."
8           MR. INGRISANO:  Objection.
9  BY MR. JEAN-LOUIS:
10 Q.  Did I read that correctly?
11 A.  Yup.
12          MR. INGRISANO:  Objection,
13      mischaracterizes.
14          THE WITNESS:  Yup.
15 BY MR. JEAN-LOUIS:
16 Q.  Who did you mean by our part?
17 A.  Potter Lawson and others writing the master plan.
18 Q.  And when you said "should be corrected to include all
19      the current uses," what did you mean by that?
20 A.  I guess we were writing that because of how it was
21      being interpreted by the City and the neighborhood
22      as, you know, the fact that we were trying to -- that
23      we didn't mention all the uses that the City and the
24      neighbors were using that sort of against the high
25      school.  We felt that because of that interpretation

Page 83

1       of the document that if we could go back and write
2       all the uses down, we would have.
3  Q.  Turn to Exhibit 167.
4  A.  Yup.
5  Q.  The last sentence of this document says "the master
6       plan was meant to be a fluid document that could be
7       modified over time as needs of the institution change
8       with input from the City, the neighbors and the three
9       Edgewood institutions."
10          Did I read that correctly?
11 A.  Yes.
12 Q.  What did you mean that the master plan was meant to
13      be a fluid document that could be modified over time?
14 A.  There is a segment of the master plan that talks
15      about how it could be changed.  So if there is ever a
16      need to make changes to it, that the process would be
17      similar to the writing of the master plan and that
18      you would meet with the neighborhood, you would meet
19      with the other institutions, you would meet with the
20      City, you would potentially, you know, propose the
21      changes and then work with the City to update the
22      master plan based on any types of different uses or
23      any changes to the master plan.
24 Q.  Okay.  Any changes to the master plan including
25      changes of use; is that correct?

Page 84

1  A.  Sure.
2  Q.  Do you know what section of the master plan that
3       section that you were just speaking of is?
4  A.  It's -- I think it's towards the end.  I think under
5       4.5, process for approvals.  Page 53.  I don't know
6       exactly where it is.
7  Q.  Okay.  Let me see if I can find it.  I believe the
8       process for approvals section 4.5 is on page 81 of
9       228.
10          MR. INGRISANO:  What page, Counsel?
11          MR. JEAN-LOUIS:  Page 81 of 228.
12          THE WITNESS:  Yeah, I don't see anything
13      there as far as updating the master plan.  I believe
14      this was more about when a project actually went
15      ahead that there -- this would be the process for
16      approval.
17 BY MR. JEAN-LOUIS:
18 Q.  Okay.
19 A.  But I know there is something, I mean, in here that
20      does state that the master plan can be modified.
21 Q.  If you could turn to page 10 of 228.
22 A.  Yes.
23 Q.  Do you see the paragraph numbered paragraph 3?
24 A.  Yes.
25 Q.  Could you read that paragraph to yourself.

Page 85

1  A.  Yes.
2           (Witness peruses document.)
3           THE WITNESS:  Yes.
4  BY MR. JEAN-LOUIS:
5  Q.  Is that the portion of the master plan that you were
6       thinking of?
7           MR. INGRISANO:  Objection, form.
8           THE WITNESS:  It's similar, yes.  I mean
9       this was a letter from the City planning department
10      letting us know that if you needed to make an
11      alteration to the plan, there was a process for it.
12 BY MR. JEAN-LOUIS:
13 Q.  Okay.
14 A.  And I thought it was -- I thought we actually wrote
15      what, you know, based on what the City had added, we
16      wrote that into the plan, but I don't know where that
17      is.
18 Q.  Do you think that what you may have written into the
19      plan was substantially similar to or was identical to
20      this language?
21          MR. INGRISANO:  I'm sorry, can you read
22      that back?
23          (Record read.)
24          MR. INGRISANO:  Objection, form.
25          THE WITNESS:  I think it may have been

22 (Pages 82 - 85)

Page 86

1 similar. The only thing I see here is -- well, they
2 say including changes to the proposed use identified
3 open space areas and other space uses. It doesn't
4 mention our -- you know, the main document that we
5 focused on was a drawing that showed building
6 additions. They don't reference that specifically.
7 But it does say including changes to proposed use
8 or -- so I would assume that it included that. But
9 I would think the process, you know, to change
10 anything in the master plan would be based on this.
11          (Exhibit 13 previously marked.)
12 BY MR. JEAN-LOUIS:
13 Q. Okay. I'm handing you what has been previously
14    marked as Exhibit 13. Can you take a look at this
15    document and tell me if you are familiar with it?
16 A. Yes.
17 Q. What is this document?
18 A. It's the zoning document for the campus institutional
19    district.
20 Q. And what do you mean by zoning document?
21 A. Or zoning ordinance.
22 Q. Did you familiarize yourself with this ordinance
23    while you were working on the Edgewood master plan?
24 A. Yes.
25          MR. INGRISANO: Objection, form, vague as

Page 87

1 to time. This document is the amended ordinance.
2    It was not in place in 2013, 2014.
3 BY MR. JEAN-LOUIS:
4 Q. Did you familiarize yourself with the ordinance that
5    was in place under the name 28.097 at the time that
6    you were working on the Edgewood master plan?
7 A. Yes.
8 Q. Could you go to paragraph 10 of this ordinance.
9 A. Yes.
10 Q. Could you read that to yourself, please.
11          (Witness peruses document.)
12          THE WITNESS: Okay.
13 BY MR. JEAN-LOUIS:
14 Q. Do you agree that paragraph 10 of this ordinance is
15    the same language that appears on paragraph 3 of page
16    10 of 228 of the master plan?
17 A. Yes.
18 Q. And does it include the same language that "no
19    alteration of an approved campus master plan
20    including changes to the proposed use of identified
21    open space areas or of our open space uses shall be
22    permitted unless approved by the plan commission,"
23    and it continues from there; is that correct?
24 A. Yes.
25 Q. If you turn back to paragraph 5(c), facilities plan,

Page 88

1    do you see that?
2 A. Yes.
3 Q. Do you see in (1) within (c) -- well, I'll start with
4    (c), it says "facilities plan includes description of
5    existing conditions on the campus, the proposed
6    conditions under the master plan."
7          Do you see that?
8 A. Yes.
9 Q. Let me back up a little bit. Section -- paragraph 5
10    is called contents of the master plan if you turn a
11    page back, do you see that?
12 A. Yes.
13 Q. And do you see where it says the master plan shall
14    include the following elements and information?
15 A. Yes.
16 Q. And going back now to (c), do you see under existing
17    conditions that that includes land uses and
18    buildings?
19 A. Yes.
20 Q. Do you see under proposed conditions that it says
21    future land uses and buildings?
22 A. Yes.
23 Q. Do you see where it also says open space areas or
24    other open space uses?
25 A. Yes.

Page 89

1 Q. Do you understand that these are requirements of
2    inclusion in a CI district master plan?
3 A. Yes.
4 Q. Based off of section -- paragraph 10, would it be
5    your understanding that if they change any of the
6    changes to proposed uses of open spaces that are
7    identified in the master plan if the use were to
8    deviate or change from the proposed use that an
9    amendment would be necessary?
10          MR. INGRISANO: Objection, form,
11    incomplete hypothetical, calls for a legal
12    conclusion.
13          THE WITNESS: Yes. Can I ask if this
14    section is -- this is the current zoning ordinance?
15          MR. JEAN-LOUIS: I will represent to you
16    that the entire ordinance is the amended version of
17    the ordinance, but it is my understanding that there
18    has not been any changes to section -- to paragraph
19    5 or paragraph 10.
20          THE WITNESS: Okay.
21          (Exhibit 153 previously marked.)
22 BY MR. JEAN-LOUIS:
23 Q. I'm handing you what's been previously marked as
24    Exhibit 153. Do you recognize this email chain?
25 A. Yes.

23 (Pages 86 - 89)

Page 90

1  Q.  And are you included on this email chain?
2  A.  Yes.
3  Q.  Do you recall receiving this email from Maggie?
4  A.  I don't recall but I wouldn't dispute it.
5  Q.  Could you read what follows No. 2 in Maggie's email
6     at the bottom, and you can read it out loud?
7  A.  "He plans to propose a resurfacing of the football
8     field and track at the liaison committee tomorrow.
9     They would also love to put in some lights and
10    bleachers to have home games, just when we thought it
11    was safe."
12 Q.  And could you continue reading?
13 A.  Sure.  "Do you know what the new process is for them
14    to be able to resurface their football field.  Should
15    we put the architectural design review committee
16    together to navigate the lights and bleachers
17    project?  Should I call Matt Tucker to check in about
18    this?  If so, do you have his number?"
19 Q.  Thank you.  And above do you want to -- could you
20    read the response?
21 A.  Sure.  "No. 1, I don't know what the process would be
22    to get approvals to resurface the football field.
23    The resurfacing could be considered maintenance but
24    the lights and bleachers would be additions."
25 Q.  Okay.  And what did you mean by the lights and

Page 91

1     bleachers would be additions?
2  A.  Physical additions to the facilities versus a
3     maintenance project.
4  Q.  Okay.  Could you read the next paragraph for me,
5     please?
6  A.  "Once the master plan is approved, the architectural
7     design review committee would be the mechanism for
8     approval.  Although this was not in the master plan,
9     it could trigger a change to the master plan or it
10    would be a conditional use that would go through the
11    same process as before."
12 Q.  So in this email were you telling Maggie that it was
13    your belief that adding lights and bleachers to the
14    athletic field would likely trigger a change in the
15    master plan or some type of conditional use process?
16 A.  Yes.
17       MR. INGRISANO:  Objection, form.
18 BY MR. JEAN-LOUIS:
19 Q.  And where did you get that belief from?
20 A.  Because the lights and the bleachers weren't a part
21    of the master plan that was being communicated with
22    the neighborhood or the City.
23 Q.  So you think because the lights were not communicated
24    with the neighbors or the City and they were not
25    included in the master plan, that is a change that

Page 92

1     would have triggered a master plan amendment,
2     correct?
3  A.  Yes.
4       MR. INGRISANO:  Objection, form.  Mr.
5     Hursh, if you can just give me a pause before you
6     answer so I can get my objection in, okay?
7       THE WITNESS:  Sure.
8       MR. INGRISANO:  Thank you.
9  BY MR. JEAN-LOUIS:
10 Q.  Did you -- you had mentioned before that you were
11    retained by the high school to work on the Stream
12    project; is that correct?
13 A.  On the high school it was the performing arts.
14 Q.  The performing arts center.  Okay.  Were you also or
15    was Potter Lawson also retained to work on any
16    amendments to the master plan?
17 A.  Yes.
18 Q.  And what amendment was that?
19 A.  It was amendment to add additional parking at the
20    high school parking lot.
21 Q.  Okay.  And do you know whether that amendment was
22    granted?
23 A.  Yes.
24 Q.  When did -- who was your contact at the high school
25    for that project?

Page 93

1  A.  Michael Elliott.
2  Q.  And when did he first approach you about that
3     project?
4  A.  He --
5       MR. INGRISANO:  Objection, form, assumes
6     facts not in evidence.  Go ahead.
7       THE WITNESS:  I don't recall but it was
8     after the master plan was approved.
9  BY MR. JEAN-LOUIS:
10 Q.  Okay.  When you submitted -- let me strike that.
11    Who submitted the master plan, Exhibit 52?
12       MR. INGRISANO:  Objection, form, vague.
13       THE WITNESS:  Yeah, I'm not sure.
14 BY MR. JEAN-LOUIS:
15 Q.  Did Potter Lawson file the document with the City?
16 A.  Yes.
17 Q.  And was Potter Lawson filing the document on behalf
18    of all three Edgewood institutions, the campus
19    school, the high school and the college?
20 A.  Yes.
21 Q.  And were you acting as the agent of all three schools
22    in filing that master plan?
23       MR. INGRISANO:  Objection, form, calls for
24    a legal conclusion.
25       THE WITNESS:  Yes.

Page 94

1  BY MR. JEAN-LOUIS:
2  Q.  Did you understand that you had to have approval of
3     the master plan from the presidents of each of the
4     three institutions or leaders of the three
5     institutions before you could file that document?
6  A.  Yes.
7  Q.  Did you obtain approval from each of the three
8     leaders before filing that document?
9  A.  Yes.
10        (Exhibit 173 marked.)
11 BY MR. JEAN-LOUIS:
12 Q.  Do you recognize this as an email from -- handing you
13    what's been marked as Exhibit 173?  Do you recognize
14    this as an email from Maggie Balistreri-Clark to
15    Scott Flanagan that you were cc'd on?
16 A.  Yes.
17 Q.  And could you read the email for me, please?
18 A.  "Scott, the final master plan documents are ready to
19    submit to the City.  Mike Elliott asked to have a
20    final review.  Doug arranged this a week or two ago.
21    Both Doug and I have sent him emails asking if
22    everything is good to go as we would like to get this
23    submitted.  Do you have advice for us on this.  Thank
24    you, Maggie."
25 Q.  Okay.  What is the date of this email?

Page 95

1  A.  October 16th, 2014.
2        (Exhibit 174 marked.)
3  BY MR. JEAN-LOUIS:
4  Q.  I'm handing you what's been marked as Exhibit 174.
5     Do you see the date of the top email on this
6     document?
7  A.  Yes.
8  Q.  And what is that date?
9  A.  October 20th, 2014.
10 Q.  Okay.  If you could turn back to the second page and
11    the third page here, last two pages, do you see at
12    the very bottom where it says on Friday, September
13    19th, 2014 at 4:43 p.m., Maggie Balistreri-Clark
14    wrote, do you see that email there?
15 A.  Yes.
16 Q.  Could you read the section No. 2 there?
17        MR. INGRISANO:  Objection, foundation.
18        THE WITNESS:  On the last page?
19 BY MR. JEAN-LOUIS:
20 Q.  On the last page.
21 A.  "2, Doug Hursh is printing up the final version of
22    the campus master plan to submit to the City.  We've
23    been working on responding to the conditions that the
24    City sent us as a part of the approval process.  Once
25    the final copies are printed, I will make sure that

Page 96

1     two copies are in the library.  Hurray."
2  Q.  And now do you see towards the middle of the second
3     last page there an email from Michael to Maggie where
4     he asks Maggie, "can you tell me if Doug and Paul
5     Cuta ever connected with our changes."
6        Did I read that correctly?
7  A.  Yes.
8  Q.  And is that the same -- is Paul Cuta the individual
9     you identified from the architecture firm that was
10    working with the high school?
11 A.  Yes.
12 Q.  Do you know what Mr. Elliott is referring to with his
13    question?
14        MR. INGRISANO:  Objection, foundation.
15 BY MR. JEAN-LOUIS:
16 Q.  We can go ahead actually to the email above that you
17    are cc'd on.
18 A.  Okay.
19        MR. INGRISANO:  Same objection.
20 BY MR. JEAN-LOUIS:
21 Q.  And actually even to the first page you send Michael
22    Elliott and Maggie an email here, do you see that?
23        MR. INGRISANO:  Same objection,
24    foundation.
25        THE WITNESS:  Yes.

Page 97

1  BY MR. JEAN-LOUIS:
2  Q.  Could you read the body of that email for me, please?
3  A.  Which one?
4  Q.  On the bottom one of the first page.
5  A.  From myself?
6  Q.  Yes.
7  A.  On September 23rd, 2014, "Mike and Maggie, here is a
8     PDF of the main body of the master plan document.  It
9     has the changes to the high school's future massing
10    and size.  Of additions based on the information that
11    we got from Paul Cuta, the document does not include
12    the appendix portion of the master plan but that
13    portion has not changed recently."
14 Q.  Okay.  So do you recall including changes to the
15    master plan based on information or drawings that you
16    got from the high school or from Paul Cuta?
17 A.  Yes.
18        MR. JEAN-LOUIS:  Actually, I'll use that
19    one later.
20 BY MR. JEAN-LOUIS:
21 Q.  If you could turn back to -- sorry, I buried my own
22    outline here somewhere.  Okay.  Sorry here, I'm not
23    sure where I placed this email.
24        MR. JEAN-LOUIS:  Want to take a five
25    minute break while I look for this?

25 (Pages 94 - 97)

Page 98

1       THE WITNESS:  Sure.
2       (Recess taken.)
3  BY MR. JEAN-LOUIS:
4  Q.  If you could look at what's been marked as Exhibit
5     174.  Do you see the email at the top there from
6     Michael Elliott?
7  A.  Yes.
8  Q.  And do you understand that email to be giving you a
9     final approval to file the master plan from the high
10    school?
11 A.  So, yes.  I mean it looks like he's giving approval.
12    I don't know if it was the final one because things
13    kept going back and forth, but yes, he's giving
14    approval based on what we sent him.
15 Q.  And you understood that you needed that approval
16    before you could move forward?
17 A.  Yes.
18 Q.  If you could turn back to Exhibit 153.
19       MR. INGRISANO:  153?
20       MR. JEAN-LOUIS:  Yes.
21 BY MR. JEAN-LOUIS:
22 Q.  Do you recall ever hearing about a proposal to add
23    lights and bleachers to Edgewood High School's
24    athletic field before October 20th of 2014?
25 A.  Maybe not formally but they have always wanted to be

Page 99

1     able to have lights and bleachers there for athletic
2     games.
3  Q.  And if we turn back to Exhibit 163, if you look at
4     the diagram on the second page, I believe you
5     testified that this was your handwriting?
6  A.  Yes.
7  Q.  And that it says on the open spaces site 1, no night
8     games, correct?
9  A.  Correct.
10 Q.  And did you draft this based on your understanding
11    that the high school had wanted to be able to do
12    night games but was not able to?
13       MR. INGRISANO:  Objection, form, asked and
14    answered.
15       THE WITNESS:  Yeah, I mean it was a
16    question, and it was my understanding that they were
17    not allowed to have night games.
18 BY MR. JEAN-LOUIS:
19 Q.  And you -- did you testify that you believe that that
20    might have been some type of agreement between
21    Edgewood High School and the neighbors?
22 A.  Yes.
23       MR. INGRISANO:  Objection, form.
24       THE WITNESS:  Yes.
25       (Exhibit 175 marked.)

Page 100

1  BY MR. JEAN-LOUIS:
2  Q.  Do you recognize this as -- where is the email on
3     that exhibit for you?
4  A.  Last page.
5       MS. ZYLSTRA:  The witness should swap that
6     and put the email on top with the attachment on the
7     bottom.  Just so we have it together correctly.
8  BY MR. JEAN-LOUIS:
9  Q.  Do you recognize this as an email from Maggie
10    Balistreri-Clark to you as well as Mary Lawson and
11    Daniel Carey?
12 A.  Yes.
13 Q.  Who is Daniel Carey?
14 A.  Daniel Carey is the previous president before Scott
15    Flanagan of the Edgewood College.
16 Q.  Okay.  And she says "Mary, Doug and Ann, this is my
17    latest attempt to respond to the unresolved issues
18    document."
19       Do you see that?
20 A.  Yes.
21 Q.  Do you know what this unresolved issues document is?
22 A.  I believe it was part of the memorandum of
23    understanding that we were trying to create with the
24    neighborhood to track potential issues that were not
25    agreed so that the master plan could move forward.

Page 101

1  Q.  Okay.  So do you believe that this, the document
2     that's attached here, do you see the document
3     memorandum of understanding is a draft document.
4     Does this appear to you to be an early draft of the
5     memorandum of understanding that I believe appears in
6     section 4.4 or 4.5 of the master plan?
7       MR. INGRISANO:  Objection, form, vague as
8     to time, foundation.
9       THE WITNESS:  Can I look at the --
10 BY MR. JEAN-LOUIS:
11 Q.  Yeah, you can look at --
12 A.  What section did you say?
13 Q.  I believe it's 4.4 or 4.5.
14       MR. INGRISANO:  4.4 was the MLU section.
15    No, wait -- 4.3 -- no, 4.3 is -- 4.2.
16       MR. JEAN-LOUIS:  4.2.
17       MR. INGRISANO:  4.2 is the MLU.
18       MR. JEAN-LOUIS:  Okay.
19       MR. INGRISANO:  I'll object, foundation.
20    These documents are not the same.
21       THE WITNESS:  Yes, I assume that's a draft
22    of what we put in the master plan.
23 BY MR. JEAN-LOUIS:
24 Q.  Okay.  Do you see in Maggie's email where she says,
25    "in addition to the issues noted here, current

26 (Pages 98 - 101)

Page 102

1   neighborhood concerns include" and then she lists
2   additional neighborhood concerns.
3        Do you see that?
4 A.  Yes.
5 Q.  Could you read paragraph No. 7.
6 A.  "The football field, although there appears to be
7    some openness to having lights on the football field
8    in recent months, the use of the field for sporting
9    events will need to be addressed in the master plan."
10 Q.  Okay.  So based off this email, is it your
11   understanding that the football field is not
12   mentioned in the memorandum of understanding draft at
13   least as of September 16, 2011?
14        MR. INGRISANO:  Objection, form,
15   foundation.
16        THE WITNESS:  I don't know.  It looks like
17   it's not.
18 BY MR. JEAN-LOUIS:
19 Q.  But you do recall lights on the football field being
20   an issue since at least the '90s; is that correct?
21 A.  Correct.
22        MR. INGRISANO:  Objection to form.
23 BY MR. JEAN-LOUIS:
24 Q.  Do you see where it says "the use of this field for
25   sporting events will need to be addressed in the

Page 103

1   master plan"?
2        THE WITNESS:  I do.
3 BY MR. JEAN-LOUIS:
4 Q.  Do you know what Maggie meant by that?
5        MR. INGRISANO:  Objection, form, calls for
6   speculation.
7        THE WITNESS:  I do not.
8 BY MR. JEAN-LOUIS:
9 Q.  What project, if you know, were you working on with
10   Maggie in September of 2011?
11 A.  Other than the master plan?
12 Q.  I guess my question is the master plan that was
13   submitted in 2014 and 2015, were you working on that
14   master plan as early as September 16 of 2011?
15 A.  We could have been, yes.
16 Q.  You --
17 A.  That might have been more like the beginning of it in
18   discussing the need for it.
19 Q.  Okay.  Do you recall any discussions between
20   September 16 of 2011 and 2015 -- sorry, and --
21   between September 16 of 2011 and 2014 of the use of
22   the high school's athletic field for sporting events?
23        MR. INGRISANO:  Objection, form.
24        THE WITNESS:  I don't recall discussing
25   it.  We may have, but I don't recall that.  It

Page 104

1   wasn't a major item of discussion.
2        MR. JEAN-LOUIS:  Okay.
3 BY MR. JEAN-LOUIS:
4 Q.  Do you recall discussing lights over that same period
5   on the athletic field?
6        MR. INGRISANO:  Objection to form.
7        THE WITNESS:  I do not.
8        MR. JEAN-LOUIS:  Okay.
9        THE WITNESS:  Not specifically.  Since the
10   '90s it's been a thing that they have discussed.
11 Q.  Could you turn, please, to Exhibit 162, please?
12 A.  Okay.  Got it.
13 Q.  Okay.  Do you see the column that was discussed
14   earlier with counsel titled
15   responsibility/coordination?
16 A.  Yes.
17 Q.  And do you recognize that some of the people listed
18   in that column are representatives of Edgewood
19   College or -- is Maggie Balistreri-Clark listed for
20   some of these sections?
21 A.  Yes.
22 Q.  And for chapter 3.8 is Ed Taylor also listed?
23 A.  Yes.
24 Q.  And your understanding is that they are both

Page 105

1   affiliated with the college, correct?
2 A.  Correct.
3        MR. INGRISANO:  Objection, form, vague as
4   to affiliated.
5        THE WITNESS:  Yes.
6 BY MR. JEAN-LOUIS:
7 Q.  This column, does it tell you who drafted these
8   sections or just who is responsible for coordinating
9   drafting these sections?
10        MR. INGRISANO:  Objection, form.
11        THE WITNESS:  It was our way to track and
12   suggest who should work on the different aspects of
13   the master plan.  Whether it ended up being that
14   way, I'm not sure.
15 BY MR. JEAN-LOUIS:
16 Q.  Looking at Exhibit 54, do you see where it says
17   Sister Kathleen, Mike and Scott at the beginning of
18   the email, "thank you for your submissions to the
19   campus master plan."
20        Do you see that?
21 A.  Um-hum, yes.
22 Q.  Do you have any reason to dispute that Sister
23   Kathleen, Mike or Scott made submissions to the
24   campus master plan?
25        MR. INGRISANO:  Objection, foundation.

27 (Pages 102 - 105)

Page 106

1        THE WITNESS:  I do not.
2  BY MR. JEAN-LOUIS:
3  Q.  If you turn to the next paragraph, it says "here is a
4     draft of chapters 1 through 3 compiled by Ed Taylor."
5        Do you see that?
6  A.  Yes.
7  Q.  Do you have any reason to believe that Ed Taylor
8     wrote chapters 1 through 3 himself as opposed to
9     compiling submissions that were provided by other
10     people?
11        MR. INGRISANO:  Objection, form.
12        THE WITNESS:  Can you ask that again?
13        MR. JEAN-LOUIS:  Yes.
14  BY MR. JEAN-LOUIS:
15  Q.  Do you have any reason to believe that Ed Taylor
16     wrote everything that is in this draft with chapters
17     1 through 3 himself as opposed to having compiled
18     submissions of other people?
19        MR. INGRISANO:  Objection to form.
20        THE WITNESS:  I am not --
21        MR. INGRISANO:  Foundation.
22        THE WITNESS:  I don't have -- I don't
23     recall how this was written.  I mean it could have
24     been either way.
25  BY MR. JEAN-LOUIS:

Page 107

1  Q.  So you don't have any knowledge as to how these
2     chapters were written; is that correct?
3  A.  I don't recall, no.
4        (Exhibit 176 marked.)
5  BY MR. JEAN-LOUIS:
6  Q.  Handing you what's been marked as Exhibit 176.  Do
7     you recognize the second email from the top of the
8     first page as an email from Maggie Balistreri-Clark
9     to yourself?
10  A.  Yes.
11  Q.  She starts "Doug, Christie is working to find out how
12     to list who the owner is.  We'll let you know."
13        Do you know who she's referring to in this
14     email?
15        MR. INGRISANO:  Objection, foundation.
16        THE WITNESS:  Not without reading the
17     whole thing.  But I'm assuming when we submit
18     anything to the City for planning approval, there is
19     an application form and it requires a signature of
20     the owner of property.  And it's a little more
21     complicated here being a campus.
22  BY MR. JEAN-LOUIS:
23  Q.  Okay.
24  A.  But that might be what it is.
25        (Exhibit 177 marked.)

Page 108

1  BY MR. JEAN-LOUIS:
2  Q.  Handing you what's been marked as Exhibit 177, do you
3     recognize the email at the top being an email from
4     Maggie Balistreri-Clark to yourself?
5  A.  Yes.
6  Q.  And what is the date and time of that email?
7  A.  January 15th, 2014, 3:45 p.m.
8  Q.  And if you turn back to Exhibit 176, the email that
9     was from Maggie to you, the second email on the first
10     page is from the same date at an earlier time; is
11     that correct?
12  A.  Correct.
13  Q.  And turning back to 177, she says "Doug, here is the
14     owner information.  There are technically four
15     owners.  Please see a listing for the four below."
16        Is that correct?
17  A.  Correct.
18  Q.  Do you understand this email and the listing of the
19     four below to be describing who are the legal owners
20     of the Edgewood Campus?
21  A.  Yes.
22  Q.  And based on this email at least, who would those
23     owners be?
24  A.  The Edgewood Campus School, Edgewood College,
25     Edgewood High School and the Edgewood Condominium

Page 109

1     Association.
2  Q.  Okay.  And were you familiar -- were you familiar
3     with the Edgewood Condominium Association as a
4     concept while you were working on drafting the master
5     plan?
6  A.  Yes.
7        MR. INGRISANO:  Objection, form.
8  BY MR. JEAN-LOUIS:
9  Q.  Had you dealt, had you interacted or had you known
10     about the condominium association while you were
11     working on projects that predated the master plan?
12  A.  No.
13  Q.  Did anyone ever inform you that the owners of the
14     land at the -- the owners of the Edgewood Campus
15     land, did anyone ever tell you that the owners were
16     the Dominican Sisters of Sinsinawa?
17  A.  Yes.
18  Q.  Yes?  And do you understand that the Dominican
19     Sisters of Sinsinawa to be different than the four
20     owners that were listed on Exhibit 177?
21        MR. INGRISANO:  Objection, form,
22     foundation.
23        THE WITNESS:  Yes.  Can I explain?
24  BY MR. JEAN-LOUIS:
25  Q.  Yes.

Page 110

1 A.  During the master plan as part of the drawings there
2    was a delineation of land created for each of the
3    institutions, so the three institutions.  Before that
4    there wasn't, they just coexisted on the land.  And
5    they wanted more of a clear delineation of what land
6    they could be in control of to control their future
7    needs for building additions.
8        And I think when we were doing the master
9    plan, the college was expanding but the other two
10   schools really weren't, did not have as much money,
11   did not have as much income and were afraid of losing
12   their land.  So the way to make everybody peacefully
13   coexist was to create those boundaries.
14 Q.  Okay.
15 A.  And that's when this condominium thing occurred.
16 Q.  Okay.  Is it your understanding that as a result of
17   that process of delineating boundaries and -- between
18   the different campus institutions that there was
19   changes in land ownership from the Dominican Sisters
20   to these individual institutions?
21 A.  I did not.
22 Q.  You didn't understand that?
23 A.  No.  I wasn't really that involved.  That didn't
24   really affect us very much, the ownership.
25 Q.  Okay.  You mentioned that you believe when you're

Page 111

1    submitting a kind of zoning document to the City that
2    you often have to list the owner of the land; is that
3    correct?
4 A.  Right.
5 Q.  Did you for any of the projects that you worked on
6    that are listed in the master plan or for submission
7    of the master plan, did you ever list the Dominican
8    Sisters of Sinsinawa as the owners of the land?
9 A.  I don't recall.
10 Q.  Do you know whether at any point in the creation or
11   relating to the submission of the master plan that
12   you ever checked with the City or the county register
13   of deeds as to who was the owner of the campus land?
14 A.  No.
15 Q.  Could you take a look at Exhibit 171.  If you turn to
16   paragraph 27 of that exhibit.  That's the declaration
17   of Michael Elliott.
18 A.  Okay.  Turn to --
19 Q.  Paragraph 27 which is on page 7 of 13.
20 A.  Okay.
21 Q.  In paragraph 27 it says "EHS identified four future
22   projects in the master plan.  The remaining 18
23   proposed projects were identified by Edgewood College
24   and the Campus School."
25       Did I read that correctly.

Page 112

1 A.  Yes.
2 Q.  And I believe you testified earlier that this
3    comports with your recollection as well; is that
4    correct?
5 A.  Yes.
6 Q.  If you turn back to page 26 -- sorry, paragraph 26,
7    in the middle of the paragraph do you see a sentence
8    where it says "as I was not then planning on
9    undertaking a building project for EHS, I did not
10   dive into the master plan beyond what I thought were
11   the basics."
12       Do you see that?
13 A.  I do.
14 Q.  Do you believe that Edgewood High School was
15   proposing building projects as part of the master
16   plan process?
17       MR. INGRISANO:  Objection, form.
18       THE WITNESS:  Yeah, I think the meaning is
19   they weren't planning to undertake a building
20   project at that point, but they were studying with
21   Paul Cuta types of projects that they might need
22   which included, you know, making the building
23   accessible and they had to add an elevator and
24   potentially other additions, but I'm not sure -- I'm
25   assuming he's meaning that they weren't doing

Page 113

1    anything at that time like pursuing a building at
2    that time.
3 BY MR. JEAN-LOUIS:
4 Q.  Okay.  But Mike Elliott and Paul Cuta did submit
5    things to you for inclusion of the master plan,
6    correct?
7 A.  Yes.
8 Q.  And you did include those submissions?
9 A.  Yes.
10       (Exhibit 178 marked.)
11 BY MR. JEAN-LOUIS:
12 Q.  I'm handing you what's been marked as Exhibit 178.
13   Could you turn to the second page of that document,
14   Potter 12554.
15 A.  Sure.
16 Q.  And if you could go to the second to the last email
17   on that page, do you see there an email from Michael
18   Elliott to Maggie Balistreri-Clark?
19 A.  Yes.
20 Q.  Could you read that email for me?
21 A.  "Since I am new to this, I just want to make sure
22   that there is understanding that we, the high school,
23   plan to go up one or two stories on the existing
24   commons.  Does this have to be shown."
25 Q.  Okay.  And then on the email above that there is an

Page 114

1    email from Maggie Balistreri-Clark replying to
2    Michael Elliott where she's also cc'd you; is that
3    correct?
4 A.  Yes.
5 Q.  And she's asking you whether you need to show the
6    massing of the buildings proposed by the high school?
7 A.  Yes.
8 Q.  And you respond in the email above that and say "we
9    have already shown the massing of the addition in our
10    massing model.  We just need to make it the same size
11    as the existing building."
12        Is that correct?
13 A.  Yes.
14 Q.  And do you see turning to the first page of this
15    exhibit on September 6 Michael Elliott writes, "Doug,
16    I'm not sure what massing is, however, the commons,"
17    which he puts in parentheses "lower right side facing
18    the front of the building, appears lower in the
19    models.  We will at some point make it the same
20    height as the rest of the building, not only -- not
21    out, only up."
22        Do you see that?
23 A.  Yes.
24 Q.  And you respond that you will change the height to
25    match the height of the auditorium; is that correct?

Page 115

1 A.  Yes.
2 Q.  And Michael then replies to you and says "Doug, sorry
3    to be a pain but I do not want any misunderstandings
4    as to our future intentions.  We would go up to the
5    same height as the existing taller side of the main
6    building.  It would add two floors max to the lower
7    commons area.  Thank you."
8        Do you see that?
9 A.  Yes.
10 Q.  So is it your understanding that Mike Elliott wanted
11    the projects related to the high school in the master
12    plan to be accurate?
13        MR. INGRISANO:  Objection, form.  Vague as
14    to projects.  Go ahead.
15        THE WITNESS:  In relationship to this
16    aspect, yes.
17 BY MR. JEAN-LOUIS:
18 Q.  And is this the only time that Michael Elliott to
19    your knowledge asked for something to be corrected or
20    changed in the master plan?
21        MR. INGRISANO:  Objection, form.
22        THE WITNESS:  I am not sure but I am not
23    very -- I just don't remember how many
24    communications we had regarding getting the massing
25    correct on these additions.

Page 116

1 BY MR. JEAN-LOUIS:
2 Q.  Do you remember discussing portions of the master
3    plan with Michael Elliott other than massing?
4 A.  I don't recall.
5        MR. INGRISANO:  Counsel, do we have time
6    for a break?
7        MR. JEAN-LOUIS:  Yeah.
8        (Recess taken.)
9 BY MR. JEAN-LOUIS:
10 Q.  Mr. Hursh, are you aware that Edgewood High School
11    submitted a proposed amendment to its master plan to
12    add features including a light -- including lights
13    and bleachers and describing use of the field for
14    athletic events?
15        MR. INGRISANO:  Objection, form,
16    mischaracterizes.  Go ahead.
17        THE WITNESS:  I'm not that familiar with
18    that.
19 BY MR. JEAN-LOUIS:
20 Q.  You're not aware if something like that occurred?
21 A.  No.
22 Q.  Okay.  Did anyone from Edgewood High School or
23    Edgewood College ever discuss with you personally
24    amending the master plan to change the use of the
25    field?

Page 117

1 A.  I'm trying to recall.  I know it was my opinion that
2    we should go through that process, but I don't recall
3    them reaching out to me in order to do that.
4 Q.  Okay.  When you say that it was your opinion that
5    they should go through that process, did you ever
6    share that opinion with anyone from Edgewood High
7    School or Edgewood College?
8 A.  I think so.
9 Q.  Who would you have shared that opinion with?
10 A.  Probably Michael Elliott.
11 Q.  Do you know if you would have shared with Michael
12    Elliott that he could amend the master plan only for
13    the limited purpose of changing the description of
14    the use of the field?
15        MR. INGRISANO:  Objection, form.
16        THE WITNESS:  We did not talk about that.
17 BY MR. JEAN-LOUIS:
18 Q.  Okay.  What do you recall -- do you recall anything
19    that you may have shared with him?
20 A.  I know that we did have a conversation when some of
21    this came up after Matt Tucker's interpretation, and
22    that they wanted to make some changes to the field.
23    And when they asked me or when I wrote that letter,
24    they requested my opinion on the subject, and I
25    believe at that time I mentioned that you could

30 (Pages 114 - 117)

Page 118

1   modify the master plan and go through that process.
2   Q.   And you said that at that time they were thinking
3        about changes to the field; is that correct?
4   A.   I'm not super familiar with what they were doing.
5        They weren't working with us.  I think they were
6        working with Vandewalle or Brian Munson.  But I knew
7        it had to do with changes at the field potentially.
8   Q.   Do you have any knowledge as to whether Edgewood High
9        School ever explored the option of changing the
10       description of the use of the field in an amendment
11       to the master plan without changing anything
12       physically at the field?
13  A.   I am not aware.
14  Q.   Could you turn back to Exhibit 165.
15  A.   I would love to.
16  Q.   It is the January 2nd --
17  A.   Got it.
18  Q.   Do you see in the second paragraph where it says "we
19       did not focus on the field or spend time discussing
20       the use of the fields with the neighborhood, the City
21       or the Edgewood institutions.  It was assumed that
22       the fields would continue to be used for athletic
23       games and events."
24  A.   Yes.
25  Q.   Do you believe that the neighbors' understanding of

Page 119

1   how the field would be used would be based on the
2   contents of the master plan and the presentations and
3   conversations that you and Edgewood had with the
4   neighbors?
5   A.   No.
6        MR. INGRISANO:  Objection, form.  Calls
7   for speculation.
8        THE WITNESS:  No.  Because we did not
9   discuss it, I assumed the neighborhoods would assume
10  that nothing was changing and they would use it the
11  same way they're using it now.  Because we've never
12  focused on the fields during any of our -- from what
13  I recall now of that time period, we didn't really
14  discuss any changes to the field.
15  BY MR. JEAN-LOUIS:
16  Q.   You stated that you lived in the neighborhood from --
17       around 1990 to 2010 you lived in Dudgeon Monroe; is
18       that correct?
19  A.   Yes, yes.
20  Q.   If you turn to Exhibit 163.
21  A.   Yes.
22  Q.   On the second page of that exhibit you testified that
23       that is your handwriting where it says "games
24       question mark."
25       Is that correct?

Page 120

1   A.   Yes.
2   Q.   Is it fair to say that in 2013 you were not aware
3        that games were played on that field?
4        MR. INGRISANO:  Objection, form.
5        THE WITNESS:  It says no night games.
6   BY MR. JEAN-LOUIS:
7   Q.   But do you see below that where it says "games
8        question mark"?
9   A.   Games question mark, yup.
10  Q.   Is that what it says?
11  A.   Yes.  It's not saying -- I mean it says no night
12       games, and then the question was games, like do they
13       want to include games I guess is what I was asking at
14       the time.
15  Q.   Well, let's turn to the first page of that exhibit.
16  A.   Yup.
17  Q.   Susan writes "basically Doug Hursh would like to
18       verify the use of the spaces indicated by 1 and 2.
19       Do games take place on this field?  Is it solely for
20       practice?"
21       Do you see that?
22  A.   Yup.
23  Q.   Did you ask Susan Serrault to verify the use of the
24       field?
25       MR. INGRISANO:  Objection to form, asked

Page 121

1   and answered.
2        THE WITNESS:  Yes.
3   BY MR. JEAN-LOUIS:
4   Q.   So do you believe that before February of 2013 that
5        you were aware that the field was used for games?
6        MR. INGRISANO:  Objection, form, asked and
7   answered.
8        THE WITNESS:  Before 2013 did you say or
9   during this time?
10  BY MR. JEAN-LOUIS:
11  Q.   Before you received the reply from Judge Schemmel --
12  A.   Yes.
13  Q.   -- do you believe that you are aware that the field
14       was used for games?
15  A.   I do believe that I was aware that field was used for
16       games and that I had seen games and I had seen soccer
17       games and football games, not at night but during the
18       day.
19  Q.   Do you know why you asked Ms. Serrault to verify
20       whether the field was used for games?
21  A.   I guess just to be sure that things had not changed.
22  Q.   So you weren't certain how the field was being used?
23       MR. INGRISANO:  Objection, form.
24       THE WITNESS:  Right.
25  BY MR. JEAN-LOUIS:

31 (Pages 118 - 121)

Page 122

1  Q.  Do you think knowing how the field was being used, is
2    that information, do you believe it was important for
3    the drafting of the master plan?
4        MR. INGRISANO:  Objection, form.
5        THE WITNESS:  In hindsight, I think it
6    would be important.  But at the time, I don't think
7    we thought it was very important because we weren't
8    making any changes to the field.
9  BY MR. JEAN-LOUIS:
10  Q.  Did you --
11  A.  Or highlighting any potential changes.  It was going
12    to stay the way it was.
13  Q.  When you asked Ms. Serrault to verify how the field
14    was being used, did you think it was important that
15    the description of the use be accurate?
16  A.  I'm assuming yes because I asked.
17  Q.  Is it fair to say that someone who lived in Dudgeon
18    Monroe would not necessarily be aware of how the
19    field is used?
20        MR. INGRISANO:  Objection, form, calls for
21    speculation, foundation.
22        THE WITNESS:  That -- yeah.  I mean I
23    lived maybe 10 blocks away, so I never was affected
24    by what happened on the field.  It's not the same as
25    the people that live right across the street, and

Page 123

1    those were typically the ones that care about what
2    happens on that field.  I'm not sure that anybody
3    else in the neighborhood cares that much.
4  BY MR. JEAN-LOUIS:
5  Q.  All right.
6  A.  In my opinion.
7  Q.  But is it fair to say that someone who lived in that
8    neighborhood in Dudgeon Monroe could be unaware of
9    how the field is being used?
10        MR. INGRISANO:  Objection, form.
11        THE WITNESS:  I think yes.
12  BY MR. JEAN-LOUIS:
13  Q.  Would it be reasonable for a neighbor to rely on the
14    master plan to understand how the field is being
15    used?
16        MR. INGRISANO:  Objection, form, asked and
17    answered.
18        THE WITNESS:  I would say no, but it
19    doesn't seem like it's -- I'm not sure how many
20    people read the master plan and get into the details
21    of it versus actually see what's going on at the
22    field.
23  BY MR. JEAN-LOUIS:
24  Q.  Did you attend meetings of the Edgewood neighborhood
25    liaison committee?

Page 124

1  A.  Yes.
2  Q.  Were drafts of the master plan shared with members of
3    that committee?
4  A.  Yes.
5  Q.  Does that committee include representatives of the
6    neighborhood associations?
7  A.  Yes.
8  Q.  Did you understand that those representatives of the
9    neighborhood associations were reading the drafts of
10    the master plan?
11  A.  Yes, yes.
12  Q.  Do you understand that they were sharing information
13    about the drafts with their neighborhood
14    associations?
15        MR. INGRISANO:  Objection, form, calls for
16    speculation.
17        THE WITNESS:  I would assume, yes.
18  BY MR. JEAN-LOUIS:
19  Q.  Thank you.  You mentioned that you were aware that
20    there were regularly scheduled meetings between the
21    leaders of Edgewood High School, Edgewood College and
22    Edgewood Campus School that sometimes included
23    discussions of the master plan; is that correct?
24  A.  Yes.
25  Q.  Did you ever attend any of those meetings?

Page 125

1  A.  I don't think I did.  It was mostly Maggie.
2  Q.  Okay.  How are you aware of it, they met in that
3    manner?
4  A.  Discussions that I had with Maggie, providing them
5    documents to review during those meetings.
6  Q.  At the neighborhood liaison committee meetings that
7    you attended, is it fair to say that Maggie
8    Balistreri-Clark served as the primary spokesperson
9    for the Edgewood Campus schools?
10        MR. INGRISANO:  Objection, form.
11        THE WITNESS:  Yes.
12  BY MR. JEAN-LOUIS:
13  Q.  Did you ever hear Maggie address projects that
14    primarily related to the high school at those
15    meetings?
16        MR. INGRISANO:  Objection, form.
17        THE WITNESS:  Yes.  I mean part of those
18    meetings were to review the documents that we were
19    putting together, and the master plan does show
20    additions to the high school.  So that was part of
21    it.
22  BY MR. JEAN-LOUIS:
23  Q.  Okay.  And you -- did you testify earlier that Maggie
24    had been appointed to lead the coordination of the
25    master plan among the three institutions; is that

Page 126

1    correct?
2  A.  Yes.
3  Q.  Do you understand that after consulting with the
4       presidents of the three institutions that she had the
5       ability to speak on behalf of them?
6            MR. INGRISANO:  Objection, form,
7       foundation.
8            THE WITNESS:  I'm not sure how to answer
9       that.  I think she would meet with the presidents
10      and make sure that she wasn't presenting anything
11      that they did not approve of.
12  BY MR. JEAN-LOUIS:
13  Q.  From your experience attending those meetings, was it
14      your impression that the neighbors viewed Maggie as
15      speaking for all three institutions?
16           MR. INGRISANO:  Objection, form,
17      foundation, calls for speculation.
18           THE WITNESS:  The neighbors knew that she
19      was part of the college, and they knew that she met
20      with the other presidents of the other institutions.
21      So as much as that goes, she was, you know,
22      providing information that was approved.
23  BY MR. JEAN-LOUIS:
24  Q.  Thank you.  Do you, to your understanding, you had
25      testified that you believe that before Edgewood was

Page 127

1       zoned campus institutional it might have been zoned
2       residential; is that correct?
3  A.  Yes.
4            MR. INGRISANO:  Objection, form,
5       mischaracterizes.  Go ahead.
6            THE WITNESS:  Yes.
7  BY MR. JEAN-LOUIS:
8  Q.  To your understanding was it voluntary for Edgewood
9       to change its zoning to campus institutional?
10  A.  Yes.
11  Q.  We'll turn back to 160 -- the June 2nd letter.  Give
12      me a second to --
13           MR. INGRISANO:  160?
14           MR. JEAN-LOUIS:  I think it's 164, but I
15      need to find it.  It's the June 2nd draft -- or the
16      January 2nd draft, 165.
17  BY MR. JEAN-LOUIS:
18  Q.  Did someone ask you to draft this letter?
19  A.  I'm trying to recall exactly how it occurred.  Yes.
20      I was made aware that the high school was having
21      difficulty and -- with this use and based on Matt
22      Tucker's interpretation, and they asked me to write a
23      letter based on my understanding of the master plan.
24  Q.  And when you say "they," do you mean the high school?
25  A.  Yes.  I think Brian Munson asked if I would write the

Page 128

1       letter.
2  Q.  The January 2nd version of the letter, do you know
3       whether you drafted this language yourself or whether
4       it was supplied to you?
5  A.  I drafted it.
6  Q.  Okay.  Do you know why the language in the second
7       paragraph of Exhibit 166 is different than the
8       language in the second paragraph of Exhibit 165?
9  A.  I don't entirely recall why it got changed, I don't,
10      other than me reading it and changing it.
11  Q.  Do you know whether you ever shared the draft that is
12      Exhibit 165 with anyone outside of Potter Lawson?
13  A.  I don't -- I couldn't tell you for sure.  It may have
14      gone to Brian, it may have gone to Mike Elliott as
15      well.
16  Q.  To your knowledge Exhibit 165, that draft of the
17      letter, has not been shared beyond the high school or
18      Vandewalle?
19           MR. INGRISANO:  Objection, form, calls for
20      speculation.  Go ahead.
21           THE WITNESS:  I don't think so.  I don't
22      think there would be anybody else that was
23      interested.
24  BY MR. JEAN-LOUIS:
25  Q.  Did you understand how the letter would be used?

Page 129

1            MR. INGRISANO:  Objection, form.
2            THE WITNESS:  I believe they were going to
3       plan commission to get -- to potentially try to get
4       whatever they were trying to get as far as use of
5       the field, and they wanted my input.  And I did not
6       go to that meeting to testify, and so I provided a
7       letter.
8  BY MR. JEAN-LOUIS:
9  Q.  Did they ask you if you would testify at that
10      meeting?
11  A.  Yes.
12  Q.  Why did you not testify at the meeting?
13  A.  I think I had a previous engagement or was out of
14      town.  Couldn't make it.
15  Q.  To the best of your recollection is that meeting, was
16      it a zoning board of appeals hearing?
17           MR. INGRISANO:  Objection, form,
18      foundation.
19           THE WITNESS:  I don't recall.
20           (Exhibit 179 marked.)
21  BY MR. JEAN-LOUIS:
22  Q.  Handing you what's been marked as Exhibit 179, do you
23      recognize the first page of this exhibit as an email
24      from Maggie Balistreri-Clark?
25  A.  Yes.

Page 130

1 Q. And are you cc'd on this email?

2 A. Yes.

3 Q. And is the document on the second page, is this a

4    draft of potential new buildings or additions that

5    was prepared by Potter Lawson?

6 A. Yes.

7 Q. Do you see on the email on the first page where it

8    says "Mike Elliott clarified the uses for the high

9    school and Doug has added information on why there

10    was more information on perimeter buildings"?

11 A. Yes, I see that.

12 Q. Did I read that correctly?

13 A. Yup. I was just trying to understand it.

14 Q. Do you know whether Mike Elliott provided any of that

15    information directly to you?

16       MR. INGRISANO: Objection, form, vague.

17       THE WITNESS: I would have no reason to

18    believe that it wasn't provided to me because we did

19    the drawing.

20 BY MR. JEAN-LOUIS:

21 Q. Do you have -- does Potter Lawson have any current

22    engagements with Edgewood College?

23 A. No.

24 Q. When was the last --

25 A. Oh, we do.

Page 131

1 Q. You do?

2 A. We do. We are looking at -- they have an old

3    building called Marshall Hall which is a historic

4    building, and they're looking at -- it was a

5    residence hall and they don't need the rooms anymore,

6    and they're wondering what to do with it, so they've

7    had us take a look at it and provide some cost

8    estimates to modify it.

9 Q. And you testified that Potter Lawson to the best of

10    your knowledge and recollection began doing work for

11    Edgewood in the mid 1990s; is that correct?

12 A. Yes.

13 Q. And would you say that you have -- that Edgewood and

14    Potter Lawson have worked together fairly

15    continuously from 19 -- from the mid 1990s to today?

16       MR. INGRISANO: Objection, form, vague as

17    to Edgewood.

18 BY MR. JEAN-LOUIS:

19 Q. Edgewood College.

20 A. Yes. But in the past maybe, I don't know the dates,

21    but we haven't done much in the past 10 years or so,

22    maybe six or seven years, I don't know. But they

23    haven't been doing much work recently.

24 Q. Would you consider Edgewood College to be a client?

25 A. Yes.

Page 132

1 Q. And would you like to continue to do business with

2    Edgewood College in the future?

3 A. Yeah, yeah, and high school, too.

4 Q. And the high school, too. Did you work --

5 A. And the City. We want to do work for the City, too.

6 Q. Have you -- are you aware of Edgewood College

7    building a athletic facility in Fitchburg?

8 A. No. I don't recall it. I know that there was some

9    discussions about athletic facilities off campus. I

10    know they had -- they were using a field in Middleton

11    and looking for other fields that they could use. So

12    I don't remember, but they may have talked to me

13    about it. We didn't have anything to do with any of

14    the work, if they did work there.

15 Q. Okay. Could you turn to page 206 of 228 of the

16    master plan.

17 A. 206?

18 Q. Yes.

19 A. Okay.

20 Q. Do you see a table there with two --

21       MR. INGRISANO: Hang on, Counsel, please.

22       MR. JEAN-LOUIS: No worries, 206.

23       MR. INGRISANO: Got it.

24       MR. JEAN-LOUIS: Okay.

25 BY MR. JEAN-LOUIS:

Page 133

1 Q. Do you see a table there with a heading conditions of

2    approval on the left-hand side and on the right-hand

3    side it says Edgewood response?

4 A. Yes.

5 Q. Do you know what the conditions of approval column

6    is?

7 A. The letter, the conditions of approval, yes, the

8    letter from the City departments with conditions of

9    the City approving the master plan.

10 Q. And those conditions are in the left-hand side

11    column?

12 A. Correct.

13 Q. Is the right-hand side column something that was

14    prepared after the letter with the conditions of

15    approval was prepared?

16 A. Yes.

17 Q. And it was inserted into the letter?

18 A. Yes.

19 Q. Was the right-hand column prepared by Potter Lawson?

20 A. Yes.

21 Q. And --

22 A. It's our way of communicating with the City as to,

23    you know, that either there is an exception of their

24    conditions or there is a change in the document or

25    there is no change in the document, just to track it

Page 134

1    to help everybody with the approval process.
2  Q.  Okay.
3        MR. JEAN-LOUIS:  Could you read that back
4    to me, please?
5        (Record read.)
6  BY MR. JEAN-LOUIS:
7  Q.  And I'll have you eventually turn to page 210 of 228,
8    but you can flip through to verify to yourself that
9    this is it a continuation of this table.
10 A.  Yes.
11 Q.  Do you see at the bottom of page 210 there is a
12   paragraph -- there is a heading actually in the
13   middle that says "please now follow the procedures
14   listed below for obtaining permits to your project."
15       Do you see that?
16 A.  Yes.
17 Q.  Do you believe that, just as you testified before,
18   the left-hand side column is from the original letter
19   from the City and the right-hand side was prepared by
20   Potter Lawson?
21       MR. INGRISANO:  Objection, form.
22       THE WITNESS:  Yes.
23 BY MR. JEAN-LOUIS:
24 Q.  And so paragraph 3 under that heading, do you
25   recognize that language in paragraph 3?

Page 135

1  A.  Yes.
2  Q.  And to you does that look like the language that we
3    discussed that's on page 10 of 228?
4        MR. INGRISANO:  Objection, form.
5        THE WITNESS:  In the zoning ordinance,
6    yes.
7  BY MR. JEAN-LOUIS:
8  Q.  In the zoning ordinance?
9  A.  Yes.
10 Q.  And on the right-hand side you're acknowledging that?
11 A.  Yes.
12 Q.  And that no changes to the master plan have been
13   made?
14 A.  Right.  I thought that we put this in the master
15   plan, but I could have -- I mean I think that's
16   still -- but maybe we didn't.
17 Q.  I thought that, too.  As part of the approval
18   process, what city employees do you work with?
19 A.  Tim Parks for the most part from planning.  There
20   were others but maybe not as significantly involved
21   as Tim Parks.
22 Q.  What was your working relationship with Tim Parks
23   like?
24 A.  We have a good working relationship.
25 Q.  Would you consider Tim Parks to be helpful?

Page 136

1  A.  Yes.
2  Q.  Would you consider him to be honest?
3  A.  Yes.
4  Q.  Would you consider him to be straightforward?
5  A.  Yes.
6  Q.  Do you have any complaints about Tim Parks' work?
7  A.  No.
8  Q.  Did you work with Matthew Tucker during this?
9  A.  Yes, yes.
10 Q.  What's your relationship with Matthew Tucker like?
11 A.  We have a good relationship.
12 Q.  Would you consider Matthew Tucker to be
13   knowledgeable?
14 A.  Yes.
15 Q.  Would you consider Matthew Tucker to have a strong
16   understanding of the City of Madison's zoning code?
17 A.  Yes.
18       MR. INGRISANO:  Objection, form, vague.
19   Mr. Hursh, can you let me have my objection, please?
20       THE WITNESS:  Yes, sorry.
21 BY MR. JEAN-LOUIS:
22 Q.  Would you consider Matthew Tucker to be honest?
23 A.  Yes.
24 Q.  Have you -- did you work with Heather Stouder at all
25   in the creation or approval of this master plan?

Page 137

1  A.  I don't recall.
2  Q.  Do you have a good working relationship with Heather
3    Stouder?
4  A.  Yes.
5  Q.  Did you work with any of -- did you work with any
6    city alders in getting this master plan approved?
7  A.  Yes.
8  Q.  Which city alders did you work with, do you remember?
9  A.  They changed every like year, so I -- I don't
10   remember their names.  It was mostly with Vilas
11   neighborhood alders.
12 Q.  Did you ever hear any sentiment expressed by Matthew
13   Tucker or Tim Parks to indicate to you that they had
14   a bias against Edgewood?
15 A.  No.
16 Q.  Did you ever hear either of them make any
17   anti-Catholic statements?
18 A.  No.
19 Q.  Did you ever communicate to the City or to any City
20   employees orally that you believe that Matthew
21   Tucker's interpretation of the master plan was
22   incorrect?
23       MR. INGRISANO:  Objection, form.  Go
24   ahead.
25       THE WITNESS:  Did I communicate to the

35 (Pages 134 - 137)

Page 138

1    City?
2         MR. INGRISANO:  Objection, form.
3  BY MR. JEAN-LOUIS:
4  Q.  Did you ever talk to Matthew Tucker about his
5      interpretation of section 3.8 of the master plan?
6  A.  No, I don't think so.
7  Q.  Did you talk to any other City officials about
8      Matthew Tucker's interpretation of section 2.8?
9  A.  Maybe just Alder Tag Evers.
10 Q.  What do you recall about that conversation?
11 A.  I think -- I recall the letter, whatever one of these
12     letters, and I recall mentioning to him that we could
13     work with the high school to modify the master plan
14     with the neighborhood and work through the issues if
15     that's what they wanted to do.
16 Q.  Did you ever express to Alder Evers that you believed
17     that Matthew Tucker's interpretation of section 3.8
18     of the master plan was incorrect?
19 A.  I may have.
20 Q.  Do you recall --
21 A.  I don't recall but that was my opinion, that it was
22     too strictly interpreted.
23 Q.  Did you -- have you worked with Tag Evers on other
24     projects?
25 A.  No.

Page 139

1  Q.  Did Tag ever express to you his views about the
2      effect of section 3.8 of the master plan?
3  A.  I don't recall that he did.
4  Q.  Did Tag ever -- Evers ever speak with you about
5      whether or not Edgewood could repeal its master plan?
6  A.  We did talk about that.  He didn't think that they
7      should repeal it.  He thought that they should modify
8      it.
9  Q.  Did you ever speak with any Edgewood College or
10     Edgewood High School or Edgewood Campus School
11     representatives about repeal of Edgewood's master
12     plan?
13 A.  I'm trying to remember.  I would imagine they might
14     have called regarding repealing it.  Specifically, I
15     don't know that I talked to anybody specifically.  I
16     think, you know, Maggie was my main contact during
17     the process, and I believe she had retired by that
18     time, and there wasn't really somebody else that, you
19     know, that we would communicate that much about it.
20 Q.  So you don't recall being consulted --
21 A.  I don't recall -- well --
22     MR. INGRISANO:  Objection, form, asked and
23     answered.
24     THE WITNESS:  I don't recall being
25     consulted, no.

Page 140

1  BY MR. JEAN-LOUIS:
2  Q.  Do you recall any other statements that were made by
3      Alder Tag Evers to you that related to Edgewood?
4  A.  Not other than -- what I remember is we had a phone
5      conversation, and he felt like I felt, that we should
6      modify the master plan and continue in the same vein
7      as the master plan by meeting with the neighborhoods,
8      understanding their concerns and trying to address
9      their concerns and address Edgewood's concerns to
10     come to a resolution and consensus.
11 Q.  So it was your opinion that Edgewood should have
12     proceeded by amending the master plan after meeting
13     with the neighbors?
14 A.  Yes.
15     MR. JEAN-LOUIS:  I don't have anything
16     else.  Thank you.
17     MR. INGRISANO:  Couple clarifications.  I
18     get to go again.  Couple clarifications for you.
19     EXAMINATION
20 BY MR. INGRISANO:
21 Q.  So Mr. Hursh, you said that you believed that Matt
22     Tucker's interpretation was a misinterpretation of
23     the master plan, correct?
24 A.  Yes.
25 Q.  So is it your testimony today that when the City

Page 141

1      misinterprets a master plan, the property holder
2      should go through the amendment process to get a
3      correct interpretation?
4      MR. JEAN-LOUIS:  Objection, form.
5      THE WITNESS:  So I said -- I guess I said
6      misinterpretation, but I think everybody can have
7      their own interpretation.  And in hindsight, could
8      we made it maybe more comprehensive so that the
9      interpretations would be more concise versus, you
10     know, from one end to the other.  But so what was
11     the center of your question?
12 BY MR. INGRISANO:
13 Q.  Your testimony was and your letter says that it was a
14     misinterpretation of the master plan.
15     So my question for you, sir, is it your
16     testimony today that the City misinterprets a master
17     plan, the property holder should have to go through
18     the amendment process before the planning commission
19     or Common Council to get a proper interpretation of
20     its master plan?
21     MR. JEAN-LOUIS:  Objection, form,
22     misstates previous testimony.
23     THE WITNESS:  I'm not sure how to answer
24     that.  We work with the City on a lot of projects.
25     And if they interpret something some way, there

36 (Pages 138 - 141)

Page 142

1 is -- for us to tell them they misinterpreted it
2 does nothing. So we have to go through some process
3 to get something amended if they -- we deal with
4 this same thing with building inspection. They
5 interpret building codes differently than we do. We
6 don't agree with them, but we have no basic recourse
7 other than to either go after a formal variance with
8 them or make the changes. So I think we're just
9 used to having to go through some sort of approval
10 process based on their interpretations.
11 BY MR. INGRISANO:
12 Q. So it's your testimony today, sir, that because you
13 don't feel like you have in a typical situation any
14 other recourse, you're stuck with kind of a
15 modification or an amendment process?
16 A. Yes, yes.
17        MR. JEAN-LOUIS: Objection, form.
18 BY MR. INGRISANO:
19 Q. Let me ask you to take a look at Exhibit 13. That's
20 28.097.
21 A. Okay.
22 Q. Section 10 on the second to last page of that
23 exhibit.
24 A. Okay.
25 Q. You've been asked about that section, changes to the

Page 143

1 master plan by the City's counsel.
2 A. Yes.
3 Q. And that section talks about changes to the proposed
4 use, correct?
5 A. Yes.
6 Q. Where does the -- this chapter of the ordinances,
7 where does it identify uses under the campus
8 institutional district?
9        MR. JEAN-LOUIS: Objection as to form.
10        THE WITNESS: I don't know that it does.
11 BY MR. INGRISANO:
12 Q. Take a look at paragraph 3(a) and (b).
13 A. Okay.
14 Q. Does that refresh your recollection, sir, about where
15 this statute, this ordinance, identifies permitted
16 uses for campus institutional districts?
17        MR. JEAN-LOUIS: Objection, form,
18 foundation, calls for speculation.
19        THE WITNESS: Yes, this looks like a list
20 of uses versus a definition of uses.
21 BY MR. INGRISANO:
22 Q. Sure. There is no other -- to your recollection
23 there is no other reference to uses in this section,
24 correct?
25        MR. JEAN-LOUIS: Objection, form,

Page 144

1 foundation, misstates previous testimony.
2 BY MR. INGRISANO:
3 Q. Of the ordinance?
4 A. Agreed.
5 Q. And one of the permitted secondary uses for a campus
6 institutional district is (5), indoor and outdoor
7 sports and recreational facilities, correct?
8 A. Correct.
9        MR. JEAN-LOUIS: Objection to form.
10 BY MR. INGRISANO:
11 Q. And to your understanding would you agree, sir, that
12 the Edgewood athletic field is an outdoor sports
13 facility?
14        MR. JEAN-LOUIS: Objection, form.
15        THE WITNESS: Yes.
16 BY MR. INGRISANO:
17 Q. If the Edgewood athletic field is holding practices,
18 it's an outdoor sports facility, correct?
19        MR. JEAN-LOUIS: Objection to form.
20        THE WITNESS: Yes.
21 BY MR. INGRISANO:
22 Q. If the Edgewood athletic field is holding games, it's
23 an outdoor sports facility, correct?
24        MR. JEAN-LOUIS: Objection to form.
25        THE WITNESS: Yes.

Page 145

1 BY MR. INGRISANO:
2 Q. Okay. So, sir, if Edgewood changes the use of its
3 field from being an outdoor sports facility that
4 holds practices to an outdoor sports facility that
5 holds games, is there a change in the use under
6 section 3(b)(5)?
7        MR. JEAN-LOUIS: Objection, form, calls
8 for a legal conclusion.
9        THE WITNESS: Not in my opinion.
10 BY MR. INGRISANO:
11 Q. Sir, you mentioned in your testimony you found Matt
12 Tucker to be honest, correct?
13 A. Correct.
14 Q. You found him to be knowledgeable, correct?
15 A. Correct.
16 Q. So if Matt Tucker were to render an opinion that the
17 Edgewood athletic field could receive a permit for
18 outdoor lighting without needing to change or amend
19 its master plan, would you have any reason to dispute
20 that conclusion?
21        MR. JEAN-LOUIS: Objection to form,
22 foundation.
23        THE WITNESS: That seems complicated to
24 me.
25 BY MR. INGRISANO:

Brown & Jones Reporting        414-224-9533
A Veritext Company        www.veritext.com

Page 146

1 Q. Sure. If Matt Tucker, and I'll represent to you that
2 Matt Tucker on February 27 of 2019 said to Edgewood
3 that they can get a light permit without needing to
4 amend their master plan. If he -- based on that
5 assumption, do you have any reason to disagree with
6 Matt Tucker and say no, Edgewood has to amend its
7 master plan to get lights?
8        MR. JEAN-LOUIS: Objection, form,
9 foundation, calls for a legal conclusion.
10       THE WITNESS: I think my opinion would be
11 the master plan, a big part of the master plan is
12 the relationship of Edgewood Campus with the
13 neighborhood. If they were to just put lights in
14 without going through a process where they discussed
15 with the neighbors and came to some agreement with
16 how they would be used and when they would be used,
17 it would be I feel like a disuse, a disservice to
18 the master plan and to their relationship with the
19 neighborhood.
20 BY MR. INGRISANO:
21 Q. So a disservice, yes. But technically speaking, for
22 purposes of the ordinances and in the terms -- and
23 the actual terms of the master plan, if Matt Tucker
24 said that a light permit could issue to Edgewood
25 without the need to amend the master plan, based on

Page 147

1 your understanding of the lighting code and your
2 understanding of the master plan, do you have any
3 reason to disagree with the conclusion that that
4 permit could issue without an amendment?
5        MR. JEAN-LOUIS: Objection, form,
6 foundation, calls for speculation, assumes facts not
7 in evidence.
8        THE WITNESS: I would go with it, with
9 Matt's decision on that.
10 BY MR. INGRISANO:
11 Q. The agreement with the neighbors that you referenced
12 from the '90s about not holding night games, do you
13 remember talking about that?
14 A. Yes.
15 Q. Have you ever seen that agreement?
16 A. That is a good question. I've seen the old master
17 plan, and I recall the history probably through Mary
18 Lawson that once -- a big part of that plan in '96
19 was getting a new road in from Monroe Street which
20 changed the traffic patterns and moved the field.
21 And originally there were lights on the field, and
22 part of the negotiations with the City as far as my
23 understanding goes or with the neighbors was that the
24 campus agreed to not have lights, and that was a
25 requirement of the neighbors to provide their

Page 148

1 approval of the remainder of the master plan that the
2 campus wanted to complete.
3        So you asked if I had seen it, I don't
4 recall if I have actually read that.
5 Q. Okay. Was that stipulation about lights, was it in
6 the master plan itself?
7        MR. JEAN-LOUIS: Objection, form.
8 BY MR. INGRISANO:
9 Q. To your knowledge?
10 A. I don't know.
11 Q. What you've just relayed to us about the master plan
12 from the '90s and the lights and the stipulation
13 about the road, you're learning all of that through
14 Mary Lawson, or are you having direct communications
15 with the neighbors and Edgewood in the '90s?
16 A. No, I was learning that through Mary Lawson. I was
17 not a part of that.
18 Q. With respect to the owners of the Edgewood Campus
19 that you identified for the campus school, the
20 college and the high school and the association, do
21 you know who owns the shares or the interest in those
22 various corporate entities?
23       MR. JEAN-LOUIS: Objection, form,
24 foundation.
25       THE WITNESS: No.

Page 149

1 BY MR. INGRISANO:
2 Q. So you knew from your experience living in Dudgeon
3 Monroe neighborhood that Edgewood played games on its
4 field, correct?
5 A. Yes.
6        MR. JEAN-LOUIS: Objection, form.
7 BY MR. INGRISANO:
8 Q. And you knew -- you know now from the exhibit you saw
9 today that Judge Schemmel advised Susan Serrault the
10 games were played on the field, correct?
11 A. Correct.
12 Q. So based on your own knowledge of the field and what
13 you're seeing here today, 3.8 you still believe
14 though in the master plan is accurate and a fair
15 characterization of the use of the field?
16       MR. JEAN-LOUIS: Objection, form.
17       THE WITNESS: Could it be more accurate?
18 I mean could we have put more description into it?
19 Yes. And I don't recall at all why we didn't put
20 more into there, but I know that the sentiment at
21 the time was we're not changing anything, so we're
22 not really describing anything new or old, and there
23 wasn't a lot of time to sort of put into that
24 description.
25 BY MR. INGRISANO:

38 (Pages 146 - 149)

Page 150

1  Q.  Well, and based on the importance that you believe
2     that that paragraph had, you gave it the appropriate
3     description, correct?
4        MR. JEAN-LOUIS:  Objection, form.
5        THE WITNESS:  Well, that chapter was about
6     open space, and that's what remain open space.
7     Whether it was used for something, this or that, but
8     it wouldn't have a building on it.
9  BY MR. INGRISANO:
10 Q.  Go to 178, sir.  You were asked about the massing,
11    your massing discussions with Mike Elliott, do you
12    remember?
13 A.  Yes.
14 Q.  Looking at this, everything in 178 with respect to
15    the discussion on massing you would agree with me is
16    consistent with the idea that the Edgewood entities
17    were focused on the master plan in terms of buildings
18    and facilities, correct?
19       MR. JEAN-LOUIS:  Objection, form.
20       THE WITNESS:  Yes.
21 BY MR. INGRISANO:
22 Q.  Can you look at Exhibit 179.  You were asked about
23    the second paragraph in that email, Mike Elliott
24    clarified the uses for the high school, correct?
25 A.  179?

Page 151

1  Q.  Yes.
2  A.  Here we go.  Your question again?
3  Q.  Yeah.  So you see the second paragraph where it says
4     Mike Elliott clarified the uses for the high school?
5  A.  Yes.
6  Q.  And the attachment here is an exhibit potential new
7     buildings or additions, correct?
8  A.  Correct.
9  Q.  Do you have any reason to believe that the uses
10    referenced that Mike Elliott clarified were uses that
11    pertained to potential new buildings or additions or
12    to open spaces or what?
13 A.  This definitely was about building additions.
14       MR. INGRISANO:  I've got no further
15    questions.
16       MR. JEAN-LOUIS:  I've just got a couple
17    brief clarifications.
18       EXAMINATION
19 BY MR. JEAN-LOUIS:
20 Q.  If you could turn back to Exhibit 13.  Do you recall
21    counsel asking you about where uses are discussed in
22    this exhibit?
23 A.  Yes.
24 Q.  And counsel was asking you about section 3, correct?
25 A.  Correct.

Page 152

1  Q.  If I could turn you, have you turn to paragraph 5
2     again.  And this is a section again on the contents
3     of the master plan, correct?
4  A.  Yes.
5  Q.  If you turn to subsection 3, do you agree that -- or
6     sorry, (c) of section 5, do you agree that it
7     discusses uses?
8  A.  Yes.
9  Q.  And do you agree that descriptions of land uses and
10    buildings are a requirement of a master plan?
11 A.  Yes.
12 Q.  Do you agree that descriptions of proposed open space
13    areas and other open space uses are a requirement of
14    the master plan?
15 A.  Yes.
16 Q.  Was it your belief when you were working on the
17    master plan that because the field was not a building
18    that its uses did not need to be described?
19       MR. INGRISANO:  Objection, form.
20       THE WITNESS:  I'm trying to think -- I
21    feel like we had that -- because we were talking
22    mostly about buildings and new buildings, that
23    that's what we focused on.  And so we did not
24    describe the uses of that field entirely.
25 BY MR. JEAN-LOUIS:

Page 153

1  Q.  And did you not describe the uses of the field
2     entirely because you were not focused on it or
3     because it was your belief that doing so was not
4     necessary?
5        MR. INGRISANO:  Objection, form, asked and
6     answered and misleading.
7        THE WITNESS:  I feel like because we were
8     not focused on it.
9  BY MR. JEAN-LOUIS:
10 Q.  Have you generally found the City to be reasonable to
11    work with on your projects?
12 A.  Yes.
13 Q.  And the zoning department?
14 A.  Yes, for the most part.
15       MR. JEAN-LOUIS:  No further questions.
16       EXAMINATION
17 BY MR. INGRISANO:
18 Q.  And you want your projects to be approved by the City
19    going forward, don't you?
20 A.  Yes, I do.
21       MR. INGRISANO:  Thank you.
22       (At 2:56 p.m., the deposition concluded.)
23             *  *  *
24       COURT REPORTER:  Same transcript order?
25       MR. JEAN-LOUIS:  Yes.

Page 154

```
 1              C E R T I F I C A T E
 2  STATE OF WISCONSIN )
                       ) SS
 3  MILWAUKEE COUNTY   )
 4         I, VICKY L. ST. GEORGE, Registered Merit
 5  Reporter and Notary Public in and for the State of
 6  Wisconsin, do hereby certify that the preceding deposition
 7  was recorded by me and reduced to writing under my
 8  personal direction.
 9         I further certify that said deposition was
10  taken at the offices of GODFREY & KAHN, S.C., One East
11  Main Street, Suite 500, Madison, Wisconsin on
12  September 2, 2022, commencing at 9:47 a.m. and concluding
13  at 2:56 p.m.
14         I further certify that I am not a relative or
15  employee or attorney or counsel of any of the parties, or
16  a relative or employee of such attorney or counsel, or
17  financially interested directly or indirectly in this
18  action.
19         In witness whereof, I have hereunto set my hand
20  and affixed my seal of office at Milwaukee, Wisconsin,
21  this 8th day of September, 2022.
22
```



```
23         _____
24         VICKY L. ST. GEORGE
           Notary Public in and for the
25         State of Wisconsin
           Commission Expires 1/29/2025
```

**[& - 2006]**

| & | | | |
|---|---|---|---|
| **&** 1:11 2:2,6 154:10 | | | |

**0**

**0018** 1:5
**06564** 29:13
**06565** 29:14

**1**

**1** 2:7 7:24 26:14
34:24 52:12
53:5,9,24 56:16
56:16 59:20
60:17 61:5,6,10
61:12 62:1
63:11 64:3,4,7
74:6 81:23 88:3
90:21 99:7
106:4,8,17
120:18
**1-15-2014** 4:12
4:13
**1-6-2020** 3:22
**1.1** 26:15 27:11
**1/29/2025**
154:25
**10** 44:6 84:21
87:8,14,16 89:4
89:19 122:23
131:21 135:3
142:22
**10-16-2014** 4:7
**10-20-2014** 3:8
**100** 12:19
**107** 4:12,13
**10th** 8:18
**11-14-2013** 4:15

**11-2-2018** 3:5
**113** 4:14
**11718** 56:6
**12** 3:13 9:13
25:12 36:11
44:6
**12-5-2013** 3:7
**12554** 113:14
**129** 4:15
**12:53** 60:17
**13** 3:3 21:22
23:18,23 24:18
36:1 86:11,14
111:19 142:19
151:20
**14** 25:25
**140** 2:19
**15** 58:4
**151** 2:20
**153** 2:21 3:8
89:21,24 98:18
98:19
**159** 3:10 29:4,7
29:25 32:25
34:20 36:1,14
**15th** 108:7
**16** 102:13 103:14
103:20,21
**160** 3:11 34:12
34:15 36:14
127:11,13
**161** 3:13 36:8,11
36:14 38:4,14
**162** 3:15 37:23
37:25 39:7
104:12
**163** 3:17 54:22
54:25 55:1,13

**59:15 60:5
79:15 80:11
99:3 119:20
164** 3:18 60:1,4,8
61:4 79:15
80:11 127:14
**165** 3:20 66:8,11
68:24 69:24
70:7 71:6 77:14
77:19,22 78:17
80:20,21 81:24
118:14 127:16
128:8,12,16
**166** 3:21 68:16
68:19 69:8,13
70:7 71:6,7
77:19 81:14,16
128:7
**167** 3:22 70:11
70:13 71:7 83:3
**16th** 95:1
**17** 3:11 26:15
34:17
**170** 4:3 5:14,16
7:19
**171** 4:4 43:25
44:3 72:17
111:15
**172** 4:5 48:5,8
49:8
**173** 4:7 94:10,13
**174** 4:8 95:2,4
98:5
**175** 4:10 99:25
**176** 4:12 107:4,6
108:8
**177** 4:13 107:25
108:2,13 109:20

**178** 4:14 113:10
113:12 150:10
150:14
**179** 4:15 129:20
129:22 150:22
150:25
**18** 47:11 111:22
**1800s** 54:5
**1839** 63:23
**1840** 63:22
**19** 3:15 38:1
60:16 131:15
**1962** 8:18
**1990** 74:11
119:17
**1990s** 131:11,15
**1994** 12:13 14:11
**1996** 12:19,24
57:13 58:2
**19th** 95:13
**1:00** 8:14

**2**

**2** 1:14 3:20
20:14 37:7 54:2
59:21 66:16
90:5 95:16,21
120:18 154:12
**2-19-2013** 3:17
3:18
**2-19-21** 20:14
**2.8** 138:8
**20** 3:6
**2000** 14:18
**2000s** 14:15
**2005** 48:14,20
**2006** 14:15

**2008**   14:15
**2010**   9:14 74:11
119:17
**2011**   13:20
102:13 103:10
103:14,20,21
**2013**   3:12,14,16
9:20 34:17 36:1
36:11 38:2
44:19 48:14,21
50:3,12,14 55:9
60:16 63:4 71:8
72:1 74:4 87:2
120:2 121:4,8
**2014**   4:8 9:20
13:20 25:4,18
44:15 49:10
66:19 71:8 72:1
74:4 87:2 95:1,9
95:13 97:7
98:24 103:13,21
108:7
**2015**   23:23 24:18
25:9,19 26:2
103:13,20
**2018**   65:12 75:22
**2019**   3:20,21
66:16 68:22
77:16 146:2
**2022**   1:14 4:6
44:6 48:9
154:12,21
**2055**   154:22
**206**   132:15,17,22
**20th**   4:8 95:9
98:24
**210**   134:7,11

**228**   20:14,15
21:23 23:18
25:12,25 26:15
51:9,22 52:3,5
52:11 58:4,14,20
58:23 78:13
84:9,11,21 87:16
132:15 134:7
135:3
**23rd**   97:7
**257-3911**   2:4
**257-9521**   2:8
**26**   44:13 65:12
112:6,6
**27**   47:9 111:16
111:19,21 146:2
**28**   20:14 72:22
**28.097**   87:5
**28.097.**   142:20
**29**   3:10 75:3
**2:56**   1:15 153:22
154:13
**2nd**   77:16
118:16 127:11
127:15,16 128:2

**3**

**3**   26:2 33:9 37:8
63:12,17 84:23
87:15 106:4,8,17
134:24,25
143:12 145:6
151:24 152:5
**3.10**   38:21
**3.8**   38:13 51:8,11
53:8 61:12,25
62:13 64:8,20
104:23 138:5,17

139:2 149:13
**30**   11:25
**300**   8:22
**32**   76:7
**33**   9:12 11:5
47:18,19
**34**   3:11
**36**   3:13
**37**   3:15
**3:21**   1:5
**3:45**   108:7

**4**

**4**   3:21 51:3,4
68:22
**4.2**   58:4,20,20
59:1 101:17
**4.2.**   101:15,16
**4.3**   58:7,23 59:8
101:15,15
**4.4**   101:6,13,14
**4.5**   84:5,8 101:6
**4.5.**   101:13
**43**   4:4
**45**   3:5 65:6,9
**48**   4:5
**4:43**   95:13
**4th**   2:7

**5**

**5**   2:17 4:3 12:13
14:11 63:4
87:25 88:9
89:19 144:6
145:6 152:1,6
**500**   1:12 2:3
154:11
**52**   3:6 20:4,9,11
20:18 38:9 51:7

58:4 93:11
**53**   84:5
**53073**   2:3
**53562**   8:20
**53703**   2:8
**54**   3:7,17 62:17
62:20 64:10,14
105:16
**5414309**   1:25

**6**

**6**   7:24 12:13
14:11 44:14
114:15
**6-13-2013**   3:10
**60**   3:18 51:9,22
52:11 78:13
**608**   2:4,8
**61**   51:23
**62**   3:7 52:3,5
**6369**   8:20
**65**   3:5 70:4
**6554**   35:16
**66**   3:20
**68**   3:21

**7**

**7**   20:10 49:8
50:1 72:20
102:5 111:19
**70**   3:22
**73**   58:14,17,18
58:20
**749**   8:22
**77**   2:18 58:23
59:9

**[8 - answered]**                                                        Page 3

| | |
|---|---|

**8**

**8**   4:6 47:18 48:9
**81**   84:8,11
**86**   3:3
**89**   3:8
**8th**   154:21

**9**

**9-16-2011**   4:10
**9-9-2013**   4:14
**90s**   12:13 13:24
   14:4 102:20
   104:10 147:12
   148:12,15
**94**   4:7
**95**   4:8
**96**   147:18
**99**   4:10
**9:47**   1:15 154:12

**a**

**a.m.**   1:15 154:12
**abbreviated**
   56:21
**ability**   42:23
   126:5
**able**   10:19 90:14
   99:1,11,12
**absolutely**   71:23
**accessible**
   112:23
**accommodate**
   7:16
**accommodation**
   47:20
**accurate**   52:7
   70:5 80:10
   81:22 82:1,2
   115:12 122:15

149:14,17
**accurately**   66:23
   67:13 70:25
**acknowledging**
   135:10
**acting**   93:21
**action**   154:18
**activity**   71:24
**actual**   146:23
**add**   37:8 64:25
   92:19 98:22
   112:23 115:6
   116:12
**added**   85:15
   130:9
**adding**   64:16
   91:13
**addition**   13:4,10
   60:17 101:25
   114:9
**additional**   92:19
   102:2
**additionally**
   60:20
**additions**   40:7,8
   46:5 86:6 90:24
   91:1,2 97:10
   110:7 112:24
   115:25 125:20
   130:4 151:7,11
   151:13
**address**   8:19,21
   22:11 55:13
   63:7 125:13
   140:8,9
**addressed**   102:9
   102:25

**adjacent**   57:16
**administrator**
   18:17
**advancing**   32:15
**advice**   94:23
**advise**   27:10
**advised**   18:19
   66:2 149:9
**advising**   18:24
**affect**   110:24
**affiliated**   105:1
   105:4
**affirming**   58:7
   58:23 59:8,9
**affixed**   154:20
**afraid**   110:11
**agent**   93:21
**ago**   94:20
**agree**   33:18
   46:14,21 57:3
   64:9 67:18
   73:17 78:22
   79:2,17,21 80:5
   80:9,14 87:14
   142:6 144:11
   150:15 152:5,6,9
   152:12
**agreed**   36:18
   100:25 144:4
   147:24
**agreement**   57:13
   57:15 59:10
   99:20 146:15
   147:11,15
**agreements**
   12:24 57:23
   58:1,7,23 59:8

**ah**   6:6,12
**ahead**   18:7 78:6
   84:15 93:6
   96:16 115:14
   116:16 127:5
   128:20 137:24
**al**   1:6
**alder**   70:14
   138:9,16 140:3
**alders**   137:6,8
   137:11
**allowed**   99:17
**alteration**   85:11
   87:19
**amend**   19:15
   117:12 145:18
   146:4,6,25
**amended**   87:1
   89:16 142:3
**amending**
   116:24 140:12
**amendment**   89:9
   92:1,18,19,21
   116:11 118:10
   141:2,18 142:15
   147:4
**amendments**
   92:16
**ample**   19:20
**anderson**   32:1
**ann**   100:16
**answer**   6:9,11
   6:25,25 7:2
   12:11,12 92:6
   126:8 141:23
**answered**   99:14
   121:1,7 123:17
   139:23 153:6

anti 137:17
anticipate 75:21
anticipated 68:8
anybody 54:1
123:2 128:22
139:15
anymore 131:5
appeals 129:16
appear 30:1 38:7
51:23 81:13
101:4
appeared 2:5,9
appears 37:8
64:10 87:15
101:5 102:6
114:18
appendix 58:2
97:12
application
107:19
appointed
125:24
approach 93:2
appropriate
150:2
approval 34:11
62:8 84:16 91:8
94:2,7 95:24
98:9,11,14,15
107:18 133:2,5,7
133:15 134:1
135:17 136:25
142:9 148:1
approvals 17:16
84:5,8 90:22
approve 21:8
126:11

approved 12:20
17:13 26:25
43:18 87:19,22
91:6 93:8
126:22 137:6
153:18
approving 133:9
approximate
74:18
approximately
9:14 11:25
13:23
archaeological
22:20
architect 7:7
11:12,13,21,23
15:22 41:4 46:5
architects 9:8,23
10:1
architectural
10:2,4,5 11:3
13:2 41:22
76:21 77:4
90:15 91:6
architecture
11:8,10,11,15,19
11:22 12:2 40:4
40:24 50:21
51:5 96:9
area 54:3 115:7
areas 34:1,3,6
86:3 87:21
88:23 152:13
argumentative
78:6 79:1 80:13
arranged 94:20
articulated
67:22

arts 11:2 13:5,10
15:9,13,18,23
92:13,14
asked 6:24 31:7
94:19 99:13
115:19 117:23
120:25 121:6,19
122:13,16
123:16 127:22
127:25 139:22
142:25 148:3
150:10,22 153:5
asking 57:1
59:18 63:9
94:21 114:5
120:13 151:21
151:24
asks 96:4
aspect 115:16
aspects 32:8
105:12
assist 20:24 56:1
77:1
associates 32:1
association
109:1,3,10
148:20
associations
124:6,9,14
assume 49:22
80:23 86:8
101:21 119:9
124:17
assumed 80:16
80:18,22 118:21
119:9
assumes 93:5
147:6

assuming 78:2
107:17 112:25
122:16
assumption
80:24 146:5
athletic 52:12
53:24 54:6,10,14
56:17 59:3,10,11
60:18 61:7,25
64:4 70:20 71:2
74:6,12 75:5
76:8,9 77:24
78:4,14,18,23
79:18 80:17
81:8,18 91:14
98:24 99:1
103:22 104:5
116:14 118:22
132:7,9 144:12
144:17,22
145:17
attached 4:22
55:24 101:2
attachment 55:2
55:8 62:20,24
63:21 100:6
151:6
attempt 100:17
attend 43:5,12
43:19 123:24
124:25
attended 42:13
43:16 125:7
attending 41:24
126:13
attorney 4:23
65:11 154:15,16

**attorneys** 6:22
**auditorium**
  114:25
**aware** 38:23
  74:23 116:10,20
  118:13 120:2
  121:5,13,15
  122:18 124:19
  125:2 127:20
  132:6

**b**

**b** 3:1 4:1 143:12
  145:6
**bachelors** 11:2
  11:22
**back** 25:9 50:19
  51:7 52:11
  57:25 59:15
  72:17 83:1
  85:22 87:25
  88:9,11,16 95:10
  97:21 98:13,18
  99:3 108:8,13
  112:6 118:14
  127:11 134:3
  151:20
**balistreri** 30:11
  39:15 42:16
  94:14 95:13
  100:10 104:20
  107:8 108:4
  113:18 114:1
  125:8 129:24
**balistreri's** 63:6
**based** 24:18
  25:20 27:19
  41:6 46:10 50:6

52:5 54:10
64:24 67:15
72:1,6,8 83:22
85:15 86:10
89:4 97:10,15
98:14 99:10
102:10 108:22
119:1 127:21,23
142:10 146:4,25
149:12 150:1
**basic** 142:6
**basically** 10:18
  11:2 41:21
  120:17
**basics** 45:20
  46:10 112:11
**basis** 15:2 18:9
**bates** 29:13
**bears** 20:13
**becoming** 24:7
**began** 51:15
  131:10
**beginning** 14:17
  28:25 29:3 34:8
  103:17 105:17
**begins** 26:23
  65:18
**begun** 13:23
**behalf** 2:5,9 5:22
  28:22 39:17
  42:22,24 55:22
  93:17 126:5
**belief** 91:13,19
  152:16 153:3
**believe** 25:4,24
  37:15 38:10
  43:4 44:25
  49:14,19 57:1,13

57:24 58:1,15
61:13 71:7 76:8
78:13 79:25
81:22 84:7,13
99:4,19 100:22
101:1,5,13 106:7
106:15 110:25
112:2,14 117:25
118:25 121:4,13
121:15 122:2
126:25 129:2
130:18 134:17
137:20 139:17
149:13 150:1
151:9
**believed** 77:18
  138:16 140:21
**best** 7:2,11,16
  13:21 49:9
  52:22 129:15
  131:9
**better** 8:7 12:17
  41:9
**beyond** 15:9
  45:19 46:9
  112:10 128:17
**bias** 137:14
**big** 146:11
  147:18
**binding** 42:24
  43:3
**birth** 8:17
**bit** 23:7 88:9
**bleachers** 90:10
  90:16,24 91:1,13
  91:20 98:23
  99:1 116:13

**blocks** 122:23
**board** 129:16
**boardman** 2:6
**boardmanclark...**
  2:9
**body** 97:2,8
**bottom** 20:10
  29:12,17 63:22
  63:24 90:6
  95:12 97:4
  100:7 134:11
**boundaries**
  110:13,17
**boys** 60:19
**break** 7:14 43:23
  50:19 77:10
  97:25 116:6
**brian** 66:16 69:2
  118:6 127:25
  128:14
**briarcliff** 8:20
**brief** 151:17
**bruce** 11:17
**build** 10:16
**building** 13:5
  15:9 16:5 40:10
  41:10,23 44:21
  45:18,25 46:3,6
  86:5 110:7
  112:9,15,19,22
  113:1 114:11,18
  114:20 115:6
  131:3,4 132:7
  142:4,5 150:8
  151:13 152:17
**buildings** 10:5
  10:14,15 12:18
  13:7 15:4 22:15

**[buildings - city]**                                                    Page 6

34:4 46:17
53:16 81:3
88:18,21 114:6
130:4,10 150:17
151:7,11 152:10
152:22,22
**built**  14:13
**bullet**  62:1
**burden**  67:23
**buried**  97:21
**business**  8:21
9:24 10:2 132:1

**c**

**c**  2:1 41:4 87:25
88:3,4,16 152:6
154:1,1
**call**  45:25 90:17
**called**  5:3 17:7
57:14 88:10
131:3 139:14
**calling**  76:9
**calls**  89:11 93:23
103:5 119:6
122:20 124:15
126:17 128:19
143:18 145:7
146:9 147:6
**campus**  3:3
10:17,21 12:5,14
12:15,25 13:2,7
13:9,12,14,16
14:8,13 15:4,8
16:4,17,21,22,23
17:7,8,9,9,10,17
17:20,25 18:2,14
19:21 20:19
21:6,16,17 22:3

22:7,13,14,15,20
23:4,17 24:3,3,7
24:8,19 25:21
26:5,6,11,23,24
26:25 27:7 30:2
30:25 34:2
35:10 39:18
40:14,15 42:17
42:22 47:12
52:6,7 53:15,20
66:20,21,21,24
67:4 74:3,7
75:14 86:18
87:19 88:5
93:18 95:22
105:19,24
107:21 108:20
108:24 109:14
110:18 111:13
111:24 124:22
125:9 127:1,9
132:9 139:10
143:7,16 144:5
146:12 147:24
148:2,18,19
**campuses**  10:14
30:23
**capabilities**
10:13
**care**  123:1
**cares**  123:3
**carey**  100:11,13
100:14
**cars**  22:14
**cas**  41:2
**cas4**  41:3 51:2
**case**  1:4 65:9

**catholic**  60:24
137:17
**cc**  55:12
**cc'd**  60:10,13
94:15 96:17
114:2 130:1
**center**  13:3,10
92:14 141:11
**certain**  73:1 78:4
121:22
**certainly**  7:6
**certificates**
11:20
**certify**  154:6,9
154:14
**chain**  89:24 90:1
**change**  36:1
38:14 71:20
80:24 83:7 86:9
89:5,8 91:9,14
91:25 114:24
116:24 127:9
133:24,25 145:5
145:18
**changed**  17:5
69:24 83:15
97:13 115:20
121:21 128:9
137:9 147:20
**changes**  10:16
27:14,18 79:8
81:5 83:16,21,23
83:24,25 86:2,7
87:20 89:6,18
96:5 97:9,14
110:19 117:22
118:3,7 119:14
122:8,11 135:12

142:8,25 143:3
145:2
**changing**  117:13
118:9,11 119:10
128:10 149:21
**chapter**  33:9
34:24 37:7 38:5
61:15 63:11,17
104:23 143:6
150:5
**chapters**  106:4,8
106:16 107:2
**characterization**
45:10 47:5
149:15
**characterize**
14:1
**characterizes**
47:2
**charge**  47:3
**check**  90:17
**checked**  111:12
**chicago**  11:14,16
**christie**  107:11
**ci**  89:2
**circulated**  34:9
**city**  1:6 6:22
10:21 12:20
17:5,6 18:11,12
19:3,11,19,22
22:8 23:4,6,9
27:10,13,14,22
27:24 32:5,5,5,7
42:20 43:7
53:23,23 65:13
66:1 68:10
69:18,21 72:2,7
72:10,13,23

79:11 80:6 81:1
82:21,23 83:8,20
83:21 85:9,15
91:22,24 93:15
94:19 95:22,24
107:18 111:1,12
118:20 132:5,5
133:8,9,22
134:19 135:18
136:16 137:6,8
137:19,19 138:1
138:7 140:25
141:16,24
147:22 153:10
153:18
city's   17:18,18
19:14 27:19
32:20 75:21
143:1
civil   32:2
claim   17:11
clarifications
140:17,18
151:17
clarified   130:8
150:24 151:4,10
clarify   15:18
41:14
clarifying   50:20
clark   2:6 30:11
39:15 42:16
94:14 95:13
100:10 104:20
107:8 108:4
113:18 114:1
125:8 129:24
classes   52:14
64:5 76:11

78:15
classification
25:1
clause   77:23
78:16
clear   6:13 23:5
110:5
clearly   6:2
client   131:24
close   22:15
code   18:11,13
136:16 147:1
codes   142:5
coexist   110:13
coexisted   110:4
coincide   38:8
college   11:1
12:15 13:2,16
15:4,6 17:9 21:1
21:14,15 22:3
30:15 37:14
39:14 46:16
47:2,12,21 55:22
62:12 65:4
72:23 77:1
93:19 100:15
104:20 105:1
108:24 110:9
111:23 116:23
117:7 124:21
126:19 130:22
131:19,24 132:2
132:6 139:9
148:20
college's   76:19
column   30:5
31:25 32:11
35:7,22 36:20

38:5,24 39:6
104:14,19 105:7
133:5,11,13,19
134:18
come   6:22 17:5
18:10 22:1
140:10
comes   7:4 23:14
coming   8:14
79:22
commencing
154:12
commission
87:22 129:3
141:18 154:25
commitment
59:2
commitments
42:24 43:4 57:9
committee   22:11
42:15,20 76:21
77:4 90:8,15
91:7 123:25
124:3,5 125:6
common   141:19
commons   113:24
114:16 115:7
communicate
10:19 34:5
40:21 137:19,25
139:19
communicated
91:21,23
communicating
133:22
communication
54:21

communications
41:17 115:24
148:14
community
12:25
company   9:3
compare   64:8
compiled   106:4
106:17
compiling   106:9
complained
74:25
complaints
136:6
complete   24:2
25:1 26:4 35:13
148:2
complicated
107:21 145:23
comport   47:15
49:4
comports   63:14
112:3
comprehensive
23:16 141:8
comprised   60:23
concept   109:4
concerns   22:12
102:1,2 140:8,9
140:9
concise   141:9
concluded
153:22
concluding
154:12
conclusion   89:12
93:24 145:8,20
146:9 147:3

conclusions
67:14 71:1
condition   18:1
conditional   24:3
24:9,11 26:5
91:10,15
conditioning
61:1
conditions   33:9
88:5,6,17,20
95:23 133:1,5,7
133:8,10,14,24
condominium
108:25 109:3,10
110:15
confirm   18:12
conjunction
60:25
connected   96:5
conscious   61:17
61:18
consensus
140:10
consider   131:24
135:25 136:2,4
136:12,15,22
considered
90:23
consistent
150:16
consultants   32:2
consulted   21:6
139:20,25
consulting   126:3
contact   14:2
15:16 16:1,4
63:11 92:24
139:16

content   33:3,20
46:18 51:20
52:18 63:16
contents   3:10,11
3:13,15 29:10,25
30:2 34:16
36:12,15 38:2
50:7 51:14 58:3
63:15 88:10
119:2 152:2
contests   74:12
continuation
60:5 134:9
continue   43:18
80:16 90:12
118:22 132:1
140:6
continues   45:17
87:23
continuously
131:15
contrary   75:9,25
contributed
52:17
control   110:6,6
conversation
65:2 117:20
138:10 140:5
conversations
46:11 53:22
119:3
convey   56:25
coordinating
30:24 31:2 33:3
33:20,25 105:8
coordination
30:6 32:12
34:25 35:7,21

36:20 38:17,24
39:5 104:16
125:24
copied   79:18
copies   95:25
96:1
copy   35:13 55:24
corner   21:22
63:22
corporate   1:10
2:15 5:2,20
10:11 17:10
148:22
correct   5:22
20:3,22 23:25
25:16,23 26:2,3
26:7,8,13 27:25
28:9 33:4,8 35:1
35:2 36:2,3,12
36:13 37:6 38:5
38:6,9,15,16,18
38:19,24 39:10
46:20,24 51:11
51:12,24,25 52:1
55:19,22,23
56:17,18 57:20
57:21 58:5,6,7,8
58:21,22 60:11
60:12,14,15 63:4
63:5,12,13,17,25
64:1,12 66:16,17
67:6 68:20,23,24
68:25 70:14,15
72:2,14 83:25
87:23 92:2,12
99:8,9 102:20,21
105:1,2 107:2
108:11,12,16,17

111:3 112:4
113:6 114:3,12
114:25 115:25
118:3 119:18,25
124:23 126:1
127:2 131:11
133:12 140:23
141:3 143:4,24
144:7,8,18,23
145:12,13,14,15
149:4,10,11
150:3,18,24
151:7,8,24,25
152:3
corrected   82:6
82:18 115:19
corrections
63:11
correctly   24:5
27:2 42:4 44:23
45:21 46:19
47:13,23 48:15
52:15 54:8 61:2
71:8 73:3 77:25
79:12 81:11,20
82:10 83:10
96:6 100:7
111:25 130:12
correspond   52:2
cost   131:7
council   141:19
counsel   5:11
20:12 58:15
84:10 104:15
116:5 132:21
143:1 151:21,24
154:15,16

[county - difficulty]                                            Page 9

county  111:12
  154:3
couple  6:1 31:12
  31:14 140:17,18
  151:16
court  1:1 6:3
  20:13 50:21
  153:24
create  19:12,19
  29:19,20 100:23
  110:13
created  22:10
  34:1,16 71:19
  110:2
creating  17:15
  23:8 42:18
  67:24
creation  111:10
  136:25
credentials
  11:20
cs  37:2
current  8:19
  15:11 69:14
  71:14 82:5,19
  89:14 101:25
  130:21
curtail  66:3
cuta  41:4 96:5,8
  97:11,16 112:21
  113:4
cv  1:5

**d**

d  2:13 3:1 4:1
  5:10 55:16
daniel  100:11,13
  100:14

dash  31:13,15
  56:22
date  8:17 25:18
  25:23 44:5
  94:25 95:5,8
  108:6,10
dated  3:5,7,8,10
  3:11,13,15,17,18
  3:20,21,22 4:5,7
  4:8,10,12,13,14
  4:15 23:23 26:1
  34:17 48:8 63:4
  66:16 68:22
  77:16
dates  131:20
day  14:14
  121:18 154:21
days  68:24
deal  142:3
dealing  66:1
dealings  80:22
dealt  22:13
  109:9
dean  30:14,15
december  26:1
  63:4
decide  6:23
decided  19:11,11
  49:23
decision  17:19
  19:14 61:17,18
  147:9
declaration  4:4
  4:5 44:3 48:8
  72:18 111:16
deeds  111:13
defendants  1:7
  2:9

definitely  151:13
definition
  143:20
degree  11:2,22
degrees  11:20
delineating
  110:17
delineation
  110:2,5
delivered  4:23
department
  18:18 25:11
  85:9 153:13
departments
  27:19 133:8
deposition  1:9
  5:20,24 7:20
  8:11 153:22
  154:6,9
describe  19:6
  53:20 78:3,23
  79:3 152:24
  153:1
described  54:10
  54:18 76:8
  152:18
describes  10:6
  79:2
describing
  108:19 116:13
  149:22
description  3:2
  4:2 53:19 54:19
  61:5,10,11,13,25
  65:1 88:4
  117:13 118:10
  122:15 149:18
  149:24 150:3

descriptions
  37:21,22 38:18
  152:9,12
design  8:25 9:5,7
  9:9,10,23 10:3,4
  77:4 90:15 91:7
designated  32:13
  32:13 33:2 39:8
designation
  31:19,20
designed  34:5
designers  9:8
  10:1
designs  9:22
detailed  22:19
details  123:20
determine  61:14
development
  10:19 23:16
deviate  89:8
dh  31:7,12,15,20
  31:20 32:4 35:1
  38:17
diagram  52:3,5
  99:4
difference  31:19
  31:21
different  10:10
  10:10 12:21
  34:10 38:4
  53:20 54:18
  68:8 83:22
  105:12 109:19
  110:18 128:7
differently  142:5
difficult  6:16
difficulty  127:21

direct 9:7 45:14
148:14
direction 23:6
154:8
directly 130:15
154:17
director 8:25 9:5
9:10,13,15
dirt 12:16
disagree 45:2
46:8 47:25
48:19 49:14
73:5,10 146:5
147:3
discuss 77:23
79:25 80:5,8
116:23 119:9,14
discussed 22:4
78:19 79:15
80:11 104:10,14
135:3 146:14
151:21
discusses 152:7
discussing 79:10
79:17 103:18,24
104:4 116:2
118:19
discussion 104:1
150:15
discussions
103:19 124:23
125:4 132:9
150:11
disparate 10:21
dispute 90:4
105:22 145:19
disservice
146:17,21

distinction 35:3
district 1:1,1 3:4
16:23 17:7,8,11
17:12,16,21 18:2
19:23 24:12
86:19 89:2
143:8 144:6
districts 143:16
disuse 146:17
dive 45:19 46:9
112:10
document 7:25
20:13,22 21:8,11
26:20 28:8,14
29:8 32:25
33:18 35:14
36:15 39:6 44:4
44:10,14 48:11
51:19 53:13
55:3 56:5 58:2
62:21,22 64:8
65:23 67:9 68:7
69:10,19 70:16
70:19,22 71:10
72:20 77:23
78:2,2,9,10 81:7
81:9,10,17 83:1
83:5,6,13 85:2
86:4,15,17,18,20
87:1,11 93:15,17
94:5,8 95:6 97:8
97:11 100:18,21
101:1,2,3 111:1
113:13 130:3
133:24,25
documentation
23:11

documents 23:8
23:10 29:20
34:1 46:4 59:24
94:18 101:20
125:5,18
doing 11:17 40:9
42:9 43:21
110:8 112:25
118:4 131:10,23
153:3
dominican 13:7
29:1 109:16,18
110:19 111:7
dos 51:14
double 20:8
doug 1:10 2:16
5:3,10 31:10
60:11 94:20,21
95:21 96:4
100:16 107:11
108:13 114:15
115:2 120:17
130:9
downtown 11:16
draft 35:4 56:8
69:6 77:16,19
99:10 101:3,4,21
102:12 106:4,16
127:15,16,18
128:11,16 130:4
drafted 23:22
45:24 53:9
66:12 68:20
105:7 128:3,5
drafting 21:25
39:17 44:18
45:9,14 49:10,15
49:20 50:9

51:15 53:7
67:15 70:16
105:9 109:4
122:3
drafts 40:13
41:24 124:2,9,13
draw 34:9
drawing 86:5
130:19
drawings 34:9
41:13 97:15
110:1
drew 34:3 72:12
drink 7:15
drive 74:9
dudgeon 74:8
119:17 122:17
123:8 149:2
duly 5:4

| e |
| --- |

e 2:1,1,13 3:1,1,1
4:1,1,1,18,18
154:1,1
earlier 69:6
77:18,19 104:15
108:10 112:2
125:23
early 101:4
103:14
easier 17:17
east 1:12 2:3
154:10
ed 37:8,11,13,20
37:20 38:17
39:15 51:15,20
63:11,15 64:16
104:23 106:4,7

**[ed - eventually]**

106:15
**edgewood** 1:2
12:5 13:22 14:3
14:8,21 15:8,16
16:10,17,21,22
19:13 20:1,18
21:1,2 22:25
23:1 24:3,8,19
26:5,23 27:25
28:15,23 30:2,15
30:18 33:1
35:16 36:21
38:22 39:7,14,18
39:20 40:2,2,3,3
41:18 42:8,11,24
45:24 46:16
47:2,12,21 48:14
48:20 49:5 50:2
52:12 54:2,3,11
54:12 55:22
57:10 59:19
61:6,23 62:5,12
64:4 65:3,3
66:20 68:11
72:22 74:7,19,25
76:19 77:1
79:11 80:9,25
83:9 86:23 87:6
93:18 98:23
99:21 100:15
104:19 108:20
108:24,24,25,25
109:3,14 111:23
112:14 116:10
116:22,23 117:6
117:7 118:8,21
119:3 123:24
124:21,21,22

125:9 126:25
127:8 130:22
131:11,13,17,19
131:24 132:2,6
133:3 137:14
139:5,9,10,10
140:3,11 144:12
144:17,22 145:2
145:17 146:2,6
146:12,24
148:15,18 149:3
150:16
**edgewood's**
49:10 139:11
140:9
**edits** 27:14
**education** 11:3
52:14 54:6 64:5
76:11 78:14,15
**educational**
10:23
**educations** 75:6
**effect** 139:2
**ehs** 44:17 45:8
45:18 46:18
47:9 63:22
72:23 75:14
111:21 112:9
**ehs's** 44:15
72:25 73:19
75:4
**ehs1825** 3:7
**either** 58:13 69:1
106:24 133:23
137:16 142:7
**elements** 22:19
88:14

**elevator** 112:23
**elliott** 4:4 15:25
28:19 44:4,8,17
47:9,19 49:1
53:5 63:10
65:11 73:6 75:3
93:1 94:19
96:12,22 98:6
111:17 113:4,18
114:2,15 115:10
115:18 116:3
117:10,12
128:14 130:8,14
150:11,23 151:4
151:10
**elliott's** 45:3
48:1 72:18
**email** 3:5,7,8,17
3:18 4:7,8,10,12
4:13,14,15 18:25
55:2,7,11,13
59:16 60:5,14
62:20 63:4,6,9
65:9,10,10,12,14
65:17 89:24
90:1,3,5 91:12
94:12,14,17,25
95:5,14 96:3,16
96:22 97:2,23
98:5,8 100:2,6,9
101:24 102:10
105:18 107:7,8
107:14 108:3,3,6
108:8,9,18,22
113:16,17,20,25
114:1,8 129:23
130:1,7 150:23

**emails** 79:19
94:21
**employed** 53:23
**employee** 30:22
37:13,14 154:15
154:16
**employees** 38:22
135:18 137:20
**enactment** 16:23
17:18,20
**ended** 50:2
105:13
**engagement**
17:4 129:13
**engagements**
130:22
**entire** 89:16
**entirely** 25:3
52:20 128:9
152:24 153:2
**entities** 12:25
13:12,14,15,17
13:23 14:3 20:1
23:1 42:22
148:22 150:16
**environment**
10:16
**erect** 59:10
**error** 23:8
**estimates** 131:8
**et** 1:6
**eternity** 68:6
**events** 80:17
102:9,25 103:22
116:14 118:23
**eventually** 51:15
134:7

**evers** 70:14
138:9,16,23
139:4 140:3
**everybody** 10:22
110:12 134:1
141:6
**evidence** 93:6
147:7
**exactly** 84:6
127:19
**exam** 11:24
**examination**
2:17,18,19,20,21
5:6 77:12
140:19 151:18
153:16
**examined** 5:4
**example** 16:9
**examples** 76:11
**exception** 38:20
133:23
**exhibit** 3:3,5,6,7
3:8,10,11,13,15
3:17,18,20,21,22
4:3,4,5,7,8,10,12
4:13,14,15 5:14
5:16 7:18,19
20:4,9,10,11,18
25:8,10 29:4,7
29:25 32:25
34:12,15,20 36:1
36:8,10,14 37:23
37:25 38:9,14
39:6 43:25 44:3
48:5,7 49:8 51:6
54:22,25 55:1
58:4 59:15 60:1
60:4,5,7 61:4

62:17,20 64:10
64:14 65:6,9
66:8,11 68:16,19
68:24 69:13,24
70:11,13 72:17
77:14,19,19,21
78:17 79:15,15
80:11 81:14,16
83:3 86:11,14
89:21,24 93:11
94:10,13 95:2,4
98:4,18 99:3,25
100:3 104:12
105:16 107:4,6
107:25 108:2,8
109:20 111:15
111:16 113:10
113:12 114:15
118:14 119:20
119:22 120:15
128:7,8,12,16
129:20,22,23
142:19,23 149:8
150:22 151:6,20
151:22
**exhibits** 4:22
**existing** 10:15
46:6 88:5,16
113:23 114:11
115:5
**expand** 12:17
**expanding** 110:9
**expansion** 10:12
**expect** 68:5
**experience** 15:23
67:15,20 72:9
126:13 149:2

**experiences**
72:13
**expires** 154:25
**explain** 17:3
109:23
**explored** 118:9
**express** 70:9
73:23 75:9,25
138:16 139:1
**expressed** 73:19
137:12
**extent** 6:10,17
6:24 7:13 80:8

**f**

**f** 154:1
**face** 18:25,25
19:2,2
**facilitate** 44:21
59:25
**facilities** 10:17
12:17 15:24
68:13 87:25
88:4 91:2 132:9
144:7 150:18
**facility** 13:6
15:18 75:16
79:8 132:7
144:13,18,23
145:3,4
**facing** 114:17
**fact** 18:13 32:15
33:19 71:14
73:6 74:25 82:4
82:22
**facts** 93:6 147:6
**fair** 14:20 32:12
32:25 36:14

37:5 39:14,20
41:11 45:10
47:4 120:2
122:17 123:7
125:7 149:14
**fairly** 74:21 76:8
131:14
**familiar** 74:23
86:15 109:2,2
116:17 118:4
**familiarity** 52:6
**familiarize**
86:22 87:4
**family** 11:17
**far** 23:4 32:20
38:5 42:9 51:19
52:25 72:11
74:18,19,21,21
80:7 84:13
129:4 147:22
**feasibility** 10:4
**features** 116:12
**february** 60:16
121:4 146:2
**feedback** 19:20
19:22 23:9
32:23 34:10
43:6 52:25 54:1
59:23
**feeder** 60:24
**feel** 8:4 82:1
142:13 146:17
152:21 153:7
**feelings** 70:9
**felt** 71:19 82:25
140:5,5
**field** 11:20 52:12
53:25 54:10,14

**[field - forth]**

56:17,22 57:2,2
57:12,17 59:2,3
59:10,11 60:19
60:21,23 61:7,25
64:4 69:14
70:21 71:2,15
73:20,24 74:6,13
74:19 75:1,5,15
76:2,8,9 77:24
78:4 79:8,18
80:1,6,23 81:5,8
81:18,18 82:5
90:8,14,22 91:14
98:24 102:6,7,8
102:11,19,24
103:22 104:5
116:13,25
117:14,22 118:3
118:7,10,12,19
119:1,14 120:3
120:19,24 121:5
121:13,15,20,22
122:1,8,13,19,24
123:2,9,14,22
129:5 132:10
144:12,17,22
145:3,17 147:20
147:21 149:4,10
149:12,15
152:17,24 153:1
**fields**   71:21 74:9
78:12,14,19,24
79:4,9,10 80:16
118:20,22
119:12 132:11
**file**   93:15 94:5
98:9

**filed**   20:14
**filing**   20:13
93:17,22 94:8
**final**   25:22 64:20
94:18,20 95:21
95:25 98:9,12
**financially**
154:17
**find**   84:7 107:11
127:15
**fine**   15:9,13
43:24
**finish**   6:17,19
**firm**   11:15 29:14
40:4,24 41:22
50:21,24 56:7
96:9
**first**   5:4 11:8
23:3 24:1 26:18
27:13 41:20
48:13 55:13
66:18 77:22,22
78:16 81:23
93:2 96:21 97:4
107:8 108:9
114:14 120:15
129:23 130:7
**fitchburg**   132:7
**five**   33:10 50:15
77:10 97:24
**flanagan**   63:10
94:15 100:15
**flip**   64:2 134:8
**floor**   2:7
**floors**   115:6
**florida**   10:25
11:4

**fluid**   68:7 83:6
83:13
**focus**   79:9 81:2,5
81:17 118:19
**focused**   86:5
119:12 150:17
152:23 153:2,8
**foley**   65:11
**folks**   39:16
**follow**   134:13
**following**   88:14
**follows**   5:5 90:5
**football**   60:20
74:17 90:7,14,22
102:6,7,11,19
121:17
**forgotten**   50:25
**form**   12:7 14:23
16:7,18,25 18:4
19:8,16 21:12
24:10,21 27:3,16
28:11,18 29:23
30:13,19 31:4,5
32:17 33:5,23
35:18 36:4,17,23
38:11,25 39:23
41:1 42:1 43:1
45:4,11 46:1,12
46:22 47:7 48:2
49:17 50:11
51:17 52:23
53:11 54:16
56:9 59:5,12
61:20 62:3,10,16
63:18 66:5,14
67:1,17,25 68:15
70:2 71:4,11
72:3,15 73:8,25

75:11 76:3,17,22
77:5 78:5,25
80:2,12 81:25
85:7,24 86:25
89:10 91:17
92:4 93:5,12,23
99:13,23 101:7
102:14,22 103:5
103:23 104:6
105:3,10 106:11
106:19 107:19
109:7,21 112:17
115:13,21
116:15 117:15
119:6 120:4,25
121:6,23 122:4
122:20 123:10
123:16 124:15
125:10,16 126:6
126:16 127:4
128:19 129:1,17
130:16 131:16
134:21 135:4
136:18 137:23
138:2 139:22
141:4,21 142:17
143:9,17,25
144:9,14,19,24
145:7,21 146:8
147:5 148:7,23
149:6,16 150:4
150:19 152:19
153:5
**formal**   142:7
**formalized**   77:2
**formally**   98:25
**forth**   98:13

**forward**   15:1
56:1 73:20
98:16 100:25
153:19
**found**   145:11,14
153:10
**foundation**   18:5
19:17 21:4,13
24:22 25:2 28:1
30:20 32:18
35:19 36:24
37:12 39:12
42:2 43:2 45:5
45:12 46:2,13,23
48:3,22 49:18
52:19 53:12
66:6 68:1 70:3
73:9 76:4 95:17
96:14,24 101:8
101:19 102:15
105:25 106:21
107:15 109:22
122:21 126:7,17
129:18 143:18
144:1 145:22
146:9 147:6
148:24
**four**   11:3 33:10
41:24 47:10
108:14,15,19
109:19 111:21
**friday**   95:12
**front**   13:10 25:7
25:14 51:7
114:18
**full**   75:15
**further**   77:7
151:14 153:15

154:9,14
**future**   10:12,13
10:16,18,19,22
17:16 22:4
23:15 34:4 40:8
47:10 57:7 68:3
82:6 88:21 97:9
110:6 111:21
115:4 132:2

**g**

**g**   2:7 5:10 55:16
**gainesville**   11:12
**games**   56:22,22
57:2,3,4,6,7,11
57:17 59:4,4,11
60:18 62:6,13
74:12,16,17,17
75:1 80:17 81:8
90:10 99:2,8,12
99:17 118:23
119:23 120:3,5,7
120:9,12,12,13
120:19 121:5,14
121:16,16,17,17
121:20 144:22
145:5 147:12
149:3,10
**gathering**   39:22
**general**   47:15
**generally**   10:8
16:4 30:1 47:17
64:6,10,14
153:10
**george**   1:16
154:4,24
**getting**   23:9
52:25 63:2

115:24 137:6
147:19
**girls**   60:19
**give**   8:17 10:23
12:3 33:16
75:20 92:5
127:11
**given**   42:16
67:20 68:4
**giving**   98:8,11
98:13
**gklaw.com**   2:4
**go**   6:1,2 9:9 18:7
19:11 51:8
72:17 78:6 83:1
87:8 91:10 93:6
94:22 96:16
113:16,23 115:4
115:14 116:16
117:2,5 118:1
127:5 128:20
129:6 137:23
140:18 141:2,17
142:2,7,9 147:8
150:10 151:2
**godfrey**   1:11 2:2
154:10
**goes**   44:17 46:16
73:19 74:21
75:13 126:21
147:23
**going**   7:7 8:13
15:1 19:12
20:17 29:6
34:14 59:15
65:8 73:20
88:16 98:13
122:11 123:21

129:2 146:14
153:19
**good**   5:8 11:25
23:3 43:22
49:21 55:11
94:22 135:24
136:11 137:2
147:16
**govern**   44:21
**governor**   54:4
**grading**   22:21
**graduated**   11:14
**granted**   92:22
**graphic**   22:6
**great**   6:10
**green**   22:16
33:11 34:2,6
53:14,15 54:3
55:25 56:6
63:25
**ground**   6:1
**groups**   10:21
**guess**   9:7 34:8
51:19 64:23,24
82:20 103:12
120:13 121:21
141:5
**guesses**   52:22
**guessing**   69:18
77:20
**guidance**   23:1
**guide**   10:18
23:15

**h**

**h**   3:1 4:1 5:10,10
55:16

**hah**  6:12
**hahs**  6:6
**hall**  13:5,6,7
  29:2,2 131:3,5
**hand**  21:22 29:6
  34:14 37:25
  44:2 63:22 65:8
  133:2,2,10,13,19
  134:18,19
  135:10 154:19
**handing**  5:16
  20:8 36:10 48:7
  54:24 60:3
  62:19 66:10
  68:18 86:13
  89:23 94:12
  95:4 107:6
  108:2 113:12
  129:22
**handwriting**
  25:14 56:12,14
  99:5 119:23
**handwritten**
  20:9 56:19
**hang**  132:21
**happened**  60:9
  122:24
**happens**  7:9
  123:2
**hard**  37:19 68:6
**harder**  62:7,14
**heading**  63:24
  133:1 134:12,24
**headings**  38:8
**heads**  6:6,6
**hear**  57:9 73:23
  75:9,25 125:13
  137:12,16

**hearing**  98:22
  129:16
**heart**  1:3
**heather**  136:24
  137:2
**heavily**  32:22
**height**  114:20,24
  114:25 115:5
**help**  23:15 37:20
  38:18 134:1
**helped**  59:24
  66:19
**helpful**  135:25
**helping**  51:15
  63:16
**hereunto**  154:19
**heritage**  54:4
**hey**  62:12
**high**  1:2 10:24
  10:25 13:9,11,16
  15:8,15,16,19,25
  21:3,5,16,17
  22:3 28:15,23
  30:18,22 33:1
  35:10,10,16
  36:21 37:5 39:7
  39:21 40:2,3,3,6
  40:7,13,15 41:10
  41:19 42:10,11
  42:13,24 45:24
  48:14 49:5 50:2
  52:13 54:3
  56:21 57:10
  59:19 60:25
  61:6,23 62:5
  64:4 65:3 74:7
  79:23 82:24
  92:11,13,20,24

  93:19 96:10
  97:9,16 98:9,23
  99:11,21 103:22
  108:25 112:14
  113:22 114:6
  115:11 116:10
  116:22 117:6
  118:8 124:21
  125:14,20
  127:20,24
  128:17 130:8
  132:3,4 138:13
  139:10 148:20
  150:24 151:4
**highlight**  53:14
**highlighting**
  122:11
**hindsight**  122:5
  141:7
**historic**  131:3
**history**  10:24
  12:5 147:17
**holder**  141:1,17
**holding**  144:17
  144:22 147:12
**holds**  145:4,5
**home**  59:3 60:21
  90:10
**honest**  136:2,22
  145:12
**honestly**  69:5
**hope**  28:5
**hospital**  17:9
**host**  59:3,4,11
  60:22
**hs**  35:9 37:2
  56:21

**hum**  13:13 59:17
  105:21
**humanity**  13:3
**hurray**  96:1
**hursh**  1:10 2:16
  5:3,8,10 29:6
  31:10 36:10
  38:1 44:2 48:7
  54:24 60:11
  66:10 68:18
  92:5 95:21
  116:10 120:17
  136:19 140:21
**hyphen**  31:15
**hypothetical**
  89:11

**i**

**idea**  61:15
  150:16
**ideas**  68:3
**identical**  85:19
**identified**  7:20
  47:10,11 66:4
  73:1,1 86:2
  87:20 89:7 96:9
  111:21,23
  148:19
**identifies**  143:15
**identify**  61:16
  143:7
**identifying**  68:6
**ignorance**  11:19
**illegal**  81:7
**imagine**  139:13
**immediate**  46:3
**impact**  53:8,13

importance
  150:1
important   122:2
  122:6,7,14
impression
  126:14
impressions
  70:25
include   10:3
  19:5 40:10 59:2
  61:14,19 69:20
  69:20 79:8 82:6
  82:18 87:18
  88:14 97:11
  102:1 113:8
  120:13 124:5
included   17:7
  21:18 22:22
  23:6,15 40:21
  58:1 68:13 86:8
  90:1 91:25
  112:22 124:22
includes   88:4,17
including   22:20
  83:24 86:2,7
  87:20 97:14
  116:12,12
inclusion   89:2
  113:5
inclusive   68:5
income   110:11
incomplete
  89:11
incorporates
  57:22
incorrect   27:11
  28:7 137:22
  138:18

indicate   137:13
indicated   120:18
indirectly
  154:17
individual   96:8
  110:20
indoor   144:6
inform   72:23
  109:13
information
  19:3 23:13 32:7
  39:22 41:21
  63:2 79:21
  88:14 97:10,15
  108:14 122:2
  124:12 126:22
  130:9,10,15
informational
  41:8
informed   73:6
ingrisano   2:2,17
  2:19 4:23 5:7,15
  8:2 12:10 14:24
  16:8,20 17:2,24
  18:6 19:10,24
  20:5,12,16 21:9
  21:20 24:13,24
  25:5 26:22 27:5
  27:21 28:4,12,20
  29:5,24 30:16
  31:1,6 32:24
  33:6,24 34:13
  35:20 36:5,9,19
  37:1,16,24 38:12
  39:3,4,13,25
  41:5 42:3 43:9
  44:1 45:7,16
  46:7,15,25 47:8

48:6,24 49:25
50:13,15,18
51:21 52:21
53:3,17 54:23
55:6 56:11
58:16,18,19 59:7
59:14 60:2
61:22 62:4,11,18
62:23 63:20
65:7,25 66:9,15
67:2,11,19 68:9
68:17 69:12
70:6,12,24 71:5
71:17 72:5,16
73:12,18 74:2
75:12 76:6,18,24
76:25 77:7 78:5
78:25 80:2,12
81:25 82:3,8,12
84:10 85:7,21,24
86:25 89:10
91:17 92:4,8
93:5,12,23 95:17
96:14,19,23
98:19 99:13,23
101:7,14,17,19
102:14,22 103:5
103:23 104:6
105:3,10,25
106:11,19,21
107:15 109:7,21
112:17 115:13
115:21 116:5,15
117:15 119:6
120:4,25 121:6
121:23 122:4,20
123:10,16
124:15 125:10

125:16 126:6,16
127:4,13 128:19
129:1,17 130:16
131:16 132:21
132:23 134:21
135:4 136:18
137:23 138:2
139:22 140:17
140:20 141:12
142:11,18
143:11,21 144:2
144:10,16,21
145:1,10,25
146:20 147:10
148:8 149:1,7,25
150:9,21 151:14
152:19 153:5,21
initially   51:14
initials   31:24
  35:9
input   32:7,21
  57:1 72:10 83:8
  129:5
inserted   133:17
insignia   29:17
inspection   142:4
institution   21:10
  47:16,21 75:15
  83:7
institutional   3:4
  16:23 17:7,20
  18:2,14 23:5
  24:4,7,19 25:22
  26:6,12,24 27:8
  66:21 67:5
  75:14 86:18
  127:1,9 143:8,16
  144:6

| | | | |
|---|---|---|---|
| **institutions** 21:7 | **interpretations** | **j** | 92:9 93:9,14 |
| 22:5 30:25 | 141:9 142:10 | | 94:1,11 95:3,19 |
| 34:10 39:18 | **interpreted** 66:3 | **january** 3:20,21 | 96:15,20 97:1,18 |
| 40:18,19 68:12 | 69:19 72:24 | 66:16 68:22 | 97:20,24 98:3,20 |
| 79:11 80:9 81:1 | 82:21 138:22 | 77:16 108:7 | 98:21 99:18 |
| 83:9,19 93:18 | **interpreting** | 118:16 127:16 | 100:1,8 101:10 |
| 94:4,5 110:3,3 | 69:21 | 128:2 | 101:16,18,23 |
| 110:18,20 | **interruption** | **jean** 2:7,18,20 | 102:18,23 103:3 |
| 118:21 125:25 | 17:22 | 2:21 12:7,9 | 103:8 104:2,3,8 |
| 126:4,15,20 | **involved** 10:8,20 | 14:23 16:7,18,25 | 104:11 105:6,15 |
| **intend** 46:16 | 12:14 14:12 | 18:4 19:8,16 | 106:2,13,14,25 |
| 75:4,20 | 15:19 16:21 | 21:4,12 24:10,21 | 107:5,22 108:1 |
| **intending** 56:24 | 19:21 20:1,21 | 25:2 27:3,16 | 109:8,24 113:3 |
| **intent** 54:17 | 28:25 29:1,3 | 28:1,11,18 29:23 | 113:11 115:17 |
| 61:13 71:9 75:9 | 33:16,25 40:16 | 30:13,19 31:4 | 116:1,7,9,19 |
| 75:25 79:3 | 40:23 45:15 | 32:17 33:5,23 | 117:17 119:15 |
| **intentionally** | 49:10,15,20 | 35:18 36:4,17,23 | 120:6 121:3,10 |
| 61:24 | 57:19 63:16 | 37:12 38:11,25 | 121:25 122:9 |
| **intentions** 115:4 | 76:19 77:3 | 39:12,23 41:1 | 123:4,12,23 |
| **interacted** 109:9 | 110:23 135:20 | 42:1 43:1 45:4 | 124:18 125:12 |
| **interacting** 40:1 | **involvement** | 45:11 46:1,12,22 | 125:22 126:12 |
| **interaction** | 17:4 19:13 | 47:7 48:2,22 | 126:23 127:7,14 |
| 39:20 | 25:21 44:18 | 49:17 50:11 | 127:17 128:24 |
| **interest** 148:21 | 45:9 47:20 | 51:17 52:19,23 | 129:8,21 130:20 |
| **interested** | 49:22 | 53:11 54:16 | 131:18 132:22 |
| 128:23 154:17 | **involving** 76:20 | 56:9 58:14 59:5 | 132:24,25 134:3 |
| **interior** 10:1,3 | **ish** 9:14 | 59:12 61:20 | 134:6,23 135:7 |
| **intern** 11:13 | **issue** 71:1 | 62:3,10,16 63:18 | 136:21 138:3 |
| **internal** 65:10 | 102:20 146:24 | 66:5,14 67:1,17 | 140:1,15 141:4 |
| **interpret** 141:25 | 147:4 | 67:25 68:15 | 141:21 142:17 |
| 142:5 | **issues** 40:20 | 70:2 71:4,11 | 143:9,17,25 |
| **interpretation** | 100:17,21,24 | 72:3,15 73:8,16 | 144:9,14,19,24 |
| 67:14 73:7,15 | 101:25 138:14 | 73:25 75:11 | 145:7,21 146:8 |
| 75:22 82:25 | **item** 53:5,24 | 76:3,17,22 77:5 | 147:5 148:7,23 |
| 117:21 127:22 | 54:2 104:1 | 77:13 78:8 79:6 | 149:6,16 150:4 |
| 137:21 138:5,8 | **items** 39:11 | 80:4,15 82:9,15 | 150:19 151:16 |
| 138:17 140:22 | | 84:11,17 85:4,12 | 151:19 152:25 |
| 141:3,7,19 | | 86:12 87:3,13 | 153:9,15,17,25 |
| | | 89:15,22 91:18 | |

**jim** 15:22 16:9
**jingrisano** 2:4
**job** 1:25 11:8
  44:19
**jonathan** 2:2
**judge** 4:5 28:21
  28:25 48:8
  55:24 59:19
  121:11 149:9
**july** 50:2
**june** 4:6 36:1
  44:6 48:9 50:12
  50:14 127:11,15

**k**

**k** 3:1 4:1
**kahn** 1:11 2:2
  154:10
**kathleen** 63:9
  105:17,23
**kept** 98:13
**kind** 10:22 14:18
  15:1 16:3 18:24
  19:12 21:23
  22:24 31:2
  36:16 67:22
  72:11 74:16
  111:1 142:14
**knew** 118:6
  126:18,19 149:2
  149:8
**knothe** 11:16
**know** 7:15 9:16
  10:13,14 13:18
  17:10 19:13,18
  22:18 23:7
  28:25 30:8
  31:17,24 35:9,13

37:19 40:16
41:12 45:14
52:17,24 55:9
69:1,4 71:23
82:22 83:20
84:2,5,19 85:10
85:15,16 86:4,9
90:13,21 92:21
96:12 98:12
100:21 102:16
103:4,9 107:12
107:13 111:10
112:22 117:1,11
117:20 121:19
126:21 128:2,6
128:11 130:14
131:20,22 132:8
132:10 133:5,23
139:15,16,19
141:10 143:10
148:10,21 149:8
149:20
**knowing** 122:1
**knowledge** 23:14
  30:17 68:11
  73:13 107:1
  115:19 118:8
  128:16 131:10
  148:9 149:12
**knowledgeable**
  136:13 145:14
**known** 109:9
**knows** 10:22

**l**

**l** 1:16 3:1 4:1
  154:4,24

**labels** 29:13
**lacrosse** 60:22
**land** 88:17,21
  109:14,15 110:2
  110:4,5,12,19
  111:2,8,13 152:9
**landscaping**
  22:16 33:11
  63:25
**lane** 8:20
**language** 27:11
  52:17 61:19
  64:7,13,19 65:4
  85:20 87:15,18
  128:3,6,8 134:25
  135:2
**lardner** 65:11
**large** 54:3
**late** 14:15 31:4
  54:5
**latest** 100:17
**lawson** 1:10 2:15
  5:2,18,22 7:20
  8:6,9,21,24 9:2
  9:11,19,24 11:5
  11:18 12:3 14:2
  14:6,19,25 15:7
  16:3,5,16,21
  29:12,13,16,20
  31:18 34:16
  55:25 67:21
  82:17 92:15
  93:15,17 100:10
  128:12 130:5,21
  131:9,14 133:19
  134:20 147:18
  148:14,16

**lawson's** 12:4
  13:21 17:3
**lead** 9:3 15:16
  21:11 31:2
  66:19 125:24
**leaders** 40:19
  94:4,8 124:21
**leadership** 40:23
  41:24 43:5
**leading** 47:3
**learning** 148:13
  148:16
**leave** 54:25
**left** 6:3 38:5
  133:2,10 134:18
**legal** 89:11 93:24
  108:19 145:8
  146:9
**letter** 3:20,21,22
  23:22,23 24:1
  26:1 66:12,18
  68:19 70:13,25
  77:15,16 85:9
  117:23 127:11
  127:18,23 128:1
  128:2,17,25
  129:7 133:7,8,14
  133:17 134:18
  138:11 141:13
**letters** 69:1,2
  70:7 71:6,7
  138:12
**letting** 85:10
**level** 60:19,20,23
**liaison** 22:10
  42:15,19 43:12
  90:8 123:25
  125:6

**liberal** 11:2
**library** 96:1
**license** 12:1
**light** 64:6,10,14
  116:12 146:3,24
**lighting** 145:18
  147:1
**lights** 57:16,18
  59:3,10 90:9,16
  90:24,25 91:13
  91:20,23 98:23
  99:1 102:7,19
  104:4 116:12
  146:7,13 147:21
  147:24 148:5,12
**limit** 53:21 61:24
  66:3 75:4 79:3
**limitation** 73:23
**limitations** 76:12
**limited** 39:21
  73:20 117:13
**line** 24:1 32:4
  33:10 66:18
  71:13,16
**list** 36:16 38:2
  71:14,23 78:9,10
  82:4 107:12
  111:2,7 143:19
**listed** 54:13,20
  76:11 104:18,20
  104:23 109:20
  111:6 134:14
**listing** 69:13
  108:15,18
**lists** 50:7 102:1
**litigation** 44:8
**little** 44:18 45:8
  88:9 107:20

**live** 74:8,10,18
  74:19 122:25
**lived** 74:11,20
  74:24 119:16,17
  122:17,23 123:7
**living** 74:13
  149:2
**llc** 51:5
**llp** 2:6
**located** 1:12
  81:4
**location** 60:17
  61:5,6,10,11
**long** 9:10 22:2
**look** 8:13,16
  20:17 21:23
  29:9 32:10 33:9
  44:13 51:6
  52:11 58:3,9
  63:21,23 77:14
  77:21 78:13
  86:14 97:25
  98:4 99:3 101:9
  101:11 111:15
  131:7 135:2
  142:19 143:12
  150:22
**looked** 50:20
  77:15
**looking** 7:18
  10:12,14 21:21
  25:7,10,12 29:25
  32:25 35:7
  36:20 40:5 50:6
  51:1,22 59:1
  61:4 64:7 68:3
  69:8 105:16
  131:2,4 132:11

150:14
**looks** 30:4 34:23
  51:22 55:11
  56:8 60:9 63:10
  98:11 102:16
  143:19
**losing** 110:11
**lot** 23:13 92:20
  141:24 149:23
**lots** 12:16
**loud** 64:3 66:18
  90:6
**louis** 2:7,18,20
  2:21 12:7,9
  14:23 16:7,18,25
  18:4 19:8,16
  21:4,12 24:10,21
  25:2 27:3,16
  28:1,11,18 29:23
  30:13,19 31:4
  32:17 33:5,23
  35:18 36:4,17,23
  37:12 38:11,25
  39:12,23 41:1
  42:1 43:1 45:4
  45:11 46:1,12,22
  47:7 48:2,22
  49:17 50:11
  51:17 52:19,23
  53:11 54:16
  56:9 58:14 59:5
  59:12 61:20
  62:3,10,16 63:18
  66:5,14 67:1,17
  67:25 68:15
  70:2 71:4,11
  72:3,15 73:8,16
  73:25 75:11

76:3,17,22 77:5
  77:13 78:8 79:6
  80:4,15 82:9,15
  84:11,17 85:4,12
  86:12 87:3,13
  89:15,22 91:18
  92:9 93:9,14
  94:1,11 95:3,19
  96:15,20 97:1,18
  97:20,24 98:3,20
  98:21 99:18
  100:1,8 101:10
  101:16,18,23
  102:18,23 103:3
  103:8 104:2,3,8
  104:11 105:6,15
  106:2,13,14,25
  107:5,22 108:1
  109:8,24 113:3
  113:11 115:17
  116:1,7,9,19
  117:17 119:15
  120:6 121:3,10
  121:25 122:9
  123:4,12,23
  124:18 125:12
  125:22 126:12
  126:23 127:7,14
  127:17 128:24
  129:8,21 130:20
  131:18 132:22
  132:24,25 134:3
  134:6,23 135:7
  136:21 138:3
  140:1,15 141:4
  141:21 142:17
  143:9,17,25
  144:9,14,19,24

**[louis - master]** Page 20

145:7,21 146:8
147:5 148:7,23
149:6,16 150:4
150:19 151:16
151:19 152:25
153:9,15,17,25
**love** 90:9 118:15
**lower** 60:19,20
114:17,18 115:6

**m**

**m** 3:1 4:1
**machine** 6:5
**madison** 1:6,13
2:3,8 8:22 12:5
18:12 27:14,22
27:24 41:6
53:23,24 65:13
66:1 68:10
154:11
**madison's**
136:16
**maggie** 30:11
35:5 39:14
42:16,22 53:2
63:6 90:3 91:12
94:14,24 95:13
96:3,4,22 97:7
100:9 103:4,10
104:20 107:8
108:4,9 113:18
114:1 125:1,4,7
125:13,23
126:14 129:24
139:16
**maggie's** 90:5
101:24

**main** 1:12 2:3
16:1 41:10 86:4
97:8 115:5
139:16 154:11
**maintained**
22:17,21
**maintenance**
90:23 91:3
**major** 104:1
**making** 43:7
61:17,18 112:22
122:8
**malone** 63:10
**manner** 125:3
**map** 59:21
**marathon** 7:13
**mark** 56:23
119:24 120:8,9
**marked** 5:14,16
20:4,8 29:4,7
34:12,15 36:8,10
37:23,25 43:25
44:2 48:5,7
54:22,25 60:1,4
62:17,19 65:6,8
66:8,10 68:16,18
70:11,13 79:14
86:11,14 89:21
89:23 94:10,13
95:2,4 98:4
99:25 107:4,6,25
108:2 113:10,12
129:20,22
**marshall** 131:3
**mary** 14:6,14,19
16:4 100:10,16
147:17 148:14
148:16

**massing** 97:9
114:6,9,10,16
115:24 116:3
150:10,11,15
**master** 3:6 8:13
10:3,7,8,9,10
12:18,20,22,23
13:19 14:12
17:8,13,15,25
18:13 19:4,6
20:6,19,25 21:3
21:6,19,25 22:19
22:23 23:2,3,7
23:13,15 26:10
26:14,15,25 27:7
27:15,18,20,23
27:24 28:7,13,21
29:2,21 30:2,24
32:6,8,16 33:3
33:21 34:11,24
35:5 37:18 38:9
39:17 40:10,13
40:22 42:18
43:18 44:16,19
44:19 45:9,19,23
46:9,18 47:3,10
49:11 50:9 51:7
52:18 53:7
55:21 57:13,14
57:19,22,24
61:12 62:6 63:3
64:8,11 66:2,4
66:20,24 67:3,14
67:20,21,24 68:2
68:4,5,7,13 71:9
71:19,25 72:8,9
72:12,23 75:21
76:20 77:2,3

78:3,3,10,22
79:5,7 81:2,2,7
82:17 83:5,12,14
83:17,22,23,24
84:2,13,20 85:5
86:10,23 87:6,16
87:19 88:6,10,13
89:2,7 91:6,8,9
91:15,21,25 92:1
92:16 93:8,11,22
94:3,18 95:22
97:8,12,15 98:9
100:25 101:6,22
102:9 103:1,11
103:12,14
105:13,19,24
109:4,11 110:1,8
111:6,7,11,22
112:10,15 113:5
115:11,20 116:2
116:11,24
117:12 118:1,11
119:2 122:3
123:14,20 124:2
124:10,23
125:19,25
127:23 132:16
133:9 135:12,14
136:25 137:6,21
138:5,13,18
139:2,5,11 140:6
140:7,12,23
141:1,14,16,20
143:1 145:19
146:4,7,11,11,18
146:23,25 147:2
147:16 148:1,6
148:11 149:14

150:17 152:3,10
152:14,17
**match** 61:11
114:25
**materials** 8:11
**matt** 18:17 69:23
90:17 117:21
127:21 140:21
145:11,16 146:1
146:2,6,23
**matt's** 147:9
**matthew** 65:12
136:8,10,12,15
136:22 137:12
137:20 138:4,8
138:17
**max** 115:6
**mazzuchelli** 13:5
**mbc** 30:8 32:5
34:25
**mean** 9:1 30:21
37:5 45:13 57:4
72:8 80:18
82:16,19 83:12
84:19 85:8
86:20 90:25
98:11 99:15
106:23 120:11
122:22 125:17
127:24 135:15
149:18
**meaning** 112:18
112:25
**means** 6:5 51:2
**meant** 6:12,13
35:3 53:19,21
71:20,23 72:1
83:6,12 103:4

**mechanism** 91:7
**meet** 26:25 27:7
60:23 83:18,18
83:19 126:9
**meeting** 40:16
41:13 42:18,19
65:20 129:6,10
129:12,15 140:7
140:12
**meetings** 19:2
22:9 40:17,18,23
41:8,14,25 42:14
42:20,21 43:5,13
43:19 123:24
124:20,25 125:5
125:6,15,18
126:13
**members** 124:2
**memorandum**
57:24 58:5,20
100:22 101:3,5
102:12
**mention** 13:18
82:23 86:4
**mentioned** 9:22
9:23 10:7 11:5
13:12 16:9,14
55:20 81:9,18
92:10 102:12
110:25 117:25
124:19 145:11
**mentioning**
138:12
**mentor** 9:8
**merit** 154:4
**met** 22:3,7,11
40:7,24 125:2
126:19

**michael** 4:4
15:25 28:17,19
44:3 49:1 65:10
93:1 96:3,21
98:6 111:17
113:17 114:2,15
115:2,18 116:3
117:10,11
**mid** 13:23
131:11,15
**middle** 6:24
60:23 96:2
112:7 134:13
**middleton** 8:20
132:10
**mike** 53:4 63:10
94:19 97:7
105:17,23 113:4
115:10 128:14
130:8,14 150:11
150:23 151:4,10
**miles** 74:22
**milwaukee**
154:3,20
**mind** 69:24
**minds** 53:14
**mine** 56:15
**minute** 77:10
97:25
**minutes** 50:16
**mischaracterizes**
82:13 116:16
127:5
**misinterpretati...**
69:25 81:9
140:22 141:6,14
**misinterpreted**
142:1

**misinterprets**
141:1,16
**misleading**
153:6
**misstate** 41:20
**misstates** 42:2
141:22 144:1
**misunderstand...**
115:3
**mlu** 101:14,17
**model** 114:10
**models** 114:19
**modification**
142:15
**modifications**
46:6
**modified** 83:7,13
84:20
**modify** 118:1
131:8 138:13
139:7 140:6
**modifying** 23:10
**moment** 70:18
**money** 110:10
**monroe** 74:8
119:17 122:18
123:8 147:19
149:3
**monthly** 40:17
**months** 102:8
**moravec** 15:22
16:9,12
**morning** 5:8
**move** 98:16
100:25
**moved** 11:14,14
147:20

**multi** 11:17
**munson** 66:16
67:13 69:3
118:6 127:25
**mutual** 40:20

**n**

**n** 2:1,13 4:1
**name** 5:9,10
40:24 41:3
50:20,24 87:5
**names** 137:10
**narrative** 35:4
**navigate** 90:16
**necessarily**
32:20 61:14
122:18
**necessary** 23:11
89:9 153:4
**need** 7:14 10:17
22:21 43:23
83:16 102:9,25
103:18 112:21
114:5,10 127:15
131:5 146:25
152:18
**needed** 32:21
40:20 66:20
67:4 85:10
98:15
**needing** 145:18
146:3
**needs** 83:7 110:7
**negotiations**
147:22
**neighbor** 123:13
**neighborhood**
22:8,10,16 42:14

42:15,19 43:8,13
62:7 65:18,20
74:9,10,11,14,21
74:24 79:11
80:1 82:21
83:18 91:22
100:24 102:1,2
118:20 119:16
123:3,8,24 124:6
124:9,13 125:6
137:11 138:14
146:13,19 149:3
**neighborhood's**
22:12
**neighborhoods**
42:19 119:9
140:7
**neighbors** 57:16
57:23,25 74:24
82:24 83:8
91:24 99:21
118:25 119:4
126:14,18
140:13 146:15
147:11,23,25
148:15
**never** 119:11
122:23
**new** 17:6,20
19:12,19,22 35:8
44:19 81:3
90:13 113:21
130:4 147:19
149:22 151:6,11
152:22
**night** 56:22 57:3
57:4,5,6,11,17
59:4,11 99:7,12

99:17 120:5,11
121:17 147:12
**nods** 6:6
**noise** 22:14
**nonuse** 78:18
**notary** 154:5,24
**notation** 20:10
32:4
**notations** 31:12
31:14 56:19,25
**note** 20:9
**noted** 101:25
**notes** 29:14
**november** 3:13
3:15 36:11 38:1
**number** 3:2 4:2
22:14 51:4
52:12 53:9
90:18
**numbered** 51:24
52:1,2 84:23
**numbers** 7:24

**o**

**o** 3:1 5:10 55:16
**oaks** 54:2,11,12
**oath** 5:4
**object** 6:23 12:7
12:9 14:23 16:7
16:18,25 19:8,16
21:4,12 24:10,21
25:2 27:3,16
28:11 29:23
33:23 36:17
38:11 50:11
56:9 101:19
**objection** 7:1
18:4 28:1,18

30:13,19 31:4,5
32:17 33:5
35:18 36:4,23
37:12 38:25
39:12,23 41:1
42:1 43:1 45:4
45:11 46:1,12,22
47:7 48:2,22
49:17 51:17
52:19,23 53:11
54:16 59:5,12
61:20 62:3,10,16
63:18 66:5,14
67:1,17,25 68:15
70:2 71:4,11
72:3,15 73:8,25
75:11 76:3,17,22
77:5 78:5,25
80:2,12 81:25
82:8,12 85:7,24
86:25 89:10
91:17 92:4,6
93:5,12,23 95:17
96:14,19,23
99:13,23 101:7
102:14,22 103:5
103:23 104:6
105:3,10,25
106:11,19
107:15 109:7,21
112:17 115:13
115:21 116:15
117:15 119:6
120:4,25 121:6
121:23 122:4,20
123:10,16
124:15 125:10
125:16 126:6,16

127:4 128:19
129:1,17 130:16
131:16 134:21
135:4 136:18,19
137:23 138:2
139:22 141:4,21
142:17 143:9,17
143:25 144:9,14
144:19,24 145:7
145:21 146:8
147:5 148:7,23
149:6,16 150:4
150:19 152:19
153:5
**objections**   73:16
**observations**
46:11
**observe**   74:6,12
**obtain**   94:7
**obtaining**
134:14
**occur**   22:7,13
25:22
**occurred**   50:10
71:24 110:15
116:20 127:19
**october**   3:11 4:8
34:17 65:12
95:1,9 98:24
**office**   9:7 17:10
154:20
**offices**   154:10
**officials**   138:7
**oh**   9:12 130:25
**okay**   5:11 6:8,13
6:20,21 7:2,3,12
7:16,23 8:1,6,10
8:16 9:17,22

10:23 12:12
13:12 14:5,17
15:11,21 16:2,14
18:19,22 19:6,25
20:6 21:10,21
22:24 23:19,22
24:14 26:21
29:11 31:22
34:7,14,22 35:11
35:24 37:4,17
41:16 43:10
44:7,9 46:8
48:25 50:14
51:1,11 52:5,22
53:18 54:2
55:10 56:24
57:9,19 58:10
60:10 64:7,18
65:2,24 67:10
69:11 70:7,23
71:22 72:19,21
77:9 78:16
79:16 81:6
83:24 84:7,18
85:13 86:13
87:12 89:20
90:25 91:4 92:6
92:14,21 93:10
94:25 95:10
96:18 97:14,22
100:16 101:1,18
101:24 102:10
103:19 104:2,8
104:13,14
107:23 109:2
110:14,16,25
111:18,20 113:4
113:25 116:22

117:4,18 125:2
125:23 128:6
132:15,19,24
134:2 142:21,24
143:13 145:2
148:5
**old**   131:2 147:16
149:22
**once**   6:16 34:8
38:20 91:6
95:24 147:18
**ones**   123:1
**open**   33:11,20
34:2,5 35:24
36:6 37:7,18
38:13 51:8,11,24
52:2,2 53:5,9,14
53:16,20,24
54:19,25 61:13
61:16 63:25
66:3 68:12 79:4
81:19 86:3
87:21,21 88:23
88:24 89:6 99:7
150:6,6 151:12
152:12,13
**openness**   102:7
**operate**   72:24
**opinion**   70:1
117:1,4,6,9,24
123:6 138:21
140:11 145:9,16
146:10
**opposed**   106:8
106:17
**option**   118:9
**orally**   137:20

**order**   17:15,16
19:3 66:21 67:4
117:3 153:24
**ordinance**   3:3
16:24 19:12,20
28:8 75:17
86:21,22 87:1,4
87:8,14 89:14,16
89:17 135:5,8
143:15 144:3
**ordinances**
19:15 143:6
146:22
**original**   4:22,22
4:23 134:18
**originally**   20:24
147:21
**orlando**   10:25
11:13
**outdoor**   144:6
144:12,18,23
145:3,4,18
**outline**   97:22
**outlined**   34:1
**outside**   128:12
**oversight**   69:14
71:15 82:5
**owned**   52:12
54:2 64:4
**owner**   107:12,20
108:14 111:2,13
**owners**   10:21
108:15,19,23
109:13,14,15,20
111:8 148:18
**ownership**
110:19,24

owns 148:21

**p**

p 2:1,1 3:1
p.m. 1:15 95:13
  108:7 153:22
  154:13
page 2:14 3:2
  4:2 7:18 20:14
  20:14 21:22
  23:18,20 25:7,10
  25:12,25,25
  26:14,15 32:3,10
  35:14,15,25 37:3
  37:7 44:6,13
  47:18,18 49:8
  51:9,22 52:3,11
  55:13 56:5,12
  58:4,14,20,23
  59:9 63:22,23,24
  64:2 72:20 76:7
  78:13 84:5,8,10
  84:11,21 87:15
  88:11 95:10,11
  95:18,20 96:3,21
  97:4 99:4 100:4
  107:8 108:10
  111:19 112:6
  113:13,17
  114:14 119:22
  120:15 129:23
  130:3,7 132:15
  134:7,11 135:3
  142:22
pages 21:22
  95:11
pain 115:3

paragraph 26:18
  44:13,14 47:9,18
  47:19 48:13
  49:8 50:1 65:16
  67:7,12 69:8
  72:22 75:3 76:7
  77:21,22 78:17
  81:16,24 84:23
  84:23,25 87:8,14
  87:15,25 88:9
  89:4,18,19 91:4
  102:5 106:3
  111:16,19,21
  112:6,7 118:18
  128:7,8 134:12
  134:24,25
  143:12 150:2,23
  151:3 152:1
parentheses
  114:17
parking 12:16
  12:17 92:19,20
parks 18:18
  135:19,21,22,25
  136:6 137:13
part 12:15 22:19
  42:9,16,20 60:17
  72:2 74:3 82:6
  82:16 91:20
  95:24 100:22
  110:1 112:15
  125:17,20
  126:19 135:17
  135:19 146:11
  147:18,22
  148:17 153:14
participate
  45:14

particular 32:14
parties 154:15
partner 47:22
passed 62:14
patterns 147:20
paul 41:4 96:4,8
  97:11,16 112:21
  113:4
pause 92:5
pdf 97:8
peacefully
  110:12
people 6:15
  55:21 104:18
  106:10,18
  122:25 123:20
percent 12:20
perfect 7:6
performing 13:9
  15:18,23 92:13
  92:14
perimeter
  130:10
period 14:1,19
  104:4 119:13
permissible
  72:25
permit 145:17
  146:3,24 147:4
permits 134:14
permitted 87:22
  143:15 144:5
person 15:16
  16:3 18:25
  32:13,13 33:14
  33:19
personal 50:8
  154:8

personally
  116:23
persons 32:13
pertained
  151:11
peruses 7:25
  26:20 55:3
  62:22 65:23
  67:9 69:10
  70:22 85:2
  87:11
phone 18:25
  51:1 140:4
phrase 64:9
physical 23:17
  52:13 54:6 64:5
  75:5 76:11
  78:15 79:8 91:2
physically 81:3
  118:12
pinckney 2:7
place 21:25
  24:25 60:18
  67:23 87:2,5
  120:19
placed 97:23
plaintiff 1:4 2:5
plan 3:6 8:13
  10:22 12:18,21
  12:23 13:19
  14:12 17:8,13,15
  18:1,13 19:4,6
  20:6,19,25 21:19
  22:1,19,23,25
  23:2,4,7,14,15
  26:10,14,15,25
  27:7,15,18,20,23
  27:24 28:7,22

**[plan - potter13623]**                                                Page 25

29:3,21 30:3,24
32:6,9,16 33:3
33:11,21 34:1,3
34:4,11,24 35:5
35:24 36:6 37:7
37:18,18 38:9,13
39:17 40:11,13
40:22 42:18
43:18 44:16,19
44:20 45:9,15,19
45:23 46:9,18
47:3,10 49:11,16
50:10 51:7,11
52:18 53:7
55:22,25 56:7
57:14,14,20,22
57:24 61:12
62:7 63:3,25
64:8,11 66:2,4
66:20,24 67:4,14
67:21,24 68:2,4
68:5,7,13 71:9
71:19,25 72:8,12
72:12,24 75:21
76:20 77:2,3
78:3,3,10,22
79:4,5,7 81:2,2,7
82:17 83:6,12,14
83:17,22,23,24
84:2,13,20 85:5
85:11,16,19
86:10,23 87:6,16
87:19,22,25 88:4
88:6,10,13 89:2
89:7 91:6,8,9,15
91:21,25 92:1,16
93:8,11,22 94:3
94:18 95:22

97:8,12,15 98:9
100:25 101:6,22
102:9 103:1,11
103:12,14
105:13,19,24
109:5,11 110:1,9
111:6,7,11,22
112:10,16 113:5
113:23 115:12
115:20 116:3,11
116:24 117:12
118:1,11 119:2
122:3 123:14,20
124:2,10,23
125:19,25
127:23 129:3
132:16 133:9
135:12,15
136:25 137:6,21
138:5,13,18
139:2,5,12 140:6
140:7,12,23
141:1,14,17,20
143:1 145:19
146:4,7,11,11,18
146:23,25 147:2
147:17,18 148:1
148:6,11 149:14
150:17 152:3,10
152:14,17
**planned**  41:10
**planner**  18:18
**planning**  10:3,7
10:8,9,10 12:22
18:18 19:14
21:3,7 28:13
37:20 45:17,24
67:21 85:9

107:18 112:8,19
135:19 141:18
**plans**  34:9 41:23
72:9 90:7
**planted**  54:4
**play**  57:11 60:19
81:7
**played**  74:13
120:3 149:3,10
**playing**  74:25
**please**  5:8 12:11
50:23 56:1 64:3
65:16 77:14
87:10 91:5
94:17 97:2
104:12,12
108:15 132:21
134:4,13 136:19
**pli**  31:15,20
**point**  28:9 62:1
111:10 112:20
114:19
**population**
22:14
**portion**  32:16
35:6 37:18 50:9
79:5 85:5 97:12
97:13
**portions**  32:6
116:2
**position**  8:7,24
**possible**  6:3
**potential**  21:15
21:18 22:4,6,12
23:17 34:4,6
46:5 100:24
122:11 130:4
151:6,11

**potentially**
17:10 64:16
83:20 112:24
118:7 129:3
**potte11725**  3:19
**potter**  1:10 2:15
5:2,18,22 7:20
8:6,9,21,24 9:2
9:11,19,24 11:5
11:18 12:3,4
13:21 14:2,25
15:7 16:2,16,21
17:3 29:11,13,13
29:16,19 31:18
34:16 35:15
55:25 56:6
67:21 82:17
92:15 93:15,17
113:14 128:12
130:5,21 131:9
131:14 133:19
134:20
**potter08777**
4:15
**potter10469**
4:12
**potter10471**
4:13
**potter11270**  4:7
**potter11511**  4:9
**potter11523**  3:9
**potter11717**
3:17
**potter12553**
4:14
**potter13623**
4:11

potter8654  3:22
potterlawson.c...
  55:18
practice  12:1
  56:22 57:2
  78:12,14 120:20
practices  52:13
  54:7 60:18 64:5
  75:5,6 76:10
  78:15 144:17
  145:4
preceding  154:6
predated  109:11
predolin  13:3
preliminary
  29:9
preparation
  20:21 67:16
prepare  8:10
prepared  8:4
  45:23 55:25
  56:7 130:5
  133:14,15,19
  134:19
preparing  21:11
  21:25 28:14
  39:16 49:10,15
prerequisite
  18:1 26:11
presentations
  43:7 119:2
presenting
  126:10
presently  57:5
president  15:25
  48:14,20 49:5,24
  100:14

presidents  43:6
  94:3 126:4,9,20
pretend  7:6
previous  42:2
  100:14 129:13
  141:22 144:1
previously  20:4
  29:4 34:12 36:8
  37:23 54:22,24
  60:1,3 62:17,19
  65:6,9 66:8,10
  68:16,18 70:11
  70:13 77:15
  79:14 86:11,13
  89:21,23
primarily
  125:14
primary  15:22
  125:8
principal  8:25
  9:1 14:2,7,20
  16:2,4 41:4
principally
  39:16
printed  95:25
printing  95:21
prior  24:7 57:22
probably  13:8
  16:1 19:1 50:12
  53:2 117:10
  147:17
procedures
  134:13
proceeded
  140:12
proceedings  5:1
process  9:9
  17:14 18:23

19:2,14,19,25
  20:2 21:3,7,24
  22:2 26:11
  28:13,22 34:8,25
  34:25 35:5
  39:21 40:5,12,22
  41:19 42:9
  59:22 66:19
  67:23 74:3
  76:20 77:3
  80:23,25 83:16
  84:5,8,15 85:11
  86:9 90:13,21
  91:11,15 95:24
  110:17 112:16
  117:2,5 118:1
  134:1 135:18
  139:17 141:2,18
  142:2,10,15
  146:14
production
  29:15
profession  67:20
programs  61:1
project  10:12
  13:8 15:1,1,13
  15:20,22 16:10
  16:12 25:21
  45:18,25 46:4
  52:6 84:14
  90:17 91:3
  92:12,25 93:3
  103:9 112:9,20
  134:14
projects  9:4,9,24
  10:5,11 13:3
  14:13 15:7,11
  16:6,14 21:16,18

22:4,6,12 44:22
  46:17 47:10,11
  47:16 77:2
  109:11 111:5,22
  111:23 112:15
  112:21 115:11
  115:14 125:13
  138:24 141:24
  153:11,18
promises  57:9
proper  141:19
properly  70:19
property  10:20
  17:12 72:25
  107:20 141:1,17
proposal  98:22
propose  83:20
  90:7
proposed  33:9
  47:11 86:2,7
  87:20 88:5,20
  89:6,8 111:23
  114:6 116:11
  143:3 152:12
proposing
  112:15
prospectively
  57:6
provide  13:2
  37:22 41:20
  131:7 147:25
provided  46:17
  51:20 79:22
  106:9 129:6
  130:14,18
providing  10:2
  19:21 125:4
  126:22

**public** 19:20
37:15 42:13
154:5,24
**purpose** 26:15
35:1,4 71:9
117:13
**purposes** 20:11
54:21 146:22
**pursue** 46:17
**pursuing** 113:1
**put** 19:4 44:20
50:23 51:7
59:23 63:2 90:9
90:15 100:6
101:22 135:14
146:13 149:18
149:19,23
**puts** 114:17
**putting** 49:20
68:4 72:9
125:19

**q**

**quarters** 35:25
**question** 6:17,20
6:23 7:2,5,9,10
23:3 55:4 56:22
96:13 99:16
103:12 119:24
120:8,9,12
141:11,15
147:16 151:2
**questions** 7:6
77:8 151:15
153:15
**quick** 6:1 38:7

**r**

**r** 2:1 3:1,1 4:1,18
5:10 154:1
**range** 14:16
**ratio** 47:16
**reach** 59:19
**reaching** 117:3
**read** 7:23 17:23
24:5 26:18 27:2
27:24 44:23
45:21 46:19
47:13,23 48:15
52:1,15 54:8
56:19 61:2 64:3
65:16 66:18
67:7 69:9 70:18
73:3 77:25
79:12 81:11,20
82:10 83:10
84:25 85:21,23
87:10 90:5,6,20
91:4 94:17
95:16 96:6 97:2
102:5 111:25
113:20 123:20
130:12 134:3,5
148:4
**reading** 18:13
90:12 107:16
124:9 128:10
**reads** 27:22
**ready** 94:18
**really** 16:13
110:10,23,24
119:13 139:18
149:22
**reason** 44:25
45:2 46:8 47:25

48:19 49:14
73:5 105:22
106:7,15 130:17
145:19 146:5
147:3 151:9
**reasonable**
123:13 153:10
**recall** 9:12,19
18:19,24 19:9
28:24 29:2,9
37:17,21 40:1
42:8,15 43:10,15
51:20 53:1 54:1
55:9,12 56:24
60:6 61:17,21,23
62:25 64:23
65:2,15 69:4
70:16 74:16
80:7 90:3,4 93:7
97:14 98:22
102:19 103:19
103:24,25 104:4
106:23 107:3
111:9 116:4
117:1,2,18,18
119:13 127:19
128:9 129:19
132:8 137:1
138:10,11,12,20
138:21 139:3,20
139:21,24 140:2
147:17 148:4
149:19 151:20
**receive** 145:17
**received** 121:11
**receiving** 90:3
**recess** 50:17
77:11 98:2

116:8
**recognize** 5:17
20:18 29:7,16
34:15 36:11
38:1 39:8 51:9
55:7 56:6,12
61:6 63:6 66:11
89:24 94:12,13
100:2,9 104:18
107:7 108:3
129:23 134:25
**recollect** 42:12
**recollection**
13:21 27:18
28:22 41:18
47:15 48:17
49:4,9,21 50:8
53:4 59:18
63:14 112:3
129:15 131:10
143:14,22
**recommendati...**
19:3
**record** 5:9 6:13
6:15 7:1 12:23
17:23 20:12
50:19,23 85:23
134:5
**recorded** 154:7
**recording** 6:4
**recourse** 142:6
142:14
**recreational**
54:6,13,15 75:16
144:7
**reduced** 154:7
**refer** 20:10
69:13

**reference** 37:4
59:9 62:6,13
86:6 143:23
**referenced**
147:11 151:10
**references** 35:16
36:21 38:4,22
59:2
**referring** 13:15
96:12 107:13
**reflect** 67:13
70:25 71:8
**reflects** 27:6
66:23 70:20
**refresh** 143:14
**regarding** 19:22
115:24 139:14
**regime** 19:13
**register** 111:12
**registered** 11:23
11:24 154:4
**regularly** 40:17
43:4 124:20
**regulations**
12:22
**related** 115:11
125:14 140:3
**relates** 36:6
**relating** 111:11
**relations** 37:15
**relationship**
10:5 13:22
115:15 135:22
135:24 136:10
136:11 137:2
146:12,18
**relative** 154:14
154:16

**relayed** 148:11
**relied** 44:15
**rely** 123:13
**remain** 34:2
53:15 150:6
**remainder** 148:1
**remaining** 47:11
111:22
**remember** 6:9
51:4 59:22 60:9
61:18 62:25
78:12 115:23
116:2 132:12
137:8,10 139:13
140:4 147:13
150:12
**render** 145:16
**renovations** 40:6
40:9
**repeal** 139:5,7
139:11
**repealing** 139:14
**repeat** 6:11 7:9
76:23
**rephrase** 7:11
**replies** 115:2
**reply** 121:11
**replying** 114:1
**reported** 1:16
**reporter** 6:3
50:21 153:24
154:5
**represent** 29:12
30:12 31:25
60:4 89:15
146:1
**representation**
52:7

**representations**
57:10
**representative**
1:10 2:15 5:2,20
28:15 79:23
**representatives**
36:22 39:8
42:12 104:19
124:5,8 139:11
**representing**
19:25 42:17
**represents** 31:17
**request** 27:14
**requested** 41:21
117:24
**requests** 4:19
**required** 17:8
18:14 22:24
23:11 27:7
67:21 72:10,11
**requirement**
18:1 147:25
152:10,13
**requirements**
27:1,8 89:1
**requires** 26:24
107:19
**residence** 29:2
131:5
**residential** 8:19
11:11 24:12
127:2
**residents** 13:6
**resolution**
140:10
**respect** 16:22
30:5 34:24
35:24 37:7

38:13,20 39:5
59:8 148:18
150:14
**respond** 100:17
114:8,24
**responding**
95:23
**response** 6:18,19
60:6,10 90:20
133:3
**responsibilities**
9:6 30:18 51:19
**responsibility**
14:8,21 16:6
30:6,24 32:12
34:25 35:7,21
36:20 38:17,24
39:5 42:17
104:16
**responsible**
32:14,15 33:2,14
33:19 105:8
**rest** 114:20
**restrict** 61:24
69:19 71:20
72:25
**restrictive** 73:14
**restroom** 7:14
**result** 110:16
**resurface** 90:14
90:22
**resurfacing** 90:7
90:23
**retained** 14:25
14:25 15:5,13
16:17 20:24
92:11,15

**retired** 14:14
16:5 139:17
**retires** 14:20
**review** 8:11 9:8
27:19 30:1
32:22 38:7
40:14,20 41:14
41:23 50:6
76:21 77:4
90:15 91:7
94:20 125:5,18
**reviewed** 7:21
49:24
**reviewing** 40:21
45:15
**rezone** 17:11
23:4 66:21 67:4
**rezoned** 18:2
24:19 26:11
**rezoning** 13:19
23:12 24:2,25
25:1,21 26:5
**right** 5:12,13 7:4
7:18 9:15,18
21:22 23:24
26:12 27:8
29:17 31:8 36:6
36:7 37:2 44:11
51:16 56:16
58:3,20 59:1
60:16 63:22
64:2,22 67:5
111:4 114:17
121:24 122:25
123:5 133:2,13
133:19 134:19
135:10,14

**rmr** 1:16
**road** 147:19
148:13
**role** 21:2,11
28:21 30:17
31:2 32:20
37:15 40:1
41:19 48:25
66:23
**roles** 9:5
**rooms** 131:5
**route** 19:11
**row** 8:22 32:14
35:22 38:21
**rude** 6:12
**rules** 6:1
**running** 36:16

**s**

**s** 2:1 3:1,1 4:1,18
4:18 5:10
**s.c.** 1:11 2:2
154:10
**saa** 31:24
**sacred** 1:2
**sacrifice** 76:1
**safe** 90:11
**sarah** 2:6
**saw** 34:19 149:8
**saying** 120:11
**says** 24:1 26:4
26:15 30:5
31:12,14,19,20
32:3,4,4 33:11
34:24,25 38:17
44:15 47:1
48:25 50:1
52:12 54:2

56:16 75:20
77:23 78:17
79:7 80:8 81:6,7
82:4 83:5 88:4
88:13,20,23
95:12 99:7
100:16 101:24
102:24 105:16
106:3 108:13
111:21 112:8
115:2 118:18
119:23 120:5,7
120:10,11 130:8
133:3 134:13
141:13 151:3
**scale** 52:9
**scheduled** 40:17
124:20
**schemmel** 4:5
28:21,25 48:8,13
48:20 55:24
59:20 60:16
121:11 149:9
**schemmel's** 60:6
60:10 61:4,10
**school** 1:2 10:24
10:25 11:8,10,11
13:9,11,16,17
15:8,15,17,19,25
16:17 21:3,5,6
21:16,16,17,17
22:3,4 28:16,23
30:18,22 33:1
35:10,10,10,16
36:21 37:5 39:7
39:21 40:2,3,6
40:8,13,14,15,15
41:10 42:10,11

42:13,25 45:24
47:12 48:14
49:6 50:2 52:13
54:3 56:21
57:11 59:19
60:23 61:6,23
62:5 64:4 65:3
74:7 79:23
82:25 92:11,13
92:20,24 93:19
93:19 96:10
97:16 98:10
99:11,21 108:24
108:25 111:24
112:14 113:22
114:6 115:11
116:10,22 117:7
118:9 124:21,22
125:14,20
127:20,24
128:17 130:9
132:3,4 138:13
139:10,10
148:19,20
150:24 151:4
**school's** 41:19
60:25 97:9
98:23 103:22
**schools** 60:24
93:21 110:10
125:9
**schreiber** 32:1
**science** 13:6
**scott** 63:10 94:15
94:18 100:14
105:17,23
**seal** 154:20

seats  77:8
second  37:3
  41:21 44:6 49:8
  50:1 56:5,12
  65:16 69:8 75:3
  78:16 95:10
  96:2 99:4 107:7
  108:9 113:13,16
  118:18 119:22
  127:12 128:6,8
  130:3 142:22
  150:23 151:3
secondary  144:5
section  33:14,20
  33:25 35:21
  37:22 38:8 51:8
  54:11,18 61:12
  81:19 84:2,3,8
  88:9 89:4,14,18
  95:16 101:6,12
  101:14 138:5,8
  138:17 139:2
  142:22,25 143:3
  143:23 145:6
  151:24 152:2,6
sections  32:21
  58:9 104:21
  105:8,9
see  12:12 26:16
  30:6 31:15
  33:12 35:16
  36:21 37:8,9
  38:14 48:9 49:2
  49:12 50:4 56:3
  56:16 58:24
  59:1,9,13 68:19
  69:14 73:21
  75:7,18,23 76:13

78:20 84:7,12,23
  86:1 88:1,3,7,11
  88:13,16,20,23
  95:5,11,14 96:2
  96:22 98:5
  100:19 101:2,24
  102:3,24 104:14
  105:16,20 106:5
  108:15 112:7,12
  113:17 114:14
  114:22 115:8
  118:18 120:7,21
  123:21 130:7,11
  132:20 133:1
  134:11,15 151:3
seeing  35:8,15
  149:13
seen  44:4,10
  48:11 55:1
  62:21 63:1
  65:13 121:16,16
  147:15,16 148:3
segment  53:1
  83:14
send  40:12,13
  96:21
sense  33:16 50:8
sent  41:13 69:2,4
  94:21 95:24
  98:14
sentence  24:8,18
  26:23 27:6 47:1
  47:19 50:1 75:3
  77:22 78:16
  79:7 80:19 81:6
  81:13,22,23,23
  82:4 83:5 112:7

sentiment
  137:12 149:20
sentiments  70:20
separate  13:17
september  1:14
  95:12 97:7
  102:13 103:10
  103:14,20,21
  114:15 154:12
  154:21
series  7:19 51:23
serrault  35:11
  39:15 55:20
  59:16,18 79:17
  79:22 120:23
  121:19 122:13
  149:9
serrault's  60:7
  60:13
served  5:17
  125:8
services  10:2
set  154:19
seven  131:22
shakes  6:6
share  76:15
  117:6
shared  117:9,11
  117:19 124:2
  128:11,17
shareholder
  8:25 9:1 16:2
shares  148:21
sharing  124:12
show  35:3 114:5
  125:19
showed  22:6
  46:5 86:5

showing  11:19
shown  113:24
  114:9
side  114:17
  115:5 133:2,3,10
  133:13 134:18
  134:19 135:10
sided  20:8
sign  25:11,18,22
signature  23:20
  107:19 154:22
signed  66:12
  68:20 70:14
significant  50:9
significantly
  135:20
signing  70:16
  75:13,20
similar  34:3
  83:17 85:8,19
  86:1
sinsinawa
  109:16,19 111:8
sir  5:17 8:17
  17:25 20:6,17,24
  21:21,24 23:18
  34:15 38:1
  39:14 47:18
  59:15 60:3 61:4
  61:9 62:19
  63:21 64:9,18,24
  65:8 66:1,11
  67:12 70:13
  75:3 141:15
  142:12 143:14
  144:11 145:2,11
  150:10

sister  47:21 63:9
  105:17,22
sisters  109:16,19
  110:19 111:8
site  10:13 34:1
  54:2 56:16,16
  68:3 81:4 99:7
sites  22:20
situation  142:13
six  131:22
sixth  33:10
size  97:10
  114:10
slash  31:13
smoothly  6:2
soccer  60:19
  74:17 121:16
solely  120:19
somebody
  139:18
soon  7:16
sorry  18:7 23:23
  31:7 32:15 33:7
  35:22 42:11
  59:4 65:21,22
  71:6 80:21
  85:21 97:21,22
  103:20 112:6
  115:2 136:20
  152:6
sort  13:17 16:5
  22:5 32:22 68:2
  72:8 82:24
  142:9 149:23
south  2:7
space  22:17
  33:11,11,20 34:2
  34:3,6,6 35:24

36:6 37:7,18
  38:13 51:8,11
  53:5,9,14,15,15
  53:16,24 54:4,5
  54:6,12,13,15,19
  55:25 56:7
  60:21,22,24
  61:14,15,16
  63:25 67:22
  79:4 86:3,3
  87:21,21 88:23
  88:24 150:6,6
  152:12,13
spaces  51:24
  52:2,2 53:20
  54:20 59:20
  66:3 68:12
  81:19 89:6 99:7
  120:18 151:12
speak  126:5
  139:4,9
speaking  12:3
  42:22 53:4 84:3
  126:15 146:21
specific  39:22
  54:19 81:17
specifically
  62:25 69:23
  86:6 104:9
  139:14,15
specificity  73:2
specify  78:18
speculation
  103:6 119:7
  122:21 124:16
  126:17 128:20
  143:18 147:6

spell  5:9
spend  79:9
  118:19
spokesperson
  125:8
sporting  102:8
  102:25 103:22
sports  75:15
  144:7,12,18,23
  145:3,4
ss  35:11 154:2
st  1:16 154:4,24
stadium  75:16
stakeholders
  10:20
stamp  20:14
  25:14 29:12
standing  11:25
standpoint  28:8
stands  35:9
stapled  20:7
start  88:3
started  6:25
  12:14
starting  10:24
starts  44:14
  81:16 107:11
state  5:8 12:1
  42:4 84:20
  154:2,5,25
stated  119:16
statement  46:9
  46:21 48:1
  73:11
statements  45:3
  137:17 140:2
states  1:1 51:19

statute  143:15
stay  122:12
stenographic  6:4
stipulation
  148:5,12
stock  9:3
stories  113:23
storm  22:21
stouder  136:24
  137:3
straightforward
  136:4
strange  41:3
stream  13:4 60:5
  92:11
street  1:12 2:3,7
  122:25 147:19
  154:11
strength  60:25
strictly  80:10
  138:22
strike  24:25
  27:23 31:13
  33:17 35:22
  93:10
string  3:8,18
  4:10
strong  136:15
structures  23:17
stuck  142:14
students  30:14
  30:15
studies  10:4
studying  112:20
subject  117:24
submission
  111:6,11

| | | | |
|---|---|---|---|
| **submissions** 105:18,23 106:9 106:18 113:8 | **sure** 7:3,17 9:16 10:7 12:19 14:11,14 19:18 19:21 24:15 | **t** | **talks** 83:14 143:3 |
| **submit** 27:23 94:19 95:22 107:17 113:4 | 25:3 29:6 31:23 39:3 41:22 43:3 | **t** 3:1 4:1,18 41:4 154:1,1 | **taller** 115:5 **tanner** 2:7 **tasked** 51:14 |
| **submitted** 21:8 25:18 27:13,25 44:8 93:10,11 94:23 103:13 116:11 | 44:6 45:17 50:1 52:20 69:24 74:8 76:24 77:9 84:1 90:13,21 92:7 93:13 | **table** 3:10,11,13 3:15 29:10,25 34:16 36:12,15 38:2 50:7 51:13 58:3 63:15 132:20 133:1 134:9 | **taylor** 37:8,11 37:13,17 38:17 39:15 51:15,20 63:11,15 64:16 104:23 106:4,7 106:15 |
| **submitting** 23:9 111:1 | 95:25 97:23 98:1 105:14 | **tag** 70:14 138:9 138:23 139:1,4 140:3 | **team** 52:13 54:7 60:22 64:5 75:5 76:10 78:14 |
| **subpoena** 4:3 5:17 29:15 | 112:24 113:15 113:21 114:16 115:22 121:21 | **take** 7:14 11:24 14:20 20:17 | **teams** 9:3 **technically** |
| **subsection** 63:24 152:5 | 123:2,19 126:8 126:10 128:13 141:23 143:22 | 24:8,25 25:9 44:13 50:15 | 108:14 146:21 **tell** 7:9 41:20 |
| **subsections** 38:5 | 146:1 | 51:6 52:11 58:9 60:18 70:18 | 62:5,12 68:10,11 73:14 86:15 |
| **substance** 17:19 22:24 | **surrounding** 10:20 | 77:10,14 78:13 86:14 97:24 | 96:4 105:7 109:15 128:13 |
| **substantially** 85:19 | **susan** 35:11 39:15 55:20 | 111:15 120:19 131:7 142:19 | 142:1 |
| **succeeded** 48:25 | 59:15,18,24 | 143:12 | **telling** 61:24 72:13 91:12 |
| **suggest** 105:12 | 60:13 79:17,22 | **taken** 1:11 5:24 50:17 77:11 | **tenure** 50:2 |
| **suite** 1:12 2:3 8:22 154:11 | 120:17,23 149:9 | 98:2 116:8 154:10 | **term** 64:25 **terms** 17:19 |
| **summarize** 21:24 | **suspicions** 52:22 **sustainability** | **talk** 8:4,7,11 9:22 14:18,19 | 22:24 146:22,23 150:17 |
| **summary** 10:23 | 35:8,17 37:2 38:21,21 | 117:16 138:4,7 139:6 | **testified** 5:5 77:18 99:5 |
| **summer** 60:25 | **swap** 100:5 | **talked** 39:6 | 112:2 119:22 |
| **summers** 11:12 | **switch** 77:8 | 51:13 132:12 | 126:25 131:9 |
| **super** 118:4 | **sworn** 5:4 | 139:15 | 134:17 |
| **supervising** 16:12 | **szylstra** 2:9 | **talking** 6:15 | **testifies** 47:9,19 |
| **supervisory** 16:6 | | 147:13 152:21 | 48:13 75:4 |
| **supplied** 128:4 | | | |
| **support** 28:2 | | | |

testify   5:22
   73:19 99:19
   125:23 129:6,9
   129:12
testimony   5:18
   26:9 42:2
   140:25 141:13
   141:16,22
   142:12 144:1
   145:11
text   17:19
thank   24:1 26:4
   34:14 43:24
   51:6 58:16 60:7
   60:13 66:23
   90:19 92:8
   94:23 105:18
   115:7 124:19
   126:24 140:16
   153:21
theater   13:5
thing   86:1
   104:10 107:17
   110:15 142:4
things   7:8 22:22
   40:20 98:12
   113:5 121:21
think   8:7 10:6
   12:12,19 13:1,14
   13:18 22:2,22
   25:6 28:3,24
   31:21 41:2,12
   42:5 45:10 47:4
   69:6 70:4 71:13
   77:9 81:1 84:4,4
   85:18,25 86:9
   91:23 110:8
   112:18 117:8

118:5 122:1,5,6
   122:14 123:11
   125:1 126:9
   127:14,25
   128:21,22
   129:13 135:15
   138:6,11 139:6
   139:16 141:6
   142:8 146:10
   152:20
thinking   85:6
   118:2
third   30:5 31:25
   41:23 95:11
thought   8:14
   45:19 46:10
   85:14,14 90:10
   112:10 122:7
   135:14,17 139:7
thoughts   67:13
three   13:17 21:7
   30:23 33:10
   35:25 40:18,19
   43:5,6 71:6,7
   83:8 93:18,21
   94:4,4,7 110:3
   125:25 126:4,15
tim   18:17 135:19
   135:21,22,25
   136:6 137:13
time   6:15,22 7:4
   12:15,24 14:1,7
   14:13,19 15:1
   16:6 19:20
   21:15 26:10
   45:23 68:4 70:1
   72:22 74:13
   75:13 79:9 83:7

83:13 87:1,5
   101:8 108:6,10
   113:1,2 115:18
   116:5 117:25
   118:2,19 119:13
   120:14 121:9
   122:6 139:18
   149:21,23
times   6:11
title   9:19 25:10
titled   104:15
today   5:12,18,21
   7:4,13 8:3,10
   26:9 44:10
   79:15 131:15
   140:25 141:16
   142:12 149:9,13
today's   20:11
told   72:2 73:13
tomorrow   90:8
top   21:22 60:7
   65:9 95:5 98:5
   100:6 107:7
   108:3
topics   7:19 8:3,8
   32:23
town   129:14
track   29:20 30:2
   60:23 90:8
   100:24 105:11
   133:25
traffic   22:14
   32:2 147:20
transcript   4:22
   4:23 5:1 153:24
trees   54:4
trial   23:8

trigger   91:9,14
triggered   92:1
true   78:22 79:25
   81:13
try   6:2,18 22:11
   23:16 129:3
trying   23:4
   42:12 78:12
   82:22 100:23
   117:1 127:19
   129:4 130:13
   139:13 140:8
   152:20
tucker   18:17
   44:15 65:13
   69:23 90:17
   136:8,10,12,15
   136:22 137:13
   138:4 145:12,16
   146:1,2,6,23
tucker's   65:17
   117:21 127:22
   137:21 138:8,17
   140:22
turn   21:21 23:18
   26:14 72:20
   79:14 83:3
   84:21 87:25
   88:10 95:10
   97:21 98:18
   99:3 104:12
   106:3 108:8
   111:15,18 112:6
   113:13 118:14
   119:20 120:15
   127:11 132:15
   134:7 151:20
   152:1,1,5

turning   108:13
  114:14
two   6:15 11:1,15
  32:23 33:10
  41:14 45:3 58:9
  68:24 94:20
  95:11 96:1
  110:9 113:23
  115:6 132:20
type   10:17 22:16
  78:18,23 91:15
  99:20
types   10:11
  39:22 40:8 43:7
  54:18 83:22
  112:21
typical   142:13
typically   40:22
  123:1

**u**

u   3:1 4:18 5:10
  5:10 41:4 55:16
uh   6:7
uhs   6:7
um   13:13 59:17
  105:21
unaware   123:8
understand   7:5
  7:8,11 21:2
  28:15 40:8 41:9
  41:18 42:21,23
  89:1 94:2 98:8
  108:18 109:18
  110:22 123:14
  124:8,12 126:3
  128:25 130:13

understanding
  5:21 10:15 12:4
  15:24 17:25
  18:9,10 24:20
  25:20 26:10
  27:6,22 30:23
  32:11 44:20
  53:8 54:12 57:7
  57:25 58:5,21
  61:9 64:13,18
  67:3 71:8,25
  72:7 76:15 89:5
  89:17 99:10,16
  100:23 101:3,5
  102:11,12
  104:25 110:16
  113:22 115:10
  118:25 126:24
  127:8,23 136:16
  140:8 144:11
  147:1,2,23
understood   37:4
  41:22 75:14
  76:10 98:15
undertake
  112:19
undertaking
  45:18 112:9
united   1:1
university   8:22
  11:4
unresolved
  100:17,21
update   83:21
updated   17:6
  68:8
updating   66:19
  66:24 84:13

usage   73:20,24
use   7:14 24:3,9
  24:11 26:6
  53:21 57:1
  59:20 60:24
  61:10,11 67:22
  71:1 74:7 75:4
  75:15 77:23
  78:9,18,23 83:25
  86:2,7 87:20
  89:7,8 91:10,15
  97:18 102:8,24
  103:21 116:13
  116:24 117:14
  118:10,20
  119:10 120:18
  120:23 122:15
  127:21 129:4
  132:11 143:4
  145:2,5 149:15
uses   54:20,20
  61:15 64:6,10,14
  66:3 68:3,6,8,12
  69:14,19 70:20
  71:14,20 72:25
  76:1 78:4 79:3,4
  79:10,18 80:1,6
  80:9,23 81:17
  82:5,7,19,23
  83:2,22 86:3
  87:21 88:17,21
  88:24 89:6
  130:8 143:7,16
  143:20,20,23
  144:5 150:24
  151:4,9,10,21
  152:7,9,13,18,24
  153:1

**v**

v   3:1
vague   64:25
  86:25 93:12
  101:7 105:3
  115:13 130:16
  131:16 136:18
vandewalle
  118:6 128:18
variance   142:7
variety   19:1
various   148:22
varsity   60:21
vein   140:6
verbally   6:9
verify   59:20
  120:18,23
  121:19 122:13
  134:8
version   34:19
  36:1,12 38:2
  56:10 89:16
  95:21 128:2
versus   31:20
  54:11 91:2
  123:21 141:9
  143:20
vicky   1:16 154:4
  154:24
viewed   126:14
views   139:1
vilas   137:10
visual   13:4
voluntary   19:7
  127:8
vs   1:5

**[w - wrote]** Page 35

| w | | | |
|---|---|---|---|
| **w**  4:1 | **wisconsin**  1:1,6 | 104:9 105:5,11 | 141:24 153:11 |
| **wait**  101:15 | 1:13 2:3,8 8:20 | 106:1,12,20,22 | **worked**  9:12 |
| **want**  6:23 28:8 | 8:23 12:1 154:2 | 107:16 109:23 | 11:11,12,15,16 |
| 62:6,14 77:8 | 154:6,11,20,25 | 112:18 115:15 | 13:1,18 39:16 |
| 90:19 97:24 | **witness**  2:14 5:3 | 115:22 116:17 | 55:21 111:5 |
| 113:21 115:3 | 7:25 8:1 12:8 | 117:16 119:8 | 131:14 138:23 |
| 120:13 132:5 | 16:19 17:1 19:9 | 120:5 121:2,8,24 | **working**  12:4 |
| 153:18 | 19:18 21:5,14 | 122:5,22 123:11 | 13:22 16:9 24:2 |
| **wanted**  12:16,17 | 24:11,23 25:3 | 123:18 124:17 | 26:4 29:1 37:17 |
| 20:6 21:18 32:7 | 26:20,21 27:4,17 | 125:11,17 126:8 | 39:21 40:4 53:7 |
| 32:8,22 59:23 | 28:2,19 30:14,21 | 126:18 127:6 | 53:23 80:25 |
| 98:25 99:11 | 32:19 36:18,25 | 128:21 129:2,19 | 86:23 87:6 |
| 110:5 115:10 | 37:13 39:1,24 | 130:17 134:22 | 95:23 96:10 |
| 117:22 129:5 | 41:2 43:3 45:6 | 135:5 136:20 | 103:9,13 107:11 |
| 138:15 148:2 | 45:13 46:3,14,24 | 137:25 139:24 | 109:4,11 118:5,6 |
| **washburn**  54:5 | 48:4,23 49:19 | 141:5,23 143:10 | 135:22,24 137:2 |
| **water**  22:21 | 50:12 51:18 | 143:19 144:15 | 152:16 |
| **way**  15:11 35:25 | 52:20,24 53:13 | 144:20,25 145:9 | **worries**  132:22 |
| 69:18,21 74:22 | 54:17 55:3,4 | 145:23 146:10 | **write**  25:25 |
| 105:11,14 | 56:10 58:17 | 147:8 148:25 | 32:21 35:4,5 |
| 106:24 110:12 | 59:6,13 61:21 | 149:17 150:5,20 | 53:1 83:1 |
| 119:11 122:12 | 62:22 63:19 | 152:20 153:7 | 127:22,25 |
| 133:22 141:25 | 65:23,24 66:7 | 154:19 | **writes**  47:9 49:9 |
| **we've**  20:6 95:22 | 67:9,10,18 68:2 | **wmc**  1:5 | 55:24 76:7 |
| 119:11 | 69:10,11 70:4,22 | **wondering** | 114:15 120:17 |
| **wednesday** | 70:23 71:12 | 131:6 | **writing**  82:17,20 |
| 65:20 | 72:4 73:10,17 | **word**  9:23,23 | 83:17 154:7 |
| **week**  94:20 | 74:1 76:5,23 | **words**  47:1 | **written**  18:11 |
| **went**  10:25 11:1 | 77:6 78:7 79:2 | **work**  11:17 | 32:9 49:23 |
| 17:14 22:8 | 80:3,14 82:1,14 | 14:11 16:22 | 85:18 106:23 |
| 34:11 40:15 | 84:12 85:2,3,8 | 29:20 37:19,20 | 107:2 |
| 64:19 84:14 | 85:25 87:11,12 | 83:21 92:11,15 | **wrong**  7:10 |
| **west**  74:22 | 89:13,20 92:7 | 105:12 131:10 | **wrote**  23:22,23 |
| **western**  1:1 | 93:7,13,25 95:18 | 131:23 132:4,5 | 52:24 60:17 |
| **whereof**  154:19 | 96:25 98:1 | 132:14,14 | 67:12 85:14,16 |
| **willing**  76:1 | 99:15,24 100:5 | 135:18 136:6,8 | 95:14 106:8,16 |
| | 101:9,21 102:16 | 136:24 137:5,5,8 | 117:23 |
| | 103:2,7,24 104:7 | 138:13,14 | |

**[x - zylstra]**                                          Page 36

| x | zylstra   2:6 77:9 |
|---|---|
| **x**   2:13 3:1 4:1 | 100:5 |

| y |
|---|
| **y**   3:1 4:1 |
| **yeah**   10:6 24:15 |
|     41:15 55:7 |
|     80:14 84:12 |
|     93:13 99:15 |
|     101:11 112:18 |
|     116:7 122:22 |
|     132:3,3 151:3 |
| **year**   11:16 137:9 |
| **years**   9:12,13 |
|     11:1,3,6,15,25 |
|     131:21,22 |
| **younger**   9:8 |
| **yup**   37:3 59:17 |
|     80:7 82:11,14 |
|     83:4 120:9,16,22 |
|     130:13 |

| z |
|---|
| **zoned**   24:9 26:24 |
|     75:14 127:1,1 |
| **zoning**   3:3 12:21 |
|     12:23 16:23 |
|     17:5,6,6,11,12 |
|     17:16,21 18:11 |
|     18:17 19:19,22 |
|     23:5 24:4,7,12 |
|     24:19 25:11 |
|     26:6 27:1,8 |
|     66:22 69:23 |
|     75:16 86:18,20 |
|     86:21 89:14 |
|     111:1 127:9 |
|     129:16 135:5,8 |
|     136:16 153:13 |

Wisconsin Rules of Civil Procedure

Chapter 804, Depositions and Discovery

Section 804.05

(6) Submission to Deponent; Changes; Signing.
If requested by the deponent or any party, when the
testimony is fully transcribed the deposition shall
be submitted to the deponent for examination and
shall be read to or by the deponent. Any changes in
form or substance which the deponent desires to
make shall be entered upon the deposition by the
officer with a statement of the reasons given by
the deponent for making them. The deposition shall
then be signed by the deponent, unless the parties
by stipulation waive the signing or the witness is
ill or cannot be found or refuses to sign. If the
deposition is not signed by the deponent within 30
days after its submission to the deponent, the
officer shall sign it and state on the record the
fact of the waiver or of the illness or absence of
the deponent or the fact of the refusal or failure
to sign together with the reason, if any, given
therefor; and the deposition may then be used as
fully as though signed unless on a motion to
suppress under s. 804.07 (3) (d) the court holds

that the reasons given for the refusal or failure
to sign require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
         COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.