**In The Matter Of:**

*Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.*

---

*Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022*

---



Excellence In Court Reporting

*Original File Balistreri-Clark Maggie 8-22-22.txt*
*Min-U-Script® with Word Index*

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 3

```
             UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WISCONSIN
──────────────────────────────────────────

EDGEWOOD HIGH SCHOOL OF THE
SACRED HEART, INC.,

            Plaintiff,

     -vs-                      Case No. 21-cv-00118

CITY OF MADISON, WISCONSIN, et al.,

            Defendants.
──────────────────────────────────────────


     Deposition of MARGARET "MAGGIE" ROSE BALISTRERI-

CLARKE, taken at the instance of the Defendants, under

and pursuant to Section 804.05 of the Wisconsin Statutes,

before Peggy S. Christensen, RPR, CRR, a Notary Public in

and for the State of Wisconsin, at Boardman & Clark LLP,

One South Pinckney Street, Suite 401, Madison, Wisconsin,

on August 22, 2022, commencing at 9:09 a.m. and concluding

at 3:58 p.m.
```

**I N D E X**

| Examination: | Page |
|---|---|
| By Ms. Zylstra | 7 |
| By Mr. Ingrisano | 169 |
| By Ms. Zylstra | 248 |

| Exhibits Identified: | | Page |
|---|---|---|
| 131 | Handwritten notes | 40 |
| 132 | Focus Paper Summary from the Dudgeon-Monroe Neighborhood Association, President: Sherwood Malamud, DRAFT, April 19, 2013 | 41 |
| 133 | 11/1/2013 Email from Maggie Balistreri-Clarke to Ed Taylor and Doug Hursh, with attachments | 48 |
| 134 | Edgewood Presidents/Tenants in Common Meeting, September 9, 2013 | 54 |
| 135 | 6/21/2013 Email from Maggie Balistreri-Clarke to the three Edgewood presidents and the 7/8/2013 response from Michael Elliott | 56 |
| 136 | April 2013 Email String, Re: DMNA Focus Paper, with attached paper | 65 |
| 137 | November 2013 Emails between Maggie Balistreri-Clarke and Michael Guns, Subject: 2013 11 12 east campus checklist draft MBC DH | 65 |
| 138 | November 2013 Email string between Maggie Balistreri-Clarke and Doug Hursh, Subject: 2013 11 18 east campus checklist draft, and Emails between Maggie Balistreri-Clarke, Doug Poland, Michael Guns, Tom Turnquist, and Jonathan Standridge | 74 |

Page 2

```
             A P P E A R A N C E S

GODFREY & KAHN, S.C., by
  MR. JONATHAN INGRISANO,
  833 East Michigan Street, Suite 1800,
  Milwaukee, Wisconsin 53202,
        appeared on behalf of the Plaintiff.


BOARDMAN & CLARK LLP, by
  MS. SARAH A. ZYLSTRA and MR. TANNER G. JEAN-LOUIS,
  One South Pinckney Street, Suite 410,
  Madison, Wisconsin 53701,
        appeared on behalf of the Defendants.


Also Present:      Leigha Vilen, Law Clark,
                   Boardman & Clark LLP
```

Page 4

| 139 | 11/18/2013 Email exchange between Michael Guns, Maggie Balistreri-Clarke, and Doug Hursh, Subject: DMNA feedback | 75 |
|---|---|---|
| 140 | 8/12/2013 Email from Maggie Balistreri-Clarke to the three Edgewood presidents, Subject: New Agreements section August 12, 2013, with attachment | 80 |
| 141 | September 2013 Emails between Maggie Balistreri-Clarke, Mike Elliott, Doug Hursh, Andrew Laufenberg, Michael Guns, and Sue Ellingson, Subject: Updates | 82 |
| 142 | 10/25/2013 Email from Maggie Balistreri-Clarke to the three Edgewood presidents, Subject: Master Plan information needed | 88 |
| 143 | 11/13/2013 Email from Maggie Balistreri-Clarke to the three Edgewood presidents, Subject: Nov 12 graphic and building uses, with 11/13/2013 Response from Elliott | 88 |
| 144 | 11/4/2013 Email from Maggie Balistreri-Clarke to the three Edgewood presidents, Subject: Master Plan docs for Board | 91 |
| 145 | January 2014 Email string, Subject: Project: Edgewood College-Master Plan Update-2012.11- File Transfer - Master Plan Document | 92 |
| 146 | January 2014 Email string, Subject: Project Edgewood College-Master Plan Update-2012 11 - File Transfer - Master Plan Document | 95 |
| 147 | January 2014 Email String, Subject: DMNA Resolution | 101 |
| 148 | 3/20/2014 Emails, Subject: Staff report-Edgewood Campus Master Plan | 105 |
| 149 | October 2014 Emails between Mike Elliott and Maggie Balistreri-Clarke, Subject: Master Plan Document? | 109 |

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 5

| | | |
|---|---|---|
| 1 | 150 | September and October 2014 Email string, Subject: Announcement and other news | 111 |
| 3 | 151 | September and October 2014 Email string, Subject: Announcement and other news | 113 |
| 4 | 152 | October 2014 Email string between Mike Elliott and Maggie Balistreri-Clarke, Subject: Master Plan document? | 126 |
| 6 | 153 | 10/20/2014 Email exchange between Maggie Balistreri-Clarke and Doug Hursh, Subject: Mike Elliott update | 128 |
| 8 | 154 | October 2014 Email string between Maggie Balistreri-Clark and Tim Parks and Matthew Tucker, Subject: Process question, and 11/4/2014 and 11/4/2014 Email exchange between Mike Elliott and Maggie Balistreri-Clarke, Subject: Resurfacing the football field | 133 |
| 12 | 155 | 5/11/2015 Email exchange between Maggie Balistreri-Clarke and Tim Parks and Matthew Tucker, Subject: Approval process - not in master plan | 142 |
| 14 | 156 | Edgewood Neighborhood Liaison Committee Meeting Minutes of April 14, 2015 | 144 |
| 16 | 157 | November 2013 Email String, Subject 2013 11 18 east campus checklist draft, with attached Edgewood Campus Master Plan Liaison Committee Meeting November 19, 2013, PowerPoint Presentation | 149 |
| 19 | 158 | December 2018 Email exchange between Maggie Balistreri-Clarke and Susan VanderSanden, Subject: Inquiry for Assistance from the High School, with email forwarded to Mike Elliott | 162 |
| 22 | 159 | Edgewood Campus Master Plan Table of Contents dated June 13, 2013 | 204 |
| 24 | 160 | Edgewood Campus Master Plan Table of Contents dated October 17, 2013 | 211 |

Page 6

| | | |
|---|---|---|
| 1 | 161 | Edgewood Campus Master Plan Table of Contents dated November 12, 2013 | 212 |
| 3 | 162 | Edgewood Campus Master Plan Table of Contents dated November 19, 2013 | 214 |
| 4 | 163 | 2/19/2013 Email from Susan Serrault to Judd Schemmel and Doug Hursh, Subject: Green Space Plan - Master Plan with attached Green Space Drawing | 221 |
| 7 | 164 | 2/19/2013 Email string between Susan Serrault, Judd Schemmel, and Doug Hursh, Subject: Green Space Plan - Master Plan | 223 |
| 9 | 165 | 1/2/2019 Letter to Brian Munson from Douglas Hursh | 235 |
| 10 | 166 | 1/4/2019 letter to Brian Munson from Douglas Hursh | 238 |
| 12 | 167 | 1/6/2020 Letter to Alder Tag Evers from Douglas Hursh | 240 |

(The original exhibits were attached to the original transcript and PDFs were provided to counsel)

(The original transcript was filed with Attorney Sarah A. Zylstra)

Page 7

1      MARGARET "MAGGIE" ROSE BALISTRERI-
2   CLARKE, called as a witness, being first duly
3   sworn, testified on oath as follows:

4

5                    EXAMINATION
6   By Ms. Zylstra:
7   Q   Could you state your name for the court reporter,
8      please.
9   A   Sure.  Margaret Rose Balistreri-Clarke.
10  Q   And, Ms. Balistreri-Clarke, your residential
11     address, please?
12  A   10 Farmington Court, Madison, Wisconsin 53717.
13  Q   And, Ms. Balistreri-Clarke, have you ever given a
14     deposition or testified at trial before?
15  A   I have.
16  Q   Okay.  Can you tell me just a little bit about
17     that?
18  A   I was the dean of students at Cardinal Stritch
19     College, and we had cleaned out some lockers in
20     the summer and found forged immigration documents
21     and we turned them over to immigration.  And then
22     I was a witness as to how we found them and why we
23     believed them to be forged.
24  Q   Any other instances in which you've been deposed
25     or testified at trial?

Page 8

1   A   No.  Mostly I've been a juror.
2   Q   Okay.  Well, because that's likely been some time
3      since you've been deposed.
4   A   Yes.
5   Q   I'll go over some rules that will help make this
6      process a little easier.
7   A   Okay.
8   Q   So this is a deposition where I get to ask you
9      some questions and get your answers.  Because we
10     have a court reporter who is trying to take down
11     both my questions and your answers, it would help
12     her greatly if we don't talk over each other.
13  A   Okay.
14  Q   So I will try and wait until you're completely
15     done with your answer before I start my next
16     question, and if you could try and wait until I'm
17     done completely with asking my question before
18     answering, it would help.  Okay?
19  A   Good practice.
20  Q   Also, because we have a court reporter taking down
21     the questions and the answers, all of your answers
22     must be verbal.
23  A   Okay.
24  Q   So if you nod your head, I might prompt you to
25     give a verbal response for her benefit.  Okay?

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 9

1  A  Yes.
2  Q  I'm sure I'm going to ask some questions today
3     that either are confusing, don't make sense, or
4     you were simply thinking about the last question
5     and didn't hear it.  That's okay.  Just tell me
6     that you want me to repeat my question or you
7     don't understand the question.  I'll be happy to
8     clarify or repeat any question you want.  Okay?
9  A  That's fine.
10 Q  All right.  Otherwise, if you answer my question,
11    I'm going to assume that you understood it and are
12    being responsive to that question.
13 A  Okay.
14 Q  And then if you need a break for any reason today,
15    you want to use the restroom, get up, walk around,
16    it's not a problem.  Just let me know when you
17    need a break.
18 A  Okay.
19 Q  All right.  Can you give me a brief description of
20    your education background, where you went to
21    school?
22 A  My undergraduate is from Stevens Point in
23    psychology and sociology.  My master's degree is
24    from Indiana University, counseling and student
25    personnel administration.  I then received a first

Page 10

1     degree in French language from the University of
2     Sorbonne in Paris.  I then received a Ph.D. from
3     the University of Wisconsin in Madison in
4     educational administration.
5  Q  Okay.  With regard to your undergraduate at
6     Stevens Point, was that at UW-Stevens Point?
7  A  UW-Stevens Point.
8  Q  And when did you get your Ph.D.?
9  A  My degree was granted in 1996.
10 Q  Okay.  Can you provide me -- Well, strike that.
11    At some point in time you worked for Edgewood
12    College; correct?
13 A  Yes.
14 Q  Can you give me your employment history with
15    Edgewood?
16 A  Yes.  I began there as the dean of students in
17    August of 1994.  During that time I was -- the
18    title of vice president for student development
19    was added.  I always retained the title of -- so
20    it was vice president for student development/
21    dean of students was my title.  And I retired on
22    June 30 of 2017.
23 Q  Okay.
24 A  No, wait.  I'm sorry.  2016.
25 Q  Okay.  So as I understood you, you held the same

Page 11

1     title during the entire twenty years that you
2     worked for --
3  A  It was 21 years.
4  Q  Okay.
5  A  I held the same position, and the title was
6     expanded from dean of students to vice president
7     for student development/dean of students.
8  Q  Okay.  Understood.  And prior to Edgewood College,
9     did you work for Cardinal Stritch?
10 A  I did.
11 Q  Okay.  And what was the year span that you worked
12    at Cardinal Stritch?
13 A  I started there in I believe it was August of
14    1981, and I left at the end of July, July 31, in
15    1991.
16 Q  Did you ever work for Edgewood High School?
17 A  No.
18 Q  Have you ever served on the board of Edgewood High
19    School?
20 A  No.
21 Q  With respect to working for Edgewood College --
22    Strike that.
23    With respect to the three Edgewood schools,
24    the campus school, the high school, and the
25    Edgewood College, for a period of time did they

Page 12

1     operate under the same corporate entity?
2            MR. INGRISANO:  Objection.  Form.
3       Foundation.
4  A  The corporate -- The Sinsinawa Dominicans owned
5     the land, and I cannot recall the Edgewood, Inc.,
6     structure at this time because in my 21 years
7     things shifted.
8  Q  Okay.
9  A  And so I never, ever considered myself to be an
10    employee of Edgewood High School but that there
11    might have been a governing entity.  I am unaware
12    of exactly that governing structure.  I can tell
13    you the Sinsinawa Dominicans all owned the land.
14 Q  At what point in time did they own it?
15           MR. INGRISANO:  Objection.
16      Foundation.
17 A  I think it was gifted to them by Governor Washburn
18    in 1880.
19 Q  And through when did they own the land, if
20    you know?
21 A  I believe they still own the land.
22 Q  And why do you believe that?
23 A  Because I haven't heard that they've sold the
24    land.
25 Q  Okay.  When you refer to the corporate governance

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 13

1  structure, do you know whether or not you were
2  paid through that corporate governance structure?
3         MR. INGRISANO: Objection. Form.
4  A  I believe I was never paid through that structure.
5     I was always Edgewood College. I was an Edgewood
6     College employee. I was always paid through
7     Edgewood College. All of my checks were signed by
8     Edgewood College.
9  Q  Okay. You're aware, are you not, that there was
10    an Edgewood Campus Master Plan that was submitted
11    to the City of Madison in January of 2014?
12 A  2014, was that the date?
13 Q  Correct.
14 A  Okay.
15 Q  I can show you a document and verify. Do you
16    recall roughly around that time period?
17         MR. INGRISANO: Objection. Form,
18      foundation.
19 A  I guess I thought -- yes. 2014.
20 Q  Prior to 2014 do you know whether the Edgewood
21    schools had a master plan back in the 1996/1997
22    time period?
23         MR. INGRISANO: Objection. Form,
24      foundation.
25 A  The 1996/97 master plan was the plan that created

Page 14

1  the entrance from Monroe through -- from Monroe
2  Street all the way through the campus on past the
3  college onto the campus school. So it was a
4  central entrance off Monroe, and it also allowed
5  for some buildings. I believe the science center
6  was granted permission, conditional use, through
7  that master plan.
8  Q  And with respect to that 1996/1997 master plan,
9     was that presented to the City of Madison Plan
10    Commission as a conditional use approval?
11         MR. INGRISANO: Objection. Form,
12      foundation.
13 A  I was not involved in that process.
14 Q  Okay.
15 A  I read it in the history of the master plan, but
16    I have no firsthand knowledge of that.
17 Q  Okay. Ms. Balistreri-Clarke, I'm showing you a
18    document that's entitled Dudgeon-Monroe
19    Neighborhood Association, Inc., Council Minutes,
20    August 14, 1996. If you could turn to page 2 of
21    this document, there is a heading Edgewood
22    Resolution. Can you see that?
23 A  Yes.
24 Q  Could you please read those paragraphs to
25    yourself.

Page 15

1  A  Do you want me to read the whole thing or just the
2     resolution?
3  Q  Just the paragraphs that are headed Edgewood
4     Resolution, those four or five paragraphs.
5  A  Okay.
6  Q  And I'm going to have you just turn the page to,
7     two more pages there is a heading called
8     Resolution about Edgewood College. Do you see
9     that?
10 A  It says Resolution about Edgewood.
11 Q  Thank you for the correction. Resolution about
12    Edgewood. Do you see that?
13 A  Uh-huh.
14         COURT REPORTER: I do need you to
15      answer yes or no.
16 Q  Can you read the Resolution about Edgewood that's
17    on that page?
18 A  "Whereas, the deed" --
19 Q  Oh, to yourself. Sorry.
20 A  Sorry. Yes.
21 Q  Okay. One last thing, and then I'll ask you some
22    questions.
23 A  Sure.
24 Q  Turning the page, there is an Advisory Votes on
25    Revised Conditional Use Plan at the top.

Page 16

1  A  Uh-huh.
2  Q  Correct? And, Ms. Balistreri-Clarke, the court
3     reporter has trouble with uh-huh.
4  A  Oh, I'm sorry.
5  Q  Because she's uncertain whether that's a yes or a
6     no.
7  A  Yeah. No, yeah, okay. No joking. Okay.
8  Q  That's okay. So that was a yes, you can see that?
9  A  Yes. Yes.
10 Q  Then there are numbers 1 through 11 on this page,
11    and if you could look at numbers 9 and 10 there
12    and read those to yourself.
13 A  Yes.
14 Q  Okay. With respect to this document, it's
15    referring to discussions regarding landscaping for
16    the practice field. Do you recall any
17    discussions -- Strike that.
18      Do you recall neighbors in the 1990s
19    expressing their desire to be involved as to the
20    landscaping for the practice field?
21         MR. INGRISANO: Objection to form
22      and foundation of this document. You haven't
23      established that she's ever even seen this
24      document before.
25 Q  I'm not expecting --

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 17

1 　　　　MR. INGRISANO: And you're
2 　refreshing recollection. You're attempting
3 　to refresh recollection of the witness before
4 　you've even asked her if she recalls the
5 　substance of these alleged meetings, so I'll
6 　object to this line of questioning.
7 Q 　And, Ms. Balistreri-Clarke, you can answer.
8 　　　　Do you recall in the 1990s neighbors
9 　expressing desire to be involved in the decisions
10 　as to the landscaping for the practice field?
11 　　　　MR. INGRISANO: Objection. Form,
12 　　foundation.
13 A 　Now, are you asking about before my involvement?
14 Q 　Well, I'm asking, regardless of whether you were
15 　involved, when you were involved, do you recall
16 　any discussions with respect to the neighbors
17 　wanting to be involved in landscaping in the
18 　1990s?
19 　　　　MR. INGRISANO: Objection. Form.
20 A 　If the question is in the '90s do I recall
21 　neighbor concern about involvement in the
22 　landscaping?
23 Q 　Correct.
24 A 　Of the campus?
25 Q 　Correct.

Page 18

1 A 　Yes.
2 Q 　Okay. What do you recall as to that?
3 A 　The landscaping of the entire campus was a concern.
4 Q 　Okay.
5 A 　We talked about landscaping a lot.
6 Q 　And can you tell me how -- or what the
7 　circumstances were of those discussions generally?
8 　That is, did they occur at meetings? Did they
9 　occur -- you know, did you get phone calls from
10 　neighbors with complaints? How is it that those
11 　concerns were generally expressed?
12 　　　　MR. INGRISANO: Objection. Form,
13 　　foundation.
14 A 　I became involved with the Neighborhood Liaison
15 　Committee, I believe that was 1997 when that
16 　committee was established. In this document it's
17 　called the working group. The title of that group
18 　was the Edgewood Neighborhood Liaison Committee.
19 　And when that group was established in this
20 　document, I was then appointed as the college's
21 　representative.
22 Q 　Okay.
23 A 　And I went to probably just about every single
24 　meeting until I left. And landscaping was --
25 　where two or more neighbors met, landscaping was

Page 19

1 　an issue because their dogs were still permitted
2 　on one campus and then -- the landscaping around
3 　every single part of that 55 acres was of concern.
4 Q 　There is reference in this document, which I'm not
5 　asking you -- it does not appear you were at this
6 　meeting, but there is reference in this document
7 　to a vote of the neighborhood association
8 　regarding whether or not they would support lights
9 　and a public address sound system and new
10 　bleachers.
11 　　　　Separate from this document, are you aware of
12 　those discussions occurring with the neighbors and
13 　the Edgewood schools in the 1990s?
14 A 　Yes.
15 　　　　MR. INGRISANO: Objection. Form,
16 　　foundation.
17 Q 　How are you aware of that?
18 A 　At the liaison committees that I became involved
19 　in starting in '97, neighbors would talk about
20 　their concerns for every corner of the campus.
21 Q 　Okay.
22 A 　And lights, bleachers, landscaping for that
23 　quadrant. Lights. So every quadrant had lights,
24 　noise, landscaping issues. Every quadrant.
25 Q 　Did any of the neighbors at any point discuss with

Page 20

1 　you the conditional use votes that had taken place
2 　prior to your time of joining the Edgewood
3 　Neighborhood Liaison Committee?
4 A 　I'm not clear on the question.
5 Q 　Fair enough. Well, this document reflects at
6 　least that there was some sort of vote of the
7 　neighborhood association.
8 A 　Okay.
9 Q 　Did you become aware at any point in time during
10 　your role on the Edgewood Neighborhood Liaison
11 　Committee that there was a vote in '96 related to
12 　lights and bleachers?
13 　　　　MR. INGRISANO: Objection. Form.
14 A 　I don't believe so.
15 Q 　Okay. Fair. Separate from this document, were
16 　you aware of the Edgewood schools seeking the
17 　neighborhood association's support for a
18 　conditional use that would allow Edgewood High
19 　School to put up lights and install a sound system
20 　back in '96?
21 A 　I don't know of that.
22 Q 　Okay. Are you aware of the City of Madison
23 　rewriting its zoning code in the 2012/2013 time
24 　period?
25 A 　Yes.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 21

1 Q   Okay.  And were you involved in any way in that?
2 A   No.
3 Q   Okay.  Were you involved in any discussions or
4     meetings regarding the changes in the ordinance as
5     it related to Edgewood's campus?
6 A   I know it was our responsibility to find out what
7     we needed to do.  I don't remember specific
8     meetings.  I don't remember how I learned that now
9     we needed a master plan.  I do believe that we
10    were now required to have a master plan to move
11    forward.
12         We had gotten a conditional use permit to
13    build our science center through this process, and
14    now the zoning code changed so that the campus
15    needed to have a master plan before anyone could
16    make any other changes.
17 Q   Okay.
18 A   How I learned of that, I have -- it was a long
19    process.
20 Q   Okay.
21 A   So --
22 Q   And with respect to current institutions -- or
23    strike that.
24         Did you know that the master plan was
25    voluntary?  That is that Edgewood had a right to

Page 22

1     choose to either do a master plan or not?
2 A   My understanding was that if we wanted to build
3     anything, we had to have a master plan.
4 Q   Okay.  And where is that -- where did you get that
5     understanding, if you know?
6 A   That was the interpretation of the code.
7 Q   Okay.  That you reviewed?
8         MR. INGRISANO:  Objection.  Form.
9 A   How I got my information, I don't remember.
10 Q   Okay.  Do you know whether -- or were you involved
11    in any discussions about whether Edgewood was in
12    favor of the changes to the zoning code?
13        MR. INGRISANO:  Objection.  Form.
14        Vague as to Edgewood.
15 A   The change in the code went from a simple process
16    to a very complicated process.  I remember general
17    discussions about the difficulty of going from a
18    simple process to a complicated process.  But
19    maybe I'm not understanding your question.
20 Q   And that's fair.  Let me ask you, when you say it
21    went from a simple process, what was your
22    understanding of what the process was prior to the
23    change in the code for what Edgewood needed to do
24    for any change in its buildings or grounds?
25        MR. INGRISANO:  Objection.  Form.

Page 23

1         Foundation.
2 A   For any change, you submitted a conditional use
3     permit.  And it was for a discrete project.
4 Q   Okay.
5 A   And we were no longer allowed to go on a project-
6     by-project process.  We now had -- we had to start
7     with a master plan.
8 Q   With respect to the conditional use process that
9     you just referred to, when Edgewood submitted a
10    request for conditional use approval prior to the
11    change in zoning, were the neighborhood
12    associations active in monitoring Edgewood's
13    activities with respect to conditional use?
14        MR. INGRISANO:  Objection.  Form.
15        Vague as to Edgewood.
16 A   Yes.
17 Q   Is it true at the time that you were at Edgewood
18    College, when you first started, that was when
19    there was a corporate structure that was overall
20    three organizations, Edgewood College, Edgewood
21    High School, and Edgewood Campus School; correct?
22        MR. INGRISANO:  Objection.  Form.
23        Foundation.
24 A   I don't know.  I think it might -- if I may
25    clarify?

Page 24

1 Q   Sure.
2 A   I started in '94.  I was the dean of students.
3     I was aware of a process going on because we all
4     wanted this entryway.  I have no idea the legal
5     structure at that point.
6 Q   Got it.
7 A   When I became involved in 1997 as the Edgewood --
8     I was a member of the Edgewood Neighborhood
9     Liaison Committee, and at that point it was
10    Edgewood and the neighbors, and people would say
11    Edgewood whether they meant the campus school, the
12    high school, or the college.  But who would answer
13    would differ depending on whose project it was.
14        So if there was a project for the campus
15    school, the campus school rep would answer.  If it
16    was the college, I would answer.  And if it was
17    the high school, whoever was the high school rep
18    would answer.
19        So the "neighbors" saw us as Edgewood, but we
20    would respond according to school.  But we had two
21    neighborhood associations, so we would say the
22    neighbors and they would say do you mean
23    Dudgeon-Monroe or do you mean Vilas.
24        So when you say Edgewood, the understanding
25    among the groups would be which Edgewood, and when

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 25

1  we would say neighbors, the understanding would be
2  which neighbors.
3  Q  Okay.
4  A  There were five of us.
5  Q  Okay.  With respect to the conditional use process
6    prior to the change in the zoning --
7  A  Yes.
8  Q  -- when Edgewood College wanted to change a
9    building --
10  A  Yes.
11  Q  -- put up a new building --
12  A  Yes.
13  Q  -- were you occasionally involved with the
14    conditional use process?
15  A  I was intimately involved.  I was always the
16    representative for the college.
17  Q  Okay.
18  A  Starting in '97.
19  Q  Okay.
20  A  So if we had a conditional -- a project, I was the
21    shepherd for that project for the college.
22  Q  Okay.  And with respect to some of the building
23    projects that went through conditional use prior
24    to the change in zoning, were the Dudgeon-Monroe
25    and the Vilas Neighborhood Associations active in

Page 26

1    monitoring what the college was doing with respect
2    to changes to its buildings and grounds?
3  A  Yes.
4  Q  Okay.  And did the neighborhood associations
5    express concerns when Edgewood College would have
6    conditional use projects that would involve lights
7    or noise or landscaping, as you said?
8  A  Yes.
9  Q  Do you know, based on your experiences, whether
10    those concerns would also typically be expressed
11    with any high school projects that would have to
12    go through the conditional use process at the
13    time?
14         MR. INGRISANO:  Objection.  Form.
15    Foundation.
16  A  Let me explain the process just so that you
17    understand.  The liaison committee's job was to
18    hammer out the issues.  And so if any one of the
19    Edgewood schools had a project, you always had to
20    start with getting permission from the other
21    schools.
22         And so we would start, Are you okay, Is
23    everybody good with this, and then we would take
24    it to the liaison committee.  And then the
25    neighbors in Dudgeon-Monroe might have issues from

Page 27

1    Vilas, but the five of us would talk and talk and
2    talk and talk.
3         When we came to our agreement, we would as a
4    group go to the Vilas Neighborhood Association.
5    They had to approve it.  Then we would go to the
6    Dudgeon-Monroe Neighborhood Association, and they
7    had to approve it.  And then we would go to the
8    city as a group.
9         I always accompanied the other Edgewood
10    schools when they would do that because the
11    college had the most projects and I had the most
12    experience.  But I would never do their
13    presentation.  I could never speak for the campus
14    school.  I could never speak for the high school.
15  Q  That process that you just described, was that the
16    process for the entire time that you were involved
17    with the Neighborhood Liaison Committee?  That is,
18    from 1997 through your retirement in 2016?
19  A  Yes.
20  Q  Okay.  That's helpful.
21         I think you said because you had the most
22    experience you often would assist the high school
23    and the campus school with their conditional use
24    process; correct?
25  A  I would always help them.

Page 28

1  Q  Okay.  And I trust that the high school president,
2    as well as the campus school president, accepted
3    and wanted your help with respect to any
4    conditional use issues that would go before the
5    city; correct?
6  A  Yes.
7         MR. INGRISANO:  Objection.  Form.
8    Calls for speculation.  Foundation.
9  A  I never knew them to have a project go to one of
10    the neighborhood associations where I was not
11    there, and I went as support and I was supporting
12    them.
13  Q  And the high school president, whoever it was at
14    the time, would ask for your help with these
15    matters; correct?
16  A  Well, I --
17         MR. INGRISANO:  Objection.  Form.
18  A  I would never -- They were doing the presentation.
19    The campus school or high school would always do
20    the presentation.  I knew the neighbors.  So I
21    would get up and say, You know me.  Now here we
22    are again.  You might not know Sister Kathleen,
23    you might not know whoever was the president of
24    the high school at the time.  They're going to
25    tell you about their project.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 29

1  Q  Okay.  And what about your interactions with the
2     city?  How did you interact with the city, if you
3     did, on behalf of Edgewood High School or the
4     campus school with respect to their building
5     projects?
6  A  The high school or the campus school would work
7     with whoever their architect was and, I mean, they
8     had to shepherd their own project.  I might advise
9     them, you know, call this person, not that person.
10    Our experience is that this or that.
11        I don't ever remember talking to the city on
12    behalf of either the high school or the campus
13    school, because they would have technical
14    questions about their project that I would not
15    know.  I never could speak on behalf of their
16    projects.
17 Q  Okay.  Well, I'll show you some documents in a bit
18    that might -- but I appreciate --
19 A  That's my memory.
20 Q  Fair enough.  It's a long time ago.
21 A  Yes.
22 Q  Okay.
23 A  Let's see.  Here is this --
24        MR. INGRISANO:  52, okay.
25 A  Okay.

Page 30

1  Q  And, Ms. Balistreri-Clarke, I'm going to first
2     give you Exhibit --
3  A  May I comment on this document?
4  Q  We're going to comment on that document.  I'm just
5     trying to orient you as to time.
6  A  Okay.
7  Q  So the first thing I'm going to show you here is
8     Exhibit 52.  I'll represent to you, but I want you
9     to look through and verify, that there has been
10    testimony that this is the Edgewood Campus Master
11    Plan that was submitted in 2014 to the city.
12 A  Okay.
13 Q  And if you turn, at the top of the page there is a
14    page 2 of 228.
15 A  Uh-huh.
16 Q  And if you turn to page 6 of 228.
17 A  Okay.
18 Q  You see a letter from the city dated April 22,
19    2014, to Doug Hursh at Potter Lawson.  Do you see
20    that?
21 A  Uh-huh.  Yes.  Yes, I do see it.  I just want to
22    see who wrote this letter.  Okay, Tim Parks.
23 Q  Okay.  And just to orient you as to time, the
24    first sentence of the letter begins, "At its
25    April 8, 2014, meeting, the Common Council

Page 31

1     approved a Campus Institutional (CI) District
2     Master Plan for Edgewood College, Edgewood High
3     School, and Edgewood Campus School subject to the
4     conditions that follow."  Do you see that?
5  A  I do.
6  Q  Okay.  That's just to orient you as to time.  So
7     you recall that it was in early 2014 that Edgewood
8     submitted -- the three Edgewood schools submitted
9     its master plan; correct?
10 A  Yes.
11 Q  Now let's go back to Exhibit 55.  Do you recognize
12    Exhibit 55 as an email from you to several
13    individuals dated October 10, 2013?
14 A  I do.
15 Q  Okay.  The email starts out, "S. Kathleen, Mike
16    and Dan."  The S. Kathleen, that's Sister Malone?
17 A  Yes.
18 Q  And who is she?
19 A  She was the president of Edgewood Campus School.
20 Q  Okay.  And Mike Elliott was, of course, the
21    president of the high school at the time?
22 A  Yes.
23 Q  And Dan Carey is who?
24 A  President of Edgewood College.
25 Q  Okay.  You indicate, "Doug Hursh and I are meeting

Page 32

1     this afternoon."  Who was Doug Hursh?
2  A  Doug Hursh was the partner with Potter Lawson, the
3     architectural firm, that was guiding the master
4     plan process --
5  Q  Okay.
6  A  -- for the Edgewood schools.
7  Q  All right.  And under subject it says, "Draft
8     architectural review process October 10, 2013."
9     Do you see that?
10 A  Yes.
11 Q  Okay.  You note in the second paragraph that
12    you've worked with Doug to streamline the process
13    even further than the draft you presented when we
14    met September 9.  Do you see that?
15 A  Yes, I do.
16 Q  Okay.  And you note, "Specifically that in the
17    future we will not hold open meetings and we will
18    not seek the approval of the two neighborhood
19    associations.  I am hopeful that having a
20    dramatically streamlined building approval process
21    will be a major benefit of the Campus Institutional
22    zoning."
23 A  Yes.
24 Q  And was that a benefit of the master plan process,
25    that is, that the Edgewood schools could go

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 33

1 through a streamlined building approval process?
2          MR. INGRISANO: Objection. Form.
3 A  Our hope was that in losing some things from the
4     conditional use process, which was a simpler
5     process, we were gaining another kind of --
6     you know, that if it was in the master plan, we
7     wouldn't for every single project have to go
8     through open meetings, meaning everybody could
9     come and then each individual, the two individual
10    neighborhood associations. So that's what this
11    letter means.
12 Q  Okay. And as you understood it, any projects that
13    were in the master plan would go through this
14    streamlined building approval; correct?
15 A  Yes.
16 Q  Instead of an individualized conditional use
17    process; correct?
18 A  Yes.
19 Q  Okay. With respect to Exhibit 52, which is the
20    campus -- the Edgewood Campus Master Plan, just
21    can you give me a general high-level overview of
22    how the neighborhood associations were involved in
23    that document?
24          MR. INGRISANO: Objection. Form.
25    Foundation. Form.

Page 34

1 Q  The preparation of that document. What was your
2     process for the master plan?
3 A  I believe it's outlined here.
4 Q  Okay.
5 A  And so if I may refresh my memory by, rather than
6     saying this is what I think it was, I think we
7     agreed on the process, it's page 9 where we said
8     this was the process.
9 Q  Okay.
10 A  It's section 1.3. May I undo this?
11 Q  Absolutely.
12          MR. INGRISANO: Counsel, did your
13    subpoena have a subpoena for records?
14          MS. ZYLSTRA: No.
15          MR. INGRISANO: Okay. So to the
16    extent that the witness is going to be
17    referring to any written documents or notes,
18    I believe those need to be made part of the
19    record. Otherwise, she has to testify from
20    her memory alone.
21          MS. ZYLSTRA: I understand. I'll
22    mark those. I'm just letting her answer --
23          MR. INGRISANO: I mean, no, I don't
24    think -- you haven't demanded them so she has
25    to voluntarily turn them over. But she's

Page 35

1     either going to testify from her memory or
2     from a record that she voluntarily turns over
3     to have marked as an exhibit.
4          MS. ZYLSTRA: Okay.
5          MR. INGRISANO: And I'll object to
6     any questions and answers that are given
7     while she's reviewing notes that aren't
8     marked.
9 Q  Ms. Balistreri-Clarke, it looks like that you came
10    today with some handwritten notes; correct?
11 A  Yes.
12 Q  And are those notes that you took recently in
13    reviewing the master plan?
14 A  Yes.
15 Q  Okay. We would like to mark those as an exhibit
16    if we can.
17 A  Sure.
18 Q  Okay.
19 A  Yes. Some of these are personal notes.
20 Q  Are they -- what are the --
21 A  But you can have everything else.
22 Q  Okay. With respect to the personal notes, do they
23    relate to any review of any Edgewood document?
24 A  It's my own notes to self, don't do this, do this,
25    you know. It's guidance to myself.

Page 36

1 Q  Okay.
2 A  It's not having anything to do with the master
3     plan.
4 Q  Okay. The guidance to yourself, were those notes
5     that you created in talking with Mr. Ingrisano at
6     all?
7 A  I don't think I need to answer that. I mean,
8     it's -- those are notes to myself.
9 Q  I appreciate that, Ms. Balistreri-Clarke, but I do
10    actually think you need to answer that question.
11    Are they notes based on information or advice that
12    was given to you by Mr. Ingrisano?
13 A  Yes.
14 Q  Okay.
15          MS. ZYLSTRA: Let's take a short
16    break, or, actually, I'll ask Tanner, can you
17    go make copies of those, please?
18 Q  And while we're waiting for that document, you
19    spoke with Mr. Ingrisano; correct?
20 A  Yes.
21 Q  Prior to your deposition?
22 A  Yes.
23 Q  And for how long did you speak with him roughly?
24 A  About 55 minutes.
25 Q  Okay. And with respect to your discussions with

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 37

1    him, what were they generally about?
2 A  The history of my involvement with the master
3    plan, and I asked for his understanding of why I
4    was involved.
5 Q  Okay.  And did Mr. Ingrisano give you suggestions
6    on how to answer my questions at all?
7 A  He told me to tell the truth, and he told me to
8    answer the question that I've been asked.
9 Q  And did he also include any kind of instructions
10    to you about not offering information unless I
11    asked for it?
12 A  He did advise me not to speculate.
13 Q  What else did he advise you?
14 A  Those.  That was it.
15 Q  Okay.
16 A  That was it.  Don't speculate.  My husband offered
17    the same advice.
18 Q  Did he tell you what topics that he expected to
19    cover at all with you today, if any?
20 A  He said it would be the master plan process and my
21    involvement.
22 Q  Any other advice that he gave to you that you
23    recall?
24 A  That was his advice, and that's what I wrote down.
25 Q  Okay.  And let me go back to an initial question

Page 38

1    that I asked you, which is, do you have any
2    recollection as to how generally the neighborhood
3    associations were involved with the preparation of
4    the master plan for Edgewood campus?
5           MR. INGRISANO: Objection.  Form.
6    Vague.
7 A  I think, if I can give you the overview, it would
8    help you to understand how it all happened.
9 Q  Okay.  That would be great.
10 A  Okay.
11 Q  Ms. Balistreri-Clarke, I'm going to return your
12    notes to you.  I'll mark them next.
13           MR. INGRISANO: Thank you.
14 A  So this is a process to create a master plan for
15    the entire 55 acres.
16 Q  Yes.
17 A  So please understand that there are three separate
18    schools.  We had three boards of directors, three
19    chairs of the board, three presidents.  I went to
20    the high school to cut through during snowy days.
21    I mean, I never went to an event at the
22    high school.  I never went to an event at the
23    campus school that I recall.  We were that
24    separate, even though we were on the same campus.
25    So now we were being asked to create a

Page 39

1    document that said this is the vision of our
2    campus.  We shared the land, so we needed to
3    create a document for our 55 acres, that we all
4    were on the same 55 acres.
5    So our first step was to create an internal
6    process, and my recollection is that we agreed
7    that for each campus the authority rested in the
8    campus, but once the campuses had decided, that we
9    would try our best to speak as one.  Otherwise, it
10    would be very confusing.  You know, that we
11    wouldn't disagree with each other and do that in
12    front of the neighbors, we would work all of that
13    out, agree on what each school was going to do,
14    and then from there we would go to the
15    neighborhood.  And they were doing the same thing.
16    They wanted to be a united front, but they had
17    different views as well.  What Dudgeon-Monroe
18    wanted sometimes wasn't what Vilas wanted.
19    You also had involved in this process
20    two alders, the alder from District 13 and
21    District 14, 10 -- I don't remember the numbers
22    anymore, but it was a lot of moving parts.  So we
23    did our best to come forward as an Edgewood
24    school, even though we were not used to speaking
25    as one in any way.  The neighbors were doing their

Page 40

1    best to speak as one, even though they were two
2    separate entities.  And the alders would do their
3    best to try and get us all to collaborate to the
4    best of our ability.
5    At that time there was a spirit of
6    collaboration and partnership among all of the
7    entities.  By that time we had worked hard and we
8    were collaborative, and we had many unresolved
9    issues, many things of which different
10    constituents were not happy, but we did our best
11    to be collaborative, to be respectful, and to move
12    forward to the best of our ability.
13 Q  Were you aware that the 1996/97 master plan was a
14    master plan of all three institutions:  Edgewood
15    College, Edgewood High School, Edgewood Campus
16    School?
17           MR. INGRISANO: Objection.  Form,
18    foundation.
19 A  I don't know that I ever read that master plan.
20 Q  Okay.
21          (Exhibit No. 131 marked for
22    identification)
23 Q  Okay.  Ms. Balistreri-Clarke, I am showing you
24    what's been marked as Exhibit 131.  Are these the
25    handwritten notes that you began referring to in

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 41

1  answering one of the questions?
2 A  Yes.
3 Q  Okay.  These appear to me to be notes -- Well,
4  strike that.  Tell me what these are notes of.
5 A  The Edgewood College Master Plan is available
6  online.  I read it online and took these notes for
7  myself.  I have not -- I had not looked at this
8  document for over seven years.
9 Q  Okay.  And when you refer to the Edgewood College
10  Master Plan --
11 A  Oh, I'm sorry.  It's the Edgewood --
12 Q  Are you referring to Exhibit 52?
13 A  It's the Edgewood Campus Master Plan, not the
14  Edgewood College Master Plan.  Yes.  The Edgewood
15  Campus Master Plan.
16 Q  Okay.  I just wanted to make sure we were
17  referring to the same document.
18 A  Yes.
19 Q  Okay.  We're going to come back to that document.
20      (Exhibit No. 132 marked for
21       identification)
22 Q  Ms. Balistreri-Clarke, can you take a second to
23  look at this document and tell me at all whether
24  you are familiar with it?
25 A  I do not remember this specific document.

Page 42

1  However, it is very much in the spirit of our
2  process.  Sherwood Malamud was the Dudgeon-Monroe
3  Neighborhood Association president and that there
4  would be a document given to us to say they met
5  with their -- Ken Golden was their alder at the
6  time, so representatives from their committee and
7  the alder would go through and say here are our
8  concerns, and that's what this document seems to
9  show.
10 Q  Okay.
11 A  And so --
12 Q  Let me ask you, on the second page, one of the
13  individuals is a Shawn Schey.  Do you see that?
14 A  Uh-huh.  Yes.
15 Q  Did you know Shawn Schey?
16 A  Shawn Schey was a neighbor of the college.  She
17  lived on -- why am I blanking on -- Terry Place,
18  which borders the college, and she was a member of
19  the Edgewood Neighborhood Liaison Committee.
20 Q  Do you know whether she was president of the
21  Dudgeon-Monroe Neighborhood Association at one
22  point in time?
23 A  I don't believe she was, but those roles would
24  shift and change.
25 Q  Did you interact with her frequently with respect

Page 43

1  to the drafting of the Edgewood Campus 2014 Master
2  Plan?
3      MR. INGRISANO: Objection.  Form.
4 A  Yes.  May I add, I interacted with every single
5  person, Ken Golden, Daryl Sherman, Sherwood -- I
6  mean, some of my problem in looking through these
7  documents, it's like, oh, you know, I mean, these
8  were people with whom I worked for a very long
9  time and we all had longstanding relationships
10  working through extremely difficult issues together.
11 Q  Okay.
12 A  And so I knew everybody and they knew me, and it
13  was hard and it was good.
14 Q  Okay.  Do you believe there was equal respect
15  between the individuals listed that you just
16  referred to -- Shawn Schey, Ken Golden, Daryl
17  Sherman, and Sherwood Malamud -- and the
18  representatives from Edgewood?
19      MR. INGRISANO: Objection.  Form,
20      foundation.
21 A  My experience was that everyone involved in this
22  process worked very hard to treat each other with
23  great respect.
24 Q  Thank you.  Okay.  If you could turn to the
25  internal page 6 of the document.  At the bottom

Page 44

1  there is a reference to Site 1 and there is a
2  paragraph there, if you want to take a moment to
3  review that.
4      MR. INGRISANO: Objection.  The
5      foundation of this document.
6 A  May I see building Site 1?
7 Q  Well, my question -- well, let me start with this.
8 A  Oh, I see what it is.  It says the plan proposes
9  an 80,000 square foot building.  I know what
10  Site 1 was.
11 Q  My question was what is Site 1?
12 A  Site 1 was a building on the Edgewood College
13  campus where a parking lot now exists.  It was
14  intended to be an 80,000 square foot building for
15  athletic and recreational purposes with structured
16  parking underneath it.
17 Q  Okay.  At least in this document, in turning the
18  page, listed uses for that Site 1 were either a
19  sports facility or a music facility.  Do you
20  recall that at all?
21      MR. INGRISANO: Objection.
22      Foundation.  Form.
23 A  If this says that a listed use was sports or
24  music, they are naming things that were in the --
25  The master plan was meant to be:  Here is a

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 45

1 placeholder, here is a placeholder, here is a
2 placeholder. Here are our needs, here are our
3 needs, here are our needs. This placeholder might
4 be used for this need or this need.
5 So if they say it could be music or
6 athletics, that would be within the realm of what
7 we were discussing. This is a placeholder. It
8 will be used for one of these needs. And they, I
9 think, are expressing a preference for one need
10 over another.
11 Q Okay. Do you recall as you sit here today Site 1
12 being a potential athletic facility?
13 A The college hoped it would be an athletic facility.
14 Q And you recall that, separate from looking at this
15 document?
16 A Oh, you bet ya. Yes.
17 Q Okay. And was the fact that it was potentially
18 going to be an athletic facility, do you recall
19 that being a concern for the neighbors?
20 A Yes.
21 Q Okay. Was the intention to put this building
22 adjacent to the high school football field?
23 A If you look at the campus, there would be the
24 college -- or the high school field, and then our
25 campus started, retaining wall currently and

Page 46

1 parking lot. Instead of retaining wall and
2 parking lot, there would be an 80,000 square foot
3 placeholder.
4 Q Okay. And were the concerns raised by the
5 neighbors with respect to this potential Site 1
6 building concerns that event parking would spill
7 into the neighborhood, for example?
8 A Yes.
9 Q Okay. Did the neighbors suggest that Edgewood
10 consider expanding the Edgedome instead of
11 building a facility next to the Edgewood High
12 School field?
13 MR. INGRISANO: Objection. Form.
14 Vague as to Edgewood.
15 A I can only say they -- I was involved from 2017
16 until -- no, let's see, from 1997 to 2017, so for
17 twenty years. In that time, any neighbor could
18 imagine anything about our campus. We had many,
19 many open meetings. We had Dudgeon-Monroe
20 meetings. We had Vilas meetings.
21 So when you say would a neighbor ever
22 recommend using the Edgedome, it's all within the
23 possible because any neighbor could recommend, why
24 don't you just -- there were neighbors who thought
25 we should move to the seminary. You know, the

Page 47

1 seminary is closing, move the whole campus there.
2 So when you ask could they have imagined this
3 or suggested that, absolutely, because that was
4 the process. Everybody was suggesting everything
5 about every school.
6 Q That's fair. Do you recall specifically
7 conversations about, rather than the Edgewood
8 College building a facility next to the
9 high school, Edgewood College renovating the
10 Edgedome? Do you recall specific --
11 A I do -- I can tell you as a principle that if
12 ever a building could be internal to the campus,
13 it was always preferable. So for any kind of
14 anything, if it could be internal ever about
15 anything, parking, residence halls, our basketball
16 games, if it could be internal, that was always
17 preferable.
18 Q And it was preferable because it had less impact
19 on the neighbors and the neighborhood?
20 A Yes.
21 Q Okay. And was there a concern that this Site 1
22 was not internal to the campus, that it was too
23 close to the neighbors?
24 A Yes. It was on Terry Place. So --
25 Q Okay. Great. That's it for this document.

Page 48

1 (Exhibit No. 133 marked for
2 identification)
3 Q Ms. Balistreri-Clarke, I'm showing you what's been
4 marked as Exhibit 133. If you could just review
5 the top email for right now.
6 A Okay.
7 Q Do you recognize Exhibit 133?
8 A I do not recall this specific document, but it
9 looks like an email that I wrote on November 1 to
10 Ed Taylor, who was the communications director at
11 Edgewood College.
12 Q Okay. And you're ccing Doug Hursh from Potter
13 Lawson on this email?
14 A Yes. Yes.
15 Q Okay. And it says, "Ed, thanks again for your
16 help with the master plan! Here are some
17 documents that I hope will be helpful. The goals
18 from the high school area a bit dated so Mike
19 Elliott may suggest updated ones." Did I read
20 that part of the email correct?
21 A Yes.
22 Q Okay. It appears to me -- well, let me ask, what
23 was Ed Taylor's role in the drafting of the master
24 plan process?
25 A Ed Taylor helped us with our communication. We

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 49

1  were not used to speaking as Edgewood, and the
2  city was asking us to do that.  And so Ed Taylor
3  would help us to present our efforts as Edgewood
4  campus.
5 Q  Okay.  You said the city was asking us to speak as
6  one.
7 A  Yes.
8 Q  Did anyone in the city ever tell you that
9  Edgewood College, for example, could not have its
10  own master plan versus Edgewood High School or the
11  campus school?
12 A  I believe we were Edgewood, Inc., at that time.
13 Q  Okay.  And how does that --
14 A  So no school could do something without the other
15  schools because of Edgewood, Inc.
16 Q  Okay.  So your understanding is that there had to
17  be one campus master plan because there was one
18  corporate entity, Edgewood, Inc.; correct?
19 A  I believe that was my understanding.
20 Q  Okay.  Do you recall having any discussions with
21  specific individuals at the city with regard to
22  that?
23 A  I do not recall how I got my clarity, whether it
24  came from Doug Hursh who was our architect or
25  whether I picked up the phone and called somebody

Page 50

1  and said can you explain this to me because we
2  don't understand it.  I don't remember how I got
3  my clarity --
4 Q  Okay.
5 A  -- on what the city was asking.
6 Q  Okay.  Forgive me if I asked this question
7  already.  You served on the Edgewood Neighborhood
8  Liaison Committee from 1997 all the way through
9  until your retirement?
10 A  Yes.
11 Q  Okay.  With regard to the documents that you
12  provided to Mr. Taylor with this email, there are
13  a number of attachments that were provided to him;
14  correct?
15 A  Yes.
16 Q  Do you know, where did you get those documents to
17  provide Mr. Taylor?
18 A  I do not remember this specific document.  What I
19  would have done is gathered what was given to me
20  in this process.  I was the shepherd, not the
21  leader, if that makes sense.  My job was to
22  gather, not speak for.  I could never speak for
23  the campus school.  I could never speak for the
24  high school.  I could never speak for the college
25  without -- I wasn't the president of any of those.

Page 51

1  I was the shepherd of the process.
2  So just as Ed was the communications
3  director, I was the communication link --
4 Q  Okay.
5 A  -- in the master plan process.
6 Q  So am I correct to understand you that you
7  gathered these documents from the three schools?
8 A  Well, this document says Sister Kathleen Malone.
9 Q  Okay.
10 A  So I would assume I got that from Sister Kathleen
11  Malone.
12 Q  Okay.  What about the Historical Summary of Campus
13  Planning & Development?
14 A  Okay.  I certainly -- this is certainly not
15  something I would have written.
16       MR. INGRISANO:  Objection.  Form.
17  Speculation.  Foundation.
18 A  Okay.  There is a document in here that says
19  Edgewood Historical Summary of Campus Planning &
20  Development September 2008.  It says that it was
21  prepared by Sister Sarah Naughton, who was the
22  Edgewood College archivist.
23 Q  I'm sorry.  Where are you seeing this?
24 A  So the first document says Sister Kathleen Malone.
25 A  Sure.  I see that.  If you could use the Potter

Page 52

1  numbers at the bottom as the one that it is.
2 A  Okay.  Potter 08668.
3 Q  Okay.  Thank you.
4 A  So the college's document was prepared by
5  Sister Sarah Naughton, who was the Edgewood
6  College archivist.
7 Q  Okay.  What about the next document that starts
8  8669?  That appears to be your name at the top and
9  draft; correct?
10 A  Yes.  Yes.  In this memo, I say "I just kept sort
11  of a log of our efforts."  And this must be the
12  document I am referring to.
13 Q  Okay.  And it appears to be somewhat chronological;
14  correct?
15 A  Yes.
16 Q  Okay.  And at the bottom of page 8670 there is a
17  heading or at the very last line it says 2013
18  Activities.  Do you see that?
19 A  Yes.
20 Q  Then there are a number of dates on the next page;
21  correct?
22 A  The next page, are you talking about 71?
23 Q  Yes.
24 A  Okay.
25 Q  So those would all be 2013 dates; correct?

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 53

1 A  They appear to be 2013 dates.
2 Q  Okay.  And there was, at least according to your
3    notes, on September 9, 2013, it says, "Three
4    Edgewood presidents meeting - review progress;
5    affirm direction."  Do you see that?
6 A  Yes.
7 Q  When you say review progress, affirm direction --
8 A  Yes.
9 Q  -- what do you mean?
10 A  I mean that their job was to look at what the
11    liaison committee had done or the master plan --
12    the master plan was being created in kind of a
13    give-and-take.  You know, we throw something out,
14    it comes back; you throw something out, it comes
15    back.  So the three presidents ultimately had the
16    authority to say yes, yes, no, or whatever.  And
17    so I would assume that they were reviewing the
18    process and affirming where we were going.  So
19    they would say, no, no, or yes, go ahead.  That
20    was their job.
21 Q  And did you have regular meetings of the three
22    presidents generally?
23         MR. INGRISANO: Objection.
24    Foundation.
25 A  I have no way of knowing how often they met.

---

Page 54

1 Q  Okay.
2         (Exhibit No. 134 marked for
3           identification)
4 Q  Ms. Balistreri-Clarke, the last exhibit that we
5    were looking at referred to a September 9, 2013,
6    meeting of the presidents.
7 A  Okay.
8 Q  Do you recall that?
9 A  No.  I mean, I see the document.
10 Q  No, I apologize.  Ms. Balistreri-Clarke, the last
11    exhibit that we were looking at --
12 A  Oh, this one.
13 Q  -- which was your draft.
14 A  Oh, yes.
15 Q  I had asked you --
16 A  Oh, refers to the September '13 meeting.
17 Q  September 9, 2013, meeting.
18 A  Oh, right.  Sorry, sorry, sorry.  Yes.
19         MR. INGRISANO: Potter 8671, is
20    that right, Counsel?
21         MS. ZYLSTRA: Correct.
22 A  Okay.
23 Q  And now I'm showing you --
24 A  Okay.  The phone number, that's not helpful.  I
25    have Potter 66 -- oh, I see what you're saying.

---

Page 55

1    Okay.  Let me get back to it.
2         On 08671, September 9 there was a meeting of
3    the three presidents to review the master plan and
4    affirm the direction, and I am listed on this
5    document as a guest.
6 Q  So starting with Exhibit 134, this appears to be a
7    meeting on September 9, 2013; correct?
8 A  I'm sorry.  I got distracted.
9 Q  That's okay.  Exhibit 134 appears to be minutes of
10    an Edgewood presidents meeting on September 9,
11    2013; correct?
12 A  Yes.  Yes.
13 Q  And you attended that meeting; correct?
14 A  This document shows I was a guest.
15 Q  All right.  And at least number 3 refers to master
16    planning process; correct?
17 A  Yes.  Yes.
18 Q  Do you believe that you gave a presentation to the
19    three presidents on September 9, 2013, to --
20 A  Yes.
21         MR. INGRISANO: Objection.
22    Foundation with respect to 134.
23 Q  Hold on.  I've got to get out my question.
24    Do you believe you gave a presentation on
25    September 9, 2013, to the three presidents with

---

Page 56

1    respect to the three presidents?
2         MR. INGRISANO: Objection.  Form,
3    foundation.
4 A  Yes.
5 Q  If you look at the top of page 2, the first
6    bullet, first sentence says, "Maggie took the DMNA
7    white paper and showed how we addressed their
8    issues."
9         With respect to the DMNA white paper, do
10    you know whether that refers to Exhibit 132?
11         MR. INGRISANO: Objection.
12    Foundation, form, calls for speculation.
13 A  I have no way of knowing.
14 Q  Okay.
15         (Exhibit No. 135 marked for
16           identification)
17 Q  Ms. Balistreri-Clarke, I'm showing you what's been
18    marked as Exhibit 135.  If you want to take a
19    moment to review the document, and then I can ask
20    some questions.
21 A  Okay.  You just want me to read the email from
22    Mike?
23 Q  Both.  And the email below, which is from you.
24 A  Okay.  What year was this?  Okay.
25 Q  Okay.  You've had a chance to review the document?

---

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 16 of 89

Edgewood High School of the Sacred Heart, Inc. v.                                      Deposition of Margaret Rose Balistreri-Clarke
City of Madison, Wisconsin, et al.                                                                                        August 22, 2022

Page 57

1  A  Yes.
2  Q  I'm going to start with the bottom email appears
3     to be an email from you to several individuals
4     dated June 21, 2013; correct?
5  A  Yes.
6  Q  And again you address your email to
7     Sister Kathleen, Mike, and Dan, which are the
8     three presidents of the three Edgewood schools;
9     correct?
10 A  Yes.
11 Q  Okay.  And you say, "I hope you are all doing
12    well.  Here are some updates and requests for
13    information regarding the master plan."  Correct?
14 A  Yes.
15 Q  Okay.  And in response to your email, Mike Elliott
16    provided information that you requested as it
17    related to Edgewood High School; correct?
18 A  Are you now talking about the top email?
19 Q  Correct.
20 A  Yes.
21 Q  Okay.  In the last paragraph of Mr. Elliott's
22    email --
23 A  Yes.
24 Q  -- he refers to a small athletic addition in the
25    back corner of the building.  Do you know what

Page 58

1     that refers to?
2  A  It looks like he's looking at a proposed draft of
3     a map and that in the back corner of some building
4     there was an athletic addition.
5  Q  Okay.  Do you know what building or what athletic
6     addition?
7  A  Not by memory.
8  Q  Okay.  In any event, in the drafting of the master
9     plan, you would reach out to the three presidents
10    to request information for purposes of that
11    information being used for drafting the master
12    plan; correct?
13 A  Yes.  Yes.
14 Q  Okay.  Ms. Balistreri-Clarke, I'll give you a
15    second to review the cover page of this document.
16 A  How much would you like me to read?  Just the
17    memo?
18 Q  We'll start with the first, and then we'll go
19    through.
20 A  Okay.
21 Q  Do you recognize Exhibit 54, the first page being
22    an email from you to the three presidents of the
23    Edgewood schools?
24 A  I do.
25 Q  Okay.  And, again, you address your email to

Page 59

1     Sister Kathleen, Mike, and Scott; correct?
2  A  Yes.  No.  By that time -- Please note by this
3     time Scott Flanagan was now the president -- no.
4     I'm not sure why.  There was a transition where
5     Scott became the new president and Dan was the
6     leaving president, the exiting president, and so
7     that this is being sent to Sister Kathleen,
8     Michael Elliott, and Scott Flanagan indicates to
9     me that he is either now the president or will be
10    the president.  And now I'm only copying Dan
11    Carey.
12 Q  Okay.  And you also cc Ed Taylor on your email?
13 A  Yes.  The communications director.
14 Q  And it says, "Subject:  Draft Edgewood Campus
15    Master Plan 2013" as the subject; correct?
16 A  Yes.  Yes.
17 Q  And it looks that there is an attachment.  That
18    is, the Draft Edgewood Campus Master Plan is
19    attached?
20 A  Yes, yes.
21 Q  And your email says that.  It says, "Here is a
22    draft of Chapters 1-3 compiled by Ed Taylor."
23    Correct?
24 A  Yes.
25 Q  And with respect to sending this draft to

Page 60

1     Sister Kathleen, Mike, and Scott, your intent in
2     sending the draft was for these three individuals
3     to review the draft; correct?
4  A  Yes.
5  Q  And to be aware of the information that was being
6     included with regard to the facilities that
7     affected their individual schools; correct?
8  A  Yes.
9             MR. INGRISANO:  Objection.  Form.
10    Ms. Balistreri-Clarke, you have to wait for
11    her question and you have to give me an
12    opportunity to object.  Okay.
13            THE WITNESS:  I'm very sorry.
14            MR. INGRISANO:  Thank you.
15 A  Could you repeat that question?
16 Q  Yeah.  Let's make sure.  I think the question was
17    your intent in sending a draft to Sister Kathleen,
18    Mike, and Scott was that they would review the
19    draft and in particular review the portions of the
20    draft that related to their individual schools;
21    correct?
22            MR. INGRISANO:  Objection.  Form.
23 A  I believe so.
24 Q  Okay.  And was it your understanding that
25    Ed Taylor took the submissions of all three

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 61

1    presidents to combine them for purposes of
2    drafting Chapters 1 through 3?
3  A  I believe that this describes that process.
4  Q  Okay.  And as far as you know, that's an accurate
5    description of the process?
6  A  Yes.
7  Q  Okay.  And you state in your third paragraph of
8    your email, "Please contact Ed Taylor at
9    edtaylor@edgewood.edu for any corrections to
10   Chapters 1-3 and me for anything on Chapter 4."
11   Correct?
12 A  That's what this says.
13 Q  And that's what you are instructing the three
14   college presidents to do; correct?
15 A  Yes.
16 Q  All right.  If you could turn to the page -- Well,
17   strike that.
18       Let me first ask -- well, if you could turn
19   to page EHS1839.  At the very last line of that
20   page it says, "Open Space Plan - Landscaping and
21   Green."  Do you see that?
22 A  Yes, I do.
23 Q  Now if you could turn the page to 1840.  There is
24   a number 1 that says, "Athletic field owned by
25   Edgewood High School.  Used for team practices,

Page 62

1    physical educations classes, and other generally
2    light uses."  Do you see that?
3  A  I do.
4  Q  Okay.  Do you know where that information came
5    from?
6  A  I do not.
7  Q  Okay.
8  A  The title of the chapter says "Proposed
9    Conditions:  Future Needs of Each Campus
10   Institution."  And so that's what the title of the
11   chapter is.  I would not have created any of these
12   documents.
13 Q  Okay.  And just for rounding that out, if you
14   could look at Exhibit 52.  Keep that open to the
15   page that we were just on.
16 A  Oh.  Sorry.
17 Q  And if you look at page 52, and if you go to the
18   page that says 60 of 228.
19 A  Okay.  52 of the master plan?
20         MR. JEAN-LOUIS: Exhibit 52.
21 Q  I'm sorry.  Exhibit 52, I apologize, and the top
22   says page 60 of 228.
23         MR. INGRISANO: Bottom of the page
24   says 42.
25 A  Okay.  I've got the page.

Page 63

1  Q  If you look under Open Spaces, number 1, it says,
2    "Athletic field owned by Edgewood High School.
3    Used for team practices, physical education
4    classes."  Do you see that?
5  A  I see that.
6  Q  Okay.  And turning back to the Exhibit 54 language
7    as to number 1.
8  A  Okay.  Yes.
9  Q  Okay.  The language, "other generally light uses,"
10   was in the draft of the campus master plan that
11   was sent to the three presidents by your email but
12   does not appear in the final draft of the master
13   plan.  Do you see that?
14 A  I do see that.
15 Q  Okay.  Do you know who or how that language got
16   removed?
17 A  No.
18 Q  Okay.  Do you recall any discussions in connection
19   with the drafting of the master plan regarding the
20   use of Edgewood High School's field?
21 A  In the master plan process, every inch of that
22   55 acres was discussed many times.  And if we were
23   talking about lights across -- you know, among all
24   55 acres, sometimes the issue would be lights as
25   if we were one school, even when we were not, or

Page 64

1    noise or setbacks or landscaping.
2        So there was never a meeting that I remember
3    where, in the master plan process, where -- in the
4    master plan process, I never remember a meeting
5    where we just talked about the athletic field, and
6    I say that because we would rarely come together
7    to talk about just one building.  You know, I
8    remember that site, that 80,000 square foot
9    building.
10 Q  Correct.
11 A  There were some meetings with just that building.
12   Other than that, I don't have a memory of just
13   anything.  The liaison committee, sometimes we
14   would, you know, now we really want to talk about
15   this one big issue, but it was rare to have a
16   meeting with just one topic.
17 Q  Okay.  You began with a statement saying that, and
18   I might not have it quite right, but, you know,
19   every inch of the 55 acres was discussed.  When
20   you say that, do you mean was discussed with the
21   Edgewood Neighborhood Liaison Committee?  Is that
22   who you're referring to the discussions?
23         MR. INGRISANO: Objection.  Form.
24 A  The meetings that I was involved in were varied
25   with subgroups coming and going.  And so if there

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 65

1 was a group that had a particular concern about a
2 particular thing, they might ask to meet with me.
3 And I have no memory of a meeting just about -- if
4 it was Edgewood High School, I might have been --
5 you know, I remember no meeting of that kind.
6 Q  Okay.
7 A  The college, certainly, because we were the
8 biggest school and had the most buildings.  There
9 were many meetings just about our arts building
10 that would just be me and the neighbors hashing
11 out a timing system for the shades, for the light
12 spillage.
13 So when you asked do I ever remember a
14 meeting where this was raised, this kind of issue
15 was interwoven into lots of meetings.
16 Q  Okay.  And when you say lots of meetings, lots of
17 meetings with various groups of the neighbors;
18 correct?
19 A  Yes.
20 Q  Okay.
21 (Exhibit Nos. 136 and 137 marked
22 for identification)
23 THE WITNESS: Can we take a break
24 after this one?
25 MS. ZYLSTRA: We can take a break

Page 66

1 right now.
2 THE WITNESS: That would be great.
3 (Recess)
4 Q  Ms. Balistreri-Clarke, I'm showing you what's been
5 marked as Exhibit 136.  Do you recognize this as
6 an email from Shawn Schey dated April 22, 2013, to
7 a number of people, one of whom is you?
8 A  Yes.
9 Q  Okay.  And she writes, "Dear Maggie and Liaison
10 Committee:  Attached is DMNA's focus paper for
11 discussion tomorrow night, a document that is very
12 much in flux."  Do you see that?
13 A  Yes, I do.
14 Q  And in terms of the document that she attached,
15 which begins on 10832.
16 A  Yes.  Thank you.
17 Q  Do you recognize this as the focus paper that we
18 looked at earlier and marked as Exhibit --
19 A  Oh, sure.  Yes.
20 MR. INGRISANO: Hold on.  Hold on.
21 Let her finish her question, please.
22 THE WITNESS: I'm sorry.
23 Q  -- Exhibit 132.
24 MR. INGRISANO: Objection.
25 Foundation.

Page 67

1 A  Okay.
2 Q  And the question is do you recognize this as a
3 draft of the focus paper that we marked as
4 Exhibit 132?
5 A  I see that it is.
6 Q  Okay.  And do you know whether the focus paper is
7 what you refer to as the white paper in your
8 meeting with the three presidents?
9 MR. INGRISANO: Objection.  Form.
10 A  Let's see.  I can't say that for sure.
11 Q  Okay.  Do you know of any other -- do you know of
12 something that you would refer to as a white
13 paper?
14 A  No.
15 Q  Okay.  Do you recall discussions at a meeting
16 relating to this focus paper?
17 MR. INGRISANO: Objection.  Form.
18 A  I can tell you that anything that was submitted as
19 issues we talked about and talked about.
20 Q  Okay.
21 A  So if I can clarify, that what is consistent with
22 our process was the neighbors' job was to bring us
23 their concerns.  In this case here it is a focus
24 paper summary.  So we would have gone through all
25 of these.  There were many documents, many

Page 68

1 discussions, but that was the process.
2 Q  Okay.  Thank you.  I'm showing you what's been
3 marked as Exhibit 137.  This appears to be emails
4 between you, Michael Guns, and Doug Hursh; correct?
5 A  Yes.
6 Q  Okay.  Who is Michael Guns?
7 A  He was the chief financial officer of Edgewood
8 College.
9 Q  Okay.  And with respect to the email, the middle
10 email from Michael Guns to you, he writes in the
11 middle of that email, "One request I have is that
12 we don't replicate language that exists elsewhere."
13 A  Yes.
14 Q  "I get it that it should cause no harm to include
15 language that is already elsewhere or lifted from
16 other documents and copied into this document.  I
17 don't understand why it is necessary."  Did I read
18 that correctly?
19 A  Yes, you did.
20 Q  And then you respond to him in the top email;
21 correct?
22 A  Yes.
23 Q  And you write, "The reason that it is helpful to
24 have agreements in this document is that this is
25 the one we will be presenting to them.  We are

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 69

1 asking for them to review it and give us a vote of
2 support."
3 A  Yes.
4 Q  "For us to say, 'Oh, it will be elsewhere in the
5 master plan' when they don't have those documents
6 will not engender the level of trust we need to
7 get their vote of support, which we still need."
8 A  Yes.
9 Q  Did I read that correctly?
10 A  Yes.
11 Q  By "them," are you referring to the neighbors or
12 the neighborhood associations?
13 A  Yes.  All five partners had to agree.  But yes.
14 Q  Okay.  And you talk about wanting the documents to
15 engender the level of trust.
16 A  Yes.
17 Q  Can you explain for me from your perspective why
18 that was important?
19 A  Number one, the neighbors and the Edgewood campus
20 had a history of mistrust.  And the master plan of
21 1997 created, I think they called it, a working
22 group that was meant to build trust, collaboration,
23 and partnership among the five entities, and then
24 six if you're counting the city.  And so
25 developing a level of trust was in our mission

Page 70

1 statement.  So everything we did was to build
2 trust with each other, and that was among the
3 three schools, among the two, one neighborhood
4 association to the other, and then nobody loves
5 the, you know --
6 Q  It's okay.
7 A  They want us to do what, you know?  So everything
8 we did was to try and build transparency and
9 trust, collaboration, and partnership.
10 Q  And you were trying not to say nobody loves the
11 city?
12 A  Nobody loves the city.
13 Q  Fair?
14 A  My god.  You want -- oh, yeah.  I mean, I loved
15 many of the individuals who worked for the city.
16 But as a -- you know, there were a lot of
17 regulations that we would all be like, They want
18 us to do what?  They want us do what?  That's the
19 nature.  And, yeah.
20 Q  That's okay.  And with respect to the master plan
21 document itself, you expected that document to be
22 as accurate as possible for purposes of
23 engendering that trust with the neighbors;
24 correct?
25 A  Yes.

Page 71

1 Q  Okay.
2 A  Is this the place to say some assumptions we have
3 not talked about about the master plan?
4 So when I say the master plan and when you
5 say the master plan, I'm not always sure we're
6 talking about the same assumptions.
7 That we saw this as placeholders, and the
8 thing we were most proud of was here is how you
9 change the master plan because needs will emerge
10 and here is how we're going to do that.
11 So we never thought we were saying, These are
12 all our needs forever and ever and it's now set in
13 concrete.  It's here is what we think and know
14 right now and, you know, we would like to have
15 this and the campus school would like to have this
16 and the high school and we know that the others
17 want us just to be a deer park, you know.  We were
18 all trying to figure out how to live together when
19 we all wanted different things.  And this document
20 was meant to say, Here are placeholders, here are
21 needs, and as things become more concrete and we
22 want to grow in these ways, here is how we're
23 going to do that.
24 MR. INGRISANO:  Move to strike as
25 nonresponsive.

Page 72

1 Q  Well, and I will ask the question.
2 Ms. Balistreri-Clarke, you just explained to
3 me what your understanding was for purposes of how
4 you thought that the master plan was to function
5 going forward; correct?
6 A  In my notes reading the master plan, I wrote,
7 there was something about -- let's see.  We want
8 to establish direction, maintain flexibility to
9 respond to changing needs, not intended as a
10 blueprint, the footprints are placeholders.
11 Q  Correct.
12 A  I'm reading from my notes of the master plan.
13 Q  Right.
14 A  So --
15 Q  And your understanding was, to the extent that the
16 college or the high school or the campus school
17 had a project or had a need and wanted to make a
18 change or to grow, that there was a process for
19 amending the master plan to address any future
20 needs or projects?
21 A  Yes.
22 MR. INGRISANO:  Objection.  Form,
23 foundation.
24 A  Okay.
25 MS. ZYLSTRA:  Can you read my

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 73

1    question back, please?
2          (Question read)
3          MR. INGRISANO: Objection to form
4    and foundation.
5  A  Yes.
6  Q  Okay.  It was your understanding that the master
7    plan did not prevent an amendment for a future
8    project; correct?
9          MR. INGRISANO: Objection.  Form.
10 Q  That there was -- Let me strike that.  That was a
11   horrible question.  Let me try again.
12 A  Okay.
13 Q  You understood that there was a process in place
14   for a master plan to be amended to add a future
15   project that wasn't in the master plan; correct?
16         MR. INGRISANO: Objection.  Form
17   and foundation.
18 A  My understanding was that this document was going
19   to be a living document and that we had proposed a
20   process for how to update the plan.  We wouldn't
21   have considered it, I think, an amendment so much
22   of an updating.  Obviously, you know, it had to be
23   updated.
24 Q  And the update would include, as part of the
25   updating process, it would include getting the

Page 74

1    support of the neighborhood associations for any
2    changes to the master plan; correct?
3          MR. INGRISANO: Objection.  Form
4    and foundation.
5  A  Well, there -- I do not have memorized what our
6    process was, but we had a little streamlined
7    process that this is how you do it.
8  Q  Okay.
9          (Exhibit No. 138 marked for
10         identification)
11 Q  Hold on one moment.  I'm sorry.  This doesn't
12   contain the attachment and it's supposed to.
13   I'm going to have you identify the document but
14   I'm going to set it aside because I want the one
15   with the attachment.
16   But just for the record, Ms. Balistreri-Clarke,
17   I handed you a document that's been marked as
18   Exhibit 138; correct?
19 A  Yes.
20 Q  And the top email is an email from Doug Hursh to
21   you dated November 19, 2013; correct?
22 A  Yes.  Yes.
23 Q  And his email says, "Here is the PowerPoint."
24   Do you see that?
25 A  Here is the PowerPoint, yes.

Page 75

1  Q  Okay.  I'm going to come back to this later and
2    we'll talk about the PowerPoint.  We'll do it at a
3    break.
4          (Exhibit No. 139 marked for
5          identification)
6  Q  Ms. Balistreri-Clarke, I'm showing you what's been
7    marked as Exhibit 139, and the top email is from
8    Michael Guns to you dated November 19, 2013;
9    correct?
10 A  Yes.
11 Q  And below that Mr. Guns appears to be responding
12   to an email that you wrote on November 19, 2013,
13   to Doug Hursh and Mr. Guns; correct?
14 A  Yes.
15 Q  Okay.  In your email you begin by saying that you
16   had a good conversation with Shawn Schey regarding
17   the VNA zoning and transportation committee
18   meeting last Thursday; correct?
19 A  Yes.
20 Q  Okay.  And you have a number of bullet points that
21   relate to your discussions with Ms. Schey; correct?
22 A  Yes.
23 Q  Okay.  And the third bullet down says, "There are
24   still some people upset with having a capacity for
25   an additional 1,600 people, but Shawn was able to

Page 76

1    point to all of the agreements that we've made to
2    address this."  Did I read that correctly?
3  A  Yes.
4  Q  And with regard to that bullet point, does it
5    relate to Site 1?
6  A  No.  1,600 I believe was an enrollment number for
7    the college.
8  Q  Okay.  All right.  And with respect to the comment
9    in the third bullet, "There are still some people
10   upset, but Shawn was able to point to those
11   agreements," Shawn Schey was trying to get
12   neighbors who were upset with Edgewood's
13   enrollment numbers to accept Edgewood's enrollment
14   numbers; correct?
15         MR. INGRISANO: Objection.  Form.
16   Calls for speculation.
17 A  Yes.
18 Q  Okay.  And you understood that she was being an
19   advocate for Edgewood in an event to reach
20   consensus; correct?
21 A  0again --
22         MR. INGRISANO: Objection.  Form.
23 A  Again, if I can describe the process.  We are
24   asking the neighbors to agree to things they're
25   not going to be happy with and they are asking us

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 77

1    to do things we are not happy with. Our job was
2    to say, This is as good as we can get in our
3    partnership and collaboration. Will you help me
4    to convince your people, and we all did that for
5    each other. That's what we did.
6  Q  Okay. And did you believe Ms. Schey made efforts
7    on behalf of Edgewood to be a good collaborator?
8  A  Yes.
9  Q  Okay. And with respect to one of the still
10   outstanding issues that's at the bottom of your
11   email, there were still some outstanding issues
12   with respect to mechanical and electrical
13   equipment on the college?
14  A  Yes. Uh-huh.
15  Q  And you understood that the concerns of the
16   neighbors related to noise of the equipment;
17   correct?
18  A  Yes.
19  Q  Okay.
20  A  And those were college buildings.
21  Q  Okay. Oh, I'm sorry. Let me go back to the top
22   email.
23      Mr. Guns writes at the top that he thinks
24   evening ambient noise levels is a problem. Do you
25   see that?

Page 78

1  A  Uh-huh. Yes.
2  Q  And what did you understand Mr. Guns to be
3    referring to there?
4  A  I think that -- now, Mike -- this is where I'm in
5    the role of ally. The neighbors are saying
6    ambient noise level is a problem and our chief
7    financial officer is saying, We're responsible for
8    the birds? You know. How can we say that here we
9    are on busy Monroe Street and we're going to be
10   responsible for the ambient noise? You know,
11   that's the context for this.
12  Q  Okay. And did you understand the neighbors were
13   concerned about the mechanical and electrical
14   equipment being louder than evening ambient noise?
15      MR. INGRISANO: Objection. Form.
16      Calls for speculation.
17  A  What are you looking at?
18  Q  I'm looking at the last paragraph, Shawn's
19   suggested wording.
20  A  The proposed wording? I see. I see that they
21   amended it so it said mechanical, they added
22   "and electrical" equipment. Every effort will be
23   made to locate, they crossed out "mechanical"
24   equipment. What I see is that they were proposing
25   changes to wording about what, you know -- I think

Page 79

1    I don't understand your question.
2  Q  That's fine. Let me direct you more. In the
3    paragraph "Edgewood's response," the last phrase
4    refers to "minimize the sound impact on the
5    neighborhood with the intent to keep perceived
6    sound levels no higher than the existing ambient
7    noise level in the neighborhood." Do you see
8    that?
9  A  I see that.
10  Q  Okay. And the neighbors are saying, "Minimize the
11   sound impact on the neighborhood with intent to
12   keep perceived sound levels no higher than the
13   existing evening ambient noise level in the
14   neighborhood." Do you see that?
15  A  For context, this is referring to equipment on
16   buildings.
17  Q  Correct.
18  A  And this is sound that would be happening all time
19   of the day and night.
20  Q  Correct.
21  A  And so our response had to do with mechanical
22   equipment that would be pouring sound into the
23   neighborhood 24/7.
24  Q  Correct.
25  A  And that's what this is about.

Page 80

1  Q  And the neighbors wanted that to be kept to levels
2    no higher than existing evening ambient noise and
3    Edgewood wanted it to be no higher than existing
4    ambient noise, not limited to evening; correct?
5    That's what the issue is?
6      MR. INGRISANO: Objection. Form.
7  A  It says, "steps will be taken to analyze and
8    minimize the sound impact on the neighborhood with
9    the intent to keep perceived sound levels no
10   higher than the existing ambient noise level in
11   the neighborhood." That's what this says.
12  Q  Right. And with respect to Mr. Guns' email,
13   that's what it related to. That is --
14  A  Oh, that he's saying this could mean daytime noise
15   level will not exceed. I think I pulled this out.
16   Let's see. Noise levels were -- we were just
17   trying to find wording that everybody could agree
18   on. I think the neighbors are concerned about too
19   noisy and the college is saying, We've got
20   buildings going on here. There is going to be
21   some noise. And we were trying to find wording.
22  Q  Okay.
23      (Exhibit No. 140 marked for
24       identification)
25  Q  Ms. Balistreri-Clarke, I'm showing you what's been

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 81

1    marked as Exhibit 140.  I'll give you a moment to
2    review that email.
3  A  Okay.
4  Q  Exhibit 140 contains an email from you dated
5    August 12, 2013, again, to Sister Kathleen, Mike,
6    and Dan, the three Edgewood school presidents;
7    correct?
8  A  Yes.
9  Q  Okay.  And you're sending the most current version
10   of one of the chapters in the master plan;
11   correct?
12 A  Yes.
13 Q  Okay.  And you note in the third paragraph,
14   "Please review this document and let me know any
15   questions or concerns that you have.  Because
16   section 4 was initially created by the neighbors,
17   I am working with Shawn Schey on this but do not
18   plan to send it out to the group until I get some
19   kind of 'go ahead' from the three presidents."
20   Did I read that correctly?
21 A  Yes.
22 Q  And you were getting the go-ahead from the three
23   presidents because you wanted to make sure that
24   everyone was in agreement on the language that was
25   in the master plan before sharing it with the

Page 82

1    neighbors; correct?
2  A  I needed the go-ahead from the three presidents
3    because otherwise I was not authorized to do
4    anything without the agreement of the three
5    presidents.
6  Q  Okay.  So as you understood it, you shared drafts
7    of the master plan with the presidents because
8    without their authorization, you could not proceed
9    with that draft; correct?
10 A  Lots of ideas are discussed, and then it's this is
11   what we are now proposing.
12 Q  Yes.
13 A  I was authorized to discuss anything I wanted to
14   discuss.
15 Q  Okay.
16 A  I wasn't authorized to say this is now what we are
17   proposing without them.
18 Q  Okay.  Perfect.  Okay.  Thank you.
19           (Exhibit No. 141 marked for
20            identification)
21 Q  Ms. Balistreri-Clarke, I'm showing you what's been
22   marked as Exhibit 141.  This is a series of
23   emails.  I'm going to give you a minute to review
24   them.
25 A  Okay.  I guess I don't need to read the whole

Page 83

1    thing?
2  Q  As long as you're generally familiar with it.
3  A  Okay.
4  Q  Okay.  In Exhibit 141, Mike Elliott is raising a
5    question about the massing for the proposed
6    high school buildings and in particular the plan
7    to go up one or two stories on the existing
8    commons; correct?
9  A  Yes.
10        MR. INGRISANO: Objection.  Form.
11 Q  Well, let me direct your attention to EHS11377 in
12   the document.
13 A  Okay.  And this is from me to Sue Ellingson who --
14 Q  And then the email above that is Mike Elliott to
15   you; correct?
16 A  Okay.
17 Q  And he says, "Since I'm new to this I just want to
18   make sure that there is an understanding that we
19   have the high school plan to go up one or two
20   stories on the existing commons.  Does this have
21   to be shown?"
22 A  Okay.
23 Q  Did I read that correctly?
24 A  Yes.
25 Q  And you understood Mr. Elliott was asking whether

Page 84

1    this needed to be shown on the master plan;
2    correct?
3  A  Yes.  That's what this says.
4  Q  And you in turn take that email and forward it to
5    Doug Hursh at Potter Lawson; correct?
6  A  Yes.  Uh-huh.
7  Q  And --
8  A  May I -- The question is:  You show a square.
9    Mike is asking do we need a three-dimensional
10   square or is just the footprint enough.  That is
11   his question.
12 Q  Okay.  And then there is some communications back
13   and forth, and Mr. Elliott writes on page 11374,
14   the bottom of the page, he writes to Mr. Hursh
15   that he's not sure what massing is.  However, the
16   commons appears lower in the models.  We will at
17   some point make that the same height as the rest
18   of the building.  Not out only up.  Do you see
19   that?
20 A  Uh-huh.
21 Q  Is that a yes?
22 A  Let's see.  I see that that's what he's written.
23   I need to think about what it means, but, yeah.
24 Q  All right.  Well, and I want to now direct you to
25   your email on the first page.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 85

1 A  Okay.

2 Q  And it's you to Mike dated September 19, 2013.

3     Do you see that?

4 A  Yes.  Yes.

5 Q  You said, "Mike, it's important that the master

6     plan be accurate so thank you for sticking with

7     this until it's right."  Did I read that

8     correctly?

9 A  Yes, you did.

10 Q  And why was it important that the master plan be

11     accurate from your understanding?

12 A  Because it was meant to be -- we wanted things to

13     match if possible.  So if we said that the college

14     was going to build an 80,000 square foot building,

15     so the map had to match the language, and Mike is

16     obviously coming in new at this point and,

17     you know, so I'm just trying to say that the

18     pieces refer to each other and part of our job was

19     to say this matches this matches this, and I'm

20     just helping him get used to that, I think, I

21     believe.

22 Q  And in terms of the importance of the master plan

23     being accurate, part of that was because you were

24     trying to be transparent with the neighborhood in

25     terms of anything that was in the master plan;

Page 86

1     correct?

2         MR. INGRISANO:  I'm sorry.  Can you

3     read that question back again?

4         (Question read)

5 A  If something was in the master plan, we hoped that

6     people would know we were all talking about the

7     same thing, you know.  That if we said site this,

8     people knew what that meant and there was a

9     description here.  Is that answering your question?

10 Q  I'm not sure that it is.  In terms of your desire

11     that the master plan be accurate, was part of the

12     reason for that that you wanted the information

13     that was provided to the neighbors in that master

14     plan to be accurate?

15         MR. INGRISANO:  Objection.  Form.

16     Vague as to whether you're asking the witness

17     on her own recollection or on behalf of

18     Edgewood generally or college or whoever.

19 A  Okay.  I would say my hope was that it would be as

20     transparent a process as possible.  And so my goal

21     was people would know what we meant when we said

22     this or that.  That when we said this is what we

23     wanted to do at this time and when we want to

24     change it this is what we're going to do, that

25     that's what we were trying to do.

Page 87

1 Q  And that process of trying to be transparent is

2     part of the reason why you wanted the plan to be

3     accurate; correct?

4 A  Yes.

5 Q  Okay.  Did you have any understanding of what

6     would happen if the master plan were not accurate

7     in some fashion?

8         MR. INGRISANO:  Objection.  Form.

9     Vague.

10 A  I can only go back to it wasn't meant to be set in

11     concrete.  It wasn't meant to be a blueprint.  It

12     wasn't meant to be anything other than from what

13     we know in 2014, this is 2014, this is what we

14     got.

15     I think that all of the entities had a wish

16     list that probably didn't make it into the master

17     plan because there would not be enough paper.

18     I mean, if I can digress, I had neighbors who

19     were not happy with the internal gates that would

20     cover our garbage, and I'm talking about internal

21     to our campus we had a set of gates covering our

22     garbage area and they weren't happy with it.  They

23     would wish that we had no garbage.  I mean, I know

24     it sounds outlandish, but I'm talking about really

25     things expressed.

Page 88

1     So every entity had kind of a wish list, and

2     nobody thought the document was everybody's wish.

3     It was, Look, here is our best effort.

4 Q  Yes.  Okay.

5 A  I don't know if that's helpful, but I'm trying to

6     give you an understanding of the -- it was a lot

7     of people with many different things they wanted.

8         (Exhibit No. 142 marked for

9         identification)

10 Q  I'm showing you what's been marked as Exhibit 142.

11 A  Okay.  Okay.

12 Q  This is an email from you to Sister Kathleen and

13     Mike Elliott --

14 A  Yes.

15 Q  -- dated October 25, 2013; correct?

16 A  Yes.

17 Q  And you're asking them to provide information for

18     purposes of putting that information into the

19     master plan; correct?

20 A  Yes.  Uh-huh.

21 Q  Okay.  That's all for that one.

22         (Exhibit No. 143 marked for

23         identification)

24 Q  I'm showing you what's been marked as Exhibit 143.

25 A  Uh-huh.  Yes.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 89

1  Q   The bottom is an email from you dated November 13,
2      2013, to a number of people; correct?
3  A   Yes.
4  Q   All right.  It includes Mike Elliott, the
5      president of Edgewood High School; correct?
6  A   Yes.
7  Q   Okay.  And being cc'ed also is Doug Hursh from
8      Potter Lawson; correct?
9  A   Yes.
10 Q   And you tell them that -- or you seem to be
11     attaching a November 13 master plan graphic along
12     with most recent version of the building uses.
13     Do you see that?
14 A   Master plan.  Yes.
15 Q   And you indicate at the bottom to Mike Elliott and
16     Sister Kathleen, "We can continue to tweak this
17     document until we submit so no worries if you want
18     to make changes.  I just want to get a good
19     version out for our board to review tomorrow."
20     Do you see that?
21 A   Uh-huh.
22 Q   Is that a yes?
23 A   Yes.  I'm sorry.
24 Q   That's okay.  And when you say until we submit,
25     are you referring to submission of the document to

Page 90

1      the city?
2  A   Yes.
3  Q   Okay.  And you understood that once it was
4      submitted to the city that the institutions
5      wouldn't be able to tweak it anymore but instead
6      if any changes had to be made to it, it would have
7      to go through --
8  A   Another process.
9  Q   -- another process?
10         MR. INGRISANO:  Objection.  Form.
11         Move to strike.
12 A   If you could ask it again, I will try and be
13     clearer.
14 Q   Sure.  You understood that you could tweak the
15     master plan up until the time it was submitted to
16     the city; correct?
17         MR. INGRISANO:  Objection.  Form.
18         Foundation.
19 A   We could tweak it until we submitted it to the
20     city because anything in it we had permission for.
21     As soon as it was approved, we were done.
22 Q   Correct.  Then if it wasn't in the master plan or
23     you wanted to change something in the master plan,
24     you understood that had to go through a different
25     process; correct?

Page 91

1  A   Yes.
2  Q   Okay.  And Mr. Elliott responded to your email
3      with some changes that he's suggesting to the
4      master plan graphic and the building uses;
5      correct?
6  A   Yes.
7  Q   Okay.  And just to be clear, on Exhibit 143, the
8      date is November 13, 2013; correct?
9  A   November 13, 2013.
10 Q   Okay.
11         (Exhibit No. 144 marked for
12         identification)
13 Q   I'm showing you what's been marked as Exhibit 144.
14     This is an email from you dated November 14, 2013.
15     This is one day after Exhibit 143; correct?
16 A   Yes.
17 Q   Okay.  And this again includes a number of people,
18     including Mike Elliott and Doug Hursh; correct?
19 A   Yes.
20 Q   And you write, "Friends, here is the version of
21     the master plan graphic and buildings summary that
22     will be distributed to the College Board of
23     Trustees this afternoon.  Mike Elliott clarified
24     the uses for the high school and Doug has added
25     information on why there is more information on

Page 92

1      perimeter buildings."  Is that correct?
2  A   Yes.  That's what this says.
3  Q   Okay.
4         (Exhibit No. 145 marked for
5         identification)
6  Q   I'm showing you what's been marked as Exhibit 145.
7      I'll give you a moment to review that.
8  A   Okay.
9  Q   I would like to start with the last page of the
10     document.
11 A   Okay.
12 Q   There is an email dated January 7, 2014.
13 A   I'm sorry.  The last page of the document?
14 Q   Oh, I'm sorry.  It isn't the last page.  It is
15     11836.
16 A   Okay.
17 Q   There is an email dated Tuesday, January 7, 2014.
18     Do you see that?
19 A   Yes.  Uh-huh.
20 Q   Okay.  And below that it says, "A File Transfer
21     has arrived on the Potter Lawson Info Exchange
22     site."  Do you see that?
23 A   Yes.  Uh-huh.
24 Q   Okay.  And then going below that, this is to
25     Mike Elliott, Sister Kathleen, and Dan Carey;

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 93

1   correct?

2   A   Yes.

3   Q   And you're cc'ed on that?

4   A   Yes, I am.

5   Q   And the remarks below say, "Here is the master

6       plan document that we are planning to post on the

7       Edgewood College website and submit to the city

8       planning department." Did I read that correctly?

9   A   Yes, you did.

10  Q   And did Doug Hursh provide drafts of the master

11      plan by doing a file transfer like you see in that

12      exhibit?

13              MR. INGRISANO: Objection.

14          Foundation.

15  A   This document describes the process of viewing the

16      master plan draft on the site. That's what this

17      describes.

18  Q   Okay. And then turning to the page before, 11835,

19      there is an email from Doug Hursh at the bottom to

20      Sister Kathleen Malone and Mike Elliott with a cc

21      to you.

22  A   Yes.

23  Q   Saying, "Good morning, Sister Kathleen and Mike.

24      I'm resending the email that has the link to the

25      master plan document. I wanted to make sure you

Page 94

1       got the email since it was not from me. Let me

2       know if you have any trouble opening the file."

3   A   Yes.

4   Q   Okay. So this was a draft of the master plan

5       document that was being provided to Mike Elliott

6       by Doug Hursh; correct?

7   A   Page 011836 says that he's transferring the

8       document that's going to be posted, and right

9       after that he says he's resending.

10  Q   Okay. Perfect. And then Mike Elliott -- you have

11      to go one page back to 11834, and at the very

12      bottom --

13  A   Yes.

14  Q   -- Mike Elliott is sending an email to Doug Hursh

15      with a cc to you.

16  A   Yes.

17  Q   Dated January 10, 2014; correct?

18  A   Yes. Uh-huh.

19  Q   And he writes, "Doug, sorry for the delay. Lots

20      to read and digest."

21  A   Yes.

22  Q   Okay. And then Mr. Elliott appears to ask

23      questions and referring to specific pages of the

24      draft master plan; correct?

25  A   Yes.

Page 95

1   Q   Is it your understanding, based on your

2       interactions with Mike Elliott, that he had read

3       the draft master plan that was provided for his

4       review?

5               MR. INGRISANO: Objection. Form.

6           Foundation.

7   A   I can only go by this document that says -- when

8       he says page 21 lists the high school enrollment

9       and that he's wanting -- he's looking at the

10      numbers and there is a discrepancy. He's choosing

11      one over the other. And this is about the master

12      plan document.

13  Q   Okay. And then in the email above that, Doug

14      Hursh writes to Mike Elliott, "Very good catch.

15      Thanks, Mike." And he asks Mike to clarify on

16      something relating to that change; correct?

17  A   Yes.

18  Q   Okay. We'll put that aside.

19              (Exhibit No. 146 marked for

20              identification)

21  Q   I'm showing you what's been marked as Exhibit 146.

22      I'll give you a second to review it.

23  A   Okay. Yes.

24  Q   Okay. And I'm going to have you turn to page

25      11839. And actually I'll start with 11840.

Page 96

1   A   11840.

2   Q   Right.

3   A   Okay.

4   Q   11840, do you recognize that email with Doug Hursh

5       transferring a draft of the master plan that was

6       the same as in the prior Exhibit 145?

7   A   This memo refers to a file transfer and it's dated

8       January 7, 2014.

9   Q   Yes.

10  A   Yes.

11  Q   And going back to 11839, you see in the middle of

12      the page Doug Hursh writing what we read before,

13      "Good morning Sister Kathleen and Mike, I am

14      resending the email that has the link."

15  A   Right.

16  Q   Do you see that?

17  A   Right.

18  Q   That's the same email. But now this is

19      Sister Kathleen Malone's response; correct?

20  A   Yes.

21  Q   Okay. And Sister Kathleen responds on January 10,

22      2014, in the second paragraph, "I have no time

23      during today to look or read it over until the

24      weekend so I will not be able to approve it until

25      at least Monday."

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 97

1 A  Yes.
2 Q  Do you see that? Okay. And going to the first
3     page, 11838, Mike Elliott responds --
4 A  I'm sorry. Where is his response?
5 Q  11838, the top email.
6 A  Okay. Sorry.
7 Q  Okay. Mike Elliott responds January 11, 2014.
8 A  Okay.
9 Q  Do you see that?
10 A  Yes, I do.
11 Q  Okay. And you're cced on this email?
12 A  Yes.
13 Q  And he writes, "Sister Kathleen, as a reference
14    point and second set of eyes, I did read through
15    the entire document carefully. I found a couple
16    typos but the rest looked good and represented
17    our discussions and conclusions well. Mike."
18    Did I read that correctly?
19 A  Yes.
20 Q  Okay. At least Mr. Elliott is representing in
21    this email that he read the entire master plan
22    document carefully. Do you have any reason to
23    believe that he did not read the entire document
24    carefully?
25        MR. INGRISANO: Objection. Form

---

Page 98

1     and foundation. Calls for speculation.
2 A  This says that he read the entire document
3     carefully. That would be all I would have.
4 Q  Okay. And my question was, you know, based on
5     your interactions with Mike with respect to the
6     master plan, do you believe based on those
7     discussions that he did read the entire document
8     carefully?
9        MR. INGRISANO: Objection. Form.
10       Calls for speculation. Foundation.
11 A  All I can say is I had no reason to believe he did
12    not read it.
13 Q  Okay. Are you aware of Mike Elliott providing any
14    untruthful information to you with respect to his
15    review of the master plan?
16 A  No.
17 Q  Okay. Ms. Balistreri-Clarke, we've looked at a
18    number of emails and documents today involving the
19    master plan and Mike Elliott. From your
20    interactions with him, including meetings with
21    him, did he play an active role in the master plan
22    as it related to anything related to the
23    high school?
24       MR. INGRISANO: Objection. Form.
25       Vague. Calls for speculation. Foundation.

---

Page 99

1 A  My experience of Mike was that he was a new
2     president and that running the high school was a
3     priority for him. He was running the high school.
4     He was -- My experience was that he was as
5     involved as he could be, that he -- you know, I
6     was the one who probably read every word four
7     times. Some of that was my job. But Mike was a
8     good -- Mike was a good partner to me.
9 Q  And what do you mean by that?
10 A  He did his -- I felt that he was doing his best.
11    He was thrown in. He came in at the end of the --
12    Judd was there at the beginning of the process and
13    then there was Mike. So he was -- I always felt
14    that he was doing his best to be transparent, to
15    be a good partner, to be helpful, to be
16    collaborative.
17 Q  Did he attend some of the Edgewood Neighborhood
18    Liaison Committee meetings?
19 A  I believe -- I would have to look at the minutes
20    for who was the rep. I believe it was -- when we
21    were talking the master plan -- the only meeting
22    for sure I remember was there was a meeting about
23    resurfacing, but that was after the master plan
24    was submitted. He presented something on the
25    resurfacing, and I remember he was there talking

---

Page 100

1     about the resurfacing.
2 Q  Okay.
3 A  Otherwise, you know, I would have to look at the
4     minutes to say which ones was he there and which
5     ones was he not.
6 Q  Okay.
7 A  But with Sister Kathleen and with Mike, they would
8     leave stuff to me if they couldn't make a meeting
9     because we were all just trying to birth the baby.
10 Q  Okay. And when they couldn't make a meeting and
11    would leave things with you, would you have
12    occasion to discuss the projects that involved the
13    high school and the campus school?
14       MR. INGRISANO: Objection. Form.
15 Q  To the extent that those came up during those
16    meetings?
17       MR. INGRISANO: Same objection.
18 A  Well, if there was no representative from one of
19    those schools, I might offer kind of an opinion.
20    I could never speak for the other schools. I
21    mean, I didn't have the authority to do that.
22    I could say, Here is what's in the master plan.
23    You know, I could say that. But if it was after
24    the master plan or we were still in process, I
25    could not speak for them.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 101

1 Q   Okay.  And because you could not speak for them,
2     you agree that Mike Elliott was responsible for
3     the portions of the master plan that related to
4     the high school?
5         MR. INGRISANO:  Objection.  Form.
6     Foundation.
7 A   My understanding was that ultimately the three
8     presidents had the authority to say this is what
9     we're doing.  That if something said Edgewood
10    College, that Dan Carey was signing off on that.
11 Q   And so Mike Elliott was responsible for those
12    portions of the master plan that related to the
13    high school?
14 A   Yes.
15        MR. INGRISANO:  Objection.  Form.
16    Vague as to "responsible."  Move to strike.
17        (Exhibit No. 147 marked for
18          identification)
19 Q   I'm showing you what's been marked as Exhibit 147.
20 A   Yes.
21 Q   Could you just take a moment to look at that
22    document?
23 A   Yes.
24 Q   Are you ready?
25 A   Yes.

Page 102

1 Q   Okay.  Let's start with the bottom email on the
2     first page.  Shawn Schey is writing an email to
3     you dated January 8, 2014; correct?
4 A   Yes.
5 Q   And she writes, "Thought you'd like to know,
6     Maggie, that tonight the DMNA Council passed the
7     following resolution:  'The Dudgeon-Monroe
8     Neighborhood Association expresses its
9     appreciation to the Edgewood schools for
10    supporting the Neighborhood Liaison Committee and
11    accepting input from Dudgeon-Monroe and Vilas
12    neighborhoods during the 2012-2014 rewrite of the
13    Edgewood Master Plan.  The Council supports the
14    submission of Edgewood's new Master Plan to the
15    city."  Did I read that correctly?
16 A   Yes.
17 Q   And you go ahead and forward this to the
18    three presidents of the Edgewood schools:
19    Sister Kathleen, Mike Elliott, and Dan Kelly;
20    correct?
21 A   Yes.  Uh-huh.
22 Q   And you write to them, "Shawn Schey asked me to
23    share with you this lovely resolution from DMNA
24    in support of our master plan."  Correct?
25 A   Yes.  Uh-huh.

Page 103

1 Q   And Mike Elliott responds, "Great news!" on
2     January 13, 2014; correct?
3 A   Yes.
4 Q   And what was your understanding as to -- Well,
5     strike that.
6         Let me ask you, you refer to it as a lovely
7     resolution.
8 A   Yes.
9 Q   Why do you refer to it as a lovely resolution?
10 A   It's hard to describe the discord among the five
11    partners, and putting two sticks together
12    wasn't -- you couldn't take that for granted.  So
13    whenever we could find a way to partnership in
14    collaboration, it was a beautiful thing.
15 Q   And did you understand that it was important for
16    the Edgewood schools to obtain the approval of a
17    neighborhood liaison -- excuse me, of the
18    neighborhood associations for Edgewood's master
19    plan to pass the --
20 A   We --
21        MR. INGRISANO:  Objection.  Form.
22 A   I can describe the process.  The three schools
23    would agree.  We would bring it to the liaison
24    committee.  We would all discuss it.  We would go
25    back to the three schools.  The three schools

Page 104

1     would say, Yep, that's what we're proposing.  We
2     would go back to the liaison committees.  When
3     those two groups said, Yep, this is what we want
4     to propose, then you ask Vilas to support it
5     because that's their -- you know, the rep couldn't
6     speak for them either, and then you go to Dudgeon-
7     Monroe or vice versa, you know.  And so everybody
8     had to approve it up and down and forward before
9     we could go to the city.
10 Q   Okay.  And do you have an understanding that
11    if the neighborhood associations, if Vilas
12    Neighborhood Association and Dudgeon-Monroe
13    Neighborhood Association, did not approve the
14    master plan, whether or not that would get
15    approval from the city?
16        MR. INGRISANO:  Objection.  Form.
17    Calls for speculation.  Calls for a legal
18    conclusion.
19 A   This is -- In this process, my belief and
20    understanding was that the city wouldn't -- the
21    liaison committee would not have approved it
22    without the Dudgeon-Monroe and the Vilas approval.
23 Q   Okay.
24 A   I see this.
25 Q   Okay.  I'm showing you what's been marked in a

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 105

1   prior deposition as Exhibit 53, and the top
2   email is an email from Mike Elliott to you dated
3   January 23, 2014; correct?
4  A  Yes.
5  Q  And going to the email below that, you're emailing
6   Dan Carey, Mike Elliott, and Sister Kathleen on
7   January 23, 2014; correct?
8  A  Yes.
9  Q  And you're saying, "Hooray!  Both Vilas and DMNA
10   have now voted to officially support the Edgewood
11   master plan.  We're almost there!"
12  A  Yes.
13  Q  Correct?
14  A  Yes.
15  Q  So the last one related -- the last email we had,
16   or, I'm sorry, the last exhibit we had was the
17   approval from DMNA.  You also got approval from
18   Vilas; correct?
19  A  Yes.
20  Q  Okay.
21  A  Is there another stack that large or is this it?
22  Q  No.
23  A  Okay.  Just wondering.  Just wanted to check.
24         (Exhibit No. 148 marked for
25            identification)

Page 106

1  Q  I'm showing you what's been marked as Exhibit 148.
2   This is an email from you to Sister Kathleen,
3   Mike Elliott, and Dan Carey, among others, dated
4   March 20, 2014; correct?
5  A  Yes.  Uh-huh.
6  Q  Okay.  And you write, "Good news!  The City of
7   Madison staff is recommending approval of our
8   campus master plan!"  Did I read that correctly?
9  A  Yes.  Uh-huh.
10  Q  And you also write, "There are a list of
11   conditions for approval from all of the different
12   departments.  I just went through them quickly and
13   they look reasonably 'doable.'"  Did I read that
14   correctly?
15  A  Yes, you did.
16  Q  Okay.  So you understood that the city was
17   recommending approval of the --
18  A  Yes.  Yes.
19  Q  Okay.  And forgive me.  You've got to just let me
20   get my question out in full.
21  A  Oh.
22  Q  That's okay.  You understood in March that the
23   city was recommending approval of the master plan;
24   correct?
25  A  Yes.

Page 107

1  Q  But you also knew there were some conditions that
2   were going to have to be resolved; correct?
3  A  Yes.
4  Q  And did you understand that after those conditions
5   were resolved that there would be a final master
6   plan that got accepted by the city?
7         MR. INGRISANO: Objection.
8      Foundation.
9  A  The process was that then it would go to the City
10   Council.  The staff was just one more partner that
11   could say no.
12  Q  Okay.
13  A  But they didn't have final approval.  The City
14   Council had final approval and the mayor.  So
15   that's the process.
16  Q  Okay.  Did the City Council vote to approve the
17   master plan?
18  A  Yes, it did.
19  Q  Okay.  After the City Council voted to approve the
20   master plan, did you understand that there were
21   some conditions still that needed to be resolved
22   by Edgewood?
23         MR. INGRISANO: Objection.  Form,
24      foundation.  The witness is reviewing the
25      exhibit and not answering from her own

Page 108

1   memory.
2  A  I would say that if they approved it with
3   conditions, saying you've got to do this before
4   you get final final, that's a possibility.
5  Q  Okay.  Let me have you look at the big master plan
6   document, Exhibit 52.
7  A  We never looked at that one.
8  Q  I'm going to come back to that.
9  A  We're coming back to that.  Okay.
10  Q  I'm going to ask you again, on the top of the page
11   it has page 2 of 228.  Can you turn to page 6 of
12   288?
13  A  Okay.
14  Q  We looked at this letter earlier; correct?
15  A  Yes.
16  Q  Okay.  Do you recognize this letter from Tim Parks
17   dated April 22, 2014?
18  A  So this shows -- okay.  So April 8 was the
19   approval of the Common Council, and then this is
20   from the city April 22.  Okay.  I see that.
21  Q  And looking at the first paragraph of the letter.
22  A  Okay.
23  Q  It says that the Common Council has approved the
24   master plan subject to the conditions that follow.
25   "These conditions of approval shall be satisfied

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 109

1  prior to the master plan taking effect and the
2  issuance of building permits for any of the
3  projects contained in the plan."  Do you see that?
4 A  Yes, I do.
5 Q  Did you have an understanding that there were
6  conditions that needed to be satisfied before the
7  master plan took effect?
8        MR. INGRISANO: Objection.  Form.
9 A  There was an email from -- if these two documents
10  can go together, there are a list of conditions
11  for approval.  This is from me.  And that they
12  looked reasonably doable.  So tell me your
13  question again.
14        MR. INGRISANO: The witness is
15  referring to Exhibit 138.
16        THE WITNESS: 148.
17        MR. INGRISANO: 148.
18 Q  My question was did you have an understanding that
19  there were some conditions that needed to be
20  satisfied before the master plan took effect?
21 A  Yes.
22 Q  Okay.
23        (Exhibit No. 149 marked for
24        identification)
25 Q  I'm showing you what's been marked as Exhibit 149.

Page 110

1 A  Okay.  So now this is in October.
2 Q  Okay.
3 A  Right.
4 Q  Yes.  Okay.  So the bottom email on Exhibit 149 is
5  an email from you from October 2, 2014.
6 A  Okay.
7 Q  Is that correct?
8 A  Yes.
9 Q  And it says, "Hi, Mike."  Correct?
10 A  Yes.
11 Q  And the top is Mr. Elliott's response to that
12  email sent to you dated October 20 of 2014?
13 A  Yes.  Uh-huh.
14 Q  Okay.  And you wrote, "Hi Mike, Doug and I agreed
15  that we would not submit the master plan document
16  to the city until you gave us the 'go ahead.'  We
17  were really hoping to submit it this week or early
18  next week.  Could you please let us know if you
19  have concerns or if we have your approval?"  Did I
20  read that correctly?
21 A  Yes.
22 Q  Now, again, because you've indicated you couldn't
23  speak for the college, you needed Mike Elliott to
24  give you the approval of the final master plan
25  document; correct?

Page 111

1        MR. INGRISANO: Objection.  Form.
2 A  Yes.
3 Q  Okay.  And Mr. Elliott says he's not sure if he
4  has the final document; correct?
5 A  Yes.
6 Q  Okay.
7        (Exhibit No. 150 marked for
8        identification)
9 Q  Have you had a chance to review it?
10 A  Yes.
11 Q  I'm showing you what's been marked as Exhibit 150.
12  And with respect to the bottom email on
13  Exhibit 150, it's from Doug Hursh to you and
14  Mike Elliott dated October 20, 2014; correct?
15 A  Yes.
16 Q  And Doug Hursh says, "Hi all, The document that we
17  sent is attached.  The changes were," and he goes
18  through and lists a number of changes that were
19  made to the master plan; correct?
20 A  Yes.
21 Q  And this is in connection with Mr. Elliott's email
22  in Exhibit 149; correct?
23        MR. INGRISANO: Objection.  Form.
24  Foundation.
25 Q  Well, let's do it this way.  Could you go back to

Page 112

1  Exhibit 149, please?
2 A  Yes.
3 Q  The email from Mike Elliott to you on October 20,
4  2014, looks to be at 9:59 a.m.; correct?
5 A  Yes.
6 Q  And Mike is saying that he's not sure if he --
7 A  Got the final document.
8 Q  -- got the final document; correct?
9 A  Yes.
10 Q  And he also says, "Paul said we had square footage
11  and drawing changes.  Were those made?"  Do you
12  see that?
13 A  Yes.
14 Q  Okay.  And then with respect to Exhibit 150,
15  this is an email from Doug Hursh to you and
16  Mike Elliott approximately 30 minutes after the
17  email in Exhibit 149; correct?
18 A  Yes.
19 Q  And Doug is attaching the master plan and
20  describing changes as they relate to the
21  high school; correct?
22        MR. INGRISANO: Objection.  Form.
23  Foundation.
24 A  Yes.
25 Q  Okay.  And you say, "Thank you Doug!  Mike please

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 113

1     let me know your thoughts. Maggie." Correct?
2  A  Yes.
3  Q  You're waiting for his approval for the master
4     plan so that it could be submitted to the city;
5     correct?
6  A  Yes.
7  Q  Okay.
8         (Exhibit No. 151 marked for
9         identification)
10  Q  I'm showing you what's been marked as Exhibit 151,
11     and the top is an email from Mike Elliott to Doug
12     Hursh and you are cced on October 20 of 2014;
13     correct?
14  A  Yes.
15  Q  Okay.  And just below that is the email from Doug
16     Hursh dated October 20, 2014, at 10:29 that was in
17     the prior exhibit we just looked at; correct?
18  A  Yes.
19  Q  Okay.  And Mr. Elliott has responded at
20     approximately 3:30 in the afternoon that
21     afternoon.  "Sorry for the delay.  We are good to
22     go on master plan."  Correct?
23  A  Yes.  That's what this says.
24  Q  All right.  And you understood from this email
25     that you now had approval from Mike Elliott as to

Page 114

1     submitting the campus -- the Edgewood Campus
2     Master Plan to the city on behalf of the
3     high school; correct?
4  A  Yes.
5  Q  Okay.  I saw a reference to -- well, let me strike
6     that and just ask you from your memory.
7        Do you recall the final master plan being
8     posted on the website for neighbors to access and
9     review?
10  A  I don't remember how.  I don't remember that.
11     I'm sure that -- yeah.  I don't remember how we
12     got the document out.
13  Q  Okay.  Exhibit 53, let me find that for you.  I'm
14     turning back to what was the previously marked
15     Exhibit 53.  If you look at the second page of
16     Exhibit 53, at the top there is an email dated
17     January 20, 2014, from you.  Do you see that?
18        MR. INGRISANO: What page again?
19        MS. ZYLSTRA: The second page of
20     the document, EHS9297.
21        MR. INGRISANO: Thank you.
22  Q  The top there.
23  A  Oh, the very top?
24  Q  Yes.
25  A  To Julia?

Page 115

1  Q  Correct.
2  A  Yes.  I see that.
3  Q  You say, "We will submit" -- in the second
4     paragraph, "We will submit the plan tomorrow
5     morning in time for the January 22 deadline."  And
6     then in the next paragraph down, "The final plan
7     is posted on the website.  Please let me know if
8     you need anything further."  Do you see that?
9  A  Okay.  I do see that.
10  Q  Does this refresh your recollection in terms of
11     the master plan being posted on a website for --
12  A  This says that the master plan was posted on a
13     website.  I don't -- I don't remember whose.
14  Q  But your understanding was that the neighbors had
15     access --
16  A  Yes.
17  Q  -- to the final master plan?
18        MR. INGRISANO: Objection.  Form.
19     Vague as to time.
20  A  Yes.  Well --
21        MR. INGRISANO: And vague as to
22     final.  We're talking about two different
23     timeframes here, October of 2014 and this is
24     dated January of 2014.
25  Q  Let me rephrase my question.

Page 116

1  A  Okay.
2  Q  Okay.  It was your understanding that in January
3     of 2014 --
4  A  Yes.
5  Q  -- the draft of the master plan as it existed at
6     that time was posted on a website such that
7     neighbors could review the information that was
8     in that draft; correct?
9  A  That's what I'm saying in this email.
10  Q  And that's true; correct?
11  A  Yeah.  I believe, yes.
12  Q  Okay.  Based on your attending meetings, including
13     Edgewood Neighborhood Liaison Committee meetings
14     in which neighbors appeared and spoke to you --
15  A  Yes.
16  Q  -- did you have any interactions with neighbors
17     that led you to believe that the neighbors read
18     the master plan that got posted; correct?
19  A  Now, when you say neighbors, we're talking about a
20     lot of people.  Are you talking about the liaison
21     committee members or neighbors from --
22  Q  Right now I'm asking about anyone.  Are you aware
23     of any of the neighbors reading the master plan?
24  A  Yes.  My impression was that they had pulled out
25     their magnifying glass and they were reading it.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 117

1  Q  Thank you.  I'd like to go back to the master plan
2     document.
3  A  Okay.
4  Q  At the top where it says 2 of 228, can you turn to
5     33 of 228?
6        MR. INGRISANO: I'm sorry.  Which
7        page, Counsel?
8        MS. ZYLSTRA: 33 of 228.
9  A  Okay.
10 Q  Okay.  And this page has a heading 3.1 Future
11    Needs of Campus Institutions; is that correct?
12 A  Yes.
13 Q  Okay.  With respect to Edgewood High School, it
14    indicates on that page that Edgewood High School
15    has identified six areas of focus in its current
16    strategic plan related to space needs.  Did I say
17    that correctly?
18 A  Yes.
19 Q  Then continuing on the top of the next column,
20    does the high school identify the six areas of
21    focus?
22       MR. INGRISANO: Objection.
23       Foundation.
24 A  They don't number them.  So they have listed what
25    their needs are.

Page 118

1  Q  Correct.  And while they haven't numbered them,
2     there are six items listed there set off by
3     semicolons; correct?
4  A  Okay.  Correct.  Yes.
5  Q  Underneath that is Edgewood College; correct?
6  A  Yes.
7  Q  All right.  And it says it has identified five
8     priorities related to space needs to be addressed
9     within the next ten years; correct?
10 A  Yes.  Uh-huh.
11 Q  Okay.  And turning to the next page, there is a
12    heading Residence Halls; correct?
13 A  Yes.
14 Q  And then turning to the next page, there are four
15    other headings, Regina Hall Remodel and Eastern
16    Expansion.
17 A  Yes.
18 Q  Athletics?
19 A  Yes.
20 Q  School of Business?
21 A  Yes.
22 Q  And music?
23 A  Yes.
24 Q  Correct?
25 A  Yes.

Page 119

1  Q  Are those headings, are those the five priorities
2     related to Edgewood College's space needs?
3        MR. INGRISANO: Objection.
4        Foundation.  Form.
5  A  Okay.  That is under the college's five
6     priorities.  So we've got residence halls, the
7     remodel -- or that's probably the same thing,
8     athletics, school of business, music.  Oh, and
9     eastern expansion.  Okay.  Yes.
10 Q  You agree with me that the subheadings that occur
11    on page 34 of 228 and 35 of 228, those five
12    headings relate to the five priorities of
13    Edgewood College; correct?
14 A  Yes.
15 Q  All right.
16 A  Can I -- yes.
17 Q  Okay.  And looking back to page 33 of 228, as I
18    understood the structure of this, Edgewood Campus
19    School wrote their paragraph as to what their
20    future needs were; correct?
21 A  Yes.
22 Q  And Edgewood High School wrote their paragraph as
23    to what their six future needs were; correct?
24 A  Yes.
25 Q  And Edgewood College wrote what their five

Page 120

1     priorities were and listed them on the next two
2     pages; correct?
3  A  Yes.  That's my understanding.
4  Q  And the five priorities that are listed for the
5     Edgewood College relate only to the college and
6     not to the high school; correct?
7  A  That's my understanding.
8  Q  Okay.  Could you turn to page 54 of 228.  Sorry.
9     Give me one minute here.  I'm sorry.  Can we start
10    on 49 of 228.
11 A  Okay.
12 Q  So there is a heading 3.5, Residence Halls and
13    Buildings 14 and 16 Diagrams and Agreements.
14    Did I read that correctly?
15 A  Yes, you did.
16 Q  Okay.  And there is a picture on that page of the
17    master plan; correct?
18 A  Yes.
19 Q  And there is a number 14 and a number 16 on two
20    buildings; correct?
21 A  Yes.  Uh-huh.
22 Q  And is Dominican Hall building 14 and Marshall
23    Hall building 16?
24 A  Yes.
25 Q  Okay.  And now going back to --

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 32 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 121

1 A  Wait.  No.  That's not right.  Dominican is in
2      white.  It's not numbered, because it's already
3      existing.  So 14 is a new residence hall, blank
4      new residence hall, and 16 is building to replace
5      current Marshall.
6 Q  I got it.
7 A  So the yellow are the proposed spaces.  The white
8      are the existing spaces.
9 Q  Got it.  Thank you.
10 A  Sorry.  It took me a minute.  So the little white
11      building over there, that's probably Siena.  There
12      is a house there too, but that doesn't belong to
13      the schools.  So the white building next to 14
14      would be Siena.  Then 14, proposed new building.
15      16, proposed new building.  They're eliminating
16      Marshall in this drawing.
17 Q  Okay.  The proposed building 14 and proposed
18      building 16 were proposed residence buildings for
19      Edgewood College; correct?
20 A  No.  I thought -- I think one of those we were
21      hoping could be a music building.
22 Q  Okay.  But both of them were proposed buildings of
23      the college?
24 A  Yes.
25 Q  Okay.  Turning past the pictures to the text on

Page 122

1      page 54 of 228.
2 A  Okay.
3 Q  There is a heading in all capital letters that
4      says Residence Halls and Buildings 14 and 16;
5      correct?
6 A  Oh, okay.  Uh-huh.
7 Q  Is that correct?
8 A  Yes.
9 Q  Then it appears to me to have subheadings --
10 A  Yes.
11 Q  -- underneath the big umbrella Residence Halls and
12      Buildings 14 and 16; correct?
13 A  Right.  Right.
14 Q  Okay.  And those subheadings appear to continue on
15      the next page, page 55 of 228; correct?
16 A  Yes.  On page 55?
17 Q  Correct.
18 A  Yes.  Uh-huh.
19 Q  And there is a subheading called Lighting.  Do you
20      see that?
21 A  Yes, I see that.
22 Q  Okay.  And it says, "Outdoor lights, security
23      box lights and other lights shall be carefully
24      designed in conjunction with the green strip
25      buffer zone and placed to minimize glare and

Page 123

1      spillage onto Edgewood (Park & Pleasure) Drive,
2      the woods and the boardwalk on Lake Wingra."
3 A  Yes.
4 Q  Did I read that correctly?
5 A  You did.
6 Q  And in terms of my understanding is that the
7      lighting -- that the lighting is referring to
8      lighting that's along the path of the lake and the
9      lights by buildings 14 and 16; correct?
10 A  Yes.
11          MR. INGRISANO: Objection.  Form
12      and foundation.
13 A  This lighting, if they're talking about lighting
14      to minimize the glare on the Park & Pleasure
15      Drive, that's behind the campus, and the lighting
16      for the woods and the boardwalk on Lake Wingra,
17      that's behind the campus.
18 Q  Okay.  This doesn't relate to lighting on Edgewood
19      High School's athletic field; correct?
20 A  This sentence does not.
21 Q  Okay.
22 A  Because it's talking about -- yeah.
23 Q  Okay.  And with respect to the next paragraph,
24      and it's referring to, underneath the ordinance
25      provision it says, "Neighbors have requested that

Page 124

1      the pole lights on both the east and west end of
2      campus will be turned off at 11:00 p.m."  Do you
3      see that?
4 A  Yes, I do.
5 Q  Again, that relates to the east and west ends of
6      campus and not lights on the athletic field;
7      correct?
8 A  They're talking about pole lights, so now they're
9      talking about security lighting.
10 Q  Okay.  All right.
11 A  So on the east and the west end of campus we had
12      security lighting.  That's what this would refer
13      to.
14 Q  Okay.  Great.  Turning a couple pages to where it
15      says page 57 of 228.
16 A  Okay.
17 Q  The heading on this is 3.6, Architectural
18      Guidelines for Perimeter Buildings; correct?
19 A  Yes.
20          MR. INGRISANO: 57?
21          MS. ZYLSTRA: 57 of 228.
22          MR. INGRISANO: Thank you.
23 Q  Again, that's the overarching heading and then
24      there are a series of subheadings underneath that;
25      correct?

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 125

1 A  Correct.  And these are architectural guidelines.
2 Q  Right.  For perimeter buildings, though?
3 A  Yes.
4 Q  Okay.  So with respect to the next page where it
5     says Site and Building Lighting.
6 A  Yes.
7 Q  You understood that to be lighting for perimeter
8     buildings; correct?
9         MR. INGRISANO: Objection.  Form
10        and foundation.  Mischaracterizes the
11        language of the document.
12 A  Well, the 3.6 says Architectural Guidelines for
13    Perimeter Buildings.  So I believe this is
14    architectural guidelines for perimeter buildings.
15 Q  Okay.
16 A  Is that answering your question?
17 Q  I believe so.  So with respect to the paragraph 7,
18    that says Site and Building Lighting.
19 A  Yes.
20 Q  Did you understand that to relate to perimeter
21    buildings?
22        MR. INGRISANO: Objection.  Form,
23        foundation.
24 A  Yes.
25 Q  Okay.  You did not understand that to be a

Page 126

1     proposal to add lights to the athletic field of
2     the high school; is that fair?
3 A  Well, it's how -- it's lighting that would affect
4     the edge of the campus, anything on the edge of
5     the campus.
6 Q  Okay.  But did you understand -- did you
7     understand this to be at all for adding stadium
8     lights for purposes of the high school athletic
9     field?
10        MR. INGRISANO: Objection.  Form
11        and asked and answered.
12 A  I would not have had that interpretation.
13 Q  Okay.  All right.  We are done with the master
14    plan.  Do you want another short break?
15 A  Yes.
16        MS. ZYLSTRA: Okay.  Let's take a
17        short break.
18        (Recess)
19        (Exhibit No. 152 marked for
20         identification)
21 Q  Ms. Balistreri-Clarke --
22 A  Actually, you can call me Doctor.  I'm not used to
23    the Ms.  You can call me Doctor.
24 Q  Well, I apologize profusely.
25 A  Or you could do Dr. Dean Ma'am, but there is like

Page 127

1     a little salute that goes with it.
2 Q  That's okay.  Dr. Balistreri-Clarke, I will
3     correct that going forward.
4         Okay.  When we last -- right before we had
5     taken a break, we were talking about the approval
6     given by Mr. Elliott on October 20 of 2014.  Do
7     you recall that?
8 A  Yes.
9 Q  Okay.  Just to reorient you.  The next exhibit is
10    Exhibit 152.
11 A  Okay.
12 Q  I'll give you a minute.
13        MR. INGRISANO: Can you read back
14        that last exchange, please?
15        (Previous portion read)
16 A  Okay.
17 Q  Okay.  So Exhibit 152 is an email exchange from
18    you and Mr. Elliott on October 20, 2014; correct?
19 A  Okay.  Yes.
20 Q  Okay.  And the third email down is from Mike
21    Elliott.  It's the email on October 20 where he
22    says he's not sure if --
23 A  Okay.  So that's this same --
24 Q  -- you sent the final document to him; correct?
25 A  Okay.  So it's --

Page 128

1 Q  That's the same email as in Exhibit 149; correct?
2 A  Yes.
3 Q  Okay.  And you respond to Mr. Elliott and invite
4     him to have lunch with you; correct?
5 A  Yes.
6 Q  Okay.  And indicate to Mr. Elliott that Doug
7     should be back within a half hour.  Is that
8     Doug Hursh?
9 A  Yes.
10 Q  And Mr. Elliott --
11 A  It says, "I hope to hear from Doug."  Oh, he'll be
12    back.  Yes, yes.  Sorry.
13 Q  Okay.  And Mike Elliott says, "On my way."
14    Correct?
15 A  Yes.
16        MS. ZYLSTRA: Okay.  And then let's
17        mark this one.
18        (Exhibit No. 153 marked for
19         identification)
20 A  Okay.
21 Q  So I've handed you Exhibit 153, which is a series
22    of emails involving you from October 20, 2014;
23    correct?
24 A  Uh-huh.  Uh-huh.
25 Q  Is that a yes?

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 129

1 A   I'm sorry.  Yes.
2 Q   Okay.  And the bottom email from you to Doug Hursh
3     dated October 20, 2014, you begin, "Doug, Mike
4     Elliott did come down for lunch."
5 A   Yes.
6 Q   Correct?
7 A   Yes.
8 Q   And this is in reference to your prior email,
9     Exhibit 152, in which you invited Mr. Elliott to
10    come down to lunch for purposes of trying to
11    secure his approval --
12 A  Yes.
13 Q  -- for the master plan; correct?
14 A  Uh-huh.  Yes.
15 Q  Okay.  And Mr. Elliott -- okay.  You write that
16    Mike plans to send his approval this afternoon.
17    He thought he'd be done by 2:30.
18 A  Yes.
19 Q  Okay.  Then you also write, "He plans to propose a
20    resurfacing of the football field and track at the
21    liaison committee tomorrow.  They would love to
22    put in some lights and bleachers to have home
23    games (just when we thought it was safe...)"
24 A  Yes.
25 Q  Correct?

Page 130

1 A   Yes.
2 Q   So did Mike Elliott speak to you about resurfacing
3     the football field and track on October 20 when
4     you met him for lunch?
5 A   If I am reporting that he came down for lunch and
6     that he plans to propose resurfacing, then yes.
7 Q   Okay.  Well, and that's what you're doing; correct?
8 A   Right.
9 Q   All right.  And you say, "Just when we thought it
10    was safe."
11 A  Yes.
12 Q  What do you mean by that?
13 A  I mean that Mike was now doing some visioning and
14    we were about to submit the master plan, and his
15    vision, which was no surprise to anyone in that
16    they would love to have lights and bleachers for
17    home games, everyone knew they would love to have
18    lights.  That was not news.  But what they were
19    ready to propose was the resurfacing of the
20    football field.
21 Q  Okay.  When you say everyone, you mean -- why do
22    you say everyone knew?
23 A  They had been talking about lights and bleachers
24    for that area since before my time.
25 Q  Since back in the '90s; correct?

Page 131

1 A   Yes.
2 Q   And from your understanding from way back in the
3     '90s, the neighborhood associations have always
4     opposed having lights and bleachers for that
5     athletic field; correct?
6 A   At that point, they would not have said yes.
7     Otherwise, we would have proposed -- you know,
8     they were opposed to our growing.  They were
9     opposed to our residence halls.  They were opposed
10    to -- Everything we ever did, they were opposed
11    to.
12 Q  Except for you got agreement from the neighborhood
13    associations as to the projects that were
14    ultimately in the master plan?
15 A  That's right.  That's why it took 20 years.
16 Q  Okay.  So the neighbors did agree to some of the
17    projects that were being --
18 A  Yes.  Absolutely.  Absolutely.
19 Q  Okay.  With respect to resurfacing the football
20    field and track, were you aware of whether or not
21    Edgewood High School had funding for that?
22 A  No.  I do remember that Mike came to a meeting and
23    talked about the surfacing that they had selected,
24    and at that meeting I believe he talked about
25    where they had gotten the funding for it.

Page 132

1     But that was like the month before I was
2     quitting my job, and so I was -- you know, I knew
3     I would never see it anyway.
4 Q   You asked as a bullet to Doug Hursh, "Do you know
5     what the (new?) process is for them to be able to
6     resurface their football field?"  Correct?
7 A   Right.  Right.
8 Q   It was your understanding that resurfacing the
9     football field was not in the current master plan;
10    correct?
11 A  I think what I'm asking is just to resurface what
12    is.  Like the master plan shows that they have a
13    field.  Can they just resurface what they've got?
14    I mean, this was all terra incognito to all of us,
15    so I was asking Doug, is there a new process for
16    this or can it be liaison committee?
17     I believe what happened is Mike came to a
18    liaison committee meeting, proposed the
19    resurfacing, they all said good, and they went
20    ahead and did it.
21 Q  Okay.
22 A  But that was -- it was -- you have to understand
23    at that time everything was kind of new.
24 Q  Understood.  Okay.
25 A  And -- right.

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 35 of 89

Edgewood High School of the Sacred Heart, Inc. v.                                    Deposition of Margaret Rose Balistreri-Clarke
City of Madison, Wisconsin, et al.                                                                                August 22, 2022

Page 133

1  Q   And while the neighbors had approved of the
2      projects that were in the master plan, you
3      understood that there wasn't an agreement from the
4      neighbors to put up lights on the athletic field
5      of the high school; correct?
6              MR. INGRISANO: Objection. Form.
7          Foundation.
8  A   I do not believe that the bleachers and lighting
9      were in the master plan, if that's what you're
10     asking me.
11 Q   Correct. All right.
12             (Exhibit No. 154 marked for
13                 identification)
14 A   Okay. Let's see. Okay.
15 Q   Okay. Exhibit 154 is a series of emails relating
16     to you and resurfacing the football field of the
17     high school; correct?
18 A   Yes. Uh-huh.
19 Q   Okay. And starting with your email that's on
20     EHS6893, do you see that?
21 A   Okay. 6893. Right. Sorry. I -- This is
22     stirring up lots of memories. Okay. Yes.
23 Q   The bottom email is from you to Matthew Tucker and
24     Tim Parks dated October 21, 2014; correct?
25 A   Yes.

Page 134

1  Q   And you asked Mr. Tucker and Mr. Parks two
2      questions; right?
3  A   Yes.
4  Q   You indicate that the high school would like to
5      resurface their football field and track and ask
6      under the new master plan process does --
7  A   Do we need to register anything.
8  Q   Do we need to register anything with the city to
9      do this; correct?
10 A   Yes.
11 Q   And by "we," do you mean -- who do you mean by
12     "we"?
13 A   We, the Edgewood schools. We're asking what's
14     this process.
15 Q   Okay. And I'm going to leave that part of it for
16     now and then go to the second question you ask.
17 A   Okay.
18 Q   Your second question is, "If one of the schools
19     wanted to make some changes that are not in the
20     master plan, what is the process for getting
21     approval of these types of changes?" Correct?
22 A   Yes. Uh-huh.
23 Q   Okay. I want to then go to Mr. Parks' email which
24     shows up on 6892.
25 A   His answer is right --

Page 135

1  Q   That's what I'm trying to establish. What
2      Mr. Parks did is wrote answers to your questions
3      within your email?
4  A   Embedded into my email, right.
5  Q   Okay. Just wanted to make sure you knew the --
6  A   Yes. Yes. So after the double grammar point,
7      that arrow, that's -- I'm asking a question, and
8      then on 006894, this would be Tim's response.
9  Q   Okay. So on page 6893, starting with, "No.
10     If EHS is replacing existing conditions," that
11     language in that entire sentence is from
12     Mr. Parks; correct?
13 A   Yes.
14 Q   Okay. And --
15 A   So he's saying they want to resurface? That's
16     maintenance. It doesn't trigger the master plan.
17 Q   Correct. That was your understanding?
18 A   That's my understanding.
19 Q   Okay. And then on page 2, "If one of the schools
20     wanted to make changes that were not in the master
21     plan," after the double arrow it says, "It will
22     depend on the nature of the changes." Do you see
23     that?
24 A   Yes.
25 Q   And then there is a long paragraph there. And is

Page 136

1      that your understanding of what Mr. Parks' answers
2      were to -- answer was to that question?
3  A   My understanding of this is that it was a process
4      and they were creating the process. They didn't
5      know either. And so he's saying it shall be
6      permitted unless approved by the Plan Commission.
7      Let's see. If the change or addition constitutes
8      a substantial alteration and if you want to come
9      in to talk about modifications of the master plan
10     with Matt and me, please let us know and we'll
11     determine how consequential."
12         So they're basically saying, you tell us what
13     change you want to make. We'll tell you the
14     process you need to follow.
15 Q   Okay. And you understood the rest of that
16     paragraph to be from Mr. Parks; correct?
17 A   Yes.
18 Q   Okay. And then let's go to your email on the
19     first page of the document. On November 4, 2014,
20     you email Mike Elliott; correct?
21 A   Yes.
22 Q   Okay. And you tell him that you wrote to -- Well,
23     strike that. Let me go back for a second.
24         You're writing to Matt Tucker and Tim Parks
25     regarding Edgewood's resurfacing of their football

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 137

1    field and their track; correct?
2  A  Yes.
3  Q  So this is at least one example where you're
4    communicating with the city on behalf of the
5    Edgewood High School; correct?
6        MR. INGRISANO: Objection. Form.
7  A  It's a question about the master plan and how does
8    the master plan apply to this. And so I am asking
9    because it's the master plan.
10 Q  Right. But this particular issue of the
11   high school football field and track relates
12   specifically --
13 A  Yes.
14 Q  -- to the high school?
15 A  I am writing to them about the high school's
16   changes to the football field.
17 Q  Correct. Okay. And you're seeking to get those
18   answers for the high school; correct?
19 A  Yes, I am.
20       MR. INGRISANO: Objection. Form.
21   Ms. Balistreri-Clarke, Doctor --
22       THE WITNESS: Oh, sorry. You can
23   call me Maggie.
24       MR. INGRISANO: -- you have to let
25   me get my objection in.

Page 138

1        THE WITNESS: Okay. I'm sorry.
2        MR. INGRISANO: You have to let her
3    finish her question. You have to let me get
4    a chance to make my objection. Okay?
5        THE WITNESS: Okay. I'm sorry.
6        MR. INGRISANO: Thank you.
7  Q  Now turning to your email on the first page.
8  A  Okay.
9  Q  You said that you wrote to both Tim Parks and
10   Matt Tucker to get their advice on how to move
11   forward with the changes to the high school
12   football field; correct?
13 A  Yes.
14 Q  Okay. And that was your reason for writing them.
15   That is to help the high school move forward with
16   the resurfacing of their football field; correct?
17 A  Yes.
18 Q  All right. And then in the next two paragraphs
19   you describe what your understanding is of their
20   answers to your questions; correct?
21 A  Yes.
22 Q  All right. And you said that your understanding
23   was simply resurfacing the football field was
24   within the scope of the current master plan with
25   the city; correct?

Page 139

1  A  Yes.
2  Q  All right. But that putting in lights, bleachers,
3    and a PA system would be considered a substantial
4    alteration of the master plan; correct?
5        MR. INGRISANO: Objection. Form.
6  A  What I say is I'm pretty sure it would be
7    considered a substantial alteration. So I was
8    pretty sure that that was the case.
9  Q  Okay. And then Mike Elliott responds to you and
10   he writes, "It concurs with the info I got from
11   unqualified sources with experience in these areas
12   and with the city."
13 A  Oh, okay.
14 Q  Do you know what he's referring to there?
15 A  I think what I'm explaining to Mike is that if you
16   want to resurface, you've got that. If you want
17   to do more than that, we need to go in and ask
18   them what the process is and they'll tell us.
19       And it sounds like he's saying -- if I'm
20   looking at this, you know, so it looks like he's
21   saying it concurs with the info that I got.
22 Q  He says from unqualified sources with experience
23   in these areas. Do you know what that's referring
24   to?
25 A  I do not.

Page 140

1        MR. INGRISANO: Objection. Form.
2    Calls for speculation. Go ahead.
3  A  Oh, sorry. I don't know.
4  Q  He also says, "Fill me in further on the shock or
5    concern with bleaches, lights, sound and how you
6    think we should proceed with phase one, resurfacing
7    the field."
8        Do you know whether you had a meeting with
9    Mike or a conversation with Mike where you filled
10   him in on that?
11 A  I don't.
12 Q  Okay.
13 A  I don't. I know he came to a meeting and talked
14   about the resurfacing. I don't know if we met to
15   talk about -- When he says fill me in on the shock
16   or concern with the bleaches, lights, and sound
17   and how you think we should proceed with phase
18   one, I only know he came to a meeting and talked
19   about the resurfacing.
20 Q  Okay.
21 A  If Mike and I ever just sat down and talked about
22   the lights and the bleachers, I don't have any
23   memory of that.
24 Q  Okay.
25 A  It doesn't mean it didn't happen.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 141

1  Q   Okay.  Can I ask you to turn to the second page
2      of the document, which has a continuation of your
3      email.
4  A   Okay.
5  Q   The second paragraph on that page says, "At
6      our last meeting, there was no objection to
7      resurfacing the football field.  However, they
8      asked whether you intended to put in lights,
9      bleachers and a PA system and were quite alarmed
10     at the prospect.  Their response was not
11     surprising, but we do need to plan our strategy
12     if this is what you want to propose."
13 A   Yes.
14 Q   Did I read that correctly?
15 A   Yes, you did.
16 Q   Why do you say the response was not surprising?
17 A   With the neighbors, there were quite a number of
18     hot button issues.  Residence halls, lights,
19     sound, traffic.  Park & Pleasure Drive.  If you
20     said those things, they were like this
21     (gesturing).  And bleachers, lighting is in that
22     mix.
23         So that they would be alarmed is to be
24     expected.  If you want to touch the Park &
25     Pleasure Drive, if you want to put in a residence

Page 142

1      hall, that's what you're going to get (gesture).
2      It's not a surprise.
3          I love this email from Tim Parks that he's
4      worried about getting dope-slapped from Matt.
5              (Exhibit No. 155 marked for
6               identification)
7  Q   I'm showing you what's been marked as Exhibit 155.
8  A   Uh-huh.
9  Q   And I'm going to start with the bottom email, and
10     it's from you to Tim Parks and Matthew Tucker
11     dated May 11, 2015; correct?
12 A   Yes.  Yes.  May 11.
13 Q   All right.  And it says, "Subject:  Approval
14     process not in master plan."  That was the subject
15     line?
16 A   You know, I think I retired in 2015.  I kept
17     saying 2016, didn't I?  I think I might have
18     retired in 2015.
19 Q   You believe you retired in June of 2015?
20 A   Yeah, instead of 2016.
21 Q   Okay.
22 A   It's been 11 years, so that would be right.  Yeah.
23     So my earlier thing, I think I was wrong on my
24     dates.
25 Q   Okay.

Page 143

1  A   That I retired in 2015.
2  Q   Okay.
3  A   Okay.  Sorry.
4  Q   That's okay.  The subject line of your email says,
5      "Approval process not in master plan."  Did I read
6      that correctly?
7  A   Yes.
8  Q   Okay.  And you write to Mr. Parks and Mr. Tucker,
9      "Edgewood High School is proceeding with the
10     upgrades to their track.  As they move forward,
11     they are exploring with our neighbors the option
12     of increasing their parking spaces beyond what is
13     in the master plan."
14 A   Uh-huh.
15 Q   "They would also like to explore the option of
16     adding additional lights and bleachers to the
17     track in the future."  You say, "The approval
18     process for anything already in the plan is clear.
19     One of our neighbors asked me to inquire what is
20     the process for amendments that are not in the
21     master plan."  Correct?
22 A   Yes.
23 Q   And with respect to your email, Matthew Tucker
24     from the city responds to that on May 11; correct?
25 A   Uh-huh.  Yes.

Page 144

1  Q   Okay.  And he provides you the language from the
2      ordinance about changes to master plans; correct?
3  A   Yes.
4  Q   Okay.  Do you know whether you provided this
5      information to the neighbors who were inquiring
6      about it?
7  A   That I sent it to the neighbors?  I have no --
8      I don't know if I sent this to the neighbors,
9      that this was the opinion we got back from Matt.
10 Q   Okay.  Do you recall ever expressing to the
11     neighbors that there was a process in place for
12     amendments to the master plan?
13 A   I know we talked about what was in the master
14     plan, and then -- now, this is talking about there
15     are -- if I'm understanding this correctly, there
16     are some gray areas where the zoning administrator
17     may issue permits for minor alterations.  So that
18     might be an opinion we had.  But since we didn't
19     have a specific proposal, I don't know that I
20     would have told them, "Here is the process."  We
21     just would have hung onto that for when we were
22     ready to make a proposal.
23 Q   Got it.  Okay.  Thank you.
24              (Exhibit No. 156 marked for
25               identification)

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 145

1 Q I'm showing you what's been marked as Exhibit 156.
2   I'll give you a second to review that document.
3 A Okay.
4           MR. INGRISANO: Counsel, is there a
5   reason why we're not using previously marked
6   exhibits?
7 A I don't believe we've --
8           MR. INGRISANO: No.  Was this not
9   contained in Exhibit 120?
10          MS. ZYLSTRA: It was contained
11  within it but you were objecting to that
12  exhibit and the first page, so therefore I
13  went back to an exhibit that you, I don't
14  believe, have a basis to object to.  If
15  you --
16          MR. INGRISANO: Now we've got no
17  foundation on this document at all, but okay.
18          MS. ZYLSTRA: I'm happy to use
19  both, but we'll start with this document.
20 A So this is -- let me just get my timing.  Right.
21  This was before I had sought what do we do.  Okay.
22  Okay.  These are just --
23 Q Okay.
24 A Yes.
25 Q So Exhibit 156, these are minutes of the

Page 146

1   Edgewood Neighborhood Liaison Committee meeting
2   of April 14, 2015; correct?
3 A Yes.  Yes.
4 Q Okay.  And you were on that committee; correct?
5 A I was there.
6 Q And it indicates that you were present at this
7   meeting; correct?
8 A Yes.
9 Q Okay.  And with respect to item number 5, it says,
10  High School construction updates.  Correct?
11 A Yes.
12 Q And there is a bullet that says High School
13  Football Field.  Do you see that?
14          MR. INGRISANO: Objection.
15  Foundation with respect to this exhibit.
16 A I see on this, the minutes, the High School
17  Football Field.
18 Q Okay.  Then the second bullet says High School
19  Parking Lot Expansion.  Do you see that?
20 A Yes.  What I don't understand is it says Mike
21  presented a graphic.
22 Q Correct.
23 A But it doesn't show Mike as present.
24 Q Correct.  And my question for you is do you
25  recall Mike presenting a graphic to show areas of

Page 147

1   expanded parking approved by the master plan in
2   April of 2015?
3           MR. INGRISANO: Objection.  Form,
4   foundation.
5 A No.  I remember a meeting where Mike presented the
6   football resurfacing.  I don't remember -- What's
7   confusing is this says he presented a graphic to
8   show the expanded parking, but he's not listed,
9   and I also believe that the person taking the
10  minutes isn't listed.
11 Q And who do you believe took the minutes?
12 A Probably Erin Bykowski.
13 Q Okay.  With respect to the high school football
14  field discussion there, it's describing the
15  resurfacing, is it not?
16          MR. INGRISANO: Objection to
17  foundation on this document.
18 Q It says, for example --
19 A "The goal is to begin construction.  The fill will
20  improve."  So when this says the fill, that would
21  have been the track will be an asphalt, pebble
22  surface.  This is referring to the resurfacing.
23 Q Okay.  Do the minutes in this document,
24  Exhibit 156, of the high school construction
25  update --

Page 148

1 A Yes.
2 Q -- does that comport with your recollection of the
3   update of the resurfacing that you indicated that
4   Mike Elliott provided to the Neighborhood Liaison
5   Committee meeting?
6           MR. INGRISANO: Objection.  Form,
7   foundation.
8 A This document would appear to be the one that in
9   my memory Mike presented the resurfacing.  But I
10  am confused as to why his name is not listed as
11  present.
12 Q Okay.  And at least the other portions of this
13  document suggest he was present at this meeting;
14  correct?
15          MR. INGRISANO: Objection.
16  Foundation.  Form.
17 A Okay.
18 Q Okay.
19 A I'm not sure if this -- An action was that I was
20  going to explore the master plan amendment issues,
21  and that's this.
22 Q Okay.
23 A So just saying.
24 Q All right.  With respect to the minutes here,
25  the last bullet says, "This will be a practice

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 149

1 facility." Do you see that bullet?
2 A  I see that.
3 Q  With respect to your memory of Mike providing a
4 report on the resurfacing of the football field to
5 the Neighborhood Liaison Committee, do you recall
6 him making that or a similar statement?
7         MR. INGRISANO: Objection.  Form
8    and foundation.
9 A  I don't -- I can't say 11 years ago I remember he
10 said that.  I can say that's what's in the minutes
11 that he said.
12 Q  Okay.  Do you have any reason to believe that as you sit here
13 today to believe that that's inaccurate?
14         MR. INGRISANO: Objection.  Form,
15    foundation.
16 A  I would believe that this would be an accurate
17 reflection of what he said.
18 Q  Okay.  Thank you.
19         MS. ZYLSTRA: Off the record.
20    (Discussion held off record)
21    (Exhibit No. 157 marked for
22     identification)
23 Q  Ms. Balistreri-Clarke, I'm showing you what's been
24 marked as Exhibit 157.  And we previously marked
25 Exhibit 138 but I had forgotten the attachment.

Page 150

1         Does the first page of Exhibit 138 appear to
2 you to be the same as the first page of Exhibit 157?
3 A  Yes.
4 Q  Okay.  And Exhibit 157 is an email from Doug Hursh
5 to you from November of 2013; correct?
6 A  Yes.
7 Q  And he says, "Here is the PowerPoint.  It has both
8 the eastern campus drawings as well as the Site 1
9 drawings."  Correct?
10 A  Yes.
11 Q  You understood these were drawings related to the
12 Edgewood Campus Master Plan; correct?
13 A  Yes.
14 Q  Okay.  And the PowerPoint that is attached is a
15 PowerPoint for an Edgewood -- I'm sorry.  If you
16 could turn to 8874.
17 A  Okay.
18 Q  The PowerPoint that Mr. Hursh attaches for you
19 is for an Edgewood Campus Master Plan liaison
20 committee meeting dated November 19, 2013; correct?
21 A  Yes.
22 Q  Okay.  And turning to page 881.
23         MR. INGRISANO: 881?
24         MS. ZYLSTRA: 8881.  I apologize.
25         MR. INGRISANO: Thank you.

Page 151

1 A  Oh, sorry.  Okay.
2 Q  Okay.  With respect to the picture contained on
3 8881, is that generally a rendering of the
4 Edgewood campus?
5 A  It is a rendering of the proposed -- let's see.
6 Q  That's fair.
7 A  Yes.
8         MR. INGRISANO: Yeah, I'll object
9    to form.
10 Q  That's a bad question.  Let me ask you, this is a
11 rendering of some of the existing buildings and
12 some proposed buildings for the Edgewood campus;
13 correct?
14 A  Yes.
15 Q  Okay.  And I think you testified the yellow were
16 buildings that were not yet in existence but were
17 being proposed to either be built or renovated in
18 some fashion; fair?
19 A  Yes.
20 Q  Okay.  We referred earlier today to a building
21 called Site 1.
22 A  Yes.
23 Q  Can you identify where Site 1 is on the map?
24 A  If you go to the left part, this is Site 1.
25 Q  Okay.

Page 152

1 A  I'm pointing to the building between the athletic
2 field of the high school and DeRicci Hall of the
3 college.
4 Q  Okay.  And that's a good explanation.  So on this
5 depiction, there is an oval track?
6 A  Yes.
7 Q  In the upper left corner; correct?
8 A  Yes.
9 Q  And the building immediately below that in yellow
10 that looks like a big rectangle, that is the
11 Site 1 building; correct?
12 A  It is, yes.
13 Q  Okay.  And that oval track, that is the Edgewood
14 High School's track and field; correct?
15 A  That's their portion of the campus.
16 Q  Okay.  And then this rendering has some white
17 buildings that appear to me to be renderings of
18 neighborhood houses that are along the outside of
19 the campus; correct?
20 A  Yes.
21 Q  And from your recollection of your time on the
22 campus, there is housing on three sides of the
23 Edgewood campus; correct?
24 A  Yes.
25 Q  And then the fourth side of the campus is on

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 153

1  Lake Wingra; correct?

2  A  Yes.

3        MS. ZYLSTRA: Okay.  I'm going to

4  take a short break and grab the exhibit

5  either 119 or 120.  I'll have to go verify

6  which one it is.

7        MR. INGRISANO: Got it.

8        MS. ZYLSTRA: Let's just take a

9  really short break.

10       THE WITNESS: Okay.  Are we done

11  with this document?

12       MS. ZYLSTRA: We are done with this

13  document.

14       THE WITNESS: And is that the same

15  with this one, are we done with this one?

16       MS. ZYLSTRA: We are.

17       (Recess)

18  Q  Ms. Balistreri-Clarke, I'm showing you what's been

19  marked at a prior deposition as Exhibit 120.  I'll

20  give you a second to review that document.

21  A  Okay.  That's just -- okay.

22  Q  Okay.  With respect to Exhibit 120, this appears

23  to be a meeting request from you to a number of

24  people; correct?

25  A  Yes.

Page 154

1  Q  Okay.  And you say, "Friends, here are the minutes

2  from our April," you say, "April 4 neighborhood

3  liaison meeting."  Do you see that?

4  A  Oh, and it was the 14th.  Yes.

5  Q  And, in fact, when you look at the attachment on

6  the first page, it says 2015-4-14 Neighborhood

7  Liaison Committee Meeting Minutes DRAFT.  Do you

8  see that?

9  A  Where does it say draft?

10  Q  Sorry.

11  A  Oh.  Yes.

12  Q  Okay.  So you had the draft minutes for the

13  April 14, 2015, Neighborhood Liaison Committee

14  meeting?

15  A  Yes.

16  Q  And you attached them and sent them to the

17  committee?

18  A  Yes.

19  Q  Is that fair?

20  A  Yes.  And other people.

21  Q  Yes.  The committee, plus others?

22  A  Right.

23  Q  And by the committee, we're referring to the

24  Neighborhood Liaison Committee?

25  A  We are.  Oh, here is a document.

Page 155

1  Q  Correct?

2  A  Yes.

3  Q  Okay.  And Exhibit 120, the minutes that are

4  attached are the same minutes that are

5  Exhibit 156; correct?

6  A  Yes.

7  Q  And these minutes that you attached include the

8  item number 5 that had the High School

9  construction updates; correct?

10       MR. INGRISANO: Objection.

11  Foundation of this document, Counsel.  I'll

12  renew my objection as to the foundation on

13  this document.  What's been provided to my

14  office have been two separate pdfs, one pdf

15  of the cover email, one pdf of the minutes.

16  I do ask that -- Based on your

17  subsequent representation after the last

18  deposition that these came from Sara

19  Eskrich's email, I would ask for native

20  copies of these documents so that we can

21  confirm their origin and that they are, in

22  fact, one attachment to the other document.

23       MS. ZYLSTRA: And I will represent

24  that the majority -- almost everyone on this

25  email is an Edgewood person.

Page 156

1        MR. INGRISANO: That is not --

2  there is only one Edgewood High School person

3  on this document.  We have not been able to

4  identify these minutes in our documents.  We

5  have not found this document.  We have

6  searched for it.  If you have found it in our

7  documents, please let me know, but we have

8  not found it.

9        THE WITNESS: Can I ask you a

10  question?

11       MR. INGRISANO: This is --

12       MS. ZYLSTRA: That's okay.  I think

13  we can have our discussions about this

14  document off.

15       MR. INGRISANO: I am reiterating my

16  request that this document be provided in its

17  native format.

18  Q  Go ahead.  You had a question, Ms. Balistreri-

19  Clarke, with regard to this document?

20  A  Just who was Anna McManus?

21  Q  That's a question I would ask you.  Who is she,

22  do you know?

23  A  Well, she either worked at the high school or the

24  campus school.

25  Q  Okay.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 157

1  A   And so if you're looking for this document, you
2      might want to try there because she has the
3      same -- see the extension end is the same as
4      Mike's.
5  Q   Right.
6  A   So it looks like I might have sent it.  And
7      Shannon McDonough --
8  Q   Correct.
9  A   -- also has that k12.  So if you're looking for --
10         MR. INGRISANO: And I will revise
11      my statement on the record regarding
12      attorney -- I'm sorry, as to Edgewood High
13      School.  Growrob at Edgewood, I do believe
14      that's a reference to Edgewood High School.
15      That's not a person whose emails have been
16      searched in this case.
17 Q   Okay.  So as I understand it, Ms. Balistreri-
18      Clarke, I'm showing, there are at least two
19      individuals on this meeting invite that were
20      Edgewood High School representatives; correct?
21 A   Bob Growney was the growrob.
22 Q   Okay.
23 A   And Mike Elliott, and I'm not sure if Anna -- I'm
24      looking for Sister Kathleen to look at -- oh,
25      Joyce Wodka and Kathleen, the campus school used

Page 158

1      the college's email and the high school had their
2      own.  So Anna McManus, Mike Elliott, and Bob
3      Growney, growrob, would all have been the high
4      school.
5  Q   And what about Shannon --
6  A   Oh, and Shannon McDonough.
7  Q   Okay.  So your belief is at least those four
8      individuals were high school representatives;
9      correct?
10 A   Yes.
11 Q   Okay.
12 A   Well, they received this email.
13 Q   Okay.  And you referenced that you believed that
14      the minutes were generally drafted by whom?
15 A   Erin Bykowski.  It's eby.  Do you see her on this
16      list?
17 Q   I do.  Beyond Mr. Elliott, is it B-y-k-o --
18 A   Yes.  Erin Bykowski.  She was actually working in
19      parking for us, she was on my staff, and she would
20      have drafted the minutes, I believe.
21 Q   Okay.  With respect to these minutes, do know
22      whether anyone objected or provided any kind of
23      revisions to these minutes?
24 A   All of that would be in the minutes.  This is
25      announcing the May 27.

Page 159

1  Q   Okay.
2  A   And any corrections or comments about this draft
3      would be in May 27.
4  Q   Okay.  And assuming, if there are no corrections
5      in the May 27 meeting minutes, do you have any
6      reason to believe that these are not the final
7      minutes of the meeting?
8         MR. INGRISANO: Objection.  Form.
9  A   I'd have to see what the May 27 minutes look like.
10 Q   Okay.  Fair enough.
11 A   I don't believe it was our practice to go back and
12      update old minutes.  We would have just commented
13      in the new minutes.  So these minutes would not be
14      considered complete, so to speak, without looking
15      at the next set of minutes.
16 Q   Okay.  And at least with respect to the person who
17      is drafting these minutes, it's an Edgewood
18      College representative who is drafting the minutes
19      for the group; correct?
20         MR. INGRISANO: Objection.  Form,
21      foundation.
22 A   I believe at that time Erin Bykowski was taking
23      the minutes.
24 Q   Okay.
25 A   Are we done with this document?

Page 160

1  Q   We are.
2  A   And this one is yours, I think.
3  Q   Thank you.  Throughout your career with Edgewood
4      College, did you have occasion to interact with
5      Timothy Parks?
6  A   Yes.
7  Q   Okay.  How often would you say or how well did
8      you know Mr. Parks?
9         MR. INGRISANO: Objection.  Form.
10 A   You're asking what my relationship is with
11      Tim Parks?
12 Q   Right.
13 A   Tim Parks was a city administrator, and I think he
14      was in charge of parking.  He was either parking
15      or -- Matt Tucker was one and Tim Parks was the
16      other.  And he was a city administrator who was
17      very by the book in some ways.  And so you'd ask
18      him and you'd get this response and -- so we had a
19      cordial relationship, but you had to get kind of
20      past the, you know, This is the regulation.
21      What do you think we should do?  Well, then
22      he would break down and talk about Matt wants to
23      dope-slap him.
24      I mean, I think I probably am punch drunk and
25      don't have enough chocolate in my system, so does

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 161

1 that answer your question?
2 Q I think so.
3 A Okay.
4 Q Was Mr. Parks generally always professional with
5 you?
6 A Oh, certainly. Certainly.
7 Q Okay.
8 A Everybody was always professional with me.
9 Q Okay. Did you generally find Mr. Parks to be
10 helpful?
11 A Yes. He was not -- he was not one to be initially
12 accommodating. He was very by the book, and it
13 took a minute to figure out how to work with him.
14 But it took a minute to figure out how to work
15 with everybody.
16 Q What about Matt Tucker, did you have occasions to
17 interact with him over the course of your career?
18 A I did.
19 Q Okay. And what was your relationship with
20 Mr. Tucker?
21 A I had cordial, professional relationships with
22 both of them.
23 Q Okay. Did you ever have occasion to interact with
24 George Hank?
25 A That name does not sound familiar to me.

---

Page 162

1 Q Okay. Did you have any interactions with
2 Alder Sara Eskrich?
3 A Seeing those minutes, she was coming on as I was
4 leaving.
5 Q Okay.
6 A So I think I met her because that shows that I met
7 her and then I retired.
8 Q Okay. Did you have any interactions with
9 Alder Lucas Dailey?
10 A I don't believe so.
11 Q Okay. With respect to all of your interactions
12 with the city employees that we just spoke about
13 and any city official, did you ever see any city
14 employee or city official express or show any kind
15 of anti-Catholic animus toward Edgewood?
16 A I have no memory of an experience of being anti --
17 you know, anyone treating me in an anti-Catholic
18 manner or speaking disparagingly of the college.
19 Q Okay.
20 A Now, again, I've been gone seven years.
21 Q Okay.
22          (Exhibit No. 158 marked for
23           identification)
24 Q I'm showing you what's been marked as Exhibit 158.
25 I'll give you a moment to look at that.

---

Page 163

1 A Okay.
2          MS. ZYLSTRA: Off the record.
3          (Discussion held off record)
4 Q With respect to 158, the bottom appears to be
5 an email from Susan VanderSanden to you dated
6 December 20, 2018. Do you see that?
7 A Yes, I do.
8 Q And she's writing to you because Mike Elliott,
9 president of the high school, has requested your
10 contact information and wanted to reach out and
11 have a brief conversation to help him prepare a
12 proposal to the city. Do you see that?
13 A I do.
14 Q And you respond and provide your contact
15 information; correct?
16 A Yes.
17 Q Okay. I'm wondering whether you, in fact, had any
18 communications in December of 2018 or January of
19 2019 with Mike Elliott with respect to preparing a
20 proposal to the city.
21 A I have no memory of being contacted by Mike Elliott.
22 Q Okay. All right. And just to follow that up,
23 have you had any contact with Mike Elliott at all
24 since you retired?
25 A I attended the college's opening of a new

---

Page 164

1 residence hall extension. He may have been there.
2 And I may have run into him socially. But I have
3 no specific memory of seeing Mike Elliott for
4 seven years.
5 Q Okay. At some point did you learn that Edgewood
6 was going to repeal its master plan?
7 A No.
8 Q Okay.
9 A No, I did not know that.
10 Q Edgewood High School appeared before the City of
11 Madison Plan Commission and the City's Common
12 Council a number of times in 2019 and '20 and '21.
13 Were you at any of those meetings?
14 A No.
15 Q Okay.
16 A I knew, in terms of what I did know, there was
17 talk and, you know. I did my best to not know
18 what was happening, because it looked difficult
19 and I left it.
20 Q Okay. Did you have any communications with any
21 city employees or any city officials after you
22 retired from Edgewood as it relates to Edgewood
23 High School and its athletic field?
24 A No.
25 Q Okay. Other than in relation to your deposition

---

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 165

1  today, did you have contacts with anyone from
2  Edgewood about your deposition?  That was a bad
3  question.
4          MR. INGRISANO: Objection.  Form.
5  Q  It was a bad question, and I'm sorry.  Let me try
6  that again.
7  A  Okay.
8  Q  Have you had any contacts with anyone from
9  Edgewood about the lawsuit?
10         MR. INGRISANO: Objection.  Form.
11     Vague as to Edgewood.
12 A  Yeah, if you could tell me what you mean by
13  Edgewood, that would be helpful.  The college, the
14  high school, the campus school?
15 Q  Any of the three.
16 A  I contacted the college to ask for a copy of the
17  master plan.
18 Q  Okay.
19 A  And I was not successful.
20 Q  Okay.  Any other contacts with anyone from
21  Edgewood Campus School or Edgewood High School
22  or Edgewood College about the lawsuit?
23 A  I had a phone call with Jonathan.
24 Q  Okay.
25 A  For, as I said, about 55 minutes.

Page 166

1  Q  Okay.  Did Mr. Ingrisano talk to you at all about
2     whether or not you had authority to speak for the
3     high school?
4          MR. INGRISANO: Objection.  Form.
5  A  I do remember trying to clarify what my role was,
6     and I had conversations with you about it and I
7     had conversations with Jonathan about it and I had
8     a conversation with my husband about it, and so
9     during that time I was trying to talk about what
10    my role was and wasn't.  I couldn't promise which
11    things I said to you and which things I said to
12    Jonathan.
13 Q  Okay.
14 A  Because the only things I wrote down were his
15    recommendation to tell the truth, don't --
16    you know, answer the question you ask me.
17 Q  And you've done your best to follow his
18    recommendations today?
19 A  Absolutely.
20 Q  Yeah.  When you were at Edgewood College, were you
21    involved in anything involving a condo association?
22 A  A condo association?
23         MR. INGRISANO: Objection.  Form.
24     Foundation.
25 A  I don't believe so.

Page 167

1  Q  Okay.  That's fine.
2  A  I don't think so.
3          MS. ZYLSTRA: Okay.  I just need
4     a minute.  I just want to see if I have
5     anything further.  I'll go through my
6     outline.  We're going to step out for a
7     minute, though.
8          MR. INGRISANO: Sure.
9          (Recess)
10 Q  Just a couple more.
11     With respect to Edgewood College and their
12  athletic programs, did you know where Edgewood
13  College soccer, for example, where they played
14  their home games?
15         MS. ZYLSTRA: Objection.  Form.
16     Vague as to time.
17 A  During my time with Edgewood College, they played
18  soccer in a number of different places.
19 Q  Okay.
20 A  So if you're asking when I was there, they were at
21  Breese Stevens.
22 Q  Okay.
23 A  And then I passed a field on my way to Harbor
24  Athletic Club, and I saw a sign that said Edgewood
25  College Soccer.

Page 168

1  Q  Okay.
2  A  So that's what I know.
3  Q  Okay.  Did you generally attend any athletic games
4     of Edgewood College?
5  A  When I could.
6  Q  Okay.  Did you attend athletic games of Edgewood
7     High School?
8  A  No.
9  Q  Okay.  Were you aware of how Edgewood High School
10    was using its track and field during the time when
11    you were at Edgewood College?
12 A  Not in specifics.
13 Q  Okay.  I presume the answer, but let's just nail
14    it down.  Did you ever talk to anyone from the
15    city about how Edgewood High School was using its
16    athletic field and track?
17 A  Not to my memory.
18         MS. ZYLSTRA: Okay.  That's all
19     I've got.
20         MR. INGRISANO: Great.  I think we
21     should probably switch up seats, if that
22     works for you.
23         MS. ZYLSTRA: Okay.  That works for
24     me.
25         (Discussion held off record)

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 169

1    THE WITNESS: So now I have to wait
2  for you to finish and Sarah to object and say
3  yes, and please call me Maggie if you can.
4  Is there a requirement to call me Ms. or
5  Dr. or whatever?  I was kind of kidding about
6  the doctor.  I'm so used to Maggie.
7    MS. ZYLSTRA: I was trying to be
8  polite.
9    THE WITNESS: Thank you.
10    MR. INGRISANO: I will call you
11  whatever you want me to call you.
12    THE WITNESS: Maggie.
13    MR. INGRISANO: My goal in
14  addressing witnesses is not to offend them.
15    THE WITNESS: Okay.  Maggie would
16  be so nice.
17    MR. INGRISANO: Got it.
18
19    EXAMINATION
20  By Mr. Ingrisano:
21 Q  Maggie, in any of your education background, do
22  you have any training or education in land use and
23  zoning?
24 A  No.
25 Q  Okay.  Do you have any training or experience in

---

Page 170

1  the law?
2 A  I took a class in higher education law, and I was
3  involved in policy for the college which was
4  considered -- which could be the basis for
5  legal -- like we could be sued if we did not
6  follow our own policy.
7 Q  Got it.  So prior to being put on the Neighborhood
8  Liaison Committee around '97, did you have any
9  experience doing land use or planning for any
10  academic institution?
11    MS. ZYLSTRA: Objection.  Form.
12    You can answer.
13 A  I had involvement in building -- Before Edgewood,
14  I was involved in building planning but not
15  anything that would be considered land use, I
16  don't believe.
17 Q  Okay.  What was your experience in building
18  planning?
19 A  When I was the dean of students at Cardinal
20  Stritch College, we built a union/library complex
21  and then there was an athletic field in the front
22  and it was just grass at that point, I believe.
23  Oh, and a gym, and I was involved in planning
24  those buildings.
25 Q  So do you have an understanding as to why you were

---

Page 171

1  the representative from Edgewood College on the
2  liaison committee and why you were the shepherd
3  for the master plan?
4    MS. ZYLSTRA: Objection.  Form.
5 A  Yes.  I can tell you exactly, because I asked and
6  said, Why me, Lord.  No.
7    Sister Esther Heffernan was the college
8  representative who worked on the master plan of
9  '97, and she was part of the group that created
10  There will be a working group.  There wasn't even
11  a name for it yet.  It was the working group.  And
12  I was relatively new to the college.  And the
13  president of the college, my boss, said that I was
14  to be the representative for the college.  And I
15  said, I'm the dean of students.  You want the
16  business officer, you know.  And he said, We need
17  your social skills.  I said, Okay.
18 Q  All right.  With respect to Exhibit 52, the master
19  plan document, based on your time working with
20  that document and crafting it and shepherding that
21  document, to use your words, as you sit here
22  today, is that a perfect document or is there the
23  possibility that there are mistakes in it?
24    MS. ZYLSTRA: Objection.  Form,
25    foundation.

---

Page 172

1 A  I would say that we worked very hard to make it
2  good, true, and accurate.  We even had a section
3  in this document called Unresolved Issues, but it
4  didn't have every unresolved issue.  There were
5  agreements, but it would have been hard to -- I
6  mean, how granular do you want to get.
7    What we did have in this process was a
8  process for if we want to move forward, here is
9  how we think we could do it.  So I think we were
10  proud of what we tried to do and that we did it
11  together.  It wasn't meant to be in concrete.
12 Q  Sure.
13 A  It wasn't meant to be the end.  It wasn't meant
14  to be perfect.
15 Q  But all of your hard effort aside and all the
16  collaboration and all the other people's hard
17  work, you can't sit here today and say that this
18  is a mistake free document; correct?
19    MS. ZYLSTRA: Objection.  Form,
20    foundation.
21 Q  There could be problems in that document that
22  you're not aware of?
23    MS. ZYLSTRA: Same objections.
24 A  I think -- could there be problems in -- well,
25  there could be anything in this document I'm not

---

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 173

1 aware of.
2 Q  Yeah.
3 A  So --
4 Q  Okay.  So look at, if I may ask you to -- you said
5    before that it was your understanding that the
6    master plan was required and that the three
7    Edgewood institutions were required to do a master
8    plan.  Do you recall that?
9 A  Yes.
10 Q  Okay.
11 A  Because --
12 Q  When you --
13 A  Can I say?
14 Q  Yes.
15 A  We were zoned -- we were given a zone.  We were
16    zoned CI, I believe, and the CI zoning meant we
17    had to have the master plan.  I believe that was
18    it.
19 Q  As part of its master plan process -- As part of
20    the master plan process, who hired Doug Hursh?
21 A  Doug Hursh had been --
22        MS. ZYLSTRA: Let me state my
23    objection.  Form, foundation.  Go ahead.
24 A  Doug Hursh -- Potter Lawson had been the architect
25    for the college for every project -- I came

Page 174

1    in '94.  Potter Lawson was the architect for every
2    project I think but one.  So they were our
3    architect.
4        So when the three schools were going to go
5    with an architect, I think the other two schools
6    agreed to go with -- so they didn't go with
7    Doug Hursh.  They went with Potter Lawson.
8 Q  Okay.  Your understanding that the master plan was
9    required of the Edgewood campus --
10 A  Yes.
11 Q  -- did that understanding come from Doug Hursh and
12    Potter Lawson?  The city?  From your own reading?
13    Where did it come from?
14        MS. ZYLSTRA: Objection.  Form,
15    foundation.
16 A  When I looked at those documents, it seemed that
17    we all had access to what the city was -- we were
18    all combing through what is the city saying we
19    have to have.  I had enough relationships at that
20    time, because this was now in I think like by 2010
21    or something those new codes came out and I had
22    been with the liaison committee since 1997, so I
23    would have shepherded other buildings through the
24    continual use -- through the conditional use
25    process, and I would have done all the college's

Page 175

1    building and then helped the high school and the
2    campus school.
3        And so how I found out that we had to have a
4    master plan, who told me and who confirmed it, so
5    did Doug tell me and the city confirmed it, did
6    the city tell me and Doug confirmed it, but I
7    would use at that time Potter Lawson and the city
8    as my authorities on what we had to do.
9 Q  Do you have a recollection of anyone from the city
10    telling you the master plan was required?
11        MS. ZYLSTRA: Objection.  Form,
12    foundation.
13 A  It was my understanding it was required.  I
14    couldn't tell you who told me.
15 Q  Okay.
16 A  But I was in meetings with people just from the
17    city, but that might have been when we were
18    already deep into the process.
19 Q  Let me ask you to turn in Exhibit 52 to page 17 of
20    228 which has page 1 there on the bottom.
21 A  Okay.
22 Q  This section 1.1 says Master Plan Purpose.  Do you
23    see that?
24 A  Uh-huh.
25 Q  I'm sorry.  Is that a yes?

Page 176

1 A  Yes.  I'm sorry.
2 Q  No, that's okay.  And do you recall who drafted
3    this text found in 1.1?
4        MS. ZYLSTRA: Objection.  Form.
5    Foundation.
6 A  I could not tell you who wrote this.  I believe --
7    you know.
8 Q  To the best of your recollection.
9 A  To the best of my recollection.
10        MS. ZYLSTRA: Same objections.
11    Go ahead.
12 A  Who wrote this.  I believe Potter Lawson wrote
13    that.
14 Q  Let me ask you to turn to that first paragraph
15    there.
16 A  Uh-huh.
17 Q  In the middle of that first paragraph, "The
18    Edgewood campus has been zoned Campus
19    Institutional" --
20 A  Right.
21 Q  -- "which requires that the campus have an
22    approved master plan to meet the zoning
23    requirements."
24 A  Yes.
25 Q  "This plan includes the requirements of a master

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 46 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 177

1   plan as outlined by the City of Madison zoning
2   ordinance." Did I read that correctly?
3 A  Yes. We all looked at zoning ordinances in those
4   days, and so I would have seen them and read them
5   and said, Oh, darn it.
6 Q  Sure. And so Potter Lawson would have reviewed
7   1.1 before this document was approved; correct?
8       MS. ZYLSTRA: Objection. Form,
9       foundation.
10 A  Potter Lawson published the document for us.
11 Q  Yes. And so as part of that process, did you have
12   an understanding that they had read what they
13   published on your behalf?
14       MS. ZYLSTRA: Objection. Form,
15       foundation.
16 A  My understanding is that Potter Lawson had an
17   intimate knowledge of what was in this document.
18 Q  Okay. Same question with respect to the City of
19   Madison. When they approved -- when the city
20   staff, the planning staff, approved this document,
21   did you understand that they were reading and
22   reviewing and would also be intimately familiar
23   with this document?
24       MS. ZYLSTRA: Objection. Form,
25       foundation.

Page 178

1 A  My expectation was that they were reading the
2   document that we submitted before they approved
3   it.
4       MR. INGRISANO: Counsel, did we
5       have an Exhibit 55 that we used today?
6       MS. ZYLSTRA: Yes, we did. I
7       believe it should be in that stack here.
8       (Discussion held off record)
9 Q  Looking back at Exhibit 55, Maggie, in the bottom
10   paragraph you were asked about a streamlined
11   approval process.
12 A  Yes.
13 Q  In looking at your email there, Exhibit 55, the
14   text actually talks about a streamlined building
15   approval process. Do you see that?
16 A  Yes.
17 Q  Okay. It was your understanding that the
18   architectural design review committee would be,
19   based on your understanding of the master plan
20   process, that the ADRC would be looking at
21   building changes; correct?
22       MS. ZYLSTRA: Objection. Form,
23       foundation.
24 A  Yes. Not only building maybe, but, yes.
25 Q  What else would they be looking at?

Page 179

1 A  Well, somebody in the city had to look at any
2   changes we wanted to make. So if it was the
3   grounds, if it was the driveways, if it was the
4   lighting. I couldn't tell you at this point who
5   had to approve what. But if we wanted to change
6   anything, somebody at the city had to approve it.
7 Q  Got it. So you don't know what the process
8   necessarily was. And, in fact, you said earlier
9   today that Tim Parks and Matt Tucker said that you
10   didn't know quite what the process would be but
11   really any change had to be -- should be run past
12   them; correct?
13       MS. ZYLSTRA: Objection. Form.
14 A  My understanding when I read that other memo was
15   that substantial changes they would have to talk
16   about, they would have to guide me through what
17   the process would be, but that resurfacing could
18   happen, was considered -- resurfacing was
19   considered maintenance and was in the master plan.
20 Q  Sure.
21 A  I was asking them about lights and bleachers.
22   They said that sounds substantial to us, come and
23   talk with us and we'll talk about what the process
24   would be. That's how I understood that memo.
25 Q  Let me ask you to take a look at Exhibit 154.

Page 180

1       MS. ZYLSTRA: 154?
2       MR. INGRISANO: Yes. 154.
3       MS. ZYLSTRA: Thank you.
4 A  Okay. Yes. I'm looking at it.
5 Q  Okay. So in looking at page 6894 on the bottom is
6   where you asked your question --
7 A  And Tim responded.
8 Q  -- to Tim, "If one of the schools wanted to make
9   some changes that are not in the master plan, what
10   is the process for getting approval of these types
11   of changes?" Do you see that?
12 A  Yes.
13 Q  Now, you did not mention lights, sound, or
14   bleachers in your email to Tim Parks; is that
15   correct?
16 A  I see no mention of that in this, no.
17 Q  Okay. So they didn't provide any kind of response
18   to you with respect to lights, bleachers, or
19   sound; is that right?
20       MS. ZYLSTRA: Object to form.
21 A  In this memo, I am saying -- I am asking them if
22   they wanted to make some changes not in the master
23   plan. So they would not know what I was talking
24   about.
25 Q  Okay. So on the first page of 154, you write

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 181

1     under -- In that third paragraph on the first
2     page.
3 A   Yes.
4 Q   You write, "I am pretty sure that putting in
5     lights, bleachers and a PA system would be
6     considered 'a substantial alteration of the
7     original plan,' as Tim Parks puts it."  Do you
8     see that?
9 A   Yes.  Yes.
10 Q  That's not Tim Parks' opinion that you're
11     conveying at that point, is it?
12 A  That's my opinion.
13         MS. ZYLSTRA: Objection.
14 Q  Okay.  Now, if in early 2019 a representative of
15     the city, like Mr. Tucker, were to write a letter
16     setting forth that it was his belief that adding
17     lights to the stadium would not require an
18     amendment of the master plan, you would have no
19     reason to disagree with that conclusion.  Is that
20     fair?
21         MS. ZYLSTRA: Objection.  Form,
22     foundation.
23 A  I would say that this document says that once --
24     just to quote Tim, The approval process would
25     depend on the nature of the changes.  And,

Page 182

1     you know, if you want to come in to discuss it,
2     Matt," he's talking about Matt Tucker, let us know
3     and we'll determine how consequential the changes
4     would be and advise the likely approval process.
5         So if somebody contacted Matt and that was
6     his opinion, then they are following this process.
7     But you gave me kind of a hypothetical.
8 Q   Sure, I did.  But you have no information --
9     So if Matt Tucker actually said that you can get
10     lights on the Edgewood football field without
11     amending the master plan, as you sit here today,
12     you are not aware of any facts or interpretation
13     of the master plan or city zoning ordinances that
14     would cause you to come to a different conclusion?
15         MS. ZYLSTRA: Objection.  Form,
16     foundation.
17 A  Well, you're saying 2019.  I left in 2016.  I
18     don't know what changes the city did in between.
19     But if he had said that to me in 2014, that's what
20     I would have believed.
21 Q  Okay.  So, again --
22 A  So that's fair.
23 Q  So you don't have a basis to disagree with the
24     city interpretation in 2019.  Is that fair?
25         MS. ZYLSTRA: Objection.  Form,

Page 183

1     foundation.
2 A   I think if Matt Tucker had told me he didn't think
3     it was substantial, then according to this, I
4     would say, Okay, it's in.
5 Q   Back to 52, Maggie.  The master plan.
6 A   Oh, yes.
7 Q   I'd ask you to turn to page 58 on the top right.
8 A   I'm sorry.  I got distracted.
9 Q   Top right, page 58 of 228.
10 A  Okay.
11 Q  All right.  So you were asked about item 7 on this
12     page 58 of 228.  Do you remember that?
13 A  Yes.
14 Q  Okay.  So by its definition, it says Site and
15     Building Lighting; correct?
16 A  Yes.
17         MS. ZYLSTRA: Objection.  Form.
18 Q  Okay.  And part b. says, "Provide lighting that is
19     required for pedestrian safety."  Do you see that?
20 A  Part b., yes.
21 Q  All right.  Was it your understanding that the
22     pedestrian safety being referenced in there was
23     pedestrian safety inside of a building or outside
24     of a building?
25         MS. ZYLSTRA: Objection.  Form,

Page 184

1     foundation.
2 A   My understanding of pedestrian safety for lighting
3     would have been outside the building.
4 Q   Okay.  So while your interpretation of this
5     provision was that it was related to buildings,
6     you don't have -- you don't know if other people
7     within the three Edgewood schools had a different
8     interpretation of this paragraph?
9         MS. ZYLSTRA: Objection.  Form,
10     foundation.
11 Q  Do you?
12 A  I can only say what my interpretation -- reading
13     this, I can say here was my interpretation.  If
14     somebody else read it and had another
15     interpretation and didn't tell me, I would have
16     no way to know that.
17 Q  Exhibit 153, Maggie.
18 A  Oh, Exhibit 153, not page 153.  Thank you.
19 Q  Yes, Exhibit 153.
20 A  Matt Tucker and Tim Parks, okay.
21 Q  All right.  So on Exhibit 153, in talking about
22     this exhibit, you mentioned that Mike Elliott and
23     Edgewood always knew that they wanted to add
24     lights to the stadium.  Do you recall that?
25         MS. ZYLSTRA: Objection.  Form,

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 185

1      foundation.
2 A  I did say something that that was always on their
3    wish list.
4 Q  Sure.  To your knowledge did Mike Elliott or
5    anyone else at Edgewood High School ever
6    misrepresent or hide their intentions from either
7    the city or the neighbors?
8         MS. ZYLSTRA: Objection.  Form,
9    foundation.
10 A  I would say that if somebody had ever asked me,
11   Does the high school want to have bleachers and
12   lights at any point, I would have said yes, and
13   I'm saying that as like an outsider.
14 Q  Sure.  My question is did you ever hear Mike
15   Elliott or anyone else at Edgewood High School
16   misrepresent or hide their true intentions with
17   respect to the athletic field in any way?
18         MS. ZYLSTRA: Objection.  Form,
19    foundation.
20 A  To my knowledge, they were representing what they
21   were able to do now.  I don't believe they were
22   misrepresenting.  If your question is were they
23   misrepresenting, I don't believe they were.
24 Q  Exhibit 153, the email from Doug Hursh to you at
25   3:59 p.m.

---

Page 186

1 A  Yes.
2 Q  The second email down.
3 A  Yes.
4 Q  Doug writes, "I don't know what the process would
5    be to get approvals to resurface the football
6    field."  Do you see that?
7 A  Doug --
8 Q  Number 1.
9 A  "I don't know what the process would be," yes.
10 Q  Got it.  "The resurfacing could be considered
11   maintenance, but the lights and bleachers would
12   be additions."  Do you see that?
13 A  Yes.
14 Q  Do you know what Doug Hursh's basis is for saying
15   that they would be considered additions?
16         MS. ZYLSTRA: Objection.  Form.
17 A  I think that at this point -- This was a new
18   process and we were using our best information as
19   to what was considered -- you know, we tried to
20   make it as complete as possible knowing that it
21   was a living document.
22       So now that we actually had something come
23   alive and want to be -- these are the first things
24   out of the gate.  So it's like do you think this
25   is in here, even though we never said we're going

---

Page 187

1    to resurface?  Do you think this is in here, even
2    though we never said we're going to do it?  It was
3    just on your wish list and now it's gotten to
4    reality time.  And so Doug is saying, I think
5    resurfacing could be considered maintenance.
6    Lights and building could be considered additions.
7    So that was Doug's opinion.
8 Q  Doug's opinion.  Doug's educated guess based on
9    his familiarity with the master plan and the
10   zoning ordinances; is that fair?
11         MS. ZYLSTRA: Wait.  Objection.
12    Form, foundation.
13 A  Okay.  I don't know if I can do this, but that
14   would have been my guess.  Now, Doug is trained
15   in all of this.
16 Q  Sure.
17 A  But by that time I had twenty years of experience
18   in what the city would have required.  But,
19   you know, I think Doug is writing to me and
20   saying, I don't know the process.  I think
21   resurfacing would be maintenance.  Lights and
22   bleachers would be additions.  So I think Doug was
23   telling me the truth, that that was his opinion.
24 Q  Got it.  This was a new -- you've described this
25   as being a new process for the city; correct?

---

Page 188

1 A  Yes.
2 Q  Were there any models of prior master plans that
3    you were able to use in crafting your master plan,
4    Exhibit 52?
5         MS. ZYLSTRA: Objection.  Form.
6 A  I don't remember if we looked at other master
7    plans.  I have -- That part probably wasn't my job
8    so much.
9 Q  Did anyone ever tell you that this was the first
10   master plan in Madison for a Campus-Institutional
11   District?
12 A  I believe I knew it was, because the code had just
13   come up, campus institution was a new zone, and we
14   were the first ones out of the gate.  So I believe
15   that was -- everybody knew that.  That's just
16   historical record.
17 Q  Exhibit 156, Maggie.
18         MS. ZYLSTRA: Counsel, I'm sorry,
19    mine are out of order.  Give me a moment.
20         MR. INGRISANO: That's all right.
21    I'll wait for you.
22         MS. ZYLSTRA: Thank you.  Okay.
23    Thank you.
24         MR. INGRISANO: Sure.
25 Q  Exhibit 156, Maggie, as you sit here today under

---

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 189

1  oath, can you say that these are the true and
2  correct meeting minutes for the April 14, 2015,
3  meeting?
4        MS. ZYLSTRA: Objection. Form.
5  A  I believe that these were the minutes as they were
6  submitted. I do see, like under present, there
7  are all of these people listed, but number 3 shows
8  that Susan Serrault did a presentation. She's not
9  listed. Number 5 implies that Mike Elliott was
10  doing a presentation, and he's not listed.
11       So these are internal minutes from three
12  nonprofits and two neighborhood associations. So,
13  you know, were they meant to be -- you know, I
14  mean -- so I believe this is as accurate -- that
15  this was intended to be a good, accurate
16  representative of what we discussed.
17 Q  The bullet points under number 5, high school
18  construction updates and that first bullet point,
19  high school football field, do you see that?
20 A  Yes.
21 Q  Did you provide that update and presentation?
22       MS. ZYLSTRA: Objection. Form.
23 A  I did not.
24 Q  Did you advise the Neighborhood Liaison Committee
25  that there would be no additional lighting or

---

Page 190

1  seating that would be installed?
2        MS. ZYLSTRA: Objection. Form,
3  foundation.
4  A  If somebody asked me about lighting and seating, I
5  would have said this is what's in the master plan.
6  But I would not have said this is what they hope
7  to do or plan to do.
8        And, as a matter of fact, I think there was a
9  memo -- yeah. I guess I'm wanting to look back
10  and see what I knew when in terms of I may have
11  known at this time that they were hoping to start
12  working toward lighting, that now -- that this is
13  the time at which they're going to start doing it.
14 Q  Okay.
15 A  But if somebody had said, What are they planning
16  to do, I hope I would have said here is what's in
17  the master plan and not jumped in front of Mike
18  Elliott.
19 Q  And what's the master plan with the city say about
20  whether there will be lighting or seating in --
21 A  It doesn't.
22 Q  -- the stadium?
23 A  I'm sorry. It doesn't. They're not mentioned in
24  here to my knowledge.
25 Q  Okay. And do you have a recollection of being

---

Page 191

1  asked about lighting and seating at the April 14,
2  2015, meeting?
3  A  I don't have that specific recollection.
4  Q  Okay. If you spoke on the issue of lighting, it
5  says, "No additional lighting or seating will be
6  installed."
7  A  Okay.
8  Q  Have you ever made a statement about Edgewood High
9  School's athletic field, including lighting and
10  seating, with the intent of conveying a binding
11  promise on Edgewood High School as to whether or
12  not it would be doing those things?
13       MS. ZYLSTRA: Objection. Form,
14  foundation.
15 A  Are you asking me did I ever intend to promise
16  something on behalf of the high school?
17 Q  Were you telling this committee on April -- Did
18  you tell this committee on April 14, 2015, that
19  Edgewood High School will not be adding seating
20  and lighting to its field?
21       MS. ZYLSTRA: Objection. Form,
22  foundation.
23 A  Okay. This document says that in terms of the
24  football field updates at this time, they would
25  not be adding lighting or seating at that time.

---

Page 192

1  They were talking about resurfacing. They did not
2  provide a lighting plan. They did not provide a
3  seating plan. I would have remembered if they had
4  done that.
5        And so if somebody said Are they adding
6  lighting and seating, and this is like getting to
7  be lots of speculation, but they were presenting a
8  resurfacing plan. They weren't presenting a
9  lighting plan or a seating plan to my knowledge.
10  So if somebody had said, Are they going to add
11  lighting and seating, I would have said, No,
12  they're resurfacing. Does that answer your
13  question?
14 Q  I'm asking a very specific question.
15 A  Okay.
16 Q  Did you promise on behalf of Edgewood High School
17  that they would not add seating and lighting?
18       MS. ZYLSTRA: Objection. Form,
19  foundation, asked and answered.
20 A  Okay. I never intended to promise anything on
21  behalf of the high school.
22 Q  Thank you. Did you tell the liaison committee on
23  April 14 of 2015 that the Edgewood field would be
24  a practice facility?
25       MS. ZYLSTRA: Same objections.

---

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 193

1       Form, foundation.  Asked and answered.
2  A  Okay.
3  Q  Did you tell the Neighborhood Liaison Committee
4     that this would be a practice facility?
5          MS. ZYLSTRA: Same objections.
6     Asked and answered.
7  A  If my understanding was based on what's in the
8     master plan, that it was a practice field, I would
9     have said it was a practice field.  So it is
10    possible that I said it's going to be a practice
11    field, if that were my understanding.
12 Q  Do you have a recollection of saying it was a
13    practice field in this meeting?
14         MS. ZYLSTRA: Same objections.
15    Form, foundation.
16 A  I honestly can say we were talking about it, but I
17    can't -- a specific sentence that I said seven
18    years ago, I don't have that.
19 Q  You said Ms. Binkowski would have --
20 A  Bykowski.
21 Q  -- Bykowski would have likely taken the minutes?
22 A  Yes.
23 Q  But she does not show up as someone that's present
24    at the meeting?
25 A  Right.

Page 194

1  Q  Is it typical that the person taking the minutes
2     lists themselves as being present?
3          MS. ZYLSTRA: Objection.  Form,
4     foundation.
5  A  You know, I'd have to look at the other minutes to
6     see if she did, if she added herself.
7  Q  And, again, you've never been employed by Edgewood
8     High School?
9  A  I've never been employed by Edgewood High School.
10 Q  Is it possible -- Did Shawn Schey ever take
11    minutes for the liaison committee meetings?
12         MS. ZYLSTRA: Objection.  Form.
13 A  I don't know, because there was a time, I'm
14    talking 20 years now, where we used to rotate, and
15    then finally I just kept doing it because nobody
16    ever wanted to do it and then we got Erin to do it
17    and that was a gift from God.
18    So if you're asking me do I believe that it's
19    possible that Shawn Schey wrote these, I do not.
20    But that's --
21 Q  Why not?
22 A  Because at this point Erin was doing the minutes.
23    Nobody wanted to do the minutes if Erin would do
24    them because she would get paid to do them.
25 Q  All right.  Maggie, I'm going to represent to you

Page 195

1     that Shawn Schey filed an affidavit in this case.
2     Paragraph 4 of that affidavit, she's referencing
3     the April 14, 2015, Edgewood Neighborhood Liaison
4     Committee meeting that you have there in front of
5     you as Exhibit 156.
6  A  Uh-huh.  Uh-huh.
7  Q  She stated, "At this meeting Maggie Balistreri-
8     Clarke attended as the representative of Edgewood.
9     She provided an update as to Edgewood High School
10    construction which is shown as number 5 in the
11    minutes.  She indicated that as to the Edgewood
12    High School football field, no additional lighting
13    or seating would be installed.  She also confirmed
14    that the football field would be a practice
15    facility.  This is memorialized in the last two
16    bullets under the high school football field
17    heading."
18    My question for you is did you present on
19    behalf of Edgewood High School -- let me ask you
20    this.  Strike that.
21    Did you provide an update on the Edgewood
22    High School construction at that meeting?
23         MS. ZYLSTRA: Objection.  Form,
24    foundation, asked and answered.
25 A  I don't believe I gave this update.  And if Mike

Page 196

1     were there, he would have answered questions on
2     the high school.
3     And the reason I'm guessing Mike was there
4     is because it says he presented a graphic on the
5     expanded parking.  And if he were there, then I
6     would not be the authority on anything about the
7     high school.
8     And when you look at the extent of these
9     minutes, things like the high school is struggling
10    with students coming as early as 7:00 and leaving
11    as late as 7:00, this is much more detailed than
12    any update I could have ever given.  And so I just
13    remember Mike talking about the surface and about
14    things they wanted and needed.  And if Mike
15    Elliott is there, he's the one speaking for the
16    high school.
17 Q  Looking at this document, looking at those
18    present, Mike Elliott is not listed as being
19    present; correct?
20 A  That's a true thing.  Neither is Susan Serrault,
21    and yet there she was giving an update on number 3.
22 Q  Well, it says Review of landscaping update for
23    site 1 from Susan Serrault.
24 A  Uh-huh.
25 Q  Do you see that?

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 197

1  A  Yes.
2  Q  That does not say that Susan Serrault was present;
3     correct?
4            MS. ZYLSTRA: Objection. Form,
5        foundation.
6  A  That's true. But if you look at Mike presented a
7     graphic, then Mike would have presented the
8     graphic.
9  Q  Well, but you don't know what that means. You're
10    speculating at this point, aren't you?
11           MS. ZYLSTRA: Objection. Form,
12       foundation.
13 A  If Mike didn't give this update, there is nothing
14    in this document that says I gave it.
15 Q  And if Mike Elliott says he did not -- he was not
16    at this meeting and did not provide this update,
17    you have no reason to disagree with that; is that
18    correct?
19           MS. ZYLSTRA: Objection. Form,
20       foundation.
21 A  I can promise you that Mike came to a liaison
22    committee meeting and gave an update on what they
23    wanted to do for the resurfacing. And all of this
24    conforms with my memory of the presentation Mike
25    did.

Page 198

1         If it was at another date, I would have to
2     look at the minutes for that. But this would
3     conform with my memory of a meeting at which Mike
4     gave updates.
5  Q  But if Mike Elliott --
6  A  Says he wasn't at that meeting.
7  Q  -- said he wasn't there and Shawn Schey says you
8     did it, why do you believe that Mike Elliott was
9     at the April 14, 2015, meeting and provided that
10    update?
11           MS. ZYLSTRA: Objection. Form,
12       foundation, asked and answered. At this
13       point it's badgering the witness.
14 A  Well, I don't know what to say.
15 Q  Yeah. Because this is an eight-year-old document,
16    seven-year-old document that you haven't looked at
17    for about seven years; fair?
18           MS. ZYLSTRA: Objection. Form.
19       Foundation. Argumentative. Badgering the
20       witness, and counsel is raising his voice as
21       well.
22           MR. INGRISANO: I am not.
23 A  Okay. I want to say that Mike -- okay. A true
24    thing is that Mike presented on the field to the
25    liaison committee. I know that for a fact. And

Page 199

1     if Shawn Schey is saying I promised something on
2     behalf of the high school, that makes me sad in
3     that I did not have the authority. I can
4     understand a misunderstanding that if she was
5     saying what's their use, if I thought it was
6     recreational, I would have said it was
7     recreational if that's what was in the master
8     plan. I did not have the authority to say this is
9     how they use it, this is how they will use it.
10 Q  I'll represent to you that the city has taken the
11    position that you were an agent of Edgewood High
12    School who had authority at this meeting to make
13    those statements to bind Edgewood High School.
14 A  Okay.
15 Q  Do you agree or disagree with that statement?
16           MS. ZYLSTRA: Objection. Form,
17       foundation. That misstates the city's
18       position. You can answer.
19 A  If the city thought I was offering a binding
20    statement on behalf of the high school, they are
21    misunderstanding what my role was.
22 Q  Exhibit 141, Maggie.
23 A  Okay.
24 Q  This email exchange, as we see it on 11375.
25    If you look down at the bottom right-hand corner,

Page 200

1     11375.
2  A  11375.
3  Q  The questions that were being asked regarding the
4     massing related to the proposed high school's
5     buildings; correct?
6  A  Yes.
7  Q  You had mentioned before, I think the word you
8     used was outlandish concerns from certain
9     neighbors and you mentioned specifically the doors
10    on internal garbage bins. Do you recall that?
11           MS. ZYLSTRA: Objection. Form.
12 A  I do.
13 Q  Can you give me examples of any other kind of what
14    you would consider to be outlandish concerns or
15    complaints raised by neighbors during your period
16    of time at Edgewood College?
17           MS. ZYLSTRA: Objection. Form.
18 A  I would say that was -- that was the most
19    surprising to me. I was not surprised by anything
20    involving lights or noise or traffic or
21    aesthetics. But when the aesthetics got down to
22    something internal that could -- that they would
23    have to come onto our campus to see it or be
24    affected by it, that to me was pretty -- that was
25    outlandish, unexpected.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 201

1 Q  I'm asking for any other examples of what you
2     would consider unexpected or outlandish complaints.
3        MS. ZYLSTRA: Objection. Form.
4 A  If you're using my definition of outlandish,
5     that's outlandish. I think that -- so that's it.
6 Q  Were there other complaints or concerns that
7     people within Edgewood College communicated to you
8     they found to be in any way unreasonable?
9        MS. ZYLSTRA: Objection. Form,
10        foundation.
11 A  Most of the rest of the college thought that their
12     having a say in anything we did, Didn't they
13     notice there were schools when they moved in?
14     If you're asking the opinion of the people at the
15     college, they're like, Did they not -- When they
16     built that house, did they not notice they were
17     across the street from a college?  And so why
18     should they have a say about fill in the blank.
19 Q  Fill in the blank.  I asked you specifically about
20     other examples that other people at Edgewood
21     College communicated to you that they thought were
22     unreasonable complaints, and I'm asking you to
23     identify those.
24        MS. ZYLSTRA: Objection. Form,
25        foundation, asked and answered.

---

Page 202

1 A  They wanted us to put electronic blinds on the art
2     center facing Terry Place because they didn't
3     trust that the lights wouldn't spill over into the
4     neighborhood after, say, 10:00.  So they wanted
5     the blinds to be closed electronically.
6 Q  What else?
7        MS. ZYLSTRA: Same objections.
8 A  They wanted us to plant a certain kind of trees
9     for screening.
10 Q  They had a particular type of tree they wanted?
11 A  Just size.  I mean, I have twenty years of people
12     asking for things and somebody at the college
13     thinks it's totally unreasonable, and so the
14     master plan was our effort to try and bring these
15     two sides together when what you think is
16     outlandish, it's pretty reasonable to me, and
17     vise versa.  We're trying to live -- you know,
18     we're trying to be neighbors.  All five of us were
19     trying to be neighbors.  And so what you want
20     might seem absolutely outrageous to me until I get
21     to know you better and say, Oh, I see.  I didn't
22     realize that was upsetting you in that way.  And
23     then we would talk about it.  And the agreements
24     we came to were in our master plan.
25        Even in the master plan there are unresolved

---

Page 203

1     issues, and it's things that people thought were
2     too beyond the pale.  And so one person's
3     outlandish is another this is my life, you know.
4     Am I -- is that --
5 Q  No.  I'm listening.  Did the master plan require
6     that the schools provide enrollment caps?
7        MS. ZYLSTRA: Objection. Form,
8        foundation.
9 A  Part of the master plan requirement was that we
10     had to say for what size population are you
11     building this building, you know.  We had to do
12     enrollment caps, because if you said you were
13     going to build -- you're going to have 7,000
14     students but you only had three residence halls or
15     something, they would say, That doesn't match.
16        So all of us were required to say, you know,
17     how many faculty, how many staff, and how many
18     students are you expecting.
19 Q  Got it.
20 A  How many will live on campus, how many will be
21     commuters.  We had to say all of that.
22 Q  Was it your understanding in going through that
23     process that the enrollment caps were binding on
24     the schools such that if enrollment were to exceed
25     the caps there would have to be some sort of

---

Page 204

1     alteration or amendment to the master plan?
2        MS. ZYLSTRA: Objection. Form,
3        foundation.  Speculation.
4 A  My understanding was that if we were going to go
5     beyond our caps, it would certainly cause -- we
6     would have to talk about it.  Our enrollments are
7     public documents.  And so we said this is what we
8     expect.  If it were going to be something
9     different, we would have to talk about it with the
10     city, with our neighbors, and, again, what are you
11     going to do about it or, you know, if we said we
12     were going to have 600 residents and one year we
13     would have 605, we would go to the liaison
14     committee and go to the city and say, What do
15     you know, we have 605.  They might say you're good
16     to go.  If you get to 610, then we've got a
17     different process for you.  My understanding was
18     we go beyond these limits, we talk about it.
19 Q  Okay.
20        (Exhibit No. 159 marked for
21        identification)
22 Q  All right.  I'm handing you --
23 A  Document 159?
24 Q  I'm handing you now what's been marked as -- you
25     can put the other exhibits away for a moment.

---

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 205

1     I'm handing you what's been marked as
2   Exhibit 159.  Do you recognize that document?
3  A   This looks like the process for -- the outline for
4   what needed to be -- this looks like the outline
5   for the master plan document, what was needed,
6   what the tasks were for every chapter, and who was
7   responsible, and what was the -- it's a process,
8   budget management process.
9  Q   This has a Potter Lawson mark on the bottom right-
10   hand corner.  Do you see that?
11  A   Yes.
12  Q   Where it says Potter Lawson, Success by Design?
13  A   Yes.
14  Q   It was your understanding that Doug Hursh or
15   someone else at Potter Lawson created this
16   document?
17  A   Yes.
18       MS. ZYLSTRA: Objection.  Form,
19   foundation.
20  A   I mean, Potter Lawson.  If this was a document
21   created by Potter Lawson, I would believe that.
22  Q   Did Doug Hursh or someone else at Potter Lawson
23   share this document with you during the master
24   plan process?
25       MS. ZYLSTRA: Objection.  Form,

Page 206

1   foundation.
2  A   I believe I would have seen it.  My initials
3   are -- you know, who is going to do what?  They
4   would not have told us who at the college was
5   going to do what.
6       And so, for example, down under sustainability,
7   it says, "Draft is complete, does it need to be
8   vetted by others at Edgewood."  So that's
9   Edgewood, Susan Serrault.  Susan probably didn't
10   talk to Doug, I did.  And so I would have had to
11   have been in conversation with Doug about this
12   process.
13  Q   So the column that says responsibility/
14   coordination, do you see that?
15  A   Uh-huh.  Yes.
16  Q   Do you recognize that you're MBC?
17  A   Yes.
18       MS. ZYLSTRA: Objection.  Form,
19   foundation.
20  Q   Who is DH?
21  A   Doug Hursh.
22       MS. ZYLSTRA: Objection.  Form,
23   foundation.
24  A   Oh, sorry.
25  Q   Who is DH-PLI?

Page 207

1       MS. ZYLSTRA: Objection.  Form,
2   foundation.
3  A   I'm not sure who PLI is.  Doug Hursh and then he
4   had people, but I don't know, or somebody -- yeah.
5   I don't know who PLI would be.
6  Q   Could it be Potter Lawson, Inc.?
7       MS. ZYLSTRA: Objection.  Form,
8   foundation.  Speculation.
9  A   I -- That would not be unreasonable, but I
10   would -- I don't know.
11  Q   Where it says under Chapter 3 -- Well, and so
12   you've seen this document before during the
13   process of the master plan; correct?
14       MS. ZYLSTRA: Objection.  Form.
15  Q   Or documents like this?
16       MS. ZYLSTRA: Objection.  Form,
17   foundation, asked and answered.
18  A   I believe this was what we used to say what's
19   needed, who is going to do it.
20  Q   Okay.  So the answer to my question is yes, you've
21   seen this document before?
22       MS. ZYLSTRA: Same objections.
23  A   Yes.
24  Q   All right.  So you recall sitting down and looking
25   at what had been assigned to you under documents

Page 208

1   like Exhibit 159?
2       MS. ZYLSTRA: Objection.  Form,
3   foundation.
4  Q   Correct?
5       MS. ZYLSTRA: Whoops.  Sorry,
6   Counsel.
7  Q   Go ahead.
8  A   Okay.  I remember working to getting clarity on
9   who was doing what, and this kind of document
10   would have been helpful in laying it out.
11  Q   Okay.  Where it says Chapter 3, midway down the
12   Chapter 3 column, it says, "Open Space -
13   Landscaping and Green Space."  Do you see that?
14  A   Yes.
15  Q   "Task: Plan and narrative."  Second line, "Plan
16   is complete."  Do you see that?
17  A   Second line.
18  Q   I'm sorry.  Second column under task.
19  A   "Plan is complete."
20  Q   Under Open Space.
21  A   Okay.  And now under -- yes.  "Plan and narrative.
22   Plan is complete."
23  Q   Do you see that?
24  A   Uh-huh.  Uh-huh.
25  Q   Then DH is the initials that were accorded

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 209

1 responsibility and coordination; correct?

2 A  Yes.

3         MS. ZYLSTRA: Objection.  Form,
4     foundation.

5 Q  All right.

6 A  Yes.

7 Q  So to your knowledge was Doug Hursh responsible
8     for the plan and narrative under the Open Space
9     Plan?

10        MS. ZYLSTRA: Objection.  Form,
11     foundation.

12 A  Okay.  The plan -- okay.  The way it -- Doug never
13     created anything out of his own -- Doug never
14     created anything.  He didn't care what -- I mean,
15     I don't mean it that way.  We would tell Doug what
16     we wanted, and he would write it down and say how
17     is this.  And then the process was we would go
18     back and forth.  No, we didn't want it blue, we
19     wanted it green, or whatever it was on anything.
20     So we would have said -- Like there might have
21     been an open space or a landscaping or green space
22     group that Doug would have worked with and then
23     helped create a plan.

24     So Doug's name is there, but for making it
25     happen.  It's just like when it says my name, I'm

Page 210

1 working with a team of people.  But it was my job
2     to make sure it got finished and submitted.

3 Q  Got it.  So I guess that's my question.  Doug
4     Hursh was the person assigned the responsibility
5     and coordination on the Open Space Plan; correct?

6         MS. ZYLSTRA: Objection.  Form,
7     foundation, asked and answered.

8 A  Yeah.  This document would say yes.

9 Q  And that doesn't necessarily mean drafting it,
10     but he's ultimately responsible to coordinate
11     the completion of that part of the plan; fair?

12        MS. ZYLSTRA: Objection.  Form,
13     foundation.

14 A  This document would imply that, yes.

15 Q  And that's consistent with your recollection of
16     his responsibilities actually; correct?

17        MS. ZYLSTRA: Same objections.

18 A  He was coordinating that, yes.

19 Q  Document 159 is dated June 13, 2013?

20 A  I'm sorry.  159?

21 Q  159 is dated on the top left-hand corner June 13
22     of 2013; correct?

23        MS. ZYLSTRA: I'll object to form.

24 A  Yes.  Well, I'm not sure why it says 1/12 --
25     2012.11.

Page 211

1 Q  Sure.

2 A  So maybe it's --

3 Q  So it's got two dates on it.  The top left-hand
4     corner says June 13, 2013?

5 A  Yes.

6         MS. ZYLSTRA: Objection.

7 Q  Top right-hand corner says November 2012?

8 A  Yes.  If that's what that means, yes.

9 Q  It says 2012.11.00?

10 A  Yes.  That's what this document says.

11 Q  Okay.

12         (Exhibit No. 160 marked for
13          identification)

14 Q  I'm handing you what's been marked as Exhibit 160.

15 A  Okay.

16 Q  So do you recognize this as being an October 17,
17     2013, dated document similar to Exhibit 159?

18         MS. ZYLSTRA: Objection.  Form,
19     foundation.

20 A  Yes.

21 Q  And, again, this is another Table of Contents --

22 A  It's only the first page.

23 Q  Yep.

24 A  If you look at the stormwater management, yes.
25     Okay.

Page 212

1 Q  Agreed.  It does not have all of the pages.  It
2     doesn't progress past stormwater management;
3     correct?

4 A  That's correct.

5 Q  Okay.  But with respect to Open Space Plan -
6     Landscaping and Green Space, the contents of
7     Exhibit 160 are the same as for Exhibit 159;
8     correct?

9         MS. ZYLSTRA: Object to form.

10 A  Yes.

11         (Exhibit No. 161 marked for
12          identification)

13 Q  I'm handing you what's been marked as Exhibit 161.
14     Do you recognize this as a November 12, 2013,
15     version of the Edgewood Campus Master Plan Table
16     of Contents?

17         MS. ZYLSTRA: Objection.  Form,
18     foundation.

19 A  Yes.

20 Q  And this again acts to identify tasks and
21     responsibility and coordination for the master
22     plan project; correct?

23 A  Yes.

24         MS. ZYLSTRA: Same objections.

25 Q  And you recall receiving multiple versions of this

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 213

1 Edgewood Campus Master Plan Table of Contents over
2 time during this project?
3        MS. ZYLSTRA: Objection.  Form,
4     foundation.
5 A  What's funny is I don't remember this document in
6   particular, but I have to say it makes sense that
7   this is how we would have -- there were so many
8   moving parts that who was doing what and who was
9   responsible and what the status was, this would
10   make sense as that kind of document.
11 Q  Got it.  But you don't have an actual recollection
12   of this particular Exhibit 161?
13 A  Not this one, no.
14 Q  But you do recall receiving versions of this
15   document during the process?
16 A  Yes.
17 Q  Okay.  Looking at the second page of Exhibit 161,
18   again let's look at the Open Space Plan -
19   Landscaping and Green Space.  Responsibility
20   and coordination is different than it was in
21   Exhibits 160 and 159; correct?
22 A  That's true.
23 Q  And now it looks like Ed Taylor has been added to
24   this?
25 A  Yes.

Page 214

1 Q  And that's consistent with the other exhibits you
2   saw today in which Ed Taylor was being asked to
3   coordinate changes and revisions to drafts of the
4   master plan.  Do you remember that?
5        MS. ZYLSTRA: Objection to form.
6 A  This says Ed Taylor to help with descriptions.  So
7   all this says is that he would help in how to talk
8   about them.
9 Q  Sure.
10 A  Not that he would have coordinated anything other
11   than that.
12 Q  Do you recall Ed being involved with the Open
13   Space Plan?
14 A  I don't.
15 Q  Okay.
16 A  That Ed -- Ed was helpful with the wording and
17   stuff.  But I don't believe he ever, like,
18   coordinated a meeting or anything.  But I could
19   be wrong there.
20 Q  All right.
21        (Exhibit No. 162 marked for
22        identification)
23 Q  I'm handing you what's been marked as Exhibit 162,
24   which is a November 19, 2013, dated draft of the
25   Table of Contents for the Edgewood Campus Master

Page 215

1   Plan.  Do you see that?
2 A  Yes, I do.
3 Q  Do you recognize this document -- I'm sorry.
4   Strike that.
5     Do you recall receiving this document?
6        MS. ZYLSTRA: Objection.  Form,
7     foundation.
8 A  Well, once again, I know that this kind of
9   document, you know, like this particular
10   document -- the minutes look familiar to me, but
11   even those I can't say, Boy, I got this one.  But
12   do I remember receiving documents like this at
13   this time to help guide the process?  Yes.
14 Q  Okay.  Now, you described yourself earlier today
15   as kind of the shepherd for this project; correct?
16 A  Yes.
17 Q  And in talking about these Exhibits 159 through
18   162, we discussed the column labeled
19   responsibility/coordination; correct?
20 A  Yes.
21 Q  And those were people that were identified as
22   having kind of not necessarily full drafting
23   responsibility but were people that were
24   identified as being responsible for working with
25   others and coordinating the completion of the

Page 216

1   particular chapter sections; correct?
2        MS. ZYLSTRA: Objection.  Form.
3 A  The responsibility or coordination might be get
4   somebody to write it and hand it in.  It might be
5   call 90 meetings and then get the agreements you
6   want.
7     So what it all involved would have been
8   different.  But in terms of who was responsible
9   for getting it in, yes, that's what that would be.
10 Q  Okay.  And looking at Exhibits 159 through 162, in
11   looking at the designations for responsibility and
12   coordination --
13 A  Yes.
14 Q  -- do you see anyone from Edgewood High School who
15   was designated to be responsible for coordinating
16   those items?
17 A  It would have been inappropriate to have somebody
18   from Edgewood High School because the three
19   schools -- well, not inappropriate.  But when it
20   came time to -- there were the three presidents
21   and then there was like landscaping.  We were the
22   only ones who had a landscaper on campus.  There
23   was parking.  We had a director of security who
24   did security for the whole campus.  You know, we
25   had the resources compared with the other schools.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 217

1 And so if they asked us to do it, we couldn't say,
2 Help pay their salary or you do part of it. They
3 were as involved as -- certainly they weren't kept
4 out of the process. If anybody wanted to do
5 something, they could have done it.
6 So I don't see anybody, but it was we had
7 more resources than they did.
8 Q So just to make sure that the record is clear,
9 Maggie, the answer to my question is no, there are
10 no Edgewood High School people listed on these
11 exhibits as being tasked with being responsible
12 for coordinating those tasks?
13 A That's right.
14 MS. ZYLSTRA: Object. Wait.
15 Sorry. Objection. Form, foundation.
16 Go ahead.
17 A Okay. Yes.
18 Q Is it fair to say that you, Doug Hursh, Ed Taylor,
19 Susan Serrault were the ones principally involved
20 in marshalling or shepherding this project
21 through?
22 MS. ZYLSTRA: Objection. Form.
23 A It depends on what part of the process you're
24 talking about.
25 Q Sure.

Page 218

1 A Because this refers to the document. But for
2 everything here, there are layers and layers and
3 layers.
4 When it came to the sustainability plan,
5 nobody said, Maggie, get us through this. Or the
6 transportation plan, you know, maybe I was there
7 if it came to a meeting with the city. But there
8 were lots and lots of people from the three
9 schools and the two neighborhood associations and
10 the city that were involved in putting this all
11 together.
12 But when it came down to it's your job to
13 make sure that the drawings are complete and we
14 need descriptive notes, fine, somebody had to do
15 that.
16 So you don't see anybody from the campus
17 school on this document. You don't see anybody in
18 the neighbors, and you don't see -- you see me and
19 Doug mostly and Ed Taylor and Susan -- everybody
20 you see is either at the college or Potter Lawson.
21 Q Beyond compiling information in response to
22 requests from the responsible individuals, are you
23 aware of any other involvement that Edgewood High
24 School had with the formation and drafting of the
25 master plan?

Page 219

1 MS. ZYLSTRA: Objection. Form,
2 foundation.
3 A Oh, I would say that they were at meetings --
4 Q Okay.
5 A -- of the liaison committee. They were at those
6 meetings. They were at the presidents meetings.
7 They were at presentations that Potter Lawson
8 would have done. I would have had individual
9 meetings with them. We would have done strategy
10 meetings about, okay, we've got to go now and I
11 would go to the three presidents and say,
12 you know, if you want me to speak on your behalf,
13 you guys have to agree. So there would have been
14 that.
15 So the three schools were kind of equal in
16 that they had to hash it out. They asked me to be
17 their shepherd, and somebody had to speak on
18 behalf of the Edgewood schools and it was really
19 one of those things where we were all standing and
20 everybody else took a step back. I mean, they
21 asked me to do it. And so I did. But I did not
22 have the authority of a president.
23 Q Exhibit 54.
24 (Discussion held off record)
25 Q All right.

Page 220

1 A Okay.
2 Q Exhibit 54, you were asked about the language on
3 1840, bottom right-hand corner --
4 A Okay.
5 Q -- of this Exhibit 54.
6 A Okay. 54.
7 Q Bottom right-hand corner, look for 1840.
8 A Got it.
9 Q Okay. All right. And you were asked about
10 number 1.
11 A Yes.
12 Q And the phrase "and other generally light uses."
13 Do you remember that?
14 A Yes.
15 Q And just to be clear, in looking at the final
16 language then in Exhibit 52, which did not have
17 the "and other generally light use" language, do
18 you have any information as to how it came to be
19 that that language appears in Exhibit 54 but does
20 not appear in Exhibit 52?
21 A The only information I have is that our process
22 was that if this said high school, they would have
23 had to edit it. And if it said campus school,
24 Sister Kathleen or somebody from the campus
25 school, and if it said college. We did not edit

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 57 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 221

1  each other's language.
2 Q  Okay.  So besides the fact that there is that
3    process, do you know that Mike Elliott or anyone
4    else at the high school revised that?
5         MS. ZYLSTRA: Object to form.
6 A  I have no way of knowing that they did not.  But
7    except to say here is the draft.  They were asked
8    to make the changes.
9 Q  Sure.
10 A  I would be -- I see no reason to believe that
11    changes were made in their name by people other
12    than them.
13 Q  But, again, you have no -- you would be
14    speculating as to --
15 A  Right.
16 Q  -- the who and the when of how that language came
17    out?
18 A  Right.
19 Q  Or the why?
20 A  Or the why.  Yeah.  "Other light uses" is not
21    going to be a great master plan.  You know, what's
22    a light use to -- I'll be quiet.
23         (Exhibit No. 163 marked for
24          identification)
25         THE WITNESS: May I ask how close

Page 222

1    we are to the end?
2         MR. INGRISANO: I don't think we're
3    that far.
4         THE WITNESS: Okay.
5         MR. INGRISANO: For me.
6         (Discussion held off record)
7 Q  I'm handing you what's been marked as Exhibit 163.
8 A  Okay.
9 Q  Have you ever seen this email before?
10 A  Well, I'm not copied on it.  So I have no reason
11    to believe that I have ever seen this email
12    before.
13 Q  Sure.  In February of 2013 do you recall asking
14    Susan to follow up with Judd Schemmel at the
15    high school about the use of the athletic field?
16 A  I don't know that -- you know, this is saying that
17    Doug has asked her to verify the use of the
18    spaces.  Susan's job was to shepherd the green
19    space plan.  So Doug is asking, Let's verify the
20    use of the spaces.  So it sounds like she's -- I'm
21    speculating, that she's writing to Judd saying
22    could you verify the uses of the spaces.
23 Q  Got it.  The attachment to this page appears to be
24    an open spaces diagram draft.  Do you recognize
25    that as being an open spaces diagram draft for the

Page 223

1    Edgewood campus?
2 A  I see that it has all the marks of open spaces
3    diagram and it was a draft.  So I wasn't really
4    part of the open spaces dialogue process, but this
5    looks very reasonable.  I don't know whose writing
6    this is.  I'm wondering if that's Susan's.  I
7    don't know.
8 Q  That's my question is do you recognize the
9    handwriting?
10 A  I do not.
11 Q  Okay.
12         (Exhibit No. 164 marked for
13          identification)
14 Q  I'm handing you what's been marked as Exhibit 164,
15    Maggie.
16         MS. ZYLSTRA: Counsel, isn't this
17    already in?
18         MR. INGRISANO: It may be.  There
19    were a couple different versions of this
20    document floating around in the Potter Lawson
21    production.
22 Q  164, have you ever seen this document before or
23    any of the emails therein?
24 A  I don't believe I've ever seen this.
25 Q  Okay.  In the middle of the page, it looks like

Page 224

1    there is an email from Judd Schemmel to Susan
2    Serrault.  Do you see that?
3 A  I do.
4 Q  Do you recognize that as Judd Schemmel's email
5    address?
6         MS. ZYLSTRA: Objection.  Form.
7 A  That would be reasonable, yes.
8 Q  Okay.  And this appears to be a response to the
9    email we just looked at in Exhibit 163; correct?
10 A  So she's asking for -- okay.  So she's asking for
11    clarification, and it would be reasonable to think
12    that this was the response.
13 Q  In fact, if you look beyond, at the bottom of
14    Exhibit 164, that email is there again reprinted,
15    correct, from 163?
16 A  Yes.  Yes.  Exactly right.
17 Q  And when you look at the middle email, it says
18    Location #1.  Do you see that?
19 A  Uh-huh.
20 Q  "In addition to practices, games do take place on
21    this athletic field.  We play lower level boys and
22    girls soccer as well as lower level football.
23    Additionally, the space is used as the home field
24    for our varsity lacrosse team.  This space has
25    been used to host a middle school level track and

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

---

Page 225

1  field meet comprised of Catholic feeder schools.
2  We also use this space in conjunction with
3  high school's summer strength and conditioning
4  programs." Did I read that correctly?
5 A  I see that, yes.
6 Q  Based on your time on campus, do you have any
7  reason to disagree with this description of the
8  use of the athletic field?
9       MS. ZYLSTRA: Objection. Form,
10       foundation.
11 A  When I was at the college, I could not have told
12  you in any detail what they used it for. If Judd
13  Schemmel in 2013 is telling Susan and Doug, Here
14  is what we use it for, then I would believe that's
15  a reasonable description.
16 Q  And it does appear that, at least from
17  Exhibit 164, Doug is cced both on Judd's response
18  and on Susan's thank you email at the top; correct?
19 A  Yes.
20 Q  Do you have any knowledge based on conversations
21  with Doug or anyone else at Edgewood High School
22  or Edgewood College, based on those conversations
23  or any other direct knowledge, as to why the
24  description of the use of the athletic field in
25  Exhibit 164 is different from the description of

---

Page 226

1  the use of the athletic field in Exhibit 52? Do
2  you have any knowledge?
3       MS. ZYLSTRA: Objection. Form,
4       foundation.
5 A  None.
6 Q  If you were going to go and ask around, Hey, it
7  looks like Judd said here is how the football
8  field is used in February of 2013, it's different
9  from what was described in the master plan, why
10  did this happen, who would you talk to?
11       MS. ZYLSTRA: Objection. Form,
12       foundation.
13 Q  Who would be the person with that information to
14  the best of your knowledge?
15       MS. ZYLSTRA: Same objections.
16 A  I would start with Susan Serrault.
17 Q  Okay. Anyone else?
18 A  Doug Hursh and Tami Holmquist. I guess not Tami.
19  I guess Susan, she just -- I would say this is an
20  email from Judd to Susan and Doug was copied on
21  it. So those are the people I would ask.
22 Q  I'm going to hand you what's been marked
23  previously as Exhibit 45. Let me ask you to take
24  a look at that document and tell me if you've ever
25  seen any of these communications before.

---

Page 227

1 A  And this was what year? Oh, 2018. Okay. I have
2  not. I have not. It's 2018.
3 Q  Let me ask you to read the email starting Brian
4  and Mike.
5 A  Okay.
6 Q  Did anyone at the city ever tell you during the
7  master plan process that you were shepherding that
8  the master plan could act to limit the programming
9  and usage of fields and open spaces on the
10  Edgewood campus?
11       MS. ZYLSTRA: Objection. Form.
12 A  I don't believe anybody made a statement saying --
13  I'm not sure what context they would have said
14  that in.
15 Q  Did anyone from the city ever tell you that the
16  master plan would act to restrict or limit
17  Edgewood from its uses of its field?
18       MS. ZYLSTRA: Same objections.
19 A  Not that I'm aware of.
20 Q  Okay. Does the idea that the master plan could
21  limit Edgewood's use of its athletic field to team
22  practices and physical education only, does that
23  comport with your understanding of what the master
24  plan was intended to do?
25       MS. ZYLSTRA: Objection. Form,

---

Page 228

1  foundation.
2 A  I believe the master plan says whatever is, I
3  guess, using Matt's here, not looking at the plan,
4  team practices and physical education, that that's
5  what was in the plan, and Matt is saying anything
6  more than that we need to talk, that is consistent.
7 Q  Was it your understanding that the master plan
8  restricted uses?
9       MS. ZYLSTRA: Objection. Form.
10 A  Well, my understanding was what Tim and Matt had
11  said was if it's not in the plan, check with us
12  and we'll tell you the process. Is it in the plan
13  or is it not.
14       So, yes, they could restrict uses if it was
15  considered way beyond the boundary. I mean, if we
16  said this is how this area is going to be used and
17  we wanted to use it to do something totally else,
18  then, you know, like if the college wanted to
19  start a circus somewhere on our campus, we would
20  have to consult with folks because they would say,
21  I don't see anything close to that in the master
22  plan. Now, that's just an exaggeration. But my
23  understanding was, yes, they could restrict use if
24  they considered it outside the master plan.
25 Q  And did you communicate that to Edgewood High

---

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 229

1     School, that that was how the Open Space Plan
2     would be interpreted by the city?
3          MS. ZYLSTRA: Objection. Form.
4     Foundation.
5  A  What I can say is I tried to be as clear as I
6     could be that if we wanted it, it should be in
7     the plan. And that anything in the plan we had
8     permission and anything outside the plan we would
9     have to go through an approval process.
10          So I probably wouldn't have said in the
11     driveways, in the open spaces, in the buildings,
12     on the water. But I would have tried to help them
13     understand that if it was in the plan, we had
14     permission, and if it wasn't, we would have to
15     seek approval, whether it's, Yeah, go ahead, no
16     issue, or something more formal than that.
17  Q  Were there any kind of changes that you could do
18     on the Edgewood campus that wouldn't require any
19     sort of involvement or approval of the city to
20     your understanding?
21          MS. ZYLSTRA: Objection. Form,
22     foundation.
23  A  The plan itself says it's not meant to be a
24     blueprint, it's not intended to be -- to restrict
25     our use, you know. I think it was a good faith

Page 230

1     effort to say, here is how we intend to use these.
2     If we say it's a dormitory and suddenly we're
3     using it for classroom, they might not -- we
4     might -- that might mean a phone call. If we're
5     going to start housing like a hotel, that might be
6     something, you know.
7          So our understanding was that be as specific
8     as -- I tried to have all three schools know, be
9     as specific as you can with what you know you want
10     to do, because if it's not in there, then we're
11     going to have to ask about it.
12          Now, every little thing, of course not. But
13     anything that could be seen to be impinging on our
14     neighbors, yes.
15  Q  And as you were going through this process, how do
16     you draw that line between what you consider to be
17     minor and what you consider to be impinging?
18          MS. ZYLSTRA: Objection. Form,
19     foundation.
20  A  What I would do is go to the liaison committee and
21     say, This is what we want to do. What do you
22     think. And if they were like, That's so in the
23     master plan, I would start there. If I really had
24     a question, I would probably, I don't know, call
25     whoever, my alders or whoever at the city,

Page 231

1     you know, go from there, have Doug check if it was
2     a regulation, and then, you know, if you want to
3     know if this isn't in the master plan, ask.
4  Q  There is still, though, it sounds like, a lot that
5     is subject to the interpretation of both the city
6     and the liaison committee; is that fair?
7          MS. ZYLSTRA: Objection. Form,
8     foundation.
9  A  Tim's guidance to us was, If you want to make a
10     change, ask us, and we'll help decide if it's in
11     the master plan or not. And between that and the
12     process we had in the plan, my understanding was,
13     if you want to do something different from what
14     you absolutely specified, here is the process.
15     It starts out informally and then it goes to more
16     formal depending on how big the issue is.
17  Q  I'm going to hand you what's been marked as
18     Exhibit 9. Have you ever seen Exhibit 9 before?
19  A  No.
20  Q  I'll represent to you that this is an official
21     notice and complaint from the City of Madison to
22     Edgewood High School demanding they discontinue
23     holding athletic contests on the athletic field
24     at 2219 Monroe Street.
25  A  Okay.

Page 232

1  Q  It goes on to say, "The Campus Master Plan states
2     that the athletic field is used for team practices
3     and physical education classes." Do you see that?
4  A  Uh-huh.
5          MS. ZYLSTRA: Objection. Form and
6     foundation of the document.
7  A  Where is that?
8  Q  The first paragraph. The first paragraph says
9     "Discontinue."
10  A  Okay. The Campus Master Plan states that it is
11     used for team practices and physical education.
12     Yes, I see that.
13  Q  When you were going through the master plan
14     process, did you have any understanding or
15     expectation that the City of Madison would issue
16     notices of violation to Edgewood High School for
17     playing games on its athletic field?
18          MS. ZYLSTRA: Objection. Form,
19     foundation. Asked and answered.
20  A  I've got to say, I didn't know enough about what
21     went on in the field. I'm saddened by this whole
22     thing. So if -- Ask your question again, please.
23  Q  Sure. When you were going through this process
24     with the master plan in 2013 and 2014, did you
25     have any understanding or expectation that the

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 233

1　　City of Madison would issue violations on Edgewood
2　　High School for holding athletic contests on its
3　　athletic field?
4　　　　　MS. ZYLSTRA: Same objections.
5 A　I think if this had happened in my time, I would
6　　have been very surprised. But that was in, when
7　　did I say I left, 2015. If suddenly this had
8　　happened, I would have been surprised.
9 Q　Why?
10　　　　　MS. ZYLSTRA: Same objections.
11 A　I think because if there were a concern, we would
12　　have all talked about it. So we had relationships
13　　and a process so that things wouldn't come to
14　　this.
15 Q　Did you have any expectation at that time that it
16　　could be even possible that the City of Madison
17　　would issue violations for playing games on an
18　　athletic field?
19　　　　　MS. ZYLSTRA: Objection.
20 A　If you're asking --
21　　　　　MS. ZYLSTRA: Wait. Objection.
22　　Form, foundation. Asked and answered. You
23　　can answer.
24 A　I think is it in their right to do so? You know,
25　　technically. Because now they have come to a

Page 234

1　　point where now they're doing a literal reading of
2　　the master plan and I guess they have the right to
3　　do that. I just -- it's too sad. It's too sad.
4 Q　Do you know why the city interpreted the master
5　　plan the way they did?
6　　　　　MS. ZYLSTRA: Objection. Form,
7　　foundation.
8 Q　Do you have any knowledge of that?
9 A　I can say that --
10　　　　　MS. ZYLSTRA: Same objections.
11 A　-- that in the master plan the high school says
12　　it's for recreational use. They did not specify
13　　games. They did not say varsity. They did not --
14　　Judd got all of that stuff. I don't know why that
15　　didn't make it into the master plan. The only
16　　thing I can say is by the time this happened, Mike
17　　Elliott was president, but Judd had written a
18　　beautiful thing about what they used it for.
19　　I don't know why that's not in the master plan.
20　　I honestly don't.
21 Q　And when you were at Edgewood, you said everyone
22　　always knew that Edgewood wanted lights and
23　　bleachers on the field; correct?
24 A　That's right.
25　　　　　MS. ZYLSTRA: Objection. Form,

Page 235

1　　foundation.
2　　　　　MR. INGRISANO: Well, that's what
3　　she testified to. I don't know why you're
4　　objecting to form and foundation.
5 Q　So do you have any reason to think, knowing what
6　　you knew about Edgewood's long-term intentions, do
7　　you have any reason to think that they would have
8　　intentionally chosen to restrict the use of their
9　　field to practices and physical education classes
10　　in the master plan? Was that an intentional
11　　choice by Edgewood?
12　　　　　MS. ZYLSTRA: Objection. Form,
13　　foundation.
14 Q　If you know.
15 A　I honestly don't know. Looking at what Judd said
16　　they use it for and what language ended up in
17　　here, I don't know why this more clear language is
18　　not in the master plan.
19 Q　And I'm asking you if you have any knowledge of
20　　Edgewood intentionally choosing to restrict the
21　　use of its field.
22　　　　　MS. ZYLSTRA: Same objections.
23 A　No.
24　　　　　(Exhibit No. 165 marked for
25　　　　　 identification)

Page 236

1 Q　I'm handing you what's been marked as Exhibit 165.
2　　Have you ever seen this letter before signed by
3　　Doug Hursh?
4 A　No.
5 Q　Can you please read it?
6 A　Ahh. Okay. Okay.
7 Q　As you sit here today, Ms. -- Maggie, sorry,
8　　Doctor.
9 A　That's all right.
10 Q　As you sit here today, do you have any reason to
11　　disagree with the discussion set forth in
12　　Exhibit 165, Mr. Hursh's explanation in
13　　Exhibit 165?
14　　　　　MS. ZYLSTRA: Objection. Form,
15　　foundation.
16 A　I would say that Doug was privy to a description
17　　that I never saw. I didn't really know what
18　　happened at the high school. They couldn't --
19　　you know, I didn't. I was the dean of students at
20　　the college. I had my hands full, thanks.
21　　So this looks like he's assuming they could
22　　do what they had always done. So he's not
23　　surprised. Because that's what they were always
24　　doing. And, you know, this is a reasonable
25　　document.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 237

1    You know, to say that it's illegal to play
2  because it's not mentioned is a misinterpretation
3  of the document, I see why Doug is saying that.
4  And maybe -- yeah.  I don't know what to tell ya.
5  Q  So my question, though, is a little different.
6    Are you aware of any reason to disagree with
7  Mr. Hursh's statements in Exhibit 165?
8        MS. ZYLSTRA: Objection.  Form,
9    foundation.
10 A  Okay.  The master plan says it's going to be
11  recreational use.  Apparently they were using it
12  for athletic games.  And so the illegal, what he's
13  saying is it's illegal to play games, well, if
14  they've traditionally been playing games, nobody
15  ever said -- nobody in the process ever, ever said
16  under Unresolved Issues, You know what they're
17  doing now, they have to stop that.  Nobody said
18  that.  We have a whole list of unresolved issues
19  from the neighbors.  And so if they were, like,
20  We're shocked that there is games happening here,
21  why didn't they put that in the Unresolved Issues?
22    So that's where I'm torn is because what they
23  were doing -- maybe I wasn't aware of what was
24  going on.  You can bet everybody else knew what
25  was going on.  Like the neighbors who cared were

Page 238

1  aware of what was going on on that field.  They
2  did not mention that as an unresolved issue.  And
3  so for them to say, You are forbidden to do that
4  or we have to address this, they didn't do that.
5    Now this is total supposition and I'm sorry
6  for messing it up, but it seems like status quo,
7  status quo, status quo.  Nobody talked about
8  status quo because it just was.  It's like when
9  the dogs used to be able to poop in the
10  high school, on that one quadrant, we dealt with
11  that internally.
12    So what they were doing on their field
13  forever wasn't in the list of unresolved issues
14  presented to us by the neighbors.  So the shocking
15  part is if they didn't do anything differently
16  from what they've always done, I don't understand
17  why -- I don't understand any of this, but then
18  I've been gone for seven years.
19        MS. ZYLSTRA: I'll move to strike.
20        (Exhibit No. 166 marked for
21          identification)
22 Q  I'm going to hand you what's been marked as
23  Exhibit 166.  It's another -- It's dated two days
24  after Exhibit 165.  Let me ask you, have you ever
25  seen Exhibit 166 before?

Page 239

1  A  No.
2  Q  Let me ask you to just read Exhibit 166 to
3    yourself.
4  A  Okay.
5  Q  Are you aware of any facts that would cause you
6    to disagree with Mr. Hursh's conclusions in
7    paragraph -- I'm sorry, in Exhibit 166?
8        MS. ZYLSTRA: Objection.  Form,
9    foundation.
10 A  Do I know of anything that would contradict Doug?
11 Q  Any facts that would cause you to disagree or
12    contradict his statements and conclusions.
13        MS. ZYLSTRA: Objection.  Form.
14 A  You're asking me about things I don't know
15    anything about at this point.
16 Q  No, no.  I asked you if you know of any facts.
17 A  Oh.  No.
18 Q  I'm asking you precisely what you know, Maggie.
19    All right?
20 A  Okay.
21 Q  Do you know of any facts --
22 A  Yes.
23 Q  -- that cause you to disagree or contradict the
24    conclusions in paragraph 166 -- Exhibit 166?
25        MS. ZYLSTRA: Objection.  Form.

Page 240

1  A  I do not.
2        (Exhibit No. 167 marked for
3          identification)
4  Q  I'm handing you what's been marked as Exhibit 167.
5    It's a letter dated January 6.  Do you see that?
6  A  I do.
7  Q  Two days after.  This is made out to Alder Tag
8    Evers.  Do you see that?
9  A  Uh-huh.
10 Q  Is that a yes?
11 A  Yes.  I'm sorry.  Yes.
12 Q  Have you ever seen this document before?
13 A  No, I have not.
14 Q  Okay.  I'm going to ask you to read its contents,
15    please.
16 A  Okay.  Yes.
17 Q  Are you aware of any facts that would cause you to
18    disagree with or contradict Mr. Hursh's statements
19    and conclusions in Exhibit 167?
20        MS. ZYLSTRA: Objection.  Form.
21 A  I guess I had not really thought about that we did
22    not list absolutely everything that was ever done
23    on any of the spaces.  You know, and he's saying
24    we did not focus on specific current uses, and,
25    you know, I wasn't involved in the open spaces

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 241

1  planning and so.
2       Yeah.  I think that everybody who saw this
3  draft would have seen it before it went, and so
4  there would have been plenty of time for any of
5  our partners to say, you know, The high school is
6  using it for this and that's not in your plan.
7  Are they going to stop doing what they're doing?
8  Nobody ever did that.
9       So if the high school just continued to do
10  what they had always done and everybody knew that
11  they had been doing it, I don't understand why
12  people didn't say, You're doing this now and you
13  didn't mention it.  You know, it's sort of -- so
14  I think my -- his statement that we did not
15  specifically focus on specific current uses of the
16  field, I guess his reason for saying that is when
17  you put it out there and say, Here it is, if
18  people were like, Well, you use it for a lot more
19  than that, aren't you going to say so?  Nobody
20  ever raised that and it wasn't in the Unresolved
21  Issues.
22       So I guess I would just have to go with this
23  all -- you know, it was meant to be a fluid
24  document that could be modified over time.  My
25  understanding is that -- yeah.  Current uses, and

Page 242

1  I don't know how long they'd been using it the way
2  they have been using it.
3       Now, I'm way speaking out of school because I
4  don't know if they started to do stuff that they
5  hadn't been doing.  They might have.  And so
6  that's why this all might have happened.
7  Q  So my question again is you're not aware of any
8  facts or reasons that would cause you to think
9  that Doug is wrong in Exhibit 167?
10       MS. ZYLSTRA: Objection.  Form.
11  A  No.  I guess this seems like a reasonable letter
12  to me, yes.
13  Q  I'm handing you what's been marked as Exhibit 22.
14  Have you ever seen this document before, Maggie?
15  A  No.
16  Q  Let me ask you to turn to the second page.  As of
17  2019, did you recognize or do you recognize Scott
18  Flanagan as president of Edgewood College?
19       MS. ZYLSTRA: Objection.  Form.
20  A  I know Scott Flanagan, and I know he was president
21  in 2019.
22  Q  Okay.  Did you ever talk to President Flanagan
23  about why Edgewood College was seeking to repeal
24  the master plan?
25  A  No.

Page 243

1       MS. ZYLSTRA: Objection.  Form.
2  A  No.
3  Q  So any reasons that Edgewood College had to repeal
4  the master plan would not be known to you?
5  A  None.
6  Q  How well do you know Mr. Flanagan?
7  A  He's a very close friend of mine.
8       MS. ZYLSTRA: Objection.  Form.
9  A  I mean close.  When we worked together, we were
10  colleagues.  We were peanut butter and jelly.
11  Since my retirement and his leaving the college,
12  we meet for coffee.  How are the kids, how is your
13  husband.  I mean, we don't date or anything, so --
14  Q  You've never talked to him about the master plan
15  since you left Edgewood?
16  A  Right.  Since I left Edgewood.
17       MS. ZYLSTRA: I'm sorry.  For the
18  court reporter, can you answer verbally no?
19  A  No.  No.
20  Q  Okay.  And in working with -- During your time
21  working with Scott Flanagan, did you find him to
22  be a reasonable and measured president for
23  Edgewood College?
24       MS. ZYLSTRA: Objection.  Form.
25  A  Yes.

Page 244

1  Q  Do you have any reason to think that he would seek
2  to repeal the Edgewood Master Plan without good
3  reason?
4       MS. ZYLSTRA: Objection.  Form.
5  A  I can't -- I'm doing my fish, you know, I can't --
6  Scott as a character was reasoned and measured,
7  yes, that's true.
8  Q  Got it.
9  A  So I have no background on this issue.  I have --
10  I don't know what led to it.  I'm seeing all of
11  this for the first time.
12  Q  Sure.
13  A  I can't judge.
14  Q  I understand.  But you know how hard it was to get
15  the master plan put together.  It was a big --
16  A  Better than anyone.
17  Q  Okay.  And based on your experience with
18  Mr. Flanagan, do you have any reason to think that
19  he would have discarded your work lightly?
20       MS. ZYLSTRA: Objection.  Form.
21  Foundation.
22  A  I wouldn't want to speculate on what led to this.
23       MR. INGRISANO: Okay.  Why don't we
24  take a break.  I think I'm almost done.
25       MS. ZYLSTRA: Okay.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 245

1                    (Recess)
2  Q  Maggie, you were asked about your conversations
3      with me.
4  A  Yes.
5  Q  Turnabout is fair play.
6  A  Okay.
7  Q  Let me ask you about your conversations with
8      Sarah.  When did you speak with Sarah?
9  A  When?
10 Q  Yes.
11 A  If you want the dates, I can tell you.
12 Q  Just ballpark.
13 A  Like -- well, I got the subpoena, and then I think
14     I called her.
15 Q  So you're looking at your notes?
16 A  I'm looking at my notes, and I was subpoenaed,
17     this says July 25, 2022.  I had COVID.  I got the
18     subpoena.  So then it says you may call me, and
19     I'm sure then I called Sarah and said what's this
20     about.
21 Q  Okay.  Got it.  And how long did you talk with
22     Sarah?
23 A  We probably talked for about 20 minutes, maybe --
24     about 20 minutes, I would say.
25 Q  Okay.  And do you recall anything said during that

Page 246

1      conversation?
2  A  She said you're going to be asked about the master
3      plan.  It was about -- a lot of that initial
4      conversation was about scheduling, when could I
5      come, because the subpoena had me scheduled for a
6      time when I was going to be in Mineral Point.  And
7      so a lot of our conversation was rescheduling my
8      deposition time.
9  Q  Okay.  So you had an initial call.  Was there a
10     follow-up call?
11 A  There was when she said we've got you for today,
12     the 22nd.
13 Q  Got it.  And how long did that call last?
14 A  I don't remember ever talking to her more than
15     15 or 20 minutes.
16 Q  Okay.  And then did you have another call this
17     weekend?
18 A  She called me when I was at Irishfest to say I
19     would probably be here longer than I thought.
20 Q  Got it.  Anything else said during that call?
21 A  Not during -- on Saturday, it was -- she had just
22     said she got a lot of documents from Potter
23     Lawson, my name was all over them, and it was
24     going to take longer than she thought.
25 Q  Sure.  Okay.  Maggie, your conversation with me on

Page 247

1      the phone, do you recall telling me that the idea
2      that the master plan could act as a restriction on
3      future use was a gross misunderstanding?
4              MS. ZYLSTRA:  Objection.  Form,
5          foundation.
6  A  I do believe that and I believe I said that.
7  Q  Do you recall telling me that the master plan was
8      never meant as or intended as a restriction on
9      future uses?
10             MS. ZYLSTRA:  Objection.  Form,
11         foundation, asked and answered.  Counsel, are
12         you -- you're making yourself a witness.
13             MR. INGRISANO:  I'm just asking
14         if -- no, I'm not.
15 A  I do remember talking with you and saying that
16     restriction of future use was never an intent of
17     the master plan.
18 Q  And as you sit here today, you believe both of
19     those statements that you told me in our prior
20     conversation?
21             MS. ZYLSTRA:  Objection.  Form,
22         foundation, asked and answered.  Misstates.
23         You can respond.
24 A  I do believe I've answered, but I think that this
25     document was never meant to restrict future use

Page 248

1      because there was a process for, if it wasn't in
2      the plan, here is what to do.
3              MR. INGRISANO:  Okay.  Thank you.
4          I have no further questions.
5
6              FURTHER EXAMINATION
7  By Ms. Zylstra:
8  Q  I have a few, just a couple follow-ups.
9  A  Okay.
10 Q  When you talk about restrict future use as that
11     language was just used by counsel, it was your
12     understanding that as to future use, if
13     something -- a future use were going to be a
14     change from what is in the master plan, there
15     would be a process that needed to be followed;
16     correct?
17             MR. INGRISANO:  Objection.  Form.
18 A  That if there were a change from what was in the
19     master plan, yes, that that -- yes.
20 Q  So when you say that the master plan was not
21     supposed to restrict a future use, is it your
22     understanding that future uses were allowed
23     provided they went through the process if it
24     was a change in the master plan?
25             MR. INGRISANO:  Objection.  Form.

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 249

1  A  I think that -- the reason I'm hesitating is that
2     it seems like there was a current use that wasn't
3     addressed.  And so I think what I'm struggling
4     with is if there is a current use and somebody
5     said, well, you never said you would use it in
6     that way, it's like, well, gosh, we were doing it,
7     you know.  Okay, let's -- I've got kind of too
8     many things going on at once.
9         But my understanding is if there was a use
10    that wasn't explicitly in the plan and somebody
11    said -- wanted to object to it, there would be a
12    process for what we would follow.  It never dawned
13    on me that the city would come in with horses
14    blazing and, you know, torches and whatever and
15    say stop and desist.  That wasn't the spirit.
16        The spirit was, you want to do something
17    that's not in here, let's move together and figure
18    out how to make that happen.
19 Q  Okay.  And with respect to Exhibit 9 that
20    Mr. Ingrisano showed you, this is not a document
21    that you've ever seen; correct?
22 A  No.  No.
23 Q  And, I'm sorry, my statement is correct?
24 A  Yes.
25 Q  Okay.

Page 250

1  A  Yes.
2  Q  And are you aware that the city never took any
3     enforcement mechanisms with respect to the
4     notices?
5  A  I am unaware of anything to do with any of this.
6  Q  Okay.  With respect to Exhibit 167, which is one
7     of the Potter Lawson letters.  Is that Exhibit 167?
8  A  Yes, it is.
9  Q  There is a sentence.  I'm going to kind of point
10    you to it.  There is a part of the sentence in the
11    last paragraph that says, "This" --
12 A  "This is a master plan document and not a zoning
13    ordinance."
14 Q  Yes.  "This is a master plan document and not a
15    zoning ordinance."  Do you see that language?
16 A  I do.
17 Q  Okay.  Were you aware that with the City Council's
18    approval of Edgewood's master plan that it became
19    an actual ordinance?
20        MR. INGRISANO:  Objection.  Form.
21    Calls for a legal conclusion.
22 A  When I read that sentence --
23 Q  Right.
24 A  -- I was aware that I was -- that Doug was into
25    distinctions that I don't know about.

Page 251

1  Q  Okay.  So in terms of this letter where it says
2     it's a master plan and not a zoning ordinance, you
3     don't know as you sit here today whether that's
4     true or not; correct?
5  A  I have no knowledge.  I have no -- I don't know
6     that I would have known.  Yeah, no.
7  Q  Okay.  And in the next sentence, which says,
8     "The master plan was meant to be a fluid
9     document," do you see that?
10 A  Yes.
11 Q  You understood, though, that to the extent that
12    changes wanted to be made to the master plan after
13    it was submitted to the city, there was an
14    approval process that must be met?
15        MR. INGRISANO:  Objection.  Form.
16 A  If you read his entire sentence, that is true.
17    "The master plan was meant to be a fluid document
18    that could be modified over time as the needs of
19    the institutions change, with input from the city,
20    the neighborhoods, and the three Edgewood
21    institutions."  That was my understanding of the
22    master plan.
23 Q  And that changes to the master plan would require
24    input from those entities that are listed; correct?
25        MR. INGRISANO:  Objection.  Form.

Page 252

1  A  With input from.  So you're saying required, and
2     there were going to be some things that the
3     neighborhoods could agree and the schools could
4     agree and we wouldn't need to go to the city.
5  Q  Fair.  But you understood at least that for
6     changes to the master plan, the neighborhoods
7     were going to have to be consulted?
8         MR. INGRISANO:  Objection.  Form.
9  Q  Fair?
10 A  I would say that that was our process.
11 Q  Okay.  Sitting here today, do you recall writing
12    any emails with regard to use of Edgewood's
13    athletic field being an unresolved issue prior to
14    the submission of the master plan?
15 A  I don't.
16 Q  Okay.
17 A  But then I wrote a lot of emails in 21 years.
18    But, you know what's funny is in the unresolved
19    issues, I was way into that unresolved issues.
20    And it wasn't until I read this again in
21    preparation for this, it's like, Wow, that's kind
22    of funny that that isn't there.
23 Q  Do you recall any emails where you told the
24    neighbors that you were not going to add that to
25    the unresolved issue list?

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

Page 253

1  A  No.  I didn't say we were not going to add it.
2     They weren't our unresolved issues.  It was their
3     unresolved issues.
4  Q  Okay.
5  A  I think we didn't see it as unresolved because we
6     were just -- what we were doing they weren't
7     objecting to.  So it didn't feel like an
8     unresolved issue, I guess.
9  Q  Okay.  You mentioned or you were asked about the
10    garbage can.  Do you recall that?
11  A  About that at an open meeting somebody wanted
12    different gates in front of our garbage cans, yes.
13  Q  That was never a serious issue that had to be
14    grappled with between the Edgewood Neighborhood
15    Liaison Committee; correct?
16          MR. INGRISANO:  Objection.  Form.
17  A  That issue was raised at an open meeting when
18    there were probably 70 or 80 neighbors there and
19    any neighbor could raise any issue.  And so when
20    I was giving that as an example of unresolved
21    issues, you know, most of the room was rolling
22    their eyes.
23  Q  Including some members of the Neighborhood Liaison
24    Committee?
25  A  Right.

Page 254

1  Q  Yeah.
2  A  People were like, You've got to be kidding.  But,
3     you know, you've got a lot of neighbors, you know,
4     and everybody has an opinion.
5  Q  Did Edgewood High School, whether it be Judd
6     Schemmel, whether it be Mike Elliott or another
7     representative of Edgewood High School, in the
8     meetings leading up to the master plan that they
9     attended with the neighbors, did you ever hear any
10    of them say to the neighbors that they wanted
11    lights and bleachers to be added to their athletic
12    field at any time in the very near future?
13          MR. INGRISANO:  Objection.  Form.
14        Vague.
15  A  When we were writing the master plan, they were in
16    transition.  So my sense was that they weren't
17    really sure what they were -- you know, they were
18    doing the best with what they had at the time.
19        But to say -- you know, they weren't going to
20    build a stadium.  I think that's fair to say.  But
21    they wouldn't -- so they wouldn't have said --
22    you know, I don't remember them ever talking about
23    it really.
24  Q  Okay.
25  A  To be fair, nobody asked them, and there were lots

Page 255

1     of opportunities.  I was there.  When the
2     high school wanted to do a project and go to the
3     two neighborhood association meetings, I would be
4     there.  And there weren't -- you know, people had
5     a chance to ask the high school whatever they
6     wanted, because at those open meetings there were
7     representatives from all three schools there.
8  Q  Okay.
9  A  So if somebody would say what does the high school
10    want to do, I would say take it away whoever the
11    president was.
12          MS. ZYLSTRA:  Okay.  That's all I
13    have.  You've been so very patient.  Thank
14    you, Dr. Balistreri-Clarke.  We appreciate
15    your time.
16          MR. INGRISANO:  Thank you.  I've
17    got nothing further.  I appreciate your time
18    today.
19          THE WITNESS:  Thank you.  You've
20    all been great.
21          (Adjourning at 3:58 p.m.)
22
23
24
25

Page 256

1  STATE OF WISCONSIN )
2  COUNTY OF DANE      ) ss.
3
4     I, Peggy S. Christensen, Registered Professional
   Reporter and Notary Public in and for the State of
5  Wisconsin, do hereby certify that the foregoing
6  deposition of MARGARET "MAGGIE" ROSE BALISTRERI-CLARKE
7  was taken before me on August 22, 2022, and reduced
8  to writing by me, a professional court reporter and
9  disinterested person, approved by all parties in
10 interest and thereafter converted to typewriting
11 using computer-aided transcription.
12    I further certify that I am not related to nor
13 an employee of counsel or any of the parties to the
14 action, nor am I in any way financially interested in
15 the outcome of this case.
16    IN WITNESS WHEREOF, I have hereunto set my hand
17 and affixed my notarial seal of office at Madison,
18 Wisconsin, this 26th day of August 2022.
19
20
21
22    _____
      Notary Public, State of Wisconsin
23    My Commission Expires August 7, 2024
24
25

Digitally signed by
Sara Joyce Faul
Date: 2022.08.26
10:01:24 -05'00'

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

**#**

**#1 (1)**
224:18

**A**

**ability (2)**
40:4,12
**able (9)**
75:25;76:10;90:5;
96:24;132:5;156:3;
185:21;188:3;238:9
**above (2)**
83:14;95:13
**Absolutely (8)**
34:11;47:3;131:18,
18;166:19;202:20;
231:14;240:22
**academic (1)**
170:10
**accept (1)**
76:13
**accepted (2)**
28:2;107:6
**accepting (1)**
102:11
**access (3)**
114:8;115:15;174:17
**accommodating (1)**
161:12
**accompanied (1)**
27:9
**accorded (1)**
208:25
**according (3)**
24:20;53:2;183:3
**accurate (13)**
61:4;70:22;85:6,11,
23;86:11,14;87:3,6;
149:16;172:2;189:14,
15
**acres (7)**
19:3;38:15;39:3,4;
63:22,24;64:19
**across (2)**
63:23;201:17
**act (3)**
227:8,16;247:2
**action (1)**
148:19
**active (3)**
23:12;25:25;98:21
**activities (2)**
23:13;52:18
**acts (1)**
212:20
**actual (2)**
213:11;250:19
**actually (9)**
36:10,16;95:25;
126:22;158:18;178:14;

182:9;186:22;210:16
**add (8)**
43:4;73:14;126:1;
184:23;192:10,17;
252:24;253:1
**added (6)**
10:19;78:21;91:24;
194:6;213:23;254:11
**adding (6)**
126:7;143:16;
181:16;191:19,25;
192:5
**addition (5)**
57:24;58:4,6;136:7;
224:20
**additional (5)**
75:25;143:16;
189:25;191:5;195:12
**Additionally (1)**
224:23
**additions (4)**
186:12,15;187:6,22
**address (8)**
7:11;19:9;57:6;
58:25;72:19;76:2;
224:5;238:4
**addressed (3)**
56:7;118:8;249:3
**addressing (1)**
169:14
**adjacent (1)**
45:22
**Adjourning (1)**
255:21
**administration (2)**
9:25;10:4
**administrator (3)**
144:16;160:13,16
**ADRC (1)**
178:20
**advice (5)**
36:11;37:17,22,24;
138:10
**advise (5)**
29:8;37:12,13;182:4;
189:24
**Advisory (1)**
15:24
**advocate (1)**
76:19
**aesthetics (2)**
200:21,21
**affect (1)**
126:3
**affected (2)**
60:7;200:24
**affidavit (2)**
195:1,2
**affirm (3)**
53:5,7;55:4
**affirming (1)**
53:18
**afternoon (5)**

32:1;91:23;113:20,
21;129:16
**again (30)**
28:22;48:15;57:6;
58:25;73:11;76:23;
81:5;86:3;90:21;91:17;
108:10;109:13;110:22;
114:18;124:5,23;
162:20;165:6;182:21;
194:7;204:10;211:21;
212:20;213:18;215:8;
221:13;224:14;232:22;
242:7;252:20
**agent (1)**
199:11
**ago (3)**
29:20;149:9;193:18
**agree (12)**
39:13;69:13;76:24;
80:17;101:2;103:23;
119:10;131:16;199:15;
219:13;252:3,4
**agreed (5)**
34:7;39:6;110:14;
174:6;212:1
**agreement (5)**
27:3;81:24;82:4;
131:12;133:3
**agreements (7)**
68:24;76:1,11;
120:13;172:5;202:23;
216:5
**ahead (10)**
53:19;102:17;
132:20;140:2;156:18;
173:23;176:11;208:7;
217:16;229:15
**ahead' (2)**
81:19;110:16
**Ahh (1)**
236:6
**alarmed (2)**
141:9,23
**alder (6)**
39:20;42:5,7;162:2,
9;240:7
**alders (3)**
39:20;40:2;230:25
**alive (1)**
186:23
**alleged (1)**
17:5
**allow (1)**
20:18
**allowed (3)**
14:4;23:5;248:22
**ally (1)**
78:5
**almost (3)**
105:11;155:24;
244:24
**alone (1)**
34:20

along (3)
89:11;123:8;152:18
**alteration (5)**
136:8;139:4,7;181:6;
204:1
**alterations (1)**
144:17
**always (22)**
10:19;13:5,6;25:15;
26:19;27:9,25;28:19;
47:13,16;71:5;99:13;
131:3;161:4,8;184:23;
185:2;234:22;236:22,
23;238:16;241:10
**ambient (9)**
77:24;78:6,10,14;
79:6,13;80:2,4,10
**amended (2)**
73:14;78:21
**amending (2)**
72:19;182:11
**amendment (5)**
73:7,21;148:20;
181:18;204:1
**amendments (2)**
143:20;144:12
**among (8)**
24:25;40:6;63:23;
69:23;70:2,3;103:10;
106:3
**analyze (1)**
80:7
**animus (1)**
162:15
**Anna (3)**
156:20;157:23;158:2
**announcing (1)**
158:25
**answered (15)**
126:11;192:19;
193:1,6;195:24;196:1;
198:12;201:25;207:17;
210:7;232:19;233:22;
247:11,22,24
**anti (1)**
162:16
**anti-Catholic (2)**
162:15,17
**anymore (2)**
39:22;90:5
**apologize (4)**
54:10;62:21;126:24;
150:24
**Apparently (1)**
237:11
**appear (10)**
19:5;41:3;53:1;
63:12;122:14;148:8;
150:1;152:17;220:20;
225:16
**appeared (2)**
116:14;164:10
**appears (16)**

48:22;52:8,13;55:6,
9;57:2;68:3;75:11;
84:16;94:22;122:9;
153:22;163:4;220:19;
222:23;224:8
**apply (1)**
137:8
**appointed (1)**
18:20
**appreciate (4)**
29:18;36:9;255:14,
17
**appreciation (1)**
102:9
**approval (41)**
14:10;23:10;32:18,
20;33:1,14;103:16;
104:15,22;105:17,17;
106:7,11,17,23;107:13,
14;108:19,25;109:11;
110:19,24;113:3,25;
127:5;129:11,16;
134:21;142:13;143:5,
17;178:11,15;180:10;
181:24;182:4;229:9,
15,19;250:18;251:14
**approvals (1)**
186:5
**approve (9)**
27:5,7;96:24;104:8,
13;107:16,19;179:5,6
**approved (13)**
31:1;90:21;104:21;
108:2,23;133:1;136:6;
147:1;176:22;177:7,
19,20;178:2
**approximately (2)**
112:16;113:20
**April (18)**
30:18,25;66:6;
108:17,18,20;146:2;
147:2;154:2,2,13;
189:2;191:1,17,18;
192:23;195:3;198:9
**architect (6)**
29:7;49:24;173:24;
174:1,3,5
**architectural (7)**
32:3,8;124:17;125:1,
12,14;178:18
**archivist (2)**
51:22;52:6
**area (3)**
87:22;130:24;228:16
**areas (6)**
117:15,20;139:11,
23;144:16;146:25
**Argumentative (1)**
198:19
**around (6)**
9:15;13:16;19:2;
170:8;223:20;226:6
**arrived (1)**

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 67 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

92:21
**arrow (2)**
135:7,21
**art (1)**
202:1
**arts (1)**
65:9
**aside (3)**
74:14;95:18;172:15
**asphalt (1)**
147:21
**assigned (2)**
207:25;210:4
**assist (1)**
27:22
**Association (14)**
14:19;19:7;20:7;
27:4,6;42:3,21;70:4;
102:8;104:12,13;
166:21,22;255:3
**associations (17)**
23:12;24:21;25:25;
26:4;28:10;32:19;
33:10,22;38:3;69:12;
74:1;103:18;104:11;
131:3,13;189:12;218:9
**association's (1)**
20:17
**assume (3)**
9:11;51:10;53:17
**assuming (2)**
159:4;236:21
**assumptions (2)**
71:2,6
**athletic (42)**
44:15;45:12,13,18;
57:24;58:4,5;61:24;
63:2;64:5;123:19;
124:6;126:1,8;131:5;
133:4;152:1;164:23;
167:12,24;168:3,6,16;
170:21;185:17;191:9;
222:15;224:21;225:8,
24;226:1;227:21;
231:23,23;232:2,17;
233:2,3,18;237:12;
252:13;254:11
**athletics (3)**
45:6;118:18;119:8
**attached (8)**
59:19;66:10,14;
111:17;150:14;154:16;
155:4,7
**attaches (1)**
150:18
**attaching (2)**
89:11;112:19
**attachment (7)**
59:17;74:12,15;
149:25;154:5;155:22;
222:23
**attachments (1)**
50:13

**attempting (1)**
17:2
**attend (3)**
99:17;168:3,6
**attended (4)**
55:13;163:25;195:8;
254:9
**attending (1)**
116:12
**attention (1)**
83:11
**attorney (1)**
157:12
**August (4)**
10:17;11:13;14:20;
81:5
**authorities (1)**
175:8
**authority (10)**
39:7;53:16;100:21;
101:8;166:2;196:6;
199:3,8,12;219:22
**authorization (1)**
82:8
**authorized (3)**
82:3,13,16
**available (1)**
41:5
**aware (27)**
13:9;19:11,17;20:9,
16,22;24:3;40:13;60:5;
98:13;116:22;131:20;
168:9;172:22;173:1;
182:12;218:23;227:19;
237:6,23;238:1;239:5;
240:17;242:7;250:2,
17,24
**away (2)**
204:25;255:10

## B

**baby (1)**
100:9
**back (42)**
13:21;20:20;31:11;
37:25;41:19;53:14,15;
55:1;57:25;58:3;63:6;
73:1;75:1;77:21;84:12;
86:3;87:10;94:11;
96:11;103:25;104:2;
108:8,9;111:25;
114:14;117:1;119:17;
120:25;127:13;128:7,
12;130:25;131:2;
136:23;144:9;145:13;
159:11;178:9;183:5;
190:9;209:18;219:20
**background (3)**
9:20;169:21;244:9
**bad (3)**
151:10;165:2,5
**badgering (2)**

198:13,19
**BALISTRERI- (4)**
7:1;156:18;157:17;
195:7
**Balistreri-Clarke (31)**
7:9,10,13;14:17;
16:2;17:7;30:1;35:9;
36:9;38:11;40:23;
41:22;48:3;54:4,10;
56:17;58:14;60:10;
66:4;72:2;74:16;75:6;
80:25;82:21;98:17;
126:21;127:2;137:21;
149:23;153:18;255:14
**ballpark (1)**
245:12
**based (15)**
26:9;36:11;95:1;
98:4,6;116:12;155:16;
171:19;178:19;187:8;
193:7;225:6,20,22;
244:17
**basically (1)**
136:12
**basis (4)**
145:14;170:4;
182:23;186:14
**basketball (1)**
47:15
**beautiful (2)**
103:14;234:18
**became (5)**
18:14;19:18;24:7;
59:5;250:18
**become (2)**
20:9;71:21
**began (3)**
10:16;40:25;64:17
**begin (3)**
75:15;129:3;147:19
**beginning (1)**
99:12
**begins (2)**
30:24;66:15
**behalf (16)**
29:3,12,15;77:7;
86:17;114:2;137:4;
177:13;191:16;192:16,
21;195:19;199:2,20;
219:12,18
**behind (2)**
123:15,17
**belief (3)**
104:19;158:7;181:16
**belong (1)**
121:12
**below (8)**
56:23;75:11;92:20,
24;93:5;105:5;113:15;
152:9
**benefit (7)**
8:25;32:21,24
**besides (1)**

221:2
**best (17)**
39:9,23;40:1,3,4,10,
12;88:3;99:10,14;
164:17;166:17;176:8,
9;186:18;226:14;
254:18
**bet (2)**
45:16;237:24
**better (2)**
202:21;244:16
**beyond (8)**
143:12;158:17;
203:2;204:5,18;
218:21;224:13;228:15
**big (6)**
64:15;108:5;122:11;
152:10;231:16;244:15
**biggest (1)**
65:8
**bind (1)**
199:13
**binding (3)**
191:10;199:19;
203:23
**Binkowski (1)**
193:19
**bins (1)**
200:10
**birds (1)**
78:8
**birth (1)**
100:9
**bit (3)**
7:16;29:17;48:18
**blank (3)**
121:3;201:18,19
**blanking (1)**
42:17
**blazing (1)**
249:14
**bleachers (22)**
19:10,22;20:12;
129:22;130:16,23;
131:4;133:8;139:2;
140:22;141:9,21;
143:16;179:21;180:14,
18;181:5;185:11;
186:11;187:22;234:23;
254:11
**bleaches (2)**
140:5,16
**blinds (2)**
202:1,5
**blue (1)**
209:18
**blueprint (3)**
72:10;87:11;229:24
**board (4)**
11:18;38:19;89:19;
91:22
**boards (1)**
38:18

**boardwalk (2)**
123:2,16
**Bob (2)**
157:21;158:2
**book (2)**
160:17;161:12
**borders (1)**
42:18
**boss (1)**
171:13
**both (12)**
8:11;56:23;105:9;
121:22;124:1;138:9;
145:19;150:7;161:22;
225:17;231:5;247:18
**bottom (26)**
43:25;52:1,16;57:2;
62:23;77:10;84:14;
89:1,15;93:19;94:12;
102:1;110:4;111:12;
129:2;133:23;142:9;
163:4;175:20;178:9;
180:5;199:25;205:9;
220:3,7;224:13
**boundary (1)**
228:15
**box (1)**
122:23
**Boy (1)**
215:11
**boys (1)**
224:21
**break (13)**
9:14,17;36:16;65:23,
25;75:3;126:14,17;
127:5;153:4,9;160:22;
244:24
**Breese (1)**
167:21
**Brian (1)**
227:3
**brief (2)**
9:19;163:11
**bring (3)**
67:22;103:23;202:14
**budget (1)**
205:8
**buffer (1)**
122:25
**build (8)**
21:13;22:2;69:22;
70:1,8;85:14;203:13;
254:20
**building (58)**
25:9,11,22;29:4;
32:20;33:1,14;44:6,9,
12,14;45:21;46:6,11;
47:8,12;57:25;58:3,5;
64:7,9,11;65:9;84:18;
85:14;89:12;91:4;
109:2;120:22,23;
121:4,11,13,14,15,17,
18,21;125:5,18;

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 68 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

151:20;152:1,9,11;
170:13,14,17;175:1;
178:14,21,24;183:15,
23,24;184:3;187:6;
203:11,11
**buildings (32)**
14:5;22:24;26:2;
65:8;77:20;79:16;
80:20;83:6;91:21;92:1;
120:13,20;121:18,22;
122:4,12;123:9;
124:18;125:2,8,13,14,
21;151:11,12,16;
152:17;170:24;174:23;
184:5;200:5;229:11
**built (3)**
151:17;170:20;
201:16
**bullet (12)**
56:6;75:20,23;76:4,
9;132:4;146:12,18;
148:25;149:1;189:17,
18
**bullets (1)**
195:16
**Business (3)**
118:20;119:8;171:16
**busy (1)**
78:9
**butter (1)**
243:10
**button (1)**
141:18
**B-y-k-o (1)**
158:17
**Bykowski (6)**
147:12;158:15,18;
159:22;193:20,21
**by-project (1)**
23:6

## C

**call (18)**
29:9;126:22,23;
137:23;165:23;169:3,
4,10,11;216:5;230:4,
24;245:18;246:9,10,13,
16,20
**called (11)**
7:2;15:7;18:17;
49:25;69:21;122:19;
151:21;172:3;245:14,
19;246:18
**calls (12)**
18:9;28:8;56:12;
76:16;78:16;98:1,10,
25;104:17,17;140:2;
250:21
**came (22)**
27:3;35:9;49:24;
62:4;99:11;100:15;
130:5;131:22;132:17;

140:13,18;155:18;
173:25;174:21;197:21;
202:24;216:20;218:4,
7,12;220:18;221:16
**campus (109)**
11:24;13:10;14:2,3;
17:24;18:3;19:2,20;
21:5,14;23:21;24:11,
14,15;27:13,23;28:2,
19;29:4,6,12;30:10;
31:1,3,19;32:21;33:20,
20;38:4,23,24;39:2,7,8;
40:15;41:13,15;43:1;
44:13;45:23,25;46:18;
47:1,12,22;49:4,11,17;
50:23;51:12,19;59:14,
18;62:9;63:10;69:19;
71:15;72:16;87:21;
100:13;106:8;114:1,1;
117:11;119:18;123:15,
17;124:2,6,11;126:4,5;
150:8,12,19;151:4,12;
152:15,19,22,23,25;
156:24;157:25;165:14,
21;174:9;175:2;
176:18,18,21;188:13;
200:23;203:20;212:15;
213:1;214:25;216:22,
24;218:16;220:23,24;
223:1;225:6;227:10;
228:19;229:18;232:1,
10
**campuses (1)**
39:8
**Campus-Institutional (1)**
188:10
**Can (80)**
7:16;9:19;10:10,14;
12:12;13:15;14:22;
15:16;16:8;17:7;18:6;
33:21;35:16,21;36:16;
38:7;41:22;46:15;
47:11;50:1;56:19;
65:23,25;67:18,21;
69:17;72:25;76:23;
77:2;78:8;86:2;87:10,
18;89:16;95:7;98:11;
103:22;108:11;109:10;
117:4;119:16;120:9;
126:22,23;127:13;
132:13,16;137:22;
141:1;149:10;151:23;
155:20;156:9,13;
169:3;170:12;171:5;
173:13;182:9;184:12,
13;187:13;189:1;
193:16;197:21;199:3,
18;200:13;204:25;
229:5;230:9;233:23;
234:9,16;236:5;
237:24;243:18;245:11;
247:23;253:10
**cans (1)**

253:12
**capacity (1)**
75:24
**capital (1)**
122:3
**caps (5)**
203:6,12,23,25;
204:5
**Cardinal (4)**
7:18;11:9,12;170:19
**care (1)**
209:14
**cared (1)**
237:25
**career (2)**
160:3;161:17
**carefully (6)**
97:15,22,24;98:3,8;
122:23
**Carey (6)**
31:23;59:11;92:25;
101:10;105:6;106:3
**case (4)**
67:23;139:8;157:16;
195:1
**catch (1)**
95:14
**Catholic (1)**
225:1
**cause (8)**
68:14;182:14;204:5;
239:5,11,23;240:17;
242:8
**cc (3)**
59:12;93:20;94:15
**cced (3)**
97:11;113:12;225:17
**cc'ed (2)**
89:7;93:3
**ccing (1)**
48:12
**center (3)**
14:5;21:13;202:2
**central (1)**
14:4
**certain (2)**
200:8;202:8
**certainly (7)**
51:14,14;65:7;161:6,
6;204:5;217:3
**chairs (1)**
38:19
**chance (4)**
56:25;111:9;138:4;
255:5
**change (23)**
22:15,23,24;23:2,11;
25:6,8,24;42:24;71:9;
72:18;86:24;90:23;
95:16;136:7,13;179:5,
11;231:10;248:14,18,
24;251:19
**changed (1)**

21:14
**changes (36)**
21:4,16;22:12;26:2;
74:2;78:25;89:18;90:6;
91:3;111:17,18;
112:11,20;134:19,21;
135:20,22;137:16;
138:11;144:2;178:21;
179:2,15;180:9,11,22;
181:25;182:3,18;
214:3;221:8,11;
229:17;251:12,23;
252:6
**changing (1)**
72:9
**Chapter (8)**
61:10;62:8,11;205:6;
207:11;208:11,12;
216:1
**Chapters (4)**
59:22;61:2,10;81:10
**character (1)**
244:6
**charge (1)**
160:14
**check (3)**
105:23;228:11;231:1
**checks (1)**
13:7
**chief (2)**
68:7;78:6
**chocolate (1)**
160:25
**choice (1)**
235:11
**choose (1)**
22:1
**choosing (2)**
95:10;235:20
**chosen (1)**
235:8
**chronological (1)**
52:13
**CI (3)**
31:1;173:16,16
**circumstances (1)**
18:7
**circus (1)**
228:19
**City (101)**
13:11;14:9;20:22;
27:8;28:5;29:2,2,11;
30:11,18;49:2,5,8,21;
50:5;69:24;70:11,12,
15;90:1,4,16,20;93:7;
102:15;104:9,15,20;
106:6,16,23;107:6,9,
13,16,19;108:20;
110:16;113:4;114:2;
134:8;137:4;138:25;
139:12;143:24;160:13,
16;162:12,13,13,14;
163:12,20;164:10,21,

21;168:15;174:12,17,
18;175:5,6,7,9,17;
177:1,18,19;179:1,6;
181:15;182:13,18,24;
185:7;187:18,25;
190:19;199:10,19;
204:10,14;218:7,10;
227:6,15;229:2,19;
230:25;231:5,21;
232:15;233:1,16;
234:4;249:13;250:2,
17;251:13,19;252:4
**City's (2)**
164:11;199:17
**clarification (1)**
224:11
**clarified (1)**
91:23
**clarify (5)**
9:8;23:25;67:21;
95:15;166:5
**clarity (3)**
49:23;50:3;208:8
**CLARKE (4)**
7:2;156:19;157:18;
195:8
**class (1)**
170:2
**classes (4)**
62:1;63:4;232:3;
235:9
**classroom (1)**
230:3
**cleaned (1)**
7:19
**clear (7)**
20:4;91:7;143:18;
217:8;220:15;229:5;
235:17
**clearer (1)**
90:13
**close (5)**
47:23;221:25;
228:21;243:7,9
**closed (1)**
202:5
**closing (1)**
47:1
**Club (1)**
167:24
**code (7)**
20:23;21:14;22:6,12,
15,23;188:12
**codes (1)**
174:21
**coffee (1)**
243:12
**collaborate (1)**
40:3
**collaboration (6)**
40:6;69:22;70:9;
77:3;103:14;172:16
**collaborative (3)**

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 69 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

40:8,11;99:16
**collaborator (1)**
   77:7
**colleagues (1)**
   243:10
**College (101)**
   7:19;10:12;11:8,21,
   25;13:5,6,7,8;14:3;
   15:8;23:18,20;24:12,
   16;25:8,16,21;26:1,5;
   27:11;31:2,24;40:15;
   41:5,9,14;42:16,18;
   44:12;45:13,24;47:8,9;
   48:11;49:9;50:24;
   51:22;52:6;61:14;65:7;
   68:8;72:16;76:7;77:13,
   20;80:19;85:13;86:18;
   91:22;93:7;101:10;
   110:23;118:5;119:13,
   25;120:5,5;121:19,23;
   152:3;159:18;160:4;
   162:18;165:13,16,22;
   166:20;167:11,13,17,
   25;168:4,11;170:3,20;
   171:1,7,12,13,14;
   173:25;200:16;201:7,
   11,15,17,21;202:12;
   206:4;218:20;220:25;
   225:11,22;228:18;
   236:20;242:18,23;
   243:3,11,23
**college's (7)**
   18:20;52:4;119:2,5;
   158:1;163:25;174:25
**column (5)**
   117:19;206:13;
   208:12,18;215:18
**combine (1)**
   61:1
**combing (1)**
   174:18
**coming (5)**
   64:25;85:16;108:9;
   162:3;196:10
**comment (3)**
   30:3,4;76:8
**commented (1)**
   159:12
**comments (1)**
   159:2
**Commission (3)**
   14:10;136:6;164:11
**Committee (55)**
   18:15,16,18;20:3,11;
   24:9;26:24;27:17;42:6,
   19;50:8;53:11;64:13,
   21;66:10;75:17;99:18;
   102:10;103:24;104:21;
   116:13,21;129:21;
   132:16,18;146:1,4;
   148:5;149:5;150:20;
   154:7,13,17,21,23,24;
   170:8;171:2;174:22;

178:18;189:24;191:17,
18;192:22;193:3;
194:11;195:4;197:22;
198:25;204:14;219:5;
230:20;231:6;253:15,
24
**committees (2)**
   19:18;104:2
**committee's (1)**
   26:17
**Common (4)**
   30:25;108:19,23;
   164:11
**commons (3)**
   83:8,20;84:16
**communicate (1)**
   228:25
**communicated (2)**
   201:7,21
**communicating (1)**
   137:4
**communication (2)**
   48:25;51:3
**communications (7)**
   48:10;51:2;59:13;
   84:12;163:18;164:20;
   226:25
**commuters (1)**
   203:21
**compared (1)**
   216:25
**compiled (1)**
   59:22
**compiling (1)**
   218:21
**complaint (1)**
   231:21
**complaints (5)**
   18:10;200:15;201:2,
   6,22
**complete (7)**
   159:14;186:20;
   206:7;208:16,19,22;
   218:13
**completely (2)**
   8:14,17
**completion (2)**
   210:11;215:25
**complex (1)**
   170:20
**complicated (2)**
   22:16,18
**comport (2)**
   148:2;227:23
**comprised (1)**
   225:1
**concern (9)**
   17:21;18:3;19:3;
   45:19;47:21;65:1;
   140:5,16;233:11
**concerned (2)**
   78:13;80:18
**concerns (14)**

18:11;19:20;26:5,10;
42:8;46:4,6;67:23;
77:15;81:15;110:19;
200:8,14;201:6
**conclusion (4)**
   104:18;181:19;
   182:14;250:21
**conclusions (5)**
   97:17;239:6,12,24;
   240:19
**concrete (4)**
   71:13,21;87:11;
   172:11
**concurs (2)**
   139:10,21
**conditional (21)**
   14:6,10;15:25;20:1,
   18;21:12;23:2,8,10,13;
   25:5,14,20,23;26:6,12;
   27:23;28:4;33:4,16;
   174:24
**conditioning (1)**
   225:3
**conditions (13)**
   31:4;62:9;106:11;
   107:1,4,21;108:3,24,
   25;109:6,10,19;135:10
**condo (2)**
   166:21,22
**confirm (1)**
   155:21
**confirmed (4)**
   175:4,5,6;195:13
**conform (1)**
   198:3
**conforms (1)**
   197:24
**confused (1)**
   148:10
**confusing (3)**
   9:3;39:10;147:7
**conjunction (2)**
   122:24;225:2
**connection (2)**
   63:18;111:21
**consensus (1)**
   76:20
**consequential (2)**
   136:11;182:3
**consider (5)**
   46:10;200:14;201:2;
   230:16,17
**considered (17)**
   12:9;73:21;139:3,7;
   159:14;170:4,15;
   179:18,19;181:6;
   186:10,15,19;187:5,6;
   228:15,24
**consistent (4)**
   67:21;210:15;214:1;
   228:6
**constituents (1)**
   40:10

**constitutes (1)**
   136:7
**construction (7)**
   146:10;147:19,24;
   155:9;189:18;195:10,
   22
**consult (1)**
   228:20
**consulted (1)**
   252:7
**contact (4)**
   61:8;163:10,14,23
**contacted (3)**
   163:21;165:16;182:5
**contacts (3)**
   165:1,8,20
**contain (1)**
   74:12
**contained (4)**
   109:3;145:9,10;
   151:2
**contains (1)**
   81:4
**Contents (6)**
   211:21;212:6,16;
   213:1;214:25;240:14
**contests (2)**
   231:23;233:2
**context (3)**
   78:11;79:15;227:13
**continual (1)**
   174:24
**continuation (1)**
   141:2
**continue (2)**
   89:16;122:14
**continued (1)**
   241:9
**continuing (1)**
   117:19
**contradict (4)**
   239:10,12,23;240:18
**conversation (10)**
   75:16;140:9;163:11;
   166:8;206:11;246:1,4,
   7,25;247:20
**conversations (7)**
   47:7;166:6,7;225:20,
   22;245:2,7
**conveying (2)**
   181:11;191:10
**convince (1)**
   77:4
**coordinate (2)**
   210:10;214:3
**coordinated (2)**
   214:10,18
**coordinating (4)**
   210:18;215:25;
   216:15;217:12
**coordination (7)**
   206:14;209:1;210:5;
   212:21;213:20;216:3,

12
**copied (3)**
   68:16;222:10;226:20
**copies (2)**
   36:17;155:20
**copy (1)**
   165:16
**copying (1)**
   59:10
**cordial (2)**
   160:19;161:21
**corner (11)**
   19:20;57:25;58:3;
   152:7;199:25;205:10;
   210:21;211:4,7;220:3,
   7
**corporate (6)**
   12:1,4,25;13:2;
   23:19;49:18
**correction (1)**
   15:11
**corrections (3)**
   61:9;159:2,4
**correctly (20)**
   68:18;69:9;76:2;
   81:20;83:23;85:8;93:8;
   97:18;102:15;106:8,
   14;110:20;117:17;
   120:14;123:4;141:14;
   143:6;144:15;177:2;
   225:4
**Council (11)**
   14:19;30:25;102:6,
   13;107:10,14,16,19;
   108:19,23;164:12
**Council's (1)**
   250:17
**Counsel (12)**
   34:12;54:20;117:7;
   145:4;155:11;178:4;
   188:18;198:20;208:6;
   223:16;247:11;248:11
**counseling (1)**
   9:24
**counting (1)**
   69:24
**couple (5)**
   97:15;124:14;
   167:10;223:19;248:8
**course (3)**
   31:20;161:17;230:12
**court (7)**
   7:7,12;8:10,20;
   15:14;16:2;243:18
**cover (4)**
   37:19;58:15;87:20;
   155:15
**covering (1)**
   87:21
**COVID (1)**
   245:17
**crafting (2)**
   171:20;188:3

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 70 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

**create (5)**
38:14,25;39:3,5;
209:23
**created (11)**
13:25;36:5;53:12;
62:11;69:21;81:16;
171:9;205:15,21;
209:13,14
**creating (1)**
136:4
**crossed (1)**
78:23
**current (11)**
21:22;81:9;117:15;
121:5;132:9;138:24;
240:24;241:15,25;
249:2,4
**currently (1)**
45:25
**cut (1)**
38:20

**D**

**Dailey (1)**
162:9
**Dan (11)**
31:16,23;57:7;59:5,
10;81:6;92:25;101:10;
102:19;105:6;106:3
**darn (1)**
177:5
**Daryl (2)**
43:5,16
**date (4)**
13:12;91:8;198:1;
243:13
**dated (36)**
30:18;31:13;48:18;
57:4;66:6;74:21;75:8;
81:4;85:2;88:15;89:1;
91:14;92:12,17;94:17;
96:7;102:3;105:2;
106:3;108:17;110:12;
111:14;113:16;114:16;
115:24;129:3;133:24;
142:11;150:20;163:5;
210:19,21;211:17;
214:24;238:23;240:5
**dates (6)**
52:20,25;53:1;
142:24;211:3;245:11
**dawned (1)**
249:12
**day (2)**
79:19;91:15
**days (4)**
38:20;177:4;238:23;
240:7
**daytime (1)**
80:14
**deadline (1)**
115:5

**dealt (1)**
238:10
**dean (9)**
7:18;10:16,21;11:6;
24:2;126:25;170:19;
171:15;236:19
**Dear (1)**
66:9
**December (2)**
163:6,18
**decide (1)**
231:10
**decided (1)**
39:8
**decisions (1)**
17:9
**deed (1)**
15:18
**deep (1)**
175:18
**deer (1)**
71:17
**definition (2)**
183:14;201:4
**degree (3)**
9:23;10:1,9
**delay (2)**
94:19;113:21
**demanded (1)**
34:24
**demanding (1)**
231:22
**department (1)**
93:8
**departments (1)**
106:12
**depend (2)**
135:22;181:25
**depending (2)**
24:13;231:16
**depends (1)**
217:23
**depiction (1)**
152:5
**deposed (2)**
7:24;8:3
**deposition (9)**
7:14;8:8;36:21;
105:1;153:19;155:18;
164:25;165:2;246:8
**DeRicci (1)**
152:2
**describe (4)**
76:23;103:10,22;
138:19
**described (4)**
27:15;187:24;
215:14;226:9
**describes (3)**
61:3;93:15,17
**describing (2)**
112:20;147:14
**description (8)**

9:19;61:5;86:9;
225:7,15,24,25;236:16
**descriptions (1)**
214:6
**descriptive (1)**
218:14
**design (2)**
178:18;205:12
**designated (1)**
216:15
**designations (1)**
216:11
**designed (1)**
122:24
**desire (3)**
16:19;17:9;86:10
**desist (1)**
249:15
**detail (1)**
225:12
**detailed (1)**
196:11
**determine (2)**
136:11;182:3
**developing (1)**
69:25
**development (3)**
10:18;51:13,20
**development/ (1)**
10:20
**development/dean (1)**
11:7
**DH (2)**
206:20;208:25
**DH-PLI (1)**
206:25
**diagram (3)**
222:24,25;223:3
**Diagrams (1)**
120:13
**dialogue (1)**
223:4
**differ (1)**
24:13
**different (20)**
39:17;40:9;71:19;
88:7;90:24;106:11;
115:22;167:18;182:14;
184:7;204:9,17;
213:20;216:8;223:19;
225:25;226:8;231:13;
237:5;253:12
**differently (1)**
238:15
**difficult (2)**
43:10;164:18
**difficulty (1)**
22:17
**digest (1)**
94:20
**digress (1)**
87:18
**direct (4)**

79:2;83:11;84:24;
225:23
**direction (4)**
53:5,7;55:4;72:8
**director (4)**
48:10;51:3;59:13;
216:23
**directors (1)**
38:18
**disagree (12)**
39:11;181:19;
182:23;197:17;199:15;
225:7;236:11;237:6;
239:6,11,23;240:18
**discarded (1)**
244:19
**discontinue (2)**
231:22;232:9
**discord (1)**
103:10
**discrepancy (1)**
95:10
**discrete (1)**
23:3
**discuss (6)**
19:25;82:13,14;
100:12;103:24;182:1
**discussed (6)**
63:22;64:19,20;
82:10;189:16;215:18
**discussing (1)**
45:7
**discussion (9)**
66:11;147:14;
149:20;163:3;168:25;
178:8;219:24;222:6;
236:11
**discussions (18)**
16:15,17;17:16;18:7;
19:12;21:3;22:11,17;
36:25;49:20;63:18;
64:22;67:15;68:1;
75:21;97:17;98:7;
156:13
**disparagingly (1)**
162:18
**distinctions (1)**
250:25
**distracted (2)**
55:8;183:8
**distributed (1)**
91:22
**District (4)**
31:1;39:20,21;
188:11
**DMNA (6)**
56:6,9;102:6,23;
105:9,17
**DMNA's (1)**
66:10
**doable (1)**
109:12
**doable' (1)**

106:13
**Doctor (5)**
126:22,23;137:21;
169:6;236:8
**document (172)**
13:15;14:18,21;
16:14,22,24;18:16,20;
19:4,6,11;20:5,15;30:3,
4;33:23;34:1;35:23;
36:18;39:1,3;41:8,17,
19,23,25;42:4,8;43:25;
44:5,17;45:15;47:25;
48:8;50:18;51:8,18,24;
52:4,7,12;54:9;55:5,
14;56:19,25;58:15;
66:11,14;68:16,24;
70:21,21;71:19;73:18,
19;74:13,17;81:14;
83:12;88:2;89:17,25;
92:10,13;93:6,15,25;
94:5,8;95:7,12;97:15,
22,23;98:2,7;101:22;
108:6;110:15,25;
111:4,16;112:7,8;
114:12,20;117:2;
125:11;127:24;136:19;
141:2;145:2,17,19;
147:17,23;148:8,13;
153:11,13,20;154:25;
155:11,13,22;156:3,5,
14,16,19;157:1;
159:25;171:19,20,21,
22;172:3,18,21,25;
177:7,10,17,20,23;
178:2;181:23;186:21;
191:23;196:17;197:14;
198:15,16;204:23;
205:2,5,16,20,23;
207:12,21;208:9;
210:8,14,19;211:10,17;
213:5,10,15;215:3,5,9,
10;218:1,17;223:20,
22;226:24;232:6;
236:25;237:3;240:12;
241:24;242:14;247:25;
249:20;250:12,14;
251:9,17
**documents (24)**
7:20;29:17;34:17;
43:7;48:17;50:11,16;
51:7;62:12;67:25;
68:16;69:5,14;98:18;
109:9;155:20;156:4,7;
174:16;204:7;207:15,
25;215:12;246:22
**dogs (2)**
19:1;238:9
**Dominican (2)**
120:22;121:1
**Dominicans (2)**
12:4,13
**done (22)**
8:15,17;50:19;53:11;

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 71 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

90:21;126:13;129:17;
153:10,12,15;159:25;
166:17;174:25;192:4;
217:5;219:8,9;236:22;
238:16;240:22;241:10;
244:24
**doors (1)**
    200:9
**dope-slap (1)**
    160:23
**dope-slapped (1)**
    142:4
**dormitory (1)**
    230:2
**double (2)**
    135:6,21
**Doug (80)**
    30:19;31:25;32:1,2,
    12;48:12;49:24;68:4;
    74:20;75:13;84:5;89:7;
    91:18,24;93:10,19;
    94:6,14,19;95:13;96:4,
    12;110:14;111:13,16;
    112:15,19;113:11,15;
    128:6,8,11;129:2,3;
    132:4,15;150:4;
    173:20,21,24;174:7,11;
    175:5,6;185:24;186:4,
    7,14;187:4,14,19,22;
    205:14,22;206:10,11,
    21;207:3;209:7,12,13,
    15,22;210:3;217:18;
    218:19;222:17,19;
    225:13,17,21;226:18,
    20;231:1;236:3,16;
    237:3;239:10;242:9;
    250:24
**Doug! (1)**
    112:25
**Doug's (4)**
    187:7,8,8;209:24
**down (22)**
    8:10,20;37:24;75:23;
    104:8;115:6;127:20;
    129:4,10;130:5;
    140:21;160:22;166:14;
    168:14;186:2;199:25;
    200:21;206:6;207:24;
    208:11;209:16;218:12
**Dr (4)**
    126:25;127:2;169:5;
    255:14
**Draft (36)**
    32:7,13;52:9;54:13;
    58:2;59:14,18,22,25;
    60:2,3,17,19,20;63:10,
    12;67:3;82:9;93:16;
    94:4,24;95:3;96:5;
    116:5,8;154:7,9,12;
    159:2;206:7;214:24;
    221:7;222:24,25;
    223:3;241:3
**drafted (3)**

158:14,20;176:2
**drafting (11)**
    43:1;48:23;58:8,11;
    61:2;63:19;159:17,18;
    210:9;215:22;218:24
**drafts (3)**
    82:6;93:10;214:3
**dramatically (1)**
    32:20
**draw (1)**
    230:16
**drawing (2)**
    112:11;121:16
**drawings (4)**
    150:8,9,11;218:13
**Drive (4)**
    123:1,15;141:19,25
**driveways (2)**
    179:3;229:11
**drunk (1)**
    160:24
**Dudgeon- (1)**
    104:6
**Dudgeon-Monroe (13)**
    14:18;24:23;25:24;
    26:25;27:6;39:17;42:2,
    21;46:19;102:7,11;
    104:12,22
**duly (1)**
    7:2
**During (20)**
    10:17;11:1;20:9;
    38:20;96:23;100:15;
    102:12;166:9;167:17;
    168:10;200:15;205:23;
    207:12;213:2,15;
    227:6;243:20;245:25;
    246:20,21

**E**

**earlier (6)**
    66:18;108:14;
    142:23;151:20;179:8;
    215:14
**early (4)**
    31:7;110:17;181:14;
    196:10
**easier (1)**
    8:6
**east (3)**
    124:1,5,11
**Eastern (3)**
    118:15;119:9;150:8
**eby (1)**
    158:15
**Ed (18)**
    48:10,15,23,25;49:2;
    51:2;59:12,22;60:25;
    61:8;213:23;214:2,6,
    12,16,16;217:18;
    218:19
**edge (2)**

126:4,4
**Edgedome (3)**
    46:10,22;47:10
**Edgewood (242)**
    10:11,15;11:8,16,18,
    21,23,25;12:5,10;13:5,
    5,7,8,10,20;14:21;15:3,
    8,10,12,16;18:18;
    19:13;20:2,10,16,18;
    21:25;22:11,14,23;
    23:9,15,17,20,20,21;
    24:7,8,10,11,19,24,25;
    25:8;26:5,19;27:9;
    29:3;30:10;31:2,2,3,7,
    8,19,24;32:6,25;33:20;
    35:23;38:4;39:23;
    40:14,15,15;41:5,9,11,
    13,14,14;42:19;43:1,
    18;44:12;46:9,11,14;
    47:7,9;48:11;49:1,3,9,
    10,12,15,18;50:7;
    51:19,22;52:5;53:4;
    55:10;57:8,17;58:23;
    59:14,18;61:25;63:2,
    20;64:21;65:4;68:7;
    69:19;76:19;77:7;80:3;
    81:6;86:18;89:5;93:7;
    99:17;101:9;102:9,13,
    18;103:16;105:10;
    107:22;114:1;116:13;
    117:13,14;118:5;
    119:2,13,18,22,25;
    120:5;121:19;123:1,
    18;131:21;134:13;
    137:5;143:9;146:1;
    150:12,15,19;151:4,12;
    152:13,23;155:25;
    156:2;157:12,13,14,20;
    159:17;160:3;162:15;
    164:5,10,22,22;165:2,
    9,11,13,21,21,22;
    166:20;167:11,12,17,
    24;168:4,6,9,11,15;
    170:13;171:1;173:7;
    174:9;176:18;182:10;
    184:7,23;185:5,15;
    191:8,11,19;192:16,23;
    194:7,9;195:3,8,9,11,
    19,21;199:11,13;
    200:16;201:7,20;
    206:8,9;212:15;213:1;
    214:25;216:14,18;
    217:10;218:23;219:18;
    223:1;225:21,22;
    227:10,17;228:25;
    229:18;231:22;232:16;
    233:1;234:21,22;
    235:11,20;242:18,23;
    243:3,15,16,23;244:2;
    251:20;253:14;254:5,7
**Edgewood's (12)**
    21:5;23:12;76:12,13;
    79:3;102:14;103:18;

136:25;227:21;235:6;
    250:18;252:12
**edit (2)**
    220:23,25
**edtaylor@edgewoodedu (1)**
    61:9
**educated (1)**
    187:8
**education (10)**
    9:20;63:3;169:21,22;
    170:2;227:22;228:4;
    232:3,11;235:9
**educational (1)**
    10:4
**educations (1)**
    62:1
**effect (3)**
    109:1,7,20
**effort (5)**
    78:22;88:3;172:15;
    202:14;230:1
**efforts (3)**
    49:3;52:11;77:6
**EHS (1)**
    135:10
**EHS11377 (1)**
    83:11
**EHS1839 (1)**
    61:19
**EHS6893 (1)**
    133:20
**EHS9297 (1)**
    114:20
**eight-year-old (1)**
    198:15
**either (14)**
    9:3;22:1;29:12;35:1;
    44:18;59:9;104:6;
    136:5;151:17;153:5;
    156:23;160:14;185:6;
    218:20
**electrical (3)**
    77:12;78:13,22
**electronic (1)**
    202:1
**electronically (1)**
    202:5
**eliminating (1)**
    121:15
**Ellingson (1)**
    83:13
**Elliott (77)**
    31:20;48:19;57:15;
    59:8;83:4,14,25;84:13;
    88:13;89:4,15;91:2,18,
    23;92:25;93:20;94:5,
    10,14,22;95:2,14;97:3,
    7,20;98:13,19;101:2,
    11;102:19;103:1;
    105:2,6;106:3;110:23;
    111:3,14;112:3,16;
    113:11,19,25;127:6,18,
    21;128:3,6,10,13;

129:4,9,15;130:2;
    136:20;139:9;148:4;
    157:23;158:2,17;
    163:8,19,21,23;164:3;
    184:22;185:4,15;
    189:9;190:18;196:15,
    18;197:15;198:5,8;
    221:3;234:17;254:6
**Elliott's (3)**
    57:21;110:11;111:21
**else (16)**
    35:21;37:13;178:25;
    184:14;185:5,15;
    202:6;205:15,22;
    219:20;221:4;225:21;
    226:17;228:17;237:24;
    246:20
**elsewhere (3)**
    68:12,15;69:4
**email (119)**
    31:12,15;48:5,9,13,
    20;50:12;56:21,23;
    57:2,3,6,15,18,22;
    58:22,25;59:12,21;
    61:8;63:11;66:6;68:9,
    10,11,20;74:20,20,23;
    75:7,12,15;77:11,22;
    80:12;81:2,4;83:14;
    84:4,25;88:12;89:1;
    91:2,14;92:12,17;
    93:19,24;94:1,14;
    95:13;96:4,14,18;97:5,
    11,21;102:1,2;105:2,2,
    5,15;106:2;109:9;
    110:4,5,12;111:12,21;
    112:3,15,17;113:11,15,
    24;114:16;116:9;
    127:17,20,21;128:1;
    129:2,8;133:19,23;
    134:23;135:3,4;
    136:18,20;138:7;
    141:3;142:3,9;143:4,
    23;150:4;155:15,19,
    25;158:1,12;163:5;
    178:13;180:14;185:24;
    186:2;199:24;222:9,
    11;224:1,4,9,14,17;
    225:18;226:20;227:3
**emailing (1)**
    105:5
**emails (10)**
    68:3;82:23;98:18;
    128:22;133:15;157:15;
    223:23;252:12,17,23
**Embedded (1)**
    135:4
**emerge (1)**
    71:9
**employed (2)**
    194:7,9
**employee (3)**
    12:10;13:6;162:14
**employees (2)**

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 72 of 89

Edgewood High School of the Sacred Heart, Inc. v.                    Deposition of Margaret Rose Balistreri-Clarke
City of Madison, Wisconsin, et al.                                                                      August 22, 2022

162:12;164:21
**employment (1)**
    10:14
**end (7)**
    11:14;99:11;124:1,
    11;157:3;172:13;222:1
**ended (1)**
    235:16
**ends (1)**
    124:5
**enforcement (1)**
    250:3
**engender (2)**
    69:6,15
**engendering (1)**
    70:23
**enough (8)**
    20:5;29:20;84:10;
    87:17;159:10;160:25;
    174:19;232:20
**enrollment (8)**
    76:6,13,13;95:8;
    203:6,12,23,24
**enrollments (1)**
    204:6
**entire (11)**
    11:1;18:3;27:16;
    38:15;97:15,21,23;
    98:2,7;135:11;251:16
**entities (5)**
    40:2,7;69:23;87:15;
    251:24
**entitled (1)**
    14:18
**entity (4)**
    12:1,11;49:18;88:1
**entrance (2)**
    14:1,4
**entryway (1)**
    24:4
**equal (2)**
    43:14;219:15
**equipment (7)**
    77:13,16;78:14,22,
    24;79:15,22
**Erin (7)**
    147:12;158:15,18;
    159:22;194:16,22,23
**Eskrich (1)**
    162:2
**Eskrich's (1)**
    155:19
**establish (2)**
    72:8;135:1
**established (3)**
    16:23;18:16,19
**Esther (1)**
    171:7
**even (14)**
    16:23;17:4;32:13;
    38:24;39:24;40:1;
    63:25;171:10;172:2;
    186:25;187:1;202:25;

215:11;233:16
**evening (5)**
    77:24;78:14;79:13;
    80:2,4
**event (5)**
    38:21,22;46:6;58:8;
    76:19
**Evers (1)**
    240:8
**everybody (15)**
    26:23;33:8;43:12;
    47:4;80:17;104:7;
    161:8,15;188:15;
    218:19;219:20;237:24;
    241:2,10;254:4
**everybody's (1)**
    88:2
**everyone (7)**
    43:21;81:24;130:17,
    21,22;155:24;234:21
**exactly (3)**
    12:12;171:5;224:16
**exaggeration (1)**
    228:22
**EXAMINATION (3)**
    7:5;169:19;248:6
**example (7)**
    46:7;49:9;137:3;
    147:18;167:13;206:6;
    253:20
**examples (3)**
    200:13;201:1,20
**exceed (2)**
    80:15;203:24
**Except (2)**
    131:12;221:7
**Exchange (4)**
    92:21;127:14,17;
    199:24
**excuse (1)**
    103:17
**Exhibit (184)**
    30:2,8;31:11,12;
    33:19;35:3,15;40:21,
    24;41:12,20;48:1,4,7;
    54:2,4,11;55:6,9;56:10,
    15,18;58:21;62:14,20,
    21;63:6;65:21;66:5,18,
    23;67:4;68:3;74:9,18;
    75:4,7;80:23;81:1,4;
    82:19,22;83:4;88:8,10,
    22,24;91:7,11,13,15;
    96:6;101:17,19;105:1,
    16,24;106:1;107:25;
    108:6;109:15,23,25;
    110:4;111:7,11,13,22;
    112:1,14,17;113:8,10,
    17;114:13,15,16;
    126:19;127:9,10,17;
    128:1,18,21;129:9;
    133:12,15;142:5,7;
    144:24;145:1,9,12,13,

25;146:15;147:24;
    149:21,24,25;150:1,2,
    4;153:4,19,22;155:3,5;
    162:22,24;171:18;
    175:19;178:5,9,13;
    179:25;184:17,18,19,
    21,22;185:24;188:4,17,
    25;195:5;199:22;
    204:20;205:2;208:1;
    211:12,14,17;212:7,7,
    11,13;213:12,17;
    214:21,23;219:23;
    220:2,5,16,19,20;
    221:23;222:7;223:12,
    14;224:9,14;225:17,
    25;226:1,23;231:18,
    18;235:24;236:1,12,
    13;237:7;238:20,23,24,
    25;239:2,7,24;240:2,4,
    19;242:9,13;249:19;
    250:6,7
**exhibits (7)**
    145:6;204:25;
    213:21;214:1;215:17;
    216:10;217:11
**existed (1)**
    116:5
**existence (1)**
    151:16
**existing (11)**
    79:6,13;80:2,3,10;
    83:7,20;121:3,8;
    135:10;151:11
**exists (2)**
    44:13;68:12
**exiting (1)**
    59:6
**expanded (2)**
    11:6;147:1,8;196:5
**expanding (1)**
    46:10
**Expansion (3)**
    118:16;119:9;146:19
**expect (1)**
    204:8
**expectation (4)**
    178:1;232:15,25;
    233:15
**expected (3)**
    37:18;70:21;141:24
**expecting (2)**
    16:25;203:18
**experience (14)**
    27:12,22;29:10;
    43:21;99:1,4;139:11,
    22;162:16;169:25;
    170:9,17;187:17;
    244:17
**experiences (1)**
    26:9
**explain (3)**
    26:16;50:1;69:17
**explained (1)**

72:2
**explaining (1)**
    139:15
**explanation (2)**
    152:4;236:12
**explicitly (1)**
    249:10
**explore (2)**
    143:15;148:20
**exploring (1)**
    143:11
**express (2)**
    26:5;162:14
**expressed (3)**
    18:11;26:10;87:25
**expresses (1)**
    102:8
**expressing (4)**
    16:19;17:9;45:9;
    144:10
**extension (2)**
    157:3;164:1
**extent (5)**
    34:16;72:15;100:15;
    196:8;251:11
**extremely (1)**
    43:10
**eyes (2)**
    97:14;253:22

**F**

**facilities (1)**
    60:6
**facility (11)**
    44:19,19;45:12,13,
    18;46:11;47:8;149:1;
    192:24;193:4;195:15
**facing (1)**
    202:2
**fact (9)**
    45:17;154:5;155:22;
    163:17;179:8;190:8;
    198:25;221:2;224:13
**facts (7)**
    182:12;239:5,11,16,
    21;240:17;242:8
**faculty (1)**
    203:17
**Fair (24)**
    20:5,15;22:20;29:20;
    47:6;70:13;126:2;
    151:6,18;154:19;
    159:10;181:20;182:22,
    24;187:10;198:17;
    210:11;217:18;231:6;
    245:5;252:5,9;254:20,
    25
**faith (1)**
    229:25
**familiar (5)**
    41:24;83:2;161:25;
    177:22;215:10

**familiarity (1)**
    187:9
**far (2)**
    61:4;222:3
**Farmington (1)**
    7:12
**fashion (2)**
    87:7;151:18
**favor (1)**
    22:12
**February (2)**
    222:13;226:8
**feeder (1)**
    225:1
**feel (1)**
    253:7
**felt (2)**
    99:10,13
**few (1)**
    248:8
**field (84)**
    16:16,20;17:10;
    45:22,24;46:12;61:24;
    63:2,20;64:5;123:19;
    124:6;126:1,9;129:20;
    130:3,20;131:5,20;
    132:6,9,13;133:4,16;
    134:5;137:1,11,16;
    138:12,16,23;140:7;
    141:7;146:13,17;
    147:14;149:4;152:2,
    14;164:23;167:23;
    168:10,16;170:21;
    182:10;185:17;186:6;
    189:19;191:9,20,24;
    192:23;193:8,9,11,13;
    195:12,14,16;198:24;
    222:15;224:21,23;
    225:1,8,24;226:1,8;
    227:17,21;231:23;
    232:2,17,21;233:3,18;
    234:23;235:9,21;
    238:1,12;241:16;
    252:13;254:12
**fields (1)**
    227:9
**figure (4)**
    71:18;161:13,14;
    249:17
**File (4)**
    92:20;93:11;94:2;
    96:7
**filed (1)**
    195:1
**Fill (6)**
    140:4,15;147:19,20;
    201:18,19
**filled (1)**
    140:9
**final (17)**
    63:12;107:5,13,14;
    108:4,4;110:24;111:4;
    112:7,8;114:7;115:6,

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 73 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

17,22;127:24;159:6;
220:15
**finally (1)**
194:15
**financial (2)**
68:7;78:7
**find (7)**
21:6;80:17,21;
103:13;114:13;161:9;
243:21
**fine (4)**
9:9;79:2;167:1;
218:14
**finish (3)**
66:21;138:3;169:2
**finished (1)**
210:2
**firm (1)**
32:3
**first (35)**
7:2;9:25;23:18;30:1,
7,24;39:5;51:24;56:5,
6;58:18,21;61:18;
84:25;97:2;102:2;
108:21;136:19;138:7;
145:12;150:1,2;154:6;
176:14,17;180:25;
181:1;186:23;188:9,
14;189:18;211:22;
232:8,8;244:11
**firsthand (1)**
14:16
**fish (1)**
244:5
**five (14)**
15:4;25:4;27:1;
69:13,23;103:10;
118:7;119:1,5,11,12,
25;120:4;202:18
**Flanagan (8)**
59:3,8;242:18,20,22;
243:6,21;244:18
**flexibility (1)**
72:8
**floating (1)**
223:20
**fluid (3)**
241:23;251:8,17
**flux (1)**
66:12
**focus (10)**
66:10,17;67:3,6,16,
23;117:15,21;240:24;
241:15
**folks (1)**
228:20
**follow (8)**
31:4;108:24;136:14;
163:22;166:17;170:6;
222:14;249:12
**followed (1)**
248:15
**following (2)**

102:7;182:6
**follows (1)**
7:3
**follow-up (1)**
246:10
**follow-ups (1)**
248:8
**foot (5)**
44:9,14;46:2;64:8;
85:14
**footage (1)**
112:10
**football (30)**
45:22;129:20;130:3,
20;131:19;132:6,9;
133:16;134:5;136:25;
137:11,16;138:12,16,
23;141:7;146:13,17;
147:6,13;149:4;
182:10;186:5;189:19;
191:24;195:12,14,16;
224:22;226:7
**footprint (1)**
84:10
**footprints (1)**
72:10
**forbidden (1)**
238:3
**forever (2)**
71:12;238:13
**forged (2)**
7:20,23
**Forgive (2)**
50:6;106:19
**forgotten (1)**
149:25
**Form (205)**
12:2;13:3,17,23;
14:11;16:21;17:11,19;
18:12;19:15;20:13;
22:8,13,25;23:14,22;
26:14;28:7,17;33:2,25;
38:5;40:17;43:3,19;
44:22;46:13;51:16;
56:2,12;60:9,22;64:23;
67:9,17;72:22;73:3,9,
16;74:3;76:15,22;
78:15;80:6;83:10;
86:15;87:8;90:10,17;
95:5;97:25;98:9,24;
100:14;101:5,15;
103:21;104:16;107:23;
109:8;111:1,23;
112:22;115:18;119:4;
123:11;125:9,22;
126:10;133:6;137:6,
20;139:5;140:1;147:3;
148:6,16;149:7,14;
151:9;159:8,20;160:9;
165:4,10;166:4,23;
167:15;170:11;171:4,
24;172:19;173:23;
174:14;175:11;176:4;

177:8,14,24;178:22;
179:13;180:20;181:21;
182:15,25;183:17,25;
184:9,25;185:8,18;
186:16;187:12;188:5;
189:4,22;190:2;
191:13,21;192:18;
193:1,15;194:3,12;
195:23;197:4,11,19;
198:11,18;199:16;
200:11,17;201:3,9,24;
203:7;204:2;205:18,
25;206:18,22;207:1,7,
14,16;208:2;209:3,10;
210:6,12,23;211:18;
212:9,17;213:3;214:5;
215:6;216:2;217:15,
22;219:1;221:5;224:6;
225:9;226:3,11;
227:11,25;228:9;
229:3,21;230:18;
231:7;232:5,18;
233:22;234:6,25;
235:4,12;236:14;
237:8;239:8,13,25;
240:20;242:10,19;
243:1,8,24;244:4,20;
247:4,10,21;248:17,25;
250:20;251:15,25;
252:8;253:16;254:13
**formal (2)**
229:16;231:16
**format (1)**
156:17
**formation (1)**
218:24
**forth (4)**
84:13;181:16;
209:18;236:11
**forward (12)**
21:11;39:23;40:12;
72:5;84:4;102:17;
104:8;127:3;138:11,
15;143:10;172:8
**found (9)**
7:20,22;97:15;156:5,
6,8;175:3;176:3;201:8
**Foundation (134)**
12:3,16;13:18,24;
14:12;16:22;17:12;
18:13;19:16;23:1,23;
26:15;28:8;33:25;
40:18;43:20;44:5,22;
51:17;53:24;55:22;
56:3,12;66:25;72:23;
73:4,17;74:4;90:18;
93:14;95:6;98:1,10,25;
101:6;107:8,24;
111:24;112:23;117:23;
119:4;123:12;125:10,
23;133:7;145:17;
146:15;147:4,17;
148:7,16;149:8,15;

155:11,12;159:21;
166:24;171:25;172:20;
173:23;174:15;175:12;
176:5;177:9,15,25;
178:23;181:22;182:16;
183:1;184:1,10;185:1,
9,19;187:12;190:3;
191:14,22;192:19;
193:1,15;194:4;
195:24;197:5,12,20;
198:12,19;199:17;
201:10,25;203:8;
204:3;205:19;206:1,
19,23;207:2,8,17;
208:3;209:4,11;210:7,
13;211:19;212:18;
213:4;215:7;217:15;
219:2;225:10;226:4,
12;228:1;229:4,22;
230:19;231:8;232:6,
19;233:22;234:7;
235:1,4,13;236:15;
237:9;239:9;244:21;
247:5,11,22
**four (4)**
15:4;99:6;118:14;
158:7
**fourth (1)**
152:25
**free (1)**
172:18
**French (1)**
10:1
**frequently (1)**
42:25
**friend (1)**
243:7
**Friends (2)**
91:20;154:1
**front (6)**
39:12,16;170:21;
190:17;195:4;253:12
**full (3)**
106:20;215:22;
236:20
**function (1)**
72:4
**funding (2)**
131:21,25
**funny (3)**
213:5;252:18,22
**further (7)**
32:13;115:8;140:4;
167:5;248:4,6;255:17
**future (19)**
32:17;62:9;72:19;
73:7,14;117:10;
119:20,23;143:17;
247:3,9,16,25;248:10,
12,13,21,22;254:12

**G**

**gaining (1)**
33:5
**games (14)**
47:16;129:23;
130:17;167:14;168:3,
6;224:20;232:17;
233:17;234:13;237:12,
13,14,20
**garbage (6)**
87:20,22,23;200:10;
253:10,12
**gate (2)**
186:24;188:14
**gates (3)**
87:19,21;253:12
**gather (1)**
50:22
**gathered (2)**
50:19;51:7
**gave (9)**
37:22;55:18,24;
110:16;182:7;195:25;
197:14,22;198:4
**general (2)**
22:16;33:21
**generally (16)**
18:7,11;37:1;38:2;
53:22;62:1;63:9;83:2;
86:18;151:3;158:14;
161:4,9;168:3;220:12,
17
**George (1)**
161:24
**gesture (1)**
142:1
**gesturing (1)**
141:21
**gift (1)**
194:17
**gifted (1)**
12:17
**girls (1)**
224:22
**give-and-take (1)**
53:13
**given (8)**
7:13;35:6;36:12;
42:4;50:19;127:6;
137:15;196:12
**giving (2)**
196:21;253:20
**glare (2)**
122:25;123:14
**glass (1)**
116:25
**go-ahead (2)**
81:22;82:2
**goal (3)**
86:20;147:19;169:13
**goals (1)**
48:17
**god (2)**
70:14;194:17

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

**goes (4)**
111:17;127:1;
231:15;232:1
**Golden (3)**
42:5;43:5,16
**Good (23)**
8:19;26:23;43:13;
75:16;77:2,7;89:18;
93:23;95:14;96:13;
97:16;99:8,8,15;106:6;
113:21;132:19;152:4;
172:2;189:15;204:15;
229:25;244:2
**gosh (1)**
249:6
**governance (2)**
12:25;13:2
**governing (2)**
12:11,12
**Governor (1)**
12:17
**grab (1)**
153:4
**grammar (1)**
135:6
**granted (3)**
10:9;14:6;103:12
**granular (1)**
172:6
**graphic (9)**
89:11;91:4,21;
146:21,25;147:7;
196:4;197:7,8
**grappled (1)**
253:14
**grass (1)**
170:22
**gray (1)**
144:16
**great (9)**
38:9;43:23;47:25;
66:2;103:1;124:14;
168:20;221:21;255:20
**greatly (1)**
8:12
**Green (8)**
61:21;122:24;
208:13;209:19,21;
212:6;213:19;222:18
**gross (1)**
247:3
**grounds (3)**
22:24;26:2;179:3
**group (13)**
18:17,17,19;27:4,8;
65:1;69:22;81:18;
159:19;171:9,10,11;
209:22
**groups (3)**
24:25;65:17;104:3
**grow (2)**
71:22;72:18
**growing (1)**

**131:8**
**Growney (2)**
157:21;158:3
**Growrob (3)**
157:13,21;158:3
**guess (15)**
13:19;82:25;187:8,
14;190:9;210:3;
226:18,19;228:3;
234:2;240:21;241:16,
22;242:11;253:8
**guessing (1)**
196:3
**guest (2)**
55:5,14
**guidance (3)**
35:25;36:4;231:9
**guide (2)**
179:16;215:13
**Guidelines (4)**
124:18;125:1,12,14
**guiding (1)**
32:3
**Guns (8)**
68:4,6,10;75:8,11,
13;77:23;78:2
**Guns' (1)**
80:12
**guys (1)**
219:13
**gym (1)**
170:23

**H**

**half (1)**
128:7
**Hall (8)**
118:15;120:22,23;
121:3,4;142:1;152:2;
164:1
**halls (9)**
47:15;118:12;119:6;
120:12;122:4,11;
131:9;141:18;203:14
**hammer (1)**
26:18
**hand (5)**
205:10;216:4;
226:22;231:17;238:22
**handed (2)**
74:17;128:21
**handing (11)**
204:22,24;205:1;
211:14;212:13;214:23;
222:7;223:14;236:1;
240:4;242:13
**hands (1)**
236:20
**handwriting (1)**
223:9
**handwritten (2)**
35:10;40:25

**Hank (1)**
161:24
**happen (6)**
87:6;140:25;179:18;
209:25;226:10;249:18
**happened (7)**
38:8;132:17;233:5,8;
234:16;236:18;242:6
**happening (3)**
79:18;164:18;237:20
**happy (7)**
9:7;40:10;76:25;
77:1;87:19,22;145:18
**Harbor (1)**
167:23
**hard (9)**
40:7;43:13,22;
103:10;172:1,5,15,16;
244:14
**harm (1)**
68:14
**hash (1)**
219:16
**hashing (1)**
65:10
**head (1)**
8:24
**headed (1)**
15:3
**heading (10)**
14:21;15:7;52:17;
117:10;118:12;120:12;
122:3;124:17,23;
195:17
**headings (3)**
118:15;119:1,12
**hear (4)**
9:5;128:11;185:14;
254:9
**heard (1)**
12:23
**Heffernan (1)**
171:7
**height (1)**
84:17
**held (8)**
10:25;11:5;149:20;
163:3;168:25;178:8;
219:24;222:6
**help (18)**
8:5,11,18;27:25;
28:3,14;38:8;48:16;
49:3;77:3;138:15;
163:11;214:6,7;
215:13;217:2;229:12;
231:10
**helped (3)**
48:25;175:1;209:23
**helpful (10)**
27:20;48:17;54:24;
68:23;88:5;99:15;
161:10;165:13;208:10;
214:16

**helping (1)**
85:20
**herself (1)**
194:6
**hesitating (1)**
249:1
**Hey (1)**
226:6
**Hi (3)**
110:9,14;111:16
**hide (2)**
185:6,16
**High (148)**
11:16,18,24;12:10;
20:18;23:21;24:12,17,
17;26:11;27:14,22;
28:1,13,19,24;29:3,6,
12;31:2,21;38:20,22;
40:15;45:22,24;46:11;
47:9;48:18;49:10;
50:24;57:17;61:25;
63:2,20;65:4;71:16;
72:16;83:6,19;89:5;
91:24;95:8;98:23;99:2,
3;100:13;101:4,13;
112:21;114:3;117:13,
14,20;119:22;120:6;
123:19;126:2,8;
131:21;133:5,17;
134:4;137:5,11,14,15,
18;138:11,15;143:9;
146:10,12,16,18;
147:13,24;152:2,14;
155:8;156:2,23;
157:12,14,20;158:1,3,
8;163:9;164:10,23;
165:14,21;166:3;
168:7,9,15;175:1;
185:5,11,15;189:17,19;
191:8,11,16,19;192:16,
21;194:8,9;195:9,12,
16,19,22;196:2,7,9,16;
199:2,11,13,20;200:4;
216:14,18;217:10;
218:23;220:22;221:4;
222:15;225:3,21;
228:25;231:22;232:16;
233:2;234:11;236:18;
238:10;241:5,9;254:5,
7;255:2,5,9
**higher (6)**
79:6,12;80:2,3,10;
170:2
**high-level (1)**
33:21
**hired (1)**
173:20
**Historical (3)**
51:12,19;188:16
**history (4)**
10:14;14:15;37:2;
69:20
**hold (5)**

**32:17;55:23;66:20,
20;74:11**
**holding (2)**
231:23;233:2
**Holmquist (1)**
226:18
**home (4)**
129:22;130:17;
167:14;224:23
**honestly (3)**
193:16;234:20;
235:15
**Hooray! (1)**
105:9
**hope (7)**
33:3;48:17;57:11;
86:19;128:11;190:6,16
**hoped (2)**
45:13;86:5
**hopeful (1)**
32:19
**hoping (3)**
110:17;121:21;
190:11
**horrible (1)**
73:11
**horses (1)**
249:13
**host (1)**
224:25
**hot (1)**
141:18
**hotel (1)**
230:5
**hour (1)**
128:7
**house (2)**
121:12;201:16
**houses (1)**
152:18
**housing (2)**
152:22;230:5
**hung (1)**
144:21
**Hursh (45)**
30:19;31:25;32:1,2;
48:12;49:24;68:4;
74:20;75:13;84:5,14;
89:7;91:18;93:10,19;
94:6,14;95:14;96:4,12;
111:13,16;112:15;
113:12,16;128:8;
129:2;132:4;150:4,18;
173:20,21,24;174:7,11;
185:24;205:14,22;
206:21;207:3;209:7;
210:4;217:18;226:18;
236:3
**Hursh's (5)**
186:14;236:12;
237:7;239:6;240:18
**husband (3)**
37:16;166:8;243:13

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 75 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

hypothetical (1)
182:7

I

idea (3)
24:4;227:20;247:1
ideas (1)
82:10
identification (36)
40:22;41:21;48:2;
54:3;56:16;65:22;
74:10;75:5;80:24;
82:20;88:9,23;91:12;
92:5;95:20;101:18;
105:25;109:24;111:8;
113:9;126:20;128:19;
133:13;142:6;144:25;
149:22;162:23;204:21;
211:13;212:12;214:22;
221:24;223:13;235:25;
238:21;240:3
identified (4)
117:15;118:7;
215:21,24
identify (6)
74:13;117:20;
151:23;156:4;201:23;
212:20
illegal (3)
237:1,12,13
imagine (1)
46:18
imagined (1)
47:2
immediately (1)
152:9
immigration (2)
7:20,21
impact (4)
47:18;79:4,11;80:8
impinging (2)
230:13,17
implies (1)
189:9
imply (1)
210:14
importance (1)
85:22
important (4)
69:18;85:5,10;
103:15
impression (1)
116:24
improve (1)
147:20
inaccurate (1)
149:13
inappropriate (2)
216:17,19
Inc (6)
12:5;14:19;49:12,15,
18;207:6

inch (2)
63:21;64:19
include (5)
37:9;68:14;73:24,25;
155:7
included (1)
60:6
includes (3)
89:4;91:17;176:25
including (5)
91:18;98:20;116:12;
191:9;253:23
incognito (1)
132:14
increasing (1)
143:12
Indiana (1)
9:24
indicate (4)
31:25;89:15;128:6;
134:4
indicated (3)
110:22;148:3;195:11
indicates (3)
59:8;117:14;146:6
individual (5)
33:9,9;60:7,20;219:8
individualized (1)
33:16
individuals (10)
31:13;42:13;43:15;
49:21;57:3;60:2;70:15;
157:19;158:8;218:22
Info (3)
92:21;139:10,21
informally (1)
231:15
information (25)
22:9;36:11;37:10;
57:13,16;58:10,11;
60:5;62:4;86:12;88:17,
18;91:25,25;98:14;
116:7;144:5;163:10,
15;182:8;186:18;
218:21;220:18,21;
226:13
INGRISANO (168)
12:2,15;13:3,17,23;
14:11;16:21;17:1,11,
19;18:12;19:15;20:13;
22:8,13,25;23:14,22;
26:14;28:7,17;29:24;
33:2,24;34:12,15,23;
35:5;36:5,12,19;37:5;
38:5,13;40:17;43:3,19;
44:4,21;46:13;51:16;
53:23;54:19;55:21;
56:2,11;60:9,14,22;
62:23;64:23;66:20,24;
67:9,17;71:24;72:22;
73:3,9,16;74:3;76:15,
22;78:15;80:6;83:10;
86:2,15;87:8;90:10,17;

93:13;95:5;97:25;98:9,
24;100:14,17;101:5,
15;103:21;104:16;
107:7,23;109:8,14,17;
111:1,23;112:22;
114:18,21;115:18,21;
117:6,22;119:3;
123:11;124:20,22;
125:9,22;126:10;
127:13;133:6;137:6,
20,24;138:2,6;139:5;
140:1;145:4,8,16;
146:14;147:3,16;
148:6,15;149:7,14;
150:23,25;151:8;
153:7;155:10;156:1,
11,15;157:10;159:8,
20;160:9;165:4,10;
166:1,4,23;167:8,15;
168:20;169:10,13,17,
20;178:4;180:2;
188:20,24;198:22;
222:2,5;223:18;235:2;
244:23;247:13;248:3,
17,25;249:20;250:20;
251:15,25;252:8;
253:16;254:13;255:16
initial (3)
37:25;246:3,9
initially (2)
81:16;161:11
initials (2)
206:2;208:25
input (4)
102:11;251:19,24;
252:1
inquire (1)
143:19
inquiring (1)
144:5
inside (1)
183:23
install (1)
20:19
installed (3)
190:1;191:6;195:13
instances (1)
7:24
Instead (5)
33:16;46:1,10;90:5;
142:20
Institution (3)
62:10;170:10;188:13
Institutional (3)
31:1;32:21;176:19
institutions (7)
21:22;40:14;90:4;
117:11;173:7;251:19,
21
instructing (1)
61:13
instructions (1)
37:9

intend (2)
191:15;230:1
intended (8)
44:14;72:9;141:8;
189:15;192:20;227:24;
229:24;247:8
intent (7)
60:1;17;79:5,11;
80:9;191:10;247:16
intention (1)
45:21
intentional (1)
235:10
intentionally (2)
235:8,20
intentions (3)
185:6,16;235:6
interact (5)
29:2;42:25;160:4;
161:17,23
interacted (1)
43:4
interactions (8)
29:1;95:2;98:5,20;
116:16;162:1,8,11
internal (11)
39:5;43:25;47:12,14,
16,22;87:19,20;
189:11;200:10,22
internally (1)
238:11
interpretation (10)
22:6;126:12;182:12,
24;184:4,8,12,13,15;
231:5
interpreted (2)
229:2;234:4
interwoven (1)
65:15
intimate (1)
177:17
intimately (2)
25:15;177:22
into (13)
46:7;65:15;68:16;
79:22;87:16;88:18;
135:4;164:2;175:18;
202:3;234:15;250:24;
252:19
invite (2)
128:3;157:19
invited (1)
129:9
involve (1)
26:6
involved (34)
14:13;16:19;17:9,15,
15,17;18:14;19:18;
21:1,3;22:10;24:7;
25:13,15;27:16;33:22;
37:4;38:3;39:19;43:21;
46:15;64:24;99:5;
100:12;166:21;170:3,

14,23;214:12;216:7;
217:3,19;218:10;
240:25
involvement (7)
17:13,21;37:2,21;
170:13;218:23;229:19
involving (4)
98:18;128:22;
166:21;200:20
Irishfest (1)
246:18
issuance (1)
109:2
issue (22)
19:1;63:24;64:15;
65:14;80:5;137:10;
144:17;172:4;191:4;
229:16;231:16;232:15;
233:1,17;238:2;244:9;
252:13,25;253:8,13,17,
19
issues (24)
19:24;26:18,25;28:4;
40:9;43:10;56:8;67:19;
77:10,11;141:18;
148:20;172:3;203:1;
237:16,18,21;238:13;
241:21;252:19,19;
253:2,3,21
item (3)
146:9;155:8;183:11
items (2)
118:2;216:16

J

January (17)
13:11;92:12,17;
94:17;96:8,21;97:7;
102:3;103:2;105:3,7;
114:17;115:5,24;
116:2;163:18;240:5
JEAN-LOUIS (1)
62:20
jelly (1)
243:10
job (13)
26:17;50:21;53:10,
20;67:22;77:1;85:18;
99:7;132:2;188:7;
210:1;218:12;222:18
joining (1)
20:2
joking (1)
16:7
Jonathan (3)
165:23;166:7,12
Joyce (1)
157:25
Judd (12)
99:12;222:14,21;
224:1,4;225:12;226:7,
20;234:14,17;235:15;

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 76 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

254:5

**Judd's (1)**
225:17

**judge (1)**
244:13

**Julia (1)**
114:25

**July (3)**
11:14,14;245:17

**jumped (1)**
190:17

**June (6)**
10:22;57:4;142:19;
210:19,21;211:4

**juror (1)**
8:1

## K

**k12 (1)**
157:9

**Kathleen (28)**
28:22;31:15,16;51:8,
10,24;57:7;59:1,7;
60:1,17;81:5;88:12;
89:16;92:25;93:20,23;
96:13,19,21;97:13;
100:7;102:19;105:6;
106:2;157:24,25;
220:24

**Keep (4)**
62:14;79:5,12;80:9

**Kelly (1)**
102:19

**Ken (3)**
42:5;43:5,16

**kept (5)**
52:10;80:1;142:16;
194:15;217:3

**kidding (2)**
169:5;254:2

**kids (1)**
243:12

**kind (28)**
33:5;37:9;47:13;
53:12;65:5,14;81:19;
88:1;100:19;132:23;
158:22;160:19;162:14;
169:5;180:17;182:7;
200:13;202:8;208:9;
213:10;215:8,15,22;
219:15;229:17;249:7;
250:9;252:21

**knew (19)**
28:9;20;43:12,12;
86:8;107:1;130:17,22;
132:2;135:5;164:16;
184:23;188:12,15;
190:10;234:22;235:6;
237:24;241:10

**knowing (5)**
53:25;56:13;186:20;
221:6;235:5

**knowledge (14)**
14:16;177:17;185:4,
20;190:24;192:9;
209:7;225:20,23;
226:2,14;234:8;
235:19;251:5

**known (3)**
190:11;243:4;251:6

## L

**labeled (1)**
215:18

**lacrosse (1)**
224:24

**Lake (4)**
123:2,8,16;153:1

**land (9)**
12:5,13,19,21,24;
39:2;169:22;170:9,15

**landscaper (1)**
216:22

**landscaping (21)**
16:15,20;17:10,17,
22;18:3,5,24,25;19:2,
22,24;26:7;61:20;64:1;
196:22;208:13;209:21;
212:6;213:19;216:21

**language (21)**
10:1;63:6,9,15;
68:12,15;81:24;85:15;
125:11;135:11;144:1;
220:2,16,17,19;221:1,
16;235:16,17;248:11;
250:15

**large (1)**
105:21

**last (24)**
9:4;15:21;52:17;
54:4,10;57:21;61:19;
75:18;78:18;79:3;92:9,
13,14;105:15,15,16;
127:4,14;141:6;
148:25;155:17;195:15;
246:13;250:11

**late (1)**
196:11

**later (1)**
75:1

**law (2)**
170:1,2

**Lawson (27)**
30:19;32:2;48:13;
84:5;89:8;92:21;
173:24;174:1,7,12;
175:7;176:12;177:6,
10,16;205:9,12,15,20,
21,22;207:6;218:20;
219:7;223:20;246:23;
250:7

**lawsuit (2)**
165:9,22

**layers (3)**

218:2,2,3

**laying (1)**
208:10

**leader (1)**
50:21

**leading (1)**
254:8

**learn (1)**
164:5

**learned (2)**
21:8,18

**least (13)**
20:6;44:17;53:2;
55:15;96:25;97:20;
137:3;148:12;157:18;
158:7;159:16;225:16;
252:5

**leave (1)**
100:8,11;134:15

**leaving (4)**
59:6;162:4;196:10;
243:11

**led (3)**
116:17;244:10,22

**left (9)**
11:14;18:24;151:24;
152:7;164:19;182:17;
233:7;243:15,16

**left-hand (2)**
210:21;211:3

**legal (4)**
24:4;104:17;170:5;
250:21

**less (1)**
47:18

**letter (12)**
30:18,22,24;33:11;
108:14,16,21;181:15;
236:2;240:5;242:11;
251:1

**letters (2)**
122:3;250:7

**letting (1)**
34:22

**level (11)**
69:6,15,25;78:6;
79:7,13;80:10,15;
224:21,22,25

**levels (6)**
77:24;79:6,12;80:1,
9,16

**Liaison (50)**
18:14,18;19:18;20:3,
10;24:9;26:17,24;
27:17;42:19;50:8;
53:11;64:13,21;66:9;
99:18;102:10;103:17,
23;104:2,21;116:13,
20;129:21;132:16,18;
146:1;148:4;149:5;
150:19;154:3,7,13,24;
170:8;171:2;174:22;
189:24;192:22;193:3;

194:11;195:3;197:21;
198:25;204:13;219:5;
230:20;231:6;253:15,
23

**life (1)**
203:3

**lifted (1)**
68:15

**light (7)**
62:2;63:9;65:11;
220:12,17;221:20,22

**Lighting (36)**
122:19;123:7,7,8,13,
13,15,18;124:9,12;
125:5,7,18;126:3;
133:8;141:21;179:4;
183:15,18;184:2;
189:25;190:4,12,20;
191:1,4,5,9,20,25;
192:2,6,9,11,17;195:12

**lightly (1)**
244:19

**lights (46)**
19:8,22,23,23;20:12,
19;26:6;63:23,24;
122:22,23,23;123:9;
124:1,6,8;126:1,8;
129:22;130:16,18,23;
131:4;133:4;139:2;
140:5,16,22;141:8,18;
143:16;179:21;180:13,
18;181:5,17;182:10;
184:24;185:12;186:11;
187:6,21;200:20;
202:3;234:22;254:11

**likely (1)**
8:2;182:4;193:21

**limit (3)**
227:8,16,21

**limited (1)**
80:4

**limits (1)**
204:18

**line (8)**
17:6;52:17;61:19;
142:15;143:4;208:15,
17;230:16

**link (3)**
51:3;93:24;96:14

**list (11)**
87:16;88:1;106:10;
109:10;158:16;185:3;
187:3;237:18;238:13;
240:22;252:25

**listed (17)**
43:15;44:18,23;55:4;
117:24;118:2;120:1,4;
147:8,10;148:10;
189:7,9,10;196:18;
217:10;251:24

**listening (1)**
203:5

**lists (3)**

95:8;111:18;194:2

**literal (1)**
234:1

**little (7)**
7:16;8:6;74:6;
121:10;127:1;230:12;
237:5

**live (3)**
71:18;202:17;203:20

**lived (1)**
42:17

**living (2)**
73:19;186:21

**locate (1)**
78:23

**Location (1)**
224:18

**lockers (1)**
7:19

**log (1)**
52:11

**long (9)**
21:18;29:20;36:23;
43:8;83:2;135:25;
242:1;245:21;246:13

**longer (3)**
23:5;246:19,24

**longstanding (1)**
43:9

**long-term (1)**
235:6

**look (37)**
16:11;30:9;41:23;
45:23;53:10;56:5;
62:14,17;63:1;88:3;
96:23;99:19;100:3;
101:21;106:13;108:5;
114:15;154:5;157:24;
159:9;162:25;173:4;
179:1,25;190:9;194:5;
196:8;197:6;198:2;
199:25;211:24;213:18;
215:10;220:7;224:13,
17;226:24

**looked (14)**
41:7;66:18;97:16;
98:17;108:7,14;
109:12;113:17;164:18;
174:16;177:3;188:6;
198:16;224:9

**looking (32)**
43:6;45:14;54:5,11;
58:2;78:17,18;95:9;
108:21;119:17;139:20;
157:1,9,24;159:14;
178:9,13,20,25;180:4,
5;196:17,17;207:24;
213:17;216:10,11;
220:15;228:3;235:15;
245:15,16

**looks (15)**
35:9;48:9;58:2;
59:17;112:4;139:20;

**Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 77 of 89**

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

152:10;157:6;205:3,4;
213:23;223:5,25;
226:7;236:21
**Lord (1)**
171:6
**losing (1)**
33:3
**lot (16)**
18:5;39:22;44:13;
46:1,2;70:16;88:6;
116:20;146:19;231:4;
241:18;246:3,7,22;
252:17;254:3
**lots (10)**
65:15,16,16;82:10;
94:19;133:22;192:7;
218:8,8;254:25
**louder (1)**
78:14
**love (4)**
129:21;130:16,17;
142:3
**loved (1)**
70:14
**lovely (3)**
102:23;103:6,9
**loves (3)**
70:4,10,12
**lower (3)**
84:16;224:21,22
**Lucas (1)**
162:9
**lunch (5)**
128:4;129:4,10;
130:4,5

**M**

**Ma'am (1)**
126:25
**Madison (14)**
7:12;10:3;13:11;
14:9;20:22;106:7;
164:11;177:1,19;
188:10;231:21;232:15;
233:1,16
**MAGGIE (27)**
7:1;56:6;66:9;102:6;
113:1;137:23;169:3,6,
12,15,21;178:9;183:5;
184:17;188:17,25;
194:25;195:7;199:22;
217:9;218:5;223:15;
236:7;239:18;242:14;
245:2;246:25
**magnifying (1)**
116:25
**maintain (1)**
72:8
**maintenance (5)**
135:16;179:19;
186:11;187:5,21
**major (1)**

32:21
**majority (1)**
155:24
**makes (3)**
50:21;199:2;213:6
**making (3)**
149:6;209:24;247:12
**Malamud (2)**
42:2;43:17
**Malone (5)**
31:16;51:8,11,24;
93:20
**Malone's (1)**
96:19
**management (3)**
205:8;211:24;212:2
**manner (1)**
162:18
**many (17)**
40:8,9;46:18,19;
63:22;65:9;67:25,25;
70:15;88:7;203:17,17,
17,20,20;213:7;249:8
**map (3)**
58:3;85:15;151:23
**March (2)**
106:4,22
**MARGARET (2)**
7:1,9
**mark (5)**
34:22;35:15;38:12;
128:17;205:9
**marked (81)**
35:3,8;40:21,24;
41:20;48:1,4;54:2;
56:15,18;65:21;66:5,
18;67:3;68:3;74:9,17;
75:4,7;80:23;81:1;
82:19,22;88:8,10,22,
24;91:11,13;92:4,6;
95:19,21;101:17,19;
104:25;105:24;106:1;
109:23,25;111:7,11;
113:8,10;114:14;
126:19;128:18;133:12;
142:5,7;144:24;145:1,
5;149:21,24,24;
153:19;162:22,24;
204:20,24;205:1;
211:12,14;212:11,13;
214:21,23;221:23;
222:7;223:12,14;
226:22;231:17;235:24;
236:1;238:20,22;
240:2,4;242:13
**marks (1)**
223:2
**Marshall (3)**
120:22;121:5,16
**marshalling (1)**
217:20
**massing (3)**
83:5;84:15;200:4

**Master (277)**
13:10,21,25;14:7,8,
15;21:9,10,15,24;22:1,
3;23:7;30:10;31:2,9;
32:3,24;33:6,13,20;
34:2;35:13;36:2;37:2,
20;38:4,14;40:13,14,
19;41:5,10,13,14,15;
43:1;44:25;48:16,23;
49:10,17;51:5;53:11,
12;55:3,15;57:13;58:8,
11;59:15,18;62:19;
63:10,12,19,21;64:3,4;
69:5,20;70:20;71:3,4,5,
9;72:4,6,12,19;73:6,14,
15;74:2;81:10,25;82:7;
84:1;85:5,10,22,25;
86:5,11,13;87:6,16;
88:19;89:11,14;90:15,
22,23;91:4,21;93:5,10,
16,25;94:4,24;95:3,11;
96:5;97:21;98:6,15,19,
21;99:21,23;100:22,
24;101:3,12;102:13,14,
24;103:18;104:14;
105:11;106:8,23;
107:5,17,20;108:5,24;
109:1,7,20;110:15,24;
111:19;112:19;113:3,
22;114:2,7;115:11,12,
17;116:5,18,23;117:1;
120:17;126:13;129:13;
130:14;131:14;132:9,
12;133:2,9;134:6,20;
135:16,20;136:9;
137:7,8,9;138:24;
139:4;142:14;143:5,
13,21;144:2,12,13;
147:1;148:20;150:12,
19;164:6;165:17;
171:3,8,18;173:6,7,17,
19,20;174:8;175:4,10,
22;176:22,25;178:19;
179:19;180:9,22;
181:18;182:11,13;
183:5;187:9;188:2,3,6,
10;190:5,17,19;193:8;
199:7;202:14,24,25;
203:5,9;204:1;205:5,
23;207:13;212:15,21;
213:1;214:4,25;
218:25;221:21;226:9;
227:7,8,16,20,23;
228:2,7,21,24;230:23;
231:3,11;232:1,10,13,
24;234:2,4,11,15,19;
235:10,18;237:10;
242:24;243:4,14;
244:2,15;246:2;247:2,
7,17;248:14,19,20,24;
250:12,14,18;251:2,8,
12,17,22,23;252:6,14;
254:8,15

**master's (1)**
9:23
**match (3)**
85:13,15;203:15
**matches (2)**
85:19,19
**Matt (17)**
136:10,24;138:10;
142:4;144:9;160:15,
22;161:16;179:9;
182:2,2,5,9;183:2;
184:20;228:5,10
**matter (1)**
190:8
**matters (1)**
28:15
**Matthew (3)**
133:23;142:10;
143:23
**Matt's (1)**
228:3
**may (23)**
23:24;30:3;34:5,10;
43:4;44:6;48:19;84:8;
142:11,12;143:24;
144:17;158:25;159:3,
5,9;164:1,2;173:4;
190:10;221:25;223:18;
245:18
**maybe (7)**
22:19;178:24;211:2;
218:6;237:4,23;245:23
**mayor (1)**
107:14
**MBC (1)**
206:16
**McDonough (2)**
157:7;158:6
**McManus (2)**
156:20;158:2
**mean (39)**
24:22,23;29:7;34:23;
36:7;38:21;43:6,7;
53:9,10;54:9;64:20;
70:14;80:14;87:18,23;
99:9;100:21;130:12,
13,21;132:14;134:11,
11;140:25;160:24;
165:12;172:6;189:14;
202:11;205:20;209:14,
15;210:9;219:20;
228:15;230:4;243:9,13
**meaning (1)**
33:8
**means (4)**
33:11;84:23;197:9;
211:8
**meant (21)**
24:11;44:25;69:22;
71:20;85:12;86:8,21;
87:10,11,12;172:11,13,
13;173:16;189:13;
229:23;241:23;247:8,

25;251:8,17
**measured (2)**
243:22;244:6
**mechanical (5)**
77:12;78:13,21,23;
79:21
**mechanisms (1)**
250:3
**meet (4)**
65:2;176:22;225:1;
243:12
**meeting (63)**
18:24;19:6;30:25;
31:25;53:4;54:6,16,17;
55:2,7,10,13;64:2,4,16;
65:3,5,14;67:8,15;
75:18;99:21,22;100:8,
10;131:22,24;132:18;
140:8,13,18;141:6;
146:1,7;147:5;148:5,
13;150:20;153:23;
154:3,7,14;157:19;
159:5,7;189:2,3;191:2;
193:13,24;195:4,7,22;
197:16,22;198:3,6,9;
199:12;214:18;218:7;
253:11,17
**meetings (33)**
17:5;18:8;21:4,8;
32:17;33:8;46:19,20,
20;53:21;64:11,24;
65:9,15,16,17;98:20;
99:18;100:16;116:12,
13;164:13;175:16;
194:11;216:5;219:3,6,
6,9,10;254:8;255:3,6
**member (2)**
24:8;42:18
**members (2)**
116:21;253:23
**memo (7)**
52:10;58:17;96:7;
179:14,24;180:21;
190:9
**memorialized (1)**
195:15
**memories (1)**
133:22
**memorized (1)**
74:5
**memory (18)**
29:19;34:5,20;35:1;
58:7;64:12;65:3;108:1;
114:6;140:23;148:9;
149:3;162:16;163:21;
164:3;168:17;197:24;
198:3
**mention (4)**
180:13,16;238:2;
241:13
**mentioned (6)**
184:22;190:23;
200:7,9;237:2;253:9

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

**messing (1)**
238:6
**met (9)**
18:25;32:14;42:4;
53:25;130:4;140:14;
162:6,6;251:14
**Michael (5)**
59:8;68:4,6,10;75:8
**middle (7)**
68:9,11;96:11;
176:17;223:25;224:17,
25
**midway (1)**
208:11
**might (29)**
8:24;12:11;23:24;
26:25;28:22,23;29:8,
18;45:3;64:18;65:2,4;
100:19;142:17;144:18;
157:2,6;175:17;
202:20;204:15;209:20;
216:3,4;230:3,4,4,5;
242:5,6
**Mike (114)**
31:15,20;48:18;
56:22;57:7,15;59:1;
60:1,18;78:4;81:5;
83:4,14;84:9;85:2,5,
15;88:13;89:4,15;
91:18,23;92:25;93:20,
23;94:5,10,14;95:2,14,
15,15;96:13;97:3,7,17;
98:5,13,19;99:1,7,8,13;
100:7;101:2,11;
102:19;103:1;105:2,6;
106:3;110:9,14,23;
111:14;112:3,6,16,25;
113:11,25;127:20;
128:13;129:3,16;
130:2,13;131:22;
132:17;136:20;139:9,
15;140:9,9,21;146:20,
23,25;147:5;148:4,9;
149:3;157:23;158:2;
163:8,19,21,23;164:3;
184:22;185:4,14;
189:9;190:17;195:25;
196:3,13,14,18;197:6,
7,13,15,21,24;198:3,5,
8,23,24;221:3;227:4;
234:16;254:6
**Mike's (1)**
157:4
**mine (2)**
188:19;243:7
**Mineral (1)**
246:6
**minimize (5)**
79:4,10;80:8;122:25;
123:14
**minor (2)**
144:17;230:17
**minute (8)**

**82:23;120:9;121:10;**
127:12;161:13,14;
167:4,7
**Minutes (54)**
14:19;36:24;55:9;
99:19;100:4;112:16;
145:25;146:16;147:10,
11,23;148:24;149:10;
154:1,7,12;155:3,4,7,
15;156:4;158:14,20,21,
23,24;159:5,7,9,12,13,
13,15,17,18,23;162:3;
165:25;189:2,5,11;
193:21;194:1,5,11,22,
23;195:11;196:9;
198:2;215:10;245:23,
24;246:15
**Mischaracterizes (1)**
125:10
**misinterpretation (1)**
237:2
**misrepresent (2)**
185:6,16
**misrepresenting (2)**
185:22,23
**mission (1)**
69:25
**misstates (2)**
199:17;247:22
**mistake (1)**
172:18
**mistakes (1)**
171:23
**mistrust (1)**
69:20
**misunderstanding (3)**
199:4,21;247:3
**mix (1)**
141:22
**models (2)**
84:16;188:2
**modifications (1)**
136:9
**modified (2)**
241:24;251:18
**moment (9)**
44:2;56:19;74:11;
81:1;92:7;101:21;
162:25;188:19;204:25
**Monday (1)**
96:25
**monitoring (2)**
23:12;26:1
**Monroe (6)**
14:1,1,4;78:9;104:7;
231:24
**month (1)**
132:1
**more (16)**
15:7;18:25;71:21;
79:2;91:25;107:10;
139:17;167:10;196:11;
217:7;228:6;229:16;

**231:15;235:17;241:18;**
246:14
**morning (3)**
93:23;96:13;115:5
**most (10)**
27:11,11,21;65:8;
71:8;81:9;89:12;
200:18;201:11;253:21
**Mostly (2)**
8:1;218:19
**move (13)**
21:10;40:11;46:25;
47:1;71:24;90:11;
101:16;138:10,15;
143:10;172:8;238:19;
249:17
**moved (1)**
201:13
**moving (2)**
39:22;213:8
**much (6)**
42:1;58:16;66:12;
73:21;188:8;196:11
**multiple (1)**
212:25
**music (6)**
44:19,24;45:5;
118:22;119:8;121:21
**must (3)**
8:22;52:11;251:14
**myself (4)**
12:9;35:25;36:8;
41:7

**N**

**nail (1)**
168:13
**name (9)**
7:7;52:8;148:10;
161:25;171:11;209:24,
25;221:11;246:23
**naming (1)**
44:24
**narrative (3)**
208:15,21;209:8
**native (2)**
155:19;156:17
**nature (3)**
70:19;135:22;181:25
**Naughton (2)**
51:21;52:5
**near (1)**
254:12
**necessarily (3)**
179:8;210:9;215:22
**necessary (1)**
68:17
**need (27)**
9:14,17;15:14;34:18;
36:7,10;45:4,4,9;69:6,
7;72:17;82:25;84:9,23;
115:8;134:7,8;136:14;

**139:17;141:11;167:3;**
171:16;206:7;218:14;
228:6;252:4
**needed (16)**
21:7,9,15;22:23;
39:2;82:2;84:1;107:21;
109:6,19;110:23;
196:14;205:4,5;
207:19;248:15
**needs (18)**
45:2,3,3,8;62:9;71:9,
12,21;72:9,20;117:11,
16,25;118:8;119:2,20,
23;251:18
**neighbor (6)**
17:21;42:16;46:17,
21,23;253:19
**Neighborhood (69)**
14:19;18:14,18;19:7;
20:3,7,10,17;23:11;
24:8,21;25:25;26:4;
27:4,6,17;28:10;32:18;
33:10,22;38:2;39:15;
42:3,19,21;46:7;47:19;
50:7;64:21;69:12;70:3;
74:1;79:5,7,11,14,23;
80:8,11;85:24;99:17;
102:8,10;103:17,18;
104:11,12,13;116:13;
131:3,12;146:1;148:4;
149:5;152:18;154:2,6,
13,24;170:7;189:12,
24;193:3;195:3;202:4;
218:9;253:14,23;255:3
**neighborhoods (4)**
102:12;251:20;
252:3,6
**neighbors (76)**
16:18;17:8,16;18:10,
25;19:12,19,25;24:10,
19,22;25:1,2;26:25;
28:20;39:12,25;45:19;
46:5,9,24;47:19,23;
65:10,17;69:11,19;
70:23;76:12,24;77:16;
78:5,12;79:10;80:1,18;
81:16;82:1;86:13;
87:18;114:8;115:14;
116:7,14,16,17,19,21,
23;123:25;131:16;
133:1,4;141:17;
143:11,19;144:5,7,8,
11;185:7;200:9,15;
202:18,19;204:10;
218:18;230:14;237:19,
25;238:14;252:24;
253:18;254:3,9,10
**neighbors' (1)**
67:22
**Neither (1)**
196:20
**new (23)**
19:9;25:11;59:5;

**83:17;85:16;99:1;**
102:14;121:3,4,14,15;
132:5,15,23;134:6;
159:13;163:25;171:12;
174:21;186:17;187:24,
25;188:13
**news (1)**
130:18
**news! (2)**
103:1;106:6
**next (22)**
8:15;38:12;46:11;
47:8;52:7,20,22;
110:18;115:6;117:19;
118:9,11,14;120:1;
121:13;122:15;123:23;
125:4;127:9;138:18;
159:15;251:7
**nice (1)**
169:16
**night (2)**
66:11;79:19
**nobody (14)**
70:4,10,12;88:2;
194:15,23;218:5;
237:14,15,17;238:7;
241:8,19;254:25
**nod (1)**
8:24
**noise (17)**
19:24;26:7;64:1;
77:16,24;78:6,10,14;
79:7,13;80:2,4,10,14,
16,21;200:20
**noisy (1)**
80:19
**None (2)**
226:5;243:5
**nonprofits (1)**
189:12
**nonresponsive (1)**
71:25
**Nos (1)**
65:21
**note (4)**
32:11,16;59:2;81:13
**notes (21)**
34:17;35:7,10,12,19,
22,24;36:4,8,11;38:12;
40:25;41:3,4,6;53:3;
72:6,12;218:14;
245:15,16
**notice (3)**
201:13,16;231:21
**notices (2)**
232:16;250:4
**November (15)**
48:9;74:21;75:8,12;
89:1,11;91:8,9,14;
136:19;150:5,20;
211:7;212:14;214:24
**number (31)**
50:13;52:20;54:24;

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 79 of 89

Edgewood High School of the Sacred Heart, Inc. v.                    Deposition of Margaret Rose Balistreri-Clarke
City of Madison, Wisconsin, et al.                                                            August 22, 2022

55:15;61:24;63:1,7;
66:7;69:19;75:20;76:6;
89:2;91:17;98:18;
111:18;117:24;120:19,
19;141:17;146:9;
153:23;155:8;164:12;
167:18;186:8;189:7,9,
17;195:10;196:21;
220:10
**numbered (2)**
118:1;121:2
**numbers (7)**
16:10,11;39:21;52:1;
76:13,14;95:10

## O

**oath (2)**
7:3;189:1
**object (12)**
17:6;35:5;60:12;
145:14;151:8;169:2;
180:20;210:23;212:9;
217:14;221:5;249:11
**objected (1)**
158:22
**objecting (3)**
145:11;235:4;253:7
**Objection (216)**
12:2,15;13:3,17,23;
14:11;16:21;17:11,19;
18:12;19:15;20:13;
22:8,13,25;23:14,22;
26:14;28:7,17;33:2,24;
38:5;40:17;43:3,19;
44:4,21;46:13;51:16;
53:23;55:21;56:2,11;
60:9,22;64:23;66:24;
67:9,17;72:22;73:3,9,
16;74:3;76:15,22;
78:15;80:6;83:10;
86:15;87:8;90:10,17;
93:13;95:5;97:25;98:9,
24;100:14,17;101:5,
15;103:21;104:16;
107:7,23;109:8;111:1,
23;112:22;115:18;
117:22;119:3;123:11;
125:9,22;126:10;
133:6;137:6,20,25;
138:4;139:5;140:1;
141:6;146:14;147:3,
16;148:6,15;149:7,14;
155:10,12;159:8,20;
160:9;165:4,10;166:4,
23;167:15;170:11;
171:4,24;172:19;
173:23;174:14;175:11;
176:4;177:8,14,24;
178:22;179:13;181:13,
21;182:15,25;183:17,
25;184:9,25;185:8,18;
186:16;187:11;188:5;

189:4,22;190:2;
191:13,21;192:18;
194:3,12;195:23;
197:4,11,19;198:11,18;
199:16;200:11,17;
201:3,9,24;203:7;
204:2;205:18,25;
206:18,22;207:1,7,14,
16;208:2;209:3,10;
210:6,12;211:6,18;
212:17;213:3;214:5;
215:6;216:2;217:15,
22;219:1;224:6;225:9;
226:3,11;227:11,25;
228:9;229:3,21;
230:18;231:7;232:5,
18;233:19,21;234:6,
25;235:12;236:14;
237:8;239:8,13,25;
240:20;242:10,19;
243:1,8,24;244:4,20;
247:4,10,21;248:17,25;
250:20;251:15,25;
252:8;253:16;254:13
**objections (15)**
172:23;176:10;
192:25;193:5,14;
202:7;207:22;210:17;
212:24;226:15;227:18;
233:4,10;234:10;
235:22
**obtain (1)**
103:16
**Obviously (2)**
73:22;85:16
**occasion (3)**
100:12;160:4;161:23
**occasionally (1)**
25:13
**occasions (1)**
161:16
**occur (3)**
18:8,9;119:10
**occurring (1)**
19:12
**October (19)**
31:13;32:8;88:15;
110:1,5,12;111:14;
112:3;113:12,16;
115:23;127:6,18,21;
128:22;129:3;130:3;
133:24;211:16
**off (13)**
14:4;101:10;118:2;
124:2;149:19,20;
156:14;163:2,3;
168:25;178:8;219:24;
222:6
**offend (1)**
169:14
**offer (1)**
100:19
**offered (1)**

37:16
**offering (2)**
37:10;199:19
**office (1)**
155:14
**officer (3)**
68:7;78:7;171:16
**official (3)**
162:13,14;231:20
**officially (1)**
105:10
**officials (1)**
164:21
**often (3)**
27:22;53:25;160:7
**old (1)**
159:12
**once (5)**
39:8;90:3;181:23;
215:8;249:8
**One (72)**
15:21;19:2;26:18;
28:9;39:9,25;40:1;
41:1;42:12,21;45:8,9;
49:6,17,17;52:1;54:12;
63:25;64:7,15,16;
65:24;66:7;68:11,25;
69:19;70:3;74:11,14;
77:9;81:10;83:7,19;
88:21;91:15;94:11;
95:11;99:6;100:18;
105:15;107:10;108:7;
120:9;121:20;128:17;
134:18;135:19;137:3;
140:6,18;143:19;
148:8;153:6,15,15;
155:14,15,22;156:2;
160:2,15;161:11;
174:2;180:8;196:15;
203:2;204:12;213:13;
215:11;219:19;238:10;
250:6
**ones (6)**
48:19;100:4,5;
188:14;216:22;217:19
**online (2)**
41:6,6
**only (18)**
46:15;59:10;84:18;
87:10;95:7;99:21;
120:5;140:18;156:2;
166:14;178:24;184:12;
203:14;211:22;216:22;
220:21;227:22;234:15
**onto (4)**
14:3;123:1;144:21;
200:23
**open (25)**
32:17;33:8;46:19;
61:20;62:14;63:1;
208:12,20;209:8,21;
210:5;212:5;213:18;
214:12;222:24,25;

223:2,4;227:9;229:1,
11;240:25;253:11,17;
255:6
**opening (2)**
94:2;163:25
**operate (1)**
12:1
**opinion (11)**
100:19;144:9,18;
181:10,12;182:6;
187:7,8,23;201:14;
254:4
**opportunities (1)**
255:1
**opportunity (1)**
60:12
**opposed (5)**
131:4,8,9,9,10
**option (2)**
143:11,15
**order (1)**
188:19
**ordinance (8)**
21:4;123:24;144:2;
177:2;250:13,15,19;
251:2
**ordinances (3)**
177:3;182:13;187:10
**organizations (1)**
23:20
**orient (3)**
30:5,23;31:6
**origin (1)**
155:21
**original (1)**
181:7
**others (5)**
71:16;106:3;154:21;
206:8;215:25
**other's (1)**
221:1
**Otherwise (6)**
9:10;34:19;39:9;
82:3;100:3;131:7
**out (39)**
7:19;21:6;26:18;
31:15;39:13;53:13,14;
55:23;58:9;62:13;
65:11;71:18;78:23;
80:15;81:18;84:18;
89:19;106:20;114:12;
116:24;161:13,14;
163:10;167:6;174:21;
175:3;186:24;188:14,
19;208:10;209:13;
217:4;219:16;221:17;
231:15;240:7;241:17;
242:3;249:18
**Outdoor (1)**
122:22
**outlandish (9)**
87:24;200:8,14,25;
201:2,4,5;202:16;

203:3
**outline (3)**
167:6;205:3,4
**outlined (2)**
34:3;177:1
**outrageous (1)**
202:20
**outside (5)**
152:18;183:23;
184:3;228:24;229:8
**outsider (1)**
185:13
**outstanding (2)**
77:10,11
**oval (2)**
152:5,13
**over (16)**
7:21;8:5,12;34:25;
35:2;41:8;45:10;95:11;
96:23;121:11;161:17;
202:3;213:1;241:24;
246:23;251:18
**overall (1)**
23:19
**overarching (1)**
124:23
**overview (2)**
33:21;38:7
**own (12)**
12:14,19,21;29:8;
35:24;49:10;86:17;
107:25;158:2;170:6;
174:12;209:13
**owned (4)**
12:4,13;61:24;63:2

## P

**PA (3)**
139:3;141:9;181:5
**page (88)**
14:20;15:6,17,24;
16:10;30:13,14,16;
34:7;42:12;43:25;
44:18;52:16,20,22;
56:5;58:15,21;61:16,
19,20,23;62:15,17,18,
22,23,25;84:13,14,25;
92:9,13,14;93:18;94:7,
11;95:8,24;96:12;97:3;
102:2;108:10,11,11;
114:15,18,19;117:7,10,
14;118:11,14;119:11,
17;120:8,16;122:1,15,
15,16;124:15;125:4;
135:9,19;136:19;
138:7;141:1,5;145:12;
150:1,2,22;154:6;
175:19,20;180:5,25;
181:2;183:7,9,12;
184:18;211:22;213:17;
222:23;223:25;242:16
**pages (5)**

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 80 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

15:7;94:23;120:2;
124:14;212:1
**paid (4)**
13:2,4,6;194:24
**pale (1)**
203:2
**paper (11)**
56:7;9;66:10,17;
67:3,6,7,13,16,24;
87:17
**paragraph (29)**
32:11;44:2;57:21;
61:7;78:18;79:3;81:13;
96:22;108:21;115:4,6;
119:19,22;123:23;
125:17;135:25;136:16;
141:5;176:14,17;
178:10;181:1;184:8;
195:2;232:8,8;239:7,
24;250:11
**paragraphs (4)**
14:24;15:3,4;138:18
**Paris (1)**
10:2
**park (5)**
71:17;123:1,14;
141:19,24
**parking (15)**
44:13,16;46:1,2,6;
47:15;143:12;146:19;
147:1,8;158:19;
160:14,14;196:5;
216:23
**Parks (23)**
30:22;108:16;
133:24;134:1;135:2,
12;136:16,24;138:9;
142:3,10;143:8;160:5,
8,11,13,15;161:4,9;
179:9;180:14;181:7;
184:20
**Parks' (3)**
134:23;136:1;181:10
**part (24)**
19:3;34:18;48:20;
73:24;85:18,23;86:11;
87:2;134:15;151:24;
171:9;173:19,19;
177:11;183:18,20;
188:7;203:9;210:11;
217:2,23;223:4;
238:15;250:10
**particular (10)**
60:19;65:1,2;83:6;
137:10;202:10;213:6,
12;215:9;216:1
**partner (4)**
32:2;99:8,15;107:10
**partners (3)**
69:13;103:11;241:5
**partnership (5)**
40:6;69:23;70:9;
77:3;103:13

**parts (2)**
39:22;213:8
**pass (1)**
103:19
**passed (2)**
102:6;167:23
**past (5)**
14:2;121:25;160:20;
179:11;212:2
**path (1)**
123:8
**patient (1)**
255:13
**Paul (1)**
112:10
**pay (1)**
217:2
**pdf (2)**
155:14,15
**pdfs (1)**
155:14
**peanut (1)**
243:10
**pebble (1)**
147:21
**pedestrian (4)**
183:19,22,23;184:2
**people (36)**
24:10;43:8;66:7;
75:24,25;76:9;77:4;
86:6,8,21;88:7;89:2;
91:17;116:20;153:24;
154:20;175:16;184:6;
189:7;201:7,14,20;
202:11;203:1;207:4;
210:1;215:21,23;
217:10;218:8;221:11;
226:21;241:12,18;
254:2;255:4
**people's (1)**
172:16
**perceived (3)**
79:5,12;80:9
**Perfect (4)**
82:18;94:10;171:22;
172:14
**perimeter (7)**
92:1;124:18;125:2,7,
13,14,20
**period (5)**
11:25;13:16,22;
20:24;200:15
**permission (5)**
14:6;26:20;90:20;
229:8,14
**permit (2)**
21:12;23:3
**permits (2)**
109:2;144:17
**permitted (2)**
19:1;136:6
**person (11)**
29:9,9;43:5;147:9;

155:25;156:2;157:15;
159:16;194:1;210:4;
226:13
**personal (2)**
35:19,22
**personnel (1)**
9:25
**person's (1)**
203:2
**perspective (1)**
69:17
**phase (2)**
140:6,17
**PhD (2)**
10:2,8
**phone (6)**
18:9;49:25;54:24;
165:23;230:4;247:1
**phrase (2)**
79:3;220:12
**physical (7)**
62:1;63:3;227:22;
228:4;232:3,11;235:9
**picked (1)**
49:25
**picture (2)**
120:16;151:2
**pictures (1)**
121:25
**pieces (1)**
85:18
**place (8)**
20:1;42:17;47:24;
71:2;73:13;144:11;
202:2;224:20
**placed (1)**
122:25
**placeholder (6)**
45:1,1,2,3,7;46:3
**placeholders (3)**
71:7,20;72:10
**places (1)**
167:18
**Plan (326)**
13:10,21,25,25;14:7,
8,9,15;15:25;21:9,10,
15,24;22:1,3;23:7;
30:11;31:2,9;32:4,24;
33:6,13,20;34:2;35:13;
36:3;37:3,20;38:4,14;
40:13,14,19;41:5,10,
13,14,15;43:2;44:8,25;
48:24;49:10,17;51:5;
53:11,12;55:3;57:13;
58:9,12;59:15,18;
61:20;62:19;63:10,13,
19,21;64:3,4;69:20;
70:20;71:3,4,5,9;72:4,
6,12,19;73:7,14,15,20;
74:2;81:10,18,25;82:7;
83:6,19;84:1;85:6,10,
22,25;86:5,11,14;87:2,
6,17;88:19;89:11,14;

90:15,22,23;91:4,21;
93:6,11,16,25;94:4,24;
95:3,12;96:5;97:21;
98:6,15,19,21;99:21,
23;100:22,24;101:3,
12;102:13,14,24;
103:19;104:14;105:11;
106:23;107:6,17,20;
108:5,24;109:1,3,7,20;
110:15,24;111:19;
112:19;113:4,22;
114:2,7;115:4,6,11,12,
17;116:5,18,23;117:1,
16;120:17;126:14;
129:13;130:14;131:14;
132:9,12;133:2,9;
134:6,20;135:16,21;
136:6,9;137:7,8,9;
138:24;139:4;141:11;
142:14;143:5,13,18,21;
144:12,14;147:1;
148:20;150:12,19;
164:6,11;165:17;
171:3,8,19;173:6,8,17,
19,20;174:8;175:4,10,
22;176:22,25;177:1;
178:19;179:19;180:9,
23;181:18;182:11,13;
183:5;187:9;188:3,10;
190:5,7,17,19;192:2,3,
8,9,9;193:8;199:8;
202:14,24,25;203:5,9;
204:1;205:5,24;
207:13;208:15,15,19,
21,22;209:8,9,12,23;
210:5,11;212:5,15,22;
213:1,18;214:4,13;
215:1;218:4,6,25;
221:21;222:19;226:9;
227:7,8,16,20,24;
228:2,3,5,7,11,11,22,
24;229:1,7,7,8,13,23;
230:23;231:3,11,12;
232:1,10,13,24;234:2,
5,11,15,19;235:10,18;
237:10;241:6;242:24;
243:4,14;244:2,15;
246:3;247:2,7,17;
248:2,14,19,20,24;
249:10;250:12,14,18;
251:2,8,12,17,22,23;
252:6,14;254:8,15
**plan' (2)**
69:5;181:7
**plan! (2)**
48:16;106:8
**Planning (12)**
51:13,19;55:16;93:6,
8;170:9,14,18,23;
177:20;190:15;241:1
**plans (6)**
129:16,19;130:6;
144:2;188:2,7

**plant (1)**
202:8
**play (5)**
98:21;224:21;237:1,
13;245:5
**played (2)**
167:13,17
**playing (3)**
232:17;233:17;
237:14
**please (21)**
7:8,11;14:24;36:17;
38:17;59:2;61:8;66:21;
73:1;81:14;110:18;
112:1,25;115:7;
127:14;136:10;156:7;
169:3;232:22;236:5;
240:15
**Pleasure (4)**
123:1,14;141:19,25
**plenty (1)**
241:4
**PLI (2)**
207:3,5
**plus (1)**
154:21
**pm (3)**
124:2;185:25;255:21
**Point (33)**
9:22;10:6,6,7,11;
12:14;19:25;20:9;24:5,
9;42:22;76:1,4,10;
84:17;85:16;97:14;
131:6;135:6;164:5;
170:22;179:4;181:11;
185:12;186:17;189:18;
194:22;197:10;198:13;
234:1;239:15;246:6;
250:9
**pointing (1)**
152:1
**points (2)**
75:20;189:17
**pole (2)**
124:1,8
**policy (2)**
170:3,6
**polite (1)**
169:8
**poop (1)**
238:9
**population (1)**
203:10
**portion (2)**
127:15;152:15
**portions (4)**
60:19;101:3,12;
148:12
**position (3)**
11:5;199:11,18
**possibility (2)**
108:4;171:23
**possible (9)**

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 81 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

46:23;70:22;85:13;
86:20;186:20;193:10;
194:10,19;233:16
**post (1)**
93:6
**posted (7)**
94:8;114:8;115:7,11,
12;116:6,18
**potential (2)**
45:12;46:5
**potentially (1)**
45:17
**Potter (31)**
30:19;32:2;48:12;
51:25;52:2;54:19,25;
84:5;89:8;92:21;
173:24;174:1,7,12;
175:7;176:12;177:6,
10,16;205:9,12,15,20,
21,22;207:6;218:20;
219:7;223:20;246:22;
250:7
**pouring (1)**
79:22
**PowerPoint (7)**
74:23,25;75:2;150:7,
14,15,18
**practice (13)**
8:19;16:16,20;17:10;
148:25;159:11;192:24;
193:4,8,9,10,13;195:14
**practices (8)**
61:25;63:3;224:20;
227:22;228:4;232:2,
11;235:9
**precisely (1)**
239:18
**preferable (3)**
47:13,17,18
**preference (1)**
45:9
**preparation (3)**
34:1;38:3;252:21
**prepare (1)**
163:11
**prepared (2)**
51:21;52:4
**preparing (1)**
163:19
**present (12)**
49:3;146:6,23;
148:11,13;189:6;
193:23;194:2;195:18;
196:18,19;197:2
**presentation (9)**
27:13;28:18,20;
55:18,24;189:8,10,21;
197:24
**presentations (1)**
219:7
**presented (12)**
14:9;32:13;99:24;
146:21;147:5,7;148:9;

196:4;197:6,7;198:24;
238:14
**presenting (4)**
68:25;146:25;192:7,
8
**president (30)**
10:18,20;11:6;28:1,
2,13,23;31:19,21,24;
42:3,20;50:25;59:3,5,6,
6,9,10;89:5;99:2;
163:9;171:13;219:22;
234:17;242:18,20,22;
243:22;255:11
**presidents (28)**
38:19;53:4,15,22;
54:6;55:3,10,19,25;
56:1;57:8;58:9,22;
61:1,14;63:11;67:8;
81:6,19,23;82:2,5,7;
101:8;102:18;216:20;
219:6,11
**presume (1)**
168:13
**pretty (5)**
139:6,8;181:4;
200:24;202:16
**prevent (1)**
73:7
**Previous (1)**
127:15
**previously (4)**
114:14;145:5;
149:24;226:23
**principally (1)**
217:19
**principle (1)**
47:11
**prior (18)**
11:8;13:20;20:2;
22:22;23:10;25:6,23;
36:21;96:6;105:1;
109:1;113:17;129:8;
153:19;170:7;188:2;
247:19;252:13
**priorities (6)**
118:8;119:1,6,12;
120:1,4
**priority (1)**
99:3
**privy (1)**
236:16
**probably (15)**
18:23;87:16;99:6;
119:7;121:11;147:12;
160:24;168:21;188:7;
206:9;229:10;230:24;
245:23;246:19;253:18
**problem (4)**
9:16;43:6;77:24;
78:6
**problems (2)**
172:21,24
**proceed (3)**

82:8;140:6,17
**proceeding (1)**
143:9
**process (141)**
8:6;14:13;21:13,19;
22:15,16,18,18,21,22;
23:6,8;24:3;25:5,14;
26:12,16;27:15,16,24;
32:4,8,12,20,24;33:1,4,
5,17;34:2,7,8;37:20;
38:14;39:6,19;42:2;
43:22;47:4;48:24;
50:20;51:1,5;53:18;
55:16;61:3,5;63:21;
64:3,4;67:22;68:1;
72:18;73:13,20,25;
74:6,7;76:23;86:20;
87:1;90:8,9,25;93:15;
99:12;100:24;103:22;
104:19;107:9,15;
132:5,15;134:6,14,20;
136:3,4,14;139:18;
142:14;143:5,18,20;
144:11,20;172:7,8;
173:19,20;174:25;
175:18;177:11;178:11,
15,20;179:7,10,17,23;
180:10;181:24;182:4,
6;186:4,9,18;187:20,
25;203:23;204:17;
205:3,7,8,24;206:12;
207:13;209:17;213:15;
215:13;217:4,23;
220:21;221:3;223:4;
227:7;228:12;229:9;
230:15;231:12,14;
232:14,23;233:13;
237:15;248:1,15,23;
242:1;251:14;252:10
**production (1)**
223:21
**professional (3)**
161:4,8,21
**profusely (1)**
126:24
**programming (1)**
227:8
**programs (2)**
167:12;225:4
**progress (3)**
53:4,7;212:2
**project (21)**
23:3;24:13,14;25:20,
21;26:19;28:9,25;29:8,
14;33:7;72:17;73:8,15;
173:25;174:2;212:22;
213:2;215:15;217:20;
255:2
**project- (1)**
23:5
**projects (13)**
25:23;26:6,11;27:11;
29:5,16;33:12;72:20;

100:12;109:3;131:13,
17;133:2
**promise (6)**
166:10;191:11,15;
192:16,20;197:21
**promised (1)**
199:1
**prompt (1)**
8:24
**proposal (5)**
126:1;144:19,22;
163:12,20
**propose (5)**
104:4;129:19;130:6,
19;141:12
**proposed (18)**
58:2;62:8;73:19;
78:20;83:5;121:7,14,
15,17,17,18,22;131:7;
132:18;151:5,12,17;
200:4
**proposes (1)**
44:8
**proposing (4)**
78:24;82:11,17;
104:1
**prospect (1)**
141:10
**proud (2)**
71:8;172:10
**provide (13)**
10:10;50:17;88:17;
93:10;163:14;180:17;
183:18;189:21;192:2,
2;195:21;197:16;203:6
**provided (14)**
50:12,13;57:16;
86:13;94:5;95:3;144:4;
148:4;155:13;156:16;
158:22;195:9;198:9;
248:23
**provides (1)**
144:1
**providing (2)**
98:13;149:3
**provision (2)**
123:25;184:5
**psychology (1)**
9:23
**public (2)**
19:9;204:7
**published (2)**
177:10,13
**pulled (2)**
80:15;116:24
**punch (1)**
160:24
**Purpose (1)**
175:22
**purposes (8)**
44:15;58:10;61:1;
70:22;72:3;88:18;
126:8;129:10

**put (14)**
20:19;25:11;45:21;
95:18;129:22;133:4;
141:8,25;170:7;202:1;
204:25;237:21;241:17;
244:15
**puts (1)**
181:7
**putting (5)**
88:18;103:11;139:2;
181:4;218:10

---

## Q

**quadrant (4)**
19:23,23,24;238:10
**quickly (1)**
106:12
**quiet (1)**
221:22
**quite (4)**
64:18;141:9,17;
179:10
**quitting (1)**
132:2
**quo (2)**
238:6,7,7,8
**quote (1)**
181:24

---

## R

**raise (1)**
253:19
**raised (5)**
46:4;65:14;200:15;
241:20;253:17
**raising (2)**
83:4;198:20
**rare (1)**
64:15
**rarely (1)**
64:6
**rather (2)**
34:5;47:7
**reach (3)**
58:9;76:19;163:10
**read (58)**
14:15,24;15:1,16;
16:12;40:19;41:6;
48:19;56:21;58:16;
68:17;69:9;72:25;73:2;
76:2;81:20;82:25;
83:23;85:7;86:3,4;
93:8;94:20;95:2;96:12,
23;97:14,18,21,23;
98:2,7,12;99:6;102:15;
106:8,13;110:20;
116:17;120:14;123:4;
127:13,15;141:14;
143:5;177:2,4,12;
179:14;184:14;225:4;
227:3;236:5;239:2;

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 82 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

240:14;250:22;251:16;
252:20
**reading (9)**
72:6,12;116:23,25;
174:12;177:21;178:1;
184:12;234:1
**ready (3)**
101:24;130:19;
144:22
**reality (1)**
187:4
**realize (1)**
202:22
**really (12)**
64:14;87:24;110:17;
153:9;179:11;219:18;
223:3;230:23;236:17;
240:21;254:17,23
**realm (1)**
45:6
**reason (25)**
9:14;68:23;86:12;
87:2;97:22;98:11;
138:14;145:5;149:12;
159:6;181:19;196:3;
197:17;221:10;222:10;
225:7;235:5,7;236:10;
237:6;241:16;244:1,3,
18;249:1
**reasonable (8)**
202:16;223:5;224:7,
11;225:15;236:24;
242:11;243:22
**reasonably (2)**
106:13;109:12
**reasoned (1)**
244:6
**reasons (2)**
242:8;243:3
**recall (44)**
12:5;13:16;16:16,18;
17:8,15,20;18:2;31:7;
37:23;38:23;44:20;
45:11,14,18;47:6,10;
48:8;49:20,23;54:8;
63:18;67:15;114:7;
127:7;144:10;146:25;
149:5;173:8;176:2;
184:24;200:10;207:24;
212:25;213:14;214:12;
215:5;222:13;245:25;
247:1,7;252:11,23;
253:10
**recalls (1)**
17:4
**received (3)**
9:25;10:2;158:12
**receiving (4)**
212:25;213:14;
215:5,12
**recent (1)**
89:12
**recently (1)**

35:12
**Recess (5)**
66:3;126:18;153:17;
167:9;245:1
**recognize (18)**
31:11;48:7;58:21;
66:5,17;67:2;96:4;
108:16;205:2;206:16;
211:16;212:14;215:3;
222:24;223:8;224:4;
242:17,17
**recollection (16)**
17:2,3;38:2;39:6;
86:17;115:10;148:2;
152:21;175:9;176:8,9;
190:25;191:3;193:12;
210:15;213:11
**recommend (2)**
46:22,23
**recommendation (1)**
166:15
**recommendations (1)**
166:18
**recommending (3)**
106:7,17,23
**record (14)**
34:19;35:2;74:16;
149:19,20;157:11;
163:2,3;168:25;178:8;
188:16;217:8;219:24;
222:6
**records (1)**
34:13
**recreational (5)**
44:15;199:6,7;
234:12;237:11
**rectangle (1)**
152:10
**refer (8)**
12:25;41:9;67:7,12;
85:18;103:6,9;124:12
**reference (7)**
19:4,6;44:1;97:13;
114:5;129:8;157:14
**referenced (2)**
158:13;183:22
**referencing (1)**
195:2
**referred (4)**
23:9;43:16;54:5;
151:20
**referring (19)**
16:15;34:17;40:25;
41:12,17;52:12;64:22;
69:11;78:3;79:15;
89:25;94:23;109:15;
123:7,24;139:14,23;
147:22;154:23
**refers (8)**
54:16;55:15;56:10;
57:24;58:1;79:4;96:7;
218:1
**reflection (1)**

149:17
**reflects (1)**
20:5
**refresh (3)**
17:3;34:5;115:10
**refreshing (1)**
17:2
**regard (7)**
10:5;49:21;50:11;
60:6;76:4;156:19;
252:12
**regarding (9)**
16:15;19:8;21:4;
57:13;63:19;75:16;
136:25;157:11;200:3
**regardless (1)**
17:14
**Regina (1)**
118:15
**register (2)**
134:7,8
**regular (1)**
53:21
**regulation (2)**
160:20;231:2
**regulations (1)**
70:17
**reiterating (1)**
156:15
**relate (8)**
35:23;75:21;76:5;
112:20;119:12;120:5;
123:18;125:20
**related (17)**
20:11;21:5;57:17;
60:20;77:16;80:13;
98:22,22;101:3,12;
105:15;117:16;118:8;
119:2;150:11;184:5;
200:4
**relates (3)**
124:5;137:11;164:22
**relating (3)**
67:16;95:16;133:15
**relation (1)**
164:25
**relationship (3)**
160:10,19;161:19
**relationships (4)**
43:9;161:21;174:19;
233:12
**relatively (1)**
171:12
**remarks (1)**
93:5
**remember (36)**
21:7,8;22:9,16;
29:11;39:21;41:25;
50:2,18;64:2,4,8;65:5,
13;99:22,25;114:10,10,
11;115:13;131:22;
147:5,6;149:9;166:5;
183:12;188:6;196:13;

208:8;213:5;214:4;
215:12;220:13;246:14;
247:15;254:22
**remembered (1)**
192:3
**Remodel (2)**
118:15;119:7
**removed (1)**
63:16
**rendering (4)**
151:3,5,11;152:16
**renderings (1)**
152:17
**renew (1)**
155:12
**renovated (1)**
151:17
**renovating (1)**
47:9
**reorient (1)**
127:9
**rep (4)**
24:15,17;99:20;
104:5
**repeal (4)**
164:6;242:23;243:3;
244:2
**repeat (3)**
9:6,8;60:15
**rephrase (1)**
115:25
**replace (1)**
121:4
**replacing (1)**
135:10
**replicate (1)**
68:12
**report (1)**
149:4
**reporter (6)**
7:7;8:10,20;15:14;
16:3;243:18
**reporting (1)**
130:5
**represent (5)**
30:8;155:23;194:25;
199:10;231:20
**representation (1)**
155:17
**representative (11)**
18:21;25:16;100:18;
159:18;171:1,8,14;
181:14;189:16;195:8;
254:7
**representatives (5)**
42:6;43:18;157:20;
158:8;255:7
**represented (1)**
97:16
**representing (2)**
97:20;185:20
**reprinted (1)**
224:14

**request (5)**
23:10;58:10;68:11;
153:23;156:16
**requested (3)**
57:16;123:25;163:9
**requests (2)**
57:12;218:22
**require (4)**
181:17;203:5;
229:18;251:23
**required (10)**
21:10;173:6,7;174:9;
175:10,13;183:19;
187:18;203:16;252:1
**requirement (2)**
169:4;203:9
**requirements (2)**
176:23,25
**requires (1)**
176:21
**rescheduling (1)**
246:7
**resending (5)**
93:24;94:9;96:14
**residence (14)**
47:15;118:12;119:6;
120:12;121:3,4,18;
122:4,11;131:9;
141:18,25;164:1;
203:14
**residential (1)**
7:10
**residents (1)**
204:12
**Resolution (11)**
14:22;15:2,4,8,10,11,
16;102:7,23;103:7,9
**resolved (3)**
107:2,5,21
**resources (2)**
216:25;217:7
**respect (61)**
11:21,23;14:8;16:14;
17:16;21:22;23:8,13;
25:5,22;26:1;28:3;
29:4;33:19;35:22;
36:25;42:25;43:14,23;
46:5;55:22;56:1,9;
59:25;68:9;70:20;76:8;
77:9,12;80:12;98:5,14;
111:12;112:14;117:13;
123:23;125:4,17;
131:19;143:23;146:9,
15;147:13;148:24;
149:3;151:2;153:22;
158:21;159:16;162:11;
163:4,19;167:11;
171:18;177:18;180:18;
185:17;212:5;249:19;
250:3,6
**respectful (1)**
40:11
**respond (6)**

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 83 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

24:20;68:20;72:9;
128:3;163:14;247:23
**responded (2)**
91:2;113:19;180:7
**responding (1)**
75:11
**responds (6)**
96:21;97:3,7;103:1;
139:9;143:24
**response (16)**
8:25;57:15;79:3,21;
96:19;97:4;110:11;
135:8;141:10,16;
160:18;180:17;218:21;
224:8,12;225:17
**responsibilities (1)**
210:16
**responsibility (8)**
21:6;209:1;210:4;
212:21;213:19;215:23;
216:3,11
**responsibility/ (1)**
206:13
**responsibility/coordination (1)**
215:19
**responsible (14)**
78:7,10;101:2,11,16;
205:7;209:7;210:10;
213:9;215:24;216:8,
15;217:11;218:22
**responsive (1)**
9:12
**rest (4)**
84:17;97:16;136:15;
201:11
**rested (1)**
39:7
**restrict (9)**
227:16;228:14,23;
229:24;235:8,20;
247:25;248:10,21
**restricted (1)**
228:8
**restriction (3)**
247:2,8,16
**restroom (1)**
9:15
**resurface (8)**
132:6,11,13;134:5;
135:15;139:16;186:5;
187:1
**resurfacing (33)**
99:23,25;100:1;
129:20;130:2,6,19;
131:19;132:8,19;
133:16;136:25;138:16,
23;140:6,14,19;141:7;
147:6,15,22;148:3,9;
149:4;179:17,18;
186:10;187:5,21;
192:1,8,12;197:23
**retained (1)**
10:19

**retaining (2)**
45:25;46:1
**retired (8)**
10:21;142:16,18,19;
143:1;162:7;163:24;
164:22
**retirement (3)**
27:18;50:9;243:11
**return (1)**
38:11
**review (29)**
32:8;35:23;44:3;
48:4;53:4,7;55:3;
56:19,25;58:15;60:3,
18,19;69:1;81:2,14;
82:23;89:19;92:7;95:4,
22;98:15;111:9;114:9;
116:7;145:2;153:20;
178:18;196:22
**reviewed (2)**
22:7;177:6
**reviewing (5)**
35:7,13;53:17;
107:24;177:22
**revise (1)**
157:10
**Revised (2)**
15:25;221:4
**revisions (2)**
158:23;214:3
**rewrite (1)**
102:12
**rewriting (1)**
20:23
**right (86)**
9:10,19;21:25;32:7;
48:5;54:18,20;55:15;
61:16;64:18;66:1;
71:14;72:13;76:8;
80:12;84:24;85:7;89:4;
94:8;96:2,15,17;110:3;
113:24;116:22;118:7;
119:15;121:1;122:13,
13;124:10;125:2;
126:13;127:4;130:8,9;
131:15;132:7,7,25;
133:11,21;134:2,25;
135:4;137:10;138:18,
22;139:2;142:13,22;
145:20;148:24;154:22;
157:5;160:12;163:22;
171:18;176:20;180:19;
183:7,9,11,21;184:21;
188:20;193:25;194:25;
204:22;207:24;209:5;
214:20;217:13;219:25;
220:9;221:15,18;
224:16;233:24;234:2,
24;236:9;239:19;
243:16;250:23;253:25
**right- (1)**
205:9
**right-hand (4)**

199:25;211:7;220:3,
7
**role (7)**
20:10;48:23;78:5;
98:21;166:5,10;199:21
**roles (1)**
42:23
**rolling (1)**
253:21
**room (1)**
253:21
**ROSE (2)**
7:1,9
**rotate (1)**
194:14
**roughly (2)**
13:16;36:23
**rounding (1)**
62:13
**rules (1)**
8:5
**run (2)**
164:2;179:11
**running (2)**
99:2,3

---

**S**

**sad (3)**
199:2;234:3,3
**saddened (1)**
232:21
**safe (2)**
129:23;130:10
**safety (4)**
183:19,22,23;184:2
**salary (1)**
217:2
**salute (1)**
127:1
**same (39)**
10:25;11:5;12:1;
37:17;38:24;39:4,15;
41:17;71:6;84:17;86:7;
96:6,18;100:17;119:7;
127:23;128:1;150:2;
153:14;155:4;157:3,3;
172:23;176:10;177:18;
192:25;193:5,14;
202:7;207:22;210:17;
212:7,24;226:15;
227:18;233:4,10;
234:10;235:22
**Sara (2)**
155:18;162:2
**Sarah (7)**
51:21;52:5;169:2;
245:8,8,19,22
**sat (1)**
140:21
**satisfied (3)**
108:25;109:6,20
**Saturday (1)**

246:21
**saw (7)**
24:19;71:7;114:5;
167:24;214:2;236:17;
241:2
**saying (42)**
34:6;54:25;64:17;
71:11;75:15;78:5,7;
79:10;80:14,19;93:23;
105:9;108:3;112:6;
116:9;135:15;136:5,
12;139:19,21;142:17;
148:23;174:18;180:21;
182:17;185:13;186:14;
187:4,20;193:12;
199:1,5;222:16,21;
227:12;228:5;237:3,
13;240:23;241:16;
247:15;252:1
**scheduled (1)**
246:5
**scheduling (1)**
246:4
**Schemmel (4)**
222:14;224:1;
225:13;254:6
**Schemmel's (1)**
224:4
**Schey (17)**
42:13,15,16;43:16;
66:6;75:16,21;76:11;
77:6;81:17;102:2,22;
194:10,19;195:1;
198:7;199:1
**school (185)**
9:21;11:16,19,24,24;
12:10;14:3;20:19;
23:21,21;24:11,12,15,
15,17,17,20;26:11;
27:14,14,22,23;28:1,2,
13,19,19,24;29:3,4,6,6,
12,13;31:3,3,19,21;
38:20,22,23;39:13,24;
40:15,16;45:22,24;
46:12;47:5,9;48:18;
49:10,11,14;50:23,24;
57:17;61:25;63:2,25;
65:4,8;71:15,16;72:16,
16;81:6;83:6,19;89:5;
91:24;95:8;98:23;99:2,
3;100:13,13;101:4,13;
112:21;114:3;117:13,
14,20;118:20;119:8,19,
22;120:6;126:2,8;
131:21;133:5,17;
134:4;137:5,11,14,18;
138:11,15;143:9;
146:10,12,16,18;
147:13,24;152:2;
155:8;156:2,23,24;
157:13,14,20,25;158:1,
4,8;163:9;164:10,23;
165:14,14,21,21;166:3;

168:7,9,15;175:1,2;
185:5,11,15;189:17,19;
191:11,16,19;192:16,
21;194:8,9;195:9,12,
16,19,22;196:2,7,9,16;
199:2,12,13,20;216:14,
18;217:10;218:17,24;
220:22,23,25;221:4;
222:15;224:25;225:21;
229:1;231:22;232:16;
233:2;234:11;236:18;
238:10;241:5,9;242:3;
254:5,7;255:2,5,9
**schools (46)**
11:23;13:21;19:13;
20:16;26:19,21;27:10;
31:8;32:6,25;38:18;
49:15;51:7;57:8;58:23;
60:7,20;70:3;100:19,
20;102:9,18;103:16,22,
25,25;121:13;134:13,
18;135:19;174:4,5;
180:8;184:7;201:13;
203:6,24;216:19,25;
218:9;219:15,18;
225:1;230:8;252:3;
255:7
**School's (7)**
63:20;123:19;
137:15;152:14;191:9;
200:4;225:3
**science (2)**
14:5;21:13
**scope (1)**
138:24
**Scott (10)**
59:1,3,5,8;60:1,18;
242:17,20;243:21;
244:6
**screening (1)**
202:9
**searched (2)**
156:6;157:16
**seating (14)**
190:1,4,20;191:1,5,
10,19,25;192:3,6,9,11,
17;195:13
**seats (1)**
168:21
**second (24)**
32:11;41:22;42:12;
58:15;95:22;96:22;
97:14;114:15,19;
115:3;134:16,18;
136:23;141:1,5;145:2;
146:18;153:20;186:2;
208:15,17,18;213:17;
242:16
**section (4)**
34:10;81:16;172:2;
175:22
**sections (1)**
216:1

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

secure (1)
129:11
security (5)
122:22;124:9,12;
216:23,24
seeing (4)
51:23;162:3;164:3;
244:10
seek (3)
32:18;229:15;244:1
seeking (3)
20:16;137:17;242:23
seem (2)
89:10;202:20
seemed (1)
174:16
seems (4)
42:8;238:6;242:11;
249:2
selected (1)
131:23
self (1)
35:24
semicolons (1)
118:3
seminary (2)
46:25;47:1
send (2)
81:18;129:16
sending (5)
59:25;60:2,17;81:9;
94:14
sense (5)
9:3;50:21;213:6,10;
254:16
sent (9)
59:7;63:11;110:12;
111:17;127:24;144:7,
8;154:16;157:6
sentence (10)
30:24;56:6;123:20;
135:11;193:17;250:9,
10,22;251:7,16
Separate (7)
19:11;20:15;38:17,
24;40:2;45:14;155:14
September (12)
32:14;51:20;53:3;
54:5,16,17;55:2,7,10,
19,25;85:2
series (4)
82:22;124:24;
128:21;133:15
serious (1)
253:13
Serrault (8)
189:8;196:20,23;
197:2;206:9;217:19;
224:2;226:16
served (2)
11:18;50:7
set (8)
71:12;74:14;87:10,

21;97:14;118:2;
159:15;236:11
setbacks (1)
64:1
setting (1)
181:16
seven (6)
41:8;162:20;164:4;
193:17;198:17;238:18
seven-year-old (1)
198:16
several (2)
31:12;57:3
shades (1)
65:11
shall (3)
108:25;122:23;136:5
Shannon (1)
157:7;158:5,6
share (2)
102:23;205:23
shared (1)
39:2;82:6
sharing (1)
81:25
Shawn (17)
42:13,15,16;43:16;
66:6;75:16,25;76:10,
11;81:17;102:2,22;
194:10,19;195:1;
198:7;199:1
Shawn's (1)
78:18
shepherd (8)
25:21;29:8;50:20;
51:1;171:2;215:15;
219:17;222:18
shepherded (1)
174:23
shepherding (3)
171:20;217:20;227:7
Sherman (1)
43:5,17
Sherwood (3)
42:2;43:5,17
shift (1)
42:24
shifted (1)
12:7
shock (2)
140:4,15
shocked (1)
237:20
shocking (1)
238:14
short (5)
36:15;126:14,17;
153:4,9
show (10)
13:15;29:17;30:7;
42:9;84:8;146:23,25;
147:8;162:14;193:23
showed (2)

56:7;249:20
showing (27)
14:17;40:23;48:3;
54:23;56:17;66:4;68:2;
75:6;80:25;82:21;
88:10,24;91:13;92:6;
95:21;101:19;104:25;
106:1;109:25;111:11;
113:10;142:7;145:1;
149:23;153:18;157:18;
162:24
shown (3)
83:21;84:1;195:10
shows (6)
55:14;108:18;
132:12;134:24;162:6;
189:7
side (1)
152:25
sides (2)
152:22;202:15
Siena (2)
121:11,14
sign (1)
167:24
signed (2)
13:7;236:2
signing (1)
101:10
similar (2)
149:6;211:17
simple (3)
22:15,18,21
simpler (1)
33:4
simply (2)
9:4;138:23
single (4)
18:23;19:3;33:7;
43:4
Sinsinawa (2)
12:4,13
Sister (29)
28:22;31:16;51:8,10,
21,24;52:5;57:7;59:1,
7;60:1,17;81:5;88:12;
89:16;92:25;93:20,23;
96:13,19,21;97:13;
100:7;102:19;105:6;
106:2;157:24;171:7;
220:24
sit (10)
45:11;149:12;
171:21;172:17;182:11;
188:25;236:7,10;
247:18;251:3
Site (23)
44:1,6,10,11,12,18;
45:11;46:5;47:21;64:8;
76:5;86:7;92:22;93:16;
125:5,18;150:8;
151:21,23,24;152:11;
183:14;196:23

sitting (2)
207:24;252:11
six (5)
69:24;117:15,20;
118:2;119:23
size (2)
202:11;203:10
skills (1)
171:17
small (1)
57:24
snowy (1)
38:20
soccer (4)
167:13,18,25;224:22
social (1)
171:17
socially (1)
164:2
sociology (1)
9:23
sold (1)
12:23
somebody (21)
49:25;179:1,6;182:5;
184:14;185:10;190:4,
15;192:5,10;202:12;
207:4;216:4,17;
218:14;219:17;220:24;
249:4,10;253:11;255:9
someone (3)
193:23;205:15,22
sometimes (3)
39:18;63:24;64:13
somewhat (1)
52:13
somewhere (1)
228:19
soon (1)
90:21
Sorbonne (1)
10:2
sorry (59)
10:24;15:19,20;16:4;
41:11;51:23;54:18,18,
18;55:8;60:13;62:16,
21;66:22;74:11;77:21;
86:2;89:23;92:13,14;
94:19;97:4,6;105:16;
113:21;117:6;120:8,9;
121:10;128:12;129:1;
133:21;137:22;138:1,
5;140:3;143:3;150:15;
151:1;154:10;157:12;
165:5;175:25;176:1;
183:8;188:18;190:23;
206:24;208:5,18;
210:20;215:3;217:15;
230:7;238:25;239:7;
240:11;243:17;249:23
sort (5)
20:6;52:10;203:25;
229:19;241:13

sought (1)
145:21
sound (16)
19:9;20:19;79:4,6,
11,12,18,22;80:8,9;
140:5,16;141:19;
161:25;180:13,19
sounds (5)
87:24;139:19;
179:22;222:20;231:4
sources (2)
139:11,22
Space (21)
61:20;117:16;118:8;
119:2;208:12,13,20;
209:8,21,21;210:5;
212:5,6;213:18,19;
214:13;222:19;224:23,
24;225:2;229:1
Spaces (15)
63:1;121:7,8;143:12;
222:18,20,22,24,25;
223:2,4;227:9;229:11;
240:23,25
span (1)
11:11
speak (22)
27:13,14;29:15;
36:23;39:9;40:1;49:5;
50:22,22,23,24;100:20,
25;101:1;104:6;
110:23;130:2;159:14;
166:2;219:12,17;245:8
speaking (5)
39:24;49:1;162:18;
196:15;242:3
specific (16)
21:7;41:25;47:10;
48:8;49:21;50:18;
94:23;144:19;164:3;
191:3;192:14;193:17;
230:7;9;240:24;241:15
Specifically (6)
32:16;47:6;137:12;
200:9;201:19;241:15
specifics (1)
168:12
specified (1)
231:14
specify (1)
234:12
speculate (3)
37:12,16;244:22
speculating (3)
197:10;221:14;
222:21
speculation (13)
28:8;51:17;56:12;
76:16;78:16;98:1,10,
25;104:17;140:2;
192:7;204:3;207:8
spill (2)
46:6;202:3

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

spillage (2)
65:12;123:1
spirit (4)
40:5;42:1;249:15,16
spoke (4)
36:19;116:14;
162:12;191:4
sports (2)
44:19,23
square (8)
44:9,14;46:2;64:8;
84:8,10;85:14;112:10
stack (2)
105:21;178:7
stadium (5)
126:7;181:17;
184:24;190:22;254:20
staff (6)
106:7;107:10;
158:19;177:20,20;
203:17
standing (1)
219:19
start (19)
8:15;23:6;26:20,22;
44:7;57:2;58:18;92:9;
95:25;102:1;120:9;
142:9;145:19;190:11,
13;226:16;228:19;
230:5,23
started (5)
11:13;23:18;24:2;
45:25;242:4
starting (6)
19:19;25:18;55:6;
133:19;135:9;227:3
starts (3)
31:15;52:7;231:15
state (3)
7:7;61:7;173:22
stated (1)
195:7
statement (10)
64:17;70:1;149:6;
157:11;191:8;199:15,
20;227:12;241:14;
249:23
statements (3)
199:13;237:7;
239:12;240:18;247:19
states (2)
232:1,10
status (5)
213:9;238:6,7,7,8
step (3)
39:5;167:6;219:20
steps (1)
80:7
Stevens (3)
9:22;10:6;167:21
sticking (1)
85:6
sticks (1)

103:11
still (10)
12:21;19:1;69:7;
75:24;76:9;77:9,11;
100:24;107:21;231:4
stirring (1)
133:22
stop (3)
237:17;241:7;249:15
stories (2)
83:7,20
stormwater (2)
211:24;212:2
strategic (1)
117:16
strategy (2)
141:11;219:9
streamline (1)
32:12
streamlined (6)
32:20;33:1,14;74:6;
178:10,14
Street (4)
14:2;78:9;201:17;
231:24
strength (1)
225:3
strike (16)
10:10;11:22;16:17;
21:23;41:4;61:17;
71:24;73:10;90:11;
101:16;103:5;114:5;
136:23;195:20;215:4;
238:19
strip (1)
122:24
Stritch (4)
7:18;11:9,12;170:20
structure (8)
12:6,12;13:1,2,4;
23:19;24:5;119:18
structured (1)
44:15
struggling (2)
196:9;249:3
student (4)
9:24;10:18,20;11:7
students (12)
7:18;10:16,21;11:6,
7;24:2;170:19;171:15;
196:10;203:14,18;
236:19
stuff (4)
100:8;214:17;
234:14;242:4
subgroups (1)
64:25
subheading (1)
122:19
subheadings (4)
119:10;122:9,14;
124:24
subject (9)

31:3;32:7;59:14,15;
108:24;142:13,14;
143:4;231:5
submission (3)
89:25;102:14;252:14
submissions (1)
60:25
submit (8)
89:17,24;93:7;
110:15,17;115:3,4;
130:14
submitted (16)
13:10;23:2,9;30:11;
31:8,8;67:18;90:4,15,
19;99:24;113:4;178:2;
189:6;210:2;251:13
submitting (1)
114:1
subpoena (5)
34:13,13;245:13,18;
246:5
subpoenaed (1)
245:16
subsequent (1)
155:17
substance (1)
17:5
substantial (7)
136:8;139:3,7;
179:15,22;181:6;183:3
Success (1)
205:12
successful (1)
165:19
suddenly (2)
230:2;233:7
Sue (1)
83:13
sued (1)
170:5
suggest (3)
46:9;48:19;148:13
suggested (2)
47:3;78:19
suggesting (2)
47:4;91:3
suggestions (1)
37:5
Summary (4)
51:12,19;67:24;
91:21
summer (2)
7:20;225:3
support (9)
19:8;20:17;28:11;
69:2,7;74:1;102:24;
104:4;105:10
supporting (2)
28:11;102:10
supports (1)
102:13
supposed (2)
74:12;248:21

supposition (1)
238:5
Sure (54)
7:9;9:2;15:23;24:1;
35:17;41:16;51:25;
59:4;60:16;66:19;
67:10;71:5;81:23;
83:18;84:15;86:10;
90:14;93:25;99:22;
111:3;112:6;114:11;
127:22;135:5;139:6,8;
148:19;157:23;167:8;
172:12;177:6;179:20;
181:4;182:8;185:4,14;
187:16;188:24;207:3;
210:2,24;211:1;214:9;
217:8,25;218:13;
221:9;222:13;227:13;
232:23;244:12;245:19;
246:25;254:17
surface (2)
147:22;196:13
surfacing (1)
131:23
surprise (2)
130:15;142:2
surprised (4)
200:19;233:6,8;
236:23
surprising (3)
141:11,16;200:19
Susan (15)
163:5;189:8;196:20,
23;197:2;206:9,9;
217:19;218:19;222:14;
224:1;225:13;226:16,
19,20
Susan's (3)
222:18;223:6;225:18
sustainability (2)
206:6;218:4
switch (1)
168:21
sworn (1)
7:3
system (7)
19:9;20:19;65:11;
139:3;141:9;160:25;
181:5

## T

Table (4)
211:21;212:15;
213:1;214:25
Tag (1)
240:7
talk (31)
8:12;19:19;27:1,1,2,
2;64:7,14;69:14;75:2;
136:9;140:15;160:22;
164:17;166:1,9;
168:14;179:15,23,23;

202:23;204:6,9,18;
206:10;214:7;226:10;
228:6;242:22;245:21;
248:10
talked (15)
18:5;64:5;67:19,19;
71:3;131:23,24;
140:13,18,21;144:13;
233:12;238:7;243:14;
245:23
talking (33)
29:11;36:5;52:22;
57:18;63:23;71:6;86:6;
87:20,24;99:21,25;
115:22;116:19,20;
123:13,22;124:8,9;
127:5;130:23;144:14;
180:23;182:2;184:21;
192:1;193:16;194:14;
196:13;215:17;217:24;
246:14;247:15;254:22
talks (1)
178:14
Tami (2)
226:18,18
Tanner (1)
36:16
Task (2)
208:15,18
tasked (1)
217:11
tasks (3)
205:6;212:20;217:12
Taylor (14)
48:10,25;49:2;50:12,
17;59:12,22;60:25;
61:8;213:23;214:2,6;
217:18;218:19
Taylor's (1)
48:23
team (8)
61:25;63:3;210:1;
224:24;227:21;228:4;
232:2,11
technical (1)
29:13
technically (1)
233:25
telling (6)
175:10;187:23;
191:17;225:13;247:1,7
ten (1)
118:9
terms (11)
66:14;85:22,25;
86:10;115:10;123:6;
164:16;190:10;191:23;
216:8;251:1
terra (1)
132:14
Terry (3)
42:17;47:24;202:2
testified (5)

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 86 of 89

Edgewood High School of the Sacred Heart, Inc. v.                    Deposition of Margaret Rose Balistreri-Clarke
City of Madison, Wisconsin, et al.                                                              August 22, 2022

7:3,14,25;151:15;
235:3
**testify (2)**
34:19;35:1
**testimony (1)**
30:10
**thanks (3)**
48:15;95:15;236:20
**there! (1)**
105:11
**therefore (1)**
145:12
**therein (1)**
223:23
**thinking (1)**
9:4
**third (6)**
61:7;75:23;76:9;
81:13;127:20;181:1
**though (10)**
38:24;39:24;40:1;
125:2;167:7;186:25;
187:2;231:4;237:5;
251:11
**thought (18)**
13:19;46:24;71:11;
72:4;88:2;102:5;
121:20;129:17,23;
130:9;199:5,19;
201:11,21;203:1;
240:21;246:19,24
**thoughts (1)**
113:1
**three (51)**
11:23;23:20;31:8;
38:17,18,18,19;40:14;
51:7;53:3,15,21;55:3,
19,25;56:1;57:8,8;
58:9,22;60:2,25;61:13;
63:11;67:8;70:3;81:6,
19,22;82:2,4;101:7;
102:18;103:22,25,25;
152:22;165:15;173:6;
174:4;184:7;189:11;
203:14;216:18,20;
218:8;219:11,15;
230:8;251:20;255:7
**three-dimensional (1)**
84:9
**Throughout (1)**
160:3
**throw (2)**
53:13,14
**thrown (1)**
99:11
**Thursday (1)**
75:18
**Tim (19)**
30:22;108:16;
133:24;136:24;138:9;
142:3,10;160:11,13,15;
179:9;180:7,8,14;
181:7,10,24;184:20;

228:10
**timeframes (1)**
115:23
**times (3)**
63:22;99:7;164:12
**timing (2)**
65:11;145:20
**Timothy (1)**
160:5
**Tim's (2)**
135:8;231:9
**title (8)**
10:18,19,21;11:1,5;
18:17;62:8,10
**today (26)**
9:2,14;35:10;37:19;
45:11;96:23;98:18;
149:13;151:20;165:1;
166:18;171:22;172:17;
178:5;179:9;182:11;
188:25;214:2;215:14;
236:7,10;246:11;
247:18;251:3;252:11;
255:18
**together (11)**
43:10;64:6;71:18;
103:11;109:10;172:11;
202:15;218:11;243:9;
244:15;249:17
**told (10)**
37:7,7;144:20;175:4,
14;183:2;206:4;
225:11;247:19;252:23
**tomorrow (4)**
66:11;89:19;115:4;
129:21
**tonight (1)**
102:6
**took (14)**
35:12;41:6;56:6;
60:25;109:7,20;
121:10;131:15;147:11;
161:13,14;170:2;
219:20;250:2
**top (28)**
15:25;30:13;48:5;
52:8;56:5;57:18;62:21;
68:20;74:20;75:7;
77:21,23;97:5;105:1;
108:10;110:11;113:11;
114:16,22,23;117:4,19;
183:7,9;210:21;211:3,
7;225:18
**topic (1)**
64:16
**topics (1)**
37:18
**torches (1)**
249:14
**torn (1)**
237:22
**total (1)**
238:5

**totally (2)**
202:13;228:17
**touch (1)**
141:24
**toward (2)**
162:15;190:12
**track (15)**
129:20;130:3;
131:20;134:5;137:1,
11;143:10,17;147:21;
152:5,13,14;168:10,16;
224:25
**traditionally (1)**
237:14
**traffic (2)**
141:19;200:20
**trained (1)**
187:14
**training (2)**
169:22,25
**Transfer (3)**
92:20;93:11;96:7
**transferring (2)**
94:7;96:5
**transition (2)**
59:4;254:16
**transparency (1)**
70:8
**transparent (4)**
85:24;86:20;87:1;
99:14
**transportation (2)**
75:17;218:6
**treat (1)**
43:22
**treating (1)**
162:17
**tree (1)**
202:10
**trees (1)**
202:8
**trial (2)**
7:14,25
**tried (5)**
172:10;186:19;
229:5,12;230:8
**trigger (1)**
135:16
**trouble (2)**
16:3;94:2
**true (12)**
23:17;116:10;172:2;
185:16;189:1;196:20;
197:6;198:23;213:22;
244:7;251:4,16
**trust (9)**
28:1;69:6,15,22,25;
70:2,9,23;202:3
**Trustees (1)**
91:23
**truth (3)**
37:7;166:15;187:23
**try (10)**

8:14,16;39:9;40:3;
70:8;73:11;90:12;
157:2;165:5;202:14
**trying (21)**
8:10;30:5;70:10;
71:18;76:11;80:17,21;
85:17,24;86:25;87:1;
88:5;100:9;129:10;
135:1;166:5,9;169:7;
202:17,18,19
**Tucker (16)**
133:23;134:1;
136:24;138:10;142:10;
143:8,23;160:15;
161:16,20;179:9;
181:15;182:2,9;183:2;
184:20
**Tuesday (1)**
92:17
**turn (20)**
14:20;15:6;30:13,16;
34:25;43:24;61:16,18,
23;84:4;95:24;108:11;
117:4;120:8;141:1;
150:16;175:19;176:14;
183:7;242:16
**Turnabout (1)**
245:5
**turned (2)**
7:21;124:2
**Turning (11)**
15:24;44:17;63:6;
93:18;114:14;118:11,
14;121:25;124:14;
138:7;150:22
**turns (1)**
35:2
**tweak (4)**
89:16;90:5,14,19
**twenty (4)**
11:1;46:17;187:17;
202:11
**two (29)**
15:7;18:25;24:20;
32:18;33:9;39:20;40:1;
70:3;83:7,19;103:11;
104:3;109:9;115:22;
120:1,19;134:1;
138:18;155:14;157:18;
174:5;189:12;195:15;
202:15;211:3;218:9;
238:23;240:7;255:3
**type (1)**
202:10
**types (2)**
134:21;180:10
**typical (1)**
194:1
**typically (1)**
26:10
**typos (1)**
97:16

**U**

**ultimately (4)**
53:15;101:7;131:14;
210:10
**umbrella (1)**
122:11
**unaware (2)**
12:11;250:5
**uncertain (1)**
16:5
**under (18)**
12:1;32:7;63:1;
119:5;134:6;181:1;
188:25;189:6,17;
195:16;206:6;207:11,
25;208:18,20,21;
209:8;237:16
**undergraduate (2)**
9:22;10:5
**underneath (5)**
44:16;118:5;122:11;
123:24;124:24
**understood (24)**
9:11;10:25;11:8;
33:12;73:13;76:18;
77:15;82:6;83:25;90:3,
14,24;106:16,22;
113:24;119:18;125:7;
132:24;133:3;136:15;
150:11;179:24;251:11;
252:5
**undo (1)**
34:10
**unexpected (2)**
200:25;201:2
**union/library (1)**
170:20
**united (1)**
39:16
**University (3)**
9:24;10:1,3
**unless (2)**
37:10;136:6
**unqualified (2)**
139:11,22
**unreasonable (4)**
201:8,22;202:13;
207:9
**unresolved (19)**
40:8;172:3,4;202:25;
237:16,18,21;238:2,13;
241:20;252:13,18,19,
25;253:2,3,5,8,20
**untruthful (1)**
98:14
**up (22)**
9:15;20:19;25:11;
28:21;49:25;83:7,19;
84:18;90:15;100:15;
104:8;133:4,22;
134:24;163:22;168:21;

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 87 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

188:13;193:23;222:14;
235:16;238:6;254:8
**update (16)**
    73:20,24;147:25;
    148:3;159:12;189:21;
    195:9,21,25;196:12,21,
    22;197:13,16,22;
    198:10
**updated (2)**
    48:19;73:23
**updates (6)**
    57:12;146:10;155:9;
    189:18;191:24;198:4
**updating (2)**
    73:22,25
**upgrades (1)**
    143:10
**upper (1)**
    152:7
**upset (3)**
    75:24;76:10,12
**upsetting (1)**
    202:22
**usage (1)**
    227:9
**use (68)**
    9:15;14:6,10;15:25;
    20:1,18;21:12;23:2,8,
    10,13;25:5,14,23;26:6,
    12;27:23;28:4;33:4,16;
    44:23;51:25;63:20;
    145:18;169:22;170:9,
    15;171:21;174:24,24;
    175:7;188:3;199:5,9,9;
    220:17;221:22;222:15,
    17,20;225:2,8,14,24;
    226:1;227:21;228:17,
    23;229:25;230:1;
    234:12;235:8,16,21;
    237:11;241:18;247:3,
    16,25;248:10,12,13,21;
    249:2,4,5,9;252:12
**used (25)**
    39:24;45:4,8;49:1;
    58:11;61:25;63:3;
    85:20;126:22;157:25;
    169:6;178:5;194:14;
    200:8;207:18;224:23,
    25;225:12;226:8;
    228:16;232:2,11;
    234:18;238:9;248:11
**uses (17)**
    44:18;62:2;63:9;
    89:12;91:4,24;220:12;
    221:20;222:22;227:17;
    228:8,14;240:24;
    241:15,25;247:9;
    248:22
**using (12)**
    46:22;145:5;168:10,
    15;186:18;201:4;
    228:3;230:3;237:11;
    241:6;242:1,2

**UW-Stevens (2)**
    10:6,7

## V

**Vague (13)**
    22:14;23:15;38:6;
    46:14;86:16;87:9;
    98:25;101:16;115:19,
    21;165:11;167:16;
    254:14
**VanderSanden (1)**
    163:5
**varied (1)**
    64:24
**various (1)**
    65:17
**varsity (2)**
    224:24;234:13
**verbal (2)**
    8:22,25
**verbally (1)**
    243:18
**verify (6)**
    13:15;30:9;153:5;
    222:17,19,22
**versa (2)**
    104:7;202:17
**version (5)**
    81:9;89:12,19;91:20;
    212:15
**versions (3)**
    212:25;213:14;
    223:19
**versus (1)**
    49:10
**vetted (1)**
    206:8
**vice (4)**
    10:18,20;11:6;104:7
**viewing (1)**
    93:15
**views (1)**
    39:17
**Vilas (12)**
    24:23;25:25;27:1,4;
    39:18;46:20;102:11;
    104:4,11,22;105:9,18
**violation (1)**
    232:16
**violations (2)**
    233:1,17
**vise (1)**
    202:17
**vision (2)**
    39:1;130:15
**visioning (1)**
    130:13
**VNA (1)**
    75:17
**voice (1)**
    198:20
**voluntarily (2)**

    34:25;35:2
**voluntary (1)**
    21:25
**vote (6)**
    19:7;20:6,11;69:1,7;
    107:16
**voted (2)**
    105:10;107:19
**Votes (2)**
    15:24;20:1

## W

**wait (10)**
    8:14,16;10:24;60:10;
    121:1;169:1;187:11;
    188:21;217:14;233:21
**waiting (2)**
    36:18;113:3
**walk (1)**
    9:15
**wall (2)**
    45:25;46:1
**wants (1)**
    160:22
**Washburn (1)**
    12:17
**water (1)**
    229:12
**way (24)**
    14:2;21:1;39:25;
    50:8;53:25;56:13;
    103:13;111:25;128:13;
    131:2;167:23;184:16;
    185:17;201:8;202:22;
    209:12,15;221:6;
    228:15;234:5;242:1,3;
    249:6;252:19
**ways (2)**
    71:22;160:17
**website (6)**
    93:7;114:8;115:7,11,
    13;116:6
**week (2)**
    110:17,18
**weekend (2)**
    96:24;246:17
**weren't (8)**
    87:22;192:8;217:3;
    253:2,6;254:16,19;
    255:4
**west (3)**
    124:1,5,11
**what's (52)**
    40:24;48:3;56:17;
    66:4;68:2;75:6;80:25;
    82:21;88:10,24;91:13;
    92:6;95:21;100:22;
    101:19;104:25;106:1;
    109:25;111:11;113:10;
    134:13;142:7;145:1;
    147:6;149:10,23;
    153:18;155:13;162:24;

    190:5,16,19;193:7;
    199:5;204:24;205:1;
    207:18;211:14;212:13;
    213:5;214:23;221:21;
    222:7;223:14;226:22;
    231:17;236:1;238:22;
    240:4;242:13;245:19;
    252:18
**whenever (1)**
    103:13
**Whereas (1)**
    15:18
**white (9)**
    56:7,9;67:7,12;
    121:2,7,10,13;152:16
**whole (6)**
    15:1;47:1;82:25;
    216:24;232:21;237:18
**Whoops (1)**
    208:5
**whose (4)**
    24:13;115:13;
    157:15;223:5
**Wingra (1)**
    123:2,16;153:1
**Wisconsin (2)**
    7:12;10:3
**wish (6)**
    87:15,23;88:1,2;
    185:3;187:3
**within (9)**
    45:6;46:22;118:9;
    128:7;135:3;138:24;
    145:11;184:7;201:7
**without (9)**
    49:14;50:25;82:4,8,
    17;104:22;159:14;
    182:10;244:2
**witness (28)**
    7:2,22;17:3;34:16;
    60:13;65:23;66:2,22;
    86:16;107:24;109:14,
    16;137:22;138:1,5;
    153:10,14;156:9;
    169:1,9,12,15;198:13,
    20;221:25;222:4;
    247:12;255:19
**witnesses (1)**
    169:14
**Wodka (1)**
    157:25
**wondering (3)**
    105:23;163:17;223:6
**woods (2)**
    123:2,16
**word (2)**
    99:6;200:7
**wording (6)**
    78:19,20,25;80:17,
    21;214:16
**words (1)**
    171:21
**work (8)**

    11:9,16;29:6;39:12;
    161:13,14;172:17;
    244:19
**worked (13)**
    10:11;11:2,11;32:12;
    40:7;43:8,22;70:15;
    156:23;171:8;172:1;
    209:22;243:9
**working (15)**
    11:21;18:17;43:10;
    69:21;81:17;158:18;
    171:10,11,19;190:12;
    208:8;210:1;215:24;
    243:20,21
**works (2)**
    168:22,23
**worried (1)**
    142:4
**worries (1)**
    89:17
**Wow (1)**
    252:21
**write (7)**
    68:23;91:20;102:22;
    106:6,10;129:15,19;
    143:8;180:25;181:4,
    15;209:16;216:4
**writes (11)**
    66:9;68:10;77:23;
    84:13,14;94:19;95:14;
    97:13;102:5;139:10;
    186:4
**writing (11)**
    96:12;102:2;136:24;
    137:15;138:14;163:8;
    187:19;222:21;223:5;
    252:11;254:15
**written (4)**
    34:17;51:15;84:22;
    234:17
**wrong (3)**
    142:23;214:19;242:9
**wrote (18)**
    30:22;37:24;48:9;
    72:6;75:12;110:14;
    119:19,22,25;135:2;
    136:22;138:9;166:14;
    176:6,12,12;194:19;
    252:17

## Y

**ya (2)**
    45:16;237:4
**year (4)**
    11:11;56:24;204:12;
    227:1
**years (18)**
    11:1,3;12:6;41:8;
    46:17;118:9;131:15;
    142:22;149:9;162:20;
    164:4;187:17;193:18;
    194:14;198:17;202:11;

Case: 3:21-cv-00118-wmc   Document #: 101   Filed: 10/27/22   Page 88 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

238:18;252:17
**yellow (3)**
121:7;151:15;152:9
**Yep (3)**
104:1,3;211:23

---

### Z

**zone (3)**
122:25;173:15;
188:13
**zoned (3)**
173:15,16;176:18
**zoning (19)**
20:23;21:14;22:12;
23:11;25:6,24;32:22;
75:17;144:16;169:23;
173:16;176:22;177:1,
3;182:13;187:10;
250:12,15;251:2
**Zylstra (164)**
7:6;34:14,21;35:4;
36:15;54:21;65:25;
72:25;114:19;117:8;
124:21;126:16;128:16;
145:10,18;149:19;
150:24;153:3,8,12,16;
155:23;156:12;163:2;
167:3;168:18,23;
169:7;170:11;171:4,
24;172:19,23;173:22;
174:14;175:11;176:4,
10;177:8,14,24;178:6,
22;179:13;180:1,3,20;
181:13,21;182:15,25;
183:17,25;184:9,25;
185:8,18;186:16;
187:11;188:5,18,22;
189:4,22;190:2;
191:13,21;192:18,25;
193:5,14;194:3,12;
195:23;197:4,11,19;
198:11,18;199:16;
200:11,17;201:3,9,24;
202:7;203:7;204:2;
205:18,25;206:18,22;
207:1,7,14,16,22;
208:2,5;209:3,10;
210:6,12,17,23;211:6,
18;212:9,17,24;213:3;
214:5;215:6;216:2;
217:14,22;219:1;
221:5;223:16;224:6;
225:9;226:3,11,15;
227:11,18,25;228:9;
229:3,21;230:18;
231:7;232:5,18;233:4,
10,19,21;234:6,10,25;
235:12,22;236:14;
237:8;238:19;239:8,
13,25;240:20;242:10,
19;243:1,8,17,24;
244:4,20,25;247:4,10,

21;248:7;255:12

---

### 0

**006894 (1)**
135:8
**011836 (1)**
94:7
**08668 (1)**
52:2
**08671 (1)**
55:2
**0again (1)**
76:21

---

### 1

**1 (25)**
16:10;44:1,6,10,11,
12,18;45:11;46:5;
47:21;48:9;61:2,24;
63:1,7;76:5;150:8;
151:21,23,24;152:11;
175:20;186:8;196:23;
220:10
**1,600 (2)**
75:25;76:6
**1.1 (3)**
175:22;176:3;177:7
**1.3 (1)**
34:10
**1/12 (1)**
210:24
**10 (7)**
7:12;16:11;31:13;
32:8;39:21;94:17;
96:21
**10:00 (1)**
202:4
**10:29 (1)**
113:16
**10832 (1)**
66:15
**11 (7)**
16:10;97:7;142:11,
12,22;143:24;149:9
**11:00 (1)**
124:2
**11374 (1)**
84:13
**11375 (3)**
199:24;200:1,2
**11834 (1)**
94:11
**11835 (1)**
93:18
**11836 (1)**
92:15
**11838 (2)**
97:3,5
**11839 (2)**
95:25;96:11
**11840 (3)**

95:25;96:1,4
**119 (1)**
153:5
**12 (2)**
81:5;212:14
**120 (5)**
145:9;153:5,19,22;
155:3
**13 (10)**
39:20;54:16;89:1,11;
91:8,9;103:2;210:19,
21;211:4
**1-3 (2)**
59:22;61:10
**131 (2)**
40:21,24
**132 (4)**
41:20;56:10;66:23;
67:4
**133 (3)**
48:1,4,7
**134 (4)**
54:2;55:6,9,22
**135 (2)**
56:15,18
**136 (2)**
65:21;66:5
**137 (2)**
65:21;68:3
**138 (5)**
74:9,18;109:15;
149:25;150:1
**139 (2)**
75:4,7
**14 (21)**
14:20;39:21;91:14;
120:13,19,22;121:3,13,
14,17;122:4,12;123:9;
146:2;154:13;189:2;
191:1,18;192:23;
195:3;198:9
**140 (3)**
80:23;81:1,4
**141 (4)**
82:19,22;83:4;
199:22
**142 (2)**
88:8,10
**143 (4)**
88:22,24;91:7,15
**144 (2)**
91:11,13
**145 (3)**
92:4,6;96:6
**146 (2)**
95:19,21
**147 (2)**
101:17,19
**148 (4)**
105:24;106:1;
109:16,17
**149 (7)**
109:23,25;110:4;

95:25;96:1,4
**111:22;112:1,17;128:1**
**14th (1)**
154:4
**15 (1)**
246:15
**150 (4)**
111:7,11,13;112:14
**151 (2)**
113:8,10
**152 (4)**
126:19;127:10,17;
129:9
**153 (8)**
128:18,21;184:17,
18,18,19,21;185:24
**154 (6)**
133:12,15;179:25;
180:1,2,25
**155 (2)**
142:5,7
**156 (8)**
144:24;145:1,25;
147:24;155:5;188:17,
25;195:5
**157 (4)**
149:21,24;150:2,4
**158 (3)**
162:22,24;163:4
**159 (12)**
204:20,23;205:2;
208:1;210:19,20,21;
211:17;212:7;213:21;
215:17;216:10
**16 (9)**
120:13,19,23;121:4,
15,18;122:4,12;123:9
**160 (4)**
211:12,14;212:7;
213:21
**161 (4)**
212:11,13;213:12,17
**162 (4)**
214:21,23;215:18;
216:10
**163 (4)**
221:23;222:7;224:9,
15
**164 (6)**
223:12,14,22;
224:14;225:17,25
**165 (6)**
235:24;236:1,12,13;
237:7;238:24
**166 (7)**
238:20,23,25;239:2,
7,24,24
**167 (6)**
240:2,4,19;242:9;
250:6,7
**17 (2)**
175:19;211:16
**1840 (3)**
61:23;220:3,7

**1880 (1)**
12:18
**19 (6)**
74:21;75:8,12;85:2;
150:20;214:24
**1981 (1)**
11:14
**1990s (4)**
16:18;17:8,18;19:13
**1991 (1)**
11:15
**1994 (1)**
10:17
**1996 (2)**
10:9;14:20
**1996/1997 (2)**
13:21;14:8
**1996/97 (2)**
13:25;40:13
**1997 (7)**
18:15;24:7;27:18;
46:16;50:8;69:21;
174:22

---

### 2

**2 (7)**
14:20;30:14;56:5;
108:11;110:5;117:4;
135:19
**2:30 (1)**
129:17
**20 (20)**
106:4;110:12;
111:14;112:3;113:12,
16;114:17;127:6,18,
21;128:22;129:3;
130:3;131:15;163:6;
164:12;194:14;245:23,
24;246:15
**2008 (1)**
51:20
**2010 (1)**
174:20
**2012 (1)**
211:7
**2012.11 (1)**
210:25
**2012.11.00 (1)**
211:9
**2012/2013 (1)**
20:23
**2012-2014 (1)**
102:12
**2013 (37)**
31:13;32:8;52:17,25;
53:1,3;54:5,17;55:7,11,
19,25;57:4;59:15;66:6;
74:21;75:8,12;81:5;
85:2;88:15;89:2;91:8,
9,14;150:5,20;210:19,
22;211:4,17;212:14;
214:24;222:13;225:13;

Case: 3:21-cv-00118-wmc  Document #: 101  Filed: 10/27/22  Page 89 of 89

Edgewood High School of the Sacred Heart, Inc. v.
City of Madison, Wisconsin, et al.

Deposition of Margaret Rose Balistreri-Clarke
August 22, 2022

**226:8;232:24**
**2014 (41)**
13:11,12,19,20;
30:11,19,25;31:7;43:1;
87:13,13;92:12,17;
94:17;96:8,22;97:7;
102:3;103:2;105:3,7;
106:4;108:17;110:5,
12;111:14;112:4;
113:12,16;114:17;
115:23,24;116:3;
127:6,18;128:22;
129:3;133:24;136:19;
182:19;232:24
**2015 (15)**
142:11,16,18,19;
143:1;146:2;147:2;
154:13;189:2;191:2,
18;192:23;195:3;
198:9;233:7
**2015-4-14 (1)**
154:6
**2016 (5)**
10:24;27:18;142:17,
20;182:17
**2017 (3)**
10:22;46:15,16
**2018 (4)**
163:6,18;227:1,2
**2019 (7)**
163:19;164:12;
181:14;182:17,24;
242:17,21
**2022 (1)**
245:17
**21 (7)**
11:3;12:6;57:4;95:8;
133:24;164:12;252:17
**22 (6)**
30:18;66:6;108:17,
20;115:5;242:13
**2219 (1)**
231:24
**228 (20)**
30:14,16;62:18,22;
108:11;117:4,5,8;
119:11,11,17;120:8,10;
122:1,15;124:15,21;
175:20;183:9,12
**22nd (1)**
246:12
**23 (2)**
105:3,7
**24/7 (1)**
79:23
**25 (2)**
88:15;245:17
**27 (4)**
158:25;159:3,5,9
**288 (1)**
108:12

**3**

**3 (7)**
55:15;61:2;189:7;
196:21;207:11;208:11,
12
**3.1 (1)**
117:10
**3.5 (1)**
120:12
**3.6 (2)**
124:17;125:12
**3:30 (1)**
113:20
**3:58 (1)**
255:21
**3:59 (1)**
185:25
**30 (2)**
10:22;112:16
**31 (1)**
11:14
**33 (3)**
117:5,8;119:17
**34 (1)**
119:11
**35 (1)**
119:11

**4**

**4 (5)**
61:10;81:16;136:19;
154:2;195:2
**42 (1)**
62:24
**45 (1)**
226:23
**49 (1)**
120:10

**5**

**5 (5)**
146:9;155:8;189:9,
17;195:10
**52 (17)**
29:24;30:8;33:19;
41:12;62:14,17,19,20,
21;108:6;171:18;
175:19;183:5;188:4;
220:16,20;226:1
**53 (4)**
105:1;114:13,15,16
**53717 (1)**
7:12
**54 (9)**
58:21;63:6;120:8;
122:1;219:23;220:2,5,
6,19
**55 (16)**
19:3;31:11,12;36:24;

38:15;39:3,4;63:22,24;
64:19;122:15,16;
165:25;178:5,9,13
**57 (3)**
124:15,20,21
**58 (3)**
183:7,9,12

**6**

**6 (4)**
30:16;43:25;108:11;
240:5
**60 (2)**
62:18,22
**600 (1)**
204:12
**605 (2)**
204:13,15
**610 (1)**
204:16
**66 (1)**
54:25
**6892 (1)**
134:24
**6893 (2)**
133:21;135:9
**6894 (1)**
180:5

**7**

**7 (5)**
92:12,17;96:8;
125:17;183:11
**7,000 (1)**
203:13
**7:00 (2)**
196:10,11
**70 (1)**
253:18
**71 (1)**
52:22

**8**

**8 (3)**
30:25;102:3;108:18
**80 (1)**
253:18
**80,000 (5)**
44:9,14;46:2;64:8;
85:14
**8669 (1)**
52:8
**8670 (1)**
52:16
**8671 (1)**
54:19
**881 (2)**
150:22,23
**8874 (1)**
150:16

**8881 (2)**
150:24;151:3

**9**

**9 (14)**
16:11;32:14;34:7;
53:3;54:5,17;55:2,7,10,
19,25;231:18,18;
249:19
**9:59 (1)**
112:4
**90 (1)**
216:5
**90s (3)**
17:20;130:25;131:3
**94 (2)**
24:2;174:1
**96 (2)**
20:11,20
**97 (4)**
19:19;25:18;170:8;
171:9