IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EDGEWOOD HIGH SCHOOL
OF THE SACRED HEART, INC.,

                              Plaintiff,                    OPINION AND ORDER

        v.                                                  21-cv-118-wmc

CITY OF MADISON, WISCONSIN,
CITY OF MADISON ZONING BOARD
OF APPEALS, CITY OF MADISON PLAN
COMMISSION, and CITY OF MADISON
COMMON COUNCIL

                              Defendants.

        Plaintiff Edgewood High School of the Sacred Heart, Inc. ("Edgewood"), claims that

defendants City of Madison and affiliated entities (collectively "the City") have violated

the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the Free Exercise

Clause and other federal and state constitutional provisions and statutes in denying a

permit for outdoor lighting at its athletic fields because Edgewood is a religious institution.

Defendants have moved for summary judgment on all claims, arguing that rather than

being driven by any religious animus, the denial of a permit for field lights was wholly

driven by the surrounding residential neighborhood association's continued resistance to

Edgewood holding loud and bright football games at night, lowering of property values and

bothering immediate neighbors.  More specifically, defendants argue that Edgewood is not

exempt from zoning criteria or resistance from neighborhood associations simply because

it is a religious school, especially where the evidence of record establishes that its religious

mission played *no* discernable role in the City's or neighborhood's opposition to the field

lighting permit.  For the reasons given below, the court agrees and will grant summary judgment to defendants on all claims.

## UNDISPUTED FACTS[1]

Edgewood is "a private, inclusive, Catholic high school in the Sinsinawa Dominicus educational tradition," located in Madison, Wisconsin, which "provides a college preparatory curriculum," and shares its campus with Edgewood College and a primary school.  In 2007, the City of Madison began rewriting sections of the City's Zoning Code.  Previously, the Zoning Code generally required an arduous application process for a conditional use permit before any institution could make changes to its buildings or outdoor spaces, which would then be reviewed by the City, subjected to a public hearing, and ultimately voted on by the City Plan Commission.  However, the University of Madison, Madison College,[2] and an Edgewood College representative all pushed the city to create a more streamlined path for campuses in Madison.  While the Edgewood representative, Maggie Balistreri-Clarke, was only employed by the college, city employees understood her to be speaking on behalf of all three Edgewood entities.

As part of the process of rewriting the Zoning Code, therefore, the City of Madison enacted M.G.O. § 28.097, which created Campus-Institutional ("CI") Districts.  That section went into effect on January 2, 2013, and stated, among other things, that CI Districts were created to:

---

[1] Unless otherwise noted, the court finds the following facts material and undisputed.

[2] Formerly known as the Madison Area Technical College or "MATC."

> Balance the ability of major institutions to change and the
> public benefits derived from change with the need to protect
> the livability and vitality of adjacent neighborhoods . . . [and]
> [e]ncourage the preparation of Campus Master Plans that
> enable adjacent neighborhoods and the broader community to
> understand the levels of development being proposed, their
> likely impacts, and appropriate mitigation measures.

(Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 10.)

While new educational and medical institutions created after the ordinance took

effect would be required to adopt a master plan, existing institutions were given the choice

of participating.  Each master plan would then be approved or rejected by the City's

Common Council based on its consistency with the City's Comprehensive Plan and the

characteristics of the neighborhood around the institution.  An approved master plan

would be in effect for 10 years and was required to describe the existing conditions and

proposed changes to buildings, open spaces, landscaping, and land uses.

Before this zoning change, the entire Edgewood campus was zoned "residential."

Once the change was enacted, Edgewood campus was rezoned as a CI district.   On April

22, 2014, Edgewood's proposed Master Plan for the district was approved by the City

subject to several conditions and ultimately took effect in late 2015.  One of the stated

benefits of the Master Plan was to streamline architectural review for projects approved in

the Plan.  The Edgewood Master Plan proposed 22 projects for the benefit of either the

high school or Edgewood College, including outdoor projects like repaving parking lots.

None of the proposed improvements related to a new athletic field.  Instead, in describing

the existing athletic field, the Master Plan identified its use as an "athletic field owned by

Edgewood High School [and u]sed for team practices, physical education classes." (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 35.)[3]

Having monitored the growth of Edgewood's campus for some time, representatives of the Dudgeon-Monroe and Vilas Neighborhood Associations that bound the campus on three sides met with Edgewood about its proposed Master Plan in 2013.[4] Based on past encounters, Edgewood High School President Mike Elliott knew getting those neighborhoods on board with any plan would be important. In particular, neighbors had previously registered noise complaints and expressed concern about lighting coming from the campus and disturbing their neighborhoods. Thus, all three Edgewood institutions reaffirmed in the Master Plan, "their commitment to the Edgewood Neighborhood Liaison Committee as a primary vehicle for ensuring strong partnership and communication." (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 41.) Indeed, Edgewood's commitment to working with the local neighborhoods is repeated throughout the plan, including a recognition that: "The residents of the city of Madison place high value on the established residential character of Dudgeon-Monroe and Vilas neighborhoods, and additionally place a very high value on the woods and other undeveloped areas that help characterize this unique area of the city." (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 48.)

---

[3] A previous draft of the Master Plan had identified the athletic field as used for team practices, physical education classes, and "other general light uses," but that last phrase was removed at some point in the approval process. (*Id*. at ¶ 44.)

[4] Bounded on its east by Lake Wingra, the Dudgeon-Monroe neighborhood is directly north of the Edgewood campus, while the Vilas neighborhood is directly west and south.

In addition to receiving approval of its Master Plan in the spring of 2015, Edgewood also received a million dollar grant from a private donor to renovate its existing track and field.  Because there are no lights at that field, Edgewood students have historically played nighttime, home games at alternate locations in Madison, principally at Breese Stevens Field, which is also homefield for Madison East High School, a public institution.  Edgewood pays to rent these fields but would sometimes get its reservation removed when other organizations got priority booking.  Hence, the school wanted to add lighting to the field and resurface the track. At that time, Edgewood High School President Elliott acknowledged that the surrounding neighborhoods expressed opposition to lights on the field.

Nevertheless, before resurfacing the track, Edgewood asked the City what needed to be done.  Apparently, the City decided that Edgewood would not need to amend its Master Plan because resurfacing could be classified as maintenance and repair.  Edgewood also applied for a permit to run conduits for lighting and communications underneath the field, which was granted.  Because the technology for the field lighting and communications were not yet available, however, the school did not request permission to install lighting at that time.

After the 2015 track upgrade, Edgewood did increase the number of games played on its field, and in May 2016, Edgewood further discussed adding lighting and seating to the field with the Neighborhood Liaison Committee.  In response, members of that committee again raised traffic, lighting, and noise concerns.  A group of residents has long opposed any expansion of the Edgewood athletic complex, and there has been

neighborhood opposition to installing lights at the athletic field at least dating back to 1996.

In March of 2017, High School President Elliott spoke with City Zoning Administrator Matthew Tucker about building a "partial stadium," prompting Tucker to point to the Master Plan as a potential obstacle. City Alder Sara Eskrich also told Elliott that lights and seating would require a Master Plan amendment. On October 17, 2018, Zoning Administrator Tucker attended a neighborhood meeting where Edgewood presented its stadium plan. After the meeting, Tucker reached out to Elliott and told him that after rereading the Master Plan, Edgewood was in violation by holding *any* competitions at the track and field because only classes and practices were disclosed as uses for the field in the Plan. On November 24, 2018, Edgewood nevertheless proceed to file for an amendment to the Master Plan to add lights, seating, and restrooms to the field. While Edgewood was in violation of city ordinance for holding competitions, Tucker allegedly told Edgewood that the City's policy would be to suspend enforcement of violations pending a Master Plan amendment, as the amendment could moot any violations. Further, Tucker allegedly noted that the parties could discuss how to proceed if the amendment application was denied.

However, before any of that unfolded, Edgewood decided to halt its attempt to amend the Plan. Rather, on February 22, 2019, Edgewood submitted an application for outdoor lighting. Tucker contemporaneously sent Elliott the following email regarding the application:

> On Friday, February 22, the Building Inspection Division accepted a lighting plan filed by Forward Electric on behalf of

6

Edgewood High School, to install lighting for the school's field. Those plans will be reviewed for compliance with M[G]O Section 10.085, and if the plans comply, electrical permits will be issued when requested. The City believes this permit can be issued without requiring amendment of the approved 2014 Master Plan. However, over the past weekend, I received a copy of the letter sent to "Edgewood Family" and a "Frequently Asked Questions" document relating to the institutions' present interest to install lights and an amplified sound system at the field (copy attached). These letters indicate that Edgewood intends to use the lights and sound system to host night games at the facility. Based on the information the City currently has regarding the historical use of the facility, it would appear that the intended use of the facility as outlined in your letter to the "Edgewood Family" and detailed in the "Frequently Asked Questions" document would conflict with the approved 2014 Master Plan for the site, which limits use of the facility to "team practices, physical education classes" (Page 42, Section 3.8, Open Spaces Plan). The purpose of this letter is to inform you that the issuance of any lighting permit under MGO sec. 10.085 does not change the City's position that the use of the facility under the master plan is limited to "team practices, physical education classes."

(Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 92.)

Even so, on February 27, 2019, Edgewood's application for outdoor lighting at its athletic field was stamped "approved" by the building inspector, although when Tucker met with his supervisor, George Hank, he decided the permit should be withheld as inconsistent with Edgewood's Master Plan. In particular, Hank was concerned that the City may be at risk if it let Edgewood make a large capital expenditure while also contending it could not use the area for night games. As a result, the City attorney sent a letter to Edgewood stating that the lighting constituted a "capital improvement" that, unless disclosed in the Master Plan, could not benefit from the easier approval scheme

under that Plan.  And because the lights were *not* disclosed as a project in the Master Plan, the City advised Edgewood would have to seek an amendment to the Plan.

Further, in March 2019, neighbors located directly across a residential street complained to the City that Edgewood was holding actual athletic competitions.  Next, an inspector observed some of those games and issued an Official Notice of Violation based on the City's interpretation of the Master Plan.  Although the City did not cite or fine Edgewood, it appealed the Notice, which was unanimously upheld.  Still, City Attorney May informed Edgewood's counsel that, although he had enforcement authority, he would not take action unless and until he gave Edgewood notice.  Attorney May also suggested that Edgewood consider terminating its Master Plan, which would allow the school to continue hosting athletic competitions without the restrictive Plan language prohibiting them.  Soon after, Edgewood requested a repeal of its Master Plan.  Because the Master Plan had the effect of an ordinance, however, another ordinance had to be passed repealing it.

Pending Edgewood's request for appeal, Alder Tag Evers also started conversing with the City Attorney about the CI District process itself.  Specifically, Evers represented that the zoning meeting about Edgewood's appeal had revealed that a CI District institution arguably could build any building without permission as long as it was enumerated a "secondary use," including paradoxically a college building, a correctional facility or an agricultural field.  Notably, Alder Evers was opposed to a stadium for Edgewood, and he began having these conversations as Edgewood attempted to repeal its Master Plan.  In

addition, Evers and City Attorney Strange drafted an amendment to the CI District zoning ordinance requiring a conditional use permit for outdoor uses.

On August 26, 2019, the City's Common Council then held a hearing to consider Edgewood's Master Plan repeal and Evers' amendment, but instead agreed to reconsider those proposals at its September 16, 2019, meeting. However, City Attorney Strange next wrote a memorandum advising the council that passing both ordinances at the same time would allow Edgewood to host competitions, while still requiring that the school get a conditional use permit for any field improvements. The council ultimately decided to push consideration of the Edgewood repeal to October of 2019, and instead voted in favor of advancing Evers' CI District amendment in September.

On September 30, 2019, Edgewood submitted another lighting application, which was denied because its Master Plan was still in effect. On October 1, 2019, the Common Council voted to amend the CI District ordinance. Although Edgewood asked for the repeal of its Master Plan to be delayed, it was ultimately considered and repealed on January 7, 2020. On March 11, 2020, Edgewood then filed for a conditional use permit for outdoor lighting.

After City staff determined that the Plan Commission could find the conditions for a permit were met, the permit went before the Plan Commission itself. However, at its May 11, 2020, meeting, the Plan Commission decided standard number three of the conditional use requirements was not met because: "the lights would have a substantial negative impact on the uses, values, and enjoyment of surrounding properties"; "no evidence was submitted by the applicant that there would not be negative impacts on the

9

lighted use of the field"; and "no mitigation measures [were] proposed to limit those impacts, noise barriers, limits on events, et cetera." (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 172.)

Edgewood appealed that decision to the Common Council, which considered evidence, including two sound studies, testimony from homeowners on property values effects, videos of past Edgewood games, and testimony from neighbors suggesting that Edgewood had been dishonest before and might not abide by its agreements. Eventually, the Common Council upheld the decision of the Plan Commission. While Edgewood still does not have field lights, the Plan Commission and Common Council have approved other Edgewood projects, including a two-story building addition in September 2021.

## OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If there is any genuine issue as to any material fact, the court cannot grant summary judgment. *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

## I.  RLUIPA (Counts I and II)

Among other things, RLUIPA prohibits city ordinances or zoning rules from treating religious land uses worse than secular land uses.  Edgewood argues that the City violated both the equal terms and substantial burden provisions of RLUIPA.  After addressing the scope of the parties' actual zoning dispute, the court will address each provision separately.

### A.  Barring Athletic Contests & Lighting of Athletic Field

As an initial matter, plaintiff spends much of its brief criticizing the City's interpretation of Edgewood's Master Plan as precluding all athletic *contests*, as opposed to athletic practices and gym classes.  While Edgewood's criticism is well taken, it is somewhat beside the point since the City's initial denial of permits under the Master Plan focused on the fact that outdoor *lighting* was never identified as a future project for the school, regardless of the approved uses of its athletic field.  So even if the City interpreted the Master Plan as allowing athletic competitions, Edgewood was not entitled to an easing of the requirements for approval of the permit applications given that outdoor lighting was not disclosed as a project in the Plan.  Indeed, open space and landscaping changes were *specifically* identified as elements that had to be disclosed in any master plan.  Then, when Edgewood's Master Plan was repealed, the City's denial of the lighting permits focused on the disturbance that field lighting and sound systems would cause the neighboring communities at night.  Thus, even if Edgewood only wanted to install lights to facilitate team *practices* at night, that would not necessarily ease neighborhood concerns that led to the permit denial.

Additionally, while the City's interpretation of Edgewood's Master Plan as precluding athletic contests was open to debate (and ultimately not enforced), it was not obviously incorrect. Edgewood notes that it has always held and continues to hold athletic contests on its field and track, which suggests that it did not intend to waive that use in the Master Plan despite language only mentioning practices and classes. Instead, the persistent tension between the neighborhood associations and Edgewood regarding the installment of an athletic stadium, *and* the fact that Edgewood removed a sentence in the Plan allowing for "other light uses" on the field, certainly suggests that night games in particular were intentionally excluded from the final plan. Unquestionably on the record, had *night* contests been included in the Master Plan, it would have received substantial pushback from the neighborhood associations before its approval as well. Just as important, Edgewood acknowledges it "never stopped scheduling games for its various teams on its field, and never stopped using its field for other activities related to its primary mission." (Pl.'s Opp'n Br. (dkt. #46) 28.) Most importantly, the City never enforced any action against Edgewood for continuing to hold athletic contests on the fields, nor was Edgewood ever actually prevented from holding athletic contests or other activities on the field.

In contrast, through its long history, Edgewood had *never* been able to play games on the field at night, and that continued to be the case during the relevant events here. Accordingly, preventing night games was the only line the City truly drew, and neither side is contending that the installation of lights for use of the athletic field and surrounding track at night was ever part of Edgewood's approved Master Plan. Thus, any argument

12

regarding whether or not the Master Plan allows athletic contests in the daytime is tangential at best, and a complete red herring at worst, to the legal claims plaintiff has actually advanced. Regardless, the court addresses the arguable relevance of this more expansive claim of discriminating treatment in this opinion.

### B. Equal Terms Provision

RLUIPA's equal terms provision states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C.A. § 2000cc(b)(1). "The equal-terms section is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses." *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007). Like other antidiscrimination laws, the equal terms provision can generally be violated by three types of statutes: "(1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006) (quoting *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1308 (11th Cir.2006)).

In a situation like that alleged by Edgewood, where "a truly neutral" zoning ordinance "is selectively enforced against religious, as opposed to nonreligious assemblies

or institutions," *Id.*, the plaintiff must show that the religious land use was treated differently from a secular land use "from the standpoint of an accepted zoning criterion." *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 373 (7th Cir. 2010). Although the "comparator" secular land use need not be identical to the religious land use in all ways, the two land uses must have been subject to the same zoning criteria. *Id*.

Here, plaintiff Edgewood offers the University of Wisconsin-Madison ("UW-Madison") and Vel Phillips Memorial High School[5] ("Memorial") as the relevant comparators. "To establish a prima facie equal-terms violation, the plaintiff must come forward with evidence of a similarly situated secular comparator that is more favorably treated in order to shift the burden to the defendant to rebut the showing of comparability." *Immanuel Baptist Church v. City of Chicago*, 283 F. Supp. 3d 670, 677–78 (N.D. Ill. 2017). However, Edgewood has not shown a prima facie violation necessary to even shift the burden of proof.

First, plaintiff points to UW-Madison as a comparator, noting that UW-Madison requested and was approved to install lights at its tennis stadium during a similar time frame. Defendants note several problems. UW-Madison applied for the lights in March 2018, nearly a year *before* its Master Plan became effective. (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 205-206.) Thus, unlike Edgewood, UW-Madison was not subject to a master plan during its initial application. The Seventh Circuit has found that "the fact that [the comparator and plaintiff] were subject to different standards because of

---

[5] At the time of filing, Memorial was named Madison Memorial High School, but its name has since changed to Vel Phillips Memorial High School.

the year in which their special use applications were considered compels the conclusion that there was no unequal treatment." *Vision Church*, 468 F.3d at 1003. Additionally, defendants note that even if UW-Madison's Master Plan had been in effect, that plan referred to the tennis stadium as a major event facility, whereas Edgewood described its field as being used solely for classes and practices. (Def.'s Op. Br. (dkt. #42) 29.) While the court is less persuaded by the City's flexible interpretations of each institution's Master Plan, the fact that UW-Madison's application was subject to entirely different zoning regulations clearly prevents comparison "from the standpoint of an accepted zoning criterion." *River of Life*, 611 F.3d at 373. Finally, the lighting of tennis courts at the UW-Madison was isolated to a part of campus surrounded by multiple athletic fields and UW educations facilities, as well as away from any residential neighbors or neighborhoods.[6]

Second, plaintiff describes Memorial High School as a comparator because its 2018 lighting application was approved by the City. Yet again, the timing and circumstances do not match. Indeed, Memorial High School chose not to create a Master Plan and was never subject to those zoning rules. (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 199.) More importantly, Memorial was also simply *replacing* its light poles, resulting in them being considered maintenance, rather than a new capital improvement (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶¶ 198-202). Finally, Memorial's football stadium is surrounded by commercial properties and a few apartment complexes, which explains why its field is shared by Madison West High School, whose historic athletic field

---

[6] A more comparable lighting arrangement would be the lighting at the UW's Camp Randall football stadium, but that lighting has been in place for decades and largely adjacent to other University buildings, commercial properties or student housing.

has never been lighted and has nearly residential neighbors, just as Edgewood High School generally shares an off-campus football field with East High School.

Thus, Edgewood has not shown that *either* of its proposed comparators were actually treated better under the same approval process as Edgewood, as their lighting applications were submitted at different time, under entirely different rules and markedly different circumstances. While a comparator need not be identical to the religious institution, courts have taken the matter of comparators seriously. For example, a court interpreting *River of Life* found that a library was not a proper comparator *despite* being zoned the same as a church because the plaintiff did not show that the library had similar parking needs to the church. *Immanuel Baptist Church v. City of Chicago*, 283 F. Supp. 3d 670, 680 (N.D. Ill. 2017). Here, the potential comparators were not even subject to the same consideration process as Edgewood, since Edgewood's proposed land use was subjected to an architectural review of its Master Plan versus the consideration of a conditional use process applied to both of the secular comparator's land use proposals.[7]

Although never triggered, even if defendants' faced a shifting of the burden of proof, they have offered overwhelming evidence of permissible reasons for treating plaintiff's proposed lighting project differently in terms of proximity to residential neighbors and

---

[7] Plaintiff also briefly argues that the City's zoning criteria were used as a "religious gerrymander," rather than a facially neutral statute, but for such an argument to prevail plaintiff "would have to show that the challenged zoning regulation separates permissible from impermissible assemblies or institutions in a way that burdens 'almost only' religious uses [and Edgewood] presented no such evidence here." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1309–10 (11th Cir. 2006). Given that this argument is made both halfheartedly and without proof of any unique burden placed on religious institutions generally, the court is equally unpersuaded by this argument.

opposition organized by adjacent neighborhood associations because of lighting, noise and crowd concerns surrounding high school football games.  Further, Edgewood has offered no evidentiary basis for a reasonable trier of fact to find those reasons pretextual.  To the contrary, its principal evidence that the City's narrowly interpreted Master Plan to restrict any athletic contests even in daylight hours *supports* the City's reasons for opposing a lighting permit, since those were also opposed by the neighborhood associations because of crowd and noise concerns.  Similarly, claims that the City manipulated the timing of its review of a conditional use permit until a new ordinance was passed is not proof of *pretext*, but rather the strength of opposition to the proposal.  Finally, a stray comment by a single city alder, who opposed Edgewood's lighting proposal in part because "private institutions" are not answerable to the general public (Pl.'s Opp'n. Br. (dkt. #46) 21-22) was just that, and insufficient to show pretext.  If anything, the fact that this is as close as plaintiff can come to a suggestion of religious animus among all the public statements made in response to the proposed lighting project is telling.

## A. Substantial Burden Provision

Edgewood next argues that the City violated RLUIPA because it substantially burdened Edgewood's religious exercise.  The substantial burden provision states:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--
> (A) is in furtherance of a compelling governmental interest; and

> (B) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C.A. § 2000cc(a)(1).

The initial question is whether putting lights on an athletic field is a religious exercise for plaintiff Edgewood at all.  RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C.A. § 2000cc-5.  Edgewood suggests that athletics have long been a part of Edgewood, consistent with the Sinisawa Dominican tradition of educating the whole person.  Yet this case is not about athletics in general; it is about Edgewood's ability to install lights in order to use its athletic field *at night*.  Whether or not athletics can be found important to Edgewood's Catholic educational mission says little, if anything, about the need to use the field at night for this purpose.  Indeed, use of the field at night has never been a part of Sinisawa's Dominican strategy, which largely takes place during regular school hours.

In fairness, plaintiff also suggests that the field *could* be used for liturgies and other religious ceremonies, but there is nothing in the record indicating that Edgewood ever uses the field for such purposes, much less that it has a need to do so at night.  The definition of religious exercise in RLUIPA is broad, but the Seventh Circuit has emphasized that "if this provision is interpreted to place religious institutions in too favorable a position in relation to other land users, there is a danger that it will run afoul of the clause of the First Amendment that forbids Congress (and by interpretation of the Fourteenth Amendment, state and local governments as well) to establish a church."  *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005).

Even if the court were to *assume* that night football (as opposed to a variety of sports conducted in gym classes and at practices) is an important element of Edgewood's religious exercise, which is certainly not a given, plaintiff offers *no* evidence that it is substantially burdened by having to play night home games at a different field.  Indeed, in a factually similar case, the Eighth Circuit found that the plaintiff "has not demonstrated that its religious exercise is substantially burdened, rather than merely inconvenienced, by its inability to use its baseball field at night."  *Marianist Province of United States v. City of Kirkwood*, 944 F.3d 996, 1001 (8th Cir. 2019).  The Ninth, Sixth, and Eleventh Circuits have all come to similar conclusions.   *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004) (finding no substantial burden because, "while the PUD ordinance may have rendered College unable to provide education and/or worship at the Property, there is no evidence in the record demonstrating that College was precluded from using other sites within the city");  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (finding that locating the synagogue several blocks away from plaintiff's preferred location is not a substantial burden);  *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1007 (6th Cir. 2017) (finding that the inability to relocate the church was not a substantial burden).[8]  While none of this case law is binding in the Seventh Circuit, it is persuasive that so many courts have analyzed similar factual circumstances to preclude the finding of a substantial burden.

---

[8] In fact, the public high school most comparable to Edgewood in terms of placement in residential neighborhoods has historically played, and continues to play, its home football games on the same, off-campus field as Edgewood -- Breese Stevens Field -- or other, similar off-campus sites.

The Supreme Court has also discussed RLUIPA burdens similarly, though admittedly has yet to clarify fully what is meant by "substantial."  For example, the Supreme Court found that a prison seriously violated the prisoner's religious beliefs by requiring him to shave his beard.  *Holt v. Hobbs*, 574 U.S. 352, 361, 135 S. Ct. 853, 862 (2015).  However, the court cannot conceptualize how Edgewood's religious exercise is seriously violated simply because it must schedule night games just a 15-minute drive east of its campus.  In fact, the school has barely supported its assertion that playing any sports games at night is important to Edgewood's sincere religious beliefs.

While Edgewood points to the Seventh Circuit's decision in *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005), that "delay, uncertainty, and expense" can be a substantial burden," *id*. at 901, "the delay, uncertainty, and expense must be accompanied by some additional arbitrary action or bad faith by the City," *Christian Assembly Rios De Agua Viva v. City of Burbank, Illinois*, 237 F. Supp. 3d 781, 789 (N.D. Ill. 2017), of which plaintiff again fails to offer proof.  Moreover, the factual circumstances in *Sts. Constantine* present a far more substantial burden than here.  In that case, the Seventh Circuit found a substantial burden on religious exercise where a Greek Orthodox Church was seriously delayed from building a new church on already-purchased land, after running out of space to worship in its former buildings.  *Sts. Constantine,* 396 F.3d at 898.  Here, Edgewood is not allowed to install lights on a lone athletic field primarily due to multiple neighborhood associations' resistance to noise and lighting from night football games, leading to it having to play night games elsewhere.  Again, this is not unique in Madison:  both East and West High Schools play home games at different fields

because they lack field lighting,[9] and even Edgewood College is building its new athletic field off-campus in a nearby town.

Certainly, conducting home high school football games off-campus costs additional time and money, but the Seventh Circuit has found that cost and difficulty do not create a substantial burden alone.  *See C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("While they may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city, they do not render impracticable the use of real property in [the city] for religious exercise.").  Here, disgruntled neighborhood associations and higher operating costs are part and parcel with locating an institution in purely residential neighborhoods, but "these conditions—which are incidental to any [residential] land use—do not amount to a substantial burden on religious exercise." *Id.* at 761.

Finally, by supplemental motion, which will be granted, plaintiff also argues the fact that the City may have reacted to neighborhood outrage can support its claim, suggesting that "[c]ourts have recognized that evidence showing a government decision was made in reaction to 'public outcry' is sufficient to give rise to an inference upon which a jury can find unequal treatment and even discrimination under RLUIPA."  (Pl.'s Supp. Br. (dkt. #77) 6.)  However, this argument does not overcome the fact that Edgewood has neither proposed  proper comparators nor shown a substantial burden.  Still, the court will briefly address its merits.  Specifically, plaintiff cites to *Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978 (9th Cir. 2006), and *Westchester Day Sch. v. Vill. of Mamaroneck*, 386

---

[9]  Indeed, East High School barely has any room for an athletic field on its cramped campus at all.

F.3d 183 (2d Cir. 2004), as supporting its argument.  (*Id*. at 6.)  However, both cases are readily distinguishable from Edgewood's situation.  First, *Guru Nanak* involved a county blocking the proposed building of a Sikh temple despite there being another Sikh temple down the road on identically zoned land, and plaintiff having agreed to every single requirement presented by the governing bodies.  456 F.3d 978, 990 (9th Cir. 2006).  While noting public opposition to the temple, the court was principally concerned about the fact that the county was preventing the new temple's construction when it had already approved a similar temple in the same area.  *Id*.  Similarly, in *Westchester*, the village board originally allowed proposed buildings for a religious school to go forward without an environmental impact statement, but reversed course when the community objected.  386 F.3d at 191.  However, the Second Circuit's opinion only briefly mentioned public outcry; instead, it focused on facts relating to traffic and parking as dispositive.  Thus, in neither opinion was the public opposition an important element of the court's ruling, and it would be a misreading of *Westchester* and *Guru* to hold that public outcry is sufficient to show unequal treatment under RLUIPA absent proof of a substantial burden on *religious exercise*, something simply lacking in this case.

## II. Free Speech and Exercise Claims (Counts III and VII)

Next, Edgewood claims that the City's decision violates its right to speech because defendant's interpretation of the Master Plan "precluded [students] from assembling on EHS's athletic field, even for expressive purposes and assemblies, for any reason other than a team practice or physical education class."  (Pl.'s Opp'n. Br. (dkt. #46) 63.)  As already noted above, however, there are at least two fundamental flaws with this argument.  First,

Edgewood has not shown that it uses its lone athletic field for *any* expressive conduct except to the extent that athletics is a form of expression in and of itself.  Certainly, Edgewood *could* hypothetically use the field for an expressive assembly, but there is no suggestion that this has ever occurred or is planned, and absent such proof, there is no proof of an injury. Second, and far more important, Edgewood, its faculty or students were *not* prevented from assembling.  While interpreting the Master Plan to disallow uses outside of practices and gym classes, the City explicitly told Edgewood that it didn't plan to enforce the violation notices; instead, it actually assisted Edgewood in repealing that plan altogether.

Plaintiff also asserts free exercise claims under the First Amendment and the Wisconsin State Constitution.  The court will simply bypass the First Amendment claim because plaintiff has not proven its claim under RLUIPA.  *See Schlemm v. Wall*, 784 F.3d 362, 363 (7th Cir. 2015) ("Arguments under the Constitution's First and Fifth Amendments (applied to the states by the Fourteenth) we bypass, because [RLUIPA] provides greater protection."); *see also Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006) ("Given the similarities between RLUIPA § 2(a)(1) and First Amendment jurisprudence, we collapse [plaintiff]'s claims for the purpose of this analysis; this approach seems most consistent with post-RLUIPA case law.")[10]

Finally, the Wisconsin Supreme Court has interpreted the Wisconsin Constitution's free exercise provision to contain the same requirement that a regulation substantially

---

[10] Even if the court did look at plaintiff's Free Exercise claim, it would have to reject a substantial burden claim unless the "local government deliberately discriminated against a religious organization (or against religion in general)." *World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531, 534 (7th Cir. 2009).  Without any indication of deliberate religious discrimination or substantial burden, the free exercise claim fails.

burden a sincerely held religious belief.  *Peace Lutheran Church & Acad. v. Vill. of Sussex*, 2001 WI App 139, ¶ 21, 246 Wis. 2d 502, 517 (Applying the Wisconsin Constitution to find that "[b]ecause the Church has failed to prove that there is a sincerely held religious belief that is substantially burdened by the application of the Village's Fire Prevention Code, our analysis could stop here.")  Again, the court has already found neither the City's zoning laws nor its actions impose a substantial burden on Edgewood's religious practices, necessitating summary judgment for the City on any Wisconsin freedom-of-worship claim. Since the First Amendment and Wisconsin Constitution require, at most, the same elements of RLUIPA, neither claim prevails in the face of the court's decision on plaintiff's RLUIPA claims.

### III.  Due Process/Void for Vagueness (Count IV)

Edgewood next argues that the City's notice warnings that it could not hold athletic competitions on campus were unconstitutionally vague, as they did not indicate how Edgewood could comply.  Certainly, "a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."  *Giaccio v. State of Pa.*, 382 U.S. 399, 402–03 (1966).  However, Edgewood's vagueness argument was largely underdeveloped to begin with, and it chose not to rebut defendant's persuasive arguments in reply.

Specifically, the City argues that the actual legislation Edgewood violated is its own Master Plan, and the competitions for which Edgewood was warned by notice were

24

proscribed by that plan.  Plus, those notices are not themselves legislation.  Moreover, at the time, Edgewood's counsel argued in response to the notices, that any athletic competitions were a legal, *non*-conforming use, suggesting that even Edgewood *knew* they were otherwise prohibited.  As defendants noted, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  *Parker v. Levy*, 417 U.S. 733, 756 (1974).  Regardless, since Edgewood failed to address these arguments at all, summary judgment is warranted.

## IV. Wisconsin Law Claims

### A. Vested Property Rights (Count V)

Edgewood further argues it had a vested property right in field lights because it complied with Madison General Ordinance ("MGO") 10.085.  The Wisconsin Supreme Court has recognized that "[r]equiring an application for a building permit which conforms to applicable zoning or building code requirements in order to show a clear legal right also serves the goals of the vested rights doctrine," and that vested rights only exist where the building code was strictly followed.  *Lake Bluff Hous. Partners v. City of S. Milwaukee*, 197 Wis. 2d 157, 175, 540 N.W.2d 189, 196 (1995).  Here, both of Edgewood's February 2019 and September 2019 applications for lighting were filed while its Master Plan was still in effect, and CI district regulations required proposed changes to open space areas comply with the master plan.  Since the lighting was never identified as a project in Edgewood's Master Plan, it did not strictly comply with zoning requirements as necessary for rights to vest.

Alternatively, Edgewood contends that this defect in the Master Plan was remedied by its eventual repeal, thereby fixing the application. However, "[a] property owner's rights do not vest until the developer has submitted an application for a building permit that conforms to the zoning or building code requirements in effect *at the time of application*." *McKee Fam. I, LLC v. City of Fitchburg*, 2017 WI 34, ¶ 47, 374 Wis. 2d 487, 506 (emphasis added). At the time both applications were filed, there is no dispute that Edgewood's Master Plan was in effect and the application did not comply with it. Later repealing the Master Plan did not create a vested right where there was none. For this reason, summary judgment for defendants is warranted on this claim as well.

### B. Violation of MGO § 28.183 & Wis. Stat. § 60.62(4e) (Count VI)

Finally, plaintiff argues that the City violated city ordinance and Wisconsin statute because it lacked substantial evidence to find that its conditional use application did not satisfy MGO § 28.183. However, MGO § 28.183(6)(a)(3) requires the City to find that "uses, values, and enjoyment of other property in the neighborhood for purposes already established will not be substantially impaired or diminished in any foreseeable manor." And in reviewing a municipal decision, courts are instructed that "the weight to accord the evidence lies within the discretion of the municipality." *Oneida Seven Generations Corp. v. City of Green Bay*, 2015 WI 50, ¶ 44, 362 Wis. 2d 290, 311. "Substantial evidence is evidence of such convincing power that reasonable persons could reach the same decision as the board. As the substantial evidence test is highly deferential to the board's findings, we may not substitute our view of the evidence for that of the board when reviewing the

sufficiency of the evidence." *Clark v. Waupaca Cnty. Bd. of Adjustment*, 186 Wis. 2d 300, 304, 519 N.W.2d 782, 784 (Ct. App. 1994) (internal citations omitted).  In terms of the actual evidence required, "a detailed or explicit explanation of the City's reasoning is not necessary" and statements made at a council meeting can be sufficient.  *Oneida*, 2015 WI at ¶ 49.

Here, the Plan Commission initially placed Edgewood's conditional use permit application on file without prejudice, then considered it for nearly five hours; similarly, the City of Madison's Common Council considered evidence for nearly four hours before upholding the Plan Commission's decision on appeal.  (Def.'s Op. Br. (dkt. #42) 46.)  At these hearings, many neighbors testified and studies were presented.  For instance, several neighbors said that they believed the addition of lights and sound equipment to the athletic field would reduce their property values.  Neighbors also testified that the noise levels from Edgewood were already excessive and disturbing.  Both Edgewood and the neighborhood associations also presented sound studies, and Edgewood's own sound study found that the nighttime noise levels would exceed 70 decibels.  (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶ 177.)  The neighborhood study anticipated even more noise disturbance than that.

In making their decision, the Common Council referred to the noise and light disturbances for neighbors and the potential effect on property values.  The Council further noted that Edgewood might not comply with suggested limits and had been dishonest with neighbors.  (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #58) ¶¶ 176-179.)  All of this constitutes substantial evidence sufficient to support the Council's ultimate decision on

appeal.  *See Eco-Site, LLC v. Town of Cedarburg*, 2019 WI App 42, ¶ 16, 388 Wis. 2d 375, 385 ("The Town denied the application because the tower was not '[c]ompatible with adjacent land' and it would substantially impair or diminish the 'uses, values and enjoyment of other Town property in the neighborhood.' We see no error by the Town in denying the application on this point.").  Accordingly, defendants are also entitled to summary judgment on this final claim.

ORDER

IT IS ORDERED that:

1)  Plaintiff's motion to supplement the summary judgment record (dkt. #77) is GRANTED.

2)  Defendants' motion for summary judgment (dkt. #34) is GRANTED.  The Clerk of Court is directed to enter final judgment in favor of defendants.

3)  The status conference set for January 3, 2023, is CANCELED.

Entered this 30th day of December, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge